1              IN THE UNITED STATES DISTRICT COURT
2                 FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,
3
              Plaintiff,
4
5        vs.                    CRIMINAL NO. 15-4268 KG

ANGEL DeLEON, et al.,
6
              Defendants.
7
                                and
8
UNITED STATES OF AMERICA,
9
              Plaintiff,
10
11       vs.                    CRIMINAL NO. 15-4269 KG

MAURICIO VARELA, et al.,
12
              Defendants.
13
                                and
14
UNITED STATES OF AMERICA,
15
              Plaintiff,
16
17       vs.                    CRIMINAL NO. 15-4275 KG

CHRISTOPHER GARCIA,
18
              Defendant.
19
          TRANSCRIPT OF MOTIONS FOR PROTECTIVE ORDERS HEARING
20            BEFORE THE HONORABLE KENNETH J. GONZALES
              THURSDAY, MARCH 3, 2016; 1:33 P.M.
21               LAS CRUCES, NEW MEXICO 88001

22   REPORTED BY:  Danna Schutte Everett, CRR, RPR, RMR, CCR 139
                   United States Court Reporter
23                 100 N. Church Street, Las Cruces, NM  88001
                   Phone:  (575) 528-1656  Fax:  (575) 528-1645
24                 dannadawn@comcast.net
          Proceedings recorded by mechanical stenography;
25   transcript produced by computer.

1   DEFENDANTS NOT PRESENT

2   FOR THE UNITED STATES:

3        UNITED STATES ATTORNEY'S OFFICE
         555 South Telshor, Suite 300
4        Las Cruces, New Mexico  88011
         BY:  MS. MARIA YSABEL ARMIJO
5             MR. RANDY M. CASTELLANO

6   FOR THE DEFENDANT JOE GALLEGOS:

7        BENJAMIN LAW FIRM
         747 E. San Antonio, Suite 203
8        El Paso, Texas  79901
         BY:  MR. BROCK BENJAMIN, Telephonically

9
10  FOR THE DEFENDANT EDWARD TROUP:

         THE HARBOUR LAW FIRM, PC
11       Post Office Box 13268
         El Paso, Texas  79913
12       BY:  MS. CORI ANN HARBOUR-VALDEZ
              and
13       PATRICK J. BURKE, PC
         999 18th Street, Suite 2055
14       Denver, Colorado  80202
         BY:  MR. PATRICK J. BURKE, Telephonically

15
16  FOR THE DEFENDANT LEONARD LUJAN:

         MR. RUSSELL DEAN CLARK
17       Post Office Box 576, Suite 4
         Las Cruces, New Mexico  88004

18
19  FOR THE DEFENDANT BILLY GARCIA:

         BOWLES LAW FIRM
20       Post Office Box 25186
         Albuquerque, New Mexico  87125-5186
21       BY:  MR. JASON BOWLES
              and
22       CASTLE & CASTLE, P.C.
         1544 Race Street
23       Denver, Colorado  80206
         BY:  MR. JAMES A. CASTLE, Telephonically

24
25  FOR THE DEFENDANT EUGENE MARTINEZ:

```
 1          GORENCE & OLIVEROS, PC
            1305 Tijeras, Northwest
 2          Albuquerque, New Mexico  87102
            BY:  MR. ROBERT GORENCE
 3               and
            KILMER, LANE & NEWMAN, LLP
 4          1543 Champa Street, Suite 400
            Denver, Colorado  80202
 5          BY:  MR. DAVID A. LANE, Telephonically

 6   FOR THE DEFENDANT ALLEN PATTERSON:

 7          MR. JEFFREY C. LAHANN
            Post Office Box  16682
 8          Las Cruces, New Mexico  88004
                 and
 9          THE LINDER FIRM
            3500 Maple Avenue, Suite 400
10          Dallas, Texas  75219
            BY:  MR. PHILLIP A. LINDER, Telephonically
11
     FOR THE DEFENDANT CHRISTOPHER CHAVEZ:
12
            MR. ORLANDO MONDRAGON
13          1028 Rio Grande
            El Paso, Texas  79902
14
     FOR THE DEFENDANT JAVIER ALONSO:
15
            MR. NOEL ORQUIZ
16          Post Office Box 971
            Deming, New Mexico  88031
17               and
            NATHAN D. CHAMBERS, LLC
18          999 18th Street, Suite 2055
            Denver, Colorado  80202
19          BY:  MR. NATHAN D. CHAMBERS, Telephonically

20   FOR THE DEFENDANT ARTURO ARNULFO GARCIA:

21          MR. BILLY R. BLACKBURN, Telephonically
            1011 Lomas Boulevard, Northwest
22          Albuquerque, New Mexico  87102

23

24

25
```

```
 1   FOR THE DEFENDANT BENJAMIN CLARK:

 2        STEPHEN E. HOSFORD, P.C.
          Post Office Box 420
 3        Arrey, New Mexico  87930
          BY:  MR. STEPHEN E. HOSFORD
 4
     FOR THE DEFENDANT RUBEN HERNANDEZ:
 5
          MR. PEDRO PINEDA
 6        Post Office Box 13447
          Las Cruces, New Mexico  88013
 7
     FOR THE DEFENDANT JERRY ARMENTA:
 8
          MITCHELL LAW OFFICE
 9        Post Office Box 2460
          Ruidoso, New Mexico  88345
10        BY:  MR. GARY MITCHELL, Telephonically

11   FOR THE DEFENDANT JERRY MONTOYA:

12        McGRAW & STRICKLAND
          165 West Lucero Avenue
13        Las Cruces, New Mexico  88005
          BY:  MS. MARGARET STRICKLAND
14            and
          OSBORN MALEDON, PA
15        2929 N Central Avenue, Suite 210
          Phoenix, Arizona  85012-2794
16        BY:  MR. LARRY A. HAMMOND, Telephonically

17   FOR THE DEFENDANT MARIO RODRIGUEZ:

18        LAW OFFICE OF SANTIAGO D. HERNANDEZ
          1219 E. Missouri
19        El Paso, Texas  79902
          BY:  MR. SANTIAGO DAVID HERNANDEZ
20
     FOR THE DEFENDANT TIMOTHY MARTINEZ:
21
          MR. STEVEN LORENZO ALMANZA
22        Post Office Box 1660
          Las Cruces, New Mexico  88004
23            and
          WALSH & LARRANAGA
24        705 Second Avenue, #501
          Seattle, Washington  98104
25        BY:  MS. JACQUELINE K. WALSH, Telephonically
```

```
 1   FOR THE DEFENDANT MAURICIO VARELA:

 2       MS. MARY STILLINGER
         4911 Alameda Avenue
 3       El Paso, Texas  79905
              and
 4       MR. MICHAEL DAVID LINDSEY
         7887 East Bellview Avenue, Suite 1100
 5       Englewood, Colorado  80111

 6   FOR THE DEFENDANT DANIEL SANCHEZ:

 7       MR. RICHARD JEWEKS
         701 N. Saint Vrain Street
 8       El Paso, Texas  79902
              and
 9       LAW OFFICE OF AMY E. JACKS
         315 E. Eighth Street, #801
10       Los Angeles, California  90014
         BY:  MS. AMY E. JACKS
11
     FOR THE DEFENDANT GERALD ARCHULETA:
12
         MR. GEORGE A. HARRISON
13       1990 E. Lohman, Suite 121
         Las Cruces, New Mexico  88001
14
     FOR THE DEFENDANT CONRAD VILLEGAS:
15
         CROW LAW FIRM
16       400 N. Pennsylvania Avenue
         Suite 1150
17       Roswell, New Mexico  88201
         BY:  MR. B.J. CROW, Telephonically
18
     FOR THE DEFENDANT ANTHONY RAY BACA:
19
         MS. THERESA M. DUNCAN
20       515 Granite, Northwest
         Albuquerque, New Mexico  87102
21
     FOR THE DEFENDANT ROBERT MARTINEZ:
22
         McELHINNEY LAW FIRM, LLC
23       Post Office 1945
         Las Cruces, New Mexico  88004
24       BY:  MR. CHARLES J. McELHINNEY

25
```

```
1    FOR THE DEFENDANT ROY PAUL MARTINEZ:

2         MS. MARCIA J. MILNER
          Post Office Box 1450
3         Las Cruces, New Mexico  88001

4    FOR THE DEFENDANT CHRISTOPHER GARCIA:

5         LAW OFFICE OF AMY SIRIGNANO, PC
          5901J Wyoming Boulevard, Northeast, #250
6         Albuquerque, New Mexico  87109
          BY:  MS. AMY SIRIGNANO, Telephonically
7
     FOR THE DEFENDANT DAVID CALBERT:
8
          THE ROMERO LAW FIRM, PA
9         1001 Fifth Street, Northwest
          Albuquerque, New Mexico  87102
10        BY:  MR. ROMAN R. ROMERO, Telephonically

11
     Also Present:  Mr. Mark Myers, Case Agent
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE COURT:  Okay.  Good afternoon, everyone.  Please
 2   be seated.
 3              All right.  We are on the record in open court in
 4   part and telephonically in United States versus DeLeon, et al,
 5   that's 15-CR-4268, United States versus Varela, et al., that's
 6   15-CR-4269, and United States versus Garcia, 15-CR-4275.
 7              What I would like to do at this particular time is
 8   ask counsel to state their appearance, and I'm going to go down
 9   the list, and as your name is called please just indicate to me
10   that you are here.  Okay?  So it's basically going to be a roll
11   call.  You just did that with my CRD, but now we're going to do
12   that on the record.
13              Okay.  So first on behalf of Joe --
14              Well, let me just recognize Ms. Armijo and
15   Mr. Castellano are both here for the United States.
16              And so on behalf of Mr. Gallegos, do I have Brock
17   Benjamin present?
18              MR. BENJAMIN:  Here on the telephone, Your Honor.
19              THE COURT:  Okay.  He's here telephonically.
20              On behalf of Edward Troup, Cori Ann Harbour-Valdez
21   and -- who is here in person.
22              MS. HARBOUR:  Your Honor, I'm here on behalf of
23   Mr. Troup, who does not waive his appearance at this hearing.
24              THE COURT:  Okay.  Thank you.
25              MR. BURKE:  Your Honor, and Patrick Burke
```

```
 1   telephonically.

 2              THE COURT:  Yes, sir.  Okay.  Thank you.

 3              On behalf of Mr. Leonard Lujan.

 4              MR. CLARK:  Good afternoon, Your Honor.  Dean Clark

 5   on behalf of defendant.

 6              THE COURT:  Good afternoon, Mr. Clark.

 7              On behalf of Billy Garcia, I see Mr. Bowles.

 8              MR. BOWLES:  Your Honor, Jason Bowles, I'm hear.

 9              THE COURT:  Yes.

10              MR. CASTLE:  Jim Castle appearing telephonically.

11              THE COURT:  Okay.  Thank you.

12              On behalf of Eugene Martinez.

13              MR. GORENCE:  Robert Gorence, Your Honor.

14              THE COURT:  Yes, sir.  And, Mr. Lane, are you on the

15   telephone?

16              MR. GORENCE:  He is not, no.

17              THE COURT:  Apparently he was present during the

18   earlier phone call.

19              MR. LANE:  Can you hear me?

20              THE COURT:  Yes.

21              MR. LANE:  I don't know what happened.  David Lane

22   appearing telephonically.

23              THE COURT:  Okay.  Thank you.

24              And on behalf of Allen Patterson.

25              MR. LAHANN:  Jeff Lahann, Your Honor.
```

9

```
1               THE COURT:  All right.
2               And, Mr. Linder, are you present by telephone?
3               MR. LINDER:  I'm here, Your Honor.
4               THE COURT:  Ah, okay.
5               All right.  Mr. Christopher -- on behalf of
6   Mr. Christopher Chavez.
7               MR. MONDRAGON:   Your Honor, Orlando Mondragon on
8   behalf of Mr. Chavez.
9               THE COURT:  All right.  On behalf of Javier Alonso.
10              MR. ORQUIZ:  Noel Orquiz, Your Honor.
11              THE COURT:  And, Mr. Chambers, are you on the
12  telephone?
13              MR. CHAMBERS:  Nathan Chambers here telephonically.
14              THE COURT:  Okay.  Thank you.
15              On behalf of Arturo Arnulfo Garcia, Mr. Blackburn,
16  are you on the telephone, sir?
17              MR. BLACKBURN:  Yes, I am, Your Honor.
18              THE COURT:  Good afternoon.
19              And on behalf of Benjamin Clark, Mr. Hosford.
20              MR. HOSFORD:  I'm here, Your Honor.
21              THE COURT:  He is present in court.  All right.
22              On behalf of Ruben Hernandez, Mr. Pineda.
23              MR. PINEDA:  I'm here, Your Honor, on behalf of
24  Mr. --
25              THE COURT:  Good afternoon.
```

 1            MR. PINEDA:  Good afternoon.

 2            THE COURT:  On behalf of Jerry Armenta, Mr. Mitchell.

 3            MR. MITCHELL:  Yes, Your Honor, I'm here.

 4            THE COURT:  Okay.  On behalf of Jerry Montoya.

 5            MS. STRICKLAND:  Margaret Strickland on behalf of

 6  Jerry Montoya.

 7            MR. HAMMOND:  Yes, Your Honor, this is Larry Hammond.

 8  I'm here.

 9            THE COURT:  All right.  Mr. Hammond is present on the

10  telephone.  Ms. Strickland is in the courtroom.

11            MS. STRICKLAND:  Good afternoon, Your Honor.  We also

12  don't waive Mr. Montoya's right to be present.

13            THE COURT:  All right.  Thank you.

14            On behalf of Mario Rodriguez.

15            MR. HERNANDEZ:  Good afternoon, Your Honor.  Santiago

16  Hernandez on behalf of Mario Rodriguez.

17            THE COURT:  Okay.  Thank you.

18            On behalf of Timothy Martinez.

19            MR. ALMANZA:  Good afternoon, Your Honor.  Steve

20  Almanza.

21            THE COURT:  Good afternoon.

22            MR. ALMANZA:  I believe learned counsel Ms. Robbins

23  is also -- or Ms. Walsh.

24            THE COURT:  Steven Almanza is present in the

25  courtroom.

1              Ms. Walsh, are you on the telephone?

2              MS. WALSH:  I am.  I'm present by phone.  I can hear

3      your voice clearly, but it's difficult to hear any of the other

4      participants.

5              THE COURT:  I see how that would be.  I'll ensure

6      that when they speak in the courtroom, that it's into a

7      microphone for the benefit of everybody who is on the telephone

8      participating.

9              On behalf Mauricio Varela.

10             MS. STILLINGER:  Mary Stillinger, Your Honor, and

11     also Dave Lindsey is here from Colorado.

12             THE COURT:  All right.  Good afternoon to both of

13     you.

14             MR. LINDSEY:  Good afternoon, Your Honor.

15             THE COURT:  On behalf of Daniel Sanchez.

16             MR. JEWKES:  Richard Jewkes and Amy Jacks appearing

17     for number 18, Daniel Sanchez.

18             THE COURT:  Okay.

19             MS. JACKS:  Amy Jacks.

20             THE COURT:  All right.  Amy Jacks is here in the

21     courtroom, as well as Mr. Jewkes on behalf of Daniel Sanchez.

22             On behalf of Gerald Archuleta.

23             MR. HARRISON:  George Harrison present.

24             THE COURT:  All right.  Good afternoon, Mr. Harrison.

25             On behalf of Conrad Villegas.

```
 1                    MR. CROW:  B.J. Crow on the telephone, Your Honor.

 2                    THE COURT:  All right.  Good afternoon, Mr. Crow.

 3                    MR. CROW:  Good afternoon.

 4                    THE COURT:  Are you in Roswell?

 5                    MR. CROW:  Yes, sir.

 6                    THE COURT:  Okay.  And for Anthony Ray Baca.

 7                    MS. DUNCAN:  Theresa Duncan present for Mr. Baca,

 8      Your Honor, who also does not waive his presence.

 9                    THE COURT:  Okay.  Good afternoon, Ms. Duncan.

10             On behalf of Robert Martinez.

11                    MR. McELHINNEY:  Good afternoon, Your Honor.

12      C.J. McElhinney.

13                    THE COURT:  Okay.  Who is present in the courtroom.

14             On behalf of Roy Paul Martinez.

15                    MS. MILNER:  Marcia Milner present, Your Honor.

16                    THE COURT:  Okay.  Good afternoon.

17             And on behalf Christopher Garcia.  Ms. Sirignano, are

18      you on the telephone?

19                    MS. SIRIGNANO:  Yes, Your Honor.  Good afternoon.

20      I'm entering my appearance for 4268 and 4275, Your Honor.

21                    THE COURT:  All right.  I'll note that you are

22      present for both cases, on the telephone.

23             And I'll just note that Ms. Stillinger is present on

24      behalf of Mr. Varela in 4269.

25             On behalf of David Calbert, Mr. Romero, are you
```

1    present?

2              MR. ROMERO:  Yes, Your Honor.  Roman Romero on behalf

3    of Mr. Calbert.  I'm communicating through the phone from

4    Albuquerque.

5              THE COURT:  Yes, sir.  All right.  Thank you.

6              And also noting for the record that Mr. McElhinney is

7    present in 4269 for Mr. Martinez, and Mr. Hernandez is present

8    in the courtroom in 4269 on behalf of Mr. Mario Rodriguez.

9              All right.  Thank you for indulging me on that.

10             Obviously, this is an unusual case because of the

11   number of defendants charged and the numbers of attorneys who

12   are representing all these folks, and the fact that we have

13   attorneys who are from various geographical locations,

14   including Las Cruces, El Paso, Ruidoso, Roswell, Albuquerque,

15   Seattle, Dallas, Denver, and I think even St. Louis.  And I may

16   have left out a location.

17             MS. JACKS:  LA.

18             THE COURT:  Los Angeles.  Thank you, Ms. Jacks.

19             So because of that we are having to proceed in a

20   somewhat unusual arrangement here.

21             Now, what I'd like to do is take up the motions that

22   are pending, and I have four motions, and, obviously, the

23   corresponding responses and replies.

24             First, the Government's Motion For Protective Order,

25   that's document 260, there was a supplement filed by the United

14

1    States, document 280; the defendants' joint response, that

2    was -- that is document 281; and then the notice of joinder to

3    defendants' response, that's as to a single defendant, document

4    283.

5            The next motion that I will be taking up is

6    Defendants' Joint Motion For Protective Order concerning all

7    defendants' professional visits and correspondence.  That's

8    document 277.  And I have the response from the United States

9    to that motion, it's document 284, and then the reply from the

10   defendants that was filed yesterday, document 296.

11           I also have to consider the Defendants' Motion For

12   Due Process at Hearing, that's document 291; and then a --

13   defendant Eugene Martinez's motion for determination of

14   competency.

15           And for that last motion, Mr. Gorence is present and

16   Mr. Lane -- in the courtroom, and Mr. Lane is on the telephone.

17   I'm going to ask that you gentlemen just remain -- I'll take up

18   that motion at the end of this string of hearings this

19   afternoon.

20           Mr. Lane, if you'll just remain on the phone, and

21   then I'll take up that motion probably as the last order of

22   business.  All right, sir?

23           MR. LANE:  No problem, Your Honor.

24           THE COURT:  Okay.  So the way I want to do this,

25   which will be in line with what I stated in my notice last

1  week, is I want to hear from the United States on its motion,

2  document 280, and then I will hear from Ms. Jacks, who will

3  argue the response to that motion, and then what I want to do

4  is make sure that any other defendant or defense counsel who

5  wishes to add or clarify the position on behalf of your

6  respective client, I'm going to give you a chance to do that,

7  whether you're here in the courtroom or you're participating by

8  telephone.  The way I have to do that, though, to ensure an

9  orderly process is, I'm just going to just go down the list

10  such as I just did and give you a chance to buy in as you deem

11  appropriate and necessary.  And then we'll do the same thing

12  with the following motion, the defendants' joint motion,

13  hearing first from Ms. Jacks on that motion, hearing

14  Ms. Duncan --

15             MS. DUNCAN:  Yes.

16             THE COURT:  -- on that motion, and then hearing from

17  Ms. Armijo or Mr. Castellano in their response, and then

18  turning back to Ms. Duncan for anything to add to your reply on

19  behalf of all the defendants, and then I'll turn once again to

20  all the -- to counsel and just go down the list.

21             So that, hopefully, will be, I realize, somewhat

22  painstaking, but to ensure everybody has a full and fair

23  opportunity to state a position or clarify, that's the way

24  we'll go forward.

25             All right.  So with those instructions, let's get

1    started.

2            MS. DUNCAN:  Your Honor, I'm sorry, I just was

3    wondering about defense motion 291, motion for due process.

4            THE COURT:  Yes.  Definitely.  And that was filed by

5    Mr. Lane on behalf -- I assume on behalf of all the defendants.

6    And I want to turn to that at least initially, at least part of

7    it, as we get started.

8            Now, Ms. Duncan --

9            And I'll just ask everyone who's participating by

10   telephone, just as you begin to speak, if you would first just

11   restate your name.  That's for the benefit of just making sure

12   we have an accurate record.  Our reporter knows just about

13   everybody by voice, but not everybody, so for that record let's

14   just try to stick to that.  Just state your name once again as

15   you speak.

16           And everyone in the courtroom, if I can just

17   reiterate, speak into the microphone for the benefit of

18   everybody on the telephone.

19           Okay.  So, Mr. Lane or Ms. Duncan, who would be

20   arguing that motion for due process?

21           MS. HARBOUR:  Your Honor, this is Cori

22   Harbour-Valdez.  I would like Mr. Lane to take the lead, if

23   possible.  I'm happy to address it.  I would like to state for

24   the record that we didn't receive notice that this hearing was

25   set for today.  The hearing notice that we received only

1    referenced the two protective orders.  And so I'd like that to

2    be made clear, that that notice wasn't part of the hearing

3    notice that we received.

4           THE COURT:  Yeah.  Okay.  Well, all right.  That's

5    fine.  Ms. Duncan did include some concern in her response on

6    the issue of presence of counsel at this hearing.  So, did I

7    get that right?

8           MS. HARBOUR:  Presence of the defendants, most

9    importantly.

10          THE COURT:  Presence of the defendants at this

11   hearing.  Ms. Duncan.

12          MS. DUNCAN:  Yes, Your Honor.  I think in the

13   footnote to our reply we had raised the issue of our clients

14   not being present, which is also an issue in the motion for due

15   process.  I mean, our concern is that there are factual

16   allegations in the Government's motion for protective order,

17   also factual allegations in this response.

18          UNIDENTIFIED SPEAKER:  We're having as really hard

19   time on the phone hearing any of this.

20          THE COURT:  Yeah, let me just -- That will be fine.

21   So Ms. Duncan is going to take the podium where the microphone

22   is located.

23          MS. DUNCAN:  And I'd like to defer to Mr. Lane, who

24   wrote the motion, and also Ms. Harbour, who I think was

25   prepared to argue it.

1          But in our reply for the defense motion for

2     protective order, we raised in a footnote this issue of our

3     clients not being present.  And our concern is, first, that our

4     clients -- I can speak on behalf of Mr. Baca, who would like to

5     be present for all proceedings in this case, given particularly

6     that he's facing potential capital charges, but with respect to

7     the two motions for protective order, the Government in its

8     motion has alleged factual allegations against Mr. Baca, and so

9     we would object to the Court considering those factual

10    allegations in his absence, because I -- I just can't respond

11    to them without the assistance of my client.

12         Also, in the response to our motion for protective

13    order, there are allegations against specific defendants, and I

14    think that their counsel would be hamstrung in responding to

15    those sorts of allegations without their clients' presence.

16         With respect to the defense motion, I think as we

17    pointed out in our reply, the Court really doesn't need to

18    address the Government's allegations, because even assuming

19    that they're true, they don't change the nature of our request

20    in any way.

21         Thank you.

22         THE COURT:  Okay.  Thank you, Ms. Duncan.

23         Mr. Lane, would you want to add anything to what you

24    put in your motion?

25         MR. LANE:  Well, you know, if -- if given a chance, I

1  would simply, basically, just reiterate everything that I've

2  said in the motion.  We all object to the lack of presence of

3  all of our clients.  This is not a mere ministerial kind of a

4  hearing.  It is of critical importance to the entire case, and

5  from a nonlegal perspective, but from a practical perspective,

6  having the defendants here to see what's going on and to see

7  their lawyers in court actually representing them and fighting

8  for them just, in fact, not only is greatly beneficial to the

9  attorney-client relationship, I think it would be beneficial

10  for all parties, the prosecutors, the Court, as well, because

11  there has got to be a level of trust between counsel and client

12  that is frequently lacking in these kinds of cases, in part

13  because things are going on behind the defendants' backs that

14  they have no ability to see with their own eyes.

15          I've said all that in the pleading, and beyond that

16  in the pleading I think I'll just stand on the record.

17          THE COURT:  Mr. Lane, if the matter was purely as a

18  matter of law, would you agree, though, that counsel would

19  be -- in those hearings be in the courtroom without the client

20  and would be similarly -- well, the issues you raise would be

21  presented in a hearing that would be purely as a matter of law,

22  I guess is what I'm trying to say, and in that regard this

23  hearing is not so much different from that instance?  What

24  would you say about that?

25          MR. LANE:  Well, clearly, the law says if it is

1   purely a matter of law it's within the sound discretion of the

2   trial Court to determine whether or not to bring in the

3   defendants.

4          The issue of a protective order, though, is a mixed

5   question of law and fact, so I -- I can speak for all the

6   defendants and their counsel, that we will object to any fact

7   finding on the record today, any factual arguments on the

8   record today, any reference to facts anywhere in the record

9   today.

10         And, yes, as a matter of law, if a purely legal issue

11  is being discussed, the defendants are not required to be

12  present.  But I think my last comment, though, was that it

13  would probably be to everyone's benefit if they were present

14  simply for the reasons I've previously stated.

15         THE COURT:  All right.  Ms. Armijo.

16         MS. HARBOUR:  Your Honor, may I just add one thing on

17  that?  We're also concerned that the Court entered an order

18  unsealing today's hearing and allowing --

19         MS. SIRIGNANO:  I'm sorry, we can't hear on the

20  phone.  Apologies, Your Honor.

21         MS. HARBOUR:  I'm sorry.  Cori Harbour-Valdez on

22  behalf of Edward Troup.

23         Our other concern is that the Court unsealed today's

24  hearings, allowing members of the public, press, and victims to

25  attend, and basically prohibiting those whose lives are at

1    stake, and we think a balancing act should have allowed if

2    members of the public to attend, most certainly those whose

3    lives are at stake today.

4              THE COURT:  Okay.  Thank you, Ms. Harbour.

5              Ms. Armijo, do you want to add anything to what you

6    put in your response as to presence of counsel and presence of

7    the defendants?

8              MS. ARMIJO:  Your Honor, just a couple things to

9    note.  I noticed Mr. Lane indicated that he speaks on behalf of

10   all defendants, and I know personally from speaking from some

11   counsel that they would have waived their clients' appearance

12   for today, so I don't know that -- if that needs to be cleared

13   up, but I do know that there are some defendants who do not

14   want to be here today.

15             MR. LANE:  I can clarify, Your Honor.  I technically

16   speak only for the defendants that signed on to the pleading.

17   I think we were unable to get a response from various counsel,

18   so it was unclear.  And maybe I am assuming things that are not

19   true, but I assume every defense counsel wants their client to

20   be present in a matter of this kind of importance.

21             MS. ARMIJO:  The other issue that I think is

22   important, given that it's something that's throughout the

23   pleadings and everyone is treating this as if it is a

24   death-penalty case, we would argue that it is not a

25   death-penalty case yet.  In fact, I have an update for the

1    Court.

2           As to all defendants, they have made it past the

3    committee and it is now, basically, on its way to the Attorney

4    General.  Although I can't say whether a recommendation was, I

5    think that everybody here would know that if there was a

6    committee hearing or if mitigation was requested we would -- we

7    would have done that by now, so no mitigation was requested,

8    there has not -- there will not be a hearing set as to any

9    defendants, and it will soon be on its way to the Attorney

10   General, so we should have within a matter of just a few weeks,

11   hopefully -- this Attorney General is new, and so we don't

12   really have --

13           MS. SIRIGNANO:  Your Honor, I apologize.  We're

14   having a really hard time hearing on the phone.

15           THE COURT:  All right.  Thank you.

16           MS. ARMIJO:  This Attorney General is new, and so I

17   don't have a gauge of how quickly she will sign off on things,

18   so to speak, or make her decision, but we are hopeful that it

19   will be soon.

20           THE COURT:  Okay.  Well, as the Indictment is

21   currently framed, there's good reason to just proceed as though

22   this is a death-penalty case until we hear otherwise.  And I

23   realize there has to be a notice one way or another, whether to

24   seek or no seek, but we have serious penalties still

25   potentially available, and so we'll just proceed with that

1    assumption.

2              Thank you, though, for that clarification.  I was

3    going to ask you about that, Ms. Armijo, and I was also going

4    to ask you in a moment whether you can update the Court and

5    everybody present on the discovery process, where we are.  I

6    realize we may be log-jammed because of this litigation, but in

7    any event, I'll be turning to you in just a moment.

8              Let me thank Ms. Duncan, Mr. Lane, and Ms. Harbour

9    for that argument.

10             Let me acknowledge here quite clearly Federal Rule of

11   Criminal Procedure 43(b)(3) states that a criminal defendant

12   must be present at every stage of trial; however,

13   Subsection (b)(3) of Rule 43 provides that a criminal defendant

14   need not be present if the proceeding involves only a

15   conference or a hearing on a question of law.  And that's been

16   made clear by Mr. Lane and Ms. Duncan and Ms. Harbour.

17             The Tenth Circuit has explained that the exclusion of

18   a defendant from the courtroom during argument on a question of

19   law does not violate defendant's constitutional right to be

20   present at every step of the proceedings.

21             Now, here I'm quoting what may be familiar to you in

22   Deschenes versus United States, 224 F.2d 688 at 693.  Although

23   Rule 43(b)(3) does not define the term "question of law," the

24   Fourth Circuit, for example, refers to Black's Law Dictionary

25   to define the term as typically referring to, quote, an issue

1  to be decided by the judge concerning the application or

2  interpretation of the law.  There, I'm citing Gonzales-Flores,

3  701 F.3d 112 at 116.  That's a 2012 case.

4         That Court continues that "An issue can be a

5  'question of law,' moreover, 'although it may turn on a factual

6  point' so long as it 'is reserved for the court and excluded

7  from the jury."  In that particular case, it was in the context

8  of a jury.

9         Here, the Court continues, "Rule 43 affords a

10  district court the discretion to decide whether a defendant

11  must be present in order for the proceeding to be conducted

12  efficiently and fairly."  There, my pinpoint is page 119.

13         The intent of Rule 43(b)(3) is to allow courts to

14  engage in trial-management functions without the need to have

15  criminal defendants present at every pretrial hearing.  There

16  again, page 119.

17         On the other hand, a criminal defendant must be

18  present at a pretrial proceeding in which the Court is required

19  to make factual resolutions based on testimony presented at the

20  proceeding.

21         Now, I have reviewed what Mr. Lane and Mr. Gorence,

22  together, have provided in their briefing, with particular

23  citation to Rohrbough versus Harris, 549 F.3d 1313 at 1316,

24  that's Tenth Circuit, 2008, where, in a civil case, for the

25  proposition that a motion for protective order is a mixed

1    question of law and fact.  Now, the Tenth Circuit there held

2    that the District Court's application of the Federal Records

3    Act to the depositions is a mixed question of law and fact, but

4    there are no disputed historical facts.  And so the Tenth

5    Circuit applied for that case a de novo review.  I understand

6    what the proposition is, although I didn't find that case

7    particularly helpful or applicable.

8         So, I'm making the following findings.  Bear in mind,

9    ladies and gentlemen, my scheduling order from January set a

10   discovery deadline for March 25th.  There -- At that time, when

11   I entered the order, some discovery had already been disclosed,

12   but the bulk of discovery I am certain has not been disclosed,

13   so we have a deadline that is really just coming around the

14   corner.  That is one of the very important reasons that I

15   wanted to have this hearing just as early as possible, to get a

16   ruling and to get discovery moving, and that's for the benefit

17   of your clients so that there is no undue delay.

18        Now, the Court's hearing on the respective motions

19   for protective order is not an evidentiary hearing in which

20   evidence and testimony will be taken.  The purpose of this

21   hearing is to determine how to disclose sensitive materials to

22   defense counsel in a way that satisfies the constitutional

23   rights of defendants and the security concerns of the

24   prosecution.

25        Now, that determination does not require this Court

1   to make any factual decisions for which defendants must be

2   present.  Instead, the purpose of this hearing requires a

3   rule -- the Court to apply Rule 16(d)(1) to decide whether and

4   to what extent to enter protective orders.

5          Carrying out its trial-management functions, this

6   Court must also take into account the logistics of having all

7   defendants present at the trial, which I would reiterate is 24

8   in number, located in Otero County, Luna County, Dona Ana

9   County, and other locations, and that this hearing is to be

10  conducted in a fair and efficient way, and that the defendants

11  need not be present.

12         So, my conclusion is that Rule 43(b)(3) in this

13  context does not require the attendance of the defendants.

14         Now, there was the notion and the consideration of

15  due process or the due process considerations.  Here, let me

16  cite United States versus Gagnon.  That's 470 U.S. 522 at 526.

17  That's a 1985 case.  And the Supreme Court in that case noted

18  that the presence of a defendant is a condition of due process

19  to the extent that a fair and just hearing would be thwarted by

20  his absence, and to that extent only.

21         Now, the right is not absolute.  The defendant's

22  presence must bear "a relation, reasonably substantial, to the

23  fullness of his opportunity to defend against the charge."

24  Now, there I'm quoting Kentucky versus Stincer, 482 United

25  States Reporter 730 at 745.

1        Now, the Tenth Circuit has explained that "Due
2   process guarantees [a defendant's] presence only when his
3   presence would be helpful at the proceeding he seeks to
4   attend -- that is, only 'if his presence would contribute to
5   the fairness of the procedure.'"  There, I'm citing United
6   States versus Beierle, 810 F.3d 1193 at 1199.  That's a 2016
7   case.
8        The Tenth Circuit has noted that "The Supreme Court's
9   focus was on whether the defendant could have assisted at the
10  proceeding...from which the defendant was absent."  It's not
11  just a matter -- I'm breaking off the quote here.  It's not
12  just a matter of being present, it's really whether the
13  defendant could contribute.
14       Turning back to the quote, "Due process does not give
15  a defendant a right to be present at a proceeding just so he
16  can gather information for later use," unquote, and that is
17  from Beierle.
18       Okay.  So for that assessment my finding is that I've
19  considered the purpose of this hearing is to determine how to
20  disclose sensitive materials to defense counsel in a way that
21  satisfies the constitutional rights of the defendants and the
22  security concerns of the prosecution, which include the
23  question of whether the sensitive information can be
24  disseminated at all to the defendants, and the presence of
25  defendants will not contribute to a fair and just hearing, and

1    my finding includes that the defendants' presence will not

2    reasonably aid in the defense of their charges in any

3    substantial way, focusing on the question that's in front of

4    me, and that's whether a protective order is appropriate in

5    either the -- for either the defense or the prosecution.

6           Now, my conclusion is that due process in this

7    instance does not require the presence of the defendants at

8    this particular hearing.

9           All right.  Counsel, you've made your record both in

10   writing and in open court.

11          Now, let me -- I want to make sure that everybody has

12   had an opportunity to state their position or any position they

13   want to clarify at this particular time.  Here, I'm just going

14   to go down the list.

15          So on behalf of Mr. Gallegos, Mr. Benjamin.

16          MR. BENJAMIN:  Brock Benjamin, Your Honor.  And we

17   would join what Mr. Lane and Ms. Harbour have articulated.

18          THE COURT:  Okay.  Do you have anything to add?

19          MR. BENJAMIN:  No, Your Honor.

20          THE COURT:  All right.  On behalf of Mr. Troup.

21          MS. HARBOUR:  Your Honor, Cori Harbor-Valdez.  I have

22   nothing more to add.

23          THE COURT:  All right.  On behalf of Mr. Leonard

24   Lujan.

25          MR. CLARK:  Your Honor, Dean Clark.  I have nothing

```
1    to add.
2              THE COURT:  On behalf of Billy Garcia.
3              MR. BOWLES:  Your Honor, nothing to add.
4              THE COURT:  On behalf of Eugene Martinez.
5              MR. LANE:  David Lane and Robert Gorence.  And we've
6    already spoken, Your Honor.
7              THE COURT:  Yes, sir.
8              On behalf of Allen Patterson.
9              MR. LAHANN:  Jeff Lahann.  And we have nothing to
10   add.
11             UNIDENTIFIED SPEAKER:  Your Honor, we can't hear
12   what's being said in the courtroom by the attorneys.
13             THE COURT:  All right.  Bear with us.  I'll just ask
14   the folks on the telephone to bear with us.  We have quite a
15   large group here in the courtroom and microphones throughout
16   the courtroom but not necessarily in front of each attorney.
17   So I'll just ask each attorney to step up to the microphone, if
18   you can.
19             That was Mr. Lahann.
20             MR. LAHANN:  Yes, Your Honor.  On behalf of
21   Mr. Patterson, we have nothing to add.
22             THE COURT:  All right.  Thank you.
23             On behalf of Mr. Christopher Chavez.
24             MR. MONDRAGON:  Orlando Mondragon, Your Honor.  We
25   have nothing to add.
```

```
 1              THE COURT:  On behalf of Javier Alonso.

 2              MR. ORQUIZ:  And, Your Honor, Noel Orquiz.  We have

 3    nothing to add.  I just want to make it clear that Mr. Alonso

 4    also objected to his not being here and to his learned counsel

 5    not being authorized to travel for this hearing.

 6              THE COURT:  All right.  Thank you.

 7              On behalf of Mr. Arturo Garcia.  Mr. Blackburn?

 8              MR. BLACKBURN:  I'm sorry, Your Honor, Billy

 9    Blackburn.  I have nothing further to add, other than the

10    comments that have been made today and the written briefs.

11              THE COURT:  Okay.  Thank you, sir.

12              On behalf of Mr. Benjamin Clark.

13              MR. HOSFORD:  Nothing to add, Your Honor.

14              THE COURT:  That was Mr. Stephen Hosford.

15              On behalf of Ruben Hernandez.

16              MR. PINEDA:  Your Honor, Pedro Pineda on behalf

17    Mr. Hernandez.  Nothing to add, Your Honor.

18              THE COURT:  Okay.  Thank you.

19              On behalf of Mr. Armenta.  Mr. Mitchell.

20              MR. MITCHELL:  Your Honor, Gary Mitchell.  I have

21    nothing further to add.

22              THE COURT:  All right.  Thank you.

23              On behalf of Mr. Jerry Montoya.

24              MS. STRICKLAND:  Margaret Strickland, Your Honor.  So

25    in considering the defendants' joint notion for a protective
```

1    order, specific allegations were made against Mr. Montoya.  Is

2    the Court disregarding those, or I just want to clarify?

3            THE COURT:  Yeah, I'm going to get to that motion.

4    For now, I just want to make clear what my ruling is as to the

5    defendants' presence.  So we'll speak to that in just a moment

6    when I turn to that motion.

7            MS. STRICKLAND:  Okay.  Then we object to him not

8    being here if the Court's going to consider those facts.  Thank

9    you.

10           THE COURT:  All right.  Thank you.

11           All right.  On behalf of Mr. Mario Rodriguez.

12           MR. HERNANDEZ:  Santiago Hernandez, Your Honor.

13   Nothing to add.

14           THE COURT:  On behalf of Timothy Martinez.

15           MR. ALMANZA:  Steven Almanza, Your Honor.  Nothing

16   further to add.

17           THE COURT:  On behalf --

18           MS. WALSH:  Your Honor, this is Jackie Walsh.  And if

19   I may make one comment in addition to what Mr. Almanza just

20   stated.  At the beginning of this hearing, the Court

21   indicated -- and again it is difficult to hear when appearing

22   by phone -- the Court had indicated something to the effect

23   that there's attorneys from various geographical places, which

24   causes us -- or makes it so that we need to proceed in an

25   unusual way, and I just wanted to note, in particular on behalf

1  of our client Timothy Martinez, I was perfectly willing to come

2  to this hearing and appear with my client and for my client,

3  but the Court's order that was entered indicated any attorneys

4  appearing more than a hundred miles shall appear by telephone,

5  so it certainly is not a situation where I voluntarily removed

6  myself from a hearing.

7         And again, we're noting our objection to Mr. Martinez

8  not being present.  And I bring that up again because the

9  Assistant U.S. Attorney, Ms. Armijo, made a comment that some

10  attorneys would have waived their clients' presence, and to be

11  perfectly clear, she is not speaking of our client Mr. Timothy

12  Martinez.

13         Thank you.

14         THE COURT:  All right.  Thank you, Ms. Walsh.

15         And I'll continue down the roll call here.

16         My point in mentioning the distribution, if you

17  would, of attorneys in this case, that was just one example of

18  how this case is unusual.  Not necessarily speaking to whether

19  the defendants or even counsel could be present.

20         Let me just say, though, that on -- as a factor in

21  the timing of the -- well, the timing of this hearing is a

22  factor and the need to meet that deadline for discovery, which

23  is on March 25th, and the logistics involved in gathering up

24  all counsel from whatever location in order to hold a hearing

25  as expeditiously as possible in order to meet that deadline I

```
 1   found -- anticipated would encumber, at least delay the setting
 2   for this hearing.  So that was my view of it.  I appreciate,
 3   though, that every attorney, so far as I know, is willing to be
 4   present physically if that was necessary.
 5            We have hearings quite frequently in criminal cases
 6   via telephone when counsel is out of town, and so oftentimes
 7   that's a matter of convenience and necessity, and this
 8   particular hearing I found to be not outside of that practice
 9   which we have implemented from time to time.
10            Now let me continue.  On behalf of Mauricio Varela,
11   and that would be Ms. Stillinger and Mr. Lindsey, anything to
12   add?
13            MS. STILLINGER:  Nothing to add, Your Honor.
14            THE COURT:  Okay.  On behalf of Daniel Sanchez.
15            MR. JEWKES:  Richard Jewkes and Amy Jacks, Your
16   Honor.  We have nothing to add for Daniel Sanchez.
17            THE COURT:  Okay.  Thank you.
18            On behalf of Gerald Archuleta.
19            MR. HARRISON:  George Harris.  And nothing to add.
20            THE COURT:  All right.  On behalf of Mr. Villegas.
21            MR. CROW:  Your Honor, B.J. Crow.  Nothing to add,
22   but Mr. Villegas does join in that motion, for the record.
23            THE COURT:  Yes, sir.  All right.  On the behalf of
24   Anthony Ray Baca.
25            MS. DUNCAN:  Your Honor, Theresa Duncan.  We have
```

```
 1   nothing to add.
 2            THE COURT:  All right.  Thank you.
 3            On behalf of Robert Martinez.
 4            MR. McELHINNEY:  C.J. McElhinney.  Nothing to add on
 5   behalf of Mr. Martinez.
 6            THE COURT:  On behalf of Roy Paul Martinez.
 7            MS. MILNER:  Marcia Milner.  Nothing to add, Your
 8   Honor, on behalf of my client.
 9            THE COURT:  Okay.  On behalf of Christopher Garcia.
10            MS. SIRIGNANO:  Your Honor, Amy Sirignano appearing
11   telephonically.  I just want to join Ms. Strickland in her
12   objection to the facts in the Government's response document
13   284.  I understand you're going to be getting to that.  And I
14   just want the record to be clear, that on February 17th I filed
15   a notice of unavailability in both cases 4268, that was
16   document 282, and in case 4275, that was document 37, and I
17   would have been present having not been out of state today.
18            THE COURT:  Yes, ma'am.  Thank you for making
19   yourself available for this hearing, though, even
20   telephonically.
21            On behalf of David Calbert.
22            MR. ROMERO:  Roman Romero on behalf of Mr. Calbert.
23   We have nothing to add, Your Honor.
24            THE COURT:  Okay.  All right.  Let me turn next to
25   the issue that was raised and to some extent has been
```

1  reiterated, and that goes to the need to have learned counsel

2  present.  Is there anything else that counsel would want to add

3  to that particular part of the motion?  I believe that was in

4  Mr. Lane's motion for due process.

5            Mr. Lane, is there anything else?

6            MR. LANE:  Well, Your Honor, I am completely stymied

7  in any efforts to communicate with my local counsel,

8  Mr. Gorence, at this point.  We can't, obviously, engage in any

9  decision making regardless of what happens at the hearing

10  today.  So our ability to consult with each other is stymied as

11  well as my ability as learned counsel to consult with counsel

12  for other defendants, and I think that is extremely important

13  in a situation like this.  So -- And I briefed all that, so I

14  stand by that objection, Your Honor.

15            THE COURT:  All right.  And, Mr. Lane, just to make

16  clear, did you receive notice of this hearing that was filed,

17  document 285, on February 25th?

18            MR. LANE:  Of course.

19            THE COURT:  And since that hearing was set, had you

20  had a chance to consult with Mr. Gorence before this hearing

21  began?

22            MR. LANE:  Yes.  I mean, I have telephone access to

23  Mr. Gorence, but the point I'm making, Your Honor, is that

24  things happen at hearings that require some changes in

25  strategy; the landscape is constantly shifting based on what

1   the Government says, based on what the Court says.  You know,

2   we have to consider many alternative plans for virtually

3   unlimited contingencies.  I am unable to do that with

4   Mr. Gorence.  He is unable to do that with me.  We are unable

5   to consult with other counsel, as well.

6          THE COURT:  All right.  Would you want to take a

7   recess at this particular time, Mr. Lane?

8          MR. LANE:  Not at this particular time, Your Honor.

9          THE COURT:  Do you have anything that you would like

10  to speak to Mr. Gorence about at this particular time?

11         MR. LANE:  Not this very moment, Your Honor, but is

12  there some provision that I can do that in the middle of the

13  hearing?

14         THE COURT:  Yeah, let me make that known.  If you

15  would like to consult with co-counsel at any time during this

16  hearing, I'll make that chance available to you, and that would

17  be between as we begin the motions that are the subject of this

18  hearing as well as between the motions that are subject to this

19  hearing.  Just please let me know.  We'll take a ten-minute

20  recess, you can make a call, consult with co-counsel if you

21  deem that necessary, and then we'll continue on with this

22  hearing.

23         And, Mr. Lane, would that be at least in part

24  satisfactory?

25         MR. LANE:  That is better than not being able to

 1    consult, Your Honor.

 2              THE COURT:  All right.  Okay.  So let me -- I

 3    mentioned this was going to be somewhat painstaking because of

 4    the numbers of attorneys that we have both in the courtroom and

 5    on the telephone, so thank you for your indulgence, and we'll

 6    get through this.  And the idea here is to get the issues, the

 7    motions decided and to give everyone as full an opportunity to

 8    state their position as possible.  So please let me know if

 9    there is anything else that you would like to do in order to

10    consult with counsel above what I just proposed.

11              All right.  The portion of your motion, Mr. Lane,

12    relating to the need to file a reply and the timing of this

13    hearing impeding that to some extent, I saw the reply filed

14    yesterday.  Is there anything else that I should -- I consider

15    that part of your motion somewhat moot, because I did see the

16    reply filed.  That was document 296, filed on March 2nd.

17              Is there any other argument that you'd like to make

18    with regard to whether counsel can file a reply?

19              MR. LANE:  No, Your Honor.

20              THE COURT:  All right.  Okay.  Taking up first the

21    United States' sealed motion for a protective order, document

22    260, and the corresponding supplement, document --

23              MS. SIRIGNANO:   Your Honor, this is Amy Sirignano.

24    Can I just ask for a point of clarification, please?  Have the

25    pleadings been unsealed or just the hearing?

1          THE COURT:  Well, the question that Ms. Sirignano is

2     asking is whether the pleadings or the briefings have been

3     unsealed or just the hearing has been sealed.  My order from

4     yesterday was just to unseal the hearing.  I was going to get

5     to the question of whether any of these briefings should be

6     unsealed, but I was going to take that up at the end of this --

7     at the end of this hearing, Ms. Sirignano.  So be patient.

8     I'll get to that in just due course.

9          MS. SIRIGNANO:  Your Honor, if I may?  Unfortunately,

10    since I'm not in the courtroom, I can't visualize if there are

11    others in the courtroom, and I only raise the concern because

12    if we're going to talk about the substance of the pleadings and

13    if the pleadings themselves are not unsealed, it would seem a

14    bit of a sticky situation if the -- if there are people in the

15    courtroom that are going to be able to listen to the

16    proceedings but the substance of the pleadings themselves are

17    not unsealed.

18          THE COURT:  I recognize that.  What I saw in one of

19    the responses from defense was -- and I think the Government

20    acknowledged that there was some agreement by defense counsel

21    to unseal the hearing only if some of the briefings can also be

22    unsealed.  I want to get to that and actually put that question

23    out to the parties, but I'm not willing -- I'm not ready to do

24    that just yet, Ms. Sirignano.

25          MS. SIRIGNANO:  Thank you, Your Honor.

1          THE COURT:  Let's see how far we can get with

2   Ms. Armijo's motion for protective order.  Let me -- And you

3   may take the podium or the speaker microphone, Ms. Armijo.

4          Let me say first that I'm interested to hear more, I

5   think, of what you would propose as good cause for a protective

6   order.  In your supplement, Ms. Armijo, you listed a number of

7   items that you are proposing should be sealed, and that's on

8   page 2 of document 280, and on page 3 you have submitted that

9   all of the disclosed materials in this case should be subject

10  to a protective order.

11         Now, the response from the defense and their own

12  proposed protective order, you have some agreement there.  It

13  seems as though all the defendants, so far as I know, and the

14  United States agree that some of these items should be or could

15  be or they agree would be under a protective order.  That's the

16  way I read the response from the defense.  And the defense will

17  have an opportunity to clarify.

18         There, as I read their response, it is more to the

19  scope of the protective order.  So I can -- For purposes of

20  argument, I'm going to agree that a protective order is

21  appropriate for the items where you have agreement with defense

22  counsel.  And those items are listed in defense's response,

23  document 281, on page 3, the middle paragraph.

24         There is agreement that some of these items could be

25  confidential, including the defendants' post-arrest statements,

1    their statements by eyewitnesses, cooperating defendants,

2    confidential Government sources regarding the defendants in

3    these cases, as well as photographs, audio-video recordings

4    that would identify such persons if shared could jeopardize the

5    safety and security of the defendants and other individuals.

6        So there is, as I see in the response, agreement that

7    if there is a protective order, and there seems to be some

8    agreement that there should be, that only the scope of it

9    really is at issue and that the agreement is that these items

10   would be within the scope of the protective order.

11       So what I'm hearing -- what I want to hear from you

12   is the good cause that you propose I should consider in

13   bringing all the other items that you've listed in your

14   supplement within the protective order.

15       I'll tell you first, I'm most interested in things

16   such as the evidence logs, scientific reports, including drug

17   laboratory reports, DNA reports, autopsy reports, hospital

18   medical records, and fingerprint reports, as well as reports of

19   experts, diagrams, expert opinions and curriculum vitae.

20       What would you propose would be the good cause I

21   should consider to bring those within the scope of the

22   protective order?  And I understand what your -- what the

23   sensitivity is and the background that you outlined in your

24   sealed motion, including specific events, including those which

25   Ms. Strickland mentioned.  I don't need to hear anything more

1    about that, but I want to hear more specifically why these

2    items that I just mentioned should be protected from copying

3    and ultimately dissemination for the possession of the

4    defendants as they are -- well, while they're in custody.

5              MS. ARMIJO:   Your Honor, I think that what's

6    important to note is -- and I'll go through different things.

7    Drug laboratory reports, I guess -- I guess on its face unless

8    there was something where one defendant was told to another,

9    since this is a racketeering case, that one drug would be sold

10   and a different drug was sold, I guess that could potentially

11   be hazardous.

12             But notwithstanding that, I think what's important in

13   even talking about evidence logs and crime scenes and things

14   like that, which on its face could seem, oh, this is something

15   that the defendant could have, could have different

16   significance for those that are involved in this crime.  For

17   instance, I know that in one of the murders the crime scenes

18   have ligatures.  What if one of those persons that was to have

19   committed this murder at the behest of another one was not to

20   have left that, and those that are involved and know about this

21   murder find out through a crime scene diagram that a ligature

22   was left behind?  Well, that could really put in danger the

23   person that was not supposed to leave that ligature behind.

24             So while a crime scene diagram may seem pretty

25   straightforward, not to put anybody in harm's way, that,

1   obviously, could have some meaning to one of the persons

2   involved in this case.

3        And I say that -- the same thing with the DNA

4   reports.  We actually do have DNA as to one person in this

5   case, and, again, that could cause harm to that person if it

6   was known that he didn't take the proper steps to take his DNA

7   off of it.

8        Same thing with the fingerprint reports.  If there

9   are fingerprint reports that show that fingerprints were left

10  behind, again, which, as in one of these murders that I can

11  think about, there was specific people that were to clean up

12  the scene, if those people didn't clean up the scene

13  sufficiently and there was evidence left behind, those persons'

14  lives could be put in jeopardy.

15       And I say that because paper is very important in a

16  case like this, which, in order to have a hit proceed, paper

17  has to be given down, and that is what has happened in a lot of

18  these murders.  And, in fact, at least one defendant, if not

19  more, in this case has been charged with their role in bringing

20  down the paper, the documentation to show that a person has

21  violated the SNM code and, thus, to be killed.

22       So -- Let's see.  Autopsy reports.  Autopsy reports

23  actually for the same reasons.  If they were to kill by

24  strangulation, but instead they stabbed a person numerous

25  times, that could go against code, because as we know some of

1     these earlier homicides are all done by strangulation.  The

2     last murder was done by shanking a person.

3               THE COURT:  Well, Ms. Armijo, here's where I'm having

4     trouble, is the -- these items will all be disclosed to defense

5     counsel, and in order to represent their clients effectively

6     they'll have to show these items to their client.  Now, your

7     proposal is that these items not be photocopied so that the

8     client would not be able to keep them.  But in sharing these

9     items with their client, defense counsel, all these items, this

10    will all be known to the defendant, their clients, including

11    maybe it's a ligature, but it's something that's inescapable

12    from their view if these attorneys are to represent their

13    clients effectively.

14              How do you guard about -- It seems like a protective

15    order as you propose it doesn't safeguard these kinds of

16    concerns.

17              MS. ARMIJO:  Well, yes, it would.

18              MR. LANE:  Before she responds, Your Honor, and I'm

19    sorry to interrupt, I have interpose an objection at this

20    point.  This is David Lane on behalf of Eugene Martinez.  This

21    is precisely the fact-based proffer that is informing the

22    Court.  Facts are being adduced on the record.  The Court is

23    considering factual proffers.  The defendants are not present.

24    That's what we meant when we were talking about this is not

25    simply a question of law.

1          So I note my objection on behalf of Eugene Martinez,

2    and I apologize for the interruption.

3          THE COURT:  All right.  Thank you.

4          And for everyone, including you, Mr. Lane, I've made

5    my ruling.  Right now I'm hearing from Ms. Armijo.  You'll get

6    a chance to state your position or restate your position.  So I

7    appreciate your indulgence.

8          Ms. Armijo.

9          MS. ARMIJO:  Your Honor, they will, obviously, learn

10   of the information from it, but it's different in that when

11   they have an actual piece of paper that is what is important

12   with the SNM.  They actually show the piece of paper to another

13   SNM member, saying, Look, this is how so-and-so violated our

14   code.  He left -- And I'm just using this -- We can even talk

15   about it in hypothetical terms, Your Honor.

16          Hypothetically, if a ligature was left behind, if it

17   is given to defendant A and he has that in his cell, he could

18   bring defendant B into his cell, show him that paper, and that

19   paper would be the violation and would show it.  The hits are

20   called, and they need to be documented, and it's the actual

21   paperwork that is -- that -- what provides the basis for these

22   hits and the documentation.

23          It's not a simple matter of one defendant saying,

24   "Hey, I saw, you know, on my discovery that this happens."

25   They need it verified.  It needs to be documented, and it's an

1    actual paper that's important, and that's the distinction that

2    is made.

3            And it's hard to know, because I know the defense is

4    saying, well, let's put it on the Government to decide what is

5    important and what is not important.  One, it's hard to know

6    what is important now versus what is important later as the

7    case progresses and defendants proceed to trial or don't

8    proceed to trial; and, two, although we would like to think

9    that we know everything about the case, something may escape us

10   and go out there for which we would later be held liable for.

11   And it's a position that we're just not comfortable taking, of

12   being responsible.

13           As for the gang -- I'm sorry.  As to the expert

14   opinions, well, one of those -- I can give you a very good

15   example of expert opinions and the CV.  In one of these charged

16   murders, it was pending in state court, there was a motion to

17   have a gang expert by the name Adam Vigil testify.  There was a

18   hearing in state court on that matter last fall.  As a result

19   of Mr. Vigil's testimony and his declaration of being a gang

20   expert, one of the defendants in a recorded conversation

21   basically wanted to put a hit out on that person, as well.  He

22   is not a listed victim because the person who was putting the

23   hit out on that person, on Adam Vigil, was co-conspiring with

24   cooperators, but he certainly had every intention to take out

25   Adam Vigil.  So in that instance a simple notice or a report

1    for an expert put Mr. Vigil's life in danger, and we have

2    that -- a recording of that.  So that is one example of how

3    expert opinions and CV's can come into play, because it has

4    come into play in this very case.

5              THE COURT:  All right.

6              MS. ARMIJO:  And I know -- Your Honor, at this point,

7    do you want me to give you an update on where the discovery is?

8              THE COURT:  I would.

9              MS. ARMIJO:  Okay.  As you know, we initially gave

10   out 48 pages of discovery that dealt with the Chris Garcia drug

11   case.  It was not in the VICAR case, and that was because the

12   case was set for trial and there was -- it was set for trial in

13   March, actually, and before it was continued we wanted to get

14   out discovery, and we sent out discovery in that case only.  It

15   was 48 pages.

16             After that discovery was sent out, Mr. Garcia's

17   attorney requested the protective order, basically saying, hey,

18   we need to get a protective order out right away, which had

19   always been our intention, of getting a protective order out.

20   None of the discovery in the VICAR, in the 68 matter, had been

21   disclosed.

22             There was a lot of going back and forth between

23   attorneys, and on February 5th Mr. Castellano e-mailed

24   everybody and said, If you all agree that you want us to start

25   disclosing materials now, I believe we have a batch of

1   discovery largely focused on Chris Garcia that is ready to go.

2   And again -- And at that point, the trial had been continued

3   until May, and he said, let us know if you object to this

4   disclosure no latter than five today, and Mr. Garcia's attorney

5   objects to any further discovery being disclosed.

6           So with that, I know that more recently one of the

7   defense attorneys contacted Mr. Castellano and indicated that

8   if there could be an agreement that we proceed with discovery,

9   and I believe Mr. Castellano said, well, if you can get every

10  single defense attorney to agree to the protective order

11  temporarily as proposed by the United States, then, you know,

12  this is something we would consider.  And we never heard back

13  from anybody.

14          So at this point in time the only thing that has

15  officially been disclosed is the 48 pages as it relates to the

16  Chris Garcia case.  On our end, we have been proceeding to

17  redact information and proceeding to work with all the

18  different discovery that we have.

19          I can tell you that we've received more discovery

20  from the FBI, things like that, more areas -- documents, so to

21  speak, but nothing has gone out, Your Honor.  And if, in fact,

22  it will be left up to the United States to parcel out things

23  and to review things carefully, it's going to cause a delay and

24  we will not be able to make the March 26th deadline.

25          THE COURT:  So what is the discovery?  I've heard

1    estimates of 5,000 pages and various or numerous audio-video

2    types of recordings.

3            MS. ARMIJO:  I would say now that we at least would

4    have at a minimum probably 10,000.  And I'm just basing that on

5    what I know are various other documents that have come in.  And

6    we still have a lot of the jail calls, the same amount of calls

7    and transcripts.  With all the transcripts and everything else,

8    I would say we easily have probably over 10,000 at a minimum.

9            THE COURT:  I find -- Okay.  That's significant.

10           What I'm sensitive to, however, is what defense

11   counsel has described as an unduly burdensome process.

12   Assuming that there is a protective order in place that covers

13   everything that you just outlined or anything -- everything

14   that you've proposed in your supplement, what I don't really

15   envision happening very easily is them, number one, spending as

16   much time as necessary to sit with their clients in going over

17   all of these thousands of pages and then taking them back from

18   their client.  Their estimate is many days.

19           And layered on top of that is the difficulty in

20   finding space, because all counsel would have to do that at the

21   very same facilities.  So I think they have a legitimate reason

22   to be concerned, that this process, if all of this is within

23   the scope of the protective order, that in, itself, is going to

24   cause significant delay, and among other things, perhaps.

25           And that's why I am -- I'm happy to know there's

1   agreement that some of these items should be within the

2   protective order.  What I'm not amenable to doing is capturing

3   it all within the protective order.  Everything that you've

4   outlined and the description that it all has to be --

5   everything disclosed has to be protected, I don't see how that

6   works in the -- in a -- to say the least, in an efficient

7   matter, but perhaps even an effective manner.

8           MS. ARMIJO:  May I throw out an alternative, Your

9   Honor?

10          THE COURT:  Yes.

11          MS. ARMIJO:  The Department of Corrections has agreed

12  to provide -- and I guess Mr. Aoki would actually probably be

13  the best one to speak to this, because I'm not sure of the

14  logistics of it, but the Department of Corrections has been

15  willing to provide for each defendant a tablet to which

16  discovery could be downloaded on and it could be held at the

17  facility and checked out by defendants in a room.

18          So, in other words, discovery -- And I don't know how

19  he's going to be dividing it.  We're going to disclose it all

20  one way.  But let's say they disclosed discovery as to

21  Ms. Stillinger's client and he puts it all on a tablet.  That

22  goes to the facility where Ms. Stillinger's client is at, and

23  then her client is allowed no Internet access, obviously, and

24  he would be allowed to go in and then access and view on his

25  own from the tablet items that -- as we agreed to.  And then

1    after that the tablet would have to be checked back in.

2            So it wouldn't allow various people to see it at one

3    time.  They'd have to see it as they would alone, not allowing

4    inmates to collaborate together on things.  And certainly with

5    the exception of an inmate having a telephone and being able to

6    take screen shots, it wouldn't create the paper trail that we

7    are so desperately worried about.  Because there hasn't -- I

8    mean, in addition to the incidents that we have listed, there

9    have been two other attempted murders just this week on SNM

10   members directly related to their being witnesses, and one of

11   them directly tied to one of the codefendants in this case

12   that's being investigated.

13           So it's of utmost importance to us that paper trails

14   not leave, and that is why the Department of Corrections is

15   willing to have tablets with the information downloaded.

16           THE COURT:  Tablets plural.  That means how many

17   tablets?

18           MS. ARMIJO:  I believe they're willing to provide a

19   tablet for each defendant.

20           MR. MYERS:  Yes, Your Honor, that's true.

21           THE COURT:  So for the benefit of everyone on the

22   telephone, let me just tell you.  So I'm not sure how much you

23   heard of that, but the proposal is for the Department of

24   Corrections to provide each of your clients with a tablet with

25   all of the discovery that would be uploaded and that would be

1    available within the facility for your client to check out for

2    a period of time and then checked back in, and that way the

3    Government's concern as far as distribution of paper would be

4    met, the client would have at least the information available

5    to him that is made available to you.  There's no -- And I

6    heard from the agent, who is sitting at the table, that that is

7    what the department is willing to do.

8              MS. ARMIJO:  Yes.  And I have Mark Myers here, who is

9    one of the co-case agents, and he's with the Department of

10   Correction's, and that is who spoke.

11             THE COURT:  Okay.

12             MS. ARMIJO:  And I will note that statements of

13   cooperating defendants maybe we should keep out of that, but

14   certainly all the other things and some of the more generic

15   discovery certainly could go on that.

16             THE COURT:  Well, is this -- Have you floated this

17   proposal by opposing counsel?

18             MS. ARMIJO:  We have not, Your Honor.  We have not

19   floated it by, because our office's position was that nothing

20   should go back at all, and I was instructed to not, basically,

21   back down on that position; however, if necessary, we would do

22   the -- provide the tablets.

23             THE COURT:  Okay.  So this -- Let me ask.  Is there

24   anything else, Ms. Armijo?

25             MS. ARMIJO:  No, unless you have any further

1   questions about the tablet or anything else.

2                    THE COURT:  I don't at this particular time.

3                    Let me hear from Ms. Jacks.  Let me ask you.  This is

4   a joint -- defendants' joint opposition to the Government's

5   sealed motion for a protective order, and in that briefing,

6   Ms. Jacks, is listed all the items that I earlier described.

7   Is there still agreement among all defense counsel that these

8   items can be within a protective order?

9                    MS. JACKS:  Your Honor, I think maybe given the

10  recent disclosures by the Government it might be a good time to

11  take a recess and let us talk and determine what our position

12  is in response.

13                   THE COURT:  All right.  That's fine.

14                   MS. JACKS:  Thank you.

15                   THE COURT:  So for everybody on the telephone, it is

16  20 -- about 18 minutes till the hour, and so we are going to

17  take a --

18                   MS. JACKS:  I'm coming back, so I was going to ask,

19  can we have until 3:00, please?

20                   THE COURT:  Until 3:00.  We'll take a break until

21  3:00 New Mexico time for those of you outside of this zone.

22  We'll reconvene at the top of the hour.  Now is the time to

23  make telephone calls and consult with your co-counsel.  So

24  please do that, and we'll reconvene at 3:00.

25                   Oh, yes.  And, indeed, please do not disconnect from

1    the telephone line for those of you on the phone.

2              MS. HARBOUR:  How can we call our learned counsel if

3    they don't disconnect?

4              THE COURT:  Oh, boy.

5              MR. BLACKBURN:  Judge, this is Billy Blackburn.  It's

6    going to be difficult for me not to, because I'm appearing -- I

7    have a hearing in Carrizozo today, so I'm sitting in a parking

8    lot and able to do this hearing on a cell phone, so it would be

9    difficult for me to consult with anybody and then not connect

10   and disconnect.

11             I mean, I think one of other things is, obviously,

12   this is -- this is the obvious time that I have no clue if my

13   client knows anything about a tablet, knows anything about a

14   computer, or can even work one of these issues.  So that is --

15   that is another problem.  So that's two of the problems.  But

16   one is me disconnecting.  I'm not going to be able to talk to

17   anybody.

18             THE COURT:  Yeah.  Now, Mr. Blackburn, let me just

19   make very clear, if I can have everybody's attention, the

20   opportunity I'm giving you right now is to consult with

21   co-counsel to the extent you're not in the same room or the

22   same location.

23             So, Mr. Blackburn, for Mr. Arturo Garcia, I don't see

24   that you have co-counsel, so this would not necessarily apply

25   to you.  I'll just ask that you stay on the telephone line and

1    be ready as we reconvene at 3:00.

2           For everybody else, I'll just ask you to do your best

3    under the circumstances to consult with your co-counsel.  We'll

4    reconvene at 3:00.

5           MS. ARMIJO:  Your Honor, if it's easier, we can step

6    out, the Government can step out.

7           MS. SIRIGNANO:  Your Honor --

8           MS. HARBOUR:  That would be helpful.  Because there's

9    no room --

10          MS. SIRIGNANO:  Are we off the record, Your Honor,

11   or --

12          THE COURT:  All right.  Let me -- Before everybody

13   starts to break away, I'm instructing the prosecutors and all

14   the representatives here for the Government to step out of the

15   courtroom.  This line will remain open so that you can consult

16   amongst yourselves within the group.  To the extent necessary,

17   and, obviously, if you have another way to consult via

18   telephone outside the courtroom, you may do that.  Okay?

19          So we'll be in recess until 3:00.

20      (Court stood in recess at 2:44 p.m. and resumed at

21      3:03 p.m. as follows:)

22          THE COURT:  Okay.  Please be seated.

23          Okay.  We are back on the record.

24          And, Ms. Jacks.

25          MS. JACKS:  Good afternoon, Your Honor.

 1          During the recess, I think what we talked about, and

 2    I think we're close to an agreement, is what -- I believe what

 3    the defense position is, is, given the Government's offer of

 4    the tablet with all the discovery for each defendant and being

 5    password-protected and the defendants having access to that in

 6    their cell, that's something that the defense would agree to,

 7    and we could -- we could end this hearing right now.  I just

 8    have a couple comments, because I'm not quite sure.  I think

 9    the Government's close to that same position, but not quite

10    there.  So I just want to make a couple of comments.

11          On a couple of occasions, the Court has said that the

12    fact that we offered to agree to a protective order and

13    actually proffered one ourselves meant that we thought the

14    Court should issue a protective order, and that's not really

15    what that means.

16          In the interest of getting the discovery and with the

17    recognition that as to some types of discovery we thought the

18    prosecution could meet their burden of showing good cause that

19    it should be protected, we proffered our protective order as to

20    certain materials.

21          So it's a fine distinction, but we're not admitting

22    that there should be one, but what we're saying is we think the

23    Government, if pressed, could meet their burden of proof to

24    show good cause as to certain types of materials.

25          THE COURT:  Okay.  I read that.  That was my

56

1    inference because you tendered your own protective order, which

2    listed those items.  That's why I came away with that

3    understanding.  But I understand what your point is.

4              MS. JACKS:  Okay.  I appreciate that.

5              I think the other -- the other comment that the

6    Government made is, I guess throughout the Government's

7    argument, it seems like there's a lot of speculation as to how

8    certain materials could potentially be used by the defendants

9    to perform various nefarious activity.

10             The issue in deciding on the protective order for the

11   Court is whether the Government has established good cause, and

12   our position is that they haven't established good cause for

13   anything.  But given that we have or are very close to an

14   agreement, what we would request at this point is that the

15   Court withhold -- or postpone further argument on this issue

16   and withhold ruling for 30 days and give us an opportunity to

17   pursue the tablet situation and see if we can't work the

18   situation out with the Government.

19             THE COURT:  Well, I will say, I will find good cause

20   in some of these items.  I do believe that there is a showing,

21   based on what I've heard and read in the briefing, for example,

22   a statement by a cooperating defendant, I think there's good

23   cause there, so that's-- but that's just one example of many

24   items that the Government seeks to protect.

25             And I agree with you, there still needs to be a

1    showing for many of these items.

2              MS. JACKS:  And I think what our position is, is that

3    if the issue with the Government or that the Government's

4    spoken about so far is the defendants passing paperwork, that

5    issue goes away if the defendants are issued tablets of their

6    own.  There's no way to print from a tablet.  The defendants

7    would have the discovery materials on an electronic device for

8    themselves.  So that's why we're agreeing to accept the tablets

9    if all of the discovery materials are provided on those

10   tablets.

11             THE COURT:  Okay.

12             MS. JACKS:  And then, finally, just in speaking with

13   counsel during the recess, I think everybody wants to reiterate

14   their objection, that much of the Government's argument was

15   fact-based and was factual allegations or factual allegations

16   combined with speculation, and we would note our continuing

17   objection to that, strike it, and finally note that if -- that

18   given those discussions, those are just the type of things that

19   the defendants should be here present to listen to and

20   understand.

21             THE COURT:  Okay.  And that being a motion to strike

22   those representations, let me consider that, although I will

23   note that the courts accept proffers in any number of contexts,

24   and that's at this point what I was viewing this as, as a

25   proffer.

```
 1              All right.  Ms. Armijo.

 2              MS. ARMIJO:  Your Honor, I believe that we provided

 3    the tablets for the items that were disagreed.  I thought at

 4    the beginning, when we started this process, that the defense

 5    had agreed that there are certain objects that should clearly

 6    be in a protective order and -- the protective order as far as

 7    not being allowed for the defendants to have in their position,

 8    that, obviously, the main thing being cooperating defendants'

 9    statements.

10              So it is our position that those sorts of things,

11    cooperating defendants' statements, should not go on the

12    tablets.  Things that should go on the tablet are the things

13    that the Court has issues with, things -- other things.  And I

14    think, really, it's the cooperators' statements that should not

15    go on the tablet.  With that, they're asking for another 30

16    days to hold this without a protective order.  That means

17    another 30 days without any discovery going out.  And that's

18    one of our concerns in this case.  And if that's what they

19    want, discovery to not go out until an agreement can be met --

20    However, I think that the United States has conceded that --

21    and has come up with a resolution to deal with the Court's

22    concerns about lots of man-hours and everything else, so our

23    position is, cooperators' statements and the items that they

24    had agreed that should not be reproduced not be reproduced.

25    Items -- All other items can go on the tablet.  And with that
```

1    maybe we could start discovery soon, as opposed to wait yet

2    another 30 days.

3           THE COURT:  Tell me specifically -- You mentioned

4    cooperating codefendants' statements.  What other specifically

5    would you want -- or not want, I should say, in the tablet if

6    that is the course that we go?

7           MS. ARMIJO:  Well, I'm referring to page 3 of their

8    document 281 -- yes -- which is items that they had agreed were

9    confidential materials.  And I would say that those items,

10   which they agreed, if shared could jeopardize the safety and

11   the security of defendants or other individuals.  I would

12   propose that those items that they had agreed upon previously

13   still not go on the tablets.  Everything else could go on the

14   tablets.

15          I believe that's what the Court had started out with

16   as far as there was some agreement here at the very beginning.

17          THE COURT:  Well, but I also heard the concern was

18   paper, and this would seem to resolve that concern, there would

19   be no paper.

20          MS. ARMIJO:  This is true, but, I say that if they

21   have the statements to memorize -- and let's say they have pad

22   and paper and they're writing them down and they're saying, "I

23   wrote this down from my discovery and this is what defendant C

24   said about us, and here, you know, on my honor, this is what I

25   copied down from this," then there is created another paper

```
 1   trail.  So that's a concern, because it is -- And again, it's
 2   just given the nature of this case and what is currently not
 3   only the motive for many of the crimes that are charged, but
 4   what is currently ongoing right now this week in this case.
 5               THE COURT:  Okay.  Thank you, Ms. Armijo.
 6               Just how soon can these tablets be made available?
 7               MS. ARMIJO:  I don't know.
 8               MR. MEYERS:  Your Honor, I think that we would have
 9   to --
10               THE COURT:  Can you speak into the microphone, and
11   just state your name for the benefit of the folks on the call?
12               MR. MEYERS:  Yes, sir, Your Honor.  My name is Mark
13   Myers.  I'm with the New Mexico Corrections Department.
14               I think the time would --
15               UNIDENTIFIED SPEAKER:  Can't hear anything, Your
16   Honor.
17               THE COURT:  All right.  Once again.
18               MR. MEYERS:  I'm sorry.  One more time.  My name's
19   Mark Myers with the New Mexico Corrections Department.
20               Your Honor, I believe that would have to involve a
21   conversation with the third party that's handling the discovery
22   and the vendor.  I believe the vendor could produce the tablets
23   very quickly.  We would just have to ensure that they could be
24   loaded in the time that you would require.
25               THE COURT:  Well, I want to set a deadline, but I
```

1    want to set a reasonable deadline.  Are we talking about two

2    weeks or two months?  What are we thinking?

3            MS. ARMIJO:  Well, as far as getting the tablets, I

4    think that maybe we could probably get it in two weeks.

5            MR. MEYERS:  We could easily get the tablets within

6    two weeks.

7            MS. ARMIJO:  We would be in possession in two weeks.

8    The only thing that we don't know is from Mr. Aoki's

9    standpoint, is him loading up.

10           And the other thing for the Court to consider is that

11   we're doing rolling discovery because we want to get things out

12   right away for people to start digesting.  And so, in a normal

13   situation, we would be sending out discovery every couple days,

14   and so something has to be worked out with Mr. Aoki to where

15   the tablets would then be collected and downloaded again.

16           THE COURT:  Okay.  Let me tell you what I am going to

17   propose, and then I'll hear from each of you as to your

18   position, whether you object to this course.

19           So, I'm going to grant the motion for a protective

20   order insofar as the items listed in document 281, page 3, are

21   listed as items for protection.  Okay?  So those items will be

22   protected under a protective order.

23           Now, I'm going to require you, Ms. Armijo, to confer

24   with opposing counsel on the tablet idea, and to the extent you

25   can agree on what should go on the tablet, please proceed with

 1   that method.  That's everything else that is not listed on page

 2   3 of document 281.

 3          Now, anything that you seek to be protected beyond

 4   what I just articulated, I'm going to require a motion from you

 5   outlining the specific reasons why that particular item should

 6   be within -- also within the scope of the protective order.

 7   I'll receive that motion and, pursuant to the rule, view that

 8   motion and the items ex parte in camera.  All right?

 9          Now, let me ask you if you have any questions about

10   that course.

11          MS. ARMIJO:  Just to be clear, anything outside

12   what's listed on page 3 of document 281 will go on the tablet.

13   Correct?

14          THE COURT:  Yes.

15          MS. ARMIJO:  And then the other items --

16          THE COURT:  But let me be clear.  Let me be clear.

17   These items that are listed in page 3, document 281, those

18   shall be disclosed to opposing counsel subject to the

19   protection of my order.  Anything beyond that will also be on

20   the tablet or disclosed to opposing counsel in any form.  What

21   I'm asking you to do is seek agreement on the tablet idea.  But

22   discovery will proceed.

23          If you have determined that there are items beyond

24   what is listed in document 281 that should be protected, you

25   are to file a motion that I will consider in camera ex parte.

1    Did that clarify it?

2              MS. ARMIJO:  With one exception, Your Honor.

3              THE COURT:  Okay.

4              MS. ARMIJO:  The items that go on -- that are outside

5    of document 281, they will go on the tablet, are they still,

6    then, not to be reproduced by paper and provided to the

7    defendants?  In other words, they're to be provided to the

8    defendants and not reproduced.  So in a sense they're under a

9    protective order, as well, it's just that they're going to be

10   allowed to be put on a tablet.  I guess that's my question.

11             MS. SIRIGNANO:  Your Honor, can you repeat the

12   question, please?  We couldn't hear on the phone.

13             THE COURT:  Yes.  So -- I assume that's

14   Ms. Sirignano.  I'll just remind everyone to speak -- on the

15   telephone just to state your name.

16             So what I want to do is make sure all the discovery

17   is turned over.  What I've articulated is what is protected as

18   of today.  That's my order for today.  Okay?

19             The scope of my order for protection is what is

20   listed in document 281, paragraph 3 -- or page 3.  Everything

21   else shall be turned over.  If you turn that over in a tablet,

22   you'll have to articulate to me what should not be provided in

23   the tablet or in any form whatsoever.  That should be subject

24   to the protection order.  I hope that clarified it.

25             MS. ARMIJO:  So if it's outside of -- and I'm sorry,

1    I just want to make sure -- if it's outside of 281, then the

2    defense can simply share it and reproduce it and do whatever

3    they please with it, so to speak, because it's not under

4    protective order?

5              THE COURT:  Yes.

6              MS. ARMIJO:  Okay.  Well, then, I guess that -- I

7    guess, then, we don't even need the tablet.

8              THE COURT:  Well --

9              MS. ARMIJO:  Because the point of the tablet was that

10   all the -- Our point in giving the tablet was that -- So our

11   position will be, if the Court's order is that this should not

12   be disclosed, then that's fine, we'll just proceed with

13   discovery as normal.  But the point with the tablet was that

14   all of the discovery would be subject to the protective order

15   in not being reproduced and shared.  And so I guess with the

16   Court's order, if the only thing that is not being reproduced

17   is the defendants' statements, then there's no need for the

18   tablets.

19             THE COURT:  Well, let me refine my order, because I'm

20   not sure that's what I'm really setting out to do.  And I

21   apologize, because ultimately what I'm trying to do is get into

22   your hands discovery.  What I'm trying to do is delineate what

23   should be within the scope of the protective order.  I have

24   found good cause for at least some of the items.  Those are the

25   items that are listed in paragraph -- page 3 of document 281.

1          Okay.  Is that clear so far?

2          MS. ARMIJO:  Yes, Your Honor.

3          THE COURT:  Okay.  Now, what I want to do is leave

4    open the possibility -- while all of that is ongoing, leave

5    open the possibility for you, Ms. Armijo, to bring -- to bring

6    to me whatever concerns you have about any other discovery.

7          MS. ARMIJO:  Yes.  And that is also clear.  Thank

8    you.

9          THE COURT:  Okay.  Now, I see heads nodding.  So let

10   me just go down the roll to give you a chance to tell me

11   whether you object to that proposal.  All right?

12         Okay.  So let me just ask, on behalf of Mr. Joe

13   Gallegos, Mr. Benjamin, do you agree?  Do you object to that

14   proposal?

15         MR. BENJAMIN:  Your Honor, I would -- my concern is,

16   I guess I don't understand.  I'm looking at the -- it's the

17   paragraph on page 281 -- document 281, page 3, that starts out

18   "On February 4th," and that lists certain items that we've gone

19   back and forth and dealt with.  And I guess I'm confused as to

20   what's going to be produced and how it's going to be produced,

21   is the best way that I would say that.  And that's why I

22   understood that if everything was going on the tablet, that

23   would make everything simple, because everything would then be

24   produced and could not be reproduced by the defendants in

25   custody.  And so I apologize, but I'm unclear, Your Honor.

```
 1                 THE COURT:  Okay.  The tablet idea, that's fine, but
 2       what I'm concerned with is the amount of time it's going to
 3       take to get that tablet, number one, and then get the
 4       information uploaded and then distributed.
 5                 So I hear counsel for the defense represent that
 6       you're willing to wait 30 days for that to, perhaps, come
 7       together.  I'm hearing from the prosecutor that it could take
 8       at least two weeks to obtain these tablets and then another
 9       period of time to actually upload the discovery into the
10       tablets, and that period of time is indefinable at this
11       particular time.
12                 So what I'm wanting to do is get discovery started so
13       that it is in your hands just as soon as possible.
14                 MS. JACKS:  And we appreciate that.  Amy Jacks on
15       behalf of Daniel Sanchez.
16                 THE COURT:  Okay.
17                 MS. JACKS:  I think maybe the reason we're having a
18       problem --
19                 MR. BENJAMIN:  Microphone please.
20                 MS. JACKS:  I think maybe the reason we're having a
21       problem wrapping our heads around this is, there's really two
22       issues we're trying to deal with.  One is what's going to be
23       disclosed to the defense counsel as soon as possible, and the
24       other is what are the defendants ultimately going to have
25       access to.
```

1            And so what I thought where we kind of were, was that

2    all the discovery materials would be disclosed to defense

3    counsel; there would be a protective order as to the materials

4    that were outlined in a protective order defense counsel

5    submitted to the Government on February 4th, which is

6    summarized on page 3 of document 281.

7            And then my other understanding is that but for those

8    materials that are -- that are protected, the rest of the

9    discovery would be loaded on a tablet at some point as soon as

10   practicable to be provided to each defendant to review

11   themselves at their leisure.

12           THE COURT:  As soon as practicable.  Okay.  So...

13           MS. ARMIJO:  And that is -- I believe that -- that,

14   basically, that was our agreement.  I believe the issue was the

15   defense wanted everything.  We did not want what was here on

16   the tablet, but if the defense agrees that it's subject to

17   protective order but for the tablet going in, that way they

18   would have it.  In other words, paper, outside of what --

19   What's outside of document 281, page 3, if it's on the tablet,

20   then they cannot provide it in paper to their clients, then

21   we'd be willing to work -- work with them and get everything

22   out as quickly as possible and continue.

23           MS. JACKS:  So I think we're almost there.  The one

24   thing I just want to make very clear is that we don't agree

25   that the items on page 3 of document 281 should be omitted from

1    the tablet.  And I think the Court's already made its ruling

2    about that.

3              But the reason we don't is the whole purpose of

4    protecting those materials was to prevent paperwork from

5    circulating in the jail.  If those materials were provided to

6    the defendants on a tablet, there is no paperwork to circulate

7    in the jail and the need to protect the materials is gone.

8              THE COURT:  Okay.  Let me take just a moment.  Don't

9    go anywhere.  Please stay on the line.  I'm going to recess for

10   just a few minutes and be right back.

11             So we are in recess.

12        (Court stood in recess at 3:25 p.m. and resumed at

13        3:33 p.m. as follows:)

14             THE COURT:  Okay.  Thank you.  Please be seated.

15             All right.  We're back on the record.

16             And what I want to do is state my ruling, which,

17   hopefully, will address the questions that were raised.  So

18   I'll be as clear and helpful as possible here.

19             So I'm going to grant the motion for a protective

20   order.  Okay?  I think there's two parts to this ruling.  The

21   first part is, the motion is granted with respect to the items

22   that are listed in paragraph -- page 3 of document 281.  Okay.

23   The motion is also granted with regard to any of the discovery

24   that can be put on a tablet.  So in that regard, all of the

25   discovery is protected.  Okay?

1          So, let me be clear here.  The items in document 281

2    shall be disclosed as soon as possible without regard to

3    whether they can be uploaded on a tablet.  So what I want is

4    those items disclosed immediately, no later than March 25th,

5    which is the deadline for discovery.

6          Now, if you have an agreement that any of the

7    remaining items within the scope, the general scope of

8    discovery, that can be put into a tablet, I'll encourage you to

9    do that, to come to an agreement.  If it's on a tablet and it's

10   not on paper, in that regard it's also protected.  The main

11   idea from the prosecutors was paper.  If it's on a tablet, then

12   it's protected insofar as it's not paper.

13         Ms. Armijo, if there is any item that you have

14   determined should not be disclosed even in the tablet, file a

15   motion, and I'll review that under the rule ex parte in camera.

16   And that option is available to any defense counsel, as well,

17   to bring those somewhat -- well, before that is put onto a

18   tablet form.

19         Any questions about what I just said, Ms. Armijo?

20         MS. ARMIJO:  I guess the only question --

21         THE COURT:  Let me just ask you to speak into the

22   microphone.

23         MS. ARMIJO:  I'm sorry.

24         I guess the only question is, then, is all the other

25   stuff that is not covered in document 281, it will still be

disclosed, can that then be reproduced by the defendants and given to them in paper?

THE COURT: Well, it's a protective order, so it cannot be reproduced, copied, and provided to the client.

MS. ARMIJO: Okay.

THE COURT: So I am finding good cause with regard to those items and also with regard to, at least initially there was some agreement that there -- if there is a protective order, these would be the items that would be protected. So I'm relying on that representation.

Nevertheless, I'm finding good cause. For any other items, I'll be -- I'll have to make a finding of good cause, and I'll do that pursuant to any motion that the United States brings to me as well as any motion that defense counsel brings to me.

Okay. So, Ms. Jacks. Yes.

MS. JACKS: Amy Jacks. I have just a question.

THE COURT: Okay.

MS. JACKS: With respect the materials that, say, in the future the Government may seek a protective order to cover, will the defense have an opportunity to view the reasons advanced by the Government and respond to the ex parte application?

THE COURT: Now, that's a fair question, Ms. Jacks. And so, it's not necessarily a response. I have to review

```
 1   those ex parte, but I'll ask -- I'll instruct you, Ms. Armijo,
 2   to meet and confer with opposing counsel.  If there is any
 3   agreement that you can come to before you file that motion, I
 4   certainly would encourage you to do that.
 5              Did that answer your question, Ms. Jacks?
 6              MS. JACKS:  Halfway.
 7              THE COURT:  Okay.  Then if you can't come to an
 8   agreement, is your question, what do you do next?
 9              MS. JACKS:  Correct.
10              THE COURT:  It's -- The rule calls for ex parte.
11   You'll know about it because you've had a chance to confer
12   about it.
13              So file your motion, Ms. Armijo.
14              Defense counsel can respond.
15              MS. JACKS:  Okay.  Thank you.
16              THE COURT:  Okay?  That's just the way we'll have to
17   move forward.  I have no idea how much still would be open
18   for -- or needing a Court ruling, but we'll just have to go one
19   step at a time as it comes up.
20              Okay.  So that's the idea.  I hope that was clear
21   enough for counsel to state an objection or -- well, to state
22   an objection.  So let me do that.
23              I'm going to go down the list.  Please bear with me.
24              Okay.  Mr. Benjamin, on behalf of Mr. Gallegos.
25              MR. BENJAMIN:  Yes, Your Honor.  And because I'm
```

1    first, if I could just clarify my understanding.  I understand

2    that, by way of example, statements of eyewitnesses, which is

3    one of the listed items in document 281, those type of things

4    will be produced to me.  I'm not -- They're subject to a

5    protective order, and I'm not allowed to reproduce those.

6          But the CV of experts, the diagrams and those kind of

7    things, the Court is instructing the Government to produce

8    those, and those are going to be produced and will be on a

9    tablet so that I can -- that will be left with my client, is my

10   understanding.  Correct?

11          THE COURT:  Correct.

12          MR. BENJAMIN:  Okay.  Your Honor, to the extent that

13   I think that the items on 281, if everything is subject to a

14   protective order, I believe that all that information should be

15   placed on the tablet, although I do like the Court's initial

16   disclosure, and so my objection would be, I guess that I would

17   like all that produced on the tablet, but I understand it's all

18   subject to a protective order.

19          THE COURT:  Well, you will have those items, those

20   items being what is listed in document 281, you'll have them at

21   least initially in paper form.

22          MR. BENJAMIN:  Yes, Your Honor.

23          THE COURT:  You'll have those in paper form, not just

24   initially, but in paper form as soon as possible.

25          All right.  Ms. Harbour-Valdez or Mr. Burke on behalf

1    of Mr. Troup.

2              MS. HARBOUR:  Your Honor, Cori Harbour-Valdez and Pat

3    Burke.  We do not object.

4              THE COURT:  You do not object.  Okay.

5              On behalf of Leonard Lujan, Mr. Clark.

6              MR. CLARK:  No objection, Your Honor.

7              THE COURT:  Okay.  On behalf of Billy Garcia,

8    Mr. Bowles or Mr. Castle.

9              MR. BOWLES:   Your Honor, I believe --

10             MR. CASTLE:  Jim Castle will be addressing this, Your

11   Honor.

12             I have two concerns.  The first is the concept of an

13   ex parte filing by the Government.  Rule 16(d) does contemplate

14   situations in which a party can request protective orders via

15   an ex parte application; however, the committee comments to

16   that rule indicate that ex parte proceedings are looked on with

17   disfavor and that the Court should look at and only authorize

18   ex parte filings if an adversary proceeding would defeat the

19   purpose of the protective order.

20             And so I believe that the Government's application

21   may in some instances contain a portion that is ex parte if

22   they have to reveal information that would defeat the purpose

23   of their requested protective order, but all else should be

24   dealt with in a filing that is not ex parte.  So that's my

25   first concern.

1          And then the second concern I have is that the

2     Government's protective order as requested in document number

3     260, subparagraph 7.b, also covers an area that isn't really

4     dealing with the dissemination of materials to a defendant.  It

5     also talks about how defense counsel could use materials that

6     we are providing, and it indicates that we shall not disclose

7     the substance of any materials received by the Government to

8     any third party unrelated to the above-captioned cases unless

9     such materials are already a matter of public record.

10         The problem with that provision -- If the Court's

11    contemplating that, then I need to address it.  If it's not,

12    then I can just be quiet.  But the problem is, is that, for

13    example, witness statements are often used by defense counsel

14    to talk to the witnesses themselves, and if we can't say, you

15    know, these indicate to us that on such and such a date you

16    said the following to an investigative individual, then we

17    can't really do our job.

18         And so I believe that portion of it is overbroad, and

19    we would ask that that portion of the protective order not be

20    included in the Court's protective order.  I think the major

21    concern that the Government has expressed is dissemination of

22    materials to defendants in custody, and with respect to that I

23    think the Court has tried to accommodate everyone's interests.

24         THE COURT:  Okay.  Let me try to address the first

25    concern, the ex parte portion of your concern, Mr. Castle.

1          So what I explained to Ms. Jacks is that Ms. Armijo

2    for the Government will be -- I'm going to be requiring a

3    meet-and-confer kind of discussion before any motion is filed

4    seeking to protect anything else beyond what I've just

5    articulated.

6          Now, for that -- in that context, you'll have a

7    chance to file a motion or respond to a motion.  Now, I would

8    anticipate there are those items that you -- that perhaps could

9    defeat the purpose.  What I'm envisioning is that you have an

10   opportunity to know what the Government is seeking to protect

11   and would have an opportunity to state your position on it

12   before I actually decide whether it, in fact, should be

13   protected.  I hope that helps.  You may not have heard that

14   when I explained that to Ms. Jacks when she was at the podium.

15          With regard to the second concern and being able to

16   utilize the discovery when you meet with any witnesses in

17   preparation for trial, the scope of the protective order is to

18   not photocopy or provide those photocopies to anybody not

19   directly related to the case.

20          I don't envision where you cannot discuss the

21   substance of an investigative report, for example, with a

22   prospective witness.  What I would make clear, because that

23   would be an item that is -- could be protected, you just simply

24   could not leave the witness with a copy of that item.  I hope

25   that addresses your concern.

```
 1              MR. CASTLE:  That satisfies our concern, Your Honor.
 2              THE COURT:  Okay.  All right.  Anything else,
 3  Mr. Castle?
 4              MR. CASTLE:  No, Your Honor.
 5              THE COURT:  Okay.  On behalf of Mr. Eugene Martinez,
 6  Mr. Gorence or Mr. Lane.
 7              MR. LANE:  Mr. Lane here.  I was concerned about the
 8  same things Mr. Castle was concerned about.  You clarified
 9  that, Your Honor, so --
10              THE COURT:  Okay.
11              MR. LANE:  -- we're good.
12              THE COURT:  All right.  And on behalf of Allen
13  Patterson, it's Mr. Lahann or Mr. Linder.
14              MR. LAHANN:  No objection, Your Honor.
15              THE COURT:  Okay.  Thank you, Mr. Lahann.
16              On behalf of Christopher Garcia, that would be
17  Mr. Mondragon.
18              MR. MONDRAGON:  No, Christopher Chavez, Your Honor.
19  No objection.
20              THE COURT:  Okay.  There's no objection.
21              On behalf of Javier Alonso.
22              MR. CHAMBERS:  Your Honor, this is Nathan Chambers.
23  First of all, thank you for clarifying the concerns that
24  Mr. Castle raised.
25              Secondly, I'm concerned -- we object to the Court's
```

1    protective order.  And let me try to briefly explain why.  The

2    Court talks about the items that are itemized on page 3 of

3    document 281.  And there are, indeed, a list of items listed

4    there; however, there's an important modifier to each of those

5    documents, and that is, that if these documents were shared

6    they'd jeopardize the safety or security of someone.

7            So, it's not as if we agreed that any statement of an

8    eyewitness should be protected.  We agreed that that might be

9    appropriate if there was a showing that production of that

10   could jeopardize the safety or security of such a person.  In

11   my view, there has been no such showing.  There's been nothing

12   even approaching that there's a showing for such protective

13   order.

14           Instead what we have are unsupported allegations and

15   rank speculation, and that is not an adequate grounds to base a

16   protective order.  So we object.

17           Furthermore, the Government, today, said that their

18   concern was with paper and the danger that paper causes.  Well,

19   because tablets are paperless, the Government's concern is then

20   obviated.  And, therefore, I agree with the comments of

21   Mr. Gallegos's counsel.  I'm sorry, I don't remember who

22   exactly it was, but I know it was Mr. Gallegos's counsel just a

23   few minutes ago who said that everything, including the items

24   listed on page 3 of document 281, should be included on the

25   tablets.  So for those reasons we object to the protective

 1    order.

 2              Thank you.

 3              THE COURT:  All right.  Thank you, sir.

 4              Mr. Blackburn on behalf of Mr. Arturo Garcia.

 5              MR. BLACKBURN:   Your Honor, I have nothing further

 6    to add, and we object based upon the comments by Mr. Chambers.

 7              THE COURT:  Okay.  On behalf of Mr. Clark,

 8    Mr. Hosford.

 9              MR. HOSFORD:  No objection.

10              THE COURT:  There's no objection.

11              Okay.  On behalf of Mr. Ruben Hernandez, that would

12    be Mr. Pineda.

13              MR. PINEDA:  No objection, Your Honor.

14              THE COURT:  All right.  Thank you.

15              On behalf of Jerry Armenta, Mr. Mitchell.

16              MR. MITCHELL:  Your Honor, I don't object; however, I

17    wish to bring to the Court's attention a problem some of us

18    have who represented these defendants in state court prior to

19    their removal to federal court, and we had discovery in those

20    cases and that discovery was dispensed to our clients.  I do

21    not wish to be held in contempt of Court or for the Court to

22    think that we disrespected your order simply because our

23    clients in some way had part of this discovery given to them

24    while we were attending to their representation in state court.

25    I just bring that to the Court's attention.  I do not think

1     that that is a problem, but I want to alert the Court to that

2     fact.

3                THE COURT:  Mr. Mitchell, you have these items, at

4     least some of them, from a disclosure in a state prosecution

5     and these items were not subject to a protective order?

6                MR. MITCHELL:  That's correct, Judge.

7                THE COURT:  Okay.  Well, I see some heads nodding

8     here in court -- in the courtroom.

9                Ms. Armijo.

10                This is new to me, so...

11                MS. ARMIJO:  Yes, Your Honor.  The Molina murder was

12     charged, which I don't have the Indictment in front of me, but

13     it's the J.M. murder was charged in state court and it was

14     dismissed in November of 2015 prior to our Indictment.  We

15     would request that there be no further dissemination.  And I

16     can tell you specifically, and we have a recording if this is

17     an issue, because I know several people have said that they

18     haven't made a showing, that as to that murder, one of the

19     codefendants in this case specifically names one of the

20     defendants in that case that was cooperating, names him by name

21     and says that he needs to be visited upon, taken care of, and

22     that his family needs to be visited upon for his cooperation

23     with the district attorney, and we have that in a recording by

24     one of the charged defendants, that we can certainly provide to

25     the Court and to anyone else who challenges that.  So that is

```
1   just one example of why the discovery should not be disclosed

2   anymore, and so I would request that as to those defendants

3   that have it and attorneys that have it -- and I believe there

4   should be three, two of which are in this case, not -- take

5   those items and treat them as they are in a protective order

6   from this point forward.

7              THE COURT:  Well, okay.  Hold on, Ms. Armijo.

8              MS. ARMIJO:  Sorry.

9              THE COURT:  So in that, when you say "the Molina

10  murder" --

11             MS. ARMIJO:  Yes.

12             THE COURT:  -- there are two counsel in this case

13  that were involved in that case in the state court?

14             MS. ARMIJO:  Yes.

15             THE COURT:  And who are they?  Mr. Mitchell?

16             MS. ARMIJO:  Mr. Mitchell and Mr. Almanza.

17             THE COURT:  Okay.

18             MS. ARMIJO:  And I believe Mario Esparza, who is not

19  part of this case, also represented one of the defendants, but

20  he is not here, but he is in custody of some of those

21  documents.

22             THE COURT:  So Mr. Molina, the one who had -- the

23  victim --

24             MS. ARMIJO:  Yes.

25             THE COURT:  -- is he one of the victims alleged in
```

1  this Indictment 4268?

2          MS. ARMIJO:  Yes.

3          THE COURT:  Okay.

4          MS. ARMIJO:  He is victim J.M., and he is one of the

5  ones that in my motion I put that he was killed as far as being

6  a cooperator.

7          THE COURT:  Well, even if I ruled that from here

8  forward it's subject to a protective order, how do we deal with

9  the information that's out there already that was the same

10 information?  It seems like I'm being asked and counsel's being

11 asked to unring that bell.

12         MS. ARMIJO:  Well, I'm just saying that there's

13 probably counsel here today that do not have those documents,

14 and so, obviously, we would be disclosing the same documents,

15 and we would ask that they not -- that they treat it as a

16 protective order for the attorneys that have not.  Obviously,

17 anything that's already been produced we can't protect, but

18 certainly here going forward, especially with any of the

19 attorneys that don't have it.

20         THE COURT:  All right.  Mr. Mitchell, so, thank you

21 for bringing that up.

22         MR. MITCHELL:  Your Honor, I can live within those

23 constraints.

24         THE COURT:  Well, all right.  So that information

25 that has been disclosed in the state court case will be subject

1    to the protective order.  Now, I think, you know, anticipating

2    what could happen, although, hopefully, it will not happen, is

3    that there is an alleged violation of the protective order with

4    regard to that particular murder.  I'll just have to deal with

5    that in a motion with the response and decide that based on

6    what's been represented here in part.  So that's the best I

7    think we can do with that at the moment.

8              MS. DUNCAN:  Your Honor, may I approach?

9              THE COURT:  Ms. Duncan would like to approach the

10   podium.

11             MS. DUNCAN:  Yes, Your Honor.  I just want to, I know

12   I'm coming out of turn, but level an objection on behalf of my

13   client, Mr. Baca, who is named in that count, the J.M. count.

14   My concern is that the Government's asking the Court to include

15   within a protective order documents that the defense collects,

16   not documents that the Government has given us, but things that

17   we do through our own investigation.

18             I'm worried because there may be some duplication, I

19   mean, not just from the state case, but from our collecting

20   records from the Department of Corrections, from our collecting

21   police reports.  So I don't want to open this door that somehow

22   I can't share defense-collected documents with my client

23   because the Government thinks that they present some sort of a

24   danger or that there may be some kind of duplication.

25             To me, it seems that the protective order should only

```
1   apply to documents that we receive from the United States
2   Government and nothing that we collect from another source.  So
3   we object on that ground.
4               THE COURT:  Okay.  That's fine.  Thank you,
5   Ms. Duncan.
6               Once again, I think the issue is going to be having
7   to sort out whether it was copied, disseminated where it should
8   not have been, to whom it should not have been, and, thus, a
9   violation of the protective order.  That's an issue for another
10  day, and I'll deal with that at that time.
11              All right.  On behalf of Mr. Mauricio Varela, that
12  would be Ms. Stillinger or Mr. Lindsey.
13              MS. STILLINGER:  Your Honor, with respect to the
14  issue the Court was just talking about and to avoid -- Yes, you
15  might have skipped Ms. Strickland.  People get us confused all
16  the time.
17              But to avoid those problems, I just wonder if maybe
18  those items that we're getting in paper form that are covered
19  by the protective order, maybe the Government could put a
20  watermark --
21              UNIDENTIFIED SPEAKER:  Can't hear.
22              THE COURT:  Yeah, you'll have to you speak up a
23  little.
24              MS. STILLINGER:  -- that if the Government could put
25  a watermark, I think, or some sort of identifying -- I think
```

1    it's a pretty easy thing to do, to put some sort of marking on

2    the documents that they disclose in paper form, because I do

3    think the protective order should just cover what they give us,

4    and then if there's something out there that hasn't been

5    watermarked, it's from a different source, and we all know it's

6    from a different source, and there won't be any confusion

7    about, was this covered by the protective order or was it not;

8    if it's duplicative, oh, well, it's a duplication, but this

9    particular piece of paper was not covered.

10           Other than that, I have no objection to the plan.  I

11   do want to talk to my client about how he -- if he can work

12   with a tablet, I don't know, but we have no objection to it

13   right now.

14           THE COURT:  Okay.  Thank you, Ms. Stillinger.

15           And, you know, thank you for that suggestion.  That

16   may be something the United States would consider.  Ultimately,

17   to show a violation of the protective order, the burden's on

18   the United States.  So there could be some steps that they

19   could take at this point to deal with what we now have is a

20   complicating factor with regard to that Molina homicide.

21           All right.  I was going to continue going down the

22   list here.

23           Mr. Castellano.

24           MR. CASTELLANO:  Thank you, Your Honor.

25           My understanding, in speaking with Mr. Aoki, is that

1  he does watermark the discovery, so we will know which defense

2  team has the discovery and we would be able to track that down.

3          One concern I have about what Ms. Duncan said about

4  the discovery, is that I understand that there are times when

5  they obtain documents that we would otherwise produce subject

6  to the protective order, but if they're able to do that, then,

7  obviously, that vitiates the protective order and defeats the

8  entire purpose of having one, if they can have documents that

9  are otherwise protected when provided by the Government, but

10  when they get it from another source, they can disclose it,

11  which means we're back to the same problem we were with paper

12  in the first place.

13          THE COURT:  Okay.  I see that as an issue for another

14  day.  So for now what I just want to hear is your position on

15  the proposal as we now have it.  So I think we can -- Well, let

16  me continue on.

17          Ms. Strickland.

18          MS. STRICKLAND:  I'm sorry.  Thank you, Your Honor.

19          Your Honor, first for the record, I spoke to my

20  learned counsel in this case, Mr. Hammond, during the break,

21  and he said that he was not able to hear everything that was

22  going on, so I'm going to object to him not being here in

23  person for that reason.

24          THE COURT:  Okay.

25          MS. STRICKLAND:  Also -- I'm sorry.  Also, when

1   Ms. Armijo was discussing the possibility that a ligature was

2   left behind, that there was an expert from the state court

3   case, DNA concerns, those are all from Mr. Montoya's case,

4   those are factual issues Mr. Montoya is not here to help his

5   counsel on.  I would ask the Court strike all of those examples

6   and not consider it at all in its order.

7          My client, Mr. Montoya's case also was a state case

8   for many years, and I have substantial discovery produced by

9   his state court attorney and from other sources, IPRA requests,

10  things like that.

11         Is the Court -- Before I complain about those being

12  protected, is the Court planning to order today that those

13  items I have from an independent source are subject to the

14  protective order?

15         THE COURT:  Let he hear from Ms. Armijo or

16  Mr. Castellano.

17         MR. CASTELLANO:  Your Honor, I do think that should

18  be protected, otherwise there's no need for the protective

19  order in the first place.  Without protection, those documents

20  could be given to the defendants, and the whole discussion

21  today was about paper.  So, if a defendant wants to prove that

22  someone else is cooperating, they provide paperwork to

23  substantiate that claim, and that's in large part why we're

24  here today prosecuting this case.  So it's basically going to

25  destroy the Court's protective order.

1          THE COURT:  Well, what I'm interested in is how to

2    enforce the protective order.  So what I'm not sure, and maybe

3    you can explain how you would be able to -- What I'm having

4    trouble seeing is, if an item that Ms. Strickland is describing

5    ends up in one of these defendant's hands and it doesn't

6    include a watermark, then where is the violation?  Who is at

7    fault for the violation?

8          MR. CASTELLANO:  I think the first question is to ask

9    whether or not that discovery is marked.  Does it say State

10   versus Montoya, for example?  And then it at least probably

11   narrows it down to one of the defense counsel from that case,

12   and then it's really a process of elimination.  It's probably

13   only three or four people.

14         THE COURT:  Well, the idea here, Ms. Strickland, is

15   to try and in some ways ultimately keep people from getting

16   hurt.  Now, the risk is there because of what we know of these

17   allegations.  So if the items that are being disclosed that are

18   identical to what is being -- in the state case that is

19   identical to what is being disclosed in the federal case, even

20   though from an independent source, we have the same problem.

21   Don't we?

22         MS. STRICKLAND:  We have a problem somebody might get

23   hurt, although I don't think the Government -- I think that's

24   an assumption.  I don't think the Government's proved that up

25   at this hearing.

```
1              I'll tell you, the defendants --
2              THE COURT:  It's the nature of the case, isn't it,
3    Ms. Strickland?  It's a VICAR prosecution, Violent Crimes In
4    Aid of Racketeering.  It's the nature of the alleged
5    organization.  Now, nothing's been proven.  Your clients are
6    presumed innocent, but it's a protective order to keep the risk
7    minimal, if at all possible.  So given what we have in the
8    nature of this case, how do we assure that that risk is
9    minimal?
10              MS. STRICKLAND:  I don't think that that's the
11   appropriate way to address the question, but I'll let the Court
12   know, the defendants have these materials that were in the
13   state court case, and I have materials that I have received
14   independently, and I didn't realize that the Government at this
15   hearing was going to ask for my case file to be now protected.
16   So if the Court is going to order that, I want time to brief
17   that.  I'm not sure the Government has the ability to even ask
18   that my materials not be given to my client.  So if the Court
19   wants to do a temporary order on that, that's fine, but I need
20   time to brief it.
21              THE COURT:  Yeah.  Okay.  So let's set that issue
22   aside.
23              MS. STRICKLAND:  Okay.
24              THE COURT:  All right?  And I would invite that
25   briefing.
```

```
 1              MS. STRICKLAND:  I will do that.

 2              THE COURT:  Okay.

 3              MS. STRICKLAND:  Just for the record, my other things

 4   were --

 5              THE COURT:  Ms. Strickland, I apologize for

 6   interrupting, but --

 7              MS. STRICKLAND:  I'm sorry.

 8              THE COURT:  -- to the extent that there are other

 9   defense counsel who would join that motion on behalf of their

10   client, please seek that --

11              MS. STRICKLAND:  I will.

12              THE COURT:  -- and indicate that on your motion.

13              MS. STRICKLAND:  Of course, Your Honor.  Thank you.

14   I will do that.

15              I would just also agree with Mr. Alonso.  I believe

16   it was his attorney speaking on the phone earlier.  We did not

17   agree in our response to the Government's motion that the items

18   listed on page 3 of document 281 should be subject to a

19   protective order, only if the Government proved at that hearing

20   that the end qualifying phrase of that sentence were to be

21   established, and it has not been.

22              Thank you.

23              THE COURT:  All right.  Thank you, Ms. Strickland.

24              Okay.  On behalf of Mario Rodriguez, Mr. Hernandez.

25              MR. HERNANDEZ:  Santiago Hernandez, Your Honor.  No
```

1    objection.

2              THE COURT:  All right, on behalf of Timothy Martinez.

3              MR. ALMANZA:  Your Honor, Steven Almanza on behalf of

4    Timothy Martinez.  I would just echo the concerns that were

5    raised by Mr. Mitchell and also Ms. Strickland.

6              The difference might be with my client, is that we've

7    had state material discovery since approximately September,

8    October, so I -- regardless of how the Court rules, we don't

9    want to run contrary to the Court's order, or give the

10   appearance that we are, since that material's already been

11   disclosed to our clients.

12             THE COURT:  All right.  Thank you, Mr. Almanza.

13             MS. WALSH:  Your Honor, this is Jackie Walsh.  I'm

14   sorry.  May I add something in addition to what my co-counsel,

15   Mr. Almanza, just stated?

16             THE COURT:  Sure.

17             MS. WALSH:  What I'd like to add is the point that it

18   certainly seems that the need for a protection order or a

19   showing of good cause for a protection order is necessarily

20   diminished by the fact that many parties -- or I assume many

21   parties already have copies of the state discovery, so I think

22   that it's almost like we're taking the cart before the horse in

23   what's happened today, in that now that this information is

24   coming before the Court after a ruling, it could affect the

25   Court's ruling or should have at least been considered by the

```
 1  Court.  But I apologize to the extent that, you know, I'm to
 2  blame for things not being taken in order.
 3          And we would also join in the objection stated by
 4  Mr. Castle, Mr. Chambers, Ms. Duncan, and what was just
 5  indicated by Mr. Marm -- Monte with regard to --
 6          THE COURT:  All right.  Thank you, Ms. Walsh.
 7          All right.  Ms. Stillinger, Mr. Lindsey, on behalf of
 8  Mr. Mauricio Varela.  Oh, you already stated.
 9          MS. STILLINGER:  I'm sorry.
10          THE COURT:  Thank you.
11          All right.  On behalf of Daniel Sanchez.
12          MS. JACKS:  Your Honor, Amy Jacks on behalf of
13  Mr. Sanchez.  We would join in the objections and concerns of
14  others and also urge the Court not make any sort of ruling with
15  respect to the issue that was just brought up today about the
16  state discovery materials.  I'm not -- We haven't had a chance
17  to brief the issue, even look into what authority the Court
18  might have to place a protective order on materials that
19  weren't disseminated by the United States Government.
20          THE COURT:  Okay.  So I'll defer ruling on that until
21  I have full briefing.  Ms. Strickland should seek your
22  position.  If you'd like to file an independent brief,
23  Ms. Jacks, you're -- you can do that, as well.
24          MS. JACKS:  Thank you.
25          THE COURT:  All right.
```

1           Okay.  And with regard to Mr. Gerald Archuleta,

2    Mr. Harrison.

3           MR. HARRISON:  No objection.

4           THE COURT:  Okay.  On behalf of Mr. Villegas,

5    Mr. Crow.

6           MR. CROW:  Yes, Your Honor, we would just rely on the

7    other counsels' objection.  And I'm just concerned that -- I

8    would just like the Government to mark what they think is

9    subject to the protective order so we're not at risk at turning

10   something over that they think is protected.

11          THE COURT:  Yes, sir.  So, Mr. Castellano.

12          MR. CASTELLANO:  Your Honor, that issue came up when

13   we were trying to discuss the protective order with defense

14   counsel.  And I think the Court has the e-mail between

15   Ms. Jacks and myself.  And I raised the issue of an inadvertent

16   disclosure by the defense not knowing what a document contains

17   or what it means, and if that happens, what's the liability for

18   something like that happening.

19          We don't want to take on that responsibility, either,

20   of being responsible for a document where we may or may not

21   know the meaning of what's contained in that document, where we

22   would miss marking it as confidential when it should have been,

23   and then us being on the hook on it.  So it's really a question

24   of who wants to be responsible for an inadvertent disclosure

25   that causes harm.  And we stated to the defense that we don't

1    want that responsibility, and it sounds like they don't either.

2            So I'm not sure that we're willing to mark things

3    confidential, and to do that would also slow the discovery

4    process because we would have to go through each document more

5    carefully in order to determine how important that is for

6    purposes of keeping it confidential.

7            THE COURT:  So, Mr. Crow, are you thinking of any

8    paper that you would get in discovery that you would want to or

9    inadvertently disclose and actually leave with your client?

10           MR. CROW:  Yes, Your Honor.  Yeah, that's correct.  I

11   mean, I always provide, you know, copies of discovery to my

12   client.  I just don't want to turn over something to him that

13   the Government thinks is protected which isn't clearly marked

14   as protected under the order.  You know, for example, in civil

15   cases, when something is subject to a protective order, it's

16   marked and all the parties know not to turn that over.  So I

17   don't want to get into some kind of situation where I turn

18   something over and the Government comes back and says, you

19   know -- you know, Mr. Crow messed up because he turned this

20   over to his client.

21           THE COURT:  Well, I think the scope of my order is

22   that there are specific items that I have included as

23   protected.  Everything else, to the extent it could be uploaded

24   on a tablet would be not paper.  I think the assumption,

25   Mr. Crow, is to assume it's protected, and if you have any

 1    questions about that, consult with the Government.

 2            MR. CROW:  Yes, sir.

 3            THE COURT:  The nature of a protective order is to,

 4    to the best we can, avoid inadvertence.  So we'll proceed with

 5    that understanding.

 6            MR. CROW:  Okay.

 7            THE COURT:  I hope that helped.

 8            All right.  Ms. Duncan, anything else you'd like to

 9    say?

10            MS. DUNCAN:  No, Your Honor.  But on behalf of

11    Mr. Baca, I join the objections of the other counsel.

12            THE COURT:  Okay.

13            All right.  Mr. McElhinney on behalf of Robert

14    Martinez.

15            MR. McELHINNEY:  No objection, Your Honor.

16            THE COURT:  Okay.  On behalf of Roy Paul Martinez,

17    Ms. Milner.

18            MS. MILNER:  No objection, Your Honor.

19            THE COURT:  And on behalf of Christopher Garcia,

20    Ms. Sirignano.

21            MS. SIRIGNANO:  Thank you, Your Honor.  I will

22    continue to object and join the arguments from prior counsel in

23    both of Mr. Garcia's cases, and I just would like to clarify

24    for the record and the Court that the 48 pages of discovery

25    that was produced was not produced solely in Mr. Garcia's drug

1   case 4275.  It was also produced in 4268 and given to all

2   defense counsel, and I understand that there was no protective

3   order at that point in time, so that discovery has already been

4   disseminated to some clients and is already in some of the

5   detention centers.

6          And so just so the Court's clear, the reason why I

7   asked for a protective order from the Government is because

8   that discovery was released without any protective order in

9   place at the time.

10          THE COURT:  So your question is whether that

11   disclosure would be protected retroactively, Ms. Sirignano?  Is

12   that the effect of your question?

13          MS. SIRIGNANO:  Well, yes, Your Honor.  My concern

14   is, is that that discovery is already out there.

15          THE COURT:  Ms. Armijo, do you seek to protect that,

16   as well?

17          MS. ARMIJO:  I believe Ms. Sirignano had wanted that

18   protected, and we -- we -- it probably should be protected, as

19   well.  And when I said that it was disclosed, it's as to the

20   drug case, but yes, we did disclose it in the 68 case, as well,

21   because it is racketeering activities, but it is -- but it is

22   her client's drug case.

23          MS. SIRIGNANO:  Your Honor, I apologize, I had a

24   difficult time hearing the Government just now.  This is Amy

25   Sirignano.

```
1              MS. ARMIJO:  Your Honor, it was my understanding that
2     defense counsel wanted that protected, and we would request
3     that it be protected, as well.
4              THE COURT:  Defense counsel meaning Ms. Sirignano?
5              MS. ARMIJO:  Yes.
6              THE COURT:  Ms. Sirignano, do you want that
7     protected?
8              MS. SIRIGNANO:  Your Honor, I did not specifically
9     request that that was material to be protected.  My request to
10    A.U.S.A. Castellano was that before any other discovery go out,
11    that we should discuss a protective order, because that was
12    material that already made it to the clients in their
13    respective detention centers.
14             THE COURT:  Okay.  That discovery, I don't know what
15    it is, so it's difficult for me to rule that it's protected
16    retroactively or prospectively.  So, Ms. Armijo, if you'd like
17    any of that protected, you'll have to file a motion.  All
18    right?
19             MS. ARMIJO:  Yes, Your Honor, that's fine.  And, like
20    I said, I was going based upon an e-mail on February 5th where
21    she said, "I object to my client Chris Garcia's discovery being
22    disclosed without an agreed-upon protective order."  So that
23    was the basis of my assumption, that she wanted it disclosed,
24    and I apologize if I misspoke for her.
25             THE COURT:  All right.  Okay.  Mr. Romero on behalf
```

1    of Mr. Calbert.

2           MR. ROMERO:  I join the same objections as the

3    codefendants' counsels in all of the three cases, Your Honor.

4    Thank you.

5           THE COURT:  All right.  Thank you, sir.

6           All right.  So, my order as I proposed it will be my

7    order that I'll enter.  I will look for additional briefing,

8    though, on the question of that state-related disclosures.

9           So I'm going to set that aside for the time being

10   from the scope of my protective order.  All right?

11          Any questions about what I just said, Ms. Jacks?

12          Mr. Almanza?

13          MS. JACKS:  I just had one comment.  I spoke briefly

14   with -- Excuse me.  Amy Jacks.  I spoke briefly with

15   Mr. Castellano.  I'm not sure what the practice of this Court

16   is, but we discussed perhaps trying to put the Court's rulings

17   into a draft protective order to submit to the Court to sign so

18   that the Court isn't -- doesn't have to spend time going

19   through that, and I think we could probably submit that to you

20   tomorrow or Monday.

21          THE COURT:  Okay.  I'll look for that proposal, then.

22   That will be appreciated.

23          Okay.  So, goodness, 15 minutes after 4:00.  We've

24   just wrapped up the first motion.  Let me jump right into the

25   second motion, and that is the Defendants' Joint Motion for

```
1    Protective Order Concerning All Defendants' Professional Visits
2    and Correspondence.  That's document 277.  I have the response
3    from the United States, document 284.
4              Ms. Duncan, do you want to handle that?
5              MS. DUNCAN:  Yes.  Thank you, Your Honor.
6              THE COURT:  Okay.
7              MS. DUNCAN:  I realize it's late, so I'll be brief.
8    And we did file our reply late yesterday.
9              UNIDENTIFIED SPEAKER:  Can't hear her, Judge.
10             MS. DUNCAN:  I apologize.  Can you hear me now?
11             UNIDENTIFIED SPEAKER:  Yep.
12             MS. DUNCAN:  Okay.  Sorry.  I'll rely mostly on our
13   papers.  There are just three points I want to make.  The first
14   is, I'm a little bit surprised that we're even litigating this.
15   There's no question that the Government's not entitled to the
16   information that we're seeking to protect.  Their only argument
17   in their response is that the Court shouldn't interfere with
18   the policies of the detention centers, which is not the issue
19   that we've raised.  And in addition to that the fact that the
20   Government's not entitled to any of this information, allowing
21   them to access and know it gives them an unfair advantage of
22   where the defense is going in its investigation and potentially
23   protected communications between defendants and their counsel.
24             The third part of it is that allowing the Government
25   to access this information would have an incredibly detrimental
```

1    impact on our relationship with our clients.  Particularly in a

2    capital case or in any murder case, the relationship between

3    counsel and the defendant is critical.  The amount of, you

4    know, maintaining trust that the counsel's not in bed with the

5    Government, that we're doing everything that we can to protect

6    our clients rights' and their confidences is critical.  So this

7    protective order is necessary to protect that relationship and

8    that information.

9         THE COURT:  Ms. Duncan, now, I get it, this is a

10   capital case until somebody tells us otherwise.  How is what

11   you are seeking different from what is ordinarily the practice?

12   There are -- It's very clear, there are certain things that the

13   Government should not be privy to, the substance of your

14   conversations with your client, any work product relating to

15   your representation of your client, any of those -- well,

16   anything that's protected under the attorney-client privilege.

17        Can you speak to whether the knowledge -- And I'll

18   ask Ms. Armijo to be clear on where she believes anything that

19   the Government might be interested in is not protected, but

20   a -- so these are things that are already very sensitive and

21   off limits to the Government.  Why would we need a protective

22   order?

23        MS. DUNCAN:  Your Honor, I think we need a protective

24   order sort of at the fringes of those rights.  So, in prior

25   capital cases, the Government has collected visitors' logs and

1    mail in anticipation of their case in aggravation.  So having

2    an order that makes clear to the detention centers and the

3    U.S. Marshals Service that information regarding defense

4    visits, correspondence between defense counsel and their

5    clients, any defense-collected documents or defense materials

6    are off limits, protects to make sure that that kind of

7    information doesn't make it to the Government inadvertently.

8              So, you know, the Government has no right to know at

9    this point what experts I've retained and are visiting my

10   client.  So I think that this protective order is just

11   necessary to ensure that attorney-client information work

12   product doesn't cross the line into the Government's hands.

13             THE COURT:  Okay.  Now, do you -- "the Government"

14   meaning the prosecution --

15             MS. DUNCAN:  The prosecution.

16             THE COURT:  -- and any agents working in the scope of

17   this particular prosecution?

18             MS. DUNCAN:  That's correct, Your Honor.  So, you

19   know, when I set up a visit with my client, I alert the

20   Marshals Service, I alert the detention center.  Both the

21   detention center and the Marshals Service know everyone who's a

22   member of my defense team.  And I coordinate those visits.

23   And, clearly, they need to know who's on my team and who's not.

24   So I'm not talking about them.  I'm just talking about the

25   prosecution, the FBI, anyone who's investigating these cases or

1   might be involved in the prosecution of my client.

2            THE COURT:  And your concern is their mere knowledge

3   of a visit by an expert, for example, working within that

4   criminal defense would be prejudicial to your client?

5            MS. DUNCAN:  It can be, Your Honor, because

6   there's -- the identity of the expert alerts the Government to

7   an area of investigation that I've decided is important on

8   behalf of my client, and that's information that the Government

9   at this point is not entitled to.  I mean, it would be the same

10  if, you know, I was to ask this Court to order the Government

11  to tell me every expert that they've consulted with so far and

12  in the future, even if they're going to -- not going to call

13  them at trial, they're just consulting experts, and you would

14  never do that, because it's improper under Rule 16.

15           And my concern is that because my client is

16  incarcerated the Government's going to get that information

17  unless the Court orders it protected.

18           THE COURT:  Okay.  And this would be in the form of,

19  for example, a visitors' log?

20           MS. DUNCAN:  Correct, visitors' log or any

21  information -- you know, whatever form it might come in from

22  the detention center of professional visits.

23           THE COURT:  Okay.  So mere knowledge of the visit by

24  virtue of a visitors' log.  Any other way that you are

25  concerned that this could be made aware to the Government?

1          MS. DUNCAN:  Counsel just reminded me.  So e-mails,

2     we put all of our requests for visits into e-mails identifying

3     who's coming and when, so I think that would be information

4     that we would want to have protected.  Also, correspondence

5     with the Marshals Service and the detentions centers about

6     those kinds of visits.

7          THE COURT:  So if, for example, you wanted to e-mail

8     the jail that you have a particular expert or investigator

9     going to visit your client, you want that off limits from the

10    United States?

11         MS. DUNCAN:  I do, Your Honor.

12         THE COURT:  As well as any other form of

13    communication to the Government of this visit?

14         MS. DUNCAN:  That's correct.

15         THE COURT:  Okay.  Just so I understand.  Okay.  Do

16    you have any general objections to the practice of the jail

17    itself, the staff, to conduct their inspections for visitors

18    that come into or out of the jail?

19         MS. DUNCAN:  No, Your Honor.  I mean, I haven't had

20    any issues, and if -- so no.

21         THE COURT:  Okay.

22         MS. DUNCAN:  I mean, if a specific issue came up, we

23    would raise it separately, but in this motion we're not

24    challenging the jail's right to look for contraband in mail or

25    to screen the materials, you know, just to purview materials to

1     see if there's contraband in terms of visits, so no.

2              THE COURT:  Okay.  Thank you, Ms. Duncan.

3              MS. DUNCAN:  Thank you.

4              THE COURT:  I'll give you a chance to reply.

5              And let me hear from Mr. Castellano.

6              MR. CASTELLANO:  Your Honor, we tend not to disagree

7     with the defense on some of those matters.

8              THE COURT:  All right.  Let me just ask you to speak

9     into the microphone.

10             MR. CASTELLANO:  Yes, sir.  We tend not to disagree

11    with the defense on some of those matters, but the problem is

12    that legal visits aren't always legal visits, legal

13    correspondence isn't always legal correspondence, and there are

14    times when we need to collect information for purposes of an

15    investigation.  So to have a blanket rule becomes a problem

16    especially if there's a need to investigate something that

17    happens.

18             So, for example, if an SNM member puts a hit out on

19    somebody and somebody's injured, we will need to see who

20    visited that person and we will need to listen to the phone

21    calls.  And so there will be a need to see who had contact with

22    that person before someone else was injured, and we had that

23    happen recently.

24             So we're not interested in who the experts are.  Even

25    though within little more than a month expert notices are due

1   anyway, I understand there are other experts that the defense

2   sometimes hires who are nontestifying experts.

3          So what I would propose is that if the -- if there is

4   a need to see the visitor logs, we could potentially use a

5   taint team to review the log, and if there's anyone who is an

6   expert, for example, that that person be redacted before the

7   log be turned over to the prosecution team.  So that's why

8   we're opposed to necessarily a blanket protective order.

9          And just as we needed good cause for a protective

10  order, the defense also needs a good cause for a protective

11  order.  So that needs to be established here today.

12         So like I said earlier, legal visits aren't always

13  legal visits.  Other people do try to come in as a member of

14  the defense team who is not a member of the defense team.

15  Legal correspondence sometimes looks like legal correspondence,

16  but it's really a way of smuggling drugs into the jail.  And so

17  that's why we say we just -- we just -- and the defense agrees

18  with this, that we should allow the jail to do what it does,

19  and if something comes to our notice that is something outside

20  of the scope of what's privileged, then we should have access

21  to that information.

22         THE COURT:  All right.

23         MR. CASTELLANO:  If I can also add, Your Honor,

24  related to that.  For defense counsel who don't know, because

25  sometimes we collect calls en masse, their calls are recorded

1   at the jail and not subject to privilege unless they follow the

2   procedures at the jail where their calls are removed from the

3   system.  So I want to let defense counsel know that, because in

4   prior cases they've complained that we listened to phone calls,

5   but the calls at the jails typically say "This call is subject

6   to recording and monitoring."  So if they do not want their

7   calls to come through to us if we're collecting information

8   on -- as part of an investigation, we would invite them to

9   follow the jail's procedures to have their calls removed from

10  the system.

11          THE COURT:  Okay.  Thank you.  And for anybody that

12  doesn't know, I assume most people, if not all, do, but for

13  purposes of any needed explanation, Mr. Castellano, what is a

14  taint team?  How does it work?

15          MR. CASTELLANO:  Your Honor, if there's an issue

16  about whether or not an item is privileged, a procedure would

17  be set up where the investigating agency would have taint

18  agents, agents who are not part of the investigative part of

19  the case.  There would be taint attorneys, who would also not

20  be part of the prosecution team.  They would get together, make

21  a decision about -- review the materials, make a decision about

22  whether or not it's privileged or not, would probably run it

23  through an ethics advisor within the office, and a decision

24  would be made what could be turned over to the prosecution and

25  what should be kept from the prosecution.  We've already done

1    that in this case on -- related to one issue.  So that's the

2    procedure that we would follow if there's an issue.

3              THE COURT:  Okay.  Thank you, Mr. Castellano.

4              Ms. Duncan.

5              MS. DUNCAN:  Briefly, Your Honor.

6              I think -- One of the concerns that we would have

7    would be the Government deciding for itself when a situation

8    rises that it would require this taint team procedure or to

9    access material that may contain attorney-client privileged

10   information.

11             At the very least, I think -- Obviously, if an issue

12   comes up where either the detention center or the U.S. Marshals

13   Service is concerned that attorney-client visitation or mail is

14   being used or misused, they should have a mechanism for

15   investigating that, but at the very least we'd ask that the

16   Government seek leave of the Court to set up -- or to notify

17   the Court of this taint team method.

18             THE COURT:  All right.  So even if I didn't impose a

19   protective order, that's something that you would ask me to

20   review if it -- that's an example of something that you would

21   want me to review when it's brought to me by the Government?

22             MS. DUNCAN:  So what we'd ask the Court to do is

23   enter the protective order that we're requesting, but include a

24   provision that if there's a need, the Government has a need to

25   collect information that might implicate the protective order,

1   that it seek leave of the Court to set up this taint team and

2   that the Court be supervising that process to make sure

3   attorney-client materials aren't disclosed to the prosecution

4   team.

5          THE COURT:  Okay.  Ms. Duncan, I'm not sure I've

6   heard anything so far, but I'll allow you to add, I'm not sure

7   we have anything here that is different from what we ordinarily

8   have in a prosecution, even of the most sensitive nature, to

9   assure that prosecutors don't have the information that they

10  simply should not have.

11         We have jail procedures that for the most part work,

12  and when they don't, then we deal with those on a case-by-case

13  basis, and there's a motion to -- in the event there's a

14  suspected or an actual violation of that attorney-client

15  privilege.  So long as within what is protected, then, that's

16  certainly concerned, an area for concern, but I don't hear, so

17  far, anything that really causes me to think that a protective

18  order is necessary for the kinds of concerns you've just

19  raised.

20         MS. DUNCAN:  If I could just answer that, Your Honor.

21         THE COURT:  Yes, ma'am.

22         MS. DUNCAN:  I think -- One of the reasons why I

23  think a protective order is necessary in this case and this

24  case is different from your average cases, is the scrutiny

25  under which the defendants are.  I mean, we see in the

1  Government's response to our motion collecting documents about

2  legal visits, legal mail.  We hear, you know, even coming in

3  today, the Government's alleging new allegations against our

4  clients.  I mean, our clients are under very close supervision

5  at the jail and the prosecution's clearly working very closely

6  with jailers and the U.S. Marshals Service to gather

7  information about our clients.

8         So, given that close scrutiny, this is not the

9  average case where, you know, the jail just collects the

10 information, occasionally the prosecution will go in to get

11 phone calls.  So given that level of scrutiny, given that this

12 is a capital case, I think enhanced protections are warranted

13 to protect the defendant's right to counsel, effective

14 assistance of counsel, and work product.

15         THE COURT:  Okay.  Thank you, Ms. --

16         MR. LANE:  Your Honor, this is David Lane.  May I

17 supplement those remarks?

18         THE COURT:  No, not yet, Mr. Lane.

19         MR. LANE:  Okay.

20         THE COURT:  But I am going to give you a chance.  But

21 please be patient.

22         I'm going to go down the list and give everyone a

23 chance to weigh in.  This is important.  It's 4:30.  We are

24 pushing the envelope here, but, nevertheless, I'm going to give

25 everybody a chance to weigh in.  I'm going ask you to keep your

1   comments very brief to the extent you have anything to add.

2   Please don't feel obligated if you simply don't have anything

3   to add to what has already been said.

4            First, on behalf of Mr. Gallegos, Mr. Benjamin.

5            MR. BENJAMIN:  No comments, Your Honor.

6            THE COURT:  All right.  On behalf of Mr. Troup.

7            MS. HARBOUR:  Cori Harbour-Valdez and Patrick Burke.

8   Nothing to add, Your Honor.

9            THE COURT:  Okay.  On behalf of Leonard Lujan.

10           MR. CLARK:  Nothing to add, Your Honor.

11           THE COURT:  On behalf of Billy Garcia.

12           MR. BOWLES:  Nothing to add, Your Honor.

13           THE COURT:  All right.  Mr. Bowles does not have

14   anything to add.

15           On behalf of Eugene Martinez, Mr. Lane.

16           MR. LANE:  Thank you, Your Honor.  David Lane on

17   behalf of Eugene Martinez.

18           Your Honor, I'd like to supplement by giving an

19   illustration of what counsel is talking about here.

20           This, unlike a normal case, is a potential

21   death-penalty case.  Mitigation is absolutely relevant.  And

22   what we have seen here is, you have law enforcement officials

23   in the persons of prison guards reading incoming mail.  They're

24   not just shaking it out to see if a handcuff key falls out.

25   They're reading it to determine, is this legitimate legal mail,

1   is this coded messages coming in from some nefarious source.

2        The point I'm making with all of this is, when you

3   have a client who is communicating primarily via U.S. mail with

4   distant learned counsel, and some of the most sensitive issues

5   in their lives are at issue, meaning mitigation, evidence of a

6   troubled childhood involving gross sexual or physical abuse, we

7   now have back and forth communications between counsel and

8   client involving these incredibly sensitive issues that are

9   absolutely relevant to saving a defendant's life, and we have

10  prison guards reading this stuff, which, obviously, would

11  prevent any defendant from writing all of these critically

12  important facts into a letter and mailing it to counsel for

13  fear that counsel might write back and refer to, you know, how

14  the defendant was sexually assaulted by his father as a child,

15  you know, over years.  Those kinds of things are not going to

16  occur when you have prison guards reading incoming and outgoing

17  mail.

18        A taint team doesn't stop this process from

19  happening, it doesn't protect the attorney-client privilege.

20  It's just more government people reading the most private --

21  the most private letters a defendant can write.

22        There are other ways, besides having another layer of

23  government bureaucracy examining incoming mail.  For example,

24  counsel has the ability to e-mail the prison and say to the

25  prison, you know, on March 4th, I mailed a letter to my client,

1    you should receive it, I've put a code -- for example, they can

2    agree on a code with the prison, a numerical code on an

3    envelope, and once the envelope arrives at the prison, if that

4    is, in fact, the numerical code that matches up with the

5    e-mail, they have assurance that this is legitimate

6    attorney-client communication.  And all they have to do is open

7    it in the presence of the inmate, shake it out so that a

8    handcuff key doesn't fall out of the envelope, and then hand it

9    over without reading it.  There should be no reading of

10   legitimate attorney-client mail.

11         I'm litigating this very issue right now in the Ninth

12   Circuit in a death-row case out of Arizona, and these proposals

13   have been considered by the courts, and we're up in the Ninth

14   Circuit Court of Appeals right now on these very issues.  But

15   that is illustrative of the problems defense counsel is facing

16   here.  The taint team doesn't solve the problem.  The only

17   thing that we should be looking for is alternatives so that

18   when legitimate attorney-client mail is coming in and going out

19   the prison has those assurances and there will be no scanning

20   of mail, no reading of mail, simply a shake-out and a

21   hand-over.

22         THE COURT:  So, Mr. Lane, what I -- and I appreciate

23   what you have just articulated, and I would agree that when you

24   have attorney-client mail aired out in open for any jail member

25   to read, that causes me concern, as well, but we have that in

1    any case.  That is something that any defense counsel, any

2    client would be concerned about.

3         What I'm looking for is something that makes this

4    case unique, where that case -- where that kind of practice

5    would be especially -- well, because of the nature of this case

6    is especially --

7         MR. LANE:  It's actually an anomaly that any mail is

8    read.  Most states -- And we briefed this in the Ninth Circuit.

9    Virtually every state in the country has an "open in the

10   presence of the inmate, shake out the letter, and hand it over

11   policy."  They're looking for drugs, they're looking for metal,

12   they're looking for any physical contraband.  But virtually

13   nobody is reading incoming correspondence.

14        THE COURT:  Okay.  So let me tell you, what I'm -- I

15   appreciate the sensitivity.  What I'm not going to do is enter

16   an order that affects the jail staff's ability to do their job

17   under existing policy and under existing law.

18        If, Mr. Lane, you know of a violation, you have

19   reason to believe that your client's rights have been violated,

20   you should bring that to the attention of the Court, but at

21   this point in time I'm not hearing anything beyond what is

22   ordinarily in place and practiced that this case presents an

23   especially high risk of a violation.  You're litigating the

24   issue presumably because of a violation, I don't know, but if

25   you do have a specific violation that you'd like to bring to my

1    attention, I would certainly invite that.  Otherwise, I would

2    note your position as objecting.

3                MR. LANE:  Yes, Your Honor.

4                THE COURT:  Okay.  To the Government's position, that

5    is.

6                All right.  Thank you, sir.

7                On behalf of Allen Patterson, that would be

8    Mr. Lahann or Mr. Linder.

9                MR. LAHANN:  Nothing further to add.

10                THE COURT:  Okay.  On behalf of Christopher Chavez.

11                MR. MONDRAGON:  Nothing to add, Your Honor.

12                THE COURT:  Nothing to add.  All right.

13                On behalf of Mr. Alonso, Mr. Orquiz.

14                MR. ORQUIZ:  Nothing further to add.

15                THE COURT:  All right.  On behalf of Mr. Arturo

16    Garcia, Mr. Blackburn, are you still there?

17                MR. BLACKBURN:  Yes, sir.  Nothing to add, Your

18    Honor.

19                THE COURT:  Okay.  On behalf of Mr. Benjamin Clark,

20    Mr. Hosford.

21                MR. HOSFORD:  Nothing to add.

22                THE COURT:  All right.  On behalf of Ruben Hernandez.

23                MR. PINEDA:  Nothing to add, Your Honor.

24                THE COURT:  Okay.  On behalf of Jerry Armenta,

25    Mr. Mitchell.

1          MR. MITCHELL:  Nothing further to add.

2          THE COURT:  All right.  Thank you.

3          On behalf of Jerry Montoya, Ms. Strickland.

4          MS. STRICKLAND:  Just very briefly, Your Honor.

5          It sounded like the Government said earlier that they

6    had gotten some phone calls between attorneys and clients in

7    this case.  If that is true, then we definitely need a

8    protective order as to those calls.  The Government should not

9    be listening to them even if they were given inadvertently.

10         THE COURT:  Okay.  If you need clarification of what

11   Mr. Castellano said, Ms. Strickland, let me invite

12   Mr. Castellano to clarify what he said.

13         MR. CASTELLANO:  Yes, sir.  When I said we had

14   previously received phone calls, it was in other cases, not in

15   this case, but like I said, there is a procedure for defense

16   counsel to follow if they want their calls completely excluded

17   from the system, otherwise they'll hear a recording that says

18   "Your calls are subject to recording and monitoring," and those

19   would be turned over if we collected a batch of e-mails

20   en masse.  And that's always been the case.  And like I said,

21   there is a procedure if they want their calls removed from the

22   system, otherwise when they call it's treated like any other

23   call.

24         THE COURT:  All right.  Are you familiar with that

25   practice, Ms. Strickland?

1          MS. STRICKLAND:  Of course, Your Honor, I call the

2     jail all the time.  But if the Government accidently gets one I

3     don't think we've obliterated privilege because it was

4     accidentally disclosed.  I want the Government to stop

5     listening to that call and notify us.

6          MR. CASTELLANO:  It's clear that letting a third

7     person in on a conversation obliterates the privilege, Your

8     Honor.

9          Regarding Mr. Lane's comments and concerns and

10    worries, people are not reading the legal mail, and there is a

11    rule in place, even by case law, that the legal mail must be

12    opened in the presence of the detained individual.  So that's

13    the practice that will continued to be followed.  They have a

14    different practice for personal mail, but as to legal mail, it

15    is opened in the defendant's presence.

16          THE COURT:  That's occurring.  What safeguards are in

17    place to make sure that doesn't end up in the prosecution's or

18    case agents' hands?

19          MR. CASTELLANO:  It would not come to our attention

20    whatsoever unless there was some -- something strange or the

21    appearance of something illegal.  So, as Mr. Lane said, if you

22    shake out the envelope and something falls out, then obviously

23    we'd be notified of the contents of the envelope, but not

24    necessarily the contents of the correspondence.

25          The same thing with drugs that are contained within

116

1    documents, we would know about that.  But the same thing

2    applies.  If there's any issue or concern about there being

3    privileged information, then once again, a taint team would

4    have to be used.

5          THE COURT:  All right.  So with regard to the calls,

6    Ms. Strickland, that -- your concern would apply to any case,

7    the practices or the procedures in place would be not only in

8    this case, but in any other case.  Trusting that you follow

9    those procedures, that at least minimizes, if not entirely

10   eliminates, the risk, but in the event that it does happen

11   inadvertently, there is a screening process.  So I would just

12   urge you to follow the procedures that are in place, assure

13   yourself and your client that that is not supposed to happen

14   and that it wouldn't.

15         MS. STRICKLAND:  I will, and I do.  If the Government

16   does receive a phone call, would they be obligated to let me

17   know about that, a recorded phone call between me and my

18   client?  Because otherwise I wouldn't know when to file a

19   motion.

20         THE COURT:  Yeah.  You know, I think what I would

21   like to know is, if that does occur, that that be brought to my

22   attention immediately.

23         MR. CASTELLANO:  Yes, Your Honor.  The first time we

24   come across that example, we will let the Court and counsel

25   know.  And usually we know it has not been excluded from the

```
1    system because there is an introductory statement at the
2    beginning of the call that says the call is subject to
3    monitoring and recording, so we would know then, but we will
4    let the Court and counsel know when we discover it the first
5    time.
6              THE COURT:  Okay.
7              MS. STRICKLAND:  Thank you, Your Honor.
8              THE COURT:  All right.  You're welcome.
9              Okay.  Continuing on.  On behalf of Mario Rodriguez,
10   Mr. Hernandez.
11             MR. HERNANDEZ:  Nothing to add, Your Honor.
12             THE COURT:  Okay.  On behalf of Timothy Martinez,
13   Mr. Almanza or Ms. Walsh.
14             MR. ALMANZA:   Your Honor, I have nothing --
15             MS. WALSH:  I'm sorry, go ahead.
16             THE COURT:  Mr. Almanza has nothing to add.
17             Ms. Walsh.
18             MS. WALSH:  Yes, Your Honor.  When the Government
19   began its response, they noted that they tend not to disagree
20   with the defense, so if they tend not to disagree with the
21   defense's request for a protection order, then they would be
22   agreeing that they cannot and should not interfere with the
23   defense function, which is knowing which members of a legal
24   team, including experts, are visiting their clients.  And the
25   Government's request for a taint team certainly undermines
```

1    their very own argument or even contrasts their very own

2    argument.

3              And I would note that any request for a taint team is

4    just a way for the Government to try to circumvent 12.2 and, as

5    noted by Ms. Duncan, have an unfair advantage and learn about

6    experts before they're ever entitled to.

7              So we would join in the objection and add our

8    additional objections that were just stated.  Thank you.

9              THE COURT:  All right, Ms. Walsh.

10             Mr. Castellano, do you wish to respond to that in any

11   way?

12             MR. CASTELLANO:  Only to say, Your Honor, that good

13   cause has still not been established.  This case is being

14   treated like any other case.  I understand the defense

15   typically says that death is different.  We understand that, as

16   well.  But I already gave examples of times when we do not

17   agree with them, and that's because legal mail isn't always

18   legal mail and legal visits are aren't always legal visits.

19             And a taint team doesn't create any problems that

20   defense counsel says anyway, because we don't learn about

21   anything at all until there is something that seems to be a

22   potential problem, and only then are we alerted and only then

23   does the taint team come into play.  So we're a few steps away

24   from that.

25             THE COURT:  But it's in that context that I would

 1   like to be notified immediately.

 2              MR. CASTELLANO:  Yes, sir.

 3              THE COURT:  Okay?

 4              All right.  Mr. Lindsey or Ms. Stillinger, on behalf

 5   of Mr. Mauricio Varela.

 6              MR. LINDSEY:  David Lindsey, Your Honor.  We join in

 7   the comments of all counsel and have nothing to add.

 8              THE COURT:  Okay.  Thank you, sir.

 9              On behalf of Daniel Sanchez, Mr. Jewkes, Ms. Jacks.

10              MR. JEWKES:   Your Honor, we have nothing to add.  We

11   join in the comments of the other counsel.  Thank you.

12              THE COURT:  Okay.  Thank you, sir.

13              On behalf of Gerald Archuleta.

14              MR. HARRISON:  Nothing further.

15              THE COURT:  On behalf of Conrad Villegas, Mr. Crow.

16              MR. CROW:  Nothing to add, Your Honor.

17              THE COURT:  On behalf of Anthony Ray Baca,

18   Ms. Duncan, this was your -- another opportunity.

19              MS. DUNCAN:  Your Honor, nothing to add.

20              THE COURT:  Okay.  On behalf of Robert Martinez,

21   Mr. McElhinney.

22              MR. McELHINNEY:  Nothing to add, Your Honor.

23              THE COURT:  On behalf of Roy Paul Martinez.

24              MS. MILNER:  Nothing to add, Your Honor.

25              THE COURT:  On behalf of Christopher Martinez.

1    Ms. Sirignano?

2          MS. SIRIGNANO:  Apologies, Your Honor.  We would join

3    in the arguments --

4          THE COURT:  Nothing to add?

5          MS. SIRIGNANO:  -- from counsel, and nothing to add,

6    Your Honor.

7          THE COURT:  All right.  And on behalf of David

8    Calbert, Mr. Roman Romero.

9          MR. ROMERO:  I join in the argument of counsel, and

10   nothing to add, Your Honor.

11         THE COURT:  Okay.  All right.  Well, thank you.

12         Now, I read your motion, I assure you, carefully,

13   trying to find from that motion, Ms. Duncan, and for the entire

14   defense team, what is it about this case that presents unique

15   difficulties.  Obviously, I get it, death is different, but

16   there are protections in place by law, by rule, and by policy

17   to assure that the attorney-client privilege is protected and

18   not violated.  Unfortunately, there are instances where it has

19   been, but I haven't yet heard anything that makes this case

20   unique that a protective order is necessary in this particular

21   case, otherwise, there would be no reason not to impose a

22   protective order in any other case.

23         There are communications you have to make with your

24   client.  Those certainly are protected just by virtue of by

25   law, by rule.

 1           Your communications to the jail to arrange for a
 2    visit I don't find within the scope of the privilege or
 3    warranting a protective order.  If you have specific law on
 4    that, however, please bring that to my attention.  So that
 5    would be very helpful.
 6           For now, I'm going to deny the motion for a
 7    protective order insofar as it relates to any protection of
 8    client visits or correspondence.  I am reminding, and I think
 9    the Government is well aware of what the precautions are and
10    what the consequences are of any violation of these protections
11    that are -- that should be very clear to everybody concerned.
12           I will ask, though, if there is additional law,
13    Ms. Duncan, please bring that to my attention.  Okay?
14           All right.  Now, that is my ruling with regard to
15    that motion.
16           It's been a long afternoon, and, as anticipated, you
17    know, this is -- because this case is fairly unique in a number
18    of ways, you know, this was an unusual hearing because of the
19    numbers, but what I endeavor to do is give everybody an
20    opportunity to state their position, whether telephonically or
21    in person, and so I don't know if we'll use this model if we
22    have to do something like this again in the future, but I would
23    be open to suggestions if there's any other model.
24           Now, I do understand the preference by counsel to be
25    present.  Because of the nature of the motion and how -- why we

1  are so close to the discovery deadline, your clients have been

2  under Indictment already for a period of months, there is a

3  batch of discovery that is ready to get out the door from the

4  Government.  My instructions to the Government is to get on

5  with that process just as speedily as you possibly can, all

6  within the context of what we just discussed today.  So that's

7  the aim and that's where we'll go.

8        All right.  Now, there's one more motion that I need

9  to take up, and that involves Mr. Gorence and Mr. Lane.  I'll

10  ask at least Ms. Armijo, if not both Ms. Armijo and

11  Mr. Castellano, to remain.

12        Mr. Lane, if you can remain on the telephone while we

13  just wrap up with this portion of the hearing.

14        Thank you, everyone.  Have a good evening.

15     (Court stood in recess at 4:48 p.m.)

16

17

18

19

20

21

22

23

24

25

1                    C-E-R-T-I-F-I-C-A-T E

2    UNITED STATES OF AMERICA

3    DISTRICT OF NEW MEXICO

4

5        I, Danna Schutte Everett, RPR, CCR, CRR, Official

6    Court Reporter for the State of New Mexico, do hereby

7    certify that the foregoing pages constitute a true

8    transcript of proceedings had before the said Court held

9    in the city of Las Cruces, New Mexico, in the matter

10   therein stated.

11       In testimony whereof, I have hereunto set my hand on

12   this 21st day of March, 2016.

13

14                  _____

                    DANNA SCHUTTE EVERETT
15                  Registered Professional Reporter
                    Registered Merit Reporter
16                  Certified Realtime Reporter
                    NM Certified Court Reporter #139
17                  100 Church Street
                    Las Cruces, New Mexico  88001
18                  Phone:  (575) 528-1656
                    Fax:  (575) 528-1656
19                  dannadawn@comcast.net

20

21

22   March 3, 2016, USA vs. DeLeon, et al.

23

24

25

Danna Schutte Everett
Official United States Court Reporter
100 N. Church, Las Cruces, New Mexico  88001
(575)528-1656