# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                      No. CR 15-4268 JB

ANGEL DeLEON, et al.,

      Defendants.


UNITED STATES OF AMERICA,

      Plaintiff,

v.                                        No. CR 16-1613 JB

ANTHONY RAY BACA, et al.,

      Defendants.

## COURT'S NOTICE OF MEMORANDUM OPINION AND ORDER ENTERED IN UNRELATED CASE NOS. 15-2485 (DOC. 181) AND 15-3883 (DOC. 51)

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                          No. CR 15-2485 JB

KEVIN FOLSE,

      Defendant.


UNITED STATES OF AMERICA,

    Plaintiff,

    vs.                                                                    No. CR 15-3883 JB

KEVIN FOLSE,

   Defendant.

### UNSEALED MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before Court on the Motion to Address Conditions of

Confinement, filed February 4, 2016 (Doc. 130 in United States v. Folse, No. CR 15-2485 JB

---

[1]In its Sealed Memorandum Opinion and Order, filed May 25, 2016 (Doc. 175 in United States v. Folse, No. CR 15-2485 JB (D.N.M.), Doc. 50 in United States v. Folse, No. CR 15-3883 JB (D.N.M.))("Sealed MOO"), the Court inquired whether the parties had any proposed redactions to protect confidential information in the Sealed MOO before the Court published a public version of the Sealed MOO. The United States has not contacted the Court or made any filings within CM/ECF to indicate that it has any proposed redactions. Folse mentioned the Sealed MOO in one additional filing. See Motion Requesting to Proceed Pro-Se at 4, filed June 13, 2016 (Doc. 180)("Pro-Se Motion")(filed ex parte). The Court will only quote one limited section of the Pro-Se Motion. Folse asserts that "when I do receive a motion or any type of documents from the courts or the prosecutors, it's way past it's [sic] deadline," and cites the Sealed MOO as an example. Pro-Se Motion at 4. Folse does not: (i) suggest any changes to the Sealed MOO's language; (ii) ask for more time; or (iii) otherwise object to the Court publishing a public version of the Sealed MOO. See Pro-Se Motion at 4. Consequently, the Court is now re-filing the Sealed MO in an unsealed form.

(D.N.M.); Doc. 13 in United States v. Folse, No. CR 15-3883 JB (D.N.M.))("Motion").[2]   The

primary issues are: (i) whether the Court has the authority to grant Defendant Kevin Folse's

requested relief, including a transfer between facilities, a lowered security level, and more minor

specific changes in his treatment within his current detention facility, which is a state prison; (ii)

whether Folse's conditions of confinement violate his rights to effective assistance of counsel or

access to the courts; and (iii) whether the Court should open a new civil matter for Folse's other

claims.   First, the Court concludes that it may provide relief, in this criminal case, only to

ameliorate conditions of confinement that impair Folse's right to effective assistance of counsel.

Second, the Court concludes that, on the record before the Court, Folse's conditions of

confinement do not violate his rights to effective assistance of counsel or access to the courts.

Third, the Court directs the Clerk of the Court to open a new civil Bivens case to address Folse's

other claims.   The Court thus denies Folse's Motion without prejudice.

## **FACTUAL BACKGROUND**

Pursuant to rule 52(a)(2) of the Federal Rules of Civil Procedure, the Court makes

findings of fact and conclusions of law to support its disposition of the Motion.   See Fed. R. Civ.

P. 52(a)(2), 65(d)(1).   See Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M.

---

[2]Folse initially filed identical motions in both of his criminal cases.   See Motion to
Address Conditions of Confinement, filed February 4, 2016 (Doc. 130 in United States v. Folse,
No. CR 15-2485 JB (D.N.M.)); Motion to Address Conditions of Confinement at 1, filed January
28, 2016 (Doc. 13 in United States v. Folse, No. CR 15-3883 JB (D.N.M.)(the "Second
Action")).   The briefing was similar in both cases.   See United States Response to Defendant's
Motion to Address Conditions of Confinement at 1, filed February 8, 2016 (Doc.
133)("Response"); United States Response to Defendant's Motion to Address Conditions of
Confinement, filed February 8, 2016 (Doc. 19 in the Second Action).   The parties agreed to
combine the two motions and hear them in one proceeding.   See Response at 1; Unopposed
Motion to Consolidate Hearing Regarding Defendant's Motion to Address Conditions of
Confinement at 1, filed February 4, 2016 (Doc. 17 in the Second Action).   The Court will treat
the two motions as one "Motion" for the sake of simplicity.   If a document number does not refer
to a specific case, the document number is within United States v. Folse, No. CR 15-2485 JB
(D.N.M.).

2011)(Browning, J.).  "[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits."  Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009)(quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)).  "The Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Unlike on a motion for summary judgment, the Court can consider evidence outside the pleadings, including hearsay, when deciding whether to grant a preliminary injunction.  See Pharmanex, Inc. v. HPF, 221 F.3d 1352, at *3 (10th Cir. 2000)(unpublished)[3](citing J. Moore, Moore's Federal Practice § 65.23 (1999)).  Moreover, at summary judgment, the facts may turn out different, and there may be genuine issues of material fact.  The Court divides its findings of fact into two sections: first, the Court will introduce the parties; and second, it will describe Folse's confinement in the Penitentiary of New Mexico ("PNM").

1.   **The Parties and the Background.**

1.     On October 8, 2015, a jury convicted Folse of four counts, including two counts of carjacking.  See Verdict, filed October 8, 2015 (Doc. 104).

---

[3]Pharmanex, Inc. v. HPF is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The United States Court of Appeals for the Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order and judgment has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that Pharmanex, Inc. v. HPF and Kennedy v. Lake, 207 F. App'x 900 (10th Cir. 2006), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

2.     Folse's sentencing is currently set for July 19, 2016.  See Order to Continue Sentencing Hearing, filed May 4, 2016 (Doc. 165).

3.     On October 29, 2015, the Court issued an Order that: (i) restricted Folse's telephone contact with parties in this case; (ii) barred Folse from making a telephone call to an outside party using another inmate's personal identification number or personal access code; and (iii) prohibited Folse from making "three-way" telephone calls in which the call as dialed is forwarded to another person.   See Order at 1-2, filed October 29, 2015 (Doc. 114)("Communications Order").

4.     On October 30, 2015, Plaintiff United States of America filed an information against Folse for physically pulling away from a corrections officer, and continuing to resist the officer "such that a second officer had to assist the initial officer in order for the two officers to regain safe and secure control over" him in violation of 18 U.S.C. § 111(a)(1).  Information at 1, filed October 30, 2015 (Doc. 1 in the Second Action).

5.     On December 21, 2015, the Albuquerque Journal published an article stating that Folse "was an FBI informant who burned his handlers from his state prison cell in 2013 by arranging the sale of fake drugs to undercover agents so he could split the proceeds with his criminal associates out on the street."   Carjacking drug dealer was an FBI informant, Albuquerque Journal (December 21, 2015).

6.     Folse's trial on his misdemeanor trial began on April 13, 2016.  See Order Continuing Trial at 1, filed April 11, 2016 (Doc. 39).

7.     After the United States presented its case, Folse requested a continuance to secure testimony important to his defense.  See Unopposed Motion to Continue April 21, 2016 Trial Setting at 1, filed April 20, 2016 (Doc. 45).

8.      The Court granted Folse's request, vacating the April 21, 2016 trial date and resetting it "after July 11, 2016." Order Continuing Trial at 2, filed April 21, 2016 (Doc. 46).

9.      The United States Marshalls Service ("USMS") is tasked with the care of federal prisoners "from the time of court-ordered custody until either their acquittal or their conviction and delivery to the Federal Bureau of Prisons to serve their sentence." Prisoner Operations, U.S. Marshals Service (Nov. 8, 2012), http://www.usmarshals.gov/duties/prisoner.htm.

10.     The USMS is responsible for the "safe, humane care and custody" of those placed in its care. Fact Sheet: Prisoner Operations, U.S. Marshals Service (Nov. 8, 2012), http://www.usmarshals.gov/duties/prisoner.htm. See Fact Sheet: U.S. Marshals Service (Mar. 11, 2016), http://www.usmarshals.gov/duties/factsheets/overview.pdf ("The Marshals Service ensures the safe, humane care of federal prisoners in its custody.").

**2.      Folse's Confinement at the Penitentiary of New Mexico.**

11.     Folse is detained at PNM outside of Santa Fe, New Mexico, pending sentencing in his first criminal case and pending his trial's completion in his second criminal case. See Motion at 1 (setting out this fact); Response at 1 (repeating this fact).

12.     PNM is a state facility housing individuals who have been convicted of offenses and sentenced to prison terms in the state of New Mexico. See Motion at 1-2 (setting out this fact); Response at 3 (not disputing this fact).

13.     The New Mexico Department of Corrections' ("DOC") website describes the facility as follows:

> The Penitentiary of New Mexico (PNM) is located along the old turquoise Trail, 14 miles south of Santa Fe.  PNM is the Department's only super-max facility, housing the highest security classification of offenders in the state of New Mexico.  The Penitentiary of New Mexico Complex is comprised of three facilities: Level-II a minimum-restrict unit, Level-IV/V and Level-VI housing the highest security classification of offenders.   PNM maintains its national

accredited status by the American Correctional Association and continues to intensify its efforts to achieve the mission of the Corrections Department by providing a balanced system approach to corrections from incarceration to community-based supervision with training, education, programs and services that provide opportunities for offenders to transition to communities.

The "level system" within the New Mexico Corrections Department requires that an inmate or inmates who cannot be managed in general population, and/or cannot function in general population due to criteria established policy will be separated from the general population.  Management of such inmates will be based upon behaviorally based step programs, in which increased privileges are granted for inmates who demonstrate appropriate behavior for a specified period of time.

Penitentiary of New Mexico: About Us, New Mexico Department of Corrections (2013), http://cd.nm.gov/apd/pnm.html (setting out these facts).  See Response (not disputing these facts).

14.     Folse is being housed with "several other federal pretrial detainees" under Level VI.  Response at 3 (setting out this fact).  See Motion (not disputing this fact).

15.     State prisoners, but not state pretrial detainees, in Level VI at PNM are held in solitary confinement.  See Motion at 2 (setting out this fact); Response (not disputing this fact).

16.     The DOC describes circumstances justifying Level VI confinement as follows: "[I]nstitutional behavior threatens the security of the institutions, requiring separation from the general population.  This behavior includes, but is not limited to, assault, escape, inciting riots and planning or participating in security threat group activities."  Frequently Asked Questions, New Mexico Department of Corrections (2013), http://cd.nm.gov/ocs/fs.html (emphasis added)(setting out these facts).  See Response (not disputing these facts).

17.     Inmates in Level VI confinement "are housed in single occupancy cells for 23 hours per day and are not allowed to congregate with other inmates.  They receive one (1) hour per day for recreation."  Frequently Asked Questions, New Mexico Department of Corrections (2013), http://cd.nm.gov/ocs/fs.html.  See Motion at 4 ("Inmates are housed in single occupancy

cells for 23 hours per day and are not allowed to congregate with other inmates."); Response (not disputing this fact).

18.     Folse may make eight calls per month to his family or other non-legal outside groups.   See Tr. at 23:2-4 (Villa)(asserting this fact); Tr. at 66:7-12 (Malone, Pflugrath)(repeating this fact).

19.     There is no limit on the number of telephone calls that Folse may make to his attorney.   See Tr. at 66:13-14 (Malone, Pflugrath)(setting out this fact); Motion at 2-3 (not disputing this fact).

20.     If there are no security restrictions at PNM, Folse may contact his attorney at any time.   See Tr. at 71:2-11 (Malone)(asserting this fact).[4]

21.     If there are security restrictions, it may take days or weeks for Folse's requests for a telephone call to his lawyer to be approved.   See Motion at 2 (setting out this fact); Response at 7 (not disputing this fact); Tr. at 71:2-11 (Malone)(stating that Folse has access to counsel "at any given time" unless there is a "security dynamic" or "lockdown").

---

[4]Folse's Motion appears to disagree, stating: "He cannot call his lawyer without going through a laborious process that can take weeks to complete -- that means weeks between the request and the phone call."   Motion at 2.   See Tr. at 22:22-23:23:1 ("You know, the clients can essentially call me at any time . . . .   You can't do that at PNM.")(Villa).   Folse did not make it clear whether this situation exists only when PNM is locked down.   See Tr. at 22:22-23:23:1 (Villa).   The Court notes that DOC officials impose lockdowns for weeks at a time, often without any advance notice.   See NM officials lift lockdown in place since 2 inmates' escape, Albuquerque Journal (March 24, 2016); New Mexico locks down state prisons for searches, Albuquerque Journal (November 24, 2015); New Mexico prisons on lockdown for annual contraband hunt, Albuquerque Journal (June 3, 2015)(noting that the lockdown "has no scheduled end date").   Because lockdowns are unpredictable and may be indefinite, the Court will analyze the legal issues under the assumption that Folse does not have constant access to his counsel.

22.     When Folse's counsel contacts PNM to attempt to set up a telephone call, PNM may take days or weeks to call him back and schedule a time.  <u>See</u> Motion at 2-3 (setting out this fact); Response (not disputing this fact).

23.     Folse's counsel may visit him on three days per week, and visits must be completed by 3:00 p.m.  <u>See</u> Motion at 3 (setting out this fact); Response (not disputing this fact); Tr. at 66:23-67:3 (Malone, Pflugrath)(not disputing this fact).

24.     Folse can visit with his counsel only through a clear barrier -- actual contact visits are prohibited.  <u>See</u> Motion at 3 (setting out this fact); Response (not disputing this fact); Tr. at 45:8-13 (Malone, Pflugrath)(repeating this fact).

25.     There is no cap on the number of times that Folse's counsel may visit him.  <u>See</u> Tr. at 66:23-67:3 (Malone, Pflugrath)(setting out this fact); Motion (not disputing this fact).

26.     Folse's counsel has been unable to bring his laptop to visits with his client.  <u>See</u> Motion at 3 (setting out this fact); Response (not disputing this fact).[5]

27.     Folse may send legal mail to his counsel without limit, unless there is "an abundance that create[s] a security issue for the facility."  Tr. at 66:16-19 (Malone).  <u>See</u> Motion (not disputing this fact).

28.     Folse has no access to PNM's "commissary," which sells basic necessities such as personal hygiene items, until he has been present at PNM for ninety days.  Motion at 3.  <u>See</u>

---

[5]Marcus Malone, a Detention Management Inspector for the USMS in the District of New Mexico, stated that it was his "understanding" that PNM would allow counsel to bring laptops to client meetings, and that it was his "understanding" that requests to do so had "never been denied."  Tr. at 71:13-21 (Malone).  The Court credits the account of Ryan Villa, Folse's prior attorney who filed the Motion.  Mr. Villa appears to be more familiar with how PNM's laptop policy operates in practice, rather than in theory.  <u>See</u> Motion at 5.  Malone's statements are less definitive and more carefully qualified.  <u>See</u> Tr. at 71:13-21 (Malone).  The Court has no reason to believe that Mr. Villa is dissembling, and Malone has not directly contradicted his testimony.

Response at 8 (stating that a "commissary *privilege* is not a right")(emphasis in original); Tr. at 51:24-52:10 (Malone)(not disputing this fact).

     29.    Folse is allowed to shower only three times each week. <u>See</u> Motion at 4 (setting out this fact); Response at 8 (not disputing this fact).

     30.    PNM officers shackle Folse's hands and feet for all movement within the prison. <u>See</u> Motion at 6 (setting out this fact); Response at 8 (repeating this fact).

     31.    PNM has provided Folse with sufficient food to maintain his current weight. <u>See</u> Response at 8 ("Defendant has failed to allege he is losing weight[.]"); Tr. at 44:4-17 (Malone, Pflugrath).[6]

     32.    Folse has been cited in seven disciplinary reports, including two involving razors. <u>See</u> Tr. at 36:12-18 (Malone)(setting out this fact); Motion (not disputing this fact).

     33.    Five of these seven reports were substantiated. <u>See</u> Tr. at 49:13-22 (Malone, Villa)(setting out this fact); Motion (not disputing this fact).

## PROCEDURAL BACKGROUND

     The Court will briefly summarize the parties' arguments for and against the Motion. The Court has described the details of Folse's underlying offense in other opinions, so it will not

---

     [6]Folse alleges that his "diet is insufficient, as he is routinely denied a full meal." Motion at 10. <u>See id.</u> at 6 ("Without commissary to supplement these meals, he goes to sleep at night starving."). The Court takes these allegations seriously, but Folse has not provided any evidence to support them. <u>See</u> <u>United States v. Williams</u>, No. 3:09-00090, 2009 WL 4824940, at *3 (M.D. Tenn. Oct. 26, 2009)(Campbell, J.)(granting relief based on several inmates' testimony on calorie intake, an independent nutritionist's evaluation, and the jail's own records of drastic weight loss). The United States, on the other hand, has stated that a nutritionist visits PNM to ensure that inmates receive proper nutrition and calorie intake. <u>See</u> Tr. at 44:10-17 (Malone). Further, Folse has not yet submitted any medical forms based on his failure to receive sufficient food. <u>See</u> Tr. at 44:14-21 (Malone, Pflugrath). The Court is reluctant to interfere with PNM's management on such thin evidence. In any case, the Court suspects that this issue will be resolved when Folse gains access to the commissary. <u>See</u> Tr. at 21:9-11 (Villa)("And so it sounds like maybe that issue has been addressed . . . .").

reprise them here.  See, e.g., Memorandum Opinion and Order, filed October 29, 2015 (Doc. 115).

      **1.**      **The Motion.**

      34.      On February 4, 2016, Folse moved the Court to address his allegedly unconstitutional conditions of confinement.  See Motion at 1.  He argues that: (i) his conditions, as applied to a pre-trial detainee, are abusive and punitive, in violation of the Fifth and Eighth Amendments to the Constitution of the United States of America; (ii) the restrictions on his visitation and communication significantly impair his ability to communicate with his counsel, in violation of the Sixth Amendment to the Constitution of the United States of America; and (iii) he is denied the same privileges as other, similarly situated pretrial detainees, in violation of the Fifth Amendment.  See Motion at 4-5.

      35.      Folse contends that pretrial detainees cannot be "subjected to any severe restrictions that 'amount to punishment of the detainee.'"  Motion at 4 (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)).  He asserts that his conditions of confinement are "not reasonably related to the non-punitive objectives of ensuring the Mr. Folse's presence at court or to ensuring the safety and security of the institutions."  Motion at 7.

      36.      Folse argues that solitary confinement and unwarranted shackling violate the Fifth Amendment.  See Motion at 9-10, 12-13.  Moreover, he explains that prison officials did not provide him with a fair hearing before placing him in disciplinary segregation.  See Motion at 10-14.

      37.      Folse also contends that his confinement at PNM violates 18 U.S.C. § 3142(i)(2), which requires that pretrial detainees be held "separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal."  Motion at 5 (quoting 18

U.S.C. § 3142(i)(2)).  He contends that his detention in a state penitentiary, alongside convicted

state offenders serving their sentences, violates the statute and the Court's detention order.  See

Motion at 5.

38.    Folse requests: (i) that the Court "reconsider its order detaining Mr. Folse, and

fashion conditions of release which will address the Court's concerns regarding potential risk of

flight or danger to the community"; or (ii) in the alternative, return him to "appropriate pretrial

detention, under appropriate conditions" with "proper medical care" and "access to effective

assistance of appointed counsel."  Motion at 5.

**2.    The Response.**

39.    The United States responded on February 8, 2016.  See Response at 1.

40.    The United States provides its reasoning for placing Folse in Level VI detention.

See Response at 3.  First, it notes that the Albuquerque Journal has publicly identified Folse as a

former cooperator with the Federal Bureau of Investigation ("FBI").  See Response at 3.  It

"understands" that Folse's former gang has given a "green light," and that "any inmate may

execute" Folse without any retribution from the gang.  Response at 3.  It adds that "prison

intelligence" has confirmed that Folse is a "marked-man because of his prior cooperation with

law enforcement."  Response at 3.  It thus asserts that it placed Folse in special protective

custody for his own safety.  See Response at 3.

41.    The United States notes that it placed Folse in PNM, because the USMS and

Bureau of Prisons ("BOP") have no detention facilities in the District of New Mexico.  See

Response at 3.  The USMS thus contracts with PNM to hold its higher-risk federal pretrial

detainees.  See Response at 3.

42.     The United States suggests that the Court first "determine whether the issues he raises is [sic] a product of his status as defendant adjudicated guilty or as a defendant held in pre-trial detention, or both."  Response at 6.

43.     The United States then addresses Folse's more specific complaints:

a.  **Manner of Holding**. Defendant has been adjudicated guilty so holding him with like inmates is appropriate. His restricted movement is a product of the level of security applicable to Defendant because he is in protective custody.

b.  **Pretrial Privileges**. Not appropriate because he is a post-adjudication defendant and Defendant has failed to allege specific concerns to state a claim, or to show he has exhausted his administrative remedies as to those specific claims.

c.  **Cleanliness**. The shower schedule for Defendant is the same as for all others in his facility.

d.  **Shackles**. He is shackled whenever moved outside his cell and a shock device might be attached, which reflect his status, his placement, and the fact he assaulted officers in the past.

e.  **Phone Access**. Defendant has failed to allege specific concerns to state a claim, or to show he has exhausted his administrative remedies as to those specific claims.

f.  **Diet**. Defendant has failed to allege he is losing weight, or to show he has exhausted his administrative remedies as to those specific claims. A commissary *privilege* is not a right.

g.  **Counsel Access**. Although his status frames how Defendant is held, the Court should also consider the pending charges in balancing factors. In this case, Defendant is alleged to have "physically pulled away from the officer while the officer was escorting defendant to another location [within the Torrance County Detention Center], and then defendant continued to resist the officer such that a second officer had to assist the initial officer in order for the two officers to regain safe and secure control over defendant." Doc. 1 (Information). Discovery has been provided and the entire episode probably lasted less than a minute. While Defendant's right to counsel cannot be prevented, in assessing the reasonableness of the existing restrictions, the complexity of the case should be a factor.

Response at 8-9.

44.     The United States also notes that Folse's isolation is appropriate, because: (i) he is not a juvenile; (ii) he is not a first-time offender; and (iii) he "has not been committed to solitary

confinement," but rather is "being kept in a facility in which special housing is the norm and not

as the result of some punishment that now is limited to a 60-day period." Response at 9.

45.     Folse did not reply to the United States' Response.

**3.      The Hearing.**

46.     The Court held a hearing on February 9, 2016.  See Tr. at 1.

47.     Folse began the discussion by arguing that "solitary confinement really isn't

effective and should be reserved for the most dangerous of offenders."  Tr. at 16:6-10 (Villa).

He noted that he was not charged with attacking a corrections officer, but rather for pulling away

from an officer.   See Tr. at 17:1-8 (Villa).   Even if solitary confinement was appropriate

punishment, he added, it should be only temporary.  See Tr. at 17:8-11 (Villa).

48.     Folse also stated that "this green light or hit has been resolved," and that he is thus

out of danger.  Tr. at 18:2-4 (Villa).  In any case, he notes that "there are ways to protect Mr.

Folse short of solitary confinement."  Tr. at 18:7-8 (Villa).

49.      Folse noted that "I don't expect this Court to tell the State of New Mexico

Department of Corrections what to do with its inmates," but added that "the Court can tell the

United States Marshals that if the state of New Mexico is going to continue to do that, then we

need to put these individuals or specifically Mr. Folse somewhere else."  Tr. at 19:9-16 (Villa).

50.     Folse allowed that the prison had "maybe" given him commissary access, thus

addressing that issue.  Tr. at 21:9-10 (Villa).

51.     Folse's counsel complained about his inability to contact his client.  See Tr. at

21:23-25:12 (Villa).  He explained that he waited "weeks sometimes with my assistant calling

every other day just to set up a simple phone call with my client."  Tr. at 22:3-5 (Villa).  PNM,

he said, allowed an attorney-client visit only on three days, and it had to end by 3:00 p.m.  See

Tr. at 22:10-14 (Villa).  Folse's counsel added that PNM's no-contact visitation policy, and prohibitions on laptop computers and privacy, further impairs his ability to speak with his client. See Tr. at 24:10-25:12 (Villa).

52.    Folse also questioned whether the USMS could order him to remain in PNM indefinitely without a hearing or any other in-depth process.  See Tr. at 25:15-26:14 (Villa).

53.    The Court and Folse agreed that the Court should analyze the conditions' constitutionality under the Eighth Amendment rather than under the due-process analysis applicable to pretrial detainees.  See Tr. at 26:15-27:1 (Court, Villa).

54.    The Court and Folse agreed that, once a prisoner is sent to the BOP, the Court cannot instruct the BOP to take any particular action.  See Tr. at 27:8-19 (Court, Villa).  Folse argued, however, that the Court retains the authority to grant his requested relief, even absent a Bivens[7] action, because he was detained under the Court's orders.  See Tr. at 28:3-17 (Villa).

55.    In response to the Court's request that he outline his requested order, the Court and Folse had the following exchange:

> MR. VILLA: Well, I think it would say that Mr. Folse should not be held in solitary confinement absent a showing of some sort of danger to himself, danger to others.  And that we're entitled to a hearing on that.  So that the Court can basically oversee, so order[] marshals to either release him from this indefinite confinement, or if they believe it's appropriate that we have some sort of hearing to determine if the Court agrees with that determination.  I mean, I don't expect you [to] ask the marshals to move him to another facility or that sort of thing, but.
>
> THE COURT: That's not what you're asking for.
>
> MR. VILLA: Not necessarily.  I mean, if the marshals, upon investigation in coordination with PNM, determine that that's their only option then they have to move them.  But I do know there are lots of other places of higher level security where the inmates are not in indefinite solitary confinement.

---

[7]In Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court held that a violation of the Fourth Amendment to the Constitution of the United States "by a federal agent acting under color of his authority gives rise to a cause of action for damages consequent upon his unconstitutional conduct."  403 U.S. at 389.

Tr. at 31:2-21 (Court, Villa).

56.     The United States disputed Folse's version of the facts and argued that he had not

exhausted his administrative remedies.  See Tr. at 32:2-8 (Pflugrath).  It asked the Court to take

judicial notice of the article in the Albuquerque Journal discussing Folse's former status as an

FBI informant.  See Tr. at 33:14-34:10 (Pflugrath).

57.     The United States then called Malone.  See Tr. at 34:17-35:5 (Malone, Pflugrath).

Malone explained that the USMS reached intergovernmental agreements with certain states to

house federal detainees.  See Tr. at 35:11-16 (Malone).

58.     Malone testified that the USMS originally housed Folse in the Sandoval County

Detention Center, but later moved him to the Torrance County Detention Facility.  See Tr. at

35:20-36:2 (Malone).    At Torrance County, Malone explained, Folse was involved in

"approximately 7 incidents," two of which "involved identification of razors."  Tr. at 36:12-18

(Malone).    Malone and three other USMS employees performed a risk assessment, and

transferred Folse and four other inmates to PNM.  See Tr. at 36:3-38:6 (Malone, Pflugrath).

59.     Malone stated that has reviewed Folse's detention at PNM on a weekly basis

since his transfer to PNM in "early December."   Tr. at 38:18-23 (Malone, Pflugrath).   He

explained his decision to keep Folse at PNM:

> We currently feel like based on his rap sheet, which entailed murder, escape,
> numerous assaults, the [incidents] he had at Torrance which I believe he has a
> current misdemeanor charge . . . disciplinary reports from the facilities, also
> intelligence reports from gang intelligence officers at the facilities that are
> provided to me indicating that different gangs have identified Mr. Folse as a
> snitch, and therefore, they would be targeting him, if we were to move him to a
> general population setting at any of other contracted facilities.

Tr. at 39:8-18 (Malone).

60.     Malone doubted that Folse would be safe in any new facility.  See Tr. at 39:23-

40:6 (Malone, Pflugrath).  He thus stated that any facility would "house him in a similar

confinement manner to provide safety." Tr. at 40:10-14 (Malone). If the Court ordered the USMS to move Folse, he noted, it would "move him to another district in a [BOP] facility which would mirror that of penitentiary New Mexico." Tr. at 43:8-11 (Malone).

61.     Malone then addressed Folse's specific complaints. See Tr. at 43:18-44:3 (Malone, Pflugrath). He noted that Folse's three weekly showers, telephone restrictions, and no-contact visits were standard for PNM and met federal detention standards. See Tr. at 43:18-44:3, 45:1-13 (Malone, Pflugrath). He explained that a nutritionist had examined the inmates' meals, and that Folse had not yet submitted more than one grievance to remedy his complaints. See Tr. at 44:10-25 (Malone, Pflugrath).

62.     Folse then cross-examined Malone. See Tr. at 46:8-10 (Malone, Villa). Folse established that Malone might not have known about any additional grievances. See Tr. at 47:2-17 (Malone, Villa). He noted that Folse would exhaust his administrative remedies by contacting USMS counsel and that his counsel had contacted the USMS on multiple occasions. See Tr. at 47:18-48:3 (Malone, Villa).

63.     Folse questioned the validity of his violation record in various detention facilities. See Tr. at 48:4-50:2 (Malone, Villa). Malone testified that five out of Folse's seven violations were substantiated, and that the other two were unconfirmed only "because he was moved" between facilities and could not attend a hearing. Tr. at 49:18-22 (Malone, Villa).

64.     Malone confirmed that Folse was not yet receiving commissary, although he added that federal policy prevents inmates from receiving commissary until they have been at their facility for ninety days. See Tr. at 52:1-14 (Malone, Villa).

65.     Folse questioned why Malone would review his file on a weekly basis if there was no other location suitable to hold him. See Tr. at 54:20-55:3 (Malone, Villa). He also asked why

the USMS could not hold him in protective custody without placing him in solitary confinement.

See Tr. at 58:19-60:1 (Malone, Villa).

66.     Malone stated that, if the Court forced the USMS to take Folse out of solitary

confinement, it

> would have to do [an] in-depth investigation of each inmate that's going to be
> housed with him.  We would probably request a pod specifically for Mr. Folse,
> and try to put some very, some inmates that we have vetted and potentially
> believe would not injure him or that he would injure.  Then we would have to try
> to [deal with] contraband issues that we've had with Mr. Folse.  We would have
> to make sure that the corrections officers are fully aware of the type of inmate to
> ensure their safety as well.  It would be very unique to Mr. Folse.

Tr. at 60:14-25 (Malone).

67.     Folse suggested that the allegations that he stole government property could

mitigate some of the danger to him from inmates angry at his cooperation with the FBI.  See Tr.

at 63:18-64:9 (Malone, Villa).

68.     The United States then elicited testimony that Folse: (i) may make unlimited

telephone calls for legal assistance; (ii) may send a reasonable amount of legal mail; and (iii)

may meet with his attorney as many times per month as he desires.  See Tr. at 66:7-67:3

(Malone, Pflugrath).

69.     The Court began to question Malone directly.  See Tr. at 67:6-10 (Court).  Malone

could neither confirm nor deny that New Mexico would place Folse in Level VI detention.  See

Tr. at 68:3-6 (Court, Malone).

70.     Malone agreed with the Court that the USMS had placed detainees in solitary

confinement at facilities other than PNM, but added that "[t]he only facility in this district that

we believe has the amount of security that can handle a high risk inmate for the federal

Government and the US Marshal service is Penitentiary of New Mexico."  Tr. at 68:12-20

(Malone).

71.     Malone also conceded that the USMS could have shipped Folse out of the state to await sentencing and trial in the misdemeanor cause, noting that it would be a "unique" situation. Tr. at 69:1-4 (Malone).

72.     Malone disagreed with Folse's account of his confinement on multiple grounds. See Tr. at 70:10-13 (Malone).  He did not "agree that it takes weeks for counsel to obtain access." Tr. at 70:16-17 (Malone).  He did not address whether Folse's counsel had experienced long delays in his requests to contact Folse. See Tr. at 71:2-3 (Malone).  He noted, however, that he had "no reason to believe that he could not get access to his counsel at any given time," absent a "lockdown" or other security restrictions. Tr. at 71:2-11 (Malone).  He stated that PNM had never denied a request to allow counsel to bring a laptop. See Tr. at 71:13-25 (Court, Malone).

73.     On the commissary issue, Malone noted that PNM's original policy did not provide commissary for inmates housed through a contract with the USMS, but had changed to allow it after inmates had been present for ninety days. See Tr. at 72:3-14 (Malone).  Folse would reach this ninety-day marker "in the next day or two." Tr. at 72:23-24 (Malone).

74.     The United States then concluded its arguments on the Motion. See Tr. at 73:13-78:17. It explained that, as a practical matter:

> Quite frankly the options available to the district of New Mexico because it doesn't have facilities are very few.  And as inspector Malone said if he were in state custody he would not be at the lower level of classification that he was at before. If he was facing in state custody almost 24 years in prison he had this assault charge that was pending. He had the 7 disciplinary incidents at Torrance. There is no reason to believe that PNM may it please not classify him higher.  As such, there is not much we can do, short of putting him outside the district.  And if we put him outside the district, the difficulties in having him available to counsel are even greater and . . . it's the same problem all over.

Tr. at 74:18-75:8 (Pflugrath).

75.     The United States again argued that Folse did not present evidence of the restrictions on his telephone, visits, or laptop. See Tr. at 74:6-10 (Pflugrath).  The United States

- 18 -

contended that the Court should defer to the United States' expertise and judgment.  See Tr. at 75:10-15 (Pflugrath).

76.     The Court asked the United States whether it had to find an Eighth Amendment violation to remove Folse from solitary confinement.  See Tr. at 75:16-19 (Court).  The United States responded that, because Folse has been convicted, it has the power to punish him.  See Tr. at 75:22-24 (Pflugrath).  It allowed that "moral standards do change," but added that the Court would have to hold that the solitary confinement was "cruel and unusual" to activate its "superintending authority" and change Folse's status.  Tr. at 76:1-8 (Pflugrath).

77.     The United States conceded that the case is "difficult," because any restrictions could potentially interfere with Folse's Sixth Amendment right before his misdemeanor trial.  Tr. at 76:11-14 (Pflugrath).  It requested that the Court perform a balancing test, consider the misdemeanor nature of the pending case, and deny the Motion.  See Tr. at 76:17-25 (Pflugrath).  Any other decision, it stated, would "[c]reate something unique just for Mr. Folse that may not be consistent with the marshal's duties and responsibilities for him or to order him outside the district which has its own problems."  Tr. at 77:1-5 (Pflugrath).

78.     The Court asked the United States again whether it had to conclude that solitary confinement violates the Eighth Amendment to order the USMS to treat Folse differently.  See Tr. at 77:10-15 (Court).  The United States answered that it did not know, but that it could issue an order to show cause to the USMS.  See Tr. at 77:24-78:4 (Pflugrath).

79.     The United States summed up the Court's options:

I think the Court feels disinclined to simply make an order right now, because it doesn't have enough information.  The question is what are the options, but the testimony is that given the options available to the Marshal Service with their existing contract, they cannot put him in any other local facility and the only facility that rises to their standards of safety and concern are at PNM for which the contract is at level 4, and the solitary confinement is not a result of specific

punishments within the state system.  That's simply where they place defendants.
And if the Court wishes to explore that further I think we'd have to present the
Court with some more information.

Tr. at 78:4-17 (Pflugrath).

80.     Folse disagreed with the United States' last point, arguing that the Court need not

declare solitary confinement unconstitutional to justify ordering the USMS to let him out of

solitary confinement.  See 79:1-11 (Villa)("It's the court[']s detention order that is holding Mr.

Folse, if you have the discretion to release him and control other conditions you certainly have

some discretion over the detention.").  Folse did not know "that you can order the marshals to

build a BOP facility or send him out of state, but you can certainly order them to take him out of

solitary confinement."  Tr. at 79:7-11 (Villa).

81.     Folse rejected the United States' proposed choice between solitary confinement

and confinement outside of New Mexico, suggesting confinement in Santa Fe or Grants instead.

See Tr. at 79:20-80:9 (Villa).

82.     In the alternative, Folse suggested that the USMS' contract with PNM did not

preclude alterations within PNM, because the contract was specific to Level VI detention.  See

Tr. at 80:23-81:6 (Villa).  He proposed that the Court "order the marshals to . . . determine if say

Grants could be safe or Santa Fe County could be safe or level 4 at PNM could be safe."  Tr. at

81:5-8 (Villa).  Even if that process failed, Folse added, he should be able to decide between

continuing at PNM in Level VI or moving to a facility outside of New Mexico.  See Tr. at 81:11-

16 (Villa).

83.     Folse concluded his arguments by asserting that the Prison Litigation Reform Act,

42 U.S.C. § 1997e, does not apply to this criminal matter, and that relief is "completely within

this Court's discretion."  Tr. at 83:7-16 (Villa).

84.     The Court then stated its inclination:

Well, I'm not going to grant the motion to change conditions this morning. I want to think about it. It raises a number of issues. Like I was asking questions about what my power is. I need to explore this PLRA. That would be real clear if we were past sentencing and he was in the custody of the Bureau of Prisons. It's not so clear at this stage. I also need to know what the standard is. Is it just my judgment what ought to be done or does it have to be a constitutional violation and if it's a constitutional violation, is this the way to handle it . . . .

Tr. at 83:18-84:4 (Court).

## CONCLUSIONS OF LAW

The Court will outline generally the applicable law surrounding preliminary injunctions. It will then describe the applicable law related to the Eighth Amendment. It will then analyze the Motion.

## LAW REGARDING PRETRIAL DETENTION CONDITIONS OF CONFINEMENT

1.    The Supreme Court of the United States laid a foundation for the law on conditions of confinement for pretrial detainees in Bell v. Wolfish. In that case, a group of pretrial detainees challenged their conditions of confinement within the Metropolitan Correctional Center in New York City, a federal short-term custodial facility. See 441 U.S. at 523. The Supreme Court rejected the United States Court of Appeals for the Second Circuit's standard, which required that pretrial detainees "be subjected to only those 'restrictions and privations' which 'inhere in their confinement itself or which are justified by compelling necessities of jail administration.'" 441 U.S. at 531. It selected a wholly different test, explaining that, "[i]n evaluating the constitutionality of conditions or restrictions of pretrial detention that implicate only the protection against deprivation of liberty without due process of law, we think that the proper inquiry is whether those conditions amount to punishment of the detainee." 441 U.S. at 535 (emphasis added).

2.     The Supreme Court spent much of its opinion distinguishing permissible "disabilit[ies] imposed during pretrial detention" from the "punishment" that the Constitution prohibits. 441 U.S. at 535.  It explained:

> Once the Government has exercised its conceded authority to detain a person pending trial, it obviously is entitled to employ devices that are calculated to effectuate this detention. Traditionally, this has meant confinement in a facility which, no matter how modern or how antiquated, results in restricting the movement of a detainee in a manner in which he would not be restricted if he simply were free to walk the streets pending trial.  Whether it be called a jail, a prison, or a custodial center, the purpose of the facility is to detain.  Loss of freedom of choice and privacy are inherent incidents of confinement in such a facility.   And the fact that such detention interferes with the detainee's understandable desire to live as comfortably as possible and with as little restraint as possible during confinement does not convert the conditions or restrictions of detention into "punishment."

441 U.S. at 537.

3.     The Supreme Court stated that a disability could constitute punishment if: (i) detention facility officials had an expressed intent to punish; or (ii) the disability bears no reasonable relationship to any legitimate government objective.  See 441 U.S. at 538; Hudson v. McMillian, 503 U.S. 1, 7 (1992); Blackmon v. Sutton, 734 F.3d 1237, 1241 (10th Cir. 2013).  It continues:

> Thus, if a particular condition or restriction of pretrial detention is reasonably related to a legitimate governmental objective, it does not, without more, amount to "punishment."   Conversely, if a restriction or condition is not reasonably related to a legitimate goal -- if it is arbitrary or purposeless -- a court permissibly may infer that the purpose of the governmental action is punishment that may not constitutionally be inflicted upon detainees *qua* detainees.

Bell v. Wolfish, 441 U.S. at 539.  See id. at 540 ("Restraints that are reasonably related to the institution's interest in maintaining jail security do not, without more, constitute unconstitutional punishment, even if they are discomforting and are restrictions that the detainee would not have experienced had he been released while awaiting trial.").

4.     The Supreme Court rejected the plaintiffs' arguments that the Constitution prevents their jailers from: (i) placing two inmates in each cell; (ii) prohibiting the receipt of hardcover books, unless mailed directly from publishers, book clubs, or book stores; (iii) forbidding the receipt of packages of personal property and food; (iv) requiring inmates to leave their cells during cell searches; and (v) performing visual body cavity searches after contact visits with outside visitors.  See 441 U.S. at 540-560.  It concluded that these practices were "reasonable responses by MCC officials to legitimate security concerns." 441 U.S. at 561.

5.     In reaching these conclusions, the Supreme Court emphasized the importance of prison officials' judgment: "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." 441 U.S. at 547.

6.     The Supreme Court also recognized that "pretrial detainees, who have not been convicted of any crimes, retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." 441 U.S. at 545.

7.     The law regarding conditions of confinement for pretrial detainees is far from settled.  In Blackmon v. Sutton, the United States Court of Appeals for the Tenth Circuit confronted a pre-trial detainees claim that juvenile detention center officials violated his clearly established constitutional rights by placing him in a restraint chair for punishment.  See 734 F.3d at 1239.  The Tenth Circuit, evaluating the defendants' qualified immunity argument, noted:

> The jurisprudential terrain between arrest and conviction remains today only partially charted.  Over the last several decades, the Supreme Court has elaborated in considerable detail the standards of care prison administrators must satisfy to avoid inflicting "cruel and unusual" punishment on convicted prisoners in violation of the Eighth Amendment. *E.g., Estelle v. Gamble*, 429 U.S. 97 (1976); *Farmer v. Brennan*, 511 U.S. 825 (1994).  The Court has, as well, expounded on

> what force officers may and may not use to effect an arrest consistent with the Fourth Amendment and its prohibition of "unreasonable searches and seizures." *E.g.*, *Graham v. Connor*, 490 U.S. 386 (1989).  But at least so far the Court has done comparatively little to clarify the standards of care due to those who find themselves between these stools -- held by the government after arrest but before conviction at trial. *See* Catherine T. Struve, *The Conditions of Pretrial Detention*, 161 U. Pa. L.Rev. 1009 (2013).

Blackmon v. Sutton, 734 F.3d at 1240.  The Tenth Circuit has not yet decided, for example, "whether a single standard of care applies to all pretrial detainees -- or whether different standards apply depending where the detainee stands in his progress through the criminal justice system."  734 F.3d at 1240.

## LAW REGARDING THE RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL

8.      The Sixth Amendment states: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."  U.S. Const. amend VI.

9.      The Supreme Court has construed the Sixth Amendment to mean that "in federal courts counsel must be provided for defendants unable to employ counsel unless the right is competently and intelligently waived."  Gideon v. Wainwright, 372 U.S. 335, 340 (1963).  In Gideon v. Wainwright, 372 U.S. 335 (1963), the Supreme Court held that the Sixth Amendment's  guarantee of the right to appointed counsel applies to state criminal prosecutions by incorporation through the Fourteenth Amendment. See 372 U.S. at 344-45.

10.      Clarifying the scope of the right to counsel, the Supreme Court later held that an indigent defendant must be appointed counsel in any criminal prosecution "that actually leads to imprisonment even for a brief period," regardless of its classification as a misdemeanor or a felony. Argersinger v. Hamlin, 407 U.S. 25, 33 (1972).

11.      Seven years later, in Scott v. Illinois, 440 U.S. 367 (1979), the Supreme Court established the outer limit of the right to counsel enunciated in Argersinger v. Hamlin. See Scott v. Illinois, 440 U.S. at 373.  The Supreme Court of Illinois had declined to extend Argersinger v.

- 24 -

Hamlin to the defendant where he was "charged with a statutory offense for which imprisonment upon conviction is authorized but not actually imposed upon the defendant." Scott v. Illinois, 440 U.S. at 369.

12.     The Supreme Court affirmed, explaining: "Even were the matter res nova, we believe that the central premise of Argersinger -- that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment -- is eminently sound and warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel." Scott v. Illinois, 440 U.S. at 373.

13.     The Supreme Court held that the Sixth and Fourteenth Amendments do not entitle an indigent defendant to trial counsel where he was convicted of theft and fined $ 50.00 after a bench trial.  See Scott v. Illinois, 440 U.S. at 367-68 ("We therefore hold that the Sixth and Fourteenth Amendments to the United States Constitution require only that no indigent criminal defendant be sentenced to a term of imprisonment unless the State has afforded him the right to assistance of appointed counsel in his defense.").

14.     To reach the merits of Folse's arguments, the Court must determine whether it has the authority to provide Folse with any relief in these criminal cases.  The Court determines that it has the authority to provide relief only to the extent that Folse's conditions of confinement impair his right to counsel or his right of court access.  It will thus deny Folse's other requests for relief.

15.     Existing cases analyze restrictions on inmates' access to counsel in two primary contexts: (i) when the inmate is a pretrial detainee; and (ii) when the inmate is a prisoner seeking to file a civil suit to challenge his past conviction.  Folse is in a different position, having been convicted of carjacking, but also attempting to defend against new charges of pulling away from

a corrections officer.  See Verdict, filed October 8, 2015 (Doc. 104); Information at 1, filed

October 30, 2015 (Doc. 1).  Cases forbidding prison officials from punishing inmates are less

applicable here, where Folse has already been convicted.  See Bell v. Wolfish, 441 U.S. at 535.

Folse, however, must defend himself from pending criminal charges.  Prisoners charged with a

new criminal offense are not limited to a watered-down version of the Sixth Amendment.

      16.    Because the Court concludes that the conditions currently imposed on Folse do

not impair his Sixth Amendment right to counsel, however, it will deny his requests for relief on

this point.

      17.    Instead of dismissing the action, the Court directs the Clerk of the Court to open a

new civil Bivens case for Folse's documents.  Thanks to the parties' briefing and helpful

arguments, the Court is prepared to rule on a civil request for injunctive relief without any need

for further briefing.

## I.    THE COURT CAN ADDRESS ONLY CONDITIONS OF CONFINEMENT THAT IMPAIR FOLSE'S ACCESS TO COUNSEL.

      18.    As a general rule, federal prisoners can challenge their conditions of confinement

only pursuant to Bivens.  See United States v. Garcia, 470 F.3d 1001, 1003 (10th Cir.

2006)("Because Appellants' claims were raised in motions filed in their respective criminal cases

and not in civil rights complaints comporting with the requirements of Bivens, they were

properly denied by the district court."); Palma-Salazar v. Davis, 677 F.3d 1031, 1035 (10th Cir.

2012)("[A] prisoner who challenges the conditions of his confinement must do so through a civil

rights action."); Boyce v. Ashcroft, 251 F.3d 911, 918 (10th Cir.)(holding that federal prisoners

must use Bivens to challenge their conditions of confinement), vacated on other grounds, 268

F.3d 953 (10th Cir. 2001).

19.     Federal pre-trial detainees may challenge their conditions of confinement by filing

Bivens actions against U.S. Marshals.  See, e.g., Jordan v. Doe, 38 F.3d 1559, 1566 (11th Cir.

1994); Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978).

20.     The Tenth Circuit has not squarely addressed whether federal pre-trial detainees

may challenge their conditions of confinement through a motion in their criminal cases --

without bringing separate civil suits.

21.     The general rule is that a defendant must file a separate civil action to address his

conditions of confinement.[8]  See United States v. Wade, No. 307-CR-00111-RRB-JDR, 2009

WL 3837151, at *1 (D. Alaska Nov. 13, 2009)(Roberts, M.J.)("Any claims concerning the

conditions of confinement cannot be brought in the federal criminal case."); United States v.

Luong, No. CR 99-433WBSGGH, 2009 WL 2852111, at *1 (E.D. Cal. Sept. 2, 2009)(Shubb,

J.)("[T]he proper procedure to redress a defendant's grievances regarding treatment within a jail

---

[8]Another line of cases declines to grant any form of civil relief within a criminal case.  In
United States v. Christy, 883 F. Supp. 2d 1040 (D.N.M. 2012)(Browning, J.), a criminal
defendant requested that the Court open an investigation into alleged prosecutorial misconduct.
See 883 F. Supp. 2d at 1050.  The Court noted that, to the extent that the defendant sought
damages, he should file a separate civil lawsuit:

> While there is not an absolute bar against a criminal defendant seeking relief that
> could be afforded in a civil suit as part of a criminal proceeding, see In re Special
> Grand Jury 89-2, 450 F.3d 1159, 1167 (10th Cir. 2006)(stating that "a motion for
> return of property under Fed. R. Crim. P. 41(g) is civil rather than criminal"), it is
> an unusual practice that can be highly disruptive and that courts generally
> discourage.

United States v. Christy, 883 F. Supp. 2d at 1050.  The Court acknowledged that it is
occasionally "more efficient to permit a criminal defendant to seek civil relief in a criminal case,
such as when a prisoner seeks the return of property seized from him under rule 41 of the Federal
Rules of Criminal Procedure."  United States v. Christy, 883 F. Supp. 2d at 1052.  The Court
nonetheless dismissed the case without granting any relief or converting it into a civil action.
See 883 F. Supp. 2d at 1053.  It cited the vague nature of the defendant's requests and the
likelihood that qualified immunity would bar his claims.  See 883 F. Supp. 2d at 1053.

or prison is to file a civil suit against the relevant parties pursuant to 42 U.S.C. § 1983, rather than a motion in his criminal case."); Merryfield v. Kansas, No. 09-3140-RDR, 2009 WL 3125470, at *3 (D. Kan. Sept. 25, 2009)(Crow, J.).

22.      This rule prevents prisoners and pretrial detainees from effectively bypassing the PLRA's exhaustion requirements, which apply to pretrial detainees and detainees awaiting sentencing.[9]  See 28 C.F.R. § 551.100; Falcon v. U.S. Bureau of Prisons, 852 F. Supp. 1413, 1423 (S.D. Ill. 1994), aff'd, 52 F.3d 137 (7th Cir. 1995)(Stiehl, J.).   As one district court explained:

> Defendant claims he is exempt from the exhaustion requirement because it does not apply to pretrial detainees challenging detention in a criminal proceeding. Defendant's argument is unavailing.   The Supreme Court, in holding that the PLRA's exhaustion requirement applies to "all inmate suits about prison life," did not distinguish between pretrial and post-trial detainees. *See Porter,* 534 U.S. at 532 . . . ; *see also George,* 2007 WL 1686321, 2007 U.S. Dist. LEXIS 42640

---

[9]Few cases have directly addressed whether the PLRA's exhaustion requirements apply to pre-sentencing inmates under USMS control, but within state prisons.   At least one case analyzed a similar situation without mentioning exhaustion.   See Bradley v. Stephens, No. 14-2093-JDT-CGC, 2015 WL 4620515, at *3 (W.D. Tenn. July 31, 2015)(Todd, J.).   The majority of cases, however, have applied the PRLA's exhaustion requirement to these inmates.   See Muhammad v. U.S. Marshal Serv., No. CIV 07-27 ERIE, 2009 WL 335189, at *5 (W.D. Pa. Feb. 10, 2009)(Cohill, J.)(determining whether PLRA-type administrative procedures were available to a federal pretrial detainee held at a county prison facility); Roberts v. Cty. of Mahoning, 495 F. Supp. 2d 670, 674 (N.D. Ohio 2005)(Dowd, J.)("The Plaintiffs exhausted all administrative remedies prior to filing this lawsuit as a proposed class action."); Williams v. Silliman, No. 9:11-CV-1477, 2014 WL 991876, at *2 (N.D.N.Y. Mar. 13, 2014)(Peebles, M.J.)("I recommend that plaintiff's motion be denied, and that plaintiff's remaining retaliation claim be dismissed based upon his failure to exhaust available administrative remedies before commencing suit."); Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708434, at *5 (W.D.N.Y. June 16, 2014)(Acara, J.)(dismissing complaint based on failure to exhaust administrative remedies).   The Court concludes that the exhaustion requirement applies to the great bulk of Folse's claims, as they seek relief available through an administrative process.   See Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006); White v. Bukowski, 800 F.3d 392, 396 (7th Cir. 2015); Johnson v. Thyng, 369 F. App'x 144, 149 (1st Cir. 2010).   The exhaustion requirement, however, does not apply to Folse's access-to-counsel claims on these specific facts.   There is no administrative process that will grant him additional access to his counsel with sufficient time to prepare his defense.

(granting the defendants' motion to dismiss pretrial MCC detainee's action due to his failure to exhaust his administrative remedies).

United States v. Khan, 540 F. Supp. 2d 344, 349 (E.D.N.Y. 2007)(Irizarry, J.).

23.    In United States v. Antonelli, 371 F.3d 360 (7th Cir. 2004), for example, the United States Court of Appeals for the Seventh Circuit determined that the defendant's filing "is not a motion in the 1978 criminal case but in actuality a separate, unrelated civil action raising a facial challenge to a BOP policy." 371 F.3d at 361. It explained that "[t]he PLRA first mandates that inmates exhaust their administrative remedies before bringing a civil action challenging prison conditions, which is what Antonelli's 'motion' does." United States v. Antonelli, 371 F.3d at 361. It condemned the defendant's attempt to "evade[]" the PLRA's "significant procedural restraints and potential consequences." United States v. Antonelli, 371 F.3d at 361.

24.    The primary exception to this general rule applies when a condition of confinement interferes with a pretrial detainee's access to counsel in a criminal case. See United States v. Wade, 2009 WL 3837151, at *1 ("With the exception of the limited jurisdiction to hear argument on whether the conditions prevent him from assisting his counsel in his defense, this Court will not consider a motion regarding a request for a change in the conditions of his confinement."); United States v. Luong, 2009 WL 2852111, at *1 ("Defendant's requests are not the first instances in which he has filed papers in this criminal case challenging the conditions of his confinement. . . .   Such filings may be appropriate in a criminal proceeding where defendant's conditions of confinement affect his ability to consult with counsel or exercise other trial rights."); Falcon v. U.S. Bureau of Prisons, 52 F.3d 137, 139 (7th Cir. 1995)("Section 3142(i)(3) is designed to protect a defendant's Sixth Amendment right to counsel, and if that right is being infringed, Judge Moreno has the statutory authority to protect Falcon's access to counsel."); United States v. Martinez-Hernandez, No. 3:15-CR-00075 JAF, 2015 WL 6133050,

at *8 (D.P.R. Oct. 15, 2015)(Fuste, J.)("A pretrial detainee may challenge conditions of his confinement that affect his right to counsel before the judge presiding over the underlying criminal case.").

25.     The Court concludes that this rule is sensible.  A defendant attempting to prepare for trial should be able to secure his or her access to counsel without filing a civil suit.  This is particularly important where the defendant has court-appointed counsel, because it would be extraordinarily difficult for him or her to file a pro se civil suit solely to prepare for trial.  The delay required to satisfy the PLRA's exhaustion requirements alone could cripple a detainee's trial preparations.

26.     The Court has only located three cases granting relief unrelated to the right to counsel.  First, the Court granted this relief in one unpublished opinion.  See United States v. Daprano, No. CR 04-2040 JB/KBM, Order, filed August 24, 2007 (Doc. 166).  In that case, an inmate had a dental condition requiring that his teeth be removed and replaced.  See Order at 1. The inmate's federal case took longer than expected, and the inmate's condition deteriorated to the point where he would "suffer permanent damage" absent "immediate replacement."  Order at 1-2.  The USMS pulled inmates' teeth, but refused to replace them, preferring instead to assign the responsibility to the BOP.  See Order at 1.  The prisoner thus could have had his teeth pulled, but could not replace them, because he was not yet in BOP custody.  See Order at 1.  The Court thus required the USMS, "under the unique circumstances of this case," to replace the inmate's teeth.  Order at 2.

27.     Second, the Honorable Todd Campbell, United States District Judge for the Middle District of Tennessee, confronted a similar situation in United States v. Williams.  Judge Campbell received a letter from the criminal defendant in one of his cases complaining about his

conditions of confinement in a state facility, presumably operated pursuant to an inter-governmental agreement with the USMS.  See 2009 WL 4824940, at *1.  Judge Campbell summarized the defendant's requests:

> [T]he Defendant requests that the Court order that he be moved to another facility or released on bond.  Alternatively, Defendant requests that the Court order the United States Marshals Service to act to ensure that the Defendant and other pretrial detainees are not being treated punitively and inhumanely while held in the custody of the federal government and order an investigation into the Robertson County Jail conditions.

2009 WL 4824940, at *1 (citations omitted).  He agreed to hold an evidentiary hearing, but limited it to "allegations that have affected Defendant Williams personally, identified in his brief as inadequate nutrition, hygiene, and medical care."  2009 WL 4824940, at *1.  Judge Campbell explained that the defendant's conditions of confinement were "relevant in this criminal case because those conditions can impede his ability to assist in his defense."  2009 WL 4824940, at *2.

28.     Judge Campbell subsequently ordered the USMS to transfer the defendant to a different facility, on the grounds that the first detention facility violated the defendant's right to adequate nutrition.  See 2009 WL 4824940, at *2.  He explained that

> the Court has the authority under the Bail Reform Act, 18 U.S.C. § 3141, *et seq.,* to make decisions regarding the detention or release of individuals awaiting trial and/or imposition or execution of sentence.  *See also* 28 U.S.C. § 1651; 28 U.S.C. § 1361.  The Court's decision, however, is informed by, though not controlled by, the standards set forth by the federal courts in civil cases brought by state and federal inmates raising constitutional challenges to conditions of confinement.  *See, e.g., Bell v. Wolfish,* 441 U.S. 520 . . . (1979)(Standards used to evaluate challenges by pretrial detainees to conditions of confinement based on Fifth Amendment Due Process Clause); *Farmer v. Brennan,* 511 U.S. 825 . . . (1994)(Standards used to evaluate challenges by convicted prisoners to conditions of confinement based on Eighth Amendment Cruel and Unusual Punishment Clause).

2009 WL 4824940, at *2.

29.     Third, the Honorable Marcia S. Krieger, United States District Judge for the

District of Colorado, found a different way to grant limited relief in United States v. Ramirez-

Robles, No. CR.A. 06CR00485MSK, 2007 WL 2021852 (D. Colo. July 11, 2007)(Krieger, J.).

The pretrial detainee in that case alleged that both of his eyes began to bleed, and moved for an

order to show cause why the United States Attorney General and the BOP Director should not be

held in contempt for violating his detention order.  See 2007 WL 2021852, at *1.  The United

States responded that the Court "lacks jurisdiction to consider the matter, which can only be

raised in a civil lawsuit."  2007 WL 2021852, at *2.  Although Judge Krieger recognized that she

could not order the "provision of particular medical treatment" in a criminal case, she ordered

that the pretrial detainee receive a medical evaluation.  2007 WL 2021852, at *2.  She cited 18

U.S.C. §§ 3145 and 3553(a) to explain her decision:

> The Defendant was detained pursuant to 18 U.S.C. § 3142(g) after the Magistrate
> Judge determined that there were no conditions of release that will reasonably
> assure the Defendant's appearance.  Among the factors the Magistrate Judge was
> required to consider was the Defendant's physical condition.  18 U.S.C. §
> 3142(g)(3)(A).   If the Defendant believes that the detention order was
> improvidently entered in that it failed to take into account a serious medical
> condition, or that his medical condition has worsened since the detention order
> was issued, then it is within the purview of this Court to review it.  See 18 U.S.C.
> § 3145.  In order for this Court to conduct such review, a medical evaluation
> diagnosing the Defendant's ailments, specifying the treatment he needs, and
> identifying what treatment he will receive and when is essential.
>
> In addition, with regard to the offense charged in this case, the Defendant has
> entered a guilty plea and is scheduled to be sentenced in August.  Under 18
> U.S.C. § 3553(a), one of the factors the Court must consider in sentencing the
> Defendant is "the need for the sentence imposed . . . to provide the defendant with
> needed . . . medical care[.]"  This requires an accurate assessment of what the
> Defendant's current medical condition is, what treatment he needs, and whether
> and where he can receive such treatment while incarcerated.  Upon receipt of this
> information, defense counsel may desire to file a motion for a non-guideline
> sentence.

United States v. Ramirez-Robles, 2007 WL 2021852, at *2.  By noting that the Court could

discontinue the defendant's detention, see 2007 WL 2021852, at *3, and suggesting that a failure

- 32 -

to provide medical care could lead to a lower sentence, see 2007 WL 2021852, at *2, Judge

Krieger effectively suggested -- without an express command -- that the government provide

better medical care for the pretrial detainee.

      30.    Folse has alleged violations of his constitutional rights related to solitary

confinement, pretrial privileges, cleanliness, shackles, telephone access, and diet. See Motion at

4-14. None of these issues "prevent him from assisting his counsel in his defense," United States

v. Wade, 2009 WL 3837151, at *1 or significantly "affect his ability to consult with counsel or

exercise other trial rights," United States v. Luong, 2009 WL 2852111, at *1. He must pursue

these claims through a civil rights action.

      31.    Folse also alleges that the United States has impeded his "constitutional right of

access to the courts," which "prohibits state actors from impeding efforts to pursue legitimate

claims and defenses." Motion at 12. The Second Circuit has explained that this claim is distinct

from an access-to-counsel claim under the Sixth Amendment:

> The Department is correct that the right to counsel and the right of access to the
> courts are interrelated, since the provision of counsel can be a means of accessing
> the courts. However, the two rights are not the same. The access claims at issue
> in *Lewis* [v. Casey, 518 U.S. 343 (1996),] concerned the ability of convicted
> prisoners "to attack their sentences, directly or collaterally, and . . . to challenge
> the conditions of their confinement." 518 U.S. at 355. By contrast, here we are
> concerned with the Sixth Amendment right of a pretrial detainee, in a case
> brought against him by the state, to utilize counsel in his defense. . . . The reason
> pretrial detainees need access to the courts and counsel is not to present claims to
> the courts, but to defend against the charges brought against them.

Benjamin v. Fraser, 264 F.3d 175, 186 (2d Cir. 2001).

      32.    The cases creating a narrow exception to the general rule -- that prisoners must

file civil actions to remedy their conditions of confinement -- apply when conditions of

confinement prevent a detainee "from assisting his counsel in his defense." United States v.

<u>Wade</u>, 2009 WL 3837151, at \*1 (emphasis added).   See <u>Falcon v. U.S. Bureau of Prisons</u>, 52

F.3d at 139 (discussing only the Sixth Amendment right to counsel).

      33.     The Court thus will not address restrictions on Folse's access to the courts that are

not directly related to his pending criminal case.

      34.     As Folse notes, any future court access claims will require that the "accused

demonstrates a violation of this right by showing that state actors hindered his or her efforts to

pursue a non-frivolous legal claim and that the defendant suffered actual harm."   Motion at 12

(citing <u>Lewis v. Casey</u>, 518 U.S. at 350).

## II.     FOLSE'S CONDITIONS OF CONFINEMENT DO NOT VIOLATE HIS SIXTH AMENDMENT RIGHT TO COUNSEL OR HIS RIGHT TO COURT ACCESS.

      35.     Folse's conditions of confinement do not impair his right to effective assistance of

counsel or his court access rights.

      36.     "[I]nmates must have a reasonable opportunity to seek and receive the assistance

of attorneys.   Regulations and practices that unjustifiably obstruct the availability of professional

representation or other aspects of the right of access to the courts are invalid."   <u>Procunier v.</u>

<u>Martinez</u>, 416 U.S. 396, 419 (1974) <u>overruled on other grounds by</u> <u>Thornburgh v. Abbott</u>, 490

U.S. 401 (1989).

      37.     Prison regulations that "unreasonably burden[] the inmate's opportunity to consult

with his attorney and to prepare his defense" are unconstitutional.   <u>Benjamin v. Fraser</u>, 264 F.3d

at 187 (quotation omitted).

      38.     "[E]ven when an institutional restriction infringes a specific constitutional

guarantee, such as the First Amendment, the practice must be evaluated in the light of the central

objective of prison administration, safeguarding institutional security."   <u>Bell v. Wolfish</u>, 441 U.S.

at 547.

39.     Folse contends that PNM prevents him from calling his attorney "without going through a laborious process that can take weeks to complete -- that means weeks between the request and the phone call." Motion at 2.  He adds that, "[w]hen counsel attempts to set up phone calls by contacting PNM, it can take days or weeks to get a call back." Motion at 2.  He also complains that "counsel cannot bring his laptop to the visit and many things that need to be reviewed with Mr. Folse require a laptop." Motion at 3.

40.     Malone disagreed at the hearing, explaining that it does not "take[] weeks for counsel to obtain access." Tr. at 70:16-17 (Malone).  Although Malone did not discuss whether Folse's counsel had experienced long delays, see Tr. at 71:2-3 (Malone), he stated that he had "no reason to believe that he could not get access to his counsel at any given time," absent a "lockdown" or other security restrictions, Tr. at 71:2-11 (Malone).  He also stated that attorneys were permitted to bring laptops to client meetings. See Tr. at 71:13-25 (Court, Malone).

41.     Malone may not be able to offer reasons for the interference, but there has been interference.  The Court concludes that PNM has blocked the attempts by Folse's counsel to bring a laptop into PNM.  The Court concludes that it may take up to fourteen days to set up a legal telephone call.   Folse's account is correct, but his conditions of confinement do not unconstitutionally impair his right of access to counsel.

### A.     THE RESTRICTIONS ON LAPTOP USE BY FOLSE'S ATTORNEY DO NOT VIOLATE FOLSE'S CONSTITUTIONAL RIGHTS.

42.     Folse has no constitutional right to have his attorney's laptop present for client meetings if a viable alternative is available.  In United States v. Rivera, 83 F. Supp. 3d 1154 (D. Colo. 2015)(Blackburn, J.), a prisoner at a maximum-security institution sought a standing order requiring the BOP to allow his attorneys to bring a laptop into the prison.  See 83 F. Supp. 3d at 1155.   The Honorable Robert Blackburn, United States District Judge for the District of

Colorado, held that the BOP's restrictions did not violate the inmate's constitutional rights for

three primary reasons.   See 83 F. Supp. 3d at 1157.   First, Judge Blackburn described the

relevant security concerns:

> It requires little to no prescience to appreciate the real need for this security
> restriction and the prodigal, precedential implications of its relaxation. The
> increased resources -- staff and equipment -- necessary to thoroughly inspect
> every laptop -- inside and out, hardware and software -- for weapons and other
> contraband to ensure the security of staff and inmates alike would be
> brobdingnagian.[10]

83 F. Supp. 3d at 1156.   Second, the prison used an internal "clean" computer and video screen

to allow the prisoner and his counsel to view "critical video" evidence without allowing the

prisoner to access outside hardware or software.   83 F. Supp. 3d at 1156.   Third, Judge

Blackburn noted that the attorney could print any other materials: "[I]t is neither unconstitutional

nor unreasonable -- given the unique security needs inherent to the custodial milieu that is

ADX[11] -- to require counsel to proceed as lawyers did for centuries prior to the late 20th

century invention of the laptop computer."   83 F. Supp. 3d at 1156.

     43.     Folse has not listed the types of evidence that "require a laptop." Motion at 3.   He

mentions that the prison has not confirmed whether its own laptop has "this particular software

that I need [for] this particular video." Tr. at 25:6-8 (Villa).   The Court notes, however, that

modern computers and browsers can easily convert one type of video to another, transfer a video

---

[10]Brobdingnagian means of "tremendous size."   Brobdingnagian, Merriam-Webster's Dictionary (May 13, 2016), http://www.merriam-webster.com/dictionary/Brobdingnagian.

[11]"ADX" refers to the United States Penitentiary Administrative Maximum Facility in Florence, Colorado, which is commonly known as ADX Florence.   ADX Florence is the highest-security prison in the United States, housing "a very small subset of the inmate population who show absolutely no concern for human life."   Inside America's Toughest Federal Prison, N.Y. Times Magazine (March 26, 2015), http://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html?_r=0.   Both PNM's Level VI and ADX Florence qualify as "supermax" prisons.   Inside America's Toughest Federal Prison, N.Y. Times Magazine (March 26, 2015), http://www.nytimes.com/2015/03/29/magazine/inside-americas-toughest-federal-prison.html?_r=0; Penitentiary of New Mexico: About Us, New Mexico Department of Corrections (2013), http://cd.nm.gov/apd/pnm.html.

onto a USB[12] flash drive, or "burn" the video onto a compact disk.  The difficulty of showing the video, at least in this instance, does not rise to the level of a constitutional violation.

44.     Folse, in seeking relief, must prove an unconstitutional interference with his right to effective assistance of counsel.  He has not developed a robust record.  He has not shown that most of his materials cannot be shown with hard copies.  He apparently has not pressed PNM about whether he can use PNM's computer.  Without more factual development, Folse has not met his burden of proof.  See United States v. Wade, 2009 WL 3837151, at *1 ("Mr. Wade must proffer some evidence to show that he is, in fact, unable to effectively assist counsel due to the conditions of his confinement. The burden of proof is on the moving party.").

### B.     THE RESTRICTIONS ON VISITATION FOR FOLSE'S ATTORNEY DO NOT VIOLATE FOLSE'S CONSTITUTIONAL RIGHTS.

45.     Folse argues that: (i) he should be allowed to have contact visits with his counsel; and (ii) his visits with his counsel should be more private.  See Motion at 2-3; Tr. at 24:21-25 (Villa).

46.     First, Folse's argument that his visits with his attorney should be contact visits is unconvincing.  In Kennedy v. Lake, 207 F. App'x 900 (10th Cir. 2006)(unpublished), a state prison required an inmate to meet with his attorney in "a non-contact interview room that required them to communicate through a glass partition via a monitored telephone connection." 207 F. App'x at 901.  The inmate, unlike Folse, specifically requested a contact interview room, but the prison denied the request.  See 207 F. App'x at 901.  The Tenth Circuit approved the

---

[12]"USB" stands for "Universal Serial Bus," a form of connector that allows computers users to attach accessories like printers to their computers.   How USB Ports Work, HowStuffWorksTech, http://computer.howstuffworks.com/usb.htm.   A USB flash drive "is a small, portable device that plugs into a computer's USB port" and "transfer[s] information from one computer to another."   How To: What is a USB flash drive?, Microsoft Windows 7, http://windows.microsoft.com/en-us/windows/what-is-usb-flash-drive#1TC=windows-7.

prison's decision, explaining: "Although Kennedy insists his Sixth Amendment right to counsel entitled him to a confidential, contact meeting with Martinez, the Sixth Amendment does not create such a per se rule of entitlement." 207 F. App'x at 902. See Mann v. Reynolds, 46 F.3d 1055, 1060 (10th Cir. 1995)("[T]he Sixth Amendment does not require in all instances full and unfettered contact between an inmate and counsel."). Although the Tenth Circuit struck down a prison's legal visitation policy in Mann v. Reynolds, it explained that the prison made no attempt to explain its policy and "permitted Inmates unfettered personal contact with virtually all those with whom they interact *except* their lawyers." See 46 F.3d at 1060 (emphasis in original). Here, PNM does not allow contact visits for any inmates. See Motion at 3. Moreover, the United States has stated that Folse was involved in at least five disciplinary reports, including two involving razors and other contraband. See Tr. at 36:12-18 (Malone). These restrictions are appropriate, given PNM's level of security. Also, Folse does not explain why a contact visit is essential to effective representation. Non-contact may make the meetings less convenient, but non-contact does not make effective representation impossible.

47.    Second, Folse's concerns about privacy during attorney-client meetings, while concerning, do not support a constitutional claim, at least on the limited record before the Court. Folse states that, during client meetings, "there are corrections officers right outside that can hear everything you say." Tr. at 24:21-25 (Villa). Folse did not provide any details of how the officers overheard him, whether he could have lowered his voice, whether he could have closed the door, or whether the information inhibited him from having an open conversation with his attorney. He has not stated that he requested that the guards provide him with additional confidentiality.

48.     "The Sixth Amendment right of an accused to effective assistance of counsel includes broad, but not unlimited, protection for consultation between the accused and his attorney." Contreras v. Artus, 778 F.3d 97, 110 (2d Cir. 2015).  See O'Mara v. Dionne, No. CIV 08-CV-51-SM, 2009 WL 2170986, at *5 (D.N.H. July 20, 2009)(McAuliffe, J.)("Obviously, pre-trial detainees such as plaintiff have a constitutional right to counsel, but jail officials are not required to facilitate communication between inmates and counsel at any time or in any manner that a detainee might desire.").

49.     Cases finding constitutional violations involve far more extreme facts than the facts here.[13]  In Johnson-El v. Schoemehl, 878 F.2d 1043 (8th Cir. 1989), the inmates had to

---

[13]Some courts have dismissed plaintiffs' cases absent a showing of actual harm.  In Dailey v. Doizaki, No. 12-CV-02798-BNB, 2013 WL 2013245 (D. Colo. May 14, 2013)(Babcock, J.), a prisoner alleged in a § 1983 case that two deputies deliberately eavesdropped on one of his calls to his attorney during his time as a pretrial detainee.  See 2013 WL 2013245, at *2.  The district court rejected this claim, explaining that "[t]he Sixth Amendment . . . does not create a per se rule that entitles Plaintiff to a confidential meeting with his attorneys." Dailey v. Doizaki, 2013 WL 2013245, at *5. It noted that the deputies "listened only on one occasion, and Plaintiff does not assert any resulting injury due to Defendants' acts." 2013 WL 2013245, at *5.  See Mastrian v. McManus, 554 F.2d 813, 821 (8th Cir. 1977)(involving a habeas petition)("Evidence that a party monitored the accused's conversations with his attorney does not necessarily establish a Sixth Amendment violation.  Rather, the accused must show, in addition, that the substance of the overheard conversation was of some benefit to enforcement officials.").  Other courts have disagreed, distinguishing pretrial detainees' right to counsel from convicted prisoners' access to the courts.  See Benjamin v. Fraser, 264 F.3d 175, 185 (2d Cir. 2001)("[W]here the right at issue is provided directly by the Constitution or federal law, a prisoner has standing to assert that right even if the denial of that right has not produced an 'actual injury.'").

The Court concludes that the second approach is closer to the standard that the Court should use here.  The reality is that, if there is no harm, the Court is unlikely to find that there is any interference with effective representation.  On the other hand, the Court's role pre-trial is prophylactic and even between conviction and sentencing, the Court must make certain that the defendant can talk to his or her attorney effectively.  Moreover, the Court cannot determine what the "actual injury" would be in a case like this, where the defendant has not yet completed trial and any future harm is speculative.  See Benjamin v. Fraser, 264 F.3d at 186 ("It is not clear to us what 'actual injury' would even mean as applied to a pretrial detainee's right to counsel.").  Thus, while Folse need not show actual injury, he needs to show that his complaints are not speculative, conclusory, or merely about inconveniences, but are likely to actually interfere with

meet with their attorneys "in public areas of the Jail where their conversations could be overheard by guards and other prisoners." 878 F.2d at 1053.  See Wolfish v. Levi, 573 F.2d 118, 133 (2d Cir. 1978), reversed on other grounds by Bell v. Wolfish, 441 U.S. 520 (1979)("When this action was instituted, most attorney visits were made in the general visiting rooms during visiting hours thereby entailing long delays, limiting the attorney's time with his client, and totally vitiating confidentiality."); Benjamin v. Fraser, 264 F.3d 175, 187 (2d Cir. 2001)(concluding that long and unnecessary wait times for visits after an attorney arrived at a facility violated the Sixth Amendment).

50.     Court access cases take an even more deferential approach to prison regulations on privacy.  In Robinson v. Gunja, 92 F. App'x 624 (10th Cir. 2004), for example, the Tenth Circuit noted:

> Mr. Robinson raises related claims that his Fifth and Sixth Amendment rights were violated through the monitoring of his . . . conversations with legal counsel. Because we have determined these calls at issue were placed on the [prison's internal] system, and thus were calls that may be recorded or monitored, the district court properly dismissed these claims.

92 F. App'x at 627.  See Fleury v. Collins, No. 10-CV-01361-LTB-KLM, 2011 WL 1706835, at *4 (D. Colo. Apr. 14, 2011)(Mix, M.J.)("Monitoring or supervision of an inmate's telephone calls with defense counsel does not necessarily violate the Sixth Amendment or the Due Process Clause of the Fourteenth Amendment."), report and recommendation adopted, No. 10-CV-01361-LTB-KLM, 2011 WL 1706908 (D. Colo. May 5, 2011)(Babcock, J.); Arney v. Simmons, 26 F. Supp. 2d 1288, 1296 (D. Kan. 1998)(Saffels, J.)("It has also been held that prison officials may tape a prisoner's telephone conversations with an attorney if such taping does not substantially affect the prisoner's right to confer with counsel."); Dailey v. Doizaki, No. 12-CV-

---

effective representation.  He may not have to show actual injury, but he needs to show actual interference or the real probability of interference with effective representation.  He has not made that showing.

02798-BNB, 2013 WL 2013245, at *5 (D. Colo. May 14, 2013)(Babcock, J.)("Furthermore, Defendants Mott and Bandcroft listened only on one occasion, and Plaintiff does not assert any resulting injury due to Defendants' acts.").

51.     Here, Folse's conversations with his attorney occur in a private room.  There is no sign of purposeful "surreptitious eavesdropping on [Folse's] consultations with [his] lawyer." United States v. Orman, 417 F. Supp. 1126, 1138 (D. Colo. 1976)(Winner, J.)(dismissing indictment based on constitutional violations).  PNM guards are not reading Folse's written communications with his counsel.  See Nordstrom v. Ryan, 762 F.3d at 910.  Again, the record is not robust.  Folse has the burden of showing the real possibility of interference, not just inconvenience.  See United States v. Wade, 2009 WL 3837151, at *1; Arney v. Simmons, 26 F. Supp. 2d 1288, 1294 (D. Kan. 1998)(Saffels, J.)("[T]he court finds that the burden is on plaintiffs to prove that prison officials have exaggerated their response to legitimate security concerns.  In the absence of substantial evidence to that effect in the record, courts should ordinarily defer to the expert judgment of prison officials.").  He needs to show that he wants to have a confidential conversation and cannot have it, no matter how hard he tries.  Without more, the restrictions on Folse's meetings with his attorney do not violate his constitutional rights.

### C.     THE RESTRICTIONS ON FOLSE'S TELEPHONE CALLS TO HIS ATTORNEY DO NOT VIOLATE HIS CONSTITUTIONAL RIGHTS.

52.     Folse contends that it can take days or weeks for his requests for a telephone call to his attorney to be approved.  See Motion at 2 (setting out this fact); Response at 7 (not disputing this fact); Tr. at 71:2-11 (Malone).  His counsel states that it may take days or weeks for him to schedule a client meeting with PNM.  See Motion at 2-3 (setting out this fact); Response (not disputing this fact).

53.     The Tenth Circuit has not set out a specific frequency of attorney-client telephone

calls that meets constitutional standards.

54.     The United States Court of Appeals for the Eighth Circuit described one prison's

restrictive regulations in Johnson-El v. Schoemehl:

> First, they were permitted access to a telephone for personal and legal purposes
> only twice a week.  They were allowed only two calls, a twenty-minute phone call
> during the week and a ten-minute call on weekends.  The only opportunity to call
> their attorneys was during the week; the weekday call, however, alternated each
> week between daytime and nighttime.  Thus, they had one chance every two
> weeks to call their attorney's office.

Johnson-El v. Schoemehl, 878 F.2d at 1051.   The Eighth Circuit described this system as

"patently inadequate," noting that it would be almost impossible for inmates to retain an

attorney.  Johnson-El v. Schoemehl, 878 F.2d at 1051.

55.     The United States Court of Appeals for the Sixth Circuit reached a different

conclusion in Stamper v. Campbell County, Kentucky, 415 F. App'x 678 (6th Cir. 2011).  In that

case, a jail prohibited a pre-trial detainee from using a telephone for the five days before his plea

hearing.  See 415 F. App'x at 678.  The jail cited an incident involving the inmate:

> The incident that led to the telephone suspension at issue began when Stamper
> and his cellmates ignored a sergeant's instruction to remove hanging towels and
> clothing that obstructed her ability to see inside. Deputy jailers then searched the
> cell and located items of contraband including pieces of metal, shank pens, and a
> broken razor handle. The search, moreover, revealed that the inmates had papered
> over an area where they had removed concrete, creating a security risk

415 F. App'x at 679.  The inmate sued under § 1983, arguing that the jail's policy violated his

Sixth Amendment right to counsel.  See 415 F. App'x at 680.  The Sixth Circuit rejected this

argument, explaining that "[e]ven if the telephone suspension violated the Sixth Amendment,

'maintaining institutional security and preserving internal order and discipline are essential goals

that may require limitation or retraction of the retained constitutional rights of both convicted

prisoners and pretrial detainees.'"  415 F. App'x at 680 (quoting Bell v. Wolfish, 441 U.S. at

- 42 -

546). The Sixth Circuit emphasized the "wide-ranging deference" owed to prison administrators on internal security matters. 415 F. App'x at 680 (quoting Bell v. Wolfish, 441 U.S. at 547). See Malki v. Hayes, No. 11-CV-5909 SLT LB, 2012 WL 32611, at *8 (E.D.N.Y. Jan. 5, 2012)(Townes, J.)("[E]ven if the telephone suspension, slow email and delays in adjudicating plaintiff's request for a legal call infringed plaintiff's Sixth Amendment rights, the MDC's countervailing interests in maintaining institutional security and preserving internal order and discipline may well justify the limitation or retraction of such rights.").

56.     Numerous courts have declined to impose tight restrictions on prison officials' judgment regarding pretrial detainees' communications with their attorneys. See O'Mara v. Dionne, No. CIV 08-CV-51-SM, 2009 WL 2170986, at *5 (D.N.H. July 20, 2009)(McAuliffe, J.)("Obviously, pre-trial detainees such as plaintiff have a constitutional right to counsel, but jail officials are not required to facilitate communication between inmates and counsel at any time or in any manner that a detainee might desire."); Porter v. Bodlovich, No. 3;94CV0889 AS, 1996 WL 535436, at *12 (N.D. Ind. Sept. 17, 1996)(Sharp, J.)(upholding prison requirement that offender present a letter from his attorney requesting a telephone call before placing a call). But see Tucker v. Randall, 948 F.2d 388, 390-91 (7th Cir. 1991)("Denying a pre-trial detainee access to a telephone for four days would violate the Constitution in certain circumstances. The Sixth Amendment right to counsel would be implicated if plaintiff was not allowed to talk to his lawyer for the entire four-day period.")(remanding case for further proceedings).

57.     Cases involving prisoners' court access claims have generally upheld even harsher restrictions. See Gilday v. Dubois, 124 F.3d 277, 293 (1st Cir. 1997)("As a prison inmate, Gilday can identify no federal or state right -- constitutional or otherwise -- to utilize a prison phone on his own terms."); Kwanzaa v. Mee, No. CIV. 09-5132 SRC, 2011 WL 2580396,

at *14 (D.N.J. June 28, 2011)(Chesler, J.)("[I]nmates' rights to communicate, even with legal counsel, are not unlimited.  Prison officials can limit communications, particularly telephone communications, to ensure, safety, security, and the orderly operation of their institution.")(citation omitted); Stokes v. Lanigan, No. CIV. 12-1478 PGS, 2012 WL 4662487, at *5 (D.N.J. Oct. 2, 2012)(Sheridan, J.)("[I]f an inmate has an alternative method to communicate freely and privately with his counsel, it is less likely that the restrictions on telephone use will rise to the level of a constitutional violation."); Wilfong v. Morris Cty. Corr. Facility, No. CIV.A. 06-2932(DRD), 2006 WL 3392938, at *6 (D.N.J. Nov. 21, 2006)(Debevoise, J.)("Were this claim of interference with legal communications one only of denial of legal telephone calls, the Complaint might fail to state a claim. Here, however, Plaintiff also alleges that his legal mail is opened outside of his presence."); Williams v. ICC Comm., 812 F. Supp. 1029, 1034 (N.D. Cal. 1992)(Peckham, J.)(holding that denial of legal telephone calls would violate prisoner's rights only if "the telephone is his only avenue for meaningful access to his lawyer because he is unable to contact his lawyer by mail or he is denied visits from his lawyer").  But see Johnson v. Galli, 596 F. Supp. 135, 138 (D. Nev. 1984)(Reed, J.)(allowing claim that use of telephone "once a week" and "sometimes at hours when the person to be called wouldn't be available" violated inmate's constitutional rights to proceed).

58.    In Kwanzaa v. Mee, for example, an inmate alleged that a prison restricted him to "one phone call per week on Thursday" and prevented inmates from "add[ing] a new attorney to their phone list for 90 days."  2011 WL 2580396, at *3.  The Honorable Stanley Chesler, United States District Judge for the District of New Jersey, rejected both arguments, describing the restrictions as a "reasonable exercise of administrative and security concerns with regard to inmates in administrative segregation."  2011 WL 2580396, at *15.

59.     These restrictions are "necessary to protect . . . legitimate government interests."
Procunier v. Martinez, 416 U.S. at 414.   "[C]entral to all other corrections goals is the
institutional consideration of internal security within the corrections facilities themselves." Pell
v. Procunier, 417 U.S. 817, 823 (1974).   Allowing any outsiders to have unmonitored contact
visits with inmates at PNM poses the risk that contraband will be introduced into the facility.
This danger is particularly heightened here, given Folse's record of disciplinary reports.  See Tr.
at 36:12-18 (Malone).   Allowing expanded telephone access, similarly, could allow Folse to
intimidate witnesses, as he may have attempted to do in the past.  See Communications Order at
1-2.  PNM's Level VI includes a dangerous population of prisoners and inmates.  See Frequently
Asked Questions, New Mexico Department of Corrections (2013), http://cd.nm.gov/ocs/fs.html.
The Court is reluctant to interfere in a state's most secure prison unit.  It also accords "substantial
deference to the professional judgment of prison administrators, who bear a significant
responsibility for defining the legitimate goals of a corrections system and for determining the
most appropriate means to accomplish them."  Overton v. Bazzetta, 539 U.S. 126, 132 (2003).
While prison officials or the USMS cannot do anything they want in the name of internal
security, the defendant must show that the security restrictions are actually -- not threatening --
interference with effective counsel representation.  Folse does not -- without more of a showing -
- need to talk to his attorney every day, every few days, or even every week.  He does need to
show more actual interference, or the possibility of interference, with effective communications
with his counsel, which he has not done.  The interference must be real world, not theoretical or
a mere inconvenience.  Folse is, after all, convicted of federal carjacking.  He cannot expect
representation at a maximum-security prison to be like walking into his attorney's office in
downtown Albuquerque.

## III.     THE COURT WILL CONVERT FOLSE'S REMAINING CLAIMS INTO A BIVENS ACTION.

60.     District judges have discretion to convert a motion for civil relief in a criminal case into a civil complaint.  See United States v. Norwood, 602 F.3d 830, 837 (7th Cir. 2010). Even after the conversion process, however, the defendant must "comply with the usual procedural requirements for maintaining a federal civil suit, such as the payment of a filing fee, and, since he is a prisoner, the limitations on prisoner civil rights suits imposed by the Prison Litigation Reform Act, 28 U.S.C. § 1915." United States v. Howell, 354 F.3d 693, 695 (7th Cir. 2004).  See United States v. Belton, No. 88-CR-130, 2007 WL 3046254, at *2 (E.D. Wis. Oct. 16, 2007)(Randa, J.)(requiring a prisoner to pay a filing fee after conversion to a civil case).

61.     The Court exercised this discretion in United States v. Daprano when the defendant submitted additional requests after the Court ordered the USMS to care for his teeth. See 2015 WL 9703299, at *5.  Instead of granting direct relief, the Court denied Daprano's requests and directed "the Clerk of the Court to open a new civil case pursuant to 42 U.S.C. § 1983 for these documents." 2015 WL 9703299, at *5.

62.     The Court will exercise this discretion here.  Because a Bivens action is the proper vehicle to pursue the remaining issues raised in Folse's Motion, the Court denies his requested relief without prejudice and directs the Clerk of the Court to open a new civil case for these documents.  Folse will be required to either pay the filing fee or file a petition to proceed in forma pauperis.  See 28 U.S.C. § 1915; United States v. Christy, 883 F. Supp. 2d at 1052.

63.     The Court has already received briefing relying on the civil cases discussing conditions of confinement and held a hearing on point.  Because the parties have had a more than adequate opportunity to address the issues, the Court will reach the issues without the need for additional briefing if Folse is willing to proceed as any other plaintiff.

**IT IS ORDERED** that: (i) the Motion to Address Conditions of Confinement, filed February 4, 2016 (Doc. 130 in United States v. Folse, No. CR 15-2485 JB (D.N.M.); Doc. 13 in United States v. Folse, No. CR 15-3883 JB (D.N.M.))("Motion"), is denied without prejudice to renewal in the civil case; and (ii) the Clerk of the Court is directed to open a new civil case for the Motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Damon P. Martinez
   United States Attorney
William J. Pflugrath
Samuel A. Hurtado
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Ryan J. Villa
Albuquerque, New Mexico

     *Attorney for the Defendant*