**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**UNITED STATES OF AMERICA,**

            **Plaintiff,**

**v.**                                                                    **15-CR-4268 JB**

**ANDREW GALLEGOS and**
**JOE GALLEGOS,**

            **Defendants.**

**OPPOSED MOTION TO SEVER COUNTS FOUR AND FIVE**

COMES NOW, Defendants Andrew Gallegos, by and through his attorney of record, Donavon A. Roberts, Esq., and joined by Brock Benjamin, Esq., attorney for Joe Gallegos, and hereby moves the Court, pursuant to Rule 14 of the Federal Rules of Criminal Procedure, and the Fifth Amendment to the United States Constitution to sever Andrew Gallegos and/or Counts four and five from the trial of the other co-Defendants, and in support states:

**INTRODUCTION**

Defendants Joe and Andrew Gallegos (Gallegos Defendants) are charged in the 15-count superseding indictment in Counts 4 and 5 with murder and conspiracy to commit murder of Adrian Burns (AB).  *See* Superseding Indictment at 18-19. [Doc. 368].  Andrew Gallegos, who is not charged elsewhere in the superseding indictment, respectfully request that this Court sever Counts 4 and 5 from trial of the other counts in the superseding indictment.  Although, Defendant Joe Gallegos is also charged in counts 1, 13, 14 and 15. *See id.,* he joints in this Motion because the offenses alleged in these other counts involve other different defendants, and occurred in different locations, three to four years after the alleged AB murder, and with respect

to count 1, twelve years before the alleged AB murder. *See id.* Furthermore, none of these additional counts have any relationship to counts 4 and 5.

In support of this Motion, Defendants Joe and Andrew Gallegos advance two main arguments: (1) Counts 4 and 5 were improperly joined under Rule 8(b), as they are not alleged to have participated in the same act or transaction or in the same series of acts or transactions that constitute crimes as the 28 other defendants; and (2) should the Court find joinder proper under Rule 8, severance is still required under Rule 14 and the Fifth Amendment because a joint trial of the two Defendants for Counts 4 and 5 alongside the 28 other defendants and the 13 other counts in the superseding indictment will deprive the Gallegos Defendants of their right to a fair trial, especially given that only a small portion of the evidence in the trial of all the defendants would be relevant to Counts 4 and 5.

In addition to protecting the Gallegos Defendants' right to a fair trial, judicial efficiency and economy supports severance, as a trial of all 24 Defendants on all 15 counts would last considerably longer given the number of defendants and the span of decades between many of the allegations. Further, a joint trial would be logistically impractical because all defendants and their counsel may not even fit in the courtroom during the trial. These logistical limitations alone implicate the Defendants' right to confront witnesses, be present at all critical stages of the trial and to have a public trial under the Sixth Amendment.

## BACKGROUND

The 24 original defendants in this case were charged by Indictment with violations of 18 U.S.C. §1959(a)(1)(5)(6) and 18 U.S.C. §2 (Violent Crimes in Aid of Racketeering or VICAR). *See* Indictment [Doc. 2]. At least 19 of the original defendants were charged with capital eligible offenses and faced the possibility of the death penalty under 18 U.S.C. § 3591 et. seq. The

original Indictment contains special findings required for the imposition of the death penalty. The Court declared the case complex on January 7, 2016.  *See* Order [Doc. 211]. On April 21, 2016, the government unsealed a superseding indictment in this case that alleges additional crimes and adds additional defendants. *See* Superseding Indictment [Doc. 368].  The government also revealed a new indictment in related case no. 16-cr-1613 JB in which some, but not all, of the defendants in the above-captioned matter, are charged with additional criminal acts.  Both indictments allege defendants are members of the *Syndicato Nuevo Mexico* (SNM), and further allege that defendants engaged in racketeering and committed violent crimes in aid thereof.

The distinct charges and separate events in the Superseding Indictment are as follows:

**Count 1: Murder of FC**

Count 1 alleges several Defendants, other than Andrew Gallegos, murdered FC on March 26, 2001, in Dona Ana County.  This alleged murder occurred almost 12 years before the alleged murder in counts 4 and 5.

**Count 2: Murder of RG**

This count is alleged against Defendants Leonard Lujan, Billy Garcia, Eugene Martinez and Christopher Chavez.  None of these Defendants are accused in Counts 4 and 5.  Count 2 alleges these Defendants murdered RG in Dona Ana County on March 26, 2001, also almost 12 years prior to counts 4 and 5.

**Count 3: Murder of FS**

This count is alleged against Defendants Javier Alonso, Edward Troup, Arturo Garcia, Benjamin Clark and Ruben Hernandez.  None of these Defendants are accused in Counts 4 and 5.  Count 3 alleges these Defendants murdered FS on June 17, 2007, in Dona Ana County.  This alleged murder occurred five years prior to the crimes alleged in Counts 4 and 5.

**Counts 4 and 5: Conspiracy to Murder and Murder of Adrian Burns (AB)**

According to the indictment, Joe and his younger brother, Andrew Gallegos, conspired to and did murder AB on or about November 12, 2012, in Socorro and Valencia counties. These alleged crimes occurred at distinctly different times and locations from the crimes alleged in any other counts in the Superseding Indictment and should be sever. Although the basis for Counts 4 and 5 are not precisely clear, it is believed the government's theory of the case is, in part, that Defendants Joe and Andrew Gallegos were allegedly low level members of the SNM who received orders from higher-up to kill AB. It is unspecified as to who specifically gave the kill-order or as to when, where, or how exactly the order came down. At the time of the murder, AB is alleged to have been the Gallegos Defendants' drug supplier and possible rival of the SNM. The Gallegos Defendants, who deny membership with the SNM, are alleged to have tortured and killed AB to gain membership or status with the SNM. AB's body (shot, gasoline doused and burnt) was found in the Bosque with his vehicle, just outside of Socorro County.

The Gallegos Defendants are alleged to have been the last people to see AB alive at his home in Los Lunas, N.M., where he was first shot and killed. Some hours after his death, the Gallegos Defendants were said to have been seen in public with blood and pin-hole burnt marks on their clothes.

On or about November 12, 2012, the State of New Mexico, by the Third Judicial District Attorney's Office in Socorro County, charged Defendants Joe and Andrew Gallegos in County Magistrate Court (Docket No: M-52-FR-2012-00230) with the murder of AB, along with several other related charges. The case was investigated by the New Mexico State Police (NMSP), who later arrested the Gallegos Defendants for the murder of AB on November 20, 2012 in Albuquerque, New Mexico. Upon information and belief, two subsequent DNA tests of the

blood found on their clothing was determined to be non-human.  The burnt marks on their clothes were also tested and determined to be non-gasoline related.  The Gallegos Defendants have asserted all along that the blood came from the roasting of a pig during a birthday celebration the night that they were seen in public, and that the burnt marks were likely from the party or from welding jobs that the brothers often did for spare cash.

On December 14, 2012, the State (after DNA testing) filed a *Nolle Prosequi* for both defendants indicating insufficient evidence to proceed.  Three years later, the first indictment in this federal cause was filed. *See* Indictment [Doc. 2].  Andrew Gallegos and the AB murder were not included in these counts until the superseding indictment was filed on April 21, 2016.  *See* Superseding Indictment [Doc. 368].  The other counts in the superseding indictment, except Counts 6 and 7 did not have a parallel state prosecution.  Furthermore, the AB murder, unlike most of the alleged murders in the Superseding Indictment, occurred outside of prison and was allegedly committed for profit and not retaliatory reasons.  Upon information and belief, there were no witnesses to the murder or specific, concrete evidence, including DNA, that directly links the Gallegos Defendants to this murder, the murder scene, or to the location where AB's body was found.

**Counts 6 and 7: Conspiracy to Murder JM and Murder of JM**

These counts involve Defendants Armenta, Montoya, Sanchez, Varela, Herrera, Perez, Rodriguez and Martinez; collectively, the 2014 Defendants.   They are alleged to have conspired to murder and to murder JM.  Defendants Sanchez and Varela, as alleged intermediate leaders of the SNM, are alleged to have given the go-ahead for the killing.  Defendant Herrera also allegedly sanctioned the killing.  Defendant Perez is accused of providing his walker to make a shank(s) for the killing.  Defendants Rodriguez and Martinez are accused of choking JM in his

prison cell until he was unconscious and Defendants Armenta and Montoya are alleged to have then stabbed Molina multiple times.  All the 2014 Defendants are alleged to be members of the SNM.

**Count 8: Conspiracy to Assault JR**

This count is alleged against Defendants Anthony Ray Baca, Gerald Archuleta, and Conrad Villegas.  Defendant Archuleta has entered a plea agreement.  *See* Plea Agreement [Doc. 586].  Defendant Villegas is not charged in any other counts in this case.  In his Plea Agreement, Defendant Archuleta states that in 2003 he had a falling out with JR, who is also alleged to be an SNM member.  *Id.* at 4.  As a result, Defendant Archuleta states he put a "green light" on JR, which is common slang for ordering the murder of a person.  *Id.*  Because of Archuleta's green light, JR was shot in 2003, but survived, and then was assaulted in 2015 in SNMCF for the same reason.  *Id.* at 4-5.  Defendant Archuleta implicates Defendant Baca as sanctioning the green light, but does not implicate either of the Gallegos Defendants, and there is no information in the discovery to indicate any others were involved.

**Counts 9 and 10: Conspiracy to Murder DS and Conspiracy to Murder GM**

Counts 9 and 10 are both alleged conspiracies to murder Dwayne Santistevan, the head of DOC's STIU and former Secretary of Corrections Greg Marcantel.  Defendants Anthony Baca, Roy Martinez and Robert Martinez, are charged in both counts.  Defendant Roy Martinez has entered a plea to both counts. [Doc. 686]. In his plea, Mr. Martinez claims he conspired with Defendants Baca, Robert Martinez, and others, to kill Marcantel and Santistevan.  There is no evidence the other defendants in these charges were involved in Counts 4 and 5.  There is also no evidence any of the Gallegos Defendants, were involved in either of these two counts.

**Counts 11 and 12: Felon in Possession of a Firearm and 924(c) against Defendant Garcia**

Both of these counts are against only Defendant Garcia, who is alleged to have committed them on November 29, 2015, in Bernalillo County, and there is no information to believe any of the Gallegos Defendants were involved in these crimes.  In fact, the events resulting in Counts 11 and 12 occurred three years *after* the alleged murder of A.B and over one hundred and fifty miles away from each other.

**Counts 13, 14 and 15: Assault, Conspiracy to Murder, and Attempted Murder of JG**

Count 13 is charged against only Defendant Joe Lawrence Gallegos and is alleged to have occurred on March 17, 2015, in Valencia County.  Counts 14 and 15 are alleged against Joe Gallegos, Santos Gonzales, Paul Rivera, Shauna Gutierrez.  These crimes are alleged to have occurred in Otero and Valencia County in February 2016.  Only Joe Gallegos is alleged to be involved in counts 4 and 5, and there is no connection to these crimes and counts 4 and 5, except for the alleged SNM membership of all the defendants.

## ARGUMENT

Joinder in criminal cases is governed by Rule 8, and severance by Rule 14 of the Federal Rules of Criminal Procedure as well as the Fifth Amendment.  Under Rule 8(a) the joinder of offenses is appropriate when the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."  Fed.R.Crim.P. 8(a).  While Rule 8(a) "is construed broadly to allow liberal joinder to enhance the efficiency of the judicial system," *United States v. Janus Indus.*, 48 F.3d 1548, 1557 (10th Cir. 1995), joinder is only proper where at least one of the Rule 8(a) conditions are met, and "those conditions, although phrased in general terms, are not infinitely elastic." *United States v. Randazzo*, 80 F.3d 623, 627 (1st Cir. 1996).  Rule 8(b) applies to the joinder of defendants in a criminal trial. *Zafiro v. United States*, 506 U.S. 534, 535 (1993).  Under Rule 8(b), joinder of

defendants is proper only where the defendants "are alleged to have participated in the same act or transactions, or in the same series of acts or transactions…." Fed.R.Crim.P. 8(b).

Even if two or more offenses or defendants are properly joined under Rule 8(a) or (b), the joinder is subject to scrutiny under Rule 14. *See also United States v. Olsen*, 519 F.3d 1096, 1102 (10th Cir. 2008). While the purpose of joinder is to "promote economy and efficiency and to avoid a multiplicity of trials," these objectives must be achieved "without substantial prejudice to the right of the defendants to a fair trial." *Bruton v. United States*, 391 U.S. 123, 131 n. 6 (1968); *Zafiro*, 506 U.S. at 540. Accordingly, Rule 14(a) provides for relief from prejudicial joinder, allowing that "[i]f the joinder of offenses or defendants in an indictment…or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed.R.Crim.P. 14(a); *Zafiro*, 506 U.S. at 537. Under Rule 14, the determination of the risk of prejudice and the decision whether to grant a motion to sever is soundly within the discretion of the trial court. *Zafiro*, 506 U.S. at 541; *United States v. Haworth*, 168 F.R.D. 658 (D.N.M. 1996)

In determining whether to grant a motion to sever under Rule 14, the Court must weigh the potential prejudice to the defendant against the considerations of judicial economy and efficiency. *Zafiro*, 506 U.S. at 537; *United States v. Dirden*, 38 F.3d 1131, 1140 (10th Cir. 1994). (*internal quotation omitted*). The Tenth Circuit has held that "[p]rejudicial joinder occurs under Rule 14 when an individual's right to a fair trial is threatened or actually deprived." Because "[t]he risk of prejudice will vary with the facts of each case," determining whether severance is required is up to the discretion of the district court. *Zafiro*, 506 U.S. at 539. *See also, Haworth*, 168 F.R.D. at 659 (granting motion to sever in light of likely prejudice to the

moving defendants given the risk of juror confusion and "the circus like atmosphere inherent in a joint trial of this nature" and finding that severance would also facilitate judicial economy).

I.      **The Gallegos Defendants must be severed, as their joinder with other 21 defendants under Rule 8(b) is improper and sets a dangerous precedent for infinite joinders.**

Rule 8(b) governs the joinder of defendants and provides in part that "[t]he indictment or information may charge 2 or more defendants if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed.R.Crim.P. 8(b).  *See also, United States v. Santoni*, 585 F.2d 667, 673 (4th Cir. 1978).

In *Zafiro*, the Supreme Court stated that joinder under Rule 8(b) "serve[s] the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."  506 U.S. at 537.  This possibility of scandal and inequity, however, is not a risk in this case.  In cases where other defendants' charges are based on the same alleged crime and similar evidence or stem from the same conduct, as was the case in *Zafiro*, the court's concern with inequality and inconsistency is understandable.  In *Zafiro*, four defendants were arrested together in an apartment with more than 70 pounds of cocaine and other drugs. *Id.* at 535-36. All four defendants were charged and convicted of conspiring to possess illegal drugs, and the Court affirmed the denial of defendants' motions to sever.  *Id.* at 541.

In *United States v. Hill*, the Tenth Circuit affirmed the district court's denial of a motion to sever where multiple co-defendants and members of the Tulsa, Oklahoma Hoover Crips were tried and convicted of conspiracy to commit bank robbery. 786 F.3d 1254, 1258 (10th Cir. 2015), *cert. denied, Hill v. United States,* 136 S. Ct. 377 (2015). Co-defendant Dejuan Hill's motion to sever was denied because the court reasoned that "[a]lthough the Indictment… charged six different robberies alleged to have been committed by different defendants over a more than two-

year period, it also alleged that the defendants had conspired and agreed with each other to commit all six of the robberies. *Id.* at 1272.

Unlike the defendants in *Zafiro* and *Hill*, here, there is no allegation that the Gallegos Defendants, and the other defendants, with the exception of Defendant Joe Gallegos where noted to have, "conspired and agreed with each other to commit" the other crimes alleged in the indictment. In short, there is no evidence that the crimes alleged in Counts 4 and 5 were part of a series of acts or transactions. Even in the most favorable light, the indictment alleges that, out of the two Defendants in Counts 4 and 5, only Joe Gallegos is alleged to have participated in any of the other counts. Also, there is no evidence of a transactional nexus between the Gallegos Defendants named in Counts 4 and 5 and any of the other defendants or other counts. There is no evidence that the Gallegos Defendants and other defendants participated in a series of acts or transactions despite the fact that the government has actively investigated these defendants for more than four years with the help of cooperating witnesses, confidential informants, and call and mail monitoring.

Further, since the crimes alleged in Counts 4 and 5 only involve the Gallegos Defendants, and are discrete and not connected to any of the other defendants, joinder of the Gallegos Defendants is improper under Rule 8(b), and a separate trial would not lead to potential inconsistent verdicts with regard to the Gallegos Defendants and the other 20 defendants, thus alleviating the *Zafiro* court's concerns for equality and consistency.

The government claims that the purpose of the offenses as well as the means and methods of the SNM constitute racketeering activity as defined in 18 U.S.C. §§ 1959(b)(1) and 1961(1). The government further claim that proof of a "common purpose" is sufficient to bring a group of people under RICO. But, the government should not be allowed to simply use the umbrella of

RICO to join every alleged SNM crime by simply alleging that the offense shared a common purpose. This would create a slippery slope that this Court, as a public policy matter, should view with great caution.  This is because given the broad parameters set by the Government in this case, almost anyone can be prosecuted under the current indictment because every crime is committed with the intent to be beneficial, and under the government's theory, almost anyone that has been incarcerated is either a member or wannabe member of the SNM. Therefore, allowing this joinder would ultimately give the government free range to join almost any gang-related crime into a single indictment and trial.

II.    **Alternatively, counts 4 and 5 should be severed under Rule 14, as the evidence of other murders, assaults, and conspiracy by SNM members will prejudice the Gallegos Defendants, and a joint trial of all defendants on all counts is impractical.**

While the federal system favors a single trial for defendants who are indicted together, *see Zafiro*, 506 U.S. 537, "[t]he Federal Rules envision, however, that circumstances may arise where joint trials would be inappropriate and, indeed, harmful to the accused's constitutional rights." *United States v. Neha*, 2005 WL 3663695, at *2 (Browning, J.) (D.N.M. Sept. 13, 2005), *aff'd, United States v. Neha*, 301 Fed. Appx. 811 (10th Cir. 2008).  Therefore, a three-step inquiry is necessary to determine whether the Court should grant a motion to sever. *United States v. Gould*, 2007 WL 1302587, at *2 (Browning, J.) (D.N.M. Apr. 6, 2007). First, the Court "must determine whether the defenses presented are so antagonistic that they are mutually exclusive." *United States v. Pursley,* 474 F.3d 757, 765 (10th Cir.2007) (*internal quotations and citations omitted*).  Second, "a defendant must further show a serious risk that a joint trial would compromise a specific trial right or prevent the jury from making a reliable judgment about guilt or innocence." *Id*. Finally, "the trial court exercises its discretion and weighs the prejudice to a

particular defendant caused by joinder against the obviously important considerations of economy and expedition in judicial administration." *Id.*

In *United States v. Hardwell,* the Tenth Circuit held that joinder under Rule 8(b) was not proper when six co-defendants were all charged with conspiracy, money laundering, and possession of cocaine with intent to distribute. 80 F.3d 1471 (10th Cir. 1996), *on reh'g in part, United States v. Hardwell,* 88 F.3d 897 (10th Cir. 1996). The Tenth Circuit explained that severance was not necessary, in part, because the "conspiracy was to commit a single offense; there were only six defendants, all charged with the [one] conspiracy" and there was not a great disparity in culpability among the defendants. *Id.* at 1487. In reaching this decision, the court directly contrasted *Hardwell,* with *United States v. Gallo*, 668 F. Supp. 736 (E.D.N.Y. 1987), a RICO case where severance was granted because it is substantially more complex than *Hardwell*, and remarkably similar to the case at hand.

In *Gallo*, the District Court granted the defendants' motion for severance under Rule 14 and separated a 22-count RICO indictment charging 16 defendants into 7 separate trials. *Id*. at 748-61. The 22 count indictment charged the defendants, alleged members and associates of the Gambino Crime Family, with RICO and a multitude of "substantive" offenses that took place over the course of two decades and were related to an alleged criminal enterprise. *Id*. at 738. Although the court determined that the defendants were properly joined under Rule 8(b), it held that severance was required under Rule 14 after considering the prejudice resulting from : (1) the complexity of the indictment; (2) the disproportionality of evidence; (3) whether there is an antagonism of defense strategies and theories; (4) whether there is evidence only admissible as to some defendants; (5) the potential inadequacy of limiting instructions; and (6) the balancing

requirements of Rule 14 including the deleterious effect of prolonged complex cases, and whether granting a severance saves time. *Id*. at 749-58.

The *Gallo* court determined that indictment was sufficiently complex given that the case was a RICO conspiracy and that jury would have to "apply the highly technical and counter-intuitive RICO conspiracy elements to a great range of disparate and predicate conspiracies and events . . ." some occurring nearly 20 years apart. *Id*. at 749-750.  The court noted that "[m]uch of the relevant evidence would have to be stored in the jury's collective mind for many months – and a good deal of it introduced only as to certain defendants or certain charges." *Id.* at 750. The court went on to note the risk of prejudice caused by disproportionality of the evidence, stating that "[t]he difficulties of complex, multifarious cases, as this are compounded for those defendants whom only a small portion of the evidence is relevant." *Id*. "The prejudice concomitant with the case's complexity" the court noted "is 'particularly injurious' to defendants charged in a small portion of the counts and who are implicated by only bits and pieces of evidence" because the jury is subjected to months and months of trial "dealing with dozens of incidents of criminal misconduct that does not involve those minor defendants in anyway. *Id.* (citing *United State v. Branker*, 395 F.2d 881, 882, (2d. Cir. 1968) (*internal quotations omitted*). With regard to the prejudice caused by an antagonism of defense strategies and theories, the court noted that while a simple showing of some antagonism was insufficient, prejudice rising to the level for severance occurs when the "jury must *necessarily* disbelieve the testimony offered on behalf of one defendant in order to believe the core testimony offered on behalf of another." *Id.* at 751 (*quoting United States v. Berkowitz*, 662 F.2d 1127, 1134 (5th Cir.1981)) (*internal quotations omitted*).

With regard to the prejudice created in joint trials when evidence is admissible only as to some defendants but not others, the *Gallo* court explained the likelihood of frequent instances in which "evidence admitted against one defendant would also be relevant as to another under Rule 401, but would be excluded as to the latter under Rule 403 in a separate trial of that defendant alone because its probative value would be outweighed by the danger of unfair prejudice." *Id.* at 752. On this front, the court concluded that it would be "wholly unreasonable for a jury to perform the intellectual feat in a joint trial of using such proof against some defendants and ignoring it as to others." *Id.* (internal quotation omitted). The court explained that, because the indictment charged a central RICO conspiracy, numerous other conspiracies in the substantive counts and the predicates acts and potential uncharged conspiracies, the result would be "conspiracies within conspiracies, and conspiracies to conceal other conspiracies, conspiracies which are discrete and finite, and those which are amorphous and indefinite, involving conspirators joining and leaving the conspiracy at various times." *Id.* at 751. Meaning that in such a complex trial, "[a]dmissibility decisions will often depend on having faith in the jury's ability to heed extraordinarily intricate limiting instructions" which "[o]ver the course of several months … would virtually be impossible without the aid of a computer" given the number of the co-defendants and counts. *Id*. at 752.

The use of such limiting instructions, the court noted, is "cited as a pivotal reason for denying severance in many cases." *Id*. The court, however, concluded that "the trial judge must be convinced that the jury . . . has a reasonable chance of understanding and acting upon instructions from the court," and that while the use of a limiting instructions cannot be "invariably rejected, neither should it be invariably accepted." *Id.* at 752 (*quoting United States v. Figueroa*, 618 F.2d 934, 943 (2d.Cir.1980) (*internal quotations omitted*). Accordingly, the

court reasoned, there will be "some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Bruton,* 391 U.S. at 135. The court found this issue extremely salient, concluding that the *Gallo* case was "far too extensive and intricate" to expect that a jury could "retain such precise discriminations weeks and months down the line, when they retire to deliberate on the basis of a warehouse of diverse evidence." *Gallo* at 753.   Although the accumulation of evidence may be slow and at times subtle, severe prejudice is stacked against the defendants over the course of time

Considering the balancing requirement of Rule 14, the court noted that "[t]rials in these 'monster' cases "create "an enormous burden on the courts, as well as on the defendants, the defense bar, juror, and even prosecutors." *Id.* at 754.  *See generally* Paul Marcus, *Re-Evaluating Large Multiple-Defendant Criminal Prosecutions*, 11 Wm. & Mary Bill Rts. J. 67 (2002); Note, *No Easy Solutions to the Problem of Criminal Megatrials*, 66 Notre Dame L.Rev. 211 (1990) (highlighting the many complications created when trying 'megatrials'). The burden on the court itself includes the purely logistical nightmare of coordinating the "schedules of scores of persons for months on end." *Id.* at 754.  For individual jury members, they are removed from the routine and comfort of their daily lives "for inordinate stretches of time" in which they "must sit stoically and silently for hours every day, day after day" adsorbing "vast quantities of information" and "perform the mental gymnastics" required by the court's limiting instructions resulting in a "process as whole" that is "undoubtedly draining, disorienting, exhausting and often demoralizing." *Id*. The court also noted the "severe disadvantages to the defendants as well," including the potential of being denied their choice of counsel and the prolonged periods of pretrial incarceration defendants face while they are supposedly presumed innocent. *Id.*

Lastly, the *Gallo* court doubted whether conducting a joint trial on all 16 counts charging 22 defendants would, in fact, save time. *Id*. at 756.  The court concluded that "the 'overall' trial time" was probably "diminished in [the *Gallo*] case by splitting up the trials" … because the trial would be "smoother and more concise . . . evidence in each case does not scatter about the various contours of the conspiracy . . . there are two or three defense counsel cross-examining and raising objections rather than one or two dozen . . . sidebars are much more infrequent . . . [and] continuances and adjournments are less common." *Id*. at 757. "More significantly" the court noted that "the later trials are certain to be shortened or even precluded by the earlier trials" because the prosecution will better understand the strengths and weaknesses of its case, and defendants will may be encouraged to accept plea offers. *Id*.

Like *Gallo*, this case deals with a complex RICO indictment spanning decades' worth of criminal allegations. In fact, this Court declared it complex on January 7, 2016, even before the government unsealed the April 21, 2016, superseding indictment. *See* Order [Doc. 211]. Also similar to *Gallo* is the disproportionality of the evidence in relation to the 30 defendants charged. A review of the discovery to date demonstrates that the government has revealed far more and far stronger evidence against some co-defendants, including audio-recorded conversations and self-incriminating statements, than against others. Accordingly, "[i]nevitable prejudice to the peripheral defendants is caused by the slow but inexorable accumulation of evidence against the major players." *Gallo*, at 750 (*quoting United States v. Kelly*, 349 F.2d 720, 759 (2d Cir.1965) (reversing conviction because the trial court should have granted severance, where "some [of the evidence regarding the co-defendant's actions] rubbed off on [defendant] we cannot doubt.")). (*internal quotations omitted*).  To date, the government has only presented rumor, conjectures and circumstantial evidence as to the guilt of the Gallegos Defendants, which is not only

substantially weaker evidence when compared to the evidence against most of the other defendants, but is clearly indicative of the government relying on the principle of "guilt by association" to prove their case in counts 4 and 5.

Given the number of defendants and the fact that discovery is still being provided, it is unclear at this point whether the 30 defendants' defenses are so antagonistic as to be mutually exclusive. However, there can be no doubt that there will be antagonistic defenses. For instance, many defendants may argue they were not or are not SNM members. Other defendants will likely argue the alleged crimes were not done in furtherance of the SNM. Defenses may be further developed as discovery and other litigation progresses, but given the variation in time, location and defendants involved in the other alleged crimes not part of the Gallegos Defendants, it is much more likely than not those mutually exclusive antagonistic defenses will risk causing prejudice to all defendants on trial. Guilt by association is at an extreme risk in this case. For instance, if the government can establish in some or all of the other counts that members of SNM carried out or attempted to carry out murders in furtherance of the SNM, and prove that one or both of the Gallegos Defendants are members of the SNM, that mere fact of gang membership could unfairly prejudice the jury into believing they are guilty of the AB murder. In fact, for those defendants, like the Gallegos Defendants, who contend to have no adult gang affiliation, the mere sight of 30-60 defendants and their lawyers sitting in a courtroom presents a stunning display to the jury of an "established gang", before even a word of evidence has been spoken. This visual imagery is extremely prejudicial to non-gang members sitting in the same courtroom. Furthermore, the gruesome images and description of multiple murders that is expected to be presented to the jury will draw a raw emotional response that is overwhelming and overly

prejudicial by their nature. The Court must guard against the prejudicial duplicity of such evidence.

What is undoubtedly clear is that much, if not all, of the evidence related to the counts in which the Gallegos Defendants are not charged is likely inadmissible in a trial on only Counts 4 and 5, and presenting it to the jury poses a serious risk that the Gallegos Defendants' right to a fair trial will be compromised as the jury will be virtually incapable of reaching a reliable conclusion about each defendant's guilt or innocence. Presentation of evidence on the multiple other alleged murders, conspiracy to commit murder, assaults and the firearms charges not contained in Counts 4 and 5 will subject the Gallegos Defendants to undue prejudice by creating an atmosphere of criminal propensity.  In Counts 4 and 5, the Gallegos Defendants are charged with conspiring to and murdering AB in furtherance of the racketeering activities of the SNM.  If the jury is permitted, however, to hear evidence of the other four alleged murders, four other conspiracies to commit murder, and other violent acts, this will essentially allow the government to introduce propensity evidence.  In other words, in hearing of the other offenses that the government will allege are similar to the AB murder—that is, some of the victims were allegedly murdered for cooperating with law enforcement—there is a substantial risk that jurors will credit these other offenses improperly in determining each Gallegos Defendant's guilt or innocence in regard to the AB murder. As the Tenth Circuit has noted, "prejudice is more likely to occur when the offenses are of the exact same character."  *United States v. Price*, 265 F.3d 1097, 1105 (10th Cir. 2001).  This prejudicial effect threatens the Gallegos Defendants right to a fair trial and weighs strongly in favor of severance.

While the government will suggest that limiting instructions would cure any potential prejudice, such instructions are unworkable in a trial of this complexity and is more aspirational

than a reality.  In a "judicial system, dedicated to truth and justice, such a lack of connection with reality is unacceptable." *Gallo*, 668 F. Supp. at 752. Asking a jury to make hyper-specific determinations after a month's long trial about how and for what they may consider a piece of evidence is impractical and unnecessary given this request for severance. If the indictment dealt with fewer counts or fewer defendants, perhaps a limiting instruction might be appropriate.

In this case, however, if no severance is granted, the jury will hear about the other murders, conspiracies to commit murder (not of the same victims), a conspiracy to commit assault, assault, and an attempted murder plus the firearms charges, all allegedly in furtherance of the SNM.  Simply hearing about this activity by alleged fellow gang members makes it unlikely the Gallegos Defendants can get a fair shake with the jury, even if a limiting instruction is given and even if the defendants present viable defenses.

For some of the reasons delineated above, this Court recently granted a severance in a related indictment. *See United States v. Baca*, 2016 WL 6404772, (Oct. 20, 2016) (Browning, J.) (granting severance in part because a joint trial would prevent the jury from making a reliable judgment in a case where many defendants with varying degrees of culpability would be tried together) (citing *Zafiro v. United States*, 506 U.S. at 539). In *Baca*, with respect to Defendant Gallegos, the Court noted that the risk of prejudice was heightened given the co-Defendants' "markedly different degrees of culpability," *id.*, and noted that the Defendant Gallegos had a "markedly different degree of culpability" in part because "he was allegedly involved in a single incident." *Baca,* 2016 WL 6404772 at *31. Although the Court based its decision to sever that case on several other factors as well, there are clear parallels with this case, where the defendants in question (except Joe Gallegos) are only charged with one incident and the related conspiracy.

In addition, as was the case in *Gallo*, severing the Gallegos Defendants from the other co-defendants would best serve the interest of the Court and the jury.[1] First, this Court will benefit from having fewer schedules to attempt to accommodate and therefore greater flexibility in scheduling matters. Also, conducting separate trials may result in defendants named in the subsequent trial accepting plea offers, thus precluding the need for a trial altogether and increasing judicial efficiency.  Second, selecting a jury will be less difficult because it will be easier to find jury members who are available for the several weeks necessary to sit for the Gallegos Defendants' trial rather than the several months required to try all 29 Defendants for all 15 Counts. Additionally, the longer that the jury has to sit, the greater the risk that Defendants will be found guilty for convenience sake and the risk that jurors' decisions will be influenced by the national media attention that has followed this case.

Severance is also required under Rule 14 to avoid violating the 6th Amendment Rights of the Gallegos Defendants to be present at all critical stages of the trial, confront the witnesses against them and have a public trial. In *United States v. Ellender*, 947 F.2d 748, 754 (5th Cir. 1991), a courtroom specially-modified with bleachers and a "special intercom system of dubious efficacy" were installed to attempt to facilitate the three-month long trial of 23 co-defendants. *Id.*

Even the largest of the federal courtrooms in the District of New Mexico cannot adequately accommodate the trial, much less *voir dire*, if a severance is not granted. *See Gomez v. United States*, 490 U.S. 858, 873 (affirming that *voir dire* is a "critical stage of the criminal proceeding, during which the defendant has a constitutional right to be present").  Unless the

---

[1] The undersigned counsel are aware of the Court's finding in *Baca*, that a joint trial in that case would "certainly be more convenient for the Court," *Baca*, 2016 WL 6404772 at *32, but argue that finding doesn't hold true in this case, given the sheer number of defendants in this indictment and the complexity of the allegations involving disparate and distinct conspiracies over a period of decades.

Court foresees a similar modification to the courtroom as that in *Ellender*, these defendants risk losing their constitutional right to confront witnesses against them.  *See* U.S. Const. Amend. VI ("[T]he accused shall enjoy the right ... to be confronted with the witnesses against him .... ");  *cf.* *Bruton v. United States*, 391 U.S. 123, 136–37 (1968) (holding that threats to a defendant's right to confront witnesses against him poses a "hazard [the Supreme Court] cannot ignore"). Depending on where they are seated, a particular defendant may not be able to see the jury or the witness, may be left out of important bench conferences (by counsel) or other important stages of the trial. Additionally, these defendants risk losing their right to the public trial if they cannot be seated in the courtroom or if the courtroom is simply too full as it has been in the past to allow access to the public and the press.  *See Presley v. Georgia*, 558 U.S. 209, 215 (2010) (explaining that "[t]rial courts are obligated to take every reasonable measure to accommodate public attendance at criminal trials").

### III.   Severance of counts 4 and 5 is necessary to protect the Gallegos Defendants' respective rights to a fair trial under the Fifth Amendment

Severance is discretionary up until the point that joinder of either defendants or offenses cause actual or threatened deprivation of a fair trial. *United States v. Butler*, 494 F.2d 1246, 1256 (10th Cir. 1974)). Misjoinder rises to the level of a constitutional violation when it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial. *United States v. Lane,* 474 U.S. 438, 446 (1986).  Under such conditions, "[t]he dangers for transference of guilt from one to another across the line separating conspiracies, subconsciously or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Kotteakos v. United States*, 328 U.S. 750, 774 (1946).  "[A] criminal defendant has no constitutional right to severance unless there is a strong showing of prejudice caused by the joint trial." *Cummings v. Evans*, 161 F.3d 610, 619 (10th Cir. 1998).  When improper joinder allows

the government to introduce prejudicial evidence that would have been inadmissible had the charges been tried separately and/or when the prosecution joins defendants with grossly disparate charges, courts have recognized the high risk of prejudice that likely requires reversal. *See, e.g., Kotteakos*, 328 U.S. at 773-774 (reversing and holding that, the government was not authorized "to string together, for common trial, eight or more separate and distinct crimes, conspiracies related in kind though they might be, when the only nexus among them lies in the fact that one man participated in all"); *United States v. Mardian*, 546 F.2d 973 (D.C.Cir.1976) (reversing defendant's conviction, who was indicted on only one of several counts and alleged to have been involved in only 5 or 45 overt acts, based upon showing of likely prejudice from a joint trial wherein he had been tried with three of the principal members of the Watergate conspiracy); *United States v. Dockery,* 955 F.2d 50, 53 (D.C.Cir.1992); *United States v. Sampol,* 636 F.2d 621, 645–48 (D.C.Cir.1980) (vacating certain defendant's convictions where the district court failed to grant severance and noting the quantity and type of evidence against co-defendants is a vital consideration in evaluating severance).

In *Butler*, which was not a RICO case but did contain a count naming all 23 defendants and charging conspiracy to convert government property, the Tenth Circuit addressed the improper joinder of multiple distinct conspiracies and the impossibility of a fair trial for some defendants under those conditions. Although the government alleged one general conspiracy, the Tenth Circuit found that the evidence supported the existence of no fewer than three. *Butler*, 494 F.2d at 1255.  In its explanation of the resulting prejudice, the Tenth Circuit could just as easily have been detailing the nature of the indictment in this case, where different combinations of the 30 charged defendants are alleged to have been involved in a series of separate acts, some of them separated by decades. The *Butler* court explained:

> The conspiracy count, which named all twenty-three defendants, alleged as dual purposes of the conspiracy the violations of both 18 U.S.C. §§ 641 and 1361 . . . . It is always difficult to evaluate evidence in a conspiracy case, and because of the secretive nature of the crime, the evidence is almost invariably circumstantial. As the Supreme Court has warned, however, caution must be taken that the conviction not be obtained by piling inference upon inference. . . . That admonition, we think, has special relevance in cases such as this, where many defendants, some of whom were not even acquainted, are charged on the basis of varying degrees of participation at various times. Guilt must be determined individually and not merely by association. Our review of the evidence must therefore be especially meticulous.

*Butler*, 494 F.2d at 1251-1252 (Internal quotation and citation omitted). The Tenth Circuit went on to say:

> Twenty-three defendants were named in the indictment. Different combinations of these defendants were involved in nearly every transaction which figured in the trial. Many of the defendants did not know one another prior to trial. Some of the members of the 3d Mobile may have assisted Sergeant Greene in obtaining and converting Government property from R & M. It is impossible, however, upon the evidence presented at trial, to link any of them with the destruction of an electronic test unit by members of another organization located elsewhere on the base . . . . because Mr. Reinke may have shared mutual acquaintances with those who collaborated in the destruction of the unit, he was forced to acquit himself of their actions. One can only guess whether he was also forced to share their guilt. We can envision circumstances where what has been alleged as one conspiracy is disclosed at trial to be several repetitive conspiracies in which there is substantial identity of parties and method . . . . In such circumstances a curative instruction may well bridge the gap between pleading and proof. Such is not the case here. Mr. Reinke, whose participation was limited to his association with Sergeant Greene and the other members of the 3d Mobile, should have been tried only on the charges arising from that association. The possibility that the issue of his guilt was confused with the guilt of other defendants involved in unrelated transactions at different times and in different places is too great. His convictions must therefore be reversed, and the case is remanded for a new trial.

*Id.* at 1256-1257.

The *Butler* analysis applies here as well, the only further wrinkle being that the crimes charged in counts 4 and 5 are alleged to have been committed in aid of racketeering activity. Here, the fact that the defendants have been charged with VICAR offenses cannot overcome the Gallegos Defendants' right to a fair trial. As the *Gallo* court determined, the complexity of a

large multi co-defendant racketeering case almost demands severance at least "where the severed trials concern aspects of the enterprise which are clearly separable and independent," as is the case here. *Gallo*, 668 F.Supp. at 758.

The Government opposes this Motion.

## CONCLUSION

WHEREFORE, for the foregoing reasons trial on Counts 4 and 5 should be severed from the other Counts to avoid prejudice to the Gallegos Defendants, and to permit a fair trial.

Respectfully submitted,
THE LAW OFFICE OF DONAVON A. ROBERTS

*/s/ Donavon A. Roberts*
Donavon A. Roberts
P.O. Box 36344
Albuquerque, NM 87176
(505) 506-3749
(505) 503-8405 facsimile
ladar170@aim.com

*/s/ Brock Benjamin*
Brock Benjamin
Richard Sindel
Attorneys for Joe Gallegos (2)
brock.benjamin@gmail.com
*Attorneys for Joe Gallegos*

**Joined by:**

*/s/ Russell Dean Clark*
Russell Dean Clark
Donald R. Knight
Attorney for Leonard Lujan (4)

*/s/ Amy E. Jacks*
Amy E. Jacks
Richard Jewkes
Attorneys for Daniel Sanchez (18)

*/s/ Erlinda O. Johnson*
Erlinda O. Johnson

Attorney for Santos Gonzalez (28)

**Unopposed by**:

*/s/ Justine Fox-Young*
Justine Fox-Young, P.C.
Attorney for Rudy Perez

*/s/ Cori Harbour-Valdez*
Cori Harbour-Valdez
Patrick Burke
Attorneys for Edward Troup (3)

*/s/ Robert R. Cooper*
Robert Cooper
James Castle
Attorneys for Billy Garcia (5)

*/s/ Jeffrey Lahann*
Jeffrey Lahann
Phillip Linder
Attorneys for Allen Patterson (7)

*/s/ Orlando Mondragon*
Orlando Mondragon
Attorney for Christopher Chavez (8)

*/s/ Nathan Chambers*
Nathan Chambers
Noel Orquiz
Attorneys for Javier Alonso (9)

*/s/ Billy Blackburn*
Billy Blackburn
Attorney for Arturo Garcia (10)

*/s/ Benjamin Clark*
Jerry Herrera
Stephen Hosford
Attorneys for Arturo Garcia (11)

*/s/ Pedro Pineda*
Pedro Pineda
Attorney for Ruben Hernandez (12)

*/s/ Gary Mitchell*

Gary Mitchell
Attorney for Javier Armenta (13)

*/s/ Larry Hammond*
Larry Hammond
Margaret Strickland
Attorneys for Jerry Montoya (14)

*/s/ Mario Rodriguez*
Santiago Hernandez
Steven M. Plotsky
Attorneys for Mario Rodriguez (15)

*/s/ Steven Almanza*
Steven Almanza
Rey Velarde
Attorneys for Timothy Martinez (16)
*/s/ Mary Stillinger*
Mary Stillinger
Joe Spencer
Attorneys for Mauricio Varela (17)

*/s/ George A. Harrison*
George A. Harrison
Attorney for Gerald Archuleta (19)

*/s/ B.J. Crow*
B.J. Crow
Attorney for Conrad Villegas (20)

*/s/ Theresa Duncan*
Theresa Duncan
Marc M. Lowry
Attorneys for Anthony Ray Baca (21)

*/s/ Charles J. McElhinney*
Charles J. McElhinney
Attorney for Robert Martinez (22)

*/s/ Marcia J. Milner*
Marcia J. Milner
Attorney for Roy Paul Martinez (23)

*/s/ Amy Sirignano*
Amy Sirignano
Christopher W. Adamas

26

Attorneys for Christopher Garcia (24)

*/s/ Michael V. Davis*
Michael V. Davis
Attorney for Carlos Herrera (25)

*/s/ Ryan J. Villa*
Ryan J. Villa
Attorney for Rudy Perez (26)

*/s/ Keith R. Romero*
Keith R. Romero
Attorney for Paul Rivera (29)

*/s/ Angela Arellanes*
Angela Arellanes
Attorney for Shauna Gutirrez (30)

**Takes No Position:**

*/s/ Douglas Couleur*
Douglas Couleur
Carlos Ibarra
Attorneys for Eugene Martinez (6)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 31st day of January, 2017, which caused counsel of record for all parties to receive a copy of this Motion electronically.

*/s/ Donavon A. Roberts*
Donavon A. Roberts