# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

**vs.**                                            **No. 2:15-cr-04268-JB**

**ANGEL DELEON, et al.,**

        **Defendants.**

## DEFENDANT PEREZ'S REPLY TO THE GOVERNMENT'S RESPONSE TO MOTION TO SEVER DEFENDANTS CHARGED WITH OFFENSES IN COUNTS 6 AND 7

Defendant Rudy Perez, by counsel, Ryan J. Villa and Justine Fox-Young, submits this Reply in support of his Motion to Sever [Doc. 807]. Defendant Perez is joined by Defendants Mario Rodriguez,[1] Mauricio Varela, Daniel Sanchez, Anthony Baca and Carlos Herrera (2014 Defendants),[2] in his request to sever the trial of Counts 6 and 7 from the trial or trials of the remaining counts in the Superseding Indictment. The United States filed its Response [Doc. 836] opposing the Motion, arguing all counts and all Defendants should be tried jointly. Defendants Joe Gallegos, Christopher Chavez, Santos Gonzales, Conrad Villegas, and Paul Rivera did not oppose the Motion. No other defendant, in response to counsel's inquiry, indicated opposition to the Motion. Since the filing of the Motion, no defendant has filed any response or other pleading indicating opposition to this Motion. To the contrary, Defendants Edward Troup, Javier Alonso and Arturo Garcia (the Count 3 Defendants) filed a Response in Support of the Motion [Doc. 812];

---

[1] Defendant Rodriguez, who did not originally join the Motion to Sever, subsequently filed a brief indicating his joinder in the Motion. *See* Doc. 845. This brief also replied to the government's Response to the Motion. Mr. Perez incorporates the arguments set forth by Mr. Rodriguez as though stated fully herein.

[2] Defendants Timothy Martinez and Jerry Montoya joined in the original Motion. However, they subsequently entered plea agreements. *See* docs. 852 and 855.

Defendants Joe Gallegos, Edward Troup, Leonard Lujan, Billy Garcia, Allen Patterson and Christopher Chavez (the Count 1 and 2 Defendants) filed a Response in Support of the Motion [Doc. 807]; Defendant Gonzales filed his Motion to Sever Defendant [Doc. 858]; Defendants Andrew and Joe Gallegos filed their Motion to Sever Counts 4 and 5 [Doc. 868]; and Defendants Troup and Billy Garcia's Motion to Sever Counts 1 and 2 (hereinafter "Garcia Motion to Sever") [Doc. 882].

Mr. Perez will not restate the sound arguments made by his co-defendants in those motions, but incorporates each as though stated fully herein.  Based on all of these pleadings before the Court, there is little doubt that severance is required under Rule 8 and Rule 14.  The only question is how the Court should sever the entirety of the Superseding Indictment.  When examining the facts of each count, the grouping of counts as set forth in Exhibit 2 [Doc. 807-2] to Defendant Perez's Motion appears to be the most logical.  *But see* Garcia's Motion to Sever [Doc. 882], at 15 (discussing severance of counts into four trials), *id.* at 18 (discussing severance of counts into five trials).  Regardless of how the other counts and defendants should ultimately be tried, what remains clear is that the six remaining Defendants charged in Counts 6 and 7 should be tried separately from the remaining defendants and the remaining counts.  This outcome is dictated both by Rule 8 and Rule 14.

It is also dictated by judicial economy, both now and during trial.  *See* Garcia's Motion [Doc. 882] at 15-20 (comparing the cost of a joint trial with the cost of severed trials).  Importantly, not only would severed trials save millions of dollars in defense costs as demonstrated by Defendant Garcia, but would also save costs and time during pretrial litigation, as many of the motions and pretrial hearings would be count or defendant specific, allowing for hearings that do not require all Defendants to be present.  Severing Counts 6 and 7 at this juncture, will streamline

the pretrial litigation that will be required and minimize expense and court time.  Undoubtedly, if the Court severs the other counts in the indictment in a similar fashion, the same judicial economy will be obtained for the Court and the parties in those counts.  The government's suggestion this Court should not sever because only a few defendants are likely to proceed to trial is misguided. This approach runs contrary to the interests of judicial economy and is also entirely contrary to the positions of the remaining Defendants.  All six of the 2014 Defendants submit they will proceed to trial.  The remaining Defendants in the remaining counts have indicated the same.  While it is certainly possible some may plea, Defendants do not wish to rely on the government's clairvoyance.

## I.   The 2014 Defendants charged in Counts 6 and 7 were improperly joined with the remaining Defendants charged in the remaining counts.

Whether analyzed under Rule 8(a) or 8(b), the Court should reach the same conclusion that the 2014 Defendants should not have been joined in the same indictment with the remaining defendants on the remaining counts.  The United States is correct that in multi-defendant cases, the Tenth Circuit has held, albeit without much analysis, that Rule 8(b) is the proper vehicle to analyze a claim of misjoinder.  *See United States v. Eagleston*, 417 F.2d 11, 14 (10th Cir. 1969). In *Eagleston*, the Court held "[u]nder Fed.R.Crim.P. 8(b) when there is a joinder of defendants and offenses totally unconnected, there is no room for judicial discretion and the court must grant severance." *Id.* (citing *Ingram v. United States*, 272 F.2d 567 (4th Cir. 1959)).  In *Eagleston*, the court reversed the conviction of a co-defendant, Faubian, based on improper joinder of defendants, because while Eagleston participated in the offenses charged in all three counts of the indictment alleging interstate transportation of stolen vehicles, Faubian participated only in counts two and three.  *Id.*  While lacking in-depth Rule 8 analysis, *Eagleston* supports the 2014 Defendants claims that they have been improperly joined not in just one count, like Faubian, but in 13 other counts

for which none of them, save Defendant Baca, allegedly participated. Even Mr. Baca only allegedly participated in three other counts, Counts 8, 9, and 10, in which none of the other 2014 Defendants are alleged to have participated. Faithful application of *Eagleston* dictates that these other 2014 Defendants could not be tried alongside Defendant Baca in Counts 8, 9 and 10. Thus, severance is required to remedy misjoinder.

To be properly joined under Rule 8(b), defendants must have been alleged to have "participated in the same act of transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). The test for joinder is a "commonsense" one. *United States v. Shellef*, 507 F.3d 82, 98 (2d. Cir. 2007). The test asks "whether, in the light of the factual overlap among charges, joint proceedings" create "sufficient efficiencies such that joinder is proper notwithstanding the possibility of prejudice to" the defendants. *Id*. To justify joinder, the government claims the SNM enterprise ties the Defendants together because all the 2014 Defendants participated in the same predicate acts of the other Defendants. *See* Response at 7. This claim is laughable.

First, and most notably, many of the 2014 Defendants, including Mr. Perez, had not even been incarcerated or allegedly become members or affiliates of SNM at the time the other Defendants were allegedly committing many of the predicate acts. For Mr. Perez, discovery reveals that the government claims he became a member of SNM in 2009. This is over two decades after the SNM's formation and a full 8 years after the murders alleged in Counts 1 and 2. The converse is also true. For instance, Defendant Billy Garcia, charged in Counts 1 and 2, was apparently no longer participating in SNM activity after 2008 and was released from prison in 2013, a year before the Molina murder. *See* Garcia Motion to Sever [Doc. 882] at 12. How could Mr. Perez and Mr. Garcia participate in the same predicate acts as each other when Mr. Garcia was

no longer involved in the SNM as of 2008 and Mr. Perez did not allegedly become a member in 2009?  Indeed, most of the Counts 1 and 2 Defendants, including Garcia, J. Gallegos, E. Martinez, Patterson and Deleon were not even in the Department of Corrections when the alleged acts underlying Counts 6 and 7 occurred.  *Id.* at 4-5; *see also id.*at 5-7 (explaining that the Counts 1 and 2 Defendants were not in prison during the time of the alleged acts charged in Counts 8 through 15).

Courts have found that even when racketeering or multiple conspiracies are alleged in one indictment, there must be some relationship between the facts underlying each offense such that proof of those facts is necessary to establish each offense.  *United States v. Flowers*, 304 F.R.D. 501, 504 (E.D. La. 2015) (citing *United States v. Harrelson*, 754 F.2d 1153, 1176 (5th Cir.1985)); *United States v. Hill*, 786 F.3d. 1254, 1272 (10th Cir.2015) (holding joinder of defendants was proper where defendants shared in an agreement to commit six different robberies and therefore participated in a common plan or scheme). "On the other hand, '[w]hen there is no 'substantial identity of facts or participants between the two offenses, there is no 'series' of facts under Rule 8(b).'" *Id.* (quoting *Harrelson*, 754 F.2d at 1176).  That is the case here.  As explained above, in the other briefing done by co-Defendants, and *infra* pp. 10-14, as well as can be demonstrated at the upcoming hearing on this matter,[3] there is not a substantial identity of participants or facts in Count 6 and 7, and the remaining counts.  Other than the allegation that SNM is an enterprise engaged in racketeering activity, there is no substantial identity of facts between Counts 6 and 7, and the remaining counts.  *Compare United States v. Hill*, 643 F.3d 807, 829 (11th Cir. 2011) (holding three distinct conspiracies were properly joined because each of the charges arose out of Hill's master scheme to defraud lenders through a common plan and design).

---

[3] *See* Minute Order [Doc. 874] (setting hearing on motion to sever Count 6 and 7 for February 7, 2017).

In fact, the allegation that SNM is a single, criminal enterprise, and this same enterprise is responsible for all 15 counts, is suspect.  *See* Garcia's Motion to Sever [Doc. 882], at 9-15 (arguing the allegations in the indictment are not related to a single enterprise, but rather several distinct and different enterprises); *See also* Ninth Circuit Pattern Jury Instruction, VICAR, § 8.151 (requiring government prove enterprise was in existence at relevant time period of violent crime).[4] In such instances, there is no litmus test and courts have looked to a number of factors to determine whether one conspiracy is part of a larger conspiracy for Rule 8 purposes.  *See id.* at 10 (citing *United States v. Abbamonte*, 759 F.2d 1065, 1069; *United States v. Woods*, 1985 U.S. Dist Lexis 16113, at 22-23 (D. Conn. 1985)); Deft. Santos Gonzales's Motion to Sever [Doc. 858] at 5 (citing *United States v. Dowtin*, 2012 WL 7679552, at 2 (E.D.N.Y. 2012); *United States v. Upton*, 856 F.Supp. 727, 736 (E.D.N.Y. 1994).  In sum, these factors include 1.) the number and type of offenses and number of defendants, 2.) the complexity of the indictment, 3.) the time between the occurrences of each conspiracy, 4.) the methods in which the conspiracies took place and other overt acts, 5.) the geographic scope and locations of the conspiracies, 6.) the extent to which the conspiracies share a common objective and interdependence upon one another.  *Id.*  Whether these factors are applied to Counts 6 and 7, or the other Counts, the outcome is the same.  *See* Garcia Motion to Sever [Doc. 882] at 13 (applying *Woods* factors).

Importantly, the government did not allege a single, overarching racketeering conspiracy count against all Defendants.  *See* Superseding Indictment [Doc. 368].  This is likely because as explained, many of the defendants were no longer in prison or involved with the SNM, there was fracturing within the SNM, and the conspiracies alleged did not have joint participants, overlapping facts and were not interdependent.  Generally, such an overarching racketeering

---

[4] The Tenth Circuit does not have a pattern jury instruction for VICAR.

conspiracy count would suffice to overcome Rule 8 misjoinder. *See United States v. Welch*, 656 F.2d 1039, 1049–50 (5th Cir.1981). The court in Welch held that "the joinder of otherwise separate acts may be allowed when the acts are properly linked by means of a conspiracy charge." *Id.  See U.S. v. Jones*, 303 F.R.D. 279, 283-85 (E.D. La. 2014) (finding no misjoinder in 12-defendant indictment charging drug and firearm conspiracies along with RICO conspiracy, where non-RICO defendants were each referenced by name in overt acts section of RICO count and RICO defendants were charged in drug and firearm conspiracy counts and all counts involved same scheme to distribute drugs). The government certainly knows how to plead an overarching RICO conspiracy.  *See United States v. Baca*, No. 2:16-cr-1613-JB, Indictment [Doc. 2], Count 1 (alleging conspiracy to violate 18 U.S.C. § 1962 (RICO)).  Instead, the government alleged discrete acts of violent crimes in aid of racketeering (VICAR) contrary to 18 U.S.C. § 1959.  The elements of a VICAR offense are: 1.) during a specified time period, an enterprise within the meaning of RICO existed; 2.) the enterprise engaged in racketeering activity; 3.) the defendants were members/affiliates of the enterprise; 4.) the defendants committed or conspired to commit a predicate crime of violence; and 5.) the purpose of doing so was for receipt of or consideration for anything of pecuniary value, or to gain entrance to, or to maintain, or to increase the defendants' position in the enterprise.  *See* 18 U.S.C. § 1959; *United States v. Kamahele*, 748 F.3d 984, 1007 (10th Cir. 2014); Ninth Circuit Pattern Jury Instruction, § 8.151.  VICAR counts are decidedly different than a RICO conspiracy, and the mere claim that the government must present evidence that a racketeering enterprise existed for each count, is not sufficient to tie all the counts together under Rule 8.  This is especially true given the extreme differences in time frames for each conspiracy.  The government must prove the enterprise existed and engaged in racketeering for each relevant time period.  The remaining elements for each conspiracy and violent crime are

completely different among the different groups of counts. Accordingly, the government's reliance on cases in which a RICO conspiracy is alleged, which ties all of the participants together, is erroneous.

Simply alleging that the Defendants are members of the SNM does not demonstrate that the Defendants are connected and is insufficient to permit joinder. Absent a showing of interrelated facts or a logical relationship between the other crimes, Counts 6 and 7 must be severed. To be sure, an "indictment need not charge a single overarching conspiracy, provided the separate conspiracies it charges arise from a common plan or scheme and so could alternatively have been charged as a single conspiracy." *United States v. Velasquez*, 772 F. 2d 1348, 1353 (7th Cir. 1985). However, "the mere fact that two conspiracies have overlapping memberships will not authorize a single indictment if the conspiracies cannot be tied together into one conspiracy, one common plan or scheme." *Id*. Here, the United States did not charge a single overarching conspiracy because they could not. The facts simply do not provide sufficient overlapping to warrant it.

In *United States v. Darden*, relied on by the government, the Eighth Circuit affirmed the district court's denial of defendants' motion to sever. 70 F.3d 1507, 1526-27 (8th Cir. 1995). After a nine-month jury trial, the defendants in *Darden* were convicted of various RICO *and* VICAR violations in connection with a cocaine and heroin trafficking enterprise. *Id*. at 1517-18. There, the indictment alleged that twenty-four defendants associated for the purpose of "(1) obtaining an income from the distribution of cocaine, heroin, and marijuana; (2) protecting and preserving the distribution enterprise from competition and interference from law enforcement; and (3) promoting the enterprise and its activities." *Id*. at 1518. The alleged RICO acts included "(i) murder and acts and threats involving murder; (ii) [felony] act(s) involving dealing in narcotic and other dangerous

drugs chargeable under state law ... and (iii) felonious ... dealing in narcotic and other dangerous drugs, punishable under any law of the United States." *Id*. at 1518-19.

Unlike the indictment in *Darden*, the United States' Superseding Indictment against the SNM Defendants does not factually deliver. For example, although the Superseding Indictment describes the SNM as a "powerful and violent prison gang, which controlled drug distribution and other illegal actives in the New Mexico penal system" the indictment does not contain a single drug charge. Instead, the Superseding Indictment strings together various murders, assaults, and alleged conspiracies dating back to 2001.  Even the United States admits that the SNM is not like an ***organized*** crime family, *see* Response in Opposition at 14-15. Unlike the traditional organized crime model, SNM's activities are largely unregulated. Instead of operating on a traditional organized crime model, the SNM has worked more like an independent franchise. Therefore, at any time, various members and associates may be active or inactive within the SNM. They may be scattered throughout different cliques in either a local jail, or the state or the federal prison systems, or on the streets where their allegiance may be first to a street gang and not the SNM. Within the SNM, status is rivalrous and chaotic, making the loose grouping of individuals prone to intra-group conflict. Additionally, given the SNM's extended confinement in segregation, members and associates have been known to opt out of the SNM and complete gang rehabilitation programs to get less restrictive housing assignments.  Under these circumstances, the Count 6 and 7 Defendants cannot be connected to the other defendants merely through their membership or association with the SNM.

This case is unique for many reasons, at least two of which are highly relevant here. First, the government's over-reliance on confidential informants ("CI") in the investigation of the SNM has not resulted in showing that Counts 6 and 7 are factually interrelated to the other courts. To

the contrary, the use of CI's has shown only to produce individually self-serving and contradictory information regarding the killing of Molina and the roles of the Count 6 and 7 Defendants.

Second, only three of the Count 6 and 7 Defendants, Jerry Montoya, Jerry Armenta, and Mario Rodriguez, were charged by the State of New Mexico in the months following the killing. Before the United States became involved, the state's investigation had concluded, and the parties in that case were only weeks away from trial.  Although Jerry Montoya and Jerry Armenta provided statements to the New Mexico State Police, they did not implicate the majority of the other Count 6 and 7 Defendants. Jerry Armenta and Timothy Martinez also provided handwritten statements indicating that the killing of Molina was the result of a personal dispute over drugs and not an SNM sanctioned hit. Therefore, aside from the stories provided by CIs after the United States became involved, there are no factual links between the Count 6 and 7 Defendants to a larger SNM conspiracy.  Further, there is no logical relationship between the murder alleged in Counts 6 and 7 and the other crimes included in the United States' indictment. *See Vasquez-Velaso*, 15 F. 3d 833, 843 (9th Cir. 1994) ("a mere factual similarity between the events is not a sufficient basis for joinder."). Accordingly, joinder under Rule 8(b) is improper, and the Defendants' Motion to Sever should be granted.

## II. Severance under Rule 14 is proper to avoid prejudice and promote judicial economy.

"Even when cautioned, juries are apt to regard with a more jaundiced eye a person charged with two crimes than a person charged with one." *United States v. Smith*, 12 F.2d 83, 85(2d Cir. 1940).  This rational observation of human behavior is even more true with regard to this case where multiple defendants have been charged with multiple crimes and implicated in a large-scale prison gang conspiracy.  In fact, the whiff of prejudice is already in the air because Defendants have been named as members of a prison gang. If counts 6 and 7 are not severed, at trial, this

evidence will be on display and evidence of the gang's alleged character for criminality and propensity for violence will be underscored in such a way that the Rules of Evidence generally prevent. It is highly unlikely that any jury instruction will provide an adequate remedy.

Further, the SNM is not just any gang or even prison gang. The SNM is a prison gang that has been continually associated with the 1980 Santa Fe Prison Right, the most violent and notorious prison riot in American history. As demonstrated by the less than subtle presence of multiple law enforcement agencies and their treatment of the Defendants at hearings in this Court, the Defendants have already been pre-judged as violent and dangerous individuals, not as people entitled to the presumption of innocence.  At trial, the jury is likely to sense this as well, and the effect of having a multi-count and multi-defendant trial will only emphasize it.  The trials of the other counts involving violent crimes outside of prison and plots to kill cabinet members and high-ranking corrections officials will only amplify the prejudice the 2014 Defendants will experience.

While the government's burden of having to prove SNM is a racketeering enterprise only once weighs in favor of a joint trial, severance is warranted given the relative ease of carrying this burden as compared with the substantial and certain prejudice of a joint trial to Defendants. The prejudice stemming from having to try Counts 6 and 7 alongside three other violent murders of allegedly similar character cannot be overlooked.  Counts 1 through 3 involve the murders in prison of three other individuals alleged to be SNM members who cooperated with authorities.  These three murders occurred many years before the Molina murder and also before Mr. Perez allegedly became a member of SNM. Given the extreme temporal differences in these murders—Counts 1 and 2 in 2001, Count 3 in 2007, and Counts 6 and 7 in 2014—the only true connection is the membership in SNM, and the alleged motives for the murders.

If the evidence is strong in a couple of the counts that the murder was in fact an SNM ordered hit on a former SNM member turned cooperator, the risk is extremely high that the jury may convict a defendant in the counts with weaker evidence merely based upon his association with the SNM.  Further, the defenses will be antagonistic.  There is evidence in Counts 6 and 7 that the murder of Molina was the result of a personal dispute between Javier Armenta, one of the hands-on killers now turned cooperators, and was not an SNM ordered hit.  The same cannot necessarily be said for Counts 1 through 3.  A trial on Counts 6 and 7, separate from Counts 1 through 3, prevents the jury from convicting the 2014 Molina Defendants merely on propensity grounds.  To be sure, if the same Defendants conspired to and murdered the victims in all 5 of these counts, they could not be heard to complain about the risk of prejudice that arises from what amounts to propensity evidence, but all of the Count 6 and 7 Defendants, including Defendant Baca, played no role in Counts 1 through 3.

A joint trial with the remaining counts in the indictment presents an entirely different, and perhaps more serious risk of prejudice.  Counts 4 and 5 involve an even more brutal murder than Counts 1-3, and involve motives much different than Counts 1-3, and 6 and 7.  According to Defendant Gallegos's Motion to Sever, the victim in Counts 4 and 5 was murdered not because he was an SNM member who violated the code of cooperating with authorities, but for retaliation and profit.  *See* Doc. 868, at 5.  Moreover, this murder occurred outside of prison and may have been aimed at taking out an SNM rival.  *Id.* at 4. It is also alleged the victim was tortured, shot, doused with gasoline and burned.  *Id.*  This extremely brutal conduct, if presented in a joint trial, would work a whole separate layer of prejudice on the 2014 Defendants.  Aside from the brutality of the murder, the fact that the murder allegedly occurred on the streets brings a whole new aspect to the case.  Jurors hearing of murder inside prison walls may not be fearful as they perhaps expect such

things to happen in prison and do not see themselves or their loved ones ever being in prison. However, outside of prison, everyone is potentially exposed.  It is simply unreasonable to expect jurors to put the facts of Counts 4 and 5 aside when deliberating on the guilt of the 2014 Molina Defendants.

Similarly, counts 13 through 15 are different in that the allegation is that some SNM members believed the alleged victim, who was not in prison, was going to testify, so they ordered him killed.  *See* Gonzales Motion for Severance [Doc. 858] at 1-2, ¶ 3.  The motive to kill the victim in these counts may also have been the victim's failure to supply Defendant Joe Gallegos's girlfriend with heroin while Defendant Gallegos was in prison.  *Id.* at 2, ¶ 5.  This type of (attempted) murder has a decidedly different flavor than those in Counts 1-3, and 6 and 7.  In the latter, the SNM is allegedly killing one of its own members for past cooperation, which is a violation of SNM's code.  The former, involves the more classic (attempted) killing of a witness who is going to testify, or killing for failure to supply drugs as agreed.  It also occurred outside of prison.  The jury hearing this evidence in a joint trial with the 2014 Molina Defendants could easily be prejudiced against them and find guilt for all the wrong reasons, overlooking reasonable doubt as to whether they actually conspired to murder Mr. Molina.

If this were not enough, yet another, different type of prejudice will occur if  Counts 6 and 7 are tried alongside Counts 9 through 12.  Counts 9 and 10 involve the alleged conspiracy to murder Greg Marcantel and Dwayne Santistevan, the Secretary of Corrections and the head of STIU.  Counts 11 and 12 relate to Defendant Garcia's possession of a firearm, purportedly to be supplied to the individual who would carry out the murders of Marcantel and Santistevan   With the exception of Defendant Baca, none of the remaining 2014 Defendants had any alleged involvement in this plot.  It is one thing for the jury to hear about prison gang members killing

their own, in prison, for violating gang code.  It is another to hear about prison gang members killing rival gang members on the street.  However, none of this compares to jurors hearing of a plot to kill a state cabinet member and one of his chief deputies.  The government alleges that Defendant Baca conspired to and ordered these two individuals killed.  It also alleges Defendant Baca ordered the murder of Mr. Molina.  While the evidence of this order in Counts 9 and 10 is strong, in the form of recorded phone calls, the evidence in Count 6 and 7 is all but non-existent, coming only from those with the least credibility—the individuals who actually killed Mr. Molina on video and who are looking for a way out. However, the jury hearing the evidence in Counts 9 and 10, may just assume the same is true in Counts 6 and 7. *See United States v. Villanueva Madrid*, 302 F. Supp. 2d 187, 191 (S.D.N.Y. 2003) (severing trial on laundering counts because it will involve evidence connecting defendant to a corrupt politician and a powerful, violent narcotics cartel, which "may well arouse jury animus that could, in a joint trial, spill over into the jury's consideration of the fraud charges, which involve an alleged scheme which, fortunately, turned out not to have injured anyone.").

As Defendant Garcia aptly argues in his Motion to Sever, a joint trial will involve the introduction of dozens if not hundreds of statements and other items of evidence that are not admissible as to most of the other Defendants.  *See* Garcia Motion at 20.  The Government would have the Court believe that all of this evidence is *res gestae* of the criminal enterprise. *Id.*  Even assuming this were true, there will still be confrontation clause and hearsay problems that will lead to dozens, if not hundreds of limiting instructions.  *Id.* at 21-23 (discussing the problems with limiting instructions in a joint trial of this case).  Defendant Garcia also aptly demonstrates why the cases relied upon by the government do not support severance here.  *Id.* at 23-25.

Finally, analyzing the cost-benefit of having separate trials in favor of one joint trial weighs heavily in favor of severance.  In his motion, Defendant Garcia compares the cost of the defense of a joint trial with that of five severed trials.  *See* Garcia Motion to Sever at 16-20.  The savings is over two million dollars.  *See* Garcia Motion to Sever, Chart, at 19-20.  Counsel for the 2014 Molina Defendants concur with the calculations made in Garcia's Motion.  The defense costs of a trial on Counts 6 and 7 is estimated to be $252,040.96 based on the estimated trial length of two weeks.  These costs would sky rocket if the 12 attorneys for the six 2014 Defendants had to sit through weeks of trial on the facts of the other 13 counts with little to do except ask the Court to read limiting instructions at each and every turn.  As noted by Garcia, this does not include costs for investigators, experts and paralegals, which should not be overlooked.  It would be much easier to estimate when an expert needs to be available either to observe certain portions of the trial or testify if the trial were just on Counts 6 and 7.  If all of the Counts were joined, experts, investigators and support staff would likely have to stay in Las Cruces longer, given the difficulty that comes with predicting when they will be needed, thereby exponentially increasing their costs.

Respectfully submitted,
THE LAW OFFICE OF RYAN J. VILLA

*/s/ Ryan J. Villa*
Ryan J. Villa
2501 Rio Grande Blvd. NW Ste. A
Albuquerque, NM 87104
(505) 639-5709
(505) 433-5812 facsimile
ryan@rjvlawfirm.com

AND

*/s/ Justine Fox-Young*
Justine Fox-Young, P.C.
1903 Wyoming Blvd. NE, Suite B

Albuquerque, NM 87112
(505) 796-8268
justine@foxyounglaw.com

*Attorneys for Rudy Perez*


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading was sent via the Court's CM/ECF system on, this 3rd day of February, 2017, which caused counsel of record for all parties to receive a copy of this Motion electronically.

*/s/ Ryan J. Villa*
Ryan J. Villa