IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' NOTICE OF, AND MOTION *IN LIMINE* TO ADMIT, GANG EXPERT WITNESSES' TESTIMONY**

The United States of America, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G), provides notice to the Court and to Defendants that the United States intends to introduce into evidence at trial the gang expert testimony described below. Under prevailing case law, the expert testimony is relevant to the issues to be tried before the jury and is admissible. The United States, therefore, moves the Court *in limine* to admit this testimony.

**Proposed Expert Testimony**

The United States intends to call Ronald Martin, Chris Cupit and Sergio Sapien of the New Mexico Corrections Department Security Threat Intelligence Unit as expert witnesses in the means and methods of operations of prison gangs, including the Syndicato Nuevo Mexico in particular, and gang affiliations of the victims and defendants. Unit Coordinator Martin will testify in general about prison gang activity and more specifically:

a. The history, culture, codes of conduct, methods of operation and communication, and behaviors of the Syndicato Nuevo Mexico ("SNM") security threat group.

b. The specific membership and affiliation of the Defendants and the Victims in SNM.

c. In general, and specific to SNM, security threat group sanctions; reasons for sanctions; how those sanctions are carried out; and a description of weapons manufactured and used.

d. The rules and requirements for members and associates to participate in SNM-sanctioned violent crimes, including homicides.

Additionally, the testimony will encompass the following information:

The Syndicato de Nuevo Mexico ("SNM"), Spanish for Syndicate of New Mexico, is a powerful and violent prison gang, which controlled drug distribution and other illegal activities within the New Mexico penal system, and was also involved in street level narcotics trafficking. It was formed in the early 1980s at the Penitentiary of New Mexico after a prison riot at the penitentiary in February, 1980. During the prison riot, twelve correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and more than two hundred were injured.

Following the prison riot, the SNM Gang expanded throughout the New Mexico penal system and has boasted of as many as 500 members since the early 1980s. The SNM Gang was comprised of approximately 250 members, who are known as "hermanos," "brothers," "carnales," "dons," "jefes," "big hommies," or "Zia manos" and who controlled the gang. The SNM operated under a "panel" or "mesa" (Spanish for table) of leaders who issued orders to subordinate gang members.

Despite being imprisoned and being closely scrutinized by prison officials, SNM Gang leaders managed to convey orders to SNM Gang members and associates throughout the prison system and outside the prison system through a variety of means, including secret notes, called "kites," or "welas," coded letters, and messages conveyed by complicit visitors. When SNM Gang

members or associates completed their sentences and rejoined their communities, they were expected to remain loyal to the SNM Gang and work to further the goals of the SNM Gang outside the prison environment.  Members who failed to show continued loyalty to the gang were disciplined in various ways, to include murder and assaults. One of the significant goals of the SNM Gang was to control and profit from narcotics trafficking.

In addition to exerting its control in the New Mexico penal system, the SNM Gang also operated on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities.  If a gang did not accede to the SNM Gang's demands, the SNM Gang assaulted or killed the gang's members who were not in custody as well as those members who were incarcerated within the New Mexico penal system.  In addition to intimidation through direct assaults, the SNM Gang was also able to assert control and influence over gang members outside the penal system because gangs did not want their members outside the penal system to be assaulted or killed, and because the gang members knew that, if they are incarcerated, they would need the protection of the SNM Gang while they served their sentences.

The SNM Gang had been and continues to be engaged in a fierce and violent war with rival gangs, to include the Barrio Azteca, Los Carnales, Sureños, and Burqueños gangs. Within the prison system, this rivalry manifested itself in beatings and stabbings, which often resulted in death. Outside the prison system, the SNM Gang fought for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM Gang also engaged in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate

against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it was strong, powerful and not to be provoked.

The SNM Gang sought to maintain its reputation for being strong and powerful and maintained its membership to continue functioning as an organization in prison and on the streets. If the SNM Gang was perceived as being weak, then rival gangs would challenge and assault its members and take over its territory. This could have caused the gang to lose membership and eventually dissolve. The SNM Gang maintained a large membership and a reputation for being strong, powerful and dominant so that rival gangs would think twice before they challenged it and victims/witnesses would think twice about assisting authorities with any prosecution attempt against it.  This allowed the gang to grow in strength, thrive in its criminal activity, and dominate its territory.  A member of the SNM Gang was expected to seek out and beat, stab, or shoot rival gang members.  Similarly, a member of the SNM Gang was expected to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.

SNM Gang members identifed themselves with the Zia symbol and the letters "SNM" or "S," which represented the "Syndicato de Nuevo Mexico" or "Syndicato" which is Spanish for Syndicate. SNM Gang members also utilized the number "19" which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area. The SNM Gang claimed the entire state of New Mexico as its territory, which was broken into four geographical regions: North, South, East, and West. As with the numbers "19," and "505," the letters "S" or "SNM," the Zia symbol, and the Spanish word "Syndicato" were commonly, but not exclusively, displayed by SNM Gang members in tattoos, graffiti, drawings, and on clothing, as a way of displaying affiliation, loyalty, and commitment to the gang.

The purposes of the SNM Gang enterprise includes the following:

a. Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, and murder;

b. Promoting and enhancing the enterprise and the activities of its members and associates through criminal acts, including, but not limited to, murder, attempted murder, narcotics trafficking, theft of vehicles, robberies, and other criminal activities;

c. Keeping victims, potential victims, witnesses, and community members in fear of the enterprise and its members and associates through violence and threats of violence;

d. Protecting the enterprise's members and associates who committed crimes by hindering, obstructing, and preventing law enforcement officers from identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders;

e. Providing information to members and associates of the enterprise, including those who were incarcerated, for the purpose of committing acts of violence, robbery, distribution of controlled substances, and other offenses;

f. Providing financial support and information to SNM Gang members and associates, including those members and associates who were incarcerated.

Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the SNM Gang were the following:

a. Members and associates of the enterprise committed, conspired, attempted, and threatened to commit acts of violence, including murders and assaults, to protect and expand the enterprise's criminal operations.

b. To generate income, members and associates of the enterprise trafficked in controlled substances and extorted narcotic traffickers.

c. To perpetuate the enterprise, members and associates of the enterprise discussed the membership, rules, and enforcement of the rules of the SNM Gang; the status of SNM Gang members and associates who were arrested or incarcerated; the discipline of SNM Gang members; SNM Gang members' encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, drug distribution, possession of firearms, and assault, as well as ways to conceal these crimes.

d. It was further part of the means and methods of the enterprise that members and associates of the enterprise concealed from law enforcement the way in which the enterprise conducted its affairs; the locations where enterprise members discussed and conducted the affairs of the enterprise; the locations where enterprise members stored and possessed weapons and narcotics; and the locations where enterprise members maintained the proceeds from narcotics trafficking.

e. Members of the SNM Gang also used violence to impose discipline within the SNM Gang. It was further part of the means and methods of the enterprise that the defendants and other members and associates of the SNM Gang agreed to distribute narcotics and commit other crimes, and to conceal their criminal activities by obstructing justice, threatening and intimidating witnesses, and other means.

**Security Threat Intelligence Unit Sergeant Ronald Martin**

Sergeant Martin has specialized knowledge and is a recognized authority on the topic of prison security threat groups, also known as prison gangs, and the SNM in particular. He has 15 years of experience and has served in the Security Threat Intelligence Unit for 11 years. Sergeant

Martin is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and law enforcement agencies.

As Sergeant, it has been Martin's responsibility to collaborate with other law enforcement authorities, conduct drug trafficking investigations inside and outside of security facilities, gather intelligence, make risk and security threat assessments, and conduct internal security investigations for certification on the California Sureno prison gang for the New Mexico Corrections Department ("NMCD").

Sergeant Martin was qualified as a gang expert and provided testimony concerning the California Sureno gang culture and ideology. He testified on behalf of the NMCD concerning security threat issues concerning SNM members.

Sergeant Martin's years of service in the NMCD dealing with prison security threat groups and SNM specifically qualifies him as a gang expert in this matter.

Sergeant Martin's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case

**Security Threat Intelligence Unit Investigator Chris Cupit**

STIU Investigator Cupit has specialized knowledge and is a recognized authority on the topic of prison security threat groups, also known as prison gangs, and the SNM in particular. He has been employed by the NMCD for approximately 11 and a half years. While employed with the NMCD, Investigator Cupit has worked at the Penitentiary of New Mexico in Santa Fe New Mexico. He was also employed at the Federal Bureau of Prisons USP Atwater in Atwater California for one and a half years. Investigator Cupit has served with the Security Threat Intelligence Unit (STIU) for approximately six and a half years as an Institutional Investigator. His

duties entailed basic gang identification, identifying organized gang threats towards staff, inmates and the public, to include investigating criminal activity of a gang, which includes a working interaction with Law Enforcement officials. STIU Investigator Cupit is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and to law enforcement agencies. Investigator Cupit is Certified Trainer for the NMCD, and provides Gang Trainings for the New Mexico Corrections Training Academy, New Mexico Law Enforcement Academy, and instructed at various seminars throughout the state.

As an STIU Investigator, Investigator Cupit has been an investigating officer and supervisor with the Department of Correction gang unit. It has been Investigator Cupit's responsibility to assist in the process to certify prison security threat groups (a.k.a., prison gangs) as criminal, to identify members of those security threat groups, and to collect intelligence on and conduct investigations into those security threat groups and associated individuals.

Investigator Cupit's years of service in the NMCD dealing with prison security threat groups and SNM specifically qualifies him as a gang expert in this matter.

STIU Investigator Cupit's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case.

**Security Threat Intelligence Unit Captain Sergio C. Sapien**

STIU Captain Sapien has specialized knowledge and is a recognized authority on the topic of prison security threat groups, also known as prison gangs, and the SNM in particular. He has been employed by the NMCD approximately 17 and a half years. While employed with the NMCD, Capt. Sapien has worked Southern New Mexico Correctional Facility in Las Cruces New Mexico, Central New Mexico Correctional Facility in Los Lunas New Mexico, and the

Penitentiary of New Mexico in Santa Fe New Mexico He has served in supervisory positions for the last 10 years as a Sergeant, Lieutenant, and Captain. Capt. Sapien and has served with the Security Threat Intelligence Unit (STIU) for over three years as the STIU Captain/Institutional Investigator. His duties entailed basic gang identification, identifying organized gang threats towards staff, inmates and the public, to include investigating criminal activity of a gang, which includes a working interaction with Law Enforcement officials. STIU Capt. Sapien is a recognized expert in his field of prison gangs; he has provided prison gang training and seminars to all levels of corrections and to law enforcement agencies.  Capt. Sapien is Certified Trainer for the NMCD, and provides Gang Trainings for the New Mexico Corrections Training Academy, New Mexico Law Enforcement Academy, and instructed at various seminars throughout the state.

As STIU Captain, Capt. Sapien has been an investigating officer and supervisor with the Department of Correction gang unit. It has been Capt. Sapien's responsibility to certify prison security threat groups (a.k.a., prison gangs) as criminal, to identify members of those security threat groups, and to collect intelligence on and conduct investigations into those security threat groups and associated individuals.

Capt. Sapien's years of service in the NMCD dealing with prison security threat groups and SNM specifically qualifies him as a gang expert in this matter.

STIU Capt. Sapien's experience demonstrates specialized knowledge that is central to this trial, and essential to the United States' burden to prove beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case.

**Applicable Law**

The information regarding the training, experience, and qualifications of the proposed witnesses in their respective field, within the context of the testimony proffered, demonstrates that

9

the testimony of this witness is both relevant and reliable. If any of the testimony outlined above is challenged, the United States respectfully submits that, pursuant to *Kumho Tire Co., Ltd. v. Carmichael*, the Court should exercise its "special gatekeeping obligation" and should determine that the testimony is admissible as the witnesses have "a reliable basis in knowledge and experience" in their field. 526 U.S. 137, 152 (1999). *See also United States v. Charley*, 189 F.3d 1251, 1261 (10th Cir. 1999); *United States v. Goxcon-Chagal*, 886 F. Supp. 2d 1222, 1233 (D.N.M. 2012) (Browning, J.), *aff'd sub nom. United States v. Medina-Copete*, 757 F.3d 1092 (10th Cir. 2014).

It is within the Court's "broad discretion" to determine the means for assessing an expert's reliability and in making the ultimate determination of reliability. *See United States v. Velarde*, 214 F.3d 1204, 1208-09 (10th Cir. 2000). The United States respectfully submits that, if the testimony outlined above is challenged, the Court should treat this notice as a proffer on the training, background and education of the witness and allow the witness's testimony. Specifically, the United States submits that the testimony of the witness has "a reliable basis in the knowledge and experience of the [relevant] discipline." *See Velarde*, 214 F.3d at 1208 (quoting *Kumho Tire*, 526 U.S. at 149). *See also Taylor*, No. CR 07-1244 WJ, Mem'm Opinion Order at 2-3.

While Rule 704(b) prohibits an expert from expressing a direct conclusion as to the actual mental state of the defendant, the proposed testimony, which provides the jury with information upon which to make that final conclusion but does not expressly draw that conclusion for the jury, has been found to be permissible and not to fall within "the narrow range of opinions still prohibited under Rule 704." *United States v. Richard*, 969 F.2d 849, 855 (10th Cir. 1992) (quoting *United States v. Theodoropoulos*, 866 F.2d 587, 591 (3d Cir.1989)); *United States v. Mirabal*, 2010 WL 3894137 (D.N.M. 2010) (Browning, J.) ("[T]aking the Tenth Circuit's language [in

10

*Richard*] at face value, the only testimony that would violate rule 704(b) is testimony that the defendant had the mental state necessary to commit the crime charged. As long as it takes the jury some inferential step to get from the testimony to the defendant's mental state, the witness testimony does not violate the rule."). Whereas the United States' expert witnesses will testify that the SNM is a prison and its criminal acts lead them to opine that the SNM is, in their opinion, an enterprise, the Honorable William P. Johnson, United States District Judge for the District of New Mexico, concluded that this is proper and admissible gang expert testimony in a RICO or VICAR case, as it does not speak to a defendant's requisite mental state. *See Taylor*, No. CR 07-1244 WJ, Mem'm Opinion & Order at 9-10 ("Defendant's argument ultimately amounts to a concern that if SA Griego opines that he is connected with a violent gang in which people often agree to commit violent crimes, the jury will *infer* that he had the requisite mental state. The Tenth Circuit has explicitly held that expert testimony giving rise to such an inference is allowable under Rule 704(b)." (citing *United States v. Richard*, 969 F.2d 849, 854-55 (10th Cir. 1992)).

In this case, there are no novel scientific principles at play and adequate assurances of reliability are set forth above. Accordingly, if any of the testimony set forth above is challenged, this Court should rule that this evidence is admissible based on the pleadings. In the alternative, even if the Court decides that some form of hearing is necessary regarding some of the testimony, the Court may reserve ruling on the testimony's admissibility until it is offered at trial. *See United States v. Nichols,* 169 F.3d 1255, 1262-63 (10th Cir.) (no abuse of discretion to decline to hold a preliminary evidentiary hearing), *cert. denied*, 528 U.S. 934 (1999).

WHEREFORE, the United States respectfully provides notice of its intent to offer the above-described expert testimony in its case-in-chief at trial because the proposed testimony has a "reliable basis in the knowledge and experience" of the witnesses' respective discipline. The

United States thus moves this court *in limine* to permit this expert testimony.

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

**Electronically filed on 10/6/2017**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM  88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney