IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Criminal Case No.  15-cr-4268-JB

UNITED STATES OF AMERICA,

Plaintiff,

v.

ANGEL DELEON,
JOE GALLEGOS,
EDWARD TROUP,
**BILLY GARCIA**,
ALLEN PATTERSON,
CHRISTOPHER CHAVEZ,
JAVIER ALONSO,
ARTURO ARNULFO GARCIA,
MARIO RODRIGUEZ,
MAURICIO VARELA,
DANIEL SANCHEZ,
CONRAD VILLEGAS,
ANTHONY RAY BACA,
CHRISTOPHER GARCIA,
CARLOS HERRERA,
RUDY PEREZ,
ANDREW GALLEGOS,
SANTOS GONZALEZ,
SHAUNA GUTIERREZ, AND
BRANDY RODRIGUEZ.
                    Defendants.

---

**RESPONSE AND OBJECTION TO GOVERNMENT'S PROPOSED GANG EXPERT
EVIDENCE (DOC. No. 1299) ON SIXTH AMENDMENT CONFRONTATION
AND EVIDENTIARY GROUNDS**

---

Defendant Billy Garcia hereby objects to the Government's Proposed Gang Expert

Evidence (Doc. No. 1299) on the grounds that it will violate his Sixth Amendment

Confrontation Clause rights and Fed.R.Evid Rule 404(b).[1] The government opposes this response. Defendants Joe Gallegos, Edward Troup, Christopher Chavez, Arturo Arnulfo Garcia, Mario Rodriguez, Daniel Sanchez, Anthony Ray Baca, Christopher Garcia, Carlos Herrera, Rudy Perez, and Andrew Gallegos join in the response and defendants Allen Patterson, Mauricio Varela, Conrad Villegas, Shauna Gutierrez, and Brandy Rodriguez have no objection to the response.  Mr. Garcia offers the following grounds in support of his position:

## I.    <u>INTRODUCTION</u>

The government seeks to call at trial three individuals it has designated as gang experts: Ronald Martin, Chris Cupit, and Sergio Sapien of the New Mexico Corrections Department Security Threat Intelligence Unit. *See* United States' Notice of, and Motion in Limine to Admit Gang Expert Witnesses' Testimony (Doc. No. 1299).

All three of these proposed experts were government investigators involved in debriefings and inmate interviews over the course of the very investigation underlying this case.  In other words, these witnesses are case agents and/or investigators who the government now seeks to also use as gang experts to prove the essential elements of VICAR charges.

The government indicates that these individuals have gained their expertise, in part, from gathering intelligence and conducting investigations, including criminal investigations into the Syndicato de Nuevo Mexico ("SNM") "in particular" and the above-captioned

---

[1] This is not the only objection the defense has to the government's endorsement of gang experts. Other objections will be set forth in separate pleadings regarding disclosure issues and *Daubert* challenges.

defendants. *See* Doc. No. 1299, p.1. The government admits quite candidly that it seeks to introduce this expert testimony to prove, "beyond a reasonable doubt the VICAR charges that it brings against the Defendants in this case."  Doc. No. 1299, p.7, 8, and 9.

The government's notice alludes to only one actual opinion that these officers would render at trial ("Whereas the United States' expert witnesses will testify that the SNM is a prison (gang) and its criminal acts lead them to opine that the SNM is, in their opinion, an enterprise.")  Doc. No. 1299, p.11.  The remaining testimony of these three officers as outlined by the government appears not to be opinion evidence at all, but rather a compilation of factual information that these officers and others have collected from testimonial statements from other gang intelligence officers and from inmates during investigative interviews. These officer sources of information include direct conversations with informants and statements by other police officers.  Those latter officers presumably received their information from other informants and/or other officers who had likewise obtained their information from other informants.

In other forensic expert situations, the basis of the expertise is not the testimonial statements of other people. For example, DNA evidence is based on science that has nothing to do with forensics. When James Watson and Francis Crick discovered the double helix shape of DNA, they were not doing so under circumstances in which an objective witness would reasonably believe that their discovery would be available for use at a later trial.

But the gang testimony in this case, which the government characterizes as expert testimony, is entirely built on anecdotal evidence which, in reality, is almost entirely derived from reports from other law enforcement officers or out-of-court statements made by gang members to law enforcement during the course of investigations.  It appears from the

government's notice that it also wishes to use the gang experts to provide a summary of evidence, like is often done in grand jury proceedings.

The Confrontation Clause contemplates an "in limine procedure" to establish the constitutional admissibility of testimonial hearsay statements. *Davis v. Washington*, 547 U.S. 813, 829 (2006). Mr. Garcia hereby asserts his Sixth Amendment rights and objects to any statements at trial that involve no expertise at all, but rather simply parrot testimonial hearsay in violation of his Confrontation Clause rights.

II. **LEGAL PRINCIPLES**

A. **Confrontation Clause**

The Sixth Amendment's Confrontation Clause guarantees the right of the accused "to be confronted with the witnesses against him." U.S. Const. amend. VI. It bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). This is a "bedrock procedural guarantee" that "commands not that evidence be reliable but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." *Id.* at 42.

Core testimonial statements include "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Crawford*, 541 U.S. at 52. They also include "those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant*, 131 S.Ct. 1143, 1155 (2011).

There is no "forensic" or "expert" exception to the Confrontation Clause. *Melendez-Diaz v. Massachusetts*, 129 S. Ct. 2527, 2535 (2009); *Bullcoming v. New Mexico*, 131 S. Ct.

4

2705, 2713 (2011); *see also Crawford*, 541 U.S. at 54 (there are no "open-ended exceptions from the confrontation requirement to be developed by the courts."); *Giles v. California*, 128 S. Ct. 2678, 2692 (2008) ("The guarantee of confrontation is no guarantee at all if it is subject to whatever exceptions courts from time to time consider 'fair.' ")

The Tenth Circuit recognizes that special considerations arise under the Confrontation Clause in the context of gang-expert testimony:

> But there is no sociological expertise in testifying to gang members' specific travels, specific uses of gang funds, or commission of specific crimes, . . ., When the expert's testimony on such matters is not based on personal knowledge but on testimonial hearsay, the testimony violates not only the rules of evidence but also the Confrontation Clause. We have repeatedly cautioned about the impropriety of permitting an "expert" witness to "parrot" testimonial hearsay. As we said in *Pablo*, "If an expert simply parrots another individual's out-of-court statement, rather than conveying an independent judgment that only incidentally discloses the statement to assist the jury in evaluating the expert's opinion, then the expert is, in effect, disclosing that out-of-court statement for its substantive truth; the expert thereby becomes little more than a backdoor conduit for an otherwise inadmissible statement." . . ., An important consideration in distinguishing proper testimony from parroting is the generality or specificity of the expert testimony. As stated in *Mejia*, when gang-expert testimony descends to a discussion of specific events recounted by others, the expert is merely adding "unmerited credibility" to the sources, 545 F.3d at 192 (internal quotation marks omitted), and summarizing evidence in a way that should be reserved for the government's closing argument.

*United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015).

In *Garcia*, the Circuit Court quoted *United States v. Mejia*, 545 F.3d 179, 187 (2d Cir. 2008) with approval.  The *Mejia* Court found:

> If the officer expert strays beyond the bounds of appropriately "expert" matters, that officer becomes, rather than a sociologist describing the inner workings of a closed community, a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt. As the officer's purported expertise narrows from "organized crime" to "this particular gang," from the meaning of "capo" to the criminality

> of the defendant, the officer's testimony becomes more central to the case, more corroborative of the fact witnesses, and thus more like a summary of the facts than an aide in understanding them.

*Mejia*, 793 F.3d at 190. [2]   In *Meija*, the district court had allowed an officer to testify as a gang expert, not only about the structure and activities of the gang to which the defendants allegedly belonged, *but also about facts gathered during the investigation*. The Second Circuit held that the lower court had erred in admitting the testimony for three main reasons. First, the expert testified about matters that were within the grasp of the average juror, in violation of Fed.R.Evid. 702. *Id*. at 194-96.  Second, portions of the expert's testimony violated Fed.R.Evid. 703 because he '"repeat[ed] hearsay evidence without applying any expertise whatsoever,' a practice that allows the Government 'to circumvent the rules prohibiting hearsay.'" *Id*. at 197 (quoting *United States v. Dukagjini*, 326 F.3d 45, 59 (2nd Cir. 2003)). Third, the expert's repetition of out-of-court testimonial statements made by individuals during custodial interrogations violated the defendants' Confrontation Clause rights under *Crawford*.  *Id*. at 198-99.

 *Garcia* and *Mejia* make clear that "[w]hen an expert's bailiwick is only "internal expertise" of the investigation at hand and the expert does no more than "disgorge . . . factual knowledge to the jury," the expert is "no longer aiding the jury in its factfinding [but is] instructing the jury on the existence of the facts needed to satisfy the elements of the charged offense."" *Garcia*, 793 F.3d at 1213 (quoting *Mejia*, 793 F.3d at 191).

 Under *Garcia*, the following types of statements from a proposed gang expert constitute inadmissible testimonial hearsay in violation of the Confrontation Clause:

---

[2] The government fails to cite or mention *Garcia*, *Mejia* or *Pablo* in its notice and *in limine* motion to admit gang expert witness' testimony.

1.      Gang expert testimony based on out-of-court statements from gang

members.  *Garcia*, 793 F.3d at 1214 ("He simply relayed what DV gang

members told him ["about the DV's home-invasion robberies of Guatemalan

immigrants"].")

2.      Expert testimony "presumably based upon testimonial-hearsay

statements of" gang members and victims to police. *Id*. at 1215.

3.      Expert testimony concerning a defendants' "status, meaning seniority or

respect" in the gang.  *Id*.

This list is not exhaustive, nor has the specific issue of gang expert testimony as it relates to

Confrontation Clause concerns been fully fleshed out to date in appellate cases.[3] This may be

due to the recency of the *Melendez-Diaz* and *Bullcoming* decisions.

This Court has previously addressed challenges to gang expert testimony but not in

the context of Confrontation Clause objections. *United States v. Goxcon-Chagal*, 885 F.

Supp. 2d 1118, 1142, (D.N.M. 2012).

The government often argues and offers assurances to the court and the defense that

the expert information will not be offered for the truth of the matter asserted.  Such

statements are not credible.  It is, of course, true that "[[o]ut-of-court statements that are

related by the expert ***solely*** for the purpose of explaining the assumptions on which that

opinion rests are not offered for their truth and thus fall outside the scope of the

---

[3] *See United States v. Pablo*, 696 F.3d 1280, 1293 (10th Cir 2012) ("We add that the manner in which, and degree to which, an expert may merely rely upon, and reference during her in-court expert testimony, the out-of-court testimonial conclusions in a lab report made by another person not called as a witness is a nuanced legal issue without clearly established bright line parameters.")

Confrontation Clause." *Id. see also Crawford,* 541 U.S., at 59–60, n. 9) (The Confrontation

Clause "does not bar the use of testimonial statements for purposes other than establishing

the truth of the matter asserted." *Williams v. Illinois*, 132 S. Ct. 2221, 2235 (2012) (emphasis

supplied).  Where the purpose in providing an expert's testimony, however, is to establish the

crime base, or the "enterprise," "racketeering," "enterprise engaged in, or its activities

affected, interstate or foreign commerce" elements or the *mens rea* element of "for the

purpose of gaining entrance to or maintaining or increasing position in an enterprise," the

evidence is absolutely offered for the truth of the matter asserted and, therefore,

Confrontation Clause analysis must apply. Even if that is not the stated purpose, there is a

great danger that the jury will use the information for precisely that purpose. "It is

nonetheless appropriate for district courts to recognize the risk that a particular expert might

become nothing more than a transmitter of testimonial hearsay and exercise their discretion

in a manner to avoid such abuses." *United States v. Johnson*, 587 F.3d 625 635 (4th Cir.

2009) (cited with approval in *Pablo*, *supra*).

> **B.** **Law enforcement witnesses who provide both expert and percipient testimony**

To the extent that experts rely on their own observations, there are significant dangers

when experts sprinkle their lay observations in with expert testimony. The Ninth Circuit has

expressly recognized:

> We have cautioned district courts about the dangers of allowing a case agent to
> offer both expert and lay opinion testimony. [A]n agent's status as an expert
> could lend him unmerited credibility when testifying as a percipient witness,
> cross-examination might be inhibited, jurors could be confused and the agent
> might be more likely to stray from reliable methodology and rely on hearsay.

*United States v. Vera*, 770 F.3d 1232, 1242 (9th Cir. 2014).

So too has the Tenth Circuit: "We recognize that witnesses who testify in both a lay capacity and an expert capacity may present special risks at trial. The 'aura of special reliability and trustworthiness surrounding expert testimony,' may give the witness 'unmerited credibility' and "create[] a risk of prejudice 'because the jury may infer that the agent's opinion about the criminal nature of the defendant's activity is based on knowledge of the defendant beyond the evidence at trial.'" *United States v. Sandoval*, 680 Fed. Appx. 713, 718 (10th Cir. 2017) (quoting *United States v. Dukagjini*, 326 F.3d 45, 53-54 (2d Cir. 2002) (citations omitted)).

The *Mejia* Court observed that, "[a]n increasingly thinning line separates the legitimate use of an officer expert to translate esoteric terminology or to explicate an organization's hierarchical structure from the illegitimate and impermissible substitution of expert opinion for factual evidence," finding "it a little too convenient that the government has found an individual who is expert on precisely those facts that the government must prove to secure a guilty verdict -- even more so when that expert happens to be one of the government's own investigators." *Mejia,* 793 F.3d at 190-91.  The Court found that the expert's particular use of facts from the case was not harmless beyond a reasonable doubt regarding the elements of the offenses to be proven.  *Id.* at 202. *See also United States v. Grinage*, 390 F.3d 746, 750 (2d Cir. 2004) ("When a jury hears that an agent's opinion is based on the total investigation, there is a risk it may improperly defer to the officer's opinion, thinking his knowledge of pertinent facts more extensive than its own."); *Dukagjini*, 326 F.3d 45, 54 ("As the testimony of the case agent moves from interpreting individual code words to providing an overall conclusion of criminal conduct, the process tends to more

closely resemble the grand jury practice, improper at trial, of a single agent simply summarizing an investigation by others that is not part of the record.").

A district court must exercise its gate-keeping responsibilities in defining the proper bounds of such expert testimony, particularly where the challenged witness is offering a hybrid of expert and lay opinion, drawing not only from training and experience, but percipient facts, and facts obtained from witnesses who are unavailable at trial. *Freeman*, 498 F.3d at 903; *Daubert*, 509 U.S. at 592-93.

Because juries typically place great stock in expert testimony, the Supreme Court has required judges to ensure "that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. This rule extends to non-scientific witness testimony, including testimony from law enforcement experts. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147 (1999).[4]

The Court in *Freeman* was concerned with allowing investigators to serve as both percipient and expert witnesses. *Freeman*, 498 F.3d at 903. First, "a case agent who testifies as an expert receives 'unmerited credibility' for lay testimony." *Id*. (quoting *Dukagjini*, 326 F.3d at 53). Second, "expert testimony by a fact witness or case agent can inhibit cross-examination" since a "failed effort to impeach the witness as expert may effectively enhance his credibility as a fact witness." *Id*. Third, "there is an increased danger that the expert testimony will stray from applying reliable methodology and convey to the jury the witness's sweeping conclusions about appellants' activities." *Id*. Fourth, there is a danger that some "jurors will find it difficult to discern whether the witness is relying properly on his general

---

[4] The defense suggests that it may be efficient to analyze the issues raised in this motion when and if a *Daubert* hearing is conducted.

experience and reliable methodology, or improperly on what he has learned of the case." *Id*. Finally, "when a case agent/expert strays from the scope of his expertise, he may impermissibly rely upon and convey hearsay evidence," running "afoul of the Sixth Amendment Confrontation Clause." *Id*. (further citations omitted); quoted in part in *United States v. Anchrum*, 590 F.3d 795, 803 (9th Cir. 2009).

One of the significant problems with a witness testifying as both an expert and a percipient witness is that different rules apply to each type of evidence. Percipient witnesses may not rely on inadmissible evidence in offering their testimony as they must have personal knowledge of the matters they relate. Fed.R.Evid. Rule 602.   Experts, by contrast, are authorized by rule to express opinions, which are arrived at, in part, through review of inadmissible evidence. Fed.R.Evid. Rule 703.

The Tenth Circuit has declined to adopt a per se rule prohibiting or authorizing the use of case agents as experts, "choosing instead to rely on determinations made by 'the trial judge who is attuned to the dynamics of the trial.'" *Sandoval*, 680 Fed. Appx. at 719.

### C.    Fed. R. Evid. 404(b)

The foundation proposed for the governmental testimony at issue here will, of necessity, violate Fed. R. Evid. 404(b). That Rule generally prohibits using evidence of 'other crimes, wrongs, or acts' to prove the "character of a person in order to show action in conformity therewith." That is precisely what the government says it wants to do here - to show how other SNM members have behaved historically as a means of explaining why the defendants in this case, and Billy Garcia in particular, must have behaved the same way during the charged period of time.

In other words, even setting aside the Sixth Amendment issues identified here, it is nevertheless clear that the gang-expert evidence would run afoul of the Federal Rules of Evidence.

III.     **APPLICATION**

The government seeks to introduce the following categories of information from its experts. After each such category, using the same lettering in the government's notice (Doc. No. 1299), the defense describes why the described evidence it is derived from testimonial statements and/or violates Rule 404(b), and therefore inadmissible:

A.     "**The history, culture, codes of conduct, methods of operation and communication, and behaviors of the Syndicato Nuevo Mexico ("SNM") security threat group**."  (Doc. No. 1299, p.1)

Virtually all of this information could only have been obtained through law enforcement interviews and interrogations of inmates or through reports prepared from gang intelligence officers. Ostensibly, the individual testifying witnesses can testify to their observations of the behaviors of gang members.  But this is lay testimony not expert testimony, and even those observations are problematic given that testimonial statements comprise the basis of identifying any particular inmate, whose behavior is being described, as a member of the SNM. Method of operation testimony is clear propensity evidence prohibited under Fed. R. Evid. 404. See Defendants' Motion for Notice of FRE 404(B), 405, 406, 608 and Res Gestae Evidence (Doc. No 1047).

It is unclear what is meant by the "behaviors" of the SNM but depending on the actual testimony there are obvious confrontation, relevancy and Fed. R. Evid. 404 concerns.

B. "**The specific membership and affiliation of the Defendants and the Victims in SNM.**" (Doc. No. 1299, p.1-2)

The government has previously indicated that any gang expert would not be an employee of the New Mexico Department of Corrections. 10/4/2016 hrg, 149:21-150:5 (Doc. No. 743). The Court relied on that representation in denying discovery of DOC materials relevant to how corrections arrived at the conclusion that a defendant is a member of the SNM. 2/18/2017 Memorandum Opinion and Order, p. 114 (Doc. No. 907). But now the government seeks to call corrections officers as experts to do exactly what they indicated they would not.

Unless the expert personally spoke to a defendant or victim and was told by that individual that he was a member of the SNM or a different gang, any such information would necessarily be derived from documents that were collected or hearsay statements that are testimonial in nature, documents which the government has not produced and successfully fought to not produce under the representation that any gang expert would not be from corrections.  To allow such testimony under the guise of expert testimony would be to tolerate an end-around to *Crawford*, and would result in the government impermissibly shielding and insulating its case and the sources of its information from scrutiny and "testing in the crucible of cross examination," *Crawford*, *supra* at 61, which is "the principal means by which the believability of a witness and the truth of his testimony are tested." *Davis v. Alaska*, 94 S. Ct. 1105, 1111 (1974).

C. "**In general, and specific to SNM, security threat group sanctions; reasons for sanctions; how those sanctions are carried out; and a description of weapons manufactured and used**." (Doc. No. 1299, p.2)

Again, unless personally observed by the witness, this information is undoubtedly derived from other law enforcement reports which are testimonial and which may contain further information derived from testimonial statements made by inmates to law enforcement. It is also unclear whether this area of offered testimony specifically relates to the crimes charged.

D.    "**The rules and requirements for members and associates to participate in SNM sanctioned violent crimes, including homicides**." (Doc. No. 1299, p.2)

This information could only have been derived from inmate interviews or interrogations in which core testimonial statements were provided.

The government also provides a narrative as to what its experts will testify.  This proposed testimony is based on testimonial statements of others to wit:

A.    "**The Syndicato de Nuevo Mexico ("SNM"), Spanish for Syndicate of New Mexico, is a powerful and violent prison gang, which controlled drug distribution and other illegal activities within the New Mexico penal system, and was also involved in street level narcotics trafficking. It was formed in the early 1980s at the Penitentiary of New Mexico after a prison riot at the penitentiary in February 1980. During the prison riot, twelve correctional officers were taken hostage and several of them were seriously assaulted and raped by inmates. Thirty-three inmates were killed during the riot, and more than two hundred were injured**." (Doc. No. 1299, p.2).

It is highly doubtful that the experts endorsed by the government witnessed any of the above-described events.  As such, this information would be gleaned from reports, which are testimonial in nature, and therefore prohibited under *Crawford* and its progeny. The deaths

and rapes of correctional officers and inmates by individuals predating the alleged formation of the SNM is completely irrelevant and highly prejudicial.

B.      "**Following the prison riot, the SNM Gang expanded throughout the New Mexico penal system and has boasted of as many as 500 members since the early 1980s. The SNM Gang was comprised of approximately 250 members, who are known as "hermanos," "brothers," "carnales," "dons," "jefes," "big hommies," or "Zia manos" and who controlled the gang. The SNM operated under a "panel" or "mesa" (Spanish for table) of leaders who issued orders to subordinate gang members**." (Doc. No. 1299, p.2)

Again, it is doubtful that the experts endorsed by the government witnessed any of the above-described events such that this proposed testimony could only be gleaned from reports, which are testimonial in nature.

The Court, if it admits any of this historical evidence of bad acts by the SNM, should also place a temporal limit on the evidence. *United States v. Cuch*, 842 F.2d 1173, 1177 (10th Cir. 1988) (Before a Court may admit such evidence, it, "must be reasonably close in time to the crime charged.")

C.      "**Despite being imprisoned and being closely scrutinized by prison officials, SNM Gang leaders managed to convey orders to SNM Gang members and associates throughout the prison system and outside the prison system through a variety of means, including secret notes, called "kites," or "welas," coded letters, and messages conveyed by complicit visitors. When SNM Gang members or associates completed their sentences and rejoined their communities, they were expected to remain loyal to the SNM Gang and work to further the goals of the SNM Gang outside**

**the prison environment. Members who failed to show continued loyalty to the gang were disciplined in various ways, to include murder and assaults. One of the significant goals of the SNM Gang was to control and profit from narcotics trafficking.**" (Doc. No. 1299, p.2)

Again, this information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement.  It is, therefore, objectionable under *Crawford*. It is also information that cooperating inmates can relate and therefore, there is no need for expert testimony on the subject.

D.     "**In addition to exerting its control in the New Mexico penal system, the SNM Gang also operated on the streets of New Mexico by intimidating and influencing smaller New Mexico Hispanic gangs for the purpose of establishing a larger network for the SNM's illegal activities. If a gang did not accede to the SNM Gang's demands, the SNM Gang assaulted or killed the gang's members who were not in custody as well as those members who were incarcerated within the New Mexico penal system. In addition to intimidation through direct assaults, the SNM Gang was also able to assert control and influence over gang members outside the penal system because gangs did not want their members outside the penal system to be assaulted or killed, and because the gang members knew that, if they are incarcerated, they would need the protection of the SNM Gang while they served their sentences**." (Doc. No. 1299, p.3)

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement.  This is the same type of testimony that crosses permissible boundaries under *Garcia* and *Mejia*.

E.      "**The SNM Gang had been and continues to be engaged in a fierce and violent war with rival gangs, to include the Barrio Azteca, Los Carnales, Sureños, and Burqueños gangs. Within the prison system, this rivalry manifested itself in beatings and stabbings, which often resulted in death. Outside the prison system, the SNM Gang fought for control of territory in which to conduct narcotics trafficking and other crimes, as well as to recruit and influence non-gang members. In addition to fighting for control over numerous illegal activities and using violence and terror for the purpose of enriching themselves, the SNM Gang also engaged in violence simply to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, to gain notoriety and show its superiority over others, and to send a message to others that it was strong, powerful and not to be provoked**." (Doc. No. 1299, p.3-4)

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. This proposed evidence is also bad character evidence that is inadmissible under Fed. R. Evid. 404(b).

F.      "**The SNM Gang sought to maintain its reputation for being strong and powerful and maintained its membership to continue functioning as an organization in prison and on the streets. If the SNM Gang was perceived as being weak, then rival gangs would challenge and assault its members and take over its territory. This could have caused the gang to lose membership and eventually dissolve. The SNM Gang maintained a large membership and a reputation for being strong, powerful and dominant so that rival gangs would think twice before they challenged it and victims/witnesses would think twice about assisting authorities with any prosecution**

17

**attempt against it. This allowed the gang to grow in strength, thrive in its criminal activity, and dominate its territory. A member of the SNM Gang was expected to seek out and beat, stab, or shoot rival gang members. Similarly, a member of the SNM Gang was expected to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.**" (Doc. No. 1299, p.4).

Again, this information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. It is also evidence which, by its very nature, is designed to give "extra" credibility to government informants. This proposed evidence is also bad character evidence that is inadmissible under Fed. R. Evid. 404(b).

G.      "**SNM Gang members identified themselves with the Zia symbol and the letters "SNM" or "S," which represented the "Syndicato de Nuevo Mexico" or "Syndicato" which is Spanish for Syndicate. SNM Gang members also utilized the number "19" which represents the 19th letter of the alphabet, "S," and "505," which corresponds with the area code for the greater Albuquerque area. The SNM Gang claimed the entire state of New Mexico as its territory, which was broken into four geographical regions: North, South, East, and West. As with the numbers "19," and "505," the letters "S" or "SNM," the Zia symbol, and the Spanish word "Syndicato" were commonly, but not exclusively, displayed by SNM Gang members in tattoos, graffiti, drawings, and on clothing, as a way of displaying affiliation, loyalty, and commitment to the gang**." (Doc. No. 1299, p.4).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement.

H.      "**The purpose of the SNM Gang Enterprise includes the following:**

1.      **Preserving and protecting the power, territory, reputation, and profits of the enterprise through the use of intimidation, violence, threats of violence, assaults, and murder**; (Doc. No. 1299, p.5).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony. It is also inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

2.      **Promoting and enhancing the enterprise and the activities of its members and associates through criminal acts, including, but not limited to, murder, attempted murder, narcotics trafficking, theft of vehicles, robberies, and other criminal activities**; (Doc. No. 1299, p.5).

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony.  This evidence is inadmissible bad character evidence under Fed.R.Evid. Rule 404(b).

3.      **Keeping victims, potential victims, witnesses, and community members in fear of the enterprise and its members and associates through violence and threats of violence**; (Doc. No. 1299, p.5).

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony.  It is also inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

4.      **Protecting the enterprise's members and associates who committed crimes by hindering, obstructing, and preventing law enforcement officers from**

**identifying the offenders, apprehending the offenders, and successfully prosecuting and punishing the offenders**; (Doc. No. 1299, p.5).

The government derived this information entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement. *Garcia* and *Mejia* preclude this type of testimony.  It is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b). It is also hearsay as to the effect on the government's lack of evidence in the case.

5.      **Providing information to members and associates of the enterprise, including those who were incarcerated, for the purpose of committing acts of violence, robbery, distribution of controlled substances, and other offenses**; (Doc. No. 1299, p.5).

The government could only have derived this information from testimonial statements made by law enforcement or inmates speaking to law enforcement.  This is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

6.      **Providing financial support and information to SNM Gang members and associates, including those members and associates who were incarcerated**." (Doc. No. 1299, p.5).

The government could only have derived this information from testimonial statements made by law enforcement or inmates speaking to law enforcement.  This is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

I.      "**Among the means and methods by which the defendants and their associates conducted and participated in the conduct of the affairs of the SNM Gang were the following**:

1.     "**Members and associates of the enterprise committed, conspired, attempted, and threatened to commit acts of violence, including murders and assaults, to protect and expand the enterprise's criminal operations**." (Doc. No. 1299, p.5).

Again, this information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. Rule 404 (b). *Garcia* and *Mejia* preclude this type of testimony.

2.     "**To generate income, members and associates of the enterprise trafficked in controlled substances and extorted narcotic traffickers**." (Doc. No. 1299, p.5).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. 404(b) and is irrelevant to the crimes charged. This information is irrelevant to the crime charged in this VICAR prosecution.

3.     "**To perpetuate the enterprise, members and associates of the enterprise discussed the membership, rules, and enforcement of the rules of the SNM Gang; the status of SNM Gang members and associates who were arrested or incarcerated; the discipline of SNM Gang members; SNM Gang members' encounters with law enforcement; the identities of individuals suspected of cooperating with law enforcement and the proposed actions to be taken against them; and plans and agreements regarding the commission of future crimes, including murder, drug distribution, possession of firearms, and assault, as well as ways to conceal these crimes**." (Doc. No. 1299, p.6).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement.  *Garcia* and *Mejia* prohibit this type of evidence, which is also inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b).

        4.     **"It was further part of the means and methods of the enterprise that members and associates of the enterprise concealed from law enforcement the way in which the enterprise conducted its affairs; the locations where enterprise members discussed and conducted the affairs of the enterprise; the locations where enterprise members stored and possessed weapons and narcotics; and the locations where enterprise members maintained the proceeds from narcotics trafficking.**" (Doc. No. 1299, p.6).

        This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b). Again, much of this information is irrelevant to this VICAR prosecution.

        5.     **"Members of the SNM Gang also used violence to impose discipline within the SNM Gang. It was further part of the means and methods of the enterprise that the defendants and other members and associates of the SNM Gang agreed to distribute narcotics and commit other crimes, and to conceal their criminal activities by obstructing justice, threatening and intimidating witnesses, and other means.**" (Doc, 1299, p. 6).

This information was derived entirely from testimonial statements made by law enforcement or inmates speaking to law enforcement and is inadmissible evidence of bad character under Fed.R.Evid. Rule 404(b). *Garcia* and *Mejia* preclude this type of testimony.

IV.   **CONCLUSION**

To be clear, despite the narrow permissive allowance for some gang expert testimony authorized in *Garcia*, supra, Mr. Garcia objects to all proposed expert testimony through the officers identified by the government because that testimony will necessarily rely almost entirely on testimonial statements of other law enforcement and testimonial statements of inmates who spoke to law enforcement.  The inmates' statements to law enforcement all occurred where the inmate or an objective person would reasonably believe that the inmate's statements to law enforcement would be available for use at a later trial.  Such statements may also be layered with double or triple hearsay and/or double or triple testimonial statements. If not carefully controlled and limited, the gang expert testimony here – as in *Mejia* and *Garcia* – could easily descend to a discussion of specific events recounted by others, with the proposed experts merely adding "unmerited credibility" to the sources, and summarizing evidence in a way that should be reserved for the government's closing argument.  *Garcia*, 793 F.3d at 1213.

**WHEREFORE**, the defendant Billy Garcia respectfully requests that the Court deny the government's motion *in limine* to admit gang-expert testimony, or at a minimum, carefully and scrupulously limit any such testimony as required by the Sixth Amendment.

Respectfully submitted this 17th day of October 2017.

/s/ Jim Castle
Robert Cooper
Jim Castle
Attorneys for Billy Garcia (5)

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2017, I presented the foregoing to the Clerk of the Court for filing and uploading to the CM/ECF system which will send notification of such filing to counsel of record.

/s/ James A. Castle
James A. Castle