IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

## UNITED STATES' RESPONSE TO DEFENDANT RUDY PEREZ'S MOTION TO SUPPRESS LOST OR DESTROYED EVIDENCE (DOC. 1300)

Defendant Rudy Perez, joined by Defendants Anthony Baca, Daniel Sanchez, Carlos Herrera, Chris Garcia, Billy Garcia, Arturo Garcia and Edward Troup, filed a Motion Suppress Lost or Destroyed evidence (Doc. 1300) ("Motion to Suppress") moving the Court for "suppression and exclusion of all evidence, physical, testimony, obtained, derived from or through or pertaining to certain lost or destroyed physical evidence."  Motion to Suppress at 1. In the alternative, Defendant is requesting the Court "to instruct the jury with an "adverse inference instruction" pursuant to *Arizona v. Youngblood* and its progeny."  *Id.*  Specifically, Defendant is requesting this Court for suppression and exclusion of the following:  (1) any and all post-cooperating statements made by government witnesses regarding allegations that Defendant voluntarily provided pieces from his walker to other inmates to make a murder weapon to be used on J.M., (2) any and all post-cooperating statements provided by goverement witnesses that the J.M. murder was "triggered by the arrival of 'paperwork' to the Southern New Mexico Correctional Facility ("SNMCF"), (3) any and all images or testimony regarding a walker that belonged to Defendant, (4) any and all evidence or testimony regarding Defendant's

walker, and (5) any and all physical evidence or testimony regarding the "paperwork"" pertaining to the murder of J.M.   Motion to Suppress at 2.   However, Defendant fails to meet his burden under *Youngblood* and as such, the Court should deny the Motion to Suppress in its entirety.

## BACKGROUND

On March 7, 2014, at approximately 5:18 p.m., a fight broke out in HUIA B-Pod at SNMCF.   First responders and an ambulance were called because an inmate had been stabbed. While life saving measures were performed on inmate J.M., no pulse was detected and he was later pronounced dead at Memorial Medical Center upon arrival.

Video surveillance prior to the murder showed Jerry Montoya and Jerry Armenta meet up and walk toward the victim's cell. Shortly after they entered the victim's cell, Timothy Martinez left the cell in a rush.   Mario Rodriguez exited next. Shortly thereafter, the victim exited his cell and appeared to be trying to get away from Montoya and Armenta.   When the victim turned towards the camera, a red blood stain in the middle of his chest was visible. Thereafter, Montoya and Armenta continued to assault the victim at the bottom of the stairs.

Following the attack, law enforcement officers found two homemade knives ("shanks") that were located in the trash can next to the staircase, and a third shank that was located in the top shower.

The autopsy report listed the cause of death as multiple stab wounds (43), most of which were to the chest and abdomen.   There were two clearly discernible stabbing patterns, indicating two persons stabbed the victim.

In March of 2014, Jerry Montoya and Jerry Armenta were charged with First Degree Murder by a State of New Mexico grand jury, along with other felonies, relating to the death of J.M.   Mario Rodriguez was charged separately by the State of New Mexico with charges relating to one of the weapons used in the murder of J.M.   All State charges were dismissed in November, 2015 based on the fact that the Federal Government was going to prosecute the murder.

On December 1, 2015, a Federal grand jury indicted codefendants Armenta, Montoya, Rodriguez, Martinez, Baca, Varela and Sanchez in Counts 4 and 5 with Violent Crimes in Aid of Racketeering for the Conspiracy to Murder and Murder of J.M.   Doc. 2 at 18-19.

The investigation continued after the Federal Indictment, and Rudy Perez made incriminating statements while in NMCD that were recorded by another inmate that was working with the Government in early 2016.

Perez was interviewed in 2014 as part of the original investigation.   However, at that time, Perez stated that he was taking a shower and, when he got out of the shower, someone had removed a piece of metal from his walker.   Photographs were taken by New Mexico Corrections Department ("NMCD") of this walker; they demonstrate a perfect fit.   That perfect fit means that one of the murder weapons is consistent with having come from Perez's walker.

On April 21, 2016, Defendants Perez and Herrera were added in the First Superseding Indictment to the counts involving the murder of J.M.

Overall, the Federal Indictments in this case charged approximately 31 defendants with, among other crimes, Violent Crimes In Aid of Racketeering, including charges that they conspired to murder and assault certain individuals. (Docs. 2, 368, 949).   Specifically, this case

deals with the Syndicato Nuevo Mexico ("SNM") prison gang, a criminal organization whose members or associates engage in acts of violence and other criminal activity including murder. Doc. 368 at 2.

Three codefendants charged in the J.M. murder have pled guilty and are expected to testify.

## RELEVANT LAW

Defendant incorporates the "legal principles and case law set forth in co-defendant Billy Garcia's Motion to Dismiss, Doc. 1283.   Motion to Suppress at 7.

Cases that involve exculpatory evidence or potentially exculpatory evidence that the government has destroyed or lost generally fall into two separate categories under the Supreme Court cases of *Trombetta* or *Youngblood*.[1]   Under *Trombetta*, a Defendant can claim a due process violation when it is shown that: (1) the destroyed evidence had exculpatory significance that was "apparent before" it was destroyed and; (2) that the defendant remains "unable to obtain comparable evidence by other reasonably available means."   *United States v. Gomez*, 191 F. 3d 1214, 1218-19 (10th Cir. 1999).

Under *Youngblood,* for destroyed evidence that is only considered to be "potentially useful," the Defendant must show government bad faith.   *Id.   See also United States v. Bohl,* 25 F.3d 904, 910 (10th Cir. 1994).   Specifically, the Supreme Court in *Youngblood* stated that a different standard from *Trombetta* should apply when it comes to evidence that could have been subjected to tests which might have led to exculpatory results.   *Youngblood,* 488 U.S. at 57-58. The fact that the government controlled the evidence before destruction and failed to preserve it

---

[1] *California v. Trombetta*, 467 U.S. 479, 488 (1984);   *Arizona v. Youngblood*, 488 U.S. 51, 58 (1988).

does not, in itself, constitute government bad faith. *United States v. Richard*, 969 P.2d 849, 853 (10th Cir. 1992), cert. denied 506 U.S. 887 (1992). Further, mere negligence on the part of the government does not amount to bad faith. *United States v. Parker*, 7 F.3d 1444, 1452 (10th Cir. 1995). Altogether, it is the Defendant's burden to show that destroyed or lost evidence was useful or exculpatory and, when relevant, that there was government bad faith. *United States v. Donaldson*, 915 F.2d 612, 614 (10th Cir. 1990); *Bohl,* 25 F.3d at 913. More specifically, Defendant "bears the burden of showing that the missing evidence met that standard when the evidence was lost." *United States v. Harry*, 816 F.3d 1268, 1276 (10th Cir. 2016). *See also Gomez*, 191 F.3d at 1218.

## ARGUMENT

Defendant is specifically alleging that there are "crucial items" no longer obtainable to include (1) surveillance records of the pods in which the "paperwork" was passed, (2) physical evidence from the NMCD corroborating whether paperwork was found on the inmates that were transferred from the Penitentiary of New Mexico ("PNM") to SNMCF, (3) surveillance recordings which would include the entrance of Defendant's cell, and (4) Defendant's walker. Motion to Suppress at 6-7. However, these items do not amount to evidence that was "apparently exculpatory" prior to being lost or destroyed. Additionally, it is pure speculation that all of these items would assist the defense by being exculpatory in nature. Most likely, the disputed evidence would have assisted the prosecution.

**A. Surveillance records of the pods in which the "paperwork" was passed.**

The paperwork that was required to confirm the J.M. hit was brought down to SNMCF by Lupe Urquizo on March 6, 2014 when he was transferred from PNM. Urquizo then gave the

paperwork to Defendant Herrera while he was still in a cell, and in turn, Defendant Herrera passed the paperwork to the adjoining Pod (most likely under the door) for the murder to be completed.

Defendant argues that the lack of surveillance recordings "of the two pods, had they not been destroyed or lost, would further corroborate" the defense theory that there was no physical evidence that paperwork passed ordering J.M.'s murder. However, the information as to the paperwork was not known to law enforcement until well after surveillance recordings were taped over. In 2014, the NMCD video recording system only saved recordings for 23 days, at which point, they were taped over. Therefore, the recordings would have been taped over in March, 2014. It was not until 2015 that information as to paperwork coming down from PNM was provided to law enforcement, and post-indictment in this case when the details as to the passing of the paperwork was provided to the government. Therefore, Defendant has not met his burden that the destroyed evidence had exculpatory significance that was "apparent before" it was destroyed.

**B. Physical evidence from NMCD corroborating whether paperwork was found on inmates that were transferred from PNM to SNMCF.**

Defendant argues that the failure to provide corroborating documents that paperwork was found on the inmates that were transferred from PNM to SNMCF immediately before J.M.'s murder is exculpatory. However, the inmate that brought down the paperwork is expected to testify that he placed the paperwork in his legal documents. As such, the correctional officer that conducted the inspection would not have conducted a thorough review of that portion of his property upon arrival at SNMCF. Additionally, the Government will be able to provide to

6

Defendant the name of the correctional officer that inspected and inventoried the transferees' property.  Currently, NMCD is searching for any documents pertaining to that inventory.

As such, Defendant fails to meet the requirements of *Youngblood* with regard to this "lost evidence."  At the initial investigation of the J.M. murder in 2014, the details of how the paperwork came to SNMCF was not known to New Mexico State Police or NMCD.  It was much later in this investigation that information about paperwork coming down from PNM to SNMCF was investigated.  There is no evidence that the Government had knowledge of any possibly exculpatory value of the evidence at the time it was lost or destroyed.  Most importantly, the Defendant will be provided with the name of the correctional officer whose duty it was to inspect and inventory the transferees' property.

**C. Surveillance records which would include the entrance of Defendant's cell and Defendant's walker.**

Defendant is also requesting surveillance records which would include the entrance to Defendant's cell, and also argues that the walker itself is an essential item of material evidence that is necessary for his defense.  Motion to Suppress at 13.

At the time of the initial investigation by NMSP, it was unknown to NMSP that one of the shanks possibly came from the Defendant's walker.  The case agent, NMSP Sgt. Antonio Palomares, did not realize that one of the shanks came from Defendant's walker.  Sgt. Palomares believed that parts from a *wheelchair* were used, and when Defendant indicated that correctional officers took his walker, he didn't realize the significance of the walker.  The walker itself is inculpatory and not exculpatory.  Defendant has not met his burden by showing that these items had an apparent exculpatory nature to them before they were destroyed.  Even

assuming that Defendant has met his burden showing that it might be potentially useful, Defendant has not met his burden of showing bad faith on the part of the government.

### D. Bad Faith.

The disputed items, at best, can only be construed as being "potentially exculpatory." The Defendant is only entitled to a dismissal of the case if he can show bad faith on the part of police. *Bohl*, 25 F.3d at 910. Here, there is absolutely no government bad faith. The loss or destruction of evidence was either done before the importance of the items was known to law enforcement, or the destruction was innocent in nature and not the result of any type of governmental malicious intent. *See Trombetta,* 467 U.S. at 488.

## CONCLUSION

For these reasons, the Court properly should deny Defendant Perez's Motion to Suppress in its entirety.

Respectfully Submitted,

JAMES D. TIERNEY
Acting United States Attorney

*Electronically filed on 10/27/17*
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM   88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send electronic notification to defense counsel of record on this date.

/s/
MARIA Y. ARMIJO
Assistant United States Attorney