1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3      UNITED STATES OF AMERICA,

4           Plaintiff,

5           VS.                         CR. NO. 15-4268 JB

6      ANGEL DELEON, et al.,

7           Defendants.

8                           VOLUME 1

9           Transcript of Motions and James Hearing
       Proceedings before The Honorable James O. Browning,
10     United States District Judge, Las Cruces, Dona
       County, New Mexico, commencing on November 27, 2017.
11

12     For the Government:  Ms. Maria Armijo; Mr. Randy
       Castellano; Mr. Matthew Beck
13
       For the Defendants: Mr. Brock Benjamin, Mr. Richard
14     Sindel; Ms. Cori Harbour-Valdez; Mr. Patrick Burke;
       Mr. Jim Castle; Mr. Robert Cooper; Mr. James Lahann;
15     Mr. Orlando Mondragon; Mr. John Granberg; Mr. Scott
       Davidson; Ms. Amy Jacks; Mr. Richard Jewkes; Mr. Marc
16     Lowry; Ms. Theresa Duncan; Ms. Amy Sirignano; Mr.
       Christopher Adams; Mr. Michael Davis; Ms. Carey
17     Bhalla; Mr. Ryan Villa; Mr. Donovan Roberts; Ms.
       Angela Arellanes; Mr. Samuel Winder
18

19     For the Defendants (Via telephone):  Ms. Justine
       Fox-Young; Ms. Amy Sirignano (a.m. only)
20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Good morning, everyone.
 2              I appreciate everyone making themselves
 3    available to me this morning.  How are y'all all
 4    doing?
 5              All right.  The Court will call United
 6    States of America versus Angel DeLeon, et al.,
 7    Criminal Matter No. 15-4268 JB.
 8              If counsel will enter their appearances for
 9    the Government.
10              MS. ARMIJO:  Good morning, Your Honor.
11    Maria Armijo, Randy Castellano, and Matthew Beck on
12    behalf of the United States.
13              THE COURT:  Ms. Armijo, Mr. Castellano, Mr.
14    Beck, good morning to you.
15              All right.  And let's go through -- for
16    the -- on the defendants, for Defendant Joe Lawrence
17    Gallegos.
18              MR. SINDEL:  Good morning, Your Honor.
19    Richard Sindel for Mr. Gallegos.
20              THE COURT:  Mr. Sindel, Mr. Gallegos, good
21    morning to you.
22              THE DEFENDANT:  Good morning, Your Honor.
23              MR. SINDEL:  Mr. Benjamin is in trial.  So
24    he may be here later.
25              THE COURT:  All right.  And for Defendant
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Edward Troup.

2              MS. HARBOUR-VALDEZ:  Good morning, Your

3    Honor.  Cori Harbour-Valdez and Pat Burke on behalf

4    of Edward Troup.

5              THE COURT:  All right.  Ms. Harbour-Valdez,

6    Mr. Burke, Mr. Troup, good morning to you.

7              THE DEFENDANT:  Good morning, Your Honor.

8              THE COURT:  And for Defendant Billy Garcia.

9              MR. COOPER:  Good morning, Your Honor.  Bob

10   Cooper and Jim Castle on behalf of Billy Garcia.  He

11   is present today.

12             THE COURT:  All right.  Mr. Cooper, Mr.

13   Castle, Mr. Garcia, good morning to you.

14             And for Defendant Allen Patterson.

15             MR. LAHANN:  Good morning, Your Honor.

16   Jeff Lahann on behalf of Mr. Patterson.

17             THE COURT:  Mr. Lahann, good morning to

18   you.  Mr. Patterson, good morning to you.

19             THE DEFENDANT:  Good morning, Your Honor.

20             THE COURT:  And for Defendant Christopher

21   Chavez.

22             MR. GRANBERG:  Good morning, Your Honor.

23   John Granberg on behalf of Christopher Chavez.

24             THE COURT:  Mr. Granberg, Mr. Chavez, good

25   morning to you.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE DEFENDANT:  Good morning.

 2              THE COURT:  And for Defendant Arturo

 3    Arnulfo Garcia?

 4              MR. DAVIDSON:  Your Honor, Scott Davidson

 5    here on behalf of Mr. Garcia.

 6              THE COURT:  All right.  Mr. Davidson,

 7    Mr. Garcia, good morning to you.

 8              THE DEFENDANT:  Good morning.

 9              THE COURT:  And for Defendant Daniel

10    Sanchez.

11              MS. JACKS:  Good morning, Your Honor.  Amy

12    Jacks and Richard Jewkes for Mr. Sanchez.

13              THE COURT:  All right.  Ms. Jacks,

14    Mr. Jewkes, Mr. Sanchez, good morning to you.

15              And for Defendant Anthony Ray Baca.

16              MS. DUNCAN:  Good morning, Your Honor.

17    Theresa Duncan and Marc Lowry on behalf of Mr. Baca,

18    who is present.

19              THE COURT:  Ms. Duncan, Mr. Lowry, Mr.

20    Baca, good morning to you.

21              THE DEFENDANT:  Good morning, Your Honor.

22              THE COURT:  And for Defendant Christopher

23    Garcia.

24              MR. ADAMS:  Good morning, Your Honor.

25    Chris Adams, here with Cindy Gilbert in the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    courtroom, and Amy Sirignano is joining us by phone.
 2    She was ill this morning.  We are here for Mr. Chris
 3    Garcia.
 4               THE COURT:  All right.  Mr. Adams, Mr.
 5    Gilbert, Ms. Sirignano, Mr. Garcia, good morning to
 6    you.
 7               MS. SIRIGNANO:  Good morning, Your Honor.
 8               THE COURT:  And for Defendant Carlos
 9    Herrera.
10               MR. DAVIS:  Good morning, Judge.  Michael
11    Davis and Carey Bhalla on behalf of Mr. Herrera.
12    Also appearing with us is our legal assistant, Sonia
13    Salazar.
14               THE COURT:  All right.  Mr. Davis, Ms.
15    Bhalla, Ms. Salazar, Mr. Herrera, good morning to
16    you.
17               And for Defendant Rudy Perez.
18               MR. VILLA:  Your, Honor, good morning.
19    Ryan Villa on behalf of Mr. Perez, who is present and
20    in custody.  And Ms. Fox-Young is joining us on the
21    phone.
22               THE COURT:  All right.  Mr. Villa.  Ms.
23    Fox-Young, are you there?
24               MS. FOX-YOUNG:  I am, Judge.  Good morning.
25               THE COURT:  Good morning.  And Mr. Perez,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    good morning to you.

2              THE DEFENDANT:  Good morning.

3              THE COURT:  And for Defendant Andrew

4    Gallegos.

5              MR. ROBERTS:  Good morning, Your Honor.

6    Donovan Roberts on behalf of Mr. Andrew Gallegos, who

7    is present.

8              THE COURT:  All right.  Mr. Roberts, Mr.

9    Gallegos, good morning to you.

10             THE DEFENDANT:  Good morning.

11             THE COURT:  And for Shauna Gutierrez.

12             MS. ARELLANES:  Good morning, Your Honor.

13   Angela Arellanes for Ms. Gutierrez, who appears in

14   person.

15             THE COURT:  All right.  Ms. Arellanes, Ms.

16   Gutierrez, good morning for you.

17             THE DEFENDANT:  Good morning.

18             THE COURT:  All right.  And Ms. Wild, are

19   you on the phone as well?

20             THE CLERK:  I am, Judge.  I think you may

21   have missed an entry for Brandy Rodriguez.

22             THE COURT:  All right.  Ms. Rodriguez.

23             MR. WINDER:  Good morning, Your Honor.

24   Samuel Winder on behalf of Jerry Walz on behalf of

25   Brandy Rodriguez.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Ms.  Rodriguez,
 2   good morning to you.  Mr. Winder, good morning to
 3   you.
 4              All right.  A couple of things -- I've got
 5   so much paper here that -- on the jury
 6   questionnaires, I wanted to send out about 2,000
 7   questionnaires, given my experience in high profile
 8   cases, large cases, where I think that there might be
 9   some difficulty in seating a jury.  I had to kind of
10   negotiate with Jury Services.  That shows you the
11   power of a federal judge.  But I negotiated.  They
12   wanted about 600, so we ended up with 1500.  So Jury
13   Services ultimately decided to send out 1500
14   questionnaires.  I think we can get a jury picked
15   with that.  It's a little lower than what I wanted,
16   but I think that's where we are.
17              Mr. Davis, I've been working on your
18   opinion.  I worked on it during the Thanksgiving
19   holidays.  I didn't get it done.  I'll get it in
20   front of me.  I brought a draft with me.  So the
21   draft is currently about 39 pages.  I'm going to have
22   to work on it some more.  But right now it's drafted
23   as a grant for the motion to disqualify.  I'm just
24   having a hard time seeing how I can say that this is
25   not a similarly related case.  So I think I indicated
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    at the last hearing that you probably need to get
 2    your house in order.  But that's where I'm leaning.
 3    I apologize for not being able to get it out, but I
 4    just had a lot of stuff going on.  But I have been
 5    working on it.  I read your supplemental materials
 6    and things like that, but that's where I am on that.
 7            MR. DAVIS:  Judge, is there any possibility
 8    the Court would consider --
 9            THE COURT:  You've got a mic right there
10    beside you, Mr. Davis.
11            MR. DAVIS:  Judge, has the Court considered
12    the possibility of just disqualifying me from
13    handling Mr. Martinez, as opposed to removing me from
14    the entire case as an alternative to
15    disqualification?
16            THE COURT:  Yeah, I think that's part and
17    parcel of the motion and the discussion, so I'll deal
18    with that.  But I'm not sure I can really sort that
19    out and leave you in the case.  So I'll work on it.
20    I'll try to get this out to you.  I'll try to get it
21    out to you this week.  I was hoping I'd get it out
22    before, but did not.  But I'll try to get it out.
23            MR. DAVIS:  Judge, what is your Court's --
24    what's the Court's consideration of me at this point
25    staying in court?  Do you want me to stay?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Go ahead and stay in court.  I
 2   haven't issued it, and -- I've been working on the
 3   thing.  It's got some issues.  I'm not completely
 4   done, but I wanted to give you a heads-up where I'm
 5   headed, so you can work to get your house in order.
 6   But I'm not ready to issue an opinion or order yet.
 7            MR. DAVIS:  Thank you, Judge.
 8            THE COURT:  All right.  Unless somebody has
 9   something else that we need to raise from a
10   preliminary matter, I think y'all have been working
11   with Ms. Wild to put some order together to the
12   hearings that we have today.  So unless there is
13   another reason to approach these, why don't we take
14   up Mr. Perez' motion for production of alleged
15   co-conspirator statements and for pretrial hearing on
16   their admissibility.
17            I guess I think -- and correct me if I'm
18   wrong -- sometimes in my mind -- and I hope y'all
19   bear with me a little bit -- I merge some of the
20   issues that we dealt with with Mr. Garcia since we
21   had so many motions that are similar to the ones
22   here, and so I'm not always quite certain what I have
23   said in regard to those motions in here.
24            But, in any case, if I haven't said it
25   here, I guess I'm having a hard time figuring out
```

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   what the basis is for me ordering the Government to

2   put a list of co-conspirator statements together.  It

3   does not exist, so it would have to be something that

4   would have to be put together.  It would be in the

5   nature of an interrogatory.  And so I'm not sure

6   that -- except for my just ability to use my raw

7   judicial power to require the Government to do it,

8   I'm not sure there is really much justification and

9   reasons for it.  So I'm not inclined to order them to

10  produce any sort of list of co-conspirator statements

11  that they have to prepare.

12          On the other hand, let me talk a little bit

13  about the James hearing and those things that we're

14  going to be taking up today.  The Tenth Circuit, as

15  everybody has noted, has a strong preference for a

16  pretrial determination of the admissibility of

17  co-conspirator statements.  I don't see any reason to

18  deviate from that strong preference.  We're still

19  two-plus months out from trial.  And I think we've

20  got time to do it, and I think we should do it.  And

21  I don't think we should be trying to have a trial

22  like this, and just relying upon the Government's

23  linking it up down the road is the way to go.  So I

24  think that we will have a James hearing, and the

25  Government will have to produce a live witness or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   witnesses.  I don't think that a written proffer is
 2   enough.  The Government -- I mean, the Tenth Circuit
 3   has also indicated that those are not favored.  And
 4   so I would prefer to have live witnesses, live
 5   witness or witnesses.
 6            The Government has asked that they be able
 7   to put on a case agent that summarizes the
 8   co-conspirator statements.  It seems the Tenth
 9   Circuit has approved that.  I'm not telling the
10   Government how to try their case, and I'm not going
11   to tell them how to do the James hearing.  But you've
12   got to make your proof by a preponderance of the
13   evidence.  If you think you can establish it with one
14   agent, subject to cross-examination, bringing in the
15   statements, then the Tenth Circuit seems to have
16   approved that, and I will, too, but -- so it's not
17   the method that I'm approving.  You just have a
18   burden of proving it by a preponderance of the
19   evidence.  If you can do it with one witness or 20
20   witnesses, that's -- the Government always has to
21   make that assessment as to how they're going to prove
22   their case.  And I can't tell you in advance whether
23   one witness or more are going to be necessary.  So
24   you'll have to make that judgment.  But in certain
25   situations the Tenth Circuit has indicated that is
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    appropriate.
 2              So Mr. Villa, with that guidance -- and I
 3    think I've been fairly consistent on this throughout,
 4    although we might not have touched on it in some
 5    detail -- what do you need with your motion?
 6              MR. VILLA:  I think that probably satisfies
 7    it, Your Honor.  If this was six months earlier, I
 8    might have pressed you to try it, and make the
 9    Government identify statements so we can try to work
10    some of these issues out.  But I think we're past
11    that point now.  I think if the Court is going to
12    order a pretrial James hearing, I think we should go
13    ahead and get on with it as we're as close as we are
14    to trial.  So that's -- I think that was really the
15    goal of the motions, to get us to the James hearing,
16    and see if we couldn't work some of these issues out.
17    But we're prepared to proceed on the James motion.
18              THE COURT:  Okay.  Let me ask:  Since your
19    motion is first, but a lot of other motions teed up,
20    let me see from the defendants' side, anybody else
21    want to talk about procedure, how I'm inclined to
22    proceed on the James hearings, co-conspirator
23    statements?
24              MS. JACKS:  Your Honor, may I --
25              THE COURT:  Ms. Jacks, you may.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MS. JACKS:  I just have a comment.  And
2    that is that to the extent that the Government
3    provides us with what statements it intends to
4    introduce as co-conspirator statements, we could
5    brief that for the Court prior to any hearing, and it
6    might make the hearing shorter.  And I thought that
7    was part of Mr. Villa's thought in filing his motion.
8              THE COURT:  Well, I'm going to let the
9    Government -- I'm not going to order it.  If they
10   want to do that to try to expedite things, that's
11   their business.  But I'm not going to order them to
12   prepare and produce a document that the law doesn't
13   require them to produce.
14             Mr. Burke?
15             MR. BURKE:  Your Honor, I endorse the
16   comments of Mr. Ryan Villa and Amy Jacks.  And your
17   suggestion makes good sense.  I did want to just
18   advise the Court, in Colorado -- where we are not --
19   it's routine to have one of these lists, and the
20   judges there have found that it streamlines things.
21   And I think almost all the judges do that there.  And
22   I attached one to one of the pleadings.  And I then
23   asked a law clerk -- third-year student at CU Law
24   School to check.  And as it turns out, New Mexico is
25   the only place that doesn't do that.  But the goal
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                1-800-669-9492
                           BEAN                          e-mail: info@litsupport.com
                         & ASSOCIATES, Inc.
                        PROFESSIONAL COURT
                           REPORTING SERVICE

```
 1    was to have a pretrial hearing sufficiently in
 2    advance that it makes sense and streamlines the
 3    process.
 4              So I believe what the Court has adopted
 5    will work.  But I didn't want the Court to think that
 6    it was some sort of idle suggestion.  It's followed
 7    by a number of courts.
 8              THE COURT:  Yeah, I looked at it.  I mean,
 9    I can't disagree that it would make sense and be
10    helpful.  But I'm -- just seems to me it would be
11    kind of raw judicial power for me to start ordering
12    the Government to do it.  I just don't see any basis
13    for it other than just:  I want it.  And it doesn't
14    seem like I can really rightfully require it.
15              MR. BURKE:  I understand.
16              THE COURT:  All right.  Thank you, Mr.
17    Burke.
18              Anyone else?
19              All right.  Mr. Castellano, are you going
20    to handle this portion?
21              MR. CASTELLANO:  Yes, Your Honor.
22              THE COURT:  Mr. Castellano.
23              MR. CASTELLANO:  Your Honor, I hear where
24    you're coming from this morning, so I'm not going to
25    belabor the point too much.  I can tell you -- and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you probably know this from your memory -- in the

2    Vigil case you did not hold a James hearing.  I will

3    say it was slightly different.  The Government moved

4    for the James statements to be admitted prior to a

5    first trial, which Judge Parker tried.  And the case

6    was reassigned to you.  You reviewed the record, and

7    based on that, agreed not to hold a James hearing.

8                   THE COURT:  Judge Parker, though, held one,

9    didn't he?

10                  MR. CASTELLANO:  I don't recall if Judge

11   Parker did.  I think --

12                  THE COURT:  I thought Judge Parker held

13   one, or in some ways satisfied James, and so it

14   wasn't necessary to redo it.  But is my memory off?

15                  MR. CASTELLANO:  It might be.  And I may

16   have missed it in the case.  What I remember from

17   reading the case is that there were frequent

18   objections during trial on hearsay grounds.  So it

19   may be that there was --

20                  THE COURT:  What happened is on the first

21   trial, Mr. Bowles and Mr. Bregman chose not to object

22   to any of the exhibits.  And on the retrial they

23   chose to object to them all.  So the second trial was

24   a whole lot different on objections, because I had to

25   make a lot of rulings that Judge Parker did not have

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                      1-800-669-9492
                                                          e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   to make.  I do remember that.  I don't know if that's
 2   helpful or not.  But it was a different trial.  There
 3   were 680 exhibits, and every one was objected to.
 4           MR. CASTELLANO:  Ultimately, you concluded
 5   that the United States -- you conditionally granted
 6   the motion; it was the United States' motion --
 7   subject to the United States proving that the
 8   statements were made in the scope of the conspiracy
 9   and in furtherance thereof.  So, ultimately, you did
10   not hold a hearing, and left it to the United States
11   to prove up the final basic element of James, which
12   is to prove it was in furtherance of conspiracy.
13           One thing I have done before, when we did
14   the Aryan Brotherhood cases, is we did prepare, I
15   think basically a summary.  We put on a summary
16   witness.  The defense stipulated that that would
17   basically be the agent's testimony because it was
18   clear that was going to be the case.  And then the
19   defense stipulated to the direct examination, and
20   then went straight to cross-examination to ask the
21   agent about the statements.  So that is one
22   possibility.
23           We will -- depending on when the hearing is
24   set, how much time we have, we will consider
25   potentially putting a list like that together, if it
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    moves things along.  I don't expect that we're going

2    to have numerous witnesses, because it will become,

3    in essence, a pretrial trial.  So more than likely it

4    will be a summary witness.  And I understand the

5    Court's leanings, with the understanding that the

6    burden is on us.

7              Your Honor, I don't know if we want to get

8    a head start on this, or we can just make them

9    exhibits at the hearing itself, but we have about 14

10   plea agreements in this case which will establish at

11   least the first two requirements of James, which is

12   the existence of the conspiracy, as well as

13   membership in the conspiracy.  So I can proffer those

14   to the Court today, or I can just make them exhibits

15   at the hearing, or I can just give you the numbers.

16   But they're all on the docket.

17             THE COURT:  I agree with you.  Let's go

18   ahead and get those in, because I do need to have the

19   defendants start telling me where the battle is.  You

20   know, if they're not going to contest these two

21   elements, then where is the battle?  So let's go

22   ahead and mark those.  Shall we mark them

23   individually?  Do you want to mark them as one, as a

24   group?  How do you want to proceed on that, Mr.

25   Castellano?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                         1-800-669-9492
                              BEAN                         e-mail: info@litsupport.com
                              ASSOCIATES, Inc.
                              PROFESSIONAL COURT
                              REPORTING SERVICE

```
 1              MR. CASTELLANO:  I will get some stickers
 2    during the break and mark them individually, because
 3    I think they could be taken in a group.  But if we're
 4    going to talk about individual plea agreements from
 5    time to time, it would be easier just to identify
 6    them by exhibit number.
 7              THE COURT:  And you said there were 14 of
 8    them?
 9              MR. CASTELLANO:  I believe it's 14.  I was
10    just counting as the Court was talking.  But it's in
11    the vicinity of 14.  But it's basically the plea
12    agreement of each defendant who has pled guilty in
13    this case, including admissions that a conspiracy
14    existed and admissions that other people remaining in
15    the case were members of the conspiracy.  So I think
16    we'll be a long way down the road for the first two,
17    which will allow us probably just to focus on the
18    statements themselves, once we get to the hearing.
19              THE COURT:  All right.  So for the purposes
20    of the James hearing, any objection to admitting
21    Government's Exhibits 1 through 14, which are the
22    plea agreements?  Not hearing any objections, the
23    Government --
24              MR. CASTLE:  Your Honor, I would object,
25    because I believe that this needs to be subject to an
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   evidentiary hearing.  A lot of these plea agreements
 2   basically are saying:  Yes, the SNM existed, and they
 3   committed some bad things during a long period of
 4   time.  And there is no analysis as to whether there
 5   is different sets or groups within the SNM, whether
 6   there is individual agreements that are made between
 7   members that are not in furtherance of the conspiracy
 8   that is alleged.  These plea agreements are very
 9   imprecise in the definition -- or in defining what
10   the conspiracy is.
11             And so these are documents that are drafted
12   by the Government, not by the witness.  These aren't
13   witness statements.  These are drafted by the
14   Government.  Obviously, one of the purposes is not
15   only to do a plea agreement, but to establish a James
16   proffer apparently.  And so I object to them because
17   they're not subject to any kind of evaluation here by
18   the Court as to whether they're to be trusted.
19             THE COURT:  Well, you're going to get your
20   evidentiary hearing.  So, I mean, all it is is some
21   documentary evidence, and I think it has some weight.
22   We've got 14 people signing off on the plea
23   agreement.  That's what they're going to testify to.
24             MR. CASTLE:  I guess, to the extent that
25   we're able --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          MR. ADAMS:  Judge, I'm told that people on
 2    the phone can't hear Mr. Castle.  May I share my mic
 3    with him?
 4          THE COURT:  Yeah.  However we want to get
 5    it to him.  Are y'all hearing me at the back okay?
 6          MR. CASTLE:  Perhaps the people on the
 7    phone are a little luckier than those in the
 8    courtroom.
 9          But as long as the defense has the
10    opportunity to call those witnesses and examine them,
11    I guess we could proceed in this fashion.  But if the
12    idea is the Government is going to make its proffer a
13    part, through plea agreements, and then protect these
14    individuals from being examined about these
15    statements, I would object.  So I think if the Court
16    is going to take them as exhibits with the idea that
17    the defense believes that it needs to examine these
18    witnesses on the statements that are in the plea
19    agreements, that that would probably be a sufficient
20    remedy to allow us to contest the information within
21    those plea agreements.
22          THE COURT:  Well, I'm not sure I've seen --
23    maybe you have -- I haven't seen where the defendants
24    have called witnesses at a James hearing.  It's
25    usually the Government's burden of proof, so it's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   their witnesses who are put on the stand and
 2   cross-examined.  As I just indicated, I'm not
 3   requiring them to call any particular witness or put
 4   on any -- you know, try their case or their hearing
 5   any particular way.  But I doubt it's going to
 6   include calling 14 witnesses.
 7            MR. CASTLE:  No, I understand they may not
 8   wish to do that.  But since it is a preliminary issue
 9   for the Court to decide by a preponderance of the
10   evidence, obviously, the defense is allowed to put on
11   evidence against it.
12            Normally, those courts that actually
13   conduct a James hearing within the context of a
14   trial, the witnesses who are being called by the
15   Government to establish the conspiracy are subject to
16   cross-examination by the defense.  And so I believe
17   the defense does have the right to not only
18   cross-examine the witnesses the Government chooses to
19   put on, but put on contrary evidence to convince this
20   Court that the conditions precedent necessary for
21   admission are not satisfied.
22            THE COURT:  Well, would it be better to go
23   back to what Mr. Castellano is saying, and do it at
24   trial?
25            MR. CASTLE:  No, I don't believe it would,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    because there runs the risk that the rules of

2    evidence cautions against, which is, to the extent

3    possible, preventing the exposure to a jury of

4    evidence that may end up being considered

5    inadmissible by the Court.

6         THE COURT:  Well, I'm not foreclosing you

7    from presenting your own evidence and what you need

8    to do at James.  I probably am not going to be too

9    excited about the defendants calling 14 witnesses to

10   try to rebut the Government's presentation.  But I'm

11   not foreclosing it.  Whatever evidence you think you

12   need --

13        MR. CASTLE:  Your Honor, I understand.

14   That wasn't my point to do that.  Granted, I'd love

15   to call any witness that's going to be against my

16   client, and get a free run at them.  But that's not

17   what my goal is here.  It's that here we're having

18   exhibits being introduced that were drafted by the

19   Government, in their words.

20        And so this is a difficult situation.  This

21   isn't giving the Court a transcript of an interview

22   with a confidential informant who we can at least

23   assess what their own words are.  This is Mr.

24   Castellano and Ms. Armijo's words, or whoever drafted

25   this plea agreement.  They drafted it and gave it to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1    the man to sign.
 2           So under those particular circumstances, I
 3    think there is a need, perhaps in certain situations,
 4    to call those witnesses.
 5           THE COURT:  All right.  I understand your
 6    position.  I won't foreclose it.  But I'm probably
 7    tipping my hand that that's not the way we're going
 8    to really run a James hearing.
 9           All right.  Anyone else on the defendants'
10    side want to say anything on this issue?
11           All right.  Then I'll admit Government's
12    Exhibit's 1 through 14 -- if that's the correct
13    number -- for the purposes of the James hearing.
14           MR. CASTELLANO:  Your Honor, during the
15    break I will get exhibit stickers and put them on
16    there and make sure the record is clean in terms
17    of --
18           THE COURT:  Ms. Solis can hand them to you
19    right now.
20           What else, Mr. Castellano?
21           MR. CASTELLANO:  Nothing else, Your Honor.
22    Thank you.
23           THE COURT:  All right.  Anything else you
24    want to say, Mr. Villa?  Anything else on your
25    motion?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. VILLA:  Your Honor, I don't think so.
 2   I guess I just wanted to clarify when the Court
 3   intends to have this hearing.
 4              THE COURT:  Well, let me ask Ms. Wild that.
 5   She's been continuing to work on this.  As I prepared
 6   for this hearing and, of course, it's always a little
 7   bit difficult to do things over holidays, but I
 8   wasn't quite certain if we were having the James
 9   hearing this week, from reading all the materials.
10   So I thought we might be here doing a James hearing
11   this morning with your motion.
12              Ms. Wild, what was your sort of
13   anticipation?  Did you think that it was going to be,
14   I hear these motions today, and then do a James
15   hearing?  Or did you think we were setting up a James
16   hearing today?  And if we weren't setting up a James
17   hearing today, when do you think that we're going to
18   set the James hearing?
19              THE CLERK:  My anticipation was the same as
20   yours.
21              THE COURT:  That we were going to have a
22   James hearing today?
23              THE CLERK:  Yes, sir.
24              THE COURT:  All right.
25              MR. VILLA:  That's kind of what I thought,
```

 

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Your Honor.

2            THE COURT:  I guess that's what I was

3    thinking we were here for today with these motions

4    set up.  Mr. Castellano, are you ready to put on Mr.

5    Acee, or whoever you're going to have as your person?

6            MR. CASTELLANO:  No, Your Honor, not to lay

7    out all of the statements.  My understanding of the

8    hearing today was to decide whether or not we were

9    going to have a James hearing, and then possibly set

10   the parameters for the hearing.  And even some of the

11   defense motions indicated that they would request --

12   actually, some of the requests were that they get the

13   statements before the James hearing.  So I think even

14   the defense anticipated that we would have a hearing

15   at a later date, as did I.

16           THE COURT:  Well, let's do this:  We've got

17   some motions we've got to cover.  But why don't you

18   begin to prepare for a James hearing this week while

19   I'm down here.  So work with Mr. Acee or whoever

20   you're going to have present those.  And I'll try to

21   skip around and get through these other motions.  But

22   if I run out, we'll probably start the James hearing

23   at some point this week.  Okay?

24           MR. CASTELLANO:  Understood, Your Honor.

25           THE COURT:  Thank you, Mr. Castellano.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. ADAMS:  Your Honor, may I?

 2              THE COURT:  You may, Mr. Adams.

 3              MR. ADAMS:  We also filed for a James

 4    hearing in 1303, and the Government's response was

 5    1379, and our reply was 1436.  I think we were on the

 6    schedule as well, and asked -- said we have the same

 7    position as Mr. Villa.

 8              THE COURT:  Yeah, I'm probably putting --

 9    the reason I started with those comments is I know

10    there are a lot of motions that raise this in various

11    forms.  Some of them want conspirators' statements,

12    some want a James hearing.  So I thought I'd just

13    start with that and get us on track.  But I

14    understand that there are a number of motions that

15    that applies to.

16              MR. ADAMS:  Thank you.

17              THE COURT:  All right.  Thank you, Mr.

18    Adams.

19              All right.  Let's then go to the United

20    States' amended notice of expert witness testimony.

21    And again, if I had Ms. Wild here and had been able

22    to talk with her a little bit more before the --

23    without the intervening holidays, I might be more

24    precise as to where I have made these comments; if I

25    made them in the case of Mr. Garcia when he was going
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to trial on his drug case, or whether it's in this

2    context.

3          Let me exhort everybody on these experts.

4    After reading everything -- and I have read

5    everything, so I'm not sitting up here without having

6    read materials.  I mean, everybody has got to do what

7    they've got to do to defend their clients here.  I'm

8    not trying to shortcut anything.  But it does seem to

9    me that it behooves us to get to the core issues.

10         It seems to me that there are probably some

11   experts, regardless of what the defendants do or want

12   to do, are going to testify in this trial.  And then

13   there are others that there may be genuine issues

14   about either their testimony or the scope of their

15   testimony.  And I guess I'd like to get to the core

16   issues, and encourage the defendants to get to the

17   core issues as soon as possible; identify for me

18   where the battles are, and then maybe on some of the

19   others we can just move ahead.

20         I mean, when I look at Dr. Zumwalt, who is

21   the state coroner, I guess I'm having a hard time

22   seeing why he wouldn't be allowed to testify in this

23   trial.

24         And on the other hand, the gang experts,

25   I've already indicated that I'm probably going to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT                          e-mail: info@litsupport.com
REPORTING SERVICE

```
1    clip significantly that testimony on both the
2    Government and the defendants' side to conform to the
3    Second Circuit's opinion, which I think the Tenth
4    Circuit has adopted or indicated they approve of in
5    the Martinez -- Second Circuit's case in Martinez.
6            So there is areas like that.  But by and
7    large, it seems to me, it would be wise if we really
8    focus in on what needs to be decided, and try to cut
9    through some of the -- I won't say -- just cut
10   through some of the static that is here.
11           So the Government has sort of put out their
12   position.  Maybe I ought to hear from the defendants.
13           Mr. Adams, I think you've been taking the
14   lead on this.  With that sort of admonition, tell me
15   where we're going with the Government's experts.
16   What do you need?
17           MS. SIRIGNANO:  Your Honor, this is Amy
18   Sirignano.  I apologize, I'm ill this morning, but I
19   can take this one just briefly.  The main issue --
20   and I don't disagree with the Court regarding
21   Dr. Zumwalt.  But we haven't received -- and it might
22   be in this most recent batch of discovery which we
23   received right before the holidays that I haven't had
24   an opportunity to go through yet -- but we haven't
25   received three CVs from the Government.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Dr. Zumwalt's is one of them.  So that was the issue

2    with him.

3            And frankly, Your Honor, it would be -- the

4    discussion in the motion that -- or the response that

5    we filed, Documents 1255, was that the Government is

6    not abiding by the requirements of Rule 16.

7            And I have this issue right now in the

8    Tenth Circuit Court of Appeals in a case before Judge

9    Herrera, United States v. Raymond Moya.  And so on

10   page 7 of Document 1255, I put forth what Rule 16

11   requires, which is the written summary of any

12   testimony of the expert, which must describe the

13   witness' opinion, the basis and reasons for the

14   opinions and the witness' qualifications, citing this

15   United States v. Sandoval case.  It's from March 1st

16   of 2017.

17           And so, Judge, the Government's amended

18   notice of expert witness testimony doesn't abide by

19   the Rule 16 requirements, and we don't have what we

20   need in terms of the basis and reasons, and the

21   qualifications with the missing CVs.  And so we're

22   just looking for more information.

23           And we expected to have a Daubert hearing

24   today.  I don't know if the Government has their

25   witnesses there.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Well, let's focus a second on
 2    Dr. Zumwalt.  Do you have his autopsy reports?  Has
 3    that been produced?
 4              MS. SIRIGNANO:  Your Honor, I'm going to
 5    defer to Ms. Harbour-Valdez.  Dr. Zumwalt's
 6    information pertains to her counts and not
 7    Mr. Garcia's counts.
 8              THE COURT:  My understanding, those have
 9    been produced, right?
10              MS. HARBOUR-VALDEZ:  They have, Your Honor.
11    In the discovery that was produced last week, we
12    received Dr. Zumwalt's CV, as well as Ms. Radecki's
13    CV.  And those were the two we were concerned about.
14              THE COURT:  I mean, my guess is that, with
15    Dr. Zumwalt, you've got his report.  He does lots of
16    autopsies.  He's probably not going to say anything
17    that's not in his report.  You've got his CV.  What
18    else do we need with Dr. Zumwalt?
19              MS. HARBOUR-VALDEZ:  We don't have any
20    other issues, Your Honor.
21              THE COURT:  Anybody else need anything on
22    Zumwalt?  Mr. Villa?
23              MR. VILLA:  I'll try to talk really loud,
24    Your Honor.  My only concern is -- with respect to
25    the Javier Molina murder, is that the notice just
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   said he's going to testify to what's in the autopsy
 2   report.  And you've seen those reports; they're long.
 3   So if we get into trial and he wants to say something
 4   else, things that I could imagine he might want to
 5   say about the Molina murder, I just want to be clear
 6   that he's sort of limited to what's in that autopsy
 7   report.  He can't go beyond it, because it's not in
 8   the Government's notice that he's going to say
 9   anything else.
10            THE COURT:  Well, I am going to do this,
11   I'm going to say his reports are adequate disclosure,
12   I will have to hold the Government to that; that if
13   it's not in his report, he can't go beyond that.
14            Who is handling this?  Mr. Beck, is this
15   your area?
16            MR. BECK:  Yes, Your Honor.
17            THE COURT:  All right.  Can you live with
18   that, that if I say, as far as Zumwalt, if he's going
19   to testify about anything else beyond his report, you
20   need to send the defendants a letter, or file
21   something with the Court that indicates:  Here's an
22   additional area he's going to testify about.  But
23   otherwise, I'll let the Government rest on his
24   reports and his CV.
25            MR. BECK:  That sounds fair, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  So that will be the
 2    rule on Zumwalt.  Anything else on Zumwalt?
 3              All right.  Let's go to Radecki.  I guess
 4    what I'm going to have to do on these, Mr. Beck, is
 5    I'm going to have to hold the Government to what's in
 6    the rule.  So I'm looking at your notice here.  Tell
 7    me where on page 2 it states her opinions.
 8              MR. BECK:  Her opinions are those revealed
 9    in her written reports disclosed to the defendants.
10              THE COURT:  Okay.  And so, again, using the
11    same sort of thing we did with Zumwalt, everything
12    she is going to say is in her reports.  And if you're
13    going to try to get anything else in, you'll send,
14    something to the defendants about that?
15              MR. BECK:  That's fine, Your Honor.
16              THE COURT:  Can everybody live with that on
17    Ms. Radecki?  Anything else we need on Ms. Radecki?
18              All right.  Let's go to Tokumaru,
19    Ms. Tokumaru.  I believe there is also -- she has
20    done a written report.  Is that also the case?
21              MR. BECK:  That's right, Your Honor.
22              THE COURT:  Same rules as for Zumwalt?
23              MR. BECK:  Yes, Your Honor.  I think that's
24    fair.
25              THE COURT:  Anybody have any different need
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   on Ms. Tokumaru?  All right.  So --

 2             MS. SIRIGNANO:  Judge, this is Amy

 3   Sirignano.  I'm just wondering, are we foreclosing

 4   the opportunity to have a full Daubert hearing, going

 5   through the Government's notice at this point?

 6             THE COURT:  No, I'm not shutting down any

 7   Daubert hearings.  I'm just trying to clear up this

 8   issue.  There was a lot of complaints in the

 9   briefing, and I'm not saying it's in yours, but that

10   the Government was giving a one-sentence summary.

11   And what I'm doing is I'm making certain that,

12   basically with this motion, that Rule 16(a)(1)(G) is

13   being complied with so we eliminate that issue today.

14   And if I need to order further disclosures, I

15   disclose those.  But I'm not foreclosing any Daubert

16   issues with this motion.

17             MS. SIRIGNANO:  Thank you, Judge.

18             THE COURT:  All right.  So anything else on

19   Ms. Tokumaru?  Mr. Villa?

20             MR. VILLA:  Your Honor, just generally with

21   this procedure that we're talking about, the concern

22   I have is, if the Government does decide these

23   experts are going to say something else and they want

24   to supplement it, when that happens.  I mean, the

25   deadline has already passed.  So I would say that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    they can't supplement it anymore.  But it seems like
 2    the door is a little bit open for them to do that.
 3              THE COURT:  Well, I take it with these
 4    people that have done reports, you don't anticipate,
 5    Mr. Beck, having any further disclosures from them?
 6    They're pretty much locked in with their reports; is
 7    that correct?
 8              MR. BECK:  That's correct, Your Honor.
 9              THE COURT:  All right.  I mean, I can't
10    ever just say "never."  I mean, trials are dynamic.
11    But I'm with the defendants' position that the time
12    has come, has already passed.  So the Government is
13    going to have to justify if something is -- they're
14    going to try to get these experts to say something
15    that's not in these reports, we've got some of these
16    people that are not quite locked in with reports, if
17    I understand the situation.  And we have to figure
18    out what to do with those in a moment.  But at least
19    these with reports the Government is not
20    anticipating, and I think the time has passed.  And
21    if they try to do it, then I'll just have to listen
22    to arguments and see what the situation is.
23              MR. CASTLE:  Your Honor, I have an
24    additional concern which actually applies to all the
25    experts.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Okay.
 2              MR. CASTLE:  And I didn't want to remain
 3     silent and thereby waive these arguments.
 4              Many of the Government's experts in their
 5     reports are relying upon another expert or another
 6     investigator's statements.  So, for example, they
 7     might have an autopsy report, and at the end it
 8     indicates that there was narcotics found in the
 9     system or there weren't narcotics found in the
10     system.  That was analyzed by some other lab and some
11     other individual.
12              I raised some of these concerns in the
13     context of the brief that we filed concerning gang
14     experts.  The Government, as a rule, has not endorsed
15     those other experts that their own experts are
16     relying upon.  And I'll give an example that concerns
17     me.  The DNA expert that analyzed a blood sample
18     found at the murder scene in the 2001 murders
19     indicates that -- they analyzed it, and it was
20     consistent with the missing defendant, Mr. DeLeon, as
21     being a contributor to the mixture.  The only way
22     that expert got that information was from some other
23     source.  Someone said they did a blood-draw on
24     Mr. DeLeon back in 2001, and said this is his blood
25     sample.  I asserted in my briefing that that is a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    problem, a confrontation problem, under Melendez-Diaz
 2    and the Bullcoming cases.
 3            So what I'm trying to tell the Court is:
 4    By not commenting here, I don't want the Court to
 5    understand that we're not going to make objections on
 6    the constitutional level to various aspects of these
 7    experts' opinions.  Because, frankly, they're relying
 8    upon either hearsay or testimonial materials that the
 9    Government either hasn't endorsed or intends to bring
10    in at trial.
11            So, as an overlay, I just wanted to raise
12    that objection.  When we get to the gang expert
13    issue, I'll be a little more specific on it.  But I
14    didn't want my silence to be interpreted that I'm
15    not -- that we're waiving any other objections on a
16    constitutional or rule of evidence basis.
17            THE COURT:  No, I understand that.  I put
18    those arguments -- I know they're different than what
19    Ms. Sirignano was talking about -- but I put them in
20    the same category.  All we're trying to do is make
21    sure that Rule 16 objections are taken care of.  I
22    know the defendants may have some Daubert issues.
23    They may have individual challenges to some
24    particular testimony the experts are going to do.
25    None of that is being waived here by trying to make
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    sure that we get the Rule 16 issues dealt with here
 2    at the very beginning.
 3              All right.  Anything else on Ms. Tokumaru?
 4              Everybody happy with where we are?  I
 5    probably shouldn't use it that way.  Nobody is happy.
 6              All right.  Let's go, then, to Ms. Shirley
 7    Garcia.  She also has a written report, Mr. Beck?
 8              MR. BECK:  Yes, Your Honor.
 9              THE COURT:  You provided the CV?
10              MR. BECK:  Yes, Your Honor.
11              THE COURT:  Anyone else need anything else
12    under Rule 16 from Ms. Garcia, with the understanding
13    that if she's going to testify about anything
14    further, it will need further disclosures by the
15    Government?
16              All right.  Then let's move to Jennifer
17    Otto.  She also has a written report.
18              MR. BECK:  Yes, Your Honor.
19              THE COURT:  Same rules of engagement.
20    Anybody else need anything under Rule 16 from Ms.
21    Otto?
22              All right.  Let's go to Mr. Paul --
23    Dr. Paul.  He has an autopsy report.
24              MR. BECK:  Yes, Your Honor.
25              THE COURT:  So, same as Dr. Zumwalt.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Anybody need anything further under Rule 16?  Same
 2    rules of engagement?
 3           All right.  Let's go to Mr. Streine -- am I
 4    staying his name correctly?  Streine?  Dr. Streine.
 5           MR. BECK:  That's as good of a guess as
 6    mine.
 7           THE COURT:  Mr. Streine.  Remind me on him.
 8    Did he -- he has written reports on his ballistics?
 9           MR. BECK:  Yes, Your Honor.
10           THE COURT:  Okay.
11           All right.  Same rules of engagement, Mr.
12    Streine?
13           MR. BECK:  Yes, Your Honor.
14           THE COURT:  All right.  Then Ms. Mikesica?
15    And she has a written report as well; correct?
16           MR. BECK:  Yes, Your Honor.
17           THE COURT:  All right.  Anything else
18    needed on her?
19           Tracy Zehringer?
20           MR. BECK:  She has a written report.
21           THE COURT:  She has a written report as
22    well?
23           MR. BECK:  Yes.
24           THE COURT:  All right.  Ms. Vigil.
25           MR. BECK:  Yes, Your Honor, she has a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   written report.
 2            THE COURT:  She has a written report.
 3   Dr. -- I'm sorry, it's not a doctor, but Mr. Young.
 4            MR. BECK:  Yes, Your Honor, he has a
 5   written report.
 6            THE COURT:  He has a written report as
 7   well.  That's been disclosed.  Ms. Smith?
 8            MR. BECK:  Yes, Your Honor, she has a
 9   written report.
10            THE COURT:  Written report.
11            MS. SIRIGNANO:  Your Honor, this is Amy
12   Sirignano.  And I just don't have all of the DNA
13   reports that I requested, and so I don't have
14   everything that I need for Rule 16 regarding the
15   tests that she did regarding the DNA analyses.
16            THE COURT:  All right.  What I'm seeing in
17   your disclosure, Mr. Beck, is that she has produced
18   one report.  Are you anticipating any further reports
19   from her, or is it just one report she's going to
20   prepare?
21            MR. BECK:  I think my understanding is that
22   her written report is the final written report, and
23   that includes her opinions to which she'll testify.
24            THE COURT:  So if she's only got one
25   report, what else do you need, Ms. Sirignano?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           MS. SIRIGNANO:  Your Honor, I think there
 2   might be two.  Because she worked on the examination
 3   regarding the homicide of AB.  And then she also
 4   performed unknown examination of the alleged firearm
 5   for the possible DNA match with my client.  And the
 6   expert notice says she will testify about the tests
 7   she performed on the firearm and the findings as to
 8   the firearms described in her report.
 9           Well, I don't know what -- exactly what
10   tests she performed, how she did them, you know.  And
11   this goes back to the argument I made last time we
12   were before this Court.  And so, in order for my DNA
13   expert to be able to challenge her final report, I
14   need Rule 16 discovery that backs up her report.
15           MR. BECK:  Your Honor, I think we hashed
16   this out last week when we talked about going through
17   that four-step process, in which if the defendants
18   need more information for some of these DNA tests or
19   forensic examinations, that they ask, and then they
20   disclose the underlying data pursuant to that DAG
21   memo on forensic examinations.
22           That wasn't last week -- it feels like last
23   week -- that was three weeks ago, two weeks ago.  So
24   I think we're --
25           THE COURT:  Let me ask this:  After
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    listening to Ms. Sirignano, do you think there is one

 2    report still, or --

 3              MR. BECK:  I think there may be two.  I

 4    think we ran into this issue what was now three weeks

 5    ago.  She did perform two different tests on two

 6    different firearms, and they were disclosed in, I

 7    think, the same report, some of the same testing.  So

 8    whether we consider it one report or two, I think Ms.

 9    Sirignano is correct, that there are two different

10    firearms she examined.

11              THE COURT:  But you think they're all in

12    one report?

13              MR. BECK:  I'm not --

14              MS. SIRIGNANO:  I don't think they are,

15    your Honor.  I think there are two reports.

16              MR. BECK:  So there may be two reports.

17              THE COURT:  Okay.

18              MR. BECK:  So it sounds like there is two

19    reports.

20              THE COURT:  But you think she has both of

21    them?

22              MR. BECK:  I think so.

23              THE COURT:  And do you disagree with that,

24    Ms. Sirignano?

25              MS. SIRIGNANO:  I definitely have her final
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    report regarding my client, and it's just limited to

2    my client.  So that's why I'm saying there are two

3    reports, because it doesn't mention the homicide of

4    AB in our report.

5              My concern, I think we came up with an

6    agreement the last hearing that the Government would

7    produce the additional DNA documents, and that we

8    would -- I would come back and request for more once

9    we got the initial production out.  But I need the

10   underlying data regarding the tests that she

11   performed on this firearm, and the underlying data

12   regarding her findings as to the DNA on the firearms

13   and the holster, which I don't believe I've received

14   yet.

15             THE COURT:  All right.  But the report

16   states the opinions; correct, Mr. Beck?

17             MR. BECK:  Yes, Your Honor.

18             THE COURT:  I mean, all the opinions are

19   set forth there.  What does she say about the basis

20   of her opinions, the reasons for her opinions?  What

21   does she say in the report?

22             MR. BECK:  I can't say without the report

23   in front of me.  I'd have to get back to the Court on

24   that.

25             THE COURT:  Are you willing, able to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

1   produce this backup that Ms. Sirignano is looking

2   at -- looking for -- for the opinions?

3            MR. BECK:  I think so.  I assume -- I mean,

4   I can't say for sure whether the FBI would have it.

5   I assume that they do.  I think, as I said I think a

6   couple of weeks ago, we talked about, if the

7   defendants had a need or a request for the underlying

8   data, the DAG memo report, that we disclose that to

9   them.  And we're happy to abide by that.

10           THE COURT:  Have you sent that letter over,

11  Ms. Sirignano?

12           MS. SIRIGNANO:  No, Your Honor.  I'm

13  working on it right now.

14           My concern is just timing, when we're going

15  to get these materials.

16           THE COURT:  Well, get your letter over.  It

17  sounds like we worked out a procedure three weeks

18  ago, and it's triggered by your letter.  So get it

19  over.  And once you get it over there, if you don't

20  get the satisfaction you want, then you can reraise

21  it with the Court.  But it sounds to me like we're

22  pretty close to the Government satisfying its Rule 16

23  obligations.  Because you know what the opinions are;

24  you know her qualifications, and some basis and

25  reasons for her opinions.  And the Government is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   willing to give you more.
 2             MS. SIRIGNANO:  Very well, Your Honor.
 3   I'll get it today to the Government.
 4             THE COURT:  All right.  So anything else on
 5   Ms. Smith?
 6             Let's go to Dr. Kastenbaum.  He has -- or
 7   she has an autopsy report.  Anything further on Dr.
 8   Kastenbaum?
 9             All right.  Let's go to Cindy Wood.  And
10   she has a written report as well.
11             MR. BECK:  Yes, Your Honor.
12             THE COURT:  Anyone else need anything
13   further on Ms. Wood?
14             All right.  Then Roger Cain; he has a
15   written report as well.
16             MR. BECK:  I don't know that he has a
17   written report.
18             THE COURT:  You say in your disclosure that
19   he has one.  But --
20             MR. BECK:  Yes, you're right.  Sorry.
21             THE COURT:  All right.
22             MR. BECK:  He does have a written report.
23             THE COURT:  All right.  Anything else on
24   Mr. Cain?
25             All right.  Then the final one is Theodore
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Chavez.
 2              MR. BECK:  And he has written a report.
 3              THE COURT:  And he has a written report.
 4   Anything further on Mr. Chavez?
 5              MS. SIRIGNANO:  Your Honor, the same
 6   question that we raised with Tiffany Smith.  I don't
 7   have -- I've got this report, but I don't know what
 8   tests he performed on the firearm, all the backup,
 9   the underlying data that he did to the firearm.  The
10   firearm was modified.  You know, what his expert
11   opinion is based on.  And so I need that additional
12   information to back up the tests he performed on this
13   firearm.
14              THE COURT:  Are you willing to produce
15   that, Mr. Beck?
16              MR. BECK:  Yes, Your Honor.
17              THE COURT:  All right.  So that will be
18   produced.  And that will satisfy the reasons and
19   basis requirement of Rule 16.
20              So with the understanding the Government is
21   going to produce some additional material on
22   Ms. Smith and Mr. Chavez, for the basis and reasons,
23   the reports will serve then otherwise as the
24   parameters of these individuals' opinions, basis and
25   reasons.  And if the Government is going to call or
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    solicit any opinion beyond what's in the reports,

 2    they will need to do a further disclosure on that.

 3            So with that, I will grant in part and deny

 4    in part any sort of request associated with the

 5    United States' amended notice of expert witnesses as

 6    it relates to the Rule 16 issues, and I will not,

 7    with this motion, dispose of or address any other

 8    expert issues.

 9            All right.  Anything else we need to take

10    up on the Rule 16 issue?

11            Let me get a little organized here so I can

12    get my materials back to Albuquerque.

13            MS. SIRIGNANO:  Your Honor, if I could just

14    request a date to have these materials disclosed,

15    assuming I get this letter over to the Government

16    today.

17            THE COURT:  Mr. Beck, when would those

18    disclosures -- what would you propose as a --

19            MR. BECK:  Well, we'll get working on it

20    once we have her letter.  I would say we'd need a

21    week from the date we receive the letter at least.  I

22    think we need more, but I think a week is fair.

23            THE COURT:  All right.  Can you live with

24    that, Ms. Sirignano, that it will be one week after

25    the Government receives your letter?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. SIRIGNANO:  Yes, Your Honor.
 2              THE COURT:  All right.  So let's turn,
 3    then, to Mr. Troup, Mr. Garcia's motion for
 4    production of alleged co-conspirator statements and
 5    for pretrial hearing on their admissibility.  This
 6    seemed to me to be about the same issues that we had
 7    with Mr. Villa's motion.
 8              Anything else we need to address on that,
 9    Mr. Burke?
10              MR. BURKE:  No.  May I speak from here,
11    Your Honor?
12              THE COURT:  As long as everybody can hear.
13              MR. BURKE:  Your Honor, I have no
14    additional comments.  You have addressed our motion
15    with your previous rulings.
16              THE COURT:  All right.  So it looks like
17    we're moving along.  So I'm putting the Government on
18    notice that we're probably going to have a James
19    hearing this week while I'm down here.
20              All right.  Anything else on Mr. Troup,
21    Mr. Garcia's motion?
22              All right.  Let's go to the United States'
23    motion, notice and motion in limine to admit gang
24    expert witness and testimony.  Again, this is seeming
25    like deja vu, but is it because it was in this case,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    or was it in Mr. Garcia's case?
2             MR. BECK:  Neither.  It was in the PNM
3    case, United States v. Mauricio Varela, et al.  We
4    were barreling towards Mr. Rodriguez.
5             THE COURT:  All right.  Well, let me
6    restate what I said.  And then, Mr. Beck, you were
7    going to relook at the Government's position.  So let
8    me sort of restate what I said sort of at the
9    beginning of the hearing.
10            It seems to me that with gang experts, and
11   people have identified them on both sides, so this
12   rule will cut the same way for both sides, although I
13   think the reality is it's the Government that wants
14   to put on a gang expert, and the defendants are
15   putting one on -- or more than one -- in rebuttal.
16   It seems to me that a gang expert can come in and
17   testify to how gangs operate in a generic sense; that
18   they can talk about some terms.
19            I think we all ought to look hard -- I
20   mean, our juries are fairly sophisticated.  They know
21   a lot about organized crime and gangs, and those sort
22   of things, so they don't need a lot of education on
23   those.  But I'm not precluding gang experts entirely,
24   because the Tenth Circuit hasn't precluded gang
25   experts entirely.  But it does seem to me it clips
```

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                      1-800-669-9492

BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE                                      e-mail: info@litsupport.com

 1   their wings in the sense that they cannot come in,

 2   and because they worked at the prison, and they got

 3   very familiar with the SNM Gang, come in and testify

 4   about the SNM gang; that they can't talk and testify

 5   specifically about that.

 6           And so I'm anticipating that most of the

 7   Government's case here about the SNM Gang, its

 8   structure, its lingo, its tattoos, its mode of

 9   operation, those things are going to come through

10   cooperating witnesses and other people.

11           It does seem to me -- and people are

12   welcome to argue on any of these issues, but

13   particularly this one -- the Government's expert

14   witnesses, since they're fact witnesses in part can

15   come in and testify how the Corrections Department

16   classified these people.  I don't think they ought to

17   be saying:  In my opinion so and so is a gang member,

18   but they can say that this is what we did at the

19   prison, we classified and put these people in as SNM

20   Gang members, and that's the reason they were in this

21   cell, in this unit and this prison.  Sort of implied

22   in that is their opinion.  But I don't think they

23   ought to be offering opinion testimony.  They can

24   offer fact testimony as to what they did, what they

25   saw, what they observed.  But the minute they shift

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    over to opinion testimony; that these people in their

2    opinion, that they're SNM Gang members, that they're

3    going to need to have some firsthand knowledge.

4         So a concern here is that most of these

5    experts, how they've accumulated their experience has

6    been through things that have been told to them.  If

7    they can testify to what they've seen or heard

8    themselves, then they're fact witnesses.  But to just

9    bring them in as opinion witnesses, and then have

10   them be a conduit for a lot of things that were just

11   told to them, I think the case law precludes that,

12   and should preclude that.  And so those would be the

13   lines that I would draw.

14        I guess after I sort of gave that ruling on

15   the PNM case, you were going to take a harder look at

16   the Second Circuit's case, Tenth Circuit cases.  Can

17   you live with what I'm saying, Mr. Beck?  Or do you

18   want to --

19        MR. BECK:  Well, I can, Your Honor, to a

20   certain extent.  I think Your Honor is right.

21        I went back and looked at United States

22   against Garcia, and that's 793 F.3d 1194.  It's a

23   case out of the Tenth Circuit, in 2015.  And it cites

24   heavily from the Second Circuit's decision in Mejia.

25   And, generally, I think the outlines the Court gave

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    is correct.  I think last time, in PNM, what was

2    maybe a little bit too restrictive was saying that

3    the experts can't testify to the SNM Gang.

4            I think that, if we look at the Garcia

5    opinion -- and I'm looking at page 1213 of the

6    Federal Reporter 3rd -- it says that, "Expert

7    testimony about a gang's history, territory, colors,

8    hand signs, graffiti use, naming practice, tattoos,

9    structure, membership rules, and similar sociological

10   evidence can assist the jury in understanding and

11   evaluating the evidence considering the specific

12   crimes charged.  But there is no sociological

13   expertise in testifying to gang members' specific

14   travels, specific uses of gangs funds, or commission

15   of specific crimes."

16           So I think what the Tenth Circuit is saying

17   there is that it's okay to talk in generalities about

18   a gang.  It's not okay to talk about specific

19   instances of gang conduct.

20           And I think that falls in line with what

21   the Court is distinguishing here, in just parroting

22   hearsay testimony.  When the officer -- when the

23   experts, as corrections officers, testify to certain

24   events that they didn't perceive, that they only

25   heard secondhand, certainly that's inadmissible

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    hearsay testimony.

 2              When they're talking about gangs in

 3    general, New Mexico Corrections Department gangs, and

 4    even the SNM that's, under the Tenth Circuit's

 5    classification, admissible expert opinion.  And the

 6    reason for that is that their experience, through

 7    what they've seen, and through different seminars and

 8    classes they take on gang culture, they become

 9    experts in identifying gang symbols, including the

10    SNM symbols, Los Nortenos, et cetera.

11              So when we use experts, they're able to

12    filter through inadmissible evidence, come up with

13    their own opinions based on their knowledge,

14    expertise, and then give their opinions.  So I think

15    it's permissible to have these experts testify to

16    specific tattoos associated with the SNM.  And I

17    think this goes along with how they classify certain

18    inmates as SNM members, and one of their indicators

19    is SNM tattoos.

20              So I think, if the Court looks closer at

21    the Garcia opinion's outlines and what is permissible

22    and what isn't permissible, I think the Court will

23    correctly conclude that certain testimony about the

24    SNM's operations is okay, as long as they don't get

25    into specific crimes or instances of conduct or

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                        1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

```
1    operations of the gang.
2              THE COURT:  Other than tattoos, what can
3    you think of that you would want these experts to
4    testify that you think I'm being too restrictive on?
5              MR. BECK:  There is certain slang terms I
6    can think of, the ways in which members identify and
7    talk with other members of the SNM; code words that
8    they use.  It may be -- I don't know whether it's
9    unique to just the SNM, but I know it is a way that
10   they associate, folks with the SNM, the way that the
11   SNM operates.
12             THE COURT:  Would you want the expert just
13   to testify that a lot of gangs use slang words to
14   communicate, or are you wanting your expert to
15   specifically talk about how SNM Gang members
16   communicate?  See, I can live with your expert --
17             MR. BECK:  Right.
18             THE COURT:  I'm not -- this is my
19   preliminary ruling -- I'll certainly hear from the
20   defendants -- I think I can live with your expert
21   coming in and saying:  One of the ways that we
22   identify who is in what gang, for placement,
23   classification, those sort of things, is tattoos.
24   And I think I could also live with the fact that your
25   expert is going to come in and say:  One of the ways
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that gangs communicate is through slang.  I think

2    those are some things that maybe not all jurors are

3    going to know.  I think some might, some might not.

4    So I think it's an area that an expert could assist.

5          I guess I would expect, though, somebody

6    else is going to tell us what are the SNM tattoos,

7    and what are the SNM slang?  Can you live with that?

8          MR. BECK:  I think that's too restrictive.

9    Because, again, looking at the language in Garcia,

10   expert testimony about a gang's history, territories,

11   colors, hand signs, graffiti use, naming practice,

12   tattoos.  A gang's tattoos, a gang's naming practice.

13   And so what we're talking about is the way particular

14   gangs operate.

15         And if we're talking about the way they

16   identify gang members, I don't expect they're going

17   to testify that if someone has a tattoo, then they're

18   classified as an SNM member.  I think it's a specific

19   tattoo.  I expect that it will be SNM tattooed on

20   their body, with the Zia symbol, among other tattoos

21   that they use to identify SNM members.

22         But, again, I don't know that they'll get

23   into that level of detail.  What I'm saying is that

24   there may be certain language.  I think the carnal as

25   an example, I think that's a way that SNM members

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                   1-800-669-9492
                                             e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    refer to other SNM members.  I don't know if that's

2    exclusive to the SNM, or if other prison gangs or

3    gangs also use that.  But I expect that they will

4    testify about that and give their opinion that that

5    would indicate that someone is an SNM member, as

6    opposed to being an associate or another member.

7            I think that based on Garcia that's

8    appropriate.  I think if they came in and said that,

9    In 2007, Mr. Baca sent a letter to another SNM member

10   that said, Carnal -- and that's what we used to

11   identify him and classify him as an SNM member --

12   that may be inappropriate, that may be hearsay

13   testimony they cannot come in.  I mean, I guess we're

14   not offering it for the truth of the matter asserted

15   in that case, but rather, why they're classified as a

16   gang member.

17           But I think that's where Garcia talks about

18   specific instances of gang conduct, is that they

19   would be referring to hearsay testimony that they

20   didn't perceive; that they didn't use that knowledge

21   and expertise to come up with that opinion.

22           THE COURT:  All right.  Other than tattoos

23   and slang words, what else do you think I'm drawing

24   the line too tightly for your experts?

25           MR. BECK:  I think they can talk about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   recruitment methods that gangs and the SNM use.  I
2   think they can talk about communication methods that
3   the SNM uses, the gangs use.  I think that would be
4   like hand signs in Garcia.  I think they can talk
5   about the types of crimes that SNM members engage in.
6   I think they can talk about the membership rules.
7   And I think they can talk about the structure and how
8   they validate other SNM members.  I think history and
9   territory in Garcia comprehends rival gangs to the
10  SNM, both within and without New Mexico Corrections
11  Department.  Then -- I think I said this, but I'm not
12  sure -- where Garcia says "expert testimony about a
13  gang's history is helpful," they could testify about
14  the SNM's history.
15          THE COURT:  Well, it sounds like to me
16  you're pretty much strongly disagreeing with my
17  proposed ruling.
18          Mr. Hammond, why don't you grab my glasses.
19  This is pretty small print for me to look at.
20          All right.  Anything else you want to say
21  about my proposed rulings?
22          MR. BECK:  I think that's it, Your Honor.
23          THE COURT:  All right.  Thank you, Mr.
24  Beck.
25          Mr. Castle, I think Mr. Garcia was the one
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that took the lead on this.  Let me first ask, the
2    line I was drawing, how did you feel about that line?
3            MR. CASTLE:  To be completely frank, I'm
4    not quite sure where the line is, because I hear the
5    Government, and they kind of construe it different.
6            THE COURT:  Well, that's their line.
7            MR. CASTLE:  Right.
8            THE COURT:  I'm talking about the line I
9    drew, which is that the gang experts can talk about
10   gangs in general.  I mean, they can certainly talk
11   about:  Tattoos is often a way that gangs identify
12   themselves.  They did talk about slang words,
13   communication.  They can talk about crimes in
14   general, without specifically, you know, talking
15   about the SNM Gang.
16           MR. GRANBERG:  Your Honor, I apologize for
17   interrupting.  I was wondering if the Court would
18   permit Mr. Chavez to use the restroom, please.
19           THE COURT:  Tell him to wait about 15
20   minutes.  Then we'll take a break.  All right.
21           MR. CASTLE:  Generically, about gangs, I
22   could understand why there might be need for a jury
23   to hear about why gangs generically use slang terms
24   and tattoos.  I'm not sure you need to do it through
25   an expert.  Because the concept of experts is where
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   they can't -- a jury can't draw those conclusions

 2   from actual lay testimony.  I imagine that the

 3   Government has a number of inmates who are going to

 4   be able to come before the Court and tell the jury

 5   that the SNM Gang uses tattoos.  And we identify

 6   ourselves by our tattoos.  And we use slang terms to

 7   mean the following.  I'm not sure why you need an

 8   expert at all.  Because this is not something that's

 9   so complicated the jury is not going to understand,

10   you know, one of these informer witnesses saying:

11   This is what we do.

12           This is not an area of expertise.  I

13   understand the Tenth Circuit has talked about it, but

14   I think more in the context of more drug cases, such

15   as this Court dealt with in the Rodriguez decision,

16   where perhaps certain words you're overhearing on an

17   audiotape between members.  There is a need to do it

18   there, because -- let's say that this was a drug --

19           THE COURT:  Hold on just a second, Mr.

20   Castle.  Where -- give me the language you were

21   referring to --

22           MR. BECK:  The paragraph that starts on

23   page 1212 and goes through page 1213.

24           THE COURT:  I don't have the full opinion,

25   so -- what page is it?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. BECK:  The language that I was
 2    referring to starts -- it's the first full sentence
 3    on page 1213.  "Expert testimony about a gang's
 4    history, territory, colors," then continuing
 5    throughout that paragraph.  I read you that sentence
 6    and the next sentence, omitting the citation.
 7              THE COURT:  Are you using Lexis rather than
 8    Westlaw?
 9              MR. BECK:  I'm using Westlaw.
10              THE COURT:  Okay.  I'm having a hard time
11    matching your pages up.  I've got page 717, so I
12    don't have any --
13              MR. BECK:  Page 717 is not included in this
14    Garcia opinion.
15              THE COURT:  Okay.  All right.  Go ahead,
16    Mr. Castle.
17              MR. CASTLE:  Yes, Your Honor.
18              I'll actually jump start right where the
19    Government just left off.  In that exact page they
20    indicate that, "There is no sociological expertise in
21    testifying to gang members' specific travels,
22    specific uses of gang funds, or commission of
23    specific crimes.  When the experts' testimony on such
24    matters is not based on personal knowledge, but on
25    testimonial hearsay, the testimony violates not only
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the rules of evidence but also the confrontation

2    clause."

3             But going back to the original question

4    from the Court is:  Could I live with the Court's

5    order?  You know, I don't believe -- we're probably

6    in disagreement with that, if it's generic.  But when

7    you get to the specifics of the SNM Gang, I believe

8    that's a problem.

9             So if that's where the Court is drawing the

10   line, you're going to talk about gangs generically,

11   whether it be a street gang, a prison gang, things

12   like that, I don't have any heartburn over that.  But

13   when you get to the specifics, I believe that is

14   absolutely going to be based upon the testimonial

15   statements that they've obtained from other gang

16   members or other officers over a period of time.

17             THE COURT:  Well, what do you do with this

18   language that Mr. Beck is relying on, that indicates

19   that the Tenth Circuit in Garcia said "a gang," so it

20   seemed to allow some expert testimony by an expert

21   witness about a gang?

22             MR. CASTLE:  Well, it I guess depends on

23   what the source of that information is.  Because

24   right after that particular sentence, they go on to

25   talk about, if the basis of your knowledge as an

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  expert is testimonial statements of others, then it's

2  not admissible.  So you can't take the sentence in

3  isolation.  That's what they're doing.  They're

4  leaving out the analysis below, which is the

5  confrontation analysis.

6          And I would invite the Court possibly to

7  proceed in the method it did in the Rodriguez case,

8  which for the record, the citation is 120 F.Supp. 3d

9  1216.  In that case -- which coincidentally were with

10 these prosecutors and with Agent Acee -- the Court

11 said, Let's put the expert on the stand, find out the

12 specific opinions, and then find out what the source

13 of their knowledge is, so that we can determine

14 whether it's in violation of various rules of

15 evidence.  In that case there was no objections on

16 the confrontation clause.  I don't believe there were

17 really objections under various other rules that I've

18 raised.  But there were a lot of them.  And the Court

19 restricted significantly the areas of expertise.

20          THE COURT:  And whose opinion is Rodriguez?

21          MR. CASTLE:  That's yours, Your Honor.  And

22 the Court in that case stated -- the Court then held

23 an evidentiary hearing to examine Acee; the dual

24 purpose of calling Acee established to analyze his

25 expertise pursuant to Daubert, and to allow

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Rodriguez, the defendant, to fully cross-examine Acee
 2   on his testimony, thus alleviating any deficiencies
 3   in the Rule 16 notice.  So it was combined issue
 4   there.
 5            THE COURT:  Was Rodriguez the case out of
 6   El Paso, where they came -- okay.  Well, was Mr. Acee
 7   testifying as an expert in that case?
 8            MR. CASTLE:  Yes, he was.  And it was out
 9   of El Paso.  And it was concerning a cartel out of
10   Mexico, and how they operated.
11            THE COURT:  But was he testifying as an
12   expert?
13            MR. CASTLE:  Yes, he was.
14            MS. ARMIJO:  Our expert, Your Honor.
15            MR. CASTLE:  So that's what I think we need
16   to do.  Because, otherwise, this is kind of
17   nonspecific.
18            For example, the Court indicated that it
19   was inclined to allow the expert to testify about
20   corrections classifications.  And I believe that the
21   Court was saying individual SNM Gang members, the
22   defendants.
23            THE COURT:  Well, here's what I was saying
24   on that:  It seemed to me that these corrections
25   officers, these three experts, do have some
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    possible -- they do have some -- in fact, it seems to
 2    me that that's probably their greatest value is that
 3    they are fact witnesses.
 4                I guess I have trouble -- I guess I have
 5    some concern about them testifying that in their
 6    opinion Mr. Garcia is an SNM Gang member.  But if
 7    they testify that the Corrections Department
 8    classified Mr. Garcia as an SNM Gang member, and
 9    that's the reason they had him in this facility, it
10    seemed to me that was okay.  I mean, implicit in that
11    is they made a determination.  But that's something
12    they did, and they acted on it.  That seems to me to
13    be different.
14                MR. CASTLE:  Well, with all due respect, I
15    disagree.  And I'll explain why.  If one of these --
16    I don't want to call them experts -- these three
17    witnesses; if they're testifying as fact witnesses,
18    they're not an expert.  They're testifying, and they
19    say, I talked to Billy Garcia; Mr. Garcia told me he
20    was a member of the SNM Gang, then that's
21    permissible.
22                If what they're doing is reading from a
23    document that -- where someone else has classified
24    Mr. Garcia as an SNM member, frankly --
25                THE COURT:  Did you say it's impermissible
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    or permissible?
 2            MR. CASTLE:  That would be permissible.
 3            THE COURT:  Okay.
 4            MR. CASTLE:  If they're testifying that
 5    they looked at a classification document and it says
 6    Mr. Garcia is an SNM member, my position is that's
 7    hearsay, but also --
 8            THE COURT:  I'm agreeing with you.
 9            MR. CASTLE:  Okay.
10            THE COURT:  On those two points, you and I
11    are in agreement.  But it seems to me, if PNM, for
12    example, if it classified him as an SNM Gang member,
13    that's a fact.  You can explore the basis for it, or
14    whatever, but that's a fact, they classify him as a
15    gang member.  And they may have put him into either
16    segregation or a particular unit or a particular
17    prison because of that classification.  Those are
18    facts.  It may be right or wrong.  They can't -- but
19    these men -- these three experts can't come in and
20    say:  In my opinion, Mr. Garcia is a gang member.
21    They can't do that.  But it's a fact that they
22    classified him as an SNM Gang member, and that may
23    have affected his classification and where he was
24    housed in segregation.  Those are facts.
25            MR. CASTLE:  Well, my argument is that if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it's being offered for the truth of the matter, if
 2    it's being offered, not to show why he's in a
 3    particular cell or block, but it's being offered to
 4    show that he's an SNM member, they need to call the
 5    witness that --
 6              THE COURT:  Well, it is being offered for
 7    that purpose because it is some evidence that the
 8    world views these people as SNM Gang members.  It's
 9    not the definitive one.  It's just some evidence.
10              MR. CASTLE:  Right.  And I think they need
11    to call the person who has actual percipient
12    knowledge that Mr. Garcia is an SNM member; not based
13    upon some document that they've reviewed, that
14    someone else compiled.  And we have no idea how they
15    compiled it; whether it was for the purposes of law
16    enforcement, which likely is the purpose, that would
17    make it within the core area of testimonial
18    statements that Crawford and its progeny say is
19    impermissible to enter in trial.
20              Now, I think they're going to be able to do
21    this independently through legitimate means.  They're
22    going to call somebody who is going to say:  I'm a
23    member of the SNM Gang, and I know Billy is, because
24    we talked about it together and he's a member.  And
25    they're going to be able to do it.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              But to have a witness from the Department
 2    of Corrections come in and read, essentially from
 3    another document or classification document, I
 4    believe is in violation of the confrontation clause.
 5              I would indicate -- one of the things that
 6    I think is a little different about this case than
 7    Garcia and the Rodriguez case that this Court
 8    presided over is that we have a very unique
 9    situation, which I haven't seen addressed.  And that
10    is the Government's experts, three experts, work for
11    one of the victims.  They're employed by the victim.
12    And one of the things that I think the Court can take
13    into account on whether it permits these three
14    individuals to testify as experts, as opposed to
15    percipient witnesses is that fact.  Is this really
16    the proper role of an expert, is to have a victim,
17    essentially, be able to employ experts that are
18    presented before the Court?
19              The other areas that I believe that the
20    Government had talked about, at least today, and also
21    addressed in their motion, they wanted specific
22    evidence about how the SNM Gang operates.  I believe
23    that that would be based upon testimonial hearsay.
24    The particular code words that the SNM used; the only
25    way that these three individuals know that is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    somebody told them.  Unless they're a member, a
2    former member of the SNM.  The only way they'd know
3    it is if they interviewed SNM members.  That's a
4    testimonial statement they're relying on.
5    Communication reference is the same.  The types of
6    crimes that SNM members commit; there is a particular
7    danger in that.  And I know the Court is probably
8    with me on that.
9              So if the Court is ruling that way, but
10   that actually goes to mental state of -- there is a
11   dual mental state in VICAR prosecutions.  One is the
12   mental state of the underlying offense.  But there is
13   also a second mental state, which is that they have
14   to say that that crime was committed for the purpose
15   of maintaining their position, et cetera, in the SNM
16   Gang.  That's a second mental state.  And I believe
17   Rule 704 prohibits expert testimony on that
18   particular area.  So if they're bringing up these
19   crimes that are being committed for the purpose of
20   maintaining their position in the SNM, they're really
21   commenting on a defendant's mental state, which is
22   prohibited under 704.
23             So, you know, what I -- I could go through
24   the rest of these areas.  But if the Court is not
25   going to allow them to put in evidence of it, then I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    don't need to continue.  But I do think there is a

2    considerable concern that, frankly, all the areas of

3    expert testimony that's being offered is all based

4    upon testimonial out-of-court statements of inmates

5    that have been interviewed over the years by these

6    officers.

7            I see someone standing.

8            THE COURT:  Well, let me do this:  We'll

9    take a break.  Let me put the proposal on the table,

10   because -- here is -- looking at the statement that

11   the court -- the Tenth Circuit made in Garcia, Judge

12   Hartz, I don't have any disagreement that expert

13   testimony about a gang's history, territory, could be

14   helpful to the jury.  But I think that only -- I

15   don't disagree with that.  I mean, that's the kind of

16   stuff that I think an expert could help on.  But

17   that's a totally different question as to whether the

18   expert can testify to that.

19           And I think Mr. Castle is correct -- and

20   this is what's prompted me to draw the line where it

21   is -- he's saying that there is no sociological

22   expertise in testifying about specific things.  And

23   he says:  When the experts' testimony on such

24   matters -- now, the question is does that just relate

25   to the prior sentence, or does it relate to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   sentence going back, is not based on personal

2   knowledge but on testimonial hearsay, the testimony

3   violates not only the rules of evidence but also the

4   confrontation clause.

5           It doesn't seem to me to make sense to say

6   one category has to comply with those, but these

7   others, they're helpful, but they don't have to

8   comply with the confrontation clause or the rules of

9   hearsay.  I don't think that's what Judge Hartz is

10  saying.  And so I'm not -- I'm inclined not to adopt

11  that reading of his ruling.  And what you've really

12  got to go back to is Judge Hartz -- you can correct

13  me if I'm wrong -- was really relying on the Second

14  Circuit's opinion in Mejia.  So I'm drawing the line

15  where the Second Circuit draws it in Mejia.  And I

16  think that's consistent with what Judge Hartz is

17  saying.

18          And so here's what I will do:  We'll come

19  back and argue this -- if anybody else wants to speak

20  on this -- the experts are not going to be able to

21  really talk about the SNM case -- gang specifically.

22  They can talk generally about gangs.  The fact that

23  SNM comes out of their mouth as they talk about other

24  gangs I don't think is important, but they can't

25  specifically talk about the SNM Gang and offer

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                     (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    testimony on that.  They can talk about a gang.

2           If, on the other hand, the Government wants

3    to push that and have them particularly, say, the

4    tattoos, they really want the experts to testify

5    about tattoos rather than something else, then I'm

6    going to have to go back to the procedure I used in

7    Rodriguez.  You'll have to identify those, and then

8    we'll have to have a hearing where those three

9    experts come in, and then I listen to what the basis

10   of their opinion is, and then make balls and strikes

11   calls on an individual basis, and we'll script it

12   out.

13          So I think that's going to have to be the

14   sort of dividing line, and that will have to be the

15   procedure we're going to use on those three experts

16   if they want to get into some areas that I know the

17   Government wants them to get into.  You'll have to

18   make a judgment as to whether talking to them, you

19   think you can satisfy -- they satisfy hearsay and the

20   confrontation clause issues.

21          All right.  We'll be in recess for about 15

22   minutes.

23          (The Court stood in recess.)

24          THE COURT:  All right.  Mr. Benjamin, are

25   you here and ready to enter an appearance?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BENJAMIN:  Your Honor, Brock Benjamin
 2    on behalf of Mr. Joe Gallegos.
 3            THE COURT:  All right.  Mr. Benjamin, good
 4    morning to you.
 5            All right.  Well, I've been looking at the
 6    break at United States v. Pablo from the Tenth
 7    Circuit; then looking at Judge Tymkovich's opinion on
 8    the Sandoval case, I think.  I thought I had it here.
 9    It's an unpublished opinion.  Is that Sandoval;
10    Tymkovich, is that Sandoval?  I've been looking at
11    Garcia and looking at Mejia.  I guess I'm fairly
12    comfortable with where I'm drawing the line.
13            So let me go to the defendants.  Mr.
14    Castle, are defendants comfortable with where I'm
15    drawing the line?
16            MR. CASTLE:  I believe so.  What I'm not
17    comfortable necessarily with is what the Government
18    is going to be offering as percipient witness or fact
19    witness testimony in this regard.  I think it's -- I
20    tried to resolve this prior -- during the break --
21    and apparently what the Government wishes to do is
22    put their experts on, and have them indicate what it
23    is they're going to testify about, some of which will
24    be percipient fact witness testimony, some of which
25    will be expert testimony.  I think it's good that we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    figured that out right off the bat, and find out

2    whether it's admissible or not.  If any of these

3    witnesses are allowed to testify as both an expert

4    and as a percipient witness, I believe that that's

5    going to have to be delineated for the jury as well.

6            But the problem is, their notification --

7    their actual motion, I think it was 1299 -- it's

8    really hard to understand whether the basis of their

9    individual's testimony is something they perceived

10   personally, or whether it's -- it was all couched as

11   expert testimony, but it only says one opinion -- so

12   I am very comfortable where the Court is drawing its

13   line.  But with regards to specific areas that

14   they're going to be getting into, I think we're going

15   to have to just analyze it as it's presented at the

16   hearing.

17           I noticed that the Court in Rodriguez at

18   the hearing told the prosecutors to put their expert

19   up, and let's have the defense cross-examine.

20   Because of that -- what I read in Rodriguez, I asked

21   the Government to have their experts here; gave them

22   Touhy letters, and told them the areas in which I was

23   going to cross-examine.  I don't believe they brought

24   them.  But I think we could certainly get them up

25   here tomorrow.  And I think we could go on that

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1    process, and we could have a definitive ruling.
 2              THE COURT:  All right.  Thank you, Mr.
 3    Castle.
 4              MR. CASTLE:  Thank you.
 5              THE COURT:  Any other defendants want to
 6    speak on this issue?  Everybody pretty comfortable
 7    with where I'm drawing the line?  Mr. Villa?
 8              MR. VILLA:  Judge, I'm comfortable.
 9              I think a couple of things that come up, I
10    think with the Court's ruling, one of the main
11    objections that we had on behalf of Mr. Perez was the
12    experts testifying that SNM is an enterprise.  It
13    sounds like the Court would not permit that.
14              But if we're going back to the generic
15    testimony, if you will, about gangs or that sort of
16    thing, I think we would want the Court to make a
17    ruling that they can't testify that gangs are an
18    enterprise or gangs are engaged in racketeering
19    activity.  I mean, if they testify about the facts
20    they've observed, I think that's different.  But
21    getting to that ultimate issue, I think, is important
22    for the Court to address, even if it's in generic
23    fashion.
24              The other two pieces which I think maybe
25    the Court is going to get to is, of course,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   challenges to these witness' qualifications, whether
 2   they can even testify about gangs in the generic
 3   fashion.  And then I think -- you know, there is
 4   three of them, so are they covering the same ground?
 5   Are they going to be offering different testimony?
 6   Is it cumulative?  So those are the issues that I
 7   think perhaps the Court is getting there, but I
 8   wanted to address.
 9              THE COURT:  Well, it would seem to me --
10   and I haven't heard Mr. Beck, and I haven't read
11   anything where they're going to testify that this is
12   an enterprise or this is racketeering activity,
13   whether they would offer opinions that the gangs are
14   enterprises.  It seems to me those are legal
15   conclusions that would be left for the jury to
16   determine after I give them jury instructions to tell
17   them how to determine those.
18              So I'll hear from Mr. Beck in a moment.
19   But I would think that the experts would not be
20   testifying about whether gangs in general, or SNM in
21   particular, are an enterprise, and whether they're
22   engaged in racketeering activity, again, generally or
23   specifically.  I wouldn't think that would be
24   appropriate for the expert.  If the expert is going
25   to testify that gangs commit crimes to advance their
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    purposes, I would think that would be the general
 2    testimony that a gang expert could provide.
 3            What else did you say?  What other areas
 4    did you --
 5            MR. VILLA:  So the other challenges that we
 6    had raised in our brief were the qualifications of
 7    these particular experts.
 8            THE COURT:  I guess I don't think that's a
 9    Daubert issue.  I think that's a qualification issue.
10    I don't know how and when you raise it.  But I didn't
11    see anything glaring here that would cause me to not
12    think that these people were qualified.  But, you
13    know, I'll let you argue that.  But nothing jumped
14    out at me saying these people weren't qualified to be
15    general gang experts.  You've got people that are
16    former gang members, prison officials.
17            I'm looking and comparing the ones that the
18    defendants brought in, it seems to me that they're
19    all kind of the same genre, and it's fairly broad as
20    far as gang experts.
21            What was other area?
22            MR. VILLA:  I think the cumulative nature
23    of their testimony.  There is three of them.  The
24    notice says they're going to testify to basically the
25    same thing, the way I read it.  And so I'm not sure
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    what the purpose of the three of them are.

2            I think the qualification issue may answer

3    some of that.  You know, one of the guys appears to

4    have a lot more experience as a higher rank.  A few

5    of these folks are, you know, a little bit lower

6    ranking.  I mean, if I get hired at DOC tomorrow, and

7    in two years I'm a sergeant in STIU, does that

8    qualify me as a gang expert for this case?  And I

9    think that's some of the folks we might be dealing

10   with.

11           THE COURT:  Okay.  All right.  Thank you,

12   Mr. Villa.

13           Anyone else on where I'm drawing the line?

14           MS. JACKS:  If I may, Your Honor.

15           THE COURT:  Ms. Jacks.

16           MS. JACKS:  Our document is 1345, and it

17   was our objection to the Government's Rule 16 notice.

18   And I think the Court was asking just a few minutes

19   ago:  Where is it that we asked for the

20   qualifications, the specific opinions, and the basis

21   for those opinions.  And this is with Rule 16.

22           So I think, even if the Government is going

23   to be permitted to call, perhaps, one or more of

24   these witnesses as a more generalized generic gang

25   expert, I still think we're entitled to know what the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   witness' qualifications are and what their specific
 2   opinions are and the bases of those opinions.  So --
 3             THE COURT:  Well, you have the resumes of
 4   all three; correct?
 5             MS. JACKS:  We actually don't.  I think all
 6   we have is, in the text of the Government's notice
 7   about the gang experts, they recited some of what I
 8   think they believe their qualifications were.  But
 9   it's nothing to the degree of a CV.  And we don't
10   have specific -- at least at this point -- the
11   generic opinions that the Government would be
12   proposing to offer.  And we don't have any specific
13   information about the bases of those opinions.
14             THE COURT:  Well, if the Government calls
15   these witnesses -- we do the Rodriguez procedure --
16   that's going to satisfy the Rule 16 issues; correct?
17             MS. JACKS:  You mean do it outside the
18   presence of the jury prior to the testimony?
19             THE COURT:  Yes.
20             MS. JACKS:  It does in part.  I think the
21   part that I don't think it satisfies is I think we're
22   entitled to -- the opportunity to prepare and to
23   assemble materials to counter these witnesses'
24   opinions and specific bases for those.  And that's
25   not really something that we can do on the fly.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    I think that's why we had that expert disclosure date
2    so far in advance of the trial date.
3            I mean, there is thousands of pages.  There
4    is a vast array of information that we might want to
5    access to prepare to cross-examine those witnesses.
6            THE COURT:  Well, let's see how it goes.
7    If you -- after we have them testify, if there is
8    still some problem with the basis and reasons or
9    qualifications, we can take it up at that point.  But
10   I think at the present time you're about to get a lot
11   of basis and reasons.  And we'll have to sort through
12   those and see if it's still inadequate.
13           All right.  Anyone else on where I'm
14   drawing the line on the defendants' side?
15           All right.  Mr. Beck, your thoughts on
16   anything else here where I'm drawing the line?
17           MR. BECK:  No.  I mean, I think I've made
18   my position clear.  And I understand the Court's
19   position.
20           We have not received Touhy letters for any
21   of our witnesses.  And they have the CVs for the
22   three --
23           THE COURT:  They got CVs for the three?
24   Because they were complaining about -- I can't
25   remember which it was, but they were complaining that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    they hadn't received them for some of these gang --
2              MR. BECK:  I think it was very recently.  I
3    think it was the last production.
4              THE COURT:  Okay.
5              MR. BECK:  We don't intend to elicit
6    testimony that the SNM is a racketeering enterprise.
7              THE COURT:  Okay.
8              MR. BECK:  And I think -- I can't remember,
9    there was a fourth.
10             THE COURT:  The cumulative.
11             MR. BECK:  Thank you.  The cumulative.
12   That was the fourth one.  We don't intend to put all
13   three of these witnesses on in each trial.  There are
14   a lot of trials coming up.  And since all three of
15   them are qualified, based on their experience and
16   training, we list them as experts, but we don't
17   intend to elicit cumulative expert testimony.
18             THE COURT:  Okay.  To satisfy the basis and
19   reasons for the opinion, so that I can do my job of
20   making sure that they're not just parroting hearsay
21   or confrontation clause testimonial --
22             MR. BECK:  I think you just made your job
23   on that a lot easier.  I mean, with the breadth of
24   the opinions that they're limited to, they're going
25   to be able to testify based on their experience and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    knowledge.

 2              THE COURT:  Are you going to try to -- for

 3    example, are you going to try to have them testify

 4    about tattoos, slang words, communication methods,

 5    recruitment methods, hand signals, membership rules,

 6    crimes that they commit, structure; those items?

 7              MR. BECK:  Well, I mean, it seems that the

 8    Court has already staked out its ground on that, that

 9    we're going to ask them:  Do prison gangs use hand

10    signals or communication tools?  Sure.

11              THE COURT:  Well -- and I thought you

12    were -- correct me if I'm wrong -- maybe we have an

13    agreement here, I thought you were saying you still

14    wanted to try to get these experts to testify on

15    these areas, and you were ready to go through the

16    procedure we used in Rodriguez to try to establish

17    that they obtained their information in some way

18    other than in a hearsay or a testimonial.  But it

19    sounds like maybe you're not.  So you're willing to

20    live with the line I've drawn?  I understand you

21    disagree with it, but if you're willing to live with

22    the line I've drawn, then it doesn't seem to me we

23    need to have a Rodriguez procedure in which they're

24    called to testify.

25              MR. BECK:  Okay.  So I think we're in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    agreement on all of those.  I think it sounds like
 2    the Court -- as I understand the Court -- it made its
 3    decision, but it's not ordering that at this point.
 4    It's going to look at the issues further and take it
 5    under consideration.  Because it's doing that, the
 6    Court would allow us to go through Rodriguez
 7    procedures to try to get any opinions that we believe
 8    are proper.
 9              THE COURT:  Well, I think given the place
10    we are, what I'm ordering -- what I'm saying is going
11    to have to be the order, and we're going to have
12    to -- it's going to have to be the order if we go to
13    trial.  I'll leave here today or tomorrow or
14    Wednesday, and try to get from y'all, everybody, what
15    you want me to look at and write an opinion on, and
16    take a second look at, or evaluate more closely.
17              But given the number of issues here,
18    unless -- I think this has to be the order.  And so
19    now I need to know whether you want a Rodriguez
20    procedure to try to get in additional information
21    from the experts, or you're willing to just say
22    they'll testify generally about gangs, but you're not
23    going to try to get specific information about the
24    SNM Gang through these three experts.
25              MR. BECK:  Okay.  May have a moment, Your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    Honor?

 2              THE COURT:  Okay.

 3              (Conferred.)

 4              MR. BECK:  Your Honor, may we put off the

 5    Rodriguez-type hearing until after lunch; at that

 6    time come back and either do the hearing or tell you

 7    that we don't need it?

 8              THE COURT:  Okay.  That's fair enough.  I

 9    think we've got enough going on here.  So I'll put it

10    off for the present time.  I can't tell you about the

11    timing here, but we'll put it off for the present

12    time and let you make a more informed decision.

13              MR. BECK:  Understood.

14              THE COURT:  Let me come back to you,

15    Ms. Jacks.  If the Government says:  We disagree with

16    you, Judge; we think we could get more in through

17    these experts legally under the Tenth Circuit law

18    than what you're allowing us, but we'll live with it;

19    in other words, we're not going to call these experts

20    to talk specifically about the SNM Gang, what else do

21    you need from a Rule 16 standpoint, or from a

22    qualification standpoint -- I'll come back to you,

23    Mr. Villa, as well on this, so be thinking of this

24    question -- for these three people to testify to the

25    general gang testimony that I'm allowing?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. JACKS:  What I would like -- it sounds
 2     like we've got the CVs in the most recent disclosure.
 3              THE COURT:  Right.
 4              MS. JACKS:  So that would probably satisfy
 5     me on that basis.
 6              With respect to the opinions, I'd still
 7     like to know what the specific opinions they're going
 8     to offer are, and what they're based on.
 9              THE COURT:  Let me -- stay right there.
10     Mr. Beck, there has not been an opinion -- there
11     hasn't been reports on these three, right?
12              MR. BECK:  They have not issued written
13     reports.
14              THE COURT:  How -- if there is no summary
15     at the present time of their opinions, then the
16     reasons and basis for those opinions, how do you
17     propose to address that concern?
18              MR. BECK:  Well, I think -- so the problem
19     is, is that their opinions are expressed in the
20     notice and motion in limine.  Now, given the Court's
21     ruling, I think a lot of those opinions are going to
22     be excluded.  So we would have to go back and talk to
23     them about what their opinions would be under the
24     framework that the Court articulated here.
25              I think -- as Your Honor said, I think
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    looking at their CVs, looking at their

2    qualifications, and looking at the opinions that

3    they're going to be able to offer at trial, it's not

4    really a close call whether they're qualified to give

5    opinions about prison gangs, when they've worked in

6    the prison system for years, and seen the way

7    multiple gangs operate.

8              I understand that sort of the sticky place

9    we're in now that there isn't -- I guess there isn't

10   really an effective Rule 16 disclosure for the

11   Court's order on this.  And I think that's something

12   that the United States will have to work with the

13   defense team to come up with a solution for.  I think

14   one can be reached.  I think we can draft a similar

15   Rule 16 disclosure to what we have in there, where

16   they give the generic-type opinions this Court will

17   allow at hearing.

18             And I think those -- to the extent that the

19   defense feels there is a need to explore those on

20   cross-examination, I think that's a perfectly

21   appropriate place.

22             THE COURT:  Well, if you come back from

23   lunch, and you say, Okay, we can live with where the

24   Court is drawing the line, and so we don't have to do

25   a Rodriguez procedure, would the Government be

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1    willing to produce, within a certain amount of time,

2    with these three experts, a summary of the

3    opinions -- I would expect -- what I'm envisioning in

4    my head is bullet points.  You bullet point what now

5    you want these people to talk about as far as prison

6    gangs or gangs in general, and then something in the

7    way of reasons and basis for those opinions?  And

8    this is what I would expect it to be, is that, you

9    know, what they have done to formulate that opinion;

10   that they explain to the defendants how they have

11   formed those opinions.

12            MR. BECK:  Well, I think -- so for the

13   first part of that, sure.  Maybe seven days after

14   Your Honor issues the order saying what the opinion

15   will be, then we could write those opinions.

16            I'm being sort of facetious on that.

17            We can put together a list of opinions, if

18   that's the course we're pursuing.

19            On the second part of that, I think the

20   case law is pretty clear that, with these law

21   enforcement type experts, drug activity, law

22   enforcement type experts that saying their experience

23   and observations and working for the Corrections

24   Department over the last couple of years form the

25   basis of this opinion is sufficient to meet Rule 16

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   requirements.
 2           THE COURT:  Okay.  Can you live with that?
 3           MS. JACKS:  I think it would depend on what
 4   the opinions were, whether I would agree.
 5           THE COURT:  All right.  Well, let's take it
 6   a step at a time.  Let me get the opinions in your
 7   hands.  You've got the CVs.  And they can probably
 8   put a paragraph together saying it's based on their
 9   experience working in prisons.  I tend to agree
10   that's probably where we are.  And I think that's
11   probably going to apply to defendants' experts as
12   well as the Government's experts.  So let's see if we
13   can work with that.
14           Thank you, Ms. Jacks.
15           Before I hear from you, Mr. Castle, let me
16   hear from Mr. Villa.  Now, we've got -- assuming the
17   Government comes back and says they can live with
18   where I'm drawing the line, you've got the CVs;
19   you're about to get the bullet points of opinions
20   they're going to offer on the general prison gang;
21   it's based upon their experience that's stated in the
22   CVs.  Anything else on that?
23           MR. VILLA:  I don't think so.  Nothing is
24   popped into my mind, Your Honor.  I have been
25   communicating with Ms. Fox-Young who may want to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    chime in, along with her three-month old, if the

2    Court is willing to hear her out real quick.

3            THE COURT:  No, that's fine.  Ms.

4    Fox-Young, are you there?

5            MS. FOX-YOUNG:  Yeah, I'm here, Your Honor.

6    I just would like to add -- I guess we need to see

7    what the Government does produce.  And we briefed

8    this in our response and our request for a Daubert

9    hearing.  But I think under Healy, the Court needs

10   look real closely at what facts outside the

11   investigation of this case these experts rely on.

12           The Court was pretty specific under

13   Rodriguez.  And I know the Court has looked at that.

14   But the Court needs to ensure that facts outside of

15   the case at hand, fact witnesses' expertise.  And I'm

16   just not sure that that's clear here.  I think

17   especially because we're looking at experiential

18   witnesses.  The Tenth Circuit has been clear, and

19   this Court has been clear that the gatekeeping role

20   needs to be relatively probing before the Court gives

21   the imprimatur of an expert monitor to these

22   witnesses.  And so I think we're going to want to

23   have a hearing.  But we'd like to see -- of course,

24   we'd like the Court to grant the hearing, but we'd

25   like to see what the opinions are first.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              THE COURT:  Well, I guess I'm not excited
 2    about having a qualification hearing.  I mean, we can
 3    do that at trial, if y'all want to challenge the
 4    qualifications at trial.  I'm not seeing Daubert
 5    issues here, so I'm not seeing a Daubert issue here.
 6              It seems to me that they are going to be
 7    experienced outside of the investigation of the SNM
 8    case.  I mean, I've excluded them talking about the
 9    SNM case.  So the fact that they're testifying
10    generally, I think that their reasons and basis could
11    state that it is -- and maybe I could require this --
12    that they state their experience beyond this case --
13    what is the reason they're testifying this, beyond
14    their investigation in this case.  So I guess that's
15    kind of what I'm thinking on that; that you're going
16    to get what you're entitled to in one shape or
17    another.  And some of the things that maybe you're
18    raising, we can -- I can order that the summaries
19    state the reasons and basis beyond the investigation
20    of this case.
21              All right.  Do you have anything else, Mr.
22    Villa?
23              MR. VILLA:  No, Your Honor.
24              THE COURT:  All right.  Mr. Castle?
25              MR. CASTLE:  Yes, Your Honor.  The one
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    problem I see is that experience can be drawn upon

2    from a number of sources.  It's a saying that

3    experience doesn't really get us to the question of

4    whether this is a confrontation clause problem again.

5            So I believe the Government in their

6    explanation of what the bases and reasons for this

7    expert opinion are, they need to tell us what the

8    source of that is.  Because, once again, if it's

9    interviews with other inmates, SNM inmates, or if

10   it's reading another report from somebody else that

11   works for STIU, that's a confrontation problem.

12           And so it would help the Court in doing the

13   analysis, beyond just whether the witness is

14   qualified, but it's really going to whether there is

15   a confrontation issue that's present, or hearsay

16   issue present.  So I would just ask --

17           THE COURT:  Well, here's the thing I

18   always -- you know, if they talk to 2000 gang

19   members, I mean, that's probably not a confrontation

20   problem, right?  It's not hearsay.  They're forming

21   an opinion based upon 2000 interviews.  If they talk

22   to one, and they come in and tell them, it's probably

23   a confrontation.  But at some point, somebody that's

24   talked to 2000 people is probably an expert, and

25   somebody that's talking to one is a conduit.  I would

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    think that once we have elevated these people to

2    talking about things on this investigation they're no

3    different than your experts, for example.

4              MR. CASTLE:  Well, I didn't endorse a

5    corrections expert.  But with that said, the courts

6    haven't really addressed this.  And that was one of

7    the things I brought up in our supplement -- I can't

8    remember the number -- that was filed just last

9    week -- and that is:  Can an opinion be composed or

10   derived from a series of testimonial statements, and

11   then somehow become insulated from the confrontation

12   clause?  And I don't believe the whole is any

13   different than the sum of its parts.

14             So if it's made of 2000 testimonial

15   statements, that opinion itself is a violation of the

16   confrontation clause.  And the reason being is,

17   you're doing indirectly what you can't do directly.

18   What you're doing is making it so that defense cannot

19   cross-examine the source of the information that the

20   expert is forming its opinion on.

21             Now, I understand that no courts have

22   really addressed this yet, and so it's a novel

23   concept.  But I believe that a pure understanding of

24   the confrontation clause would apply to it.

25             Very quickly, I went back and analyzed this




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    thing from an original intent aspect.  And at the

2    time the Framers framed the Constitution Sixth

3    Amendment, they had expert witnesses that were

4    testifying at that point.  But experts were required

5    to testify in the form of hypothetical questions.

6    And so they weren't allowed to make opinions that

7    were the kinds that the Government is issuing.  When

8    the Sixth Amendment was enacted, it did not delineate

9    between what kind of witness it was.  It says

10    "witnesses."  So that would apply to experts and

11    nonexpert witnesses.

12          And so I believe that -- well, our position

13    is -- doesn't matter what I believe -- what our

14    position is, is that the Sixth Amendment is violated

15    when the prosecution puts up an expert whose opinion

16    is derived from out-of-court testimonial statements

17    by others.

18          THE COURT:  All right.  Well, take a look

19    at the Fourth Circuit's opinion in United States v.

20    Johnson, which was the one that the Tenth Circuit

21    relied on, I think, pretty heavily in Pablo, which is

22    this March opinion that Judge Tymkovich -- it's an

23    unpublished opinion -- but it came out this year.

24    And I think it may address some of the things that

25    you're talking about.  It doesn't maybe put it in the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    language that you're using.  But when it says:  The

2    question is whether the expert is, in essence, giving

3    an independent judgment, or merely acting as a

4    transmitter for testimonial hearsay, I think once we

5    started getting more general information, the less

6    likely it is that it's a conduit for testimonial

7    information.  I'll probably draw the line somewhere

8    around that Fourth Circuit case which Judge Tymkovich

9    relied upon -- Chief Judge Tymkovich relied upon in

10   Pablo.

11           All right.  Anything else on this?  It

12   looks like we're going to wait till after lunch to

13   make a final decision.  Anything else anybody wants

14   to say?  Mr. Villa?

15           MR. VILLA:  I think you alluded to it in

16   speaking to Ms. Fox-Young.  But the Government's new

17   notices will include the basis of these experts'

18   opinions outside of investigation of this case.

19           THE COURT:  It should say -- the basis of

20   the opinion should specify what it's done outside of

21   scope of the investigation in this case.

22           MR. VILLA:  And I notice that the Court is

23   mentioning the defense experts.  And I know the law

24   is not going to change just because they're defense

25   experts.  But the Government hasn't filed objections

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    or anything else.  And the Court's not expecting us
2    to do anything different.
3            THE COURT:  We'll get to your experts in a
4    moment.  I mean, I have read all the notices that the
5    defendants have filed.
6            I did notice the Government hadn't done
7    anything with those.  Let's see what they want to do
8    on that score.  But let's focus on the Government's
9    experts at this point, because I think whether y'all
10   end up calling expert witnesses at all may be greatly
11   reduced if the Court's proposed line drawing is
12   adopted.
13           All right.
14           I guess Pablo was written by Judge Ebel in
15   2012.  That's published.  It's Sandoval that's the
16   Judge Tymkovich opinion that came out in 2017.
17           All right.  Let me set that material aside
18   and we'll pick that up after lunch.
19           But to answer your question, Mr. Villa, no,
20   I don't think you need to do anything more.  I think
21   it's -- probably the Government's got to do the next
22   move to see whether they -- what they want to do with
23   your expert or experts.
24           The next motion I have up, Ms. Sirignano,
25   Mr. Adams, is Mr. Garcia's motion for a Daubert

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    hearing, and to exclude Government expert witness

2    testimony.  And I think this is joined by Defendant

3    Patterson and quite a few other defendants.

4           Is there anything that's still alive that I

5    haven't ruled on or taken care of with this motion

6    and our prior motions?  Mr. Adams?  Ms. Sirignano?

7           MS. SIRIGNANO:  Your Honor, we were

8    requesting the Daubert hearing of the experts, in

9    addition to the Rule 16 violations that we believed

10   in the previous response to the Government's expert

11   notice.  And so I was hoping to be able to have the

12   Daubert hearing this week sometime, so the Court

13   could perform its gatekeeping role in determining the

14   reliability and the basis and the relevancy of each

15   Government expert witness.  So that's why this motion

16   was filed.

17          THE COURT:  Well, that was the reason I was

18   trying to start the hearing with the bit of an

19   exhortation.  Do the defendants really want a Daubert

20   hearing of Dr. Zumwalt?  I mean, is that really where

21   we're going?  I mean, some of these people -- I mean,

22   is that really what you're thinking, Ms. Sirignano,

23   we need to have Daubert hearings of Dr. Zumwalt and

24   some of these people?

25          MS. SIRIGNANO:  Judge, Dr. Zumwalt is not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    part of my client's alleged counts in the indictment.
 2    Your question is better directed to those who joined
 3    that, as well as to their counsel.  But I definitely
 4    would like a Daubert hearing for sure on the two
 5    experts that are specifically relevant to our case,
 6    FBI forensic examiner Tiffany L. Smith, as well as
 7    the FBI forensic examiner Theodore Chavez.
 8            THE COURT:  So you're wanting a Daubert
 9    hearing of Smith and Chavez.
10            Let me ask the defendants?  Who else are
11    you going to want, if anybody, Daubert hearings of?
12    Is there anybody else besides Smith and Chavez?
13            MR. VILLA:  Again, Your Honor, I think it
14    depends on the new notices we get with respect to the
15    gang experts.  But I don't want to foreclose that.
16            THE COURT:  Okay.  I guess it seems to me
17    the defendants are in a little bit of a difficult
18    position demanding a Daubert hearing on the gang
19    experts, given that y'all got gang experts as well.
20    There seems to be some agreement there is expertise
21    in this area.  I don't know how you're going to
22    evaluate whether a certain gang expert's opinion is
23    peer reviewed or subject to error rates.  I mean, I
24    don't know what the standard, really, on gang experts
25    is going to be as far as a Daubert hearing.  It seems
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    to me it's going to be the field of
2    cross-examination, rather than any Daubert issue.
3              MR. VILLA:  I certainly think it's
4    nontraditional, Your Honor.  But, you know, if there
5    is a particular opinion that we have concerns about
6    the reliability, I think the purpose of the Daubert
7    would be to explore the basis for those opinions, how
8    they came to that conclusion, you know, that gangs
9    have tattoos, gangs use slang words.  I don't
10   anticipate Daubert hearings on that.
11             But the issues -- depending on what comes
12   up in the notice -- that touch more on what's
13   happening at least in Counts 6 through 12 or the
14   other counts, those types of opinions we may ask the
15   Court to scrutinize prior to trial for their
16   reliability.
17             MS. SIRIGNANO:  And, Judge, if I could just
18   chime in, I think what's concerning -- at least to
19   our client -- is that the bases really haven't been
20   disclosed with many of these experts.  And I don't
21   know, particularly, if some of these medical
22   examiners relied on toxicology reports or other
23   scientific reports in determining their expert
24   opinion.  And whether or not those tests were done
25   with reliability and meet the standards of 702, Rule
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    702, Daubert, and Kumho Tire.  So that's why this

2    motion was filed, just to make sure that the

3    confrontation issue, Sixth Amendment confrontation

4    issue, is satisfied, and the Court can satisfy its

5    gatekeeping function, with making sure that this

6    evidence is reliable and credible with all the

7    Government's experts.

8             THE COURT:  Well, I guess I'm a little

9    disappointed to hear now that the basis and reasons

10   have been disclosed with many of these experts, given

11   that we spent a good chunk of the morning carefully

12   going through the Rule 16 requirements, and everybody

13   being satisfied that the written reports for almost

14   all the experts satisfied that requirement.  So I

15   guess now I'm disappointed to hear you saying, Ms.

16   Sirignano, that you don't know the basis and

17   opinions; they haven't been disclosed.  So what are

18   you trying to say?

19            MS. SIRIGNANO:  Well, Judge, I think my

20   position earlier this morning was that, at least in

21   the two experts that concern Mr. Garcia -- I've been

22   consistent -- that they haven't been disclosed.

23            THE COURT:  Well, now, you just -- Ms.

24   Sirignano, you just used "many of these experts."  So

25   if you're just limiting your comments to Ms. Smith

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    and Mr. Chavez, I can deal with it.  But if you're

 2    making a blanket statement that "many of these

 3    experts" you do not know the basis and reasons for

 4    their ruling, after we've spent a long time this

 5    morning going through the Rule 16 and talking about

 6    the written reports, I need to have you either

 7    withdraw that comment or clarify it.

 8              MS. SIRIGNANO:  I apologize, Your Honor.  I

 9    overstated.  I'm concerned with our two experts,

10    Judge.

11              THE COURT:  All right.  Well, then my

12    memory with Smith and Chavez is you do have written

13    reports from both of them.  Am I correct?

14              MS. SIRIGNANO:  Yes, Your Honor.

15              THE COURT:  And we have worked out a

16    procedure for getting opinions, and the basis and

17    reasons for those opinions for the gang experts;

18    correct?

19              MS. SIRIGNANO:  Yes, Your Honor.

20              THE COURT:  So can I put aside that there

21    is any disclosure issues or problems?  If you want a

22    Daubert issue on those people, that's a separate

23    issue.  But can I put aside the basis and reasons for

24    the time being?

25              MS. SIRIGNANO:  Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Who else?  Anybody

 2    else think there is going to be Daubert issues to

 3    anybody else other than Smith, Chavez, and possibly

 4    the gang experts after the Government discloses their

 5    opinions?

 6            MR. BENJAMIN:  Your Honor, if I may have

 7    just a second.  That is my position, but it's

 8    regarding Dr. Zumwalt.

 9            THE COURT:  Take your time.

10            Mr. Benjamin?

11            MR. BENJAMIN:  Yes, Your Honor.  And Your

12    Honor, I would refer the Court to something that my

13    investigator, Bill Elliott, had provided to me this

14    morning, that I'm still in the process of reviewing,

15    but the reason we joined the motion regarding

16    Dr. Zumwalt was some, essentially, information that

17    I've been -- Bill Elliott, my investigator, has

18    communicated to me over past investigations.  But

19    there was an article this morning, on Monday,

20    November 27 --

21            THE COURT:  Well, I was only using Zumwalt

22    as an example.  Is that really -- I wasn't suggesting

23    that you were -- or even Ms. Sirignano -- were

24    challenging Mr. Zumwalt.  You may, but I was just

25    using him as an example.  Is that really -- were you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    really challenging Dr. Zumwalt on a Daubert basis?
 2              MR. BENJAMIN:  Your Honor, I am -- I
 3    believe Mr. Gallegos will be, at least at this point
 4    in time, Mr. Gallegos will.  And I apologize, I
 5    misunderstood the Court's question.
 6              THE COURT:  So we add Dr. Zumwalt to -- as
 7    a person there is going to be a Daubert challenge to.
 8              All right.  Anyone else besides Smith,
 9    Chavez, Dr. Zumwalt, and possibility the Government's
10    gang experts?
11              All right.  Mr. Beck, are you handling the
12    Daubert issues here on the experts?
13              MR. BECK:  That's right, Your Honor.
14              THE COURT:  All right.  What about Smith?
15    Are you going to -- how are you going to deal with
16    the Daubert challenge, or propose to deal with it?
17              MR. BECK:  Well, Your Honor, I don't
18    understand what the basis of the Daubert challenge
19    is.  I mean, I guess if we're going to have to get
20    into whether the conclusions were reliable -- and I
21    mean, if the Court is going to order a Daubert
22    hearing, then we're going to have to present
23    Ms. Smith for a Daubert hearing.
24              THE COURT:  All right.  Same for Chavez,
25    Dr. Zumwalt, and if in fact, there are Daubert issues
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   with the gang experts?
 2             MR. BECK:  Right.
 3             THE COURT:  Same response?
 4             MR. BECK:  Yes, Your Honor.
 5             THE COURT:  Let me ask Ms. Wild -- are you
 6   still on the phone?
 7             THE CLERK:  Yes, sir.
 8             THE COURT:  Were you, in setting up these
 9   hearings this week, anticipating that we would do
10   Daubert hearings while we were here?
11             THE CLERK:  Yes.
12             THE COURT:  Okay.  Where is Ms. Smith?
13             MR. BECK:  I think they're in --
14             MS. SIRIGNANO:  Your Honor, I believe she's
15   in Quantico.
16             MR. BECK:  Right, in Virginia.
17             THE COURT:  And where is Chavez?
18             MR. BECK:  Quantico, Virginia.
19             THE COURT:  And Dr. Zumwalt is in
20   Albuquerque?
21             MR. BECK:  That, I don't know.
22             MS. SIRIGNANO:  Not any longer, Your Honor.
23             THE COURT:  Where is he now?
24             MS. SIRIGNANO:  I just know he's left OMI,
25   but I'm not sure where he's living or working.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Your gang experts are all in
 2    Santa Fe?
 3            MR. BECK:  No.  Ron Martin is here; he just
 4    stepped into the courtroom during the last break,
 5    Chris Cupit is in Albuquerque on his way down here, I
 6    believe.  And Sergeant Sapien, I believe, is in Santa
 7    Fe.
 8            THE COURT:  Well, on the gang experts --
 9    well, think about how we can use this time
10    profitably.  If we need to start moving some of those
11    experts here to do the Daubert, think about which
12    ones you want to try to get here, and whether we've
13    got the time to do it.
14            I'll keep plowing through motions.  And
15    we'll be taking a lunch break here in about 45
16    minutes.  But let's think about trying to turn part
17    of this week into Daubert hearings, and which
18    witnesses you want to get here and start dealing
19    with.
20            MR. BECK:  Understood.
21            THE COURT:  All right.  So I think we've
22    fleshed out the Daubert issues.
23            Is there anything else, Ms. Sirignano, Mr.
24    Adams, you want to say on the Daubert issues, other
25    than, I guess, we'll have to set up the Daubert
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    hearings themselves either this week -- or if we
 2    don't get them done this week -- in the future?
 3              MS. SIRIGNANO:  No, Your Honor.  Thank you.
 4              THE COURT:  Anybody else?  Any other
 5    defendants on the Daubert issues, other than what
 6    we're -- the hearings themselves?
 7              All right.  So let's take up Mr. Garcia's
 8    motion for specification of co-conspirator statements
 9    in a pretrial hearing on the statement's
10    admissibility.  Given what I've already ruled and how
11    we're going to proceed on satisfying the James
12    requirements -- I understand there has been some
13    development, some discussions among the parties, so
14    we may be refining that.
15              But, Mr. Adams, it's your motion.  Is there
16    anything else I need to do to address the issues in
17    your motion?
18              MR. ADAMS:  No, sir.  We are still on the
19    same page with Mr. Villa and his request.  And if
20    there have been discussions, we've not been privy to
21    them.  So we'd like the hearing.
22              THE COURT:  Okay.  But my rulings have
23    addressed them all?  Everything in your motion I've
24    already addressed?
25              MR. ADAMS:  Yes, sir.  I think we were just
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    asking for the James hearing.  And you said:  We'll
2    have the James hearing, and it looks like we'll have
3    it in short order.  That sounds like fun.
4              THE COURT:  All right.  Anybody else on
5    Mr. Garcia's motion?
6              Mr. Castellano, are you handling this?
7              MR. CASTELLANO:  Yes, Your Honor.
8              I don't know if we finalized all the
9    discussions, but during the break there were
10   discussion with some of the teams about potentially
11   providing statements to them, and streamlining the
12   process, and going forward from there.
13             I think at least -- possibly two teams may
14   want to have a Daubert hearing, so we just need to
15   prepare our witnesses during the break, maybe
16   tomorrow have the hearing, whatever the Court's
17   pleasure is.  I believe Defendant Garcia and
18   Defendant Perez may be the two who want them.
19             The other ones, we've agreed to prepare the
20   statements.  It basically would be a summary, who
21   made the statement to whom, the context of the
22   statement.  And then I think streamline things in
23   that fashion.
24             THE COURT:  Okay.
25             MR. CASTELLANO:  So I think we may have
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                      1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
1     bifurcation of the James hearing.
2              THE COURT:  All right.  So it sounds like
3     Mr. Adams, Ms. Sirignano, Mr. Villa, y'all are going
4     to get the James hearing.  Everybody else has worked
5     out a proceed with the Government to satisfy --
6              MR. ADAMS:  I mean, nobody asked me about
7     it.  But had they asked me, I would have said that's
8     exactly what had been requested in 1303.  And I
9     think, at this point, with a January 29 date, we'd
10    rather just have a witness put up cold, and get into
11    it, just so we can know what we're dealing with right
12    around the corner.  So we would have loved the
13    Government's response to have been:  Hey, let's do
14    this bifurcated way, so you can actually prepare for
15    the hearing.  But since we're here, and it's the week
16    after Thanksgiving, and we're going to be in front of
17    a jury in two months, we'd just like to get a witness
18    up and get it going.
19             THE COURT:  Well, I think that's what Mr.
20    Castellano is saying.
21             MR. ADAMS:  So I guess that's my way of
22    saying I'm in agreement with brother counsel.
23             THE COURT:  All right.  So everybody, other
24    than really Mr. Villa and Mr. Adams, y'all have
25    worked out -- you're going to get a statement from
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    them.
 2              And does that bring -- Mr. Castellano, does
 3    that bring their James hearing to a conclusion, or is
 4    that -- they're going to get the statement and then
 5    they can request or have a James hearing without --
 6    how does it work?  Is it bifurcated?
 7              MR. CASTELLANO:  Yes, Your Honor.  It's my
 8    understanding they'll get the statements and they'll
 9    make a determination at that point whether they want
10    to challenge the statements.
11              THE COURT:  All right.  So it's two-step
12    for everybody else.  And it's -- we go immediately
13    into hearings with --
14              MR. ADAMS:  Judge, I'm sensing there are a
15    number of people who have not made that agreement, or
16    feel like they've not made that agreement.
17              THE COURT:  Well, they need to speak up.
18              MR. VILLA:  Your Honor, I think I can speak
19    to that.
20              THE COURT:  I don't really need to hear
21    from you or from Mr. Garcia.  I need to hear from
22    other people in the room.  So Mr. Lowry looks like
23    he's up.
24              MR. LOWRY:  Thank you, Your Honor.
25              No, Mr. Castellano did mention that to us
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   during the break.  And in the middle of that
 2   conversation we discussed with the Rudy Perez team,
 3   Mr. Baca would join Mr. Perez in just moving this
 4   forward.  We have a trial, I would point out, is in
 5   less than two months at this point.
 6            THE COURT:  Is it the 29th, or I have the
 7   date wrong?
 8            MR. LOWRY:  29th, Your Honor.  Two months.
 9   Losing track of time.
10            THE COURT:  Too far behind.
11            MR. LOWRY:  I know these two months are
12   going to go by very rapidly, Your Honor, so we would
13   like to move this forward.
14            THE COURT:  All right.  So let me ask you,
15   Mr. Castellano, is your evidence on the James going
16   to be any different with Baca than it is Perez?  Is
17   it going to be the same hearing?
18            MR. CASTELLANO:  Mr. Baca is involved in
19   multiple conspiracies, so his would include
20   additional statements.
21            THE COURT:  Additional statements, okay.
22            What's your thoughts on what Mr. Lowry just
23   said?
24            MR. CASTELLANO:  Sounds like he wants to
25   have a hearing.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1            THE COURT:  Right.
 2            MR. CASTELLANO:  So we just need to have
 3    time to prepare the witnesses.  What I'd ask is
 4    sufficient time, so that we can have a smooth --
 5            THE COURT:  But you're ready to go on
 6    Perez?  You're ready to go on Garcia?  And if we've
 7    got more time, then we'll start with Baca?
 8            MR. CASTELLANO:  Yes.  We'll do what we
 9    need to do.  I just ask time to prepare it so that
10    way we can avoid a lot of refreshing recollection and
11    a disjointed hearing.  So I'm asking time to prepare
12    the witnesses to make sure we know which statements
13    we're covering for the hearing.
14            THE COURT:  Okay.  All right.  Other than
15    Perez, Baca, Garcia --
16            MS. JACKS:  We don't have any agreement --
17            THE COURT:  You don't have any agreement?
18            MS. JACKS:  -- with the Government.  So
19    we're ready to proceed as well on behalf of Mr.
20    Sanchez.
21            MR. CASTELLANO:  We'll cover the entire
22    Molina case with the James hearing.
23            THE COURT:  All right.  Is that then --
24    we're going to get an immediate James hearing on the
25    Molina murder, and then everybody else is going to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  get bifurcated, get to see the statements first, then
 2  you get to decide whether you want a James hearing?
 3  Everybody in agreement on that?
 4            All right.  Anything else, Mr. Garcia, Ms.
 5  Sirignano, on your motion, that I need to deal with?
 6            MR. ADAMS:  No, sir.  Thank you.
 7            MS. SIRIGNANO:  No, Your Honor.  Thank you.
 8            THE COURT:  All right.  The next motion is
 9  one that I think we've covered.  It's Daniel Sanchez'
10  motion on the Rule 16 issue, the gang expert issue,
11  how we're going to proceed.  Is there anything else
12  on that issue, that motion, Ms. Jacks, Mr. Jewkes?
13            MS. JACKS:  No.
14            THE COURT:  We've covered it all?
15            MS. JACKS:  Yes.
16            THE COURT:  All right.  And then the next
17  motion, I think, is yours, Mr. Benjamin, for a James
18  hearing.  And you're -- if I understand where you
19  are, are you in the bifurcation, or immediate
20  hearing?
21            MR. SINDEL:  Your Honor, if I may address
22  that.  We are in the bifurcation.
23            THE COURT:  You're in the bifurcation.
24            So is there anything else, then, with your
25  motion that I need to address at this time?
```

 

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. SINDEL:  Not that I could think of at

2    this time.

3          THE COURT:  Okay.  How about you, Mr.

4    Benjamin.  Anything you can think of?

5          MR. BENJAMIN:  No, Your Honor.

6          THE COURT:  All right.  So the bifurcation

7    will take care of that.

8          While we're waiting probably for the

9    Government to tell us what they're going to do on

10   experts, and then on the James hearing, let me see if

11   I can pick up a couple of issues.  If I can't, I

12   can't.  But let me see if I can pick up a couple of

13   issues.

14         Let me take up these peremptory challenges.

15   Let me give you some musings out loud here, and then

16   formulate it into a probable ruling here.  With this

17   many defendants, it seems to me it's going to be very

18   difficult to give three additional peremptory

19   challenges.  That's going to be 45, if we have all 15

20   heading toward -- we just talked about -- I mean,

21   just think about that, we're going to have 60 people

22   probably in the courtroom as we select the jury.

23   I'll probably end up summoning -- I haven't talked to

24   Ms. Wild -- maybe we have, and I have forgotten the

25   specifics -- and if she remembers, maybe she go ahead

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and fill us in -- but I guess what I'm envisioning in

2    my mind, we'll probably have 60 people in the

3    courtroom, in this courtroom, and we will probably

4    attempt to pick the jury from that.

5            If I give every defendant three, that's

6    going to be in the first trial, that's going to be

7    18, that's going to be very difficult to try to do.

8    I don't think we'll get a jury picked.  If I, in the

9    second trial, with nine, that's -- you can just start

10   multiplying the numbers.  It gets very difficult to

11   try to pick a jury.

12           So I'm probably not going to allow three

13   peremptory challenges.  I would like to wait a little

14   bit to see if everybody that's in the room is going

15   to trial.  If everybody in the room is going to

16   trial, then I'm going to probably have to be very

17   restrictive and not allow additional peremptory

18   challenges.

19           If I end up with one person, there is no

20   need for additional peremptory challenges, if there

21   is two -- you know, I've got a little leeway to give

22   each person a little bit of independent judgment

23   rather than collective judgment, I'd probably be a

24   little receptive to that.

25           On the other hand, if we're dealing with

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1    these numbers here, I'm just not going to get a jury
 2    picked if I start giving individual peremptory
 3    challenges.
 4              So I guess what I'm inclined to do is deny
 5    the motion without prejudice.  Let's see what things
 6    happen over the next 62 days.  And then I can make a
 7    little bit more informed decision.  The defendants
 8    can sort of reraise it a little closer to the trial.
 9    But right at the moment I just don't think I can, at
10    this point, tell the defendants that they're going to
11    get additional peremptory challenges.  I think we're
12    going to have to work within the parameters of the
13    rules, and me not exercise my discretion to give it.
14              If the picture looks different than it does
15    right this minute in this room, maybe I can be a
16    little bit more liberal, and then it's possible that
17    we get down to a number that doesn't require any
18    additional peremptory.
19              So I guess that's what I'd like to do is
20    deny it without prejudice, and the defendants reraise
21    it as we get closer to trial, and test my temperature
22    there.
23              Mr. Villa, it looked like you were going to
24    get up and talk first.
25              It's Mr. Cooper's motion, so I better ask
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492

**BEAN**
**&ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                 e-mail: info@litsupport.com

```
 1   him if he has anything.  Mr. Castle, do you want
 2   to --
 3              MR. VILLA:  I was just getting the mic for
 4   Mr. Castle.
 5              MR. CASTLE:  The case law is clear that
 6   it's the discretion of the Court.  And I think the
 7   Court is within its discretion to delay ruling or to
 8   deny this without prejudice at this point.
 9              I mean, frankly, we'll take whatever we can
10   get.  And our arguments might be better focused when
11   we get farther down.  And I think the Court is wise
12   to hold off on this at this point.
13              THE COURT:  All right.  Thank you, Mr.
14   Castle.
15              Did you have anything you wanted to say,
16   Mr. Villa, on this?
17              MR. VILLA:  No, Your Honor.
18              (A discussion was held off the record.)
19              THE COURT:  I think Ms. Wild has reminded
20   me -- if this is agreeable to everybody -- we'll
21   bring 60 in, and if we don't get them picked, we'll
22   bring them in waves of 20.  So we'll keep people down
23   in the jury room, and then we'll bring in waves of 20
24   until we get our jury picked.
25              Anybody else on peremptory challenges?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              How about from the Government?  Who was
 2    going to speak on that issue?
 3              MS. ARMIJO:  Your Honor, I can speak on
 4    behalf of the United States.  We're in agreement with
 5    the Court's preliminary ruling:  Deny it without
 6    prejudice, and just see how we end up.
 7              THE COURT:  All right.  Anybody else have
 8    anything on peremptory challenges?
 9              So I'll deny it without prejudice.  Let's
10    see where we are as we get closer to trial.
11              All right.  Mr. Villa, I want to take up
12    the issue that you had raised a little bit earlier.
13    And that is the expert report or expert notices --
14    notices of experts that the defendants have filed.  I
15    think that's what all these are.
16              Let me ask the Government:  After you have
17    reviewed -- I think there is nine that the defendants
18    have filed.  Mr. Beck, are you going to take these,
19    this part of expert testimony?
20              MR. BECK:  Yes, Your Honor.  I think, given
21    the Court's ruling, if we're going to be required to
22    talk about a given Rule 16 notice disclosure about
23    the bases of the opinions -- more than I think Rule
24    16 requires -- I think what's good for the goose is
25    good for the gander -- there should be a reciprocal
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   requirement for the defendants on that.  If we see
 2   anything at that time, we might object to it.
 3            THE COURT:  Well, I mean, in a case like
 4   this, the goose for the gander argument doesn't
 5   strike me as very helpful.  I didn't think I was
 6   requiring anything beyond Rule 16.
 7            I guess my question to you is:  Do you have
 8   specific Rule 16 challenges or Daubert challenges to
 9   their experts?  I mean, for example, some of this
10   stuff is pretty voluminous.  I mean, most of it is
11   resumes, and stuff like that.  But --
12            MR. BECK:  Right.  And I mean -- no, with
13   the bases of Rule 16, no, with the additional
14   requirements.  That's what I was asking for was the
15   reciprocal from the defendants on the bases for their
16   opinions.  I mean, I get their base on their
17   experience and their knowledge.  And I think that's
18   what Rule 16 requires.  But to the extent that the
19   United States is now going to have to talk about
20   additional bases for our experts, I think that should
21   be reciprocal.  I understand if the Court is not
22   going to order, that that's the Court's discretion.
23            THE COURT:  Well, let's take them one at a
24   time, as we did your experts.  Let's go with
25   Dr. Graham.  This is I think, Mr. Benjamin, your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    expert.  Have you produced any expert report here?  I
2    know you've given them a CV, but have you produced
3    any expert report?
4              MR. BENJAMIN:  You said Dr. Graham, Your
5    Honor?
6              THE COURT:  Yeah, I'm looking -- medical
7    examiner, Michael Graham, M.D.
8              MR. BENJAMIN:  Mr. Sindel is going to
9    handle that, Your Honor.
10             MR. SINDEL:  Your Honor, we have not.  We
11   have produced the CV.  We have not produced any
12   reports.  We will be able to do that.
13             THE COURT:  All right.
14             MR. SINDEL:  Although I'm really doubting
15   that we will be calling him as a witness at this
16   point in time.
17             THE COURT:  All right.  What do you
18   propose, Mr. Beck, as a deadline to produce the Rule
19   16 report for these experts?
20             MR. BECK:  I think two weeks is fine.
21             THE COURT:  Let me ask -- I'm going to go
22   through these experts.  If I determine that the
23   disclosures have not complied with Rule 16, could all
24   the defendants live with a deadline of two weeks from
25   today to produce either a report or a summary that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

 1    complies with Rule 16 requirements?  Mr. Benjamin?

 2              MR. BENJAMIN:  Your Honor, for Ms. Susana

 3    Ryan, she has given me a list that she says -- she's

 4    the DNA expert that I've designated -- she has a list

 5    that she has provided me that I was going to give to

 6    the Government today of materials she requires,

 7    essentially materials that we talked about last time,

 8    in order do that.  And these are materials that have

 9    been provided, as I said, in a prior trial in this

10    district.

11              THE COURT:  Well, you may need to

12    supplement her report.  But can you still live with

13    14 days from today that everybody produce either

14    opinions or either a report or a summary that

15    complies with Rule 16?  You may have to supplement it

16    after you get some material.  But can everybody live

17    with that?

18              MR. BENJAMIN:  I think, as long as the --

19              MS. SIRIGNANO:  Your Honor, this is Amy

20    Sirignano.  I'm definitely going to need to

21    supplement.  But we can make an initial disclosure,

22    yes.

23              THE COURT:  Okay.

24              MR. BENJAMIN:  Yes, Your Honor.  Same thing

25    as Ms. Sirignano said for Ms. Ryan.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Mr. Lowry?
 2              MR. LOWRY:  Your Honor, we noticed up two
 3    experts for Mr. Baca.  One was a computer forensic
 4    expert.  Another was a handwriting expert.  The
 5    handwriting expert was noticed out of abundance of
 6    caution for rebuttal.  We'd like to consult with our
 7    colleagues from the United States to see whether that
 8    would be necessary.
 9              As for the computer forensic expert, the
10    last hearing we addressed the cellphones and the
11    ELSUR devices.  We haven't had access to them yet.
12    So, Your Honor, if we could have the two weeks run
13    after we get access to the cellphones.  We'll set
14    that up as soon as possible.  But it still leaves
15    open the question of the ELSUR devices that I'm
16    working with other colleagues on our side of the case
17    to designate an expert if the Court allows access to
18    those devices.  But, of course, all of that is yet to
19    be determined by the Court.  So what I'm asking for
20    is the two weeks to run after the relevant experts
21    have had time to get access to the material they
22    would need to generate a report.
23              THE COURT:  Well, what's your thoughts
24    about that, Mr. Beck?
25              MR. BECK:  Your Honor, I think if there is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    opinions they know the expert is going to testify to,
2    then they can provide those in two weeks.  If it's
3    something that -- I mean, obviously it's not going to
4    have any opinions on the ELSUR devices.  The expert
5    hasn't seen them.  So that wouldn't make any sense.
6    So I think an initial disclosure in two weeks, if an
7    initial disclosure is necessary, that's fine.  And
8    then, if it needs to be supplemented after more
9    discovery is submitted, or in this case the ELSUR
10   devices are reviewed.  I think that's appropriate.
11              THE COURT:  Yeah, I guess I'm still
12   inclined to stick with that.  Everybody has got to
13   comply with Rule 16 within 14 days.  If we have to
14   supplement, we have to supplement.  But not delay the
15   initial report.  I think you've got to start getting
16   some stuff out there.  I mean, some of you -- I'm not
17   being critical here, but you know, we set up a
18   procedure three weeks ago, and some of you haven't
19   sent your letters to the Government.  So,
20   realistically, you can't be complaining too much if
21   you're not -- we set up a procedure and you don't
22   send in the letters to the Government.  That doesn't
23   trigger anything.  I'm not going to be real
24   sympathetic to everybody saying, Well, the Government
25   hasn't produced stuff when we set up a procedure, and

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492



```
1    nobody has taken advantage of it, or some people
2    haven't taken advantage of it.
3           So I think the disclosure on Graham is
4    inadequate.  So you'll need to supplement or produce
5    a report that complies with Rule 16 within two weeks
6    from today.
7           As far as Ryan is concerned, I think the
8    same ruling on that.
9           Let's go, then, to Dr. Raven.  I think all
10   her testimony -- well, same thing, Mr. Villa, I think
11   you're going to have to given the Government more on
12   that.  So report in two weeks.
13          MR. VILLA:  Your Honor, I think Dr. Raven
14   was noticed purely as a rebuttal witness.  And based
15   on the Court's rulings this morning that the
16   Government's experts on the pathology -- I think
17   earlier I said Dr. Zumwalt.  I misspoke.  It's Dr.
18   Kastenbaum.  If there aren't any additional
19   supplementation made by the Government beyond what's
20   in the autopsy report, we wouldn't intend to call
21   Dr. Raven.
22          THE COURT:  Okay.
23          MR. VILLA:  I think we were just trying to
24   meet the deadline at that point.
25          THE COURT:  All right.  So unless you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    supplement, there is no need for any additional
 2    information on Dr. Raven.  Would you agree with that?
 3              MR. BECK:  That's fine.
 4              THE COURT:  All right.  Then, let's go to
 5    Mr. Troup's notice for Karen Green.  I'm going to
 6    have to refresh my memory about Ms. Green.
 7              MR. BURKE:  Your Honor, Karen Green is a
 8    DNA expert.  And we actually did send an email over
 9    to the prosecutors in October asking for additional
10    information.  And I think in all of the busywork that
11    we've been engaged in, that email has been ignored.
12    The additional request that we made related to
13    protocols that the lab had back in 2001, as well as
14    protocols in 2014, when some DNA was retested.
15              So we would ask for two weeks from when we
16    get the material that we asked for five or six weeks
17    ago.
18              THE COURT:  All right.  Well, I think I've
19    got to treat everybody consistent here.  So I need
20    something that complies with Rule 16 on what you
21    already have, and then you can supplement it.
22              MR. BURKE:  Within two weeks.
23              THE COURT:  Within two weeks.
24              MR. BURKE:  All right.  Thank you, Your
25    Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Is that agreeable, Mr. Beck?
 2              MR. BECK:  Yes, Your Honor.
 3              THE COURT:  All right.  Mr. Baca's
 4   handwriting expert, Songer.
 5              MR. LOWRY:  Your Honor, we'll enter a
 6   preliminary report within two weeks.
 7              THE COURT:  And same for Kesden?
 8              MR. LOWRY:  Yes, Your Honor.
 9              THE COURT:  Is that acceptable, Mr. Beck?
10              MR. BECK:  Yes, Your Honor.
11              THE COURT:  Mr. Garcia's chemist, Janine
12   Arvizu.  I guess I don't think that's probably
13   adequate either.  I mean, we had some areas of
14   testimony, but we don't have her opinions and the
15   basis or reasons for them.  So I'm inclined to
16   require some report in two weeks.  Ms. Sirignano?
17   Mr. Adams?
18              MS. SIRIGNANO:  That's fine, Your Honor.
19              THE COURT:  Okay.  Same for Brian, Mr.
20   Brian?
21              MS. SIRIGNANO:  Your Honor, he's a computer
22   specialist.  And we haven't yet received access to
23   the digital evidence.  So I can get something out,
24   and then we'll need to supplement on him.
25              THE COURT:  Where are we on -- y'all had
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    some placeholders, firearms experts and DNA experts.

 2    Where are you on that?  Have you chosen experts yet

 3    on those categories?

 4              MS. SIRIGNANO:  Yes, Your Honor, with the

 5    DNA expert.  And I'm having some difficulty with the

 6    firearms expert, which we can resolve within the next

 7    two weeks.

 8              THE COURT:  Okay.  So let me have some

 9    reports on those two.  And you'll need to identify

10    your expert and give your expert's CV within two

11    weeks.  If we don't have a name and an expert, then I

12    think we're probably going to have to start excluding

13    experts.  So we need to pin that down.

14              MS. SIRIGNANO:  Yes, Your Honor.

15              THE COURT:  All right.  Anything else, Mr.

16    Beck, on Mr. Garcia's experts?

17              MR. BECK:  No, Your Honor.

18              THE COURT:  All right.  Did you have

19    something you wanted to say, Mr. Villa?

20              MR. VILLA:  No, Your Honor.

21              THE COURT:  Okay.  Let me go then to Carlos

22    Herrera's expert, Shannon McReynolds.  We've got the

23    CV, but no report.  So I think, given this is a

24    prison gang person, I need to hold you to the same

25    requirements I am the prison gang expert of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Government.  So I need something that complies with
 2   Rule 16.  So you'll need to bullet point the
 3   opinions.
 4            MS. BHALLA:   Your Honor, I don't have a
 5   problem with that.  The issue with that, I think
 6   we're going to need a little bit more --
 7            THE COURT:  Is the microphone floating
 8   around here?
 9            MS. BHALLA:  As we identified in our
10   disclosure, Your Honor, a lot of Mr. McReynolds'
11   testimony is going to be in the form of rebuttal
12   testimony.  And until we get some more opinions from
13   the Government witnesses laid out, I don't know how
14   much more we can actually supplement our disclosure.
15   We'll do the best we can with what we have.  But we
16   don't have a lot to work with at the moment.
17            THE COURT:  I well, I think you do.  I
18   think you do.  I mean, if the Government comes back
19   in after lunch and says they can live with the line,
20   they've today identified some areas they're going to
21   talk about generally, about 10 areas they're going to
22   talk about generally with gang experts.  So --
23            MS. BHALLA:  As long as we have that, we
24   won't have a problem doing that, Your Honor.
25            THE COURT:  Okay.  And if you need to
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                            e-mail: info@litsupport.com



```
1    supplement, you can.  So I think the disclosure is
2    not adequate on that.  So you'll need to be more
3    specific.
4             I think probably, Mr. Beck, the basis and
5    the reasons for his opinion are probably pretty well
6    set out.  If you need anything further on that, it's
7    going to be his experience.  Like your experts, he's
8    not going to be constrained by an investigation of
9    this case.  So I think the basis and reasons,
10   probably the notice is sufficient.  It's -- what you
11   need is the opinions?
12            MR. BECK:  I think so, yeah.  It's a pretty
13   easy thing to meet with these law enforcement
14   experts.  So I agree that the bases is adequate.
15            THE COURT:  So Ms. Bhalla, I think what I'm
16   looking for is the same thing I'm looking for from
17   the Government, just bullet points, what the opinions
18   are.  We've got a CV.  I think you've given the basis
19   and reasons.  So it's just bullet points in the
20   opinions.
21            MS. BHALLA:  Thank you, Your Honor.
22            THE COURT:  All right.  Mr. Lowry?
23            MR. LOWRY:  Your Honor, just briefly a
24   housekeeping matter.  At the last hearing we
25   discussed the ELSUR devices and the cellphones.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    if I understand it correctly, Ms. Armijo --
 2              THE COURT:  I was going to address those
 3    after I get through with the experts.  Does this
 4    relate directly to the experts?
 5              MR. LOWRY:  It does, Your Honor, because I
 6    think there is an open question before the parties,
 7    are the multidefense team limited to one computer
 8    forensic expert to review both classes of devices?
 9    And if that's the case, the defense team needs to
10    select a specific expert.  Because I think we've
11    noticed an expert, and I think Amy Sirignano's team
12    noticed an expert.
13              THE COURT:  Let me come back to that.  Let
14    me come back to the devices probably after lunch.
15    But I want to address the Ms. Jacks' letter to the
16    Government and see where we are on that.
17              Here, do I get to laugh that Rudy Perez is
18    calling John Shanks to be an expert on shanks?  I
19    mean, do we all get to enjoy that?
20              MR. VILLA:  Yes, Judge.
21              THE COURT:  All right.  Thank you.
22              What else do you need on Mr. Shanks?  You
23    need bullet points on his opinion, and that's it?
24              MR. BECK:  Yes.
25              THE COURT:  All right.  So two weeks, give
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   me that.  Then you may have to supplement after you
 2   get the Government's opinions.  But --
 3              MR. VILLA:  Judge, we don't have a problem
 4   supplementing.  Mr. Shanks just underwent a back
 5   procedure, and I don't know the current state of his
 6   health.  Could I have three weeks?  And if there is
 7   any issues, we can report back to the Court?
 8              THE COURT:  Let's do it the other way.  Let
 9   me set a deadline of two weeks.  And if you need to
10   move for an extension on it, work with your
11   colleagues and Mr. Beck and move for it.  But let me
12   go ahead and set it so I'm consistent with everybody.
13   And if you need to move, you can.  Let's just do a
14   list of opinions.  Does that work for you, Mr. Beck?
15              MR. BECK:  Yes, Your Honor.
16              THE COURT:  So that's all you'll get for
17   Mr. Shanks is just a list of bullet point of
18   opinions.
19              The same way on Mr. Garcia and Mr. Troup's
20   gang or corrections expert?  Mr. Cooper, Mr. Castle,
21   and Ms. Harbour-Valdez, Mr. Burke, can y'all live
22   with two weeks, you'll give us bullet points on your
23   people, and you can supplement later if you --
24              MR. BURKE:  Yes, Your Honor.
25              THE COURT:  All right.  And then does that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    work for you as well?

2            MR. COOPER:  Judge, I don't believe that we

3    endorsed an expert.

4            THE COURT:  I had you down as -- okay, so

5    this is a placeholder.

6            MR. COOPER:  I think we just declined to

7    endorse one particular -- or the gang expert, Mr.

8    McReynolds.  We chose to decline to endorse him, and

9    I think that was the nature of that filing.

10           THE COURT:  Well, I guess then what I need

11   from you is -- I guess you need to make a decision

12   within two weeks.  You need to indicate if you're not

13   going to call an expert, state that.  If you are,

14   then in two weeks you need to provide a CV and a list

15   of opinions.

16           MR. COOPER:  We will, Your Honor.  Thank

17   you.

18           THE COURT:  Does that work for you as well,

19   Ms. Harbour-Valdez?

20           MR. BURKE:  Yes, Your Honor.

21           THE COURT:  Is that satisfactory on that,

22   Mr. Beck?

23           MR. BECK:  That's fine, Your Honor.

24           THE COURT:  All right.  And then let's see,

25   Mario Rodriguez's expert?  Anything I need to deal



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

129

1    with on that one?

2              MR. BECK:  No, Your Honor.  He's no longer

3    a defendant.

4              THE COURT:  We'll just put that aside.  All

5    right.  Anything else?  Do you, at the present time,

6    Mr. Beck, intend to Daubert challenge any of the

7    defendants' experts?

8              MR. BECK:  No, Your Honor.

9              THE COURT:  Okay.  So we're looking at

10   additional Rule 16 disclosures for the defendants'

11   experts, but nothing further on that.  All right.

12   Why don't, after lunch, we do two things:  One is we

13   take up this issue, Ms. Jacks, your letter, and y'all

14   can then -- Mr. Lowry, that can be your point to

15   inform me on where we are, what I need to help you

16   with as far as experts on that.  I'll look forward to

17   the Government telling me what they're going to do,

18   if they can live with the line I'm drawing on gang

19   experts.

20             And then the Government has two choices.  I

21   think they can either go into a James hearing, or if

22   we need to do something on the gang experts, we can

23   go into that direction, but we'll probably move

24   rapidly into those two areas after lunch.

25             All right.  Mr. Castle?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. CASTLE:  Yes, Your Honor.
 2              THE COURT:  Let me have Mr. Villa first.
 3    He was up first.  Let me see him.
 4              MR. VILLA:  Judge, I just wanted -- I mean,
 5    I know this is sort of sua sponte with respect to the
 6    defense experts, but we did notice a couple of
 7    experts in the spring under the first deadline.  I
 8    think it was the third or second scheduling order.  I
 9    don't think the notices are deficient, but I didn't
10    want to waive any ability to call those experts
11    because they hadn't been mentioned this morning.
12              THE COURT:  Why don't you do this:  Before
13    you go to lunch, tell Ms. Solis where they are,
14    because they weren't in my bundle of material.  And
15    I'll take a look at them.  Mr. Beck, you take a look
16    at them and see if you think they are deficient.  If
17    you are, we can raise those after lunch.  You've got
18    two of them?
19              MR. VILLA:  I believe we had three,
20    although one we probably won't call anymore.  But
21    I'll identify all of them.
22              And Mr. Castle informs me he has the same
23    issue that he wanted to raise.  So --
24              THE COURT:  All right.  So if y'all just
25    tell Ms. Solis what I'm looking at.  Mr. Beck, if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you'll take a look at them and see if you have Rule
 2   16 problems with them; if not we'll move on.  If
 3   there are, if we'll take those up after lunch.
 4              All right.  Y'all have a good lunch.  We'll
 5   meet back here in about an hour, hour and 5 minutes,
 6   the best we can.  Nobody is going to start without
 7   anybody.  But let's shoot for an hour.
 8              (The Court stood in recess.)
 9              THE COURT:  All right.  I believe Mr.
10   Benjamin has left.  Mr. Sindel, you're still here.
11   Is that where we are?
12              MR. SINDEL:  That's my punishment, Your
13   Honor.
14              THE COURT:  Okay.  All right.
15              All right.  During the break, I looked at
16   these additional notices.  So let's take those up.
17   Mr. Perez, I think, has five additional ones.  On
18   Laura Child -- well, let me ask you, did you have a
19   chance to look at these during the break, Mr. Beck?
20              MR. BECK:  Your Honor, I did not.  We were
21   working with our experts to prepare them for Daubert
22   and James hearings.  So I did not get a chance to
23   look at those.
24              THE COURT:  Okay.  Well, it looked to me
25   like Laura Child, we probably needed to supplement
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    hers, so I would just include it in the same.
 2            Raymond Carrillo, I think you probably need
 3    to do more.  That may be one that you're going to
 4    have to supplement depending on what happens down the
 5    road.  So I'm just going to plow through these unless
 6    you have comments, Mr. Beck.
 7            On Dr. Brislan, I thought that was pretty
 8    complete, so I don't think you need to do anything
 9    more on Brislan.  If the Government wants to come
10    back and ask for more, they can.
11            I think on Dr. Spence, I think you do need
12    to supplement that, so that's not adequate at the
13    present time.  So we'll do the two weeks.
14            And let me refresh my memory on French.
15    Yeah, I think we need opinions of Dr. French.  You
16    give the scope or area of testimony, but not exactly
17    what he's going to testify.  So I think we're going
18    to need more on that.  So if you'll supplement that
19    within 14 days.
20            And I believe, Mr. Lowry, you joined some
21    of those.  I don't have in my head which ones you
22    joined, but I'll put you in the same category that
23    those that need supplementing, you'll need to
24    supplement within 14 days.  Dr. Brislan, if you
25    joined Dr. Brislan, I don't think we need to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   supplement that.  I think that's pretty adequate,

2   unless the Government comes back and thinks

3   otherwise.

4           Let's see.  Mr. Castle for Mr. Garcia, I

5   think you had Dr. Danielson.  I think there was

6   sufficient disclosure on his qualifications, if I

7   recall.  But given that you've gotten -- you now have

8   the reports of the Government's witnesses.  I think

9   you'll need to supplement your report.  It may be

10  that after there is more disclosure on the DNA, you

11  will need to supplement.  But I think we need more at

12  the present time.  So I'll require that.

13          And then finally -- oh, that was the notice

14  of joinder.  Let's see, Mr. Lowry, Ms. Duncan, you

15  joined Child, Carrillo, and Spence.  So you didn't do

16  Brislan.  So my rulings will apply to that.

17          Mr. Villa, I think you joined Mr. Garcia's

18  notice, Ms. Troup's notice, Mr. Sanchez.  So if you

19  have anything further on those, you'll need to do

20  those within two weeks.  Unless my memory is off, I

21  think I required supplemental disclosures in all

22  three of those.

23          All right.  Anything else on Rule 16

24  obligations?  At the present time no Daubert motions

25  from the defendants, so that should cover the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    defendants' experts.
 2            Ms. Jacks, you may not be the right one to
 3    jump on here, but I'll start with you.  Where are we
 4    on -- and then I'll maybe go over to Mr. Lowry --
 5    where are we on the dispute about the recording
 6    devices?  Are you just waiting for a response from
 7    the Government?  Is that kind of the status of that?
 8            MS. JACKS:  We are, Your Honor.  We filed
 9    our letter, which is Document 1459, on November 20.
10    And so we haven't heard from the Government.  I think
11    what we realized is that in conducting our analysis,
12    we maybe made some assumptions about who had phones
13    and who had recording devices.  And I think what
14    we've realized is that we really need to flesh out
15    which cooperators had what devices, and go from
16    there.
17            You have seen the letter, right?
18            THE COURT:  I have.  And so let me make
19    sure I understand.  The letter is, after you sat down
20    and looked at it, you thought you needed more
21    information, you were making assumptions.  So the
22    letter reflects your need you're rethinking the
23    assumptions that you had, and now your current
24    information needs?
25            MS. JACKS:  Correct.  We also consulted
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    some experts both in academia and in law enforcement

2    regarding how -- regarding what is an FBI ELSUR

3    device, as opposed to some other recording device,

4    and how are those devices maintained and handled, and

5    how is the integrity of the information preserved on

6    those devices versus a cellphone, or some sort of

7    some other recording device.  So we tried to divide

8    up our questions very specifically to the Government,

9    so that we could identify which recordings were made

10   on some sort of FBI dedicated and monitored recording

11   device versus some other -- by some other method.

12           THE COURT:  All right.  So you're just in

13   the waiting stage.  All right.  Do you need anything

14   from me at the present time?

15           MS. JACKS:  Well, it would be nice -- I

16   think we can't really move forward on this issue

17   until we have answers from the Government.  And then

18   we can determine whether we want to look at the

19   devices, who can look at the devices, what they need

20   to be looking for, and try to make an argument to the

21   Court about why we need that.  But until we have

22   these answers, we can move slower.

23           THE COURT:  Thank you, Ms. Jacks.

24           All right.  Mr. Lowry, you were going to, I

25   think, begin to educate me on how this is tied to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    some expert issue.  So let me let you -- now that
2    you've got my full attention on that issue, why don't
3    you --
4              MR. LOWRY:  Thank you, Your Honor.  I did
5    consult and conferred with Ms. Jacks both in the
6    development of the letter that was sent to the
7    Government, because after the last set of hearings,
8    it was --
9              THE COURT:  So your input is into
10   Ms. Jacks' letter.
11             MR. LOWRY:  Yes, Your Honor.  We would join
12   that letter.
13             But it was our understanding after the last
14   set of hearings that you had appointed Ms. Jacks to
15   be the point person for the defense teams, if you
16   will.  That's my interpretation of it given the
17   Court's directive.  And it seemed at the time that --
18   because there were numerous requests in motions to
19   compel addressed to the ELSUR devices, and if I
20   recall correctly the Court said, Well, I'm going to
21   appoint -- let's have one person work with the
22   Government to development access.  If memory serves
23   correctly, you were emphatic that maybe, you know, if
24   the Court was inclined to give access to those
25   devices, it would be a single defense counsel or a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    defense expert.  And as Ms. Jacks has since stated,

2    we've identified a couple of experts.  One is our

3    Mr. Kesden.  And Ms. Sirignano identified -- we have

4    the academician, and they have a retired FBI agent.

5    And if the Court's inclined to grant access to the

6    devices, if both of them could work collaboratively

7    on this, it would get it done quicker, because time

8    is of the essence as we roll into trial.

9              Now, it's my understanding from the United

10   States -- and I didn't understand the Court's ruling

11   on the ELSUR devices to actually cover the cellphones

12   as well.  But from my communications with my

13   colleagues on the other side of the case today, it

14   appears to be that the United States believed that

15   the Court's directive applied to both genres of

16   devices, both the cellphones and the ELSUR devices.

17   I didn't understand the Court's ruling to be that

18   way.  We'd like to have some guidance from the Court,

19   just so we'd like to move forth expeditiously in

20   this.  And if we could get, you know, both experts to

21   look at the cellphones, at least initially, that

22   could be accomplished much quicker and much more

23   efficiently, and pool the knowledge, both the

24   practical hands-on knowledge from the retired FBI

25   agent, and the point of view of a professor from

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Carnegie Mellon University to do this more

2    expeditiously, Your Honor.

3              So that was the concern.  We'd like, I

4    guess, the Court's directive on how to handle that,

5    because there seems to be --

6              THE COURT:  Well, this what I would think,

7    that if you're going to have experts, it seems to me

8    that you probably ought to go ahead and do a

9    disclosure now on those experts.

10             MR. LOWRY:  We disclosed them.

11             THE COURT:  What are their names?

12             MR. LOWRY:  Well, Greg Kesden was in the

13   disclosure we made.  And I don't think Ms. Sirignano

14   is here, but I'm sure Mr. Adams has the disclosure

15   that the Chris Garcia team did.

16             THE COURT:  So the two experts --

17             MS. SIRIGNANO:  Judge, I'm here.  It was

18   Tim Brian in our expert notice.

19             THE COURT:  Say that again, Ms. Sirignano.

20             MS. SIRIGNANO:  Tim Brian is our computer

21   forensic expert.  He was disclosed as a retired FBI

22   agent, works with him.

23             THE COURT:  So the two experts you're

24   talking about, they've been disclosed?

25             MR. LOWRY:  Yes, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  And so the question is you're
 2    going to need more information before you can state
 3    what they're going to testify about?
 4              MR. LOWRY:  And I know that we've done this
 5    in other cases.  And this is -- my understanding,
 6    this is fairly routine within the Department of
 7    Justice at this point.  If they have mirror images of
 8    the cellphones, they could ship those to other FBI
 9    offices within the country.  In a different case
10    right now I'm working with the local AUSAs that
11    shipped computer images, images of other digital
12    devices to the FBI office in Pittsburgh to work with
13    Mr. Kesden.  And that's worked out, frankly, very
14    smoothly and efficiently.  I haven't had an
15    opportunity to speak with my colleagues on the other
16    side of the case.  But something like that could
17    hasten the process, if you will.
18              THE COURT:  All right.  Thank you, Mr.
19    Lowry.  Before I hear from you, Mr. Beck, anybody
20    else on this cellphone or this recording device issue
21    on the defendants' side?
22              All right.  Mr. Beck?
23              MR. BECK:  I think we have the same
24    understanding as Mr. Lowry about the Court's order.
25    The cellphones we're making available to defense
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    counsel on request.

2         The ELSUR devices are the devices that the

3    Court ordered us to disclose via letter to the

4    defense, whether they're available.  I've worked with

5    one defendants' attorney and one expert to allow them

6    to inspect the devices, as long as that's okay with

7    the FBI.

8         THE COURT:  Have you gotten any more

9    information, after you looked at this a little bit,

10   as to the FBI's position on this?  Are they that

11   nervous about an order saying one attorney and one

12   expert on the defense side look at this stuff, before

13   we go any further with a confidentiality order, that

14   they not disclose it to any of the defendants, any

15   other counsel, or anybody else, until that person

16   thinks there is something there that's worth looking

17   at?

18        MR. BECK:  Yeah, I don't think we've had a

19   lot more clear guidance.  I believe that the FBI

20   general counsel wants to be involved if we are going

21   to turn any more information --

22        THE COURT:  How do I move this forward?  If

23   I were to -- do you need a court order?  I mean, if I

24   ordered it, and then with the understanding the

25   Government could come back and ask me to reconsider

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    before anything is done, would that move things

 2    forward so we can get a final answer from the FBI?

 3              MR. BECK:  I mean, I think we can get

 4    together and let FBI counsel know what's going on.  I

 5    hasten to say no, because I think that would move it

 6    forward.  And it sounds like the Court is willing to

 7    reconsider once we get FBI involved.

 8              THE COURT:  Why don't we do this:  Why

 9    don't I order it.  Because I've thought about it, and

10    it just seems to me that we need to move this issue

11    forward a little bit.  So I'll order it produced.

12    If -- we're going to be here a few days and be back

13    soon, if the Government wants -- the FBI is that

14    uncomfortable with it, they can explain it.

15              I mean, I guess my rationale is these

16    devices were given to people, you know, who then used

17    them in the prison context.  Some of them's resumes

18    are probably not equivalent of Ms. Jacks' and the

19    experts here.  And so I think that the FBI has

20    trusted them with some people that the Court would

21    feel less comfortable with them having it than

22    Ms. Jacks and their expert.  That's sort of the

23    rationale I have.  And with the very limited

24    disclosure, just to see whether there is anything

25    moving forward on this, given where we are, and they



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492
PROFESSIONAL COURT                          e-mail: info@litsupport.com
REPORTING SERVICE

```
1    have trial preparation, that's my rationale for doing
2    it.
3              MR. BECK:  I understand that, Your Honor.
4              THE COURT:  All right.  With that, okay on
5    the cellphones, Mr. Lowry?  Now we know what we're
6    doing with the devices?
7              MR. LOWRY:  Yes, Your Honor.  If we could
8    just get some guidance if our experts could work
9    collaboratively together or do you truly want us to
10   pick one --
11             THE COURT:  Right at the moment, I think
12   that I'm going to get more cooperation with the FBI
13   if we have one.  So let's -- I'll let Ms. Jacks pick
14   the one.
15             MS. JACKS:  Actually, what I'd like to do,
16   Your Honor, if you don't mind, is confer with Mr.
17   Lowry and with Ms. Sirignano, and then between us
18   we'll pick the lawyer and the expert.  How's that?
19             THE COURT:  Okay.  All right.  And then let
20   the Court and Mr. Beck know.
21             MR. BECK:  That's fine with the United
22   States.
23             THE COURT:  And let's just have one expert
24   at the present time.  And then, if this person finds
25   that something is there that needs further
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    disclosure, we can take it an incremental step at a
 2    time.
 3             Now, on the letter, do you need the
 4    information still in the letter?
 5             MS. JACKS:  We really do, for our expert to
 6    be able to know what needs to be done.
 7             THE COURT:  Let me ask Mr. Beck, do you
 8    have a time frame in which you'll be responding to
 9    the letter, Mr. Beck?
10             MR. BECK:  I believe that they're working
11    on a response to the letter right now.  So I don't
12    know the timeframe, but I would think it would be
13    quickly.
14             THE COURT:  Why don't you propose one?
15             MR. BECK:  A week from today.
16             THE COURT:  Could you live with that,
17    Ms. Jacks?
18             MS. JACKS:  I can.
19             THE COURT:  All right.  So a week from
20    today, unless we hear otherwise, we'll get a letter
21    from the Government with a response to Ms. Jacks'
22    letter.
23             Mr. Lowry?
24             MR. LOWRY:  Your Honor, well --
25             THE COURT:  You need to talk to Ms. Jacks
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

BEAN & ASSOCIATES, Inc.

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    or -- y'all talk.
 2           MS. JACKS:  I think Mr. Lowry has just
 3    reminded me that we owe some sort of disclosure
 4    within two weeks.  I'd ask that that disclosure be
 5    within two weeks of when we get the Government's
 6    response to the letter.
 7           THE COURT:  Give me what you have in two
 8    weeks.  I've got to stick tight on that deadline, or
 9    I'm going to start making individual ones on the
10    defense side.  And I can't do that.  So give me what
11    you got in two weeks.  And then you can supplement.
12           All right.  Anything else on the phones,
13    the recording devices, Mr. Lowry, Ms. Jacks?  Any
14    other defendants?
15           MR. LOWRY:  No, Your Honor.
16           THE COURT:  Mr. Beck, anything further on
17    that?
18           MR. BECK:  No, Your Honor.
19           THE COURT:  All right.  So how does the
20    Government wish to proceed?  Let's go to the -- why
21    don't we discuss where we were before lunch on how
22    the Government wants to -- whether they can live
23    with, even if they don't agree with -- live with my
24    operating rule for the Government gang expert.
25           MR. BECK:  Your Honor, I don't think so.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    think we intend to put on our -- we've got two

 2    experts here.  We've got Chris Cupit and Ron Martin.

 3              THE COURT:  Those are both your gang

 4    experts?

 5              MR. BECK:  Yeah.  Sergeant Sapien is not

 6    available right now.

 7              THE COURT:  Okay.

 8              MR. BECK:  But we've got them, we intend to

 9    proceed with them.

10              But before we do that, we were hoping that

11    we could proceed with the James hearing, as it

12    concerns the Molina murder at this time.  And then

13    stop that once we're done with the statements from

14    the Molina murder, and then probably at that time go

15    into the Daubert hearing for Mr. Cupit and

16    Mr. Martin.

17              THE COURT:  All right.  Any objections from

18    the defendants to so proceeding?

19        A.   All right.  Mr. Beck, do you wish to

20    present you -- or Mr. Castellano, if you want to

21    present your evidence or witnesses.

22                        JAMES HEARING

23              MR. CASTELLANO:  Yes, Your Honor.  The

24    United States calls Special Agent Bryan Acee.

25              THE COURT:  Mr. Acee, if you'll come up and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    stand next to the witness box on my right, your left.

 2    Before you're seated, Ms. Solis will swear you in.

 3                        BRYAN ACEE,

 4         after having been first duly sworn under oath,

 5         was questioned and testified as follows:

 6                        DIRECT EXAMINATION

 7              THE CLERK:  Take a seat and state and spell

 8    your name for the record.

 9              THE WITNESS:  My name is Bryan Acee,

10    B-R-Y-A-N, A-C-E-E.

11              THE COURT:  Mr. Acee, Mr. Castellano.

12              MR. CASTELLANO:  Thank you, Your Honor.

13              Your Honor, I'm going to try to -- in terms

14    of organization, what we tried to do over the lunch

15    hour was probably break this down potentially by

16    witness, and by count or charge.  So, as Mr. Beck

17    indicated, this is a discussion of statements related

18    to the Molina murder, which is Counts 6 and 7,

19    occurring on or about March 7, 2014.

20    BY MR. CASTELLANO:

21         Q.   Okay.  Agent Acee, I want to talk to you

22    about a witness named Lupe Urquizo.  Are you familiar

23    with him?

24         A.   I am.

25         Q.   And have you had a chance to visit with him

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492


BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    and discuss any statements made in relation to the

2    Molina murder?

3         A.   I have a couple times.

4         Q.   Let me start with the statement by Anthony

5    Ray Baca to Mr. Urquizo about the Molina murder.

6    What do you recall about shot callers being

7    mentioned?

8         A.   Mr. Urquizo told me that he had a

9    conversation with Mr. Baca, in which Mr. Baca told

10   Urquizo to get with the shot callers down at the

11   Southern New Mexico Correctional Facility, or

12   Southern, and to let them know that Baca wanted

13   Javier Molina hit.  The "he" being Baca reiterated to

14   Urquizo to make sure those guys knew to take care of

15   Molina, and that if they didn't do it, he told

16   Urquizo to just stab him.

17        Q.   When you say "stab him," who are you

18   referring to?

19        A.   Molina.

20        Q.   And do you know the approximate timeframe

21   in which these statements were made, how close in

22   time to when Mr. Urquizo was moved down to the

23   Southern facility?

24        A.   I don't.  I just recall off the top of my

25   head that it was before Urquizo went down while he

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was still at the Level 6 up at PNM, the north

2    facility.

3         Q.   And were you aware whether David Calbert

4    was involved with the paperwork from the north to the

5    south?

6         A.   Yes, Urquizo told me that Calbert brought

7    him that paperwork.

8         Q.   When we refer to the "paperwork," are we

9    talking about the paperwork indicating or

10   substantiating the hit on Javier Molina?

11        A.   Yes, I believe specifically it was a

12   two-page LCPD report, or two pages from that report.

13        Q.   What was the purpose of the report being

14   moved from the north facility down to the south?

15        A.   Well, at the time there was some

16   disagreement within the SNM about the significance of

17   the paperwork.  There had been some hits carried out

18   where it was on one or two members' word.  And

19   members were now, at this time, insisting on actually

20   seeing the paperwork.  So that was the significance

21   of the actual documents traveling down to the

22   south -- excuse me to the Southern facility, where

23   Molina was located.

24        Q.   And just so the Court understands, when we

25   talk about PNM North and South, is that a different

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    facility than the Southern New Mexico Correctional
 2    Facility?
 3         A.   It is.  If you think of PNM as a campus, if
 4    you will, there are different facilities there.  So
 5    the north facility is the Level 6.  The south
 6    facility is the Level 5.  And then you also will hear
 7    us talk about the Southern New Mexico Correctional
 8    Facility, which is here in Las Cruces, which is
 9    referred to as "Southern."
10              MR. DAVIS:  Judge, we're having difficulty
11    hearing back here.  If he could speak into the
12    microphone.
13              THE COURT:  Pull it a little closer to you,
14    Mr. Acee.
15         Q.   What did Mr. Urquizo say about conversation
16    that he and David Calbert had about the paperwork?
17         A.   Well, Calbert explained to Urquizo that
18    Baca wanted the paperwork to go down to Southern in
19    Las Cruces.  And Urquizo said, I already know,
20    because he'd already talked to Baca about that
21    paperwork going down.
22         Q.   And at some point after that was Mr.
23    Urquizo transferred to the Southern New Mexico
24    Correctional Facility in or near Las Cruces?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Tell the Court about the conversation that

2   Mr. Urquizo had with Mario Rodriguez and Timothy

3   Martinez?

4      A.   Urquizo had a conversation with both Mario

5   Rodriguez and Timothy Martinez once he arrived down

6   at Southern.  At that time, Urquizo was in I believe

7   they call it orientation, so he wasn't out in the

8   population, so to speak, with the other inmates,

9   where he could freely talk.  So they were passing

10  notes on a window.

11          And in the first note that Urquizo

12  received, it was from Mario Rodriguez and Timothy

13  Martinez, and they were asking about the paperwork on

14  Javier Molina and Jerry Montoya, because they had

15  been expecting paperwork for both.  Urquizo wrote

16  back saying that he had the paperwork for Molina

17  only.  He didn't have the paperwork for JR, for

18  Montoya.  But that it was still in his property.  As

19  he sat in this cell in orientation, he didn't have

20  his property.

21          So some additional conversations happened

22  the next day.  A few of the other members came back

23  to find out if Urquizo had his property.  And they're

24  passing notes again -- or holding notes up to the

25  window, excuse me.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              So the following day, Carlos Herrera
 2    inquired whether or not Urquizo had the paperwork.
 3    Urquizo had just received his box of property.  And
 4    amongst that he had an envelope that he'd indicated
 5    was his legal paperwork.  And among dozens of other
 6    documents from past cases were these two LCPD -- two
 7    documents from the LCPD report that indicated Molina
 8    cooperated or gave a statement to the police.
 9              So he retrieved that and turned it over to
10    Carlos Herrera, Dale Chavez, Juan Mendez, Alex Munoz.
11    Those four "S" members reviewed the paperwork, and
12    each made a comment to the effect of, Damn, this is
13    it?  It's just two sentences in this report.
14         Q.   Did Mr. Urquizo and Mr. Herrera have any
15    other conversations related to the Molina hit?
16         A.   They did.  I'm just looking over my notes.
17              MR. VILLA:  Your Honor, I don't have a
18    problem with Agent Acee refreshing his recollection.
19    But I'd ask that he not testify to his notes or have
20    them in front of him unless he's refreshing his
21    recollection.
22              THE COURT:  Well, it's a James hearing.
23    You can cross-examine him about what he's looking at
24    and things, but I'll let him get this information out
25    to you in the form that the Government wants.  But
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   you can cross-examine him about it.  Overruled.
 2        Q.   Let me move forward to Mr. Rodriguez
 3   showing the paperwork to Daniel Sanchez.  Is there
 4   any indication that Mr. Rodriguez wrote a letter to
 5   Urquizo?
 6        A.   Yes.
 7        Q.   What did he do with it?
 8        A.   He sent it under the door.  And in that
 9   Rodriguez -- he communicated that Rodriguez and
10   Sanchez were going to move on Molina.  Rodriguez
11   explained the plan.  And apologized to Urquizo for
12   moving so quickly.  And that the reason he did that
13   is during the Molina hit there were actually supposed
14   to be three individuals that were supposed to be hit
15   at the same time.  However, the paperwork didn't come
16   down supporting the subject being hit that Urquizo
17   wanted hit.  So that's what that apology was about.
18   And he wanted to -- he, Rodriguez -- wanted to make
19   sure that Urquizo wasn't upset about that fact.  He
20   had a lot of respect for him, and just said, Hey,
21   we've got to move, and it's going to happen quickly.
22             And that was generally what was in that
23   letter.  And Urquizo said he wrote back to Rodriguez
24   and said he understood.
25        Q.   And I mentioned Rodriguez.  Are we talking
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    about Mario Rodriguez?

2         A.   Yes.

3         Q.   I'm going to talk to you about something

4    that Mr. Urquizo heard Mr. Sanchez say during the

5    Molina hit.

6         A.   It was actually what I would characterize

7    toward the end of the hit, because now the

8    correctional officers are starting to respond to the

9    pod, and they're running there en masse.  And Urquizo

10   said he heard Daniel Sanchez yell, "Fuck, yeah."

11        Q.   Okay.  While we're on Mr. Urquizo, I'm

12   going to talk about a couple of statements related to

13   the Julian Romero assault.

14             MR. CASTELLANO:  Your Honor, that's Count

15   8.

16        Q.   Okay.  While we're on him, what did you

17   learn from Mr. Urquizo about conveying information

18   regarding the Julian Romero assault?

19        A.   Julian Romero was down here at the Southern

20   Facility at the time Urquizo and another member named

21   Jonathan Gomez were in charge of the pod.  Word had

22   come down via Jonathan Gomez that they were to hit

23   Julian Romero.  And they picked Conrad Villegas to do

24   that.  They discussed that.  They agreed to it, and

25   they gave that instruction to Conrad.  And he



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    followed through with it.

 2            The other thing that Urquizo related was

 3    that it was important to Baca -- that is Anthony

 4    Baca -- that Julian not be killed; that he just be

 5    stabbed or beat up, but not killed.

 6        Q.   Let me go back to the Molina murder and

 7    talk about Jerry Montoya.  Are you aware of

 8    statements that he made related to the Javier Molina

 9    murder?

10        A.   Yes.

11        Q.   And were some of these statements made on

12    the actual day of the murder?

13        A.   Yes.

14            MR. LOWRY:  Your Honor, can I just raise a

15    quick objection.  This happened so quickly, I didn't

16    realize there is two other witnesses that are in the

17    courtroom.  Can we invoke the rule?

18            THE COURT:  Who are your other witnesses

19    here?

20            MR. CASTELLANO:  Nancy Stemo is one

21    witness, and --

22            MR. LOWRY:  I believe it's Mr. Cupit.

23            MR. CASTELLANO:  The two individuals in

24    back are Mr. Cupit and Mr. Martin, the experts for

25    the other hearing.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  I think the experts can stay.
 2    Do you have another witness you're presenting on the
 3    James hearing?
 4              MR. CASTELLANO:  No, only -- Ms. Stemo is
 5    the only one here in the court presently, so yes, she
 6    would be the other witness.
 7              THE COURT:  On the James hearing?
 8              MR. CASTELLANO:  Yes.
 9              THE COURT:  Let's exclude her from the
10    proceedings.  The experts can stay.
11              MR. CASTELLANO:  All right.  The witness
12    has left the room, Your Honor.  So I'll proceed, if
13    that's okay with the Court.
14              THE COURT:  You may.
15    BY MR. CASTELLANO:
16        Q.   Okay.  So tell us about what Mr. Rodriguez,
17    Mario Rodriguez, said or did with Mr. Montoya, that's
18    Jerry Montoya?
19        A.   Mr. Montoya told me that sometime after
20    5:00 p.m., while in the pod, Mario Rodriguez called
21    out to him and told him to follow him to Rodriguez'
22    cell.  Rodriguez gave Montoya a shank and said that
23    it was from Rudy Perez.  Rodriguez told Montoya that
24    it was time to put in some work.
25              Montoya asked who, inquiring who was going
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to be the recipient of the work, if you will.  And

2    Rodriguez answered "Javier."

3              Montoya asked, "Why?"

4              And Rodriguez said, "Because he's a rat."

5    Montoya asked to see the paperwork, and Rodriguez

6    said that it had already been passed to another pod,

7    but that he didn't need to worry because he,

8    Rodriguez, had verified it, as had "Dan Dan" or

9    Daniel Sanchez.  Montoya had some other questions and

10   asked where he was to actually hit Molina.  Rodriguez

11   told him that it would be in Molina's cell.

12             Montoya protested a little bit and said

13   that he didn't think that would be a good location

14   because of the cameras.  He argued about the angles

15   of the cameras with Rodriguez.  And Rodriguez

16   ultimately said, "Dan doesn't want the cameras

17   covered.  He has an evidentiary hearing coming up,

18   and needs to be seen on camera."

19   Q.   When you say "Dan," who do you understand

20   that to be?

21             THE COURT:  Do you have an objection, Mr.

22   Lowry?

23             MR. LOWRY:  No.  I just want to point out

24   for the record that Special Agent Acee was reading

25   off his notes, Your Honor, during that entire

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    response.

2             THE COURT:  Okay.

3             MR. LOWRY:  That wasn't an independent

4    recollection, but it was a direct recital from his

5    notes, Your Honor.

6             THE COURT:  All right.

7    BY MR. CASTELLANO:

8        Q.   We're going back to the question of who you

9    understood the "Dan" to be?

10       A.   Daniel Sanchez.

11       Q.   Ultimately, what was Mr. Montoya's

12   response?

13       A.   He accepted the directive and said that

14   he'd help.

15       Q.   Did he inquire whether anyone else would be

16   helping?

17       A.   He did.

18       Q.   What was Mr. Rodriguez' response?

19       A.   Mr. Rodriguez explained to Mr. Montoya that

20   Jerry Armenta would also have a shank and would help,

21   and that Daniel Sanchez had already talked to Armenta

22   and Armenta was ready.  He also told Montoya that

23   "Red," or Timothy Martinez would be helping; that

24   he'd go into Molina's cell and get him high, and then

25   knock him out, so that the two Jerrys, Jerry Montoya

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    and Jerry Armenta, could come in and commence with
2    stabbing Molina.
3         Q.   So is it your understanding that Timothy
4    Martinez was supposed to knock out or incapacitate
5    Mr. Molina before he was stabbed?
6         A.   Yes.
7         Q.   What happened when Mr. Montoya went back to
8    his cell?
9         A.   Dan Sanchez came in sometime later and
10   asked, You know what's up?"
11             Montoya said, "Yeah."
12             Sanchez said, "Okay, be trucha," which I
13   understand to mean to be careful or to watch out.
14        Q.   And was there any conversation between
15   Jerry Montoya and Jerry Armenta related to the Molina
16   murder?
17        A.   Yes, Armenta explained that he was -- he,
18   Armenta -- was perching in front of his cell, which
19   is just kind of squatting and hanging out.  Daniel
20   Sanchez signaled for Montoya to go upstairs because
21   he'd been downstairs.
22             Montoya did.  After getting to the top of
23   the stairs, he squatted next to Armenta, and in a low
24   voice said to him, said to Armenta that, "It's him or
25   us," and by "him," he was referring to Molina.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Armenta basically repeated the same thing back, like,

2    "Yeah, it's either him or us."

3        Q.   Let me turn your attention to statements

4    taken from Timothy Martinez.  You referred to Timothy

5    Martinez as also related to the Molina murder?

6        A.   I have several times.

7        Q.   What do you recall about Timothy Martinez

8    saying that Mario Rodriguez said to him that he was

9    supposed to do before the Molina murder?

10       A.   So on the morning of the Molina murder, Tim

11   Martinez had come back from his work detail at the

12   wheelchair program.  And shortly after entering the

13   pod, Mario Rodriguez called him over, and then told

14   him to go get high.  Timothy thought that was an

15   unusual request.  I think he described himself as not

16   a regular user of drugs.  And so he asked Mario why.

17   Mario Rodriguez again told him, "Just trust me.  Go

18   get high."  And Timothy kind of objected to that and

19   kept questioning him.  So Mario said, "Sit down, I'll

20   explain what's going on."  And then they had a

21   conversation about what was to take place.

22       Q.   Did the conversation cover the paperwork on

23   Javier Molina?

24       A.   Yes.

25       Q.   What was explained to Mr. Martinez by Mario

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Rodriguez?

2         A.   It was explained to him that the paperwork

3    on Molina had arrived; that he was a snitch, and that

4    he was to get hit.  And then from there they went

5    into more detail.

6         Q.   And what did Mr. Rodriguez tell Timothy

7    Martinez what Daniel Sanchez said about Martinez

8    getting involved?

9         A.   That Daniel Sanchez wanted Timothy to go,

10   to be on the mission.

11        Q.   When you say "the mission," what are you

12   talking about?

13        A.   To hit Molina.  And that Daniel Sanchez had

14   insisted on Martinez participating.  Specifically

15   Rodriguez said, "Dan is making you go."

16             Martinez said, "Okay.  What do I have to

17   do?"

18             Rodriguez answered, "Dan wants you to go

19   into the room and beat him up so he can't leave."  By

20   "him," that would be Molina.  "So that he can't leave

21   the room and Jerry and Jerry" -- being Montoya and

22   Armenta -- "will go in and hit him.  They have some

23   bone crushers.  And Molina has to go."  By bone

24   crushers, that's a slang term for larger shanks.

25        Q.   What was Martinez' response to that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   He said, "Okay, I'm going to go get high."
 2        Q.   So was that an indication that he was going
 3   to go get high in preparation for the Molina murder?
 4        A.   Yes.
 5        Q.   At some point was there an indication by
 6   Mr. Martinez that Daniel Sanchez talked to him about
 7   the Molina murder?
 8        A.   Yes.  Sanchez was in the cell next door to
 9   Martinez and began pounding on the wall.  Sanchez
10   asked of Martinez, "Did 'Blue' talk to you" --
11   something to that effect, "'Blue' talk to you yet?"
12   And Martinez told him that he, "Blue," or Rodriguez
13   had talked to him.
14        Q.   What was Daniel Sanchez' explanation to
15   Timothy Martinez about why he should be involved?
16        A.   What Martinez told me -- and this is a
17   direct quote -- "You've got to do this.  You got to
18   earn your huesos," or your bones.
19             Sanchez went on about how the SNM had lost
20   respect over the years, and they needed to take
21   things back to the old days when the S used violence
22   to get respect.  Sanchez said, "S is about violence.
23   We get respect through violence."  Martinez said that
24   he questioned Sanchez about why Molina had to be hit
25   and why he needed to be involved in it.  Why he,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Martinez, needed to be involved in it.

2        Q.   What was Daniel Sanchez' explanation?

3        A.   He basically said that Martinez hadn't done

4    anything yet.  He hadn't earned his bones, hadn't

5    committed any violent acts, and that he needed to do

6    something more significant than just bring drugs into

7    the institution.

8        Q.   And did Mr. Sanchez give any ultimatum to

9    Timothy Martinez related to this hit?

10       A.   Yes.  Martinez told me that Sanchez told

11   him he'd have to do it or else.  And Martinez took

12   that to understand that "or else" would be you need

13   to do this or you're going to get hit.

14       Q.   Now, did Mario Rodriguez at some point

15   explain to Timothy Martinez that he didn't want him

16   to go?  By that I mean go to commit the murder?

17       A.   Yes.  As Mr. Martinez explained it, they

18   were friends, and that he had lobbied -- he, Mario

19   Rodriguez -- had lobbied to have Timothy not go and

20   to get a pass on it.  But that Daniel Sanchez had

21   insisted.  And Rodriguez said -- and this is a quote

22   -- "But if it's your time, you've got to go.  You got

23   to do this for the family.  Then it will be someone

24   else's time."

25       Q.   Did Mr. Martinez indicate that he

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    understood?

2        A.   He did.

3        Q.   And was there an explanation by Mr.

4    Martinez about something to do with Mr. Molina's

5    shank?

6        A.   Yeah, quite by coincidence, Molina -- I

7    mean, he had a shank, but he gave it to Timothy

8    Martinez that morning.  He was going to go shower, if

9    I recall.  And he said, Here, hold my shank, hold my

10   fiero, or whatever term he used.  And Timothy

11   Martinez took the shank and put it in his cell in his

12   commissary bag.  Timothy Martinez related that to

13   Mario Rodriguez.  And I think they both just thought

14   it was, based on their comments, good fortune on

15   their part that Molina wouldn't have a shank and be

16   able to fight back.

17       Q.   And what was Mr. Rodriguez' comment to

18   Timothy Martinez about having taken the shank?

19       A.   He said, "Perfect, now he can't stab you."

20       Q.   Let me turn your attention to after the

21   assault or close in time to the assault.  Did Mr.

22   Rodriguez say anything to Mr. Martinez about not

23   saying anything to others?

24       A.   He did.  He told them to stay quiet and

25   that everything would be okay.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   I want to also go back to where the shank
2   came from.   What did Timothy Martinez explain about
3   at least one of the shanks?

4      A.   Martinez told me that Sanchez, Daniel
5   Sanchez, had obtained one of them from who they
6   referred to as "Fat Ass," which was sort of a
7   in-house nickname for Rudy Perez.   Sanchez had told
8   Martinez that Perez had given him two pieces of metal
9   from his walker, and that that's what they'd made the
10   shanks out of.   Sanchez had made the comment to
11   Martinez, "What else is Fat Ass going to do?"   And
12   actually, the comment made after that was Martinez'
13   opinion.   So that concluded what Sanchez said about
14   that.

15      Q.   I want to turn your attention now to
16   statements by Anthony Baca about keeping an eye on
17   Javier Molina or any distrust about him.

18      A.   Okay.

19      Q.   Is there any indication that Anthony Baca
20   was suspicious of Molina?

21      A.   Yes.   Martinez -- and this is all taking
22   place after the Molina murder; this is well after,
23   almost two years later.   Baca and Martinez are
24   incarcerated up at the Level 6 at PNM North.   And
25   Baca told Martinez, "If they would have let me out,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Javier wouldn't be dead, and that man would still be
 2   alive.  But they didn't, and what's done is done.
 3   When they wouldn't let me out we had to make a
 4   statement.  They called my bluff.  And now they have
 5   a dead man on their hands."
 6        Q.   Was there ever any indication that Mr. Baca
 7   had kept in touch with Jonathan Gomez?
 8        A.   Yes.
 9        Q.   And what was that discussion?
10        A.   Jonathan Gomez, or "Baby G," was and is
11   often referred to as Mr. Baca's protege, and that
12   communications would come down to other members
13   through Jonathan Gomez, and that Jonathan Gomez had
14   related to Timothy Martinez and others that "Pup"
15   didn't trust Molina and to -- they should keep their
16   eye on Molina.
17        Q.   What can you tell the Court about a
18   statement by Mr. Sanchez about people just going back
19   to the old ways and not just beating people up
20   anymore?
21        A.   I thought I might have already covered
22   that, but I can go back to that.
23             Daniel Sanchez had told Martinez and others
24   within the S that the gang needed to go back to the
25   old ways, and that there would be no more just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   beating people up.  Sanchez said, "We're going to
 2   take it back to where the S is feared and respected.
 3   No more jumping people.  We'll kill so people know
 4   there are consequences."
 5            (Mr. Benjamin entered the courtroom.)
 6       Q.   I'll turn your attention to a January 26
 7   statement by Timothy Martinez.  That's going to be a
 8   statement relating to Javier Molina when they were in
 9   the cell with him.  What was said at that point?
10       A.   I had some follow-up questions for Mr.
11   Martinez after the first debrief.  So I specifically
12   asked what conversation or what statements were made
13   by Mario Rodriguez when they were in the cell, in
14   Molina's cell.  And Martinez said that Mario
15   Rodriguez was standing in the doorway.  And as Molina
16   was getting up, Mario Rodriguez said, "He's getting
17   up.  What the fuck?"
18       Q.   And was Mr. Molina supposed to be getting
19   up or was he supposed to be incapacitated?
20       A.   No, he was supposed to be knocked out.
21       Q.   Let me turn your attention now to
22   statements by Mr. Baca to Mr. Martinez about hitting
23   Corrections Department officials.
24            MR. CASTELLANO:  Your Honor, this is now
25   going to relate to Counts 9 and 10.  That's the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    conspiracy to murder Dwayne Santistevan, and Count 9

2    and 10 is conspiracy to murder Gregg Marcantel.

3        Q.   So if you can, what did Mr. Baca say to Mr.

4    Martinez about hitting corrections officials?

5        A.   This conversation took place after Baca

6    kind of went on a rant with Martinez about Javier

7    Molina, and the fact that the Corrections Department

8    should have listened to him, Baca.

9            Baca told Martinez that there was stuff in

10   the works for Marcantel and Santistevan.

11   Specifically, he said that he'd like to get the

12   wardens, too.  Baca explained that to Martinez, that

13   "If we hit them, what's the worst that's going to

14   happen?  They'll send us out of state, but then

15   they'll ship us back.  And then they'll know we're

16   for real.  It started with Javier Molina, and now it

17   continues.  Javier was a building block for bigger

18   jobs for Marcantel and for the respect we once had."

19       Q.   And what about statements relating from --

20   to Timothy Martinez by Mr. Garcia, Christopher

21   Garcia?

22       A.   That conversation took place after the

23   first wave of indictments and take-down arrests.

24   When they were out at the Otero prison facility,

25   Martinez said that Chris Garcia -- they were actually

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  talking about the guy named Jeremiah Martinez, a/k/a

2  "Cyclone."  And the conversation turned to Gregg

3  Marcantel.  At the time, Chris Garcia was upset about

4  the situation and blamed it on Baca.  He specifically

5  said to Martinez, "Pup" -- which is an alias for Baca

6  -- "called me saying he needed guns.  It was right

7  after the Holly Holmes fight and people were shooting

8  guns in the air.  So "Pup" tells me he needs some

9  guns for a job to hit Marcantel and Santistevan.  And

10  I thought:  Who the fuck is going to do that?  'Pup'

11  was talking all drunk, saying Krazo" -- who is Eric

12  Duran -- "had a phone.  I didn't trust Krazo so

13  anyway."

14       Q.   And that was a statement by Christopher

15  Garcia?

16       A.   It was.  He and Martinez continued to talk

17  about it.  And that's where this Jeremiah Martinez

18  comes up, and how they acquire the firearm that's to

19  be used.

20       Q.   What was the nature of that conversation?

21       A.   Garcia was kind of laying out what happened

22  with the Marcantel and the Santistevan hit, or the

23  planned hit, and why it was so screwed up.  And he

24  said, "I called 'Cyclone'" -- in this case that's

25  Jeremiah Martinez -- "for the guns.  He gave me some

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    piece of shit .22 or .25" -- caliber.  "Those fucking
 2    things weren't going to do shit.  They would have
 3    just made Marcantel mad.  'Cyclone' claimed it was
 4    good one.  He had used it a few times."  And Garcia
 5    said, "It was a piece of shit, maybe one or two shots
 6    because the clip was all fucked up."
 7         Q.   All right.  Let me turn your attention now
 8    to statements taken from Jerry Armenta.
 9         A.   Mr. Castellano, I am happy to do that one,
10    but I think Agent Stemo was on that one.
11         Q.   Oh, was she on that one?
12              MR. CASTELLANO:  Your Honor, at this point,
13    I pass the witness related to these statements.
14              THE COURT:  All right.  Thank you, Mr.
15    Castellano.
16              Who wants to go first?  Mr. Villa?
17              MR. VILLA:  I'm happy to, Your Honor.
18              THE COURT:  Do you want to go first?  Y'all
19    decide.  I'm not --
20              MR. LOWRY:  No, Your Honor.  Under Rule
21    613, I believe we're entitled to see Mr. Acee's
22    notes.  I mean, he's read extensively from his notes
23    throughout his entire testimony.
24              MS. JACKS:  I would join.
25              MR. LOWRY:  I think, Your Honor, if we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    could take an afternoon recess to allow the defense

 2    teams an opportunity to review the notes, which we're

 3    entitled to do under Rule 613.

 4             THE COURT:  You can look at the notes.  But

 5    let's go ahead with cross-examination.  Who is going

 6    to do the cross-examination?

 7             MR. VILLA:  I'm not concerned about the

 8    order, but I think the purpose of looking at the

 9    notes would be to aid the cross-examination.

10             THE COURT:  Well, take a look at them.  Ask

11    him for them.

12             MR. VILLA:  Do you want us to do it now?

13             THE COURT:  You can do it now.  But let's

14    keep the pace up on cross-examination.  It's a little

15    bit of an ordeal getting people in and out, so --

16             MR. LOWRY:  Your Honor, is it okay if I sit

17    next to him?

18             THE COURT:  You bet.  You can look at it

19    together.

20             MR. CASTELLANO:  Your Honor, I'll object to

21    the extent that many of those are not his statements.

22    613 refers to his statements.  So for any of those

23    not prepared by Agent Acee, I would object.

24             MS. JACKS:  I think it's 612, and I think

25    if he looks at any writing, we're entitled to see it.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You can look at the notes.
 2              MS. JACKS:  Your Honor, it's 24 pages.
 3    There are how many attorneys here attempting to read
 4    it.  I'm wondering if we could get some copies made
 5    before we proceed.
 6              THE COURT:  I'm sure y'all have some
 7    questions of Mr. Acee about his testimony.  Y'all
 8    have been waiting for it for a while, so I'm sure
 9    there are some things you can do.  Y'all can take the
10    notes back.  One of you can start asking some
11    questions that you've been wanting to ask him for a
12    while.
13              MR. VILLA:  Your Honor, I've got a few
14    questions that I'll ask while my colleagues are
15    looking at these, and let them clean it up
16    afterwards, I guess.
17              THE COURT:  All right.  Go ahead, Mr.
18    Villa.
19                        EXAMINATION
20    BY MR. VILLA:
21         Q.   Agent Acee, good afternoon.
22         A.   Good afternoon.
23         Q.   Let's start with the conversations you
24    relayed from Mr. Urquizo.  I believe you testified --
25    and I'm just going to jump ahead to the point in time
```

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    when Mr. Urquizo and Mario Rodriguez and Timothy
 2    Martinez are passing notes.
 3         A.    Yes.
 4         Q.    So this occurred at Southern New Mexico
 5    Correctional Facility?
 6         A.    Yes.
 7         Q.    At the time Mr. Urquizo had been recently
 8    transferred to Southern New Mexico from PNM?
 9         A.    Correct.
10         Q.    When was Mr. Urquizo transferred?
11              MS. ARMIJO:  Your Honor, if I may, I
12    believe they've taken Agent Acee's notes to go and
13    make copies of.  Some of his notes may not have been
14    disclosed yet.  We don't mind them looking at them.
15    But we do object to the defense making copies of
16    them, which we don't have control of.
17              THE COURT:  Don't make copies.  That wasn't
18    what I intended.  So somebody go back and do that.
19    That's not what I said you could do.  I said you
20    could look at them.
21              MS. ARMIJO:  Sorry, Your Honor.
22              THE COURT:  Mr. Villa.
23         A.    Mr. Villa, off the top of my head, I'm not
24    sure the exact dates of what his transfer were.
25         Q.    Can you tell me relative in time to when
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Molina was murdered?

2        A.   Right before.

3        Q.   When you say right before, we're talking

4    just days?

5        A.   Days.  Because, as I recall, the

6    orientation is two days, so it was within two or

7    three days.

8        Q.   And orientation, that's the point when

9    someone is brought to a new facility and they're not

10   released to population and they go through some sort

11   of process?

12       A.   I believe that's correct.

13       Q.   It's your understanding that period is

14   approximately two days?

15       A.   That's my understanding.

16       Q.   So Mr. Urquizo gets transferred down to

17   Southern from PNM -- and I tend to refer to

18   Southern -- Las Cruces as Southern, and PNM South as

19   the South, if that's okay?

20       A.   I agree with you.

21       Q.   Okay.  So Mr. Urquizo is transferred down

22   to Southern.  And within a couple of days he's out of

23   the orientation?

24       A.   Correct.

25       Q.   And isn't it true that he was placed into

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   what I'll call yellow pod.  I don't know the exact
 2   number, but that's the name of the housing unit that
 3   he was in?
 4        A.   My recollection is the same.
 5        Q.   The adjacent housing pod is blue pod;
 6   correct?
 7        A.   Yes.
 8        Q.   And it's in the blue pod where Mr. Molina
 9   was?
10        A.   Yes.
11        Q.   It's in the blue pod where Mr. Molina was
12   attacked and stabbed and murdered?
13        A.   Yes.
14        Q.   So while the inmate is in orientation, they
15   don't get to get out into the pod?
16        A.   That's my understanding.  I've not
17   witnessed that.  I've never worked for Corrections,
18   but that's how it's been explained to me.
19        Q.   Explained to you by those in Corrections?
20        A.   Yes.
21        Q.   And when these conversations took place
22   between Mr. Urquizo, was it after orientation -- I'm
23   sorry, Mr. Urquizo, Mario Rodriguez, and Timothy
24   Martinez?
25        A.   I think that it's happening as part of the
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   orientation process.  And I say that because Mr.

2   Urquizo was not free to exit his cell, so his house

3   or his cell was closed, and he was having to pass

4   notes through a window and converse through a door.

5   I just don't know enough about the orientation.  But

6   at some point he arrives at the facility and there is

7   an orientation and he ends up assigned to yellow pod.

8          Q.   And within yellow pod he's got his own

9   cell?

10         A.   That's my understanding, yes.

11         Q.   The cell is shut and locked during

12  orientation?

13         A.   Yes.

14         Q.   He can't get out of that cell?

15         A.   Again, I've never been there.  That's

16  what's been explained to me.  I haven't witnessed it

17  or observed anyone go through orientation, but that's

18  my understanding from talking to Corrections folks

19  and the cooperating defendants.

20         Q.   Is that how Mr. Urquizo explained it to

21  you?

22         A.   Yes.

23         Q.   Mario Rodriguez and Timothy Martinez were,

24  I think you testified on direct, passing notes

25  discussing with Urquizo the paperwork that he had?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   Mario Rodriguez and Timothy Martinez were

 3   housed in blue pod; correct?

 4        A.   Correct.

 5        Q.   The adjacent pod?

 6        A.   Yes.

 7        Q.   And those two pods are separated by a door?

 8        A.   A couple.

 9        Q.   And if you will, the pods -- I kind of

10   think of them as pie-shaped, where the control center

11   is at the tip of the pie, and the crust of the pie

12   would be where the cells are?

13             MR. CASTELLANO:  Objection, Your Honor.

14   This isn't related to any statements.  We're only

15   talking about statements at this point.

16             THE COURT:  Well, give me -- tie it in to

17   what the James hearing is about.

18             MR. VILLA:  Well, I'm trying to determine

19   how these conversations took place between Timothy

20   Martinez and Mario Rodriguez when they're in an

21   adjacent pod.

22             THE COURT:  I'm going to give defense

23   counsel a little leeway.  Keep it tight to the

24   statements here.  But overruled.

25        Q.   Just to paint the picture real briefly:
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    There is two stories, the top cells and bottom cells;
 2    correct?
 3         A.   Correct.
 4         Q.   And if you put two pie crusts together,
 5    that's where the two pies sort of adjoin each other?
 6         A.   Yes.
 7         Q.   And that door between the two pods doesn't
 8    get opened?
 9         A.   It shouldn't.
10         Q.   So it's your testimony that Urquizo tells
11    you he's passing notes of some kind between Mario
12    Rodriguez and Timothy Martinez discussing the
13    paperwork that he has brought down?
14         A.   Would you like me to explain that, sir?
15         Q.   Well, did I state your testimony correctly?
16         A.   Yes.
17         Q.   Okay.  Now, you want to provide an
18    explanation of how that took place?
19         A.   Just what Urquizo told me.
20         Q.   What did Urquizo tell you?
21         A.   That "Blue" and "Red" -- or, excuse me,
22    Rodriguez and Martinez, were on some kind of -- I
23    don't know if it was a cleaning detail or a work
24    detail or painting or something, where they were
25    outside the pod, able to walk by yellow pod.  So they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   held up notes.  They're standing outside yellow pod,

 2   holding up a note on the glass to that entry door.

 3   And Urquizo would either motion, or at some point he

 4   did write a note back.

 5        Q.   And "Blue" and "Red," sometimes it's

 6   easier -- Mario Rodriguez is "Blue"; right?

 7        A.   Yes.

 8        Q.   Timothy Martinez is "Red"; correct?

 9        A.   Yes.

10        Q.   Those are their nicknames?

11        A.   Yes.

12        Q.   You indicated that Mr. Urquizo at one point

13   wrote back that he had paperwork on Javier Molina but

14   not on Jerry Montoya?

15        A.   Correct.

16        Q.   Did you determine how it was that Mario

17   Rodriguez or Timothy Martinez would have known that

18   Urquizo had this paperwork?

19        A.   Well, it was -- my understanding was that

20   it was anticipated -- highly anticipated -- and

21   Urquizo explained it as everybody was really excited,

22   like the place came alive when he came down on the

23   transport with Varela.

24        Q.   Urquizo came down with Mauricio Varela?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   But he didn't tell you how it was that

2    these individuals were excited or anticipated that he

3    had this information?

4      A.   No, he just explained it as -- I mean,

5    there had been failed attempts before.  The order had

6    come down at least three times.  So this time it was

7    being talked about again.  But this time, paperwork

8    was actually supposed to show up.  So people were now

9    asking:  Did the paperwork show up?

10          MS. JACKS:  Your Honor, I'm going to

11   object.  This is unclear whether this is a narrative

12   of this witness, or something that Urquizo told him.

13          THE COURT:  Well, I'll let Mr. Villa

14   control his own cross-examination.  Overruled.

15          Mr. Villa.

16     Q.   Let me ask you this:  Mr. Urquizo told you

17   that the order had been made three different times?

18     A.   Well, several defendants have told me that.

19   Urquizo was one of them.  I'm struggling to remember

20   exactly how he said it.  But I've heard that from

21   several defendants.

22     Q.   Let's focus on Urquizo.  Your testimony is

23   that Urquizo told you the order had come to kill

24   Javier Molina three separate times?

25     A.   More than once.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                               e-mail: info@litsupport.com

```
 1        Q.   More than once?

 2        A.   Yes.

 3        Q.   From whom did he say the order came?

 4        A.   I couldn't say as I sit here.

 5        Q.   Now, you indicated that there was

 6   communication between Urquizo and "Blue," Mario

 7   Rodriguez, where Mario Rodriguez apologized that one

 8   of the three people supposed to be hit wasn't part of

 9   this plan; correct?

10        A.   Correct.  I can't recall his name, but yes.

11        Q.   The name of the third person?

12        A.   Yeah, he was someone in yellow pod, I

13   believe.

14        Q.   The other two would be Javier Molina and

15   Jerry Montoya?

16        A.   Yes.

17        Q.   But you don't remember the name of the

18   third person in yellow pod?

19        A.   I think it's in my report, which I don't

20   have in front of me anymore.

21        Q.   The one that was taken off --

22        A.   Yes.

23        Q.   See if we can get that back.

24             MR. LOWRY:  May I approach the witness,

25   Your Honor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  You may.
 2       Q.   Mr. Acee, would you take a look at your
 3   notes and see if that refreshes your recollection as
 4   to who the third person was?
 5       A.   You know what, sir, it doesn't, because I
 6   have a mixture of 302s here, with reports I've
 7   written.  And I also just have some Word documents
 8   with notes.  And for Urquizo I just have notes
 9   pertinent to what I thought I'd be testifying about
10   today.  So I don't actually have my 302 on that
11   interview.  I'm sorry.
12       Q.   All right.  We'll see if we can't find it
13   while I'm finishing up here.
14            And I take it, because you didn't testify
15   to it, that at no point in the communications with
16   Mr. Urquizo and Mario Rodriguez did Mario Rodriguez
17   explain how they were going to try to obtain shanks
18   to use on Javier Molina?
19       A.   No.  Urquizo didn't relate that to me.
20       Q.   And at any point in any communication you
21   had with Mr. Urquizo, he did not relate to you that
22   he had knowledge about the source of the shanks used
23   on Javier Molina?
24       A.   That's a tricky one.  Because after the
25   fact, everybody talks about it.  So that wasn't --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    I'm not sure how to answer that.  After the fact, a
 2    lot of guys knew about it.  But they didn't have what
 3    I'd call direct knowledge at the time.  They heard
 4    about it later.
 5         Q.   So other cooperating defendants, other
 6    folks had heard, via rumor or otherwise, the source
 7    of the shanks?
 8         A.   Lots of people heard about it after the
 9    fact.
10         Q.   You testified that one of the things Mr.
11    Urquizo stated in his conversation with Anthony Baca,
12    while still up at PNM, was that Mr. Baca wanted
13    Urquizo to get in touch with the shot callers down at
14    Southern?
15         A.   Correct.
16         Q.   Who were those individuals?
17         A.   I don't know.  I don't know that Urquizo
18    knew until he got there.
19         Q.   Mr. Urquizo didn't relay that Mr. Baca
20    identified a specific person?
21         A.   No, his specific term was "shot callers."
22         Q.   Was it understood that Mr. Urquizo would be
23    able to figure that information out or -- is that
24    what it is?
25         A.   Yes.  I don't think it's difficult.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Mr. Baca didn't know?
 2        A.   I don't know what Baca knew.  What Urquizo
 3   told me was:  "Get in touch with the shot callers at
 4   Southern.  I think there are different ones in each
 5   pod."
 6        Q.   I'm going to jump now to Jerry Montoya.  I
 7   believe it was your testimony that Jerry Montoya told
 8   you that Mario Rodriguez talked to him and provided
 9   him a shank for the killing of Javier Molina?
10        A.   Yes.
11        Q.   And it was your testimony he said that the
12   shank was from Rudy Perez?
13        A.   Yes.
14        Q.   That's the extent of what Jerry Montoya
15   told you on that subject, right; the shank was from
16   Rudy Perez?
17        A.   On the subject of Rudy Perez?
18        Q.   This statement that Mario Rodriguez made to
19   Jerry Montoya, the shank was from Rudy Perez, right,
20   Jerry Montoya didn't tell you anything else about
21   that statement, did he?
22        A.   I'd have to refer to my 302s.  I did more
23   than one debrief of Jerry.  But, yeah, I'd want to
24   review my reports.
25        Q.   Let me ask you this:  Before we get into
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    those reports, did it matter to Mario Rodriguez --
 2    when you were interviewing Jerry Montoya, did it
 3    matter the source of the shanks that Mario Rodriguez
 4    provided to him, or just that he provided the shank?
 5        A.   Did it matter to me?
 6        Q.   Did you glean from the conversation between
 7    Jerry and Mario Rodriguez that it made any difference
 8    where the shanks came from?
 9        A.   I don't know that I understand.
10        Q.   Well, I guess what I'm trying to say is
11    whether Mario Rodriguez provided the shanks to Jerry
12    Montoya, the purpose of that was to execute the hit
13    on Javier Molina; correct?
14        A.   Right.
15        Q.   And he was providing him a murder weapon?
16        A.   Correct.
17        Q.   It didn't matter where the murder weapon
18    came from, as far as you understood that
19    conversation, right?
20        A.   No.
21        Q.   There were other shanks in the pod; you
22    knew about that?
23        A.   Yes.
24        Q.   Other places to get shanks from?
25        A.   I believe so.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And it was clear from the conversation that

2   what Mario wanted was for Jerry Montoya to use that

3   shank and stab Javier Molina?

4      A.   Right.

5      Q.   Regardless of where the shank came from?

6      A.   Correct.

7           MR. VILLA:  May I have just a moment?

8           THE COURT:  You may.

9      Q.   Let's turn to Timothy Martinez.  You said

10  that Mr. Martinez told you -- I think this is the day

11  that the hit goes down, but he'd gotten back from his

12  work detail at the wheelchair program.

13     A.   Yes.

14     Q.   And the wheelchair program is a program

15  that's at Southern, where inmates fix up wheelchairs

16  and walkers and things like that?

17          MR. CASTELLANO:  Objection, Your Honor.

18  We'd ask that we not make this a discovery

19  expedition, but focus on the statement again.

20          THE COURT:  Tie that into the James

21  hearing.

22          MR. VILLA:  Well, Your Honor, the second

23  element for Mr. Perez is whether they can prove that

24  he was a participant in the conspiracy with Javier

25  Molina.  And I think to do that they're asserting

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                      1-800-669-9492
                                                             e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    that the shank came from Mr. Perez' walker, and this

2    wheelchair program is another source of shanks that

3    are going to be similar or exactly the same as the

4    one that the Government claims is Mr. Perez'?

5              THE COURT:  Well, I'll allow a little

6    leeway here.  It's kind of hard to cabin this stuff.

7    But if it goes too far afield, renew your objection.

8    Overruled.

9         A.   You were asking me what the purpose of the

10   wheelchair program was?

11        Q.   That's right.

12        A.   I think that the inmates at Southern at

13   that time could construct wheelchairs that I think

14   were sent overseas.  I don't know if they made

15   walkers.  My understanding, walkers are something

16   that's checked out from the medical facility, or

17   assigned to an inmate by medical staff.  So I think

18   there is a distinction there.

19        Q.   All right.  So setting aside walkers that

20   come from medical staff to inmates that need a

21   walker, you don't know whether walkers were in the

22   wheelchair program, as one of the things that inmates

23   would fix up?

24        A.   I've not heard that, no.

25        Q.   Okay.  So now I want to talk to you about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the conversation between Timothy Martinez and Daniel

2    Sanchez, where there is this conversation again about

3    the source of the shanks used for Javier Molina's

4    killing.  Did I understand your testimony to be that

5    that conversation took place after the assault?

6         A.   Do you mind if I look at my report?

7         Q.   By all means.

8         A.   I have three 302s here, debriefs of Timothy

9    Martinez.

10              Now, the first conversation that Martinez

11   and Sanchez had, it was what I would characterize as

12   Sanchez verifying, where he was asking:  "Did 'Blue'

13   talk to you yet?  Do you know what you need to do?"

14   So there was that conversation which would have

15   happened before.

16        Q.   And during that conversation they discussed

17   the shanks that Mario Rodriguez was providing?

18        A.   I don't see anything -- in that initial

19   conversation, I don't see anything referencing the

20   shanks.  It's more about the loss of respect for the

21   S over the years.

22        Q.   Okay.  And earning your bones, that sort

23   thing?

24        A.   Yes, sir.

25        Q.   When did you understand the conversation

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    between Timothy Martinez and Dan Sanchez had taken

2    place regarding where the shanks came from?

3        A.   I'm on page 8 of my 302, my December 29,

4    2016 debrief of Timothy.  It's on page 8, toward the

5    bottom.  Do you want me to read it?

6        Q.   Well, does that refresh your recollection?

7        A.   Yes, sir.

8        Q.   Why don't you tell me in your own words

9    when you understood that conversation to have

10   occurred.

11       A.   I asked Timothy to tell me about the

12   shanks.  And that's when he related that Daniel

13   Sanchez told him he got them from Rudy Perez.  He

14   used a different name for him, a nickname.  But

15   that's when he mentioned that.

16       Q.   But he didn't tell you when the

17   conversation took place?

18       A.   No.

19       Q.   So you don't know when that conversation

20   occurred?

21       A.   I think it may have happened after.  But

22   that's just my opinion.

23       Q.   So you're speculating?  I mean, you didn't

24   ask Mr. Martinez when it occurred?

25       A.   Correct.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   You didn't ask him:  Did this occur before
 2   or after the assault?
 3        A.   That's right.
 4        Q.   Now, whenever this conversation took place,
 5   it's your testimony that "Dan Dan" told Timothy
 6   Martinez that Rudy had given him two pieces?
 7        A.   Yes.
 8        Q.   And he said something to the effect of what
 9   else is "Fat Ass" going to do?
10        A.   That's what Martinez related to me, yes.
11        Q.   And Martinez didn't -- related to you what
12   Daniel Sanchez was saying to Timothy Martinez?
13        A.   Correct.
14        Q.   And Martinez didn't ask Daniel Sanchez to
15   clarify that statement as far as you know, right?
16        A.   I don't think he did.
17        Q.   So "What else is 'Fat Ass' going to do"
18   could mean:  He's sick, he's lying in bed, he's not
19   going to be able to fight us; we're going to take his
20   stuff?
21        A.   That's not my interpretation of that.
22        Q.   But you didn't ask?
23        A.   Correct.
24        Q.   And you don't know?
25        A.   I have an idea.  But I didn't ask that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   question.
 2        Q.   Okay.   Whatever your idea is, you're
 3   speculating?
 4        A.   Yes.
 5             MR. VILLA:  Your Honor, I'm going to pass
 6   the witness on to colleagues.  But if I may, I may
 7   have a few follow-up questions.
 8             THE COURT:  All right.  Thank you, Mr.
 9   Villa.
10             Mr. Adams, did you want to go next?
11             Mr. Lowry?
12             Ms. Jacks, do you want to go?
13             MS. JACKS:  I'll defer.
14             THE COURT:  Mr. Lowry?
15                    EXAMINATION
16   BY MR. LOWRY:
17        Q.   Good afternoon, Special Agent Acee.
18             Special Agent, you said you spoke to Lupe
19   Urquizo?
20        A.   Yes.
21        Q.   And according to your testimony earlier
22   today you said that Mr. Urquizo claimed that he had
23   spoke with Mr. Baca?
24        A.   He did.
25        Q.   And where did that conversation take place?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1     A.   I believe that took place at the Level 6,
 2  the north facility.
 3     Q.   Level 6 is the most secure facility in the
 4  New Mexico Department of Corrections; isn't that
 5  right?
 6     A.   You're correct.
 7     Q.   Inmates aren't free to roam the halls of
 8  Level 6, are they?
 9     A.   No.  I think there are some exceptions
10  for -- I think they call them porters and stuff like
11  that, but generally, no.
12     Q.   Did you ever -- how do you know these two
13  individuals were in a position to speak with each
14  other?
15     A.   I don't.  I'm just reporting what Urquizo
16  told me.
17     Q.   So for all you know -- well, when you spoke
18  to Mr. Urquizo it was with a debrief with the United
19  States Government; correct?
20     A.   I don't think so.  I think the first time I
21  just went up to the penitentiary, and introduced
22  myself.  I don't think he had an attorney at that
23  point.
24     Q.   And he was at Level 6?
25     A.   He was at 5 or 6, so he was either at the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  South, or he was at the North.  I'm not sure.

2       Q.   So you don't recall where you met with him?

3       A.   I met with him at PNM.  And it's limited

4  where I can meet with these guys and talk to them.

5  But actually, come to think of it, I think it might

6  have been at the South, at the Level 5.

7       Q.   Would it refresh your recollection if you

8  looked at your 302?

9       A.   It would, except that I don't have it in

10 front of me.  I don't have the Urquizo.  The 302 that

11 I have -- I have all of the 302s of the Timothy

12 Martinez debrief.  And then the other people I spoke

13 about are just on notes.

14      Q.   Your bullet points.  Do you have any sense,

15 was Urquizo, to your knowledge, ever a porter?

16      A.   Well, I think as a cooperator he was, but

17 before that I don't know.

18      Q.   Was he a cooperator at the time he had this

19 alleged conversation with Mr. Baca?

20      A.   No.

21      Q.   So my question for you was:  Was he one of

22 these rare individuals that had the liberty to roam

23 the halls of Level 6 when this conversation took

24 place?

25      A.   Doubtful.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   So it would be a rather simple task to
2  check the housing records to see if this conversation
3  was possible, wouldn't it?
4     A.   I think so.
5     Q.   So if the housing records reflect that
6  these two individuals lived in completely different
7  units in Level 6, do you think it was possible that
8  this conversation happened?
9     A.   I think the only thing I would want to
10  check was, like, the rec schedule:  Could they have
11  been on the yard at the same time?  Because I'm not
12  exactly sure how that works.  But I think I
13  understand what you're asking.  I would want to
14  follow up and check that.
15     Q.   Did you?
16     A.   No.
17     Q.   So you don't even know if this conversation
18  was possible?
19     A.   I don't.  I'm just simply reporting what
20  Urquizo's statement is.
21     Q.   Right.  And by the time you spoke to Mr.
22  Urquizo, the take-down of the SNM -- what the
23  Government refers to as the take-down of the SNM had
24  already transpired.
25     A.   At least one or two phases, yes.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492

PROFESSIONAL COURT                              e-mail: info@litsupport.com
REPORTING SERVICE

```
1        Q.   Okay.  So it's fair to say that it was
2   common knowledge within the inmates residing within
3   the Department of Corrections that you could exchange
4   information, in terms to dodge an indictment?
5        A.   They might have thought that.  We were up
6   there quite a bit.
7        Q.   There was a good reason for them to think
8   that, wasn't there?
9        A.   Probably.
10       Q.   And that's because the FBI agents routinely
11  visited people, the unindicted people that resided in
12  Level 6 and Level 5?
13       A.   Probably tried to talk to all of them.
14       Q.   Right.  And that was one of the common
15  conversation techniques, if you will, to tell the
16  folks:  You can be with us or against us, your call?
17            MR. CASTELLANO:  Objection, Your Honor.
18  Once again, I'd ask that it be focused on the
19  statements.
20            MR. LOWRY:  Your Honor, I'm trying to get
21  to the context with which Mr. Urquizo made the
22  statement, because it goes to the credibility of the
23  statement.
24            THE COURT:  Well, I guess I'm not quite
25  convinced that we're at the credibility stage.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. LOWRY:  Here's where I'm really going
 2      with this, Your Honor.  The fact of the matter is, it
 3      was physically impossible for this conversation to
 4      have taken place based on housing records, and the
 5      fact that the United States didn't even do its due
 6      diligence to examine whether --
 7              THE COURT:  But even if that's the case,
 8      what does that have to do with --
 9              MR. LOWRY:  Well, it goes into how -- the
10      United States wants to introduce these alleged
11      statements as co-conspirator statements that come in.
12      And if they never transpired, it seems to be like
13      fabrication, rather than a co-conspirator statement.
14              THE COURT:  Well --
15              MR. CASTELLANO:  That's the subject of
16      cross-examination at trial.
17              THE COURT:  Yeah, I'm going to sustain the
18      objection.  I think we're getting into the merits.
19         Q.   Do you know when the conversation took
20      place?
21         A.   Between Baca and Urquizo?
22         Q.   Correct.
23         A.   I couldn't give you a date when they were
24      both housed there.  And I agree with you that that
25      wouldn't be difficult to narrow down.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        Q.   Could you give me a month?

2        A.   No, I -- as you know, Mr. Baca was out of

3   state a lot, transferred a lot.  I couldn't tell you.

4        Q.   So I take it you would agree with me that

5   the conversation didn't happen when Mr. Baca was out

6   of the state?

7        A.   I would agree with that.

8        Q.   So in relation to the Molina, would you

9   agree with me the Molina homicide or the Molina event

10  happens on March 7, 2014?

11       A.   Correct.

12       Q.   So this conversation took place -- do you

13  have any sense -- a week before?  Two weeks before?

14  A month before?  A year before?

15       A.   No, I think it's going to be the latter, as

16  opposed to the sooner.  It's not going to be in close

17  proximity to March 7, 2014.  It's going to be

18  sometime before.  As I had explained earlier, this

19  was from my recollection the third time the hit order

20  had come down.

21       Q.   Why wasn't the hit carried out, though, the

22  first two times it was ordered?

23       A.   Well, I'm going to speculate, because

24  it's --

25            MR. CASTELLANO:  Objection, Your Honor.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Doesn't relate to the statements.

2           THE COURT:  Tie it to the James hearing.

3    How is this going to relate to what I've got to

4    determine?  I think we're getting a little afield.

5           MR. LOWRY:  I'll withdraw it, Your Honor.

6      Q.   Well, let's move on to you said that Mr.

7    Urquizo talked to David Calbert?

8      A.   Yes.

9      Q.   Do you know when that conversation took

10   place?

11     A.   That would be closer to the March of 2014.

12   Because Calbert was transferred from the Level 6 to

13   the Level 5, where Urquizo was at.

14     Q.   And so, if I understand this right, did Mr.

15   Calbert tell you this?  Because if I understood your

16   testimony correctly, you said Mr. Urquizo said that

17   Mr. Calbert had said --

18     A.   Correct.  So I was recalling or reading

19   from my notes, what Urquizo told me.

20     Q.   What does Mr. Calbert say?

21     A.   His statement was very, very similar to

22   Urquizo's.  I think it matched on everything.  But

23   they -- the most glaring difference I noticed had to

24   do with Varela's involvement.

25     Q.   Okay.  Explain to me the match points.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                     201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492
                                                          1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1         A.   That there were two pages of paperwork.  It
2    was an LCPD report.  It looked kind of fishy, as they
3    described it; that Calbert took it to the south
4    facility, the Level 5; gave it to Urquizo, and then
5    Calbert believed that it went down -- of course he
6    remained behind.
7         Q.   And where did the conversation between Mr.
8    Baca and Mr. Calbert take place?
9         A.   Well, I'd be making an assumption there.
10        Q.   Well, you had access to Mr. Martinez;
11   correct?  Pardon me, Mr. Urquizo.
12        A.   I had access to him, I debriefed him --
13        Q.   Right.
14        A.   -- Mr. Calbert.  My interactions with Mr.
15   Calbert have been far less, because he was assigned
16   to other places when I came on board.  So I'm not
17   sure -- I have talked to him, but I don't know if I
18   wrote his debrief.
19        Q.   Would it be important for you to know when
20   the conversation took place?
21        A.   Between Calbert and Mr. Baca?
22        Q.   Correct.
23        A.   It's an important timeframe.
24        Q.   Was it before January of 2014?
25        A.   I couldn't tell you, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Was it in January of 2014?

 2          A.   Mr. Lowry, I don't mean this

 3   disrespectfully.  You keep asking, but I honestly

 4   don't know.

 5          Q.   You don't have any idea.  So if I

 6   understand your testimony correctly you don't know

 7   where, and you don't know when?

 8          A.   Well, I presume it happened at the Level 6,

 9   because Calbert went from the 6 to the 5.  But that's

10   what I was told by Urquizo.

11          Q.   And again, Calbert wasn't the type of rare

12   individual that would have an all-access pass to roam

13   Level 6?

14          A.   No, I don't think so.

15          Q.   Did Mr. Baca enjoy those kinds of

16   privileges when he was at Level 6?

17          A.   Very doubtful.

18          Q.   Why were the other -- why was -- what did

19   they tell you -- well, they said -- why the paperwork

20   was necessary for the Molina hit.  Where did this

21   requirement come from, the one you described in your

22   direct, that sort of the rules -- and I don't know

23   how to describe it -- changed, evolved, morphed?

24          A.   Well, to answer that I'd be combining what

25   dozens of SNM members have told me.  I mean, I have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    an opinion, if that's what you want to hear.

 2         Q.   Well, I want to know what your

 3    understanding of the rules were, how they changed,

 4    why the paperwork was necessary?

 5         A.   There were political hits over the years

 6    that there wasn't paperwork.  And again, it wasn't a

 7    snitch, and then it was later found out that it was a

 8    bad hit or he wasn't a snitch.  It was a hit over

 9    someone not sharing dope, or over a female.

10              And that was against the rules of old.  But

11    the rules have changed over time.

12         Q.   So that would be unauthorized, if you will?

13         A.   Well, the guys that called it wouldn't say

14    it's unauthorized.  But the general opinion is, yeah,

15    they -- the SNM needed to get control over what were

16    the rules, and what's the understanding of what the

17    rules are?  There has to be paperwork.

18         Q.   Okay.  So -- and this is where I want to

19    drill down on this, because these are supposedly

20    co-conspirator statements.  So who was in charge of

21    making the rules for this endeavor?

22         A.   Well, my understanding is that when Baca is

23    in New Mexico, when he's not out of state -- it's not

24    disputed -- that he sets the rules -- and in his

25    absence, there is a top-down mesa or a table, or a

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    panel of leaders.  And that's even disputed because
 2    of politics in different facilities.
 3         Q.   So if Mr. Baca makes the rules, why is he
 4    in Level 6?
 5              MR. CASTELLANO:  Objection, Your Honor.
 6    This is not relating to the statements.
 7              MR. LOWRY:  Your Honor, actually it is.
 8    Because what they're trying to allege -- and we've
 9    gone through this throughout the entirety of this
10    case -- but they're trying to allege a single
11    overarching conspiracy.
12              THE COURT:  Well, I'll allow this question.
13    Overruled.
14         Q.   So if Mr. Baca is the -- I believe you
15    said:  When he's in New Mexico, he's the guy?
16         A.   Correct.
17         Q.   Then why was he a Level 6 and not Southern?
18         A.   Well, Level 6 is where Department of
19    Corrections, being the leader of the S -- I think
20    over the years he's been at a lot of facilities.  But
21    at that time that's where the Department of
22    Corrections wanted to keep an eye on him as a leader.
23              A lot of the leaders of the various prison
24    gangs are housed at the Level 6.
25         Q.   But if I understand the disclosures in this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    case, he was in Level 6 because other people in

2    Southern had him sent there?

3         A.   Kited him out, I think they called it.

4         Q.   Would that be fair to say?

5         A.   I've heard that, too.  I've not seen those

6    statements.  Or I haven't talked to any SNM members

7    who said I'm the one that kited "Pup" out.  So I

8    understand how that concept works.  But I'm not sure

9    I can answer that.  I don't know what they were doing

10   back then.

11        Q.   But your colleague, Lance Roundy, was one

12   of the individuals that actually was instrumental in

13   passing along the message to the Department of

14   corrections that Mr. Baca needed to be taken from

15   Southern to Level 6 for his own safety?

16        A.   That may have happened.  I wasn't part of

17   the case when Roundy was working it.  I was working

18   other stuff in another place.

19        Q.   And you haven't studied his 302s as part of

20   your investigation in this case?

21        A.   I've read them.  I wouldn't say I studied

22   them.  But I have read them, and I know he worked

23   closely with Corrections.

24             THE COURT:  Mr. Lowry, would this be a good

25   time for us to take our afternoon break?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MR. LOWRY:  Your Honor, may I review the
2     notes during the break?
3              THE COURT:  You can review the notes during
4     the break.
5              MR. LOWRY:  I won't make a copy.
6              THE COURT:  All right.  We'll be in recess
7     about 15 minutes.
8              (The Court stood in recess.)
9              (Ms. Sirignano entered the courtroom.)
10             THE COURT:  All right.  Ms. Sirignano, you
11    rose from the grave, and you're with us now?
12             MS. SIRIGNANO:  Yes, Your Honor.
13             THE COURT:  Are you feeling better?
14             MS. SIRIGNANO:  Yes.
15             THE COURT:  All right.  Mr. Mondragon, I
16    was told you came in.  All right.  You're here as
17    well.  You want to enter your appearance?
18             MR. MONDRAGON:  Yes, Your Honor.
19             THE COURT:  All right.  Okay.  Any others?
20             All right.  Mr. Acee, I'll remind you
21    you're still under oath.
22             Mr. Lowry, if you wish to continue your
23    cross-examination of Mr. Acee, you may do so at this
24    time.
25             MR. LOWRY:  I do, Your Honor.  Thank you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    very much.
 2              THE COURT:  Mr. Lowry.
 3    BY MR. LOWRY:
 4         Q.   Special Agent Acee, how are you doing?
 5              Special Agent, you testified on direct
 6    that -- I believe I have this right -- that Mr.
 7    Urquizo, if I understood you correctly, once the
 8    assault on Mr. Molina takes place, Mr. Urquizo
 9    explained to you that he heard Daniel Sanchez say
10    something to the effect of "Fuck, yeah"?
11         A.   Yes.
12         Q.   Now, I just want to make sure I understand
13    this right.  Mr. Sanchez is in the blue pod?
14         A.   Correct.
15         Q.   And Mr. Urquizo was in the yellow pod?
16         A.   Yes.
17         Q.   And Mr. Urquizo, because he's a new arrival
18    in the yellow pod, is locked into his room?
19         A.   He was when he first arrived.  At the time
20    of the hit, he was or was not, I'm not sure.  I think
21    he's locked in his room, though, in yellow pod.
22         Q.   And Mr. Urquizo's claim is that he's locked
23    in his room; as the doors open between the two pods
24    he hears this?
25         A.   No, he said he just heard it.  And I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    said -- I asked, "How did you know it was 'Dan Dan'?"

2        Q.    And what did he say?

3        A.    "I just know his voice, he has a unique

4    voice."  Made fun of him for being a farmer in his

5    former life or something.

6        Q.    So does he know what he's saying, "Fuck,

7    yeah" about?

8        A.    Molina getting hit was his impression.

9        Q.    How do you know that was his impression?

10       A.    That's what we talked about.  I said,

11   "Well, how do you know what was going on?  What could

12   you hear from yellow pod?  How did you know when it

13   went down?"

14             He said it was loud and he heard a lot of

15   commotion, and specifically heard "Dan Dan" say that.

16             And I had the same question, "Like, how do

17   you know it was him?"

18       Q.    Now, with regard to -- I want to move on

19   from the Molina situation to talk about the Julian

20   Romero assault.  And I believe you testified on

21   direct that -- was this still Mr. Urquizo?  What did

22   Mr. Urquizo tell you about Mr. Baca and the Julian

23   Romero?

24       A.    That Mr. Baca did not want Romero killed.

25   You know, he'd made a mistake regarding the whole

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    "Styx" thing, and the wife there.  But he'd been

2    around a long time and that he should just be beat up

3    or stabbed, but not killed.

4         Q.   Okay.  Now, did Mr. Urquizo hear Mr. Baca

5    say this?

6         A.   I don't think so.  He related that that

7    came down when Jonathan Gomez, "Baby G," came down,

8    who I referred to as a protege of Mr. Baca's.

9         Q.   Did you speak to Mr. Gomez?

10        A.   I have spoken with him.

11        Q.   And what did he relate to you about what

12   Mr. Baca allegedly said?

13        A.   He didn't comment on that.

14        Q.   Did you ask Mr. Gomez about that?

15        A.   Yes.

16        Q.   So he didn't confirm what Mr. Urquizo had

17   told you?

18        A.   Not exactly.

19        Q.   What do you mean "not exactly"?

20        A.   He danced around for a long time.  But no,

21   he didn't -- to answer your question, he didn't.

22        Q.   Did he get the award for Dancing With the

23   Stars?

24        A.   He was one of the better -- yeah, ones to

25   avoid answering questions about Mr. Baca.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com


1     Q.   Did he answer the questions at all?

2     A.   In a roundabout way, yes.

3     Q.   Describe for me what you mean by "a

4  roundabout way."

5     A.   Sure.  It was -- what we were talking about

6  was why the hits hadn't happened.  The Molina hits

7  hadn't previously happened because "Baby G" or

8  Jonathan Gomez was in Southern at the time.  And I

9  had been hearing from different SNM members that the

10  order had gone down when "Big Jake," Manuel Jacob

11  Armijo was there, "Baby G," some of the Clarks.  And

12  that because Molina was from Las Cruces the hit

13  didn't take place.  So I was trying to question

14  Jonathan about that.  "Is that true?  What do you

15  think of all that?"

16         And he said there were times that orders

17  came down from the top.  He didn't say Baca

18  specifically, but orders came down from the top, and

19  basically, if he didn't agree with those orders, it

20  didn't happen.  And that was sort of his offer to me

21  to say, "See, we don't always follow the orders."

22         So that's what I'm recalling regarding Mr.

23  Baca and the Molina hit and Jonathan Gomez and our

24  conversation.

25     Q.   Now, if I understand you correctly,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Gomez says that, "We don't follow Mr. Baca's
2    orders"?
3         A.   Not exactly.  He just wanted to make it
4    clear that he might receive an order, but he was his
5    own man, and would process it, and think and consider
6    what was best for all the guys in the pod and all the
7    guys in the facility.  Because there was a rift
8    between people living in the north Santa Fe, and the
9    guys in Cruces; that the guys in the north wanted --
10   they didn't think the guys in Las Cruces had it as
11   bad as them.  So they'd send these orders down to hit
12   people, and then the guys down south wouldn't do it.
13        Q.   Now, there was a period of time in 2013,
14   where Mr. Baca lived with -- at Southern, with Mr.
15   Molina; correct?
16        A.   I believe so.  I don't know how close, in
17   what proximity.  But I believe so.
18        Q.   Would you -- if I told you that they both
19   lived in blue pod together for a period of time at
20   Southern, would you have reason to doubt that?
21             MR. CASTELLANO:  Objection, Your Honor.
22   Straying away from the statements again.
23             MR. LOWRY:  Your Honor, no, this gets right
24   back to the conspiracy.
25             THE COURT:  Well, I'm going to allow this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   testimony.  Overruled.
 2        A.   If you told me that, I believe you.
 3        Q.   I believe you said earlier that when Mr.
 4   Baca was in New Mexico, his word ruled what you claim
 5   to be the SNM?
 6        A.   In the latter years, yeah.  Certainly not
 7   when he was a young man, but in the latter years,
 8   yes.
 9        Q.   Was 2013 one of the latter years?
10        A.   Yes.
11        Q.   So if Mr. Baca wanted Mr. Molina dead in
12   2013, and they lived in the same pod, why wasn't Mr.
13   Molina killed?
14             MR. CASTELLANO:  Objection, calls for
15   speculation.
16             THE COURT:  Well, would you just be
17   speculating?
18             THE WITNESS:  Yes, sir.
19             THE COURT:  Sustained.
20        Q.   I want to bring your attention to some
21   statements that you said that Tim Martinez overheard
22   Mr. Baca say.  And I believe -- and you kind of
23   pointed that out to me in your 302.  I'm happy to
24   return this to you, if you'd like.
25             MR. LOWRY:  May I approach the witness,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Your Honor?

 2              THE COURT:  You may.

 3              MR. LOWRY:  May I ask him a question first?

 4         Q.   According to your 302 -- and I'm looking at

 5    this, and it's page 2 of 7 on a 302, dated January

 6    26, 2017.  You've written in your 302 that Baca told

 7    Martinez, quote, "If they would have let me out,

 8    Javier wouldn't be dead.  That man would still be

 9    alive.  But they didn't, and what's done is done.

10    When they wouldn't let me out, we had to make a

11    statement.  They called my bluff.  And now they have

12    a dead man on their hands."  What did he mean by

13    "they called my bluff"?

14         A.   Well, I believe that had to do with Mr.

15    Baca's communications or requests to the Department

16    of Corrections referred to as the Jerry Roarke

17    letter.  I believe that's what it's in reference to.

18         Q.   But what was the bluff?

19         A.   I'm speculating:  That if they would

20    have -- if the Department of Corrections would have

21    followed Mr. Baca's recommendation or idea, that this

22    wouldn't have happened, the Molina homicide wouldn't

23    have happened.

24         Q.   But when Mr. Baca lived with Mr. Molina in

25    Southern, Mr. Molina was alive; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   He was.

2        Q.   And why do you think that this is a

3    statement meaning that Mr. Baca wanted Molina dead?

4        A.   Like why did I record that?  Why did I

5    think that was --

6        Q.   No, why did you think this is a statement

7    concerning a conspiracy to kill Mr. Molina?

8        A.   Well, he's -- Mr. Baca is relating to

9    another SNM member that -- again, and part of this is

10   what I'm surmising -- if they'd listen to me, is what

11   he says, this wouldn't have happened.  This was an

12   SNM hit, and he's a known leader of the SNM.  So, to

13   me, this is an important statement regarding that

14   homicide.

15       Q.   But if I understood your testimony on

16   direct -- correct me if I'm wrong -- you said after a

17   homicide takes place all kinds of people take credit?

18       A.   Did I say that today?

19       Q.   Something along those lines.

20       A.   I've seen that in this case where -- I'm

21   trying to think of a specific example.  But I have

22   seen within the SNM where -- yes, I can think of it

23   now -- members have claimed, when talking to other

24   members, that they've participated in a crime that

25   they didn't.  I have seen that.  I don't know that I

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                     1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1    talked about that today, but --
 2         Q.   Okay.  So you wouldn't -- again, I just
 3    want to make sure I understand your testimony
 4    correctly.  But if I understand what you're saying
 5    now, you wouldn't disagree with me that people lay
 6    claim to things they didn't do?
 7         A.   Sure.
 8         Q.   And there may be all kinds of motivations
 9    for making those kinds of claims?
10         A.   Yes.
11         Q.   And one of them might be for
12    self-preservation?
13         A.   Certainly.
14         Q.   So this particular quote was much after the
15    fact?
16         A.   Yes, a couple of years.
17         Q.   And you understand that when Mr. Baca was
18    residing with Mr. Molina in Southern, Mr. Molina was
19    safe and sound?
20         A.   Yes.  In fact, I think there is even some
21    pictures in discovery of them posing together, yeah?
22              MR. LOWRY:  May I have a moment, Your
23    Honor?
24              THE COURT:  You may.
25         Q.   And quickly, Agent Acee, do you know where
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   Mr. Baca allegedly made this statement to Mr.
 2   Martinez?
 3        A.   Yes, while they were housed together at the
 4   Level 6.
 5        Q.   And when was that?
 6        A.   Shortly before the take-down, when we
 7   brought Mr. Baca back.
 8        Q.   And where was Mr. Martinez' -- where was
 9   his cell in relation to Mr. Baca's cell?
10        A.   I couldn't tell you.
11        Q.   At the time the statement was made, Eric
12   Duran was residing right next to Mr. Baca?
13        A.   It would have been around that timeframe,
14   yes.  It took us a while to arrange movements and
15   stuff, but it would have been that general timeframe.
16        Q.   And that's my point, is if not you, someone
17   in the FBI, the Department of Justice arranged --
18   orchestrated this living arrangement where Mr. Baca
19   would live right beside Mr. Duran?
20        A.   Yes.  We asked them at the Department of
21   Corrections -- they're a partner -- ultimately, it's
22   their move, but yes, we asked for it.
23        Q.   And they obliged you --
24        A.   Yes.
25        Q.   -- in all of your requests?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Not all of them.

2        Q.    But -- well, they obliged you in putting a

3   cellphone and a recording device in the room with

4   Mr. Duran?

5        A.    Yes.

6        Q.    So why didn't Mr. Duran capture those

7   statements on the recording devices if they were

8   made?

9        A.    I don't know.  I surmise that Mr. Baca is

10  conversing -- I know for a fact he's conversing with

11  Mr. Duran through the ventilation pipes under the

12  bed.

13       Q.    Right.

14       A.    I don't know if the conversation with

15  Martinez is in the yard, if it's passing within the

16  pod for showers or meals.  Or I know some inmates are

17  able to talk through the opposite vent on the other

18  side of the wall, or through sometimes ventilation or

19  pipes that lead down between the tiers.

20       Q.    Is there documentation of the time inmates

21  would have spent together in the yard, rec yard?

22       A.    That's a question for Corrections.  I'm not

23  sure.  I know it's not much for a Level 6 inmate,

24  maybe an hour.  And I don't think they have to go, if

25  they don't want to.  But that's a question for them.

SANTA FE OFFICE                                                                      MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                               FAX (505) 843-9492
                                                                                        1-800-669-9492
                                                                            e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              MR. LOWRY:  No further questions, Your
 2   Honor.
 3              THE COURT:  All right.  Thank you, Mr.
 4   Lowry.
 5              Ms. Jacks, do you have cross-examination?
 6              MS. JACKS:  Yes, Your Honor.  Thank you.
 7                       EXAMINATION
 8   BY MS. JACKS:
 9         Q.   Good afternoon, Agent Acee.
10         A.   Good afternoon.
11         Q.   I'm going to try to approach this in a
12   logical fashion.  We'll see how long that lasts.
13              Let's start with your interviews with Lupe
14   Urquizo.  You testified about a bunch of statements
15   he made to you.  Do you recall that testimony?
16         A.   Yes.
17         Q.   Just, in general, were all those statements
18   made during the same interview with him or different
19   interviews?
20         A.   Different.
21         Q.   Okay.  How many total interviews have you
22   had with Mr. Urquizo?
23         A.   At least three.
24         Q.   And in that three, does that include the
25   one where you mention that you spoke to him before he
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                               1-800-669-9492
                                                         e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    had an attorney and before he was even a suspect in
 2    the case?
 3         A.   Yes, that would have been my first one, up
 4    at PNM.
 5         Q.   And do you recall the date or the month and
 6    year of that interview?
 7         A.   No.  It would be the first sentence of the
 8    my 302.  But no.
 9         Q.   Well, the information that you related here
10    today, is that information he told you in that first
11    interview before he became a potential suspect in
12    this case?
13         A.   That's a summary of all of the debriefs
14    with him.  So if I did three, it would be a summary
15    of all three.
16         Q.   I guess my question was -- did he talk to
17    you freely in that first interview?
18         A.   Yes.
19         Q.   And he told you things about the murder or
20    the homicide of Javier Molina?
21         A.   Yes and no.  I mean, he was worried, and
22    that's why we got him an attorney.  I mean, he
23    started down that road, and he started to tell me
24    stuff.  And then we wanted him to cooperate, and we
25    made the decision that we should get him an attorney.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   So you facilitated him getting counsel, and

2    then the next meeting was actually with his counsel

3    present?

4        A.   Yes.

5        Q.   And then the third meeting was with his

6    counsel present?

7        A.   Any subsequent ones after would have been

8    with his counsel.

9        Q.   Okay.  And is it fair to say that all of

10   your contacts with Mr. Urquizo occurred after the

11   initial take-down in this case in December of 2015?

12       A.   Definitely.  I didn't even know who he was

13   until his name was mentioned here in court.

14       Q.   And it sounds like when you talked with him

15   the first time, he became concerned, noticeably

16   concerned, about some sort of liability he might

17   have?

18       A.   He did to a lesser extent than I did.  I

19   definitely did.

20       Q.   Okay.  So you viewed him as a potential

21   suspect, but he initially maybe didn't?

22       A.   I think I could have let him keep talking

23   but that would have hurt the relationship later.

24       Q.   I want to talk, though, specifically about

25   the first statement that you told us about, which was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Urquizo claimed during one of your interviews

2    that Mr. Baca had told him that he wanted Javier

3    Molina hit?

4         A.   Yes.

5         Q.   It was in the first interview, second

6    interview, or third?

7         A.   I think we didn't get into details until

8    the second, at least the second interview.

9         Q.   So I guess I should be more specific.  Did

10   he tell you that Baca wanted Javier Molina hit in the

11   first interview?  Did he mention that at all?

12        A.   I'd have to refer to my 302.

13        Q.   Do you have it?

14        A.   No.

15        Q.   But your recollection is that he did tell

16   you something to that effect in the second interview.

17        A.   What my recollection was I spoke to

18   Urquizo, and he told me that.  Whether it was in the

19   first, second, or interview -- I don't think it would

20   be in the third; it would be the first or second.

21        Q.   Okay.  You're the case agent for this case,

22   right?

23        A.   I am.

24        Q.   You're an FBI agent?

25        A.   I am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   For how many years?
 2        A.   A little over nine.
 3        Q.   I would assume that you've been in
 4   situations where people make false statements to you?
 5        A.   Yes.
 6        Q.   Or people lie to you?
 7        A.   Yes.
 8        Q.   Or people tell you what they want to hear,
 9   because they want to ingratiate themselves to you in
10   some way?
11             MR. CASTELLANO:  Objection, relevance.
12             THE COURT:  Overruled.
13        A.   I'm sure they do.
14        Q.   Because people want to avoid going to jail,
15   right?
16        A.   Generally, yes.
17        Q.   And so part of your job as the investigator
18   is to make inquiries about what people tell you, to
19   try to verify those things, right?
20        A.   Yes.
21        Q.   Because if you're going to take action
22   based on something, you'd want it to be reliable?
23        A.   True.
24        Q.   You'd want it to be credible?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Did you record any of your meetings with
 2   Mr. Urquizo?
 3        A.   Certainly not after he had an attorney, and
 4   I don't think I recorded the first one.
 5        Q.   But that's something you could check on?
 6        A.   Yes.
 7        Q.   So it's possible that you recorded it?
 8        A.   Possible.  I record a lot of my interviews.
 9        Q.   When you spoke with Mr. Urquizo about his
10   claim that Baca wanted Javier Molina hit, did you ask
11   him:  Was this is a face-to-face conversation with
12   Mr. Baca?
13        A.   Yes, because I asked him where:  "Like,
14   where were you?"
15        Q.   And what did he say?
16        A.   I believe he said they were at the North,
17   Level 6.
18        Q.   That he was at PNM Level 6, and that Mr.
19   Baca was at PNM Level 6?
20        A.   Yes.
21        Q.   And that they were both -- PNM Level 6 is
22   divided into various units, isn't it?
23        A.   It is.
24        Q.   So it wouldn't be -- like, a person from
25   one unit couldn't talk to a person from the other
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  unit, could they?

2      A.   We've arranged that to happen, and I think

3  it naturally can happen, but it's not a daily

4  occurrence.

5      Q.   Did you ask Mr. Urquizo where he was when

6  Mr. Baca supposedly made this statement?

7      A.   Not beyond they were incarcerated together

8  at the Level 6 -- or it may have been the Level 5.  I

9  don't recall.

10      Q.   Well, you said Level 6 before, now you

11  can't recall if it's Level 5 or Level 6?

12      A.   Yeah.  I'd want to look at my 302 to tell

13  you specifically but I'll say that it was at PNM.

14      Q.   Okay.  So now you're just saying it was at

15  a prison, the Penitentiary of New Mexico, at any one

16  of their facilities?

17      A.   No, I'm saying it was either at the Level 5

18  or the Level 6.  And if I had my 302, I might be able

19  to be more specific.

20      Q.   But you don't have it?

21      A.   I don't.

22      Q.   Did you ask Mr. Urquizo how it was that he

23  came to speak with Mr. Baca?  Was it as he was

24  passing his cell?  Was it through the vents in the

25  cell?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No.

 2        Q.    You didn't ask him?

 3        A.    No.

 4        Q.    Did you ask him who was present -- if any

 5   other inmates were present at the same time?

 6        A.    No.

 7        Q.    And did you ask him what year this was?

 8        A.    I would have asked, you know, generally

 9   when did this take place.

10        Q.    What did he say?

11        A.    I don't remember.

12        Q.    Well, was it in 2014?

13        A.    I think it would have been.  I'm only

14   hesitating because the homicide was in March.  That's

15   early in the year.  And I know that movements and

16   transfers take a while.  So it could have been in

17   late 2013.

18        Q.    I'm not asking you to speculate.  I'm

19   asking what Mr. Urquizo told you.

20              When did Mr. Urquizo say that Baca told him

21   he wanted Javier Molina dead?

22        A.    If you are asking for a specific date, I

23   don't have it.

24        Q.    Okay.  You were the investigator on the

25   case, right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   I was.  Not in 2014, but I am now.

2        Q.   Did you ask Mr. Urquizo:  "When did you

3   have this conversation with Mr. Baca?"

4             MR. CASTELLANO:  Objection, asked and

5   answered.

6        A.   Yes.

7             MS. JACKS:  I don't think it's been

8   answered.

9             THE COURT:  Overruled.

10       A.   Yes, I asked.

11       Q.   What did he say?

12            THE COURT:  Direct comments to the Court,

13   not to opposing counsel.

14       A.   Yes, I tried to flesh that out.  What I

15   don't have in front of me is my 302 with those

16   details.

17       Q.   Maybe we'll come back to this tomorrow.

18   But I guess, do you have any -- did Mr. Urquizo give

19   you a date, a general date, when this conversation

20   supposedly happened?

21       A.   I kept pressing him for a timeline.  The

22   problem is, as I sit here right now, I don't know

23   what that timeline is.

24       Q.   Okay.  Did he ever give you a timeline?

25       A.   To the best of his abilities, he did.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  And you said you had to press him.
2  You had to repeatedly question him about that?
3      A.   Not that he was uncooperative.  The problem
4  is these guys don't have calendars or a way to know
5  what day it is.  So they go with what pod they were,
6  what color it was, and what room.  So I don't have
7  access to that information.  So I kept pushing him
8  for, Well, what was the weather like?  What color pod
9  was it?  And so that's typically how I got the
10  timelines from guys that have been incarcerated, like
11  Mr.  Urquizo, for so long.
12      Q.   Is it fair so say that if he gave you a
13  timeline it should be in your 302s?
14      A.   Yes.
15      Q.   And that you would be able to reference
16  that and give us the timeline, if it exists?
17      A.   Yes.
18      Q.   I may have lost the answer to this in that
19  last exchange.  You didn't ask him or you didn't get
20  information from him exactly how the conversation
21  occurred, whether it was between cells, through a
22  door, in the rec cage, on some sort of transport?
23      A.   No.  Those are the questions that I would
24  ask.  But again, as I sit here, I don't know how to
25  answer that without looking at my report.

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                 (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                               1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1        Q.   Okay.  And if he gave you an answer, it

2    should be reflected in your 302?

3        A.   It should be.

4        Q.   Now, assuming that Mr. Urquizo gave you

5    some sort of timeline about when this alleged

6    conversation took place, what efforts did you make to

7    verify that Urquizo was in a place where he could

8    have actually had the conversations?

9        A.   So all of these interviews are -- it's

10   myself and one or more STIU officers.  So I'll

11   typically conduct the interview, and then I'll look

12   to one of the STIU guys.  They'll also be taking

13   notes, or in some cases they're in a location where

14   they can check on a computer and give me like a yeah

15   or a no, and can I press on with that interview.

16   That's typically how we do these debriefs.  So I,

17   myself, don't have that access.  I have to rely on

18   the Department of Corrections.

19       Q.   So who was the STIU person that was present

20   during your interviews of Lupe Urquizo?

21            MR. CASTELLANO:  Objection, Your Honor.

22   We're straying away from the statements again.

23            THE COURT:  Tie this to the James hearing.

24            MS. JACKS:  I think one of the issues is

25   whether the statement was actually made.  And so I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



 1    think what I'm trying to get to is what corroboration

 2    there is that the inmates even had access to speak

 3    with each other.

 4            THE COURT:  I'm going to sustain.  I still

 5    think the credibility issues are getting a little far

 6    afield.

 7       Q.  You're saying, as an FBI agent, when Mr.

 8    Urquizo told you, "I was with Baca during this time

 9    period," the way you would investigate that is look

10    over to somebody else who was conducting the

11    interview with you and wait for them to nod yes or

12    no?

13            MR. CASTELLANO:  Objection.

14            THE COURT:  Sustained.

15       Q.  Did you make any other effort besides

16    looking to a correctional officer to verify the

17    information Mr. Urquizo gave you about his location?

18            MR. CASTELLANO:  Objection.

19            THE COURT:  Sustained.

20       Q.  All right.  I want to move on.

21            I think the next thing you said was Mr.

22    Urquizo told you that David Calbert brought the

23    paperwork to him, Mr. Urquizo, at PNM Level 5?

24       A.  Yes.

25       Q.  And is that accurate?  Did I make that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    statement correctly?

2         A.   I think you did.

3         Q.   Okay.  Did you ask Mr. Urquizo when that

4    supposedly happened?

5         A.   Yes.

6         Q.   And what did he say?

7         A.   Again, that timeline that I referred to

8    earlier would be in my 302, if he described how that

9    happened.  As I sit here today, I don't remember all

10   the details of that.

11        Q.   Okay.  My question was when?  My next

12   question was going to be how.  But my question then

13   was when, so your answer is "I don't know"?

14        A.   My answer is I'd need to look at my 302

15   where I recorded all that.

16        Q.   And if he provided you an answer to when,

17   that would be in your 302?

18        A.   Yes.

19        Q.   And how did he -- did Mr. Urquizo say that

20   Calbert brought this paperwork?

21        A.   Calbert was transferred from the Level 6 to

22   the Level 5, so he brought it with him.

23        Q.   And how did he bring it with him, according

24   to Mr. Urquizo?

25        A.   I don't know.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

228

```
 1        Q.   You'll agree with me that police reports
 2    regarding other inmates is contraband within the
 3    Department of Corrections?
 4        A.   No, I don't agree with that.
 5        Q.   Oh, you don't?
 6        A.   No.
 7        Q.   So you think that police report -- I guess,
 8    let me go back.  For Mr. Calbert to bring some
 9    paperwork from PNM Level 6 to Level 5, would his
10    property have to be searched?
11        A.   No, not that intently.  I found my
12    affidavits in SNM pods in Level 6.
13        Q.   So you're talking from personal experience?
14        A.   Yes.
15        Q.   Okay.  Did Mr. Urquizo tell you whether Mr.
16    Calbert had to engage in any sort of special
17    surreptitious paperwork to get their paperwork over
18    from PNM Level 5?
19        A.   No.  And I don't believe I asked that
20    question.
21        Q.   Did Mr. Urquizo tell you how Mr. Calbert
22    supposedly gave them the paperwork?
23        A.   No, not beyond:  He just gave me the
24    paperwork.
25        Q.   So like they met in the hallway of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    prison and exchanged paperwork?

2         A.   Yeah.   They're in the same pod.   They can

3    stand around and dance if they want.

4         Q.   Is that how Mr. Urquizo said he got it?

5         A.   He said he got it from Calbert when he

6    arrived.

7         Q.   When Mr. Calbert arrived?

8         A.   Correct.

9         Q.   And how much before that or how long after

10   that was Mr. Urquizo transferred, if he told you?

11        A.   I think he said he had it -- Urquizo said

12   he had it for two weeks, is my recollection.

13        Q.   Did Mr. Urquizo tell you that he made any

14   sort of effort to hide it or obscure it in some

15   manner?

16        A.   Yes.   He put it amongst his legal

17   paperwork, which was nothing more than a folder, or a

18   manila envelope, with police reports stemming from

19   his conviction.

20        Q.   So Mr. Urquizo -- is this the first

21   interview, second interview, or third interview that

22   he told you these details?

23        A.   Mr. Urquizo gives us a synopsis.   He kept

24   saying, "I know what you're looking for.   I know what

25   you want."   He referenced a conversation that he'd

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

1   had with you at the prison.  And that's when he just

2   kind of started sweating and getting nervous.  And

3   that's when I made the -- not a singular decision, it

4   was with consultation with the U.S. Attorney's

5   Office, but that we should get him a target letter

6   and get him an attorney, and then do a thorough

7   debrief.  So he gave me just a snippet.

8        Q.   In the first interview.  But it sounds like

9   most of your information came from the second or

10  third interview?

11       A.   That's fair, yes.

12       Q.   And he told you that he made an effort to

13  hide this supposed paperwork by putting it in with

14  his legal materials?

15       A.   Yes.

16       Q.   And then I'm assuming -- well, I don't want

17  to assume -- did he tell you that he transported his

18  legal materials when he was moved?

19       A.   Well, he didn't transport it on his person.

20  He caused it to be transferred.  You know, because

21  he's locked down, he's shackled like the defendants

22  are today.  But it was in his box, if you will, of

23  property.

24       Q.   In his property?

25       A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So when Mr. Urquizo was moved from PNM to

2 Southern New Mexico Correctional Facility, he went in

3 a van, and he had some property that was towed behind

4 him?

5      A.   Something like that, yes.

6      Q.   And he told you that he brought it in his

7 legal work?

8      A.   Yes.

9      Q.   Now, are you aware that when inmates are

10 transferred from one prison to another, their

11 property is inventoried?

12      A.   It is.

13      Q.   Well, are there New Mexico Department of

14 Corrections regulations requiring that an inmate's

15 property be inventoried at the institution that's

16 sending him and at the institution that's receiving

17 him?

18      A.   I'm not familiar with their policies that

19 closely.  But that sounds -- that seems reasonable,

20 and I'm sure something like that exists.

21      Q.   Okay.  And did you make any efforts to look

22 into those policies as they applied to Mr. Urquizo's

23 supposed transportation of legal materials to

24 Southern in the days before the Molina homicide?

25      A.   No.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   So you don't know if there are property

2    inventories that exist that show that Mr. Urquizo

3    transmitted legal paperwork with him; that Mr.

4    Urquizo transferred legal paperwork along with

5    himself, when he came down to Southern?

6          A.   There could be, but I'm doubtful.

7          Q.   Why are you doubtful?

8          A.   Well, I mean, the same correctional

9    officers -- no offense to them, there are some even

10   in this courtroom -- those are also the same ones

11   we're arresting for bringing in contraband.  So if

12   I'm going to sit here and say, Yeah, everybody does

13   their job perfectly, and there is a perfect

14   inventory, most of the COs, in my experience, are

15   scared to look at anything that says "legal mail."

16   That's how they get most of their dope in.

17         Q.   Well, did you make any effort to find out

18   what the property inventories for Mr. Urquizo showed?

19              MR. CASTELLANO:  Objection, Your Honor.

20              THE COURT:  Tie it -- tell me where -- how

21   this goes to the James stuff.  It looks like it's

22   more credibility issues.  Do you still want to pursue

23   it?

24              MS. JACKS:  I do.  I think I already know

25   the Court's ruling.  I think one of the issues is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   whether the statements were actually made.

2          THE COURT:  All right.  Sustained.

3     Q.   Now, when Mr. Lowry was talking to you

4   about this issue, I think you brought up -- I didn't

5   really understand this, but I think you brought up

6   that there was some difference or there was some

7   inconsistency between what Urquizo said and what Mr.

8   Calbert said involving Mauricio Varela.

9     A.   Yes.

10    Q.   Regarding this alleged transfer of

11  paperwork?

12    A.   Yes.

13    Q.   What was that?

14    A.   Well, Urquizo spoke -- or implicated Varela

15  more significantly.  I think part of that was because

16  he was on a transport with him, and he ended up in

17  Southern with him, where Calbert didn't travel with

18  him.  So he had more time with him.  And they had

19  different opinions on how involved Varela was and how

20  influential he would be in pushing for Molina to get

21  hit.

22    Q.   Did Urquizo ever tell you that Varela

23  carried the paperwork?

24    A.   No.

25    Q.   Okay.  And did Calbert ever tell you that

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                 e-mail: info@litsupport.com

1    Varela -- that he gave the paperwork to Varela?

2         A.   No, they matched to a tee there, that it

3    went to Urquizo.

4         Q.   I want to move forward to after Mr. Urquizo

5    is transferred to Southern New Mexico Correctional

6    Facility.  And I think you testified earlier that

7    when an inmate is first transferred they're placed

8    in, quote, "orientation"?

9         A.   That's my understanding.

10        Q.   And orientation, basically, means that

11   you're locked in your cell?

12        A.   I think so.  But I'm not an expert on that.

13   I've never witnessed that take place.  Like, I have

14   no firsthand knowledge of that.  But that's my

15   understanding.

16        Q.   Okay.  Well, you used the word

17   "orientation," so is that what you meant, that he was

18   somehow locked in his cell and isolated from having

19   interactions with other inmates?

20        A.   Orientation -- I got that term from

21   Department of Corrections personnel, that a person

22   would be in orientation for two days when they first

23   arrive.

24        Q.   Did you ask the Department of Corrections

25   personnel that told you that what that meant?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                      1-800-669-9492

 

PROFESSIONAL COURT
REPORTING SERVICE                                        e-mail: info@litsupport.com

1      A.   Yes.

2      Q.   And what did he or she say?

3      A.   When inmates are transferred -- and I don't

4  know -- I'm hesitating, because I don't know if it

5  only applies to STGs or prison gangs, or all inmates,

6  but that, in this case, SNM members, when they were

7  moved from facilities, there was a two-day

8  orientation.  Their property arrived sometime later.

9  And I'm not sure.  It sounded like there was some

10  kind of checklist that a person going through

11  orientation had to go through.  Maybe medical and

12  other stuff.  And again, it's not my area of

13  expertise.

14      Q.   Well, you referenced that Mr. Urquizo told

15  you that during this period of orientation he was

16  able to pass notes on a window with Mario Rodriguez

17  and Timothy Martinez?

18      A.   I want to clarify.  He said that he held

19  notes up, as opposed to passing.  He held it up to a

20  window.

21      Q.   And was it a window from his cell into the

22  pod, or some other window?

23      A.   No, I believe it's his -- it's a window

24  affixed to his door that's viewable from people

25  passing the pod, like on the first level outside the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    pod.

2         Q.    The common areas of the unit?

3         A.    The part of the common area of the unit.

4    But in this case you have guys that live in another

5    pod that are passing in the hallway, where there is a

6    door and a window as well.

7         Q.    Okay.  Well, did you ask Mr. Urquizo what

8    window he supposedly held some note up to?

9         A.    Yes, and he told me, you know, blue pod 1A

10   12, which means nothing to me.  But he made those --

11   he, as best he could, identified what rooms, like all

12   these guys do when they recount where they've been.

13        Q.    And did you put that information in your

14   notes?

15        A.    I believe I did.

16        Q.    And is that reflected in your 302?

17        A.    I think so.

18        Q.    Was it your -- I mean, you're sitting here

19   talking to him, interviewing, you need to have an

20   understanding of what he's saying, right?

21        A.    Well, I can understand what he's saying

22   without having the exact layout of the facility.

23   That wasn't an area I was familiar with.

24        Q.    Was it your understanding when you spoke

25   with him that these notes he was talking about, he

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    held up to a window that was on the door of his cell?
 2         A.   Yes.
 3         Q.   And do you know whether from the door of
 4    his cell he can see into another pod?
 5         A.   I don't think he can.  And I'm going off my
 6    walking around the facilities.
 7         Q.   And from the door of his cell -- is the
 8    door of his cell -- the window in the door of his
 9    cell visible to another pod?
10         A.   I don't think so.  I think you have to be
11    walking by in that hallway, that common hallway.  I
12    don't know that you can see into another pod.
13         Q.   So my question is:  You do know that the
14    people he allegedly told you he showed a note to,
15    Mario Rodriguez and Timothy Martinez, were in a
16    different pod?
17         A.   Yes.
18         Q.   So did you ask Mr. Urquizo:  How is it that
19    two guys from a different pod could see a note that
20    you held up on the door of your cell?
21         A.   Yes.
22         Q.   What did he say?
23         A.   That those two, being "Blue" and "Red,"
24    Rodriguez and Martinez, were on some kind of -- he
25    described it as, I think, a work detail or something;
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  something had them out in the hallway working or

 2  cleaning or painting.

 3       Q.   So Mr. Urquizo told you that Mario

 4  Rodriguez and Timothy Martinez were able to see these

 5  notes he wrote because they were in a position where

 6  they could see his cell door window?

 7       A.   Yes, that's what he said.

 8       Q.   And you said you walked through that

 9  facility, Southern New Mexico Correctional Facility?

10       A.   Once.

11       Q.   Do you have a way to verify that that's

12  possible?

13            MR. CASTELLANO:  Objection, Your Honor.  I

14  believe that goes to credibility and not the actual

15  statements.

16            THE COURT:  I'll allow this statement, this

17  question.  Overruled.

18       A.   You're asking if I believe that's possible?

19       Q.   I just asked if you did anything to confirm

20  whether or not that's possible?

21       A.   Not beyond talking to the corrections

22  officers, no.

23       Q.   Well, did you talk to a corrections officer

24  that told you that was possible?

25       A.   Yes, several.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   And did they explain how that would be?

2        A.   Yes.

3        Q.   How?

4        A.   That those guys would be allowed to travel

5  between pods, or in that -- around that unit.  And

6  that you could hold up a note or make hand signals or

7  any other kind of gesture through a window.

8        Q.   So what they told you is that if Mario

9  Rodriguez and Timothy Martinez had access to Lupe

10  Urquizo's pod, then they could walk by his cell door

11  and see what was hanging up in his window?

12        A.   Well, I think -- no, what I'm saying, is if

13  they had access to that hallway.  I don't believe

14  that they ever entered his pod.

15        Q.   Well, what hallway are you talking about?

16        A.   I'm talking about -- maybe I shouldn't call

17  it a hallway -- but the area outside the pod.

18        Q.   The area outside Mr. Urquizo's pod?

19        A.   Yes.

20        Q.   You mean outdoors?

21        A.   No.  His pod door doesn't open up to

22  outdoors.  There are hallways.

23        Q.   Well, his pod door opened up to a common

24  area, right?

25        A.   Yes.  Ms. Jacks, I think we're just not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    agreeing on what we should call it.  But I'll call it
 2    the area outside the pod door.
 3         Q.   Okay.  So the information you got, or your
 4    verification consisted of talking to correctional
 5    officers, who told you that if Mario Rodriguez or
 6    Timothy Martinez were outside Mr. Martinez' pod door,
 7    they could see a note held up?
 8         A.   Yes.
 9         Q.   And did you make -- this is a Level 4, New
10    Mexico State penal facility, right?
11         A.   Yes.
12         Q.   So inmates' movements are fairly highly
13    regulated, right?
14         A.   Less so than in other facilities.
15         Q.   Less so than Level 5 and Level 6?
16         A.   Correct.
17         Q.   But more so than Level 1, 2, and 3?
18         A.   Fair to say.
19         Q.   And did you make any effort -- do you know
20    whether inmates from one pod can travel into a
21    different pod?
22              MR. CASTELLANO:  Objection, relevance.
23              THE COURT:  Sustained.  I think we're
24    getting a little far afield.  I've given you a little
25    bit of leeway.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           MS. JACKS:  I appreciate that.
 2           THE COURT:  But I think we better bring it
 3    back in.
 4      Q.   Did you speak with any correctional
 5    officers to find out whether on March 6 or 7, 2014,
 6    Mario Rodriguez and Timothy Martinez had left blue
 7    pod?
 8      A.   No.
 9      Q.   Now, with respect to this note on the
10    window, did Mr. Urquizo tell you what day he got to
11    Southern New Mexico Correctional Facility?
12      A.   I think he got there on the 4th or 5th, is
13    what he said.
14      Q.   Did you verify that with any independent
15    information?
16      A.   Yes.
17      Q.   And what was that?
18      A.   Department of Corrections' records.
19      Q.   Okay.  What did the Department of
20    Corrections' records show?
21      A.   Inmates' travel.
22      Q.   On what day did Mr. Urquizo arrive at
23    Southern New Mexico Correctional Facility according
24    to the Department of Corrections records?
25      A.   I'd have to look at them.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   What day was Javier Molina -- what day was
2    the Molina homicide?
3        A.   The 7th.
4        Q.   March 7?
5        A.   Yes.
6        Q.   Okay.  Did you ask Mr. Urquizo what day it
7    was that he first started putting these notes up on
8    the door -- on the window of his cell door?
9        A.   My recollection was that these guys were on
10   him as soon as he got there.  They were eager to find
11   out if the paperwork came down, because there was
12   supposed to be three people hit.  And --
13       Q.   May I stop you right there?
14       A.   Sure.
15       Q.   My question was:  Did you ask Mr. Urquizo
16   when it happened?
17       A.   Yes.
18       Q.   And what was his answer?
19       A.   That's what I'm thinking about.
20       Q.   It sounds like what his answer was is right
21   away he started holding up his notes.
22       A.   What does that mean?  I mean, I have to ask
23   follow-up questions.  And that's what I'm thinking
24   about.
25       Q.   Okay.  So from the time that he got there,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Mr. Urquizo told you he started holding up these
 2    notes?
 3         A.    No.
 4         Q.    Okay.
 5         A.    He got there; he was put in orientation.
 6    And that as soon as he was around these guys, being
 7    other S members, they were all over him to find out
 8    if he had paperwork.  So he had to answer by writing
 9    a note, because he wasn't free -- either in
10    orientation or locked up in his cell -- to freely
11    speak with them or communicate, other than through
12    note and hand signals and talking through the door.
13         Q.    So do you know, was that on March 4, March
14    5, March 6, or March 7?
15         A.    I would want to look at my notes and my
16    report to be more specific.
17         Q.    If there is a date, it would be in your
18    302?
19         A.    Yes.
20         Q.    Or I'm sorry, if Mr. Urquizo gave you a
21    date?
22         A.    He gave me one.  We also pulled records
23    from Corrections to verify what we're told.  We've
24    done that, and turned those over as well.
25         Q.    Now, Mr. Urquizo, I think you testified
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   earlier, told you that he had held additional notes
 2   up to the window the next day?
 3        A.   Do you mind if I look at my notes?
 4        Q.   Not at all.
 5        A.   Okay.  So I make two references to a
 6   letter, or notes.  One is when "Blue" and "Red"
 7   inquire about the paperwork.  And that's done via
 8   them holding up the note and him holding up a
 9   response.
10             Later, I made reference to Rodriguez
11   sending a letter to Urquizo, sort of apologizing and
12   explaining why they had to move so quickly.
13             Those are the two letters or notes I
14   referred to.
15        Q.   Okay.  And it may be something got lost in
16   my listening to your testimony.  So let me go back.
17   So, according to what you've just said -- again,
18   you've had a chance to refresh your memory --
19   according to what Lupe Urquizo told you, he said that
20   Mario Rodriguez and Timothy Martinez were the first
21   ones to hold up a note to the window of his cell?
22        A.   Yes.
23        Q.   And they wanted to know if there was
24   paperwork?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And then he held up a note back; is that
 2   right?
 3        A.   Confirming that there was.
 4        Q.   Okay.
 5        A.   And he brought it.
 6        Q.   So that's the first -- and this is the
 7   window of Mr. Urquizo's cell door?
 8        A.   Yes.
 9        Q.   And then there was another exchange at the
10   window of Mr. Urquizo's cell door?
11        A.   Between other people and Mr. Urquizo, yes.
12        Q.   Involving Mario Rodriguez?
13        A.   No.
14        Q.   Oh.
15        A.   Carlos Herrera, Dale Chavez, Juan Mendez.
16        Q.   And Alex Nunez?
17        A.   Yes.
18        Q.   Okay.  You did testify about that earlier.
19   So this is the second time notes are being held up to
20   the cell door?
21        A.   I don't think I said it was notes.  They
22   were conversing through the door.
23        Q.   Okay.
24        A.   Because they're in the same pod.
25        Q.   All right.  So I was talking about the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    notes.  So let's go -- I'm going to get back to that
 2    conversation.  But I was talking about the notes.
 3    And I thought what you answered was you also talked
 4    about a letter that Mario Rodriguez wrote to Mr.
 5    Urquizo, where he was apologizing to him for
 6    something?
 7         A.   That's a subsequent letter, yes.
 8         Q.   And is that -- according to Mr. Urquizo's
 9    story, is that also a note that was supposedly held
10    up to the window of his cell door?
11         A.   No, that was a letter that he sent up.
12         Q.   Okay.  A letter that Mario Rodriguez sent
13    to Mr. Urquizo?
14         A.   Yes.
15         Q.   And how is that -- did Mr. Urquizo tell you
16    how that letter was sent?  Obviously not through the
17    mail.
18         A.   Just the SNM prison mail, yeah.
19         Q.   Did he tell you?
20         A.   Yes.  He sent it over from the other pod.
21    We didn't break down the specific movements of it.
22         Q.   Okay.  So you're saying he got some sort of
23    prison communication.  Was this also supposedly held
24    up in his window?
25         A.   No.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   Okay.  It was something that was slid under

2  his door, the door?

3    A.   That's what I surmise, yes.

4    Q.   Did you ask him how he got the letter?

5    A.   Not beyond "Blue" sent me a letter, and

6  this is what it said.

7    Q.   Okay.  He didn't have a copy of the letter,

8  did he?

9    A.   No.

10    Q.   And you didn't ask him exactly how he got

11  it; you're just guessing when you say it was somehow

12  slid under his door?

13    A.   I think I'm more than guessing.  But no, I

14  didn't ask that question.

15    Q.   Okay.  And with respect to this supposed

16  letter that he got, when did he say he got that?  Was

17  it the same day that the note had been held up, the

18  first note had been held up to his cell door, or a

19  different day?

20    A.   Different day.

21    Q.   Was it the next day?  Two days later?

22    A.   I think it was the next day.

23    Q.   And did he tell you what time of day or

24  whether he was still on, quote, "orientation"?

25    A.   I believe he still was on orientation.  And

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    if he mentioned what time it was, it's going to -- if

2    he told me, it's in my 302.

3         Q.   And correct me if I'm wrong, but the gist

4    of this letter that Mr. Urquizo told you about was it

5    was some sort of an apology because there was a

6    person he wanted hit that wasn't on the list, that

7    wasn't going to be hit?

8         A.   No.  He was due to be hit.  The paperwork

9    didn't come, so there wouldn't be one.

10        Q.   So he was going to have to wait?

11        A.   Yes.

12        Q.   Now, I want to go back to the conversation

13   with the four individuals:  Carlos Herrera, Dale

14   Chavez, Juan Mendez, and Alex Munoz?

15        A.   Yes.

16        Q.   Okay.  Mr. Urquizo told you that he had a

17   conversation with the four of these individuals while

18   he was still on orientation?

19        A.   Well, I want to clarify something.  We keep

20   saying it's while on orientation.  What I can tell

21   you as I sit here is it was in the pod and Urquizo

22   was locked down in his room.  Whether we're going to

23   call that orientation or not, I'm not sure if I'm

24   technically correct, but that's where it happened and

25   that was the setting.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   So Urquizo was locked in his cell, and
 2     these guys were talking to him from the area outside
 3     of cell?
 4          A.   Yes.
 5          Q.   All at the same time, according to Mr.
 6     Urquizo?
 7          A.   Yes.
 8          Q.   And when did he say this conversation
 9     happened?  The same day that the first note was held
10     up -- that he says the first note was held up to his
11     window, or a different day?
12          A.   Both days.  The guys -- those guys and
13     others in the pod hovered around his door talking to
14     him.  But he didn't have his property yet.  So I
15     moved forward in my question of Urquizo to, "Well,
16     when you got your property, tell me what happened
17     then."
18          Q.   Okay.  So did he get his property?
19          A.   He did.
20          Q.   When did he say he got it?
21          A.   It was definitely not the first day.  I
22     think it was the second day.  And that I covered in
23     the 302 quite a bit.
24          Q.   Okay.  And do you know approximately when
25     the second day?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.   I don't.

2          Q.   Did he tell you?

3          A.   I think so, but I just don't remember.

4          Q.   And when he got his property, did Mr.

5     Urquizo tell you what he did with it?

6          A.   Yes.  He slid it under the door.  And those

7     four people that you just mentioned read it and

8     commented on it.

9          Q.   And the comment was, "Damn, this is it?

10    Two sentences," something like that?

11         A.   Something like that.

12         Q.   So sort of an incredulous sort of comment?

13         A.   Yes.

14         Q.   And the paperwork that he claims that he

15    slid under his door was this paperwork he'd

16    supposedly smuggled drown with his legal materials?

17         A.   Yes.

18         Q.   Now, did you make any inquiries of anybody

19    at the New Mexico Department of Corrections about who

20    inventoried Mr. Urquizo's property at Southern New

21    Mexico Correctional Facility?

22         A.   I have not.

23         Q.   Did you find out who it was, if anybody,

24    that gave him his property back?

25         A.   I don't know the name of the person that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    did.

2          Q.   Or when?  Do you know when, in relation to

3    the Molina homicide?

4               MR. CASTELLANO:  Objection, Your Honor.

5               THE COURT:  Sustained.

6          Q.   Do you have any independent verification

7    that shows that Mr. Urquizo's property was returned

8    to him prior to Mr. Molina being killed?

9               MR. CASTELLANO:  Same objection.

10              THE COURT:  Sustained.

11         Q.   All right.  I'm going to move on to Mr.

12   Urquizo's claim about Mr. Sanchez.  And if my notes

13   are correct, you say that during one of your

14   interviews, Mr. Urquizo told you that after Molina

15   was killed, or during the time period that Molina was

16   killed, that he heard Daniel Sanchez yell, "Fuck,

17   yeah"?

18         A.   Correct.

19         Q.   Did he tell you that in all three of the

20   interviews, or --

21         A.   No.  I mean, I try not to cover the same

22   stuff we already talked about.  It came up in one of

23   the interviews.  And I, frankly, found that kind of

24   hard to believe.  So I asked him about it:  "How do

25   you know it was Sanchez?"

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Well, Mr. Urquizo and Mr. Sanchez were in
2  separate pods; correct?
3      A.   Yes.
4      Q.   They were separated by concrete walls?
5      A.   They were.
6      Q.   And was there any way that from his cell,
7  Mr. Urquizo could see into the adjacent pod?
8      A.   No, not really.  I mean, Urquizo and others
9  have described the response, but -- you know, of
10  officers and medical staff, but not -- no one has
11  been able to say they could see into the pod.
12      Q.   Do you know the distance between Mr.
13  Urquizo's cell and the blue pod where Mr. Molina was
14  killed?
15      A.   I don't.
16      Q.   Do you know the last time Mr. Urquizo and
17  Mr. Sanchez ever spoke with each other?
18      A.   Not off the top of my head, no.
19      Q.   Do you know if they ever spoke to each
20  other?
21      A.   Yes, I think they have.
22      Q.   Did Mr. Urquizo tell you when, before
23  claiming to hear Mr. Sanchez yell, "Fuck, yeah," the
24  last time he'd spoken to Mr. Sanchez?
25      A.   I don't know if I asked him that.  I don't

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    know the answer to that.

2         Q.   Now, during the homicide of Mr. Molina,

3    from when the attack on Mr. Molina first started, was

4    there an inmate that was on the phone in blue pod, to

5    your recollection?

6         A.   At the specific time of the homicide, I

7    don't believe so.  I know that I've spoken with two

8    defendants who told me they used the phone, and they

9    loitered about the phone.  But I don't know that

10   someone was on it at the time of the homicide.

11        Q.   Do you know if there is a recording from a

12   telephone call that encompasses the Molina homicide?

13   That was disclosed as part of discovery in this case.

14        A.   If you said it did, I believe you.

15        Q.   You don't have any independent

16   recollection?

17        A.   No.

18        Q.   Have you made any effort to listen to that

19   recording to see if you can hear somebody yell,

20   "Fuck, yeah," on the recording?

21        A.   I just said I'm not aware of a recording.

22        Q.   I'm going to move on to your statements

23   that you testified about regarding Jerry Montoya.

24   And I think where I want to start is, according to

25   your testimony, it sounds like Mr. Montoya initially

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                           (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                      1-800-669-9492



1    claims he was approached by a Michael (sic) Rodriguez

2    to participate in the stabbing of Mr. Molina?

3        A.   Mario.

4        Q.   Yeah, I'm sorry.  Did I say --

5        A.   You said "Michael."

6        Q.   I'm sorry, Mario Rodriguez.  Is that right?

7        A.   Yes.

8        Q.   And according to Mr. Montoya's statement,

9    he said it was around 5:00 p.m., the day of the

10   actual homicide?

11       A.   Yes.

12       Q.   According to what Mr. Montoya told you, he

13   told you that Mario Rodriguez told him not to worry

14   because he, meaning Mr. Sanchez, verified it.  Is

15   that what Mr. Montoya told you?

16       A.   That, yes, Montoya said that both Mario

17   Rodriguez and Sanchez had reviewed it and verified

18   it.

19       Q.   Okay.  But Montoya said that the person who

20   gave him the information that Mr. Sanchez had

21   verified it was actually Mario Rodriguez?

22       A.   Yes.

23       Q.   Mr. Montoya didn't say he heard that

24   directly from Mr. Sanchez?

25       A.   Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And again, Mario Montoya (sic) said that he

2  was told something about Mr. Sanchez not wanting the

3  camera covered?

4    A.   Right.

5    Q.   But that wasn't from Mr. Sanchez either;

6  that was, according to Mr. Montoya, that was from

7  Mario Rodriguez?

8    A.   Yes.

9    Q.   When was it that Mr. Montoya first made

10  these statements to you?

11    A.   Well, Mr. Montoya already had an attorney,

12  so it took us a little bit longer to arrange a

13  debrief.  So the specific answer is that would be,

14  again, the first sentence of my 302, I'll note where,

15  what date, when it took place.

16    Q.   It was after the original indictment in

17  December 2015, right?

18    A.   It was definitely after, yes.

19    Q.   And it was after the second indictment in

20  2016, wasn't it?

21    A.   I don't remember.

22    Q.   Well, in fact, it was sometime, what,

23  almost a year ago, right?

24    A.   If you have the date, ma'am, I trust you.

25  I'm not sure.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                         1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   Prior to telling you this at that -- prior
 2   to telling you that it was Mario Rodriguez who told
 3   him what he wanted him to do and said, "Don't worry,
 4   Sanchez verified it," and that Sanchez didn't want
 5   the camera covered, prior to telling you that, had
 6   Mr. Montoya made inconsistent statements about his
 7   participation in the stabbing of Mr. Molina?
 8        A.   To other law enforcement?
 9        Q.   Yes.
10        A.   I believe he did.
11        Q.   And, in fact, did he deny his
12   participation?
13        A.   I assume he would.
14        Q.   Is that a yes?
15        A.   It's been some time since I read it, but he
16   probably did.
17        Q.   I think based on the direct examination,
18   the only direct communication that you testified
19   about today between Mr. Sanchez and Mr. Montoya is
20   that Mr. Montoya claims that Mr. Sanchez said to him
21   something along the line of, "You know what's up?"
22        A.   "Okay, be trucha."
23        Q.   Meaning, "Okay, be careful"?
24        A.   Yes.
25        Q.   And that's the only conversation that Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Montoya claims to have had with Mr. Sanchez directly?

2        A.    That I recall, yes.

3        Q.    And when was that communication with Mr.

4    Sanchez according to Mr. Montoya?

5        A.    The day of the homicide.

6        Q.    And was it before or after Mr. Rodriguez

7    had told him that he was supposed to be participating

8    in the stabbing of Mr. Molina?

9        A.    After.

10       Q.    So if the conversation between Montoya and

11   Rodriguez happened at 5:00 p.m., this was sometime

12   after 5:00 p.m.?

13       A.    That makes sense.

14       Q.    Okay.  And did you ask Mr. Montoya where he

15   was and where Mr. Sanchez was when that communication

16   supposedly happened?

17       A.    In Montoya's cell.

18       Q.    Now, there is video recording of the

19   activities in blue pod on March 7, 2014, surrounding

20   the time of the Molina homicide, right?

21       A.    Yes.

22       Q.    Have you watched those recordings?

23       A.    I have.

24       Q.    And have you reviewed those recordings to

25   see if, in fact, Mr. Sanchez and Mr. Montoya entered

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                              e-mail: info@litsupport.com

```
 1    Mr. Montoya's cell, or were present in Mr. Montoya's

 2    cell sometime after 5:00 p.m.?

 3         A.   As I sit here, I couldn't tell you.

 4         Q.   Did you make any effort to look?

 5         A.   I've watched it several times, yes.

 6         Q.   And, specifically, did you make any effort

 7    to identify that moment in time where these two were

 8    supposedly alone in Mr. Montoya's cell?

 9         A.   I don't remember making note of that.

10         Q.   And obviously if it did happen, that would

11    have been something you would have made a note of,

12    right, because it would have been important, it would

13    have corroborated the claims of Mr. Montoya?

14         A.   I don't think I did.

15         Q.   You don't think did you what?

16         A.   I don't think I sought out that specific

17    section to corroborate that.

18         Q.   Did you make any effort to corroborate the

19    statement of Mr. Montoya with respect to --

20              MR. CASTELLANO:  Objection, relevance.

21              THE COURT:  Sustained.

22         Q.   All right.  So now I'm moving on to, I

23    think, a statement of Mr. Armenta that you testified

24    about.  And just to direct your attention, I think on

25    direct examination you testified that Mr. Armenta
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    said that he was --

 2         A.   Ma'am, I'll stop you.  I didn't talk about

 3    him.

 4         Q.   So maybe my notes are bad.  I have

 5    something here about Mr. Sanchez supposedly signaling

 6    to Mr. Montoya to go up, and Montoya went up the

 7    stairs and sat next to Armenta, who was hanging in

 8    front of his cell.  Do you recall that testimony?

 9         A.   I do.  Montoya's version of what happened,

10    yes.

11         Q.   Okay.  So that's something that Mr. Montoya

12    told you supposedly happened?

13         A.   Yes.

14         Q.   And when he told that you, did you ask him,

15    Well, where was -- where were you?  Where was Mr.

16    Sanchez?  What was the signal that he supposedly

17    gave?

18         A.   Yes.  I asked him to walk me through it.

19         Q.   And what did he say?

20         A.   I don't remember if it was a nod or a

21    point, I'd have to look at my 302.  But that's a

22    summation of what Mr. Montoya told me occurred.

23         Q.   And where did Mr. Montoya say Mr. Sanchez

24    was when the signal was supposedly made?

25         A.   I believe he said he was downstairs.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And where was Mr. Montoya when the signal
 2   was supposedly made?
 3        A.   Down as well.
 4        Q.   So both people were allegedly on the -- in
 5   the common area downstairs?
 6        A.   Yes.
 7        Q.   And again, did you review the video from
 8   blue pod the evening of the Molina stabbing to
 9   determine whether such a signal was actually made by
10   Mr. Sanchez?
11        A.   Yes.  And I don't recall seeing the signal.
12   I just recall seeing Montoya go upstairs.
13        Q.   All right.  I'm moving on to Timothy
14   Martinez.  One of the first things in my notes is
15   that -- I have you saying that Timothy Martinez told
16   you that Mario Rodriguez told him the morning of the
17   Molina homicide to go get high?
18        A.   Yes.
19        Q.   Is that accurate?
20        A.   It is.
21        Q.   Okay.  And the morning being sometime
22   before noon?
23        A.   I'd assume so.
24        Q.   And is -- according to the story of Timothy
25   Martinez, was it also in the morning that he then
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   engaged Mr. Rodriguez in this conversation about:

2   Why would I go get high, and was getting sort of an

3   attitude about why Rodriguez was telling him what to

4   do?

5       A.   Yes.

6       Q.   So, again, before noon, right?  That's what

7   morning means?

8       A.   It does to you and I, yes.  I think it was

9   probably before noon.

10      Q.   You can confirm that Mr. Martinez actually

11  said the word morning --

12      A.   Yes.

13      Q.   -- the morning of?

14      A.   Yes.

15      Q.   And again, when was this interview with Mr.

16  Martinez?  Or maybe we should say -- I don't know how

17  many you've had.  More than one?

18      A.   I definitely had more than one.  This --

19  the first interview looks like December 29.

20      Q.   Of what year?

21      A.   2016.

22      Q.   So after the indictment?

23      A.   Yes.

24      Q.   The first indictment.  Actually, over a

25  year after the first indictment, right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.

2       Q.   And prior to December 29 of 2016, Mr.

3   Martinez had made statements that were -- that denied

4   any sort of participation in the Molina homicide,

5   right?

6       A.   Yes.

7       Q.   Okay.  And was it during the same interview

8   with Mr. Martinez that Mr. Martinez told you that

9   Michael (sic) Rodriguez said that it was Daniel

10  Sanchez that wanted Timothy Martinez to participate

11  in the assault on Molina?

12      A.   Mario.  Yes.

13      Q.   Okay.  So that wasn't something that Daniel

14  Sanchez told Mr. Martinez?

15      A.   No, they had their own subsequent

16  conversation.  But the one you just recounted was

17  between Mario Rodriguez and Timothy Martinez.

18      Q.   And this is the same conversation when

19  Mario Rodriguez told Timothy Martinez that he's

20  supposed to go in and beat up Molina so that he can't

21  leave?

22      A.   Essentially, I think it was "knock him

23  out," yes.

24      Q.   And was this conversation part of the same

25  morning conversation about how the assault on Molina

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    was going to go down?
 2         A.   Yes.  I can clarify an earlier answer if
 3    you want me to regarding times.
 4         Q.   That's fine.
 5         A.   I see it on page 3 of my December 29
 6    debrief report.  Martinez returned to the pod, you
 7    and I were discussing it being in the morning.  He
 8    specifically says he returned to the pod at around
 9    3:40 or 3:45 p.m.
10         Q.   Okay.  So he's saying it was the afternoon?
11         A.   The day of the homicide, yes.
12         Q.   Was there a previous statement that he made
13    to you that it was in the morning of the Molina
14    homicide that Mario Rodriguez told him he needed to
15    go get high?
16         A.   I don't know how you and I got on that.  I
17    went along with that, but I'm not sure how we got on
18    morning.
19         Q.   Yeah, well, I think when you initially
20    testified about the statement, you said the morning,
21    but --
22         A.   I think I read from my notes.  And I can
23    check them.
24         Q.   Sure, if you have them up there.
25         A.   We're talking about Martinez, and I went
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    directly from the 302, so -- I'm sorry, I just don't

2    know where we got morning.

3         Q.    Okay.  Was that something in your notes?

4         A.    Well, no.  When I was being questioned by

5    Mr. Castellano, I went off some highlights in my 302.

6    So I think maybe where we got stuck on morning was

7    that at 7:30 in the morning he left the pod to attend

8    his shift at the wheelchair program.  I just wanted

9    to clarify.

10        Q.    I think that's important, so I appreciate

11   that.  So Martinez, basically according to what you

12   seem to recall from these interviews, was gone from

13   7:30 in the morning till about 3:30 in the afternoon.

14        A.    I'm recording what he tells me, yes.

15        Q.    So if you did say morning, that was a

16   mistake?

17        A.    If I did -- I thought I was following your

18   lead.

19        Q.    I was just looking at my notes what you

20   said before.  Whatever, I'm glad we got it cleared

21   up.

22              So according to your 302, the conversation

23   that supposedly Martinez had with Mario Rodriguez was

24   somewhere around 3:40, 3:45 in the afternoon.

25        A.    Yes.  That's when he returned to the pod,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                 1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                      e-mail: info@litsupport.com

```
 1   yes.
 2        Q.    And it was the same day of the Molina
 3   homicide?
 4        A.    Yes.
 5        Q.    Now, you testified about some conversations
 6   that Mr. Martinez claimed to have had with Mr.
 7   Sanchez?
 8        A.    Yes.
 9        Q.    And I want to start with the first one
10   where I think you said that Mr. Sanchez asked if
11   "Blue" had talked to him yet?
12        A.    I remember that, yes.
13        Q.    So did you ask Mr. Martinez when that
14   conversation occurred and where?
15        A.    Yes.
16        Q.    What did he say?
17        A.    It was after count, which was I think at
18   4:00 p.m.  So this is shortly after returning from
19   the wheelchair program.  I mean, I can read from my
20   report, but what I recall is he was making coffee,
21   and Mr. Sanchez came in and asked him some questions
22   relating to:  "Did "Blue" talk to you and explain
23   what's going on?"
24        Q.    So he -- Mr. Martinez was making coffee
25   where?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    In his cell.

2      Q.    So this is a conversation that Mr. Martinez

3  told you took place with -- between himself and Mr.

4  Sanchez and Mr. Martinez' cell?

5      A.    No, I think that they had the ability to do

6  that, except that now it's count, or it's about to be

7  count, so everyone has to go into their house, or

8  their cell.  And Martinez was making coffee, and Mr.

9  Sanchez was pounding on his wall to get his

10  attention.  They had adjoining cells.

11      Q.    So this was a conversation, according to

12  Martinez, that was between cells through the wall or

13  a vent or something?

14      A.    Yes.

15      Q.    And then I think you went on to say that

16  Mr. Martinez told you that Mr. Sanchez said something

17  about SNM needing to take things back, and that when

18  the S used violence, the S gets respect.  I'm

19  paraphrasing.

20      A.    That paraphrases it.

21      Q.    When was that it Mr. Martinez claimed that

22  Mr. Sanchez said that?

23      A.    This would be sometime around the 4:00

24  count.  And I don't know how long count takes, but

25  sometime after.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So this was part of the conversation that
 2   he claimed to have with Mr. Sanchez between the two
 3   of them while they're both in their cells?
 4        A.   Yes.
 5        Q.   While they're both in their separate cells?
 6        A.   Correct.
 7        Q.   And I think the final statement that you
 8   attribute -- that you said Timothy Martinez
 9   attributed to Mr. Sanchez was to the effect of --
10   that Mr. Martinez needs to participate in the assault
11   on Molina because he hadn't earned his bones, and
12   that he needed to do it or else?
13        A.   Correct.
14        Q.   When did Mr. Martinez claim that happened?
15        A.   That's that same conversation.
16        Q.   Mr. Martinez told you that Mario Rodriguez
17   lobbied to give Martinez a pass, but that Mr. Sanchez
18   insisted that he participate?
19        A.   That's the story, according to --
20        Q.   Mr. Martinez?
21        A.   Correct.
22        Q.   Did Mr. Martinez give you the details of
23   that situation?  I mean, did he actually see Mario
24   Rodriguez speaking with Mr. Sanchez about that?
25        A.   No.  I mean, he related that they were
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    tight, Mr. Sanchez and Mr. Rodriguez.  But he didn't

2    say he saw them having that conversation.

3         Q.   Okay.  Did he say anything other than

4    that's what Mario Rodriguez told him?

5         A.   No.  I mean, he gave me some background on

6    why Mr. Sanchez might feel that way.  But that's all

7    he said about that.

8         Q.   Did he say when that supposedly happened?

9         A.   When Mario and Mr. Sanchez talked?

10        Q.   When Mario Rodriguez was doing his lobbying

11   to give Martinez a, quote, "pass"?

12        A.   No.  I'd assume it was earlier that day or

13   in the days leading up to it.  But I don't have the

14   exact time.

15        Q.   And you didn't ask Mr. Martinez when that

16   allegedly happened, if it did?

17        A.   No, he just related what Rodriguez told

18   him.

19        Q.   And other than Rodriguez telling him, he

20   didn't have any other personal knowledge about that

21   conversation actually taking place between Rodriguez

22   and Daniel Sanchez?

23        A.   No.

24        Q.   Now, I'm unclear -- and I'll admit that my

25   notetaking suffered during the direct examination.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    But I have here something about on January 26, of

2    some unknown year, there was somebody -- and I'm not

3    sure if it's Mr. Rodriguez or somebody else talking

4    about statements by Mr. Rodriguez -- that Mr.

5    Rodriguez stood in the door, as Molina was getting up

6    and yelling, "He's getting up.  What the fuck?"

7        A.   Yes, so I probably referred to my January

8    26, 2017, 302 report.

9        Q.   And that's of who?  What interview?

10       A.   Timothy Martinez.

11       Q.   Okay.  So that was something that Timothy

12   Martinez told you?

13       A.   Yes.  This is -- more specifically, I had

14   some issues or follow-up questions with my earlier

15   interview.  So I'm drilling down, if you will, on

16   other additional details.

17       Q.   And so on that date it was Martinez that

18   was attributing some statements to Mario Rodriguez

19   about yelling, "He's getting up.  What the fuck?"

20       A.   Correct.

21       Q.   And at that point, Mr. Martinez claims that

22   Rodriguez is standing by the cell door of Javier

23   Molina?

24       A.   Yes.

25            THE COURT:  Ms. Jacks, would this be a good

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    point for us to take our break for the evening?
 2              MS. JACKS:  I think it is.  And I actually
 3    think I'm done.
 4              THE COURT:  Okay.  All right.
 5              MS. JACKS:  Then I have overnight to think
 6    about things.
 7              THE COURT:  I know.  I've had that
 8    experience many times in my life.
 9              All right.  I appreciate everybody's hard
10    work.  See you tomorrow morning.  And have a good
11    evening.  Be safe in your travels.
12              (The Court stood in recess.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN &
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1                C-E-R-T-I-F-I-C-A-T-E

2

3    UNITED STATES OF AMERICA

4    DISTRICT OF NEW MEXICO

5

6

7        I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8    Official Court Reporter for the State of New Mexico,

9    do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13       In testimony whereof, I have hereunto set my

14   hand on December 6, 2017.

15

16

17

18   _____
     Jennifer Bean, FAPR, RMR-RDR-CCR
19   Certified Realtime Reporter
     United States Court Reporter
20   NM CCR #94
     333 Lomas, Northwest
21   Albuquerque, New Mexico 87102
     Phone:  (505) 348-2283
22   Fax:    (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE


MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com