```
 1                    UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3    UNITED STATES OF AMERICA,        Case No. 1:14-cr-00070-SO
                                       Cleveland, Ohio
 4              Plaintiff,             Monday, February 23, 2015
                                       9:10 a.m.
 5         vs.

 6    NEAL ATWAY,
      SCOTT COCHRAN,
 7
                 Defendants.
 8

 9           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
         BEFORE THE HONORABLE SOLOMON OLIVER, JR.,
10            CHIEF UNITED STATES DISTRICT JUDGE

11
      APPEARANCES:
12
      For the Government:       Antoinette T. Bacon
13                              Mark S. Bennett
                                Assistant United States Attorneys
14                              801 West Superior Avenue
                                400 U.S. Court House
15                              Cleveland, Ohio   44113
                                216-622-3600
16
      For the Defendant        Roger M. Synenberg
17    Neal Atway:              Clare C. Moran
                                Synenberg, Coletta & Moran
18                              55 Public Square, Ste. 1331
                                Cleveland, OH 44113
19                              216-622-2727

20    (APPEARANCES CONTINUED PAGE 2.)

21    Official Court Reporter:  Heidi Blueskye Geizer, RMR-CRR
                                United States District Court
22                              801 West Superior Avenue
                                7-178 U.S. Court House
23                              Cleveland, Ohio   44113
                                216-357-7092
24
      Proceedings recorded by mechanical stenography, transcript
25    produced by computer-aided transcription.
```

**GOVERNMENT'S EXHIBIT C**

1    APPEARANCES: (CONTINUED)

2    For the Defendant          John B. Juhasz, Jr.
     Scott Cochran:             7081 West Blvd., Ste. 4
3                               Youngstown, OH 44512-5610
                                330-758-7700
4
                                Lynn A. Maro
5                               Maro & Schoenike
                                7081 West Blvd., Ste. 4
6                               Youngstown, OH 44512
                                330-758-7700
7
                            -   -   -   -   -
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 3 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   117 of 178.   PageID #: 4721

117

Williamson - Direct/Mr. Bennett

1      Call your next witness.  We'll go a few minutes.

2                    MR. BENNETT:  Thank you, Your Honor.  This

3   should be brief.  The government calls Hugh Williamson.

4                    THE COURT:  Before you take your seat, my

14:57:44  5   deputy will swear you in.

6                    (The witness is sworn.)

7                    THE COURT:  You may be seated.

8      DIRECT EXAMINATION OF HUGH S. WILLIAMSON

9   BY MR. BENNETT:

14:58:00  10   **Q.**    Good afternoon, agent Williamson.  Can you please

11   introduce yourself to the Ladies and Gentlemen of the Jury

12   and spell your complete name for the court reporter?

13   **A.**    My name is Hugh S. Williamson.  That's H-U-G-H, Hugh;

14   S, as in Stuart; Williamson, W-I-L-L-I-A-M-S-O-N.

14:58:20  15   **Q.**    And by whom are you currently employed?

16   **A.**    I'm currently employed with the FBI as a supervisory

17   special agent.

18   **Q.**    And where are you located?

19   **A.**    I'm located in Quantico at the Operational Technology

14:58:32  20   Division.

21   **Q.**    And what is your actual job title?

22   **A.**    I'm the program manager for the body recorder program

23   for the FBI.

24   **Q.**    And in that capacity what are your job duties?

14:58:43  25   **A.**    I'm responsible for the acquisition and deployment of

Williamson - Direct/Mr. Bennett

1    body recorders to all the FBI field offices, and I'm also

2    involved in training new agents in how to use body

3    recorders.

4    Q.    And let's just, since we mentioned it a couple times,

14:59:00 5    make sure everyone understands, what is a body recorder?

6    A.    A body recorder is a very small computer, basically a

7    solid state digital computer.  It is designed to record

8    audio or audio/video covertly, and is done so that it can be

9    used by an agent or a source to record meetings with

14:59:23 10    persons.

11    Q.    And is it referred to as a body recorder because it's

12    normally somehow affixed to or attached to a person's body

13    or does it need not to be actually attached?

14    A.    It doesn't have to be attached to a body.

14:59:36 15    Q.    Have you heard of the term F Bird before?

16    A.    Yes.  An F Bird is an older term referring to the type

17    of body recorder made by ADS, Adaptive Digital Systems,

18    which are the majority of our recorders.

19    Q.    So the recorders are not actually made by the FBI,

14:59:56 20    they're made by another company?

21    A.    Yes.  They're manufactured by a company in California

22    called Adaptive Digital Systems, and they're basically made

23    completely there and then sent to us, and we deploy them.

24    Q.    And is there a checks and balances between ADS and the

15:00:13 25    FBI with regard to the software and the accessibility and

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 5 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   119 of 178.   PageID #: 4723

119

Williamson - Direct/Mr. Bennett

1    certain codes that is kind of built into the security of the

2    recorders?

3    **A.**    In order for the recorder to -- to use the recorder

4    there's a software package that the manufacturer has

15:00:27  5    proprietary software, as well as the proprietary software on

6    the digital recorder.  They completely control that.  They

7    have all the coding, and we don't have the coding.  They

8    program them, they make them work a certain way, and then

9    they send us a software you use to download the recordings

15:00:46  10    and erase the recorder.  But that software itself is

11    entirely a software that's maintained and updated and backed

12    up by the company.  We just get updates from the company.

13    We don't do anything to change the software.

14    **Q.**    So in essence, the FBI doesn't have a way to alter any

15:01:06  15    of the recordings?

16    **A.**    No, sir, no way to change that software on our part.

17    We'd have to go back to the company.

18    **Q.**    Have you also heard of a recorder model the Eagle 4A?

19    **A.**    Yes.  The Eagle 4A is an audio only recorder.  It was

15:01:19  20    manufactured by Adaptive Digital Systems.

21    **Q.**    And in preparation for your testimony here today were

22    you able to ascertain the body recorder that was used here

23    by the Youngstown agents?

24    **A.**    I was given the serial numbers for the body recorders

15:01:35  25    and verified that they were body recorders that were

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 6 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed: 07/30/15   120 of 178.   PageID #: 4724
120

Williamson - Direct/Mr. Bennett

1    manufactured and deployed by us to the Cleveland FBI.

2    **Q.**    And can you explain how these recorders actually work,

3    in essence?

4    **A.**    Basically, again, they're a little computer, very

15:01:53  5    small, and they're designed by the company so that they will

6    record only either audio or audio and video recordings.  And

7    they're designed in such a way that you can turn it on, it

8    will record; you can turn it off, it will stop recording.

9    If you turn it on again it will start another session, it

15:02:10 10    won't record over the first session.  It will keep recording

11    until it runs out of memory or runs out of power.  And as

12    long as it's on, it will be recording if it's functioning

13    properly.

14         There's no way that you can take the recording off of

15:02:27 15    the recorder until you hook the recorder to a computer with

16    the software called the Bird software, which allows you to

17    transfer the recording that was made on the recorder to an

18    evidentiary disk.  While the recorder is recording it

19    creates an authentication hashing.  It's a numerical coding

15:02:49 20    on the computer on the recorder.  It verifies that it is an

21    authentic recording.  And when that is transferred to an

22    evidentiary disk that authentication is kept with it, and it

23    will only play on the Bird software if that code matches, it

24    authenticates.

15:03:10 25         The recording is a bunch of numbers, so if the

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 7 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   121 of 178.   PageID #: 4725
121

Williamson - Direct/Mr. Bennett

1    recording is a bunch of numbers, say the number 100, and the

2    authentication is 2, 2 times a hundred equals 200.  If you

3    were to do anything to the recording you'd change the

4    number, it would be like 2 times 101.  It wouldn't equal

15:03:29  5    200, it would be 202, and so it wouldn't play on the

6    recorder.  The recorder has to see that the equation works

7    according to the authentication code to be played again.

8    Q.    And then once it's taken from the recorder and put

9    into the system, the F Bird 2, you can have an evidentiary

15:03:46  10   copy so you can bring it in here and play it?

11   A.    Yes.  So you have the evidentiary copy you've made on

12   the Bird software, and the Bird software allows it to export

13   a player, a Bird player.  The proprietary software will only

14   allow you to play that recording because it's not like your

15:04:05  15   common recording you have on your MP3 or iPhone, it's a

16   different format, it's proprietary.  And we can give the

17   evidentiary copy to somebody to review, but they can only

18   listen to the evidentiary copy with that proprietary player.

19   If you try to play it on anything else you wouldn't hear

15:04:22  20   anything.

21   Q.    And again, it's set up to not be able to be altered in

22   any way, and if per any chance it would be altered, you're

23   saying that kind of the algorithm that's there and the

24   series of numbers would not allow it to play?

15:04:35  25   A.    That's correct.  The whole purpose of going to this

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 8 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   122 of 178.   PageID #: 4726

122

Williamson - Direct/Mr. Bennett

1   company and the way they designed it is so when you record

2   it, it is fixed.  You can't change it.  If you were to

3   change it it would conflict with the authentication code

4   that happened when it was recording, so it wouldn't play,

15:04:51  5   and you'd know that it was not the original recording

6   because it wouldn't play, you'd have an error code.

7   **Q.**    And I believe you said every time you stopped and

8   started you get a new session?

9   **A.**    That's correct.  Every time you start it and stop it

15:05:03 10   it creates a new session.  It keeps the -- say you turn it

11   on and it played or it recorded for an hour.  If you turn it

12   off and turn it on again it would keep that hour and start

13   another recording.  And you would keep doing that as long as

14   you had memory on the recorder.

15:05:17 15   **Q.**    And when it's transferred over that information

16   travels with it?

17   **A.**    That's correct.

18   **Q.**    So I couldn't have a conversation I started and get to

19   a point where I don't want to record this and then start

15:05:28 20   recording again and it would look like one big continuous

21   session with 15 minutes out of it?

22   **A.**    No.  It would show you when you turned on and turned

23   off the recording.  It would show as a record of when the

24   recorder was turned on and when it was turned off, and the

15:05:41 25   evidentiary copy would show all the recordings that were

123

Williamson - Direct/Mr. Bennett

1    made on that recorder.

2    **Q.**    And can I rewind it and go over something if I didn't

3    like how something went?

4    **A.**    No.   There was a -- this version here, the Eagle 4A,

15:05:55 5    was originally designed to allow to plug in an audio jack

6    and listen.   We disabled those.   You couldn't listen,

7    there's no purpose to it.   But the other -- you can't go

8    back and rewind it while you have the recorder.   You have to

9    plug the recorder into the software in a computer, transfer

15:06:17 10    it to an evidentiary disk, and then it allows you to listen

11    to what it on the recorder.

12    **Q.**    And so it's kind of a one-way recording?

13    **A.**    It's a one-way recorder, exactly.   You can record and

14    you can only listen if you download that software, that

15:06:34 15    recording through the software, the proprietary software to

16    an evidentiary disk, and you can only listen to it with the

17    proprietary software that checks the authentication code to

18    the recorder.

19    **Q.**    And we talked about the recorder not being able to be

15:06:47 20    altered.   With regard to that disk itself and what's been

21    downloaded, is there an edit function that the FBI has where

22    they can alter any of that?

23    **A.**    No.   There's nothing we can do to alter those.   We can

24    delete them, is all we can do.

15:07:00 25    **Q.**    And I think we talked briefly about the source code

124

Williamson - Direct/Mr. Bennett

1      and the proprietary nature of that.  So the FBI doesn't

2      have --

3      **A.**    Not all the source code is maintained by Adaptive

4      Digital Systems.  They have a vested interest in keeping

15:07:14  5      that, in keeping that secure.  We're not their only

6      customer, and they want to make sure that what they sell

7      cannot be tampered with.  That's what they sell, something

8      that can't be tampered with.

9      **Q.**    And then I believe you said earlier "if they work."

15:07:26 10      Have you seen instances where they do, in fact, malfunction?

11      **A.**    Yes, I've seen them fail as they get -- because

12      they're little computers.  Imagine taking a computer and you

13      stick it -- you may keep your computer in your house in air

14      conditioning and maintaining the temperature.  If you stick

15:07:44 15      it outside and it gets hot or cold, it would eventually

16      damage your computer board.  These little computers are

17      subject sometimes to extreme temperatures, heat, and

18      humidity.  The boards expand, contract, and they break, and

19      they fail.  I've seen then fail.  And subsequently we

15:08:00 20      decommission recorders after a certain period of time if

21      they're too old.  It is like having an eight-year-old

22      computer.  You get rid of it and get a new computer.

23      **Q.**    And the Eagle 4A that we mentioned earlier is one of

24      the ones that had been used here.  Is that an older unit?

15:08:16 25      **A.**    Yes.  It's -- the two -- the two serial numbers I was

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 11 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   125 of 178.   PageID #: 4729

125

Williamson - Direct/Mr. Bennett

1   given for the two recorders used are old.  They are

2   now -- that model is decommissioned, it is no longer

3   authorized for use after January 31.  To the best of my

4   recollection, they're over ten years old.

15:08:35  5   Q.   And so if an agent out in the field has one that

6   malfunctions, what's the kind of protocol for that?

7   A.    If it malfunctioned it doesn't record.  You don't have

8   a recording or you may have a partial recording.  Instances

9   happen where someone will turn it on and think it's turned

15:08:52  10   on, and they go to the meeting of some sort and they think

11   they recorded the conversation, and they get back, and it

12   didn't work, and there's nothing we can do.  Or you turn it

13   on and it stops halfway or for only a minute, and the best

14   you can do is whatever is on the recorder is what was

15:09:06  15   recorded.

16        And they usually -- they can malfunction because

17   someone failed to turn the button on correctly or they

18   turned it off by accident, or the battery went dead, or

19   because the solid state computer failed because it's got a

15:09:22  20   malfunctioning chip or something.

21   Q.   And if an agent comes across one that does fail on

22   them do they send it back, do they try to get it fixed?

23   A.   Well, yes, they can send it back to the manufacturer,

24   they can see if they can fix it.  With the old ones they

15:09:36  25   can't fix them because the parts for them aren't even

126

Williamson - Cross/Mr. Synenberg

1    manufactured anymore, so we get new recorders and give them

2    new ones.

3    Q.    Again, with regard to your anticipated testimony here

4    today, other than being provided those serial numbers, were

15:09:49 5    you asked to look at any other information?  Did you review

6    any other documents in any way relative to the facts of the

7    evidence in this case?

8    A.    No, nothing at all.  I'm just here to tell you how a

9    recorder works and the fact those two recorders were, in

15:10:03 10   fact, Eagle 4A's we issued to Cleveland, and they're now

11   decommissioned and should not be used.

12                MR. BENNETT:  No further questions.  Thank you

13   very much.

14                THE COURT:  Any questions, Mr. Synenberg?

15:10:14 15                MR. SYNENBERG:  Yes, Your Honor.  Thank you.

16        CROSS-EXAMINATION OF HUGH S. WILLIAMSON

17   BY MR. SYNENBERG:

18   Q.    Agent Williamson, in preparation for your testimony

19   here you said you went back and checked the serial numbers

15:10:32 20   of the body recorders that you had acquisitioned to the

21   Youngstown FBI, correct?

22   A.    I was sent the serial numbers by the Youngstown -- by

23   the agents here in Cleveland, the two serial numbers that

24   were used.

15:10:44 25   Q.    Have you ever seen two body recorders being used at

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 13 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed: 07/30/15   127 of 178.   PageID #: 4731
127

Williamson - Cross/Mr. Synenberg

1    the same time in the event that one of them malfunctions to

2    get the conversation on the other recorder?

3    **A.**   We sometimes use body recorders in that situation.  We

4    could do that theoretically.

15:11:06  5    **Q.**   In preparation for your testimony today were you

6    informed that on November 5, 2012, there was a body recorder

7    used in this case that malfunctioned?

8    **A.**   No.

9    **Q.**   You did not know that?  Now, when a body recorder

15:11:24 10   malfunctions what is the agent supposed to do?

11   **A.**   Go to the tech agent and say my body recorder didn't

12   work, and you get a new body recorder.

13   **Q.**   Are they required to get an answer or figure out why

14   it malfunctioned?

15:11:39 15   **A.**   You can send the recorder back and we can look at it

16   and see why it malfunctioned, send it back to the

17   manufacturer.  We can do a test on it to see if it was a

18   lock -- we could test it ourselves and see does it work for

19   us, did they put the battery in right, is there something

15:11:53 20   wrong with it that we can see, and then we'd send it back to

21   the manufacturer to see if they could see if something was

22   wrong with it.

23   **Q.**   In preparation for your testimony here today were you

24   asked to check the records of the FBI in Quantico to

15:12:07 25   determine whether or not the recorder that malfunctioned on

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 14 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed: 07/30/15   128 of 178.   PageID #: 4732

128

Williamson - Cross/Mr. Synenberg

1    November 5, 2012, had in fact malfunctioned or had just been

2    turned off?

3    **A.**    No, sir.

4    **Q.**    So are you hearing this for the first time from me

15:12:21  5    that there was a body recorder on November 5 of 2012 worn by

6    Chuck Muth to capture a conversation with Neal Atway for two

7    and a half hours that malfunctioned?

8    **A.**    That's the first I've heard of it, yes, sir.

9    **Q.**    Now, when you talk about malfunction, malfunction to

15:12:40 10    me is different than Chuck Muth deciding to turn it off.

11    Can a person wearing the body recorder turn it off if he

12    chooses to?

13    **A.**    That specific recorder, yes, they could.

14    **Q.**    Okay.  And we're not talking about -- turning it off,

15:12:57 15    does that equate with a malfunction?

16    **A.**    No.  But if you have a recording you'd have to go back

17    and see why it stopped recording, and there would be a code

18    that would show up to say why it stopped recording when you

19    go to look at it with a software.  It could tell you battery

15:13:10 20    failure, it was turned off; or something else, an error code

21    of another kind.

22    **Q.**    But who would I go to, if not you, in the FBI to look

23    at their records to see if there is a record as to whether

24    or not this November 5, 2012 recorder malfunctioned or was

15:13:30 25    just turned off?

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 15 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   129 of 178.  PageID #: 4733

129

Williamson - Cross/Mr. Synenberg

1   **A.**    You'd have to talk to the case agents here as to what

2   record they have.  We don't maintain records like that at

3   Quantico.

4   **Q.**    Okay.  Now, I would imagine the circumstances are such

15:14:00  5   when someone is asked to wear a body recorder that they're

6   put in danger.

7   **A.**    Sometimes that happens.

8   **Q.**    I mean, I would take it body recorders are used in

9   terrorist situations, investigations?

15:14:16  10   **A.**    We use them in all our investigations, yes, sir.

11   **Q.**    Drug investigations?

12   **A.**    In all of our investigations, yes, sir.

13   **Q.**    And is it a practice of the FBI to protect the person

14   who is wearing a body recorder for the FBI, to be listening

15:14:35  15   to what's going on in the event that their person with the

16   body recorder finds themselves in danger?

17   **A.**    That is a decision made by the case agent, and it is a

18   case-by-case basis.

19   **Q.**    And so for example, if an agent is in surveillance

15:14:53  20   outside of a building where someone is working undercover

21   with a body recorder, can that same body recorder transmit

22   what is being said back to the agent in that car in addition

23   to recording the conversation?

24   **A.**    No, sir.

15:15:09  25   **Q.**    Okay.  How is that transmission from that person who

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 16 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   130 of 178.   PageID #: 4734
130

Williamson - Cross/Mr. Synenberg

1    is working undercover --

2                   THE COURT:  Mr. Synenberg, I don't mean to

3    interrupt.  I'm going to have to take a break now, and then

4    we'll come back.  Let's take about 20 minutes.

15:15:24 5                   THE CLERK:  All rise.

6                   (Recess had.)

7                   (Proceedings in the presence of the Jury:)

8                   THE COURT:  Sir, you're still under oath.

9         Sir, do you understand?

15:41:09 10                   THE WITNESS:  Yes, Your Honor.

11                   THE COURT:  All right.  Mr. Synenberg?

12                   MR. SYNENBERG:  Thank you, Your Honor.

13   Q.   Agent Williamson, I think you told us at the beginning

14   of your testimony that you were program manager and head of

15:41:18 15   acquisition and deployment of recorders to all FBI offices.

16   Is that correct?

17   A.   Yes, sir.

18   Q.   Are you the person who communicates with this company

19   that provides these recorders?  I think you said it's ADS?

15:41:38 20   A.   I'm one of the persons, yes, myself and the engineers

21   who work with me.

22   Q.   So is there a protocol in the FBI to make sure that

23   when a recorder malfunctions that there's a record kept of

24   it to prevent that recorder from again being used until you

15:41:56 25   know why it malfunctioned?

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 17 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed:  07/30/15   131 of 178.   PageID #: 4735
131

Williamson - Cross/Mr. Synenberg

1    **A.**    If the recorder is sent to us we would have a record

2    of it of that going back to ADS, but if the recorder wasn't

3    sent to our office then I wouldn't have that.

4    **Q.**    And what circumstances exist that permit an agent in

15:42:13  5    the field with a malfunctioning recorder to make a decision

6    not to return it to you?

7    **A.**    I can't speak for the case agent or the tech agent in

8    the field to what they did or didn't do, sir.

9    **Q.**    Okay.  And we talked -- before the break we were

15:42:30 10    talking about the ability to transmit a conversation on a

11    person who is wearing a body recorder to an agent who's

12    doing surveillance.  Do you recall that?

13    **A.**    Yes, sir.

14    **Q.**    And I think you said that the body recorder records,

15:42:45 15    it does not transmit.

16    **A.**    That's correct.

17    **Q.**    So what would a person wearing a body recorder also

18    wear to transmit the conversation to the agent in the

19    vehicle or somewhere else to protect that person if he

15:43:02 20    needed protection?

21    **A.**    They would wear a transmitter.

22    **Q.**    And how big is a transmitter?

23    **A.**    It depends on how far you're trying to transmit.  I'm

24    not a transmitter expert, but I think they are roughly the

15:43:15 25    same size as the body recorders usually.

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 18 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed: 07/30/15   132 of 178.   PageID #: 4736
132

Williamson - Cross/Mr. Synenberg

1    **Q.**    And how big is a body recorder?

2    **A.**    The Eagle 4A is about this square (indicating).  It's

3    not very big.  It's about a couple inches by a couple

4    inches.

15:43:25  5    **Q.**    And what does it look like?  Is it put inside a fob?

6    Is it disguised as a fob in a key chain?

7    **A.**    The Eagle 4A is an aluminum case.  It's a square

8    aluminum case that contains it, a couple inches square and

9    about a quarter-inch thick.

15:43:43  10    **Q.**    And is there a protocol to give an agent in the field

11    guidance to when he should also have the person wearing a

12    body recorder wearing a transmission device?

13    **A.**    That's something I don't deal with.  That would be

14    something decided operationally in the field.

15:44:02  15    **Q.**    So it's not mandated -- I'm an agent and I'm sending

16    someone undercover with a body recorder -- that I also make

17    sure they have a transmitter so I can listen to what's being

18    said?

19    **A.**    I don't know, sir.  I can't speak to that.  I'm not

15:44:15  20    familiar with that.

21              MR. SYNENBERG:  Thank you.  I have no further

22    questions.

23              THE COURT:  All right.  Will there be any

24    examination on behalf of Mr. Cochran?

15:44:32  25              MR. JUHASZ:  Thank you, Your Honor.

133

Williamson - Cross/Mr. Juhasz

1      CROSS-EXAMINATION OF HUGH S. WILLIAMSON

2   BY MR. JUHASZ:

3   **Q.**    Mr. Williams, how are you doing today?

4   **A.**    Good, sir.  Thank you.

15:44:39 5   **Q.**    Good.  I just have a couple questions to follow up on

6   some of the things you've been asked.  Did I hear you

7   say -- you said these recorders can start to malfunction for

8   a variety of reasons, correct?

9   **A.**    They can.  It's rare, but they can.

15:44:51 10   **Q.**    They're like little computers, right?

11   **A.**    Yes, sir.

12   **Q.**    It's rare, but it happens, right?

13   **A.**    Yes, sir.

14   **Q.**    Have you run across any sort of equipment that never

15:44:57 15   malfunctions on any occasion?  Everything is subject to

16   malfunction, right?

17   **A.**    Eventually, yes, sir.

18   **Q.**    Okay.  Now, I think you were talking about it would be

19   sort of the analog if you left your computer outside to be

15:45:12 20   exposed to the elements, eventually it would break down and

21   malfunction, correct?

22   **A.**    Yes, sir.

23   **Q.**    And the same sort of thing can happen here if I get

24   nervous because -- I'm sweaty because I'm going into a

15:45:23 25   meeting with three mobsters wearing a wire, whatever it is.

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 20 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed: 07/30/15   134 of 178.   PageID #: 4738
134

Williamson - Cross/Mr. Juhasz

1    That might or can affect the computer eventually, correct?

2    **A.**    If moisture gets into the container eventually it

3    would, but it's a contained device.  It's protected from the

4    body --

15:45:38   5    **Q.**    Okay.

6    **A.**    -- sweat and stuff.

7    **Q.**    So when you say, for example, I thought I heard you

8    say chip failure --

9    **A.**    If the computer itself were to fail I call that a chip

15:45:49  10    failure.  I'm not a computer scientist.  I just am referring

11    to the solid state recorder failing.  It has computer chips

12    in there.  If it's exposed to heat and cold and it expands

13    and contracts, that can break the contacts, the chips with

14    the board, and the electrical connections.

15:46:07  15    **Q.**    Okay.  And I thought I heard you say when

16    Mr. Synenberg was asking you some questions about protocol,

17    if a recorder like this fails, did I hear you say that

18    there's a way to access it through the computer software to

19    sort of figure out why it failed?

15:46:28  20    **A.**    Whenever you make a recording, the only way you can

21    get the recording off the recorder is to hook the recorder

22    up to the US Bird software, and if there is a recorder on

23    there it will show.  And if for some reason it stops

24    recording it will show you why it stopped:  Was it turned

15:46:44  25    off, was there a loss of power, that sort of thing.

Williamson - Cross/Mr. Juhasz

1   **Q.**   All right.  So two different things there.  First of

2   all, you need the software to download the actual recording

3   of whatever meeting or whatever the person was wearing the

4   wire for, correct?

15:46:59   5   **A.**   Yes, sir.

6   **Q.**   But then if you have a situation where it fails, where

7   the body recorder fails, if I understand it, you can load it

8   into this software and it will say, well, someone took the

9   battery or someone turned it off, or the chip failed.

15:47:13   10   **A.**   If for some reason somebody failed to turn it on or it

11   didn't turn on at all it wouldn't show anything at all, but

12   if it turned on and turned off it would show some activity

13   on the board, on the computer, on the software.  But again,

14   you have to hook it up to the software to see what it would

15:47:30   15   say.

16   **Q.**   And if I further understand it, in connection with

17   this case nobody ever sent you a recorder saying can you

18   figure out why this thing didn't work?

19   **A.**   No, sir.

15:47:42   20   **Q.**   And then the last thing is, so if I understand it, you

21   can't alter a recording that's made, correct?

22   **A.**   You cannot alter these recordings.  To the best of my

23   knowledge, there's no way to alter a recording on an ADS

24   recording.

15:47:56   25   **Q.**   The only way to alter it is just to delete it

Case 2:15-cr-04268-JB   Document 1551-3   Filed 12/06/17   Page 22 of 23
Case: 1:14-cr-00070-SO   Doc #: 219   Filed: 07/30/15   136 of 178.   PageID #: 4740
136

Williamson - Further Redirect/Mr. Bennett

1    altogether?

2    **A.**    Completely destroy it, delete it.

3              MR. JUHASZ:  That's all I have.  Thank you.

4              THE COURT:  All right.  Anything further,

15:48:06 5    Mr. Bennett?

6         FURTHER REDIRECT EXAMINATION HUGH S. WILLIAMSON

7    BY MR. BENNETT:

8    **Q.**    One question, Agent Williamson.  And I don't know that

9    you would necessarily know, but if there is a failure out in

15:48:13 10   the field and say a body recorder, if they get it back after

11   an hour-long meeting and there's just nothing there, not

12   even the preamble or any of that information, do you know

13   what the agent in the field, what their standard operating

14   procedure is for the agent in the field to do if they've had

15:48:33 15   that malfunction?

16   **A.**    Normally they would go to a tech agent and have the

17   tech agent look at it.  I mean, they could look at it

18   themselves on the Bird software.  They could try to turn it

19   on and turn it off themselves and see if it still worked.

15:48:47 20   They could very well have failed to turn it on.  Going back,

21   they would have to look back and see what they think

22   happened and talk to a tech agent.  If they couldn't figure

23   it out they could send it back to us.

24   **Q.**    And what about the gathering of any information that

15:49:01 25   may have occurred during that hour-long meeting?  Do you

137

Williamson - Further Redirect/Mr. Bennett

1   know what the protocol is there?

2   **A.**   If it's not on the Bird recorder there's no

3   information to be gathered.  It's either on the recorder or

4   it's not.

15:49:12  5          MR. BENNETT:  Okay.  No further questions.

6   Thank you.

7          MR. SYNENBERG:  No further questions, Your

8   Honor.

9          MR. JUHASZ:  No other questions, Your Honor.

15:49:18 10   Thank you.

11          THE COURT:  All right.  You may step down,

12   sir.

13       Call your next witness.

14          MS. BACON:  Thank you, Your Honor.  The United

15:49:23 15   States calls Special Agent Herb Fitzgerald.

16          THE COURT:  Go ahead, go around and take the

17   stand.  And before you take your seat my deputy will swear

18   you in.

19          (The witness is sworn.)

15:50:43 20          THE COURT:  You may be seated.

21       DIRECT EXAMINATION OF HERBERT D. FITZGERALD, JR.

22   BY MS. BACON:

23   **Q.**   Sir, would you tell us your name and spell your last

24   name for the court reporter?

15:50:56 25   **A.**   Herbert D. Fitzgerald, Junior.  F-I-T-Z-G-E-R-A-L-D.