1        THE CLERK:  You can have a seat in the far chair,

2   please.

3                HUGH WILLIAMSON,

4   called as a witness on behalf of the People, being first duly

5   sworn, was examined and testified as follows:

6                DIRECT EXAMINATION

7                BY MR. ELWARD:

8        Q    Good morning, Mr. Williamson.  Would you please

9   introduce yourself for the members of the jury and tell them

10  where you work?

11       A    I'm Hugh Williamson.  I'm a supervisor, special

12  agent in the FBI, and I work at Quantico, Virginia, at our

13  operational technology division.

14       Q    Mr. Williamson, you're here to tell this jury about

15  the covert body recording devices that were used in this

16  case.  But before we get to that, I want to get a little bit

17  of an introduction and background.  Could you take us through

18  your career in the military leading up to and including your

19  current position at the FBI?  Tell us about your time in the

20  United States Marine Corp.

21       A    I enlisted in the Marine Corps in 1982, spent six

22  years enlisted with the OCS in 1988, served as an officer in

23  the marine corps, active and reserve, until 1999, and then

24  joined the marine corps -- joined the FBI in 1999.

**GOVERNMENT'S EXHIBIT D**                    **R1118**

1        Q    And let's -- let's go through that career in the

2   FBI.  I want to talk about your career from 1999 to 2004.

3   Tell us about that.

4        A    In 1999, I was assigned to the Baltimore Division

5   and worked as a street agent working criminal matters,

6   national security matters, counterterrorism matters.  And

7   then in 2004 -- in Baltimore Division.  And then in 2004, I

8   took a job in the counterterrorism division at FBI

9   headquarters.

10       Q    All right.  And so that's 2004 to 2009.  Let's talk

11   about what did you do for the FBI after 2009?

12       A    In 2009, I was assigned to Quantico where I worked

13   in the technical operations coordination unit coordinating

14   FBI tactical attacks, tactical efforts against

15   counterterrorism matters primarily.  And then I was

16   transferred into the microphone audio program, worked in the

17   development of microphone audio technology for covert --

18   authorized covert body recorders.  And then in 2013 became a

19   program manager in the audio surveillance unit.

20       Q    All right.  Let me stop you there.  You're the

21   program manager for the audio surveillance unit.  Describe

22   what the -- describe what -- did you have to have any

23   training?

24       A    They -- my background, I'm a history major, so they

R1119

1    take FBI agents and give us specialized training in

2    electronics and tactical devices, how to use them, how to

3    work with them.  And I went through that training and then

4    worked hands-on with engineers, electronics, technicians, and

5    how to use the devices, how to make them work.  And I'm a

6    program manager in the audio surveillance unit for all of the

7    FBI's covert body recorders.

8        Q    Now, your current position is what?  What's your

9    current job with the FBI?

10       A    I'm program manager for the FBI's covert body

11   recorder program and also its body transmitter program.  I

12   supervise electrical engineers, electronics engineers, and

13   electronics technicians in developing, maintaining, and

14   deploying covert body recorders for the entire FBI.

15       Q    Describe for this jury the staff that works for you

16   in Quantico, Virginia.  How many people do you have working

17   for you?

18       A    Currently I have about eight people working for me,

19   electronics engineers, two of them, and then six electronics

20   technicians.

21       Q    Mr. Williamson, you're not an engineer yourself?

22       A    No, sir, I'm not.

23       Q    But are you familiar with the way the covert body

24   recording device that was used in this case, are you familiar

```
 1    with the way it operates?
 2         A    Yes, I am.
 3         Q    Do you have based -- and that's based on what?
 4         A    Experience and training, sir.
 5              MR. ELWARD:  And, Judge, at this time I would offer
 6    Mr. Williamson as an expert in the field of the covert body
 7    recording device that was used and in covert audio recording
 8    operations that used the recording device in this case.
 9    We're going to focus in on the device in this case.  But I'd
10    offer him as an expert in that field, based on his training
11    and expertise.
12              THE COURT:  Mr. Liefer.
13              MR. LIEFER:  Are you offering him as an expert for
14    the device itself?  What exactly -- I'm sorry.
15              MR. ELWARD:  The covert body recorder that was used
16    in this case.  That he's an expert in the way it was operated
17    and the way -- he's an expert in the way the recordings in
18    this case were gathered and downloaded.
19              MR. LIEFER:  For that specific purpose, no, I don't
20    have any objection, your Honor.
21              MR. ELWARD:  Your Honor, I'd ask --
22              THE COURT:  The record will show that the witness
23    will be qualified to give testimony as an expert in the use
24    of the covert recording device used in the case of People v.
```

1    Drew Peterson --

2            MR. ELWARD:  Thank you.  Your Honor, may I

3    approach?

4            THE COURT:  -- on trial at this time.

5            MR. ELWARD:  May I approach?  I've shown Counsel

6    previously Exhibit 39.  May I approach, your Honor?

7            THE COURT:  Yes, sir.

8    BY MR. ELWARD:

9        Q    Mr. Williamson, I'm handing you now for the record

10   what I've marked for identification purposes as People's

11   Exhibit 39.  Do you recognize that?

12       A    Yes, sir.

13       Q    What do you recognize that to be?

14       A    This is a declaration from the manufacturer of the

15   body recorder, ODIC.

16       Q    Are you familiar with the data on that?

17       A    Yes, sir.

18       Q    Is that the type of material that's reasonably

19   relied on, people in your field, in determining the

20   reliability and the authentication of covert body recordings?

21       A    Yes, sir.

22       Q    Okay.  I want to take you through how it is that

23   the recording device, the covert body recording device that

24   was manufactured and is described in People's Exhibit 39, how

1    was that -- how was that used in this case?  Or how does it

2    work?  Tell us how does this work, the covert body recorder

3    that was used in this case.

4        A    Basically all of our covert body recorders are

5    basically little computers, and they only record, and they

6    only allow you to download the -- what's recorded to it and

7    that's it.  You can't do anything with it.  You can't back it

8    up.  You can't, you know, rewind it or override it without

9    going through a proper download of what is already recorded.

10       Q    I want to talk to you, Mr. Williamson, about this

11   idea of a lossless device, a lossless device.  What does that

12   mean?

13       A    Lossless recording versus what they call lossy

14   recording.  Lossless recording collects all the audio in an

15   environment so that when the microphone picks up information,

16   every bit of information the microphone is hit with goes on

17   to the computer versus the lossy recording, which is like an

18   MP-3 player which records just what's changed in the

19   environment.

20       Q    Now, the device -- the covert body recording

21   devices that were used in this case, they're manufactured by

22   a company named ODIC; is that right?

23       A    Yes, sir.

24       Q    Okay.  I want to take you through -- I want to take

R1123

1    you to that.  How -- what software do they use?

2         A    They use proprietary software that they only have

3    access to the coding of.  The FBI, no one else has access to

4    coding of the software.  It's designed for us to use the

5    recorder, but we can't actually access the software, so --

6         Q    And is there any way for you to transfer data from

7    the covert body recorder without the propriety ODIC software?

8         A    No, sir.

9         Q    Are there any other inputs in the device that was

10   used -- the devices that were used in this case besides

11   microphone inputs?

12        A    The microphone input is the only audio input.

13        Q    Is there -- so is there any other way to put data

14   on this recording, on this covert body recorder, besides what

15   the microphone gathers in?

16        A    No, sir.

17        Q    All right.  But at some point you have to download

18   the recording from the covert body recorder to a laptop.  Can

19   you take us through that?  How does that work?

20        A    Basically you hook up the recorder to a laptop that

21   has the proprietary software on it and it can see the

22   recorder and see what's been recorded on it.

23        Q    When you say "it can see," what are you talking

24   about?  The laptop?

R1124

1      A      The proprietary software can see the recorder and

2   the recordings on it.

3      Q      All right.  And once it sees what's on there, take

4   us to the next step that it goes through.

5      A      The user can then -- the only thing they can do,

6   they can see what's on there.  The only thing they can do is

7   download it, and they can download it only to an optical disc

8   in its entirety so it all --

9      Q      Let me stop you there.  What's an optical disc?

10  What do you mean?

11     A      Like a CD or DVD or Blu-Ray disc.

12     Q      All right.  All right.  So take us through that.

13  So the only way it can be downloaded from the recording

14  device is to one of these optical media, like a CD or DVD or

15  a Blu-Ray disc.  All right.  What's the next step?

16     A      When it does this, the proprietary software goes

17  through a process of authentication.  It downloads all the

18  information that's been put onto the recorder onto the disc,

19  and it creates a -- what they call a hash, the secure hash

20  that makes sure that it's not -- nothing's done to it and

21  it's not changed.  It writes it all onto a disc and then

22  locks the disc so the disc can't be manipulated.  And you can

23  read the disc, but you can't write over it or edit it.

24     Q      Now, when you say it can't be manipulated, you

1    can't write over it, what do you mean?

2         A    You can look at the disc with your computer and you

3    can see the files, but you can't do anything to the files.

4         Q    You can play them at some point?

5         A    You could play them, you could -- but you can't

6    copy them without the proprietary software.

7         Q    All right.  So you told us about this secure hash

8    which is the authenticated hash.  All right.  Take us through

9    now.  What's the recording device then do next or what does

10   the software do when you're trying to download the recording?

11        A    It creates -- basically, it takes the hash and

12   creates the disc so that it has both the original evidence in

13   the proprietary format as well as a hash file that the

14   proprietary software uses to authenticate it, and it provides

15   a player so you can play that audio back.  You can put it on

16   a disc and give it to somebody that can play the audio back

17   and listen to it.

18        Q    All right.  And what's the next step that the

19   software goes through?

20        A    It -- again, it actually goes back and looks at the

21   disc and checks it, runs the completed disc back through the

22   algorithm it has in the proprietary software and confirms,

23   verifies the disc.  It basically checks to make sure that

24   everything has downloaded accurately and that the algorithm

1    comes up with the correct solution to prove that it is the

2    original recording.

3        Q    All right.  Let's talk about the step of

4    validation.  What does the ODIC software do in terms of

5    validating the recording after it's done this comparison?

6    What's the next step?  Is -- the person that's downloading

7    the disc, what are they told with respect to it being

8    validated?

9        A    It'll give you a message that says that the disc is

10   successfully validated and allows you to -- at that point in

11   time is the only time you can erase what's on the recorder.

12       Q    All right.  And so then what's the next step?

13       A    If the operator wants to, they can erase everything

14   on the recorder.  If they do so, it erases everything on the

15   recorder.

16       Q    Now, you told us -- you told us earlier that the

17   FBI doesn't have any of the proprietary software that would

18   allow you to manipulate or edit the files that are on the

19   recording device; is that right?

20       A    Yes.

21       Q    So this procedure is plugging the recording device

22   into a laptop, having it downloaded, and then the machine or

23   the software checks to see if it's made a perfect copy of

24   what's on the recording device; is that right?

R1127

1      A      Yes, that's correct.

2      Q      Okay.  So what's -- why did you pick this software

3  that the FBI couldn't -- you couldn't manipulate or change in

4  any way?

5      A      We want to ensure that the evidence that's gathered

6  is protected.  It's the authentic, complete, and honest

7  evidence that's been recorded.

8      Q      Now, is there an on or off button?  Well, let me

9  back up a step.  The covert recording devices that were used

10  in this case here, you've had a chance to see them; is that

11  correct?

12      A      Yes, sir.

13      Q      Is there an on/off switch on those recording

14  devices?

15      A      No, sir.

16      Q      How do you get recordings on them?

17      A      In order to make recordings, these devices, you

18  have to use the proprietary software to look at the recorder

19  and set the record start -- the record start time and how

20  long it will record, so a program like you'd program a VCR.

21  You want it to turn on at a certain date and time and run for

22  a certain period of time.  You do that with the proprietary

23  software and then you disconnect it and you -- it will do

24  that on its own.

R1128

1    Q    Now, once you've made this copy, once it's

2    downloaded all the data that's on the recording device, I

3    believe you said at that point the person downloading can hit

4    erase; is that right?

5    A    Yes.

6    Q    But you're able to make copies of the files that

7    have been downloaded from the recording device.  Take us

8    through how that's done.

9    A    After you've downloaded an original copy and the

10    proprietary software sees an original copy has been

11    successfully created, it will allow you to make more copies

12    of the files individually or as a group, but it only puts --

13    it can put them either in the DAT format, which can be only

14    seen with proprietary software, or it allows you to make a

15    software version or a copy in an AU file form, which can be

16    played on a commercial player.  You can play it in Windows or

17    Apple.

18    Q    Have you had a chance to examine the original discs

19    in this case that were downloaded from the covert body

20    recorders that were used here?

21    A    I was able to validate the original discs.

22    MR. ELWARD:  For the record, I'm showing opposing

23    counsel what I've marked as Exhibits 9, 10, 11, and 12.  May

24    I approach, your Honor?

1          THE COURT:  Yes, sir.

2     BY MR. ELWARD:

3          Q    Mr. Williamson, let me hand you what I've marked as

4     People's Exhibits 9, 10, 11, and 12 for identification.  Sir,

5     do you recognize those?

6          A    Yes, sir.

7          Q    What are those?

8          A    These are the original evidentiary discs that were

9     provided me by the case agent, Brian Clark, last night.

10         Q    Case agent from the FBI?

11         A    Yes, sir.

12         Q    Have you had a chance to examine those discs?

13         A    Yes, sir.

14         Q    Were they properly downloaded?

15         A    Yes, sir.  We -- I supervised Special Agent Clark

16    last night, we loaded it onto the proprietary software using

17    a laptop, we ran a validation check against each one of them,

18    and they all came out successful.

19         Q    What does that mean, ran a validation check?

20         A    It's a -- on the proprietary software, one of the

21    options it provides the user is you can take a disc, you want

22    to check and see if it's an authentic ODIC disc and it has

23    actually been hashed correctly and make sure it's not been

24    tampered with.  You put it into the CD and use a software to

R1130

1    run a verification check, choose verification.  The software

2    runs the data that's on the disc through the algorithm again

3    that's on the software and compares the solution to what's --

4    the solution already on the disc.  If they don't match, it's

5    not a successful verification.  If they do match, then it's

6    successful.

7        Q    And you did it on all four of those discs; is that

8    correct?

9        A    Yes, sir.

10       Q    Let me have them back.  Mr. Williamson, let me ask

11   you questions -- let me ask you a couple questions about the

12   covert body recorders that were used in this case.  You've

13   had a chance to see those devices since this investigation

14   has occurred; is that right?

15       A    Yes, sir.

16       Q    Is there an input jack on those covert recording

17   devices?

18       A    There's no input jack for audio.  There's a place

19   to connect a USB port to connect it to the computer, but it's

20   not an input jack for an audio.

21       Q    So the recording device is what?  It's just a

22   microphone?

23       A    It has strictly the ability to record audio, live

24   audio over the microphone.

R1131

1          Q     Does it differentiate in terms of sound?

2          A     It collects all -- all noise information in the

3     environment and records it bit by bit to the recorder memory.

4          Q     Mr. Williamson, based on your training and

5     experience in the FBI, your examination of the covert body

6     recorders that were used in this case, the downloaded

7     recordings that you examined with Agent Clark, do you have an

8     opinion as to the authenticity and integrity of the

9     recordings that were recovered from the covert body recorders

10    used in this case?

11         A     In my opinion, they're authentic ODIC recordings

12    that are authentic evidentiary recordings of audio by that

13    recorder.

14         Q     When you say "authentic," sir, what do you mean?

15         A     It captured all the information, all the noise that

16    was present when the recorder was recording.

17              MR. ELWARD:  One moment, Judge.  Nothing further at

18    this time, Judge.

19              THE COURT:  Counsel approach.

20                   (Sidebar held off the record.)

21              THE COURT:  Mr. Liefer, your witness.

22              MR. LIEFER:  Thank you, your Honor.

23

24

**R1132**

CROSS EXAMINATION

BY MR. LIEFER:

Q    Good morning.

A    Good morning.

Q    You said you examined the devices that were used in this case?

A    I took all three devices and I ran test recordings on them and verified that they functioned properly.

Q    And you're talking the actual devices that were used in this case?

A    Yes, sir.

Q    Okay.  And how many were there?

A    Three.

Q    Do you know if all three devices were used?

A    To the best of my knowledge, they were the ones that were used that were sent to us by the Chicago field office saying that they had used them.

Q    Did you get them back after they were used?

A    They were shipped to our office from the Chicago field office.

Q    So you have them back now, the devices themselves?

A    They're in our custody, yes, sir.

Q    Okay.  And who was responsible for actually physically downloading the audio off those devices?

R1133

1           MR. ELWARD:  Judge, objection as to what time he's

2   talking about.  The recordings in this case or is it in the

3   testing that Mr. Williamson conducted?

4           MR. LIEFER:  I can clarify, your Honor.

5           THE COURT:  Okay.  He'll clarify his question.

6   BY MR. LIEFER:

7       Q    The recordings that were taken, not the test

8   recordings but the recordings that were taken that is on

9   those CD's, who physically downloaded those onto those CDs,

10  do you know?

11      A    It was another FBI agent.  It was not myself.

12      Q    Do you know who the FBI agent was?

13      A    I believe it was Special Agent Hatcher.  I'm not

14  sure of his name.

15      Q    Okay.  And you said that you did -- you tested

16  those CD's recently?

17      A    I tested them last week.  Excuse me.  I tested the

18  evidentiary CD's last night with Special Agent Clark.

19      Q    All right.  You hadn't seen the evidentiary CD's

20  before last night?

21      A    I saw copies of the evidentiary CD's in Quantico at

22  our evidentiary room there, and I made verifications of the

23  copies there successfully.

24      Q    But not the originals?

1      A     Not until last night.

2      Q     And these are -- and you're saying that these are

3    the actual original CD's that the audio is downloaded onto

4    from the device?

5      A     I don't have firsthand knowledge of that, sir.  I'm

6    just told that they are the evidentiary CD's, but I know that

7    those are authentic copies from the MOTIF ODIC recorder.

8      Q     I'm trying to understand here.  So you're saying

9    they're authentic copies and that the software authenticated

10   those copies right there?

11     A     I'm saying that those recordings were made on an

12   ODIC recorder, an ODIC MOTIF recorder, and they are

13   authentic.  They're valid, validated authentic recordings.

14   They've not been altered.

15     Q     But those could be copies and not the actual

16   original CD's?

17     A     Theoretically, yes, sir, they could be copies, but

18   they still are valid ODIC recordings that have not been

19   tampered with or changed.  So they were made on an ODIC

20   recorder and they're made on the ODIC recorder the serial

21   number shows and the date and time it shows there.

22     Q     That's -- when you're talking about the serial

23   number and the date and time, that's called metadata,

24   correct?

**R1135**

269

1      A      I didn't mention metadata, but yes, that's in the

2  metadata.

3      Q      Okay.  And that's -- and that's on the CD that

4  tells you what was used to record those, correct?

5      A      The finalized CD has a file called an XML file and

6  it has that information on it.

7      Q      Did those CD's have that information on them?

8      A      I did not check those CD's.  I checked that they

9  were authentic.

10      Q      So you don't know if those -- the recordings on

11  those CD's are from the devices that were used in this

12  investigation as you sit there right now?

13      A      The ones I ran the checks on in Quantico did match

14  those.

15      Q      But not -- those CD's you didn't look at the

16  metadata, correct?

17      A      I did not look at the metadata on those, no.

18      Q      And the metadata tells you the serial number of the

19  recording device that was used, correct?

20      A      Yes, it does.

21      Q      So your -- you can't testify today that the

22  recording devices that were used in this investigation, that

23  those are the recordings from those exact devices?  You can't

24  say that for sure because you didn't check the metadata?

R1136

1          MR. ELWARD:  Objection; asked and answered.  He's
2     already testified as to what he was told by Agent Clark.
3          THE COURT:  I'll sustain the objection.  He did
4     answer that he doesn't know if this was the original or a
5     copy.
6          MR. LIEFER:  That's not the question I'm asking.
7     I'm asking about the metadata.
8          MR. ELWARD:  That wasn't the question he asked.  He
9     didn't ask about metadata.  He said you can't tell this jury
10    whether those came from the original recording devices.
11         THE COURT:  I thought he already testified --
12         MR. ELWARD:  Yeah.
13         THE COURT:  -- that he didn't -- he didn't look at
14    the metadata to know --
15         MR. ELWARD:  Right.
16         THE COURT:  -- on this -- on the disc we got here
17    in the courtroom.
18         MR. ELWARD:  Right.  9, 10, 11, and 12.
19         MR. LIEFER:  I can move on.
20         THE COURT:  He's already said that.
21    BY MR. LIEFER:
22         Q    Okay.  You can validate copies of the recordings?
23         A    If you take the copies of a recording and you run
24    it through the proprietary software, it can run an

1    authentication validation process on it and authenticate it.

2        Q    How does that work?  I mean, does it compare it to

3    something or how can it -- how can it say that that's --

4        A    Again, I'm not an engineer, but the proprietary

5    software takes the data that's on the CD and it looks at the

6    data and runs it through what's called a SHA-256 algorithm,

7    and it's like an equation.  All the numbers that are on the

8    recording, the original recording, millions and millions of

9    numbers, all ones and zeros, is a number and it puts in the

10   equation, comes with the solution.  The solution can only be

11   a certain number and that's the hash code that is attached to

12   the file.  So the proprietary software takes that and runs it

13   through that algorithm again, compares the solution and

14   confirms the solution matches.

15       Q    Okay.  And these devices in particular come on at a

16   certain time; is that correct?

17       A    They would be programmed to come on at a certain

18   time.

19       Q    How is that program done?  How do you do that?

20       A    The proprietary software allows the user to hook

21   the recorder up and look at a control panel on the software,

22   and it allows you to set a date and a time that you want the

23   recorder to turn on and for how long it should run.

24       Q    How many different settings can you put on one

1    particular recording device?

2                    MR. ELWARD:  Objection; relevance.

3                    THE COURT:  Overruled.

4        A    I don't know if I understand the question, sir.

5        Q    So you're saying we can set it, you know, that it

6    comes on at a certain time.  How many different settings?

7    Can you put different times and different amounts of time?

8    How many different settings can you put on there for it to

9    come on?

10       A    That's a -- that capability is limited to, I mean,

11   how many times you enter it in the -- it's a function of the

12   memory on the recorder, how long it will do it.

13       Q    But you're saying that you put -- you plug this

14   thing in, you get on the software and that's where you

15   program the setting for it to come on, correct?

16       A    That's correct.

17       Q    So I'm asking you how many different settings can

18   you put on there?  Like can you put one on for ten minutes to

19   come on at this time and one for 20 minutes to come on at

20   this time?

21       A    Yes.

22       Q    How many -- how many different settings can you put

23   on there?

24       A    I don't know.  I've never tried to overload it.

R1139

273

```
 1          Q     That's fine.  Do you know the capacity of the
 2    recording device, how much data it can hold?
 3          A     It's two gigabytes.
 4          Q     Okay.  And do you know in relation to time how much
 5    that is?
 6                MR. ELWARD:  Judge, I'm going to object.  Can we
 7    approach?
 8                     (Sidebar held off the record.)
 9                THE COURT:  Mr. Liefer, as to the question -- well,
10    the first thing I think that we need to ask the witness is,
11    he testified about gigabyte, if he can give us a definition
12    of what is a gigabyte.
13                THE WITNESS:  A gigabyte is a term for how many
14    bytes of information.  A megabyte is a million bytes,
15    gigabyte is -- and, again, I'm not an engineer.  I'm trying
16    to remember what exactly -- how many megabytes is a gigabyte.
17    A thousand megabytes is one gigabyte.
18                THE COURT:  Okay.  There you go.  And that's got to
19    do with information that can be stored?
20                THE WITNESS:  Yes, your Honor.
21                THE COURT:  All right.  Mr. Liefer, let's move
22    along.
23                MR. LIEFER:  Okay, your Honor.
24
```

**R1140**

1    BY MR. LIEFER:

2        Q    So you're saying to download this, you plug in a

3    device to the PC, correct?

4        A    And it connects to the proprietary software.

5        Q    And you have the software on your -- the FBI has

6    the software on one of their PC's?

7        A    Yes.

8        Q    Who puts the software on the PC?

9        A    It could be the tech agent or the case agent.

10       Q    It's not ODIC, the company that makes the device?

11       A    No, sir.

12       Q    Okay.  And before the information goes from the

13   device to the CD, it's actually stored on the PC, correct?

14       A    For a period of time when you're making a transfer

15   from the recorder to an evidentiary disc, it has to go

16   through the random memory of the computer, its cache memory.

17   It sits there before it's put onto the DVD or the CD or the

18   Blu-Ray disc.

19       Q    So just to be clear, it goes from the device to the

20   computer, it's stored in the computer, the FBI's PC, and then

21   it goes to the CD?

22       A    It's not stored -- it's stored in short-term memory

23   and it's only done through the proprietary software.  The

24   proprietary software does all this seamlessly.  You press a

1    button and it does all these things within a minute or

2    minutes.  And never is it something that the operator has any

3    control over.  It's done automatically.  So the information

4    that was on the recorder for a short period of time is in the

5    random memory of the computer and then it's taken from the

6    random memory by the computer and put onto the disc.  It's no

7    longer in the random memory.

8         Q    And then it's erased from both the computer or the

9    random memory and the device?

10        A    At the end of the validation of the download, the

11   proprietary software erases it from the RAM memory on the

12   computer and also from the recorder.  Well, no, it doesn't

13   erase from the recorder until you actually delete it on the

14   recorder.

15        Q    The PCs that are used, the computers that are used

16   for this specific task, are those computers used for anything

17   else or do you just have one computer for this specific task?

18        A    I can't speak to that.  I have no knowledge of what

19   the computers were used for in this case.

20        Q    And you haven't reviewed any specific recordings

21   that were on the CD's, correct?

22        A    No, sir.

23             MR. LIEFER:  Can we approach the bench?

24                  (Sidebar held off the record.)

R1142

BY MR. LIEFER:

Q    You testified earlier that the device is technically a microphone with a little computer, correct?

A    It's a computer that has microphones attached to it.

Q    Okay.  So how many microphones are there?

A    You can have up to two microphones to it.

Q    Do you know what these particular devices had?

A    Had one microphone, is my understanding.

Q    And is it like a part of the device itself or is it separate?  Do you know?  I mean, if you know.

A    It's -- basically the little microphones are electrical and they're soldered to the board using a wire, soldered, hard wired to the board.

Q    And that's done before you get it?

A    It can be done by the company or it can be done by technicians at FBI Quantico as well.

Q    Do you know what happened with these devices?  Did you guys put the microphones on or did ODIC, the company that made the device?

A    I don't know.

Q    And these devices were specifically tested?

A    They were tested before being sent to the FBI Chicago, and we probably also test as part of the same thing

1  in Chicago before they used them.

2      Q    And that's done with the software?

3      A    You can only use the software to run the recorder.

4      Q    So your testimony is that you tested these devices

5  in Quantico, sent them to Chicago, and then Chicago used them

6  in this investigation?

7      A    I did not test the devices in 2014.  One of our

8  engineers, electronic technicians would have done that.

9      Q    Okay.  When you test a device with that software,

10  is there some sort of window or something that pops up and

11  says everything's good or, I mean, what's -- how do you know

12  if it's working?

13      A    What you do is you program the recorder to make a

14  recording, turns on according to the programmed time, makes a

15  recording, then you take it, you connect it to the software,

16  you download that to an evidentiary disc, and it gives you a

17  successful download signal, and then you can run a validation

18  check on it again to confirm it.

19      Q    To your knowledge, was anything printed off the

20  computer?  Is there any documentation to show that these

21  devices were tested and they were good to go?

22      A    No.

23          MR. LIEFER:  That's all the questions I have.

24          THE COURT:  Redirect.

REDIRECT EXAMINATION

BY MR. ELWARD:

Q    One question.  Mr. Williamson, as you sit here
today, do you have any doubt in your mind as to the
reliability and authenticity of the recordings on Exhibits 9,
10 and 11 and 12?

A    I have absolutely no doubt as to the authenticity
and reliability of those recordings.

MR. ELWARD:  I don't have any further questions.

MR. LIEFER:  No more questions.

THE COURT:  You may step down.  About 11 minutes
after 12.  We're going to break for lunch.  And lunch is on
your own.  I think your cars are in the back of the
courthouse.  So the bailiff will take charge and see that you
go to your cars.  Well, I'd really like to get started with
our trial again before 1:30 this afternoon.  When you return
to the courthouse from your lunch, you'll come upstairs and
have a seat there in the jury room.

And I should tell you, as I told you before we
started the trial and which I'll tell you throughout the
course of the trial, when you go to lunch, you go to eat with
some of your fellow jurors, you shouldn't sit down through
your lunch hour and discuss the evidence that you've heard in
the case so far.  You'll have plenty of time to discuss the