1

```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW MEXICO

3     UNITED STATES OF AMERICA,

4          Plaintiff,

5          VS.                        CR. NO. 15-4268 JB

6     ANGEL DELEON, et al.,

7          Defendants.

8

9                          VOLUME 1

10         Transcript of Motion to Suppress Proceedings
      before The Honorable James O. Browning, United States
11    District Judge, Las Cruces, Dona County, New Mexico,
      commencing on December 7, 2017.

12

13    For the Government:  Ms. Maria Armijo; Mr. Randy
      Castellano; Mr. Matthew Beck
14
      For the Defendants: Ms. Sara Priddy; Ms. Cori
15    Harbour-Valdez; Mr. Patrick Burke; Mr. Robert Cooper;
      Mr. Jeff Lahann; Mr. Orlando Mondragon; Mr. John
16    Granberg; Mr. Billy Blackburn; Mr. Scott Davidson;
      Ms. Amy Jacks; Mr. Richard Jewkes; Ms. Amy Sirignano;
17    Mr. Christopher Adams; Mr. Marc Lowry; Ms. Theresa
      Duncan; Ms. Carey Bhalla; Mr. William Maynard; Mr.
18    Ryan Villa; Ms. Justine Fox-Young; Mr. Donovan
      Roberts; Ms. Lisa Torraco; Ms. Angela Arellanes; Mr.
19    Samuel Winder

20
      For the Defendants (Via telephone):  Ms. James Castle
21

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  All right.  Let's get started.
2    Look around the room.  I think we've got everybody
3    that is supposed to be here today.  Help your buddies
4    out, make sure that everybody has an attorney.
5              All right.  The Court will call United
6    States of America versus Angel DeLeon, et al.,
7    Criminal Matter No. 15-CR 4268 JB.
8              If counsel will enter their appearances for
9    the Government.
10             MS. ARMIJO:  Good morning, Your Honor.
11   Maria Armijo, Randy Castellano, and Matthew Beck on
12   behalf of the United States.
13             THE COURT:  All right.  Ms. Armijo, Mr.
14   Castellano, Mr. Beck, good morning to you.
15             And sitting in for Brock Benjamin and
16   Richard Sindel for Defendant Joe Lawrence Gallegos?
17             MS. PRIDDY:  Sara Priddy for Mr. Gallegos.
18             THE COURT:  All right.  Ms. Priddy, good
19   morning to you.  Mr. Gallegos, good morning to you.
20             THE DEFENDANT:  Good morning, Judge.
21             THE COURT:  And Mr. Gallegos, I understand,
22   through Mr. Benjamin, you consent to Ms. Priddy being
23   your counsel for today and tomorrow.
24             THE DEFENDANT:  Yes, sir.
25             THE COURT:  I understand Mr. Benjamin had
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  some family member having some surgery, and so
 2  something came up really suddenly.  Most of the
 3  motions we're going to hear today, I don't think
 4  directly impact you as well.  And I think Mr.
 5  Benjamin talked to you about that; is that correct?
 6            THE DEFENDANT:  Yes, sir.
 7            THE COURT:  All right.  For Defendant
 8  Edward Troup.
 9            MS. HARBOUR-VALDEZ:  Good morning, Your
10  Honor.  Cori Harbour-Valdez and Pat Burke on behalf
11  of Edward Troup.
12            THE COURT:  All right.  Ms. Harbour-Valdez,
13  Mr. Burke, Mr. Troup, good morning to you.
14            THE DEFENDANT:  Good morning.
15            THE COURT:  And for Defendant Billy Garcia.
16            MR. COOPER:  Good morning, Your Honor.  Bob
17  Cooper on behalf of Billy Garcia.  Judge, Mr. Castle
18  just texted me and says he's getting a busy signal
19  when he's calling in.  He would like to be --
20            THE COURT:  Is anybody on the line?
21            THE CLERK:  I am, Judge.
22            THE COURT:  All right.  That's Ms. Wild.
23            I don't know, Ms. Standridge, is there a
24  way to check and see what's happening as far as --
25            THE CLERK:  Does he have the right call-in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   number, Judge?
 2              THE COURT:  Why don't you give me the
 3   number so I can give it out.
 4              THE CLERK:  505-348-2041.
 5              THE COURT:  2041?
 6              THE CLERK:  Yes, sir.
 7              THE COURT:  Do you want double-check, Mr.
 8   Cooper, and see if he's got the right number.
 9              MR. COOPER:  505-348 --
10              THE COURT:  -- 2041.
11              MR. COOPER:  That is not the number.  But
12   we'll get it to him thank you.
13              THE COURT:  All right, we'll try it.  Good
14   morning, Mr. Cooper, Mr. Castle, Mr. Garcia, good
15   morning to you.
16              THE DEFENDANT:  Good morning.
17              THE COURT:  All right.  For Defendant Allen
18   Patterson.
19              MR. LAHANN:  Good morning, Your Honor.
20   Jeff Lahann on behalf of Mr. Patterson.
21              THE COURT:  Mr. Lahann, Mr. Patterson, good
22   morning to you.
23              THE DEFENDANT:  Good morning, Your Honor.
24              THE COURT:  For Defendant Christopher
25   Chavez.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. GRANBERG:  Good morning, Your Honor.

2    John Granberg for Mr. Christopher Chavez.

3          THE COURT:  All right.  Mr. Granberg and

4    Mr. Chavez, good morning to you.

5          THE DEFENDANT:  Good morning, Your Honor.

6          THE COURT:  And for Defendant Arturo

7    Arnulfo Garcia.

8          MR. BLACKBURN:  Good morning, Your Honor

9    Billy Blackburn and Scott Davidson on behalf of

10   Mr. Garcia, who is present.

11         THE COURT:  All right.  Mr. Blackburn,

12   Mr. Davidson, Mr. Garcia, good morning to you.

13         THE DEFENDANT:  Good morning, Your Honor.

14         THE COURT:  For Defendant Daniel Sanchez.

15         MR. JEWKES:  Good morning, Your Honor.

16   Richard Jewkes and Amy Jacks representing Daniel

17   Sanchez, who is before the Court.

18         THE COURT:  All right.  Mr. Jewkes,

19   Ms. Jacks, Mr. Sanchez, good morning for you.

20         THE DEFENDANT:  Good morning.

21         THE COURT:  And for Defendant Anthony Ray

22   Baca.

23         MR. LOWRY:  Good morning, Your Honor.  Marc

24   Lowry and Teri Duncan on behalf of Anthony Ray Baca,

25   who is present.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Mr. Lowry, Ms.
 2   Duncan, Mr. Baca, good morning to you.
 3            THE DEFENDANT:  Good morning, Your Honor.
 4            THE COURT:  And for Christopher Garcia.
 5            MR. ADAMS:  Good morning, Your Honor.
 6   Chris Adams and Amy Sirignano on behalf of
 7   Mr. Garcia.
 8            THE COURT:  All right.  Mr. Adams, Ms.
 9   Sirignano, Mr. Garcia, good morning to you.
10            THE DEFENDANT:  Good morning.
11            MR. ADAMS:  Thank you, Your Honor.
12            THE COURT:  And for Defendant Carlos
13   Herrera.
14            MS. BHALLA:  Good morning, Your Honor.
15   Carey Bhalla for Carlos Herrera, with Mr. William
16   Maynard, who is joining us today.  And Sonia Salazar,
17   our paralegal.
18            THE COURT:  All right.  Ms. Bhalla, Mr.
19   Maynard, good morning to you.  Mr. Herrera, Ms.
20   Salazar, good morning to you.
21            For Defendant Rudy Perez.
22            MR. VILLA:  Your Honor, good morning.  Ryan
23   Villa and Justine Fox-Young on behalf of Mr. Perez,
24   who is present in custody.  We have with us at our
25   table Ms. Laura Schile.  She's our expert.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Mr. Villa, Ms.
 2    Fox-Young, Mr. Perez, good morning for you.
 3              THE DEFENDANT:  Good morning.
 4              THE COURT:  Ms. Schile, good morning to
 5    you.
 6              And for Defendant Andrew Gallegos.
 7              MR. ROBERTS:  Your Honor, Donovan Roberts
 8    for Andrew Gallegos.  With me today is Lisa Torraco,
 9    who is joining us.
10              THE COURT:  All right.  Mr. Roberts, Ms.
11    Torraco, and Mr. Gallegos, good morning to you.
12              THE DEFENDANT:  Good morning.
13              THE COURT:  And for Defendant Shauna
14    Gutierrez.
15              MS. ARELLANES:  Angela Arellanes for Ms.
16    Gutierrez, who is present today.
17              THE COURT:  All right.  Ms. Arellanes, Ms.
18    Gutierrez, good morning to you.
19              THE DEFENDANT:  Good morning.
20              THE COURT:  And for Defendant Brandy
21    Rodriguez.
22              MR. WINDER:  Good morning, Your Honor.  Sam
23    Winder on behalf of Jerry Walz on behalf of Brandy
24    Rodriguez.
25              THE COURT:  All right.  Mr. Winder,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    Ms. Rodriguez, good morning for you.

 2              And then for Eric Duran, we're going to

 3    have some -- is Eric here?  Do we have -- is

 4    Mr. Duran in the courtroom?

 5              MS. ARMIJO:  Your Honor, Mr. Duran -- there

 6    is a warrant out for his arrest.  He's not present.

 7              THE COURT:  Okay.  All right.  Let me check

 8    my notes.  We've got some new counsel and things.

 9    We've got Ms. Priddy, Ms. Torraco, Mr. Maynard, and

10    then Ken del Valle will be appearing for Mr. Duran if

11    we get him available.

12              All right.  I think that's everything.

13              I did get the opinion entered on Ms.

14    Gutierrez, Ms. Arellanes, so I did get that opinion

15    entered.  You may not have seen it because it didn't

16    get entered, I think, till this morning.  But it is

17    entered.

18              MS. ARELLANES:  All right.  Thank you,

19    Judge.

20              THE COURT:  So I didn't hear back -- that

21    doesn't mean that you didn't do what I asked you to

22    do -- I didn't hear back through Ms. Wild whether

23    y'all had a new batting order.  So presently I'm

24    working on an opinion on Mr. Sanchez' motion to

25    sever, which is a reconsideration motion.  So I'm

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   working on an opinion there.  If y'all got something
 2   better or more pressing or something you want me to
 3   reconsider or look at more closely or give you more
 4   detailed guidance, let me know.  That will give me a
 5   little bit of guidance.  But that's what I'm working
 6   on at the present time.
 7            Let's see, we've got a table over here for
 8   Mr. Perez and his attorneys.
 9            Ms. Wild has worked with you to come up
10   with a batting order to try to use these days as
11   efficiently as possible.
12            My understanding is that the first motion
13   we're to take up today is a suppression motion that
14   was filed by Defendant Carlos Herrera.  And so,
15   Ms. Bhalla, are you taking the lead on that?
16            MS. BHALLA:  Well, Your Honor, to be
17   perfectly candid with the Court, the conversations
18   that we had would be that the conflict motion would
19   go first, then our motion to continue would go
20   second, and then Mr. Villa was going to start with
21   the motion to suppress lost and destroyed evidence.
22   So that's sort of my -- I think that was our
23   understanding of the batting order.
24            THE COURT:  Well, let me -- Ms. Wild,
25   that's an inverted order from what I have.  Do you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    see any problems from a scheduling standpoint in

2    taking the, I guess conflict, motion up first?

3              THE CLERK:  No, Judge.  And actually there

4    is a note that I gave you; there was an addition, and

5    it didn't reflect it.  It looked like to me you'd

6    probably be taking up 4 -- and it's actually 4 and 5

7    first.  So that's right, that's what the plan was.

8              THE COURT:  Okay.  So Ms. Bhalla, do you

9    want to take up -- do you want take up the motion

10   regarding attorney conflict first, or your motion

11   to -- I've already taken care of, I think, appointing

12   another counsel, Mr. Maynard.  So I guess it would be

13   then the motion to continue portion of that.  Do you

14   want to take that up first or the attorney conflict

15   first?

16             MS. BHALLA:  Your Honor, I wasn't raising

17   the attorney conflict motion.  That was Mr. Lowry's

18   motion.

19             THE COURT:  No, but I was going to you to

20   look at the order.  And you said that y'all had an

21   agreement on order.  So which one do you want to take

22   up first?

23             MS. BHALLA:  Oh, I'll defer to Mr. Lowry on

24   that, Your Honor.

25             THE COURT:  Do you want to go then?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1          MR. LOWRY:  Well, Your Honor, it's the

2    United States' motion, but I very much appreciate if

3    we could address this first.  They filed a written

4    pleading on Monday.  I haven't had an opportunity to

5    respond in writing.  But I think I'm ready to proceed

6    on my feet, if you will, and to file a written

7    pleading, you know, over the weekend, if necessary.

8    But I'm prepared to argue it today.  But it's,

9    obviously, not my motion.  It's the United States'

10   motion.

11          THE COURT:  Do you want to take it up at

12   this time, Mr. Castellano?

13          MR. CASTELLANO:  Yes, Your Honor.  That was

14   our understanding of the order as well.

15          THE COURT:  Okay.

16          MR. CASTELLANO:  The conflict motion would

17   go first, and the motion to continue would be second.

18          MS. HARBOUR-VALDEZ:  Your Honor, I'm sorry

19   to interrupt, but I'm getting messages from the folks

20   on the phone that they can't hear anyone except you.

21          THE COURT:  All right.  So folks, you've

22   got to speak into the microphone so the people on the

23   phone can hear.  I guess I probably need to know who

24   all is on the phone.  I know Ms. Wild.  And I guess

25   Mr. Castle is on the phone; is that correct, Mr.

SANTA FE OFFICE                                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                      Albuquerque, NM 87102
(505) 989-4949                                                                                    (505) 843-9494
FAX (505) 843-9492                                                                      FAX (505) 843-9492
                                                                                              1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1    Castle?

2              MR. CASTLE:  Yes, Your Honor.

3              THE COURT:  Who else is on the phone?

4              MS. HARBOUR-VALDEZ:  Your Honor, our

5    paralegal, Raquel Rodriguez, is also on the call.

6              THE COURT:  Okay.  Anybody else on the

7    phone?

8              All right.  Mr. Castellano, if you wish to

9    argue the conflict motion.

10             MR. CASTELLANO:  Yes, sir.  Thank you.

11             Last week, you kind of hinted that the

12   timing of this motion -- and what I can tell the

13   Court is that this came up, I think, two weeks ago

14   now, as I was reviewing discovery for the next set of

15   disclosures.  And one of the items in the discovery

16   was STIU file of Eric Duran.  As I looked through

17   that file, there were a couple of documents in there.

18   And one of them indicated that he said that Mark

19   Donatelli was his attorney.  That was the first time

20   I had seen that.

21             And then somewhere else in the discovery

22   there was also a paycheck or a check, and it was also

23   written to attention of Mark Donatelli.  And so, once

24   that happened, we inquired of Mr. Lowry whether or

25   not he knew or believed there was any conflict as it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    related to his firm's representation of Eric Duran.
 2            Eric Duran is a cooperator in this case.
 3    The Court has heard a few times that he has recorded
 4    some of the defendants, including Mr. Baca.  So one
 5    of the issues we'll have to address is whether or not
 6    the prior representation and the current
 7    representation create a conflict, since part of the
 8    defendants will be attacking Eric Duran, who will be
 9    a witness for the Government and against Mr. Baca
10    among others.
11            THE COURT:  Could you elaborate?  Maybe Mr.
12    Lowry is prepared to elaborate on what that prior
13    representation was.  What was the Rothstein firm
14    representing Duran on?
15            MR. CASTELLANO:  I'll give my limited
16    understanding.  And I think Mr. Lowry will be better
17    at focusing on that, Your Honor.  But my
18    understanding was that Mr. Duran had a lawsuit
19    against the Corrections Department.
20            THE COURT:  So it was a civil suit?
21            MR. CASTELLANO:  That's my understanding.
22            THE COURT:  And I assume it was probably in
23    the nature -- not of a 2254, or anything like that,
24    habeas; it was something to do with his corrections
25    facility?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1            MR. CASTELLANO:  That's my understanding.
2     It may have been a suit against corrections guards
3     themselves.  And so the firm represented him while he
4     was an inmate at the facility.  And there is
5     another -- that's the first issue.
6            THE COURT:  Do you know any more about the
7     suit than that?
8            MR. CASTELLANO:  No, I know very little
9     about the suit.  Only that he indicated that Mr. --
10    we may have a copy of the complaint, Your Honor.
11           THE COURT:  You don't have --
12           MR. CASTELLANO:  We may have a copy.
13           THE COURT:  You do.
14           MR. CASTELLANO:  What I've just been handed
15    is a complaint for damages for deprivation of civil
16    rights and for supplemental state law claims, Civil
17    No. 01-14 -- I can't tell if there is another 1,
18    WWD/DJS.  And in that, apparently what happened was
19    some guards were alleged to have beat up Mr. Duran in
20    the facility.  He filed suit and the suit was
21    dismissed after there was a settlement in the case.
22    And the Donatelli firm represented him as a prisoner
23    at the facility.
24           THE COURT:  So the guards allegedly beat up
25    Mr. Duran?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MR. CASTELLANO:  That's my understanding,
2    Your Honor, yes.
3              THE COURT:  Is there any discussion in the
4    complaint, just perusing it, that SNM was involved;
5    that that was an issue at all in that case?  Was it
6    at all SNM related?
7              MR. CASTELLANO:  I'm looking at it right
8    now, Your Honor.  So I'm just kind of skimming it.
9    It's a 28-page document.  When I sit down I can give
10   it a closer look, but as I'm looking through this,
11   obviously, at the time Mr. Duran was an inmate.  And
12   so I'm only speculating here, in the context of the
13   representation, assuming there would have been
14   discussions about his status as an inmate, which
15   could have touched on his status as a gang member,
16   that I'm not sure of.  I don't know about the
17   communications between counsel and Mr. Duran.  And
18   there is --
19             THE COURT:  What is -- let me ask you this:
20   Given what you know about the case, would you say
21   that that civil lawsuit is the same case as this one?
22             MR. CASTELLANO:  Well, I think, given the
23   nature of the racketeering enterprise, I think it
24   certainly could be.  Because if he is viewed as an
25   SNM Gang member, or was housed with the SNM Gang
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                    1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    members, then that would certainly touch on it.  And

2    so the answer is I think it could be.

3            THE COURT:  So it's not that you see an

4    actual conflict at this time?  You're seeing this as

5    more of a potential conflict?

6            MR. CASTELLANO:  Certainly a potential

7    conflict.  I'd have to think more about the actual

8    conflict.  Because once again, I don't know of the

9    communications between Mr. Duran and the Donatelli

10   law firm in terms of how much of the overlap was with

11   his status as an SNM member or associate in the

12   context of being an inmate at the facility.

13           THE COURT:  You know, that's -- I'm having

14   a harder time with this one saying that it's the same

15   or related case.  It seems to me that most of your

16   briefing went off on the confidential information

17   prong of that, rather than in -- like in Mr. Davis'

18   situation, where I went off more on the same or

19   related case, given that murder is going to be used

20   by the Government to prove enterprise and

21   racketeering activity.

22           MR. CASTELLANO:  I agree.  I think the

23   murder certainly was stronger in terms of raising the

24   conflict issue.  So what we're going to have here is

25   really a lot of it's going to be based on the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    communications between counsel and Mr. Duran, and

2    whether or not any conversations that were gained or

3    any information gained from the law firm can be used

4    in cross-examination.  And so a lot of that is going

5    to be based on communications between counsel and

6    Mr. Duran.

7              THE COURT:  Do we know at all about whether

8    Mr. Duran is willing to waive any conflict here?

9              MR. CASTELLANO:  We don't, Your Honor.  And

10   as part of the motion, we've asked that counsel be

11   appointed to him so someone else independent can have

12   a conversation with him.

13             THE COURT:  And I have appointed Ken Del

14   Valle to do that.  But we don't know where any of

15   that stands?

16             MR. CASTELLANO:  No.  There is an

17   outstanding warrant for Mr. Duran's arrest.  And so

18   at this time, until he's apprehended, no one will

19   have a chance to meet with him to discuss the

20   conflict issue.

21             THE COURT:  That's not much of a

22   cooperating witness, is it?

23             MR. CASTELLANO:  Not right now.  He's

24   taking a little time off right now.

25             THE COURT:  He's the only one?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                    1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                   e-mail: info@litsupport.com

```
 1              MR. CASTELLANO:  Right.  And if you're done
 2    with this, there is actually a second issue which
 3    came up.  So, in the context of asking about this
 4    lawsuit, Ms. Armijo asked counsel for the Department
 5    of Corrections whether this is the same Duran from
 6    the Duran Consent Decree.  And it's not the same
 7    person.  And that was, I believe, Dwight Duran.
 8              But this is an issue I discussed with Mr.
 9    Lowry probably a year ago.  And it didn't seem to be
10    an issue at the time.  And the discussion was related
11    to the Donatelli law firm's representation or
12    oversight of the Duran Consent Decree.  And so the
13    consent decree was a class action.  And all the
14    inmates I believe in Level 3 or above were considered
15    members of the class.  So most of the consent decree
16    was pretty much finished and resolved.  Mr. Lowry, I
17    think at that time, also believed the litigation had
18    resolved.  So we thought it was a past issue.
19              When this came up with counsel,
20    Mr. Brewster, from the Department of Corrections, he
21    indicated that the consent decree has been revived in
22    the last couple of years, and there has been ongoing
23    litigation including the Donatelli law firm.  Some of
24    the litigation, as I understand it, is related to the
25    rules on how many people can be housed together and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    how much square footage is permitted for housing

2    prisoners.  And the other -- I think it has to do

3    with recreation rooms and game rooms.  But there has

4    been ongoing litigation.

5            So in that context the Donatelli law

6    firm -- I discussed this with Mr. Lowry this week --

7    he's aware of the issue.  So their firm, in essence,

8    potentially represents all defendants in this case,

9    due to the consent decree because they are

10   potentially members of a class.  So --

11           THE COURT:  Where is that case, though?  I

12   thought that case had been terminated.

13           MR. CASTELLANO:  That's correct, Your

14   Honor.  Most of that case, I believe, has been

15   terminated.  Except, like I said, in the last couple

16   of years, it's been revived in a couple of areas

17   related to housing of prisoners and use of day rooms

18   and, I think, recreation rooms.

19           THE COURT:  Who has that case?  What

20   federal judge has that case?

21           MR. CASTELLANO:  I don't know.  I only know

22   that the Department of Corrections is involved, and

23   the Donatelli firm is involved, and I think a couple

24   of other firms are involved in the oversight of the

25   remaining litigation.  So, apparently, it's alive and

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492



```
1   well.
2           So the other question we have to answer is
3   whether or not that creates other conflicts, because
4   the Donatelli firm, in essence, could represent any
5   member of the class, which could be any of the
6   individuals in this courtroom or any cooperators who
7   were housed in Level 3 or above, which would probably
8   be everybody.
9           So the other issue we have there is whether
10  or not there are conflicts, whether or not the firm
11  has represented these people, which I think they have
12  as part of the class, and whether or not they've had
13  discussions, including confidential discussions, with
14  anyone in this case; that would be defendants and
15  cooperators who have not been charged.
16          So it may be an issue we have to look into
17  further.  It may be that the firm has to go through
18  its records and see whether or not it's interviewed
19  anybody in this case as part of that representation.
20  But, in essence, they represent anyone in custody, I
21  think, at Level 3 or above.
22          THE COURT:  All right.  Anything else, Mr.
23  Castellano?
24          MR. CASTELLANO:  Not right now, Your Honor.
25  I will look through this complaint a little bit more
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   when I have time, and if anything else comes up, I'll

2   let the Court know.

3            THE COURT:  Well, I certainly should let

4   everybody know I'll have to give this some thinking

5   myself.  Of course, I was Deputy Attorney General

6   representing the State during the time of the Duran

7   Consent Decree, so I was attorney for the State

8   during that period of time.  I don't know if that

9   creates any problems or not.

10            Ms. Standridge just told me that Duran is

11   assigned to Judge Gonzales.  So I guess you're right.

12   I thought the thing was long over.  But I did some

13   work on that myself when I was state attorney.  So we

14   need to keep that in mind.

15            All right.  Thank you, Mr. Castellano.

16            MR. CASTELLANO:  Thank you, Your Honor.

17            THE COURT:  Anybody else want to weigh in

18   on this before I hear from Mr. Lowry?

19            All right.  Mr. Lowry.

20            MR. LOWRY:  Good morning, Your Honor.

21   Thank you.

22            THE COURT:  Mr. Lowry.

23            MR. LOWRY:  Your Honor, I have -- well, let

24   me get right to the point.  When we were initially

25   assigned representation in this case for Mr. Baca, we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   had no inclination whatsoever that Eric Duran was

 2   involved whatsoever.

 3          And it wasn't until the first -- what I

 4   would call the real substantive discovery production

 5   by the United States on March 25, 2016, that my

 6   colleague, Teresa Duncan, started plowing through

 7   discovery, as she's prone to do.  And during that, we

 8   looked at the confidential recordings from the a/k/a

 9   Ironman.  And it was pretty quickly ascertained by

10   Ms. Duncan who the real identity of Ironman was.  And

11   she determined that it was Eric Duran.  So she did

12   what a methodical defense attorney did --

13          THE COURT:  That Mr. Duran has never been a

14   party to any of the SNM cases that I have; correct?

15          MR. LOWRY:  Not to my knowledge, Your

16   Honor, unless there is a sealed pleading -- of which

17   there are many that I'm unaware -- but, to my

18   knowledge, he is not.

19          So, in the context of her research, Ms.

20   Duncan came across press reports regarding this civil

21   case.  And she immediately contacted me.  And we

22   immediately contacted Mr. Donatelli to set up a

23   firewall.  And our thinking at the time was:  This

24   was a civil case that was completely unrelated to the

25   SNM matter.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          And I have, Your Honor, since the filing of

 2     this motion, in talking about it with opposing

 3     counsel last week, just looked at the publicly

 4     available material in this case.  And we ordered the

 5     transcript.

 6          These aren't allegations, by the way.  The

 7     reality of this case was -- and this is what I've

 8     learned from publicly available information, because

 9     Mr. Donatelli and I really haven't spoken about it --

10     that Mr. Duran was a resident of Hobbs, in the Lea

11     County Correction Facility there, and went to the

12     dining hall with about 30 other inmates.  And one of

13     the correctional officers assigned him a seat, unlike

14     anybody else in the dining hall.  Mr. Duran took

15     offense to that, and there were words exchanged,

16     which ended up with the correctional officer telling

17     him he was going to return to his cell and he had

18     forfeited his right to have lunch.

19          That caused a little bit of ill will.  And

20     Mr. Duran said, No, I'm going to go get another tray

21     because the guard had discarded the first tray, the

22     lunch tray.  And he went and stood back in line.  The

23     guards, at that point, extricated him out of the room

24     and took him to a hallway where approximately --

25     according to the criminal complaint that was filed

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1   against the guards -- proceeded to handcuff him

2   behind his back, put him prone on the floor and

3   kicked -- two guards, one on each side, kicked his

4   head repeatedly, for which there was a criminal

5   complaint filed against three guards.

6           One pled guilty, cooperated with the United

7   States.  And the Department of Justice, Barbara

8   Bernstein, prosecuted three guards who didn't plead

9   guilty and got guilty verdicts on all three.  So

10  there were four convictions.

11          So there is no allegations -- this is

12  proven fact -- that the correctional officers with

13  the Department of Corrections beat the stuffing out

14  of Eric Duran.  And it didn't involve any

15  gang-related activity at all.  It's just about a

16  kerfuffle that happened in the dining hall.

17          Now, we've looked -- and I have, Your

18  Honor -- we've looked at the transcript that's

19  available in that case.  I can mark them as exhibits.

20  We have the opening statements, all of Duran's

21  testimony, and the closing statements for the Court.

22  I will mark them today and tender them as Exhibits A,

23  B, and C.

24          But the only reference of gang activity at

25  all in that case was in the criminal case -- not the

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                                              Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                1-800-669-9492
                                                                                e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    civil case, but the criminal case -- was the United

 2    States, Barbara Bernstein, when they were putting on

 3    Mr. Duran, had an oral motion in limine in front of

 4    the Court, and said:  Whatever these guards are going

 5    to do with their defense, we want to make sure that

 6    they're not going to say that this -- they were

 7    afraid there was going to be a gang incident in the

 8    cafeteria that led them to Mr. Duran.  And the

 9    criminal defense attorneys agreed that gangs weren't

10    at issue in that case at all.  And so that's the only

11    time gangs were mentioned.  And it wasn't

12    SNM-specific.  It was generic, and --

13           THE COURT:  It was a motion in limine to

14    keep it out of the trial?

15           MR. LOWRY:  Yes.  And they just didn't want

16    the defendants, the correctional officers, trying to

17    curry favor with the jury saying that this guy was

18    affiliated with gang X, whatever it was.

19           At the time, it strikes me as odd because,

20    as we all know, the Department of Corrections had

21    made specific housing assignments related to the SNM,

22    and that never was the Hobbs facility or the Lea

23    County Correctional Facility.  We all know that

24    that's been Southern for some years.

25           So there is no objective indication at all

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that this was SNM-related.  In fact, all of the
2    objective evidence indicates that this was not gang
3    related at all; that this was just an altercation.
4             And if you look at the trial transcript in
5    its totality -- and the Court can take judicial
6    notice of the trial transcript as part of the Court's
7    records, but I'll mark these as A, B, and C.  This
8    was really about the guards -- at that time Wackenhut
9    had just opened that facility; they had just taken it
10   over.  There was a lot of push-back about them being
11   ineffective caretakers of the facility because there
12   was a widespread feeling that the guards didn't
13   really control the facility and the guards were
14   trying to demonstrate who was boss, so to speak.  So,
15   when they ran across an uppity inmate in the
16   institution, they were going to be determined to set
17   the record straight and show who was in charge.
18            That didn't work out so well, because there
19   were four criminal convictions on the COs as a result
20   of that.  But it wasn't gang-related at all.
21            So that's what I know today.
22            Frankly, back in March of last year, we
23   just had a couple of press reports that I shared with
24   opposing counsel.
25            But at the time, we did what I consider to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    be double duty.  We said:  Mr. Donatelli, don't talk
 2    about this case with us, ever.  And between Ms.
 3    Duncan and I, we said she would handle Eric Duran as
 4    a witness, and I would not, because of the firm's
 5    prior representation of Mr. Duran.
 6            So at the time we really thought that, you
 7    know, we had done due diligence at -- A, we'd made a
 8    determination that this case wasn't substantially
 9    related to this case; that no conflict actually
10    existed.  But, as a prophylactic measure, we wanted
11    to double down and make sure we did the right thing.
12    So we assigned Ms. Duncan the honor of handling the
13    Duran witness, and having Mr. Donatelli refrain from
14    ever talking about this.
15            Now, I want to back up for a second because
16    it bears repeating.  I did a little research after
17    your opinion came out on Sunday.  I think it's
18    important for the Court to understand the physical
19    dynamic of the firm.  A, this case had come -- was
20    litigated and had been resolved; the settlement
21    agreement was reached September 18 of 2012.  I didn't
22    join the firm until September of -- well, pardon me,
23    not 2012, but 2002.  I joined the firm in September
24    of 2003.  So this case had been mothballed by the
25    time I took employment with the firm.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              But more importantly, is that Mr. Donatelli
 2       has always worked and lived in Santa Fe -- out of the
 3       Santa Fe office of the Rothstein Law Firm.  And since
 4       day one I've always lived and worked in the
 5       Albuquerque office of the Rothstein Law Firm in
 6       Albuquerque, New Mexico.  This is important, because
 7       I think a lot of the Rules of Professional Conduct
 8       with imputed conflicts and these kinds of things
 9       really imagine lawyers in the same firm sharing the
10       same filing cabinets, talking about the case over the
11       water cooler break, at lunch, whatever.  And the
12       reality of this case is that, for a number of years
13       with the firm, I've rarely, if ever, saw Mark
14       Donatelli -- maybe two or three, half a dozen times a
15       year, and just at social functions.  So there is no
16       pipeline, electronic or otherwise, between the
17       Albuquerque office and the Santa Fe office, where we
18       can share files.  Unfortunately, even with the
19       internet, even today, we don't share files between
20       the offices.  So the commingling of information just
21       wasn't possible, and in fact, never happened.  So I
22       just want to bring that to the Court's attention so
23       you could understand that, obviously, one of the
24       rules of professional conduct is concerned acutely
25       with how confidential client information is handled.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                               1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    And I never had access to -- either before we became

2    aware of this or after, except for what I've just

3    done in preparation for this -- defending this motion

4    in reality.  So that's important for the Court to

5    understand.

6           So we've analyzed this as the case is

7    fundamentally not a conflict, because this civil case

8    is just not substantially related to this present

9    RICO case at all.  And I can say that with a high

10   degree of confidence, having reviewed the civil

11   complaint.  And I have a copy I'll tender as Exhibit

12   D.  And having reviewed -- not completely, because

13   the trial transcript is about approximately 1300

14   pages long -- but I have reviewed the openings and

15   closings and the Eric Duran testimony.  And there was

16   just no real issue about gang involvement, in

17   general.  More specifically, there is absolutely no

18   mention of SNM throughout the case.  I had a

19   paralegal do a word search, once we PDF'd the trial

20   transcript, and we can't find any reference under SNM

21   at all.

22           So I just don't think there is a conflict,

23   because I don't think the cases are substantially

24   related, as the Rules of Professional Conduct

25   contemplate.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Which brings us to the second part of the
 2   analysis.  Because, as you know through your opinion,
 3   there is two parts:  Where the case is substantially
 4   related, and then what do we do about the
 5   confidential information?
 6          And with regard to the confidential
 7   information, like I said earlier, there is really no
 8   overlap between my office and Mr. Donatelli's office.
 9   Although, if we take the rule as logical extreme, one
10   could argue that that's irrelevant.
11          But what I would suggest, Your Honor, that
12   if you look at Rule 109(c), which is really talking
13   about representation of current clients, vis-a-vis
14   former clients, and how you handle confidential
15   information, there is exceptions where that
16   information has become more available, or there is a
17   waiver on behalf of the former client.
18          And I think that's important here, Your
19   Honor.  And I want to point the Court to the
20   Government's actual motion.  And when the Government
21   raised this last week -- and I've worked as
22   transparently as I can with my colleagues on the
23   other side of this case to explain to them my role,
24   how the firm functioned.  Last week, they even took a
25   picture of me to send to Mr. Duran, to see if he
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   recognized me.  To my knowledge, he didn't ever
2   recognize me, which is not surprising, because I
3   wasn't at the firm at the time.
4           And when we were in the hall speaking with
5   Ms. Wild, Ms. Armijo had mentioned to me that, Well,
6   of course, you have a problem with confidential
7   information because Mr. Duran would have talked to
8   Mr. Donatelli about his drug dealing for the SNM.
9   And at the time I said, Well, that's pretty
10  remarkable, because this is the first I've heard
11  about it from you, the prosecutor for the United
12  States.  And that sentiment is repeated at page 2 of
13  Document 1534, at the bottom of the page in the
14  motion.  It says, "It is believed during the course
15  of this representation, Duran discussed his prison
16  activities, to include illegal drug activity at a
17  minimum."  And that sentiment is carried over into
18  Footnote 7, which says, "Assume Duran testifies at
19  trial, Duran would likely be cross-examined about his
20  involvement as an SNM inmate and member.  During his
21  representation of Duran, Mr. Lowry's firm dealt with
22  that very issue."
23          Well, Your Honor, I'm just going to submit
24  to the Court that the only way my colleagues on the
25  other side of this case could know of anything like
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that -- which I have no idea whatsoever -- is if they
 2    consulted with Mr. Duran about it.  And if they
 3    consulted with Mr. Duran about it, Mr. Duran has
 4    waived his attorney-client confidences that he had
 5    with Mr. Donatelli.  And it bears repeating again.  I
 6    know nothing about what those confidences were.  But
 7    it strikes me as a bit ironic that the United States
 8    knows more about those confidences than I do.  And
 9    they're saying that I have a conflict.
10              In preparing for this motion, we did talk
11    to Mr. Donatelli.  He's available, but not until
12    after lunch, if Your Honor wants to talk to him about
13    the nature of his representation.  He's at the ADX
14    taking some death penalty teams through the facility
15    this morning.  But what he did tell me -- and you'll
16    see this in the exhibit -- that there is a Barbara
17    Bernstein, who was the Department of Justice attorney
18    out of Washington, D.C., who prosecuted the three
19    guards who wouldn't plead guilty, and that they
20    worked very closely together throughout the duration
21    of the criminal case and the civil case.  And my
22    understanding is, without going into any detail at
23    all, is -- Mr. Donatelli told me yesterday -- that
24    there was nothing that he knew that Ms. Bernstein
25    with the Department of Justice didn't know.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              And so, again, I'm just coming back to this
 2     idea that to the extent there could be any
 3     confidential information imputed to me, that's
 4     information that the client waived by sharing it all
 5     with the Department of Justice.
 6              THE COURT:  Well, are you relying, then, on
 7     waiver rather than on --
 8              MR. LOWRY:  Well, Your Honor, it's a
 9     two-for.  I'm saying I didn't have any, as a
10     practical matter --
11              THE COURT:  But you and I talked at the
12     last hearing -- I don't have the number in front of
13     me -- about the fact, on this issue, it seemed to me,
14     just looking at the rules in connection with the
15     Davis motion, that any sort of information that the
16     firm has is imputed to all members of the firm.  So
17     we can't -- we wouldn't be able to take a practical
18     approach, and say, Well, this attorney doesn't have
19     it and this one does.  It's imputed to the firm and
20     all the attorneys in the firm.
21              MR. LOWRY:  And I -- well, let me take a
22     step back before I jump into that pool too deeply.
23     And I think Your Honor struck the right cord in the
24     Davis opinion, which is, really at the first cut at
25     examining and analyzing the confidential information
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    is really an objective inquiry.  And this is set out

2    in the Committee Commentary No. 3 of Rule 16-109.

3    And I'm going to quote from the rule.  And it says,

4    quote, "A conclusion about the possession of such

5    information may be based on the nature of the

6    services the lawyer provided the former client and

7    the information that would in ordinary practice be

8    learned by a lawyer providing such services."

9            What that standard does is really focus us

10   back to the original civil suit, and say, jeez, if

11   I'm representing a prison inmate in a personal injury

12   case, does that really necessitate me making an

13   inquiry into his drug dealing habits for any

14   particular gang?

15           And I think, Your Honor, the appropriate

16   analysis is:  Well, no.  There is nothing objective

17   about the civil suit, which is, you know, a half a

18   dozen or so guards kicking in Mr. Duran's head, that

19   had anything to do with gangs, drug dealing, or

20   anything.  There was just the opportunity to share

21   that kind of information never availed itself, if you

22   look at the cases objectively.

23           And so I would argue to the Court that we

24   really don't need to get deep into the weeds of what

25   confidential information was provided to Mr.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Donatelli, because an objective analysis indicates

2     that there would have been none.  That would be my

3     first argument.

4            Then my second argument would be, Your

5     Honor, as you pointed out, that if there was

6     confidential information about drug dealing or SNM

7     Gang-related activities, I'm certainly not aware of

8     it.  And the fact that Ms. Duncan is available to

9     handle this means that any imputed knowledge that I

10    could possibly have under Rule 16-110 is not relevant

11    to Ms. Duncan's handling of this particular witness.

12    So, I mean, I think that's a factor the Court needs

13    to consider, as you're well aware.  Even if you think

14    there is a potential conflict or an actual conflict,

15    alternative measures to remedy that conflict are

16    relevant to the analysis.  In here, we have a ready,

17    willing and able attorney that's not

18    conflict-burdened at all, no matter how you slice it

19    or dice it, available, and who has handled

20    Mr. Duran's file and investigation from the

21    beginning.  And so I just -- I don't think it ripens

22    into a cause that the Court needs to be concerned

23    about.

24            Now, this spirals into the fact, as the

25    United States just conceded, Mr. Duran is a fugitive

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    from justice.  He's absconded.  I mean, he's not even

2    available.  We don't know what his position is.

3           The fact of the matter is, Mr. Duran has a

4    very colorful history of doing precisely this.  His

5    first adult conviction, in 1997, was for aggravated

6    burglary and forgery.  And the court in Clovis tried

7    to remedy his initial felonious nature with drug

8    treatment.  And he walked away from drug treatment in

9    early 1998, and absconded.

10          The Court should know that when he was

11   located in Portales, in June of 1998, the officers

12   detained him, put him in a police car, and somehow he

13   got into the driver's seat of the police car.  And

14   when the police tried to apprehend him from driving

15   away, he drug a police officer about 30 or 40 feet,

16   and the police officer discharged his service weapon

17   about eight times at the departing car.  And

18   Mr. Duran got away.

19          So he's not the type of individual who is

20   going to walk in freely, and you know, renew his

21   cooperation with the United States.

22          I mean, at this point, Your Honor, I'm not

23   convinced that we will have Mr. Duran available for

24   trial.  So, if Mr. Duran is not here, obviously,

25   there is no need to cross-examine him in any event,

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492
                                                                                1-800-669-9492
                                                              e-mail: info@litsupport.com




BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1    and then there is no conflict.  So I mean, that's

2    just in Mr. Duran's nature.

3           Then finally, Your Honor, I've asked my

4    colleagues -- and I cooperated with them in good

5    faith to the extent I could, and I've asked them, and

6    we've asked in Brady, and explicitly and otherwise in

7    Document 1053 and in our other motion to compel that

8    we just heard at the beginning of this month, for the

9    CI contracts and the information related to

10   Mr. Duran, that still haven't been filed.

11          And the reason I would like to see them --

12   and if I could put this up on the Elmo, Your Honor --

13   and I realize these aren't quite compatible.  But

14   this is a cooperation agreement that the United

15   States just entered into with Michael Flynn.  And I'm

16   certainly not trying to put them on equal pedestals

17   here.  But if you'll see, in paragraph 8 of Mr.

18   Flynn's agreement, the United States demanded that:

19   "Your client shall cooperate fully, truthfully,

20   completely and forthrightly with this office and

21   other federal, state, and local law enforcement

22   authorities identified by this office in any and all

23   matters to which this office deems cooperation

24   relevant."  And I'm almost positive that such an

25   agreement would have attached to Mr. Duran's

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                    1-800-669-9492
                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   cooperation in this case, given that the United

 2   States has compensated him in over $45,000 worth of

 3   United States' funds.  I just don't think that that's

 4   a sum of money that escaped the Department of

 5   Treasury coffers very lightly, without a similar type

 6   of agreement.

 7           And this is where I'm talking about waiver;

 8   that Mr. Duran has gone to the United States, has

 9   told them everything he knows.  And that there is no

10   confidential information with regard to his SNM

11   activities, A, that could be imputed to the firm,

12   but, B, that could be imputed to me, in this

13   roundabout way, to establish even a potential

14   conflict, much less an actual conflict, Your Honor.

15           So I just come back to the central point

16   that there is no conflict in this case.  The matters

17   aren't substantially related.  And to the extent one

18   could even ever assume, if you got into -- not an

19   objective analysis, but a substantive analysis to

20   find out what Mr. Duran told Mr. Donatelli -- that

21   that type of information has been waived.

22           Your Honor, with regard to the Duran

23   Consent Decree, I would just say that -- again, these

24   cases aren't substantially related -- my

25   understanding is that the current iteration of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    consent decree is that the Department of Corrections

2    had signed a permanent order with the court that the

3    Department of Corrections would not use public

4    facilities, meaning gymnasiums, open rooms, that kind

5    of thing, to house inmates, and the inmates wouldn't

6    be sleeping on boats in gymnasiums and other types of

7    public spaces.  And I don't claim to know the details

8    of that.  I think we could all look at the court

9    docket and get a better feel for it.  But the idea

10   that Mr. Donatelli, or his successor at the firm, is

11   looking at the sleeping arrangements of Department of

12   Corrections' inmates, I just really don't see the

13   overlap or the dovetail here.

14          Again, if you look at the case objectively,

15   there is no real reason for anybody to share the type

16   of information about gang activities or drug dealing

17   activities or murders or homicides or witness

18   intimidation or any of the type of activities that

19   are alleged in the indictment.  I mean, none of those

20   activities are related to where he slept last night.

21   I mean, they're not related to how good is the

22   medical providers at your facility.

23          So, Your Honor, I'm not saying the Court

24   shouldn't be concerned about it.  I think the Court

25   will do an exacting analysis of it, as it did in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Davis' case.  But I think that the allegations

2    that these cases warrant the disqualification of

3    myself because of confidential information being

4    shared has been amply remedied by Ms. Duncan, taking

5    Duran from the onset, as soon as we identified him;

6    firewalling Donatelli out of this case completely.

7    And with regard to Mr. Duran, I'm just the fifth

8    wheel, so to speak.

9              So, if the Court has any questions for me,

10   I'm happy to answer them.

11             THE COURT:  My law clerk has given me a

12   copy of the Duran case, the one involving Eric Duran.

13   I'm looking at the list of defendants here in this

14   case.  Of course, Robert Perry, the Secretary, I know

15   him; I've known Mr. Perry for a long time.

16             It also has John Shanks, who is Rudy Perez'

17   expert.

18             Any thoughts about that?

19             MR. LOWRY:  Is that the Duran case?

20             THE COURT:  Yeah.  You're suing Mr. Perez'

21   expert.

22             MR. LOWRY:  Your Honor, honestly, if it

23   causes the Court any concern, I believe that's why I

24   wanted to get this matter before the Court as soon as

25   possible.  I'm happy to go back and do a fine-tune

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    analysis of that, and compare the involvement of any

2    witnesses with the record here.

3           But it doesn't give me -- at this moment,

4    no, I don't have any reason to be concerned about it

5    because, frankly, I'm vastly ignorant about why

6    Mr. Shanks or anybody else would have been sued and

7    what their role was in the case.  So, unfortunately,

8    I'm not in a position to give the Court any

9    meaningful guidance on that.

10          THE COURT:  All right.  Let's get your

11   exhibits marked; see if there is any objection from

12   Mr. Castellano about them.  I have a copy of the

13   complaint.  That doesn't mean that I've got a

14   complete one with all the exhibits and everything.

15   So give me whatever you've got.  And, Mr. Castellano,

16   give me whatever you've got.

17          MR. CASTELLANO:  Your Honor, if you have

18   the complaint, you have what I have.  And there is no

19   objection to the admission of defendant's exhibits.

20          The only other question I would ask related

21   to the representation for the consent decree is, for

22   example, in terms of confidential communications, the

23   attorney might ask the defendant why he's classified

24   at Level 4, 5, or 6, and this could relate to them

25   being a gang member.  And I don't know the answer to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that question.  Their firm would.  So that still
 2    remains to be seen in terms of who they may have
 3    interviewed or spoken with, who is a part of this
 4    case.
 5              THE COURT:  I marked up my copy.  Do you
 6    have a clean copy of the complaint, Mr. Lowry?
 7              MR. LOWRY:  I do, Your Honor.  I have a set
 8    for everybody here.
 9              THE COURT:  Why don't you identify for the
10    record what you're about to give to the Court.
11              MR. LOWRY:  I will, Your Honor.
12              Your Honor, I'm about to hand to the Court
13    exhibits that I've marked A through D.  Exhibit A is
14    Volume 2; it's a partial trial transcript of the
15    criminal case.  It is criminal number 01-CR-593.  It
16    was in front of Chip Johnson, Your Honor.  That's
17    Defense Exhibit A.
18              Defense Exhibit B is an additional trial
19    transcript.  It's the opening statements from that
20    trial.
21              And Exhibit C is the trial transcript of
22    the closing statements from that trial.
23              And Exhibit D would be the civil suit that
24    was filed on December 18, 2001.  And that is
25    01-CV1411, assigned to WD -- that's Judge Deaton --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   and DJS.  So, Your Honor, if I may approach.
 2              THE COURT:  All right.  Any objections to
 3   Defendant Baca's Exhibits A, B, C, and D, Mr.
 4   Castellano?
 5              MR. CASTELLANO:  No objection, Your Honor.
 6              THE COURT:  Any objection from any of the
 7   other defendants?
 8              All right.  They'll be admitted.
 9              And that has about everything that you
10   would be able to give me as well, right, Mr.
11   Castellano, you don't have any additional exhibits?
12              MR. CASTELLANO:  That's correct, Your
13   Honor.
14              THE COURT:  All right.  Anything else, Mr.
15   Lowry?
16              MR. LOWRY:  If I may approach?
17              THE COURT:  You may.
18              MR. LOWRY:  Your Honor, if I may, Ms.
19   Duncan would like to be heard on a few of the matters
20   involved in this.  And if I could relinquish the
21   podium to her, so she could speak on this matter,
22   Your Honor, I'd greatly appreciate it.
23              THE COURT:  All right.  Thank you, Mr.
24   Lowry.
25              Ms. Duncan.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      MS. DUNCAN:  Your Honor, I'll be brief.  I

2  won't repeat anything that Mr. Lowry has already

3  pointed out.

4      I just -- I wanted to tell the Court that I

5  have independently investigated this issue on behalf

6  of Mr. Baca.  I agree with Mr. Lowry's analysis that

7  there is no conflict.  I've read through these

8  transcripts.  There is nothing in the civil lawsuit

9  that Eric Duran filed against Wackenhut that would

10  bear on this case.

11      As Mr. Lowry mentioned, the Government

12  filed a motion in limine in the criminal case, which,

13  essentially, was exactly the same allegations, which

14  is why those transcripts are relevant.  And moved in

15  limine to exclude any evidence of gang activity by

16  Mr. Duran.  The defense agreed that it wasn't

17  relevant, that the incident was not at all

18  gang-related.

19      But one point I wanted to make to the Court

20  is, according to discovery and available public

21  information, Mr. Duran wasn't even a member or

22  affiliated or suspected of being a member of the SNM

23  in 2001, when this lawsuit was pending.  If you look

24  at the Government discovery, the gang that he was

25  allegedly affiliated was the Eastside Locos.  And the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    first place I can see him being allegedly involved,

 2    or any kind of allegation that he was involved with

 3    the SNM was in 2005, so long after the civil lawsuit.

 4            The other issue that I wanted to raise with

 5    the Court is in its motion, the Government alleges

 6    that, perhaps, Mr. Duran spoke with Mr. Donatelli

 7    about his drug dealing.  So, number one, if there was

 8    drug dealing, it certainly wasn't on behalf of the

 9    SNM, because he had no affiliation with them at that

10    point.

11            But number two is, during the criminal

12    case, there was another motion in limine about

13    Mr. Duran's use of drugs, and whether the defense

14    intended to introduce that evidence at trial.  And

15    the court excluded the evidence because the defense

16    didn't -- that wasn't their argument -- their

17    argument wasn't Mr. Duran was on drugs, and

18    therefore, they had to take him down.  The only

19    argument they intended to make was some general

20    argument about drugs in prison, and prisons are

21    dangerous.  So that wasn't an issue.  There is

22    nothing on the objective record that would indicate

23    it would have been an issue that Mr. Duran would have

24    discussed with counsel.

25            So, you know -- and I am -- in a sense, we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    discovered the civil lawsuit last year.  As Mr. Lowry

2    said, I've been prepared to cross-examine Eric Duran.

3    I've taken the lead on the investigation, and putting

4    together that cross-examination.  So, you know, there

5    is no conflict.  But out of an abundance of caution,

6    we have taken protective measures.  And those

7    protective measures are more than adequate under the

8    circumstances.

9              THE COURT:  Have you talked to Mr.

10   Donatelli?

11             MS. DUNCAN:  I spoke to him briefly in

12   March of -- March of last year, I did.  When we

13   first -- when I first discovered that Mr. Donatelli

14   had represented Eric Duran, I called him and spoke to

15   him, with Mr. Lowry, about it.  And Mr. Donatelli

16   expressed to me that he did not see it as a conflict,

17   because of the limited nature of the litigation.

18             THE COURT:  I'm just thinking a little bit

19   out loud:  I wonder if it might make some sense if

20   you sit down, with some of the things that Mr. Lowry

21   was suggesting that I do ex parte, maybe you do, and

22   then do some affidavit or letter or report to the

23   Court about what he would say about those topics that

24   Mr. Castellano has raised.

25             MS. DUNCAN:  I'm happy to do that, Your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Honor.  I could have a conference call with Mr.

2    Donatelli and report back to the Court.

3            THE COURT:  Why don't you get a

4    transcript -- I know y'all are getting transcripts of

5    this -- and go through carefully what Mr. Castellano

6    is talking about as far as confidential information.

7            Because it seems to me that I'm having a

8    harder time saying this is a related case, or the

9    same case.  But it does seem to me there is at least

10   the potential for some confidential information of

11   the nature that Mr. Castellano is raising.  And it

12   seems to me I don't have something that forecloses

13   that.

14           So maybe your report, your affidavit, your

15   investigation, might go a long way.  Because Mr.

16   Castellano is not going to be able to get that.  And

17   without me sitting and talking to Mr. Donatelli, and

18   then, perhaps, finding out information I really

19   probably don't need to know, I'm not sure there is a

20   way of putting -- closing the gap.

21           MS. DUNCAN:  I'm happy to do that, Your

22   Honor.  I'll get a transcript as soon as I can and

23   share that with Mr. Donatelli, and report back to the

24   Court.

25           But I am -- just based on my own

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    investigation and my responsibilities to Mr. Baca, I
 2    am convinced that there is no conflict.
 3              And, like I said, I am able and willing to
 4    handle the Duran matter.
 5              THE COURT:  I know that Mr. Davis kept
 6    bringing that up -- Ms. Bhalla as well -- but I
 7    didn't see a lot in my work on -- with the Davis
 8    memo -- that told me that handing it to co-counsel
 9    solved any problems.
10              So if you, in y'all's work, Mr. Lowry said
11    he wanted to file something over the weekend -- you
12    might look at that a little bit, because I didn't see
13    a lot that gave me much encouragement that that
14    was -- helped any on the conflict issues.
15              MS. DUNCAN:  I think there are some cases
16    on point on that, Your Honor.  And we definitely will
17    brief it and have it filed by Monday.
18              THE COURT:  All right.
19              MS. DUNCAN:  Thank you.
20              THE COURT:  Thank you, Ms. Duncan.
21              Mr. Castellano, before I give you the last
22    word, Mr. Lowry, did you have anything else you
23    wanted to say?
24              MR. LOWRY:  Your Honor, just -- I think the
25    best case, with the issues you just raised -- pardon
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  me, Jennifer -- the best case I can recall, Your

 2  Honor, would be a district court out of West

 3  Virginia -- or pardon me, out of the Western District

 4  of Virginia, Durham v. Blankenship.  That's at 461

 5  F.Supp., 492.  And in that case, like this one, the

 6  defendant had two attorneys, and the court -- as this

 7  Court was -- was concerned about the zealous and

 8  impartial defense of the present client.  And I'll

 9  quote from the opinion at page 499.  "The court notes

10  that two attorneys, Simpson and Singer, represented

11  petitioner at his 1972 trial.  While petitioner

12  alleges that Simpson was limited by divided loyalty,

13  petitioner made no such allegation against Tisinger,

14  nor has he alleged that Simpson influenced Tisinger.

15          "Furthermore, the Court finds no evidence

16  whatsoever in the record to indicate that there was a

17  conflict of interest of any nature that would taint

18  the assistance that Tisinger would afford the

19  petitioner."

20          Now, albeit, this is one of those cases

21  that's looking in the rearview mirror at a

22  conviction, but I think the analysis here is sound;

23  that, if there is nothing that can be -- whatever

24  could be said about the Rules of Professional

25  Conduct, imputing knowledge to me, Your Honor,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    wouldn't bear on Ms. Duncan's ability to represent

2    Mr. Baca.

3              And, Your Honor, I don't want to belabor

4    the point.  But I would point out, as you pointed out

5    in your opinion, that the Rules of Professional

6    Conduct don't necessarily govern or completely

7    control the constitutional analysis with regard to

8    Mr. Baca's right to the attorney of his choice.  And

9    the reason I say that -- and I'm not diminishing the

10   role or, you know, sliding the Rules of Professional

11   Conduct in this matter -- but, as this Court knows as

12   well, you know, there is certain rules that the Court

13   has declined out of the Rules of Professional Conduct

14   to apply to federal practitioners.

15             Interestingly enough, the one rule applies

16   to the United States Attorney's Office, and those

17   attorneys' right not to interfere with

18   attorney-client relations by subpoenaing defense

19   attorneys to federal grand juries.

20             So, you know, the Court has the authority,

21   as you pointed out, to rule that, in a specific case,

22   the Rules of Professional Conduct don't necessarily

23   apply.  And I'm not suggesting that the Court should

24   take the rules lightly.  But I think, given the

25   nature that -- the way we handle this, the degree we

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                    1-800-669-9492
                                                        e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    took to make sure that no confidential information
2    was ever shared with Mr. Baca's defense team, and
3    even within the defense team to make sure that Ms.
4    Duncan handled this particular witness -- more than
5    ensured that whatever could be said about the
6    confidences that Mr. Duran may have shared with Mr.
7    Donatelli, that those were maintained, and they
8    weren't either used or revealed in the sense that
9    Rule 16-109 contemplates.
10            Thank you, Your Honor.
11            THE COURT:  And I assume that, if I decide
12   this can be waived, or if there is a conflict and it
13   can be waived, Mr. Baca will waive?
14            MR. LOWRY:  That's my understanding, Your
15   Honor.  Ms. Duncan and I went and spent an hour with
16   Mr. Baca last night, and told him that this was going
17   to be teed up first thing this morning.  And he's
18   prepared to discuss that with Your Honor, if you'd
19   like.  Ms. Duncan led that conversation, for the
20   obvious reasons.  But I wanted to be there, just in
21   case Mr. Baca had any questions of me about the role
22   I had in this case and my participation.
23            But I would assure the Court that, when
24   this whole thing arose back last spring that we
25   brought it to Mr. Baca's attention at that time.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it just never -- you know, it hasn't cropped up in
 2    the context of our conversations.
 3            But if the Court wanted to speak with him,
 4    I'm sure he's willing to speak with you.
 5            THE COURT:  Well, I won't do a colloquy
 6    today.  But I'm understanding that he's prepared and
 7    willing to waive any conflict, if I decide that's a
 8    necessary step.
 9            MR. LOWRY:  Yes, Your Honor, that's my
10    understanding.
11            THE COURT:  All right.  Thank you, Mr.
12    Lowry.
13            Mr. Castellano, I'll give you the last word
14    on this issue.
15            MR. CASTELLANO:  Your Honor, I really don't
16    have any argument.
17            What I want to ask the Court is:  In Ms.
18    Duncan's discussions with Mr. Donatelli, if there is
19    anything the Court wants to know about the
20    representation of the class?  That's another topic
21    particular that she can discuss with him.
22            I don't know what he discusses with inmates
23    when he goes out to oversee the consent decree or
24    what's left of it.  So that would be another issue to
25    explore, would be whether or not they talk about gang
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  membership; why they're classified at a certain

2  level, things of that nature; and whether they can

3  search their files to see if they've represented

4  anyone in this case.

5         So I just put that out there as a

6  suggestion, other answers that we can get now.

7         THE COURT:  I appreciate it.  And if you

8  think of anything else, pass those on to Ms. Duncan,

9  because I think it would be a good idea to be as

10  comprehensive at this fact-gathering stage as we can.

11         MR. CASTELLANO:  I will, Your Honor.

12         THE COURT:  All right.  Anything else, Mr.

13  Castellano?

14         MR. CASTELLANO:  No, sir.  Thank you.

15         THE COURT:  Thank you, Mr. Castellano.

16         Well, as I've indicated, I'm not convinced

17  that this is the same or related case.  It seems to

18  me that it's different.  So it seems to me that, to

19  establish that they're the same case, related case,

20  we're going to have to look at this confidential

21  information.  It seems to me it's more in the nature

22  of a potential conflict.  And it seems to me that it

23  is in the nature of a conflict that can be waived.

24         So we've got a lot of more information that

25  we need to get.  And we also need to probably find

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    out where Mr. Duran is on this issue.

2            The consent decree case, I guess the case

3    was reopened.  It is before Judge Gonzales.  So it's

4    not really a successive representation case.  It may

5    be a concurrent representation case.  I'm afraid I'd

6    just be thinking out loud, but it would seem to me

7    that some of the same rules of waiver and substantial

8    case or related case would still apply, so we may be

9    able to do that analysis together.

10           And then, with the additional information

11   we may get from talking to Mr. Donatelli about how he

12   interviews and what he does in that case, it may be

13   that that is a waivable situation as well.

14           So I'm not inclined to disqualify anybody

15   today.  I think we've got some more work to deal

16   with.  So we're a little bit down the road before

17   we're going to be able to make an informed decision

18   on that.

19           All right.  Let's, then, take up -- I guess

20   the next motion is, Ms. Bhalla, your motion to --

21   your portion of the motion to continue the January 29

22   trial as to Mr. Herrera.  Let me give you what my

23   thoughts are.  I guess I'm inclined to deny the

24   motion without prejudice to you renewing it down the

25   road.  It seems that Mr. Maynard -- I would assume,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                           e-mail: info@litsupport.com

1   you know, that your case is in good shape in the

2   sense that despite there being a lot of material

3   here, you can probably sort it out and figure out

4   what's relevant to Mr. Herrera and what's not.  In

5   some ways, the case has some complexities, but on the

6   other hand, in some ways, once you get through it and

7   figure out the evidence, it's a rather

8   straightforward murder case, and with, in fact,

9   fairly limited information.  We're still about 60

10  days out, a little bit less.  I guess I wouldn't be

11  inclined to grant the motion, and wouldn't be

12  inclined to grant it, certainly, at this time.  It

13  seems to me you're probably in pretty good shape to

14  try the case with Mr. Maynard.  But those are my

15  thoughts after reviewing your motion.

16          Ms. Bhalla.

17          MS. BHALLA:  Well, first off, Your Honor, I

18  appreciate the vote of confidence on that, in that

19  regard.  But, Your Honor, I think that one of the

20  reasons most of these gentlemen have two lawyers is

21  to deal with exactly what you said:  The amount of

22  discovery.  In my motion, I stated to the Court that

23  there were over approximately, you know, 10,000

24  anticipated documents in the beginning of the case.

25  And I was filing that in a little bit of a hurry,



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    because I knew about the Court's position on the
2    conflict, and I was trying to move things along as
3    quickly as I could, in terms of getting counsel
4    appointed and figuring out where we were.  But I've
5    relooked at those numbers.  And just for the 4268
6    case -- this isn't including 1613 and the other
7    matter -- there are 38,963 JPG files.  There are
8    2,824 PDF files.  And there are 4,939 audio files.
9    And the Court is correct, it is a lot of discovery,
10   but, you know, at the end of the day, you know what
11   you have on your client, and you prepare with that,
12   and you proceed.  And I think that I would be more
13   game if I felt that that were the picture in this
14   case.
15           But we really have had a hard time getting
16   some of the discovery sorted out.  There is so much
17   of it, but it's also been a little bit difficult to
18   get sort of a straight answer about what evidence the
19   Government intends on using.  And that sort of segues
20   in a little bit to our suppression motion, although I
21   don't anticipate us getting into that this
22   afternoon -- maybe this afternoon.
23           But one of the things that the Government
24   alleged a year ago, in November, which was pretty
25   recently after I'd been assigned to the case -- and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   that's another little aside, Your Honor.  Most of the
 2   lawyers in this courtroom -- of course that doesn't
 3   apply to Ms. Torraco being here today as well -- but
 4   most of the lawyers have been here for a couple of
 5   years.  I came in a year later.  And, you know,
 6   Mr. Davis and I had divided things up, and analyzing
 7   all of the discovery wasn't in my division of labor
 8   task.  That being said, I'm going to do the best I
 9   can to catch up.  But one of the issues, as I was
10   beginning to articulate, is that after that hearing
11   in November, the Government alleged that Carlos
12   Herrera had made some statements, and, basically,
13   that amounted to admissions.  And we asked for those
14   statements back in November.  And we've been asking
15   for those statements repeatedly over the course of
16   the last year.
17           And in November -- at the November we
18   had -- at one of the early November hearings, we had
19   a motion to compel.  And the Government indicated
20   that they would provide that, pinpointed transcripts.
21   Well, I still don't have the pinpointed transcripts.
22   And I communicated with Ms. Armijo via email last
23   week, and I said, You know, it seems to me like, if
24   there is an admission, it would be nice for us to
25   know before we litigate a suppression motion.  And I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   still haven't received that.

 2          Now, I've narrowed down which transcript I

 3   think the Government is referring to, and I've

 4   reviewed it, and I still don't necessarily see an

 5   admission.  And that's something that we'll get into

 6   later.  But I think what it shows to the Court is

 7   that this isn't easy to determine what evidence the

 8   Government plans on introducing against our clients,

 9   and that's part of the problem when the discovery is

10   this massive.  It's finding what is applicable to our

11   client, and having the time necessary to review that

12   evidence.

13          The other issue, Your Honor, is experience.

14   And I am going to put out there that I'm going to do

15   my best to catch up.  I've sort of laid out my

16   experience for the Court.  I'm not shy about the fact

17   that I don't have a lot of federal criminal

18   experience.  And I think why that is relevant is,

19   when I called Mr. Maynard to help me with this case,

20   I said, you know, it's complex, and there is not a

21   lot of lawyers left on the complex panel, and I

22   really need somebody to help.  And he looked at me

23   and said, okay.  And we talked about it.  Well, once

24   he got in, after he'd been appointed and started

25   looking at the evidence, he said, "Well, you know,

SANTA FE OFFICE                                             MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                    1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE            e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.

 1   Ms. Bhalla, there are complex cases, and then there
 2   are complex cases."  And I don't think that I had
 3   done a very good job of alerting him to the fact that
 4   this was of the more severe complex category.  And
 5   that goes to my experience, Your Honor, because I
 6   haven't had a lot of complex federal criminal cases.
 7   And to me, I guess I just assumed they were all like
 8   this, which I'm glad to say is not the case.
 9           But I think that when you're looking at
10   sifting through that much discovery, and trying to
11   figure out what is applicable to your client, then it
12   does become relevant.  This hasn't been a very
13   straightforward process for us.
14           And with that being said, Your Honor, I
15   think I might let Mr. Maynard address some of the
16   issues that he feels arise from coming in so late in
17   the game, Your Honor.
18           THE COURT:  Well, a couple of -- some of
19   the things you raise, I think, are just issues that
20   all the defendants are having, and -- or at least
21   complaining about, as far as discovery and those
22   things.  Those don't seem to me to rise to a level of
23   a motion to continue right now, because nobody else
24   seems to be thinking that that is -- you know, that
25   discovery is at a point where they need to move

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    because of lack of discovery.  So it seems to me

2    you're not unique in that complaint about needing

3    something here or something there to get the case

4    ready to try.  Your thoughts on that?

5              MS. BHALLA:  Well, I would just say that I

6    agree that that's true, that I think that is a common

7    theme among all the parties.  But the difference is

8    the other parties have been here for two years and

9    have been able to review a lot more of the discovery

10   than I have been able to review.  And I don't know if

11   the Court -- you know, one of the -- a huge issue we

12   had when I first came into the case was that our

13   investigator, Daniel Berge, got a job at the Federal

14   PDs, and is no longer on this case, and we had to

15   bring in a new investigator.  So Michael Davis came

16   in, I believe, six months later than all the other

17   attorneys.  I came in a year after all the other

18   attorneys.  And I don't know how long our

19   investigator has been on the case, but not as long --

20   you know, for a shorter amount of time than I've been

21   on the case.

22             And so, yes, that problem is not unique to

23   us.  But we've had less time to try to go through

24   this discovery and find on our own initiative and

25   through our own investigation, which discovery is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    relevant.
 2              Just yesterday, I found some discovery that
 3    may be pretty exculpatory, that we hadn't seen
 4    before, and that's because we're playing catch-up
 5    here.  And I've lost the person who was trying to
 6    really understand the discovery.  It's one thing to
 7    read it and relay what you've read.  It's another to
 8    really sift through it and see what's relevant and
 9    what's not.  And we haven't had the same amount of
10    time to prepare on this issue as others.
11              THE COURT:  All right.  Thank you, Ms.
12    Bhalla.
13              Mr. Maynard.
14              MR. MAYNARD:  Your Honor, I have five days
15    in this case.  It is true that when I spoke to Ms.
16    Bhalla at first I was very hesitant to get into the
17    case and then I said, Okay, well, let's give it a
18    try.  I knew nothing about this case except that it
19    existed and that it was a complex case.  I've really
20    known nothing about the SNM Gang in any detail
21    whatsoever.  I haven't been following it in the
22    press.  And I'm still trying to get oriented, with my
23    head spinning, about the cast of characters, the
24    names and the relationships, who is going to trial in
25    January, and who is going to trial in April.  I can
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    tell the Court I will do my best, if a continuance is
2    denied, to be ready.  I can't guarantee in any way I
3    will be ready.  I'm not in a position to know if my
4    colleague is prepared, because I don't know enough
5    about her preparation.  And, of course, since Friday
6    afternoon, when I learned I was going to be on the
7    case, when I was appointed, I've also had to spend
8    much of my time trying to ethically shed my
9    responsibilities to my existing clients.  I've taken
10   my name off the criminal appointment panels in state
11   court and federal court.  But I can't just instantly
12   dump some of these cases.  I have continuing
13   obligations to them.
14            So, with the quantity of evidence I'm,
15   frankly, very concerned that there are some critical
16   pieces of evidence that because of the lack of time I
17   won't be able to appreciate and perceive.  And this
18   is the risk.
19            THE COURT:  All right.  Thank you, Mr.
20   Maynard.  There used to be a -- Joe Namath used to
21   throw to an El Paso wide receiver named Maynard.  Is
22   that any relation to you?
23            MR. MAYNARD:  I don't think so, Your Honor.
24            THE COURT:  All right.  He was a pretty
25   good UTEP ballplayer.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. MAYNARD:  Right.
 2            THE COURT:  Caught a lot of Joe Namath's
 3   passes.  I just wondered.  He used to come over to
 4   Hobbs, too -- shows you where the NFL is today -- in
 5   the off season he'd tell ties.  He'd hang the ties in
 6   the laundry shops in Hobbs.  I'd get his autograph.
 7   That's what he'd do in the off season.
 8            All right.  Good to have you in the case,
 9   Mr. Maynard.
10            MR. MAYNARD:  Thank you, Your Honor.
11            THE COURT:  All right.  Any other
12   defendants want to speak on this motion to continue?
13            All right.  From the Government's
14   standpoint, Mr. Castellano, are you going to handle
15   it?
16            MR. CASTELLANO:  Yes, Your Honor.
17            THE COURT:  All right.  Mr. Castellano.
18            MR. CASTELLANO:  At this point, I'd say I
19   agree with the Court's approach.  I understand the
20   position that Mr. Herrera's attorneys are in.  I
21   think that, in addition to the position they're in,
22   though, there is a joint defense agreement.  And so,
23   obviously, the teams are working together in
24   preparation for this case.  So if the Court needs
25   to -- I don't have any objection to the Court hearing
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   ex parte what they have and haven't done, or how far

2   they are in their preparation, just so we can make a

3   record here.

4           But what I would ask is that the Court deny

5   the continuance for now.  Move us closer to trial, to

6   see where they are.  And if they truly are not ready

7   to continue to trial, then I think we make our record

8   at that point.  And the question then becomes whether

9   or not it's a continuance of all the defendants in

10  the Molina case, or whether or not it results in a

11  severance.  But I just don't think we're there yet.

12          THE COURT:  All right.  Thank you, Mr.

13  Castellano.

14          Does anybody have any objection if Ms.

15  Bhalla and Mr. Maynard want to submit additional

16  material to me ex parte so that I can see any

17  problems that they have in making this determination?

18          Not hearing any, I'll give you that

19  additional opportunity, if you want to send anything

20  ex parte so I can see it, and you can make your

21  record as well.  And I'll also give you the last word

22  on your motion, Mr. Maynard, Ms. Bhalla.

23          MS. BHALLA:  Just briefly, Your Honor, you

24  know, one of the things that I failed to mention to

25  the Court is, at this time, there are 290 something,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                              1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    I think, witnesses disclosed on the Government's

2    witness list.  And so, you know, trying to get Mr.

3    Maynard up to speed on who the actual players are in

4    this case is a challenge.  But I think that we can

5    submit that in part of the ex parte comments, and so

6    I won't go into that too much here, Your Honor.

7            THE COURT:  Okay.  Do you have anything

8    else you want to say, Mr. Maynard?

9            MR. MAYNARD:  No, Your Honor.

10           THE COURT:  All right.  So I'm going to

11   deny the motion without prejudice to renew.  I do

12   think we're still far enough out from the case that I

13   think that the defendant can be prepared.  I reviewed

14   Mr. Maynard's impressive resume.  And also I have

15   every confidence, given my work with Mr. Davis, that

16   he's handing off the case in very good shape, and

17   that the documents that have been in discovery that's

18   been produced, it's been searched very well for the

19   materials that Mr. Herrera -- that is pertinent to

20   Mr. Herrera and important to his defense.  So I think

21   the case is being handed off.  We'll take a look at

22   it.  We'll continue to monitor it.  I certainly want

23   Mr. Herrera and all the defendants to get a fair

24   trial.  But at the moment, I feel like he's going to

25   get a fair trial, and he's going to get it starting

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   January 29, because I think that the hand-off has
2   been relatively smooth, and the amount of documents
3   and the discovery that's really pertinent to Mr.
4   Herrera is fairly contained.  But we'll continue to
5   monitor the situation.
6           All right.  Are we now ready to go to the
7   motions to suppress?  Ms. Bhalla, do you know what
8   the order is?  What's next?
9           MS. BHALLA:  My understanding, Your Honor,
10  was that Mr. Villa's intention was to start with the
11  motion to suppress lost evidence.  I will ask him if
12  that's going to be different or the same today.
13          THE COURT:  And when we talk about the
14  motion to suppress, are we talking about your motion
15  1294 to suppress the statements that Mr. Herrera made
16  to Billy Cordova, or are we talking about one of the
17  other motions to suppress?  Is that the one?
18          MS. BHALLA:  I was just here first, Ryan.
19  There were two motions to suppress, Your Honor.  Mr.
20  Villa and I both filed motions to suppress statements
21  to Billy Cordova that are similar.  And that's why we
22  joined those motions.
23          Mr. Villa also has a second -- I don't know
24  which, if it was first or second -- but a separate
25  suppression motion for lost or destroyed evidence.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Our conversations about the schedule included that

2    the lost or destroyed evidence motion would go first.

3    And then we would try to begin the suppression

4    motion, if there was enough time.  And we may have to

5    do the suppression motion a little bit in

6    installments, because our expert isn't here until

7    next week.  And so there was going to be a little bit

8    of shuffling around on that issue.  But that the

9    motion to suppress lost or destroyed evidence would

10   go first.

11           THE COURT:  All right.  Is that your

12   understanding, Mr. Villa?

13           MR. VILLA:  It is, Your Honor.  I think

14   that Ms. Wild indicated to me -- to the group -- a

15   little while ago that I think there is a different

16   set of notes that perhaps the Court needs to look at.

17   But we're going to proceed with the number 1300, Mr.

18   Perez' motion for lost or destroyed evidence.

19           We asked to move up 1294 and 1295, the

20   suppression motions regarding Billy Cordova's

21   statements to at least start them this week, because

22   of, my understanding, the absence of Eric Duran made

23   it so we couldn't do those motions for Mr. Baca, so

24   we're trying to fill, essentially, tomorrow with

25   those other suppression motions.  So we're going to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   start 1300 this morning.  And I believe that's the

 2   Government's understanding as well.

 3              THE COURT:  Is that correct, Mr.

 4   Castellano?  Ms. Armijo?

 5              MS. ARMIJO:  Yes, Your Honor.

 6              THE COURT:  Well, I reviewed the material

 7   on this lost or destroyed evidence.  We've had some

 8   discussion about this walker.  Certainly, we'll hear

 9   anything anybody wants to say, but it seems to me

10   that what you're doing, and unless I'm wrong and

11   don't understand how this area of law works, is that

12   I thought the Tenth Circuit had made it somewhat

13   clear that before you begin to get remedies for lost,

14   destroyed information, you were going to have to

15   establish a very heightened standard on the

16   defendant's part -- on the Government's part -- that

17   there was intentionality, bad faith, those sort of

18   things.

19              And here, it seems to me -- and again,

20   maybe I don't understand all the facts, but if there

21   was any sort of problem with the way the evidence was

22   handled, it was by the New Mexico State Police, and

23   not by the United States Attorney's Office.  And so

24   it's difficult to, A, impute any bad faith or the

25   heightened standards that are required to receive
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                         1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                  e-mail: info@litsupport.com

1    relief to the Department of Justice, when those were

2    the actors.  And secondly, it didn't seem to me that

3    there was any bad faith, or -- here, it was more just

4    a very negligent way of, perhaps, handling

5    information that may not have been perceived as very

6    important then, but now, as we get ready for trial

7    against Mr. Perez, it looks a whole lot more

8    important.

9            So it seemed to me it was going to be

10   difficult for you to get to those high standards that

11   were necessary to get any sort of relief.  It seemed

12   to me that you may have a lot of impeachment

13   information here; you may be able to really nick the

14   Government around for some of the things they've

15   said, and representations they've made, and the

16   importance of the shank.  But it fell into the

17   cross-examination category rather than something the

18   Court should either instruct the jury, suppress

19   evidence, or those sort of things.

20           So those are my thoughts coming in, after

21   reading everything.

22           MR. VILLA:  And, Your Honor, I think that

23   there is a heightened standard, essentially bad

24   faith, with respect to Youngblood.  And Youngblood

25   says:  If there is potentially exculpatory evidence,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    in order to get some kind of relief, I think that the

2    Court has to find that the Government acted in bad

3    faith.  And I think it's interesting to note, you

4    know, in Youngblood, a jury instruction was given.

5    So --

6               THE COURT:  Let's do this:  I've kind of

7    lost track on time --

8               MR. VILLA:  Oh, sure.

9               THE COURT:  Why don't we take our morning

10   break, and I'll come back in.  Because I need to have

11   you talk to me fully, without being rushed, about

12   Youngblood.  So we'll be in recess for about 15

13   minutes.

14               MR. VILLA:  Yes, Your Honor.

15               (The Court stood in recess.)

16               THE COURT:  Everyone got an attorney?  Look

17   around, help your buddies out, so we can make sure

18   everybody has got an attorney.

19               All right.  While we're shifting Mr. Perez

20   around in his table, let me ask, Mr. Castellano --

21   everybody kind of be quiet.

22               Mr. Castellano, on the conflict motion, I

23   think I asked the same question I did of you on the

24   Davis motion; I'll ask it here:  There, you felt like

25   the ethics compelled Mr. Davis to be disqualified.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

```
 1    Are you at that position where you think that Mr.
 2    Lowry and his firm have to be disqualified, or are
 3    you at a different position on this motion?
 4              MR. CASTELLANO:  At this point, I think we
 5    are at a slightly different position, just because
 6    there is information that we don't know.  And we
 7    don't know what we don't know at this point.  But on
 8    its face, where we are now, it seems to be a lesser
 9    of a problem than it was with Mr. Davis.  That's what
10    I can say based on what we have now.
11              THE COURT:  Okay.  All right.
12              MR. CASTELLANO:  I think the issue is still
13    looming, but it doesn't seem as strong as it did with
14    Mr. Davis.
15              THE COURT:  It looks to me like the Duran
16    Consent Decree, that the notes take care of
17    themselves.  I don't think they treat the class
18    members as clients of the firm.  So I'll explore that
19    a little more, but a quick look at that doesn't
20    indicate that they're treated as class members.  I'll
21    have to look at that, because I do think, in certain
22    situations, it sure looks to me like there is a close
23    similarity.  But there is something in the notes.  So
24    I think it's probably going to be a confidential
25    information problem.  And it looks like to me like,
```

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1   if it's contained -- in other words, Mr. Lowry

2   doesn't have any confidential information, and he's

3   walled off, I'm not sure then I can then find that

4   it's the same or a related case with the information.

5   Even if there is some information there that might

6   concern me.  So I'm at least moving or thinking in

7   the direction of not granting that motion.  So that's

8   kind of where I am.

9           MR. CASTELLANO:  I agree.  I think the Eric

10  Duran issue seems like a lesser problem.  I guess one

11  thing we'll have to figure out with the class -- I

12  don't look at class actions often at all -- but I

13  assume in any class there could be conflicts within a

14  class.  And the attorneys representing them would

15  have to sort through any conflicts that are with the

16  class.  They still cannot represent people who are

17  completely within the class.  And I think that's what

18  we have to get to the heart of.

19          THE COURT:  Yeah, and that class was

20  certified so long ago, that class certification

21  decision was made so long ago that, you know,

22  conflicts that may exist now probably weren't

23  something that Judge Burciaga was thinking about, or

24  could have had knowledge about.  So it's probably a

25  different world now.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. CASTELLANO:  It may be, Your Honor.
 2    And my understanding, which is very limited, from
 3    what Mr. Brewster told me, I think that all
 4    defendants who, I believe are Level 3 or higher may
 5    be members of the class.  So they have the different
 6    classifications levels, so that would, I believe,
 7    include probably everyone in this case who has been
 8    in the prison system at some point.
 9              THE COURT:  All right.  Thank you, Mr.
10    Castellano.
11              Did you want to say something on that, Mr.
12    Lowry?
13              MR. LOWRY:  Your Honor, not particularly on
14    that.
15              I just have one housekeeping matter that I
16    raised during the argument.  And I'd asked to get
17    the, what I call the confidential informant contracts
18    disclosed from the United States.  I mean, we're
19    still, you know, struggling to get that material.  I
20    think it's Brady and Giglio that should already have
21    been released.  But I think it helps us.  And the
22    reason I put on the Michael Flynn cooperation
23    agreement, so we could just understand the type of
24    language that's often used in those.  And I think it
25    would be helpful to pin down the Court's concerns
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    about the confidential information, to have that, so
 2    we could talk more intelligently about waivers and
 3    the scope of, quote, "confidential information, "and
 4    how it was used.
 5              THE COURT:  Where are we on the production
 6    of those, Ms. Armijo?
 7              MS. ARMIJO:  Your Honor, I believe it was
 8    requested specifically towards the end of last week,
 9    or maybe even this weekend.  I think, when we spoke
10    on Saturday, actually.  And so Special Agent Acee
11    brought down documents with him this morning.  And I
12    have not had an opportunity to review them, but I
13    believe we are inclined to disclose all of that
14    information, as far as any paperwork.  And I say
15    "paperwork," because I don't believe we had an
16    official contract.  The FBI had a contract.  So there
17    is paperwork, but we will go ahead and disclose that,
18    that he had with Special Agent Acee.
19              THE COURT:  All right.  Why don't you take
20    a look at what they give you, Mr. Lowry.  If it's
21    different from what you're needing, then you can
22    reraise that issue.  But let's hold it off until you
23    get the documents, which look like you're going to
24    get today.  Is that acceptable?
25              MR. LOWRY:  Yes, it is, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Mr. Villa.
 2            Now, let me just ask, because I may be
 3   ignorant on this issue:  Is this Youngblood test the
 4   same one that I use over in the civil context for
 5   deciding whether I should give an adverse inference
 6   instruction to a jury when there has been a
 7   spoliation of evidence?  Is it the same analysis in
 8   the civil area and the criminal area?  Because I'm
 9   very familiar with the civil area; less so in the
10   criminal later.
11            MR. VILLA:  I don't think it is, Your
12   Honor.  But I also don't think Youngblood dictates
13   whether you give a jury instruction or not.  The
14   reason is, what I was getting to before I stepped
15   away, was they gave a jury instruction in Youngblood.
16   It was a dismissal at a higher sanction, when
17   evidence is destroyed.  And the Court came down and
18   said exactly as you said, Your Honor:  There has to
19   be bad faith on the part of Government in order to
20   get to a dismissal-type remedy under the due process
21   test.  The Youngblood court didn't say You can't give
22   a jury instruction, or some other remedy.  And I
23   think it's important to note that one of the reasons,
24   in Youngblood, for the holding they reached is there
25   was a jury instruction given.  I think the Court can
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   look at some other things.

 2           And Youngblood also is a different test

 3   than California versus Trombetta.  That's 1984.

 4   Youngblood did not overrule Trombetta.  And Trombetta

 5   deals -- and the distinction is, evidence that is

 6   apparently exculpatory before it's destroyed, right?

 7   Youngblood says it is exculpatory.  It's exculpatory,

 8   and the Government destroys it, and they do it in bad

 9   faith, the court can dismiss.  We haven't even asked

10   the Court for dismiss as a remedy.  We're asking for

11   suppression.  And I think the Court has the authority

12   to do that, if it found bad faith, and if the

13   evidence was exculpatory under Youngblood.

14           THE COURT:  What exactly are you

15   suppressing here?  I mean, if it's lost, what are we

16   suppressing?

17           MR. VILLA:  So what we would ask the Court

18   for the remedy to be is to suppress all the evidence

19   in connection with the walker.  So the photos that

20   the Government purports to say is Mr. Perez' walker,

21   the shanks that the Government purports to say came

22   from Mr. Perez' walker, the testimony from

23   cooperating witnesses, who by the way, never

24   mentioned Mr. Perez' walker until they cooperated in

25   this case; that the shanks came from Mr. Perez'
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  walker, the Court heard some of that testimony last

2  week.  We've listed a number of those things, both

3  our motion and our reply, the evidence that we've

4  identified that the Court ought to suppress, if it

5  finds either a Youngblood or a Trombetta violation.

6  And I think that's the appropriate remedy.

7         The alternative request we have of the

8  Court would be a jury instruction.  I think the Court

9  could probably give the jury instruction regardless

10  under the ideas of Youngblood and Trombetta.  But to

11  get to suppression, I think we need to establish a

12  Youngblood or a Trombetta violation.  But we haven't

13  asked, under the specific circumstances of this case,

14  for a dismissal.

15         And I think, to respond to the Court's

16  comment about, Well, the Department of Justice didn't

17  do it, or these prosecutors didn't do it:  I don't

18  think that's the standard.  I think that, clearly if

19  state actors were on the investigation team, and they

20  said:  This evidence is exculpatory to Mr. Perez, we

21  better throw it in the fireplace so he doesn't win

22  his case because we really want to get him, and the

23  United States Government decided they wanted to

24  prosecute the case because they have jurisdiction, I

25  don't think they're off the hook.  There is still a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    due process violation for which a remedy is due.  And
 2    I think the same thing under Trombetta.  If the
 3    agents are state actors, and they determine that --
 4    there is an objective standard under Trombetta that
 5    the evidence was apparently exculpatory, and then
 6    they don't preserve it, it doesn't matter that
 7    they're state actors and it's a federal prosecution.
 8             And, Your Honor, I think that we believe
 9    that we can establish, with the witnesses that we
10    have prepared to put on today and the evidence that
11    we submit, that there was both a Trombetta violation
12    and a Youngblood violation.  I mean, the Court will
13    have to make some, perhaps, credibility
14    determinations, when it comes to Youngblood and bad
15    faith.  But Trombetta is objective.  Did these
16    individuals know -- and you're going to -- some of
17    the evidence you're going to see today that is three
18    days after this alleged homicide, Mr. Perez was
19    interviewed, and he told Agent Palomares that STIU
20    had taken his walker that morning, or perhaps it was
21    the day before, and they had said there was a piece
22    missing from the walker.  And Mr. Perez said, "I
23    didn't do anything.  I don't know anything, it was
24    missing when I" --
25             THE COURT:  I thought I also read -- and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    correct me if I'm wrong -- that Mr. Perez said that

2    there was piece missing.  Did he also confirm that

3    there was piece missing?

4            MR. VILLA:  He didn't.  He says in the

5    statement --

6            THE COURT:  Did or did not?

7            MR. VILLA:  He did not.  He says in the

8    statement that STIU told him there was a piece

9    missing, and then Mr. Perez says, "I'm not involved

10   in this.  And I don't know who is involved.  And I

11   was in the shower."  So three days after the

12   homicide, it's apparent that the walker is

13   exculpatory, because Mr. Perez is denying any

14   involvement, and he's denying that he has any

15   knowledge.

16           And the only way we figure that out is, if

17   we have the walker, and we have the alleged shanks,

18   and we can do what the Government says they can do.

19   I don't know how.  They've told this Court many, many

20   times that the shanks demonstrate a perfect fit with

21   the walker.  Well, those are the types of tests or

22   other things that Trombetta talks about.  So the next

23   step of Trombetta is, if the evidence was apparently

24   exculpatory before it was lost or destroyed, then,

25   can you show -- what would you have done with that



 1    evidence?  And we have our expert witness here today

 2    prepared to talk about that, and I think we can get

 3    that out through some of the testimony you're going

 4    to hear today.  But is there a perfect fit?  Could

 5    these pieces have come from this walker?  Does it

 6    look the same as Mr. Perez' walker?  Is it the same

 7    type of metal?  Is it the same color?  Would it fit

 8    in the location where the piece was missing?  Those

 9    types of things, I think the Court has to analyze in

10    determining a Trombetta violation.  I mean,

11    Youngblood is, yes, you have to look at bad faith.

12    But with respect to Trombetta, those are the issues

13    that we intend to present to the Court.

14             THE COURT:  All right.  Are you ready to

15    put on evidence?

16             MR. VILLA:  Yes, Your Honor.

17             THE COURT:  Mr. Beck, are you handling the

18    argument on this?

19             MR. BECK:  I'm going to handle some

20    portions of the legal argument, so can I respond to

21    some of those legal principles.

22             THE COURT:  All right.  Do you want to make

23    an opening statement?

24             MR. BECK:  Sure.  I think the Court's

25    initial argument -- initial impressions are correct

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    here, that there is really no basis to suppress the

2    evidence, and there wouldn't be evidence suppressed.

3    There wasn't any apparently exculpatory nature.

4              And I'll point the Court to a couple of

5    Tenth Circuit decisions:  United States against

6    Glass, which is 128 F.3d 1398, a 1997 decision, and

7    then a 2006 decision, United States against

8    Pettigrew, 468 F.3d 626.  And those cases don't deal

9    with -- I guess what we're talking about on the

10   substantive law, but the procedural law.  And what

11   they say is that the Court doesn't need to hold an

12   evidentiary hearing if there aren't contested

13   materials of fact, sort of a civil standard test, as

14   I would take it here.

15             And if the Court looks at the pleadings in

16   this case, and Mr. Perez' contentions, the things

17   that he contends aren't material facts to suppress

18   the evidence.  What it is, is it's basically "he said

19   she said."  Perez said he wasn't involved.  But

20   everyone agrees that the shanks came from the walker;

21   everyone agrees that they fit the walker.  Mr. Perez

22   says, "They took it while I was in the shower."

23             So, really, it's a question of who is the

24   jury going to believe?  And that is a question for

25   the jury.  To suppress evidence of a walker that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   doesn't exist isn't an appropriate remedy.  So I
 2   think that was the Court's impression.  And I think
 3   it's a correct one, is that really what -- I mean,
 4   everyone agrees that there was a walker; the shanks
 5   came from the walker; and that the walker is gone
 6   now.  Really, it's a question, will the jury believe
 7   the United States' cooperators and officer witnesses,
 8   and the photographs that they've seen, or will they
 9   believe Mr. Perez' story that:  Yes, it was my walker
10   that they took, but I didn't have any part in putting
11   the shanks there.
12          And so -- and the Court can also consider
13   Mr. Perez' statements that were played, I think, a
14   couple weeks ago in court, where he admits that he
15   gave the walker so that the shanks could be made.
16          So I think the point that there wasn't -- I
17   think the point that these statements only came after
18   people were cooperating, I think, is inaccurate.  I
19   think Mr. Perez' statements were the first times that
20   the walker came into the picture, that they came from
21   his shank (sic).
22          So I expect that, if the Court holds a
23   hearing, that's the evidence that will come out, is
24   that everyone agrees that the walker doesn't exist;
25   everyone agrees that the shanks came from the walker.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1            I also think that the Court -- I also think

2      that the Court had a point about look at Corrections

3      Department separately from the United States

4      Department of Justice, with the nuance that I think

5      Mr. Villa is correct that, if there is a violation of

6      a person's constitutional rights, regardless whether

7      that was the state actor, you know, the state

8      counterpart or the federal government, obviously

9      that's grounds for suppression.

10           THE COURT:  Yeah, I would agree with that.

11     I hope I wasn't -- didn't bungle that that badly.

12     But I was trying to get on this -- all the time I

13     have suppression hearings where it's the State

14     Police; you know, they're doing it, and we determine

15     whether it's a violation.

16           But here, I was trying to think of the

17     parallels in the civil area, where you have to prove

18     bad faith, it would seem to me that it's a little

19     more difficult then to take away probative evidence

20     from the federal government that --

21           MR. BECK:  Right.  And I think that's where

22     the nuance comes in about objectively exculpatory

23     evidence.  And there has to be some quantum of proof

24     that it is exculpatory if the evidence is lost.  So

25     if the Court looks at the Court's Harry decision in

SANTA FE OFFICE                                                                MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                                      1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1   2011 -- I think it carried on into 2012, that case --
 2   you know, there were text messages that everyone
 3   agreed were lost.  And there was evidence that those
 4   were exculpatory text messages that were lost by the
 5   Government.
 6            The evidence, I assume the Court will hear
 7   in the coming day, is that there isn't any dispute --
 8   I mean, there isn't any evidence that this was
 9   exculpatory evidence, as opposed to inculpatory
10   evidence.
11            So, I think, if the standard were that
12   helpful evidence to the Government is lost, or didn't
13   appear, whether we're talking about the walker, or
14   whether we're talking about the paperwork that we'll
15   hear about later today, there would be very few cases
16   that actually went to the jury, if any.  Because
17   either we have the evidence, and so a defendant is
18   going to plead guilty, or we don't have the evidence
19   and the Court dismisses the charges.
20            THE COURT:  Do you have any thoughts, so as
21   I keep this law in mind, this distinction that Mr.
22   Villa is drawing between Youngblood and Trombetta,
23   which standard applies here, and what standard I'm
24   going to need to apply in this case?
25            MR. BECK:  Not currently.  But I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  certainly -- I anticipate having some thoughts about
 2  that by the time we're done today.  So I have to look
 3  at that.  I haven't looked at that issue.
 4           THE COURT:  You said in your briefing --
 5  Mr. Villa, you cited a lot to a case I wrote back in
 6  2014, about United States v. Harry.  And my memory of
 7  that case, and then what you put in there about the
 8  case still seemed to talk about bad faith.  Isn't
 9  that still going to be one of the things you're going
10  to have to establish, is going to be bad faith?
11           MR. VILLA:  Your Honor, I think, yes, for
12  purposes of a due process Youngblood-type violation,
13  I think we have to get to bad faith.
14           THE COURT:  I'm looking at what you say on
15  page 10, you're quoting me, you say:  "The inquiry
16  into bad faith must necessarily turn on the
17  Government's knowledge of the exculpatory value of
18  the evidence at the time it was lost or destroyed.
19  And if I understand the facts at the time, is that
20  they were not focusing on Mr. Perez at all at the
21  time that they were doing the initial arrest,
22  investigation, and prosecution.  It was only later
23  that any government began to focus on Mr. Perez.  Am
24  I wrong on that?
25           MR. VILLA:  Well, to some degree, I think
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you are, and I think that's why we have to elicit
 2   some of these facts.  I think that your quote there
 3   on page 10 from Harry doesn't change my analysis.
 4   The inquiry into bad faith must necessarily turn on
 5   the Government's knowledge of exculpatory evidence.
 6   So if the Government knows it's exculpatory, it's
 7   obviously exculpatory, we have to show bad faith.
 8   That's Youngblood.
 9             But Trombetta, if it's apparently
10   exculpatory or potential exculpatory, right, this
11   objective standard, then we don't have to show bad
12   faith.
13             And the next step under Trombetta is, Well,
14   what could you have done if they had preserved this
15   stuff and done their job the way they were supposed
16   to?
17             And I disagree with a couple of the factual
18   allegations.  We don't agree that the shanks came
19   from the walker.  We don't agree that the shanks fit
20   the walker.  We don't know that because the evidence
21   was lost.  That's the second part of Trombetta.
22   We're not able to make that determination.
23             And we disagree -- I mean, whether Agent
24   Palomares is willing to admit to it or not, he was
25   told by Mr. Perez that the walker was in play.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    because, under Trombetta, we submit it's an objective
 2    standard, it doesn't matter what he subjectively
 3    believed.
 4              THE COURT:  But aren't you going to have to
 5    establish that it was the exculpatory value of Mr.
 6    Perez' walker that was apparent; not that the walker
 7    was in play, but that the exculpatory value of the
 8    walker was apparent.  If anything, it was
 9    inculpatory.  It was establishing that Mr. Perez was
10    involved, or at least something that he had was
11    involved.  And they never did -- the state folks
12    never did anything with it.
13              MR. VILLA:  That's the second piece.  And I
14    think you'll hear evidence about that.  And that gets
15    me to the wheelchair program, in that there was
16    evidence within the same timeframe, within a couple
17    of weeks, from the informants primarily, that metal
18    was coming into this particular pod from the
19    wheelchair program.
20              Jason Wright is here today.  He's -- I
21    believe he will testify about that.  He told STIU
22    agents -- or excuse me, a couple of folks told STIU
23    agents that Jason Wright, as well as three or four
24    others in blue pod were getting metal into the
25    wheelchair program.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

88

1          It's our contention that it is absolutely

2     plausible that these shanks were not from Mr. Perez'

3     walker, but from another walker or another source out

4     of the wheelchair program.  And they knew that within

5     a couple weeks of this investigation.

6          We don't know when the walker was disposed

7     of.  We don't even know -- and, Your Honor, I'll show

8     you on the Elmo here -- this photo, which is going to

9     be admitted, because the Government agrees, is one of

10    the few photos that have been produced in discovery,

11    that we think the Government is going to say is Mr.

12    Perez' walker.  But we don't know that.  There isn't

13    a single piece of paper in this evidence documenting

14    the confiscation of Mr. Perez' walker.  The

15    centerpiece of the Government's case against Mr.

16    Perez here is that the shanks came from a walker.  I

17    don't know if they're going to say it's this walker.

18    It's produced in discovery along with some other

19    pictures of the shank, and the same sort of set of

20    photographs.  So I think that's the Government's

21    theory.  But I don't know.

22          I don't know what Agent Palomares, or the

23    other individuals who are going to testify today, are

24    going to say about this walker.  Why was it taken

25    into this room, wherever this room is, looks like



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1     maybe somebody's office.  Why was it photographed?
 2                And then, when you take that information,
 3     and you couple it with what Mr. Perez' says to Agent
 4     Palomares, which is, I don't know.  I mean, the piece
 5     is missing, but that doesn't mean it had anything to
 6     do with this murder.  Maybe it did; maybe it didn't.
 7     But Mr. Perez tells him, "I'm not involved.  I didn't
 8     do anything wrong.  Tell STIU I didn't do anything
 9     wrong."
10                So the value, then, becomes exculpatory
11     immediately, or the potential value, because there is
12     metal coming in from the wheelchair program.  There
13     is information within the first two weeks that there
14     is lots and lots of shanks in this pod.  There is
15     contradictory information about which one of the
16     actual hands-on killers used which shank.
17                And, therefore, having the walker -- I
18     mean, perhaps, if you have it, and you can do the
19     testing on it, it becomes inculpatory.  But it also
20     might be exculpatory.  So it has potential
21     exculpatory value, and, therefore, you preserve it.
22     It was seized for a reason.  It was photographed for
23     a reason.  This photograph -- I don't know when it
24     was taken, we're hoping to explore that with these
25     witnesses.  But I think that all dictates whether
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   these agents knew it had potential exculpatory value
 2   before they lost or destroyed it.
 3            THE COURT:  All right.  Well, are you ready
 4   to put on your first witness or evidence?
 5            MR. VILLA:  We are.  There is a little bit
 6   of housekeeping.  So that the Government and Mr.
 7   Perez have stipulated to all these exhibits, which
 8   they're all marked, and we can move to admit them
 9   now, and we'll use them as we go along, if that's
10   okay with the Court.
11            THE COURT:  All right.  Why don't you go
12   ahead and move their admission?
13            MR. VILLA:  So, Your Honor, we've labeled
14   them RP, for Rudy Perez, and then A through MM.
15            THE COURT:  A through MM?  So is that A
16   through Z, and then you go back and it's AA through
17   MM?
18            MR. VILLA:  Yes, Your Honor.  So with the
19   Government's agreement, we would move to admit all of
20   those pieces of evidence.  Primarily it's reports,
21   photographs, and there is one video.  I could go
22   through each, if you'd like.
23            THE COURT:  All right.  Well, I'll go ahead
24   and admit these.  In the future, on the defendants'
25   side -- this is one area that I do have a little bit
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    of a rule -- you go A to Z, and then when you start
2    going back, it's AA, AB, AC.  And so then, if you
3    keep going, it's BA, BB, BC.  So a little bit of
4    order there; otherwise, we get into seven or eight
5    Zs, and my mind begins to shut down when we have that
6    much lettering going on.
7              But I'll go ahead and admit these.  Any
8    objection, Mr. Castellano?  Are you going to, or Ms.
9    Armijo?
10             MS. ARMIJO:  No, Your Honor, no objection.
11             THE COURT:  All right.  Any defendant have
12   any objection?
13             Before I start taking evidence, any
14   defendant want to say anything on this motion to
15   suppress?  Anything you want to say?
16             All right.  Mr. Villa.
17             MR. VILLA:  The last other piece of
18   housekeeping is we've also agreed that the Court can
19   incorporate the prior testimony, to the extent it
20   matters, and we'll point the Court to that from last
21   week, with respect to this matter, as well as the
22   suppression hearings that we're going to hear later
23   today or tomorrow, including the Government's
24   exhibits that have been admitted already.
25             THE COURT:  All right.  You may have to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    help me figure out what's relevant out of that.
2              MR. VILLA:  Absolutely.
3              THE COURT:  All right.
4              MR. VILLA:  With that, Your Honor, we would
5    call Agent Palomares from the New Mexico State
6    Police.
7              THE COURT:  Mr. Palomares, if you'll come
8    up and stand next to the witness box on my right,
9    your left.  Before you're seated, Ms. Standridge, my
10   courtroom deputy, will swear you in.
11                    ANTONIO PALOMARES,
12       after having been first duly sworn under oath,
13       was questioned and testified as follows:
14                    DIRECT EXAMINATION
15             THE CLERK:  Please be seated and state your
16   name for the record.
17             THE WITNESS:  Antonio Palomares.
18             THE COURT:  Mr. Palomares.  Mr. Villa.
19             MR. VILLA:  Thank you, Your Honor.
20   BY MR. VILLA:
21       Q.   Mr. Palomares, how are you employed?
22       A.   I'm employed by New Mexico State Police.
23       Q.   What is your title?
24       A.   I'm a sergeant.
25       Q.   So is it okay if I refer to you as Sergeant
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Palomares?
 2        A.   Yes, sir.
 3        Q.   How long have you been employed by the New
 4   Mexico State Police?
 5        A.   Eleven years.
 6        Q.   Prior to that, were you in law enforcement?
 7        A.   No.
 8        Q.   When you became employed with the New
 9   Mexico State Police, did you go to the law
10   enforcement academy?
11        A.   Yes, I did.
12        Q.   That's in Santa Fe?
13        A.   Yes.
14        Q.   You became a certified law enforcement
15   officer?
16        A.   Yes.
17        Q.   What year was that?
18        A.   2006.
19        Q.   At the academy did you receive training
20   with respect to investigations?
21        A.   I was an officer, so not at the time.
22        Q.   When did you become -- well, let me ask you
23   this:  After you were an officer and worked on the
24   streets, did you do patrol?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Did you -- at some point you become an
2    investigator or detective?
3    A.   Yes, I did.
4    Q.   When was that?
5    A.   2014.
6    Q.   And was there some process that you went
7    through to become -- what do they call it?
8    Investigator?  Detective?
9    A.   Yes, basically, an agent for State Police
10   Investigations Bureau.
11   Q.   So can I refer to that as a detective?
12   A.   Yes.
13   Q.   What process did you go through to become a
14   detective?
15   A.   Oh, there is some tests you've got to take
16   through the State Police, some interviews.  And
17   eventually they choose the most qualified person for
18   the position.
19   Q.   Do you receive training at some point about
20   conducting investigations?
21   A.   Yes.
22   Q.   Is that after you become an investigator?
23   A.   Correct.
24   Q.   Can you tell me briefly about that
25   training?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
                                            e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   There is different trainings, whichever we

2   put in for some type of investigations, interviews,

3   how to deal with -- so it's interviews, any type of

4   confidential informants.

5      Q.   So, as of 2014, you were a detective?

6      A.   I promoted to detective in 2014.  I worked

7   as a detective for three years, and last year I

8   promoted to sergeant.  Now I'm a sergeant with the

9   Investigations Bureau.

10      Q.   So you supervise other investigators and

11   detectives?

12      A.   Yes, sir.

13      Q.   When did you -- what month in 2014 did you

14   become a detective?

15      A.   It was the first of the year.

16      Q.   January?

17      A.   Yes, sir.

18      Q.   And the training you received, was that

19   before January or during January?

20      A.   It was after.

21      Q.   After?

22      A.   Yes.

23      Q.   Can you tell me what month you received the

24   training?

25      A.   I don't recall.



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                     1-800-669-9492
PROFESSIONAL COURT                                      e-mail: info@litsupport.com
REPORTING SERVICE

BEAN & ASSOCIATES, Inc.

```
 1        Q.   In the spring and summer?
 2        A.   It would be hard to say.  I don't recall.
 3   There is different classes that we attend.
 4        Q.   Were you trained on evidence collection?
 5        A.   I don't think so.
 6        Q.   What about evidence preservation?
 7        A.   I don't think so.
 8        Q.   What were you trained on as an investigator
 9   with respect to evidence for a crime?
10        A.   Well, I mean, I was trained as evidence
11   since 2006, in the academy.
12        Q.   Were you trained then about collecting
13   evidence?
14        A.   Yes.
15        Q.   And preserving evidence?
16        A.   Correct.
17        Q.   And when I say "preserving evidence," you
18   understand I mean not destroying evidence, losing
19   evidence; making sure that there is a chain of
20   custody for the evidence?
21        A.   Correct.
22        Q.   Is that fair?
23        A.   Yes.
24        Q.   And were you trained on the Department of
25   Public Safety's policies and procedures with respect
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   to evidence and property handling?

2       A.   Yes.

3       Q.   All right.  I'm going to show you on your

4   screen there -- you should be able to see that --

5   what's already been admitted as Defendant's Exhibit

6   RP-MM.  Have seen that before?

7       A.   I seen it.  I haven't seen it lately, but

8   yes, that's evidence property handling from the

9   Department of Public Safety.

10      Q.   Is that the policy and procedure that was

11  in effect in 2014 for the Department of Public

12  Safety?

13      A.   I'm not sure.  The policies change over

14  time.  So I don't know if that's the same one or not.

15      Q.   Are you able to tell me when this

16  particular policy was changed or amended?  I'll let

17  you answer that question?

18      A.   According to the one we have here, it says

19  effective date, 3/12/2012.

20      Q.   And can you tell me when, if you know, or

21  if ever this particular policy was changed?

22      A.   I don't know that.

23      Q.   Would you agree with me that this was the

24  appropriate policy in effect, at least as of March

25  12, 2012?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   This is the policy that you, as a State
 3   Police Officer, were required to know about, right?
 4        A.   Correct.
 5        Q.   And to follow?
 6        A.   Yes.
 7             MS. JACKS:   For the record, is there an
 8   exhibit number?
 9             MR. VILLA:   Yes, it's RP-MM.
10        Q.   Agent Palomares, you investigated the
11   homicide -- the alleged homicide of Javier Molina
12   that occurred at the Southern New Mexico Correctional
13   Facility; is that true?
14        A.   I did.
15        Q.   And that investigation began March 7, 2014?
16        A.   Correct.
17        Q.   Let me ask you this:  You came to the
18   Southern New Mexico Correctional Facility that
19   evening about 7:15, March the 7th; is that correct?
20        A.   Yes.
21        Q.   And following this investigation, initially
22   at least, you prepared some search warrants for DNA?
23        A.   Correct.
24        Q.   And those were individuals that you
25   believed might have had a role in this investigation;
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1    correct?
 2         A.   Yes.
 3         Q.   I'm going to show you what has already been
 4    admitted as Defendant's Exhibit RP-D.  It is a search
 5    warrant for Jerry Montoya; correct?
 6         A.   Yes.
 7         Q.   I'm going to turn the page to the next
 8    page.  This is an affidavit for search warrant for
 9    that same Jerry Montoya?
10         A.   Yes.
11         Q.   You prepared this affidavit; correct --
12         A.   I did.
13         Q.   -- based on, at least part of the
14    investigation you were conducting of the Javier
15    Molina homicide?
16         A.   Yes.
17         Q.   Now, you understood that at least on March
18    7, 2014, Mr. Molina had been assaulted by at least
19    two inmates in the Southern New Mexico Correctional
20    Facility?
21         A.   Two inmates or four inmates?
22         Q.   Well, when I say assaulted, I mean the
23    individuals who were actually seen stabbing him.
24         A.   I don't understand your question.  I mean,
25    there was four people involved.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  Why don't you tell me who the four

2   people were involved, as you understood it?

3      A.   It was Jerry Armenta; Jerry -- I forgot his

4   last name.  I'd have to see the paperwork.

5      Q.   Would that have been Jerry Montoya?

6      A.   Yes.  Mario Rodriguez and Timothy Martinez.

7      Q.   And that evening, when you came to

8   Southern, you were shown a video of the assault;

9   correct?

10      A.   Correct.

11      Q.   That was a video that is captured from

12   video cameras within the pod where the assault

13   occurred?

14      A.   Yes.

15      Q.   And on that video, you were -- or at least

16   informed by others the identities of these four

17   individuals that were involved in the assault?

18      A.   Yes.

19      Q.   Who informed you of that?

20      A.   It was -- I don't recall names.  STIU from

21   Corrections.

22      Q.   What is STIU?

23      A.   Security Threat Intelligence Unit.

24   Basically, correctional officers.

25      Q.   Were they assisting you in this

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                      1-800-669-9492
                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    investigation?

2         A.   Yes.  I mean, they were on scene there.

3    They work there.

4         Q.   They were helping you identify who these

5    individuals were?

6         A.   Correct.

7         Q.   Now, would you agree with me that the video

8    that you saw, you saw it about 8:20 p.m. that

9    evening?

10        A.   That's fair to say.

11        Q.   Okay.  And I'm not actually going to play

12   this video.  It's already been admitted as evidence

13   as RP-C.  The video of the Javier Molina murder,

14   would you -- if you recall, is approximately 17, 18

15   minutes long?

16        A.   Possibly, yes.

17        Q.   Let me show you Exhibit RP-E.  This is a

18   New Mexico Correctional Department Inmate Misconduct

19   Report prepared by -- I'll show you the last page,

20   second to the last page -- Daniel Blanco?

21        A.   Okay.

22        Q.   And it indicates Daniel Blanco is a

23   Captain?

24        A.   Yes.

25        Q.   Who is Captain Daniel Blanco?



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                       1-800-669-9492
                                                                 e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.   At the time he was a Captain for STIU at

2    the Corrections Department.

3        Q.   And did you work with him in investigating

4    the Javier Molina homicide?

5        A.   Yes, he was there as well.

6        Q.   Now, this particular document that I've

7    shown you discusses timeframes from the video of the

8    Javier Molina homicide, does it not?

9        A.   I haven't read it.

10       Q.   Have you ever seen this document before?

11       A.   Yes.

12       Q.   Okay.  Do you remember when the last time

13   you read it?

14       A.   I don't remember.

15       Q.   Okay.  Do you agree with me that this

16   document discusses various timeframes as things occur

17   in the video?

18       A.   I can't agree with it because I haven't

19   read it.

20       Q.   Would you like to look at it?

21       A.   Sure.

22            MR. VILLA:  May I approach?

23            THE COURT:  You may.

24       Q.   Have you read the document?

25       A.   I read the first part.  It shows times and

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                              1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    dates.

 2          Q.    And do you recall, when you watched the

 3    video, knowing that there were times and dates

 4    related to that video?

 5          A.    Yes, sir.

 6          Q.    And did you watch the video with Captain

 7    Blanco?

 8          A.    I don't know if he was there at the time I

 9    was shown the video.  Numerous STIU members were

10    there at the scene of the video.  So I'm not sure who

11    was there at the time.  But I was shown a video by

12    STIU.

13          Q.    Where were you when you were shown the

14    video?

15          A.    I believe it was in the STIU office.

16          Q.    Whose office?

17          A.    STIU.

18          Q.    It's just generally the STIU, or is there

19    an individual in STIU that has an office?

20          A.    It's a squad room for STIU.  They have

21    their own cubicles or computers.

22          Q.    It's what kind of room?  I'm sorry?

23          A.    It's a squad room where they have their

24    computers.

25          Q.    A squad room?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    So you were there, and there were a number
 3   of other individuals there?
 4        A.    Correct.
 5        Q.    How did they get the video?
 6        A.    How did they get it?
 7        Q.    Well, let me back up a little bit.
 8              The video is from within the pod; correct?
 9        A.    Correct.
10        Q.    There is a couple of different camera
11   angles?
12        A.    Yes.
13        Q.    And the camera angles cover the entire pod?
14        A.    Correct.
15        Q.    And so my question to you is:  Do you know
16   how that video came from wherever it was recording
17   from the pod into the STIU squad room where you were
18   able to view it?
19        A.    I don't know how that works.  I was shown a
20   video.  So I don't know how they -- I wasn't sure how
21   they got video.  I'm not sure of your question.
22        Q.    Okay.  So you don't know?
23        A.    I don't know.  I mean, I was shown a video.
24        Q.    But you don't know how they captured it?
25        A.    It captures the pod with two different
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

1    angles on the camera.

2         Q.   I understand that.  But you don't know how

3    whatever you were being shown in the squad room was

4    recorded so that you could see it?

5         A.   Right, yes.

6         Q.   You don't know that?  Is that true?  I

7    mean, you didn't ask them:  How did you record this

8    so I can watch it here now?

9         A.   No, I didn't go into that detail.

10        Q.   Did you ask them how far back the video

11   would capture recordings before it, say, recorded

12   over or deleted?

13        A.   No.

14        Q.   Were you ever shown any other video beside

15   the video you saw at the STIU squad room?

16        A.   I don't think so.

17        Q.   And the video, you were able to use for the

18   preparation of your affidavit for a search warrant

19   for Jerry Montoya; is that true?

20        A.   Yes.

21        Q.   And on -- I believe -- excuse me, starting

22   at page 3 of your affidavit -- it indicates that

23   Sergeant -- the last paragraph on the bottom there --

24   Sergeant Archuleta advised that 1 A B pod video

25   cameras recorded the incident; true?

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                           1-800-669-9492
                                                                  e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1        A.   Correct.

2        Q.   So Sergeant Archuleta is of STIU?

3        A.   Yes.

4        Q.   He told you that?  Was Sergeant Archuleta

5    the one that told you there was video from the pod?

6        A.   Possibly.  He probably did.

7        Q.   Okay.  And it indicates, the last sentence

8    there, at 8:20 you were shown the video recordings of

9    the incident?

10       A.   Correct.

11       Q.   All right.  Now, the remainder of your

12   affidavit documents the times and things that are

13   seen on the video; correct?

14       A.   Yes.

15       Q.   And it identifies the individuals in the

16   video; true?

17       A.   Correct.

18       Q.   And you didn't know who those individuals

19   were; correct?

20       A.   I was given names.

21       Q.   By STIU?

22       A.   Yes.

23       Q.   Because they knew who they were?

24       A.   Yes.

25       Q.   So they would have told you -- this is --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    for instance, on your paragraph that I'm pointing to
 2    here, in the middle where it begins, "At
 3    approximately 5:16:03, Inmate Rodriguez" -- they told
 4    you when you're watching the video that's Inmate
 5    Rodriguez, right?
 6         A.   Yes.
 7         Q.   So they were helping you with this
 8    investigation?
 9         A.   Correct.
10         Q.   And you also identified Inmate Montoya as
11    an individual that's involved in the assault;
12    correct?
13         A.   Correct.
14         Q.   And Inmate Martinez; true?
15         A.   Yes.
16         Q.   That's Timothy Martinez?
17         A.   Yes.
18         Q.   And Inmate Jerry Armenta, which you
19    testified about; correct?
20         A.   Yes.
21         Q.   And all of those individuals, the
22    identities were provided to you by STIU?
23         A.   Correct.
24         Q.   The same individuals that were showing you
25    this video?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   Correct.
 2        Q.   And you used that to prepare this affidavit
 3   to get DNA from those four individuals; correct?
 4        A.   Yes.
 5        Q.   This particular document, RP-D, is just for
 6   Jerry Montoya.  But you used the same affidavit for
 7   the other three individuals, didn't you?
 8        A.   I used different search warrants; same
 9   affidavit for all four.
10        Q.   Okay.  Relying on the evidence from the
11   video?
12        A.   Correct.
13        Q.   And I'll represent to you, by agreement of
14   the prosecution, that this video is on RP-C, just so
15   that you know that.
16             But I wanted to make sure that, other than
17   the video you've discussed in your affidavit, did you
18   capture any other video in connection with this
19   investigation?
20        A.   No.
21        Q.   Did STIU, to your knowledge, capture any
22   other video with respect to this investigation?
23        A.   I don't know that.
24        Q.   Now, as you arrived at Southern -- and when
25   I say "Southern," I'm just referring to the prison;
```

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    that's okay?
 2         A.   Yes.
 3         Q.   And when you arrived at Southern, there
 4    were some other officers there from State Police
 5    helping you with the investigation along with these
 6    STIU officers; correct?
 7         A.   Yes.
 8         Q.   And a K-9 officer came with a K-9; correct?
 9         A.   Yes, that was a correctional officer.
10         Q.   I'm sorry.  So there was a correctional
11    officer from Southern that had a K-9; right?
12         A.   Correct.
13         Q.   And the K-9 went into the pod where this
14    alleged homicide occurred, right?
15         A.   Yes.
16         Q.   What kind of K-9 was that?  Was it a drug
17    sniffing dog, or something else?
18         A.   I don't know that.
19         Q.   Do you know what the purpose of bringing
20    the K-9 into the pod was?
21         A.   Looking for any type of narcotics or -- I
22    wasn't sure, positive -- weapons.
23         Q.   Let me show you what has already been
24    admitted as Defendant's RP-F.  This is a diagram of
25    the lower cells anyway, in the pod where Javier
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Molina was allegedly murdered; correct?
 2         A.   Correct.
 3         Q.   And it indicates on the top of the pod is B
 4    pod 1 A?
 5         A.   Yes.
 6         Q.   Do you know if it's referred to shorthand
 7    as blue pod?
 8         A.   Yes, I believe so.
 9         Q.   Is it okay if I call it blue pod?
10         A.   Yes, that's fine.
11         Q.   So this first page of this exhibit shows
12    you where the cells are along the edges of the pod;
13    correct?
14         A.   Correct.
15         Q.   And the common room, and that sort of
16    thing?
17         A.   Yes.
18         Q.   And would you agree with me that these
19    cells are on the bottom floor of the pod, and the pod
20    is two floors?
21         A.   I believe that's the top floor.
22         Q.   Well -- so let me point you to the top of
23    this document where it says "depicting lower level"?
24         A.   Correct.
25         Q.   So this is the lower level of the pod?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.    Yes.

2        Q.    Now, I'll show you the second page, so you

3    can see it.   That's the upper level of the pod;

4    correct?

5        A.    Correct.

6        Q.    So the lower level of the pod -- and on

7    this diagram, which is prepared, it indicates where

8    certain things were found.   For instance, bloodstains

9    are documented, where I'm pointing to the lower

10   right-hand corner of the diagram, near the main

11   entrance; is that true?

12       A.    Correct.

13       Q.    And you're aware here -- I'm pointing to

14   cell 115 -- that that's the cell where Mr. Rudy Perez

15   was housed?

16       A.    I believe so, yes.

17       Q.    Do you have any reason to believe that's

18   incorrect?

19       A.    No, sir.

20       Q.    Now, do you know that the K-9 went into

21   each of the cells in the pod?

22       A.    I believe so.

23       Q.    Are you aware that the K-9 apparently

24   alerted to cell -- some other cells -- but to cell

25   115?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

```
 1          A.   I don't recall if it alerted to 115.  I
 2   think it alerted to two cells.  I can't remember
 3   which ones.
 4          Q.   Do you know if any evidence was discovered
 5   as a result of those alerts?
 6          A.   I don't think so.
 7          Q.   Now, I think you testified that you weren't
 8   sure if the K-9 alerted to cell 115?
 9          A.   I don't think any evidence was collected
10   from the K-9 search.
11          Q.   Okay.  I understand that.  But you weren't
12   sure if the K-9 had alerted to cell 115?
13          A.   I would have to review my reports.  I know
14   it alerted to two holding cells.  I'm not sure if 115
15   was one of those holding cells.
16          Q.   If I showed you your report, would that
17   refresh your recollection?
18          A.   Yes, sir.
19               MR. VILLA:  May I approach, Your Honor?
20               THE COURT:  You may.
21          Q.   Agent Palomares, let me show you the cover
22   of what's called Supplemental No. 2.  Is that a
23   report you prepared?
24          A.   Yes, I did.
25          Q.   And it begins at Bates 1591, so people can
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                     1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                            e-mail: info@litsupport.com

```
 1    follow along.
 2            On Bates 1602, will you look at what I've
 3    highlighted.  Don't read it out loud, just let me
 4    know if that refreshes your recollection.
 5        A.   Yes, sir.  According to my reports, the K-9
 6    alerted to holding cell 108 and 115.
 7        Q.   115 being the cell that Mr. Perez was
 8    housed in?
 9        A.   Yes, sir.
10        Q.   But you don't know -- well, you know that
11    no evidence was recovered as a result of the alert,
12    but you don't know what the K-9 necessarily was
13    alerting for?
14        A.   Correct.
15        Q.   Whether it was drugs or bombs or weapons or
16    something else?
17        A.   I believe it was drugs at the time.
18        Q.   Now, a little while later, you were
19    present, were you not, for a debriefing -- this is
20    now March 8, 2014, at 4:30 a.m.?
21        A.   Yes.
22        Q.   And at that debriefing, there were agents
23    from the State Police present; correct?
24        A.   Correct.
25        Q.   And agents from -- well, I don't know if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    they're agents -- but STIU officers from the

2    Department of Corrections?

3         A.   Yes.

4         Q.   Who was present?

5         A.   There was a lot of people there, basically

6    involving -- from state police personnel to

7    corrections personnel, from correctional officers to

8    supervisors.

9         Q.   What was the purpose of the debrief?

10        A.   The purpose of the investigation, to see if

11   we had any other leads at the time that we'd

12   investigate, just to make sure we cover everything on

13   our investigation.

14        Q.   And what were the leads that were discussed

15   at that point?

16        A.   At that point, it was just -- the only

17   information that we had was a video.  So, you know,

18   we wanted to make sure that we recover all the

19   evidence, conducted interviews.

20        Q.   And so, at some point, you did learn that

21   this alleged homicide on Javier Molina was carried

22   out purportedly as an SNM hit, I mean, it was

23   ordered; correct?

24        A.   Not on this date.

25        Q.   Well, not necessarily on March 7.  But you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   learned at some point that this was allegedly an

 2   SNM-ordered hit?

 3        A.   Yes.

 4        Q.   And on what date did you say you learned

 5   that?

 6        A.   I don't remember a date.  Possibly --

 7   maybe -- once I -- well, we went back -- I went back

 8   to the scene once, on March 7 -- well, March 8, we

 9   left the location.  I went back on March 10, 2014.

10   At that point I learned there was some type of orders

11   that were sent to commit the crime.

12        Q.   You mean orders -- the orders from an SNM

13   Gang member to assault Javier Molina?

14        A.   Correct.

15        Q.   How did you learn that information?

16        A.   That was information that came through

17   STIU.

18        Q.   They provided you the information?

19        A.   Yes.

20        Q.   How did you understand they learned the

21   information?

22        A.   I wasn't sure.  I was assuming they spoke

23   to SNM -- to the inmates that were involved.  I'm not

24   sure.

25        Q.   And as you sit here today, do you know how
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    they first discovered this alleged hit?
 2         A.   I wasn't sure.
 3         Q.   Are you aware that STIU discovered this on
 4    March 8, 2014?
 5         A.   No.
 6              MR. VILLA:  Well, let me -- may I approach
 7    again, Your Honor?
 8              THE COURT:  You may.
 9         Q.   I need to get this back from you, Agent.
10         A.   Okay.
11         Q.   That report of Captain Blanco's, that I
12    showed you, which is Defendant Rudy Perez's Exhibit
13    E, right above Mr. Blanco's signature, it indicates,
14    does it not, that on March 8, 2014, STIU members
15    conducted interviews with all SNM members housed in
16    Unit 1 A?
17         A.   Yes.
18         Q.   And 1 A, that's the blue pod, right?
19         A.   Yes.
20         Q.   And it indicates that, "At the conclusion
21    of the interviews information was obtained which
22    indicated Inmate Molina was to be moved on" --
23    parenthetical assaulted -- "due to paperwork that was
24    brought from Santa Fe with SNM members; correct?
25         A.   Is that a question?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   This report indicates that, does it not?
 2        A.   Yes.
 3        Q.   And when you went back on March 10th, you
 4   learned about that as well?
 5        A.   I learned their orders came from -- we were
 6   told a name by the name of "Pup."  I can't remember
 7   his name.  That's what I learned, that the orders
 8   came from a different leader of the gang.
 9        Q.   And on March the 10th, you then conducted
10   some interviews yourself of some of the inmates;
11   correct?
12        A.   Correct.
13        Q.   Isn't it true that you interviewed Mr. Rudy
14   Perez?
15        A.   I did.
16        Q.   And when you interviewed him, he told you
17   that during the homicide he was in his room?
18        A.   Correct.
19        Q.   Right?
20        A.   Yes.
21        Q.   He said:  "If you don't believe me, you can
22   get the tape," right?
23        A.   Yes.
24        Q.   And do you recall whether you saw Mr.
25   Perez, from the video that you observed?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't recall my -- I was more concerned

 2   on the people involved with the incident.  There were

 3   numerous inmates that were in view.  I don't -- I

 4   didn't pay attention to that.  I was paying attention

 5   to the inmates who were involved in the altercation.

 6        Q.   And so you didn't see Mr. Perez being

 7   involved in the altercation?

 8        A.   No.

 9        Q.   And you did not ask for any video, say, of

10   the day before, a couple days before that, to try to

11   determine how this paperwork got passed around?

12        A.   No, sir.

13        Q.   Were you aware that the video system at

14   Southern went back approximately 23 days?

15        A.   No.

16        Q.   Did you ever ask that question?

17        A.   I don't recall.

18        Q.   Do you know if the STIU agents that were

19   involved in this investigation were aware of the

20   video system's capabilities?

21        A.   I don't know that.

22        Q.   And during the interview that you conducted

23   of Mr. Perez, he told you that STIU took his walker

24   from him, didn't he?

25        A.   Correct.
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                                 1-800-669-9492
                                                                        e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1       Q.   He didn't tell you that it was a

2    wheelchair; he told you it was a walker?

3       A.   Correct.

4       Q.   And he told you that STIU had told him that

5    there was a piece missing from his walker, right?

6       A.   He said something was missing from his

7    walker.

8       Q.   And that was the reason STIU took it from

9    him?

10          MS. ARMIJO:   Objection; calls for

11   speculation.

12          THE COURT:   Well, I'm going to allow him to

13   testify, because I think a lot of this goes to -- I'm

14   still focusing on bad faith.   So I've got to know

15   what his knowledge is.   And if he's -- if he has some

16   idea as to where evidence is or things, I think that

17   may play into it, so I'm going to probably be fairly

18   broad here.   Overruled.

19   BY MR. VILLA:

20      Q.   Go ahead, Agent.

21      A.   He said, "They took it away from me," so I

22   understood as correctional officers.

23      Q.   And you understood that the reason -- or at

24   least you suspected that the reason the walker was

25   taken from him was related to a piece being missing

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                                         e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.

1    from it?

2         A.   Correct.

3         Q.   And he said that it had just happened; they

4    had just taken it from him, right?

5              MS. ARMIJO:  Your Honor, I'm going to

6    object to the leading nature now, at this point.

7              THE COURT:  Well, I'm assuming that this is

8    more your witness than it is Mr. Villa's.  So I'm

9    going to let him get the information out however he

10   wants.

11             MS. ARMIJO:  Your Honor, I just note that

12   he is not in any way appeared to be hostile.  And

13   this is his burden.  So we would object, because

14   there is no hostility here.  And he should be put to

15   the same rules as all parties.

16             THE COURT:  Well, I'm going to let him

17   conduct the examination the way he wants.  Overruled.

18        Q.   Do you remember the question?

19        A.   Can you replay again?  Repeat?

20        Q.   Sure.  Mr. Perez told you that it had just

21   happened, they had just taken the walker?

22        A.   Yes, he mentioned something about his

23   walker taken away from him on March 8 -- I'm sorry,

24   March 10th.

25        Q.   Just a couple days after the homicide?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Correct.

 2        Q.   The homicide was March 7?

 3        A.   Yes, sir.

 4        Q.   And you were there to talk to him about the

 5   Javier Molina homicide?

 6        A.   Yes, that was on March 10th.

 7        Q.   And in response to the questions you had of

 8   him about the Javier Molina homicide, he conveys to

 9   you that his walker had been taken from him?

10        A.   Correct.

11        Q.   And that's sort of close to the beginning

12   of the interview; do you remember that?

13        A.   Yes, sir, I think so.

14        Q.   And later in the interview he repeats to

15   you again that they said -- "they" being STIU or a

16   CO -- that a piece was missing off of his walker?

17        A.   Correct.

18        Q.   And he told you that he thought it came up

19   missing when he was in the shower?

20        A.   Yes.

21        Q.   He told you he didn't know who took it,

22   right?

23        A.   He knew, he had an idea, and he was going

24   to handle it on his own.

25        Q.   Okay.  So he said:  I suspect I know who
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    took it -- didn't tell you any names -- but said he
 2    was going to take care of it?
 3         A.   Correct.
 4         Q.   Okay.  And he also told you, did he not,
 5    that -- referring to the homicide of Javier Molina --
 6    that he didn't know there was anything going on; he
 7    didn't know there was problem with Javier Molina?
 8         A.   Correct.
 9         Q.   He didn't know that -- if this was a hit,
10    he didn't know it was going to happen?
11         A.   Correct.
12         Q.   And he wasn't involved?
13         A.   Correct.
14         Q.   So let me back up.  Well, let's do this.
15              MR. VILLA:  May I approach, Your Honor?
16         Q.   Agent Palomares, I'm showing you what's
17    been already admitted as Mr. Perez' Exhibit LL.  It's
18    a transcript of the interview that you and I just
19    discussed, is it not?
20         A.   I'm not sure I have ever seen this paper
21    before.
22         Q.   Would you like to go ahead and look at it?
23              THE COURT:  Ms. Fox-Young, why don't you
24    check on Mr. Perez, to make sure -- this is all his
25    stuff here, so make sure he's doing okay.
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1              MR. VILLA:  Thank you, Your Honor.
 2              THE COURT:  Mr. Villa.
 3         Q.   Would you like to look at that, Agent, to
 4    see if you recognize it?
 5         A.   I've never seen it.  What do you mean to
 6    "look at it"?
 7         Q.   Let's do it this way:  The cover page is
 8    State of New Mexico versus Jerry Armenta, right?
 9         A.   Yes, sir.
10         Q.   And there was a state prosecution of Jeremy
11    Armenta, was there not?
12         A.   Yes.
13         Q.   You were the case agent for that
14    prosecution on that case, were you not?
15         A.   Yes.
16         Q.   And on the cover page it has listed an
17    attorney for the State of New Mexico, right?
18         A.   Correct.
19         Q.   Who is that?
20         A.   It's Daniel Dougherty.
21         Q.   You worked with Mr. Dougherty in
22    prosecuting this case.
23         A.   Yes, I did.
24         Q.   And it has listed there the attorney for
25    Mr. Armenta; Gary Mitchell, right?
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492



124

```
 1        A.   Correct.
 2        Q.   And isn't it true that Mr. Mitchell, at
 3   some point, interviewed you in preparation for this
 4   trial?
 5        A.   I don't recall.  It's been three or four
 6   years.
 7        Q.   So I'll represent to you this transcript
 8   came from the DA's office, and that's how I came to
 9   have it.  But you've never seen it before?
10        A.   I don't recall, sir.
11        Q.   Okay.  Well, maybe on a break I'll ask you
12   to look at it a little closer and see if it's the
13   transcript of the interview you and I were just
14   discussing.  Okay?
15        A.   I'm sure -- I mean -- it's the interview,
16   so I'm sure that's the interview that I conducted.
17        Q.   You are sure?
18        A.   Yes, sir.  I mean, if it's the paperwork,
19   yes.
20        Q.   Okay.  And I think I discussed this -- so
21   excuse me if I'm repeating myself -- but at any point
22   in time, did you ever go back, with the video system
23   at Southern, and look to see if you could determine
24   anything about this paperwork business on Javier
25   Molina?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Going back to Southern?

2        Q.   Going back and looking at the video.  Maybe

3   not the day of the homicide, maybe the day before, or

4   12 hours earlier, some point in time, to see if you

5   can discern how this whole hit was orchestrated.

6        A.   No, sir.

7        Q.   And you did understand -- I think you said

8   this -- but you understood that there was some

9   paperwork that came down from Santa Fe to Southern,

10  and was passed around in the pod, and that was the

11  paperwork that led to the hit on Javier Molina?

12       A.   Not at the time, I didn't know anything

13  about paperwork.  I knew that orders came from Santa

14  Fe.

15       Q.   Okay.  Did you, at any point in time, go

16  back into this video and look and see if you could

17  determine -- see somebody go in, say, Mr. Perez' room

18  and fiddling with his walker?

19       A.   I had no reason it, to go back.

20       Q.   Okay.  After the interview -- or let me

21  just make sure I'm clear with my question -- after

22  the interview of Rudy Perez, did you ever go back and

23  look at the video to see if you saw somebody taking

24  his walker or messing with his walker?

25       A.   I probably reviewed the video.  It was an

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492
                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    ongoing investigation.  I wasn't concerned with the
 2    walker.  I was concerned on the investigation that
 3    took place at the time of the incident.
 4         Q.   Okay.  And I'm not asking about your
 5    concerns or your thoughts.  I'm just asking whether,
 6    after this interview with Mr. Perez, you went back to
 7    look at the video and see if you saw somebody going
 8    into Mr. Perez' room and messing with his walker?
 9         A.   I mean, that's my question.  I wasn't
10    concerned on the walker.  I was concerned on the
11    investigation.
12         Q.   And I believe you.  I understand you
13    weren't concerned.  But I just want to know what you
14    did and what you didn't do.
15         A.   No, I didn't go back and look for a walker.
16         Q.   Okay.  Maybe look for a time when Mr. Perez
17    went to the shower and somebody went into his room?
18         A.   No, sir.
19         Q.   You didn't do that?
20         A.   No, sir.
21         Q.   Did you ever see Mr. Perez' walker?
22         A.   I saw the first time on the interview on
23    March 7.
24         Q.   Where was it?
25         A.   We conducted an interview with him, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    he -- when he walked into our office, he had it with

2    him.

3         Q.   This is on March the 7th?

4         A.   Yes, sir.

5         Q.   And during that interview Mr. Perez told

6    you that he didn't see anything; didn't know anything

7    about the homicide?

8         A.   Correct.

9         Q.   And so you conducted a second interview

10   March the 10th?

11        A.   Correct.

12        Q.   So the first time that you interviewed him

13   on March the 7th, he came to your office?

14        A.   It was at one of the offices there at the

15   correctional facility.

16        Q.   And he was using a walker?

17        A.   Correct.

18        Q.   Did you examine that walker?

19        A.   No.

20        Q.   Okay.  Let me show you what's been marked

21   as Mr. Perez' Exhibit HH.  Do you know who took this

22   photo?

23        A.   No, I don't.

24        Q.   Do you know where this photo was taken?

25        A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.   Are you able to tell me -- well, I guess we

 2   could agree this is a walker, right?

 3      A.   Yes, sir.

 4      Q.   Can you tell me whose walker it is?

 5      A.   I don't know that.

 6      Q.   So you knew on March the 7th that Mr. Perez

 7   had a walker?

 8      A.   Yes.

 9      Q.   And on March the 10th he didn't have the

10   walker anymore?

11      A.   Correct.

12      Q.   Let me show you just a few photographs

13   here.  This is Defendant Perez' I.  Are these

14   photographs that were taken by some state police

15   investigators that you were working with on March the

16   7th?

17      A.   Yes.

18      Q.   And this is the front door of 1 A blue pod;

19   correct?

20      A.   Yes, sir.

21      Q.   It's a series of four different photos?

22      A.   Yes.

23      Q.   And that's how it was on March the 7th?

24      A.   Yes.

25      Q.   Exhibit J is walking into 1 A blue pod;

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    correct?

 2         A.   Correct.

 3         Q.   In the bottom right-hand corner photo you

 4    can see what appears to be blood in the left bottom

 5    corner of that photo; is that right?

 6         A.   Yes.

 7         Q.   Is that where you know Mr. Molina was --

 8    had collapsed following the assault?

 9         A.   Yes.

10         Q.   Let me show you K.  And I'll switch it in

11    just a minute, but the bottom left-hand corner is

12    that same door walking into blue pod, right?

13         A.   Yes.

14         Q.   And then, if I rotate the picture, the

15    photograph identified as DSC0012 is sort of a shot

16    into the center of the pod, right?

17         A.   Correct.

18         Q.   And well, then DSC0011 is the left side of

19    pod, the stairway going up to the second level?

20         A.   Yes.

21         Q.   Would you agree with me that Mr. Perez'

22    cell -- and it may not be in view here, but on

23    DSC0012, it would be the right-hand side of that

24    photo on the bottom?

25         A.   Correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And from the video you watched, you could
 2   see all of the cells, correct, from the two different
 3   camera angles?
 4        A.   I think so.  I'm not sure if it covers 115
 5   and the one above 115.  I'm not sure.
 6        Q.   Let me show you L.  These are also from
 7   blue pod, all four of them?
 8        A.   Correct.
 9        Q.   And let's focus on the right-hand side,
10   DSC0016, there is a TV there?
11        A.   Yes.
12        Q.   That TV -- and then there is a phone as
13   well on the right-hand side of DSC0016 -- those are
14   both in the pod; correct?
15        A.   Correct.
16        Q.   And inmates in the pod can use the phone
17   and the TV?
18        A.   I'm assuming, yes.
19        Q.   And orienting to the left side of that
20   photograph, that's where the units begin, the cells
21   begin; correct?
22        A.   Correct.
23        Q.   And that's the side where 115 is?
24        A.   Yes.
25        Q.   And the other photos, again, are just
```



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                   1-800-669-9492
BEAN & ASSOCIATES, Inc.                                   e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

1    different shots -- 14 and 13 shots of the inside of

2    the pod?

3         A.   Correct.

4         Q.   15, DSC0015, you can see the edge of the TV

5    there sticking out, right?

6         A.   Correct.

7         Q.   That's the same TV from 16?

8         A.   Yes, sir.  I'm assuming yes.

9         Q.   And I don't want you to assume.  You were

10   in there.  Does that appear like how it was on March

11   7th?

12        A.   It is, but it's the picture from 15 to 16,

13   the picture is different.  But, yes, there is a TV

14   there on 16.

15        Q.   Got it.  That's a different angle?

16        A.   Right.

17        Q.   And on 15 -- I'm going to point with my

18   finger, and actually I think we can mark this cell.

19   Can you tell me, is that cell 115?

20        A.   Correct, yes.

21        Q.   All right.  And then the last one of this

22   is M.  This is just a photo of 115, with the door and

23   then inside of 115; correct?

24        A.   Yes, sir.

25        Q.   Do you know if, at the time this photo was

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    taken, there was a walker in that cell?

 2         A.   I don't know that.

 3         Q.   Do you know these photos to be taken on

 4    March 7 or March 8 of 2014?

 5         A.   Yes, sir.

 6         Q.   Let me jump over to N.  This is a different

 7    series of photos that were taken by the defense.  Was

 8    that also a photo of blue pod?

 9         A.   Yes.

10         Q.   And the telephone we were talking about

11    earlier is in this photo?

12         A.   Yes.

13         Q.   Now, at the top right-hand corner of the

14    photo -- I'm going to identify, first, this black

15    cylindrical object.  Is that a camera?

16         A.   I'm not sure.

17         Q.   Okay.  And over here, above the exit sign,

18    there is another same looking object.  Do you know if

19    that's a camera?

20         A.   It appears to be a camera, yes.

21         Q.   This is C -- or excuse me, O, pretty much

22    the same photo; true?

23         A.   Correct.

24         Q.   Okay.  And now I'm going to show you P.

25    Again, this is a little bit different angle of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    blue pod, but it indicates right in the middle of the

2    photo 1 A B pod.  That's the blue pod; correct?

3         A.   Yes.

4         Q.   And again, in the left-hand side center is

5    cell 115?

6         A.   Correct.

7         Q.   Now, you're familiar with the recovery of

8    what's believed to be the shanks that were allegedly

9    used to assault Javier Molina, are you not?

10        A.   Yes.

11        Q.   One of the shanks was found in the blue pod

12   in a trash can; correct?

13        A.   Yes.

14        Q.   And another one was found upstairs in the

15   shower drain?

16        A.   Correct.

17        Q.   And if I understand it correctly, from your

18   observations of the video, you saw Mr. Armenta to be

19   one of the people that appeared to be stabbing Javier

20   Molina; correct?

21        A.   Correct.

22        Q.   And Mr. Armenta then goes to the trash can

23   where a shank is found, and it looks like he drops an

24   object in there?

25        A.   Correct.

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   The other shank that ends up in the shower

2  drain, Mario Rodriguez is seen getting that shank and

3  going into the shower; correct?

4    A.   Correct.

5    Q.   And that's the shank that came from Jerry

6  Montoya; did it not?

7    A.   Yes.

8    Q.   Jerry Montoya was the other person alleged

9  to be -- or on video appeared to be stabbing Javier

10  Molina; correct?

11    A.   Correct.

12    Q.   So we have two -- I'll call these

13  individuals "stabbers," right?

14    A.   Yes.

15    Q.   Mario Rodriguez and Timothy Martinez, who

16  you also got affidavits for DNA for, were not seen

17  stabbing Mr. Molina; correct?

18    A.   Correct.

19    Q.   They were just seen going into his room and

20  coming out right before the two stabbers went in?

21    A.   Yes.

22    Q.   And then Mr. Rodriguez, who we just

23  discussed, put one of the shanks in the shower drain?

24    A.   Yes.

25    Q.   Okay.  So let's focus on Mr. Armenta.  You

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1    see him on the video.  He appears to be stabbing
 2    Javier Molina.  And then he puts an object in the
 3    trashcan, which is in the downstairs portion of the
 4    pod; correct?
 5         A.   Yes.
 6         Q.   And I want to show you Mr. Perez' Y.  These
 7    are photographs of -- at least the first three --
 8    225, 226, and 227, are photographs of the shank that
 9    was recovered from the trashcan; correct?
10         A.   Correct.
11         Q.   Same trashcan that you saw Mr. Armenta
12    appear to put an object in right after the assault?
13         A.   Yes.
14         Q.   And this particular shrank was then taken
15    out, and put into a box for evidence collection,
16    right?
17         A.   Yes.
18         Q.   And it's a dark picture.  But you can see
19    the shank in the box in 228, right?
20         A.   Yes.
21         Q.   So let me show you Z.  That's the same
22    shank from the trashcan; correct?
23         A.   Yes.
24         Q.   All four of the photos in Z?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   This is a shank that had some sort of

2   cellophane or tape wrapped around the end of it?

3        A.   Correct.

4        Q.   Then a rope attached to the end?

5        A.   Yes.

6        Q.   And AA, that's a close-up photo of that

7   same shank; true?

8        A.   Correct.

9        Q.   Show you another one, BB; the same shank?

10       A.   Yes.

11       Q.   And then I just want to show you DD.   Is

12   this a close-up of the same shank?

13       A.   I believe so.

14       Q.   Can you tell me the significance of this

15   close-up picture?

16       A.   I'm not sure.   I didn't take those

17   pictures.

18       Q.   Does it appear like the tip or the point of

19   the shank is bluish, or has some sort of paint or

20   something on it?

21       A.   Yes.

22       Q.   Now, let's show you EE, which is pictures

23   of the shower inside of the blue pod on the second

24   level; correct?

25       A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And there is a marking in there, a yellow
 2   number 3.  That's a crime scene number for you to
 3   document where things were found; correct?
 4        A.   Right.
 5        Q.   And this is the upstairs shower, where the
 6   shank that Mario Rodriguez was believed to have put
 7   in the drain was found?
 8        A.   Yes.
 9        Q.   The shank that Jerry Montoya allegedly
10   used?
11        A.   Correct.
12        Q.   And EE has got the same crime scene number
13   3, with a close-up picture of the shank; true?
14        A.   Yes.
15        Q.   And it looks like maybe some of the
16   drainpipe area of the shower?
17        A.   Yes.
18        Q.   Y'all actually had to take some of the
19   pipes out to get to the shank?
20        A.   Yes, sir.
21        Q.   These three shanks -- let me show you
22   Defendant's S -- are pictured -- well, excuse me, two
23   of the shanks are pictured here, are they not?
24        A.   Yes.
25        Q.   And so the top picture, if you're looking
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    at Defendant's S, is the shank seen from -- recovered

2    from the shower?

3          A.   Correct.

4          Q.   And the bottom is the shank recovered from

5    the trashcan?

6          A.   Yes.

7          Q.   The middle is just a piece of metal that

8    was also recovered from the same trashcan; was it

9    not?

10         A.   Yes.

11         Q.   Now, do you know if this middle piece, that

12   was also recovered from the trashcan, do you know

13   where that came from?

14         A.   That came from the trashcan, first level.

15         Q.   Do you know the source, how it ended up in

16   the trashcan where it came from?

17         A.   No, sir.

18         Q.   What about either of the other two?

19         A.   Well, they were -- the bottom one was

20   thrown in the trashcan.  The top one was taken to the

21   shower by Jerry.

22         Q.   Mario Rodriguez.  To the shower?

23         A.   Correct.

24         Q.   Okay.  But my question for you is:  Do you

25   know where this metal came from?

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492
                                                    1-800-669-9492
                                           e-mail: info@litsupport.com




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.    No, sir.
 2        Q.    These shanks, these pieces of metal and the
 3   shanks, were discovered on late night, March the 7th,
 4   maybe early morning March the 8th, by you and your
 5   investigative team?
 6        A.    Correct.
 7        Q.    And V is just one more picture of the same
 8   three pieces of metal on the bottom, right?
 9        A.    Yes.
10        Q.    And you can see on the left-hand side the
11   State Police evidence boxes that they were packaged
12   in?
13        A.    Yes.
14        Q.    Okay.  One more close-up of this is
15   Defendant's W.  The same three pieces of metal we
16   were just discussing.
17        A.    Yes.
18        Q.    And then here is X; it's a close-up of that
19   other piece of metal that was found in the trashcan?
20        A.    Correct.
21        Q.    You didn't think this piece of metal was
22   actually used as a shank, did you?
23        A.    No, sir.
24        Q.    When this piece of metal was discovered,
25   did you have an idea what you thought it was, or why
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you guys took it as evidence?

2         A.   It's a metal.  It shouldn't be there.  It

3    was the same material as the other shanks; that's why

4    it was taken into evidence.

5         Q.   So was it the same material as -- let me

6    show you N -- or, excuse me, W -- this shank here on

7    the bottom?

8         A.   At the time I observed the shrank, I didn't

9    see it as a close-up.  To me, it looks the same.

10        Q.   Okay.  I mean, it appears the same.  I'm

11   not asking if it is the same.

12        A.   Yes, sir.

13        Q.   But this top piece of metal from the shower

14   drain, that's a little different than the other two,

15   isn't it?

16        A.   The shape, yes, sir.

17        Q.   I'm sorry?

18        A.   It's a shape, different shape.

19        Q.   It looks a little older, maybe rusted?

20        A.   I'm not sure.

21        Q.   Okay.  In the course of your investigation,

22   did you learn about the wheelchair program at

23   Southern?

24        A.   Yes, I did.

25        Q.   And you learned that individuals in blue

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    pod were working in the wheelchair program at

2    Southern, did you not?

3         A.   I did.

4         Q.   And you learned that those individuals

5    would often bring metal from the wheelchair program

6    into the blue pod; correct?

7         A.   That they would bring metals into the blue

8    pod?

9         Q.   Pieces of metal from the wheelchair

10   program.

11        A.   That was my understanding at the time.

12        Q.   At the time of this investigation?

13        A.   Correct.

14        Q.   Within a week of this investigation, you

15   learned about this information; correct?

16        A.   When I arrived on scene, that's when I

17   learned that the inmates were working at the

18   wheelchair program.

19        Q.   And were taking metal from the wheelchair

20   program into the blue pod, right?

21        A.   That was my understanding, yes.

22        Q.   And, at least, you had information to that

23   effect?

24        A.   Correct.

25        Q.   And making shanks out of it?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Correct.
 2        Q.    And you knew that in the wheelchair
 3   program, that inmates that worked there would take
 4   wheelchairs and rehabilitate them, fix them up, give
 5   them to nonprofits, or things like that, right?
 6        A.    I believe so, yes.
 7        Q.    And they also did that with walkers?
 8        A.    I only heard wheelchair.  I didn't hear
 9   anything else.
10        Q.    You never heard about a walker?
11        A.    No.
12              MR. VILLA:  May have a moment, Your Honor?
13              THE COURT:  You may.
14              MR. VILLA:  Pass the witness.
15              THE COURT:  All right.  Thank you, Mr.
16   Villa.
17              Any other defendant want to ask any
18   questions of Mr. Palomares?
19              All right.  Ms. Armijo, if you have
20   cross-examination of Mr. Palomares.
21                    CROSS-EXAMINATION
22   BY MS. ARMIJO:
23        Q.    Sergeant Palomares, was your initial
24   understanding, after responding on March 7, and that
25   initial investigation leading to the early morning
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    hours of the 8th, was that it was potentially a
 2    wheelchair involved, as far as a source for the
 3    shanks?
 4         A.   Yes.
 5         Q.   Now, at any point in time, prior to your
 6    leaving Southern for the first part of the
 7    investigation, did you have any idea that, instead of
 8    a wheelchair as a source, that it could have been a
 9    walker?
10         A.   No.
11         Q.   Now, I believe you indicated that, as part
12    of your investigation -- let me ask you this way:  As
13    part of your investigation, did you, or members of
14    your team attempt to interview the inmates of blue
15    pod?
16         A.   We did.
17         Q.   And is it fair to say that the majority of
18    those people were not forthcoming with information?
19         A.   Correct.
20              MR. VILLA:  Objection, Your Honor.
21              THE COURT:  I'm sorry?
22              MR. VILLA:  I think it's leading and
23    argumentative.
24              THE COURT:  Don't lead.  Don't lead.  But,
25    otherwise, the question is proper.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1              MS. ARMIJO:  So you're not going to allow
2    me to cross-examine him.
3              THE COURT:  You can cross-examine him.  I'm
4    not saying it's argumentative.  But don't lead.
5    BY MS. ARMIJO:
6         Q.   Now, as far as witnesses, was Mr. Perez
7    part of that?
8         A.   Yes, he was.
9         Q.   And what did he initially tell you or
10   members of the state police team when he was
11   interviewed?
12        A.   He told me that he didn't see anything.  I
13   believe he said he was in his room, holding cell.  He
14   didn't see anything.
15        Q.   Did he provide you any further information
16   at that time?
17        A.   No.
18        Q.   And at the time that he came to the
19   interview, what did he use, if anything, to assist
20   him with his walking?
21        A.   He had a walker.
22        Q.   At that point in time -- is that point in
23   time included in the information, in the period of
24   the first time that you were investigating that case?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1          Q.    Going to your return to Southern.    What

2    date was that again?

3          A.    March 10th, 2014.

4          Q.    Wait, I'm sorry, let me go back to that

5    first time.   Were you in charge of the portion of the

6    investigation that dealt with evidence collection?

7          A.    No.

8          Q.    Is there a special team that deals with

9    evidence collection?

10         A.    We have a Crime Scene Team.   They are in

11    charge of collecting evidence.

12         Q.    And who was in charge of collecting

13    evidence?

14         A.    I believe it was Agent Norman Rhodes.

15         Q.    So now, then, going to March 10th, at that

16    point, did you conduct additional investigations?

17         A.    I did.

18         Q.    And as part of those additional

19    investigations, did you interview Mr. Perez?

20         A.    Yes, I did.

21         Q.    And, at that point in time, what did you

22    learn as you recall -- well, let me back up.   Did you

23    have an opportunity to actually listen to your

24    recorded interview?

25         A.    I did.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

146

```
 1        Q.   And what did he indicate to you as far as
 2   his walker at that point in time?
 3        A.   He indicated a part of his walker was
 4   missing.  And he said, "They took it away from me."
 5   So I understood that he was referring to correctional
 6   officers.
 7        Q.   And did he indicate to you at what point in
 8   time it came up missing?
 9        A.   He indicated a part of his walker was
10   missing.
11        Q.   And I'm going to show you Defendants'
12   Exhibit --
13             MS. ARMIJO:  Mr. Villa, do you have the
14   transcript?
15             MR. VILLA:  Oh, I believe I --
16        Q.   I'm going to refer to Exhibit RP-LL,
17   specifically, which, just so that you're familiar
18   with -- now, have you had an opportunity to review
19   this to see if it's accurate?
20        A.   No.
21        Q.   I'm going to page 26 of this.  And in
22   looking there, do you see around line 12, he talks
23   about when the piece came up missing.  Does that
24   refresh your recollection?
25        A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.    And what did he indicate?
 2        A.    He advised me that he was in the shower
 3   when his piece of evidence -- the walker was missing.
 4        Q.    All right.  And what does he go on to tell
 5   you about the walker?
 6        A.    He tells me that a piece was missing, and
 7   they took it away from him.  And he advised that he
 8   was going to handle it on his own.
 9        Q.    At any point in time did he tell you that
10   he thought that weapons could have been made with it?
11        A.    No.
12        Q.    Now, as you were doing that interview, what
13   was your understanding of where possible shanks could
14   have come from?
15        A.    From the wheelchair program.
16        Q.    And at that point in time, when he was
17   talking about the walker, given what he told you, did
18   you at that time associate the walker with being used
19   with shanks?
20        A.    No, I didn't.
21        Q.    Now, on March 10th, did you have -- I
22   believe you testified previously that somewhere
23   around that date that you had information that -- an
24   idea that it had been authorized prior to that date
25   by people other than the ones that committed the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   actual stabbing; is that correct?
 2        A.   Correct.
 3        Q.   Now, did you have any idea at that time
 4   that there was actual, what we would refer to as
 5   paperwork, that came down from Santa Fe?
 6        A.   Not at that time.
 7        Q.   And specifically, I'm talking about March
 8   of 2014.  Were you aware of any paperwork coming down
 9   from Santa Fe?
10        A.   No.
11        Q.   At some later point in time, did you become
12   aware of paperwork possibly coming down from -- and
13   when I say "Santa Fe, I guess I'm referring to the
14   penitentiary up there?
15        A.   Correct.
16        Q.   And why don't you tell us about that.
17        A.   I learned on the paperwork, a few months
18   later after the investigation.  I can't remember the
19   date.  But it was when FBI started assisting with the
20   investigation.
21        Q.   Okay.  So -- but you indicated that it was
22   a few months later?
23        A.   Correct.
24        Q.   And when you say FBI, would that have been
25   Special Agent Lance Roundy?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.   Correct.
 2          Q.   Now -- and that was the first time that you
 3    actually learned about some potential paperwork?
 4          A.   Yes.
 5          Q.   Now, as far as the walker, did anyone ever
 6    tell you -- prior to this case being dismissed by the
 7    State of New Mexico for federal prosecution, had you
 8    been provided with any information about a walker
 9    being part of the -- as a potential source for
10    shanks?
11          A.   I don't think so.  I think a question -- I
12    was asked a question about the walker, but I didn't
13    know at the time that the walker was used as part of
14    the incident.
15          Q.   Okay.  And when was that -- this happened
16    in -- just so that we can get a timeframe -- if this
17    incident occurred March 7 of 2014 -- well, let me ask
18    some other questions of you first.  Were charges
19    initially brought by the State of New Mexico?
20          A.   What charges?
21          Q.   Were charges initially brought out of this
22    incident by the State of New Mexico?
23          A.   Yes.
24          Q.   And did that prosecution continue to some
25    point in time?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    It was dismissed at some point.
 2        Q.    Okay.  Do you recall the reason for the
 3   dismissal?
 4        A.    Because the federal government was going to
 5   charge at the federal level.
 6              THE COURT:  Ms. Armijo, is this a good
 7   place for us to maybe take our lunch break?
 8              MS. ARMIJO:  Absolutely, Your Honor.
 9              THE COURT:  All right.  We'll be in recess
10   for about an hour.  Let's try to get back here.  I
11   brought food in so that I will not leave the
12   building.  And I'm not saying y'all do the same
13   thing.  But we're going to be ready to go pretty
14   quick.  We've done pretty well this morning getting
15   people in and out.  Let's keep it up.  All right.
16   Have a good lunch.
17              (The Court stood in recess.)
18              THE COURT:  All right.  Let's take a head
19   count here.  I think we've got everybody, a lawyer
20   for everybody.  Take a look around the room, help
21   your friends out.  All right.
22              Looks like, Mr. Mondragon, you've entered
23   an appearance this afternoon.  Good to see you.
24              MR. MONDRAGON:  Yes, Your Honor.
25              THE COURT:  All right.  Anything, Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Villa, y'all need to discuss with me, or are you
 2    ready to go?
 3              MR. VILLA:  I think we're okay, judge.
 4              THE COURT:  All right.  Ms. Armijo, if you
 5    wish to continue your cross-examination of Mr.
 6    Palomares.
 7              Mr. Palomares, I'll remind you you're still
 8    under oath.
 9              THE WITNESS:  Okay.
10              THE COURT:  Ms. Armijo.
11    BY MS. ARMIJO:
12        Q.  Sergeant Palomares, at some point during
13    your investigation, did you realize that there was an
14    allegation that actual paperwork came down, possibly
15    from Santa Fe, in reference to the Javier Molina
16    murder?
17        A.  Yes, I did.
18        Q.  And do you have an idea approximately when
19    that was during this investigation?
20        A.  It had to have been maybe May or June of
21    2015, roughly.
22        Q.  Okay.  So May or June, 2015.  And were you
23    ever in possession of that paperwork?
24        A.  No.
25        Q.  And when I say "you, I should also include
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   State Police?

 2        A.   Correct, no.

 3        Q.   Are you aware of any law enforcement entity

 4   that was in possession of that paperwork?

 5        A.   No.  Because I was the case agent.

 6             MS. ARMIJO:  Thank you.  No further

 7   questions.

 8             THE COURT:  Thank you, Ms. Armijo.

 9             Any other defendant have any questioning?

10   Mr. Villa, do you have redirect?

11             MR. VILLA:  Yes, Your Honor.

12             THE COURT:  Of Mr. Palomares.  Mr. Villa.

13                  REDIRECT EXAMINATION

14   BY MR. VILLA:

15        Q.   Good afternoon, Agent Palomares -- or

16   excuse me, Sergeant Palomares.

17        A.   That's okay.

18        Q.   So you were the case agent for this case?

19        A.   Yes, sir.

20        Q.   As the case agent, you're responsible for

21   directing the investigation of the homicide itself?

22        A.   Correct.

23        Q.   And I understand that you had individuals

24   helping you with the state police, who were

25   documenting evidence, taking photographs, things like
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that, right?
 2          A.    Yes.
 3          Q.    You had individuals from New Mexico
 4    Department of Corrections that were also assisting
 5    you, showing you video, and those sorts of things;
 6    correct?
 7          A.    Yes.
 8          Q.    And they had identified this plot, if you
 9    will, to put a hit on Javier Molina, and they told
10    you about it, right?
11          A.    Yes.
12          Q.    You said that you were not aware of
13    paperwork until sometime in May or June of 2015?
14          A.    Yes, sir, roughly.
15          Q.    How did you become aware of that?
16          A.    That's when I attended a meeting with the
17    FBI personnel at the AUSA Office here in Las Cruces.
18          Q.    The FBI told you about it?
19          A.    Correct.  I think it was FBI or DEA -- USA
20    personnel.
21          Q.    There were FBI agents assisting in this
22    investigation from the beginning; true?
23          A.    Yes.
24          Q.    Agent Lance Roundy conducted some
25    interviews in that first few days after the homicide?
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.   Correct.
 2         Q.   So you were also working with them as part
 3    of this investigation?
 4         A.   Yes.
 5         Q.   And as the case agent, you're responsible
 6    for essentially the entire case, right?
 7         A.   Correct.
 8         Q.   Including all the evidence that's
 9    collected?
10         A.   Yes.
11         Q.   All the evidence that's seized?
12         A.   Yes.
13         Q.   And all facets of the investigation,
14    knowing who has done what, and what needs to be done;
15    that sort of thing?
16         A.   Oh, basically, the way it works, we have
17    the Crime Scene Team.  It is -- there are state
18    police agents, and they are the ones in charge of
19    collecting any type of evidence.  At that time, once
20    evidence is collected, then they release evidence to
21    me.
22         Q.   And so you're aware of the evidence that's
23    been collected?
24         A.   Correct.
25         Q.   So if there was other evidence that needed
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   to be seized or collected or followed up on, that

2   would be your job?

3        A.   Yes.

4        Q.   And your Crime Scene Team from the state

5   police was there collecting a lot of this evidence,

6   right?

7        A.   Yes.

8        Q.   But the NMCD personnel, STIU, they were

9   collecting evidence, too, weren't they?

10       A.   Well, depends.

11       Q.   Some evidence, right?  They got the video?

12       A.   Right, yes.

13       Q.   And then they got you some other

14   information, like about how -- this plot on Javier

15   Molina; correct?

16       A.   Yes.

17       Q.   And they were trying to gather intelligence

18   for you?

19       A.   Yes.

20       Q.   Now, you talked a little bit about with Ms.

21   Armijo the wheelchair program.  Who informed you

22   about the wheelchair program?

23       A.   I was notified -- when I first arrived on

24   scene, I was notified by STIU.

25       Q.   What were you notified?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    The inmates had a wheelchair program; that
 2   they were allowed to work during work hours.
 3        Q.    And STIU notified you of that because they
 4   thought it might be important to your investigation?
 5        A.    Correct.
 6        Q.    Did you learn about the facts, that metal
 7   or shanks were coming into blue pod from the
 8   wheelchair program from STIU?
 9        A.    Yes, that was my understanding initially,
10   that the shanks came from the wheelchair program.
11        Q.    And can you tell me who with STIU gave you
12   this information?
13        A.    I don't recall, sir.  There was too many
14   STIU officers at the time.
15        Q.    Did you go over to the wheelchair program
16   and investigate it?
17        A.    No, I didn't.
18        Q.    Have you been there at any point in time
19   during this investigation?
20        A.    No.
21        Q.    Did you interview anybody from the
22   wheelchair program, like a CO, or somebody that would
23   be supervising over there?
24        A.    No.
25        Q.    And these case agents who took the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   evidence -- including the shanks that we saw this

2   morning -- you're supervising them; correct?

3          A.   Correct.  But there is a supervisor

4   assigned to impact team -- I'm sorry, Crime Scene

5   Team.  He's the one in charge of collecting any type

6   of evidence.  But at the same time, yes, I'm making

7   sure all the evidence that we need to obtain at the

8   time of the incident, it's collected.

9          Q.   You were aware at the time of the discovery

10  of the shanks in the trashcan?

11         A.   Yes.

12         Q.   And the shower drain?

13         A.   Yes.

14         Q.   You saw the shanks yourself?

15         A.   Yes.

16         Q.   And these shanks appear to be -- I mean,

17  perhaps, they're broken or bent a little bit, but

18  solid pieces of metal, right?

19         A.   Correct.

20         Q.   That may have come from some other source,

21  such as the wheelchair program?

22         A.   Correct.

23         Q.   And you knew that information in the first

24  two days of your investigation:  March 7, March 8?

25         A.   Yes, sir.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   So, on March 7 -- you testified about this

2  with Ms. Armijo -- you interviewed Mr. Perez.  He

3  told you he didn't see anything, right?

4       A.   Correct.

5       Q.   And Mr. Perez had a walker that day?

6       A.   Yes, he did.

7       Q.   And on March the 10th, you went back and

8  you interviewed Mr. Perez again.  And he didn't have

9  a walker that time?

10      A.   Correct.

11      Q.   The walker that he had the first time

12 looked normal to you?

13      A.   I didn't pay attention to it.  I was more

14 concentrated on conducting an interview.

15      Q.   But you knew that the walker was made of

16 metal?

17      A.   Yes, I mean some -- yes, it was metal.  I

18 didn't look at it.  Like I said, I was more

19 concentrated on conducting the interview.

20      Q.   It wasn't the type of walker -- I guess

21 I've seen a few walkers -- maybe more than I care to

22 since this case -- but some of them are a little less

23 solid and plastic, and others have wheels, are a

24 little more solid and metal; true?

25      A.   Correct.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                         1-800-669-9492
                                                              e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

 1        Q.    And Mr. Perez' was the type that was a
 2    little more solid and metal?
 3        A.    I can't recall.  I think the walker had
 4    wheels.  But other than that, I don't recall paying
 5    attention to the walker.
 6        Q.    And when you interviewed Mr. Perez -- I
 7    just want to make sure that this is clear -- he told
 8    you that, "they," being somebody from the Department
 9    of Corrections, said a piece was missing from his
10    walker, right?
11        A.    Yes, sir.
12        Q.    He did not tell you himself:  A piece was
13    missing from my walker, right?
14        A.    He said a piece was missing from his
15    walker, and they took it away.
16        Q.    No, I understand that.  But he said, in
17    terms of they told him, when they took it away that a
18    piece was missing from his walker, right?
19        A.    I'm not sure.  I don't recall.
20        Q.    Well -- and he said that it must have come
21    up missing in the shower?
22        A.    Correct.  He said he was in the shower.
23        Q.    And I just want to make sure that we're
24    clear.  When you had this conversation with him, you
25    did tell him -- or you asked him about, you know, did

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    orders come down from Santa Fe, in terms of orders to
 2    hit Molina?
 3        A.   Yes.
 4        Q.   And he didn't say -- he said he didn't know
 5    about that, right?
 6        A.   Correct.
 7        Q.   When you learned about these orders, did
 8    you have some idea how the orders came down from
 9    Santa Fe?
10        A.   No.  I never worked the case.  I was more
11    concentrated on investigating the homicide.
12        Q.   I mean, if somebody had ordered Javier
13    Molina to be hit from Santa Fe, they would be part of
14    this homicide investigation, wouldn't they?
15        A.   Yes, sir.  But I was never told by any
16    witnesses that the orders came from Santa Fe.
17        Q.   You learned that from STIU?
18        A.   Yes, sir.
19        Q.   And STIU learned that from doing interviews
20    of inmates; correct?
21        A.   Yes, sir.
22        Q.   Did you ask about -- STIU about those
23    interviews that they had done?
24        A.   We spoke briefly about the interviews.  And
25    that's what I gather, somehow the orders came from
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Santa Fe.

2         Q.    Did you make any attempt to follow up on

3    that investigation and try determine if to orders had

4    come from Santa Fe?

5         A.    Well, when we asked Mr. Perez, we asked if

6    orders came from Santa Fe, and he said he didn't know

7    anything about it.

8         Q.    Independent of Mr. Perez, did you --

9         A.    No, sir.

10        Q.    Let me make sure I get the whole question

11   out.  Did you do any other investigation to try to

12   determine whether that was true?

13        A.    No, sir.

14        Q.    Did you try to figure out how, if orders

15   came down, how they came down?

16        A.    No, sir.

17        Q.    And I want to make sure that I understand

18   completely.  You did not go back and actually try to

19   view footage from prior days, or other than the

20   footage of the assault, you didn't try to view any

21   other footage?

22        A.    No.

23             MR. VILLA:  May I have a moment, Your

24   Honor?

25             THE COURT:  You may.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. VILLA:  That's all the questions I

2     have.

3          THE COURT:  Thank you, Mr. Villa.

4          All right.  Mr. Palomares, you may step

5     down.  Is there any reason that Mr. Palomares cannot

6     be excused from the proceedings?

7          MS. ARMIJO:  Your Honor, we have asked him

8     to wait around.

9          THE COURT:  Okay.  All right.  You need to

10    stay under charge then.

11         All right.  Ms. Fox-Young, does Mr. Perez

12    have his next witness or evidence?

13         MS. FOX-YOUNG:  Yes, Your Honor.  Mr. Perez

14    calls Daniel Bustamantes.

15         THE COURT:  Mr. Bustamantes, if you'll come

16    up and stand next to the witness box on my right,

17    your left.  Before you're seated, Ms. Standridge, my

18    courtroom deputy will swear you in.

19              DANIEL BUSTAMANTES,

20       after having been first duly sworn under oath,

21       was questioned and testified as follows:

22                  DIRECT EXAMINATION

23         THE CLERK:  Please be seated and state your

24    name for the record.

25         THE WITNESS:  Daniel Bustamantes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Mr. Bustamantes.  Ms.
 2    Fox-Young.
 3    BY MS. FOX-YOUNG:
 4        Q.   Good afternoon, sir.
 5             Can you tell me where you're currently
 6    employed?
 7        A.   I'm employed with the Las Cruces School
 8    Districts.
 9        Q.   Okay.  And how long have you been employed
10    there?
11        A.   Approximately three years.
12        Q.   And where you were employed on March 7 of
13    2014?
14        A.   Southern New Mexico Correctional Facility,
15    State of New Mexico, Department of Corrections.
16        Q.   And what was your position there?
17        A.   I was a sergeant for STIU.
18        Q.   When did you start in that job, if you can
19    recall?
20        A.   Maybe a year before.
21        Q.   So maybe spring of 2013?
22        A.   Maybe.
23        Q.   Okay.  And do you have a recollection of
24    the events on March 7, 2014, involving the death of
25    Javier Molina?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    No, I don't.  I can't remember.

2        Q.    You don't remember anything about that?

3        A.    I remember I took pictures at the hospital.

4        Q.    Okay.  And I'll get to that.

5              But you remember Javier Molina dying?

6        A.    Yes.

7        Q.    And you remember that you had some role in

8   that investigation?

9        A.    Yes.

10       Q.    Do you recall, on March 7, 2014, when you

11  learned of the death?

12       A.    No.

13       Q.    Do you recall who gave you a role in that

14  investigation, who gave you a job to do?

15       A.    No.

16       Q.    Okay.  Tell me what you do remember.  You

17  remember going to the hospital, you said?

18       A.    Yes.

19       Q.    And you photographed Javier Molina?

20       A.    Yes.

21       Q.    And did you conduct any interviews that you

22  recall?

23       A.    I can't remember.

24       Q.    Do you remember photographing anything else

25  in the course of the investigation?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492
                                              e-mail: info@litsupport.com


**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   No.
 2        Q.   Mr. Bustamantes, when you -- if you recall,
 3   when you took photographs in the course of this
 4   investigation, or any investigation, did your name
 5   get applied to the photograph?  Was there a marker on
 6   the photograph that showed that you took it?
 7        A.   Yes.
 8        Q.   And was that always true when you did STIU
 9   investigations?
10        A.   Yes.
11        Q.   Do you remember anybody else who you worked
12   with on this case?
13        A.   Particularly, or just in general?
14        Q.   Do you remember any other officers who
15   worked on it with you?
16        A.   STIU; the members themselves.
17        Q.   How many STIU officers were located at
18   Southern at that time?
19        A.   I can't remember exactly the number.  I
20   mean, four or five.
21        Q.   And do you remember an Ernest Holguin?
22        A.   Yes.
23        Q.   Was he an STIU officer at Southern in March
24   of 2014?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Did he work with you during the course of
 2   this investigation?
 3        A.   Yes.
 4        Q.   Do you remember Adam Vigil being present?
 5        A.   No.
 6        Q.   Do you remember anybody coming from Santa
 7   Fe during the course of the investigation, with STIU?
 8        A.   No.
 9        Q.   Do you recall seeing a walker during the
10   course of your investigation?
11        A.   No.
12        Q.   And you didn't photograph a walker?
13        A.   No.
14        Q.   And as far as you know, you didn't do
15   anything else related to the Javier Molina
16   investigation?
17        A.   All I did was -- all I remember is taking
18   pictures of Javier Molina at the hospital.
19        Q.   After you took the pictures, do you know
20   what you did with them?
21        A.   I can't recall who I turned them in to.
22        Q.   Do you recall if it was state police you
23   turned them in to?
24        A.   For sure, no, I don't remember.
25        Q.   Do you remember if Agent Palomares was
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   present for any of your work on the investigation?
 2        A.    Yes.
 3        Q.    Was he present for briefings with you?
 4        A.    I can't remember.
 5        Q.    Was he at the hospital?
 6        A.    No.
 7        Q.    So you just remember him being present at
 8   the jail?
 9        A.    At the facility?
10        Q.    At the prison.
11        A.    Yes.
12             MS. FOX-YOUNG:  Your Honor, I'll pass the
13   witness.
14             THE COURT:  Thank you, Ms. Fox-Young.
15             Any other defendant want to ask any
16   questions of Mr. Bustamantes?
17             All right.  Mr. Castellano.
18             MR. CASTELLANO:  There is no cross, Your
19   Honor.
20             THE COURT:  No cross.  All right, Mr.
21   Bustamantes, you may step down.
22             Is there any reason that Mr. Bustamantes
23   cannot be excused from the proceedings,
24   Ms. Fox-Young?
25             MS. FOX-YOUNG:  No, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  Mr. Castellano?

2              MR. CASTELLANO:  No, Your Honor.

3              THE COURT:  All right.  You are accused

4    from the proceedings.  Thank you for your testimony.

5              Anybody else need him for anything?

6              All right.  Ms. Fox-Young, does Mr. Perez

7    have his next witness or evidence?

8              MS. FOX-YOUNG:  Yes, Your Honor.  Mr. Perez

9    will call Ernest Holguin.

10             THE COURT:  Mr. Holguin, if you'll come up

11   to the witness box on my right, your left.  Before

12   you are seated, Ms. Standridge, my courtroom deputy,

13   will swear you in.

14                        ERNIE HOLGUIN,

15        after having been first duly sworn under oath,

16        was questioned and testified as follows:

17                      DIRECT EXAMINATION

18             THE CLERK:  Please be seated and state your

19   name for the record.

20             THE WITNESS:  My name is Ernie Holguin.

21             THE COURT:  Mr. Holguin.  Ms. Fox-Young.

22   BY MS. FOX-YOUNG:

23        Q.  Good afternoon, Mr. Holguin.  I see you're

24   wearing an STIU shirt.  Are you currently employed by

25   STIU of the Department of Corrections?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.    Yes, ma'am, I am.

 2          Q.    And where are you located?  Where do you

 3    work for them?

 4          A.    I work here at Southern, in Las Cruces, New

 5    Mexico.

 6          Q.    Sir, how long have you worked there in this

 7    capacity?

 8          A.    In this capacity, 10 years; total 16.

 9          Q.    I'm sorry a, total of 16?

10          A.    In corrections; but 10 within the STIU.

11          Q.    And the whole time you were at Southern?

12          A.    Yes, ma'am.

13          Q.    Were you at any time -- well, could you

14    tell me what your first assignment was at Southern,

15    ten years ago?

16          A.    I was Correctional Officer 1.

17          Q.    And how long did that last?

18          A.    For five years.  And then I promoted to

19    K-9, and gang unit.

20          Q.    Were you at any time, working as a

21    correctional officer, in a pod with alleged or

22    validated SNM members?

23          A.    Yes, ma'am.

24          Q.    And which pod was that?

25          A.    At the time, it was 1 units.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          Q.    Could you repeat that?

 2          A.    In the 1's.

 3          Q.    The 1's?

 4          A.    One units, yes, ma'am.

 5          Q.    Is that 1 A and 1 B?

 6          A.    1 A.

 7          Q.    And what period of time were you there?

 8          A.    As a correctional officer, I believe, like

 9    two years.  And STIU, through my whole career we've

10    been in and out of there.  We don't work the floor

11    every day.

12          Q.    So you stopped working the floor in about

13    2006?

14          A.    2007.

15          Q.    And then you said you moved to the gang

16    unit and K-9?

17          A.    Yes, ma'am.

18          Q.    And what do your job duties entail?

19          A.    Primarily K-9 searches, and monitoring

20    gangs within the prison.

21          Q.    And in the course of your job duties, do

22    you interview inmates?

23          A.    Yes, ma'am, I do.

24          Q.    And informants?

25          A.    Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Continuing to this day; correct?

 2        A.   Yes, ma'am.

 3        Q.   Do you recall where you were on March 7,

 4   2014, which is when Javier Molina was killed?

 5        A.   I believe I was off shift, and was called

 6   back in to our facility.

 7        Q.   You think you were called in that night?

 8        A.   Yes, ma'am.

 9        Q.   Do you remember who called you?

10        A.   It would have been our coordinator,

11   Mr. Blanco.

12        Q.   Could you tell me Mr. Blanco's full name?

13        A.   Daniel Blanco.

14        Q.   And is Daniel Blanco employed at Southern

15   New Mexico Correctional Facility?

16        A.   Yes, ma'am.

17        Q.   And he's STIU?

18        A.   Coordinator, yes, ma'am.

19        Q.   He's a captain?

20        A.   He's a coordinator; he's a little bit above

21   the captain.

22        Q.   I see.  And was he a coordinator at that

23   time?

24        A.   Yes, ma'am.

25        Q.   And so it's your recollection that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1     Coordinator Blanco called you in and -- called you on
 2     your phone --
 3          A.   Yes, ma'am.
 4          Q.   -- and asked you to come in?
 5          A.   Yes, ma'am.
 6          Q.   Do you remember what happened when you
 7     arrived?
 8          A.   There had been a stabbing at our facility,
 9     so all of the gang unit was called in.
10          Q.   And how many individuals comprised the gang
11     unit at that time?
12          A.   At that time, I believe there was five of
13     us total, plus the coordinator.
14          Q.   Do you remember who else -- so you were
15     one?
16          A.   I'm one, yes.
17          Q.   And there are four more?
18          A.   Yes.  It was officer -- K-9 Officer
19     Maldonado, Sergeant Ruben Archuleta, Officer Josh
20     Segala.  And this was our total unit at the time.
21          Q.   So four, plus the coordinator?
22          A.   Yes, ma'am.
23          Q.   And everybody arrived that night?
24          A.   Yes, ma'am.
25          Q.   And did Coordinator Blanco have you in for
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    a briefing when you arrived?

2        A.   Yes, ma'am.

3        Q.   At that time was State Police on scene?

4        A.   No.

5        Q.   So it was just you guys?

6        A.   It was just us guys, yes.

7        Q.   And did Captain Blanco give you all

8    directives at the time of that briefing?

9        A.   Yes.

10       Q.   What was your directive?

11       A.   I was sent to assist Sergeant Bustamantes,

12   at the hospital for -- to take pictures, to assist in

13   taking pictures.

14       Q.   So you traveled to the hospital right away

15   with Sergeant Bustamantes?

16       A.   I went separately.

17       Q.   And that was that night?

18       A.   Yes, ma'am.

19       Q.   And then did you return to the facility?

20       A.   Later on that night, yes, ma'am.

21       Q.   Did you meet again that night with the rest

22   of the gang team?

23       A.   I don't believe so.  I went to the back,

24   where I was sent to talk to Mr. Blanco.

25       Q.   Are there -- we've heard some testimony

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that there is something called -- I don't know what
 2    it's called exactly, but a large room that STIU uses
 3    that has computers at Southern?
 4         A.   Yes, ma'am.
 5         Q.   What do you call that?
 6         A.   It's just our office, just the STIU office.
 7         Q.   Are there individual offices contained in
 8    that area?
 9         A.   Not in that area.  I think you're probably
10    referring to the phone yard, and the units where
11    there are actually separate offices there.
12         Q.   Who had offices in the phone yard at that
13    time?
14         A.   I don't recall who the unit manager was,
15    but it's usually the unit manager and the two
16    caseworkers.  I couldn't tell you who they were at
17    that time because they rotate.
18         Q.   So they're not STIU officers, per se?
19         A.   No.
20         Q.   And do you recall what role -- I think you
21    said Officer Maldonado -- had?
22         A.   Yes, he was with me when we conducted
23    interviews.
24         Q.   And how about Sergeant Archuleta?
25         A.   I don't recall where he was at.  I'm sure
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    he was in the back somewhere.

2         Q.   But he took his orders from Coordinator

3    Blanco?

4         A.   Yes, ma'am.

5         Q.   And did you say Officer Segura?

6         A.   Segala.

7         Q.   Segala.  What was his role?

8         A.   I don't know exactly what he was doing, but

9    he's one of the other gang officers that conducts

10   interviews.

11        Q.   So when you returned from the hospital that

12   night, did you begin conducting interviews?

13        A.   Yes, ma'am.

14        Q.   Can you tell me who you interviewed?

15        A.   I believe Timothy Martinez, Rudy Perez -- I

16   can't remember; he has three names -- but I ended up

17   doing five that night total.

18        Q.   And all with Officer Maldonado?

19        A.   Yes, ma'am.

20        Q.   And did you watch any video that night?

21        A.   No, I didn't, no.

22        Q.   Did you ever watch any video of the

23   homicide?

24        A.   Later on, after it was all -- we were done

25   with our stuff, yes, I did.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Do you remember when?
 2        A.   That would probably have been the next day.
 3        Q.   Do you recall when State Police arrived on
 4   scene?
 5        A.   I remember them showing up.  I don't know
 6   the exact time, or anything like that.
 7        Q.   Do you remember how many officers?
 8        A.   I believe there was two.
 9        Q.   Do you remember who came?
10        A.   I believe Agent Palomares, and I can't
11   remember the other officer's name.
12        Q.   So you conducted five interviews that
13   night.  What did you do the next day?
14        A.   I believe we just completed our paperwork,
15   and go and just review what we'd gone over basically.
16        Q.   And you all met?
17        A.   Yes, ma'am.
18        Q.   And did you all -- did the whole gang unit
19   watch the video together at some point?
20        A.   No, not that the whole unit, no.  Just
21   individually one or two guys at a time would be
22   looking at it.
23        Q.   Did you watch it by yourself?
24        A.   No, I watched it with Officer Maldonado.
25        Q.   Where were you when you watched it?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Within our office, in the main building.

2    We have a separate office from the offices in the

3    back.  It's actually our office.

4        Q.   So if you know, did somebody pull a tape

5    from the pod itself and retrieve it and take it into

6    the main office to be viewed?  Do you know how that

7    works?

8        A.   No, we actually can view it off of our

9    computers in our office.

10       Q.   So from the STIU office you have access to

11   all of the video in the facility?

12       A.   Yes.

13       Q.   How long does that last, say -- and I'm

14   talking about March of 2014.  If you wanted to look

15   back at video from two weeks prior, could you from

16   the STIU office?

17       A.   Yes, we can look back two weeks.

18       Q.   How far back could you look?

19       A.   I couldn't tell you -- give the exact date

20   or time on that.  I know we can go back to at least a

21   month.

22       Q.   At least a month.  Do you know how long

23   that video exists before -- well, do you know if the

24   video is kept permanently?

25       A.   I wouldn't know.  I would assume they make

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    a copy of it.

2         Q.   I didn't ask a very clear question.  If you

3    wanted to go today and -- well, let me move on.

4              So you think you could go back at least a

5    month at that time?

6         A.   Yes.

7         Q.   Have you ever been involved in -- for

8    purposes of this investigation, were you involved in

9    making a copy of that video?

10        A.   No.

11        Q.   Do you know who was?

12        A.   No, I don't.

13        Q.   So after you watched the video with Officer

14   Maldonado, what steps did you take?  You said you did

15   some paperwork?

16        A.   Yes.  We were just referencing to the video

17   from the interviews that we conducted.

18        Q.   You were watching the video and comparing

19   it to what you had learned in the interviews?

20        A.   Correct.

21        Q.   Can you tell me specifically what you were

22   looking for?

23        A.   We were just trying to make sure we had the

24   correct inmates that were involved.

25        Q.   Okay.  And so you confirmed that Timothy

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                               Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                               FAX (505) 843-9492
                                                                                 1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                            e-mail: info@litsupport.com

```
1    Martinez was pictured?

2         A.   Yes, ma'am.

3         Q.   And that Jerry Montoya was pictured?

4         A.   Yes, ma'am.

5         Q.   And that Jerry Armenta was pictured?

6         A.   Yes, ma'am.

7         Q.   And Mario Rodriguez.

8              Did you do anything else in the course of

9    your investigation, vis-a-vis the video?

10        A.   No.

11        Q.   And do you know when -- you said you

12   could -- did you actually pull it through the

13   computer system, or did somebody else pull it up for

14   you to see?

15        A.   I believe somebody else pulled it up.

16        Q.   Do you know?

17        A.   It might have been Officer Maldonado.

18        Q.   Do you remember when you started watching

19   it, at what point in the video?

20        A.   I think we just went off the times that

21   were given to us, and we started at that particular

22   time and we just watched it from there.

23        Q.   Who gave you that time?

24        A.   Through the interviews.

25        Q.   So the inmates gave you times?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.    Correct.

 2        Q.    And you watched from there.  But you didn't

 3   look prior to the times that the inmates gave you?

 4        A.    "Prior"?  What do you mean by --

 5        Q.    You didn't look to see any video from

 6   earlier that afternoon?

 7        A.    Yeah, I looked back just to check things.

 8   But I mean, from the interviews, we actually used

 9   those times and started from there to get right to

10   where it actually started.

11        Q.    To corroborate what you had heard?

12        A.    Yes.

13        Q.    But you think you looked back earlier in

14   the video?

15        A.    Right.  Yeah, we may have gone -- instead

16   of, you know, at 13 minutes, we may have gone back to

17   like, 11, just to make sure we covered everything to

18   that point.

19        Q.    Okay.  And I'm not asking you to speculate,

20   and I know it's been a little while, but do you

21   remember looking back before the time stamp given to

22   you by those inmates?

23        A.    Maybe minutes.

24        Q.    Okay.  Just to get ahead of it, so that you

25   could watch from that time?

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    That's right.

 2        Q.    Not hours?

 3        A.    That's right.

 4        Q.    When you -- what paperwork did you

 5   complete?

 6        A.    Just all of our memos, completed the

 7   interviews.

 8        Q.    And were those memos to Captain Daniel

 9   Blanco?

10        A.    Yes, ma'am.

11        Q.    Did you do a separate memo for each

12   interview that you conducted?

13        A.    Yes, ma'am.

14        Q.    So there was a memo with regard to your

15   interview of Mr. Armenta?

16        A.    Yes.

17        Q.    And Mr. Montoya?

18        A.    Yes.

19        Q.    And Mr. Rodriguez?

20        A.    Yes.

21        Q.    And Mr. Martinez?

22        A.    Yes.

23        Q.    Do you remember any other memos that you

24   did?

25        A.    I did one for Mr. Perez.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   And those were all within the day of the

2    murder?

3        A.   Yes, ma'am.

4        Q.   Do you remember talking to any other

5    inmates in the days following about the Molina case?

6        A.   Not in the days following -- well, maybe

7    within a couple of weeks I talked to another inmate.

8        Q.   Tell me about that.

9        A.   It was basically the same type of

10   interview, just asking if he could -- you know, what

11   had happened that night, or what knowledge he had.

12       Q.   Was that interview conducted in the phone

13   yard?

14       A.   Yes, ma'am.

15       Q.   Who was that of?

16       A.   I can't remember his name.  I have it,

17   though.  Oh, I know, Inmate Gonzalez.

18       Q.   That's Samuel Gonzalez?

19       A.   Yes, ma'am.

20       Q.   And what brought you to interview Samuel

21   Gonzalez?

22       A.   I just felt that he'd be somebody we needed

23   to talk to.  We were just doing interviews, random

24   interviews of other inmates.

25       Q.   It was random?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                        1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

```
 1        A.   Yes.  I felt it was maybe somebody we
 2   needed to talk to, so I talked to him -- or
 3   interviewed him.
 4        Q.   If you remember, what made you think that
 5   he was somebody you needed to talk to?
 6        A.   I just felt he was influential.
 7        Q.   Do you remember what he may have told you
 8   of note or what he did tell you of note in that
 9   interview related to this case?
10        A.   Not at this time.
11        Q.   Do you remember doing a memo to Captain
12   Blanco with regard to that interview?
13        A.   Yes, ma'am.
14             MS. FOX-YOUNG:  Your Honor, may I approach?
15             THE COURT:  You may.
16        Q.   Sir, without telling me what this document
17   is, do you remember it?
18        A.   Yes, I do.
19        Q.   And actually this document has been
20   admitted into evidence, and so I'll go ahead and
21   publish it.  This is Defendant's Exhibit RP-B.  And
22   you'll see on the first page it looks like this is
23   your enclosure memo, is it not, to Captain Blanco?
24        A.   Yes, ma'am.
25        Q.   And it's dated March 19, 2014?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.   Yes, ma'am.
 2         Q.   And so was this actually the day that you
 3    interviewed Mr. Gonzalez?
 4         A.   Yes, ma'am.
 5         Q.   I know you said you don't recall exactly
 6    what was said.  Do you recall receiving a letter from
 7    Mr. Gonzalez that you attached to the memo?
 8         A.   Yes.
 9         Q.   And you reviewed that for purposes of
10    crafting a memo?
11         A.   Yes, ma'am.
12         Q.   Do you recall Mr. Gonzalez, on the 14th of
13    March, telling you something about Javier being
14    killed because of what the papers these guys had in
15    their possession?
16         A.   Yes, ma'am.
17         Q.   And that was also in the written document
18    that he gave you?
19         A.   Correct.
20         Q.   Did he tell you anything else about that
21    paperwork?
22         A.   Everything that was explained to me is
23    there in the memo.  I couldn't tell you off the top
24    of my head.
25         Q.   Okay.  And do you recall Mr. Gonzalez
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    telling you that you should look at the cameras

2    because the cameras don't lie, and that some of what

3    he had told you would be shown on the cameras?

4         A.   I don't remember that exactly.  But I know

5    it was brought up.

6         Q.   But you did review the document that he

7    gave you fully?

8         A.   At that time, yes.

9         Q.   It's not typed.  It's a little hard to

10   read, but do you see the very last portion of this

11   memo on page 12976 --

12        A.   Yes.

13        Q.   -- from Mr. Gonzalez, where he says that

14   "Cameras don't lie, and what I said about some of

15   this will prove I'm right through cameras."

16        A.   Yes, ma'am.

17        Q.   Do you remember him telling you that now?

18        A.   Yes.

19        Q.   What, if anything, did you do after talking

20   to Mr. Gonzalez about the paperwork and the cameras?

21        A.   That came back -- like I was telling you,

22   we went and reviewed everything, and made sure that

23   it matched up to what we already had.

24        Q.   Okay.  You reviewed that same segment

25   starting with the part that the inmates told you this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   is where the assault began?

 2        A.   Correct.

 3        Q.   You didn't look at any footage from that

 4   afternoon or the morning?

 5        A.   No.

 6        Q.   Do you know if anybody did?

 7        A.   I don't know.

 8        Q.   Do you remember from that camera footage --

 9   do you remember where Rudy Perez was housed, what

10   cell he was in?

11        A.   I don't remember the cell, but I know it

12   was on the bottom tier.

13        Q.   Do you remember if you could see it when

14   you looked at the camera footage?

15        A.   If we looked at the cameras, we probably

16   could see, but I don't recall.

17        Q.   Specifically.

18        A.   Specifically.

19        Q.   Do you remember talking to anybody else

20   regarding the Molina murder in the days following?

21        A.   Inmate-wise?

22        Q.   Yes.

23        A.   No.

24        Q.   When you talked to Mr. Gonzalez about the

25   paperwork, and he told you that he thought that Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Molina was killed because of papers?

2        A.    Um-hum.

3        Q.    And that's in his -- the written submission

4    he gave you.

5        A.    Yes.

6        Q.    You're somewhat familiar with SNM, right?

7        A.    Yes, ma'am I, am.

8        Q.    You've been working with SNM since --

9        A.    Actually, since I started, since 2002.

10       Q.    Okay.  So can you tell me if SNM needs

11   paperwork to validate a hit?

12       A.    Yes, they do.

13       Q.    And so during the course of this

14   investigation, did you learn that paperwork was

15   actually transferred between pods?

16       A.    We knew it was transferred between

17   facilities, and then once it got to our facility, it

18   was transferred through pods.

19       Q.    From the yellow pod to the blue pod?

20       A.    Correct.

21       Q.    But you never were able to look at the

22   cameras to see if you could find that paperwork

23   transfer?

24       A.    Right, it would be difficult to do that.

25       Q.    But you didn't look for it, right?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

```
1        A.    I didn't look for it.
2        Q.    Okay.  And you don't know if anybody else
3   did?
4        A.    No, ma'am, I don't.
5        Q.    Going back to the interviews that you
6   conducted on the night of the 7th.
7        A.    Yes, ma'am.
8        Q.    I think you said there were five.
9        A.    Yes.
10       Q.    Did you learn anything that night about the
11  paperwork?
12       A.    Yes, I believe so.  I believe several, or
13  three of the inmates had brought it up.
14       Q.    Do you remember who told you that?
15       A.    Not off the top of my head, no.
16       Q.    But you and Mr. Maldonado heard about the
17  paperwork on March 7?
18       A.    Correct.
19       Q.    And I know that you said you don't
20  specifically remember any other interviews.  If I
21  told you that you did do an interview, or there is a
22  memo that's been produced to the defense from March
23  17, 2014, detailing an interview that you conducted
24  in the phone yard, with Art Maldonado present, does
25  that remind you -- do you remember who you might have
```

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    interviewed?
 2         A.   No, ma'am, I don't.
 3         Q.   I'm showing you here on the Elmo what's
 4    been marked as Exhibit RP-A.  It appears to be
 5    another memo that you did to Captain -- Coordinator
 6    Blanco.
 7         A.   Yes, ma'am.
 8         Q.   On the 17th.  And you can take a minute to
 9    take a look at it.  I know this is only the first
10    page of it.
11         A.   Right.
12         Q.   It's two-and-a-half pages.  And if you'd
13    like to look -- do you remember who this is?
14         A.   Yes, I believe that's Inmate Gonzalez
15    again.
16         Q.   Okay.  How do you know that it's Inmate
17    Gonzalez?
18         A.   Just from the first paragraph.  I remember
19    that discussion.
20         Q.   In any event, in the course of this
21    interview, which is 10 days after the murder, you
22    learned, did you not, that there were a number of
23    shanks in the SNM pod?
24         A.   Correct.
25         Q.   And I think this inmate tells you, in your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    words, that he knows where there are shanks, and he
 2    can give you one right then, but first he wanted his
 3    property back?
 4        A.   Correct.
 5        Q.   And he told you about one that was in 7
 6    blue pod --
 7        A.   Correct.
 8        Q.   -- in particular.  And I think he went into
 9    a great deal of detail about some history of the SNM
10    with you?
11        A.   Correct.
12        Q.   And then he -- showing you the second page
13    of this memo -- and if you look down the second to
14    last paragraph, the last full paragraph there -- I
15    think you reported to Captain Blanco that you asked
16    more about where the shanks were in the pod, right?
17        A.   Correct.
18        Q.   And do you remember what this individual
19    told you about the wheelchair program?
20        A.   Yes.
21        Q.   What did he tell you?
22        A.   He explained to me that that's where one of
23    them had come from, one of the shanks.
24        Q.   He said, "That's where all the shanks come
25    from"?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   Did he give you any detail about what kinds
 3     of things would come in from the wheelchair program?
 4          A.   I believe he just talked about metal,
 5     basically metal, and how they would get around the
 6     officer to bring it in.
 7          Q.   How did they get around the officer to
 8     bring it in?
 9          A.   Allegedly, they would get patted down.
10     They would leave a jacket inside the work area, and
11     then request to go back and pick it up.  And inside
12     that jacket would be the contraband.
13          Q.   Did he tell you how long that had been
14     going on?
15          A.   I don't recall how long.
16          Q.   And he told you that Jason Wright is the
17     one that brought those in from the wheelchair
18     program, right?
19          A.   Yes.
20          Q.   And he also told you that it was his own
21     duty to know where all the shanks were; is that
22     right, and who had them?
23          A.   Yes.
24          Q.   Did he tell you where all the shanks were
25     in the pod?
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        A.   Some were given out.  I don't believe all
 2   of them were, but some were given.
 3        Q.   And did you ask him where the shanks -- the
 4   shank or shanks that were used in the Molina killing
 5   came from?  Do you remember?
 6        A.   I don't recall, no.
 7        Q.   This same individual also told you that --
 8   something about Lupe Urquizo asking him what to do
 9   with paperwork, did he not?
10        A.   Yes.  He asked if he could help him get rid
11   of it.
12        Q.   He asked this person how he could get rid
13   of that paperwork?
14        A.   Yes, ma'am.
15        Q.   And he told you that if you or anybody
16   investigating this case were to look at the camera,
17   that you would actually see Mr. Urquizo get his
18   property, and then give an envelope to Carlos
19   Herrera; is that right?
20        A.   Yes, ma'am.
21        Q.   And having learned about these two sort of
22   major areas of inquiry from this individual, you
23   learned about metal coming from the wheelchair
24   program, you learned about the paperwork, did you go
25   back to the video at any point, and look to see if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    you could see metal coming in, or if you could see a

 2    paperwork transfer?

 3         A.   I didn't personally do that.

 4         Q.   Okay.  How did you transmit this memo to

 5    Captain Blanco?

 6         A.   I typed it out and handed it to him, gave

 7    him copies of it.

 8         Q.   Do you know what happened to it after that?

 9         A.   I don't know.

10         Q.   Did you ever talk to State Police about

11    these findings?

12         A.   I believe they received the same memos that

13    Captain Blanco -- Coordinator Blanco received.

14         Q.   Agent Palomares received the same memos?

15         A.   Yes, ma'am.

16         Q.   How do you know that?

17         A.   I gave them to him.

18         Q.   You gave them to Agent Palomares?

19         A.   Yes.

20         Q.   Did you give them to Agent Palomares the

21    same day that you wrote them?

22         A.   No.

23         Q.   Do you know when you gave them to him?

24         A.   No, I don't remember.  It was probably a

25    short time after that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   But there is not a report documenting the

2   transfer of those memos; you just handed them to him?

3      A.   I don't know.

4      Q.   Do you recall how long the investigation of

5   the murder continued after -- obviously, it was still

6   going on on the 19th -- after the 19th, did you

7   continue to interview anybody else?

8      A.   Not specifically for this particular

9   reason.  But, you know, I did continue interviewing

10  inmates, but not for this particular thing.

11     Q.   Okay.  What, if anything, did you do upon

12  learning that metal was coming out of the wheelchair

13  program and being used to make shanks?

14     A.   It was reported to Coordinator Blanco, then

15  he turns around and reports that information to the

16  Warden, and then they get together and make up a

17  plan, or whatever they're going to do.

18     Q.   And it was reported to Palomares?

19     A.   Yes.

20     Q.   Did you ever go visit the wheelchair

21  program to investigate those claims?

22     A.   Yes, I did.

23     Q.   Tell me what you did there.

24     A.   Me and Officer Maldonado, we just went down

25  to where the program is held, and we just did a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   walk-through, and looked at their security procedures
 2   for our own --
 3          Q.   What were those security procedures?
 4          A.   They described pretty much the same thing;
 5   that they would put tools up, do an inventory, pat
 6   down the inmates, and then release them from there
 7   back to their unit.
 8          Q.   Did you have any reason to disbelieve Mr.
 9   Gonzalez when he told you metal was coming out of
10   there?
11          A.   No.
12          Q.   You believed him?
13          A.   I believed him.
14          Q.   And do you know if anybody else did any
15   further -- made any further inquiries as to how metal
16   was coming out of the wheelchair program?
17          A.   I don't.
18          Q.   There are wheelchairs worked on in the
19   wheelchair program, right?
20          A.   Right.
21          Q.   Do you know if there were also walkers in
22   the wheelchair program?
23          A.   I believe there was just various different
24   types of wheelchairs, walkers, wheelchairs, the
25   aluminum walkers that don't have wheels on them, that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    sort of thing, a wide variety.

2         Q.   Did you photograph it at that time?

3         A.   I didn't, no.

4         Q.   Do you know if anybody photographed the

5    wheelchair program at the time of your walk-through?

6         A.   No, nobody did.

7         Q.   Did you then make a report to Captain

8    Blanco about what you had learned at the wheelchair

9    program?

10        A.   We verbally spoke to him and explained what

11   we had learned.

12        Q.   Was it your belief then that these inmates

13   had obtained shanks from the wheelchair program?

14        A.   I believed it was possible.

15        Q.   So you believed that it was possible, but

16   you didn't know exactly where the shanks came from,

17   right?

18        A.   We weren't for sure, but that was an avenue

19   we had to look at, and it was very possible.

20        Q.   Did anybody else do anything to exhaust

21   that avenue, to further inquire as to the metal

22   coming out of that program?

23        A.   I couldn't tell you on that.

24        Q.   Okay.   Were you present or involved in any

25   subsequent -- I think you said that the night of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    murder, you interviewed -- you talked to Rudy Perez?

2        A.   Yes, Rudy -- five of the total, I believe.

3    The memos were submitted.

4        Q.   Did you ever talk to Rudy Perez again?

5        A.   I don't recall.

6        Q.   Do you remember that Rudy Perez had a

7    walker?

8        A.   Yes, we discussed it on one of the memos

9    that I turned in.

10       Q.   One of your memos discussed Mr. Perez'

11   walker?

12       A.   Yes, ma'am.

13       Q.   That was a memo to Captain Blanco?

14       A.   Yes, ma'am.

15       Q.   What did it say about Mr. Perez' walker?

16       A.   We were just discussing the color, what

17   type, if he did have one, if anything was missing off

18   it.

19       Q.   What caused you to write that memo?

20       A.   I think we were still looking at different

21   avenues on weapons.  So we knew that was in the pod,

22   so we conducted an interview with Mr. Perez.

23       Q.   Did you compose that memo before or after

24   talking to Mr. Gonzalez, if you remember?

25       A.   I can't remember.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   Okay.  Was it close in time to the murder?
2        A.   Yes.
3        Q.   And did you, yourself, examine Mr. Perez'
4   walker?
5        A.   No.
6        Q.   How did you know what color it was?
7        A.   Through questioning through him, his
8   answers.
9        Q.   You asked Mr. Perez what color the walker
10  was?
11       A.   Yes, I did.
12       Q.   And what else did you ask him?
13       A.   You know, why he had it in his cell.  He
14  explained to me that he needed it to walk, to get
15  around, basically.
16       Q.   Was this on the night of the murder?
17       A.   I don't remember if it was on the night of
18  the murder.
19       Q.   Was this even close in time to the Molina
20  murder?
21       A.   Yes.
22       Q.   It was after?
23       A.   It was after.
24       Q.   And so you drafted a memo to Captain Blanco
25  that included the color of the walker?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.    Yes.

 2          Q.    And what other details?

 3          A.    Parts that were missing off it.

 4          Q.    What parts were missing?

 5          A.    Specifically, a rod that was held down with

 6    two nuts.

 7          Q.    And how did you know that part was missing?

 8          A.    He advised me that it was missing.

 9          Q.    Mr. Perez told you that?

10          A.    Yes, ma'am.

11          Q.    But you don't know the date?

12          A.    It would be on the memo.

13          Q.    Have you seen the memo since you wrote it?

14          A.    No.

15          Q.    When you talked to Mr. Perez, he was

16    unwilling to tell you anything, make any statements

17    about the murder; is that right?

18          A.    Correct.

19          Q.    And so you recall composing this memo about

20    the walker, but it was totally based upon

21    information, secondhand information; you didn't

22    examine the walker?

23          A.    Correct.

24          Q.    Did you ever see the walker?

25          A.    No, I didn't.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And you also gave this memo to Agent
2   Palomares, like the others?
3      A.   Yes, ma'am.
4      Q.   And you handed it to him?
5      A.   Yes.
6      Q.   Do you remember composing any other memos
7   with regard to this investigation?  I know there are
8   the two Gonzalez ones, and you said there were five
9   on the night of the murder, and there was one about
10   the walker.  Any others?
11      A.   I think that's all.
12      Q.   Did you ever talk to Jason Wright?
13      A.   I spoke to him, but I don't recall the date
14   or time.
15      Q.   Did you try to talk to him about taking
16   metal out of the wheelchair program after you learned
17   that from Mr. Gonzalez?
18      A.   Yeah, I believe so.
19      Q.   Would you have done a memo if you did talk
20   to him?
21      A.   Yes.
22      Q.   But sitting here today, you just don't
23   remember?
24      A.   I just don't, yeah.
25      Q.   Do you know if Mr. Perez' walker was taken

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    from him?

2         A.    He -- during the interview that I had with

3    him, he did say that the pod had been shaken down,

4    and he was questioned as to why his walker had been

5    taken.  And I told him it had nothing to do with me;

6    that it had to do with the shakedown crew that had

7    conducted the shakedown.

8         Q.    Do you know who took it?

9         A.    No, I don't.

10        Q.    Somebody in the shakedown crew?

11        A.    From his statement I would assume.

12        Q.    But you don't know from any other source?

13        A.    I don't know.

14        Q.    And you've never seen it?

15        A.    No.

16        Q.    And you've never examined it.  Do you know

17   if anybody with STIU has seen it?

18        A.    Not that I know of, no.

19        Q.    Did you ever ask anybody where it was?

20        A.    No, ma'am.

21        Q.    But you talked about it as a potential

22   avenue to consider?

23        A.    Correct.

24        Q.    But never tried to locate it?

25        A.    When Mr. Perez had advised me it had been

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    taken, I figured it had been taken for a reason.  So
 2    I no longer went to look for any of that stuff.
 3         Q.   But you were in the middle of conducting a
 4    murder investigation, right?
 5         A.   Yes, ma'am.
 6         Q.   And trying to find the source of those
 7    shanks?
 8         A.   Um-hum.
 9         Q.   But you never looked for the walker?
10         A.   I never went looking for it, no, ma'am.
11         Q.   Do you know when the shakedown -- if there
12    was any pattern to it -- when the shakedown crew
13    would shake down a pod at that time, where any
14    contraband would go?
15         A.   Usually, they confiscate and take it to ID.
16         Q.   ID?
17         A.   Yes.
18         Q.   What does that stand for?
19         A.   Inmates' property, is what it is.  And
20    that's where they put all their personal belongings,
21    things that they can't have, stuff like that, goes
22    through ID first.
23         Q.   And according to policy, they give the
24    inmate a receipt?
25         A.   Yes.  And if that was confiscated, they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    would have given him a confiscation slip.
 2        Q.   Did you ever see a confiscation slip for
 3    the walker?
 4        A.   No, I didn't.
 5        Q.   Did you ask about one?
 6        A.   No, I didn't.
 7        Q.   Did you review anything that was shaken
 8    down from those pods on the night of the murder?
 9        A.   No.
10        Q.   Do you know if anybody in STIU looked at
11    any of that property?
12        A.   No.
13        Q.   You don't know?
14        A.   I don't know if they did.
15        Q.   Do you know if State Police did?
16        A.   I don't.
17        Q.   Did your memo on Mr. Perez' walker discuss
18    the fact that it was actually taken into -- that it
19    was actually seized as contraband by the shakedown
20    officers?
21        A.   Yes.  In that memo I did put that.
22        Q.   And that it was in a property room?
23        A.   I didn't put that.  I just put down what
24    Mr. Perez had told me about it being confiscated.
25        Q.   But you didn't do any other follow-up?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

204

```
 1        A.   No.
 2        Q.   I understand.  Are you familiar with the
 3   New Mexico Corrections Department policies regarding
 4   cameras that apply to all prisons?
 5        A.   I don't know it by word, but I'm familiar
 6   with it.
 7        Q.   You're generally familiar?
 8        A.   Yes.
 9        Q.   Are you familiar with the policy that
10   requires original recordings to be secured and
11   maintained for a minimum of 10 years?
12        A.   No, I'm not.
13        Q.   And that's because you didn't really handle
14   anything to do with the recordings?
15        A.   Exactly.
16             MS. FOX-YOUNG:  Your Honor, just a moment.
17             THE COURT:  Certainly.
18        Q.   Did you ever meet Agent Palomares at any
19   point during the course of the investigation?
20        A.   Yes, that night.
21        Q.   On the 7th?
22        A.   Yes, ma'am.
23        Q.   And then you described handing him memos.
24   Did you meet with him when you handed him memos?
25        A.   The memos were given to him at a later
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    date, not that night, because I still hadn't written

2    them.

3         Q.   Okay.  I understand.  So on the 17th, when

4    you wrote a memo that you gave to Captain Blanco, and

5    you also gave to Agent Palomares, did you just hand

6    it to Agent Palomares, or did you actually talk with

7    him about the contents of it?

8         A.   No, I believe on that one, I think it was

9    emailed to him.

10        Q.   You emailed it to him?

11        A.   Yeah.

12        Q.   Do you know if you still have those emails?

13        A.   I might on my cell.

14        Q.   You have your e-mails going back to 2014?

15        A.   I'm hoping I do.

16        Q.   I'm sure you do a lot of emailing.

17        A.   Yes.

18        Q.   So some of the memos you emailed, but some

19   of them you handed to him?

20        A.   Yes.

21        Q.   But you gave him every memo that you wrote

22   with regard to this investigation?

23        A.   Yes.

24        Q.   Now, in addition to emailing him and

25   handing him the memos, did you also talk to him about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   any of these findings?

2       A.   I believe the night of, I talked a little

3   bit with him about some interviews, information I had

4   received from the interviews.

5       Q.   But everything else was in writing?

6       A.   Yes, everything else was in writing.

7       Q.   All right.  I'd like to show you --

8            MS. FOX-YOUNG:  Your Honor, I'd like to

9   move the admission of Defendant Exhibit RP-NN.  The

10  Government, I think, doesn't object.

11           THE COURT:  Any objection?

12           MR. CASTELLANO:  No objection.

13           THE COURT:  Anybody else?  Rudy Perez'

14  Exhibit NN will be admitted into evidence.

15      Q.   All right.  Looking at Exhibit NN -- it's a

16  little hard to tell with the way the light is, but it

17  appears that there is a carpeted floor.  Can you see

18  that?

19      A.   Yes.

20      Q.   And maybe a soft piece of furniture.  Do

21  you know what this is looking at?  If this is taken

22  at a room located at Southern New Mexico Correctional

23  Facility?

24      A.   I couldn't tell you.

25      Q.   Do you know if any of the facility has a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    carpeted floor?

 2         A.   Yeah, a lot of the rooms have carpeted

 3    floors.

 4         Q.   Does the carpet look like this?

 5         A.   It's hard to see it in this light.

 6              MS. FOX-YOUNG:  Your Honor, may I approach

 7    the witness?

 8              THE COURT:  You may.

 9         Q.   It's a little easier to see on the

10    original.  Can you tell a little bit better looking

11    at that printout?

12         A.   Yes.

13         Q.   Do you know where that carpet is?

14         A.   No, I don't.

15         Q.   Is the STIU area carpeted?

16         A.   Yes, ma'am, it is.

17         Q.   Is it carpeted in this color?

18         A.   Yes -- well, it's similar to this.

19         Q.   Okay.  Is there anything else about that

20    photograph that indicates to you where it was taken?

21         A.   No, ma'am.

22         Q.   Okay.

23              MS. FOX-YOUNG:  Your Honor, just a moment.

24              THE COURT:  Certainly.

25         Q.   Is there wood paneling in that STIU area?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, not in our office, no.
 2        Q.   Okay.  But the carpet that you said looked
 3   similar to this carpet, was that there in March of
 4   2014?
 5        A.   Yes.
 6        Q.   Is there an evidence room in that area?
 7        A.   No, ma'am.
 8        Q.   Is that just the big open area?
 9        A.   This one right there?
10        Q.   The area that's carpeted, with the carpet
11   that looks like this carpet.
12        A.   Oh, yes, it's our office.  It's a big room
13   with computers and desks.
14        Q.   Okay.  In the initial interviews that you
15   conducted the night of the murder, and the next day
16   that you've told me about --
17        A.   Yes, ma'am.
18        Q.   -- that you did memos of, did you learn
19   anything about the source of the shanks in the course
20   of those interviews, the shanks that were recovered
21   and -- the shanks that were recovered that night?
22        A.   I believe there was a statement made that
23   it came from this particular wheelchair -- walker.
24        Q.   Who do you think made a statement about the
25   piece coming from a wheelchair?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I can't remember.  I'd have to look at the
 2   memos.
 3        Q.   Okay.  And do you know if those memos
 4   became part of the investigative file in this case?
 5   Would they be recoverable?
 6        A.   Yes.
 7        Q.   They all exist somewhere?
 8        A.   Yes.
 9        Q.   Where is that?
10        A.   I probably have copies of them for sure.
11   I'm sure my supervisor also.
12        Q.   Captain Blanco?
13        A.   Yes.
14        Q.   But you maintain a file of all of your
15   memos?
16        A.   Yes, I do.
17        Q.   Okay.
18             MS. FOX-YOUNG:  Your Honor, I'll pass the
19   witness.
20             THE COURT:  Thank you, Ms. Fox-Young.
21             Any other defendant have any questions?
22             All right.  Mr. Castellano, do you have
23   cross-examination of Mr. Holguin?
24             MR. CASTELLANO:  Yes, sir, I do.
25             THE COURT:  Mr. Castellano.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                         EXAMINATION
 2    BY MR. CASTELLANO:
 3         Q.   Good afternoon, Mr. Holguin.
 4              Let me ask you about paperwork.  In all
 5    your years with the Corrections Department, how many
 6    times have you recovered paperwork in a case like
 7    this, where you actually found evidence of the order
 8    to kill somebody?
 9         A.   There has been a couple of instances.
10         Q.   A couple of instances in how many years?
11         A.   Seventeen.
12         Q.   And what is the difficulty of recovering
13    paperwork in a situation like that?
14         A.   Nobody gives it up, so you have to actively
15    be out there looking for it.
16         Q.   And in your -- based on your training and
17    experience, how is it that people get rid of
18    paperwork?
19         A.   Tear it, flush it, burn it, swallow it.
20         Q.   So in your experience, have there been
21    times where you've asked people about paperwork and
22    later learned that it had been destroyed?
23         A.   Yes.
24         Q.   Give us some examples, if you would, about
25    a conversation about paperwork, and why it's no
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                      1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1    longer around?
 2         A.   Basically, it's no longer around because
 3    they don't want anybody to find out about it, or be
 4    traced.  So, like, on certain types of drug
 5    transactions, with names on it, obviously they don't
 6    want people to know who is buying the drugs, or
 7    whatever contraband is being introduced.  And they
 8    get rid of it in that manner so that we can't recover
 9    it.
10         Q.   And in this case you said there was a
11    shakedown group?
12         A.   Yes.
13         Q.   Did they find any paperwork?
14         A.   I wouldn't know about that, sir.
15         Q.   So, in other words, after the shakedown,
16    were you aware of anyone forwarding paperwork
17    regarding this murder?
18         A.   From the shakedown crew?
19         Q.   Correct.
20         A.   No, sir.
21         Q.   And from anyone else, were you aware of the
22    recovery of paperwork?
23         A.   No, sir.
24         Q.   Were you aware of whether anyone was
25    looking for the paperwork?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    No, sir.

2        Q.    Now, in this case, Mr. Gonzalez actually

3    told you what happened to the paperwork, didn't he?

4        A.    Yes.

5        Q.    And what did he tell you?

6        A.    I'd have to read the memo.  I don't have it

7    in front of me.

8        Q.    I'll show it to you.

9        A.    Okay.

10       Q.    I'm showing you -- this is Defendant RP-A.

11   And for the record, it's also DeLeon 12964 on the

12   Bates stamp.  I'm going to just go ahead and point to

13   it, so you don't have to read the whole document.

14             What can you tell us about the paperwork?

15       A.    Just what I wrote right there.

16       Q.    We have to make a record, so go ahead and

17   tell us what you read.

18       A.    If you can put it up, I'll read it.

19       Q.    Sure.

20       A.    I put, CI looked bad so he got rid of it.

21   He said, if you look at the camera, you'll see, and

22   then give a yellow envelope to Carlos Herrera.

23       Q.    You said here, what happened to the

24   paperwork?

25       A.    So he got rid of it.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

213

```
 1        Q.   Right.  Who got rid of the paperwork?
 2        A.   He doesn't specify.
 3        Q.   And who are the two people we're talking
 4   about?  We're talking about Lupe Urquizo, a
 5   conversation between him and Mr. Gonzalez; is that
 6   correct?
 7        A.   Right.
 8        Q.   So one of those two people apparently got
 9   rid of the paperwork?
10        A.   Well, it's insinuating Urquizo.
11        Q.   And this is a memo that's dated March 17 of
12   2014?
13        A.   Right.
14        Q.   So, in other words, 10 days after the
15   murder they tell you what happened to the paperwork?
16        A.   Correct.
17        Q.   So if someone tells you the paperwork has
18   been destroyed, are you going to continue looking for
19   it?  Or what's your next step?
20        A.   We'll continue to look for it.
21        Q.   Did anybody find it?
22        A.   No.
23        Q.   Since this report takes place 10 days after
24   the murder, do you know from your recollection, from
25   reading this, when the paperwork was destroyed?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    No, I don't.

2          Q.    So you just know sometime between the

3     murder itself and 10 days later it was destroyed?

4          A.    Correct.  Or it could have been prior to

5     the murder.

6          Q.    Why do you think it could have been prior,

7     just from your training and experience?

8          A.    We don't know exactly when it came in, so

9     it could have been read and destroyed at that time

10    prior to the murder.

11         Q.    And so, in other words, even though

12    paperwork may be necessary for a hit like this, once

13    everybody reviews the paperwork, is there a need to

14    keep it around anymore?

15         A.    Not that I -- I wouldn't think so.

16         Q.    And you also had an indication here that

17    Jason Wright was taking metal from the wheelchair

18    program.  Do you recall that?

19         A.    Yes.

20         Q.    Now, even though there was a discussion

21    about the source of the murder weapons, is it fair to

22    say you believed you had already recovered the murder

23    weapons in this case?

24         A.    Yes.

25         Q.    How important to you was it at that point,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    since you actually recovered the murder weapons, to
 2    look for the source of the weapons?
 3         A.   It was still important, because we were
 4    still looking for weapons.  I believe we continued
 5    days after that looking for weapons.
 6         Q.   Okay.  Now, weapons in general, or the
 7    weapons from the murder?
 8         A.   Weapons in general.
 9         Q.   Okay.  So, in other words, since you had
10    the weapons from the murder, were you looking for any
11    other murder weapons from the Molina murder?
12         A.   Yes, we were still looking.
13         Q.   Did you find anything else that you knew or
14    believed to be those weapons?
15         A.   No.
16         Q.   Now, why was it important to have
17    information that Jason Wright was bringing weapons or
18    metal from the wheelchair program?
19         A.   During the course of the interviews, it was
20    just questions that we were asking, trying to figure
21    out where the contraband was coming from.  And these
22    were statements that were made.
23         Q.   Was it one of the theories that the weapons
24    may have come from the wheelchair program?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Okay.  I'm going to test your memory here a

2   little bit.  From the initial interviews you did of

3   Timothy Martinez and the others, what did you

4   learn -- I'm going to go down the list.  What did you

5   learn from Timothy Martinez about the murder from

6   your discussion with him?

7        A.   I would be more comfortable referring back

8   to the memo, because I did notate exactly what was

9   said.

10       Q.   Do you recall if he pointed the finger at

11  anybody?

12       A.   I don't recall that he pointed the finger

13  at anybody.

14       Q.   What about Mario Rodriguez, also known as

15  "Blue"?

16       A.   No, I don't recall.

17       Q.   What about Jerry Montoya or Jerry Armenta?

18       A.   Without the memo, I couldn't.

19       Q.   What about Rudy Perez?

20       A.   No.

21       Q.   No, you don't recall, or no, he didn't give

22  you anything?

23       A.   No, he didn't say anything in reference to

24  the murder.

25       Q.   When was Rudy Perez a suspect in this

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                           e-mail: info@litsupport.com



1    murder in your eyes?

2            MS. FOX-YOUNG:  Objection, leading.

3            THE COURT:  Overruled.

4        A.    In my eyes?  I never had him as a suspect

5    in the murder.

6        Q.    Please explain that.

7        A.    Well, I know Mr. Perez, and he was not

8    healthy at the time, so I didn't -- me, personally, I

9    did not believe that he would be involved in that

10   type of activity, due to his health.

11       Q.    And in addition to what you knew of him,

12   what did you hear about him and his involvement with

13   this murder?

14       A.    I heard nothing other the discussion I had

15   with him about his wheelchair -- or his walker.

16       Q.    So if that were the case, how much of this

17   investigation did you focus on Mr. Perez?

18       A.    Me, personally?  Just that memo and

19   interview that I conducted with him.

20       Q.    So what was your belief, then, about his

21   walker and how it may have been involved?

22       A.    It was explained on that memo.

23       Q.    So, in other words, was it your belief at

24   all that he had given the pieces of his walker to be

25   made into shanks?



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                            1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                              e-mail: info@litsupport.com

```
 1        A.    According to his statement, no.
 2        Q.    At that point, did you have anything to
 3   indicate otherwise?
 4        A.    No.
 5        Q.    And based on that, how much further did you
 6   look into Rudy Perez as a suspect in this murder?
 7        A.    That would be the extent of it right there.
 8        Q.    Now, is it fair to say, even for Mr.
 9   Gonzalez, that you had other people who became
10   suspects?
11        A.    Yes.
12        Q.    Do you remember what he said -- first of
13   all, what did he say about people like "Dan Dan" or
14   Daniel Sanchez, in terms of their authority to call a
15   hit like this?
16        A.    Again, without the memo, I couldn't.
17        Q.    Let me start with -- this is page 12968,
18   and this is from Defendant's RP-B.  I'll go ahead and
19   show you, for starters; by looking at this, do you
20   remember him telling you about a tabla or a table?
21        A.    He wrote this.  He didn't tell me.
22        Q.    Well, did you review it and discuss it with
23   him in any way?
24        A.    No.
25        Q.    Now, reading this, and based on what you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    knew about the SNM, what significance did it have

2    that people like "Dan Dan" and Carlos Herrera are

3    mentioned as being on the table?

4         A.   Correct.  That would indicate they were

5    some kind of decision makers within our facility.

6         Q.   And what significance did that have, in

7    your mind, that they were decision makers?

8         A.   That they could make decisions on anything

9    that happened in that unit.

10        Q.   Including a murder?

11        A.   Including a murder.

12        Q.   Okay.  I'm going to point out to you, so

13   you don't have to read the whole thing.  It's on page

14   12972 of that exhibit.  And it says, "Sparky got his

15   shank from detail.  'Dan Dan's shank was also from

16   detail.  And that's the one that Scarface was caught

17   with."

18             So did you actually catch "Dan Dan," or

19   Daniel Sanchez, with any shanks as a result of these

20   searches?

21        A.   Not me.

22        Q.   Are you aware of anyone else?

23        A.   No.

24        Q.   Going back to the authority to call shots,

25   according to this witness, do you see here where Mr.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    Gonzalez claimed he told Alex and Carlos that he was

 2    going to stick this dude?

 3        A.   Yes.

 4        Q.   And do you know who he was talking about

 5    when he referred to Alex and Carlos?

 6        A.   I'm guessing Carlos Herrera and -- I don't

 7    know Alex's last name.

 8        Q.   I'm showing you the same page I showed you

 9    earlier about the table.  Was it your understanding

10    that Alex referred to Alex Munoz and Carlos Herrera?

11        A.   Yes.

12        Q.   Going back to page 12974.  I'm going to go

13    ahead and indicate for you here as well.  So on the

14    day of the murder, he was called to the door by "Dan

15    Dan."  Who do you understand "Dan Dan" to be?

16        A.   That's one of the individuals on the table.

17        Q.   Is that Daniel Sanchez?

18        A.   Yes.

19        Q.   And is it your understanding here that he

20    was advised not to move on "Marijuano"; in other

21    words, "Dan Dan" was telling him not to do something?

22        A.   Correct.

23        Q.   Is that because he had authority to order

24    him not to do things?

25        A.   Well, he's just advising him, so I guess

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    he's just telling him.
 2        Q.   Or, if he did, he would get dealt with?
 3        A.   Um-hum.
 4        Q.   Okay.  I'm going to focus on the bottom of
 5    the page now here.  Do you know who "Marijuano" is?
 6        A.   Lupe Urquizo.
 7        Q.   Lupe Urquizo?
 8        A.   Yes.
 9        Q.   And so it's Mr. Gonzalez' version that when
10    "Marijuano" got his property, he noticed he was
11    giving some type of paperwork to Alex and Carlos?
12        A.   Correct; that's what he wrote.
13        Q.   Do you know why he would have given
14    paperwork to Alex and Carlos, as people who were on
15    the table?
16        A.   No.
17        Q.   And when we talk about paperwork, was it
18    your understanding that that was the paperwork that
19    would result in the murder of Javier Molina?
20        A.   According to this, yes.
21        Q.   So anywhere in here, in this statement, do
22    you see any mention of Rudy Perez?
23        A.   No, I don't.
24        Q.   Once again, you do you see the discussion
25    at the bottom of the page, page 12975 of the exhibit.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1     It says, "He asked me if he should throw the papers
2     away.  I couldn't say no because it would sound
3     fishy.  So I told him, 'Do what you think is right.'"
4     And so is that a discussion, once again, of the
5     paperwork on Javier Molina?
6          A.   Yes, I guess so.
7          Q.   Based on that statement, were you surprised
8     that there was never a recovery of the paperwork?
9          A.   No.
10         Q.   Are you ever surprised when you can't
11    recover paperwork such as this?
12         A.   No.
13         Q.   When you saw the video of the Molina
14    murder, what do you recall about how many camera
15    angles you had?
16         A.   I only looked at one, so I only know of
17    one.
18         Q.   So you had one angle that you were able to
19    see?
20         A.   That I looked at.
21         Q.   Now, you mentioned earlier that it was your
22    belief that three inmates told you about paperwork
23    the night of the murder.  Do you remember that?
24         A.   Yes.
25         Q.   Do you remember who that was?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN &amp; ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't.
 2        Q.   Do you remember what they said other than
 3   discussion of paperwork?
 4        A.   Yes.
 5        Q.   What do you remember?
 6        A.   I just remember that the paperwork was
 7   brought down from Santa Fe, from the facility in
 8   Santa Fe, to the facility at Southern.
 9        Q.   And what did you or others do in response
10   to receiving that information?
11        A.   What did we do?
12        Q.   Yes.  In other words, did you begin
13   searching for the paperwork?
14        A.   Yes.
15        Q.   Did you find the paperwork?
16        A.   No.
17        Q.   And how soon after you received that
18   information did you search for the paperwork?
19        A.   This was after the homicide had already
20   occurred.  So it was during that period of the
21   shakedown that they were given directives to look for
22   this paperwork also.
23        Q.   So to give us an idea, it would have been
24   within a day?  Within two days?  What's your best
25   recollection?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    Probably within hours.

2        Q.    And based on the information you received,

3   where would you have searched for the paperwork?

4        A.    We would have probably started in the pod.

5   With the information that we received we would have

6   probably started with that, and then worked our way

7   to there.

8        Q.    And that still resulted in no finding of

9   paperwork?

10       A.    As far as I know, no.

11            MR. CASTELLANO:  May I have a moment, Your

12   Honor.

13            THE COURT:  You may.

14            MR. CASTELLANO:  Thank you, Your Honor.

15            THE COURT:  Mr. Castellano.

16   BY MR. CASTELLANO:

17       Q.    I just want to make sure I understood you.

18   If I understood you correctly, going back to your

19   discussion of Rudy Perez and his walker, was he a

20   suspect at all in your eyes, from the information you

21   learned and from your discussions with him?

22       A.    In my eyes, no.

23       Q.    And even with a piece missing from his

24   walker?

25       A.    Correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1          MR. CASTELLANO:  I pass the witness, Your

 2   Honor.

 3          THE COURT:  Thank you, Mr. Castellano.

 4          Any defendant have anything?  Mr. Maynard?

 5                    EXAMINATION

 6   BY MR. MAYNARD:

 7     Q.   Mr. Holguin, being with the prison system

 8   corrections for a long time, you're familiar with the

 9   camera operation system?

10     A.   Yes.

11     Q.   And you're familiar with how the different

12   pods segregate inmates out from each other?  I mean,

13   it's not easy to walk from one pod to the other if

14   you're an inmate?

15     A.   Correct.

16     Q.   All right.  And you were describing the

17   capacity or the technical capacity of the cameras a

18   while ago.  The cameras go on 24 hours, 24/7?

19     A.   Yes, sir.

20     Q.   And digitally, do they record and then

21   overwrite, and record and overwrite?

22     A.   My understanding is that, yes, they record

23   continuously, and somewhere it starts pushing stuff

24   out as it gets full.

25     Q.   I mean, how much history is in the

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   recording before it's pushed out?  Like a day, 24
 2   hours?  Two days?
 3        A.   I couldn't tell you exactly.  I would
 4   assume more than a day.
 5        Q.   You would assume more than a day?
 6        A.   Yes, because --
 7        Q.   Now, when you first started investigating
 8   this homicide, you hadn't spoken with Mr. Gonzalez,
 9   Samuel Gonzalez?
10        A.   No.
11        Q.   And you spoke with him, was it, how many
12   days later?
13        A.   I believe I said 10.
14        Q.   The 10th?
15        A.   Ten days.
16        Q.   Ten days later, around the 17th?
17        A.   Correct.
18        Q.   Okay.  Now, had the cameras in the pod
19   where the homicide occurred, had the memories been
20   completely recorded?
21        A.   I couldn't tell you that.
22        Q.   You don't know?
23        A.   No, sir.
24        Q.   And you've seen what is preserved for
25   purposes of this particular case, right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.

 2        Q.    And how long is that?

 3        A.    I couldn't tell you exactly.

 4        Q.    Like 10 minutes?

 5        A.    Yeah.

 6        Q.    Five minutes, 10 minutes?

 7        A.    Like 10 minutes.

 8        Q.    And so, as far as you know, the rest of

 9   those 24 hours, or maybe 23 hours and 50 minutes, was

10   just deleted.  Has it been preserved?

11        A.    I couldn't tell you if it has or hasn't.

12        Q.    Now, there is also cameras covering angles

13   between pods?

14        A.    Correct.

15        Q.    Now, Mr. Herrera was not in that pod when

16   the homicide occurred, was he?

17        A.    I don't recall where he was at.

18        Q.    You don't know.  Okay.

19              When did you first start focusing on

20   paperwork?

21        A.    Probably right when we started conducting

22   the interviews, it was brought up.

23        Q.    And how soon?

24        A.    That would have been the night of.

25        Q.    The night of, and there was mention of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    paperwork?

2         A.   Yes.

3         Q.   All right.  And the paperwork naturally

4    would be something that's exchanged between different

5    people?

6         A.   Correct.

7         Q.   Would there be a good probability that that

8    paperwork exchange would be on a camera?

9         A.   If the camera caught it, yes.

10        Q.   Was there any attempt to preserve -- and

11   apparently not, not that you know of -- there was no

12   attempt to preserve the entire memory that was

13   present in the camera after the homicide was

14   discovered?

15        A.   Correct.  To my knowledge, yes.

16        Q.   To your knowledge.  And as far as you know,

17   there was no attempt to preserve any of the memory in

18   the cameras of the neighboring pods?

19        A.   Correct.

20        Q.   Now, has there been any attempt to your

21   knowledge -- not just personal knowledge, but your

22   awareness that you've heard from other

23   investigators -- to try to pin down what the

24   paperwork that's missing might have been about?

25        A.   Yes.  But, like I said, we have no

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                            1-800-669-9492
                                                                 e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    resources to evaluate that, so it would be

 2    speculation.

 3         Q.   But it would have something to do with the

 4    victim of the homicide?

 5         A.   Yes.

 6         Q.   And so the state and the feds have

 7    resources to trade 302s or reports of investigation

 8    in which Mr. Molina was involved?

 9         A.   I would guess, so yes.

10         Q.   Okay.  And we've heard reference to a

11    Mr. -- is it, Urquizo, the name?

12         A.   Urquizo.

13         Q.   Urquizo.  Had he been transferred from

14    another facility?

15         A.   Yes.

16         Q.   From Santa Fe?

17         A.   Yes.

18         Q.   Now, security measures are taken when

19    inmates travel from pod to pod?

20         A.   Correct.

21         Q.   And security measures are taken when

22    inmates travel from facility to facility?

23         A.   Correct.

24         Q.   And if you could describe those security

25    measures.  There is a pretty thorough check of all of
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    the personal property and paperwork, is there not?

2         A.    I couldn't tell you exactly what they do.

3    I could tell you what I do in reference to that.

4         Q.    Well, let's first hear what you do.  And

5    then, if you're aware of any policy.  We'll find out

6    if you comply with policies, I guess.

7         A.    When we transfer somebody out, we go

8    through their property.  We strip search, pat-down,

9    place handcuffs, restraints on the individual.  But

10   the most important thing is we do go through the

11   property.  We do check the property.

12        Q.    Okay.  And the property, typically, would

13   not be a lot, but what would it consist of?

14        A.    Personal stuff, their personal clothing,

15   paperwork, pictures, things of that nature.

16        Q.    Okay.  Now, if the paperwork looks anything

17   like a legal document, do you read it?

18        A.    No.  We go through it.  We don't read it,

19   though.

20        Q.    Okay.  So you don't look -- your practice

21   is not to actually read papers?

22        A.    No, not to read legal documents --

23        Q.    Okay.

24        A.    -- that pertains to the case.

25        Q.    How about handwritten personal letters?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   Yes, we'll look through that as well.

2    Q.   You'll look through that.  And, if you're

3  aware, would a staff member in Santa Fe or in Las

4  Cruces look through those papers in that manner when

5  a person is transferred out and transferred in?

6    A.   I'm sure they do.

7    Q.   And presumably there is a record of that

8  somewhere?

9    A.   Yes.

10    MR. MAYNARD:  No further questions.

11    THE COURT:  Thank you, Mr. Maynard.

12    Anyone else?  Ms. Fox-Young, do you have

13  redirect of Mr. Holguin?

14    MS. FOX-YOUNG:  Thank you, Your Honor.

15    THE COURT:  Ms. Fox-Young.

16                 REDIRECT EXAMINATION

17  BY MS. FOX-YOUNG:

18    Q.   Mr. Holguin, I think Mr. Castellano asked

19  you about recovering the murder weapons and whether

20  you continued to look for source of weapons.  And you

21  said that it was important to keep looking, right?

22    A.   Correct.

23    Q.   And you don't know, sitting here today, do

24  you, whether the shanks recovered were the murder

25  weapons?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                               1-800-669-9492
PROFESSIONAL COURT                           e-mail: info@litsupport.com
REPORTING SERVICE


BEAN & ASSOCIATES, Inc.

```
 1        A.    From the video, yes, we're assuming that
 2   those are the ones that were used.
 3        Q.    You're assuming, though, you don't know
 4   that you had the murder weapons?
 5        A.    Right at that time, no.
 6        Q.    And you don't know where they came from?
 7        A.    No.
 8        Q.    The night of -- well, during the course of
 9   all of your interviews, your investigation, nobody
10   pointed the finger at Rudy Perez?
11        A.    No.
12        Q.    And are you aware that someone at the New
13   Mexico Corrections Department did photograph a
14   walker?
15        A.    I'm personally not aware of it --
16        Q.    Okay.
17        A.    -- other than this picture you just showed
18   me.
19        Q.    You were asked a lot of questions about
20   whether you had tracked down the murder weapons, and
21   what evidence you had collected, and what conclusions
22   you had drawn.  Your job in this case was just to
23   chase down evidence, right, and conduct interviews?
24        A.    Exactly.
25        Q.    And it was State Police's job to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    investigate the case and figure out who ought to be
2    charged, right?
3         A.   Yes, ma'am.
4         Q.   And that was Agent Palomares?
5         A.   Yes, ma'am.
6         Q.   With regard to the video, I just wanted to
7    clarify, you told me -- and I know you couldn't put
8    an exact time on it -- but you told me that in March
9    of 2014, you think you could go back and look at a
10   month's worth of video prior to current, right?
11        A.   Yes.
12             MS. FOX-YOUNG:  Thank you, Your Honor.
13   That's all.
14             THE COURT:  Thank you, Ms. Fox-Young.
15             All right.  Mr. Holguin, you may step down.
16   Is there any reason that Mr. Holguin cannot be
17   excused from the proceedings?  Mr. Castellano?
18             MR. CASTELLANO:  No, Your Honor.
19             THE COURT:  How about you, Ms. Fox-Young?
20             MS. FOX-YOUNG:  No, Your Honor.
21             THE COURT:  Anyone else?  Mr. Maynard?
22   Anybody?  All right.  You're excused from the
23   proceedings.  Thank you for your testimony.
24             All right.  Why don't we take our afternoon
25   break.  We'll be in recess for about 15 minutes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              (The Court stood in recess.)
 2              THE COURT:  All right.  Let's everybody
 3    grab a seat.  If we've got everybody with an
 4    attorney.  Look around and help your fellow man on
 5    this.  Make sure everybody has got an attorney.
 6              All right.  Mr. Villa, you've got your next
 7    witness or evidence?
 8              MR. VILLA:  Your Honor, Ms. Fox-Young is
 9    actually bringing back Mr. Holguin.  There is some
10    new information that's come to light, so I'm going to
11    let her re-call him and examine that.
12              THE COURT:  All right.
13              All right.  Mr. Holguin, if you'll come up
14    and take your seat in the witness box.  I'll remind
15    you that you're still under oath.
16              Ms. Fox-Young.
17              MS. FOX-YOUNG:  Thank you, Your Honor.
18                   FURTHER REDIRECT EXAMINATION
19    BY MS. FOX-YOUNG:
20         Q.   Mr. Holguin, I apologize.  I neglected to
21    ask you in your earlier testimony whether you brought
22    any paperwork with you today.  Did you?
23         A.   Yes, ma'am, I did.
24         Q.   And is the paperwork that you brought with
25    you your investigative file related to the Molina
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

235

```
 1    case?
 2         A.   Yes, ma'am, it is.
 3         Q.   And what does that contain?
 4         A.   Memos, copies of the pod, the inmates in
 5    the pod at the time, and I believe some other
 6    personal notes that I took during my interviews.
 7         Q.   Related to your investigation?
 8         A.   Yes, ma'am.
 9         Q.   And that memo that you talked to me about
10    earlier with regard to Rudy Perez' walker, and your
11    interview of him, is that in there?
12         A.   Yes, ma'am, it is.
13         Q.   Okay.  And that memo talks about when Mr.
14    Perez told you a piece went missing from his walker,
15    doesn't it?
16         A.   Yes, it does.
17         Q.   What does it say about that?
18         A.   I'd have to look at it again.
19              MS. FOX-YOUNG:  Okay.  Your Honor, I think
20    the Government has Mr. Holguin's investigative file.
21    I'd like to move its admission as an exhibit in
22    total, but I don't have it in my hands.
23              THE COURT:  Any objection to that, Ms.
24    Armijo?
25              MS. ARMIJO:  Yes, for several reasons.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    One, there is information here that's not related to

2    the Molina murder, or this motion.

3           During the course of his direct

4    examination, when he was talking about memos that he

5    had written, that we had not seen, I went out to try

6    and find his file.  And in looking at it, there are

7    some memos here that I know that we, prosecution,

8    don't have.  And I don't believe that Palomares has

9    seen it.  We will disclose it immediately.  In fact,

10   I suggested that he go and copy it immediately.  And

11   I don't oppose some of the items.

12          But other items have inmates' personal

13   information that we normally redact.  There is

14   information in here about other homicides that we

15   would be opposed to -- that are some that are

16   possibly ongoing investigations, that we would object

17   to.

18          We certainly don't object to the admission

19   of this 3/14/14.  We just need to make a copy,

20   because this is the only copy that could be in

21   existence.

22          THE COURT:  Let me have Ms. Fox-Young --

23   and maybe you could ask him some questions -- what is

24   this?  It sounded like, when you were questioning Mr.

25   Holguin, it was the investigation file for the Molina

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   murder.  Now, Ms. Armijo seems to look at it, and her

 2   description of it is it may be much broader than

 3   that; just murders.  Do you want to talk to him a

 4   little bit about what's in this file?

 5   BY MS. FOX-YOUNG:

 6        Q.   Certainly.  Mr. Holguin, I know you said

 7   that this file contains memos related to the Molina

 8   murder; is that right?

 9        A.   Yes, ma'am.

10        Q.   And also notes related to the Molina

11   murder?

12        A.   Yes.

13        Q.   Does it contain anything that, in your

14   opinion, is unrelated to the murder?  Is it all work

15   that you did in this investigation?

16        A.   There is probably some stuff in there

17   that's unrelated to the murder.

18        Q.   Okay.  Have you reviewed it?

19        A.   Not recently.

20        Q.   But you brought it in response to our

21   subpoena today, as responsive on this case?

22        A.   Yes, ma'am.

23             MS. FOX-YOUNG:  Your Honor, we've had only

24   a moment, maybe 30 seconds, to look at the file.  It

25   clearly contains Brady material.  And if the Court

SANTA FE OFFICE                                      MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   would like, I can get into the details.  I don't
 2   think the Government objects.  I don't think the
 3   Government will tell you it's not Brady.  It's pretty
 4   significant, and it's highly relevant to our motion.
 5   The problem is we take time -- I mean, I don't want
 6   to waste the rest of the Court's day messing around
 7   with what is or isn't in it, and I would suggest that
 8   maybe we could have it admitted under seal.
 9            I understand that there is confidential
10   information the Government is concerned about
11   disclosing.  But we don't want to lose any of the
12   contents.  And there is Brady in there that should
13   have, frankly, been disclosed to the defense a long
14   time ago.  I think, for the Government to say now
15   they're going to make a determination about what's
16   relevant and what isn't, is somewhat problematic.  I
17   think, if we can just get it admitted, and it's under
18   the seal, and maybe the Court can review it in
19   camera, then we don't have a problem with any
20   documents disappearing.
21            THE COURT:  Well, I think it's in the
22   Government's possession.  I don't think any documents
23   are going to disappear.  Why don't we do this:  Why
24   don't we give it an exhibit number, and it will just
25   be a placeholder right now for those documents that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the Government is going to turn over.  And then, if
 2    we have a dispute on some, then we'll work out a way
 3    to resolve it.  So why don't you give me a number.
 4    What's your next number?
 5              MS. FOX-YOUNG:  It's RP-OO, Your Honor.
 6              THE COURT:  Should have remembered,
 7    shouldn't I?  All right.  So is this an acceptable
 8    way to do it?
 9              MS. ARMIJO:  Yes, Your Honor.
10              THE COURT:  All right.  So I'll admit
11    RP-OO.  We don't exactly know the contents of it.
12    But it will be at least some materials that the
13    Government, after reviewing Mr. Holguin's file, are
14    willing to produce.  And then, if there is some that
15    they don't produce, we'll figure out what we're going
16    to do with that.
17              MS. FOX-YOUNG:  Your Honor, I think it
18    might make sense if we move to admit the one memo
19    that the Government doesn't object to admitting,
20    that's clearly related to Rudy Perez and Mr.
21    Holguin's investigation with regard to the walker.
22    It's just, I think, a three-page document.  And I
23    don't think the Government believes it needs to be
24    redacted.  If we could move its admission as a
25    separate exhibit and get that in the record.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Any objection to that, Ms.
 2    Armijo?
 3              MS. ARMIJO:  As long as I can go get a copy
 4    of it because this is the only copy we have.
 5              THE COURT:  All right.  So that copy of
 6    that three-page memo will be admitted as Rudy Perez'
 7    Exhibit RP-PP; correct?
 8              MS. FOX-YOUNG:  Yes, Your Honor.
 9              THE COURT:  Anybody got a problem with the
10    way we're doing this?  All right.  So it will be
11    admitted into evidence.
12    BY MS. FOX-YOUNG:
13        Q.   Mr. Holguin, I only have one copy of this
14    memo, and I don't know, did you have a chance to look
15    at it today?
16        A.   No.
17        Q.   Okay.
18              MS. FOX-YOUNG:  Your Honor, may I approach
19    the witness?
20              THE COURT:  You may.
21        Q.   Mr. Holguin, is this another memo that you
22    drafted for Captain Blanco?
23        A.   Yes, ma'am, it is.
24        Q.   And what is the date on it?
25        A.   3/14/14.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  And you maintained a copy for
 2   yourself and submitted one to Captain Blanco?
 3        A.   Yes.
 4        Q.   And you also submitted one to Agent
 5   Palomares?
 6        A.   Yes.
 7        Q.   And did you submit that to Agent Palomares
 8   by email or by hand?
 9        A.   I can't remember.
10        Q.   One or both?
11        A.   Yes, ma'am.
12        Q.   And if you did send to it him by email, you
13   might still have those emails?
14        A.   Yes, ma'am.
15        Q.   We talked earlier about Mr. Perez' walker
16   and the memo that you wrote with regard to the
17   missing part.  Is this the memo you were talking
18   about?
19        A.   Yes, ma'am, it is.
20        Q.   And this has been admitted as -- or, Your
21   Honor, I move the admission of Defendant's Exhibit
22   PP.
23             THE COURT:  We've admitted it.
24        Q.   It's in evidence.
25             In this memo do you tell Captain Blanco and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Agent Palomares anything about a part that was

2    missing from Rudy Perez' walker?

3         A.   Yes.  Through this memo, yes, I do.

4         Q.   What did you tell them?

5         A.   I advised them in the memo where it states

6    that a piece of metal was taken from his walker.  And

7    there was two nuts laying on the floor, was how he

8    knew it was missing.

9         Q.   Okay.  Did your memo say anything about

10   when that piece went missing?

11        A.   I don't have a date on it.  I just -- where

12   he advised me that they were conducting shakedowns in

13   his unit, and found that the metal part was missing

14   from it.  And that's why they confiscated his walker,

15   three to four weeks ago, prior.

16        Q.   So your memo is dated March 14, 2014?

17        A.   Yes, ma'am.

18        Q.   Is that the day -- I'm sorry, you say in

19   the memo that you conducted the interview the day

20   before?

21        A.   Yes.

22        Q.   And as you just said, you learned from Mr.

23   Perez, he told you that he noticed the part was

24   missing three to four weeks prior?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       Q.   So that would put the part missing sometime
 2  in February?
 3       A.   Yes.
 4       Q.   Well in advance of Javier Molina's death?
 5       A.   Yes.
 6       Q.   And apart from providing this information
 7  to Agent Palomares and Captain Blanco -- Coordinator
 8  Blanco, did you do anything else to chase down what
 9  might have happened to that walker?
10       A.   No, ma'am, I didn't.
11       Q.   In the course of your memo, you also talk
12  about Mr. Perez telling you that he wasn't a part of
13  the murder; is that right?
14       A.   Correct, the memo, yes.
15       Q.   And that he had heard some things after the
16  fact, but that he wasn't a part of it, and that he
17  was in his cell that night?
18       A.   Correct.
19            MS. FOX-YOUNG:  Thank you, Your Honor.
20  I'll pass the witness.
21            THE COURT:  Any other questions, Mr.
22  Castellano?
23            MR. CASTELLANO:  Yes, Your Honor.
24            THE COURT:  All right.  Mr. Castellano.
25
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                        EXAMINATION
 2    BY MR. CASTELLANO:
 3         Q.    Okay.  Mr. Holguin, this is the same
 4    Exhibit RP-PP, and what we're talking about here is a
 5    statement where Mr. Perez claimed the parts went
 6    missing three or four weeks ago.  Do you see that?
 7         A.    Yes.
 8         Q.    By his claim, this would be a time before
 9    the Javier Molina murder?
10         A.    Correct.
11         Q.    And then at the bottom of the page, there
12    is an indication where you ask him what he knew about
13    the murder.  Do you see that?
14         A.    Yes, I do.
15         Q.    And then he just claimed he wasn't part of
16    it.  He claimed he didn't see anything.  And that he
17    saw Javier Molina on the floor; is that correct?
18         A.    Yes.
19         Q.    But he did hear afterwards, in segregation,
20    that everybody knew there was paperwork on Molina,
21    and they had been waiting for it for a while to come
22    in?
23         A.    Correct.
24         Q.    Do you know how long people had been
25    waiting for the paperwork, from your conversation
```

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                    1-800-669-9492



1    with Mr. Perez?

2          A.    No, I don't.

3          Q.    And are you aware of any later evidence,

4    where Mr. Perez admitted that the shanks came from

5    his walker?

6          A.    No.

7                MR. CASTELLANO:  I pass the witness, Your

8    Honor.

9                THE COURT:  Thank you, Mr. Castellano.

10               Anything further, Ms. Fox-Young?

11               MS. FOX-YOUNG:  Nothing further.

12               THE COURT:  All right.  Mr. Holguin, you

13   may step down.  Thank you for your testimony.

14               All right.  Ms. Fox-Young, Mr. Villa, does

15   Mr. Perez have his next witness or evidence?

16               MS. FOX-YOUNG:  Yes, Judge.  Mr. Perez

17   calls Adam Vigil.

18               THE COURT:  Mr. Vigil, if you'll come up

19   and stand next to the witness box on my right, your

20   left.  Before you're seated, the courtroom deputy Ms.

21   Standridge will swear you in.

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                    ADAM VIGIL,
 2        after having been first duly sworn under oath,
 3        was questioned and testified as follows:
 4                    DIRECT EXAMINATION
 5             THE CLERK:  Please be seated.  And state
 6   your name for the record.
 7             THE WITNESS:  My name is Adam Vigil.
 8             THE COURT:  Mr. Vigil.  Ms. Fox-Young.
 9   BY MS. FOX-YOUNG:
10        Q.   Good afternoon, Mr. Vigil.
11        A.   Good afternoon.
12        Q.   Can you tell me where you're currently
13   employed?
14        A.   I'm currently employed with the New Mexico
15   Department of Corrections at the Penitentiary of New
16   Mexico, in Santa Fe.
17        Q.   How long have you been at the Penitentiary
18   of New Mexico, working for NMCD?
19        A.   Approximately 34 years.
20        Q.   What is your position?
21        A.   I'm the STIU coordinator.
22        Q.   How long have you been in that job?
23        A.   This time around 10 years.
24        Q.   So the last 10 years you've been doing that
25   job?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   And is there anybody in STIU who you report
 3     to?  Are you at the top of STIU?
 4          A.   I'm a coordinator.  I have two other
 5     individuals above me.
 6          Q.   Who is above you?
 7          A.   Two other individuals.  We have a deputy
 8     director and an STIU administrator.
 9          Q.   Can you tell me their names?
10          A.   Currently, the deputy director position is
11     vacant.  And acting administrator is Andrew Sweeney.
12          Q.   And in March of 2014, you were the STIU
13     coordinator for the state?
14          A.   For the Penitentiary of New Mexico.
15          Q.   For the Penitentiary of New Mexico.  And
16     was there a separate coordinator, STIU coordinator,
17     for Southern New Mexico Correctional Facility?
18          A.   Yes.
19          Q.   Who was that?
20          A.   I believe it was Daniel Blanco at the time.
21          Q.   And is he still the coordinator?
22          A.   Yes.
23          Q.   Do you remember -- do you have an
24     independent recollection of anything related to
25     Javier Molina's death on March 7, 2014, at Southern?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1      A.   As to what?

 2      Q.   Do you remember that case?

 3      A.   I remember the murder, yes.

 4      Q.   Did you go to Las Cruces after the murder?

 5      A.   Yes.

 6      Q.   When did you go?

 7      A.   That was a while back.  I can't remember

 8  exactly when, but it was either a month or a week

 9  after.

10      Q.   Either a month or a week?

11      A.   Somewhere in between there.

12      Q.   Okay.  And when there is a murder anywhere

13  in a New Mexico Correctional Department facility, do

14  you always go in your current position?

15      A.   No.  Sometimes different coordinators are

16  designated to do different things.  And I happened to

17  be the one that was sent down there.

18      Q.   Who sent you down there?

19      A.   My boss.  I believe it was either Andrew

20  Sweeney, or Dwayne Santistevan.

21      Q.   So you got the word from Mr. Santistevan or

22  Mr. Sweeney that you needed to go to Southern because

23  there had been a murder?

24      A.   Yes.

25      Q.   And you drove down to Las Cruces?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.

 2        Q.    And the investigation was already underway

 3   when you arrived?

 4        A.    Yes.  Pretty much it was already done and

 5   over with.

 6        Q.    Okay.  Tell me what you did with regard to

 7   that case.

 8        A.    I was one of the components that went down

 9   there to conduct an after action review of the

10   incident.

11        Q.    Is that customary for all murders?

12        A.    It's customary for major incidents.

13        Q.    What does it consist of?  What does an

14   after action review consist of?

15        A.    This group of individuals are sent down

16   there to assess what happened, you know, what to look

17   for, and see if any discrepancies occurred during or

18   after the incident occurred.

19        Q.    Who else was part of this after action

20   review?

21        A.    It was myself, Ms. Visti Curry.

22        Q.    Could you repeat that?

23        A.    Her name is Visti Curry.

24        Q.    Who is she?

25        A.    She currently holds the rank of Deputy
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Warden at Central New Mexico Correctional Facility.
 2         Q.   And Mr. Santistevan or Mr. Sweeney also
 3    selected her for this job?
 4         A.   I don't know who selected her.
 5         Q.   Okay.  But you both arrived at the same
 6    time?
 7         A.   No.  I believe she was already there before
 8    I was.
 9         Q.   Okay.  What happened when you got there?
10         A.   We were given different tasks.  We had a
11    briefing on the different tasks that we were assigned
12    to do.
13         Q.   Who assigned you tasks?
14         A.   I believe it was Warden Missy Ortiz.
15         Q.   She was the Warden at Southern?
16         A.   Yes.
17         Q.   What were your tasks?
18         A.   My particular task was to go and look at an
19    area called the wheelchair project.
20         Q.   Did you go by yourself?
21         A.   No.  I had a group of people with me, a
22    little team.
23         Q.   Who was on that team?
24         A.   I don't recall.
25         Q.   Was Ernie Holguin on that team?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    I don't believe so.
 2          Q.    How many people?
 3          A.    Maybe four.
 4          Q.    So the Warden asked you to go look at the
 5    wheelchair program?
 6          A.    That was one of my -- that was my task was
 7    to go look at the wheelchair.
 8          Q.    From the Warden?
 9          A.    From the Warden -- or yeah, it was from the
10    Warden and maybe Major -- not major -- yeah, Major
11    Herman.
12          Q.    Was a Major at Southern?
13          A.    Yes.
14          Q.    And so you did that; you went and visited
15    the wheelchair program?
16          A.    Yes, we went and checked out the area.
17          Q.    What did you do to check it out?
18          A.    We went in there.  We looked at what was
19    going on in there.  We checked inventories.  We
20    checked the tool system.  We checked the shakedown
21    procedure areas.  Just basically did a scan of what
22    was going on in that particular room.
23          Q.    When you say you checked inventories, did
24    you mean you checked inventories of all the metal
25    that it was in there?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    No.   That wasn't -- the way it was

2   explained to me by the project manager that was there

3   then -- and I don't recall his name --

4        Q.    Was that Ernie Rodriguez?

5        A.    I don't know.

6        Q.    Okay.   Go on.

7        A.    Anyway, first thing we did was check the

8   tools and the inventory to see if they were going on

9   there.   We checked on how they brought in the

10  wheelchairs, how they were taken apart, disassembled,

11  and how they put different parts in different bins

12  and stuff.

13       Q.    What were you looking for?

14       A.    Anything that could be fashioned into a

15  weapon.

16       Q.    And did you find that they could?

17       A.    Well, there are several items on a

18  wheelchair that could be fashioned into a weapon,

19  yes.

20       Q.    There is a lot of metal in that program?

21       A.    Metal as to what?

22       Q.    Lots of different kinds of metal used in

23  that program?

24       A.    Yeah.   For the chairs that are made out of

25  metal, yes.



SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
                                                 e-mail: info@litsupport.com

1          Q.    And did you see walkers?

2          A.    No, I saw mainly wheelchairs.

3          Q.    Mainly wheelchairs?

4          A.    Um-hum.

5          Q.    Did you catalog what was there?

6          A.    No.

7          Q.    Did anybody catalog what was in there?

8          A.    I saw some documents from the project

9    manager on how they get boxes of stuff in.  But there

10   was nothing individually cataloged, no.

11         Q.    Did you make copies of those documents?

12         A.    No.

13         Q.    You just viewed them when you were in

14   there?

15         A.    Yes.

16         Q.    Did you photograph the wheelchair program?

17         A.    No.

18         Q.    Did anybody?

19         A.    No.  Not my little team, no.

20         Q.    Did you generate a report?

21         A.    I did a briefing at the end of our little

22   stay.  And then I passed on some information to

23   Ms. Curry, who was the team leader.

24         Q.    Was that an oral briefing?

25         A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Who was present?

 2          A.   There was a bunch of us there.  I can't

 3   recall everybody who was there.

 4          Q.   STIU officers?

 5          A.   No.  The only one that maybe had been

 6   there, Daniel Blanco; that's about it.

 7          Q.   And a bunch of others?

 8          A.   Yes.

 9          Q.   Were they all NMCD employees?

10          A.   Yes.

11          Q.   Any State Police?

12          A.   No.

13          Q.   Were they all employees at Southern New

14   Mexico?

15          A.   Yes.

16          Q.   So you gave an oral briefing, and then you

17   met with the Warden?

18          A.   Well, she was one of the members in that

19   briefing.

20          Q.   Okay.  And what was message of your

21   briefing?  What was the substance of it?

22          A.   That there was poor accountability on some

23   of the equipment that was there.

24          Q.   You said "poor"?

25          A.   Yes.  The shakedown procedures needed to be
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX 505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    enhanced a little bit.

2         Q.   What was faulty about the procedures?

3         A.   Just the coverage of one person in that

4    particular area.  There should have been at least

5    two.

6         Q.   So while the inmates were in there working

7    on the wheelchair program, there was just one person?

8    Is that what you were saying?

9         A.   There was one supervisor, yes.

10        Q.   And while they were shaken down, there was

11   only one person?

12        A.   Yes.

13        Q.   And you found that that was problematic?

14        A.   Yes.

15        Q.   What else did you brief the Warden and

16   others on?

17        A.   That was it.  That was my assignment, and I

18   was done.

19        Q.   Do you know what prompted the Warden to ask

20   you to review the program?

21        A.   Well, the murder happened; that's why I was

22   down there.  I would have been part of an after

23   action team.

24        Q.   But why, in particular, did you go to the

25   wheelchair program?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                         (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                      1-800-669-9492
                                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.    That was the task I was assigned to go do.
 2        Q.    Okay.  You don't, yourself, know why?
 3        A.    No.
 4        Q.    You said you had tasks as part of this
 5   after action procedure.  Did you have additional
 6   tasks besides the one you told me about?
 7        A.    No.  Just look at the tool inventories, how
 8   the equipment came in and out; shakedown procedures;
 9   and this was it.
10        Q.    Okay.  And you gave an oral briefing, and
11   then you were done?
12        A.    Yes.
13        Q.    Did you have anything to -- did you view
14   any evidence in this case?
15        A.    No.
16        Q.    Did you collect any evidence?
17        A.    No.
18        Q.    Did you maintain any evidence back in Santa
19   Fe at your office?
20        A.    No.
21        Q.    So you didn't look at any physical evidence
22   while you were down there whatsoever?
23        A.    No.
24        Q.    Except for anything that was in the
25   wheelchair program?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          A.    That's it.
2          Q.    Okay.  Are you familiar with the
3    Corrections Department's inventory chain of custody
4    forms?
5          A.    To an extent, yes.
6          Q.    Have you ever completed one?
7          A.    Yes.
8          Q.    And you don't think you did one in this
9    case?
10         A.    I don't believe so.
11         Q.    Okay.  If I represented to you that the
12   Government has produced a chain of custody form that
13   has the name "A. Vigil, STIU Coordinator" on it, is
14   it possible that's you?  Or --
15         A.    Yeah, it more than likely is.
16         Q.    Okay.  I know it's been a while.
17         A.    Yes.
18         Q.    Would it refresh your memory -- well, are
19   you sure that you didn't complete a chain of custody
20   form in this case?
21         A.    Not that I recall.  But if you have a
22   document saying I did --
23         Q.    It's possible you did?  Would it refresh
24   your memory if I showed you a chain of custody form?
25         A.    Sure.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.    Do you recognize that document?
2        A.    Yes.
3        Q.    Do you know what it is?  Can you tell me
4   what it is?
5        A.    It's a chain of custody form.
6        Q.    Okay.  And without telling me anything that
7   is contained in it, you recognize that form?
8        A.    Yes.
9        Q.    And did you actually complete that form?
10       A.    No, I did not.
11       Q.    Is your name anywhere on that form?
12       A.    My name is typewritten at the top as
13  "evidence recovered by," and then somebody printed my
14  name down at the bottom there.
15            MS. ARMIJO:  Your Honor, can we have a
16  Bates stamp number, at least for reference?
17            MS. FOX-YOUNG:  Yes.  It is 30188.
18            Your Honor, I'd like to move the admission
19  of Defendant's PP -- I think that's what we're on.
20            THE COURT:  I think we already have --
21            MS. FOX-YOUNG:  QQ.
22            THE COURT:  All right.  Any objection, Ms.
23  Armijo?
24            MS. ARMIJO:  No, Your Honor.
25            THE COURT:  Any objection from anyone else?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              All right Rudy Perez' Exhibit QQ will be
 2     admitted into evidence.
 3     BY MS. FOX-YOUNG:
 4         Q.   Mr. Vigil, on this chain of custody form
 5     that you looked at you, you noted that your name is
 6     printed at the top, and your name is written in at
 7     the bottom in these areas to fill in receipt or
 8     transfer of evidence; is that right?
 9         A.   That's correct.
10         Q.   But you didn't write that?
11         A.   No, that's not my writing.
12         Q.   Do you know who did?
13         A.   No, I don't.
14         Q.   This chain of custody form appears to be
15     for a DVD of video evidence; is that right?
16         A.   Yes, that's what it says on the first
17     number 1 line there.
18         Q.   And it's from March 13, 2014?
19         A.   Yes.  That's the date of evidence
20     recovered, 3/13.
21         Q.   It says, "The DVD of video evidence was
22     recovered on March 13, 2014," which was six days
23     after the Molina murder; is that right?
24         A.   Yes.
25         Q.   And it says the "evidence was recovered by
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    A. Vigil, STIU coordinator."  And that's you?

 2          A.    Apparently so, yes.

 3          Q.    But you don't remember recovering it?

 4          A.    No, I don't recall it.  It's been a while.

 5          Q.    Do you have any reason to disbelieve that,

 6    based upon this chain of custody form, you did

 7    recover it?

 8          A.    Can you repeat the question?

 9          Q.    Oh, do you have any reason to disbelieve

10    that you recovered it, based upon this chain of

11    custody form that the Government has produced?

12          A.    No.

13          Q.    Okay.  Well, if you can just tell me, does

14    this show that -- if you look at the bottom where

15    it's written in in somebody's handwriting, it says,

16    "April 11, 2014, 4:40 p.m."  And then it has your

17    name.  And it says, "Transfer."  Would this indicate

18    that the video evidence was transferred to somebody

19    else on April 11, 2014?

20          A.    Yes.

21          Q.    Do you know who that person is?

22          A.    No, I don't.

23          Q.    Do you -- I know you don't specifically

24    recall taking in video evidence in this case.  Do

25    you, as a practice, take in evidence in other cases?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.    Cases that I handle at my facility, I do.
 2        Q.    Just at PNM?
 3        A.    Yes.
 4        Q.    And where do you keep that evidence?
 5        A.    We have a secured area, evidence locker
 6   area, we secure evidence in.
 7        Q.    And if you had taken in the video evidence
 8   in this case, is that where it would have been, at
 9   PNM, according to this form?
10        A.    No.  I don't recall taking it to PNM.
11        Q.    Did you have any part in a disciplinary
12   officer's investigation report of Mario Rodriguez in
13   this case?
14        A.    Not that I recall.
15        Q.    You don't remember doing that?
16        A.    No, I don't remember.  Like I said, it's
17   been a while.
18        Q.    This is Bates 30174 and 75.  Mr. Vigil, do
19   you recognize this document?
20        A.    Yes.
21        Q.    Okay.  If you can, tell me what it is.
22        A.    It's a disciplinary officer's investigative
23   report.
24        Q.    Okay.  And you said you don't remember
25   having anything to do with any evidence related to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Mario Rodriguez, or the Molina murder, taking it in.

2   But if you look at the second page of that document,

3   you see where I've highlighted at the bottom?

4        A.   Yes.

5        Q.   Does that refresh your recollection as to

6   your role with the evidence?

7        A.   It refreshes my memory, yes.

8        Q.   Okay.  And so, having looked at that, what

9   do you now remember?

10       A.   That I took it with me.

11       Q.   What was it?

12       A.   The videotape.

13       Q.   Okay.

14       A.   The video, DVD, or whatever you call it.

15       Q.   And you kept it in your office?

16       A.   Yes.

17       Q.   And this is just your personal office at

18   PNM?

19       A.   Yes.  And I'm the only one who has access

20   to it.

21       Q.   Oh, you're the only one with access?

22       A.   Yes.

23       Q.   Okay.  Do you sometimes keep other evidence

24   in that office?

25       A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   This was a unique circumstance?

2      A.   Yeah.  I think it was -- this case was

3  going on at the time is why I held onto it.

4      Q.   Why didn't it go to State Police?

5      A.   That, I don't know.

6      Q.   Did you ever view the video when you had it

7  in evidence?

8      A.   No.

9      Q.   So this is the only time in your 34-year

10  career at PNM that you've ever taken in evidence and

11  put it in your office?

12      A.   Yes.

13      Q.   And did somebody instruct you to do that?

14      A.   I think it was just a transfer of the

15  evidence for the case up in Santa Fe.  It wasn't

16  there to be permanent, just to be made part of case

17  to turn over to somebody else.

18      Q.   Okay.  So you remember you transferred it

19  to somebody else, to this A -- on Exhibit QQ, it

20  appears to be a name that starts with a W.  You're

21  not sure who that is?

22      A.   No, I don't.

23      Q.   Okay.  Is it possible that you also took

24  other evidence to your office at the same time as you

25  took that video evidence?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492
                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   No.

2      Q.   It's not possible?

3      A.   No.

4      Q.   How do you know?

5      A.   Because there would have been other forms

6    generated, if I had taken more evidence.

7      Q.   Okay.

8           MS. ARMIJO:  No objection.

9           MS. FOX-YOUNG:  Your Honor, I'd like to

10   admit Defendant's RR.

11          THE COURT:  I heard you say "no objection,"

12   Ms. Armijo.

13          MS. ARMIJO:  No objection.

14          THE COURT:  All right.  Anybody else have

15   an objection?  All right.  Rudy Perez' Exhibit RR

16   will be admitted into evidence.

17     Q.   So Mr. Vigil, it's your testimony that for

18   the first time in 34 years, or at least in 2014 it

19   was the first time, or the only time, you took

20   evidence, the video evidence from this case to your

21   office in Santa Fe, but you don't know precisely why?

22     A.   No, other than maybe I turned it over to

23   the disciplinary officer.  But that was it.

24     Q.   And this document, Exhibit RR, which you

25   just looked at, indicates -- and you agreed that --

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                            FAX (505) 843-9492
                                                                                 1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                        e-mail: info@litsupport.com

```
 1    this was to allow for your completion of the after
 2    incident review.  Do you recall that?
 3         A.   No.
 4         Q.   This is the second page of this
 5    disciplinary officer's investigation report.  The
 6    very last paragraph reads, "The video evidence stayed
 7    secure in STIU Coordinator A. Vigil's office, to
 8    allow for his completion of the after incident
 9    review."  You don't dispute that that is what this
10    investigator concluded?
11         A.   He may have.  If that's what he put, then
12    that's probably what I did.  Like I said, it's been
13    quite a while.
14         Q.   Okay.  But you say that your only task as
15    far as the after incident review was concerned, was
16    to go to the wheelchair program?
17         A.   Right.
18         Q.   You didn't have anything to do with the
19    video evidence?
20         A.   No.  Not that I recall, no.
21         Q.   Okay.  You didn't watch it.  You didn't
22    take it -- other than taking it into evidence and
23    holding it in your office in Santa Fe?
24         A.   I remember watching it one time, when I
25    initially went for the state case, on the trial.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.   Where was that?

 2         A.   That was at the DA's here in Dona Ana

 3    County.

 4         Q.   Did you go for a pretrial interview and you

 5    watched it?

 6         A.   Yes.

 7         Q.   Okay.  So that wasn't as part of the

 8    investigation; it was after the fact?

 9         A.   Right.

10         Q.   And it's your testimony that you didn't

11    have anything to do with any other physical evidence

12    at Southern on this case outside of the wheelchair

13    program?

14         A.   Yes.

15         Q.   Did you ever see a walker that was taken

16    into evidence?

17         A.   No.

18         Q.   Never saw one.  Did you ever see a

19    photograph of one?

20         A.   No.

21         Q.   Are you aware that a walker was taken in?

22         A.   No, I wasn't aware a walker was taken in.

23         Q.   Okay.  You're only aware of the various

24    ambulatory devices that you saw in the wheelchair

25    program, but you don't know if anything was taken
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  into evidence?

2       A.   No, I don't.

3       Q.   Okay.  Did you bring any files with you

4  today --

5       A.   No.

6       Q.   -- in response to the subpoena?

7       A.   No.  I didn't know why I was here to begin

8  with.

9       Q.   Do you have any files or documents related

10  to the Javier Molina murder?

11      A.   No.

12      Q.   Do you have any emails?

13      A.   Emails, no.

14      Q.   Did you talk to anybody with State Police

15  about this murder?

16      A.   I sat in on an interview with one suspect.

17  But that was it.

18      Q.   Who was the suspect?

19      A.   Armenta.

20      Q.   And who else was at that interview?

21      A.   Detective Paul Garnice (phonetic).

22      Q.   Do you recall the date of that interview?

23      A.   No, I don't.

24      Q.   It was not the day of the murder?

25      A.   No.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.    It was later?
 2          A.    Later.
 3          Q.    And so you had occasion to talk to
 4    Detective Palomares at that time?
 5          A.    Well, I transported Inmate Armenta to the
 6    State Police headquarters, and there was an interview
 7    conducted.
 8          Q.    You transported him?
 9          A.    My crew did, me and my crew.
10          Q.    You drove him from Southern to State
11    Police?
12          A.    No.  I believe he was housed at PNM at the
13    time.
14          Q.    And was this in March of 2014, or this was
15    later?
16          A.    This was later.
17          Q.    When you -- was it in 2014?
18          A.    I don't recall.
19          Q.    Was it -- you don't know what year it was?
20          A.    No, I don't recall.  I just know we
21    assisted with transporting this inmate to the State
22    Police, and that was it.
23          Q.    Was it close in time to the murder?
24          A.    I don't recall.
25          Q.    But you sat in on the interview?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Yeah.

 2          Q.    Did you take any notes?

 3          A.    No.

 4          Q.    And at that time, you talked to Agent

 5    Palomares about the case?

 6          A.    I didn't talk to him, no.  They said this

 7    guy was a suspect, and he was going to interview him.

 8          Q.    Okay.  Are you generally familiar with the

 9    New Mexico Corrections Department policies and

10    procedures?

11          A.    Pretty much.

12          Q.    Have you been trained on them?

13          A.    I reviewed and trained on some, yes.

14          Q.    You probably had a part in drafting and

15    revising them, too?

16          A.    Yes.

17          Q.    Okay.  I don't know if you know it by

18    number, but are you familiar with the policy on

19    cameras, video, portable stationary, pan, tilt and

20    zoom?

21          A.    No.

22          Q.    I'm going to show you what's been marked as

23    RP-KK.  Do you know what this is?

24          A.    According to the heading up there, it's a

25    policy for New Mexico Department of Corrections.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   So it's a single policy in the New Mexico

2   Corrections Department policy manual?

3       A.   Yes.

4       Q.   And you see the date on it?

5       A.   Which one?

6       Q.   Well, the last date.  It was effective

7   when?  It was last revised when?

8       A.   The review revised date is 2/29/12.

9       Q.   And you've never reviewed this policy?

10      A.   I may have.  I may have skimmed it and gone

11  through it.  But I couldn't tell you verbatim what it

12  is.

13      Q.   Okay.  I don't expect you to be able to

14  recite it verbatim.  But do you recall the

15  requirement and policy that original video recordings

16  be properly secured and maintained for a minimum of

17  10 years?

18      A.   No.

19      Q.   Well, in this policy, that requirement is

20  right here in the middle of the page, under

21  Subsection B, "Storing of video recordings."  Do you

22  see where it says that, "The original recording shall

23  be properly secured and maintained for a minimum of

24  10 years"?

25      A.   The first paragraph?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                            (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492

 

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Yes, Subsection B 1.

2    A.   Yes.

3    Q.   And looking at that now, are you familiar

4  with that requirement in NMCD policy?

5    A.   I am now.

6    Q.   You are now.  Okay.  Do you have any reason

7  to disbelieve that this document is the policy that

8  was last revised on February 29, 2012?  In form, does

9  it appear to be an NMCD policy on cameras?

10    A.   Yes.

11    Q.   You just don't know it by heart?

12    A.   No.

13    Q.   Do you remember any other STIU personnel

14  that you worked with at Southern on the Molina

15  investigation?

16    A.   No, other than my counterpart, Daniel

17  Blanco.  But it's his facility.

18    Q.   Okay.  And have you talked with Captain

19  Blanco -- or Coordinator Blanco about this case?

20    A.   No.

21    Q.   Not at any time?

22    A.   No.  My involvement in the case was, like I

23  said, for the initial state trial.  And we haven't

24  discussed the case with anybody since then.

25    Q.   But back in March of 2014, after the

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 843-9492                                                           FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

 1    murder, did you work with Captain Blanco on this

 2    case?

 3        A.   No.

 4        Q.   Was he present at your briefing?

 5        A.   I believe so.

 6        Q.   Okay.  So other than that?

 7        A.   Other than that, I don't believe.

 8        Q.   Okay.  Now, at PNM, you must be familiar

 9    with the Corrections Department policy governing

10    contraband control, tracking, and disposal, right?

11        A.   Yes.

12        Q.   Are you familiar with the requirement that

13    when contraband is seized from an inmate, that inmate

14    receives a receipt?

15        A.   Contraband?

16        Q.   Yeah.  When somebody is shaken down and

17    contraband is seized, is there a document that gets

18    generated?  Or is there a contraband log?

19        A.   Contraband log; there is a contraband log.

20    There is a log, but the inmate is not required to get

21    a receipt of that.

22        Q.   Just -- it's only logged?

23        A.   It's only logged, yes.

24             MS. FOX-YOUNG:  Your Honor, I move the

25    admission of Rudy Perez exhibit -- I think we're at

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    PP?  No, we're not.

2              THE COURT:  I think your next one is SS.

3              MS. FOX-YOUNG:  SS.  Thank you, Judge.

4              MS. ARMIJO:  No objection.

5              THE COURT:  Is it RR?  Any objection to

6    Rudy Perez' Exhibit RR?  It was SS.  So SS will be

7    admitted into evidence.

8    BY MS. FOX-YOUNG:

9         Q.   So this document, Exhibit SS, I think is

10   the Corrections Department policy governing

11   contraband control, revised January 25, 2012, is it

12   not?

13        A.   Yes.

14        Q.   And at the bottom, the attachments include

15   a miscellaneous contraband log?

16        A.   Yes.

17        Q.   And is that the document that you're saying

18   does get filled out when contraband is seized?

19        A.   I have to actually look at the log that

20   you're talking about.

21        Q.   I understand.  But the reference to the

22   contraband log, that's what you're talking about,

23   gets filled out when contraband is seized, and that's

24   required by policy?

25        A.   That's a log that gets filled out.  It's a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    general log.  If I remember the policy, if I'm being

 2    correct, the log itself is just a general log.

 3         Q.   For contraband, when it's seized?

 4         A.   That's correct.  But the inmate doesn't get

 5    a copy of that.

 6         Q.   I understand.  And this is the policy that

 7    requires that, that you're looking at, this NMCD

 8    090300?

 9         A.   Yes.

10         Q.   Okay, thank you.

11              MS. FOX-YOUNG:  Your Honor, I move

12    Defendant's Exhibit TT.

13              THE COURT:  Any objection, Ms. Armijo?

14              MS. ARMIJO:  No, Your Honor.

15              THE COURT:  Any other defendant?  All right

16    Rudy Perez's Exhibit TT will be admitted into

17    evidence.

18              Is there somebody on the telephone that

19    doesn't have their mute button on?  Y'all might put

20    the mute button on.  Check it, because we're getting

21    a lot of feedback here.

22    BY MS. FOX-YOUNG:

23         Q.   The New Mexico Corrections Department also

24    has a separate policy on inmate property; is that

25    right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.

2       Q.   And is that what we're looking at here on

3  Exhibit TT, revised September 4, 2013?

4       A.   Are you talking about the policy name?

5       Q.   Yes.  Is that this policy, the inmate

6  property policy from -- that was revised September 4,

7  2013, and in effect in March of 2014?

8       A.   Yes.

9       Q.   And this separate policy requires, does it

10  not, that a receipt for confiscated property form be

11  filled out when property is confiscated?

12      A.   Yes.

13      Q.   And that form is listed there on this first

14  page?

15      A.   Yes, it's the highlighted one you have

16  there.

17      Q.   Yes.

18           I understand that you did an oral briefing

19  after the conclusion of your review of the wheelchair

20  program.  Do you know if -- and you didn't generate a

21  report, right?

22      A.   Not that I recall, no.

23      Q.   Okay, that you remember.  Do you know if

24  there was an after incident report that was generated

25  by anybody?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1       A.   I believe Ms. Curry generated one.

 2       Q.   Okay.  And did she include any of your

 3  findings in that report?

 4       A.   She probably did.

 5       Q.   Have you seen it?

 6       A.   I don't recall if I did or not.

 7       Q.   Do you say that you believe she did it

 8  because after action reports are customarily done

 9  when you do an after action review?

10       A.   Yes.

11       Q.   And there would be no reason why she

12  wouldn't have done one?

13       A.   No, there wouldn't be a reason why.

14       Q.   Where are those kept?

15       A.   That, I don't know.  Probably -- the after

16  action report usually goes to the warden of the

17  facility, and probably to the deputy director of the

18  department.

19       Q.   You said you do after action reviews in

20  cases of major incidents.  When there are crimes

21  charged and there is a law enforcement agency

22  investigating, as in this case, when there is a

23  murder, does that after action report go to that law

24  enforcement agency?

25       A.   I don't know.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Do you know if there is a policy that
 2   governs that?
 3        A.   That, I don't know either.
 4        Q.   Do you know if the after incident review
 5   gets sent to the ACA for accreditation purposes?
 6        A.   I wouldn't be able to answer that.  I don't
 7   know.
 8        Q.   You don't deal with that process?
 9        A.   No, I don't.
10             MS. FOX-YOUNG:  Thank you, Your Honor.
11   Pass the witness.
12             THE COURT:  Thank you, Ms. Fox-Young.
13             Any other defendants have questions of
14   Mr. Vigil before the Government engages in
15   cross-examination?
16             MR. LOWRY:  Your Honor, just briefly.
17             THE COURT:  Mr. Lowry.
18                      EXAMINATION
19   BY MR. LOWRY:
20        Q.   Good afternoon, Mr. Vigil.
21        A.   Good afternoon.
22        Q.   Mr. Vigil, after the Molina -- after March
23   7, after you went down to Southern, you returned back
24   to Santa Fe?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

278

```
1          Q.   How many days were you in Las Cruces?
2          A.   I don't remember.  It's been a while.
3     Maybe one, maybe two days.
4          Q.   Do you recall an event where you and the
5     Secretary of Corrections and a film crew went and
6     spoke with Mr. Baca, Mr. Sanchez, and Mauricio Varela
7     before they were sent out of state?
8          A.   No.
9          Q.   You don't recall that?
10         A.   I was not part of that.
11         Q.   Okay.  Do you recall participating in a
12    video of the other alleged members of the SNM that
13    were housed in Level 6?
14         A.   No.
15         Q.   You don't recall that?
16         A.   I don't recall video cameras being there.
17    I know that was with Mr. Marcantel and one of the
18    units, and he was explaining why the SNM members were
19    housed at the north facility.
20         Q.   Do you recall the Secretary explaining to
21    that group of people his discharge of Mr. Baca, Mr.
22    Sanchez, and Mr. Varela?
23         A.   I know that he referred to suspects.  I
24    don't remember him mentioning them by name.
25         Q.   Do you recall a comment that the Secretary
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    made that they were crying when they left?

2         A.   No.  That, I do not recall.

3         Q.   So you don't recall being with him when he

4    was with those three gentlemen when he addressed

5    them?

6         A.   I wasn't there for the meeting with the

7    three gentlemen.

8              MR. LOWRY:  Okay.  No further questions,

9    Your Honor.

10             THE COURT:  All right.  Thank you, Mr.

11   Lowry.

12             Any other defendant?

13             All right.  Ms. Armijo, if you wish to

14   cross-examine Mr. Vigil.

15                        EXAMINATION

16   BY MS. ARMIJO:

17        Q.   Mr. Vigil, do you know what was on the

18   video that Ms. Fox-Young was referring to that you

19   took up there?

20        A.   I knew it was about the incident that

21   occurred in the pod.

22        Q.   All right.  So was it your understanding

23   that that was a video of the actual murder?

24        A.   Yes.

25        Q.   And the interview that you were referring

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   to with Mr. Armenta, did that take place after Mr.
 2   Armenta had been charged by the state?
 3        A.   Yes.
 4        Q.   And was it in reference to him being a
 5   possible witness?
 6        A.   Yes.
 7             MS. ARMIJO:  And I believe that is all I
 8   have.  Thank you.
 9             THE COURT:  All right.  Thank you,
10   Ms. Armijo.
11             Any other defendants have any further
12   redirect?  Ms. Fox-Young?
13             MS. FOX-YOUNG:  No, Your Honor.
14             THE COURT:  All right.  Mr. Vigil, you may
15   step down.  Is there any reason that Mr. Vigil cannot
16   be excused from the proceedings?
17             MS. ARMIJO:  No, Your Honor.
18             THE COURT:  Ms. Fox-Young?
19             MS. FOX-YOUNG:  No, Your Honor.
20             THE COURT:  All right.  You're excused from
21   the proceedings.  Thank you for your testimony.
22             All right.  Mr. Villa, do you have further
23   witnesses or evidence that Mr. Perez wants to
24   present?
25             MR. VILLA:  Yes, Your Honor, Mr. Perez
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

281

```
1   calls Jason Wright.
2            MR. CASTELLANO:  Your Honor, may we
3   approach regarding Mr. Wright?
4            THE COURT:  You may.
5            All right.  We're going to do it in open
6   court.
7            MR. CASTELLANO:  My understanding is that
8   Mr. Wright is a former SNM member.  I don't think
9   he's represented by counsel, so I just want to make
10  sure we tread lightly before we put him on the stand,
11  because he can be subject to potential criminal
12  liability.  I don't know what they're going to ask
13  him.  Mr. Villa gave me a little preview.
14           But if he's talking about shanks coming
15  from the wheelchair program, there is potential
16  criminal liability.  And I want to say that before
17  he's in the courtroom, so I don't influence his
18  testimony in any way.  But I just want to make sure
19  that we know what we're doing when we put him on the
20  stand.
21           THE COURT:  Your thoughts, Mr. Villa?
22           MR. VILLA:  Well, Your Honor, I don't
23  intend to ask him about anything that he, himself,
24  did directly, but more the knowledge that he had.  I
25  don't know what cross-examination the United States
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    has.  But, you know, I think with respect to

2    questions that might relate to self-incrimination, we

3    probably have to take them a question at a time.

4              THE COURT:  Well, I'm sure y'all would

5    agree with me, I'm not sure any of us want to be the

6    ones making the call.

7              MR. VILLA:  I certainly can't do that for

8    him, Your Honor.

9              THE COURT:  Yeah.  I guess what I'm

10    concerned about is, I'm running out of quickly

11    available lawyers to come over here.

12              MR. VILLA:  Across the street.

13              THE COURT:  Well, I'm dipping pretty deep

14    into El Paso.  Let me ask this:  Can I work with

15    Ms. Wild to see if I can get an attorney for him and

16    then we come back to Mr. Wright at another point?

17              MR. VILLA:  I think that's fine, Your

18    Honor.  That was the last of the witnesses Mr. Perez

19    intended to call -- oh, I'm sorry, there is one more.

20    Oops.  But we could move on to the next witness, Your

21    Honor.

22              THE COURT:  Ms. Wild, are you still on the

23    phone?

24              THE CLERK:  She's away from her desk.

25              THE COURT:  All right.  Well, let's move

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    forward, and let me see if I can contact her.  I
 2    hadn't gotten a response to one question I had asked
 3    her a little earlier, so I don't know if she's
 4    quickly available.  But let's move on to your next
 5    witness, and let me see if I can get an attorney
 6    appointed for Mr. Wright.
 7              MR. VILLA:  Yes, Your Honor.  And that's
 8    Ms. Fox-Young's witness.
 9              THE COURT:  All right.  Ms. Fox-Young.
10              MS. FOX-YOUNG:  Your Honor, Mr. Perez calls
11    Laura Schile.
12                     LAURA SCHILE,
13         after having been first duly sworn under oath,
14         was questioned and testified as follows:
15                   DIRECT EXAMINATION
16              THE CLERK:  Please be seated.  State your
17    name, spelling it for the record.
18              THE WITNESS:  Thank you.  My name is Laura
19    Schile, S-C-H-I-L-E.
20              THE COURT:  Ms. Schile.  Ms. Fox-Young.
21    BY MS. FOX-YOUNG:
22         Q.  Ms. Schile, could you tell the Court what
23    your educational background is?
24         A.  I am -- well, absolutely.  I have a
25    bachelor's degree from St. Mary College in
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

284

1    Leavenworth, Kansas.  Would you like me to go on with

2    my career?

3         Q.   Yes, go on.

4         A.   From there, I started graduate school in

5    microbiology at the University of Kansas.  I did not

6    finish.  But I was recruited to do DNA breakage and

7    repair research at the University of Texas, M.D.

8    Anderson.  After about three years of performing DNA

9    breakage and repair research as a molecular biologist

10   for M.D. Anderson, I started with the Texas

11   Department of Public Safety, when DNA -- STR DNA just

12   started up in the forensic field.  They wanted to get

13   molecular biologists and train them to be forensic

14   scientists.  So that's when I started my career as a

15   forensic scientist.

16              I was trained in hair comparison, serology,

17   DNA, crime scenes, blood spatter, evidence handling

18   procedures, all by the Texas -- and hair

19   comparisons -- all by the Texas Department of Public

20   Safety.  I was stationed in Houston.

21              After approximately five-and-a-half years,

22   I went to the Oklahoma City Police Department and got

23   that crime laboratory on line with DNA.  I wrote --

24   in this whole process I was writing protocols and

25   procedures, as well as doing casework, crime scenes,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

```
 1    DNA analysis.  So I started the DNA laboratory in --
 2    for the Oklahoma City Police Department.  I was with
 3    them for approximately 23 months.  Then I resigned
 4    and went to work for the Oklahoma Indigent Defense
 5    System.  I was with them for approximately nine
 6    years, at which time, in the middle of that, I
 7    started my own business.  Then, in 2010, I went
 8    full-time with my own business as a forensic
 9    consultant.
10         Q.   Okay.  And since that time, you have been
11    proffered as an expert in other cases, and we have
12    proffered you as an expert in this case?
13         A.   That's correct.
14         Q.   And you have listened to the testimony in
15    the hearing on this motion.  What else have you done,
16    generally speaking, to prepare as an expert in this
17    case?
18         A.   I've reviewed numerous documents, numerous
19    pages.  I have gone on several site visits.  I have
20    reviewed -- I've viewed evidence in this case.
21         Q.   And have you reviewed the video evidence
22    that has been admitted, taken in the pod on March 7,
23    2014?
24         A.   Yes, I have.
25         Q.   And you have reviewed the statement by Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Perez?
 2         A.    Yes.
 3         Q.    And you've reviewed all the exhibits that
 4    have come into evidence in the course of this
 5    hearing?
 6         A.    Yes, I have.
 7         Q.    In the course of your review of the
 8    video --
 9              MS. FOX-YOUNG:  Your Honor, in the
10    interests of time, I'm not going to go through
11    proffer her as an expert and getting her qualified
12    unless the Government is going to object, and we can
13    go through in detail.  But I know the Court would
14    like to streamline some of these matters.
15              THE COURT:  Any objection --
16              MR. BECK:  No, Your Honor.
17              THE COURT:  -- to her offering opinion
18    testimony?  It doesn't sound like it.  Anyone else?
19              MR. BECK:  Not for purposes of this
20    hearing.
21              THE COURT:  Anyone else?  All right.  So
22    Ms. Schile will be allowed to offer opinion
23    testimony.
24    BY MS. FOX-YOUNG:
25         Q.    Ms. Schile, you reviewed the video that was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    collected in this case.  Can you tell me how long it

 2    is?

 3         A.   One is approximately -- on my computer,

 4    what it reads -- 35 minutes and 17 seconds; one is 35

 5    minutes and 50 seconds --

 6         Q.   Okay.  So --

 7         A.   -- approximately.

 8         Q.   And both of those videos were produced.

 9              And you made some site visits in this case

10    as well, did you not?

11         A.   That is correct, yes.

12         Q.   Where have you visited?

13         A.   Southern; several locations within the

14    Southern.  And I believe Central or -- I apologize.

15         Q.   PNM?

16         A.   PNM.

17         Q.   Okay.  Did you visit the wheelchair program

18    at Southern?

19         A.   Yes, twice.

20         Q.   And did you visit the pods that we've been

21    discussing today, 1 A and 1 B?

22         A.   Yes, blue pod and yellow pod.

23         Q.   And the video that you reviewed, is 35

24    minutes, that's in evidence, that was taken from blue

25    pod?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    And that's Exhibit RP-C.
 3              I'm going to show you Defendant's Exhibit
 4   N.  Do you know what this is?
 5        A.    That's a photo within blue pod.
 6        Q.    Okay.  And do you know who took this photo?
 7        A.    I believe I took this photo.
 8        Q.    And does the photo depict the cameras that
 9   picked up the video that's Exhibit C?
10        A.    Yes.
11        Q.    And that is here, here, and here?
12        A.    There are three cameras, but we were
13   informed that one was not working.
14        Q.    Okay.  And the two cameras that were
15   working, did they reveal in the video all the cells
16   in the pod?
17        A.    Yes.
18        Q.    I'm going to show you Defendants RP-P.
19   It's a little hard to see on the Elmo.  But this cell
20   right here, can you read the number on that cell?
21        A.    It appears to be 115.
22        Q.    115.  And do you know where Rudy Perez was
23   housed in this pod?
24        A.    I believe it was 115.
25        Q.    And is that cell clearly visible on the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    video that you reviewed?

2         A.   Yes, it is.

3         Q.   And can you also see the doors located in

4    the upper right and the lower right on the video?

5         A.   Yes, you can.

6         Q.   And the same is true with respect to the

7    other side of the pod?  Can you see all the way to

8    the doors?

9         A.   That's correct.

10        Q.   And those doors are the doors -- I mean,

11   you inspected the scene there.  Are those doors the

12   doors that lead into the neighboring pod?

13        A.   Yes, they are.

14        Q.   Okay.  Is that yellow pod, as is referred

15   to in this case?

16        A.   Yes.

17        Q.   Okay.  And so you could see on the video

18   the four doors in blue pod as --

19        A.   Yes.

20        Q.   -- in full?

21        A.   Yes.

22        Q.   And there is direct -- would you say there

23   is direct line of sight into cell 115 on the video?

24        A.   Yes.  I mean, you can see that cell in that

25   video quite clearly.  Well, as clearly as any of the

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492

 

BEAN
&ASSOCIATES, Inc.

1-800-669-9492
e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

1    cells in the video.

2         Q.   And the video starts -- I know you've

3    watched it; you know the length of it.  You know what

4    it records.  And you've heard testimony earlier today

5    about it starting just before the homicide occurs; is

6    that right?

7         A.   Yes.

8         Q.   In your expert opinion -- and you've worked

9    on numerous crime scenes; is that right?

10         A.   That is correct.

11         Q.   If you were working on reviewing this crime

12    scene and collecting evidence, knowing the evidence

13    that is in the record, would you have collected

14    earlier video footage?

15         A.   Absolutely.

16         Q.   And why is that?

17         A.   For some of the allegations that have been

18    made in statements.  One of the things -- working out

19    of the Texas Department of Public Safety, or the

20    Oklahoma City Police Department, one of the things

21    we're trained in is that if statements were made,

22    then you go out of your way to do everything you can

23    to corroborate or not corroborate the statements.

24    And so it would be very important to be able to view

25    what the statements are alleging.

SANTA FE OFFICE                                                         MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                      1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                     e-mail: info@litsupport.com

1          Q.   Based on the evidence in this case, and the

2     timeline in this case that you've reviewed and heard,

3     how much video would you preserve in order to

4     investigate those allegations?

5          A.   Well, I would think in the least you would

6     want to do 48 hours.  But I think that what I would

7     do, if I had been doing the crime scene and

8     collecting it, I would have collected to the point

9     that the statement said that information was coming

10    in, and you could see it on the video.  And then I

11    would also have collected it throughout the crime

12    scene, to have a video documentation of the crime

13    scene.

14         Q.   So you're talking about the allegations

15    about paperwork, you'd want to capture that?

16         A.   Yes.

17         Q.   Okay.  And in the course of your work on

18    this case, you said you visited the wheelchair

19    program.  Did you photograph the wheelchair program?

20         A.   Yes.  Both times I visited, I did photo

21    documentation.

22         Q.   You visited twice.  And tell me what you

23    observed the first time.

24         A.   It was a room with several tables, and I'd

25    say numerous and various pieces of wheelchairs in

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    there at some point in their lifespan, either
 2    completely put together or partially put together.
 3         Q.   I'll show you what has been marked as
 4    Defendant's Exhibit H.  Is this a photograph of the
 5    wheelchair program?
 6         A.   Yes, it is.
 7         Q.   Now, does this capture everything that was
 8    in the room where the wheelchair program was housed?
 9         A.   No, it certainly doesn't.
10         Q.   Okay.  And this visit was made when?  In
11    December of 2016; is that right?
12         A.   Yes, I believe so.
13         Q.   And you can see -- although it doesn't
14    capture the whole room, you can see some shelving
15    with materials on it.  Did you inspect that area?
16         A.   Yes.  So there is shelving with various
17    parts of wheelchairs, wheelchairs in whole.  There is
18    also shelving containing containers -- actual
19    containers that hold parts of wheelchairs.
20         Q.   Okay.  And other pieces of metal --
21              THE COURT:  Hold on.  Is that Ms. Wild?
22              THE CLERK:  Yes, sir.
23              THE COURT:  The witness that Mr. Perez
24    wants to call, Jason Wright, is a former SNM Gang
25    member, or an SNM Gang member.  And we're a little
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    concerned that he may need an attorney to advise him

2    about testifying.  Any thoughts?

3            THE CLERK:  My thoughts are I'm going to

4    have to take a look and see what's available.  And

5    I'll just have to look into it just a bit.

6            THE COURT:  All right.  If you don't mind

7    beginning that process, I'd appreciate it.

8            THE CLERK:  I don't.  Do we know when he is

9    going to testify?

10           THE COURT:  Well, we were going to call him

11   a minute ago.  But we've moved on to Mr. Perez'

12   expert.  So we're buying some time right now for you.

13           THE CLERK:  All right.  I'll see what I can

14   do.

15           THE COURT:  Thank you.

16           THE CLERK:  Sure.

17           THE COURT:  Ms. Fox-Young.

18           MS. FOX-YOUNG:  Thank you, Your Honor.

19   BY MS. FOX-YOUNG:

20       Q.  So you visualized various kinds of metal, I

21   think you were describing in the wheelchair program

22   on that visit?

23       A.  Yes, I did.  And there were -- on the table

24   there were nuts and bolts out -- well, nuts and

25   bolts.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Okay.  And then you visited again?

2        A.    Yes, I did.

3        Q.    And what did you see that time?

4        A.    It was quite different.  It was not as

5   clean.  There was a lot more equipment present.  I

6   believe I visited in June.  There was a lot more

7   equipment present.  There were not only wheelchairs,

8   but there were numerous walkers as well.

9        Q.    There were walkers the second time, but not

10   the first time?

11        A.    That is correct.

12        Q.    And the first time everything was pretty

13   cleaned up and tidied up?

14        A.    Yeah, it was pretty pristine.  The second

15   visit, not so much.

16        Q.    And you say walkers, were they -- this is

17   Defendant's RP-NN, and this is appears to be a walker

18   with wheels on it.  Were they walkers like this, with

19   seats and wheels?  Or can you describe what they

20   looked like?

21        A.    Many of them had seats or an area to sit

22   down.  Wheels, possible brake mechanisms on the

23   handles.  So many of them looked very similar to

24   that.

25        Q.    Okay.  And you also went to view the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      evidence in this case, did you not?

2           A.   Yes, I did.

3           Q.   And you photographed it?

4           A.   Yes, I did.

5           Q.   This is Defendant's RP-W.  Do you recognize

6      this picture?

7           A.   Yes, I do.

8           Q.   What is this?

9           A.   That is a picture of what was represented

10     to me as three of the shanks that were found in blue

11     pod.

12          Q.   This is Defendant's RP-V.  What is this?

13          A.   That is a picture that I took that

14     represents -- or that photo documents four of what

15     was represented to me as the shanks found in the blue

16     pod.

17          Q.   Okay.  And were you able to examine these

18     materials?

19          A.   Yes, I was.

20          Q.   Now, you weren't able to test their metal

21     component or anything, were you?

22          A.   Oh, no.  Just by examining photo document,

23     is all I was able to do.

24          Q.   And this photograph here shows them next to

25     boxes.  Are these the evidence collection boxes that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Agent Palomares testified about?
 2         A.   Yes.  I am assuming that those are the same
 3    boxes.
 4         Q.   I'm going to show you Defendant's RP-W
 5    again.  You've heard testimony that, allegations that
 6    a shank used to kill Javier Molina came from a walker
 7    that was Rudy Perez', right?
 8         A.   Yes.
 9         Q.   And you went and you inspected -- you
10    viewed the evidence in this case; you looked at what
11    are the purported shanks that were recovered?
12         A.   Yes, I did.
13         Q.   And can you tell, in viewing them, what
14    they came from?
15         A.   Oh, no, I wouldn't be able to do that.
16         Q.   Can you tell if they are all the same
17    material?
18         A.   No.  I wouldn't purport to be able to tell
19    you that.
20         Q.   And your photograph looking at them pretty
21    close-up shows that one of them appears to be,
22    perhaps, rusted or dirty, can you tell what that is,
23    aged.  Do you know?
24         A.   I do not know.
25         Q.   Okay.  Now, you've heard a lot of talk
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                      1-800-669-9492
                                                                 e-mail: info@litsupport.com



1    about this walker that doesn't seem to exist anymore,

2    but perhaps existed at one time.  And it's not in

3    evidence.  And you have viewed all the physical

4    evidence in this case; is that right?

5         A.   Yes.  When I was there, I asked if that was

6    everything.  And I was instructed that, in fact,

7    everything that I had viewed was every piece of

8    evidence in the case.  So, going on that, yes, I will

9    say that I viewed all the evidence in the case.

10        Q.   And there was no walker there.

11             Now, if there were a walker that had been

12   preserved, a walker that the Government alleges

13   belonged to Rudy Perez, what forensic analysis, what

14   testing would you want to do with respect to these

15   shanks, these pieces, to see if it, in fact, came

16   from that walker?

17        A.   I think that forensic tool mark analysis

18   would be done.  I think it would be sent to the

19   forensic trace department.

20        Q.   And would that be done in comparison to the

21   walker, or can it be done in isolation, with no

22   walker?

23        A.   No.  You would most definitely need the

24   walker to do a comparison-type forensic examination.

25             You could also do metallurgy.

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT              e-mail: info@litsupport.com
REPORTING SERVICE

1      Q.    And what else would you want to do in order

2   to explore possible theories that the pieces didn't

3   come from the walker?  What else would you do to rule

4   that out?

5      A.    Well, I think your main thing would -- your

6   main forensic disciplines would consist of trace

7   analysis, which would consist of tool mark

8   comparisons.  And, again, metallurgy are

9   possibilities.

10      Q.    Okay.

11      A.    And you can also do, you know, depending on

12   what you're looking at -- obviously, there is other

13   trace analysis, as well as DNA analysis.

14      Q.    But you can't do any of that because you

15   don't have the walker itself.

16            Now, what we do have are photographs that

17   the Government purports are of a walker that was

18   seized.  Now, do these photographs tell you, for

19   purposes of your analysis, how big this walker is?

20      A.    There are no scales on any of the pictures

21   that I have seen, no scales whatsoever.  So there is

22   no way of knowing how -- the size of that.

23      Q.    Okay.  Do they tell you what the metal

24   component is, what it's made of?

25      A.    No.  There is no brand, make, model, serial

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    number, there is no identifying marks that would help

2    get the information needed to be obtained.

3        Q.   Okay.  And then all the documents you've

4    reviewed, all the discovery in this case, you've not

5    seen a report that does include those

6    characteristics:  Measurements?

7        A.   I have not found anything like that.

8        Q.   And so, in your opinion, is there any way

9    to determine, based upon the shanks themselves and

10   these photographs, whether they came from this

11   walker?

12       A.   No.  In my opinion, you would absolutely

13   need the walker to do the comparison to, to be able

14   to answer a question like that.

15       Q.   Okay.  And you're also trained in evidence

16   collection and preservation.  And you've talked about

17   that with regard to the video.  How, just according

18   to standard practices, not necessarily the local

19   practice, how should a walker in this case have been

20   taken into evidence, and examined and preserved?

21       A.   Well, it would be taken into evidence.  It

22   would be packaged.  And then, if it goes on for photo

23   documentation, then the proper photo documentation

24   with proper scales, 90 degree photos, you can get an

25   idea of size.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        But, initially, you would take that in; you

2   would write a case number, initials, and then make

3   sure that it immediately gets -- or it gets into a

4   secured storage evidence area.  And then submit it to

5   the laboratory.

6        Q.   And have you seen any documentation that

7   demonstrates proper chain of custody for this item in

8   Defendant's NN?

9        A.   No, I have not.

10        Q.   Okay.  And how about for the photo?  Is

11   there any documentation whatsoever as to who took the

12   photo, and where the item photographed was held?

13        A.   No, not that I have received.

14        Q.   Okay.  I think you have heard -- it's not

15   testimony from the Government, but claims from the

16   Government that there is a perfect fit:  Using the

17   shanks, which you photographed and apparently the

18   photo of the walker itself, the Government claims to

19   have established that those pieces of metal fit

20   perfectly into this item, and so it's clear that they

21   came from it.  Do you know how anybody could properly

22   say that they fit perfectly, given these photos?

23        A.   I honestly have no idea how anybody would

24   have been able to make any sort of match, let alone

25   that statement, without having the walker and the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1   pieces of metal in the same room, or at least sizes,

 2   and make and model number.

 3        Q.   Okay.  And you've also -- have you reviewed

 4   any policies of the New Mexico Corrections

 5   Department, State Police, in this case?

 6        A.   Yes, I have.

 7        Q.   And what is your opinion as to whether or

 8   not the New Mexico Corrections Department followed

 9   their policies in terms of preserving evidence?

10        A.   In my opinion, they have not followed the

11   protocols and procedures that they have in place.

12        Q.   In what ways have they failed to follow

13   those protocols and procedures?

14        A.   For example, the wheelchair is on the

15   screen.  There is no name of who took this photo, the

16   time, the date, where it was taken, the walker

17   itself.  There is no evidence log.  There is -- in

18   their protocols and procedures there is a designated

19   evidence custodian that is supposed to not only

20   secure the chain, but also make sure that the

21   appropriate paperwork is filled out.  And there is no

22   evidence custodian listed in any paperwork that I

23   have seen, nor is there any evidence logs that should

24   have been filled out by the said evidence custodian,

25   per protocol.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Okay.  And the walker itself was not

2    preserved, we've heard that; don't know where it is

3    today; don't know when it was destroyed.  But can you

4    tell the Court in your expert opinion what is the

5    standard practice for evidence preservation on an

6    item like this in a homicide case?

7        A.   On something like -- well, any item of

8    evidence, in my experience in a homicide case, is --

9    as far as how long it's preserved?  Is that the

10   question?

11       Q.   Yes, how long should it be preserved?

12       A.   It would be preserved until -- well,

13   forever, essentially, until the -- all parties

14   have -- are deceased, or that litigation has

15   completely stopped.

16       Q.   And when I say an "item like this," I mean

17   a potential source of a murder weapon.  It is your

18   opinion that that should be preserved until the

19   conclusion?

20       A.   It is my experience that items such as

21   this, such as a potential murder weapon, is held and

22   stored indefinitely, if you will.

23       Q.   And have you ever seen a homicide case

24   where a potential source of a murder weapon was not

25   preserved?  Was photographed and then not preserved?

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                 (505) 843-9494
FAX (505) 843-9492                                                       FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Not photographed and not preserved.  But it
 2   is not something that I have seen common, no.
 3             MS. FOX-YOUNG:  Your Honor, I'll pass the
 4   witness.
 5             THE COURT:  Let me ask everybody if we
 6   could do what we did, I think, last week.  We're kind
 7   of at an odd break time.  But Ms. Bean and I just
 8   finished up a jury trial last night, then I drove
 9   down here.  So I don't want to wear her out.  If I
10   get the men to just stay in their place, I'll sit
11   here too, none of us will move.  Attorneys, you can
12   move around, but be coming back in as soon as
13   Ms. Bean rests her fingers just a little bit.  I'd
14   like to get a little bit more done here.  So we'll be
15   in recess for about 15 minutes.  The men can hang
16   with me.  I'll sit here at the bench as well.  I
17   guess I should say the defendants.  If the attorneys
18   want to drift out a little bit, they can.  As soon as
19   Ms. Bean is ready to go we'll get back in here.
20             (The Court stood in recess.)
21             THE COURT:  Let's try to get back in our
22   seats here.  Look around, make sure everyone has got
23   an attorney.  Everyone got an attorney?
24             Ms. Schile, I'll remind you you're still
25   under oath.  Anybody want to ask Ms. Schile questions
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

304

1    before Mr. Beck does?

2          All right.   Mr. Beck, if you wish to

3    cross-examine Ms. Schile, you may do so at this time.

4                        EXAMINATION

5    BY MR. BECK:

6          Q.   Ms. Schile, on your direct examination you

7    talked about -- you said you would have collected

8    video earlier; is that right, in this case?

9          A.   Yes.

10         Q.   I think you said you came to that

11   conclusion based on the allegations that were made?

12         A.   I came to that conclusion based on the

13   statements that were made.

14         Q.   And which statements were those?

15         A.   For example, there was an interview on

16   March 14, followed up by a written report on March

17   17, that said at least twice, but I believe several

18   more times -- I don't have that right in front of me

19   -- "Go and look at the videos, you'll see it on the

20   video," a couple of times.

21         Q.   And what are we looking for on those

22   videos?

23         A.   People passing information from one pod to

24   another pod through a door.

25         Q.   So that's related to the paperwork that you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    were saying you would have got in these videos

2    earlier?

3        A.   That's one thing.

4        Q.   Is there another thing?

5        A.   Well, then, of course, to look at anything

6    that was going on with -- throughout the day of the

7    incident.

8        Q.   So you would have wanted the videos from

9    the day, to see what was going on?

10       A.   Absolutely.

11       Q.   In the pod?

12       A.   Yes.

13       Q.   Now, did you put together a timeline in

14    this case of who knew what at what time?

15       A.   No, I have not.

16       Q.   You said, I think, you reviewed a lot of

17    documents in this case?

18       A.   Yes.

19       Q.   And you did site visits?

20       A.   Yes.

21       Q.   And then you reviewed evidence?

22       A.   That's correct.

23       Q.   And did you take a log of the evidence that

24    you reviewed?

25       A.   I believe that everything I reviewed is on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   a sheet of paper with my initials on it that one of

2   the detectives had.

3        Q.   One of the detectives here today had?

4        A.   I think it could have been Detective

5   Palomares.  And I apologize for not saying his name

6   right.

7        Q.   That's all right.  So the evidence you

8   reviewed, I'm guessing you're talking about the

9   physical evidence that you reviewed at Southern?

10       A.   No, this was physical evidence that I

11  viewed at the State Police here in Las Cruces.

12       Q.   Okay.  So when you talked earlier about the

13  evidence you reviewed, that was the physical evidence

14  you reviewed here with the State Police?

15       A.   Yes, that's correct.

16       Q.   Do you have a log of the documents that you

17  reviewed?

18       A.   No, I do not.

19       Q.   Okay.  When you said that you reviewed the

20  tape about the allegations about the paperwork, in

21  what you reviewed and what you heard today, Detective

22  Palomares didn't know about the paperwork after the

23  incident, did he?

24       A.   According to one of the correctional

25  officers, he did.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                      1-800-669-9492
                                                            e-mail: info@litsupport.com




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   According to Agent Palomares, did he?

2      A.   Yes -- no, I'm sorry.  What I'm saying is

3   that one of the corrections officers that we heard

4   today said that he gave the detective all of the

5   notes that he had.  And, of course, that 14th and

6   17th of March statement was one of the memos that he

7   was referring to.

8      Q.   Agent Palomares today said he didn't know

9   about it, didn't he?

10     A.   That's what I -- I believe that he did not

11  say that he didn't know about it.  I believe he said

12  that he found out about it in 2015.  My recollection

13  of testimony.  And I apologize if that is incorrect,

14  but that's what I recollect.

15     Q.   Fair enough.  Now, Exhibit W, which I can't

16  seem to find here.  Give me a moment.  You testified

17  about this picture on direct examination with

18  Ms. Fox-Young, right?

19     A.   Yes, I did.

20     Q.   And as I'm looking down at the bottom of

21  that picture, it appears to me that those two left

22  pieces of metal have threads on them.  Is that what

23  it looks like to you?

24     A.   Yes.  Certainly, the middle piece is

25  threaded.  And it does appear that there might be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   demarcations of what could be threads on the left
 2   piece from this picture.
 3        Q.   And you saw those when you viewed evidence
 4   with the New Mexico State Police, like you were
 5   saying?
 6        A.   Yes, that is correct.
 7        Q.   And did they have threads on them?
 8        A.   Yes.
 9        Q.   And you'd agree with me that you
10   reviewed --
11             THE COURT:  Hold on, Mr. Beck.  Somebody on
12   the phone doesn't have their mute button on.  If
13   you'll put your mute button on.  We're getting a lot
14   of feedback.  Thank you.
15             Mr. Beck.
16        Q.   In the testimony you reviewed from Mr.
17   Perez, he said that a piece of his walker was taken
18   out, right?
19        A.   Yes.
20        Q.   And you heard testimony today that I think
21   one of the correction officers said he said a piece
22   of his walker was taken out with nuts and bolts,
23   right?
24        A.   Did he say that that's what Mr. Perez said,
25   or that's what the shakedown people said?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   I believe the testimony was that's what Mr.

2   Perez said.

3        A.   Okay.  If that's the testimony, then -- I

4   was under the impression that it's what the shakedown

5   people reported.

6        Q.   Okay.  In either case, if that's the

7   testimony, that's fine.  You'd agree with me that it

8   would be helpful to you to compare those threads with

9   Mr. Perez' walker, right?

10        A.   With the threads?

11        Q.   The threads on this shank, or this piece of

12   metal here, in Exhibit RP-W, it would be helpful to

13   compare those threads to the threads on Mr. Perez'

14   walker?

15        A.   Yes.  Or it would be helpful to be able to

16   compare those pieces.

17        Q.   Right.  That would be helpful to you?

18        A.   Yes.

19        Q.   Why would that be helpful?

20        A.   Because that's only way to know if -- that

21   would be the only way to be able to do a tool mark

22   comparison or to even do a size comparison.

23        Q.   What would that tool marker size comparison

24   tell you, if you're able to do that?

25        A.   If those pieces could even fit into an

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                        1-800-669-9492
                                                              e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

1    unknown area of where a piece is supposed to have

2    been missing.

3         Q.   In this case, if you took those pieces and

4    compared them with Mr. Perez' walker, what would that

5    tell you?

6         A.   Well, I can't tell you what it would tell

7    me.  I could say what it could tell me.

8         Q.   Okay.

9         A.   It could tell me whether those pieces were

10   a possibility for having been associated with that

11   walker at some point, or whether those pieces were

12   not forensically associated with that walker at some

13   point.

14        Q.   And through those tests, that's the only

15   way you could tell that; you said that earlier,

16   right?

17        A.   In my opinion, that's correct.

18        Q.   And you didn't perform those tests?

19        A.   No, sir, I did not.

20        Q.   You'd agree with me that, if they did fit

21   in Mr. Perez' walker, under those two tests, that

22   would be evidence that those came from Mr. Perez'

23   walker, right?

24        A.   It would be an indication that they

25   possibly came from the walker.  It would not be an

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    indication of a certainty.

2         Q.   Okay.  So even if we had the walker, you

3    couldn't tell for certain that those came from Mr.

4    Perez' walker?  Is that what you're saying?

5         A.   That is correct.  If you did metallurgy,

6    and added some tests, then the possibility would go

7    up, or down.  But that's correct.

8         Q.   Did you do metallurgy tests on these pieces

9    in Exhibit RP-W?

10        A.   No.

11        Q.   Did you do metallurgy tests on Mr. Perez'

12   walker?

13        A.   I've never seen the walker.  I've only been

14   told that one exists.

15        Q.   So is that a no?

16        A.   Pardon me?

17        Q.   Is that a no, you didn't do those tests on

18   Mr. Perez' walker?

19        A.   That is correct.

20        Q.   And just to follow up on that, you'd agree

21   with me, if you did those tests, those metallurgy

22   tests on those pieces and on Mr. Perez' walker, and

23   those matched, that would indicate that those pieces

24   of metal came from his walker?

25        A.   That could be a possibility, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.   And that would corroborate his statements

 2   that you reviewed, in which he said it came from his

 3   walker; is that right?

 4      A.   It certainly could.

 5      Q.   Could it not corroborate his statements, if

 6   it was the same metal?

 7      A.   It can be the same metal and not fit.   I

 8   mean, other aspects -- again, it would be a series of

 9   things.

10      Q.   Right.   I'm not asking about that.   We can

11   move on.

12      A.   Okay.

13      Q.   So I just want to be clear.   You don't know

14   what size walker Mr. Perez' walker was, right?

15      A.   No, sir, I don't.

16      Q.   And you don't know what metals Mr. Perez'

17   walker was made out of?

18      A.   I do not.

19      Q.   And you don't know what metals, those

20   pieces, the shanks we saw, were made out of the?

21      A.   I do not.

22      Q.   So you'd agree with me that, at this point,

23   it's indeterminate whether those shanks came from Mr.

24   Perez' walker, in your expert opinion?

25      A.   I cannot determine that, that's correct.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                           e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   Now, did you ever -- in your involvement in
 2   this case, did you ever tell the State Police to
 3   preserve Mr. Perez' walker?
 4        A.   No, I did not.
 5        Q.   Did you ever tell the New Mexico
 6   Corrections Department to preserve Mr. Perez' walker?
 7        A.   No, sir, I did not.
 8        Q.   Did you, in the documents you reviewed, see
 9   an instance in which someone told STIU or the New
10   Mexico Corrections Department to preserve Mr. Perez'
11   walker?
12        A.   I apologize.  Did I see a memo in regard --
13   did I see anything regarding --
14        Q.   A request to preserve Mr. Perez' walker?
15        A.   No, I did not.
16        Q.   And that goes to anyone.  Did you see a
17   request to anyone to preserve Mr. Perez' walker?
18        A.   Protocol would say that, if it was
19   collected, then it is preserved.  So insofar as
20   reviewing two protocols, the State, and then the New
21   Mexico Corrections facility --
22        Q.   I don't want to cut you off.
23        A.   Okay.
24        Q.   My question was:  Did you see, in the
25   documents you reviewed, a request to preserve Mr.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   Perez' walker?
 2        A.   Well, in my opinion, the protocol is -- I
 3   mean, you follow your protocol.  So a request from a
 4   named single individual, no.  But as far as following
 5   a protocol, then, yes.  If that makes sense.
 6        Q.   Not quite.  I think I understand what
 7   you're saying.  But I guess -- let me better phrase
 8   my question.  Did you see a request in the documents
 9   you reviewed from a person to another person or
10   entity asking to preserve Mr. Perez' walker?
11        A.   No, sir, I did not.
12             MR. BECK:  Pass the witness, Your Honor.
13             THE COURT:  All right.  Thank you, Mr.
14   Beck.
15             Any defendant have any recross they want to
16   do?
17             All right.  Ms. Fox-Young, do you have
18   recross of Ms. Schile?
19             MS. FOX-YOUNG:  Thank you, Your Honor.
20                        EXAMINATION
21   BY MS. FOX-YOUNG:
22        Q.   Ms. Schile, the prosecutor asked you if
23   you -- why you might want to see the video evidence
24   from earlier in the day, before the portion that was
25   preserved.  And you talked about the paperwork.  Is
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    there anything else going on in the pod that day that

2    you would want to see, if you could go back in time

3    and look at the video from before the time it was

4    preserved?  Would you want to look in any particular

5    cell?

6        A.   Well, I think that it would be helpful to

7    know what's going on throughout the day in that pod.

8    Again, if certain statements have been made about

9    allegations or corroborating allegations, I think

10   that you always want to go and see if you can do

11   that.

12       Q.   Okay.  And specifically, the allegations in

13   this case that somebody went in to Rudy Perez' cell

14   and took a piece which was subsequently fashioned

15   into shanks and used in the murder, would the video

16   evidence from earlier in the day tell you anything

17   about that?

18       A.   Absolutely.  It would tell you who is going

19   in and out of, you know, cells; how people are

20   carrying themselves; if it appears that things are

21   getting carried in and out.  All of that is a

22   possibility.  I can't tell you anything for sure,

23   because there was no video of such.  But I can say

24   what I would have hoped to have done, if I was doing

25   the crime scene.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Right.  And you told me for sure earlier

2   that there is direct line of sight from those cameras

3   into Rudy Perez' cell?

4      A.   Yes, I did.

5      Q.   Okay.  The prosecutor asked you about

6   comparing these shanks to the walker, and asked you,

7   I think, if you could be certain that they came from

8   a walker, if we had the walker and you could compare

9   threads.  And I think you said it would tell you

10  something, but you couldn't be certain.

11          If we had the walker, and you could examine

12  the walker, and you could order testing of the metal

13  pieces, these shanks and the walker, and do all the

14  other forensic testing that you described, or some

15  portion thereof, you could potentially exclude the

16  walker as a source of weapons; correct?

17     A.   Oh, absolutely.

18     Q.   Okay.  And so, if we had the walker with

19  us, while you might not be able to definitely say

20  with absolute certainty the pieces came from it, you

21  could definite exclude it, given certain results.

22     A.   I hate to use the word "definitely."  Yes,

23  it's absolutely possible that you would be able to

24  exclude it.

25     Q.   And I know you haven't done these tests.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    And we don't have the walker here to test?

2        A.   Yes.

3        Q.   But the prosecutor asked you:  You didn't

4    test the metal of these shanks.  And if we had the

5    walker, you'd want to test -- would you want to test

6    the metal on the shanks?

7        A.   Yes, absolutely.  And the walker itself.

8        Q.   Okay.  And I won't have you recite all the

9    other things that you have told me and told the

10   Government that you'd want to do.  But you have

11   already sort of run through that litany.  And is one

12   of the reasons that you'd want to do that, to exclude

13   the walker as a source of weapons?

14       A.   Yes, either include or exclude.

15            MS. FOX-YOUNG:  Thank you, Your Honor.  No

16   more questions.

17            THE COURT:  All right.  Thank you, Ms.

18   Fox-Young.

19            All right.  Ms. Schile, you may step down.

20   Thank you for your testimony.

21            THE WITNESS:  Thank you.

22            THE COURT:  Well, we're working on getting

23   an attorney for Mr. Wright.  We've got -- Ms. Wild

24   has got calls to three different attorneys.  The one

25   I had in mind, she had in mind, doesn't look like he



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   can do it.  So we're going to have to scramble.

2   They've all got telephone numbers, so if they get her

3   message, they can talk to her tonight.  And we'll try

4   to get somebody in place.

5          But let's break for the evening.  I

6   appreciate everybody's hard work.  Everybody be safe

7   on their travels.  And we'll see you in the morning.

8   Have a good evening.

9          (The Court stood in recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                    C-E-R-T-I-F-I-C-A-T-E

 2

 3    UNITED STATES OF AMERICA

 4    DISTRICT OF NEW MEXICO

 5

 6

 7         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

 8    Official Court Reporter for the State of New Mexico,

 9    do hereby certify that the foregoing pages constitute

10    a true transcript of proceedings had before the said

11    Court, held in the District of New Mexico, in the

12    matter therein stated.

13         In testimony whereof, I have hereunto set my

14    hand on December 14, 2017.

15

16

17

18         _____
           Jennifer Bean, FAPR, RMR-RDR-CCR
19         Certified Realtime Reporter
           United States Court Reporter
20         NM CCR #94
           333 Lomas, Northwest
21         Albuquerque, New Mexico 87102
           Phone:   (505) 348-2283
22         Fax:     (505) 843-9492

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com