1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5         VS.                    CR. NO. 15-4268 JB

6    ANGEL DELEON, et al.,

7         Defendants.

8                      VOLUME 2

9         Transcript of Motion to Suppress and James
     Hearing Proceedings before The Honorable James O.
10   Browning, United States District Judge, Las Cruces,
     Dona County, New Mexico, commencing on December 8,
11   2017.

12
     For the Government:  Ms. Maria Armijo; Mr. Randy
13   Castellano; Mr. Matthew Beck

14   For the Defendants: Ms. Sara Priddy; Ms. Cori
     Harbour-Valdez; Mr. Patrick Burke; Mr. Robert Cooper;
15   Mr. Jeff Lahann; Mr. Orlando Mondragon; Mr. John
     Granberg; Mr. Billy Blackburn; Mr. Scott Davidson;
16   Ms. Amy Jacks; Mr. Richard Jewkes; Ms. Amy Sirignano;
     Mr. Christopher Adams; Mr. Marc Lowry; Ms. Theresa
17   Duncan; Ms. Carey Bhalla; Mr. William Maynard; Mr.
     Ryan Villa; Mr. Donovan Roberts; Ms. Lisa Torraco;
18   Ms. Angela Arellanes; Mr. Samuel Winder

19
     For the Defendants (Via telephone):  Ms. James Castle
20

21

22

23

24

25


SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Let's get started.  It looks
 2      like everybody is here.  Everyone has got an
 3      attorney, ready to go.
 4              A couple of announcements.  Peter
 5      Giovannini will be coming over.  But I'm not sure I
 6      can get him over here till this afternoon to
 7      represent Jason Wright.  So I may have to work around
 8      him.  I think he's waiting for a state court verdict,
 9      so we'll work with his schedule.  But he'll be here
10      this afternoon.
11              As far as the defense lawyers, I am caught
12      up with CJA vouchers through November 30.  In my
13      view, that's not bad.  And then there is another
14      packet that I worked on yesterday that got Fed Ex'd
15      back to my office in Albuquerque.  So there will be
16      another batch that will hit probably today.  And then
17      there was a small batch that I didn't see in my
18      briefcase that I'll take back tonight.  That will be
19      in the chair and probably get processed on Monday.
20      So I'm waiting for a Fed Ex to come in today and it
21      may have some more vouchers.  But I'm working on
22      them, staying on top of them.  So if anybody has any
23      complaints or concerns, let us know, but I think
24      we're doing a pretty good job on that score.
25              All right.  How do you we want to shift
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   here, given that we're probably not going to have

 2   Giovaninni over here till noon?

 3            MR. VILLA:  Your Honor, we have one more

 4   witness to call, that may or may not obviate

 5   Mr. Wright.  But in response to the events of

 6   yesterday, we've got another witness to call.

 7            THE COURT:  All right.

 8            MR. VILLA:  Would you like us to proceed?

 9            THE COURT:  Yes, go ahead and call your

10   next witness.

11            MR. VILLA:  Mr. Perez calls Gary Ainsworth.

12            THE COURT:  Mr. Ainsworth, if you'll come

13   up and stand next to the witness box on my right,

14   your left.  Before you're seated, Ms. Standridge, my

15   courtroom deputy, will swear you in.

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                    GARY AINSWORTH,
 2        after having been first duly sworn under oath,
 3        was questioned and testified as follows:
 4                       EXAMINATION
 5             THE CLERK:  Please be seated and state your
 6   name for the record, spelling your last name.
 7             THE WITNESS:  My name is Gary Ainsworth.
 8   A-I-N-S-W-O-R-T-H.
 9             THE COURT:  Mr. Ainsworth.  Mr. Villa.
10             MR. VILLA:  Thank you, Your Honor.
11   BY MR. VILLA:
12        Q.   How are you employed?
13        A.   Private investigator.
14        Q.   Just briefly, can you tell me about your
15   professional background?
16        A.   Sure.  I've been a private investigator
17   since January 1, 2009.  Prior to that, I was a
18   Special Agent with ATF.  Retired from ATF in 2008,
19   after about 20 years.
20        Q.   And Mr. Ainsworth, did I hire you to
21   conduct investigation on behalf of Mr. Perez?
22        A.   Yes, sir.
23        Q.   And specifically with respect to Jason
24   Wright, can you tell me, did you conduct an
25   investigation?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes, sir.  I accompanied you to

2  Northeastern New Mexico -- I don't remember if it's

3  detention facility or correctional facility -- in

4  August, this past August, 2017.  And we interviewed

5  Mr. Wright.

6      Q.   So I want to ask you just a little bit

7  about that interview.  Mr. Wright did speak to us?

8      A.   Correct.

9      Q.   And just focusing on the issue of the

10  wheelchair program and walkers, did you interview

11  Mr. Wright about his memory of the type of walker

12  that Mr. Perez had on March 7, 2014?

13      A.   Yes, sir.

14      Q.   And just for background, where was Jason

15  Wright, as you understood it from the interview, on

16  March 7, 2014?

17      A.   In the same pod where Mr. Molina was

18  murdered.

19      Q.   And that's also the pod where Mr. Perez

20  was?

21      A.   Correct.

22      Q.   And what was Mr. Wright's memory of the

23  type of walker that Mr. Perez had?

24           MR. CASTELLANO:  Objection; calls for

25  hearsay.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Well, we're trying to figure
 2   out whether evidence should come in.  I think I
 3   better hear it.  Overruled.
 4        Q.   Can you answer?
 5        A.   He recalled the walker that Mr. Perez, that
 6   Rudy Perez used.
 7        Q.   Was he able to describe it?
 8        A.   He said he recalled it, and he described.
 9   Because he said it had, like, that middle seat in it.
10        Q.   Now, did Mr. Wright discuss whether he
11   worked in the wheelchair program around the time,
12   March 7, 2014?
13        A.   He did.  And he said that he did work in
14   the wheelchair program during that time.
15        Q.   And just briefly, what did he say that they
16   did in the wheelchair program?
17        A.   It was basically repairing and rehabbing
18   wheelchairs and walkers.
19        Q.   Now, he did say that they repaired and
20   rehabbed walkers?
21        A.   Correct.
22        Q.   Did he talk about whether the walkers that
23   he worked on and repaired bore any similarity to the
24   type of walker Mr. Perez had?
25        A.   Yes, sir, he did.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   What did he say?
 2        A.   He said there was up to 10 of them in the
 3   wheelchair program that were similar to Rudy Perez'
 4   walker.
 5             MR. VILLA:  May I have just a moment, Your
 6   Honor?
 7             THE COURT:  You may.
 8             MR. VILLA:  I'll pass the witness.
 9             THE COURT:  All right.  Thank you, Mr.
10   Villa.  Before the Government cross-examines, other
11   defendant have any questions of Mr. Ainsworth?
12             All right.  Mr. Castellano, do you have
13   cross-examination of Mr. Ainsworth?
14             MR. CASTELLANO:  Yes, Your Honor.  May I
15   have a moment?
16             THE COURT:  Mr. Castellano.
17                     EXAMINATION
18   BY MR. CASTELLANO:
19        Q.   Good morning, Mr. Ainsworth.
20        A.   Good morning.
21        Q.   When you interviewed Mr. Wright, did you
22   prepare any report or have any notes from that
23   interview?
24        A.   No, sir, no notes.
25        Q.   What do you have that recorded the essence
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    of the interviews?
 2         A.   The interview was recorded.  And --
 3         Q.   Are you able to produce that, a copy of the
 4    recording for us?
 5              MR. VILLA:  Your Honor, I mean, he can
 6    certainly answer the question.  But I believe that
 7    recordings of witness interviews are protected under
 8    Rule 16 from disclosure.  And he certainly has not
 9    relied on it to refresh his recollection for his
10    testimony.
11              MR. CASTELLANO:  We're able to see what the
12    witness used to refresh his recollection, Your Honor.
13              THE COURT:  He said he didn't.  You can ask
14    questions, but Mr. Villa said he didn't listen to it.
15    Is that what you said?
16              MR. VILLA:  What I meant to say is I didn't
17    ask him to refresh during the course of his
18    testimony, right?  I think if he forgot something and
19    he used it to refresh his recollection, the
20    Government would be entitled to it.  But I hadn't
21    asked him to do that during the course of the direct.
22              THE COURT:  Lay a little more foundation.
23    Let's see -- he may have some questions on that score
24    of Mr. Ainsworth, and we'll see what we're going to
25    do.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.    Mr. Ainsworth, what did you do to prepare

2    for your testimony today?

3          A.    Reviewed the recording.

4          Q.    And when was the last time you heard the

5    recording?

6          A.    Last night.

7          Q.    And so I take it you reviewed the recording

8    to refresh your recollection for testimony today?

9          A.    Correct.

10              THE COURT:  Well, I think he's entitled to

11   it then.

12              MR. VILLA:  Well, Your Honor, I think under

13   612, if it refreshes his recollection during his

14   testimony, they'd be entitled to it.

15              THE COURT:  I think if he did it in

16   preparation for the testimony, he's entitled to it as

17   well.

18              MR. VILLA:  So we can make arrangements to

19   provide it then.

20              THE COURT:  Okay.

21              MR. CASTELLANO:  Thank you, Your Honor.

22   BY MR. CASTELLANO:

23          Q.    Mr. Ainsworth, I'm going to show you what's

24   been admitted as Defendant's Rudy Perez' HH.  Can you

25   tell us whether this photo or a similar photo was

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

```
 1   shown to Mr. Wright?

 2        A.   It was not.

 3        Q.   So when you spoke to Mr. Wright, were you

 4   just basically testing his memory without the use of

 5   anything such as a photograph?

 6        A.   Well, we were asking him questions.  But I

 7   did not have that photograph in the interview.

 8        Q.   And so he described as -- a walker with

 9   kind of, as you described it, a seat in the middle;

10   is that accurate to say?

11        A.   I believe that was what he said, correct,

12   that it did have a seat.

13        Q.   And what did he say about having any

14   knowledge of whether or not Rudy Perez' walker was

15   used in any way in relation to the Molina murder?

16             MR. VILLA:  Objection, Your Honor.  Outside

17   scope.

18             THE COURT:  Overruled.

19        A.   I'm sorry.  Could you repeat it?

20        Q.   What did he say about his knowledge or his

21   belief about the use of Rudy Perez' walker in the

22   Molina murder?

23        A.   You know, it was a long interview, and

24   without -- I would be rather hesitant -- there may

25   have been something said about it.  I don't recall
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the exact details, though.

2        Q.   Did you listen to the entire recording last

3    night in anticipation of your testimony?

4        A.   No, I only listened to portions.

5        Q.   Which portions did you listen to?

6        A.   The portion where he talked about, I

7    believe, that there was ten walkers in the wheelchair

8    program that were similar to Mr. Perez'.  And there

9    was couple of other portions that I listened to also.

10        Q.   And when you say "similar," did you dig

11    down to what he meant by similar, in terms of were

12    they exact duplicates?  Were they also just walkers?

13        A.   I believe his words were they were exactly

14    the same, but -- and again, that's from my

15    recollection of it.

16        Q.   To the best of your recollection, you think

17    there were 10 exactly the same?

18        A.   I believe it was up to 10, is what he said,

19    that he recalled working on.

20            MR. CASTELLANO:  May I have a moment, Your

21    Honor?

22            THE COURT:  You may.

23        Q.   Okay.  And I understand I'm testing your

24    recollection here, Mr. Ainsworth.  What, to the best

25    of your recollection, what do you recall exactly what

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Mr. Wright told you about the walkers, starting with

 2   Mr. Perez' walker?

 3        A.   He recalled the walker.  He recalled that

 4   Mr. Perez relied on the walker to get around.  And

 5   then he spoke about the wheelchair program and what

 6   went on within the wheelchair program.  And I believe

 7   it was primarily that there was -- I believe he said,

 8   like, up to 10 walkers in the program that were like

 9   Mr. Perez'.

10        Q.   Okay.  What did he recall about the color

11   of the --

12             MR. VILLA:  I apologize for the

13   interruption.  Your Honor, Mr. Perez has to go to the

14   bathroom fairly urgently.  Can we take just a short

15   break?

16             THE COURT:  All right.  Let's just wait for

17   a second.

18             (The Court stood in recess.)

19             MR. VILLA:  Your Honor, the U.S. Marshals

20   wanted me to let you know Mr. Perez is having some

21   intestinal problems.  That's what's going on right

22   now.  I just wanted you to know that.

23             THE COURT:  All right.  We'll just have to

24   gut through it.

25             MR. VILLA:  Thank you, Judge.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. CASTELLANO:  It's so early.
 2              (The Court stood in recess.)
 3              THE COURT:  All right.  Let's go back on
 4   the record.
 5              All right.  Mr. Ainsworth, I'll remind you
 6   you're still under oath.
 7              Mr. Castellano, if you wish to continue
 8   your cross-examination of Mr. Ainsworth.
 9   BY MR. CASTELLANO:
10       Q.   Okay.  Mr. Ainsworth, tell us about the
11   dimensions -- well, first of all, the size of Rudy
12   Perez' walker, as related to you?
13       A.   I'm sorry, I couldn't -- I don't think
14   you're speaking into the mic.  I couldn't hear you
15   back here.
16       Q.   Tell us about the size of Rudy Perez'
17   walker as it was relayed to you by Mr. Wright.
18       A.   I don't think he gave the size.
19       Q.   Or the shape or the dimensions?
20       A.   I don't think he gave any of that either.
21       Q.   What about the same questions as to those
22   that were in the wheelchair program?
23       A.   None of that either.
24       Q.   Was there any discussion about Mr. Wright
25   bringing shanks into the pod from the wheelchair
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    program?
 2         A.   There was a discussion about shanks, and
 3    how they could have been brought in from the
 4    wheelchair program.
 5         Q.   Okay.  Tell us about that, please.
 6              MR. VILLA:  Objection; outside the scope.
 7              THE COURT:  Well, I think that it's within
 8    the scope.  Overruled.
 9         A.   And I'm sorry, you wanted to know again --
10         Q.   Yes, tell us about the discussion of shanks
11    being brought into the pod.
12         A.   I believe that what he said was that when
13    you worked in the wheelchair program, there were
14    times when you were searched, and I believe he said
15    there were times when you weren't.  And to the best
16    of my recollection, when you went to the restroom,
17    when you were working at the wheelchair program,
18    there were times that you were not searched.  So I
19    believe it would be possible then -- I'm paraphrasing
20    here -- but to possibly put shanks in the restroom,
21    and somehow coordinate with the folks in the laundry,
22    to have shanks brought back in.  And again that's
23    paraphrasing, so --
24         Q.   Was it your understanding that he was
25    either a current or former SNM Gang member?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I believe so, yes, sir.  I don't remember
 2   if he told me that or not.  But just from the fact
 3   that he was in that pod, that was my understanding.
 4        Q.   All right.  That would have been an SNM
 5   pod; is that correct?
 6        A.   From my understanding.
 7             MR. CASTELLANO:  Pass the witness, Your
 8   Honor -- no, I don't.
 9        Q.   Did Mr. Wright admit to you that he brought
10   shanks into the pod?
11        A.   I don't believe that he did.
12        Q.   Is that your best recollection today; is
13   that correct?
14        A.   That's correct.  And like I said, I did
15   bring -- there is a recording, so --
16        Q.   Do you know when you might be able to
17   produce that recording for us?
18             MR. VILLA:  Your Honor, I have it.  I'm
19   happy to produce it, so we don't have to put the onus
20   on Mr. Ainsworth.
21             THE COURT:  Okay.
22             MR. CASTELLANO:  That's fine, Your Honor.
23             THE COURT:  All right.
24             MR. CASTELLANO:  I pass the witness.
25             THE COURT:  All right.  Thank you,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Castellano.

2              Anybody else have any redirect of Mr.

3    Ainsworth?

4              All right.  Mr. Villa, if you wish to

5    conduct redirect?

6                    REDIRECT EXAMINATION

7    BY MR. VILLA:

8         Q.   Mr. Ainsworth, did you or I ever ask

9    Mr. Wright whether he, himself, brought shanks into

10   the pod?

11        A.   I don't think we did.

12        Q.   I just want to back up a little bit.  You

13   were aware, because you've been working on this case,

14   that we were having this hearing this week?

15        A.   Correct.

16        Q.   And in advance of that hearing, did I ask

17   you to come down and testify?

18        A.   Yes.

19        Q.   Well -- and I don't mean today.  I mean,

20   this week, prior to this week?

21        A.   Prior to this week, no.  You asked me --

22   you called me last night, I believe, about 6:30, 6:00

23   or 6:30 to come testify today.

24        Q.   So prior to 6:30 last night, had you

25   anticipated testifying today?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1        A.   I did not.
 2        Q.   About when was the interview of Mr. Wright?
 3        A.   August of 2017; August 18, I believe.
 4        Q.   And since that time, have you conducted
 5   many other interviews?
 6        A.   Yes, I have.
 7             MR. VILLA:  That's all the questions.
 8             THE COURT:  Thank you, Mr. Villa.
 9             All right.  Mr. Ainsworth, you may step
10   down.  Thank you for your testimony.
11             What do you want to do with Mr. Wright?
12   Are you satisfied with the record where it is now,
13   and we can move beyond Mr. Wright?  Do you want to
14   pick him up this afternoon?
15             MR. VILLA:  May I have one moment?
16             THE COURT:  Sure.
17             MR. VILLA:  Your Honor, see if maybe this
18   proposal would work.  I think that the Government
19   intends to put on a couple of witnesses.  Can we
20   reserve Mr. Wright and see what happens?
21             THE COURT:  Sure.  Are you done, otherwise,
22   other than Mr. Wright?
23             MR. VILLA:  Yes, Your Honor.
24             THE COURT:  All right.  Anyone else have
25   anything they want to put on as far as witnesses or
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    evidence on this motion to suppress?  All right.  Mr.
 2    Castellano, does the Government -- Ms. Armijo, does
 3    the Government wish to put on any witnesses or
 4    evidence?
 5              MS. ARMIJO:  Yes, we're going to call James
 6    Mulheron.
 7              THE COURT:  Mr. Mulheron, if you'll come up
 8    and stand next to the witness box on my right, your
 9    left.  Before you're seated, my courtroom deputy, Ms.
10    Standridge, will swear you in.
11                        JAMES MULHERON,
12        after having been first duly sworn under oath,
13        was questioned and testified as follows:
14                      DIRECT EXAMINATION
15              THE CLERK:  Please be seated.  State your
16    name, spelling it for the Court.
17              THE WITNESS:  James Mulheron,
18    M-U-L-H-E-R-O-N.
19              THE COURT:  Mr. Mulheron.  Ms. Armijo.
20    BY MS. ARMIJO:
21        Q.   Mr. Mulheron, where are you employed?
22        A.   Southern New Mexico Correctional Facility.
23        Q.   And how long have you worked for -- so do
24    you work for New Mexico Corrections Department?
25        A.   Yes, ma'am, I do.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1         Q.    And how long have you worked for them?

 2         A.    Twenty-five years.

 3         Q.    And what is your current position?

 4         A.    Warden at the facility.

 5         Q.    Okay.  And when you say "Southern New

 6   Mexico Correctional Facility," is that commonly known

 7   as "Southern"?

 8         A.    Yes, it is.

 9         Q.    And that is different from what is known as

10   South, which is part of the Penitentiary of New

11   Mexico; correct?

12         A.    Correct, it is different.

13         Q.    And back in March of 2014, where were you

14   working with Corrections?

15         A.    I was a Deputy Warden at the Southern New

16   Mexico Correctional Facility.

17         Q.    And were you working on March 7, 2014, when

18   Javier Molina was killed?

19         A.    I had worked that day.  The incident was

20   after hours.

21         Q.    And were you called in that evening?

22         A.    Yes, I was.

23         Q.    Now -- and did you assist -- or why don't I

24   ask you:  What did you do when you were called in?

25         A.    Basically, responded to the facility.  We
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   ensured that the crime scene was secure and that we

 2   had proper security in the housing unit.

 3        Q.   And then, after that, did you assist with

 4   the investigation as needed?

 5        A.   As needed, yes, ma'am.

 6        Q.   Were you ever made aware that shanks were

 7   recovered?

 8        A.   I was.

 9        Q.   And did you assist in the investigation

10   that night or early morning in reference to shanks?

11        A.   That evening, yes, ma'am.

12        Q.   And can you tell us what you did?

13        A.   One of the things we did, I went to the

14   wheelchair restoration program.

15        Q.   Can you tell us what that is?  I think

16   we've heard a lot about it, but I don't know that

17   anybody has explained what it is.

18        A.   It's a program where the facility receives

19   wheelchairs, walkers that are in bad condition.

20   Those wheelchairs and walkers are then restored to

21   like-new condition.  Once we get a significant load

22   of them, say 200, those wheelchairs are shipped to

23   third world countries.  And the work is performed by

24   inmates.

25        Q.   So the inmates are not working on
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    wheelchairs for people in Corrections, are they?

2         A.   No, ma'am.

3         Q.   Okay.  So it's a program to basically allow

4    inmates to work on something to send to third world

5    countries?

6         A.   A couple reasons we do it.  One is to give

7    employment to inmates, and also the goal is that the

8    inmates give something back to other people, that

9    they're doing something useful.

10        Q.   Now, why that night did you decide to go

11   and look at the area where the wheelchair program is?

12        A.   Based on what the shanks looked like, they

13   weren't -- to me, they felt something consistent with

14   the wheelchair piece, a walker piece.  We had, I

15   believe, three or four inmates that lived in that pod

16   that were employed in that program.  So it kind of

17   made sense that we would go look in the wheelchair

18   program, where they have access to the metal.

19        Q.   Off the top of your head, do you remember

20   the inmates in that program?

21        A.   No, ma'am, I don't remember who they were.

22        Q.   But at least that night you were made aware

23   of that fact?

24        A.   Yes, I was.

25        Q.   And had you had an opportunity that evening

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to actually look at the shanks that were recovered?

2       A.   I believe I looked at photographs of the

3   weapons recovered.

4       Q.   And just for the record, what is a shank?

5       A.   It's a homemade weapon, made of metal,

6   wood.  It's any kind of a piece of contraband

7   fashioned into a weapon.

8       Q.   Now, so then you went into the area, and

9   what did you observe?

10      A.   We did a thorough search of the wheelchair

11  restoration area.  We didn't find any of the metal in

12  there consistent with the shanks that were recovered

13  in the unit.  And what I mean, like they weren't

14  consistent, as the shanks were black in color.  None

15  of the wheelchairs or walkers had any kind of metal

16  on them that were black, that were consistent with

17  that color.

18      Q.   Now, do you remember if there were any

19  walkers on March 7?  Let me ask you, did do you it

20  late on March 7 or early March 8?

21      A.   I couldn't tell you.  It would have been

22  late at night or early, early morning the 8th.

23      Q.   And during that search of the wheelchair

24  program area, did you find any walkers?

25      A.   I believe at that time there was maybe two

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  walkers in there.  All the other were wheelchairs.

2      Q.   And were there any missing pieces from

3  those walkers?

4      A.   No, those two walkers were intact.

5      Q.   And after that -- and you say that not only

6  you but other people did the search with you?

7      A.   Yes, ma'am.

8      Q.   Now, after that night, at some other time,

9  did you do further looking into the situation with

10  the shanks?

11     A.   Yes.

12     Q.   And why don't you tell us about that.

13     A.   I'd say a couple days later, a week or so,

14  as the investigation was still going on, and they

15  still hadn't located where the shanks had been taken

16  from, or made from, I remember that there was an

17  inmate in that pod that had a walker.  By off chance,

18  I went in there and talked to the inmate.

19     Q.   And who was that inmate?

20     A.   It was Rudy Perez.

21     Q.   All right.  And you went in to go see him?

22     A.   Yeah.  I was doing my rounds at the

23  institution.  So when I got --

24     Q.   Explain what your rounds are, what you do

25  you do.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   As a Warden or a Deputy Warden, you do
 2   weekly rounds in Level 6 units, housing units,
 3   program areas, basically check on the conditions, you
 4   make yourself available.
 5        Q.   And so during the rounds -- and do you do
 6   the rounds in the morning, afternoon, at night?  When
 7   do you do them?
 8        A.   Typically, first thing in the morning
 9   between 8:00 and 10:00 a.m.
10        Q.   And so what did you -- you indicated that
11   you went to go talk to Mr. Perez?
12        A.   Yeah, as far as my rounds, eventually I got
13   to the housing unit that he was in.  So I decided --
14   I talked to Mr. Perez.  Naturally, I opened the door.
15   I went in.  His walker was present.
16        Q.   Okay.  Now, I'm going to stop you there.
17   What housing unit was he in?
18        A.   That I remember, it was housing unit 2 A.
19        Q.   Okay.  Now, was that a different housing
20   unit than he was in on March 7, the day of the
21   murder?
22        A.   Yes.  He was in housing unit 1 A the night
23   of the murder.
24        Q.   And so when you went to go see him, he was
25   in 2 A.  Where is that, you know, in connection
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    with -- or how far away is that from where he was?
 2         A.    It's a couple hundred yards away from the
 3    previous housing unit.
 4         Q.    Is it in the same building?
 5         A.    No, it's a separate building.
 6         Q.    Okay.  So you went to go see him, and -- in
 7    his cell; is that right?
 8         A.    Yes, ma'am, that's correct.
 9         Q.    And what did you see?
10         A.    The walker was there.  And the first thing,
11    I looked at the walker, and I did observe a piece of
12    metal missing.
13         Q.    All right.  And did you talk to him about
14    that?
15         A.    I did.  You know, initially, I asked Mr.
16    Perez what happened to the metal.  At first he told
17    me he didn't know, and, you know, didn't know what I
18    was talking about.  I asked him a few more times, and
19    he told me, "They took it."
20         Q.    Okay.  And did you ask who took it?
21         A.    I asked him who took it.  Again, initially,
22    he didn't want to answer.  And then he finally told
23    me -- I can't remember exact words, but he said, No
24    disrespect, but they told me, if I said anything,
25    I'll be next.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.   And did he indicate to you anything
 2   as far as how he would deal with the issue?
 3        A.   No.
 4        Q.   Based on that, what did you do?
 5        A.   Based on that, I left the housing unit.   I
 6   directed -- I don't know who it was, one of the
 7   officers -- to bring the walker up to my office.   And
 8   at that point, I contacted STIU Ruben Archuleta.
 9        Q.   Why did you contact him?
10        A.   To take photographs of the walker.
11        Q.   Now --
12             MS. ARMIJO:   I'm going to mark for evidence
13   Exhibits 27, 28, and 29, which are similar to defense
14   exhibits, except they have a sticker on them.   So
15   I'll move for their admission.
16             THE COURT:   Any objection?
17             MR. VILLA:   No, Your Honor.
18             THE COURT:   Any objection from any other
19   defendants?   Not hearing any, Government's Exhibits
20   27, 28, and 29 will be admitted into evidence.
21        Q.   All right.   And I'm showing you Exhibit
22   Number 27.   Can you see that photograph?
23        A.   Yes, ma'am.
24        Q.   All right.   And I'm looking at the top
25   here.   There is a sticker on it.   And do you have any
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                    e-mail: info@litsupport.com

1    reason to believe that -- so you indicated that you

2    had STIU Officer Ruben Archuleta take the

3    photographs?

4          A.   Yes, ma'am.

5          Q.   All right.   And did you do anything -- did

6    you direct anyone to do anything with the walker

7    prior to him taking pictures of it?

8          A.   No, I did not.

9          Q.   Did somebody move it from the cell to

10   another location?

11         A.   Yes.

12         Q.   Okay.   And how did that happen?

13         A.   Correctional officer -- the housing, the

14   rover picked it up and took it from the cell to my

15   office.

16         Q.   All right.   And then did Ruben Archuleta

17   actually take a photograph of it?

18         A.   Yes, ma'am.

19         Q.   And then, did you make any further requests

20   at that time?

21         A.   Yeah.   I believe I contacted STIU, and I

22   believe it was Officer Ernie Holguin, and I provided

23   him with that additional information I got from Rudy

24   Perez.

25         Q.   And what did you ask him to do?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Conduct an interview.
 2        Q.    And after that, did you -- was that your
 3   way of getting follow-up done on it, so to speak?
 4        A.    Yes, ma'am, that was my follow-up.
 5        Q.    Now, do you know what happened to the
 6   walker?
 7        A.    I do not know, ma'am.
 8        Q.    Did it stay in your office for some period
 9   of time, or you don't know?
10        A.    No.  I really don't remember.  I don't
11   believe it did.
12        Q.    Okay.  And as I'm showing these pictures,
13   is that how it appeared?  I'm showing Exhibit 28.  Do
14   you know what we're looking at here?
15        A.    Yes, ma'am, I do.
16        Q.    What is it we're looking at?
17        A.    The bottom of a walker, the cross-members,
18   the support things.  I'm not sure what the
19   terminology would be.  But the two pieces -- those
20   are actually two separate pieces of metal that are
21   tied together.
22        Q.    Okay.  And when you say -- and I'm showing
23   you Exhibit 29.  What is it that we're looking at?
24        A.    It's another view of the cross-member.
25   They're tied together with -- I forget what it was, a
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    washcloth or something.  The missing piece of metal

2    would have run from one side to the other and would

3    have held those two pieces together.

4        Q.   Okay.  So you say "from one side to the

5    other," you mean where this -- and I'm looking at the

6    photograph, on the left side where there is a white

7    piece of cloth, to the other side; is that correct?

8        A.   That's correct.

9        Q.   And is that what was obvious to you when

10   you went in the cell?

11       A.   Yes.  The first thing that brought my

12   attention to it was the way it was tied off.  And

13   then I looked down, and that cross-member was

14   missing.

15       Q.   Now, you indicated that there was a couple

16   other walkers in the wheelchair program.  Were they

17   the same color or were they a different color?

18       A.   No, ma'am.  And that's one of the things;

19   the two that were in that program were stainless

20   steel, where this one was painted black.

21       Q.   Okay.  So --

22       A.   And they were different models, they were

23   stainless steel.

24       Q.   As we're looking at -- and I'm putting up

25   Exhibit 27.  Were there any walkers in the wheelchair

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    program when you did your review of it March 7/8 that
 2    were consistent with the wheelchair that is depicted
 3    on Exhibit 27?
 4         A.   No, there was not.
 5         Q.   And just so that we're clear, Exhibit 27,
 6    whose wheelchair was this?
 7         A.   That was Rudy Perez.
 8              MS. ARMIJO:  And if I may just have one
 9    moment, Your Honor?
10              THE COURT:  Certainly.
11         Q.   Now, are you also familiar with the video
12    system that was in place at Southern back in March of
13    2014?
14         A.   Somewhat familiar with it.
15         Q.   Specifically, are you familiar with how
16    long the retention was?
17         A.   Yes, ma'am.
18         Q.   And explain to us how long the taping, so
19    to speak, or the video portion would be retained?
20         A.   Typically, we retained anywhere from 22 to
21    about 50 days of video.  It would depend on which
22    DVR; if a DVR had 10 cameras hooked up to it or five
23    cameras, which would kind of determine the retention
24    on it.
25         Q.   And would how active an area also determine
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   the retention?

2        A.   It could.  The more area, the more

3   movement, the more storage space it will take up,

4   versus if a camera was just pointed off into, say,

5   the rec yard, where there is limited movement.

6        Q.   And so why does it not retain?  Does it

7   tape over it, or what happens?

8        A.   Yeah, because of the storage space that

9   would be required to retain anything more than that,

10  basically what the system does -- anywhere from 22 to

11  50 days it will start recording over it.

12       Q.   Now, is there -- and I believe the defense

13  has marked one -- is there a policy for retaining

14  that footage that's just there recorded?

15       A.   No, ma'am.

16       Q.   Okay.  Now, I believe yesterday the defense

17  had pointed out in one of the policies that there is

18  a 10-year retention of something -- of either DVDs or

19  CDs.  Do you know what that's in reference to?

20       A.   I would view that in reference to if there

21  is actually an incident with a misconduct report, and

22  you're going to use the video recording as evidence,

23  so you would download it onto a disc, and the

24  retention for that disc would be the 10 years.

25       Q.   All right.  So just so that we're clear,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Corrections is not required to keep all footage that
 2    they ever record in all facilities for 10 years, are
 3    they, by policy?
 4         A.   No, ma'am, we are not.
 5         Q.   Okay.  It's just items that are downloaded
 6    and kept as part of either an investigation, or for
 7    whatever reason?
 8         A.   Investigation criminal matter, in-house
 9    behavioral management problem, something that that
10    item is going to be used as evidence.
11              MS. ARMIJO:  All right.  I have no further
12    questions.  Thank you.
13              THE COURT:  Thank you, Ms. Armijo.
14              Let me see if any of the defense lawyers
15    have questions of Mr. Mulheron before Mr. Villa does.
16              All right.  Mr. Villa, if you wish to
17    conduct cross-examination of Mr. Mulheron, you may do
18    so at this time.
19              MR. VILLA:  Thank you, Your Honor.
20              THE COURT:  Mr. Villa.
21                        EXAMINATION
22    BY MR. VILLA:
23         Q.   Good morning, Mr. Mulheron.
24         A.   Good morning.
25         Q.   So let me make sure I understand.  You
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   don't know what happened to the walker?

 2        A.   No, sir, I don't.

 3        Q.   It was brought to your office?

 4        A.   Yes, it was.

 5        Q.   After you went to Mr. Perez' cell and spoke

 6   to him?

 7        A.   Yes.

 8        Q.   After the Javier Molina murder?

 9        A.   Yes.

10        Q.   Within -- I think you testified -- it was a

11   week or so; is that right?

12        A.   I believe it was a week or so.

13        Q.   And you asked STIU Officer Archuleta to

14   photograph the walker?

15        A.   I did.

16        Q.   In your office?

17        A.   Yes.

18        Q.   Because you thought it was important?

19        A.   Yes.

20        Q.   You thought it might have something to do

21   with this Molina homicide?

22        A.   Possibly.

23        Q.   Okay.  And this is, well, almost three

24   years ago; a little less than three years ago?  A

25   long time ago, right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

    1        A.   Right.

    2        Q.   But you don't know what happened to the

    3   walker?

    4        A.   I don't.

    5        Q.   You don't know where it went?

    6        A.   I do not.

    7        Q.   But you seem to remember pretty clearly the

    8   details about the two other walkers that were in the

    9   wheelchair program; do I understand that right?

   10        A.   Yes, you do.

   11        Q.   Okay.  That memory is good?

   12        A.   I remember that, yes, sir.

   13        Q.   All right.  Let me ask you this:  Did you

   14   document taking Mr. Perez' walker from him?

   15        A.   I did not.

   16        Q.   Why not?

   17        A.   I didn't see no reason in it.

   18        Q.   I'm sorry?

   19        A.   I didn't see no reason to document that I

   20   took it.

   21        Q.   Well, it's true that there is a policy for

   22   confiscation of inmate property, isn't there?

   23        A.   There is.

   24        Q.   And doesn't that policy say that you're

   25   supposed to give an inmate a receipt when you

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                 1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

```
 1    confiscate their property?
 2         A.   Well, I don't think it addresses State
 3    property.
 4         Q.   I'm sorry?
 5         A.   The walker was State property.
 6         Q.   Okay.  Did you think that it might have
 7    been important to document potential evidence in a
 8    homicide?
 9         A.   I did.  Like I said, that's why I contacted
10    STIU.
11         Q.   At the time, you were the Deputy Warden?
12         A.   Correct.
13         Q.   Let me make sure I have this right.  You
14    think that you went to see Mr. Perez about a week
15    after?
16         A.   Yes.
17         Q.   So the homicide occurred March 7?
18         A.   Correct.
19         Q.   And the week after would have been
20    approximately March 14?
21         A.   Yes.
22         Q.   You don't think it was sooner than that?
23         A.   I don't -- that I recall, it was March 14.
24         Q.   That you saw Mr. Perez?
25         A.   Yes.
```

SANTA FE OFFICE                                                                      MAIN OFFICE
119 East Marcy, Suite 110                                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                                             Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   All right.  And then you asked Mr. Holguin
 2   to go interview him?
 3        A.   I did.
 4        Q.   Do you know how soon Mr. Holguin
 5   interviewed Mr. Perez after you asked him to do that?
 6        A.   I do not.
 7        Q.   Did you see a memo or documentation from
 8   Mr. Holguin about his interview?
 9        A.   Not that I recall.
10        Q.   Did he report back to you after he
11   conducted the interview?
12        A.   No.
13        Q.   Now, you were aware that the State Police
14   were conducting investigation into this homicide,
15   right?
16        A.   Correct.
17        Q.   And actually, there were some briefings
18   that took place in connection with their
19   investigation?
20        A.   I'm sure there were.
21        Q.   Were you present at those briefings?
22        A.   I could have been.  I don't recall.  I
23   probably was, but I don't recall specifically.
24        Q.   Okay.  Well, let's assume for sake of
25   argument that there might have been more than one.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Do you think you attended more than one briefing?

2         A.   I probably did.

3         Q.   Okay.  And you attended at least one

4    briefing?

5         A.   Yeah, absolutely.

6         Q.   And maybe two?

7         A.   I would say I did, at least one.

8         Q.   And at that briefing, members of the State

9    Police were present?

10        A.   Correct.

11        Q.   Did that also include Agent Palomares?

12        A.   I believe so.

13        Q.   Now, were you aware of what happened with

14   the video of the Javier Molina homicide, how that was

15   captured and provided to the State Police?

16        A.   No, I do not.

17        Q.   You didn't have any involvement in that?

18        A.   No.

19        Q.   Let me back up just a little bit.  Did you

20   review anything to prepare for your testimony today?

21        A.   Actually, I don't believe I reviewed

22   anything.  Well, I reviewed a memorandum on the

23   cameras, on which cameras were operational and not

24   operational.

25        Q.   Cameras within the blue pod?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    That was facility-wide.

 2          Q.    Oh, facility-wide?

 3          A.    Yes.

 4          Q.    And where is that memorandum?

 5          A.    I believe it's in the room in the back.

 6          Q.    Who prepared that memorandum?

 7          A.    I think it was Deputy Warden Edgman.

 8          Q.    Why did you review that?

 9          A.    Just to see what cameras were working or

10    not, so I would be familiar with -- if I was asked

11    which cameras were working that day of the murder, I

12    would know.

13          Q.    Did you review anything else?

14          A.    No.

15          Q.    Did you meet with members of the

16    prosecution team before your testimony?

17          A.    Yes, I did.

18          Q.    When did you do that?

19          A.    This morning.

20          Q.    And was that to discuss your testimony this

21    morning?

22          A.    It was.

23          Q.    Did you meet with them before this morning

24    regarding this case?

25          A.    No, I haven't.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   This was the first time?

 2        A.   This is the first time I've met them.

 3        Q.   And that includes the three attorneys here

 4   sitting at the counsel table, as well as FBI Agent

 5   Acee?

 6        A.   Yes.

 7        Q.   Did you bring anything else with you

 8   besides that memorandum you just discussed?

 9        A.   No.

10             MR. VILLA:  Your Honor, I'd ask that the

11   Court ask Mr. Mulheron to produce that memorandum.

12             THE COURT:  Any thoughts on that, Ms.

13   Armijo?

14             MS. ARMIJO:  Your Honor, he didn't bring

15   it.  I gave it to him.  He actually is filling in --

16   was coming in to fill in for a witness that we had

17   coming from Santa Fe, but was snowed in.  And so I

18   don't mind giving it to them.

19             THE COURT:  Mr. Villa, I think she's

20   handing you the memo.

21             MS. ARMIJO:  I provided it to him.  But I

22   believe we've called in the person that wrote the

23   memo to come testify, and he's on his way here.

24             MS. JACKS:  Is there a Bates number on

25   that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. ARMIJO:  It is not.  It's not been
 2    disclosed.
 3    BY MR. VILLA:
 4         Q.   Mr. Mulheron, when you went to Mr. Perez'
 5    cell, you testified that he was in a different pod;
 6    correct?
 7         A.   Correct.
 8         Q.   And which pod was that again?
 9         A.   The pod, I don't know specifically.  I
10    think it was blue pod.  But the housing unit was 2 A,
11    housing unit 2 A.
12         Q.   So the homicide was housing unit 1 A where
13    Javier Molina was allegedly murder, right?
14         A.   Correct.
15         Q.   In blue pod housing unit 1 A?
16         A.   Yes.
17         Q.   And when you went to see Mr. Perez, it was
18    in housing unit 2 A; you're not sure which pod?
19         A.   Right.  I'm not sure.  I believe it was
20    blue pod also.
21         Q.   Which cell was it?
22         A.   I don't recall.  It was on the top tier.
23         Q.   He was on the top tier?
24         A.   Or the bottom, I don't remember.
25         Q.   So you don't remember which tier?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.
 2        Q.   Did you take a photograph of the walker as
 3   it was in Mr. Perez' cell?
 4        A.   I did not.
 5        Q.   And I think, if I understand correctly, you
 6   didn't actually take the walker; you had Officer
 7   Archuleta do that?
 8        A.   No, I had a housing unit officer take it.
 9        Q.   The housing unit officer in that pod?
10        A.   Yes.
11        Q.   He took it to your office?
12        A.   Correct.
13        Q.   Okay.  It's your testimony that this is the
14   walker -- I'm showing you Government's Exhibit 27 --
15   that was taken to your office?
16        A.   Yes.
17        Q.   Was that in your office?
18        A.   It appears to be.  Well, yeah, it's in my
19   office.
20        Q.   Your office have wood paneling on the
21   walls?
22        A.   Yes.
23        Q.   And I'll show you another picture, Exhibit
24   29.  Do you recognize that carpeting from your
25   office?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.    I do.

 2        Q.    Now, there is stickers here on the top that

 3   indicate it's from Inmate Rudy Perez; it has a date,

 4   a time, who the photo was taken by.  Do you know

 5   where this particular photo with the stickers on it

 6   came from?

 7        A.    Ruben Archuleta.

 8        Q.    Do you know how they came to be in the

 9   Government's possession in this case?

10        A.    I don't.

11        Q.    When was the last time you saw these

12   photographs?

13        A.    This morning.

14        Q.    When was the first time you saw these

15   photographs?

16        A.    I would say -- I don't know the first time.

17        Q.    Okay.  So you did review these photographs

18   before your testimony?

19        A.    I did, yes.

20        Q.    So aside from the memo about the cameras,

21   and these photographs, did you review anything else

22   for your testimony?

23        A.    No.

24        Q.    How long did the walker stay in your

25   office?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't remember.
 2        Q.   Do you know where the walker was from the
 3   time of Mr. Molina's homicide until you had the
 4   housing officer take it from Mr. Perez?
 5        A.   No, I don't.
 6        Q.   Now, would you agree with me -- maybe you
 7   can't see it quite as well in 27 -- but in 29, it
 8   looks like the outer metal parts of the walker, for
 9   lack of a better word, have some kind of coloring,
10   red or black coloring?
11        A.   Yes.
12        Q.   Do you see that there?
13        A.   Are you talking about the pieces as a
14   whole, or --
15        Q.   Yeah, it's like it's painted or something,
16   decorative painting?
17        A.   I see black.
18        Q.   Okay.  So let me like direct your attention
19   to -- see where I put the arrow?
20        A.   Right.
21        Q.   So that post appears to me to have two
22   different colors on it, maybe a shade of red and
23   black?
24        A.   It's hard to say.  Possibly looks like a
25   flash from the camera.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Okay.

 2        A.    I think my copy is a little darker.

 3        Q.    Let me show you --

 4        A.    As far as it's coming up on the screen.

 5        Q.    Maybe it's the screen.

 6              MR. VILLA:  May I approach, Your Honor?

 7              THE COURT:  You may.

 8        Q.    See if that looks a little better.

 9        A.    Okay.

10        Q.    Does it look like it has some red coloring

11   on there?

12        A.    It looks like it possibly could.

13        Q.    Do you remember that's what it looked like?

14        A.    I remembered it as being black.

15        Q.    You talked about the alleged shanks that

16   were recovered.  You didn't actually see the shanks

17   yourself; you saw photographs of them?

18        A.    Correct.

19        Q.    Let me show you Defendants' RP-BB.  Do you

20   recognize that?

21        A.    Yes, I do.

22        Q.    Does that look like one of the shanks that

23   was recovered?

24        A.    It does.

25        Q.    I'm going to show you a closer up picture
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    of that RP-DD.  Do you remember seeing a picture like
 2    that?
 3         A.   I believe I might have, yes.
 4         Q.   And I don't know, maybe the glare is not
 5    any good, but can you see any coloring near the tip
 6    of the shank, where I've put the arrow there?
 7         A.   It appears to be blue.
 8         Q.   Blue, okay.
 9              You did not try to -- well, we know you
10    didn't because you never got the shanks; correct?
11         A.   Correct.
12         Q.   Did you ever ask anybody to look at the
13    shanks and see if they matched or were similar to the
14    metal on Mr. Perez' walker?
15         A.   No, I did not.
16         Q.   And do you know if anybody actually tried
17    to do that?
18         A.   No, I do not know that.
19         Q.   Have you ever had potential evidence of a
20    homicide in your office before?
21         A.   I don't believe so.
22         Q.   Have you ever had evidence of any crime in
23    your office before?
24         A.   I doubt it.
25         Q.   I'm sorry?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                        e-mail: info@litsupport.com

```
 1          A.   I doubt it.
 2          Q.   Is there any procedure that you have for
 3   handling evidence that you have in your office?
 4   Like, what's supposed to happen to it?
 5          A.   Typically, it would be taken in possession
 6   by whoever is investigating it.
 7          Q.   That would be, in this case, the State
 8   Police?
 9          A.   The State Police or STIU.
10          Q.   All right.  But you don't know what
11   happened to the walker at your office?
12          A.   No, I don't.
13          Q.   One day it was there; one day it wasn't?
14          A.   It was there.  I know somebody picked it
15   up.  I believe it was Officer Ernie Holguin.  But I
16   couldn't tell you a hundred percent.
17          Q.   Do you know if Officer Holguin documented
18   in any way his dealings with this walker?
19          A.   No, I don't.
20          Q.   What about Officer Archuleta?
21          A.   I don't know if he did or not.
22          Q.   So you haven't seen any documentation
23   demonstrating a chain of custody for this walker?
24          A.   No.
25          Q.   When you went over to the wheelchair
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                      e-mail: info@litsupport.com

```
 1    program, and you say you saw just a couple of
 2    walkers, did you take photographs of them?
 3         A.   No.
 4         Q.   Did you measure them in any way?
 5         A.   No.
 6         Q.   What about Mr. Perez' walker, did you
 7    measure it in any way?
 8         A.   I did not.
 9         Q.   Did you ask anybody else to?
10         A.   No, I didn't.
11         Q.   Same question with the ones in the
12    wheelchair program.  Did you measure those, or did
13    you ask anyone else to measure those?
14         A.   No, I did not.
15         Q.   Now, the reason you took the walker is you
16    thought perhaps it might have been related to the
17    homicide of Javier Molina, right?
18         A.   Yes.
19         Q.   Mr. Perez didn't tell you that?
20         A.   No.
21         Q.   He just told you they took it?
22         A.   Told me that they took it.
23         Q.   He didn't tell you when they took it?
24         A.   No, he didn't.
25         Q.   And you knew that there were other shanks
```

SANTA FE OFFICE                                         MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    that made their way into blue pod where Javier Molina
2    was murdered, right?
3         A.   No.
4         Q.   So you didn't think that shanks were
5    getting into that pod?
6         A.   As far as how?
7         Q.   Just generally.
8         A.   I didn't know.  Do I think?  Yeah, I
9    probably did.
10        Q.   All right.  And did you have a belief that
11   perhaps metal from the wheelchair program was being
12   brought into that pod to be made into shanks?
13        A.   No.
14        Q.   You didn't have any idea that that might
15   have been happening?
16        A.   I didn't have any evidence it was
17   happening.  When you're dealing with an inmate
18   population, there is always a belief that it's
19   happening.
20        Q.   Okay.  So it's something you're on the
21   lookout for?
22        A.   Yes.
23        Q.   It's a security concern?
24        A.   Yes.
25        Q.   So you have to be wary of it?
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Correct.
 2        Q.   You knew there were several inmates in the
 3   pod where Javier Molina was murdered that were
 4   working in the wheelchair program, right?
 5        A.   Yes.
 6        Q.   And you knew there was a possibility they
 7   may have taken metal from the wheelchair program into
 8   the pod, perhaps for Mr. Molina's assault, but also
 9   earlier in time?
10        A.   There is always that belief.  I don't know
11   if it was true or not.
12        Q.   When did the wheelchair program begin?
13        A.   I couldn't really tell you.  I can guess.
14        Q.   I don't want you to guess.  But were you
15   present at Southern when the wheelchair program
16   began?
17        A.   I was.
18        Q.   Can you tell me if it began prior to the
19   year 2014?
20        A.   It did.
21        Q.   It did?
22        A.   It did.
23        Q.   Okay.  And how long were individuals, if
24   you know, in the blue pod where Javier Molina was
25   murdered working in the wheelchair program?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I would believe a couple of months.
 2        Q.   And you knew that throughout the life of
 3   the program, if you will, walkers and wheelchairs
 4   were coming in and out of there; correct?
 5        A.   Correct.
 6        Q.   And they were rehabbing them, or perhaps
 7   using some for spare parts, and then they would rehab
 8   them and send them off to third world countries, as
 9   you testified?
10        A.   Correct.
11        Q.   Both walkers and wheelchairs?
12        A.   Correct.
13        Q.   So you knew it was possible that somebody
14   at some point in time took some metal from the
15   wheelchair program, and got it to the blue pod?
16        A.   It's possible they could attempt to.  I
17   can't say that they did.
18        Q.   No, I'm not asking if you knew they did.
19        A.   There is always a possibility.  It's a
20   prison.  You know, it is what it is.
21        Q.   At the time you were investigating the
22   Molina homicide and talking to Mr. Perez, you knew
23   there was a possibility?
24        A.   Correct.
25        Q.   And that there was a possibility that the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    shanks used on Mr. Molina may have come from Mr.

2    Perez' walker?

3        A.   Correct.

4        Q.   And have come from a different walker?

5        A.   Correct.

6        Q.   Not necessarily the two that you saw when

7    you went, but from an earlier point in time?

8        A.   Correct.

9        Q.   Now, let's go back to the video.  You said

10   that a video can hold images from approximately --

11   did you say 50 or 15 -- at the high end?

12       A.   At the high end, it was 50.

13       Q.   And then the shorter end was how long?

14       A.   Twenty-two days.

15       Q.   And you didn't know when Mr. Perez -- when

16   he told you they took it, you didn't know when that

17   happened?

18       A.   No, I did not.

19       Q.   But you didn't go to the video to try to

20   determine if you could see somebody perhaps going

21   into Mr. Perez' cell and taking something from his

22   walker?

23       A.   No, I did not.

24       Q.   But you didn't ask anybody else to do that?

25       A.   No, I didn't specifically ask him to do

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                     1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE                                          e-mail: info@litsupport.com

```
 1    that.
 2         Q.    But you knew your cameras were capable of
 3    going back in time, that maybe you could have seen
 4    that?
 5         A.    Correct.
 6         Q.    Are you aware that an after action review
 7    was done in connection to the Javier Molina homicide?
 8         A.    Yes.
 9         Q.    Were you involved in that?
10         A.    I don't believe I was.
11         Q.    So you just knew they were there doing it,
12    but you didn't get involved yourself?
13         A.    I don't believe I did.
14         Q.    When you say you don't believe, what do you
15    mean?
16         A.    I mean, I could have talked to them.  They
17    might have interviewed me.  I don't remember.
18         Q.    I see.  But you weren't actively conducting
19    an investigation yourself?
20         A.    No.  That would have been done by
21    individuals from outside of the institution.
22         Q.    Did you ever review a report concerning
23    that after action review?
24         A.    I don't believe I did.  That would have
25    been sent to the Warden.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   Did you ever participate in a meeting

2  concerning the findings or conclusions of that after

3  action review?

4      A.   Not that I remember.

5      Q.   Or briefing of any kind?

6      A.   That would have been done with the Warden.

7      Q.   I mean, did the Warden ever come to you and

8  say:  We had a briefing from this after action

9  review, and these are the things we think we should

10  do differently?

11      A.   Not in that way.  She would have come and

12  say, We're going to institute this new thing, so

13  let's start it on so and so date, or we're going to

14  do this differently.

15      Q.   Did she do that?

16      A.   I don't remember if she did or not.

17      Q.   Did you ever get an email or memo about

18  changes that were being made?

19      A.   I don't recall if I did or not.

20      Q.   Who was responsible for determining who

21  could work in the wheelchair program?

22      A.   It would have been the housing unit

23  manager.

24      Q.   So for this particular case that's housing

25  unit 1 A?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                          1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        A.    Correct.
 2        Q.    And the manager of that housing unit can
 3   decide which inmates in their housing unit are
 4   allowed to work there?
 5        A.    Yes.
 6        Q.    Is that decision reviewed by anybody or --
 7        A.    No, that's the job of the housing unit
 8   manager.
 9        Q.    Do you know Adam Vigil?
10        A.    Adam Vigil, I do.
11        Q.    From Santa Fe.  I believe he's the STIU
12   coordinator?
13        A.    Yes.
14        Q.    Were you aware that he had reviewed the
15   wheelchair program and found that the security there
16   was deficient, after the homicide?
17        A.    No, I wasn't.
18        Q.    Is that the first time you've heard that?
19        A.    It is.
20        Q.    Okay.  Now, are you aware that Officer
21   Holguin, other than interviewing Mr. Perez, had also
22   conducted other interviews of inmates concerning the
23   Javier Molina homicide?
24        A.    I was aware, yes.
25        Q.    You knew he was doing that while -- in the
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

```
 1    aftermath of the homicide?
 2        A.   Yes.
 3        Q.   Did he talk to you about what he learned in
 4    his interviews?
 5        A.   No.
 6        Q.   Did he provide you memos of those
 7    interviews?
 8        A.   No.  And it wouldn't --
 9        Q.   I'm sorry?
10        A.   It wouldn't go to me.
11        Q.   Why not?
12        A.   I'm the Deputy Warden.
13        Q.   Who would it go to?
14        A.   To the Warden.
15        Q.   Anyone else?
16        A.   To the STIU coordinator, somebody within
17    STIU chain of command.
18        Q.   What about the State Police who were
19    conducting the investigation?
20        A.   Maybe not.  I don't know.  That would be
21    better left answered to the Warden or STIU.
22        Q.   Or Officer Holguin?
23        A.   Correct.
24        Q.   When you went to the wheelchair program,
25    other than looking at the two walkers that you said
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    were there, did you do any sort of inventory of what
 2    you had on hand there?
 3         A.   We went through the inventory.  We didn't
 4    just look at the walkers.  We looked at the
 5    wheelchairs, the tools, spare parts.
 6         Q.   When you said "we," who else was with you?
 7         A.   I don't recall.  It would have been Deputy
 8    Warden Edgman; there would have a few correctional
 9    staff.
10         Q.   So you looked at what was there on hand in
11    the wheelchair program?
12         A.   Correct.
13         Q.   Did you look at documentation that was
14    there?
15         A.   We looked at the tool inventory.
16         Q.   Tool inventory.  What does the tool
17    inventory consist of?
18         A.   Consists of an inventory of the tools.
19         Q.   Does it consist of an inventory of the
20    wheelchairs or walkers?
21         A.   No.
22         Q.   Was there an inventory of the wheelchairs
23    or walkers?
24         A.   I don't recall there being one.
25         Q.   So you think maybe there wasn't one?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It's possible.
 2        Q.   As you sit here today, you're not aware of
 3   an inventory that says what walkers, what wheelchairs
 4   came in or went out?
 5        A.   No.
 6        Q.   And then was there an inventory of any kind
 7   of the spare parts that were being used to
 8   rehabilitate the walkers or wheelchairs?
 9        A.   No.  What they had was basically bins with
10   spare parts in it.  But I don't recall any
11   inventories.
12        Q.   Okay.  And, of course, without an
13   inventory, you wouldn't necessarily be able to know
14   what was supposed to be there and what was missing?
15        A.   Correct.
16        Q.   Did you know that the agent who was
17   investigating the homicide in this case had a belief
18   or understanding that perhaps the shanks used in the
19   Molina homicide came from a wheelchair?
20        A.   No, I did not.
21        Q.   Did you ever have an understanding that
22   they might have come from a wheelchair?
23        A.   I did not.
24        Q.   Did you ever tell anybody that it came from
25   a wheelchair?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    No, I did not.

 2          Q.    Did you ever speak to Agent Palomares, the

 3     investigator from the State Police?

 4          A.    I believe I may have just greeted him the

 5     night -- that evening.  But I've dealt with him a few

 6     times on different issues, but nothing besides:  Hi,

 7     and how are you doing, and this is what we got.  And

 8     I think our conversation that night was very limited

 9     to just a greeting.

10          Q.    Did you talk to him after that?

11          A.    I don't believe I've talked to him beside,

12     I seen him this morning and talked to him.

13          Q.    You didn't tell him about the walker that

14     you took from Mr. Perez?

15          A.    I don't think I had any more contact with

16     him after that night.

17          Q.    Did you tell anybody else besides Officer

18     Archuleta about the walker you took from Mr. Perez?

19          A.    I would have told the Warden.

20          Q.    Told the Warden.  And the Warden at the

21     time was who?

22          A.    Melissa Ortiz.

23          Q.    Do you remember what Ms. Ortiz told you in

24     response to that?

25          A.    I don't remember specifically what she
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    said.

2         Q.    She didn't ask you to document it in any

3    way?

4         A.    No.

5         Q.    Are there procedures or protocols that you

6    follow when taking evidence that might be from a

7    crime occurring in the prison?

8         A.    Yes.

9         Q.    Can you tell me what those are?

10        A.    Typically, it's documented with a chain of

11   custody.

12        Q.    Say again?

13        A.    It's documented with a chain of custody,

14   typically.

15        Q.    But this particular walker, you're not

16   aware of any documentation of a chain of custody?

17        A.    No.

18        Q.    What about Archuleta's photography?  Are

19   you aware of a report documenting that he photoed

20   this walker?

21        A.    I'm not.

22             MR. VILLA:  May I have just a moment, Your

23   Honor?

24             THE COURT:  You may.

25             MR. VILLA:  May I approach, Your Honor?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.
 2        Q.    I'm going to show you the memo that you
 3   reviewed with respect to the video cameras.
 4        A.    Yes.
 5        Q.    And it indicates there about the cameras in
 6   the blue pod where Mr. Molina was murdered; correct,
 7   is that right?
 8        A.    It does.
 9        Q.    And it has in parentheses "poor quality"?
10        A.    It does.
11        Q.    What does that mean?
12        A.    Maybe poor quality film.  One of the things
13   is the recordings are delayed.  So when you see
14   someone move, it kind of skips a little bit.  So some
15   of them are more distorted than others.  I couldn't
16   answer for sure what "poor quality" -- I didn't write
17   the document, so I wouldn't --
18        Q.    Do you know if all the cameras in the pod
19   were working on March 7, 2014?
20        A.    I don't remember specifically.  I believe
21   two, at least two were.
22        Q.    Now, were you aware that a site visit of
23   the wheelchair program, as well as the blue pod, was
24   conducted by the defense attorneys and others in this
25   case?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I am.
 2        Q.   And I believe that the first one occurred
 3   in December.  I may be a little off on my times.
 4   Does that sound about right?
 5        A.   I'll take your word.  I don't remember the
 6   specific dates or times.
 7        Q.   Were you familiar with the inventory at the
 8   time in the wheelchair program when we did our site
 9   visit?
10        A.   No.
11        Q.   Did you know that at the time, during the
12   site visit, there wasn't any walkers in there?
13        A.   I did not know that.
14        Q.   Now, the second site visit was conducted by
15   smaller members of the defense team.  I think that
16   was in the summertime in June.  Do you remember that?
17        A.   Not specifically.  But I know there was a
18   couple of visits.
19        Q.   Okay.  And were you familiar with the
20   inventory in the wheelchair program at that time?
21        A.   No.
22        Q.   Did you know that there were quite a few
23   walkers during that second visit?
24        A.   No.
25        Q.   Had you been in the wheelchair program at
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    all as part of your job duties?

2          A.    I go randomly.

3          Q.    You go randomly?

4          A.    I do.

5          Q.    Let me show you -- this is a photo on a

6    laptop -- forgive me -- from the wheelchair program.

7    Can you see that okay?

8          A.    I do.

9          Q.    And there are, looks to me, half a dozen or

10   so walkers in there.  Would you agree?

11         A.    Yes.

12         Q.    Have you been in the wheelchair program at

13   other times when there is quite a few walkers in

14   there?

15         A.    I don't remember specifically.  There could

16   have been.

17               MR. VILLA:  I'll pass the witness, Your

18   Honor.

19               THE COURT:  Thank you, Mr. Villa.

20               Let's go back to Mr. Castellano -- Ms.

21   Armijo, do you have redirect of Mr. Mulheron?

22               MS. ARMIJO:  No, Your Honor.  No questions.

23               MS. JACKS:  Your Honor, I'm going to ask a

24   few questions, but I'd like to confer with Mr. Villa.

25               MR. VILLA:  Sure.



SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                         1-800-669-9492
PROFESSIONAL COURT                                        e-mail: info@litsupport.com
REPORTING SERVICE

```
 1              THE COURT:  All right.  Let me find out for
 2   the record who is on the telephone.
 3              MR. CASTLE:  Jim Castle.
 4              THE COURT:  All right.  Mr. Castle, good
 5   morning.  Who else?
 6              MR. CASTLE:  Good morning, Your Honor.
 7              THE COURT:  Who is that?
 8              MR. CASTLE:  That was still Mr. Castle,
 9   just saying good morning.
10              THE COURT:  Oh, okay.  Just Mr. Castle is
11   on the phone.  All right.
12              MR. VILLA:  Your Honor, I may have a couple
13   more questions, if the Court would indulge me.
14              THE COURT:  All right.
15   BY MR. VILLA:
16        Q.   You testified that Mr. Perez, when you were
17   asking him about the missing part of his walker,
18   said, No disrespect, but if -- they told me if I said
19   anything to anybody, I'd be next.
20        A.   Yes.
21        Q.   And that occurred while you were in Mr.
22   Perez' cell in the other housing unit?
23        A.   Correct.
24        Q.   And you didn't write that down?
25        A.   I didn't.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   You didn't document that?
 2        A.   I didn't.  I didn't have a need to.
 3        Q.   Well, you understood that the State Police
 4   were investigating the Javier Molina homicide;
 5   correct?
 6        A.   Correct.
 7        Q.   And you had a thought or a belief perhaps
 8   that one of the shanks may have came from Mr. Perez'
 9   walker?
10        A.   Correct.
11        Q.   And you also knew that the FBI was involved
12   in the investigation?
13        A.   At that time, no, I did not.
14        Q.   Well, the FBI was conducting interviews
15   within a couple of days of Javier Molina homicide of
16   inmates at your facility, were they not?
17        A.   Not that I know of.
18        Q.   All right.  But it's your testimony that
19   you did not have a need to document Mr. Perez'
20   statement?
21        A.   I didn't.  That's why I contacted STIU.
22        Q.   Did you tell STIU about the statement?
23        A.   I did.
24        Q.   Did STIU -- well, who did you tell?
25        A.   Ernie Holguin.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Did Ernie Holguin document that anywhere?

 2        A.    You'd have to ask Ernie Holguin.

 3        Q.    And after you talked to Mr. Perez, you went

 4   back to your office?

 5        A.    I did.

 6        Q.    And had the walker brought to your office?

 7        A.    I did.

 8        Q.    In your office you have a computer?

 9        A.    I do.

10        Q.    And can you type on that computer?

11        A.    Yes.

12        Q.    You had paper there?

13        A.    Probably copier paper.

14        Q.    Okay.  That you could print out a document,

15   if you wanted to type a document?

16        A.    If I wanted to.

17        Q.    And a notepad, you can write things down?

18        A.    I don't have a notepad.

19        Q.    No notepad?

20        A.    No.

21        Q.    Pen and paper?

22        A.    I have a pen.

23        Q.    Are you allowed to have your cellphone in

24   the office?

25        A.    No.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   You have to keep it in the car?
 2          A.   At that time -- are you referencing --
 3    which date?
 4          Q.   The day after -- well, the day you talked
 5    to Mr. Perez and then went back to your office, were
 6    you allowed to have a cellphone?
 7          A.   No.
 8          Q.   Is that because you have to keep it outside
 9    in the car?
10          A.   Correct.
11          Q.   Okay.  So you have the computer, pen and
12    paper, but you didn't document that Mr. Perez told
13    you this?
14          A.   That's correct.
15               MR. VILLA:  Those are all the questions I
16    have.
17               THE COURT:  All right.  Thank you, Mr.
18    Villa.
19               Ms. Jacks, did you have anything?
20               MS. JACKS:  Just a few follow-ups.
21               THE COURT:  All right.  Ms. Jacks.
22                         EXAMINATION
23    BY MS. JACKS:
24          Q.   Mr. Mulheron, when is the first time that
25    you told anybody associated with law enforcement, the
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                  1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

1    FBI, or the prosecution about that statement that you

2    claim Mr. Perez made?

3         A.   A couple days ago.

4         Q.   So sometime in December of 2017?

5         A.   Correct.

6         Q.   And I think Mr. Perez (sic) asked you some

7    questions.  You didn't have any notes or anything

8    that you referred to to refresh your memory about

9    that alleged statement from Mr. Perez?

10        A.   No.

11        Q.   You just, two or three days ago, remembered

12   it out of the blue, and told the Government?

13        A.   I didn't remember it out of the blue.  It

14   was the first time I was asked about it.

15        Q.   You're aware -- in your position, you were

16   aware that the FBI was investigating the homicide of

17   Javier Molina, right?

18        A.   At that time?

19        Q.   At any time?

20        A.   Well, I'm aware now.

21        Q.   When did you become aware of that?

22        A.   I don't know, several years ago.

23        Q.   So sometime shortly after the homicide?

24        A.   I'd say about two years ago or so.

25        Q.   Okay.  And did you also become aware that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    the FBI was investigating that homicide as part of

 2    alleged activities in furtherance of the SNM Gang?

 3         A.   I did.

 4         Q.   And how many times do you think, since the

 5    homicide of Mr. Molina, have you met with somebody

 6    from the FBI investigating the SNM Gang?

 7         A.   Maybe once, if that.

 8         Q.   You have a phone, right?

 9         A.   I do.

10         Q.   And you use that to contact prosecutors?

11         A.   I don't believe I've talked to any

12    prosecutors.

13         Q.   You didn't talk to any prosecutors today?

14         A.   In person, I did.

15         Q.   Okay.  But let me ask you this:  How did

16    you know to come to court today?

17         A.   Oh, I was contacted by Mark Myers.

18         Q.   And who is Mr. Myers?

19         A.   The Chief of Staff for Corrections

20    Department.

21         Q.   Okay.  And he's in touch with Government

22    prosecutors and investigators?

23         A.   I would believe so.

24         Q.   Did you ever mention to Mr. Myers this

25    alleged statement that you claimed to have heard from

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492
                                                   e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Mr. Perez?

2         A.   I did.  And that's when it came up a few

3    days ago.

4         Q.   So the first time you mentioned it was a

5    few days ago to Mr. Myers?

6         A.   Yes.

7              MS. JACKS:  Thank you.  I have nothing

8    further.

9              THE COURT:  Thank you, Ms. Jacks.

10             All right.  Ms. Armijo?

11                    REDIRECT EXAMINATION

12   BY MS. ARMIJO:

13        Q.   Now, in addition to meeting this morning,

14   is it possible that you met the prosecutors a few

15   months ago when we went out to Southern?  And you may

16   not remember.

17        A.   And I don't remember.  I get a lot of

18   visitors, a lot of people.

19        Q.   All right.  So talking about this case was

20   the first time that you met with the prosecutors to

21   discuss the case?

22        A.   Yes, it is.

23        Q.   And by telling -- by requesting a housing

24   officer to take the walker to your office, requesting

25   Ruben Archuleta to take a photograph of it, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    requesting Holguin to interview him, was that what
 2    you did to basically further the investigation on the
 3    walker and Mr. Perez' involvement?
 4         A.    That is what I did.
 5         Q.    Okay.  In your duties as Deputy, and
 6    Warden, do you go and interview inmates and document
 7    it, and take an active part of the investigation, or
 8    is that left to people in STIU?
 9         A.    It's left to STIU.
10              MS. ARMIJO:  That's all I have.  Thank you.
11              THE COURT:  Thank you, Ms. Armijo.
12              All right.  Mr. Mulheron, you may step
13    down.  Is there any reason Mr. Mulheron cannot be
14    excused from the proceedings, Ms. Armijo?
15              MS. ARMIJO:  Your Honor, from this motion,
16    yes.  We may call him on other motions that will be
17    next week.
18              THE COURT:  All right.
19              MS. ARMIJO:  Or possibly, depending on
20    where we are later today.
21              THE COURT:  All right.  Is there any reason
22    he cannot be excused from this hearing, Mr. Villa?
23              MR. VILLA:  No, Your Honor.
24              THE COURT:  Any of the defendants?
25              All right.  You're excused from this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   hearing.  Thank you, Mr. Mulheron.
 2             All right.  Ms. Armijo, does the Government
 3   have its next witness or evidence?
 4             MS. ARMIJO:  We do.  It's the person that
 5   wrote the memo.
 6             And Your Honor, for clarification, we were
 7   having another person to come testify, but -- as I
 8   indicated as to this, but it will be William
 9   Edgman -- but they were stuck up in Santa Fe.
10             THE COURT:  I don't know your name yet, but
11   you look like the witness.  So if you'll come up and
12   stand next to the witness box on my right, your left,
13   before you're seated, Ms. Standridge, my courtroom
14   deputy will swear you in.
15                       WILLIAM EDGMAN,
16        after having been first duly sworn under oath,
17        was questioned and testified as follows:
18                     DIRECT EXAMINATION
19             THE CLERK:  Please be seated.  State your
20   name, spelling your name for the record.
21             THE WITNESS:  William Edgman.  My last name
22   is E-D-G-M-A-N.
23             THE COURT:  I guess I got confused.  I
24   thought Mr. Edgman was stuck up in Santa Fe.
25             MS. ARMIJO:  Mr. Roarke was.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Mr. Who?
 2              MS. ARMIJO:  Roarke.
 3              THE COURT:  All right.  Mr. Edgman.  Mr.
 4  Castellano.
 5              MR. CASTELLANO:  Thank you, Your Honor.
 6              I just want to check.  Is the next number,
 7  number 30?
 8              THE COURT:  I think so.
 9  BY MR. CASTELLANO:
10      Q.  Good morning.  Please tell us what you do
11  for a living?
12      A.  I am the Deputy Warden at Southern New
13  Mexico Corrections Facility.
14      Q.  How long have you worked for the
15  Corrections Department?
16      A.  I just started my 20th year this year.
17      Q.  And back in 2014, what was your position?
18      A.  I was the Major, Chief of Security.
19      Q.  I'm going to show you what's been marked
20  for identification as Government's Exhibit 30.  While
21  I'm doing that, tell us what your responsibilities
22  were as the Major back in 2014.
23      A.  I had several duties as the Major.  The
24  primary duties -- I'm the overall highest ranking
25  security officer out there at the facility.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                  1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                     e-mail: info@litsupport.com

```
 1    Supervise day-to-day operations from what the shift
 2    supervisor is doing, what the officers are doing;
 3    doing security audits, making sure that the officers
 4    are following proper policies, following the post
 5    orders, again, while doing the security audits,
 6    ensuring the infrastructure of the facility is well
 7    maintained.
 8         Q.   Did you know that you were testifying this
 9    morning?
10         A.   I did not.
11         Q.   When did you find out you were testifying?
12         A.   About 30 minutes ago.
13              MR. CASTELLANO:  May I approach the
14    witness, Your Honor?
15              THE COURT:  You may.
16         Q.   Handing you what's been marked for
17    identification as Government's Exhibit 30.  Do you
18    recognize that document?
19         A.   I do.
20         Q.   Tell us what it is.
21         A.   It's a review of the camera system, and
22    it's listing all the discrepancies in the cameras for
23    March 10, 2014.
24         Q.   Do you know who prepared that document?
25         A.   I did.
```

SANTA FE OFFICE                                                                MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                     Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                            1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1         Q.   When did you prepare the document?
 2         A.   March 10, 2014.
 3         Q.   And does it accurately reflect your
 4   findings from a review of the camera system at that
 5   time?
 6         A.   Yes, it does.
 7              MR. CASTELLANO:  Your Honor, I move the
 8   admission of Government's Exhibit 30.
 9              THE COURT:  Any objection, Mr. Villa?  Ms.
10   Fox-Young?
11              MS. FOX-YOUNG:  No objection, Your Honor.
12              THE COURT:  Any other defendants?  Not
13   hearing any, Government's Exhibit 30 will be admitted
14   into evidence.
15         Q.   Now, you noted the date was March 10 of
16   2014.  Do you recall why you prepared this document
17   on that date?
18         A.   For that date I was told to get a list of
19   all the cameras that were not operational.
20         Q.   Why was that?
21         A.   Due to having a homicide at the facility.
22   We had been working towards upgrading our camera
23   system, and this was going to help us upgrade our
24   camera system, identifying the numerous cameras that
25   were out.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So going down the list here, there is an

2  indication that says, "the following cameras are

3  nonoperational"?

4      A.   Correct.

5      Q.   Can you explain that to us?

6      A.   The following cameras are nonoperational,

7  meaning I didn't have any video, or there was an

8  issue with some of those cameras.

9      Q.   In terms of where the murder occurred on

10  March 7, 2014, did you take any notes about any of

11  the cameras in that pod?

12      A.   Camera 106, which is 1 A B pod right

13  camera, says "poor quality."

14      Q.   I indicated there on the exhibit an arrow

15  near 106.  And can you, for the Court, explain what

16  you mean -- first of all, when it says 1 A B right,

17  what does that tell us?

18      A.   It is the right camera in the pod.  There

19  are three cameras in the pod:  Left, center, and

20  right.

21      Q.   And what did you learn or discover when you

22  reviewed the cameras in that pod?

23      A.   That that right camera had poor quality.

24  By noting that it had poor quality, it was either out

25  of focus or the reticle in the camera was out,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    showing a bright spot.  So the video itself, you
 2    couldn't identify anything or be able to make
 3    anything out on the video, but the camera itself was
 4    not out.
 5         Q.   So by process of elimination, if the -- if
 6    you only had a notation as to the right camera, did
 7    that tell you that the left and center cameras
 8    appeared to be functioning as they should have?
 9         A.   Yes.
10         Q.   And were you familiar with the system at
11    that time, in terms of video retention and how long,
12    for example, the system would retain a video?
13         A.   The retention of video at that time -- I'm
14    not familiar with each DVR.  The only thing I can say
15    is when it was initially set up what the retention
16    policy was supposed to be.
17         Q.   Well, as time passed, tell us about trends
18    you noticed in the video system, in terms of how much
19    it would retain or not retain, things of that nature.
20         A.   Depending on some DVRs.  Some DVRs we were
21    lucky to get seven days of retention.  Other DVRs, we
22    might get 30 days of retention.
23         Q.   And how often -- well, did you do this in
24    response to the homicide that occurred at the
25    facility?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    And did you do this at other times?
 3        A.    Yes.
 4        Q.    What was the purpose of doing it on the
 5   other occasions?
 6        A.    As one of my jobs as the Chief of Security
 7   at the time is, again, to look for failures in our
 8   infrastructure, our security processes, which is a
 9   camera is part of infrastructure and security.  So
10   I'd note discrepancies in the camera system in order
11   to get the contractor out to conduct the proper
12   repairs.
13            THE COURT:  Mr. Castellano, would this be a
14   good time for us to take our morning break?
15            MR. CASTELLANO:  Yes, Your Honor.
16            THE COURT:  All right.  We'll be in recess
17   for about 15 minutes.
18            (The Court stood in recess.)
19            THE COURT:  Let's try to go back on the
20   record.  All right.  Let's settle down.  I think --
21   look around, I think every defendant has counsel.
22   Make sure your co-defendants are all represented
23   here.
24            All right.  Mr. Edgman, I'll remind you
25   that you're still under oath.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            Mr. Castellano, if you wish to continue

 2    your direct examination of Mr. Edgman, you may do so.

 3            MR. CASTELLANO:  Yes, sir.  Thank you.

 4            THE COURT:  Mr. Castellano.

 5    BY MR. CASTELLANO:

 6       Q.   Okay.  I'm showing you what's been admitted

 7    as Rudy Perez Exhibit F.  And when we were talking

 8    about your testimony this morning I had you draw a

 9    diagram.  But if we can make this work, I'll use this

10    instead.  If you can, first, can you tell us -- and

11    when you touch your screen, you'll be able to

12    basically draw on the screen.  So if you can just

13    touch the places where you recall where the pods are,

14    where the cameras are in the pod?

15       A.   Okay.  So there are three cameras in each

16    pod.  So you have -- is that coming out?  So where

17    that arrow is would be your right camera.  Close to

18    this corner here would be the center camera.  And

19    then right above the pod door would be the left

20    camera.

21       Q.   Okay.  So you have three cameras in the

22    pod.  And if you can, can you tell us how the cameras

23    work in terms of capturing what is inside the pod?

24    Does it capture sectors or certain segments of the

25    pod?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.    Correct.  Each camera will capture a
2    certain sector of the pod.
3        Q.    To the best of your ability, can you draw
4    lines showing what might be captured by each camera
5    angle, or which sector?
6        A.    So the left camera would capture
7    approximately the left of the pod.  The right camera
8    would capture the right portion of the pod.  And the
9    center camera would overlap those sectors.
10        Q.    Okay.  So for the record, you've drawn some
11    lines on the exhibit from the area labeled "Main
12    Entrance," and you've drawn four lines showing
13    various segments of the pod.  Is that accurate?
14        A.    Correct.
15        Q.    And do you recall in which pod the Molina
16    murder or assault started?
17        A.    In which pod?
18        Q.    I'm sorry, in approximately which portion
19    of this diagram, or which cell?
20        A.    Cell 105, which is on the top tier.  But it
21    corresponds with 113, which is on the bottom.
22        Q.    So, in other words, is this diagram a
23    diagram of the lower section of the pod?
24        A.    Correct.
25        Q.    And then there is an upper section.  And

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   you've got corresponding numbers for top and bottom?
 2       A.   Correct.
 3       Q.   And do you recall where Rudy Perez' room
 4   was?
 5       A.   I believe he was 115.
 6       Q.   So I've drawn a circle around 115 there.
 7   So when you mentioned that the right camera was
 8   having difficulty, or was of poor quality, was that
 9   the area where Rudy Perez' cell was?
10       A.   Yes.
11            MR. CASTELLANO:  I pass the witness, Your
12   Honor.
13            THE COURT:  Thank you, Mr. Castellano.
14            Let me go ahead and have Ms. Fox-Young
15   cross-examine Mr. Edgman.
16            Ms. Fox-Young.
17            MS. FOX-YOUNG:  Thank you, Your Honor.
18                      EXAMINATION
19   BY MS. FOX-YOUNG:
20       Q.   Good morning, sir.
21       A.   Good morning.
22       Q.   I didn't catch your current rank.  Did you
23   say you're currently the Deputy Warden at Southern?
24       A.   Correct.
25       Q.   And so your title is Deputy Warden?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          A.   Yes, ma'am.

2          Q.   All right.  Deputy Warden, you said that in

3    2014, you were the Major and the Chief of Security

4    for the facility; is that right?

5          A.   Correct.

6          Q.   And one of your duties in that job capacity

7    was to make sure that the proper policies were

8    followed at Southern; is that right?

9          A.   Correct.

10         Q.   And that included policies on evidence

11   collection?

12         A.   Correct.

13         Q.   I think you said that.  Correct me if I am

14   mischaracterizing your testimony.

15         A.   No, that's what I said.

16         Q.   Okay.  And did that include chain of

17   custody for evidence collection?

18         A.   That's part of our policies, yes, ma'am.

19         Q.   Can you tell me what the policy on chain of

20   custody for evidence collection was in March 2014?

21         A.   As far as?

22         Q.   What's the proper protocol to follow in

23   March 2014, if you're collecting evidence at the

24   facility?

25         A.   With the chain of custody, if you collect
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    things on the chain of custody, date and time you

2    collected it, and the disposition of that evidence

3    after you collected it, whether it went to the

4    evidence locker, you turned it over to somebody else.

5         Q.   And the facility has chain of custody forms

6    to use for that purpose?

7         A.   Yes, ma'am.

8         Q.   In conformity with the New Mexico

9    Corrections Department policy on evidence collection?

10        A.   Yes, ma'am.

11        Q.   Do you have -- in March 2014, were there

12   labels that were to be affixed to evidence collected

13   to make that process easier?

14        A.   No, ma'am.

15        Q.   When evidence was collected at that time --

16   and if it's the same today, you can tell me that --

17   how was somebody supposed to document that they

18   actually collected evidence on a certain date and

19   time, and the disposition, where was that recorded?

20        A.   On the evidence envelope.

21        Q.   The evidence envelope?

22        A.   Yes, ma'am.

23        Q.   So all evidence was to be in an envelope as

24   well?

25        A.   If it would fit in an evidence envelope, it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    would go into a evidence envelope.  I can't say all
 2    evidence would go into an evidence envelope.
 3         Q.   Some evidence is too big to fit in an
 4    envelope.  And when evidence is too big to fit in an
 5    envelope, what is the proper protocol for collecting
 6    it and maintaining chain of custody?
 7         A.   You would affix that evidence envelope to
 8    the item, because the evidence envelope itself has
 9    the chain of custody with a description of the
10    evidence.
11         Q.   So the envelope itself, with the
12    information, date and time collection, and
13    disposition would be attached to the piece of
14    evidence?
15         A.   Right.
16         Q.   And that was under you, as Chief of
17    Security in March of 2014, that was proper protocol?
18         A.   Yes, ma'am.
19         Q.   Where was any evidence collected at the
20    facility to be held?
21         A.   In our evidence locker.
22         Q.   Where is that located?
23         A.   Master control.
24         Q.   Is that evidence -- how big is that
25    evidence locker?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Maybe a 2 by 4 by 4.

 2          Q.    Two feet by four feet?

 3          A.    Two feet deep, four feet wide, four feet

 4    high.

 5          Q.    Is it still there?

 6          A.    Yes, ma'am.

 7          Q.    If an outside entity is investigating a

 8    case, some other law enforcement agency, do they take

 9    custody of that evidence, or does it remain at the

10    facility?

11          A.    They take custody of it.

12          Q.    At what point do they take custody?

13          A.    When they collect it.

14          Q.    When who collects it?

15          A.    The outside agency.  If the outside agency

16    is conducting the investigation, then they're the

17    ones collecting the evidence.

18          Q.    Okay.  And in this case, the Javier Molina

19    homicide, who was conducting the investigation?

20          A.    From my understanding, it was State Police.

21          Q.    And so did State Police collect the

22    evidence in this case?

23          A.    One would assume they did.

24          Q.    Do you know for certain?

25          A.    No, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  Did you have anything to do with

2      collection of evidence related to the Javier Molina

3      homicide?

4      A.   No, ma'am.

5      Q.   Did you ever review any evidence related to

6      the homicide?

7      A.   No, ma'am.

8      Q.   To this date, have you reviewed any

9      evidence related to the homicide?

10      A.   No, ma'am.

11      Q.   Did the prosecution?

12           MR. JEWKES:  Your Honor, could we ask the

13      witness to speak up?

14      A.   How's that?

15      Q.   I can hear you fine, Deputy Warden.

16      Everybody?

17           So to this day, you haven't reviewed any

18      evidence related to the Molina homicide?

19      A.   No, ma'am.

20      Q.   And you didn't participate in collecting

21      any?

22      A.   No, ma'am.

23      Q.   When did the prosecution contact you

24      regarding your testimony today?

25      A.   At about 9:30 this morning.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        Q.    Okay.  Who contacted you?

 2        A.    As a matter of fact, it was my Warden that

 3    called me and said, "Come on down."

 4        Q.    Who is that?

 5        A.    James Mulheron.

 6        Q.    He said, Come on down to court to testify?

 7        A.    He said, "Come on down, they want to talk

 8    to you."

 9        Q.    Okay.  And you arrived here and you talked

10    to the Government?

11        A.    Yes, ma'am.

12        Q.    Who did you talk to?

13        A.    I forget his name, but the gentleman with

14    the goatee right behind you.

15        Q.    And did you bring any documents with you?

16        A.    I did not.

17        Q.    Did you have any documents related -- as

18    far as you know, related to the Molina case?

19        A.    I do not.

20        Q.    No emails?

21        A.    No, ma'am.

22        Q.    No memos?

23        A.    No, ma'am.

24        Q.    Did you ever receive any emails or memos

25    that you recall related to the Molina case?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                        1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        A.    No, ma'am.

 2        Q.    Have you ever talked to Rudy Perez?

 3        A.    When I do my rounds.

 4        Q.    Okay.  Are you aware that Rudy Perez, at

 5   one point when he was housed at Southern, had a

 6   walker in his possession?

 7        A.    Afterwards, I heard about that.  At the

 8   time, I really wasn't familiar with Mr. Perez nor did

 9   I even realize he had a walker with him in his cell.

10        Q.    Did you customarily -- you said when you

11   did your rounds, you would see Mr. Perez?

12        A.    Yes, ma'am.

13        Q.    Did you customarily do rounds in blue pod

14   in March of 2014?

15        A.    In March of 2014, yes.

16        Q.    Every day?

17        A.    No.

18        Q.    When did you do rounds?

19        A.    Usually, around once a week.

20        Q.    And that was in your capacity as Chief of

21   Security?

22        A.    Correct.

23        Q.    Did you do rounds in every pod once a week?

24        A.    Yes, ma'am.

25        Q.    Did you ever see Mr. Perez' walker?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Not that I recall.
 2        Q.   Have you ever seen a walker that somebody
 3   claims belonged to Mr. Perez since?
 4        A.   No, ma'am.
 5        Q.   Now, you testified that you think after the
 6   fact -- I think you mean after the homicide -- you
 7   heard something about a walker?
 8        A.   Yes.
 9        Q.   What did you hear?
10        A.   That Mr. Perez had a walker, and it was
11   confiscated from him.
12        Q.   Who told you that?
13        A.   I don't recall.
14        Q.   Was this close in time to the murder?
15        A.   Yes, a short period after.  I don't know
16   exactly how many days or whatnot, but maybe a couple
17   of weeks afterwards.
18        Q.   You think it was a couple of weeks later?
19        A.   That's what I -- from my recollection, yes,
20   ma'am.
21        Q.   Okay.  But you don't have any notes or
22   reports or other documentation that tells you that?
23   That's just your memory?
24        A.   Correct.
25        Q.   Do you remember who told you that Rudy
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Perez had a walker?

2         A.   No, ma'am.

3         Q.   Do you remember if it was somebody in STIU?

4         A.   I don't remember.

5         Q.   Did you attend any briefings pertaining to

6    the Molina homicide?

7         A.   We had debriefings pertaining to the

8    homicide, yes, ma'am.

9         Q.   Who conducted those debriefings?

10        A.   At the time it would be the Warden.  We'd

11   have STIU in there.  The Warden, STIU.

12        Q.   Okay.  Can you educate me, just because I'm

13   not entirely familiar with your organizational

14   structure.  Was STIU underneath you?  Currently, are

15   they underneath you in the facility as Chief of

16   Security?  Were you supervising STIU officers?

17        A.   No, ma'am.

18        Q.   Who was supervising them?

19        A.   They had a deputy director, an STIU manager

20   up in Central Office.  They didn't fall under the

21   facilities.

22        Q.   Who was that person?

23        A.   I don't recall who it was at that time.

24        Q.   In Southern, was that person Captain

25   Blanco?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   He would be the STIU Coordinator for the

2   facility, correct.

3       Q.   But he answered to somebody at Central?

4       A.   At Central Office.

5       Q.   You mean PNM?

6       A.   Central office, Santa Fe; deputy directors,

7   director, yes, ma'am.

8       Q.   Okay.  But in March of 2014, you were not

9   part of STIU at all?

10      A.   No, ma'am.

11      Q.   Have you reviewed the video that the

12  prosecutor was asking you about that was produced by

13  the cameras in the blue pod?

14      A.   I've seen the video.

15      Q.   Okay.  Sir, I'm showing you what's been

16  marked as Rudy Perez Exhibit N.  And this is an

17  exhibit that has been admitted.  I'll represent to

18  you that it's a photograph that was taken in blue

19  pod.  Do you recognize it as that?

20      A.   Yes, ma'am.

21      Q.   And the Government asked you some questions

22  about the three cameras in blue pod, right?

23      A.   Yes.

24      Q.   Do you see them pictured here?

25      A.   I do.



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                            1-800-669-9492
                                                    e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   Is this camera that I'm pointing to one
 2   that was working on March 7, 2014?
 3        A.   Yes.
 4        Q.   And this camera?
 5        A.   Yes.
 6        Q.   And this camera?
 7        A.   That's the camera with poor picture
 8   quality.
 9        Q.   Okay.  So it was working, but you say it
10   had poor picture quality?
11        A.   Yes, ma'am.
12             MS. JACKS:  For the record, what camera is
13   that?
14             MS. FOX-YOUNG:  For the record, this is the
15   camera on the far left of Rudy Perez Exhibit N.  The
16   upper left.
17        Q.   Is that right, sir, this camera?
18        A.   Looking at it from this perspective, yes,
19   it's on the left.  If you're in the pod, that would
20   be the right camera.
21        Q.   That visualized the -- facing the cells and
22   the pod, the far right side?
23        A.   Yes, ma'am.
24        Q.   And I think you testified that you
25   conducted a review or an inspection of all the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    cameras at Southern in the days following the Molina

 2    homicide?

 3         A.   Yes, ma'am.

 4         Q.   When did you start that review?

 5         A.   March 10th.

 6         Q.   And I apologize if you've already testified

 7    to this, but who asked you to do the review?

 8         A.   The Warden.

 9         Q.   And so you went in and physically inspected

10    each camera?

11         A.   I did not physically inspect each camera.

12         Q.   How did you do your review?

13         A.   There is a monitor at master control, which

14    we have the capability of reviewing every camera in

15    the facility.  So what I did is I scrolled through

16    every camera in the facility, to see if we were

17    getting video feed from those cameras.

18         Q.   And is that -- were you sitting in the STIU

19    office when you did that?

20         A.   No.

21         Q.   Master control.

22         A.   Master control.

23         Q.   Okay.  And you produced this memo on March

24    10, 2014?

25         A.   Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   I see that for several cameras -- three of

2    the cameras you indicate poor quality; is that right?

3    A.   Yes, ma'am.

4    Q.   Now, where you didn't indicate poor

5    quality, were you representing to the warden that the

6    camera was totally nonfunctional?

7    A.   Correct, no video feed at all.

8    Q.   None at all.  And was there any way for you

9    to tell when you did that review how long that had

10   been the case?

11   A.   For that would I have to go back to my last

12   review of the cameras.

13   Q.   Do you know when your last review was?

14   A.   Probably six months prior to that.  And

15   that would be a guess.

16   Q.   So probably around the fall of 2013?

17   A.   Possibly.

18   Q.   So what this memo then says is that on

19   March 10, 2014, this is the state of these cameras?

20   A.   Correct.

21   Q.   But you don't know the state of the cameras

22   on March 9?

23   A.   No, ma'am.

24   Q.   Okay.  Or any other day?

25   A.   My guess would be similar to this, but no,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    not unless I did a review of the cameras each and

 2    every day and say:  This date, this is how the state

 3    of our cameras were this date, and this date.  But,

 4    no.

 5         Q.   Okay.  Now, could you have actually -- I

 6    can't remember if you explained how far back in time

 7    you could go.  If you wanted to pull a specific feed

 8    in doing that review, could you look back three

 9    weeks?

10         A.   It would depend on how the state of the

11    DVR.

12         Q.   Okay.  But you didn't do it?

13         A.   No, ma'am.

14         Q.   I understand that you did periodic reviews

15    to see if the cameras were working, maybe every six

16    months?

17         A.   Correct.

18         Q.   Or upon request of the Warden?

19         A.   Correct.

20         Q.   If a camera wasn't working, would master

21    control report that to you?

22         A.   Master control doesn't have a view of every

23    camera at any given time.

24         Q.   Does anybody?

25         A.   No.  You have to scroll through the

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                          1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

 1   cameras.

 2       Q.   So is there anybody at the facility, in

 3   March of 2014, who would report a faulty camera?

 4       A.   Again, if master control was scrolling

 5   through a camera and they found out a certain camera

 6   wasn't operational, they would report to the shift

 7   supervisor.  We did have electronics technician whose

 8   job at the time was to -- the upkeep of the system as

 9   far as he could upkeep it.  So there is a reporting

10   mechanism in place, yes, ma'am.

11       Q.   Okay.  And those reports would make their

12   way to you?

13       A.   Not all the time, no, ma'am.

14       Q.   Sometimes they would just go to the

15   technician?

16       A.   Yes, ma'am.

17       Q.   In the course of your review, on March 10,

18   2014, did you look to see if there were any reports

19   of faulty cameras?

20       A.   Not on that day, no.

21       Q.   Okay.  So you didn't look to see whether

22   anybody had made a report that a camera wasn't

23   working?  You just looked to see if they were working

24   on that day?

25       A.   Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  The cameras that appear on
 2   Government's Exhibit 30, numbered 50 and 51, labeled
 3   Education Exterior PTZ, and Education Interior PTZ,
 4   are those of the education building?
 5        A.   Yes, ma'am.
 6        Q.   Are there any other cameras that are
 7   located at the education building, either inside or
 8   outside?
 9        A.   Today or back then?
10        Q.   Back then.  Thank you.
11        A.   I believe so.  I couldn't tell you a
12   hundred percent.
13        Q.   Do you know what cameras 50 and 51 face,
14   what they look at and record?
15        A.   I do not.  That's the title of those
16   cameras, Education Exterior, PTZ.  If I were to guess
17   on it, would be the PTZ on the outside of education,
18   facing our E gate, which is our gate going on to the
19   compound.
20        Q.   Is that where inmates enter the education
21   building?
22        A.   No, ma'am.
23        Q.   Is it where they exit?
24        A.   No, ma'am.
25        Q.   So would either of these cameras capture
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    anybody leaving that building?
2         A.   Probably the interior PTZ, depending on
3    where it was facing, because it's a PTZ.
4         Q.   Okay.  I know you said you conducted this
5    review to see if they were working.  Did you actually
6    look at the feeds from any of these cameras for
7    purposes of determining what might have happened in
8    the days prior to March 10, 2014?
9         A.   No, ma'am.
10        Q.   Did anybody ask you to?
11        A.   No, ma'am.
12        Q.   Do you know what building the wheelchair
13   program is located in?
14        A.   Yes, ma'am.
15        Q.   What building is that?
16        A.   Education building.
17        Q.   Do you know if camera 50 or 51 captures any
18   portion of the wheelchair program, the entry to it?
19        A.    50 would not.  But 50 is exterior PTZ; 51,
20   I would say would not, because if I were to look at
21   it, the interior PTZ would probably be at the
22   innermost part of education, as you first walk in.
23   The wheelchair program is at the back of education.
24        Q.   Is there a camera -- was there a camera, in
25   March of 2014, that did capture any portion of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    wheelchair program?

 2          A.    Not that I'm aware of.

 3          Q.    Were there cameras inside the wheelchair

 4    program?

 5          A.    At that point in time, not that I'm aware

 6    of.

 7          Q.    And you just don't think there was a camera

 8    angle that captured the door?

 9          A.    Correct.

10          Q.    Is there any way you could find out?

11          A.    Possibly.

12          Q.    I mean, is there a document that exists

13    that details what camera -- where the cameras were in

14    March of 2014, and what they captured?

15          A.    No, ma'am, not that I'm aware of.

16          Q.    Only your memory?

17          A.    Sure.

18          Q.    Okay.  Have you been -- you were asked by

19    the Warden to do this review of the surveillance

20    system.  Were you asked to do anything else by the

21    Warden around this time related to -- well, were you

22    asked to do anything else related to the Molina

23    homicide?

24          A.    No, ma'am.

25          Q.    Did the Warden ask you in person to do
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    this?

2         A.    I'd say most likely, yes, ma'am.

3         Q.    Okay.  How did you find this document?

4         A.    The one that's in your hand, it was

5    presented to me by the attorney this morning.

6         Q.    Did they present you with any other

7    documents?

8         A.    No, ma'am.

9         Q.    You said that the camera had poor quality

10   on the right side?

11        A.    Yes, ma'am.

12        Q.    When is the last time that you reviewed the

13   camera -- the footage from the Molina homicide?

14        A.    2014.

15        Q.    Not since?

16        A.    No.

17        Q.    Okay.  So do you have any recollection of

18   whether the footage captured all of the cells in blue

19   pod, whether there was an actual image of the cells

20   on March 10th?

21        A.    The left camera would pick up some of the

22   cells in its sector.  The center camera would pick up

23   its sector.  And the right camera -- again, if I put

24   down poor quality, it's because you couldn't make out

25   anything in the pod, but still sending video feed.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       Q.   Just so I understand, this assessment that
 2   you made on March 10th was based upon what you saw on
 3   March 10th?
 4       A.   Yes.
 5       Q.   But you also -- correct me if I'm wrong --
 6   reviewed the video that was captured on March 7?
 7       A.   Yes.
 8       Q.   And when did you review that?
 9       A.   Probably the next day after the homicide.
10       Q.   Did you -- were you by yourself?
11       A.   No.
12       Q.   Who did you review it with?
13       A.   Probably there with me, the Wardens, the
14   Deputy Wardens.  I couldn't tell you exactly who I
15   was with.  I don't remember everybody that was there.
16       Q.   Do you remember how the camera quality was
17   on that tape?  I don't know if it was a tape or you
18   were watching it live?
19       A.   No, we weren't watching it live.
20       Q.   Well, I don't know if you were playing a
21   tape, or if you were pulling it from the system.  Do
22   you know?
23       A.   It was probably a CD.
24       Q.   A CD.  Okay.  Do you remember one way or
25   another whether the quality was poor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    On the video that we saw, the quality was

2  pretty good.

3      Q.    Okay.   And was that for all of the cameras?

4      A.    No.

5      Q.    Tell me which cameras did not have good

6  quality?

7      A.    I can't tell you because we didn't have a

8  video of a bad quality camera.   The video had two

9  cameras in it, the left and the center.   There are

10  three cameras in the pod.   The right camera, there

11  was no recording.

12      Q.    Okay.   But the two cameras that we talked

13  about; the one in the middle --

14      A.    That's the center.

15      Q.    -- of Defendant's Exhibit N.

16      A.    Yes.

17      Q.    And the one on the --

18      A.    Left; that is the left camera.

19      Q.    The left camera, you think were working and

20  did not have poor quality?

21      A.    Correct.

22      Q.    And were those cameras able to capture all

23  of the cells in the pod, from your recollection from

24  2014?

25      A.    All the cells in the pod?   No, ma'am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Those two cameras would not capture all the cells in

2    the pod.

3         Q.   Which cells were not captured on the feed

4    that you watched in March of 2014?

5         A.   I couldn't tell you exactly off of that

6    video.  But off of my experience, I could tell you

7    which cells would have been captured based off those

8    two cameras locations.

9         Q.   Do you remember any cells not being

10   captured when you watched that video?

11        A.   No.

12             MS. FOX-YOUNG:  Your Honor, just a moment.

13             THE COURT:  Certainly.

14        Q.   Sir, are you familiar with the New Mexico

15   Corrections Department policy regarding cameras that

16   existed in March of 2014?

17        A.   I'm not familiar with it, no.

18        Q.   Was it your job as Chief of Security to

19   make sure that all of the policies in effect at the

20   institution were abided by?

21        A.   Security policies, yes, ma'am.

22        Q.   Okay.  And you said evidence collection

23   policies?

24        A.   Yes.

25        Q.   Have you ever seen -- I'll show you -- this

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    is Rudy Perez' Exhibit KK.  Do you remember -- are

2    you familiar with this policy number 130700 governing

3    cameras?

4          A.   I'm sure I've seen it before.

5          Q.   And I'll represent to you that this -- you

6    can see the date on it.  This was last revised in

7    February 2012.  It was in effect in the early part of

8    2014.  And you'll see there is some portions of this

9    policy that pertain to the stationary cameras at the

10   facility.  Are you familiar with that?

11         A.   I see it.

12         Q.   Okay.  And in March of 2014, it was

13   required, was it not, by the department that the

14   Chief of Security or designee will review all

15   stationery cameras and PTZ cameras weekly; is that

16   right?

17         A.   That's what it says there, yes, ma'am.

18         Q.   Okay.  And so, in March of 2014, were you

19   then required to review all those cameras weekly

20   according to this policy?

21         A.   According to the policy, yes, ma'am.

22         Q.   Okay.  And in practice, sounds like it

23   didn't always happen?

24         A.   No, ma'am.

25         Q.   And the policy also requires the Chief of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE                                 e-mail: info@litsupport.com

 1    Security to document those inspections, and forward

 2    them to the Warden's office for review, right?

 3         A.   Yes, ma'am.

 4         Q.   Do you know if you ever documented -- I

 5    know we have this document that was presented to you

 6    by the prosecution.  Are there other documents where

 7    you forwarded to the Warden, a document detailing

 8    your inspections?

 9         A.   Yes, ma'am.

10         Q.   Okay.  Did you do that every time you did

11    an inspection?

12         A.   Yes, ma'am.

13         Q.   Do those still exist?

14         A.   I do not know.

15         Q.   You send them to the Warden?

16         A.   We gave them to the Warden.

17         Q.   Would you email them, or hand them to the

18    Warden?

19         A.   I'd write it out in a hard copy and hand it

20    to him.

21         Q.   Are you familiar with the locations of all

22    the cameras at the facility in your current capacity?

23         A.   As the cameras are at right now?

24         Q.   Yes.

25         A.   Not every single one of them, because we



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    just had a new camera system put in.

 2         Q.   When was that?

 3         A.   That got completed two months ago.

 4         Q.   Okay.  Prior to the installation of the new

 5    system, are you familiar with the locations of all

 6    the cameras?

 7         A.   Not of every single camera, no.

 8         Q.   You described where the cameras were

 9    located in the education building to me; is that

10    right?

11         A.   I didn't describe where all the cameras

12    were located in the education building.  I described

13    where 50 and 51 were located.

14         Q.   I'm showing you an image.  Do you recognize

15    this image?  Do you know where this is at Southern?

16         A.   Yes.

17         Q.   And you're familiar with which portion of

18    which building that's in?

19         A.   Yes.

20         Q.   Can you tell me which one?

21         A.   Okay.  So that door that you see open, if

22    you went through that door, you would be going up the

23    hallway to the entrance and exit of the actual

24    education building.  Coming down the hallway, that's

25    a portion that we call the horseshoe.  So if you came
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   down the hallway, you would make a right, and that
 2   would get you to the doorway to get to the wheelchair
 3   program.
 4        Q.   Okay.  It's a little hard to see.  But on
 5   your description this open door, is that to the
 6   wheelchair program?
 7        A.   No, ma'am.
 8        Q.   Where is -- is that around to the left?  Do
 9   you have to turn left at the end of this hallway to
10   get to the wheelchair program?
11        A.   You come down the hallway, and you have to
12   turn right.
13        Q.   And go through that door?
14        A.   No.
15        Q.   Can you show me on your screen where the
16   wheelchair program is related in relation to this --
17        A.   Okay.
18        Q.   -- hallway?
19        A.   You'd have to come through the door, come
20   down the hallway, and then you're going to veer right
21   at the end of this hallway.
22        Q.   Okay.  And do you see any cameras depicted
23   in this image?
24        A.   No.
25        Q.   Do you see these devices in the upper right
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    corner of the screen?

2        A.   I see that there.

3        Q.   And also this one?

4        A.   To my knowledge, that's a smoke detector.

5        Q.   Okay.  Is this a camera that you circled,

6    do you know?

7        A.   Based off the image, I couldn't be one

8    hundred percent sure, but I'd say it's a camera.

9        Q.   Okay.  Do you know if there is a camera in

10   that location?

11       A.   Right now?

12       Q.   Yes.

13       A.   Right now, I'd say yes, there is a camera

14   in that location.

15       Q.   Do you know if there was a camera in that

16   location in March of 2014?

17       A.   Looking at this picture, that looks like

18   our old camera system.  So if there is a picture of

19   it there, when this picture was taken, I'd say yes,

20   there was.

21       Q.   Okay.  Would this camera, or does this

22   camera capture any portion of the wheelchair program,

23   if you know?

24       A.   It would not.

25       Q.   It does not.  And do you know if there was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     another camera that was in place in March of 2014

2     that did?

3          A.   I do not.

4          Q.   You don't know?

5          A.   No.

6               MS. FOX-YOUNG:  No further questions, Your

7     Honor.

8               THE COURT:  All right.  Thank you, Ms.

9     Fox-Young.

10              Any other defendants have questions for

11    Mr. Edgman?

12              MS. JACKS:  Your Honor, I do.

13              THE COURT:  Ms. Jacks.

14                        EXAMINATION

15    BY MS. JACKS:

16         Q.   Good morning, Mr. Edgman.

17         A.   Good morning.

18         Q.   I just want to clear up some questions that

19    I have about this memo.  So I'm holding what's

20    Government's Exhibit 30, which is a memo that you

21    prepared on March 10, 2014?

22         A.   Yes, ma'am.

23         Q.   And you reviewed that today before

24    testifying?

25         A.   Yes, ma'am.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   But the memo was provided to you by the

2  Government?

3       A.   Yes, ma'am.

4       Q.   You didn't bring it with you?

5       A.   No, ma'am.

6       Q.   Okay.  And I'm looking at it.  Let's see,

7  if I'm just looking at the top -- I need to make this

8  smaller.  So you prepared this memo to the Warden to

9  document which cameras were working, partially

10  working, or nonfunctional; is that right?

11      A.   Yes, ma'am.

12      Q.   And the first sentence of this memo says,

13  "The following cameras are nonoperational," and then

14  that is a colon?

15      A.   Right.

16      Q.   Then there is a three-page list of cameras?

17      A.   Correct.

18      Q.   So are you meaning to say that every camera

19  listed in this memo is nonoperational?

20      A.   Yes, ma'am.

21      Q.   Okay.  So every camera on the three-page

22  list was either partially working or not working on

23  March 10, 2014?

24      A.   Yes, ma'am.

25      Q.   Okay.  And I want to direct you to cameras

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   102, 106, and 107.  Okay, is that how you designate

2   those cameras?

3         A.   That's how they are identified on the

4   camera system, yes, ma'am.

5         Q.   Okay.  And I want to show you the

6   photograph that's been marked as Rudy Perez Exhibit

7   N, which is a diagram depicting the unit where the

8   Molina homicide occurred.  Do you recognize this

9   diagram?

10        A.   Yes, ma'am.

11        Q.   Okay.  So can you tell me, there is a

12  camera over the blue exit door on the far right-hand

13  side of the photograph.

14        A.   Correct.

15        Q.   Is that camera 102, 106, or 107?

16        A.   No.

17        Q.   What camera is it?

18        A.   I couldn't tell you the number of the

19  camera.  I could tell you it would be the left

20  camera.

21        Q.   Okay.  Well, can we go back to this list?

22        A.   Sure.

23        Q.   That's where I'm having trouble.

24             Which camera is the left -- I see another

25  way to designate the cameras, 1 A A, 1 A B, and 1 A

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   C?

2        A.   1 A A is housing unit 1 A, A pod.  1 A B is

3   B pod, 1 A C is C pod.  Three different pods.

4        Q.   All right.  So the cameras in the exhibit I

5   just showed you, RP-N, can you tell me what cameras

6   they are?

7        A.   Sure.  If you can put up the picture, I can

8   tell you.

9        Q.   Let's start with the one on the far right

10  over the blue exit door, the blue door with the exit

11  sign?

12       A.   That would be the right camera.  This is

13  the center camera for the pod.  And that would be the

14  left, or the right camera.  So left, center, and

15  right.

16       Q.   So the camera over the blue exit door is

17  the left camera?

18       A.   Yes, ma'am.

19       Q.   Center is obvious.  And the other camera is

20  the right?

21       A.   Correct.

22       Q.   Okay.  On this list of cameras in the memo

23  that you prepared on March 10th, can you tell me

24  where those cameras -- if they're located on the

25  list, where they were on the list?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   So 1 A B right is poor quality.  So the
 2   right camera in B pod.
 3        Q.   So that is this one right here, number 106,
 4   1 A B, right?
 5        A.   Correct.
 6        Q.   And that's the camera that's poor quality?
 7        A.   Correct.
 8        Q.   So it was functioning on March 10, 2014,
 9   but it wasn't functioning well?
10        A.   Correct.
11        Q.   The images were fuzzy?
12        A.   I'm not one hundred percent certain if the
13   images were fuzzy, or if the reticle inside the
14   camera itself was showing a bright picture.
15        Q.   Okay.
16        A.   Poor quality; you couldn't make anything
17   out.  But as to whether it was a blurred picture, or
18   a bright picture due to the reticle in it; that, I
19   don't remember.
20        Q.   Okay.  But the camera wasn't broken; it was
21   running, it was functioning?
22        A.   It was sending video feed, yes, ma'am.
23        Q.   It just wasn't functioning at top quality?
24        A.   Correct.
25        Q.   And that would be the camera -- just so we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   are all clear, I'm showing you Rudy Perez N.  That
 2   would be the camera that's --
 3        A.   The right camera.
 4        Q.   The camera that's not over the blue exit
 5   door?
 6        A.   Correct.
 7        Q.   Okay.  So that one was, on March 10th,
 8   filming, but filming poor quality, camera 106?
 9        A.   Correct.
10        Q.   Okay.  Let's talk about the camera over the
11   blue exit door, the camera that you call the left
12   camera.
13        A.   Correct.
14        Q.   Which camera is that on this Exhibit 30?
15        A.   It's not on that list, because it was
16   operational.
17        Q.   That camera was working?
18        A.   Yes, ma'am.
19        Q.   A hundred percent?
20        A.   Yes, ma'am.
21        Q.   So not on the list of nonoperational
22   cameras?
23        A.   Correct.
24        Q.   And what about the center camera; is that
25   on this list?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, ma'am, it's not.

2      Q.   So that was working on March 10, 2014?

3      A.   Yes, ma'am.

4      Q.   Referring to the camera, the 106, the 1 A B

5   right.  On March 10, 2014, if you'd been asked to

6   pull video feed from that camera, the poor quality

7   camera, could you have done that?

8      A.   I'd imagine so, yes, because it's sending

9   video feed to the DVR.

10      Q.   Okay.  Now, is the Southern New Mexico

11   Correctional Facility accredited by some sort of

12   agency?

13      A.   Back then, or at this point in time?

14      Q.   Back then, back in March of 2014.

15      A.   I'm not one hundred percent sure, but I'd

16   probably say in 2014 our ACA accreditation had

17   expired.

18      Q.   As part of your ACA accreditation, do you

19   have to make reports regarding surveillance cameras

20   in the institution?

21      A.   I'm not one hundred percent sure on their

22   standards for video surveillance.

23      Q.   If a camera is broken -- and I mean by

24   broken, not sending video feed -- do you have some

25   sort of duty, either under the ACA standards or New

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

1    Mexico Department of Corrections standards, to make a

2    report within a certain period of time?

3         A.   Not that I'm aware of.

4         Q.   This report that you prepared about the

5    following cameras being nonoperational is dated March

6    10, 2014.  Do you know the previous report, the one

7    before this, the date on that?

8         A.   I do not.

9         Q.   Would there be one?

10        A.   Yes, ma'am.

11        Q.   Do you know how often you prepared reports

12   about the list of nonoperational or partially

13   functioning cameras?

14        A.   About every six months.

15        Q.   So at the longest you would expect to have

16   a report maybe from October?

17        A.   The fall of '13.

18        Q.   October, November, 2013?

19        A.   Yes, ma'am.

20        Q.   And where are these reports kept?

21        A.   Where are they kept?

22        Q.   Right.

23        A.   I don't know what the Warden would do with

24   them after I gave it to her.

25        Q.   But you provide the report to the Warden?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Correct.
 2        Q.    And then the Warden maintains custody of
 3    it, or does whatever she does with it?
 4        A.    Correct.
 5        Q.    And if a camera is not working, what is the
 6    reason for that?
 7        A.    I don't know.
 8        Q.    Could be anything?
 9        A.    Could be anything.
10        Q.    Could be turned off?
11        A.    We can't just turn off the camera.
12        Q.    And when a camera is not functioning, is
13    there a specific period of time that you have, or
14    that you're supposed to get the camera fixed?
15        A.    Not that I'm aware of.
16        Q.    And I want to go back to this list in
17    Government's Exhibit 30.  Are there -- first of all,
18    are there cameras in unit 1 A C pod?
19        A.    Yes.
20        Q.    And were there cameras there in March of
21    2014?
22        A.    Yes.
23        Q.    How many?
24        A.    Three.
25        Q.    And would they be the same configuration as
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the cameras in B pod?

2         A.   Yes.

3         Q.   Right, center, and left?

4         A.   Correct.

5         Q.   And according to this list on March 10,

6    2014, were any of those three cameras not working

7    based on your observations?

8         A.   Yes, ma'am.

9         Q.   Which one?

10        A.   1 A C right.

11        Q.   And is that what you call -- is that on

12   this list, camera 107?

13        A.   Yes, ma'am.

14        Q.   And in your terminology, right, center, or

15   left, which camera is that?

16        A.   Right.

17        Q.   The right.  What about the other two

18   cameras in unit 1 A C, based on your March 10, 2014

19   review?

20        A.   They would be operational.

21        Q.   So on March 10, 2014 there were two

22   functioning cameras in unit 1A C?

23        A.   Yes, ma'am.

24             MS. JACKS:  Thank you.  I have nothing

25   further.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1            THE COURT:  Thank you, Ms. Jacks.

2            Did you have something, Mr. Lowry?

3                        EXAMINATION

4   BY MR. LOWRY:

5       Q.  Good morning.

6       A.  Good morning.

7       Q.  I just want to get a little clarification.

8   Hope this helps everyone in the room.  This is Rudy

9   Perez Exhibit N, and this is a photograph of the blue

10  pod; is that correct?

11      A.  Yes, sir.

12      Q.  Okay.  Above these cameras, this is the

13  guards' observation station, isn't it?

14      A.  Yes, that's the officers' station, yes.

15      Q.  And as a matter of perspective, that's why

16  the cameras are labeled right, center, and left,

17  because they're labeled from how the guards would

18  observe the pod?

19      A.  Correct.  Or how you're looking at the pod

20  coming in the door.

21      Q.  Correct.  And that's the same for each pod?

22      A.  Yes, sir.

23      Q.  And so the blue pod, as I recall, housing

24  unit 1 A was on one end, then there is blue, yellow,

25  and then green?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yellow, blue, and then green in 1 A.
2  Yellow is A pod.
3      Q.   And that's where I'm going with this.  If
4  you could explain the layout of how they were laid
5  out.
6      A.   How the pods are laid out in the housing
7  unit?
8      Q.   Correct.
9      A.   So yellow pod was A, blue pod was B, and
10 red pod was C.
11     Q.   So that would correspond with what we see
12 on Government's Exhibit 30, with 1 A A right would
13 be --
14     A.   The right camera in A pod.
15     Q.   And that is green pod?
16     A.   A pod is yellow.
17     Q.   So A pod is in the center?
18     A.   Yes.
19     Q.   A pod is yellow.  B pod is blue?
20     A.   Correct.
21     Q.   And then C pod would be the green pod?
22     A.   Correct.
23     Q.   So in each pod, as you looked at it from
24 the guards' station on top, the camera on the
25 right-hand side of the pod was out?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                            1-800-669-9492
                                               e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1        A.    Correct.
2        Q.    Now, I just want to be clear on this, and
3   this is Rudy Perez Exhibit F.  I believe you
4   described this is a schematic of the lower level of
5   the pod; correct?
6        A.    Correct.
7        Q.    Okay.  And right here, where it says "long
8   walkway" over here, there would be a transit door
9   between the blue pod and the yellow pod; correct?
10        A.    Correct.
11        Q.    And the camera that was out in this pod
12   would have captured that door; correct?
13        A.    Correct.
14        Q.    But the same guard station, the camera on
15   the other side of that door in yellow pod was
16   functioning on March 7, 2014, wasn't it?
17        A.    It should have been.
18        Q.    According to Government's Exhibit 30, it
19   was, wasn't it?
20        A.    That's dated March 10th.
21        Q.    Okay.  On March 10, 2014, was this camera
22   functioning?
23        A.    Yes.
24        Q.    Do you have any reason to believe it was
25   not functioning on March 7?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.   No, I don't.

 2        Q.   In fact, Ms. Jacks had discussed a little

 3   earlier about your policy to report nonfunctioning

 4   cameras, and I believe you said you weren't aware of

 5   the policy?

 6        A.   Correct.

 7        Q.   Okay.  But if we look at the Department of

 8   Corrections policy, which is marked Rudy Perez

 9   Exhibit KK -- and this is New Mexico Corrections

10   Department policy 130700, at page 3 -- any

11   nonfunctioning camera should have been reported to

12   the Warden within 48 hours; isn't that right?

13        A.   That's what it says.

14        Q.   Well, that was the policy of the

15   Corrections Department, wasn't it?

16        A.   Yes.

17        Q.   And that policy wasn't followed by the

18   staff at Southern, was it?

19        A.   No.

20        Q.   So would there be any -- and the reason --

21   you're Chief of Security at that time?

22        A.   Yes.

23        Q.   As Chief of Security, is it important for

24   you to have the cameras fully functioning?

25        A.   Oh, of course.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

 1        Q.   Why didn't you make sure this policy was
 2   adhered to?
 3        A.   As far as reporting it, or getting them
 4   fixed?
 5        Q.   Well, I would assume that the reason you
 6   report it is so it gets fixed?
 7        A.   So we could attempt to get them fixed,
 8   correct.
 9        Q.   Okay.  Do you just attempt to do the job,
10   or do you do the job?
11        A.   We have contractors that come out to do the
12   cameras, which goes through the business office, get
13   the contractors to come out to work on the cameras,
14   to look at the cameras.  Then they tell you what's
15   wrong with them.  They give you a quote to get them
16   fixed.  And you have a certain amount of time to get
17   them fixed.  You exceed that time, then you start the
18   whole process all over again.
19        Q.   Which would be why you'd want 48 hours
20   notice, so you could start that policy as quickly as
21   possible, isn't it?
22        A.   Yes.
23        Q.   So it doesn't really help once every six
24   months.  You could lose six months' worth of security
25   video?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I can tell you this about getting the

2   contractors in to come fix those cameras; those

3   contractors were called in numerous times.

4      Q.   But my question is nobody would know to

5   make the call unless the Warden was put on notice

6   within 48 hours of a camera going bad?

7      A.   The camera system was an ongoing issue.  So

8   it was an ongoing process to get the contractors to

9   come in to work on the cameras, ongoing.

10     Q.   But if you're the Warden, you want to know

11  if you have a nonfunctioning camera, don't you?

12     A.   Yes.

13     Q.   And that's why you have this policy in

14  place?

15     A.   Okay.

16     Q.   No, I'm asking you.

17     A.   Yes, yes.

18     Q.   So at any time during the course of the

19  Molina investigation, were you aware of anybody

20  asking to see the left-hand camera in yellow pod?

21     A.   No.

22     Q.   Was there any interest ever expressed by

23  anybody to view any of the cameras in yellow pod?

24     A.   Not that I'm aware of.

25          MR. LOWRY:  No further questions, Your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Honor.
 2               THE COURT:  Thank you, Mr. Lowry.
 3               Any other defendants have
 4   cross-examination?
 5               Ms. Bhalla?
 6               MS. BHALLA:  Thank you, Your Honor.
 7                          EXAMINATION
 8   BY MS. BHALLA:
 9       Q.   Good morning.
10       A.   Good morning.
11       Q.   I just have a couple of questions.  Was
12   part of your job as -- in security to review
13   classification files on the inmates?
14       A.   No, ma'am.
15       Q.   Okay.  Who would be responsible for that?
16       A.   Several people.  The unit manager and the
17   classification officer.
18       Q.   And who was unit manager at the time?
19       A.   That, I don't recall.  Unit managers have
20   changed.  They change quite often.
21       Q.   Okay.  So you said the unit manager.  And
22   who was the other person?
23       A.   Classification officer.
24       Q.   And do you know who the classification
25   officer was at the time?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    I do not.

2        Q.    Did you ever review the classification

3   files as part of security?

4        A.    No.

5        Q.    Did you ever take time to study which

6   inmates were put on which levels of restrictions for

7   security reasons?  Were you aware of what, in

8   general, the pods -- were they on lockdown, or if

9   they were classified as Level 6, or classified as

10  Level 4?  Would you be aware of that information?

11            MR. CASTELLANO:  Objection, relevance, Your

12  Honor, this doesn't touch on the cameras.

13            THE COURT:  Well, I'll give her a little

14  leeway.  Let's not go too far.  I don't want to turn

15  this into discovery.

16       A.    That housing unit in general, it housed the

17  SNM.

18       Q.    And what does that mean?

19       A.    They're Level 4s.

20       Q.    And were they treated as Level 4s after the

21  homicide, do you know?

22            MR. CASTELLANO:  Objection, relevance.

23            THE COURT:  What's the relevance of this to

24  the motion to suppress?

25            MS. BHALLA:  Well, I'm trying to understand



SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                  201 Third NW, Suite 1630
Santa Fe, NM 87501                          Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492
                                                    1-800-669-9492
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                          e-mail: info@litsupport.com

```
 1    exactly what his role was in security at the time,
 2    and how they were reviewing the files.  It may be a
 3    little far afield, Your Honor, and it's my last
 4    question.
 5              THE COURT:  I think we're getting a little
 6    far afield.  Sustained.
 7              MS. BHALLA:  Thank you, Your Honor.
 8              THE COURT:  Thank you, Ms. Bhalla.
 9              Anyone else have any other
10    cross-examination of Mr. Edgman?
11              All right.  Mr. Castellano, if you wish to
12    redirect Mr. Edgman.
13              MR. CASTELLANO:  Thank you, Your Honor.
14              THE COURT:  Mr. Castellano.
15                    REDIRECT EXAMINATION
16    BY MR. CASTELLANO:
17         Q.   Deputy Warden, you were asked about the
18    sectors, once again, in terms of what was captured.
19    I'm going to show you Rudy Perez' Exhibit F.  You
20    said on cross-examination you had -- based on your
21    experience -- an idea of what would have been cut out
22    if the right camera was not working.  Can you just
23    draw a line on the diagram approximating where you
24    think would have been cut out.  We'll see the video
25    eventually, but from your experience, what would have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    been cut out by the absence of a working camera on

2    the right side?

3              MS. JACKS:  Objection; that misstates his

4    testimony.

5              THE COURT:  Well, he can clear it up if he

6    disagrees with it.  Overruled.

7         Q.   Okay.  So for the record, you've drawn

8    basically a cut-out of this exhibit with a line

9    between cells 114 and 115; is that accurate?

10        A.   Yes, sir.

11        Q.   So if a right camera was not working, is it

12   fair to say you couldn't see that portion that's been

13   cut out?

14        A.   Correct.

15             MS. JACKS:  Same objection; misstates the

16   testimony.

17             THE COURT:  Overruled.

18        Q.   Let me ask that again.  So you cut out a

19   section of this diagram which cuts out exhibits

20   115 -- or cells 115 and 116; is that your

21   approximation of what would not be captured by the

22   cameras?

23        A.   Yes, sir.

24        Q.   And did you know cell 115 to be Rudy Perez'

25   cell?

SANTA FE OFFICE                                                                           MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                               Albuquerque, NM 87102
(505) 989-4949                                                                              (505) 843-9494
FAX (505) 843-9492                                                                     FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   I do now.

2      Q.   You were asked about this policy regarding

3  the cameras, and a number 5, on Rudy Perez KK.  This

4  is page 3 of the exhibit, talks about reporting

5  cameras to the Warden within 48 hours.  Now, do you

6  actually know whether or not that part of the policy

7  was followed?

8      A.   I'd say it wasn't.

9      Q.   Okay.  Now, let me ask you this.  Were you

10 responsible for reporting every outage of the

11 cameras, or were there others who were also

12 responsible?

13     A.   There is others that are responsible.

14     Q.   So, as far as you know, you may not have

15 done this, but you can't speak for others?

16     A.   Correct.

17     Q.   Now, when the security system or the camera

18 system was first put in place, did that come with a

19 means of maintaining those cameras?  Was there

20 anything tied to that contract which meant people

21 would come out routinely and monitor and fix those

22 cameras?

23     A.   I'm not aware of that.

24     Q.   In other words, each time you became aware

25 of a camera not working, did you or others as far as

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you know put in a work order to get cameras repaired?

2        A.   Yes.

3        Q.   What would be some of the problems when you

4    tried to get cameras repaired?

5        A.   So I believe the contractor at the time was

6    HEI.  So they would contact the contractor.  The

7    contractor would come out, give us an estimated cost

8    of what, you know, it would cost to either replace

9    DVRs, replace cameras; tell us what was wrong.  And

10   then we would have 30 days to get the purchase order

11   together to have them come out and abide by that

12   quote.  After 30 days, if there was no purchase order

13   in place, then the contractor would have to come back

14   out, give another analysis of the system and a new

15   quote.

16       Q.   To the best of your knowledge and

17   recollection, tell us about the fastest repair that

18   you witnessed and the slowest repair that you

19   witnessed.

20       A.   None.

21       Q.   Well, in other words, how fast have you

22   seen a camera get repaired?

23       A.   I never saw a camera get repaired by HEI.

24       Q.   Well, in terms of knowing that a camera was

25   repaired.  Let's say you had a report that a camera

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    wasn't working, there is a work order, and then the

 2    camera appears to be working.  So based on that part

 3    of your experience, what can you tell us?

 4          A.    I never saw it happen.

 5          Q.    Now, how regularly were you aware of work

 6    orders being put in to repair the cameras?

 7          A.    I couldn't give an exact amount or when

 8    they're put in.  I know what I did on my part as far

 9    as getting with the business office to get the

10    contractors to come in to look at things.

11          Q.    Tell us about your part.

12          A.    In my part, after I submit the

13    documentation with the Warden, I'd get with the

14    business office, let them know that we have issues

15    with our camera system.  And in turn, they would go

16    contact the contractor who was in charge of the

17    camera system.

18          Q.    Can you tell the Court whether you do this

19    on a regular basis?

20          A.    Constantly.

21          MR. CASTELLANO:  I pass the witness, Your

22    Honor.

23          THE COURT:  All right.  Mr. Edgman, you may

24    step down.  Is there any reason Mr. Edgman cannot be

25    excused from the proceedings?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. CASTELLANO:  No, Your Honor.

2          MS. FOX-YOUNG:  No, Your Honor.

3          THE COURT:  All right.  You're excused from

4    the proceedings.  Thank you for your testimony.

5          All right.  Ms. Armijo, Mr. Castellano,

6    does the Government have further witnesses or

7    evidence it wishes to present?

8          MS. ARMIJO:  Not as to this motion, Your

9    Honor.

10          THE COURT:  All right.  How about Mr.

11   Perez?  Does he have further witnesses or evidence he

12   wishes to present in rebuttal?

13          MR. VILLA:  We do not, Your Honor.  And

14   that includes Mr. Wright, so he can be released from

15   the writ.

16          THE COURT:  So we don't need Mr. Wright.

17   All right.  So are you done with, then, the evidence

18   portion?

19          MR. VILLA:  We are.

20          THE COURT:  Do you want to argue in support

21   of your motion?

22          MR. VILLA:  Ms. Fox-Young would, Your

23   Honor.

24          THE COURT:  All right.  Ms. Fox-Young.

25          MS. FOX-YOUNG:  May it please the Court,

SANTA FE OFFICE                                                                MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                     Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Your Honor.

2            THE COURT:  Ms. Fox-Young.

3            MS. FOX-YOUNG:  As the Court heard in

4    opening argument, Mr. Perez argues that the Court

5    should suppress all evidence pertaining to the walker

6    and the video in this case.  I won't detail the

7    litany of evidence, unless the Court would like to

8    hear it.

9            On the basis of both Trombetta, and if the

10   Court moves to Youngblood, Youngblood.  It's our

11   position that based upon the evidence that the Court

12   has heard, and that we have submitted and detailed in

13   the pleadings and the attachment to our reply, the

14   evidentiary value of the walker was -- it was clearly

15   apparent that it was exculpatory very near in time to

16   the Molina murder.

17           The Court has heard evidence from the case

18   agent, State Police, that he heard directly from Mr.

19   Perez that his walker had been taken, and also that

20   he had nothing to do with the murder.  And I'll just

21   reiterate for the Court.  I know the Court heard

22   testimony on this, but it was somewhat contradictory.

23   The transcript for Mr. Perez' interview on March 10th

24   with Agent Palomares has been admitted.  And Mr.

25   Perez actually told the case agent, "They took my

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    walker today saying a part was missing off my walker.

2    And I was, like, you know what I mean, that was news

3    to me, you know what I mean?"  He says again, "They

4    took my walker from me."  He never says to Agent

5    Palomares that he was involved in the removal of a

6    piece.  He says again, in response to Agent Alvarado

7    and Agent Palomares, "You know what I mean, they came

8    and they said a piece was missing off my walker,"

9    meaning STIU had.

10          The Court heard a litany of evidence from

11   various STIU officers and other Corrections

12   Department employees and personnel about the fact

13   that the investigators on this case never were able

14   to rule out a separate source for shanks.  They don't

15   know, to this day, where they came from.

16          And the Court heard a lot of testimony

17   about the wheelchair program.  Agent Palomares

18   himself, and the Government in their response say,

19   you know, we think this metal actually came from the

20   wheelchair program, from a wheelchair.  The Court

21   heard this morning the Major testify that it

22   certainly is -- this piece certainly could have come

23   from other walkers in the wheelchair program.  That

24   was Mr. Mulheron.

25          The Court heard significant testimony

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    impeaching Agent Palomares from Mr. Holguin that he
2    knew from multiple sources about metal coming out of
3    the wheelchair program.  He testified that not only
4    did he submit this to the head of STIU at Southern,
5    Coordinator Blanco, but he gave it all to Agent
6    Palomares.  He gave every memo to him, including a
7    memo that we received yesterday, which the Government
8    represents it had not seen until yesterday, that
9    states that Mr. Perez -- and this is our Exhibit
10   PP -- that Mr. Perez actually advised Ernie Holguin
11   that he had found that a metal part was missing from
12   the walker weeks prior, three to four weeks prior.
13           He describes -- and Mr. Holguin asks if he
14   had a purple walker; totally different from the
15   walker photographed and purported to be Mr. Perez'.
16           And this is clearly Brady, first of all,
17   Your Honor, and should have been produced long ago,
18   highly relevant to the Court's inquiry here as to the
19   exculpatory nature of this walker.  I mean, the
20   Corrections Department knew it.  They -- we don't
21   know today, because we haven't heard from a witness
22   who will own up to having confiscated it and seized
23   it -- we heard that it was seized in the process of
24   shakedowns.  We've heard that somebody took it and
25   brought it to an office -- not an evidence room --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    and photographed it with these grainy photographs,
 2    that don't show scale, size, color, material.  But
 3    they seized it, and they photographed it because they
 4    knew it was important.  And the reason they knew it
 5    was important is because they cannot identify the
 6    source of these shanks.  And to this day, they can't.
 7             They knew there was lot of metal floating
 8    around that pod.  They had informants telling them
 9    exactly how the metal was getting out of the
10    wheelchair program, which is why in their after
11    action review the Warden and the folks in Santa Fe
12    said:  You've got to go look at this wheelchair
13    program; this may be coming from there.
14             They didn't document any inventory.
15    Sitting here today witnesses tell you:  We don't know
16    what was there and we don't know what was missing.
17             This is classic exculpatory evidence.  This
18    is textbook law school Trombetta evidence.  You
19    heard -- the Court heard from Mr. Ainsworth, who said
20    that Mr. Wright absolutely testified that walkers
21    like Mr. Perez' walker, which he had an independent
22    recollection of, were in the wheelchair program in
23    March of 2014.  He worked in that program.  He told
24    Ernie Holguin, and possibly others -- or it was
25    represented that he had actually taken metal out of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the wheelchair program.  I don't know that Mr. Wright

2    told him that, but Mr. Gonzalez did.

3            And so the prosecution team knew the value

4    of this walker.  What we know after this hearing is

5    that it existed for some time.  It was not tested.

6    It was not swabbed.  It was not -- we don't know the

7    metal component.  And we don't actually know how long

8    it was around.  But we know that Agent Palomares was

9    apprised of all of this information, and that nobody

10   on the prosecution team was able to rule other

11   sources of metal out as a source of the weapon.  And

12   so I think clearly under Trombetta, the exculpatory

13   value was apparent.

14           Even if the Court moves to the Youngblood

15   analysis -- and as we argued in opening, Youngblood

16   didn't overrule Trombetta, but if the Court moves to

17   the Youngblood analysis, and finds that it's

18   necessary for suppression that Mr. Perez show bad

19   faith --

20           THE COURT:  Well, haven't I already -- as

21   at least me -- decided that you have to do that in

22   Harry?  I mean, haven't I already made that sort of

23   legal determination that that's required?

24           MS. FOX-YOUNG:  I don't know the facts of

25   Harry well enough to distinguish it for the Court.  I

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                                 (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                              1-800-669-9492
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

```
1    think the Court may have moved quickly to find that
2    there was no apparent exculpatory value of the walker
3    before hearing evidence.  And if the Court doesn't
4    want to hear any more argument on Trombetta, I'll
5    move to Youngblood.
6            THE COURT:  Well, I'm just asking.  I mean,
7    I'm not cutting you off in any way.  I may need to
8    re-look at it.  But at least once before I took a
9    hard look at this issue, and I thought I had
10   concluded that it's going to require a showing of bad
11   faith.
12           MS. FOX-YOUNG:  Certainly under Youngblood,
13   if the Court makes a finding that the exculpatory
14   value of the walker was not apparent, even after
15   hearing that the Corrections Department seized it;
16   that there was a lot of talk about whether or not the
17   piece came from it or from another source --
18           THE COURT:  It would seem to me that, if
19   anything was apparent -- and I'm not sure where I'm
20   going to go on the apparent part of -- if anything
21   was apparent, it was not that it was exculpatory, but
22   that it might have been inculpatory.  Because it
23   seems to me the people that were focusing on Mr.
24   Perez were looking at him from a possible player in
25   it.  Those people who were not focusing on him would
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    not have been looking at inculpatory.  So it's hard
 2    to match up your people in a way that would get you
 3    to the point where the people that were focusing on
 4    Mr. Perez were looking at that as inculpatory.  It
 5    seems to me it's the opposite.
 6              Your thoughts on that?  Maybe I'm missing a
 7    piece of evidence that would get you to where you
 8    need to go.  But it seems to me, anybody that was
 9    focusing on Mr. Perez were looking at him in an
10    inculpatory way.  And everybody that wasn't focusing
11    on him wouldn't have been focusing on the walker as
12    an exculpatory piece of evidence.
13              Does that make sense?
14              MS. FOX-YOUNG:  I think the Court is right
15    that that was the focus of the witnesses.  However,
16    it's an objective standard under Trombetta and under
17    Youngblood.
18              And so, back in 2014, it's apparent from
19    all the testimony, that nobody seemed to care about
20    chasing down the source of those shanks.  Yet, in
21    their minds, Your Honor, they did nothing to chase
22    that down, and to do anything that could quantify --
23              THE COURT:  But that's the thing:  If
24    nobody was interested in chasing down the shanks, it
25    seems to me that it wasn't apparent that any of that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    information was going to be exculpatory.

2            MS. FOX-YOUNG:  Well, I think --

3            THE COURT:  If anything, looking back at

4    it, you would have thought they would have gone after

5    it more vigorously as inculpatory evidence.

6            MS. FOX-YOUNG:  Well, I think it's hard to

7    say.  I'm not sure that the subjective -- I think the

8    subjective view of those witnesses doesn't matter

9    because it's an objective standard.

10           But if the Court wants to move to

11   Youngblood, finding that it wasn't -- the exculpatory

12   value was not apparent under Trombetta, I think the

13   Court has to find that a complete failure to

14   investigate even evidence that was seized.  I mean,

15   clearly, Your Honor, they knew this walker was

16   important.  If they thought it was inculpatory, why

17   wasn't it tested?  Why wasn't it fit against the

18   shanks that they had?

19           But a complete failure to complete any

20   investigation.  I mean, you heard testimony that --

21   from a witness who says, yes, this walker was

22   important.  It was in my office.  We thought it might

23   be the source.  We did nothing with it.  And short of

24   saying we took it outside and melted it in the

25   dumpster -- I mean, they have absolutely lost or

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    destroyed this evidence.  And as far as the value is

2    concerned, from an objective standard, the possible

3    exculpatory nature or possibly utility under

4    Youngblood, the Court has heard from Ms. Schile as to

5    what should have been done and what could be done now

6    if we had it.  You know, whether --

7              THE COURT:  Well, I agree with that.  If

8    I'm looking, though, for -- if I'm looking for bad

9    faith, it seemed to me Ms. Schile didn't close the

10   gap.  She just gave us a negligence standard; that

11   this is what, in her view, a reasonable police

12   investigation would have done.  But she didn't give

13   me anything that would get me up to the bad faith

14   standard.

15             What would you -- I know you disagree on

16   the standard -- but if you were to -- if you had to

17   argue what in the evidence I've heard over the last

18   two days would get you to bad faith, what would you

19   point to?

20             MS. FOX-YOUNG:  I would point, Your Honor,

21   to the firsthand knowledge that Agent Palomares had

22   of the importance of this walker, and the fact that

23   other sources hadn't been ruled out.  That was from

24   Mr. Perez himself.

25             Numerous memos from Ernie Holguin.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You think that's bad faith or
 2     just not good work?
 3              MS. FOX-YOUNG:  I think, when this Court
 4     saw the impeachment of Agent Palomares, and that
 5     either he absolutely buried his head in the sand, to
 6     quote Judge Posner, or lied on the stand -- and I'm
 7     not saying he did -- but it's one or the other.  He
 8     received this information from Ernie Holguin as to
 9     all these other sources of metal; the fact that metal
10     was coming in; the fact that Mr. Perez told him the
11     part had been missing for three or four weeks, all
12     these memos that the Court saw that are in evidence,
13     either received those and threw them in the trash --
14     which is clearly bad faith -- or he lied to the
15     Court.  And the same thing with the witness this
16     morning of their own.
17              So I don't know what the point a completely
18     botched investigation --
19              THE COURT:  Well, let's pause on that.
20              What's your position?  Do you think he lied
21     to the Court, or do you think that he was up to
22     monkey business when he was throwing that material
23     out?  What's your theory?
24              MS. FOX-YOUNG:  Your Honor, I'm not -- I
25     don't think it matters.  Either way, it's bad faith.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Either -- I mean, you're the case agent for the New
 2    Mexico State Police investigating a murder --
 3              THE COURT:  But you're making a closing
 4    argument here.  Tell me what you want me to find.
 5    When I make my findings of fact, do you want me to
 6    find monkey business at the time, or that he came
 7    into federal court and lied here yesterday?
 8              MS. FOX-YOUNG:  I think that, with respect
 9    to each of these witnesses, the Court has to make a
10    credibility determination.  And --
11              THE COURT:  Was he telling the truth
12    yesterday, or was he -- I mean, do you want me to
13    find that the bad faith occurred back when he threw
14    out the material, or the bad faith occurred -- or
15    that he was lying yesterday?  And if he was lying
16    yesterday, what is the story here?  What's the story
17    he's lying about?  I mean, he came in and seems
18    rather credible, because how does it help him to say
19    he just tossed it out?
20              MS. FOX-YOUNG:  It's hard to explain why
21    you didn't actually preserve exculpatory evidence and
22    why you didn't do anything to chase down the source
23    of the murder weapon.
24              THE COURT:  But if you're going to lie,
25    wouldn't you come in and say, I never had it?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1              MS. FOX-YOUNG:  Which is what he said, Your
2     Honor.  He said that he did not receive those
3     materials from Ernie Holguin; that he never saw a
4     walker; that he never saw any evidence of a walker;
5     that he never talked to anybody about the walker.
6     And then the Court heard all these witnesses from the
7     Corrections Department say:  We were totally focused
8     on the walker, we seized the walker, we photographed
9     the walker, we talked to people about the walker.
10             I just don't think it stands to reason that
11    the case agent didn't know about it.  Maybe he forgot
12    about it.  But the important thing is that at the
13    time he received these materials.  And it was -- at
14    some point I think the Court has to find that it's
15    bad faith not to -- I mean, this is a case agent for
16    New Mexico State Police investigating a murder.  How
17    do you not look into the source of the murder weapon?
18             Now, the fact that the State didn't care
19    about a broader conspiracy in 2014, and the feds have
20    picked it up and cast a wide net, I think, is
21    immaterial.  The source of that --
22             THE COURT:  Why is that immaterial?
23    Because it seems to me it's the bad faith at the time
24    of the evidence gathering that I have to focus on.
25    Would you agree?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MS. FOX-YOUNG:  I would agree.
2              THE COURT:  So, if for some reason, they
3     didn't make a broader investigation, isn't the fact
4     that the United States has decided to broaden the
5     investigation, isn't that really relevant?  Because,
6     otherwise, Mr. Perez wouldn't be in this case, or in
7     any case.  And that has to explain -- it's the United
8     States' plowing here that's picked up Mr. Perez.
9              MS. FOX-YOUNG:  Your Honor, let me be more
10    precise.  At the time of the investigation, in March
11    of 2014, the Court heard testimony from witnesses
12    that everybody in those pods was a suspect.  They
13    talked to as many people as they could.  Everybody
14    who is SNM validated or suspected was a suspect.
15    They didn't know who committed that murder.  And the
16    reason they talked to Rudy Perez was to find out
17    where the thing came from.
18              And so the fact that they didn't follow-up
19    on those leads I think is immaterial.  The fact that
20    Agent Palomares absolutely disregarded clear
21    exculpatory evidence -- maybe the Court finds that
22    it's potentially exculpatory, but I think you have to
23    find that the walker itself -- I'll tell you this:
24    Had the Corrections Department ruled out the
25    wheelchair program as a source, if they put on
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    witnesses who said:  We know this came from the
2    walker, here are all the reasons that we know that,
3    it would be clearly inculpatory, and we would have no
4    argument.
5            But they told the Court the opposite.  I
6    think much to the Government's surprise.  Witness
7    after witness said:  We don't know where this thing
8    came from.  It could have come from the walker; it
9    could have come from somewhere else.  In fact, there
10   was a lot of hard evidence that it did come from
11   somewhere else.  And that was all known at the time.
12   That was all -- I mean, whether Agent Palomares will
13   cop to it or not, I think a very credible witness, in
14   Ernie Holguin, testified he provided it all.  He had
15   a very distinct memory.  And he's the only witness
16   who documented anything.  It's all in his memos, and
17   he provided it.  Nobody else -- I mean the
18   Government's theory isn't documented in notes.  There
19   is no report as to what happened to this thing.
20           So I think if the Court is going to make a
21   credibility determination, it's got to be that Ernie
22   Holguin was believable when he said he gave all this
23   to the case agent.
24           THE COURT:  Well, tell me the credibility
25   determination.  If you want to write my opinion and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    my facts, who lied and what did they lie, and what

2    then was the truth?

3            MS. FOX-YOUNG:  The truth is that the

4    prosecution team had the information that this walker

5    was exculpatory, and this video was potentially

6    exculpatory at the time of the murder.  I think that

7    is clearly elicited in the testimony.  Witness by

8    witness, and I think that comes from Ernie Holguin --

9    you know, clear impeachment of Agent Palomares --

10   whether Agent Palomares was lying or misremembering

11   he's got documented material that he turned over.  If

12   the Court looks closely at Defendant's Exhibit PP,

13   it's really material to this question as to what they

14   knew.

15           Now, because of the nature of this

16   investigation, it's easy for the Government to say,

17   Well, STIU knew this, and Santa Fe knew this, and

18   State Police knew this.  But they can't point fingers

19   in opposite directions and claim that nobody was

20   responsible for carrying out the investigation.

21           And so, as a unit, as a whole, the

22   Corrections Department, working hand in hand with

23   State Police, they had this information and they

24   disregarded it.  I think Agent Palomares clearly lied

25   to the Court when he said he didn't know that the

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                     Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

1    walker was in play.  If I were the Court, I would

2    make that finding based upon the testimony.  That's

3    presumptuous of me, but since the Court has asked how

4    I would write the findings.

5         I think Major Mulheron this morning was

6    less than honest when he said he didn't know what

7    happened to the walker.  He knew the shank may have

8    come from another walker.  And nobody has come

9    forward to tell this Court what happened to the

10   thing.  The Court has heard that, you know, for the

11   first time in history this critical piece of evidence

12   that might have been the source of a murder weapon

13   was held in somebody's office.

14        I mean, I can go on and on about how the

15   investigation was odd, and evidence wasn't preserved.

16   And I think the Court has to take that into

17   consideration when you make a bad faith

18   determination.  At what point do we go over the

19   precipice and say:  You have to conduct a real

20   investigation.  You cannot just ignore significant

21   evidence.  I don't know if that answers the Court.

22        THE COURT:  Well, I guess the thing that's

23   somewhat telling to me is that when the State did its

24   prosecution, it didn't go this direction with Mr.

25   Perez.  So I find that to be very telling, that they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   did their thing, and the United States is doing their
 2   thing.
 3            MS. FOX-YOUNG:  Well, is the Court
 4   asking --
 5            THE COURT:  Well, I mean, it sort of fits.
 6   I mean, you brought in a lot of people that were back
 7   there.  And they weren't focused on Mr. Perez or this
 8   walker.  And that's exactly where the prosecution
 9   went, too.  They didn't focus on Mr. Perez.
10            MS. FOX-YOUNG:  Well, and the prosecution
11   dismissed folks out.  I mean, the State case looks
12   entirely different for a whole bunch of reasons.
13            THE COURT:  But isn't that very
14   significant?
15            MS. FOX-YOUNG:  I don't think so, because
16   in any investigation --
17            THE COURT:  They dismissed the State case;
18   the feds take over, and it went a different
19   direction.  But the fact that nobody in the State was
20   interested in Mr. Perez and his walker, I don't know,
21   I think that's of some significance.
22            MS. FOX-YOUNG:  It is of significance.  But
23   it is the job of investigators, it is the job of
24   State Police to ferret out the evidence.
25            THE COURT:  If the feds hadn't been around
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    here, you wouldn't be complaining about their
 2    investigation, right?
 3             MS. FOX-YOUNG:  They wouldn't be here for
 4    me to complain about.
 5             THE COURT:  Let's take this up after lunch.
 6    All right.  We'll be in recess for about an hour.
 7    I'm going to leave the building, so depending on how
 8    quickly we get food.  I'm not going to start without
 9    anybody.
10             (The Court stood in recess.)
11             THE COURT:  All right.  Let's go on the
12    record.  I think everybody has now got counsel here.
13    Look around the room, make sure everybody has got
14    counsel.
15             All right.  Mr. Granberg, looks like you're
16    joining us for the afternoon.
17             MR. GRANBERG:  Yes, Your Honor.
18             THE COURT:  Good afternoon, Mr. Granberg.
19             Mr. Burke, you're going to leave after the
20    first break; is that correct?
21             MR. BURKE:  Yes, Your Honor.
22             THE COURT:  All right.  So be safe on your
23    travels.
24             MR. BURKE:  Thank you, Your Honor.
25             THE COURT:  Are there any other changes?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Anybody on the phone?
 2              MR. CASTLE:  Yes, Your Honor.  Jim Castle.
 3    I'm on the phone.
 4              THE COURT:  All right, Mr. Castle.
 5              All right.  Ms. Fox-Young, do you wish to
 6    continue your argument?
 7              MS. FOX-YOUNG:  Thank you, Your Honor.  I
 8    believe, when we left off, the Court was asking what
 9    our position is as to the fact that the State did not
10    charge Mr. Perez in the State case.  And I think the
11    Court wonders what knowledge -- I won't speak for the
12    Court, but what knowledge could be imputed, or what
13    the exculpatory -- what the apparent or potential
14    exculpatory value of evidence is, if these
15    investigators aren't going after Rudy Perez.  Is
16    that --
17              THE COURT:  Well, I guess -- let me break
18    it down a little bit, because I probably was merging
19    two things.  But one is on the, sort of, first prong,
20    the Trombetta prong.  It seems to me that, if the
21    prosecution didn't focus on Mr. Perez, it's more
22    difficult for you to say that the walker was either
23    exculpatory -- of exculpatory significance, or that
24    it was apparent before destruction, so it seems to
25    me, if the whole sweep of the investigation is more
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    difficult to say than it was apparent, because it was
 2    focused.
 3             And then the second thing -- I think this
 4    is where we were talking -- is that it seems
 5    difficult to say, if we get into the bad faith, that
 6    they were acting in bad faith, given that nobody was
 7    focusing on Perez, even through the State
 8    prosecution.
 9             MS. FOX-YOUNG:  Okay.
10             THE COURT:  So it sort of goes, I think, to
11    both your Trombetta argument, and also to the bad
12    faith, the Youngblood.
13             MS. FOX-YOUNG:  And I would just say that I
14    think the Court is right to point --
15             THE COURT:  Take the first one first.
16    Let's go back and plow a little bit the Trombetta,
17    because I jumped a little bit to the bad faith.  But
18    go back and plow that a little more.
19             MS. FOX-YOUNG:  Yes, Your Honor.
20             I think the Court is right to point out
21    that the New Mexico Corrections Department and, of
22    course, the district attorney, did not, perhaps, have
23    Mr. Perez in their sights as investigation matured.
24    But I think that also cuts other way, Judge, and that
25    is because he wasn't charged.  You know, so what --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and we maybe know a portion of what the Corrections

2    Department did with that walker.  We know that it was

3    seized, confiscated, inspected to some degree,

4    photographed.  And they didn't charge Mr. Perez.  And

5    so there --

6            THE COURT:  If you're not charging, you're

7    not focusing, is really the Government -- and I think

8    would it be the State officials would be charged with

9    this -- can you really charge them with, you know,

10    looking for exculpatory evidence?  I mean, generally,

11    you begin to look at exculpatory evidence when you're

12    focusing on someone as a suspect or target.  Not

13    looking for exculpatory evidence of people you're not

14    targeting.

15            MS. FOX-YOUNG:  Well, I think in doing

16    this --

17            THE COURT:  I mean, your argument is --

18    almost has to be that they should have been targeting

19    Mr. Perez from the very beginning, and therefore,

20    they should have been looking for exculpatory

21    evidence from the very beginning.

22            MS. FOX-YOUNG:  Yes, Judge.  And I think,

23    either under Trombetta or Youngblood, in assessing

24    the value of the evidence, in doing the analysis, the

25    Court should look, not -- I think it's irrelevant

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   what the DA decided to do, vis-a-vis Mr. Perez.  What

2   is relevant is that all these folks with the

3   Corrections Department, part of the prosecution team,

4   whenever they were working, and Agent Palomares, the

5   case agent -- whether or not they'll admit it -- were

6   focused on Perez.  They interviewed him.  They say

7   that's why they took the walker.  They thought it

8   might have come from him.  They were exploring that.

9   And they're the ones that lost the evidence.  It's

10  not the DA who made that decision.

11         So we have to look early on.  This is

12  structurally a little bit strange, because the

13  investigation was conducted in 2014, and after the

14  State case dropped, the feds bring it up.  But the

15  feds are relying on this investigation, and they've

16  worked hand in hand with this team.  And so I think

17  the Corrections Department is either part of the team

18  or not.

19         Objectively, they had to know, when they

20  were looking at Mr. Perez as a suspect in that pod,

21  that this piece of evidence had exculpatory value.

22         THE COURT:  Well, let's back up for a

23  second, because don't you have to establish that for

24  it to be apparent that it was exculpatory before

25  destruction, don't you have to first establish that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it's apparent and obviously exculpatory now?  And if
 2    it's not, then it's kind of irrelevant, a lot of the
 3    things you and I are talking about, because isn't it
 4    your duty to establish, right this minute, that that
 5    walker, wherever it is, is exculpatory?
 6              MS. FOX-YOUNG:  Your Honor, I think that's
 7    the easy part of the inquiry, you know, given
 8    multiple -- and the answer is yes.
 9              THE COURT:  What is the most -- what is the
10    best evidence you have that that walker had no parts
11    missing?
12              MS. FOX-YOUNG:  Well, I don't think that's
13    the only question.
14              THE COURT:  But isn't it really?
15              MS. FOX-YOUNG:  Well --
16              THE COURT:  If you can't establish right
17    this minute that that walker -- whether it's in a
18    garbage dump or still floating around at the Pen, you
19    know, has all its parts there, then it's not
20    apparently exculpatory now; it wouldn't be apparently
21    exculpatory then, would it?
22              MS. FOX-YOUNG:  I don't think anybody
23    disagrees -- in fact, Mr. Perez made a statement that
24    STIU had found a piece was missing there.
25              THE COURT:  So from that alone, how can we
```

SANTA FE OFFICE                                               MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    say that the walker is obviously exculpatory?

2           MS. FOX-YOUNG:  Well, because there was

3    metal all over that pod.  And because this Court has

4    heard testimony from Corrections Department officials

5    that they had strong belief that walkers in the

6    wheelchair program could have produced that shank.

7           THE COURT:  But it seems to me that that

8    undercuts, though, the obviously or apparently.

9    Because if that walker would show up this afternoon

10   about 3:00, you know, and it had parts missing, I

11   don't think we still could say it's apparently or

12   obviously exculpatory.  You've got to take some --

13   several inferences in your direction.  And the

14   Government will take some inferences in their

15   direction.

16          MS. FOX-YOUNG:  And I understand, if the

17   Court doesn't feel that this is in the universe of

18   Trombetta --

19          THE COURT:  Well, but argue with me.  I

20   mean, I've got to first deal with your Trombetta

21   argument.  So I'm grappling with it so I can write an

22   opinion on it.

23          MS. FOX-YOUNG:  Your Honor, given --

24          THE COURT:  Tell me what's wrong with my

25   analysis.



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          MS. FOX-YOUNG:  Given the testimony from

2     witnesses yesterday and today that the shanks may not

3     have come from the walker.  Folks who were on the

4     prosecution team telling this Court that they believe

5     the shanks could have come from the wheelchair

6     program; that was not.  There are inmates who say

7     metal was coming in from the wheelchair program.

8          It's a strange coincidence that, in March

9     of 2014, there were walkers of the same type as Mr.

10    Perez' in the wheelchair program where SNM, or at

11    least blue and yellow pod inmates were working.  And

12    so I think the Court has to grapple with that; that

13    there has been strong testimony that the shanks may

14    not have come from the walker.  It's unusual to see a

15    case like this, where perhaps there is an identical

16    walker with missing pieces in the wheelchair program.

17         The Court has heard evidence that there was

18    no inventory.  The Government doesn't know what may

19    have been missing.  And so from the defense

20    perspective, and even from an investigative

21    perspective, you can't rule out a very obvious

22    source.  And you have multiple individuals telling

23    you that's where they think it came from.  There is

24    apparent exculpatory value.  How do you not --

25         THE COURT:  But you've shifted now to

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    Youngblood with that language, would you agree?

 2              MS. FOX-YOUNG:  Apparent exculpatory value?

 3              THE COURT:  Well, if it's indeterminate --

 4    I mean, isn't that what Youngblood is saying?  If

 5    it's indeterminate, exculpatory value, you just don't

 6    know.  You've got a walker back there that has pieces

 7    missing.  That seems to be the best we have.  So

 8    that's indeterminate as to which way it goes, whether

 9    it's exculpatory or not.  And that could be used very

10    much against the defendant.  Here's your walker, it's

11    missing pieces.

12              MS. FOX-YOUNG:  And I think drawing the

13    line there, you may never have anything that

14    satisfies the Trombetta standard.

15              And Youngblood didn't overrule Trombetta

16    And I understand where the Court is coming from.  I

17    can't say, standing here today, that it absolutely,

18    you know, would prove -- if we had the walker here

19    today and could test it, that it absolutely would

20    prove to be exculpatory.  But it clearly has value

21    and should be tested.  I think that is what is

22    apparent.

23              THE COURT:  It seems to me, once you make

24    that argument, you shift over to Youngblood.  That's

25    my only point, is once I hear those words out of your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    mouth, it sounds to me like we're in Youngblood.  And
 2    if that's your point, we both agree, you've got to go
 3    the bad faith route.
 4              MS. FOX-YOUNG:  I think, given the
 5    testimony, we meet the Trombetta standard.  But I
 6    understand the Court's reluctance to find that it
 7    absolutely was apparent.  We think it was apparent.
 8    We think that, according to these witnesses, it was
 9    apparent.
10              THE COURT:  It seems to me the witnesses --
11    the best you can probably establish is that it's an
12    interesting piece of evidence.  But it's not
13    exculpatory.  I didn't think you got really somebody
14    to say, Yeah, that -- we were looking at it, and it
15    was all together and it was exculpatory.
16              MS. FOX-YOUNG:  Well, I mean, if the Court
17    would like, we can move to Youngblood.
18              THE COURT:  All right.
19              MS. FOX-YOUNG:  And I know the Court did
20    look at Youngblood closely, and Harry, and the other
21    cases.  I know the Court is familiar with the factors
22    from the Bohl case, Tenth Circuit, and the inquiry
23    that must be made into bad faith.  I think clearly
24    the Government knew, the Corrections Department and
25    State Police knew, at the time that this walker was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    lost or destroyed or whatever happened to it, that it

 2    had evidentiary value, and that it should be tested.

 3    I mean, witnesses have told the Court that they

 4    examined it; that they kept it.  We don't know what

 5    happened to it after that.  But that, without testing

 6    it, essentially, they couldn't rule out whether or

 7    not it was the source of the murder weapon.

 8              THE COURT:  What test would you really have

 9    done here?

10              MS. FOX-YOUNG:  Well, for one thing, Your

11    Honor, I think the test that the prosecution claims

12    to have done, that we haven't heard evidence was

13    done, of simply taking the pieces that were recovered

14    and comparing them to the walker.  I mean, the

15    Government has told you that they make a perfect fit.

16    We haven't heard evidence of that.  But that might be

17    the first think that any layperson would do.  I think

18    the Court heard a lot about forensic testing that

19    could be done.  We don't know whether it's the same

20    sort of metal, the same color, the same dimensions.

21    I mean, they are pretty basic testing, which maybe it

22    was done, and witnesses haven't told this Court about

23    it.  But all of those things would comprise a pretty

24    basic investigation to determine the source.

25              THE COURT:  If you were to point to a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   case -- do you have a case in which the Court has

2   concluded, from anywhere, Tenth Circuit or otherwise,

3   in which the Court concluded that failure to do tests

4   is going to rise to the level of bad faith?

5            MS. FOX-YOUNG:  I don't think we're arguing

6   that it was the failure to do tests.  I mean, I think

7   it's the failure to preserve it so it could be

8   tested.

9            But the Court has heard that the

10  Corrections Department didn't even follow their own

11  policies and procedures as to preserving this

12  evidence.  When they took it in, they put it in an

13  office, photographed it, in blatant disregard of

14  their own policies.

15           And I do think there are cases -- let me

16  see if I can cite to the Court -- that address that,

17  that sort of circumstance.  I think Agent

18  Palomares -- and I don't know what the Court's

19  findings will be with respect to the knowledge that

20  he had at the time of the investigation --

21           THE COURT:  If you were writing it, what

22  would you say I should say about that?

23           MS. FOX-YOUNG:  That based upon the

24  testimony of the other witnesses, he completely

25  disregarded and failed to consider clearly
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    exculpatory evidence pertaining to Mr. Perez.  And

2    that is, for one thing, the memo from Mr. Holguin

3    that states that Mr. Perez said that the piece had

4    been missing since February.  Didn't chase that down

5    at all.  All of the information that was coming from

6    informants that these shanks came out of the

7    wheelchair program.

8              And so -- and then, even if the Court finds

9    that a failure to investigate is in bad faith, I

10   think to come into this Court and demonstrate that

11   all that material was disregarded, or to lie to the

12   Court, shows bad faith.

13             At some point --

14             THE COURT:  But do you look at the bad

15   faith that's going on now?

16             MS. FOX-YOUNG:  Bad faith in the course of

17   the investigation, which is continuing.  I mean,

18   today, we've had production of Brady materials, today

19   we've had production of materials pertaining to the

20   cameras that recorded the homicide.  I mean, the

21   investigation has been ongoing since March 7, 2014.

22   So yes, I think the bad faith continues.  I think the

23   analysis of whether or not there is bad faith

24   continues.

25             The pertinent period for the Court -- the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Court obviously is focused on March of 2014, and what
 2    happened to that walker, and whether agents acted in
 3    bad faith.  But I think it's very telling that the
 4    case agent was pretty severely impeached by STIU
 5    officers who say he had all this information.  And
 6    Palomares said he didn't explore it.
 7            There is a case I'd like to cite for the
 8    Court, United States v. Elliott, which is 83 F.Supp.
 9    2d 637, it's out of the Eastern District of Virginia
10    from 1999, and --
11            THE COURT:  Who is the judge on it?
12            MS. FOX-YOUNG:  That's a good question,
13    Your Honor.  Let me see if I can pull it up.  Let me
14    give the Court first a pin cite.  It's at 650 to 51.
15    And the Court there discusses that -- it's Judge
16    Payne, P-A-Y-N-E.  The Court discusses the fact that
17    it was -- the Government was arguing that it was
18    stupid for the DEA agent to have destroyed evidence;
19    said it wasn't in bad faith, because bad faith can
20    only be found if there is specific intent.  And the
21    court addresses how Trombetta and Youngblood analyses
22    play into that, and says the bad faith really isn't
23    confined to the circumstance in which a DEA agent
24    deliberately says:  I'm going to deprive the private
25    defendant of due process or hurt his case.  That,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   basically, can't be the test.  Because if that's the
 2   test, there is nothing to stop -- there is no line to
 3   draw to place a check on the destruction of evidence.
 4   And in every case, law enforcement agents would be
 5   able to defend the destruction of evidence, as they
 6   are here, by lying about their subjective intent, or
 7   by violating with impunity the rules they're
 8   obligated to follow.  It's an objective standard,
 9   Your Honor.  And think the Court -- any law
10   enforcement officer can come in and say:  I didn't
11   know, I didn't care to know, I can't remember.
12   That's not the standard.  I mean, this is clearly
13   highly relevant evidence.  Corrections Department
14   knew that; that's why they confiscated the walker;
15   that's why they took it in to STIU.  That's why they
16   took pictures of it.  That's why they questioned Rudy
17   Perez, that's why they questioned all these other
18   guys.
19           And for them to come in now and say, Well,
20   we just don't know what happened.  It was in my
21   office.  I remember all these other specifics, but I
22   just can't tell you what happened to it.  I think
23   that's bad faith.  And Judge Payne speaks to that.
24           I would like to make another -- I don't
25   want to jump the gun, if the Court has other
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    questions about the bad faith inquiry, but I would

2    like to --

3              THE COURT:  Go ahead.

4              MS. FOX-YOUNG:  On the question of whether

5    a remedial jury instruction is proper, this is a

6    somewhat active area of law.  And I know in the

7    opening, the Court asked whether the civil standard

8    applies.  And I know the Court is very familiar with

9    the Henning case and spoliation claims in the civil

10   context.  I don't think it applies in the due process

11   context.  I think the Court should look at this

12   through a different lens.

13             THE COURT:  What is the difference between

14   the civil standard and bad faith?  I'm having trouble

15   seeing in the Tenth Circuit spoliation jurisprudence

16   how it's different than bad faith, which is the words

17   the Supreme Court used.  Do you have any thoughts on

18   that?

19             MS. FOX-YOUNG:  I don't know that the Tenth

20   Circuit has construed that point.  I haven't found a

21   case on that.  But other circuits have.  There is a

22   case out of the first circuit, United States v.

23   Flores-Rivera, 787 F.3d 1, at 19, and Note 13, which

24   says:  Negligent destruction of a particular piece of

25   evidence likely to be exculpatory might justify an

SANTA FE OFFICE                                                                              MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                            (505) 843-9494
FAX (505) 843-9492                                                                   FAX (505) 843-9492
                                                                                        1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                              e-mail: info@litsupport.com

```
 1    instruction, a spoliation instruction.
 2              THE COURT:  Isn't that where the Tenth and
 3    the First differ, is that the Tenth -- the First
 4    sometimes -- some of the other circuits will give you
 5    negligence, but the Tenth won't.
 6              MS. FOX-YOUNG:  In the civil context?
 7              THE COURT:  In spoliation?
 8              MS. FOX-YOUNG:  That may well be.  I can't
 9    say I know exactly the jurisprudence out of the First
10    Circuit on the civil --
11              THE COURT:  I thought that's what made the
12    Tenth a little bit -- about the highest standard.
13    I'm not saying they are the highest, but they employ
14    the highest standard as far as spoliation before you
15    start giving those instructions.
16              MS. FOX-YOUNG:  I think the difference in
17    the criminal context is the Court has to look to
18    prejudice to the defendant.  This is all through the
19    lens in the context of a due process inquiry.
20              So, even if the Court finds -- and I think
21    the Court has ample evidence to make a finding of bad
22    faith here -- but even if the Court finds that this
23    falls short of bad faith in some way, looking at a
24    remedial jury instruction in the criminal context is
25    different.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          And as I said, I don't have a Tenth Circuit

2     cite for the Court.  There is another case out of the

3     Ninth Circuit, United States v. Sivilla, which is

4     Noonan from 2013, finding that bad faith is not

5     required for a remedial jury instruction.  And that

6     again, you're looking at negligent destruction of

7     evidence.  I think the Court clearly has found there

8     was negligence here.  Well, the Court hasn't made any

9     findings, but seems to have observed that.  And that

10    you look at significant prejudice to the defendant.

11         There has got to be some mechanism for the

12    Court to address the fact that the linch pin of the

13    Government's case here, the walker that is alleged to

14    have produced the murder weapon, the case against

15    Rudy Perez, you know, the walker is missing, and

16    there is no explanation for why.  I mean, clearly, it

17    was important to the prosecution team at the time, in

18    2014.  And there has not been a reasonable

19    explanation to the Court.

20         Bohl speaks for that in the bad faith

21    inquiry.  You know, whether the Government is able to

22    offer an innocent explanation for its failure to

23    produce evidence.  I don't think the Court has heard

24    that.

25         And so, of course, we think there is ample

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   evidence for the Court to make that bad faith finding
2   if the Court turns to Youngblood.  But we want the
3   Court to also consider the value of a remedial
4   instruction here, as we get closer to trial.
5               THE COURT:  All right.  Anything else, Ms.
6   Fox-Young?
7               MS. FOX-YOUNG:  Not at this time, Judge.
8               THE COURT:  Thank you, Ms. Fox-Young.
9               Mr. Beck, let me see if any other
10  defendants want to weigh in on this debate before I
11  hear from the Government.  Anyone else?
12              All right.  Mr. Beck?  Why don't we start
13  where Ms. Fox-Young left off.  Would you concede
14  negligence?
15              MS. BECK:  Well, if you notice by where I'm
16  sitting at the table there, I'm not in a position to
17  concede much.  But I think --
18              THE COURT:  You're at the podium.
19              MS. BECK:  But I think the facts -- I think
20  the undisputed facts, I think --
21              THE COURT:  Well, what --
22              MS. BECK:  I think there is negligence.
23              THE COURT:  What do you think about this
24  investigation?  I mean, do you think it was shoddily
25  done?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MS. BECK:  I wrote down a note from Ms.
 2  Fox-Young's closing argument just now that -- I think
 3  she said -- and I want to get this right -- the
 4  investigation was odd.  And I would say it was more
 5  than odd.  I would say the evidence today shows that
 6  it was not a well-performed investigation.  I think
 7  that losing the walker -- and there is no testimony
 8  that I recall as to where that was, how it was
 9  destroyed, how it was lost.  I think that shows that
10  it was not a good investigation.
11            So I'm not conceding that there was
12  negligence, but I wouldn't be surprised if the Court
13  looks back at the lengthy transcript and finds there
14  was negligence.
15            But negligence doesn't meet the standard
16  under Youngblood.
17            THE COURT:  Well, let's start with
18  Trombetta and go back.  And maybe I'm wrong in
19  looking at it this way, but it seems like there may
20  be some evidence here that, if we had the walker
21  here, it might -- if you had other evidence, would
22  show something exculpatory.
23            MS. BECK:  And that takes us -- that
24  statement right there takes us from Trombetta to
25  Youngblood.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1              THE COURT:  So you think that to meet
 2    Trombetta, if somebody would wheel in, at 3:00, the
 3    walker, and it had parts missing, which seems to be
 4    what everybody is conceding, that because we look at
 5    that and can't instantly conclude that that's
 6    exculpatory, then we're out of Trombetta?
 7              MS. BECK:  Exactly, yes.  I think to be in
 8    Trombetta --
 9              THE COURT:  So we've got to be able to do
10    it, and the officers back then had to be able to do
11    it.  They had to look at it and say:  It can't go
12    either way; it's got to be apparently or obviously --
13              MS. BECK:  That would take us into
14    Trombetta.
15              THE COURT:  Take it out.
16              MS. BECK:  No.  So, if the officers back
17    then looked at Mr. Perez' walker, and saw that there
18    was no part missing --
19              THE COURT:  Then that would be exculpatory.
20              MS. BECK:  That would be Trombetta.  That
21    would be apparently exculpatory, talking about the
22    walker then --
23              THE COURT:  Is there any evidence over the
24    last two days that that was the case?
25              MS. BECK:  No, there is no evidence of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that.
 2              THE COURT:  Everybody seems to agree that
 3    there were some parts missing.
 4              MS. BECK:  Right, exactly.  And I would
 5    point out to the Court some of our best evidence.  I
 6    think yesterday morning I said:  Mr. Perez does not
 7    dispute that he noticed, and told officers that the
 8    walker was gone.
 9              And so I will point the Court to the
10    defendants' exhibit -- I have it written down here
11    somewhere.  All right.  Maybe I don't.  The
12    transcript of the interview with Palomares.  And Ms.
13    Fox-Young began her closing argument pointing out
14    portions of the interview from March 10th of 2014.
15    And the Court should note on the front page of
16    this -- again, this is in evidence -- that this is
17    against Jerry Armenta.  And that gets to the Court's
18    point, which the Court has made multiple times, that
19    no one was looking at Perez.
20              So, for the Court to read later on -- I'd
21    like the Court to start at page 19, and read
22    through -- read all the way through page 28.  Because
23    in here, Mr. Perez admits to being a member of the
24    SNM.  And that's on page 20.  Agent Alvarado asked
25    him:  "When did you get validated?  When did you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   start with SNM?"

 2           And he says, "Way back.  They just barely

 3   validated me in 2008, though."

 4           They, meaning STIU.  And now we're talking

 5   about validation, not when he joined.

 6           Mr. Perez has said, "I was under the radar.

 7   I was on the line the whole time, then (Spanish)

 8   didn't bother me because I do my time."

 9           He goes on to talk about why he can't say

10   anything to law enforcement, because he would be

11   killed if he does.  And he talks here -- and

12   basically, says, "I'm an old timer," this is page 21,

13   line 16.  "Nobody tells me.  'Pup' don't tell me what

14   to do.  Styx don't tell me what to do.  Yeah, there

15   is not a motherfucker here who is going to tell me

16   what to do no more."

17           So he's saying:  I don't get told what to

18   do.  I don't do anything.  And that lays the context

19   here for page 26, where he says, "You know what I

20   mean, and because they came and they said a piece of

21   my walker was missing" -- that's STIU.

22           Agent Alvarado says, "Yeah."

23           And he says, "When that piece came up

24   missing, I was in the shower.  What was I going to

25   do?  Go make a big thing about it?"

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          And that right there is his admission,

2   which the defendants put into evidence, that he knew

3   that piece was missing from his walker.  That

4   admission takes us out of the Trombetta, because now

5   we have undisputed evidence, even he admits.  And

6   again, we're assuming that some portion of this is

7   truthful.  But it is undisputed that the walker was

8   missing a piece right here.

9          Then he goes on to say, "I was going to

10  clean that up on my own."  And that plays back into

11  the piece that no one was telling him what to do.

12          Now, I also want to point out that -- and

13  I'm jumping ahead a little bit here -- but in the

14  Court's decision in Harry, and looking back at the

15  Tenth Circuit's case in Bohl, one of the indicia that

16  we're looking for in bad faith is whether this is a

17  crucial piece of evidence, okay?  And this is not a

18  crucial piece of evidence.  "This" being the walker

19  in this case.  Because Rudy Perez was only found

20  after the original indictment.  And the Court and

21  everybody has heard this multiple times, when he

22  admitted to the CHS that he provided his walker to

23  other defendants to be made into shanks to kill

24  Javier Molina, because that is the work that he could

25  do.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          Okay.  And this is Exhibit 16.  This is

2     from the hearing on November 27, 28, 29.  But they

3     were all incorporated and admitted here.  Where Rudy

4     Perez now admits to Cordova, the CHS in this case,

5     that he provided his walker.

6          And so here, at the bottom of Bates 20531,

7     he says, "Rudy Perez says they came to me and they're

8     like, Big Dog, something has to be taken care of, but

9     we need squina.  You don't have to do nothing.  You

10    don't have to say nada.  You don't have to do fuck."

11    Basically, that's when they took his walker and made

12    the shanks.

13         And again, when the Court is deciding this,

14    I would urge the Court to read through that entire

15    transcript, because in that transcript he says, I

16    have never told anyone except for you, the CHS, that

17    I did this, that I provided my walker to put in work

18    for the family.

19         And so now, again, this is the only time we

20    have competing stories from Rudy Perez throughout the

21    testimony here, that this was missing when he went in

22    the shower; it was missing two weeks earlier; they

23    took his walker on the morning of the 10th; they took

24    it the 14th.  And Rudy Perez explains in Government's

25    Exhibit 16 why that is.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492

BEAN
ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1              Those statements -- and again, I will note
2    that the reason I said it was undisputed yesterday is
3    because it's on page 5 of Mr. Perez' motion here in
4    the brief, where he says, "Mr. Perez disclosed to
5    NMSP Agents Palomares and Alvarado that prior to the
6    murder, a piece of his walker went missing while he
7    was in the shower."
8              So that's why, until yesterday, I thought
9    it was undisputed.  Because he pointed that out in
10   his brief --
11             THE COURT:  Well -- and I didn't hear Ms.
12   Fox-Young going in a different direction on that.
13             MS. BECK:  Right.
14             THE COURT:  I thought she gave you that.  I
15   think everybody agrees that right now, if we were to
16   find that, everybody would expect it to be missing
17   pieces.
18             MS. BECK:  So now we're into Youngblood.
19   In Youngblood we have to have possible exculpatory
20   evidence -- or indeterminate, I think, is the
21   language.  And I think we've got that from Ms. Schile
22   yesterday.  She said, at best, it's indeterminate.
23             This is the Court's decision in United
24   States against Harry, 927 F.Supp. 2d 1185.  And so
25   now I'm reading from page 1216 there.  "The inquiry
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  into bad faith must necessarily turn on the

2  Government's knowledge of the exculpatory value of

3  the evidence at the time that it was lost or

4  destroyed."

5          And that's, Your Honor, quoting the Bohl

6  decision from the Tenth Circuit, which we've talked a

7  lot about today.

8          So when we're talking about bad faith and

9  about the negligence, and about some conflicting

10 testimony today, the salient inquiry here is the

11 evidence of the Government's knowledge of the

12 exculpatory value of the evidence at the time it was

13 lost or destroyed.

14         To this date, the Government doesn't have

15 any knowledge of the exculpatory value of that piece

16 of evidence.  And it never did.  Because everyone

17 agrees that the walker was inculpatory.

18         THE COURT:  Well, I guess right at this

19 moment, you would just as soon have that walker here

20 to wave in front of the jury --

21         MS. BECK:  Precisely.

22         THE COURT:  -- to show the missing pieces?

23         MS. BECK:  Precisely.

24         I think everyone would agree -- and most

25 having more experience than me -- that this is a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    unique case, where the United States is not relying
 2    on a lot of hard, or material -- material is the
 3    wrong word -- hard or physical evidence.  A lot of
 4    our best evidence is co-conspirator statements.
 5              And, here, you just saw Mr. Perez'
 6    co-conspirator statement, which is our best evidence.
 7    No one is hiding that.  That's why he's indicted.
 8              And so here -- well, we can come back to
 9    that --
10              THE COURT:  Hold on just a second.
11    Mr. Hammond, could you get my glasses?  I'm trying to
12    read these cases.
13              Go ahead, Mr. Beck.
14              MS. BECK:  So, if we look -- and I can find
15    this because I have this decision here -- but I
16    copied this note down, and I think it's a little bit
17    more clear -- this is from the Bohl decision -- "The
18    Trombetta standard of exculpatory evidence has not
19    been met here, because on the record before us, the
20    Government's test results suggest that the towers'
21    chemical composition failed to conform to the
22    contract specifications."
23              In that case, it was fraud, alleging that
24    the materials used in these towers were less than the
25    contract called for.  And so, in that case, the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    towers were the best evidence.  But because the

2    Government had some evidence that backed up its

3    theory that the towers wouldn't have been

4    exculpatory, it took it out of Trombetta.  And when

5    the Court goes back and reads that decision, you'll

6    see that the possibility of the towers being

7    exculpatory --

8              THE COURT:  You're talking about Bohl?

9              MS. BECK:  Bohl.  The possibility of the

10   towers being exculpatory was much greater than here,

11   because there had been tests performed by the

12   company, for which these defendants worked, that

13   manufactured the towers, that showed that the

14   materials actually complied with the contract.  So

15   there was some physical testing evidence that showed

16   there may be exculpatory value.

17             But, as you'll see, even Bohl and Bell seem

18   to agree that it takes it out of the apparently

19   exculpatory evidence category of Trombetta.

20             And, so then we get into Youngblood.  And

21   the Court -- the Tenth Circuit laid out a test, which

22   this Court adopted, looking at the text messages in

23   its Harry decision -- and I think there is some good

24   language here -- the first I'll point out -- and this

25   is on page -- this is, again, on page 910 of that

SANTA FE OFFICE                                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                         Albuquerque, NM 87102
(505) 989-4949                                                                                    (505) 843-9494
FAX (505) 843-9492                                                                           FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    decision -- the Tenth Circuit said that it had

2    previously observed that the mere fact that the

3    Government controlled the evidence and failed to

4    preserve it by itself is insufficient to establish

5    bad faith.

6            And I'd submit to the Court, that when we

7    look back, that would be the extent of the evidence;

8    that we controlled it -- not United States, of

9    course -- that STIU or NMCD controlled it, and that

10   it was lost.

11           But down at the bottom of that page, find

12   "potentially useful evidence" as evidence which,

13   quote, "no more can be said than that it could have

14   been subjected to tests, the results of which might

15   have exonerated the defendant."

16           And I think that is probably the Defendant,

17   Mr. Perez', best evidence here, is Ms. Schile's

18   testimony that she could have performed tests on the

19   walker that may have exonerated the defendant.

20           So now, we're into the bad faith.  And this

21   is the test that the Court adopted.  As I said, it

22   must necessarily turn on what the Government knew.

23   And so here, when we're looking at page 911 -- this

24   is what I said, is that -- I said earlier -- is that

25   there was -- "Bell and Bohl had additional

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    independent evidence, the possibility that the steel
 2    met the contract specifications.  They had done tests
 3    previously and it met those."
 4            And that's what I'm talking about.  We
 5    don't have that physical probative evidence here.
 6            Nevertheless, when we're looking at bad
 7    faith, the first thing we do is look to notice to
 8    preserve.  There is no testimony that anyone put the
 9    government -- whether that be New Mexico State
10    Police, STIU, or NMCD -- on notice to preserve the
11    walker before it was lost.
12            The second part is more than mere
13    conclusory potential exculpatory value.  And that is
14    where they talk about TSL; the company that
15    manufactured these, had done tests on the towers
16    before, that showed the materials they were made of
17    complied with the contract, which negated the most
18    crucial piece of evidence, that the materials in
19    fact -- what the United States was saying, the
20    materials, in fact, did not meet the contract
21    specifications.
22            Here, I submit to the Court that, when we
23    look at all of the evidence, from everyone who
24    testified over the last day and a half, that all we
25    had is mere conclusory potential exculpatory value,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   at best.

 2            So, that's two.

 3            The third is, not only --

 4            THE COURT:  Are you standing or have an

 5   objection?

 6            MS. FOX-YOUNG:  I thought he was winding

 7   up.

 8            THE COURT:  Well, we'll let you know when

 9   he's wound up.

10            MS. BECK:  Yeah.

11            The third is possession and control.  And

12   this is after the notice is received.

13            So, again, we don't have evidence of notice

14   here, and we certainly don't have evidence of

15   possession and control after the notice was received.

16            THE COURT:  Well, when you say "notice,"

17   you're certainly not saying that some defendant has

18   got to send notice, right?  It's just notice in a

19   practical sense, right?

20            MS. BECK:  I think -- I mean --

21            THE COURT:  You could have a situation

22   where we're in a case, and somebody says, Hey, don't

23   destroy this evidence.  I mean, that would be notice.

24   But I mean, back then, you still have a Trombetta or

25   Youngblood situation before lawyers are involved,

SANTA FE OFFICE                                                                      MAIN OFFICE
119 East Marcy, Suite 110                                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                                             Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                                FAX (505) 843-9492
                                                                                     1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE                                             e-mail: info@litsupport.com

```
 1   or --
 2            MS. BECK:  I don't know the answer to that,
 3   Your Honor.
 4            In this case, in Bohl, the towers were in
 5   existence when this litigation started.  And the
 6   lawyers and the defendants all -- and the company
 7   made notice multiple times to preserve the towers
 8   before they were taken down and destroyed.
 9            So, in this case, they have notice from
10   lawyers and defendants before they were taken down
11   and destroyed.
12            The fourth category is -- and I can't even
13   read my handwriting there -- but, if we look at
14   Headnote 7, there is the evidence disposed of here
15   was central to the Government's case.
16            As I said -- and I think, as Your Honor
17   pointed out -- rightly so -- we would love to have
18   the walker here, because that would be, probably, our
19   best evidence against Mr. Perez.
20            But right now, central to the Government's
21   case is Mr. Perez' statements, and Mr. Rodriguez'
22   statements -- who is going to come in and say he saw
23   Mr. Perez giving his walker to be made into shanks.
24            The fifth, is that the Government --and
25   this is what Ms. Fox-Young alluded to -- the fifth
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1   category there is that the Government offers innocent
 2   explanation for its failure to preserve.  But it is a
 3   little bit more nuanced.  When the Tenth Circuit
 4   looks at authority, it says it teaches that if the
 5   government destroys or facilitates the disposition of
 6   evidence, knowing of its potentially exculpatory
 7   value, then we look to whether there might exist an
 8   innocent explanation.
 9           And so, in this case, the Government didn't
10   know -- still doesn't -- of any potentially
11   exculpatory value.
12           So that fifth category, is once we have
13   notice, once there is potential --
14           THE COURT:  Well, I'll ask you the same
15   question I asked Ms. Fox-Young:  If you were writing
16   my findings of fact, what would you put here?  What
17   is the Government's explanation for how this
18   disappeared?
19           MS. BECK:  The -- I think the evidence
20   would reflect that Warden Mulheron -- and I hope I'm
21   pronouncing his name right -- observed the walker, in
22   the Warden's office.  I don't think he was the Warden
23   at the time.
24           He had photos taken of it, which photos
25   have been entered into evidence twice in this.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    then we don't know.  His testimony at that point was
 2    that he believes that Officer Holguin took possession
 3    of the walker.  But I don't think Mr. Holguin
 4    testified to that.
 5             So, I wish I had a better answer for Your
 6    Honor, but the answer is we don't know.
 7             We know where it was on March 14, which is
 8    in the Warden's office, and then after that, we don't
 9    know.  So there is no explanation here.
10             But no explanation may be negligence, at
11    best.  It is certainly not bad faith under the
12    circumstances here.
13             Which gets me into where we started, and
14    then both departed from, which was the spoliation
15    sanction remedial jury instruction.  I think the
16    Court is right that the Tenth Circuit has a higher
17    civil standard.  I also have not seen any departure
18    from this in the criminal versus civil context.
19             But I think Youngblood, incorporating a bad
20    faith component to any sanction, to any due process
21    violation for destruction of evidence, likely, is the
22    same thing for remedial jury instructions.  And I say
23    likely, intentionally, because the case from which --
24    I think Ms. Fox-Young cited to the Court -- said
25    that, if the Government likely destroyed or lost

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

**BEAN
& ASSOCIATES**, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

184

```
1    evidence that might have had exculpatory -- or excuse
2    me, that was likely exculpatory -- if the Government
3    destroyed or lost evidence that was, quote, "likely
4    exculpatory," that, quote, "might warrant a remedial
5    instruction."
6            And whether we looked to bad faith or
7    negligence, we don't have, number one, that this was
8    likely exculpatory.  I think that all the evidence
9    shows that it was likely, if not totally inculpatory.
10   And even if we had that, that case says that it might
11   warrant a jury instruction.
12           In this case, if we look back at the
13   testimony; if we look back at Officer Holguin; if you
14   look back at Palomares -- but particularly Holguin --
15   he said:  Mr. Perez came to me; he said they took the
16   piece out of my walker three to four weeks before
17   that.  And I didn't have any reason not to believe
18   Mr. Perez.
19           And I think there are reasons Mr. Perez was
20   not targeted as one of the participants, number 1.
21           No one contends that he stabbed Mr. Molina.
22           Number 2, no one contends that he
23   manufactured the shanks that were used.
24           And he also -- there may be other reasons
25   that a targeted investigation into a murder by the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    limited resources of the State don't look to a wide
 2    range of conspiracy, as maybe a VICAR or a RICO
 3    prosecution by the United States would.
 4              And so if -- although, the destruction of
 5    the walker, in retrospect, isn't ideal, it's
 6    understandable what happened.  And if you could
 7    not -- if you suppressed evidence, or even gave a
 8    jury instruction because of lost or destroyed
 9    inculpatory evidence that may have some exculpatory
10    value, there would be very few, if any, RICO
11    conspiracy prosecutions that happen afterwards.
12    Because, what happens in these types of cases -- and
13    what happened here -- is that, as we get evidence, as
14    we collect evidence, prosecute defendants; those
15    defendants cooperate with the United States, and more
16    evidence is collected -- which largely -- especially
17    in this case -- relies on only statements where
18    evidence is destroyed -- that happens.  And that does
19    not support a basis for suppression of any evidence,
20    or a negative jury instruction.
21              I think -- and now I am wrapping up -- but
22    before I do, I think this motion included suppression
23    of paperwork.  The same principle applies.  Although,
24    in this case, I would say, if you look back at your
25    Harry decision, it also talks about in that case
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    evidence that was never in the United States'

2    possession.  It is a much higher bar for exclusion or

3    suppression.

4              And I think it may have been Officer

5    Holguin who testified about his interview of a CI

6    witness who said that Urquizo asked him what to do

7    with the paperwork.  And he said:  "Destroy it."

8              Mr. Urquizo destroyed it.

9              I think that establishes that the paperwork

10   was never in the Government's possession, and so it

11   was not destroyed by the Government.

12             But, again, if you look back at the Harry

13   case, in that case there were text messages that

14   allegedly were possessed by the United States, the

15   Court couldn't come up with any exculpatory valve of

16   those.  I would say the same thing about the

17   paperwork.  I don't see how that could have been

18   exculpatory.

19             In the Harry case, the Court said that

20   those text messages likely came in under the Best

21   Evidence Rule.  And I would submit to the Court that

22   that is the correct analysis here.  When we talk

23   about the paperwork, it was never in the United

24   States' possession.  There certainly wasn't bad faith

25   in its instruction on behalf of the Government.  And

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES, Inc.**
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

```
 1    any discussion about that in testimony at trial just
 2    goes back to the Best Evidence Rule and the best
 3    evidence would be those statements about it.
 4              THE COURT:  All right.  Thank you, Mr.
 5    Beck.
 6              All right.  Before I give Ms. Fox-Young the
 7    last word on this motion, anyone want to say anything
 8    on the defense side?
 9              All right.  Ms. Fox-Young.
10              MS. FOX-YOUNG:  Your Honor, first, it
11    simply isn't true that there is a different standard
12    under the due process clause for RICO cases.  I think
13    the Court, of course, knows that.  The federal
14    government picked this case up, and they have to take
15    the evidence as they find it.  And the standard
16    applies:  Trombetta, Youngblood, and all the other
17    case law applies, just as it does to non-RICO cases.
18              With regard to the civil standard that the
19    Court is very familiar with, and the question of
20    notice, I would just -- and I think the Court
21    knows -- is familiar with all these cases, but I
22    would point the court to Baker 2012 Westlaw 12294413,
23    Tenth Circuit case.  That's United States -- I'm
24    sorry, Tenth Circuit case from August 2012.  The
25    Tenth Circuit talks about the duty to preserve
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

188

```
 1   evidence, which arises at the time that litigation is
 2   imminent, the obligation to preserve evidence when
 3   the party has notice that the evidence is relevant to
 4   litigation, or when a party should have known that
 5   the evidence may be relevant to future litigation.
 6           The Browder case, which Judge Brack handled
 7   in 2016, explores the law on spoliation, and includes
 8   these Tenth Circuit cites.
 9           I think it does inform the notice inquiry.
10   And there is no question, in March of 2014, that the
11   Corrections Department, State Police are on notice,
12   to the extent the civil standard applies, are on
13   notice that this is going to pertain to a criminal
14   case.
15           So the Government's argument that the
16   defense has some burden to inform the Government that
17   they shouldn't destroy evidence, I think, is
18   unavailing.
19           And the Court pointed out that we're well
20   after the fact.  There certainly are cases, and Mr.
21   Beck explored them, where the Government is on actual
22   notice from a defense attorney.  But this is apparent
23   notice.  I think the Court can find that they should
24   have known that litigation was imminent; that a
25   criminal case was imminent.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            I would like to draw the Court's attention
 2    to some additional testimony from last week, and the
 3    parties have agreed that it's incorporated into this
 4    hearing.  Agent Stemo testified about Mario
 5    Rodriguez' debrief.  And in short, in summary, Mario
 6    Rodriguez described Mr. Perez as scared when he came
 7    in, when Mr. Rodriguez came in to the cell, and
 8    basically stated that Mr. Perez didn't want to be
 9    otherwise involved.  He appeared scared, and he made
10    some statements that he didn't want be hurt.  And
11    then Mario Rodriguez went on at some length about
12    that.
13            And so we'd ask the Court to consider this
14    is not an open-and-shut case, where -- I know that
15    the Court has said the fact that a lot of evidence
16    points to a missing piece from the walker is very
17    significant and material.  Nobody knows where those
18    shanks came from.  And that's what makes this
19    evidence so important.
20            Mr. Perez himself, in the subsequent
21    statements made to an informant that are the subject
22    of a separate suppression motion that the Court will
23    hear, Mr. Perez doesn't know what was ultimately used
24    to kill Javier Molina.  And if it didn't come from
25    his walker, he's innocent.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          And so the Government likes to say because

2     he made these subsequent statements, that's why he

3     was charged, we absolutely know what happened.  The

4     Government's own witnesses don't know what happened,

5     they don't know where the shanks came from, and that

6     is precisely why it would be so useful, so critical,

7     and we argue of an exculpatory nature, to examine the

8     walker.

9          The Court will recall that Agent Acee, with

10    regard to those statements -- I'm not going to get

11    into this in any great detail because we are going to

12    argue this on the other suppression motion -- but

13    Agent Acee testified that people do take credit for

14    things that they didn't do.  The Court will hear some

15    of the other reasons for that on our other motion.

16         But, as the Court continues to point to

17    what's relevant, is what was known in 2014 about the

18    importance of this walker.  And I think Mr. Beck

19    conceded that, to some degree.  With all due respect,

20    the Government can say all day that they'd like to

21    have the walker here today; that that would be

22    preferable.  But, in fact, I think they're in a much

23    more advantageous position just being able to rely on

24    grainy photographs, without scale, and to be able to

25    get up and say to the jury and to the Court:  We can

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                              1-800-669-9492
                                                  e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    demonstrate a perfect fit.  And they have done that

2    in open court.  They have done it in the pleadings.

3           That is precisely what we are asking the

4    Court to suppress and to not allow, because the

5    defense cannot counter that.  We don't have the

6    actual walker to compare.  We have a bunch of murky

7    testimony about what wasn't done.  And people don't

8    know what happened to it.  But when the Government

9    gets up and argues:  It's a perfect fit, we know it

10   came from his walker for all these reasons, that is

11   the linch pin of their case; that is what makes this

12   so material; and that is why I think the Court has to

13   consider, under Bohl and the Bohl factors, that it

14   goes directly to Mr. Perez' defense.

15          And so, if the Court is inclined to make

16   any ruling as to where the Government can and can't

17   go, we would ask the Court to not allow the

18   Government to make statements that there would have

19   been a perfect fit, when there is no evidence to

20   support it, and, of course, to suppress these grainy

21   photographs, other evidence of the walker, and

22   testimony as to any way that anybody can represent

23   that it is the source of the murder weapon in this

24   case.

25          And I have nothing further unless the Court
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   has any questions.
 2            THE COURT:  I don't.  Thank you,
 3   Ms. Fox-Young.
 4            Well, as I said in the Harry case, under
 5   the two-prong Trombetta test, the Government violates
 6   a defendant's right to due process when it destroys
 7   evidence whose exculpatory significance is apparent
 8   before destruction.  I will give some further thought
 9   to my analogy that I've been using, but I still think
10   that it's useful, that if we had the walker here
11   today, its exculpatory significance would not be
12   apparent even today.  You have to draw some other
13   inferences, and have some other evidence before it's
14   available.  And so it doesn't meet Trombetta
15   standard.  So I think it fails on its exculpatory
16   significance being apparent, and that there is no
17   evidence here that anybody thought it being
18   exculpatory at the time.
19            So I think that we are dealing with a
20   Youngblood situation.  And looking at the test in
21   Bohl that Judge Ebel wrote, again, he repeated the
22   Trombetta standard, but then he added that in
23   Youngblood, Trombetta was extended; that the
24   exculpatory value of the evidence is indeterminate,
25   and all that can be confirmed is that the evidence
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was potentially useful for the defense, then

2    defendant must show that the Government acted in bad

3    faith in destroying the evidence.  Youngblood tells

4    us why they have this bad faith standard, why it's

5    not just negligence, or why Trombetta is not the

6    standard to use.  The Supreme Court in Youngblood

7    stated that part of the reason for the difference in

8    treatment is found in the observation of Trombetta,

9    that, quote, "Whenever potentially exculpatory

10   evidence is permanently lost, the Court faces the

11   treacherous task of divining the import of materials

12   whose contents are unknown and very often disputed.

13   Part of it stems from our unwillingness to read the

14   fundamental fairness requirement of the due process

15   clause.  And Lisenba versus California, as imposing

16   on police and undifferentiated duty to retain and

17   preserve all material that might be of conceivable

18   evidentiary significance in a particular

19   prosecution."  The Supreme Court continued, "We think

20   that requiring a defendant to show bad faith on the

21   part of the police both limits the extent of the

22   police's obligation to preserve evidence to

23   reasonable bounds, and confines it to that class of

24   cases where the interests of justice most clearly

25   require it; i.e., those cases in which the police

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    themselves, by their conduct, indicate that the

2    evidence could form a basis for exonerating the

3    defendant.  We, therefore, hold that unless a

4    criminal defendant can show bad faith on the part of

5    the police, failure to preserve potentially useful

6    evidence does not constitute a denial of due process

7    of law."

8            I don't think I'll be able to find from the

9    evidence that's been presented over the last two days

10   any bad faith.  I think the Government has conceded

11   negligence.  I think Ms. Schile's testimony would

12   confirm that.  But that's about as far as it rises.

13   It just doesn't look like it was the most thorough

14   investigation.  And, obviously, the United States has

15   been more thorough in uncovering some evidence at

16   this point for an additional defendant.

17           So I'm inclined to rule that this case does

18   not fall within Trombetta because the evidence, even

19   if it was here, would not be apparently exculpatory.

20   It's a Youngblood situation.  And the defendant has

21   not proven that the state officials at the time acted

22   in bad faith.  As far as the notes, I just don't

23   think they were ever in the possession of the

24   Government, so it's not a situation where the

25   Government can be blamed for not having those notes.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1              So if this is a motion that the defendant
2    or defendants would like me to take a closer look at,
3    I'd be inclined to do so.  Otherwise, barreling
4    toward trial, that will have to be my ruling is that
5    I'm not going to suppress any evidence as a result of
6    this motion.
7              All right.
8              MS. FOX-YOUNG:  Your Honor?
9              THE COURT:  Yes.
10             MS. FOX-YOUNG:  Just one quick cleanup
11   item.
12             Mr. Beck informed me that -- and I don't
13   want to misstate the Government's position, but I
14   think they're willing to file -- I don't remember the
15   exhibit number, but Mr. Holguin's investigative file
16   under seal.  I think it's Exhibit OO.  And I would
17   just like to get that done before the day is over.
18   And then they're going to go ahead and do the
19   redactions, figure out what's not relevant, and
20   provide it in discovery.  But we want to get that
21   done while we're here today.
22             THE COURT:  All right.  Is that where you
23   are, Mr. Beck?
24             MS. BECK:  That's correct, Your Honor.
25             THE COURT:  All right.  So I will so order.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1            All right.  Ms. Fox-Young, do you and Mr.

2    Villa have your next motion to suppress?

3            MR. VILLA:  Yes, Your Honor.  This is the

4    motion to suppress concerning the statements

5    allegedly made by Mr. Perez to Billy Cordova, so I

6    believe the burden is on the Government to proceed.

7    And I think they have intended to put on some

8    witnesses, but I don't want to speak for them.

9            THE COURT:  Do you wish to make any opening

10   statement?

11           MS. ARMIJO:  Your Honor --

12           MR. VILLA:  I'll hear from Ms. Armijo, but

13   yes, I can give an opening.

14           MS. ARMIJO:  Your Honor, this is the motion

15   that I had talked about this morning with Mr. Roark;

16   that he was going to be our first witness to testify,

17   and probably more to the point on a lot of the

18   issues.  He was supposed to come down yesterday, and

19   did not because of the snow and icy roads.  I asked

20   him to come down this morning, but he did not come

21   down this morning, presumably for the same reasons,

22   for icy roads.  However, he will be here Tuesday.

23           We were trying to possibly get another

24   witness in his place, but didn't realize till the

25   noon hour that that person did not have the same

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
BEAN & ASSOCIATES, Inc.                                            e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

197

```
 1    knowledge that Mr. Roark has.
 2              So with that, Billy Cordova -- his attorney
 3    is not available till next week.  We would propose to
 4    start -- to finish the James hearing at this time,
 5    and then go ahead and start the motions to suppress
 6    with all of the witnesses next week.
 7              THE COURT:  Any thoughts?
 8              MR. VILLA:  Your Honor, I think that's
 9    fine.  I'll consult with Ms. Fox-Young real quick,
10    and maybe Ms. Bhalla, because so that the Court knows
11    we really want the Court to consider 1294 and 1295,
12    the two motions to suppress together.
13              THE COURT:  All right.
14              MR. VILLA:  But I don't think that's a
15    problem.  That would be fine, Your Honor.
16              THE COURT:  Let me ask Ms. Armijo, are
17    there any witness problems here?  I mean, it's not
18    snowing in Albuquerque.  I had to drive back here.  I
19    didn't know there was any bad weather.  Where is the
20    bad weather?
21              MS. ARMIJO:  Your Honor, I'm telling you
22    what he indicated to me last night, and -- that there
23    were icy roads.  I don't think there is any snow now.
24    I had asked him to drive this morning, and to provide
25    a reason why he did not drive this morning, and I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    have not gotten that reason.  All I know is that he

2    had last told me that there were icy roads.  And he

3    is in Santa Fe, Your Honor.  He's not in Albuquerque,

4    he is in Santa Fe.

5            THE COURT:  All right.  We'll then take

6    up -- anybody have a problem with that?

7            MS. SIRIGNANO:  Your Honor, I do.  This is

8    Amy Sirignano for the record.  And just for the

9    record, because I'm trying to get along here and move

10   this along as quickly as possible, I live in Santa Fe

11   right now.  And yes, there was some snow yesterday.

12   But I was on a telephonic hearing this morning with

13   Judge Attrep in Santa Fe, and there was no issue at

14   all with the roads this morning.  Last night it was a

15   little bit problematic, in the afternoon.  But, as

16   you know, in Santa Fe, it melts the same day.  We

17   also have a witness here, who spoke to her mother,

18   and the roads were -- this morning -- the roads were

19   fine from Chama to Santa Fe.

20           The only real issue that I have about this,

21   Judge, is that if we proceed to the James hearing, I

22   anticipate that they're going to put on statements

23   regarding my client, Mr. Garcia, and Mr. Baca,

24   because we requested this James hearing.  And I have

25   spent a significant amount of time, me,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Ms. Harbour-Valdez, Ms. Wild, and the Government --

2    specifically, hours trying to get an order on this.

3    And I asked the Government in an email if they

4    subpoenaed their witness.  And I never got a

5    response.  We have an obligation, if we make an

6    agreement with opposing counsel, the Court, the

7    Court's representative, that they're going to have

8    evidence on the day that we all scheduled it, to make

9    sure that we know that this isn't going to happen;

10   not, you know, at noon, during the lunch hour, or

11   with the Court at 2:30, but to let us all know, so we

12   can shift gears, if we need to, to take up something

13   else, Your Honor.  And so I just want the Court to

14   know that I'm trying not to make a big deal about

15   this, but the reasons of this change are really

16   suspect.  And I'd like to know if these witnesses

17   were subpoenaed, after we all made this arrangement

18   among the parties to be here today.

19              Thank you, Judge.

20              THE COURT:  Were they under subpoena?

21              MS. ARMIJO:  Mr. Roark was not under

22   subpoena.  But he was going to be here, planning to

23   be here, and we spoke to him about it.  Given his

24   position with the Department of Corrections, I don't

25   think he is trying to avoid being down here.  He is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    cooperative.  And so we had no reason to believe that

2    he had to be subpoenaed.  I certainly will subpoena

3    him for next week.  But there really was no reason to

4    believe that he would not be here.

5             As to the James hearing, I believe Mr.

6    Castellano was just about finished.  I think he only

7    has one more statement to go over, and then it was

8    just going to be cross-examination.

9             THE COURT:  All right.  Well, I think the

10   best we can do is work on the James hearing.  And I

11   always knew that was going to be the fumes here; that

12   if we got through with all the suppression, we were

13   going to go back to the James hearing.  So 2:30

14   Friday afternoon, let's try to finish up, or make

15   some progress on the James hearing.

16            MR. VILLA:  Your Honor, just to perhaps

17   save us a little bit of work this weekend, the

18   Government and I have -- Ms. Armijo and I have

19   discussed which witnesses they're going to be

20   calling.  It sounds like they are going to call Billy

21   Cordova.  The previous exchanges we had with each

22   other were sort of, if necessary.  If we need to do a

23   writ, we'll do a writ, we'll get him down here

24   ourselves.  But if Ms. Armijo is planning to have him

25   here, then we'll save a little bit of time in

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    preparing that and having the Court prepare a writ.
 2              MS. ARMIJO:  I believe he will be here.
 3    Well, he'll be in Southern New Mexico, yes.
 4              MR. VILLA:  I just want to see if we're off
 5    the hook on getting a writ.  He'll be in court.
 6              MS. ARMIJO:  He will be available to both
 7    parties.
 8              MR. VILLA:  Thank you.  Is that okay,
 9    Judge?
10              THE COURT:  That's fine.  You're going to
11    make him available; is that what you're saying, Ms.
12    Armijo?
13              MS. ARMIJO:  Yes, Your Honor.  We've
14    requested him to be moved.
15              THE COURT:  He'll be in the building.
16              MS. ARMIJO:  We have to make arrangements
17    with the US Marshals to have him in the actual
18    building, but yes.
19              MR. VILLA:  You'll do that, I don't need to
20    prepare the writ?
21              MS. ARMIJO:  Yes.
22              THE COURT:  That's what he is trying to
23    find out, if he needs to prepare any paperwork for me
24    to get him here.
25              MS. ARMIJO:  And I don't want to make any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   promises where he is, because obviously his safety is
2   an issue, and I don't want to say that in open court.
3           THE COURT:  I understand.  But Mr. Villa
4   doesn't need to prepare any paperwork for me to order
5   that he be here.
6           MS. ARMIJO:  No, you do not.
7           MR. VILLA:  Thank you.
8           MS. ARMIJO:  And if there is anybody
9   else -- I think we were working together last weekend
10  to try and streamline things -- if there is anybody
11  else that he or Ms. Bhalla needs, that we can try to
12  streamline things, and we'll be working over the
13  weekend to do that.
14          MR. VILLA:  Thank you.
15          THE COURT:  All right.  Ms. Bhalla?
16          MS. BHALLA:  I can speak with Ms. Armijo
17  after the hearing.
18          THE COURT:  All right.  Ms. Armijo.
19          MS. ARMIJO:  Your Honor, I believe we just
20  have another housekeeping matter to take care of,
21  that Mr. Beck will take care of, and I'll try to take
22  it up before we start, if there is anything else.
23  But I do know we want to put something on the record.
24          THE COURT:  All right.  Mr. Beck.
25          MS. BECK:  I wish I knew how to do this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    better, but unfortunately I don't.  I'm going to work
2    as best I can here.  It was brought to our attention
3    today that there, at some point, was a request for
4    compensation to specific individuals in this case.
5    And so we disclosed what starts at Bates No. 30709
6    and goes to Bates number 30714, a list of persons who
7    the defense asked us for compensation.  At the bottom
8    there are three names:  Manuel Armijo, Richard
9    Gallegos, and Santos Gonzalez, for whom there isn't a
10   CHS number, and for whom there isn't a code name, no
11   payments provided.  That indicates that they are not
12   cooperators in this case.  Their names -- and the
13   defense specifically requested their compensation,
14   and so we answered the defendants' request.  But we
15   don't want to create any impression that these folks
16   are cooperating with the Government for obvious
17   reasons.  So we just wanted to make that perfectly
18   clear, that it was brought up to us that there may be
19   some confusion in this document.  But that's why they
20   don't have CHS numbers.  They're not signed up with
21   the FBI.  Thank you.  I misspoke.  So Manuel Armijo
22   and Richard Gallegos do not have CHS numbers, and
23   Santos Gonzalez is not cooperating in any capacity.
24   I should have made that clear.
25             THE COURT:  All right.  Directing your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    questions to the Court, any defense lawyers have
 2    questions you want me to ask Mr. Beck about what he
 3    just said?
 4              All right.  Mr. Lowry?
 5              MR. LOWRY:  Your Honor, only to the sense
 6    that in the Brady-Giglio materials that we talked
 7    about at the last hearing.  I appreciate the
 8    Government disclosing the total amounts.  But what we
 9    had really anticipated seeing are the individual
10    receipts, individualized payments that were made.
11    They're important to us.  As we recall from our
12    motion to compel, we had asked information related to
13    Grace Duran.  We believe that some of these receipts
14    were probably signed by Ms. Duran on Eric Duran's
15    behalf.  And understanding the timing and the amount
16    and the nature of individualized payments would be
17    very critical for us to understand.  And we haven't
18    been able to -- I've asked opposing counsel for that.
19    I don't think we've had explicit agreement to get
20    that material to date.  And I would just like the
21    Court's assistance here in making sure that we get
22    that in as timely a manner as possible.  Thank you.
23              MS. ARMIJO:  They were turned over as to
24    Mr. Duran, which is what he was requesting.
25    Typically, they were turned over today to our office
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    to go out in the next set of discovery.  But we do
 2    have them and we will provide them.
 3              THE COURT:  Do you know when that next set
 4    is going out?
 5              MS. ARMIJO:  We can probably get a
 6    condensed set out possibly Monday to Mr. Aoki.
 7              THE COURT:  All right.  Does that work,
 8    then, for you, Mr. Lowry?
 9              MR. LOWRY:  In the bigger picture it does,
10    Your Honor, but if I remember correctly from
11    yesterday, I think I owe the Court a brief.  And if
12    the United States would be so kind as to send me the
13    confidential human source or confidential informant
14    contracts to assist me with my brief writing over the
15    weekend, I'd greatly I appreciate it, Your Honor.
16              THE COURT:  Can that be done?
17              MS. ARMIJO:  I don't know off the top of my
18    head -- because I don't have them here -- if it has
19    information that needs to be redacted.  I know that
20    our office requires us to do it over USAFX, which I
21    don't know how to do.  And if I can figure out a way
22    to do it, I will.
23              THE COURT:  Can you just delay filing your
24    brief, Mr. Lowry?
25              MR. LOWRY:  You just read my mind, Your
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Honor.

2           THE COURT:  All right.  So do you want to

3  just do that then?

4           MR. LOWRY:  That's fine.

5           THE COURT:  Because it sounds like you're

6  going to get this information maybe as early as

7  Monday.

8           All right.  Mr. Castellano?

9           MR. CASTELLANO:  Yes, Your Honor.  We will

10  re-call Special Agent Acee.

11           THE COURT:  Mr. Acee, I'll remind you

12  you're still under oath for the purposes of the James

13  hearing.

14           Mr. Castellano, if you wish to continue

15  your direct examination of Mr. Acee.

16           MR. CASTELLANO:  Yes, sir, thank you.

17                    BRYAN ACEE,

18    after having been previously duly sworn under oath

19    was questioned and testified further as follows:

20                DIRECT EXAMINATION

21  BY MR. CASTELLANO:

22     Q.   Just to get us up to speed, Agent Acee,

23  when we were here last time, we were discussing

24  Government's Exhibit's 26, and that's Christopher

25  Garcia Bates stamp 1085.  Do you recall that?



SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1        A.   I do.

 2        Q.   And do you remember what the nature of this

 3   conversation or interaction dealt with?

 4        A.   Yes.  This conversation was between Mario

 5   Montoya, the confidential human source, and Chris

 6   Garcia.  They are at Garcia's house as this is taking

 7   place and being recorded.

 8        Q.   What was the purpose of the meeting?

 9        A.   Mario Montoya went to Garcia's house to

10   pick up firearms; in this case just one, to be used

11   on the hit on Gregg Marcantel.

12        Q.   Okay.  I'm going to go ahead -- and we've

13   covered some other parts of the conversation, so I'll

14   move to Bates stamp 1095 on that transcript.  I'll

15   start here with the highlighted portion, where the

16   CHS says, "I'm going to put this away and Imma come

17   back."  Can you tell us what's going on there?

18        A.   The CHS has received a .22 caliber pistol

19   from Garcia, and he's telling him that he's going to

20   go put it away, and that he'll come back to the house

21   afterward.

22        Q.   Okay.  Then tell us about the rest of the

23   conversation.

24        A.   Mr. Garcia brings up "Chuco," who is Mandel

25   Parker.  Do you want me to read from this, or just
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    tell you what I know of it?

2        Q.   Yes, tell us what the rest of the

3    conversation means in the context of this page.

4        A.   Sure.  So Mr. Garcia says, "Then with

5    'Chuco' too he has to be, like you said, right after

6    we take him, if he looks" -- unintelligible.  Both

7    are speaking at the same time, there is overlap --

8    "take it all."  Garcia says, "At all just right

9    there.  Even if he has to take him to the fucking

10   thing and get him and put the thing on him.  The

11   weapon on him, and leave it on, leave it there.  A la

12   verga.  It's fucked up, but if he -- if he right away

13   gets out and says, What's up fool."

14           Montoya says, "I'm gonna say nothing.  He's

15   not gonna say nothing.  You're gonna get down and do

16   it and that's it.  I mean" -- unintelligible -- "do

17   it.  I'm going to do it."

18           Garcia says, "Yeah."

19           Montoya says, "I'll do it and then I'll do

20   him right after, know what I mean.  I already, I

21   already pretty much got" -- unintelligible -- "good."

22       Q.   Let me stop there.  What's going on in the

23   context of that conversation?

24       A.   Garcia is expressing some doubts about

25   "Chuco," Mandel Parker, who had previously agreed to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

 1    help Mario Montoya kill Marcantel and Santistevan.

 2    And what they're discussing is "Chuco," or Mandel

 3    Parker, might be a weak link.  If he gets picked up,

 4    he might tell.  So that they're discussing killing

 5    Parker, and leaving all the evidence, to include the

 6    murder weapon, with Parker.

 7         Q.   So was it your understanding from the

 8    operation that Mr. Baca, Mr. Garcia, and Mr. Parker

 9    had agreed to kill Secretary Marcantel?

10         A.   Yes.

11         Q.   Okay.  I'm turning to the next page.  It's

12    Bates stamped 1096.  And I want to focus on the last

13    statement highlighted on the page, which is

14    Mr. Garcia's.

15         A.   Garcia says, "Give him a hotshot, you know,

16    whatever.  But hey, just tell him, yeah, fucking a,

17    my only chance, let me put in some jale for you.  I

18    told him."

19         Q.   What was your understanding of the

20    discussion about the hotshot?

21         A.   Garcia is suggesting to the CHS, Mario

22    Montoya, that he give Mandel Parker a hotshot, which

23    is a fatal dose of heroin.

24              MR. CASTELLANO:  Your Honor, just so the

25    Court knows, for the record, the next statements are

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   attributable to Rudy Perez, and so I'll note for the

2   record that these are the subject of the motion to

3   suppress, this set here.

4               THE COURT:  Okay.

5               MR. CASTELLANO:  I'm going to bring them in

6   to the Court's attention, like we did last week.  So

7   last week the Court heard evidence related to

8   Government's Exhibit 16, so I won't cover that today.

9   I believe that was already covered.  Okay.  I'm

10  turning to the record.  This is DeLeon Bates stamp

11  20540.  And for the record, this is a marked-up

12  transcript.  The transcripts, once introduced, will

13  be clean transcripts.  But this is for ease of

14  focusing the testimony.

15       Q.   Okay.  I want to turn attention to a

16  statement here by Rudy Perez referring to "Crocodile"

17  answering for it and BB answering for it.  Do you see

18  that portion?

19       A.   Yes.

20       Q.   Can you tell us basically what the

21  statement is and who was involved in the statement?

22       A.   Do you want me to read it first, or just --

23       Q.   Go ahead and read it, and then put it into

24  context, please.

25       A.   Rudy Perez says, "Yeah, and you know, check

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    this out, a, and it's like what was discussed.

2    'Crocodile' about has to answer for it.  BB has to

3    answer for it, um, I think there is four or five that

4    have to answer.  Why it was never done the first the

5    paperwork got sent down."

6         Q.   Do you know what that is a discussion

7    about?

8         A.   Yes.

9         Q.   What is it?

10        A.   Mr. Perez is talking about the prior times

11   the paperwork for Javier Molina was sent down to

12   Southern.  "Crocodile" is an SNM member who was in

13   charge of the pod; I don't remember his name.  BB was

14   another SNM member in charge of the pod down there.

15   That's Javier Rubio.  And they're going to have to

16   answer for the fact that paperwork went down and

17   Molina wasn't hit.

18        Q.   And who is that statement attributed to?

19   I'm going to draw your attention to the next portion

20   there.

21        A.   Mr. Perez is saying, "I, I heard 'Pup' say

22   they have to answer for that no matter how close I am

23   to them."

24        Q.   Okay.  And so what type of conspiracy are

25   we talking about when it comes to the paperwork and

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492
                                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   "Pup," or Mr. Baca saying people have to be

2   responsible?

3       A.   There was an expectation that when the

4   paperwork was produced, the other members of the gang

5   would act on it.  They didn't.  And in this statement

6   Mr. Perez is saying that he heard from "Pup," Anthony

7   Baca, that they would have to answer for it.

8       Q.   And is that because from the investigation

9   you've learned that the paperwork went down

10  previously, but the murder was not committed?

11      A.   Yes.

12      Q.   The next statement is from DeLeon Bates

13  stamp 20544.  I'm going to direct your attention now

14  to more discussion about paperwork.  Who is making

15  the statement this time?

16      A.   Mr. Perez.

17      Q.   And what is the statement as it relates to

18  paperwork?

19      A.   Within that statement he's saying, quote,

20  "He's got the paperwork a year before.  That's when

21  he told me, hey, we got it.  Yes, but we're not gonna

22  show it.  So you just make sure you show some love,

23  no?"

24      Q.   Okay.  And then continue.

25      A.   The CHS says, "Orale, so hey, that's -- so

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1   that's why -- so that's why that fool Javi, Javier
2   was fucking always sending coffee to him because he
3   knew he was a chaffa fucker."
4           Perez says, "He was.  He was covering his
5   ass, dog."
6       Q.   Can you tell the Court whether that was a
7   further discussion of the paperwork that was
8   discussed just a minute ago in your testimony?
9       A.   Yes, I believe it is.
10      Q.   And for purposes of context, are you
11  familiar with the word "chaffa" that's on that page?
12      A.   Yes.
13      Q.   What does that generally refer to?
14      A.   They're no good.
15      Q.   I'm drawing your attention to DeLeon Bates
16  stamp 20555.  And I want to talk to you once again
17  about discussions about paperwork.
18      A.   I'll start where you pointed, or --
19      Q.   Yes.
20      A.   So the CHS is asking, "So that's what it
21  was, it was the paperwork on Jesse Sosa."
22           Mr. Perez responds, "That, that, that, that
23  was part of it, and then Archie's boy was the other
24  half."
25      Q.   And I'll show you right here.  Tell us what
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Perez says about his discussions with others.

2         A.   Toward the bottom of his statement, Mr.

3    Perez says, "I told them vatos not like" --

4    unintelligible -- "think about that, and they

5    basically told me, you know what, a this is going to

6    happen regardless, just stay out of it."

7         Q.   Now, what's your understanding of the

8    context of this statement?  Stay out of what?

9         A.   The Molina hit.

10        Q.   And was it your understanding from the

11   investigation that there was a conspiracy to murder

12   Javier Molina?

13        A.   Yes.

14        Q.   And once again, DeLeon 20557.  I'm going to

15   direct your attention here to a statement by Mr.

16   Perez.

17        A.   Mr. Perez is saying, "You feel me?  Like I

18   say, they told me to shut up and just stay out of it,

19   and they did what they wanted to do.  Then later on,

20   suicide mission was there."

21        Q.   And what's the discussion about the pieces?

22        A.   CHS asked Mr. Perez, "So why did you give

23   them pieces, carnal?"

24        Q.   Okay.  Continue on down the page with the

25   discussion, and tell us who was making each statement

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   here.
 2        A.   They continue talking about the pieces, and
 3   Mr. Perez says, "I just, I just get out of it, let
 4   them do their own thing.  I was nobody, I just, fuck
 5   it."
 6             The source says, "Yeah, but they fucking
 7   got them" -- unintelligible -- "from your fucking,
 8   from your walker, carnal.  Could have gotten you
 9   caught up, you know what I'm saying?"
10             Mr. Perez says, "Oh, it did, it did.  Look
11   where I'm at."
12        Q.   Let me take you down the page here to Mr.
13   Perez' explanation.
14        A.   Mr. Perez says, "I just got out of the
15   hold" -- I believe that's a mistake; it should be
16   hole -- "I was real sick.  So for me to actually
17   participate in doing some dirt" -- unintelligible --
18   "physically I wasn't able to.  But we all have to do
19   our part."
20        Q.   Continue with that statement, please.
21        A.    "But we all have to do our part, you know
22   what I mean?  One way or another, homes, everybody
23   has to put their part.  Do you feel me?"
24        Q.   Now, taking you back to the pieces.  What
25   is that a discussion of?
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                              e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.    The shanks.

 2          Q.    From where?

 3          A.    Mr. Perez' walker.

 4          Q.    And can you put it in the context of him

 5    saying he has to do his part?

 6          A.    He just got done describing that he got out

 7    of the hole.  He was sick.  He physically wasn't able

 8    to do his part.  But he was, by providing the metal

 9    that were fashioned into shanks to do the hit.

10          Q.    Turning your attention to DeLeon Bates

11    stamp 20558, and I want to draw your attention to the

12    top of the page here, where it says, "The old man was

13    pissed."  Can you tell us who made that statement?

14          A.    Mr. Perez made that statement.

15          Q.    Okay.  Please continue reading the

16    statement and we'll put it into context.

17          A.    "The old man was pissed, bro, he was like,

18    he, he, he, he was upset with them, the other fools

19    over there.  They -- why didn't they handle it a year

20    sooner when the" -- unintelligible -- "took the

21    paperwork over there.  Well you send the paperwork up

22    there."

23          Q.    Okay, continue.

24          A.    CHS asks "Who?"

25                Mr. Perez says, "Who?"
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              CHS says, "Spider."

 2              Mr. Perez says, "Yeah."

 3      Q.    Continue.

 4      A.    Source says, "Yeah, I already know."

 5              Mr. Perez:  "And, and, and see, that was

 6      something that he was going to have to handle when he

 7      got over there, a."

 8              CHS asks:  "Who, 'Spider'?"

 9              Mr. Perez says, "Yup, they told him you

10      send the fucking" -- unintelligible -- "over there

11      and find out why the fuck it wasn't taken care of."

12              The CHS asked:  "Is that what 'Pup' told

13      him?"

14              Mr. Perez says:  "Huh?"

15              CHS asked:  "Is that what 'Pup' told him?"

16              Mr. Perez says:  "I know somebody told him.

17      I don't know who exactly but I knew, I knew" --

18              The CHS asks:  "What did 'Pup' say, because

19      what did 'Pup' say because the" -- unintelligible --

20      "wasn't done earlier?"

21              Mr. Perez responds:  "He, he didn't like

22      it."

23      Q.    Let me stop you there.  First of all, there

24      is mention of "Spider" here.  Do you know who

25      "Spider" is?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    That's David Calbert.

 2        Q.    And do you know what "Spider"'s role was in

 3   the Molina murder?

 4        A.    Mr. Calbert passed the paperwork, in this

 5   case, two pages from an LCPD police report, that

 6   indicated Molina gave a statement to the police and

 7   cooperated.  Mr. Calbert took that from the Level 6

 8   at PNM to the Level 5 at PNM and gave it to Lupe

 9   Urquizo, "Marijuano."

10        Q.    What was the purpose of moving the

11   paperwork?

12        A.    Urquizo and Varela -- Mauricio Varela --

13   were scheduled to be transported down to the Southern

14   New Mexico Correctional Facility.  So they were

15   passing paperwork to eventually make it down to

16   Southern, where Molina was.

17        Q.    For what purpose?

18        A.    To provide the paperwork so Molina could be

19   hit.

20        Q.    So when there is a discussion about the

21   "old man" on top, and then "Pup," who is that

22   referring to?

23        A.    One and the same, Mr. Baca.

24        Q.    So is it an indication that Mr. Baca was

25   not happy that the hit had not been taken care of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   earlier?

 2        A.   Yes.

 3             MR. CASTELLANO:  Your Honor, I pass the

 4   witness.

 5             THE COURT:  All right.  Thank you, Mr.

 6   Castellano.  Let's do this:  Let's take our break

 7   before we start cross-examination.  I think it would

 8   be a good time for us to do that.  So we'll be in

 9   recess for about 15 minutes.

10             (The Court stood in recess.)

11             THE COURT:  All right.  Looks like

12   everybody has counsel.  So let's go back on the

13   record.  Look around, make sure everybody has got

14   counsel.

15             I understand that Ms. Fox-Young has left,

16   and she's now going to join us by phone.  Are you

17   there, Ms. Fox-Young?  Not yet.

18             All right.  Ms. Schile has left us.

19             And Ms. Jacks, you're going to leave at

20   4:00; is that correct?

21             MS. JACKS:  I may.  We'll see how things

22   are going.

23             THE COURT:  All right.  Be safe.

24             There has been some inquiries about Monday

25   or Tuesday.  My understanding is that we're starting
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    at 1:00 o'clock on Monday.  So I think if you look at
 2    CM/ECF, I think it shows that.  So that's my
 3    understanding.  Ms. Wild had a death in her family
 4    this morning, so she's en route to north Texas now.
 5    She's a little bit out of pocket.  But CM/ECF says
 6    1:00.  I thought it was 1:30.  But it looks like it's
 7    1:00.  But I'm planning on being here on Monday, and
 8    I'd like for you to join me.
 9              MR. BLACKBURN:  Is that an invitation?
10              THE COURT:  No, that's a court order.  I
11    don't want there to be an ambiguity.  It's a court
12    order.
13              MS. ARMIJO:  And Your Honor, Ms. Wild knew
14    this when we scheduled that, I will be in trial.  But
15    Mr. Castellano and Mr. Beck will be sure to carry on
16    without me.
17              THE COURT:  Okay.  Mr. Acee, you're back on
18    the stand.  I remind you you're still under oath.
19              It looked like Ms. Fox-Young was going to
20    be the one to get up, and she's gone.  So who is
21    going to lead off?
22              MR. VILLA:  Your Honor, it was actually
23    going to be me for my team, but I'm happy to defer to
24    my co-counsel to start first, Ms. Jacks.
25              THE COURT:  Do you want to go first,
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                            1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.

221

```
 1   Ms. Jacks?
 2              MS. JACKS:  I would like to, if I might.
 3              THE COURT:  All right.  Ms. Jacks.
 4              MS. JACKS:  And I won't be long.
 5                          EXAMINATION
 6   BY MS. JACKS:
 7        Q.   Good afternoon, Agent Acee.
 8        A.   Good afternoon.
 9        Q.   So last week you testified about some
10   conversations or some statements made by Mr. Baca and
11   Mr. Garcia that were the subject of recordings;
12   correct?
13        A.   Yes.
14        Q.   And then you added to that this afternoon
15   with one additional or some additional recorded
16   statements by Mr. Garcia; is that right?
17        A.   Yes.
18        Q.   And those statements are being offered, I
19   guess as -- or being proffered as coconspirator
20   statements relating to the conspiracy to kill
21   Corrections Secretary Marcantel and STIU Chief
22   Santistevan?
23        A.   Yes.
24        Q.   Mr. Sanchez wasn't involved in any
25   conversations regarding those crimes, was he?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.   He was not.

 2         Q.   In fact, he's not charged with those

 3    crimes, is he?

 4         A.   No.

 5         Q.   So if there is a conspiracy to kill

 6    Marcantel or Santistevan, Mr. Sanchez is not a part

 7    of it, not even alleged to be a part of it?

 8         A.   Not that I'm aware of.

 9         Q.   Now, I want to ask you a few questions

10    about the statements you testified to this afternoon

11    regarding Rudy Perez.

12         A.   Okay.

13         Q.   And you referenced a transcript which is

14    Government's Exhibit 16.  Is that a transcript of a

15    recording?

16         A.   Yes.

17         Q.   And it's a recording that was made by who?

18         A.   Billy Cordova.

19         Q.   And Billy Cordova is one of the

20    Government's cooperators in this case?

21         A.   He is.

22         Q.   And do you know -- how did he make that

23    recording?

24         A.   With what I'll call a body wire, or I think

25    in the past in these hearings we've been calling them
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    an ELSUR device, which stands for electronic

2    surveillance.

3         Q.    Okay.  So some sort of electronic

4    surveillance device?

5         A.    Yes.

6         Q.    And where was Mr. Cordova and Mr. Perez at

7    the time those recordings were made?

8         A.    They were at the Penitentiary of New

9    Mexico.  And I believe they were at the Level 6 or

10   the north facility.

11        Q.    And were they housed in adjacent cells?

12        A.    Yes.

13        Q.    What was the date of the statements that

14   you testified about this afternoon?

15        A.    I don't have the exact date, but it took

16   place in February of 2016.

17        Q.    So almost two full years after the homicide

18   of Mr. Molina?

19        A.    Yes.

20        Q.    And with respect to the statements that

21   Rudy Perez made regarding paperwork, do you know

22   whether that was something that Rudy Perez had

23   personal knowledge of, or whether he was relaying

24   something that was told to him by someone else?

25        A.    My interpretation of listening to the



SANTA FE OFFICE                                               MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492
                                               e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   conversation and reading the transcripts is that he
 2   had quite a bit of knowledge about it.  I'm not
 3   sure --
 4       Q.   Well, my question was:  Do you know?  It
 5   wasn't what your interpretation was.
 6       A.   No.
 7       Q.   You don't know?
 8       A.   I don't know.
 9       Q.   And you said you don't know the date of the
10   recordings.  Is there a reason that you don't know
11   the date?
12       A.   Yes.
13       Q.   What is that reason?
14       A.   The informant didn't state the date at the
15   beginning or the end of the recording.
16       Q.   Okay.  Well, he had some high-tech FBI
17   recording device, didn't he?
18       A.   That's your opinion.  I don't consider it
19   high-tech.
20       Q.   So it's an unreliable recording device?
21       A.   It's reliable, but I wouldn't call it
22   high-tech.
23       Q.   Is there a reason the FBI recording device
24   doesn't record the date of conversations that are
25   being made by its informants?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    That's not my area of expertise.

2        Q.    How are you sure it was February 2016?

3        A.    I met Billy Cordova just a few weeks before

4   that.  He agreed to go up there.  We transferred him;

5   gave him the device.  And that was in February.  We

6   collected it before the month was over.

7        Q.    Okay.  So you personally provided him with

8   a device?

9        A.    No, because I can't walk into the facility

10  freely.  But I set in motion him receiving a device.

11       Q.    And did you check out the device?

12       A.    Me or one of the agents who works with me

13  did.

14       Q.    Was it you or somebody else?

15       A.    I can't tell you.  I don't know.  We'd have

16  to look at the logs.

17       Q.    And did you collect the device?

18       A.    No, not from the informant, because, again,

19  I can't get in the facility to do that.  So I would

20  have collected by way of Corrections.

21       Q.    So the way the device was transferred to

22  Mr. Cordova is it went from you or some other agent

23  to a New Mexico Department of Corrections official of

24  some sort?

25       A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And he or she provided the device to Mr.
 2   Cordova?
 3        A.   Yes.
 4        Q.   And then, that or some other corrections
 5   official, collected it from Mr. Cordova?
 6        A.   Correct.
 7        Q.   And then gave it back to somebody in the
 8   FBI?
 9        A.   Yes.
10        Q.   And all of that happened in February of
11   2016?
12        A.   It did.
13        Q.   Which is how you know the conversations
14   recorded on the device had to be sometime in
15   February --
16        A.   Yes.
17        Q.   -- 2016?
18             When you spoke with Mr. Cordova about
19   wearing the electronic surveillance device or using
20   the electronic surveillance device, was he at a
21   different institution?
22        A.   Yes.
23        Q.   And once he was transferred to PNM, did you
24   speak to him any further?
25             MR. CASTELLANO:  Objection, relevance.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

227

```
 1          THE COURT:  Tie it to the James hearing.
 2     Q.   Let me go -- once he was transferred to
 3   PNM, did you go to PNM and personally speak with him
 4   about the device or the conversations he was
 5   recording on it?
 6     A.   Not in February 2016, no.
 7     Q.   Prior to sending Mr. Cordova, or having Mr.
 8   Cordova transferred up to PNM did you -- you or
 9   anybody else in your presence -- provide him with
10   instructions on how to operate the device?
11     A.   Yes.
12     Q.   And was it you?
13     A.   I believe it was me.
14     Q.   What did you tell him?
15     A.   "Here's how you turn it on.  Here's how
16   turn it off."
17     Q.   Did you tell him anything else?
18     A.   Yes.  I explained to him that -- I pointed
19   out that it's a small device; consequently, it has
20   small batteries.  And that I didn't want people's
21   life stories.  I just wanted pertinent information,
22   so to keep it relevant to what we're looking for.  He
23   can't just turn it on and let it run for days.
24     Q.   I'm assuming -- implicit in that comment is
25   you told him what kind of information you wanted him
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   to go get, right?

2        A.   Yes.

3        Q.   And specifically what did you tell him the

4   kind of information that you were sending him up

5   there to go get?

6        A.   Information about the Javier Molina murder.

7        Q.   And did you specifically tell him you

8   wanted statements that incriminated people that he

9   was housed next to?

10        A.   No, I don't talk like that.  I told him I

11   wanted information about Javier Molina's murder.  And

12   he knew he'd be next to Rudy Perez.

13        Q.   You told him that:  Once you go up to PNM,

14   you'll be housed next to Mr. Perez?

15        A.   Yes.

16        Q.   Was Mr. Cordova -- I'm sorry, did you

17   discuss with Mr. Cordova what you believe to have

18   happened with respect to the homicide of Molina?

19        A.   No.

20        Q.   Did Mr. Cordova have access to any

21   discovery materials?

22        A.   No.

23        Q.   And what sort of -- I mean, Mr. Cordova

24   obviously isn't somebody that does something for

25   nothing.  What was he expecting in exchange for going

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   and getting these statements?
 2              MR. CASTELLANO:  Objection, relevance.
 3              THE COURT:  Tie it to the James hearing.
 4   What's the relevance of it?
 5              MS. JACKS:  I'll withdraw the question for
 6   the time being.
 7              THE COURT:  Okay.
 8              MS. JACKS:  I have nothing further at this
 9   time.
10              THE COURT:  All right.  Thank you, Ms.
11   Jacks.
12              Do you want to go next, Mr. Villa?
13              MR. VILLA:  I'm happy to, unless one of my
14   colleagues wants to.
15              THE COURT:  I think they're deferring to
16   you, Mr. Villa.
17              MR. VILLA:  And, Your Honor, Mr. Castellano
18   was relying on some transcripts that he showed to
19   Agent Acee for refreshing his recollection, I
20   imagine, that he read to the Court.  I was just
21   wondering if I can use those same materials.
22              THE COURT:  Any objection, Mr. Castellano?
23              MR. CASTELLANO:  Not at all, Your Honor.
24   All I would say, if we can just keep them in this
25   order, because these will be exhibits for the next
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    hearing.  But as long as I get them back, there is no

2    problem with anyone using them.

3              THE COURT:  Can you keep them in order, Mr.

4    Villa?

5              MR. VILLA:  Yes, Your Honor.  It looks like

6    it's already -- has it already been admitted?

7              MR. CASTELLANO:  Your Honor, one of these

8    is Exhibit 16, which was already admitted in one of

9    the previous hearings, but the other ones have not

10   been.  I have exhibit stickers on them without

11   numbers.  So 16 has been admitted, but the rest have

12   not, so I identified them by the Bates number.

13             THE COURT:  Thank you, Mr. Castellano.

14             Mr. Villa.

15                      EXAMINATION

16   BY MR. VILLA:

17        Q.   Good afternoon, Agent Acee.

18        A.   Good afternoon.

19        Q.   So with respect to your handling of Mr.

20   Cordova, you told him that it was a small device and

21   so it had a small battery life; correct?

22        A.   Yes.

23        Q.   How long was the battery life?

24        A.   I don't know.  I mean, the techs give us a

25   guess, but they're not reliable.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   We're talking about a digital recording
 2   device, right?
 3        A.   Yes.
 4        Q.   You called it a body wire, but it's not a
 5   wire that he wears on his body, right?
 6        A.   It is not.
 7        Q.   It's like a little recording device,
 8   rectangular in shape?
 9        A.   Yes.
10        Q.   Something like I could pick up at Best Buy?
11        A.   I don't think so.
12        Q.   No?
13        A.   I haven't seen one there.
14        Q.   Produced at the Department of Justice, or
15   something you can get commercially?
16             MR. CASTELLANO:  Objection, relevance.
17   This is going to the subject of the motion to
18   suppress.  I would just ask that we focus on
19   statements.
20             MR. VILLA:  We can deal with it next week,
21   Judge.
22             THE COURT:  All right.
23        Q.   You said that you knew he'd be next to Mr.
24   Perez.  How did you know that?
25        A.   I knew Mr. Perez had some kind of sanction
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    or disciplinary action, and he was being sent to

2    Level 6 to do some amount of time there.  And our

3    strategy was to put what I'll call wired informants

4    next to Mr. Perez and Mr. Herrera, to see if we could

5    collect information about the Molina homicide.

6            So my conversations with Corrections,

7    trying to figure out how to make that happen --

8    because I'm not able to do that without them -- I

9    learned that Mr. Perez was due to be sent up there.

10   And so then we put in motion those two inmates being

11   next to each other.  The mechanics of that I rely

12   largely on the Corrections to tell me when that could

13   happen.

14        Q.   Because they're the ones that put people

15   where they're supposed to go in their cells, or

16   housing plans, that sort of thing.

17        A.   Yeah.  They move the bodies.

18        Q.   So getting back to the question about these

19   statements that Mr. Perez made, and whether he had

20   personal knowledge or whether he was telling Mr.

21   Cordova things that he, himself, had learned,

22   second-, or perhaps thirdhand, did you have any

23   information before putting Mr. Cordova next to Mr.

24   Perez, or helping to arrange that, that Mr. Perez did

25   have this knowledge firsthand or secondhand or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

233

1    thirdhand?

2         A.    I believed he did.  But I wanted evidence

3    of it.

4         Q.    So you didn't have -- well, what was your

5    belief based on?

6         A.    My review of the old -- what I'll call "the

7    old SNM files," I inherited those as part of this

8    case, and information that I had learned from

9    cooperators.

10        Q.    Did any of that include statements that Mr.

11   Perez himself had made either in a document you

12   reviewed or to a cooperator?

13        A.    I remember reviewing his statements that he

14   made to either detectives or STIU.

15             As far as with regard to cooperators, I

16   couldn't tell you which cooperators; there is too

17   many of them.  But I believe that I did have

18   information from cooperators.  But I wanted

19   recordings.

20        Q.    Okay.  And the information that you had

21   from cooperators, was that firsthand information from

22   Mr. Perez, so Mr. Perez saying:  I did X, or I did Y?

23        A.    No, I think it's more of guys relating what

24   they heard.  I can't say that it was firsthand.

25        Q.    And the statements that Mr. Perez made,

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

234

```
 1    that you reviewed to STIU, or to detectives, those

 2    were the statements made in the aftermath of the

 3    Molina homicide?

 4         A.   Yes, sir.

 5         Q.   Statements that we've examined for the

 6    previous motion?

 7         A.   Yes.

 8         Q.   So it's fair to say that you suspected

 9    perhaps he had a role in providing pieces from his

10    walker?

11         A.   At best, I suspected.

12         Q.   And you told Mr. Cordova that's what you

13    wanted him to talk to Mr. Perez about?

14         A.   Yes.  I don't know that I mentioned the

15    walker.  I just said "the Molina homicide."

16         Q.   So, for instance -- let me jump to the

17    right page here.  I believe it's 20557.

18         A.   I have copies, too.  Do you want me to go

19    to that?

20         Q.   Let's see here.  No, I'm sorry.  I'll get

21    it for you.  So there is the part where Mr. Cordova

22    and Mr. Perez are talking about the pieces coming

23    from his walker; correct?

24         A.   Yes.

25         Q.   And Mr. Cordova asks -- hang on just a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1    second here.  Well, right here where I'm -- wrong

 2    one.  Mr. Cordova asks, "Yeah, and then yeah they

 3    used those as the fierros, you know what I'm saying?"

 4              A fierro is a shank; correct?

 5         A.   Yes.

 6         Q.   He's referring to the pieces which were

 7    brought up here -- I just pointed to it earlier --

 8    from the walker, right?

 9         A.   Yes.

10         Q.   So do you know how Mr. Cordova had the

11    knowledge, or the allegation anyway that Mr. Perez

12    gave pieces, or pieces were taken from his walker to

13    make shanks?

14         A.   Are you asking for my opinion, or --

15         Q.   No, I'm asking if you know how Mr. Cordova

16    knew that?

17         A.   I think I do.

18         Q.   Okay.  Go ahead.

19         A.   Most of the guys in the S know quite a bit

20    about that hit.

21         Q.   About the Molina hit?

22         A.   Yes.

23         Q.   And just from talking to each other?

24         A.   Yes.

25         Q.   And you know that from talking to the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   cooperating witnesses?
 2        A.   Yes.  And I mean, I interview a lot of SNM
 3   guys, and not all of them cooperate.  They'll talk to
 4   me but, they don't want to cooperate.  But I know it
 5   from talking to probably close to 100 members or
 6   associates, former members.
 7        Q.   So a lot of those guys know about the
 8   Molina murder, right?
 9        A.   Guys that were in the feds at the time,
10   yes; weren't even in the state know about it.
11        Q.   Weren't even in the blue pod?
12        A.   Correct.
13        Q.   Word travels fast?
14        A.   It's been a few years.
15        Q.   So this information that Mr. Cordova knew
16   about the Molina homicide or the source of the shanks
17   for the Molina homicide, you didn't provide that to
18   Mr. Cordova?
19        A.   No.
20        Q.   He knew it on his own, before he gave
21   these -- or had these recordings made of Mr. Perez?
22        A.   Yes.  In fact, when I first met Mr.
23   Cordova, he related a lot of details of that homicide
24   to me.  And I didn't expect that when I met him.
25        Q.   So you were surprised at the knowledge he
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    had?

2        A.    I was surprised he even talked to me.

3        Q.    And the knowledge he had was gained from --

4    like many of the other members of the SNM, talking to

5    other people in the gang, talking about what happened

6    because the word travels fast, right?

7        A.    Yes.

8        Q.    But you knew that Mr. Cordova, himself,

9    didn't have direct knowledge about how the shanks

10    were made or whether they were taken from Mr. Perez'

11    walker?

12        A.    I didn't know what he knew until I started

13    talking to him.  Some guys obtain confessions from

14    people that were present in blue pod.  But Mr.

15    Cordova was pretty popular and had talked to a lot of

16    guys, so I think he had some firsthand knowledge when

17    I first met him.

18        Q.    And as you testified a minute ago with

19    Ms. Jacks, you don't know whether Mr. Perez'

20    knowledge about the shanks or the source of the

21    shanks came from secondhand information or firsthand

22    information that he knew himself?

23        A.    Well, I don't know what Mr. Perez knew,

24    because I've never talked to him.

25        Q.    So it's possible that he got knowledge

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    about the Molina homicide just like many of the
 2    others, through word-of-mouth?
 3         A.   Not according to his recordings, no.
 4         Q.   Well, before these recordings got made?
 5         A.   Well, I didn't know what Mr. Perez knew
 6    before the recordings, no.
 7         Q.   Okay.  Fair enough.
 8              You testified that you weren't certain who
 9    provided the recording device on a particular day to
10    an NMCD official, to then provide it to Mr. Cordova.
11    And I think you said you needed to check the logs.
12              THE COURT:  Hold on just a second.
13              MR. CASTELLANO:  Objection, relevance.
14    We're not talking about statements at all at this
15    point.
16              THE COURT:  Can you wait on this?
17              MR. VILLA:  Yes, I guess so.  It's fair.
18         Q.   You would agree with me that the -- if
19    there was a conspiracy to murder Javier Molina, that
20    conspiracy was over by the time these statements were
21    made?
22         A.   I assume so.  When does the conspiracy end?
23         Q.   Well, if it's a conspiracy to murder Javier
24    Molina, wouldn't it be when Mr. Molina is killed?
25         A.   I suppose, unless they were still getting
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    rid of evidence years later.  But, yeah, it sounds

2    like it was over.

3         Q.   Well, that might be a conspiracy to destroy

4    evidence or tamper with evidence, right?

5         A.   Yeah, I guess if the walker showed up

6    today, it would still be -- if someone had been

7    hiding it this whole time, maybe we could pull them

8    into that.  I'm not sure.  I'd have to talk to the

9    U.S. Attorney's office on that.

10        Q.   Would you pull in some of these NMCD guys

11   on that conspiracy?  Just kidding.

12             But there is no question that these

13   statements were made 23 months after Javier Molina

14   was killed?  Approximately 23 months.

15        A.   No question.

16        Q.   All right.  Getting back to -- it's on

17   20540, Bates number, the statements Mr. Perez made

18   about "Crocodile."  Okay.  So they are right here in

19   the center when Mr. Perez said, "Yeah, and you know

20   check this out, and it's like what was discussed,

21   'Crocodile' about has to answer for it."  Did I

22   understand your testimony you don't know who

23   "Crocodile" is?

24        A.   I've heard of him.  But off of top of my

25   head, no, he wasn't a focus of this case.

SANTA FE OFFICE                                                            MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

240

```
 1        Q.   Okay.  Did BB -- the other person
 2   identified in the same statement, did you testify
 3   that was Javier Rubio?
 4        A.   I did.
 5        Q.   And you were interpreting that statement as
 6   to mean they had to answer for not carrying out the
 7   Javier Molina murder at some point earlier in time?
 8        A.   Correct.
 9        Q.   Do you have any knowledge about how Mr.
10   Perez gained his knowledge that he conveyed to Mr.
11   Cordova about these two individuals?
12        A.   No.
13        Q.   Or about how they were supposed to have
14   carried out a hit of Javier Molina?
15        A.   No.
16        Q.   How was it that you came to the conclusion
17   that this conversation was about carrying out a hit
18   on Javier Molina?
19        A.   The short answer is my knowledge of the
20   case.  And I've debriefed Javier Rubio, BB.
21        Q.   I see.  So you're making the conclusion
22   about what Mr. Perez is saying here based upon your
23   knowledge of the case, a debrief of Mr. Rubio, that
24   sort of thing?
25        A.   Yeah, my interpretation of it, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.    Okay.   Would you agree with me, in the

2    course of these conversations that Mr. Perez and Mr.

3    Cordova had, that we've been reviewing for this

4    hearing, that the recording device appears to have

5    been turned on and off; correct?

6    A.    Absolutely.

7    Q.    So all these recordings that you've

8    reviewed are from a series of different digital audio

9    files?

10    A.    Yes.

11         (Ms. Jacks left the courtroom.)

12    Q.    And a lot of the times the recordings are

13    turned off what I would say midstream?

14    A.    Turned on midstream as well.

15    Q.    Okay.   So that was my second question.

16    They're turned off midstream, meaning in the middle

17    of the conversation, right?

18    A.    Yes.

19    Q.    Or at least it appears the conversation is

20    not ended, right?

21    A.    I agree with you.

22    Q.    And turned on in the same fashion?

23    A.    Yes.

24    Q.    And it was Mr. Cordova who had complete

25    control to turn on and off the device, as you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    testified?
 2                MR. CASTELLANO:  Objection, relevance.
 3                MR. VILLA:  Well, I think that does go to
 4    whether we've got a complete conversation here.
 5                THE COURT:  I'll give you a little room
 6    here.  Overruled.
 7         A.   Mr. Cordova was in sole control of that
 8    device being turned on or off, absent a battery
 9    failure or being out of power, yes.
10         Q.   And then was it the same procedure for you
11    to get the recording device back; you had to get it
12    from an employee of NMCD?
13         A.   Yes.
14                MR. VILLA:  May I have just a moment, Your
15    Honor?
16                THE COURT:  You may.
17                MR. VILLA:  That's all the questions I
18    have.
19                THE COURT:  Thank you, Mr. Villa.
20                Any other defendant have -- Mr. Maynard?
21                MR. MAYNARD:  Your Honor, I wasn't here
22    last week, so I'm not sure if I'm taking the
23    issues -- the questions out of turn.
24                THE COURT:  All right.
25                MR. MAYNARD:  The Court is going by
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   declarant or by defendant?
 2           THE COURT:  Well, I probably won't
 3   interrupt you, but Mr. Castellano might.  So just
 4   plow ahead.
 5                   EXAMINATION
 6   BY MR. MAYNARD:
 7       Q.   Now, Mr. Acee, you testified, was it last
 8   week --
 9       A.   Yes, sir.
10       Q.   -- about these James statements?
11       A.   I did.
12       Q.   Okay.  Co-conspiracy statements?
13       A.   Yes, sir.
14       Q.   All right.  And you testified briefly this
15   afternoon about -- is that a continuation of your
16   direct?
17       A.   Yes, it was.
18       Q.   All right.  Now, your testimony right here
19   was about statements made -- recorded by Mr. Cordova,
20   and made by Mr. Perez?
21       A.   That's correct.
22       Q.   And this was in February of 2016?
23       A.   Yes, sir.
24       Q.   And shortly thereafter, or maybe at the
25   same time recordings were being made with respect to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Herrera, Carlos Herrera?

2         A.   Yes, they were, by two different

3    informants.

4         Q.   Okay.  So the recordings that were made of

5    Mr. Herrera's statements were from a different

6    informant?

7         A.   Well, there were two.  Mr. Cordova was one

8    of the informants that recorded Mr. Herrera.  And

9    Mr. Gerald Archuleta also recorded Mr. Herrera.

10        Q.   Okay.  Both did?

11        A.   Both did.

12        Q.   Okay.

13        A.   And I believe at different times.

14        Q.   And this was in February and March of 2016?

15        A.   I'd want to look at our reports.  But that

16   sounds about the time frame.  Because we picked up

17   Mr. Archuleta in December, and it took some time to

18   work all that out.

19        Q.   Now, you testified to statements that were

20   recorded and put on a transcript this afternoon?

21        A.   Yes, sir.

22        Q.   In your opinion, from your understanding of

23   the context, are any references being made directly

24   or indirectly in any of those statements to Carlos

25   Herrera, the ones that you referred to, and that were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    brought out in the Bates stamped transcripts today?

2        A.    Just today?  Your question is --

3        Q.    Just about today for now.

4        A.    I don't believe so.

5        Q.    And have you gone into yet the supposed or

6    alleged James statements made by Mr. Herrera?

7    Because these were made by Mr. Perez.

8        A.    Correct.  I think I may have covered that

9    last week.  And I believe my colleague, Agent Stemo,

10   did as well.  And I was -- we kind of split -- there

11   were so many transcripts and stuff, we kind of split

12   the duty last week.

13       Q.    Okay.  Now, you're familiar with most all

14   of the James statements that you have obtained, that

15   the FBI has obtained, during the investigation?

16       A.    Don't give me too much credit, sir.  I've

17   got a lot of reports up there.  I mean, I have

18   reviewed them at one time.  But I definitely need to

19   look at them again.

20       Q.    I understand perfectly well.  I've been

21   trying to do this for just a few days.

22           Now, looking back over the statements made

23   by other defendants and other people involved -- not

24   Mr. Cordova, not Archuleta -- are there other

25   statements in which Mr. Carlos Herrera is a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   participant in conversations, co-conspiracy
 2   conversations according to any information available
 3   to you?
 4        A.   Yes.  So if I understand you correctly, did
 5   Mr. Herrera participate in conversations other than
 6   were recorded by either one of the informant?
 7        Q.   Right.
 8        A.   Yes.
 9        Q.   And I may be taking this out of turn, but
10   do you have these statements indexed?  Do you have an
11   index?
12        A.   Can I point you to them?
13        Q.   Do you have an index of co-conspiracy
14   statements?
15        A.   A mental one, or --
16        Q.   Or one written?
17        A.   No.
18        Q.   Because what I would like to do -- and I
19   don't know if I'm out of turn -- but I'd like to go
20   through them one by one.
21        A.    I'll defer to somebody else on that.
22        Q.   During the conspiracy, and in furtherance
23   and VICAR conspirators.
24        A.    I think I understand what you're asking.
25   I'm just not sure how to proceed.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

247

```
 1          Q.    Well, the first one that comes to mind.
 2          A.    Would you like names of people who have
 3    mentioned him; is that what you're asking me?
 4          Q.    Yes.
 5          A.    Okay.  So Mario Rodriguez, "Blue."
 6          Q.    Now, these are conversations that you've
 7    come to be aware of through your investigation?
 8          A.    Yes, sir.
 9          Q.    Okay.
10          A.    Timothy Martinez, "Red."
11          Q.    "Red"?
12          A.    "Red."  There is a "Blue" and there is a
13    "Red."
14          Q.    Okay.
15          A.    Jerry Armenta, "Creeper."
16          Q.    And you have 302s reflecting these?
17          A.    Yes, sir.
18          Q.    Okay.
19          A.    Which I prefer to have in front of me when
20    I do this.
21          Q.    I understand.
22          A.    Okay.  So I said Jerry Armenta.
23                Jerry Montoya, JR or "Plaz," or "Little
24    Plaz."
25                And this is where I'm slowing down, because
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we've interviewed so many SNM members.  I believe

2    there were some individuals up at the RPP Program,

3    which is the gang dropout program.  We interviewed

4    everybody up there as well.  And there are -- forgive

5    me, sir, but there are literally dozens, you know, a

6    significant number of 302s.

7         Q.   Sure.

8         A.   So tough to do, but I think the names I

9    gave you are the people that were all present in the

10   pod, and --

11        Q.   Present in what pod?

12        A.   Blue pod.  And gave statements.  Oh, I left

13   out a significant one.  That's Lupe Urquizo,

14   "Marijuano."

15            So if I had to point you to the 302s, those

16   would be the ones I would certainly want to start

17   with, if I were in your position, sir.  But I want to

18   note that there are going to be other ones.  I just

19   can't come up with them all as I sit here.

20        Q.   Is that advice for defense counsel?

21   Anyway.

22            Now, these are not recorded that you're

23   referring to; these are just other -- these are 302s

24   from interviews with suspects or with members?

25        A.   Yes, sir.  I mean, some of the -- to be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    clear, some of the conversations I had with these
 2    guys are recorded.  But they're not your client or
 3    Mr. Perez.  Those gentlemen aren't recording those
 4    guys.  This is just me taking a statement from
 5    somebody, and some might be recorded.  So there could
 6    be some recordings.
 7         Q.   In any of the recordings, are there any
 8    confessions made that are -- you know, made by Mr.
 9    Herrera that are recorded?
10         A.   No.  The only recordings of Mr. Herrera are
11    either jail calls.  And I can't think of anywhere he
12    discusses the homicide, or the conversations with the
13    two informants.
14         Q.   That were recorded?
15         A.   Yes, sir.
16         Q.   Well, are there any admissions or
17    confessions in those conversations?  You've seen the
18    transcripts, haven't you, or you've listened to them?
19         A.   I have.  And I believe there are.
20         Q.   And you believe there is a confession, or
21    an admission?  Which?
22         A.   I believe there is an admission by Mr.
23    Herrera for his role, describing his role, an
24    admission relevant to, or pertaining to his role in
25    that incident.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1          Q.    And what would that role be?

2          A.    Well, he had a lot of opinions about it.

3    But specifically passing the paperwork on to the guys

4    in blue pod, and reviewing the paperwork, seeing the

5    paperwork.

6          Q.    And you remember having seen that in a

7    transcript?

8                MR. MAYNARD:   May I approach the witness,

9    Your Honor?

10               THE COURT:   You may.

11         Q.    And I'll be loaning to the witness a

12   transcript that's Bates No. 20839.  And if you'd just

13   take a couple of minutes and see if you might see it

14   in this particular document.  You may not, but this

15   is not the only one.

16         A.    Do you know which CHS this is?

17         Q.    My understanding is that this informant is

18   Mr. Davila, but I may be incorrect.

19         A.    Mr. --

20         Q.    I mean, Mr. Cordova.

21         A.    Okay.  I hate to take this much time to do

22   this.  I think I found probably the first reference,

23   and I'm on -- I guess it's Bates No. 20843.  I'm at

24   the middle of the page.  Mr. Herrera's sentence

25   starts with, "And they wanna sit there."

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                        e-mail: info@litsupport.com

```
 1        Q.    Where?
 2        A.    Yes, sir.  This is where I'm referring to
 3   this statement in here.
 4        Q.    Okay.
 5        A.    I'd have to -- what would you like me to
 6   do?
 7        Q.    No, just if you'd point it out what you
 8   think is an implicating statement?
 9        A.    Yes, sir.
10        Q.    And why do you think it's implicating?
11        A.    What I believe Mr. Herrera is talking about
12   here is, after the fact, the guys in the SNM are
13   talking about what happened with Javier.  And here it
14   just says, "Javier," but I believe that's Javier
15   Molina.  And he says, "And they wanna sit there and
16   talk all that shit when that shit happened with
17   Javier.  They were hurt about me.  And they said, a,
18   that fucking" -- unintelligible -- "I was" --
19   unintelligible -- "and, a" -- unintelligible --
20   "fucking" -- unintelligible -- "when you wanna
21   criticize people that are on the tabla because they"
22   unintelligible -- "because it wasn't done correctly.
23   Well, why did you do -- everybody has their own" --
24   unintelligible -- "carnal" -- unintelligible --
25   "what's your solution then?"
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Now, unless you listen to the recording,
2   you don't know how long the unintelligible
3   information is in those breaks, do you?
4      A.   I think it's just a word or two that our
5   interpreters didn't understand.
6      Q.   And can you even tell if, in fact, the
7   recording had been turned off for a few seconds or
8   for a minute?  Is there a way technically to find
9   out?
10      A.   Yes, there is.  And I don't believe that's
11   what happened in the middle of this statement.
12      Q.   And you've listened to it?
13      A.   Yes, sir.
14      Q.   And what makes you believe not?  What makes
15   you believe it hasn't been tampered with, on and off?
16      A.   Because it flowed continuously.  The
17   "unintelligible" is not silence.  It's not a break in
18   conversation.  It's -- some other noise covers it, or
19   the person listening can't make out word, the
20   specific word that was said.  But these sentences
21   flow pretty well.  And it looks like there is just a
22   missing phrase or word.
23      Q.   Or there could be a missing sentence?
24      A.   There could be.
25      Q.   All right.  And go on.  If you find another

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    implicating statement.

 2             So you think he's talking about himself in

 3    that particular excerpt that you mentioned?

 4         A.   I do.  I think he's part of the tabla that

 5    he's referencing.

 6         Q.   But if he's not part of tabla, maybe he's

 7    talking about someone else.

 8         A.   If he's not part of it?

 9         Q.   Right.

10         A.   I don't think he's not part of it.  I think

11    he is part of it.

12         Q.   I understand.

13         A.   Okay.  I think I just went -- I did, I just

14    went to the next page, at 20844.  On this page we're

15    in the -- starts off with the long statement by Mr.

16    Herrera.

17         Q.   And that statement has probably close to

18    two dozen unintelligible gaps?

19         A.   Sir, I would say there is some

20    unintelligible words.  With respect, I disagree on

21    saying they're gaps.  Did you want me to read what

22    I'm referring to?

23         Q.   Are you talking about the upper half of

24    that page?

25         A.   Yes, sir, probably a few sentences in.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  And any other -- I don't want to

2  take up more time than is necessary, but I'd like

3  to -- if you can go through it.

4    A.   Keep going?

5    Q.   Keep going.

6    A.   Okay.  The next one, I would point you to

7  20845, the last statement on the page by Mr. Herrera,

8  and it flows into the next page.

9    Q.   All right.  And what puts this -- what's

10  the context in this that implicates, in your opinion,

11  Mr. Herrera?

12    A.   I think this speaks to the -- I think what

13  they're talking about is they're touching a little

14  bit on the background of the failed hits before, the

15  last two times it came down; things were good in

16  Cruces.  There was some politics and some drama

17  there.  The orders had come down a couple of times.

18  My understanding is that the guys that had the keys

19  and were running Southern liked when things were

20  peaceful.  And I think that part of this conversation

21  talks about that.

22    Q.   You refer to having "keys."  What do you

23  mean by that?

24    A.   Being in charge of the facility for the

25  SNM.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                      e-mail: info@litsupport.com

```
 1        Q.    Okay.

 2        A.    And that when the paperwork came down, it

 3   was rejected by certain individuals because things

 4   were good:  Drugs were coming in, people were getting

 5   along.  And that was important to those that were

 6   there.

 7            So, to specifically answer your question, I

 8   think that they're talking about some of the politics

 9   in that.

10        Q.    So this may not relate to the Molina

11   homicide?

12        A.    I think it does.  Because Mr. Herrera seems

13   to go on, and he's discussing the fact that -- that

14   it ultimately does happen, and now some of the same

15   people are upset.  They were complaining that it

16   wasn't happening.  It happened.  And now they're mad

17   that it did happen, and everyone is on lockdown.

18        Q.    So people are complaining about being on

19   lockdown?

20        A.    As an aftermath of the hit.  And then that

21   is a reference that the feds are coming and the RICO

22   Act -- they're bringing the RICO Act.

23        Q.    All right.  So they're complaining -- he's

24   talking about lockdown?

25        A.    Well, he's talking about -- I have to read
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it more closely.  I had moved on, but what he's --

 2         Q.   You can move on.

 3         A.   Okay.

 4         Q.   If I could interrupt.  Let me ask you this

 5    way: is a lot of the conversation about gang politics

 6    and not necessarily about Molina?

 7         A.   A lot of it is.  But I thought you were

 8    asking me to show co-conspirator statements.

 9         Q.   Right, regarding the counts relating to the

10    death of Mr. Molina.

11         A.   Sure.  And I respect that we might

12    disagree.  I think some of these politics -- because

13    Mr. Herrera exerts what he thinks the politics should

14    be, and what the philosophy should be.  And think

15    that's on point with what happened in Molina.  But

16    that's just --

17         Q.   That's your opinion?

18         A.   -- my opinion, sir.

19         Q.   In fact, he's also complained about

20    decisions made higher up than he is?

21         A.   Absolutely.

22              MR. MAYNARD:  All right.  No further

23    questions.

24              THE COURT:  Thank you, Mr. Maynard.

25              Any other defendant?  Mr. Adams, did you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    have questions?
 2                    EXAMINATION
 3    BY MR. ADAMS:
 4         Q.   Chris Garcia was not in custody in 2014;
 5    correct?
 6         A.   I don't think he was.
 7         Q.   And he was arrested December 3, 2015, when
 8    you took down all the people who were out on the
 9    streets?
10         A.   Yes, sir.
11         Q.   And he's not alleged to have any
12    involvement in the Molina homicide?
13         A.   None at all.
14         Q.   And, in fact, he wasn't even incarcerated
15    at the time when Mr. Molina was killed, and was not
16    in the unit?
17         A.   He may have been in the feds.  I can't
18    remember.  But, no, he wasn't down in Southern New
19    Mexico.
20         Q.   So is it a safe assumption on my part that
21    none of the statements related to the Molina homicide
22    are in any way being offered by you as James
23    statements against Mr. Garcia?
24         A.   Yes, sir, that's correct.
25              MR. CASTELLANO:  Your Honor, I'm going to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   object, because it calls for a legal conclusion, and

 2   that will be for the parties to argue to the Court.

 3            THE COURT:  All right.  Well, I'll let him

 4   testify.  And I think I'll have to sort out what is a

 5   legal conclusion or not.  But I'll allow him to

 6   testify.

 7            MR. ADAMS:  Judge, I guess what's going to

 8   help me in the scope of my questioning, if there are

 9   a bunch of statements that are being offered against

10   other defendants related to the Molina homicide, and

11   not Mr. Garcia, then I don't have a dog in that

12   fight.  But if those statements are also being

13   arguably used against Mr. Garcia, who had no

14   involvement at all in that incident, then we need to

15   explore a lot more than I thought we would be

16   exploring.

17            THE COURT:  Mr. Castellano?

18            MR. CASTELLANO:  I understand where Mr.

19   Adams is coming from, but Agent Acee won't be making

20   that determination.  I'm okay if he asks those

21   questions.  But our arguments won't be to that.  But

22   he's welcome to ask them.

23            THE COURT:  Okay.  So you're pretty

24   restricted on questioning.  But I'm going to have to

25   sort out down the road.  It sounds like these

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                                    1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    statements are going to be offered against

2    Mr. Garcia, right?

3              MR. CASTELLANO:  Yes, Your Honor.  As I

4    explained to Mr. Adams on the break, some of these

5    statements relate directly to the murder, so

6    therefore, they are clearly co-conspirator

7    statements, if they relate to the murder.

8              But the issue with the VICAR and the

9    enterprise is that there are other conspiracies out

10   there, and there are other elements that are met by

11   the statements.  Some of these statements could even

12   result, or result in co-conspirator statements as

13   relating to a legal conspiracy.  And these statements

14   don't have to be charged to be co-conspirator

15   statements.  That's my point about what we're

16   bringing in here.

17             THE COURT:  But the bottom line is these

18   statements are going to be used against Mr. Garcia,

19   right?

20             MR. CASTELLANO:  They are, Your Honor, I

21   agree.  We will tend to use them in that way against

22   all members of the enterprise.

23             MR. ADAMS:  Judge, I find that to be a bit

24   of a curious position taken by the Government --

25             THE COURT:  It may be.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MR. ADAMS:  -- for this reason --
2              THE COURT:  But for right now you just need
3    to get these statements out.
4              MR. ADAMS:  Yes, sir.
5              THE COURT:  Because at least the
6    Government's position is they're trying to use them
7    against Mr. Garcia.
8              MR. ADAMS:  That's what I'm hearing.  But
9    the other day they said they were calling Agent Stemo
10   to testify, to put in the statements about the Molina
11   conspiracy.  And then they referred to the Marcantel
12   conspiracy as separate conspiracies.  And now their
13   position is they don't want to be limited by their
14   own view of two separate conspiracies.
15             THE COURT:  Well, I shouldn't be making
16   arguments for the Government, but I'm trying to
17   formulate this in my head, so I'm talking out loud to
18   try sort to it out myself.  What I understand is that
19   they are using certain agents to get the James
20   statements to the defendants and to the Court.  And
21   so they're using different people.  And they broke it
22   down by conspiracy between Molina, and then the
23   Corrections Secretary.  But they're not conceding by
24   doing that that all this evidence is going to be used
25   against each of the defendants in the first trial.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          How did I do?  Did I state your position?

2          MR. CASTELLANO:  Yes, Your Honor.  And for

3    example, from time to time, when we had a conspiracy,

4    when we're talking about statements by certain

5    people, I flagged that I was deviating and touching

6    on another potential conspiracy.

7          For example, in the Baca statements, I

8    highlighted a conspiracy to murder members of

9    Mr. Armenta's family.  So I did try to deviate and

10   highlight other things that were out there, including

11   the drug conspiracy and a conspiracy by Mr. Baca to

12   bring drugs into a facility.  So I highlighted those

13   where I could.  But we're definitely not painting

14   ourselves into a corner saying Molina's (sic)

15   statements only go to Molina.

16          THE COURT:  Let me ask:  Maybe I'm

17   interpreting the Government's position too broadly.

18   But when you have an enterprise, are you saying that

19   whole enterprise is a conspiracy, so that any

20   statements in furtherance of the enterprise can be

21   used against any member of the enterprise?

22          MR. CASTELLANO:  Well, I don't think that

23   we're saying the enterprise is a conspiracy.  But

24   these statements touch on other elements of the

25   crime.  So, for example, we have to prove the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   enterprise engaged in racketeering activities.  Any
 2   of these statements which establishes another crime
 3   is something that establishes that the enterprise has
 4   engaged in racketeering activity.  And so that's
 5   something that might be used against other
 6   defendants.
 7           THE COURT:  Okay.
 8           MS. SIRIGNANO:  Your Honor, just a point of
 9   clarification.  And I was on the phone during the
10   last hearing when this happened.  And I remember what
11   the agreement was, was that some of us wanted to go
12   forward with these James hearings, and some of us
13   wanted to have the Government write down what the
14   statements would be.  I don't know if it was split
15   out between the Group 1 trial and the Group 2 trial.
16   But I just remember not everybody wanted to go
17   forward with this hearing.
18           So based on what I'm hearing from the
19   Government at this point, based on that all these
20   statements are going to be used against all
21   defendants, I'm to assume that we have to wait until
22   we get these statements from the Government in
23   writing, which was the agreement that was proposed at
24   the last hearing?  I'm just curious --
25           THE COURT:  My understanding is that this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    James hearing is basically against the five
 2    defendants that are going to go on January 29.
 3            MR. CASTELLANO:  That's how it ended up.
 4            THE COURT:  That the others -- there were
 5    some other people that had agreed to take the written
 6    statements that the Government had always wanted to
 7    proceed.  But given the fact that we were barreling
 8    toward trial on the 29th, they were prepared to go
 9    ahead and give you what you wanted.
10            MS. SIRIGNANO:  Okay.  I guess that just
11    doesn't jive with what I'm hearing right now, based
12    on the Government's theory, or statement to all of us
13    that any co-conspirator statement, whether or not it
14    comes out at this hearing, or in written form, could
15    be used to prove up the -- any alleged criminal act,
16    or based on their enterprise evidence to be used at
17    trial.  And so I'm just trying to get a clarification
18    of that, because if they're going to try and bring in
19    statements that aren't subject of an actual hearing,
20    I'd like to be able to plan for that.
21            Quite frankly, we weren't ready to go
22    forward with this today.  So I just need to know one
23    way or the other.
24            THE COURT:  Well, I do want to correct --
25    it's at the bottom of my notes here from Ms. Wild.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    It says:  "If there is time left, evidence will
2    resume on the James hearing."  So I certainly came
3    down here expecting that if we barreled through
4    motions, we would be at a James hearing.  So I don't
5    think that's quite fair.
6              But let me let Mr. Castellano respond on
7    the -- we're not getting all the evidence of the
8    enterprise in the James hearing; is that correct?
9              MR. CASTELLANO:  That's correct, Your
10   Honor.  And I understand what they're saying about
11   statements.  The way it broke down with the
12   stipulation at the last hearing was that the people
13   in the January trial, a number of them, decided they
14   did not want the statements in writing.  So we
15   proceeded with breaking it down in that way.  The
16   people in the April trial ended up being those who
17   wanted the statements in writing.
18             THE COURT:  Let me give a shot at trying to
19   clarify what we're saying.  You're going to prove two
20   conspiracies on January 29:  One Molina; one the
21   Corrections Secretary, correct, those are your two
22   conspiracies?
23             MR. CASTELLANO:  Well, those are the two
24   conspiracies -- well, those are the crimes we have to
25   prove.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  And those are the two
 2   conspiracies that you're going to prove for
 3   evidentiary purposes at the James hearing?
 4              MR. CASTELLANO:  Yes and no.  Because, if
 5   there is other evidence, then the other evidence
 6   could be presented.  But, yes, in terms of the trial
 7   presentation, those are the conspiracies.
 8              THE COURT:  Those are the two conspiracies.
 9              Now, you may have other evidence that
10   you're going to produce for purposes of establishing
11   enterprise, and for purposes of producing -- or
12   proving racketeering activity, other crimes in
13   furtherance of the enterprise, those sort of things.
14   But those, you will rely upon normal evidentiary
15   rules, other than the exemption for -- exception for
16   conspiracy, co-conspirator statements; correct?
17              MR. CASTELLANO:  We will.  And frankly, I
18   hadn't thought through it that well in terms of using
19   a lot of the co-conspirator statements for the Group
20   2 people.  But I think those could be admitted.  But,
21   of course, the Court hasn't ruled on those.  So I'm
22   not sure we can admit them if the Court hasn't ruled
23   on them.
24              THE COURT:  Well, the Group 2 people,
25   you're talking about the people we're going to try in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    April?
 2              MR. CASTELLANO:  That's correct.
 3              THE COURT:  All right.  So I'm wondering,
 4    though, if we can have some agreement that the
 5    conspiracies that are in the statements that are
 6    being provided for the April trial are not going to
 7    be used in this case here under the exception for
 8    co-conspirator statements.  You may be able to get
 9    that evidence in under other exceptions or other
10    rules of evidence.  But it seems to me that, if
11    you're going to try to get it in for a co-conspirator
12    statement, then we need to probably -- not
13    probably -- we need to have it as part of this James
14    hearing.
15              MR. CASTELLANO:  I agree with the Court,
16    that in order to introduce those, the other
17    statements, which are going to the April trial, we
18    would probably need to do that.
19              But the other part of an
20    association-in-fact enterprise is the ongoing nature
21    of the enterprise.  So we may go back years, to
22    crimes predating the crimes charged in this
23    indictment.  As the Court knows, we've got crimes
24    charged back to 2001.
25              THE COURT:  But you would not rely on
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   co-conspirator statements that are not being

 2   introduced as part of this James hearing?

 3           Let me see if I can articulate better.  If

 4   they don't hear from your agents in this James

 5   hearing, which is the one for the January 29 trial,

 6   they don't have to worry about it coming in to this

 7   case under the exception for co-conspirator

 8   statements.  Is that fair?

 9           MR. CASTELLANO:  I understand the Court's

10   question.  That is a fair question.  I just hate to

11   limit our presentation of evidence at trial.

12           THE COURT:  Don't you think I have to,

13   though?  I mean, don't you think, if we're going to

14   have a meaningful James hearing, I've got to say:  If

15   they're not going to bring it out here orally --

16   that's the way we've decided to proceed -- that you

17   can't use it -- you can use the evidence, but you

18   can't get it in through the co-conspirator

19   statements.  You've got to get it in some other way.

20           MR. CASTELLANO:  I understand what the

21   Court is saying.  And --

22           THE COURT:  I think that will have to be

23   the rules of engagement.

24           MR. CASTELLANO:  I understand that.  And I

25   think the Court would obviously have to rule on those

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    other statements in order for them to be

2    co-conspirator statements anyway.  So we could try to

3    focus on presenting other crimes, and possibly

4    staying away from the co-conspirator statements

5    themselves.  I understand that.

6            THE COURT:  Well, I'm not limiting you.  I

7    mean, if you want to load these guys up and have them

8    present some more, you can.  It's your James hearing,

9    and you're putting on your evidence.  But I do think

10   the rules of engagement have to be that whatever

11   they're going to hear is an exception to the hearsay

12   rule under the co-conspirator statements, that

13   somebody has got to spit it out in a James hearing

14   here.

15           MR. CASTELLANO:  I understand.

16           THE COURT:  For the first one.  Then we'll

17   figure out the rules of engagement for the second

18   one.

19           MR. CASTELLANO:  I understand where the

20   Court is coming from.  I'll discuss it with counsel.

21   And plan to proceed that way now.  But there may be

22   something we want to bring out.  We'll do that.

23           THE COURT:  We may have to reopen the James

24   hearing.

25           MR. CASTELLANO:  That's correct, Your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   Honor.
2           THE COURT:  All right.  Now, is that
3   addressing y'all's concerns?  Did I get close?
4           MS. SIRIGNANO:  Yes, Your Honor.  Well, to
5   the extent for this hearing and not a new reopened
6   hearing, what I'm hearing is, is that we're going to
7   proceed today and finish this James hearing.  But it
8   seems like they, once they consult with themselves on
9   how they're going to get statements in, whether it be
10  direct evidence or any other hearsay objection, or
11  they might need to reopen the James hearing, I
12  understand.
13          THE COURT:  We're probably not going to
14  have a hearing on all of their evidence.
15          MS. SIRIGNANO:  Yes, Your Honor.
16          THE COURT:  I mean, the James hearing is
17  limited to co-conspirator exception, and getting that
18  evidence out.  You're getting a lot of evidence with
19  suppression, so you're getting some free discovery
20  here, no doubt about it.  But you're not going to get
21  everything.
22          MS. SIRIGNANO:  I understand.
23          THE COURT:  They get to put on evidence of
24  their enterprise, but they just won't get it in
25  through the co-conspirator statements.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                MS. SIRIGNANO:  Thank you, Judge.
 2                THE COURT:  Does that address your
 3      concerns, Mr. Lowry?
 4                MR. LOWRY:  Your Honor, I think it does.  I
 5      just want to make sure I understand a point of order
 6      quickly.  One of the purposes I raised the bill of
 7      particulars was to sort of pin down what I would call
 8      the predicate acts.  And if I understood Mr.
 9      Castellano and I understood the Court's ruling, that
10      you weren't going to limit them to what predicate
11      acts they chose to prove the enterprise.  That's
12      okay.  But I was a little concerned, why I stood up
13      is I thought I heard Mr. Castellano say that they
14      were going to use those predicate acts through the
15      co-conspirator exception.  And I think the Court
16      addressed that by saying we're going to limit that to
17      what statements are provided through the agents as
18      part of the Molina and Marcantel charges.
19                THE COURT:  The James hearing.
20                MR. LOWRY:  Exactly, the James hearing.
21      But, if I understood things correctly, the Government
22      is reserving the right to reopen this after they
23      consider --
24                THE COURT:  I mean, they always have that
25      right.  They can always come back.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. LOWRY:  I didn't want to argue with
 2    that.  I wanted to make sure I understood the playing
 3    field.
 4            THE COURT:  We'll see what they do.  Maybe
 5    we're getting our box and we can bring the box with a
 6    lid on it.
 7            You don't look happy, Mr. Adams.
 8            MR. ADAMS:  My head is spinning, Your
 9    Honor.
10            THE COURT:  Oh, you understand everything.
11            MR. ADAMS:  I'm trying to -- I was trying
12    to figure out how to jump in here, because I'd really
13    not given thought to asking much related to the
14    Molina conspiracy.  So I'll have to make some
15    adjustments.
16    BY MR. ADAMS:
17        Q.   Mr. Acee, do you have the notes that you
18    had with you the other day that I believe were DeLeon
19    3298?
20        A.   Yes.
21        Q.   May I have those?  And we'll just put them
22    on the Elmo.
23        A.   I think I referred to this.  This was a
24    timeline, I called it.  And then this was the
25    transcript that I started today.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And these were documents that you went over

2  during your direct exam last week, or the week

3  before, with Mr. Castellano?

4       A.   Yes, sir.

5       Q.   I'm on page DeLeon 3298.  Which of these

6  statements, here on 3298, were you thinking applied

7  to Mr. Garcia directly, or by, in your view, in

8  furtherance of his involvement in the conspiracy?

9       A.   I don't believe any do on that first page.

10      Q.   Turn to page 3299.  We'll start at the top.

11  These pages contain highlights.  Were those your

12  highlights and check marks added onto the document?

13      A.   Yes, sir.

14      Q.   Do any of these statements relate -- and I

15  don't know how to take the blue arrow off, or I

16  would.  I'll just leave that alone, because I'm not

17  techie and I know that.

18           Do any of these at the top half of the page

19  relate to Mr. Garcia or his role in the alleged

20  conspiracy?

21      A.   The conspiracy on Mr. Marcantel?

22      Q.   Hard for me to know.  That's what I thought

23  I would be asking you about, but I guess I should ask

24  you more globally about Mr. Garcia, as it relates to

25  any of these statements, in any way, in your mind, as

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the witness to offer all this stuff on behalf of the

2    Government, related to Mr. Garcia and SNM?

3         A.   Not on the top of that page, I don't see

4    anything.

5         Q.   All right.  Let me go to the bottom of the

6    page.

7         A.   I think that the first time it might come

8    up -- and I want to be cautious to make sure I'm

9    pointing out everything to you.  It might be at

10   0730.010.

11        Q.   Where it says, "CHS says to 'Pup' that

12   Robert" -- Robert Martinez, "wrote 'Pup' a wila

13   saying he was going to take care of Santistevan,

14   because he knows 'Pup; hates him.  'Pup' responds

15   with yes."

16        A.   Yes, sir.

17        Q.   And first of all, what is the 0730 signify?

18        A.   That's the recording device.

19        Q.   All right.  And who had that recording

20   device?

21        A.   Eric Duran.

22        Q.   And do you know what date this was on?

23        A.   So I have all the transcripts for 0730.  I

24   can look through them.  Off the top of my head, I

25   don't.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                         1-800-669-9492
                                                  e-mail: info@litsupport.com



```
 1          Q.   All right.  Up above, at 730.007, it says,
 2     "The CHS gives the date of October 23, 2016."  Is
 3     that in the ballpark?
 4          A.   Definitely in the ballpark.
 5          Q.   How does that have any direct impact on
 6     Mr. Garcia?
 7          A.   I don't think it has any direct impact on
 8     him.  Yet it's one of the first indications that this
 9     plot is being discussed or mentioned.
10          Q.   And this is on a body wire?
11          A.   Yes, sir.
12          Q.   And was it a full recording of the body
13     wire, or were there unintelligible parts?
14          A.   There is probably unintelligible parts.  I
15     have the actual transcript here.
16          Q.   All right.  Will you please look at the
17     actual transcript?
18          A.   Sure.  I see one unintelligible.  There
19     might be some other ones.  It's not a very long
20     transcript.  It's only two and a quarter pages.
21          Q.   And for the purpose of our record, can you
22     tell us what page of the discovery the transcript is
23     on?
24          A.   Yes, it starts at 6043, and it ends at
25     6046.
```

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

1      Q.   Of DeLeon?

2      A.   Yes, sir.

3      Q.   All right.  Thank you.  So do you have any

4  corroboration, or was this one-on-one alleged

5  conversation between Mr. Baca and Mr. Duran?

6      A.   It's a one-on-one conversation.

7      Q.   No one else was around?

8      A.   Well, I wasn't there.  I think it would be

9  pretty tough for other people to hear, given how they

10  have to communicate in the cells.

11      Q.   No other context was provided for that

12  conversation?

13      A.   Yes, sir.  There is definitely more

14  context, because the transcript is quite a bit

15  lengthier than this one sentence summary.  And this

16  is a summary written by an agent other than myself.

17      Q.   Why would there be unintelligible parts of

18  the transcript?

19      A.   Somebody could cough.  There could be a

20  noise.  The person transcribing it simply might not

21  understand the word.  I've had that happen to me,

22  where you keep playing it, and you just can't

23  understand what the word being used is.

24      Q.   You are the case agent, and -- yes?

25      A.   I am.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                      1-800-669-9492
                                                             e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   And you're familiar with the different
 2   people involved --
 3        A.   Yes, sir.
 4        Q.   -- in this case?  You've reviewed the
 5   audiotapes?
 6        A.   Yes.
 7        Q.   Did you review this audiotape and try to
 8   help out with any unintelligible spots?
 9        A.   Yes, I've reviewed it.  No, I didn't try to
10   help out with any unintelligible spots.
11        Q.   Were you able to hear stuff that is not
12   included on the transcript?
13        A.   In this particular one, I don't believe so.
14        Q.   How did -- there is one more conversation
15   listed at the bottom of the page, 0730.011.  Does
16   that, in your view, have any relation to Chris
17   Garcia's involvement -- alleged involvement with SNM?
18        A.   Yes.
19        Q.   How?
20        A.   Well, you said -- does it show his
21   involvement in SNM, and it makes reference to proper
22   drug dealing.  I would think Mr. Garcia would be a
23   good teacher of proper drug dealing.
24        Q.   Fair enough.  I'll ask it more narrowly and
25   then more broadly, if I can.  Does it have any
```



SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    relation, specifically, to the allegations related to

 2    the attempted harming of Mr. Marcantel?

 3         A.   No, sir.

 4         Q.   But you do believe it has references to

 5    drug dealing and the gang, and that Mr. Garcia might

 6    be relevant that way?

 7         A.   I do.

 8         Q.   All right.  Let's go to the next page.

 9    Well, let me back up.  On the bottom of that

10    Mr. Garcia is in no way referenced directly in that

11    conversation, is he?

12         A.   He is not.

13         Q.   And the conversation as to 0730.011.

14              Just to be clear, Eric Duran was wearing

15    the body wire for most of these conversations?

16         A.   Yes.  I keep calling it the body wire, but

17    he had the wire.

18         Q.   And he was not a member of SNM at that

19    time?

20         A.   He was a member.  He was a member.

21         Q.   He was also a member of the FBI's

22    cooperating witness group, wasn't he?

23         A.   He was.

24         Q.   All right.  And you can't conspire with a

25    federal agent or government agents?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1       A.   My understanding is we and our informants

 2   cannot be part of the conspiracy.

 3       Q.   All right.  So at this point he was working

 4   for you; no doubt about that?

 5       A.   No doubt.

 6       Q.   And he was infiltrating -- or the plan was

 7   for him to infiltrate suspected SNM activities, so

 8   you could find out more information about them?

 9       A.   He was already in the middle.  And we were

10   late to the game, so we joined it.

11       Q.   Well, you sent him in next to Mr. Baca with

12   a recording device for the purpose of getting

13   evidence to use in court?

14       A.   To be correct, we brought Mr. Baca in.

15   Mr. Duran was already there.

16       Q.   All right.  On the top of the next page,

17   3300, 730.011 continues.  Is there anything else in

18   that reference, that part, that you believe has any

19   significance for Mr. Garcia?

20       A.   No.

21       Q.   Let me try to show you the rest of the

22   page.  You have a lot of items checked off and

23   highlighted.  So will you just please look at this

24   and tell me the next section that you believe has

25   implications for Mr. Garcia?  Christopher Garcia, of

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                       1-800-669-9492

PROFESSIONAL COURT                  e-mail: info@litsupport.com
REPORTING SERVICE

1    course.

2         A.    I think we need to move down, sir, to 019.

3         Q.    Yes.

4         A.    I would start at 019.

5         Q.    All right.  Is it the whole section of 019?

6         A.    To play it safe, I'd say all of that

7    transcript, yes.

8         Q.    All right.  So we have "Pup" tells CHS to

9    have Mario "Poo Poo" hit Santistevan and/or Adam

10   Vigil, not Marcantel, and to have Chris Garcia

11   finance it.  So let me stop there.  So that mentions

12   Chris Garcia's name.  Was Chris Garcia's name

13   mentioned on the actual transcript?

14        A.    I believe it was.

15        Q.    All right.  Was there any -- did you have

16   any information at that time whether Chris Garcia was

17   in the loop on anything related to Marcantel at that

18   point?

19        A.    I may have, because, as you may know, Duran

20   would provide me updates on the cellphone.  So I, of

21   course, am not seeing this information until after we

22   recover the device and download it.  So I think I may

23   have known that -- actually, I think I did know that

24   Chris Garcia's name was coming up before I heard the

25   actual recording.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                e-mail: info@litsupport.com

1     Q.   That his name was coming up or that he had

2  been contacted and talked to?

3     A.   Well, I know that he was contacted and

4  talked to because of, course, that happened on the

5  phone that we had the wiretap on.

6     Q.   Related to procuring guns?

7     A.   Yes, sir.

8     Q.   As opposed to drugs?

9     A.   He helped with both.  But yes, firearms.

10    Q.   You think that had happened by October 24,

11 2015?

12    A.   I believe so, yes.

13    Q.   All right.  And so, as a result -- and then

14 it says on here that -- it says, "It needs to be done

15 because the administration is going to tear us to

16 shreds little by little."

17         Then the next bullet point is "'Pup" says

18 after the hits are done all the brothers will be

19 separated in various states, and that communication

20 with one another will be critical."  And it says that

21 he and "Baby G" have a code that they use to write to

22 each other using two key numbers.

23         Do those statements have anything to do

24 with Garcia?

25    A.   I suspect the middle one does, but not the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    one related to "Baby G" and the codes.

2         Q.   That the brothers will be split up and

3    communication will be critical?

4         A.   Yes.

5         Q.   At the bottom of the page, 0730.020, there

6    is more stuff about Marcantel.  Again, Garcia's name

7    is not referenced in that?

8         A.   It's not referenced in this very short

9    summary, but I would want to double check the actual

10   transcript.

11        Q.   All right.  You think that this -- okay,

12   feel free to.

13        A.   Sure.  So, sir, just to be clear, you want

14   me to point out if Mr. Garcia's name is mentioned?

15        Q.   Referenced in the 020 entry.

16        A.   I don't see Mr. Garcia's name referenced.

17        Q.   And in both the 019 and 020 entries, the

18   statements attributed to Mr. Baca is that he's

19   actually saying:  Do not harm Marcantel.  That's what

20   Eric Duran is reporting?

21        A.   Yes.  I'm only hesitating because this was

22   written by another agent, and that was his

23   interpretation of the recordings.  This is before we

24   had stuff transcribed.

25             Mr. Adams, should I follow you with the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    actual transcript to make this quicker?
 2         Q.   Sure.
 3         A.   I'll track it.
 4         Q.   I turned to page 3301.  And again, you have
 5    highlighted and checked off materials related to
 6    entries 0730.021 and 0730.022.  Are those being
 7    offered, in you view, against Mr. Garcia?
 8         A.   I think they are.
 9         Q.   Why?
10         A.   It's discussed in the conspiracy.
11         Q.   Right after the part about:  Don't hurt
12    Marcantel; hurt other people so Marcantel can be
13    fired, which we just went over on the previous page.
14    So these are the next entries.  And how does this
15    have relation or connection in your mind to
16    Mr. Garcia?
17         A.   Well, this is the conspiracy.  Mr. Baca is
18    laying out where he believes some of the would-be
19    victims live.  And so I believe this is -- from an
20    investigative standpoint, I believe this is relevant
21    to the conspiracy.
22         Q.   And is it your belief that Mr. Garcia had
23    joined the Marcantel conspiracy at this point in
24    time?
25         A.   I don't think he had yet.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So those would be statements prior to his

2  being recruited or asked to join that conspiracy?

3      A.   Perhaps.  I need to line up the timeline a

4  little tighter, but I think you're correct.

5      Q.   Again, is there any other corroborations

6  for these communications or the context of them other

7  than what's on the body wire and the transcript?

8      A.   Well, there subsequently is.

9      Q.   All right.  Fair enough.  How about as to

10  this particular conversation and the particular

11  recording.  Were there any other guards around, any

12  other inmates or anything?

13      A.   No, I'm just pausing because I'm thinking

14  of the letters.  And I'm trying to remember what was

15  sent out in the letters.  But no, there was no one

16  else that I believe witnessed this conversation.

17      Q.   All right.  I'll turn to DeLeon 3302.  And,

18  again, there are many entries with check marks and

19  highlighted marks.  Please let me know what you

20  believe applies to Mr. Garcia for purposes of the

21  James hearing.

22      A.   I think we can go to the next page.

23      Q.   All right.  So nothing on 3302?

24      A.   No, sir.

25      Q.   See how easy that was?  If we could just

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492
                                             e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1   have nothing on all these pages, we could really move
2   through this.  All right.  Page 3303?
3        A.   I'm looking at 1188.007.
4        Q.   All right.  And what is device 1188?
5        A.   That's what we've been calling a body wire,
6   an ELSUR device.
7        Q.   Who had that?
8        A.   Mr. Duran.
9        Q.   What was the other one?
10       A.   The other one was 0370.  This is evidence
11  of us switching the devices out, because I'm either
12  worried they're full or out of batteries.
13       Q.   So it's a similar device, similar
14  technology; it's just a different version?
15       A.   Yes.
16       Q.   All right.  So we have 1188.007.  And this
17  is where there are actual conversations with Chris
18  Garcia?
19       A.   Correct.
20       Q.   And Mr. Garcia was telling Eric Duran that
21  he had was at home recuperating from surgery?
22       A.   Well, they talk about the surgery.  It's
23  kind of a funny conversation.  I think it had been
24  some time ago, though.
25       Q.   It might be funny to you, and it might not
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    be funny to Mr. Garcia.

2          A.    I apologize.

3          Q.    There is a conversation about surgery on

4    his testicles as a result of being shot?

5          A.    Correct.

6          Q.    All right.  And then tell me what part of

7    this entry that you're focusing on?

8          A.    I highlighted it.  It says "Pup" and CHS.

9    CHS:  "Ask Garcia for Mario's phone number."  That

10   would be Mario Montoya.

11         Q.    And what else on the page?

12         A.    Well, to speed it up, sir, everything that

13   I highlighted.

14         Q.    Okay.  You believe all this relates to

15   Chris Garcia and the Marcantel conspiracy?

16         A.    I do.

17         Q.    I'm showing you page 3304.  This is the one

18   that has the handwritten notes.

19               THE COURT:  Before we take on this

20   statement, why don't we take about a 15-minute break.

21   Let me let Ms. Bean rest her fingers.  Then we'll

22   come back in and go for another half hour.

23               All right.  We'll be in recess for about 15

24   minutes.

25               (The Court stood in recess.)

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Everybody grab a seat.  Looks
 2   like all the defendants have an attorney.  Look
 3   around, make sure that everybody is covered.
 4            All right.  Mr. Roberts, you're leaving at
 5   about 5:15.
 6            MR. ROBERTS:  Yes, Judge.
 7            THE COURT:  All right.  Be safe on your
 8   trip.
 9            MR. ROBERTS:  Thank you, Judge.
10            THE COURT:  All right.  Mr. Acee, I'll
11   remind you you're still under oath.
12            Mr. Adams, if you wish to continue your
13   cross-examination of Mr. Acee, you may do so at this
14   time.
15            MR. ADAMS:  Thank you, Your Honor.
16            THE COURT:  Mr. Adams.
17   BY MR. ADAMS:
18       Q.  Mr. Acee, on what day did Chris Garcia, in
19   your view, join the conspiracy to kill Gregg
20   Marcantel?
21       A.  The day he agreed to -- he said he had
22   firearms, and agreed to pass them on to whomever
23   needed them.
24       Q.  In November of 2015?
25       A.  October or November.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   All right.  So you don't have an actual

2  date?

3      A.   Not off the top of my head, no.

4      Q.   Can you find a date?  Is there something I

5  can give you to help you find a date?

6      A.   If you have the wire intercept transcripts.

7  What I have are the body wire ones here.

8      Q.   All right.  Which one do you think

9  establishes the date that Chris Garcia allegedly

10  joined the Marcantel conspiracy?

11      A.   I think that the telephone recordings would

12  be the ones I would want to refer to.

13      Q.   Okay.  Which phone call in particular?

14      A.   Well, I'm going to say the one in which he

15  agrees to provide the firearms.

16      Q.   All right.  So that was the one -- and in

17  your mind, that's the time Chris Garcia entered the

18  conspiracy related to Gregg Marcantel?

19      A.   In my mind, yes.

20      Q.   All right.  Chris Garcia was arrested on

21  December 3, 2015, we mentioned earlier; correct?

22      A.   Yes, sir.

23      Q.   What time of day?

24      A.   Early morning.

25      Q.   6:00 a.m.?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, I had nighttime service warrants, so it
2  was before 6:00 a.m.
3      Q.   There are statements that you referenced in
4  your direct on December 3, 2015.  And they were on
5  DeLeon 3306.  And item 1168.007, the date listed
6  there is December 3, 2015.  Do you believe that to be
7  accurate?
8      A.   No.
9      Q.   What date do you think that is?
10     A.   I think it's early December; I think it's
11  the 1st or 2nd.
12     Q.   It's typed out twice.  It says December 3,
13  2015.  And the CHS gives the day of the 12/3/2015?
14     A.   Correct.
15     Q.   So you think that's inaccurate?
16     A.   I do.
17     Q.   All right.  And 1168.080, which are
18  highlighted items that you went over with the AUSA in
19  your direct, they're references to "Mario should have
20  done the hit over the night."  Wouldn't that be
21  consistent with it being on December 3, 2015, or
22  later?
23     A.   Not necessarily, no.
24     Q.   All right.  Well, what date do you believe
25  this is?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.   I think it's December 1st or 2nd.

 2        Q.   So you think it was prior to the arrest of

 3   Mr. Garcia?

 4        A.   Yes, I think it was just prior, within a

 5   day or two.

 6        Q.   All right.  In your direct examination, you

 7   referenced statements from Roy Martinez and Robert

 8   Martinez related to killing Gregg Marcantel, didn't

 9   you?

10        A.   Yes, sir.

11        Q.   And let me put DeLeon 3371, which were part

12   of your notes.  At the bottom there is a reference to

13   March 23, 2015, you had a meeting with the STIU

14   administrator related to that information; correct?

15        A.   No, sir.  This was actually -- yes and no.

16   We were up there on a separate case, and then the

17   STIU sort of interrupted that meeting to point out

18   that they discovered this information.

19        Q.   And was that the first you'd heard about

20   any talk about killing Gregg Marcantel?

21        A.   Yes, sir.

22        Q.   What was the source of that information?

23        A.   If I remember correctly, Captain Sapien

24   said that he either obtained letters from one of his

25   informants, who I believe was Eric Duran, or

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                 (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Duran caused Captain Sapien to become aware of

2    it.  But that was the gist of it.  The SNM was

3    sending out leaders to hit Marcantel and Santistevan.

4        Q.   So either Gregg Marcantel sent a letter to

5    the STIU administrator, or somehow got word to him

6    that he had heard this information?

7        A.   I think you might have misstated.  You said

8    Marcantel got the word?

9        Q.   No, I'm sorry.  That Eric Duran got the

10   word that there was a conspiracy forming against Mr.

11   Marcantel.

12       A.   Yes, sir.

13       Q.   All right.  You referenced in here to a

14   credible and reliable CHS.  And that would be Eric

15   Duran?

16       A.   Yes.  And let me clarify, this isn't my

17   report, but I used it for the timeline.  I thought it

18   was a good timeline.  But this is -- the STIU is

19   claiming that it's a credible and reliable informant.

20   I didn't know Eric Duran at this time.

21       Q.   Okay.  So you had never met the man.  He

22   wasn't one of your guys at that point?

23       A.   Correct.  And it would be, I think, a

24   couple of months before I'd meet him.

25       Q.   And so you, or whoever wrote this report,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492



1    relied on their vouching for him being credible and

2    reliable?

3         A.   Yes, sir.

4         Q.   Where was this conversation allegedly held?

5         A.   The one with me?

6         Q.   No, about the Martinezes discussing taking

7    action against Mr. Marcantel.

8         A.   I don't know.

9         Q.   Was it in a cell pod?

10        A.   Well, it would have to be.

11        Q.   It could be in a rec yard?

12        A.   Perhaps.

13        Q.   Were there any other witnesses other than

14   the credible and reliable CHS, Eric Duran?

15        A.   Not at that time, no.  Cooperators come

16   forward later, but at that time, no.

17             MR. ADAMS:  Judge, I beg your indulgence.

18             THE COURT:  Certainly.

19             MR. ADAMS:  Thank you.  May I pass the

20   witness to my colleague, Mr. Lowry?

21             THE COURT:  All right.  Thank you, Mr.

22   Adams.

23             Mr. Lowry, cross-examination of Mr. Acee?

24             MR. LOWRY:  Thank you, Your Honor.

25             THE COURT:  Mr. Lowry.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1                    EXAMINATION
2   BY MR. LOWRY:
3        Q.   Good afternoon, Special Agent Acee.
4        A.   Good afternoon.
5             MR. LOWRY:  May I approach, Your Honor?
6             THE COURT:  You may.
7        Q.   Let me start off, Agent Acee, you just
8   testified -- I think it was on the last document we
9   were looking at were the last calls, that you didn't
10  believe those calls were placed on December 3, 2015.
11       A.   Those recordings, I don't think that's an
12  accurate date.
13       Q.   Okay.  And why don't you think that's an
14  accurate date?
15       A.   I think Mr. Duran got the wrong date.
16       Q.   And if I understood your testimony earlier,
17  that particular document was created before the
18  transcripts of those conversation were made?
19       A.   Yes.  And I should clear something up, if
20  you'll permit me, about the date.
21       Q.   Absolutely.
22       A.   Okay.  So Mr. Adams asked me what time we
23  started serving search warrants.  And we started very
24  early, perhaps as early as 4:00 in the morning.  And
25  that would apply to Mr. Garcia.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              But we, the FBI, didn't serve any search
 2    warrants at the Department of Corrections.  It was
 3    STIU and their cert team that rounded up the
 4    gentlemen that were up there.  So I think that date
 5    may be off.  But it is possible that recording was
 6    made, because that device wasn't recovered until
 7    December 3.  So it is possible.  I've sat here and
 8    said I think the date is wrong, but I'm actually
 9    backpedaling.  And it could be possible.
10         Q.   And that's fair.
11              My next question would be:  Did you ever
12    have the opportunity to review the HAWK data
13    regarding the conversations before drafting that
14    report?
15         A.   No.
16         Q.   So you didn't have --
17         A.   And I didn't draft the report, sir.
18         Q.   Fair enough.  So whoever drafted the
19    report, do you think they had access to that kind of
20    information, the downloads from the ELSUR devices?
21         A.   No.
22         Q.   So we're not quite sure what the date would
23    be for that recording, if I'm understanding you
24    correctly?
25         A.   Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Now, I want to back up for a second and

2    talk about the Marcantel conspiracy.  And I believe

3    in your testimony last week you had talked about --

4    if I understood you correctly, there were statements

5    made by Roy Martinez and Rob Martinez?

6        A.   Yes.

7        Q.   To the best of your knowledge, that is the

8    first anyone in the Department of Corrections or the

9    FBI learned about that conspiracy?

10       A.   Yes.

11       Q.   And I believe you testified that there was

12   a letter sent by one of those two to Mr. Baca after

13   he was shipped out of the state?

14       A.   I don't recall that.

15       Q.   If there was communication like that, would

16   that be the type of corroborative information you

17   would need to know, whether Mr. Baca understood the

18   conspiracy or not?

19       A.   That would be helpful, yes.

20       Q.   Was STIU actively monitoring the mail of

21   Roy Martinez at that time?

22       A.   I believe so.

23            And Mr. Lowry, I'll be honest, I didn't

24   know who Roy Martinez was.  I didn't know much about

25   the SNM before that date.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1         Q.   Before March of 2015?

2         A.   Correct.

3         Q.   But it's fair to say that you worked

4    closely with STIU since March of 2015?

5         A.   Absolutely.

6         Q.   And you developed a pretty substantial

7    working knowledge about their basis of knowledge

8    about the Marcantel conspiracy?

9         A.   Yes.

10        Q.   And so I'm asking you, from your training

11   and experience and your investigation in this case if

12   you are aware that Roy Martinez' mail was being

13   scrubbed or censored as it left the facility?

14        A.   I hope it was.  But sometimes I'm

15   disappointed.  And I make mistakes as well.

16        Q.   And I'll ask you the same question with

17   regard to Rob Martinez or "Baby Rob"?

18        A.   My answer would be the same.  I hope it

19   was.

20        Q.   Do you have any sense from your

21   investigation in this case whether Mr. Baca's mail

22   was being screened as it entered either the Arizona

23   facility?

24        A.   I believe it was.

25        Q.   And it would also have been screened when
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    he was at ADX in Florence, Colorado?

2          A.   It definitely was up there.

3          Q.   And you don't have any letters -- there is

4    no correspondence from either one of those facilities

5    referencing the Marcantel --

6          A.   That is correct.

7          Q.   Now, if I understand the case correctly,

8    Mr. Baca was transferred out of the Department of

9    Corrections within the days following -- I think it's

10   March 12, if I'm correct?

11         A.   That's my understanding as well.

12         Q.   Did Mr. Roy Martinez have an opportunity to

13   talk to Mr. Baca between the Molina murder and his

14   transport out?

15         A.   I don't believe so.

16         Q.   The same question for "Baby Rob"?

17         A.   I don't believe so.

18         Q.   So, to the best of your knowledge, as the

19   case agent investigating that conspiracy, was there

20   any direct communication between either Roy Martinez

21   or "Baby Rob" Martinez with Mr. Baca?

22         A.   Not after the murder, no.

23         Q.   And it's your understanding that this

24   scheme, the conspiracy, plot originated post-Molina

25   murder?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    No.

2      Q.    When do you think it originated?

3      A.    I later learned, through talking with

4  cooperators, that the idea went back as early as

5  2013.  My investigation on what we always refer to as

6  the hits or the conspiracy started in March of 2015.

7  But in talking with guys, I learned that it had been

8  talked about before.

9      Q.    What guys?

10      A.    A few -- well, I'd have to get back to you.

11  I'd have to spend some time looking at 302s.  But I'd

12  feel comfortable saying two to three SNM members who,

13  of course, would be cooperators now, told me they had

14  conversations with Mr. Baca relating to hitting -- I

15  think they all pertain to Santistevan.

16      Q.    And those would have predated the Molina

17  March 7, 2014?

18      A.    Yes, sir.  Because the dates that I'm

19  thinking of in my reports is, the best that those

20  informants could come up with, was 2012, 2013.

21      Q.    Do you have reason to believe that those

22  informants' statements were credible?

23      A.    Well, I never fully believe informant

24  statements, I mean -- but I write down what they tell

25  me.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                             FAX (505) 843-9492
                                                                                  1-800-669-9492
                                                                            e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   And I guess that's my point, is you don't

2    have -- did you do any independent corroboration of

3    those statements?

4    A.   Tough to do.  But I try where we can, yeah.

5    Q.   We'll come back to that next week or the

6    next James meeting, if you will.

7         I want to jump up a bit.  Just this

8    afternoon you were talking about the statements, the

9    Perez/Cordova recordings.  And if I read the language

10   you were highlighting correctly, you believe that Mr.

11   Perez had made statements about Mr. Baca's desire

12   to -- regarding Mr. Baca in which conspiracy?  The

13   Molina conspiracy?

14   A.   Molina.  Yes, I don't -- I've read Mr.

15   Perez' transcripts a lot in the last couple of days.

16   I don't think there is any mention of Marcantel.  So

17   it mostly pertained to the Molina.

18   Q.   And any opportunity Mr. Baca had to speak

19   with Mr. Perez would have been after the Molina

20   homicide?

21   A.   Well, I don't -- about the homicide?

22   Q.   Correct.  That's what --

23   A.   Based on what I have reviewed, I think

24   that's correct.

25   Q.   So all of the statements referenced in

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                          e-mail: info@litsupport.com

```
1    the -- what I'll call the Perez/Cordova recorded
2    conversations, those statements took place after that
3    event had transpired?
4         A.   I believe so.
5         Q.   So those statements couldn't have been made
6    in an effort to have Mr. Molina killed, could they
7    have?
8         A.   No, if they're made after.  No.
9              MR. LOWRY:  May I approach, Your Honor?  I
10   just want to get the marked statements.
11             THE COURT:  You may.
12             MR. LOWRY:  Your Honor, I have a request.
13   It's 5:25.  I don't want to waste the five minutes,
14   but I think I could save the five minutes if we
15   adjourned early, and I resumed the next time we had
16   the James hearing with Mr. Acee, rather than fumbling
17   through the exhibits.
18             THE COURT:  Go ahead.  We'll wait on you.
19   Don't worry about it.  Take your time.
20             While you're looking through those, I want
21   to come back to a point with Mr. Adams.  Let me
22   explore a little bit with you, while Mr. Lowry is
23   looking at these documents, it seems to me -- you
24   were talking about your head swimming and trying to
25   get a grasp -- this is what I think is going on --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    tell me if I'm wrong -- what I'm doing with this
2    James hearing is trying to determine whether certain
3    statements are going to come in for two conspiracies
4    in the first trial, Molina and the Secretary.  But
5    that both conspiracies are going to be used against
6    all five defendants to establish enterprise,
7    racketeering, furtherance of the enterprise, and
8    things like that.  Do you see it differently?
9              MR. ADAMS:  Judge, we have been working on
10   some jury instructions.  And I have not been one of
11   the point people on that.  So I would like to consult
12   our work product on that.  But I think that does make
13   sense.  But, obviously, the focus has to be on the
14   indicted VICAR offenses.  And for us, that is not the
15   Molina incident.  For us, that is the Marcantel
16   allegations.  So I do think there can -- by their
17   charging decision, it's messier than a traditional
18   trial.  But --
19             THE COURT:  But isn't the reality we're
20   going to be in this room on the 29th, and the
21   Government is going to be putting on two
22   conspiracies.  And both are harmful to you, right?
23   Because, even if you're not involved in one, you're
24   going to be sitting there, and they're going to be
25   saying, Yeah, but it's the same enterprise, it's the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    same furtherance of that enterprise, and these are
2    the crimes that were committed in furtherance of it?
3    Isn't that the reality?  I mean, you may not --
4              MR. ADAMS:  I think that is.  I think that
5    was why there have been motions to sever.  Even
6    within the January 29 group, people wanted to sever
7    because of the overlap or prejudice, or however you
8    want to refer to it.
9              THE COURT:  But even if they were severed,
10   you were just sitting there with Mr. Garcia, they can
11   come in with any group of crimes they want to,
12   though, to try to prove their enterprise?  I mean,
13   that's the reality.  That's the reason the
14   severance -- I'm working on Mr. Sanchez, so I've been
15   up here looking at his anyway.  But the reality is,
16   they could pick their crimes to show it, so --
17             MR. ADAMS:  But Judge, there are not overt
18   acts in this indictment.  So I would think 403 --
19   this is off the top of my head -- I believe 403 would
20   have to be used by the Court to regulate what kind of
21   evidence could be admissible.  If we were solely in
22   the Gregg Marcantel counts, and nothing else were
23   merged, if they wanted to put up, you know, a 2008
24   homicide that five other alleged SNM members
25   committed, you know, we would have a hard time with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that, and we would ask you not to let them do it.
2    And I suspect you would be troubled by their wanting
3    to just scare the jurors.  And so there has to be
4    some limit.
5            1613, it may be different.  They have overt
6    acts; they've alleged hundreds of them.  But in this
7    case there aren't overt acts, so I would think the
8    403 balancing has to kick in and guide what can be
9    used against different people, and where curative
10   instructions and limiting instructions come into
11   play.
12           THE COURT:  Well, I'll certainly listen,
13   but I think I've signaled early on that I'm not
14   seeing those limitations.  It seems to me that the
15   Government, pretty much, they get to choose how they
16   want to prove the enterprise.  And you might think
17   one crime is worse than another crime, but, you know,
18   from a 403 standpoint, I think it's very difficult to
19   go in and start telling the Government, Well, that
20   crime is not too prejudicial, but this crime is okay.
21   I probably am not going to go that direction.
22           We don't have to argue it today, but put it
23   in the back of your mind.
24           MR. ADAMS:  I will look at the jury
25   instructions in the very near future, because I look
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                           FAX (505) 843-9492

**BEAN**
**& ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    forward to continuing the discussion.

2              THE COURT:  I'm not seeing this as really

3    more jury instructions.  I'm seeing this as more

4    evidentiary rulings I've got to make.  And I'm

5    sitting here going:  It looks like this stuff is

6    coming in.

7              So, anyway, we don't have to discuss it,

8    but that's -- when you said your head was swimming,

9    it seems to me that it shouldn't be swimming because

10   it's coming in.  You may not have an interest in that

11   conspiracy, and sitting there and being the lawyer

12   that gets up and tries to defend against it; you may

13   want to rely on your co-counsel for that, or other

14   defendants' counsel.  But it seems to me, you know,

15   from a legal, theoretical standpoint, you have an

16   interest.

17             That's the reason I've been having a fairly

18   wide open James.  Anybody got any -- because I'm

19   seeing that the Government is planning to use this

20   evidence potentially against everyone in the room.

21             MR. ADAMS:  Well, that's the purpose of the

22   RICO statute.  There is an overarching conspiracy,

23   Your Honor.  And under that, there are smaller

24   conspiracies under the same roof according to the

25   theory of the Government.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Well, I don't mind being
 2    educated on this, but -- you can tell I'm trying to
 3    be honest with you what's in my head.  And if I'm
 4    wrong, if I don't understand how the evidence is
 5    going to come in, you probably need to start
 6    educating me earlier rather than later.  Because I've
 7    signaled several times in this case that I'm not
 8    seeing how to keep this evidence out.  It seems to me
 9    that, once they made this a racketeering case and a
10    VICAR case, and when they are trying it that way, the
11    evidentiary standards are quite broad.
12            Anyway --
13            MR. LOWRY:  Your Honor, if I may on that
14    point.
15            THE COURT:  Okay.
16            MR. LOWRY:  Well, this -- I don't want to
17    belabor the issue, but this was one of the reasons I
18    brought up the bill of particulars motion earlier in
19    the year, is because, frankly, the palette of
20    possibilities for the Government is fairly large
21    here.  And I'm concerned about the nature of, you
22    know, surprise.  I mean -- or just what the
23    Government plans on to base the predicate acts.  And
24    I think that's why one's head may swim at a certain
25    point in time.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              And I just didn't know if we can get any
 2      additional -- I understand the Court's position.  I
 3      don't think it's a matter of saying one is more
 4      prejudicial than the other.  But it would be nice to
 5      know what the constellation of those prejudicial acts
 6      could be, so the defense could properly prepare.
 7              THE COURT:  Well, we've crossed that
 8      bridge.  If you want an opinion on it, that might be
 9      something that you want me to turn to sooner rather
10      than later, is trying to put out an opinion on it.
11              But do you want to say something else, Mr.
12      Adams?  I'll let you have the last word.
13              MR. ADAMS:  I do.  But I'm going to stew on
14      it a little bit longer and bring it up another time.
15              But I think, Judge, I will say that we did
16      get -- and we filed a response this morning, or last
17      night -- we got the 404(b) notices.  And they were
18      every single Overt Act from 1613 alleged against
19      Mr. Garcia.  So I guess in the Government's view, it
20      would be similar to what you're saying, that there
21      are no parameters on what might be relevant evidence
22      in this trial.  And so I'm wondering how -- if we --
23      we're not really going to have any notice on what
24      we're facing.
25              THE COURT:  Well --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1            MR. ADAMS:  If 255 overt acts for a July
 2    trial are somehow now all potentially relevant for a
 3    January 29 trial, A, I don't know that we know what
 4    we're facing; and B, I don't know how we're going to
 5    finish our rodeo in six weeks, as scheduled.
 6            THE COURT:  Well, I would assume that, at
 7    some point, the Government is going to decide what it
 8    is going to throw at you.  I mean -- and so they'll
 9    probably say:  We're not going to throw 210, we're
10    going to throw 30, 15.  But that's kind of their
11    choice.
12            MR. ADAMS:  It would be wonderful to be
13    able to litigate the real stuff and not the fake
14    stuff.  I think it would be helpful for all of us to
15    know what we're really facing January 29th, not the
16    hypothetical Titanic situation.
17            THE COURT:  You can think over the weekend,
18    and tell me what -- other than raw judicial power --
19    I have to force them to tell you that.  We're back to
20    where we're plowing old ground.
21            Let's call it a night.  See y'all at 1:00
22    on Monday.  Everybody be safe.
23            If you do decide you want me to be writing
24    or working on something in particular, so this is
25    informed discussion, you tell me.  All right.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          MS. SIRIGNANO:  Judge?

2          THE COURT:  Everybody be safe.  Have a good

3    weekend.

4          (The Court was adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1                    C-E-R-T-I-F-I-C-A-T-E

2

3      UNITED STATES OF AMERICA

4      DISTRICT OF NEW MEXICO

5

6

7          I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8      Official Court Reporter for the State of New Mexico,

9      do hereby certify that the foregoing pages constitute

10     a true transcript of proceedings had before the said

11     Court, held in the District of New Mexico, in the

12     matter therein stated.

13         In testimony whereof, I have hereunto set my

14     hand on December 15, 2017.

15

16

17

18     _____
       Jennifer Bean, FAPR, RMR-RDR-CCR
19     Certified Realtime Reporter
       United States Court Reporter
20     NM CCR #94
       333 Lomas, Northwest
21     Albuquerque, New Mexico 87102
       Phone:   (505) 348-2283
22     Fax:     (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com