```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF NEW MEXICO

 3    UNITED STATES OF AMERICA,

 4          Plaintiff,

 5          VS.                      CR. NO. 15-4268 JB

 6    ANGEL DELEON, et al.,

 7          Defendants.

 8                          VOLUME 2

 9          Transcript of Combined Motions to Suppress
      Proceedings before The Honorable James O. Browning,
10    United States District Judge, Las Cruces, Dona
      County, New Mexico, commencing on December 12, 2017.
11

12    For the Government:  Mr. Randy Castellano; Mr.
      Matthew Beck
13
      For the Defendants:  Mr. Brock Benjamin; Ms. Cori
14    Harbour-Valdez; Mr. Patrick Burke; Mr. Robert Cooper;
      Mr. Jeff Lahann; Mr. Orlando Mondragon; Mr. John
15    Granberg; Mr. Billy Blackburn; Mr. Scott Davidson;
      Ms. Amy Jacks; Mr. Richard Jewkes; Ms. Amy Sirignano;
16    Mr. Christopher Adams; Mr. Marc Lowry; Ms. Theresa
      Duncan; Ms. Carey Bhalla; Mr. William Maynard; Mr.
17    Ryan Villa; Ms. Justine Fox-Young; Mr. Donovan
      Roberts; Ms. Lisa Torraco; Ms. Angela Arellanes; Mr.
18    Samuel Winder

19
      For the Defendants (Via telephone):  Mr. James
20    Castle; Ms. Margaret Stickland

21
      For the Witness Billy Cordova:  Mr. John Moon Samore
22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          THE COURT:  Let's go on the record.  Are
 2   there any changes to counsel?  I see Ms. Fox-Young
 3   here.  Anybody have got any changes?
 4          MS. HARBOUR-VALDEZ:  Mr. Burke is here
 5   today.
 6          THE COURT:  Mr. Blackburn, good morning to
 7   you.  Ms. Torraco, good morning to you.
 8          Any other changes or additions?
 9          All right.  I understand today's task, at
10   least beginning, is to get through -- is it the two
11   combined motions, the two we're going to argue
12   together, Mr. Villa's and Ms. Bhalla's, is the one
13   we're going to argue this morning, the combined?
14          MR. VILLA:  Yes, your Honor.  And it may
15   spill into tomorrow.
16          THE COURT:  Ms. Bhalla, are you going to
17   take the lead on it?
18          MS. BHALLA:  Your Honor, certainly.  I
19   think that, if the Court wants to hear some arguments
20   before we get started, or do you want to just go
21   straight into the hearing?
22          THE COURT:  It's up to you, however you'd
23   like to present your motion.
24          MS. BHALLA:  Okay, Your Honor.
25          We are going to present evidence today, I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    think both teams, that Billy Cordova was providing

2    drugs to both Carlos Herrera and Rudy Perez at the

3    time that he made the recordings in question.  We're

4    going to talk about the times of those recordings.

5    Some of the devices, and how the devices are used

6    will be relevant.  We're certainly not going to be

7    asking about any trade secrets, in terms of the

8    recordings, as we discussed yesterday.

9              So I think, if the Court can give us a

10   little bit of leeway, we're going to demonstrate the

11   use of drugs, and the fact that it was coercive.

12   Certainly, the Government knew about the access to

13   drugs.  Special Agent Acee testified about that -- I

14   don't know if it was last week or the week before --

15   that he knew they were bringing drugs in and out;

16   that that was a common practice; that he was aware of

17   that.  We're going to introduce records to show the

18   Government's knowledge on that issue.

19             And I believe that Mr. Villa has some

20   experts.  His client has some other issues that will

21   be involved.  But for Mr. Herrera's purposes, the

22   crux of what we're going to be proving today and

23   tomorrow is that drugs were used in order to obtain

24   these confessions, at least that's what the

25   Government alleges is that they're confessions.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           We talked a little bit about that as well
 2   last week in terms of -- in terms of -- I'm trying to
 3   think of the way to phrase it, Your Honor.
 4   Basically, they were moving inmates around on
 5   purpose, putting them in different housing levels on
 6   purpose in an effort to extract information.
 7           The Government has alleged that we have
 8   confessions in this case.  And we argued a little bit
 9   about the context, and we talked about that with Mr.
10   Acee.  But our position is that any and all
11   statements that were made to Billy Cordova should be
12   suppressed based on the evidence that we're going to
13   present that drugs were being given to the defendants
14   in this case.
15           And that's what we're going to talk about,
16   Your Honor.
17           THE COURT:  All right.  Thank you, Ms.
18   Bhalla.
19           Mr. Villa, Ms. Fox-Young, do you want to
20   say anything as a preliminary matter?
21           MR. VILLA:  Thank you, Your Honor.
22           THE COURT:  Mr. Villa.
23           MR. VILLA:  For Mr. Perez' case it actually
24   starts about the day after the alleged murder of
25   Javier Molina.  He was placed, along with everybody
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    else in the pod, into Level 6, temporary

2    administrative segregation, which Level 6, for all

3    intents and purposes, is solitary confinement.

4             For Mr. Perez, however, he remained there

5    for the next 23 months until the statements that are

6    at issue in this hearing.  He stayed at Southern

7    until about June of 2015, and then he was transferred

8    to PNM, which is the Level 6, Level 6, if you will,

9    at that point.  So if you are in Southern, and you

10   get into a little bit of trouble, they'll put you in

11   Level 6 as a punishment for 30, 60, 90 days,

12   depending on what the infraction is.

13            If you are going to PNM North, where Mr.

14   Perez goes, that is a much higher standard in place.

15   And what the Court is going to hear is that,

16   essentially, there was no justification for Mr. Perez

17   to have gone there.  The United States in their

18   response claims it was due to that they were

19   handicapped cells at PNM.  But what you will hear,

20   Your Honor, is that there are many, many ADA

21   compliant handicapped cells throughout the New Mexico

22   Department of Corrections.  And placing somebody in

23   Level 6, with the highest restrictions that are

24   available, because they are handicapped or have a

25   disability, would violate the ADA.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1         And what you hear about Level 6 at PNM is

2    there are no contact visits.  An inmate is allowed

3    two noncontact visits.  Depending on which witness we

4    hear from, four to eight phone calls a month.  You're

5    not entitled to shower every day.  You get it every

6    couple of days.  And you get to go out to recreation.

7    But what you'll find out for Mr. Perez' case -- and

8    you'll see video of the cell that Mr. Perez was in,

9    the cell Mr. Cordova was adjacent to, Mr. Perez, and

10   the recreation yard.  And it's essentially a giant

11   cage with cement on the floor and not much else.

12         And Mr. Perez had to be transported from

13   the pod where his cell was to recreation, via a

14   wheelchair.  A wheelchair was kept in the pod, not in

15   his cell.  And he wasn't provided a walker.

16         You'll hear that towards the tail end of

17   his time in PNM he was finally being able to walk a

18   little bit on his own.  But this was beyond the time

19   that Mr. Cordova was involved.

20         And so, when they took Mr. Perez to

21   recreation, they wouldn't let him take his wheelchair

22   in to the recreation cage.  And all there is is

23   cement on the floor.  You'll get to see some of that.

24   So rather than crawl around on the floor, Mr. Perez

25   often did not go to recreation.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          So, at the time that he gave this

2     statement, his state of mind, due to the long-term

3     solitary confinement, was very compromised.

4          You'll also hear about his medical

5     conditions at the time.  We have our expert,

6     Dr. Heather Brislen, who is going to testify and tell

7     the Court about Mr. Perez' general medical state at

8     the time.

9          You'll also hear from one of the

10    individuals that treated Mr. Perez at the time.  He

11    was on a large number of medications, due to a number

12    of different health conditions.  He had a seizure

13    disorder.  He was on psychological medication,

14    diabetes, pain medication for his leg problems, which

15    is why he has difficulty walking.  And all those

16    things were in play at the time that he gave these

17    statements.

18          In addition, Your Honor, as Ms. Bhalla

19    said, you're going to hear that the same day that

20    Billy Cordova took the statements that are arguably

21    the most inculpatory, or the Government would

22    probably suggest are the most inculpatory, Mr.

23    Cordova provided Mr. Perez Suboxone:  Once in the

24    afternoon, before dinner, and then dinner, and then

25    some after dinner.  And it was at that time it caused

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                            1-800-669-9492
PROFESSIONAL COURT                      e-mail: info@litsupport.com
REPORTING SERVICE

1    Mr. Perez to be intoxicated.

2              And you'll hear from Dr. French, who will

3    tell you about Suboxone, or generically,

4    buprenorphine -- I might be pronouncing that wrong --

5    and the effects that it can cause in somebody,

6    intoxication it will have.  You'll hear about how

7    high other inmates have reported they've gotten from

8    Suboxone.  And it was at that time that Mr. Perez

9    made the statements that we're challenging.

10             And, Your Honor, I cite in the briefs to

11   the Tenth Circuit Gonzalez case, which I think is

12   just sort of reciting U.S. Supreme Court case law.

13   But some of the things the Court takes into account

14   in determining if a statement is involuntary or

15   coerced, in addition to threats, intoxication from

16   drugs, those sorts of things; the typical

17   governmental coercion that is often raised in these

18   cases are the individual's age, Mr. Perez' age, his

19   intelligence, his education, the length of detention,

20   any threats or coercion that are made on him, and

21   those sorts of things.  So it's the totality of the

22   circumstances approach that the Court -- we're asking

23   the Court to consider.

24             And so it's not just 23 months in solitary

25   confinement, without any justification at all from

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the New Mexico Department of Corrections, in

2    violation of their policies.  It's not just Mr.

3    Perez' medical and mental state.  It's not just the

4    Suboxone.  It's all of those things combined, Your

5    Honor.  And Arizona versus Fulminante has made it

6    very clear that even if it's not a police officer

7    doing these things, if it's a governmental informant,

8    paid informant, as Mr. Cordova was, they can coerce

9    someone.  So we're not in the Colorado versus

10   Connelly territory, where there isn't governmental

11   involvement, it's just somebody on their own

12   extracting a statement.  We're in the territory where

13   this is a paid governmental informant, in conjunction

14   with Agent Acee and the New Mexico Department of

15   Corrections.

16          And as the Court is well aware, this was a

17   joint investigation.  As you heard last week, there

18   were individuals from STIU and the Department of

19   Corrections conducting an investigation.  And they

20   all pulled the strings to get Mr. Perez to where he

21   was to make these statements.

22          THE COURT:  All right.  Thank you, Mr.

23   Villa.

24          Mr. Castellano, Mr. Beck, do you have any

25   opening remarks?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. BECK:  I'll direct Your Honor to two

2    important cases I think the Court should look at.

3    First, is a Tenth Circuit case from 1996, Nickel

4    against Hannigan, 97 F.3d 403.  The second is the

5    Court's decision from 2005, in United States against

6    Tafoya, which may be found at 399 F. Supp 2d 1227.

7    And in those cases, to find that a statement was

8    involuntary, and therefore inadmissible, due to

9    police coercion or tactics, especially in the Tenth

10   Circuit, the Tenth Circuit lays out sort of the

11   process we have to look at.

12          And the first is whether the mental

13   condition surely led to an involuntary statement.

14   The second is whether law enforcement taking the

15   statement had knowledge of this mental deficiency or

16   condition that made this statement involuntary.  And

17   then, even if those two are met, the third is whether

18   the Government purposefully took advantage of this

19   known mental condition or incapacity to coerce the

20   statement.

21          And the testimony I expect the Court will

22   hear today, and likely into tomorrow, just won't meet

23   that standard.  If we look at Mr. Perez' contentions

24   about being improperly placed in administrative

25   segregation or housing like that, while that may give

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                             FAX (505) 843-9492
                                                                                    1-800-669-9492
                                                                            e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    rise to a civil 1983-type claim, the Court will find
2    that that's not a basis to suppress the statement.
3            The basis is, again, this three-step
4    process for whether the Government took advantage of
5    a known mental defect.  I couldn't find a case in
6    which administrative segregation or some kind of
7    prison conditions led to suppression of a statement
8    as involuntary.
9            With regard to, I think, Mr. Herrera's and
10   Mr. Perez' arguments and contention that these
11   statements were coerced via Mr. Cordova providing
12   them Suboxone within the prison system, I expect that
13   over the next two days the Court will hear from Mr.
14   Cordova whether he provided them Suboxone, and I
15   expect the answer will be no.  Agent Acee, I expect,
16   will also testify as to what instructions he gave Mr.
17   Cordova as to how Mr. Cordova was placed next to
18   Herrera and Perez; that the Government did not have
19   any control over where Mr. Herrera and Mr. Perez
20   were, the conditions that they were kept --
21           THE COURT:  When you say the word
22   "Government," are you talking about the United
23   States?
24           MR. BECK:  The United States Government.
25   The FBI did not have any control over where Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Herrera and Mr. Perez were housed in Corrections.

2   The FBI negotiated to place Mr. Cordova next to where

3   New Mexico government kept Mr. Herrera and Mr. Perez.

4            THE COURT:  So the State made the call

5   where Mr. Perez went, and then what the United States

6   did was come in and say:  Can we have the cell next

7   door?

8            MR. BECK:  Precisely.  That's the case for

9   both Mr. Perez and Mr. Herrera.  And that's where

10   these statements came from.

11            In the Court's case, in Tafoya, the Court

12   looked at the excited state of the person giving the

13   confession, and basically said, yes, the person was

14   excited, but there is no evidence, listening to the

15   recording, listening to the testimony of the

16   officers, that the officers somehow used that excited

17   state in order to coerce a confession.

18            THE COURT:  Will you remind me of the facts

19   in Tafoya?

20            MR. BECK:  Not very well -- so this was a

21   motion to suppress based on an involuntary detention,

22   a prolonged detention.  My understanding from

23   reviewing it briefly this morning is that the police

24   pulled over a car, suspected that there were drugs or

25   other contraband in the car, and detained the person,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   did sort of:  You're free to go, do you mind if I ask
 2   you a few more questions?  And then at that point
 3   found it.  Once the contraband was found, the
 4   defendant was apparently very excited and said that
 5   because he was excited and had been arrested, he
 6   involuntarily provided those statements.
 7        I think what the Court looked at in the
 8   involuntariness of the statements was that, yes, the
 9   person was excited, but looking at the statements,
10   they were voluntary, intelligent statements.  He had
11   no problem answering law enforcement's questions.  He
12   did so intelligently.  And there wasn't evidence that
13   the police used this excitement in a nefarious way to
14   somehow coerce a confession.
15        So I think it's a very high burden to meet
16   that third prong that the Government knowingly used
17   some deficiency to coerce an involuntary statement.
18   I expect that there will not be facts at the end of
19   this hearing that will allow the Court to properly
20   conclude that burden is met in this case.
21        I think that's probably a pretty good
22   introduction, and with that --
23        THE COURT:  Are y'all going to present
24   evidence first?
25        MR. BECK:  We are, Your Honor.  It's our
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    burden.
 2              THE COURT:  All right.  Mr. Beck, if the
 3    Government wishes to present its first witness or
 4    evidence.
 5              MR. BECK:  We do, Your Honor.  The
 6    Government calls Special Agent Bryan Acee to the
 7    stand.
 8              THE COURT:  Mr. Acee, if you'll come up.
 9    Before you're seated, Ms. Standridge will swear you
10    in.
11                      BRYAN ACEE,
12        after having been first duly sworn under oath,
13        was questioned and testified as follows:
14                   DIRECT EXAMINATION
15              THE CLERK:  Please be seated.  State your
16    name for the record.
17              THE WITNESS:  Good morning.  My name is
18    Bryan Acee, B-R-Y-A-N, A-C-E-E.
19              THE COURT:  Mr. Acee.  Mr. Beck.
20              MR. VILLA:  Your Honor, I apologize, I
21    don't think there is anyone in the courtroom.  Can we
22    invoke the rule with the exception of experts?
23              THE COURT:  Any objection to that, Mr.
24    Beck?
25              MR. BECK:  No, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  So we'll invoke the
 2    rule.  Any witnesses in this suppression hearing will
 3    be required to remain outside of the courtroom until
 4    they are called to testify.  They cannot discuss
 5    their testimony with each other, but they may discuss
 6    their testimony with the attorney.
 7              Mr. Beck.
 8    BY MR. BECK:
 9         Q.   Special Agent Acee, what was your role in
10    this investigation into the SNM that led to the
11    prosecution that we're here for today?
12         A.   I'm the lead case agent for the FBI.
13         Q.   In your role as the lead case agent, did
14    you come in contact with a person named Billy
15    Cordova?
16         A.   I did.
17         Q.   How did that happen?
18         A.   In January of 2016, I was up at the
19    Metropolitan Detention Center, MDC, in Bernalillo
20    County.  I was there with other agents and STG folks
21    from MDC, and we were speaking with SNM members.  I
22    pulled out an SNM member who had agreed to cooperate
23    with us.  The manner in which that informant was
24    brought into the office kind of compromised the
25    informant, so the STG suggested we pull out everybody
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    from the SNM pod, to make it look like it's more

2    routine questioning.

3         Q.   Okay.  Let's go back here.  So STG, is that

4    the Security Threat Group for New Mexico Corrections

5    Department?

6         A.   No, STG is the Security Threat Group for

7    the Metropolitan Detention Center.

8         Q.   Okay.  So this is different than STIU,

9    which we've referred to throughout these cases?

10        A.   It's a different unit.  Their functions are

11   the same, just a different facility.

12        Q.   All right.  And so the informant you first

13   pulled out was not Billy Cordova?

14        A.   Correct.

15        Q.   So I think you were talking about STG

16   recommended you pull out all the SNM.

17        A.   Yes, to give that informant a little bit of

18   cover, I guess.

19        Q.   In January of 2016, were you already

20   undergoing the investigation that led to this

21   prosecution?

22        A.   Yes, we were well into it at that point.

23        Q.   Okay.  So what happened after STG

24   recommended you pull out all the SNM members?

25        A.   Well, I asked who else they had.  They

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   mentioned Billy Cordova.  I didn't know him.  The
 2   officers that knew him said he wouldn't talk to us
 3   and that he'd probably try to fight us.
 4   Nevertheless, they brought him into the office.
 5        Q.   Is this an office at the Metro County
 6   Detention facility?
 7        A.   It is; it's the STG office.
 8        Q.   And what happened when Mr. Cordova came in
 9   to the STG office?
10        A.   He had a big -- he was unhandcuffed.  He
11   came in, had a big smile on his face, kind of sized
12   everybody up, and then sat down.  And I initially
13   didn't enter the conversation.  I just kind of sat
14   off to the side and watched the STG officers talk to
15   him; told him who we were.  And Mr. Cordova just
16   opened up about being fatigued or tired of the SNM.
17        Q.   What else did he say?
18        A.   Ultimately, he said he was willing to
19   cooperate and talk, because he was unhappy with where
20   his life had gone as a result of being part of SNM.
21        Q.   When you say "he was willing to cooperate,"
22   did you tell him you were investigating the SNM?
23        A.   I did.
24        Q.   And is that what you understood he meant by
25   "willing to cooperate"?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    Why did you understand that?
 3        A.    Well, we talked about it.  In fact, I
 4   had -- at that time I had assigned an agent to start
 5   compiling overt acts on Mr. Cordova.  I intended
 6   to -- he was a target.  I never envisioned sitting
 7   down and talking to him at that point.
 8        Q.    After he said he was willing to cooperate,
 9   what happened?
10        A.    Well, Mr. Beck, again, it caught me off
11   guard.  I didn't expect to talk to him.  So we were a
12   little bit behind the curve at that point.  He said
13   he wanted to cooperate.  I needed to understand the
14   reasons that he was at MDC, his pending charges, and
15   where he was headed.  I learned that he'd already
16   been convicted and sentenced, and was due to go to
17   state prison any day.  And so we formulated a plan in
18   the following days or weeks to wire him up when he
19   arrived at New Mexico Correctional Facility.
20        Q.    Let me go back there.  Who is "we," when
21   you say "we formulated a plan"?
22        A.    The FBI and the Department of Corrections.
23        Q.    And you said this plan entailed wiring up.
24   What does that mean?
25        A.    Equipping him with a recording device.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   And then what happened once you formulated
2     this plan?
3     A.   We had to just kind of sit back and wait
4     for the judicial and corrections systems to kind of
5     wind things up and have him be designated to a
6     facility.
7     Q.   Who designated him to a facility?
8     A.   As part of his sentencing, he was sentenced
9     to the New Mexico Corrections Department.  And then
10    the Corrections Department did what they do with any
11    inmate.  I think they initially go to Central for an
12    intake process, and then he ultimately was sent up to
13    PNM.
14    Q.   Did you play a role in where he was sent
15    when he went to PNM?
16    A.   I did not.
17    Q.   What happened once this process played out
18    and he was designated to go the PNM?
19    A.   I opened him up as a confidential human
20    source, to formalize the process.  I explained --
21    once he ended up at PNM, I got with the STIU folks to
22    see who Mr. Cordova would be around, and then begin
23    formulating a plan to introduce a recording device
24    into the facility, which isn't easy to do.
25    Q.   Where did you learn that Mr. Cordova would

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   be placed at PNM?

 2        A.   I think he was to go to the South or the

 3   North, either the Level 5 or the 6.

 4        Q.   Okay.  Did you at some point talk with STIU

 5   officers about where to place Mr. Cordova at PNM?

 6        A.   Yes.

 7        Q.   And how did that come about?

 8        A.   Well, Mr. Cordova had explained that he was

 9   present during the Molina -- there is a little bit of

10   background to this.  He explained that he was present

11   during the Molina homicide.

12        Q.   When did he tell you that?

13        A.   When I first met him in January.

14        Q.   Okay.

15        A.   So he had some knowledge.  If I remember

16   correctly, he had lived in yellow pod at the time of

17   the homicide.  And he had some information based on

18   his experiences that he thought Carlos Herrera and

19   Rudy Perez were involved in that homicide.  And I'll

20   be honest, that was relatively new information to me.

21        Q.   When you heard that -- did you hear that on

22   January 16?

23        A.   Yes.

24        Q.   And then what happened?

25        A.   He felt that if he were near those guys, he
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    could get them to talk about the homicide.  And I

2    thought that was a good idea.  I just wanted to make

3    sure that if there was any conversation it was

4    recorded so it wasn't just him coming back and

5    telling me:  Yeah, they admitted it.  So I discussed

6    that with my counterparts at the STIU.

7            And I don't know their full process of

8    figuring out how they can get folks next to each

9    other, but what was represented to me was that Carlos

10   Herrera was already there, and that Mr. Cordova could

11   be placed next to him.  And that Mr. Perez had some

12   kind of pending disciplinary issue, where he was --

13   don't misquote me, but he was due to be sent to the

14   Level 6, something of that nature.

15        Q.   And what happened when STIU provided you

16   that information about where Mr. Herrera was placed

17   and where Mr. Perez was going to be placed?

18        A.   Well, I represented that, if that was

19   possible, then I wanted Cordova to be next to him and

20   to be wired up.

21        Q.   And was Mr. Cordova placed next to Carlos

22   Herrera and Rudy Perez?

23        A.   He was.

24        Q.   And was he, as you said, "wired up"?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.    Did you direct STIU or anyone at

2   Corrections to place either Mr. Perez or Mr. Herrera

3   in the cell at PNM at which they were placed at that

4   time?

5        A.    No.

6        Q.    Did you ask for Mr. Perez or Mr. Herrera to

7   be placed in any form of restrictive housing?

8        A.    No.

9        Q.    So I want to talk to you a little bit about

10   the process of Mr. Cordova being wired up.  Do you

11   provide any instructions or admonitions to a

12   cooperating source when they're going to be wired up?

13        A.    Yes.

14        Q.    Did you do that with Mr. Cordova in this

15   case?

16        A.    I did.

17        Q.    What did you tell him?

18        A.    Well, you asked two questions there.  So

19   the admonishments that we do are standard

20   admonishments with any informant when we open them.

21   We need to do that within 90 days or sooner if we're

22   going to start tasking them.  So in the case of Mr.

23   Cordova, I met him in January, and he was wired up

24   and in the facility by February.  So we moved fairly

25   quickly on that.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   All right.  And what are those

2   admonishments generally?

3       A.   Sure.  There is four mandatory

4   admonishments.  And they are that the person know

5   that their participation or work for the FBI is

6   completely voluntary; that the FBI will strive to

7   protect their identity, but there are circumstances

8   where we're unable to do that, such as legal

9   proceedings; that they have to be truthful with us.

10  I have some notes that I'm going to refer to.

11      Q.   That's fine.

12      A.   Oh, and that they must follow these

13  admonishments and not take any independent action.

14  Those are the four required admonishments.  There are

15  a dozen or so of what I'll call special

16  circumstances.  For example, if a person is

17  represented by legal counsel, there are extra

18  admonishments, or if they work for the media, or they

19  have access to medical information.  So with each

20  these informants, when we do the admonishments, we'll

21  note which ones we gave them, and those would be

22  reflected in their file.

23      Q.   Did you note which admonishments you gave

24  to Mr. Cordova?

25      A.   Yes, they're noted in his file.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        Q.   And did you note which admonishments you
 2   gave to Mr. Cordova?
 3        A.   My notes don't, but his informant file
 4   does.
 5        Q.   Beyond those four general admonishments,
 6   did you give any admonishments to Mr. Cordova in
 7   addition to those four?
 8        A.   Yes.  The other -- so the official
 9   admonishments were noted in his file, and will still
10   be contained in his file.  The other what I'll call
11   directions or guidance I gave him --
12        Q.   All right.  Let me stop you there.  I think
13   you earlier said that I asked two questions,
14   admonishments and instructions.  I just want to make
15   sure we're all following you.  Are we now moving to
16   the instructions that you gave him?
17        A.   We are.
18        Q.   And what were those instructions that you
19   gave him?
20        A.   They primarily had to do with the devices,
21   him making recordings.
22        Q.   And what were those instructions about the
23   devices and the recordings?
24        A.   I pointed out that the recording devices
25   were simple.  We had a conversation about the
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                            1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   devices.  Because I had introduced more complex

2   devices and they were failing.

3         Q.   Had you introduced those more complex

4   devices with Mr. Cordova in the past?

5         A.   No.  With other informants in the prison.

6         Q.   All right.  What instructions did you give

7   to Mr. Cordova about the device that you sent in with

8   him?

9         A.   That we dumbed it down.  This is a simple

10  device.  It's small; consequently, the batteries are

11  small.  If you can get these guys talking about the

12  murders, either the murder of Molina or any other

13  murders, that's what I'm interested in.  I'm not

14  interested in drug talk, exploits with girlfriends,

15  or life stories.  What I'm looking for is specific

16  talk about homicides.  I told him to be cognizant of

17  the battery life because there is no way to tell from

18  the device how much battery life is left.  And to be

19  careful with the device, because the correctional

20  staff in the prison -- no one knew that these guys

21  had it.  Only STIU and Deputy Secretary Myers were

22  aware of it.  And then I asked him some questions

23  about whether or not he thought, based on his

24  experience at the Level 6 and Level 5, if he could

25  conceal it, if he thought it would be found in a

SANTA FE OFFICE                                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                         Albuquerque, NM 87102
(505) 989-4949                                                                                          (505) 843-9494
FAX (505) 843-9492                                                                              FAX (505) 843-9492
                                                                                                        1-800-669-9492
                     BEAN                                                                  e-mail: info@litsupport.com
                     &ASSOCIATES, Inc.
                     PROFESSIONAL COURT
                     REPORTING SERVICE

 1    shakedown or other scenarios.

 2         Q.    And what did he say in response to those

 3    questions?

 4         A.    He thought he could conceal it.  He had

 5    some concerns because some of the devices -- not all

 6    of them -- have lights.  And from my conversation

 7    with him and other informants, I knew that the

 8    majority of their conversations took place under

 9    their bunks, because that's where the vent is located

10    between the cells, and that's a relatively -- can be

11    a dark area, and this light might illuminate.  I knew

12    from some failed experience with other informants

13    that that light was a problem.  But, ultimately, Mr.

14    Cordova was positive and thought that he could pull

15    it off.

16         Q.    Did you give him any instructions about

17    saying a preamble before he starts a recording, or

18    any additional instructions telling him about the

19    simplicity of the device?

20         A.    Yes, I told him when he could, try to put

21    the date on there.  And if he was talking about a

22    group of people, or more than one, to make it clear

23    who he was speaking with, to say their name in the

24    conversation.  Or when he walked away, if he could

25    get to the other end of the cell and whisper into it.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                     1-800-669-9492
                                                              e-mail: info@litsupport.com


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   Have you listened to all the recordings

2    that Mr. Cordova took inside the prison?

3      A.   I have.

4      Q.   Did he give that preamble of the date or

5    names of everyone he was talking to in every

6    recording?

7      A.   No.

8      Q.   I want to talk to you now about the

9    recordings made in this case.  You said that you had

10   heard all the recordings Mr. Cordova took, right?

11     A.   I have.

12     Q.   And those include the recordings of Mr.

13   Herrera?

14     A.   Yes.

15     Q.   Do those also include the recordings of Mr.

16   Perez?

17     A.   Yes.

18     Q.   I want to talk to you about the recordings

19   involving Mr. Perez.  And I'm going to give you seven

20   discs and transcripts.  And if you'd review them and

21   tell me whether these are the recordings that Mr.

22   Cordova made of Mr. Perez.  Are those Mr. Cordova's

23   recordings of Mr. Perez?

24     A.   Yes.

25          MR. BECK:  Your Honor, at this time, the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   United States is going to move into evidence these
 2   seven recordings, and we're going to continue the
 3   numbering from the last motions to suppress hearing.
 4               THE COURT:  Is there a reason to do that?
 5   Should we keep these separate?
 6               MR. BECK:  I think we were going to
 7   incorporate some of the exhibits from the last motion
 8   to suppress hearing into this motion to suppress
 9   hearing.
10               THE COURT:  Okay.
11               MR. BECK:  It seems to me it makes sense
12   for the Government to do that.  If the defendants --
13   since Mr. Herrera, I don't think, has entered any
14   exhibits, you might start over and Mr. Perez might
15   continue on.
16               THE COURT:  All right.  So what are your
17   numbers here?
18               MR. BECK:  I might ask for some help.
19               THE COURT:  I've got 30 as being your last
20   one.  Does that sound about right?
21               MR. BECK:  Yes, Your Honor.
22               THE COURT:  So do you want to go with 31?
23               MR. BECK:  Yes.
24               MR. VILLA:  Your Honor, do we want to do 31
25   for the disc and the 31A for the corresponding
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   transcript?
 2            THE COURT:  Do you want to do that?
 3            MR. BECK:  I think that makes sense, Your
 4   Honor.
 5            THE COURT:  All right.  So you've got 31
 6   through 38, and then the transcripts will be A for
 7   each one; is that correct?
 8            MR. BECK:  I must have miscounted.  We have
 9   31 through 37.  We'll have 31A through 37A.
10            THE COURT:  All right.  Any objections?
11   All right.
12            MR. VILLA:  Not for purposes of this
13   hearing.  I just want to clarify, so we have six
14   discs and six transcripts?
15            MR. BECK:  Yes, we do.  And I have an
16   additional copy of each one of the discs for the
17   defense.
18            MR. VILLA:  No objection.
19            THE COURT:  All right.  Any other
20   objections or comments?  All right.  Government's
21   Exhibits 31, 32, 33, 34, 35, 36, and 37 will be
22   admitted into evidence.  And Government's Exhibit's
23   31A through 37A will be admitted into evidence.
24            MS. DUNCAN:  Your Honor, for us in the back
25   of the courtroom, we have trouble seeing the Elmo.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    So would you mind telling us the Bates numbers of the

2    transcripts, and we can pop them up on our computer.

3            MR. BECK:  Transcript 31A will begin at

4    Bates No. 2534 and continue through 2542.  Transcript

5    32A will start at 2543 and continue through 2548.

6    Transcript 33A will begin at 2549 and continue

7    through 2568.  Transcript 34A will start at 2553,

8    continuing through 2568.  Transcript 35A will start

9    at 2569 and continue through 2571.  Transcript 36A

10   will begin at 2572 and continue through 2584.

11   Transcript 37A begins at 2585 and continues through

12   2586.

13           MR. JEWKES:  Your Honor, may it please the

14   Court.  Could you have Mr. Beck announce the page

15   range one more time for 31A, please?

16           MR. BECK:  Transcript 31A begins at page

17   2534 and continues to 2542.

18           MS. JACKS:  Your Honor, it looks like 33A

19   and 34A are crossing over in the same page ranges.

20   Can we read those again?

21           MR. BECK:  33 and 34.

22           MS. JACKS:  Yes.

23           MR. BECK:  33A is 2549 through 2552.  34A

24   is 2553 through 2568.

25           MS. JACKS:  Thank you.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. VILLA:  Your Honor, I'm going to ask
 2    the Court -- the rule has been invoked.  Mr.
 3    Cordova's attorney, I believe, is present in the
 4    courtroom.  I don't know that he has to be excused.
 5    But maybe you could notify him the rule has been
 6    invoked and he can't speak to his client about any of
 7    the testimony that's taken before he testifies.
 8              THE COURT:  Is Mr. Samore, are you Mr.
 9    Cordova's attorney?
10              MR. SAMORE:  Yes, sir.
11              THE COURT:  All right.  So the rule has
12    been invoked.
13              MR. SAMORE:  It has?
14              THE COURT:  It has.  Well, I think nobody
15    is saying you can't be here.  But just be aware that
16    you can't be a conduit back to your client as to
17    what's going on here.  And I know that now that you
18    know the rule is invoked, you wouldn't.
19              MR. SAMORE:  We are very conscientious of
20    that, and I don't intend to see him until after he
21    testifies.
22              THE COURT:  All right.  Thank you, Mr.
23    Samore.  Good morning to you.
24    BY MR. BECK:
25         Q.  Special Agent Acee, in preparation for your
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    testimony today, did you review two New Mexico State
 2    Police recordings of Mr. Perez?
 3         A.   I did.
 4         Q.   And I'm showing you what we'll mark as
 5    Government's Exhibit 38 and Government's Exhibit 39.
 6    Are those the two recordings that you reviewed of Mr.
 7    Perez' interviews with the New Mexico State Police in
 8    this case?
 9         A.   They are.
10         Q.   And what's your understanding of when those
11    interviews took place?
12         A.   Shortly after the homicide of Javier
13    Molina.
14         Q.   Special Agent Acee, what was the date of
15    the first interview with Mr. Perez?
16         A.   March 8, 2014.
17         Q.   And what was the date of the second
18    interview with Mr. Perez?
19         A.   March 10, 2014.
20              MR. BECK:  Your Honor, at this time, the
21    United States moves into evidence Government's
22    Exhibit 38 and 39, which are the first and second
23    interviews respectively.
24              THE COURT:  Any objection?
25              MR. VILLA:  So 38 is March 8 and 39 is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   March 10?
 2             MR. BECK:  Yes.
 3             MR. VILLA:  No objection for this hearing.
 4             THE COURT:  Anybody else have any comments
 5   or objections?  Ms. Duncan?
 6             MS. DUNCAN:  Your Honor, we have no
 7   objection.  We would again ask for the Bates range.
 8             THE COURT:  All right.  So not hearing any
 9   other objections, Government's Exhibits 38 and 39
10   will be admitted into evidence.
11             Mr. Beck, do you mind providing those Bates
12   ranges?
13             MR. BECK:  I don't and I will after the
14   break.  It doesn't say on these DVDs what are the
15   Bates numbers for the DVDs.  But I will provide that
16   on the record after the break.
17             THE COURT:  All right.  Does that seem
18   satisfactory, Ms. Duncan?
19             MS. DUNCAN:  It does, Your Honor.
20             THE COURT:  Mr. Beck.
21        Q.   You've listened -- have you listened to
22   these recordings that Mr. Cordova took of Mr. Perez?
23        A.   Yes.
24        Q.   And have you listened to the New Mexico
25   State interviews of Mr. Perez?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                                  e-mail: info@litsupport.com

```
 1        A.    I have.

 2        Q.    Does it sound like Mr. Perez is under the

 3   influence of drugs during the interviews that Mr.

 4   Cordova took of Mr. Perez?

 5              MR. VILLA:   Objection; lack of foundation,

 6   speculation.

 7              THE COURT:   Well, I'm going to have to

 8   figure out whether this evidence is admissible.   So

 9   I'll start letting people tell me what they think on

10   this stuff, because I'm going to need help deciding

11   whether it's involuntary.   So I'm going to allow it.

12   Because the Government has got to function here and a

13   responsibility not to get information that's

14   involuntary, so that's everybody's responsibility.

15   Overruled.

16        A.    It did not sound to me like he was.

17        Q.    Why is that?

18        A.    Well, I've listened to the recordings

19   several times.   I understand that it's been alleged

20   that Mr. Perez was under the influence of Suboxone

21   provided by Mr. Cordova.   In light of that, when I

22   listened to it, and I compare that to my experiences

23   earlier in my career of arresting people for being

24   under the influence, such as in cases of DUI, or my

25   experiences as a law enforcement officer in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    California, where it was unlawful to be under the

 2    influence of a controlled substance, I have conducted

 3    those investigations.  And my review of Mr. Perez'

 4    statements is, he didn't sound like he was under the

 5    influence of a central nervous system depressant.

 6         Q.   You talked about your previous DUI

 7    experience.  Have you had experience in detection of

 8    persons being under the influence of narcotics or

 9    alcohol?

10         A.   I have.

11         Q.   What is that experience?

12         A.   In addition to just the basic California

13    Highway Patrol Academy, and experience arresting

14    persons under the influence, I also completed their

15    advanced drug training 40-hour course, and their drug

16    recognition expert, 80-hour course, to be able to

17    make determinations of people being under the

18    influence of controlled substances.  That was quite

19    some time ago, late '90s, early 2000s.  I haven't

20    kept those certifications up.  But in my time as a

21    police officer/detective, I arrested a lot of people,

22    and many of those arrests were for being under the

23    influence of alcohol or narcotics.

24         Q.   The 40-hour and the 80-hour training you

25    talked about for detecting persons under the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    influence of alcohol or narcotics, are those in

2    addition to the general training you had received as

3    a California State Highway Patrol Officer?

4         A.   Yes, sir.

5         Q.   What's the purpose of that additional

6    training for you?

7         A.   It was to be able to arrest people for

8    being under the influence of substances other than

9    alcohol.  And then to be able to arrest people for

10   violations of 11-550 of the Health and Safety Code,

11   the California Health and Safety Code, that is; that

12   is being under the influence of a controlled

13   substance.  To walk around in public in California

14   and be under the influence was a crime.  And so the

15   California Highway Patrol saw fit to have officers

16   that were able to make those evaluations.  So that's

17   the training that I underwent.

18        Q.   And did you perfect those arrests under the

19   California State Health Code for people being under

20   the influence after that training?

21        A.   I did when asked to do, so yes.

22        Q.   And although it was some time ago, did you

23   apply that training and experience when you listened

24   to these recordings that Mr. Cordova took of

25   Mr. Perez?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                        e-mail: info@litsupport.com



1      A.   I did, as well as, even as an FBI agent,
2  I'm still frequently talking with and dealing with
3  people that are under the influence of either heroin
4  or methamphetamine or other substances.
5      Q.   Did you specifically listen to these
6  recordings of Mr. Perez, Mr. Cordova took, to
7  ascertain whether, in your training and experience,
8  Mr. Perez was under the influence of narcotics or
9  other drugs?
10      A.   I did.  In the last couple of weeks, I went
11  back and listened to them again, to see if I could
12  discern anything.
13      Q.   Before you sent Mr. Cordova into the prison
14  to record conversation with Mr. Perez, did you know
15  about any psychological conditions that Mr. Perez
16  had?
17      A.   No.
18      Q.   Did you instruct Mr. Cordova to take
19  advantage of any psychological conditions that Mr.
20  Perez might have?
21      A.   No.
22      Q.   Did Mr. Cordova tell you he intended to
23  take advantage of any alleged psychological problems
24  Mr. Perez had?
25      A.   No.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                 1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1         Q.   Did you provide Suboxone to Mr. Cordova to
 2    take into the prisons when he was recording these
 3    conversations with Mr. Perez and Mr. Herrera?
 4         A.   No.
 5         Q.   Did you know that Mr. Cordova took in
 6    Suboxone to the prisons during this time?
 7         A.   No.  And I don't think that he did.
 8         Q.   Why don't you think that?
 9         A.   I don't have any information to believe
10    that he did.  I've talked to him about that, and he
11    denies that.  I didn't overhear any conversations in
12    which that took place.  And each time I had to send
13    in a recording device or switch it out, that was
14    accomplished through STIU shaking down his house or
15    his cell.  And they didn't find any contraband
16    either.
17         Q.   What does shaking down his house or his
18    cell mean?
19         A.   Searching it.
20         Q.   To your knowledge, did Mr. Cordova have
21    Suboxone or drugs in the prison during the times he
22    was recording Mr. Perez or Mr. Herrera?
23         A.   No.
24         Q.   Did you instruct Mr. Cordova to threaten
25    Mr. Perez or Mr. Herrera to take these statements
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    from them?

2         A.    No.

3         Q.    Did you instruct him to promise Mr. Herrera

4    or Mr. Perez anything in return for these statements?

5         A.    No.

6         Q.    To your knowledge, did Mr. Cordova threaten

7    or promise anything to Mr. Perez or Mr. Herrera to

8    receive these statements?

9         A.    No.

10        Q.    In preparation for your testimony did you

11   also listen to the recordings Mr. Cordova took of Mr.

12   Herrera?

13        A.    I did.

14        Q.    Did you also, listening to these

15   recordings, specifically listen for whether, in your

16   training and experience, Mr. Herrera was under the

17   influence of drugs or narcotics?

18        A.    I did.

19        Q.    And based on that training and experience,

20   and specifically listening to those conversations,

21   did you conclude that Mr. Herrera sounded like he was

22   under the influence of drugs or narcotics?

23        A.    He did not sound like he was under the

24   influence.

25        Q.    Why is that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Well, in listening to him speak, I didn't

2   detect that he was.  I also recall some comments

3   where Mr. Cordova and one of the other inmates was

4   talking about Mr. Herrera doing bad, which I

5   understand to mean needing drugs, not high on drugs.

6      Q.   Why do you understand that to mean needing

7   drugs?

8      A.   That's just a term that people who use

9   drugs or are part of that subculture, if you will,

10  that's a term they use to describe -- they'll say:

11  I'm doing bad.  And that means they're in need of a

12  fix or they're in need of drugs, as opposed to are

13  doing bad because now I'm high and I have drugs.

14     Q.   When you listened to that conversation, did

15  you get the impression from your training,

16  experience, and knowledge that Mr. Herrera was on

17  drugs while making those statements?

18     A.   No.

19     Q.   Did you also review a conversation in which

20  Mr. Herrera -- or excuse me -- excuse me, it's not

21  Mr. Herrera.  Did you also review a conversation in

22  which Mr. Cordova discussed drugs and drug prices

23  with another inmate?

24     A.   Yes.

25     Q.   What was that conversation?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   That conversation is contained on the

2    Herrera recordings, and it's Mr. Cordova and another

3    SNM member named Dale Chavez, whose alias is

4    "Dreamer."  Mr. Chavez and Mr. Cordova are debating

5    or having a conversation about the price of Suboxone

6    on the streets.  Mr. Cordova had been on the streets

7    more recently than Mr. Chavez, and they had a

8    disagreement with the prices.  They also were talking

9    about the prices of Suboxone inside the prison versus

10   on the streets.

11       Q.   Was Mr. Cordova selling Suboxone to

12   Mr. Chavez during that conversation?

13       A.   No, it was more the opposite.  He was

14   talking about buying some from him.  In the

15   context -- I looked at that transcript a few times.

16   What it sounds like to me is he's trying to set up a

17   deal where he could have somebody purchase it on the

18   streets for him, and what those prices would be, and

19   then what they would cost inside.  And I think that

20   that is in line with what our objectives were.

21   Because, at that time, I was contemplating

22   introducing another cellphone into the institution,

23   and in this case to Mr. Cordova.  So part of his role

24   would have been to introduce undercover FBI agents on

25   the streets to purchase drugs to make it look like we

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   were smuggling them into the prison.
 2       Q.   Did you ever smuggle drugs into the prison
 3   through Mr. Cordova?
 4       A.   No.
 5       Q.   So we talked about Mr. Cordova supplying
 6   drugs.
 7            I want to talk to you about Mr. Herrera's
 8   psychological condition.  Did you ever know about any
 9   psychological condition that Mr. Herrera had during
10   these recordings?
11       A.   No, I don't know about any of his medical
12   conditions.
13       Q.   Did the FBI know about any of his
14   psychological conditions, if he has any?
15       A.   No.
16       Q.   Did you tell, instruct, or did anyone from
17   the FBI instruct Mr. Cordova about Mr. Herrera's
18   psychological conditions, if he had any?
19       A.   No.
20       Q.   Did you instruct Mr. Cordova to take
21   advantage of any of Mr. Herrera's psychological
22   conditions, if he had any?
23       A.   No.
24            MR. BECK:  May I have a moment, Your Honor?
25            THE COURT:  You may.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Special Agent Acee, when Mr. Cordova
 2   arrived at the PNM North facility, do you know who he
 3   was placed next to first?
 4          A.   I believe he was next to Mr. Herrera first.
 5          Q.   And at the same time was he next to Mr.
 6   Perez?
 7          A.   No.  Because those recordings took place in
 8   different facilities.
 9          Q.   So after he was placed next to Mr. Herrera,
10   was he moved to be placed next to Mr. Perez?
11          A.   Yes.
12          Q.   Did you coordinate that movement of Mr.
13   Cordova?
14          A.   No.
15               MR. BECK:  Pass the witness, Your Honor.
16               THE COURT:  Thank you, Mr. Beck.
17               Ms. Bhalla, do you want to start the
18   cross-examination?
19               Mr. Villa?
20               MR. VILLA:  I think I'm going to go first
21   on this one, if that's okay.
22               THE COURT:  All right.  Mr. Villa.
23               MR. VILLA:  Thank you, Your Honor.
24               THE COURT:  Mr. Villa.
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                        EXAMINATION
 2   BY MR. VILLA:
 3        Q.   Good morning, Agent Acee.
 4        A.   Good morning, sir.
 5        Q.   So if I understand it correctly, you were
 6   at MDC, which is the Bernalillo County Metropolitan
 7   Detention Center, in January of 2016?
 8        A.   Yes.
 9        Q.   And that is the first time you spoke to
10   Billy Cordova?
11        A.   It is.
12        Q.   You said you were there with other agents
13   and STG folks?
14        A.   Yes.
15        Q.   The other agents being FBI agents?
16        A.   Yes.
17        Q.   What about STIU?
18        A.   No.
19        Q.   Anybody from New Mexico Corrections
20   Department?
21        A.   Mark Myers may have been there.
22        Q.   Okay.  May have, or he was?
23        A.   Well, he's usually with us, but he
24   sometimes has to go up to Santa Fe for stuff.  I'd
25   have to look at the reports.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   If you saw the report of that initial

2   interview, would that refresh your recollection?

3     A.   Yes.

4     Q.   So the Court knows, I imagine the Court

5   knows, but who is Mark Myers?

6     A.   At that time, Mark Myers was a Deputy

7   Secretary.  I can summarize it -- and he was our

8   go-to person for the Department of Corrections,

9   because Mr. Marcantel was a victim.

10     Q.   I understand.

11          MR. VILLA:  May I approach?

12          THE COURT:  You may.

13     Q.   Agent Acee, I'm handing you what -- I call

14   it a 302; I'm not sure if it is.  But can you tell me

15   if that's the report for your initial interview with

16   Billy Cordova?

17     A.   This isn't the initial one.

18     Q.   What is it?

19     A.   This is similar to a 302.  This is a 1023.

20   I'm sure you have lots of these.  This is when a

21   person has been opened as an informant, and this is

22   how we take in information from the informant.  So

23   what this is is -- looks like this is a debrief of

24   Mr. Cordova, although the CHS number is blocked out,

25   but this is actually taking place back at our office,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the FBI office.
 2        Q.   Okay.  So let's back up just a little bit.
 3    What's the date of that interview?
 4        A.   The 7th of January, 2016.
 5        Q.   And can you tell me if this was before or
 6    after the meeting at MDC?
 7        A.   Looks like it was three days after, because
 8    on the first sentence I say, "On January 4th, this
 9    confidential human source indicated to me that he
10    wished to leave the SNM."  So on the 7th, we
11    interviewed him at our office.
12        Q.   So does the report there indicate who was
13    with you on January 4?
14        A.   It does not.
15        Q.   Does the report indicate who was with you
16    on January 7?
17        A.   Yes, sir.
18        Q.   Was Mr. Myers present?
19        A.   He was.
20        Q.   Were there also other individuals present
21    from the New Mexico Department of Corrections?
22        A.   There were three STIU officers present.
23        Q.   And who were they?
24        A.   Captain Sergio Sapien, Sergeant Ronald
25    Martin, and Officer Chris Cupit.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Mr. Martin, that being the same individual

2    who testified here a couple weeks ago during the

3    Daubert hearings?

4    A.   Yes, sir.

5    Q.   And what was the purpose of the interview

6    at your office of Mr. Cordova?

7    A.   This was the first in-depth debrief,

8    because my time with him at MDC was limited.

9    Q.   Did you prepare a report of the January 4th

10   interview?

11   A.   I'm not sure.  I may not have.

12   Q.   So the January 7 was the more in-depth

13   debrief, the one you have there in front of you?

14   A.   I would call that the first debrief, yes.

15   Q.   And individuals from the New Mexico

16   Department of Corrections were there throughout the

17   debrief?

18   A.   There were four of them there.

19   Q.   And they stayed there the whole time?

20   A.   I think so, yes.

21   Q.   Were they also part of the plan that you

22   formulated to have Mr. Cordova take recording devices

23   and talk to other suspects?

24   A.   Absolutely.  It can't happen without them.

25   Q.   Got it.  Now, getting back to the January

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492          BEAN                                   FAX (505) 843-9492
                           &ASSOCIATES, Inc.                       1-800-669-9492
                           PROFESSIONAL COURT                      e-mail: info@litsupport.com
                           REPORTING SERVICE

 1    4th meeting at MDC, Mr. Myers may have been there;

 2    there was STG -- and those are STG folks from MDC;

 3    correct?

 4        A.   Yes.

 5        Q.   Are you aware that those STG folks

 6    communicate with STIU about shared intelligence and

 7    things like that?

 8        A.   I think they do.

 9        Q.   Was anybody else besides other FBI agents,

10    maybe Mr. Myers, and STG present?

11        A.   I think that Sergeant Nathan Lerner would

12    have been present, because he was the supervisor over

13    that unit, and the debriefing took place in his

14    office.  So I think he was there.

15        Q.   Sergeant Lerner of MDC?

16        A.   He was actually a Bernalillo County

17    sergeant at that time.  He's retired now.  He had

18    worked the SNM for many years and had knowledge of

19    them.  I'm pretty sure he was there as well.

20        Q.   Understood.  Did Mr. Cordova have an

21    attorney present during that January 4th visit?

22        A.   He did not.

23        Q.   Did he have an attorney present at the

24    January 7th visit?

25        A.   No.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   Do you know if he had an attorney at the

2    time that he was interviewed?

3       A.   Well, he had an attorney in his state case.

4    But he had already been sentenced on the state case.

5    It wasn't until sometime later that we got him a

6    federal attorney through giving him a target letter.

7       Q.   And you did that after these two debriefs?

8       A.   Yes, sir.

9       Q.   Do you know where Mr. Cordova was prior to

10   the time he was at MDC?

11      A.   My impression is he'd been there almost a

12   year; that he'd been at MDC for about a year.

13      Q.   Did you investigate that aspect -- I mean,

14   after you talked to him and thought about this, did

15   you look into where he had been prior to MDC?

16      A.   No.  The only investigation I did was to

17   confirm that he'd been sentenced.  Because I had some

18   concerns talking to him.  And I made it clear to him

19   that I didn't have any questions about his pending

20   state case.  That's the only thing I looked into.

21      Q.   What was that pending state case?

22      A.   He was charged with first degree murder.

23   He was sentenced on a manslaughter.

24      Q.   Did you do any further investigation as to

25   other prior convictions of Mr. Cordova?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   Yes.  I did that when I opened him as an

2 informant.  That's one of the categories we have to

3 populate, if you will, in the opening documents.

4    Q.   Okay.  So I'll ask you about that in just a

5 minute.  Was it then, during the January 7th

6 formal -- more formal debrief that you guys talked

7 about introducing him into the prison with recording

8 devices?

9    A.   I believe so.

10    Q.   And it's your testimony, I think, that you

11 didn't control where Mr. Cordova actually went?

12    A.   No.  I mean, I think I have lots of good

13 ideas, but the Corrections Department doesn't always

14 listen.  So it's entirely up to them.

15    Q.   So when did you first learn where Mr.

16 Cordova was going to go?

17    A.   I think once he arrived.

18    Q.   When you say "once he arrived," what do you

19 mean?

20    A.   Once he -- because, again, he was still at

21 MDC, and he hadn't been transferred yet.  I didn't

22 have any involvement in that transfer, speeding it up

23 or slowing it down, or otherwise.

24         I was notified by the STIU once -- I think

25 I got some updates as to Mr. Cordova's progress in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   being transferred from MDC to Corrections.  And then,
 2   at some point, they let me know what facility he was
 3   at.  And I'll be honest with you, early on in the
 4   case, I was confused, like everyone else, about the
 5   North and the South and Southern.  So it didn't much
 6   matter to me where he was -- just I needed to know
 7   when to introduce the recording equipment.
 8        Q.   When did he tell you that he thought he
 9   could talk to Rudy Perez and Carlos Herrera about the
10   Javier Molina murder?
11        A.   Early on.  And it may have been at this
12   January 7th debrief.  Because, again, I didn't know
13   who Mr. Perez was.  I didn't know anything about him.
14   I knew a little bit about Mr. Herrera, and I can go
15   into that if you'd like.  But I didn't know, nor did
16   I have a lot of information about them being involved
17   in that homicide.  I didn't know Mr. Perez at that
18   time was alleged to have been --
19        Q.   Well, let's back up then.  This case was
20   originally indicted in November 2015?
21        A.   Yes.
22        Q.   And you were the case agent at that time?
23        A.   I was.
24        Q.   Counts 6 and 7 of that original indictment
25   was the conspiracy to and the murder of Javier
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Molina?

2        A.   Yes.

3        Q.   And it included some of the other

4   co-defendants, but not Mr. Perez or Carlos Herrera?

5        A.   Correct.

6        Q.   You had investigated the Molina homicide?

7        A.   Yes.

8        Q.   Prior to that first indictment?

9        A.   Yes.

10       Q.   But you didn't know that Mr. Perez was a

11   potential suspect?

12       A.   I'd seen his name mentioned in much of what

13   I refer -- I had to reference at that time was the

14   state investigation.  I didn't have any cooperators

15   yet.  We were looking at, at one time, as many as 30

16   homicides to charge in the SNM case.  And so I didn't

17   have the knowledge that I have now at that time.  No,

18   I largely relied on what had already been done, what

19   the State had done.  And, as you know, Mr. Perez was

20   not a key person in that investigation, if at all.

21       Q.   We might have to agree to disagree on that.

22       A.   Okay.

23       Q.   As of January 7, at least the idea was

24   discussed that Mr. Cordova could talk to Rudy Perez

25   and Carlos Herrera?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   About the Javier Molina homicide?
 3        A.   That's correct.
 4        Q.   And you thought at the time that Mr.
 5   Cordova was on his way to prison?
 6        A.   He definitely was, yes.
 7        Q.   But you didn't know where he was going to
 8   be placed?
 9        A.   I did not, no.
10        Q.   You didn't know where Carlos Herrera or
11   Rudy Perez were placed?
12        A.   No, let me back up.  Being that they were
13   all SNM, I knew that they wouldn't be at a Level 1,
14   2, or 3 facility.  But I had no specific knowledge
15   about where they would be or what level or what pod,
16   or any of that.
17        Q.   Some of the individuals with you on the
18   7th, they might have had an idea, right?
19        A.   Sure.  They're knowledgeable about that
20   stuff, definitely.
21        Q.   The NMDC and STIU folks?
22        A.   I don't think the NMDC guys would know as
23   much as the STIU guys would know the state prison
24   system.
25        Q.   That's what I meant.  On January 7th at
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   your office, STG wasn't there from MDC anymore,

2   right?

3        A.   No, they were there.  The MDC guys got

4   there.  And that makes sense, because they're

5   probably the ones that had to transport him because

6   he had to be turned over to the state.

7        Q.   So he was transported from MDC to your

8   office?

9        A.   Correct.

10           MR. VILLA:  And, Your Honor, I'd like to

11   mark a document for identification.  Do you want us

12   to go ahead and keep going continuously from last

13   time?

14           THE COURT:  Are you going to be relying on

15   anything from the prior hearing?  I guess, just as a

16   general rule, I'd like keep these hearings somewhat

17   contained, rather than having just a running number.

18   Now, the Government said they were going to use some

19   of the exhibits from the prior hearing.  Are you?

20           MR. VILLA:  I mean, I don't think so off

21   the top of my head.

22           THE COURT:  Why don't we do this, then:  On

23   the defendants' side, why don't we just start over.

24   Why don't you start with A on this.  If you need to

25   move something over, later down the road, maybe we

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

```
 1    can remark it here.
 2             MR. VILLA:  Okay.  So I'm going to mark
 3    this for identification as RP-A.
 4             THE COURT:  All right.
 5             MR. VILLA:  If I could indulge the clerk to
 6    borrow a stapler, it might work better than this
 7    paperclip.  Thank you.
 8        Q.   Agent Acee, I'm showing you what's marked
 9    for identification as RP-A.  Can you tell the Court
10    what that is?
11        A.   This is a judgment and sentence for Billy
12    Cordova.
13        Q.   And is this the judgment and sentence
14    related to the case that he was in MDC for, as you
15    testified here about just a little while ago?
16        A.   Is it?  Where are the charges?
17        Q.   Oh, well, if you turn to the second page,
18    you can look and see what the charges are.
19        A.   It looks like it is.
20        Q.   Voluntary manslaughter?
21        A.   Yes, sir.
22        Q.   And does this document appear to be an
23    accurate copy of the judgment and sentence?
24        A.   It does.
25             MR. VILLA:  Your Honor, I'd move to admit
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Defendant's RP-A.
 2               THE COURT:  Any objection, Mr. Beck?
 3               MR. BECK:  No objection for this hearing,
 4    Your Honor.
 5               THE COURT:  Rudy Perez' Exhibit A will be
 6    admitted into evidence.  I assume nobody else had any
 7    problem with it.  Not hearing any, it will be
 8    admitted.
 9    BY MR. VILLA:
10        Q.   Agent Acee, I'm going to show you this on
11    the screen.  This is RP-A that we just talked about;
12    correct?
13        A.   Yes, sir.
14        Q.   And at the top it has the clerk's stamp
15    indicating when this was filed, does it not?
16        A.   It does.
17        Q.   And does it not indicate that the judgment
18    and sentence was filed May 12, 2016?
19        A.   Correct.
20        Q.   Which would have been approximately four
21    months after your meeting with Mr. Cordova?
22        A.   Yes.
23        Q.   And three months after he was sent to PNM
24    and took statements from Mr. Perez?
25        A.   Correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.   Because those statements occurred
 2 approximately February 2016?
 3      A.   Yes.
 4      Q.   So you figured out fairly quickly, in
 5 speaking to Mr. Cordova, perhaps in the first or
 6 second meeting, that he was at Southern, down here in
 7 Las Cruces, when the Javier Molina murder occurred;
 8 correct?
 9      A.   Yes.
10      Q.   He was in the yellow pod?
11      A.   Correct.
12      Q.   And he told you that he had -- or he knew
13 about the case or at least had an understanding of
14 what happened?
15      A.   Yes.
16      Q.   And at the time that you talked to him, I
17 think you testified on direct that you were compiling
18 or about to compile overt acts against Mr. Cordova?
19      A.   Yes.
20      Q.   To indict him?
21      A.   Correct.
22      Q.   Was there an understanding of which case
23 you were going to indict him?  Was it going to be a
24 stand-alone or one of these cases that was already
25 pending?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   I intended to include him in the RICO

2   indictment.

3        Q.   The 1613 case?

4        A.   Yes.

5        Q.   Which I believe that came down in the

6   spring of 2016.

7        A.   April, yes.

8        Q.   Did you tell Mr. Cordova that you had that

9   intent?

10       A.   At some point I did, yes.

11       Q.   When was that point?

12       A.   It may have been at the meeting on the 7th.

13       Q.   So he had an understanding that he was a

14   target of yours in the SNM cases?

15       A.   Absolutely.

16       Q.   Did you tell him that if he cooperated, he

17   wasn't going to be indicted?

18       A.   Not exactly like that.  What I told him was

19   that this was coming, these indictments; the

20   dismantlement of the SNM.  And I even introduced him

21   to the agent that was compiling his overt acts.  And

22   I said, I guess we can stop doing that now.

23       Q.   Who was that?

24       A.   Thomas Neale.

25       Q.   So Mr. Neale was present during this

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                          1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    meeting?

 2         A.   He was.

 3         Q.   And you said:  This is the guy that's going

 4    to compile the overt acts against you for this

 5    racketeering indictment?

 6         A.   Well, that was -- that I had tasked with

 7    that, and he was compiling -- he had a stack of

 8    letters, and he was listening to phone calls.  And

 9    because Mr. Cordova was enthusiastically -- I'll

10    use -- willing to help, I was -- I think saying it

11    more as a joke, but just saying:  I guess we'll be

12    done with that then; we can work on somebody else.

13         Q.   Did you tell Mr. Cordova what the overt

14    acts were that you were considering?

15         A.   No.

16         Q.   Did you tell him the potential charges --

17    did you talked about the RICO conspiracy that he can

18    be charged with?

19         A.   I won't say we talked about it.  I mean, I

20    definitely said:  Let me introduce you to somebody,

21    or this is, you know, Tom; he's putting together the

22    overt acts on what I intended to charge you with by

23    way of grand jury indictment.

24         Q.   Did you tell him the potential penalties

25    for those charges?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    No.

2        Q.    The voluntary manslaughter that Mr. Cordova

3   was sentenced for, was that suspected to be an

4   SNM-related killing?

5        A.    He and I probably disagreed whether or not

6   it was.  But I think that it could have been included

7   in overt acts.

8        Q.    So it was clear following that meeting

9   that, in exchange for his cooperation, you were going

10  to stop having Agent Neale compile overt acts against

11  Mr. Cordova for prosecution?

12       A.    It was clear to Agent Neale and I.  I'm not

13  sure what Mr. Cordova's understanding of that was.

14       Q.    But Mr. Cordova was present when you and

15  Agent Neale reached that clarity?

16       A.    Yes.

17       Q.    The other individuals from NMCD and STIU

18  were there as well during that period of time.

19       A.    Yes.

20       Q.    After that, you testified you formalized

21  the process of opening him as a CI; correct?

22       A.    I opened him as a CI after the meeting on

23  the 4th.

24       Q.    After the meeting on the 4th?

25       A.    Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   What do you have to do to open Mr. Cordova

2   as a CI?

3        A.   It doesn't take a whole lot.  I mean, I can

4   go through the process if you like.  We have to do

5   some checks, internal checks, to make sure they're

6   not a target of another investigation.  We run their

7   criminal history.  We make sure -- in doing our

8   internal checks, we're checking to make sure that

9   they haven't been an FBI informant in the past, or

10  they're not currently one.  Because I don't know who

11  another agent's informants are, and I don't have the

12  ability to check.  So I have to go through a central

13  point of contact to check that.  So I did all my

14  checks.  And then I went through our system for all

15  informant things is Delta -- you might have seen that

16  on some of the paperwork.  Like this form here is a

17  Delta FD 1023 document.  So I opened him as an

18  informant in Delta, assigned him a code name, fill

19  out all the forms; supervisor approves it, and now

20  he's open.

21       Q.   Did you speak to Mr. Cordova around this

22  point in time, I guess in one of these two meetings,

23  about the consideration he might receive for becoming

24  an informant?

25       A.   No.  The only consideration he may have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    been aware of -- I guess that's a better question for
 2    him -- but the only thing he may have been aware of
 3    was that he was a target and now he's not.
 4         Q.   So I'm not asking you to tell me what he
 5    thought.  But did you tell him he could be paid
 6    money?
 7         A.   No, I don't think I did.
 8         Q.   At any point in time, did you talk to him
 9    about being paid money?
10         A.   I think, down the road at some point in
11    time we had a conversation about that.  When he got
12    out of prison.  He indicated he'd like this kind of
13    work.  And I said, Well, if you want to make -- it's
14    not much of a career, but if you want to do this when
15    you get out, I can look at relocating you to another
16    city, where you can work for another agent.  A lot of
17    these guys thought they wanted to do that kind of
18    thing.  So I think that's the only time I talked
19    about that.
20         Q.   And at what point in time was that?
21         A.   This is quite some time later.  At that
22    time he was living in the cooperator pod up at PNM
23    with the other cooperators.  So his operational
24    duties, if you will, were already -- had concluded.
25         Q.   When did his operational duties end?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   In my mind, they ended with the Phase 2
 2   takedown in April of 2016.  Because he was burnt.
 3        Q.   You mean when Mr. Perez and Mr. Herrera
 4   were indicted?
 5        A.   Yes, sir.
 6        Q.   And I guess it began in January of 2016?
 7        A.   Yes.  He was opened in January, but
 8   operationally, he wasn't working until February, when
 9   he did the recordings.
10        Q.   Getting back to the opening process.  If a
11   CI turns out to be the target of another
12   investigation, are they disqualified from becoming
13   your CI?
14        A.   Not necessarily.  I mean, that could be an
15   opportunity for the case agent that's targeting him.
16   Let me back up actually.  It could.  It just really
17   depends on the circumstances.
18        Q.   What about if they're an informant being
19   used by another agent, you discover that in your
20   checks, does that disqualify them?
21        A.   No.  Because in that case, another FBI
22   agent -- I mean, they're already opened.  So, you
23   know, shame on me for not -- that's one of the first
24   questions I'll usually ask:  Have you ever done this
25   before?  Have you ever worked for anybody?  Try to
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                              e-mail: info@litsupport.com

```
 1    get that out of the way right away, so I know what
 2    their experience is being an informant.
 3         Q.   Over the period of time that Mr. Cordova
 4    was operational you testified about, essentially, the
 5    late winter and spring 2016, he was paid for the work
 6    that he did; correct?
 7         A.   No, I disagree with that.  I think he was
 8    given some -- monetary funds were put on his
 9    commissary account.  But in my mind that's different
10    than paying him.  But I'll defer to you.
11         Q.   Well, I guess on that I'd probably defer to
12    the Judge.  But let me just make sure we clarify.
13    There is documentation from the U.S. Attorney's
14    Office that has been disclosed to us that Mr. Cordova
15    received $600.
16         A.   Yes, sir.  To be clear, those are payments.
17    I mean, what Eric Duran got, in my mind, was a
18    payment.  What these guys got was 50 bucks a month in
19    commissary to buy extra soup and make phone calls.
20         Q.   Okay.  So Eric Duran got something on the
21    order of $45,000?
22         A.   Something like that.
23         Q.   That's a good year's salary for a nice
24    paying job?
25         A.   Sure.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.   Mr. Cordova received $600.   And what

2    I'm trying to get at is how he got that.   So is it

3    your testimony that that 600 was the sum total of

4    money that was put on his commissary?

5      A.   Yes, sir.   That's us putting what averages

6    to maybe $50 a month in commissary.   It's money that

7    I check out, the FBI gives to me; I pull out of the

8    bank; I then deliver it to the Department of

9    Corrections, and they put it on his commissary

10   account.

11     Q.   Well, if he's -- I'm no math whiz, but if

12   he's working for you January through April, that's

13   approximately four months.   It averages to a little

14   more than $50 a month, right?

15     A.   Let's be clear, January to April is

16   operational.   But I didn't close it.   I mean, he's

17   still an informant.   Just because he's no longer

18   operational, I'm not going to cut off the guy's

19   commissary.   That might cause some problems between

20   us.

21     Q.   So you kept the gravy train going for a

22   period of time?

23     A.   Is it a gravy train?   I guess.

24     Q.   $50 a month is what you think was provided

25   to Mr. Cordova for some period of time?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   That's an average.  We never negotiated a

2   deal.  That's just what I either did or instructed

3   the agents that worked with me to do.

4      Q.   When did that begin?

5      A.   I'm not sure.  But what I can tell you is

6   to any monies that were put on any of these guys',

7   these cooperators' accounts, there are receipts that

8   are signed and there is paperwork on it.  So I would

9   defer to that paperwork.

10      Q.   Can you tell me if it began before Mr.

11   Cordova began recording statements with Mr. Perez?

12      A.   I don't think it began before.  It probably

13   started in February, around the same time.

14      Q.   Around the same time?

15      A.   Yes, sir.

16      Q.   And did it just -- for Mr. Cordova, if you

17   know, did it just appear on his account as a

18   Christmas present, or did you or one of your agents

19   inform him it was coming?

20      A.   I'm sure we had a conversation about it,

21   and he had to sign a receipt for it.  So there would

22   have been some conversation.  As to how it appeared,

23   we would cause it to show up on their account as if a

24   family member posted that money, not the FBI.

25      Q.   So it would look like it came from a family

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                 1-800-669-9492
                                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1 | member, but Mr. Cordova would know, because you told
 2 | him, it was coming from you?
 3 |      A.   That's fair to say.  And, again, he'd have
 4 | to sign an FBI receipt acknowledging that he received
 5 | that money.
 6 |      Q.   Understood.  When you open up Mr. Cordova
 7 | specifically as an informant, is there any sort of
 8 | agreements that he signs?
 9 |      A.   No.
10 |      Q.   At any point in time, did you guys broker a
11 | deal:  If you do this, I'm not going to charge you in
12 | this RICO indictment?
13 |      A.   No.  I mean, I've described what our
14 | informal conversation was.  But there was nothing
15 | formal like that, there was nothing like that in
16 | writing, no.
17 |      Q.   To this day, there isn't?
18 |      A.   No.  I mean.  He got a Kastigar letter at
19 | this point.  I know that the U.S. Attorney's Office
20 | and his attorney had some conversations.  But between
21 | me and Mr. Cordova there was no formalized contract
22 | or agreement like that.
23 |      Q.   Now, getting back to where Mr. Cordova was
24 | going to be sent to, I think you testified that,
25 | initially, you thought he was going to go to PNM

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    South or North?

2        A.    Yes.

3        Q.    Why did you think that?

4        A.    Because the Department of Corrections,

5    following the Molina homicide, moved all the SNM up

6    to PNM.

7        Q.    Either North or South?

8        A.    Yes.  I believe the majority of their pods

9    were in the South.  And the only guys that were in

10   the North were there on disciplinary problems, is my

11   understanding.

12       Q.    You testified -- and maybe we've gone over

13   this a bit -- you testified that when Mr. Cordova

14   told you he thought he could talk to Rudy Perez and

15   Carlos Herrera about the Javier Molina homicide, that

16   was sort of new information to you?

17       A.    Yes.

18       Q.    And I guess it was in January of 2016 that

19   you sort of connected the two dots:  Billy Cordova,

20   who you were investigating, Javier Molina homicide,

21   which you had investigated, and potentially Rudy

22   Perez and Carlos Herrera?

23       A.    Yes, because when Billy told me he'd been

24   in yellow pod, I'd probably seen that information

25   before, but that kind of jumped out at me.

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                       1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        Q.   Did Mr. Cordova tell you that he had spoken
 2   to Mr. Perez prior to the date of your meeting with
 3   Mr. Cordova in January?
 4        A.   Well, he represented that they were friends
 5   and carnals, and -- yes.
 6        Q.   When he says they're carnals, what does
 7   that mean?
 8        A.   They're both SNM members in good standing.
 9        Q.   What about Carlos Herrera?  I think I
10   brushed over that.  You said you had some information
11   about Mr. Herrera prior to Mr. Cordova mentioning
12   him?
13        A.   Yes.  And that revolved around Mr.
14   Cordova's -- I'll call it business relationship --
15   with Mr. Herrera's mom and some of his brothers.
16        Q.   So Mr. Cordova had a business relationship
17   with Mr. Herrera's mom and brothers?
18        A.   Yes.
19        Q.   That business relationship being drugs?
20        A.   Correct.
21        Q.   Illegal drugs?
22        A.   The sales of illegal drugs.
23        Q.   Including drugs, bringing drugs inside the
24   prison; correct?
25        A.   I don't know how accomplished or
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    experienced Mr. Cordova was at that.  I know that he
 2    was, by all accounts, a pretty good drug dealer on
 3    the streets.  I think that he obtained heroin from
 4    some of the members of the Herrera family.  His
 5    ability to traffic drugs in the prison I'm not as
 6    familiar with.  And he doesn't have a reputation as
 7    being very accomplished at that, as opposed to on the
 8    streets, he was a little better known for that.
 9         Q.   So he's got a rep on the streets, not so
10    much in the prison.  But if I understand it, you are
11    not completely aware of his trafficking abilities or
12    lack thereof within the prison?
13         A.   Fair to say, yes.
14         Q.   Or ability to get drugs into the prison?
15         A.   Correct.
16              THE COURT:  Mr. Villa, would this be a good
17    time for us to take our morning break?
18              MR. VILLA:  Yes, Your Honor.
19              THE COURT:  All right.  We'll be in recess
20    for about 15 minutes.
21              (The Court stood in recess.)
22              THE COURT:  Let's begin to take our seats.
23    It looks like everybody has an attorney.
24              All right.  We'll go back on the record.
25    All right.  Mr. Acee, I'll remind you you're still
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    under oath.  Mr. Villa, if you wish to continue your
 2    cross-examination of Mr. Acee, you may do so at this
 3    time.
 4              MR. VILLA:  Thank you, Your Honor.
 5              THE COURT:  Mr. Villa.
 6    BY MR. VILLA:
 7         Q.   Agent Acee, I think we left off talking
 8    about Mr. Cordova's reputation for his drug
 9    trafficking exploits inside and outside prison.  Does
10    that sound about right?
11         A.   Yes, sir.
12         Q.   You did find out when you interviewed him
13    January 7th that he knew how to smuggle stuff into
14    the prison; correct?
15         A.   I assume he -- I assume he does.
16         Q.   Well, I'm not asking if you assume it.  He
17    told you he could smuggle things into the prison,
18    didn't he?
19         A.   I don't know if he did.
20         Q.   So let me show you that same -- 1023 is
21    what you call it?
22         A.   Yes, sir.
23         Q.   This is Bates 2910.  The second paragraph
24    here, where it says, "Beginning in 2005, CHS
25    regularly purchased crack cocaine from Chris Garcia,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    and smuggled it, along with phones and money, via an
 2    unknown correctional officer to fellow SNM members."
 3    Right?
 4         A.   Yes, sir.
 5         Q.   And he told you that during that meeting?
 6         A.   Yes.
 7         Q.   You knew he had been in prison before,
 8    right?
 9         A.   Yes.
10         Q.   That's how he became an SNM member?
11         A.   Yes.
12         Q.   He told you during this meeting what his
13    role, if you will, is in SNM?
14         A.   Yes.
15         Q.   He said he was an enforcer?
16         A.   Correct.
17         Q.   What's an enforcer?
18         A.   He described it as somebody that put in a
19    lot of work, or was a soldier and did the missions
20    that the other SNM members tasked him with.
21         Q.   And when you hear the term "putting in a
22    lot of work," based on your investigation, what does
23    that mean to you?
24         A.   It can mean a few things.  It means that
25    he's assaulting people when it needs to happen; he's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  representing the S in correctional facilities, even

2  if outnumbered.  He's bringing in dope, if that's his

3  thing.  His thing might just be knocking people out

4  or stabbing people.

5       Q.   When he says he's a soldier, he does

6  missions, what does that mean to you?

7       A.   He takes care of business.  He assaults,

8  stabs, shoots rivals, informants, things along those

9  lines.

10       Q.   And you understood that to be the case when

11  you tasked Agent Neale to start compiling overt acts

12  against Mr. Cordova, didn't you?

13       A.   Yes.

14       Q.   Including -- some of those overt acts in

15  1613 were alleged murders, right?

16       A.   On Mr. Cordova, at least one murder.  I

17  felt that his most recent -- that manslaughter, I

18  thought we could make a case for that being an overt

19  act.

20       Q.   What about the alleged murder of Sammy

21  Chavez?

22       A.   That one is a little trickier.

23       Q.   You had information, at least from some

24  sources, that Mr. Cordova shot Sammy Chavez in the

25  back, along with Sergio Rodriguez; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   I do recall seeing that information.  To

2    answer your question whether I would have used that

3    as an overt act or not, I would have had to look at

4    what evidence we had.  We certainly were reviewing

5    it.

6    Q.   It was on your radar?

7    A.   Yes.

8    Q.   And Sergio Rodriguez has, in fact, been

9    indicted in 1613.  And one of the overt acts against

10    him is the murder of Sammy Chavez?

11    A.   I believe you're right.  He definitely has

12    been indicted, and I think that is one of the overt

13    acts.

14    Q.   And Mr. Cordova, because you stopped

15    compiling overt acts, stopped investigating him as a

16    target, and turned him in an informant, has not been

17    charged with those crimes?

18    A.   He has not.

19    Q.   Has he been charged with any crime in

20    connection with your investigation of the SNM that

21    you know about?

22    A.   No.

23    Q.   You said he stopped becoming operational in

24    April of 2016, because he'd been burned by the

25    superseding indictment, right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   Yes.  I mean, that was a decision I made
2   that I didn't want him to be operational any longer.
3        Q.   You didn't use him anymore after that
4   period of time?
5        A.   Not for active or proactive operational
6   stuff.  I mean, he may have continued to help us with
7   historical context, but not operational.
8        Q.   Providing information about the SNM or
9   individuals in the SNM?
10       A.   Yes.
11       Q.   Is that still ongoing?
12       A.   People providing information about the SNM?
13       Q.   Mr. Cordova.
14       A.   No, I closed him.
15       Q.   When did you close him?
16       A.   I closed him in January of 2017, I believe.
17       Q.   Did you continue to pay him through January
18   2017, or is he still being paid?
19       A.   He is not still being paid.  His payments
20   would have ceased when we closed him.
21       Q.   Do you know if that was when the last
22   payment was made, in January of 2017?
23       A.   That would have been the last, or it may
24   have been in December.  I'd have to look through his
25   file.  But what I can represent to you is that no
```



SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                              1-800-669-9492
                                                    e-mail: info@litsupport.com

```
 1    payments were made after he was closed.

 2         Q.   Close in time to January, December?

 3         A.   He may have received a payment then, yes.

 4         Q.   And were all his payments via the same

 5    method, through his commissary account, under the

 6    guise that it came from family?  Was he paid in any

 7    other way?

 8         A.   Yes.  Sometimes cooperators, particularly

 9    when they're incarcerated, they have a concern for

10    their family, if they've got kids.  I think Mr.

11    Cordova asked us to give his money to his wife once

12    or twice so that she could buy some school clothes.

13    He has a couple young daughters.  And we'll do that.

14    It's his money, wherever he wants it to go is fine

15    with us.  And so I can remember meeting his wife, I

16    think, once.  And I may have sent agents to meet her

17    one other time.

18         Q.   That being Crystal Salas?

19         A.   I don't recall her name.

20         Q.   Do you recall the first name?

21         A.   I think it was Crystal.

22         Q.   Is that the same Crystal Salas against whom

23    he's -- well, maybe that's not the right question.

24    You are aware that he was convicted in 2010 of

25    aggravated assault against a household member?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.   I'm aware of that.

2        Q.   And that was the against his wife, the same

3    one that you all paid?

4        A.   Yes.

5        Q.   He was convicted in that because he broke

6    her jaw?

7        A.   I don't remember what the injuries were.

8    But that incident was also -- we were going to

9    include as overt acts, because we thought it was gang

10   related.

11       Q.   Because you had information that Gerald

12   Archuleta, or "Styx," had told Mr. Cordova to do that

13   because he believed she had been fraternizing with

14   another SNM member.

15       A.   Correct.  I'm not sure what exactly

16   Archuleta's representations were, but that wouldn't

17   surprise me.  And I do know that he talked to

18   Archuleta.  And you're accurate to say that it was

19   over her relationship with another SNM member.

20       Q.   Be that as it may, they were still married

21   at the time of Mr. Cordova's cooperation, and you or

22   another agent paid her some of the money that was due

23   to him?

24       A.   Correct.

25       Q.   At his instruction?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   Did you speak to him at all about other
 3   things related to being an informant, such as witness
 4   protection, relocation, that kind of thing?
 5        A.   I think we had that conversation.  I
 6   usually do with cooperators, in discussing with the
 7   options are.  I know in his case, he was interested
 8   in tattoo removal.  And in my experience, that's a
 9   lot easier to do in the feds.  And I wanted to charge
10   Mr. Cordova.  I wanted to charge him.  However, once
11   he got an attorney, the trajectory of that changed,
12   so -- it changed.
13        Q.   So he never got tattoo removal on the FBI's
14   dime?
15        A.   Correct.
16        Q.   Or is there some understanding that you're
17   aware of that he's going to be placed in, say,
18   witness protection?
19        A.    Not at this point.  That may -- and I have
20   to -- I am not ultimately the one responsible for
21   that.  My colleagues at the U.S. Attorney's Office
22   have a big part of that, and other parts of the FBI.
23        Q.   So what I want to focus on is the
24   communications that you had with Mr. Cordova about
25   that.  You did discuss those things with him
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   generally?
 2        A.   I did.  And as I recall, he wasn't very
 3   interested in that.
 4        Q.   Now, you testified about this, I think, on
 5   direct, but -- maybe it was on cross -- that he got
 6   an attorney after a target letter was issued; true?
 7        A.   Correct.
 8        Q.   That was a target letter issued by the
 9   United States Attorney's Office?
10        A.   Yes.
11        Q.   For what charge?
12        A.   I think Racketeer Influenced and Corrupt
13   Organizations Act conspiracy.  I think it was RICO
14   conspiracy.  It may have been a drug conspiracy.  I'm
15   not sure.
16        Q.   When was that target letter issued?
17        A.   Early 2016.  Well, I take that back.  It
18   was issued when I was pushing to charge him
19   federally, so it would have been -- to give you a
20   date range, sometime between January, and I would say
21   May of 2016.  And I have copies of that in his files.
22   So I could get you an exact date.  I just don't have
23   it today.
24        Q.   So you can't say whether it was before the
25   recordings of Mr. Perez?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   I actually took some notes on Mr. Cordova.
2   I may have noted it in there.  If I could take a look
3   at those?
4        Q.   You may.
5        A.   Okay.  March of 2016 is when the target
6   letter was issued.
7        Q.   And are those the same notes you referred
8   to during your direct examination about the
9   admonishments Mr. Cordova was given?
10       A.   No, that was a different note.
11       Q.   So --
12       A.   Would you like me to produce that?
13            MR. VILLA:  Well, I'm going to ask the
14  Court, Your Honor, if we can review the notes that he
15  just reviewed, as well as the notes that he reviewed
16  during his direct?
17            MR. BECK:  No objection to that.
18            THE COURT:  You want to do it now?
19            MR. VILLA:  I might have some of my
20  colleagues help me out, if that's okay with the
21  Court.
22       A.   So this is Mr. Cordova.  I highlighted it
23  so I could find it quickly.  And then this is CHS
24  policy notes.
25       Q.   So you were pushing to prosecute Mr.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                          BEAN                            1-800-669-9492
                        & ASSOCIATES, Inc.        e-mail: info@litsupport.com
                        PROFESSIONAL COURT
                           REPORTING SERVICE

1    Cordova federally, either stand-alone, or perhaps

2    bring him into one of these indictments?

3         A.   Yes, sir, I wanted to charge him with RICO

4    conspiracy.

5         Q.   And that was after he had agreed to

6    cooperate?

7         A.   Yes.

8         Q.   So the purpose of charging him would be to

9    have him enter into some sort of cooperation

10   agreement and be perhaps doing his prison time in the

11   federal system?

12        A.   Correct.

13        Q.   Because you thought that was safer place

14   for him?

15        A.   No, I just wanted to charge him.  I don't

16   know that it's safer.  That's debatable.

17        Q.   So you wanted to charge him because of the

18   crimes he'd committed?

19        A.   Yes.  And I thought it was in line with

20   some of his goals for programming and the tattoo

21   removal.  And I urged -- I always urge these guys to

22   move out of state.  They don't always want to.  But

23   bringing him into the feds, obviously, gives us, as

24   FBI agents, a little bit more ability to help that

25   process, as opposed to staying in the state system,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    where we don't have a lot of influence.
 2         Q.   And you communicated at least some of that
 3    to Mr. Cordova, did you not; that if he was in the
 4    federal system, he could get some of these benefits
 5    like tattoo removal, or you might have a little more
 6    influence over his location, if he wanted to move
 7    out, those sorts of things?
 8         A.   Those sorts of things.  I just described to
 9    him what I'd seen in the past with other prison
10    gangs, what was possible.  I mean, all these
11    cooperators will tell you I don't promise them
12    anything, and I make it known that I'm a lowly GS 13
13    agent.  I don't make those kinds of decisions.  But
14    that I can push for it.
15         Q.   But he never was prosecuted federally?
16         A.   He was not.
17         Q.   Can you tell me why?
18         A.   My understanding is, once he had counsel,
19    they didn't think, between he and his counsel, that
20    that was a good idea.
21         Q.   So Mr. Cordova and his attorney
22    communicated to you that they didn't think it was a
23    good idea for him to be prosecuted?
24         A.   No, they communicated that to the
25    prosecutors.  I may have been part of that.  I was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   part of some of those conversations or emails.

 2        Q.   And he never was, in fact, prosecuted?

 3        A.   He was not.

 4        Q.   He got what he wanted?

 5        A.   I don't know.  That's a question for him.

 6        Q.   Okay.  Let's talk about Mr. Perez, your

 7   understanding where he was at the time.  I think you

 8   testified around the time of this January meeting

 9   with Mr. Cordova that you learned that Mr. Perez had

10   some sort of pending disciplinary action?

11        A.   Yes, I believe it was Captain Sapien that

12   explained that to me.

13        Q.   So what did Captain Sapien explain to you?

14        A.   Well, in communicating to me what the

15   possibilities were, to have Cordova next to Perez, he

16   said that Perez had some -- because he was at another

17   facility.  He wasn't at the North -- excuse me, he

18   wasn't at PNM.  And I don't know where he was.  What

19   was communicated to me is that he owed some time --

20   my words -- at PNM for some past disciplinary

21   problem.  And so that because he owed that time, he

22   would be doing that time, and because Billy was a

23   cooperator -- excuse me, Mr. Cordova was a

24   cooperator, he had no disciplinary time coming, but

25   because he's a cooperator, we can throw him into

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   Level 6.  So the idea was to put Perez where he was
 2   due to be going and then have Cordova be there as
 3   well.
 4        Q.   So Captain Sapien knew about that idea?
 5        A.   Oh, yes, he knew about it.
 6        Q.   And you didn't yourself independently
 7   investigate where Mr. Perez was on January 2016?
 8        A.   No.
 9        Q.   You relied on what the NMCD and STIU folks
10   were telling you?
11        A.   All I knew he was in state prison, but I
12   had no idea where.
13        Q.   But it was your understanding from what
14   they told you that he was not in PNM?
15        A.   Correct.
16        Q.   And it was your understanding from what
17   they told you that he owed some period of time for
18   some disciplinary infraction so he could be put
19   there?
20        A.   Yes.
21        Q.   And all of the information that you had
22   about where Mr. Perez was, his disciplinary
23   situation, that all came verbally from the other
24   officers you were working with?
25        A.   Correct.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.   Nothing that you reviewed yourself or

 2 documents that you looked at?

 3      A.   No, I didn't look at anything.

 4      Q.   But the idea, anyway, was to get

 5 Mr. Cordova next to Mr. Perez, so that Mr. Cordova

 6 could try to record conversations with Mr. Perez?

 7      A.   Yes, sir.

 8      Q.   Did you conduct any investigation into Mr.

 9 Perez' medical state?

10      A.   None at all, no.

11      Q.   You knew at, least at the time you sent Mr.

12 Cordova in to be operational, the allegation was,

13 anyway, that a piece of metal came from Mr. Perez'

14 walker?

15      A.   Yes, sir.

16      Q.   So you understood at least that Mr. Perez

17 had to use a walker?

18      A.   In 2014, he did.  That's what I understood,

19 yes.

20      Q.   And all that information you got from

21 various sources, but you didn't take any steps to

22 investigate that yourself?

23      A.   No, I didn't investigate anybody's medical

24 conditions throughout this case ever at all.

25      Q.   When, if you know, did Mr. Cordova get

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    placed next to Rudy Perez to conduct these recorded

 2    interviews, if you will?

 3         A.   Can I look at my notes?

 4         Q.   Yeah.  Do we still have them?

 5         A.   February 2016, he was placed next to Mr.

 6    Perez.  I don't have the exact date in February.

 7         Q.   And how come you don't have the exact

 8    today?

 9         A.   Well, the simple answer is I relied on

10    corrections for that.  I could obtain that date by

11    looking at their prisoner location manifest or list.

12    But my involvement with moving, like I'm not part of

13    the transcript.  I'm not at the prison.  I certainly

14    wasn't able to walk into any of those facilities and

15    go where I wanted to go.  I didn't have keys to the

16    place, if you will.

17         Q.   Were you ever shown the pod where Mr. Perez

18    was housed before Mr. Cordova got there?

19         A.   No.  I mean, since then, I've seen it

20    because it's an SNM pod, and we've done a number of

21    searches or shakedowns in there, and FBI agents have

22    participated in those.  But at that time I had not

23    been in there.

24         Q.   So you know now where the pod was that Mr.

25    Cordova recorded Mr. Perez?
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't think I've been -- I think it was Q
 2   pod in the North.  I don't know that I've been in Q
 3   pod, but I've walked by it.
 4        Q.   If you saw a diagram of it, would you
 5   recognize it?
 6        A.   I might.
 7             MR. VILLA:  May I have a moment?
 8             THE COURT:  You may.
 9             MR. VILLA:  So I'm going to mark this, Your
10   Honor, as RP-B.  May I approach?
11             THE COURT:  You may.
12        Q.   Agent Acee, I'm showing you what I've
13   marked for identification as RP-B.  This is a
14   three-page document; true?
15        A.   Yes, sir, it is.
16        Q.   And the first page is PNM Level 5; correct?
17        A.   Yes.
18        Q.   Second page is PNM Level 6?
19        A.   Yes.
20        Q.   And it has on PNM Level 6 where Q pod is?
21        A.   Yes.
22        Q.   Then the third page is the layout of PNM
23   Level 6 that shows you where the recreation yard is;
24   is that true?
25        A.   That is true.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   In looking at these, can you tell me if
 2   they appear to be an accurate depiction of those
 3   locations?
 4        A.   Yes, sir, they do.
 5             MR. VILLA:  Your Honor, I'd move to admit
 6   RP-B.
 7             THE COURT:  Any objection?
 8             MR. BECK:  No objection, Your Honor.
 9             THE COURT:  Any objection from any of the
10   defendants?  All right.  Rudy Perez' Exhibit B will
11   be admitted into evidence.
12        Q.   So let me show you the second page.  That's
13   the same pod, Level 6 Q pod, which is in the bottom
14   left corner.  That's the pod that you know where Mr.
15   Perez -- Mr. Cordova recorded Mr. Perez; correct?
16        A.   Yes.
17        Q.   And down on the bottom left-hand corner is
18   the cell where Mr. Perez was located?
19        A.   I'll take your word for it.  If it was, I
20   don't know it that well, to know the numbering.
21        Q.   You don't know which cell Mr. Perez was in?
22        A.   I don't.
23        Q.   Or Mr. Cordova?
24        A.   I just know they were next to each other.
25        Q.   In the Q pod?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes, sir.

 2        Q.    There is an upstairs level and a downstairs

 3   level?

 4        A.    Correct.

 5        Q.    Do you know that it was the downstairs

 6   level?

 7        A.    I think that they may have been moved

 8   around a little bit.  But I do know that Cordova

 9   talked through the vent to -- no, that's when he was

10   next to Herrera.  So I think they were downstairs.

11        Q.    And the cells downstairs, there are maybe

12   four or five on the downstairs level, and maybe four

13   or five on the top, maybe a little more?

14        A.    Maybe a little more.

15        Q.    But there is a cell at the end of each

16   level that only has one neighbor next to it, right?

17        A.    Yes.

18        Q.    Because if you're not in the middle, you

19   don't have neighbors on either side of you, you only

20   have a neighbor on one side?

21        A.    Yes.

22        Q.    Do you know that Mr. Perez, when Mr.

23   Cordova was placed next to him, was at the far corner

24   where the only neighbor he had was Mr. Cordova?

25        A.    If you say that's how it was, I agree.  I
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                           1-800-669-9492
                                          e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    haven't seen it.  If Mr. Perez was in the corner,
 2    then he would only have one neighbor.
 3         Q.   I don't want to testify.  I'm just
 4    wondering whether you know that?
 5         A.   I don't.
 6         Q.   How did you get Mr. Cordova the recording
 7    devices that he used to record Mr. Perez?
 8         A.   I gave them to the STIU, and they would
 9    deliver them to not only Cordova but any of the
10    cooperators there, usually via a ruse, where they
11    would shake their house down, they call it, search
12    their cell, and leave it in there for them.
13         Q.   Did the individuals who provided the
14    recording device, those were the same individuals
15    that did the shakedown?
16         A.   Yes.
17         Q.   So they knew, for lack of a better word,
18    that the fix was in?
19         A.   Those officers?
20         Q.   Yes.
21         A.   Yeah, to be clear, only those officers knew
22    there were devices in the facility.  The regular
23    correctional officers didn't.  And that was always a
24    concern because they could find it, and it could be
25    countered contraband.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   I'll talk to you about that in just a

2   minute.  But these individuals that you gave the

3   recording device to would create the ruse like they

4   were doing a shakedown?

5      A.   Correct.

6      Q.   But it wasn't a necessarily a real

7   shakedown, like a housing officer might do on a

8   random basis?

9      A.   Well, it just had the added bonus of

10   introducing an ELSUR device.

11      Q.   So they would do the ruse as a shakedown,

12   introduce the ELSUR device, and they, of course, knew

13   at the time that Mr. Cordova was cooperating with

14   you?

15      A.   Absolutely.

16      Q.   And those individuals were Captain Sapien?

17      A.   Yes, Sergeant Martin.

18      Q.   Sergeant March?

19      A.   And Officer Cupit.

20      Q.   Officer Cupit?

21      A.   Yes.

22      Q.   And I think you testified that Mr. Myers

23   knew it as well?

24      A.   Yes, but he wasn't -- I mean, he is an

25   administrator, so he wouldn't have been involved in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the shakedowns.

2        Q.   So he didn't do the shakedowns, but he knew

3    what was going on?

4        A.   Correct.

5        Q.   And anybody else?

6        A.   Well, I mean, there are other officers in

7    the STIU.  They just weren't my points of contact.

8    There was probably one or two other officers, and

9    then their K-9 guys.  I'm sure they had some

10   awareness because we always met at the STIU office,

11   and we would talk.  But the specifics of the

12   operation, those were my points of contact.  And who

13   they told from there, I'm not sure.

14       Q.   But you had a conversation with Mr. Cordova

15   to make sure that hopefully if he had this ELSUR

16   device and got a shakedown, a -- real shakedown from

17   somebody who wasn't in the know -- that he could hide

18   it or prevent from it being discovered?

19       A.   Yes, the STIU and Mr. Cordova had a more

20   in-depth conversation about that, the sort of ins and

21   outs of how to avoid that.  And I think they talked

22   about what officers worked, because some of them were

23   more prone to do shakedowns than others.  But, yeah,

24   that conversation happened.

25       Q.   And you felt confident, or at least Mr.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Cordova told you that he felt confident he could do

2  it?

3       A.   Yes.

4       Q.   He could keep this device hidden from a

5  shakedown or from another officer that didn't know

6  about this?

7       A.   He thought he could.

8       Q.   How big is the device?

9       A.   A couple inches by a couple inches.

10      Q.   And it's plastic or metal or something like

11 that?

12      A.   It's metal.

13      Q.   You're familiar with the size of a Suboxone

14 strip?

15      A.   Yes.

16      Q.   Is it bigger or larger than a Suboxone

17 strip?

18      A.   The recording devices are much larger, much

19 heavier, much thicker than a Suboxone strip.

20      Q.   You were not present during any of these

21 shakedowns when the device was provided to Mr.

22 Cordova?

23      A.   That's correct.

24      Q.   Then you got the recordings back via the

25 same method?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes.

2      Q.   So the ruse of a shakedown, they get the

3   ELSUR device back and they give it to you?

4      A.   Essentially, I mean, they may have not had

5   to do a shakedown.  Perhaps the informant had a

6   medical visit or some other sort of ruse, but it was

7   always by ruse.

8      Q.   For Mr. Perez' recordings how many times

9   was Mr. Cordova provided the ELSUR device?

10      A.   Well, based on my review of transcripts, I

11   think three different devices were used.  And what

12   that would signify to me, we're switching off the

13   device because, again, we're concerned that the

14   battery is going to die.  So in reviewing

15   transcripts, it looks like three different devices

16   were used.

17      Q.   Over what time period?

18      A.   Somewhere between two weeks and a month, in

19   February of 2016.

20      Q.   Now, I know you prepared at least one

21   report concerning what Mr. Cordova learned from Mr.

22   Perez.  But did you prepare a report each time you

23   got this device back?

24      A.   No.

25      Q.   Did you interview Mr. Cordova following

SANTA FE OFFICE                                                                MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                 1-800-669-9492
                                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    each time that you received the device back?

2         A.   Definitely not.

3         Q.   So you interviewed Mr. Cordova at least

4    once prior to introducing the device to him?

5         A.   Yes, I think we probably met at least three

6    times before.

7         Q.   Okay.  And that's where you discussed with

8    him, as you testified on direct, to try to do the

9    preamble and hide the light and all those sorts of

10   things, right?

11        A.   Yes.

12        Q.   After receiving all the recordings back

13   from Mr. Cordova, you listened to them?

14        A.   Not -- I eventually did.  Not necessarily

15   right away, no.

16        Q.   When do you think you first listened to

17   them?

18        A.   I think I first assigned other agents to

19   listen to them, because they were splitting up

20   responsibilities.  And so I didn't listen to them

21   until we were preparing for grand jury in April.  So

22   I would have listened to them in late March.

23        Q.   At any point in time, after receiving the

24   devices back from Mr. Cordova, did you interview them

25   again?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1       A.   I think I did.

2       Q.   When was that?

3       A.   I met with most of the cooperators before

4   going to grand jury in April.  So it would have been

5   in late March or early April.

6       Q.   Do you know if Agent Neale reviewed the

7   recordings prior to that period of time when you did

8   and you were preparing for grand jury?

9       A.   It would have been Agent Neale or Agent

10   Sainato.

11       Q.   And Agent Neale prepared a report, did he

12   not, concerning some of the information Mr. Cordova

13   received from Mr. Perez?

14       A.   I believe.

15       Q.   And you saw that report?

16       A.   Yes.

17       Q.   Do you remember the report being dated

18   February 11, 2016?

19       A.   I take your word for it.

20       Q.   If I show it to you, will that refresh your

21   recollection?

22       A.   Thank you.

23            MR. VILLA:  May I approach?

24            THE COURT:  You may.

25       Q.   Agent Acee, is that Agent Neale's 1023

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492
                                                                                        1-800-669-9492



```
 1    report?
 2         A.   Yes.
 3         Q.   Can you tell me the Bates numbers on the
 4    two pages?
 5         A.   3308, 3309.
 6         Q.   The report, if you want to look at the
 7    second page, it discusses some information that Mr.
 8    Cordova got from Mr. Perez?
 9         A.   Yes, sir.
10         Q.   The report is dated February 11, 2016;
11    true?
12         A.   The report is.  The date of contact was the
13    9th, two days earlier.
14         Q.   So the date of contact was February 9th.
15    Can you tell me what that means?
16         A.   Yes, with all these reports, with these
17    Delta reports, these CHS reports, there is always
18    three dates.  So there is the date of the actual
19    contact; there is the date the agent starts the
20    report, and then the third date is when the
21    supervisor gets around to actually approving it.
22         Q.   Was this report prepared at the conclusion
23    of all the recordings that Mr. Cordova captured of
24    Mr. Perez?
25         A.   I don't believe so.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   It was still ongoing?
2        A.   Yes.
3        Q.   So let's go back.  We talked about -- you
4   said you met with Mr. Cordova at least three times
5   before he started the recording.  Does that include
6   the first two times?  One at MDC and the one at your
7   office?
8        A.   Yes.
9        Q.   So when was the third time?
10       A.   I'm not sure.  I usually do that just
11  before they're going to go operational, just to make
12  sure.  Because some time goes by, and I want to make
13  sure they haven't changed their mind, they're
14  prepared, they have any questions of me.
15       Q.   Were the same individuals present at least
16  at the third meeting that we know from your report
17  were at the second meeting?
18       A.   Probably.
19       Q.   And when you say "probably," there is a bit
20  of uncertainty?
21       A.   No.  I mean, without having a report in
22  front of me to say this is exactly who was there, I'm
23  just saying that probably, because most of these
24  debriefs were done with the same group of FBI agents
25  and the same group of Corrections officials.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   No question, at the third meeting there was
 2   at least some, if not all of the group of
 3   correctional figures?
 4        A.   Yes.
 5        Q.   In talking to Mr. Cordova to get him
 6   prepared for this, did you talk to him about what
 7   questions he should be asking Mr. Perez?
 8        A.   No.  I told him what I wanted him to focus
 9   on.  But most of these guys are good at conversing
10   and talking, and they know what to say.  It's kind of
11   an insult me telling them what to say or how to
12   strike up the conversation.
13        Q.   You didn't give him a list of questions or
14   write something down for him?
15        A.   I just said I wanted information on
16   murders.
17        Q.   Murders, as opposed to drugs or baby mama
18   drama or whatever?
19        A.   Exactly.
20             MR. VILLA:  I think we're on C.
21             THE COURT:  Yes, you have A and B.
22             MR. VILLA:  May I approach?
23             THE COURT:  You may.
24        Q.   Agent, I want to show you what I've marked
25   as Mr. Perez' Exhibit C.  You've seen that document
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   before?

2        A.   Yes.

3        Q.   This is the screenshot of -- I guess it's

4   the metadata or the files for the recordings of Mr.

5   Perez; true?

6        A.   Yes.

7        Q.   The same or substantially the same

8   condition as when you saw it before?

9        A.   Yes.

10            MR. VILLA:  Your Honor, I'd move to admit

11   Exhibit C.

12            THE COURT:  Any objection?

13            MR. BECK:  No objection, Your Honor.

14            THE COURT:  Any objection from the

15   defendants?  All right.  Rudy Perez' Exhibit C will

16   be admitted into evidence.

17        Q.   Agent, I'm going to show you Exhibit C

18   here.  Now, this is a printout of the files that

19   contain the recordings that Mr. Cordova captured of

20   Rudy Perez, right?

21        A.   Yes.

22        Q.   And I know we've admitted -- or the

23   Government admitted six of the recordings.  But this

24   actually lists a total of 11; true?

25        A.   True.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And some of them have very short periods of

2  time, so I assume that they didn't capture anything

3  of significance or that sort of thing?

4      A.   I'd have to listen to them.

5      Q.   Okay.  Did you listen to them in

6  preparation for this hearing?

7      A.   Yes.

8      Q.   And of the six that have been introduced,

9  can you see others that perhaps do contain

10  information that you think is significant or should

11  be introduced?

12      A.   I have some questions about maybe one.  It

13  seems to me there might be seven that are pertinent.

14  But I acknowledge that six were introduced.

15      Q.   Other than these 11, are you aware of any

16  other recordings that Mr. Cordova captured of Mr.

17  Perez?

18      A.   Yes.

19      Q.   And what are those recordings?

20      A.   Well, this is -- 1168 is the serial number,

21  1168.  I think there were recordings captured on

22  serial number 0730, and another device.  And I have

23  those on the table back there, if you want me to get

24  them and tell you what the third one was.

25      Q.   Perhaps we can get that up to you so you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    don't have to come down.

 2              But the exhibits that were introduced by

 3    Mr. Beck, are they all represented here on RP-C, or

 4    did they come from different devices?

 5        A.   No, they were -- the ones that he

 6    introduced today?

 7        Q.   Yeah.

 8        A.   No, they were 1168.  They were these.

 9        Q.   They were all 1168?

10        A.   Yes.

11        Q.   And 1168 denotes the device that was used?

12        A.   Correct; that's the serial number, so, yes.

13              MR. VILLA:  Your Honor, could Mr. Beck

14    provide that information to refresh Agent Acee's

15    recollection?

16              THE COURT:  He may.

17        A.   Mr. Villa, it looks like they were all

18    1168.  I think I got confused with Mr. Baca's

19    recordings, which I also had here.  Sorry about that.

20        Q.   That's all right.  I appreciate it.  So

21    you're fairly sure, after reviewing your file, that

22    1168 was the only device that recorded Mr. Perez;

23    correct?

24        A.   I'm hesitating because I thought we

25    switched the device.  But as I sit here, that must
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    have been the only device we used.

2         Q.   Now, we heard testimony yesterday about why

3    the dates that are depicted here on this metadata,

4    Exhibit C, may not be accurate.  But let me ask you

5    this:  Was there an ELSUR technician or somebody

6    besides yourself that prepared this device before it

7    was given to Mr. Cordova?

8         A.   Yes.  And to be clear, I don't have the

9    equipment, the training, or the ability to do

10   anything with the device other than check them out,

11   transport it, and vice versa.

12        Q.   So you got the device from a tech in the

13   Albuquerque field office?

14        A.   Yes.  We get the devices from the TTAs, the

15   technically trained agents, special agents that

16   specialize in this.  Generally, how it works is we

17   put in a request.  We explain what the environment is

18   like and what our objectives are.  They say:  Here's

19   your choices.  And sometimes we don't have a choice.

20   And we take that device and we bring it back, we're

21   turning it in to a different individual, and that's

22   the ELSUR technician that actually downloads it.

23        Q.   Did either of those individuals inform you

24   whether the dates on the device were accurate?

25        A.   Not that I recall.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   Did you have a conversation with either one

2  of them about whether the dates had been set to be

3  accurate for, you know, Mountain Time and the current

4  date, and that sort of thing?

5      A.   No.

6      Q.   So is it just the case, then, that you

7  don't know for certain if the dates of these

8  recordings are accurate?

9      A.   I learned a lot about that this week.  And

10  I presume they are.  But based on what I've heard

11  this week, I'm not sure.

12      Q.   So the dates run from February 1st through

13  February 4, 2016?

14      A.   They do.

15      Q.   And that is at least close in time to when

16  this operation was occurring?

17      A.   Yes, sir, it was.

18      Q.   But you can't say precisely what the date

19  is?

20      A.   Now, I have my own doubts.  Based on what

21  I've heard this week, I'd want to compare this to the

22  prison records of what cells those two gentlemen were

23  in.

24      Q.   What about the time -- it has a time of

25  each recording -- do you have any reason to believe

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                             Albuquerque, NM 87102
(505) 989-4949                                       (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492
                                                1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    the times are incorrect?

2         A.    I don't.  But if you told me they were or

3    we found some other document that showed they were, I

4    guess I wouldn't be surprised, no.

5         Q.    In each of the transcripts -- so, for

6    instance, 33A, it has listed on there the date of the

7    recording.  And it's February/XX/2016, right?

8         A.    Yes, sir.

9         Q.    Because you're not able to accurately

10   determine what day these were taken?

11        A.    Correct.

12        Q.    Now, with respect to Mr. Cordova, while

13   this operation, if you will -- and when I say

14   "operation," I'm talking about recording Mr. Perez,

15   and I guess we can include Mr. Herrera -- were you

16   monitoring his prison phone calls?

17        A.    I personally was -- Cordova's or the other

18   guy's?

19        Q.    Mr. Cordova's.

20        A.    No.

21        Q.    Were you monitoring who was coming to

22   visit?

23        A.    No.  And to be clear, I don't have that

24   information at my fingertips.  I'd have to get that

25   from the STIU.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   Did you ask the STIU, during the period of

2   time Mr. Cordova was operational, to listen to his

3   phone calls?

4        A.   No.

5        Q.   Did you ask them to tell you or keep track

6   for themselves who is coming to visit him?

7        A.   No.  I mean, they do keep track of that,

8   but I didn't tell them to, no.

9        Q.   Same question with respect to mail.  Did

10  you ask them to look into his mail to see who he was

11  receiving mail from?

12       A.   No.

13       Q.   Did Billy Cordova ever talk to you on the

14  phone from the prison?

15       A.   During that time?

16       Q.   During the time he was operational.  I

17  guess from January the time, through, I think you

18  said you closed him was around January 17?

19       A.   I don't think so.  I mean, these -- most of

20  the guys, I tell them:  Don't call me.  But they

21  still do.  I don't think so.

22       Q.   Did he have your number?

23       A.   Would he have had my number?

24       Q.   Yes.

25       A.   Probably.  I think his wife would have had
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    my number, yes.  That's usually how the

2    communications go.

3         Q.   Did she call you during this time period?

4         A.   No.  She would send texts once in a while.

5    I don't know if it was during this time period or

6    after, though.

7         Q.   Was Mr. Cordova given urinalysis during the

8    time he was operational?

9         A.   I don't know.

10        Q.   Did you ask STIU or anybody from NMCD to

11   give him drug tests?

12        A.   No.

13        Q.   Do you know if his pod -- or excuse me, his

14   cell, was shooken down -- shaken down -- we need a

15   grammar professor -- during the time he was

16   operational, not when it was a ruse -- to give him

17   the ELSUR device?

18        A.   I only know when STIU did it.  I don't know

19   when the regular COs assigned to that pod would have

20   done it.  I don't have any information on that.

21        Q.   Did you ever learn that he was found to

22   have contraband, drugs, anything like that, on him?

23        A.   Not when he was operational.  I'm sure in

24   his past he did.

25        Q.   All right.  But you didn't instruct anybody

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to say:  Shake him down, check on him, make sure he's

2    doing what he's supposed to be doing?

3         A.   No.

4         Q.   You then listened to these recordings of

5    Mr. Perez recently, and one of the things you said

6    you were listening for was if it sounded like he was

7    intoxicated, right?

8         A.   Yes, sir.

9         Q.   And as you listen to it, I think you said

10   you relied on some of your training when you were a

11   police officer?

12        A.   Yes, sir.

13        Q.   So I'll dive into that in a second, but let

14   me ask you this:  Have you ever listened to a

15   recording of Mr. Perez when he was known to be under

16   the influence of any drug?

17        A.   No.

18        Q.   When you were a police officer -- was it

19   California State Police?

20        A.   Yes, sir.

21        Q.   When did you become an officer there?

22        A.   I started out in the sheriff's department

23   in '97; went to CHP in 2000.

24        Q.   I'm sorry?

25        A.   2000.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        Q.    CHP, California Highway Patrol?

2        A.    Yes, sir.

3        Q.    When did you get the 40-hour training that

4    you described on direct examination?

5        A.    I was trying to remember that.  It was

6    early in my career.  I think it was -- the 40-hour I

7    had to do first, and I think that was in 2001.  And

8    then the more advanced training was in 2002.

9        Q.    That being the drug recognition training?

10       A.    Yes, sir.

11       Q.    Can you tell me when Suboxone was invented?

12       A.    No.

13       Q.    Can you tell me when the FDA approved it?

14       A.    I recently read that, but I don't recall

15   the date.

16       Q.    Were you trained during this drug

17   recognition, 80-hour course that you did, about

18   Suboxone?

19       A.    No.

20       Q.    Were you trained in how to identify if

21   somebody is under the influence of Suboxone?

22       A.    No.

23       Q.    So the DRE training -- that's Drug

24   Recognition Evaluation for short -- it's not just

25   about any one drug, right?  It's about a number of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    drugs you can detect?

2         A.   Yes, sir.  The focus is more on trying to

3    make a determination.  And I will say that's a

4    determination to the level of what I'll call probable

5    cause.  Not a medical conclusion.  It's just enough

6    probable cause, as an officer, I would feel

7    comfortable making that arrest.  And that focus was

8    primarily on stimulants and depressants, and then

9    alcohol.

10        Q.   And part of the training is you're

11   physically being able to see the suspect and observe

12   them; correct?

13        A.   Yes.  We did our evaluations in the Skid

14   Row area of Los Angeles, the downtown area, between

15   like 3rd and 6th Street.  So we would actually do

16   evaluations on live subjects that we suspected that

17   were under the influence.

18        Q.   You're trained, things to look for when

19   you're looking at a suspect, right?

20        A.   Yes.

21        Q.   You look at their eyes?

22        A.   Yes, sir.

23        Q.   See if they're bloodshot, or pupils have

24   dilation or restriction?

25        A.   Yes, sir.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492
                                               e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   Look at their skin?
 2        A.   Yes.
 3        Q.   I think part of it -- I don't know if it
 4   did back then, but did it include like taking some
 5   vital signs, pulse, things like that?
 6        A.   It did.
 7        Q.   Looking for other signs of drug use, like
 8   needle tracks, or white powder around the nose, those
 9   sorts of things?
10        A.   Yes, sir.
11        Q.   And also included -- I guess they're called
12   field sobriety tests?
13        A.   Yes.
14        Q.   People are doing different tasks:
15   Standing, walking, touching their fingers to their
16   nose, all that sort of stuff?
17        A.   Correct.
18        Q.   And you used all of that to try to reach a
19   conclusion about what someone might be under the
20   influence of?
21        A.   Yes.  To the point of either making a
22   determination for an arrest or not to arrest them.
23        Q.   And with respect to Mr. Perez, the only
24   thing you did was listen to the recordings?
25        A.   Yes, sir.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                               1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                               e-mail: info@litsupport.com

1      Q.   You didn't look at anything else to try to

2  determine whether or not he was under the influence?

3      A.   That's correct.

4           MR. VILLA:  May I have a moment, Your

5  Honor?

6           THE COURT:  You may.

7      Q.   Agent Acee, you're aware that Mr. Cordova,

8  I think in January of 2017, or so, got in trouble at

9  PNM?

10     A.   Yes, sir.

11     Q.   He got in trouble for having sex in the

12 contact room?

13     A.   Yes.

14     Q.   Okay.  What's the contact room, as far as

15 you understand it?

16     A.   Well, I've watched the video.  And I went

17 up and sort of investigated the circumstances.  And

18 what it was, was a small room located in the North

19 facility.  It had glass windows.  There was a table

20 with a couple of chairs.  And there was a camera in

21 there.

22     Q.   And the PNM North facility is a Level 6

23 facility; true?

24     A.   It is.

25     Q.   And are you aware of what the New Mexico

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Department of Corrections policies were at the time
2    for contact visits for inmates in Level 6?
3         A.   No.
4         Q.   Do you know whether Mr. Perez was given
5    some special permission on the contact visit for this
6    January period of time?
7         A.   I did in my follow-up -- we'll call it
8    investigation, if you will, I learned more about
9    that.
10        Q.   What did you learn?
11        A.   I learned that the cooperators -- I'll call
12   it L pod -- that's where they were living, those that
13   were cooperating with the Government -- were housed
14   together.  And they were given, I think, Level 4
15   privileges, although they were housed at the Level 6.
16   And I believe that those privileges include contact
17   visits, which I understand to be a visit with your
18   family.  But things like, you know, physical
19   touching, beyond hugging your kids, is not permitted.
20        Q.   So the inmates were in L pod, which is a
21   Level 6 facility, but given Level 4 privileges?
22        A.   That's my understanding.  I asked the same
23   kind of questions when I found out this happened, and
24   went up there and was trying to get to the bottom of
25   it.  And that's what was explained to me.
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Whom did you ask?

2        A.    Well, I had conversations with everyone

3    from the Secretary, on down to managers of the unit.

4        Q.    And I think you called it the cooperator

5    pod, because all of the cooperators in this SNM case

6    were in that pod?

7        A.    Not all of the cooperators.  But all the

8    cooperators that were housed at PNM were in there,

9    yes.

10       Q.    Did you ultimately learn how it was that

11   they were given Level 4 privileges, even though they

12   were in Level 6 pod?

13       A.    Yes.  What was explained to me is that they

14   got the same privileges that an inmate leaving the

15   gang, or renouncing the gang, would get if they

16   stepped down and went to RPP.  These guys were

17   prevented from going to RPP because they were there

18   on CJ holds, on marshals -- federal holds.  And so

19   they were afforded those privileges, even though they

20   couldn't transfer out of the facility because of the

21   case.

22       Q.    And I won't get too far into this, but Mr.

23   Cordova wasn't the only one that was violating the

24   contact rule of doing more than just hugging or

25   kissing their family?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No.   I believe there were four.

 2        Q.    Okay.   With respect to Mr. Cordova, did he

 3   get any sort of discipline or issue related to his

 4   having a sex in the contact room in violation of

 5   policy?

 6        A.    Yes.

 7        Q.    What was that?

 8        A.    I closed him.   The Department of

 9   Corrections threw him in the hole for six months, or

10   maybe longer, I'm not sure.   My communications with

11   him stopped at that point in time.   And the State

12   referred he and his wife to the CYFD.

13        Q.    Has he been prosecuted?

14        A.    Oh, and the case was referred to the State

15   Police, but I don't believe any of the men were

16   prosecuted.

17        Q.    So you closed him in that period of time?

18        A.    I did.

19        Q.    Is that what caused you to close him?

20        A.    Yes.

21        Q.    And you haven't used him since then?

22        A.    I haven't even talked to him since then, up

23   until yesterday.

24        Q.    You spoke to him yesterday?

25        A.    Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   What did you speak about?
 2        A.   I greeted him.  He was transported here
 3   from Clayton.  So I oversaw the transfer of -- or
 4   helped coordinate the transfer of Mr. Cordova from
 5   the STIU up north, to the correctional staff out here
 6   at Southern.  And I asked him how he was doing.  Told
 7   him he needed to shave.  Just small talk.
 8        Q.   When you closed him in January, did you
 9   talk to him then?
10        A.   Yes, I talked to everybody in the pod.
11        Q.   And what did you tell Mr. Cordova?
12        A.   I'd frame it as I was angry, I was
13   disappointed.  And I told him he needed to take his
14   medicine.  Whatever was coming was coming, and he
15   earned it.  I told him not to be surprised if CYFD
16   got contacted.  And I said some other angry things to
17   him.
18        Q.   Like what?
19        A.   I said it to all four of the guys who were
20   involved that I was disappointed; I didn't do things
21   to make them look bad or disrespect them.  Respect
22   was a big thing for these guys, and guys in that
23   position.  I felt that they had disrespected me.
24   Although I wasn't taking it personally, but they
25   disrespected the Bureau, the FBI.  And they had some
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    rough days coming and they just needed to be men

2    about it and face their ass-whooping.

3        Q.   Is one of the reasons that you canceled him

4    in that period of time is this action by him

5    demonstrated a lack of you're being able to trust

6    him?

7        A.   Yes -- I mean, there had been other small

8    issues in the pod -- nothing that was criminal, but

9    just bickering, and bickering with staff, and I'd had

10   to go up there before.  And I hated doing that.  It

11   was like baby-sitting.  It was like, Come on guys,

12   like, we can get through this.  So this was, yeah,

13   the last straw.  So I'd already given them some

14   admonishments about:  Go along, get along.  You know,

15   the COs don't like you guys -- you're big boys.  Do I

16   have to keep coming up to talk to you kind of stuff.

17   So when this happened, this was a flagrant violation

18   of following the rules, which they have to do, or

19   they get closed.

20       Q.   Because if they don't, you can't trust

21   them?

22       A.   I can't control them.  I mean, I can

23   understand why he did what he did, but he's got to

24   follow the directions that were given.  And the

25   directions are:  Don't cause problems, and follow the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    institution's rules.
 2         Q.   One of the reasons you want to control them
 3    is so that you can trust them, right?
 4         A.   Yes.
 5         Q.   And you can't trust Billy Cordova anymore?
 6         A.   I don't agree with that.  I think, if he's
 7    left alone in a room with his wife, he's going to
 8    have sex with her if he can.  That doesn't mean I
 9    can't trust him.
10              MS. JACKS:  Objection.  He's misstating
11    evidence.  He wasn't alone.  He was with two minor
12    children.
13              THE COURT:  Well, overruled.  He can
14    testify.  You can deal with it in cross.
15              Mr. Villa.
16              MR. VILLA:  That's all the questions I
17    have.  Thank you, Mr. Villa.
18              THE COURT:  Ms. Jacks.  You're kind of
19    eager to get a piece of him.  Do you want him?
20              MS. JACKS:  I do have some questions, Your
21    Honor, but I think Ms. Bhalla is going next.
22              THE COURT:  All right.  Ms. Bhalla.
23                        EXAMINATION
24    BY MS. BHALLA:
25         Q.   Good morning.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Good morning.
 2        Q.    Give me just a second to get organized
 3   here.
 4              Since we're on the topic of Mr. Cordova's
 5   contact with his wife, I had a couple of questions
 6   about that, if you don't mind.
 7              You had indicated -- let me just make sure
 8   I'm stating this correctly -- that they were given
 9   privileges to be in Level 3 because of their
10   cooperation; is that correct?
11        A.    Level 4 privileges.
12        Q.    Level 4 privileges.  And who did you speak
13   to about that so that they got those privileges?
14        A.    No -- these are facts that I learned
15   afterward, when I went up there and tried to piece
16   together how this disaster happened.
17        Q.    Okay.  I'm not asking about who gave him
18   permission to have the contact visits -- that was a
19   little unclear -- what I'm asking you is:  At some
20   point after these guys cooperated, you spoke to
21   someone about them cooperating, presumably STIU; is
22   that correct?
23        A.    Yes.
24        Q.    And they were moved because they were
25   cooperating; is that correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   And they were moved to a level -- did you
 3   say a Level 4 or a Level 5 facility?
 4        A.   No, they were in the Level 6, in L pod, at
 5   the North.
 6        Q.   Okay.  And when were they given -- at some
 7   point, they were moved to Level 4?
 8        A.   No, they remained in Level 6.  But the
 9   restrictions, I'll call it, that they were under were
10   that of Level 4 privileges.
11        Q.   Okay.  I understand.  So, even though they
12   were in Level 6, they were sort of given more
13   privileges, which would account for maybe Level 4
14   privileges?
15        A.   That was my understanding.
16        Q.   And that was because they were cooperating
17   with the Government; correct?
18        A.   Yes.  And they didn't renounce the gang.
19        Q.   Okay.  Who gave them those privileges?
20        A.   I'm not sure.
21        Q.   Okay.  Did you speak to anybody about who
22   let them be on Level 4 status -- I'll call it interim
23   Level 4?
24        A.   No, that was my question, too.  But I had
25   to be diplomatic about it.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Diplomatic about asking who gave the

2   authority for them to be in that classification?

3      A.    Yes.

4      Q.    Why is that?

5      A.    At that point in time, it was difficult for

6   me to walk into the Department of Corrections and ask

7   their bosses what they were thinking or what they

8   were doing.  I asked those questions, but just not as

9   pointedly as you're asking.

10      Q.    So you don't know who made the decision to

11   allow them to be on interim Level 4 status?

12      A.    I have an idea of the people that were

13   involved in that decision, but maybe not.

14      Q.    Okay.  Can you tell me who you think might

15   have been involved in that decision?

16      A.    I think that it involved Deputy Secretary

17   Booker, Joe Booker; Mr. Roarke, who, at the time --

18   he's since been promoted -- but I think he was the

19   director of adult prisons.

20      Q.    Do you think maybe that's why he wasn't

21   here last week?

22      A.    I don't know.  I guess there was some ice

23   somewhere or something.

24      Q.    Okay.  Who else was responsible for that

25   decision, that you know, our suspect?

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.   I think the Warden would be -- I mean, my
 2    understanding is you can't really -- you shouldn't do
 3    anything in the facility without giving the warden a
 4    courtesy part in that conversation.  So I think those
 5    three.
 6         Q.   And remind me, who was the warden at that
 7    time?
 8         A.   German Franco.
 9         Q.   Okay.  And do you know if Mr. Mares was
10    involved in that decision at all?
11         A.   Say the name?
12         Q.   Mr. Mares, am I saying that right?
13         A.   Oh, Myers?  Mark Myers?
14         Q.   Yes.  Thank you.
15         A.   He probably would have been.
16         Q.   He probably --
17         A.   I mean, he's with us all the time.  He
18    works out of our building.  But he belongs to them
19    and I'm not always part of his conversations with his
20    colleagues there.
21         Q.   Okay.  What about Roland Mares?  I think
22    that's who I was trying to ask about maybe.
23         A.   I don't know him.  I don't know if I've
24    ever met him.
25         Q.   Okay, that's fine.
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                    1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1              At the time that they were in Level 6, but
 2     they were -- I'll just say classified as Level 4 --
 3     was that what you referred to as the "cooperator
 4     pod"?
 5          A.   Yes.
 6          Q.   Okay.  Who was in the cooperator pod, that
 7     you know about?
 8          A.   Billy Cordova, Frederico Munoz, Gerald
 9     Archuleta, Javier Rubio, Benjamin Clark, Jerry
10     Armenta, Paul Rivera; Timothy Martinez, when he came
11     over; Eric Duran until he was released.  And then, as
12     other defendants started to cooperate -- they may
13     have joined it later, but then, that would have
14     stopped in January of 2017, when these incidents we
15     became aware of, L pod dissolved, and people were
16     transferred out or transferred to other facilities.
17     And that was a decision between Marshal Service and
18     the Corrections Department.
19          Q.   Okay.  Can you give me -- and I know
20     everybody was coming in at different times, so I'm
21     not trying to pin you down to specifics here, but a
22     general timeframe of when the defendants that you
23     listed, or the cooperators that you listed, were in
24     the cooperation pod?
25          A.   Oh, man.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BECK:  Your Honor, I'm going to object;
 2    beyond the scope of direct, and irrelevant.  This
 3    doesn't relate to a motion to suppress.
 4            MS. BHALLA:  Your Honor, I think it's
 5    relevant.  Because one of the things that we're
 6    trying to find out is what the Government and what
 7    the informants knew about what was happening when
 8    these guys were in the pods with -- next to Rudy
 9    Perez and next to Carlos Herrera.  If these guys were
10    all in the cooperator pods together, I'm curious
11    whether or not they were talking about that, whether
12    or not they were talking about drugs, what
13    conversations they had about drugs, and whether or
14    not they were conversing as a group about that
15    subject.  So I'd like to link it in, if I can.
16            THE COURT:  Well, this doesn't implicate
17    any -- this is all past history now, so there is not
18    any security --
19            MR. BECK:  No.
20            THE COURT:  -- interests here.
21            MR. BECK:  No.
22            THE COURT:  I think I'll give her a little
23    bit of leeway here and see if she ties it up.
24    Overruled.
25            Ms. Bhalla.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MS. BHALLA:  Thank you.
 2       Q.   I think you see where I'm going with this
 3   now.  Can you tell me about what time frame they were
 4   in there?
 5       A.   That's tough to do, for a number of
 6   reasons.  The marshals contract with PNM.  They had
 7   to increase the number of beds so the additional CJ
 8   holds could go there.
 9            I could try to sketch out maybe who the
10   initial L pod people were, and then who joined later.
11       Q.   And I have a feeling we'll probably go into
12   lunch.  So maybe what we can do is take that up after
13   lunch.  If you get a chance to review that, I would
14   appreciate it.  I do have a couple of other questions
15   about it while we're on the subject.
16            You mentioned in your previous testimony
17   that you would go in and talk to them as a group; is
18   that correct?
19       A.   Correct.
20       Q.   Okay.  And so did you all share information
21   or what would you talk to them about when you went in
22   to talk to this group?
23       A.   I feel a little better saying this, but it
24   was like a scolding.
25       Q.   Every time?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes.

2      Q.   Okay.  So every time you went in there it

3  was because there was a problem?

4      A.   That, or to sign receipts.

5      Q.   Excuse me?

6      A.   I went there at the request of the

7  Corrections Department sometimes, to help everybody

8  stay focused on the long-term goals here, and not to

9  get -- there was a lot of bickering.

10     Q.   Do you know what the bickering was about?

11     A.   Stupid stuff.  Like personalities; the guys

12  didn't like each other.

13     Q.   Did you say to sign receipts?

14     A.   Yes.  So, if payments were made, then we'd

15  go up and I'd have them sign receipts.

16     Q.   Okay.  And that would be to the informants,

17  payments made to the informants?

18     A.   Yes.

19     Q.   And when you went up there to sign the

20  receipts, did the other informants see that you were

21  signing receipts?  Did they know that's why you were

22  coming?

23     A.   They weren't dumb.  They knew what we were

24  doing.

25     Q.   Did they know how much money, or have an

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                    1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
 1    idea about who was getting paid what?
 2         A.    Probably.  I don't put anything past these
 3    guys, but I didn't talk to them about it.  And they
 4    didn't complain to me, like, Hey, this guy is getting
 5    more or something.  So I don't know what they talked
 6    about.
 7         Q.    So you don't think that might have been a
 8    source of the bickering?
 9         A.    No.  The bickering was sometimes childish
10    stuff, that I didn't expect to be doing.
11         Q.    I want to move back into the payments.  You
12    talked to Mr. Villa about paying Mr. Cordova $600, is
13    that correct -- or putting it on his books; is that
14    fair to say?
15         A.    That was his number.  That sounds about
16    right.
17         Q.    Okay.  You mentioned that -- in your notes,
18    and I was going to ask you about that -- let me just
19    locate that real quickly.  And you may want to look
20    at your notes, just because I'm going to ask you
21    about them.  On your expenses for Billy Cordova you
22    noted "Reimburse for reasonable cost in support of
23    FBI investigation."  Do you recall that note?
24         A.    Yes.  That's a different note.  So what I
25    did is I have notes on CHS policy.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   Right.

2     A.   Because I anticipated being asked about

3  that.  Then I have notes on Cordova's timeline.

4     Q.   Okay.  So that was on Mr. Cordova's

5  timeline; is that fair to say?

6     A.   No.  I think where I'm talking about

7  payments --

8     Q.   Correct.

9     A.   -- and expenses.  I wasn't able to bring in

10  our policy manual on CHSs, because it's a secret.

11  The overall classification is secret.  That being

12  said, the portions that deal with criminal informants

13  is all unclassified.  But I can't bring the document

14  in, so I got approval to take some notes.

15     Q.   That's fine.  And all I'm asking is -- I'm

16  not asking about the how you arrived at those notes.

17  I'll probably ask you that in a minute.  But one of

18  your notes on those -- on that piece of paper says

19  "reimburse for reasonable costs in support of FBI

20  investigation"?

21     A.   Yes.

22     Q.   What does that mean?  What is that about?

23     A.   So there is two kinds of payments we can

24  make.  We can make a payment for services rendered or

25  for expenses.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Okay.

2      A.    That is the definition of what would fall

3  under expense.

4      Q.    So the payment for services rendered would

5  also be considered an expense; is that correct?

6      A.    No.   I'm sorry, I'm probably not doing a

7  good job of explaining this.

8            So there is two ways I can request money to

9  pay an informant for their services, which I would

10  describe as:   Here's your reward, if you will, or

11  here's your payment for helping.

12      Q.    Which would be the money you put on his

13  books?

14      A.    Correct.

15      Q.    Okay.

16      A.    Expenses are -- I can't think of, in a

17  prison scenario where that might come up.   But say on

18  the street, if I'm asking a source to drive

19  somewhere, and they get a flat tire, or I can put

20  fuel in the vehicle, and I can repair the car.

21      Q.    I understand that.   So were there any

22  expenses related to Mr. Cordova's cooperation?

23      A.    Not that can I think of.

24      Q.    Okay.   So that note doesn't indicate that

25  you were getting reimbursed for expenses paid on Mr.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492
                                                       e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1     Cordova?

2          A.    No.   And I take that back, if I purchased

3     an informant lunch, like if I ever bought Mr. Cordova

4     lunch, I would -- that would fall under expenses.

5          Q.    So you don't recall what your expenses were

6     with Mr. Cordova?

7          A.    I don't think I had any.   If I did -- I'm

8     trying to remember what it could have been -- it

9     might have been maybe a meal.   That's the only thing

10    I could think of.

11         Q.    Okay.   What documents did you review to

12    generate the notes that you brought today?

13         A.    Well, for the CHS policy, I looked through

14    the guide, which is that secret guide; got approval

15    to make these notes.

16              For Mr. Cordova, I opened up -- well, his

17    informant file is closed, so I had to have the closed

18    file electronically sent to me.   I went through it

19    and noted dates I thought I might be asked about.

20         Q.    Can you talk about what information is in

21    Mr. Cordova's file?

22         A.    Sure.

23         Q.    Okay.   Can you tell us what's in Mr.

24    Cordova's file?

25         A.    Any report that we generated as a result of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



```
1    him debriefing with us.  I'll start at the beginning.
2    It's going to have his photo, his criminal history,
3    what we call an opening document, which is the agent
4    that opened him; in this case, me.  Why I was opening
5    him.
6         Q.   And this would have been in January?
7         A.   Yes.
8         Q.   Of 2015?
9         A.   '16.
10        Q.   Okay.
11        A.   Any payment information would be in there,
12   copies of receipts, the admonishments, which I think
13   sometimes may have been referred to as contracts, but
14   they're actually just admonishments.  They're the
15   rules that we're telling the person.  It will note
16   which rules we told on what date, and who witnessed
17   it.
18        Q.   Okay.
19        A.   That's all I can think of in a criminal
20   matter.  I mean, when you get into national security
21   stuff, there is other stuff.  But in these cases,
22   that's the bulk of what's going to be in that file.
23        Q.   So there wouldn't be anything in that file
24   that would implicate national security interests?
25        A.   Absolutely not, no.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

132

```
 1        Q.   And Mr. Cordova's cover has already been
 2   blown so to speak; is that correct?
 3        A.   Correct.
 4        Q.   Would you have any objection to turning
 5   over that file?
 6        A.   I don't.  I don't object to any of this
 7   stuff.  I just have to check with the Bureau.  And I
 8   think it would be turned over.
 9        Q.   Okay.  Thank you for that.
10             You talked a little bit about the
11   instructions that you gave, or the admonitions that
12   you gave to Mr. Cordova.  Did you ever instruct him
13   not to bring drugs into the facility or to use drugs
14   during the course of this operation?
15        A.   Not specifically.  He was advised, you
16   know, to follow all the rules, and not break any
17   laws.  But not specifically.
18        Q.   Okay.  And I think Mr. Villa asked you a
19   little bit about this.  Did you request -- I know
20   that you couldn't go in and search any of the cells,
21   but did you request STIU to check the cells
22   periodically?
23        A.   No.
24        Q.   During the time that the recording device
25   was in there?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.
 2        Q.   You talked a little bit -- and I think Mr.
 3   Villa asked you a little bit about your DRE or DUI
 4   experience in recognizing signs of impairment; is
 5   that correct?
 6        A.   Yes.
 7        Q.   Okay.  Would it be fair to say that part of
 8   what you're looking for when you're doing a DRE
 9   investigation is whether or not a suspect is able to
10   respond to the questions that you ask?
11        A.   Yes.
12        Q.   Would it matter to you if someone was
13   unable to answer a question, if they weren't able to
14   understand their response to your question?
15        A.   That would matter, yes.
16        Q.   Would it matter if they stuttered?
17        A.   Yes.
18        Q.   Okay.  I want to take you to a transcript
19   that I believe you talked to Mr. Maynard about a
20   little bit last week.  And it starts with Bates No.
21   20839.  And I'm going to hand you a copy of that
22   transcript, if that's all right with the Court.
23             THE COURT:  You may.
24        Q.   I want you to just take a couple of
25   seconds, and let me know when you're ready to discuss
```

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                 1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.

1    that transcript.

2         A.   I read this this morning, ma'am.

3         Q.   Okay, good.  Do you recognize that as being

4    a transcript between Carlos Herrera and Billy

5    Cordova?

6         A.   Yes.

7         Q.   And this was during the time that Billy

8    Cordova was next to Mr. Herrera?

9         A.   Yes.

10        Q.   Is this the transcript that you discussed

11   with Mr. Maynard last week?

12        A.   Yes.

13        Q.   And you were providing some context on --

14   for us on why you felt that some of these statements

15   were inculpatory?

16        A.   Yes.

17        Q.   I would like you to look at the first real

18   page of the transcript, meaning where the

19   conversations begin.  The top of the page says, "Hey

20   carnal."  Do you see that?

21        A.   Yes.

22        Q.   Do you see Mr. Herrera's response on the

23   second block -- I'll call it a block -- does that

24   make sense to you?

25        A.   I do see it.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Okay.   How many lines are in that block?
 2        A.    Five.
 3        Q.    Okay.   I'm going to say four-and-a-half,
 4   but I'll let you go with five.   How many
 5   unintelligibles -- how many unintelligible words are
 6   in those five lines?
 7        A.    Eight.
 8        Q.    Okay.   And I want to take you to the
 9   bottom, several pages later, of 20847, Bates No.
10   20847.   Do you mind taking a look at that?
11        A.    Okay.
12        Q.    If you will please look at the third block
13   from the bottom, where it starts out, "Unintelligible
14   carnal."   Do you see that?
15        A.    Yes.
16        Q.    Would you agree with me that there are 12
17   lines of text in that conversation block?
18        A.    Yes.
19        Q.    And in those 12 lines, there are 23
20   unintelligible words?
21        A.    Yes.
22        Q.    And one stutter?
23        A.    Yes.
24        Q.    I'm going to take you back to page -- the
25   first real page -- which is Bates No. 20840, if you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   don't mind.
 2        A.   Okay.
 3        Q.   And this is a conversation going back and
 4   forth between Mr. Herrera and Mr. Cordova; correct?
 5        A.   Yes.
 6        Q.   So some of these blocks belong to Mr.
 7   Cordova?
 8        A.   Yes.
 9        Q.   Blocks of text.
10             Do you have any reason to disagree with me
11   that there are 21 unintelligible words from Mr.
12   Herrera on that single page of this transcript?
13        A.   I don't have any reason to disagree with
14   you.
15        Q.   And if you flip through the transcript, do
16   you have any reason to disagree with me that almost
17   every single page is like this?
18        A.   I agree.
19             MS. BHALLA:  Your Honor, I would like to go
20   ahead and move this exhibit into evidence.  I think
21   that the way we would do it is CH-A; is that correct?
22             THE COURT:  I think that's correct.
23             MS. BHALLA:  Okay.  And if I may take the
24   document from Agent Acee.
25             I'm going to move that into admission.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Any objection?

 2            MR. BECK:  No objection, Your Honor.  I

 3   don't know if Ms. Bhalla intends to move the

 4   recording in.  But, if not, then we will probably get

 5   the recording entered in later.  There is no

 6   objection to the transcript.

 7            THE COURT:  All right.  Any other objection

 8   or comment?  All right.  Then Carlos Herrera's

 9   Exhibit A will be admitted into evidence.

10       Q.   I'm going to shift gears a little bit.  I'm

11   sorry, there is a lot to cover.

12            You mentioned when you first started your

13   testimony this morning that you were surprised when

14   Mr. Cordova told you that Mr. Herrera may be

15   involved; is that correct, when you got that

16   information from Mr. Cordova?

17       A.   Did I say that word?

18       Q.   I wrote it down.  I'd like to think I wrote

19   it down correctly.

20       A.   I like to think nothing surprises me.

21   Perhaps I said that.

22       Q.   Would it be fair to say that you didn't

23   have that information previously?

24       A.   Absolutely.

25       Q.   So this was the first time that you heard
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    that Mr. Herrera may have been involved?

2         A.   I might have read it in some of the old

3    stuff, but it was the first time I recall someone, a

4    live witness, if you will, or another SNM member

5    telling me.

6         Q.   So would it be fair to say it was the first

7    sort of tangible grasp that you could get on Mr.

8    Herrera in this case?

9         A.   Related to the Molina homicide, yes.  I

10   think we had some leads or some information regarding

11   drug trafficking.

12        Q.   Okay.  And that's a fair distinction.  Just

13   in terms of the Molina homicide.

14        A.   Yes.

15        Q.   Okay.  And when you had that first meeting

16   with Mr. Cordova -- and I got a little confused about

17   that for the reason you explained that, when you look

18   at the 302s -- what are the other things called?

19        A.   1023s.

20        Q.   1023s.  You're going to have to bear with

21   me on those.  The dates are sort of different; you've

22   got three dates on there?

23        A.   Yes.  You should know on the 302s, there

24   are three dates, too.  It's confusing.

25        Q.   Okay.  But all of those initial meetings
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    with Mr. Cordova were in January?
 2         A.   Yes.
 3         Q.   And how many of those meetings were there?
 4         A.   I think there were three.
 5         Q.   Okay.  And in any of those meetings, did
 6    Mr. Cordova tell you how or why he thought Mr.
 7    Herrera was involved in the Molina homicide?
 8         A.   Yes.
 9         Q.   Okay.  And what did he say to you?
10         A.   Well, what I recall is that he told us that
11    Mr. Herrera was an influential member in yellow pod,
12    and might have been a llavaro or the keyholder or the
13    pod boss.
14         Q.   Okay.
15         A.   He talked about the paperwork having been
16    brought down and given to Mr. Herrera.  And at that
17    point, I thought all that was good, but I wanted
18    recordings.
19         Q.   Okay.  Did you think that that information
20    was important, that he provided you in those meetings
21    in January?
22         A.   Yeah.  I mean, it was -- well, yes and no.
23    I mean, it's important that there is another guy from
24    the SNM telling me a story.  But where can we go with
25    this story?  That's when it becomes important to me.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492



PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1        Q.   Well, would it be fair to say that the
 2   information that you were provided prompted you to do
 3   further investigation?
 4        A.   Yes.
 5        Q.   And in that sense the information was
 6   important?
 7        A.   Yes.
 8        Q.   Was that information documented in any of
 9   the 302s or 1023s that were a result of this January
10   meeting?
11        A.   Definitely not of the first meeting at MDC;
12   that I'll characterize as a recruitment, if you will.
13        Q.   Okay.
14        A.   I think the first report is the 7th, and
15   I'm not sure if that information is in there.
16        Q.   Would it help if you reviewed it?
17        A.   Sure.
18        Q.   Okay.  I'm going to have to see if I
19   brought that one up with me.  I did.
20             I'm going to hand you -- actually since
21   we're going through these, I'm going to hand you --
22   all right.  Here we go.  Basically, what I'm going to
23   hand you are the 302s or the 1023s that I believe to
24   be related to your initial conversations with Mr.
25   Cordova.  And I'm just going to ask you to take a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    look at those.
 2         A.   Ma'am, I'm looking for references to yellow
 3    pod and Carlos Herrera and the murder?
 4         Q.   Correct.  And the first question I'm going
 5    to ask you actually is more -- are those the 302s or
 6    the 1023s that you generated as a result of your
 7    meetings with Mr. Cordova in January?  And to be
 8    perfectly fair, I may have handed you one that's not.
 9    So please take a look and make sure that those are
10    correct.
11         A.   I think that their report also is on point.
12    I think that's the same source.
13         Q.   Okay.  And did you get a chance to
14    review -- I think there are three of them.  Did you
15    get a chance to review all three?
16         A.   Yes.
17         Q.   Would it be fair to say that in one report
18    Mr. Cordova details some of the drug trafficking
19    issues we talked about earlier?
20         A.   Yes.
21         Q.   Okay.  Would it also be fair to say that
22    there is no information contained in those reports
23    that indicates that Mr. Herrera was involved in the
24    Molina homicide?
25         A.   I did not see a mention of that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  And those were the only documents
 2   that you generated after your meetings with Mr.
 3   Cordova.  Are there any other forms?  I mean, I don't
 4   know what all the names for -- are there any others
 5   that would have documented your initial meetings with
 6   Mr. Cordova?
 7        A.   I didn't generate any of these.
 8        Q.   Okay.
 9        A.   And to answer your question, as to if there
10   are other forms, I'd have to check that closed
11   informant file to see what's in there, and then the
12   SNM case file.
13        Q.   Is that the file that you said you wouldn't
14   have an objection to turning over, provided that you
15   get the permission from your superiors?
16        A.   Yes.
17             THE COURT:  Ms. Bhalla, would this be a
18   good time for us to take our lunch break?
19             MS. BHALLA:  Certainly, Your Honor.  Thank
20   you.
21             THE COURT:  All right.  We'll be in recess
22   for about an hour.  Have a good lunch.
23             (The Court stood in recess.)
24             THE COURT:  Let's everyone take their
25   seats.  I think everybody has got an attorney, a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    client.  Look around, make sure everybody has got

2    somebody.

3           It's a little warm.  If the lawyers want to

4    take off jackets or something, that's fine, go ahead.

5    We'll be working to try to reduce the heat.  It was

6    probably all that chicken in here that heated it up.

7    I had turkey from Walmart.  I feel jealous.

8           All right.  Mr. Acee, I'll remind you

9    you're still under oath.  Ms. Bhalla, if wish to

10   continue your cross-examination of Mr. Acee.

11          Mr. Mondragon is here.

12          MR. BECK:  Your Honor, we're going to be a

13   little unconventional with the Court's indulgence.

14   Everyone is sort of working on a tight timeline

15   today.  We have Mr. Cordova here in the courthouse.

16   His attorney has a hearing tomorrow afternoon at

17   1:00.  The way things have been going, we're going to

18   try to everyone work together to see if we can

19   finish.  We're going to have Special Agent kind of

20   stop here and redo the rest of Ms. Bhalla's

21   cross-examination and anyone else's.  But we think

22   it's an efficient use of everyone's time if we put

23   Mr. Cordova on the stand and try to get him done this

24   afternoon, if at all possible.

25          THE COURT:  All right.  Everybody in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    agreement with that?  All right.  Mr. Acee, you may
 2    step down.
 3            MR. BECK:  So we're going to work on
 4    getting Mr. Cordova up here as soon as possible.  I
 5    think the marshals are coordinating that as we speak.
 6            THE COURT:  Hey, guys, let's talk a second
 7    here.  Everyone be on best behavior when Mr. Cordova
 8    comes in here, okay?
 9            DEFENDANT TROUP:  Yes, sir.
10            MR. BECK:  To make --
11            THE COURT:  Let me make a new comments
12    here.  We've got to start practicing for the jury,
13    right?  There is going to be people walking into the
14    courtroom during the jury trial.  And I bet your
15    defense lawyers are going to tell you:  Look like
16    you're playing poker, you know.  Nothing happened,
17    and you want to be on your best behavior.  So I bet
18    I'm just echoing what your lawyers are saying.  But
19    let's do a practice run here, okay?
20            All right.  Mr. Beck.
21            MR. BECK:  To make an efficient use of the
22    Court's time, I believe that a couple of defendants
23    for this motion to suppress had the marshals execute
24    service of subpoenas this morning for some witnesses
25    to be here as early as this afternoon, or as late as
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1   tomorrow.
 2           The attorney for New Mexico Corrections
 3   Department, their general counsel, contacted us, and
 4   German Franco, the Warden at PNM is unable to be here
 5   tomorrow because of some issues that he has.  He's
 6   unable to be here tomorrow.  So the United States --
 7   Corrections Department asked the United States to
 8   move orally to quash that subpoena for him.  I am
 9   doing that now.  I think there is good cause to quash
10   that subpoena, given that it was served this morning,
11   for him to be here tomorrow.  I have a sense with the
12   amount of witnesses that we will present this
13   afternoon and tomorrow morning, through tomorrow
14   afternoon, it's not going to put anyone at a
15   disadvantage.  I don't think that he would testify
16   tomorrow afternoon regardless.  But given the late
17   service, and given that Warden Franco cannot attend,
18   I think there is good cause to quash that subpoena
19   that was served on him this morning.
20           THE COURT:  Any objections to doing that?
21           MS. FOX-YOUNG:  Your Honor, I think it's
22   true that we may not need to call him, and there are
23   some other witnesses.  But we'd like to hold it open
24   for later, if we do decide.  I think --
25           THE COURT:  Do you want me to quash this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    subpoena, and then I can reissue at the time that you
 2    need him?
 3              MS. FOX-YOUNG:  Yes, Your Honor.
 4              THE COURT:  All right.  Anybody else have
 5    any problem with that?  All right.  So the subpoena
 6    as to -- it's German Franco, right?
 7              MR. BECK:  Yes.
 8              THE COURT:  -- German Franco, will be
 9    quashed.
10              MR. BECK:  Thank you, Your Honor.
11              I just received an update from the marshals
12    that he should be here in about one minute or right
13    now.
14              THE COURT:  I think he's coming in the back
15    door here.  All right, Mr. Cordova --
16              THE WITNESS:  Do I stand?
17              THE COURT:  Yeah, why don't you stand.  And
18    before you're seated, Ms. Standridge will swear you
19    in.
20
21
22
23
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      BILLY CORDOVA,
 2        after having been first duly sworn under oath,
 3        was questioned and testified as follows:
 4                    DIRECT EXAMINATION
 5              THE CLERK:  Please be seated.  State your
 6    name for the record, spelling it.
 7              THE WITNESS:  Billy Cordova.  B-I-L-L-Y.
 8    Cordova, C-O-R-D-O-V-A.
 9              THE COURT:  Mr. Cordova.  Mr. Castellano.
10              MR. CASTELLANO:  Thank you, Your Honor.
11    BY MR. CASTELLANO:
12        Q.   Good afternoon, Mr. Cordova.
13        A.   Good afternoon.
14        Q.   Have you ever testified in court before?
15        A.   No, sir.
16        Q.   I'm going to ask you some questions, and
17    starting with where you were in January of 2016.  Do
18    you remember where you were?
19        A.   I believe in MDC, county jail.
20        Q.   Where is that located?
21        A.   Albuquerque, New Mexico, on the west side.
22        Q.   And what were you doing at the facility at
23    that time?
24        A.   I was waiting on sentencing for a trial I
25    had went to.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   And do you remember about how long you had

2     been at that facility?

3     A.   Maybe about two months.

4     Q.   And where had you been housed before that

5     time?

6     A.   At the PNM North, back and forth from

7     Central, Los Lunas, CNM CF, back to PNM.

8     Q.   When you say CNM CF, is that the Central

9     New Mexico Facility?

10    A.   Yes, sir.  I would go about every two weeks

11    back and forth from motions.

12    Q.   And were those motions related to your

13    trial?

14    A.   Yes, sir.

15    Q.   And can you tell the Judge whether you were

16    convicted in that case?

17    A.   Yes, sir.

18    Q.   What was the crime that you were convicted

19    for?

20    A.   Manslaughter.

21    Q.   And are you currently incarcerated?

22    A.   Yes, sir.

23    Q.   Is it for that same crime?

24    A.   Yes, sir.

25    Q.   Now, during your time at MDC, did you ever

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    meet somebody named Bryan Acee?

 2         A.   Yes, sir.

 3         Q.   How did you meet him?

 4         A.   He came and pulled me out, talking about a

 5    RICO Act; that he was looking at me for a RICO Act on

 6    the SNM.

 7         Q.   Did he say he was looking specifically at

 8    you or at the SNM in general?

 9         A.   At the SNM in general.

10         Q.   And did you expect to see him on that day?

11         A.   No, sir.

12         Q.   Tell us what happened when you walked into

13    the room with him.

14         A.   I remember he was sitting to the left, and

15    two other agents were sitting in front of me on the

16    other side, on the opposite side of the table.

17         Q.   And did they explain to you what was going

18    on at that time?

19         A.   Yes, sir.

20         Q.   And what did they tell you?

21         A.   They told me that they had just picked up

22    the SNM on a RICO Act, and they were doing a second

23    indictment, and that they were looking at me for a

24    RICO.

25         Q.   What was your response to hearing that

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                         e-mail: info@litsupport.com

```
 1    information?
 2         A.    It took a while for it to set in, and I
 3    made the decision to cooperate with the FBI.
 4         Q.    Now, where were you in terms of -- at that
 5    time, were you an SNM Gang member?
 6         A.    I guess you could say, yeah.  But at heart,
 7    no.
 8         Q.    So let me ask you about that, then.  You
 9    said "at heart, no."  Where were you in your own mind
10    in terms of the SNM?
11         A.    I just didn't want nothing do with them
12    anymore.
13         Q.    So if that was the case, how did this
14    timing work out for you between your mindset of
15    wanting to get out of the gang and meeting someone
16    from the FBI?
17         A.    It was just luck, coincidence.
18         Q.    What did you agree to do at that first
19    meeting, and then maybe at later meetings?  Let's
20    start with that meeting.
21         A.    I agreed to get some wiretaps for them on a
22    murder that occurred, Javier Molina.
23         Q.    If you recall, did they ask you
24    specifically about the Molina homicide or just
25    murders in general?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    They asked me about murders in general.

2   I'm the one that told them about the Molina murder.

3   Because I figured I was there in MDC when they had

4   did the first sweep.  And I was in Southern New

5   Mexico when the Molina murdered occurred, so I know

6   who was involved in it, and I knew who was sweeped up

7   and who was still left behind.  So I was honest with

8   them.  I was honest with them, tell you what I can

9   give you, but this is what it is.

10       Q.    Let me ask you this:  You said that you

11  knew who was swept up.  Does that mean you knew who

12  was charged initially?

13       A.    Yes.

14       Q.    And in your mind, did you think there were

15  some people who had not been charged who were part of

16  the Molina murder?

17       A.    Yes.  I knew, because when I was coming in

18  the middle of my trial, I seen everybody in there.

19  They were all in there.

20       Q.    And at that point who did you think was

21  missing from the Molina murder?

22       A.    Carlos Herrera and Rudy Perez.

23       Q.    Now, you said you were at Southern when the

24  Molina murder took place.  In which pod were you?

25       A.    I was in yellow pod, cell 116, on the top

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                 1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    tier or -- yeah.

 2         Q.    And do you know in which pod the Molina

 3    murder occurred?

 4         A.    It occurred in blue pod.

 5         Q.    And so the Judge knows, where is the yellow

 6    pod in relation to the blue pod?

 7         A.    Right next to it.  Blue pod is the first

 8    pod when you come in, yellow pod is in the middle,

 9    and green pod is to your right.  So, yeah, it's right

10    next to my pod.

11         Q.    And was there any type of door or anything

12    that connected the two pods?

13         A.    Yeah, there is a two-tier separation doors

14    on the top tier and the bottom tier.

15         Q.    So, in other words, could you access the

16    blue pod from the yellow pod through a door?

17         A.    Yes, sir, that is how we communicate with

18    other inmates in the next pods.

19         Q.    Okay.  Now, you mentioned wiretaps of

20    people.  What do you mean by that term "wiretap"?

21         A.    I told them that I could get them talking

22    about the murder, and I agreed to cooperate and go

23    get it.

24         Q.    Now, if this was in January, about how soon

25    do you think it was before you were recording

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    somebody?

 2         A.    February.

 3         Q.    And did you record somebody in that

 4    timeframe?

 5         A.    Yes, I recorded Rudy Perez at PNM North.

 6    It was in Q pod.   He was in 101 and I was in 102.

 7         Q.    And when you mentioned the numbers 101 and

 8    102, are those the cell numbers in that pod?

 9         A.    Yes, sir.

10         Q.    I'm showing you what's been admitted as

11    Rudy Perez' Exhibit B.   It's Bates stamped 28475 for

12    the record.

13         A.    Yes.

14         Q.    Okay.   Do you recognize what's on the

15    exhibit right now?

16         A.    Yes, yes, sir.

17         Q.    What is that?

18         A.    That is Unit 3A at PNM North.

19         Q.    And you mentioned one of the pods where you

20    recorded Mr. Perez.   Which pod was that?

21         A.    The first pod on the left.

22         Q.    So Q pod?

23         A.    Yes, sir.

24         Q.    Do you recall approximately where you were

25    and where Mr. Perez was?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I was in cell 102 and Perez was in cell
 2   101.
 3        Q.   Do you know where -- approximately where on
 4   that picture those cells would be?
 5        A.   Yes, sir.  About the bottom left-hand
 6   corner.
 7        Q.   I'm going to highlight the screen here, put
 8   an arrow.
 9        A.   Yes, right there.  Right there.
10        Q.   And so you think there were two cells in
11   the corner?
12        A.   Yes, sir.
13        Q.   Top tier or bottom tier?
14        A.   Bottom tier.
15        Q.   And were you given any type of recording
16   device to capture your conversations?
17        A.   Yes, sir.
18        Q.   Okay.  I won't ask you to describe it for
19   us, but was it a device you were able to use to
20   record the conversations?
21        A.   Yes, sir.
22        Q.   And did you know how to turn it on and off?
23        A.   Yes, sir.
24        Q.   Was there any way for you to rewind or
25   delete --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    No, sir.

2        Q.    -- conversations?

3        A.    No, there was only a button for on and off,

4    and that was it.

5        Q.    Once again, without describing the button,

6    was it easy to turn on and off, so that you wouldn't

7    record things by accident or cut things off by

8    accident?

9        A.    Yes, sir.

10       Q.    Tell us about when you were housed in Q

11   pod, what type of housing or classification level was

12   that?

13       A.    Level 6.

14       Q.    And tell us what it means to be in Level 6,

15   as best as you understand it.

16       A.    It's a max secured prison.  So anytime you

17   leave your cell, you got to get cuffed through a food

18   port, and you've got to be with a two-man escort, two

19   COs escort you either to the yard or shower, and that

20   is how you get escorted, in restraints, at all times.

21       Q.    So at this time were you able to move about

22   freely and talk to Mr. Perez?

23       A.    No.

24       Q.    How were you able to communicate with him?

25       A.    Through under the bunk in the cell.  There

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                       Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   is a ventilation system right there.  It's a heater.

2        Q.   And so the Judge understands, how are you

3   able to talk to people through the vents?

4        A.   You are able to talk real good, real clear.

5   There is two ways.  There is one on top, which is the

6   ventilation system that keeps the air flow

7   circulating in the cell, and the bottom one is a

8   heater.

9        Q.   And have you and other inmates been able to

10  communicate using the vents before?

11       A.   Yes, that's how we communicate without

12  talking on the tiers.

13       Q.   All right.  So other than speaking to Mr.

14  Perez through the vents, did you ever have a

15  face-to-face interaction with him?  Were you able the

16  move around that way?

17       A.   No, sir.

18       Q.   And do you remember approximately how long

19  you were housed next to Mr. Perez?

20       A.   To my recollection, I can't be right-on,

21  but about a month.

22       Q.   Do you remember approximately how many days

23  or times you were able to record him?

24       A.   To my recollection, between three, four, or

25  five.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And just so we're clear, are we saying

 2    three, four, or five times, or days?

 3        A.   Days.

 4        Q.   If you can tell us about your interactions

 5    with Mr. Perez in terms of how you got him to start

 6    talking.  Did you guys know each other from before?

 7        A.   Yes.

 8        Q.   How did you know each other from before?

 9        A.   We were both SNM Gang members.  We gave

10    time in the same unit together.

11        Q.   About how long do you think you knew Mr.

12    Perez?

13        A.   Since 2009, in Las Cruces, New Mexico, in

14    the SNM CF.

15        Q.   When you say SNM CF, is that the Southern

16    New Mexico Correctional Facility?

17        A.   Yes, sir, it's a Level 4 facility there.

18        Q.   And what type of information did you think

19    you would be getting from Mr. Perez during your

20    conversations?

21        A.   About him giving the piece of steel from

22    his wheelchair to provide a shank to murder Javier

23    Molina.

24        Q.   Were you able to get that information from

25    him?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

158

1          A.   Yes, sir.

2          Q.   When you were recording him, did you try to

3     put the device close to the vent to capture the

4     conversation?

5          A.   Yes, sir, I put it right on.

6          Q.   Did you try to intimidate Mr. Perez in any

7     way?

8          A.   No, sir.

9          Q.   Do you remember any discussions about him

10    either being a rat or people talking about him?

11         A.   Well, I would say pressure points, because

12    I can't go right-on and ask him about a murder case,

13    you know, what I'm saying?

14         Q.   Well, what, if anything, would be wrong if

15    you went directly to asking him about the Molina

16    murder?

17         A.   Well, it's a hear no, see no evil code we

18    live by.  So anything like heroin or cocaine or weed,

19    outspoken like that, something is wrong, do you know

20    what I'm saying?  So we use code words for

21    everything.  So what I was using was an indirect

22    question to get an honest answer, you get what I'm

23    saying?  I was using pressure points to get him to

24    reveal the truth.

25         Q.   Some of these conversations in the

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE                                    1-800-669-9492
                                                     e-mail: info@litsupport.com

1    transcripts appear to start maybe mid-sentence.  What

2    can you tell us about turning on the device to record

3    conversations?

4         A.   Well, the device I had had two AAA

5    batteries.  I didn't know how long I was going to be

6    there.  I didn't know what was going to be expected

7    of me.  So it's not like I go to a 7-Eleven and buy

8    batteries.  So I turned it on when I felt something

9    needed to be recorded, and I turned it off when it

10   was just gibberish.

11        Q.   All right.  So when you turned it on, what

12   did you think you would be capturing?

13        A.   The details on him giving the shank to "Dan

14   Dan" Sanchez to sharpen, to do the murder on Javier

15   Molina.

16        Q.   So you touched on that a little bit ago.

17   Did you know how long you would be housed next to Mr.

18   Perez?

19        A.   No, I didn't know.

20        Q.   Do you know how long it would be before you

21   could maybe get new batteries?

22        A.   No.

23        Q.   Did you have concerns about conserving the

24   batteries?

25        A.   Very concerned.



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                               1-800-669-9492
                                              e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          Q.   The allegation in this case is that you
 2    gave Mr. Perez Suboxone before you spoke to him.  Can
 3    you tell the Judge whether or not you ever gave him
 4    Suboxone?
 5          A.   No, Your Honor, I never gave Rudy Perez no
 6    Suboxone.
 7          Q.   Do you know what Suboxone is?
 8          A.   Yes, sir.
 9          Q.   Do you recall if you gave anything to Mr.
10    Perez during the time you were housed next to each
11    other?
12          A.   No, sir.
13          Q.   Just to clarify my last question:  I think
14    you asked you if you recalled giving him anything.
15    Did you give anything to Mr. Perez?
16          A.   No, he gave me some ear buds for an AM/FM
17    radio.  That was about it.  But I never gave him
18    nothing.
19          Q.   So it's your testimony that he gave you ear
20    buds, but you didn't give him anything?
21          A.   No.
22          Q.   As best as you could tell, did Mr. Perez
23    appear to be under the influence of Suboxone or
24    anything of that nature?
25          A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Did his answers seem responsive to your

2   questions?

3        A.   Yes.

4        Q.   Okay.  Now, after you finished the

5   recordings with Mr. Perez, were you moved next to

6   anyone else in this case?

7        A.   Yes.

8        Q.   Who was that person?

9        A.   That was Carlos Herrera.

10       Q.   Now, was that in the same pod or a

11   different pod?

12       A.   No, it was a different pod.  It was a

13   different facility.  It was PNM South.  It was a

14   Level 4 facility.

15       Q.   And approximately how long were you housed

16   next to Mr. Herrera?

17       A.   Approximately, maybe a few weeks, a month

18   tops, I think.

19       Q.   And do you remember approximately how many

20   days you were able to record him?

21       A.   Between seven to eight days, probably about

22   a week, maybe a little over a week.

23       Q.   And how is it that you were able to talk to

24   Mr. Herrera?  Did you know each other from before?

25       A.   Yes, sir.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



```
 1        Q.   Where did you know him from?

 2        A.   I knew him from the same facility, when we

 3   were Level 5 inmates.  We used to have GED classes

 4   together.  And then I knew him from the Level 4 in

 5   the South.

 6        Q.   Were you ever in the same pod with him at

 7   the Southern New Mexico Correctional Facility?

 8        A.   Yes, sir.

 9        Q.   When was that?

10        A.   I was with him in 2009 to 2010, and I was

11   with him in 2013, 2014.

12        Q.   Were you in the same pod as Mr. Herrera or

13   a different pod when the Molina murder occurred?

14        A.   I was in the same pod with him.

15        Q.   So, based on your prior relationship with

16   him, did you feel that he would open up and talk to

17   you?

18        A.   Yes, sir.

19        Q.   And did he, in fact, do that?

20        A.   Yes, sir -- well, to a certain point.  He

21   wasn't really trying to say nothing too much, so I

22   got to him reveal other ways, you know what I mean?

23        Q.   Okay.  What do you mean he didn't appear to

24   want to say anything?

25        A.   At first, he didn't want to say anything.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    But then I got him to admit it indirectly.

2         Q.   And what do you recall he told you?

3         A.   We were just talking about the tabla, and

4    about who should be calling hits on rats, such as

5    Javier Molina.  And how the tabla should be the ones

6    to say what goes and what don't go.  So that's how I

7    got him to implicate himself in the murder, because

8    he was part of the tabla.

9         Q.   If you can tell the Court what the tabla

10   is?

11        A.   It's a five-person direct board that calls

12   all policies and business transactions, murder

13   transactions, anything that goes on, makes the rules,

14   and does -- they're the ones that say:  What goes --

15   onda -- the onda, which is in the SNM Gang, they say,

16   "What goes and what don't go."

17        Q.   I'll ask you the same question about Mr.

18   Herrera.  Did you give him any drugs before talking

19   to him?

20        A.   No, sir.

21        Q.   Did you and Mr. Herrera exchange anything

22   during your time next to each other?

23        A.   I gave him some canteen, that was about it.

24        Q.   Be a little more specific in terms of what

25   you might give someone with canteen.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1      A.    Canteen is prison store-bought food, nutty

2  bars, soups, chips, coffee; stuff like that.

3      Q.    How were you able to get those things to

4  Mr. Herrera?

5      A.    When I first got to the Level 4 facility

6  there, we were under investigation for the -- no,

7  for --

8      Q.    Was it another assault?

9      A.    Yeah, it was another assault on another SNM

10 member, Julian Romero.  That was his name.  So they

11 had us under investigation, because they didn't know

12 who could be housed with who, and they didn't know if

13 letting us out, there was going to be another

14 assault.  So during that time, we had food ports on

15 our doors and food ports are little holes that open

16 and lock, and there are latches.  And when the latch

17 opened for food, he threw me a bag tied to a line.  I

18 threw some food in it, and he pulled it back.  That

19 was about it.

20     Q.    Do you remember approximately how many

21 times that happened?

22     A.    Once.

23     Q.    I'm going to ask you about a conversation

24 that took place with Mr. Cordova and another person,

25 I believe named Dale Chavez?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes, sir.
 2        Q.    Do you remember that conversation?
 3        A.    Yes, sir.
 4        Q.    First of all, who is Dale Chavez?
 5        A.    Dale Chavez is "Dreamer" from Albuquerque,
 6   from a street gang, Valley Gardens.
 7        Q.    And were you housed near Mr. Herrera, where
 8   were you housed in relation to where he was?
 9        A.    Right next to him.
10        Q.    And during that time -- since you said it
11   was Level 4, what kind of movement did you guys have
12   at that point?
13        A.    At that time, we were barely getting ready
14   to come out on tier time, that's for two hours, we
15   just come out on the pod and that's it.
16        Q.    So there were times that you were able to
17   see Mr. Herrera face-to-face?
18        A.    Yes.
19        Q.    Did you guys exchange anything during that
20   timeframe?
21        A.    No, sir.
22        Q.    So if you and Mr. Herrera were next to each
23   other, where was Mr. Chavez located?
24        A.    Directly upstairs from me, in the cell
25   upstairs directly up.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And the times you recorded Mr. Herrera, did
 2   you have a recording device?
 3        A.   Yes, sir.
 4        Q.   And how did you two communicate at that
 5   point?
 6        A.   Underneath the bunk in the heater, the same
 7   way me and Perez did.
 8        Q.   And, as best as you could, did you try to
 9   get the recording device near the heater?
10        A.   Direct on.
11        Q.   During the time that Mr. Chavez was there,
12   were you also able to capture part of the
13   conversation with him?
14        A.   Yeah, but it was a different vent.  It was
15   the ventilation, the one that circulates the air.  So
16   that one is directly on top of the desk.
17        Q.   So you have a lower vent to talk to Mr.
18   Herrera, and then a higher vent to talk to people
19   above you?
20        A.   Yes, sir.
21        Q.   I'm going to show you what's DeLeon Bates
22   stamp 20999.  And I want to ask you about a
23   conversation you had with Mr. Chavez and Mr. Herrera.
24   The time that you finally reached the facility, about
25   how long had it been since you were on the streets?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I would say approximately a year and a few

2   months.

3      Q.   Now, this is a conversation that starts

4   mid-sentence.  And do you see the discussion about --

5   well, you say, "They're still going for five, 10, or

6   12 out there, no?"

7      A.   We're talking about Suboxone strips.

8      Q.   So on that occasion were you actually

9   talking about drugs?

10     A.   Yes, sir.  I was talking about buying drugs

11  from him.

12     Q.   What was the purpose of having that

13  discussion with him?

14     A.   Because I didn't know what Bryan Acee was

15  going to have me do next.  So I was just trying to

16  collect as much things as I can for the FBI.

17     Q.   So talk about drugs could involve drug

18  trafficking?

19     A.   Yes, sir.

20     Q.   Tell us about this conversation.  You seem

21  to be going back and forth on prices, five, 10, and

22  12 are some of the numbers you mentioned.

23     A.   Those are the cost per strip.

24     Q.   So having been on the streets about a

25  little more than a year before that, were you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    familiar with the drug prices?

2         A.    Yes, sir.

3         Q.    And was this discussion related to you

4    having given any drugs to Mr. Herrera?

5         A.    No, sir.

6         Q.    On the next page, DeLeon page 21000, at the

7    top of the page Chavez says -- calls out the name

8    "Lazy."  Do you know who that person is?

9         A.    Yes, sir, that's Carlos Herrera.

10        Q.    At that point, were you and Mr. Chavez and

11   Mr. Herrera able to communicate with each over?

12        A.    Yes, sir.  That was the top vent above the

13   desk.

14        Q.    Okay.  On that same page are you the person

15   identified as the "CHS" on this?

16        A.    Yes, sir.

17        Q.    Do you see where it says, "Are you crashing

18   out, 'Lazy'?"

19        A.    Yes, sir.

20        Q.    What are you asking Mr. Herrera at that

21   point?

22        A.    Is he going to sleep.

23        Q.    And do you see where Chavez asks him or

24   asked the question:  "He's over there doing bad,

25   huh?"

SANTA FE OFFICE                                                         MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1        A.    That means he ain't got no drugs.

 2        Q.    Now, explain that to someone who doesn't

 3    understand, when Chavez says someone is doing bad,

 4    what does that mean?

 5        A.    He wasn't high, so he was doing bad.  So

 6    like if you're doing good, means you're high.  That's

 7    the terms we use.  When we talk about people, we can

 8    say:  "That guy is doing good in the streets."  That

 9    means he's out there doing the most, robbing,

10    jacking, doing whatever he can for the onda, to

11    further our goals in the onda.  At that point what we

12    were talking about doing bad was not having any

13    drugs.  So you're doing bad is when you're not

14    feeling good, we didn't have no drugs.  We weren't

15    feeling good, in other words.

16        Q.    Had you had drugs at the time, would you

17    have been using them?

18        A.    Of course.

19        Q.    Why do you say that?

20        A.    Because I'm an addict.  And I would

21    probably have been giving them some, too.  I'm just

22    being honest.

23        Q.    About how long do you think you were housed

24    next to Mr. Herrera?

25        A.    Maybe around a month or so.  Maybe a little

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    over a month.

2         Q.   And if you were with him that period of

3    time you captured maybe a little more than a week,

4    what else were you doing or talking about during that

5    timeframe?

6         A.   I was trying to get him to talk about the

7    Molina murder.  And he wouldn't go into it directly.

8    So I had to get it from him indirectly by getting him

9    to talk about the SNM, the organization, how he's on

10   the tabla, and how the tabla sees things should be

11   done for onda, and how shots should be called.  That

12   was it.

13            MR. CASTELLANO:  May I have a moment, Your

14   Honor?

15            THE COURT:  You may.

16        Q.   You mentioned these words a few times.  But

17   just to clarify the tabla, what are you referring to?

18        A.   The tabla is the five-man desk that calls

19   any shot, such as a murder.  They're the only ones

20   that can call that shot on another brother.  Anybody

21   else hits a brother without probable cause, could be

22   held accountable by the tabla.  So the tabla is the

23   one that issue out all the discipline actions, such

24   as violations, people getting beat up for, you know,

25   breaking policies or regulations, rules of onda, to

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                              1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                          e-mail: info@litsupport.com

1    murders, to how the whole structure is ran.

2          Q.   So when you get Mr. Herrera to talk about

3    hitting snitches, is that something the tabla would

4    approve?

5          A.   Yes, of course.

6          Q.   And he was a member of the tabla?

7          A.   Yes, sir.

8          Q.   You mentioned the onda again.  Who are you

9    referring to when you use the word "onda"?

10         A.   Onda, it's a term used is destiny.  It's

11   our -- what we use for the SNM, supposed to be our

12   destiny.  So that's what I use when I say that, the

13   SNM.

14         Q.   Now, in terms of any instructions given to

15   you, were you instructed to take advantage of any

16   potential psychological or mental problems that Mr.

17   Perez may have had?

18         A.   What do you mean?

19         Q.   Basically, were you instructed to take

20   advantage of any problems that Mr. Perez may have, in

21   order to get statements from him?

22         A.   No, sir.

23         Q.   Did you, in fact, take advantage of any

24   disabilities he may have had in order to get

25   statements from him?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

1        A.   No, sir.

2        Q.   The same question when it comes to Mr.

3   Herrera.   Were you instructed to take advantage of

4   any issues or disabilities that he may have had?

5        A.   No, sir.

6        Q.   And did you, in fact, do that?

7        A.   No, sir.

8        Q.   Going back to your movement next to Mr.

9   Perez, did you know when you were going to be moved

10  next to him?

11       A.   No, sir, just spur of the moment.

12       Q.   So how much notice did you have before you

13  were moved from your location at the time next to Mr.

14  Perez?

15       A.   Probably about an hour.

16       Q.   And same question regarding Mr. Herrera.

17  Did you know at what point you might be moved next to

18  him?

19       A.   About the same.

20       Q.   In other words, did people share with you

21  details of the operation, about when you might be

22  moved or where?

23       A.   No.   They would just tell me on spur

24  moment.

25       Q.   Now, based on things you said to the FBI,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    was it your understanding that at some point you
 2    might be placed next to either of those two
 3    gentlemen?
 4         A.    I just -- like I said, it was a spur moment
 5    thing.  Just here, use this.  You said you can get
 6    this, you know what I mean?  I was given the rules
 7    when he talked to me, told me they don't lie, they
 8    don't give us drugs, don't entrap people.  It's all
 9    about being honest.  So what he wanted was the truth,
10    plain and simple.  That's what Bryan Acee said.  So
11    he gave me a task and I followed it through.
12              MR. CASTELLANO:  May I have a moment, Your
13    Honor?
14              THE COURT:  You may.
15              MR. CASTELLANO:  Thank you, Your Honor.  I
16    pass the witness.
17              THE COURT:  Thank you, Mr. Castellano.
18              Are you going to take the lead, Ms. Bhalla?
19              MS. BHALLA:  Yes, Your Honor.  Thank you.
20                        EXAMINATION
21    BY MS. BHALLA:
22         Q.    Good afternoon, Mr. Cordova.
23         A.    Good afternoon, Miss.
24         Q.    My name is Carey Bhalla.
25         A.    Nice to meet you.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Nice to meet you also.

2             Before you came to court today, did you

3    know what you would be asked to testify about?

4        A.   To be honest with you, no.  I just got

5    transferred over here.  Last night I got to CNM CF.

6    I didn't even know this was coming.

7        Q.   Did anybody go out to speak you to last

8    night?

9        A.   I just spoke to my lawyer.  He told me this

10   is what it's going to be, and this is what we're

11   doing.

12       Q.   Did he tell you what the conversation would

13   be about today?

14       A.   Yes, ma'am.

15       Q.   And who transported you here this morning?

16       A.   I believe correctional officers from CNM

17   CF.

18       Q.   Did you recognize any of them?

19       A.   No, ma'am.

20       Q.   Okay.  And I wanted to ask you a little bit

21   about some of the housing issues that Mr. Castellano

22   was asking you about.  You were housed in Las Cruces

23   or Otero during the Molina homicide?  Where were you

24   housed during the Molina homicide?

25       A.   I was in Southern New Mexico Correctional

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

175

1    Facility.

2         Q.   Sorry, I was thinking of now, and not back

3    then.  So you were at Southern?

4         A.   Yes, ma'am.

5         Q.   Okay.  And you were in the yellow pod?

6         A.   Yes, ma'am.

7         Q.   Okay.  And you were talking a little bit

8    about how, even though you guys were on Level 4, you

9    were on lockdown?

10        A.   No, ma'am, I was at the South.

11        Q.   At South?

12        A.   Yes, ma'am.

13        Q.   How were you able to move around, and what

14   was life like for you when you were at Southern

15   during the Molina homicide?

16        A.   We're on tier time.  We were out all day at

17   that time.  The Secretary of Corrections had came

18   down and pretty much said that we'd been doing good,

19   we'd been earning our privileges back.  And we were

20   on a step process routine, because of what kind of

21   individuals we were.

22        Q.   What does that mean?

23        A.   We were in a level program.  It goes based

24   on your behavior.  It's based on the privileges

25   you're allowed to get.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Okay.  What happened after the Molina

2   homicide, in terms of how you guys were housed, or

3   what things were like for you then?

4        A.   It was -- you know, they came in, they did

5   their investigation, they shook everybody down, they

6   looked for wilas, anything that can help them with

7   the investigation.  And that was it.  Then we were

8   kept on lockdown for a little bit.

9        Q.   How long were you kept on lockdown?

10       A.   I got out in April, so I can't tell you.

11       Q.   Where did you go in April?

12       A.   I went home.

13       Q.   Okay.  You got released?

14       A.   Yes, ma'am.

15       Q.   Did you get let out of the lockdown before

16   you went home?

17       A.   No, ma'am.

18       Q.   Okay.  And what was lockdown like when you

19   were at Southern?

20       A.   Like any other lockdown.  You just get your

21   three meals a day, you get your canteen in your cell,

22   you watch TV in your cell, you listen to radio in

23   your cell.  It's all in your cell.  You get 23 hours

24   a day, you get five days of rec.  You get your

25   showers five days a week.  That's it.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

```
 1        Q.   All right.  Do you have any tier time?

 2        A.   No, ma'am.

 3        Q.   What about rec time?  I missed that, I'm

 4   sorry.

 5        A.   Yeah, you get one hour five days a week.

 6        Q.   One hour five days a week.  And when you're

 7   out on rec, are you by yourself or are there people

 8   out there?

 9        A.   No, ma'am, we're in cages.

10        Q.   You're in cages in the rec room?

11        A.   Yes, ma'am.

12        Q.   So it's a cage outside?

13        A.   Yes, ma'am.

14        Q.   How big is the cage?

15        A.   Probably about 7 feet by 7.  You're in

16   there by yourself.  That's only when we were on

17   Interim Level 6 Status.  That's why.

18        Q.   And it's called Interim Level 6?

19        A.   Yes, ma'am.

20        Q.   Is it really rec time?  I mean, what's that

21   like?  Do you get to move around much?

22        A.   Well, for individuals that are murdering

23   each other, that's the best they can do.

24        Q.   Well, I understand that.  But I mean, does

25   it feel like actual rec time?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yeah, we went outside, pull a bar, a bar in
 2   your rec cage.  You get to talk to your friends out
 3   there.  It's rec time.
 4        Q.    How do you get to talk to them if you're in
 5   a cage?
 6        A.    Through the cage.
 7        Q.    Are they in other cages?
 8        A.    Yes, ma'am.
 9        Q.    How many cages are outside?
10        A.    About approximately, I believe, 12.
11        Q.    Twelve?
12        A.    Twelve cages.
13        Q.    And they're all about the same size?
14        A.    Yes, ma'am.
15        Q.    Do you know if Carlos was put on Interim
16   Level 6 during that time as well?
17        A.    We all were.
18        Q.    Okay.  And was he still there when you were
19   released?
20        A.    Yes, ma'am.
21        Q.    And was he still on lockdown when you were
22   released?
23        A.    Yes, ma'am.
24        Q.    After the Molina homicide, did Carlos say
25   anything to you about the homicide?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

179

```
 1        A.   Well, we would all -- he told me before, so
 2   I knew what was going on.  And when we were all out
 3   there in the yard, pretty much everybody was trying
 4   to keep quiet.  But there was things being said.
 5        Q.   Can you give me some details?
 6        A.   That it was about time that (speaks
 7   Spanish) went.  Excuse my language.  So what it means
 8   in English, "It's about time that piece of S went."
 9        Q.   Okay.  And who said that?
10        A.   A few guys.
11        Q.   Did Carlos Herrera say that?
12        A.   Well, they were saying it towards him.
13        Q.   Towards Carlos?
14        A.   Yes, ma'am.
15        Q.   But you never heard Carlos say that?
16        A.   Well, he was the one that called it.
17        Q.   How do you know he was the one that called
18   it?
19        A.   Because the order came out from the hole.
20        Q.   How do you know that he's the one who
21   issued the order from the hole?
22        A.   Because I was right there when it was going
23   on.
24        Q.   And what did you see or what did you hear
25   when it was going on?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    I seen paperwork being passed around.   And

2    he told me, "Get on your phone, call your people,

3    because we're about to go on lockdown."

4        Q.    Who said that?

5        A.    Carlos Herrera.

6        Q.    What paperwork did you see?

7        A.    It was some paperwork on Javier Molina,

8    something about a burglary and Jesse Sosa, something

9    about the cop, related to heroin, was going to book

10    him on a PV.

11        Q.    Did you read it?

12        A.    Yes, ma'am.

13        Q.    Who all read it?

14        A.    Pretty much everybody Carlos thought was

15    important to see it.

16        Q.    Do you know who brought the paperwork in?

17        A.    It had already been there.   It had already

18    been there, old set of paperwork, and then a new set

19    of paperwork came with Archie and "Marijuano," and

20    they pushed the issue when they were in orientation

21    to do it.

22        Q.    And when did that happen?

23        A.    Around -- it happened within hours.   They

24    arrived, and it happened within a day; maybe at most,

25    two days, if that.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   I'm going to break this up a little bit.
 2   So you said there was old paperwork?
 3        A.   Yes, they were extorting the guy for drugs.
 4        Q.   Say that again.
 5        A.   They were extorting him for drugs.
 6        Q.   Okay.  Tell me about -- when did the old
 7   paperwork come down?
 8        A.   Been there for two years.
 9        Q.   Do you know who brought that paperwork?
10        A.   No.
11        Q.   And you said they were extorting him for
12   drugs.  Who they were extorting for drugs?
13        A.   Molina.
14        Q.   Molina.  And what was in that paperwork
15   that led you to believe they were extorting him for
16   drugs?
17        A.   Him ratting on Jesse Sosa, he spoke to the
18   cops.  See, in the SNM, we have a no-talk policy to
19   police officers.  Basic -- a basic sentence, even if
20   you're not ratting, you're helping an agent with his
21   investigation.  That's still talking.
22        Q.   You know what, do me a favor, if you don't
23   mind.  I think what's happening is you're getting
24   just a little bit close --
25        A.   Sorry about that.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        Q.   No, that's okay.  It gets a little muffled

2   when you're too close to it.

3             So, can you repeat that?  I'm sorry?

4        A.   There is a no-talk policy to cops.  And the

5   way he did, he said, This is where Jesse Sosa was,

6   the last time I seen him, and that was about it.

7        Q.   Okay.  And so that paperwork, I guess, no

8   one ever acted on it?

9        A.   Well, it was because he was hitting drugs,

10  and they seen they can extort him.  But once "Pup"

11  got locked up, "Pup" brought it to the

12  administration, stating:  If you let me out, I'll put

13  a stop to all hits, all green lights.  And when that

14  didn't happen, he sent the order out to "Lazy" to

15  handle it.  And "Lazy" was getting too lazy to --

16       Q.   To handle it?

17       A.   Yes.  And he was getting pressure by all

18  sides saying, Hey, you're on the tabla, you got to

19  handle this.

20       Q.   And that was with the old paperwork or the

21  new paperwork?

22       A.   The new paperwork.

23       Q.   Okay.  I'm going to go back.  Let's stay on

24  the old paperwork for a while, if that's okay with

25  you.  We'll get to the new paperwork.  But I'm still

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

 1    a little confused.  With the old paperwork --

 2        A.   It's the same paperwork.

 3        Q.   Okay.  So that paperwork came down two

 4    years previously?

 5            MR. CASTELLANO:  Your Honor, I object to

 6    relevance at this point.  We're not talking about the

 7    recordings, or how the recordings took place.

 8            THE COURT:  What's the relevance of this to

 9    the suppression motion?

10            MS. BHALLA:  Your Honor, I think what we're

11    trying to establish is -- part of what we're trying

12    to establish is what information was provided before

13    they went in to do the recordings, and what

14    information they were trying to obtain, and what

15    lengths -- what methods they would use to obtain that

16    information.  And I think that one of the things that

17    may be relevant for the Court is how much that

18    information is consistent and how much that

19    information is inconsistent.

20            THE COURT:  Well, isn't the real focus here

21    on how voluntary or involuntary the statements that

22    Mr. Herrera and Mr. Perez gave?  It seems to me going

23    back up that way is getting us focused on things

24    that's not terribly important.

25            MS. BHALLA:  I would say, Your Honor, that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   what he knew is relevant to what he was able -- or
 2   what tools he would need to utilize to gather more
 3   information.  So, for example, if he didn't have a
 4   lot of information prior to this, he may be more
 5   inclined to use more severe methods to get the
 6   information that was promised.  And how that
 7   information differs, when he's next to Carlos, or
 8   when he's next to Rudy, versus his original
 9   knowledge, I think can show -- give the Court some
10   indication of what these informants were doing in
11   order to extract information.
12           THE COURT:  Well, I'll give you a little
13   leeway, but not much here, because I think we're
14   going too much up the Government's food chain.  We
15   need to be looking more at what Mr. Herrera and Mr.
16   Perez were thinking and doing.
17           MS. BHALLA:  Okay.  I understand, Your
18   Honor.  I'll try to wrap this up.
19       Q.   I want to go back to -- so let me make sure
20   I understand this correctly, okay.  The old paperwork
21   was the same paperwork as the new paperwork?
22       A.   To my knowledge, yes.  And when the new
23   paperwork got there, it got there with two different
24   individuals that pushed the issue for him to be hit.
25       Q.   Tell me a little bit more about that.
```

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   They just said:  Here it is.  What's taking

 2   so long, "Lazy"?  You've got the order to handle

 3   this.  Why haven't you handled this?  So "Lazy" went

 4   on and passed the order for him to get hit.

 5        Q.   Who did he pass the order to?

 6        A.   "Dan Dan" Sanchez -- they all agreed.  "Dan

 7   Dan" Sanchez, Carlos Herrera, Juan Mendez, "Big

 8   Shadow" and "BB" were all in the tabla.  And that's

 9   what happened.  They pushed the issue for him to get

10   hit.

11        Q.   Who brought the paperwork down?  I think

12   you already answered that, and I'm sorry.

13        A.   Archie and "Marijuano."

14             MR. CASTELLANO:  Same objection, Your

15   Honor.

16             MS. BHALLA:  I'm moving on.

17        Q.   You testified earlier that you first began

18   meeting, or the first meeting that you had with Agent

19   Acee was in January; is that correct?

20        A.   Yes, ma'am.

21        Q.   And how long had you been in custody at

22   that point?

23        A.   About a year and three months.  A year and

24   two months -- a year and a month.

25        Q.   So you'd been in custody a year and a half?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   A year and a month.
 2        Q.   A year and a month, sorry.  So you'd been
 3   in custody a year and a month the first time you met
 4   with Agent Acee?
 5        A.   Yes, ma'am.
 6        Q.   And am I right that STIU brought you in to
 7   meet with Acee?  Who brought you in to meet with
 8   Acee?
 9        A.   STIU Gerardo.
10        Q.   Who did you say?
11        A.   STIU Gerardo at MDC county jail.
12        Q.   Okay.
13        A.   That's in Albuquerque, New Mexico.
14        Q.   And do you remember if any other officers
15   were present?
16        A.   I don't remember.
17        Q.   Okay.  Do you remember how many people were
18   in the room?
19        A.   All I know is there was two agents with
20   Bryan Acee, and that was it.
21        Q.   Okay.  Do you know if they were male or
22   female?
23        A.   They were all male.
24        Q.   Did you give Agent Acee any information at
25   that initial meeting, the very first one?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I told him what I could do for him on the
 2   Molina murder.  And what I was willing to do for him
 3   was work for him and get wiretaps on murders.  If I
 4   can get people talking about old murders, new
 5   murders, whatever, just murders.
 6        Q.   Okay.  So you didn't tell him that you were
 7   going to tie Carlos Herrera and Rudy Perez into the
 8   Molina homicide?
 9        A.   Yes, I did.
10        Q.   Okay.  And how exactly did you tell him
11   that?
12        A.   I told him there is two people that still
13   haven't been convicted on that murder.
14        Q.   Okay.
15        A.   And he asked me who, and I told him.
16        Q.   Did you give him any other names?
17        A.   At that time, no, ma'am.
18        Q.   Okay.  And when did you meet with him
19   again?
20        A.   Approximately two days later.
21        Q.   And still at MDC?
22        A.   Yes, ma'am.
23        Q.   Okay.  And what happened at that meeting?
24        A.   I told him what I could do for him.  And he
25   explained to me more or less the policies of the FBI.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    He said that they don't give me drugs to give people.

 2    They don't want lies.  They don't want -- what they

 3    want is the truth.  They don't create perjury, or

 4    none of that, so they want the truth.  If I can't get

 5    them the truth on murders, then there is no reason

 6    for him to work with me.

 7        Q.   So did Agent Acee specifically tell you he

 8    wasn't going to give you drugs?

 9        A.   Yes, he explained the policies.  He said

10    the FBI don't give people drugs to go do things with

11    drugs.  They don't -- ran me down the policies -- if

12    you're going to work, this is how it has to be.

13        Q.   Okay.  Did you tell Agent Acee that you

14    wanted drugs?  What prompted him to give you that --

15    to tell you that?

16        A.   Probably just running me down the policies.

17    That way, I wouldn't do something that would

18    jeopardize his case.

19        Q.   Okay.  What was your agreement?  If you

20    provided the information, what were you going to get

21    out of it?

22        A.   Immunity to anything that I had ties with

23    the SNM.

24        Q.   So you didn't want a reduction in sentence?

25        A.   I'm not asking for nothing.

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                       FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   You didn't ask him for a single thing?

 2          A.   No, ma'am.

 3          Q.   Okay.  You testified previously that you

 4     were next to Rudy Perez first?

 5          A.   Yes, ma'am.

 6          Q.   And then you got moved next to Carlos

 7     Herrera afterwards?

 8          A.   Yes, ma'am.

 9          Q.   So you weren't next to them at the same

10     time?

11          A.   No, ma'am.

12          Q.   Did you meet with Agent Acee again after

13     that second meeting, after he gave the instructions?

14          A.   After he gave me the instructions?  What do

15     you mean?  Clarify that question.

16          Q.   Well, we talked about the first meeting and

17     the second meeting.  And the second meeting you

18     indicated that he sort of told you what the rules

19     were, if you will.  Is that fair to say?

20          A.   I passed on the recordings to an STIU

21     officer, and he gave it back to Bryan Acee.

22          Q.   How many times did you meet with Agent Acee

23     before you were given the recorder?

24          A.   One time.

25          Q.   So you only met with him one time prior to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   getting the recorder?
 2        A.   Yes, ma'am.
 3        Q.   Was it a wire, or was it like a little
 4   hand-held recorder?
 5        A.   It was a hand-held little box that you turn
 6   off and on, had AAA batteries.
 7        Q.   Okay.  When you were placed next to Carlos,
 8   did anyone ever search your cell?
 9        A.   Yes, ma'am -- no, not Carlos.  When, yes,
10   the STIU went in there, they acted like they searched
11   my cell, and they left a recording device.
12        Q.   Explain to me how you got the recording
13   device?
14        A.   That was with Perez.  Cupit, STIU Cupit,
15   went into my cell, acted like he was searching it.
16   He left the recording device for me.
17        Q.   Okay.  So you got two separate recording
18   devices for each -- one for Rudy Perez, one for
19   Carlos Herrera?
20        A.   From my recollection, it was two different
21   times, yes.
22        Q.   Okay.  So the first time was for Rudy
23   Perez?
24        A.   Yes, ma'am.
25        Q.   Okay.  And I will probably let Mr. Villa
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    ask you about that, okay?  I'm going to ask you about

2    the recording device that you were given with Carlos,

3    okay?  When were you given the recording device for

4    Carlos?

5          A.   The same day I arrived to the South.

6          Q.   The same day you arrived to South, okay.

7    And how did you get the recording device then?  Is

8    that when Cupit gave it to you?

9          A.   Cupit gave it to me then.

10         Q.   And it was under the guise of a cell

11   search?

12         A.   No, ma'am.  He gave it to me when I was

13   entering into the cell.

14         Q.   Okay.  So he just handed it to you?

15         A.   Yes, ma'am.

16         Q.   Where were you?

17         A.   I was coming back from, I believe, court at

18   that time.

19         Q.   So did he give it to you on the van?

20         A.   Yes, ma'am.  When he was strip searching

21   me, he gave it to me.  And I took it back with me to

22   the unit.

23         Q.   Okay.  And did any of the correctional

24   officers know that you had it?

25         A.   No, ma'am.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Who knew that you had it besides Acee and

2    Cupit?

3        A.    Nobody.

4        Q.    And how long did you have it?

5        A.    About two or three weeks.

6        Q.    Okay.  And how many times do you think that

7    you recorded Carlos?

8        A.    Probably about seven, eight times, if not

9    more.

10       Q.    Seven or eight times?

11       A.    That's a lot.

12       Q.    Over the course of, you said, two weeks?

13       A.    Yes, ma'am, about two or three weeks.

14       Q.    Two or three weeks?

15       A.    From my recollection.

16       Q.    During the time that you had the recorder

17   in your cell, with Carlos next to you, did anybody

18   ever -- did you ever turn the recording device in

19   periodically, or did you have --

20       A.    No, ma'am.  I had it the whole time.

21       Q.    Okay.  And during the time that you were

22   next to Carlos, did anyone search your cell?

23       A.    Yes, ma'am.

24       Q.    Who searched your cell?

25       A.    By that time STIU had already came and

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                             1-800-669-9492
                                                             e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    picked up the recording device on "Lazy," you get
 2    what I'm saying?
 3         Q.   Yes.
 4         A.   And they'd given me a second recording
 5    device.  We had switched it out through the trays.
 6         Q.   Through the food trays?
 7         A.   Yes, ma'am.  Then after that, they came and
 8    they searched, the other COs, and they found the
 9    second recording device I had for "Lazy."  At that
10    time they transported me out of there.
11         Q.   Okay.  So during the time that you had the
12    first recording device, no one searched your cell?
13         A.   No, ma'am.
14         Q.   And no one came to check it?
15         A.   No, ma'am.
16         Q.   And you didn't have any conversations with
17    Acee?
18         A.   No, ma'am.
19         Q.   And you didn't have any conversations with
20    Cupit, or anybody from STIU?
21         A.   No, ma'am.
22         Q.   Okay.  And then you got a second device
23    while you were still next to Carlos?
24         A.   Yes, ma'am.
25         Q.   And was that device the same, or was it
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   different?
 2        A.   More or less the same.  It had AAA
 3   batteries, and it had an on and off button.
 4        Q.   Did you look to see if there was date on
 5   it?
 6        A.   No, ma'am.  It was just all silver.
 7        Q.   Silver.  Did it have a digital display?
 8             MR. CASTELLANO:  Objection, Your Honor.
 9   May I ask that the witness not answer questions
10   related to the device itself.
11             THE COURT:  Well --
12             MR. BECK:  Your Honor, if I may, I think we
13   may tread lightly.  I think his answer, I expect,
14   will be the same as what we heard from Special Agent
15   Williamson.
16             THE COURT:  I'm not sure I heard the answer
17   to this.
18             MR. BECK:  I think I elicited that
19   testimony with Special Agent Williamson.
20             THE COURT:  Okay.  All right.  Why don't we
21   take these one at a time, so we -- if we do this:  Is
22   there any objection to this specific question?
23             MR. BECK:  There is not, Your Honor.
24             THE COURT:  Answer this question.  Then
25   we'll take them one at a time.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    To my recollection, I can't remember.

2        Q.    Okay.  So how did you know it was

3    recording?

4        A.    Because when you hit the switch, the light

5    would beep, and then you would wait for it to go off.

6    The light would go red, then you wait for it to go

7    off, then you would start recording.  And when things

8    were being said, the light, it will go off and on.

9    So you knew when things were being said.  That's how

10   you knew, I could hear them, you know what I'm

11   saying?

12       Q.    Did it make an actual noise?

13       A.    To my recollection, kind of like a little

14   hmmmm, kind of thing, but real dim.

15       Q.    Like the noise of a motor?

16       A.    Like a recorder, like when you're hearing a

17   recorder on.  And when someone would speak, the light

18   would flash so you knew that it was catching what

19   they were saying.

20       Q.    So the light would flash, but it wasn't

21   making a noise with the flashing?

22       A.    No.

23       Q.    Okay.  And the times that you were talking

24   to Carlos, did you notice that the light was

25   flashing?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                              1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                         e-mail: info@litsupport.com

```
 1          A.   Yes, ma'am.

 2          Q.   Okay.  So you're pretty confident that the

 3    conversations were recorded?

 4          A.   Yes, ma'am.

 5          Q.   And were you pretty close to him in

 6    terms -- you guys were communicating through the

 7    vent?

 8          A.   Yes, ma'am.

 9          Q.   So did you hold the recording device right

10    up to the vent?

11          A.   Yes, ma'am.

12          Q.   And could you understand everything that

13    Carlos was saying?

14          A.   Yes, ma'am.

15          Q.   And you felt that it was easy to

16    understand?

17          A.   Yes, ma'am.

18          Q.   Okay.  And tell me again how you got the

19    second device.

20          A.   I got the second device through the food

21    tray.

22          Q.   Through the food tray?

23          A.   Yes.

24          Q.   And did you -- was it sort of a

25    simultaneous exchange --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, ma'am.

 2        Q.   -- the first device?

 3        A.   They gave me the first, they gave me the

 4   second.

 5        Q.   On the same food tray?

 6        A.   Through different food trays.

 7        Q.   Okay.  On the same day?

 8        A.   Yes, ma'am.

 9        Q.   At the same time?

10        A.   Not at the same time.  Different times.

11        Q.   So when did you -- when did you give the

12   first device?

13        A.   I gave it to them for lunch.  And then I

14   had food trays, because they were serving us

15   styrofoam because we were on lockdown because of an

16   escape.  And a second one came when they came back

17   down for a trash run; that's when they gave me back a

18   second device.

19        Q.   And how long was the trash run after lunch?

20        A.   Probably about 20 minutes.

21        Q.   Twenty minutes.  How did you know to give

22   the device through the food tray?

23        A.   Because he signaled me.

24        Q.   How did you know what the signal would be?

25        A.   I gave him a thumbs up that I had what he
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    needed on the recorder.  And he said, "All right.

2    The tray" -- pointed at the tray.

3         Q.   And who was that?

4         A.   That was "C Boy" from STIU.  "C Boy,"

5    that's all I know him by.

6         Q.   "C Boy"?

7         A.   Yes.

8         Q.   You don't know his real name?

9         A.   No, ma'am.

10        Q.   How did you know -- how did "C Boy" know

11   that that was the signal?

12        A.   Common sense.

13        Q.   Well, you had to know that "C Boy" was the

14   one who was going to take the recording, right?

15        A.   When you go, like I was doing something, I

16   was looking for every little signal, you know what

17   I'm saying?  I'm in a tense environment.

18        Q.   So you never met with "C Boy" ahead of

19   time?

20        A.   I'm not understanding your question.

21        Q.   Well, what I'm trying to ask you is:  You

22   communicated with "C Boy" in a quiet fashion?

23        A.   I gave him a thumbs, and he tells me, "The

24   tray."

25        Q.   Okay.

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   Him and Cupit had came to pass out trays,

2   STIU Cupit.  So when I gave him the thumbs up, he

3   pointed to the tray at my window, giving it to me

4   through the food port.

5      Q.   Was "C Boy" a corrections officer, or --

6      A.   STIU officer.

7      Q.   Okay.  And you recognized him as an STIU

8   officer?

9      A.   Yes.

10      Q.   And did you meet with "C Boy" at the same

11   time that you met with Acee?

12      A.   Yes, ma'am.  He was in the room with us as

13   well.

14      Q.   Okay.  Do you remember what other STIU

15   officers were in the room?

16      A.   Cupit, Sapien, just STIU.

17      Q.   Okay.  You don't -- okay.  When you were

18   given the second device through the trash tray, was

19   it basically the same as the first device, or was it

20   different?

21      A.   More or less, but a little bit bigger.

22      Q.   A little bit bigger?

23      A.   Yes, ma'am.

24      Q.   Did it function the same way?

25      A.   Yes, ma'am.

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                       201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1       Q.   Okay.  With the light and the hum?

 2       A.   Yes, ma'am.

 3       Q.   And you felt confident with that device

 4  that it was recording everything that you guys were

 5  talking about?

 6       A.   Yes, ma'am.

 7       Q.   And the same thing with the second device,

 8  you were close to the vent?

 9       A.   The second device, I never recorded

10  nothing.

11       Q.   Oh, you never recorded anything on the

12  second device?

13       A.   No, ma'am.

14       Q.   Why is that?

15       A.   Because the next day they shook down.  And

16  I couldn't get Carlos to say anything else.

17       Q.   When you say, "the next day they shook

18  down," did the correction officers toss your cell?

19       A.   Yes, ma'am.  They came and shook down the

20  whole unit.

21       Q.   Okay.  And they found the recording device

22  at that time?

23       A.   Yes.

24       Q.   And what did they say to you when they

25  found it?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                        1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1        A.    "What is this?"
 2        Q.    And what did you say?
 3        A.    "I don't know."
 4        Q.    Did they write you up for it?
 5        A.    No, ma'am.  I told them it was a battery
 6   pack.  By then, they took me to the front, and pretty
 7   much, the STIU had came down and told me, "This is
 8   what it is."
 9        Q.    So they intervened on your behalf?
10        A.    More or less, yes, ma'am.
11        Q.    Okay.  So you never got a sanction for
12   that?
13        A.    No, ma'am.
14        Q.    Okay.  And after that, where did you go?
15        A.    I went, I believe, to MDC county.
16        Q.    Okay.  And how long did you stay there?
17        A.    About two months.
18        Q.    About two months.  Okay.  And what happened
19   after that?
20        A.    I went -- I was sentenced, and I came back
21   to prison.  And I went back to PNM North.
22        Q.    Did you ever get put in the cooperator pod?
23        A.    What do you mean?
24        Q.    Well, are you aware of who the other
25   government informants are in this case?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.    More or less.

2      Q.    Okay.  Were you placed in the same similar

3  pod as those guys?

4      A.    Yes, ma'am.

5      Q.    Okay.  When you were recording Carlos, did

6  he ever say he authorized the hit?

7      A.    I got him to admit to it indirectly.

8      Q.    Okay.  I'm asking you a pretty specific

9  question here.

10     A.    Yes, he admitted.

11     Q.    Okay.  So Carlos said to you:  I authorized

12 the Molina hit?

13     A.    Yes.

14     Q.    Okay.  How many times did he say that?

15     A.    What he said is, "Rats, fools that rat need

16 to go.  And that's what we're all agreeing on the

17 tabla."  He was talking to me about the tabla, how

18 everybody is on the same page with the tabla.

19     Q.    Did he use the word "Javier Molina" in that

20 sentence?

21     A.    I was telling him about Javier Molina.

22     Q.    How many times has Javier Molina been

23 suspected as a rat?

24     A.    To my recollection, just that once.

25     Q.    Just that one time?  There were no other

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    times?

2         A.   Not that I know of, Miss.

3         Q.   How many SNM homicides have been related to

4    ratting?

5         A.   Ratting, numerous.

6         Q.   Numerous.  And did Carlos Herrera ever take

7    responsibility for those hits?

8         A.   From my recollection, I know he cooperated

9    one other.

10        Q.   Okay.  And which one was that?

11        A.   "Bobaloo," Bobbie Ortega in Hobbs.

12        Q.   Did you talk to him about that homicide

13   while you were in the cell next to him?

14        A.   No, ma'am.  I never got that on the

15   recorder, I believe.

16        Q.   Okay.  Did you get any other admissions on

17   the recorder?

18        A.   Explain yourself.

19        Q.   From Carlos Herrera, about the Molina

20   homicide?

21        A.   I'm still not understanding.

22        Q.   Well, you said that Carlos took

23   responsibility for the Molina homicide by talking

24   about taking care of rats; is that correct?

25        A.   Yes, ma'am.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                           1-800-669-9492
                                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   And being on the tabla; is that correct?

2      A.   Yes, ma'am.

3      Q.   Did he make any other statements?

4      A.   To my knowledge, just explaining the rules

5  of the onda, what he felt the policy should be, what

6  him and the tabla thought how everything should be

7  ran, and how other members should be X'd out for

8  messing up, other high ranking members.  That was it.

9      Q.   Is it fair to characterize that as

10 political talk?

11     A.   Yeah, it is political talk.

12     Q.   Okay.

13     A.   That's how things get done, Miss.  It's

14 politics, politic in onda, whether it's right or

15 wrong, what that tabla says, it goes.  That's why I'm

16 here today doing what I'm doing, you know what I'm

17 saying?

18     Q.   What was your role in the SNM?

19     A.   I was a soldier.

20     Q.   Okay.  And what does that mean?

21     A.   I did whatever the SNM asked me to do.

22     Q.   Did you ever take any part in the decision

23 making?

24     A.   No, ma'am.  I wasn't that high up.

25     Q.   Okay.  Were you ever able to get Suboxone

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                          1-800-669-9492
                                              e-mail: info@litsupport.com



```
 1    when you were in custody?
 2         A.    No, ma'am.
 3         Q.    Never, not once?
 4         A.    No, ma'am.
 5         Q.    What about other drugs?
 6         A.    What do you mean in custody?
 7         Q.    Did you ever have or use drugs as an inmate
 8    in custody?
 9         A.    Yes, ma'am.
10         Q.    Okay.   When?
11         A.    All the time.
12         Q.    All the time?
13         A.    Yes, ma'am.
14         Q.    How did you get them?
15         A.    Got them from visits, mostly through
16    visits.
17         Q.    Who would bring them to you?
18         A.    Well, other people would hit -- we call
19    them mules, so they would use them to hit their
20    drugs, and then we just do -- just get our cut.
21         Q.    Did you have anyone that brought it in for
22    you in visits?
23         A.    Yeah.
24         Q.    Who brought it in for you?
25         A.    Different people, "Baby G," Antoine Gomez.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1     But mostly it was for -- that was it.  And I would
2     use, like, from Carlos Herrera, he would hit a lot of
3     drugs.  I would use from him.  I would just mostly
4     get a cut from other big time, what we call carnals,
5     brothers, that would hit.  And I would get a cut.
6     They'd send me an issue once in a while, you know
7     what I mean?
8          Q.   Why did you get a cut?  Why were you
9     getting it?
10         A.   Because I was a soldier.
11         Q.   Okay.  And so that was sort of payment?
12         A.   Well, it's in the family.  Most carnals get
13    an issue from what's going in.
14         Q.   Okay.  Were you getting drugs in custody
15    when you were at MDC?
16         A.   No, ma'am.
17         Q.   You never got any drugs while you were in
18    custody at MDC?
19         A.   No, ma'am.
20         Q.   When you were next to Carlos, did you ever
21    get any drugs when you were in custody then?
22         A.   No, ma'am.
23         Q.   Did you ever get written up while you were
24    in custody for having drugs?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Did you ever get written up while you were

2   in custody for providing dirty UAs?

3        A.    Yes, ma'am.

4        Q.    Do you know when that happened?

5        A.    Yes, ma'am.

6        Q.    When?

7        A.    It happened -- I believe one happened back

8   in 2012 -- no, no, no -- yeah, 2012 -- I had one for

9   possession of doing dangerous drugs, and another for

10   dirty urine.  And then, in 2016, I believe I had one

11   for dirty urine, for pills.  And then recently

12   something came through the mail, but the STIU looked

13   into it and looked into it, and they just seen --

14   they don't know what it was.

15        Q.    Say that again.  They didn't see what it

16   was?

17        A.    They don't know who sent it or how it got

18   sent.  It had a return address.  And I never get mail

19   where I'm at.  So they checked the mail logs.  They

20   checked the phone call history.  And they see that I

21   don't ever make a phone call longer than five, 10

22   minutes.  And I never talk about no drugs.

23        Q.    You never talked about drugs on any of your

24   jail calls?

25        A.    No, ma'am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Not once?  Not ever?

 2        A.   No, ma'am.

 3        Q.   Okay.  I'm going to show you a disciplinary

 4   log that we got for you, that I think is going to

 5   detail some of your use or possession or UA history.

 6   Do you mind -- I'm going to put it right up here.

 7   Can you see that on your screen there?  Can everybody

 8   else see it?

 9        A.   Yes, ma'am.

10        Q.   Is that your name at the top left corner?

11        A.   Yes, ma'am.

12        Q.   And does that look like it's an accurate

13   representation of your disciplinary history?

14        A.   Yes, ma'am.

15        Q.   Is anything missing?

16        A.   No, ma'am.

17        Q.   Okay.

18        A.   Yes, ma'am.  Something missing in the mail,

19   like I said, and they investigated it.  And like I

20   said, they went back, they checked all my phone logs,

21   because I'm way on the other side of the state.  I

22   never talked about drugs.  They checked my mail logs.

23   I never get mail.  Once a month, that's it.

24        Q.   You just said they recently investigated

25   your mail.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, ma'am.

 2        Q.   Why did they investigate it?

 3        A.   Because something suspicious had came

 4   through the mail.  And they looked into it, and they

 5   said that they were going to investigate it.  And

 6   they did.  And they seen that.  It looked suspicious.

 7        Q.   What about it looked suspicious?

 8        A.   It looked like someone was sending me

 9   something that wasn't -- you know what I mean -- that

10   I wasn't supposed to get, you know what I'm saying?

11   In other words, they sent me something like, saying I

12   was --

13        Q.   Contraband?

14        A.   Yes, ma'am.

15        Q.   What kind of contraband?

16        A.   I don't know.  They just said they were

17   investigating it.  They never told me.  They never

18   got back to me.

19        Q.   And this was in 2017?

20        A.   Yes.

21        Q.   Did you get disciplined for it?

22        A.   No, ma'am.

23        Q.   And you don't know what the contraband was?

24        A.   No, ma'am, because it was through the mail.

25   And it was never in my possession.  And they went
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    back, they checked my phone logs.  I was never
 2    talking about drugs.  They checked my mail, my mail
 3    logs.  They seen that I never got mail like that
 4    before.  So the facility checked into it.
 5         Q.    Earlier, you talked about how after the
 6    Molina homicide you guys got put down because there
 7    was an investigation pending, right?
 8         A.    Yes, ma'am.
 9         Q.    Did you ever go to a hearing on that issue?
10    Did they ever present you with any evidence that you
11    were involved in the investigation?
12         A.    This is what it was, Miss.  They gave us a
13    hearing, and they had us sign a paper saying that we
14    were under Internal Level 6 investigation, because
15    they didn't know if there was more people that were
16    going to get murdered.
17         Q.    Okay.  And did they do anything like in
18    2017, when contraband was sent to you at the jail,
19    that you never received?
20         A.    Well, what they did is they came, and they
21    notified me, and they said, "This is going to be
22    investigated, and if we find out that you had
23    something to do with this, you're going to get a
24    disciplinary action."  So they went back and they
25    investigated it, and they said, "There is nothing
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    there."

2         Q.   Who said they were going to investigate it?

3    STIU, or --

4         A.   No, the director of the program where I'm

5    at.

6         Q.   Who is that?

7         A.   Hastings.

8         Q.   Hastings?

9         A.   Yes, ma'am.

10             MS. BHALLA:  Your Honor, I'm going to go

11   ahead and move this into evidence.  And I need to get

12   an exhibit sticker, if you can just excuse me.

13             THE COURT:  All right.

14             MS. BHALLA:  Your Honor, at this time, I'm

15   going to move into evidence Exhibit CH-B.  I do have

16   a clean copy which I can provide.  I'm sorry that I

17   wrote on this when I wasn't supposed to.

18             THE COURT:  Any objection, Mr. Castellano?

19             MR. CASTELLANO:  May have a look at it,

20   Your Honor?  I don't believe I have an objection.

21             No objection, Your Honor.

22             THE COURT:  Anybody else have an objection?

23   Not hearing any, Carlos Herrera's Exhibit B will be

24   admitted into evidence.

25             MS. BHALLA:  Thank you, Your Honor.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Mr. Herrera, how often did you use drugs
 2   when you were in custody?  Daily?  Weekly?  Monthly?
 3   Give me an approximation.
 4        A.   Depends when we had it.  Sometimes we had
 5   it, sometimes we didn't.  It just depends the way the
 6   environment was going.  Sometimes we had access to
 7   visits.  Most times we didn't have access to the
 8   visits.  It just depends on what was going on at the
 9   time.  So, yeah, there was time where six months we
10   wouldn't have nothing, and then there was a time
11   where we went six months we did have something.
12        Q.   And when you did have it, how often would
13   you use it?
14        A.   Every day.
15        Q.   Multiple times a day?
16        A.   Yes, ma'am.
17        Q.   Did you ever talk to Agent Acee about that?
18        A.   Yes, ma'am.
19        Q.   About the fact that you used drugs?
20        A.   Yes, ma'am.
21        Q.   When did you have that conversation with
22   him?
23        A.   Well, he let me know that he didn't want me
24   doing that no more, you know what I mean?
25        Q.   When did he let you know that?
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949          BEAN                                       (505) 843-9494
FAX (505) 843-9492      & ASSOCIATES, Inc.            FAX (505) 843-9492
                                                              1-800-669-9492
                        PROFESSIONAL COURT          e-mail: info@litsupport.com
                        REPORTING SERVICE

1     A.   He wanted me to clean up and get my life

2   right.   If I'm going to be -- he wanted me to do good

3   for myself.

4     Q.   When did he tell you that?

5     A.   When we first met, he explained to me,

6   like, Look, I want you to do good.

7     Q.   Did you tell him about your drug problem

8   then?

9     A.   Yes, ma'am.

10     Q.   So the first time you met with Agent Acee,

11   you talked to him about the fact that you were a drug

12   addict?

13     A.   No.   We didn't talk about drug addict, but

14   I think he more or less knew, you know what I mean?

15     Q.   How did he more or less know?   What did you

16   tell him?

17     A.   I didn't tell him nothing.   I just told him

18   we get drugs, we use drugs, we're all drug addicts.

19   He didn't sit down and talk to me:   Do you have a

20   drug problem, you know what I mean?   I told him

21   straight up:   That's what we do, we extort drugs, we

22   use drugs and we sell drugs.

23     Q.   Okay.   And I get that it wasn't a

24   counseling session.   I'm not trying to imply that it

25   was.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.    That's why I'm getting confused at.

2      Q.    What I'm asking you is what information you

3   told him about your drug use at the meeting?

4      A.    Yeah.  I told him that that's what we are,

5   basically, mostly drug addicts; that's what we kill

6   for.  That's basically what we stand for, drugs and

7   money.

8      Q.    Okay.  Did you ever sign an agreement with

9   the government, a formal agreement about your

10  cooperation?

11     A.    Just a Kastigar letter.  That was it.

12     Q.    When did you receive that?

13     A.    When they first got me an attorney.

14     Q.    And when was that?

15     A.    Back in, I would say, May.

16     Q.    Of 2017 or 2016?

17     A.    May of 2016, 2017; something like that.

18     Q.    So after you did the recordings is when you

19  got the Kastigar letter?

20     A.    Yes, ma'am.

21     Q.    Did you receive any payments for your

22  services?

23     A.    I got like 50 bucks a month, so like,

24  living expenses, just so I could have for myself, you

25  know what I mean?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                      e-mail: info@litsupport.com

```
 1        Q.    When did you start getting those?

 2        A.    Probably like -- I want to say, like, 2016,

 3   July, or something, or --

 4        Q.    After the recordings or before the

 5   recordings?

 6        A.    After.

 7        Q.    Okay.  And did any of that money go to your

 8   wife, Crystal?

 9        A.    No, ma'am.

10        Q.    Okay.  And did you ever talk to Crystal

11   about your cooperation?

12        A.    Yes, ma'am.

13        Q.    Okay.  And did you talk to her over the

14   phone about that?

15        A.    Yes, ma'am.

16        Q.    Do you know whether or not Agent Acee ever

17   talked to Crystal about your cooperation?

18        A.    No, ma'am.

19        Q.    Do you know if Crystal ever talked to Agent

20   Acee?

21        A.    Yes, ma'am.

22        Q.    And when did that happen?

23        A.    When she was in fear for her life.

24        Q.    And when was that?

25        A.    Probably around -- she just wanted to know
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    if she had help, you know what I mean, if someone
 2    went and tried to hurt her, back like around the same
 3    time July, August.
 4         Q.   After the recording?
 5         A.   Yes, ma'am.
 6         Q.   Did Crystal talk to you about that?
 7         A.   Yes, ma'am.
 8         Q.   After you were finished with the recording
 9    devices, and after you got moved out, did you meet
10    with Agent Acee after that?
11         A.   What do you mean?
12         Q.   Well, after you -- after you got passed the
13    second recording device through the food tray, right,
14    shortly thereafter, you were moved to another
15    facility?
16         A.   We met with my lawyer.
17         Q.   So what I'm trying to ask -- you didn't
18    meet with Agent Acee for -- until you got a lawyer?
19         A.   Yes, ma'am.
20         Q.   In May of 2016?
21         A.   Yes, ma'am.
22              MR. CASTELLANO:  Your Honor, I'm going to
23    object to this line of questioning.  This is the line
24    of questioning following the recording, so it doesn't
25    have anything to do with the voluntariness of the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   statements.
 2            MS. BHALLA:  Your Honor, if information was
 3   given to Agent Acee in conversations about the
 4   recordings and about the conversations and about what
 5   was going on during this conversations, I do believe
 6   that is relevant.
 7            THE COURT:  Well, I'm getting a little lost
 8   on the timeframe here.  I think we need to maybe
 9   clean that up.
10            But let's don't do it now.  Let's take our
11   afternoon break, let you come back in and establish
12   the timeframe.  I'm getting a little confused as to
13   when you're talking about.
14            All right.  We'll be in recess for about 15
15   minutes.
16            (The Court stood in recess.)
17            THE COURT:  All right.  Let's go on the
18   record.  Make sure everybody has got a lawyer.  I
19   think they do.
20            Mr. Cordova, I'll remind you you're still
21   under oath.
22            THE WITNESS:  Yes, Your Honor.
23            MR. CASTELLANO:  Your Honor, before we
24   proceed, what I'd like to do is just lodge my
25   objection so we avoided every conversation we had
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   with Agent Acee following the recordings.  I mean, if
 2   there are specific questions about people's
 3   vulnerabilities, or something that goes to the
 4   voluntariness of the statement, I understand that's
 5   fair game.  But to get into every conversation
 6   following the recordings, I think we're getting a
 7   little far out there.
 8           THE COURT:  Here's what I'm thinking, Ms.
 9   Bhalla:  I think -- and Mr. Castellano can speak for
10   himself -- I think everybody recognizes you probably
11   have a little bit of right to test the credibility of
12   the witness, you know.  If you think that Mr. Acee is
13   telling him what to say and feeding him stuff then,
14   you know, you get to explore that a little bit.
15           But I agree with Mr. Castellano, I don't
16   think now is the time and place to go through every
17   conversation.  So if you keep it general and do what
18   you've got to do as far as numbers and meetings and
19   stuff like that, I think probably Mr. Castellano
20   would probably agree that's probably fair game.
21           But as far as just a discovery of
22   everything that Mr. Acee and Mr. Cordova talked
23   about, probably not.
24           Can you fit your questions into something
25   that I'm inclined to allow?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. BHALLA:  Yes, Your Honor.  And I'll try
 2    to be more focused in my questions.  I think I got a
 3    little confused about the timeframe as well, which is
 4    why we may have gone so far afield.
 5              THE COURT:  All right.
 6    BY MS. BHALLA:
 7       Q.   Mr. Cordova --
 8              THE COURT:  Hold on just a second.  Who is
 9    on the phone?  I've been a little negligent about
10    making sure I know who is on the phone.  Who is on
11    the phone right now?
12              MS. STRICKLAND:  I'm on the phone.  This is
13    Margaret Strickland.
14              MR. CASTLE:  Jim Castle; I'm on the phone
15    as well.
16              THE COURT:  Ms. Strickland, Mr. Castle.
17              Okay.  Anyone else?  All right.  I'm only
18    hearing two people.  So if somebody has got their
19    mute button on, we're not hearing you.
20              MS. HARBOUR-VALDEZ:  Your Honor, it may be
21    our paralegal, Raquel Rodriguez.
22              THE COURT:  Ms. Rodriguez, are you there?
23              MS. RODRIGUEZ:  I'm here, Your Honor.
24    Thank you.
25              THE COURT:  Okay.  Anybody else.  I've got
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    three people on the phone.  If there is more than

2    three, you've got your mute button on, you haven't

3    entered an appearance?

4              All right.  Ms. Bhalla?

5              MS. BHALLA:  Thank you, Your Honor.

6    BY MS. BHALLA:

7         Q.   After you provided the last recording

8    device to the STIU officer through the food tray, did

9    you meet with Agent Acee after that?

10        A.   Yes, with my lawyer.

11        Q.   Okay.  So when you handed in the last

12   device, is it fair to say that that was in February

13   of 2016?

14        A.   No, it was like in April or May.

15        Q.   When you handed in the last recording

16   device?

17        A.   Around April, I think it was.

18        Q.   For Carlos Herrera?

19        A.   Yes, ma'am.

20        Q.   When were you placed next to Carlos

21   Herrera?  What month?

22        A.   I'm pretty sure it was April, Miss.

23        Q.   Okay.  So you were placed next to Carlos

24   Herrera in April?

25        A.   Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And so for approximately three weeks?

 2        A.   I don't know approximately, but around

 3   there, three weeks, a month.

 4        Q.   Okay.  So maybe not more than a month; is

 5   that fair to say?

 6        A.   Yes, ma'am.

 7        Q.   And so immediately after that -- so if that

 8   was in April, so then it would have been late April,

 9   early May of 2016, when you were through with your

10   recording device with Mr. Herrera?

11        A.   Yes, ma'am.

12        Q.   Okay.  And so then, in May of 2016, you sat

13   back down with Agent Acee and with your attorney?

14        A.   Yes, ma'am.

15        Q.   Okay.  Did you provide information about

16   the recordings or the conversations that you had with

17   Mr. Herrera to Mr. Acee at that time?

18        A.   With my lawyer?

19        Q.   Yes.

20        A.   Yes, ma'am.

21        Q.   Did you talk to him about the statements

22   that you were able to get from Mr. Herrera?

23        A.   At that time, I can't remember.  But I

24   think he said that -- no, I don't think so.  We sat

25   down, talked to my attorney; talked about, like,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  that, yeah.  So I don't think so.  I don't remember,

2  to tell you the truth.

3       Q.   Did you ever talk to Agent Acee about what

4  you got on the recording device when you were next to

5  Carlos Herrera?

6       A.   I told him, "I did my best, and here's what

7  it is."

8       Q.   When did you tell him that?

9       A.   When we were with my lawyer.

10      Q.   Okay.  Do you know whether or not they

11  recorded that conversation with you?

12      A.   I don't know, ma'am; pretty sure, probably,

13  more than likely.

14      Q.   So, in May of 2016, you talked to Agent

15  Acee in a very limited fashion about the information

16  that you received from Mr. Herrera when you were

17  placed next to him?

18      A.   It wasn't information.  What was said, it

19  was more or less:  What I told you I would get, it's

20  on there.

21      Q.   Did you talk to Agent Acee any further

22  about the communications that you had with Mr.

23  Herrera?

24      A.   No, ma'am.

25      Q.   So you've never discussed that issue with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Mr. -- with Agent Acee again?
 2        A.   No, ma'am.
 3        Q.   Okay.  When Mr. Castellano asked you about
 4   a transcript that involved you -- I believe, Dale
 5   Chavez and Carlos Herrera -- do you remember that?
 6        A.   No, what?
 7        Q.   A transcript?
 8        A.   About who asked me?
 9        Q.   Mr. Castellano, the AUSA.
10        A.   I remember him asking him now, yes.
11        Q.   Okay.  I'm going to give you a copy of that
12   transcript, because I have couple of other questions
13   for you about that.  Okay?
14        A.   All right, Miss.
15             MS. BHALLA:  Your Honor, may I approach?
16             THE COURT:  You may.
17        Q.   Is that the same transcript that Mr.
18   Castellano talked to you about?
19        A.   Just now?
20        Q.   Well, on direct examination, before I got
21   up.
22        A.   Yes, ma'am.
23        Q.   Do you see the little numbers at the bottom
24   right of the page?
25        A.   Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Okay.  I'm going to go on the first page,
 2   which is 20999, that's the Bates number, just so you
 3   know where we are.
 4        A.    I don't understand.
 5        Q.    Okay.  I'm just trying to show you --
 6        A.    I understand what you're saying, 0999?
 7        Q.    I just want to make sure we're on the same
 8   page.
 9        A.    Yes, ma'am, we're on the same page.
10        Q.    Okay, good.  So you testified, I believe,
11   that at the time that you were meeting with Carlos
12   Herrera, or the time you were next to him, you'd
13   already been in custody for a year and a month; is
14   that correct?
15        A.    About a year and a couple months.
16        Q.    Okay.  So roundabout.  So a year and a
17   couple months?
18        A.    Yes, ma'am.
19        Q.    So you hadn't been --
20        A.    I was around about a year and a month.
21   Herrera was around a year and a few months.
22        Q.    Okay.  But you had been in custody for a
23   year and a month or a year in two months?
24        A.    A year and a few months.
25        Q.    Okay.  And you testified that this was the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    price for street drugs; is that correct?

2        A.   No.  We were both talking about the price

3    of street drugs, okay?

4        Q.   Okay.

5        A.   And he tells me eight, 10, or 12.  And

6    we're -- I'm talking about buying Suboxone from him.

7        Q.   Okay.  So you were trying to buy from

8    Mr. Chavez?

9        A.   Yes, ma'am.

10       Q.   Okay.  At that time?

11       A.   Yes, ma'am.

12       Q.   Okay.  And is it fair to say that, if you

13   go -- do you see how on the paper there are little

14   blocks -- I should say rectangles -- that contain the

15   text?

16            Here, I think it might be easier if I just

17   put this on the Elmo.  Can you see the screen okay,

18   if I put this up here?

19       A.   Yes, ma'am.

20            THE COURT:  Mr. Castellano?

21            MR. CASTELLANO:  I just recommend that we

22   do that.  There is no jury here, so we don't need to

23   worry about that.

24            MS. BHALLA:  I'm just not used to this yet.

25       Q.   If you look at this line right here -- and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    I believe that's Mr. Chavez speaking; is that

2    correct?  "You still get me for ten?"  Question?

3         A.    Yeah.

4         Q.    Did Mr. Chavez make that statement?

5         A.    Yes, ma'am.

6         Q.    And was that directed at you?

7         A.    Yes, ma'am.

8         Q.    Okay.

9              MS. BHALLA:  Your Honor, if I can just have

10   one moment, I think that I'm probably through.

11             THE COURT:  All right.  Certainly.

12             MS. BHALLA:  Oh, actually, before I do

13   that, Your Honor, I want to move this transcript into

14   evidence.  And I believe that would be CH-C.

15             THE COURT:  Well, I'm not seeing a B.

16             MS. BHALLA:  B is the disciplinary logs,

17   Your Honor.

18             THE COURT:  All right.  So this will be C.

19             Any objection, Mr. Castellano?

20             MR. CASTELLANO:  No, Your Honor.

21             THE COURT:  Anyone else?  Not hearing any

22   objection, Carlos Herrera's Exhibit C will be

23   admitted into evidence.

24             MS. BHALLA:  Okay.  Now, if I can have just

25   a moment, Your Honor, I think I'm almost through.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Certainly.

 2              MS. BHALLA:  Thank you, Your Honor.

 3              I'm going to pass the witness.

 4              THE COURT:  Thank you, Ms. Bhalla.

 5              All right.  Mr. Villa, are you next?

 6              MR. VILLA:  Thank you, Your Honor.

 7              THE COURT:  Mr. Villa.

 8                        EXAMINATION

 9    BY MR. VILLA:

10         Q.   Good afternoon, Mr. Cordova.

11         A.   Good afternoon.

12         Q.   If I understand it correctly, your role in

13    the SNM is a soldier?

14         A.   Yes, sir.

15         Q.   So you do whatever is asked of you by

16    members that are higher up in the SNM?

17         A.   Yes, sir.

18         Q.   Does that include assaulting people?

19         A.   Yes, sir.

20         Q.   And you might have to just get at little

21    bit closer to the mic when you answer, you can scoot

22    your chair up; that way everybody can hear you.

23              So that was a yes?

24         A.   Yes.

25         Q.   When did you become a member of the SNM?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    About 2003.

2          Q.    2003?

3          A.    I was a posfate (phonetic) in 2000, and I

4    became a carnal in 2003.

5          Q.    When you become a carnal, that means you're

6    a member of the SNM, right?

7          A.    Yes, sir.

8          Q.    When you first became a member, did you

9    stay a soldier?

10         A.    Yes, sir.

11         Q.    As part of being a soldier, when there is

12   drugs in the prison, if I understand your testimony

13   correctly, you get to have some of those drugs?

14         A.    Yes, sir.

15         Q.    And you use them?

16         A.    Yes, sir.

17         Q.    And I think you testified that's kind of

18   what you guys do:  You get drugs and you use the

19   drugs, right?

20         A.    Use drugs, sell drugs, yeah.

21         Q.    You're all addicts?

22         A.    Yes, sir.

23         Q.    And drugs include typical street drugs,

24   like heroin, cocaine, and such things?

25         A.    Yes, sir.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   And Suboxone, too?

2        A.   Yes, sir.

3        Q.   So you've used Suboxone?

4        A.   Yes, sir.

5        Q.   You had it provided to you before by

6   others?

7        A.   Yes, sir.

8        Q.   When you use Suboxone, it gets you high?

9        A.   When you're clean from heroin, yes.

10       Q.   But when you're not clean on heroin, it

11  doesn't?

12       A.   No.  It depends how long you've been

13  without heroin.  Have to be usually 36 hours without

14  any opioids in your body.  If you take it 36 hours

15  before, then you get sick; you get what I'm saying?

16       Q.   Yeah.

17       A.   I'm saying, if I just used heroin or pills

18  right now, I have to wait 36 hours, you get what I'm

19  saying?

20       Q.   Yeah, if you take it within 36 hours, you

21  take Suboxone, within 36 hours --

22       A.   You get sick, you go through withdrawals.

23       Q.   Got it.  But if you wait that 36 hours from

24  taking heroin or pills, then you can get high from

25  Suboxone?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.
 2        Q.   And when you get high, what does that feel
 3   like?
 4        A.   Same thing.
 5        Q.   Similar to heroin?
 6        A.   Yes, sir.
 7        Q.   When you said pills, you're talking about
 8   like opiate pills?
 9        A.   Yes, sir.
10        Q.   Prescription pills, things like that?
11        A.   Yes, sir.
12        Q.   Those were some of the things that you got
13   issued to you by other members of the SNM when you
14   were being a soldier?
15        A.   Yes, sir.
16        Q.   Do you also join -- did you also join the
17   SNM for protection?
18        A.   No, sir.
19        Q.   Why did you join the SNM?
20        A.   Because I thought it was a brotherhood.  It
21   was something that was respected.  And that's what I
22   thought it was.
23        Q.   You talked about the onda, or the destiny
24   of the SNM, right?
25        A.   Yeah.  I thought it was a brotherhood.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    thought guys were going to have your back.  It's not
 2    like that, though.
 3        Q.    Did it serve as protection, while you were
 4    in the prison, to be a member of the SNM?
 5        A.    I didn't need protection.
 6        Q.    I mean, you could have still gotten
 7    assaulted or attacked, but if other members --
 8        A.    We protect our own, yes.
 9        Q.    They protect each other?
10        A.    Yes.
11        Q.    Okay.  So whether you need it or not, it's
12    a benefit you get from being in the SNM?
13        A.    Yeah, I agree.
14        Q.    In addition to being able to get drugs?
15        A.    Yes, sir.
16        Q.    When you decided to cooperate with Agent
17    Acee, it's my understanding that he told you he was
18    investigating you for RICO, right?
19        A.    Yes, sir.
20        Q.    And was going to prosecute you for RICO?
21        A.    Yes, sir.
22        Q.    Did he tell you the specific acts that he
23    was going to prosecute you for?
24        A.    No, sir.
25        Q.    Did he talk to you about murders that he
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1   was investigating you for?
 2       A.   No, sir.
 3       Q.   But he told you, or at least you understood
 4   that if you cooperated, you would have immunity from
 5   anything you did as an SNM member?
 6       A.   Yes, sir.  When I got my lawyer, yes, sir.
 7       Q.   What did you understand at the time you
 8   spoke to Agent Acee, in January, that you were going
 9   to get in exchange for your cooperation?
10       A.   Well, nothing was set in stone.  It was:
11   What can you bring to the table?  It has to be
12   honest, it has to be clean.
13       Q.   Did you believe you could avoid being
14   charged for RICO, if you did this cooperation?
15       A.   Yes.
16       Q.   And you also -- at some point you were
17   starting to get money on your books, right?
18       A.   Yes.  But I get more money from my family
19   than I got from them.
20       Q.   All right.  All right.  What else did you
21   think you might be able to get if you cooperated
22   besides not getting prosecuted in this RICO?
23       A.   Nothing.  I didn't ask for nothing.
24       Q.   Okay.  And I guess it's fair to say you
25   didn't want to be prosecuted for RICO, right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

233

```
 1          A.    Yes, sir.

 2          Q.    That didn't sound so good to you?

 3          A.    You can say that.

 4          Q.    Now, if I understand it correctly, when you

 5    have drugs available in prison, you would use them?

 6          A.    Yes, sir.

 7          Q.    I think you testified that you would share

 8    them with your fellow members; correct?

 9          A.    Yes, sir.

10          Q.    So, if you had Suboxone in prison, you

11    would use it?

12          A.    Yes, sir.

13          Q.    You would share it with your cellmates or

14    other people that you were being incarcerated with?

15          A.    Yes, sir.

16          Q.    When you use Suboxone, how much would you

17    use?

18          A.    It just depends what you're using.  It goes

19    up, it goes down.

20          Q.    So Suboxone comes in little strips?

21          A.    Yes, sir, or pills.

22          Q.    Let's talk about strips.  If you have a

23    strip, how much of a strip do you use to get high?

24          A.    You can use a quarter of that strip, a half

25    of that strip, or a whole strip.  It just depends on
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    your tolerance.

2         Q.   Everybody is a little different?

3         A.   Yes, sir.

4         Q.   Now, are you still using drugs?

5         A.   No, sir.

6         Q.   When was the last time you used?

7         A.   The last time I used was probably when I

8    was on medication.  But for something -- for some

9    medication that -- I don't know, that wasn't mine, so

10   I just stopped taking medication all in all, because

11   they will report to your pod.  And what they do is

12   you can't see the medication you're taking.  They

13   just just pop the pills.  And there is about 600 guys

14   that got delivered to, and they just pop pills right

15   away, and they've got to crush it, and throw water in

16   it, so you can't see what you're taking, do you get

17   what I'm saying?

18        Q.   Yeah.

19        A.   They hand it to you.  And there is many

20   times they make mistakes.  So one of the times I was

21   UA, I came up dirty for pills.  So I told them I

22   didn't want my pills no more.

23        Q.   When was that?

24        A.   This was back, like, in July.

25        Q.   Of this year?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes, sir.
 2          Q.   Putting aside the prescription pill
 3   issue -- I'm talking about illegal drugs -- when was
 4   the last time you used an illegal drug?
 5          A.   An illegal drug, it's been a good minute.
 6          Q.   What is a good minute?
 7          A.   A "good minute" is like about a couple
 8   years ago.
 9          Q.   A couple years ago?
10          A.   Yes, sir.
11          Q.   And you haven't used any illegal drugs or
12   nonprescribed drugs intentionally since then?
13          A.   Yes, sir.
14          Q.   So let's go now to the time in -- when
15   you're at MDC in January.  And actually, let's go
16   back a little bit more from that.  If I understand it
17   correctly, you got released from prison before that
18   January timeframe?
19          A.   Yes, sir.
20          Q.   In April of 2014?
21          A.   Yes, sir.
22          Q.   So that was about a month after the Molina
23   murder?
24          A.   Yes, sir.
25          Q.   And you were locked down from the time of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the Molina murder until you got released?

 2         A.   Yes, sir.

 3         Q.   When you get released, were you on parole?

 4         A.   Yes, sir.

 5         Q.   How long were you on parole?

 6         A.   Before I came back.

 7         Q.   So did you come back on a parole violation?

 8         A.   Yes, sir.

 9         Q.   Was the parole violation also the facts

10    that led to the murder charge that you got -- went to

11    trial on?

12         A.   Can you clarify that?

13         Q.   So did they violate your parole because you

14    picked up the murder charge?

15         A.   Yes, sir.

16         Q.   And the murder charge, ultimately, you were

17    convicted of manslaughter?

18         A.   Yes, sir.

19         Q.   After a trial?

20         A.   Yes, sir.

21         Q.   Did Agent Acee ever tell you he was looking

22    at you at that particular murder as an SNM murder?

23         A.   No, sir.

24         Q.   Did he ever tell you he was looking at you

25    for the murder of Sammy Chavez?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Later on, yes, sir.

 2        Q.    When was "later on"?

 3        A.    Later on, when I had my attorney, and we

 4   started talking.

 5        Q.    All right.  But not in January when you

 6   guys decided to give you the recording device?

 7        A.    Yes, sir.

 8        Q.    So you were released in April; you pick up

 9   the new charges; parole violates you; and then they

10   take you to MDC first?  Or do you go to PNM,

11   ultimately?

12        A.    No, I go to MDC; then I go to Central; then

13   I went to PNM.

14        Q.    But then they're bouncing you back to MDC

15   because you've got to go to court?

16        A.    Well, to Central, to PNM -- but like, in

17   November of 2015, they had canceled their contract

18   with Central, and I went back to MDC.  So the last

19   two months I was at MDC, on my trial.

20        Q.    The reason you're at MDC is because you

21   have your murder trial in Bernalillo County?

22        A.    Yes, sir.

23        Q.    And the reason they keep taking you back

24   and forth is because your parole had been violated?

25        A.    Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Previous to being at MDC in January, the
 2   day you had the meeting with Agent Acee, you had been
 3   at PNM for some periods of time in the fall; correct?
 4        A.   Yes, sir.
 5        Q.   Did you know that Rudy Perez was there at
 6   the time?
 7        A.   Yes, sir.
 8        Q.   Had you spoken to him during that period of
 9   time?
10        A.   Yes, sir.
11        Q.   Had you spoke to him about the Molina
12   murder?
13        A.   No, sir.
14        Q.   But just generally?
15        A.   Yes, sir.
16        Q.   All right.  Did you understand -- before
17   you left Southern in April, to get released onto
18   parole, did you understand that Mr. Perez might have
19   been involved in the Javier Molina murder?
20        A.   Yes, sir.
21        Q.   How did you come to that understanding?
22        A.   Because -- how everything was playing out.
23        Q.   Explain that to me.
24        A.   They needed to get shanks.  And them people
25   were, like, don't get them from the wheelchair, you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    know what I mean, because they didn't want to be

 2    responsible for losing the wheelchair program.  And

 3    that's when people were like, just get them from his,

 4    you know what I mean, from his walker?

 5         Q.   Did you hear about that before the Molina

 6    murder or after?

 7         A.   I heard about it before and after.

 8         Q.   All right.  And so there was discussions

 9    about using Mr. Perez' walker instead of something

10    from the wheelchair program?

11         A.   Yes, sir.

12         Q.   Did you ever learn, before that meeting

13    with Agent Acee, whether Mr. Perez actually agreed to

14    let them take a piece from his walker?

15         A.   Yeah, he agreed.

16         Q.   No.  I mean, I'm talking about before you

17    met with Agent Acee.  Did you learn that Mr. Perez

18    agreed to that?

19         A.   Yes, sir.

20         Q.   How did you learn that?

21         A.   I just told you.  I heard before, and I

22    heard after the Molina murder.

23         Q.   That Mr. Perez had agreed?

24         A.   Yes.

25         Q.   Who told you that?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I talked to "Dan Dan" through the door, and
2   he told me, "We already got a piece over here.  We're
3   going to take care of this."
4      Q.   This is before the murder?
5      A.   Yes, sir.
6      Q.   Did "Dan Dan" say:  Rudy agreed to let me
7   take the piece?
8      A.   Yes, sir.
9      Q.   He said that?
10     A.   He said, "We're just going to get it from
11  his walker.  I already hit him up."
12     Q.   Say the last thing again.
13     A.   "I already hit him up," like I already
14  asked him.
15     Q.   Got it.  So you understood from that that
16  Rudy agreed?
17     A.   Yes, sir.
18     Q.   But "Dan Dan" didn't specifically say Rudy
19  had agreed?
20     A.   He specifically said he agreed.  That's our
21  lingo; that's the way we talk.
22     Q.   When he said, "I already hit him up"?
23     A.   Yes.
24     Q.   That's your lingo?
25     A.   Yes.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Did you tell that to Agent Acee?

 2        A.   Pretty sure.

 3        Q.   All right.  Other than that conversation,

 4   did you have conversations with anybody else after

 5   the fact that led you to believe Mr. Perez had

 6   agreed?

 7        A.   Yes.  When we were at the North, everybody

 8   was talking.  They even thought he was talking.  They

 9   were going to move on him because they thought he was

10   talking.

11        Q.   They thought Mr. Perez was talking?

12        A.   Yes.  Because they said the shank came from

13   his walker, and they knew where the shank came from.

14   How did they know where the shank came from?

15        Q.   This is what the guys are saying?

16        A.   Yes.

17        Q.   The guys in PNM?

18        A.   Yes.

19        Q.   And you knew that the first indictment had

20   actually happened in the fall of 2015, right, the

21   first federal indictment?

22        A.   The first federal in the fall?

23        Q.   Yeah.

24        A.   You could say that.

25        Q.   Well, you knew at least as of January
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that --

2        A.   Well, I was there in the MDC county jail,

3    the same thing, when they brought everybody in on the

4    RICO Act.

5        Q.   Okay.  So I was going to ask you about

6    that.  Seg 3 is a pod in NMDC?

7        A.   Yeah, it's a Seg pod.

8        Q.   And they brought people in who had been

9    indicted in the first indictment of this case?

10        A.   Yes, sir.

11        Q.   And it did not include Mr. Perez?

12        A.   Did not include Mr. Perez or Mr. Herrera.

13        Q.   So you thought:  Where are these two guys?

14    They're missing?

15        A.   Yes, sir.

16        Q.   Some of the other guys thought that, too?

17        A.   Probably more or less.  That's just the way

18    it is.  They talk, that's the way it is.

19        Q.   You used the term "they were going to move

20    on him," right, did I say that right?

21        A.   You said that right.

22        Q.   And so they were going to move on him,

23    meaning members of the SNM were going to move on Mr.

24    Perez, because they thought he was cooperating?

25        A.   Yes.

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                    1-800-669-9492
                                                    e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   They thought he was the reason the federal

2   government knew the pieces came from his walker?

3    A.   Not the federal government.  When they

4   locked down the pod, they knew where it came from.

5   So they were thinking:  How did they know where that

6   piece came from, you get what I'm saying?

7    Q.   Yeah.

8    A.   That's why.

9    Q.   And those discussions were still being had

10  in PNM in the fall of 2015, right?

11   A.   A little before that they were talking

12  about it in the yard.  People would talk behind his

13  back.  When they would see him there, they would talk

14  all cool with him, you know what I mean?

15   Q.   Got it.  Fast-forward to the times when

16  recorded him.  That was in February 2016, right?

17   A.   Yes, sir.

18   Q.   You knew that Mr. Perez knew about these

19  rumors that he had cooperated, right?

20   A.   Mr. Perez knew?

21   Q.   Yeah.

22   A.   About the rumors?  Well, yeah, he told me,

23  Hit up "Pup" when they brought up "Pup" back from out

24  of state.  And "Pup" said, "Don't worry about it,

25  carnal."  Well, that's "Pup," he'll tell you whatever

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1   you want to hear.
 2        Q.   So Mr. Perez was worried about it, right?
 3        A.   Yeah.
 4        Q.   He was concerned that they thought he was
 5   an informant?
 6        A.   Yes, sir.
 7        Q.   You knew that?
 8        A.   Yes, sir.
 9        Q.   You talked to Mr. Perez about that?
10        A.   Yes, sir.
11        Q.   And you talked to him about that around the
12   time you were recording him; correct?
13        A.   Yes, sir.
14        Q.   And I think you used the term when you were
15   talking to Mr. Perez, "pressure points," right?
16        A.   Yes, sir.
17        Q.   You used pressure points?
18        A.   Yes, sir.
19        Q.   To help get him to talk about the Molina
20   murder?
21        A.   Yes, sir.
22        Q.   And you knew that that was one of the goals
23   of this investigation; that's what Agent Acee wanted
24   you to do was to get Mr. Perez to talk about the
25   Molina murder?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.   Well, I knew myself because I've been in

 2   the game a long time, so I knew more or less what

 3   they would want and what they wouldn't want.

 4        Q.   But Acee told you he wanted murders, right?

 5        A.   That was it.

 6        Q.   He didn't want other stuff, he wanted

 7   murders?

 8        A.   He wanted murders.

 9        Q.   One of the things you thought you could

10   deliver to him was the Molina murder?

11        A.   Yes, sir.

12        Q.   So do you remember when you got moved from

13   MDC to PNM?

14        A.   From MDC to PNM?

15        Q.   Yes, sir.  And I'm talking about right

16   after you meet with Acee in January, you get moved to

17   PNM at some point, right?

18        A.   A matter of days.

19        Q.   Just a matter of days?

20        A.   Yes, sir.

21        Q.   Now, there was a meeting with Acee at MDC,

22   right?

23        A.   I was moved to PNM two days later.

24        Q.   Okay.  Let me ask you this:  There was also

25   a meeting with Acee at the FBI office, right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

246

```
 1          A.   Yes, sir.
 2          Q.   So were you moved to PNM after that?
 3          A.   Yes, sir.
 4          Q.   And how soon after that were you placed
 5     next to Mr. Perez?
 6          A.   Right away.
 7          Q.   Right away?
 8          A.   Yes, sir.
 9          Q.   Okay.  So you get placed with Mr. Perez
10     in -- I'm showing you -- it's the same thing, but I'm
11     going to show you the one that's marked Defendant's
12     RP-B.  And when you get moved to PNM within a matter
13     of days, you get moved to the Q pod, right?
14          A.   Yes, sir.
15          Q.   The Q pod is where Mr. Perez is?
16          A.   Yes, sir.
17          Q.   I think you testified that you were at --
18     you were in cell 102; correct?
19          A.   Yes, sir.
20          Q.   And Mr. Perez was in cell 101?
21          A.   Yes, sir.
22          Q.   Cell 101 is at the very end of the bottom
23     tier of Q pod, right?
24          A.   Yes.
25          Q.   So the only neighbor for Mr. Perez would
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    have been whoever is in 102?

2         A.   Yes, sir.

3         Q.   When you got moved there, that was you?

4         A.   Yes, sir.

5         Q.   So he doesn't have any neighbor on the

6    other side of him, just you?

7         A.   No, it was -- Jesse Sosa was on the other

8    side of me.

9         Q.   Jesse Sosa was in 103?

10        A.   Yes, sir.

11        Q.   Did you record conversations with Jesse

12   Sosa?

13        A.   No, sir.

14        Q.   Was anybody wondering why he wasn't

15   prosecuted in this case?

16        A.   Yes, sir.

17        Q.   The other SNM members were?

18        A.   Were they concerned about it?

19        Q.   Yes.

20        A.   Well, yes.

21        Q.   Because the paperwork on Javier Molina was

22   that he had ratted Jesse Sosa to the police, right?

23        A.   Yes, sir.

24        Q.   So that you and Agent Acee talked about

25   recording Jesse Sosa?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.

 2        Q.   Did you try to record Jesse Sosa?

 3        A.   Yes, sir.

 4        Q.   Did you record Jesse Sosa?

 5        A.   No, sir.

 6        Q.   Why not?

 7        A.   Because he never gave me any relevant

 8   information.

 9        Q.   Did you try?

10        A.   I tried.

11        Q.   Now, where was -- let me ask you this:  Was

12   "Marijuano" in Q pod?

13        A.   He wasn't with me.

14        Q.   And "Marijuano" was Lupe Urquizo, right?

15        A.   He was upstairs.  But I don't remember

16   nobody being downstairs with us.

17        Q.   Lupe Urquizo was the individual that --

18        A.   I know who "Marijuano" is.

19        Q.   Okay.  Just so that the Court recalls, this

20   is the person that supposedly brought the paperwork

21   down the second time right before Molina got

22   murdered, right?

23        A.   Him and Archie, yes.

24        Q.   Archie being Mauricio Varela?

25        A.   Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.    Did you ever try to record Lupe Urquizo?

 2          A.    No, sir.

 3          Q.    Were you ever placed next to him?

 4          A.    No, sir.

 5          Q.    Now, when you're at -- I'm going to jump

 6    around in time just a little bit -- but when you're

 7    at Southern in the yellow pod, you knew that Rudy

 8    Perez was in the blue pod, right?

 9          A.    Rudy Perez was in blue pod, yes, sir.

10          Q.    And you knew that he was sick?

11          A.    Yes, sir.

12          Q.    He had some health problems?

13          A.    Yes, sir.

14          Q.    Needed a walker to get around on?

15          A.    Yes, sir.

16          Q.    Had the nurses come giving him medication

17    on a daily basis?

18          A.    Yes, sir.

19          Q.    And when you were -- skipping ahead now --

20    back to PNM, in the fall of 2015, before you meet

21    Agent Acee at MDC, you said that Mr. Perez was there

22    at PNM, right?

23          A.    Yes, sir.

24          Q.    And you spoke to him a little bit?

25          A.    Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And you knew he was still sick?

 2        A.   Yes, sir.

 3        Q.   Still took a lot of medications?

 4        A.   Yes, sir.

 5        Q.   Had to get wheeled around the place in a

 6   wheelchair; he wasn't allowed to walk around?

 7        A.   Yes, sir.

 8        Q.   You knew all that?

 9        A.   Yes, sir.

10        Q.   And you knew that when you got next to Mr.

11   Perez in the Q pod in February of 2016, right?

12        A.   Yes, sir.

13        Q.   As a matter of fact, in the pod outside of

14   his cell they kept his wheelchair, didn't they?

15        A.   Yes.

16        Q.   They took him to medical a lot?

17        A.   Yes, sir.

18        Q.   And every day they would come and give him

19   medication, wouldn't they?

20        A.   Yes, sir.

21        Q.   You saw that happen?

22        A.   Yes, sir.

23        Q.   Just like you described, they come and they

24   crush up the pill, and they make you take it?

25        A.   Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   So you knew that was happening for Mr.

2  Perez?

3    A.   Yes, sir.

4         MR. VILLA:   May I have just a moment, Your

5  Honor?

6         THE COURT:   You may.

7    Q.   Now, in the Q pod, you were placed there

8  not because of discipline, but because you were going

9  to try to record Mr. Perez, right?

10   A.   Yes, sir.

11   Q.   But individuals that are there normally are

12 there for some sort of disciplinary reason, right?

13   A.   Yes, sir.  Not apparently.  I was at PNM

14 before that.  I was in Q pod.  So I was under

15 investigation pending Interim Level 6.

16   Q.   That was after your parole violation?

17   A.   Yes, sir.

18   Q.   But before you had cooperated?

19   A.   Yes, sir.

20        MR. VILLA:   Your Honor, I believe we're on

21 D for Mr. Perez, if I'm not mistaken.

22   Q.   Mr. Cordova, I'm just going to show you

23 this on the screen.  I have here a disc.  It's

24 entitled, "PNM North Edited Walk-through" with the

25 label Defendant's Exhibit RP-D.  Do you see that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    there?

2         A.   Yes, sir.

3         Q.   I'm going to represent to you there is a

4    video that I'm going to show you of a walk-through

5    that was done at PNM.  I'm going to see if you

6    recognize that, okay?

7              Do you see that on your screen, Mr.

8    Cordova?

9         A.   Yes.

10        Q.   I've got a video here, you see on the left

11   where it has Q 102 on a door?

12        A.   Yes.

13        Q.   Does that look like the cell that you were

14   in when you were next to Mr. Perez?

15        A.   Yes, sir.

16        Q.   I'm going to play the video here for a

17   little bit.

18             (Video played.)

19        Q.   Now, I paused it here just a second.  Can

20   you see that next to 102 is Q 101?

21        A.   Yes, sir.

22        Q.   And that's the cell where Mr. Perez was in

23   when you recorded him?

24        A.   Yes, sir.

25        Q.   And you see this pole here in the middle of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the screen where I just put the pink arrow?

2         A.   Yes, sir.

3         Q.   Is that where they kept Mr. Perez'

4    walker -- or excuse me, wheelchair?

5         A.   Right there.

6         Q.   Is that yes?

7         A.   Yes, sir.

8         Q.   Okay.  And just make sure -- I know you're

9    looking at the video, you might have to pull the mic

10   over just so we can hear you.

11        A.   It's a little bit more in front of his

12   door.

13        Q.   The wheelchair was?

14        A.   Yeah.

15        Q.   Okay.

16             (Played video.)

17        Q.   Now, we're going into Q 101 here.  And the

18   last time you see there on the bottom, 14:48:54?  Do

19   you see how that clock is running there on the

20   bottom?

21        A.   Yes, sir.

22        Q.   Is that about where we are?

23        A.   Yes.

24        Q.   Does the Q 101 cell look about the same as

25   the way your cell was?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir, without that here on that wall
 2   right there, on that side of the wall.  My heater is
 3   underneath the bunk, like his is.
 4        Q.   It's underneath the bunk where the heaters
 5   are that you're able to talk?
 6        A.   Yes, sir.
 7        Q.   And we're about to go under there, I think,
 8   here in just a second.  And this is the upper vent
 9   that circulates the air?  We're now at about
10   14:49:33?
11        A.   Yes, sir.
12        Q.   Sometimes you talked through those vents,
13   right?
14        A.   Yes, sir.
15        Q.   But for Mr. Perez, it was the heater under
16   the bed; is that right?
17        A.   Yes, sir.
18        Q.   So what we're looking at now, at about
19   14:50, that's underneath the desk, right?
20        A.   Yes, sir.
21        Q.   And 14:50:07, we're underneath the bed
22   looking at the heater vent?
23        A.   Yes, sir.
24        Q.   And this is again in Mr. Perez' room; true?
25        A.   Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Could you hear better talking through this

2    vent than the other one?

3    A.   Almost the same.

4    Q.   Did you ever talk to Mr. Perez through the

5    other vent?

6    A.   When I would just be pacing back in my

7    cell.  Because if you can rewind it, through those

8    holes, you can see into the next cell.

9    Q.   Oh, I see.  Okay.  So from the vent above

10   the desk, you can actually see into the next cell?

11   A.   Yes, sir.

12   Q.   So occasionally you guys spoke that way?

13   A.   Yes, sir.  But I never recorded him right

14   there.

15   Q.   I understand.  So you just recorded him

16   under the bed?

17   A.   Yes, sir.

18   Q.   So now we're going into Q 102.  This is

19   about 14:56:27.  Does that look about right to you,

20   Mr. Cordova?

21   A.   Yes, sir.

22   Q.   Does this cell look about the same as it

23   looked when you were there?

24   A.   Yes, sir.

25   Q.   So now we're looking under the bed.  This

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   is 14:56:57.  This is the vent where you would have
 2   spoken to Mr. Perez; correct?
 3        A.   Correct.
 4        Q.   And I think you testified you put the
 5   recording device right onto the vent?
 6        A.   Right under it.
 7        Q.   Under it?
 8        A.   Right under it, right up against it.
 9        Q.   Where we're looking right now?
10        A.   Yes, sir.
11        Q.   This is 14:57:23, 24?
12        A.   You can hear clearer under it.
13        Q.   Okay.
14        A.   It's got a screen just like that, with
15   holes in it, and you can see -- you can hear better.
16        Q.   How do you signify to Mr. Perez that you
17   wanted to speak to him?
18        A.   I knock on the desk.  And then I just
19   say -- I just call him through the vent, and I start
20   talking to him.
21        Q.   Now, this particular Q pod, you knew at the
22   time was a Level 6 pod?
23        A.   Yes, sir.
24        Q.   And you had testified, I believe, earlier
25   about the restrictions there in Level 6?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes, sir.

2      Q.   So let me go a little bit further.

3           (Video played.)

4      Q.   I'm going to pause there at 14:58:47.  Now,

5  I understand that it's your testimony you didn't

6  provide Mr. Perez any Suboxone before you questioned

7  him, right?

8      A.   Yes, sir.

9      Q.   But if you were -- if you had Suboxone, at

10 least in the past, it's your testimony that you would

11 happily share it with another carnal?

12     A.   Yes, sir.

13     Q.   And if you're both in a cell similar to

14 this, is there a way that you could provide Suboxone

15 to each other?

16     A.   Yes, sir.

17     Q.   How do you do that?

18     A.   Can you see those holes through the vent?

19     Q.   The holes in the upper vent on the desk?

20     A.   Yeah.  You can see into the next room.

21     Q.   Yes, sir.

22     A.   You make a little fishing pole, and you put

23 it on the end of the fishing pole and send it

24 straight through.

25     Q.   And it works like that, no problem?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No problem.
 2        Q.    Is there any way to pass things under the
 3   doors?
 4        A.    Nah, but Suboxone, you wouldn't want to do
 5   it like because you wouldn't want to get it trapped
 6   on the freeway.  That's what we call the pod out
 7   there, the freeway.
 8        Q.    So the walkway between the two cells is the
 9   freeway?
10        A.    Yes, sir.
11        Q.    And you wouldn't want to try to send the
12   Suboxone that way, right?
13        A.    No.  The only thing we usually send like
14   that is just soups, chips.  Unless we really have to
15   fish.  That's a little different, you know?
16        Q.    Say that again.
17        A.    Unless I have to fish four houses down,
18   then I'll do it like that.  But right there, I just
19   make a little pole, and pass it -- put it on the tip
20   and pass it right through.
21        Q.    But if somebody, say, four houses down,
22   meaning four cells down, wanted something, you could
23   try to fish them a line that way?
24        A.    Yes, sir.
25        Q.    That's like a piece of string?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1         A.   Yes, sir.
2         Q.   You could send something down the line, and
3    they catch it and bring it in?
4         A.   Yes, sir.
5         Q.   You can send Suboxone that way?
6         A.   Yes, sir.
7              MR. VILLA:  Your Honor, I guess for the
8    record, I'd move to admit RP-D.  It sounds like Mr.
9    Cordova is familiar with the video that's on there.
10             THE COURT:  Any objection, Mr. Castellano?
11             MR. CASTELLANO:  If I can just have a
12   representation about what the rest of the video
13   shows, I don't think we'll have a problem.
14             MR. VILLA:  Oh, I'd be happy to show -- the
15   other half is the rec yard.  And Mr. Cordova is
16   probably familiar with it.  But that's coming up here
17   next.
18             THE COURT:  All right.
19             MR. CASTELLANO:  I don't have an objection.
20   I was just wondering what the rest of the video
21   shows.
22             THE COURT:  All right.  Any objection from
23   anyone?  Not hearing any, Rudy Perez' Exhibit D will
24   be admitted into evidence.
25        Q.   Mr. Cordova, when you're in Level 6, during
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  this time that you're actually doing the cooperation,

2  did they take you out to rec and all that sort of

3  stuff?

4       A.    Yes, sir.  I went out maybe about once.

5       Q.    But you're supposed to go or be allowed to

6  go at least five times?

7       A.    You're allowed, but you don't have to go.

8       Q.    You can choose not to?

9       A.    Yes, sir.

10      Q.    So, if you go to rec, they allow you five

11 times a week?

12      A.    Yes, sir.

13      Q.    And you're at rec outside for an hour?

14      A.    Yes, sir.

15      Q.    Did you ever see Mr. Perez go to rec?

16      A.    Once in a while.

17      Q.    But not every day?

18      A.    Not every day.

19      Q.    Did he tell you about why he didn't go to

20 rec?

21      A.    Just some people don't like going out all

22 the time.

23      Q.    Did he ever tell you he didn't go to rec

24 because they wouldn't let him take his wheelchair

25 there?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   He never told me that.
 2        Q.   How long were you next to Mr. Perez for
 3   this period of time when you're recording him?
 4        A.   I would say a month, approximate; probably
 5   about a month.
 6        Q.   Now, I'm going to continue and see if you
 7   recognize the rec yard here.  When you go to rec,
 8   they take you out one at a time?
 9        A.   Yes, sir.  It's a two-man escort.
10        Q.   You're escorted by two corrections
11   officers?
12        A.   Yes, sir.
13        Q.   So now we're at the elapsed time on this
14   video, 15:58:08.  Do you recognize this as the
15   walkway to get to the rec yard?
16        A.   Yes, sir.
17        Q.   When they take you out to rec, do they put
18   you in handcuffs and a belly chain?
19        A.   Just handcuffs behind your back.
20        Q.   Handcuffs behind your back, that's it?
21        A.   Well, they take you to a strip cage, and
22   then they put you in the strip cage, uncuff you
23   through a cuff port, then they strip you naked, you
24   squat and cough for them.  Then they put cuffs on you
25   and take you to the yard.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   With two corrections officers at a time?

2        A.   Yes, sir.

3        Q.   So now we're looking down this hallway.

4   It's 15:59:02, is this the entrance to the cages for

5   the rec yard?

6        A.   Yes, sir.

7        Q.   Now, it says on the video that it was

8   filmed June 6, 2017.  Do the rec yards look the same

9   or similar to the way they looked when you were

10  there?

11       A.   Yes, sir.

12       Q.   Does anything look different?

13       A.   No, sir.

14       Q.   Did you ever see Mr. Perez out in the rec

15  yard while you were there?

16       A.   Yeah, sometimes.

17       Q.   Did you see him in his wheelchair, or was

18  he walking?

19       A.   Sometimes he'd be in his wheelchair,

20  sometimes he'd be walking.

21            MR. VILLA:  I'll stop it there.  Your

22  Honor.  I'll represent to the Court the rest of it is

23  more parts of the rec yard.

24       Q.   Did you guys have a slang term for

25  Suboxone?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                            1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                e-mail: info@litsupport.com

```
 1        A.   Yeah.

 2        Q.   What was it?

 3        A.   Naranja.

 4        Q.   Is that a Spanish word?

 5        A.   Yeah, it's Spanish for orange.

 6        Q.   For orange.  How did you come up with -- if

 7   you know -- with that slang term for it?

 8        A.   It's because the color is orange.

 9        Q.   The strips are?

10        A.   Yes, sir.

11        Q.   I see.  Did you have slang terms for -- if

12   you want to ask somebody:  Do you want to get high,

13   or are you high?  What kind of terms did you use for

14   that?

15        A.   Yes, sir.  A cura.  "Wanna cura?"

16        Q.   What does that mean?

17        A.   Shot.  A cura is a shot.  It's like Spanish

18   for like a term, like, "Get well."  Like a cura.  So

19   it's like:  "You want a get well shot?"

20        Q.   Did you ever use the term "channel change"?

21        A.   Yes, sir.

22        Q.   What is a channel change?

23        A.   Meaning getting high.

24        Q.   Because a person is getting high, they're

25   changing their own channel?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          A.    Yes, sir.

 2          Q.    All right.   Now at the time that you

 3    recorded Mr. Perez, did you know how long he'd been

 4    there?

 5          A.    Maybe at the North.

 6          Q.    At the North?

 7          A.    Probably about a good year,

 8    year-and-a-half.

 9          Q.    And you knew that because he told you?

10          A.    Because we were all there about that much.

11          Q.    Did you know that he was kept there in

12    Level 6 during that entire year-and-a-half?

13          A.    Yes, sir.

14          Q.    Did he ever tell you about whether he had

15    been given a hearing or an ability to challenge being

16    there in Level 6?

17          A.    Well, they would give us hearings, but they

18    would bring us -- and they would tell us that we were

19    placed on Interim Level 6, due to an investigation

20    going on with the SNM, with the power struggle, and

21    like wars, and people getting killed, getting moved

22    on, and stuff.

23          Q.    So did the individuals like Mr. Perez and

24    yourself, at least before your cooperation, did they

25    ever get a chance to get out of the Level 6 after the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Molina murder?

2         A.    Yes.

3         Q.    When did that happen?

4         A.    I don't know.  A lot of them came here, but

5    some of them went back to the South.

6         Q.    So the South would be Level 5?

7         A.    Level 4.

8         Q.    Level 4?

9         A.    Yes, sir.

10        Q.    Okay.  But as long as you knew, and at the

11   time you recorded Mr. Perez, he had been locked down

12   there for about a year-and-a-half?

13        A.    Yes, sir.  About maybe a little longer, a

14   couple of years.

15        Q.    Have you ever been locked down that long?

16        A.    Yeah.  I spent most of my time in solitary

17   confinement.

18        Q.    What does that do to you?

19        A.    Nothing.

20        Q.    Does it affect -- does it change you?  Does

21   it affect you at all?

22        A.    Some ways, yeah; some ways, no.

23        Q.    It's different than Level 4, when you can

24   be out in the pod the whole time, isn't it?

25        A.    Yes, sir.



SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                     1-800-669-9492
                                                 e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   And the recreation when you're on Level 4
 2   is different?  You're allowed to interact with other
 3   people?
 4        A.   Yes, sir.
 5        Q.   When was the first time that you heard that
 6   Mr. Perez and Mr. Herrera said you gave them Suboxone
 7   before you recorded them?
 8        A.   This is the first time I've heard about
 9   this.
10        Q.   So today?
11        A.   Today.
12        Q.   Nobody mentioned anything to you before?
13        A.   Well, my lawyer talked to me and told me:
14   This is what it is.
15        Q.   Last night?
16        A.   I keep in contact with my lawyer regularly.
17   Yes, last night he told me, when I came down here, he
18   said, You're going to have a court for this, and this
19   is going to be the hearing.
20        Q.   Okay.  So when the Government filed their
21   response --
22             THE COURT:  Hold on just a second.  Mr.
23   Samore, why don't you come up here and get a little
24   closer, in case you need to make any objection.
25             Go ahead, Mr. Villa.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   So Mr. Cordova, when the Government filed a

2   response in this Court saying that Mr. Perez and Mr.

3   Herrera's allegations that you gave him Suboxone

4   weren't true, you didn't tell them that?

5    A.   Tell -- I don't understand your question.

6    Q.   Okay.  So we filed a motion, and the

7   Government files a response.  And you know what a

8   motion and a response are, right?

9    A.   Yes, sir.

10    Q.   And the Government's response -- have you

11   seen the Government's response in this case, to this

12   issue, this motion?

13    A.   No.  I talked to my lawyer.

14    Q.   All right.  I don't want to get into

15   necessarily what you found out.  But is it your

16   testimony that today, or maybe yesterday, is the

17   first time you ever heard that there was this

18   accusation being made?

19    A.   Yes, this is when my lawyer talked to me

20   prior to this.

21       THE WITNESS:  When was it, John?

22       MR. SAMORE:   I can't answer that.

23       THE WITNESS:  Oh, you can't.

24    A.   All right.  So about a couple days ago, he

25   told me:  You're going to be subpoenaed.  They're

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    trying to impeach you.  And then -- so we don't know
 2    when the court will be, but it will be soon.  Then
 3    all of a sudden, they just picked me up and brought
 4    me.
 5         Q.   All right.  Let me ask you this:  Did you
 6    have a conversation with Agent Acee in January of
 7    2017?
 8         A.   January of 2017, conversation about what?
 9         Q.   Did you have any conversation at all with
10    Agent Acee January of this year?
11         A.   I know he cut me off because of what
12    happened with me, and that was it.
13         Q.   But he came to see you, didn't he?
14         A.   Yes.
15         Q.   He talked to you?
16         A.   Yes.
17         Q.   At any point in that conversation, did he
18    ask you whether you had provided Suboxone to Mr.
19    Perez or Mr. Herrera?
20         A.   No, sir.
21         Q.   Did he tell you that that was an allegation
22    in this case?
23         A.   No, sir.
24         Q.   So you didn't learn that that was an
25    allegation in this case until a couple days ago?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, sir.
 2        Q.   Well, is that true?
 3        A.   Yes, sir.
 4        Q.   And you understand, of course, that if you
 5   had provided Suboxone to Mr. Perez before you
 6   recorded him, that might put you in some serious
 7   trouble?
 8        A.   Yes, sir.
 9        Q.   And if you'd provided it to Mr. Herrera
10   before you recorded him, that might also put you in
11   serious trouble?
12        A.   Yes, yes, sir.
13        Q.   Now, I think we heard that when you got
14   recording devices for recording Mr. Perez, it came
15   from an STIU officer?
16        A.   Yes, sir.
17        Q.   And they would act like they're doing a
18   shakedown of your room, and leave the recording
19   device?
20        A.   One time they did that.  The other time I
21   got it through a tray.
22        Q.   For Mr. Perez?
23        A.   No.
24        Q.   Just for Mr. Herrera?
25        A.   For Mr. Herrera.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1        Q.   So with Perez it was the shakedown?

2        A.   Yes, sir.

3        Q.   How long did you have that recording device

4    before you turned it back in?

5        A.   Till they came and picked me up.

6        Q.   So the entire time you were next to Mr.

7    Perez?

8        A.   Yes, sir.

9        Q.   And your estimate was a couple weeks, maybe

10   a month?

11       A.   Yes, sir.

12       Q.   Other than when they brought the digital

13   recording device, did they do any other shakedowns of

14   your room during that time period that you were

15   recording Mr. Perez?

16       A.   No, sir.

17       Q.   Did they do any drug testing of you?

18       A.   No, sir.

19       Q.   And who was the STIU officer that brought

20   you the recording device for Mr. Perez?

21       A.   Cupit.

22       Q.   Mr. Cupit.  Do you know his first name?

23       A.   No, sir.

24       Q.   Did you have any conversations with Mr.

25   Cupit when that happened, or he just dropped it off

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    for you?

2        A.   He pulled me out, told me, "I'm going to

3    drop a recorder in your cell."

4             I said, "All right."

5             He went in there, it was shaken down, and

6    he dropped recorder in, and he left.

7        Q.   Cupit was present when you had your meeting

8    with Acee about doing this, right?

9        A.   Yes, sir.

10       Q.   And he was present at MDC?

11       A.   No, he wasn't.

12       Q.   Was he present at the FBI office when you

13   met?

14       A.   Yes, sir.

15       Q.   And Captain Sapien, was he present for the

16   meeting --

17       A.   I can't recall.

18       Q.   How about any meetings?

19       A.   Huh?

20       Q.   Was Captain Sapien present for any

21   meetings?

22       A.   Yes.

23       Q.   Which ones?

24       A.   When I went to go see my lawyer.

25       Q.   Okay.  You don't recall seeing him before

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    that?

 2         A.    No, sir.

 3         Q.    Now, you received a target letter in this

 4    case, didn't you?

 5         A.    What do you mean?

 6         Q.    Well, it's a letter from the United States

 7    Attorney's Office saying that you might be the target

 8    of a grand jury investigation?

 9         A.    No, sir.

10         Q.    You don't ever remember getting a letter

11    like that?

12         A.    No, sir.

13         Q.    Have you ever been prosecuted for anything

14    in connection with this federal investigation?

15         A.    No, sir.

16         Q.    So is it fair to say, since the

17    manslaughter case got resolved, you haven't been

18    prosecuted for anything else?

19         A.    No, sir.

20         Q.    And I think it was your testimony that the

21    money you received on commissary from the FBI, that

22    you were getting more money than that from your

23    family?

24         A.    Yes, sir.

25         Q.    Did the FBI ever give money to your family?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, sir.

 2        Q.   They never gave money to your wife?

 3        A.   No, sir.

 4        Q.   Or anybody else?

 5        A.   No, sir.

 6             MR. VILLA:   May I have a moment, Your

 7   Honor?

 8             THE COURT:   You may.

 9        Q.   Just a couple of things I forgot to ask

10   you, Mr. Cordova.

11             Is the price of Suboxone higher on the

12   streets than it is in prison?

13        A.   No, it's less on the streets, and higher in

14   prison.

15        Q.   Do you know why that is?

16        A.   Because it's prison.

17        Q.   You pay more?

18        A.   Yes, sir.

19        Q.   How do you pay for it?

20        A.   You send money to people.

21        Q.   On the outside.  What if you want it from

22   somebody else that has it on the inside, that wants

23   to sell it to you?

24        A.   You give them canteen.  It's mostly

25   canteen.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   But that value -- whatever the canteen is

2  is going to be higher than what you might pay for it

3  on the street?

4      A.   Yes, sir.

5      Q.   Okay.  Now, I want to go back to something

6  you said earlier, that after the Molina murder, when

7  they locked everybody down, that they knew right away

8  that the piece -- the shank had come from Mr. Perez'

9  walker.  You said they knew that, right?

10     A.   Yes.

11     Q.   Who is "they"?  You're talking about STIU?

12     A.   Yes, sir.

13     Q.   How did you know that they knew?

14     A.   Because when "Red" came back, "Red" was

15  telling Perez about that.  And when we would go to

16  yard in the cages, all that was out there, you know

17  what I'm saying?

18     Q.   Yeah.

19     A.   So that's why.

20     Q.   Okay.  And that was information that you

21  knew at the time you recorded Mr. Perez?

22     A.   Yes, sir.

23     Q.   And you used that information, didn't you?

24     A.   Yes, sir.

25     Q.   To talk to Mr. Perez about the Molina

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   murder?

 2        A.   Yes, sir.

 3        Q.   And get him to talk to you about the

 4   murder?

 5        A.   Yes, sir.

 6        Q.   And isn't it true that, in the course of

 7   those recordings, Mr. Perez was saying:  I didn't

 8   cooperate, I didn't tell the police anything, or STIU

 9   anything?

10        A.   What he means when he says that is:  "I

11   didn't say nothing."  In other words, see no evil,

12   hear no evil, speak no evil.  So what he's stating is

13   "I didn't say nothing," get what I'm saying?

14        Q.   Yes.

15        A.   So, in other words, I'm telling you, I see

16   you do something, then I tell you, I didn't see you

17   do, you know what I'm saying?  So what he's stating

18   is he gave it to him, but he don't know nothing about

19   it.  So, in other words, he's keeping his mouth shut,

20   he's not making a statement to the police.  That's

21   what he's stating.

22        Q.   But didn't he also say to you that at the

23   time, after the Molina murder, he did not say

24   anything to STIU, he did not cooperate?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   He wanted you to know that?

 2        A.   He wanted me to know that.

 3        Q.   Because you could spread the word to the

 4   other carnals that he wasn't a cooperator?

 5        A.   Yes.

 6        Q.   And, therefore, he wouldn't get hit?

 7        A.   Yes.  What he was doing is just trying to

 8   get, I guess, people on his side, and make them

 9   believe -- and he shouldn't have to do that, though,

10   you know what I mean?

11        Q.   I understand.  But he was protecting

12   himself?

13        A.   Well, that's how it goes in the high game.

14        Q.   Right, so he didn't get moved on?

15        A.   Yeah.

16             MR. VILLA:  That's all I have.  Your Honor.

17             THE COURT:  Thank you, Mr. Villa.

18             Anyone else have cross-examination of Mr.

19   Cordova?

20             All right.  Mr. Castellano.

21             MS. JACKS:  Your Honor --

22             THE COURT:  Ms. Jacks?

23             MS. JACKS:  I was told by Ms. Fox-Young

24   that they might seek to interrupt with a witness

25   that --
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                             1-800-669-9492
                                                             e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1            MS. FOX-YOUNG:  Your Honor, we have a very
 2    short witness.  I talked to Mr. Beck about what may
 3    be a ten-minute witness.  He's from way up north, and
 4    I was hoping we might get through him today.  So I
 5    wanted to let Ms. Jacks know that he's got to get
 6    back to El Rito.  And I don't think the Government
 7    objects.  But we don't need to do it now.  Perhaps we
 8    can finish up.
 9            THE COURT:  Okay.  What if we go to 4:30 on
10    cross-examination of Mr. Cordova, then we put him on
11    right after we come back from the break, so about
12    4:45, 5:00?
13            MS. FOX-YOUNG:  I think that would be fine
14    Your Honor.  And I don't want to cut Ms. Jacks short.
15            THE COURT:  I doubt anybody is going to cut
16    Ms. Jacks short.
17            MS. JACKS:  I'm happy to go whenever is
18    convenient.
19            THE COURT:  All right.  Get after it.
20                       EXAMINATION
21    BY MS. JACKS:
22        Q.  Mr. Cordova, you, prior to becoming an
23    informant in this case, you considered yourself an
24    SNM soldier; is that right?
25        A.  Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And you got out of prison shortly after the

 2   Molina homicide?

 3        A.   Yes, ma'am.

 4        Q.   What was the date?

 5        A.   I believe it was April 28.

 6        Q.   Of 2014?

 7        A.   Yes, ma'am.  Is that correct?

 8        Q.   When did you get rearrested?

 9        A.   I got rearrested December 3rd.

10        Q.   Of the same year, 2014?

11        A.   Yes, ma'am.

12        Q.   And that arrest, December 3rd of 2014, was

13   for a homicide?

14        A.   Yes, ma'am.

15        Q.   That you were alleged to have committed?

16        A.   Yes, ma'am.

17        Q.   And you ultimately went to trial on that

18   case?

19        A.   Yes, ma'am.

20        Q.   And you were convicted of a lesser charge,

21   a manslaughter?

22        A.   Yes, ma'am.

23        Q.   And when was that jury verdict?  When was

24   that conviction?

25        A.   I'm sure it was on December 8, if I'm not
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    mistaken.

2         Q.   Of 2015?

3         A.   Yes, ma'am.

4         Q.   So when you first were approached, and met

5    Agent Acee, you were convicted of the manslaughter,

6    but awaiting your sentencing?

7         A.   Yes, ma'am.

8         Q.   And that's when you were at the MDC in

9    Albuquerque?

10        A.   Yes.

11        Q.   So you would agree with me that you killed

12   somebody in December of 2014, right?

13        A.   Yes, ma'am.

14        Q.   Who?

15        A.   Ray Gurule.

16        Q.   Ray Gurule?

17        A.   Gurule.  Yes, ma'am.  G-U-R-U-L-E.

18        Q.   Okay.  And why did you kill him?

19        A.   I didn't kill nobody, Miss.

20        Q.   So you got convicted of a crime you didn't

21   commit?

22        A.   Yes, ma'am.

23        Q.   And you were falsely accused of the killing

24   of Ray Gurule?

25        A.   Yes, ma'am.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                            e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   Were there allegations in your homicide
 2   case that you had committed a crime because you were
 3   a soldier for SNM?
 4        A.   In that crime?
 5        Q.   Yes.
 6        A.   No, ma'am.
 7        Q.   So it was -- the prosecutor in that case
 8   alleged that you killed somebody, but they thought
 9   you'd done it for your own purposes?
10        A.   Yes.
11        Q.   And it sounds like your defense was you
12   didn't do it?
13        A.   Yes, ma'am.
14        Q.   And the jury convicted you of a lesser
15   charge?
16        A.   Yes, ma'am.
17        Q.   Would you agree with me that as an SNM
18   soldier, it's possible for you to commit crimes based
19   on your own motivations that have nothing to do with
20   SNM?
21        A.   No, ma'am.  What it is, when you're a
22   soldier, you have to do sanctioned crimes.  They have
23   to be sanctioned by the tabla.  We don't want idiots
24   running around.  That's how they do it.  They don't
25   want idiots running around causing trouble, where
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   trouble is not to be caused, you know what I'm
 2   saying?
 3        Q.   So I'm just curious, is it possible when
 4   you're an SNM soldier, based on your experience, that
 5   if you, for example, decided to get into a fight with
 6   somebody, that it was for your own personal reasons?
 7        A.   Yes, ma'am, you can also do that.
 8        Q.   Okay.  Because you don't stop being a human
 9   being, do you?
10        A.   Exactly.
11        Q.   And if someone irritates you or aggravates
12   you for a personal reason, you might decide to take
13   action completely on your own?
14        A.    It depends what it is, or who it is.  It
15   gets real political.  If it's another gang member,
16   there might be issues there.  So it depends who it
17   is.  You can't just walk up to anybody and do
18   anything at the time, because it's real straight
19   policies and rules on certain things you need to do
20   in the SNM.
21        Q.   Let me just stop you there, Mr. Cordova.
22   Are you making the assumption I'm talking about
23   crimes in prison versus crimes in the streets?
24        A.   I'm talking about it all in general.
25        Q.   Anywhere?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Anywhere.
 2        Q.    And so your answer would apply to
 3   anywhere -- that anywhere, even if you're an SNM
 4   soldier, anywhere where you are, you're capable of
 5   committing a crime based on your own motivation, and
 6   not being ordered by the gang?
 7        A.    As long as you don't cause conflict within
 8   the clique, they don't really care about it.  But if
 9   it brings conflict and disruption, then they care.
10        Q.    When you met with Agent Acee in January of
11   2016, did Agent Acee communicate to you that he knew
12   you had just been convicted of a homicide?
13        A.    Yes, he knew I'd been convicted of a
14   homicide.
15        Q.    And he knew you were awaiting sentencing?
16        A.    Yes, ma'am.
17        Q.    And did -- I think you testified earlier
18   that during that conversation, that's when Agent Acee
19   told you that he was looking at you as the target of
20   a racketeering prosecution?
21        A.    No, that's not what he said.  He said:
22   This is what things are being said.  But, no, that's
23   not true.  Because in my court it says other.  So you
24   can go ahead and you can look up my case if you want,
25   yourself, and it will state there were no witnesses,
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492

**BEAN & ASSOCIATES,** Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    stated different.  You get what I'm saying?

 2        Q.   I understand.  Your position is your case

 3    had nothing do with SNM Gang activity.  I understand

 4    that.

 5             My question is, when you met with Agent

 6    Acee --

 7        A.   No, he wasn't looking at me for that

 8    murder.

 9        Q.   Okay.  Did he tell you that he was looking

10    at you as the potential target of a racketeering

11    prosecution?

12        A.   What Bryan Acee asked me:  Did that person

13    disrespect you in any way or disrespect the SNM?  And

14    I told --

15        Q.   Mr. Cordova, I'm going to ask you if you'd

16    answer the question, and then we can go on and talk

17    about what you want to talk about.

18        A.   Yes, ma'am.

19        Q.   Okay.  So the question was:  In January of

20    2016, when you first met with Agent Acee, did he tell

21    you you were being looked at or considered as a

22    target of some sort of racketeering prosecution?

23        A.   Yes, ma'am.

24        Q.   And did he tell you the types of crimes

25    that he thought you had committed in the past that

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1    made you such a target?

2        A.   He didn't say that.  But he said I was

3    being looked at.

4        Q.   Okay.  Well, did he tell what things you

5    had done that were causing you to be looked at?

6        A.   At that time, no, ma'am.

7        Q.   Did he mention to you that the homicide

8    that you'd just been convicted of was something he

9    was looking at, Agent Acee?

10       A.   He asked me:  Is it SNM related?  Did they

11   disrespect the SNM in any way, or anything like that?

12   And I said no.

13       Q.   All right.  So during that conversation,

14   you sought to assure him that the crime that you had

15   just been convicted of had nothing to do with the SNM

16   Gang?

17       A.   Yes, ma'am.

18       Q.   But he was asking you questions about

19   whether that crime was related to the gang, right?

20       A.   Yes, ma'am.

21       Q.   And in your mind -- well, did you know --

22   you said you had witnessed people being arrested on

23   the first SNM racketeering takedown?

24       A.   Yes, ma'am.

25       Q.   When Agent Acee told you that you were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    being looked at as a target of a racketeering
 2    investigation, and asking you questions about a
 3    homicide that you'd just been convicted of, what went
 4    through your mind in terms of what sort of time you
 5    might be facing?
 6         A.   There again, you're putting words in my
 7    mouth.  He never said I'm being looked at for that
 8    murder.  He asked me:  Is it SNM related?  He didn't
 9    say I was being looked at for the murder.  He just
10    asked me:  Is it SNM related?
11         Q.   When Acee told you you were being looked at
12    as target of a racketeering prosecution, what went
13    through your mind in terms of what sort of time you
14    might be looking at?
15         A.   It wasn't also what he had told me.  It was
16    everything else he had talked to me about:  About
17    doing this; about how he's worked with many other
18    organizations, and if he thinks it's worth it.  At
19    one time I thought it was worth it.  But now, it's
20    not worth it.
21         Q.   So he gave you -- he sort of acted as a
22    counselor?
23         A.   He gave me an opportunity to dismantle the
24    SNM.  And I chose to join on is what happened.
25         Q.   Is that how he put it to you:  That here's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    your opportunity to dismantle the SNM?
 2         A.   No.  That's how I took it.
 3         Q.   How did Agent Acee put it?
 4         A.   To stop these guys from committing more
 5    murders.
 6         Q.   Did Agent Acee discuss with you
 7    opportunities that perhaps he could present to you if
 8    you were to become a witness for him?
 9         A.   Opportunities?  Like what?
10         Q.   Well, like let's talk about tattoo removal.
11    Did he talk about that with you?
12         A.   He talked about that, he talked about
13    WITSEC facility and all that.  And I denied it.
14         Q.   Let's just go one by one, okay.  He talked
15    about tattoo removal with you; is that right?
16         A.   Yeah.
17         Q.   And did he talk about that maybe he could
18    help you get tattoos removed?
19         A.   But this was after.  This was later on when
20    I spoke to my attorney and him.
21         Q.   In a different conversation?
22         A.   In a different conversation.
23         Q.   Okay.  Well, I want to stick with this
24    first conversation, so give me a second.
25         A.   So, no.  If it's the first conversation,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   no.
 2        Q.   In the first conversation did he talk to
 3   you about the fact that -- did he talk to you about
 4   the fact that he was going to ask you to wear some
 5   sort of recording device and record conversations?
 6        A.   He said, "Are you willing to do this?"
 7             And I said yes.
 8        Q.   And did he tell you why he wanted you to
 9   wear some sort of recording device to record
10   conversations?
11        A.   That was in the second conversation.  So,
12   no, we never talked about that.  The first
13   conversation I told him what I can do for him, and
14   then we just stayed at that.  That's all it was.
15        Q.   And the idea was, if you would agree to do
16   something for him, he wouldn't continue to pursue you
17   as a target in a racketeering investigation?
18        A.   We didn't really get into that till later
19   on.
20        Q.   Well, is that what you understood, though?
21   Is that one of the reasons you agreed to record
22   conversations?
23        A.   Well, yeah.  No, I knew something --
24        Q.   You knew if you'd agree, Acee would back
25   off, right?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    To be honest with you, I just agreed.

 2        Q.    Let's go to the second conversation.

 3   Because in the second conversation I think you said

 4   that he explained to you why he wanted you to wear --

 5   use a recording device?

 6        A.    Because my say-so, my word, wouldn't

 7   matter.  So he needed me to get it on a recording.

 8        Q.    So, essentially, what he told you, if you

 9   say something is true --

10        A.    Get it on a recording.

11        Q.    -- he's not going to believe you unless

12   there is a recording of it?

13        A.    It's not that.  It's just that he needs it

14   on recording.  He can't --

15        Q.    Rely on your word?

16        A.    Not that he don't believe me, because

17   that's the way the court system works, right?

18        Q.    He told you that he couldn't believe just

19   your word, so he would want you to capture these

20   conversations or statements on recordings?

21        A.    In other words, if it's true, get it for

22   him on recording.

23        Q.    So if it's true, prove it, right?

24        A.    Not prove it.  "If it's true, can you get

25   it for me?"
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            And I said, "Yes, I can."
 2            He said, "Okay, then go ahead."
 3       Q.   And specifically when you discussed these
 4    recordings, were you discussing recording Mr. Perez?
 5       A.   Now what, miss?
 6       Q.   When you discussed making these recordings
 7    with Acee, were you discussing recording Mr. Perez,
 8    Rudy Perez?
 9       A.   Yes, ma'am.
10       Q.   And you had, just about a month or so
11    prior -- been housed with Rudy Perez at PNM, right?
12       A.   I'd say about a few months before that.
13       Q.   Prior to your conviction in the murder
14    case?
15       A.   Yes, ma'am.
16       Q.   And you knew, because you had lived with
17    Mr. Perez at various times over the years, that he
18    had medical problems, right?
19       A.   Yes, ma'am.
20       Q.   Did you know the nature -- did you know the
21    nature of those problems?
22       A.   He just told me he got stabbed and shot a
23    bunch of times.
24       Q.   Okay.  Did Mr. Perez complain to you about
25    the fact that he was in a lot of pain?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   I know he said it slowed him down.  But how

2    hard?  He was still going.

3    Q.   Did you know, when you talked with Agent

4    Acee, that Mr. Perez was being prescribed medication

5    while he was at PNM?

6    A.   Yes, ma'am.

7    Q.   And the medication in the form of pain

8    killers, right?

9    A.   Yes, ma'am.

10   Q.   Do you know the names of the medication

11   that he was being prescribed based on your

12   conversations with him?

13   A.   I think that Neurontin, Tramadol, Depakote.

14   And I can't recollect the rest.

15   Q.   Vicodin?

16   A.   Vicodin?  I don't know if it was Vicodin,

17   but he told me a lot.

18   Q.   And you knew, when you talked with Agent

19   Acee, that Mr. Perez had been when you last saw him

20   taking those kind of medications on a daily basis?

21   A.   Yes, ma'am.  No, I hadn't talked to Acee

22   about that.

23   Q.   You didn't mention that to Acee?

24   A.   I didn't mention that to him.

25   Q.   But in your mind you knew that Perez was on

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                      1-800-669-9492
                                                           e-mail: info@litsupport.com



1    those kind of medications, right?

2        A.    Yes, ma'am.

3        Q.    And did you have any opinion as to how

4    those medications affected Mr. Perez, based on

5    watching?

6        A.    Just made him feel good.

7        Q.    Making him relaxed?

8        A.    Yeah.  To make him feel good.

9        Q.    Now, you testified on direct examination

10   about sort of the plan of how you were going to get

11   some sort of recorded statement from Mr. Perez.  Do

12   you recall that testimony?

13       A.    What do you mean?

14       Q.    Well, I think you had a plan, because you

15   said part of your plan was you weren't going to go in

16   there and intimidate him to try to get him to make

17   statements.

18       A.    Intimidate him?

19       Q.    Right.

20       A.    Do I sound intimidating on the recording?

21       Q.    No.

22       A.    There you go.

23       Q.    You didn't hear my question.  I said part

24   of your plan, at least that you testified about when

25   Mr. Castellano was asking you questions, was that you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    weren't -- you were not going to try to intimidate

2    him, right?

3         A.   I didn't try to intimidate him.

4         Q.   That's not the question.

5         A.   You're asking me if I tried to intimidate

6    him?

7         Q.   No, I'm not.

8         A.   Then what are you asking?

9         Q.   I'm saying part of your plan was

10   deliberately to not intimidate him, right?

11        A.   To not intimidate him.  So what are you

12   trying to say, I'm going to butter him up?

13        Q.   That you're going to what?

14        A.   I'm going to butter him up.

15        Q.   What I'm trying to ask --

16        A.   Can you please get to the point, Miss,

17   because you're, like, confusing me.

18        Q.   Excuse me, that's for the Judge, Mr.

19   Cordova.

20             My question is that you formed a plan in

21   your mind, and with Agent Acee, about how you were

22   going to get these recorded statements from Mr.

23   Perez, right?

24        A.   Of course.

25        Q.   Okay.  And part of that plan was that you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1    were going to not -- you were not going to use

 2    intimidation as a tactic?

 3         A.   No.   I did not use intimidation as part of

 4    a tactic.

 5         Q.   And you testified earlier that you were

 6    going to use --

 7         A.   Same question.

 8         Q.   You testified earlier that you were going

 9    to use -- and I'm going to use the term you said --

10    "pressure points."  Do you recall that testimony?

11         A.   Yes, ma'am.

12         Q.   Where did that term pressure points come

13    from?

14         A.   Pressure points is you can't approach him

15    directly, and say, Hey --

16              MS. JACKS:  Object as nonresponsive.

17              MR. CASTELLANO:  Objection, Your Honor.  He

18    is answering the question.

19              MS. JACKS:  No, he's not.

20              THE COURT:  Well, hold on, hold on.

21              THE WITNESS:  Jeez.

22              THE COURT:  Mr. Cordova, do this for me,

23    okay?

24              THE WITNESS:  Yes, sir.  Sorry, Your Honor.

25              THE COURT:  Let's not add a bunch of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    comments while --
 2            THE WITNESS:  Sorry about that.
 3            THE COURT:  -- while the defense lawyers
 4    are asking the questions.
 5            Probably Mr. Castellano doesn't mind what
 6    you say, but we're in cross-examination.  So listen
 7    very carefully to Ms. Jacks' question.  Just answer
 8    it and then be quiet.
 9            Ms. Jacks.
10    BY MS. JACKS:
11        Q.   Let me repeat the question.  Whose term was
12    pressure points?
13        A.   That's my term.
14        Q.   Okay.  And what did that mean?
15        A.   Pressure points is I can't approach him
16    directly and just say, Hey, did you -- you know what
17    I mean?  So I've got to talk to him, and get the feel
18    about what's going to be said next.
19        Q.   Try to put him at ease?
20        A.   Trying to get him to reveal the truth,
21    without asking him directly.  So it's asking him
22    indirectly, and getting him to reveal it on his own.
23        Q.   And you said that you recorded -- let me go
24    back for a second, because I want to ask you a couple
25    of questions about the recordings.  Do you recall
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that Mr. Villa asked you some questions about whether
 2    you made efforts to record Jesse Sosa?  Do you recall
 3    those questions?
 4         A.   Yes, ma'am.
 5         Q.   And you said that you didn't make any
 6    recordings of Jesse Sosa?
 7         A.   No, ma'am.
 8         Q.   And I think -- do you recall the testimony
 9    that you said that you tried to, but Jesse Sosa never
10    gave you any information?
11         A.   Never gave me any information.  So it
12    wasn't worth turning on the recorder.
13         Q.   Okay.  So that's what I'm getting to.  So
14    when you say that you tried to get information from
15    Jesse Sosa, did you talk to him --
16         A.   Yes, ma'am.
17         Q.   -- about -- let me finish the question.
18    Did you talk to him about the homicide of Mr. Molina?
19         A.   Yes, ma'am.
20         Q.   And did you talk to him with an effort to
21    try to get him to make statements about it?
22         A.   Yes, ma'am.
23         Q.   And on how many occasions do you think you
24    initiated those conversations?
25         A.   Probably a few days.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

296

1      Q.   Over the course of a few days?

2      A.   Yes, ma'am.

3      Q.   And was idea that -- I mean, I'm just

4   trying to understand.  You didn't have the recorder

5   on when you tried to talk to him about this?

6      A.   No, ma'am.

7      Q.   So was your plan -- you had a plan for

8   getting statements from Jesse Sosa, too, right?

9      A.   Yes.

10      Q.   And was the plan to get Jesse Sosa to talk

11   about the Molina homicide when the recorder was off,

12   and then get him to talk about it again, but record

13   it?

14      A.   Yes, ma'am.  Not only when it's off.  Like

15   when you're talking to somebody, you get the feel

16   about what they're about to say.  You get to where

17   it's meeting.  And then you turn it on, you get what

18   I'm saying?

19      Q.   Right.  I do.  And is that the same kind of

20   plan that you used to try to get incriminating

21   statements from Mr. Perez?

22      A.   Yes, ma'am.

23      Q.   Kind of talk to him a little bit about it,

24   see what he's going to say?

25      A.   Yes, ma'am.

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                         (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492
                                                       1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1      Q.   And then try to bring the topic up later
2  when you turn the recorder on?
3      A.   Yes, ma'am.
4      Q.   Or when it gets to a point where he seems
5  like he's just about to make some sort of statement,
6  you flip the recorder on real quick?
7      A.   Yes, ma'am.
8      Q.   And is that a plan of using the recorder
9  that you just came up with on your own, or did you
10  have any help from anybody?
11      A.   That was my plan.
12      Q.   Earlier, when you testified, you said you
13  didn't have the recorder; that you would turn the
14  recorder off when the person was talking just
15  gibberish?
16      A.   Yes, ma'am.
17      Q.   What is gibberish?
18      A.   When there is nothing to be said; there is
19  nothing to be talked about.  He wasn't talking about
20  murders.  He wasn't talking about nothing that was
21  going to incriminate him.
22      Q.   So that's what I'm getting to.  So, in your
23  mind, if somebody wasn't saying something that
24  incriminated them in a murder, like Agent Acee
25  wanted, you'd turn the recorder off?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            A.   Yes, ma'am.

 2            Q.   Now, I think you answered some questions

 3    probably from all the lawyers that have been up

 4    questioning you about Suboxone.  Do you know what

 5    Suboxone is?

 6            A.   Yes, ma'am.

 7            Q.   And have you -- you've used it in custody,

 8    right?

 9            A.   Yes, ma'am.

10            Q.   And you've used it at every place where

11    you've been in custody, right?

12            A.   Most places, yes, ma'am.

13            Q.   Well, is there anyplace where you've been

14    in custody that you haven't used it?

15            A.   Yes, ma'am.

16            Q.   Where?

17            A.   Where I'm at now.

18            Q.   Okay.  So right now, you're in sort of

19    what's called the RPP Program?

20            A.   Yes, ma'am.

21            Q.   And you haven't been -- you haven't used it

22    there?

23            A.   No, ma'am.

24            Q.   Other than that, any other facility housing

25    assignment where you have not used Suboxone?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, I pretty much used them at every

2  facility I was at in the past.  That's the only

3  facility I never used it.

4      Q.   And if I understand your testimony

5  correctly, the way you get Suboxone when you're in a

6  facility, is either somebody brings it in through a

7  visit -- that's one way, right?

8      A.   Yes, ma'am.

9      Q.   Or somebody gives it to you?

10     A.   Yes, ma'am.

11     Q.   Some other inmate gives it to you?

12     A.   Yes, ma'am.

13     Q.   Is there any other way to get it?

14     A.   Yes, ma'am.

15     Q.   How?

16     A.   The mailman.

17     Q.   The mail?

18     A.   Yes, ma'am.

19     Q.   Any other way?

20     A.   Just visits; COs; someone gives it to you,

21  or visits.

22     Q.   Okay.  So you added one there.  You said

23  correctional officers?

24     A.   Yes, ma'am.

25     Q.   So you can get Suboxone sometimes from a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    corrupt correctional officer?

2         A.   You pay them, and he's willing to bring it,

3    yes.

4         Q.   So we have through visits, through the

5    mail, through correctional officers, and through

6    other inmates?

7         A.   Yes, ma'am.

8         Q.   Does that pretty much complete the list the

9    ways you can get it?

10        A.   Yes, ma'am.

11        Q.   When you were moved in February of 2016,

12   next to the cell where Mr. Perez was, did you have

13   interaction with correctional officers?

14        A.   Just the STIU.

15        Q.   But what about the officers that were in

16   charge of supervising your unit?

17        A.   All right.  Can you clarify the question,

18   Miss, please?  When you say interaction, what kind of

19   interaction?  Do you mean like them bringing me

20   drugs, or them taking me to the yard, taking me to

21   the shower, bringing me my food?

22        Q.   Interaction I mean any contact.  So

23   maybe --

24        A.   Yes, ma'am.

25        Q.   Did you have any contact with correctional

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  officers?

 2       A.   Yes, ma'am.

 3       Q.   Did you send and receive mail?

 4       A.   No, ma'am.

 5       Q.   In February of 2016, you didn't send or

 6  receive any mail?

 7       A.   No, ma'am.  If I received any mail, it was

 8  more than likely a money order.  That was it.

 9       Q.   Wait, wait.  What's the answer then?

10       A.   It was just a money order.  That's it.

11       Q.   So then the answer would be, yes, you did

12  receive mail?

13       A.   I'm just saying, because I know I get a

14  money order once a month, you know what I'm saying?

15  So if I did, it was only a money order.  It wasn't a

16  letter out, it wasn't a letter in.

17       Q.   Okay.  But you did receive mail?

18       A.   Not when I was next to Perez, no.

19       Q.   Did the money order come through the United

20  States Postal Service?

21       A.   Yes, ma'am.

22       Q.   And it's your testimony that that is not

23  mail?

24       A.   I said if I received mail, it's a money

25  order.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

302

```
1        Q.   My question was:  Did you receive mail.  So
2   can you answer that question?
3        A.   I don't recollect.  I don't remember.
4        Q.   So it seems like what you're saying is a
5   money order sent through the mail is not mail?
6        A.   What I'm saying is, if it's a letter, no, I
7   didn't receive no mail or no letters, when I was next
8   to Perez.
9        Q.   Did you get visits in February of 2016?
10       A.   No, ma'am.
11       Q.   And were there other inmates housed with
12  you in February of 2016?
13       A.   Whoever was there.
14            THE COURT:  All right.  Let's take our
15  break for 15 minutes.  I'm not telling the marshals
16  what to do, but if you want to leave Mr. Cordova
17  outside of the courtroom until we get done with this
18  witness, because we're not going to pick up Mr.
19  Cordova right when we start.  Do you understand?
20            (The Court stood in recess.)
21            THE COURT:  Let's see, Ms. Fox-Young, did
22  y'all have your witness you want to put on at this
23  time?
24            MS. FOX-YOUNG:  Yes, Your Honor.  We call
25  Jose Martinez.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1            THE COURT:  Mr. Martinez, if you'll come up
2   and stand next to the witness box on my right, your
3   left.  Before you're seated, my courtroom deputy will
4   swear you in.
5                 JOSE BERNARDINO MARTINEZ,
6        after having been first duly sworn under oath,
7        was questioned and testified as follows:
8                     DIRECT EXAMINATION
9            THE CLERK:  Please be seated and state your
10  name for the record.
11           THE WITNESS:  My name is Jose Bernardino
12  Martinez.
13           THE COURT:  Mr. Martinez.  Ms. Fox-Young.
14           MS. FOX-YOUNG:  Thank you, Your Honor.
15  BY MS. FOX-YOUNG:
16       Q.   Good afternoon, Mr. Martinez.  What is your
17  profession?
18       A.   I'm a medical provider, a PA.
19       Q.   What does PA stand for?
20       A.   Physician's assistant.
21       Q.   Where are you currently employed?
22       A.   Currently, I'm with the Clinica Del Norte
23  facilities out in El Rito, New Mexico.
24       Q.   Was there a time when you were employed
25  working at the Penitentiary of New Mexico?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    Yes, ma'am.

2        Q.    When was that?

3        A.    Probably 2015 and 2016, part of 2016.

4        Q.    Were you working as a physician's assistant

5   there?

6        A.    Yes.

7        Q.    What were your job duties?

8        A.    Everything.  Primarily, sort of like a

9   family practice practitioner, doing physicals, taking

10  care of emergencies, on-call; seeing whatever needed

11  to be seen.

12       Q.    You were there every day seeing patients?

13       A.    Every day.

14       Q.    And do you remember seeing a patient named

15  Rudy Perez?

16       A.    Yes, I do.

17       Q.    And that was in 2015 and 2016?

18       A.    Yes.

19       Q.    Do you remember what you saw him for?

20       A.    He had multiple things:  High blood

21  pressure.  He was a Type II diabetic.  He had a

22  seizure disorder.  He had cholesterol problems.

23  That's what I can remember.  Primarily, when I was

24  seeing him, I was seeing him because he was morbidly

25  obese, and he was in a wheelchair.  And we were
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    trying to get him -- my contact with him was

2    primarily around that.  The other stuff I also saw a

3    little bit, but I was seeing if we can get him

4    ambulating.  He had a wheelchair, he had a walker in

5    his unit.  And we were trying to -- we got him to a

6    point to where he was able to ambulate, and we were

7    trying to get him a cane.

8         Q.   Do you recall what unit he was in?

9         A.   Level 6.

10        Q.   That's fine.

11        A.   Okay.

12        Q.   And when you saw him, did he come to see

13   you, or did you go to see him in his unit?

14        A.   No, routinely, he -- when I went to see

15   him, he came to see me, because we didn't have direct

16   contact in terms of the cells in the unit.  In that

17   unit, if there was something that needed to be seen

18   faster, they would bring him in to the medical

19   clinic.  If something -- I did the call, I would go

20   out to the unit, but they had to bring him out from

21   his cell into the triage room.

22        Q.   Do you remember how often you saw him?

23        A.   I would say a couple times a week;

24   sometimes less, sometimes more.

25        Q.   Okay.  And I'm going to ask you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    specifically about if you remember the time period --

2    Mr. Perez, I'll submit to you, was at PNM from June

3    2015 until about May of 2016.  Were you working at

4    PNM that whole time?

5          A.   Yes.

6          Q.   And during that period of time, do you

7    remember how often you saw him?

8          A.   Sometimes weekly, sometimes once or twice a

9    month.  But I would say once or twice weekly.

10         Q.   Once or twice weekly on average?

11         A.   On average.

12         Q.   And you said he was using a wheelchair.

13   When he came to see you, whether that was in the unit

14   or in the medical facility, did he come in a

15   wheelchair?

16         A.   Yes, he was always escorted.

17         Q.   He was escorted by whom?

18         A.   Officers, unit officers.  Level 6 is a max,

19   so they're not let out to walk on their own.  They

20   have to be escorted everywhere they're going.

21         Q.   So these were correctional officers from

22   Level 6 who brought him to you?

23         A.   Yes.

24         Q.   Were there STIU officers?

25         A.   I don't ever recall any STIU officers.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   You just know he was escorted by officers?

2      A.   Yes.

3      Q.   Do you recall if Mr. Perez was in pain?

4   Did he complain to you of pain during that period of

5   time?

6      A.   One of his many complaints.  He was

7   complaining of pain, complaining of not feeling well.

8      Q.   And did you talk to him about the seizures?

9      A.   Yes.

10      Q.   And do you know if he had any seizures

11   while he was at PNM?

12      A.   We had three or four people with seizure

13   disorders.  I can't honestly tell you that I remember

14   specifically him having a seizure, or me being called

15   out.  He could have, but I don't know if it was one

16   the others.

17      Q.   And there is no way for you to know for

18   certain whether he had a seizure or not?

19      A.   No.

20      Q.   Was that no?

21      A.   No.

22      MS. FOX-YOUNG:  Thank you, Your Honor.

23   Just a moment.

24      THE COURT:  Certainly.

25      MS. FOX-YOUNG:  Your Honor, I'll pass the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    witness.

 2              THE COURT:  Thank you, Ms. Fox-Young.

 3              Let me ask the defendants if anybody has

 4    any cross-examination of Mr. Martinez?

 5              All right.  Mr. Beck?

 6                        EXAMINATION

 7    BY MR. BECK:

 8         Q.   Good afternoon, Mr. Martinez.

 9              In the time that you saw Mr. Perez from

10    2015 to 2016, did you have conversations with Mr.

11    Perez when you'd see him?

12         A.   Yes.

13         Q.   Did these conversations include a

14    diagnostic of how he's feeling?

15         A.   It was the conversations in terms of his

16    the chief complaint, and my addressing that chief

17    complaint in whatever manner at the time.

18         Q.   Did you have those conversations about his

19    complaints each time you saw him?

20         A.   Yes.

21         Q.   Did you converse with him about anything

22    else during this time?

23         A.   Other than addressing his complaint and how

24    I was going to address it, either order something,

25    fill his medications.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   And he was able to intelligently
 2   communicate with you about his complaints?
 3          A.   Yes.
 4          Q.   He was able to answer the questions you
 5   had?
 6          A.   Yes.
 7               MR. BECK:  Pass the witness, Your Honor.
 8               THE COURT:  All right.  Thank you, Mr.
 9   Beck.
10               Ms. Fox-Young, any redirect of Mr.
11   Martinez?
12               MS. FOX-YOUNG:  No, Your Honor.  He may be
13   excused.
14               THE COURT:  All right.  Mr. Martinez, you
15   may step down.  Ms. Fox-Young says he can be excused.
16   Mr. Beck, can he be excused?
17               MR. BECK:  Yes, Your Honor, he may.
18               THE COURT:  Anybody else?
19               Did you have anything, Mr. Samore?  No?
20               All right.  You are excused from the
21   proceedings.  Thank you for your testimony.
22               All right.  Are we ready to bring Mr.
23   Cordova back in?  And Mr. Samore, if you want to come
24   back up.
25               Ms. Jacks.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              All right.  Mr. Cordova, I'll remind you
 2     that you're still under oath.
 3              THE WITNESS:  Yes, Your Honor.
 4              THE COURT:  All right.  Ms. Jacks, if you
 5     wish to continue your examination of Mr. Cordova, you
 6     may do so.
 7              MS. JACKS:  Thank you.
 8              THE COURT:  Ms. Jacks.
 9                   EXAMINATION (Continued)
10     BY MS. JACKS:
11        Q.   Mr. Cordova, before the break I was asking
12     you some questions about your plan to make these
13     surreptitious recordings.  Do you recall those
14     questions?
15        A.   Yes, ma'am.
16        Q.   Was this your first time acting like an
17     undercover informant, making recordings, or had you
18     done that before?
19        A.   I haven't done that before, Miss.
20        Q.   I want to pick back up on our discussion
21     about Suboxone.  And when you made the recordings of
22     Mr. Perez and Mr. Herrera, you were at PNM Level 6,
23     right?
24        A.   No, Herrera I was at Level 4.  Perez, I was
25     at Level 6.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   When you made the recordings of Mr. Perez,
2  you were at PNM Level 6; correct?
3      A.   Yes, ma'am.
4      Q.   And you had gotten Suboxone smuggled in to
5  you before at PNM Level 6, haven't you?
6      A.   Yes, ma'am.
7      Q.   And, in fact, your mother was detained for
8  smuggling Suboxone into PNM Level 6, wasn't she?
9      A.   Yes, ma'am.
10     Q.   What year was that?
11     A.   I don't know if it was Suboxone.  But she
12 was caught from my little brother.  That was in 2012,
13 '11, 2011, January.
14     Q.   I want to ask you some questions about the
15 Exhibit CH-C.  And it's a transcript of a
16 conversation between you, Dale Chavez, and Carlos
17 Herrera.  You answered some questions about this when
18 the prosecution asked you about it.  Do you remember
19 that?
20     A.   Yes, ma'am.
21     Q.   And, specifically, I'm going to direct you
22 to what's been marked as page 20999.  Back up a
23 little bit, and just give you a chance to read it.
24 But you'd agree with me that what's reflected on this
25 page is a discussion about Suboxone, right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Yes, ma'am.
 2          Q.    And what are you talking about with
 3    Mr. Chavez in this?
 4          A.    Comparing prices to Suboxone on the
 5    streets.
 6          Q.    On the streets versus in prison?
 7          A.    No.
 8          Q.    Just on the streets?
 9          A.    On the streets.
10          Q.    And I think when Mr. Castellano asked you
11    some questions about this, you said that -- and I
12    want to try to quote you -- that you were talking
13    about Suboxone strips with Mr. Chavez because, quote,
14    "I didn't know what Bryan was going to have me do
15    next."  Do you recall that testimony?
16          A.    Yes, ma'am.
17          Q.    And who is Bryan?
18          A.    Bryan Acee.
19          Q.    So Agent Acee is who you were referring to?
20          A.    Yes, ma'am.
21          Q.    And you said you didn't know what Bryan was
22    going to have you do next?
23          A.    Yes, ma'am.
24          Q.    Can you flesh that out for me a little bit.
25    What was going through your mind?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I didn't know what was going on, you know

2   what I mean?  He told me:  Do what you can, and get

3   as much murders as you can and do what you can.  So I

4   went in there, and I was doing what I do.

5      Q.   Did he tell you or did he make you think at

6   some point that, if you got as much information on

7   murders for him, that somehow you could get out to

8   the streets and be working undercover on drug deals

9   in the streets?

10     A.   No, ma'am.

11     Q.   That wasn't in your mind?

12     A.   No, ma'am.

13     Q.   What did you think it was that -- well,

14  you're talking about Suboxone prices on the street

15  here, right?

16     A.   Yes, ma'am.

17     Q.   And so what did you think Bryan was going

18  to have you do next with respect to Suboxone on the

19  streets?

20     A.   I was just doing what I do in prison with

21  the SNMers, and talk about drugs and prices, and get

22  things going.  And if it was possible, I would have

23  let Bryan know what was going on.  And if he felt it

24  was serious enough, he would act on it.  If not, then

25  throw it to crazy.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                      1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1      Q.   Did Bryan -- and by Bryan I'm meaning Agent

2   Acee -- ever talk to you about, after your

3   cooperation was done in this case, possibly moving

4   you to some other state where you could perform

5   undercover services for the FBI out on the streets?

6      A.   No, ma'am.

7      Q.   After you made the recordings that you

8   testified about today, I think you said that you were

9   appointed a lawyer; is that right?

10     A.   Yes, ma'am.

11     Q.   And when was that?

12     A.   Around May.

13     Q.   May of 2016?

14     A.   Yes, ma'am.

15     Q.   And was it also in May of 2016 -- or let me

16  go back.  When were you moved after you made the

17  recordings of Mr. Herrera?

18     A.   Around April or May.

19     Q.   Of 2016?

20     A.   Yes, ma'am.

21     Q.   And were you moved to another facility or

22  another unit or where were you moved?

23     A.   Another facility.

24     Q.   And where was that?

25     A.   MDC.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                       (505) 843-9494
FAX (505) 843-9492                                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   In Albuquerque?

 2        A.   Yes, ma'am.

 3        Q.   And at some point were you moved back to

 4   Level 6 in a pod called L pod?

 5        A.   Yes, ma'am.

 6        Q.   When did that happen?

 7        A.   Around May.

 8        Q.   So shortly after you got your lawyer?

 9        A.   Yes, ma'am.

10        Q.   You went from MDC in Albuquerque back to

11   Level 6 in L pod?

12        A.   Yes, ma'am.

13        Q.   Now, once you were placed in L pod, were

14   your conditions of confinement Level 6 confinement

15   conditions?

16             MR. CASTELLANO:  Objection, relevance.

17             THE COURT:  What's the relevance of that?

18             MS. JACKS:  Well, this is cross-examination

19   on something that was brought out, I believe -- let

20   me see if it was in direct.  And the relevance goes

21   to bias or other motives with respect to benefits.

22             MR. CASTELLANO:  This would be after the

23   recordings, though, so we're talking about a

24   different bias for a different hearing.

25             MS. JACKS:  Well, it goes to his honesty
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    and credibility in this hearing.
 2              THE COURT:  It's a little hard for me to
 3    slice it that close.  So I'll overrule the objection.
 4         Q.   So the question, Mr. Cordova -- I think the
 5    Judge says you can answer it -- is, were the
 6    conditions of confinement in L pod, Level 6
 7    conditions of confinement?
 8         A.   It was controlled movement, where we get
 9    tier time.
10         Q.   Okay.  So "controlled movement" meaning
11    that when you went out of the pod, you had to be
12    escorted by correctional officers?
13         A.   Yes, ma'am.
14         Q.   But you weren't locked in your cell 23
15    hours a day?
16         A.   No, ma'am.
17         Q.   In fact, you were able to spend most of the
18    day hanging out on the tier in the unit?
19         A.   Yes, ma'am.
20         Q.   And can you tell me who else was in L pod
21    when you were there?
22         A.   Munoz, Frederico Munoz; Robert Martinez;
23    Gerald Archuleta; Benjamin Clark; I believe Timothy
24    Martinez; Roy Martinez, I think.  And that's it from
25    my recollection.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 
BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      Q.    Were you moved out of L pod at some point?

 2      A.    Yes, ma'am.

 3      Q.    When did that happen?

 4      A.    In January.

 5      Q.    Of 2017?

 6      A.    I believe so.

 7      Q.    Now, with respect to getting the tier time,

 8   did you also get other benefits such as contact

 9   visits with your familiar?

10      A.    Yes, ma'am.

11      Q.    What other sort of benefits did you get

12   besides those two things?

13      A.    Basically, that was it.

14      Q.    And was anybody housed in L pod that was

15   not a government cooperator while you were there?

16      A.    To my recollection, no.

17      Q.    So everybody there had something to do with

18   being a government witness in this case?

19      A.    I believe so.

20      Q.    And while you were in L pod, did you --

21   were you able to see any of the discovery in this

22   case?

23      A.    No, ma'am.

24      Q.    Did any of the people housed with you have

25   computer tablets?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    I didn't have one.

2        Q.    That's not my question.

3        A.    I don't know if they had one.

4        Q.    You never saw one?

5        A.    No, ma'am.

6        Q.    Nobody ever showed you one?

7        A.    No, ma'am.

8        Q.    You have no idea what's on any of the

9   tablets?

10       A.    No, ma'am.

11       Q.    Do you know whether people who were

12   defendants and became cooperators in this case were

13   issued computer tablets that they brought with them

14   to L pod?

15       A.    I don't know, ma'am.  I don't know anything

16   about that.

17       Q.    Was it ever explained to you why you were

18   in a Level 6 prison, but getting privileges that were

19   more appropriate for Level 4 inmates?

20       A.    Pretty much, that whole prison was opened

21   up.  Everybody was pretty much getting tier time

22   then.

23       Q.    I understand that.  Everybody in L pod,

24   right?

25       A.    No, the whole prison.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.    Everybody in the whole Level 6 of PNM?
2          A.    Except the 3s.  The 2s and the 1s, they all
3    get tier time.  They got the Drug Suppression Unit.
4    You have the Gang Unit, which is in H pod.  You
5    have -- and all of them get tier time.
6          Q.    Do you think that the fact that you were
7    transferred to a pod with a bunch of other Government
8    witnesses and given contact family visits and tier
9    time had anything to do with you agreeing be a
10   government witness or making recordings?
11         A.    I think me walking away from the SNM was
12   enough for the administration to trust me and allow
13   me to have my privileges, like a regular RPP inmate
14   would have.  That's what I believe.
15         Q.    So you don't think it had anything to do
16   with the fact that you wore a wire or were agreeing
17   to testify as a government witness?
18         A.    I don't think so.
19         Q.    Now, in addition to getting the privileges
20   and the family visits, you also got money, didn't
21   you?
22         A.    Yes, ma'am.
23         Q.    And who gave you the money?
24         A.    The money just got put on my books.  It was
25   $50 a month.  I'm pretty sure it was Bryan.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Bryan Acee, the agent?

2      A.   Yes, ma'am.

3      Q.   And did Agent Acee ever explain to you why

4  he was going to start giving you money?

5      A.   Just living expenses, if I needed

6  something.  I need to call my family, put money on

7  the phone to call my family.  You know, get me

8  hygiene, if I need hygiene, stuff like that.

9      Q.   So let's be clear.  Before January of 2016,

10  was Agent Acee or any other member of law enforcement

11  putting money on your books every month?

12      A.   Before January '16?

13      Q.   Before January of 2016.

14      A.   Before?

15      Q.   Yeah.

16      A.   No, ma'am.

17      Q.   And after you made the recordings, Agent

18  Acee started putting money on your books every month;

19  is that right?

20      A.   Yes, ma'am.

21      Q.   Did your wife also receive money from law

22  enforcement?

23      A.   Not that I know of.

24      Q.   Did you ask for your money to be given to

25  your wife for any reason?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   No, ma'am.

2      Q.   Do you have -- or living with you and your

3 wife, do you have three young daughters?

4      A.   Yes, ma'am.

5      Q.   What are their ages?

6      A.   Teenage ages, 13, 12, 11.

7      Q.   And did you ever ask Agent Acee to give

8 money to your wife because your kids needed something

9 for school?

10      A.   No, ma'am.

11      Q.   Now, while you were -- I'm going to go back

12 to L pod.  I realize I forgot to ask you some

13 questions.

14           While you were in L pod, you were able to

15 talk freely with other people that were in L pod,

16 right?

17      A.   Yes, ma'am.

18      Q.   And you were housed with them 24 hours a

19 day, seven days a week, right?

20      A.   Yes, ma'am.

21      Q.   Did you ever discuss your testimony or your

22 expected testimony in this case?

23      A.   No, ma'am.

24      Q.   Did you ever discuss the Javier Molina

25 homicide?

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        A.   No, ma'am.

2        Q.   Did you ever discuss what sort of benefits

3   these other informants were getting for being

4   government witnesses?

5        A.   No, ma'am.

6        Q.   Not at all?

7        A.   No, ma'am.

8        Q.   It never came up?

9        A.   No, ma'am.

10        Q.   Did you ever find out that other people

11   were making more money than you, from Agent Acee

12   putting money on their books?

13        A.   No, ma'am.

14        Q.   Did you ever find out that other informants

15   got a -- do you know what a lump sum is?

16        A.   What is that, Miss?

17        Q.   I'm asking you do you know what it is?

18        A.   What are you --

19        Q.   Well, is there a process in the New Mexico

20   Department of Corrections, where the Department of

21   Corrections can just cut time off your sentence by

22   giving you a lump sum of credits?

23        A.   Oh, I don't know.

24        Q.   Did you ever discuss with any of the other

25   people housed in L pod whether any of them received

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    lump sum payments or lump sum credits against their
 2    sentence because of their position as government
 3    witnesses?
 4         A.   No, ma'am.
 5         Q.   Was Eric Duran in L unit at all while you
 6    were there, or L pod?
 7         A.   Yes, ma'am.
 8         Q.   And did Mr. Duran get released to the
 9    streets while you were in L pod?
10         A.   I know he left.  I don't know where to.
11         Q.   Did Mr. Duran ever talk with you about the
12    fact that he got a lump sum credit so that he could
13    get released from custody?
14         A.   No, ma'am.
15         Q.   Did he ever tell you he got payments in the
16    area of $25,000 from Agent Acee?
17         A.   No, ma'am.
18         Q.   Now, are you still receiving the $50 a
19    month from Agent Acee?
20         A.   No, ma'am.
21         Q.   When did those payments stop?
22         A.   January '17.
23         Q.   This year.  And did something -- well, was
24    something discovered in January of this year that
25    caused the payments to stop?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   I believe so.

2        Q.   Well, you believe, or you know?

3        A.   I know so.

4        Q.   I mean, I think when you referenced this,

5   when Mr. Villa was asking you questions, you said

6   that you were -- the payments were cut off.  Do you

7   recall that testimony?

8        A.   I didn't say the payments were cut off.  I

9   said I was cut off communicating with him.

10       Q.   You were cut off communicating with Acee?

11       A.   Yes.

12       Q.   And did that happen at the same time the

13  payments were cut off?

14       A.   Yes, ma'am.

15       Q.   And I think what you told Mr. Villa is you

16  were cut off because of what happened to you?

17       A.   Yes, ma'am.

18       Q.   Well, the truth is, it's not what happened

19  to you, right, it's what you did?

20       A.   Yes, ma'am.

21       Q.   And what did you do, or what did you do

22  that was discovered in January of 2017, that caused

23  you to be cut off from Agent Acee and the payments?

24       A.   I was caught having inappropriate relations

25  with my wife in a visiting room.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    When you say "inappropriate relations," you
 2   had sex with your wife in the visiting room, didn't
 3   you?
 4        A.    Yes.
 5        Q.    And you did it on more than one occasion?
 6        A.    Yes, ma'am.
 7        Q.    How many times did you do it?
 8        A.    I can't recall.
 9        Q.    Well, was it more than two times?
10        A.    About two times, a couple of times.
11        Q.    And while you were -- we're talking sexual
12   intercourse; correct?
13        A.    Yes, ma'am.
14        Q.    And while you were engaging in sexual
15   intercourse with your wife, were any of your
16   daughters present in the visiting room?
17        A.    Yes, ma'am.
18        Q.    Which ones?
19        A.    My two girls.
20        Q.    The two, the 11- and 12-year-old?
21        A.    Yes, ma'am.
22        Q.    And on one occasion the 13-year-old was
23   present, wasn't she?
24        A.    Yes, ma'am.
25        Q.    And at the time that you were engaged in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    sexual intercourse with your wife, how --

2         A.   I got two girls.  I don't have three girls.

3    I got two girls.

4         Q.   Okay.  You have two and your wife has a

5    daughter from another relationship?

6         A.   No, ma'am.

7         Q.   Who is the 13-year-old -- not her name, but

8    what is her relation to you?

9         A.   We don't have that.

10        Q.   Was it always the same two --

11        A.   Yes, ma'am.

12        Q.   -- children present every time you had

13   sexual intercourse with your wife?

14        A.   Yes, ma'am.

15        Q.   And at the time that you were engaging in

16   intercourse with your wife, how far were your two

17   daughters from you and your wife in this visiting

18   room?

19        A.   On the other side of the table, playing a

20   game.

21        Q.   Were they closer to you than the courtroom

22   deputy here sitting right in front of you in the pink

23   and white shirt?

24        A.   About that far.

25        Q.   And can you explain to me how it was that

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    you and your wife engaged in sexual intercourse in

2    front of your daughters?

3         A.   I seen a weakness the system, and I

4    exploited it.  That's all it was.

5         Q.   Okay.  I appreciate that.  You get away

6    with what you can get away with, right?

7         A.   Well, it's not what I can get away with.

8    It wasn't like that at the time.  It's my wife, you

9    know what I'm saying?  Those are my children.  If you

10   and your husband -- I'm assuming, do you have a

11   husband -- you have relations, right?

12        Q.   I'm not going to have sexual relations in

13   front of a 13-year-old, 11-, 12-year-old children.

14             But my question, Mr. Cordova, was how did

15   you --

16        A.   It wasn't my kids where they can see me.

17        Q.   Can you explain to us in this courtroom how

18   was it that you and your wife engaged in sexual

19   intercourse in front of 11 and 12-year-old girls?

20        A.   I covered her up.  And it was mostly

21   touching, more than anything.  They were on the other

22   side playing a game.  I made sure they were

23   distracted.  And that's how it went down.

24        Q.   Did your penis enter your wife's vagina

25   during those -- I mean, that's what sexual

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
 1    intercourse is, right?
 2         A.   Yeah.
 3         Q.   So we're on the same wavelength, right?
 4         A.   Yes, ma'am.
 5         Q.   So now you're saying is mostly touching,
 6    but it was more than touching, right?
 7         A.   It was, on one occasion, yes.
 8         Q.   So how did you and she have contact in this
 9    visiting room?
10         A.   We were in contact visits.
11         Q.   She sat on your lap, right?
12         A.   Yes, ma'am.
13         Q.   And she bounced up and down while your two
14    little girls were playing Monopoly?
15         A.   Yes, ma'am.
16              MS. JACKS:   I have nothing further.
17              THE COURT:   Thank you, Ms. Jacks.
18              Anyone else on the defense side that has
19    questions?
20              Ms. Duncan?
21              MS. DUNCAN:   Yes, Your Honor.  May I have a
22    moment, Your Honor?
23              THE COURT:   Certainly.
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      EXAMINATION
 2   BY MS. DUNCAN:
 3        Q.   You discussed with Ms. Jacks the benefits
 4   that you received at Level 6, correct, after
 5   cooperating?
 6        A.   Yes, ma'am.
 7        Q.   In addition to those that you mentioned
 8   when you were talking with Ms. Jacks, you also
 9   received unlimited phone calls; correct?
10        A.   Just the regular phone calls an RPP inmate
11   would get.
12        Q.   And they were paid for by someone other
13   than you?
14        A.   By me, but the money was put on my books,
15   yeah.
16        Q.   By someone other than you?
17        A.   Yes, ma'am.
18        Q.   You were also allowed to have shoes from
19   the street brought in by your family?
20        A.   I remember that, yes.
21        Q.   You said that Eric Duran was with you at
22   Level 6; correct?
23        A.   Yes, ma'am.
24        Q.   Are you aware that Eric Duran tried to
25   record you using a wire?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                MR. CASTELLANO:  Objection, relevance.
 2                THE COURT:  What is the relevance of this?
 3                MS. DUNCAN:  Your Honor, if he's aware of
 4     it, I think that he learned things from Mr. Duran.
 5     So Mr. Duran recorded this witness before this
 6     witness recorded Mr. Perez or Mr. Herrera.  So I'd
 7     ask him if he knew that, and what he learned from
 8     Mr. Duran, based on how to use the recorders and to
 9     get information.
10                THE COURT:  I guess I'm not following how
11     that helps us on this motion to suppress.  I'll
12     sustain.
13                MS. DUNCAN:  Well, Your Honor, if I could
14     just -- I think the way that it's relevant is that
15     Mr. Duran was trying to get information from Mr.
16     Cordova, using certain techniques.  And so what I'd
17     like to explore is --
18                THE COURT:  How does that help me determine
19     whether Mr. Perez and Mr. Herrera gave voluntary
20     statements?
21                MS. DUNCAN:  Because it goes to the
22     techniques that Mr. Cordova used to get Mr. Perez and
23     Mr. Herrera to make statements.
24                THE COURT:  Sustained.  This is getting far
25     afield.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1    BY MS. DUNCAN:
 2         Q.   Who did you discuss the Molina case with or
 3    the Molina murder with before you spoke to Rudy Perez
 4    about the case?
 5         A.   Can you say that again, Miss?
 6         Q.   Sure.  So you recorded Mr. Perez or talked
 7    to Mr. Perez about the Molina murder in February of
 8    2016; correct?
 9         A.   Yes, ma'am.
10         Q.   Before that date, who had you discussed
11    that murder with?
12         A.   Who I had discussed that murder with?
13         Q.   Yes.
14         A.   Everyone would talk about it in the yard.
15         Q.   So can you give me -- who is everyone?
16         A.   All the other Syndicatos that were there,
17    "Spider," "Blue," "Red," Creeper," basically all the
18    ones that were involved in it.
19         Q.   Other than "Spider," "Blue," "Red" and
20    "Creeper," did you discuss the murder with anyone
21    else?
22         A.   "Red."
23         Q.   Did you discuss it with your wife?
24         A.   No, ma'am.
25         Q.   Did you discuss it with STIU?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, ma'am.
 2        Q.   Before speaking with Mr. Acee in February
 3   or January of 2016, had you discussed it with any
 4   other law enforcement officer?
 5        A.   No, ma'am.  Before Bryan Acee, I never
 6   worked with any other law enforcement.  Never talked
 7   to STIU.  I never made a statement on nobody, none of
 8   that.
 9        Q.   You mentioned that it was STIU Officer
10   Gerardo who introduced you to Mr. Acee; is that
11   correct?
12        A.   Yes, ma'am.
13        Q.   Had you spoken with him before he
14   introduced you to Mr. Acee?
15        A.   Never.
16        Q.   Was that the first time you had met
17   Mr. Gerardo?
18        A.   I know who he is.  I just never spoke to
19   him.
20        Q.   In January 2016, when you were in MDC and
21   spoke with Mr. Acee, were there any other SNM members
22   in the pod with you?
23        A.   Where at?
24        Q.   MDC, in January of 2016.
25        A.   Yes, ma'am.  It was Salamon, "Silent" from
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Los Lunas or Belen.  That was basically it, that I
 2    can recall.
 3         Q.   And what is "Silent's" real name?
 4         A.   Honestly, I can't tell you.
 5         Q.   What about Salamon?
 6         A.   Can't tell you either.
 7         Q.   Did you discuss with "Silent" or Salamon
 8    the arrest of other SNM members in December of 2015?
 9         A.   We discussed that all the time, Miss.
10         Q.   And what did you discuss?
11         A.   Just what happened with the RICO Act, and
12    all that.
13         Q.   Did you discuss concerns about the three of
14    you being charged?
15         A.   No, ma'am.
16         Q.   Did either Salamon or "Silent" tell you
17    that they were cooperating with law enforcement?
18         A.   I didn't know that at that time.
19         Q.   And when did you know that?
20         A.   Later on, down the line, when things
21    started; people talk, people say things.
22         Q.   So when you say "down the line," when would
23    that be?
24         A.   About a year later.
25         Q.   And in what context?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   I was at X pod.  I was in the hole for what
2   I got in trouble for doing in the visiting room.  I
3   was there for six months with other individuals,
4   other gang members, like Burquenos, and they would
5   talk about it.  And they would say:  This is what we
6   hear.  But that's it.
7        Q.   Did you talk to any other SNM members,
8   former members or affiliates, about cooperating with
9   the government?
10       A.   No, ma'am.
11       Q.   At no time --
12       A.   No, ma'am.
13       Q.   -- did you ever discuss that?
14            When do you get out of prison?
15       A.   In about 20 months.
16       Q.   Twenty months from today?
17       A.   Yes, ma'am.
18       Q.   And when did you go to the RPP Program?
19       A.   I went to the RPP Program in July of this
20  year.
21       Q.   I think you testified that you left PNM
22  North in January of this year; is that correct?
23       A.   No, I left L pod and went to X pod in
24  January of this year.
25       Q.   And did you remain in X pod until you went
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to the RPP Program in July?

2          A.    Yes, ma'am.

3          Q.    And how is it that you went to the RPP

4    Program in July?

5          A.    Because Level 6, they don't have Interim

6    Level 6 no more, so if you have 30-day seg, that

7    what's the most I was supposed to do in seg.  But I

8    ended up doing six months because of the wait, the

9    hold, the bedding, it's real packed down there.

10   Because I was waiting for RPP in the first place.  I

11   was already waiting to go down there.

12         Q.    So you were on a wait list --

13         A.    Yes, I was ready to consider RPP.  And I

14   was waiting to go to RPP.

15         Q.    So for how long had you been on the RPP

16   wait list?

17         A.    For about a year.

18         Q.    Now, I understand that you recorded Rudy

19   Perez and Carlos Herrera; correct?

20         A.    Yes, ma'am.

21         Q.    And you tried to record Jesse Sosa?

22         A.    Yes, ma'am.

23         Q.    Are there any other individuals who you

24   tried to record?

25         A.    No, ma'am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.   Any other individuals --
 2         A.   Yes, ma'am.  There was Alex Munoz.  Sorry
 3   about that.
 4         Q.   Did you make any recordings of Alex Munoz?
 5         A.   Yes, ma'am, but I don't think -- I don't
 6   know what was said, or what, but, yeah, I made some
 7   recordings with him.
 8         Q.   Other than those four men, did you make or
 9   attempt to make any recordings?
10         A.   No, ma'am.
11              MS. DUNCAN:  If I could have a minute, Your
12   Honor?
13              THE COURT:  You may.
14              MS. DUNCAN:  No further questions, Your
15   Honor.
16              THE COURT:  Thank you, Ms. Duncan.
17              Anyone else on the defense side that has
18   cross-examination of Mr. Cordova?
19              All right.  Mr. Castellano, do you have
20   redirect of Mr. Cordova?
21              MR. CASTELLANO:  Thank you.
22              THE COURT:  Mr. Castellano.
23                     REDIRECT EXAMINATION
24   BY MR. CASTELLANO:
25         Q.   Mr. Cordova, you were asked about coming in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    yesterday and meeting with your attorney.  Do you
 2    remember that?
 3         A.   Yes, ma'am -- I mean, yes, sir.  My bad.
 4         Q.   Do you remember who else was present when
 5    you met with your attorney yesterday?
 6         A.   The US District Attorney and at court
 7    briefly.  And that was it.  Just seen them like
 8    passing by.  That was it.  When they said:  Hi, you
 9    got court.  Spoke with my lawyer.
10         Q.   Do you remember meeting with me last night?
11         A.   Yes, sir.
12         Q.   And did I tell you generally what would be
13    asked of you today?
14         A.   To say the truth.
15         Q.   Now, when you got to go to rec time, when
16    you were housed with Mr. Perez --
17         A.   Yes, sir.
18         Q.   -- you mentioned that he sometimes didn't
19    go to rec time; is that correct?
20         A.   Yes, sir.
21         Q.   And were there, at that time, multiple
22    people who would go to rec time in the cages?
23         A.   Yes, sir.
24         Q.   Now, at that time, do you recall Mr. Perez
25    telling you that he was under investigation?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.
 2        Q.   Now, in terms of the SNM, do you remember
 3   the SNM getting locked down after the Molina murder?
 4        A.   Yes, sir.
 5        Q.   And what about the Julian Romero assault?
 6        A.   That's why we were still under
 7   investigation, because we had just came out of
 8   lockdown.  And they had moved on Julian Romero.  And
 9   SNM is known for killing their own people a lot.  So
10   they didn't know who was next.  So we were under
11   investigation lockdown.
12        Q.   And so do you recall if that was July of
13   2015, or approximately when that was?
14        A.   Yeah, it was in 2015.
15             THE COURT:  Mr. Castellano, are you trying
16   to finish this witness up tonight?
17             MR. CASTELLANO:  I am, Your Honor.  I've
18   got a few more questions.
19             THE COURT:  Okay.  Go ahead.  Let's see if
20   we can finish him up.
21        Q.   Now, you mentioned earlier that you had
22   interacted with Rudy Perez before.  Do you remember
23   that?
24        A.   Yes, sir.
25        Q.   Now, the times you interacted with him, did
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   you ever have any problem understanding him?
 2        A.   No.
 3        Q.   Did he ever appear to have any problem
 4   understanding you?
 5        A.   No.
 6        Q.   You mentioned that he was in pain and he
 7   took painkillers.  Did you ever notice that affecting
 8   your ability to communicate with each other?
 9        A.   No, sir.
10        Q.   What about when you recorded him?
11        A.   No, sir.
12        Q.   Earlier, you talked about turning on and
13   off the recorder when you were recording Mr. Herrera
14   and Mr. Perez.  Do you ever remember them saying they
15   weren't involved in the Molina murder?
16        A.   No, sir.
17        Q.   Was that even when the recorder was off?
18        A.   Yes, sir.
19             MR. CASTELLANO:  Pass the witness, Your
20   Honor.
21             THE COURT:  All right.  Thank you,
22   Mr. Castellano.
23             All right.  Any reason Mr. Cordova cannot
24   be excused from the proceedings?
25             MR. VILLA:  No, Your Honor.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Everybody in

 2    agreement with that?  Mr. Castellano?

 3              MR. CASTELLANO:  Yes, Your Honor.

 4              THE COURT:  All right.  Anybody else?

 5    Defendants?  All right.  Not hearing any, Mr.

 6    Cordova, you're excused from the proceedings.  Thank

 7    you for your testimony.

 8              THE WITNESS:  All right, Your Honor.  Thank

 9    you.

10              THE COURT:  All right.  Let's shut her down

11    for tonight.  We'll see y'all tomorrow.  Everybody be

12    safe.  And I appreciate everybody's hard work.

13              (The Court stood in recess.)

14

15

16

17

18

19

20

21

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1                    C-E-R-T-I-F-I-C-A-T-E

2

3    UNITED STATES OF AMERICA

4    DISTRICT OF NEW MEXICO

5

6

7        I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8    Official Court Reporter for the State of New Mexico,

9    do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13       In testimony whereof, I have hereunto set my

14   hand on December 19, 2017.

15

16

17

18   _____
     Jennifer Bean, FAPR, RMR-RDR-CCR
19   Certified Realtime Reporter
     United States Court Reporter
20   NM CCR #94
     333 Lomas, Northwest
21   Albuquerque, New Mexico 87102
     Phone:   (505) 348-2283
22   Fax:     (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com