1

1        IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW MEXICO

3   UNITED STATES OF AMERICA,

4        Plaintiff,

5        VS.                    CR. NO. 15-4268 JB

6   ANGEL DELEON, et al.,

7        Defendants.

8                    VOLUME 3

9        Transcript of Combined Motions to Suppress
    Proceedings before The Honorable James O. Browning,
10   United States District Judge, Las Cruces, Dona
    County, New Mexico, commencing on December 13, 2017.
11

12   For the Government:  Ms. Maria Armijo; Mr. Randy
    Castellano; Mr. Matthew Beck
13
    For the Defendants:  Mr. Brock Benjamin; Ms. Cori
14   Harbour-Valdez; Mr. Patrick Burke; Mr. Robert Cooper;
    Mr. Jeff Lahann; Mr. Orlando Mondragon; Mr. John
15   Granberg; Mr. Billy Blackburn; Mr. Scott Davidson;
    Ms. Amy Jacks; Mr. Richard Jewkes; Ms. Amy Sirignano;
16   Mr. Christopher Adams; Mr. Marc Lowry; Ms. Theresa
    Duncan; Ms. Carey Bhalla; Mr. William Maynard; Mr.
17   Ryan Villa; Ms. Justine Fox-Young; Mr. Donovan
    Roberts; Ms. Lisa Torraco; Ms. Angela Arellanes; Mr.
18   Samuel Winder

19
    For the Defendants (Via telephone):  Mr. James Castle
20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Let's go on the
 2    record.  I appreciate everybody being here on time,
 3    ready to go.  I guess we've got three defendants
 4    without the black boxes today.  I guess we got some
 5    injuries, so a few people that have got them off.  So
 6    I appreciate everybody working hard to make
 7    everything work for us.  I do appreciate everybody's
 8    being cooperative here.
 9              Let's see.  Ms. Harbour-Valdez, you're
10    going to need to go to a show cause hearing in front
11    of Judge Vidmar at 9:30?
12              MS. HARBOUR-VALDEZ:  Yes, Your Honor.
13    Thank you.
14              THE COURT:  And, Mr. Burke, you're leaving
15    at noon?
16              MR. BURKE:  At the afternoon break.
17              THE COURT:  Afternoon break.
18              Let's see.  I didn't put on the record Ms.
19    Sirignano left after the last break yesterday
20    afternoon; correct?
21              MS. SIRIGNANO:  Yes, Your Honor.
22              THE COURT:  Who is on the phone?
23              MR. CASTLE:  Jim Castle is on the phone.
24              THE COURT:  Mr. Castle, good morning to
25    you.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1            Anybody else on the phone?  I've got one

 2    person on the phone?  Anybody with a mute button on

 3    that's on the phone?  All right.

 4            Any other changes that we have?

 5            All right.  Mr. Adams.

 6            MR. ADAMS:  Judge, I do have one

 7    housekeeping matter related to the black boxes.  The

 8    gentlemen, the defendants have been out of the black

 9    boxes.  Then there was some sort of issue that I

10    heard about in the beginning of the November

11    hearings, November 8 and 9, I believe, and they were

12    put back in the black boxes.  And you had indicated

13    that we should get to the bottom of it.  But you

14    didn't need to necessarily dig that deep in the

15    weeds.  There apparently had been some sort of

16    reference to somebody bringing in shanks.  But that

17    person was actually a cooperating witness, not these

18    defendants.  They have been here, they've been

19    behaving.  From my view in the back, they seem to do

20    great; great yesterday in a situation where nobody

21    really knew how they would behave when a cooperating

22    witness came and testified in the afternoon.

23            So my request is that for the hearings next

24    week, if they could all be out of their black boxes.

25    I believe there was a time when Mr. Baca was behind a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    screen, and that was challenged, and you listened,
 2    and you addressed Mr. Baca, as I recall, and you
 3    stood up and you stepped down and said:  You're a
 4    leader of men, and he may very well be a leader of
 5    men, and could you get a gentleman's agreement that
 6    if he came out from behind the screen, he would
 7    conduct himself like he should in your courtroom.
 8    And he has.  That was over a year ago.  And he has.
 9              And I think if you have that same address
10    to these gentlemen today, starting next week, you're
11    not going to have any problems with them.  We need to
12    get them starting to feel more natural as their trial
13    approaches, how they might really be in the
14    courtroom, and not just caged up like they're walking
15    someplace in the BOP.  That will help us help them.
16    And we make a request of you today.
17              THE COURT:  Well, let's do this:  Why don't
18    you talk to the marshals, the gentleman right back
19    there at the back of the door is the one to talk to.
20    So talk to him.  And I'll probably take a lot of my
21    cues from what their pulse is.  So why don't y'all
22    talk to them.  We're going to be here all day.  And
23    I'm sure somebody will be get back with me and let me
24    know what they're thinking.  Okay?
25              MR. ADAMS:  Thank you, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Thank you, Mr. Adams.
 2              All right.  Mr. Beck, have you joined the
 3    defense side over there?
 4              (Applause.)
 5              THE COURT:  A lot of times, I've seen where
 6    they wouldn't take you, but --
 7              MR. BECK:  They wouldn't, Your Honor.
 8              I believe -- I think the plan is this
 9    morning that we'll put Bryan Acee back up, and Ms.
10    Bhalla will resume her cross-examination, and we'll
11    pick up where we left off yesterday on the motion to
12    suppress.
13              THE COURT:  Okay.  Boy, I got lost.  We
14    finished with Mr. Cordova.  Had we broken --
15              MR. BECK:  Yes, we did, yesterday we
16    decided after lunch to put on Mr. Cordova to make
17    sure he got finished, and I think Ms. Bhalla was
18    still cross-examining Mr. Acee.
19              THE COURT:  All right.  Mr. Acee, if you'll
20    return to the witness box, I'll remind you you're
21    still under oath.  Ms. Bhalla, if you wish to
22    continue your cross-examination of Mr. Acee.
23              MS. BHALLA:  Yes, sir.  Thank you.
24              THE COURT:  Ms. Bhalla.
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      EXAMINATION
 2   BY MS. BHALLA:
 3        Q.   Good morning, Agent Acee.
 4        A.   Good morning.
 5        Q.   I think where we left off yesterday, we
 6   were talking about the 302s and the 1023s that were
 7   prepared on Mr. Cordova.  Were any -- and you were
 8   here for the testimony yesterday; correct?
 9        A.   Yes.
10        Q.   Okay.  You heard about a meeting that Mr.
11   Cordova says took place after he was pulled from the
12   pods next to Mr. Herrera and Mr. Perez, between you,
13   Mr. Cordova, and his attorney?
14        A.   Yes.
15        Q.   Okay.  Did you prepare any kind of report
16   on that meeting, or was a report prepared?
17        A.   I'm not sure.  My recollection of that
18   meeting was discussing him being charged federally.
19        Q.   Okay.  So you didn't have any conversations
20   with him about -- at that time, about what
21   information he was able to extract?
22        A.   No.  My recollection is that, once he got
23   an attorney, there were no more debriefings.
24        Q.   Okay.  Did you ever have a debrief with him
25   about the statements he was able to retrieve from Mr.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Perez and Mr. Herrera?

2        A.   Not a full debrief, no.

3        Q.   Okay.  So did you have an informal meeting

4    then?  What did you have?

5        A.   I think we had some informal meetings.  We

6    had some discussion.  But once his attorney got

7    involved, I didn't have the same access to him.

8        Q.   Okay.  Did you memorialize those

9    conversations in any way?

10       A.   I'm not sure.  I would need to check his

11   informant file and our case file.

12       Q.   Okay.  You testified yesterday that once

13   you found out about what happened with Mr. Cordova

14   and some of the other informants with the contact

15   visits, that you went and spoke to them; is that

16   correct?

17       A.   Yes.

18       Q.   Okay.  After you found out about the issue

19   that we're here for today, about the Suboxone or the

20   allegations that Suboxone was given, did you go talk

21   to Mr. Cordova about that?

22       A.   No.

23       Q.   So you never confronted him or asked him

24   about that allegation?

25       A.   No.  He was asked.  But it was through his

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    attorney, and the response was provided back through

 2    his attorney.  I didn't speak to him directly.

 3         Q.   Who was responsible for getting him an

 4    attorney?

 5         A.   The Court.

 6         Q.   Okay.  And do you know why that happened?

 7         A.   We gave him a target letter.

 8         Q.   Okay.  To your knowledge, did you discuss

 9    lump sum credits with Mr. Cordova?

10         A.   No.

11         Q.   Were lump sum credits given to Mr. Cordova?

12         A.   No.

13         Q.   Okay.  Are you familiar with Mr.

14    Rodriguez's 302 dated -- the conversation took place,

15    I should say, on November 1st of 2017?

16         A.   Did I write that one, or did Stemo?

17         Q.   I believe you wrote it.

18         A.   I'm familiar with it.

19         Q.   You are?

20         A.   Yes.

21         Q.   Do you recall speaking with him about the

22    effects of segregation and solitary confinement?

23         A.   Yes.

24         Q.   Okay.  Do you recall his statement:

25    Everyone gets paranoid, and that inmates in solitary

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                              e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   confinement develop significant psychological and
 2   social problems as a result?
 3        A.   He did tell me that.
 4        Q.   Okay.  Did he also detail to you how
 5   Suboxone is typically mailed into the prison
 6   disguised as legal mail?
 7        A.   Yes.
 8        Q.   Do you also recall him telling you, and I
 9   quote, "Suboxone gets you higher than fuck"?
10        A.   Yes.
11        Q.   Okay.
12             MS. BHALLA:  Can I have just one second,
13   Your Honor?
14             THE COURT:  You may.
15             MS. BHALLA:  I have nothing further.
16             THE COURT:  Thank you, Ms. Bhalla.  Any of
17   the defendants have cross-examination?
18             MR. LAHANN:  Your Honor, if I may.
19             THE COURT:  Mr. Lahann.
20                       EXAMINATION
21   BY MR. LAHANN:
22        Q.   Agent Acee, do you recall yesterday, when
23   Mr. Beck was asking you if it appeared that Mr. Perez
24   seemed under the influence in the recordings that you
25   listened to?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    Yes, sir.

2          Q.    And you stated that he seemed fine?

3          A.    Yes.

4          Q.    And Mr. Beck, in laying that foundation, he

5     went through your previous life as a patrol officer.

6     And I think you said that you had the DRE training in

7     California?

8          A.    Yes, sir.

9          Q.    And were you actually certified?

10         A.    Yes.

11         Q.    And that's -- from what I've heard from DRE

12    experts, they describe it as one of the most rigorous

13    trainings that they've done in their law enforcement

14    careers.  Would you agree with that?  Intellectually

15    rigorous.

16         A.    It had its challenges.

17         Q.    The DRE protocol is a 12-step protocol; is

18    that right?

19         A.    Yes, sir.

20         Q.    And actually, there is a 13th step, because

21    somebody in the field, an officer in the field, has

22    already done field sobriety tests, and they brought

23    somebody in to the station; you're usually called out

24    as a DRE to kind of follow-up; is that correct?

25         A.    Yes, sir.  The first step, though, is I

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

 1    would redo many of those same field sobriety tests.

 2         Q.    And you would agree that the protocol is

 3    much more complicated than a standardized roadside

 4    field sobriety test; is that right?

 5         A.    Yes, sir, it is.

 6         Q.    And if you're doing that entire protocol,

 7    the 12 steps -- well, the 11 steps that you do --

 8    that should take about an hour and a half?

 9         A.    Sometimes longer, yes.

10         Q.    Because during that hour and a half or

11    longer, you're required to take the suspect's pulse

12    and blood pressure, and temperature three different

13    times; is that right?

14         A.    Yes, sir.

15         Q.    You give the standardized field sobriety

16    tests again; is that right?

17         A.    It is, correct.

18         Q.    And you give additional physical tests

19    beyond the standardized tests; is that right?

20         A.    Yes.

21         Q.    The Romberg Balance, and the touching the

22    nose, and all that?

23         A.    Dark room, yes.

24         Q.    Dark room, because you're checking pupil

25    size in light, and then you turn the lights off and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    you check it again; is that right?
 2         A.   Yes, sir.
 3         Q.   The 11th step in the DRE protocol is,
 4    basically, you writing down your opinion; is that
 5    correct?
 6         A.   Yes, sir.
 7         Q.   And you're taught as a DRE expert that
 8    every opinion needs to be logged, whether you find
 9    somebody under the influence or not; is that correct?
10         A.   Correct.
11         Q.   And the 12th step, of course, is taking
12    blood and sending results to have that analyzed?
13         A.   Toxicology, yes, sir.
14         Q.   Okay.  And because you were listening to a
15    recording in this case, it's safe to say that you
16    didn't do any of those 11 steps that you would be
17    required to do to form an opinion about whether
18    somebody is under the influence?
19         A.   Correct.
20         Q.   So your opinion that Mr. Perez seemed not
21    under the influence really is pretty much a lay
22    opinion; is that correct?
23         A.   Fair to say.
24              MR. LAHANN:  Thank you.  No further
25    questions.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Thank you, Mr. Lahann.

 2              Any other defendants have cross-examination

 3     of Mr. Acee?

 4              MS. JACKS:  I have a few questions.

 5              THE COURT:  Ms. Jacks.

 6              Ms. Armijo, I didn't welcome you today.

 7     Good morning to you.

 8              MS. ARMIJO:  Thank you, Your Honor.

 9                        EXAMINATION

10     BY MS. JACKS:

11        Q.   Good morning, Agent Acee.

12        A.   Good morning.

13        Q.   I just want to follow up on a couple of

14     things that you spoke about yesterday, and I think

15     this was on direct examination.

16              One of the things that you talked about was

17     Billy Cordova's murder conviction or conviction for

18     manslaughter in December of 2015.  Do you recall that

19     testimony?

20        A.   Yes.

21        Q.   And I think what you said was that you were

22     investigating that, or you were considering that as a

23     potential racketeering activity of the SNM; is that

24     right?

25        A.   Yes.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   And I think you also said that you and Mr.
 2    Cordova -- you thought you and Mr. Cordova disagreed
 3    about that?
 4          A.   Yes.
 5          Q.   You heard Mr. Cordova testify about that
 6    offense yesterday, didn't you?  You were here in
 7    court?
 8          A.   I was.
 9          Q.   And Mr. Cordova said that he was convicted
10    of a crime that he didn't commit.  Was that true?
11          A.   Well, he was convicted.
12          Q.   But was he convicted of a crime he didn't
13    commit?
14          A.   I believe he was convicted of a crime he
15    did commit.
16          Q.   Okay.  So the testimony that Mr. Cordova
17    gave yesterday was false?
18               THE COURT:  Well, I think I probably should
19    be the one to determine that rather than Mr. Acee.
20    So I'll not allow that question or answer.
21          Q.   Agent Acee, did you discuss with Mr.
22    Cordova that you were investigating that homicide,
23    whether it be a murder or manslaughter, as a
24    potential overt act in the racketeering conspiracy?
25          A.   No.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Did you discuss with him the fact that he
 2   was convicted of that offense, and that it could be
 3   used in some federal prosecution?
 4        A.   I don't think I did.
 5        Q.   I also think on direct examination you
 6   testified that, after you opened Mr. Cordova as a
 7   confidential informant, you talked to him about
 8   perhaps continuing his work as a confidential
 9   informant once he got out of the prison.  Do you
10   recall that?
11        A.   He asked me if that was a possibility.
12        Q.   And it was something that you had done with
13   other government informants in this case?
14        A.   Yes.
15        Q.   And you're saying Mr. Cordova initiated
16   that conversation?
17        A.   Yes.
18        Q.   As a potential career path outside of
19   prison?
20        A.   Yes.
21        Q.   In exchange for -- he would work as an
22   informant in exchange for money?
23        A.   I believe that was his thoughts, yes.
24        Q.   And you talked with him about that in
25   either the meeting on January 4, 2016 or January 7,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    2016?

 2         A.   No.  That conversation, I remember it

 3    happened up in L pod, what we've been calling the

 4    cooperator pod.  He pulled me off to the side.

 5         Q.   Do you recall approximately when that was?

 6         A.   I think it would have been late 2016,

 7    because the incident where they had the inappropriate

 8    contact or sex was January, is when I terminated him.

 9    So it was prior to that.

10         Q.   So was it shortly before that?

11         A.   It would have probably been within a few

12    months of that.

13         Q.   Well, you worked with another government

14    cooperator, Eric Duran, correct, in terms of hooking

15    him up with some other agent on the outside to work

16    as a confidential informant in exchange for money

17    outside, once he got released from prison, right?

18         A.   It's true that I hooked him up with agents

19    in another division.  I presume they would pay him.

20    But that's their decision.

21         Q.   But that was -- kind of the thought, was to

22    give him a way to support himself once he got out of

23    prison?

24         A.   Well, I always push for:  You need to get a

25    job.  Don't count on a paycheck from us.  But I'm
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    sure he wanted money, and I believe he was paid some

2    amount of money.

3         Q.   Was the discussion you had with -- the

4    discussion when Mr. Cordova pulled you over and

5    inquired, maybe something like that would work out

6    for him, was that contemporaneous with that working

7    out for Mr. Duran?

8         A.   I was doubtful it could work as well for

9    Mr. Cordova, because he didn't want to leave New

10   Mexico.

11        Q.   That wasn't my question, though.  My

12   question was, was the timing of Mr. Cordova

13   approaching you contemporaneous with the timing of

14   that arrangement being made for Mr. Duran?

15        A.   I'm sorry.  I see what you're saying.

16   Mr. Duran was gone for a few months.  I think they

17   were in the pod at the same time.  So they may have

18   talked about that.  Am I answering your question?

19        Q.   Yes.

20        A.   But I'm not sure.

21        Q.   And the timing -- does that, in your mind,

22   seem to be approximately the same time that that had

23   happened for Mr. Duran?

24        A.   Yes, that could have lined up.  I don't

25   know what Duran told him.  I certainly didn't tell

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the other defendants where Duran was going, or what

2    he was going to be doing.

3        Q.   Okay.  And you're clear about the fact that

4    it was Mr. Cordova that approached you, suggesting

5    this arrangement might work out for him?

6        A.   Yes, minus the relocation to another state

7    part.  He wanted to stay in New Mexico and work.

8        Q.   But yesterday, when you talked about this

9    conversation, you said that you talked to him about

10   when he gets out, you could relocate him to another

11   city, and with another agent, do some sort of active

12   cooperation?

13       A.   I don't know that I said that.  And I can

14   try to clarify, if you'd like.

15       Q.   That's all right.  We have a transcript,

16   so -- I want to talk to you a little bit about L pod.

17   When was it that you first became aware that there

18   was an arrangement at the New Mexico Department of

19   Corrections where all the cooperators were being

20   housed together?

21       A.   I think I became aware of it as soon as the

22   marshals had the first six guys up there, because the

23   contract allowed for six.  So that would have been

24   sometime after the first phase takedown, sometime

25   after December 2015.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   Sometime shortly after December 2015?

2          A.   I believe so.

3          Q.   And how did you find out that that was the

4     way the informants were being handled?

5          A.   That they were being sent up there?

6          Q.   Right.

7          A.   I track where most of the defendants are,

8     cooperators and not.

9          Q.   Because you would need to go up and talk to

10    them?

11         A.   That's one of the reasons.

12         Q.   Were the cooperating witnesses housed in

13    the same pod, L pod, at your request?

14         A.   No.

15         Q.   To make it easier on you or other people

16    participating in the investigation?

17         A.   No.  I'd argue that it didn't make it

18    easier.

19         Q.   Did you have any concerns about -- first of

20    all, do you know who made that decision?

21         A.   No.

22         Q.   And whoever made that decision, did they do

23    it in consultation with you?

24         A.   I don't think so.

25         Q.   Did they do it in consultation with the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Government, to your knowledge?

2        A.    No.

3        Q.    When you found out about it sometime after

4    December of 2015, that the cooperators were being

5    housed together, did you have any concerns about that

6    situation?

7        A.    I did.  And those concerns lasted the

8    entire time, men were transferred in and out of that

9    pod.

10       Q.    Did you discuss those concerns with

11   anybody, either from the -- with the Government

12   prosecutors or with people from the New Mexico

13   Department of Corrections?

14       A.    Yes.

15       Q.    And can you tell me who you talked about

16   that with?

17       A.    Yes.  Anytime there were issues, I'd

18   consult with the three prosecutors at the table, and

19   oftentimes the various defense attorneys that

20   represented those men, as well as STIU at the Pen,

21   and sometimes administrators there, depending on what

22   the issue was.

23       Q.    Well, did you have any sort of overarching

24   concerns about the Government housing its cooperating

25   witnesses in the same place, where they could

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    interact freely with each other?
 2         A.   I had some concerns.
 3         Q.   And what were -- and I'm talking about
 4    overarching concerns, not about personal differences
 5    between people, but just generally, why that might
 6    not be a good idea?
 7         A.   Yes.
 8         Q.   Can you tell me why that would be?
 9         A.   Talking to one another.
10         Q.   And doing what?  Getting their stories
11    straight?
12         A.   Well, they're talking to one another about
13    the case.
14         Q.   And there is no way to prevent that, is
15    there?
16         A.   Not if they're housed together.
17         Q.   Did you bring that issue to anybody in an
18    effort to prevent that situation from continuing, all
19    the cooperators being housed together?
20         A.   No.
21         Q.   And if I understand your testimony
22    correctly, that ultimately -- that pod was ultimately
23    broken up sometime in January of 2017?
24         A.   Yes.
25         Q.   And that was due to the fact that numerous
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   cooperators were using contact visits to engage in
 2   sexual activity with females?
 3        A.   Four of them were.
 4        Q.   Over an extended period of time, right?
 5        A.   Happened more than once.
 6        Q.   I want to ask you some questions about
 7   providing a recording device to Billy Cordova,
 8   specifically.  When you talked to him about sending
 9   him into the prison to make recordings, did you talk
10   to him about the importance of preserving the
11   integrity of the evidence he was collecting?
12        A.   Not in those words, no.
13        Q.   Well, did you talk -- did you talk to him
14   at all, or did you advise him at all about how the
15   recording device was to be operated, in terms of when
16   he's having conversations with people, what
17   conversations he should be recording?
18        A.   Yes.
19        Q.   And what did you tell him?
20        A.   Well, that if it's not recorded, the
21   conversation, in my mind, didn't happen.  So if there
22   was pertinent information that he was able to talk to
23   these gentlemen about, it needed to be recorded.
24             At the same time I reminded him that it was
25   a small device and that it was battery powered.  That
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    I had had cooperators in this case tell me they've

2    obtained confessions, if you will, from people; I get

3    the device back and it's not on there.  So it doesn't

4    count in my mind.  So I just reiterated the

5    importance of conserving the battery and making sure

6    he captured the conversations.

7         Q.   Did you give him any instruction about

8    capturing entire conversation, as opposed to just

9    snippets of conversations?

10        A.   No.  And it would be a fair to say I didn't

11   do that.  And I placed the importance on, if they're

12   talking about murders, make sure it's recorded.

13        Q.   When did you start paying Mr. Cordova on

14   his commissary account?

15        A.   A review of his file would enable me to

16   give you an exact answer.  But I believe it was

17   shortly after I opened him.  Because that's normally

18   what I do.  I wouldn't deviate from that.  So I think

19   it was by February of 2016.

20        Q.   And it was a monthly payment of $50?

21        A.   No.  Because it's difficult to get the

22   money in there.  So the average was 50.  So if I

23   could put $300 on the books, and then not deal with

24   it again until several months later, that's what I

25   did.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

24

```
 1        Q.   When was the last time you made a payment
 2   to his commissary account?
 3        A.   I'm not sure.  I think it covered up till
 4   December.  It might have covered January, because I
 5   might have advanced it.  But I closed him in January.
 6   And in order for me to close him, all payments have
 7   to be completed and rectified, and the paperwork is
 8   in.  So January he didn't receive any money after
 9   that for sure.
10        Q.   Okay.  So your testimony is that after you
11   found out about the way he was abusing the privileges
12   and engaging in sexual activity in front of children,
13   you stopped paying him?
14        A.   Not only that, I closed him.  Yes.
15        Q.   So you -- closing means you terminated him
16   as a cooperating witness?
17        A.   No, as a confidential human source.
18   Whether or not he's a witness isn't my decision.
19        Q.   Okay.  So you closed him as a confidential
20   source, you closed the file on him?
21        A.   I did.
22        Q.   And since January of 2017, have you made
23   any effort or any recommendations to charge him as
24   part of an SNM racketeering case, whether it be a
25   violent crime in furtherance of racketeering or RICO
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    conspiracy or something else?
 2         A.   I have had no communication with him since
 3    January.  I pushed for him to be charged with RICO
 4    conspiracy.  His attorney had different ideas.  And
 5    those conversations were between the prosecutors and
 6    the attorney.
 7         Q.   Well, that sounds like conversations that
 8    happened prior to his -- prior to January 2017.
 9         A.   I think they were.
10         Q.   I think my question was since January 2017.
11         A.   I don't think there has been any
12    conversation about that.
13              MS. JACKS:  Thank you.  I have nothing
14    further.
15              THE COURT:  Thank you, Ms. Jacks.
16              Any other defendants have cross-examination
17    of Mr. Acee?
18              Mr. Beck, do you want to conduct redirect?
19              MR. BECK:  Yes, Your Honor.
20              THE COURT:  Mr. Beck.
21                   REDIRECT EXAMINATION
22    BY MR. BECK:
23         Q.   Agent Acee, on cross-examination was your
24    testimony that at some of these preliminary meetings
25    with Billy Cordova, STIU officers Sapien, Cupit, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Martin were there?
 2         A.   Yes.
 3         Q.   And was Mark Myers there?
 4         A.   Yes.
 5         Q.   And did they tell you anything about
 6    Mr. Perez or Mr. Herrera's psychological or mental
 7    issues, if there were any?
 8         A.   No.
 9         Q.   Did they tell you anything about the
10    medications that Mr. Perez was taking?
11         A.   No.
12         Q.   And did you ask them to move or house Mr.
13    Perez or Mr. Herrera in any way?
14         A.   No.
15         Q.   I want to talk to you about Exhibit RP-C.
16    Do you remember testifying about that exhibit
17    yesterday?
18         A.   Yes, sir.
19         Q.   I think you said -- did you say there were
20    seven pertinent recordings on there?
21         A.   I think I was asked, would I agree that
22    there were six.  And I thought there could be a
23    seventh, because it looked like there was more than
24    just a few seconds of recording.
25         Q.   Was the seventh you pointed to Number 1
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    yesterday, session Number 1 on there?

2         A.   No.

3         Q.   Which session was the pertinent one that

4    you thought you might not have talked about?

5         A.   Well, I'm not sure, because I was asked, I

6    think, isn't it true there are six, and when I looked

7    at the times I thought it might be.  If the decision

8    is mine, I'm going to look at all of them.  But there

9    might be a seventh one.

10        Q.   I'm going to show you what has been

11   previously admitted last week in a motion to suppress

12   hearing as Government's Exhibit 16.  And who does

13   that transcript say is the participants in that

14   conversation?

15        A.   CHS and Rudy Perez.

16             MR. BECK:  All right.  May I approach, Your

17   Honor?

18             THE COURT:  You may.

19        Q.   Take a look at that transcript, and tell me

20   whether you're familiar with the conversation in that

21   transcript.

22        A.   I am.

23        Q.   Who is the CHS in that transcript?

24        A.   It's -- I have a blank on his name -- it's

25   Mr. Cordova.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Billy Cordova from yesterday?

 2        A.    Yes.

 3              MR. BECK:  Your Honor, at this time, the

 4    United States moves to admit, for the purposes of

 5    this motion to suppress hearing, Government's Exhibit

 6    16?

 7              THE COURT:  Any objection?

 8              MR. VILLA:  Your Honor, I don't.  I just

 9    want to clarify whether it is the same as, you know,

10    the transcripts that were admitted yesterday.

11              MR. BECK:  It's not.  It's the seventh

12    recording from this.

13              MR. VILLA:  No objection.

14              THE COURT:  Anybody else?

15              All right.  Government's Exhibit 16 will be

16    admitted into evidence.

17              MS. DUNCAN:  I'm sorry, Your Honor.  If we

18    could get the Bates number for the transcript.

19              MR. BECK:  It begins at 20529, and it ends

20    at Bates No. 20533.

21        Q.    Special Agent Acee, I want to clarify, did

22    you request of the New Mexico Corrections Department

23    that the cooperators that were housed in L pod be

24    given special privileges?

25        A.    No, I didn't have anything to do with that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Did you ask that they be allowed conjugal
 2   visits?
 3        A.   No.
 4        Q.   I want to direct your attention, Agent
 5   Acee, to what was admitted yesterday as Carlos
 6   Herrera, CH-A.  Do you recall looking over this
 7   exhibit with Ms. Bhalla yesterday?
 8        A.   Yes.
 9        Q.   I believe she pointed out some of the UIs
10   or unintelligibles in that.  Do you recall that
11   testimony yesterday?
12        A.   Yes.
13             MR. BECK:  Your Honor, at this time, the
14   United States moves to admit Government's Exhibit 40
15   and 40A, copies of which I provided to Ms. Bhalla.
16   And they are the unenhanced for Exhibit 40, and the
17   enhanced Exhibit 40A, recordings of the conversation
18   from which this transcript is taken.
19             THE COURT:  Any objection, Ms. Bhalla?
20             MS. BHALLA:  No objection for purposes of
21   this hearing.  There is something I would like to
22   point out, but I think I can do that in closing
23   arguments, Your Honor.
24             THE COURT:  Anybody else have any
25   objection?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              All right, Government's Exhibit 40 and 40A
 2    will be admitted into evidence.
 3         Q.   Looking over this transcript yesterday --
 4    had you reviewed this transcript before yesterday?
 5         A.   Yes.
 6         Q.   Is it fair to say that there is a few --
 7    that there is a fair amount of unintelligibles in
 8    this transcript?
 9         A.   Yes.
10         Q.   Do you know whether Mr. Cordova was
11    recording Mr. Perez person-to-person, or how were
12    they recording each other?
13         A.   Person-to-person; they're separated by a
14    prison wall, speaking through an air vent.
15         Q.   Do you know if Mr. Cordova was recording
16    Mr. Perez through that air vent?
17              MS. BHALLA:  Objection, speculation.  He
18    wasn't present for that, Your Honor.  That testimony
19    was elicited from Mr. Cordova yesterday.
20              THE COURT:  Well, ask him if he knows.  If
21    he says yes, then we'll listen to his answer.  It's a
22    yes-no question.  Do you know?
23         A.   Yes.
24         Q.   How do you know that?
25         A.   Based on Mr. Cordova telling me that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   What did he tell you?
 2             MS. BHALLA:  Objection, Your Honor.
 3             THE COURT:  Well, I can hear what he said.
 4   It might differ.  Overruled.
 5        A.   Mr. Cordova explained to me that he got Mr.
 6   Perez to talk to him through the vents and that he
 7   recorded it.
 8        Q.   Have you spoken with a number of SNM
 9   members?
10        A.   Yes.
11        Q.   How many SNM members would you say you've
12   spoken with?
13        A.   Somewhere between 50 and 100.
14        Q.   And in conversations with SNM members,
15   generally, do you understand every word that they
16   say?
17        A.   No.
18        Q.   And I want to go back to sort of the
19   beginning of conversing with SNM members.  Did you
20   have a difficult time maybe understanding maybe every
21   word they say?
22        A.   Yes.
23        Q.   Why is that?
24        A.   They have their own language or phrases
25   that I hadn't heard before.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Yesterday, when I asked you about Mr.

2   Herrera's -- what you learned from listening to his

3   voice here -- I think, did you say that, in your

4   opinion, he was under the influence of any drugs or

5   narcotics during these conversations?

6      A.   I said that I -- it was my opinion that he

7   was not.

8      Q.   And when you listened specifically for

9   whether you thought that he was under the influence

10   of drugs or narcotics, did you listen to the

11   recordings or did you read the transcripts?

12      A.   Both.

13      Q.   And when you listened for whether he was

14   under the influence of narcotics, did you rely

15   primarily on listening to the recordings, or in

16   reading the transcripts?

17      A.   Primarily on listening to the recordings.

18           MR. BECK:  Your Honor, just as sort of a

19   housecleaning matter, at this time the United States

20   would move -- moves for the admission of Government's

21   Exhibit 41 and 41A, which are respectively the

22   recording of the conversation and the enhanced

23   recording of the conversation, the transcript for

24   which was admitted yesterday as Carlos Herrera, CH-C.

25           THE COURT:  All right.  Any objection to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    those?  All right.  Government's Exhibits 41 and 41A
2    will be admitted into evidence.
3         Q.   I believe you discussed with Ms. Jacks the
4    cooperators being housed together in L pod?
5         A.   Yes.
6         Q.   What direction did you give to NMCD to
7    direct them to house the cooperators together?
8         A.   None.
9         Q.   It sounds like you think they could have
10   talked about this case together while they were
11   housed together?
12        A.   They could have.
13        Q.   Did you take statements from each of these
14   cooperators before they went into housing in L pod?
15        A.   I have a list of who I think was there.
16   I'll just look at that real quick.
17        Q.   You may.
18        A.   Yes, I did.
19        Q.   And were those statements reflected in a
20   report that you or someone else later memorialized?
21        A.   Yes.
22             MR. BECK:  May I have a moment, Your Honor?
23             THE COURT:  You may.
24             MR. BECK:  Nothing further, Your Honor.
25   Pass the witness.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Thank you, Mr. Beck.
 2              All right.  Mr. Acee, you may step down.
 3              Did you have something, Mr. Villa?
 4              MR. VILLA:  Just a brief recross on one
 5    exhibit that was admitted from the previous hearings,
 6    Government's Exhibit 16.
 7              THE COURT:  Go ahead, Mr. Villa.
 8              MR. VILLA:  Thank you, Your Honor.
 9                       EXAMINATION
10    BY MR. VILLA:
11         Q.   Good morning, Agent Acee.
12         A.   Good morning.
13         Q.   So Exhibit 16 was the seventh, if you will,
14    statement of Mr. Perez to Mr. Cordova that we
15    overlooked yesterday?
16         A.   Yes.
17         Q.   And I'm going to show you Exhibit RP-C.
18    Are you able to tell me which one of these recordings
19    is reflected in the transcript of Exhibit 16?
20         A.   Can you slide it down?  Can I look at the
21    front page of the transcript?
22         Q.   Oh, the transcript, sure.
23         A.   No, I can't.
24         Q.   And is that true with respect to the other
25    exhibits that were admitted yesterday?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Some of the transcripts -- no, because some

 2   of the transcripts list the serial number of the

 3   device used, and then they're in sequential order, so

 4   it will say dash 001, or 004, so I think we could put

 5   them in order on those transcripts.

 6        Q.   But for this particular one, you cannot?

 7        A.   No, sir.

 8             MR. VILLA:  That's all I have.

 9             THE COURT:  Thank you, Mr. Villa.

10             Mr. Beck, do you have any redirect?

11             MR. BECK:  No, Your Honor.

12             THE COURT:  All right.  Mr. Acee, you may

13   step down.  Thank you for your testimony.

14             All right.  Does the Government have

15   further witnesses or evidence on the suppression

16   motion?

17             MS. ARMIJO:  Yes, Your Honor.  The United

18   States will call Jerry Roark.

19             THE COURT:  Mr. Roark, if you'll come up

20   and stand on the witness box on my right, your left.

21   Before you're seated, my courtroom deputy, Ms.

22   Standridge, will swear you in.

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                        JERRY ROARK,
 2         after having been first duly sworn under oath,
 3         was questioned and testified as follows:
 4                     DIRECT EXAMINATION
 5              THE CLERK:  Please be seated.  State and
 6    spell your name for the record.
 7              THE WITNESS:  Jerry Roark, J-E-R-R-Y; last
 8    name R-O-A-R-K.
 9              THE COURT:  Mr. Roark.  Ms. Armijo.
10              MS. ARMIJO:  Thank you, Your Honor.
11    BY MS. ARMIJO:
12         Q.   Where Roark, where are you employed?
13         A.   The New Mexico Corrections Department.
14         Q.   When did you start with Corrections?
15         A.   In 1989.
16         Q.   And in what capacity?
17         A.   I started as a correctional officer.
18         Q.   And what different capacities -- what's
19    your current title?
20         A.   My current title is Deputy Secretary of
21    Operations.
22         Q.   And who is your -- how many supervisors do
23    you have?
24         A.   I have one supervisor.
25         Q.   And who is that?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   The Secretary of Corrections.
 2        Q.   Okay.  So is it fair to say that only the
 3   Secretary of Corrections is above you?
 4        A.   Yes, ma'am.
 5        Q.   Now, what positions have you held
 6   throughout the years since starting as a correctional
 7   officer?
 8        A.   I went through the ranks of the custody
 9   series.  I was a sergeant, lieutenant, captain,
10   major.  I spent a little bit of time as a
11   classification officer.  And I was also a Deputy
12   Warden.  I then became the Director of Adult Prisons,
13   and then this position.
14        Q.   And how long have you been in your current
15   position?
16        A.   About six months.
17        Q.   Prior to that, what was your position?
18        A.   Director of Adult Prisons.
19        Q.   And as Director of Adult Prisons, what were
20   your duties?
21        A.   I oversaw the 11 prison facilities within
22   the State of New Mexico.
23        Q.   And when were you the Director of Adult
24   Prisons, approximately?
25        A.   From October 2011, till June of this year.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Now, in your capacity in working with the
 2   Corrections Department, are you aware of what an STG
 3   is?
 4        A.   Yes, ma'am.
 5        Q.   What is an STG?
 6        A.   It's a Security Threat Group.
 7        Q.   And are you familiar with Syndicato de
 8   Nuevo Mexico?
 9        A.   Yes, ma'am.
10        Q.   And what is that?
11        A.   It's a Security Threat Group within the
12   State of New Mexico.
13        Q.   Now, let's go over a little bit about
14   classifications.  Are you familiar with the different
15   classifications that New Mexico Corrections
16   Department has for inmates?
17        A.   Yes, ma'am.
18        Q.   Okay.  Tell us a little bit about that.
19        A.   Well, we have a scoring system that scores
20   inmates based on various things, based on various
21   criteria.  So they can score anywhere from Level 1 to
22   Level 4 points.
23        Q.   Okay.  And which is the lowest security?
24        A.   Level 1 would be the lowest security.  It's
25   the minimum security.  And then each -- Level 2 would
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  be, like, a minimum restrict -- it's a little fewer

2  privileges than a minimum.  Then the Level 3 is like

3  medium security.  And Level 4 is what we usually, a

4  lot of times, just call closed custody.

5       Q.   So would Level 4 be your highest

6  classification?

7       A.   It is.

8       Q.   And now, have you heard people use the

9  terms before Level 5 or Level 6?

10      A.   Yes, ma'am.

11      Q.   Is that really a correct term?

12      A.   Well, it is a correct term.  A lot of

13 people use it as a classification term.  Level 6 and

14 Level 5 really was designed to be a program.  Inmates

15 who engaged in misconduct or had security issues, we

16 couldn't put them in a general population, at that

17 point they were put in Level 6.  And Level 5 is

18 actually a step-down from Level 6 to prepare them to

19 go back into general population.

20      Q.   Is it an actual classification or is it

21 more programming?

22      A.   Well, it's a secure environment.  No one

23 scores Level 6 points.  You have to engage in --

24 there has to be some either behavior nexus, or some

25 sort of threat to security nexus in order to be

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492
                                                            e-mail: info@litsupport.com




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   placed into Level 6.

2        Q.   Okay.  And so, in general, the highest you

3   can go is 4, unless there is some other sort of

4   special consideration that would bump you up to 6; is

5   that right?

6        A.   As far as getting points on your scoring

7   instrument, yes, it's Level 4.

8        Q.   Okay.  So now, what are the things that can

9   happen for someone to -- and how would you refer to

10  it?  I want to use the terms that you would refer to

11  it.  Would it be Level 6 or would it be some other

12  term?

13       A.   It depends on the time frame.  In July of

14  2015, we changed our policies, and we refer to Level

15  6 now as things like predatory behavior management

16  program, restrictive housing.  So we've changed the

17  terminology.

18       Q.   Okay.  So let's go to -- and when was that

19  change?

20       A.   July of 2015.

21       Q.   All right.  So let's go to 2014, the

22  beginning of 2014.  What sort of system or

23  classifications did you have?

24       A.   We still have Level 5 and Level 6 at that

25  time.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Now, in regard to STGs, was there any sort

2   of consideration as far as classification for

3   somebody who was either suspected or validated member

4   of an STG?

5        A.   Yes, ma'am.  If you're a member of the

6   Security Threat Group, you can even score below, you

7   were automatically overridden to Level 4.

8        Q.   And why is that?

9        A.   Because we considered membership in a

10  Security Threat Group to undermine our ability to

11  keep other inmates safe.

12       Q.   So was it a threat to the institution?

13       A.   It was a threat to the institution and a

14  threat to particular -- to other inmates.

15       Q.   And so, in 2014 -- and has it changed since

16  then, as far as classification, if you are either

17  validated or a suspected member of an STG?  Is it

18  still an automatic 4?

19       A.   Yes, ma'am.  Nothing has changed on that.

20       Q.   So with the security threat groups, what

21  sort of things did you do to try and manage them?

22  And I'm going to be specific, in about the end of

23  December 2013, early 2014.

24       A.   Yes, ma'am.  In December of '13, we changed

25  the Level 4 policy.  At one time, inmates who were

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                             1-800-669-9492
                                                  e-mail: info@litsupport.com

```
1    Level 4 all got the same privileges.  We decided at
2    that point that there were certain Level 4 inmates,
3    including members of security threat groups, and
4    those also who have a history of escaping from a
5    secure perimeter, we decided that they were never
6    going to leave Level 4, so we wanted to give them
7    additional privileges.  So we changed the privilege
8    matrix of Level 4, and we developed a Tier 1 and a
9    Tier 2 privilege system.
10        Q.   Okay.  So at that point in time -- and
11   we're talking December 2013 -- Level 4 was divided up
12   into two different tiers?
13        A.   Yes, ma'am.
14        Q.   And I'm going to hand you -- what exhibit
15   number are we on?
16             MR. BECK:  We're on 42.
17             MS. ARMIJO:  -- what will be marked as
18   Exhibit Number 42.  Your Honor, I'm going to move for
19   the admission of Government's Exhibit 42, which is a
20   Level 4, Table of Services.
21             THE COURT:  Any objection from the
22   defendants?
23             MS. FOX-YOUNG:  No objection, Your Honor.
24             MS. BHALLA:  No, Your Honor.  Although we
25   would like to see it.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Government's
 2   Exhibit 42 will be admitted into evidence.
 3        Q.   And I'm showing a table of services that
 4   said Level 4.  Are you familiar with this document?
 5        A.   Yes, ma'am.
 6        Q.   And when did this -- and I believe it talks
 7   about Tier 1 and Tier 2.  Is that consistent with the
 8   testimony you were just giving about there being two
 9   tier systems in Level 4?
10        A.   Yes, ma'am.
11        Q.   So when did these changes start being
12   implemented?
13        A.   December of 2013.
14        Q.   And is this current today?
15        A.   Yes, ma'am, it is.
16        Q.   So I believe you were talking about Tier 2
17   specifically.  Were they given more privileges than
18   Tier 1?
19        A.   It's the other way around.  Tier 1 actually
20   got more privileges than Tier 2.
21        Q.   Okay.  So Tier 1 got more privileges than
22   Tier 2?
23        A.   Yes, ma'am.
24        Q.   And where were the security threat group
25   people in?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    They were in Tier 1.

2        Q.    Okay.  And the reason again for the

3    distinction between the two?

4        Q.    Well, we decided the Security Threat Group

5    members were -- because we were never able to place

6    them in a regular general population, that we would

7    start incrementally giving them more privileges.  And

8    that was the first step towards doing that.

9        Q.    And so what -- as of December of 2013, what

10   were the privileges in Level 4, Tier 1?

11       A.    Well, I need to probably differentiate

12   between Tier 1 and Tier 2.

13       Q.    Okay.

14       A.    On things like visits, in the original

15   Level 4 policy, they were allowed three contact/

16   noncontact visits a month.  We increased it to six

17   visits a month, three noncontact, three contact with

18   immediate family members.  We increased tier time in

19   Tier 2.  The original Level 4 in Tier 2 was two to

20   four hours a day.  We made it a mandatory four hours

21   a day in Tier 1.  Meals out of cell, it was two meals

22   out of the cell in the original Level 4.  In the new

23   tier system, Tier 1 got three meals out of their cell

24   every day.

25            And I think we made one other change.  The

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   religious ceremonies, there were no group religious
 2   ceremonies in the original Level 4, except for a
 3   sweat lodge, because of some state statute issues.
 4              We gave one group recreation a month in
 5   Tier 1.
 6        Q.    And where was SNM -- where was the general
 7   population of SNM members being held at that time?
 8        A.    The majority of them were at Southern New
 9   Mexico Correctional Facility.
10        Q.    And who made the decision for that?  I
11   mean, I should say, why were they being held down at
12   Southern?
13        A.    That's where they had been when I got the
14   job.  And there was no need to move them.  We just
15   had them isolated there.
16        Q.    Now, early in 2014, did you have an
17   opportunity to meet with someone in reference to SNM
18   and possible changes with them?  Let me just be more
19   specific.  Did you have an opportunity to meet with
20   Anthony Baca?
21        A.    I did.
22        Q.    And who was Anthony Baca?
23        A.    He was a member of the SNM.
24        Q.    And what was your understanding of his
25   position?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.    The majority of our STIUs thought he was in
 2     a leadership position within the SNM.
 3          Q.    And why did you meet with him?
 4          A.    I was debating whether or not I wanted to
 5     send him back to Southern New Mexico Correctional
 6     Facility.
 7          Q.    Where was he being housed at that time?
 8          A.    The Penitentiary of New Mexico, North
 9     facility.
10          Q.    And what sort of -- at PNM, what sort of
11     classifications did they have there?
12          A.    He was in the Level 6 facility.
13          Q.    And so tell us about the meeting with Mr.
14     Baca.
15          A.    Well, I met with Mr. Baca, and asked him
16     what he thought about going back to Southern.  And he
17     told me that he had enough influence that he could
18     keep it quiet.  And I also asked him about whether --
19     that I appreciated him keeping it quiet, but I also
20     asked him about recruiting for the SNM.  And he would
21     not answer that question.
22          Q.    Now, why was it that you had a conversation
23     with Mr. Baca?  Was there previous -- had you had
24     success with another STG group?
25          A.    I did, with the Los Carnales.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   And what was that?
 2          A.   Well, I had spoke to them about giving them
 3   increased privileges, and allowing them increased
 4   privileges, with some guarantees that they would no
 5   longer be in the business of recruiting.  And they
 6   actually agreed to that.
 7          Q.   And did Mr. Baca agree to that same
 8   condition when you met with him?
 9          A.   He just wouldn't answer.
10          Q.   And what did you take that to mean?
11          A.   I took that to mean that he wasn't going to
12   commit to that kind of a promise, that the answer was
13   no.
14          Q.   And based on that, what did you decide to
15   do or not to do?
16          A.   Well, I just thought the answer was no.
17   But I did do a videoconference with STIU, because I
18   wanted to kind of get another opinion, to make sure
19   my kind of gut reaction was right.
20          Q.   And what decision did you make after that?
21          A.   I decided he wasn't going back to Southern
22   New Mexico Correctional Facility.
23          Q.   Did you, at some point after that meeting,
24   get a letter addressed to you from Mr. Baca?
25          A.   I did, in early February.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

48

```
 1        Q.   And was your meeting before that letter?
 2        A.   My meeting with Mr. Baca was.  But my
 3   meeting with STIU was after I got the letter.
 4        Q.   So even after meeting with Mr. Baca, there
 5   were no changes made as far as classification or
 6   programming with SNM members?
 7        A.   No, not at all.
 8        Q.   Did something happen on March 7th of 2014?
 9        A.   Yes, ma'am.
10        Q.   What happened?
11        A.   Javier Molina was murdered.
12        Q.   And based upon that, what decision did you
13   make as far as SNM Gang members?
14        A.   At that moment the decision was made to
15   lock down all SNM members in the State of New Mexico.
16        Q.   And did you do so?  Was that your decision?
17        A.   I did consult with the Secretary and Deputy
18   Secretary.  But yes, I mean, ultimately, it was my
19   decision.
20        Q.   So what did that entail?
21        A.   That entails inmates, you know, are in
22   their cell.  They don't have any group activity.  It
23   requires investigation, searches of cells,
24   interviews, going through their property.  Just
25   various things happen in a lockdown, including
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    rephotographing inmates, updating emergency lists,

2    updating tattoo lists, all that kind of thing.

3        Q.    And did that happen immediately after the

4    Molina murder?

5        A.    The process began immediately after.

6        Q.    Now, what sort of -- have you been doing

7    anything before then, before March 7, as far as

8    programming with SNM -- or what was their situation?

9        A.    Well, again, we were -- we divided Level 4

10   into Tier 1 and Tier 2, with the hope that we were

11   going to increase programming for the SNM.

12       Q.    And so then, after March 7, you had a

13   lockdown?

14       A.    We did.

15       Q.    Now, were people moved around?

16       A.    Yes, ma'am.

17       Q.    And by "people," I mean SNM members.

18       A.    Yes, ma'am.

19       Q.    And what did you do in general?

20       A.    In general, we decided that some of the SNM

21   were such a threat to security that we felt they

22   needed to be in a facility that was designed and

23   built for maximum security, or higher security

24   inmates.  So we moved several of them to the PNM

25   North facility.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Did you move any of them out of state?

 2          A.   We did.

 3          Q.   Who did you move out of state?

 4          A.   We moved Daniel Sanchez, Archie Varela, and

 5     Anthony Baca out of state.

 6          Q.   And was that as a result of the Molina

 7     murder?

 8          A.   Yes, ma'am.

 9          Q.   Now, after moving people -- when you say to

10     the North, do you mean the north facility, or to PNM?

11     I should clarify, is the north facility part of PNM?

12          A.   Yes, ma'am.

13          Q.   And how many facilities are at PNM?

14          A.   There are three separate facilities.

15          Q.   And what is the name for those facilities?

16          A.   There is the North facility, which also is

17     called the Level 6 at that time.  The South facility,

18     which is called -- at that time was called Level 5.

19     And then there is the Penitentiary of New Mexico,

20     Level 2.

21          Q.   Now, so after the Molina murder, what did

22     you do as far as classifications and programming, if

23     anything, for SNM members?  Let me rephrase it.  Did

24     they stay on lockdown until today, all of them?

25          A.   They're not on lockdown anymore today.  But
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    yes, we had a prolonged step-down for our lockdown.
 2         Q.    Okay.   Explain what a step-down is.
 3         A.    A step-down is where we gradually give
 4    privileges back to the inmates after a lockdown.
 5         Q.    Okay.   And so did you start that process?
 6         A.    We -- yes, ma'am, we did start that
 7    process.
 8         Q.    When did the stepping down process start,
 9    if you can recall?
10         A.    If I'd be able to look at my notes, ma'am.
11         Q.    Okay.   Do you have notes there to refresh
12    your recollection?
13         A.    I do.
14         Q.    And during cross-examination, do you have
15    any problem letting the defense look at those notes?
16         A.    Absolutely not.
17         Q.    And I don't want you to read from your
18    notes.  If you can look at your notes to refresh your
19    recollection and then testify.
20         A.    Yes, ma'am, I can.
21               So as soon as the murder, we did lock them
22    all down, and we kept them on lockdown, with nothing
23    but showers every 72 hours until late in March,
24    around March 26.  And then we allowed them to, in
25    addition to showers, we began giving them recreation
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   five days a week.
 2        Q.   So they started getting recreation March
 3   26, did you say?
 4        A.   That's correct.
 5        Q.   And would that be in 2014?
 6        A.   Yes, ma'am, 2014.
 7        Q.   Okay.  And then what additional stepdowns
 8   occurred?
 9        A.   We incrementally started stepping them down
10   on April 3 of 2014.  Instead of showers every 72
11   hours, we gave them three showers a week, in addition
12   to the five days of recreation.  And then --
13        Q.   And then what, if you can recall?
14        A.   Over time, we started adding additional
15   canteen.  We started adding additional visits.  And
16   we added visits.  We added phone calls.  We just were
17   on a very slow, methodical step-down for the
18   lockdown.
19        Q.   Was something going to happen in July of
20   2015, and did you take steps to notify members about
21   a change that you were going to make?
22        A.   Yes, ma'am.  At that time, we decided, in
23   July of 2015, we were ready to resume normal
24   activities with the SNM.  And we were ready to go
25   back to the tier process within Level 4.  At that
```



SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                               e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

53

```
 1   point, we conducted what we call townhalls with the
 2   SNM, to let them know that we were going to restore
 3   them back to normal.
 4        Q.   So tell us how the townhalls work?
 5        A.   Well, typically a townhall is we just call
 6   all the inmates into individual pods.  It depends on
 7   how the Warden likes to do it.  Different wardens
 8   like to get them all into the gym.  Some like to go
 9   pod to pod.  But they went, and actually just kind of
10   talked to the inmates, and tell them:  This is the
11   issues, we're going to restore -- and we call them
12   townhalls, because they're like a townhall.  At that
13   point we allow some dialogue with the inmates.
14        Q.   So if the inmates have questions of you,
15   you'll answer the questions?
16        A.   A warden will typically do that, yes,
17   ma'am.
18        Q.   Okay.  And did you have townhalls with SNM
19   members about increasing their privileges?
20        A.   Yes, there were townhalls.  But it wasn't
21   me.  It was wardens at the facility that did it.
22        Q.   Was it at your direction?
23        A.   Yes, ma'am.
24        Q.   Now, are you aware of an incident that
25   occurred that kind of changed what you had been
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    planning on doing in July of 2015?

 2         A.   Yes, ma'am.  On July 13 of 2015, three days

 3    after we finished the townhalls, and we began to lift

 4    off our lockdown and resume normal, Julian Romero was

 5    assaulted.

 6         Q.   And who is Julian Romero?

 7         A.   He's a member of the Security Threat Group,

 8    SNM.

 9         Q.   And based upon the investigation and your

10    understanding of what the motive was for that, did

11    you take any more steps to change what was going to

12    be an increase of privileges?

13         A.   Yes, ma'am.  We began to -- we locked them

14    down again.

15         Q.   So after the Julian Romero assault

16    lockdown -- SNM went back into lockdown?

17         A.   Yes, ma'am.

18         Q.   And that would have been July of 2015?

19         A.   That's correct.

20         Q.   Now, also in 2015, in the summer of 2015,

21    were you aware of whether or not there was an ongoing

22    investigation that had commenced with the FBI and

23    members of Corrections into the SNM?

24         A.   Yes, ma'am.

25         Q.   Were you an active part of that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    investigation, or was that left to other people in
 2    Corrections?
 3         A.   It was left to other people in Corrections.
 4         Q.   But you were aware of it?
 5         A.   Yes, ma'am, I was.
 6         Q.   Do you know -- and if you don't know,
 7    that's fine -- but do you know what started that
 8    investigation?
 9         A.   Yes, ma'am.  It was because of threats to
10    the safety of Secretary Marcantel and some of the
11    STIU members.
12         Q.   Now, I'm going to fast-forward.  And were
13    you aware of the impending indictment in this case
14    and the initial round-up in December of 2015?
15         A.   Yes, ma'am, I was aware of that.
16         Q.   And up until that time, what was the
17    status, in December of 2015, of SNM members?  How
18    were they being held?
19         A.   They were still on lockdown.
20         Q.   And why were they still on lockdown?
21         A.   Because of the -- because we had concerns
22    for their safety.  We didn't know who was going to be
23    a victim of violence next.
24         Q.   Okay.  When you say you didn't know who
25    would be a victim of violence next, do you mean other
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    SNM members?

2         A.   Yes, other SNM members.

3         Q.   Now, fast-forwarding a little bit to

4    February of 2016, is that after the first initial

5    round-up that was done by the federal government?

6         A.   Yes, ma'am.

7         Q.   And what was the situation with the SNM at

8    that time?

9         A.   We decided that it was time to start

10   resuming normal.  And at that point we had a -- in

11   addition to recreation and showers and visits and

12   phone calls, we decided to add tier time to their

13   privileges.

14             MS. ARMIJO:  Your Honor, the United States

15   would move for admission of 43 through 45 into

16   evidence, which is Offender's Physical Location

17   History.  I believe at least a few of these are

18   attached to my response.

19             THE COURT:  All right.  Any objection from

20   the defendants?

21             MS. BHALLA:  None from Mr. Herrera, Your

22   Honor.

23             MS. DUNCAN:  I would ask, offender

24   histories for who?

25             MS. ARMIJO:  For Rudy Perez, Carlos

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Herrera, and Billy Cordova.
 2              MS. DUNCAN:  No objection for this hearing.
 3              THE COURT:  All right.  Not hearing any
 4   objection, Government's Exhibits 43, 44, and 45 will
 5   be admitted into evidence.
 6              Ms. Armijo.
 7        Q.   And Mr. Roark, are you familiar with --
 8   first, I'm showing you Exhibit 43 -- are you familiar
 9   with this item?
10        A.   I am.
11        Q.   And can you tell us what -- and this one
12   says, "Offender Physical Location History for Perez,
13   Rudy Lee."  Can you tell us what that is?
14        A.   Yes, that's a history of the inmate's
15   location within NMCD, and it's taken off of our
16   Criminal Management Information System.
17        Q.   And then I'm showing Exhibit 44.  Who this
18   is a history of?
19        A.   It's Carlos Herrera.
20        Q.   And to be fair, are these just the first
21   pages, which would include the year 2016, for them?
22        A.   Yeah, it's -- the last date on these are
23   April 2016.
24        Q.   All right.  And then I'm showing Exhibit
25   45.  Who is that an offender location for?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Billy Cordova.
 2        Q.    Now, in reference to -- first, let's start
 3   with -- have you had an opportunity to compare the
 4   Billy Cordova offender location in comparison to --
 5   and I can put it right up -- first, let me start --
 6   which is 45, to Exhibit 43.  And specifically I'm
 7   going to point out on Exhibit 45, there, towards the
 8   top it says, "Next to Perez."  And it has a location
 9   for him on January 21st of 2016 to February 9th of
10   2016.  Where is that location?  N 3A Q 102 S?
11        A.    That's the Penitentiary of New Mexico North
12   Facility, housing unit 3A, Q pod and the cell is 102.
13        Q.    Okay.  And then I'm showing the Rudy Perez
14   one.  That says, 10/20/2015 to 4/18/2016.  It says N
15   3A, Q 101 S.  Where is that?
16        A.    Again, that's the North facility, housing
17   unit 3A, Q pod, and the cell is 101.
18        Q.    And so is it fair to say then that Mr.
19   Cordova was next to Mr. Perez from January 21st of
20   2016 to February 9th of 2016?
21        A.    Yes, ma'am.
22        Q.    And then moving along to Mr. Herrera's,
23   which is Exhibit 44.  On the first line -- or on the
24   first -- I guess it's the second yellow highlighted
25   line underneath the start date time, it says
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    2/16/2016 to 4/20/2016.  And the location is S 2A L

2    101 S.  Where is that located?

3         A.    That's the Penitentiary of New Mexico,

4    South facility, housing unit 2A, l pod, and the cell

5    is 101.

6         Q.    And would that be Level 4?

7         A.    That would be where we housed the Level 4

8    SNM, yes.

9         Q.    And then, looking at Mr. Cordova's, does it

10   look like he was there 2/16/2016 through March 18th

11   of 2016?

12        A.    Yes, ma'am.

13        Q.    And would those two cells, then, would he

14   have been next to him?

15        A.    Yes, ma'am, he was.

16        Q.    Now, in reference to Mr. Perez, what kind

17   of cell is that, the N 3A, Q 101 S?

18        A.    That cell is in a unit that has handicapped

19   access.

20        Q.    And do you know why he was placed there?

21        A.    Because he has a walker, and on occasion,

22   he uses a wheelchair.

23        Q.    Is there -- do you have a handicap cell in

24   the South facility?

25        A.    No, ma'am, we didn't.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   And underneath that, it looks like he's at
2  another N 3B X 105 S.  Is that also a handicapped
3  cell.
4      A.   That's in a handicapped -- that's in a pod
5  that has handicapped access, yes, ma'am.
6      Q.   And it looks like, again, on Exhibit 43
7  that, that when he was sent to PNM, on June 17 of
8  2015, he immediately went into the handicapped?  Is
9  that what it appears?  I'm looking at --
10     A.   Well, he immediately went to that pod, yes,
11 ma'am.
12     Q.   I should say to that handicap -- a pod that
13 had a handicapped cell?
14     A.   Yes, ma'am.
15     Q.   Now, when did you start lifting
16 restrictions again for SNM?  The time period being
17 early 2016.
18     A.   Well, we added tier time in February of
19 '16.  We had already started removing restrictions in
20 terms of recreation and showers and visits and phone
21 calls.  But we didn't add congregate activity until
22 February of 2016.
23     Q.   So before then, you had already started
24 adding what other privileges before February of '16,
25 if you can recall?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1         A.   I don't recall, ma'am.
2         Q.   Okay.  But you know that you did start
3    adding other privileges?
4         A.   We did.
5         Q.   And what kind of privileges in general
6    would those have been?
7         A.   Recreation -- it would have been very
8    basic.  It would have been recreation, showers --
9         Q.   How about --
10        A.   -- visits and phone calls.
11        Q.   And was that part, as you referred to
12   earlier, the stepping down process?
13        A.   Yes, ma'am.
14        Q.   Now, when an inmate has -- the medical
15   records for an inmate, are those protected by HIPAA?
16        A.   Yes, ma'am, they are.
17        Q.   And would people -- on the investigative
18   side of New Mexico Corrections Department, would
19   people just -- would anybody have access to the
20   medical records, or are they kept by a different
21   entity?
22        A.   They're kept by our medical vendor.
23        Q.   Okay.  So is that somebody even different
24   from Corrections?  Do you have a special vendor for
25   medical?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    That's right.  We contract our medical
 2   services to a vendor.
 3        Q.    So, for instance, is anybody able to, on
 4   STIU, able to just go and pull up medical records?
 5        A.    No, ma'am, they can't.
 6        Q.    And are you aware of anybody in the
 7   investigation of SNM, in 2016, or at any time,
 8   getting medical records of Mr. Perez?
 9        A.    Not that I'm aware of.
10        Q.    And would they even be able to?
11        A.    Not unless the inmate signs a release form.
12              MS. ARMIJO:  May I have a moment?
13              THE COURT:  You may.
14              MS. ARMIJO:  I pass the witness.  Thank
15   you.
16              THE COURT:  Thank you, Ms. Armijo.
17              Do the defendants have cross-examination of
18   Mr. Roark?
19              MS. FOX-YOUNG:  Your Honor, yes.  I think
20   it might be -- I don't know if the Court would like
21   to take a break now.  I'm happy to begin for a few
22   minutes, if the Court would like, or --
23              THE COURT:  Okay.  We'll take our break.
24   Let me make a little bit better record here of what I
25   said about the black boxes this morning.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            Billy Garcia doesn't have -- because he's
 2    got abrasions on his wrist.  Arturo Garcia has cuts
 3    on his wrist.  And Allen Patterson doesn't have it.
 4    Those are the reasons for those three gentlemen not
 5    to have theirs on there.
 6            I guess, Mr. Adams, I guess as I sit here
 7    and listen to this testimony, you know, I mean,
 8    what's going through my head a little bit is every
 9    time the prison sort of loosened up on the SNM Gang,
10    it seems like something happened.  So y'all might
11    give that some thought.  That's going through my head
12    as I listen to this testimony.
13            All right.  We'll be in recess for about 15
14    minutes.
15            (The Court stood in recess.)
16            THE COURT:  All right.  We'll go back on
17    the record.
18            Mr. Roark, I'll remind you that you're
19    still under oath.
20            Ms. Fox-Young, if you wish to cross-examine
21    Mr. Roark, you may do so at this time
22            MS. FOX-YOUNG:  Thank you, Your Honor.
23            THE COURT:  Ms. Fox-Young.
24            MS. FOX-YOUNG:  Just briefly, Your Honor.
25    During the break, Mr. Lowry asked the Government if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the defense could take a look at the notes that this
 2    witness brought with him.  And I'd like to move that
 3    they be admitted.  But first, I'd just like to make a
 4    record as to what's contained here.
 5             The Court will be familiar with the
 6    critical incident review that was referenced in
 7    testimony last week, that Corrections Department
 8    didn't produce, the Government didn't produce,
 9    although we requested it.  There is something called
10    a critical incident review, from March 13, 2014,
11    included here.
12             I haven't had time, I haven't had an
13    opportunity, Your Honor, to review everything in
14    detail.  But I'll tell the Court that it is full of
15    Rule 16 and Brady information.  To begin with, there
16    are -- in this critical incident review, there are
17    numerous references to Timothy Martinez, a
18    cooperating defendant in this case, how he was acting
19    strange on the day of the murder, how he had
20    strangely left a pair of shoes behind in the
21    wheelchair program.
22             The Court heard from Ernie Holguin last
23    week -- apparently, Ernie Holguin as part of this
24    review said that Mr. Martinez was acting strange.
25             There is a section titled, "Issues and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      concerns," which notes that there was not a metal
2      detector in the wheelchair program or a frisker for
3      inmates when they left.  It talks about lack of tool
4      control, talks about a complete lack of security
5      measures in place for the wheelchair program, and on
6      and on.
7              You know, I don't know what possible
8      explanation there is for the fact that this hadn't
9      been produced to the defense.  It's full of Brady,
10     Giglio, and Rule 16.
11             I'm not going to read the entire document.
12     That is one of the documents.  There is also a memo
13     dated February 17, 2014, from Mr. Roark to the Warden
14     at Southern, and Deputy Wardens, involving the SNM.
15     It talks about downgrading Los Carnales, talks about
16     SNM Level 4.  Another memo to Mr. Myers -- who has
17     been present in this court for numerous hearings; I
18     believe he's present today -- dated May 17, 2016
19     regarding Anthony Baca.  A document that was
20     introduced by the Government in the course of Mr.
21     Roark's direct testimony, Level 4 Table of Services.
22     And that's already in evidence.  Some notes with a
23     timeline beginning March 7, 2014, with the Javier
24     Molina murder, running all the way through April 18
25     of 2016.  I believe these are Mr. Roark's notes.  A

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    memo from Mr. Roark, dated March 14, 2014, to Gregg

2    Marcantel, detailing background on the SNM.  And

3    apparently Mr. Roark's own white paper and incident

4    summary describing the intelligence that the

5    Corrections Department and the Government gathered,

6    their response.  A summary of their critical incident

7    review, vulnerabilities that they found with regard

8    to the prison, the correctional officers,

9    manipulative inmates.  The fact that the wheelchair

10   program was not security friendly.  The fact that

11   wheelchairs have many parts and components, making

12   accountability difficult.  Lack of basic security

13   practices.  Goes on and on, with more and more Brady.

14   A request for an immediate security upgrades request

15   by the Warden herself.  She requested upgrades in

16   equipment and security to assist in the mission, to

17   manage high-risk inmates, and provide them

18   programming.  Asked for metal detectors, asked for

19   video surveillance, asked for easier to access

20   control center, gun ports.  It goes on.

21            Apparently, Mr. Roark in some way,

22   according to this document, assembled and gathered

23   information from a whole variety of sources that the

24   Government has had access to, and sent this on up to

25   Gregg Marcantel the week after the murder.  This has

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                            1-800-669-9492
BEAN & ASSOCIATES, Inc.                              e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

1    not been provided to the defense.  And I don't know

2    what the explanation is for that, but we'd like that

3    entered into evidence now.

4            There is an email from Mr. Roark to then

5    Warden German Franco at PNM, I believe, Warden

6    Melissa Ortiz at Southern, Robert Stewart, and

7    copying Anthony Romero, regarding SNM recreation.

8    That's also from March 2014.

9            This packet includes numerous emails from

10   March 2014 regarding treatment of SNM members, or

11   alleged SNM members, following the assault,

12   monitoring behavior.

13           And I believe those are the categories.  As

14   I represented to the Court, I haven't had an

15   opportunity to look at all this.  I don't know if the

16   Court would like to hear from the Government on this

17   or wants to inquire as to why this hasn't been

18   produced.  But I'm going to mark it as Defendant's

19   Rudy Perez Exhibit D.  Pardon me, Your Honor, Exhibit

20   E.

21           THE COURT:  Yeah, I think so.

22           MS. FOX-YOUNG:  And we'd like a copy of it

23   for the defense to look at as well.  We've got a

24   number of lawyers who want to review this for

25   questioning of Mr. Roark.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Any objection to
 2  Rudy Perez -- marking it as E -- and admitting it
 3  into evidence, Ms. Armijo?
 4            MS. ARMIJO:  No objection.
 5            THE COURT:  All right.  Anybody else have
 6  any objection?
 7            All right.  Rudy Perez' Exhibit E will be
 8  admitted into evidence.
 9                        EXAMINATION
10  BY MS. FOX-YOUNG:
11       Q.   Good morning, Mr. Roark.
12       A.   Good morning.
13       Q.   This packet of documents that's been marked
14  as Exhibit E -- I can show it to you -- I'll
15  represent the Government handed this to us.  Would
16  you like to take a look at it and tell me if this is
17  what you brought?
18       A.   I can look at it quickly, ma'am.  Yes,
19  ma'am.
20       Q.   Mr. Roark, is this a file that you kept in
21  your office?
22       A.   It was an electronic file.
23       Q.   Where is that file kept?
24       A.   It's on my computer in my office.
25       Q.   Is there anything else in that file?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    Yes, ma'am.  I have SNM notes in that file.

2          Q.    Is it an SNM file, or a Molina file, or

3     something else?

4          A.    I have it labeled "SNM."  So it mostly has

5     to do with the lockdown.

6          Q.    When did you produce that file to the

7     prosecutors?

8          A.    Yesterday, when I came down.  I came down

9     with those notes that I reviewed.

10         Q.    What time yesterday?

11         A.    3:30, 4:00.  I'm sorry, I don't know the

12    exact time.

13         Q.    And you gave it to the prosecutors when you

14    arrived?

15         A.    Well, I had arrived earlier in the day, but

16    I left those notes in my hotel room.

17         Q.    When did you give it to the prosecutors?

18         A.    Yesterday afternoon.

19         Q.    Sometime after 3:30?

20         A.    Yes, ma'am.

21         Q.    And did you give them anything else?

22         A.    No, that was it.

23         Q.    Did you author the critical incident review

24    that you brought with you, dated 3/13/2014?

25         A.    No, ma'am, I did not.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Who did?

 2        A.    Vistula Curry.

 3        Q.    Could you spell that first name?

 4        A.    V-I-S-T-U-L-A.

 5        Q.    How do you know that?

 6        A.    I assigned her to do the after action with

 7   two other people.  And I have known her for a while,

 8   and I recognize that as her writing style.

 9        Q.    Oh, this is a typewritten report.  I'm

10   going to show it here.  This is the first page of

11   Defendant's Exhibit E, titled New Mexico Corrections

12   Department, Critical Incident Review, Dated

13   3/13/2014.  Facility:  Southern New Mexico

14   Correctional Facility.  Ms. Curry authored this

15   report?

16        A.    Yes, ma'am.

17        Q.    And you said you knew that because you

18   recognized her writing.  Do you see handwriting on

19   this document?

20        A.    I don't.  It has to do with writing style,

21   and the fact that she also used the policy form.  A

22   lot of people, when they do critical incident reviews

23   and after actions, kind of use -- they kind of use a

24   memorandum form, because it's hard to get all the

25   information on the policy form.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   So you recognize Ms. Curry's distinctive

2   memo writing style?

3     A.   And the fact that she used a policy form

4   instead of using a memorandum.

5     Q.   Is she still employed by the Corrections

6   Department?

7     A.   She is.

8     Q.   Where is she now?

9     A.   She's a Deputy Warden at Central New Mexico

10  Correctional Facility.

11    Q.   And you assigned her the task, along with

12  two others, of doing the critical incident review at

13  Southern?

14    A.   That's correct.

15    Q.   And when did you make that assignment?

16    A.   I probably made that assignment that Monday

17  morning after the incident.

18    Q.   Do you know that?

19    A.   I don't know for sure, but it would be

20  shortly after the incident.

21    Q.   Okay.  And on March 13, you received this

22  document back?

23    A.   That's correct.

24    Q.   Who else worked on it?

25    A.   STIU Coordinator Adam Vigil and Captain

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Adam Whitfield.

2         Q.   How do you know that?

3         A.   Those are the people I assigned to do it.

4         Q.   You just remember?

5         A.   In this case, I do, yes, ma'am.

6         Q.   And what did you do when you received the

7    critical incident review back?

8         A.   Well, I read it.

9         Q.   Does it mention Rudy Perez anywhere, if you

10   recall?

11        A.   I don't recall without seeing it, ma'am.

12        Q.   And you brought with you a packet of emails

13   between you and other Corrections Department

14   employees; is that right?

15        A.   That's correct.

16        Q.   How did you assemble these emails?

17        A.   They were in my folder on my desktop -- not

18   on my desktop, on my computer.

19        Q.   What folder is that?

20        A.   I believe it's titled "SNM."

21        Q.   Is that within the Outlook program?  Is

22   that within an email program?

23        A.   No, ma'am.  These were emails that were

24   saved onto the folder that's in my -- it's on my

25   computer -- I'm sorry, I'm not an IT person, so I'm

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    struggling with terms.  But it's in my folder under

2    the Adult Prisons Division.

3          Q.   This is the same folder that the critical

4    incident review was in?

5          A.   They're all in the same folder, yes.

6          Q.   Okay.  All of these documents?

7          A.   That's correct.

8          Q.   So at the time you received or sent these

9    emails, in 2014 or 2015, as they may be dated, you

10   saved them and put them in the folder?

11         A.   They were originally on my email.  My

12   administrative assistant made it easier for me and

13   put them into a folder for me, yes.

14         Q.   You asked your assistant to put everything

15   that was SNM-related in that folder?

16         A.   Yes, ma'am.

17         Q.   Okay.  And is there anything else in the

18   folder that you did not bring with you today?

19         A.   Yes, ma'am, there is other information in

20   the folder.

21         Q.   I think you said there were some notes; is

22   that right?

23         A.   Yes, ma'am.  There is going to be some

24   notes in there, yes.

25         Q.   Okay.  I don't know why you wouldn't keep

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    it, but I'm going to ask you to preserve that folder.
 2    If it hasn't already been produced to the Government,
 3    we're going to ask for it.  Or if it hasn't been
 4    produced to us, we're going to ask for it.
 5         A.   Yes, ma'am.  We created that folder for the
 6    fact that we knew we were going to have IPRA
 7    requests.
 8         Q.   Okay.  And you knew that there might be
 9    litigation?
10         A.   Yes, ma'am.
11         Q.   And one of the documents that you brought
12    with you is addressed to Mark Myers, Chief of Staff,
13    NMCD.
14         A.   Yes, ma'am.
15         Q.   Is he still Chief of Staff at NMCD?
16         A.   He is.
17         Q.   Do you know if Mr. Myers provided any SNM
18    documents to the prosecutors?
19         A.   I don't know, ma'am.
20         Q.   Have you talked to him about it?
21         A.   I haven't talked to him about that.
22         Q.   What, if anything, did you do in March of
23    2014, when you got this after action report back from
24    Ms. Curry?
25         A.   I read the report.  And I also -- I also
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    created a document for Secretary Marcantel.

 2        Q.   Okay.  So the document titled, "White

 3    paper, Syndicato de Nuevo Mexico," dated March 14,

 4    2014, which is part of this exhibit -- I'm showing

 5    you the first page of it -- from you to Gregg

 6    Marcantel -- you authored?

 7        A.   Yes, ma'am.

 8        Q.   And you basically summarized the

 9    information that was in the after action report for

10    purposes of this white paper?

11        A.    It was more than just the white paper.  It

12    was also based on some videoconferencing that we

13    had -- I had done with the Security Threat

14    Intelligence Unit.

15        Q.   Tell me about that.  When was that

16    videoconferencing done?

17        A.   I don't know the exact dates, but it was

18    somewhere between March 7 and March 14.

19        Q.   How do you know that?

20        A.   Because we were having regular meetings

21    after the incident to determine what we were going to

22    do with SNM.

23        Q.   Okay.  These are STIU people who were

24    employed at Southern?

25        A.   Well, not just Southern.  I wanted input

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                                             Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.                                                            1-800-669-9492
                                                                        e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    from everyone that knew the STIU.  So there -- were
 2    on the conference call was STIU staff from Central
 3    New Mexico Correctional Facility and the Penitentiary
 4    of New Mexico.
 5         Q.   Do you remember who?
 6         A.   No, ma'am, I don't.
 7         Q.   These were Skype calls?  Did you say
 8    videoconference?
 9         A.   Videoconferencing, yes, ma'am.
10         Q.   Okay.  And you set them up?
11         A.   I did.
12         Q.   And so, through the course of those
13    videoconferences, you obtained some additional
14    information that wasn't in the after action review?
15         A.   That's correct.
16         Q.   Do you remember what?
17         A.   Well, I'd have to look at the after action.
18    But some of the information was specific to
19    individual SNM members, on how information got down
20    there for the murder, and stuff like that.
21         Q.   Okay.  Do you remember if Ernie Holguin was
22    involved in those calls?
23         A.   I don't remember him specifically, but he
24    was likely on the phone calls.
25         Q.   Okay.  And his feedback went into that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      after action report?

2          A.   It would have been all the STIU.  He

3      probably didn't speak up, because it's usually -- on

4      the conference calls it's usually the coordinator

5      that speaks up in the conference calls.

6          Q.   Okay.  So you drafted this white paper, and

7      you sent it to Gregg Marcantel.  What else did you do

8      in the days following the Molina murder?

9          A.   I didn't really do anything.  I mean, my

10     job is to just turn it over to the wardens and STIU,

11     and let them investigate.

12         Q.   Did you meet with any prosecutors back

13     then, in 2014?

14         A.   No, ma'am, I didn't.

15         Q.   Did you draft any other documents after you

16     drafted this white paper?

17         A.   I believe that's the last report I did on

18     this.

19         Q.   Okay.  And your report says that

20     intelligence efforts were ongoing, and you expected

21     significant additional information.  Do you know

22     whether you received additional information and

23     further intelligence that wasn't included in your

24     white paper?

25         A.   No, ma'am.  At that point, the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    investigation was turned over to STIU and other

2    investigators to conduct.

3         Q.   Okay.  Do you remember writing to Mr.

4    Marcantel that Inmate Perez' life was threatened in

5    the course of the events leading up to the murder?

6         A.   I don't recall that.  But if you can show

7    me, if it's in the white paper, I'm certainly willing

8    to look at it.

9         Q.   If it's in the white paper, you wrote it?

10   I'll show you right here:  "Inmate Perez' life was

11   threatened if he did not do this or told anyone about

12   it," do you see where it says that?

13        A.   Yes, ma'am.

14        Q.   Do you know how you knew that?

15        A.   This was the initial information after the

16   incident, and that was gathered by STIU.  And who

17   from STIU got that, I don't recall now.

18        Q.   Okay.  But you knew that there had been a

19   threat on Inmate Perez' life.  What, if anything, did

20   you do to follow up on that threat?

21        A.   Well, they were continuing to do

22   investigation.  This was all preliminary and initial

23   information.  So a lot of this hadn't been

24   corroborated.  So this is what we initially thought.

25        Q.   Okay.  So you didn't know if any of this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was true?

2        A.   Nothing was corroborated.

3        Q.   Okay.  The critical incident review that

4    you received talks about Tim Martinez, also known as

5    "Red," acting strangely on the day of the murder.  Do

6    you remember that?

7        A.   I do remember that.

8        Q.   What, if anything, did you do to follow-up

9    on that intelligence?

10       A.   Again, that was turned over to STIU and

11   other investigators who were in charge of that

12   investigation.

13       Q.   So you don't know if anything else was done

14   to follow-up on that information?

15       A.   I don't know what they asked, no.

16       Q.   Okay.  That was in the ballpark of STIU at

17   that point?

18       A.   That's correct, ma'am.

19       Q.   When is the first time that you talked to

20   the federal prosecutors about the Molina murder?

21       A.   When they called me last week.

22       Q.   What day?

23       A.   Oh, I don't recall what day.  Tuesday or

24   Wednesday, ma'am.

25       Q.   Okay.  They called you to tell you that



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    they were going to call you to testify in this
 2    hearing?
 3         A.   Yes, ma'am.
 4         Q.   Okay.  Did you ever talk to them before
 5    that --
 6         A.   No.
 7         Q.   -- in 2015 or 2016 or 2017?
 8         A.   No, ma'am.
 9         Q.   Okay.  Have you talked at all to Mr. Myers
10    about the Molina murder?
11         A.   Just in passing, how things are going.  But
12    that's all, ma'am.
13         Q.   Just because you knew that he was involved
14    in the prosecution?
15         A.   Yes, ma'am.  And also, I needed some
16    updates to just kind of know what to do with SNM, in
17    terms of giving them privileges and stuff.
18         Q.   Okay.  Continue up until the present time.
19         A.   Yes, ma'am.
20         Q.   And have you talked to Agent Bryan Acee
21    about the Molina murder?
22         A.   Yes, ma'am.  At some point, I did have a
23    conversation with Agent Acee, but I don't recall what
24    it was about.
25         Q.   Do you know when you talked to him?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Maybe a year ago.

 2        Q.    Where were you?

 3        A.    I was probably in Santa Fe, in my office.

 4        Q.    Did he come to see you?

 5        A.    No, ma'am.  It was a phone call.

 6        Q.    Did he call you?

 7        A.    I believe I was asked to call him.

 8        Q.    Who asked you to call him?

 9        A.    Mr. Myers.

10        Q.    Mr. Myers asked you to call Mr. Acee.

11  Why -- did he tell you why he wanted you to call him?

12        A.    Actually, yes, ma'am.  No one has asked me

13  this for a while, so I'm recollecting my memory.

14        Q.    That's fine.

15        A.    It had something to do with putting money

16  on the inmates' books.

17        Q.    Which inmates?

18        A.    Those who were cooperating with the

19  investigation.

20        Q.    So Mr. Myers told you to call Mr. Acee to

21  discuss putting money on inmates' books?

22        A.    No, that's not exactly right.  It was how

23  the process works.  If someone puts inmate money on

24  inmates' books, how that works.

25        Q.    What did Mr. Myers tell you about making
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the call?  He told you he wanted you to call Acee,

2    and I think you're remembering why.  Tell me why.

3         A.   To explain how the whole process of putting

4    money on inmates' books works.

5         Q.   Okay.  And so then you did call Mr. Acee?

6         A.   I did.

7         Q.   And you explained to him how he could go

8    ahead and put money on inmates' books?

9         A.   That's not exactly -- the conversation was

10   more how that works, instead of go ahead and do it, I

11   mean --

12        Q.   Okay.  What did you tell Mr. Acee?

13        A.   I told him that the process works, that you

14   have to send in -- it usually works like this; you

15   send in money, you send in a money order, and it's

16   then placed -- it goes to the inmate accounts person

17   at the facility, and then at that point they debit

18   that, or they put that money into the inmates'

19   account.

20        Q.   Okay.

21        A.   It's a very simple process.

22        Q.   And did he tell you he was going to go

23   ahead and do that?

24        A.   No, ma'am, he didn't.

25        Q.   What, if anything, did he tell you?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          A.    I don't know if he told me anything other

2     than:   Thank you for the information, ma'am.

3          Q.    Okay.   Have you had any other conversations

4     with Mr. Acee?

5          A.    No, ma'am.

6          Q.    Have you had any other forms of

7     communication with Mr. Acee?

8          A.    No, ma'am.

9          Q.    What did you do to prepare to testify

10    today?

11         A.    Mostly, I looked over those forms that you

12    have.

13         Q.    The documents that you brought with you?

14         A.    Yes, ma'am.

15         Q.    Did you look at anything else?

16         A.    I scanned over stuff, but that seemed like

17    the most relevant stuff, so --

18         Q.    Okay.   Is it fair to say you scanned over

19    everything in your SNM file, and then you pulled out

20    these documents because you thought they would

21    pertain to the subject matter?

22         A.    I think that's fair, yes, ma'am.

23         Q.    Okay.   And did you also look at any New

24    Mexico Corrections Department policies?   I know that

25    there is a portion of a policy contained in what you

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.                                           1-800-669-9492
PROFESSIONAL COURT                                          e-mail: info@litsupport.com
REPORTING SERVICE

```
 1    brought.  Did you look at any other policies in
 2    preparation for your testimony?
 3          A.   Not -- part of my job is to look at
 4    policies, so -- no, I didn't specifically look at
 5    policies for those.  But, yes, I review policies on a
 6    regular basis, ma'am.
 7          Q.   You're very familiar with them, just by
 8    virtue of your job?
 9          A.   Yes, ma'am.
10          Q.   Did the Government -- did the prosecutors
11    ask you to review anything prior to your testimony?
12          A.   Well -- they did.  When we talked, we
13    talked about the privileges and stuff, so that's kind
14    of why I looked at the privileges, so of course I
15    didn't have that memorized.
16          Q.   Oh, the SNM privileges?
17          A.   Correct.
18          Q.   Was it Ms. Armijo who called you?
19          A.   It was.
20          Q.   Did she ask you to bring anything with you?
21          A.   She didn't.
22          Q.   Did she ask you if you had an SNM file?
23          A.   No, ma'am, she didn't.
24          Q.   She's never asked you that?
25          A.   I don't think she has, no, ma'am.
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Oh, had you talked to her ever before last
 2   week?
 3        A.   No, ma'am, I haven't.
 4        Q.   I think you testified that you were at
 5   some -- I know you've had a long career with the
 6   Corrections Department -- at some point you were a
 7   classification officer; is that right?
 8        A.   I was.
 9        Q.   And that was before you headed up the adult
10   corrections -- the Adult Prisons Division?
11        A.   That's correct.
12        Q.   How long were you a classification officer?
13        A.   Not for very long; about nine months.
14        Q.   And then, did you have another job in
15   between, before you ran adult prisons?
16        A.   I did.
17        Q.   What was that job?
18        A.   Immediately before adult prisons, I was a
19   Deputy Warden.
20        Q.   Okay.  At which facility?
21        A.   The Penitentiary North facility.
22        Q.   How long?
23        A.   About 10 months.
24        Q.   Do you know what year that was?
25        A.   I do.  I got promoted in the summer of
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   2010.

2       Q.   So sometime in 2011, you assumed

3   responsibilities as head of adult prisons?

4       A.   I was asked to come over in April of 2011.

5       Q.   Okay.  And you remained in that position

6   until when?

7       A.   Till May or June of this year.

8       Q.   So from 2014 until this last summer, 2017,

9   you were heading up adult prisons?

10      A.   Yes, ma'am.

11      Q.   And where is your -- are you located at the

12  main office in Santa Fe?

13      A.   Yes, ma'am, I am.

14      Q.   Not at PNM?

15      A.   Not at PNM.

16      Q.   But you're very familiar with how things

17  work at PNM, how the Corrections Department runs that

18  facility?

19      A.   Yes, ma'am.

20      Q.   Can you tell me, is the entirety of PNM

21  North, is it comprised of segregation units?

22      A.   We call them restrictive housing, but --

23      Q.   You call them restrictive housing now,

24  right?

25      A.   That's correct.  Yes, we did have a period

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492
                                                                                   1-800-669-9492
                                                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   of time where we had a general population type of
 2   unit at PNM.  We called it a Drug Suppression
 3   Program.  We had it there for about a year, year and
 4   a half.
 5         Q.   When was that?
 6         A.   Beginning of 2016, and we moved it about
 7   two months ago.
 8         Q.   Okay.  Now, other than that, it's all
 9   restrictive housing or segregation?
10         A.   Yes, ma'am.
11         Q.   Okay.  I think you actually -- you prefer
12   to use the term Special Management; is that right?
13         A.   No.  Actually, that's an old term.  It's
14   restrictive housing now.
15         Q.   Now it's restrictive housing.  Okay, in
16   2014, it was special management, right?
17         A.   It was.
18         Q.   Okay.  What's the difference between
19   special management and restrictive housing?
20         A.   Restrictive housing is a term coined by the
21   American Correctional Association, and the National
22   Institute of Corrections.  It's kind of -- they're
23   just trying to get all states and all municipalities
24   and counties to use the same terminology, so we don't
25   have 50 different terms being used across the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    country.  So when we talk to each other, we know what
 2    we're talking about.
 3        Q.   And it used to be called "solitary
 4    confinement," right?
 5        A.   We never used that term.  But yeah, some
 6    states have used that in the past.
 7        Q.   Well, do you remember, in 2014, testifying
 8    to a committee of the Legislature and, saying that
 9    the Correctional Department is no longer using the
10    term "solitary confinement," instead, we now say
11    "special management"?
12        A.   What year was that, ma'am?  I'm sorry.
13        Q.   2014.
14        A.   We were transitioning.  I don't remember
15    saying that.  I would have -- I don't know why I said
16    that.  We would have -- we never used the term
17    "solitary confinement."  We did use special
18    management, and we transitioned to using restrictive
19    housing.  So I'm not sure why I said that.
20        Q.   Okay.  Well, whatever it's called, you'd
21    agreed with me, would you not, that solitary
22    confinement or special management or restrictive
23    housing has effects on inmates living under those
24    conditions; is that right?
25        A.   Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And what are those sorts of effects?
 2        A.    It does impact their mental health.
 3        Q.    In what ways?
 4        A.    In negative ways.  Because you're isolating
 5   their contact with other people.
 6        Q.    And it can make them confused?
 7        A.    I'm not a mental health professional.  So I
 8   know that from reading studies, it's related to
 9   depression and stuff like that.  So --
10        Q.    Okay.  You know from reading studies, and
11   you also know, because you worked in PNM for a pretty
12   long time, and you've worked in other facilities
13   where inmates are held in segregation, right?
14        A.    Yes, ma'am.
15        Q.    And so, have you observed depression in
16   inmates who are housed that way?
17        A.    Yes, ma'am.  They can become depressed,
18   or -- and, yes.
19        Q.    Sometimes they don't know what time it is;
20   they become disoriented in some ways, do they not?
21        A.    They can for periods of time, yes, ma'am.
22        Q.    Only short periods?
23        A.    Again, I'm not a mental health
24   professional.  You're asking me from what I saw.  And
25   I never experienced where someone -- I never had that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   personal experience.  I did see them have mental
 2   health crises in short periods of time.  I never saw
 3   it where it --
 4        Q.   Okay.  So you observed what you call mental
 5   health crises for people who were held in seg.  And I
 6   understand you're not a mental health professional.
 7   I'm not asking for mental health opinions, but I
 8   appreciate that explanation.  And so, is it fair to
 9   say that housing inmates in segregation can have a
10   deleterious effect on somebody's mental health?
11        A.   Yes.  And again, it's like anything else,
12   it's dependent on that individual.
13        Q.   It affects different people differently?
14        A.   It does, correct.
15        Q.   And it might matter how they are when they
16   go in, right?
17        A.   Oh, yes, ma'am.
18        Q.   So if they're in worse physical health when
19   they go in, would that have an impact on how
20   segregation affects them?
21             MS. ARMIJO:  Objection, foundation.
22        Q.   Just from your personal experience, and the
23   articles that you've read.
24        A.   It could.
25        Q.   Okay.  And also --
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  I guess you probably need to
 2   term all these questions what he has observed, and
 3   from his experience.  Because I think, if you keep
 4   asking those questions that are more, I think,
 5   appropriate to an expert, I'm going to have to
 6   sustain the Government's objection.
 7              So, if you wanted to ask him what he's
 8   observed, I'll allow that.  But probably, if you just
 9   ask him open-ended questions that are more for a
10   psychologist, then I'll sustain the Government's
11   objections.
12              MS. FOX-YOUNG:  Yes, Your Honor.  And I'll
13   just note the witness did say that he had relied on
14   some, I think, papers and conferences, and he's done
15   outside work.  But I'm going to move on, Judge.
16         Q.   And so I understand that you're no longer
17   at PNM.  Do you know if there has been made an effort
18   to reduce the time that inmates are held in special
19   management -- or I'm sorry, restrictive housing?
20         A.   Yes, ma'am.  Under the previous leadership,
21   we were told to reduce timeframes in restrictive
22   housing, and told to reduce the number of inmates in
23   restrictive housing.
24         Q.   Okay.  Which leadership was that?
25         A.   Secretary Marcantel.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1         Q.    Okay.  And that was in 2014?

 2         A.    We began the process as early as 2013, yes,

 3    ma'am.

 4         Q.    And why, if you know, was there a move to

 5    reduce time that inmates would be held in restrictive

 6    housing?

 7         A.    There is actually three reasons:  One is

 8    the mental health issues that you talked about.  The

 9    second is the cost issue, it costs more money to put

10    an inmate into restrictive housing, because it's more

11    staff intensive.  And the third reason is access to

12    programming.  It's just more difficult to get an

13    inmate to programming if they're in restrictive

14    housing.

15         Q.    Okay.  So you said that began in 2013, that

16    movement?

17         A.    Yes, ma'am.

18         Q.    And has it -- does it continue through the

19    present?

20         A.    In terms of the percentages in segregation,

21    that's still the department philosophy.  But we've

22    had an increase in violence and other incidents in

23    our prison, so we've -- and we've had some repeat

24    offenders that have had to go back to our restrictive

25    housing programs, so we've had to increase the times
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    for inmates.

2         Q.   So back in 2014, the goal was to reduce

3    time in restrictive housing to 30 days, to a month;

4    is that right?

5         A.   That's a difference, ma'am.  That's for

6    disciplinary restrictive housing.

7         Q.   Okay.  That's just if you're there on

8    discipline?

9         A.   That's correct.

10        Q.   And tell me the difference.  Why else might

11   you be in restrictive housing under the department's

12   policies?

13        A.   Well, we need to put people in restrictive

14   housing to protect other inmates, and to protect the

15   public.  So if you are engaged in a misconduct we

16   deem serious enough that we will put you in a

17   program.  At that time it was called Level 6.  It's

18   now called predatory management behavior program.

19   And it's designed, not for disciplinary reasons, it's

20   designed to give you programming to prepare you to go

21   back to general population.

22        Q.   Is there a Corrections Department policy

23   that outlines the requirements for this predatory

24   management behavior program?

25        A.   There is, ma'am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And which one is that?

2      A.   I don't have the policy in front of me.

3  It's in Chapter 7.

4      Q.   And that's one area of Level 6?

5      A.   It's a new name for Level 6, to put it

6  simply.

7      Q.   Okay.  So today -- so in 2014, you called

8  Level 6, Level 6.  Today you call it the predatory

9  management behavior program?

10     A.   We did.  And that's because Level 6 was a

11 very complex policy.  And we wanted to simplify it.

12 And other reasons is because we just felt like we

13 needed to define exactly what inmates we wanted in

14 that program.

15     Q.   Okay.  And so, when did you change the name

16 of this program and make the other changes that

17 you've described?

18     A.   It was July of 2015.

19     Q.   Okay.  Now, the Level 6 policy of governing

20 placement criteria and procedures, has that also been

21 changed?

22     A.   It has.  We don't have a Level 6 policy

23 right now.

24     Q.   There is no Level 6 policy at all?

25     A.   Not right now, ma'am.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  But in 2015, there was?

2    A.   Until July of 2015, yes, ma'am.

3         MS. FOX-YOUNG:  Mr. Roark -- we're on F, I

4    think, Your Honor -- I'm going to show you a document

5    I'm marking as Rudy Perez Exhibit F.  Your Honor, I

6    move the admission of this exhibit.  And I think the

7    Government --

8         MS. ARMIJO:  No objection.

9         THE COURT:  Anybody else have an objection?

10   All right.  Defendant Rudy Perez' Exhibit F will be

11   admitted into evidence.

12   Q.   Mr, Roark, do you know what this document

13   is?

14   A.   I do.

15   Q.   Okay.  And it is a Level 5 and Level 6

16   placement criteria and procedures policy; is that

17   right?

18   A.   That's correct.

19   Q.   It looks to me like it was last reviewed or

20   revised in June of 2014?

21   A.   That's correct.

22   Q.   But it's your testimony that this is no

23   longer in effect today?

24   A.   This is no longer in effect today.

25   Q.   And what is the date that it stopped being

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    in effect?

2        A.   It was July -- I don't remember the date --

3    it was July of 2015.

4        Q.   Okay.  And I'll represent to you that your

5    general counsel produced this document to us as a

6    document that was in effect, policy document that was

7    in effect, I believe, in the early part of 2015.  And

8    so I think that's consistent with your understanding.

9    I don't have the exact date.  But we both agree,

10   prior to July of 2015, it was in effect?

11       A.   That's correct.

12       Q.   Okay.  And this document requires, does it

13   not, that if somebody -- if an inmate is housed in

14   Level 6, if they're to be housed there, they first

15   must be identified as a validated security threat

16   group member or a suspected STG member, or someone

17   associated with an STG.  It goes on.  Is that right?

18       A.   That's one of the reasons.

19       Q.   Okay.  And there is actually a requirement,

20   if you look at the first page of this policy, that in

21   addition to that, the inmate must have a documented

22   history of institutional behavior that meets one of

23   the following criteria:  Either acts of violence or

24   directing others to engage in violence.  Is that

25   right?  Or threatening or forcing other inmates,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    staff, or members of the public, or directing others
 2    to engage in threats or coercion, or involvement in
 3    or directing others to engage in organized
 4    unauthorized activity.  It goes on.
 5          So an inmate has to meet one of the
 6    criteria from list C1 and list C2; is that right?
 7      A.   In order to be placed in a Level 6
 8    placement, yes, ma'am.
 9      Q.   Or a Level 5, right?
10      A.   No.  Level 5, you can't be placed -- level
11    5 is a stepdown from Level 6, to prepare you to go
12    back to general population of some sort.  You can't
13    get placed straight into Level 5 without going to
14    Level 6.
15      Q.   Okay.  However, if you're going to be
16    placed in Level 6, back at this time, until the
17    policy was no longer in effect, it was not enough
18    just to be a suspected STG member, a validated
19    member; there had to be an act of violence or a
20    credible threat or evidence of coercion of other
21    inmates or something else to hold you in Level 6; is
22    that right?
23      A.   According to the policy, yes, ma'am.
24      Q.   Why is this policy no longer in effect, do
25    you know?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Yes, ma'am.  It had to do with all the

2   things -- some of the other things I talked about.

3   The policy was very long and confusing to read.  So

4   we wanted to simplify the policy.  The policy was

5   written in such a way that almost half our inmates at

6   the Level 6 were in there for protective custody

7   reasons.  We thought that was a waste of resources.

8   And we wanted to cut down on the numbers in

9   restrictive housing.  And we thought this policy was

10  written in such a way it was easy to put an inmate

11  into restrictive housing.

12       Q.   Okay.  And on the face of this policy that

13  was produced by your department several months ago,

14  it doesn't say it's no longer in effect, right?  It

15  just has the effective date and the revised date?  It

16  doesn't say it's no good anymore?

17       A.   I'm not sure I understand the question,

18  ma'am.

19       Q.   Just looking at this document, you can't

20  tell that it's no longer in effect.  This is the

21  document that your department produced with regard to

22  criteria for Level 6?

23       A.   That's right.  There is no end date on it,

24  ma'am.

25       Q.   Okay.  And so we talked a little bit about

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    reducing time in restrictive housing in 2014.  And
 2    you recalled that, beginning in 2013, and certainly
 3    going into 2014, and even to the present, it's the
 4    department's philosophy, you want to reduce the time
 5    that inmates are held in special management.  Do you
 6    know -- well -- and you recall that you did give
 7    testimony to that effect in the summer of 2014, that
 8    you were trying to reduce the time that inmates were
 9    in special management?
10        A.   Yes, ma'am.
11        Q.   Okay.  And you also recall that you have
12    explained in the past that a panel is to regularly
13    review the status of every inmate who is held in
14    restrictive housing?
15        A.   That's correct.  That's in the new policy,
16    yes.
17        Q.   And that panel is supposed to determine if
18    there is a credible threat that requires the
19    continued use of restrictive housing, right?
20        A.   That's correct.
21        Q.   Okay.  And you talked in your direct
22    examination -- I think you referred to your notes --
23    a timeline that you had created that detailed the
24    history of how SNM has been housed by the Department;
25    is that right?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, ma'am.  That timeline was the timeline
 2   after the Molina murder.
 3        Q.   Okay.  I'm showing you a document that is
 4   part of Defendant's Exhibit E.  And it says, "Primary
 5   tasks," at the top; then it has some handwriting on
 6   it?
 7        A.   Yes, ma'am.
 8        Q.   Did you write this writing?
 9        A.   Yes, ma'am.
10        Q.   Okay.  And I think you walked through this
11   timeline, and you explained to the Court that there
12   had been changes with regard to the way the
13   Corrections Department housed SNM members over the
14   years and months, since March 2014; is that right?
15        A.   We hadn't really started changing until
16   December of 2013.
17        Q.   Okay.  But you talked about specific times.
18   You said that, in July of 2015 -- or June -- yeah,
19   July of 2015, the Department resumed normal
20   activities with regard to the SNM?
21        A.   That was our plan, yes, ma'am.
22        Q.   Okay.  And then you said that that
23   subsequently changed?
24        A.   Yes, ma'am.
25        Q.   And that, again, in February 2016, the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Department started resuming normal activities?
2         A.   To include tier time, yes, ma'am.
3         Q.   Okay.  But that hasn't changed since that
4    time?
5         A.   Well, currently, we're resuming normal with
6    the SNM who are in Level 4, that are still living
7    with us.
8         Q.   Okay.  So the status quo hasn't changed
9    since February 2016, when you resumed normal
10   activities?
11        A.   That's right.  The tier process, the Level
12   4 matrix hasn't changed, ma'am.
13        Q.   Okay.  And was that February 1, 2016?
14        A.   That's when we began to resume normal, yes.
15        Q.   Are there documents that reflect that?
16        A.   Just that email that you have.
17        Q.   That's an email from whom to whom?
18        A.   I believe it's from me to the wardens.
19        Q.   Telling them, as of February 1, 2016, you'd
20   be resuming normal activities with regard to the SNM?
21        A.   No.  We began giving them tier time.
22        Q.   Okay.
23        A.   I believe it wasn't until April 18 that we
24   increased the tier time, and we started giving group
25   recreation.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  And so beginning February 1, 2016,
 2   were there any individuals who were suspected SNM or
 3   validated SNM who weren't given tier time?
 4        A.   Those that remained in -- those who
 5   remained in -- who had been assigned to the predatory
 6   behavior management program.
 7        Q.   Formerly PNM Level 6?
 8        A.   That's correct.
 9        Q.   Okay.  And why weren't they given tier
10   time?
11        A.   Because they had been assigned to the
12   program; because of some sort of misconduct they had
13   been involved in.
14        Q.   They had been assigned there for
15   misconduct, and that's pursuant to the policy that
16   you and I just went over?
17        A.   Or a similar such policy, yes, ma'am.
18        Q.   Well, that was the policy that was in
19   effect, right?  I thought there was no other policy
20   dealing with Level 6.
21        A.   The PBMP policy replaced the Level 6.  We
22   changed the name of the program.
23        Q.   The PBMP policy?
24        A.   Yes, ma'am.
25        Q.   When did the PBMP policy take effect?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    July of 2015.
 2        Q.    Okay.  So placements in Level 6 prior to
 3   July of 2015 were pursuant to the policy you and I
 4   just went over?
 5        A.    Yes, ma'am.
 6        Q.    Subsequent disciplinary placements are
 7   pursuant to the PBMP policy?
 8        A.    Yes, ma'am.
 9        Q.    Did you happen to bring the PBMP policy
10   with you?
11        A.    No, ma'am, I did not.
12        Q.    Are you familiar with Rudy Perez?
13        A.    A little bit, yes, ma'am.
14        Q.    How do you know him?
15        A.    Through my years working in prisons.  I
16   don't know --
17        Q.    You don't know him personally?
18        A.    No, ma'am.
19        Q.    You never talked to him?
20        A.    I may have.
21        Q.    Okay.  Have you ever been involved in
22   making a housing or classification decision about
23   Rudy Perez?
24        A.    Not that I recall, no, ma'am.
25        Q.    Okay.  Are you aware that Rudy Perez was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

104

```
 1    housed at PNM North for a period of time?
 2         A.   I am aware of that.
 3         Q.   Do you know when that began?
 4         A.   Not without looking at the inmate locator
 5    documents.
 6         Q.   You just remember that he was there?
 7         A.   I do.
 8         Q.   Were you there at the same time?
 9         A.   It's possible that in 2010 he could have
10    been there.  I just don't recall.
11         Q.   Okay.  But how do you know that he was
12    there for some period of time?
13         A.   Because of the lockdown, I know some of the
14    inmates were moved from the Southern to the
15    Penitentiary of New Mexico.
16         Q.   Mr. Roark, I'm going to show you
17    document -- move the Court for admission of Rudy
18    Perez Exhibit G.
19              THE COURT:  Any objection Ms. Armijo?
20              MS. ARMIJO:  Oh, no, Your Honor.
21              THE COURT:  Any objection from any
22    defendant?
23              All right.  Rudy Perez Exhibit G will be
24    admitted into evidence.
25         Q.   Mr. Roark, this is a document called
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1      "Interim Level 6 Disciplinary Placement," dated March
 2      11, 2014, for Rudy Perez.  Are you familiar with this
 3      form?
 4           A.   Yes, ma'am, I am.
 5           Q.   Okay.  Have you ever looked at this Interim
 6      Level 6 Disciplinary Placement for Rudy Perez?
 7           A.   I don't recall ever seeing it before,
 8      ma'am.
 9           Q.   Well, it says that on March 11, 2014, Rudy
10      Perez was involuntarily placed in Level 6; is that
11      right?
12           A.   That's correct.
13           Q.   And do you know the basis for that
14      placement?
15           A.   It was pending the investigation.  It was
16      part of the investigation.
17           Q.   Okay.  So was everybody in blue and yellow
18      pods at Southern placed in Interim Level 6 pending
19      the investigation in March of 2014?
20           A.   We were investigating all of the SNM.  So
21      yes, ma'am, they should have all been placed on
22      Interim Level 6.
23           Q.   Do you know how long those individuals were
24      held in Interim Level 6?
25           A.   No, ma'am, not without reviewing other
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

106

 1    documentation, no.

 2             MS. BHALLA:  We just couldn't hear the

 3    answer in the back of the room.

 4             THE COURT:  He said, "No, ma'am, not

 5    without reviewing other documentation, no."

 6        Q.   So do you know if Mr. Perez was

 7    subsequently released from Interim Level 6 placement?

 8        A.   I don't know, ma'am.

 9        Q.   Do you know if the individuals who were

10    being investigated in March of 2014 were released,

11    those suspected SNM members?

12        A.   Some were released, yes, ma'am.

13        Q.   Okay.  I'm going to show you Government's

14    Exhibit 43, which I think you already looked at --

15    and the Government asked you, the prosecutor asked

16    you about a period of time in 2016.  Can you tell

17    me -- and this is Rudy Perez' Offender Physical

18    Location History, right?

19        A.   Yes, ma'am.

20        Q.   Can you tell me -- looks to me like Mr.

21    Perez was then sent to the Penitentiary of New Mexico

22    on June 17, 2015.  Is that how this reads?

23        A.   That's correct.

24        Q.   Okay.  Do you know why he was sent there?

25        A.   No, not specifically, no, ma'am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.   You don't know if it was for discipline?

2          A.   No, ma'am, I don't know.

3          Q.   Okay.  What are -- what, if any, are valid

4     reasons for him to have been sent there, if you know,

5     in June of 2015?

6          A.   There could have been any number of

7     reasons.  He could have -- we were moving the SNM a

8     lot.  We were moving SNM out of the Southern, so we

9     were bringing a lot of them up to the penitentiary.

10         Q.   Let me ask you this:  We looked at

11    Defendant's Exhibit F, and you explained to me that

12    in June of 2015, in order to be sent to Level 6, you

13    had to be identified as an STG member or suspected

14    STG member, something else C1, but there also had to

15    be a documented history of institutional behavior

16    meeting one of the following criteria.  There had to

17    be an act of violence, or directing others to engage

18    in violence; threats or coercion of other inmates; or

19    involvement in directing others to engage in

20    organized unauthorized activity.  Is that right?

21         A.   That's in the policy, yes, ma'am.

22         Q.   And so you don't know, sitting here today,

23    whether Rudy Perez had done anything that met the

24    criteria contained in this policy?

25         A.   Not without documents in front of me, no.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

108

1    I can't tell you, no.

2         Q.   Since you've never seen those documents,

3    you don't know why Mr. Perez was housed in Level 6?

4         A.   I don't know specifically why he was sent

5    to Level 6 on that date, no.

6         Q.   Okay.  Do you know anybody who would know?

7         A.   You could ask -- could you look at -- that

8    information should be in his file.

9         Q.   Who maintains that file?

10        A.   The penitentiary -- whatever, his

11   caseworker.

12        Q.   So that would be a caseworker at PNM?

13        A.   Possibly or -- yes, that's a possibility.

14        Q.   Okay.  That's the only person who would

15   know why Mr. Perez was housed at Level 6 in the June

16   of 2015, that caseworker?

17        A.   The unit manager would also know, and

18   probably the warden and deputy warden.

19        Q.   Okay.  And who are the warden and deputy

20   warden?

21        A.   The deputy warden at this time at the PNM

22   North facility is -- the acting Deputy Warden is

23   Wendy Perez.

24        Q.   Okay.  So she would know all about why Rudy

25   Perez was housed in Level 6 in June of 2015?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Well, I can't say she would know
2 everything, because again, she may have to refer back
3 to the documentation.  So --
4      Q.   Okay.  I think it was your testimony, sir,
5 that you don't recall having any involvement at any
6 time in Mr. Perez' housing at PNM; is that right?
7      A.   Not specifically his housing, no.
8      Q.   Okay.  If we look at Government's Exhibit
9 43, you can see that Mr. Perez was held at PNM, as we
10 said, from June 17, 2015.  And can you tell when he
11 left PNM?  Is it this April 18, 2016 that he left?
12      A.   No, ma'am.  It showed that he went to
13 Southern New Mexico Correctional Facility, but the
14 next line shows he was housed back at the North.  So
15 I'm not sure what that entry was.
16      Q.   Okay.  And so he was held, at least until
17 April 18, 2016, from June 17, 2015?
18      A.   No.  It looks like he was held at PNM North
19 from June 17, 2015 to April 28 of 2016.
20      Q.   Okay.  So about 10 months?
21      A.   Yeah, roughly, ma'am.
22      Q.   But you don't know why?
23      A.   Because there was an ongoing investigation
24 with SNM.
25      Q.   Okay.  But you don't know of any threat or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    other justification for holding Mr. Perez according

2    to the policies?

3         A.   Not according to the policies.

4         Q.   Okay.  And you don't know who made the

5    decision to house him at PNM?

6         A.   Well, we were moving the SNM out of the

7    Southern New Mexico Correctional Facility, and moving

8    them to the Penitentiary of New Mexico.

9         Q.   When you say "we," who do you mean?

10        A.   The Department.

11        Q.   Okay.  But the Department had to follow the

12   policies in effect at the time, right, in June 2015?

13        A.   We had policies, yes, ma'am.

14        Q.   Okay.  And so, in June 2015, in order for

15   Mr. Perez to be held at PNM, there must have been a

16   finding that there was some sort of credible threat

17   or documented history of violence on his part to

18   justify that; is that right?

19        A.   We can lock up people pending the outcome

20   of an investigation.

21        Q.   Okay.  So is it your testimony that the

22   only reason Rudy Perez was held in June 2015, was

23   because he was thought to be an SNM member?

24        A.   We had -- no, no, ma'am, that's not right.

25        Q.   Okay.  Tell me why he was held.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492
                                                           e-mail: info@litsupport.com



1    A.   He was held because he was part of the

2    investigation, a part of the SNM.  We didn't know who

3    was involved with who.  We didn't know what SNM

4    members were going to conduct acts of violence on

5    what other SNM members.  We didn't understand the

6    factions.  We had had a murder, we had had an

7    assault.  We just -- we were investigating the whole

8    SNM, ma'am.

9    Q.   And June 2015 was 15 months after the

10   Javier Molina murder; is that right?

11   A.   Yes, ma'am.

12   Q.   Okay.  And so what happened 15 months after

13   the Javier Molina murder that caused you to move

14   inmates who were thought to be SNM to PNM?

15   A.   We wanted to put all the SNM in one

16   facility.  So that was our decision.

17   Q.   But all the SNM weren't held at PNM, right?

18   A.   We were moving them, we were transitioning

19   them out of the Southern New Mexico Correctional

20   Facility.

21   Q.   So is it your testimony that you made the

22   decision in June of 2015, 13 months after the Javier

23   Molina murder, to move all the SNM or suspected SNM

24   inmates to PNM Level 6?

25   A.   Well, some of them wound up going to the

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    South facility.  But yes, in that course of time.

2         Q.   Okay.  So you made the decision to move

3    everybody that you thought was SNM to the

4    Penitentiary of New Mexico in the summer of 2015?

5         A.   Yes.  I consulted with the Secretary and

6    Deputy Secretary, but yes.

7         Q.   Okay.  And you made the decision, then, to

8    move Rudy Perez to the Penitentiary of New Mexico?

9         A.   Yes, ma'am.

10        Q.   Okay.  Now, a little while ago you told me

11   you didn't recall having anything to do with Rudy

12   Perez being housed at PNM.  Tell me what you remember

13   about that now.

14        A.   Well, the decision was made -- I didn't

15   specifically know of Rudy Perez' case, in terms of

16   where we were going to place him, but I made the

17   decision, yes, we're going to move all the SNM to the

18   Penitentiary.

19        Q.   Okay.  And what was the basis for that

20   decision?  What prompted you, 13 months after the

21   Javier Molina murder, to make that decision?

22        A.   The decision was made because it was just

23   going to be easier to do an investigation if we had

24   them all in one place.

25        Q.   So over a year after the murder, you

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    decided that you wanted them all to be -- all the SNM
 2    members to be at the Penitentiary of New Mexico, to
 3    continue the investigation?
 4        A.   Yes, ma'am.  I think that's fair.
 5        Q.   Okay.  And that is the reason that Rudy
 6    Perez was held there in June of 2015, because you
 7    were completing an investigation of the SNM?
 8        A.   Yes, ma'am.
 9        Q.   Are you aware that -- let me ask you this:
10    The Government asked you about N 3A Q 101 S, right?
11        A.   Yes, ma'am.
12        Q.   And the prosecutor asked you -- I think Ms.
13    Armijo asked you if that was a handicapped cell.  And
14    you said, "It's located in an area that has
15    handicapped cells," right?
16        A.   It's in an area that has handicapped
17    access.
18        Q.   Okay.  It is not, in itself, a special
19    handicapped cell, right?
20        A.   I'd have to look at that cell.  We do have
21    handicapped cells that have showers in them.  But
22    that specific one, I can't tell you.
23        Q.   You can't tell me if that's one of them.
24        A.   That's right.
25        Q.   And are you aware that the Government --
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   have you talked to the Government about their

2   response to -- the pleading that they filed in this

3   case for this hearing on Mr. Perez' motion to

4   suppress?  Did you have anything to do with that?

5       A.   I'm not sure what you're asking, so I guess

6   the answer is no.

7       Q.   Okay.  The court document that was filed in

8   this case, for this hearing, by the prosecution

9   stated that Mr. Perez was held in this cell because

10  it's a handicapped cell.  But you can't tell me if

11  this is a handicapped cell?

12      A.   I can tell you the pod has handicapped

13  access.

14      Q.   Okay.  But you've already told me that the

15  reason that Mr. Perez was held in this cell is

16  because you were continuing an investigation of the

17  SNM?

18      A.   We were continuing.  Both items are true.

19      Q.   You've answered my questions on that.

20           Now, are you familiar with Mr. Billy

21  Cordova?

22      A.   I do know Inmate Billy Cordova, yes.

23      Q.   Do you know that he was, for a period of

24  time, held at the Penitentiary of New Mexico Level 6?

25      A.   I do.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1          Q.   And do you know when he was there?
2          A.   Unless I look at the -- I can't tell you
3     off the top of my head.  But --
4          Q.   Okay.  And he -- do you know him
5     personally?
6          A.   I know him a little bit better than Rudy
7     Perez, just because I happened to work in the same
8     areas that he lived in.  But, no, I don't really know
9     him personally.
10         Q.   You had just been at the same facilities
11    that he's been in at the same time?
12         A.   More often than Mr. Perez.
13         Q.   Okay.  Is he one of the individuals you
14    talked to Mr. Acee about, when you talked about
15    putting money on inmates' books?
16         A.   We didn't talk about individual inmates,
17    no.
18         Q.   Are you aware that he was getting money put
19    on his books by the Government while he was at PNM?
20         A.   I probably was -- yes, ma'am, I was aware.
21         Q.   Okay.  And you helped make that happen?
22         A.   I told him how that works.
23         Q.   Because there is a way to do it so that you
24    can't tell, looking at the documentation, that the
25    money is coming from the government, right?
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492
                                                    1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1        A.   No, ma'am.  That I would have -- no, ma'am.

2        Q.   Okay.  And did you have anything to do with

3   making the decision to house Billy Cordova at PNM?

4        A.   It's kind of like Rudy Perez:  No, not

5   directly.  I didn't tell anyone to put him in that

6   cell.  But yes, I did tell them:  We're moving him to

7   PNM.

8        Q.   But you don't remember when that happened?

9        A.   Not without looking at the dates on the

10   inmate locator.

11        Q.   I'm going to show you Government's Exhibit

12   45.  This is Billy Cordova's location history.  You

13   remember this.  Looking at this document, can you

14   tell me when Mr. Cordova went to PNM?

15        A.   It looks like he originally went to PNM on

16   January 7, 2016.  I'm sorry, ma'am, how far down do

17   you want me to read?

18        Q.   No, that's fine.  January 7, 2016.  And so

19   you explained that in the summer, June of 2015, you

20   made the decision to bring all the SNM inmates to

21   PNM, right?

22        A.   We were transitioning the SNM all to PNM,

23   yes, ma'am.

24        Q.   Do you know if Billy Cordova is SNM?

25        A.   He is.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  But he was not brought there in the
2   summer of 2015, according to this Government's
3   Exhibit 45, right?
4      A.   No, ma'am.  He hadn't transitioned yet, no,
5   ma'am.
6      Q.   He wasn't brought there until January 2016.
7   And so you asked for him to be brought there in
8   January 2016?
9      A.   I mean, yes.  Ultimately, I'm responsible.
10  But I don't do the transport orders.  But the answer
11  is yes.
12     Q.   But did you ask that he be moved to PNM?
13     A.   I knew that the SNM were being moved to
14  PNM.
15     Q.   Okay.  And we already talked about Rudy
16  Perez, and he was moved in June of 2015.  And you
17  told me you were involved in transitioning all the
18  SNM to PNM, right?
19     A.   That's correct.
20     Q.   Okay.  Now, we're in January of 2016.  And
21  you asked for Mr. Cordova -- can you tell me if
22  anybody else who is SNM was moved to the Penitentiary
23  of New Mexico in January of 2016?
24     A.   I can't tell you without looking at
25  transport orders and stuff like that, ma'am.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  But you asked that Mr. Cordova be

2   moved in January of 2016, looking at Government's

3   Exhibit 45?

4      A.   Well, if you look at the locator history,

5   it looks like he had court -- he had already been at

6   the PNM North, if you look down.  And he had gone to

7   Central because he had to go to court.  For those

8   inmates that are go into court to Albuquerque, we

9   transfer them to Central until they're done with

10  their court dates.

11     Q.   Okay.  And in January 2016, Mr. Cordova was

12  pending -- do you recall Mr. Cordova was pending

13  sentencing?

14     A.   No, ma'am, I can't say that I recall that.

15     Q.   I know you deal with a lot of people coming

16  in and out of facilities.  And so, if you don't

17  remember specifically, that's fine.  I'm just trying

18  to figure out if you know why he was brought there in

19  January of 2016?

20     A.   It looks like -- I mean, just based on this

21  documentation -- of course, I don't know what he was

22  doing at MDC -- but it looks like he was out to

23  court.

24     Q.   Okay.  And when he came to PNM in January

25  2016, if he had not yet been sentenced, what are the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    reasons that he could have been held at PNM pursuant

2    to the policies?

3         A.   If he hadn't been sentenced yet?

4         Q.   Yeah.  I know you don't know if he hadn't

5    been sentenced.  But if an inmate is pending

6    sentencing, and they're held at PNM, what are the

7    valid reasons for that?

8         A.   Well, I mean, there is several different

9    reasons.  It could be all the things that we had

10   already talked about.  It could be because he's a

11   county hold.  We hold inmates for the county, and

12   then they reimburse us.  So that's a possibility.

13        Q.   And that's where the county asks the New

14   Mexico Corrections Department to hold an inmate at

15   Level 6?

16        A.   Yeah.  Sometimes they'll specifically

17   request a facility.  But sometimes they'll just

18   say -- they'll remand them to our custody, and we

19   just decide where to place them.

20        Q.   You make that classification decision then?

21        A.   We do.  And we usually -- usually, when the

22   courts send us someone, it's because they're creating

23   some sort of security problem within the county jail.

24   So we just kind of -- most of the time send them to

25   the Penitentiary North facility.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

120

```
 1        Q.   Okay.  And Mr. Cordova also could have been
 2   held there for discipline, right?
 3        A.   Discipline, yes, ma'am.
 4        Q.   And if that were the case, there would be
 5   documentation of that in his NMCD file?
 6        A.   Yes, ma'am, there would be.
 7             MS. FOX-YOUNG:  Your Honor, I move to admit
 8   Rudy Perez Exhibit H.  I don't believe the Government
 9   objects.
10             THE COURT:  Is that correct?
11             MS. ARMIJO:  No objection.
12             THE COURT:  Anybody else have any
13   objection?  All right.  Defendant Rudy Perez' Exhibit
14   H will be admitted into evidence.
15        Q.   Okay.  And I think, Mr. Roark, you said
16   that you didn't recall having anything to do
17   specifically with Rudy Perez' housing at PNM, but you
18   did request that all the SNM inmates be moved?
19        A.   Yes.  I get transport orders, and I get
20   told about transports.  So, yeah, I would have known
21   that he was getting moved to the penitentiary.
22        Q.   Okay.  Showing you what's been marked as
23   Rudy Perez Exhibit H, and I will try to zoom in on it
24   so can you see it.  And if you want to see the
25   document itself, I'll bring it to you.  But I'll
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    represent to you that this is an email chain that
 2    appears to involve you and Ms. Wendy Perez, who I
 3    think you talked about, who is the Deputy Warden; is
 4    that right?
 5         A.   Yes.
 6         Q.   And Roland Mares.  Who is he?
 7         A.   He is -- I believe at the time he was a
 8    classification officer.
 9         Q.   Okay.  And do you see where there is an
10    email from you that's included in this document?
11         A.   I do.
12         Q.   And it appears to be from February 11,
13    2015; is that right?
14         A.   Yes.
15         Q.   It looks like you wrote all the wardens,
16    and you talked to them -- is this to all the wardens?
17         A.   It was.
18         Q.   Okay.  And Wendy Perez received this email?
19         A.   She eventually received it, yes.
20         Q.   Okay.  It looks like you sent an email to
21    the wardens talking about inmates who owe
22    disciplinary time under the old rules, right?
23         A.   Yes, ma'am.
24         Q.   And Ms. Wendy Perez took this email, and it
25    looks like the email was then forwarded to German
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    Franco, right?  If you just look up at the top of
 2    this document.
 3         A.   Yes, eventually, yes, ma'am.
 4         Q.   And the subject line reads, "Rudy Perez
 5    40830," and then in the body of the email it says,
 6    "Call me on this so I can explain, please."  Do you
 7    see that?
 8         A.   Yes, ma'am.
 9         Q.   Do you know what that's about?
10         A.   I don't know what Ms. Perez and Mr. Franco
11    talked about, no.
12         Q.   Okay.  And then down at the bottom in this
13    email -- and I know this document contains different
14    emails.  It was produced this way from the
15    Corrections Department, I will represent to you.  At
16    the bottom there is a description from Mr. Roland
17    Mares to Shane Donahue, Wendy Perez.  Who is Shane
18    Donahue?
19         A.   I don't recognize the name.
20         Q.   And it talks about an old report from three
21    years prior, right, February of 2013?
22         A.   It does.
23         Q.   But you don't know anything about that with
24    regard to Rudy Perez?
25         A.   No, not today, I don't.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.
 2             MS. FOX-YOUNG:  Your Honor, just a moment.
 3             THE COURT:  Certainly.
 4             MS. FOX-YOUNG:  Your Honor, I'll pass the
 5    witness.
 6             THE COURT:  Thank you, Ms. Fox-Young.
 7             Ms. Bhalla, do you have cross-examination
 8    of Mr. Roark?
 9             MS. BHALLA:  Your Honor, if we could have
10    just a couple of minutes to reorganize the exhibits?
11    It shouldn't take but a minute.
12             (A discussion was held off the record.)
13                        EXAMINATION
14    BY MS. BHALLA:
15        Q.   Good afternoon, Mr. Roark.  I think it's
16    afternoon now.
17             You testified that everybody was put on
18    lockdown in March of 2014, after the Molina homicide;
19    is that correct?
20        A.   Yes, ma'am.
21        Q.   Okay.  And that was in the Southern
22    facility?
23        A.   Well, it was all SNM.  So not just at
24    Southern; it was at Central and --
25        Q.   So wherever they were located?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, ma'am.
 2        Q.   Okay.  And I'm going to show you a
 3   document.  Can you see that on your computer screen?
 4        A.   Yes, ma'am, I can.
 5        Q.   And do you see that that is an Interim
 6   Level 6 placement for Mr. Herrera?
 7        A.   Yes, ma'am.
 8        Q.   And that is dated March of 2014?
 9        A.   Yes, ma'am.
10        Q.   So would you agree with me that Mr. Herrera
11   was also placed on Interim Level 6 lockdown after the
12   Molina homicide?
13        A.   I would.
14        Q.   Okay.  And when you look at these location
15   histories -- I'm going to show you what has been
16   marked as Government's Exhibit 44, which would be the
17   location history for Mr. Herrera.  Can you take a
18   look at that?
19        A.   Yes, ma'am.
20        Q.   Do you see his location history for March
21   of 2014?
22        A.   Yes, ma'am, I see it.
23        Q.   Does that location history indicate whether
24   or not he was on Interim Level 6?
25        A.   It doesn't.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

125

```
 1        Q.   Excuse me?
 2        A.   The location history itself doesn't show
 3   that.
 4        Q.   Okay.  So by looking at the location
 5   histories alone, you can't tell, wherever these
 6   inmates were, what restrictions were placed on them
 7   in terms of Interim Level 6 or Level 4 or general
 8   population?
 9        A.   That's correct, not just looking at this.
10        Q.   Okay, thank you.
11             Now, I'm going to show you another document
12   for Mr. Herrera.  Would you agree that this is
13   another Interim Level 6 placement for Mr. Herrera?
14        A.   It is.
15        Q.   And then it's dated December of 2014?
16        A.   Yes, ma'am.
17        Q.   And would you agree with me that Mr.
18   Herrera was still on Interim Level 6 at that time?
19        A.   He was.
20        Q.   Okay.
21             MS. BHALLA:  Your Honor, I want to move --
22   gosh there is too many exhibits up here.  I would
23   like to move those two interim placements with Mr.
24   Herrera into evidence as Exhibits D and E for Mr.
25   Herrera.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

126

```
1              THE COURT:  Any objection, Ms. Armijo?
2              MS. ARMIJO:  I don't.  But I would ask in
3     the future before we show things, that we have an
4     opportunity to have it placed into evidence.
5              THE COURT:  All right.  Anybody else have
6     any objections?  All right.  Then Defendant Carlos
7     Herrera's Exhibits D and E will be admitted into
8     evidence.
9     BY MS. BHALLA:
10        Q.   Do you recall, Mr. Roark, testifying about
11    the Level 5 and Level 6 placement criteria and
12    procedures?
13        A.   I do.
14        Q.   And do you recall that one of their
15    criteria is that they are actively participating in
16    gang-related activities?
17        A.   I do recall that.
18        Q.   Okay.  I'm going to show you a couple of
19    other classification forms, but I believe I need to
20    show Ms. Armijo first.
21             Can you see this document on your screen,
22    Mr. Roark?
23        A.   Up till number 9.
24        Q.   Okay.  I can scroll it down.
25    Unfortunately, I don't think I can make the whole --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   is there a way to make it smaller?
 2           MS. ARMIJO:  Your Honor, I'm going to
 3   object.  She's going to move it into evidence.  We
 4   don't have any objection.  But at least for the
 5   record if she's going to mark it and put for the
 6   record what exhibit she is referring to.
 7           THE COURT:  Are you going to move this into
 8   admission, Ms. Bhalla?
 9           MS. BHALLA:  Yes, Your Honor, I believe we
10   left off with E.  So I believe it would be Carlos
11   Herrera's F and G.  And I didn't have enough -- I
12   still need to mark it with the exhibits.
13           THE COURT:  All right.  There is no
14   objection from the Government on these?
15           MS. ARMIJO:  No, Your Honor.
16           THE COURT:  Anybody else have any
17   objection?  Defendant Carlos Herrera's Exhibits F and
18   G will be admitted into evidence.
19       Q.   Is that better, Mr. Roark?
20       A.   It is.
21       Q.   Okay.  And can you read the title of that
22   document for us?
23       A.   It's Reclassification Scoring Form.
24       Q.   Okay.  And the review date on this document
25   was June 18 of 2014?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

 1          A.    That's correct.

 2          Q.    And at that time Mr. Herrera was still

 3   being held on Interim Level 6; is that correct?

 4          A.    I believe that's correct.

 5          Q.    Would you also agree with me that, if you

 6   go down to number 9, "Gang membership and activities

 7   in the past ten years" -- can you take a look at that

 8   section?

 9          A.    Yes, ma'am.

10          Q.    And isn't it true that the form indicates

11   that Mr. Herrera had no gang activity or membership

12   in the last 10 years?

13          A.    That's what the form says, yes.

14          Q.    But he was still being held in Interim

15   Level 6?

16          A.    That's correct.

17          Q.    I'm going to show you another form, which

18   would be F, I believe -- G -- thank you.  Is that a

19   similar form to the one that you just reviewed?

20          A.    It is.

21          Q.    And is the review date on that December 2nd

22   of 2014?

23          A.    It is.

24          Q.    And is he still being held in Interim Level

25   6, Mr. Herrera?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   And again, if you look at number 9, the
 3     indications are that Mr. Herrera still had no gang
 4     involvement or activities in the past 10 years; is
 5     that correct?
 6          A.   On the first page of the scoring form
 7     that's correct.
 8          Q.   Would you like to see the second page?
 9          A.   Yes, ma'am, I would.
10          Q.   Does the second page tell you anything
11     different?
12          A.   Yes.  It does.  It shows that there is a
13     mandatory override factor; that he can't go to Level
14     1, Level 2, Level 3 facility, because he's a
15     validated or suspected STG member.
16          Q.   That's correct.  But he's still being held
17     in Interim Level 6 based on the STIU investigation;
18     is that correct?
19          A.   That's true, ma'am.
20          Q.   Okay.
21               THE COURT:  Ms. Bhalla, would this be a
22     good time for us to take our lunch break?
23               MS. BHALLA:  Your Honor, you know what, to
24     be honest, I really don't have that much more.  I
25     don't know if you want me to finish up with him.  I
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    mean, I think maybe four minutes.  We can take a

2    break, that's fine.  But just in the interests of

3    being candid with the Court.

4           THE COURT:  All right.  Go ahead.

5       Q.   I'm just going to show the Government two

6    more documents.

7           MS. BHALLA:  What number am I on?  H.

8    Thank you.

9       Q.   I'm going to show you a document that will

10   be Carlos Herrera's Exhibit H.  Can you take a minute

11   to review that document, Mr. Roark?  Is that form

12   related to Mr. Herrera?

13      A.   Yes, ma'am.

14      Q.   And it's a committee review form?

15      A.   It's a TAP committee review form.

16      Q.   And it's dated December of 2014?

17      A.   It is.

18      Q.   And if you look at the bottom where it

19   says, "Security needs or recommendations," isn't it

20   correct that there are none?

21      A.   That's correct.  No one wrote anything in

22   there.

23      Q.   I'm going to show you -- and you testified

24   previously, Mr. Roark, that a lot of the SNM inmates

25   were being moved to PNM in the summer of 2015; is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that correct?

 2         A.    I believe that's when we began moving

 3    them --

 4         Q.    Okay.

 5         A.    -- many of them.

 6         Q.    I'm going to show you what's been marked as

 7    Government's Exhibit 44.  When was Mr. Herrera moved

 8    from Southern to PNM?

 9         A.    It looks like the last time was January 27.

10         Q.    Of what year?

11         A.    2016.

12         Q.    So that would have been after the summer of

13    2015?

14         A.    It was.

15              MS. BHALLA:  Can I have just one moment,

16    Your Honor?

17              THE COURT:  You may.

18              MS. BHALLA:  I have nothing further, Your

19    Honor.  Thank you.

20              THE COURT:  Thank you, Ms. Bhalla.

21              All right.  Let's go ahead and take our

22    lunch break.  We'll be in recess for about an hour.

23    Have a good lunch.

24              (The Court stood in recess.)

25              THE COURT:  All right.  Everybody take
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    their seats.  We'll go on the record.  Look around,
 2    make sure everybody has got a lawyer.  Looks to me
 3    like everybody does.  Let's just make sure.
 4              All right.  Anybody have any further
 5    cross-examination of Mr. Roark?
 6              All right.  Ms. Armijo, do you have
 7    redirect?
 8              MS. ARMIJO:  I believe Mr. Jewkes does.
 9              THE COURT:  Oh, Mr. Jewkes.  All right.
10    Mr. Roark, I'll remind you that you're still under
11    oath.  Mr. Jewkes.
12              MR. JEWKES:  Thank you, Your Honor.  May it
13    please the Court.
14              THE COURT:  Mr. Jewkes.
15              MR. JEWKES:  Your Honor, if I may, I'd like
16    to look at the white paper admitted for purposes of
17    this hearing as RP-D, if I may have just a moment.
18              THE COURT:  You may.
19                        EXAMINATION
20    BY MR. JEWKES:
21        Q.   Good afternoon, Mr. Roark.
22        A.   Good afternoon.
23        Q.   I pronounced your last name correctly,
24    Roark?
25        A.   It's Roark, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   Mr. Roark, this white paper that was
2     discussed earlier this morning, you're the author of
3     it?
4          A.   Yes, sir.
5          Q.   And did you have any assistance in writing
6     it?  By that I mean, are you the sole author of this
7     report?
8          A.   I'm the sole author.
9          Q.   So all conclusions in this report are your
10    conclusions?
11         A.   They were conclusions based on the
12    preliminary and initial information we received.
13         Q.   Okay.  Did you rely on any information from
14    informants?
15         A.   Not directly.
16         Q.   Not directly.
17              If we may -- can you see this all right?
18         A.   Yes, sir, I can.
19         Q.   How does this magnify?  Thank you.
20              We're looking at -- even though it's not
21    marked as page 1, it's the first page in this packet.
22    And it says, "Video footage shows that inmate Daniel
23    Sanchez, 43068, was orchestrating and directing the
24    assault."  You wrote that?
25         A.   I did, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And how many times did you watch that
 2   video, the video of the March 7 assault?
 3        A.    Once or twice.
 4        Q.    Once or twice.  Have you viewed it
 5   recently?
 6        A.    No, sir, I have not.
 7        Q.    Can you tell us exactly what you saw in
 8   that video that indicated that Daniel Sanchez was
 9   orchestrating and directing the assault?
10        A.    No, sir, I can't do that today.
11        Q.    You can't do that?
12        A.    No, sir.
13        Q.    Would it surprise you if I told you that in
14   the video Mr. Sanchez is seated at a card table, a
15   steel table, in the middle of the pod?
16        A.    I haven't seen the video in a while, sir.
17        Q.    You haven't?
18        A.    No, sir.
19        Q.    Okay.  So having not seen the video in
20   quite a while, is it possible that this statement is
21   incorrect?  In other words, not necessarily the
22   truth, not that you lied.  I'm just saying that you
23   could be wrong?
24        A.    I wrote this three years ago, so
25   perceptions do change, yes, sir.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1         Q.   Fair enough.
 2              Now, what, if anything, do you remember
 3    about the video of the March 7 assault on Javier
 4    Molina?  Anything?
 5         A.   Very little, sir.  I viewed it three years
 6    ago, so I'd have to see it again, sir.
 7         Q.   Mr. Roark, you've been with the Department
 8    of Corrections since 1989?
 9         A.   Yes, sir.
10         Q.   By my count, that's 28 years.  You worked
11    your way up from the bottom, started off as a
12    detention officer, or a correctional officer;
13    correct?
14         A.   That's correct, sir.
15         Q.   Okay.  I take it you're familiar with
16    shanks?
17         A.   I am.
18         Q.   Do you know what a shank is?
19         A.   Yes, sir, I do.
20         Q.   You've probably seen them a bunch of times,
21    haven't you?
22         A.   I have.
23         Q.   Do you know how they're made?
24         A.   Generally, how they're made, yes, sir.
25         Q.   How long does it take to make a shank?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Well, it depends.  It depends on the type

2    of material, how motivated the inmate is, the tools

3    he has available, if he has any.  I mean, I don't

4    know there is a time period, but it depends.

5        Q.   It varies, right?

6        A.   Yes, sir.

7        Q.   Okay.  We'll agree that most of the time

8    shanks are made out of steel, would you agree?

9        A.   Most of the time.  There are exceptions.

10        Q.   Okay.  And you're aware that there were

11    three shanks seized in connection with this case --

12    and for the sake of simplicity, let's call it the

13    Molina case, all right?

14        A.   Yes, sir.

15        Q.   Three shanks in evidence.  Have you ever

16    seen those shanks?

17        A.   I haven't seen them in a while, no, sir.

18        Q.   No, okay.  Do we both agree that inmates

19    doing time in the New Mexico Department of

20    Corrections are not allowed to have files or electric

21    grinders?  Do you agree with that?

22        A.   In their personal property, that's correct.

23        Q.   So how are these shanks made?  If they're

24    made out of steel, and they're made surreptitiously,

25    how is that accomplished?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492
                                                                                1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                          e-mail: info@litsupport.com

1          A.    Well, a lot of times the inmates will -- if

2    the metal is pliable enough, they'll take the metal

3    and they'll grind it against the concrete, and that

4    sharpens it.

5          Q.    Okay.  So in a typical prison setting,

6    we're talking about either concrete floor, concrete

7    wall, or maybe a concrete pillar?  Would you agree

8    with that?

9          A.    Yes, sir.

10         Q.    And you train your correctional officers to

11   look for grind marks, either on the walls, on the

12   pillars, or on the floors, would you agree with that?

13         A.    That's part of the search training, yes,

14   sir.

15         Q.    They check these various places several

16   times a day, don't they?

17         A.    They're required to do three cell searches

18   a day in each housing unit.  So they do check.  They

19   do look into every cell, but they only do three cell

20   searches that are beyond just a casual observance.

21         Q.    All right, sir.  Well, after March 7, 2014,

22   are you aware of any of the employees, DOC employees

23   out there at Southern, looking for such grind marks,

24   specifically in the blue pod at Southern New Mexico?

25         A.    It should have been part of their job, yes,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   sir.

2       Q.   Did you indicate anything about that in

3   your white paper, Mr. Roark?

4       A.   Not in the blue pod, no, sir.

5       Q.   Not in that blue pod?

6       A.   No.

7       Q.   So can we safely assume then that there

8   were no grind marks found in blue pod on or after

9   March 7, 2014?  Would that be a safe assumption?

10      A.   There was none that I know about, yes, sir.

11           MR. JEWKES:  Pass the witness, Your Honor.

12           THE COURT:  Thank you, Mr. Jewkes.

13           Did someone else want -- Ms. Duncan.

14           MS. DUNCAN:  Yes, Your Honor.  Thank you.

15           THE COURT:  Ms. Duncan.

16           MS. DUNCAN:  If I may just have a moment,

17  Your Honor.  I need some of these exhibits.

18           THE COURT:  You may.

19                        EXAMINATION

20  BY MS. DUNCAN:

21      Q.   Good afternoon.

22      A.   Good afternoon.

23      Q.   I wanted to talk to you about the

24  conversation that you had with Anthony Ray Baca in

25  January of 2014.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes, ma'am.

2       Q.   Can you begin by telling us why was Anthony

3   Ray Baca transferred from Southern New Mexico

4   Correctional Facility to PNM North in 2013?

5       A.   I don't want to mislead you.  I'd have to

6   look at the file exactly to tell you why he was

7   transferred.  I mean, there were some safety issues,

8   but I don't remember exactly.

9       Q.   Okay.  So there were some safety issues.

10  Would I be correct in saying that there were

11  confidential informants that indicated that there

12  might be a threat to Mr. Baca's life?

13      A.   It would be something like that.  Again, I

14  don't remember the exact circumstances.  But, yes,

15  ma'am.

16      Q.   Do you recall that his transfer to PNM was

17  based on an involuntary placement in Level 6;

18  correct?

19      A.   That's correct.

20      Q.   Based on personal safety; correct?

21      A.   That's correct.

22      Q.   And I would like to show you what I'm going

23  to mark as Anthony Baca -- AB-A.  And for the record,

24  this is Bates stamped DeLeon 27801.

25           MS. DUNCAN:  Your Honor, I don't think the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

140

```
 1   Government has any objection, so I would move the
 2   admission.
 3            THE COURT:  Anybody else have an objection?
 4   All right.  Defendant Anthony Baca's Exhibit A will
 5   be admitted into evidence.
 6   BY MS. DUNCAN:
 7       Q.   So I'm showing you Exhibit AB-A.  And this
 8   is the Interim Level 6 disciplinary placement for
 9   Anthony Baca; correct?
10       A.   That's correct.
11       Q.   And it's dated June 28 of 2013; correct?
12       A.   That's correct.
13       Q.   And it's signed by Captain Daniel Blanco.
14   Who was Captain Blanco at that time?
15       A.   He was the captain of the Security Threat
16   Intelligence Unit at Southern New Mexico Correctional
17   Facility.
18       Q.   At the bottom of the form, in the area
19   that's known as 72-hour review, that gives specific
20   justification for the action; correct?
21       A.   To keep him on -- to remain in Interim
22   Level 6, yes, ma'am.
23       Q.   So let me ask you about the procedure.  So
24   how is it that an inmate is put in involuntary
25   placement for his own protection?  What's the process
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    for that?

2         A.   Well, in this case -- there is a couple

3    ways to do it.  Well, I mean, if the inmate asks --

4    at that time, if an inmate asked to be placed in

5    involuntary placement, we would do that.  If an

6    inmate -- if we have information based on

7    confidential sources that an inmate would be placed

8    in involuntary segregation, we would do that at that

9    time.

10        Q.   And so how -- so in this case, Mr. Baca was

11   placed in involuntary segregation; correct?

12        A.   That's correct.

13        Q.   So what is the process for placing an

14   inmate in involuntary segregation?  Is there a

15   procedure that the Department of Corrections follows

16   to do that?

17        A.   There is.  There is this placement form,

18   and then there should have been a confidential

19   information memorandum to support the lockup.

20        Q.   And can you tell us what is the

21   confidential information memorandum?

22        A.   It's a summary of confidential information.

23   We have nine criteria in order to lock someone up for

24   confidential information.  You have to meet four of

25   those nine criteria.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Do you know off the top of your head the

2   nine criteria?

3        A.   I can try.  I don't know about if I'll

4   remember all nine of them, ma'am.  But some of them

5   are date and time of incident; person, date and time

6   of information received; place the information was

7   received; the person who received the information;

8   efforts to corroborate the information; the exact

9   nature of the information; whether the informants had

10   provided reliable information in the past.  I'm

11   missing three I can't recall now.

12        Q.   And with that confidential information, is

13   there a form that is used to verify the confidential

14   information?

15        A.   It's not to verify.  It's to summarize the

16   confidential information.  And you have to outline

17   all the four criteria that you met.

18        Q.   And when is that memorandum written that

19   you submitted?

20        A.   Upon the decision to place him into Level

21   6; to remove him from Interim Level 6 and into Level

22   6.

23        Q.   So after the decision is made to put

24   someone into Interim Level 6 -- I see on this form

25   that is a 72-hour review section at the bottom.  Do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you see that?

2         A.   Yes, ma'am.

3         Q.   And what is the purpose of that review?

4         A.   The purpose of the review is to make sure

5    that we're not housing someone in restrictive housing

6    that shouldn't be there.

7         Q.   And what is the process for that review?

8         A.   The chief of security should go talk to the

9    inmate, and then look over the evidence related to

10   the lockdown.

11        Q.   And so is it the chief of security alone

12   who conducts the 72-hour review?

13        A.   It's the chief of security or the unit

14   manager.

15        Q.   And after the 72-hour review, the result of

16   that review is for someone to remain in Level 6,

17   what's the next step?

18        A.   At that point, you have -- at that point

19   the unit manager needs to start working on referring

20   them to Level 6.

21        Q.   And describe that process to us, please.

22        A.   You write -- pretty much, you write a

23   justification on the document to the classification

24   bureau chief, who then makes a determination that

25   this person is going to go to Level 6.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MS. DUNCAN:  I'm going to mark another

2     exhibit.  This would be Anthony Baca B.  For the

3     record, it is DeLeon Bates stamped 27792 through

4     27814.  Your Honor, I would move for the admission of

5     Anthony Baca Exhibit B.

6          THE COURT:  Any objection, Ms. Armijo?

7          MS. ARMIJO:  No, Your Honor.

8          THE COURT:  Anybody else have an objection?

9          Anthony Baca Exhibit B will be admitted

10    into evidence.

11    Q.   I want to show you the first page of

12    Anthony Baca Exhibit B.  And this is Bates No. DeLeon

13    27792.  Is this an example of the confidential

14    informant memo that you mentioned earlier?

15    A.   This is a confidential information

16    memorandum.

17    Q.   And who would have written -- so on the

18    page -- first, there is a typed summary of the

19    confidential information; correct?

20    A.   That's correct.

21    Q.   And then lower on the document is some

22    handwriting.  Can you tell us, what is that

23    handwriting?

24    A.   It looks like someone reviewed this report

25    to see if it met the four to nine criteria.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So these four criteria:  Staff member, date
 2   received; location received; and efforts to
 3   corroborate, those are all confidential information
 4   criteria?
 5        A.   Yes, ma'am.
 6        Q.   Do you know who wrote this?
 7        A.   I don't recognize the handwriting at all,
 8   ma'am.
 9        Q.   So you said that after the 72-hour review,
10   then a packet is put together to do a more formal
11   referral to Level 6; is that correct?
12        A.   That's correct, ma'am.
13        Q.   Let me -- I'm going to hand you this
14   Anthony Baca Exhibit B, and I'm wondering if that
15   packet is contained in this exhibit.
16             MS. DUNCAN:  Your Honor, may I approach?
17             THE COURT:  You may.
18        A.   No, ma'am, it's not.
19        Q.   Where would that packet be held or kept?
20        A.   It would be at the classification -- it
21   would be at the Classification Bureau.
22        Q.   And where is the Classification Bureau?
23        A.   Well, now, we call it the Offender
24   Management Services.  That's in Albuquerque.  They
25   keep packets of all referrals to Level 6 in our new
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    program.
 2         Q.   What would you expect to see in a referral
 3    packet?
 4         A.   Just kind of a summary that's -- of what
 5    you have.  It would justify why he needed to be
 6    placed in Level 6, and it would contain a lot of the
 7    confidential information that you handed me.
 8         Q.   And so once you receive the referral
 9    packet, what happens next?
10         A.   It gets approved or denied for placement in
11    Level 6.
12         Q.   And is there a form that's filled out when
13    someone is approved or denied?
14         A.   There is.
15         Q.   And is that form provided to the inmate at
16    issue?
17         A.   Yeah, there will be a committee action for
18    the inmate.
19         Q.   And after someone is approved for Level 6,
20    is there an appeal process?
21         A.   They can appeal their placement in Level 6,
22    yes.
23         Q.   And when that decision is being made to
24    keep someone at Level 6, is there a hearing?
25         A.   The inmate can make an appeal.  It's a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    written appeal.

2         Q.   So is there ever any formal process by

3    which an inmate can respond to the allegations that

4    led him to be placed in Interim Level 6?

5         A.   He can make his response to the committee

6    through the unit management team, and he can also

7    make a written appeal also.

8         Q.   So once someone has been confirmed to Level

9    6, is there a review process to determine whether

10   they should be released from Level 6?

11        A.   There is.  There is a couple of ways --

12   there are several ways to do it in Level 6.  There is

13   regularly scheduled committee actions.  And they can

14   make a referral.  You can even -- you can request --

15   the unit manager can request a special committee

16   because he thinks, he or she may think the inmate is

17   ready to leave level 6.  There is annual reviews.

18   There is regular reviews being done on the inmate.

19        Q.   And in February or January of 2014, you

20   mentioned that you were deciding whether or not to

21   release Mr. Baca from Level 6; correct?

22        A.   That's correct.

23        Q.   And so what process were you following to

24   make that decision?  I guess, let me go back.  So

25   what triggered you to consider releasing Mr. Baca

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    from Level 6?

 2         A.   Well, what triggered me is because the

 3    Secretary and the Deputy Secretary, my bosses, were

 4    saying, Let's reduce the size of segregation, let's

 5    build trust with our gang members.  They were

 6    noticing what other states had done.  And I

 7    decided -- I had already done this with another

 8    prison gang, and I was successful in doing it.  So I

 9    decided I wanted to try to do it with the SNM.

10         Q.   So the SNM, in general, not Mr. Baca

11    specifically?

12         A.   Well, I needed to talk -- it's like any

13    organization.  You talk to the leadership first, and

14    see if that leader is interested in increased

15    privileges, getting him out there.  I just wanted to

16    see where his mind was on all this.

17         Q.   But Mr. Baca was in Level 6 because there

18    was a threat or at least an alleged threat against

19    his life; correct?

20         A.   There was.

21         Q.   So he wasn't in Level 6 because he was

22    alleged to be the leader of the SNM; correct?

23         A.   He wasn't.  But he was a known leader in

24    the SNM.

25         Q.   So when someone is sent into Level 6 as a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    result of involuntary segregation, for example, if

2    there is a threat on their life, how do they get out

3    of Level 6?  Is there a different process if you're

4    brought in disciplinary versus you're brought

5    arguably for your safety?

6         A.   Yeah.  It's the review process.  At that

7    point when we think that the threat is no longer

8    there, we can release the inmate.

9         Q.   So when you were deciding whether or not to

10   release Mr. Baca, wasn't the question whether it

11   would be safe for him to be returned to general

12   population?

13        A.   That was one of the questions.

14        Q.   What were the other questions?

15        A.   Well, for me, it was was everybody going to

16   be safe.

17        Q.   So having brought him in to Level 6 for his

18   own safety, you felt that that justified keeping him

19   in Level 6 for any other reason?

20        A.   I'm not sure I understand.

21        Q.   I phrased that badly.  So if you bring

22   someone in to Level 6 for their own protection, and

23   then the cause of concern for their safety

24   dissipates, your opinion is that you can continue to

25   keep them in Level 6 for reasons other than why they



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    were originally placed there?
 2         A.   It's possible that that could happen, yes,
 3    ma'am.
 4         Q.   So is there a process for transferring
 5    from:  I'm putting you in involuntary placement for
 6    your own safety to now I'm holding you in
 7    administrative segregation for another reason?
 8         A.   Yes, ma'am.  You should start at Interim
 9    Level 6, and start the process over again.
10         Q.   And did you do that in Mr. Baca's case?
11         A.   I did not.
12         Q.   Do you know, was Mr. Baca ever given
13    notice -- so after that original classification, it
14    was determined he was going to be in Level 6.  Was he
15    given written notice of that decision?
16         A.   He should have been, but I can't -- unless
17    I have his file showing where he signed for it, I
18    can't tell you that for sure.
19         Q.   And if that document existed, would it be
20    in the classification file held in Albuquerque?
21         A.   No -- if -- it should be in Albuquerque
22    now, because he's not in our custody.  But, usually,
23    it's at the files at whatever facility they're in
24    custody at.
25         Q.   So, originally, they would have been at PNM
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1     Level 6, but then eventually transferred to
 2     Albuquerque?
 3          A.   Correct.
 4          Q.   Do you recall whether Mr. Baca appealed his
 5     placement at PNM Level 6?
 6          A.   I don't recall.
 7          Q.   If an inmate appeals their placement at
 8     Level 6, what's the process?
 9          A.   They write an appeal.  And the appeal goes
10     up to -- the appeal can go all the way up to the
11     director of adult prisons.
12          Q.   And so at the time, that would have been
13     you?
14          A.   It would have.
15          Q.   Then, when you're reviewing an appeal, what
16     do you typically do?
17          A.   Well, it's usually assigned to whoever is
18     the appeals officer.  And they do an investigation
19     into it.  They look at all the documentation.  And
20     then they bring it to me as a summary, and they kind
21     of give me a briefing on what they found.
22          Q.   And do you rely just on the appeals
23     officer's briefing, or do you do any kind of
24     independent investigation?
25          A.   It depends on how serious.  It depends on
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the inmate and how -- and what they found.  I mean,
 2    it just kind of varies.  Occasionally, I would ask
 3    for more information.  Sometimes I thought the
 4    information was complete, and that was fine, and I
 5    signed off on it.  So it depends.
 6         Q.   But you have no independent recollection of
 7    whether Mr. Baca appealed or you were involved in an
 8    appeal for him?
 9         A.   Ma'am, almost all the inmates appeal, so I
10    can't remember them all.  No, ma'am.
11         Q.   So the meeting you had with Mr. Baca -- was
12    in it January or February of 2014?
13         A.   It was in January, ma'am, I'm sure.
14         Q.   And was anyone else present?
15         A.   Yes.  Larry Phillips was with me.
16         Q.   And was that a meeting initiated by you or
17    initiated by Mr. Baca?
18         A.   It had -- well, it had to be initiated by
19    me.
20         Q.   Did you take any notes during your meeting
21    with Mr. Baca?
22         A.   No.  Usually, I don't take notes in front
23    of the inmates, because they're less likely to talk
24    if you're taking notes in front of them.
25         Q.   Would you take notes or record what
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    happened at the meeting after it was concluded?
 2         A.   Sometimes I would.  If there was some
 3    very -- if there was a lot of detailed information, I
 4    would.
 5         Q.   Did you do so in this case?
 6         A.   I didn't, because there wasn't really a lot
 7    of detailed information.
 8         Q.   I'd like to show you -- this is from Rudy
 9    Perez Exhibit E.  I'm not sure what page.  I'm
10    showing you a memo from you to Chief of Staff, Mark
11    Myers, May 17 of 2016.  Do you recognize this
12    document?
13         A.   I do.
14         Q.   And in this document you are discussing the
15    meeting you had with Mr. Baca in January of 2014;
16    correct?
17         A.   Yes.
18         Q.   And why did you write this memo on May 17,
19    2016, two years later?
20         A.   Mr. Myers asked me to write a memo.
21         Q.   And tell us about that conversation.  What
22    exactly did he say to you?
23         A.   Well, they had the letter that Mr. Baca had
24    written me in February of 2014.  And they just asked
25    me what -- they just asked me, what brought on the
```

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    letter, and, you know, what was my conversation with

2    Mr. Baca like.  And so I just documented it.

3        Q.   Have you had conversations with anyone

4    other than Mr. Myers about -- let's say -- in this

5    case -- the first indictment was filed in December of

6    2015.  Since December 2015, have you discussed your

7    meeting with Mr. Baca with anyone other than Mr.

8    Myers or during this hearing?

9        A.   Not that I recall, no.

10       Q.   And in your memo you state that Grievance

11   Administrator, Larry Phillips, was also present;

12   correct?

13       A.   He was.

14       Q.   So why was a grievance administrator at

15   your meeting with Mr. Baca?

16       A.    I probably wanted a witness with me,

17   because Mr. Baca is a high ranking member of the SNM.

18   And, you know, I don't recall, but it is possible

19   that Mr. Baca had filed an appeal.  And I wanted a

20   grievance officer with me there to hear what he had

21   to say.  So that is a possibility.  I just don't

22   remember.

23       Q.   So is the grievance administrator someone

24   who coordinated appeals if they were filed, or

25   response to appeals?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1          A.   Yes.

2          Q.   And Larry Phillips, does he still work for

3     the Department of Corrections?

4          A.   No, ma'am, he does not.

5          Q.   And when did he leave Corrections?

6          A.   About two years ago.

7          Q.   Do you know where he works now?

8               MS. ARMIJO:  Your Honor, I'm going to start

9     objecting.  This is getting way beyond the scope of

10    what's relevant here.  This is a motion to suppress

11    for Perez and Herrera, and now it's just a fishing

12    expedition, asking about where people are located.

13              MS. DUNCAN:  Your Honor, Ms. Armijo asked

14    this witness a long series of questions about

15    Mr. Baca being transferred to PNM North, about his

16    meeting with Mr. Baca, about the letter that Mr. Baca

17    wrote, and grievance process, and I'm trying to

18    understand how that came -- I think that is fairly

19    within the scope of what came out on direct.

20              THE COURT:  Well, but how is that relevant

21    to what I've got to decide, which is the

22    voluntariness of these statements?

23              MS. DUNCAN:  It's relevant, one, because it

24    came out on direct, but also two, because the

25    question of whether or not Department of Corrections

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was following its own procedures and putting people

2    into Level 6, the punitive measures I think is

3    directly relevant to Mr. Perez' argument that where

4    he placed was coercive; also to Mr. Herrera's

5    argument that the Department of Corrections

6    classification procedures were not being followed in

7    his case.

8         THE COURT:  I guess I'm not seeing what

9    Baca's -- it's one thing for Perez and for Herrera,

10   but it doesn't -- it seems to me it is just discovery

11   on Baca.  So I'm going to sustain.

12        MS. DUNCAN:  Okay.

13        Q.   You testified on direct that, when you were

14   questioning Mr. Baca about -- well, let me ask you

15   again:  So you testified on direct about your

16   conversation with Mr. Baca; correct?

17        A.   Yes, ma'am.

18        Q.   And remind us of what questions you asked

19   Mr. Baca during that meeting?

20        A.   Well, the only question I asked him --

21   because it really was a conversation for him to

22   convince me that he could go back to Southern.  The

23   only real question, direct question, I asked him was

24   about gang recruitment.

25        Q.   Okay.  Did you ask him about how the gang,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    SNM, was operating at Southern New Mexico
 2    Correctional Facility?
 3         A.   No, ma'am, I didn't ask for that kind of
 4    information.
 5         Q.   Let me show you what I'm going to mark as
 6    Anthony Baca Exhibit C.
 7              MS. DUNCAN:  Your Honor, I understand there
 8    is no objection.  I'm going to move to admit Anthony
 9    Baca Exhibit C.
10              THE COURT:  Any objection?
11              MS. ARMIJO:  No objection.
12              THE COURT:  Any other defense lawyer have
13    any objection?  Not hearing any, the Court will admit
14    Anthony Baca Exhibit C into evidence.
15              MS. DUNCAN:  And just for the record, Your
16    Honor, it's Bates stamped 4476.
17              May I approach the witness, Your Honor?
18              THE COURT:  You may.
19         Q.   Mr. Roark, I'm handing you Anthony Baca
20    Exhibit C.  Do you recognize this?
21         A.   Yes.
22         Q.   Tell us what it is.
23         A.   It's a letter that Mr. Baca wrote me about
24    three or four weeks after we met.
25         Q.   And what is -- is the letter in response to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    your meeting with Mr. Baca?

 2         A.   Yes, ma'am.

 3         Q.   Can I grab that from you?  Thank you.

 4              And in this letter Mr. Baca is responding

 5    to concerns that you raised during the meeting;

 6    correct?

 7         A.   Yes.

 8         Q.   And the concerns that, according to the

 9    letter, that you had raised were maintaining a

10    peaceful environment at Southern New Mexico

11    Correctional Facility Level 4?

12         A.   That's what he wrote, yes, ma'am.

13         Q.   Do you recall discussing that with

14    Mr. Baca?

15         A.   He's the one that told me that he would

16    keep it peaceful.

17         Q.   And in the letter, Mr. Baca raised -- at

18    the very bottom of the letter -- raised a concern

19    about the STIU staff's negative attitude towards him;

20    correct?

21         A.   I don't see that.  But, yes, I do remember

22    that.

23         Q.   And did you do anything to address Mr.

24    Baca's concerns?

25         A.   No, ma'am, I didn't.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.   So after your meeting with Mr. Baca, you
 2    testified you decided not to release him from Level
 3    6; correct?
 4         A.   I did.
 5         Q.   Did you document that decision?
 6         A.   No, ma'am, I didn't.  I didn't document it.
 7              MS. DUNCAN:  If I could just have a moment,
 8    Your Honor?
 9              THE COURT:  You may.
10              MS. DUNCAN:  No further questions, Your
11    Honor.
12              THE COURT:  Thank you, Ms. Duncan.
13              Any other defendant have cross-examination
14    of Mr. Roark?
15              All right.  Ms. Armijo, do you have
16    redirect of Mr. Roark?
17                   REDIRECT EXAMINATION
18    BY MS. ARMIJO:
19         Q.   Mr. Roark, I'm going to start with Exhibit
20    AB-C, which you were just questioned about.  And it
21    says in there -- she was just asking you -- "she"
22    being Ms. Duncan -- about Mr. Baca's concerns about
23    STIU staff's negative attitude.  Did you see that?
24         A.   I do.
25         Q.   In there, does Mr. Baca also talk about his
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    approach to resolve other problems with no violence?

2    Is that indicated there?

3         A.   He does write that, yes.

4         Q.   He says, "Nor the way I refer to various

5    issues to resolve others' problems with no violence.

6    There is a rush to judgment on their part."  Is that

7    correct?

8         A.   I do see that.

9         Q.   And the date on this is February 7th of

10   2014?

11        A.   It is.

12        Q.   And what happened again on March 7th of

13   2014?

14        A.   There was a murder of an SNM member.

15        Q.   And would you consider that a violent act?

16        A.   Yes, ma'am.

17        Q.   Now, in reference to -- let me go back.

18   Defendant's Exhibit RP-E.  In your memo, your white

19   memo, do you discuss Rudy Perez' walker?

20        A.   I do.

21        Q.   And was there something else that you

22   mentioned in that memo significant to Rudy Perez'

23   cell?

24        A.   Yes.  The initial information was that he

25   had taken parts off his walker, and there were scrape

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    marks in his cell.
 2         Q.   And what significance do scrape marks have
 3    in a cell?
 4         A.   It's an indicator that there was metal
 5    being sharpened.
 6         Q.   Metal being what, I'm sorry?
 7         A.   Sharpened.
 8         Q.   All right.  And would metal be sharpened
 9    for shanks purposes, possibly?
10         A.   Yes, to make the metal into a point, to
11    make it a shank.
12         Q.   I'm going to show -- what's my next
13    exhibit, I'm sorry?
14              THE CLERK:  46.
15              MS. ARMIJO:  I move for the admission of
16    Exhibit 46, which is Offender Discipline History of
17    Rudy Perez.
18              THE COURT:  Any objection?
19              MS. FOX-YOUNG:  No, Your Honor.
20              THE COURT:  Not hearing any, Government's
21    Exhibit 46 will be admitted into evidence.
22         Q.   And in looking at this document, does it
23    show -- well, why don't you tell us was this document
24    is.
25         A.   It's a document called "Offender
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Disciplinary History."  It's taken off of the

2    Criminal Management Information System.  It's a

3    history of an inmate's misconduct.

4        Q.   And does it show that he had misconduct on

5    September 17 of 2014, looking at the last line there?

6        A.   That's the date of his hearing, his final

7    hearing.  So that doesn't necessarily mean that's

8    when the misconduct occurred.  That's when the

9    hearing occurred.

10       Q.   All right.  So the final hearing date was

11   on September 17.  And what type of classification was

12   it, of a discipline action?

13       A.   It was a major misconduct report.

14       Q.   And was he found guilty?

15       A.   Yes, ma'am, he was.

16       Q.   And as a result of that, would there be any

17   sanctions that would be upon him?

18       A.   There would be some sanctions.

19       Q.   And what kind of sanctions would that

20   include?

21       A.   It could be anything.  It could be loss of

22   privileges, loss of good time, time in disciplinary

23   restrictive housing.

24       Q.   Now, I believe that for Mr. Perez -- I'm

25   showing you Exhibit 43 -- you were asked on

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492

PROFESSIONAL COURT                              e-mail: info@litsupport.com
REPORTING SERVICE

```
 1    cross-examination as to these pods, and if they were
 2    handicapped pods.  Or how would you describe them?
 3        A.   I would describe that the pods themselves
 4    have handicapped access because they have ramps, and
 5    other ADA.
 6        Q.   And the cells in there, are there special
 7    considerations for handicapped accessibility?  Is
 8    there a distinction between cells in this pod and
 9    cells in other pods?
10        A.   Some of the cell doors are wider in order
11    to allow wheelchair access.
12        Q.   Okay.  And in looking at that, in these two
13    cells, it looks like -- if you can look there, Q 101
14    S and X 105 S, are you aware if those would have been
15    special cells for wider access?
16        A.   I'd have to look at the cells, ma'am.  I
17    can't say for sure yes.
18        Q.   And is that the purpose of the pod being a
19    handicapped pod?
20        A.   It is.  And all those cells are on the
21    bottom tier.  And that's where we have the access, on
22    the bottom tiers.
23        Q.   Okay.  So 101 and 105 are on the bottom?
24        A.   Yes, ma'am.
25        Q.   And is it your belief that you have the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    access for that and special dimensions on the bottom?

2         A.   Yes, ma'am, I do believe that's correct.

3    Yes, ma'am.

4         Q.   Now, you were also asked about inmates that

5    are in what I will term as confinement.  I believe

6    they were using the term "solitary confinement," but

7    restrictive conditions, and the mental health aspect

8    of it.  Do you recall those questions?

9         A.   Yes, ma'am.

10        Q.   Okay.  Are there efforts that New Mexico

11   Corrections Department has to combat any issues with

12   inmates who are on restrictive housing with limited

13   contact?

14        A.   Yes, ma'am.

15        Q.   Tell us about that.

16        A.   Every inmate that's placed into restrictive

17   housing requires a review, a mental health review.

18   That's a policy, and that's also an American

19   Correctional Association Standard.  So every inmate

20   that goes into restrictive housing is reviewed for

21   mental health.  Mental health is part of unit

22   management team.  Correctional officers in

23   restrictive housing units are required to do half

24   hour unit checks.  That way, if there is a mental or

25   medical breakdown of some sort, they can immediately

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1    call for assistance.  Mental health is also required

2    to do regular rounds in restrictive housing units.

3         Q.   And I believe you indicated that before

4    they go into the restrictive housing, there is an

5    assessment done?

6         A.   There is an assessment done, yes.

7         Q.   And what about caseworker -- what's a

8    caseworker in New Mexico Corrections Department?

9         A.   A caseworker, it's more commonly called a

10   classification officer.  Their job is to ensure that

11   the inmate is properly classified, is receiving their

12   services as they need; that they're -- help the unit

13   manager, make sure they're in the proper programming;

14   that their quarterly good time is being done; that

15   all -- any issues with the inmate, aside from

16   security issues, are being addressed.

17        Q.   Okay.  Is it fair to say they're there to

18   assist the inmate and inmate needs, in addition to

19   other --

20        A.   They're not advocates for the inmates.  But

21   yeah, they're there to assist inmates.

22        Q.   And is there a caseworker assigned to

23   people in restrictive housing?

24        A.   Yes.

25        Q.   Was there a caseworker assigned to Rudy

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Perez?
 2        A.   There would have been.
 3        Q.   And so would that have been part of his --
 4   when he was staying at the North facility restrictive
 5   housing, would that have been part of what was
 6   happening with him?
 7        A.   Yes, ma'am.
 8        Q.   And how often is it that there is some sort
 9   of issue, mental issue, with someone in restrictive
10   housing?
11        A.   I would say it happens, but it's not an
12   everyday or common incident.  I don't know if I can
13   give you numbers.  But it's -- it happens, but it's
14   rare.
15        Q.   It's rare?
16        A.   Yeah.  It's not a daily occurrence, ma'am.
17        Q.   And what happens when there is a mental
18   health crisis?
19        A.   Well, it depends on the nature of the
20   crisis.  Mental health is called -- mental health is
21   called, and they meet with the inmate and evaluate
22   the inmate in most circumstances.
23        Q.   And are there special provisions made for a
24   person that is having mental issues, that is in
25   restrictive housing for their future housing?  In
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    other words, in what was formerly Level 6, did you

2    have any way to assist an inmate as far as housing

3    that was having mental issues because of the solitary

4    nature of it?

5        A.   Yeah.   There is actually two ways.   If the

6    inmate we thought was suicidal or going to harm

7    themselves, we would isolate him in an area where we

8    could put him on a mental health watch.   And the

9    other way, if they're just kind of dealing with

10   things like I mentioned earlier, depression and those

11   kind of things, and they were serious enough that the

12   regular treatment or the regular meeting with the

13   mental health professional wasn't working, we have an

14   area called the Alternative Placement Area.   This is

15   an area where inmates can be placed in Level 6, at

16   the time, where they can get mental health treatment,

17   including things like group treatment, until they are

18   stabilized, and then they would go back to Level 6.

19       Q.   And would you be made aware of situations

20   when that happens?

21       A.   Not from my position as Director of Adult

22   Prisons.   I usually wouldn't be made aware.   That

23   would be done at the facility level.

24       Q.   You were asked about changes in July of

25   2015, as to lifting up -- stepping down, I guess you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   would call it, on the SNM.  And then something
 2   occurred in reference to Julian Romero.  Do you
 3   recall that?
 4        A.   I do.
 5        Q.   And where was Julian Romero being housed?
 6        A.   At Southern New Mexico Correctional
 7   Facility.
 8        Q.   And are you aware of when Southern lifted
 9   the restrictions, in relationship to the Julian
10   Romero assault, when that occurred?
11        A.   It was within a couple hours.
12        Q.   The changes you were talking about -- going
13   back to the mental health issue -- would that change
14   the housing of a person?  You were talking about how,
15   if they had a mental breakdown, that you would move
16   the person?
17        A.   We would.
18        Q.   And would that be included in the offender
19   physical location history?  In other words, would the
20   move to the different part, to deal with the mental
21   issue, would that be reflected in the offender
22   physical location history?
23        A.   It would.  It would show a change of pod,
24   or that he was moved to the back of the infirmary for
25   a little bit.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

169

1      Q.   And in regard to Rudy Perez, from 2015 to

2    2016, is there any indication that he was ever moved

3    for mental health reasons?

4      A.   There is no indication on this form, no,

5    ma'am.

6      Q.   Are there other reasons that people are

7    placed at the northern facility, other than being a

8    level -- at the Level 6 for stepdown?  Do you hold

9    other types of inmates there?

10      A.   We do.  We have to place inmates that

11   Interim Level 6 pending investigation.  We house

12   inmates there who are in prehearing detention.

13   Sometimes an inmate will commit an act at their

14   particular facility that we consider so serious and

15   egregious, and egregious against public safety that

16   we feel like he needs to go to the North facility for

17   the sake of protecting the public and protecting that

18   facility.

19      Q.   And I believe you were asked by Mr. Jewkes

20   about Mr. Sanchez -- the statement about Mr. Sanchez

21   orchestrating a murder in your memo?

22      A.   Yes.

23      Q.   Could someone be orchestrating a murder and

24   not be an actual participant in the stabbing?

25           MS. FOX-YOUNG:  Your Honor, objection,



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    relevance to this whole line.
 2              THE COURT:  Well, it's been asked, and it's
 3    been on the floor.  I guess everybody thought it was
 4    relevant when they were cross-examining.  Overruled.
 5         A.   That's possible, yes, ma'am.
 6         Q.   In reference to -- I'm showing you
 7    Government's Exhibit 47 --
 8              MS. BHALLA:  Your Honor, we're going to
 9    object to that exhibit because it doesn't have any
10    identifying information for our client.  I don't know
11    that that pertains to my client necessarily.  It's
12    got a handwritten note with the identification on it,
13    but --
14              THE COURT:  Well, let's see if the witness
15    can authenticate it.
16         Q.   Are you familiar, first, with that type of
17    document?
18         A.   I am.
19         Q.   And what type of document is that?
20         A.   It's from CMIS; it shows what their
21    privilege level is.
22         Q.   And when you say "their privilege level,"
23    who is it that you're talking about?
24         A.   An individual inmate.
25         Q.   Does that have a name associated with it?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It has a handwritten name.
 2             MS. ARMIJO:  Your Honor, I'm going to move
 3   for the admission of Government's Exhibit 47.
 4             THE COURT:  Is that the one that Mr. Roark
 5   is looking at?
 6             MS. ARMIJO:  Yes.
 7             THE COURT:  What is the name on it?
 8             MS. ARMIJO:  Handwritten, it says "Carlos
 9   Herrera, and there is a signature on there.
10             MS. BHALLA:  I'm going to object again.  I
11   mean --
12             THE COURT:  Do you want to voir dire the
13   witness?
14             MS. BHALLA:  Yes, Your Honor.
15                  VOIR DIRE EXAMINATION
16   BY MS. BHALLA:
17        Q.   Mr. Roark, did you write Carlos Herrera's
18   name on that document?
19        A.   I did not.
20        Q.   Is that your signature?
21        A.   No, ma'am.
22        Q.   Do you know who prepared that document?
23        A.   It's a captain, but I don't recognize the
24   signature.
25        Q.   And were you shown this document prior to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    today?

 2         A.   Not prior to today, no.

 3         Q.   When were you shown this document?

 4         A.   At lunch.

 5              MS. BHALLA:  Okay.  I don't think they've

 6    laid a sufficient foundation, Your Honor.  I don't

 7    think he has any personal knowledge of the document.

 8    He can't recognize -- he didn't prepare it.  He

 9    wasn't there when it was signed.  He's not sure who

10    signed it, I don't think.  Maybe I'm a little

11    confused about that.  But I don't think they've laid

12    a sufficient foundation.  We're not sure that that

13    actually belongs to Mr. Herrera.

14              THE COURT:  Well, is this a document that's

15    been produced before in discovery?

16              MS. BHALLA:  Not that I've seen, Your

17    Honor, no.

18              MS. ARMIJO:  Your Honor, they're going to

19    check.  While they're checking, I'm going to ask a

20    couple more questions about some of the defense

21    exhibits.

22    BY MS. ARMIJO:

23         Q.   In CH-D and E it has placement history for

24    Mr. Herrera; is that correct?

25         A.   Yes, ma'am.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Okay.  And what housing level was he?
 2          A.   He was Level 6.
 3          Q.   And this is back on what date?  And I'll
 4    show you the bottom.
 5          A.   December 12, 2014.
 6          Q.   And in looking at Government's Exhibit 44,
 7    just to compare dates, this is December 2014.  Where
 8    was he in December of 2014?  Can you tell?
 9          A.   He was at -- December of 2014, he was at
10    Southern New Mexico Correctional Facility.
11          Q.   And does Southern New Mexico Correctional
12    Facility, do they have a Level 6 program?
13          A.   They don't have a Level 6 program, no.
14          Q.   Okay.  So even though he was classified
15    Level 6, on December 12 of 2014, was he still being
16    held at a Level 4 facility?
17          A.   He was being housed at Southern New Mexico
18    Correctional Facility, and it was a Level 4.  But we
19    had all the SNM on lockdown.
20          Q.   Okay.  So -- and I guess that would be a
21    question that I have.  So even if he was at Southern,
22    he would have been treated as a Level 6 on lockdown,
23    or is that different?
24          A.   No, everyone in SNM was on lockdown.
25          Q.   Okay.  And the Level 6 start date that you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    have here, were these because he was in SNM -- I'm

2    referring to CH-E -- was that because he was a SNM

3    member?

4         A.   Yes, ma'am.

5         Q.   Now, going to January of 2016, it looks

6    like he went to PNM -- "he" being Carlos Herrera?

7         A.   Yes, ma'am.

8         Q.   And then at that point, where is he housed?

9    What -- which of your facilities at PNM was he

10   housed?

11        A.   He was housed at the South facility.

12        Q.   And what is the South facility?

13        A.   That was the Level 4.  At that time, it had

14   transitioned -- it was being transitioned to the

15   Level 4s for SNM.

16        Q.   So, at least in January of 2016, based upon

17   where he was sent, and his location, what level was

18   his classification?

19        A.   He should have been Level 4, ma'am.

20        Q.   And I'm going to show you Government's

21   Exhibit 47 and 44 together.  And does it appear -- in

22   addition to the handwritten name, does it appear to

23   be consistent with that of Carlos Herrera's, given

24   where he was placed?  And if you can't tell, that's

25   fine?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It's off a little bit.  But that could have
 2   been just bad mapping by the caseworker.
 3        Q.   But based on Exhibit 44, in January of
 4   2016, what was Mr. Herrera's classification?
 5        A.   He was Level 4.
 6             MS. ARMIJO:  Thank you.  No further
 7   questions.
 8             THE COURT:  I guess my thoughts are that
 9   it's sufficiently authenticated.  There is no -- was
10   the document produced earlier?
11             MS. ARMIJO:  47?
12             THE COURT:  Yeah, was it produced earlier.
13             MS. ARMIJO:  Yes.
14             THE COURT:  It's not been a question of its
15   genuineness, I'll admit it in evidence subject to the
16   criticisms you have.  So I'll take it into account
17   when I make a ruling as to the weaknesses of the
18   document.
19             MS. BHALLA:  That's been marked as 47,
20   that's what I'm confused about.
21             MS. ARMIJO:  Yes.  Government's 47.
22             THE COURT:  So I'm going to admit it into
23   evidence.
24             Ms. Fox-Young?
25             MS. FOX-YOUNG:  Brief recross, Your Honor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1              THE COURT:  Yeah.
 2              MS. FOX-YOUNG:  That's the only reason I
 3   was standing.  I don't have any objection.
 4              THE COURT:  Do you have anything further to
 5   say on the exhibit, Ms. Bhalla?
 6              MS. BHALLA:  No, Your Honor, I don't think
 7   so.  Thank you.
 8              THE COURT:  All right.  Ms. Fox-Young.
 9                   EXAMINATION
10   BY MS. FOX-YOUNG:
11        Q.   Mr. Roark, you were asked some questions
12   about a hearing that was held on September 14, 2014,
13   for Rudy Perez.  Do you remember that?
14        A.   I do.
15        Q.   It's not your testimony that Mr. Perez was
16   held, beginning in June 2015, six months -- eight
17   months after that hearing, at PNM, as a result of any
18   disciplinary violation discussed at that hearing, is
19   it?  Do you know one way or another if that September
20   2014 hearing had anything to do with Mr. Perez being
21   held at PNM in June 2015?
22        A.   I don't know, ma'am.
23        Q.   You don't know.  Have you seen any
24   documentation that would indicate that Mr. Perez was
25   held beginning in June 2015, and for a subsequent 10
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    months, as a result of something in September 2014?

2         A.    No, ma'am.  I don't know of anything.

3         Q.    Okay, thank you.

4               You talked a little bit about -- and

5    correct me if I'm misstating your testimony -- but

6    you talked about, at Level 6, every inmate has -- did

7    you say a caseworker or a classification officer?

8         A.    They're synonymous terms.

9         Q.    And that person is an NMCD employee?

10        A.    That's correct.

11        Q.    And everybody is assigned one?

12        A.    That's correct.

13        Q.    And you said that person deals with any

14   issues aside from security that need to be addressed;

15   is that right?

16        A.    That's correct.  That's an

17   oversimplification, but yes.

18        Q.    Generalizing?

19        A.    Generalizing, yes.

20        Q.    And would that then include, getting a

21   little bit more specific, the inmate's physical

22   needs?

23        A.    No.  Other than the obligation if they saw

24   the inmate had a physical need that needed to be

25   addressed, they'd call medical.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.    Something that was obvious?

2    A.    Or the inmate complains, yes.

3    Q.    Okay.  If it came to their attention?

4    A.    Correct.

5    Q.    And you talked about mental health needs,

6    and that person observing any mental health needs,

7    and potentially moving them to another area of PNM,

8    right?

9    A.    That wouldn't be them.  That would be the

10   mental health professional that would do that.

11   Q.    Okay.  So all that testimony about the

12   Corrections Department responding to mental health

13   needs and mental health breakdowns, and moving

14   somebody to a different place at PNM as a result of

15   mental health needs, that's not true?  Correct me.

16   A.    It is true.

17   Q.    Okay.  But that's not the classification

18   officer that does that?

19   A.    They would do it on mapping.  But what

20   happens -- I guess I should explain.  What happens is

21   if an inmate is having a mental health issue, and for

22   whatever reason, how it came to our attention, was it

23   the inmate complaints or whether we notice something

24   unusual, at that point someone intervenes, a mental

25   health professional.  They evaluate the inmate.  If

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    they determine, hey, this inmate needs more help than

2    I can give them in the particular unit he is in, they

3    can do a request to place him in Alternative

4    Placement Area in order for him to get additional

5    therapy, additional attention to his needs.

6         Q.   Sure.  And all I'm trying to get at is it's

7    the classification officer who does that, right, the

8    New Mexico Corrections Department employee?

9         A.   The answer to that is yes and no.  The

10   classification officer knows where to place the

11   inmate, right.  But it's the mental health person who

12   says he needs to go to this unit.

13        Q.   Got it.  And the classification officer or

14   caseworker facilitates providing treatment; they

15   would get that inmate to a mental health

16   professional, right?

17        A.   Well, it doesn't necessarily have to be

18   them.  It could be a correctional officer or a unit

19   manager, anyone who comes to the attention, that

20   notices this inmate has needs.

21        Q.   Any NMCD employee?

22        A.   Yes.

23             MS. FOX-YOUNG:  No more questions, Your

24   Honor.  Thank you.

25             THE COURT:  All right.  Thank you, Ms.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Fox-Young.

 2            Ms. Armijo, any further redirect?

 3                        EXAMINATION

 4   BY MS. ARMIJO:

 5        Q.   You said unit manager.  Do inmates have

 6   contacts with unit managers as well?

 7        A.   They do.

 8        Q.   Up at PNM, how often?

 9        A.   They're supposed to make weekly rounds, but

10   they also do the committees, the review committees

11   for inmates.

12        Q.   And you indicated previously that it's

13   every half hour they're checked on?

14        A.   Every half hour a security person has to do

15   rounds.

16            MS. ARMIJO:  No further questions.

17            THE COURT:  Thank you, Ms. Armijo.

18            If I didn't make it clear, Government's

19   Exhibit 47 will be admitted into evidence.

20            All right.  Mr. Roark, you may step down.

21   Is there any reason Mr. Roark cannot be excused from

22   the proceedings?

23            MS. ARMIJO:  No, Your Honor.

24            THE COURT:  Anybody on the defense side

25   want to -- any problem with him being excused?  All
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    right.  You are excused from the proceedings.  Thank
 2    you for your testimony.
 3            All right.  Ms. Armijo, does the Government
 4    have further witnesses or evidence it wishes to
 5    present on the motions to suppress?
 6            MS. ARMIJO:  No, Your Honor.
 7            THE COURT:  Thank you, Ms. Armijo.
 8            Mr. Villa, Ms. Bhalla, do the defendants
 9    have witnesses they wish to present?
10            MR. VILLA:  Your Honor, we do.  I think
11    both defendants do.  But I think we've discussed it,
12    and we'll put on the next three.
13            THE COURT:  All right.
14            MR. VILLA:  So, Your Honor, we call
15    Defendant Rudy Perez.
16            THE COURT:  Mr. Perez, if you'll come up to
17    the witness box.  Before you're seated, Ms.
18    Standridge will swear you in.
19                    RUDY PEREZ,
20        after having been first duly sworn under oath,
21        was questioned and testified as follows:
22                  DIRECT EXAMINATION
23            THE CLERK:  Please be seated and state your
24    name for the record.
25            THE DEFENDANT:  Rudy Perez.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Mr. Villa.
 2    BY MR. VILLA:
 3         Q.   Good afternoon, Mr. Perez.
 4         A.   Good afternoon.
 5         Q.   And you might have to get a little closer
 6    to the mic, just to make sure we hear you.  Okay?
 7         A.   All right.
 8         Q.   How old are you?
 9         A.   48; I'll be 49 next month.
10         Q.   And in February of 2016, when the
11    conversations that are at issue in this hearing took
12    place with Mr. Cordova, how old were you?
13         A.   47, I guess.
14         Q.   47?
15         A.   Um-hum.
16         Q.   How far did you go in school?
17         A.   Tenth grade.
18         Q.   Tenth grade?
19         A.   Yes.
20         Q.   Did you ever get a GED?
21         A.   No.
22         Q.   Now Mr. Perez, do you recall when you were
23    in PNM in around January, February 2016, when Mr.
24    Cordova was placed next to you?
25         A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.    And what cell and pod were you in at the
2   time?
3        A.    I was in Q pod, 101.
4        Q.    The same pod that Mr. Cordova testified
5   yesterday that you all were in?
6        A.    Yes.
7        Q.    And when Mr. Cordova was placed next to
8   you, did he give you anything?
9        A.    Yes.
10       Q.    What did he give you?
11       A.    Suboxone.
12       Q.    How did he give it to you?
13       A.    On a pole through the vent.
14       Q.    The vent above the desk that we saw on the
15  video?
16       A.    Yes.
17       Q.    And you said on a pole.  Are you talking
18  about what?
19       A.    Paper rolled up, call it a fishing pole,
20  fish through the vent.
21       Q.    Now, do you recall how much Suboxone he
22  gave you?
23       A.    More than a quarter.
24       Q.    When you say a quarter, a quarter of what?
25       A.    Strip.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And did he give you that Suboxone before he
 2   talked to you about the Javier Molina homicide?
 3        A.   Yes.
 4        Q.   Did you take that Suboxone before you
 5   talked to him about the homicide?
 6        A.   Yes.
 7        Q.   How did you feel after you took the
 8   Suboxone?
 9        A.   High.
10        Q.   You said "high"?
11        A.   Yes.
12        Q.   And how many different times did Mr.
13   Cordova give you Suboxone?
14        A.   A couple of those days that he was there.
15        Q.   So it was more than one day?
16        A.   Yes.
17        Q.   And on a particular day, did you all
18   discuss the Javier Molina homicide a couple of
19   different times?
20        A.   Yes.
21        Q.   And did he give you Suboxone more than once
22   on that day?
23        A.   Yes.
24        Q.   Okay.  So do you remember about the time of
25   day he gave you -- the first time he gave you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Suboxone on that particular day?

2        A.    If I remember right, the first one was

3    right after lunch.

4        Q.    And was it the quarter strip?

5        A.    Yes.

6        Q.    When was the second one?

7        A.    After dinnertime, right after they passed

8    out meds.

9        Q.    And you took that?

10       A.    Yes.

11       Q.    Now, I know the answer to this, but you

12   don't remember the specific date that that actually

13   happened?

14       A.    No, sir.

15             MR. VILLA:   May I have just a moment, Your

16   Honor?

17             THE COURT:   You may.

18   BY MR. VILLA:

19       Q.    Did you get high each time you took the

20   Suboxone?

21       A.    Yes.

22       Q.    And each time you spoke to Mr. Cordova

23   about the Javier Molina murder, were you high?

24       A.    Yes.

25       Q.    There was also testimony yesterday about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you providing Mr. Cordova some ear buds?

2        A.   Yes.

3        Q.   Why did you provide him the ear buds?

4        A.   He had hooked me up, and I didn't have no

5    money, no canteen.  So I looked out for him.  That's

6    the only thing I had.

7        Q.   What do you mean he hooked you up?

8        A.   He got me high.

9        Q.   With the Suboxone?

10       A.   Yes.

11            MR. VILLA:  That's all the questions I

12   have, Judge.

13            THE COURT:  All right.  Thank you,

14   Mr. Villa.

15            Do any of the other defendants have

16   cross-examination of Mr. Perez?

17            Does the United States have questions?

18            MR. CASTELLANO:  Yes, Your Honor.

19                      EXAMINATION

20   BY MR. CASTELLANO:

21       Q.   Good afternoon, Mr. Perez.  So you said on

22   at least one occasion he gave you Suboxone after

23   dinnertime, after your meds; is that correct?

24       A.   Yes.

25       Q.   Now, what meds were you taking?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    A bunch.
 2        Q.    Any of them opiates?
 3        A.    No, they don't let us have opiates there.
 4        Q.    All right.  Let's talk about your
 5   medications then, as best as you remember.  Go ahead
 6   and tell us what each of the meds was.
 7        A.    Tramadol, Gabapentin, psych meds, blood
 8   pressure medication, seizure med, diabetes
 9   medication.
10        Q.    I take it this was not the first time that
11   you've had Suboxone in prison?
12        A.    No, sir.
13        Q.    And how did the topic come up about him
14   offering Suboxone to you?
15        A.    Oh, when they brought him in that morning,
16   he talked to the homies upstairs.  And then he tells
17   them:  Who's here?"  He banged on the wall.
18              I say, "What's up?"
19              He says, "'Shadow.'"
20              I said, "What's up, fool?"
21              He says, "Nada."  He says, "You wanna
22   channel change?"
23              I said, "Hell, yeah."
24              He says, "Give me a minute."
25        Q.    So the first day -- the very first day you
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1     were there, he gave you drugs?

2          A.   Yes.

3          Q.   And that very first day is when you made

4     incriminating statements to him?

5          A.   I don't remember when they were done.

6          Q.   One thing we'll have to get to the bottom

7     of is whether you gave statements the same day that

8     you were high.  So do you know whether that day you

9     got high and gave statements?

10         A.   Got high every day he was there.

11         Q.   Every day?

12         A.   Pretty much.

13         Q.   Well, you told your attorney a couple of

14    times, and now you're telling us every.  So let's --

15         A.   He was only there three days, man.

16         Q.   Are you sure?

17         A.   Three days.

18         Q.   Okay.  You know the records show otherwise;

19    correct?

20         A.   Yeah.

21         Q.   So you're saying --

22         A.   The three days.

23         Q.   What do you recall about the statements you

24    gave Mr. Cordova?

25         A.   I really don't remember much.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Now, even though you don't remember, it's
 2   fair to say what you told him was pretty accurate,
 3   wasn't it?
 4        A.   What I was told?
 5        Q.   Well, in other words, you talked about
 6   giving your -- pieces of your walker to be served as
 7   shanks.  Do you recall that?
 8        A.   That's what they said.
 9        Q.   Right.  And you've seen the transcripts?
10        A.   Yes.
11        Q.   And you've heard the recordings?
12        A.   Yes.
13        Q.   And you admitted to giving pieces of your
14   walker to be used as shanks?
15        A.   I lied.
16        Q.   Okay.  But your lie was consistent with
17   what the other evidence shows in this case; you know
18   that, right?
19        A.   I lied.
20        Q.   So you lied, but it's consistent with the
21   other evidence in this case?
22             MR. VILLA:  Objection, argumentative.
23             THE COURT:  Well, it's cross-examination.
24   Overruled.
25        Q.   In other words, how did that happen?  You
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    lied, but it's consistent with everything else we

2    know from the case?  That's what I want to get to the

3    bottom of.

4              MR. VILLA:  Same objection.

5              THE COURT:  Overruled.

6         A.   If you remember when the crime was

7    committed, alleged crime was committed, and when

8    those recordings were done, there was a whole thought

9    of he said, they said, she said, a lot of things were

10   repeated.

11        Q.   Right.  But you repeated the right things,

12   including the fact that --

13        A.   Because I was told from certain people.

14        Q.   Well, how did you lie, then, if you got it

15   right?

16        A.   No.  I was told by certain people, and I

17   repeated it.  But it was a lie.  I didn't give

18   nothing.

19        Q.   So let's back up a little bit.  You said

20   that "Red" was involved with the murder; correct?

21        A.   No.

22        Q.   You said "Blue" was involved with the

23   murder?

24        A.   No.

25        Q.   You said Mr. Sanchez, "Dan Dan," was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    involved with the murder?

2         A.   No.

3         Q.   You know the transcripts show otherwise?

4         A.   Yes.

5         Q.   So what I'm saying is, in the transcript

6    you said these things?

7         A.   I repeated what I was told.

8         Q.   And what I'm asking is whether you said

9    that in the transcript -- let's focus on the

10   transcript, first, regardless of whether you say it's

11   a lie -- you said in the transcript that Mr.

12   Rodriguez was involved with the murder?  Yes?

13        A.   That's what the transcript says.

14        Q.   And you said on the transcript that Mr.

15   Sanchez was involved in the murder?

16        A.   I don't remember that part.

17        Q.   And you also said that "Pup" was upset

18   because this should have been done a year earlier?

19        A.   Again, I was repeating what was being said.

20        Q.   And when asked whether or not you would

21   have given up your walker pieces as shanks, you said

22   you would not have unless it was a justified move?

23        A.   That was a lie.

24        Q.   Also, when Mr. Cordova asked you about

25   people talking about you -- because there was an


SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1    indication that you might be snitching; correct?  Do
 2    you remember that?
 3         A.   Yes.
 4         Q.   And I'll show you on page 20536 of DeLeon,
 5    you indicated to him that you talked to "Pup," and he
 6    said not to worry about it, basically, because you
 7    were good, right?  Show you right here.
 8         A.   Yes.
 9         Q.   All right.  So in other words, you made a
10    conscious decision to defend your honor when other
11    people alleged that you were snitching?
12         A.   You have to.
13         Q.   Right.  And so you made a conscious
14    decision to defend yourself against those
15    allegations?
16         A.   Again, I lied.
17         Q.   So you were snitching then?
18         A.   No.
19         Q.   You were defending your honor?
20         A.   Yes.
21         Q.   And consistent with what you're telling us
22    today, you told him, "I don't know nothing, brother.
23    I didn't see nothing.  I don't know nada.  And that's
24    the way it's going to stay."
25         A.   That's the truth.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Right, because that's consistent with the
2   code, right?
3        A.   No.  That's the truth.
4        Q.   Well, you said it's consistent with the
5   code in your statement here.  I'll show you in a
6   second.  Let me ask you this also:  If you were under
7   the influence of Suboxone, you were consciously lying
8   to Mr. Cordova?
9        A.   When they took me to the North, I started
10  hearing the lies and the gossip and the bullshit.  I
11  had already, you know what I mean, I've got to cover
12  my own ass.  Like I said, I lied.
13       Q.   So you consciously lied to him; you made a
14  decision to deceive Mr. Cordova?
15       A.   Anybody that asked, that's what I said.
16       Q.   But you made a conscious decision to
17  deceive Mr. Cordova?
18       A.   To protect myself.
19       Q.   But that means you did it?
20       A.   No.
21       Q.   By that I mean you deceived Mr. Cordova?
22       A.   No.  If anybody asked, that's what I said.
23  I lied.
24       Q.   And do you have a reputation for being a
25  drug user from the S?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. VILLA:  Objection, Your Honor.  Outside
 2   the scope.
 3              THE COURT:  How is this related to the
 4   scope?
 5              MR. CASTELLANO:  One, it has to do whether
 6   or not he truly ingested Suboxone; and two, it may
 7   affect how Suboxone affected him.
 8              THE COURT:  Overruled.
 9        A.   Do you want to come see my arms?
10        Q.   I just want the answer.
11        A.   I'm a full-blown addict.
12        Q.   And so how much did you use close in time
13   to when Mr. Cordova gave you Suboxone?
14        A.   Pretty much gave me around a quarter strip
15   each time.
16        Q.   But you didn't inject it.  You said --
17        A.   No.
18        Q.   -- you said you wanted to show your arm.
19        A.   Yes.  I'm an addict, man.
20        Q.   The question is:  Other than what you claim
21   Mr. Cordova gave you, when was the most recent use
22   before that time?
23        A.   A while.
24        Q.   How long?
25        A.   A while.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.    Two days?
 2          A.    After I got out of the hospital.
 3          Q.    Your records don't show that, you know
 4   that?
 5          A.    I got sick -- September 4 is when I had
 6   surgery.  I stayed in the hospital a year.  November,
 7   2012, I had just got back to Southern; stayed at
 8   Southern until they shipped me to the North.  And I
 9   was on pain medication pretty much the whole time.
10          Q.    What kind of medication was for the pain?
11          A.    The gabapentin, the Tramadol.
12          Q.    You also recall that, when Mr. Sanchez
13   returned from out of state, he asked you why certain
14   guys weren't charged.  Do you remember that?  This is
15   DeLeon 20550.
16          A.    Where is that at?
17          Q.    "'Dan Dan' is asking you, or not, why did
18   'Junior' and 'Creeper' get charged, but why didn't
19   'Blue' and 'Red' get charged?"  Do you remember that?
20          A.    That's what it said.
21          Q.    So you're indicating to him that you had a
22   conversation with "Dan Dan," and you're recollecting
23   that.  Do you remember that conversation?
24          A.    Yes.
25          Q.    So were you intimidated by Mr. Cordova?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   No.
 2        Q.   He's not intimidating, is he?
 3        A.   No.
 4        Q.   You have to speak up so she can get it.
 5        A.   No.
 6        Q.   And so he, otherwise, he didn't intimidate
 7   you into saying these things?
 8        A.   No.
 9        Q.   And yesterday you heard him say that one
10   way to get drugs from one cell to the other is
11   through the vent; correct?
12        A.   That's pretty much the main way we do it,
13   man.
14        Q.   So after hearing that yesterday, that's
15   your testimony today, after hearing what Mr. Cordova
16   said?
17             MR. VILLA:  Objection, mischaracterizing
18   argumentative.
19        A.   That's the truth.
20             THE COURT:  I don't think it's
21   argumentative.  Overruled.  I'll let you deal with
22   any inconsistency in cross.  Overruled.
23        Q.   And you knew about the paperwork on Javier
24   Molina, did you not?
25        A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. VILLA:  Objection, outside the scope.

 2    He's asking whether he knows about a specific fact,

 3    not about the statements.

 4              MR. CASTELLANO:  I'm showing it here on the

 5    screen, Your Honor.  There is discussion about the

 6    paperwork.

 7              MR. VILLA:  So, Your Honor, if the question

 8    is about a discussion with Mr. Cordova --

 9              THE COURT:  I think the paperwork may be

10    exceeding it.  We better stick with what Mr. Villa

11    brought out.

12              MR. CASTELLANO:  Sure, Your Honor.

13        Q.   Do you see here, Mr. Perez, when you're

14    discussing the paperwork?

15              MR. VILLA:  Objection, outside the scope.

16              THE COURT:  Sustained.  You don't have to

17    answer these questions.

18        Q.   Who is "Creeper," Mr. Perez?

19              MR. VILLA:  Objection, outside the scope.

20              MR. CASTELLANO:  Well, Your Honor, these

21    are all Mr. Perez' statements.  And so the question

22    is whether or not these were voluntarily given.  If

23    they're coherently made --

24              THE COURT:  I certainly think your

25    questions are within the scope of this motion.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    don't think that they are within the scope of the
 2    direct examination.  Given he's a defendant, I'm
 3    going to guard him carefully.  And so I'll sustain
 4    the objection.  But I do note that, you know, he's
 5    leaving a lot of questions on the table.
 6              MR. VILLA:  Well, the question is who is
 7    "Creeper?"
 8              THE COURT:  I know, but I mean you're
 9    leaving a lot of questions for him.  But that's your
10    call.  But I'll sustain the objection.
11         Q.   Do you recall whether at the time of the
12    Molina murder that you were sick?
13              MR. VILLA:  Objection, outside the scope.
14              THE COURT:  Well, he brought up his health,
15    so I'll let him ask this question.  Overruled.
16         Q.   Do you recall about the time the Molina
17    murder happened, that you had been sick shortly
18    before that?
19         A.   Yes.
20         Q.   And what was the problem back then?
21         A.   I had a bowel obstruction.
22         Q.   And so, when you mentioned that to Mr.
23    Cordova, that was true.  I'll go ahead and show you
24    here on the visualizer.  It's Bates stamp 20557.  And
25    you told him, "I just got out of the hole.  I was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    real sick."
2         A.   I wasn't in the hole.  I just got out of
3    the hospital.
4         Q.   Okay.  Were you real sick?
5         A.   Yes.
6         Q.   The fact that you were sick was true, about
7    the time of the Molina murder?
8         A.   Yes.
9         Q.   Can you tell the Court whether it was the
10   truth or a lie when you told Mr. Cordova that Mr.
11   Baca was not happy that the Molina murder hadn't been
12   taken care of already?
13             MR. VILLA:  Objection.
14        A.   You have to ask Billy Cordova that.
15             THE COURT:  Overruled.
16        A.   Did you hear me?
17        Q.   I did hear you.
18        A.   You have to ask Mr. Cordova that.
19        Q.   Your statement here -- this is your
20   statement, not Mr. Cordova's.  "Find out why the fuck
21   it wasn't taken care of.  Is that what 'Pup' told
22   him?  Huh, is that what" --
23        A.   Again, you would have to ask Billy Cordova,
24   because he's the one who told me that.
25        Q.   And when Mr. Cordova told you, "What did
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    'Pup' say," your response was, "He didn't like it"?

2         A.   Again, that's what they said.

3         Q.   Who is they?

4         A.   Billy Cordova.

5         Q.   Well, you're telling Mr. Cordova that

6    someone else told you that Mr. Baca wasn't happy?

7         A.   Eric Duran recorded a conversation between

8    Billy Cordova and Raviesso (phonetic), when we were

9    in X pod.  Billy Cordova was the one telling us, when

10   I had just got there.

11        Q.   That "Pup" wasn't happy --

12        A.   And your records will prove that.

13        Q.   -- that the hit hadn't been done a year --

14        A.   No, he just said that "Pup" wasn't happy.

15        Q.   About what?

16        A.   He just said "Pup" wasn't happy about it.

17        Q.   Was it the truth or a lie when you told Mr.

18   Cordova, "No one deserves a free pass on a

19   violation"?

20        A.   Again, you should have had the first part

21   of the conversation.

22        Q.   Is it your testimony that someone should or

23   should not get a free pass on a violation of the

24   rules of the SNM?

25        A.   I might call that.  I don't know.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                    1-800-669-9492
                                                                            e-mail: info@litsupport.com



```
 1        Q.   Do you know the rules of the SNM?
 2             MR. VILLA:  Objection, outside the scope.
 3             THE COURT:  Sustained.
 4        Q.   Were you lying or were you telling the
 5   truth when you discussed the members of the tabla
 6   with Mr. Cordova?
 7             MR. VILLA:  Same objection.
 8             THE COURT:  I'm going to allow these
 9   questions since he is saying some things are true and
10   some things are false.  So I'll allow this.
11   Overruled.
12        Q.   Okay.  I'll ask the question again.  So
13   once you have reviewed the transcript, this is Bates
14   stamp 20562.  Was that the truth or a lie when you
15   told Mr. Cordova, "People who were on the tabla"?
16        A.   I guess that would be on who you asked.
17        Q.   Well, we're asking you today.
18        A.   Again, I was repeating what I was told.
19        Q.   So being a member of the SNM then, you
20   didn't know who the members of the tabla were?
21        A.   Since you're pointing out this transcript,
22   it's like I told him, I wasn't involved in nothing.
23   I stayed in my room.  I had just got out of the
24   hospital.  I didn't know nothing.  I didn't care
25   about nothing.  I was just trying to get better, man.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.                                            1-800-669-9492
PROFESSIONAL COURT                                                 e-mail: info@litsupport.com
REPORTING SERVICE

```
 1    When I say I lied, I was going by what other people

 2    said.  So whether it's true, not, I don't know.  I

 3    should have never repeated it.

 4              THE COURT:  Mr. Castellano, is this a good

 5    time for us to take our afternoon break?

 6              MR. CASTELLANO:  Sure, Your Honor.

 7              THE COURT:  All right.  We'll be in recess

 8    about 15 minutes.

 9              (The Court stood in recess.)

10              THE COURT:  All right.  Let's go on the

11    record.  Look around, make sure everybody has got an

12    attorney.  Looks like everybody does to me.

13              Ms. Jacks, you're leaving at 3:45 for a

14    flight.  All right.  Be safe going back.

15              Let me give you a little information.  Some

16    of y'all were asking Ms. Standridge what the schedule

17    was for next week.  I haven't been able to get a

18    confirmation of this from Ms. Wild, but what my

19    office back in Albuquerque is showing is that I have

20    hearings on 12/18 and 12/19.  So I'm expecting to be

21    here myself at 9:00 on Monday morning.  I'm traveling

22    back on 12/20.  And then I have hearings in the

23    afternoon at 1:30, 2:30 and 3:30 on 12/20.  So that's

24    what Ms. Standridge is showing.  So I hope that's

25    what everybody else is showing as well.  But somebody
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    indicated that they thought we might be doing

2    something on Wednesday.  But it's not on my calendar,

3    and I haven't able to confirm it with Ms. Wild.  But

4    it's not anything I can talk to today.

5            MS. JACKS:  Can I ask a question?

6            THE COURT:  You may.

7            MS. JACKS:  When I found out about those

8    dates, I did submit a travel request to the CJA

9    office.  I haven't heard back yet.  I inquired this

10   morning again, and still have not heard back.  So I'm

11   just wondering, if Ms. Wild's absence --

12           THE COURT:  I couldn't tell you on that.

13   You can try to call Ms. Wild.  She's supposed to be

14   back in Albuquerque today.  I can tell you this, the

15   Fed Ex has already come today and it had no vouchers

16   in it.  It's already turned around, and I'm about to

17   open -- the Fed Ex that I sent back had no vouchers

18   in it.  So as far as on my desk, unless some have hit

19   my desk back in Albuquerque today, there is no

20   vouchers.  I'm caught up.

21           MS. JACKS:  Right.  I think this is just a

22   travel request.  I'm not sure how those are approved.

23           THE COURT:  Same way.  I approve them.

24   It's no different than any other.  So my desk here in

25   Las Cruces is clean.  I can't tell you what's on my

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    desk building up today.  But there won't be any Fed
 2    Exes sent out today.  So I won't be back in till
 3    tomorrow.  I've got to start doing some stuff at
 4    12:30.  So if there is travel vouchers on my desk
 5    today, I'm probably not going to get to them until
 6    later in the afternoon tomorrow or tomorrow night.
 7              All right.  Mr. Perez, I'll remind you
 8    you're still under oath.  Mr. Castellano, if you wish
 9    to continue your cross-examination of Mr. Perez, you
10    may do so at this time.
11              MR. CASTELLANO:  Thank you, Your Honor.
12              THE COURT:  Mr. Castellano.
13    BY MR. CASTELLANO:
14         Q.   Mr. Perez, are you willing to execute a
15    medical release so that we can check your
16    medications?
17              MR. VILLA:  Objection, Your Honor.
18              THE COURT:  I'll let him answer that
19    question.
20              MR. VILLA:  I mean --
21              THE COURT:  You're not bound by it.
22              MR. VILLA:  I'm sorry?
23              THE COURT:  You're not bound by it.
24              MR. VILLA:  I'm not sure if you're
25    cognizant of this.  But I just wanted to bring to the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Court's attention Rule 104(d), which concerns
 2   cross-examining a defendant in a criminal case.  And
 3   it says that, "By testifying on a preliminary
 4   question, a defendant in a criminal case does not
 5   become subject to cross-examination on other issues
 6   in the case."
 7             THE COURT:  I think I've been trying very
 8   hard to toe the line there.
 9             MR. VILLA:  I think you are.  I just want
10   to bring it up because it's a little more than just
11   scope of direct kind of issues.
12             THE COURT:  No.  But -- by that I mean I'm
13   trying to protect him as much as possible.  I know
14   you're offering him for a limited purpose.  And I'm
15   trying to protect him.  But since he's brought up his
16   medical, I'll let him answer the question.  But
17   you're not necessarily bound by it if you decide it's
18   not in his interests to do so.  But you can answer
19   the question.
20        A.   No.
21        Q.   This is Government's Exhibit 16, Bates
22   stamped 20531.  So Mr. Perez, it's your testimony
23   that you lied when you said the shanks came from your
24   walker?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    You also lied when you told Mr. Cordova

2    that he was the only person who knew that?

3        A.    Again, I lied.

4        Q.    You also lied when you said no one else

5    knows except two other people who were there; is that

6    correct?

7        A.    Again, that was a lie.

8        Q.    Who were you lying about when you mentioned

9    the two other people?

10        A.    Like you were told yesterday and today,

11    there were rumors.  And I know Billy.  I know him

12    real good.  I lied to him.  I told him what I had to

13    tell him, to make sure it got out there.  Because I

14    know he likes to run his mouth, and he'll repeat it.

15        Q.    And actually, you told him, if he repeats

16    any of this, you're going to know, because you're the

17    only person he told that to, that was the truth?

18        A.    No.

19        Q.    Well --

20        A.    That's a lie.

21        Q.    Well, were you the only person who you told

22    this information to?

23        A.    No.

24        Q.    Okay.  So you told this information to

25    other people?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1           MR. VILLA:  Objection, outside the scope.

2           THE COURT:  Well, I'll let him answer this

3    question, but probably not much more.

4       Q.   I'm not going to ask you about the other

5    conversations.  What I'm asking is, whether or not

6    you had told other people this?  Because you told him

7    here that he is the only one who knows about it.

8       A.   If you go back to the beginning of the

9    transcript, he starts off when we left off the last

10   conversation in X pod.  There was two other people

11   involved in that conversation.  So, again, go back to

12   Billy Cordova and ask him who was there when we had

13   that conversation.

14      Q.   But I'm asking you, because you mention it

15   here, who were the two people?

16          MR. VILLA:  Well, Your Honor, I object to

17   that.  I think the Court said he could say yes or no

18   whether he spoke to two other people.  Who the two

19   other people were is outside the scope of direct.

20          THE COURT:  Well, let's don't ask him who

21   are the other two people.  But I will let you get the

22   number.

23      Q.   Your testimony, when you said "the feds

24   took those two people," was that the truth or a lie?

25      A.   A lie.

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

208

```
 1        Q.   So the feds did not take those two people,
 2   whoever they were?
 3        A.   Right.
 4        Q.   On DeLeon 20532, you also lied when you
 5   said, "I can't put work in for the family, I've got
 6   to be willing to do my part"?
 7        A.   Yes.
 8        Q.   Here's what I was referring to earlier,
 9   DeLeon 20535.  You told him, "I talked to you --
10   unintelligible -- I've been a hundred percent honest
11   with you, if somebody else came along and asked me
12   questions I wouldn't even answer one of them."  Was
13   that the truth or a lie?
14        A.   Again, sir, from X pod, we were all in that
15   same conversation.
16        Q.   Was that the truth or was it a lie?
17        A.   A lie.
18        Q.   And so you lied when you told him you were
19   being one hundred percent honest with him?
20        A.   Yes.
21        Q.   Now, when you told Mr. Perez (sic) here on
22   DeLeon 20536, "I don't know nothing, brother.  I see
23   nothing.  I don't know nada," that was actually the
24   truth, wasn't it?
25        A.   That, because I was in my room.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Right.  So you're saying that part was the

2   truth?

3      A.   Yes, that was.

4      Q.   "And that's how it's going to stay"?

5      A.   I can't tell you something I saw that I

6   didn't see, man.

7      Q.   Now, you say you were in your room.  Your

8   room was in blue pod, was it not?

9      A.   115.

10     Q.   The same pod where Javier Molina was

11  murdered?

12     A.   Yes.

13     Q.   Was that a yes?

14     A.   Yes.

15     Q.   And then, on page 20537, Mr. Cordova is

16  saying, "That's what they were saying because Jesse

17  gave the weed, the fucking paperwork to 'Spider',

18  'Spider' passed to Archie when he knew he was coming

19  down there to Cruces and then Archie gave to it

20  'Lazy.'  And then he gave it to 'Dan Dan.'"

21          And your response was, "I already know all

22  that."  Was that a lie?  You didn't really know all

23  that?

24     A.   Because of what Billy had told us in X pod.

25     Q.   So you only knew it because Billy Cordova

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    told you?

2         A.   Yes.

3         Q.   And even though Billy Cordova was in the

4    pod next to you, he knew more about the Molina hit

5    than you did; is that fair to say?

6              MR. VILLA:   Objection, outside the scope.

7              THE COURT:   Well, I'll allow that.

8    Overruled.

9         Q.   You could go ahead and answer, sir.

10        A.   Yes.

11        Q.   On Bates stamp 20540, you also lied when

12   you said, "'Crocodile' had to answer for it, 'BB' had

13   to answer for it."

14        A.   Again, I was repeating what Billy had told

15   us.

16        Q.   Okay.   So why it was never done the first

17   the paperwork got down there, was a lie?

18        A.   Again, you'd have to ask Billy Cordova.

19        Q.   And even though you say in the next line

20   you heard "Pup" say they have to answer for that no

21   matter how close you are to them?

22        A.   Again, Billy had told us that.

23        Q.   So Billy told you that "Pup" said to you?

24        A.   No, I never talked to "Pup."   And as I just

25   said, sir, the records will reveal that.   I hadn't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    talked to Mr. Baca since March 15, 2010, when I
2    paroled from Cruces.  I never seen him.  I never
3    talked to him again till they brought him back from
4    Florence.  So that was the last time I talked to him.
5         Q.   So you had lied when you said you had a
6    conversation with "Pup" and "Pup" told you that "they
7    have to answer for it no matter how close you are to
8    them"?
9         A.   Again, sir, I had not spoken to "Pup," so
10   it had to be a lie.
11        Q.   Now, you said you heard a lot of rumors
12   about what happened with Molina; correct?
13        A.   There was a whole bunch.
14        Q.   And how was it that you picked these names
15   to lie about, as opposed to other names you heard out
16   there?
17        A.   Like you said, sir, the records will
18   reveal, when DOC took me to the North, they put me in
19   X pod.  And please go look.  And you tell me where I
20   was at.  And you can answer your own question.
21   That's how I knew, and I found out, is that, you know
22   what I mean?
23        Q.   But that wasn't the question, sir.  The
24   question was:  How did you know to pick these names
25   versus other names that you heard?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   Because those are the names that we were
 2   told.
 3        Q.   You said you heard a bunch of rumors about
 4   a bunch of names.
 5        A.   Yes.
 6        Q.   Okay.  But for some reason, you decided to
 7   pick these names.
 8        A.   After a while, you kind of figure out
 9   what's BS, you know what I mean?  And Billy had told
10   us a whole bunch of BS.
11        Q.   Could you just have fed back to him the
12   same BS he gave you about the names?
13        A.   If you go back to the beginning of the
14   recording, where he comes on and he says, "Do you
15   remember what you were telling me', because that was
16   a conversation we were all having in X pod, when he
17   said, they said, she said.
18        Q.   So in other words, you were just repeating
19   back stories that Billy Cordova told you?
20        A.   That's what I said.  Now, knowing what I
21   know today, they were lies.
22        Q.   How do you know they're lies?
23        A.   I didn't give nobody nothing.  I don't know
24   nothing came from my walker, because they don't have
25   my walker so we can test the material that they say
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   came from my walker, sir.
 2        Q.   We're talking about other lies here, as
 3   well, sir.  I mean, you said you lied that "Red" was
 4   involved, and "Blue" was involved?
 5        A.   I don't know none of that.
 6        Q.   You know they pled guilty to it?
 7        A.   Now, because you gave us our tablets.  I
 8   only saw what I saw.
 9        Q.   You didn't know that he had pled guilty?
10        A.   No, I did not.
11        Q.   Or that Mr. Martinez had pled guilty?
12             MR. VILLA:  Objection, Your Honor.  This is
13   getting outside the scope, whether these guys pled
14   guilty.
15             THE COURT:  Sustained.
16        Q.   Now, once again, you lied about the
17   paperwork being there the year before; correct?
18        A.   I wasn't there, so I don't know.  Again,
19   I'm just going by what we were told.
20        Q.   And you lied about one of the dudes being
21   less than a year to the house?
22             MR. VILLA:  Object to the
23   mischaracterization.  He hadn't said that he lied.
24   In some of these questions he lied and some of the
25   questions he's saying he's repeating what he's been
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    told.
 2              THE COURT:  Well, I'll let you work on that
 3    on redirect.  Overruled.
 4         Q.   Okay.  I'll rephrase it, Mr. Perez.  Was it
 5    sure or not that "one dude was less than year to the
 6    house"?
 7         A.   Who was that?
 8         Q.   I don't know.
 9         A.   I don't know who it was.
10         Q.   How about "Red," "Red" was only two years
11    to the house.  You know who "Red" is?
12         A.   I knew he was less than four or five, yeah.
13         Q.   So that was kind of true, what you told Mr.
14    Cordova?
15         A.   That's -- four or five is a whole lot
16    different than one.
17         Q.   Okay.  So you're still lying?
18         A.   I had to, wouldn't you say?
19         Q.   And then "Blue" was just a couple of years
20    to the house.  Was that true or was that false?
21         A.   I don't know how much time he was doing or
22    what.  I mean, I just met the guy.
23         Q.   Was it true or was it a lie when you told
24    Mr. Cordova you gave him your pin number?
25         A.   Check your records.  I gave him the phone
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    call, because Wendy Perez had came through
2    complaining about his pin number.  She says is
3    somebody using your pin at the South?  He bitched and
4    complained and cried.  I said, "Look, dog, who you
5    been calling?"
6              He says, "My mom."
7         Q.   So that was the truth?
8         A.   Yes.
9         Q.   That's all I'm asking.  Is it true or is it
10   false?  It's true, right?
11        A.   I did give him my pin.
12        Q.   Now, here, you're talking about SNM
13   leadership here.  And was it really the truth or a
14   lie when you said, "They let their addiction cloud
15   their mind to make the right calls"?
16        A.   That was an opinion.
17        Q.   Okay.  Is it your opinion that they have
18   let their addictions cloud their minds?
19             MR. VILLA:  Objection, outside the scope,
20   what his opinion is allegedly about SNM leadership.
21             THE COURT:  I'll let you ask him if his
22   statements are true or false, but I think I'll
23   sustain that objection.
24        Q.   Okay.  You heard the Judge then.
25             THE COURT:  You don't need to answer that.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So the question is, is that statement true
 2   or false, based on your opinion?
 3        A.   False now.
 4        Q.   It's false now?
 5        A.   Now, that I know everything.
 6        Q.   Okay.  And your statement on DeLeon 20554,
 7   "The other vatos should have already taken care of
 8   them the year before"?
 9        A.   Again repeating what Cordova had told us.
10        Q.   What did he tell you about who those vatos
11   were?
12             MR. VILLA:  Objection, outside the scope.
13             THE COURT:  Sustained.
14        Q.   So let me ask you this, Mr. Perez:  You
15   said for every single one of these conversations you
16   were under the influence of Suboxone; is that
17   correct?
18        A.   Pretty much.
19        Q.   How were you able to remember all the stuff
20   that Billy Cordova told you under the influence of
21   drugs?
22        A.   You know, when your life is pretty much,
23   you know what I mean, when I was hearing rumors, I
24   had plenty of time to think about it, man.  I was
25   scared.  I couldn't fight.  I couldn't even walk.  So
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    I made sure.

2        Q.   I'm not sure I understand.  You made sure

3    what?

4        A.   I lied to Billy to make, because like I

5    told you, Billy -- everybody, anybody that knows

6    Billy will tell you, he has a big mouth, he repeats

7    it.  I figure:  Tell him that, he'll go repeat it.

8        Q.   But the question is how were you able to

9    remember all these details under the influence?

10   That's the question.

11            MR. VILLA:  Objection, asked and answered.

12            THE COURT:  Overruled.  You need to answer

13   that question.

14       A.   Pretty much from the whole conversation we

15   were having in X pod.

16       Q.   So even though you were under the influence

17   of Suboxone, you remembered everything that's on

18   these pages?

19       A.   Not everything.

20       Q.   Well, you were able to -- well, you told

21   him these things?

22       A.   Last night, when I went back to the jail,

23   the same papers you're looking at, I went through the

24   tablet, started looking and going through, because I

25   didn't remember half the shit that was said.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   I'm not asking --
 2          A.   I still don't remember most of it.  I'm
 3    only going by what I read on the tablet, and what you
 4    read on the paper.
 5          Q.   I'm not asking about your recollection
 6    today.  I'm asking about your recollection when you
 7    gave the statements to Mr. Cordova.
 8          A.   Go over the calls, and ask Billy Cordova
 9    why he kept turning it on and off.  There is a lot of
10    the conversation that he didn't record.  And I wonder
11    why?  Have you ever thought about that, man?
12          Q.   Sir, I'm wondering why you're not answering
13    the question.  That's what I'm wondering.
14          A.   Call Mr. Cordova and ask him.
15          Q.   Mr. Cordova is not here, sir.
16          A.   Go get him another warrant, bring him back.
17          Q.   The question is about your memory, sir?
18          A.   Bring Billy Cordova back and ask him about
19    his memory and why he didn't record all the
20    conversations that was being had that day.
21          Q.   What I'm hearing you say is that you are
22    referring to answer the question.
23          A.   I don't know.
24          Q.   If you're going to refuse to answer the
25    question, I'll just move on, so just tell me.
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                                FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

219

```
 1        A.   I don't remember.
 2        Q.   Was it the truth or a lie when you said,
 3   "No matter what the fuck we do, do not let the
 4   motherfucker out of the door, right or wrong"?
 5        A.   Again, that's opinion.
 6        Q.   Okay.
 7        A.   Because, if you remember, when it's done,
 8   was done, a lot of he said, they said, she said.  My
 9   opinion.
10        Q.   Your opinion was that they shouldn't have
11   let him out of the cell?
12            MR. VILLA:  Objection to what his opinion
13   actually was.  It's outside the scope.
14            THE COURT:  Well, he's brought up his
15   opinion.  He said this is his opinion.  I think Mr.
16   Castellano has a right to figure out what his opinion
17   is.  Overruled.
18        A.   That's my opinion.
19        Q.   But what I'm asking is your opinion is
20   about letting someone out of the cell for a hit?
21        A.   Again, you'd have to hear the whole
22   conversation.
23        Q.   Okay.  Let's continue with the
24   conversation.  Okay.  "They didn't have the fucking
25   door.  He's running down the steps, down the steps."
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Again, I'm repeating what we were told.

 2          Q.    You were being told what?

 3          A.    Billy was telling us what had happened.  I

 4    didn't know what the hell had happened.

 5          Q.    So, in other words, he told you how the hit

 6    went down on Molina?

 7          A.    I'm telling you, he knows more about it

 8    than I did at the time.

 9          Q.    But we're talking about Molina here, right?

10          A.    That was part of the conversation, what he

11    was telling us.

12          Q.    Right.  Including the fact that he came out

13    running, referring to Molina?

14          A.    When Acee catches Eric Duran, you can ask

15    Eric Duran, because he's the one that told us that

16    part.

17          Q.    It's your turn to testify today, Mr. Perez,

18    so I need to get this information from you.

19          A.    I'm just letting you know, sir.  When you

20    catch Eric Duran, you can ask him, because when he

21    was recording that conversation between the three of

22    us, Eric Duran was telling us this and that.

23          Q.    And what you're talking about here, based

24    on what other people told you is, about the Molina --

25          A.    What we were told.
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                              1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   About the Molina murder?
 2        A.   Yes.  I don't know what's true and what's
 3   not.  I was just repeating what we were told.
 4        Q.   Okay.  And you don't know whether it's true
 5   or not whether or not this "happened in front of the
 6   camera, and everything"?
 7        A.   Again, just going by what they were saying.
 8        Q.   And they also told you then that someone
 9   was yelling, "Get him, get him, get him"?
10        A.   Yes.
11        Q.   And they also told you that "Dan Dan" was
12   supposed to get rid of the fierros?
13        A.   That was what Billy had said.
14        Q.   And fierros are shanks?
15        A.   Depending on who you ask.
16        Q.   You gave a statement here, where you say --
17   this is DeLeon 20566 -- "How did Alex or 'Lazy' let
18   vatos stay in that pod knowing that 'Lazy" read the
19   discovery himself."  Did someone else tell you that
20   "Lazy," or Mr. Herrera, had read the discovery?
21        A.   That's what Billy was telling us.  That's
22   why I say, what is a lie, true?  Nobody knows.  You'd
23   have to ask Billy Cordova.
24        Q.   Is this the truth or a lie or something
25   that someone else told you, "Somebody knew the truth
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    about 'Creeper' beforehand, that's what they made him
 2    do what he did, do you know what I mean"?
 3         A.   That came out of "Creeper"'s mouth.
 4         Q.   What came out of the "Creeper"'s mouth?  I
 5    didn't understand that.  Someone knew the truth about
 6    "Creeper"?
 7         A.   You'd have to ask "Creeper."
 8         Q.   Do you remember a conversation you had with
 9    Mr. Cordova about Mr. Baca going to administration
10    about getting moved back?
11         A.   I didn't know nothing about that until Eric
12    Duran and them were telling us about it.
13         Q.   Okay.  Well, was it a lie or was it the
14    truth when you said, "'Pup' should have known all
15    about that brother when he was there, but the dope
16    got the best of him over there too"?
17         A.   Again, that's opinion.
18         Q.   Was it a truth or a lie when you responded
19    to -- when you said, "Yeah," to Billy's question
20    about remembering what happened to "Pancho" and
21    "Looney" in Cruces, did you really remember that,
22    what happened to those guys?  Or did you lie?
23         A.   Which part?
24         Q.   All right.  "Yeah, but see, they're not
25    bringing him for that shit with 'Pancho' and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1   'Looney', remember that, remember that shit with

2   'Pancho' and 'Looney' in Cruces?"

3          And your response is, "Yeah"?

4       A.   I did remember that.  I remember the

5   situation.  Don't know nothing about it.  But I

6   remember something happened.

7       Q.   So when Mr. Cordova says, "Dawg, you the

8   one that called that Billy.  You see so they might be

9   getting him for that"?

10      A.   Repeat that again.

11      Q.   Right there he's talking about who called

12  the hit on Castillo and Garza.  So right here you're

13  talking about the "Pancho" and "Looney" murders in

14  2001.  And you say that you recall that?

15      A.   Right before that he says, "Billy" -- "I

16  said old school, you know what I mean?"  So I don't

17  know nothing about that.  You'd have to ask, again,

18  Billy Cordova for that.  I wasn't even in the system

19  back then.

20      Q.   And then, when he asked you, Billy, "Called

21  that right?  'Looney' and 'Pancho' after that, they

22  shut us down."

23          And your response was, "Yeah"?

24      A.   Again, that's when we got hurt.  Is it the

25  truth or a lie?  Who knows?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   On Bates stamp 20565, was this a truth or a

2  lie when you told Mr. Cordova, "I tell you dog, I'm

3  from the old school.  I got schooled right, homes"?

4      A.   My opinion.

5      Q.   So in your opinion, you got schooled right?

6      A.   My opinion.

7           MR. CASTELLANO:  May I have a moment, Your

8  Honor?

9           THE COURT:  You may.

10          MR. CASTELLANO:  Pass the witness, Your

11  Honor.

12          THE COURT:  Thank you, Mr. Castellano.

13          Any other defendants have cross-examination

14  or redirect of -- cross or redirect of Mr. Perez?

15          All right.  Mr. Villa, if you wish to

16  conduct redirect of Mr. Perez, you may do so at this

17  time.

18          MR. VILLA:  Thank you, Your Honor.

19          THE COURT:  Mr. Villa.

20                  REDIRECT EXAMINATION

21  BY MR. VILLA:

22      Q.   Mr. Perez, during this time period when Mr.

23  Cordova was giving you Suboxone, were you taking any

24  other illegal drugs?

25      A.   No.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                             1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                             e-mail: info@litsupport.com

```
 1        Q.   You were taking the medications that you
 2   testified about on cross-examination.  And those
 3   medications came from the medical folks at the
 4   prison?
 5        A.   Yes.
 6        Q.   You weren't taking any other -- well, let
 7   me ask you this:  You weren't taking any other form
 8   of illegal drugs besides Suboxone?
 9        A.   No.
10        Q.   And when you took the Suboxone that Billy
11   gave you, how did you ingest it?
12        A.   Put it in a spoon, broke it down, swallowed
13   it.
14        Q.   Is that how you did it every time?
15        A.   Yes.
16        Q.   I think Mr. Castellano asked if you
17   injected it.  You did not inject it?
18        A.   No.
19        Q.   You remember the conversation with Mr.
20   Castellano about how you knew Billy would run his
21   mouth and he would talk a lot, and so that's why you
22   were talking to him.  Why did you want Billy to talk
23   a lot about what the two of you were talking about?
24        A.   To stop the rumors.
25        Q.   Which rumors?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    People were saying that I said this or

2     that.

3          Q.    Why did you want the rumors stopped?

4          A.    Because I don't want to get hurt.

5                MR. VILLA:  Just a moment, Your Honor.

6                THE COURT:  You may.

7                MR. VILLA:  No further questions.

8                THE COURT:  All right.  Thank you,

9     Mr. Villa.

10               All right.  Mr. Perez, you step down.

11    Thank you for your testimony.

12               All right.  Mr. Villa, does Mr. Perez have

13    further witnesses or evidence he wishes to present?

14               MR. VILLA:  We do, Your Honor.

15               MS. FOX-YOUNG:  Your Honor, Mr. Perez calls

16    Dr. Edward French.

17               THE COURT:  Dr. French, if you'll come up

18    and stand next to the witness box on my right, your

19    left.  Before you're seated, my courtroom deputy, Ms.

20    Standridge, will swear you in.

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                        EDWARD FRENCH,
 2          after having been first duly sworn under oath,
 3          was questioned and testified as follows:
 4                       DIRECT EXAMINATION
 5               THE CLERK:  Please be seated.  State your
 6     name, and spell it for the record.
 7               THE WITNESS:  Edward French, F-R-E-N-C-H.
 8               THE COURT:  Dr. French.  Ms. Fox-Young.
 9     BY MS. FOX-YOUNG:
10          Q.   Good afternoon, Dr. French.
11          A.   Good afternoon.
12          Q.   Can you tell the Court what your profession
13     is?
14          A.   I'm a professor of pharmacology at the
15     University of Arizona College of Medicine.
16          Q.   How long have you been doing that?
17          A.   At the University of Arizona since 1988.
18          Q.   And did you work in that field before 1988?
19          A.   Yes.
20          Q.   Where?
21          A.   I got my doctorate degree in pharmacology
22     from UCLA in 1976.  And then, from there, I did three
23     years of what we call post-doctoral research at the
24     Salk Institute, which was a behavioral pharmacology
25     lab.  And from there, went to the Max Planck
```



SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492            BEAN                                        FAX (505) 843-9492
                          & ASSOCIATES, Inc.                                    1-800-669-9492
                          PROFESSIONAL COURT                      e-mail: info@litsupport.com
                            REPORTING SERVICE

228

```
1    Institute of Psychiatry in Munich, Germany, for an
2    additional year of research.  And then to the
3    University of Maryland, at Baltimore School of
4    Medicine, from '80 to '88.
5         Q.   You're aware that you've been proffered as
6    an expert to testify in this case?
7         A.   Yes, I have.
8         Q.   And the areas are for expertise in
9    pharmacology?
10        A.   Yes.
11        Q.   Do you have any particular background or
12   experience in toxicology?
13        A.   We, in pharmacology, think of everything as
14   "a dose."  So everything can become a toxic substance
15   if there is enough of it around.
16        Q.   Okay.  And also in neuroscience?
17        A.   Yes.
18        Q.   Tell me about that.
19        A.   Well, my interest is in drugs, and how they
20   affect brain and behavior.  So I'd have to know about
21   the connections of the brain and the way that
22   chemicals get moved so that we can process
23   information and evaluate the world we live in.
24        Q.   Thank you, Dr. French.
25             MS. FOX-YOUNG:  Your Honor, I'm not going
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to go through a complete detail of Dr. French's

2    background and experience, unless the Government

3    wants to challenge him for purposes of this hearing,

4    which I know with our previous expert the Government

5    didn't have an issue.

6              THE COURT:  Do you have any problem with

7    Dr. French offering opinion testimony?

8              MS. ARMIJO:  Do you have his CV as an

9    exhibit?

10             MS. FOX-YOUNG:  Your Honor, we have

11   tendered that as Document 1052-1.  It's in the

12   record.  We filed an expert disclosure back in the

13   spring, and then we supplemented.  So it's all

14   been -- the Government has been provided with all

15   that.

16             MS. ARMIJO:  I was just saying for purposes

17   of the hearing today.  But I'm not questioning his

18   credentials.  I just wanted to see if they had one

19   here today.

20             THE COURT:  All right.  So you don't have

21   any problem with him offering opinion testimony?

22             MS. ARMIJO:  No, Your Honor.

23             THE COURT:  Anybody else?  All right.  So

24   the Court will allow Dr. French to offer opinion

25   testimony.  What is the specific area?



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com

```
 1            MS. FOX-YOUNG:  Dr. French -- we'd like
 2    Dr. French to offer opinion testimony in the areas of
 3    pharmacology, toxicology, and neuroscience for
 4    purposes of this hearing.
 5            THE COURT:  All right.  Without any
 6    objection, then, the Court will allow opinion
 7    testimony in those areas.
 8    BY MS. FOX-YOUNG:
 9        Q.  Dr. French, did you review any materials
10    prior to coming to testify at this hearing?
11        A.  Yes, I did.  Several hundred pages that you
12    sent to me, which were physician directions or -- I
13    forgot the correct term -- physician notes -- and
14    medication records.
15        Q.  Okay.  Are they the medication
16    administration records for Rudy Perez?
17        A.  Yes, they are.
18        Q.  And do you know if they cover the time
19    period -- if they included the time period of
20    February 2016?
21        A.  Yes, 2016, back many years.
22        Q.  Okay.  And are you aware of a substance
23    that -- I think you've been here part of the day and
24    heard some of the testimony.
25        A.  Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   Are you aware -- do you have any

2   familiarity with the substance called Suboxone?

3       A.   Yes, I do.

4       Q.   That's been described today?

5       A.   Yes.

6       Q.   Tell me what the composition of Suboxone

7   is.

8       A.   Suboxone is a combination medication.  It

9   has an active ingredient, a very, very potent active

10  ingredient called buprenorphine, and also it contains

11  a substance called naloxone.  And if we've been

12  listening to the news, we know that naloxone is also

13  the name to Narcan, which is a opiate antagonist.

14      Q.   And is Suboxone a drug that is approved by

15  the FDA?

16      A.   Yes, it was approved in, I believe 2002, to

17  be used to help maintenance of opiate dependence.

18      Q.   And you've heard testimony -- and maybe you

19  know otherwise -- that it is used by individuals to

20  get high, is it not?

21      A.   Sure.  It's an opiate.

22      Q.   Okay.  Can you tell me -- can you compare

23  it to any other opiates?  Is it similar to any other

24  opiates you've studied?

25      A.   It's very different in many ways.  Similar

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    in some ways, but different in many other ways.  If
2    you'll bear with me, I'll try to explain the
3    pharmacology of it a little bit.  So when we think of
4    opiates, they act on receptors in our brain, and also
5    other parts of our body, but in our brain they act on
6    a particular receptor.  And we have substances like
7    morphine, heroin, methadone, which we call full
8    agonists.  In other words, they occupy that receptor
9    to do what it's going to be doing.
10            Now, buprenorphine is a little bit
11   different.  It acts on that same receptor, but it
12   doesn't have the same bang for the buck.  It does
13   certain things well.  It can treat pain.  People can
14   get high with it.  But there is a certain dose
15   limitation; in other words, if you keep pushing the
16   dose, keep taking more of it, you don't get any
17   bigger effect, which is not the same case with
18   morphine or heroin or methadone.
19        Q.   Other than the dosage difference, can you
20   compare it in any way to morphine for me?
21        A.   Well, yes.  So morphine, we would call
22   morphine a full opiate agonist.  We would call
23   buprenorphine a partial opiate agonist.  So it has a
24   ceiling effect -- morphine doesn't have a ceiling
25   effect on the system, but buprenorphine does.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Would you classify Suboxone as being in the

2   family of morphine-like drugs, or is it in a

3   different family of drugs?  How could you

4   characterize it?

5      A.   It's an opioid.  So it's certainly in that

6   family.  But it's not a drug, I think, that we would

7   see being abused quite a bit because of that ceiling

8   effect.  In other words, people abuse these

9   substances because they can take more of it and get

10  higher and higher.  But buprenorphine, which is in

11  Suboxone, the more you take, you won't get much

12  higher.

13     Q.   Okay.  So you reach a point, you get high

14  and then it stops?

15     A.   Right.

16     Q.   And can you compare it to morphine in terms

17  of its strength?

18     A.   Yes.  So, when it comes to analgesia, in

19  other words, to relieve pain, it is about 25 -- or

20  when it comes to the action of the opiate receptor,

21  it's about 25 times more potent, binding to that

22  opiate receptor.

23     Q.   Okay.  So is it fair to say it's a potent

24  drug, has a ceiling effect, but it is a potent drug

25  that can get you pretty high?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

234

1        A.   It can get you high, yeah.  And let me -- I

2    want to explain something, so -- because it's

3    confusing when you talk about partial agonist and

4    full agonist.  So we all have heard about Narcan, how

5    Narcan can be used to reverse a heroin overdose.  So

6    Narcan has a lot of affinity for the opiate receptor,

7    but it doesn't produce any opiate effects.

8             So buprenorphine is between what we think

9    of like naloxone and morphine.

10       Q.   Okay.  So is it -- tell me what that has to

11   do with its strength relative to morphine for the

12   person ingesting it.

13       A.   It will produce analgesia like morphine,

14   but there is, again, that limitation to how much

15   analgesia you can get with it.

16       Q.   Okay.  And I think you heard testimony a

17   little bit earlier about, and you looked at the

18   records that Mr. Perez, in February 2016, was

19   prescribed Tramadol.  Do you recall that?

20       A.   Yes.

21       Q.   And also prescribed gabapentin?

22       A.   Yes.

23       Q.   Do you have an opinion as to whether or not

24   taking tramadol or taking gabapentin would affect the

25   efficacy of Suboxone, in terms of getting you high.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                       1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                          e-mail: info@litsupport.com

1    Is my question clear?

2         A.   Yes.

3              So let me start with the gabapentin,

4    because gabapentin has no affinity for opiate

5    receptors.  So we can just put gabapentin aside.

6    It's used for pain, but it doesn't have an opiate

7    action.

8         Q.   So it would not interfere with getting high

9    and using Suboxone?

10        A.   Correct.

11        Q.   Okay.

12        A.   Now, tramadol is a synthetic opiate, which

13   is used for pain relief.  It's not as potent, for

14   example, as morphine.  And so, if tramadol were on

15   board, let's say, and you were to take Suboxone which

16   has buprenorphine in it, that buprenorphine just

17   overtakes the tramadol.

18        Q.   Okay.  And so, in layman's terms, if I took

19   tramadol, and I also took Suboxone, I would still get

20   high from the Suboxone?  It would sort of override?

21        A.   Yes.

22        Q.   Or you said overtake?

23        A.   Yes.

24        Q.   You talked about the analgesic effects of

25   Suboxone?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

236

1          A.    Yes.

2          Q.    And you talked about, in layman's terms,

3     Suboxone can get a person high?

4          A.    Yes.

5          Q.    Is there a technical term for that?  Under

6     the influence?

7          A.    Well, there is a word for a high.  A high

8     can be what we call euphoric.  So euphoria would be a

9     pleasurable sensation, which is what people think of

10    when they think of a high.

11         Q.    And also it can reduce pain?

12         A.    Yes, it can.

13         Q.    Does Suboxone have any other effects on a

14    user?

15         A.    Well, it will bind the opiate receptors.

16    But for some reason, there are certain parts of the

17    brain that don't respond as well to Suboxone as they

18    do to morphine.

19              And the great thing about Suboxone, in a

20    sense, is that ceiling effect.  It's really -- it's

21    pretty hard to kill yourself with Suboxone in a

22    sense, because the breathing, the respiratory

23    inhibitions that morphine produces, which takes our

24    breath away; that's what kills people, is that

25    morphine stops us from breathing.  There is a ceiling

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    effect with Suboxone so you don't get that big

2    depression of breathing.

3         Q.    So your breathing wouldn't slow as much in

4    taking Suboxone?

5         A.    Yes.  Probably not by dose, yes.

6         Q.    And what I'm trying to get at as well, are

7    there any other effects or side effects of taking

8    Suboxone for a user, that you know of, or have

9    encountered?

10        A.    Oh, sure.  There are side effects that are

11   in some ways similar to other opiate side effects.

12   Some people will get sleepy.  Some people complain of

13   dizziness.  And of course, if you start to depress

14   the central nervous system, which is what these drugs

15   are, they're depressants, you get a diminution in a

16   person's ability to make proper judgments or to think

17   things through.

18        Q.    So it can affect cognition.

19        A.    Yes.

20        Q.    Can it cause sedation?

21        A.    Yes.

22        Q.    And confusion?

23        A.    Yes.

24        Q.    Can it cause a change in the level of

25   consciousness?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   That's a little bit tricky, because I think
 2   of these drugs, if they're causing a person to be
 3   high, and they're causing it because they're
 4   inhibiting our brain, then I would think that it is
 5   changing our level of consciousness.  That's how I
 6   would look at it.  In other words, you're just not in
 7   the game, you're not one hundred percent when you're
 8   high.
 9        Q.   So Suboxone can cause alterations in
10   judgment?
11        A.   Yes.
12        Q.   Changes in level of consciousness?
13        A.   Yes.
14        Q.   Sedation?  Confusion?
15        A.   Yes.
16        Q.   I think you said weakness?
17        A.   I didn't say weakness.
18        Q.   Can it cause weakness?
19        A.   I would think it could cause some weakness,
20   sure, I would think so.
21        Q.   Are there any other effects that you know
22   of?
23        A.   Well, it can maybe cause itching, because
24   opiates cause people to itch.  Maybe reduce blood
25   pressure, because opiates have a central nervous
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    system depressant effect, so maybe blood pressure

 2    could go down.  There are probably, you know, a

 3    laundry list of side effects that have been reported.

 4              MS. FOX-YOUNG:  Thank you, Your Honor.

 5    I'll pass the witness.

 6              THE COURT:  Thank you, Ms. Fox-Young.

 7              Any other defendants want to cross-examine

 8    Dr. French?

 9              All right.  Ms. Armijo, do you wish to

10    cross-examine Dr. French?

11              MS. ARMIJO:  Thank you, Your Honor.

12                         EXAMINATION

13    BY MS. ARMIJO:

14         Q.   So, Dr. French, you're a Wild Cat?

15         A.   Yes, more or less.

16         Q.   I am, too.

17         A.   But they're not doing very well.

18         Q.   That's okay.  It's early in the season.

19              All right.  Now, in looking at your notice,

20    not the one defense has provided for you.  Sorry.  It

21    indicates that you are going to talk about drugs and

22    everything.  And it says your opinion is based on the

23    review of the defendant's medical records, including

24    medication administration records, as well as

25    information provided by his health care providers,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    other witnesses to Mr. Perez' state at the relevant

 2    time periods, and information provided by Mr. Perez'

 3    defense team.  Is that all correct?

 4         A.   I believe so.  There was a third thing in

 5    there, I wasn't really sure.  Say the third thing

 6    again.

 7         Q.   Okay.  Well, I guess you came and you gave

 8    an expert opinion --

 9         A.   Right.

10         Q.   -- on Suboxone and other things?

11         A.   Right.

12         Q.   And I believe you were asked by defense

13    counsel, and you said that you looked at his medical

14    records?

15         A.   Correct.  Those are the physician

16    instructions that were provided.

17         Q.   Okay.  But you're basing your opinion on a

18    lot more, based upon this notice; correct?

19         A.   Well, I'm basing my opinion that I know

20    that these drugs were used, and I know what these

21    drugs do.  So I guess that's what I'm basing my

22    opinion on.

23         Q.   Okay.  Were you provided with information

24    from his health care providers?

25         A.   What was in the physician records that were
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  given to me.

2       Q.   And did you bring those with you today?

3       A.   They're in my briefcase, yes.

4       Q.   Would you mind allowing the prosecution

5  team to look at that?

6       A.   No.

7            MS. FOX-YOUNG:   Your Honor, these have all

8  been disclosed to the Government.

9            And I'll just note that this notice is for

10  trial as well as for this hearing.   And so I think

11  the Government knows that it's broader, and the

12  opinions are broader than subject --

13            THE COURT:   Well, if he's got the materials

14  with him, he can show them to them.   But --

15       Q.   Are you also basing your opinion today --

16  and we also talked about the records -- on:   It says

17  other witnesses to Mr. Perez' state at relevant time

18  periods.   Are you basing anything that you testified

19  today based upon other witnesses to Mr. Perez' state

20  at relevant time periods?

21       A.   No.   I don't have any documentation about

22  what other witnesses said.

23       Q.   Okay.   And it also says, "and information

24  provided by Mr. Perez' defense team."

25       A.   Yes.   I have -- there is a couple of blurbs

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    from the defense attorneys about kind of the
 2    timeframe when things were happening.
 3         Q.   Okay.  And did you use that for your
 4    opinion?
 5         A.   No, I didn't use it for my opinion.  I
 6    just -- I'm going to try to explain this in a simple
 7    way.
 8              So I was given a timeframe, and I was asked
 9    to look at the medication records.  And so, when I
10    looked at the medication records, I tied it in to the
11    events that was in the timeframe.  In other words,
12    there was an event in 2014, I believe in March of
13    2014, and then there was the event in 2016.  So I
14    looked at the medication records that kind of like
15    book-ended those dates.
16         Q.   And you talked a lot about Suboxone use;
17    correct?
18         A.   Yes.
19         Q.   Does anything in those medical records --
20    and did you get the medical records?  I'm sorry.
21              MR. VILLA:  Yes, I have them.
22              MS. ARMIJO:  Could he have them?
23              MR. VILLA:  Could I let Dr. French look
24    through his own stuff?
25         A.   What do I do?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. ARMIJO:  I was going to have -- for the
 2    speed of things, I was going to have my co-counsel
 3    look those over for me.  And I believe Mr. Beck is
 4    going to be looking those over for me.
 5         Q.   Now, you talked a lot about Suboxone;
 6    correct?
 7         A.   Yes.
 8         Q.   Do any of those medical records have any
 9    indication that Mr. Perez took Suboxone?
10         A.   No.
11         Q.   So what are you basing your opinion on, as
12    far as -- well, strike that.  Is it your opinion that
13    Mr. Perez took Suboxone?
14         A.   It is my opinion.
15         Q.   Okay.  What are you basing that on?
16         A.   Oh, I'm basing it first on the interactions
17    that I had with the defense attorneys that they had
18    brought this up, that Suboxone was involved.  And
19    then I sat in the courtroom today and I heard a lot
20    about it.
21         Q.   Okay.  Well, let's get -- if you're basing
22    your opinion that he was on Suboxone by what the
23    defense attorneys told you, what did they tell you?
24         A.   That Suboxone was involved.
25         Q.   Okay.  Other than what the defense team has
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    told you -- and I'm assuming what you're talking
 2    about with Mr. Perez' testimony -- do you have any
 3    other independent proof that Suboxone was -- that Mr.
 4    Perez took Suboxone?
 5         A.   No.
 6         Q.   Okay.  So you're just basing it off his
 7    testimony and what the defense has provided you?
 8         A.   Yes.
 9         Q.   And is what the defense provided to you
10    about his use in those documents?
11         A.   No.
12         Q.   Okay.  So what did the defense tell you?
13         A.   That Suboxone was involved on the events of
14    around -- was it February 2016?
15         Q.   Okay.  In the event, hypothetically
16    speaking, Suboxone was not ingested by Mr. Perez,
17    would you agree with me that all of your testimony
18    about Suboxone use and its impact on a person would
19    not apply to him?
20         A.   I don't follow that, because I just heard
21    that it was involved.
22         Q.   Okay.  Well, that's his testimony.  Were
23    you here yesterday?
24         A.   No.
25         Q.   Okay.  Well, yesterday, let's just assume
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  there was a witness that testified that he did not

2  give him Suboxone.

3          A.   Okay.

4          Q.   So it was somebody that was on the stand,

5  under oath, just like Mr. Perez, but testified to the

6  complete opposite.

7          A.   Okay.

8          Q.   Okay.  So I understand that you are basing

9  your opinion based upon what Mr. Perez said.  But I'm

10  asking you, hypothetically speaking:  If the other

11  witness was correct, and Mr. Perez was not on

12  Suboxone, your testimony as to the impact on

13  Mr. Perez of taking Suboxone would be irrelevant?

14          A.   Correct.

15          Q.   Now, did you have an opportunity to -- were

16  you provided with the actual recordings of the

17  telephone calls where the defense is alleging he was

18  on Suboxone?

19          A.   No.

20          Q.   Wouldn't that be important for you, based

21  on your expert testimony of whether or not a person

22  is on Suboxone and given all of the different things

23  that you were talking about that they could be under

24  all the impact, to actually listen to the calls?

25          A.   It would be helpful.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.   It would have been helpful, right?
 2         A.   Yes.
 3         Q.   And maybe, if you listened to them, you
 4   could have heard somebody who was speaking
 5   rationally, whose words were not slurring?
 6         A.   Oh, wait a minute now.  Can I hold you off
 7   for just a second?
 8         Q.   Sure.
 9         A.   So, you made a giant leap there.
10         Q.   Okay.
11         A.   Your leap is that, because there is no
12   slurred speech and there is another -- no other
13   behaviors which would indicate a person is on an
14   opiate, that they're not on an opiate, and that's
15   false, that's completely false.
16         Q.   Okay.  Now, why did you say then that it
17   would have been helpful for you to listen to the
18   calls?
19         A.   Well, it would have been helpful, if there
20   had been certain indications like slurred speech, or
21   the person is falling asleep and banging their head
22   on the table, or they can't walk or something, that
23   can be useful.
24         Q.   Okay.
25         A.   But just the fact that those aren't there
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    doesn't mean that they're not under the influence.
2        Q.   Okay.  But it would have been helpful, and
3    your opinion would been more complete, because you
4    could have come in and testified that that person did
5    or did not have those symptoms, while on this call?
6    I'm just talking about the symptoms now.
7        A.   Right.  If they didn't have the symptoms,
8    that's fine, it doesn't necessarily mean they're not
9    under the influence.
10       Q.   Well, I understand.  But you were talking
11   about them not having those symptoms; correct?
12       A.   Correct.
13       Q.   So now, you weren't provided with the
14   calls.  Were you provided with the transcripts?
15       A.   No.
16       Q.   Okay.  Would that have been helpful for you
17   to at least read them to see if there were any
18   issues?  Again, not to determine whether or not the
19   person was under the influence, but to see whether or
20   not they had any of those symptoms that you might be
21   able to even just read, like slurred speech; if a
22   person was incoherent in a conversation?
23       A.   Well, again, if those things were in the
24   transcripts, then they would substantiate one part,
25   which is maybe there is an overdose of a central
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

248

```
 1    nervous system depressant, causing those problems.
 2    If it's not in the transcript, it doesn't mean that
 3    it didn't exist.
 4         Q.   Well, but if it's not in the transcript, it
 5    means that they weren't having the symptoms of that;
 6    correct?
 7         A.   Having the symptoms doesn't necessarily
 8    mean that they're not under the influence.
 9         Q.   Okay.  Well, we're going to talk about that
10    in a minute.  But would it have been helpful for you
11    to have the recordings and transcript in order for
12    you to make -- have an opinion based upon something
13    that you're actually testifying about?
14         A.   I could probably answer that question by
15    saying:  It could maybe have been helpful, but I'm
16    not sure it would have been necessary.
17         Q.   All right.  So you don't know if he had
18    slurred speech, was falling asleep, incoherent, or
19    anything on those recordings?
20         A.   I don't know that.
21         Q.   Okay.  Now, did you have a written opinion
22    for the defense?
23         A.   No.
24         Q.   Now, is a person able to -- under the
25    influence, is a person able to rationally think?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   To a degree, sure.
 2        Q.   Okay.  And are they able to remember
 3   things?
 4        A.   To a degree, yes.
 5        Q.   And if -- are they able to -- and I guess
 6   you're saying to a degree.  So why don't you explain
 7   that.  Is there -- strike that.
 8             Is there a continuum of under the influence
 9   for, if someone is under Suboxone?
10        A.   Oh, now you're asking about Suboxone?
11        Q.   Yes.
12        A.   Again, it's because it's a unique drug, the
13   continuum is not like the same you'd see with
14   morphine or heroin.  But there is a dose effect.
15   There is always a dose effect with drugs.  So there
16   is a continuum, it's just not as big a continuum.
17        Q.   Okay.  Did you hear any testimony that Mr.
18   Perez was under heroin or morphine?
19        A.   No, I didn't hear anything like that.
20        Q.   Okay.  So then let's stick with Suboxone.
21        A.   Okay.
22        Q.   You said it's a smaller continuum; correct?
23        A.   Correct.
24        Q.   So on that smaller continuum, what would
25   you expect a person under the influence of Suboxone
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    to have symptoms of?
 2         A.   Well, again, it depends on the dose.
 3         Q.   Okay.
 4         A.   So they could be feeling good, be high.
 5    They could have what we call euphoria, a pleasant
 6    sensation.
 7         Q.   Okay.  And under that one -- and I'll stop
 8    there.
 9         A.   Okay.
10         Q.   Under the good and feeling high and feeling
11    the euphoria, is that such a state that they cannot
12    remember things or think rationally?
13         A.   Oh, no, not at all.
14         Q.   They can still remember things and think
15    rationally?
16         A.   Yes, sure.
17         Q.   Make decisions?
18         A.   They can.  Doesn't mean the decisions are
19    correct, but they can.
20         Q.   Not have their will overborne, so to speak?
21         A.   I guess if they're a strong enough person,
22    probably not, but it depends on the person's own
23    personality, how influenced they can be.
24         Q.   Okay.
25         A.   So a drug may reduce that level, and make
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    them even more under the influence than someone else.
 2         Q.   Okay.  Now, let's go to the -- to something
 3    further down on the continuum.
 4         A.   Okay.
 5         Q.   What would be the signs that you would see
 6    if somebody were not just in that happy, feel good
 7    state?
 8         A.   They could be dizzy.  They could be maybe a
 9    little sleepy.  I think that those would probably
10    be -- maybe a little bit confused.
11         Q.   Okay.  And you would expect if somebody is
12    in that state that that might be obvious from maybe
13    their conversation, if someone is confused or dizzy,
14    possibly sleepy?
15         A.   I don't think from a conversation I would
16    jump to that conclusion.  I think that -- I think
17    that when people are confused, that they're not
18    responding to, let's say, particular questions or
19    particular source, people seeking information from
20    them, they may seem confused.  Like when was the last
21    time you had dinner with your dog?  Well, you know, I
22    don't know.  I can't remember.
23         Q.   Okay.
24         A.   So that confusion could be a drug induced
25    confusion.  What dog?  I don't even have a dog.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  Good example.  If you had listened

2   to the recordings of Mr. Perez, wouldn't you be in a

3   better place to know if he had any of that confusion,

4   like you were just talking about with the dogs?

5      A.   I don't know.  Because to me, it's a

6   conversation between -- I don't know between who it

7   is -- but it's a conversation between two people.

8   And I'm not sure that I would be in a position to

9   determine based upon what they're talking about, if

10  one of them is confused.

11          Now, if one of them was, I guess, asking

12  specific questions about specific events or specific

13  times or whatever, and the other person is not able

14  to really answer, then I might be able to say, Well,

15  it sounds a little confused.

16     Q.   Okay.  But since you didn't review that,

17  you can't tell us?

18     A.   Right.  I can't tell you.

19     Q.   You can't tell us.  And other than Mr.

20  Perez' testimony, you don't have any indication that

21  he was under the influence of Suboxone at all?

22     A.   Correct.

23          MS. ARMIJO:  If I may have a moment?

24          THE COURT:  You may.

25     Q.   A quarter of a strip of Suboxone, are you

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                       e-mail: info@litsupport.com

1    familiar with what that amount is?

2        A.   I don't know the milligrams that would be

3    in the quarter of a strip.  But a full strip is what

4    people will put under their tongue.

5        Q.   And that would be for the medical dosage of

6    it?

7        A.   Yes.

8        Q.   So a quarter strip, would that be a smaller

9    amount, obviously, than a full strip?

10       A.   Yes.

11       Q.   And so then it would be a quarter dosage of

12   what a normal dosage of Suboxone is; correct?

13       A.   Yeah, it would be one quarter of what would

14   be in that strip, correct.

15       Q.   And does a person's size or weight factor

16   into that?

17       A.   No.

18       Q.   So a person could weigh 350 pounds or 100

19   pounds and the impact would be the same?

20       A.   Pretty much, yes.  Weight doesn't really

21   enter into drug effects very often because -- just

22   because a person is 300 pounds, doesn't mean that

23   they have three times as much blood in their system

24   as a person who is 100 pounds.

25       Q.   Okay.  What about someone who is an addict?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

254

1    Does that impact it?

2        A.    Impact the --

3        Q.    Impact the effect of the drug?

4        A.    Oh, if they're an addict, if they're an

5    ongoing addict?

6        Q.    Yes.

7        A.    Then that's a really, really good one,

8    because --

9        Q.    Okay.  Tell us about that?

10       A.    That's why buprenorphine or Suboxone is

11   used, is because, if you are an ongoing addict --

12   let's say you're just using heroin all the time, and

13   you decide to take Suboxone, you don't get high from

14   Suboxone.  You go through withdrawal.  So it actually

15   causes withdrawal.  So that's why it's used for

16   opiate maintenance programs.

17       Q.    Okay.  So if you're a heroin addict and you

18   use Suboxone, it doesn't impact you; correct?

19       A.    It does.  It makes you go through

20   withdrawal.

21       Q.    Okay.  So it doesn't get you high?

22       A.    Oh, no, not at all.

23       Q.    It's used to make you withdraw from it;

24   correct?

25       A.    Well, it was --



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   From heroin?
 2        A.   It was used incorrectly, so it would make a
 3   person withdraw.
 4        Q.   Okay.
 5        A.   A person wouldn't voluntarily give
 6   themselves Suboxone or naloxone if they were loaded
 7   up on heroin.
 8        Q.   And if a person is not an addict --
 9        A.   Right.
10        Q.   -- what is the impact of it?
11        A.   Then it acts like an opiate.
12        Q.   Okay.  If someone uses Suboxone on a
13   regular basis, so it's a continuous use of Suboxone,
14   does that euphoria, feel good state that you were
15   describing earlier, is that diminished?
16        A.   When you say "continuous," can you define
17   what you mean by continuous?
18        Q.   Well, if they use it daily?
19        A.   No.  It would -- it's -- Suboxone contains
20   the other ingredient I mentioned, naloxone, which is
21   an antagonist also.  So you can get a little bit high
22   from the buprenorphine, and you get some of the
23   opiate effects.  But if you're using it over and over
24   again, then you don't necessarily become what I'd
25   call tolerant, because the naloxone is preventing the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    opiate from acting.  I know this sounds very

2    confusing.  But Suboxone is a really fascinating but

3    confusing drug.

4        Q.   All right.  But, again, it would still be

5    on that smaller continuum, correct, that you were

6    talking about, as opposed to morphine and other

7    drugs?

8        A.   Yes.  And I think it's because the morphine

9    and the other drugs do not have that other ingredient

10   in them, naloxone.

11            MS. ARMIJO:  All right.  Thank you.  No

12   further questions.

13            THE COURT:  All right.  Thank you, Ms.

14   Armijo.

15            Anyone else have any question of

16   Dr. French?  All right.  Ms. Fox-Young, if you have

17   redirect of Dr. French.

18            MS. FOX-YOUNG:  Thank you, Your Honor.

19            THE COURT:  Ms. Fox-Young.

20                  REDIRECT EXAMINATION

21   BY MS. FOX-YOUNG:

22       Q.   Dr. French, did Mr. Villa or I ask you to

23   tender any opinion in this case as to whether Mr.

24   Perez was high?

25       A.   No, you did not.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And did we ask you to tender an opinion as

2  to how high he was?

3       A.   No.

4       Q.   Or whether he was confused?

5       A.   No.

6       Q.   At the end of your cross-examination, there

7  was a discussion of addiction and how addiction might

8  affect a high that you get from Suboxone; is that

9  right?

10      A.   Correct.

11      Q.   Now, addiction is sort of a general term.

12 Is it the recency of use of drugs -- I mean, say

13 you're an addict, and you haven't used for six weeks.

14 Does the fact of your addiction affect the efficacy

15 of the Suboxone in getting you high?

16      A.   That's a very, very good question.  So

17 addiction doesn't really fit in really well with what

18 you're asking.  But I'll try to explain where I'm

19 coming from.  So addiction is a loss of control.

20 People finally get to a point where the drug has

21 highjacked their brain and their behavior, and they

22 lose control over the use of that drug.

23           Now, what happens with repeated use of a

24 drug is that you have to take more, and you become

25 tolerant, so you take even more, and then you become

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    dependent upon that drug.  So that, if you don't have
2    the drug, you need to take more to get back, so you
3    don't go through withdrawal.
4              Now, the thing about -- I guess where I'm
5    going here is that people who are addicted and have
6    lost control, and who are using enormous amounts of
7    drugs like heroin or methadone, or any of the other
8    full opiate drugs, they stop taking it -- we see this
9    all the time in the current opioid crisis, people who
10   are on OxyContin or oxycodone for pain, and they take
11   it, and they like it.  And they take more of it, and
12   they like it even more.  And then they can't get it
13   anymore.  And some of them will go off of the drug
14   and become abstinent so they don't take the drug
15   anymore.  But then their addiction says:  I like that
16   drug, I think you should take that drug, and they go
17   back to taking what they took the last time, which is
18   what kills them.  Because now the drug that they had
19   been taking for, you know, for many, many weeks or
20   months, they're taking too much of it, so they become
21   abstinent.  So the body re-equilibrates, it goes back
22   to a condition, which is like the first time they
23   took it.  I don't know if that answers your question
24   at all.  But if you are off the drug for a while, and
25   then you take an opiate, you'll get high from it.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.   That does answer my question.   And
 2   more specifically, I know you testified -- you
 3   weren't here to hear the testimony in the proceedings
 4   yesterday, but I'll represent to you that one of the
 5   Government's witnesses, Mr. Billy Cordova, testified
 6   that if an individual has not had Suboxone or
 7   opiates -- I believe you said opiates -- for 36
 8   hours, then you take Suboxone, the Suboxone will work
 9   to get that person high.   Is that consistent with
10   your understanding?   Is that true based upon what you
11   know of the drug?
12        A.   Yes.
13             MS. FOX-YOUNG:   Okay.   No further
14   questions, Your Honor.
15             THE COURT:   All right.   Thank you, Ms.
16   Fox-Young.
17             All right.   Dr. French, you may step down.
18   Thank you for your testimony.
19             THE WITNESS:   Thank you.   Do I get those
20   records back?
21             THE COURT:   What happened to Dr. French's
22   records?
23             MR. BECK:   He may have them back.
24             THE COURT:   All right.   Does Mr. Perez have
25   his next witness or evidence?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. VILLA:  Well, Your Honor, we're in a
 2    bit of a conundrum.  We do, and we think that our
 3    next witness may take about the same time as
 4    Dr. French.  However, the last witness that's here
 5    for both Mr. Herrera and Mr. Perez is Shannon
 6    McReynolds, and I think his availability -- so
 7    neither one of these experts is available next week.
 8    Our expert is going to be much more available in
 9    January than Mr. McReynolds is, because he has to
10    leave the country.  So I think what we're going to
11    try to do is put McReynolds on and finish him.  And
12    then we're going to have to find another time to
13    resume the suppression hearing that sounds like won't
14    be next week.
15              THE COURT:  Any objection to taking
16    Dr. McReynolds right now?
17              MR. BECK:  No, Your Honor.  That's fine.
18              THE COURT:  And I have gotten a little
19    information from Ms. Wild.  She's, I guess getting
20    back into pocket.  And this is what she's saying.
21    She says, "I thought we could do a half day on
22    Wednesday."  And they said that she knew -- she said
23    that Michelle, my courtroom deputy that's replacing
24    Ms. Wild, knew that she needed Wednesday.  She said
25    she'll work it all out.  Initially set Monday and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Tuesday, and then picked up the 20th, the week before
 2   last.  So before anybody runs and makes flight or
 3   scheduling connections, you better check with her.
 4   Because I guess she's thinking we've got Wednesday
 5   morning.  So I just say that because people were
 6   asking if we were doing it Wednesday.  And I was
 7   giving you what information I had based on my
 8   schedule.  But Ms. Wild, I think, is trying to pick
 9   up Wednesday morning.
10            All right.  So is it Dr. McReynolds?
11            MR. VILLA:  Your Honor, just a couple of
12   things.  We had a couple of NMCD folks under
13   subpoena.  Given the time, Ms. Armijo has asked if we
14   can release them.  We can.  That is Ms. Wendy Perez
15   and Mr. Roland Mares.  They can be released.  And, of
16   course, we'll have to find a date in January to
17   resume this hearing, because as I said, our expert
18   won't be available next week.  I just want to make
19   sure that that's clear, so whatever is done next
20   week, it won't be the continuation of this hearing.
21            THE COURT:  Okay.  I'm reluctant to do all
22   this wheeling and dealing on scheduling without
23   Ms. Wild.  But is the Government okay with that?
24            MR. BECK:  I mean, it sounds like that's
25   the plan.  It sounds like there is really not much we
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    can do with that.  We have already -- we've already
 2    booked the two witnesses for, I think, Mr. Garcia's
 3    Daubert hearing, from FBI headquarters.  They're
 4    coming down here next week Monday and Tuesday, so I
 5    think that is set in stone.  If we can't do this
 6    Wednesday, we can't do much anyway, so --
 7             THE COURT:  What are the hearings next
 8    week?
 9             MR. BECK:  I believe next week Ms. Wild has
10    scheduled, or at least the parties anticipate -- and
11    I think everyone agrees on this -- the parties
12    anticipate next Monday and Tuesday is the Daubert
13    hearings for Mr. Garcia that he asked for, for the
14    two FBI scientists from Quantico to come down.
15    They've already booked their flights.  So they will
16    be here next week.
17             MS. HARBOUR-VALDEZ:  Your Honor, as well as
18    the pretrial hearing that was noticed up for the
19    18th.
20             THE COURT:  Oh, we are going to do the
21    pretrial in December?
22             MS. HARBOUR-VALDEZ:  That was what was
23    noticed.
24             MR. VILLA:  Sounds like we could fill the
25    time, and resume Mr. Perez' hearing later.  I just
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    didn't want to mess anybody up.  I think that was the
 2    plan anyway, was to try to be done, so we can stay on
 3    task for next week.
 4             MS. SIRIGNANO:  Your Honor, if I could just
 5    have a quick second.  I understand the Government's
 6    witnesses are going to be here Monday and Tuesday.
 7    But I don't believe it's going to take both days all
 8    day.  Mr. Adams is going to handle the firearms
 9    expert, which could be an hour or so, and the DNA
10    expert, depending on how long the Government takes to
11    put on their evidence.  And our expert isn't going to
12    be here.  It's just going to be cross-examination of
13    their expert.
14             THE COURT:  Well, so it sounds like we may
15    have some trouble filling up the days, so I'm not
16    going to commit to anything.  Right at the moment,
17    we'll go ahead and get McReynolds on the stand and
18    get his testimony.  But I really can't commit to
19    anything until we get Ms. Wild back in pocket.
20             MR. VILLA:  And, Your Honor, I'm not trying
21    to get us to commit to what we're doing next week
22    other than that we'd like the opportunity to complete
23    the presentation of our evidence, and aren't able to
24    do that next week.
25             THE COURT:  I understand the situation.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    But I'm not committing to it.  We'll take McReynolds,
 2    and we'll figure out what to do over the next two
 3    days before we get back together next Monday.
 4            All right.  Do you want to swear in -- is
 5    it Dr. McReynolds?
 6            THE WITNESS:  No.  It is Shannon
 7    McReynolds.
 8                   SHANNON McREYNOLDS,
 9       after having been first duly sworn under oath,
10       was questioned and testified as follows:
11                   DIRECT EXAMINATION
12            THE CLERK:  Please be seated.  State and
13    spell your name for the record.
14            THE WITNESS:  My name is Shannon
15    McReynolds, S-H-A-N-N-O-N, M-C-R-E-Y-N-O-L-D-S.
16            THE COURT:  All right.  Mr. McReynolds.
17    Ms. Bhalla.
18            MS. BHALLA:  Thank you, Your Honor.
19    BY MS. BHALLA:
20       Q.   Mr. McReynolds, how are you currently
21    employed?
22       A.   I have a third party contract as a senior
23    corrections advisor with the U.S. State Department in
24    their Bureau of International Narcotics and Law
25    Enforcement Activities.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.    And what do you do in that job?

2          A.    My job is to provide assistance to the

3    State Department on projects involving prisons in

4    other countries.

5          Q.    And how were you employed prior to this

6    job?

7          A.    Prior to this job, my career was

8    approximately 25 years with the New Mexico

9    Corrections Department.

10         Q.    And what positions did you hold while you

11   were in the Corrections Department?

12         A.    I started in 1990 as a corrections officer.

13   In 1992, I became a classification officer; did that

14   for eight years.  In approximately 2000, I became a

15   programs manager; did that for a year; went on to be

16   a unit manager with the South facility at the

17   Penitentiary.  I then transferred over to Central

18   office.  Over there, I did appeals of placement Level

19   6.  I also did interstate compact.  After that, I was

20   a contract monitor, where I monitored privately

21   operated facilities that the Department had a

22   contract with.  After that, I became the PREA

23   Coordinator for the Department.  And two years from

24   retirement, I was appointed as the Inspector General

25   for the Department.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And what did you do as the Inspector

2   General?

3      A.   As the Inspector General, I had three

4   primary duties.  First, was to monitor the privately

5   operated facilities to determine whether or not they

6   were complying with the terms of the contract, and to

7   assess liquidated damages.

8           The second thing that I did was I also

9   continued our efforts to implement PREA in the New

10  Mexico Corrections Department.

11          And thirdly, I reviewed inmate appeals of

12  placement in Level 6, and briefed the Director of

13  Adult Prisons on what the response should be.

14     Q.   Thank you.  Did you provide me with a copy

15  of your curriculum vitae for this case?

16     A.   I did.

17          MS. BHALLA:  Okay.  Your Honor, I'd like to

18  go ahead and move that into evidence as Carlos

19  Herrera Exhibit I.

20          MR. BECK:  No objection, Your Honor.

21          THE COURT:  All right.  Let's see, Carlos

22  Herrera's Exhibit I will be admitted.

23          MS. BHALLA:  Your Honor, I'm going to move

24  to admit Mr. McReynolds as an expert for purposes of

25  this hearing, only in terms of classification

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1    procedures and policies.  I'm trying to do this in an
 2    abbreviated fashion, so we can get through with this,
 3    because I don't know if the Government has any
 4    objection.
 5            THE COURT:  Mr. Beck, do you have any
 6    objection to Mr. McReynolds offering opinion
 7    testimony in those areas?
 8            MR. BECK:  I mean, I guess is he offering
 9    opinion testimony as to classification for New
10    Mexico, or generally, or is he offering fact
11    testimony to what happened with the defendants in
12    this case?
13            MS. BHALLA:  Fact testimony to what
14    happened with the defendants in this case and opinion
15    testimony as to whether or not the justifications for
16    the classifications given in Interim Level 6 were
17    valid, or if they complied with the relevant policies
18    and procedures.
19            MR. BECK:  I mean, it seems to me that
20    that's just fact testimony, if he's saying they
21    didn't comply with procedures factually.  That's not
22    an opinion.
23            MS. BHALLA:  I'm happy to proceed, and if
24    there is a problem, we can address it as we go along.
25            MR. BECK:  That's fine.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                 THE COURT:  Well, I don't know what that
 2     means.
 3                 MS. BHALLA:  If the Government has an
 4     objection, Your Honor, to any of the testimony that
 5     we're going to elicit from him, I can go back and lay
 6     a foundation for that testimony, if the Government
 7     has an objection.
 8                 THE COURT:  Are you willing to proceed that
 9     way?
10                 MR. BECK:  That's fine.
11                 THE COURT:  Okay.  All right.  We're
12     kicking the can down the road, huh?  All right.
13                 MS. BHALLA:  I'm just trying to be
14     expedient, Your Honor.
15                 THE COURT:  I guess I wonder, though, if he
16     doesn't have personal knowledge of everything, he's
17     not going to be a fact witness.  But it seems to me
18     he's about to tell me whether the New Mexico
19     Corrections Department did something right or wrong
20     based upon just his review of the materials.  And I
21     guess that's an odd expert.  I'm not even sure it's
22     an expert.  It's like -- I mean, I can't say I
23     haven't seen somebody being used this way by a party,
24     but it's more just a summary witness, rather than
25     really an expert witness.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              But if the Government is willing to allow
 2      him to testify, subject to further objection, I
 3      shouldn't stand in the way.
 4      BY MS. BHALLA:
 5          Q.   Mr. McReynolds, have you done a review of
 6      any of the classification or housing records in this
 7      case?
 8          A.   Yes, I have.
 9          Q.   And have you reviewed some of Carlos
10      Herrera's records in this case?
11          A.   Yes, I have.
12          Q.   And have you reviewed some of Mr. Perez'
13      records in this case?
14          A.   Yes.
15          Q.   Okay.  Can you tell us what you determined
16      about -- let me go back, I'm sorry -- you've been
17      present for the full two days of hearings that we've
18      had in this matter?
19          A.   Yes.
20          Q.   Okay.  And have you been able to listen to
21      some of the testimony that's been elicited in these
22      two hearings?
23          A.   Yes.
24          Q.   And has some of that information helped you
25      with your testimony today?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1      A.    Yes.

 2      Q.    Okay.  And that would be in addition to

 3  reviewing those records?

 4      A.    That is correct.

 5      Q.    Okay.  Have you been able to make any kind

 6  of determination about where Mr. Herrera was housed

 7  in 2014?

 8      A.    It started off at the Southern New Mexico

 9  Correctional Facility, and then he was transferred up

10  to the Penitentiary South facility.

11      Q.    And to the best of your recollection, when

12  was Mr. Herrera housed in Southern?

13      A.    From 2014, after the Munoz (sic) homicide,

14  and then he was transferred up to the Penitentiary.

15            MR. BECK:  Your Honor, I'm going to object

16  to hearsay at this point.  And I think this is

17  probably what the Court was getting at.  I'm guessing

18  he's relaying what is asserted on placement histories

19  and documents he's seen.  It would be him testifying

20  to hearsay.

21            THE COURT:  Well, in this hearing, I guess,

22  it's not hearsay I'm troubled with.  I mean, you've

23  got to hear hearsay to sometimes determine whether

24  other evidence is admissible.  So that's not my

25  problem.  And I probably am not going to keep him

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

271

```
1    from testifying either as a fact witness or as an
2    expert because he's relying on hearsay.
3             My problem is he seems to me not to be an
4    expert.  He's simply going to -- he may offer an
5    opinion, but he's not an expert in New Mexico
6    classifications and whether they were done properly.
7    Maybe I'm sort of thinking I don't need an expert.  I
8    need two lawyers standing there arguing and telling
9    me what the problem is, not an expert telling me.
10            So I guess, maybe it's more not -- it's not
11   helpful here.
12            MR. BECK:  I think you're getting ahead of
13   me, Your Honor.  What I was going to say is that, if
14   he's going to be testifying to hearsay documents, I
15   think we might as well admit those hearsay documents,
16   and then we can compare them, with two lawyers
17   arguing from one place or another, whether those
18   documents, and what's documented on them, complies
19   with the policy that we've already had testimony was
20   in effect at the time.  So I'm agreeing with Your
21   Honor, that I don't see that there is helpful or
22   useful information coming from this witness.
23            MS. BHALLA:  May I, Your Honor?
24            THE COURT:  You may.
25            MS. BHALLA:  Your Honor, we heard from Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Roark about placement, about housing histories, about

2    classification.  Mr. Roark testified about those

3    placements and transfers and classifications based on

4    documents, many of which were supplied by the

5    Government.  I don't understand why Mr. McReynolds

6    can't testify regarding those same documents, which

7    I'll go through with him.

8              THE COURT:  But Mr. Roark works at the

9    Corrections Department, is a fact witness.

10             MS. BHALLA:  That's correct.

11   Mr. McReynolds worked at the Department of

12   Corrections for over 25 years --

13             THE COURT:  But not --

14             MS. BHALLA:  -- as general inspector.

15             THE COURT:  Not in New Mexico.

16             MS. BHALLA:  Yes, in New Mexico, Your

17   Honor.

18             THE COURT:  It still seems like an odd

19   thing.

20             MR. BECK:  Your Honor, it seems to me that,

21   if they wanted to ask -- and they may have and I may

22   just have missed it -- whether the documents in Mr.

23   Herrera's and Mr. Perez' file complied with what was

24   on -- what was in the policies, we could have done

25   that with Mr. Roark, and why he was placed there, or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

273

```
 1    through other witnesses who may have placed him
 2    there.  And I think we just let Ms. Perez go, Wendy
 3    Perez go, who actually may have had a hand as a fact
 4    witness in placing Mr. Herrera or Mr. Perez, or both,
 5    in a certain facility at the PNM North.  And so --
 6              THE COURT:  Let's do this:  Let's see what
 7    your exhibits are.  If you have some exhibits to
 8    admit, let's go ahead and get those admitted.  Let's
 9    show those to the Government, and then let's see what
10    then we're going to do with the witness here.
11              MS. BHALLA:  Your Honor, I think what we're
12    going to do is go through some of the exhibits that
13    Mr. Roark testified about.
14              THE COURT:  Well, let's do it my way.
15              MS. BHALLA:  Okay.
16              THE COURT:  Hand your exhibits to the
17    Government.  Let's see what we're going to do with
18    them.  I'm not sure I'm going to let you do it with
19    Mr. McReynolds.
20              All right.  Let's take an afternoon break.
21    Maybe you can talk a little bit and come to an
22    agreement about what, if anything, we're going hear
23    from Mr. McReynolds, and I'll make a ruling on it
24    when we get back.
25              (The Court stood in recess.)
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Let's all take our
 2      seats.  Everybody look around and make sure that all
 3      the defendants have an attorney.  Everybody looks
 4      like they've got somebody.
 5              All right.  Mr. Beck, Ms. Bhalla, did y'all
 6      work out some procedure here?
 7              MR. BECK:  We didn't, Your Honor.
 8              THE COURT:  Did not.
 9              Well, here's what I would propose:  That I
10      not accept him for opinion testimony.  If you want to
11      treat him like an agent; sometimes the prosecution
12      puts an agent on, they walk through documents and
13      show me the documents, they can show me the
14      documents.  And you can kind of do a dog and pony
15      show, get your documents in.  I don't think there is
16      any objection to the documents.  Is there, Mr. Beck?
17              MR. BECK:  No, Your Honor.
18              THE COURT:  But he not offer opinion
19      testimony.  And you can make your point, you can go
20      ahead and argue your point.  But I'll not accept him
21      for opinion testimony.
22              MS. BHALLA:  Okay, Your Honor.  I
23      appreciate the Court's --
24              THE COURT:  What do you think about that,
25      Mr. Beck?  I can tell by Ms. Bhalla, that's not her
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   favorite thing.
 2           MR. BECK:  That's fine, Your Honor.
 3           THE COURT:  All right.
 4           MS. BHALLA:  Your Honor, I would like to
 5   make a record that he is a 702 expert based on his
 6   training and experience in classifications in the New
 7   Mexico Department of Corrections for over 25 years;
 8   that he can offer his opinion on the facts and
 9   circumstances that have been presented in this case.
10   He's not a fact witness.  He is a classic 702 expert.
11   Based on his training and his experience in
12   corrections.  And he is qualified to give an opinion
13   about whether or not the policies and procedures in
14   NMDOC were followed.
15           THE COURT:  All right.  Well, I told you
16   how I'm going to rule.  He can't offer opinion
17   testimony.  But if you want to use him to get your
18   documents in and you want to make your point.
19           Seems to me, this is just what lawyers do.
20   They take the policies, they get them, and they argue
21   that they weren't followed.  I guess I'm not thinking
22   that his testimony is useful.  I need two lawyers
23   telling me why they violated the policy.  And then,
24   if they violated the policy, what in the world that
25   has to do with the suppression motions.  But I think
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that's as far as I'm going to go.
 2              MS. BHALLA:  Let me ask you a question,
 3    Your Honor:  Is your hesitation on this issue in
 4    regards to relevance, or is it in regards to his
 5    expertise?
 6              THE COURT:  Well, if we had a jury over
 7    here, I wouldn't let you put on experts that weren't
 8    helpful to the jury.  I don't see it any different
 9    here.  This is sort of just arguing from the facts.
10    So get your facts in.  He doesn't really offer any
11    facts because he doesn't have any personal knowledge
12    here.  And so you haven't offered him for personal
13    knowledge.  So all you're doing is letting him say
14    something you can say just as well, that I can
15    determine just as well.  And then, we've got to make
16    an enormous leap as to how that's relevant to whether
17    what Mr. Herrera and what Mr. Perez said is
18    involuntary.  I think there is a fairly large gap
19    there.
20              MS. BHALLA:  If you would let me address
21    the question of relevance, I think it might be
22    helpful.
23              THE COURT:  You can address it.  Your time
24    is slipping away.
25              MS. BHALLA:  I understand.  But I think I
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    need to do that for the record, Your Honor.
 2              THE COURT:  Go ahead.
 3              MS. BHALLA:  Thank you, Your Honor.
 4              In terms of relevance, and why this is
 5    important, one of the things that we've been hearing
 6    about and one of the things that is at issue in this
 7    case --
 8              THE COURT:  I think this is more
 9    appropriate for argument time.  But if you want to go
10    ahead and argue it now, go ahead.
11              MS. BHALLA:  Well, it makes it difficult
12    for me, Your Honor, because if we want to get him to
13    provide expert opinions on what happened here --
14              THE COURT:  He's not going to be allowed to
15    offer expert opinions.  I've ruled.
16              MS. BHALLA:  Okay.  So then do I need to --
17    let me just keep it very brief, Your Honor.  I'm
18    sorry, but I feel that I have to do this.  If what --
19    if Mr. McReynolds provides testimony about whether or
20    not these policies or procedures were followed, it's
21    relevant, because the Government has argued --
22              THE COURT:  He cannot provide that
23    testimony.
24              MS. BHALLA:  I understand.  But what I'm
25    trying to articulate is the relevance.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1           THE COURT:  Like I said, I think that's
2   more appropriate for argument.  But if you want to
3   use your time right now to argue, you can go ahead.
4           MS. BHALLA:  Can I have just one moment,
5   Your Honor?
6           THE COURT:  You may.
7   BY MS. BHALLA:
8       Q.   Mr. McReynolds, I'm going to go ahead and
9   show you some documents that have already been
10  admitted into evidence.  The first will be Carlos
11  Herrera's Exhibit D.  I'm going to put it on the
12  screen here.  Can you take a look at that document,
13  please?
14      A.   Yes.
15      Q.   And is that an interim level disciplinary
16  placement regarding Mr. Herrera?
17      A.   It's a placement of Carlos Herrera into
18  Interim Level 6, involuntary segregation.
19      Q.   And what is Interim Level 6?
20      A.   Interim Level 6 is a status where a
21  referring facility places an inmate on lockdown for
22  five days.  They send the justification to Central
23  office.  Central office then makes a determination as
24  to whether or not they will accept his placement into
25  Level 6, and send him up to the penitentiary, the

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.

1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

1  North facility.

2       Q.   And how often is the review supposed to

3  happen on Level 6 placement?

4       A.   For the first eight weeks it's supposed to

5  happen every week.  Thereafter, once every 30 days.

6       Q.   And have you reviewed other inmate

7  disciplinary placement records regarding Mr. Herrera?

8       A.   Yes, I have.

9       Q.   Do you have any understanding as to how

10 long he was placed in Interim Level 6?

11      A.   From the time of his initial placement,

12 March 11, 2014, up until now.

13      Q.   Okay.  And what is life like for someone

14 who is in Interim Level 6?

15      A.   In Interim Level 6 they are in a cell, a

16 single bunk cell.  It has access to natural light and

17 ventilation.  But all -- there is no congregate.

18 They rec for one hour for five days a week.  They are

19 restricted to a shower three days a week.  They do

20 not have -- they have all their meals taken inside

21 their cell.  They may have a television.  At the time

22 this policy was in effect, they were allowed to have

23 a television.  One of the things that the department

24 was wanting to make sure is that there weren't any

25 sensory deprivation situations there.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And what are the policy requirements for
 2   placing someone in Interim Level 6?
 3        A.    There is a number of reasons.
 4              MR. BECK:  Objection, Your Honor.
 5              THE COURT:  Sustained.
 6        Q.    Mr. McReynolds, are you aware of a policy
 7   concerning placement in Level 6?
 8        A.    Yes.
 9        Q.    Do you know what the terms of that policy
10   are?
11        A.    Yes.
12        Q.    Can you tell us what the terms of the
13   policy are?
14              MR. BECK:  Objection, Your Honor.
15              THE COURT:  Sustained.
16              MS. BHALLA:  I'm sorry, Your Honor?
17              THE COURT:  Sustained.  I guess I'm just
18   not seeing.  The defendants have fought very hard the
19   gang experts.  It looks to me like this is a similar
20   sort of person.
21              MS. BHALLA:  I'm sorry, Your Honor.
22              THE COURT:  It seems like to me it's a
23   similar sort of person.  You're wanting to keep the
24   Department's gang experts out.  And this looks like
25   the same sort of thing to me.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MS. BHALLA:  He's not being -- Your Honor,
2     the testimony that we're trying to elicit today is
3     about classifications.
4          THE COURT:  I understand that.  But it's
5     the same sort of witness.  You're bringing somebody
6     in from the Department.  They're trying to bring
7     somebody in to testify about the SNM Gang.  You're
8     trying to bring somebody in to talk about this
9     classification.  It seems to me it's a very similar
10     sort of expert.  And I think I'm being fairly
11     consistent in just saying these aren't the kind of
12     experts that are appropriate.
13          MS. BHALLA:  Well, Your Honor, I think that
14     Mr. Roark provided testimony about the policy, about
15     whether or not the policy was followed, about whether
16     or not -- what the situations regarding the policy
17     were.  I think, if we're looking at consistency, that
18     Mr. McReynolds should be allowed to testify regarding
19     the same things.
20          Also, Your Honor, the Government has never
21     filed an objection to Mr. McReynolds being qualified
22     as an expert despite our expert notices being filed a
23     while ago.
24          THE COURT:  Well, if I understood it, the
25     Government didn't understand what he was going to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    testify about until today.  There was no written

2    report.  And the question was whether he was going to

3    come in and talk about classifications in general,

4    which is the impression I had, that he was going to

5    talk about classifications in a general way, and this

6    isn't where you put people, and things like that; not

7    specifically talking about what had occurred

8    factually in this case.

9              If you can show me your notice, I'd be glad

10   to look at it and be corrected on that.  But I think

11   that was the reason -- the Government didn't know

12   exactly what he was going to testify about.

13             MS. BHALLA:  Well, Your Honor, I believe in

14   our original notice, we did indicate that he was

15   going to testify --

16             THE COURT:  If you have the notice --

17             MS. BHALLA:  I can get it.  I didn't print

18   it off and bring it with me, Your Honor, because I

19   didn't anticipate this being an issue.

20             I also filed a supplemental notice, as

21   requested by the Court, I believe on Monday.  And so

22   that has been filed as well.

23             But if you could give me a second, I can go

24   get a copy of that, or at least pull it up from

25   Pacer.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                 1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

283

```
 1            THE COURT:  All right.  But you're using
 2    your time here to do those things.  It's up to you
 3    how you want to use the next 15 minutes.
 4            MS. BHALLA:  I understand that, Your Honor.
 5    But I don't really see that I have a choice at this
 6    point, because if I'm not allowed to elicit testimony
 7    from our witness about the policies and procedures
 8    and about the classifications, I'm not sure how we're
 9    going to proceed.  So, if the Court wants a copy of
10    the original notice to -- so that we can show you
11    he's going to testify about classification procedures
12    and policies, and how inmates were housed, I think
13    that the Government has been put on sufficient notice
14    to that issue.
15            THE COURT:  All right.  I'm not sure it's
16    going to change any of my rulings, but --
17            MS. BHALLA:  If it's not going to change
18    any of the Court's rulings, we can proceed.  But part
19    of what Mr. Roark testified today was to the policies
20    and procedures that were in place regarding the
21    movement of these inmates.  And so I would like to be
22    able to ask him about those policies and procedures.
23    BY MS. BHALLA:
24        Q.   Mr. McReynolds, are you aware of general
25    policies and procedures regarding placement inmates
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN**
**& ASSOCIATES,** Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

```
1    in Level 6?

2        A.   Yes.

3        Q.   I'm going to ask you to review what's been

4    marked as Government's Exhibit 47.  Can you tell us

5    what that document is?

6             MR. BECK:  Objection --

7        A.   That is a step --

8             MR. BECK:  Objection, Your Honor.  I think

9    we're getting into what a New Mexico Corrections

10   Department document is.

11            THE COURT:  I'm just not sure this witness

12   provides any testimony that the Court is going to

13   hear.  So, Mr. McReynolds, you may step down.  Thank

14   you for your testimony.

15            All right.  Where do we go as far as

16   witnesses on the motion?

17            MR. BECK:  I think Ms. Fox-Young may have a

18   witness.

19            THE COURT:  Ms. Fox-Young, do you want to

20   bring your witness, Ms. Fox-Young?

21            MS. FOX-YOUNG:  Thank you, Your Honor.  Mr.

22   Perez calls Dr. Heather Brislen.

23            THE COURT:  Dr. Brislen, if you'll stand

24   next to the witness box before you're seated, Ms.

25   Standridge will swear you in.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      HEATHER BRISLEN,
 2        after having been first duly sworn under oath,
 3        was questioned and testified as follows:
 4                    DIRECT EXAMINATION
 5             THE CLERK:  Please be seated.  State your
 6   name and spell it for the record.
 7             THE WITNESS:  Thank you.  My name is
 8   Heather, H-E-A-T-H-E-R; Brislen, B-R-I-S-L-E-N.
 9             THE COURT:  Ms. Brislen, is it doctor,
10   or --
11             THE WITNESS:  Yeah.
12             THE COURT:  Dr. Brislen.  Ms. Fox-Young.
13   BY MS. FOX-YOUNG:
14        Q.   Good afternoon, Dr. Brislen.  What is your
15   profession?
16        A.   I'm an internal medicine physician.
17        Q.   And where do you practice?
18        A.   I practice in a couple of capacities in
19   Albuquerque, New Mexico.  I have my own private
20   primary care practice.  And I'm also a clinical
21   faculty member at the University and the VA, where I
22   teach internal medicine residents.
23        Q.   How long have you been doing that?
24        A.   Since about 2011.
25        Q.   So for the past six-plus years?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Right.

2        Q.    And where did you complete your training?

3        A.    At the University of New Mexico.

4        Q.    And that was medical school?

5        A.    Right.  I did medical school at UNM,

6   between 2003 and 2007; residency then from 2007,

7   2011.  I also -- my first job after that was at the

8   VA, and I did clinical informatics training, along

9   with my initial junior faculty position there, while

10  I did primary care.

11              MS. FOX-YOUNG:  Your Honor, just a moment,

12  please.

13              THE COURT:  Certainly.

14              MS. FOX-YOUNG:  Thank you, Your Honor.

15       Q.    Are you aware, Dr. Brislen, that you have

16  been tendered as an expert in this case to give

17  opinions on internal medicine?

18       A.    That's my understanding, yes.

19              MS. FOX-YOUNG:  And Your Honor, I'll again

20  ask the Government if the Government objects to Dr.

21  Brislen giving any opinions as to this hearing?  If I

22  need to lay a better foundation and go through her

23  background, I can.  She was noticed up properly.  And

24  I think the Court found that we didn't need to file a

25  supplemental notice for her.  She was -- the expert

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that the Court did not order us to supplement on
 2    Monday.  So I don't have a document number, but her
 3    CV has been provided.
 4              THE COURT:  Hold on just a second.  Let's
 5    see what Mr. Beck --
 6              MR. BECK:  We'll stipulate to her expertise
 7    for this hearing.
 8              THE COURT:  All right.  And you don't have
 9    any objection to her offering opinion testimony on
10    internal medicine?
11              MR. BECK:  Not for this hearing, Your
12    Honor.
13              THE COURT:  All right.  Anybody else have
14    an objection?
15              All right.  Dr. Brislen can offer opinion
16    testimony on internal medicine.
17              MR. BECK:  May we request which document
18    number she's noticed as an expert in?
19              MS. FOX-YOUNG:  Your Honor, it's Document
20    1050, filed April 5.
21              MR. BECK:  Thank you.
22              MS. FOX-YOUNG:  And we also noticed her
23    within that broader category of internal medicine, to
24    testify as to her opinions on outpatient care and
25    clinical informatics, specifically care for medically
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    complex patients.  I don't know if the Government
 2    will stipulate --
 3              MR. BECK:  We'll stipulate.
 4              THE COURT:  No objection to her testifying
 5    on opinion testimony in those areas?
 6              MR. BECK:  No objection.
 7              THE COURT:  Anyone else?
 8              All right.  She may offer opinion testimony
 9    in those areas.
10    BY MS. FOX-YOUNG:
11         Q.   Dr. Brislen, did you review records
12    pertaining to Rudy Perez in the course of your
13    preparation for work as an expert in this case?
14         A.   Yes.  I've reviewed extensive medical
15    records, both in print and digitally provided,
16    spanning -- 1992 was the earliest, though the bulk of
17    the comprehensive set is 2000 to the present.
18         Q.   So from 1992, to the present you looked
19    at --
20         A.   That's right.
21         Q.   And do some of those records detail Mr.
22    Perez' physical health?
23         A.   Yes.
24         Q.   And do some of them detail his mental
25    health?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

289

```
 1          A.    Yes.
 2          Q.    And do they address physical trauma that he
 3    sustained?
 4          A.    Yes.
 5          Q.    And his mobility?
 6          A.    Yeah.
 7          Q.    Can you tell me, can you tell the Court
 8    what physical diagnoses he has?  And I understand
 9    it's a long period of time.
10          A.    Sure.
11          Q.    I'd like specifically to know if you can,
12    relying on your work and the records, what physical
13    diagnoses he had in February of 2016?
14          A.    Sure.  I think what makes that complicated
15    is that he's had a really remarkable history in both
16    physical, violent trauma, accidental trauma, and
17    surgical trauma.  So he has compounded issues that
18    sort of have occurred in layers, affecting his
19    ability to be mobile and physically healthy.
20               If you were categorizing where he is right
21    now, I would say the primary issues are he's had a
22    number of traumas and surgeries to his abdomen and
23    thorax, which have resulted in really profound
24    alteration of normal musculature.  So his posture is
25    off, his ability to carry himself without falling is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    off.  And the structural health of his abdomen is

 2    permanently altered.

 3              Internally, he had a dramatic small bowel

 4    obstruction with perforation in 2012, that required

 5    further surgeries, revealing that all of these

 6    different injuries that he's had over time have

 7    developed into a lot of scar tissue.  That makes him

 8    vulnerable not only to digestive issues now, but also

 9    permanently at very high risk for re-obstruction.

10    Devastating sort of intestinal complications --

11         Q.   Okay.  And not to interrupt you, but you

12    heard Mr. Perez testify earlier about a surgery, and

13    that he had been sick and been out.  That was for the

14    intestinal blockage you're describing?

15         A.   That's right.

16         Q.   You also looked at records that pertained

17    to Mr. Perez' IQ and his mental debility?

18         A.   That's right.  Just to comment real quick,

19    there has been sort of almost too many to count

20    musculoskeletal injuries to his extremities, which

21    affect his ability to walk, and permanent sort of

22    disability there as well.

23              For his mental health, he's under pretty

24    continuous psychological care.  And the notes

25    comprehensively add up pretty clearly to some --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. BECK:  Objection, Your Honor.  I'm not
 2    sure she can offer opinion testimony about mental
 3    health conditions.  I understood she's an internal
 4    medicine doctor and will offer opinions about
 5    outpatient care and clinical care.  I think the
 6    medical records may speak for themselves, when they
 7    talk about a mental conditions.  But I was under the
 8    understanding she was an expert in medical
 9    conditions.
10              THE COURT:  Well, why don't you lay a
11    foundation.  See what background she has for mental.
12         Q.   As part of your training, your medical
13    training, have you studied psychiatric care?
14         A.   I would say I'm not a psychiatrist, but
15    garden variety psychiatric issues are within the
16    scope of what I do.  And that would include
17    depression, anxiety, PTSD, a variety of supportive
18    care under shared care with a psychiatrist for
19    anything more complex than that.
20         Q.   So you also have experience treating
21    patients for those types of issues?
22         A.   That's right.
23         Q.   In addition to your medical trainings?
24         A.   Right.
25              THE COURT:  Well, I think that so many
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    internists do some mental health.
 2            MR. BECK:  I think that's sufficient, Your
 3    Honor.
 4            THE COURT:  You know, she's not trying to
 5    overdo what an internist, I think, does these days.
 6    So I'll continue to allow her to testify.  If you
 7    think it's getting into psychiatry, then you can
 8    reraise the issue.
 9            Ms. Fox-Young.
10            MS. FOX-YOUNG:  Thank you, Your Honor.
11    BY MS. FOX-YOUNG:
12       Q.   And so, Dr. Brislen, along those lines, I
13    think you were starting to say you have reviewed
14    records that pertain to Mr. Perez' mental condition,
15    and also to any medications that he was taking for
16    mental health?
17       A.   That's right.  So he's had mood disorders
18    pretty much throughout the time of the records that I
19    covered, and has been taken from antipsychotics, like
20    Haldol, to -- at the time that we're talking about,
21    he was taking Nortriptyline, which I understood to
22    be -- it's a tricyclic antidepressant, which you can
23    use both for depressive symptoms, mood stabilization,
24    also pain control.
25       Q.   And have you looked at any records that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   pertain to his IQ?

2         A.   Yes.   Actually, that's almost always

3   included in his intake visit at every facility that

4   he's been at, that he's known to have a low IQ,

5   innate since childhood, as well as mood disorders

6   kinds of things.

7         Q.   And that's seen throughout the records?

8         A.   Right.

9         Q.   Do you know if he has any neurological

10  conditions?

11        A.   Yes.   He has seizure disorder, which I

12  think is a major part of his overall health picture.

13  His seizure disorder was known to have existed

14  already in 1992.

15             Subsequent to that, he had a number of

16  traumatic brain injuries from -- one was a violent

17  episode, and then a number of car accidents.   A

18  couple of those were noted to significantly worsen

19  his seizure disorder.   And then he's got

20  throughout -- this is sort of another theme in his

21  health records, is that changing his antiseizure

22  medications in order to get better control; he's done

23  a number of laboratory studies that show that his

24  therapeutic levels of those medications is not high

25  enough to give him adequate control.

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                             Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                     1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

294

```
 1              And then a really sort of profound thing
 2    that happened during those hospitalizations, when he
 3    was acutely sick, and in and out of the sort of
 4    incarceration medical facility and University
 5    Hospital, he was diagnosed with status epilepticus,
 6    which is a life-threatening emergency seizure.  He
 7    had a single seizure that lasted eight days.
 8         Q.   Can you give us the time period for the
 9    status epilepticus diagnosis?
10         A.   Yes.  That, I believe, was in May of 2013.
11         Q.   And he had a seizure that lasted how long?
12         A.   Eight days.
13         Q.   And after that time, his medication was
14    changed?
15         A.   His medication was changed.  And what was
16    interesting about that seizure was it was revealed
17    that he not only has classic tonic-clonic
18    shaking-type seizures, but he also has these
19    subclinical seizures, which is, you know, to an
20    outsider, looks sort of like spacing out, not
21    participating in conversation, maybe a period of
22    lapsed cognition.  But it's not classically
23    identifiable as a seizure.  But because it's a
24    generalized seizure, the person having the seizure
25    may also not be aware that they are having or have
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                     e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    had a seizure.
 2              So that particular episode medically was
 3    very interesting, and a number of different
 4    neurologists saw him at UNM.  And he was discharged
 5    on a new medication that he hadn't taken before
 6    called lacosamide at that time.  He's no longer on
 7    that medication now.
 8         Q.   Okay.  Jumping forward from that time to
 9    January and February 2016, you reviewed the records
10    that indicate what medications Mr. Perez was
11    prescribed?
12         A.   That's right.
13         Q.   Can you tell the Court what medications he
14    was prescribed during that period?
15         A.   I can.  And if you'll -- things were kind
16    of in flux, so let me tell you a little bit of a
17    story there, too.  When he first transitioned to that
18    facility, PNM, he was taking gabapentin, initially,
19    which was used, in his case, for neuropathic pain.
20    So he's got a number of pain issues, I would imagine,
21    due to his musculoskeletal disorders and trauma.  So
22    he was switched from a medication called gabapentin,
23    to a medication called Trileptal.  Trileptal is an
24    anti-seizure medication, but in his case at that
25    time, it was being used to control his pain.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          There are a number of recorded notes

2    between P.A. Martinez, who we met yesterday, and

3    Rudy, that his pain was not well controlled at that

4    time.  And on January 21, his medication was

5    switched.  And that was a switch made from Trileptal

6    to Nortriptyline, which I mentioned earlier, is an

7    antidepressant that can also be used for pain.

8          The problem in that case, though, is even

9    in a healthy person without a seizure disorder, you

10   can't stop Trileptal cold turkey or it will

11   precipitate seizures.  Because it's neuroactive pain

12   medication, it acts on your brain in particular, and

13   it can lower the seizure threshold.  So that

14   medication needs to be weaned off over four to six

15   weeks.  Unfortunately, it wasn't done that way.

16         So starting at the end of January 2016, he

17   had a medication error that would have predisposed

18   him to seizures.  Again, he had several -- we know

19   that he had at least two different kinds of seizures

20   that he was prone to, both obvious shaking,

21   tonic-clonic-type seizures, and also these

22   subclinical or partial or nonshaking-type seizures.

23         THE COURT:  Ms. Fox-Young, let's talk a

24   little bit about scheduling.  How much longer do you

25   have with this witness?  Because we're past 5:30.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. FOX-YOUNG:  Three minutes, Your Honor,
 2    or less.
 3              THE COURT:  All right.
 4              MS. FOX-YOUNG:  She talks fast.
 5              THE COURT:  That creates other problems.
 6        A.   Did you want me to go through more of his
 7    medications at the time of --
 8        Q.   Dr. Brislen, I'd just like to ask you,
 9    specifically in February 2016, was Mr. Perez taking
10    any opiates?
11        A.   He was taking tramadol twice a day.  And
12    we -- there is some controversy about whether or not
13    to classify tramadol as an opiate.  Tramadol is a
14    synthetic medication that's sort of like a lesser
15    cousin of classic pain control opiates, like --
16        Q.   Okay.  Sorry to interrupt.  We heard
17    Dr. French testify about tramadol and the way
18    Suboxone can overtake -- like it overtakes tramadol.
19    Are there any other opiates -- and I understand maybe
20    tramadol is not properly characterized as an
21    opiate -- any other opiates that Mr. Perez was
22    taking?
23        A.   No, nothing administered or prescribed.
24              MS. FOX-YOUNG:  Your Honor, I pass the
25    witness.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1            THE COURT:  All right.  Thank you, Ms.
2    Fox-Young.
3            Any of the defendants have questions of Dr.
4    Brislen?
5            Mr. Beck.  How long do you think your cross
6    will last?
7            MR. BECK:  I think it should be short, Your
8    Honor.
9            THE COURT:  All right.
10                       EXAMINATION
11   BY MR. BECK:
12       Q.  And I'm trying to catch up, because you did
13   speak really fast.
14       A.  I'm facing the clock.
15       Q.  No, no, I got you.  That, plus my
16   handwriting is very difficult.  You said at the end
17   there -- and I'll work my way back I guess -- that
18   Mr. Perez was taking no other opiates prescribed.
19   Was that your testimony?
20       A.  That's right.
21       Q.  Was he taking opiates that weren't
22   prescribed?
23       A.  I wouldn't know.
24       Q.  You didn't see anything in the medical
25   records that reflect he was taking opiates that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    weren't prescribed?

 2         A.   Correct.

 3         Q.   And other than what you've heard from him

 4    or his attorneys, do you have any other evidence he

 5    was taking opiates that weren't prescribed?

 6         A.   No.

 7         Q.   Did you listen to the recordings of Mr.

 8    Perez that have been entered into evidence in this

 9    hearing?

10         A.   No.

11         Q.   Did you form an opinion whether he was

12    having any kind of seizure during those recorded

13    conversations?

14         A.   No.

15         Q.   Did you form an opinion whether he had

16    seizures at any specific times during February of

17    2016?

18         A.   I think, you know, similar to what his

19    primary care provider, P.A. Martinez, said yesterday.

20    It would be hard to know for anyone, including Rudy

21    himself.  But my answer is no, I don't have an

22    opinion.

23         Q.   That's a no.

24              MR. BECK:  Nothing further, Your Honor.

25              THE COURT:  All right.  Thank you, Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Beck.
 2            Anyone else?  Ms. Fox-Young, redirect?
 3            MS. FOX-YOUNG:  Your Honor, just one
 4   question, I think.
 5                    REDIRECT EXAMINATION
 6   BY MS. FOX-YOUNG:
 7       Q.   Dr. Brislen, how would you describe Mr.
 8   Perez' general medical health in February 2016?
 9       A.   Gosh, it's hard to narrow that down.  I
10   would say his general health was fragile, and I would
11   characterize him as very high risk of seizures.  If I
12   was his provider at that time, that would have my
13   primary concern, in addition to falls.
14            MS. FOX-YOUNG:  Thank you, Your Honor.  No
15   further questions.
16            THE COURT:  Thank you, Ms. Fox-Young.
17            Dr. Brislen, you may step down.  Thank you
18   for your testimony.
19            All right.  I'm about to finish up on the
20   opinion for the severance motion for Mr. Sanchez.  So
21   I'm going to get that out the door.  If y'all have
22   something else you want me to reconsider, think
23   harder about -- Ms. Sirignano?
24            MS. SIRIGNANO:  Judge, we filed a notice
25   regarding the 4275, the Garcia drug case, which you
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   requested to be brought into this case.
 2              THE COURT:  I'll tell you what to do:  If
 3   you've got a list, tomorrow when y'all are talking to
 4   Ms. Wild, give her that list.  Okay?
 5              MS. SIRIGNANO:  I will, Judge.  It's been
 6   filed and I'll give one to her.
 7              THE COURT:  All right.  So there is a
 8   notice that tells me what I need -- yeah, I've seen
 9   that.
10              MS. SIRIGNANO:  Yes, Judge.
11              THE COURT:  Is everybody in agreement?  If
12   somebody thinks something ought to go ahead of Ms.
13   Sirignano's motions from the Garcia drug case that
14   we're smoothing over here, let me know.  Otherwise,
15   I'll take Ms. Sirignano's as the line-up.
16              All right.  I'll see y'all at 9:00.
17   Lawyers need to talk to Ms. Wild to get the schedule
18   down, what we're doing on Wednesday.
19              Thanks for everybody's hard work.  Be safe.
20   Have a good weekend.  See y'all on Monday.
21              (The Court was adjourned.)
22
23
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1               C-E-R-T-I-F-I-C-A-T-E

2

3   UNITED STATES OF AMERICA

4   DISTRICT OF NEW MEXICO

5

6

7        I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8   Official Court Reporter for the State of New Mexico,

9   do hereby certify that the foregoing pages constitute

10  a true transcript of proceedings had before the said

11  Court, held in the District of New Mexico, in the

12  matter therein stated.

13       In testimony whereof, I have hereunto set my

14  hand on December 20, 2017.

15

16

17

18  _____
                Jennifer Bean, FAPR, RMR-RDR-CCR
19              Certified Realtime Reporter
                United States Court Reporter
20              NM CCR #94
                333 Lomas, Northwest
21              Albuquerque, New Mexico 87102
                Phone:  (505) 348-2283
22              Fax:    (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com