```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5         VS.                        CR. NO. 15-4268 JB

6    ANGEL DELEON, et al.,

7         Defendants.

8                        VOLUME 1

9         Transcript of Combined Motions to Suppress
     Proceedings and Daubert Hearings before The Honorable
10   James O. Browning, United States District Judge, Las
     Cruces, Dona County, New Mexico, commencing on
11   December 18, 2017.

12
     For the Government:  Ms. Maria Armijo; Mr. Randy
13   Castellano; Mr. Matthew Beck

14   For the Defendants:  Mr. Brock Benjamin; Ms. Cori
     Harbour-Valdez; Mr. Patrick Burke; Mr. Robert Cooper;
15   Mr. Jeff Lahann; Mr. Orlando Mondragon; Mr. John
     Granberg; Mr. Billy Blackburn; Mr. Scott Davidson;
16   Ms. Amy Jacks; Mr. Richard Jewkes; Ms. Amy Sirignano;
     Mr. Christopher Adams; Mr. Marc Lowry; Ms. Theresa
17   Duncan; Ms. Carey Bhalla; Mr. William Maynard; Ms.
     Justine Fox-Young; Mr. Donovan Roberts; Ms. Lisa
18   Torraco; Ms. Angela Arellanes; Mr. Jerry Walz

19
     For the Defendants (Via telephone):  Mr. James Castle
20

21

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1              THE COURT:  All right.  Good morning

2    everyone.  Let's grab a seat.  It looks to me like

3    everybody has at least one attorney.  So make sure

4    you look around, check for your co-defendants, and

5    make sure everybody has an attorney.

6              I don't think there is a big change in

7    attorneys from last week.  I know, Mr. Villa, you're

8    on the telephone, and you will be gone this afternoon

9    and tomorrow; is that correct?  Mr. Villa, are you

10   there?  Got your mute button on?  Mr. Villa?  All

11   right.  Well, that's what I understand his situation

12   is; is that correct?

13             MS. FOX-YOUNG:  Your Honor, Mr. Villa is

14   going to call in for portions.  He might just be

15   getting on momentarily.

16             THE COURT:  All right.  And I understand

17   Raquel, your paralegal, is going to be calling in?

18             MS. HARBOUR-VALDEZ:  Yes, Your Honor.

19             THE COURT:  Are you on the phone?

20             MS. RODRIGUEZ:  I'm here.

21             THE COURT:  All right.  Ms. Rodriguez, good

22   morning to you.

23             Any other changes in counsel this morning?

24             All right.  I understand from Ms. Wild and

25   Ms. Standridge that you have the same thing I have in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES,** Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

```
 1   front of me, and that is the notice, the batting
 2   order for this week.  And so the only other thing I
 3   know to mention to you is I think that Ms. Wild has
 4   been in touch with you about the jury questionnaires,
 5   putting those into your hands.  So if there is any
 6   questions on that, we can discuss it.  Otherwise, I
 7   assume Ms. Wild has discussed that.
 8             Ms. Wild, you're on the phone as well this
 9   morning; correct?
10             THE CLERK:  I am, Judge.
11             THE COURT:  Is there anything I should go
12   ahead and put on the record about the jury
13   questionnaires?
14             THE CLERK:  I don't think so.  I sent out
15   that email.  So just to confirm they received the
16   email and the rolling production and the date set.  I
17   don't have the information.  I think it should be
18   accurate.
19             THE COURT:  How long is the email?
20             THE CLERK:  The email is not very long.
21             THE COURT:  Why don't you go ahead and read
22   it into the record so it's in the record.  You and I
23   have talked about it, but I think it would be good if
24   I heard it and everybody else and it's on the record.
25             THE CLERK:  Sure.  I sent an email this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   morning to Ms. Armijo, Mr. Sirignano, and Ms.
 2   Harbour-Valdez that stated the following:
 3            "Good morning.  Please let the parties know
 4   that the juror questionnaires will be distributed
 5   electronically to counsel for the Group 1 defendants
 6   on a rolling basis, as follows:  December 20 -- there
 7   is a typo; it should say 2017 -- December 27, 2017,
 8   and January 3, 2017 (sic).  Please let me know if you
 9   have any questions or concerns."
10            THE COURT:  All right.  Ms. Harbour-Valdez,
11   did you have anything you wanted to say on that?
12            MS. HARBOUR-VALDEZ:  Your Honor, I hadn't
13   circulated that to the group yet.  But now that it's
14   in the record, it's taken care of.
15            THE COURT:  All right.  Everybody knows.
16   Anybody have any comments on that?  All right.
17            Thank you, Ms. Wild.
18            All right.  What I think is originally
19   noticed for today is the defendant's motion for order
20   to show cause for noncompliance of district court
21   orders during the May 9 through the 10th hearings.
22   It looked like that was mostly yours, Ms. Sirignano.
23   Are you going to take the lead on it?  What is left?
24   It looked like y'all were getting things resolved.
25   But tell me what issues are left for us to resolve.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Maybe we'll take them one at a time and deal with
 2    them that way.
 3            MS. SIRIGNANO:  Good morning, Your Honor.
 4    Amy Sirignano for Christopher Garcia.
 5            THE COURT:  Ms. Sirignano.
 6            MS. SIRIGNANO:  Mr. Lowry is going to take
 7    the lead on this one.
 8            THE COURT:  All right.  Thank you, Ms.
 9    Sirignano.
10            Mr. Lowry.
11            MR. LOWRY:  Thank you, Your Honor.  I
12    conferred with the United States this morning, Your
13    Honor.  I think your instincts are correct.  We've
14    narrowed this down a bit.  And I'm reading off of the
15    reply brief on page 2.  With regard to the rough
16    notes, I believe that the United States has indicated
17    to us that they have preserved all the rough notes.
18    And they've indicated that they're considering them
19    to be Jencks material to be produced on the Jencks
20    timeline.  I know that there is at least a handful
21    that we think may fall into the Brady, Giglio.  I
22    didn't get a chance to speak with Ms. Armijo about
23    that.  But it comes to mind, the February 19 debrief
24    with Eric Duran.  So if we could just again request
25    that the United States do their Brady-Giglio review
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    for those materials, to see if there is exculpatory.

2              THE COURT:  This is the Eric Duran 302?

3              MR. LOWRY:  Yes, Your Honor.  And there was

4    an audio-taped conversation, a sit-down at the FBI

5    office in Santa Fe that was associated with that.

6    That's been produced in full.  I guess my concern is

7    the rough notes may indicate that there is more to

8    that meeting than the tape recorder captured.  I

9    think, if I remember correctly, Ms. Armijo didn't

10   seem to think that that was the case.  But I don't

11   have the luxury of looking at the rough notes to

12   understand that or not.  So --

13             THE COURT:  All right.  Do you want to --

14   let's take these one at a time.  Anybody else have

15   anything on that?

16             All right.  Ms. Armijo.

17             MS. ARMIJO:  Your Honor, I believe that

18   what we indicated was we would review all the --

19   there would be a review of the notes for

20   Brady-Giglio.  I don't know that we agreed

21   necessarily that they would be disclosed.  However,

22   they are being preserved at a minimum.  I'll get

23   to -- and I think Mr. Lowry and I had briefly talked

24   about this right before court, and we had agreed to

25   kind of talk over a break to try and resolve some of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE                                        e-mail: info@litsupport.com

```
 1    these issues, because there is a couple of things
 2    that I had questions for him about.  So that might be
 3    a better use of our time, because most of it, I
 4    think, is resolved, and we're working on a couple of
 5    other issues.
 6              THE COURT:  Well, if it's Jencks material,
 7    of course, what I've said in the past, you don't have
 8    to disclose it till Jencks requires you to disclose
 9    it.  But if it is Brady or Giglio material, I take a
10    little different position than the Government does;
11    that needs to be turned over immediately.  So if you
12    do you find some Brady and Giglio material in here,
13    Duran 302s or materials, then those need to be
14    produced immediately.
15              MR. LOWRY:  Your Honor, I want to echo what
16    Ms. Armijo said.  We had -- before court began this
17    morning, we were working constructively through what
18    few differences we have left.  And I don't know if
19    the Court's preference is to hold off on this to
20    maybe right after the lunch break.
21              THE COURT:  All right.  Why don't we do
22    this:  Unless somebody has an objection, we'll put it
23    aside, and see if y'all have any disputes.  If there
24    are disputes, I'll put it on you, Mr. Lowry and Ms.
25    Sirignano, to tell the Court.  Otherwise, I'll assume
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   all the disputes have been resolved here.  And y'all
 2   tell me if you don't have it, you'll bring it back
 3   up.
 4              MR. LOWRY:  Thank you, Your Honor.  If
 5   necessary we'll bring it right back after the lunch
 6   hour.
 7              THE COURT:  All right.  I understand the
 8   next portion of the hearing will be the resuming of
 9   the presentation of evidence and argument on the
10   motion to suppress involuntary statements.  This is
11   1294 and 1295.  Are these the two we're taking
12   together?
13              MS. FOX-YOUNG:  Yes, Judge.
14              THE COURT:  All right.  So who has got
15   presentation of evidence?  Do you have it, Ms.
16   Fox-Young?
17              MS. FOX-YOUNG:  Your Honor, for Mr. Perez
18   we have no further witnesses.
19              THE COURT:  All right.  Mr. Maynard, do you
20   have witnesses you want to present?
21              MR. MAYNARD:  Your Honor, we've discussed
22   whether to present witnesses, or in lieu of a
23   witness, an affidavit.  And I would like to present
24   in support of Mr. Herrera's motion to suppress the
25   affidavit as an exhibit, the affidavit which is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   attached to the motion itself regarding the
 2   conditions of -- the segregation conditions that he
 3   was in, and receipt of Suboxone from Mr. Cordova in
 4   support of a motion to suppress.
 5              THE COURT:  All right.
 6              MR. MAYNARD:  And that's the end of our
 7   evidence.  We rest.
 8              THE COURT:  All right.  What is this going
 9   to be marked as, as an exhibit in this hearing?
10              MR. MAYNARD:  I need to talk to counsel and
11   see if --
12              MS. BHALLA:  I believe it's J.
13              MR. MAYNARD:  CH-J.
14              THE COURT:  All right.  Help me out, Ms.
15   Bhalla.  Is that where you were on the hearings for
16   the 1294 and 1295?
17              MS. BHALLA:  I believe so, Your Honor.
18              THE COURT:  I have that as your next
19   exhibit; correct?
20              MS. BHALLA:  Yes, Your Honor.
21              THE COURT:  Ms. Standridge, do you agree
22   with that?
23              THE CLERK:  Yes.
24              THE COURT:  All right.  Any objection to
25   that from any other defendants?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              How about you, Ms. Armijo?

 2              MS. ARMIJO:  No, Your Honor.

 3              THE COURT:  All right.  So Carlos Herrera's

 4    Exhibit J will be admitted into evidence.

 5              All right.  Any further witnesses or

 6    evidence, Mr. Maynard?

 7              MR. MAYNARD:  No, Your Honor.

 8              THE COURT:  How about any other defendants?

 9    Anybody else have anything on 1294, 1295 they want to

10    present?

11              All right.  Ms. Armijo, does the Government

12    have rebuttal evidence or evidence it wishes to

13    present?

14              MS. ARMIJO:  We do not.

15              THE COURT:  All right.  Are the defendants

16    ready to argue the motion?  Ms. Fox-Young?

17              MS. FOX-YOUNG:  Thank you, Your Honor.

18              THE COURT:  Ms. Fox-Young.

19              MS. FOX-YOUNG:  As the Court heard in Mr.

20    Perez' opening argument -- and the Court is well

21    aware and familiar with the standard -- it is the

22    Government's burden to prove the constitutionality of

23    any statements made by Mr. Perez, the statements at

24    issue in this case.

25              The Court knows that a finding of coercion
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    does not depend -- need not depend upon actual

2    violence by a Government agent, and that a credible

3    threat is sufficient, and that that threat might be

4    mental or physical.  And that comes from Fulminante,

5    which of course we cite, at 49 U.S. 279, at 287.

6               Without rehashing everything that we

7    briefed, and the information that's contained in our

8    pleadings, I would just like to draw the Court's

9    attention to some of the evidence that came out in

10   the course of the hearing.  The Court heard first

11   about Mr. Perez' health -- not first in the hearing,

12   but it's a critical factor -- the Court heard from

13   Dr. Brislen, who at the end of our hearing on

14   Wednesday described Mr. Perez as extremely fragile.

15   She talked about the documentation, the evidence of a

16   series of physical traumas to Mr. Perez, the multiple

17   organ system problems that he had at the time of

18   February 2016, his persistent and uncontrolled

19   seizures, a low IQ that he had had documented since

20   childhood, anxiety, severe pain for which he took

21   tramadol and gabapentin.  She talked about his

22   seizure medication, which was changed in January of

23   2016, right before the statements that he made to

24   Billy Cordova, and talked about how it wasn't

25   tapered, and should have been.  Also talked about his

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  diabetes, abdominal problems, and other psych

2  disorders.

3          Clearly, Mr. Perez' physical and mental

4  health was well evident to the Corrections

5  Department.  He had a walker outside his cell.  And

6  the Court heard from Physician's Assistant Martinez

7  who said that he saw Mr. Perez approximately twice

8  weekly during this time for various maladies.  He was

9  taken to and from those appointments by correctional

10  officers.

11          The Court also knows that Mr. Perez had

12  been in segregation all told at PNM, was a total of

13  10 months.  He had been there since the summer of

14  2015.  And prior to that, he was held in segregation

15  at another facility.  But he had been in segregation

16  at PNM Level 6 since June of 2015.  The Court heard

17  that that was not pursuant to the Department's

18  policy, which is only instructive insofar as it

19  demonstrates that the Department was looking for

20  reasons to hold Rudy Perez, reasons contrary and

21  outside of policy, to hold Rudy Perez so that they

22  could extract statements from him.  And, you know,

23  the Court will see that in the Government's response,

24  the Government says Mr. Perez was not specifically

25  targeted to be placed in restrictive housing.  He was

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                              1-800-669-9492
                                                   e-mail: info@litsupport.com



1    held there because he needed a handicapped cell,

2    because he was an SNM member, because he'd had

3    discipline.  There is no documentation of this.

4         What there is documentation of is that well

5    over a year after the Department had closed the books

6    on the Molina investigation, they shipped Mr. Perez

7    to Santa Fe and held him at PNM, and had no

8    justification for it.  He didn't have a hearing.

9    There was no credible threat as required by -- and I

10   don't have the exhibits in front of me, if the Court

11   would like to go through them -- but as required by

12   the Corrections Department policies.  They just held

13   him there because they wanted to put him in a corner

14   cell next to Billy Cordova and work to extract

15   statements.

16        The Court heard from Mr. Roark about the

17   deleterious effects of holding somebody in

18   segregation.  And I know the Court has heard various

19   other cases in the criminal and civil context, and

20   probably could take judicial notice of the effects of

21   living in solitary, with little to no rec, no access

22   to other people, to sunlight.  The Court saw the cell

23   where Mr. Perez was housed in the video.  And just

24   very limited stimulation for weeks and weeks and

25   weeks on end.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.                                                                  1-800-669-9492
PROFESSIONAL COURT                                                                 e-mail: info@litsupport.com
REPORTING SERVICE

```
 1           So at the time, then, that the Government
 2     places Mr. Billy Cordova, who had been opened as an
 3     informant and was acting as a government agent, in a
 4     cell next to Mr. Perez, the Government has already
 5     primed Mr. Perez to do what they want -- I mean, they
 6     want to extract statements.  The Court heard from
 7     Agent Acee that Mr. Cordova was instructed to record
 8     statements and he said to get bodies, to get whatever
 9     he could in order to get that information for
10     Mr. Acee.
11           I think Billy Cordova's testimony was very
12     illuminating for the Court.  One of the first things
13     he talked about were the pressure points that he used
14     to get Rudy Perez to talk.  And he said, Your Honor,
15     he confirmed absolutely the SNM was going to move on
16     Rudy Perez.  He said to this Court, "they were going
17     to move on him," meaning they were going to kill Rudy
18     because they thought that he was cooperating at the
19     time.
20           And he explained -- and for background, the
21     first indictment in this case was in November 2015.
22     Mr. Perez was not indicted.  And so rumors were
23     swirling around the prisons.  Cordova testified that
24     within days they knew the piece came from a walker,
25     and they assumed it was because Rudy talked, that's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   why SNM members, including Billy Cordova, thought
 2   that piece must have come from -- they thought that's
 3   why the Government knew where the piece came from.
 4   Everybody suspected Mr. Perez.  Mr. Perez knew it,
 5   and Billy Cordova knew it.  And that is the main
 6   pressure point, in Billy Cordova's language, that he
 7   used to extract statements.
 8           Mr. Cordova had every reason to do anything
 9   he could to get Mr. Perez to talk.  He was getting a
10   get out of jail free card from Agent Acee on the RICO
11   case.  Agent Acee made it very clear that Agent Neale
12   was going to stop compiling overt acts against Billy
13   Cordova if he cooperated, if he got statements.
14           I think the Court can also deduce from Mr.
15   Cordova's testimony that he really can't be trusted.
16   Agent Acee talked about how he had to close him as an
17   agent because he couldn't follow the rules and he
18   couldn't be controlled.  And the Court should take
19   that into consideration.
20           Next, the Court heard ample evidence, after
21   all of the evidence of Mr. Perez' frailty, his
22   situation, mental and physical, in February 2016,
23   this agent of the Government, Billy Cordova, gives
24   him Suboxone.
25           Now, Billy Cordova, of course, denied that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    on the stand.  And the Government will argue that
 2    there is no proof that he did provide it.  The Court
 3    heard on cross-examination that Cordova said he was
 4    never asked by the Government whether he had given it
 5    to Rudy, and didn't know it was the subject of a
 6    hearing.  He wouldn't cop to giving him Suboxone when
 7    he was on the stand, but he knew everything about
 8    Suboxone.  The Court heard him talk about using it in
 9    every facility except for he says didn't use it in
10    Clayton.  He talked about how he fished a line, how
11    he would fish a line, how he had fished lines through
12    the vents of the cells.  He walked through the video
13    from PNM and said exactly how it was done.  How much
14    it took to get high, when he would take it, how you
15    would get it.  He knew in and out everything there
16    was to know about Suboxone, and freely admitted that
17    he would use it, and he would share it if he had it.
18            The Court heard from Mr. Perez, of course,
19    who testified credibly that he had been given it, and
20    he had taken it on multiple occasions when he talked
21    to Billy Cordova.
22            The Court also heard from Dr. Edward
23    French, who testified both in direct and on cross
24    about the effect that Suboxone could have on
25    overbearing someone's will.  I think Ms. Armijo asked
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   him directly if that was possible.  And he said,

2   Absolutely, reduces judgment, reduces executive

3   function.  I think, when you look at Rudy Perez and

4   the state that he was in, the time that he had spent

5   in seg, the time -- or the numerous and escalating

6   physical and mental conditions that he had, then he's

7   given Suboxone, I think clearly could overbear his

8   will.  And it did.

9            I think when the Court looks at the

10  standard from Fulminante, and the Fulminante case

11  itself, the facts here really do parallel that case.

12  They come about as close as you can come to

13  Fulminante, given the circumstances here.

14            I'll note that the Tenth Circuit in United

15  States versus Gonzales; that's 164 F.3d 1285, at

16  1289, has discussed the relevant factors that courts

17  have identified in considering whether or not there

18  is coercion.  Those include the suspect's age,

19  intelligence, and education, the length of detention

20  and questioning, the use or threat of physical

21  punishment, and whether Miranda warnings were given,

22  and the accused's physical and mental

23  characteristics, the location of the interrogation,

24  and the conduct of the police officers.  One by one,

25  you know, the Court heard about Mr. Perez' age,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   intelligence, and education, and his extreme

2   debilitating physical conditions, his mental state.

3   He had been in seg for a long period of time, which

4   clearly had consequences and effects for him; the

5   conduct of the Corrections Department and the FBI and

6   Billy Cordova all working together to extract these

7   statements from him; the where he was placed; the

8   fact that he was placed in a cell where he could only

9   talk to Cordova, all really significant.

10        And you almost can check every box when you

11   look at these factors that have been identified.  I

12   think this is absolutely a clear, almost textbook

13   case of coercion under those cases.

14        The Court will likely remember the facts

15   from Fulminante, where the Supreme Court affirmed the

16   Arizona Supreme Court.  In that case, a prisoner had

17   confessed to a fellow inmate who was a paid

18   informant.  The prisoner, the defendant there, had

19   been in prison in New York, and he was befriended by

20   the CI.  The CI learned that he was a suspect in the

21   murder of his 11-year-old stepdaughter in Arizona.

22   And the CI told him, Look, I'll protect you from

23   other prisoners who have learned about the fact that

24   you're a suspected child killer, if you'll tell me

25   about the murder.  And he did.  And he did it for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    protection.  The CI then reported the confession to

2    police.  And Fulminante was charged.  At trial, the

3    court denied his motion to suppress, and he was

4    convicted.  And he was sentenced to death.  The

5    Supreme Court, on hearing this, explained that

6    because that CI's offer of protection was based on a

7    credible threat of violence, Fulminante's will was

8    overborne in such a way as to render his confession

9    the product of coercion.  And then the Court didn't

10   rely on these factors in that case, but talked again

11   about low intelligence, lack of education, small

12   stature, and feelings of vulnerability.

13          Mr. Perez, when you look at all these

14   factors that form the context for where he was in

15   February 2016, when he made these statements, he

16   absolutely was vulnerable.  And it was that threat,

17   Billy Cordova saying they were going to move on him,

18   that was in his mind, among other things, when he

19   made the statements.  Cordova knew that he could get

20   him to say virtually anything because he couldn't

21   protect himself.  He couldn't defend himself.  Mr.

22   Perez was largely immobile.  He was very sick.  He

23   knew that -- and as he told the Court, Billy Cordova

24   had a big mouth, and he would protect him if he gave

25   him what he needed.  And that's exactly what he did.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1            The Court I think is also well aware of the
 2    Guerro, G-U-E-R-R-O, decision; that's Tenth Circuit,
 3    983 F.2d 1001 at 1002.  That's a case from 1993.  And
 4    the Government cites it.  The Guerro court found that
 5    the police must overreach by exploiting a weakness or
 6    a condition known to exist in order to find coercion.
 7    That's exactly what happened here.
 8            And I think the Government -- we'll see
 9    what they have to say, but I think they'll likely
10    argue that, Look, Corrections Department put Rudy
11    Perez where they put him.  The FBI didn't know.  And
12    Billy Cordova just popped up in Level 6, and this
13    just happened.  That's not the way it works.  All
14    those entities and Mr. Cordova were working together
15    as government agents, and they exploited the
16    weaknesses and vulnerabilities in Mr. Perez, knowing
17    that there were rumors that he was cooperating, and
18    knowing that he feared for his life.
19            And that, Your Honor, is precisely what
20    makes the extraction of these statements coercive --
21    in our briefing we cite to -- I've given you
22    Gonzalez -- I think the Court in Tafoya looked
23    closely at this issue.  That's your case, Your Honor.
24    Of course, in Tafoya, the individual was Mirandized.
25    And all the cases point out that that's pretty
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492
                                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   significant.  Here, of course, Mr. Perez wasn't.  But
 2   I think if the Court looks to the cases that you
 3   cited in Tafoya, they are also instructive.  I'll
 4   also point the Court to Beecher versus Alabama case,
 5   where the Supreme Court held that the confession of a
 6   prison escapee, accused of rape and murder was
 7   involuntary, when he was questioned by investigators
 8   in an infirmary while he was under the influence of
 9   morphine for a gunshot he sustained.  The court heard
10   from Mr. French that Suboxone is stronger than
11   morphine.  And the cocktail that Mr. Perez was on, I
12   think, clearly makes the statements involuntary.
13         And unless the Court has any specific
14   questions, I will respond in a reply.
15         THE COURT:  I don't believe I have any at
16   this time.  Thank you, Ms. Fox-Young.
17         Mr. Maynard, Ms. Bhalla, do you have
18   argument on Mr. Herrera's part?
19         THE COURT:  Ms. Bhalla.
20         MS. BHALLA:  Thank you, Your Honor.  I'll
21   try to keep it brief.  I think that Ms. Fox-Young did
22   a good job going over the case law.
23         You know, Your Honor, I think it's
24   interesting that some of the testimony was that they
25   didn't know why these guys were in seg, or that it
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was part of the investigation.  The policy, when you

2    look at it, is pretty clear that they have to have a

3    real, justifiable reason why these guys were put in

4    administrative segregation.

5            And I think that the evidence that we've

6    submitted through the records shows that after the

7    Molina homicide, Mr. Herrera was put on lockdown from

8    the time of the homicide onward.  They're still in

9    administrative seg.  And that is absolutely a tool

10   that the Government can use to prime the pump to get

11   people ready to make statements.

12           One of the things I find the most

13   interesting about that argument is when you look at

14   the internal documents regarding Mr. Herrera, you see

15   that there were no articulable safety threats in any

16   of the other documents.  In fact, his classification

17   records indicated that he had no gang activity for

18   the past 10 years, and there were no active security

19   threats on his file, which tells you that that wasn't

20   done as part of the investigation into the Molina

21   homicide.  It was done for a specific purpose and for

22   a specific reason.

23           Mr. Cordova testified that drugs are life.

24   At first, he denied having this conversation with

25   Special Agent Acee.  But later, he admitted to him

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   that when Special Agent Acee brought him in to talk
 2   to him before he was put in the cell next to Mr.
 3   Herrera and Mr. Perez, Look, drugs are life.  And
 4   Special Agent Acee testified that he doesn't recall
 5   giving him any special instructions not to use drugs
 6   when he was placed next to Mr. Herrera, even though
 7   Mr. Cordova told Mr. Acee, and Mr. Acee was aware of
 8   the use of drugs.
 9            And I want to think about, or draw the
10   Court's attention to what happens in a typical
11   controlled substance bust.  When you've got an agent
12   working with an undercover person; they go to buy
13   drugs, they get searched.  They search them.  They
14   make sure they don't have any other money, they make
15   sure they don't have any other drugs, they make sure
16   it's a clean site, they send them, they do the bust,
17   they come back and then they make the arrest.  None
18   of that happened here.  And it happened for a reason.
19   They didn't search Cordova.  They didn't make sure he
20   wasn't using drugs.  They weren't checking his tape
21   or checking the recording out to make sure that there
22   were no tools of coercion being employed.  They
23   turned a blind eye to it because it was beneficial to
24   them.  And there is no doubt that Cordova was working
25   as an agent for the Government.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          I'm going to ask the Court to really take a

2     look at the transcripts that we admitted during this

3     hearing, and to look at Mr. Herrera's statement, and

4     to look at the number of inaudibles and the number of

5     stutters, and the number of times he's nonresponsive.

6          The evidence in the transcripts, where Mr.

7     Cordova is talking about how much he can get drugs

8     for, about purchasing drugs, about giving those drugs

9     to the people who were next to him in the cells.

10    There is ample evidence for the Court to find that

11    this was happening and that this was going on, and

12    that Mr. Herrera was impaired at the time he made

13    those statements, just by looking at the transcripts.

14    And Special Agent Acee himself testified that that

15    would be something he would consider as a DRE

16    officer:  A person's ability to comprehend,

17    understand, and respond to questions.

18          One thing that Fulminante and these other

19    cases talk about, one of the major reasons we have --

20    we have limits on this.  And one of the reasons the

21    Court should look at suppressing this is to prevent

22    future violations of the Constitution.  And that's

23    the question I have, you know, for the Court:  Is

24    this how we want to do business?  Do we want to be

25    putting informants next to people and allowing them

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   to give drugs to defendants who have been in
 2   lockdown, who have been isolated, who have been
 3   deprived of pretty much anything resembling a normal
 4   life, give them drugs so that they can get
 5   statements?  Is this how we want to do business?  And
 6   I would pose that the answer to that question is no.
 7           And I would ask the Court to look at the
 8   transcripts, to look at Mr. Herrera's affidavit, to
 9   look at the documents that prove that NMDOC had no
10   reason to put these guys on lockdown, and to suppress
11   the statements.
12           Does the Court have any questions for me,
13   Your Honor?
14           THE COURT:  Not at this time.  I appreciate
15   it, Ms. Bhalla.
16           MS. BHALLA:  Thank you, Your Honor.
17           THE COURT:  All right.  How about any of
18   the defendants?  Do y'all want to speak on these two
19   motions to suppress by Mr. Herrera and Mr. Perez,
20   from the defendants?
21           All right.  Mr. Beck, are you going to
22   handle the argument here?
23           MR. BECK:  Yes, Your Honor.
24           THE COURT:  Mr. Beck.
25           MR. BECK:  I think it's important to look
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    first at Mr. Perez.  And Your Honor was able to view
2    Mr. Perez on the stand.  And it's important to look
3    what was in the motion, versus where we've come to
4    today.
5              The first thing in the motion was the
6    statements are not voluntary and not intelligent,
7    because Mr. Perez was under the influence of Suboxone
8    provided to him by Mr. Cordova.  You heard Mr.
9    Cordova get up on the stand and say he didn't do so.
10   You heard Mr. Perez contrary to that.
11             But I want the Court to look at
12   cross-examination of Mr. Cordova, because Mr. Villa
13   brought out from Mr. Cordova that Mr. Cordova was a
14   soldier, and that he was known for talking a lot.
15   And indeed, Mr. Perez was intelligent enough,
16   although purportedly under the influence of Suboxone
17   and couldn't give voluntary or intelligent
18   statements, but yet was intelligent enough to know
19   that he could use Mr. Cordova to spread rumors
20   amongst everyone else in prison that he wasn't a rat.
21   So that gets rid of the not voluntary, not
22   intelligent.  Mr. Perez said that same thing on the
23   stand.  He said he knew Mr. Cordova was a soldier, he
24   knew he talked a lot in the prisons.  And Mr. Perez
25   could use Mr. Cordova to spread rumors around him to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    insulate himself.

2           So the key inquiry here is whether they

3    were voluntary and intelligent statements, or whether

4    they were coerced statements by some mental

5    incapacity.  Mr. Perez' own testimony, as well as

6    cross-examination of Mr. Cordova, by his own counsel,

7    get rid of any possibility that Mr. Perez did not

8    give voluntary and intelligent statements.  Indeed,

9    both of them brought out that he used Mr. Cordova in

10   a very intelligent manner.

11          And so regardless -- I mean, the inquiry is

12   clear:  There has to be some mental incapacity.  That

13   mental incapacity then has to be known by the

14   Government.  And then, third, the Government has to

15   take advantage of that known mental incapacity.

16          So the Court doesn't even have to reach the

17   decision here whether Mr. Cordova actually provided

18   Suboxone, because Mr. Perez' testimony was clear that

19   he provided a voluntary and intelligent statement.

20   Indeed, Mr. Perez said that he could recall specific

21   details about who was involved in the Molina homicide

22   from months before, when they were in a different

23   facility in the X pod.

24          Now, Ms. Fox-Young got up here and talked

25   about how we can't believe --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1            THE COURT:  I'm not sure I quite understood
2     that last statement.  If you want to elaborate or say
3     it again.
4            MR. BECK:  Yes.  When Mr. Castellano was
5     cross-examining Mr. Perez, he asked Mr. Perez:  You
6     have all these specific details that identify exactly
7     who was involved in the Molina homicide, who had the
8     shanks, who made the shanks, who stabbed Molina, who
9     took the shank after the murder, who didn't take the
10    shank after the murder, although he should have.  How
11    do you remember those?  And Mr. Perez said, Well, Mr.
12    Cordova told me, and that's how I knew those.  And
13    Mr. Castellano dialed him down and said, Well, when
14    did he tell you this?  He said, Well, we were all
15    together in X pod months before Billy Cordova came
16    in, and Eric Duran came in, and they had these
17    recorders; months before that we were in X pod.
18            And so now you've got someone who is
19    asserting in the motion that he was under the
20    influence of narcotics, or he didn't have a high
21    enough IQ, or somehow his physical disabilities
22    prevented him from making voluntary and intelligent
23    statements, when he did so, but yet, he can recall
24    specifically the exact things that -- not that he
25    knew, but that he was told only months before that,
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   or months before that.  I mean, that just is not
 2   credible, to know every one of those details, having
 3   only been told that, as opposed to actually
 4   experiencing it and actually being there.
 5           So any claim that his statements were
 6   involuntary and unintelligent are just vitiated by
 7   his testimony and by what Mr. Villa brought out on
 8   cross-examination.
 9           To the extent -- I think there was
10   something about, if you look at the Fulminante case,
11   in that case, the defendant's statement was
12   involuntary because he was given a promise of
13   protection.  There was never any testimony brought
14   out from Mr. Cordova.  Mr. Cordova never testified on
15   direct examination that he ever promised Rudy Perez
16   anything in exchange for these.  What he said was
17   that he used pressure points, which Ms. Jacks brought
18   out on cross-examination.  He said -- and you'll find
19   this in the transcript when they're produced -- he
20   said in response to Ms. Jacks' cross-examination what
21   he meant by pressure points was that they can't come
22   out directly and say, Hey, did you do this?  And so
23   what he was doing was -- I'm quoting -- "trying to
24   get him to reveal the truth."  So pressure points
25   meant he was talking in coded language to try to get
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the truth out, because in the prison walls, if you're

2    surreptitiously recording someone, you can't say,

3    Hey, did you provide the shanks for the Molina

4    homicide?  So with all that evidence, it's destroyed.

5              Now, if we get to the contentions about

6    being kept in involuntary segregation, and this

7    elaborate plan and this ruse to keep all of the SNM

8    members throughout the entire prison system in Level

9    6 secured lockdown, just so that we could go and --

10   just so that the FBI could go and get statements from

11   two people in the SNM, Perez and Herrera, if we think

12   about how illogical that is, when they said they had

13   hundreds of SNM members that were locked down, that

14   contention doesn't hold water.

15             But beyond just that being not logical, the

16   testimony didn't support it.  You heard from Mr.

17   Roark the reasons -- and he was in control of this,

18   he was head of the adult prison system.  You heard

19   from him the reasons they were on lockdown.  The

20   Molina homicide was that, if you look back at the

21   policy, it says, a violent incident was one of the

22   requirements.  That's the Molina homicide.  So he

23   attributed that to the entire STG, Security Threat

24   Group, all SNM members, all SNM-suspected members.

25             Now, that might be too broad, but that's

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    not the inquiry here.  That may be -- as I said in
 2    opening arguments for this, that may be a reason for
 3    a 1983 claim from Mr. Perez, Mr. Herrera, or other
 4    SNM members, but it's not a basis to find the
 5    statements involuntary or coerced by law enforcement
 6    in some manner.
 7           So, to find that there was coercion --
 8    excuse me, let me go back -- so the Molina homicide,
 9    and then as soon as they were being let down and
10    preparing to let them back into Level 4, in the
11    summer of 2015, in July 2015, Mr. Roark told you
12    there was the Julian Romero assault, and they were
13    again -- that was a violent incident, now they're
14    back into Level 6 under the policy.  So the fact
15    testimony from Mr. Roark, you heard it from the
16    horse's mouth about why those decisions were made,
17    and they do fit within the policy.  There is a
18    violent incident.
19           To find that this was a ruse, and that the
20    FBI somehow placed Mr. Herrera and Mr. Perez in the
21    cells solely to put Mr. Cordova next to him, you have
22    to find at least two people's testimony up there on
23    the stand incredible.  You have to find that Special
24    Agent Acee lied when he said he had no information
25    about why they were placed there; he didn't direct
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    anyone to do that; he didn't ask for anyone to do
 2    that.  And you have to find him lying when he said he
 3    didn't hear that from any of the STIU officers or
 4    from Mr. Myers.  You also have to find that Mr. Roark
 5    lied when he said he didn't have any information from
 6    the FBI asking him to move Mr. Herrera and Mr. Perez.
 7    You have to find that Mr. Roark lied when he told you
 8    that they placed them in Level 6 because of the
 9    Molina homicide and then because of the Julian Romero
10    assault.  So that's two-fold.
11            I think that gets rid of Mr. Herrera's
12    claim about being put there.  Also, I think the
13    argument was:  Read the transcripts, there is a lot
14    of unintelligibles.  If the Court looks closely at
15    the transcripts here, what the Court will find is
16    Carlos Herrera's Exhibit C.  And this was the
17    transcript in which you heard Mr. Cordova testify
18    that, when Mr. Chavez says, "Over there doing bad,
19    huh," in reference to "Lazy," Carlos Herrera, "doing
20    bad" as in not high, as in sober.  So you have that
21    testimony.  He was sober, was going to bed.  Then you
22    have Carlos Herrera's Exhibit A.  Now, bearing the
23    day -- this is one where I think was brought out how
24    many UIs there are, how many unintelligibles.  But
25    you heard unintelligible doesn't mean anything other
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                                1-800-669-9492
                                                           e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   than whoever is listening to that can't make out the
 2   word.  In this first page we came up with, I think,
 3   one stutter.
 4            Now, instead of reading the transcripts, I
 5   would invite the Court to listen to the recordings.
 6   We heard from Mr. Perez.  We got his testimony up
 7   there.  Some of the words, some of what he was saying
 8   was difficult to understand.  You heard from Special
 9   Agent Acee that it's difficult to understand what
10   these guys are saying -- excuse me, what these SNM
11   members are saying in the prison.  And in the
12   recording it's difficult to say.  That doesn't mean
13   he's under the influence, as opposed to it's
14   difficult to understand.
15            Now, we didn't benefit from getting to hear
16   Mr. Herrera up there on the stand, and listen to
17   whether we could understand him perfectly clearly.
18   All that we have from Mr. Herrera is an affidavit, an
19   affidavit in which he didn't take the stand,
20   submitted only this affidavit.  If we look at this,
21   Mr. Herrera says, during the time he was in there,
22   "Billy Cordova was an inmate at PNM South, and was in
23   a cell next to me."  He goes on to say, "Prior to
24   each of these conversations, Cordova would place
25   strips of Suboxone under the door of my cell."  So
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    again, we have in paragraph 2, the cell next to Mr.

2    Herrera.  In paragraph 6, Suboxone strips under the

3    door.  Except that when we heard about Mr. Cordova's

4    knowledge of drugs in the prisons -- and I grant it

5    was extensive -- he said that if someone was in the

6    cell next door, he passed Suboxone strips through the

7    vents.  After he said that, you heard Mr. Perez get

8    up on the stand and he testified under oath that

9    Billy Cordova placed Suboxone in his cell through the

10   vents, exactly as he heard Mr. Cordova say earlier.

11           This, in paragraph 6 of Mr. Herrera's

12   affidavit, is contrary to that.  Billy Cordova said

13   if there was someone in the cell next to him, he

14   would not give him Suboxone strips under the door.

15   He would only do that if someone was down -- I think

16   he said the freeway or the interstate, or whatever

17   that was.  If there were multiple cells in-between,

18   they would fish them under the door.  If they were

19   next to each other, they went through the vents.  So

20   not only do we have only an affidavit, we have an

21   affidavit that is inconsistent with two people's

22   testimony.

23           Again, I think if we look at -- I know Ms.

24   Fox-Young listed all of what I think the case law

25   refers to as the circumstances of voluntary and

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                    1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   intelligent statement.  Oftentimes, what we're
 2   looking at is that statement in isolation, and we
 3   don't benefit from the testimony that we've heard
 4   over these two days.  We don't benefit from hearing
 5   from the defendant himself.  We don't benefit from
 6   the defendant's testimony that he used,
 7   intelligently, Mr. Cordova to spread rumors about
 8   himself.  We don't hear from the person who recorded
 9   the conversation oftentimes.
10          So I would say, if the Court looks at the
11   transcripts, the Court looks at the evidence over
12   these last two days, the Court should find voluntary
13   and intelligent statements.
14          So, finally, I think there was sort of a
15   policy argument made at the end that, if we go down
16   this road, you know, we're inviting future violations
17   of this.
18          I would say the other side of that policy
19   argument is just as strong.  If this Court finds
20   that, because these folks were in prison, their
21   statements were, as a matter of law, not voluntary
22   and intelligent, there can be no more recordings made
23   of voluntary and intelligent confessions within the
24   jail system.  And in a system in which we have
25   violent prison gangs, we have murders, assaults on a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   daily basis, that can't be a good policy to just say,
 2   as a matter of law, we cannot send recorders in there
 3   to record voluntary and intelligent statements by
 4   other prison inmates.
 5             I'll stand for questions, or else I'm done.
 6             THE COURT:  I don't believe I have any
 7   questions.  Thank you, Mr. Beck.
 8             Let me ask other defendants, before I hear
 9   from Ms. Fox-Young and Ms. Bhalla, if they have any
10   final comments?  Anybody else have anything they want
11   to say on these two motions?
12             All right.  Ms. Fox-Young.  You may
13   certainly say whatever you want to on your motion, or
14   the motions.  What do you -- how do you respond to
15   Mr. Beck's pointing out that in Mr. Perez' testimony
16   he did seem to have a lot of details about the
17   murders?  I think everybody would agree with that.
18   Your story being that he had heard all that.  The
19   Government saying that is really not credible that he
20   knew all those details just from hearing other
21   people?  Your thoughts on that?
22             MS. FOX-YOUNG:  Yes, Your Honor.  I'll
23   respond in a couple of ways.  First of all, more than
24   a year-and-a-half after the statements were given,
25   Mr. Perez has had the benefit of months and months to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    look at these statements, and to learn about this
2    case.  We all have in hearing after hearing.  In
3    February 2016, you know, things were different.  So
4    his testimony is retrospective.  That's, I think, the
5    first point.
6              Secondly, Judge, we're not arguing that Mr.
7    Perez had no awareness of reality; that he couldn't
8    hold a conversation; that he was so drugged and so
9    infirm that he couldn't converse.  And that's not the
10   test.  I think the Court has to go back to the law,
11   and sort of a distraction to say, well, you know, Mr.
12   Perez admitted that he was lying, or some statements
13   were true, or some statements are corroborated in the
14   discovery.  None of that makes any difference.  The
15   Court has to look back at Fulminante and its progeny,
16   and make the inquiry as to whether or not there was
17   coercion under those cases.  And it's a totality of
18   the circumstances test.  It's a combination of all of
19   the factors that we have identified and that the
20   Court has heard.
21             And so I think it's a bit of a distraction
22   to go into -- remember Mr. Castellano asked Mr.
23   Perez:  Don't you think it's interesting that some of
24   this is corroborated, you know, and this is evidence
25   that has come out in the case?  It's completely
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   irrelevant.  If the Court looks at Fulminante, there
 2   was no allegation there or no assertion there that
 3   Mr. Fulminante couldn't carry on a conversation, that
 4   he couldn't make conscious decisions.  That's just
 5   simply not the test.
 6          And so, yes, Your Honor, I mean, I think
 7   Mr. Perez was pretty clear when he went through
 8   statement by statement with the Government what he
 9   knows now about what may or may not be true, what may
10   or may not have really happened.  And he explained to
11   the Court, I think, very clearly and credibly that at
12   the time there was a bunch of stuff that had been put
13   in his mind by Billy Cordova.  And that's what he was
14   fixating on.  That's what he seized on in order to
15   protect himself.  And that's where he had learned
16   some of those facts.  He didn't know whether they
17   were true or not.
18          Again, I don't think it really goes to the
19   Court's inquiry.  I don't know if I've adequately
20   answered the Court's question, or if I should move on
21   to other points.
22          THE COURT:  Go ahead.
23          MS. FOX-YOUNG:  Okay.  Additionally, you
24   know, the Government responds on Billy Cordova's
25   pressure points saying Billy Cordova was just using

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   coded language.  He explained to the Court that

2   that's what he meant by pressure points.  What he

3   explained to the Court was, essentially, he was

4   capitalizing on Rudy Perez' fear.  Mr. Cordova is a

5   smart, manipulative, seasoned guy.  And he said, They

6   were going to move on him. I used that information.

7   I knew that Rudy knew it, I knew it, everybody knew

8   it, that he was thought to be cooperating.  That was

9   a pressure point that I used in order to extract

10  information to get him to talk to me, to get what I

11  needed to get benefits from the Government.

12          And I -- I think his language was the most

13  instructive that the Court has heard, when he talked

14  about those pressure points, what he used as a

15  Government agent to get Rudy to talk.

16          Moving to the fact that Mr. Perez was held

17  in Level 6, without justification, according to

18  policy or even reason, I'd like to show the Court one

19  exhibit that came into evidence last week, and note

20  that, you know, the Government could have put on

21  testimony.  It's their burden.  They could have put

22  on testimony or evidence to explain why Mr. Perez was

23  held.  But it doesn't exist.  There is no rational,

24  reasonable explanation pursuant to policy for why Mr.

25  Perez was there.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              What I want to show the Court -- I'm not
 2     sure where this exhibit is, but it's the email that
 3     Mr. Roark testified about, that was forwarded by
 4     Wendy Perez, a year after Mr. Roark sent it.  Mr.
 5     Roark's emails was to all the wardens, and it said,
 6     we've got to do these routine audits in order to make
 7     sure that people are doing their proper disciplinary
 8     time.  Ms. Perez, who the Government could have put
 9     on today to rebut these allegations and to meet their
10     burden, then sends that email along to the Warden,
11     and says, "Call me about this."  Subject line:  Rudy
12     Perez.
13              I think it clearly shows a year later, more
14     than a year after Mr. Roark testified that they
15     closed the books on the Molina investigation, and
16     things had returned back to normal with the SNM, they
17     are looking for reasons to hold Rudy Perez in Level
18     6.  And, you know, to the Government's argument that
19     Mr. Cordova just appears, he just sprouts in Level 6
20     one day, he just shows up there.  Special Agent Acee
21     had nothing to do with it.  The New Mexico
22     Corrections Department had nothing to do with it.
23     You know, sort of borders on the absurd.  Of course,
24     they had something to do with it.  Of course, he
25     shows up there just days after Special Agent Acee
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   opens him as an informant.  And he's there for a

2   specific reason.  Mr. Perez and Mr. Herrera are there

3   for specific reasons.

4           The entire SNM was not held there at that

5   time, and the Court heard it had been many months

6   since those guys were shipped to Level 6.  They were

7   targeting these two potential defendants.  They

8   wanted to extract statements from them, and that's

9   why they came up, Judge, with a reason to hold them.

10  And let me just briefly draw the Court's attention to

11  RP-H, which Mr. Roark testified that he did send this

12  email, February 11, 2015, to all the wardens about

13  these routine audits that were to be done.

14          Wendy Perez -- the Court can see, Wendy

15  Perez finds that email a year later, changes the

16  subject line, and forwards it to Roland Mares, who I

17  believe is the Warden, and then to German Franco, who

18  actually I think is the Warden, and says, "Call me on

19  this, so I can explain, please."

20          What subsequently happens is that the

21  Corrections Department finds a ruse, a reason to hold

22  Rudy Perez in Level 6.  And Mr. Roark testified there

23  was no credible threat according to their policy that

24  existed in February 2016.  There was no paperwork

25  documenting a reason, a proper reason, to hold Mr.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Perez there.  Nothing at all.  And it's the

2    Government's burden.  They have not put on any

3    testimony to explain why Mr. Perez was there, except

4    Billy Cordova and Special Agent Acee and Mr. Roark

5    saying, Yeah, he was there at the same time.  It was

6    right after Mr. Cordova was opened as an informant.

7    Mr. Cordova just ends up next to him.

8            I mean, it just defies reason that this

9    just magically happened.  It absolutely was known and

10   engineered.  The Court doesn't have to disbelieve

11   Special Agent Acee.  I think it's reasonable to

12   conclude that Special Agent Acee was forthright with

13   the Court in saying he didn't know exactly where Mr.

14   Cordova would be placed and when.  But it was the

15   Corrections Department, working with the FBI, working

16   with this Government agent, CI, to extract statements

17   from Mr. Perez that matter.  So the Court doesn't

18   have to disbelieve Special Agent Acee.  And the Court

19   certainly doesn't have to disbelieve Mr. Roark when

20   he says, Yes, Mr. Perez was held in Level 6.  It was

21   essentially contrary to policy.  You know, I can't

22   give you an explanation as to why he was there.  You

23   know, Mr. Cordova just showed up next to him.  I

24   can't explain this.  The Government has not given the

25   Court any other reason except for this sort of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  amorphous testimony, yes, there was no credible
 2  threat.  You know, he was SNM, so we believe we can
 3  hold him there.  I mean, I think the Court can
 4  believe all that and take it all into consideration.
 5  And it clearly fits well within our arguments that
 6  Mr. Perez was held there improperly, and specifically
 7  for the purpose of extracting statements.
 8            Again, Your Honor, it's just the
 9  Government's burden to prove that these statements
10  weren't coercive.  And I don't think that they've
11  given the Court anything to go on as far as a theory
12  that this just appeared magically.
13            With regard to the Suboxone, I think Mr.
14  Cordova's testimony was very clear as to how Suboxone
15  could be fished from one cell to the next.  I think
16  there are multiple ways that can be done.  The Court
17  heard from Mr. Perez as to how he received it and
18  took it.
19            And I think, clearly, the Government falls
20  short of meeting the standard to show that these
21  statements were constitutionally taken.  When you
22  look at the relevant circumstances, the
23  characteristics of Mr. Perez, the details of how
24  these statements were extracted, where he was placed,
25  and what he was up against, there is no question but
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  that the Court should suppress them.

2          THE COURT:  All right.  Thank you, Ms.

3  Fox-Young.

4          Ms. Bhalla, I'll give you the last word on

5  these two motions.

6          MS. BHALLA:  Thank you, Your Honor.  I just

7  want to address a couple of points.

8          Mr. Perez, at the time that Mr. Cordova was

9  placed next to Mr. Perez, was in a different facility

10 than when he was placed next to Mr. Herrera.  And

11 while their conditions of confinement were similar,

12 their housing situation was different.  And I think

13 that explains the different methods for getting drugs

14 into the cell.  It's going to be different depending

15 on where they are.  But what is consistent is that

16 Mr. Cordova was providing drugs.

17         I don't think that the Court has to find

18 that Special Agent Acee lied about his knowledge

19 about placement.  He could walk away from that

20 decision.  This was a joint investigation.  NMDOC was

21 working with the feds.  All that Special Agent Acee

22 had to do was tell them, "I want Cordova next to

23 these guys.  You guys make it happen."  And whatever

24 methods they employ to do that are attributable to

25 the Government, whether or not Special Agent Acee

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   approved it.
 2           In terms of the transcripts, the -- I'm
 3   sorry, I don't have the exhibit number in front of
 4   me, Your Honor -- but the exhibit that we talked
 5   about where Mr. Cordova was discussing prices for the
 6   drugs that he could get, the Government alleges that
 7   these were the prices for street drugs.  Mr. Cordova
 8   testified he'd been in custody for 13 months at that
 9   point, and he was able to get a better price than
10   Mr. Chavez.  And that was the discussion.  And
11   Mr. Chavez specifically says:  You can still get them
12   for five, right?  Yeah.
13           Now, when they say Mr. Herrera was going
14   through withdrawals and not high, it's interesting
15   that's their argument now.  Because in their briefing
16   their argument was that it was bedtime, and they were
17   all sleepy.  And I think that's an interesting thing
18   that the argument is changing depending upon what Mr.
19   Cordova has been telling them.  And I would ask the
20   Court to look at the briefing and compare it to the
21   argument today that he was withdrawing rather than he
22   was sleepy.
23           So that's all I have to finish up, Your
24   Honor.  Unless the Court has any questions.
25           THE COURT:  I don't believe so.  Thank you,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Ms. Bhalla.

2                MS. BHALLA:   Thank you, Your Honor.

3                THE COURT:   Well, let me say with this

4    motion, since a lot of effort has been put into it, I

5    would be glad to take it under review and advisement.

6    Y'all have pointed out today a number of things that

7    you would like me to review, and issue an opinion

8    with detailed findings of fact and conclusions of

9    law, if that's what you'd like for me to do.   As

10   we've been going through the hearings -- and I'll

11   probably do it every day, and at the conclusion of

12   each hearing, or set of hearings, try to determine

13   what you'd like for me to work on, and take a special

14   look, and this may be one of them.

15               But I am going to give a ruling this

16   morning that will be the ruling for trial, unless --

17   and these will constitute my findings of fact, unless

18   this is one of the sets of motions that the parties

19   would like for me to spend more time on between now

20   and trial.

21               Let me first talk -- there has been an

22   invitation by both sides that I be careful about how

23   my rulings might impact upon other prison

24   investigations.   I think I got my hands full here in

25   determining what I should do with this evidence.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Certainly, I'm always aware of the impact that my

2    rulings may have on future investigations or other

3    cases.  But I'm also mindful I'm a district judge,

4    and my rulings have only impact on the trial I'm

5    about to have.  And so I will probably not get too

6    wrapped up in trying to figure out what the impact

7    will be on future prison investigations.

8            Let me start by indicating on this the

9    prison placement.  I do think that to go the

10   direction that the defendants want me to go in this

11   case does require me to probably find that Mr. Acee

12   and Mr. Roark were not credible in certain of their

13   testimony.  I know Ms. Fox-Young has offered ways of

14   getting there that do not put their testimony in

15   doubt.  But I do think that, in the end, it would.

16           And I find Mr. Acee credible that he did

17   not have any role in placing Mr. Herrera and Mr.

18   Perez, and that the Corrections Department did that.

19   Mr. Roark seems to corroborate that, in the sense

20   that why they were where they were was because of the

21   Molina homicide, and that was the reason for the

22   lockdown.  So I don't find the placement issue really

23   helps the defendants much on the coercion and the

24   voluntariness issue, which is what this motion is

25   about -- these two motions are about.  I don't see

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492
                                                    e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    information on the placement side that really

2    undercuts what Mr. Acee and Mr. Roark, rather

3    straightforwardly testified about, about how they got

4    where they are.  Certainly, Mr. Acee was involved in

5    putting Mr. Cordova next to the cells of Mr. Herrera

6    and Mr. Perez.  But I don't think he had any

7    involvement in where those two defendants were

8    placed.  And I think Mr. Roark's testimony supports

9    that.

10            I guess y'all may have -- I may be the only

11   one in the room that really didn't know what Mr.

12   Cordova was going to look like.  Somebody else

13   probably had some knowledge.  And I am probably the

14   most ignorant there, so I was curious as to what he

15   would look like, how he would testify, and what that

16   testimony would present.  I did think that Mr.

17   Cordova was a very good witness, and found him to be

18   credible in all material respects.  I don't think he

19   promised Mr. Perez, Mr. Herrera anything.  I think by

20   pressure points, I do agree with Mr. Beck's

21   assessment that you don't just walk in to one of

22   these facilities and start asking people:  What was

23   your role in the killing of Molina.  You have to talk

24   in coded language.  And Mr. Cordova was trying to

25   figure out how he could get the testimony from Mr.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Herrera and Mr. Perez that he needed to do his job.

2    I don't think that I find him credible in that he did

3    not provide Suboxone.  And so I find that -- I will

4    credit in my findings of fact in all material

5    respects his testimony where it differs from Mr.

6    Herrera and Mr. Perez.

7              In contrast to Mr. Cordova, I found that

8    much of Mr. Perez' testimony was incoherent and hard

9    to follow, and difficult to come up with a structured

10   response to what Mr. Cordova's rather straightforward

11   story was.  Either he's lying here on the stand, or

12   he was lying then.  There may have been times he lied

13   both.  But in the end, I can't put together a

14   credible enough and coherent enough story to find his

15   testimony credible here in the courtroom.

16             I think Mr. Perez is intelligent.  I think

17   was intelligent at the time.  I've reviewed enough of

18   these transcripts to find him intelligent at the

19   time.  His testimony that he knew he could use Mr.

20   Cordova to spread the rumor or tale or story that he

21   was not a rat, I think, undercuts his argument now

22   that his statements then were involuntary.  I don't

23   find any considerable mental defect or incapacity.

24   He may have some health problems, may use some drugs.

25   But it doesn't seem that there is any evidence that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the Government knew those things, or more

2    importantly, knew those things and tried to take

3    advantage of it.  His statements appear, both at the

4    time that he gave them and his testimony here in the

5    courtroom, are that his statements were voluntary and

6    intelligent.  He knew details of the murder.  And I

7    certainly don't find these beyond a reasonable doubt,

8    that's a function for the jury.  This is just for

9    purposes of the suppression motion.  But I don't find

10   credible that he only knew those things because they

11   were told him.  I will find that more likely than

12   not, he knew those details because he was involved in

13   the murder of Mr. Molina.  I don't think that there

14   is sufficient evidence that he was under drugs or was

15   incapable of making the statements voluntarily and

16   intelligently.

17          I find the same with Mr. Herrera because of

18   the persuasive testimony of Mr. Cordova.

19          So I will deny the motion to suppress

20   involuntary statements 1294 and motion to suppress

21   statement 1295.

22          I understand that the next thing we were

23   going to go to was a resumption of the Daubert

24   hearing as to the gun.  I believe this is Mr. Chavez'

25   motion on the gun -- Chavez' testimony.  I'm not sure

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
1    I can read my notes here, but is that where we're
2    going next, is the Daubert hearing?
3              MR. ADAMS:  Yes, sir, I believe so.
4    Mr. Garcia had filed a Daubert challenge to the gun
5    that was seized from his home, and Mr. Chavez was
6    noticed as the expert.
7              THE COURT:  Okay.  And y'all will have to
8    refresh me where we were on that.  I know we got --
9              MR. ADAMS:  We have not started that, Your
10   Honor.
11             THE COURT:  We've not started that.  All
12   right.  So is the Government going to take the lead
13   on this motion?
14             MR. CASTELLANO:  Yes, Your Honor.  We're
15   calling Theodore Chavez.  Just to clarify, this is
16   not a firearm seized from Mr. Garcia's home.  It was
17   turned over as part of an undercover operation.
18             MR. ADAMS:  I accept that friendly
19   amendment.  That's correct.
20             THE COURT:  All right.  Mr. Castellano, you
21   have witnesses or evidence you wish to present on
22   this motion?
23             MR. CASTELLANO:  Yes, Your Honor.  The
24   United States calls Theodore Chavez.
25             THE COURT:  Mr. Chavez, if you'll come up
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    and stand next to the witness box on my right, your
 2    left.  Before you're seated, Ms. Standridge, my
 3    courtroom deputy, will swear you in.
 4                    THEODORE CHAVEZ,
 5        after having been first duly sworn under oath,
 6        was questioned and testified as follows:
 7                    DIRECT EXAMINATION
 8            THE CLERK:  Please be seated, and the state
 9    your name for the record.
10            THE WITNESS:  First name is Theodore, and
11    the last name is Chavez.
12            THE COURT:  Mr. Chavez.  Mr. Castellano.
13            MR. CASTELLANO:  Thank you, Your Honor.
14    BY MR. CASTELLANO:
15        Q.   Good morning, Mr. Chavez.
16        A.   Good morning.
17        Q.   Where are you currently employed?
18        A.   I'm currently employed by the Federal
19    Bureau of Investigation Laboratory, located in
20    Quantico, Virginia.
21        Q.   What are your duties at the laboratory?
22        A.   My primary duties as physical scientist
23    forensic examiner, is to receive evidence relating to
24    firearms and tool marks, conduct examination on those
25    requested items, provide examination results, and
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    issue a laboratory report, and then provide testimony

2    to those results in a court of law.

3         Q.   Can you tell us a little bit about your

4    educational background?

5         A.   I received a bachelor's in physics from St.

6    Vincent College, located in Latrobe, Pennsylvania.

7         Q.   And what other types of training and

8    experience do you have?

9         A.   Upon entering employment there at the FBI

10   Lab, I entered what approximately would be a

11   three-year training program, in order to become

12   qualified within the firearms and tool marks unit.

13   That just allowed for me to receive a training manual

14   that outlined the training progress throughout those

15   years, whether it be sign-offs by a qualified

16   examiner, or also sort of a mentorship, conducting

17   casework alongside those other qualified managers.

18        Q.   What is firearms identification?

19        A.   Firearms identification can be defined as

20   the comparison between bullets, cartridge cases,

21   other ammunition components, to determine if they

22   were produced by a specific firearm.

23        Q.   And what makes firearms identification

24   possible?

25        A.   Firearms identification is possible due to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    the manufacturing of these items, whether it's a
 2    barrel of a firearm, or a slide from a firearm.  It's
 3    these manufacturing processes that leave individual
 4    characteristics or microscopic marks that are used
 5    for identification.
 6         Q.   You told us a little bit about your
 7    training earlier.  Who conducted that training?
 8         A.   When I received the training manual, there
 9    is a training program manager for the unit.  And I
10    was assigned to a training coordinator.  The training
11    coordinator who overlooked my training was Eric
12    Smith.
13         Q.   And as part of your duties, have you been
14    involved with the training and/or instructing of
15    others?
16         A.   Since qualification, yes.
17         Q.   What types of training have you provided?
18         A.   So the FBI has an Evidence Response Team,
19    or ERTs, throughout different field offices.  And in
20    order to become a member of the ERT, they will go to
21    what's described as a basic class.  And it's hosted
22    there in Virginia at the Operational Response Center.
23    And part of their one-week, if not two-week training,
24    they learn the different types of examinations that
25    my unit performs, as well as understanding the type

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492



                                                                      1-800-669-9492
BEAN & ASSOCIATES, Inc.                                   e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

 1    of evidence handling that is necessary to preserve

 2    those items that are submitted to the lab.

 3        Q.   Are you a member of any professional

 4    associations?

 5        A.   I am.

 6        Q.   Can you tell us about that?

 7        A.   I am a regular member of AFTE, the

 8    Association of Firearms and Tool Mark Examiners.  And

 9    that is just a professional organization; it has

10    various firearms and tool mark examiners within the

11    U.S., as well as international.

12        Q.   Any other professional associations?

13        A.   No.

14        Q.   Were you required to pass any standardized

15    tests to become qualified for your post?

16        A.   Yes.  So upon qualification, I would have

17    had to have completed a total of three oral boards

18    and three moot courts.  Those were all handled by

19    qualified examiners within the unit, as well as

20    outside evaluators.  Upon completing those tasks or

21    those outlines within the training manual, I was then

22    qualified as a firearms and tool mark examiner, able

23    to complete casework independently.

24        Q.   And was it those people who determined that

25    you were qualified to reach your conclusions?

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1       A.    That is correct.

2       Q.    Is your work peer-reviewed?

3       A.    Yes.   There are two types of reviews:   A

4   technical, as well as an administrative review.

5       Q.    And how does the peer review work?

6       A.    A technical review will be conducted on any

7   supporting documentation, to include a laboratory

8   report that is issued, or prior to issuance.   The

9   technical review is handled by another qualified

10  examiner within the same category of testing.   So

11  they will review all supporting documentation to

12  ensure that it supports outlined results.

13          And the second type of review is

14  administrative review.   That is handled by typically

15  a supervisor in my case, my unit chief.   And so she

16  just ensures that the contributor is receiving a

17  sound laboratory report, as well as all

18  administrative tasks are completed to have that

19  report issued.

20      Q.    And is this regularly done as part of your

21  responsibilities and the conclusions that you reach?

22      A.    That is correct.

23      Q.    Do you work in the accredited laboratory?

24      A.    Yes, I do.   The FBI lab is accredited by

25  ASCLD Lab, or the American Society of Crime

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Laboratory Directors, Laboratory Accreditation Board.
 2         Q.   How did they accredit your laboratory?
 3         A.   Typically, a reaccreditation occurs every
 4    five years.  So throughout the five-year window,
 5    there are surveillance visits that occur.  I handle
 6    the quality assurance program for my unit, so I have
 7    working knowledge of all the internal audits that are
 8    conducted yearly, as well as a review of the
 9    documents, and actual participation in those
10    surveillance visits by outside assessors.
11         Q.   Do you have established protocols for
12    conducting examinations?
13         A.   Yes, we do.
14         Q.   Who established those protocols?
15         A.   A protocol, if it's an existing protocol,
16    will go through an annual review.  The annual review
17    is done just to ensure that the business practices
18    that are being handled within the unit are
19    functioning under this SOP.  It will go through a
20    technical review if it's a new document.  And the
21    document would then be reviewed by our technical
22    leader.  And upon review by the unit, it then will be
23    reviewed by FASU, the Forensic Analysis Support Unit.
24    And they will just ensure that it's in line with the
25    accreditation requirements that are observed by the
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  laboratory.

2      Q.   As part of your responsibilities did you

3  receive a Phoenix Arms pistol, serial number 4208834,

4  at the laboratory?

5      A.   That's correct.

6      Q.   For what purpose did you receive this

7  firearm?

8      A.   In this case, the firearm was submitted for

9  a function test.  Because it is also a pistol, I

10  searched a national database search.  So the report

11  that I issued would have contained a function test,

12  as well as national database searches.

13      Q.   Let's start with the database searches

14  first.  What is the purpose of those searches?

15      A.   So there are three different types of

16  database searches, all handled by the DOJ:  There is

17  NCIC, the National Crime Information Center; eTrace,

18  which is the electronic tracing system; and NIBIN,

19  which is the National Integrated Ballistic

20  Information Network.  NCIC is a stolen gun record

21  database that can be searched by anyone who has an

22  NCIC account; eTrace is information that is also

23  collected either by a purchaser, or upon distribution

24  by a manufacturer, basically just gives a historical

25  timeline of that firearm; NIBIN is a database that



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    allows for cartridge cases to be searched against

 2    each other.  So it's acquisition, as well as a

 3    correlation.

 4         Q.   So, in this case, can you tell us about the

 5    results of each of those database searches?

 6         A.   So the NCIC have no records, which

 7    indicated it was not stolen.  The eTrace did have an

 8    existing trace number.  So that trace number or the

 9    trace may have actually been conducted by the field

10    office.  And that's -- one of the policies we have

11    currently in place, as part of the field evidence

12    policy, is that anyone in the field offices who prior

13    to sending it to the lab will have conducted that

14    trace.  And the NIBIN result was also no associations

15    at the time.

16         Q.   After the NIBIN search, is that something

17    that tells you -- for example, you have a crime scene

18    with unknown cartridges; are those put in the system

19    for a possible match for future crimes, so you can

20    match them up?

21         A.   That's correct.  The NIBIN will contain

22    cartridge cases that have no associated known

23    firearm.

24         Q.   Okay.  Now, tell us about the function

25    test, please.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    So I would receive the firearm in the unit

2   and be conducting sort of a general population of

3   make, model, caliber, different features of that

4   firearm, to include the serial number, the overall

5   length of the firearm, as well as preparing it for

6   function testing.   So at the laboratory we have a

7   water tank not much longer than the witness stand

8   here, that is filled with water.   And what we'll

9   actually do is take the firearm, and we'll test fire

10   it into a water tank.   In this case I tested it

11   twice.   So I first loaded a round into the chamber,

12   as well as it was noted that no magazine was

13   submitted with this firearm.   So I used the reference

14   firearms collection, which the FTU also maintains,

15   Firearms and Tool Marks Unit maintains, and that

16   contains over 7,000 different types of firearms.   So

17   I was able to use a magazine that had the same

18   functionality allowed for it to work with the pistol;

19   test fired into the tank two times, and collected

20   those known bullets, as well as known cartridge

21   cases.   The cartridge cases would then be entered

22   into NIBIN, and the bullets be used for additional

23   information collecting the GRCs, or the general

24   rifling characteristics of that barrel.

25      Q.    Each time you fired the weapon -- you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   mentioned first by putting a round in the chamber,

 2   and then using a magazine to feed ammunition through

 3   the firearm.  On each occasion, did the firearm

 4   function as designed?

 5        A.   Yes, it did.

 6        Q.   Do you recall what caliber this firearm

 7   used?

 8        A.   This was a .22 long rifle caliber.

 9        Q.   For those who don't understand firearms or

10   ammunition, the fact that it's called a .22 long

11   rifle, does that mean it's only used for rifles or

12   can it also be used for pistols?

13        A.   There are manufacturers that have both

14   pistols and rifles calibered for a .22 long rifle.

15        Q.   In other words, can you fire a .22 long

16   rifle ammunition through this pistol?

17        A.   That's correct.

18             MR. CASTELLANO:  May I have a moment, Your

19   Honor?

20             THE COURT:  You may.

21             MR. CASTELLANO:  Thank you, Your Honor.  I

22   pass the witness.

23             THE COURT:  Thank you, Mr. Castellano.

24             Any defendant before Mr. Adams have any

25   cross-examination of Mr. Chavez?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              All right.  Mr. Adams.
 2              Let me put on the record.  Ms. Fox-Young
 3    asked that we indicate that Rochelle Marin from Mr.
 4    Villa's office is also on the phone.  Is there anyone
 5    else that's come on the phone since we started the
 6    hearing that hasn't entered an appearance?  Make sure
 7    your mute button is not on if you're about to speak.
 8              All right.  Mr. Adams.
 9              MR. JEWKES:  May I approach?
10              THE COURT:  You may.
11              MR. JEWKES:  Our client, Daniel Sanchez,
12    was taken out of the courtroom by the Marshal
13    Service.  He's very ill.  And there is a question as
14    to whether or not they should return him to the
15    courtroom.  Mr. -- the marshal whose name escapes me,
16    he goes by the name of Mick.
17              THE COURT:  It's Mick.
18              MR. JEWKES:  He was just telling me the
19    situation.  So we wanted to put on the record that
20    Mr. Sanchez is not in the courtroom due to illness.
21              THE COURT:  What kind of illness does he
22    have, Mick?
23              MR. MICKENDROW:  He is throwing up, Your
24    Honor.  My concern is just having him stay here all
25    day and being uncomfortable.  Unfortunately, the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Marshal Service is unable to provide any medication
 2    whatsoever, due to our policies.  And at least, if
 3    he's returned to the facility, they might be able to
 4    provide him something in which he'd be a bit more
 5    comfortable.
 6              THE COURT:  Well, let's do this:  Let's
 7    take our morning break.  Let's see if we can give him
 8    some fluids or something like that, and get him
 9    sitting back in here.  I'd rather the marshals not
10    make that decision.  I'd rather -- hold on, hold on.
11    Everybody be quiet.  I'd rather the marshal not make
12    that decision whether he's in or out.  If he can't do
13    it, or something like that, that's a different
14    question.  But maybe we could reposition him or
15    something like that, if it's something we're
16    concerned about being contagious or something.  But
17    let's see if we can get some fluids in him, let him
18    use the restroom a little bit and then maybe we can
19    resume.
20              MR. MICKENDROW:  Understood, Your Honor.
21              THE COURT:  All right.  We'll be in recess
22    about 15 minutes.
23              (The Court stood in recess.)
24              THE COURT:  All right.  We'll go back on
25    the record.  I think everybody has got a lawyer, at
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   least one.  Look around, make sure your co-defendant
 2   has a lawyer.
 3           All right.  Mr. Sanchez, are you doing
 4   okay?
 5           THE DEFENDANT:  I'm good, Your Honor.
 6   Thank you.
 7           THE COURT:  All right.  Raise your hand if
 8   you run into any problems.
 9           All right.  Mr. Adams, you wanted to
10   discuss marking some exhibits?
11           MR. ADAMS:  Yes, sir.  I have two.
12           THE COURT:  What I'd like to do, if this is
13   all right with you, since we're going into a new
14   hearing, let's go ahead and mark these as Christopher
15   Garcia Exhibits A and B.
16           MR. ADAMS:  Yes, sir.
17           MS. SIRIGNANO:  Your Honor, one second,
18   please, because we've got A and B for the DNA
19   hearing.  So --
20           THE COURT:  I know, but if we're starting a
21   new hearing, I want to have the exhibits running for
22   the hearings rather than just running forever.
23           MS. SIRIGNANO:  Okay.  Thank you, Your
24   Honor.
25           MR. CASTELLANO:  Judge, I don't have any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    objection to marking those as C and D, Your Honor, if
 2    they anticipate an A and B.  Whatever the Court wants
 3    to do.
 4             THE COURT:  I think this is going to be A
 5    and B, right, Mr. Adams?
 6             MR. ADAMS:  Yes, Your Honor.
 7             MR. CASTELLANO:  Your Honor, and Mr. Adams
 8    showed me these exhibits during the break.  And I
 9    have no objection to admission of either one.
10             THE COURT:  All right.  Anybody else got an
11    objection to these two exhibits?  Not hearing any,
12    Christopher Garcia's Exhibits A and B will be
13    admitted into evidence.
14             MR. ADAMS:  Thank you, Your Honor.
15             THE COURT:  Mr. Adams.
16                        EXAMINATION
17    BY MR. ADAMS:
18        Q.   Mr. Chavez, let me show you -- and your
19    screen should be on -- Christopher Garcia Exhibit A.
20    Is this the gun that you examined?
21        A.   That is correct.
22        Q.   And the serial number on that is 4208834?
23        A.   That is correct.
24        Q.   When did you receive the gun?
25        A.   I received the gun prior to 8/25/2016.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

66

```
 1          Q.   And when did you return the gun?
 2          A.   Within a day after 9/22/2016.  And if I may
 3    indicate where I am -- the green arrow there shows
 4    8/25.  So that would indicate when the examination
 5    started.  So we could have received the firearm prior
 6    to that.  Back down to 9/22, that's the date that
 7    indicates when I completed my exams.  So the firearm
 8    would have been returned after 9/22.
 9          Q.   And so the record is clear, those dates are
10    found on Defendant's Exhibit A that's in front of you
11    on the screen now?
12          A.   That's correct.
13          Q.   And is this part of your worksheet that you
14    completed?
15          A.   Yes, this is page 1 of 4 of the examination
16    results that would support my laboratory report.
17          Q.   Let me show you Exhibit B.  This is a chain
18    of custody form.  Are you on the chain of custody
19    form?
20          A.   I do not recognize this chain of custody
21    form for one reason.  This could be a field chain of
22    custody, that being any transactions that are made
23    outside the laboratory, the FBI Laboratory, will have
24    their own chain of custody.
25          Q.   And has that been provided with your lab
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    notes, do you know?
 2         A.   The case 1A should have been provided
 3    during discovery requests.
 4         Q.   So you don't know anything about this
 5    Exhibit B, and your name is not on it?
 6         A.   My name does not appear.  However, I do see
 7    indications of FBI Laboratory stamped on there, that
 8    shows the reasons analysis.  But that could have been
 9    Joseph -- what I believe is Joseph -- that name looks
10    familiar, as a case agent.
11         Q.   Sainato?
12         A.   Sainato -- possibly transferring it to the
13    lab, which means out of his custody.  But again, I'm
14    not familiar with it, and my name does not appear on
15    this chain of custody.
16         Q.   So your sole determination or primary
17    determination is that the was gun was operable when
18    it arrived to you in the laboratory?
19         A.   As received, correct.
20         Q.   Do you know what condition the gun would
21    have been in when it was seized and taken into
22    custody by the FBI?
23         A.   I don't.
24         Q.   Do you know whether the gun had been
25    manipulated at all by any case agent or other FBI
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    person before it got released to the FBI laboratory?

2        A.    The only policy that was currently in place

3    is that the firearm must be rendered safe, and that

4    is just to allow for it to be packaged accordingly,

5    and shipped under regulations by, I believe, Fed Ex.

6        Q.    Would it be against policy for an agent to

7    take a nonoperational gun, and to mess with it, fix

8    it, so that it would fire before sending it to the

9    lab for analysis?

10       A.    I'm unaware of any type of policy.

11       Q.    One way or another?

12       A.    No.   The only policy that currently is in

13   place, again, is to ensure that it is rendered safe.

14   If a firearm were to be submitted as inoperable,

15   there is an examination conducted by my unit that

16   would outline on that same worksheet what was not

17   operating.   And we would attempt to correct or at

18   least use some of the components to make it

19   functional.   But in this case, that did not exist.

20       Q.    Why would you do that?

21       A.    To collect known test fires.   So in order

22   to enter those into the database.

23       Q.    And again, for your database information,

24   the eTrace didn't produce any -- the eTrace and the

25   NCIC, and what was the third one?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                       1-800-669-9492

PROFESSIONAL COURT                        e-mail: info@litsupport.com
REPORTING SERVICE

BEAN & ASSOCIATES, Inc.

1        A.    ETrace had no record -- excuse me, NCIC had

2    no records; eTrace had a preexisting trace number,

3    meaning someone from the field had already requested

4    the information of that pistol.  NIBIN came back as

5    no associations.

6        Q.    All right.  When had that information been

7    requested on eTrace?  Was it related to this

8    investigation, or did it predate?

9        A.    May I see Government's Exhibit A again?

10       Q.    I have all four pages.

11       A.    If you could display it, possibly.  So what

12   the arrow is indicating is a trace number.  So for

13   me, that indicates for eTrace, that line there,

14   previously traced.  I have access to the trace

15   number, but I don't know when that occurred, only

16   that it was during the year 2015.

17       Q.    All right.  Can you find out when that

18   request was made?

19       A.    Yes, I can.

20       Q.    Can we ask you to provide that to the

21   prosecution so they can let us know?  Or I'm happy to

22   email you.

23       A.    I can provide that information.

24            MR. ADAMS:  All right.  Thank you.  I don't

25   have any further questions.



SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                                e-mail: info@litsupport.com

```
1              THE COURT:  Thank you, Mr. Adams.
2              I think I already asked this, but anybody
3    else got any questions of Mr. Chavez on the defense
4    side?
5              All right.  Mr. Castellano, if you have
6    redirect of Mr. Chavez.
7              MR. CASTELLANO:  Thank you, Your Honor.
8                     REDIRECT EXAMINATION
9    BY MR. CASTELLANO:
10       Q.   Mr. Chavez, in terms of chain of custody,
11   did someone else at the laboratory have custody of
12   this firearm prior to your examination?
13       A.   Yes, they did.
14       Q.   What was that purpose?
15       A.   The purpose is just the type of examination
16   that is being requested.  There are some examinations
17   that would take precedence, like DNA or latents, that
18   would precede our handling of the firearm, to include
19   this is a multiunit submission, meaning that there is
20   a person doing both intake, as well as preparing it
21   for shipment.  So there is a request coordinator on
22   this submission.  And it serves multiunits, so DNA,
23   latents, and firearms.  So I would only be a part of
24   that chain of custody, full chain of custody.  The
25   RC, or anyone assisting the RC in packaging, or
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    accepting the firearm at the laboratory, would be the
 2    main point of contact for being the first one on the
 3    chain, or the last one on the chain.
 4         Q.   Were you aware of whether DNA testing
 5    occurred before the time you handled the firearm?
 6         A.   Yes, it did occur.
 7              MR. CASTELLANO:  No further questions, Your
 8    Honor.
 9              THE COURT:  All right.  Thank you, Mr.
10    Castellano.
11              MR. ADAMS:  No follow-up.
12              THE COURT:  All right.  Mr. Chavez, you may
13    step down.  Thank you for your testimony.  May
14    Mr. Chavez be excused from the proceedings, Mr.
15    Castellano?
16              MR. CASTELLANO:  Yes, Your Honor.
17              THE COURT:  Mr. Adams?
18              MR. ADAMS:  Yes, sir.  And if we could get
19    that extra follow-up information sooner rather than
20    later, it would be very helpful.  Thank you.
21              THE COURT:  All right.  Any other defendant
22    have any objection to Mr. Chavez being excused?  All
23    right.  You're excused from our proceedings.  Thank
24    you for your testimony, Mr. Chavez.
25              All right.  Mr. Castellano, does the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Government have further witnesses or evidence -- Ms.
 2   Armijo, on this motion?
 3             MS. ARMIJO:  Yes, we have Tiffany Smith.
 4             MS. SIRIGNANO:  Your Honor, can I clarify?
 5   Is Ms. Smith being called for the firearm or for DNA?
 6             THE COURT:  I think we're on the firearm
 7   motion right at the moment; correct?
 8             MS. ARMIJO:  Well, I assumed we were still
 9   just doing Daubert, in general.  She is doing DNA on
10   the firearm, but it is DNA.
11             THE COURT:  All right.
12             MS. ARMIJO:  So, I guess, I don't believe
13   we have anything more as far as testimony from
14   ballistics on the firearm.
15             THE COURT:  All right.  Is this still,
16   though, related to one motion, Ms. Sirignano, or is
17   it two separate motions?
18             MS. ARMIJO:  I believe it's one motion that
19   they filed challenging all of our Daubert.  But I
20   don't know how the defense would want to handle it.
21             MS. SIRIGNANO:  Your Honor, the notice that
22   the Government filed, Document 1242, included expert
23   witness testimony of Mr. Chavez and Ms. Smith.  So
24   our Daubert challenge was for both experts within
25   their amended notice of expert witness testimony.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  Well, why don't, before we
2      bring in -- unless Ms. Smith is relevant to
3      Mr. Chavez, why don't we hold off on her and finish
4      up the Daubert hearing on Mr. Chavez.  Do y'all have
5      any further witnesses or evidence, Mr. Castellano, on
6      Chavez' Daubert hearing?
7              MR. CASTELLANO:  No, Your Honor.
8              THE COURT:  All right.  Mr. Adams, do you
9      have -- do the defendants have any witnesses or
10     evidence it wishes to present on the Daubert
11     challenge to Mr. Chavez?
12             MR. ADAMS:  No, sir.  And, Your Honor, our
13     concern had been that he would go farther than the
14     report.  If that is the scope of his testimony, we
15     have no objection to that.
16             THE COURT:  All right.  Is that the
17     position of all the defendants on Mr. Chavez?  All
18     right.  So Mr. Chavez will be admitted -- will be
19     allowed to offer opinion testimony within the scope
20     of his report and testimony today.
21             All right.  Now, let's call Ms. Smith.
22             MS. ARMIJO:  And, Your Honor, we're
23     starting fresh, correct?  Do you want to start fresh
24     for this?
25             THE COURT:  Let's start fresh on Smith's
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   Daubert hearing.  Let's take these individually.
 2           Ms. Smith, if you'll come up and stand next
 3   to the witness box on my right, your left.  Before
 4   you're seated, my courtroom deputy, Ms. Standridge,
 5   will swear you in.
 6                   TIFFANY SMITH,
 7       after having been first duly sworn under oath,
 8       was questioned and testified as follows:
 9                   DIRECT EXAMINATION
10           THE CLERK:  Please be seated.  State your
11   name for the record.
12           THE WITNESS:  My name is Tiffany Smith.
13           THE COURT:  Ms. Smith.  Ms. Armijo.
14           MS. ARMIJO:  Thank you, Your Honor.
15   BY MS. ARMIJO:
16       Q.  What is your current occupation?
17       A.  I'm a forensic examiner in the DNA Casework
18   Unit of the FBI Laboratory.
19       Q.  And what are your responsibilities as a
20   forensic examiner with the FBI?
21       A.  As a forensic examiner, it is my
22   responsibility to determine which items of evidence
23   require DNA testing.  I will direct a team of
24   biologists to perform that testing in the laboratory.
25   I will review the data of that testing, perform any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    necessary comparisons between items of evidence and

2    known DNA samples taken directly from individuals.  I

3    will then report those comparisons in a report, and

4    then testify if needed.

5         Q.   When did you start working for the FBI?

6         A.   August of 2010.

7         Q.   And have you received any specialized

8    training in the area of forensic DNA analysis since

9    joining the FBI Laboratory?

10        A.   Yes.  Once I was hired by the FBI

11   Laboratory, I went through a year-and-a-half training

12   program, where I worked alongside qualified forensic

13   examiners, performing the same job duties as I

14   currently perform; however, it was under their direct

15   supervision.  I worked on mock items of evidence in

16   the laboratory.  I wrote reports that were then

17   reviewed.  I took a series of moot court exercises

18   and oral board examinations, and passed a competency

19   test at the end of my training.

20        Q.   Now, please describe your work experience

21   prior to joining the FBI.

22        A.   Prior to joining the FBI Laboratory, I was

23   a graduate student at West Virginia University, where

24   I worked in a forensic-based research laboratory for

25   three years; that was through the university.  I also

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   taught courses relating to, not only DNA, but also
 2   forensic DNA.  And I also was an intern for a summer
 3   at the Connecticut State Forensic Laboratory, where I
 4   observed qualified examiners performing multiple job
 5   duties at that lab.
 6         Q.   And what is your educational background?
 7         A.   I have bachelor's of science degree in
 8   forensic and investigative sciences at West Virginia
 9   University.  And I have a master's in biology degree
10   also from West Virginia University.
11         Q.   How do you stay current in your field?
12         A.   I stay current in my field by reading
13   articles, attending training at the laboratory, and
14   then sometimes outside laboratory.  We receive talks
15   by our DNA Support Unit, which provides us training
16   as well.
17         Q.   And have you ever been qualified as an
18   expert in the field of DNA testing before?
19         A.   Yes, I have.
20         Q.   And can you tell us where and when,
21   approximately.
22         A.   I've testified approximately 31 or 32
23   times.  Both in New Mexico, in Texas, Oklahoma, North
24   Dakota, Florida, Maryland, Guam, U.S. Virgin Islands.
25   I'm sure there are many others.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And have you been qualified as an expert --
 2   you indicated in New Mexico, was that in federal
 3   court?
 4        A.   Yes, it was.
 5        Q.   And do you recall the names of the cases?
 6        A.   I believe it was U.S. versus Thomas
 7   Rodella.
 8             MS. ARMIJO:  All right.  Now, Your Honor,
 9   we would ask that Ms. Smith be qualified as an expert
10   in the field of DNA testing.
11             THE COURT:  Any objection to Ms. Smith
12   offering opinion testimony in that area?  Ms.
13   Sirignano?  Anyone else?
14             MS. SIRIGNANO:  No objections at this time,
15   Your Honor.
16             THE COURT:  All right.  Ms. Smith will be
17   allowed to offer opinion testimony in the area of DNA
18   testing.
19             MS. ARMIJO:  And, Your Honor, I also
20   have -- I think without objection -- I'm moving in
21   Exhibits 1, 2, and 3, which are Ms. Smith's CV and
22   two lab reports in reference to her testimony today.
23             THE COURT:  Any objection, Ms. Sirignano?
24             MS. SIRIGNANO:  No, Your Honor.
25             THE COURT:  Anyone else?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              All right.  Government's Exhibits 1, 2, and
2    3 will be admitted for this Daubert hearing.
3         Q.   Ms. Smith, what is DNA?
4         A.   DNA stands for deoxyribonucleic acid.  And
5    it is our hereditary material.  We receive half our
6    DNA from our mother and half from our father.  And it
7    controls not only what we look like, but also
8    controls all the different chemical processes going
9    on within the body.
10        Q.   And where is DNA found?
11        A.   DNA is found within our cells, and the
12   cells are the building blocks that make up our body.
13   We have skin cells, heart cells, muscle cells; males
14   have sperm cells, and there is DNA in these cells.
15        Q.   And does DNA vary from person to person?
16        A.   Yes, DNA is unique to a person, with the
17   exception of identical twins.  Over 99 percent of our
18   DNA is the same, and that's what makes us human, it
19   gives us two arms, a nose, a mouth.  However, there
20   is approximately 1 percent of our DNA that varies
21   between individuals, which makes us unique.
22        Q.   And what kind of differences do you examine
23   in DNA?
24        A.   For forensic purposes, I look at small
25   regions of the DNA that are repeated back to back.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    We call these STRs, or short tandem repeats.  The

2    number of repeats a person has differs versus another

3    individual.  So, for instance, it's similar to the

4    way a train would work, where all trains have an

5    engine and a caboose, but some trains are longer

6    because they have more repeats, or more box cars.

7    And that's the same with DNA testing that I perform.

8    Some individuals may have seven repeats, others may

9    have 10, making them different at locations.

10         Q.    And how is DNA typing performed at the FBI?

11         A.    There is a series of steps that must be

12   done.  The first is a collection, where we have to

13   collect these cells off of an item of evidence, or

14   from a known sample.  And this is usually by cutting

15   or swabbing an item.  We then go through an

16   extraction process where we're adding chemicals and

17   heat to the item releasing DNA from those cells.  We

18   then determine how much DNA we are able to obtain.

19   We then run that through an amplification or copying

20   process.  That process will only copy the locations

21   of the DNA that vary between individuals.  We will

22   then run it through an instrument, which will

23   generate a DNA profile.  I can then compare that DNA

24   profile from an item of evidence to a DNA profile

25   that was taken directly from a known person.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And what are the possible conclusions of a

2    DNA test?

3       A.   There are two main types of conclusions.

4    The first is an exclusion, and that is when the DNA

5    from an item of evidence is different than the DNA

6    from a known individual, and therefore, we say that

7    person is excluded as a possible contributor to that

8    DNA.

9            The other major conclusion is a match.  And

10   that is when the DNA from an item of evidence is the

11   same as the DNA from a known individual.  Therefore,

12   we say that person could be a possible contributor to

13   that sample.

14      Q.   And how do you determine the significance

15   of a DNA match?

16      A.   If we have a DNA match, we have to generate

17   a statistic to show if it is a strong match or if the

18   profile is common in the general population.  What we

19   calculate at the FBI Lab is something called a

20   likelihood ratio.  It's where we compare alternating

21   hypotheses.  The first is:  What is the probability

22   of that DNA evidence, given it originated from a

23   certain person of interest.  We compare that to the

24   probability of the evidence, given that it originated

25   from a random, unrelated, unknown individual.  The

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  larger the number we get, the more support that the
2  DNA originated a certain person of interest.
3      Q.   And is it possible to identify the source
4  of the DNA?
5      A.   Yes.  At the FBI laboratory, when we
6  calculate that likelihood ratio, if the number we get
7  is over 700 billion, then we attribute an individual
8  as the source of the DNA.
9      Q.   And what is a mixture?
10     A.   A mixture is when you have DNA from more
11 than one individual on an item.  So, for instance,
12 multiple people come in contact with an item, and
13 they all are leaving their DNA on that item.
14     Q.   How does a mixture affect the possible
15 conclusions from a DNA test?
16     A.   It doesn't.  The conclusions are the same.
17 You can still compare a person to a mixture, and you
18 can still have an exclusion, meaning a person does
19 not match any of the contributors within that
20 mixture.  Or you could also have a match in there,
21 where you would still calculate a likelihood ratio.
22     Q.   And how do you know that the results of --
23 that you get are reliable?
24     A.   The biologist and examiners that are
25 performing the training or doing the comparisons are

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   both extensively trained.  The laboratory itself is
 2   an accredited laboratory, which means that an outside
 3   body come in to the laboratory and reviews the
 4   standard operating procedures and policies, to ensure
 5   that the results we are getting are reliable.  The
 6   DNA unit is specifically also audited yearly, to
 7   ensure that we're following quality assurance
 8   standards for forensic DNA testing laboratories.  And
 9   we also run controls of each step of the process.
10        Q.   And do you follow protocol that has been
11   set by the FBI?
12        A.   Yes, we do.
13        Q.   And is that protocol set by anybody else or
14   just the FBI?
15        A.   So the FBI has its own protocols and
16   procedures.  However, the basis of those procedures
17   has been validated.  It's also recommended by SWGDAM.
18   There are other laboratories that are using similar
19   protocols.
20        Q.   Let's go on to this specific case.  Did the
21   FBI Laboratory receive evidence pertaining to your
22   testimony today?
23        A.   Yes, we did.
24        Q.   And I'm going to first refer, to assist
25   you -- how many reports did you generate in reference
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  to your testimony?

2       A.   Two in reference to this testimony.

3       Q.   Now, I'm going to show you first what's

4  been marked as Government's Exhibit 2.  Are you

5  familiar with this item?

6       A.   Yes, I am.  That is a copy of my report

7  that was dated January 3rd of 2017.

8       Q.   And can you tell us, in general, what you

9  first did in this case, as far as did you receive

10  items to examine?

11       A.   The FBI Laboratory received multiple

12  submissions in this case.  When I was assigned to

13  this case, I combined those submissions into one

14  laboratory report.  The items of evidence that came

15  up to the DNA Casework Unit were inventoried by our

16  case administrative group.  I, then, reviewed the

17  incoming paperwork, and I deemed what should be

18  tested, and directed my biologist to perform that

19  testing.

20       Q.   And does Government's Exhibit 2 list the

21  items that you received in this case, which I believe

22  go to exhibit or item number 54 on the second page;

23  is that correct?

24       A.   These are the items that I tested in this

25  case.  We may have received more.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   All right.  And what was the first step in

2  testing these items as far as your analysis?

3    A.   It depends on the items.  So, for instance,

4  with the Phoenix Arms pistol and the canvas holster,

5  I directed my biologist to perform DNA testing on

6  those items, which means they would take swabbings of

7  the items.  My biologist swabbed the textured

8  portions of the Phoenix pistol.  And separately they

9  also swabbed the outside fabric surface of the canvas

10 holster.  For the additional items, most of those

11 items started with blood testing.

12   Q.   Okay.  So, specifically, and what we're

13 here for today, are you referring to items number 3

14 and 4?

15   A.   Yes, I am.

16   Q.   And what was done with those items after

17 the initial swabbing and examination?

18   A.   They went through the routine process,

19 where we collected the DNA, extracted the DNA,

20 eventually amplified the DNA, and generated profiles.

21 I then interpreted those profiles, and wrote this

22 report.  At that time, I did not have knowns to

23 compare to these two items, so they were just

24 reported out generally as mixtures of DNA.

25   Q.   And specifically with items 3 and 4 -- and

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                    1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    I'm now looking at, I believe, page 3 of Exhibit 2.

2    Does that contain -- what were your results from item

3    number 3 and item number 4?

4         A.   For item number 3, I did get a mixture of

5    DNA, which again means that more than one person came

6    in contact with that item.  And I also look at a sex

7    determining region, to tell whether the DNA came from

8    males or females.  And in this case, it came from

9    both a mixture of male and female DNA.

10        Q.   And what about for the swabbing from the

11   outside surface of the holster?

12        A.   For the holster, again, it was a mixture of

13   DNA.  And so, therefore, again, that means that more

14   than one person came in contact with that item.

15   However, from the sex typing results here, I detected

16   male DNA.

17        Q.   Now, you can't tell when a person left the

18   DNA on there, can you?

19        A.   No, I cannot.

20        Q.   So after you did the testing on this, did

21   you then generate this report?

22        A.   Yes, I did.

23        Q.   And, in fact, you indicate on items number

24   3 and 4 that the mixture is suitable for comparison

25   purposes; correct?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    That is correct.

2        Q.    So what would you expect to get after

3   listing that on the report?

4        A.    After that report, I was hoping to get

5   potential known reference samples, which are known

6   samples taken directly from a person, in order to do

7   comparisons to those items.

8        Q.    And did you get that in this case?

9        A.    I did, yes.

10       Q.    All right.  Now, I'm going to show Exhibit

11   3.  Are you familiar with this item?

12       A.    I am, yes.

13       Q.    Tell us what we're looking at?

14       A.    This is a buccal sample from Mr.

15   Christopher Garcia.  And a buccal sample is a cheek

16   swab that is taken directly from a person.  And we

17   treat this as a known reference sample, meaning we

18   know where the DNA came from on this item.

19       Q.    And what you do with that sample?  And I

20   believe it's item number 58; is that correct?

21       A.    That is correct.  The same process was done

22   on item 58 as the previous items.  We took a cutting

23   of the buccal sample.  The biologist then performed

24   the same extraction, quantification amplification

25   steps.  Eventually, a profile was generated.  I,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   then, reviewed that profile, and I was able to
 2   compare that profile back to the Phoenix Arms pistol,
 3   in addition to the holster.
 4        Q.    And what were your conclusions based on
 5   that?
 6        A.    So for the Phoenix Arms pistol, I compared
 7   the DNA profile from that pistol to Mr. Garcia.  When
 8   I did that comparison, I was not able to visually
 9   exclude him as a possible contributor.  Therefore,
10   when I interpreted this pistol, I interpreted the DNA
11   as originating from four individuals.  When I ran the
12   statistic for Mr. Garcia, it was determined that the
13   DNA typing results for the pistol were at least 28
14   times more likely to -- if they originated from
15   Mr. Garcia and three unrelated, unknown individuals
16   than if they originated from four unrelated, unknown
17   individuals.  So this provided moderate support that
18   Mr. Garcia is a contributor to the DNA from the
19   Phoenix Arms pistol.
20        Q.    Now, in reference to the holster, did you
21   get different results from the holster?
22        A.    From the holster, I also interpreted that
23   holster as originating from four individuals.  From
24   that holster, when I compared it to the DNA from the
25   holster to Mr. Garcia, he again matched that profile.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    When I calculated my likelihood ratio, it was over

2    our threshold of 700 billion, so therefore, I was

3    able to satisfy that Mr. Garcia is the source of one

4    of the contributors on that holster.

5         Q.   Now, tell us a little bit about what you

6    mean about it was greater than your -- what term did

7    you use?

8         A.   We have a threshold.  So when we calculate

9    that likelihood ratio, as that number increases, the

10   more support that a certain person of interest is

11   included as a contributor.  So once that likelihood

12   ratio reaches 700 billion, we no longer report the

13   likelihood ratio, we just state that an individual is

14   the source of the DNA.

15        Q.   And do you know from your notes

16   approximately what the ratio was?

17        A.   I don't recall specifically.  But I do

18   believe it was in the quadrillions.

19        Q.   Quadrillions?

20        A.   Yes.

21        Q.   And as far as -- do you know approximately

22   how many people there are on Planet Earth?

23        A.   There is approximately 7, 7 and a half

24   billion people.

25        Q.   There is obviously a difference in the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    numbers between the holster and the firearm; is that
 2    correct?
 3         A.   That is correct, yes.
 4         Q.   Okay.  And what sort of things could impact
 5    that?
 6         A.   It depends on how much DNA is present.  It
 7    depends on if Mr. Garcia is, in fact, a true
 8    contributor.  If he is not, then the number would be
 9    expected, potentially, to be lower.  It also depends
10    on how many people handled a certain item, and in
11    what order.  So, for instance, if one person handled
12    the item first, and then multiple people handled it
13    later, that could potentially limit their ability.
14    So it's really hard to say specifically.  But there
15    are a variety of reasons.
16         Q.   Now, in general, with DNA, do you know how
17    long DNA has been used in the scientific world for
18    testing in forensics?
19         A.   It's been used since the '80s.  However,
20    specifically, the type of testing we currently are
21    using, the FBI has been doing it since 1999.
22         Q.   And is it generally accepted in the
23    scientific communities?
24         A.   Yes, it is.
25         Q.   And does the FBI maintain the standards for
```

SANTA FE OFFICE                                            MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                       1-800-669-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1    that type of testing, I should say?
 2         A.   Yes, we do.
 3         Q.   And is that part of your accreditation?
 4         A.   Yes, it is.
 5              MS. ARMIJO:  May I have just a moment, Your
 6    Honor?
 7              THE COURT:  You may.
 8         Q.   Now, when you request a sample from a
 9    person to make your matches, do you just use -- do
10    you use the swab from an arrest, or what is it
11    exactly that you use?
12         A.   We are not allowed to use swabs from time
13    of arrest.  Those are specifically collected for
14    entry into a database searching purposes.  For direct
15    comparison to items of evidence, we do require a new
16    sample to be collected.
17              MS. ARMIJO:  All right.  Thank you.  I'll
18    pass the witness, Your Honor.
19              THE COURT:  Thank you, Ms. Armijo.
20              Ms. Sirignano, do you want to start?
21              MS. SIRIGNANO:  Thank you, Your Honor.
22              THE COURT:  Ms. Sirignano.
23              MS. SIRIGNANO:  I'm going to need a minute,
24    Your Honor.
25              THE COURT:  Certainly.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MS. SIRIGNANO:  Thank you, your Honor.

2          With the Court's indulgence, I'm going to

3     ask Ms. Torraco to vacate there, so we have a little

4     more room.

5          THE COURT:  Are you agreeable with that,

6     Ms. Torraco?

7          MS. TORRACO:  Yes, Your Honor.

8          THE COURT:  Thank you, Ms. Torraco.

9          MS. SIRIGNANO:  Your Honor, Ms. Gilbert is

10    here at the podium with me because we're going to use

11    Trial Director in this cross-examination.

12         THE COURT:  All right.  Ms. Gilbert, good

13    morning to you.

14         MS. SIRIGNANO:  Your Honor, may I approach?

15         THE COURT:  You may.

16                    EXAMINATION

17    BY MS. SIRIGNANO:

18         Q.   Good morning, Ms. Smith.

19         A.   Good morning.

20         Q.   I'm handing you what's been marked CG-A and

21    DNA on the bottom.  Do you recognize that?  It's

22    approximately 317 pages.

23         A.   Yes, I do.  It is a copy of my original

24    case file for the first submission.

25         Q.   And when you say "the first submission,"

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that would be items 3 and 4 that you just previously
 2    testified about?
 3         A.   Correct.  They're the first submissions for
 4    myself.  It was, I believe, the third or fourth
 5    submission for the laboratory.  But yes, that's what
 6    I'm referring to.
 7         Q.   And that would be the alleged gun and the
 8    holster in this case?
 9         A.   That is correct.
10              MS. SIRIGNANO:  Your Honor, I'd like to
11    move for admission of CG-A DNA at this time?
12              THE COURT:  All right.  CG-A.  All right.
13    Any objection, Ms. Armijo?
14              MS. ARMIJO:  No, Your Honor.
15              THE COURT:  Any objection from the other
16    defendants?  All right.  Christopher Garcia's Exhibit
17    A will be admitted for this Daubert hearing.
18              MS. SIRIGNANO:  Thank you.
19         Q.   Ms. Smith, can you take a look at this
20    exhibit, please?  What is it?
21         A.   This is the case file from my second
22    report.
23         Q.   And so you recognize it as your case file?
24         A.   Yes, I do.
25         Q.   And when you say the "second report," that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   would be the report you did regarding Mr. Garcia's
 2   buccal swab?
 3        A.   That is correct.
 4             MS. SIRIGNANO:  Your Honor, at this time,
 5   I'd move admission of Mr. Garcia's CG-B DNA.
 6             THE COURT:  Any objection, Ms. Armijo?
 7             MS. ARMIJO:  No, Your Honor.
 8             THE COURT:  From any other defendant?
 9             All right.  Christopher Garcia's Exhibit B
10   will be admitted into evidence for this Daubert
11   hearing.
12             Ms. Sirignano.
13             MS. SIRIGNANO:  Thank you, Your Honor.
14        Q.   So Ms. Smith, I'm just going to talk a
15   little bit about your background and your previous
16   testimony about the two reports, Government's 1 and
17   2.  And you said that you have biologists that do the
18   work for you; correct?
19        A.   That is correct.  The FBI laboratory has a
20   team approach, where we have examiners that direct
21   the testing and they oversee all the testing.  The
22   decisions are made by the examiners.  The comparisons
23   and interpretations are made by the examiners.
24   However, we do have biologists that perform the
25   hands-on testing in the lab.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And so what's part of your review?

2      A.   I review the biologists' notes, I review

3   the profiles that were generated.  I review the

4   incoming paperwork of the items prior to them being

5   tested at the laboratory.  I review the entire case

6   file.

7      Q.   And that's what you have in front of you in

8   Exhibits CG-A and CG-B DNA; correct?

9      A.   That is correct.  These are copies of my

10   case file.

11      Q.   Which includes the biologists' reports as

12   well; correct?

13      A.   That is correct, yes.

14      Q.   And so in so much you review their work,

15   you adopt their work as well?

16      A.   I do.  I'm in constant contact with the

17   biologists.  So, as they're performing testing, if

18   they have any questions, they will come seek me out.

19   If they have no questions, then I will just review

20   their notes, make sure there are no issues, and then

21   write my reports based off those.

22      Q.   And you, yourself, do not do any instrument

23   testing, or you did not do any instrument testing for

24   these two reports, Government's Exhibits 1 and 2?

25      A.   That is correct.  The biologists would do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    that.

 2        Q.   And so what would happen if you found an

 3    error in one of the biologist's reports or notes?

 4    What's the process?

 5        A.   It depends on what the type of error is.

 6    If the error is an administrative error, such as a

 7    spelling discrepancy, I would just correct the

 8    spelling discrepancy.  If it is something that I

 9    cannot just correct, I will go seek out the

10    biologists, have a conversation with them, and make

11    any adjustments as needed.  If there is an error

12    affecting their work, then it would be brought up to

13    a technical leader.  And then the decision would be

14    made from that point on from our quality program.

15        Q.   So you would review a report first, and

16    then, if there was an error, then it would go to a

17    technical leader for review?

18        A.   That's the normal process.  It really just

19    depends on the type of error.  If it was an

20    instrument error, we may just proceed with a new

21    instrument.  It really just depends on the specific

22    situation.  In this case, there was no noted error,

23    so I don't have any of those issues in this case.

24        Q.   Can you talk a little bit about your error

25    rate with this particular program, STRmix?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1      A.    There is no documented error rate for

2   STRmix, as we use it at the laboratory.   The STRmix,

3   if it has an error while running, we will re-run the

4   program.   But there is no calculated error rate.

5      Q.    And at times, when you re-run the sample,

6   do you get different findings than the first run,

7   when you read -- when -- a sample as an error?

8      A.    Yes, if there is an error, then it means

9   the software will not complete properly.   So when you

10  re-run the software, you will get the correct value.

11     Q.    And how many times in your history with the

12  FBI have you had to do that?

13     A.    I can only think of one to two, maybe,

14  instances.   And that was because the DNA types that

15  were seen were not separated fully because of how

16  close in size they were.   So STRmix was not able to

17  handle that specific instance.   So I ignored that

18  location.

19     Q.    You talked with Ms. Armijo on direct

20  examination that the DNA unit has manuals and

21  protocols and procedures; correct?

22     A.    That is correct, yes.

23     Q.    Do you have any of those with you here

24  today?

25     A.    I do not have them with me, no.   They were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    provided on a CD, on discovery.  But I don't
 2    typically bring those with me on testimony.
 3         Q.   So they were provided to the Government?
 4         A.   Yes.  So copies of my protocols that were
 5    relevant to the case as well as my case files are
 6    typically handed over on discovery, as part of our
 7    quality assurance program.
 8         Q.   When was that handed over?
 9         A.   I don't know specifically.  Once we get a
10    discovery request in, our normal process is to make
11    copies of the case files, also provide copies of our
12    protocols.  Those are handed over to our legal
13    department.  And from my understanding, our legal
14    department mailed them December 7, via an email I
15    received.  So I don't know specifically when they
16    were received or anything like that.
17         Q.   December 7th of 2016?
18         A.   Of 2017.
19         Q.   2017.  Was that last week?
20         A.   Based on the email, I have, yes.
21              MS. SIRIGNANO:  Your Honor, at this time,
22    I'd like to ask for the Government to turn over those
23    policies and procedures that were turned over by
24    Ms. Smith as part of the discovery process.
25              THE COURT:  Any response on that, Ms.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Armijo?

 2              MS. ARMIJO:  Your Honor, I will check to

 3    see if they were disclosed yet.  I know that I was

 4    handed today a CD that was sent on December 14 to

 5    Special Agent Nancy Stemo.  But, in looking at it

 6    this morning, I didn't see policies and procedures,

 7    but I'll have to have somebody else go look at it.

 8    But it was sent to Nancy Stemo on the 14th.  So I'm

 9    trying to figure out -- it is true the legal people

10    said that they sent it to us on December 7th, which

11    means that we, at least New Mexico, would have

12    received it.  I'm trying to track that down to see if

13    that was disclosed or not.  I believe what I have in

14    my hand today is from a different examiner and

15    different report.  So I will be tracking that down,

16    and certainly have no objection to turning it over,

17    if it has not already been disclosed.

18              THE COURT:  All right.  Ms. Sirignano?

19              MS. SIRIGNANO:  Your Honor, it has not

20    already been disclosed.  And the Government did know

21    that we were having this hearing today.  I did file,

22    as the Court requested, over the weekend, a

23    declaration from our expert, Janine Arvizu, regarding

24    the need for the protocols and procedures in order to

25    properly do an audit.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          And I'm also getting a sworn declaration

2     affidavit from Dr. Dan Krane, regarding -- he's a DNA

3     expert in this case -- regarding the need to have

4     those SOPs, policies and procedures, in order to

5     discuss the extraction process, the quantitative

6     results of the DNA, the amplification process, the

7     instrument calibration, and then the comparison of

8     the result to the known person.

9          So, Your Honor, I would submit that I need

10    those documents in order to properly do a

11    cross-examination.

12         THE COURT:  Well, do the best you can.  And

13    then we'll see if the Government can find those and

14    get them in your hands pretty quickly.

15         MS. SIRIGNANO:  Thank you, Your Honor.

16    Q.   So is it normal procedure for you, as an

17    examiner, when you have produced a report, to provide

18    your reports and the SOPs, manuals, policies and

19    procedures, to the United States Attorney's Office?

20    A.   We do, once requested.  So I work --

21    typically, I have 30 or so cases assigned to me at

22    once.  And most of those don't ever go to trial.  So

23    when the attorney requests a discovery, that's when

24    we would hand over all of our materials.  We would

25    hand over copies of our case files, and then also

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    copies of our standard operating procedures.  So it's

2    not every case.  It's only when requested.

3         Q.   And that's routine; policies and procedures

4    manuals go along with the case file when you have

5    notice of litigation; correct?

6         A.   That is true.  It depends on the case.

7    Sometimes it's a little more complicated.  So for a

8    case like this, where there are many submissions,

9    sometimes the legal team in order to expedite the

10   process, will send out things piecemeal.  Usually,

11   they'll try to send it out in all one packet.  But

12   because this case is still ongoing at the laboratory,

13   there are still open examinations at the laboratory,

14   they may or may not have sent it in different

15   packets.  I'm not sure specifically to that.

16        Q.   Thank you.

17             So you testified earlier that DNA has been

18   around since 1999; correct?

19        A.   The DNA testing that we specifically

20   perform at the lab, the STR, short tandem repeats,

21   has been around since '99 at the FBI Laboratory.

22        Q.   Short tandem repeats?

23        A.   Correct.

24        Q.   Now, tell us a little bit about the -- you

25   used a STRmix computer program to perform the STR, or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   short tandem repeat testing in this case; correct?

2        A.   STRmix was not used for the testing.  It

3   was used for the interpretation calculation of a

4   likelihood ratio after the testing was completed.

5   STR testing itself is the actual process by which the

6   DNA is copied and the profile is generated.  But

7   STRmix is a tool that we use to generate likelihood

8   ratios and to do mixture deconvolution, or separation

9   of contributors in a mixture.

10       Q.   So how is STRmix different than the

11  previous method that the FBI was using before the FBI

12  adopted STRmix?

13       A.   The previous method threw out a lot of

14  information.  It was called a combined probabilty of

15  inclusion.  It's still a valid method to use;

16  however, if you have low level samples, you cannot

17  include multiple locations in your statistic

18  calculation.  So you are actually -- as an examiner,

19  you're not able to use the information or all the

20  information that was present.

21            STRmix is a continuous model that models

22  for different processes within the DNA process.  It

23  models for drop-out.  So if you're missing

24  information, it actually has modeling for that.  It

25  also can model artifacts that can be seen.  So it's a



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    better tool that utilizes the entire profile, versus
2    just parts of the profile.
3         Q.   So it's not a human analysis by any means;
4    correct?
5         A.   There is definitely human involvement.  So,
6    as an examiner, I first do a visual comparison to see
7    if I believe the individual can be visually excluded.
8    If a person is visually excluded as a contributor, I
9    do not run STRmix.  I actually do that step first.
10   If I cannot visually exclude an individual, I will
11   then run STRmix.  But I must review the output of
12   STRmix.  So the report that STRmix generates, I
13   review that report as well.
14        Q.   So did you do a visual comparison in this
15   case?
16        A.   I did, yes.
17        Q.   And what were your results?
18        A.   I cannot visually exclude Mr. Garcia to
19   either the holster or the pistol; therefore, I ran
20   STRmix for both items.
21        Q.   And is that reflected in your reports?
22        A.   That's just part of our procedure.  So it's
23   not specifically laid out in the report.  However, if
24   there was an exclusion, it would state that I
25   excluded in that report.  It would say an individual
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    is excluded in the report.

2         Q.   And what did you visually compare?

3         A.   The DNA profile from Mr. Garcia to the DNA

4    profile from both holster, as well as the pistol.

5         Q.   So let's be a little bit more certain with

6    what we're talking about here.  So you called the DNA

7    profile from Mr. Garcia, item 58(1)a; correct?

8         A.   I'm not sure what you're referring to.  The

9    parentheses one at the end?

10        Q.   Yes.

11        A.   That is just the collection item.  So it's

12   actually just item 58.  But in the collection notes,

13   it will have the parentheses, because that's part of

14   the software we use to track the sample.  It

15   automatically adds that.  But in my report it would

16   just be item 58.

17        Q.   And then the firearm was item 3; correct?

18        A.   Correct.

19        Q.   And the holster you identified as item 4;

20   correct?

21        A.   That is correct.

22        Q.   So you compared the DNA profile of item 58

23   with item 3 and item 4; correct?

24        A.   That is correct, yes.

25        Q.   Okay.  And when you say the DNA profile,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    what actually are you looking at?

2        A.   I'm looking at alleles, or DNA types, that

3    are present at each location.  So in STR testing --

4    at the time the holster and the pistol was tested, we

5    were looking at a kit that looks at 15 STR, or short

6    tandem repeat, locations.  Each of these locations

7    has DNA types present at them.  The totality of all

8    15 types is what I'm referring to as a DNA profile.

9            With Mr. Garcia, I was using a different

10   kit that actually looks at 24 DNA locations.  And I

11   compared those profiles to the previously tested

12   evidence items.

13       Q.   Okay.  So let's go into that a little bit.

14   What's an allele?

15       A.   An allele is a DNA type at a location.  So,

16   for instance, if you receive seven repeats from your

17   mom, then that would be called a seven allele.  If

18   you receive 10 from your dad, that would be a 10

19   allele.  Your DNA profile at that location would be a

20   7/10.  It's a combination of both alleles together

21   which makes up your DNA profile.

22       Q.   And the kit that you use to test the

23   firearm and the holster is called what?

24       A.   Identifiler.

25       Q.   And how many locations does it test?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

105

1      A.   It looks at 15 locations, in addition to a

2   sex determining region.

3      Q.   Then you used a different kit for the

4   buccal sample, correct, item 58?

5      A.   That is correct.  And that's because the

6   buccal sample came in approximately a year later.  So

7   at that time, we were no longer using Identifiler.

8   We were using a new kit called GlobalFiler, which

9   looks at 21 locations, and then three sex-determining

10   locations, for a total of 24.

11      Q.   And why did the FBI go to the GlobalFiler

12   kit?

13      A.   We went to the kit because it looks at more

14   locations, therefore, it has more discrimination

15   potential.  In addition, one of the main reasons is

16   CODIS, which is the DNA database, is going to be

17   switching to more locations in the future.  And so it

18   was recommended -- or mandated -- that all

19   laboratories that participate in CODIS, which is the

20   Combined DNA Index System, or that database, start

21   using more up-to-date kits that have more locations.

22      Q.   So I'd like to talk to you a little bit

23   about this STRmix program.

24           Can you pull up CG-B 25, please.

25           Ms. Smith, what's this?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    A.   This is the evidence check-in notes that my

2    case administration group documented as the item was

3    received into the DNA Casework Unit for the item 58

4    buccal sample for Mr. Garcia.

5    Q.   And in terms of relevant considerations for

6    STRmix, the STRmix program only asks specific

7    questions that you or the analyst or the examiner

8    puts into the program; correct?

9    A.   That is correct, yes.

10   Q.   And so with your hypotheses, you just

11   compare Mr. Garcia's item 58, the buccal sample, with

12   items 3 and 4; correct?

13   A.   That is correct.  I do it individually,

14   yes.

15   Q.   Can you pull up CG-A 17.

16        Ms. Smith, do you recognize this document?

17   A.   I do.  That is the incoming lab exam

18   request from the field, when the items -- the pistol

19   and the black holster were submitted to the

20   laboratory.  This is the documentation I received.

21   Q.   You received this from whom?

22   A.   This would come from the FBI agent

23   submitting the evidence to the lab, or any other

24   contributor, when they submit evidence to the lab,

25   they're required to fill out either a lab exam

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   request or a letter.

2       Q.   And this is an electronic communication

3   from Agent Sainato; correct?

4       A.   Yes, that is correct.

5       Q.   In the Albuquerque Division?

6       A.   Yes, that is correct.

7       Q.   Part of that request is, it states at the

8   bottom of that the page that entity, Mario Montoya,

9   is known to have touched items; correct?

10      A.   It is listed as that, yes.

11      Q.   Entity Christopher Garcia is believed to

12  have touched items; correct?

13      A.   That is correct.  That is also listed.

14      Q.   At any point in time in your review of

15  items 3 and 4, did you consider Mario Montoya's DNA

16  as part of your testing and analysis?

17      A.   I did not receive a sample from Mr.

18  Montoya, no.

19      Q.   Why?

20      A.   One was not provided.

21      Q.   So you did not consider Mr. Montoya's DNA

22  in your findings then?

23      A.   Unless a sample is submitted from

24  individuals, I cannot consider them in my findings,

25  no.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

108

1      Q.   But from this electronic communication, you

2   know from the agent that entity Mario Montoya is

3   known to have touched the item; correct?

4      A.   That is correct.  And that's part of the

5   misconception, is that DNA, we cannot use samples

6   from databases for direct comparisons.  So these

7   individuals are listed under the assumption that

8   either us or latent fingerprints can pull their

9   samples for direct comparison.  But, legally, DNA is

10  not allowed to do that.  And so the agent would have

11  had to submit known reference samples directly to us,

12  in order for me to do those comparisons.

13     Q.   And Mr. Mario Montoya is a government

14  cooperating witness; correct?

15     A.   I do not know specifically who he is, no.

16          MS. SIRIGNANO:  Your Honor, may I approach?

17          THE COURT:  You may.

18          MS. SIRIGNANO:  Can you pull up CG-E DNA?

19     Q.   Ms. Smith, do you recognize this document?

20     A.   I do not.  It's between Agent Sainato

21  and -- it looks like a different employee with the

22  laboratory.  Not myself.

23          MS. SIRIGNANO:  One moment, please, Your

24  Honor.

25     Q.   Ms. Smith, we've already determined that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Agent Sainato was the case agent in Albuquerque
 2    submitting evidence to the lab; correct?
 3         A.   That is correct, yes.
 4         Q.   And in this email -- Sherine Ali is a
 5    fingerprint examiner?
 6         A.   Yes, I believe so, yes.
 7         Q.   Do you know Ms. Ali?
 8         A.   I do not, no.
 9         Q.   So in looking at this email, Agent Sainato
10    advises Ms. Ali -- and I'm going to quote from it, in
11    the middle of the page -- "We're just hoping that
12    Mr. Garcia's DNA fingerprints will be on the gun
13    and/or holster for additional confirmation"; is that
14    correct?
15         A.   That's what it states in this email, yes.
16         Q.   And then on the top of the page it says,
17    "You were interested in DNA examinations, but because
18    of the nature of the evidence, DNA examinations would
19    not be performed for these items."  Correct?
20         A.   That is also in a separate email, yes.
21         Q.   So you've never seen this document before?
22         A.   No, we don't typically have all the emails
23    from the other units in between the agents and other
24    laboratory examiners.  Just like they wouldn't
25    necessarily have our emails.  So, no, I have not read
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    this email.
 2        Q.   You were told by the FBI Albuquerque that
 3    they were hoping to find Mr. Garcia's DNA on items 3
 4    and 4?
 5        A.   I was not told that specifically.  It was
 6    listed in a lab exam request, that they believe
 7    Mr. Garcia may have been in contact or handed this
 8    item over.  So they were expecting, potentially, his
 9    DNA to be on this item.  Yes, that was in the lab
10    exam request that was previously shown.
11        Q.   That was the last document that I pulled up
12    on the visualizer; correct?
13        A.   That is correct, yes.
14        Q.   So you have knowledge that Mr. Garcia,
15    perhaps, had touched these items; correct?
16        A.   Yes.  That was listed in the lab exam
17    request, that he may have handed those over, yes.
18        Q.   So how do you overcome any kind of bias
19    from knowing that he might may have touched these
20    items?
21        A.   I perform the -- so for -- in this case,
22    the comparison was performed over a year later.  I
23    could not visually exclude, because Mr. Garcia's DNA
24    types were consistent with those on the firearm.  So
25    I ran STRmix.  And STRmix doesn't have any bias
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    potentially incorporated within the software.  It

2    does a mixture deconvolution first, before it even

3    looks at the known.  And then it also will, at that

4    point, compare the known and calculate a likelihood

5    ratio based off that.  So there would be no bias

6    associated with this.

7         Q.   But without having Mr. Montoya's profile to

8    consider, you've got a huge gap in the statistical

9    analysis with STRmix; correct?

10        A.   This would be independent of any additional

11   contributors.  Because on both firearm and the

12   holster there is a mixture of four individuals on

13   each of them.  So I do expect other people to

14   potentially match both of these items.

15        Q.   But you can't rule out Mr. Montoya one way

16   or the other; correct?

17        A.   That is correct.  I cannot rule out anyone,

18   because I did not receive any additional known

19   reference samples.

20        Q.   And at no point in time did you go back to

21   the laboratory, after you saw that incoming

22   electronic communication, and say, Hey, can you

23   please get a DNA sample from Mr. Montoya so I can use

24   it in my comparison; correct?

25        A.   No, I did not.  And, again, this case,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

1  because there were so many submissions going on at

2  once, I wasn't sure, originally, who needed to be

3  compared to what.  We had other buccal samples and

4  unrelated submissions.  And so, at that time, I did

5  not request any additional knowns.  The Garcia sample

6  came at a later date, directly to me.

7       Q.   So you've got a big gap in your mixture and

8  your analysis profile, without Mr. Montoya's DNA

9  profile; correct?

10      A.   I don't think that has anything to do with

11  Mr. Montoya's sample.  Again, there was a four-person

12  mixture on both the holster and on the firearm.  When

13  I compared Mr. Garcia, I could not visually exclude

14  him from either.

15           One of those items, the holster, there was

16  much stronger support for Mr. Garcia being a

17  contributor, because that likelihood ratio was

18  greater than 700 billion.

19           For the gun, the likelihood ratio that I

20  calculated was 28.  But that would be independent of

21  any other individuals.

22      Q.   But it's safe to assume that Mr. Montoya

23  could be one of those three or four unknown

24  individuals that was not properly analyzed; correct?

25      A.   He could be one of the contributors.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    would not say it was not properly analyzed.  However,

 2    he was not analyzed because I never received a sample

 3    from him.

 4            But, again, when we receive samples from

 5    the laboratory, we run every individual separately,

 6    or independently from the item.  So we wouldn't --

 7    having Mr. Montoya's sample would not have changed my

 8    comparison to Mr. Garcia.

 9        Q.   Okay.  Let's look at CG-B 62, please.

10            MS. SIRIGNANO:  Your Honor, we need a

11    moment here.  I apologize.

12            THE COURT:  That's all right.

13            MS. SIRIGNANO:  Thank you, Your Honor.

14            THE COURT:  Certainly.

15            MS. SIRIGNANO:  I love technology.

16        Q.   Ms. Smith, you recognize this document CG-B

17    062?

18        A.   I do.  This is the STRmix output report

19    that was generated in reference to the firearm.

20        Q.   And it's a number of pages in length;

21    correct?

22        A.   Correct.  It is listed as 20 pages.

23        Q.   That's down at the bottom of the document;

24    correct?

25        A.   That is correct, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

114

```
 1          Q.    And so looking at this document, and the
 2     title, "Summary of input data," this shows that you
 3     used the IDplus version 2.4; correct?
 4          A.    That is correct.
 5          Q.    You determined there were four contributors
 6     in this sample?
 7          A.    Yes, I did.
 8          Q.    And the input files are items 3 1A;
 9     correct?
10          A.    That is correct.
11          Q.    That would be the firearm?
12          A.    Correct.
13          Q.    And then the known contributors under the
14     hypothesis is item 58(1); correct?
15          A.    That is correct.
16          Q.    That is Mr. Garcia's buccal sample?
17          A.    Correct.
18          Q.    And so why is the next column "known
19     contributors under Hd" blank?
20          A.    The way the STRmix works is if you have no
21     additional individuals that you know for a fact will
22     be on that item, that would be left blank, and it's
23     just unknown contributors at that point.  So, for
24     instance, the known contributors under Hd for this
25     would be four unrelated unknown individuals.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   But you knew from the electronic

2  communication that Mario Montoya had touched this

3  firearm; correct?

4      A.   It was listed as a contributor, but I did

5  not have Mr. Montoya's sample when this analysis was

6  run.  And I still do not have that sample.  If I had

7  that sample, if we know that the firearm was touched

8  by him, I could include him as both a known

9  contributor under both Hp and Hd.  But, again, I do

10  not have the sample.

11      Q.   So you've got a big gap in your analysis

12  here, because the known contributor, Mario Montoya,

13  his DNA wasn't run; correct?

14      A.   I do not have a big gap here.  This is a

15  normal process for when we have only one buccal

16  sample.  This is how it normally would be.  So there

17  is not a big gap in this analysis.

18      Q.   But knowing that he did touch the firearm,

19  you could have run the sample, and it would have been

20  more accurate, had the sample been run; correct?

21  Instead of four unknown individuals?

22      A.   Without having his known sample -- just

23  because an individual comes in contact with a

24  firearm, it does not mean their DNA would be present.

25  So I can't say that Mr. Montoya would even be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    conditioned on here, which is when we include someone

 2    under Hd.  Because without having his known, I don't

 3    know if his DNA was present on that item.  So I don't

 4    want to make an assumption that it was, because I

 5    don't have that sample.

 6          Q.   Can you pull up CG-B 065, please?

 7               MS. SIRIGNANO:  I apologize, Your Honor.

 8          Q.   Ms. Smith, this is Document 56.  Do you

 9    recognize it?

10          A.   Yes, I do recognize this.  This is, again,

11    a page of the STRmix output file.

12          Q.   And in the middle of the page it says

13    "parameters"; correct?

14          A.   That is correct.

15          Q.   These are the input values that the FBI

16    enters into the STRmix program?

17          A.   Those are the parameters that are entered

18    based off of our validation.  So those will remain

19    identical every time.

20          Q.   And that's the FBI's validation, right?

21          A.   That is correct.  When the FBI goes online

22    with any type of software or kit, we have to validate

23    that kit for use in our hands.  And it was the same

24    for STRmix.  So these are the parameters that are

25    locked into the software so that the user cannot

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    change them.

2         Q.   And these parameters that are locked in

3    were derived by the FBI; correct?

4         A.   The FBI's DNA Support Unit, who did the

5    validation, along with ESR, which is the individuals

6    who developed STRmix.  Both the validation and these

7    parameters were determined in combination of the two.

8         Q.   What's the ESR?  I'm sorry, I missed that.

9         A.   The ESR, it's Environmental Science and

10   Research Institute.  It is the organization that

11   developed STRmix.  They did their own developmental

12   validation first.  They, then, trained us on STRmix,

13   and they assisted us in our internal validation.

14        Q.   Is that an outside agency?

15        A.   That is, yes.

16        Q.   So it's proprietary software that the FBI

17   has purchased?

18        A.   That is correct.  It is software that is

19   available for purchase.  And there is multiple

20   laboratories using it currently.

21        Q.   And are part of co-developers of the

22   Environmental Science Research Unit, John Buckleton;

23   correct?

24        A.   Yes.

25        Q.   James Curran?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Yes.
 2          Q.    And Jo-Anne Bright?
 3          A.    That is correct, yes.
 4          Q.    So they're the co-developer of STRmix.
 5   Anyone else?
 6          A.    I don't know specifically.  I believe there
 7   was a Mr. Duncan -- but I don't recall his exact
 8   involvement.  I'm sure there are multiple other
 9   individuals, though, involved, but those are the main
10   three.
11          Q.    So towards the bottom of that page, there
12   is a box called "stutter variance," and there is a
13   value next to that.  Can you explain that?
14          A.    This value specifically came from our
15   validation, using part of the software that actually
16   allows you to run single source samples through the
17   software, to generate how much variance is on average
18   that you're seeing.  So this is based off of, again,
19   that validation.  Specifically, how it was derived
20   would have come from the DNA Support Unit.
21          Q.    Okay.  But what's stutter?
22          A.    Stutter is an artifact of the amplification
23   process.  So when you are copying the DNA, there
24   are -- a very common occurrence is that the DNA
25   strand can slip during that copying.  That creates a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    stutter peak, which is one base pair shorter than the

2    parent.  So, for instance, if a person has a seven

3    allele, you will see a very, very small peak at

4    potentially the six location, just due to natural

5    stutter.

6         Q.   So it's like a natural error, a natural

7    anomaly in the amplification process?

8         A.   I wouldn't call it specifically an error.

9    It's a known artifact.  So this is something that can

10   be reviewed by an examiner.  It's also part of our

11   validation, where we estimate what those stutter

12   percentages should be at each of the different

13   locations.  And so, like I said, it's part of the

14   process.

15        Q.   And can you explain what drop-in is?

16        A.   Drop-in is when alleles that may not be

17   present in the profile show up in the profile, just

18   due to natural contaminant.  We did not see any

19   drop-in in our validation, so it's set at zero.  We

20   did not see it in any of the samples we ran at the

21   parameters we set it at.  We do not see drop-in, so,

22   therefore, we do not include it, and therefore is set

23   as zero in our parameters here.

24        Q.   So drop-in cap, drop-in frequency, drop-in

25   parameters, which is part of this document, it's all

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    been zeroed out; correct?

2         A.   That is correct, yes.

3         Q.   So the FBI DNA Support Unit, with their

4    validation, is saying that there is zero natural

5    contaminant in all your samples?

6         A.   Based off of the settings we run our

7    samples at.  For instance, when we're doing the

8    amplification process, our normal process, through

9    the thousands of samples we analyzed with known

10   profiles, we saw no instances of drop-in at the set

11   parameters.  We set our parameters based on the fact

12   that we did not want to see any drop-in.  So we set

13   all of our thresholds above any potential drop-in.

14   That can typically be seen with very low level

15   samples that are run through an increased sensitivity

16   testing, which we do not do at the FBI Laboratory.

17        Q.   So what you're saying is that there is no

18   natural contaminant at all with your samples, based

19   on your zero values entered?

20        A.   It's different.  So contamination can

21   happen.  So, if a person sneezes while they're

22   processing the evidence, their sample could show up

23   on an item.  It did not happen in this incidence, but

24   that can happen.  That's not what I'm referring to

25   here.  Drop-in is just when, if you know a person's



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  DNA profile, you just see a very small DNA peak that

2  shouldn't -- that doesn't belong there, it's just

3  natural from the environment.  And we do not see any

4  of that instance in our validation, based off of the

5  way we process our samples.

6      Q.   Well, the peaks are really important in the

7  analysis; correct?

8      A.   That's correct.  That's why we did our

9  validation, so we would not see any of those

10 instances.

11     Q.   But they do show up naturally; correct?

12     A.   At very low level, with increased

13 sensitivity testing, which we do not do at the FBI.

14     Q.   Can you please pull up CG-B 62, please.

15          Okay.  Ms. Smith, let's try and do it the

16 old-fashioned way.  Okay.  This is Document 62.  So

17 towards the bottom of the page, there is a column

18 called "Run Information," or a heading called "Run

19 Information."  Can you explain what total iterations

20 acceptance rate means?

21     A.   Total iterations is how many -- so, as part

22 of the STRmix process, it goes through an MCMC, or

23 Monte Carlo Markov Chain process, where it will go

24 through different iterations of the profile.  So it

25 will estimate what those different genotypes are.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          With large -- with multiple people in the

2   mixture -- so, in this instance, four individuals, in

3   order to reach the 400,000 post burn-in acceptance,

4   which what that means is we allow the first 1,000

5   excepts to be thrown out because we know that that's

6   too early in the steps of the process, so the last

7   4,000 would be -- or excuse me, the last 400,000 --

8   would be the ones that are going to generate a more

9   accurate deconvolution of your mixture.

10          The total iterations is how many iterations

11  actually had to be generated in order to reach that

12  400,000 accepts.  It's a very complicated process.

13  But what that means is it had to run through 3.4

14  million iterations before it accepted the profile,

15  for a total of 500,000 times.

16      Q.   And this is all information that's been put

17  into the program based on the validation studies that

18  you've all done; correct?

19      A.   That is not put into the program.  The

20  400,000 is set into the program.  So the first

21  100,000 of the deconvolution is thrown out.  That's

22  part of the validation.  The last 400,000 is also

23  from the validation.  The total iterations is going

24  to be profile dependent.  When you have mixtures of

25  four individuals, that number is going to be higher.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    When you have lower number of contributors, say, one
 2    or two, it's going to be much lower, because it's
 3    easier to deconvolute lower number of contributor
 4    mixtures.
 5        Q.   And we don't have that in this case.  We
 6    have -- what you said in your report is four
 7    individuals; correct?
 8        A.   That is correct.
 9        Q.   So, let me see if I could break this down
10    into --
11             THE COURT:  Let me ask this:  Ms.
12    Sirignano, would this be a good time for us to take
13    our lunch break?
14             MS. SIRIGNANO:  Yes, Your Honor.
15             THE COURT:  All right.  We'll be in recess
16    for about an hour.
17             (The Court stood in recess.)
18             THE COURT:  All right.  Everybody take
19    their seats.  Nobody needs to rise.  Just go ahead
20    and be seated.  Everybody take their seats, and make
21    sure everybody has got a counsel.
22             I should have identified Mr. Walz is here
23    rather than Mr. Winder.  Mr. Walz, good afternoon to
24    you.
25             MR. WALZ:  Thank you, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Mr. Castle, you're here.
 2              MR. CASTLE:  Yes, Your Honor.
 3              THE COURT:  Good afternoon to you, Mr.
 4     Castle.
 5              MR. CASTLE:  Good afternoon.
 6              THE COURT:  Who is on the phone?
 7              THE CLERK:  I am, Judge.
 8              THE COURT:  Okay.  Anyone else on?  Take
 9     your mute button off.
10              MS. RODRIGUEZ:  Raquel Rodriguez.
11              THE COURT:  Anyone else?
12              All right.  Ms. Smith, I'll remind you that
13     you're still under oath.
14              Ms. Sirignano, if you wish to continue your
15     cross-examination of Ms. Smith, you may do so at this
16     time.
17              MS. SIRIGNANO:  Thank you, Your Honor.
18              THE COURT:  Ms. Sirignano.
19              MS. SIRIGNANO:  Your Honor, I'd just like
20     to put on the record that about five minutes ago the
21     Government gave to Mr. Adams, who gave to me, this
22     binder, this white binder of the DNA Casework Unit's
23     policies and procedures.  And so I'd like to ask that
24     I have the evening to review this, and then recall
25     Ms. Smith tomorrow, if, after my review, there is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    some cross-examination that I might need to ask her
2    about.
3                THE COURT:  How does the Government feel
4    about that?
5                MS. ARMIJO:  Maybe, if she finishes her
6    examination today, and takes a break -- I just know
7    that Ms. Smith has flight reservations to leave
8    tonight at 9:00 p.m., and I don't know if she has a
9    conflict tomorrow.  We'd indicated to her that she
10   would be on the stand today, and back to work
11   tomorrow.  So I'm not sure what she has going on.  I
12   can certainly talk to her about it at break.
13               THE COURT:  Well, let's see how we go.
14   Maybe you can take a break and see if there is
15   anything in there.  I guess my sense is that the
16   policies and procedures don't really impact the
17   Daubert issue.  I'm having a hard time seeing how the
18   policies and procedures within the FBI are going to
19   impact a Daubert issue here.  She's here to say what
20   she did.  And I'm not sure that whether they did or
21   didn't do what they might have in the policies or
22   providers is going to impact that.  But --
23               MS. SIRIGNANO:  And, Your Honor, I don't
24   agree with you one hundred percent that -- only for
25   the record, Your Honor -- I'm not trying to be
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   argumentative -- we've been asking for these
 2   documents for quite some time now.  And Ms. Smith
 3   testified that this is routine with turning over
 4   discovery in her office.
 5           And, quite frankly, my position is that,
 6   with the statistical results and this STRmix computer
 7   program, and the threshold levels, which I talked to
 8   the Court a little bit about before, I didn't know
 9   what they were.  And I still don't know exactly what
10   they all are, because they're contained in that
11   binder that I got just before we resumed.
12           So I understand she has to get home to
13   Virginia, and we're close to the holidays.  But I
14   just would like the opportunity to take a look at it
15   before I release her from testifying, Your Honor.
16           THE COURT:  Well, let's see if we can --
17   maybe we move to other things here in a little bit,
18   see if you can take a look at it during -- while
19   other people are doing other things.
20           MS. SIRIGNANO:  Thank you, Your Honor.
21           THE COURT:  Ms. Sirignano.
22   BY MS. SIRIGNANO:
23       Q.   Ms. Smith, I think before lunch we were
24   talking about the run information on page CG-B 62.
25   And you were explaining at the time about iterations;
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    correct?

2         A.   Correct, yes.

3         Q.   Okay.  And so you had stated that there

4    were 3.4 million iterations within this STRmix

5    program when the sample was run; correct?

6         A.   That's how many iterations were run while

7    the sample was going through the STRmix process, yes.

8         Q.   Okay.  And you had talked about MCMC, which

9    you said was Monte Carlo Markov Chain; correct?

10        A.   Correct.

11        Q.   And in layman's terms, that's the algorithm

12   type that the program runs; yes?

13        A.   Yes, that is one of them.

14        Q.   And it checks the genotype when it runs

15   through the system?

16        A.   So you enter a DNA profile into the

17   software; it then deconvolutes the mixture, which

18   means it separates out the different contributors as

19   part of that MCMC process.  And then, lastly, it will

20   apply a likelihood ratio to that deconvoluted

21   mixture.

22        Q.   And you testified it used models to do

23   that; correct?

24        A.   Correct.  It uses statistical models, in

25   addition to biological models, which include stutter,

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                      1-800-669-9492
                                                              e-mail: info@litsupport.com



1    degradation, things of those natures.

2         Q.    And on page CG-B 065, it shows that there

3    were 500,000 checks, or guesses, the program, before

4    it accepts or rejects a hit, so to speak; correct?

5         A.    500,000 is the amount of the accepts, not

6    the rejects.

7         Q.    Accepts.

8              So the computer program -- if I've got this

9    correct -- because I'm not a statistician -- it goes

10   through all of the data that came from all the

11   profiles, from the electropherograms, and it does all

12   these checks or guesses before it accepts an actual

13   type; correct?

14        A.    What it's doing is, you enter a profile

15   into the software; the first step is to break that

16   mixture, or that sample up into its different

17   components.  What it does is it looks at what DNA

18   types are present in the sample.  It then uses a

19   logarithm to guess what it thinks the profile should

20   look like based off of the DNA types that are there.

21   And compares that to the observed profile, what I

22   entered.  If it's similar to the observed profile, it

23   will accept that iteration.  If it's not similar at

24   all, that guess is not similar to what the actual

25   profile looks like, it will reject that profile, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    it will not include that as part of breakdown of the

2    mixture.

3              And so it does this over and over and over

4    again, until it's accepted the profile 500,000 times.

5         Q.   And it stops after 500,000 times; correct?

6         A.   Correct.  And after it stops, it will apply

7    weights to the different deconvolutions, or mixture

8    breakdown, that it observed.  And then, from there,

9    it will apply -- or calculate likelihood ratios, if

10   there are known individuals that are also included in

11   your input.

12        Q.   Okay.

13             So you talked about weight.  So let's go to

14   CG-B 66.  You previously testified there were four

15   contributors to this mixed sample; yes?

16        A.   Correct.

17        Q.   Okay.  So on 66 -- this is contributor 1's

18   profile; correct?

19        A.   That is correct.

20        Q.   Okay.  So in the middle column it says

21   weighting, that's the weighting from the algorithm

22   running and doing the checking?

23        A.   Correct.  That is the percentage of the

24   time it assigned that contributor, each of those

25   different genotypes that are listed there.  And the

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492



PROFESSIONAL COURT                                                    1-800-669-9492
REPORTING SERVICE                                              e-mail: info@litsupport.com

```
 1    genotype is just the different profile at that
 2    location.
 3         Q.   And so on the left-hand column it says
 4    "locus"; correct?
 5         A.   Correct.
 6         Q.   And locus is one of those STR locations,
 7    those short tandem repeat locations, for instance, D8
 8    S 1179 is the name of one of those locations?  And
 9    those locus appear on an electropherogram; correct?
10         A.   Correct.
11         Q.   What's an electropherogram?
12         A.   An electropherogram is a printout of the
13    DNA profile as it comes off the instrument.
14         Q.   Okay.  Can we pull up GC-B 59?  This is an
15    electropherogram; correct?
16         A.   Correct, this is the DNA profile seen on
17    the Phoenix Arms pistol at all of the locations on
18    the screen.  It's just some of the locations.  But
19    for this sample, the 15 locations plus the sex
20    determining region would have been typed.
21         Q.   And you've got nine loci on this
22    electropherogram; correct?  And those are the boxes
23    in orange?
24         A.   On this page, the page -- this profile goes
25    onto additional pages, but on this specific page
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    there are nine.
 2         Q.   Okay.  And can you pull up 60, please?
 3              And these are the remaining loci?
 4         A.   Yes, that is correct.
 5         Q.   And on page 61, is this your blank or your
 6    control?
 7         A.   No, it is not.  Let me back up just a
 8    little.  It is, in essence, a form of a control, but
 9    it is not what I refer to as a control.  A control is
10    when you analyze a sample through the entire process
11    that we know has no DNA in it.  This is actually an
12    internal lines size standard.  What that means is it
13    is actually is put into the sample, or with every
14    sample, and it helps to estimate what the alleles
15    are, based off their sizes.  So this is a known that
16    we put into every sample so that we can determine
17    what the DNA types are.
18         Q.   Okay.  Let's return to page 59, because
19    we're going to compare page 66 with page 59.
20              So if you could go through this a little
21    bit with me.  The loci in the top left-hand corner is
22    the D8 loci; correct?
23         A.   That is correct, yes.
24         Q.   And moving on to the right, D21, D7, and
25    then CSF; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Correct.

2        Q.   And then going back to page 66, the locus

3   that I just stated appears on the left-hand column,

4   those first four, D8, D21, D7, and CSF; correct?

5        A.   Correct.  They are listed on this page.

6        Q.   Okay.  So they correspond; correct?

7        A.   Correct, yes.

8        Q.   And if you kept going down through page 66

9   and the subsequent pages, it would go through each --

10   21 different loci; correct?

11        A.   For contributor 1, and then it would repeat

12   itself for all four contributors.

13        Q.   For all four contributors, okay.

14        So I would like to ask, for Contributor 1,

15   on page 66, on the very top it says, Contributor 1,

16   42 percent.  So Contributor 1, STRmix determined 42

17   percent of that sample came from Contributor 1;

18   correct?

19        A.   Approximately, yes.

20        Q.   And then, on page 068, you determined that

21   or STR determined that Contributor 2 was 30 percent

22   of the sample; correct?

23        A.   Yes.  Again, this is an estimation.  But

24   yes.

25        Q.   Yes.  And these are all estimations;

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   correct?
 2        A.   Correct.
 3        Q.   And, in your report, you have determined
 4   that Mr. Garcia's DNA is most consistent with
 5   Contributor 2; correct?
 6        A.   That is not listed in my report.
 7        Q.   I'm sorry, in your worksheet -- did you
 8   call it a worksheet?  Let me pull up the document.
 9   Document 62.  Is that correct?
10             THE WITNESS:  Your Honor, may I refer to my
11   original page of this, just so I can see the
12   noncopied version?
13             THE COURT:  Any objection to that, Ms.
14   Sirignano?
15             MS. SIRIGNANO:  No, not at all, Your Honor.
16             THE COURT:  You may do so.
17        A.   Oh.  Yes, I'm sorry, I can determine it
18   here.  Yes.  So STRmix assigned Mr. Garcia to
19   Contributor 2, that is correct.
20        Q.   And you can see that under the summary of
21   contributors, if you go over to the number 2, and you
22   go down to that bottom box, the number 58b(1), that's
23   the item 58, which was the buccal sample from
24   Mr. Garcia; yes?
25        A.   Yes.  The way this works is it puts
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Garcia wherever it gave the highest likelihood

2    ratio.  He could be any of those contributors,

3    potentially.  It just will provide you with the one

4    that gives the highest likelihood ratio.

5         Q.   You have no idea if he could be 1, 2, 3, or

6    4, is that what you're saying?

7         A.   When you compare him to a profile, you can

8    see that he cannot visually be excluded.  STRmix runs

9    the software against Mr. Garcia and the mixture, and

10   it will give you the one that has the highest

11   likelihood ratio.  But that does not mean that it

12   absolutely has to be that contributor.  It could be

13   other contributors.

14        Q.   So STRmix is saying that the most probable

15   genotype is based on the computer guessing and

16   checking the genotype ratios from the different

17   contributors; correct?

18        A.   I wouldn't say it's just guessing.  It's

19   using mathematical modeling and statistical modeling,

20   as well as biological modeling, to generate an

21   expected profile based off of the data we're seeing.

22   And then that compares any contributor -- so

23   Mr. Garcia, in this case -- to all four

24   deconvolutions, all four contributors.  And it

25   provides the likelihood ratio for the one that gives

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the highest likelihood ratio or the most support,
 2    that is correct.
 3         Q.   The highest likelihood ratio.
 4         A.   And in that case, it was 28 for this case.
 5         Q.   28 percent.
 6         A.   Not 28 percent.  The likelihood ratio was
 7    28.
 8         Q.   Right, so I'm trying to get from where we
 9    are now to 28, so if you could just work with me
10    here.  I'm trying to understand this whole system,
11    this whole process here.
12              Now, we're going to look at contributor 2,
13    which STRmix determined was approximately 30 percent
14    of the sample, the total sample, right?
15         A.   Yes, that's correct.
16         Q.   Okay.  And again, this has the locus, the
17    combinations, D8, D21, D7, CSF, like we discussed
18    earlier; correct?
19         A.   Correct, yes.
20         Q.   And so on page B81, that's Mr. Garcia's
21    profile, correct, from STRmix?
22         A.   That was the profile that I entered into
23    STRmix, yes.
24         Q.   So at the D8 locus, his allele combination
25    is -- excuse me, his genotype combination is 13, 15;
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    correct?

2        A.    Correct.

3        Q.    Tell us what that means.

4        A.    It means that at the D8 location,

5    Mr. Garcia received a 13 from either his mother or

6    his father and a 15 from the other parent, making his

7    DNA type at that location a 13, 15, which means he

8    has 13 repeats, and 15 repeats of the STR locus.

9        Q.    And so each locus going down the left-hand

10   column here, that 21 locus from the kit that you were

11   running, it has -- corresponds with a genotype on the

12   right; correct?

13       A.    Yes, that is correct.

14       Q.    And those are the numbers that the program

15   uses to identify Mr. Garcia's DNA, the numbers in the

16   genotype; correct?

17       A.    This is the last step of the process, so I

18   will input Mr. Garcia's profile into STRmix after the

19   deconvolution is already done.  So it doesn't utilize

20   Mr. Garcia's profile until the entire mixture

21   deconvolution is done.  It will then compare him to

22   the four contributors to see if there is a match, in

23   essence.  And if there is, it will provide a

24   likelihood ratio.

25       Q.    Okay.  So let's do that.  Let's go back to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   page 68 -- actually, I'm sorry, on the bottom of 68,
 2   I believe there was a 69, and at the 13, 15 genotype,
 3   which we just established that was Mr. Garcia's
 4   genotype, the weighting was 12.544 percent; correct?
 5        A.   Yes.  It would be on the next page, not the
 6   page that's on the screen.
 7        Q.   Okay.  And so I don't want to belabor the
 8   issue, but if we compare page 81, and then the locus
 9   on page 69 -- could you go back to the entire page
10   69 -- Mr. Garcia's profile would be found -- or
11   wouldn't be found in this contributor 2 profile;
12   correct?
13        A.   I'm not sure I understand the question.
14   Could you repeat it?
15        Q.   I'm sorry, that was a bad question.
16             So looking at page 81, each locus has a
17   corresponding genotype for Mr. Garcia; correct?
18        A.   That is correct, yes.
19        Q.   So, if we compare page 81, which is on the
20   right-hand side of the screen, with the contributor 2
21   profile coming from page 69, on the left-hand side of
22   the screen, we could do what the STRmix program does,
23   and find each genotype for Mr. Garcia, if it's
24   present in the contributor 2 profile; yes?
25        A.   Yes, that is correct.  However, I will
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    state that you don't -- depending on the profile, and

 2    in this case it was a low-level mixture -- there are

 3    some locations where you may not see Mr. Garcia's

 4    types.  You may see a QQ, which means that STRmix

 5    estimated that drop-out could have occurred at that

 6    location.  So you will not necessarily see his

 7    alleles at every single location.

 8         Q.   And so you find that in the D3 locus, as

 9    well as the D2S locus, and the TPOX locus; correct?

10         A.   No.  D3, his DNA is included in that

11    deconvolution.  CSF, I am not seeing his location, or

12    his DNA.  So that would be an instance where the QQ

13    under this contributor number would have been applied

14    to Mr. Garcia.

15         Q.   And, I'm sorry, you're right.  I misspoke.

16    D3 is there.  CSF is not there, as well as D2 on the

17    next page, and TPOX; correct?

18         A.   I want to go through each one specifically

19    to feel comfortable agreeing to that.  But it would

20    not surprise me based on the level of this profile.

21         Q.   And you said the level of this profile is

22    low; correct?

23         A.   That's correct.  And that's consistent with

24    the likelihood ratio that was calculated as well.

25         Q.   So just looking at the first locus, D8, the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   program is saying that 12.54 percent at the 13, 15
 2   genotype is Mr. Garcia's.  And so 74.76 is not
 3   Mr. Garcia's; correct?
 4       A.    Again, it's not in relation to Mr. Garcia.
 5   What the profile is doing is it's saying 12.54
 6   percent of the time it saw that contributor and its
 7   deconvolution have a 13, 15.  Mr. Garcia happens to
 8   have a 13, 15, so that weighting would be applied to
 9   his likelihood ratio.  But, yes, you're correct, the
10   other percentage of the time, 80-something percent of
11   the time it was not consistent with what Mr. Garcia
12   had, that is correct.
13       Q.    74.76 percent; yes?
14       A.    Possibly.  I'd have to get a calculator.
15       Q.    Very good.  I'll let you know my math is
16   good.
17       A.    I think it actually would be a little
18   higher.  Because if it's only 12.4, I think it would
19   be more in the 80s.
20       Q.    Okay.  I'll take your word for it.
21            So looking at all of these locus, D2,
22   Mr. Garcia's weighted was 9.8 percent; at D7, it was
23   26.03 percent; at CSF, you said that there was the
24   QQ, the drop-out; at D3, the weighting was 9.9947
25   percent.  This is Document 69.  At TH01 the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    percentage was 4.9476 percent.  And at D13, it was

2    4.48 percent.

3         I'm on page 70 now.  At the locus D16, it

4    was 13.70 percent.  At D2, there was drop-out.  At

5    D19, it was 8.24 percent.  And I won't go through the

6    last five locus.  But all very, very low percentages;

7    correct?

8         A.   That is correct, yes.

9         Q.   So that's consistent with the low

10   likelihood ratio; correct?

11        A.   Yes.  So, typically, when you have a

12   mixture like this where there is a lot of

13   possibilities for the contributors -- and I can tell

14   that just based on looking at the mixture -- it's a

15   low level, four-person mixture, there is a lot of

16   possibilities of who could have contributed to this

17   mixture.  And that's reflected on the likelihood

18   ratio that I got.  The likelihood ratio typically

19   will range from less than 1.  But when it is a

20   positive possible association, or more support that a

21   person is included, it will range from 2 up to over

22   700 billion.  So it is a large range.  And in this

23   case, the likelihood ratio was 28, which is on the

24   lower end of the spectrum, yes.

25        Q.   Very low end of the spectrum?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    Correct, I would agree.

2          Q.    When 700 billion is that high, correct, the

3     highest?

4          A.    That's correct.  And that's why we provide

5     the number.  But we also provide a level of support,

6     and we actually list that in our report, so that you

7     can see what the different groupings are that the FBI

8     Lab reports, to not confuse anybody.

9          Q.    Okay.  So let's talk about your report at

10    B003.  I'm just going to talk about item one right

11    now.  Is this your report?

12         A.    Yes, that is my second report, that is

13    correct.

14         Q.    I think the Government introduced this as

15    number 2.  And it's dated June 27, 2017?

16         A.    Yes, that's correct.

17         Q.    This was after you got Mr. Garcia's buccal

18    sample?

19         A.    Yes, that's correct.

20         Q.    And in your report you stated, "Male and

21    female DNA was obtained from item 3," which is the

22    gun; correct?

23         A.    Yes, that is correct.

24         Q.    And so how did you draw this conclusion?

25         A.    This conclusion was drawn by looking at the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    sex determining region.  It's called amelogenin.  If

2    you are a female, you'll be an XX at that location.

3    If you're a male, you will automatically be an XY.

4    So, if you have only male DNA, you expect the X and Y

5    peaks to be of the same or similar heights.  If you

6    have a mixture of both male and female, you expect

7    there to be slight discrepancies.  So the FBI's

8    policy based off our validation, is that if the ratio

9    is less than 60 percent between X and Y, we'll say

10   that it's a mixture of both male and female.

11        Q.   Less than 60 percent?

12        A.   Yes.

13        Q.   And that would be in your policies;

14   correct?

15        A.   That would be mentioned in the policies,

16   yes.

17        Q.   I didn't know that.

18             So let's go to B-060.  And this is another

19   electropherogram; correct?

20        A.   That is the same item, item 3.  That's the

21   one we previously looked at.

22        Q.   Well, we looked at the D8 locus initially

23   on page 59, and now we're on page 60, which starts

24   with the D19 locus; correct?

25        A.   Correct.  It is the same profile; it's just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the second page of the profile.  That's correct.

2          Q.    Thank you.  So at the bottom of the page,

3   on the left-hand side, there is a green bar, and you

4   stated that this was amelogenin locus?

5          A.    Amelogenin, yes.

6          Q.    Okay.  So this, you stated, discusses the

7   proportions of the X and Y chromosomes; yes?

8          A.    Correct.  In here, you can see that the X

9   and Y are very similar, so the majority of this

10  profile mostly contains male DNA; however, based off

11  the ratio, it was less than 60 percent, so therefore,

12  I called it a mixture of both male and female.

13         Q.    Okay.  So let's do the work behind this

14  data here.  So the X box refers to what?

15         A.    The X box is the X allele or the X DNA

16  type, and that's found in both men and women.

17  Females have two copies of it.  They receive one from

18  mom, one from dad.  Males always will receive a Y

19  from their dad; so the X comes from the mother, so

20  they have one X one Y.  So those are just the DNA

21  types that are possible at the amelogenin locus.

22         Q.    So at 855, which is in the X box, RFU, or

23  relative fluorescent units, there was 106.26;

24  correct?

25         A.    That is not correct.  So 106.26 is the size

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    of that allele.  855 is how much of it was present.

2    So that's the RFU value.  So 106.26 and 855 are

3    really unrelated with one another.  They're just both

4    aspects of that X allele.

5         Q.   Of the X allele.  Okay, thank you.

6              And then, in the Y, there was 495 RFU

7    present; correct?

8         A.   That is correct.

9         Q.   So we're talking about the DNA molecules in

10   this particular allele; correct?

11        A.   That does not reflect how many DNA, or how

12   much DNA necessarily was present.  It's not

13   correlated specifically to how many molecules are

14   there.  What it's doing is, the more DNA you have in

15   the system, the more fluorescence that DNA gives off

16   when it runs through the instrument.  And the reason

17   why it does that is that all the DNA is labeled with

18   fluorescent tags, so that when it passes the camera,

19   it will pick up on how much DNA is present.  So the

20   more DNA present, the higher those numbers are.  But

21   it does not correspond to exactly how many molecules

22   are present.

23        Q.   Thank you for clarifying that.

24             So based on this XY combination, and that

25   the Y at 495 RFUs is shorter than 60 percent, that's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    an indication that both men and women contributed to
2    the sample?
3         A.   Yes.  It appears based off of the ratio
4    that there is mostly male DNA there; however, it does
5    appear that the X is slightly higher.  And if it is
6    less than 60 percent, then we would state in our
7    report that it's a mixture of both male and female,
8    have at some point come in contact with that item.
9         Q.   Do you know what the percentage is?
10        A.   I don't recall off the top of my head
11   without a calculator.  I believe it was in the 50s,
12   but I can't recall exactly.
13        Q.   Okay.  So let's go to CG-A 113.  And this
14   was part of the -- your notes for items 3 and 4;
15   correct?
16        A.   Yes, that's correct.
17        Q.   And we know that to be true based on the
18   left-hand side of the page, the column that says
19   exhibit number?
20        A.   That is correct, yes.
21        Q.   And the quantification test that you do
22   determines if there is enough DNA for the actual
23   process; yes?
24        A.   It allows us to see how much DNA is
25   estimated to be in that sample.  Because we do want
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   to target a specific amount of DNA.  We want to
 2   target approximately one nanogram of DNA to get the
 3   best results.  And with low level samples like these,
 4   we were not able to target that full amount.
 5        Q.   So you did not have one nanogram of DNA in
 6   either one of these samples; correct?
 7        A.   That is correct.  We did not have a total
 8   of one nanogram when we did our processing.  We know
 9   that we can process lower than that.  It's just based
10   off our validation, we aim for one nanogram because
11   then we know we're going to see the most information
12   based off the validation.
13        Q.   So you did two tests here, the duo human
14   test and the duo male test; yes?
15        A.   It is one test, but it looks at both the
16   amount of human DNA and also male.  The reason why we
17   do this is because on some cases this will allow us
18   to determine if we should use a different STR typing
19   kit that looks at male DNA only.
20        Q.   And looking at Exhibit 3, the human DNA
21   that was detected, the quantities, and nanogram per
22   microliter was 0.0448; correct?
23        A.   Not percent.
24        Q.   Excuse me.  Go ahead.
25        A.   It's 0.0448 nanograms per microliter.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And then for a male, it was 0.0432
 2   nanograms per microliter; yes?
 3        A.   Yes.  But these, again, are estimations but
 4   yet it is.
 5        Q.   Yes.  So they're all approximations in your
 6   whole report or your bench notes and your summary
 7   sheet; correct?
 8        A.   It is an estimation based off of how the
 9   PCR process works, yes.
10        Q.   So, in terms of percentages, the PCR
11   process found approximately 4 percent female DNA and
12   96 percent male DNA; yes, based on the quantities of
13   nanograms per microliter?
14        A.   I would have to get a calculator to
15   determine that.  But, again, these are estimates, so
16   I wouldn't say that that's an exact representation.
17        Q.   Well, I'm just doing the math:  0.0448 to
18   turn it into a percentage.  And does that sound
19   unusual that only 4 percent would be female DNA?
20        A.   Not necessarily, no.  Like I said, looking
21   at the profile, the majority of it does appear to be
22   male, the X and the Y chromosome proportions were
23   very similar.  So, no, that wouldn't necessarily
24   surprise me.
25             I just don't want to agree on specific
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    numbers without a calculator present.

2         Q.    Fair enough.

3              So turning back to the electropherogram on

4    B60.  How do you reconcile this electropherogram with

5    the quantitative notes that we just looked at?

6         A.    It's very common with low-level samples

7    like this, because it is low amount of DNA.  The

8    process is not exact, it is an estimation.  So you

9    can have slight differences between what you're

10   seeing at amelogenin, and what you're seeing in your

11   quantification notes.  So I'm not surprised to see

12   that.

13        Q.    The differences?

14        A.    Yes.  So the quantification notes looked

15   more similar in the amount of human and male.  But

16   again, at low-level samples it is extremely important

17   to remember that it is an estimation.  Same thing

18   with the amplification here.  This is a four-person

19   low-level mixture.  So, again, you're going to see an

20   estimation of what is in that sample.

21        Q.    So how do you calculate the degree of

22   imbalance on this electropherogram in terms of women

23   or men at this locus?

24        A.    I can't without knowing exactly who is in

25   the sample.  It could be one female to three males,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    potentially.  It could be very little DNA.  It could

2    be individuals that have slight mutations at their

3    amelogenin types, make their Y chromosomes slightly

4    shorter.  So it could be four males.  There is

5    possibilities that I can't speak to specifically

6    without knowing exactly what the makeup of the sample

7    is.  And we never can tell that makeup.

8         Q.   Never know; correct?

9         A.   That's correct.  We don't know how this DNA

10   or when it got deposited on this item.

11        Q.   So you drew the conclusion that male and

12   female DNA was obtained from item 3, but you have no

13   idea.  It could have been four females; correct?

14        A.   No, I would not expect that, no.

15        Q.   But you just said that it could be more

16   than one woman; correct?

17        A.   It's possible.  What it looks like is it

18   looks like mostly male DNA, with some slight

19   contribution from a female.  I can't say for certain

20   what that makeup is, because I do not know whose DNA

21   is on this item.  So I cannot say for certain.

22        Q.   But the total of the XY contribution, it

23   could be more than 4 percent from the qualitative

24   results that you received during the actual process

25   of processing the DNA; correct?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492
                                                                           1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.   Yes, that is correct.  And that's again

2   because they are low-level samples.  We know that --

3   the reason we target one nanogram from each

4   individual is because you know you're going to see a

5   complete picture of DNA.  With less than one

6   nanogram, we know that we're not getting all of the

7   information.  So you're going to see slight

8   discrepancies between the quantification and the

9   profile, because, again, these are estimates.

10       Q.   And that would be in your SOPs, right, that

11  you require -- or you prefer, at least, one nanogram

12  of DNA to run through the PCR process, yes?

13       A.   That would mostly be in our amplification

14  procedure, yes.

15       Q.   But you had significantly less with this

16  sample; correct?

17       A.   I would say we had quite a bit less, yes.

18       Q.   Okay.  Let's go to CG-B.  65, please.

19            Now, we already talked about the parameters

20  and how the FBI has set, and based on their

21  validation they've locked in a zero value for their

22  drop-in cap, drop-in frequency, and drop-in

23  parameters; yes?

24       A.   Yes, that is correct.

25       Q.   Now, if you do have drop-in or drop-out,

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492
                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
1    how do you know?
2         A.   I would not expect to have drop-in because
3    we did not see it in our validation.  And we ran
4    thousands upon thousands of samples through our
5    validation.
6         Q.   But it naturally occurs; yes?
7         A.   There is DNA in the environment, that is
8    true.  However, through the amplification process,
9    how you amplify your samples, how many cycles you
10   use, things like that, that is when you're going to
11   see drop-in.  Each lab is different.  They may have
12   more sensitive instruments than others.  So,
13   therefore, our validation was done to ensure we saw
14   no drop-in.  And we did not in our samples.  We made
15   sure to set our thresholds above that drop-in value.
16   And that would be through our validation.
17        Q.   And contamination would be part of that;
18   correct?
19        A.   The drop-in and contamination are two
20   separate incidents.  Contamination is when a
21   biologist may show up on an item, or if two items are
22   touching one another, then they could show up on an
23   item.  But in this case each item was processed
24   separately.  And, again, I did not see any instances
25   of contamination.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   But it occurs -- maybe not in this sample,

2  but it occurs generally in all kinds of laboratories;

3  true?

4      A.   I would say it can happen.  It's not a

5  common occurrence.  There is quality measures in

6  place to prevent it.  And then, if contamination is

7  identified, the samples are reprocessed.

8      Q.   I just am having difficulty understanding,

9  with zero parameters, how you can really reconcile

10  drop-in or contamination.  And I understand that

11  you're saying that it was validated.  But it happens.

12  And so with a zero parameter, you've got no leeway

13  for any of these natural events to happen; yes?

14      A.   Correct.  What it does is it will -- STRmix

15  will not model drop-in.  And the reason it's not

16  modeling it, is because we did a very extensive

17  validation, which is also published in peer review

18  articles that discusses what we did in our

19  validation.  And it was determined that we saw no

20  drop-in at the parameters we were using.  So,

21  therefore, we do not expect to see it.  And even if

22  it did occur in this case, which there is no evidence

23  of, and I would not expect, it wouldn't have a real

24  effect, because of the fact that it is a four-person

25  low-level mixture.  To see one additional peak show

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    up would not exclude anybody specifically.

2        Q.   Okay.  So I just want to talk a little bit

3    about this validation.  The peer review articles that

4    you referred to in your internal validations on

5    STRmix were done on Version 2.3; yes?

6        A.   Yes, it was done on the original version, a

7    paper was written on the original 2.3.  But, however,

8    every time we up to a new version, we do another

9    validation of that software.  But the peer review

10   article is not specifically to each version.

11       Q.   Correct.  So the version that y'all used,

12   or that you used on this sample was the new version

13   2.4.05; correct?

14       A.   Yes.  And it's just -- there is some

15   modifications to this newer version, allows us to

16   accommodate GlobalFiler, which is the newer kit.

17   However, again, a full validation was done.  But the

18   background information of how the validation was

19   accomplished is in the peer review paper.  They are

20   very similar.

21       Q.   But they are also different, because it's a

22   different version; yes?

23       A.   Slight differences.  It's kind of like when

24   you have Windows 8 goes to Windows 9.  There are

25   differences, but the main format is the same.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   We're looking at B 062, up on the left-hand

2    corner, it says which version you used; correct?

3    A.   That is correct, yes.

4    Q.   Version 2.4.05.  So there is no peer review

5    articles or no published papers regarding this

6    version?

7    A.   We don't have a peer review publication for

8    this specific version.  However, the validation is on

9    STRmix, in general, and the use of STRmix.  The

10   things that have changed were revalidated, and those

11   are going to be reviewed by peers during audits and

12   accreditation.

13   Q.   What's been changed?

14   A.   For instance, the layout is changed

15   slightly.  So the calculations are similar, but the

16   layout of the report is more user friendly.  There

17   are slight modification this allows us now -- we

18   validate at 2.4.05, for using GlobalFiler, which is

19   an updated kit.

20        So we did a very extensive validation on

21   this version.  However, we could not publish it

22   because we have already put a publication out, and

23   most publications don't want same publication

24   multiple times.

25   Q.   And the validation summary, is that part of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the documents that I was given, the SOPs and the
 2    manuals and the protocols, or not?
 3        A.    No.
 4        Q.    Are these validation studies public?
 5        A.    The validation report is public.  The
 6    STRmix validation is on many, many, many CDs.  So it
 7    does exist, but we typically do not provide that on
 8    discovery.
 9        Q.    Is that something that we could get, when
10    you get back to your office and provide it?
11        A.    That would have to go through our legal
12    department.  We don't typically provide that, no.
13        Q.    Well, I'll ask your legal department then.
14        A.    I will say that the validation paper is
15    public, which you can access.
16        Q.    But it's of a different version; correct?
17        A.    Correct.  But the validation is the same
18    between the two.
19        Q.    But the versions are different; correct?
20        A.    That is correct, yes.
21        Q.    Okay.  So let's look at CG-A 140.  This is
22    a different electropherogram from what we've been
23    looking at; yes?
24        A.    Yes, this is a positive control.
25        Q.    Positive control.  And this is a single
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    source profile; yes?

2         A.    That is correct.

3         Q.    And looking at the bottom right-hand corner

4    of the D18 locus there is a peak there, an allele

5    peak, and underneath it there is a box that says

6    "Spike, 279.75," and then 54, that's RFUs; correct?

7         A.    That's correct.

8         Q.    That's the height of the peak, the 54 RFUs?

9         A.    Yes, that's correct.

10        Q.    Okay.  So what's the FBI threshold for peak

11   height in all electropherograms?

12        A.    Fifty.

13        Q.    Fifty.  And --

14        A.    At this time.  Excuse me.  It has changed.

15        Q.    It has changed?

16        A.    With the GlobalFiler, we now have a

17   different threshold.  But with Identifiler, the

18   Identifiler threshold is 50.

19        Q.    So in this electropherogram, which was done

20   at the same time that items 3 and 4 were done, the

21   threshold was 50 RFUs?

22        A.    That is correct, yes.

23        Q.    And what is it for GlobalFiler now?

24        A.    The threshold is 150.  And then the

25   drop-out threshold is 725.  And that's because we're

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    using different instruments that are more sensitive,

2    and they actually -- the numbers are much higher in

3    those instruments.

4        Q.   And that would be probably another change

5    in the version of the software that you're using

6    based on this GlobalFiler kit that you're using?

7        A.   The software itself is the same.  The kits

8    we're running is more about allele frequencies.  So

9    how common the different types are seen at the

10   different locations.  And there are some changes made

11   to the software to accommodate the different kits,

12   that is correct.

13       Q.   Because there would be more locations that

14   you're looking at from 15 to 21 loci; correct?

15       A.   Correct.  But that again, is not the STRmix

16   itself.  The validation has to be done on the kit

17   itself, so that we can enter those values into

18   STRmix.  So, for instance, you're going to see

19   slightly different stutter ratios between the

20   GlobalFiler and the Identifiler, just due to how the

21   kits behave.

22           For this case it's really only relevant

23   with Identifiler, because the known reference sample

24   is the only sample that was run with GlobalFiler.

25   And that was not deconvoluted using STRmix.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492
                                                   e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   Let's just go a little slower because

2  Ms. Bean's hands aren't keeping up with us.

3         So the different thresholds for the peak

4  heights, for the stutter ratios, for the drop-out

5  thresholds, those are all in the white binder that I

6  just received after lunch; correct?

7    A.   No, those would be based off our

8  validation.  Those binders are specifically our

9  protocols on how to interpret data, how to run the

10  date through collection, extraction.  And those are

11  not procedures.  Those are thresholds that we enter

12  into STRmix through validation.

13    Q.   And you just said that the validation

14  studies or reports are only public for the newer

15  version -- or the older version; correct?

16    A.   The older version which would have those

17  same ratios.  The old version that's published is

18  based off of Identifiler, which is relevant to this

19  case.  So although the version number changes, the

20  stutter ratios, the variances, all of that would be

21  the same as validation, which is published.

22    Q.   So I'm assuming, based on all this data,

23  that the FBI continues to change and upgrade their

24  kits and the software, and the DNA process using

25  STRmix; correct?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   The STR process is the same.  We look at

2  different kits when necessary.  We want to maintain

3  the kit that we have.  So we have GlobalFiler now.

4  We're going to continue using GlobalFiler, and until

5  a new kit comes out that the FBI deems is worthy of

6  validating.

7           It really depends on the scenario.  We do

8  stay up to date.  With the STRmix software there are

9  new versions all the time.  It depends on what those

10 changes are, whether or not we will do a new

11 validation on the new software.  We just won't

12 implement those version changes if they're irrelevant

13 to our analysis.

14     Q.   And so how does the FBI reconcile a

15 previous version with a better version and the

16 results from a previous version?  It would seem

17 inconsistent to me, that work that was done

18 previously on an older version is not as accurate as

19 the newer version?

20     A.   I disagree with that completely.  The two

21 versions would be -- before we switch to a new

22 version, we'd actually do a side-by-side comparison

23 to ensure we're getting the same results using both

24 versions.  So you're not going to get a different

25 answer with the newer version.  The newer version



SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492
                                                e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   just has more features.  It allows us to use

2   GlobalFiler.  That's not because of the STRmix

3   software.  That's because we validated GlobalFiler

4   using the newer version.  The software always could

5   handle it.  We just hadn't validated it yet.

6        Q.   So what I'm hearing is that this is all

7   done within the FBI, and all validated by the FBI.

8   Has any outside entity or any peer review article

9   been done or any study been done between the older

10  versions and the newer versions that would make it

11  generally accepted in the scientific community?

12       A.   STRmix, in general, has already been

13  accepted in Daubert challenges for -- at the state

14  level.  There are many, many papers out about STRmix.

15  And they may discuss the different versions.  I don't

16  know specifically of a paper that talks about the

17  comparison between the two.  I'm sure ESR, which is

18  the developer of it, has a paper out there.  They

19  have hundreds of papers out there on all their

20  different mathematical models for their testing.  So

21  I'm pretty sure there probably is.  But I just don't

22  know it off the top of my head.

23       Q.   Okay.  But you didn't really answer my

24  question.  Do you know if there is a paper or

25  something that's been peer reviewed, generally

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                             1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1    accepted in the scientific community, that has done a
 2    comparison, other than the FBI's validation, between
 3    these two versions of STRmix?
 4         A.    Again, STRmix itself is --
 5         Q.    I'm sorry.  I'd like to ask you to answer
 6    the question, please.
 7         A.    I don't know the specific paper that
 8    compares the two.  However, STRmix has been
 9    extensively peer reviewed.
10         Q.    The previous version, not the one that
11    we're talking about?
12         A.    Again, I disagree with that, because STRmix
13    itself has been developmentally validated, but would
14    use multiple version.  They run tests before they use
15    multiple versions.  They run tests before they
16    release the versions.  And before a lab can utilize
17    them, they have to go through a validation process.
18    So there may not be a paper that specifically
19    addresses the different versions.  But STRmix, in
20    general, has gone through this extensive peer review
21    publication.  The versions are minor changes between
22    the different ones.  Again, just the same as
23    Microsoft Office 8 will be slightly different than
24    Microsoft Office 9, but the backbone is still the
25    same.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Let's talk about Microsoft 7 versus 10.
2  They're extremely different; correct?
3    A.   It's possible.  Again, I can't speak to the
4  specific changes that ESR made.  I can tell you that
5  our validation did those studies and showed them to
6  be providing the exact same results.  So, therefore,
7  I'm completely confident using different versions of
8  the software.
9    Q.   But you can't say with any certainty that
10  this new version, other than the FBI's own study, has
11  been generally accepted in the community; correct?
12  I'm not talking about the program, I'm talking about
13  the version.
14    A.   Well, ESR has been using it for forensic
15  casework since the beginning.  So I do know that
16  there are other labs that are doing this, yes.
17    Q.   ESR, meaning proprietary software
18  developer; yes?
19    A.   They are the developer, but they're also a
20  forensic laboratory that does caseworking analysis.
21  So they have been using it in Australia and also New
22  Zealand.  And again, there are 30 or so, at least,
23  different labs in the country using it.  So they
24  would also have to validate each software.  They may
25  not be published about the differences between those


SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   two specifically; however, again, every lab that uses

 2   the different softwares must validate them prior to

 3   their use.  So it's not just the FBI.

 4       Q.   Okay.  Thank you.

 5            Let's go back to CG-A 140.  I'm sorry, I

 6   went off on a little tangent there.

 7            And we were talking about the D18 locus

 8   there and the box with the 54 RFU peak, which you

 9   said was above the 50 RFU threshold.  And there has

10   been a red line, diagonal red line, put through this

11   box; correct?

12       A.   That is correct, because it is not a DNA

13   peak.  That's why it was crossed out.

14       Q.   Well, what is it?

15       A.   It's a spike which is an artifact.  It's

16   pull-up from the camera.  The camera cannot visualize

17   that separation well.  So it's labeled as a spike by

18   the software, and it is excluded, and I reviewed it,

19   agreed, and then my technical reviewer also agreed.

20       Q.   And you put the line manually through this

21   spike; correct?

22       A.   I did.  However, the software labeled it as

23   a spike.

24       Q.   Well, you don't really know if that's a

25   real DNA molecule or not, or a real peak for a real

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                 1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

164

```
 1   DNA molecule or not, do you?
 2        A.   I do based off my training and experience.
 3   I can visualize the differences.  They have a
 4   different morphology, meaning spikes are generally
 5   thinner.  They typically fall right below a peak in
 6   another color, which in this case it did.  This is a
 7   known artifact.
 8        Q.   And contamination could be a spike, too;
 9   correct?
10        A.   Contamination would not be a spike, no.  It
11   would be a peak that falls within a bin that is
12   labeled as an allele.  And this is not what this is.
13        Q.   And let's go to CG-A 201.  This is another
14   electropherogram; correct?
15        A.   Yes, that is correct.
16        Q.   And it came from item 22; yes?  At the top
17   on the left-hand corner?
18        A.   Yes.  And item 22 is a swab from a stain at
19   04 Aaron Court.  It's a different submission.
20        Q.   And just for example, by way of example,
21   looking down at the D19 locus on the bottom left-hand
22   corner of the electropherogram, the 17 allele has
23   also been stricken at 56 RFUs; correct?
24        A.   That is correct.  And on the next page of
25   my electropherogram there is a zoom-in of that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   location.  And it does not have the correct

2   morphology of a peak.  So, therefore, it was struck

3   through.

4          Q.   What do you mean by doesn't have the

5   correct morphology of a peak?

6          A.   As you can see, the peaks in this diagram

7   are thin, tall peaks.  The 17, if you zoomed in on

8   that, which I do have a zoom of, that was provided in

9   my case file, it's a flat, wide peak.  So it's

10  consistent again with bleed-through, which is another

11  artifact in the process.

12         Q.   What's bleed-through?

13         A.   Bleed-through, again, is when the camera

14  cannot distinguish the colors.  It's kind of similar

15  to when a child slightly colors outside lines.  It's

16  not really picking up just in that one color channel.

17         Q.   What else could that be other than

18  bleed-through?

19         A.   I don't think it's anything else besides

20  bleed-through, based off of the zoom-in off the peak,

21  which you cannot see in this electropherogram

22  printout.

23         Q.   Let's go to B 59, please.

24              Okay.  And we're back to item 3, this

25  electropherogram.  And at the D21 locus, you kept the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    59 RFU peak; correct?
2         A.   I'm sorry.  Can you repeat which locus, so
3    I can see specifically what you're referring to.
4         Q.   Oh, sure.  D21.
5         A.   Yes, I did.
6         Q.   Okay.  So how do you reconcile that this
7    was at 59 RFUs, and the two samples we saw before
8    were in that 50 to 60 range, and you kept this peak?
9         A.   Again, it's comparing apples to oranges.
10   The 32.2 here looks like a peak.  It has the correct
11   shape.  It has the correct morphology.  It's falling
12   into a bin and being called by the software.  The
13   other two peaks that you showed previously, although
14   they are above 50, they do not have the correct shape
15   or morphology, so therefore, they were crossed out.
16   That is part of my job as a forensic examiner to
17   interpret every allele that I'm seeing to determine
18   if whether it is a true peak or a potential artifact
19   prior to running it through any software.
20        Q.   And would your standards for interpretation
21   be in this binder of policies and procedures, or is
22   this something you learned elsewhere?
23        A.   The basic information will be in the
24   policies.  It will mostly just state what a spike is,
25   what bleed-through potentially is, what stutter is.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   It will not go into detail.  That mostly was during

2   my training.

3        Q.   But you'd agree that a 50 to 60 RFU range

4   in a low sample, low-level sample, is difficult to

5   assess if there are DNA molecules or not; correct?

6        A.   Again, I don't agree that.  The validation

7   that was done on Identifiler showed that anything

8   above 50 would be considered a true peak, versus

9   background noise, unless it has the incorrect

10  morphology, which those are easily distinguished.  So

11  a spike is easy to tell that it is not a real DNA

12  type based off of the shape of the peak.  Also

13  bleed-through is the same way; it's easy to

14  distinguish, versus a real peak.

15       Q.   So you're calling it a spike morphology and

16  the artifact morphology -- the morphology for an

17  artifact or a spike is different than an actual

18  allele; correct?

19       A.   Correct, yes.

20       Q.   And so how do you determine if there is

21  drop-in or contamination in these peaks?

22       A.   Contamination if there is a profile that I

23  can compare to my staff -- we have a staff database

24  that I will compare certain profiles to.  I will be

25  able to see it in blanks.  We run negative controls

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    and blank samples through the process.  A blank has
 2    no DNA in the sample.  So when I run that through the
 3    process, if I see any DNA in that sample, or in the
 4    negative control, I know that I have contamination.
 5    And that did not occur in this case.
 6         Q.   Okay.  Let's turn to number of contributors
 7    to a mixture.  And you said that there were four in
 8    your report at CG-B 003; yes?
 9         A.   Yes.
10         Q.   And you said the interpretation of item 3
11    was performed assuming that the DNA originated from
12    four individuals; correct?
13         A.   Yes, that's correct.
14         Q.   And that's four and only four; yes?
15         A.   My interpretation was a four.  We never
16    know exactly how much people are on a sample.
17    However, through my training and experience, I
18    determined it was four individuals.
19         Q.   So four and only four?
20         A.   My interpretation was run at four.  I do
21    not know specifically.  There could be more -- or
22    there would not be less -- there could be more, but
23    however, based on what I saw, I interpreted that that
24    is four.
25         Q.   It could be three or more; correct?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Again, I'd have to look at the profile.  I

2   saw no evidence of three.  I saw four individuals

3   during my interpretation.

4        Q.    And you used the maximum allele count to

5   come to that determination?

6        A.    One of those -- that's one method.  I also

7   used peak heights between different alleles.  So, for

8   instance, if the two peaks are present, and they came

9   from one person, they should be of similar heights.

10  If there is a big discrepancy between them, I know

11  that that has to be two people, so I would use that

12  information in addition to the maximum allele count,

13  which is just counting up the number of alleles I see

14  and dividing it by two.

15       Q.    Let's do that.  At CG-B 59, and at locus

16  D13 there are seven alleles present there; correct?

17       A.    Yes, that is correct.  So it has to be at

18  least four individuals.  And based off the peak

19  heights and the rest of the profile, I determined it

20  was four.

21       Q.    And did you use this locus D13, these peak

22  heights to make that determination?

23       A.    That was one of them, yes.

24       Q.    And which other ones did you use?

25       A.    I would use the whole profile.  I look at



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    the entire profile.  I'll look at each location.  D13
2    had seven alleles, so I knew it had to be four.  If
3    there was more than four, I would say it's five
4    individuals.  However, in this case, that's not what
5    I saw.
6         Q.   But it could be three or more, yes?
7         A.   Based off of D13, I do not believe it could
8    be three or more.
9         Q.   Okay.  So what you said earlier was any
10   human can contribute up to two alleles; correct?
11        A.   Correct.
12        Q.   So if you have seven alleles divided by
13   two, it's 3.5; correct?
14        A.   Correct.  So that has to be four people,
15   because you can't have half an allele.
16        Q.   So, technically, your conclusion should be
17   at least four; correct?
18        A.   No.  So STRmix, you must determine the
19   number of contributors.  So when I look at the
20   profile as a whole, I will estimate the number of
21   contributors, which in this case I did four.  I then
22   run it through the software at four.  I will look to
23   see the output, if there are any issues with that
24   deconvolution.  In this case, I did not see any.
25   Therefore, I reported it as four, based off my

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   training and experience.

2       Q.   Correct.  But just to be clear, STRmix, if

3   you put in four, it's going to generate data for four

4   individuals; yes?

5       A.   It will, yes.  But if it doesn't agree with

6   that, sometimes you will see red flags when you're

7   reviewing the output.  You'll see issues with the

8   deconvolution don't make sense.  And in that case, I

9   didn't do that.

10      Q.   But the program doesn't come back and say,

11  Hey, this should be three, does it, or this should be

12  five, does it?

13      A.   No, it does not.  And that, again, is the

14  human intervention aspect.  The human intervention

15  is -- we've been doing number of contributors for a

16  very long time, and that's based off my training and

17  experience, I came to four.

18      Q.   And the data set could be completely wrong

19  if you chose four, and it should have been three or

20  five; correct?

21      A.   It wouldn't be completely wrong.  We did

22  our validation, and we actually tested that so

23  through our validation we actually increased the

24  number by one, and we also decreased the number by

25  one, to see what would happen if you are incorrect in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  your assumption.  And we saw the effect was

2  negligible.  The reason we do this is we do not know

3  how many contributors are ever present, because we

4  were not there to see what DNA was left on an item.

5  We can only use what we're seeing in the profile, and

6  do the number based off of our training and

7  experience.

8       Q.   Right.  So like you just said, you don't

9  know exactly how many numbers of contributors there

10 are on a profile, especially when there is a mixed

11 sample like this; correct?

12      A.   Correct.  We never know.  We make the best

13 estimate we can based off of what we're seeing.

14      Q.   And that's all it is, is a best estimate,

15 it's a guess; correct?

16      A.   It is an estimation.  That's why we include

17 those limitations in our reports.

18      Q.   And it's a subjective determination here;

19 that's why I was saying that your report should say

20 at least four, instead of four?

21      A.   The interpretation using STRmix, that

22 likelihood ratio was developed based on four.  That

23 is why it is listed as four in my report.  And it was

24 also technically reviewed by another qualified

25 examiner, who also agreed that it was four.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   Correct.  But you're putting the data into

2   STRmix, and STRmix is generating the profiles based

3   on the number of individuals you put into the system;

4   yes?

5       A.   It is generating profiles, yes.  But you,

6   as an examiner, have to assess that profile first.

7   The same thing with my technical reviewer would

8   assess that profile first, before looking at the

9   STRmix, and before running STRmix.  Therefore, my

10  technical reviewer and myself both agreed that it was

11  four prior to running STRmix.

12      Q.   And what publications have you done or the

13  FBI has done on the uncertainty in determining the

14  number of individuals in a mixture?

15      A.   There is never any certainty, unless you

16  make up the mixture yourself.  So there are no

17  publication based off of the certainty of the number.

18  Through our validation, we discuss what would happen

19  if you guessed the number wrong.  So if you put in

20  four, and it was really five, or you put in four, and

21  it was really three, the validation covers those

22  scenarios.

23      Q.   Right.  And so the data would be incorrect,

24  if you put the wrong number in; yes?

25      A.   The number of contributors would.  The

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                     FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    deconvolution showed that the -- in most instances,

2    the deconvolution were similar.  The only issue we

3    saw was that low-level contributors would tend to get

4    split out to two, instead of one, which would be

5    incorrect.  However, it also lets you false

6    exclusions.

7         Q.   And that's what we have here is a low-level

8    contributor; true?

9         A.   The whole profile is low level.

10        Q.   Right.  So this is my point:  Specifically,

11   is that the false, unknown individuals, false

12   contributors, with low-level samples like this, there

13   is significant uncertainty in this process; correct?

14        A.   Again, I don't agree with that.  I'm using

15   my education and training to estimate the number of

16   contributors, which I did here.  I then analyzed the

17   output from STRmix, and I saw no discrepancies.  And

18   then my technical reviewer both independently

19   interpreted the profile, and then also ran or --

20   reviewed my STRmix output, and again agreed with me.

21   So I do not believe there is issues.

22        Q.   Are you familiar with NIST?

23        A.   I am, yes.

24        Q.   The National Institute of Standards and

25   Technology?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1         A.    Yes, I am.

2         Q.    Are you familiar with their 2015 study, the

3    Coble paper, regarding the uncertainty in the number

4    of contributors in the new CODIS process?

5         A.    I have not read specifically that paper,

6    but I've heard of that paper.

7         Q.    What have you heard about it?

8         A.    Just that they did a study using multiple

9    laboratories.  But that's all I know about the paper.

10        Q.    Multiple laboratories with multiple

11   contributors for samples; correct?

12        A.    Yes.  Again, that's based off of an

13   individual's training and experience.  I can't speak

14   to specifically what they found in their study, and I

15   can't speak to what they did in their study, because

16   I have not read that paper.

17        Q.    Have you or the FBI done a study on the

18   number of contributors in the mixture?

19        A.    Part of our validation, we ran samples of

20   known number of contributors through the software.

21   And we also analyzed what the number looked like

22   after it was amplified.  So we did do studies on it

23   as part of our validation, but that would not

24   specifically be published.  That would -- parts of

25   that would be published in the internal validation

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    paper.  But we did additional studies as well.

2          Q.    For the old software program; correct?

3          A.    For the software program that specifically

4    speaks to Identifiler.  We also did it with the new

5    software as well.

6          Q.    But nothing public in terms of uncertainty

7    with number of contributors in the STR program within

8    the FBI; yes?

9          A.    Again, I disagree with that.  We don't have

10   a paper specifically labeled that.  However, the

11   validation paper is published, and it does talk about

12   what happens when you run STRmix with incorrect

13   number of contributors, which addresses your

14   question.

15         Q.    So you referred to this validation paper

16   quite a number of times here.  So was that the paper

17   you're saying that I need to get from your legal

18   department?

19         A.    No, that paper is readily available on the

20   internet.

21         Q.    But the one on the newer software, I'd need

22   to get from the legal department; correct?

23         A.    The validation studies, all the paperwork,

24   that is part of our -- that is in our laboratory.  We

25   don't typically hand over our validation on discovery



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    requests.  But our legal could potentially assist you
2    with that.  I just know we don't normally hand that
3    over.
4         Q.   Right.  But referred to a number of times
5    today; yes?
6         A.   Our validation is the key aspect of our
7    testing.  We will not bring anything online until
8    it's been validated, both developmentally by the
9    manufacturer, and then also internally.  So it is
10   extremely important, yes.
11        Q.   Has the FBI studied drop-out or possibility
12   of contamination with multiple individuals in a
13   mixture?
14        A.   We looked at drop-out as part of our
15   validation, again.  Contamination wouldn't be
16   specifically addressed in that study.  However, it
17   would refer to the fact that we did not see drop-in.
18             MS. SIRIGNANO:  One second, please.
19             THE COURT:  Certainly.
20        Q.   Okay.  Let's go to the likelihood ratio.
21   Finally, CG-B 003, that's your report.  And you had
22   two hypotheses here, and then you determined your
23   likelihood ratio; yes?
24        A.   That's correct, yes.
25        Q.   The first hypothesis you assumed that the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   DNA originated from four individuals; yes?

2        A.   That would have been both hypothesis would

3   assume four.  Who those individuals are would be the

4   differences.  But yes.

5        Q.   Okay.  And the second hypothesis, I guess

6   what I saw was that Mr. Garcia, and there were three

7   unknowns, to equal four; yes?

8        A.   Yes.  So one hypotheses was Mr. Garcia and

9   three unrelated unknown individuals.  The other

10  hypothesis was four unrelated, unknown individuals,

11  which did not include Garcia.

12       Q.   Okay.  So -- and this report you did on

13  June 27, 2017; yes?

14       A.   That is correct, yes.

15       Q.   And so the likelihood ratio you determined

16  in your report was the DNA typing results.  And there

17  is a footnote there, little 2, for item 3, are at

18  least 28 times more likely if they originated from

19  Garcia and three unrelated, unknown individuals, than

20  if they originated from four unrelated unknown

21  individuals; correct?

22       A.   Yes, that's correct.

23       Q.   And the calculations in your footnote were

24  performed using African American, Caucasian,

25  Southeastern Hispanic, and Southwestern Hispanic

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    populations; correct?
 2         A.   Yes, that's correct.
 3         Q.   And the likelihood ratio -- can we go to
 4    the next page, please, CG-B 004, please.  That's on
 5    the next page; right?
 6         A.   Yes, that is the table that we provide to
 7    help explain where those likelihood ratios fall.
 8         Q.   So we've got 28 here; correct?
 9         A.   That is correct.
10         Q.   And that would fall within the likelihood
11    ratio of 10 to 99.  And the qualitative equivalent or
12    the verbal equivalent that the FBI assigned at this
13    time with this likelihood ratio was moderate support;
14    correct?
15         A.   Yes.  But that is, again, based off
16    published -- this table was published by the
17    Association of Forensic Science Providers.  We use
18    that table for this information.
19         Q.   Are you the only one that uses this table?
20         A.   Not from my understanding, no.  I believe
21    other laboratories use it.  We have changed it
22    slightly when we switched to GlobalFiler; however,
23    this is a peer-reviewed published table.  So I'm
24    assuming there are a lot of labs that use this.
25         Q.   Do you know where it was peer reviewed?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   I do not know off the top of my head, no.

 2          Q.   Is it accurate?

 3          A.   I'm not sure what you mean by that.

 4          Q.   Is the table accurate?

 5          A.   It is just a qualitative equivalent.  Each

 6     person is going to have to depend or use that

 7     information, and apply how much support they believe

 8     is present in that sample.  However, it is used to

 9     assist individuals reading my report kind of where

10     the numbers I'm providing fall.  So for -- in this

11     case, 28 is lower on the spectrum.  So it ranges from

12     2 to over 700 billion.  So this table is just meant

13     to show what that means.

14          Q.   So you didn't actually say it was accurate.

15     I appreciate your response.  But it's literally right

16     above weak support.  And then uninformative; correct?

17     It's not extremely strong support; yes?

18          A.   Yes, that's correct.

19          Q.   And so if it was extremely strong support,

20     then the ratio would be a million to less than 700

21     billion; yes?

22          A.   That's correct, yes.

23          Q.   Based on this standard or this chart in

24     your report; correct?

25          A.   Correct, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Are you familiar with the State of New York
 2     versus Hillary case?
 3          A.   I am, yes.
 4          Q.   And there was Frye hearing in that case?
 5          A.   Yes.
 6               MS. SIRIGNANO:  Okay.  Your Honor, I'd like
 7     to offer the transcript of the Hillary case.  It's
 8     found at either the People of the State of New York
 9     versus or Oral N. Hillary; State of New York, County
10     Court, County of St. Lawrence; that's in Canton, New
11     York.  And liked to mark this as CG-G, DNA.
12               MS. ARMIJO:  Your Honor, I've never seen
13     this before.
14               THE COURT:  Hold on just a second.  Let me
15     get the marking of the exhibit.  I thought this was
16     going to be C.  Do you have some in between?
17               MS. SIRIGNANO:  I might, Your Honor, yes.
18     I have -- I had marked E.
19               THE COURT:  You haven't offered any of
20     these?
21               MS. SIRIGNANO:  You're right, Your Honor.
22     I didn't introduce C or D.  I introduced E.  And I
23     might introduce F.  But that one is G.  Do you want
24     me to renumber them?
25               THE COURT:  Why don't we mark this as C,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1   because if you don't offer them, it will just make
 2   the record confusing.  Is that okay?
 3             MS. SIRIGNANO:  Yes, Your Honor.
 4             THE COURT:  All right.  Ms. Armijo?
 5             MS. ARMIJO:  I've never seen this before.
 6   Our witness has never seen it before.  She's not a
 7   witness in this.  And it appears -- I don't know who
 8   testified, but she did not testify.  So I would
 9   object on relevance grounds.  And unless this witness
10   is intimately familiar with this, or we can have a
11   proffer of why this is relevant, I'm going to object
12   to it.
13             THE COURT:  All right.  Well, I think I
14   have read that transcript before in another case, so
15   I'm familiar with it.  I think it has enough
16   relevance here.  So I'll admit -- anybody else have
17   any objection or thoughts on it?
18             All right.  So I'm going to admit Chris
19   Garcia's Exhibit C.
20             Ms. Sirignano.
21             MS. SIRIGNANO:  Thank you, Judge.
22   BY MS. SIRIGNANO:
23        Q.  You stated, Ms. Smith, that you were
24   familiar with this case?
25        A.  I am familiar slightly, yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. SIRIGNANO:  May I approach?
 2              THE COURT:  You may.
 3         Q.   I've handed you page 75 of that transcript.
 4   Dr. John Simon Buckleton testified at this hearing;
 5   correct?
 6         A.   Yes, he did.
 7         Q.   And Dr. Buckleton is one of the co-founders
 8   or co-developers of the STRmix program, yes?
 9         A.   He is, yes.
10         Q.   And he testified at this hearing in New
11   York, yes, about the likelihood ratios in STRmix;
12   correct?
13         A.   That is correct, yes.
14         Q.   And looking at page 75 there, he talks
15   about likelihood ratios between one and 1,000 to be
16   inconclusive; correct?
17         A.   I don't see that.  I might not have -- half
18   the question is cut off.
19              MS. SIRIGNANO:  Oh, I'm sorry.  May I
20   approach, Your Honor?
21              THE COURT:  You may.
22         Q.   Here's page 74.
23         A.   Yes, that is what Dr. Buckleton does say in
24   this testimony.
25         Q.   And he is one of the producers of this
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    software; yes?

2        A.   On the software, the likelihood ratio and

3    the number and the meaning behind it is not

4    specifically about the software.  It's about a

5    likelihood ratio, and what the likelihood ratio

6    means.  The software is just a tool to calculate the

7    likelihood ratio.  But he does state that, yes.

8        Q.   And so the reason why he said that the

9    likelihood ratios range between one and 1,000 to be

10   inconclusive is because that's the range where the

11   greatest occurrence of false positives or false

12   inclusions occur; correct?  Based on your training

13   and experience, Ms. Smith.

14       A.   We know that the lower the number, when

15   more and more individuals, that can occur.  It was

16   seen very, very infrequently.  However, that is

17   reflective of the statistics.  So again, a statistic

18   of 28 is very low on the spectrum.

19       Q.   And that's when the too close to call

20   instances occur, and the data is uninformative

21   regarding the likelihood ratios because the greatest

22   occurrences of false positives; yes?

23       A.   I would not say it's unreliable.  It is

24   still an estimate.  Again, there is still more

25   support that Mr. Garcia is potentially a contributor.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    However, that likelihood ratios is what is important,
 2    and that is 28.  That is lower on the spectrum.  So
 3    it could match a lot of people.  So there could be a
 4    lot of people that could be included as potential
 5    mixture.
 6         Q.   So the 28 percent likelihood ratios could
 7    include what you just said, "a lot of people"; yes?
 8         A.   That is possible, yes.  And again, it's not
 9    a percent.  The likelihood ratio is not a percent.
10    The likelihood ratio is 28.
11         Q.   Likelihood ratio is 28.  And the word I
12    used was "uninformative."  And Dr. Buckleton said
13    that one to 1,000 would be inconclusive because it
14    would be hard to differentiate between a donor and a
15    non-donor, what you just said; yes?
16         A.   Yes.  That is part of -- that's his
17    opinion.  Again, the FBI Lab did not have an
18    inconclusive zone for Identifiler.  We just reported
19    the statistic.  We're just trying to give the
20    information, and how that is applied is up to the
21    individuals reading our report.
22         Q.   But you do now, right, based after this
23    Hillary testimony with this GlobalFiler kit, you all
24    now have changed your likelihood ratios where one to
25    100 is inconclusive; yes?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    A.   We have done that with GlobalFiler.  But

2    that was not based off the Hillary testimony.  That

3    was actually based off of our validation and what we

4    saw in validation.

5    Q.   So your validation study completely changed

6    the likelihood ratios a month after you did your

7    report here; correct?

8    A.   It was using a different kit.  GlobalFiler

9    has a lot more locations.  So, in general, if a

10   person cannot be excluded visually, the likelihood

11   ratio numbers that you get are very high.  They can

12   be in the nonillions, for instance, or in the

13   decadillions.  They get extremely, extremely high.

14   So, therefore, when we did our validation, we looked

15   at an inconclusive zone and did determine that

16   anything within -- up to 100 on the support for the

17   proposition that a person was included, would be

18   consider inconclusive.  But that is based off the

19   GlobalFiler validation, not the Identifiler.

20        THE COURT:  Ms. Sirignano, would this be a

21   good time for us to take our first afternoon break?

22        MS. SIRIGNANO:  It would be, Your Honor.

23        THE COURT:  All right.  We'll be in recess

24   for about 15 minutes.

25        (The Court stood in recess.)




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              THE COURT:  All right.  Let's everyone grab
 2    a seat.  Make sure everybody has got an attorney.
 3              All right.  Ms. Smith, I'll remind you that
 4    you're still under oath.  Ms. Sirignano, if you wish
 5    to continue your cross-examination of Ms. Smith, you
 6    may do so at this time.
 7              MS. SIRIGNANO:  I do, Your Honor.  Thank
 8    you.
 9              THE COURT:  Ms. Sirignano.
10    BY MS. SIRIGNANO:
11        Q.   Ms. Smith, before we broke, or before we
12    had a break, you were testifying about this
13    likelihood ratio chart on page 004, B 004, of your
14    report.  And then right before we took a break, we
15    were talking about the GlobalFiler kit, and that the
16    chart has changed; correct?
17        A.   It has changed since we went online with
18    GlobalFiler, that is correct, yes.
19        Q.   And the one to 100 range is now -- the
20    qualitative equivalent is inconclusive, correct, for
21    GlobalFiler?
22        A.   Yes, one to 99 is inconclusive, that's
23    correct.
24        Q.   And on your report -- can you back this
25    out.  You, in Footnote 1, stated that you did use the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    GlobalFiler kit; correct?

2        A.    That was only used on the reference sample.

3    That was not used on the evidence sample.  The

4    interpretation is based off the evidence, not the

5    reference samples.  But I did use it in this case

6    specifically for the sample for Mr. Garcia only.

7        Q.    And so you had both kits used in this case;

8    correct?

9        A.    Yes, because the samples were submitted a

10   year apart, so we went online with GlobalFiler

11   January of this year, and so we started amplifying

12   DNA after that date with GlobalFiler.

13       Q.    So there is really no scientific basis,

14   based on the earlier chart and the new chart, that

15   would show that there is moderate support versus

16   inconclusive in the likelihood ratio of 28; correct?

17       A.    28 is a number that just provides

18   information.  That chart was based off a

19   peer-reviewed, published chart that was already

20   available that when we discussed it with other

21   laboratories at SWGDAM, they were also using that

22   chart.  Since we switched to GlobalFiler, we decided

23   to base it specifically on our most up-to-date

24   validation studies, so that is changed slightly by

25   including the inconclusive zone.  But also that has a



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    lot to do with the fact that GlobalFiler has a lot
 2    more loci in its kit.
 3         Q.   Right.  And the 28 that was found was
 4    inconclusive with this GlobalFiler, the new chart;
 5    correct?
 6         A.   No.  A likelihood ratio of 28 would be
 7    inconclusive, but that would have to be from a sample
 8    that was amplified with GlobalFiler, which this is
 9    not.  So it is completely separate.
10         Q.   But did you testify that the buccal swab
11    from Garcia was amplified with GlobalFiler; correct?
12         A.   The buccal sample was.  But the
13    deconvolution using STRmix was done using Identifiler
14    on the samples, not GlobalFiler.  The kit used for
15    the buccal sample was irrelevant for this.
16         Q.   I just don't think that there is any
17    scientific basis for these labels and --
18              MS. ARMIJO:  Objection.
19              THE COURT:  Sustained.
20              MS. SIRIGNANO:  Sorry, Your Honor.
21         Q.   The qualitative equivalent, moderate
22    support, is based on what scientific basis?
23         A.   In my report you can see that it is in
24    accordance with standards published by the
25    Association of Forensic Science Providers.  So that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was based off of their peer-reviewed publication.  We

2    feel that providing information to what that

3    likelihood ratio is, is the best policy.  So when we

4    calculated the likelihood ratios using Identifiler,

5    at that time, we always provided a number in both

6    directions, even with exclusions.  When there was

7    more support for a possible exclusion, we still

8    provided those numbers as well.

9        Q.   But you didn't really answer my question.

10   I asked what scientific basis was used to come up

11   with these qualitative equivalents?

12       A.   I don't specifically recall what is in

13   their publication.  However, we know that a one is

14   uninformative.  That is how a likelihood ratio works.

15   We also know that when you have low numbers, you're

16   going to have less support.  And that is explained on

17   testimony.  How, you know, a number of 28 means it

18   could -- the DNA could have originated from

19   Mr. Garcia, but also could have originated from other

20   individuals.  And that is why this equivalent is

21   helpful.  We're just trying to be helpful to the

22   individuals reading our report.

23       Q.   And the helpfulness changed from moderate

24   support to inconclusive with the new GlobalFiler

25   amplification kit; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   You can't compare the two, because one is

2   using Identifiler and one is using GlobalFiler.   They

3   are different kits because we have different number

4   of loci.   Identifiler is looking at 15 locations, so

5   the numbers are generally lower for Identifiler.

6   With GlobalFiler, you're looking at 21 locations that

7   likelihood ratios are calculated for, so they're

8   higher.   So you can't compare the two charts to one

9   another like that.

10          MS. SIRIGNANO:   May I have a minute?

11          THE COURT:   You may.

12      Q.   You've testified a few times that you used

13   both kits to come up with this report.   It would seem

14   intuitive that you could compare these two charts.

15      A.   I can see why you think that.   However, the

16   GlobalFiler amplification kit was utilized on the

17   known reference sample; however, the deconvolution,

18   the mixture deconvolution was used using the

19   Identifiler kit.   Because at the time the gun and

20   holster were processed, we were only using the

21   Identifiler kit.

22          A known reference sample, it does not

23   matter what kit you use.   We obtain knowns from other

24   laboratories that may have used a kit that we don't

25   even use at the FBI Laboratory, and we can still use



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    it, because STRmix is not taking into account what
 2    kit was used, when it comes to the known reference
 3    samples.  It only matters what kit was utilized for
 4    the evidence items.
 5              So, in this case, the only relevant kit to
 6    the STRmix deconvolution is Identifiler, which
 7    utilizes this equivalent chart.
 8         Q.   Let's turn to item 4 on page CH-B 085.
 9    Item 4 is the holster that you analyzed; correct?
10         A.   Yes, it is.
11         Q.   And do you recognize page 85 here?
12         A.   I do.
13         Q.   And that's your 22-page summary report or
14    summary sheet?
15         A.   That is correct.  This is my STRmix
16    deconvolution for item 4, which is the holster, and
17    its comparison to Mr. Garcia.
18         Q.   And let's turn to page B 087.  And the
19    header on this page is "Per locus likelihood ratios";
20    correct?
21         A.   That is correct.
22         Q.   And so this data, where did this come from?
23         A.   This is the likelihood ratios calculated
24    for Mr. Garcia, based off of the mixture
25    deconvolution that was used for the holster.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    And were all categories used in this

2    analysis, meaning Caucasian, SEH, SWH, EAH?

3        A.    Whenever I calculate a likelihood ratio, I

4    always calculate it for at least these four.  We

5    always calculate for Caucasian, African American,

6    Southeast and Southwest Hispanics.  The one that is

7    reported is the lowest likelihood ratio.  We always

8    report the lowest number.

9        Q.    Which was the lowest number?

10        A.    In this case, the lowest number was for the

11    Southwest Hispanics.  Here, it was 8.3 to the 15.

12    However, that number was not written in the report,

13    because it was greater than 700 billion, which met

14    our source threshold.  So it will just say Mr. Garcia

15    was the source of one of the contributors to this

16    holster.

17        Q.    And the greater than 700 billion, that

18    source threshold, where did that number come from?

19        A.    The FBI has been using source thresholds

20    for many years.  Other laboratories are also using

21    it.  This threshold was deemed by the FBI Laboratory.

22        Q.    Have there been publications, other than

23    the validation studies on these source thresholds?

24        A.    There are publications based off of the

25    source attribution thresholds.  Different

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

194

```
 1    laboratories do use different thresholds, though.
 2    Some laboratories may use the world population.  Some
 3    may use just the United States population.  At the
 4    FBI, we use the world population, then we increase
 5    that up to 700 billion, just to ensure that we
 6    wouldn't expect to see it again.
 7        Q.   So you use the world population, and you
 8    increase 700 billion?
 9        A.   So at the time when we came up with this
10    number, the world's population was 7 billion.  So we
11    increased that to 700 billion, just to be cautious.
12        Q.   And these numbers are determined by the
13    FBI; correct?
14        A.   That threshold that we use is determined by
15    the FBI.  Other labs also have source attribution,
16    and that would be based off their own policies.
17             MS. SIRIGNANO:  Your Honor, pass the
18    witness at this time.
19             THE COURT:  Thank you.  Ms. Sirignano.
20             Any other defendants have cross-examination
21    of Ms. Smith?  Mr. Lowry?
22                      EXAMINATION
23    BY MR. LOWRY:
24        Q.   Good afternoon, Ms. Smith.
25        A.   Good afternoon.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   I just wanted to follow-up briefly on the

2    validation issue.  Are you familiar with a gentleman

3    named Bruce Budowle?

4    A.   I am, yes.

5    Q.   Who is Bruce Budowle?

6    A.   Bruce Budowle is an individual who used to

7    work for the FBI Laboratory.  I believe now he's

8    still at the University of North Texas.

9    Q.   How long did he direct the FBI Analytical

10   Laboratory?

11   A.   I don't know specifically.  He has not been

12   with the lab since I've worked there.

13   Q.   Okay.  But it's fair to say he directed the

14   FBI's Analytical Laboratory for a number of years?

15   A.   He was not a director.  He worked as a

16   research individual that assisted in the bringing of

17   a lot of our softwares online, yes.

18   Q.   And it's software regarding the DNA

19   analysis?

20   A.   Policies and procedures, yes.

21   Q.   Are you familiar with Mr. Budowle's work

22   that's critical of using low copy number DNA samples?

23   A.   I am not specifically, because the FBI Lab

24   does not do low copy number.

25   Q.   Well, and the reason I'm asking is, I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    remember at the beginning of Ms. Sirignano's
2    presentation, you were looking at the nanograms of
3    DNA available in these two samples, sample 3 and
4    sample 4.  Do you recall that?
5         A.   Yes, the FBI Lab aims for one nanogram;
6    however, we have processed samples with less than
7    that.
8         Q.   Right.  And the ideal sample would be a
9    nanogram?
10        A.   According to our validation, yes.  But we
11   can go, again, much lower.
12        Q.   But the ideal sample for a DNA test would
13   be a nanogram; correct?
14        A.   Yes, that's what we strive for.
15        Q.   And I believe, looking at items 3 and item
16   4, they are roughly about half a nanogram?
17        A.   Roughly, yes.
18        Q.   And on top of that you're claiming that
19   that half a nanogram was four separate individuals?
20        A.   Roughly, yes.
21        Q.   And so if you just took the half a
22   nanogram, divided by four, there would be relatively
23   little DNA per individual in the sample; correct?
24        A.   Yes, if they were contributing similar
25   amounts.  But yes, you're right.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   The assumption is they're contributing
2    equally?
3    A.   Correct.
4    Q.   But traditional DNA samples, if you assume
5    equal contribution, they would all be in the arena of
6    low copy number samples?
7    A.   They would have little template DNA, yes.
8    Low copy number testing is specifically using
9    enhanced techniques to see the DNA, which is known to
10   pick up drop-in, which is the false alleles.  That is
11   using, for instance, increased number of
12   amplification cycles.  At the FBI we're using 27 for
13   Identifiler.  So, for instance, maybe using 30.  That
14   is an enhanced technique for low copy number testing.
15   Q.   Right.  But I'm not asking about the
16   techniques to accommodate for low copy numbers.  I'm
17   saying just the raw data would be in the arena of low
18   copy numbers?
19   A.   It would be lower template, yes.
20   Q.   And let's be fair to the Court here.  By
21   "lower template" you mean there is less DNA per
22   individual in the sample?
23   A.   Yes, this is a low-level sample, that is
24   correct.
25   Q.   And by low-level sample, we mean a sample

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that's probably under 250 picograms?

2         A.    Potentially.  I can't state specifically

3    how much DNA each person is contributing.

4         Q.    Right.  And again, with the assumption a

5    half a nanogram divided by four.

6         A.    Right.  But that would be less than 250,

7    right.

8         Q.    And 250 picograms, that's relatively the

9    industry standard for defining low copy number?

10        A.    That is possible, yes.  Like I said, we

11   don't do low copy numbers, so I don't know

12   specifically what those labs quantify it as.

13        Q.    That brings me to STRmix.  Because the

14   reason you use STRmix is so you can circumvent

15   historical problems with low copy numbers; isn't hat

16   right?

17        A.    I wouldn't say it's to circumvent it, no.

18   The low method we would see information that we just

19   could not utilize.  So STRmix allows us to use the

20   entire profile.  Our validation of STRmix looked at

21   lower than one nanogram templates of DNA.  So we

22   looked at degraded samples.  We looked at low copy

23   samples for that validation.

24        Q.    Let's talk about that validation quickly,

25   because I didn't really catch it either on direct or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the cross-examination.  You validated the STRmix

2    using the equipment at your laboratory at Quantico;

3    correct?

4        A.   Correct, yes.

5        Q.   And for a validation to be done correctly,

6    you have to use the same equipment using the same

7    software?

8        A.   Yes.  So in order to do a validation, we

9    use -- however we're planning on using it for

10   casework is what you must validate.  So you have to

11   validate the appropriate equipment, the software, the

12   STR typing kits, everything, yes.

13       Q.   Because the validation in your lab, in

14   Quantico, for the Identifiler kit with, you know, a

15   specific -- oh, I forget what you call the actual

16   chromatography machine, but might be different from

17   your lab to a lab in New Mexico?

18       A.   Correct.  That's why it's important that

19   the validation be done in-house.  All labs must do an

20   internal validation first.  And there is actually a

21   program within STRmix called Model Maker that assists

22   you in doing that.

23       Q.   So for STRmix, you validated using the

24   nanogram as baseline?

25       A.   No.  So STRmix -- so GlobalFiler

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

1    amplification, when we brought online GlobalFiler,

2    independent of STRmix, that is where we deemed that

3    GlobalFiler behaves a certain way using one nanogram.

4    So that's what we would aim to, so we didn't miss any

5    information.  STRmix, though, during the validation

6    we looked at a variety of types of mixtures, a

7    variety of amounts of DNA.  So that we knew it

8    crossed all the potential types of samples we would

9    expect to see in casework.

10          Q.   So let's talk about the validation for

11   STRmix.  For a single source sample, how low did you

12   go with the DNA quantity in your validation studies?

13          A.   I don't recall specifically how low.  I

14   know that we went down to the picogram level.  I

15   don't remember specifically what that level was at

16   this point.

17          Q.   So do you recall that, for a single source

18   sample, that your validation studies got below 250

19   picograms?

20          A.   I know that there were definitely samples

21   at about 300 picograms.  But I don't recall exactly

22   how low it went.  So I don't recall that.

23          Q.   Now, let's talk about a two-source sample,

24   a known two-source sample.  Did you validate for

25   STRmix going down below 250 picograms per source?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1     A.  So as we increased the number of

2  contributors in our validation, we decreased -- we

3  definitely adjusted the ratios.  So for two people,

4  we tested a 20 to one, a one to one, a one to 20, and

5  that varied in the amount of DNA.  For a four-person

6  mixtures we did the same thing.  We did like a 16 to

7  one, to one to one, all the way down to a one to one

8  to one to one mixture ratio.  And that covered where

9  some of those people were very, very low levels, in

10  the hundreds of picograms.  And we actually saw in

11  certain instances those people dropped out, or could

12  not be seen in the profile.  So we did cover that

13  range in our validation.

14     Q.  Okay.  Well, I'm not sure you answered my

15  question.  I'm going to ask it again.  Because you

16  said you validated down into the hundreds of

17  picograms.  And my question is:  Did you validate the

18  two-source sample below the low copy number, the low

19  template number of 250 picograms?

20     A.  I believe we did.  I believe we went down

21  to 125 picograms.  But I would have to refresh my

22  memory.  I can't recall specifically, because so many

23  mixtures were run.

24     Q.  So you can't recall, is the answer today?

25     A.  Specifically for two person, no.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.    What about for a three-person sample?

2          A.    Again, I don't recall the exact amount of

3    DNA.  I do know that we degraded the samples, using

4    UV light, and also using clean, fresh samples.  And

5    we saw a variety of things.  But I don't recall

6    exactly how low we went.  I believe it was 125

7    picograms, though.

8          Q.    But that would be in the validation

9    studies?

10         A.    Yes, it would.

11         Q.    And those were the validation studies you

12   said you'd have to talk to your legal department

13   about disclosing to the defense team?

14         A.    We don't typically hand over validation

15   studies as part of discovery.  So, yes, if those were

16   requested, they would have to go through our legal

17   department, yes.

18         Q.    But for today's purposes, talking to this

19   Court, you can't say definitively whether you

20   validated the STRmix for two-source samples below 250

21   picograms?

22         A.    I do have the peer-reviewed publication of

23   our validation with me.  I can refer to that, if

24   you'd like, so I can refresh my memory exactly how

25   low we went.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1        Q.   Sure.

2             THE WITNESS:  Your Honor, do you mind if I

3   refer to my notes?

4             THE COURT:  Any problem with that, Mr.

5   Lowry?

6             MR. LOWRY:  Not at all.

7             THE COURT:  All right.  You may do so.

8        A.   Okay.  We did actually cover that range.

9   So in our internal validation of STRmix for the

10  interpretation of single source and mixed DNA

11  profiles paper, which is published in the Forensic

12  Science International Genetics, it does list out a

13  summary of the mixtures that we tested.  Those

14  mixtures, depending on the number of contributors,

15  ranged from .006 nanograms up to one nanogram.

16       Q.   Okay.  So that's well above the 250

17  picogram level?

18       A.   That is much lower, yes.

19       Q.   The 250 picogram is much lower than the .6

20  nanogram?

21       A.   It's .006 nanograms.

22       Q.   Got it.  60 picograms?

23       A.   Yes, I believe that's correct.  I would

24  need a calculator.  I'm not great with math in my

25  head.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          Q.   Now, if we're talking about 60 picograms,

 2    that's probably -- for everybody else in the

 3    courtroom, that's probably one or two cells?

 4          A.   It's very low cells, yes.   Typically, it

 5    would just be a couple of cells, yes.

 6          Q.   And how -- for that level of validation,

 7    was that a single-source sample?

 8          A.   So for a number of contributors, that .006

 9    to .9 nanograms, that was for two contributors.   For

10    four contributors, it was .05 nanograms to 3.2

11    nanograms.   And that template range varied on the

12    contributor.

13          Q.   So pass that back to me one more time.   Was

14    that three contributors?

15          A.   Three contributors range from .021 to one

16    nanogram contributor template.

17          Q.   And so in this case, we're talking about

18    you assumed four contributors to the sample?

19          A.   Correct.   But, again, I want to reiterate

20    that the quantification is an estimate.   So, again,

21    we don't know exactly how much DNA starting material

22    we had.

23          Q.   Correct.   And that's one of the problems

24    with mixtures, is you never know how much a single

25    contributor provided in the mixture; isn't that true?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   We never know how much anybody contributed

2   to a mixture.  We have to use our training,

3   education, and experience to determine the

4   interpretation of that.

5      Q.   Well, you really -- you think looking at an

6   electropherogram you can deduce how much of a sample

7   any one contributor made?

8      A.   No, you can't do that.  I agree with you.

9   You look at the entire profile, and see if you're

10  seeing a low-level mixture, a high-level mixture.  Do

11  I think drop-out may have occurred?  If I don't think

12  drop-out occurred, then I'm going to interpret the

13  profile differently.

14     Q.   So I just want to come back to the four

15  contributors to a sample.  Did the FBI validate for

16  STRmix below 250 picograms per contributor?

17     A.   The chart in this paper specifically states

18  that the FBI Laboratory, for a number of contributors

19  of four, it ranged from .05 nanograms to 3.2

20  nanograms.  So about exactly the amount of total DNA

21  that I saw here, about half a nanogram.

22     Q.   Right.  So that was for a half a nanogram

23  for any single contributor?

24     A.   For this one table, that's what it appears,

25  yes.  Again, I would have to read the entire paper

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   again to be sure.  But --

2        Q.   My question is really simple here.  For

3   samples, where we're assuming there are four

4   contributors, did the FBI validate for any -- for a

5   mixed sample with four contributors -- that you can

6   give valid results for a single contributor in the

7   mix that was less than 250 picograms?

8        A.   I don't know specifically the number.

9   However, I do know the FBI validated a range of low

10  level and high level template amounts.  That gives me

11  confidence in the way STRmix interpreted the sample.

12       Q.   But when you're talking about template

13  amounts, you're talking about the total template

14  amount?

15       A.   Right, but we're making the assumption that

16  we know it's 250.  And I know for a fact that this

17  profile is not a one to one to one to one mixture, so

18  that's not an appropriate assumption for this case.

19       Q.   So let's talk about this case.  What would

20  you estimate the ratios would be?

21       A.   Well, STRmix -- I don't recall the exact

22  ratios.  I would need to do that calculation.  We

23  don't do that specific calculation, but it estimated

24  approximately a 42 percent contributor, a 30 percent

25  contributor, a 20 percent contributor, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

207

1    approximately a 7 percent contributor.  So I don't
2    know specifically what those ratios are without doing
3    the math.  But it is not a one to one to one to one.
4         Q.   Out of those percentages, which one of
5    those percentages of the sample would you attribute
6    to the potential match for Mr. Garcia?
7         A.   I cannot state specifically which one he
8    is, if he is in there at all.  And the reason for
9    that is that is not how STRmix works.  However,
10   STRmix attributed him to the 30 percent contributor.
11   If that is, in fact, from Garcia, which we cannot
12   say.
13        Q.   And if you assume for the sake of argument,
14   it's a 30 percent contributor, and you started out
15   with a half a nanogram, he's roughly, what, 125, 150
16   picograms?
17        A.   Approximately.  But, again, quantification
18   is an estimate, so I can't correlate that directly to
19   that.
20        Q.   Okay.  But I want to come back to where I
21   started with.  Mr. Budowle's critique of DNA analysis
22   for a low template DNA is that the whole analysis
23   becomes unstable and unpredictable given the low
24   template amounts of DNA?
25        A.   I don't agree with that assessment.  I am

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    not familiar with specifically what paper you're

2    referring to.  From my understanding, low copy number

3    testing, if he's referring to that, is very different

4    than low template amount.  Our validation covered a

5    variety of ranges.  And we see these types of

6    mixtures routinely on firearms and other items in

7    which the individual is most likely touching, versus

8    body fluid.  So I'm completely confident in my

9    results.  And the 28 is reflective of that low-level

10   sample.

11       Q.   Ms. Sirignano asked you about drop-in.  And

12   you said that in your validation studies, the FBI

13   didn't come across drop-in as part of the validation

14   studies; is that correct?

15       A.   That is correct.  With Identifiler, we saw

16   no instances of drop-in.  So when we set our

17   parameters for our amplification, we assumed a

18   drop-in rate of zero for STRmix because of that

19   validation.

20       Q.   And by the time you get to your

21   electropherogram, and you're looking at the peak

22   heights -- now refresh my recollection, is there

23   absolutely no analytical, no stochastic threshold?

24   Using STRmix, do you have a stochastic or analytical

25   threshold for when you're calling an allele for a

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                         e-mail: info@litsupport.com

1  peak height?

2      A.   So STRmix uses a threshold of 50.  So

3  anything below 50 is considered potential background

4  noise.  Anything above 50 is considered a true peak,

5  unless the analyst, including myself, looks at the

6  data and deems that to be an artifact; then it would

7  be removed.

8          We also have a threshold of 200 for

9  Identifiler.  Therefore, what that means is, if the

10 peak is below 200, we know we may not see its partner

11 peak.  So, for instance, if a person is 7, 10, we may

12 only see the 7.  And that is also part of our

13 validation.  STRmix does not use that second

14 threshold, because it is a continuous model and

15 models for drop-out.

16     Q.   So if I understand what you said, I'm

17 trying to understand that, you don't use the 50 RFU

18 for STRmix?

19     A.   STRmix does use the 50 RFU; that's the

20 analytical threshold.  It does use that.  Anything

21 above 50 is considered a peak, not background noise.

22     Q.   Unless the analyst attributes that peak to

23 stutter or some kind of known artifact?

24     A.   If the analyst attributes that to a known

25 artifact, such as bleed-through or pull-up, STRmix



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   models stutter, so we do not delete out stutter

2   necessarily.

3        Q.   I think that you said STRmix had been

4   validated at the state level?

5        A.   Both federal and state.  We're a federal

6   laboratory, and we validated STRmix.  However, it's

7   also being used by other federal laboratories, in

8   addition to state laboratories.

9        Q.   What state court has validated, in a

10  Daubert challenge, STRmix for a four-contributor

11  sample?

12       A.   I don't specifically know the number of

13  contributors that have been challenged.  I do know

14  that Michigan is one that did approve the use of

15  STRmix.  And I know there are others.  I believe

16  there is seven or eight now.  But I don't know the

17  mixture ratios that they had.

18       Q.   What I'm talking about is a specific

19  scientific challenge to STRmix.  I mean, there would

20  be a difference between challenging STRmix for a

21  single contributor sample, as opposed to a

22  four-contributor sample, wouldn't it?

23       A.   It would be a different challenge.

24  However, if the laboratory validates them both, then

25  I would say that they're both scientifically valid.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And my final question would be:  For a
 2   four-contributor sample, do you have the validation
 3   studies that show any single contributor less than
 4   250 picograms can get a reliable test result using
 5   STRmix?
 6        A.   I can't recall the specific numbers, no.
 7   But I do know we have the four-person mixture
 8   validation.  And I could find that information out.
 9             MR. LOWRY:  No further questions.
10             THE COURT:  Thank you, Mr. Lowry.
11             Any other defendants have cross-examination
12   of Ms. Smith?
13             All right.  Ms. Armijo, you have redirect
14   of Ms. Smith?
15                  REDIRECT EXAMINATION
16   BY MS. ARMIJO:
17        Q.   Starting where we left off.  In the states
18   that you were talking about with Mr. Lowry, is that
19   the same scientific validation that you would
20   consider this case?
21        A.   Yes, it is.  They would have done their own
22   internal validation at the specific laboratories.
23   But it would be on the same software, and an internal
24   validation would have to be done, just like we did.
25        Q.   You were asked on cross-examination about
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    how you protect against bias in this case.  And how

2    is it that STRmix protects against bias?

3         A.   STRmix does not have a means of having

4    bias, because it is just a software program.

5         Q.   Let's see.  Now, you were talking about the

6    STRmix validation version that you use.  Can you

7    explain a little bit about the extensive validation

8    that the FBI does with the version that you have

9    done?

10        A.   Whenever the FBI Laboratory receives a new

11   version from the ESR, or the software -- or the

12   company that generated STRmix, they do an in-depth

13   validation to show that it's behaving the same way as

14   the previous validation.  So they will potentially

15   run new samples.  They will run the same data through

16   both software versions to ensure they're getting the

17   same exact result.  And we do that every time we have

18   a new version.  So we will not bring on a new version

19   unless it meets those validation criteria.

20        Q.   Was that done in this case?

21        A.   Yes, it was.

22        Q.   Now, you were talking on cross-examination

23   about the validation where you get the low-level

24   split-out into two, I believe -- I'm sorry, I was

25   trying to write quickly.  You said that the only

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    thing that would cause would be false exclusions; is

2    that correct?  Do you know what I'm referring to?

3         A.   Yes, I know what you're referring to.

4    That's not necessarily true.  So, if you

5    underestimate the number of contributors, so, for

6    instance, if you call it a three-person mixture, and

7    it is really a four-person mixture, then you could

8    falsely exclude people, because you're not seeing --

9    you're not attributing to the correct number of

10   individuals.  If you falsely increase the number of

11   contributors, meaning it is really a three-person

12   mixture, but you call it a four-person mixture, it

13   will potentially generate a very low-level extra

14   contributor, where you could falsely include.

15   However, in our validation studies, we saw that it

16   remained near uninformative.

17        Q.   And you indicated the validation paper that

18   was published is regularly available on the internet?

19        A.   Yes, that is correct.  Both the

20   developmental and the internal validation papers are

21   readily available.

22        Q.   Now, Ms. Sirignano admitted into

23   evidence -- actually, I don't believe I see it.  Do

24   you have -- maybe you have it -- the transcript from

25   that New York case.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I only have two pages of that transcript up
 2   here.
 3             MS. ARMIJO:   Can we have the full copy of
 4   it, please?
 5        Q.    Are you familiar with this case?
 6        A.    I am vaguely familiar, yes.
 7        Q.    Okay.   And what were the issues in this
 8   case?
 9        A.    In this case, specifically, the state in
10   which this hearing was set, their laboratory was not
11   validated for using STRmix.   They did not -- they had
12   not done a validation study.   They were not using
13   STRmix on casework.   So they requested -- or someone
14   requested John Buckleton to use the data from the
15   laboratory and run it through STRmix.   The problem
16   with that is STRmix does require you to generate the
17   data on your own instruments, because the software's
18   parameters are based off of your own validation.   So
19   the parameters he used were not based off of the
20   laboratory's data.   They were just estimates.   And it
21   was found that it was not suitable.   And he could not
22   testify to it, because he did not run the samples
23   himself through the laboratory.
24        Q.    And in this case, did the FBI run samples
25   themselves?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.  All of this data came off of our own

2   instruments that have been validated for using

3   software.

4       Q.   Is the FBI validated for using STRmix?

5       A.   Yes, we are.

6       Q.   So is that a distinction from the New York

7   case?

8       A.   Yes, it's a large distinction.

9       Q.   And you were talking about comparing the

10   different charts with Ms. Sirignano.  Can you explain

11   the differences between the charts, when you're

12   talking about the numbers?

13       A.   Are you referring to the kits that were

14   used?  I'm not sure which charts.

15       Q.   She was talking about the charts for the

16   numbers, when you talked about the number 28, as

17   opposed to being a moderate support?

18       A.   Yes.  So the charts in this report that's

19   relevant for this case is based off of a published

20   chart that was available to us when we brought STRmix

21   online.  Likelihood ratios were newer to us as well.

22   So we referred to individuals who are familiar with

23   the qualitative equivalent.  So we went to a

24   peer-reviewed publication and used those -- that

25   chart for identifying when we went online with this.



SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                          e-mail: info@litsupport.com

1           When we switched to GlobalFiler, because it

2   uses so many more locations, we routinely saw numbers

3   that were much, much higher.  So based off of our

4   validation, we deemed to have an inconclusive zone up

5   to 100.

6        Q.   And is that why you indicate that, with the

7   28, it already takes that into account?

8        A.   It does.  I mean, the 28 is a low number on

9   that chart, when you look at how large it can get.

10  So that is part of why we provide the numbers.  It's

11  just information.  It means that there was more

12  support that Mr. Garcia was a contributor, but it

13  does not necessarily mean that he is the only

14  possible contributor.

15       Q.   Now, in reference to the amount of samples

16  in this case, was it, in your opinion, enough of a

17  sample?

18       A.   Yes, it was.

19       Q.   And did the amount of the sample impact any

20  of the validation of your testing?

21       A.   No, it did not.

22       Q.   And he was using the term "low copy," and

23  you were using the term "low template."  What is the

24  distinction?

25       A.   For me, personally, low copy refers to a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   technique in which you take low-level samples and try
 2   to increase the amount of sample you have by using
 3   techniques that are going to make your samples
 4   potentially contain drop-in and other artifacts.
 5   It's a way to increase the level of DNA you have,
 6   which we do not do at the FBI Laboratory.
 7        Q.   And in reference to the STRmix, where you
 8   said it was seven or eight other states in which
 9   there have been Daubert hearings and it's been
10   approved.  Is it the same scientific validation that
11   you use?
12        A.   Yes, it is.  And again, that was an
13   estimation.  I don't know the exact number.  It's
14   around six or seven.  But that is based off of
15   STRmix.  And the individual labs do their own
16   validation, but it is the same software, yes.
17             MS. ARMIJO:  I have nothing further.  Thank
18   you.
19             THE COURT:  Thank you, Ms. Armijo.
20             All right.  Ms. Smith, you may step down.
21   Thank you for your testimony.
22             THE WITNESS:  May I be excused, Your Honor?
23             THE COURT:  May she be excused?
24             MS. SIRIGNANO:  Your Honor, I'd like to
25   review the SOPs that were just given to me and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

218

```
1    re-call her in the morning just briefly, to see if I
2    could use any of that materials in my
3    cross-examination.
4              THE COURT:  How do you feel about that, Ms.
5    Armijo?
6              MS. ARMIJO:  Cross-examination of whom?
7              MS. SIRIGNANO:  Of the witness.
8              MS. ARMIJO:  Your Honor, I think that that
9    would be going more towards -- and I think the Court
10   gave a great deal of indulgence to Ms. Sirignano.
11   This was more than just a Daubert hearing.  This was
12   more of a cross-examination and preview and fishing
13   expedition.  So we would request that she be excused
14   at this point, unless there is something specific
15   that she can point to.
16             THE COURT:  I don't think --
17             MS. SIRIGNANO:  Your Honor, I can't look at
18   materials or rely on materials or cross-examination
19   using materials that I haven't had five minutes to
20   review.  And, unfortunately, this is a Daubert
21   hearing, and despite my colleague's continued
22   thoughts about us doing a discovery fishing
23   expedition, all these questions and the SOPs -- which
24   is why I asked for them months ago -- is within the
25   purview of Daubert and within cross-examination.  And
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    because the Government waited until the afternoon of

2    the hearing to provide us with these documents,

3    Mr. Garcia shouldn't be penalized to have the

4    opportunity to review it and cross-examine the

5    witness on them.  She referred to the SOPs on

6    multiple instances here, and I haven't even had a

7    chance to review them.

8              THE COURT:  Well, I'd asked earlier -- you

9    filed something, I guess, last night about -- I

10   needed something from your expert as to why the FBI's

11   DNA policies and procedures were essential to the

12   Daubert hearing.  And Ms. Arvizu, I guess, stated in

13   the document you filed last night, she says, in sort

14   of an ambiguous last sentence on page 2, lines 6

15   through 12, she said, "Without access to laboratory's

16   policies and procedures, an independent reviewer

17   would be unable to evaluate whether the subject

18   testing conformed to applicable requirements of" --

19   and here is where it's not clear, it says, "FBI

20   policies, laboratory procedures, and consensus

21   standards."  If FBI modifies those three clauses,

22   then again, that's what I've been saying all along,

23   I'm not sure that anybody is telling me that these

24   are necessary for their Daubert hearing.  So she's

25   not clear.  It's a very conclusory sentence.  I was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    hoping for more.
 2               And so without more, Ms. Smith, you are
 3    excused.  I still don't have any foundation as to why
 4    this is necessary for a Daubert hearing.  Thank you
 5    for your testimony.
 6               THE WITNESS:  Thank you, Your Honor.
 7               THE COURT:  All right.  Does the Government
 8    have further witnesses or evidence it wishes to
 9    present on the Daubert hearing?
10               MS. ARMIJO:  No, Your Honor.  We have
11    nothing further.
12               THE COURT:  All right.  Do the
13    defendants -- Ms. Sirignano, do the defendants have
14    any witnesses or evidence it wishes to present on the
15    Daubert hearing?
16               MS. SIRIGNANO:  No witnesses at this time,
17    Your Honor.
18               THE COURT:  All right.  Do you wish to
19    argue in support of your motion?
20               MS. SIRIGNANO:  I do, Your Honor.
21               THE COURT:  All right.  Ms. Sirignano.
22               MS. SIRIGNANO:  Your Honor, we've heard
23    from the witness, the Government's witness, the
24    Government's expert today, about the process that
25    they use to run this DNA, and then the STRmix
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    program, both the earlier version and this new

2    version.

3            And what we did hear today was that this

4    software program has -- the new version has not been

5    peer reviewed.  There hasn't been anything publicly

6    published about this STRmix version; that they've got

7    all these internal validation tests and reports, but

8    nothing within the public realm, other than the

9    earlier version of the software that explains how

10   they validated this.

11           And I submit, Your Honor, that this DNA

12   testing on this low-level sample, as you heard from

13   the witness, is very unreliable.  It's prone to false

14   positives.  It's uninformative.  It's too close to

15   call.  And the developer of the STRmix software

16   testified in that earlier case, although it being

17   different, that this likelihood ratio of 28 would be

18   inconclusive.  And the reason for that is the

19   possibility of false inclusions.  The witness stated

20   specifically that she could not say that Mr. Garcia

21   was in this mix at all, or specifically, that he was

22   in the mix, or whether he was in the mix at all.

23           So based on the math and based on the

24   science, they assumed that he was a 30 percent

25   contributor to this number 2 individual.  And I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   believe, based on Mr. Lowry's and my

2   cross-examination of this witness, a low-level sample

3   with a likelihood ratio of 28 is very sketchy, Your

4   Honor.  It's uninformative.  And we would ask at this

5   time, Your Honor, that because the witness testified

6   that she can't deduce who contributed to the sample,

7   especially in a low-level sample like this, that you

8   use your gatekeeping function under Daubert and the

9   other cases, and exclude this DNA evidence from

10  trial.

11          Thank you.

12          THE COURT:  All right.  Thank you, Ms.

13  Sirignano.

14          Anyone else wish to argue in support of the

15  Daubert challenge?

16          All right.  Ms. Armijo, if you wish to

17  respond?

18          MS. ARMIJO:  Yes, Your Honor.

19          Quite simply, that's more of an argument

20  for a jury as far as the levels of it, and how much

21  weight to give it.  And you don't hear a DNA analyst

22  ever say:  This is Chris Garcia's sample.  They

23  always talk about numbers; that's why it's one in 28,

24  one in 700 billion.  That's how you they determine

25  it.  They're not able to ever say that something has

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    come specifically from a person.  So that's not

2    surprising.

3              In this case, the software was validated by

4    the FBI.  The sample was sufficient.  It may not have

5    been a great one.  But she even testified that they

6    see these samples routinely on items such as

7    firearms, as opposed to DNA fluids, like a rape kit

8    or things like that, that this sample is sufficient.

9    And it clearly -- the method used by the FBI is a

10   valid scientific method; that the Court should allow

11   her to testify as a result on the firearm and the

12   holster.

13             THE COURT:  All right.  Thank you,

14   Ms. Armijo.

15             Anyone else have any rebuttal?

16             All right.  Ms. Sirignano, anything final?

17   I'll give you the final word.

18             MS. SIRIGNANO:  No.  Thank you, Your Honor.

19             THE COURT:  Well, I think the defendants

20   that joined this motion were trying to establish a

21   large gap between what the FBI was doing and maybe

22   what they should be doing.  And I'm not sure that the

23   gap is that great.  It seems to me that the

24   Government has established that the FBI's procedures

25   are in line with what other laboratories and experts

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    would do.

2              I think, at most, the arguments have gone

3    to a misapplication or incorrect testing or

4    inadequate testing, rather than that the methodology

5    here is somehow flawed or not peer reviewed, or not

6    scientific.  And I think that's the purpose of the

7    Daubert motion.  There may be a great deal over the

8    last day that goes to cross-examination, to weaken

9    the Government's case in reliance on the information.

10   But as far as the methodology that the FBI is using

11   generally, and in this case, I think it's

12   scientifically sound and satisfies the Daubert

13   standard.

14             So I will deny the motion to exclude

15   Ms. Smith, and allow her to testify as to what is in

16   her report, and as to what was disclosed in today's

17   testimony.

18             All right.  My understanding is that the

19   next issue that we go to will be the motion for

20   additional discovery regarding monetary payments to

21   inmate informant witnesses.  I know that there was --

22   no hearing was requested here, but I think to

23   actually get through some of these issues, and try to

24   resolve them, I'm going to need counsel to give me

25   input.  I think this might have been yours,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Ms. Harbour-Valdez?

2              MS. HARBOUR-VALDEZ:  No, Your Honor.  It's

3    Mr. Castle.

4              THE COURT:  Mr. Castle.  I knew it was this

5    corner over here.  Mr. Castle.

6              MR. CASTLE:  Thank you, Your Honor.

7              You know, I really don't have a lot more

8    argument other than what I put in my motion.

9              THE COURT:  I have read everything, but let

10   me make sure that I understand what you're asking.

11   So refresh my memory on this motion.

12             MR. CASTLE:  Well, what we've gotten so far

13   is a summary of payments.  We haven't gotten a lot of

14   information, like how it came about that someone got

15   $2,000 or 40,000, such as did they request it?  Did

16   they express a need?  We don't know how it was paid.

17   We don't know what kinds of agreements were made in

18   return for the money; that it was a quid pro quo of

19   sorts.  We don't have receipts that they've given.

20   We don't know whether -- I think the Court heard

21   earlier testimony in one of the last couple weeks

22   where Agent Acee talked about how some payments are

23   made for expenses and some are made for services

24   rendered, I think is what I indicated.  So we don't

25   know whether these amounts are one or the other

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   obviously.  We don't want to be in a situation where
 2   we're cross-examining, and it turns out it is for
 3   gasoline to come to court.
 4              But all these things are relevant to the
 5   bias of the witness, the motivation of the witness in
 6   testimony.
 7              THE COURT:  I guess you're trying to fit
 8   all this into Giglio, right?
 9              MR. CASTLE:  Exactly.  And I think the
10   Government basically said -- originally what they
11   asked us is they wanted to check with the FBI to see
12   what they would be willing to share.  I'm not sure
13   that's really been standard.  I think the standard is
14   what they're required to share.  And I'm not sure
15   whether I need to argue a lot, if they're going to
16   agree to turn this over.
17              THE COURT:  Well, let's see what they say.
18   I guess I'm inclined to think this is probably
19   impeachment material that's Giglio.  You've just got
20   to get it and get it to them.  Ms. Armijo?
21              MS. ARMIJO:  Your Honor, I think we could
22   shortcut a lot of this.  We are agreeing to turn
23   over, on all of the CHSs that we have them on, FBI
24   files on, or payments to, the entire files, which
25   would include all this information.  So anything that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

227

```
 1   they request that's specific to the files, we will,
 2   in fact, turn over.
 3          It does require some FBI redaction.  And
 4   then it will come to our office for personalized
 5   information redaction.  But we are agreeing to give
 6   over the files that should include everything that
 7   they're requesting.  If, after they review the files,
 8   there are specifics they can come to us and say:
 9   What about this or what about that.  But I think that
10   that's the first step, and we should be able to
11   resolve these issues giving the complete file.
12          THE COURT:  With that representation of
13   what they're willing to do, which sounds like it's
14   what they've got to do under Giglio, is there
15   anything more you need on this motion, Mr. Castle?
16          MR. CASTLE:  The only thing I would add, is
17   that a lot of times promises are not in written form.
18   So, for example, the FBI manual that I referenced in
19   the motion itself encourages agents to provide
20   bonuses to cooperating witnesses after trial.  If
21   information like that has been communicated orally,
22   and not put in writing, I think their obligation
23   extends to that.
24          So I think it's a great start that they're
25   going to look at that.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Let me ask you, Ms. Armijo,
 2    would you agree that, if the FBI is making those sort
 3    of promises, it would fall within the scope of the
 4    request?
 5              MS. ARMIJO:  Probably so, yes.  But I can't
 6    think of any instances in which that is being done.
 7    But if there is, and it will fall under that request,
 8    then it will be noted.
 9              THE COURT:  All right.  Could you also do
10    this:  That, after you talk to probably Mr. Acee, and
11    he can talk to his FBI, would you send a letter and
12    say:  With the materials we're producing, we know of
13    no other promises or benefits that are being bestowed
14    other than what's going to be revealed by the
15    documents produced?
16              MS. ARMIJO:  Yes, Your Honor.
17              THE COURT:  Does that get you on that, what
18    you need, Mr. Castle?
19              MR. CASTLE:  Almost.  Because I think
20    what's more --
21              THE COURT:  You're on a roll, you're going
22    to keep asking.
23              MR. CASTLE:  Exactly.  I've had a couple of
24    weeks of rest, and I'm charged up.
25              But I think what's relevant, in addition to
```

SANTA FE OFFICE                                               MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                              1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

```
 1   what the FBI has promised, is what's been requested
 2   by these witnesses.  So these are individuals who are
 3   well schooled in the art of receiving what they want.
 4   And sometimes they want more than what the FBI gives.
 5   And I think their bias would be revealed additionally
 6   by anything they requested that Agent Acee in his
 7   decision decided not to provide.  I think there was
 8   some testimony that when requests come in, it has to
 9   be screened, and evaluated, and they may or may not
10   give it to the particular witness.  I think those
11   requests also have to be memorialized in some
12   fashion, and provided to the defense.
13          The only other comment I'd make is that
14   this was ordered to be produced back in November.
15   Here we are, at the end of December, along with all
16   the other Giglio material.  And so any speed with
17   which we could receive this material would be
18   appreciated.  And I think an order from the Court
19   would be in line with that.
20          THE COURT:  Let me take these in bites.
21   Ms. Armijo, is Mr. Acee going to be the only one
22   that's going to know or have the information that
23   people were requesting things that may or may not
24   have been given?  Are there going to be any other FBI
25   agents, personnel involved?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

230

```
 1                MS. ARMIJO:  May I have a moment?
 2                THE COURT:  Certainly.
 3                MS. ARMIJO:  I think, even if it wasn't
 4     him, it would be reported to him.
 5                THE COURT:  All right.  Could we do this?
 6     Could we have Mr. Acee sit down on each cooperating
 7     witness, and just think about it, and think about if
 8     anything was requested; if he has to talk to somebody
 9     else, and then could he do something for you that
10     indicates to the best of his memory, and any review
11     of documents he has to make, that these are the
12     requests that were made and not honored?
13                MS. ARMIJO:  Yes.
14                THE COURT:  All right.  And I know you've
15     got the timeline or deadline.  But now, does that
16     sort of handle substantively the request, Mr. Castle?
17                MR. CASTLE:  I believe it does, Your Honor.
18                THE COURT:  All right.  When could we have
19     these three categories:  One, documents, and then the
20     two representations that would be made largely by Mr.
21     Acee through the U.S. Attorney's Office?
22                MS. ARMIJO:  Well, the documents
23     themselves, I think would be easier, because it's
24     just a matter of copying them.  So maybe on -- I
25     guess, January 1st is a holiday -- maybe January 2.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Would that deadline be
 2     acceptable, Mr. Castle?
 3            MR. CASTLE:  Can I turn around and look at
 4     the folks that are going to trial first?
 5            THE COURT:  Can y'all live with that, end
 6     of business on January 2?
 7            MR. CASTLE:  Seeing no hands wagging.
 8            THE COURT:  All right.  So I'll set that
 9     for the deadline for all three of those categories:
10     Documents and the two representations.
11            Ms. Sirignano?
12            MS. SIRIGNANO:  Quick question.  Does that
13     mean it's going to go to Mr. Aoki on the 2nd or does
14     that mean it's going to come to us on the 2nd,
15     because there is some turnaround time we need to take
16     into consideration.
17            MS. ARMIJO:  When I say we give something,
18     we give it to Mr. Aoki.  We don't know what he does,
19     we're not privy to that information.  So when we
20     disclose something, it goes to Mr. Aoki.
21            THE COURT:  What sort of volume are you
22     looking at on this particular production?
23            MS. ARMIJO:  Each informant file, of the
24     official informants is probably, on average, about 25
25     pages or so.  So it's not a great deal.  It's not
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    like the four boxes that we're going to be disclosing
2    from a request from the Perez camp.  So it should be
3    much smaller than that.
4              THE COURT:  Could we do on this one, given
5    the squeeze we're beginning to get, because we'll be
6    swinging within 30 days of the trial, with a January
7    2 production, could you send one set of materials to
8    Mr. Castle, and then the rest to Aoki?  And then, Mr.
9    Castle, if you need to distribute it to some key
10   people, then you can submit the cost of that copying
11   on your CJA voucher.
12             MR. CASTLE:  I will take that on, Your
13   Honor.
14             THE COURT:  Could we do that on this single
15   issue, Ms. Armijo?
16             MS. ARMIJO:  Yes, as long as we're not
17   going to keep doing it, because it's a big burden for
18   our staff to keep producing it to different people.
19             THE COURT:  Well, I'll let y'all promise
20   each other, but I'm not going to be bound by any
21   promises.  So I may have to order something as we get
22   closer to trial.  So if you'll do it on this one,
23   let's take this one and do it on this one, and then I
24   may have to be ordering some different stuff as we
25   get closer.  But I think we have an agreement on this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   one.
2            So I'll so order.  Anything else on that
3   order or that motion, Mr. Castle?
4            MR. CASTLE:  No, Your Honor.
5            THE COURT:  Anybody else?
6            MS. ARMIJO:  Your Honor, just so we're
7   clear.  These documents should be -- when we send it
8   to Mr. Aoki, we always make it clear that they are
9   sealed.  And so this, obviously, would be under the
10  protective order, and we will note that in the letter
11  to Mr. Castle.
12           THE COURT:  Everybody in agreement on that?
13           MR. CASTLE:  Yes, Your Honor.
14           THE COURT:  All right.  I've worked out
15  something with Ms. Armijo and Mr. Castle.  Anybody
16  have any objection to that?
17           Ms. Fox-Young, you're up first, so I'll
18  give you first.
19           MS. FOX-YOUNG:  No objection, Your Honor.
20           I just want to get into a little bit of
21  detail.  The Court heard from Billy Cordova and
22  Special Agent Acee last week about the kinds of
23  promises that Mr. Castle references that might not be
24  written down.  Special Agent Acee told the Court that
25  he -- the Government had promised that Mr. Cordova
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    wouldn't be charged in the RICO, as a result of his
 2    cooperation.  I think that's precisely the sort of
 3    benefit that wouldn't be documented.  And I think Ms.
 4    Armijo just said they would submit something that
 5    says that there were no other benefits.  And so I
 6    just ask the Court if the Court might order, when
 7    Special Agent Acee goes through and looks at requests
 8    that were made and not honored, that he also document
 9    those types of benefits that have been afforded.
10              Thank you, Judge.
11              THE COURT:  All right.  Do you understand,
12    Mr. Acee, and I'm speaking through Ms. Armijo, that's
13    the kind of stuff you need to be thinking of?
14              MR. ACEE:  Yes, Your Honor.
15              THE COURT:  Is that agreeable, Ms. Armijo?
16              MS. ARMIJO:  Yes, Your Honor.
17              THE COURT:  All right.  Mr. Lowry.
18              MR. LOWRY:  Yes, Your Honor.  Just briefly.
19    Just to follow-up on what Ms. Fox-Young said.  There
20    were benefits -- and I just want to make sure we're
21    clear with the Government and Mr. Acee -- that we
22    know that Eric Duran worked in other jurisdictions.
23    And I believe in our Brady-Giglio motion we had
24    defined the benefits that any cooperating witness
25    would receive, could run from any manner of federal
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    departments.  So we just want to make sure the

2    financial benefits from other jurisdictions of the

3    Department of Justice are included in the disclosure

4    as other types of benefits, like securing dismissals

5    of traffic tickets, criminal cases, that kind of

6    thin.  I mean, we're of the mind that Mr. Duran has

7    been the beneficiary of a number of interventions on

8    his behalf with regard to those types of things.  And

9    we haven't had any disclosure that I can lay my

10   fingers on.  So if this would be included as well, it

11   would be much appreciated.

12           THE COURT:  All right.  And you're

13   listening to this, Mr. Acee?

14           MR. ACEE:  Yes, sir.

15           THE COURT:  And, Ms. Armijo, are you

16   agreeable to directing Mr. Acee to include that sort

17   of category in the information he's going to provide?

18           MS. ARMIJO:  And just so that we're clear,

19   if there is documentation as to things, he's not

20   including it.  What we're looking for specifically is

21   things that are not documented?

22           THE COURT:  Yes.

23           MS. ARMIJO:  Yes, Your Honor.

24           THE COURT:  Everybody in agreement how

25   we're going to handle Mr. Castle's motion?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1           All right.  The next motion is a motion for
2    advanced notice of witnesses to be called by the
3    Government.  Again, this was one that Mr. Castle and
4    Mr. Cooper didn't ask for a hearing on, but I thought
5    it would make sense for us to talk about it, because
6    it's hard for me to probably work out something with
7    everybody, if I'm just sitting in my chambers doing
8    an order.
9           So here's my thoughts.  Let me give you my
10   thoughts, and then see if we can hammer out something
11   that works.  I probably am not inclined to tell the
12   Government how far in advance to disclose their
13   witnesses.  I realize that some of you have
14   indicated, persuasively, that that's going to require
15   you to probably have experts sitting around listening
16   to testimony longer than what would be the case if
17   the Government would give advance notice.  So I have
18   a couple of thoughts on this issue.  One, in a trial
19   like this -- and I did them as a lawyer, I've done
20   them as a judge -- it's hard for us to get through
21   this thing if we don't cooperate a little bit.  It's
22   one thing for me to order something.  It's another
23   thing, we just try to cooperate.  What I typically
24   see, and what I typically did when I was practicing,
25   as everybody at the end of the day, tell people who

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                   1-800-669-9492
                                                         e-mail: info@litsupport.com


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    their witnesses are going to be for the next day.

2    And that is generally a gentlemen's and gentleladies'

3    way of trying to make a trial bearable for everybody

4    involved, so they have some anticipation of what is

5    going to occur the next day.  It would be nice -- I'm

6    speaking now to the Government's table -- it would be

7    nice to see if we could have a little bit more

8    advance knowledge on people where the experts are

9    going to be involved.  And that's because I have an

10   interest, and the Government and us all as taxpayers

11   have an interest in not having experts sitting around

12   any more than is going to be necessary.

13            So I was going to propose this:  Without

14   ordering the Government to give advance warning, see

15   if they would be willing to give some advance

16   knowledge of -- notice of when they're going to call

17   somebody.  And then, with the expert witnesses, if

18   the defendants could send the Government a letter,

19   and say, All right, we're going to want our experts

20   here for these witnesses.  And if the Government

21   could try to tell the defendants to the best of their

22   knowledge when that limited universe -- if you put

23   every witness on there, this isn't going to work, but

24   if you tell the Government that these three or four,

25   however many witnesses, we're going to have experts

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                                  e-mail: info@litsupport.com

1    here, can you tell us in advance, to the best of your

2    knowledge, when, at least within some range, those

3    experts, those witnesses are going to be there, it

4    might help us not have experts here all the time,

5    make sure the experts are here when they're supposed

6    to be, and try to save taxpayers some dollars.

7             So I think I know -- well, Mr. Castle, it's

8    your motion.  What do you think about the proposal

9    I'm putting on the table?  You may have some

10   fine-tuning to that.  But, you know, everybody that's

11   experienced a long trial like we're about to have,

12   knows at some point we've got to work together to get

13   through this thing.  And this was the way I was

14   thinking about handling your motion.

15            MR. CASTLE:  Well, the Government is right.

16   There are no rules requiring anything.  And so,

17   frankly, this is completely within the Court's

18   discretion, so we'll take whatever we can get.

19            I would analogize to exhibits.  I mean,

20   there is no rule that requires the parties to, in

21   advance of trial, try to give a good faith list of

22   our exhibits.  But the Court knows that that's --

23            THE COURT:  I'm probably going to lean on

24   people on exhibits.

25            MR. CASTLE:  Right, right.

SANTA FE OFFICE                                            MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Otherwise, it just gets
 2    unwieldy to get through one of these things.
 3              MR. CASTLE:  And it's along those lines
 4    that I made this request.  I mean, I think there is
 5    the issue of experts, which is one, but I think there
 6    is an issue of what crime base are you going to be
 7    dealing with for a while?  I mean, I have seen this
 8    group of prosecutors.  They're going to be organized.
 9    They're not going to be sprinkling in, you know, one
10    crime base witnesses with another crime base
11    witnesses.
12              THE COURT:  Well, in fact, if you look at
13    the motions, what I understand them to be
14    requesting -- and I'm favorable to this motion,
15    although I want to hear what the defendants say -- I
16    think what they're saying, they want to take these
17    things in categories, they want to put Mr. Acee on
18    the stand, knock out some testimony, and some other
19    witnesses.  And then they may want to bring Mr. Acee
20    back, let him do it again.  I'm inclined to allow
21    that, because I think it will help the defendants
22    compartmentalize the parts of this trial.  And I
23    really think they're allowed to do that anyway.  So,
24    if we have sort of an agreement on that aspect, it
25    may help the Government be more helpful on your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

240

```
 1   request.
 2            MR. CASTLE:  I wasn't responding to that
 3   motion, but it seems reasonable to me, because I
 4   think the only way to logically explain this to a
 5   jury -- and frankly, I'd love it if they were
 6   illogical with the jury -- but I don't think they're
 7   going to be that way.  I think they're going to
 8   produce evidence concerning certain counts that are
 9   related.  Then we'll do the next counts and proceed
10   in that fashion.  Obviously, there is going to be
11   some enterprise evidence that they're going to put on
12   generally.  So I would ask for that because, in our
13   trial, which is trial number 2, if they put on Counts
14   1 and 2 first, and then, for the next eight weeks
15   they're going to be focusing on evidence that doesn't
16   relate to Counts 1 and 2, I'm telling -- well, Mr.
17   Cooper and I are going to tell the rest of our staff
18   to go home, and not charge the federal government.
19            And so there is a practical need for it.
20   But I think it's a practical need that goes both
21   ways.  Because I think that what the defense would do
22   when we were told in advance what witnesses are going
23   to be called, my guess is they're going to ask:  How
24   long do you think cross-examination is going to take?
25   And if both sides play close to the vest with their
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    cards, as far as the order in which witnesses are
 2    going to be called, it's going to be utter chaos.
 3    Nobody can plan anything.  They're not going to know
 4    if we're going on for three days with a particular
 5    witness or expert, and that will put their schedules
 6    off.
 7              And I do understand what the Court is
 8    saying:  Let's try to be collegial about this.  And I
 9    really hope we can be on that.  My goal, in filing
10    this motion, was to hopefully get the Court to make
11    some orders, so we all knew what that situation --
12    how we're going to operate here.
13              So I think the Court had indicated both,
14    you know, the experts, and hopefully the night
15    before -- but I would hope also what crime base we're
16    going to be dealing with as a general concern.
17              And frankly, Judge, the only reason not to
18    do this, not to tell the other side what witnesses
19    you're going to call is tactical gamesmanship, to try
20    to get an advantage on the other side.  I'm not sure
21    that's what we're after here, as far as fairness.
22              And the final thing I would note, is the
23    prosecution asked for any rules to be for both sides.
24    And I would agree to that.  I mean, I think we have
25    to tell them what witnesses -- we're going to be
```

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    telling each other, we're going to be tripping over

2    each other, the different defense teams.  So I think

3    that's fair, if we could operate in that fashion.

4              THE COURT:  All right.  Thank you, Mr.

5    Castle.

6              Any other defendant want to speak to this

7    issue?

8              All right.  Ms. Armijo, what will you give

9    us?

10             MS. ARMIJO:  Your Honor, I think that that

11   is reasonable, as long as the defense -- we certainly

12   can do it the night before, because I know that in

13   long trials that's what we routinely do.  And we

14   certainly can help out with longer term things, as

15   long as we have who it is that they're interested in,

16   knowing that there might be some wiggle room.

17             I would add one caveat to that.  I would

18   ask that the information as to the witnesses the next

19   day, as it pertain to cooperators, not be relayed to

20   the defendants.

21             THE COURT:  Let me ask the defense lawyers:

22   Could you live with that; that if -- whether it's the

23   night before, or in advance, that the Government,

24   when they're going to put witnesses on, not be

25   conveyed to the defendants themselves?  Live with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that, Mr. Castle?

 2              MR. CASTLE:  Yes, Your Honor.

 3              THE COURT:  All right.  Anybody that can't

 4    live with that?  So I think the more people can live

 5    with that, the more the Government is going to feel

 6    more comfortable, if it's attorneys' ears information

 7    only, or attorneys' eyes, they're going to be more

 8    comfortable about sharing strategy in advance.

 9              Mr. Maynard?

10              MR. MAYNARD:  Yes, Your Honor.  I'm just

11    not sure -- I mean, I can anticipate I may have a

12    need, on the spur of the moment, because a certain

13    witness is coming up the next day, and is one of the

14    informants or cooperators, and I may want to talk to

15    my client about it.

16              THE COURT:  Well, if you can't, then I'm

17    not going to probably order the defendants -- the

18    Government to disclose anything.  So if you're going

19    to take that position, you're probably not going to

20    get information the day before.

21              MR. MAYNARD:  Well, if it puts me in a

22    bind, I would rather have the information, even if I

23    can't share it with my client than to not have it at

24    all.

25              THE COURT:  Well, you've got to pick your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    side here.
 2              MR. MAYNARD:  Obviously --
 3              THE COURT:  Tell the Government what you're
 4    going to do.
 5              MR. MAYNARD:  Well, I'll have to keep it
 6    from my client.
 7              THE COURT:  Okay.
 8              MR. MAYNARD:  I mean, I don't like it, but
 9    if that's going to be the rule, I have to accept it.
10              THE COURT:  All right.
11              Anything you want to add, Mr. Cooper?  Ms.
12    Sirignano?
13              MR. COOPER:  No, Your Honor.  Thank you.
14              THE COURT:  Anything, Ms. Sirignano?
15              MS. SIRIGNANO:  Your Honor, I'm happy with
16    this agreement, I'm not objecting to it.
17              I think part of our anxiety on the defense
18    is that the Government's witness list right now is
19    280-plus --
20              THE COURT:  We're going to talk about that.
21    I know it's an issue and a problem, and we'll -- I
22    can't guarantee a solution.  But we're going to work
23    on it.
24              MS. SIRIGNANO:  Thank you, Judge.
25              THE COURT:  All right.  So the Government
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   has an assurance from the defense counsel that if you
 2   will disclose witnesses in advance, they will not
 3   disclose it to the defendants.
 4           So let me ask this:  Let me see if I can
 5   push the Government a little bit to try to help the
 6   defendants get ready for this.  And this is just an
 7   idea.  I -- and again, we might need to work on it.
 8   But would the Government be willing to give the
 9   defendants, at some point, a rough outline of how
10   you're going to try the case?  And I don't mean by
11   that, paragraph 1A, little 1, little 2, telling them
12   step by step.  But would you be willing to give them
13   a big outline of, you know, this week is going to be
14   enterprise, this week is going to be Counts X and X,
15   so they have some sense of where the witnesses are
16   likely to show up, so that Mr. Castle and Mr. Cooper
17   can do -- and the other lawyers can do -- kind of
18   send their staff home, and go on airplane mode for a
19   little bit?  Can something like that be provided?
20   And I'm not trying to pin down time.  I'm not trying
21   to talk about the detail of it.  Could we get
22   something like that?
23           MS. ARMIJO:  Yes, Your Honor.  I think we
24   could do that before the trial starts.  It's not
25   something that would be generated immediately.  But
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   we could certainly do that.  And again, with the
 2   caveat that -- for instance, as a hypothetical, if we
 3   can say we want to have evidence on the Javier Molina
 4   murder during these days, well, then, they're going
 5   to anticipate Mr. Cordova coming in on those dates.
 6   And so we would again request that that specific
 7   information not be shared for safety concerns,
 8   because I think the marshals have their hands full
 9   right now.  And so we would agree to do that in
10   general terms.
11           THE COURT:  All right.  If the Government
12   is willing to do that, put out a general outline of
13   when the boxes they're going to have -- and that's
14   the way I'm thinking of it, so I hope this is helpful
15   to somebody -- boxes of how they're going to do the
16   trial, without filling it all in, would again, the
17   defense lawyers again agree to not disclose that
18   general trial outline to clients?  Mr. Castle, could
19   you agree?
20           MR. CASTLE:  I agree, Your Honor.
21           THE COURT:  Is there anybody that would not
22   agree?
23           All right.  Let's see if we can push a
24   little further on the experts.  What do you think
25   about my idea of the defendants' -- and it's not
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   going to work if everybody says, okay, you know, I
 2   need to know on all 210 witnesses -- but if you can
 3   identify some key witnesses that your expert has got
 4   to be here for, could you send a letter to the
 5   Government, and perhaps, we get an agreement from the
 6   Government that the Government would try to identify
 7   those people as soon as possible as to where
 8   generally they're going to try to call those
 9   witnesses, so you could have your experts here?
10   Maybe everybody sort of discipline themselves --
11   we've got five defendants; maybe everybody limit
12   themselves to three witnesses or something that
13   they're going to tell the Government, could you tell
14   us where -- and that will be about 15 witnesses --
15   could you tell us generally where they're going to
16   be, and try to keep us informed as the trial goes
17   along?  What do you think about that idea, Mr.
18   Castle?  I think this is more -- maybe Ms. Sirignano
19   was the one that talked a lot about the experts.  It
20   may not have been so much your concern.  But what do
21   you think?
22                MR. CASTLE:  That seems to be a reasonable
23   accommodation.  The only other thing I would note is,
24   I'm not sure whether the Court is contemplating
25   allowing some experts to perhaps call in and listen
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

248

```
 1   to the testimony, if they can't make it here?  I
 2   don't know if we filed that, or there has been a
 3   motion on that, or whether it's been covered by the
 4   pretrial.
 5              THE COURT:  I'm agreeable to that.  We'll
 6   see what the Government says here in a minute.  But
 7   rather than having the defendants sit back there,
 8   have it on here, and they can listen to it.  I'd ask
 9   the experts to -- assuming nobody tells me that
10   that's broadcasting, so it violates the Chief
11   Justice's order against broadcasting -- if I can have
12   an agreement from the experts that they're not going
13   to be sitting there recording it, or putting it on
14   the internet, or something like that, and get me in
15   trouble.  But assuming nobody telling me that that's
16   a problem, I'm receptive to that.  And it doesn't
17   seem to me a great deal different than somebody
18   sitting back behind Ms. Sirignano for two or three
19   days, and somebody sitting here and doing that.
20              (A discussion was held off the record.)
21              THE COURT:  Ms. Sirignano, it sounds like
22   Mr. Castle is sort of in agreement with that.  What
23   do you think?
24              MS. SIRIGNANO:  In agreement, Your Honor.
25              My only request would be that we get that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1   letter from the Government -- I'm happy to write that
2   letter over the next couple of days.  I've got three
3   experts that travel nationwide and internationally,
4   and so it's very important for our defense to make
5   sure that they're available during the time that we
6   need them here.  And so my request would only be that
7   we work with each other to narrow that timeframe
8   down, so we have continuity of the testimony.  And
9   not for just us to call our witnesses, but for them
10  to be here when the Government witnesses are present.
11          And if the phone, if that's something that
12  you'd agreed to with the phone, that possibly could
13  work, so long as they're not testifying in another
14  proceeding, Your Honor.
15          THE COURT:  All right.  Let's do this:
16  I've got to give Ms. Bean a break.  Let me take a
17  short break, and take about a 15-minute break and
18  we'll come back in, and see if we can hammer this
19  out.
20          During the break, I'd like all the defense
21  lawyers to take a look at my opinion in Vigil, and
22  the Government to look at it, too.  I haven't had a
23  chance to study it, but I'd like to pick that up next
24  on the plea agreements.  I'd like to go to that
25  motion.  It's always nice if I do something
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    consistent in this case with what I did in another
 2    case.  But it's not essential.
 3           So if that answered all your questions, I
 4    remember working on that.  But I think we can
 5    probably hammer out a compromise on what we're going
 6    to do with plea agreements and addendums.  So we'll
 7    be back in 15 minutes.
 8           (The Court stood in recess.)
 9           THE COURT:  All right.  We'll go back on
10    the record.  It looks like every defendant has an
11    attorney.  Make sure we look around, help your
12    co-defendants out.
13           All right.  Are you on the phone, Ms. Wild?
14    Ms. Wild, do you have your mute button on?  Ms. Wild
15    was expressing some concern to Ms. Standridge about
16    the experts being in the back.  And I was going to
17    tell her that I think what she's concerned about is
18    that the AO has a policy, as you know, when we do
19    and -- because of the size of these courtrooms --
20    when we do voir dire, we often use a microphone to
21    amplify, particularly the jurors' voices.  I think
22    the AO allows that.  But once the trial begins, I
23    think because of the frequency the microphones are
24    on, they don't allow those to be on.  I don't think
25    that applies to telephones.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Is she is on now?  Ms. Wild, are you on the
 2    phone?  Ms. Wild, are you on the phone?
 3              THE CLERK:  Yes, sir.
 4              THE COURT:  I was telling them that you had
 5    some concerns about having the experts on the
 6    telephone listening.  But I was wondering if what you
 7    were thinking about was that my memory is that the AO
 8    had a policy that when we use the microphones in voir
 9    dire, that it was okay to use them then, but once the
10    trial started, i.e., the jurors raise their hand and
11    are sworn in, for double jeopardy purposes, that we
12    had to cut the microphones off because of the
13    frequency could be picked up outside of the
14    courtroom.  Is that what you were thinking of?
15              THE CLERK:  It may be.  I'm looking in my
16    file right now.  Hold on.  Yes, there is.  We did get
17    an AO policy about the wireless microphone security
18    concern.
19              THE COURT:  I'm not seeing anything -- any
20    problem with experts listening in -- not testifying,
21    but listening in to testimony.  Are you thinking of
22    something that I'm not thinking of?
23              THE CLERK:  Potentially.
24              MR. CASTLE:  Judge, I might be able to
25    short-circuit this.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              THE CLERK:  Do you want to discuss it now?
 2              THE COURT:  Well, is it something you need
 3      to discuss with me?
 4              THE CLERK:  I think we better talk.
 5              THE COURT:  Hold on, Mr. Castle.  Let me
 6      see what Ms. Wild is thinking of.  Hold on.
 7              (A discussion was held off the record.)
 8              THE COURT:  Well, let me think about Ms.
 9      Sirignano's request -- or maybe it was Mr. Castle's
10      request -- of having a line open.  I guess, if I
11      could figure out a way, you know, how during these
12      hearings, people are bouncing on and off, and I don't
13      have time to get a clear record of who is on and who
14      is off -- if I just have an open phone, I don't have
15      a lot of control who can call in and participate.  So
16      if we can figure out some solution to that, maybe
17      it's doable.  But it might create some problems if I
18      just got an open phone line and people calling in and
19      out on our "meet me" conference line.
20              MR. CASTLE:  I think we have a solution,
21      Judge.
22              THE COURT:  Okay.
23              MR. CASTLE:  Some of the attorneys for the
24      defense have requested daily transcript.  And I think
25      that's up with the budgeting attorney.  And I was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    just talking to --
2              THE COURT:  Has Carey approved that?
3              MR. CASTLE:  I think it's pending for her.
4    But our experts are not going to be looking to see
5    the demeanor of another expert, they are listening
6    for content.  You can get content from a transcript
7    so I think at this point in time, we're not making a
8    request for them to be able to call in.  I think, if
9    we get rejected the idea of daily transcript, then we
10   might reraise it.  But I think that might be a very
11   efficient way and less costly way to deal with the
12   expert who is not appearing.
13             THE COURT:  Well, I don't want to look a
14   stipulation or a gift horse in the mouth.  But if I
15   understood what Mr. Sirignano saying, she was talking
16   about having her expert here for some fact witnesses.
17   Am I wrong?
18             MS. SIRIGNANO:  Probably not, Your Honor.
19   It would be in -- to consider the Government's
20   experts.
21             THE COURT:  All right.  Maybe that solves
22   it.  I thought Ms. Waters had approved the dailies
23   for the trial.  But maybe I'm ahead of the game.
24   So --
25             MS. SIRIGNANO:  Mr. Villa had made that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    request, I believe.  And I think some of us wanted
 2    dailies, and some of us wanted real-time during the
 3    hearings.  And I believe Your Honor has the real-time
 4    as well during trial; is that correct?
 5              THE COURT:  I have real-time.
 6              MS. SIRIGNANO:  Yes.  So Mr. --
 7              THE COURT:  I have real-time all the time.
 8              MR. CASTLE:  Are you on airplane mode, Your
 9    Honor?
10              MS. SIRIGNANO:  I think there is discussion
11    about real-time and daily transcripts.
12              THE COURT:  My knowledge is that I have not
13    seen a request for real-time from anybody.  But I
14    thought I had approved, or Ms. Waters had approved
15    the request for daily.  So that's where I am on -- as
16    far as my memory is concerned.
17              MS. SIRIGNANO:  Your Honor, would it be
18    possible to get the real-time?
19              THE COURT:  Well, why don't y'all talk
20    to --
21              MS. SIRIGNANO:  Ms. Waters.
22              THE COURT:  -- Ms. Waters, and we'll go
23    from there.
24              MS. SIRIGNANO:  Will do, Your Honor.  Thank
25    you.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Before I hear from
 2   you, Mr. Castellano, is what I have sort of hammered
 3   out with at least on the defense side, agreeable to
 4   everybody?  I can put in this, as can you tell, I'm
 5   not ordering the Government to do any of this.  But
 6   it's going to be a gentlemen's and gentleladies'
 7   agreement, and once we agree, I consider that a
 8   stipulation.  I will enforce it.
 9              Does everybody see the difference?  I do,
10   but nobody else does.  Just like any other
11   stipulation.  I mean, once it's there, I agree.  But
12   I'm not going to -- you know, we're a little bit at
13   the mercy of the Government here, because I'm
14   probably not going to order them to do much as far as
15   disclosure.  Does everybody agree with this?  Because
16   you're agreeing not to share some stuff with your
17   clients.  And I'll enforce that with my powers, if
18   everybody agrees.
19              MR. BLACKBURN:  Judge, what does the
20   real-time cost?
21              THE COURT:  Well, I don't know.
22              MR. BLACKBURN:  I mean, I thought that you
23   can get it, we just flip a switch and it comes over
24   here, too.
25              THE COURT:  No, she's shaking her head.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BLACKBURN:  Besides the add-on cost for

 2    you, I mean, I thought it was --

 3            THE COURT:  It's a big deal to make it

 4    available for clients, for parties.  Certainly, in

 5    these big civil cases that I have, and stuff, where

 6    costs are not apparently a problem, they pay for it,

 7    and want it.  But it's not routine in any case

 8    because the costs are significant.

 9            MR. BLACKBURN:  I'll talk to Ms. Bean about

10    it.

11            THE COURT:  But it's different than what

12    I've got up here.

13            All right.  Anybody else on the defense

14    side?  Everybody can live with what we've hammered

15    out?

16            All right.  Let's see what Mr. Castellano

17    says.

18            MR. CASTELLANO:  Based on what's been

19    stated, Your Honor, it may not come to this.  My only

20    concern about having experts on the phone would be

21    that, if it does come to that, that we identify the

22    experts before the jury comes in, otherwise, the jury

23    is going to hear a bunch of names about experts and

24    who they may be tied to or what they may be an expert

25    in.  So I would just say, to the greatest extent
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    possible, that we identify those people before the
2    jury comes so they don't hear extraneous information.
3    Typically, when experts are in the courtroom they sit
4    in the back and no one gets to hear from them unless
5    they become witnesses.
6            THE COURT:  What is the difference from
7    your standpoint?  I agree with you, it sounds like
8    we're going to try and avoid having experts on the
9    telephone.  What is your concern, if they're sitting
10   there quietly, how is that different than being in
11   the back behind Mr. Maynard?
12           MR. CASTELLANO:  I see it as the same, but
13   typically, when they sit in the back, no one
14   identifies them or why they're in court.  They're
15   only to give information and aid the defense, they
16   may not be there to actually testify.  But the jury
17   hears some expert on some subject matter that person
18   never identified, speaking about someone outside in
19   the ozone.  That's just information the jury doesn't
20   need to know, unless and until that witness becomes
21   relevant to the proceedings.
22           THE COURT:  Let's do this:  Unless somebody
23   comes back and reraises the issue, we will not have
24   an open telephone line with experts calling in on
25   "meet me" conference line.  I won't deal with that
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                                        1-800-669-9492
                                                          e-mail: info@litsupport.com

```
 1    problem or work with that problem.  If the defendants
 2    want to reraise it, and think it's a solution, for
 3    example, you don't get approval on dailies, or
 4    something like that, then you can reapproach it.  But
 5    we'll take that issue off the table.
 6              Now, can the Government live with
 7    everything that I've sort of hammered out?  Does that
 8    give you the assurance to try to disclose some
 9    information, any fine-tuning you want to do to the
10    agreement?
11              MR. CASTELLANO:  I think that works fine,
12    Your Honor.
13              THE COURT:  And you understand my
14    distinction that I'm not going to order you to do it?
15    But once we agree to it here, I will enforce it with
16    whatever powers I have.
17              MR. CASTELLANO:  Yes, sir.  That's
18    understood.
19              THE COURT:  All right.  Mr. Castle, then,
20    is there anything else on your motion that you think
21    I can do, or should do, or any other issues?
22              MR. CASTLE:  No, Your Honor.
23              THE COURT:  All right.  So I will probably
24    not be granting that motion.  But we've worked out
25    something that will try to help us get through the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    trial.

2            All right.  The next issue is Document

3    1502, which is the motion in limine regarding plea

4    agreements and addenda.  I've not had a chance to

5    look at my Vigil opinion that was the subject of the

6    briefing.  So, if anybody tells me I'm about to be

7    inconsistent here, please do.  My memory was that I

8    didn't make a flat ruling on anything on that.  But

9    correct me if I'm wrong.  I guess my impression of

10   the plea agreements and addenda in this case is they

11   probably shouldn't come in, just whole hog, in the

12   sense that they'd just be admitted into evidence.  It

13   seems to me they probably contain some hearsay, some

14   out of court statements being offered for the truth

15   of the matter, particularly, the defendant or

16   cooperators' statements of what occurred.  That

17   probably needs to come in through the witness being

18   here and under oath and subject to cross-examination.

19           On the other hand, it is a contract, and

20   contracts do often come in for purposes of:  There is

21   a contract.  And it is not so important that the

22   terms be truthful.  It's the fact that the parties

23   reached a contract.  So I guess I'm wondering what we

24   can maybe agree to that should come in.  It seemed to

25   me in the reply that I read today, came in over the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   weekend, maybe offered us perhaps a starting point
 2   that the defendants were suggesting what they could
 3   live with is -- that I'm not sure I'm going to go the
 4   Old Chief way, in the sense that, because the
 5   defendants are willing to stipulate, that the
 6   Government doesn't get to put in, maybe a redacted
 7   plea agreement.  But I'll listen to that.
 8            But it does seem to me that probably what
 9   ought to come in is going to be -- is going to be the
10   charges to which the informant pled, the sentencing
11   concessions, that section of the plea agreement,
12   whatever the informant has to do to secure those
13   concessions, which may be that he has to cooperate,
14   he or she has to cooperate, and testify truthfully,
15   and those sort of things.  But that might be the
16   limit of what ought to come in.
17            Let me turn to you, Mr. Castle, Mr. Cooper,
18   since it's your motion.  I know you don't like the
19   idea of a redacted plea agreement coming in.  But it
20   seems to me that it's a contract, so some of the
21   terms probably are not hearsay.  They're more in the
22   terms of this is what occurred, and the exchange of
23   those problems.  Could you live with that redacted
24   plea agreement?
25            MR. CASTLE:  Well, I actually attached a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

261

```
 1   copy of a plea agreement redacted, anticipated where
 2   the Court might go, given its ruling in Vigil.
 3            THE COURT:  Tell me -- refresh my memory
 4   what I did in Vigil.
 5            MR. CASTLE:  Well, Vigil, the Court allowed
 6   the plea agreements in.  But they were different
 7   kinds of plea agreements.  So one of them had no
 8   recitation of the facts, another one had recitation
 9   of the facts in which they implicated that weren't on
10   trial.  So there wasn't the same issues, and the
11   Court didn't address confrontation at all.
12            Another argument that I thought of today,
13   flying to court, is that these witnesses are going to
14   be questioned what their agreement is.  And then what
15   the Government wants to do is put the actual written
16   agreement in to support what the agreement was.  And
17   when they do that, they're essentially -- it's a
18   prior consistent statement, but it really becomes
19   testimony by the informant in written form that the
20   jury takes back to the jury room.
21            THE COURT:  Well, if we keep out the
22   statement of the facts, their version of events, tell
23   me -- I certainly understand that -- what else in the
24   agreement are you concerned about?
25            MR. CASTLE:  Well, there is a portion of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   the agreement where the Government indicates that
 2   they believe that the -- or they're asserting the
 3   defendant has clearly demonstrated --
 4             THE COURT:  Tell me what page you're on.
 5             MR. CASTLE:  Of the plea agreement, or --
 6             THE COURT:  Yes, the plea agreement.
 7             MR. CASTLE:  It would be page 5, paragraph
 8   10.  Unfortunately, that might be redacted on the
 9   Court's copy, because I suggested a redaction.  But
10   what it says is, "The defendants clearly demonstrate
11   the recognition of affirmative acceptance of personal
12   responsibilities for the defendant's criminal
13   conduct."  That sentence, I believe, is an assertion
14   that both the United States and the defendant are
15   making, because --
16             THE COURT:  I'm looking at page 5.  But I'm
17   still not seeing it.  Point to me where it is on page
18   5.
19             MR. CASTLE:  It's paragraph 10.
20             THE COURT:  Okay.  Oh, okay.
21             MR. CASTLE:  It's that first sentence, that
22   I believe is an assertion that both defendants and
23   the United States are making.
24             THE COURT:  Do you want that sentence out?
25             MR. CASTLE:  Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

263

```
 1              THE COURT:  All right.  So you want that
 2    out.  You probably want 8 out, or at least the
 3    statement of the facts there out?
 4              MR. CASTLE:  Yes.
 5              THE COURT:  What else are you worried
 6    about?
 7              MR. CASTLE:  On page 3 of the plea
 8    agreement, there is an indication of -- may I have a
 9    moment?  I'm floating between two documents here.
10              THE COURT:  Are you thinking the sentencing
11    stuff ought to come out?
12              MR. CASTLE:  No, I think the sentencing
13    information is relevant.  But at the beginning of --
14    on page 3, paragraph 7D talks about the Court's role
15    in accepting or not accepting the plea agreement.
16    And I believe that that is going to be problematic,
17    because it almost indicates that in that situation --
18              THE COURT:  That's the 801(d)(2)(A)
19    problem?
20              MR. CASTLE:  Yes, exactly.  And it's also
21    vouching.  Because the agreement, obviously, was
22    already accepted.  So it indicates there that the
23    Court --
24              THE COURT:  Well, it's really not, because
25    they pled before a magistrate, they've accepted the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   plea but not the plea agreement.

 2           MR. CASTLE:  I understand.  But the jury is

 3   not going to know that.  So the jury is not going to

 4   be steeped in that.  What I am concerned about is

 5   that they'll look at that, and they'll see the date

 6   of the agreement.  And there has been no rejection by

 7   the Court; that to be interpreted as the Court's

 8   approval of the plea agreement, and instead of having

 9   us do cross-examination, have to go through a number

10   of hoops to say the Court hasn't agreed to it, where

11   the jury is going to be looking at Your Honor, and

12   wondering whether Your Honor has or hasn't, and

13   expecting the Court to say I've either accepted it or

14   haven't accepted it.  Why do we need to put that in

15   here, when it can possibly be interpreted as -- even

16   if the parties don't invoke the imprimatur of the

17   Court, it has that appearance.

18           THE COURT:  All right.  What else?

19           MR. CASTLE:  The only other aspect is I

20   believe we were objecting to the counsel for the

21   attestation, or I'm not sure what the word would be,

22   but the agreement on page at the end of the plea

23   agreement, the attestation on page 9 of the attorney

24   for the particular defendant witness.

25           THE COURT:  Tell me what the problem with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that is.
2              MR. CASTLE:  Well, it's his statement.
3    He's not testifying.  And it's obviously a
4    testimonial statement that was made, it's a solemn
5    declaration.
6              THE COURT:  So just take out the Gary
7    Mitchell here, his signature block, and paragraph to
8    which he attests?
9              MR. CASTLE:  Yes.
10             THE COURT:  What else?
11             MR. CASTLE:  That's it, Your Honor.  If the
12   Court doesn't buy my argument about the kind of being
13   super testimony, to just explain in a little more
14   detail.
15             THE COURT:  Isn't what's going to happen is
16   you guys are going to impeach these guys with the
17   fact they've got a plea agreement?  So probably
18   what's going to happen is the Government is going to
19   go first, and they're going to do most of the heavy
20   lifting for you, or because of you.  And so they're
21   going to go into detail on this.
22             It's not -- this is me talking, you're the
23   defense lawyer -- but it's not a lot of vouching,
24   because it's coming in at the same time that they're
25   talking about it.  It's not like they're going to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    talk about it and then come back and support it with
2    the plea agreement.  It's all coming in at the same
3    time.  Here's the deal you got.  Do you see much harm
4    with that?
5              MR. CASTLE:  I don't see a lot.
6              THE COURT:  Let me ask -- I haven't talked
7    to the Government at all here -- but if they can live
8    with these -- excising these portions of the plea
9    agreement and the addendums, can everybody live with
10   this, this much will come in, as a contract?  Ms.
11   Duncan?
12             MS. DUNCAN:  Your Honor, I have one other
13   paragraph I'd like to suggest for redaction, and that
14   would be on page of 6, paragraph 12.  "The defendant
15   stipulates that he does not possess any exculpatory
16   information regarding any of his charged
17   co-defendants."  That's really a legal conclusion.
18   And I don't think that that should be put in front of
19   the jury.
20             THE COURT:  Okay.  Anybody else?  You could
21   live with these redactions that we've talked to Mr.
22   Castle and Ms. Duncan about?
23             MR. BENJAMIN:  Your Honor, it's not so much
24   a redaction, as it was a confusion that happens, when
25   the Government listed the plea agreements that they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
1    were going to use.  And I was just going to -- I
2    guess we would object to any plea agreements as the
3    nontestifying defendants that have pled that are not
4    going to come in.  The one specifically I'm thinking
5    of was Santos Gonzalez, because he was on a list --
6    part of what happened when I was not here and Mr.
7    Sindel was covering -- but I understand he was on a
8    list of people they're intending on using.  And he
9    relates to Mr. Gallegos.  It's just something I want
10   to raise with the Court.
11              THE COURT:  I'm sorry, I'm not tracking
12   here.  This would be a witness that is not
13   testifying, but they're bringing in his plea
14   agreement?
15              MR. BENJAMIN:  His name was involved in
16   that.  I don't know if that's been rectified or not.
17   But that's a concern, yes, Your Honor.
18              THE COURT:  Of course, you can certainly
19   impeach somebody that's not here, if in another way
20   they're testifying in the court.  Is he going to be
21   testifying in some way --
22              MR. BENJAMIN:  No.
23              THE COURT:  -- somehow that doesn't involve
24   him being in court?
25              MR. BENJAMIN:  No, Your Honor.  He's, my
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

268

```
 1    understanding, out.
 2              THE COURT:  Remind me who he is?
 3              MR. BENJAMIN:  Santos Gonzalez, Ms. Erlinda
 4    Johnson's client.
 5              THE COURT:  All right.  Anybody else got
 6    any candidates for redactions?  Can you live with
 7    this, if the Government can live with it?
 8              All right.  Mr. Castellano?
 9              MR. CASTELLANO:  Your Honor, I just wanted
10    to address the plea agreement regarding Santos
11    Gonzalez.  He's not testifying.  And I admitted all
12    the plea agreements in this case for purposes of the
13    James hearing, so that's for a different
14    consideration before the Court, not for trial
15    testimony.  That included Conrad Villegas and Santos
16    Gonzalez, who are both not witnesses.  It's for a
17    different determination before the Court.
18              MR. BENJAMIN:  And, Your Honor, I
19    apologize.  I was just nervous.
20              THE COURT:  Well, but those portions of the
21    plea agreement, you would not be -- correct me if I'm
22    wrong -- you would not try to be bringing those in as
23    an out-of-court statement under the co-conspirator
24    exception, am I correct?
25              MR. CASTELLANO:  That's correct, for trial
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    purposes.  For purposes of the James hearing, we have
 2    to establish the existence of a conspiracy.
 3              THE COURT:  All right.
 4              MR. CASTELLANO:  So it's to meet other
 5    elements related to James.
 6              THE COURT:  All right.  Okay.  So does that
 7    give you some comfort, Mr. Benjamin?
 8              MR. BENJAMIN:  It does, Your Honor.
 9              THE COURT:  Let me hear -- let me get Ms.
10    Sirignano before I turn this over completely to the
11    Government.
12              MS. SIRIGNANO:  Your Honor, we're assuming
13    all these plea agreements have the same format;
14    correct?
15              THE COURT:  Well, yeah, for purposes of
16    trying to do this.  I know that there may be some
17    unique ones out there, but at least a box here,
18    seeing if we can hammer something out.
19              MS. SIRIGNANO:  Thank you, Judge.
20              THE COURT:  All right.  Mr. Beck, do you
21    think you could live with these redactions?  You get
22    the plea agreement in, but take out the portions that
23    the Court or defendants are most concerned about?
24              MR. BECK:  So I think there is two answers.
25    Yes, but with the caveat that if something becomes
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    relevant during cross-examination.  So I'm thinking,
 2    you know, the factual basis --
 3           THE COURT:  I think you can still use those
 4    to impeach:  You know, haven't you told this Court
 5    such-and-such.  I think you can still impeach a
 6    witness with a prior statement.  So these things
 7    don't go away.
 8           MR. BECK:  Well -- and I think they could
 9    be admissible as prior consistent statements to rebut
10    the presumption that --
11           THE COURT:  They might.
12           MR. BECK:  -- that they said something
13    different.
14           So what I'm saying I think we can live with
15    those -- and I think we'll propose other redactions
16    with the sentencing provisions, and things like
17    that -- and I think that's fine as a starting off
18    basis.  But I just -- I want the Court and everyone
19    to be aware that we may ask the Court to address that
20    based on what comes out in cross-examination.
21           THE COURT:  Could everybody live with these
22    redactions, understanding that they may come in for
23    other purposes, if the Government lays some
24    foundation?  But at least, when they're putting on a
25    witness, and they introduce the plea agreement, it
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   will have these redactions, at least these
 2   redactions?
 3           MR. CASTLE:  Your Honor, we can live with
 4   that.  But I would ask that before the prosecution
 5   attempted to bring in redacted portions, that that be
 6   handled outside the presence of the jury, just
 7   because someone might open the door to a particular
 8   area of evidence, that's a theory of relevancy, it's
 9   not a theory of necessarily admissibility that deals
10   with confrontation.  So I can't imagine how -- even
11   if you could open the door to the Government's
12   statement that someone has provided substantial
13   assistance, it's still a confrontation issue that
14   needs to be dealt with.  And so, just satisfying the
15   400 series doesn't necessarily satisfy the 800 series
16   or the Constitution.  So I think what they're
17   proposing is that those are the right to reraise some
18   of these issues, but it would have to be outside
19   presence of the jury, in our opinion.
20           THE COURT:  Can you agree that if you're
21   going to get into prior inconsistent statement, or
22   somehow the witness has opened this up, you'll just
23   approach the bench before you --
24           MR. BECK:  We would certainly ask the Court
25   to allow us to do that before we intended to bring
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that up in open court.
2              THE COURT:  Okay.  All right.  Mr. Adams?
3              MR. ADAMS:  Yes, sir.
4              Judge, I just have one matter to put on the
5    record about incorporating our midstream Miranda
6    motion from 4275.  Is this a good time to do that, or
7    should I hold until tomorrow?
8              THE COURT:  Refresh my memory what 4275 is.
9              MR. ADAMS:  We had about a day-long
10   suppression motion.  It was a three-hour statement by
11   Mr. Garcia upon his arrest.  He was not Mirandized
12   for the first 16 minutes.
13             THE COURT:  You're talking about, do you
14   want to move it into this case?
15             MR. ADAMS:  Yes, sir.
16             THE COURT:  I think you have a document
17   that does that, right?
18             MR. ADAMS:  We referenced it.  I have the
19   specific ECF numbers.  I mean, I'm happy to do it
20   tomorrow morning.
21             THE COURT:  I thought Ms. Sirignano had
22   filed a motion --
23             MR. ADAMS:  She filed a motion.  That
24   document wasn't specifically referenced.  We
25   referenced it orally last week.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Let's do it tomorrow.
 2              MR. ADAMS:  Thank you.
 3              THE COURT:  Do we have an agreement then on
 4    the plea agreements coming in and how they're going
 5    to come in?  Anybody disagree with it?  All right.
 6    So that's what -- hold on just a second.
 7              THE CLERK:  Judge?
 8              THE COURT:  Yes.
 9              THE CLERK:  Doc 1486 outlines the motion
10    number, and the 4275 for this case, you've seen it,
11    it's a notice.
12              THE COURT:  Okay.  Let me leave that for
13    tomorrow.  Because I want to make a few comments
14    tonight.
15              So we're going to take up the bad acts
16    tomorrow.  Let me ramble just a little bit.  You'll
17    just have to accept this, think about it overnight.
18    I know everybody is working hard, but I'm a little
19    bit frustrated by the bad acts.  It's like we're both
20    trains or something passing in the night here, and
21    people, I think, are being too formalistic here.
22              When I got the Government to list out the
23    bad acts, remember what we were doing.  The
24    defendants were coming in and saying some of what
25    they're going to use to prove enterprise and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   racketeering activity, and that sort of thing, is
 2   going to be -- or in furtherance of the enterprise --
 3   is going to be bad acts.  We want to take a shot at
 4   it, we just don't want to take their word for it.
 5           So I told the Government to do their
 6   traditional stuff, which is usually as a matter of
 7   caution, they do a notice that says something to the
 8   effect:  Here's our 404(b); we don't agree with all
 9   this being 404(b), but here's all the bad things
10   we're going to introduce.
11           And I was hoping that we would be able to
12   figure out a way for the Court to make a decision on
13   this.  So I'm going to first fault the Government.
14   It seems to me you've got to tell me what you think
15   is 404(b) evidence.  Because, if you do, you've got a
16   certain amount of proof that you've got to do for a
17   404(b).  If you're saying that, okay, what we're
18   really doing is I want to use this information to
19   show enterprise and furtherance of the enterprise's
20   activity, then we go down a different path.  And then
21   I've got to make kind of a relevance, and say it's in
22   that box.  It's a res gestae type of argument.  So I
23   think, on the letters that you send, you've got to
24   tell them more.
25           Defendants:  I understand the Government
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   has to prove 404(b) to get it in, and the burden is
 2   on them.  But you've got to help them.  I mean, you
 3   can't just say:  "The burden is on them."  You've got
 4   to start telling me what these events are.  I mean, I
 5   don't know about shoplifting and marijuana use, and
 6   things like that.  So you've got to help me here.  I
 7   think everybody is relying on a little bit of canned
 8   briefing, formalized briefing, and everybody is
 9   saying, Well, they've got the burden of proof.  But
10   you've got to educate me.  I can't make an informed
11   decision.
12           If you're not going to inform me, you're
13   not going to help me out here, I will go through and
14   I'll tell you what's in, what's out, based upon these
15   letters and upon the briefing.  But it ain't much.
16   And, probably, people are not going to like the meat
17   cleaver approach that I'm going to take.  So you've
18   got to educate me.
19           So think about it overnight, how you're
20   going to do that, and how you're going to do it
21   quickly.  Are we going to do that in the morning?
22   Are we going to sit here and go through Christopher
23   Garcia's letter, and y'all educate me one by one, and
24   I make baseball calls all morning, and all day long?
25   That's fine, that's one way of doing it.  If you've
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.                                            1-800-669-9492
PROFESSIONAL COURT                                                 e-mail: info@litsupport.com
REPORTING SERVICE

```
 1    got a different approach -- we've got to get it
 2    going.  Because I consider two things to be very
 3    crucial for me to do my job, the thing that keeps me
 4    awake, one is the 404(b) stuff, all this stuff coming
 5    up first thing in the morning, how are we going to do
 6    it so that we don't have a bunch of stuff coming into
 7    the trial that doesn't advance the enterprise or
 8    would not come under a 404(b) analysis.
 9             It seems to me that these defendants have
10    enough things that they probably are going to not
11    like coming into trial, that's going to come in like
12    a freight train anyway, without talking about, you
13    know, parking tickets and shoplifting, and that sort
14    of stuff.  And so we've got to get real here.  So
15    help me get real, in the morning, how we're going to
16    do this.
17             The second thing is the James stuff, you
18    know, the James hearing.  What statements are going
19    to come in as co-conspirator statements, and what
20    statements are going to come in and satisfy
21    Bruton/Smalls problems there?
22             Those are the two or three things that keep
23    me awake at night.  So help me do those.  I want to
24    do a good job.  I don't want, you know, to have stuff
25    floating around that shouldn't be floating around in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    this trial.

2            And, you know, at the same time, I don't

3    want to tell the Government how to try their case.

4    So I'm trying to balance those things.

5            All right.  I appreciate your hard work --

6    no, got to go.  Talk to me tomorrow.

7            Have a good evening.  Appreciate it.  Be

8    safe.

9            (The Court stood in recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

278

1              C-E-R-T-I-F-I-C-A-T-E

2

3   UNITED STATES OF AMERICA

4   DISTRICT OF NEW MEXICO

5

6

7         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8   Official Court Reporter for the State of New Mexico,

9   do hereby certify that the foregoing pages constitute

10  a true transcript of proceedings had before the said

11  Court, held in the District of New Mexico, in the

12  matter therein stated.

13        In testimony whereof, I have hereunto set my

14  hand on December 27, 2017.

15

16

17

18        _____
          Jennifer Bean, FAPR, RMR-RDR-CCR
19        Certified Realtime Reporter
          United States Court Reporter
20        NM CCR #94
          333 Lomas, Northwest
21        Albuquerque, New Mexico 87102
          Phone:  (505) 348-2283
22        Fax:    (505) 843-9492

23

24

25



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com