IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff*,

vs.                                                                                                          No. 2:15-cr-04268-JB

ANGEL DELEON, et al.

    *Defendants.*

**MOTION TO STRIKE COOPERATING WITNESSES
FROM TESTIFYING IN THIS CASE
&
REQUEST FOR EVIDENTIARY HEARING**

Under the Fifth Amendment to the United States Constitution and Fed. R. Crim. P. 12(b), Defendant Anthony Ray Baca, joined by Defendants Carlos Herrera, Rudy Perez, Billy Garcia, Shauna Gutierrez, Edward Troup and Daniel Sanchez, respectfully moves the Court to strike the trial testimony of cooperating witnesses Lupe Urquizo, Billy Cordova, and Benjamin Clark, or, in the alternative, conduct an evidentiary hearing to allow Defendants to demonstrate that the recorded statements and related testimony are and were coerced by unlawful government conduct.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 9, 2017, a grand jury returned the Second Superseding Indictment in this case, indicting twenty-two defendants. *See* Second Superseding Indictment [Doc. 949]. That Indictment charges Defendant Anthony Ray Baca with five violent crimes in aid of racketeering, contrary to 18 U.S.C. § 1959. Those crimes include conspiracy to murder J.M. (Count 6), the murder of J.M. (Count 7), conspiracy to commit assault resulting in serious bodily injury to J.R. (Count 8), conspiracy to

murder D.S. (Count 9), and conspiracy to murder G.M. (Count 10). The Indictment alleges that these offenses were committed "as consideration for the receipt of, and as consideration for a promise and agreement to pay, anything of pecuniary value from the Syndicato de Nuevo Mexico Gang (SNM), and for the purpose of gaining entrance to and maintaining and increasing position in the Syndicato de Nuevo Mexico Gang (SNM), an enterprise engaged in racketeering activity." [*Id.*]

This case encompassed a wide ranging federal investigation into the alleged activities of the Defendants. In conducting this investigation, the United States placed considerable pressure on inmates serving time in New Mexico's prisons to talk to federal agents and federal prosecutors. As testimony in this case reflects, FBI Agents would visit with selected inmates serving time at the New Mexico Department of Corrections and inquire of them whether they would like to be charged in the RICO conspiracy case, or, instead, cooperate with the FBI and the United States in this investigation. *See* Transcript, November 27, 2017, p. 194. While that technique, standing alone, may pass constitutional scrutiny, threatening the prosecution of loved ones and family members crosses the line from seeking the voluntary participation of any individual to officially coercing that person to cooperate with a federal investigation. This motion addresses three witnesses who encountered such coercion in this case.

### A. BENJAMIN CLARK

On September 1, 2016, Mr. Clark called home from the penitentiary to his mother. While discussing family members, Mr. Clark informed his mother that:

> CLARK: Did you know–did you know, if I didn't do what I did, they were going to try to charge you and Jeanette.
>
> MOM: Well, I know you said that.
>
> CLARK: I don't think I ever told Jeanette that though. But I couldn't let that happen. Vernon would have went down too.

MOM:     For what?  Were we informed that we were doing anything that was illegal.

CLARK:   It doesn't–it doesn't matter.  I mean, the three ways–any three ways that you did for any–any of them dudes was promoting.  You know, and that's–that's what you call that.  You know, you might have just got probation or something, but–

MOM:     Yeah, but how could that be considered promoting?  There–there's no recording or anything that says that I can't do a three way for you.

CLARK:   Yeah, but see, with the way they look at it is that you're helping to–the way–the way the law is set up is if you're helping someone to promote any kind of criminal activity because so and so said this on the phone or I said this on the phone or you sent somebody money or–or anything like that.

MOM:     Uh-huh.

CLARK:   If you're–if anything like that happens, you're aiding and abetting a criminal and a gang member.

MOM:     Okay.

CLARK:   So, I mean, they already charged a couple people's moms and old ladies, you know.

MOM:     I got to let you go.

CLARK:   I love you, mom.

MOM:     Okay?  No, I got to take my doggies outside.

CLARK:   No.  You talking to me?

MOM:     Yeah, I'm talking to you, mijo.  I got–I'm taking my dogs outside to go potty.

CLARK:   Well, I'm just–

MOM:     Don't go on the truck.

CLARK:   I'm just–I'm just letting you know that that's–you know, I mean–

MOM:     Yeah.

| | | |
|---|---|---|
| CLARK: | | –that was one of the things I thought about, you know. |
| MOM: | | Yeah, okay. |
| CLARK: | | I couldn't–I ain't going to let you guys fall for my bullshit. You know what I mean? |
| MOM: | | Yeah, I hear you. |

Audio Transcript of Jailhouse call between Benjamin Clark and his mother, pp. 9-10, attached as Exhibit A.

**B. BILLY CORDOVA**

On September 4, 2016, Billy Cordova called home to his wife, Crystal. As the two discussed their relationship, Mr. Cordova told his wife the following:

> . . . And then the fucking feds come in and say, look, we're going to fucking tax your wife, we're going to tax your fucking mom, this is what we have on you. Boom, slap a file on me. I'm like, what? I'm like–and they're coming after everybody. I'm like, no, fuck this. Fuck these fools. You know what I mean? Gave me a few days to think about it.
>
> What would my daughter do right now babe? They want fucking me to be in a fucking federal detainment after seeing her dad go to jail for my mom gamed up. You didn't know you piped down 18 months to 2 years after the trials are done.

Audio Transcript of Jailhouse call between Billy Cordova and his wife, Crystal, p. 6, attached as Exhibit B.

**C. LUPE URQUIZO**

On March 12, 2017, Lupe Urquizo spoke with his brother, Daniel, on the telephone. Mr. Urquizo discussed with his brother the fact that federal agents had visited with him recently in prison, and that they knew about criminal activity (drug deals) that Urquizo and his brother had done in Las Cruces, Clovis, and Baltimore. Urquizo told his brother, "they came to see me about two months ago, and they were asking me about you, 'no' I told him. Ssh, why are you asking about Daniel?" Audio

Transcript of Jailhouse call between Lupe Urquizo and his wife, p. 7, attached as Exhibit C. Responding to the reality that he could be drug into the federal investigation, Daniel asked Urquizo, "But did you tell them not to fuck with me or what?" *Id*, p. 8. Urquizo then told his brother, "Yeah, fuck, yeah. I told 'em. And then Urquizo said:

> Then they told me, they were asking me "how much time do you [Daniel] still have" and I, I told them that "I believed that you still had some years left, and all that" you see, and I told him, "well, you know, if I do all that, I want to make sure that my bro is all good too and all that" you see. . . . And they said to me "yeah, well, as long as you're, you're truthful and all of that, well, *we'll take care of everything*.

*Id* (emphasis added).

As these conversations show, these witnesses believed that they had to cooperate with the FBI's investigation in order to avoid having our federal government prosecute their family members. This tactic is the hallmark of coercion. For that reason, all of their testimony should be suppressed, and these three individuals should be struck as witnesses.

## ARGUMENT

### *BENJAMIN CLARK, BILLY CORDOVA, AND LUPE URQUIZO'S COOPERATION WAS INVOLUNTARY, THEREFORE THEIR TESTIMONY IS INADMISSIBLE*

While the Fifth Amendment right against compelled incrimination is a personal right and may not normally be asserted on another's behalf, federal courts have held that the use of another person's coerced statements and testimony may violate a defendant's rights under the Due Process Clause of the Fifth Amendment. *See Clanton v. Cooper*, 129 F.3d 1147 (10th Cir. 1997). *See also Wilcox v. Ford*, 813 F.2d 1140, 1148 (11th Cir. 1987); *United States v. Chiavola*, 744 F.2d 1271, 1273-74 (7th Cir. 1984); *United States v. Fredericks*, 586 F.2d 470, 480 (5th Cir. 1978); *LaFrance v. Bohlinger*, 499 F.2d 29, 34-35 (1st Cir. 1974); *Bradford v. Johnson*, 476 F.2d 66 (6th Cir. 1973), *aff'g* 354 F. Supp. 1331

(E.D. Mich 1972).  As stated by the Tenth Circuit in *Clanton*, when the use of evidence "offends the Constitution, a person may challenge the government's use against him or her of a coerced confession given by another person."  129 F.3d at 1158; *see also Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) ("Confessions wrung out of their makers may be less reliable than voluntary confessions, so that using one person's coerced confession at another's trial violates his rights under the due process clause.").

      The evidence here suggests Clark, Cordova, and Urquizo agreed to implicate Mr. Baca and others in criminal conduct in exchange for leniency not only for themselves but, more importantly, to keep their loved ones and close family members from being prosecuted by the United States.  More disturbingly, the evidence here underscores a pattern of coercion, one in which law enforcement agents targeted alleged members of the SNM whose family members could have easily been prosecuted.  Hardly anything could be more coercive than threatening to prosecute one's mother, one's wife, or one's brother.

      "Under Supreme Court and Tenth Circuit precedent, a promise of leniency is relevant to determining whether a confession was involuntary and, depending on the totality of the circumstances, may render a confession coerced."  *Clanton*, 129 F.3d at 1159.  Threats to harm or charge a witness's loved one with a federal crime unless the witness cooperates or waives a constitutional right can also be sufficiently coercive to overcome the witness's will and render the cooperation or waiver involuntary.  *See United States v. Pacheco*, 819 F. Supp. 2d 1239, 1247 (D. Utah 2011) ("Besides promises of leniency, threats also can undermine the voluntariness of a confession. This is particularly so when the threat is against a defendant's family."); *cf. United States v. Bolin*, 514 F.2d 554, 560-61(7th Cir. 1975) ("In view of the fact that the defendant signed the consent form while undergoing custodial interrogation and only after he had been impliedly threatened that his girlfriend would be arrested if he

did not sign, we hold that the consent was involuntary and therefore invalid."). Whether a threat to prosecute a third party is coercive turns on whether the threat could have been lawfully executed. *United States v. Johnson*, 351 F.3d 254, 263 (6th Cir. 2003). District Courts within the Tenth Circuit have suppressed evidence when the totality of the circumstances shows that the "consent" provided by an individual was not freely provided. *United States v. Moore*, 96 F. Supp. 2d 1154, 1160 (D. Colo. 2000) (holding that the federal wiretap law, 18 U.S.C. § 2511(2)(c), was violated because the consent to record the call was not voluntarily given to law enforcement officials). Here, the threats made against these witnesses' loved ones was very real. Law enforcement officers apparently played audio recordings and demonstrated that they could prove that their loved ones had aided and abetted their criminal conduct. Hence, any one of these family members could have easily been charged with criminal activity.

The pattern of coercive conduct here underscores the fact that these unfair, and unconstitutional, law enforcement tactics were very effective. The witnesses talk about being confronted by law enforcement officers with an investigatory file containing evidence that could be used not only against them, but their family as well. The witnesses discuss being given time to think about their choices, about how they wanted to address the situation for their family members. But the key fact is that each witness discusses making their decision to participate with this federal investigation in order to protect loved ones from being prosecuted. *See* Clark ("I ain't going to let you guys fall for my bullshit."); Cordova ("What would my daughter do right now, babe?"); Urquizo ("if I do all of that, I want to make sure that my bro is all good too and all that"). This evidence demands an evidentiary hearing on whether the United States can present these witnesses at trial in keeping with the fundamental fairness that the due process clause of the Fifth Amendment demands.

### *THE UNITED STATES FAILURE TO TIMELY DISCLOSE, OR COMPLETELY DISCLOSE, BRADY/GIGLIO MATERIALS DEMANDS A SWIFT AND EFFECTIVE REMEDY–STRIKING THESE WITNESSES FROM THE TRIAL*

On October 4, 2016, this Court and the United States agreed to the following *Brady/Giglio* review, and acknowledged that a mere computer word search was insufficient:

> COURT: I'm uncomfortable with there not being an Assistant U.S. Attorney putting their feet in the shoes of the defendants and the defendants' counsel, and being creative about how this information could possibly be used to benefit the defendant. And I don't think there is an algorithm or search function that does that. I think that takes a human being sitting there putting their feet in the defense lawyers' shoes and saying, Could I use this? So if that's the search that has been done or is contemplated, I don't think that's adequate.
>
> MR. BECK: Understood, Your Honor.

Transcript of October 4, 2016 Hearing, p. 11, lines 7-19.

At a later motions hearing, the Court agreed with Defendant Baca's definition of *Brady/Giglio* materials to include any benefit or inducement provided to family members of the cooperating witnesses:

> LOWRY: Your Honor, I just want to make sure I understand the scope of the disclosure correctly. Because in my thinking, when we were talking about *Brady* and *Giglio* information, in terms of the benefits, it's not just the payments, per se, cash payments, but all kinds of other incentives or inducements provided to cooperating individuals: Lump sum meritorious awards, you know, fixing traffic tickets, fixing arrest warrants, favoritism given to people, to their families, to their loved ones.
>
> COURT: Well, I'll say this: I read your list, and -- I think it was your list where you listed that out -- as a general matter, I think I agree that is *Giglio* material. Did you have any disagreement with that list? I think it was in Mr. Lowry's motion, Mr. Beck. Did you have any disagreement that that was probably a rather detailed, but good list of what --
>
> BECK: Benefits provided to spouses and –

8

|  |  |
|---|---|
| COURT: | Right, right. Now, when you say you're going to produce the compensation, are you thinking it's going to include such an extended list here, or are you thinking that you're probably just producing the cash? |
| BECK: | I'll look through it. I know we're producing cash that's paid to their commissary accounts and cash that's paid to them. I can't say for certain as I stand here, because I haven't looked through it all, whether that's included. But I understand Mr. Lowry's point. |
| COURT: | At some point you would agree that that has to be produced, but it may not be in this bundle that you're trying to get together by the 17th? |
| BECK: | Right. |

Transcript of November 8, 2017 Hearing, pp. 118-120.

In ruling on the disclosure of *Brady* and *Giglio* materials, the Court held "it would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the Government to postpone disclosures to the last minute, during trial." Doc. 907, p. 59, quoting *United States v. Burke*, 571 F. 3d 1048, 1054 (10th Cir. 2009). The Court reasoned that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" *Id*., quoting *Burke*, 571 F.3d at 1054. With regard to cooperating witnesses on whom the Plaintiff has relied, the Court required "early *Brady* review of these materials by the Government. . . . You've got to produce the *Brady* materials promptly, immediately." Doc. 907, p. 106.

On October 13, 2017, Defendant Baca, in Doc. 1332 ("Motion to Compel Immediate Production of *Brady* and *Giglio* Materials"), forewarned the Court about this scope of this problem. Nevertheless, here we are, one the eve of trial, just as predicted, and the United States has not abided by its obligation disclose favorable materials, while the defense teams scramble to digest thousands of hours of belated audio disclosures and discovery dumps. At this juncture, the Defendants seek a sure

9

and swift remedy for these violations–strike these three witnesses and all of their related testimony and purported co-conspirator statements. The Court has alerted the United States that such a remedy is possible. *See* Doc. 907, p. 59 (holding that the "exclusion of witnesses, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial" are possible remedies for violating the disclosure rules). The unequivocal evidence from the United States' own witnesses indicate that they were forced to cooperate in order to avoid having family members criminally prosecuted. The tactic is unfair and violates the due process clause of the Fifth Amendment.[1] Accordingly, the Defendants request that these three witnesses be struck, as well as all of their purported co-conspirator testimony from this case.

## CERTIFICATE OF CONFERENCE

Undersigned counsel contacted counsel for the United States and the other defendants for their position on this motion. AUSA Maria Armijo advised that the United States opposes the relief requested herein. The remaining Trial 1 Defendants, through their counsel, join this motion. No other Defendant has opposed this motion at the time of filing.

## CONCLUSION

For the reasons discussed above, Defendants respectfully ask the Court to strike all trial testimony of cooperating witness Clark, Cordova, and Urquizo, as well as any purported co-conspirator statements attributed to each witness. In the alternative, Defendants request that the Court conduct an evidentiary hearing to allow Defendants to demonstrate that the statements and testimony of these witnesses was secured through unconstitutional coercive conduct.

---

[1] It goes without saying that if any defense counsel threatened a witness with the prosecution of a family member if they did not cooperate with the defense, or paid a witness $45,000 for their testimony, that counsel would be a defendant in this case and not an attorney before the Court.

Respectfully submitted,

ROTHSTEIN DONATELLI LLP

*/s/ Marc M. Lowry*
MARC M. LOWRY
500 Fourth Street NW, Suite 400
Albuquerque, NM 87102
(505) 243-1443
mlowry@rothsteinlaw.com


*/s/ Theresa M. Duncan*
Theresa M. Duncan
Duncan Earnest, LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

*Attorneys for Anthony Ray Baca*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 25th day of January 2018, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel for Plaintiff and Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

*/s/ Marc M. Lowry*
Marc M. Lowry