IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.                                                                                                                                                         No. 2:15-cr-04268-JB

ANGEL DELEON, et al.

    *Defendants*.

**TRIAL BRIEF BY DEFENDANT ANTHONY RAY BAC REQUESTING THE IMMEDIATE PRODUCTION OF *BRADY/GIGLIO/KYLES* MATERIALS**

Defendant Anthony Ray Baca respectfully tenders this request for the Court to compel the immediate production of *Brady*/*Giglio*/*Kyles* materials currently in the possession of the United States. Defendant Baca's counsel has conferred with the United States, who has indicated to defense counsel that this discovery request will not be honored, insofar as it concerns the contemporaneous field notes of FBI and Task Force Officers who interviewed key government witnesses involved in this case. As grounds, Defendant Baca contends:

*Laboratory Analysis of Heroin*

1. During the defense cross examination of Mario Montoya, Mr. Montoya testified that the drug quantity referenced in his plea agreement is based on the chemical analysis of the drugs seized from him in this case.

2. There is no indication in the discovery related to this case that the heroin seized from Mr. Montoya was ever chemically analyzed by any laboratory. There was no need to have that heroin analyzed, since Mr. Montoya agreed to cooperate with the United

States shortly after his arrest for his sale of heroin to undercover officers in this matter.

3. Accordingly, the absence of a laboratory report is impeachment information that goes directly to Mr. Montoya's credibility as a witness to this jury.

### *Field Notes of FBI & Task Force Agents involved in the witness interviews of Lupe Urquizo, Mario Rodriguez, and Timothy Martinez*

4. In addition to the request above, on Monday, February 26, 2018 the FBI Agent responsible for this investigation, Agent Bryan Acee, testified.

5. Agent Acee recalled interviewing a government witness, Lupe Urquizo, on March 6, 2017.

6. During his testimony, Agent Acee recalled discussing the assault of Julian Romero with Lupe Urquizo.

7. During his testimony, Agent Acee acknowledged that during the discussion of Romero assault, Lupe Urquizo claimed (1) that he provided the FBI with the incorrect names about who ordered the Romero assault, or (2) that the FBI wrote the names incorrectly in the 302 report.

8. In the FBI 302 report dated March 6, 2017, Urquizo claimed that Defendant Baca ***did not*** want Romero to be killed or stabbed, which was contrary to Urquizo's trial testimony asserting that Mr. Baca wanted Romero to be killed.

9. Nevertheless, Agent Acee testified that Urquizo told Agent Acee on March 6, 2017 precisely what Agent Acee told Julian Romero: Defendant Baca did not want to see Romero stabbed or killed.

10. In addition, Urquizo testified at trial that he never communicated with Mario Rodriguez or Timothy Martinez by holding notes up to a window in a door when Urquizo arrived at the Sourthern Correctional Facility on March 6, 2014.

11. This too is at odds with the FBI 302 report that claimed, unequivocally, that "Rodriguez held the note up to the door."

12. During the pretrial hearings in this case, Agent Acee discussed, at length, the manner in which Urquizo communicated with Rodriguez and Martinez through the glass window in Urquizo's cell door on March 6, 2014. *See* November 27, 207 Transcript of Hearings, pp. 235-245. *See* Dkt. 1545.

13. Agent Acee discussed, during the November 27, 2017 hearing, that Urquizo had informed him that Rodriguez and Martinez were allowed out in the hallway between the Blue and Yellow pods, and that Urquizo communicated with them by holding notes up to his cell window. *Id.*, pp. 236-237.

14. Agent Acee also discussed that Rodriguez and Martinez were in the hallway "cleaning or painting." *Id*. p. 238.

15. No such testimony came in a trial. No communication through a window was ever discussed.

16. Accordingly, the March 6, 2017 302 discussing the communication through a window was false.

17. When confronted with the March 6, 2017 FBI 302 at trial, Urquizo testified "that's not what I said that's not what I said." *See* February 6, 2018 Trial Testimony (Unofficial Real Time p. 22 for February 6, 2018).

18. At this point, considerable tension exist between the credibility of the FBI, and the credibility of the United States fact witness Lupe Urquizo.

19. Access to all of the field notes concerning the law enforcement interviews of the three principle witnesses involved (Urquizo, Rodriguez, and Martinez) for the purported March 6, 2014 communication through the window of Urquizo's cell door are necessary to determine, with finality, whose credibility–Agent Acee's or Lupe Urquizo's–has been compromised in this case.

20. A primary defense theory in this case is that the witnesses offered by the United States have coordinated a false narrative to avoid the RICO conspiracy prosecution indicted in United State's 16-cr-1613 case.

21. Urquizo's alteration of his March 6, 2017 statement to the FBI is consistent with the defense theory, and access to all of the field notes involved in this matter should be produced to challenge the prosecution's case under *Kyles*.

### *Memorandum in Support of Motion*

In *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United States Supreme Court held that suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good or bad faith of the prosecution. The disclosure obligation imposed by *Brady* and its progeny is grounded in the constitutional guarantee of due process of law under the Fifth and Fourteenth Amendments of the United States Constitution. Consequently, the Government's failure to disclose material exculpatory evidence violates the defendant's constitutional right to a fair trial. *Smith v. Secretary of the New Mexico Department of Corrections,* 50 F.3d 801, 823 (10th Cir. 1995).

Due process requires the disclosure of material, exculpatory evidence which "if suppressed, would deprive the defendant of a fair trial." *United States v. Bagley*, 473 U.S. 667, 675 (1985). In order to establish a *Brady* violation, the defendant bears the burden of establishing: "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the accused; and (3) that the evidence was material." *United States v. Hughes*, 33 F.3d 1248, 1251 (10th Cir. 1994). "Suppression occurs not only where the information is never disclosed voluntarily but also where the information is disclosed later than the time when the obligation arose." *United States v. The LaRouche Campaign*, 695 F.Supp. 1290, 1296 (D. Mass. 1988), see also *United States v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000) (evidence must produced at a time when disclosure would be of value to the accused).

It is irrelevant for *Brady* purposes whether the suppression of material, exculpatory evidence was the result of negligence or design. *Smith v. Secretary, supra,* 50 F.3d at 823. On the contrary, "if the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 110 (1976). Moreover, just because a particular piece of information is not in the prosecutor's files does not mean that *Brady* is satisfied because an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in a case." *Kyles v. Whitley,* 514 U.S. 419, 437 (1995). Therefore, for *Brady* purposes the prosecution includes not only the attorneys who are prosecuting the case but also the prosecutor's entire office, law enforcement personnel associated with the case and other arms of the state which are a part of the prosecution "team." *Giglio v. United States*, 405 U.S. 150 (1972), *see also Smith v. Secretary, supra,* 50 F.3d at 824.

Evidence may be material and favorable to the accused even if it will only impeach the testimony of a prosecution witness.  *See Giglio*, *supra,* 405 U.S. at 154-155.  "Because impeachment is integral to a defendant's constitutional right to cross examination, there exists no pat distinction between impeachment and exculpatory evidence under *Brady*."  *United States v. Hughes, supra,* 33 F. 3d p. 1252.  This is especially true where a witness' credibility is material to the question of guilt.  *Ibid*, see also *Smith v. Secretary, supra,* 50 F.3d at 825.

The third and final element of a *Brady* violation is that the suppressed evidence was material to guilt or punishment.  "Implicit in the requirement of materiality is a concern that the suppressed evidence might have affected the outcome of the trial."  *Agurs, supra,* 427 U.S. at 104.  Suppressed evidence is material if there is a reasonable probability that, if the evidence had been disclosed to the defense, the result of the proceeding would have been different.  *Ibid*.  A court must view the suppressed evidence in relation to the record as a whole and "what might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict."  *Smith v. Secretary,* 50 F. 3d at 827.

### *The search for exculpatory information must include the entire prosecution team and must be granular and detailed as required by law and the US Attorney's Manual*

Just because a particular piece of information is not in the prosecutor's files does not mean that *Brady* is satisfied because an "individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in a case." *Kyles v. Whitley,* 514 U.S. 419, 437, 115 S.Ct. 1555, 1567, 131 L.Ed.2d 490 (1995).  Therefore, for *Brady* purposes, the prosecution includes not only the attorneys who are prosecuting the case, but also the prosecutor's entire office, law enforcement personnel associated with the case, and other arms of the state which are a part of the prosecution "team." *White v. McKinley*, 519 F.3d 806,

814 (8th Cir. 2008) (stating that "*Brady's* protections also extend to actions of other law enforcement officers such as investigating officers."); *see also Giglio,* 405 U.S. 150 (1972).

This duty under *Brady* and *Giglio* to search broadly among all involved agencies, including the several state and federal law enforcement agencies involved in this case, was reaffirmed in the guidance given all federal prosecutors in a 2010 memo by Deputy Attorney General David W. Ogden, which continues to provide specific expectations of federal prosecutors in fulfilling their discovery obligations. *See* Memorandum from David W. Ogden, Deputy Attorney General, U.S. Dep't of Justice, to Department Prosecutors (Jan. 4, 2010), *available at* https://www.justice.gov/usam/criminal-resource-manual-165-guidance-prosecutors-regarding-criminal-discovery (regarding criminal discovery guidelines indicates that "members of the prosecution team include federal, state and local law enforcement officers and other government officials participating in investigation and prosecution of the criminal case against the defendant") (hereinafter "Ogden Memo"). [1] The same inclusive definition is contained in the US Attorney's Manual at 9-5.001:

> **B(2) The prosecution team.** It is the obligation of federal prosecutors, in preparing for trial, to seek all exculpatory and impeachment information from all the members of the prosecution team. Members of the prosecution team include federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. *Kyles,* 514 U.S. at 437.

Offices of the U.S. Attorneys, *9-5.001 – Policy Regarding Disclosure of Exculpatory Impeachment Information*, U.S. DEP'T OF JUSTICE (updated June 2010),

---

[1] Although it is clear that the Ogden Memo is not intended to have the force of law, or create any additional rights for defendants, it is nonetheless sets out specific expectations of every Assistant United States Attorney across the nation, and is intended to be used in fulfilling their discovery obligations in every case.

https://www.justice.gov/usam/usam-9-5000-issues-related-trials-and-other-court-proceedings#9-5001.[2]

The Ogden Memo spells out the types of documents and communications that should be reviewed by the AUSA in the case to ensure all *Brady/Giglio* has been disclosed.  As part of the *Giglio* disclosure process, the investigative agencies' entire investigative files, including documents such as the FBI (or the TFOs) electronic communications (EC), inserts, emails, etc. should be reviewed by the prosecutors for discoverable information, including *Brady* and *Giglio*.  The Ogden Memo referred to above discusses the materials to be reviewed by the Government in determining whether discoverable *Brady* and *Giglio* materials are contained in the file.  The Ogden Memo suggests that if *Brady* and *Giglio* is contained in documents that are considered "internal" documents, such as an email, an insert, an administrative document, or an EC, "it may not be necessary to produce [to the defense] the internal document, but it will be necessary to produce all of the discoverable information contained in it." *Id*. at 4, ¶ 1.

*Giglio* requires the review of confidential informant (CI)/witness (CW)/human source (CHS) and source (CS) files by the prosecutors.  The Ogden Memo also instructs Assistant U.S. Attorneys to review informant/witness files described above for discoverable information and copy relevant portions for discovery purposes.  In this case, given the length of time that the investigation has been pursued, the number of agencies that were involved, together with the large number of potential witnesses identified in the Government's discovery, the defense requests the prosecutor produce the field notes and laboratory analysis requested above as it falls under the classes of *Brady*, *Giglio,* and *Kyles* information subject to disclosure.

---

[2] The Ogden memo is cited in and remains as guidance in the U.S. Attorney's Manual at 9-5.001.

A prosecutorial review of information obtained in all witness interviews is necessary to comply with *Brady, Giglio,* and *Kyles*. The Ogden Memo also obligates Assistant United States Attorneys to review agent and prosecutor notes and original records of substantive interviews with witnesses. The prosecutor should ensure that during the interview of witnesses "[m]aterial variances in a witness's statement should be memorialized, even if they are within the same interview, and they should be provided to the defense as *Giglio* information." Ogden Memo at p. 7 ¶ 8(a). Even trial preparation meetings between prosecutors and witnesses may produce new or inconsistent information disclosed by the witness. "New information that is exculpatory impeachment information should be disclosed consistent with the provisions of USAM § 9-5.001, even if the information is first disclosed in a witness preparation session." Ogden Memo at p. 4, ¶ 8(b).

The prosecutorial review of agent rough notes is requested here by the Defendant Baca, consistent with the dictates of the Ogden Memo. The Ogden Memo instructs prosecutors to review agent notes "if there is a reason to believe that the notes are materially different from the memorandum, if a written memorandum was not prepared, if the precise words used by the witness are significant, or if the witness disputes the agent's account of the interview." *See* Ogden Memo at p. 7, ¶ 8(c). In this case, Lupe Urquizo has disputed, in open court, Agent Acee's account of the interview. For that reason, the field notes in this case should be disclosed to the defense, just as any chemical analysis related to Mario Montoya's drug analysis should be.

## CONCLUSION

WHEREFORE, Defendant Anthony Ray Baca respectfully requests that the Court order the immediate production of all field notes concerning every FBI Agent and Task Force Officer participating in any meeting involving the cooperating witnesses Lupe Urquizo, Roy Paul

Martinez, Timothy Martinez, as well as the DEA laboratory report discussed by Mario Montoya during his cross-examination by Defendant Baca's counsel during this trial.

        Respectfully submitted,

        /s/ Marc M. Lowry
        MARC M. LOWRY
        500 Fourth Street NW, Suite 400
        Albuquerque, NM  87102
        (505) 243-1443
        mlowry@rothsteinlaw.com

        /s/ Theresa M. Duncan
        Theresa M. Duncan
        Duncan Earnest LLC
        515 Granite NW
        Albuquerque, NM 87102
        505-842-5196
        teri@duncanearnest.com

        *Attorneys for Anthony Ray Baca*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 28th day of February 2018, I filed the foregoing pleading electronically through the CM/ECF system, which caused counsel for Plaintiff and Defendants to be served by electronic means, as more fully reflected on the Notice of Electronic Filing.

/s/ Marc Lowry
Marc Lowry