IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | CRIMINAL NO. 15-4268 JB |
| | ) | |
| vs. | ) | |
| | ) | |
| **ANGEL DELEON, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT DANIEL SANCHEZ'S MOTION TO DISMISS CASE FOR GOVERNMENT'S OUTRAGEOUS MISCONDUCT AND IRREPARABLE VIOLATION OF BRADY V. MARYLAND, DEFENDANT CARLOS HERRERA'S MOTION TO DISMISS, OR IN THE ALTERNATIVE, FOR MISTR[IA]L BASED ON REPEATED BRADY AND GIGLIO VIOLATIONS, AND TO DEFENDANT PEREZ'S MOTION TO DISMISS**

The Defendants move this Court to dismiss the case, because they contend that the United States violated its obligations under *Brady v. Maryland*, 373 U.S. 83 (1967), and *Giglio v. United States*, 405 U.S. 150 (1972). But the United States did not violate *Brady*, because the information disclosed is cumulative, is not exculpatory, and is not material. Moreover, even if there was a *Brady* violation, which there was not, the Defendants are not entitled to a remedy, because they cannot articulate any prejudice the delay caused. Moreover, the disclosure of this cumulative and not-exculpatory information during the case, before the Defendants have closed their case-in-chief, and during which time the United States noted it would not oppose the Defendants recalling any witnesses whom they wish and whom the United States would make available, does not prejudice the Defendants. Thus, there hasn't been any *Brady* violation and the Defendants aren't entitled to any remedy.

Moreover, the asserted late disclosure of already-produced information that Defendant Sanchez contends is "the government's outrageous misconduct" does not fit within the Tenth

Circuit's very limited recognition of such a defense. It simply doesn't apply. Defendant Sanchez cannot show that there was any "excessive government involvement in the creation of the crime," or "significant government coercion to induce the crime." *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013) (citation omitted) (Gorsuch, J.). The Court should therefore refuse to provide Defendant Sanchez any relief on that basis, and should refuse to entertain any motion for an evidentiary hearing on such a non-existent claim.

The Court should conclude properly that there was no *Brady* violation and that there was not outrageous government conduct on which the Court properly may grant any relief. Accordingly, the Court should deny and dismiss the motions.

## BACKGROUND

The trial began on January 29, 2018.

Lupe Urquizo testified on Monday, February 6, 2018, and continued to testify Urquizo on Tuesday, February 7, 2018. Even before Urquizo testified, Defendants impeached Urquizo's credibility through David Calbert, by inquiring about a meeting that Urquizo and Calbert had at the FBI office in Albuquerque before Calbert debriefed with the United States. The Defendants asked Calbert whether he gave certain statements "after you'd sat down with Lupe Urquizo and gotten your stories straight right?" Rough Trial Transcript, February 5, 2018 ("Feb. 5 Tr."), at 19:16-17. Calbert admitted that "we talked about it [a little] bit about it." *Id.* at 18-19. *See also id.* at 35:15-18. Indeed, the Defendants impeached Urquizo by going through Urquizo's conversation with Calbert, including eliciting that they discussed the Javier Molina murder, and painting a picture of Urquizo attempting to secure Calbert's cooperation to further Urquizo's own self-interest. *Id.* at 45:4-51:2.

2

Urquizo testified that, when he entered Housing Unit 1A, where the Molina murder occurred, he first talked with Mario Rodriguez and Timothy Martinez at the window between Blue Pod and the U-shaped foyer that connects Blue Pod, Yellow Pod, and Green Pod. *See id.* at 224:5-18. Urquizo testified that he then walked to the inner pod door that separated Yellow and Blue Pod, while a corrections officer was searching Urquizo's future cell, at which time Blue slid a note under the door. *See id.* at 225:4-226:9. Urquizo testified the first note said that "[Rodriguez] was hoping I had the paperwork because he's ready to get [rid of] Javier Molina." *Id.* at 227:21-24. Urquizo testified that, the next day, Rodriguez wrote Urquizo another note, which said that "that's good that you got this paperwork on this fucker. Now we could take care of him. Obviously nobody likes him so we're going to take care of him." *Id.* at 231:20-24. Urquizo testified that afterwards, he put a hit on Defendant Sanchez. Urquizo testified that he and Rodriguez agreed to put a hit on Defendant Sanchez because "all this wouldn't have happened if 'Dan Dan' Sanchez would have did his job and his job was to cover the [camera] and he didn't do his job." *Id.* at 235:3-11.[1]

During Urquizo's direct examination, Urquizo was impeached with his prior convictions and with several criminal acts he committed inside and outside of prison. Urquizo was also

---

[1] Another way to say that Defendant Sanchez should be hit because he didn't do "his job . . . to cover the [camera]," *id.*, is to say that Rodriguez and Urquizo agreed to put a hit on Defendant Sanchez "because he did not participate in the MOLINA homicide or even cover the camera like he was supposed to." Defendant Daniel Sanchez's Motion to Dismiss Case for Government's Outrageous Misconduct and Irreparable Violation of Brady v. Maryland [Doc. 1841] ("Sanchez MTD"), Exhibit A [Doc. 1841-1] ("Urquizo Jan. 22 Notes"), at 4. This information previously was disclosed in the *Jencks* production in early January, where the FBI 302 Report from March 6, 2017 states that "RODRIGUEZ also said, 'Dan screwed up. He was supposed to cover cameras.' . . . . 'Dan was supposed to get Creeper's Shank.'" Exhibit 2, Mar. 6, 2017 FBI 302 ("Mar. 6 302"), at Bates 43641. Moreover, the same Mar. 6 302 states: "SNM called a greenlight on Daniel SANCHEZ after the MOLINA hit because he failed to cover the camera and did not retrieve ARMENTA's shank after the hit." *Id.* Thus, this information previously was disclosed.

impeached on direct with his Plea Agreement, prior statements to corrections officers about "turn[ing] the case upside down and not cooperate," *id.* at 238:5-13, and his payments and other benefits as a government cooperator.

Cross-examination of Urquizo was robust. Here are some examples of the impeachment of Urquizo. Defendant Baca impeached Urquizo's testimony that Defendant Baca called the hit on Julian Romero and wanted Romero killed, by presenting him with SA Acee's 302 report from a March 6, 2017 debrief in which the report said that Urquizo said that Defendant Baca wanted Romero beat up only. *See id.* at 245:2-247:25. Defendant Baca impeached Urquizo with a telephone call with his wife, with a separate telephone call with his sister, and with a phone call with his brother, in which he said that he agreed to cooperate because he was being threatened with the death penalty, and also made statements about promised benefits in his sentence if he pled guilty. *See id.* 252-265; Rough Transcript, February 6, 2018 ("Feb. 6 Tr."), at 11-16. Defendant Baca impeached Urquizo with an inconsistent statement from the March 6, 2017 302 in which the 302 said that Rodriguez held the note up to a glass window on the door, and not that Rodriguez provided a note under the door. *See id.* at 19:15-23:1. Defendant Baca also impeached Urquizo by pointing out that his Plea Agreement provides for concurrent state and federal time, and got Urquizo to agree that he's "hoping" to not serve any additional time other than the time he has left on his state sentence. *See id.* 50:6-15. *See also id.* 103:14-106:8 (Defendant Perez impeaching Urquizo with same). Defendant Perez impeached Urquizo with showing that his statement about Perez's admission to the shanks coming from his walker was inconsistent with several of his other statements to the FBI, in which he didn't mention Defendant Perez. *See id.* at 74:2-25; 89:14-97:18. Defendant Sanchez had a long impeachment with Urquizo, in which he brought out several inconsistent statements that Urquizo made during an interview with

4

Defendant Sanchez's attorney and investigator. *See id.* at 106:16-130:16; 141:9-142:6. (Notably, several of these statements which weren't inconsistent with his direct testimony were impeached later through the testimony of Defendant Sanchez's investigator on February 23, 2018). Defendant Sanchez even brought out that his attorney and investigator returned to meet with Urquizo, during which point he was provided the report of the meeting to correct any misstatements, and during which time he executed a release for his property inventory records. *See id.* at 130:17-134:17.

Mario Rodriguez testified on Tuesday, February 7, 2018. Rodriguez continued to testify on Wednesday, February 8, 2018. Rodriguez was impeached on direct examination with his criminal history, including that he was first imprisoned at age 18, "straight out of the juvenile system." Rough Trial Transcript, Feb. 7, 2018 ("Feb. 7 Tr."), 28:3-7. Rodriguez testified that, when he learned that Urquizo and Mauricio Varela were coming to the Southern New Mexico Correctional Facility, he wrote a letter to Urquizo letting him know who was in the pod, that there was hit on him, asking Urquizo for "syringe," and "giving him the rundown of what was going on." *Id.* at 148:7-16. He provided Urquizo that note under the pod door. *Id.* at 148:16-149:4. (Rodriguez also testified that he introduced Timothy Martinez to Urquizo through the door -- at the same time impeaching Rodriguez, Martinez and Urquizo, because Rodriguez said that Martinez "was the hitter," i.e., the drug dealer, and Rodriguez wanted Urquizo "in on the ride," i.e., to enjoy drugs with them while in the pod. *Id.* at 154:24-155:3.) Rodriguez testified that he wrote Urquizo a second letter, but that this letter asked "[w]hat's up with the paperwork?" *Id.* at 155:21-24. During Rodriguez's direct, the video of the Molina murder was

admitted, Rodriguez narrated the events of that video and, importantly, he testified that he'd previously seen the videos in this case. *See id.* at 207:14-15.[2]

During direct examination of Rodriguez, he was impeached with his Plea Agreement, with his previous crimes, and with the payments and benefits he received as a cooperator.

During direct examination of Rodriguez, he was impeached with, among other things, several inconsistent prior statements, with letters between Jerry Armenta and Jerry Montoya in the state case, with his previous sexual-assault case, and with his inconsistent statements about registration as a sex offender as a result of that case. *See* Rough Trial Transcript, February 8, 2018 ("Feb. 8 Tr."), at 212:14-218:11. Just by way of example, Defendant Perez impeached Rodriguez with his prior drug use, including Suboxone use daily and methamphetamine use on occasion. *See id.* at 10:14-11:21. Defendant Perez also impeached Rodriguez by eliciting that he'd viewed the discovery in the case on his tablet. *See id.* at 14:12-19. Several Defendants impeached Rodriguez with his meeting with Defendant Sanchez's brother, Ronald Sanchez, with eliciting that he may benefit from getting Defendant Sanchez to plead guilty, and with several statements he made about the benefits and niceties of being a government cooperator. *See, e.g.,* 15:24-18:17. Defendant Perez also impeached Rodriguez by showing that he made several statements to the FBI at several different times, including at least two times where he was able to revise the 302 before it was filed, in which he didn't revise a statement about Defendant Perez being scared when he took the walker, which he testified he couldn't remember saying. *See id.*

---

[2] During the hearing on the motions to dismiss on March 1, 2018, Defendant Herrera pointed out that it appeared Rodriguez had discovery from the Molina murder state case. It was a typed page that seemed to be a typed description of the video. Rodriguez was implicated in the state's case against Molina. The times and events related on that paper appear to align exactly with the Molina video, which was admitted without objection. There is nothing inconsistent or notable in that paper. And, indeed, Rodriguez testified that he'd seen the video before.

27:23-33:21. Defendant Perez pointed out that Rodriguez never corrected that statements at any meeting with the FBI. *See id.* Defendant Herrera impeached Rodriguez by eliciting that he intended to kill Mauricio Varela in the Courthouse, and that he said that he intended to kill Defendant Herrera. *See id.* at 53:12-54:15. Defendant Baca pointed out that Rodriguez had "ample opportunity to review everything that was on th[e] tablet." *Id.* at 56:2-57:11. Defendant Baca also impeached Rodriguez by showing to the jury a video of Rodriguez assaulting an inmate for a long period of time by stabbing him with a knife while the inmate was restrained. *See id.* 57:6-76:2. And Mr. Baca elicited that Rodriguez "lied" to the FBI at the debrief in which he told the FBI he wasn't an SNM member. *Id.* at 76:3-7. Defendant Sanchez impeached Rodriguez by eliciting that, aside from the tablet, Rodriguez had the discovery in the State Molina murder case since "shortly after the Molina homicide." *Id.* at 181:18-182:2. Defendant Sanchez also impeached Rodriguez by eliciting that he was housed with Jerry Montoya after the Molina murder, and even that they had a plan to get their stories straight so that Armenta would take the blame for the murder and Rodriguez and Montoya may get off, which included that Rodriguez was aware of a letter that Armenta wrote to Montoya's lawyers to that effect. *See id.* at 186:14-187:1. *See id.* at 187:1-188:25.

Jerry Armenta testified on Thursday, February 8, 2018, continuing through Friday, February 9, 2018, and concluded on Monday, February 12, 2018. Armenta was impeached on direct examination with his Plea Agreement, with his criminal history and previous crimes, with the payments and benefits he received as a cooperator, with his crimes while cooperating as an informant, with tampering with his tablet, and with having sex during a contact visit while cooperating. On cross-examination, Armenta was impeached with several prior inconsistent statements, with past conduct related to an alleged sexual offense against a 14-year-old family

member, with pornography searches on his tablet for "teen" pornography terms, with videos of oral sex during a contact visit, and with the letter that he wrote to Montoya's attorneys under penalty of perjury. *See* Government's Exhibits 756, 757. *See also* Rough Trial Transcript, February 9, 2018 ("Feb. 9 Tr.") at 162:2-164:2; *id.* at 175:2-198:20; Rough Trial Transcript, February 12, 2018 ("Feb. 12 Tr."), at 14:1-20:9.[3] Defendant Sanchez also cross-examined Armenta regarding orders of judicial immunity that were provided to other SNM members based on this letter. Defendant Sanchez also impeached Armenta with a letter written by government cooperators to New Mexico Corrections Department asking for a gathering -- or pizza party -- because of their cooperation. *See id.* at 43:13-52:16; *see* Defendant's Exhibit EJ.

Jerry Montoya testified on Monday, February 12, 2018, and continued to Tuesday, February 13, 2018. On direct examination, Montoya was impeached with his Plea Agreement, with his criminal history and previous crimes, with the payments and benefits he received as a cooperator, with his crimes while cooperating as an informant, including bringing in drugs and a cell phone, and a sexual relationship with a corrections officer, with whom he had sex three times. On cross-examination, Montoya was impeached by Defendant Perez about his plea agreement and the letter that Armenta wrote to Montoya's lawyers as being his "ticket to freedom." *Id.* at 316:11-13. Montoya was also impeached with several prior inconsistent statements, including two calls with his wife in which he said that he may get 0-10 years or even a time-served sentence, with the plan for Armenta to take the blame for the Molina murder, which Armenta testified about, and with his criminal conduct with a 29-year-old corrections officer who has two children. Defendant Baca impeached Montoya with a letter that he wrote to

---

[3] Armenta testified that he constructed the details of this letter "with Mario Rodriguez and Timothy Martinez." *Id.* at 162:9-12.

his attorneys in the state case to tell them he needed to provide them with Armenta's letter in which Armenta takes the blame for the murder, which Armenta and Montoya testified was a plan they created with Martinez and Rodriguez. *See* Rough Trial Transcript, February 13, 2018 ("Feb. 13 Tr."), at 37:4-40:4. Defendant Baca elicited from Montoya that he expected Martinez would testify that Montoya had nothing to do with Molina murder, which he knew was "false" testimony before a court just like the court he was in that day. *Id.*at 40:1-25. Defendant Baca impeached Montoya by eliciting that his lawyers filed letters and pleadings with the Court for which Armenta was granted immunity "based on the false statement that you presented through your attorney." *Id.* at 42:18-43:7. Defendant Baca also impeached Montoya by pointing out that he asked "Armenta to lie" for him. *See id.* at 50:9-12.

Timothy Martinez testified on Tuesday, February 13, 2018. On direct examination, Martinez was impeached with his Plea Agreement, with his criminal history and previous crimes, including extensive drug dealing, with the payments and benefits he received as a cooperator, with his crimes while cooperating as an informant, including bringing in drugs into the facilities and selling them to other inmates, including other government cooperators. On cross-examination, Defendant Martinez was impeached several times. He was impeached by Defendant Baca about all of the crimes he committed since he "got close to the Lord." *Id.* at 210:21-212:3. He was impeached by his prior inconsistent statements to law enforcement after the Molina murder and to the FBI while cooperating in this case. Defendant Baca impeached him by showing that he had all of the discovery on his tablet since "among the earliest of the discovery." *Id.* at 217:4-21. Defendant Baca also impeached Martinez with the statement that he provided to Montoya's lawyer, which he wrote under his "own free will," which was "false." *Id.* at 218:17-220:24. Martinez was impeached by a letter he wrote to get Montoya off of the state

case in the Molina murder, which he admitted "none" of which is "true." *Id.* at 231:1-3; *see id.* at 226:6-227:17; *see also* Defendant's Exhibit FO. Defendant Baca also impeached Martinez with an affidavit that he provided to Montoya's attorneys, which was submitted "under oath," the same oath that Martinez took that day. Feb. 13 Tr. at 249:11-12. *See id.* at 245:5-249:13; Defendant's Exhibit Fp.

Special Agent Bryan Acee testified on Friday, February 23, 2018. At the conclusion of Special Agent ("SA") Acee's direct testimony on February 23, the Defendants decided not to proceed with cross-examination and, instead, to call him as a witness during their case-in-chief. *See* Clerk's Minutes for Trial, February 20, 2018 to February 23, 2018 [Doc. 1828], at 27, 4:38. Defendants examined SA Acee in their case-in-chief on February 26, 2018. At the time of Defendants' examination of SA Acee, Defendants had been provided a document found in Rodriguez's property on February 23, 2018, which was a letter from Rodriguez that made statements about the Molina murder very similar to those of Armenta's letter to Montoya's lawyer: Government's Exhibit 756. During Defendants' examination of SA Acee, Defendants impeached Rodriguez by pointing out that the statements contained within the Rodriguez letter were entirely inconsistent with Rodriguez's testimony about the Molina murder during the trial. Defendants also impeached SA Acee by eliciting from SA Acee that the document was produced to them only on February 25, the evening before SA Acee was testifying. The Defendants additionally impeached several statements of Urquizo's trial testimony by eliciting from SA Acee statements that Urquizo made in past debriefs with the FBI that were inconsistent with Urquizo's prior statements.

On or about February 27, 2018, the Defendants called Special Agent Nancy Stemo to testify. Defendant Perez impeached Rodriguez's trial testimony about whether Defendant Perez

appeared to Rodriguez as scared with Rodriguez took his walker. Defendant Perez elicited from SA Stemo that she remembers that Rodriguez told her that during the interview from which her 302 of the interview was produced. Defendant Perez also impeached Rodriguez through SA Stemo by eliciting that Rodriguez never told her to revise that 302 when he looked over her draft 302 before she serialized it, nor had Rodriguez ever communicated to her at all that Defendant Perez didn't appear scared when Rodriguez took the walker. Defendants also impeached Rodriguez through SA Stemo by asking SA Stemo to read through the Rodriguez letter produced on February 25, and eliciting through SA Stemo line-by-line that the statements in that letter were inconsistent with the statements that Rodriguez provided to her during his FBI interview. Finally, Defendants impeached the United States' investigation, by eliciting from SA Stemo that she found this document when she was asked to transport Rodriguez's property, and she found this document in a box that had been in FBI possession since June of 2017.

On February 27, 2018, the United States produced to Defendants the entirety of the documents that were contained within Rodriguez's personal property from which the Rodriguez letter was obtained. In that production, there were documents taken from Rodriguez's journal in which he wrote about several of the crimes in which he's participated throughout his life, as well as song lyrics, poems, and other writings. Many of the crimes about which he wrote were recitations of crimes to which he also testified in Court. His description of these crimes and his feelings and thoughts during those crimes aligned with his trial testimony, that he was a devoted gang member and criminal, and a devoted SNM soldier. In Rodriguez's property was also an address book that contained contacts for several people. Among the contact information was a list of addresses of persons who appear to be associated with the State of New Mexico's prosecution of the Molina murder, including his co-Defendants Montoya and Armenta, witnesses

about whom he testified in Court, including Jason Wright, as well as criminal defense attorneys, state FPDs, the clerk of the court, and the judge (with his associated office at the Third Judicial District Courthouse).

On February 28, the United States produced to Defendants the FBI agents' notes from interviews with Urquizo, Rodriguez, and Martinez. Included within the production of the notes were notes taken during a January 22, 2018, pre-trial preparation meeting for Urquizo. *See* Urquizo Jan. 22 Notes. The notes from Urquizo's pre-trial preparation are four pages. The notes were taken by Special Agent Joseph Sainato. The corresponding January 22, 2018 FBI 302 for that pre-trial preparation meeting with Urquizo, which SA Stemo authored, is one page, with four paragraphs. *See* Exhibit 1 ("Jan. 22 302"). The Jan. 22 302 relates new statements and information, not previously disclosed to the defense, including: (1) a statement by Defendant Carlos Herrera relayed to Urquizo immediately after the murder; (2) an admission by Defendant Perez that he believed he'd be charged in the murder, because he gave his walker to be made into shanks; (3) that Jonathan Gomez and Urquizo told Conrad Villegas to hit Romero, and that there were others who were supposed to assist; and (4) that Defendant Baca told Gomez to take care of the hit, that Gomez informed Urquizo about the hit, and that Urquizo and Gomez wanted to move up in the organization and tasked Villegas with the hit because he was housed close to Romero and had the opportunity to perform the hit.

## PROCEDURAL HISTORY

On March 1, 2018, Defendant Sanchez filed his Sanchez MTD. He moves the Court to dismiss the case based solely on the Urquizo Jan. 22 Notes. He complains that there was exculpatory information in the Urquizo Jan. 22 Notes that was withheld. But he's mistaken. The information on which he bases his complaints about exculpatory information is all information

that previously was disclosed in the Mar. 6 302, which the United States provided all Defendants, including Sanchez, in early January as part of the *Jencks* disclosure.[4] Granted, Defendant Sanchez is correct that none of the information to which he cites in his Sanchez MTD was disclosed in the FBI 302 based on the January 22, 2018 pre-trial preparation. But Defendant Sanchez fails to acknowledge that this information, which isn't exculpatory, was provided in the Mar. 6 302.

On March 1, 2018, Defendant Herrera filed Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for Mist[ia]l Based on Repeated Brady and Giglio Violations [Doc. 1842] ("Herrera MTD"). Herrera moves to dismiss the case or declare a mistrial because he contends that the information in Rodriguez's property "contains *Giglio* and *Brady* materials." *Id.* ¶ 5. To the extent that the information disclosed from Rodriguez's property contains information that may be *Giglio* or *Brady*-type information, the United States disclosed the information before Defendant Herrera closed his case, and so he still has time to use these materials. Defendant Herrera also contains that notes disclosed on February 28, 2018, that contradict that Herrera ordered the murder and show that Martinez "under another impression that has nothing whatsoever to do with Carlos Herrera." Herrera MTD ¶ 12. But Defendant's Herrera's are mistaken. The notes of SA Acee state that Martinez doesn't know "*how*" Herrera was involved. They do not state that Martinez doesn't know that Herrera was involved. The United States does not contend, and there is no evidence, that Herrera talked to Martinez at all

---

[4] The Jencks Act doesn't require disclosure of Jencks information until after the witness testifies at trial. The United States provided this material weeks before trial even began. So Defendant Sanchez's complaints about late disclosure of this information are without a sound basis in the facts or the law. The United States provided the Defendants the same information weeks before it was required, just not in the same form. Notably, to the extent that these notes may be used for impeachment, they'd be impeachment materials for Agent Sainato, who wrote the notes, whom did not and will not testify at this trial.

about ordering the Molina murder. Rather, Herrera ordered the murder from Yellow Pod, and that order was communicated to Rodriguez and Sanchez in Blue Pod, who then directed Martinez to participate in the murder. Defendant Herrera contends that "[t]his is not the first violation of the Court's order to disclose *Brady* and *Giglio* materials," but does not cite any support for that accusation.

On March 1, 2018, Defendant Perez filed Defendant Rudy Perez's Motion to Dismiss [Doc. 1844] ("Perez MTD"). Defendant Perez bases his motion to dismiss the case on the documents in Rodriguez's property and on law enforcement notes. *See* Perez MTD ¶ 10. He contends that the documents are "material, exculpatory, and contain valuable impeachment material." *Id*. However, he does not to which documents he contends are material or exculpatory. And Defendant Perez (along with all other Defendants) declined the United States' offer to make any witnesses available for the Defendants to call and re-examine on March 2, 2018 and throughout this trial.

Because these motions fail to find support in the facts or in the law, the Court should deny and dismiss these motions.

<u>**RELEVANT LAW**</u>

## A. RELEVANT LAW REGARDING BRADY VIOLATIONS

A *Brady* claim consists of three elements, which the defendant must prove by a preponderance of the evidence: (1) the government suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material. *United States v. Ford*, 550 F.3d 975, 981 (10th Cir. 2008). Evidence is material if, "'in the context of the entire record,'" there is a reasonable probability that the result of the proceeding would have been different had the

evidence been disclosed. *Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (quoting *United States v. Agurs*, 427 U.S. 97, 112 (1976)); *see also Smith v. Cain*, 132 S.Ct. 627, 630 (2012).

The belated disclosure of impeachment information favorable to the accused violates due process only if an earlier disclosure would have created a reasonable doubt of guilt. *See United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009). The Tenth Circuit held that, when the Court concludes that an earlier disclosure would have created a reasonable doubt of guilt, the Court has discretion what remedy to apply:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial. The choice of remedy is in the sound discretion of the district court. Fed.R.Crim.P. 16(d)(2) authorizes the district court in cases of non-compliance with discovery obligations to "permit the discovery or inspection," "grant a continuance," "prohibit the party from introducing the evidence not disclosed," or "enter any other order that is just under the circumstances."

*Id.* at 1054-55 (citations omitted).

In *Burke*, the Tenth Circuit recognized that, while some older Tenth Circuit decisions foreclosed remedies for *Brady* productions during trial, it's not accurate to say that there's a bright line rule that belated disclosures of *Brady* materials during trial precludes any remedy. But the Tenth Circuit held that, "the untimely disclosure of Brady material . . . may violate due process if the defendant can show he was prejudiced by the delay." *Id.* at 1055-56. Not every delay in disclosure of *Brady* material is necessarily prejudicial to the defense. *Id*. at 1056. To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial. *Id.*

Importantly, it is irrelevant for Brady purposes whether the nondisclosure was the result of negligence or design. *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 823 (10th Cir.

1995). "The test [for materiality] generally doesn't fluctuate with the government's culpability." *United States v. Reese*, 745 F.3d 1075, 1084 (10th Cir. 2014). "'The good faith or bad faith of the prosecutor has no bearing on the due process inquiry required by *Brady*.'" *Id.* (quoting *United States v. Buchanan*, 891 F.2d 1436, 1442 (10th Cir. 1989)).

## B.  RELEVANT LAW REGARDING OUTRAGEOUS GOVERNMENT CONDUCT

"As articulated by this circuit, a defendant asserting the outrageous government conduct defense bears the burden of proving either '(1) excessive government involvement in the creation of the crime, or (2) significant government coercion to induce the crime.'" *United States v. Dyke*, 718 F.3d 1282, 1288 (10th Cir. 2013) (citation omitted) (Gorsuch, J.) (quoting *United States v. Pedraza*, 27 F.3d 1515, 1521 (10th Cir. 1994)). The Tenth Circuit noted in *Dyke* that, finding criticisms of the outrageous government conduct defense "persuasive, two circuits have disavowed the defense altogether." *Id.* at 1286 (citing *United States v. Tucker*, 28 F.3d 1420, 1426-27 (6th Cir. 1994); *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995)). The Tenth Circuit didn't go so far as to disavow the outrageous government conduct defense altogether, but instead put itself in the "never say never camp--or at least the don't-say-never-if-you-don't-have-to camp," recognizing that it has "so far declined to inter it formally," and has "yet to find a single case where the defense applies." *Id.* at 1287. Given this, it's no wonder that the Honorable William P. Johnson concluded that "the burden of establishing outrageous government conduct is exceedingly high. *United States v. Brown*, No. 16 CR 3212 WPJ, 2017 WL 4271319, at *4 (D.N.M. Jan. 31, 2017) (Johnson, J.).

## ANALYSIS

The Court should deny the motions to dismiss in full. With regard to the alleged *Brady* violations, the Court must view the information on which these allegations are based "'in the

context of the entire record.'" *Turner*, 137 S. Ct. at 1893. The record establishes that the cross-examination and impeachment of Rodriguez was robust. And much of the information which may be used for impeachment based on the Rodriguez property information is cumulative. Rodriguez admits to crimes, but he's been impeached several times over with his criminal conduct and the vicious nature and repetition of his criminal conduct. With regard to the letter, the letter was never sent, and Rodriguez was already impeached with prior inconsistent statements, including with his knowledge of Martinez's, Montoya's, and Armenta's conspiring together to escape culpability for the Molina murder in the state case. Moreover, the Defendants already used the letter for impeachment of Rodriguez in this trial. Twice. With regard to the alleged *Brady* violations based on the FBI agents' notes, there is no *Brady* violation. The information in the Urquizo Jan. 22 Notes all previously was disclosed in early January in the Mar. 6 302. And Herrera's contention that Martinez's statement that he didn't know how Herrera was involved in the murder is not exculpatory -- it simply shows that he didn't know how Herrera was involved, which corresponds with the evidence: that he never discussed the murder with Herrera.

With regard to Defendant Sanchez's outrageous government conduct defense, to the extent that the Tenth Circuit recognizes this limited defense, it doesn't apply at all to the facts here.

## A. THERE WAS NO BRADY VIOLATION, BECAUSE THE INFORMATION IS CUMULATIVE, NOT EXULPATORY, AND PREVIOUSLY WAS DISCLOSED.

### 1. There is no *Brady* violation, because Defendant Sanchez possessed all of the information on which his Sanchez MTD is based weeks before trial, as it is contained in the original and principal debrief of Urquizo in the Mar. 6 302.

Defendant Sanchez contends that there was a *Brady* violation in not disclosing the Urquizo Jan. 22 Notes based on three statements. First, that "Mario Rodriguez passed Urquizo a

note under the door, that stated his desire to have Timothy Martinez, Jerry Armenta and Jerry Montoya do the hit." Sanchez MTD at 2. The Urquizo Jan. 22 Notes don't say that. They say that the note "stated *the* desire to have Timothy MARTINEZ, Jerry MONTOYA and Jerry ARMENTA do the hit on MOLINA." Urquizo Jan. 22 Notes at 3 (emphasis added). This aligns with Urquizo's Mar. 6 302 that says: "RODRIGUEZ then wrote URQUIZO a letter and sent it to him under the door. RODRIGUEZ said that he and SANCHEZ were gonna have the pod move on MOLINA." Mar. 6 302, at 3, Bates 43640. Certainly, if Defendant Sanchez cross-examined Urquizo about what it meant that the letter "stated *the* desire" to have Martinez, Montoya and Armenta do the hit on Molina, either Urquizo would've said that the letter said Rodriguez and Sanchez were going to have Martinez, Montoya and Armenta do the hit, or it would've been elicited from Urquizo on re-direct. Because that's what Urquizo's has said all along. Thus, that the Urquizo 302 Notes don't fully explain what "the" means isn't exculpatory, and it certainly isn't "material" under *Brady*.

Second, Sanchez claims that the notes are exculpatory because "Rodriguez said that Montoya, Armenta and Martinez were going to be tasked with the hit." Sanchez MTD at 3. Again, the Urquizo Jan. 22 Notes don't say that. They say the note stated the desire that they'd be tasked with the hit. Moreover, the same analysis above applies; Urquizo would've stated on cross-examination or re-direct that the letter said Rodriguez and Sanchez were going to task Montoya, Armenta and Martinez with the hit. That's been the theory all along, and it's the same theory that was provided in the Mar. 6 302. Moreover, on cross-examination of Rodriguez, Rodriguez was confronted with his trial testimony that Defendant Sanchez wanted Montoya, Armenta and Martinez to do the hit. On cross-examination, Rodriguez was asked whether, since he was a 100% devoted SNM soldier, he wanted the murder to happen and wanted Montoya,

Armenta and Martinez to kill Molina. He said yes; that's the mindset he was in as a devoted SNM member. So to whatever use Defendant Sanchez claims he would put this statement in the Urquizo Jan. 22 Notes, he's already put it to that use. He cannot show that any "delay should be regarded as materially prejudicial." *See Burke*, 571 F.3d at 1056.

Third, Defendant Sanchez says that the government's case that he participated in the murder by approving the murder and assigning the others' roles is inconsistent with the statement in the Urquizo Jan. 22 Notes which he contends say that, "[a]fter the murder, Urquizo, Rodriguez, Calburt, Robert Martinez, and Roy Martinez talked about hitting Daniel Sanchez because he did not participate in the homicide or even cover the camera like he was supposed to." Sanchez MTD at 3 (emphasis omitted). Again, this same information was previously disclosed in the Mar. 6 302. The Mar. 6 302 states that "RODRIGUEZ also said, 'Dan screwed up. He was supposed to cover cameras.' . . . . 'Dan was supposed to get Creeper's Shank.'" *Id.*, at 4, at Bates 43641. Moreover, the same Mar. 6 302 states: "SNM called a greenlight on Daniel SANCHEZ after the MOLINA hit because he failed to cover the camera and did not retrieve ARMENTA's shank after the hit." *Id.* The report states that "Leadership within the SNM discussed hitting Ronald SANCHEZ, since they couldn't get to Dan Dan." *Id.* Thus, this information previously was disclosed. Defendant Sanchez cannot show, therefore, that that any "delay should be regarded as materially prejudicial," because there was no delay in providing him with this information.[5] *See Burke*, 571 F.3d at 1056.

---

[5] The Defendants also have the location histories for each of Urquizo, Rodriguez, Calbert, Robert Martinez and Roy Martinez, which show that they were together when Defendant Sanchez was out of state. They also have numerous reports, both 302s and 1023s, that reflect that Calbert and Urquizo are friends, that Calbert, Urquizo, Rodriguez and Robert Martinez and Roy Martinez are SNM members and even leaders.

Thus, there is no *Brady* violation where Defendant Sanchez contends there is one. *Brady* does not depend on the form or means of the information provided; it depends on disclosure of the information. The obligation is to provide the information, not to provide the information in duplicative reports and notes.

Thus, to the extent that Defendant Sanchez contends that "the information contained in the suppressed notes of the January 22, 2018 Urquizo interview would have informed the cross-examination strategy of each and every government cooperating witness that participated in the Molina homicide," or that it "also would have also [sic] informed coordination of defense strategy between all of the four trial defendants and perhaps averted the pursuit of conflicting defenses that has developed at this trial," Defendant Sanchez already had that information in the Mar. 6 302, which he does not complain about. Defendant Sanchez had this information. And he had this information in the Jencks disclosure which the United States disclosed before the statutory requirement to disclose it after the witness testifies. He therefore cannot meet the Tenth Circuit's prejudice requirement for any level of a remedy, let alone dismissal.[6]

    **2.  Neither Defendant Herrera nor Defendant Perez can establish a *Brady* violation, because the information is not exculpatory, and because the information is cumulative to that which has been used at trial; therefore, they cannot meet their burden to show any prejudice.**

Defendants Herrera and Sanchez both base their motions to dismiss on the disclosure of the documents in Rodriguez's property. First of all, the most probative evidence for the Defendants was a letter from Rodriguez in which he provided statements about the Molina murder "of my own free will" that were inconsistent with his in-court testimony. But that letter

---

[6] Dismissal, it's worth pointing out, is not a proper remedy even if there had been some *Brady* violation. *See United States v. Davis*, 578 F.2d 277, 280 (10th Cir. 1978) ("[A] violation of due process under *Brady* does not entitle a defendant to acquittal . . . .").

has already been used by the defense. It was used twice. The Defendants cross-examined SA Acee about the document, entered it into evidence, and walked through the letter line-by-line in front of the jury. While they did that, they elicited from SA Acee line-by-line that the testimony in the letter was different than Rodriguez's trial testimony. They did the exact same cross-examination a second time with SA Stemo, changing only that the statements in the letter were different from what Rodriguez told SA Stemo -- as she was excluded from the trial under the rule of exclusion of witnesses. So the Defendants used this letter. And they used it probably more effectively, because whereas Rodriguez could've explained both on cross and on re-direct why he gave those differing statements, neither SA Stemo nor SA Acee could provide that rebuttal. Thus, Defendants cannot show that they were prejudiced by the delayed disclosure of this letter.

And it's not as if Rodriguez didn't get impeached. He was impeached several times, on several grounds, by each Defendant. Rodriguez was also impeached about the plan to provide the story he gave in the letter when he was asked about Martinez's, Montoya's, and Armenta's plan to create a version of the Molina murder in which only Armenta would take the fall. That plan also was brought out through each of Martinez, Montoya, and Armenta, all of whom included Rodriguez as in on the plan.

For this reason as well, the letter in Rodriguez's property from Martinez's wife regarding that Martinez's, Armenta's, and Montoya's stories aren't aligning is cumulative to the information already admitted as evidence in this trial. *See* Herrera MTD ¶ 8. There is no doubt that there was a plan to tell a false story about the Molina murder in the state case. And since that has been established through Rodriguez, Martinez, Armenta, Montoya, and SA Acee, it's not lost on the jury.

Similarly, the information found in Rodriguez's address book in which he had the addresses for those involved in his state case is not exculpatory or material. *See* Herrera MTD ¶ 10. It's been established many times throughout this case that Rodriguez was a defendant in the state case, and so he had access to all of this information in connection with that case. Defendants may get more use out of that address book and the information therein by cross-examining any of the three FBI agents who the Defendants requested to be available for trial, and who the United States is making available. Again, therefore, Defendants cannot establish prejudice.

With regard to the letters from Gerald Archuleta, Archuleta testified that he kept in contact with SNM members while he was out of state in Tennessee. *See* Herrera MTD ¶ 9. And indeed, he was impeached when he said that he did so to keep up appearances. He was cross-examined and impeached when he admitted that he was being furnished drugs from an SNM member during that time and that Urquizo called him to report on the Julian Romero assault. So this information, as well, is cumulative and, therefore, not material.

Defendant Perez's Perez MTD does not add to that information that is contained within Herrera's MTD. And for that reason, Defendant Perez also cannot establish the prejudice required for any *Brady* violation sanction. *See Burke*, 571 F.3d at 1056. The only addition that Perez has is that, "[g]iven the contents of these documents, Counsel for Mr. Perez would have changed trial strategy, including the cross examination of multiple cooperating witnesses." Perez MTD ¶ 11. But Defendant Perez does not explain how his trial strategy would have changed. And it would not have. Defendant Perez may have had a few more documents with which to impeach Rodriguez, but it would not have added to the trial. Rodriguez was impeached extensively, especially by Defendant Perez throughout the trial. At every opportunity, Defendant

Perez put Rodriguez's arrest picture in front of the jury and let it hang there long after talking about it. Defendant Perez, and the other Defendants, may contend that Rodriguez's "hundreds of handwritten pages which detail assaults, murders and his role within the SNM" may have added to the cross-examination, Herrera MTD ¶ 10,[7] but that contention does not withstand scrutiny. Rodriguez's writings are actually mitigating when compared with the questions elicited about his crimes and the video of his Esparza assault that Defendant Baca played for the jury -- two times from different cameras. Rodriguez's writings explain how he came to the mindset in which he committed these assaults, and discussed remorse for the lifestyle that brought him to that mindset. Those are not writings that would've helped Defendant Perez's defense that Rodriguez is a dangerous, perhaps psychopathic or sociopathic, criminal.

Perhaps most telling that the documents in Rodriguez's property would not have changed Defendant Perez's "trial strategy, including the cross examination of multiple cooperating witnesses," Perez MTD ¶ 11, is that the United States offered to make all cooperators available for the Defendants to be recalled to this trial when these motions were filed, but each Defendant, including Defendant Perez, put on the record that they didn't want to call any of the cooperating witnesses back.

The cross-examination of Rodriguez, and the cross-examination of each cooperator, was robust. Each cooperating witness was impeached substantially, several times. These documents in Rodriguez's property would not have added anything to those examinations, and, if they were used at all, would not have made any material difference with any witness. Under these circumstances, and given that neither Defendant Herrera nor Defendant Perez, nor any other

---

[7] The United States read through the 900+ pages of documents in the Rodriguez file, and the writings about his life, including his assaults, were contained in a composition notebook that spanned dozens of pages, but not hundreds.

Defendant can "articulate to the district court the reasons why the delay should be regarded as materially prejudicial," the Court should deny and dismiss these motions to dismiss. *Burke*, 571 F.3d at 1056.

Finally, Defendant Herrera contends that the United States committed a *Giglio* violation by not turning over SA Acee's notes from Martinez's December 2016 interview in which the notes said that Martinez did not know "how" Herrera was involved in the Molina murder. *See* Herrera MTD ¶ 12. That's simply not the case. There's no contention by the United States, and there's been no evidence, that Martinez knew or should have known how Herrera was involved in the Molina murder. The evidence shows that Herrera agreed to the murder as the Yellow Pod leader and aided and abetted the murder by passing the paperwork from Yellow Pod to Blue Pod, where Rodriguez and Sanchez signed off on the murder and assigned the roles of the other cooperators. There's been no evidence, and the United States doesn't contend, that Martinez knew at the time of Herrera's involvement at all. Now, granted, this would be a different analysis if the notes said that "Herrera was not involved," or even if they said that Martinez "does not know *that* Herrera was involved" in the Molina murder. But the notes don't say that. The notes say only that Martinez didn't know *how* Herrera was involved at the time of the murder, which squares with the 302s on Martinez, squares with the evidence, and squares with the United States' theory and presentation of the case.

Accordingly, because the Defendants cannot show that the United States failed to disclose any exculpatory information, the Defendants cannot meet there burden to show that there's been any *Brady* violation. Moreover, because Defendants cannot "articulate to the district court the reasons why the delay should be regarded as materially prejudicial," even if there were

some *Brady* violation, which there isn't, the Court should deny and dismiss these motions to dismiss. *Burke*, 571 F.3d at 1056.

## B. DEFENDANT SANCHEZ CANNOT ESTABLISH THE DEFENSE OF OUTRAGEOUS GOVERNMENT CONDUCT

Defendant Sanchez bases his Sanchez MTD on information all of which previously was disclosed, and none of which is exculpatory. The Urquizo Jan. 22 Notes do not provide any information that wasn't already contained in a 302 for Urquizo's interviews. The Urquizo Jan. 22 Notes should have been reduced to a formal 302. They were not. Agent Sainato explained at the March 1, 2018 hearing that he was out of town at SWAT training after the interview, and didn't write a formal 302 from the notes. A 302 was written for the January 22 pre-trial preparation meeting with Urquizo, documenting the additional statements and information Urquizo provided at that meeting. *See* Jan. 22 302. The government's conduct wasn't outrageous.

Whereas the note Rodriguez provided to Urquizo "stated *the* desire to have Timothy MARTINEZ, Jerry MONTOYA and Jerry ARMENTA do the hit on MOLINA," Urquizo Jan. 22 Notes at 3 (emphasis added), importantly, the Urquizo Jan. 22 Notes do not say that the note stated that it was *his* (i.e., Rodriguez's) desire to have Martinez, Montoya, and Armenta do the hit. Similarly, whereas the Urquizo Jan. 22 Notes state that Rodriguez, Urquizo and others put a hit on Sanchez because he didn't participate in the murder and cover the cameras, the principal debrief of Urquizo in the Mar. 6 302 which was provided to defendants early made clear that Defendant Sanchez didn't participate properly in the actual murder, because he "'screwed up. He was supposed to cover the cameras,'" and "'was supposed to get Creeper's shank." Mar. 6 302, at 4, Bates 43621.

Thus, even if there was some type of remedy for outrageous government conduct related to production of these notes, the United States' conduct doesn't rise to the level of "shocking,

outrageous, and clearly intolerable." *See, e.g., United States v. Mosley*, 965 F.2d 906, 910 (10th Cir. 1992) (citing *United States v. Russell*, 411 U.S. 423, 432 (1973) (conduct must violate " 'fundamental fairness' " or " 'shock[ ] the universal sense of justice,' "); *United States v. Nichols*, 877 F.2d 825, 827 (10th Cir.1989) (conduct must be "shocking and outrageous and reach [ ] an 'intolerable level' "); *United States v. Ryan,* 548 F.2d 782, 789 (9th Cir.) (conduct must be "so grossly shocking and so outrageous as to violate the universal sense of justice")).

But more importantly, to the extent that the Tenth Circuit recognizes an outrageous government conduct defense, it doesn't apply here to alleged withholding of agents' notes. "As articulated by this circuit, a defendant asserting the outrageous government conduct defense bears the burden of proving either '(1) excessive government involvement in the creation of the crime, or (2) significant government coercion to induce the crime.'" *Dyke*, 718 F.3d at 1288. Neither of those two possible cases have anything to do with the conduct that Defendant Sanchez alleges here. The Court should therefore deny and dismiss the Sanchez MTD.

## CONCLUSION

For these reasons, the United States asks the Court to deny the Sanchez MTD, the Herrera MTD, and the Perez MTD.

Respectfully Submitted,

JAMES D. TIERNEY
First Assistant United States Attorney

**Electronically filed on 3/2/2018**
MARIA Y. ARMIJO
RANDY M. CASTELLANO
MATTHEW M. BECK
Assistant United States Attorneys
200 N. Church Street
Las Cruces, NM 88001
(575) 522-2304 – Tel.

I HEREBY CERTIFY that I electronically
filed the foregoing with the Clerk of the
Court using the CM/ECF system which
will send electronic notification to defense
counsel of record on this date.

/s/ _____
MATTHEW M. BECK
Assistant United States Attorney