2      A.    May I review that sir?

3      Q.    Absolutely.  May I approach, Your Honor?

4            THE COURT:  You may.

5      A.    Thank you.

6      Q.    And because you were concerned about that,
7  you instructed Mr. Montoya to tell him, right, what
8  the gun was for?

9      A.    In no uncertain terms, yes.

10     Q.    Now, I want to move away from the Marcantel
11 allegations to the Julian Romero.  We're going to go
12 backwards in time?

13     A.    Okay.

14     Q.    Now, you recall taking Mr. Romero to the
15 Old Main to take a tour?

16     A.    A tour, yes, I asked him to do a record not
17 guilty which he described his history in the SNM and
18 how the riot started.  He turned 21 the first night
19 of the riot and I asked him to walk me around and
20 explain that and the history of the SNM.

21     Q.    And that was last March 31, 2017?

22     A.    That sounds right.

23     Q.    And even though you spent the better part
24 of probably half a day with him, you didn't produce a
25 302 on that?

1      A.   I don't think that's correct.

2      Q.   Okay and I could be wrong?

3      A.   I think I did.

4      Q.   But during that trip, you told Mr. Romero

5   that Mr. Baca didn't want him killed?

6      A.   Yes, that's my understanding.

7      Q.   Right.  And you told Mr. Baca that Lupe

8   Urquizo wanted Julian Romero killed?

9      A.   I haven't talked to Mr. Baca in a while.

10     Q.   You told Mr. Romero pardon me?

11     A.   Mr. Romero, yes.

12     Q.   So on that trip, on the way home you told

13  Mr. Romero Lupe Urquizo was the one that wanted you

14  dead?

15     A.   And some other guys, but that Baca just

16  wanted him beat up, you're right.

17     Q.   And you said and Mario Rodriguez wanted him

18  dead?

19     A.   I don't know if I said that, but because

20  Mario left.  Mario was down there, but I think he got

21  transferred before the actual assault.

22     Q.   We can play the recording if you like.

Page 160

```
                      4268DAY20022618A.txt
23      A.   I don't think you've ever lied to me, Mr.
24   Lowry.  If you're representing that that's what I
25   said --
```
                                                                  146

```
 1       Q.   I try not to.
 2       A.   I believe you.
 3            THE COURT:  Mr. Lowry, can we talk to the
 4   jurors and see when they want to take their lunch
 5   break.  Do y'all want to do like we did on Friday and
 6   take about a 15 minute break and go another hour and
 7   a half and take a late lunch, everybody in agreement
 8   with that.  Looks like everybody hands going up does.
 9   that work not counsel and the parties.
10            All right.  Why don't we take a 15 minute
11   break.  And the jury did come in a little bit later,
12   so we'll do that.  All rise (.(The jury left the
13   courtroom.)
14            THE COURT:  All right we'll be in recess
15   for about 15 minutes.
16            (The Court stood in recess.)
17            THE COURT:  All right.  Let's go on the
18   record.  While Ms. Standridge is bringing the jury
19   in, let me continue to talk a little bit about this
20   count 8.  I know it's Count 3, I think, in our
```
                            Page 161

4268DAY20022618A.txt

21  current drafting.  But on Friday the Court orally
22  denied Mr. Baca's motion for a judgment of acquittal
23  under Rule 29 of the Federal Rules of Criminal
24  Procedure as to Count 8, or Count 3 now, in our
25  current instructions.  It's the conspiracy to commit

                                                    147

 1  assault resulting in serious bodily injury.  But I
 2  understood Mr. Baca to be arguing that the
 3  uncontroverted evidence indicated that Mr. Romero did
 4  not actually suffer a serious bodily injury.  And
 5  what the United States replied is that the Romero
 6  conspirators intended to inflict serious bodily
 7  injury to Mr. Romero, or perhaps to kill him.  And
 8  then the Court denied Mr. Baca's motion, reasoning
 9  that the intent of the conspirators and not the
10  result of actual assault provides the relevant
11  inquiry.
12          Now, here is my concern is that committing
13  and conspiring to commit assault with intent to
14  inflict serious bodily injury, I'm not sure it
15  violates 28 USC Section 1959 of the VICAR statute.
16  What VICAR prescribes instead, is racketeering
17  motivated -- and I'm going to quote the language of

```
                        4268DAY20022618A.txt
18   the statute -- assaults -- it says assault, but a
19   plural on it -- assaults -- and here's the key
20   language -- resulting in -- that's the language I
21   think we need focus on -- resulting in serious bodily
22   injury.  But also violates state or federal law.  So
23   that's right out of the Section 1959(a).
24             Accordingly, if my concern is that the
25   Court concludes that the evidence presented in the
                                                         148


 1   United States case-in-chief would not permit a
 2   probably juror to infer that Julian Romero suffered
 3   serious bodily injury, then the Court needs to enter
 4   a judgment of acquittal on Count 8, which is Count 3
 5   in our instructions.
 6             Mr. Baca is charged with conspiring to
 7   commit assault resulting in serious bodily injury in
 8   violation of New Mexico law.  But the details of New
 9   Mexico's assault statute, I don't think determine the
10   elements of that offense.  This is kind of an
11   interesting area, establishing that Mr. Baca violated
12   VICAR by conspiring to commit assault resulting in
13   serious bodily injury in violation of New Mexico law
14   requires the United States to prove that, one, Mr.
15   Baca's conduct constitutes generic conspiracy to
                            Page 163
```

4268DAY20022618A.txt

16   commit assault resulting in serious bodily injury,

17   and two, that Mr. Baca's conduct also violated New

18   Mexico law.

19          So it looks like the jury is ready.  I'll

20   give you some cites maybe before you go to lunch or

21   after you get back from lunch, some cases that I'd

22   like for you to look at and comment on.  But that's

23   the language I'm sort of hanging up on.  It's out of

24   the federal statutes.  So I'll give you some cites so

25   that you can can get a fuller sense of what I'm
                                                          149

1   thinking.  All rise ((The jury entered the

2   courtroom.)

3          THE COURT:  All right.  Mr. Acee, I'll

4   remind you're still under oath.

5          Mr. Lowry, if you wish to continue your

6   direct examination of Mr. Acee, you may do so at this

7   time

8          MR. LOWRY:  Thank you, Your Honor, I do.

9          THE COURT:  Mr. Lowry.

10   BY MR. LOWRY:

11     Q.   Agent Acee, we left off talking about the

12   Julian Romero assault.  And I just wanted to -- we

4268DAY20022618A.txt
13   were talking about your conversation with Mr. Romero
14   your way home from visiting Old Main, and the things
15   you told Mr. Romero.  You told Mr. Romero that it was
16   the younger guys that wanted to kill Mr. Romero.
17        A.   Yes.
18        Q.   And that essentially Mr. Baca intervened
19   and said I don't want him killed he can't be stabbed.
20   If anything happens to him you could beat him up but
21   that's it?
22        A.   That's not exactly what you said.  You said
23   and I'll quote, he didn't want you to get hurt too
24   bad?
25        A.   That sounds more like it, yes.
                                                        150


1         Q.   So essentially Mr. Baca was calling off the
2    dogs so to speak?
3         A.   Calling it down.
4         Q.   Because, again, this generational
5    difference between the thinking, if you will?
6         A.   I don't know what Mr. Baca's thinking was,
7    but that's how it was related to me by at least one
8    of the guys involved.
9         Q.   And that was your understanding?
10        A.   That was my understanding based on my
                      Page 165

4268DAY20022618A.txt

11  conversation with him.

12      Q.  Right.  Now, I'm just more than idly

13  curious, but when Mr. Urquizo was here, he testified

14  that Mr. Baca ordered Mr. Romero to be killed?

15      A.  Did he?

16      Q.  Yes.

17      A.  Okay.  I thought it was someone else that

18  said that.  "Baby G", Jonathan Gomez.

19      Q.  Well, bear with me for a second.  May I

20  approach, Your Honor?

21          THE COURT:  You may.

22      A.  Do you want me to read beyond the first

23  page?

24      Q.  If you care to.  I just want you to be

25  comfortable with the testimony?

                                                    151

1       A.  Okay, sir.

2       Q.  So did I understand his testimony to to

3   Court and jury correctly that when Mr. Urquizo

4   testified he said that he wanted -- that Mr. Baca had

5   ordered Julian Romero to be killed?

6       A.  Yes.

7       Q.  But that's not what you understood?

Page 166

 8      A.   No.  And in that that you just had me

 9  review, it looks like he's saying either misstated it

10  or we miss recorded it -- recorded it in our report.

11      Q.   And that's what I was just getting ready to

12  show you, your report of one of your interviews with

13  him, this would be on March 6, so this would you have

14  gone to visit Mr. Urquizo on the 24, he says I need

15  an attorney, and then that precipitated this initial

16  debrief.

17      A.   That time line sounds correct.

18      Q.   May I approach, Your Honor?

19           THE COURT:  You may.

20      A.   Yes, sir.

21      Q.   And this is where in his trial testimony he

22  said he tried to blame you on, my understanding was

23  he was trying blame you on sloppy report writing if

24  you will?

25      A.   No, that's not what I read.

                                                     152

 1      Q.   Okay what did you read?

 2      A.   That either he made a mistake or we got the

 3  names wrong.

 4      Q.   Right.  And -- but he certainly said in his

 5  trial testimony that Mr. Baca wanted to murder Mr.

Page 167

4268DAY20022618A.txt

```
 6    Romero.
 7         A.   Yes.
 8         Q.   And that's not what he told you on March 6,
 9    2017?
10         A.   No, I don't believe that's what he told me.
11         Q.   In fact, he told you the exact opens told
12    you the story, the same version of events that you
13    told Mr. Romero?
14         A.   Yes.
15         Q.   Was United States going to do anything to
16    correct Mr. Urquizo's testimony that Mr. Baca wanted
17    Mr. Romero dead?
18         A.   I don't know.
19         Q.   Mr. Urquizo, it's fair to say this report
20    also, he makes a comment in your report as you
21    reported it.  I want to move on from the Julian
22    Romero thing and actually this is going to be while
23    we're on Mr. Urquizo I want to clean this up, but Mr.
24    Urquizo had informed you that when he initially got
25    to the Southern facility here in Las Cruces, that he
                                                      153


 1    was communicating with Timothy Martinez and who was
 2    the Mario Rodriguez and they were communicating by
```

Page 168