1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3     UNITED STATES OF AMERICA,

4                    Plaintiff,

5         vs.              NO:  CR-15-4268 JB

6     ANGEL DELEON, et al.,

7                    Defendants.

8

9         Transcript of Motions Hearing before The

10    Honorable James O. Browning, United States District

11    Judge, Las Cruces, Dona Ana County, New Mexico,

12    commencing on March 13, 2018.

13
      For the Plaintiff:  Ms. Maria Armijo, Mr. Randy
14    Castellano, Mr. Matthew Beck

15

16    For the Trial 2 Defendants:  Mr. Brock Benjamin;
      Ms.  Cori Harbour-Valdez; Mr. Patrick Burke; Mr. Jim
17    Castle; Mr. Robert Cooper; Mr. James Lahann; Mr. Joe
      Shattuck; Mr. John Granberg; Mr. Edwardo Solis;
18    Mr. Billy Blackburn; Mr. Donovan Roberts; Ms. Lisa
      Torraco; Ms. Angela Arellanes.
19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1           THE COURT:  All right.  Let's go on the

 2    record.  I think everybody has got an attorney now.

 3    I appreciate you being here on time and ready to go.

 4    I appreciate your assistance.

 5           All right.  Mr. Castle indicated on his

 6    motion to sever that he was going to rest on the

 7    papers, but other people joined that, so I want to

 8    make sure all the defendants have had their day on

 9    the motion to sever.

10           And Mr. Granberg, you spoke to Ms. Bevel

11    this morning, and so if you want to speak on the

12    motion, you're free to do so.

13           MR. GRANBERG:  Thank you, Your Honor.

14           THE COURT:  Mr. Granberg.

15           MR. GRANBERG:  Your Honor, on behalf of

16    Christopher Chavez, we join Mr. Castle's motion for

17    severance, docket number 1743.  And we would just

18    reargue similar grounds that were argued yesterday by

19    Ms. Torraco.

20           We'd argue that prejudice would attach to

21    Mr. Chavez by being tried with seven other

22    co-defendants.  We would argue that the amount of

23    limiting instructions that counsel would have to make

24    during the course of the trial would be numerous,

25    considering the number of co-defendants being tried

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   with him; and furthermore, we'd argue that a

 2   severance -- ideally, we would prefer Mr. Chavez be

 3   tried by himself.  But practically speaking, we would

 4   argue that a severance on Counts 1 and 2 from the

 5   rest of the group would comprise two trial groups of

 6   five and five.  So I know that the Court is

 7   considering --

 8            THE COURT:  That would require me to try

 9   some people twice.

10            MR. GRANBERG:  Yes, Your Honor, it would

11   require just Gallegos and Edward Troup to be tried

12   twice, but I'm sure they don't mind.  But I

13   understand the Court is considering a move to

14   Albuquerque.  So if this severance for Mr. Chavez

15   plays any part in the decision-making process for

16   that move, we'd ask the Court to hold it in abeyance

17   until the Court makes a decision on Albuquerque or

18   Las Cruces.

19            THE COURT:  All right.  Thank you, Mr.

20   Granberg.

21            Any other defendants, whether you join it

22   or not, anybody else want to speak on this issue?

23            MR. BURKE:  Your Honor, we had joined, and

24   we agree with Mr. Castle.

25            THE COURT:  All right.  Thank you, Mr.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

4

 1    Burke.

 2            All right.  Does the Government want to

 3    speak on this issue?  Mr. Beck.

 4            MR. BECK:  Your Honor, I'm fine to join Mr.

 5    Castle in submitting on our response.

 6            THE COURT:  All right.  Well, I certainly

 7    won't preclude anybody from renewing a motion to

 8    sever.  I think the attorneys for the defendants made

 9    motions to sever just about every day of the trial.

10    So you're welcome to renew it.

11            But at the present time, I'm fairly

12    comfortable with the breakdown that we've made.  I'm

13    concerned about the numbers that we have here and the

14    logistics of the trial and where it's going to be,

15    and how you put everybody together, some of the

16    things we talked about yesterday.

17            At least as to how we're going to try the

18    defendants together, I still am comfortable.  So I'll

19    deny the motion without prejudice to renewing it,

20    unless the circumstances change to a considerable

21    degree.  All right.

22            The next motion I guess that we have up is

23    the -- I guess the topic that we have is the one that

24    we started yesterday with the severance, the James

25    motion.  So tell me how y'all would like to proceed.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Let me start with you, Mr. Castellano, if
 2      you want to tell me how the Government plans to
 3      proceed.
 4              MR. CASTELLANO:  Yes, Your Honor.  It
 5      sounds like in spite of the table, defense counsel
 6      wants a James hearing, so we're going to put Agent
 7      Stemo on the stand and go through these one statement
 8      at time.  So if the Court has the table in front of
 9      the Court, we'll put her on the stand and take the
10      statements.
11              THE COURT:  All right.  Is that how the
12      defendants want to proceed?  Is that the way y'all
13      were hoping it would proceed?
14              MR. BENJAMIN:  That was my understanding
15      how the agreement was reached in November, Your
16      Honor.
17              THE COURT:  That's what you want to occur
18      now?
19              MR. BENJAMIN:  Yes, Your Honor.
20              THE COURT:  Everybody else in agreement?
21              All right.  Ms. Stemo, if you'll return to
22      the witness stand.  And I'll remind you that you're
23      still under oath.
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      NANCY STEMO,

 2        after having been previously duly sworn under

 3        oath, was questioned, and continued testifying

 4        as follows:

 5                      EXAMINATION

 6   BY MR. CASTELLANO:

 7        Q.   Good morning, Agent Stemo.

 8        A.   Good morning.

 9        Q.   Do you have the table in front of you

10   that's prepared with the James statements?

11        A.   I do.

12             THE COURT:  Can I ask the defendants, on

13   the document, I now have had a chance to read the

14   document that was filed yesterday, but this is Joe

15   Gallegos' response to the United States' notice of

16   proposed James statements.  Does this constitute a

17   document that reflects all the defendants' thinking,

18   or is this just your thinking?  Or what is the import

19   of this?  How far does it --

20             MR. BENJAMIN:  That's mine, Your Honor.

21   And I can't speak for everybody, but counting the

22   documents that were filed on Sunday, I believe most

23   teams filed one.  I know, for instance -- I know

24   Mr. Chavez filed one.  I know Andrew Gallegos filed

25   one.  I know Billy Garcia filed one, Your Honor, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    I've got a hand from Edward Troup.  I don't remember

2    seeing one, but I know that they filed one, as well,

3    is what I'm being told, Your Honor.  So I believe

4    just about everybody filed one.

5          THE COURT:  Well, I hope I have

6    everybody's.  I'll do an inventory here.  I've got

7    everybody's.  Okay.  So I've got yours, Mr. Benjamin.

8          MR. SHATTUCK:  Your Honor, on behalf of Mr.

9    Patterson, we did not file one, but we joined in all

10   the others.

11         THE COURT:  All right.  I've got

12   Mr. Roberts' and Ms. Torraco's which has been joined

13   by Mr. Benjamin.  And all these were filed yesterday?

14   Because I'm looking at -- we had a lot of James

15   briefing back in October.  We're not talking about

16   anything like that; we're talking about responses

17   specifically to the Government's newest document;

18   right?

19         MS. HARBOUR-VALDEZ:  Your Honor, I believe

20   everyone's was filed on Sunday except for Edward

21   Troup.  Ours was filed yesterday.  It's document

22   1920.

23         MR. CASTLE:  Actually, Your Honor, ours was

24   filed on March 9.  We filed two.  One was 1908, which

25   was a generalized brief filed on behalf all
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   defendants, remaining defendants; and then
 2   Mr. Garcia's specific objections are in 1909.  So
 3   that was filed on March 9, Friday.
 4           MS. ARELLANES:  Angelina Arellanes, on
 5   behalf of Shauna Gutierrez.  I filed mine on Sunday.
 6   It's 1914 document number.
 7           THE COURT:  Okay.  Well, I'm not sure that
 8   I have everybody's.  So let me get a pad here and
 9   write down the numbers, and then I'm going to have
10   Ms. Bevel or my law clerk print out the documents.  I
11   got Mr. Andrew Gallegos, then I got Mr. Joe Gallegos.
12   But the other people, other than those two, give me
13   the numbers.
14           MS. HARBOUR-VALDEZ:  Troup is 1920, Your
15   Honor.
16           MS. ARELLANES:  Shauna Gutierrez was filed
17   as 1914.
18           MR. GRANBERG:  Your Honor, Christopher
19   Chavez is 1916.
20           MR. CASTLE:  Mr. Garcia's is 1909 and 1910.
21   Mr. Billy Garcia.  I said 1908 earlier, Judge.  That
22   was wrong.
23           THE COURT:  So you filed two of them?
24           MR. CASTLE:  Right.  One is a general one
25   that's on behalf of all defendants.  We were just the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    filer.  That's 1910.  And then the specific one is
2    1909.
3              THE COURT:  Okay.  Anybody else got the two
4    Gallegoses?  All right.  So Mr. Hammond, Ms. Bevel,
5    if you'll print out 1920, 1914, 1916, 1909, and 1910.
6    Doesn't look like I have those.
7              THE CLERK:  Okay.
8              THE COURT:  All right.  Mr. Castellano.
9    The reason I was doing this, I was looking at Mr.
10   Benjamin's, and he didn't seem to object to the first
11   12.  He picked up with 13, and I didn't realize other
12   people had filed.
13             MR. CASTELLANO:  Right.  And given the
14   various objections, I plan on going through each of
15   the statements.  If defense counsel says they don't
16   have an issue with it, we'll move to the next one.
17   But we'll take them one at a time beginning with
18   Number 1.
19             THE COURT:  Okay.
20                   DIRECT EXAMINATION
21   BY MR. CASTELLANO:
22       Q.   Agent Stemo, looking at Statement Number 1
23   on the table, is that an accurate statement, that
24   Billy Garcia tasked Leonard Lujan with finding people
25   to murder Mr. Garza and Mr. Castillo?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   Yes, it is.
 2             MR. CASTLE:  Objection, Your Honor.  There
 3   is no foundation that this witness would know whether
 4   that's true or not.
 5             THE COURT:  Let's see what she knows.
 6   They've got to put a witness on here that explains --
 7   and if she can't do it, she'll let us know.  But I've
 8   got to let them make their presentation the way
 9   they're doing it.
10   BY MR. CASTELLANO:
11        Q.   Leonard Lujan is listed as the source of
12   that information.  Are you aware of Mr. Lujan making
13   that statement?
14        A.   Yes, I am.
15        Q.   Indicating that Mr. Garcia is the one who
16   ordered the murders?
17        A.   Yes.
18        Q.   And was there an indication by Mr. Lujan
19   that these murders were supposed to happen
20   simultaneously?
21        A.   Yes.
22        Q.   And in terms of the background,
23   approximately how long before the murders happened on
24   March 26, 2001, did Billy Garcia find himself in the
25   same facility with Mr. Lujan to have this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    conversation?

 2         A.   He was there approximately one to two weeks

 3    before the murders happened.

 4         Q.   And so according to Leonard Lujan, was this

 5    a personal interaction between the two?

 6         A.   Yes.

 7         Q.   Looking at Statement Number 2, was there

 8    also an indication by Mr. Lujan that Mr. Garcia told

 9    him that Mr. Castillo and Mr. Garza were to be taken

10    out by strangulation?

11         A.   Yes.

12         Q.   Looking at Statement Number 3, was there an

13    indication by Mr. Lujan that the murders were an

14    order by Billy Garcia?

15         A.   Yes.

16         Q.   Was there also an indication that anyone

17    who didn't follow that order would be killed?

18         A.   Yes, I believe Mr. Garcia instructed Mr.

19    Lujan to select backup hit teams in case the two

20    original hit teams didn't carry out their orders.

21         Q.   So in other words, in order to fulfill the

22    order that people would be killed for not following

23    through, there were supposed to be backup teams to

24    make sure that it happened?

25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Looking at Statement Number 4, there was an

2   indication by Leonard Lujan that Billy Garcia was

3   planning to kill everyone in the unit who had a green

4   light, starting with Mr. Castillo and Mr. Garza?

5      A.   Yes.

6      Q.   Were these all statements given to Mr.

7   Lujan by Mr. Garcia after he arrived at the facility?

8      A.   Correct.

9      Q.   Turning to Statement Number 5, there is an

10  indication on the table that the murders needed to be

11  done because the SNM Gang was losing status with

12  other gangs?

13     A.   Yes.

14     Q.   And along those lines with that statement,

15  was there an indication by Mr. Garcia that the SNM

16  needed to clean its own house?

17     A.   Yes, there was.

18     Q.   Is that the reason why the SNM was killing

19  its own gang members?

20     A.   Yes.

21     Q.   Statement Number 6, there is an indication

22  on the table, the sources being Mr. Lujan and

23  Mr. Eugene Martinez, that Leonard Lujan told them,

24  "I'm telling you right now where it's coming from and

25  everything," referring to Billy Garcia?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   There was an indication both by Mr. Lujan
 3   and Mr. Martinez that he passed that order on to
 4   Eugene Martinez?
 5        A.   There was.
 6        Q.   In Statement Number 7, there is a statement
 7   attributed to Leonard Lujan that Billy Garcia ordered
 8   the murder due to Castillo cooperating with law
 9   enforcement?
10        A.   Yes.
11        Q.   And on each of these statements, are these
12   statements leading up to the murder on March 26 of
13   2001?
14        A.   Yes.
15        Q.   Is there also an indication that Billy
16   Garcia ordered the Garza murder because he'd been a
17   former Los Carnales member?
18        A.   Yes.
19        Q.   And in the context of this case, have you
20   heard the term "jumping fences"?
21        A.   I have.
22        Q.   Would this be consistent with that phrase?
23        A.   Yes.
24        Q.   In Statement Number 9, there is a statement
25   attributed to Billy Garcia to Leonard Lujan
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    indicating, quote, "What the fuck is going on?  I

2    sent word a long time ago to clean house."

3           Was there an indication by Mr. Lujan that

4    Mr. Garcia told him that?

5       A.  Yes.

6       Q.  What was the purpose of Mr. Garcia telling

7    Mr. Lujan that in the context of what Mr. Lujan said?

8           MR. CASTLE:  Objection, speculation.

9           THE COURT:  Well, I'll let y'all

10   cross-examine.  But let's see what the Government --

11   what their theory is.

12      A.  Mr. Garcia had sent word to Mr. Lujan via,

13   I believe it was, Ernest Guerrero that Mr. Lujan was

14   supposed to take the keys at Southern.  That did not

15   get back to Mr. Lujan.  Additionally, it was said

16   that the SNM was supposed to clean the house with the

17   previous message that also did not get to Mr. Lujan;

18   therefore, he didn't take any action.

19   BY MR. CASTELLANO:

20      Q.  And then once Mr. Garcia arrived at the

21   facility, did he then make sure that Mr. Lujan took

22   action?

23      A.  Yes.

24      Q.  Turning to statement 10, the source is

25   attributed to Mr. Leroy Lucero indicating that he

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    received word from Billy Garcia that several hits

2    were supposed to happen.  Garcia told him, meaning

3    Mr. Lucero, he didn't need help because Lucero was

4    getting out?

5              MR. BURKE:  Your Honor, I have -- it's

6    really not an objection, but it's a clarification.  I

7    think Leroy Lucero's lawyer filed a motion to quash,

8    and I think in that motion he said that he's not

9    testifying unless he gets immunity or something like

10   that.  And so I'm wondering if -- since I think the

11   purpose of all this is to clarify what we're really

12   going to have at trial, whether that testimonial

13   issue should be discussed now, whether Leroy Lucero

14   will be --

15             THE COURT:  Well, I don't think it should

16   be discussed now.  I think the Government ought to

17   put out statements, tell us as fully as it wants to

18   what evidence it has to support.  Then I think y'all

19   cross-examine.  But I don't think we're into Bruton

20   issues yet or that.

21             MR. BURKE:  All right.

22             THE COURT:  I think we're trying to figure

23   out what statements are going to come in through the

24   co-conspirator portion that makes these statements

25   nonhearsay.  If the Government is going to try to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   squeeze it in through that, they're going to have to
 2   prove it.  This is their proof.
 3            MR. BURKE:  Thank you, Your Honor.
 4            MR. CASTELLANO:  I agree with the Court,
 5   Your Honor.  At this point the only question is
 6   whether or not these statements are admissible.
 7   Whether they come in at trial is a different story.
 8            THE COURT:  Well, even admissible under one
 9   section of 801.
10            MR. CASTELLANO:  Correct.
11            THE COURT:  It's even more limited than
12   just whether they're admissible.  They may be
13   inadmissible for some other reason.
14            MR. CASTELLANO:  Agreed, Your Honor.
15   BY MR. CASTELLANO:
16       Q.   Okay.  So related to this statement, was
17   there an indication that Leroy Lucero received word
18   from Billy Garcia that several hits were supposed to
19   happen, but that Mr. Lucero didn't need to help
20   because he was getting out?
21       A.   Correct.
22       Q.   Was there an indication by Mr. Lucero that
23   he confirmed this information with Angel Munoz?
24       A.   Yes.  They actually spoke over the phone.
25            MR. CASTELLANO:  Your Honor, I don't
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    remember if I added Angel Munoz to the co-conspirator

 2    yesterday.  If not, I would add his name to this

 3    list.

 4              MR. BLACKBURN:  You did.

 5              MR. CASTELLANO:  Okay.

 6    BY MR. CASTELLANO:

 7         Q.   Turning to statement 11 --

 8              THE COURT:  This is on Castillo?

 9              MR. CASTELLANO:  Yes.  These are the

10    Castillo and Garza murders.

11              THE COURT:  You had him as the first

12    nonindicted co-conspirator.

13              MR. CASTELLANO:  As Angel Munoz?

14              THE COURT:  Yes.

15              MR. CASTELLANO:  Okay.  Thank you.

16    BY MR. CASTELLANO:

17         Q.   Statement 11, there is an indication here

18    in the table that Leroy Lucero confirmed the message

19    that several hits were supposed to happen with Angel

20    Munoz.  Munoz said, "Something has to happen, carnal.

21    Billy is on his way."

22         A.   Yes.

23         Q.   And did you get that information from Leroy

24    Lucero?

25         A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   And did he indicate that Angel Munoz
2  confirmed this information with him?
3     A.   He did.
4     Q.   Do you recall how this information was
5  confirmed?
6     A.   It was over the telephone.
7     Q.   What kind of call was it, as best as you
8  recall?
9     A.   I believe it was a three-way call.
10     Q.   Statement 12 refers to a statement where
11  Leonard Lujan met with Eugene Martinez and tasked him
12  with the murder of Garza by strangulation, and told
13  Martinez to pick people to help?
14     A.   Yes.
15     Q.   Did you have that information, the source,
16  as both Leonard Lujan and Eugene Martinez?
17     A.   Yes, I do.
18     Q.   Was there an indication that Martinez was
19  picked as one of the people because he was in the
20  same pod as Mr. Garza?
21     A.   Yes.
22     Q.   Statement 13 indicates that Leonard Lujan
23  met with Joe Gallegos, Angel DeLeon, and Criminal,
24  also known as Michael Jaramillo, and ordered Castillo
25  murdered by strangulation?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   Was there an indication that Leonard Lujan
 3   said that he, in fact, did these things?
 4        A.   Yes.
 5             MR. BENJAMIN:  Your Honor, and for the
 6   Court's purposes, we filed written objections.  I
 7   don't have any new objections based upon the
 8   testimony that's been proffered for that statement.
 9   If the Court would consider that a running objection?
10             THE COURT:  It's going to consider what?
11             MR. BENJAMIN:  I'm just trying -- for the
12   Court's purposes, Your Honor, that Statement 13 is
13   the first statement that I filed a written objection
14   to.  So at this point in time I would not object, but
15   I would ask that the Court consider my objections.
16             THE COURT:  Y'all don't have to renew your
17   objections.  You're going to get to cross-examine
18   her, and then we're going to have argument.  So if
19   there's problems, you're going to get full
20   opportunity to tell me what's wrong with these
21   statements coming in to the co-conspirator.  I've got
22   to come up with a better word than "exception," but
23   co-conspirator prong.
24             MR. BENJAMIN:  Thank you, Your Honor.
25
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    BY MR. CASTELLANO:

 2         Q.    And Statement Number 13.   Was there an

 3    indication that Joe Gallegos, Angel DeLeon, and

 4    Michael Jaramillo were in the same pod as Mr.

 5    Castillo?

 6         A.    He actually picked them because he was

 7    standing in front of the pod and they were together

 8    and Mr. Lujan knew all three had green lights on

 9    them.

10         Q.    Statement Number 14 indicates that Billy

11    Garcia wanted knowledge of the plan kept to very few

12    individuals?

13         A.    Yes.

14         Q.    What do you remember about that statement?

15         A.    He didn't want a lot of people to know,

16    probably because the more people that know, the more

17    likely that law enforcement will find out.

18              MR. CASTLE:   Your Honor, can we have a

19    clarification?   Is "probably" part of a statement

20    that Lujan made or the agent made?

21              THE COURT:   Well, I'll let you go into that

22    on cross.   I don't think it's probably proper to

23    object at this point.   Let's let them put on their

24    case, and you can go into it on cross.

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   BY MR. CASTELLANO:

 2        Q.   Statement Number 15.  There is an

 3   indication that Billy Garcia congratulated Leonard

 4   Lujan by telling him Amor.  So did that happen on or

 5   about March 26, 2001?

 6        A.   It did.

 7        Q.   Is that a statement attributable by Billy

 8   Garcia made to Leonard Lujan?

 9        A.   Yes.

10        Q.   Statement Number 16.  There is an

11   indication that Frederico Munoz was part of a

12   committee that sanctioned a hit on Garza and

13   Castillo; Munoz wanted Garza killed for being Los

14   Carnales?

15        A.   Yes.

16        Q.   And has Frederico Munoz admitted this

17   information?

18        A.   Yes, he has.

19        Q.   And was there an indication that Frederico

20   Munoz also later confirmed what had happened after

21   the hits took place?

22        A.   Yes.

23        Q.   And was Mr. Munoz at a different

24   facility -- was he at PNM whenever he was on this

25   committee that ordered the hits?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   He was.

2       Q.   Statement Number 17 refers to the Freddie

3 Sanchez murder.  There is an indication here that

4 Arturo Garcia placed a hit on Freddie Sanchez because

5 he was suspected of cooperating with law enforcement?

6       A.   Yes.

7       Q.   And Eric Duran is listed as the source?

8       A.   Yes.

9       Q.   How does -- according to Eric Duran, how

10 did he know this information?

11      A.   Eric Duran was with Arturo Garcia when the

12 hit was put out.

13      Q.   Statement Number 18 indicates that Ben

14 Clark passed around paperwork on Sanchez's

15 cooperation with police, stating, "Everyone who needs

16 to see it has seen it.  Get rid of it."

17        So is there an indication that Ben Clark

18 said this?

19      A.   Yes.

20      Q.   And was the information provided by Ruben

21 Hernandez?

22      A.   It was.

23      Q.   And did this happen on or before June 17,

24 2007, the date of the murder?

25      A.   It did.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Statement 19 refers to Arturo Garcia

2   writing to Frankie Gonzalez that Brian and Raymond

3   Rascon were to take care of the next murder for SNM?

4      A.   Yes.

5      Q.   And Mr. Alonso is listed as the source?

6      A.   Yes.

7      Q.   What was the indication that Mr. Alonso was

8   aware of this information?

9      A.   I believe Mr. Alonso saw the letter.

10      Q.   And what is your understanding of where

11   Mr. Garcia was when the letter was sent?

12      A.   PNM North unit.

13      Q.   Statement 20 refers to Ben Clark putting

14   Javier Alonso in charge of making sure that Freddie

15   Sanchez was killed and told the Rascon brothers to

16   complete the hit.  So is that a statement

17   attributable to Ben Clark?

18      A.   Yes.

19      Q.   And did Javier Alonso -- was he aware of

20   that statement?

21      A.   He was.

22      Q.   Statement 21 refers to word being sent from

23   the green pod that if Sanchez was not killed, others

24   in the blue pod would be killed?

25      A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   So was there an indication that a message

2   was sent from one pod to the other indicating that

3   this hit should occur or others would be harmed?

4        A.   Yes.

5        Q.   And did Javier Alonso remember the person

6   who actually sent the message under the door?

7        A.   No, he couldn't remember that.

8        Q.   Did he recall whether Ernest Guerrero was

9   one of the people who sent the message to that

10  person?

11       A.   Yes.

12            MR. CASTELLANO:  Your Honor, I don't know

13  if I gave the Court Ernest Guerrero yesterday as part

14  of the Freddie Sanchez conspiracy.

15            THE COURT:  That name doesn't ring a bell

16  to me.

17            MR. CASTELLANO:  If not, I would add Ernest

18  Guerrero to that list.

19            THE COURT:  This would be the Freddie

20  Sanchez?

21            MR. CASTELLANO:  Yes, sir.

22            THE COURT:  And how do you spell -- Ernest

23  I can probably handle.  But what is the last name?

24            MR. CASTELLANO:  G-U-E-R-R-E-R-O.

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   BY MR. CASTELLANO:

 2        Q.   Agent Stemo, Statement 22 indicates that

 3   Edward Troup was told to go help with the Sanchez

 4   murder.  Who is the person who ordered that?

 5        A.   Javier Alonso.

 6        Q.   And did Javier Alonso admit that he told

 7   Troup to go help with the murder?

 8        A.   He did.

 9        Q.   Statement 23 indicates that while Edward

10   Troup and Javier Alonso were finishing killing Mr.

11   Sanchez, that the Rascon brothers, Brian and Raymond,

12   came and asked if they could help.  So what was the

13   background of the Rascon brothers showing up at the

14   scene of the murder?

15        A.   The Rascon brothers were tasked to do the

16   hit originally.  But when Javier Alonso approached

17   them, Raymond Rascon said they didn't want to do it

18   because they were short to the door, meaning they

19   were going to get out of prison shortly.  Therefore,

20   Javier Alonso instructed Edward Troup and they both

21   went into Freddie Sanchez' cell and took care of

22   business.  When they were doing that, the Rascon

23   brothers came to offer their aid as a way to save

24   face with the gang.

25        Q.   And is Javier Alonso the source of that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    information?

2        A.   It is.

3        Q.   So on Statement 24, when the Rascon

4    brothers show up at the door, does Javier Alonso then

5    tell them to keep lookout after they asked if they

6    could help?

7        A.   Yeah.  I think he tells them to keep aguas,

8    which means keep lookout.

9        Q.   You said "keep aguas"?

10       A.   Yes.

11       Q.   In Statement 25, there is an indication by

12   Javier Alonso that Edward Troup had kissed him on the

13   cheek and told him he was proud of him.  Was this in

14   relation to the murder of Freddie Sanchez?

15       A.   Yes, I believe the kiss happened

16   afterwards.

17       Q.   And did this happen on or about June 17,

18   2007?

19       A.   Yes.

20       Q.   Following the murder, in Statement Number

21   26 was an indication that Edward Troup began telling

22   Ruben Hernandez that he was next?

23       A.   Yes.

24       Q.   And what was the indication about Ruben

25   Hernandez at or around the time -- at or around the

SANTA FE OFFICE                                               MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                 (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                            1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                     e-mail: info@litsupport.com

1    time of the murder?

2         A.    I believe Mr. Hernandez did not cover the

3    cameras properly.

4         Q.    At that point, according to statements by

5    Javier Alonso and others, was Ruben Hernandez seen as

6    possibly scared and weak?

7         A.    Yes, he was actually on crutches at the

8    time.

9         Q.    Related to the statement, is there another

10   statement related to Edward Troup stating, in part,

11   that Ruben Hernandez failed to cover the camera

12   because he was scared?

13        A.    Yes.

14        Q.    Statement 27.  There is an indication that

15   Arturo Garcia sent word about Sanchez to Ben Clark?

16        A.    Yes.

17        Q.    And are Ben Clark and Eric Duran sources of

18   that information?

19        A.    They are.

20        Q.    And consistent with a statement earlier by

21   Mr. Duran, was there an indication that Mr. Duran was

22   with Arturo Garcia when the order went out?

23        A.    Yes.

24        Q.    In Statement 28 it says Ben Clark and

25   Arturo Garcia sent several letters about Sanchez to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    each other.  Did Ben Clark indicate that he had
 2    exchanged letters with Arturo Garcia about Sanchez?
 3         A.   He had.
 4         Q.   Did he indicate how the messages were sent
 5    back and forth?
 6         A.   They were going through Mr. Arturo Garcia's
 7    wife.
 8         Q.   Statement 29 indicates that Mr. Alonso and
 9    Edward Troup were expected to oversee the murder, and
10    Troup told the Rascon brothers to hit Freddie
11    Sanchez?
12         A.   Yes.
13         Q.   Had Ben Clark and Javier Alonso both
14    indicated that this was the case?
15         A.   They both have.
16         Q.   Statement Number 30 indicates that Leonard
17    Lujan told Willie Amador and Jesse Ibarra to handle
18    that, and told Eugene Martinez that "I'm running this
19    prison now."  In this statement, is Eugene the source
20    of the information?
21         A.   Yes.
22         Q.   Did he indicate that Leonard Lujan told him
23    this?
24         A.   He did.
25         Q.   And at this time when that statement was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   made, was Eugene Martinez in the same pod as
 2   Mr. Garza?
 3        A.   He was.
 4        Q.   Statement Number 31 indicates that
 5   Christopher Chavez heard about the hit on Garza and
 6   volunteered to participate in the operation.  Did
 7   Mr. Eugene Martinez indicate that this was the case?
 8        A.   Yes.
 9        Q.   Did he also indicate why Mr. Chavez might
10   have a motive to join in on this murder?
11        A.   I believe there were two reasons.  One was
12   that Mr. Garza would withhold heroin papers from
13   Mr. Chavez.
14             And the second was back when Mr. Garza and
15   Mr. Chavez were housed at the old Albuquerque jail,
16   Mr. Garza actually stole Mr. Chavez's shoes while he
17   was asleep.  When Mr. Chavez woke up, he tried to get
18   his shoes back, and Mr. Garza basically told him,
19   "You're not getting your shoes back.  You need to
20   PC."
21        Q.   He said "PC"?
22        A.   Yes.
23        Q.   Statement 32 indicates that Willie Amador
24   told Eugene Martinez to be lookout during the Garza
25   murder, and stated "If something happens, you already
```





SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    know."  And so in that situation, did Eugene Martinez
 2    indicate that Willie Amador told him to look out?
 3         A.   He did.
 4         Q.   And what did the further statement, "If
 5    something happens, you already know" mean to Eugene
 6    Martinez?
 7         A.   If something happens in that cell, they
 8    need assistance, Mr. Martinez had to help.
 9         Q.   And when you say "assistance," is that
10    related to the Garza murder?
11         A.   It is.
12         Q.   Statement Number 33 indicates that, "While
13    strangling Garza, someone in the room yelled 'close
14    the door.'"  Did Mr. Martinez indicate that he heard
15    that statement coming from the cell?
16         A.   He did.
17         Q.   Did he indicate that Allen Patterson and
18    Christopher Chavez were two people in that cell?
19         A.   They were.
20         Q.   Statement Number 34 indicates Leonard Lujan
21    approached Eugene Martinez and told him to talk to
22    Willie Amador about the murders?
23         A.   Yes.
24         Q.   And is this similar to I think what we had
25    in statement 30?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   In Statement 35 there is an indication that

 3   Eugene Martinez asked Billy Garcia, and Billy Garcia

 4   confirmed the order and said, "It's coming from me

 5   and make sure it happens."

 6             Is this an indication that Eugene Martinez

 7   had a direct conversation with Billy Garcia?

 8        A.   It is.

 9        Q.   Once again, was Eugene Martinez tasked with

10   overseeing and participating in the murder of

11   Mr. Garza?

12        A.   Yes.

13        Q.   Okay.  Statement 36 indicates that Joe

14   Gallegos later informed Leroy Lucero that "Lawrence

15   Torres saw and was concerned that Torres might

16   snitch."  Is this related to the Castillo murder?

17        A.   It is.

18        Q.   In terms of timing, did this one actually

19   happen on March 26, 2001, or was that later?

20        A.   It was later, about four or five years

21   later.

22        Q.   And so was there an indication by Joe

23   Gallegos that Lawrence Torres might snitch, having

24   seen something related to the murder?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE


MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BENJAMIN:  Your Honor, I don't know --
 2   if I may, I don't know if it would be more
 3   appropriate on cross, but I didn't understand what
 4   "four or five years later" referred to.
 5            MR. CASTELLANO:  I'll clarify, Your Honor.
 6   I think statement 36 will actually be an admission
 7   and not a co-conspirator statement, looking at this
 8   more closely.  So the indication is that Joe Gallegos
 9   later informed Leroy Lucero, four or five years
10   following the murder, that he was concerned about
11   Lawrence Torres.  So I would agree this one is
12   probably not a co-conspirator statement, but
13   something more akin to an admission.
14            THE COURT:  Okay.  All right.
15   BY MR. CASTELLANO:
16       Q.   Statement Number 37 indicates that Edward
17   Troup told Lawrence Torres, "This has nothing to do
18   with you.  Don't come up here."  Can you put that
19   statement into context, Agent Stemo?
20       A.   On the morning of the murder, March 26,
21   2001, Lawrence Torres woke up.  As he walked out to
22   heat up water for his coffee, he saw Angel DeLeon and
23   Edward Troup, and it looked like to him that they
24   were disassembling a laundry bag.  He put his water
25   into the microwave, went back to his cell.  He heard
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   a struggle, so he looked out to see what was
 2   happening, and he saw Mr. Edward Troup sitting at a
 3   table.  Mr. Torres tried go upstairs to see what was
 4   happening, and that's when Mr. Troup made that
 5   statement.
 6        Q.   And this is a statement made by Edward
 7   Troup to Lawrence Torres?
 8        A.   Yes.
 9        Q.   In statement 38, it indicates that Angel
10   DeLeon had a scratch on his finger and told a female
11   corrections officer that he cut himself.  Did Mr.
12   Torres hear Angel DeLeon say that?
13        A.   He did.
14        Q.   And what was the indication or the concern
15   about Angel DeLeon having a scratch on his finger?
16        A.   He wanted people to know that he had cut
17   himself so that they didn't tie that injury to the
18   murder of Mr. Castillo.
19        Q.   So was there an indication that Angel
20   DeLeon had participated in that murder?
21        A.   There was.
22        Q.   In Statement 39, there is an indication
23   that Kyle Dwyer traveled to the Southern New Mexico
24   Correctional Facility with paperwork on Sanchez.  Did
25   Mr. Clark indicate that Kyle Dwyer had brought
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    paperwork to the facility?

 2         A.   He did.

 3         Q.   What was the purpose of bringing the

 4    paperwork?

 5         A.   It's confirmation that someone has

 6    cooperated with law enforcement.

 7         Q.   And at this point, are you aware of

 8    anything that Kyle Dwyer said in relation to

 9    delivering the paperwork?

10         A.   No.

11         Q.   Statement Number 40 indicates that the

12    paperwork came from the Crazy Town Roswell Gang.  Is

13    this the paperwork we just discussed in Statement

14    Number 39?

15         A.   Yes.

16         Q.   What was the purpose of the Crazy Town

17    Roswell Gang turning this paperwork over to the SNM?

18         A.   Mr. Sanchez was actually from Roswell.

19    These individuals would have been familiar with Mr.

20    Sanchez.

21         Q.   And was there any indication that Mr.

22    Sanchez had allegedly cooperated with law enforcement

23    in Roswell?

24         A.   Yes.

25         Q.   And was there also an indication that the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Crazy Town Roswell Gang turned this over to the SNM
 2   so they could clean their own house?
 3        A.   Yes.
 4        Q.   In Statement 41 is an indication that Joe
 5   and Andrew Gallegos "just," quote, unquote, "pulled a
 6   job and had to go clean up," and that they were
 7   giving heroin and money to friends to help them out.
 8   And Joe Gallegos said, quote, unquote, "I just came
 9   up."  So the first part of that, there are probably a
10   couple of statements in there.  But there is an
11   indication that when the Gallegos brothers indicated
12   they'd just pulled a job, did they use the term
13   "movida"?
14        A.   Yes.
15        Q.   And when Leroy Vallejos or Michael Sutton
16   were there hearing those statements, what was the
17   understanding of Joe Gallegos' comment, "I just came
18   up"?
19        A.   That they had just acquired money and
20   drugs.
21        Q.   And did this happen on or about November
22   12, 2012, the time of the Adrian Burns murder?
23        A.   Yes.
24        Q.   In Statement Number 42 it indicates that
25   Joe and Andrew Gallegos were covered in blood and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    advised they were, quote, unquote "cleaning the
 2    house."  Did that also happen on or about November
 3    12, 2012?
 4         A.   Yes.
 5         Q.   The second part of Statement 42 indicates
 6    that "Joe Gallegos later went by Leroy Vallejos'
 7    house and tried to give Vallejos his and Andrew
 8    Gallegos' truck."
 9              What's the approximate timing of when Joe
10    Gallegos tried to give his truck to Mr. Vallejos?
11         A.   I believe it was two to three days later.
12         Q.   And by "later," you mean after the murder?
13         A.   Yes.
14         Q.   So is it your understanding that by trying
15    to get rid of the truck, that may have been involved
16    with the homicide or tied to it?
17         A.   Yes.
18         Q.   Exhibit 43 is one we touched on yesterday
19    regarding Charlene Baldizan agreeing to get rid of
20    the van that the Gallegos brothers knew the police
21    were looking for.  And did that happen approximately
22    November 20 of 2012?
23         A.   It did.
24         Q.   And according for Charlene Baldizan, did
25    she indicate that the brothers knew that the police
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   were looking for it?

 2        A.   Yes.

 3        Q.   And did she indicate which brother, or did

 4   she say "the brothers"?

 5        A.   I think she said "the brothers."

 6        Q.   And at some point was Charlene Baldizan

 7   arrested for harboring a fugitive?

 8        A.   Yes.

 9        Q.   As best as you remember, if you recall, was

10   Charlene Baldizan involved in any way in helping the

11   Gallegos brothers to get the hotel?

12        A.   She was there.

13        Q.   And when they were at the hotel, did that

14   mean they had left where they lived and were they

15   later found at a hotel away from their home?

16        A.   Yes.

17        Q.   Was there an indication that law

18   enforcement was looking for them at that time?

19        A.   There was.

20        Q.   In statement 44 it indicates that --

21             MR. CASTELLANO:  Your Honor, in Statement

22   44 I'm going to remove the words "and Andrew," so it

23   should just say, "Joe Gallegos asked Jason Van Veghel

24   to clean up the living room."

25             THE COURT:  Okay.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    BY MR. CASTELLANO:

 2         Q.   So referring to Joe Gallegos and cleaning

 3    up the living room, did Jason Van Veghel indicate

 4    that Joe Gallegos asked him to do that and gave him

 5    some heroin for doing it?

 6         A.   Yes.

 7         Q.   And was there also an indication that Joe

 8    Gallegos asked Van Veghel to clean blood off of an

 9    air compressor?

10         A.   Yes.

11         Q.   And approximately when did this happen?

12         A.   The next morning.

13         Q.   And when you say "the next morning," is

14    that the morning following the Burns murder?

15         A.   Yes.

16         Q.   Statement 45 indicates that the next day at

17    Joe Gallegos' request Andrew Gallegos threw a set of

18    keys and a wristwatch into a field.  Did Jason Van

19    Veghel tell law enforcement this information?

20         A.   He did.

21         Q.   And how does he know this information?

22         A.   He was in the truck with him.

23         Q.   Okay.  So were they driving down the road

24    in a truck?

25         A.   They were.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   That's the point where Joe Gallegos asked
 2   Andrew Gallegos to throw those things out of the
 3   vehicle?
 4        A.   Yes.
 5        Q.   And how close in time did this happen to
 6   the murder?
 7        A.   It was one or two days after the murder.
 8        Q.   In Statement 46 it indicates that "Joe
 9   Gallegos found out police were coming to search the
10   house and he gave several guns and other stolen goods
11   to Jason Van Veghel to store elsewhere."  How close
12   in time did this allegedly happen to the Burns
13   murder?
14        A.   One or two days after.
15        Q.   And did Jason Van Veghel indicate that
16   this, in fact, happened?
17        A.   Yes.
18        Q.   In referring to firearms, was there an
19   indication that Adrian Burns, in addition to being
20   burned, was also shot?
21        A.   Yes.
22             THE COURT:  What is your theory on the
23   shooting?  I notice at some places it was a shotgun,
24   other places a .22.
25             MR. CASTELLANO:  I have to check the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    records.  I think it's probably something more akin
 2    to a .22.
 3              THE COURT:  Okay.
 4    BY MR. CASTELLANO:
 5        Q.   Statement Number 47 indicates that Santos
 6    Gonzalez told Jose Gomez, "You remember me?"
 7              "Do you remember," that first part, is that
 8    an indication that Jose Gomez said Santos Gonzalez
 9    said those words to him at the time that he and
10    others assaulted Jose Gomez?
11        A.   Yes.
12        Q.   And was that on or about February 27, 2016,
13    the actual day of the assault?
14        A.   It was.
15        Q.   Now, the second part of Statement 47
16    indicates they then told Gomez that Joe Gallegos put
17    a hit out on him and they were there to kill him?
18        A.   Yes.
19        Q.   So when Jose Gomez said "they," who was he
20    referring to?
21        A.   Santos Gonzalez, Brandy Rodriguez, and Paul
22    Rivera.  I believe he also mentioned another female,
23    but he couldn't remember her name.
24        Q.   Statement Number 48 indicates that Shauna
25    Gutierrez said, quote, unquote, "They didn't finish
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   him after Gomez ran away."  Who is the source of this
 2   information?
 3       A.   Brandy Rodriguez.
 4       Q.   Was this information that Shauna Gutierrez
 5   had following the assault on Jose Gomez?
 6       A.   Yes.
 7            MR. CASTELLANO:  And Your Honor, Statement
 8   48, I can tell the Court, Brandy Rodriguez is not
 9   cooperating with the Government at this time, but I
10   am submitting this statement for the Court's
11   consideration in case that changes.  So this is just
12   for admissibility purposes right now.
13            THE COURT:  Would you agree it's probably
14   not a co-conspirator statement?
15            MR. CASTELLANO:  I agree that statement is
16   probably not coming in, unless Brandy is the source
17   of that information or someone else heard that
18   statement.
19            THE COURT:  In other words, unless she's
20   here and on the stand?
21            MR. CASTELLANO:  I agree.  I'm trying to
22   give the Court as much information beforehand as
23   possible.
24            THE COURT:  Okay.
25
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   BY MR. CASTELLANO:

 2        Q.   Statement 49 indicates that Santos Gonzalez

 3   and Paul Rivera knocked at Charlene Parker-Johnson's

 4   door and then told her that she should leave the

 5   house.  Was Charlene Parker-Johnson the person who

 6   said that Santos Gonzalez and Paul Rivera said these

 7   things to her?

 8        A.   Yes.

 9        Q.   And was this on the date of the actual

10   assault of Jose Gomez?

11        A.   It was.

12        Q.   Statement 50 indicates that Santos Gonzalez

13   and Paul Rivera yelled, "He's running," and, "He's

14   running away," when Jose Gomez started to run.  Did

15   Charlene Parker-Johnson also hear these words by

16   Santos Gonzalez and Paul Rivera?

17        A.   Yes.

18        Q.   What was the context of Jose Gomez running

19   away?  Was this after he'd been knocked unconscious

20   with a machete and another object?

21        A.   Yes.  After the assault, the assailants

22   actually exited the house.  They thought he was dead.

23   And Mr. Gomez came to and was able to get away.

24        Q.   And is that the context in which these

25   statements were made, "He's getting away," or "He's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    running"?

 2         A.    Yes.

 3         Q.    Statement 51 indicates that Joe Gallegos

 4    placed a hit on Gomez because Joe Gallegos feared

 5    Gomez would testify against him on a state murder

 6    charge.   Is Paul Rivera the source of that

 7    information?

 8         A.    He is.

 9         Q.    And are Shauna Gutierrez and Brandy

10    Rodriguez the ones who told Paul Rivera this?

11         A.    Yes.

12         Q.    Now, I'm looking at Count 13 of the

13    indictment, which is assault with a dangerous weapon

14    upon Jose Gomez occurring on or about March 17, 2015.

15    Was this the incident in which Jose Gomez was

16    supposed to be a witness against Joe Gallegos where

17    he cut his hand?

18         A.    I don't think that was in 2017.

19         Q.    March 17, 2015?  Beforehand?

20         A.    Yes.

21         Q.    At one point was that charged in state

22    court?

23         A.    I believe so.

24         Q.    And was Jose Gomez supposed to be a witness

25    against Joe Gallegos in that case?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   Statement 52 indicates, "Upon learning

 3   where Gomez was staying, Shauna Gutierrez and Brandy

 4   Rodriguez agreed they needed to go after Gomez."

 5             Did Paul Rivera and Brandy Rodriguez both

 6   indicate that this was the case?

 7        A.   Yes.

 8        Q.   Statement 53 indicates that Paul Rivera

 9   agreed to help with the hit on Gomez.  And so was

10   that by his own admission?

11        A.   It was.

12        Q.   Statement 54 is attributed to Brandy

13   Rodriguez saying, "You better not testify against my

14   jefe, or I'll kill you."  Did Paul Rivera hear that

15   statement during the assault?

16        A.   He did.

17        Q.   And did Brandy Rodriguez say that?

18        A.   Yes.

19        Q.   Was there any indication that Brandy

20   Rodriguez referred to or considered Joe Gallegos her

21   boss?

22        A.   Yes.

23        Q.   How do you know that?

24        A.   I believe I've seen letters where she

25   addresses him as such, or jefito.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1        Q.   And Statement 55 indicates that Santos
 2   Gonzalez also stated he was going to kill Gomez.  Did
 3   Paul Rivera hear that during -- at or about the time
 4   of the Jose Gomez assault?
 5        A.   Yes.
 6        Q.   Statement 56 indicates that Brandy
 7   Rodriguez, Paul Rivera, and Santos Gonzalez told
 8   Shauna Gutierrez they had completed their mission,
 9   and did that refer to the assault on Jose Gomez?
10        A.   It did.
11        Q.   And was that immediately following the
12   assault?
13        A.   Yes.
14        Q.   Was there also an indication that Shauna
15   Gutierrez laughed and said she was happy to hear
16   Gomez was likely dead?
17        A.   Yes.
18        Q.   And is Paul Rivera the source of that
19   information?
20        A.   Yes.
21        Q.   Statement 57 indicates that Shauna
22   Gutierrez told Santos Gonzalez to move the truck they
23   had used to another location and leave it for a few
24   days.  Did Paul Rivera hear Shauna Gutierrez say
25   those words?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   He did.
 2        Q.   And was that the truck that was allegedly
 3   involved with them driving over to assault Jose
 4   Gomez?
 5        A.   It was.
 6        Q.   So by moving the truck, would that help
 7   them avoid detection by law enforcement?
 8        A.   Yes.
 9        Q.   Okay.  Statement 58 I'm going to break down
10   into two parts, starting with the second part.  Was
11   there an indication that Shauna Gutierrez told Paul
12   Rivera, Santos Gonzalez, and Brandy Rodriguez to go
13   get him, referring to Jose Gomez?
14        A.   Yes.
15        Q.   So is that a statement before the assault?
16        A.   It is.
17        Q.   And then after the assault, was there an
18   indication that Shauna Gutierrez said, "How come you
19   guys didn't do the job more fully?"
20        A.   There was.
21        Q.   Was that, once again, when they reported
22   back to Shauna Gutierrez following the Jose Gomez
23   assault?
24        A.   Yes.
25        Q.   Statement 59 has the words "Don't testify"
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  in quotes.  Was that an indication that Paul Rivera

2  told Jose Gomez not to testify?

3       A.   Yes, during the assault.

4       Q.   Is that by Paul Rivera's own admission?

5       A.   Yes.

6       Q.   Statement 60 indicates that Brandy

7  Rodriguez and Shauna Gutierrez had people in place

8  for an attack on Gomez.  The date on there is

9  indicated as March 29, 2017.  Do you know why that

10 date is listed?

11      A.   That's the date Mario Chavez spoke with

12 FBI.

13      Q.   What was Mario Chavez' relationship with

14 Brandy Rodriguez, Shauna Gutierrez, and Joe Gallegos?

15      A.   He stated that he was an intermediary

16 between the three.  He would pass letters between Joe

17 Gallegos, who was in county jail at the time, and

18 Brandy Rodriguez and Shauna Gutierrez.

19      Q.   And from Mario Chavez' statement at this

20 point, do you know if he learned about this

21 information before or after the Jose Gomez assault?

22      A.   I don't know.

23      Q.   Statement 61 indicates Joe Gallegos ordered

24 the hit on Gomez, and Shauna Gutierrez planned the

25 hit.  Is that also attributed to Mario Chavez?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It is.

 2        Q.   And in the table I had the declarant as

 3   Shauna Gutierrez.  Should that actually be Brandy

 4   Rodriguez, the declarant of that information?

 5        A.   Yes.

 6             MR. CASTELLANO:  Your Honor, on Statement

 7   Number 61, the declarant should be Brandy Rodriguez

 8   and not Shauna Gutierrez.

 9             THE COURT:  All right.

10   BY MR. CASTELLANO:

11        Q.   And when Mario Chavez told you that Joe

12   Gallegos ordered the hit on Gomez and that Shauna

13   Gutierrez planned the hit, do you know if he learned

14   that information before or after the Gomez assault?

15        A.   I don't know.

16        Q.   On Statement Number 62 --

17             MR. BENJAMIN:  Your Honor.

18             THE COURT:  Yes.

19             MR. BENJAMIN:  May I ask the Government to

20   clarify they're not limiting that statement the same

21   way that they did the last one if Brandy Rodriguez

22   doesn't testify?

23             MR. CASTELLANO:  Well, all these statements

24   are dependent on the source of the information

25   testifying, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Okay.
 2              MR. CASTELLANO:  What we're asking for is
 3    initial rules on admissibility.
 4              One thing I will say about Statement Number
 5    61 is, if Mario Chavez learned of this information
 6    before or at or about the time of the assault, it
 7    would be a co-conspirator statement.  If it was made
 8    following, it's an admission by Brandy Rodriguez; it
 9    would then be considered a statement against
10    interests or an admission by Brandy Rodriguez.  And
11    at this point we do not know the timing where Mario
12    Chavez learned that information in either Statement
13    60 or Statement 61.
14              THE COURT:  Now, Rodriguez -- his name is
15    Randy?
16              MR. CASTELLANO:  Brandy Rodriguez.  And
17    Brandy Rodriguez was one of the people who
18    participated in the assault against Jose Gomez.
19              THE COURT:  Okay.
20              MR. CASTELLANO:  But the same applies, I
21    would say, with Statements 60 and 61.  If we have
22    further information that that happened, the
23    information there was learned before the assault,
24    they would be co-conspirator statements.  And if they
25    were learned after the assault, they would either be
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    admissions and/or statements against interests.
 2    BY MR. CASTELLANO:
 3         Q.   Turning to Statement Number 62, Agent
 4    Stemo, there is an indication that paperwork on
 5    Sanchez, meaning Freddie Sanchez, was delivered from
 6    Arturo Garcia to Ben Clark approving the murder.  And
 7    we have three sources of information.  So was there
 8    an indication that Samuel Gonzales, John Montano, and
 9    Javier Rubio provided information to this effect?
10         A.   Yes.
11         Q.   Was there also indication from the reports
12    that Joe Martinez, also known as Cheech, helped to
13    deliver the paperwork?
14         A.   There was.
15         Q.   Okay.  Statement Number 63 lists Cheeky and
16    Coquito being tasked with the murder of Sanchez, but
17    did not want to carry it out.  So once again, for
18    clarification, is Cheeky Raymond Rascon?
19         A.   Yes.
20         Q.   And is Coquito Brian Rascon?
21         A.   Yes.
22         Q.   And is that information that they told to
23    Samuel Gonzalez?
24         A.   Yes.
25         Q.   Statement 64 indicates that Javier Alonso
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1    asked how to get rid of the marks on his hands from
2    strangling Freddie Sanchez.  Did Samuel Gonzales hear
3    Javier Alonso make that remark?
4         A.   He did.
5         Q.   Statement 65 refers to two things.  The
6    first is a statement by Ben Clark that John Montano
7    heard on or about the time of the Freddie Sanchez
8    murder, and the quote is, "That'd be messed up if the
9    paperwork on the guy I just got showed up."
10         So was that an indication of a reference to
11   Freddie Sanchez?
12         A.   Yes.
13         Q.   And the second part of that Statement 65
14   indicates that Ben Clark also sent Arturo Garcia a
15   list of names of people in the pod.  Was that also
16   referred to as a roll call?
17         A.   Yes.
18         Q.   What was your understanding, if you know,
19   of the purpose of the names that Arturo Garcia
20   requested from Benjamin Clark?
21         A.   So that he would know who was present at
22   the pod and who would be next, or who hasn't put in
23   work.
24         Q.   And Statement 66 indicates that Edward
25   Troup and Javier Alonso attempted to hide in John
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Montano's cell after lockdown following the Sanchez

 2   murder.

 3            MR. BURKE:  Your Honor, objection.  It's

 4   not a statement.

 5            MR. CASTELLANO:  I would agree with that,

 6   Your Honor.  And what we don't know at this point is

 7   what Edward Troup and Javier Alonso may have said to

 8   John Montano, or what the interaction was.  So I give

 9   that to the Court for the Court's information, and if

10   we provide more information on that, we'll supplement

11   the record, Your Honor.

12            THE COURT:  So it's kind of a placeholder

13   that you think there were some statements made there?

14            MR. CASTELLANO:  Yes, sir.  At this point I

15   agree it is an act, but nothing else.  But we will

16   supplement with words if we find them.

17   BY MR. CASTELLANO:

18       Q.   Statement Number 67 indicates that Jimmie

19   Gordon was asked to get information on Garza from

20   Geraldine Martinez.  And is this Garza in terms of

21   the Rolando Garza murder?

22       A.   It is.

23       Q.   And who was Geraldine Martinez?

24       A.   She was a librarian.

25       Q.   Was she a librarian at the prison facility?

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                       1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   She was.
 2        Q.   Was Jimmie Gordon aware of any information
 3   about Garza and a potential hit on him?
 4        A.   He was.  He mentioned being in, like, a
 5   committee where they were discussing who was green
 6   lit.
 7        Q.   And then at some point right before the
 8   Garza murder, was it then that Geraldine Martinez
 9   asked him to get information about Garza?
10        A.   Yes.
11        Q.   Okay.  Statement Number 68 indicates Billy
12   Garcia put a hit on Archuleta, referring to Gerald
13   Archuleta, which is communicated to him through Baby
14   Zack over a disagreement about Castillo's murder.
15   And is this actually information we learned from
16   testimony and statements by Gerald Archuleta?
17        A.   I know about the statements.  I wasn't here
18   for the testimony.
19        Q.   What about the statements?  Was it an
20   indication that Baby Zack approached Gerald Archuleta
21   to kill him at Billy Garcia's request?
22        A.   Yes.
23             MR. CASTELLANO:  And, Your Honor, for -- I
24   didn't have a name yesterday.  I believe Baby Zack is
25   identified as Reynaldo Garcia.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Let's see where I had him on my
 2     chart.
 3              MR. CASTELLANO:  He would be a separate
 4     conspiracy that was identified yesterday.
 5              THE COURT:  Oh, okay.  For Archuleta.
 6              MR. CASTELLANO:  Yes.
 7              THE COURT:  All right.  The name again?
 8              MR. CASTELLANO:  Reynaldo, R-E-Y-N-A-L-D-O.
 9     Last name, Garcia.
10     BY MR. CASTELLANO:
11        Q.   Okay.  Ms. Stemo, turning to Statement
12     Number 69, there is an indication that Brandy
13     Rodriguez kicked Jose Gomez and said, "This is a
14     message from Joe."  Did Paul Rivera hear that during
15     the assault on Jose Gomez?
16        A.   He did.
17        Q.   And was Brandy Rodriguez one of the people
18     who was there to assault Jose Gomez?
19        A.   Yes.
20        Q.   Okay.  Statement Number 70 indicates that
21     Shauna Gutierrez stated she is, quote, unquote, "ride
22     or die with Joe Gallegos," after admitting she and
23     Joe Gallegos put a hit on Brandy Rodriguez based on
24     the belief that she was cooperating.
25              Now, in terms of the timing of this
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    statement, what do we know about its timing?
 2         A.    It was around the time that Paul Rivera had
 3    chosen to cooperate.  He and Shauna Gutierrez were in
 4    a transport van together and headed to court, and
 5    that's when she made these statements to him.
 6         Q.    So is this a statement made following the
 7    assault on Jose Gomez?
 8         A.    Yes.
 9              MR. CASTELLANO:  Your Honor, I would not
10    identify this as a co-conspirator statement related
11    to the assault on Jose Gomez, but as a separate
12    conspiracy to harm Brandy Rodriguez.  And this is
13    based on the belief that she was cooperating with law
14    enforcement.  That's Statement Number 70.
15              THE COURT:  So this is --
16              MS. ARELLANES:  Judge, I think that's
17    basically irrelevant to the counts for which Shauna
18    has been indicted.
19              THE COURT:  Well, let me see if I
20    understand what the Government is suggesting.  So
21    this is -- I think we had seven conspiracies.  You
22    got an eighth one now?
23              MR. CASTELLANO:  Yes.
24              THE COURT:  And tell me what you're going
25    to call this one.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. CASTELLANO:   I would say conspiracy to

2    hit Brandy Rodriguez.   At this point in time there

3    was a belief, right before Paul Rivera was

4    cooperating -- he wasn't yet -- that Brandy Rodriguez

5    was cooperating with law enforcement, and Shauna

6    Gutierrez made a statement to him that she and Joe

7    Gallegos had put a hit out on Brandy.

8          THE COURT:   Okay.   And your conspirators in

9    this eighth conspiracy?

10          MR. CASTELLANO:   The two would be Shauna

11    Gutierrez and Joe Gallegos.   Among other things, in

12    terms of a co-conspirator statement, it could be to

13    avoid detection by law enforcement.   So in other

14    words, if they believed that Brandy Rodriguez would

15    provide damaging information against them, putting a

16    hit on her would help avoid that situation.

17    BY MR. CASTELLANO:

18          Q.   Agent Stemo, looking at Statement Number

19    71, it indicates Christopher Chavez asked the

20    question:   "Is this right?" in reference to the Garza

21    murders, and Leroy Lucero responded, "You got to do

22    what you got to do."

23          Did Leroy Lucero indicate this is a

24    conversation he had with Christopher Chavez?

25          A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Did this conversation take place before the

2    Garza and Castillo murders?

3    A.   It did.

4    Q.   And what was the context, according to

5    Leroy Lucero, in which Christopher Chavez asked this

6    question?

7    A.   Mr. Lucero said that Mr. Chavez came up to

8    him and was unsure about the murder.  That's why he

9    asked.  Mr. Lucero told him, "You got to do what you

10   got to do."

11        And then Mr. Chavez kind of stuck around

12   Mr. Lucero until he was released.  Mr. Lucero thought

13   that Mr. Chavez was staying by him because Mr. Lucero

14   and Mr. Garza were close, and he didn't want Mr.

15   Lucero to forewarn Mr. Garza.

16   Q.   So when Leroy Lucero indicated that

17   Christopher Chavez wasn't sure about the murder, was

18   he clarifying whether or not there was, in fact, a

19   green light on Mr. Garza?

20   A.   Yes.

21   Q.   Statement 72 indicates that Javier Alonso

22   asked if the marks on his hands were noticeable.  Was

23   that a statement he made to John Montano?

24   A.   Yes.

25   Q.   And was this following the Freddie Sanchez

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    murder?

 2        A.   It was.

 3        Q.   And was there concern that Javier Alonso

 4    had marks on his hands from the strangulation?

 5        A.   Yes.

 6        Q.   Statement 73 indicates that Edward Troup

 7    and/or Jesse Trujillo ordered the surveillance

 8    cameras covered.  This is -- the source being Ruben

 9    Hernandez?

10        A.   Yes.

11        Q.   Did Ruben Hernandez, in separate

12    statements, mention both Jesse Trujillo and Edward

13    Troup?

14        A.   He did.

15        Q.   And what was the purpose of covering the

16    surveillance cameras?

17        A.   So that the correctional officers couldn't

18    watch what was happening.

19        Q.   Was Ruben Hernandez one of the people who

20    was supposed to cover the cameras?

21        A.   Yes.

22        Q.   And was Jesse Trujillo one of the other

23    people?

24        A.   Yes.

25        Q.   Statement 74 has the quote, "Now hurry,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Bolo, now you know what time it is," in reference to
 2    covering the cameras.  Is that a statement that Jesse
 3    Trujillo made to Ruben Hernandez?
 4         A.   Yes.
 5         Q.   And once again, was that a reference to
 6    covering the cameras to avoid detection by law
 7    enforcement for the Freddie Sanchez murder?
 8         A.   Yes.
 9         Q.   Statement 75 indicates a quote by Jesse
10    Trujillo that said, "Just stay there and don't let no
11    one in.  Use your crutch to block the door if you
12    have to."  Was that a statement by Jesse Trujillo to
13    Ruben Hernandez?
14         A.   Yes.
15         Q.   And what was the purpose of making that
16    statement?
17         A.   Mr. Hernandez was not in great physical
18    shape since he was on crutches, and his attempts to
19    block the camera weren't working out very well.  So
20    Mr. Trujillo instructed him to do something else
21    since he was also helping cover cameras.
22         Q.   Statement 76 has a quote, "Ya estuvo,"
23    meaning "all done; take them off," in reference to
24    the camera covers.  Did Jesse Trujillo tell that to
25    Ruben Hernandez once the murder happened and they
```

SANTA FE OFFICE                                                                                        MAIN OFFICE
119 East Marcy, Suite 110                                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                    Albuquerque, NM 87102
(505) 989-4949                                                                                    (505) 843-9494
FAX (505) 843-9492                                                                      FAX (505) 843-9492
                                                                                                 1-800-669-9492
                                                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    were now uncovering the cameras?
 2         A.   Yes.
 3         Q.   And by murder, I mean the Freddie Sanchez
 4    murder.
 5         A.   Yes.
 6         Q.   Statement 77 indicates that "Kyle asked
 7    Ruben Hernandez to take something to Samuel Gonzales
 8    and to tell Samuel Gonzales, 'that was all he had.'"
 9    Do you remember the context of the passing of this
10    paperwork?
11         A.   Mr. Gonzales asked Ruben to go get
12    something from Mr. Dwyer.  Mr. Dwyer had a piece of
13    paper on the ground, and that's when he made the
14    statement that was all he had.  Mr. Hernandez grabbed
15    what was there and took it to Mr. Gonzales.
16         Q.   And so in Statement Number 77 where we have
17    the name Kyle, does that refer to Kyle Dwyer?
18         A.   I believe so.
19         Q.   And is Statement 78 tied to Statement 77
20    where "Samuel Gonzalez asked if Sanchez was dead, and
21    then again asked, 'For real, is he dead?'"
22         A.   Yes.
23         Q.   And is that a statement or a question that
24    Samuel Gonzalez posed to Ruben Hernandez?
25         A.   It was.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Is that when Ruben Hernandez gave the

2   paperwork to Samuel Gonzalez?

3      A.   I think it was right after.

4      Q.   Statement 79 has the name Chicky.  Is that

5   also supposed to be Cheeky, referring to Raymond

6   Rascon?

7      A.   Yes.

8      Q.   And so in this situation was Raymond Rascon

9   cutting off his sleeves and asking Ruben Hernandez to

10  hang up his wet sleeves?

11     A.   Yes.

12     Q.   And was this following the Freddie Sanchez

13  murder?

14     A.   It was.

15     Q.   Was there an indication or concern that

16  Raymond Rascon was cutting off his sleeves because

17  there might be something incriminating on the

18  material?

19     A.   Yes.

20     Q.   And the same thing with Statement Number 80

21  where it says Edward Troup told Chicky or Cheeky to

22  cut his sleeves in small pieces or give the sleeves

23  to someone next door?

24     A.   Yes.

25     Q.   Was that a statement that Edward Troup made

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to Ruben Hernandez?

2         A.   I think he overheard it.

3         Q.   And when he overheard it, was that for the

4    purpose of disposing evidence?

5         A.   Yes.

6         Q.   Statement Number 81 has a quote which says,

7    "First thing in the morning we need you to move the

8    body in the fetal position and wipe down the toilet."

9              On this one, for clarification, is this a

10   statement by Brian Rascon to Ruben Hernandez?

11        A.   Yes.

12             MR. CASTELLANO:  Your Honor, Statement

13   Number 81, the declarant should be -- I'm sorry, I

14   think it is at different times --

15        Q.   Was there an occasion that both Brian

16   Rascon and Edward Troup said these things to Ruben

17   Hernandez?

18        A.   Yes.

19        Q.   In Statement 82 there is a quote that says,

20   "That's what we are all asking of you," which is a

21   statement told to Ruben Hernandez when he didn't want

22   to clean the cell.  When we refer to cleaning the

23   cell, is that the cell where Freddie Sanchez was?

24        A.   Yes.

25        Q.   And did Brian Rascon make that statement to

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                           (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                    1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1    Ruben Hernandez?

2        A.   He did.

3        Q.   Statement 83 also has another quote that

4    says, "Now, that's an order.  You already know what

5    time it is."  So is that a statement to Ruben

6    Hernandez when he continued not to want to clean the

7    cell?

8        A.   Yes.

9        Q.   And did Brian Rascon make that statement to

10   Ruben Hernandez?

11       A.   He did.

12       Q.   Was the purpose of cleaning the cell to

13   hide any possible evidence of foul play?

14       A.   Yes.

15       Q.   Once again, is that the cell referring to

16   Freddie Sanchez's cell?

17       A.   It is.

18       Q.   Statement 84 indicates that, "Ruben

19   Hernandez asked if he was next for refusing to clean

20   the cell and Brian Rascon told him, 'No, the door is

21   closed.  What can you do?'"

22            What did Ruben Hernandez communicate was

23   his concern when he was talking to Brian Rascon?

24       A.   He thought that if he didn't follow through

25   with the orders of cleaning the cell, that he would

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492
                                                    e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1    be next to be hit.

2        Q.    Statement 85 is a statement attributable to

3    Edward Troup.  It says, quote, unquote, "You're next,

4    motherfucker," said to Ruben Hernandez as they passed

5    each other.  Is this a statement that Edward Troup

6    said to Ruben Hernandez following the Freddie Sanchez

7    murder?

8        A.    Yes.

9        Q.    And this is similar to I think Statement

10   Number 26, where there was concern that Ruben was

11   scared and viewed as weak, and had possibly failed to

12   cover the cameras?

13       A.    Yes.

14       Q.    Statement Number 86 is attributed to Jesse

15   Trujillo.  And it says, "We better be ready for hell,

16   because we're fixing to go through hell."  Was that

17   statement in relation to the Freddie Sanchez murder?

18       A.    Yes.

19       Q.    And was that an indication that people

20   should be prepared because they're going to get law

21   enforcement scrutiny following the murder?

22       A.    Yes.

23       Q.    Statement 87 indicates that Edward Troup

24   stated that it was every man for themselves, and if

25   you can get a plea bargain for 15 or less, to do it,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    but no ratting.  That's a no-no.  In Statement 87, we
 2    have on the table Brian Rascon is the declarant.  Is
 3    that actually a statement by Edward Troup?
 4         A.   Yes.
 5         Q.   Was there also indication by Edward Troup
 6    that he was going to get life?
 7         A.   Yes.
 8         Q.   Statement 88 says -- has a quote, "Go wipe
 9    down the toilet.  Don't worry about moving the body,"
10    a statement by Brian Rascon to Ruben Hernandez?
11         A.   Yes.
12         Q.   Was that a statement made to Ruben
13    Hernandez the day following the Freddie Sanchez
14    murder?
15         A.   Yes.
16              MR. CASTELLANO:  May I have a moment, Your
17    Honor?
18              THE COURT:  You may.
19              MR. CASTELLANO:  Thank you.  I pass the
20    witness.
21              THE COURT:  All right.  Thank you, Mr.
22    Castellano.
23              Who wants to go first on cross-examination?
24    Do you want to pick up, Mr. Benjamin?  Mr. Castle?
25              MR. BENJAMIN:  Your Honor, I can.  I don't
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    necessarily -- I didn't know what the Court's

2    preference was as far as how it had its conspiracies

3    numbered.  I've got the most statements, but --

4              THE COURT:  I'll track however y'all want

5    to go.  So y'all just decide how y'all want to go.

6              MR. BENJAMIN:  Seeing nobody else jumping

7    up, Your Honor --

8              THE COURT:  All right.

9                    CROSS-EXAMINATION

10   BY MR. BENJAMIN:

11       Q.   Agent, let me direct you -- I'm going to

12   try to do these in order as much as I can.  The first

13   question I have is regarding Statement 13.  This is a

14   statement that was made by Leonard Lujan, and is

15   attributed -- okay.  You do have the chart.  I think

16   it's on page 8.

17             And what is the statement that is Statement

18   13?  Because that statement -- in the table, that's

19   simply an action, I think.

20       A.   Just a moment.  Mr. Alonso says he talked

21   to -- initially he says Joe Castillo, but then he

22   later clarifies.  He talked "to Joe Castillo from

23   Belen, uh Criminal.  I don't know his real name but

24   his name's Kriminal and then uh, Angel, a little dark

25   complected guy. Those three, I talked to all three of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  them in front of (unintelligible) at the time, K, uh,

2  yeah in front of the K units right there in the walk

3  area and uh I told 'em exactly what, what, what, what

4  we wanted to do and me and Castillo had the, the

5  discussion.  Me and Castillo had the discussion.  Me

6  and Castillo" -- he's referring to Joe Gallegos --

7  "had the discussion that he wanted him to, uh, he had

8  told me, well, does he want us to give him a hotshot

9  or what, and I told him no, no, no, he wants you guys

10  to take him out and strangle him.  He wants you guys

11  to strangle him out."

12       Q.   So in regards to Statement 13, that is a

13  statement that was given in 2008 by Leonard Lujan,

14  correct?

15       A.   2007.

16       Q.   I apologize.  And that was a statement that

17  was given immediately -- it's about an hour and a

18  half statement, and it was given right before a court

19  setting; correct?

20       A.   I'm not sure what setting they were in

21  front of.

22       Q.   Okay.  You can hear on the audio, "We've

23  got to go, the Court is ready"?

24       A.   Sure.  I haven't listened to it.

25       Q.   Okay.  How do you believe that this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    statement was made?  You're reading a transcript of
 2    that interview?
 3          A.   Yes, but I've also been in meetings with
 4    Leonard Lujan where he reiterates the information
 5    he's given in the past.
 6          Q.   And he never in that statement refers to
 7    Joe Gallegos as anything other than Joe Castillo;
 8    correct?
 9          A.   Incorrect.
10          Q.   When does he refer to him as Joe Gallegos?
11          A.   In a couple seconds.  Someone asked him if
12    he means Joe Gallegos, and he says yes.
13          Q.   Correct.  Leonard Lujan never refers to Joe
14    as Joe Gallegos; somebody else -- when he says
15    Castillo, the agent in the room says "Gallegos."  And
16    he says, yes, and agrees with that?
17          A.   That's correct.  However, in other
18    statements he does say Joe Gallegos.
19          Q.   Prior to this statement in 2007 does he say
20    Joe Gallegos?
21          A.   Not that I know of.
22          Q.   And so Leonard Lujan identifies Joe, pause,
23    pause, Joe, pause, Castellano I think, and somebody
24    else, an agent in the room, says "Gallegos"; correct?
25          A.   In this instance, yes.
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                          FAX (505) 843-9492
                                                                                1-800-669-9492
                                                                        e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        Q.    Okay.  And at no point in time prior to

2   that does he ever identify Joe Gallegos?

3        A.    Not that I'm aware of.

4        Q.    And then subsequent to that he identifies

5   him as Joe Gallegos because that's what the agent

6   told him; correct?

7        A.    No, he's also shown a photo array or a

8   photo line-up.  I'm not sure what the photo setup

9   was, but he's shown a photo and he clarifies that

10  that's him he talked to.

11       Q.    After being prompted by the agent?

12       A.    Yeah, I guess so.

13       Q.    And that was a 2007 statement, not a 2001

14  statement as reflected in the table; correct?

15       A.    Correct.

16       Q.    Next would be Statement 36.  And Agent, I

17  don't know if yours has the file numbers, but I was

18  just going to identify them by the page numbers

19  they're on.  I think you probably have a prefiled

20  version.  If you don't, it would be page 19 from

21  Document 1903, Attachment 1, Your Honor.

22            MR. BENJAMIN:  And Your Honor, before I

23  forget, I'm looking at my notes; I would like to

24  clarify that the Court had asked whether document

25  1918 was Mr. Gallegos' objections or whether it was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    group objections.  I, at least on Mr. Gallegos'
 2    behalf -- I think this is correct for all the
 3    defendants -- am going to join the other defendants'
 4    objections.  I am simply dealing with the statements
 5    that I believe are directly implicating Mr. Gallegos.
 6    But I think that the other statements, whether or not
 7    a conspiracy is formed or whether or not they're
 8    accurate and correct, we would join those other
 9    defendants for the record.
10             THE COURT:  Okay.
11             MR. BENJAMIN:  Thank you, Your Honor.
12    BY MR. BENJAMIN:
13         Q.   Okay, Agent, are you at Statement 36?
14         A.   Yes.
15         Q.   And when and where was this statement made?
16         A.   In New Mexico, January 2018.
17         Q.   New Mexico, January 2018?
18         A.   Yes.
19         Q.   And I apologize.  I probably should phrase
20    that a little bit better.  When did Mr. Joe Gallegos
21    inform Leroy Lucero that he was concerned that
22    Lawrence Torres saw and was concerned he was a
23    snitch?
24         A.   We don't have the exact timeframe.  Mr.
25    Lucero estimates four to five years after 2001.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  And where was Lucero -- and I'll
 2   refer to him as Joe because there are two Gallegoses.
 3   Where were Lucero and Joe at when the statement was
 4   made?
 5        A.   I believe they were at the PNM North unit.
 6        Q.   And four to five years is the best date you
 7   have?
 8        A.   Yes.
 9        Q.   Do you know what pod they were in?
10        A.   I don't.
11        Q.   Okay.  For corroboration purposes, did you
12   ever confirm that Leroy and Joe were in the same pod?
13        A.   I think we ordered his location history.  I
14   haven't had a chance to look at it.
15        Q.   So we don't know if they were in the same
16   pod?
17        A.   Right.
18        Q.   And Leroy's contention is that this
19   statement was made at PNM North four or five years
20   after the fact?
21        A.   Yes.
22        Q.   And did he say why he thought Torres would
23   snitch?
24        A.   Why Mr. Gallegos thought that?
25        Q.   Did Joe tell Leroy why he thought Torres
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    would snitch?

 2         A.   Yes.

 3         Q.   Why?

 4         A.   He said Mr. Torres heard something and came

 5    out of his cell, looked up, and saw what was going

 6    on.

 7         Q.   Okay.  But why did he think he would

 8    snitch?

 9         A.   I don't know.

10         Q.   Okay.  Because this was four to five years

11    after the fact; correct?

12         A.   Yes.

13         Q.   And there had been at least two

14    investigations by the State of New Mexico in between

15    2001 and 2005?

16         A.   For which murder?

17         Q.   And I apologize if that was vague.  The

18    State of New Mexico -- there were attempts to have

19    the murder investigated by the State of New Mexico,

20    by Susana Martinez' district attorney's office;

21    correct?

22         A.   I don't know that.

23         Q.   Okay.  Are you aware whether or not the

24    2001 murder was attempted to be investigated before

25    2005?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    Okay.  And so there is no evidence to

3    suggest that Torres attempted to snitch before 2005;

4    correct?

5        A.    No.

6        Q.    Okay.

7              MR. CASTELLANO:  Objection to relevance,

8    Your Honor.  We're focusing on the statement and so

9    those are words attributable to Joe Gallegos.  Those

10   are his words.

11             MR. BENJAMIN:  And Your Honor, I think I'm

12   allowed to fully explore why that statement would

13   have been made and there's essentially additional

14   facts I think I can bring out.

15             THE COURT:  Yeah, I'm not familiar enough

16   with these statements to make a fine-tuned

17   distinction, so I'll overrule and give you some

18   leeway.

19             MR. BENJAMIN:  Thank you, Your Honor.

20             THE COURT:  Let you explain this to me.

21             Let's do this:  I hate to interrupt this

22   particular statement, but I need to give Ms. Bean a

23   break.  So let me take about a 15-minute break and

24   we'll come back in.

25             MR. BENJAMIN:  Thank you, Your Honor.



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  We'll be in recess
 2   for about 15 minutes.
 3              (The Court stood in recess.)
 4              THE COURT:  All right.  Let's go back on
 5   the record.  Look around the room.  I think everybody
 6   has got an attorney.
 7              All right.  Ms. Stemo, I'll remind you
 8   you're still under oath.
 9              Mr. Benjamin, if you wish to continue your
10   cross-examination of Ms. Stemo, you may do so at this
11   time.
12              MR. BENJAMIN:  Thank you, Your Honor.
13   BY MR. BENJAMIN:
14      Q.   Agent Stemo, we were on Statement Number
15   36, I believe.  And this was the statement made by
16   Mr. Lucero regarding Joe being concerned that
17   Lawrence Torres would snitch; correct?
18      A.   Yes.
19      Q.   And my last question, if I'm not mistaken,
20   was -- excuse me -- if I'm not mistaken was whether
21   or not you knew of any investigations that had gone
22   on between 2001 and 2005 or '06; correct?
23      A.   Yes.
24      Q.   Because 2005 or 2006 would be four to five
25   years later after the murder?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    And are you aware of any investigations
 3   that had gone on?
 4        A.    Yes.
 5        Q.    Okay.  And there were individuals
 6   interviewed?
 7        A.    Yes.
 8        Q.    And do you know if Lawrence Torres had been
 9   interviewed on any of those times?
10        A.    He had.
11        Q.    And he had not said anything about Joe
12   Gallegos; correct?
13        A.    He had.
14        Q.    Okay.  And so why would Joe Gallegos be
15   informed that Lawrence would snitch if he had already
16   said something about Joe Gallegos?
17        A.    I don't know.
18        Q.    Okay.  That doesn't make sense, does it?
19        A.    I don't know.
20        Q.    Okay.  So when was Joe Gallegos at PNM?
21        A.    I don't know.
22        Q.    Okay.  Are you aware Joe Gallegos was on
23   the streets in 2006?
24        A.    No.
25        Q.    Are you aware Joe Gallegos was discharged
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    in 2005 from the State of New Mexico?

 2         A.   No.

 3         Q.   That would make that timeline unreasonable;

 4    correct?

 5         A.   It all depends.

 6         Q.   On what?

 7         A.   His memory.  He could have said four to

 8    five years when we pressed him.  It could have been

 9    earlier.

10         Q.   And he could have not remembered the

11    statement accurately; correct?

12         A.   That's possible.

13         Q.   And there is nothing else to corroborate

14    that the statement existed?

15         A.   Yes.

16         Q.   And Statement Number 41 is next.  Are you

17    there, ma'am?

18         A.   I am.

19         Q.   This statement was made at a gas station

20    after the alleged -- after essentially about 11:00

21    p.m. that night; correct?

22         A.   Yes.

23         Q.   And Michael Sutton and Leroy Vallejos,

24    though, were not together at the gas station

25    according to the statements; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    I believe they were.
 2          Q.    Let me rephrase that.  They arrived in the
 3     same vehicle; correct?
 4          A.    I believe so.
 5          Q.    And then they separated?
 6          A.    I don't know that.
 7          Q.    Okay.  And who was this statement made to?
 8          A.    To Mr. Vallejos.
 9          Q.    But not in front of Mr. Sutton; correct?
10          A.    I think he was in earshot.
11          Q.    You think or you know?
12          A.    I don't know.
13          Q.    Because the statements imply that they were
14     not together; correct?
15          A.    I disagree with that.
16          Q.    Okay.  Because Michael Sutton's first
17     statement doesn't even name Leroy Vallejos.  He says
18     he was there with a friend.
19          A.    Correct.
20          Q.    And it's not until later on in the
21     investigation that they determine who the friend is?
22          A.    Yes.
23          Q.    Okay.  Because Michael talks about walking
24     one place, and Leroy being -- his friend Leroy being
25     in another place; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   I don't remember that.
 2          Q.   Do you have any reason to disagree with
 3     that?  Actually, withdrawn.
 4               Let me ask you this.  Do you have any
 5     reason to believe or do you have any notes from the
 6     agents that said that this statement was made in
 7     front of both individuals?
 8          A.   No, I don't have anything indicating that.
 9          Q.   And the reports don't indicate that, as
10     well; correct?
11          A.   I'd have to reread them to be sure.
12          Q.   Okay.  You had the opportunity to review
13     the reports last night; correct?
14          A.   Yes.
15          Q.   Did you?
16          A.   Yes.
17          Q.   And do the reports say that the statement
18     was made to Leroy Vallejos and Michael Sutton, or do
19     the reports say they were made to Leroy Vallejos?
20          A.   I believe they say the statements were made
21     to Leroy Vallejos.
22          Q.   Okay.  So Michael Sutton doesn't have any
23     personal knowledge of this statement?
24          A.   I can't say that he does.
25          Q.   Okay.  And they mentioned cleaning up in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    this statement; correct?
 2         A.   They do.
 3         Q.   What is your understanding of what they
 4    were attempting to clean up?
 5         A.   The homicide.
 6         Q.   Do you have any specific understanding of
 7    what they were going to clean up?
 8         A.   I can speculate.
 9         Q.   That's what we're doing as to whether or
10    not -- what this statement is about; right?
11         A.   Yes.
12         Q.   Okay.  Because we don't -- "clean up" by
13    itself is not an incriminating statement; right?
14         A.   No.
15         Q.   Okay.  You're speculating and you're
16    determining that the cleaning up was in regards to
17    something; right?
18         A.   Yes.
19         Q.   What were you speculating that it was in
20    regards to?
21         A.   The crime scene.
22         Q.   Okay.  Do you have any evidence to suggest
23    that they went back to Bernardo -- and I'm referring
24    to the crime scene as Bernardo because that's the
25    exit; correct?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   That's where the body is found.  I believe

2  the crime scene was at 4 Aaron Court.

3    Q.   Okay.  So they had to go clean up 4 Aaron

4  Court; correct?

5    A.   Yes.

6    Q.   And there was blood found at 4 Aaron Court;

7  correct?

8    A.   There was.

9    Q.   Okay.  Was there any Adrian Burns' blood

10  found at 4 Aaron Court?

11    A.   When State Police went in 2012, I don't

12  think they were looking for blood.  So when --

13    Q.   Okay.  Excuse me.  Go ahead.

14    A.   So when the FBI returned I believe in 2016

15  they looked for blood then, and there was no blood

16  linking back to Adrian Burns.

17    Q.   And they took I believe it's 40 samples out

18  of that house; correct?

19    A.   I don't know the exact number, but it was a

20  lot.

21    Q.   The one that sticks in my head is there's

22  at least the number 35, so there is more than that;

23  correct?

24    A.   I don't know.

25    Q.   Okay.  And all of those samples had blood

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   on them; correct?

 2        A.   Suspected blood.

 3        Q.   Okay.  Some of it was animal blood?

 4        A.   I don't know that for sure.

 5        Q.   Some of it was human blood?

 6        A.   I don't know that for sure.

 7        Q.   Okay.  None of it was Adrian Burns' blood?

 8        A.   Correct.

 9        Q.   So that suggests that "clean up" doesn't

10   refer to Adrian Burns' blood; correct?

11        A.   Not necessarily.

12        Q.   What does "clean up" refer to?

13        A.   4 Aaron Court in 2012, not 2016.

14        Q.   They had this statement in 2012; correct?

15        A.   Yes.

16        Q.   And their interpretation of that statement

17   didn't lead them to believe that there was blood at 4

18   Aaron Court; right?

19        A.   I believe so.

20        Q.   So that's your interpretation that has led

21   to no blood on 35-plus samples at 4 Aaron Court?

22        A.   Correct.

23        Q.   New Mexico State Police in 2012 also looked

24   at some other things that they believed "clean up"

25   might have referred to; correct?
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                          BEAN                           e-mail: info@litsupport.com
                          & ASSOCIATES, Inc.
                          PROFESSIONAL COURT
                          REPORTING SERVICE

```
 1        A.    What do you mean?

 2        Q.    They tested essentially the truck blood

 3   samples found in the truck in 2013, early '13;

 4   correct?

 5        A.    Yes.

 6        Q.    And there was no Adrian Burns' blood found

 7   on those; correct?

 8        A.    Correct.

 9        Q.    Let me move to Statement 42.  Statement 42

10   is essentially two statements, correct?

11        A.    Yes.

12        Q.    And those two statements are -- the first

13   one would be Joe and Andrew Gallegos were covered in

14   blood and advised they were cleaning the house.  That

15   statement was made to who?

16        A.    I believe that was Daniel Orndorff.

17        Q.    Correct.  And not only Daniel Orndorff;

18   correct?

19        A.    Yes.

20        Q.    And he was advised why they were covered in

21   blood; correct?

22        A.    I don't know that the Gallegos brothers

23   told him.  He was aware they had a matanza in the

24   previous days.

25        Q.    And their clothes actually were seized that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

83

```
1    were covered in blood; right?
2         A.   I don't remember that.
3         Q.   At the hotel on November 20, blue sweat
4    pants?
5         A.   There was some clothes with suspected blood
6    on it.  I'm not sure that that's what they were
7    wearing.
8         Q.   Didn't that blood come back as animal
9    blood?
10        A.   I don't remember that.
11        Q.   Joe Gallegos -- and this is once again
12   Statement 42, the second half.  "Joe Gallegos later
13   went by Leroy Vallejos' house and tried to give
14   Vallejos his and Andrew Gallegos' truck."  What truck
15   was this?
16        A.   Just a moment.  It doesn't specify.
17        Q.   Do we know what truck this was?
18        A.   I don't.
19        Q.   Okay.  So the only thing we know is what
20   Leroy states; right?
21        A.   Yes.
22        Q.   And there was essentially three trucks that
23   were recovered at Joe Gallegos' house?
24        A.   That sounds right.
25        Q.   Okay.  Were there any trucks of Joe
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   Gallegos' that were recovered at Leroy Vallejos'

2   house?

3        A.   I don't think so.

4        Q.   Do Joe and Andrew have a truck that is

5   registered together?

6        A.   I don't think they do.

7        Q.   Okay.  There is nothing to corroborate

8   Leroy Vallejos' statement; correct?

9        A.   I don't think so.

10        Q.   Okay.  Let me direct you to Statement 43.

11   Did you review this statement last night?

12        A.   I did.

13        Q.   And do you have an opinion as to which of

14   the brothers made this statement?

15        A.   An opinion?

16        Q.   Does Charlene -- is this statement

17   attributable to one person?

18        A.   No.

19        Q.   Okay.  Did both brothers make the

20   statement?

21        A.   I don't know.

22        Q.   Okay.  So who is the declarant of the

23   statement that they were going to get rid of the van

24   because the brothers were looking for it?

25        A.   I can't say.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   Let me direct you to 43, Agent.  When was
2  this statement made?
3       A.   November, 20, 2012.
4       Q.   When did Jason Van Veghel make this
5  statement?
6       A.   You said 43?
7       Q.   And I apologize.  Let me, I guess, be a
8  little more pointed with my question.  The statement
9  is alleged to have been made from Joe, when he asked
10 Jason Van Veghel to clean up the living room and pull
11 up the carpet in 2003 (sic).  When did Jason Van
12 Veghel first make that statement?
13      A.   To law enforcement?
14      Q.   Yes.
15      A.   2015.
16      Q.   And he had been interviewed prior to that;
17 correct?
18      A.   Briefly.
19      Q.   He had been interviewed by Agent Madrid for
20 a long time; correct?
21      A.   I believe that's the interview I'm talking
22 about, 2015.
23      Q.   He was interviewed, though, prior to that
24 statement to Agent Madrid; correct?
25      A.   I believe so.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And he never mentioned pulling up carpet?
 2        A.   No.
 3        Q.   Who else was at the house that day?
 4        A.   Which day?
 5        Q.   Actually -- thank you.  There was another
 6   individual that was at the house when the house was
 7   raided; correct?
 8        A.   Which time?
 9        Q.   Thank you once again.  November 15, 2012,
10   the New Mexico State Police went to 4 Aaron Court?
11        A.   Yes.
12        Q.   They located an individual there by the
13   name of Ms. Cartwright, Karen Cartwright?
14        A.   Yes.
15        Q.   And she is involved or was involved with
16   Jason Van Veghel; correct?
17        A.   Correct.
18        Q.   She was interviewed extensively at that
19   time; correct?
20        A.   I believe so.
21        Q.   She never mentions that there is an issue
22   with the carpet?
23        A.   She did not.
24        Q.   Okay.  And she had had substantial contact
25   with Jason from the 12th to the 15th, when she was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    interviewed?
 2         A.   I believe so.
 3         Q.   They were both living at 4 Aaron Court?
 4         A.   Yes.
 5         Q.   And that was never brought up as
 6    something -- and Ms. Cartwright probably is described
 7    as being very, very free with information when she's
 8    interviewed; correct?
 9         A.   I don't know who would make that
10    description.  I've never spoken with her, so I can't
11    agree to that.
12         Q.   Correct.  You've never spoken to her to
13    interview her; correct?
14         A.   Correct.
15         Q.   Have you spoken and interviewed Jason Van
16    Veghel?
17         A.   I have not.
18         Q.   Ms. Cartwright talks a lot, and about a lot
19    of things on that audio.  And you're smiling, so I
20    think that's an agreement; correct?
21         A.   I don't think I listened to all of it.
22         Q.   Okay.  There's essentially two audios that
23    are over two hours in length?
24         A.   Okay.
25         Q.   But when she's talking, she talks a lot;
```



SANTA FE OFFICE                                                                              MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                              Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 843-9492                                                               FAX (505) 843-9492
                                                                                      1-800-669-9492
                                  BEAN                                    e-mail: info@litsupport.com
                                  &ASSOCIATES, Inc.
                                  PROFESSIONAL COURT
                                  REPORTING SERVICE

88

```
 1   correct?

 2        A.   Yes.

 3        Q.   And she provides a lot of information?

 4        A.   Yes.

 5        Q.   A lot of opinions?

 6        A.   Yes.

 7        Q.   Okay.  And a lot of other extraneous

 8   information?

 9        A.   Yes.

10        Q.   And she didn't ever provide you information

11   regarding a carpet?

12        A.   I don't think she did.

13        Q.   And Statement 45 was provided to law

14   enforcement at the same time; correct?

15        A.   No, I don't think so.

16        Q.   When was Statement 45 first provided to law

17   enforcement.

18        A.   Just a moment.  April 8, 2016.

19        Q.   Okay.  So that statement wasn't provided at

20   the same time that Jason Van Veghel provided the

21   information about the carpet?

22        A.   Correct.

23        Q.   That was essentially a later piece of

24   information?

25        A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And that wasn't ever discussed or
 2   interviewed or anything else in the prior
 3   investigation by New Mexico State Police?
 4        A.   I don't think so.
 5        Q.   Okay.  And 150 or so -- and correct me if
 6   I've got the number wrong, but it was a huge amount
 7   of people went out in the field and looked where
 8   Jason Van Veghel said the keys and watch were thrown?
 9        A.   I don't know how many people went out
10   there.
11        Q.   Have you reviewed that ROI?
12        A.   What's an ROI?
13        Q.   Special Agent Acee makes a report for that
14   search; correct?
15        A.   Yes.
16        Q.   And describes the number of people?
17        A.   I don't remember seeing that report
18   recently.
19        Q.   And describes a lot of quote, unquote, "not
20   just agents, but like volunteers and other people
21   that go out there and look in that field"?
22        A.   Yes.
23        Q.   And they don't find any watch and keys?
24        A.   Correct.
25        Q.   So there is no information to corroborate
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

90

```
 1    that Jason Van Veghel ever saw this watch and keys
 2    thrown?
 3         A.   Correct.
 4         Q.   And Jason Van Veghel is not what we would
 5    refer to as probably a reliable source; right?
 6         A.   What do you mean?
 7         Q.   He's got convictions for his -- felony
 8    convictions for theft?
 9         A.   Yes.
10         Q.   He's got a lot of impeachable material.
11         A.   He does.
12         Q.   Okay.  And he's not charged as an
13    individual in this case; correct?
14         A.   Correct.
15         Q.   And he was not charged as an individual in
16    the underlying murder -- state murder investigation?
17         A.   Correct.
18         Q.   Statement 46.  This statement was -- this
19    statement is alleged to have been made on or about
20    November 13; correct?
21         A.   Yes.
22         Q.   Where was Jason Van Veghel living in 2012?
23         A.   4 Aaron Court.
24         Q.   Where was he living on the 14th?
25         A.   4 Aaron Court.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   When did the police raid 4 Aaron Court?

 2        A.   I don't remember the date exactly.

 3        Q.   November 15, 2012, sound about right?

 4        A.   Yes.

 5        Q.   He was still living there; he had just gone

 6   out when the police showed up?

 7        A.   Yes.

 8        Q.   Because Karen Cartwright was still there

 9   when the police shopped up?

10        A.   Yes.

11        Q.   And he was living at 4 Aaron Court with

12   Karen Cartwright?

13        A.   Yes.

14        Q.   So Jason Van Veghel -- the statement is Joe

15   Gallegos found out the police were coming to search

16   the house.  And let me stop there.  How did Joe

17   Gallegos find out that the police were coming to

18   search the house?

19        A.   I believe I read a statement from Daniel

20   Orndorff that he heard the police were going over, so

21   he went to the Gallegos residence and forewarned

22   them.

23        Q.   Okay.  And that's not correct, though;

24   correct?  The police didn't go on the 13th?

25        A.   No.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

92

```
 1         Q.   The police didn't go on the 14th?
 2         A.   No.
 3         Q.   Okay.  So what guns and stolen goods were
 4    given to Jason Van Veghel?
 5         A.   I don't know.
 6         Q.   What did Jason Van Veghel do with the
 7    unknown stolen goods and guns?
 8         A.   He put them in a trailer that he would
 9    sometimes reside at.
10         Q.   Okay.  Where is that?
11         A.   I don't think he gave us that information.
12         Q.   Did you ask?
13         A.   I wasn't there.  I don't know whether or
14    not they asked.
15         Q.   And there have been a lot of guns in the
16    State Police investigation attributed to Joe
17    Gallegos; correct?  Let me rephrase that.  Joe
18    Gallegos -- and the Court asked this question:  How
19    was the murder -- was it a shotgun or a .22?  The one
20    opinion is that he was shot with a .22 long rifle,
21    rival, .22 caliber long rifle, rifle; correct?
22         A.   Yes.
23         Q.   And the State Police recovered two
24    different rifles that they tried to attribute to Joe
25    Gallegos; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I believe so.

2      Q.   Okay.  And they were both ruled out, not

3   just unknown, but they were both determined not to

4   have fired the projectiles that killed Adrian Burns?

5      A.   Yes.

6      Q.   One was a Stevens, and one was a

7   prior-to-1946 -- some type of weapon?

8      A.   I don't remember the make and models.

9      Q.   But there's two?

10     A.   Yes.

11     Q.   And so we don't have any proof to suggest

12   that these guns existed?

13     A.   The guns that were found?

14     Q.   Any guns that attributable to Joe Gallegos;

15   correct?

16     A.   Correct.

17     Q.   Because the investigation has been wrong

18   two times?

19     A.   Yes.

20     Q.   Statement 47, Agent.  And this is Santos

21   Gonzalez told Gomez, "You remember me?"  And Santos

22   Gonzalez knew Jose Gomez; correct?

23     A.   I believe so.

24     Q.   Okay.  They knew each other from Los Lunas?

25     A.   I don't know where they knew each other



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   from.
 2        Q.   Okay.  You've been to Los Lunas or Los
 3   Chavez where Charlene Parker's house is; correct?
 4        A.   No.
 5        Q.   Okay.  Are you aware of how far that house
 6   is -- and Jose Gomez is at 4 Rosemary Court; correct?
 7        A.   I don't know that.
 8        Q.   And Joe Gallegos' house is at 4 Aaron Court
 9   we've heard; right?
10        A.   Yes.
11        Q.   And you can walk from those three houses
12   within five minutes?
13        A.   Yes.
14        Q.   Okay.  They are exceedingly close?
15        A.   They are.
16        Q.   And so Santos Gonzalez -- did he know Jose
17   Gomez?
18        A.   I believe you just said he did.
19        Q.   I'm, I guess, asking.
20        A.   I don't know.  I've never spoken to either.
21        Q.   When was this statement made?  To law
22   enforcement.  Let me clarify.
23        A.   February 27, 2016.
24        Q.   And that was made to -- that's the first
25   half of that statement only, though; correct?  Santos



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    Gonzalez told Gomez, "You remember me?"
 2        A.   Yes.
 3        Q.   That statement does not contain, "They then
 4    told Gomez that Joe Gallegos put a hit out and they
 5    were there to kill him"?
 6        A.   It does.
 7        Q.   Okay.  And who was that made to?
 8        A.   To Jose Gomez.
 9        Q.   Who was the law enforcement official that
10    that was made to?
11        A.   Deputy Otto King.
12        Q.   And he was the primary investigator;
13    correct?
14        A.   I believe so.
15        Q.   Statement 48.  Shauna Gutierrez did not go
16    to Charlene Parker-Johnson's house with the other
17    individuals, did she?
18        A.   She did not.
19        Q.   So the statement, "They didn't finish him
20    when Gomez ran away" couldn't have happened, did it?
21        A.   What do you mean?
22        Q.   Where was the statement made?  At Charlene
23    Parker Johnson's house?
24        A.   No.
25        Q.   Shauna Gutierrez didn't know that Gomez ran
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  away, did she?
 2      A.    I believe she was informed by either Santos
 3  Gonzalez, Brandy Rodriguez, or Paul Rivera.
 4      Q.    But she's not -- I mean, then she's telling
 5  Brandy?
 6      A.    Yes.
 7      Q.    But Brandy knows that firsthand.
 8      A.    She does.
 9      Q.    So describe what you understand Statement
10  48 is?
11      A.    Paul Rivera, Brandy Rodriguez, and Santos
12  Gonzalez finished assaulting Jose Gomez.  They
13  returned to where Shauna Gutierrez is, and they relay
14  the events that occurred.  In her response Shauna
15  Gutierrez says this:  "They didn't finish him."
16      Q.    And that's a question?
17      A.    No.
18      Q.    And that's a statement made on -- I guess
19  I'm not understanding how that's a statement that she
20  can make.
21      A.    What do you mean?
22      Q.    How can she make a statement to three
23  people who were there that she wasn't there?  I
24  mean -- I'm sorry.  I'm lost.  How can she make that
25  statement?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     A.    In response to what she was told.

2     Q.    Which would be a question, wouldn't it?

3     A.    Not necessarily.

4     Q.    For clarification, three people go, three

5   people come back and they tell Shauna Gutierrez, and

6   Shauna Gutierrez makes this statement based upon the

7   information they delivered to her.

8     A.    Yes.

9     Q.    And Brandy Rodriguez is the only person who

10  heard it?

11    A.    As far as I know.

12    Q.    Statement 49, Agent.  The statement, I

13  understand, that's coming out of 49 should be that

14  Charlene Parker-Johnson should leave the house.  But

15  what does that statement consist of?  Because this

16  sounds like a summary, not a statement.

17    A.    Charlene tells the FBI the following:  The

18  men knocked on the door and asked for Gomez, who was

19  sleeping in the bedroom.  The men told Charlene she

20  should leave the house.  The men pushed past her and

21  went into Gomez' room.  Charlene heard shouting and

22  then the sounds of a fight.  Charlene said, "It was

23  the worst sound I've ever heard.  They almost killed

24  him.  It was terrible."

25    Q.    What is the statement, though?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    That is the statement she gave to us.
 2        Q.    Correct.  That's a statement she gave to
 3   you.  But we're not -- we can't admit -- you can't
 4   admit the statement that she gave to you.  You have
 5   to admit her words.  What were her words?
 6        A.    The words I have is, "It was the worst
 7   sound I've ever heard.  They almost killed him.  It
 8   was terrible."
 9        Q.    Right.  But that's not Statement 49.
10        A.    Correct.
11        Q.    Okay.  What are the words that they -- and
12   my next question is going to be who.  But what are
13   the words that they told Charlene Parker-Johnson?
14        A.    They just told her she should leave the
15   house.  She doesn't specify who said it.
16        Q.    It wasn't asked -- no, no, no, and you're
17   moving on to question two.  Question one is:  What
18   was she told?  Not the substance of what she
19   understood.  She understood she should leave the
20   house; right?
21        A.    Yes.
22        Q.    What was she told?
23        A.    I don't know.
24        Q.    And who told her that?
25        A.    I don't know.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Statement 50 is, and it's in quotes, "So I
 2   understand that he's running, he's getting away,"
 3   were words that were expressed; correct?
 4        A.    Yes.
 5        Q.    Okay.  But who said those?
 6        A.    Both Santos Gonzalez and Paul Rivera.
 7        Q.    Each said "He's running," and each said,
 8   "He's getting away"?
 9        A.    Yes.
10        Q.    Okay.  And that's from Charlene
11   Parker-Johnson?
12        A.    Yes.
13        Q.    Did Charlene Parker-Johnson also repeat
14   what -- strike that.
15             Statement 50 -- I'm sorry, 51.  That was
16   50.  Statement 51 is once again a summary.  What was
17   the statement that is summarized in 51?
18        A.    Just a moment.  There is no statement that
19   we took down.
20        Q.    And you were asked on direct, I think, and
21   actually it was said on direct that this wasn't
22   related to Count 13, the assault in 2015; right?
23        A.    Yes.
24        Q.    And because there is no statement, we don't
25   know what murder charge they were referring to or
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    this summary refers to; right?
 2         A.   Correct.
 3         Q.   And Otto King's report summarizes that Jose
 4    Gomez provided a very specific reason as to why he
 5    was being attacked; correct?
 6         A.   Yes.
 7         Q.   And he tells a deputy that, and he tells
 8    his mother, both, that he was being robbed and
 9    attacked for money; right?
10         A.   I don't remember seeing that.
11         Q.   Okay.  In his report to his mother it says,
12    "They came for my money"?
13         A.   I can see if I have it here.
14         Q.   Okay.
15         A.   Give me a second.  He does say they asked
16    him for money.
17         Q.   And he's very specific about that they were
18    there for his money?
19         A.   Well, he also says they were there to hit
20    him because he was going to testify against Joe
21    Gallegos.
22         Q.   He says that?
23         A.   Yes.
24         Q.   And what was he going to testify against
25    Joe Gallegos for?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



 1        A.    Joe Gallegos had actually assaulted Jose

 2   Gomez the year prior.  He had stabbed him.  And Jose

 3   Gomez had agreed to cooperate against Joe Gallegos

 4   for that.

 5        Q.    You said on direct that this statement was

 6   not in regards to Count 13, which is that alleged

 7   assault?

 8        A.    What is Count 13?

 9        Q.    Count 13 is the alleged assault on Jose

10   Gomez with a deadly weapon in March of 2015.

11        A.    I must have been mistaken.

12        Q.    That was Randy Castellano's question to you

13   and you agreed.

14        A.    So Count 13 is the 2015 assault?

15        Q.    The 2015 assault.

16        A.    Then I must have been mistaken.

17        Q.    And so we're clear, you're saying that if

18   Jose Gomez said -- and his statement is they were

19   there -- and it's in quotes -- "my money"; correct?

20        A.    Yes.

21        Q.    But then you also believe that he was being

22   retaliated on for the assault in 2015?

23        A.    Yes.

24        Q.    And Jose Gomez and Joe Gallegos have a long

25   history; right?  They live within probably -- is it

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                     (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    fair to say you could almost throw a football from

 2    one house to the other house?

 3         A.   Yes.

 4         Q.   And Jose Gomez has asked Joe Gallegos to

 5    kidnap him, is the statement that's in the discovery

 6    at one point in time; right?

 7         A.   I'm not familiar with that statement.

 8         Q.   But they have a back-and-forth

 9    relationship; right?

10         A.   What do you mean by that?

11         Q.   They know each other, they live in a small

12    town, and they have personal interaction?

13         A.   Yes.

14         Q.   Okay.  And there is an audio from February

15    of 2016 that says, "Leave Jose Gomez alone"?

16         A.   Which audio?

17         Q.   There is a audio call, jail recording that

18    says, "Leave Jose Gomez alone," right?

19         A.   Not that I'm aware of.

20         Q.   Statement 52.  "Upon learning where Gomez

21    was staying, Shauna Gutierrez, Brandy Rodriguez

22    agreed they needed to go after Gomez."  That again is

23    a summary.  What was the statement?

24         A.   The only statement I have is Paul Rivera

25    says Shauna said that she had just learned where
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Gomez was staying.

 2       Q.   So are you -- for 52, the only statement

 3   that you believe was made is Brandy saying, "I know

 4   where Jose Gomez was staying"?

 5       A.   It says that?

 6       Q.   That's what I'm asking.  I'm trying to find

 7   out -- 52 says, "Declarant Shauna Gutierrez and

 8   Brandy Rodriguez; source Paul Rivera and Brandy

 9   Rodriguez."  So I'm trying to figure out what 52 is.

10       A.   So Paul Rivera says Shauna said that she

11   had just learned where Gomez was staying.  Shauna and

12   Rodriguez agreed they need to go after him.  Shauna

13   asked Paul Rivera to assist and he agreed.  That's

14   Paul Rivera's.

15       Q.   Right.  And so that doesn't -- Brandy

16   doesn't say that?

17       A.   Give me a second.  I'll find it.

18       Q.   Okay.

19       A.   "Brandy Rodriguez on February 27, 2016,

20   says she was at Shauna's residence, and Shauna showed

21   up and told her Tiny was at Charlene's residence, and

22   they needed to go get him.  Rodriguez said she, Oso,

23   and Santos got into Shauna's truck.  She said she

24   drove to Charlene's residence.  Oso and Santos went

25   inside, and she went in the back and spoke with

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Charlene."
 2         Q.   Okay.  Once again, that's a summary.  The
 3    only thing we have is one specific statement;
 4    correct?
 5         A.   I don't consider that a summary.  Rodriguez
 6    said "she said."
 7         Q.   But she said -- essentially it describes
 8    what she's doing, not what she said.  She got, "We
 9    got -- we decided to go over to the house"; right?
10         A.   No.  She said Shauna told her she knew
11    where Tiny was, and they needed to go get him.
12         Q.   And that statement comes from Shauna, not
13    from Brandy?
14         A.   Brandy says she heard Shauna say that.
15         Q.   Okay.  And so who is the declarant of that
16    statement?
17         A.   That would be Shauna.
18         Q.   Not Brandy?
19         A.   Correct.
20         Q.   Okay.  And so there is only one statement,
21    and that was the statement by Shauna?
22         A.   Correct.
23         Q.   Okay.  And that statement was made to an
24    individual who is now cooperating; right?
25         A.   Brandy?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   No, Paul.

 2        A.   That statement was made to both Brandy and

 3   Paul.

 4        Q.   Statement 53.  Did Paul Rivera make or tell

 5   you that he made a statement?

 6        A.   Yes.

 7        Q.   And what was that?

 8        A.   Shauna asked Paul to assist, and he agreed.

 9        Q.   Okay.  But nobody has ever said "I agreed";

10   right?

11        A.   I don't know.  Some people would.

12        Q.   What did he say?

13        A.   I don't know what his exact agreement was.

14        Q.   Okay.  Statement 54.  Who is Ms. Rodriguez

15   referring to in this statement?

16        A.   For jefe?

17        Q.   Yes.

18        A.   Gallegos.

19        Q.   Why does she call Joe Gallegos her jefe?

20        A.   They're both in the same street gang.  I

21   think she considers him to be the leader of the gang.

22        Q.   Or she considers him her adopted father, is

23   what she has said in the past, too; correct?

24        A.   That's also possible.

25        Q.   That one is in print.  The leader of the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    street gang is a theory?

 2         A.   It is.

 3         Q.   Statement 55.  What did Santos Gonzalez

 4    say?  What was his statement?

 5         A.   I don't have his exact statements.

 6         Q.   Okay.  In other words, we don't know what

 7    he said?

 8         A.   Correct.

 9         Q.   Okay.  Statement 56 has a summary that told

10    Shauna Gutierrez that they had completed their

11    mission.  Who said that, and who said -- what did

12    they say?

13         A.   Paul Rivera didn't clarify who said it.

14         Q.   Did he say he said it?

15         A.   No, he just said "they."

16         Q.   So we don't have a declarant?

17         A.   Well, we have one; we just don't know who.

18         Q.   And our job is to attribute that statement,

19    a statement to an individual person; correct?

20         A.   It is.

21         Q.   Okay.  And we don't know either of those

22    two parts.

23         A.   Not at this time.

24         Q.   How many times have you interviewed Paul

25    Rivera?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   Once or twice.

2        Q.   At least two; right?

3        A.   I think so.

4        Q.   Shauna is attributed with saying she was

5   "happy to hear," and that's in quotes and then "Gomez

6   was likely dead" is not.  A declarant is not listed

7   for Shauna.  So who said that they were happy to hear

8   Gomez was likely dead?

9        A.   Shauna Gutierrez said that.

10       Q.   Okay.  But per the table she's not listed,

11   right, as a declarant?

12       A.   You're correct.

13       Q.   Okay.  She said, "Happy to hear," and

14   that's it, or we don't know what she said?

15       A.   I don't know what she said after that.

16       Q.   Okay.  Statement 57.  What did Shauna

17   Gutierrez tell Santos Gonzalez?

18       A.   She instructed him to take the green truck

19   and park it at the trailer mentioned above; it

20   belonged to a Mexican national; and leave it there

21   for several days.

22       Q.   And that sounds like an understanding or an

23   instruction.  But what did she say?

24       A.   I don't know.

25       Q.   Okay.  Was Paul Rivera present when that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    instruction was given?
 2         A.   He was.
 3         Q.   And -- but during two interviews he was not
 4    asked what she said?
 5         A.   No.
 6         Q.   Statement 58.  This statement was given
 7    when -- and more importantly, because I think the
 8    answer is February 27, is what the chart says --
 9    where was this given?
10         A.   When was it given to law enforcement?
11         Q.   No.  When did Shauna say, "How come you
12    guys didn't do the job more fully?"
13         A.   It was said by Shauna to Brandy Rodriguez
14    on the day of the assault.
15         Q.   Right, but where?
16         A.   Mr. Joe Gallegos' house.
17         Q.   Which is the 4 Aaron Court?
18         A.   Yes.
19         Q.   And she said -- who is saying that she
20    said, "How come you guys didn't do the job more
21    fully?"  Because that's in quotes.  Both people are
22    saying that?  Brandy and Paul?
23         A.   Brandy Rodriguez says that.
24         Q.   And those are the words that she said
25    Shauna used?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   So she's the only one that says that; not
 3     Paul?
 4          A.   I'm checking.
 5          Q.   Okay.  I'm sorry.
 6          A.   I couldn't find where Paul Rivera says
 7     that.
 8          Q.   So that statement is attributable to Brandy
 9     Rodriguez only?
10          A.   Yes.
11          Q.   Statement 60.  Brandy Rodriguez and Shauna
12     Gutierrez had people in place for an attack on Gomez.
13     And Mr. Castellano said that they were unclear about
14     when that statement was made; correct?
15          A.   Yes.
16          Q.   When does Mario say that statement was
17     made?
18          A.   I didn't ask him.
19          Q.   Okay.  That's important; right?
20          A.   It is.
21          Q.   Okay.  Because Brandy defined the two
22     groups -- or the two types of evidence that would
23     change if it was before or after the day of the
24     assaults; right?
25          A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   How does he know that?
 2        A.   From what he told me, he was a go-between
 3   for Joe Gallegos, Shauna Gutierrez, and Brandy
 4   Rodriguez when Joe Gallegos was in county jail.
 5        Q.   Okay.  When was that?
 6        A.   I didn't ask him.
 7        Q.   When was Joe Gallegos in county jail?
 8        A.   I don't know.
 9        Q.   And how does -- did you ask him how he
10   knows these people?
11        A.   He's from that area.  He used to sell drugs
12   in that area, as well.
13        Q.   That's what he said?
14        A.   Yes.
15        Q.   Did you ask him how he knows Shauna,
16   Brandy, or Joe?
17        A.   I didn't ask him that specifically, where
18   they met.  He did tell me that one of the Gallegos
19   brothers actually brought him into the SNM.
20        Q.   Well, but that's a very unspecific
21   reference, because there's five of them; right?
22        A.   I said "Gallegos brothers" because I don't
23   remember if it was Joe or Andrew.
24        Q.   Well, there is Frankie, Ben, Anthony, Joe?
25        A.   Right.  Mario Chavez -- I think he said Joe
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    initially.  Then in the second interview he said

2    Andrew.

3         Q.   Okay.  Which was it?

4         A.   Andrew.

5         Q.   Brought him into the gang?

6         A.   Yes.

7         Q.   Not Joe?

8         A.   Correct.

9         Q.   Okay.  And when and where did Andrew bring

10   him into the gang?

11        A.   I don't think I have that 302.  Sometime in

12   approximately 2013.

13        Q.   Okay.  And was he in custody or out of

14   custody when that happened?

15        A.   He was out of custody.

16        Q.   And we're referring to Mario Chavez?

17        A.   Yes.

18        Q.   And where was Andrew Gallegos at that time?

19        A.   He was also out of custody.

20        Q.   Now, when and where did he pass letters?

21        A.   I didn't ask him specifically.

22        Q.   Did you check the jail to find out if Mario

23   had visited Joe Gallegos?

24        A.   I didn't.

25        Q.   Okay.  Besides taking Mario at his word,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    what information did you do to corroborate this?

2         A.   It was unrelated to the Gallegoses.  He

3    told me someone had shown him a note about being in

4    charge.  And I was able to track that down.

5         Q.   "Track that down," what does that mean?

6         A.   Location history wise, he said someone

7    specific either passed him a note or talked to him

8    saying he was in charge of a specific facility.  We

9    were able to determine that he had given us the wrong

10   name, because gang members use similar monikers, so

11   we were able to corroborate his information once

12   we -- once we had the location history for the

13   specific gang monikers, we were able to ask Mario to

14   clarify, and he was able to.

15        Q.   And that's related to a gang instance, but

16   that's not related to Joe or any information he

17   provided about Joe?

18        A.   Correct.  You asked me if I corroborated

19   anything.  I did.

20        Q.   Oh, and I apologize.  I should have said

21   "regarding Joe."

22        A.   No, I didn't.

23        Q.   Okay.  Because he states that he was taking

24   information and passing information to -- from Shauna

25   to Joe in 2014; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't think he gave me a date.

 2        Q.   Okay.  Can you look?

 3        A.   No, he didn't.  He just told me when he met

 4   Shauna, which was approximately 2014.

 5        Q.   And that statement, you're not saying,

 6   sounds like, that's when Joe and Shauna were dating?

 7        A.   I'm not sure.  Oh, you're correct.  Yes.

 8        Q.   He says Joe and Shauna were dating in 2014?

 9        A.   Yes.

10        Q.   Do you know when Joe and Shauna were

11   dating?

12        A.   I don't know.

13        Q.   Did you attempt to find that out?

14        A.   I think the answer varies.  I've heard they

15   were dating for a couple months starting in 2015.

16   But I've never confirmed that.

17        Q.   Okay.  So we have no -- we have information

18   that Mario Chavez gave you the name of a moniker, and

19   you believe that that moniker was referring to

20   somebody else and that reference was accurate, but we

21   don't know that?

22        A.   No, I do know that.  I confirmed that with

23   him.

24        Q.   With him?

25        A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1     Q.   So you went back to confirm something with

 2  him?

 3     A.   I did, yes.

 4     Q.   But you didn't confirm any of this

 5  information regarding Joe?

 6     A.   No, I didn't.

 7     Q.   And you didn't confirm the information as

 8  to whether this happened before or after the assault?

 9     A.   Correct.

10     Q.   Okay.  So we have -- we know you understand

11  how to corroborate information.  This was a choice

12  not to corroborate the information.

13     A.   Yes, I have limited time.

14     Q.   I'm sorry?

15     A.   I have limited time.  I can't run

16  everything down.

17     Q.   And I understand that completely.  That's

18  my problem, too.  But this statement is going to be

19  used against Mr. Gallegos; correct?

20     A.   I don't know that.

21     Q.   Well, what's the purpose of the statement?

22  It's to be used against --

23     A.   I don't make those decisions.

24     Q.   Okay.  But --

25          MR. CASTELLANO:  I'd object about the line

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492
                                                        1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE
                                              e-mail: info@litsupport.com

```
 1    of questioning about corroboration.  That would be a
 2    proper subject for cross-examination at trial.  And
 3    the Court would give an instruction that the jury can
 4    find someone guilty on the uncorroborated testimony
 5    of a cooperator.  So the corroboration or not really
 6    isn't an issue here.
 7              THE COURT:  Well, I'm going to let Mr.
 8    Benjamin explore.  I'm trying to learn these
 9    statements and the context of them.  So I need to
10    know what we've got here.  Overruled.
11    BY MR. BENJAMIN:
12        Q.   Mario Chavez -- did he just -- you were
13    talking to him about some other information I think
14    initially; correct?
15        A.   No, I don't think so.
16        Q.   The purpose of your visit with Mario Chavez
17    was to find out what he knew about Joe Gallegos and
18    the attack on Tiny, Jose Gomez?
19        A.   No, I think we approached him because he
20    had recently arrived in prison.
21        Q.   Okay.
22        A.   And he was claiming to be an SNM Gang
23    member.
24        Q.   Okay.  And it was just an exploratory
25    interview?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    It was.
 2          Q.    Okay.  And your ROI starts out, though,
 3   with the information regarding Joe Gallegos; right?
 4          A.    An ROI --
 5          Q.    Sorry, your report of investigation, your
 6   302.
 7          A.    Yes.
 8          Q.    And that then became important information;
 9   right?
10          A.    It did.
11          Q.    And that was received in your first
12   interview with him?
13          A.    Yes.
14          Q.    And so the other -- the note that he --
15   you'd said he received a note from somebody that was
16   in charge of a facility?
17          A.    Yes.
18          Q.    And that was the name that you ran down?
19          A.    Yes.
20          Q.    And who was that?
21          A.    Jeremiah Martinez.  He referred to him as
22   Cyclone.
23          Q.    And you ran that information down to
24   confirm that?
25          A.    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Because that was something that you deemed
 2   was important; right?
 3        A.   Yes.
 4        Q.   And so did you deem this information not
 5   important or --
 6        A.   No.
 7        Q.   Okay.  We could have confirmed whether
 8   Mario Chavez ever visited Joe Gallegos in jail?
 9        A.   We could.
10        Q.   And we could confirm if he had sent him
11   letters when they were in jail; right?
12        A.   I don't know that we could do that.  Some
13   of the jails don't keep track of what goes in and
14   comes out.
15        Q.   But we don't know what jail this is; right?
16        A.   I think it was the Valencia County Jail.
17        Q.   And have you done that with them to find
18   out if they would have been able to tell you if the
19   letter had gone in and out?
20        A.   No.
21        Q.   And how did Mario -- I think I've asked
22   when he learned this information.  How did he learn
23   this information?
24        A.   To my knowledge, he was hanging out with
25   Brandy and Shauna as a way to pass those messages.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Brandy is dating -- excuse me, Brandy is
 2    Joe's essentially adopted or related family member,
 3    or a close tie to Joe; correct?
 4        A.   Yes.
 5        Q.   Shauna, at some point in time, was dating
 6    Joe Gallegos; correct?
 7        A.   Yes.
 8        Q.   Did you ever ask why they needed a third?
 9        A.   I think I did.
10        Q.   What was that answer?
11        A.   I don't have in it front of me so I may not
12    be entirely accurate.
13        Q.   Okay.
14        A.   I think they said they wanted to avoid any
15    scrutiny from others.  He had passed letters from
16    other SNM members.  And that's a common tactic that
17    they use.
18        Q.   Well, but nobody was concerned with the
19    SNM; right?
20        A.   I don't know that that's true.
21        Q.   Okay.  Did Valencia County list Joe
22    Gallegos as an SNM member that needed to be -- and
23    they have a segregation list at most jails; right?
24        A.   I'm sure they do.
25        Q.   Okay.  Was there anything to indicate that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Mario Chavez was needed because Brandy or Shauna were

2    not allowed to visit Joe at Valencia County?

3         A.   I never looked, so I couldn't tell you.

4         Q.   I apologize, I skipped Statement 59 by

5    accident.  Let me ask you just to refer to the one

6    right above that.  Statement 59 was made at Charlene

7    Parker-Johnson's house?

8         A.   Yes.

9         Q.   That's in the report?

10        A.   Yes.

11        Q.   And forgive me.  When I say that's in the

12   report and you're referring to something, we're

13   talking about the report by deputy -- I think it's

14   deputy, but Otto King, the investigator, correct?

15   The Valencia --

16        A.   No, I'm talking about the FBI report.

17        Q.   Okay.  Where did they get that information?

18        A.   "They" meaning?

19        Q.   The FBI report.

20        A.   We spoke with Paul Rivera.

21        Q.   Okay.  Is "don't testify" a statement that

22   was made on the day of February 27, 2016?

23        A.   Yes.

24        Q.   Is that in Otto King's report?

25        A.   I don't think so.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   What do we have to tell us if that

2   statement was made on February 27?

3      A.   Paul Rivera's statement.

4      Q.   That was given when?

5      A.   September 16, 2016.

6      Q.   When he decided to start cooperating?

7      A.   Yes.

8      Q.   Okay.  Now earlier I asked you, in

9   Statement 47, whether there was any information in

10   the report.  And I think I made a mistake, because

11   we're talking about different reports.  In Otto

12   King's report, does it say that Joe Gallegos put a

13   hit out on him?

14      A.   Otto King's report?

15      Q.   Yes.

16      A.   Yes, it does.

17      Q.   So we're talking about two different

18   reports; right?

19      A.   Yes.

20      Q.   Okay.  One of which was created at the

21   scene, and one of which was created essentially six

22   to eight months later or so; depending on the math,

23   from March to September, I guess that's six months?

24      A.   One wasn't at the scene.  It was at the

25   hospital.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  "The day of," is that better?
 2        A.   Yes.
 3        Q.   Okay.  I think that would take us to
 4   Statement 61.  Joe Gallegos ordered the hit on Gomez,
 5   and Shauna Gutierrez planned the hit.  And this is
 6   Brandy Rodriguez that we were told was the declarant,
 7   not Shauna Gutierrez; correct?
 8        A.   Correct.
 9        Q.   How did Joe order the hit?
10        A.   I don't know.
11        Q.   Did Mario tell you how?
12        A.   He did not.
13        Q.   Okay.  And what was the statement that Joe
14   used to order the hit?
15        A.   I don't know.
16        Q.   Okay.  And what was the statement of how
17   Shauna Gutierrez planned the hit?
18        A.   I don't know.
19        Q.   The next statement, if I could ask you,
20   Agent, is 69.
21        A.   Okay.
22        Q.   Statement 69 is -- this is a message from
23   Joe; correct?
24        A.   Yes.
25        Q.   And because that's in quotes, that's what
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we're understanding was the actual statement?

2         A.   Yes.

3         Q.   Brandy Rodriguez never told you she said

4    that?

5         A.   I don't think she did.

6         Q.   Okay.  Statement 70.  This statement was

7    made after Paul Rivera had started cooperating with

8    the Government; correct?

9         A.   Yes.

10        Q.   Okay.  And during your conversations with

11   cooperators generally, I assume you tell them that

12   what they tell you can provide a benefit to them?

13        A.   I don't tell them that every time.

14        Q.   Okay.  Have you ever told them that?

15        A.   Are we talking about Paul Rivera

16   specifically?

17        Q.   I said generally, but let's talk about Paul

18   Rivera specifically.  Did you talk to Paul Rivera?

19        A.   I don't think I ever told him that anything

20   he told me would benefit him.

21        Q.   Okay.  Why was he speaking with the

22   Government, Paul Rivera?

23        A.   I think on this specific instance I went up

24   to PNM to just visit with the cooperators.  I hadn't

25   met them, and I was new to the case.

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492
                                                    e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1         Q.   Okay.
 2         A.   So it was more like an introduction.  And
 3    since I had been at a previous debrief with Mr.
 4    Rivera, he pulled me aside to give me this
 5    information.
 6         Q.   This information?
 7         A.   Yes.
 8         Q.   Okay.  And so this information wasn't
 9    provided to you in a debrief.  This information was
10    provided to you, just specifically to you at an
11    impromptu meeting?
12         A.   Yes.
13         Q.   And his words to you were Shauna said what?
14         A.   "She's ride or die with Gallegos."
15         Q.   Okay.  And that is what he said, and the
16    interpretation then comes from that; correct?
17         A.   Yes.
18         Q.   Because that has no mention -- that is a
19    statement of loyalty, not a threat, right?
20         A.   Correct.
21         Q.   All right.  And statement of loyalty is
22    about the relationship between Shauna and Joe?
23         A.   Yes.
24         Q.   And so there was no information in that
25    statement provided that they had put -- that Joe had
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    put a hit on Brandy Rodriguez?

2        A.   He didn't give me her exact words, but he

3    relayed the content of the conversation.

4        Q.   Okay.

5        A.   And that included placing a hit on Brandy

6    Rodriguez.

7        Q.   And how was that hit placed?

8        A.   I don't know.

9        Q.   When was that hit placed?

10       A.   I don't know.

11       Q.   Do you have any information to believe that

12   hit on somebody that there is a lot of information

13   that refers to Joe as his daughter, was ever placed?

14       A.   I don't.

15       Q.   The answer is no; correct?

16       A.   I don't know.

17       Q.   But there is no information?

18       A.   I can't say yes or no to that without going

19   out and looking for that.

20       Q.   Have you gone out and looked for that?

21       A.   No, we told Ms. Rodriguez that we thought

22   there might be a hit on her.

23       Q.   Okay.  And have you witnessed Ms. Rodriguez

24   when she was in the courtroom?

25       A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   Waving at Joe?

2          A.   Yes.

3          Q.   Joe waving at her?

4          A.   Yes.

5          Q.   And this was over the course of essentially

6    probably almost a year; right?

7          A.   Yes.

8          Q.   Okay.  Did anybody ever act like they

9    believed there was a hit on each other?

10         A.   No.  However, based on experience and

11   reports, the SNM play friendly with people they know

12   they're going to kill.

13         Q.   We're talking about somebody -- we're not

14   talking about SNM.  We're talking about somebody who

15   has lived in that person's house since they were 8;

16   correct?

17         A.   Yes.

18         Q.   And that is Brandy Rodriguez living in Joe

19   Gallegos' house; correct?

20         A.   Correct.

21         Q.   Okay.  So there is no information and there

22   is actually information suggesting otherwise?

23         A.   Yes.

24              MR. BENJAMIN:  I think I'm done, Your

25   Honor.  If I could just have a couple of seconds to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    go back through.

 2              THE COURT:  You may.

 3              MS. ARELLANES:  Your Honor, I think Ms.

 4    Gutierrez requires a break.

 5              THE COURT:  All right.  Well, let's talk

 6    about how we want to take a break.  Do we want to

 7    take a 15-minute break and then come back and take a

 8    late lunch; go for a while and take a late lunch?

 9    We're taking kind of an early odd break.  Or do you

10    want to take your lunch break now and come back at

11    12:35, something like that?  What do you want to do?

12    How many of you want to take a late lunch?  How many

13    want to take a lunch break now.  All right.  Well,

14    that wins it, then.

15              All right.  See you back -- not much voter

16    participation.  It's good old America; right?

17              All right.  We'll see you back about 12:35,

18    12:40 something like that.

19              (The Court stood in recess).

20              THE COURT:  All right.  Let's go on the

21    record.  It looks to me like every defendant has at

22    least one attorney.  So I think we're ready to go.

23              Mr. Benjamin, did you decide you were done?

24              MR. BENJAMIN:  Yes, Your Honor, I'm done.

25              THE COURT:  So Mr. Burke, are you going to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    be next?
 2              MR. BURKE:  Yes, Your Honor.  Thank you.
 3              THE COURT:  All right.  Mr. Burke.
 4                    CROSS-EXAMINATION
 5    BY MR. BURKE:
 6         Q.   Agent Stemo, how long have you been an FBI
 7    agent?
 8         A.   A little under two years.
 9         Q.   A little under two years.  And is this case
10    here what you've been spending most of your time on?
11         A.   Yes.
12         Q.   All right.  And did you have any prior law
13    enforcement experience prior to joining the FBI?
14         A.   No.
15         Q.   When you joined this investigation, what
16    did you do to prepare for being a good investigator
17    on the case?  What sorts of reports and interviews
18    did you do to get yourself up to speed?
19         A.   I read the entire case file.  I initially
20    sat in a lot of interviews and read those write-ups.
21         Q.   When you read the entire case file, you
22    recognized that there had been prior FBI cases that
23    had morphed into, if that's the right phrase, the
24    current case?
25         A.   I did not initially.  This is, it was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    dubbed Operation Atonement.  There were other case

2    files that I didn't know of initially, and I can't

3    say I've read all of those.

4         Q.   And you were present when Judge Browning

5    described his view of the case, that it was inspired

6    in many ways by the threats on Mr. Marcantel?

7         A.   Yes.

8              MR. CASTELLANO:  Objection, relevance, Your

9    Honor.  This isn't regarding any James statements.

10             THE COURT:  Well, let me see where he's

11   going.  I'll give him a little leeway.  Overruled.

12             MR. BURKE:  Thank you.

13   BY MR. BURKE:

14        Q.   So that was the instigating reason for the

15   investigation?

16        A.   Yes.

17        Q.   And then what you did, what the task force

18   did, was, they started looking, in addition to that,

19   at some homicides.  For example, the first one would

20   have been the Javier Molina homicide, which was in

21   2014.  Is that a fair assessment of how the

22   investigation went?

23        A.   I don't know.  I wasn't there for it, so I

24   don't know what they looked at first.

25        Q.   When you joined the investigation, what was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    the focus then?

 2        A.    When I got there, we were actually doing

 3    more search and arrest warrants.  I think we arrested

 4    two or three people that were not charged in this

 5    indictment.

 6        Q.    So were you working on this case shortly

 7    before the first indictment?

 8        A.    No.

 9        Q.    You came onto the team after the first

10    indictment?

11        A.    Yes.

12        Q.    All right.  Thank you.  The primary case

13    agent -- is that Mr. Acee?

14        A.    Yes.

15        Q.    And who were some of the other FBI agents

16    who have worked on this case?

17        A.    Joe Sainato and Thomas Neale.

18        Q.    Thank you very much.  Turning to the

19    outline, did you help prepare the outline?

20        A.    I did not.

21        Q.    Do you know if any FBI agents helped

22    prepare the outline?

23        A.    I don't know.

24        Q.    Not that you know of?

25        A.    Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And then did you take a look at some files
 2   last night in order to be prepared to testify here
 3   today?
 4        A.   Yes.
 5        Q.   And you have a binder before you which is
 6   what?  What is that binder?
 7        A.   It contains different 302s, State Police
 8   reports, and I think Valencia County reports
 9   regarding statements made by different individuals.
10        Q.   And were you attempting to gather in that
11   binder the reports that would be reflected in the
12   James outline, what I'm calling the James outline?
13        A.   I didn't gather anything.  It was provided
14   to me.
15        Q.   No, were you looking for reports that would
16   assist you in testifying today?
17        A.   Yes.
18        Q.   And you knew you would be testifying about
19   this outline?
20        A.   Yes.
21        Q.   All right.  Thank you.  I'd like to go
22   through a few of them.  It will take me just a bit.
23             Number 11.  Leroy Lucero's statement.  Do
24   you see that there?
25        A.   I do.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And is his nickname Smurf?  Is that one of
 2   his nicknames?
 3        A.   It is.
 4        Q.   And he was at one time a federal prisoner,
 5   he was in the Bureau of Prisons?
 6        A.   He was.
 7        Q.   And did you go back and look at his
 8   interview when he was at a BOP facility in
 9   Pennsylvania?
10        A.   Last night, or previously?
11        Q.   At any time.
12        A.   I have.
13        Q.   And I believe he was at Lewisburg; is that
14   correct?
15        A.   Yes.
16        Q.   And was that the first time that Smurf
17   talked to federal agents?
18        A.   I don't believe so.
19        Q.   Do you know when the first time would have
20   been?
21        A.   No.
22        Q.   And Mr. Lucero is claiming that Angel Munoz
23   made statements to him; is that correct?
24        A.   Yes.
25        Q.   And he's deceased, isn't he?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    All right.  And then have you talked to him
 3   yourself, Leroy Lucero?
 4        A.    Yes.
 5        Q.    How often?
 6        A.    I've spoken to him about five times.
 7        Q.    All right.  And is he here in New Mexico?
 8        A.    Yes.
 9        Q.    In custody?
10        A.    No, he's not.
11        Q.    Is he on supervised release now?
12        A.    I think he still might be.
13        Q.    All right.  And when was the last time you
14   talked to him?
15        A.    About a week or so ago.
16        Q.    Thank you very much.  Let me ask you to
17   turn to Statement 13.  That's a Lujan statement.
18        A.    Okay.
19        Q.    He made statements to you or your
20   colleagues that he met with Mr. Gallegos, Angel
21   DeLeon, and Kriminal; and that's Michael Jaramillo;
22   is that correct?
23        A.    Yes.
24        Q.    And where did that meeting take place?
25        A.    The first time he made the statement?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Yes.  It was a bad question.  Where did

2    Lujan say he met with those three people?

3    A.   I believe he said it was in front of the

4    unit they resided in, P pod.

5    Q.   And he was clear about that and who the

6    three people were?

7    A.   Initially he misidentified Joe Gallegos as

8    Joe Castillo.

9    Q.   All right.  And then as far as Angel DeLeon

10   and Kriminal, Michael Jaramillo, he was clear about

11   that?

12   A.   Yes.  He did not identify Kriminal as

13   Michael Jaramillo.

14   Q.   He just had the nickname?

15   A.   Yes.

16   Q.   And you subsequently tied that down to be

17   Michael Jaramillo?

18   A.   Yes.

19   Q.   And he made that same statement a couple of

20   other times?

21   A.   He did.

22   Q.   And those were the three people who Lujan

23   says were tasked with killing Pancho Castillo?

24   A.   Yes.

25   Q.   Let me ask you to turn to Statement 16.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    That's a Frederico Munoz statement.  Is he a

2    co-conspirator, then?

3         A.   Yes, I believe he is.

4         Q.   And has he been charged in this case?

5         A.   He was charged under the RICO indictment.

6         Q.   And including this particular murder?

7         A.   I'm not sure.  I'd have to look at the

8    overt acts for him.

9         Q.   All right.  Well, was there a separate

10   count designated for this as to Mr. Munoz?

11        A.   I don't think there was.

12        Q.   All right.  Thank you.  Let me ask you to

13   turn to Statement 19.  Javier Alonso is talking about

14   Arturo Garcia and says that Arturo Garcia wrote to

15   Frankie Gonzalez that Brian and Raymond Rascon were

16   to take care of the next murder for SNM.  Do you see

17   that there?

18        A.   I do.

19        Q.   Now, did Javier Alonso say that he saw the

20   letter; is that what he said?

21        A.   Yes.

22        Q.   And this was a letter supposedly written by

23   Arturo Garcia to Frankie Gonzalez?

24        A.   Yes.

25        Q.   And do you have that letter?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.    No.

 2        Q.    So Frankie Gonzalez is a co-conspirator?

 3        A.    Yes.

 4        Q.    And has he been charged?

 5        A.    He has not.

 6        Q.    All right.  Turning to 20, this is another

 7   Javier Alonso statement.  And when did he talk to you

 8   or your colleagues?

 9        A.    I believe the first meeting was in August

10   of 2017.

11        Q.    So this was after he decided to be an

12   informant and enter into a plea agreement; is that

13   correct?

14        A.    I think the first meeting was before he

15   pled guilty.

16        Q.    Okay.  Sort of a proffer?

17        A.    Yes.

18        Q.    And then he had subsequent meetings?

19        A.    I think we met with him after he pled.

20        Q.    All right.  And so all of the information

21   in this statement, including 20, comes after he had

22   made his plea agreement or made a decision to reach a

23   plea agreement?

24        A.    I believe so.

25        Q.    All right.  And he was very clear that Ben
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Clark put him in charge of the killing?

2         A.   Yes.

3         Q.   All right.  Thank you.  Let me ask you to

4    turn to 21.  This is the statement that Javier Alonso

5    says that he was talking to somebody at the door

6    between the blue pod and the green pod; is that

7    correct?

8         A.   Yes.

9         Q.   And he remembered, I believe, that Ernest

10   Earn Dog Viero had started some communication about

11   getting the job done or something like that?

12        A.   Yes.

13        Q.   But he does not know -- Javier Alonso does

14   not know who it was that actually told him to, in

15   effect, get moving?

16        A.   Correct.  He could not remember that

17   individual's name.

18        Q.   All right.  Is Ernest Guerrero a

19   co-conspirator?

20        A.   Yes.

21        Q.   Has he been charged?

22        A.   He has not.

23        Q.   Turning to 22, so what Alonso said in

24   conjunction with his plea agreement is he told Edward

25   Troup to help?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   He did.

 2        Q.   Were his statements, Javier Alonso's

 3   statements, recorded?

 4        A.   No.

 5        Q.   Turning to 23, Javier Alonso is talking

 6   about the killing of Fred Sanchez, and he remembers

 7   that both Rascons came to the cell?

 8        A.   He does.

 9        Q.   Now, are -- so they're co-conspirators,

10   Brian and Raymond?

11        A.   Yes.

12        Q.   And have they been charged?

13        A.   No.

14        Q.   Why not?

15        A.   I don't know.

16        Q.   Okay.  That was before your involvement in

17   the case?

18        A.   Yes.

19        Q.   Have you met with them?

20        A.   No, I haven't.

21        Q.   Have any of your colleagues met with them?

22        A.   I don't believe so.

23        Q.   All right.  Thank you.

24             Turning to 24.  So in addition -- I take it

25   from this that in addition to coming into the cell,
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    the Rascon brothers were also assigned the job of

 2    being lookouts.

 3         A.   Yes.

 4         Q.   Let's turn to 25.  Javier Alonso recalls

 5    that Edward Troup kissed him on the cheek and said he

 6    was proud of him?

 7         A.   Yes.

 8         Q.   Where did that take place?  Was that still

 9    in the cell?

10         A.   I could check, if you'd like.

11         Q.   Absolutely.

12         A.   It's unclear where it happened.

13         Q.   Pardon?

14         A.   It's unclear where it happened.

15         Q.   He provided you no details regarding the

16    location as to that event or that statement?

17         A.   Correct.

18         Q.   Let me ask you to turn to 29.  Ben Clark.

19    Now, in contrast to the Statement Number 13, where

20    Javier Alonso recalled that Ben Clark made the

21    assignment to him, here is a statement where the

22    assignment allegedly is to Alonso and Troup.  Do you

23    see that there?

24         A.   I do.

25         Q.   When did Clark make that statement?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Just a moment.

 2                MR. CASTELLANO:   Just a point of

 3     clarification.   Does he mean that statement to law

 4     enforcement or that statement to those individuals?

 5                MR. BURKE:   The statement to law

 6     enforcement.   Thank you.

 7          A.    He made that specific statement on April

 8     12, 2016.

 9     BY MR. BURKE:

10          Q.    April 12, 2016?

11          A.    Yes.

12          Q.    That's when Ben Clark said that he assigned

13     the job to Alonso and Troup?

14          A.    Yes, that's when he told law enforcement

15     that.

16          Q.    Were you working on the task force and were

17     you present when Benjamin Clark entered his plea in

18     the United States District Court for the District of

19     New Mexico?

20          A.    I don't think so.

21          Q.    It's actually an exhibit.   And were you

22     aware that when that happened, he gave no specific --

23     basically no specifics about the Freddie Sanchez

24     killing?

25          A.    No, I wasn't present for that, nor have I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   seen the plea agreement.

2        Q.   Okay.  Well, it's a matter of record.  He

3   said all he did was pass the paperwork and everybody

4   knew what they had.  He didn't make any assignments.

5   Does that surprise you?

6        A.   No.

7        Q.   And why doesn't it surprise you?  Because

8   informants change their statements with some

9   frequency?

10       A.   Partly that.  Partly also because when they

11  plead guilty, the judge has them explain what they

12  did and sometimes they offer more detail than what's

13  on the paperwork.

14       Q.   Okay.  And if I were to represent to you

15  that I've read the entry of plea, the Rule 11

16  advisement, and there's no additional details, would

17  that surprise you?

18       A.   No.

19       Q.   Because informants do sort of add and

20  embellish later on after they enter their plea?

21       A.   I don't agree with embellishment.  It could

22  be that, but sometimes they remember more once you've

23  asked them questions and they have time to think

24  about it.

25       Q.   All right.  So when he's asked some

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    questions, such as:  Do you remember giving an

2    assignment to anyone, questions like that, then they

3    may remember more details?

4         A.   No, not necessarily.

5         Q.   All right.  Let me ask you to turn to 36.

6    And Mr. Benjamin did ask you about this.  This is,

7    again, Smurf remembering things.  So Smurf remembered

8    that four or five years after March 26, 2001, Joe

9    Gallegos talked to him about the 2001 homicides?

10        A.   He remembered having that conversation and

11   he believed that conversation happened four to five

12   years after.

13        Q.   Thank you.  I'd now like you to turn to 37.

14   Lawrence Torres.  His statement is that Edward Troup

15   was seated at a table on the second floor; is that

16   correct?

17        A.   That's part of his statement.

18        Q.   And Edward Troup says, "Don't come up.

19   This has nothing to do with you.  Don't come up

20   here."  Is that correct?

21        A.   Yes.

22        Q.   And so Edward Troup was really advising him

23   to steer clear of whatever might have been going on.

24   Is that -- according to Mr. Torres, is that the way

25   that happened?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't know what Mr. Torres understood
 2   that to mean to him.
 3        Q.   Fair enough.  Looking at 38, Lawrence
 4   Torres remarks that Angel DeLeon had a scratch; is
 5   that correct?
 6        A.   Yes.
 7        Q.   And Angel DeLeon has not been brought into
 8   this case; he is still at large?
 9        A.   Correct.
10        Q.   And turning to 39, Ben Clark is talking
11   about Kyle Dwyer.  Do you see that there?
12        A.   I do.
13        Q.   He is deceased, is he not?
14        A.   Yes.
15        Q.   Mr. Dwyer.  Then turning to 40, I believe
16   you said this on earlier examination, the Crazy Town
17   Roswell Gang provided the paperwork; is that right?
18        A.   Yes.
19        Q.   Now, that is sort of a feeder gang?  Is
20   that --
21        A.   There are SNM members who come from that
22   gang.
23        Q.   And was the Crazy Town Roswell Gang -- were
24   they offended that one of their own turned into a
25   snitch, Mr. Castillo?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I don't know.
 2        Q.    What was the role of the Crazy Town Roswell
 3   Gang besides -- why did they provide the paper to the
 4   prison and the SNM?
 5        A.    I believe it's common practice for gang
 6   members who acquire paperwork on other gang members
 7   to provide that to the gang so they can clean their
 8   own house.
 9        Q.    And was Javier Alonso -- was he from
10   Roswell?
11        A.    I don't think he was.
12        Q.    You don't think he was.  Okay.  Thank you.
13   Let me ask you to look at 62.  Paperwork on Sanchez
14   was delivered from Arturo Garcia to Ben Clark
15   approving the murder, and that is a statement
16   attributed to these four people:  Samuel Gonzalez,
17   John Montano, Javier Rubio, and Joe Cheech Martinez;
18   is that correct?
19        A.    No.
20        Q.    Please tell me what was wrong with that.
21        A.    I don't believe Joe Martinez made that
22   statement.
23        Q.    Okay.  Samuel Gonzalez, John Montano, and
24   Javier Rubio did?
25        A.    Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   And at the time, Samuel Gonzalez and John
2     Montano were in the same pod; correct?
3          A.   Yes.
4          Q.   Are they co-conspirators?
5          A.   They're not.
6          Q.   And they've not been charged?
7          A.   I take that back.  They are
8     co-conspirators, but they have not been charged.
9          Q.   All right.  Did you get the impression that
10    this was an SNM pod, referring to the Freddie Sanchez
11    homicide?
12         A.   Yes.
13         Q.   And did you get the impression that
14    everybody except Castillo knew that Castillo was
15    going to be hit?
16         A.   Frank Castillo?
17         Q.   I'm sorry, Fred Sanchez.  Thank you.
18         A.   Can you repeat the question?
19         Q.   Yes.  On the 2007 homicide, Freddie
20    Sanchez, did you get the impression that everybody in
21    the pod knew about the hit except for the victim?
22         A.   I think Freddie Sanchez knew he was green
23    lit.
24         Q.   So basically everybody in the pod knew that
25    it was going to be a hit?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't know that everybody knew.  But it
 2   was common knowledge.
 3        Q.   And it was even common knowledge with the
 4   staff, the COs all knew that he was going to be hit?
 5        A.   I believe the STIU unit had an awareness of
 6   it.  I don't know about all the COs.
 7        Q.   And in fact, STIU -- they were very
 8   surprised that Sanchez was allowed to stay there.
 9   And they were very upset when they came in after the
10   weekend and found that he was still there but he was
11   dead?
12        A.   Yes, I think they put in a request to have
13   him moved.
14        Q.   And that request was ignored?
15        A.   I believe so.
16        Q.   I see.  Now, turning to 63, that's Samuel
17   Gonzales again.  He apparently knew that Cheeky,
18   that's Raymond, and Coquito, that's Brian, they were
19   supposed to hit Sanchez?
20        A.   Yes.
21        Q.   And when did he say that?
22        A.   One moment.  He told that to law
23   enforcement on February 22, 2017.
24        Q.   That's the first time that he spoke to law
25   enforcement?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    I'm not sure.  He was in the RPP Program,
2   so he spoke with STIU before.
3        Q.    Okay.  So because he went into the RPP
4   Program, part of that is that he must sort of give
5   statements about what his involvement in gangs had
6   been prior to going into RPP?
7        A.    Or his knowledge of anything that's
8   occurred.
9        Q.    All right.  So he may have spoken to -- and
10  have you seen the reports that may have been
11  generated as a result of his acknowledgment or his
12  familiarity with gang activity?
13       A.    I don't think I have.
14       Q.    All right.  But as far as your group, that
15  would have been February of 2017?
16       A.    Yes.
17       Q.    And were you in on that interview?
18       A.    I was not.
19       Q.    And have you ever met him?
20       A.    I have not.
21       Q.    And do you know the last time that he was
22  spoken to?
23       A.    I believe he testified in the last trial.
24  Does that count?
25       Q.    Okay.  Let's turn to 65.  John Montano
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    mentions, "They'd be messed up if the paperwork on

 2    the guy I just got showed up.  Ben Clark also sent

 3    Arturo Garcia a list of names of people in the pod."

 4          I think on an earlier examination you

 5    referred to that as a roll call.  Have you seen that

 6    roll call?

 7    A.   No.

 8    Q.   You have not seen that letter?

 9    A.   No.

10    Q.   That was not seized by STIU?

11    A.   Not that I know of.

12    Q.   Do you know when Ben Clark was in that pod?

13    A.   June 27?  No.  June 28, 2007.

14    Q.   Okay.  And was he -- as far as you know,

15    was he -- I'm not going to do that.  Did you know

16    that he was moved before the homicide?

17    A.   I did.

18    Q.   All right.  Do you know how long before the

19    homicide he was moved?

20    A.   It was a day or two before.

21    Q.   Was he moved before Sanchez showed up at

22    the blue pod?

23    A.   I don't think so.

24    Q.   So you believe that he was there when

25    Sanchez showed up?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I believe so.
 2        Q.   Let me ask you to turn to 66.  Montano
 3   has -- well, were you present during any of the
 4   Montano debriefings?
 5        A.   I was.
 6        Q.   And he has told you that Edward Troup and
 7   Javier Alonso attempted to hide in his cell?
 8        A.   Yes.
 9        Q.   And is this where you're going to interview
10   him some more and see if he remembers anything more?
11        A.   No.  I believe it was on my first encounter
12   with him.
13        Q.   He said that?
14        A.   I can check.  Give me a second.
15        Q.   Please do.
16        A.   What was the question again?
17        Q.   The question was:  When you heard during
18   the debriefing of John Montano that they were hiding
19   or attempting to hide in his cell, did you ask him
20   about anything else he might have remembered or any
21   statements that he might have heard during that
22   rather odd activity?
23        A.   No, we didn't get into specifics on that
24   encounter.
25        Q.   And was that the first time that he was
```



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    interviewed, as far as you know?

 2         A.   By the FBI?

 3         Q.   Yes.

 4         A.   Yes.

 5         Q.   And have you seen any STIU interviews or

 6    any other interviews by state law enforcement of Mr.

 7    Montano?

 8         A.   Not that I can recall.

 9         Q.   All right.  Thank you.  I'd like you to

10    turn to 73.  Ruben Hernandez.  And this is -- in the

11    document the declarant is an and/or, Edward Troup

12    and/or Jesse Trujillo.  When was Ruben Hernandez

13    first interviewed or when was the first time that

14    Ruben Hernandez gave a statement to either the FBI or

15    state authorities?

16         A.   I think the first time he actually wrote a

17    letter to the prison administration.  The date that I

18    have on the memo, because his letter is undated, is

19    July 11, 2007.

20         Q.   July 11, 2007, he wrote a letter to state

21    authorities regarding what he remembered about the

22    Freddie Sanchez homicide; is that correct?

23         A.   Yes.

24         Q.   And you've read the letter?

25         A.   I've read a transcript.  It's a little hard
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    to understand.

 2         Q.   I understand.  Would you take a look at it

 3    now, and see if you agree with me that when he wrote

 4    out that statement, it says that he ordered Jesse

 5    Trujillo to cover the cameras?

 6         A.   "He" being Ruben?

 7         Q.   Yes.

 8         A.   Just a moment.

 9         Q.   Thank you.

10         A.   I don't see that it says Jesse ordered

11    Ruben to cover the cameras.

12         Q.   And actually, Edward Troup is not mentioned

13    in that part of the statement about covering the

14    cameras.  Isn't that true?

15         A.   Correct.

16         Q.   All right.  And then turning to 75, Ruben

17    Hernandez again is communicating with Jesse Trujillo,

18    and Jesse Trujillo says, "Just stand there," and

19    apparently Ruben was using a crutch at the time?

20         A.   Yes.

21         Q.   All right.  Did Ruben Hernandez say that he

22    put the wet toweling on the cameras?

23         A.   He tries to.

24         Q.   And then Trujillo ended up doing it?

25         A.   Ruben couldn't do it quite as well as they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    would have liked him to.
 2         Q.   So they were covering for each other, sort
 3    of?
 4         A.   I would say Jesse Trujillo was covering for
 5    Ruben.
 6         Q.   All right.  When you read the letter that
 7    Ruben Hernandez wrote shortly after the homicide to
 8    the STIU, I think, did you see the part where the
 9    upper tier was supposed to put cups on the cameras?
10         A.   Yes.
11         Q.   And something happened and they weren't
12    able to put the cups on the cameras?
13         A.   Yes.  I believe a CO found them.
14         Q.   A CO found them, and that was the upper
15    tier, so the whole upper tier was involved in the
16    homicide?
17         A.   I'm not sure.
18         Q.   But the one -- when you've read about this,
19    the way they've expressed it is:  The upper tier was
20    supposed to cover the cameras; right?
21         A.   I don't remember that.  I just remember
22    Ruben and Jesse Trujillo being involved with the
23    cameras.
24         Q.   Do you remember the cups part?
25         A.   I remember.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   They were supposed to, but they may not

2    have done it, the upper tier?

3      A.   Yes.

4      Q.   So they were co-conspirators, too?

5      A.   Yes.

6      Q.   And they weren't charged?

7      A.   Correct.

8      Q.   All right.  Please turn to 77.  Ruben

9    Hernandez, Kyle -- once again, that's a person who is

10   deceased; right?

11     A.   Yes.

12     Q.   But Kyle supposedly asked Ruben to take

13   something to Samuel Gonzales, and the paperwork was

14   skimpy or something?  What was that about?

15     A.   It was a piece of paper that was folded up.

16     Q.   Do you know how that fits into this?

17     A.   No.

18     Q.   But that's not the paperwork that allowed

19   the green light, then?

20     A.   Not that I know of.

21     Q.   All right.  And -- but supposedly Ruben,

22   you know, went upstairs, Kyle asked Ruben, so, yeah,

23   Ruben went up to Gumby's cell?

24     A.   He did.

25     Q.   And then turning to 79, this is Chicky, so

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   that's Raymond Rascon?  He's cutting the sleeves off

 2   it, and I believe you explained this, that's because

 3   there was a concern that Chicky would have had

 4   evidence such as DNA on his clothing?

 5        A.   I believe so.

 6        Q.   Turning to 81, it's Ruben talking to Brian

 7   or Edward again, so we have the either/or.  "First

 8   thing in the morning we need you to move the body."

 9   And actually, I believe it was Ruben and Brian Rascon

10   talking to each other, wasn't it?  If you want to

11   look, that would be fine.

12        A.   I believe he makes two statements that are

13   very similar, but he interchanges the names.

14        Q.   All right.  And we could look at his

15   written letter to see that?

16        A.   Yes.

17        Q.   Then he speaks only to Brian Rascon, and

18   said, "That's all we're asking," he told Ruben, when

19   he didn't want to clean the cell.  "Just clean the

20   cell."  And Ruben balked; is that right?

21        A.   Right.

22        Q.   And then in 84, again, Brian is telling

23   him, "Follow the order, Ruben," in effect?

24        A.   Yes.

25             MR. BURKE:  That's all I have, Your Honor.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                       1-800-669-9492



```
 1    Excuse me.  Let me check with my co-counsel.
 2              THE COURT:  Certainly.
 3              MR. BURKE:  That's all I have.
 4              THE COURT:  Mr. Castle, do you want to go
 5    next?
 6              MR. CASTLE:  Thank you, Your Honor.
 7                     CROSS-EXAMINATION
 8    BY MR. CASTLE:
 9         Q.   Agent Stemo, you indicated earlier that
10    you've been an agent for two years; is that right?
11         A.   A little under.
12         Q.   A little under.  And did you go to the
13    Academy for that, or sometime --
14         A.   During that timeframe, yes.
15         Q.   During that timeframe.  And do you have a
16    particular specialty within the FBI?
17         A.   No.
18         Q.   I want to go through the statements like
19    the other attorneys did.  Okay?  But only certain
20    ones.  First, if we could start with Statement Number
21    1.  That's a statement where the person making the
22    statement is Leonard Lujan; is that right?
23         A.   Correct.
24         Q.   How many times have you personally talked
25    with Leonard Lujan?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   About four.
 2        Q.   Were those in interview formats, or debrief
 3   formats, or can you tell us a little bit about those?
 4        A.   I believe I was at two of his interviews;
 5   and then other times we met for administrative
 6   matters.
 7        Q.   So in what calendar years would those
 8   interviews have been?
 9        A.   2017.  It could have been 2016, as well.
10        Q.   During those interviews, were notes taken
11   or were they recorded?
12        A.   Notes.
13        Q.   Did you take the notes or someone else?
14        A.   It must have been someone else.  I wasn't
15   the lead on those.
16        Q.   Okay.  I want to show you one report.  I
17   show you a report that begins at page 42995 Bates
18   stamp.  Is that the report of one of the meetings
19   that you had with Mr. Lujan?
20        A.   Yes.
21        Q.   There should be some handwritten notes
22   somewhere concerning this meeting?
23        A.   Yes.
24        Q.   Was there a particular reason the interview
25   wasn't recorded?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It's not our practice to record interviews
 2   with people that are cooperating, and we're not
 3   required to do so by policy.
 4        Q.   Well, what's the purpose behind that
 5   practice?
 6        A.   I don't know.  I'm not a policy writer.
 7        Q.   So you don't have any personal preference
 8   one way or the other?
 9        A.   No, not really.
10        Q.   So you could have recorded your interview
11   with Mr. Lujan?
12        A.   I could have.
13        Q.   It's not policy not to record; is that
14   right?
15        A.   It is policy that we obtain approvals
16   before that.
17        Q.   And did you ever attempt to get any
18   approvals?
19        A.   No.
20        Q.   Or are you aware of any attempts to get
21   approvals?
22        A.   No.
23        Q.   So this interview is January 5, 2017.  You
24   talked about another one.  Was it before or after the
25   January 5 interview?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    I'm not sure.  I could have been mistaken

2   and only been at one.

3        Q.    Well, tell us what you remember about the

4   two or one interviews.

5        A.    I remember that interview.  It was, I

6   think, in Bernalillo.

7        Q.    And what about the second one you were

8   thinking about recalling a little bit earlier?

9        A.    I think I was meeting with Leonard, and he

10  might have told me that he needed to speak with his

11  attorney regarding medical issues.  It wasn't

12  anything substantive to the case.

13       Q.    Well, would that have been medical issues

14  concerning his mental health?

15       A.    I think he wanted, like, reading glasses

16  and a cane.

17       Q.    That's a second date you're talking about

18  that happening?

19       A.    I think so.

20       Q.    I'm going to approach you again with a

21  report.  Perhaps I need reading glasses.  I will

22  search my computer instead of using my eyesight.  I

23  should have showed you my computer.  Do you have that

24  report with you?

25       A.    I think I do.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   Okay.  Wasn't it in that one report, in
2    that interview, that Mr. Lujan spoke of his medical
3    needs, and that would be at page 42606?
4          A.   He talked about that.
5          Q.   So there's two different times you're
6    talking to him; right?
7          A.   Yes.
8          Q.   And in one he -- you make this report and
9    he talks about his glasses; right?
10         A.   Um-hum.
11         Q.   Now, I want to talk about the second time
12   you talked to him.
13         A.   Yes.
14         Q.   What was the subject of that interview?
15         A.   I think I was actually giving him money on
16   his commissary, and he told me about the medical
17   needs, again.  It's not unusual for people to bring
18   up medical needs to us.
19         Q.   Okay.  So you were giving him money and he
20   was telling you about other things that he needed;
21   right?
22         A.   He was telling me to tell his attorney to
23   relay that to the marshals.
24         Q.   And did you do a report about the provision
25   of money to Mr. Lujan on that date?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.    No, but there are records of the request.
 2          Q.    And then you indicated there were a total
 3    of five.  What were the other three occasions that
 4    you had contact with Mr. Lujan?
 5          A.    I estimated about five.
 6          Q.    Yes.
 7          A.    It would be for the same reason.
 8          Q.    So are these times where he'd call you or
 9    you would go out to see him?
10          A.    On one occasion I called him.  I think he
11    was at Luna County at the time.  The other times I
12    would go to the facility.
13          Q.    Going back to Statement Number 1, did Mr.
14    Lujan indicate to you where this -- or is this from
15    an interview that you conducted of Mr. Lujan,
16    Statement Number 1?
17          A.    No, this was led by Bryan Acee.
18          Q.    So in your review of Mr. Acee's report, did
19    Mr. Lujan indicate where this conversation occurred?
20          A.    The one in Statement 1?
21          Q.    Yes.
22          A.    All he says is, it occurred at Southern New
23    Mexico Correctional Facility.
24          Q.    In the investigation, are you aware of
25    anyone who could corroborate that meeting?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    With Mr. Garcia?

2          Q.    Between Mr. Garcia and Mr. Lujan.

3          A.    No.

4          Q.    So there were no corrections officers that

5    saw the two of them discussing matters?

6          A.    I haven't seen any reports of that.

7          Q.    No other inmates that saw that happening?

8          A.    Not that I'm aware of.

9          Q.    And isn't that the same meeting that both

10   Statement Number 1, Statement Number 2, Statement

11   Number 3, and Statement Number 4 happened?  Was it

12   all at the same meeting between Mr. Garcia and Mr.

13   Lujan?

14         A.    I believe there were two meetings where

15   they discussed the pending hits.

16         Q.    And I take it with regard to both of those

17   meetings, there's no other witnesses who saw or

18   recounted those meetings?

19         A.    I believe Mr. Lujan made a statement that

20   one of the COs told him he had them on camera in the

21   rec yard.  But I've never seen a report that

22   corroborates what Mr. Lujan was told.

23         Q.    In fact, he said, I believe, that the

24   warden of the facility warden, Tafoya, said he had

25   videotape of that meeting and confronted Mr. Lujan

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    about that; is that right?
 2         A.   I think that's what I'm referring to.
 3         Q.   And did you ever find any reports about --
 4    from Warden Tafoya or anyone saying that they had
 5    videotape of the meeting between Billy Garcia and Mr.
 6    Lujan?
 7         A.   No, I haven't.
 8         Q.   With regards to those meetings, essentially
 9    what Mr. Lujan was saying is that Mr. Garcia made the
10    order to kill these two individuals; is that right?
11         A.   Yes.
12         Q.   Now I want to flip over a little bit to
13    Leroy Lucero.  Do I have this right, that Mr. Lucero
14    is telling you the order came from a man by the name
15    of Angel Munoz?
16         A.   From my understanding is, Mr. Garcia
17    approached Mr. Lucero --
18         Q.   Hold on.  I'm just asking that question.
19    Did he say the hit came from Angel Munoz?
20         A.   No, he confirmed the hit with Angel Munoz.
21         Q.   So the phone call with Angel Munoz happened
22    after Mr. Garcia entered into the unit?
23         A.   I don't know when the phone call happened.
24         Q.   But doesn't Mr. Lucero state the first time
25    he heard about the hit was when he made a phone call
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    and confirmed the hit with Angel Munoz?

 2         A.   I don't know that he says that.

 3         Q.   Well, does he indicate that the green light

 4    was put on any of these individuals prior to ever

 5    meeting with Mr. Garcia?

 6         A.   He didn't indicate that.

 7         Q.   Who is Alfred Lino Giron?

 8         A.   He's an SNM member, and he's an SNM leader.

 9         Q.   Was he the leader at Southern for a time

10    period prior to these murders?

11         A.   He was.

12         Q.   When he left the facility, who did he leave

13    in charge of the facility?

14         A.   I'm not sure.

15         Q.   Do you recall that he left Leroy Lucero in

16    charge of the facility?

17         A.   I don't know that.

18         Q.   In your view of the reports, had Mr. Giron

19    put a red light, meaning a stop, on the murder of

20    these two individuals?

21         A.   He put a stop on all green lights.

22         Q.   And after he left, do you know who took

23    charge of the facility.

24         A.   I don't.

25         Q.   You don't recall Leroy Lucero ever saying
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   that he took charge of the facility?
 2        A.   I don't.
 3        Q.   How many interviews did you do with Mr.
 4   Lucero that you were present at?
 5        A.   One.
 6        Q.   I think you talked earlier about a
 7   three-way call that was placed.  Do you recall that?
 8        A.   Yes.
 9        Q.   And who was the -- tell us about that.
10   Tell us what happened.
11        A.   Mr. Lucero could not remember which inmate
12   approached him, telling him he needed to make a
13   three-way call.  He had an inmate call Angel Munoz,
14   as far as I know, and that's how that happened.
15        Q.   So was it Mr. Lucero wanting to get a call
16   to Angel Munoz and using a third party?
17        A.   Yes.
18        Q.   And did he indicate why he used a third
19   party, instead of using his own phone privileges?
20        A.   He did not.  But I believe it was because
21   Angel Munoz was in custody at the time, as well.
22        Q.   Do you recall that Angel Munoz was actually
23   on the streets at the time?
24        A.   He could have been.
25        Q.   Well, you can't call from one facility to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    another prison?

2        A.   Right.

3        Q.   So does it make sense that it would have

4    been someone on the streets that they would have been

5    calling?

6        A.   It's possible.

7        Q.   Well, is there a possibility that Leroy

8    Lucero could have been placing a three-way call to an

9    inmate at the other prison in the New Mexico

10   Corrections Department?

11       A.   It's not unheard of, where one inmate calls

12   a third party and then another inmate calls that same

13   third party or someone with them; they put the phones

14   on speaker and talk to each other that way.

15       Q.   So I take it you didn't try to figure out

16   during your interview of Mr. Lucero the details of

17   that phone call?

18       A.   No, we didn't ask enough questions about

19   that.

20       Q.   So if I get this right, Mr. Lujan says that

21   the order came from Billy Garcia, and Mr. Lucero says

22   the order came from Angel Munoz.  Do I have that

23   right?

24       A.   No, Mr. Lucero confirms the hit with Angel

25   Munoz.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And did Mr. Lujan indicate that the hit had
 2   to be confirmed with Angel Munoz?
 3        A.   I don't think Mr. Lujan talks about Mr.
 4   Munoz at all.
 5        Q.   Does he talk about Leroy Lucero at all?
 6        A.   No, I don't think he does.
 7        Q.   And does Leroy Lucero mention Mr. Lujan at
 8   all?
 9        A.   I think he does.  He did not believe that
10   Mr. Lujan was in a position to make decisions.
11        Q.   So according to Mr. Lujan's story, the
12   conspiracy that was occurring didn't include Leroy
13   Lucero?
14        A.   That's correct.
15        Q.   And Leroy Lucero's story is that the
16   conspiracy he was part of didn't include Leonard
17   Lujan?
18        A.   Correct.  But Mr. Lucero also says that
19   Mr. Billy Garcia told him he didn't need him for
20   anything.
21        Q.   I understand.  That wasn't the question,
22   though, was it, Agent?
23        A.   No, it wasn't.
24        Q.   Let's go to Statement 6.  In that, someone
25   indicated that Leonard Lujan talked to Eugene
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Martinez and told him, "I'm telling you right now
 2    where it's coming from and everything," referring to
 3    Billy Garcia; is that right?
 4          A.   Yes.
 5          Q.   Now, when Leonard Lujan was interviewed,
 6    did he ever say that he told Mr. Martinez where the
 7    hit was coming from in any of his interviews?
 8          A.   I can check.
 9          Q.   And if so, tell us which ones.
10          A.   He does say that.
11          Q.   He does say that in which interview?
12          A.   The September 12, 2007, interview.
13          Q.   And what does he specifically say?
14          A.   "So the next day I went to, hmm, to school,
15    to edu, the education building, and that's when I
16    spoke with Eugene Martinez.  I took him around the,
17    the, the hallway to the other side where it's pretty
18    isolated, not too many people go back there.  And I
19    told him what Wild Bill wanted to done, what Billy
20    Garcia wanted done.  And I told him how, how he
21    wanted it done, and basically what time he wanted it
22    done, in the morning, you know."
23          Q.   So you took from that that he said that
24    Billy Garcia made these specific orders, not just
25    that this is what the order was?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          A.    Yes.

 2          Q.    Were there any witnesses that corroborated

 3     that meeting at the Southern Correctional Facility?

 4          A.    Aside from Eugene Martinez?

 5          Q.    Yes.

 6          A.    No.

 7          Q.    I guess what they're saying is:  They went

 8     to a remote area of the yard and had this

 9     conversation, or behind one of the buildings; is that

10     right?

11          A.    Yes.

12          Q.    Were there any corrections officers who

13     said, "Hey, we saw this unusual meeting behind a

14     building; these two inmates alone were having a

15     meeting behind a building"?  Did any of them say

16     that?

17          A.    None that I'm aware of.

18          Q.    Was Leonard Lujan a suspect from the early

19     days of the investigation into the murders of Garza

20     and Castillo?

21          A.    I don't know, since I wasn't there for the

22     early parts of the investigation.

23          Q.    Oh, I know, but you've reviewed the

24     reports; right?

25          A.    Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        Q.   And do you recall Mr. Lujan's name was

 2   mentioned by various informants as to having been

 3   involved?

 4        A.   It depends on which investigation you're

 5   talking about.  Are you talking about the New Mexico

 6   State investigation?

 7        Q.   Yes.

 8        A.   No, it was not.

 9        Q.   It was not.  And was Eugene Martinez?

10        A.   He was.

11        Q.   And yet no Corrections officer reported

12   having seen Eugene Martinez do something unusual and

13   having this meeting behind a building?

14        A.   Not that I'm aware of.

15        Q.   Let's go to Statement Number 11, if we

16   could.  Earlier you indicated that Leroy Lucero had

17   confirmed with Angel Munoz the hit that Billy had

18   told him about; is that right?

19        A.   Yes.

20        Q.   And in this statement, Statement Number 11,

21   you say that Munoz -- I'm sorry, what's stated here

22   is that Leroy Lucero said that Munoz over the phone

23   said, "Something has to happen, carnal.  Billy is on

24   his way."

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So would this have happened before
 2   Mr. Garcia was at Southern?
 3        A.   I don't know.
 4        Q.   What do you take from that statement?
 5        A.   I can infer that Mr. Garcia had not been at
 6   Southern when the phone call happened.
 7        Q.   When did the conspiracy to kill these two
 8   inmates start generally?
 9        A.   I'm not sure as to the date and time.
10        Q.   Would it have been before Mr. Garcia ever
11   arrived at Southern New Mexico Correctional Facility?
12        A.   Yes.
13        Q.   So in this statement Leroy Lucero stated
14   that Angel Munoz said that several hits were supposed
15   to happen; is that right?
16        A.   Yes.
17        Q.   How many hits?
18        A.   I don't know.
19        Q.   I take it this is from your interview with
20   Mr. Lucero in 2017?
21        A.   Just a moment.  I'm not sure if that's what
22   he said in January 2018.
23        Q.   Oh, it's January 2018.  I'm sorry.  You're
24   not sure what he said then?
25        A.   No, I don't have the transcript.
```



SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492          BEAN                       FAX (505) 843-9492
                         & ASSOCIATES, Inc.              1-800-669-9492
                         PROFESSIONAL COURT       e-mail: info@litsupport.com
                          REPORTING SERVICE

1      Q.   There is a transcript of that?

2      A.   I believe there is.

3      Q.   And so that would be an instance where it

4  was actually recorded?

5      A.   Yes.

6      Q.   So why did you record Mr. Lucero's

7  statement in 2018, but you're not recording Lujan's

8  statements when he made them?

9      A.   I think we did it because we didn't want to

10  get anything wrong.

11      Q.   Fair enough.  And that wasn't a concern

12  when you were meeting with Mr. Lujan?

13      A.   No, it wasn't.

14      Q.   Statement 14, Billy Garcia wanted knowledge

15  of the plan kept to very few individuals.  Does Mr.

16  Lujan say that was during the first meeting or the

17  second meeting?

18      A.   I can check.

19      Q.   Actually, I'll move on.  It's probably not

20  relevant to these proceedings.

21           There was some indication that before

22  Mr. Garcia ever made it to the prison, that a person

23  by the name of Ernest Guerrero was supposed to bring

24  the message down of the murders?

25      A.   Yes.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.   So was this everyone at the facility, or

2   certain members of the SNM knew that these murders

3   were supposed to happen, but they were waiting for

4   word from someone to give blessing to these murders?

5        A.   I don't know.

6        Q.   Okay.  Well, what's your understanding?

7        A.   I believe there were green lights that

8   people were aware of.  I don't know conclusively that

9   Frank Castillo, Rolando Garza were on that list.

10       Q.   Did Ernest Guerrero ever go to Southern the

11   months before the murders here?

12       A.   I don't know.  I've never verified that.

13       Q.   Have you or your colleagues interviewed Mr.

14   Guerrero?

15       A.   I don't think we have.

16       Q.   So would Mr. Guerrero be a co-conspirator,

17   as well?

18       A.   Yes.

19       Q.   And who gave him the orders to bring down

20   to Southern?

21       A.   I don't know.

22       Q.   Who told you that Mr. Guerrero was supposed

23   to have done that?

24       A.   Mr. Lujan.

25       Q.   How did he know about that?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Mr. Billy Garcia told him.

 2          Q.   So it was after the fact?

 3          A.   After which fact?

 4          Q.   After Mr. Guerrero was supposed to come

 5     down and didn't come down, Mr. Garcia said something

 6     to the effect of he should have come down and told

 7     us?

 8          A.   Yes.

 9          Q.   So Mr. Guerrero -- according to at least

10     Leonard Lujan, Billy Garcia didn't know that Mr.

11     Guerrero hadn't made it to Southern?

12          A.   I don't know that he did or did not make

13     it.  What Mr. Lujan was told was that a message was

14     given to Mr. Guerrero, and he did not relay that

15     message to Mr. Lujan.

16          Q.   Was there paperwork that was involved that

17     had to be shown to anyone for these murders to

18     happen?

19          A.   Not that I'm aware of.

20          Q.   Do you recall a witness by the name of

21     Jimmie Gordon?

22          A.   Yes.

23          Q.   And him talking about paperwork on the

24     murders being provided to Leroy Lucero?

25          A.   I don't remember that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   You're not familiar with his statements?
2          A.   I remember generally he was asking for
3     information from the librarian.
4          Q.   I think earlier today we heard that Jimmie
5     Gordon was a co-conspirator.  Do you recall that?
6          A.   Yes.
7          Q.   What was his role?
8          A.   He was in, like, a meeting with several SNM
9     members and they were discussing green lights.
10         Q.   And who was at that meeting?
11         A.   I don't know, off the top of my head.
12         Q.   Leroy Lucero was one, though?
13         A.   I don't know.
14         Q.   But Mr. Garcia was not; do you recall that?
15         A.   I don't know.
16         Q.   So do you know the identities of any of the
17    people that were involved in this meeting?
18         A.   No, not off the top of my head.
19         Q.   Whoever they were, would they all be
20    co-conspirators?
21         A.   I would assume so.
22         Q.   So were they all participating in the
23    agreement to kill these two individuals?
24         A.   I believe so.
25         Q.   Including Mr. Gordon?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   I don't think -- he's not an SNM member.

2    He was there because they were using him.

3    Q.   So is it fair to call him a co-conspirator,

4    then?  Is that the correct designation?  Or a

5    witness?

6    A.   Personally, I'd call him a witness.

7    Q.   So he wasn't part of the agreement to kill?

8    A.   No.

9    Q.   Let's go to Statement Number 16.  Freddie

10   Munoz said he was part of a committee that sanctioned

11   the hit.  Do you know, did he indicate who was part

12   of the committee?

13   A.   I think he has, but I don't remember who

14   was there.

15   Q.   So I take it all the members of the

16   committee would be co-conspirators, as well?

17   A.   Yes.

18   Q.   Did he tell you how many people?

19   A.   No.

20   Q.   Did he tell you where this took place?

21   A.   At PNM.

22   Q.   Did he tell you where at PNM?

23   A.   Not that I remember.

24   Q.   Was Billy Garcia present during that

25   meeting, according to Freddie Munoz?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    I don't know.
 2          Q.    So was this a statement that he relayed to
 3    Mr. Garcia?
 4          A.    I don't know.
 5          Q.    Was Mr. Guerrero at that meeting?
 6          A.    I don't know.
 7          Q.    Are you familiar with an individual by the
 8    name of Jake Armijo?
 9          A.    Yes.
10          Q.    And in the investigation was there
11    information developed that Jake Armijo brought down
12    the hit order on these two individuals who were
13    murdered on March 26?
14          A.    I think Mr. Lucero and Mr. Armijo had
15    confirmation, as well.
16          Q.    So was Jake Armijo a co-conspirator on
17    these murders?
18          A.    He could be.
19          Q.    Did he ever admit to you that he brought
20    down information, or to your colleagues -- let me
21    start that over.  Too many pronouns and mixed
22    metaphors there, whatever.
23                Did Jake Armijo ever indicate to you or any
24    of your colleagues that he participated in any
25    fashion in the murder of these two individuals?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No.
 2        Q.    I think you may have been asked this, but
 3   I'm not sure.  Was Frederico Munoz ever charged with
 4   his participation in the murders of Garza and
 5   Castillo?
 6        A.    I'm not sure.  It could be an overt act for
 7   his RICO indictment.
 8        Q.    And the members of the committee, whoever
 9   they may be -- were they indicted?
10        A.    I'm not sure.
11        Q.    Have any of them been interviewed?
12        A.    I'm not sure.
13        Q.    Are you aware of any corroboration by
14   anybody, whether it be a corrections officer, STIU
15   officers, or other inmates that could corroborate
16   this statement here in Number 16?
17        A.    None that I'm aware of.
18        Q.    Let's go to Statement Number 30.  This is a
19   statement that Eugene Martinez -- says Eugene
20   Martinez, I guess, overhears Leonard Lujan talking to
21   Willie Amador and Jesse Ibarra; is that correct?
22        A.    I believe so.
23        Q.    So where did that discussion happen?
24        A.    Just a moment.  I think Statement Number 30
25   is incorrect.  What it actually says is, Lujan told
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Martinez to tell SNM members Willie Amador and Jesse

2    Ibarra to handle that.

3         Q.   I'm sorry, so it's Eugene Martinez who is

4    talking to Willie Amador and Jesse Ibarra?

5         A.   No, it's Eugene Martinez talking to Leonard

6    Lujan.

7         Q.   And he's relaying that he recruited Amador

8    and Ibarra to do the murders?

9         A.   Essentially.  He doesn't say it that way.

10        Q.   Well, you said -- I'm trying to paraphrase.

11   Is that a fair characterization?

12        A.   Yes.

13        Q.   And so has anybody corroborated that Willie

14   Amador and Jesse Ibarra were part of this conspiracy?

15        A.   No.

16        Q.   Does Leonard Lujan say that happened in any

17   of his interviews?

18        A.   I don't think he mentions Willie Amador or

19   Jesse Ibarra.

20        Q.   So, again, we have an instance where Eugene

21   Martinez is talking about a conspiracy involving

22   Jesse Ibarra and Eugene Martinez, and Mr. Lujan is

23   talking about a conspiracy, and they're not included?

24        A.   Correct.

25        Q.   Would this have been the day of, the day

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   before the murders, or a week before?
 2        A.   The day before.
 3        Q.   So would this discussion have been behind
 4   the building?
 5        A.   Martinez was walking back to his spot from
 6   the visitation room, and they met behind the chapel.
 7        Q.   So is this a separate meeting than we
 8   talked about earlier?
 9        A.   I don't know.
10        Q.   31 is a statement by Eugene Martinez
11   saying, "Christopher Chavez heard about the hit on
12   Garza and volunteered to participate."  Where did
13   that conversation take place?
14        A.   Just a moment.  In the pod they resided in.
15   They didn't say where exactly.
16        Q.   Did he say when?
17        A.   March 25, 2001.
18        Q.   And I take it Chavez did not tell Martinez
19   how he had heard about the hit?
20        A.   No.
21        Q.   Going to Number 32, so this is a statement
22   by Eugene Martinez saying that Willie Amador asked
23   Eugene to be the lookout during the Garza murder,
24   "and if something happens, you already know"; is that
25   right?
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   Was Eugene Martinez a lookout in the murder
 3   or a participant in the murder?
 4        A.   He was both.
 5        Q.   To your knowledge, did Mr. Amador
 6   participate in the murders?
 7        A.   No.
 8        Q.   And has Mr. Amador ever been interviewed?
 9        A.   No.
10        Q.   Is he alive?
11        A.   I take that back.
12        Q.   I'm sorry?
13        A.   I think he was interviewed by Corrections
14   staff or New Mexico State Police.
15        Q.   Fair enough.  Right in the beginning of the
16   case; right?
17        A.   Yes.  He was not interviewed by the FBI.
18   And he's deceased.
19        Q.   And do you know when he died?
20        A.   I don't remember the year off the top of my
21   head.
22        Q.   Would it have been after the FBI started
23   investigating these 2001 murders?
24        A.   Which time?
25        Q.   Yeah.  Well, fair enough point.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1              Number 33.  This is a statement by Eugene
2    Martinez saying, "While strangling Garza, someone in
3    the room yelled 'Close the door'"?
4         A.   Yes.
5         Q.   So is Mr. Martinez -- where is Mr. Martinez
6    at the time that's happening?  Is he in the cell?  Is
7    he not?
8         A.   He was not in the cell.
9         Q.   Was he at the doorway watching?
10        A.   He was at the entrance to the pod door.
11        Q.   Okay.  And so he says he doesn't know who
12   yelled it?
13        A.   Correct.
14        Q.   So at that point he doesn't know who the
15   participants are in the strangulation at all?
16        A.   No, he knew.  He saw people enter the cell.
17        Q.   Okay.  And then what does he say after
18   that?  Did he participate in the murder other than
19   being at the pod door?
20        A.   He goes in and offers assistance.
21        Q.   And did he do more than offer the
22   assistance?
23        A.   No, he helped.
24        Q.   What did he say he did?
25        A.   He entered the room and jumped onto Garza's
```



SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1    legs.
 2         Q.   And what were his words when he offered to
 3    help?
 4         A.   I don't think he said anything.
 5         Q.   So he just participated, he jumped in?
 6         A.   Yes.
 7         Q.   Number 34 is a statement by Eugene where he
 8    says that he was approached by Leonard Lujan and that
 9    Leonard Lujan told him to go talk to Willie Amador
10    about the murders; is that right?
11         A.   Yes.
12         Q.   Is that also a statement -- well, did Mr.
13    Lujan say that happened?
14         A.   No.
15         Q.   Have you had an occasion to interview him
16    since Mr. Martinez made this statement?
17         A.   I think we could have found the time.
18         Q.   No, have you?
19         A.   Have we?  No.
20         Q.   Let's go to 36.  Have you participated in
21    an interview of Lawrence Torres?
22         A.   Somewhat.
23         Q.   If you could explain.
24         A.   I met with him before.  We've talked about
25    it briefly.  But I wouldn't say I interviewed him
```

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    about it.

2         Q.   Have you talked to him about the murders?

3         A.   Yes.

4         Q.   Did you talk to him about his mental

5    health?

6         A.   No.

7         Q.   Did he discuss his mental health?

8         A.   No.

9         Q.   Or his desire to testify?

10        A.   He said he would testify.

11        Q.   And while you were talking to him, did you

12   notice anything about his mental health?

13        A.   I think he has, like, a kidney disease or

14   something similar to that, that's affecting his

15   physical abilities.

16        Q.   Did he indicate that he participated in any

17   fashion in the murders?

18        A.   No.

19        Q.   Did he witness the murders?

20        A.   He thinks he did, one of them.

21        Q.   When you say he thinks he did, is he not

22   sure?

23        A.   No, that's not it.  He saw Angel DeLeon and

24   Edward Troup disassembling the laundry bag.  He heard

25   a commotion and looked out.  He saw Joe Gallegos and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Angel DeLeon enter Fred Castillo's cell.  He saw them
2    enter the cell.  He heard the struggle.
3         Q.   So he doesn't think -- he actually is a
4    percipient witness?
5         A.   Yes.
6         Q.   And I think on this statement, it's how
7    long after the murders?
8         A.   About two years.
9         Q.   And does he say where that happened?
10        A.   Where what happened?
11        Q.   Where that discussion happened, the one
12   that's recounted in 36.
13        A.   That's actually Leroy Lucero.
14        Q.   Okay.  Did Mr. Lucero recount where he had
15   this discussion with Mr. Gallegos?
16        A.   Yes, at PNM.
17        Q.   And I take it because you don't have source
18   here as Lawrence Torres, that Lawrence Torres has not
19   confirmed that happened?
20        A.   Are we looking at the same statement?
21        Q.   It says, "Lawrence Torres saw and was
22   concerned Torres might snitch."  Well, I'll go on,
23   actually.
24             Number 38, if we could go to that.
25   Lawrence Torres.  This is a statement by Lawrence
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Torres; right?
 2         A.   Yes.
 3         Q.   Okay.  I got one up right.  So Lawrence
 4    Torres made the statement when?
 5         A.   2003.
 6         Q.   He indicated that Angel DeLeon had a
 7    scratch on his finger; is that right?
 8         A.   Yes.
 9         Q.   Were there examinations done of all the
10    inmates after the murders?
11         A.   I believe so.
12         Q.   And was there -- have you seen any
13    photographs of these scratches on Mr. DeLeon's
14    finger?
15         A.   No.
16         Q.   Was there any female CO that said that she
17    had this --
18         A.   Not that I'm aware of --
19         Q.   -- discussion?
20         A.   -- no.
21         Q.   If you go to Statement Number 67.  We're
22    getting towards the end.
23         A.   Okay.
24         Q.   Maybe if I just read it to you.  The source
25    is Jimmie Gordon, the declarant is Jimmie Gordon, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    he said he asked to get information on Garza from

 2    Geraldine Martinez?

 3         A.   Yes.

 4         Q.   Had Geraldine Martinez been interviewed by

 5    you and your colleagues?

 6         A.   I don't think so.

 7         Q.   Was this printed information that they

 8    wanted?

 9         A.   I believe so.

10         Q.   And do you know when Jimmie Gordon was

11    asked to get that information on Garza in relation to

12    the murders?

13         A.   No, I don't.

14         Q.   And did he indicate who asked him to get

15    the information on Garza?

16         A.   No.

17         Q.   Do you recall him saying Leroy Lucero asked

18    him?

19         A.   No, I don't.

20         Q.   Let's go to 68.  This is where Gerald

21    Archuleta says that he was going to have a shoot-out

22    apparently with Baby Zack, and Baby Zack wanted to

23    kill him; is that right?

24         A.   Yes.

25         Q.   And in the context of that, apparently,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   according to Gerald Archuleta, Baby Zack says:  "I'm
 2   here to kill you because Billy Garcia told me to kill
 3   you," something to that effect.  Or tell us what he
 4   said.
 5        A.   It's pretty lengthy.
 6        Q.   Okay.  Maybe summarize for us.  All I want
 7   really is what Baby Zack's words are, because that's
 8   what we're talking about, is his statements, Baby
 9   Zack's statements.
10        A.   Gerald did not tell us what Baby Zack
11   exactly told him.
12        Q.   Okay.  Did he summarize what Baby Zack told
13   him?
14        A.   No, not really.  All he said is, Well,
15   there's an issue between Billy Garcia and Gerald
16   Archuleta after the double murders involving Julian
17   Romero.  They had a meeting where they couldn't
18   resolve the issue, and he says this:  "The two men
19   did not resolve the dispute, and Billy Garcia would
20   rather send his nephew to try and kill Archuleta."
21        Q.   Did he say how he knew that?
22        A.   I don't think he did.
23        Q.   So we don't know the source of that
24   information?
25        A.   We might have it.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Not from Mr. Archuleta?

2        A.    Right.

3        Q.    And I take it he's not saying that Baby

4    Zack walked up with a gun and said, "Hey, I'm here to

5    shoot you because there is that disagreement between

6    Julian Romero and Gerald Archuleta, and my cousin

7    sent me to murder you"?  It wasn't anything like

8    that; right?

9        A.    I don't think so.

10       Q.    Did he say Billy Garcia told him -- did he

11   go up and say to Gerald Archuleta:  I had a

12   conversation directly with Billy Garcia where he told

13   me to give these orders, or anything like that?

14       A.    I don't think that's how that works.

15       Q.    Okay.  There was shooting and Gerald

16   Archuleta made some assumptions about why it

17   happened, based upon the relationship of Baby Zack

18   and Billy Garcia?

19       A.    I think that's fair to say.

20       Q.    Did that shooting have any relationship to

21   the 2001 murders?

22       A.    It's my understanding part of the reason

23   the issue started was because Gerald Archuleta

24   disagreed with those green lights and those hits

25   being carried out.



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                1-800-669-9492
BEAN & ASSOCIATES, Inc.                          e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   Because those were buddies of his of some

 2   sort?

 3        A.   I think Frank Castillo and Rolando Garza

 4   were regarded as good brothers.

 5        Q.   Did Gerald Archuleta ever indicate he

 6   talked to Billy Garcia about this personally?

 7        A.   I think he has.

 8        Q.   Well, do you recall that Mr. Garcia went to

 9   talk to Gerald Archuleta and told him not to try to

10   kill Julian Romero and to stop doing that kind of

11   conduct?

12        A.   Yeah, I think that's the conversation I'm

13   talking about.

14        Q.   They didn't have a sit-down conversation

15   about Baby Zack and what Baby Zack did --

16        A.   No.

17        Q.   -- or didn't do?  I guess he never shot

18   Gerald Archuleta; right?

19        A.   No.  I think Gerald Archuleta shot Baby

20   Zack.

21        Q.   You'd indicated at one point that Billy

22   Garcia had made a statement to Leonard Lujan that he

23   didn't want knowledge of the murders to be spread

24   around to other people essentially; is that right?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And then you indicated that you said that

2  was probably because Billy Garcia wanted no one to

3  know.  Is that your interpretation, or is that

4  something that Mr. Lujan said?

5      A.   I think that's my interpretation.

6      Q.   Can you go back to Statement 36?  This is

7  where Joe Gallegos or Leroy Lucero says Joe Gallegos

8  told him that Lawrence Torres saw him, and was

9  concerned Torres might snitch.  Do you see that?

10     A.   Yes.

11     Q.   During that conversation between Leroy

12  Lucero and Joe Gallegos, did he mention Billy Garcia

13  at all?

14     A.   No.

15     Q.   And in regards to this entire chart of

16  statements, are we to assume that if Billy Garcia is

17  not mentioned in one of the blocks that -- during

18  that conversation that is being relayed in those

19  little blocks of information, that Billy Garcia's

20  name was not mentioned by the witness, by the

21  declarant or the source?

22     A.   Not necessarily.  Since I wasn't part of

23  making the chart, I can't 100 percent say yes or no

24  to that.

25     Q.   Well, can you recall any statements by any

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    of the sources or the declarants in this chart where

 2    they mention Billy Garcia that's not set forth in the

 3    chart?

 4         A.   I think I can.

 5         Q.   Okay.

 6         A.   Let's see.  The report that mentions

 7    Frederico Munoz being part of the committee that

 8    sanctioned Castillo and Garza.  I think in that same

 9    report he speaks with Billy Garcia, who confirms he

10    was part of it.

11         Q.   That's a later interview; right?  That's

12    something he said happened a few years after the 2001

13    murders?

14         A.   Yes.

15         Q.   That wouldn't be a co-conspirator

16    statement?

17         A.   Well, he was part of the conspiracy in that

18    he ordered the green lights.

19         Q.   Fair enough.  So when Freddie Munoz is

20    relaying this, is he saying he and Billy Garcia are

21    having a discussion about how the hit went down, et

22    cetera?  What were the circumstances?  What I'm

23    trying to get at is whether it was a course or

24    furtherance of the conspiracy, was it part of the

25    conspiracy, that discussion between Mr. Munoz and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Mr. Garcia?
 2        A.   I would say they were just discussing the
 3   conspiracy.
 4        Q.   So it wouldn't have been, "Hey, we need to
 5   keep these witnesses quiet, or we need to do this,
 6   that, or the other, to try to get away with the
 7   murder"?
 8        A.   Well, we don't know the full extent of the
 9   conversation.
10        Q.   Well, we're here today to talk about it.
11   What's written in the report about the conversation
12   that allegedly happened between Frederico Munoz and
13   Billy Garcia after the 2001 murders?
14        A.   Munoz had a personal conversation with
15   Billy Garcia after the hits on Garza and Castillo,
16   whereby Garcia admitted to the killings.
17        Q.   Have you talked to Mr. Munoz?
18        A.   Yes.
19        Q.   On how many occasions?
20        A.   A few, less than five.
21        Q.   Okay.  And were those formal interviews?
22        A.   Yes.
23        Q.   How many?
24        A.   I couldn't give you an accurate number off
25   the top of my head.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.   I mean, is it more than two?

2          A.   Maybe two; it could be three.

3          Q.   And in those interviews, did he expand at

4     all on the statement you just discussed concerning

5     Mr. Garcia and he?

6          A.   Not the ones that I've been at.

7          Q.   He's not a particularly shy guy about

8     talking about things, is he?

9          A.   No.

10         Q.   He's pretty loquacious?

11         A.   Yes.

12         Q.   And he didn't give you any more details

13    about this alleged discussion with Billy Garcia?

14         A.   No, I don't think the interviews I was at

15    we were talking about Trial 2 defendants.

16         Q.   Was he ever given one of those

17    questionnaires where you write --

18         A.   Yes.

19         Q.   I just want to make sure for the record we

20    understand what I'm talking about.  It's probably,

21    whatever, 100 questions; is that right?

22         A.   I think it's like 200.

23         Q.   Okay, 200.  And there's facts of the case

24    put into the body of the questionnaire?

25         A.   The questions about facts of the case?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Yes.   Right.   It's not just an open-ended

2   question like:   What do you know about this murder?

3   It has more detail than that; is that right?

4        A.   It does.

5        Q.   And actually just as a kind of background

6   question, how many different witnesses were those

7   questionnaires provided to, just estimate?

8        A.   More than 10, less than 25.

9        Q.   And in Mr. Munoz' questionnaire, did he

10  provide any more details concerning this alleged

11  discussion with Mr. Billy Garcia, like where it

12  happened, where the discussion happened?

13       A.   I'm not sure.   I don't think I've read it

14  lately.

15       Q.   Do you know -- I mean, you're the witness

16  here for that particular statement, so --

17       A.   No, I don't.

18       Q.   You don't know where it happened?

19       A.   No.

20       Q.   You don't know whether there were any

21  witnesses to it?

22       A.   No.

23            MR. CASTLE:   No other questions.

24            THE COURT:   All right.   Thank you, Mr.

25  Castle.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Any other cross-examination of Ms. Stemo?
 2    Do you want to go, Ms. Torraco?
 3              MR. SHATTUCK:  We don't have any questions.
 4              THE COURT:  You don't have any?  I'll tell
 5    you what.  Why don't y'all talk about who wants to go
 6    next?  Why don't we take our afternoon break and be
 7    in recess till 2:30, and you can decide who is going
 8    to question Ms. Stemo.
 9              (The Court stood in recess.)
10              THE COURT:  All right.  Let's go back on
11    the record.  I think every defendant has got an
12    attorney.
13              Mr. Granberg, were you going to go next?
14              MR. GRANBERG:  Yes, Your Honor.
15              THE COURT:  All right.  Mr. Granberg.
16              Agent Stemo, I'll remind you you're still
17    under oath.
18              THE WITNESS:  Yes, Your Honor.  I'm ready.
19                     CROSS-EXAMINATION
20    BY MR. GRANBERG:
21         Q.   During Mr. Castellano's direct, you had
22    mentioned that the motives for Mr. Chavez
23    volunteering were effective shoes and withholding
24    heroin.  Did I hear you correctly?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   What are you basing that statement from?

2    A.   So the withholding of heroin is something

3  Eugene Martinez told us.  One second, I'll give you a

4  Bates number.  So the Bates number for the shoes

5  incident is 32048.

6    Q.   So there is a separate statement for the

7  withholding of heroin?

8    A.   I believe so.

9    Q.   Do you know the Bates number for that?

10   A.   I'll find it.

11   Q.   Okay.

12   A.   42802.

13   Q.    Now, are you aware of any other statements

14 made regarding Mr. Chavez' motives for the murder?

15   A.   Aside from those two?

16   Q.   Aside from those two, or in addition to

17 those two?

18   A.   No, I don't think so.

19   Q.   Now, Statement 31 says Chavez heard about

20 the hit on Garza and volunteered to participate in

21 the operation.  Did Chavez make a statement saying

22 that he wanted to join in?  Or how is Statement 31 a

23 hearsay statement?

24   A.    In both instances, Mr. Martinez just said

25 that Chavez volunteered upon hearing about the hit.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And I'll backtrack.   Bates No. 42082, is
 2   that also Eugene Martinez?
 3        A.   Yes.   And actually, Eugene Martinez says
 4   Mr. Chavez overheard Mr. Martinez and Willie Amador
 5   talk on the top tier.   And that's when he volunteered
 6   to conduct the hit.
 7        Q.   Okay.   So would you agree with me that
 8   those are personal reasons as opposed to, say,
 9   carrying it out for the SNM?
10        A.   I think it could be both.
11        Q.   Okay.
12        A.   You're not supposed to be disrespected as
13   an SNM member.
14        Q.   Okay.   Can you explain that?   Can you
15   elaborate on that a little bit?
16        A.   I don't think disrespect is looked upon in
17   the SNM as something that you can do.   So even if
18   someone else from the gang disrespects you, you're
19   supposed to do something about it.
20        Q.   Okay.   Who is being disrespected in this
21   instance?
22        A.   Well, Mr. Chavez was disrespected when
23   Mr. Garza took his shoes.
24        Q.   Oh, I see.   I see.   I was thinking
25   something different.   Let's jump to Statement Number
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   33.   In Statement Number 33 there is a statement,

2   "Close the door," but the declarant could be either

3   Allen Patterson or Christopher Chavez.  Was it both

4   of them, or was it just one of them?

5        A.   I don't know.

6        Q.   Okay.  Were there any other sort of

7   debriefs or investigative statements that you've

8   uncovered that would sort of shed light on who it

9   would have been, Mr. Patterson, Mr. Chavez?

10       A.   No.

11       Q.   And I take your attention to Bates number

12  19128.

13       A.   I don't have that with me.

14       Q.   I was trying to put up on the screen Bates

15  No. 19128.  Now, Agent Stemo, are you familiar with

16  this statement at all?  Agent Stemo, why don't I just

17  bring my laptop up to you?

18            MR. GRANBERG:  May I approach, Your Honor?

19            THE COURT:  You may.

20       A.   I think I have seen that before.

21  BY MR. GRANBERG:

22       Q.   Are you familiar with the context this

23  statement was given in?

24       A.   No.

25       Q.   To your knowledge, do you know who Source 7

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    is?

 2         A.   Not I'm aware of.

 3         Q.   Okay.  But in this document it states that

 4    it was actually Patterson that said, "Close the

 5    door"; correct?

 6         A.   Yes.

 7         Q.   So as far as you know, you have no idea who

 8    Source 7 is?

 9         A.   I don't.

10         Q.   You don't.  All right.

11              So when you answered my question a few

12    minutes ago regarding who the actual declarant might

13    have been, were you aware of this statement?

14         A.   It was familiar to me, yes.

15         Q.   So now that you've had a chance to kind of

16    refresh your memory --

17         A.   Um-hum.

18         Q.   -- does that change your answer at all?

19         A.   No, I don't think it does.  We were

20    discussing what Eugene Martinez heard.  I don't know

21    that Source 7 is Eugene Martinez.

22         Q.   Is Source 7 a name or a designation that's

23    ever been assigned to Eugene Martinez?

24         A.   I don't know that.

25         Q.   Okay.  So did Chavez indicate to Eugene

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that he felt disrespected with regards to the shoes;

 2    do you know?

 3         A.   I don't think Eugene told us that.

 4         Q.   How about in reference to the heroin?

 5         A.   I don't think Eugene told us that either.

 6         Q.   So if Eugene didn't tell you that, what's

 7    your basis for your answer that the reason why he's

 8    doing that is for being disrespected?

 9         A.   I think it's an inference.  There's a

10    reason why Eugene Martinez brought those issues up

11    after he said -- after or before he said that

12    Mr. Chavez volunteered to conduct the hit.

13         Q.   Okay.  So getting back to Statement Number

14    33, so Eugene cannot 100 percent attribute who said

15    it; correct?  "Close the door"?

16         A.   Correct.

17         Q.   Let's jump to Statement Number 71.  I

18    believe that's another Chavez statement.  Now, in

19    this particular instance the source is Leroy Lucero;

20    correct?

21         A.   Yes.

22         Q.   Is Leroy Lucero a co-conspirator, in your

23    opinion?

24         A.   Yes.

25         Q.   He is.  Are you familiar with the term
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    "overt acts"?

2         A.   Yes.

3         Q.   In regard to conspiracies?

4         A.   Yes.

5         Q.   From your knowledge, what was Mr. Lucero's

6    overt act in the murder of Mr. Garza?

7         A.   He confirmed the hit with Mr. Munoz.

8         Q.   Did he order the hit?

9         A.   I'm not aware that he did.

10        Q.   Okay.  So when you say "confirm, " what are

11   you -- can you elaborate on that particular point,

12   confirm?

13        A.   He spoke with Mr. Munoz and received

14   information that both Mr. Frank Castillo and Mr.

15   Rolando Garza were, in fact, green lit.

16        Q.   But it was also your testimony that it was

17   Mr. Garcia that ordered the hit; correct?

18        A.   Yes.

19        Q.   So how is it that both Mr. Garcia and Mr.

20   Munoz and Mr. Lucero had the same roles or

21   responsibilities here?

22        A.   Mr. Lucero did not order the hit.  I think

23   it's possible for more than one shot-caller to order

24   a hit.  Mr. Munoz -- and this is speculation; I don't

25   know what transpired between Mr. Munoz or Mr. Garcia.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    But Mr. Munoz could relay to Mr. Garcia who is a

 2    shot-caller and was at Southern to carry out the hit.

 3         Q.   So you're saying Mr. Lucero's role as

 4    purely a relay person is enough for --

 5         A.   I don't think he was a relay person.

 6         Q.   You just said he was possibly --

 7         A.   I think he confirmed the hit.  And doing so

 8    allowed for the hits to happen.

 9         Q.   So you're saying that he confirmed the hit

10    with Mr. Munoz, that the order came down from

11    Mr. Garcia?

12         A.   No.

13         Q.   Well, then, what is it you're saying?

14         A.   I'm saying Mr. Lucero confirmed the hit

15    with Mr. Munoz.  I don't know if Mr. Munoz also

16    issued an order for the hits.  Because I don't know

17    what Mr. Munoz and Mr. Billy Garcia talked about.

18    What I'm saying is that it's possible for more than

19    one leader to order a hit.

20         Q.   And did Mr. Lucero recently arrive at the

21    pod to relay this information?

22         A.   No, Mr. Lucero was at Southern, and was due

23    to get released.

24         Q.   Okay.  Now, there have been numerous other

25    statements.  Are you familiar with the term

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    "committee"?

2         A.   Yes.

3         Q.   And are you familiar with who are the

4    individuals selected to be on that committee in

5    reference to the SNM?

6         A.   Well, it varies.

7         Q.   Okay.  Is there any reference to Mr. Chavez

8    being either on the committee or selected to be on

9    the committee, as far as you know?

10        A.   No.

11        Q.   What about Mr. Lucero?

12        A.   I don't think I've seen anything that says

13   he was on the committee.

14        Q.   And the persons that are on the committee

15   would have the sort of knowledge which could confirm

16   a hit or not; correct?

17        A.   Yes.

18             MR. GRANBERG:  Your Honor, I'll pass the

19   witness.

20             THE COURT:  Thank you, Mr. Granberg.

21             Anyone else?  Mr. Blackburn?

22                    CROSS-EXAMINATION

23   BY MR. BLACKBURN:

24        Q.   Ms. Stemo, I'm sorry, how long have you

25   been with the FBI?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    A little under two years.

2        Q.    And I know Mr. Castle asked you some

3   questions earlier about your specialties.  Do you

4   have any specialties in the FBI?

5        A.    No.

6        Q.    Have you listed yourself as a profiler at

7   any time?

8        A.    No.

9        Q.    Have you ever placed any of that

10  information on a search warrant or anything

11  concerning your ability to profile individuals or to

12  be able to concentrate on basically what their

13  lifestyles may have been?

14       A.    No.

15       Q.    All right.  So you're just a special agent,

16  a field person out doing investigations; is that what

17  it is?

18       A.    Yes.

19       Q.    Are there any specialties that you can get

20  when you're in the FBI?

21       A.    I believe so.

22       Q.    And what type would those be?

23       A.    They could be like a special weapons and

24  tactics operator; you can be part of the evidence

25  response team.  There's various trainings you could

SANTA FE OFFICE                                                                MAIN OFFICE
119 East Marcy, Suite 110                                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                                         Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                         FAX (505) 843-9492
                                                                             1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

```
 1   get to become an expert.
 2        Q.   Okay.  So I want to talk to you about Count
 3   3, which is the Freddie Sanchez hit.  When did that
 4   occur?
 5        A.   2007.
 6        Q.   All right.  Do you remember what month in
 7   2007?
 8        A.   June.
 9        Q.   And where did that occur at?
10        A.   The Southern New Mexico Correctional
11   Facility.
12        Q.   And what is your understanding of the
13   circumstances surrounding the initial conversation or
14   planning concerning that particular hit?
15        A.   I believe there were rumors and paperwork
16   showing that Mr. Freddie Sanchez had cooperated with
17   law enforcement and that Mr. Benjamin Clark at one
18   point possessed that paperwork, and that had gotten
19   back to Arturo Garcia, who, in turn, relayed to Mr.
20   Benjamin Clark and Frank Gonzalez that the Rascon
21   brothers were to take care of the next thing that
22   happened.  I don't think Mr. Garcia said what that
23   was specifically.  But he said they were next.
24        Q.   And at the time of the hit on Mr. Sanchez
25   in Southern New Mexico, where was Arturo Garcia at?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1       A.   He was at PNM.

 2       Q.   How long had he been at PNM that you're

 3  aware of?

 4       A.   I don't know.

 5       Q.   And where was Ben Clark?

 6       A.   He was at Southern New Mexico.

 7       Q.   And how long had Ben Clark been at Southern

 8  New Mexico; do you recall?

 9       A.   I don't recall.

10       Q.   Did you interview Ben Clark or sit in on

11  any of the interviews with him?

12       A.   I don't think I did.

13       Q.   Okay.  As it relates to what you said, the

14  rumors about Freddie Sanchez, who was it that

15  informed you about those rumors, that there was some

16  type of law enforcement cooperation as it relates to

17  Mr. Sanchez?

18       A.   I think I read that Mr. Ruben Hernandez was

19  aware.  I believe John Montano was aware.  Javier

20  Rubio had heard about the paperwork.  Ben Clark.

21       Q.   And going back, do each of those -- okay,

22  is it your understanding that they had been aware of

23  the paperwork prior to the hit that occurred in June

24  of 2007?

25       A.   I don't know.



SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492
                                                  e-mail: info@litsupport.com

1      Q.   Did Mr. Clark tell you that people

2  delivered the paperwork to Southern New Mexico in,

3  like, April of that year?

4      A.   I'm not sure if he said April.  Let me

5  check.

6      Q.   Actually March or April.

7      A.   Just a moment.

8      Q.   Do you have 41974 in front of you, Bates

9  No.?

10     A.   I do.

11     Q.   Okay.

12     A.   Thank you.  You're correct, it says March

13  or April, 2007.

14     Q.   So what you learned from this is that

15  individuals in SNM had been aware of some type of

16  paperwork that existed as to Freddie Sanchez; is that

17  correct?

18     A.   Yes, I believe so.

19     Q.   And I think that you covered some of this

20  with Mr. Burke earlier, but I just want to ask you

21  about this.  When did Freddie Sanchez arrive at

22  Southern New Mexico?

23     A.   I think it was June 15, 2007.

24     Q.   And when he arrived, he told the

25  classification officers and other individuals there

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    at Southern New Mexico that he knew that there was a
 2    hit out on him, didn't he?
 3         A.   He did.
 4         Q.   And he asked that he not be placed in a
 5    certain pod if there was an SNM pod, and he not be
 6    placed in that particular pod, did he not?
 7         A.   I believe so.
 8         Q.   And the classification person that was in
 9    charge of that made a recommendation that he not be
10    placed in that pod, did he not?
11         A.   I believe so.
12         Q.   And when the classification officer came
13    back to work a few days later, he was somewhat
14    shocked that Mr. Sanchez had not been moved?
15         A.   I believe so.
16         Q.   But he himself, Freddie Sanchez, knew there
17    was a hit on him; right?
18         A.   Yes.
19         Q.   And what is your understanding from the
20    people that you interviewed about individuals that
21    have a hit on them as to how that hit is supposed to
22    take place?  I mean, is that an open season if
23    somebody has a green light on them?
24         A.   I think it depends who you talk to.  Some
25    will say that you need confirmation from others.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    Some will say that you need the actual paperwork.

 2         Q.   So depending on what day it is and who

 3    you're talking to depends upon what the answer may be

 4    to a certain extent?

 5         A.   Yes.  The rules can be very fluid.

 6         Q.   Let me have you look at Statement Number

 7    17, if you don't mind.  Do you have that one?

 8         A.   I do.

 9         Q.   Okay.  The declarant on this is Arturo

10    Garcia and the source is Eric Duran.  And what is

11    your understanding about Statement Number 17 and how

12    that took place and the circumstances surrounding

13    that?

14         A.   Eric Duran was housed with Arturo Garcia

15    and stated that --

16         Q.   In Santa Fe; right?

17         A.   Yes.

18         Q.   At the North facility?

19         A.   I don't know for sure.

20         Q.   Go ahead.  I'm sorry.  I didn't mean to cut

21    you off.

22         A.   He stated that Arturo Garcia gave the hit

23    to Benjamin Clark, and that Eric Duran was with

24    Mr. Garcia when the hit was put out.

25         Q.   So what does Mr. Duran tell you about that?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    Is he actually listening to him or -- let me back up.
 2    Where is Mr. Clark at the time?
 3         A.   He's at Southern.
 4         Q.   So we're talking all the way across the
 5    state; right?
 6         A.   Yes.
 7         Q.   So how was it that Eric Duran was aware
 8    that Arturo was sending this to Ben Clark?  What does
 9    he tell you about that?
10         A.   He doesn't say how the hit was put out.
11         Q.   He just tells you that he's -- he says that
12    Arturo Garcia put the hit on Sanchez because he was
13    suspected to be cooperating with law enforcement; is
14    that correct?
15         A.   Yes.
16         Q.   And do you know, did Mr. Duran tell you
17    when he became aware of the statement?
18         A.   I don't think he specifically says when it
19    occurred.
20         Q.   And when did he tell you about this
21    particular statement?
22         A.   This occurred on February 19, 2015.
23         Q.   February 19, when?
24         A.   2015.
25         Q.   All right.  Have you seen a location
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    history for Mr. Duran?

2        A.   I have not.

3        Q.   Have you seen a location history for

4    Mr. Garcia, Arturo Garcia?  I keep having to mention

5    that because of Billy Garcia.

6        A.   I don't think I have.

7        Q.   Let me ask you about Statement Number 18.

8    The source of this is Ruben Hernandez; correct?

9        A.   Yes.

10       Q.   And where was Ruben Hernandez at the time

11   of this hit on Freddie Sanchez?

12       A.   He was also at Southern.

13       Q.   And his comment is that Ben Clark passed

14   around paperwork on Sanchez' cooperation with the

15   police, stating that everyone needed to see it?

16       A.   Yes.

17       Q.   Did he say when he was aware of -- did

18   Hernandez tell you when he was aware of the

19   paperwork?

20       A.   I don't think he did.

21       Q.   How was it -- what is your understanding as

22   to where this paperwork came from?

23       A.   From the Crazy Town Roswell Gang.

24       Q.   And who obtained that paperwork?

25       A.   I don't know.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1       Q.    Do you know how it was obtained?

2       A.    No.

3       Q.    Have you ever seen any copies of that?

4       A.    I have not.

5       Q.    Are you aware of any of that paperwork

6   that's in the possession of the FBI or anything in

7   this case?

8       A.    Not to my knowledge.

9       Q.    And what did Ruben Hernandez state as to

10  stating everyone needs to see it and get rid of it?

11      A.    What do you mean by that?

12      Q.    I'm asking you.  Statement Number 18 says

13  that everyone who needs to see it has seen it; get

14  rid of it.  I'm just looking at Number 18.  What did

15  Ruben Hernandez tell you about that?

16      A.    Just a moment.  Doesn't really elaborate

17  after that.  He just says there were meetings after

18  Ben Clark said that.

19      Q.    But it came from Ben Clark?

20      A.    Yes.

21      Q.    But there was a meeting afterwards,

22  basically?

23            Let me have you go over to Statement Number

24  19.  The source on this was Javier Alonso.  Now, at

25  the time of the hit on Mr. Sanchez, in June of 2007,

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                                              Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                               1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                                               e-mail: info@litsupport.com

```
 1   where was Mr. Alonso?

 2        A.   He was also at Southern.

 3        Q.   Have you interviewed him?

 4        A.   I was present for it.

 5        Q.   And the statement is that Arturo Garcia

 6   wrote to Frankie Gonzalez that Brian and Raymond

 7   Rascon were to take care of the next murder for SNM?

 8        A.   I don't think he said "murder."  I think he

 9   said "the next thing."

10        Q.   Okay.  That's what you were saying earlier,

11   okay.  Now, did Mr. Alonso tell you that he actually

12   saw the paperwork?

13        A.   I think he did.

14        Q.   Okay.  And has anybody ever been able to

15   describe to you what this paperwork actually says?

16        A.   No, I don't know that we asked.

17        Q.   Well, was the -- what was the paperwork?

18   Was it police reports, or was it something from

19   somebody saying:  "This guy needs to be hit because

20   he was with the Crazy Towns, and he needed to be

21   taken out"?  Or what is your understanding of, quote,

22   the paperwork?

23        A.   I don't know what it is.

24        Q.   No one ever explained that to you, or you

25   didn't hear that in any of the interviews?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.
 2        Q.   How many pages it was, what did it look
 3   like?  Was it on blue paper or pink paper or white
 4   paper, or anything like that?
 5        A.   No, I don't think so.
 6        Q.   Did anybody ever tell you what or who did
 7   anything with the paperwork afterwards?
 8        A.   I believe that part, he gave it to Kyle
 9   Dwyer and told him to get rid of it.
10        Q.   Let me have you look at Statement Number
11   21, if you don't mind.  Do you have it?
12        A.   Yes.
13        Q.   So we don't know who the declarant is in
14   this particular matter; right?
15        A.   Correct.
16        Q.   And where was -- when Javier Alonso hears
17   this statement, where was he at at the time that this
18   statement was made to him?  Was he in the green pod
19   or was he in the blue pod?
20        A.   I'm not sure of the coloring schemes.  He
21   was in the pod that Fred Sanchez was in.
22        Q.   And did the word come from the other pod?
23   I mean, this word is coming from another pod?
24        A.   Yes.
25        Q.   And he has no clue who was making these
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    statements and at what point in time?

2        A.   Well, he says it happens before the murder.

3    He doesn't remember who it was that gave the message.

4        Q.   Did he ever tell you who this may have come

5    from?

6        A.   No.

7        Q.   Let me go to Statement Number 27.  The

8    source is Ben Clark and Eric Duran.  Are these two

9    separate statements that individuals are making?

10   They were never together, were they?

11       A.   I don't think they were together.

12       Q.   We know that Eric Duran, at the time of the

13   hit, was in Santa Fe with Mr. Garcia; and Ben Clark

14   had already been down in Las Cruces; is that correct?

15   At Southern New Mexico; is that correct?

16       A.   Yes.

17       Q.   How was it that each of these individuals

18   said that Arturo Garcia sent word about Sanchez to

19   Ben Clark?  How did they communicate?

20       A.   You mean Ben Clark and Mr. Garcia?

21       Q.   Yes.

22       A.   Mr. Clark says that he and Arturo Garcia

23   would communicate via letters that they would send to

24   Mr. Garcia's wife.

25       Q.   And how was that to occur?  How did he say

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that was to occur, that he would send them directly
 2    to Mr. Garcia's wife?
 3         A.   I believe so.
 4         Q.   So do you have any of those letters at all?
 5         A.   We don't.
 6         Q.   You have no letters going from Mr. Clark to
 7    Mr. Garcia, nor from Mr. Garcia to Mr. Clark, either
 8    which way; right?
 9         A.   I think it's possible.  I don't remember
10    off the top of my head.  We do have some letters from
11    one inmate to another inmate.  But I don't know if
12    it's the letters communicating that Freddie Sanchez
13    hit.
14         Q.   And so you took care of Statement Number
15    28, when you're talking about -- is this how you're
16    saying that these letters were exchanged, and the
17    intermediary was supposedly Mr. Garcia's wife?
18         A.   Yes.
19         Q.   Do you know where she was living at the
20    time?
21         A.   I don't.
22         Q.   Let me go to Statement Number 39.  Got it?
23         A.   Yes.
24         Q.   So the declarant in this matter is Kyle
25    Dwyer; right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.

 2        Q.    Was he an SNM member?

 3        A.    I think he is.

 4        Q.    And how do you know that?

 5        A.    I believe he's been validated by the New

 6   Mexico Corrections Department.

 7        Q.    At the time, where was -- on the date in

 8   question, in June 17, 2007, where was Mr. Dwyer?

 9        A.    I believe he was in the pod.

10        Q.    In Santa Fe?  I mean, in Las Cruces?

11        A.    Yes.

12        Q.    How long had he been there?

13        A.    I'm not sure.

14        Q.    Have you ever looked at his transfer papers

15   or anything?

16        A.    I have not.

17        Q.    And Mr. Dwyer is deceased; right?

18        A.    Yes.

19        Q.    And when did he die?

20        A.    I'm not sure.

21        Q.    Do you know what he died of?

22        A.    I think he overdosed.

23        Q.    Was that an overdose inside the facility or

24   outside the facility?

25        A.    It was actually in a hotel or a motel in
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492
                                                 e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Las Vegas.

2         Q.   And the statement is:  Kyle Dwyer came to

3    Southern New Mexico with the paperwork on Sanchez.

4    Are we talking about all the same paperwork, one,

5    two, or do we have any idea?

6         A.   What do you mean?

7         Q.   I don't know.  You're the one talking

8    about -- you guys are talking about paperwork.  Was

9    there just -- what was the paperwork that we're

10   talking about here?

11        A.   I'm not sure.

12        Q.   Was Ben Clark sure?

13        A.   I'm not sure that we asked him.

14        Q.   Let's go to Statement Number 40.  As to the

15   paperwork that you didn't ask Mr. Clark about and we

16   don't know anything about much, that paperwork came

17   from Crazy Town Roswell Gang; is that correct?

18        A.   Yes, that's what he said.

19        Q.   And that's what Clark told you?

20        A.   Yes.

21        Q.   Did Clark say how he was aware that that

22   paperwork came from Crazy Town Roswell Gang?

23        A.   He did not.

24        Q.   I think you told Mr. Burke earlier this

25   morning that this had something to do with Crazy Town

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                    1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                       e-mail: info@litsupport.com

```
 1   Roswell Gang wanting SNM to clean up their mess,
 2   meaning the Roswell messes.  Would you explain that?
 3        A.   I don't think that's what I said.
 4        Q.   So I'll give you the opportunity to refresh
 5   my memory.
 6        A.   I think it's common practice for gangs
 7   to -- if they find out someone has cooperated and
 8   they can get the paperwork on someone, even if it's
 9   in a different gang, they'll provide that paperwork
10   to that individual's gang, so that they can clean
11   their own house.
12        Q.   And that's what Ben Clark is telling you
13   that happened in this particular case?  Or that's
14   just your impression or assumption of what they were
15   doing?
16        A.   I think that's my impression.
17        Q.   All right.  Did any of the people you ever
18   interviewed indicate how the paperwork came from the
19   Crazy Town Roswell Gang, how they got possession of
20   it to give it to somebody to give it to somebody to
21   somehow pass it in the paperwork?
22        A.   No, I don't think anyone has.
23        Q.   Now, there was some mention at some point
24   in time about Cheech having been involved in this
25   paperwork being passed.  Do you remember that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I do.

 2        Q.    And who did you learn that from?

 3        A.    Just a moment.

 4        Q.    Sure.  Did this come from Leroy Lucero?

 5        A.    I'm not sure.  I don't think that's right,

 6   though.

 7        Q.    I didn't mean to interrupt your search.  I

 8   was trying to help you.  I'm looking at this in

 9   connection with Statement 62 if that's going to help

10   you.

11        A.    That would help.  That was stated by Samuel

12   Gonzales.

13        Q.    Samuel Gonzales is the one that said

14   that -- looking at 62, you have three people:  Samuel

15   Gonzales, John Montano, and Javier Rubio.  Can you

16   tell me what each of those basically stated as

17   relates to the paperwork delivered from Arturo Garcia

18   to Ben Clark?

19        A.    Yes.  Gonzales stated that "Cheech, Joe

20   Martinez, delivered the paperwork on Sanchez from

21   Arturo Garcia to Benjamin Clark, who approved the

22   murder."

23        Q.    With no Kyle Dwyer in there; right?

24        A.    Correct.

25        Q.    And again, all of these individuals --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Samuel Gonzalez, John Montano and Javier Rubio -- are

2    at Southern New Mexico; correct?

3        A.   Yes.  John Montano doesn't say where the

4    paperwork comes from.  He just says that Clark told

5    John "That'd be messed up if the paperwork on the guy

6    just got showed up."

7        Q.   And then Mr. Rubio?

8        A.   Mr. Rubio says, "Joe Martinez a/k/a Cheech,

9    took the paperwork down and showed it to him.  Edward

10    Troup and Javier Alonso were involved in the murder."

11    There is one more.

12        Q.   So what does Joe Martinez say about this?

13        A.   I believe he denied it.

14        Q.   He denied even knowing anything about the

15    paperwork; right?

16        A.   I believe so.

17        Q.   And how many times did you talk to him?

18        A.   I think twice.

19        Q.   And was that all, then -- both of those

20    conversations or interviews it was as it related to

21    investigation of this case, it had nothing to do with

22    just casual seeing them at places and things like

23    that?

24        A.   Yes.

25        Q.   I say that because you say you went one

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   time to see somebody else and they pulled you aside

2   and started talking to you.

3        A.   Yes.

4        Q.   These are formal, sit-down interviews, to a

5   certain extent planned, I would say.

6        A.   Yes.

7        Q.   And the last one I want to talk to you

8   about -- and you talked about this a little bit with

9   Mr. Burke -- is Statement Number 77.

10       A.   Okay.

11       Q.   Again, we know that Mr. Dwyer is not

12   around.  He's deceased; correct?

13       A.   Yes.

14       Q.   And this was Mr. Dwyer asking Ruben

15   Hernandez, who is, again, in Southern New Mexico, to

16   take something to Samuel Gonzales, and tell Samuel

17   Gonzales that was all he had; correct?

18       A.   Yes.

19       Q.   And it was just a piece of paper folded up;

20   right?

21       A.   Yes.

22       Q.   Has anybody ever said what that paper said?

23       A.   No.

24       Q.   So we don't know if that was, "Hey, I'll

25   meet you at chow tonight, and let's talk about who's

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    going to win the national championship for the NCAAs
 2    in 2007"; right?
 3         A.   Right.
 4              MR. BLACKBURN:  I have nothing further,
 5    Your Honor.
 6              THE COURT:  Thank you, Mr. Blackburn.
 7              Ms. Torraco, do you have cross-examination
 8    of Ms. Stemo?
 9              MS. TORRACO:  Yes, Your Honor.
10              MR. COOPER:  Your Honor, if I may, before
11    she starts, I'd like to invoke the rule for this
12    motion hearing and all subsequent motion hearings, if
13    I may.
14              THE COURT:  Well, who is going to be your
15    representative for the next trial?
16              MS. ARMIJO:  It will be Bryan Acee, but
17    he's not even here today.  But he would be allowed
18    in.
19              THE COURT:  Is there a witness -- I mean,
20    we can invoke the rule, but is there a witness here
21    that you're concerned about?
22              MR. COOPER:  No, but I'm afraid we may see
23    some witnesses, and I would hate for Agent Stemo or
24    somebody else to go in and start talking to these
25    witnesses about the testimony that's coming out of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    this courtroom.
 2              THE COURT:  All right.  The rule has been
 3    invoked.  Witnesses may not discuss their testimony
 4    with each other.  They may discuss it with attorneys.
 5    They will be required to remain outside of the
 6    courtroom until they are called to testify within the
 7    courtroom.
 8              MR. COOPER:  Thank you, Your Honor.
 9              THE COURT:  Mr. Cooper.
10                   CROSS-EXAMINATION
11    BY MS. TORRACO:
12         Q.   Good afternoon.  I think I'm the last
13    lawyer, so there is light at the end of the tunnel
14    for you.
15              I want to start with the statements that
16    surround the 2001 incident.  Do any of those
17    statements apply to Andrew Gallegos?
18         A.   No.
19         Q.   And is Andrew Gallegos in any way
20    implicated regarding any of the 2001 statements?
21         A.   No.
22         Q.   Was he present for any of those statements?
23         A.   I don't think so.
24         Q.   And was Andrew Gallegos an SNM member in
25    2001?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    A.   I don't know.

2    Q.   Do you believe he was an SNM member at any

3   time?

4    A.   Yes.

5    Q.   And when was that?

6    A.   Sometime around 2005, 2006.

7    Q.   So are you saying that, therefore, he was

8   not an SNM member in 2001?

9    A.   I'm not saying that.

10   Q.   Okay.  And why do you say that he was an

11   SNM member in 2005 and 2006?

12   A.   I say that's an approximation.  I believe

13   we have witnesses that will say Mr. Gallegos joined

14   the SNM in the federal prisons.

15   Q.   Okay.  And when was Andrew Gallegos in the

16   federal system?

17   A.   I believe he was indicted in 2005.  I'm not

18   sure when exactly he was sent off.

19   Q.   Okay.  So your investigation concludes that

20   he became an SNM member after 2005; is that what I

21   heard you say?

22   A.   I wouldn't make that generalization.  I

23   believe --

24   Q.   Based on your investigation?

25   A.   That's just my belief.  I don't know much

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    about Mr. Gallegos before 2005.

2         Q.   Okay.  And regarding the 2007 statements,

3    do any of those apply to Andrew Gallegos?

4         A.   They do not.

5         Q.   And do you know if he was around for any of

6    those conversations?

7         A.   I don't think he was.

8         Q.   Okay.  And is he in any way involved in

9    either the creating or the hearing of those

10   statements?

11        A.   No.

12        Q.   Okay.  So I'd like to start with Statement

13   Number 41.  And I know that Mr. Benjamin asked you

14   extensively about this, so forgive me if I ask

15   something again.  It's only because I was confused.

16   Was it ever established who the declarant was on

17   Statement Number 41?

18        A.   I believe it was Joe Gallegos.

19        Q.   So you believe it was or it is Joe

20   Gallegos?

21        A.   I can check?

22        Q.   Okay.  Great.

23        A.   I'm mistaken.  In one report it says Joe

24   makes the statements.  In another report it says

25   Smiley, which is Andrew Gallegos' moniker.



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492          BEAN                             FAX (505) 843-9492
                           &ASSOCIATES, Inc.                      1-800-669-9492
                           PROFESSIONAL COURT             e-mail: info@litsupport.com
                             REPORTING SERVICE

```
 1        Q.   Can you give me the number of the report

 2   that says that Joe Gallegos made that statement?

 3        A.   3445.

 4        Q.   And what day is that report dated?

 5        A.   November 21, 2012.

 6        Q.   And whose report is it?

 7        A.   James Mowduk.

 8        Q.   And what department is he with?

 9        A.   New Mexico State Police.

10        Q.   And regarding 3445, who attributes that

11   statement?  What's the source?

12        A.   The person who tells us that is Michael

13   Sutton.

14        Q.   And in what context does Michael Sutton

15   make that statement?

16        A.   He stated that Leroy Vallejos was given a

17   rolled-up wad of money from Joe, and that Leroy

18   Vallejos stated that "They told me we just pulled off

19   a movida and we gotta go clean up."

20        Q.   So I'm going to repeat that, and tell me if

21   I'm correct.  Michael Sutton says that he was told by

22   Leroy Vallejos --

23        A.   Correct.

24        Q.   -- that Joe Gallegos said he just pulled a

25   movida?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.  I also have the report where Leroy
 2   Vallejos say that.
 3        Q.   Okay, great.  Can we stick to the first one
 4   and then we'll move on in just a second?  What is
 5   your understanding of the word "movida"?
 6        A.   It's a move.
 7        Q.   Okay, a move.
 8        A.   Yes, or a job.
 9        Q.   And the exact quote that Michael Sutton
10   attributes to Leroy Vallejos is what?
11        A.   "We just pulled off a movida, and we got to
12   go clean up."
13        Q.   And according to this particular report,
14   Joe says that and he says "we," correct?
15        A.   Correct.
16        Q.   And there is no reference to Andrew
17   Gallegos; is that correct?
18        A.   Not in that specific statement.
19        Q.   Okay.  And I understand that there is
20   another one, but let's just stay with that one for a
21   couple of minutes.  So on the chart we've received
22   under Statement Number 41, where it says Joe and
23   Andrew, according to Michael Sutton, that would be an
24   incorrect sentence.  It should just say "Joe,"
25   correct?  "Joe says we just pulled off a movida"?
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                e-mail: info@litsupport.com

```
 1        A.    No.

 2        Q.    Why?

 3        A.    This is a statement that Leroy Vallejos

 4   told to Michael Sutton relaying what Joe said.

 5        Q.    Right.  But I thought you told me the

 6   statement is that Joe told Leroy, "We just pulled off

 7   a movida"?

 8        A.    Correct.

 9        Q.    So that's the statement, "We pulled off a

10   movida"?

11        A.    Yes.

12        Q.    In what context was that statement made?

13        A.    Meaning Joe and Andrew.

14        Q.    How do you know that it incriminated

15   Andrew?

16        A.    In the same statement -- let me find it.

17   Leroy Vallejos and Michael Sutton encountered Joe and

18   Andrew Gallegos.  There was no other individuals with

19   them.

20        Q.    Okay.  And where did they encounter them?

21        A.    At the Allsup's.

22        Q.    And what day was that?

23        A.    I believe it was November 12, 2012.

24        Q.    So they said, "We just pulled off a job, or

25   a movida," and then later Joe says "and we have to go
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   clean up"?

 2        A.   Yes.

 3        Q.   Okay.  What else was the context of that

 4   statement?

 5        A.   Joe had given Mr. Vallejos money and drugs.

 6        Q.   Okay.  And how does Michael Sutton know

 7   that?

 8        A.   He was there.

 9        Q.   Michael Sutton was present at the

10   statement?

11        A.   Yes.

12        Q.   I thought you just said that Leroy told

13   Michael Sutton about the statement?

14        A.   Yes.

15        Q.   Okay.  And he was also present?

16        A.   Yes, I believe he was there.

17        Q.   Okay.  So now I'm really confused.  Did

18   Michael Sutton hear the statement, or was he told the

19   statement from Leroy?

20        A.   Well, he makes more than one statement.

21        Q.   Michael Sutton does?

22        A.   He does.

23        Q.   Okay.  So let's start with the first one

24   where he says that Leroy told him that he had pulled

25   a movida.  When is that statement made?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1         A.    November 21.

2         Q.    Then you say he gave another statement?

3         A.    Yes.  I don't think I have that with me.

4         Q.    And what does Michael Sutton say about the

5    second statement?

6         A.    Would you like me to read all of it for

7    you?

8         Q.    How long is it?

9         A.    It's about a paragraph.

10         Q.    Let me ask you a few questions about it

11    first.  When did Michael Sutton give the second

12    statement?

13         A.    November 21.

14         Q.    Did you just say that?

15         A.    Yes.

16         Q.    Sorry about that.  And was the second

17    statement tape-recorded?

18         A.    I believe it was.

19         Q.    And was the first statement tape-recorded?

20         A.    I don't have it in front of me, but I think

21    it was.

22         Q.    Okay.  So you think there's tape recordings

23    for both of those statements?

24         A.    Yes.

25         Q.    Now, let's go on to Leroy Vallejos.  What

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   did Leroy say?
 2       A.   He said they ran into Joe and Smiley at the
 3   Allsup's getting gas and beer.  Leroy said he bummed
 4   a cigarette from Joe, and Joe gave him one, and then
 5   he said, 'Here, take the whole pack.'  He said Joe
 6   asked him if he was doing okay.  And he said he was,
 7   but didn't have any money.  Joe said, 'Here,' and
 8   gave him 18 dollars.  Leroy said Joe told him, 'I
 9   just came up.'  We asked Leroy what he thought that
10   meant, and he said he remembered thinking that they
11   must have just robbed someone."
12           Do you want me to continue?
13       Q.   Well, earlier, I thought you told me and
14   told the Court that Leroy Vallejos attributed the
15   statement to Andrew.  So that's what I'm interested
16   in talking about.
17       A.   All right.  You meant that statement.  So
18   this is another statement that Leroy relayed to
19   Michael Sutton.  Smiley said they had just finished a
20   movida, which is Spanish for a move or a job.
21       Q.   And what report are you referencing for
22   that statement?
23       A.   Do you need the Bates number?
24       Q.   Yes, please.
25       A.   That's on 3868.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And whose report is that?

 2        A.   Nathan Lucero.

 3        Q.   And is he also with the State Police?

 4        A.   He is.

 5        Q.   Is there a third statement about who made

 6   the movida comment, or is that the only two

 7   references?

 8        A.   There is the one I just read previously.

 9        Q.   Yes.  So there's those two?

10        A.   There is -- the two I just read off were

11   Michael Sutton.  And then there is one from Leroy

12   Vallejos on 3892.

13        Q.   Okay.  So the one that you just read to me

14   and to the Court that's 3868, was that your testimony

15   that Michael Sutton had relayed that to the state

16   police officer because that said Andrew?

17        A.   Yes.

18        Q.   Okay.  So Michael Sutton at one time says

19   it was Joe, and another time says it was Andrew that

20   made that statement?

21        A.   Correct.

22        Q.   Is that correct?

23        A.   Correct.

24        Q.   Okay.  So now let's move on to what Leroy

25   says and that you said was 3892.  What does Leroy
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   relay to the police?

 2        A.   This is on December 5, 2012.  "Leroy said

 3   Joe asked him if he was doing okay, and he said he

 4   was, but didn't have any money.  Joe said, 'Here,'

 5   and gave him 18 dollars.  Leroy said Joe told him 'I

 6   just came up.'"

 7        Q.   Was there any reference in that statement

 8   about the movida?

 9        A.   I don't think so.

10        Q.   Okay.  And was that statement also

11   tape-recorded?

12        A.   Yes.

13             MS. TORRACO:  May I have just a moment,

14   Your Honor?

15             THE COURT:  You may.

16   BY MS. TORRACO:

17        Q.   Okay.  And how do you know movida means

18   move?

19        A.   I know Spanish.

20        Q.   Okay.  Does movida mean murder?

21        A.   No.

22        Q.   Did either Leroy or Michael Sutton ever

23   clarify what movida meant?

24        A.   I'm not sure that they did.  In his later

25   statement, Leroy says something kind of leading to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that.

2         Q.   And I'm open for what that is.

3         A.   I'm looking for it.

4         Q.   Okay.

5         A.   On 3/9 Leroy said he knew that that Babylon

6    had got to see them -- meaning the brothers -- before

7    he went missing.  And he told Michael that his

8    sister's boyfriend was probably a done deal.  He said

9    he felt they had just killed and robbed someone.

10        Q.   And who says this?

11        A.   Leroy Vallejos.

12        Q.   And he said that he felt --

13        A.   Yes.

14        Q.   Let's move on to Statement Number 42.

15   Again, I'm not clear with who the declarant was.  I

16   know Mr. Benjamin asked you extensive questions.  So

17   I'd like to divide -- and I believe this is what you

18   did with Mr. Benjamin.  You divided that statement.

19   And the first part of Statement Number 42 says, "Joe

20   and Andrew Gallegos were covered in blood and advised

21   they were cleaning the house."  And that was -- I

22   believe you attributed that to Daniel Orndorff; is

23   that correct?

24        A.   I believe so.

25        Q.   Do you want to confirm that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   It is.
 2        Q.   And you also have Michael Sutton and Leroy
 3   Vallejos listed as sources for Statement Number 42.
 4   Are either of those men also a source for that first
 5   part of the statement?
 6        A.   Let me check.  Michael Sutton said the
 7   Gallegos brothers said they needed to go and clean
 8   up.  I don't think Leroy was involved in that
 9   statement.
10        Q.   Okay.  And the statement from Michael
11   Sutton was -- when he says that they needed to go
12   clean up, was that tape-recorded?
13        A.   Yes.
14        Q.   And is that also a statement that was given
15   to the New Mexico State Police in 2012?
16        A.   Yes.
17        Q.   Okay.  And what Bates number are you
18   referencing?
19        A.   For Michael Sutton?
20        Q.   Yes, please.
21        A.   I lost it.  Let me find it.
22        Q.   That's okay.
23        A.   It's 3868.
24        Q.   Okay.  Thank you.  And here it says, "Joe
25   and Andrew were covered in blood."  Is that an
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    observation or a statement or something else?

2         A.   It's Mr. Orndorff described the Gallegos

3    brothers as being covered in blood.  It could be both

4    a statement and an observation.

5         Q.   And that statement by Daniel Orndorff that

6    they were covered in blood -- was that recorded?

7         A.   Yes.

8         Q.   And what is the context of that statement?

9         A.   He describes the Gallegos brothers being

10   covered in blood, and they reasoned -- "they" being

11   the Gallegos brothers -- that they had been at a

12   matanza the previous day.

13        Q.   Did you ever confirm whether or not they

14   did have a matanza the previous day?

15        A.   No, but I believe other sources have

16   confirmed that or corroborated that.

17        Q.   And did Daniel Orndorff make the statement

18   at the Allsup's that he saw this at the Allsup's or

19   is this someplace else?

20        A.   I believe Daniel only saw them at the 4

21   Aaron Court trailer.

22        Q.   Okay.  So that's where he saw them covered

23   in blood?

24        A.   I believe so.

25        Q.   And what date was that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   That he saw them or that he made the

 2   statement?

 3        Q.   Both.

 4        A.   The day Mr. Orndorff saw them covered in

 5   blood was the day of the homicide.

 6        Q.   So is Mr. Orndorff a co-conspirator?

 7        A.   No.

 8        Q.   And what about Mr. Sutton?  Was he a

 9   co-conspirator?

10        A.   I'd consider him more of a witness.

11        Q.   Same thing with Mr. Orndorff?  He's a

12   witness?

13        A.   Yes.

14        Q.   And what about Leroy Vallejos?

15        A.   He could be considered a co-conspirator.

16        Q.   How so?

17        A.   He was given drugs and money that could

18   have been evidence.

19        Q.   Okay.  And are you able to trace the fact

20   that the drugs and money did indeed come from

21   something relating to the Adrian Burns murder?

22        A.   Not concretely.  I believe both Mr. Sutton

23   and Daniel Orndorff described the packaging that was

24   similar to how Mr. Burns packaged his heroin.

25        Q.   And they're saying that the heroin that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    they were given that day was consistent with the
 2    Adrian Burns packaging?
 3         A.    Yes.
 4         Q.    And regarding the statement that they were
 5    cleaning the house, I don't know if you -- you've got
 6    a copy of the document; correct?
 7         A.    Yes.
 8         Q.    And that's in quotations.  Did you put that
 9    in quotations?
10         A.    No, I didn't write this.
11         Q.    Okay.  And were they discussing actually
12    cleaning the home they live in?
13         A.    Can I read the statement to you?
14         Q.    Sure.
15         A.    "Daniel stated that he entered 4 Aaron
16    Court sometime around 9:30 p.m. and observed Joe and
17    Andrew Gallegos trashing the house.  Daniel stated
18    that Joe and Andrew were obviously tweaking on
19    methamphetamine, and they advised that they were
20    cleaning the house."
21         Q.    And I want to go back to the beginning part
22    of that statement, because I'm not sure, did you say
23    that they were "trashing the house"?
24         A.    That's what Mr. Orndorff believed they were
25    doing.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    What does that mean?

2        A.    You'd have to ask him.  I don't know what

3   he meant.

4        Q.    Okay.  Could it mean that they were making

5   a mess in their house?

6        A.    It could.

7        Q.    Okay.  And this cleaning the house

8   statement -- could that mean that they were literally

9   cleaning their home?

10        A.    Possible.

11        Q.    Now, the second part of this statement,

12   "Joe Gallegos later went by Leroy Vallejos' house and

13   tried to give Vallejos and Andrew Gallegos the

14   truck."  Who said that?

15        A.    Leroy did, Mr. Vallejos.

16        Q.    So what is the statement that is attributed

17   to one of the Gallegoses?

18        A.    "Leroy said that the next day, on Tuesday,

19   Joe came by his house and wanted to give him their

20   truck."

21        Q.    So is there a statement there?

22        A.    That is a statement.  Just because it's in

23   quotations doesn't mean it's not a statement.

24        Q.    Okay.  Let's move on to Statement Number

25   43.  Is Charlene Baldizan considered to be a

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                                             Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   co-conspirator?
 2        A.   Yes.
 3        Q.   Why is that?
 4        A.   She assisted the Gallegos brothers in
 5   hiding from law enforcement.
 6        Q.   And is that where the harboring a fugitive
 7   charge came from?
 8        A.   I believe so.
 9        Q.   And are you aware of the disposition of
10   that particular charge?
11        A.   I think it was dismissed.
12        Q.   Okay.  Do you know why she stated that she
13   thought that the Gallegos brothers thought the police
14   were looking for the van?
15        A.   She said the suspect knew it was registered
16   to them and they did not want it at the motel where
17   they were staying.
18        Q.   And did she attribute that to either one of
19   the Gallegos brothers?
20        A.   She did not.
21        Q.   And when did she make the statement?
22        A.   November 20.
23        Q.   And that was against the State Police?
24        A.   Yes.
25        Q.   Okay.  And that statement was recorded?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   I believe it was, but I'm not entirely

2    sure.

3    Q.   And do you know why the charges were

4    dismissed?

5    A.   No.

6    Q.   Do you know if she was given an immunity

7    agreement?

8    A.   I don't know.

9    Q.   Okay.   Statement Number 44.   And I believe

10   when you were testifying as Mr. Benjamin was asking

11   you questions, you said that it was only Joe Gallegos

12   asked Jason to clean up the living room; is that

13   correct?

14   A.   I'd have to double-check.

15   Q.   Okay.

16   A.   Yes, it was.

17   Q.   There is also something about Joe Gallegos

18   asked Van Veghel to clean blood off the air

19   compressor?

20   A.   Yes.

21   Q.   What's the significance of the air

22   compressor?

23   A.   Aside from there being blood on there?   I

24   don't know that there is any more.

25   Q.   There is no other significance, other than

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   there was blood?
 2        A.   Yes, evidence.
 3        Q.   And who tested the blood on the air
 4   compressor?
 5        A.   No one did.  Mr. Van Veghel wiped it off.
 6        Q.   But isn't it true, if he just wiped it off,
 7   that there would still be blood that would be
 8   viewable, like through a black light or something?
 9        A.   I don't believe the New Mexico State Police
10   were looking for blood in 2012 or 2013.
11        Q.   Okay.  So was there any blood tested from
12   the air compressor?
13        A.   Not that I'm aware of.
14        Q.   Okay.  Move on to Statement Number 45.  And
15   who was the source of Statement Number 45?
16        A.   Jason Van Veghel.
17        Q.   And he gave the statement in 2016; is that
18   correct?
19        A.   Yes.
20        Q.   Which field was Andrew Gallegos alleged to
21   have thrown these keys and the wristwatch?
22        A.   It's a field off of Ladera Road.
23        Q.   How do you know?
24        A.   That's what Mr. Van Veghel says.
25        Q.   And his statement -- was that recorded?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I don't think it was.

 2        Q.   Was that a statement taken by the FBI?

 3        A.   Yes.

 4        Q.   And what is the FBI policy for recording

 5   statements?

 6        A.   We're only mandated to record interviews of

 7   recently arrested people right after Miranda or

 8   before Miranda but if a person is being Mirandized.

 9        Q.   Okay.  And Jason Van Veghel was not

10   Mirandized?

11        A.   No, I don't think he was.

12        Q.   Is that because he was not considered to be

13   a co-conspirator?

14        A.   I don't know.

15        Q.   Was Jason Van Veghel considered to be a

16   co-conspirator?

17        A.   I think he is.

18        Q.   And the wristwatch.  What significance is

19   that?

20        A.   I think there is an assumption that it may

21   have belonged to the victim.

22        Q.   And how do you know that?

23        A.   I think it's an assumption.

24        Q.   Okay.  So you don't know that?

25        A.   No.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   And did anyone report a missing watch?
 2          A.   No.
 3          Q.   And did the wife or the girlfriend or the
 4     mother or anyone else in Mr. Burns' life report that
 5     there was a watch missing?
 6          A.   Not to my knowledge.
 7          Q.   And what about the keys?  What were the
 8     keys to?
 9          A.   I think that's another assumption that it
10     belonged to the vehicle that was burned.
11          Q.   Okay.  And was that ever confirmed?
12          A.   No, we never found the keys.
13          Q.   And did you ever find the watch?
14          A.   No, we didn't.
15          Q.   What efforts did the FBI make to -- or the
16     New Mexico State Police or any other agency make to
17     find the keys or wristwatch in that field?
18          A.   They attempted to conduct a search of
19     fields on Ladera Road.
20          Q.   And when was that?
21          A.   I believe it was 2016.
22          Q.   Okay.  So the fact that a wristwatch and
23     the set of keys may have been thrown by Andrew
24     Gallegos -- I guess I want you to somehow tell me how
25     that's relevant.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Well, it's based on the assumption that the
 2   keys belonged to the burned vehicle and the watch
 3   belonged to the victim.
 4        Q.   Okay, thank you.  Statement Number 46.  I'm
 5   not clear on what the stolen goods were.
 6        A.   I'm not either.
 7        Q.   Okay.  So we don't know?
 8        A.   No.
 9        Q.   Okay.  And the guns.  What is the
10   significance of the guns?
11        A.   A gun was used to murder Mr. Burns.
12        Q.   And was it one of these guns that --
13        A.   We don't know.  They weren't recovered.
14        Q.   Okay.  So there's other reasons why Mr.
15   Gallegos might want to get rid of a gun and some
16   stolen goods; isn't that true?
17        A.   Yes.
18        Q.   And this statement by Jason Van Veghel --
19   was that also in 2016?
20        A.   Yes.
21        Q.   And that was also the statement that was
22   not recorded?
23        A.   Correct.
24        Q.   You started to tell me about the policy.
25   Is that policy written anywhere?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I believe so.

 2        Q.   Is that something that we have access to?

 3        A.   I don't know.

 4        Q.   And do you mind sharing that policy with

 5   us?

 6        A.   I'd have to speak with our chief division

 7   counsel.

 8        Q.   And does Jason Van Veghel acknowledge that

 9   he did take a gun and other stolen goods?

10        A.   That's what he told us.

11        Q.   And does he tell you where he stored those

12   goods?

13        A.   No, he doesn't.

14        Q.   And did he ever turn those goods over to

15   you?

16        A.   No, he didn't.

17        Q.   Did the FBI ask for those guns?

18        A.   I don't know.  I wasn't there.

19        Q.   Okay.  Who took that statement?

20        A.   Agent Acee.

21        Q.   And what document are you referencing to

22   give me this information and to give it to the Court?

23        A.   43658 and 59.

24        Q.   I'm sorry?

25        A.   And 59.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And there is no documentation as to whether

2   or not Jason Van Veghel ever produced those stolen

3   goods and the weapons?

4      A.   No, not to my knowledge.

5      Q.   Not to your knowledge, he didn't produce

6   it?  Not to your knowledge, it wasn't requested?

7      A.   Both.

8      Q.   Okay.  Thank you.

9           Now, regarding the statements that have

10  been tendered that referenced on or about February 27

11  of 2016, do those in any way relate to Andrew

12  Gallegos?

13     A.   They do not.

14     Q.   None of them are attributed to him;

15  correct?

16     A.   Correct.

17     Q.   And none of them reference him; correct?

18     A.   Correct.

19     Q.   And he's not involved in any way with

20  anything that went on on or about February 27 of

21  2016; isn't that true?

22     A.   Correct.

23     Q.   Now, there is a Statement 51.  I'm a little

24  confused by that statement, if you can help me out.

25  It might have been changed.  I don't know.  So you're

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                      1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    going to have to help me.  "Joe Gallegos feared Gomez

2    would testify against him on a state murder charge."

3        Do you have any reason to believe that

4    references the Adrian Burns murder?

5        A.   No.

6        Q.   Are you positive that does not reference

7    the Adrian Burns murder?

8        A.   Yes.

9        Q.   And then Statement Number 54.  This is

10   another 2016 statement.  What was the context of

11   Brandy Rodriguez' statement when she said, "You

12   better not testify against my jefe"?

13       A.   I believe she was talking about Joe

14   Gallegos and she was telling this to Jose Gomez.

15       Q.   And Paul Rivera was the one that gave this

16   statement to the FBI?

17       A.   He did.

18       Q.   And is that statement recorded?

19       A.   No.

20       Q.   And so when Paul Rivera gave you that

21   statement, what were the surrounding circumstances

22   that he explained to you?  Specifically I want to

23   know if anyone else called Joe Gallegos "jefe."

24       A.   I don't think anyone else did.

25       Q.   Do you need to verify that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   I can look, but I'm pretty sure that no one

2   else called him "jefe."

3        Q.   And specifically did Andrew Gallegos ever

4   call him "jefe"?

5        A.   Not to my knowledge.

6        Q.   So based on your investigation, is it fair

7   to say that Andrew Gallegos did not call him "jefe"?

8        A.   That's a fair assumption.

9        Q.   I'm sorry?

10       A.   That's a fair assumption.

11       Q.   Well, I don't want to assume.  I want to

12   know what you've learned in your investigation.

13       A.   I don't remember seeing anything where

14   Andrew refers to his brother as jefe.

15       Q.   And does anyone else?  Because before you

16   keep saying that's an assumption, I assume so.  Does

17   anyone else call Joe Gallegos jefe except for Brandy?

18       A.   Not that I'm aware of.

19       Q.   Okay.  And I want to confirm on Statement

20   Number 69.  There is a statement there that Paul

21   Rivera attributes to Brandy Rodriguez saying, "This

22   is a message from Joe."  That is a direct quote?

23       A.   The actual sentence says Rodriguez entered

24   the bedroom and kicked Gomez once and said something

25   to the effect of "This is a message from Joe."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.
 2             MS. TORRACO:  May I have a moment, Your
 3   Honor.
 4             THE COURT:  You may.
 5             MS. TORRACO:  That's all the question I
 6   have.  Thank you.
 7             THE COURT:  Thank you, Ms. Torraco.
 8             MS. TORRACO:  Thank you, Your Honor.
 9             THE COURT:  All right.  Ms. Arellanes.
10             MS. ARELLANES:  Thank you, Your Honor.
11                    CROSS-EXAMINATION
12   BY MS. ARELLANES:
13        Q.   I'd like to follow up on some of the
14   questions that Mr. Benjamin asked you this morning.
15        A.   Okay.
16        Q.   Now, with regard to Statement Number 47,
17   I'll direct your attention to that statement?
18        A.   Okay.
19        Q.   The declarant there is -- I'm sorry, the
20   source there is Jose Gomez; is that correct?
21        A.   Yes.
22        Q.   And in fact, Jose Gomez gave a couple of
23   statements during the course of this investigation;
24   is that correct?
25        A.   I believe so.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And the first statement was on 2/27/16,

2  when he was talked to at the hospital by Otto King?

3      A.   Yes.

4      Q.   And then the second statement he gave was

5  on 3/9/16, when he was interviewed by Mr. Acee, Agent

6  Acee?

7      A.   I believe so.

8      Q.   And in the statement at the hospital Jose

9  Gomez said that Oso told Gomez, "You remember me?"

10      A.   No, he said Gonzalez said that.

11      Q.   Okay.  Now if I show you a transcript of

12  the statement where he said that Oso said, "You

13  remember me, fool," would that -- where do you get

14  that information that Santos told Gomez, "You

15  remember me?"  Where is it written down?

16      A.   In Detective King's report.

17      Q.   Now, have you seen the transcript of Jose

18  Gomez's interview at the hospital?

19      A.   No.

20      Q.   Okay.  And if I show you a statement of

21  that showing what he said, he said it was Oso that

22  told him that rather than Santos --

23      A.   That would help.

24          MS. ARELLANES:  May I approach the witness,

25  Your Honor?

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                     201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                    1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1            THE COURT:  You may.
 2   BY MS. ARELLANES:
 3       Q.   I'll direct your attention to this part.
 4            MR. CASTELLANO:  Your Honor, is there a
 5   Bates stamp associated with that?
 6            MS. ARELLANES:  There is no Bates stamp.
 7   It was an interview taken at the hospital.  I don't
 8   think there is a transcript of that in the discovery.
 9       A.   This doesn't look like a transcript.
10   BY MS. ARELLANES:
11       Q.   Okay.  Have you listened to the interview?
12       A.   I have not.
13       Q.   Okay.  So you actually have not listened to
14   the interview itself?
15       A.   No.
16       Q.   Okay.  So you can't say for certain, other
17   than the report by Otto King, that Santos was the
18   source of that information to Jose Gomez; is that
19   correct?
20       A.   Correct.
21       Q.   So once you interview -- once you listen to
22   the audio of that particular interview, you probably
23   would have a little bit more information about that;
24   is that correct?
25       A.   Okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And the next statement is that they told
 2   Gomez that Joe Gallegos put a hit out and they were
 3   there to kill him.  When was that statement made by
 4   Jose Gomez?
 5        A.   On the same day of the assault.
 6        Q.   Okay.  And to whom?
 7        A.   To Mr. King.
 8        Q.   And did you listen to the audio interview
 9   of Agent Acee of Jose Gomez?
10        A.   I don't know that there is audio.
11        Q.   Okay.  Yeah, there is.  You haven't
12   listened to it?
13        A.   No, I haven't.
14        Q.   Now, with regard to Statement Number 48,
15   the source of that statement is Brandy Rodriguez; is
16   that correct?
17        A.   Yes.
18        Q.   And that particular statement -- have you
19   reviewed the 302 of Brandy's statement on 32816?
20        A.   That's not 302.  That's a Valencia County
21   report.
22        Q.   So I think there is a 302.  I believe if I
23   show you the 302, would you agree that there is a
24   302 --
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    -- on Brandy.  Okay.

2            THE COURT:  Ms. Arellanes, do you want to

3      let her look at this during the break?

4            MS. ARELLANES:  Sure, Your Honor.

5            THE COURT:  Let's be in recess about 15

6      minutes.

7            (The Court stood in recess.)

8            THE COURT:  Let's go back on the record.

9            All right, Ms. Stemo.  I'll remind you that

10     you're still under oath.

11           Ms. Arellanes, if you wish to continue your

12     cross-examination of Ms. Stemo, you may do so at this

13     time.

14           MS. ARELLANES:  Thank you, Your Honor.

15           THE COURT:  Ms. Arellanes.

16     BY MS. ARELLANES:

17     Q.    Okay.  Now, going back to Statement Number

18     47, Jose Gomez gave an audio statement that you did

19     not hear; is that correct?

20     A.    Yes.

21     Q.    And in that audio statement he mentioned

22     that Joe Lawrence was seeing an ex-girlfriend by the

23     name of Mary Crumpton; is that correct?

24     A.    I don't know.  Like I said, I didn't listen

25     to the audio.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Now, with regard to Statement Number 48,
2  the declarant there is -- the source there is Brandy
3  Rodriguez and she stated that Shauna Gutierrez didn't
4  finish him when Gomez ran away?
5      A.   Yes.
6      Q.   Now, that particular statement is not
7  written on the 302 of 328 that I showed you earlier;
8  is that correct?
9      A.   Correct.
10      Q.   And in fact, that statement is not on the
11  302; that Brandy Rodriguez gave several statements to
12  Acee; is that correct?
13      A.   I'm not sure if she spoke to Agent Acee.
14  But she did give several statements to FBI agents.
15      Q.   Okay.  The first statement was on 3/28/16,
16  the 302 that I showed you.
17      A.   Yes.
18      Q.   Then there was another statement on
19  7/12/16.  There was another 302 written about that?
20      A.   July 6, 2016.
21      Q.   I'm sorry, July 12 of 2016.
22      A.   That's the date of entry.  The interview
23  was actually on the 6th.
24      Q.   I've got a copy.  Do you wish to look at
25  it?

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                       1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                        e-mail: info@litsupport.com

```
 1        A.    Sure.
 2        Q.    I'll give you a chance so you don't have to
 3   hunt for it.
 4              MR. CASTELLANO:   Could we have a Bates
 5   stamp for that 302, please?
 6              MS. ARELLANES:   43423.
 7        A.    I have that report.   It is an interview on
 8   July 6.
 9   BY MS. ARELLANES:
10        Q.    July 6.   The date of entry was on July 12.
11   I'm sorry.   Yeah.   And that particular statement is
12   not in that 302?
13        A.    Correct.
14        Q.    And in fact, Brandy said that she was
15   pretty drunk on the day of the event?
16        A.    Yes.
17        Q.    And she was highly intoxicated at 9:00 in
18   the morning?
19        A.    I believe so.
20        Q.    And she had a spotty memory of the events?
21        A.    Yes.
22        Q.    Now, jumping over to Statement Number 51.
23   The source of that statement is Paul Rivera.   And the
24   statement says that Shauna Gutierrez and Brandy
25   Rodriguez told him that Joe Gallegos had put a hit --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   the declarant was Shauna Gutierrez and Brandy

 2   Rodriguez, and Joe Gutierrez had placed a hit on

 3   Gomez, because Gallegos feared Gomez would testify

 4   against him on a state murder charge; is that

 5   correct?

 6        A.   I think you mixed up some names.  Paul

 7   Rivera doesn't say who told him.  He just says he was

 8   with Shauna and Brandy, and he learned of the green

 9   light on Mr. Gomez.

10        Q.   Oh, okay.  And so again I direct your

11   attention to the 302 of Paul Rivera dated 10/26/16.

12        A.   Okay.

13        Q.   And I direct your attention to the last

14   paragraph of the first page, and that would be Bates

15   No. 43417.

16        A.   Okay.

17        Q.   And it says, "Although Rivera did not know

18   why Rodriguez wanted to confront Rodriguez, he went

19   with her and Gonzalez in Gutierrez's truck."  Did he

20   say that?

21        A.   Yes.

22        Q.   And in fact, Paul Rivera gave an audio

23   statement when he was interviewed back in May of

24   2016; is that correct?

25        A.   I'm not sure.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  If I show you a transcript, will

2   that reassure you that there was an audio statement?

3      A.   It would.

4           MS. ARELLANES:  May I approach the witness,

5   Your Honor?

6           THE COURT:  You may.

7      A.   Yes.

8   BY MS. ARELLANES:

9      Q.   Then have you listened to this audio

10   statement?

11      A.   I have not.

12      Q.   I'm sorry?

13      A.   I have not.

14      Q.   Okay.  And I think you testified earlier to

15   Ms. Torraco that you -- there was not an audio

16   statement of Paul Rivera, didn't you?

17      A.   His later statements.

18      Q.   His later statements, okay.  And in the

19   audio statement, Rivera tells Acee supposedly they're

20   saying that he had a beef with Joe before Joe stuck

21   him through his hand; you don't recall that?

22      A.   Well, Mr. Acee was at that interview.

23      Q.   Yeah.  All right.  So I'll direct your

24   attention to the middle of the page right here.

25      A.   Do you want me to read it?



SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492
                                                                              1-800-669-9492
                  PROFESSIONAL COURT                       e-mail: info@litsupport.com
                      REPORTING SERVICE

```
1         Q.   Well, read this part right here.
2         A.   Okay.  "Mr. Rivera:  But that was over.  I
3    don't know.  But they're saying that he knows about a
4    murder Joe did, I guess, out here, that he's
5    testifying against him.  That's what Brandy says."
6         Q.   Okay.  So that's what Brandy says; is that
7    correct?
8         A.   According to Paul Rivera.
9         Q.   Well, he's the source of your -- he's going
10   to be a witness for the Government in this case?
11        A.   Yes.
12        Q.   But he didn't say anything about Shauna,
13   did he?
14        A.   In this transcript?
15        Q.   Right.
16        A.   I don't know.  I'd need to read the entire
17   transcript.
18        Q.   In that particular portion, that particular
19   paragraph?
20        A.   No, he doesn't.
21        Q.   And again, with regard to Statement Number
22   52, the source, there again, is Paul Rivera.  Okay.
23   And it's not clear.  I guess there are two sources
24   there, Paul Rivera and Brandy Rodriguez.
25        A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   It says, "Upon learning where Gomez is

2   staying, Shauna and Brandy agreed they needed to go

3   after Gomez"?

4      A.   Yes, that's what that says.

5      Q.   And again I direct your attention to the

6   302 of 10/26/16 of Paul Rivera.  I think I lost it.

7   Oh, here it is.  Do you have that Bates No. 43417?

8      A.   I have it.

9      Q.   And on the fourth paragraph down it says,

10  "Gutierrez learned that Gomez was at a nearby

11  trailer.  Rodriguez said, 'Let's go,' to Gomez and

12  Rivera"; is that correct?

13     A.   Yes.

14     Q.   So there is nothing in that particular

15  paragraph that says that Shauna Gutierrez and Brandy

16  Rodriguez agreed?

17     A.   No, not in that paragraph.

18     Q.   Now, with regard to -- I'll jump over to

19  Statement Number 56, and that's Paul Rivera.  So that

20  would be Bates No. 43413.

21     A.   Okay.

22     Q.   And so the source there again is -- I think

23  Mr. Benjamin talked about this this morning -- the

24  declarant is Brandy Rodriguez, Paul Rivera, or Santos

25  Gonzalez?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    They told Shauna Gutierrez that they had

3    completed their mission, and Shauna Gutierrez laughed

4    and said she was "happy to hear" Gomez is likely

5    dead.  Now, on this particular 302, is there anything

6    in there saying this statement?

7        A.    There is.

8        Q.    There is?

9        A.    Yes, on the next page.

10        Q.    I'm sorry?

11        A.    On the next page.

12        Q.    What Bates number?

13        A.    43414.

14        Q.    Okay.

15        A.    The third paragraph at the end, it says,

16    "Shauna laughed and said that Gallegos would be happy

17    to hear the news."

18        Q.    And this is the interview of 5/8/16?

19        A.    Yes.

20        Q.    Now, with regard to Statement Number 58,

21    okay, the source there is Brandy Rodriguez, and the

22    statement is:  "How come you guys didn't do the job

23    more fully after she previously told Rivera,

24    Gonzalez, and Rodriguez to go get him."

25            Now, the source of that statement is Brandy

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Rodriguez; is that correct?
 2         A.   Just a moment.  Let me find it.
 3         Q.   Okay.
 4         A.   Yes, that is Brandy.
 5         Q.   Brandy did not say that on 3/28/16 when she
 6    was arrested; is that correct?
 7         A.   I don't believe so.
 8         Q.   And she also gave a statement on 7/12/16,
 9    or that was the date of the 302.  She didn't say that
10    at that time, did she?
11         A.   I don't think she did.
12         Q.   And when did Paul Rivera state this
13    particular statement?
14         A.   Brandy Rodriguez made that statement.
15         Q.   Okay.  But there is an entry saying that
16    Paul Rivera is also a source.
17         A.   I think that references the "go get him"
18    part.
19         Q.   I'm sorry?
20         A.   I think that references the "go get him"
21    part.
22         Q.   Okay.
23         A.   That's on 43423.
24         Q.   Now, with regard to Mario Chavez, the
25    statement says Brandy Rodriguez and Shauna Gutierrez
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    had people in place for an attack on Gomez.  Where

2    did Mario Chavez get that information?

3         A.   Brandy Rodriguez told him that.

4         Q.   And how does he know Brandy Rodriguez?

5         A.   I don't know.

6         Q.   And that particular information was

7    obtained on 4/19/17; is that correct?

8         A.   No.

9         Q.   That information was obtained on 3/29/17?

10        A.   Yes.

11        Q.   Approximately over a year after the alleged

12   assault?

13        A.   Yes.  I take that back.  I think Mario

14   Chavez dated Brandy Rodriguez briefly.

15        Q.   Okay.  And one of the statements is that he

16   says that he was the go-between, between when Joe

17   Lawrence was in jail in the county jail in Valencia

18   County?

19        A.   Yes.

20        Q.   And he was the go-between between him and

21   who?

22        A.   Shauna Gutierrez and Brandy Rodriguez.

23        Q.   So he would give notes to Brandy and

24   Shauna?

25        A.   I believe so.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  Now, Joe Lawrence is actually dating
 2   Mary Crumpton at that time; is that correct?  Or do
 3   you know?
 4        A.   I don't know.
 5        Q.   And I suppose if you had listened to Jose
 6   Gomez' interview, you would hear that?
 7        A.   If it's on there.
 8        Q.   I'm sorry?
 9        A.   If it's on there, yes.
10        Q.   And what benefit did Mr. Mario Chavez get
11   in talking to you guys?
12        A.   I don't think he received anything aside
13   from a Kastigar letter.
14        Q.   Okay.  Then how did he get wind about
15   Mr. Mario Chavez?
16        A.   I believe one of the STIU officers at
17   Central notified me that a new SNM member had
18   arrived.
19        Q.   Okay.  And how is that relevant to the
20   assault to Jose Gomez, though?
21        A.   It wasn't at the time.  I just went down
22   and talked to Mr. Chavez.
23        Q.   But how did you know to talk to him?
24        A.   It was just a tip that I received from an
25   STIU officer.  There was nothing indicating that he
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    would have any information.
 2          Q.   All right.  And did he say when Brandy told
 3    him when Shauna told her they would get people
 4    together to assault JG, Jose Gomez?
 5          A.   No.
 6          Q.   Now, with regard to -- go to Statement
 7    Number 69 and 70.  Let's go to Statement Number 70.
 8    The source there is Paul Rivera; the declarant there
 9    is Shauna Gutierrez?
10          A.   Yes.
11          Q.   And Shauna Gutierrez stated she is ride or
12    die with Joe Gallegos after admitting that she and
13    Joe Gallegos put a hit on Brandy Rodriguez based on
14    her belief that Rodriguez was a cooperator?  Now,
15    this was obtained on a bus ride from Torrance County
16    to court in November of 2016, one of the court
17    hearings?
18          A.   I believe so.
19          Q.   And now, was that statement recorded in any
20    way?
21          A.   Which statement?
22          Q.   That she's ride or die with Joe Gallegos?
23          A.   No, it wasn't.
24          Q.   Paul Rivera was not wired at that time?
25          A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And in fact, Joe Lawrence was housed in

2  Otero County at that time; is that correct?

3    A.   I believe so.

4    Q.   And Shauna Gutierrez was housed in Torrance

5  County at that time?

6    A.   I believe so.

7    Q.   Now, did you intercept any letters between

8  Shauna or Joe indicating that there was a conspiracy

9  to murder Brandy Rodriguez?

10    A.   I did not, no.

11    Q.   Are there any letters at all that you know

12  of?

13    A.   No.

14    Q.   Okay.  Are there any phone calls between

15  anybody showing that there is a conspiracy to murder

16  Brandy Rodriguez between Shauna and Joe Lawrence?

17    A.   None that I'm aware of.

18    Q.   So the only thing you really have is a

19  statement by Paul Rivera?

20    A.   Yes.

21    Q.   No corroboration at all?

22    A.   No.

23    Q.   By any source?

24    A.   No.

25    Q.   By anybody?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No.
 2        Q.   Now, in the bus ride there were other
 3   people in the bus at the same time; is that correct?
 4        A.   I assume so.
 5        Q.   Normally men and women are not placed
 6   together in the bus ride from the jail?
 7        A.   I don't know that.
 8        Q.   They usually keep the females separated
 9   from the men?
10        A.   I don't know what the transport policies
11   are.
12        Q.   Who placed Paul Rivera next to Shauna
13   Gutierrez?
14        A.   I don't know.
15        Q.   Was that a calculated move?
16        A.   No.
17        Q.   But you don't know that?
18        A.   No.
19        Q.   Obviously Paul Rivera sat next to Shauna
20   Gutierrez to engage in a conversation with her; is
21   that correct?
22        A.   I don't know that he said that they sat
23   next to each other.  He just said they had a
24   conversation on a van.
25        Q.   Okay.  All right.  And no one else heard
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that conversation?

2         A.   Not I'm aware of.

3         Q.   None of the guards?

4         A.   Not that I'm aware of.

5         Q.   Or any of the other inmates?

6         A.   No.

7         Q.   So it's just a bald statement by Paul

8    Rivera?

9         A.   Yes.

10             MS. ARELLANES:   I have no further

11   questions.

12             THE COURT:   Thank you, Ms. Arellanes.

13             Before I ask Mr. Castellano if he has any

14   redirect, does any other defendant want to ask

15   anything further?

16             All right.   Mr. Castellano.

17                  REDIRECT EXAMINATION

18   BY MR. CASTELLANO:

19        Q.   Agent Stemo, turning to the Burns murder,

20   you were asked, related to Statement 41, about any

21   evidence collected from the house and anything Jason

22   Van Veghel did.   Were you aware of whether or not he

23   was asked to remove a carpet from Joe Gallegos and

24   Andrew Gallegos' house?

25        A.   Yes.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492
                                                                         1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                            e-mail: info@litsupport.com

 1        Q.   And in addition, was he asked to wipe down
 2   a compressor to remove the blood from it?
 3        A.   Yes.
 4        Q.   And in your experience, would that have
 5   made it more difficult to collect evidence from that
 6   home?
 7        A.   It would have.
 8        Q.   You also were asked about your experience.
 9   What were you doing before the FBI?
10        A.   I was in the military.
11        Q.   Which branch?
12        A.   The United States Army.
13        Q.   For how long?
14        A.   Six years.
15        Q.   What was your rank?
16        A.   I was a staff sergeant.
17        Q.   And what was your MOS?
18        A.   I was an intelligence analyst.
19        Q.   Okay.  Now, you were asked about this once
20   again at the gas station related to the Burns
21   homicide.  There is an indication that they were --
22   the Gallegoses were giving out money and drugs.  Do
23   you recall that?
24        A.   Yes.
25        Q.   And was it -- related to the drugs, was

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1    there something distinctive about the way that Adrian

2    Burns would package his drugs?

3         A.   There was.

4         Q.   And did the witnesses who received those

5    drugs recognize those as the drugs that Adrian Burns

6    would normally have and package?

7         A.   Yes.

8         Q.   The statements we have related to the Jose

9    Gomez assault, when the table refers to things that

10   they said generally, is that an indication that the

11   group was conveying information to someone like

12   Shauna Gutierrez?

13        A.   Yes.

14        Q.   For example, let me turn your attention to

15   Statement Number 56.  So when it says, "They told

16   Shauna they had completed their mission," was that an

17   indication, then, by Paul Rivera that the group had

18   conveyed that information to Ms. Gutierrez?

19        A.   Yes.

20        Q.   You were asked about a statement, not

21   necessarily a co-conspirator statement but an

22   admission, that Billy Garcia admitted to the Castillo

23   and Garza murders.  Do you recall that?

24        A.   I do.

25        Q.   Do you know if there was any specific

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    follow-up so far as to that statement?
2         A.   I think there was.
3         Q.   And you were asked about the incident
4    between Baby Zack and Gerald Archuleta.  So were you
5    present at Trial 1 when that testimony was given?
6         A.   I was not.
7         Q.   You were also asked about -- by Ms.
8    Arellanes about a possible, prior conflict between
9    Joe Gallegos and Jose Gomez.  Do you remember that?
10        A.   Yes.
11        Q.   And if there is a prior conflict, would
12   that then provide a reason or a motive for Joe
13   Gallegos to then stab or assault Jose Gomez?
14             MR. BENJAMIN:  Objection, speculation, Your
15   Honor.
16             THE COURT:  Well, it may be, but I want to
17   hear what the Government's theory is for getting
18   these things in, so I'll overrule it.
19        A.   Yes.
20             MR. CASTELLANO:  May I have a moment, Your
21   Honor?
22             THE COURT:  You may.
23             MR. CASTELLANO:  Thank you, Your Honor.  I
24   pass the witness.
25             THE COURT:  Thank you, Mr. Castellano.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Did you have something further, Mr.
 2    Benjamin?
 3              MR. BENJAMIN:  Yes, Your Honor.
 4              THE COURT:  All right.  Mr. Benjamin.
 5                   RECROSS-EXAMINATION
 6    BY MR. BENJAMIN:
 7         Q.   I'm going to do this kind of the way Mr.
 8    Castellano did.  I'm going to refer to these
 9    statements generally.  If there is one that you want
10    me to go back and refer to, I can go back and refer
11    to it.  But you were asked about the packaging, if
12    there was a unique way that the drugs were packaged;
13    correct?
14         A.   Yes.
15         Q.   And that was something that was known to
16    the New Mexico State investigators, State Police?
17         A.   Yes.
18         Q.   They were the ones that took Michael
19    Sutton's statement?
20         A.   Yes.
21         Q.   On the day of -- essentially the 13th is
22    when they took his initial statement?
23         A.   Yes.
24         Q.   Okay.  And they looked for that packaging
25    at the house three days after.  Well, they searched
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the house three days after; correct?

 2         A.   They did search.

 3         Q.   And there was no packaging marked in the

 4    way that Daniel Orndorff referred to Babylon

 5    packaging his drugs; correct?

 6         A.   Not that I'm aware of.

 7         Q.   You're smiling.  That kind of is something

 8    they would have looked for, probably; right?

 9         A.   I would think so.

10         Q.   And they certainly would have noted it if

11    they'd found it?

12         A.   Yes.

13         Q.   And there was an -- Mr. Castellano asked

14    you about wiping things down?

15         A.   Yes.

16         Q.   We don't know what they could have found,

17    is probably the best way to put it, had they tested

18    any of the materials for -- that had been wiped down;

19    correct?

20         A.   In 2012?

21         Q.   In 2012 or in 2016, both times that DNA was

22    looked for.

23         A.   Yes.

24         Q.   Okay.  And if you look at the 2003 Chevy

25    Silverado, that's the white truck that was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    essentially seized that I think the New Mexico State

 2    Police believes was used in the murder; correct?

 3         A.   Yes.

 4         Q.   That truck is anything but clean; is that

 5    fair?

 6         A.   Yes.

 7         Q.   There is no way to describe that truck as

 8    having been wiped down.  And will you go so far as to

 9    agree, anywhere on that truck?

10         A.   I don't know that.

11         Q.   Okay.  But they found blood in that truck?

12         A.   I think suspected blood.

13         Q.   And they cut it out and they found out it

14    wasn't; right?

15         A.   I believe so.

16         Q.   Okay.  And so the house and the 2003 truck

17    would indicate that this was not an overly

18    sophisticated or wiped-down set of, I wouldn't say

19    crime scene, but that's the Government's term.  But

20    neither one of these was wiped down or handled very

21    sophisticatedly; is that correct?

22         A.   By whom?

23         Q.   By the Gallegos brothers, or Joe

24    specifically.

25         A.   I would disagree.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  What part of the 2003 Chevy

2  Silverado leads you to believe that it was handled

3  sophisticatedly?

4      A.   I would disagree to the 4 Aaron Court

5  portion of your statement.

6      Q.   Okay.  Why?

7      A.   Because we have witness testimony -- not

8  testimony, but a witness statement that he helped

9  clean up, specifically he moved the carpet, he

10 cleaned the air compressor, he got rid of wood.

11     Q.   And this is an individual who -- everything

12 he's told you cannot be corroborated; correct?

13     A.   To some extent.

14     Q.   I mean, we know about the watch and keys

15 that he told you about.  There is no other mention of

16 those watch and keys in the reports.

17     A.   Correct.

18     Q.   He's told you about the carpet.  That

19 wasn't mentioned by Karen Cartwright?

20     A.   Correct.

21     Q.   And then so, as a general -- or a specific

22 statement, Jason Van Veghel, who is a known drug

23 user, convicted felon, hasn't had any of his

24 information corroborated?

25     A.   That's not true.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        Q.    What has been corroborated?

 2        A.    His timeline leading up to when he says the

 3    watch and the keys were thrown out of the truck.

 4    That matches up with what Karen Cartwright told us.

 5        Q.    What did she tell you?

 6        A.    Their timelines match.  He says that they

 7    picked her up, I think, two days after the homicide.

 8    And she confirms the date that they picked her up was

 9    two days after the homicide.

10        Q.    Well, she bought it out the 13th; right?

11        A.    I don't know that.  I could be wrong on two

12    days.  It could have been one day.

13        Q.    Well, but -- and we're discussing --

14    Ms. Cartwright never mentions -- Karen Cartwright

15    never mentions that the keys or watch were --

16        A.    Mr. Van Veghel doesn't put Karen Cartwright

17    in that truck when that happens.

18        Q.    Right.  But at no point in time does he

19    tell her that, "Oh, by the way, I threw keys and a

20    watch out of the car."  This is a 2016 statement

21    about keys and the watch thrown out of the car on the

22    date that they picked up Karen Cartwright.

23        A.    Yes.

24        Q.    And his statement, in and of itself, is not

25    consistent.  He says one or two days later, I think,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    is when stuff happens?
 2         A.   Yes.
 3              MR. BENJAMIN:  Pass the witness, Your
 4    Honor.  Thank you.
 5              THE COURT:  Thank you, Mr. Benjamin.
 6              Mr. Castle, do you have further recross?
 7              I'm sorry.  Mr. Burke.  I'm sorry.
 8              MR. BURKE:  Thank you, Judge.
 9                   RECROSS-EXAMINATION
10    BY MR. BURKE:
11         Q.   Just one, Agent Stemo.  I think Mr.
12    Castellano asked you if there had been any follow-up
13    about the statement by Billy Garcia admitting
14    involvement in the homicides.  Did I hear that
15    correctly?
16         A.   Yes.
17         Q.   And you said there was follow-up?
18         A.   Yes.
19         Q.   What was that?
20         A.   I believe Agent Acee spoke with
21    Mr. Frederico Munoz and wrote a report about it.  I
22    don't have that in front of me, so I don't remember.
23         Q.   Okay.  That's the follow-up?
24         A.   Yes.
25              MR. BURKE:  All right.  Thank you.  That's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   all I have.
2              THE COURT:  Thank you, Mr. Burke.
3              All right.  Mr. Castellano, do you have any
4   further redirect?
5              MR. CASTELLANO:  No, Your Honor.
6              THE COURT:  All right.  Ms. Stemo, you may
7   step down.  Thank you for your testimony.
8              THE WITNESS:  Thank you, Your Honor.
9              THE COURT:  Does the Government have
10  further witnesses or evidence it wishes to present in
11  support of its James statements?
12             MR. CASTELLANO:  No, Your Honor.
13             THE COURT:  All right.  How about the
14  defendants?  I'd heard some suggestion there might be
15  some witnesses on the James statements.  Mr. Castle?
16             MR. CASTLE:  No, we have no witnesses on
17  the James statement, but I can speak on behalf of all
18  the defendants, we have witnesses on the other --
19             THE COURT:  The motions.
20             MR. CASTLE:  -- and other statements.
21             THE COURT:  All right.  Well, let me tell
22  you what I'm doing, and then you tell me what you
23  want to do.  I am working on a chart.  I'm trying to
24  figure out a little bit the best way to present or
25  decide these issues.  I kind of began to think that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the way to maybe do it is to put on this table that

2    the Government has -- put the statement there at the

3    top, just cut and paste the statement.  Underneath it

4    put defendant and objections.

5              I created another chart here that has the

6    objecting documents.  That's the documents that I got

7    from everybody either today or tomorrow.  I'm losing

8    track of time.  And then beginning to put some

9    rulings over here.  But I'm inclined to think I'm

10   going to put the Government's chart first and then

11   notice under their chart they have defendant

12   objections, then put the objections documents

13   underneath it, so I know who is objecting to it, and

14   then underneath that put some ruling on that.

15             Now, if you want to go ahead and argue

16   these one by one right now, that's fine.  If you want

17   to let me take what I've got, what I've heard, give

18   you a chart, like I think I did that in the first

19   trial.  I think I did that to get it started.  If

20   you'd like me to do that, and if we come back to

21   this, you can come back and say, "Hey, Judge, I think

22   you got it all wrong, and here's why," or, "That's

23   close enough; we can live with it," or something like

24   that.

25             I'm not trying to cut anybody off and I'm

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492
                                                    e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   not trying to do your job.  I'm just simply trying to
 2   get it.  You're standing, Mr. Castellano.  Do you
 3   have a thought?
 4            MR. CASTELLANO:  I do, Your Honor.  I would
 5   prefer the approach you just mentioned.  But what I
 6   really wanted to say also is if it makes it easier
 7   for the Court, I can send this table to the Court.
 8            THE COURT:  I asked Mr. Hammond, my law
 9   clerk, that, and he's much better with computers than
10   I am.  So that was not necessary.  So I think we're
11   okay.  I think we can cut and paste.  I had the same
12   thought, but that would have been my suggestion and
13   probably a few years ago my clerks would have
14   accepted it.  But I guess they're beyond me now.
15   Does that sound okay?
16            MR. CASTLE:  Yes, I think it does, Your
17   Honor, as long as after we see it, we can raise any
18   specific objection.
19            THE COURT:  Then you come back and pick out
20   some of these and take me on.
21            MR. CASTLE:  Makes sense.
22            THE COURT:  Okay.  I hate to stumble ahead
23   without argument, but maybe that's the best way to do
24   it, but it's not precluding argument.
25            MR. CASTELLANO:  The only thing I would
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    add, Your Honor, is that I'm not sure I briefed the

2    Alcorta case at the time we filed this.  It is a case

3    I brought to the Court's attention before, and that's

4    853 F3d 1123.  It the Tenth Circuit 2017.  And this

5    is the one that talks about avoiding detection by law

6    enforcement as a means of furthering the conspiracy.

7    So I would just add that.

8              THE COURT:  Is it furthering the

9    conspiracy, the eight conspiracies you identified, or

10   does it have to be a separate conspiracy as it does

11   for some of the concealment?  You have to have a

12   separate conspiracy for the concealment of the

13   evidence and those things?

14             MR. CASTELLANO:  According to the case, if

15   the conspiracy is ongoing, or the conspiracy hasn't

16   been completed in its entirety, then it can also be

17   in furtherance of the conspiracy.

18             THE COURT:  Well, I would agree with that.

19   I mean, I think if it's ongoing, and it's during.

20   What concerns me is if it's concluded and then -- one

21   downside to doing it this way is that I'm going to go

22   ahead, since I'm thinking on these statements, and

23   probably begin to give you some rulings on the

24   evidence other than maybe the co-conspirators

25   statement.  I didn't preclude anybody from arguing,

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   saying, "I don't think you got it right," or, "I
2   think you're missing something."
3           But probably my ruling section, I'm going
4   to start going ahead.  And this is where Mr. Beck I
5   think was anticipating maybe pulling his motion up,
6   that I may begin to start making a stab at whether I
7   think some of this might come in some other ways.
8   And y'all have done that today.  I've been listening,
9   and the Government has pulled back some statements
10  saying they don't think it's co-conspirator.
11          So don't panic, but I may go ahead and
12  start putting my thoughts down and telling you what I
13  think it is, and then I'll give you a shot, Mr. Beck,
14  to argue your motion.  But I'm going to start going
15  ahead while I'm concentrating on these statements and
16  start giving you rulings on them and then come back
17  to them.  All right?
18          If everybody is comfortable with that,
19  we'll try to get that out as soon as possible.  And
20  if we begin to crawl through the week and y'all are
21  getting nervous and I'm not getting it to you, I can
22  give you a partial chart, something like that, and
23  give you a chance to argue.  So before we get out of
24  here, you tell me what you need and what you want,
25  and I'll try to accommodate as much as possible.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          All right.  If I understand where we're

2   going next, we're going to the bill of particulars.

3   So I don't know how y'all want to argue these but

4   I'll just take them in order.

5          I think the first bill of particular is

6   1320.  It's Gutierrez's motion for bill of

7   particulars.

8          Ms. Arellanes, do you want to take the lead

9   on this or take your motion up?

10          Let me give you some thoughts I have on

11   many of these motions for bill of particulars like

12   yours.  I think it was filed the middle of October.

13   And it seems like there's a lot of water under the

14   bridge at this point, and now we're even further --

15   more water under the bridge with the James hearing.

16   Tell me what you really need to try to defend Ms.

17   Gutierrez in this case.  What is it that you don't

18   think you know that you need to defend her in this

19   trial?

20          MS. ARELLANES:  Well, Judge, I've gone

21   through all the discovery pretty well.  And again,

22   you know, one of the allegations is that she's an

23   associate or a prospect of the Syndicato.  And other

24   than the romantic relationship, although we've tread

25   over this before --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You think that's it.
 2              MS. ARELLANES:  Yeah, that's it.
 3              THE COURT:  What if Mr. Castellano or
 4   whoever is going to argue this gets up and says
 5   that's all he's got?  Does that kind of do it for
 6   you?
 7              MS. ARELLANES:  That does it, I guess,
 8   yeah.
 9              And with regard to the second part, one of
10   the elements is that there has to be some
11   consideration of pecuniary value received by Ms.
12   Gutierrez for her efforts.  And so again, there is no
13   indication what type of pecuniary value.
14              THE COURT:  There is another part there,
15   too, about gaining status and membership and
16   enhancement within the organization.  If she -- and I
17   haven't thought this through.  I'm certainly not
18   making any ruling.  It's not mine to make, anyway.
19   But if she's an associate of SNM, it would seem that
20   if she's planning the hit, and she's telling them the
21   location and those sort of things, that that would
22   enhance her status within the organization.  Would
23   that not satisfy that prong?  And even if it doesn't
24   satisfy the prong, isn't that some evidence of it?
25              MS. ARELLANES:  They have to show, first of
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    all, that she's a member of the organization.

2              THE COURT:  Or an associate.

3              MS. ARELLANES:  Or an associate.  Yes,

4    and --

5              THE COURT:  What do you understand that

6    word to mean?

7              MS. ARELLANES:  An associate means, or an

8    associate-in-fact, and there has to be some sort of

9    longevity in the organization, more than two months

10   or four months.

11             THE COURT:  And where do you get that

12   language?

13             MS. ARELLANES:  And I think I've argued it

14   once before.  I don't have it with me at the moment.

15             THE COURT:  Is this the motion to dismiss?

16             MS. ARELLANES:  It is, Your Honor, it is.

17   And so for purposes of entering, maintaining, or

18   gaining position within the organization, there is no

19   indication that she was intending on entering,

20   gaining, or maintaining a position in the

21   organization.  So again, she's not a member.  I think

22   the Government has conceded that.  They may say that

23   she's an associate, but then again, they need to

24   prove that she's an associate.  And if she's an

25   associate, what type of benefit would she receive for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    the predicate violent crime?
 2             So that's pretty much what I'm asking for,
 3    Judge.
 4             THE COURT:  Thank you, Ms. Arellanes.
 5             MS. ARELLANES:  Thank you.
 6             THE COURT:  Anybody else want to comment on
 7    Ms. Gutierrez's motion for bill of particulars?
 8    Anybody got any on the defense side?
 9             All right.  Mr. Castellano, are you going
10    to argue this?
11             MR. CASTELLANO:  Yes, Your Honor.
12             THE COURT:  We're doing a little bit of
13    deja vu with the motion to dismiss, which I actually
14    got an opinion out on this one.  Do you have anything
15    more that she's an associate other than this romantic
16    relationship with Mr. Gallegos?
17             MR. CASTELLANO:  Well, of course, the time
18    they were romantic, and then anytime, even through
19    today, where they are still associated and still on
20    good terms with each other.  So yes, we would
21    describe her as an associate, not as a member.  That
22    would be through the evidence, and of course, the
23    Court has now heard through the James hearing, some
24    of the things that were associated with attacking
25    Jose Gomez for Joe Gallegos.  And so we have that --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the evidence before the Court even through the James

2    hearing.

3              THE COURT:  But you don't have any evidence

4    that she's an associate other than what's been

5    disclosed in discovery or here in open court?

6              MR. CASTELLANO:  That's correct, through

7    discovery.

8              THE COURT:  So this is it?

9              MR. CASTELLANO:  Through discovery, through

10   phone calls, things of that nature, yes.

11             THE COURT:  Which prong are you going to

12   try to prove her -- is it the advancement within the

13   organization or enhancement in the organization, or

14   is there some pecuniary benefit that she received?

15             MR. CASTELLANO:  We're not aware of any

16   pecuniary benefit, so it would be the other prong.

17             THE COURT:  It's not pecuniary benefit.

18             MR. CASTELLANO:  Correct.

19             THE COURT:  It's the enhancement?

20             MR. CASTELLANO:  That's correct.

21             THE COURT:  Can an associate enhance their

22   position in an organization that they're not a member

23   of?

24             MR. CASTELLANO:  I think they can do things

25   because it's expected of them by virtue of their

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    relationship to the enterprise, and an associate can
 2    also aid and abet another member of the enterprise.
 3            So, for example, if Jose Gomez is in harm's
 4    way criminally, as he was with Jose Gomez as a
 5    witness against him, then Shauna Gutierrez could help
 6    to either intimidate witnesses or get rid of
 7    witnesses to help Joe Gallegos.  So --
 8            THE COURT:  Again, on this prong, this
 9    enhancement of status or position prong, you have no
10    other evidence, other than what's already been
11    produced or said here in open court --
12            MR. CASTELLANO:  Correct.
13            THE COURT:  -- or in the briefing?  You
14    don't have any other evidence other than you've
15    already --
16            MR. CASTELLANO:  Yes, that's correct, Your
17    Honor.  I would say through the discovery and through
18    what we have in court.
19            THE COURT:  Anything else on these two
20    aspects that Ms. Arellanes is now focusing on at this
21    hearing?  Anything else you can tell her that you're
22    going to do to get a conviction of her client on
23    those two prongs?
24            MR. CASTELLANO:  No.  Just through witness
25    testimony and any investigation that happens between
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   now and trial, which would, of course, include

 2   potentially phone calls and things of that nature,

 3   but not much more than that.

 4           THE COURT:  All right.  Anything else, Mr.

 5   Castellano?

 6           MR. CASTELLANO:  No, Your Honor.

 7           THE COURT:  Anybody else?  Any other

 8   defendant on this motion?

 9           All right.  Ms. Arellanes, do you have any

10   rebuttal on it?

11           MS. ARELLANES:  No, Your Honor.

12           THE COURT:  All right.  I'm going to deny

13   the motion for bill of particulars.  I think that

14   it's a little bit historical now, because it was

15   filed in October and we've had a lot more discovery

16   and narrowing of the issues.  But I do think that at

17   this point probably -- not probably.  I think Ms.

18   Gutierrez has a good sense of what the Government is

19   going to do to her at trial and what evidence is

20   going to be and on those particular prongs, so I'm

21   going to deny the motion for a bill of particulars.

22           All right.  So we go for defendant Joe

23   Gallegos' motion for a bill of particulars.  What is

24   it at this point, Mr. Benjamin, that you really need

25   from the Government to fully defend Mr. Benjamin

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    (sic) at trial.

2            MR. BENJAMIN:  Hopefully, Mr. Benjamin

3    won't need defending at trial, Your Honor.  But

4    should I stick my foot in my mouth again, I might.

5    Billy is being helpful, Your Honor.

6            The Court said Defendant Gallegos' motion

7    for bill of particulars.  I've got three on file.

8    The first one is Document 1143, Your Honor.  That

9    should be for Counts 4 and 5.  And then I don't know

10   the document number, but there is one for Count 13,

11   and then one for Counts 14 through 16.

12           THE COURT:  All right.

13           MR. BENJAMIN:  And if I may, Your Honor,

14   the first one that I'd like to deal with is Counts 4

15   and 5.  And I quoted in the James response what my

16   concern is with counts --

17           THE COURT:  Go ahead and elaborate, because

18   I'm going to have to spend some time probably this

19   evening digesting more the defendants' responses,

20   because as you know, I didn't gather all of them up

21   until today, or yesterday.  I can't remember.

22           MR. BENJAMIN:  I gave the Court plenty of

23   time, when I filed it at midnight, and then so -- no,

24   Your Honor, I fully understand.

25           THE COURT:  It's not your fault.  I'm

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    trying to absorb all this.

2         MR. BENJAMIN:  This case has been a huge

3    learning curve, Your Honor.

4         Count 4 and 5, as I discussed with the

5    Court on May 10th, is a murder charged in the State

6    of New Mexico.  There is nothing that has been

7    produced.  There has been nothing -- and actually

8    that's not entirely accurate, Your Honor.  There was

9    one document produced in discovery early on that was

10   labeled 1580, and this document said that Joe

11   Gallegos was overheard talking on the wire about an

12   order from Gerald Archuleta, Styx.

13        THE COURT:  When you say 1580, that's the

14   Bates number?

15        MR. BENJAMIN:  Yes, Your Honor.  I

16   apologize.

17        THE COURT:  That's fine.  We're getting

18   where the document numbers are exceeding the Bates

19   numbers, which is a little unusual for a case.

20        MR. BENJAMIN:  Very much so, Your Honor.

21   And that document, this order to kill somebody that

22   was overheard on a wire, was later retracted in

23   February of 2017 by Special Agent Acee, saying that

24   that was a mistake.

25        THE COURT:  Now, refresh my memory about

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    that.  Because was that in court --
2              MR. BENJAMIN:  That was a 302 that the
3    Government --
4              THE COURT:  So a 302.
5              MR. BENJAMIN:  Yes, Your Honor, the Court
6    produced and we had because we had filed a motion
7    requesting grand jury transcripts to see what
8    information had been presented to the grand jury to
9    secure the indictment on Counts 4 and 5.
10             THE COURT:  So Mr. Acee says that was an
11   error?
12             MR. BENJAMIN:  Yes, Your Honor.  And taking
13   the Government at face value, that presents a larger
14   problem for me to understand this now than it did in
15   May of 2017, because in May of 2017 I assumed that
16   that would be clarified or there would be something
17   else that came forward.
18             THE COURT:  All right.  Go back and tell me
19   exactly what the Government was saying before they
20   retracted.
21             MR. BENJAMIN:  There's two things that they
22   were saying.  The first was that Joe Lawrence
23   Gallegos was heard talking about being ordered by
24   Gerald Archuleta, Styx, on the wire to kill Adrian
25   Burns, and that would have been an order from an
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   individual in the SNM to kill somebody for the

 2   benefit of the SNM.  That statement that I'm

 3   paraphrasing was retracted.

 4            The other mention is what I've cited in

 5   document 1981, which is a --

 6            THE COURT:  This is another 302.

 7            MR. BENJAMIN:  Document 1981 is Joe

 8   Gallegos' James response that was filed since, the

 9   first thing this week, Your Honor.

10            THE COURT:  Okay.

11            MR. BENJAMIN:  And essentially the second

12   page of that document I believe is where the quote

13   is, is a quote from Ms. Armijo at the motion to

14   produce the James -- motion to produce grand jury

15   transcripts.  And her statement, what she related to

16   the Court, is that there would be a cooperator that

17   comes forward that would testify about how Joe

18   Gallegos was disrespected and that he was then killed

19   for that purpose.  That would track the indictment.

20   The concern now is --

21            THE COURT:  And that he was disrespected by

22   Burns.

23            MR. BENJAMIN:  Yes, Your Honor.

24            THE COURT:  And that was the link between

25   this murder and the enterprise.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          MR. BENJAMIN:  Yes, Your Honor.  And there

2    is a New Mexico State report supplement 36 that is

3    done by a New Mexico State police officer Agent

4    Madrid that documents that this is what she was told

5    and overheard in a meeting with the FBI.  And that

6    meeting occurred in February of 2015, Your Honor.

7          THE COURT:  Who was in the meeting that was

8    giving them information?

9          MR. BENJAMIN:  She's kind of vague.  She

10   lists a couple of people.  She lists herself and

11   Agent Smith and a couple other agents.

12         THE COURT:  Was there a confidential

13   informant that was sitting there giving them

14   information?

15         MR. BENJAMIN:  I have read it multiple

16   times, Your Honor.  My impression is yes.  I can't

17   tell the Court that my impression is correct.

18         THE COURT:  And it was a State Police?

19         MR. BENJAMIN:  Yes, Your Honor.

20         THE COURT:  Is it one of the State Police

21   reports that I read attached to the motion to

22   dismiss?

23         MR. BENJAMIN:  No, Your Honor, I don't

24   believe I've attached that to the motion to dismiss.

25   So this statement -- what is in this New Mexico State

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Police report is what Ms. Armijo, I believe, read and

2   provided us in rebuttal on the grand jury motion.

3   And that is where we were arguing the idea that I put

4   forth that a murder in New Mexico is a murder.  And

5   as long as it's not done for a specified VICAR

6   reason, it's not one that needs to be or can be heard

7   in this court.  And I can tell the Court now, after

8   having heard the James hearing testimony, seen the

9   James proffer, that there has been no evidence and is

10  no evidence that I'm aware of that links any reason

11  for Joe Gallegos to have killed Adrian Burns and for

12  argument's sake, Your Honor, for a --

13              THE COURT:  SNM.

14              MR. BENJAMIN:  -- SNM or otherwise VICAR

15  reason.  So I'm taken back to the statement was made

16  in February.  The ROI -- excuse me, the report that

17  created this original retracted statement was created

18  later that year in 2015, in August.  There is another

19  meeting between the State Police and the FBI

20  approximately one week after that, middle of August

21  of 2015, and it sounds like they're proceeding on

22  what is a VICAR-based reason.  Adrian Burns was

23  killed because he was disrespected.  Agent Madrid

24  then takes that information, absent the cooperator,

25  because she is clear in her report that she's not

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   going to name, identify, or deal with the information
 2   that is in the FBI's files, and takes that
 3   information to two district attorneys in the state of
 4   New Mexico who both essentially decline to prosecute
 5   a state-based murder.
 6            THE COURT:  I know it was taken here in
 7   Dona Ana County.  Where else did she take it?
 8            MR. BENJAMIN:  Socorro and Valencia.  It
 9   was not here in Dona Ana, Your Honor.  Essentially,
10   the jurisdiction was based on the murder scene, and
11   essentially, the belief that he was killed at 4 Aaron
12   Court, and he crossed those two lines between where
13   they believed he was killed in Valencia County.
14            THE COURT:  Which is the one that Dona Ana
15   County declined?
16            MR. BENJAMIN:  The 2001 murder, Your Honor.
17            THE COURT:  Okay.
18            MR. BENJAMIN:  The 2001, Castillo and Garza
19   murder.  So the reason I preface that is because we
20   now have to go back to the idea that this prosecution
21   has to be premised on a cooperator, a cooperator
22   providing the information that Adrian Burns was
23   disrespected and, as the Court a couple minutes
24   before asked Ms. Arellanes, is there a financial gain
25   or is it an advancement in the SNM?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          And I don't think there is any evidence

2     that I've seen at all that suggests that there is a

3     monetary gain here.  The state case, and the Court

4     has heard this briefly --

5          THE COURT:  I think we may have even taken

6     that out of the jury instructions in the first trial.

7     We just went to the jury on the advancement or

8     maintaining the status, I think is my memory.

9          MR. BENJAMIN:  Okay.  And Your Honor, I

10    think that's the only thing that would be argued

11    here.  But we have had the cooperator statement

12    hearing.  We have the chart.  I do not have any

13    evidence to believe that there is anything linking my

14    client, Joe Gallegos -- and I think the Andrew

15    Gallegos team has adopted this and joined this -- but

16    there is nothing linking Mr. Gallegos to a VICAR

17    reason.

18          THE COURT:  Well, let's say Mr. Castellano

19    says he doesn't have anything else.  He's grabbing

20    notebooks over there, so he's probably going to try

21    to say something else.  Let's say he doesn't say

22    anything.  What do I do?  I mean, a bill of

23    particulars is not going to help you on that score.

24    It's more in the nature of a motion to dismiss, which

25    we know from Ms. Arellanes is difficult in the Tenth

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   Circuit.  So what do we do with that, assuming your
 2   box is accurate and the Government has got nothing
 3   else to put in it?
 4              MR. BENJAMIN:  The remedy I'm seeking
 5   today, Your Honor -- and the Court dealt with this in
 6   May when it said that we will readdress this if there
 7   is no evidence that appears -- my remedy today is, I
 8   am seeking the identification of essentially -- and
 9   the facts that support it as a bill of particulars --
10   Joe Lawrence Gallegos was disrespected by So-and-so
11   by telling him that, you know, he had shorted him on
12   his last transaction to the SNM, and that is the type
13   of information.
14              THE COURT:  Is that what you think -- I
15   mean, I read all the stuff more with your motion to
16   dismiss, all of the 302s, and I was wondering, where
17   is the SNM connection as I read those.  That's the
18   theory of the Government, that Burns shorted them
19   some drugs, and those drugs were going to the SNM
20   Gang.  Is that what their theory is?
21              MR. BENJAMIN:  Your Honor, that's my
22   problem.  I can stand here and tell the Court I have
23   no idea what their theory is.  I know they believe,
24   based upon the state investigation, that Mr. Gallegos
25   killed Adrian Burns.  I don't believe they have a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    justification or a reason.  I can't tell the Court
 2    what that is.  I can't -- and unusual for someone in
 3    my position, I can't even speculate as to what that
 4    is, because there is production in this case through
 5    the State of dirty officers.  There's the production
 6    that's essentially information that's been produced
 7    regarding --
 8              THE COURT:  Well, refresh my memory on
 9    that.  I read something about that.  Refresh my
10    memory as to what the dirty officers were.
11              MR. BENJAMIN:  The Los Lunas --
12              THE COURT:  Oh, that they had invaded his
13    house.
14              MR. BENJAMIN:  No, Your Honor, this is
15    totally different.  There's two different allegations
16    I'm aware of.  And they go off I think a very side
17    track.  But there is a Detective Torres that worked
18    with the Los Lunas Police Department in the drug task
19    force, and there is allegation regarding Adrian
20    Burns' money, and also the --
21              THE COURT:  The $80,000, $200,000.
22              MR. BENJAMIN:  There is $28,000 that was
23    known to have been seized and returned.  And then
24    there's vast other amounts that have been
25    articulated.  But there are witnesses in Agent
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Madrid's report --

2             THE COURT:  There was some indication in

3    the materials I read that some of that was, like, hid

4    at his house, and then others that he had a bank

5    account?

6             MR. BENJAMIN:  And I think, Your Honor,

7    having done investigations and reviewing things, I

8    think most of those probably boil down to urban

9    myths.

10            THE COURT:  They were interesting.

11            MR. BENJAMIN:  I think that they are, very

12   much so.  But I think it's kind of like:  My neighbor

13   is exceedingly wealthy.  Why?  Because I believe he's

14   wealthy.  We have children, and our children have

15   interesting visions of why something happens.  And

16   that's what I interpret most of these myths or

17   beliefs about Adrian Burns.

18            But there's all different kinds of things.

19   And I think that this goes back to the State firmly

20   believes that it doesn't have enough to prosecute.

21   And I can't even guess, based upon all the

22   information that's been provided, as to what -- there

23   is no reason, if I take the facts at face value, that

24   Joe Gallegos would have wanted to kill his supplier.

25   Because he was the one that -- I mean, I think we can

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                            1-800-669-9492
                                                       e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   kind of imagine things, but there is nothing that has
 2   been produced, proffered, or in the James statements
 3   for the co-conspirator, which is where the statement
 4   would have had to have come from, that comes close.
 5           And so I'm asking, I guess, first off, Your
 6   Honor, in the motion for a bill of particulars, for
 7   specific information to support the VICAR element of
 8   this offense.  When that doesn't appear, Your
 9   Honor -- and at this point in time I can say it
10   doesn't appear because I don't believe it will
11   appear.  The Court is correct.  I then have to come
12   back to this Court with a motion to dismiss and seek
13   that.
14           THE COURT:  Well, I know this isn't
15   probably the appropriate time, but since I've been
16   thinking about it, if you had no more evidence, am I
17   going to be able to help you out any more than I can
18   help out Ms. Arellanes and Ms. Gutierrez in the sense
19   that if the Government doesn't consent to a motion to
20   dismiss or -- they're not going to consent to a
21   motion to dismiss -- consent to me considering the
22   facts on a motion to dismiss, aren't we stuck with
23   going to trial, them having laid out their evidence,
24   and either the jury find that they failed to prove
25   this; or after I hear all the evidence, set aside any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   verdict because there is not sufficient evidence?
 2   Aren't you and I stuck with a trial if they don't
 3   say, "Yeah, it's in evidence, decide it now"?
 4            MR. BENJAMIN:  Your Honor, I have a theory
 5   under United States v. Abney, and that was a case
 6   where the Court found interlocutory appeal was well
 7   founded.  It was for a Speedy Trial basis, and also
 8   essentially it references other cases.  I think that
 9   if the Government says, "We have no other evidence
10   other than Joe Gallegos was a member of the SNM and
11   we believe, the Government believes, we get to get up
12   to there and say he was involved in the 2001 murder,
13   he was involved in this, and we bring in all the
14   other enterprise evidence and get to say that you get
15   to consider this murder for VICAR purposes, I don't
16   believe that they get to put forth an offense as a
17   VICAR purpose without a good-faith belief that it is
18   tied to a VICAR reason.  So I think that what the
19   Court is allowed to do is take at face value what the
20   Government responds to with the motion for the bill
21   of particulars.  And then their abdication and, I
22   believe, change in position from May of 2010, that
23   there will be nobody, I believe that allows this
24   Court to essentially dismiss; or, in the alternative,
25   I think the Court can always sever Counts 4 and 5,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   because if it is not -- the Government doesn't get to

2   try a case that it has no jurisdiction to try.  And I

3   don't think that under due process that that ever is

4   an idea.

5          So that's where I'm truly at a loss, Your

6   Honor, because they can't just kind of hold Joe next

7   to the SNM and say that it should have rubbed off on

8   his other acts.  That's just like -- the only example

9   that can come to mind is as an Assistant District

10  Attorney, I practiced law for the State of Texas, and

11  I wasn't allowed to have a private practice.  But I

12  was going to be able to sue an individual personally

13  for things that arose, but that was me doing things

14  in the practice of law outside of what I was supposed

15  to be doing for the Government.  But that's the same

16  thing here.  Just because you're associated with the

17  SNM doesn't mean that everything you touch or did for

18  the SNM --

19          THE COURT:  I understand that.  We kept the

20  Government -- I think we worked hard to keep them

21  honest.  The evidence wasn't going to come into this

22  case about every criminal activity of the defendants

23  in the first trial, and we'll do the same here.  So I

24  understand that point, that it can't just be a crime.

25  I mean, I read all your State Police reports.  I

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                       (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    don't know what they call them.  I call them 302s.  I
 2    read all them in the motion to dismiss, and I have
 3    the same question.  Where is the connection with the
 4    SNM?  So I understand the point.
 5              MR. BENJAMIN:  And the Court asks a very
 6    pointed question.  I don't know.  I can guess what
 7    they're going to say in Counts 14 through 16,
 8    something like that.  That's easy, Your Honor.
 9    That's a fact question.  Respectfully, I don't have
10    the answer to the fact question here.  I can't even
11    guess.
12              THE COURT:  All right.
13              MS. TORRACO:  Your Honor --
14              THE COURT:  Does anybody else want to speak
15    on this?  Ms. Torraco?
16              MS. TORRACO:  Thank you, Your Honor.  I
17    just wanted to address --
18              THE COURT:  You're interested in this
19    issue?
20              MS. TORRACO:  Yes, Your Honor.  I am
21    interested in this issue.  My client is mostly very
22    interested in this issue.  I just wanted to address
23    your proposed remedy because --
24              THE COURT:  I haven't proposed one here
25    yet.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MS. TORRACO:  I'm sorry, and I don't want
 2    to correct the Court, but there was a question to Mr.
 3    Benjamin about how do you propose that this play out.
 4            THE COURT:  Well, assuming the box remains
 5    empty, I'm trying to think how you remedy the problem
 6    short of a trial, which is probably y'all's
 7    interests.
 8            MS. TORRACO:  I would propose we do a
 9    hearing based on jurisdiction alone.
10            THE COURT:  Where does that get me?  You
11    can read the opinion I wrote for Ms. Arellanes and
12    Ms. Gutierrez, when I read those Tenth Circuit cases.
13    Unless the Government is willing to play ball and
14    say, "Yes, Judge, yes, Court, here's the facts,
15    that's all we got, we're all interested from an
16    academic standpoint in what the answer is, go ahead
17    and decide," which they do, they do that from time to
18    time -- not all the time, but from time to time --
19    but if they don't do that, we've got to go have a
20    trial and then sort it out afterwards.
21            MS. TORRACO:  I hear what you're saying.
22    But I think that the Court has to establish that it
23    has jurisdiction before it.
24            THE COURT:  But let's take a civil case, so
25    we get a little divorced from it.  Even in a civil
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  case, in a 12(b)(1) motion, if the merits and the

2  jurisdiction are all tied together, I've got to do

3  the normal things.  I can't decide it on a 12(b)(1).

4  I've got to do it under 26, summary judgment, or even

5  a trial before I can determine.

6          It's Aristotelian.  You know, you don't

7  know if you have a happy life until you're dead or

8  not.  It is a little bit one of those things that

9  sometimes you do not know the answer until you have

10  the trial.

11          Let's to do this:  I don't want to cut you

12  short --

13          MS. TORRACO:  It's fine.

14          THE COURT:  We better pick this up

15  tomorrow.  I appreciate y'all's hard work.  See you

16  at 8:30 in the morning.

17          MS. TORRACO:  Thank you, Your Honor.

18          THE COURT:  Thank you.

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  UNITED STATES OF AMERICA

2  STATE OF NEW MEXICO

3

4                    C-E-R-T-I-F-I-C-A-T-E

5       I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

6  Official Court Reporter for the State of New Mexico,

7  do hereby certify that the foregoing pages constitute

8  a true transcript of proceedings had before the said

9  Court, held in the District of New Mexico, in the

10  matter therein stated.

11       In testimony whereof, I have hereunto set my

12  hand on this 20th day of March, 2018.

13

14       _____

15       Jennifer Bean, FAPR, RMR-RDR-CCR
        Certified Realtime Reporter
16       United States Court Reporter
        NM Certified Court Reporter #94
17       333 Lomas, Northwest
        Albuquerque, New Mexico 87102
18       Phone:        (505) 348-2283
        Fax: (505) 843-9492
19       License expires:  12/31/18

20

21

22

23

24

25


SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com