1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4         Plaintiff,

5         VS.                    CR. NO. 15-4268 JB

6    ANGEL DELEON, et al.,

7         Defendants.

8

9         Transcript of Motion Proceedings and 104 Hearing
     before The Honorable James O. Browning, United States
10   District Judge, Las Cruces, Dona County,
     New Mexico, commencing on March 15, 2018.
11

12   For the Government:  Ms. Maria Armijo; Mr. Matthew
     Beck
13
     For the Trial 2 Defendants: Mr. Brock Benjamin, Ms.
14   Cori Harbour-Valdez; Mr. Patrick Burke; Mr. Jim
     Castle; Mr. Robert Cooper; Mr. James Lahann; Mr. Joe
15   Shattuck; Mr. John Granberg; Mr. Eduardo Solis; Mr.
     Billy Blackburn; Mr. Donovan Roberts; Ms. Lisa
16   Torraco; Angela Arellanes

17
     For the Defendant Lujan:  Mr. Dean Clark
18

19   For the Defendant Clark:  Mr. Stephen Hosford

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          THE COURT:  All right.  Let's go on the

2     record.  It seems that we have an attorney for every

3     defendant.  Look around the room and help me out, but

4     it looks like that's the case.

5          The next motion that we had was Mr. Troup

6     and Mr. Billy Garcia's motion for production of

7     co-conspirator statements and for pretrial hearing

8     admissibility.  But as I heard people coming in -- we

9     may have already dealt with most of that issue -- but

10    as I heard people coming in, they were saying that

11    they may need to get witnesses on and off.

12          Let me ask y'all before I start plowing

13    ahead, do y'all have some needs as far as witnesses,

14    or need to go a particular direction?  Mr. Beck?

15          MR. BECK:  Yes, Your Honor.  I think the

16    intention is to go to Mr. Benjamin's motion to

17    suppress that we sort of bypassed last night, so we

18    can get a New Mexico State Police agent back on the

19    road.  And then Special Agent Trent Pedersen is here

20    from Utah.  He would be Billy Garcia and Troup's

21    motions to dismiss for preindictment delay.  And he

22    needs to get back to Utah tonight.

23          THE COURT:  So we're just going to take

24    some witnesses; they're not necessarily the same

25    motion, but we'll just get some witnesses out of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    way; is that your --
 2              MR. BECK:  I think there will only be the
 3    one witness for Mr. Benjamin's motion -- or motion to
 4    suppress.
 5              MR. BENJAMIN:  I think it's fairly simple,
 6    and I would hope, open and shut issue, Your Honor.  I
 7    was going to talk to Ms. Armijo about essentially a
 8    stipulation.
 9              THE COURT:  Okay, go ahead.
10              (A discussion was held off the record.)
11              MR. BENJAMIN:  Your Honor, I'm ready to
12    proceed on Mr. Gallegos' motion to suppress
13    statements.
14              THE COURT:  Okay.  Are we going to have
15    argument first?  Is that what we're going to do?
16              MR. BENJAMIN:  What I'm going to do, Your
17    Honor, is move to admit Defendant Gallegos' Exhibit
18    A1 and A2, which is an excerpt of a November -- it's,
19    essentially, the relevant excerpt from a November 20,
20    2012 interview of Mr. Joe Gallegos by Agent
21    Williamson and Agent Mowduk, M-O-W-D-U-K.  Williamson
22    is common spelling.  And I would move to admit those
23    for the purposes of this hearing, Your Honor.
24              THE COURT:  Any objection, Ms. Armijo?
25              MS. ARMIJO:  No, Your Honor.  I'm going to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    be moving in the entire transcript for the Court to

2    consider, but I don't oppose those two.

3              MR. BENJAMIN:  And I don't oppose the

4    entire transcript, Your Honor.  And as we're moving

5    in the entire transcript, any objection to offering

6    it?  I'll put it on a CD, the audio for -- the actual

7    audio, Your Honor.  It was a recorded transcript.  I

8    think it's, for my purposes, I believe, easier to

9    understand in the written form.

10             May I approach the exhibit, Your Honor?

11             THE COURT:  You may.  Is there any other

12   objection to Defendant Joe Gallegos' Exhibits A1 and

13   A2?  Not hearing any, Defendant Joe Gallegos'

14   Exhibits A1 and A2 will be admitted into evidence.

15             MR. BENJAMIN:  Your Honor, when the Court

16   considers A1 and A2, which are pages 5 and 6 -- that

17   I have marked backwards -- out of the statements, the

18   defendant was Mirandized on page 4, and as the

19   Government has moved to admit that entire document,

20   and the audio that we've moved to admit, Your Honor,

21   the Court can see that he was Mirandized.  And then

22   agent -- the agent follows up with -- started on page

23   5, which is labeled A2:  "Basically, these four

24   rights.  Do you understand these rights?"

25             Joe Gallegos says, "Yes, sir."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Agent Mowduk says, "Okay.  With these

2    rights in mind, do you want to talk to us?"

3          Joe Gallegos at that point in time says, "I

4    don't want to make no statements."  And he explains

5    why he does not want to make any statements.

6          The agents continue, and then he, Mr.

7    Gallegos, essentially says on page 6 at the top, "So

8    I would rather not talk to anybody, you know what I

9    mean?  No disrespect.  I just" -- and then is

10   interrupted by Agent Mowduk again.  And I think

11   coming immediately following the Miranda statements,

12   there can be no other way to construe:  "I don't want

13   to make no statements" as an assertion of his right

14   to remain silent under Miranda.

15         Agent Mowduk and Agent Williamson then

16   continue for approximately a minute or two discussing

17   a lot of things, and then trying to -- the phrase

18   that comes to mind that I've used in state court,

19   Your Honor, respectfully, is just sweet-talk him, or

20   butter him up, and then get him to begin talking.

21   And there is nothing relevant that is discussed for

22   about 20 minutes.  And so they are simply

23   disregarding his very clear and very blanket:  "I

24   don't want to make no statements."  And then he

25   reiterates that, as I said, essentially, two

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    responses later.  And so I think that I would ask the
 2    Court -- and this is why I excerpted these two pages,
 3    that I think it's quite clear that he asserted his
 4    right to remain silent.
 5              And that's the extent of the evidence on
 6    this.  As I said, Your Honor, I think it's fairly
 7    open and shut.
 8              THE COURT:  All right.  Thank you, Mr.
 9    Benjamin.
10              MR. BENJAMIN:  May I approach Ms. Bevel?
11              THE COURT:  You may.
12              MR. BENJAMIN:  Thank you.
13              THE COURT:  I did listen to these on
14    Saturday.  So this is the one that you filed in
15    response to the motion, right?
16              MS. ARMIJO:  Yes, Your Honor.
17              THE COURT:  Okay.  I listened to that.  In
18    the folder for that there was also another tape.  And
19    I wonder if it just -- the clerk's office -- there
20    were several documents on this.  There was an Exhibit
21    B, which was an account transaction history for Eric
22    Duran.  And then there was also exhibits that Mr.
23    Lowry submitted as a supplement to his motion to
24    compel immediate production of Brady and Giglio, and
25    he attached a CD as well.  Do those have anything to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    do -- they were in the folder for this motion, but it
 2    was just this one.  I listened to all of them, but --
 3              MS. ARMIJO:  No, Your Honor.
 4              THE COURT:  They don't have anything to do
 5    with it?
 6              MS. ARMIJO:  No.
 7              THE COURT:  Okay.  All right.  Anyone else
 8    want to say anything on this motion before we hear
 9    from Ms. Armijo?
10              All right.  Ms. Armijo.
11              MS. ARMIJO:  And, Your Honor, I do have the
12    witness available to put it in context.  Our position
13    is that it was an equivocal statement, not
14    unequivocal.  And that he eventually does ask for an
15    attorney at the very end.  And the transcripts that
16    we will tender will be Exhibits 1 and 2, and so I
17    think that we could probably do it with just very
18    limited testimony from Agent Williamson.
19              THE COURT:  Okay.  Mr. Williamson, if
20    you'll come up and stand next to the witness box on
21    my right, your left, before you're seated, Ms. Bevel,
22    my courtroom deputy, will swear you in.
23
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                        RICHARD WILLIAMSON,

 2           after having been first duly sworn under oath,

 3           was questioned and testified as follows:

 4                        DIRECT EXAMINATION

 5                THE CLERK:  Please state your name, and

 6     spell your last name for the record.

 7                THE WITNESS:  My name is Richard

 8     Williamson, W-I-L-L-I-A-M-S-O-N.

 9                THE COURT:  Mr. Williamson.  Ms. Armijo.

10                MS. ARMIJO:  Thank you, your Honor.

11     BY MS. ARMIJO:

12           Q.  And, sir, how are you employed?

13           A.  Currently, I'm a Sergeant for the New

14     Mexico State Police, serving in the Special

15     Operations Bureau.

16           Q.  And Sergeant, how long have you worked for

17     New Mexico State Police?

18           A.  I've been in law enforcement for 17 years,

19     and all but three and a half years of that were with

20     State Police.

21           Q.  And we're going to go back to 2012.  What

22     was your assignment then?

23           A.  At that time I was serving as a criminal

24     investigations agent in Albuquerque.

25           Q.  And were you assigned to work an
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    investigation that involved the death of Adrian

2    Burns?

3         A.   I was assigned as the case agent.

4         Q.   And in that regard at some point in time,

5    was Joe Gallegos arrested pursuant to -- well, was he

6    arrested?

7         A.   He was.

8         Q.   Do you recall when that was?

9         A.   That was November 20, 2012.

10        Q.   And when was Adrian Burns' body discovered?

11        A.   November 12, 2012.

12        Q.   And do you recall if you received a warrant

13   for Joe Gallegos' arrest?

14        A.   We did.

15        Q.   And when was that obtained, approximately?

16        A.   I don't recall the exact date.  It was just

17   a few days after the discovery of Adrian's body, and

18   shortly before the 20th.

19        Q.   Okay.  So sometime between the 12th and the

20   20th?

21        A.   Yes.

22        Q.   And is it fair to say that you had spent

23   some time looking for Joe Gallegos?

24        A.   Yes.

25        Q.   And when he was arrested, where was he?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                         e-mail: info@litsupport.com

1        A.    At a motel in Albuquerque.

2        Q.    Just so that we're clear, where was it that

3    Joe Gallegos had been residing at that time?

4        A.    At No. 4 Aaron Court in Los Chavez, or Los

5    Lunas, New Mexico.

6        Q.    All right.  Was it your impression that Joe

7    Gallegos was on the run from law enforcement?

8        A.    That was our impression, yes, ma'am.

9        Q.    When you arrested him, did you have an

10   opportunity to question him?

11       A.    We did.

12       Q.    And where did that take place?

13       A.    At the New Mexico State Police office in

14   Albuquerque.

15       Q.    And when did it take place?

16       A.    That evening, continuing into early

17   morning.

18       Q.    Do you recall approximately what time it

19   was that he was arrested?

20       A.    I believe it was around 8:30 on the 20th.

21       Q.    And were you present when he was arrested,

22   or did you have to be called in?

23       A.    I was called in.

24       Q.    And so when you met with him for the first

25   time, was it at the police station, the New Mexico

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    State Police station in Albuquerque?

2        A.   Yes.

3        Q.   And approximately what time was it that you

4    first met with him?

5        A.   I believe it was around 8:30, 8:45.  I'm

6    not real sure.  I don't recall.

7        Q.   Okay.  And when you spoke to him, what was

8    the setting?

9        A.   We were in an interview room, myself and

10   Agent Jim Mowduk, a very small room with a table and

11   three chairs.

12       Q.   And was it recorded?

13       A.   It was.

14       Q.   And how was it recorded?

15       A.   Audio and visual, through the system that

16   was there in that interview room.

17       Q.   Okay.  So it was audio and visual?

18       A.   Yes, ma'am.

19       Q.   And you indicated you had another agent

20   present?

21       A.   Yes.

22       Q.   And how were you dressed?

23       A.   I think at that time I was probably much

24   like this, but without the coat and tie.

25       Q.   You weren't in a uniform?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, I was in plainclothes.

2      Q.   Did you have a visible -- a firearm

3  visible, if you recall?  And you may not recall.

4      A.   I don't recall.  But we generally did carry

5  our firearm, so --

6      Q.   And in the room when you met with Mr.

7  Gallegos, was he handcuffed?

8      A.   He was.

9      Q.   And throughout the interview did he remain

10  handcuffed?

11     A.   Before we began the interview, he was

12  handcuffed behind his back, as we generally do for

13  transport.  Before the interview, I made him more

14  comfortable by placing his handcuffs in front.

15     Q.   Did you ascertain whether or not he needed

16  to use the facilities or needed any water or anything

17  like that.

18     A.   We did.  Agent Mowduk asked him.

19     Q.   And did he make any requests?

20     A.   No.  He said he was fine.

21     Q.   Now, before I get into the actual -- your

22  actual conversation with him, at any point in the

23  conversation, did he appear to be incoherent or

24  unable to understand you?

25     A.   Not at all.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                   1-800-669-9492

**BEAN**
**& ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                    e-mail: info@litsupport.com

1    Q.   Did he appear to be under the influence of
2 any drugs to the extent that you were concerned about
3 his mental ability to understand your questions?
4    A.   No, he did not.
5    Q.   At any point in time, did it appear to you
6 that he was having difficulty comprehending what you
7 were saying?
8    A.   No.
9    Q.   At any point in time -- and I'm talking
10 about the entire time that you conversed with him --
11 did you use any force or threats against him?
12    A.   No.
13    Q.   At any time did you make him any promises?
14    A.   No.
15    Q.   Was there actually a break in the interview
16 at some point?
17    A.   There was.
18    Q.   Okay.  And can you explain that to us?
19    A.   We took a break so he could use the
20 restroom, get a drink.  So he was allowed to do that.
21    Q.   And approximately how long was your entire
22 conversation with him?
23    A.   The entire conversation, I believe, was
24 about an hour and 37 minutes.  And I don't recall if
25 that includes the first discussion and the second

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    discussion combined, or how that breaks down.

 2         Q.   I know you probably haven't had an

 3    opportunity to, but the defense has had the

 4    transcript -- or the recording transcribed.  So I'm

 5    going to go ahead and hand that -- actually, I think

 6    you have a copy in the back.  But at some point, was

 7    he read his rights?

 8         A.   At the very beginning, yes, ma'am.

 9              MS. ARMIJO:  All right.  And Your Honor,

10    may I have the Elmo?

11              THE COURT:  You may.

12         Q.   And Sergeant, I'm looking at what's

13    Government's Exhibit 1 and 2, which I'm moving in for

14    purposes of this hearing with no objection.

15              THE COURT:  No objection?

16              MR. BENJAMIN:  No, Your Honor.

17              THE COURT:  Anybody else?  All right.

18    Government's Exhibits 1 and 2 will be admitted into

19    evidence.

20         Q.   All right.  Now -- and I'm referring to

21    page 4 of this.  And here it says, "Since you are in

22    handcuffs, since you were transported in a unit and

23    all that stuff, I can't talk to you unless I advise

24    you of your Miranda rights.  So what I need to do is

25    advise you of your Miranda rights.  And I'll do that

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    verbally from a card."  Does that appear to be what
 2    was said to Mr. Gallegos?
 3         A.   It does, by Agent Mowduk.
 4         Q.   All right.  Then I'm going to go to page 5.
 5    And at some point here it says, Agent Mowduk -- it
 6    says, he indicated, "I don't want to make no
 7    statements because I've been -- I know you checked my
 8    record" -- and then he goes on to explain that he's
 9    been taken advantage of in the past, and he doesn't
10    have trust for people; is that correct?
11         A.   That's correct.
12         Q.   And then what did you indicate to him after
13    that?
14         A.   That his mother had indicated to us, in our
15    conversations with her, that they did want to make a
16    statement to give their side of the story.
17         Q.   And was that true?
18         A.   Yes.  Agent Mowduk had been talking to her
19    for about three or four days prior to that.  As far
20    as I knew, that was what he indicated.
21         Q.   Okay.  And so you were informing him of
22    that?
23         A.   Yes.
24         Q.   And then he goes on to talk to you for a
25    bit.  And I'm going to go to page 6 of that.  Then at
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    some point he says, "So I would rather not talk to

 2    anybody, you know what I mean?  No disrespect."  Is

 3    that something that he said?

 4         A.   I believe so, yes.

 5         Q.   And then what did you all do?

 6         A.   We just gave him some more information, and

 7    Agent Mowduk sort of explained why he was there, and

 8    what was going to happen.

 9         Q.   Okay.  Now -- and then after that, did he

10    ever indicate to you unequivocally that he did not

11    want to speak to you?

12         A.   Not that I recall.  He said that he did

13    have some things that he would like to state.

14         Q.   Okay.  And is that something that he did

15    say to you after all?

16         A.   Yes.  It's in the recordings.  I'm not sure

17    if it's in the transcript or not.

18         Q.   Okay.  But in the recordings he did

19    indicate to you that he wanted to speak to you?

20         A.   Correct.

21         Q.   Okay.  And then did he speak to you?

22         A.   He did.

23         Q.   Now, I know we already talked about at some

24    point in time that there was a break; correct?

25         A.   Correct.
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492
                                                   1-800-669-9492
                                         e-mail: info@litsupport.com



PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.   And then after the break, at some point
 2   towards the end of your conversation with him, did he
 3   indicate he wanted an attorney?
 4        A.   He did.
 5        Q.   All right.  And I'm going to go to Exhibit
 6   Number 2, page 24.  At least this is one of the times
 7   he says, "I'd just like a lawyer and that's it"?
 8        A.   Yes, ma'am.
 9        Q.   Then do you clarify that?  And then he says
10   again, "I just want a lawyer"; correct?
11        A.   Correct.  And Agent Mowduk advised, "You'll
12   get a lawyer."
13        Q.   All right.  And then it's after that that
14   the interview concludes; correct?
15        A.   Yes, ma'am.
16        Q.   Okay.  Now, prior to that, prior to what we
17   are seeing on this and what is on the recording, did
18   he ever absolutely say to you:  "I want a lawyer"?
19        A.   Not that I recollect, or we would have
20   stopped.
21        Q.   And other than the beginning, where he's
22   talking to you about whether or not -- I don't want
23   to misquote it -- where he says that, "I don't want
24   to make no statements because I know you checked my
25   record," and then he goes on to talk --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   Other than that -- or after he made that
 3   statement, did he continue to talk to you and he
 4   indicated that he wanted to talk to you?
 5        A.   He did.
 6        Q.   And did you take that to mean, given that
 7   he still continued to talk to you, and he didn't
 8   absolutely say -- that he didn't say "I don't want to
 9   talk to you," is that why you continued to talk to
10   him?
11        A.   Yes.
12             MS. ARMIJO:   Thank you.  I pass the
13   witness, Your Honor.
14             THE COURT:   Thank you, Ms. Armijo.
15             Mr. Benjamin, do you have cross-examination
16   of Mr. Williamson?
17             MR. BENJAMIN:   Yes, Your Honor.
18             THE COURT:   Mr. Benjamin.
19             MR. BENJAMIN:   May I approach the exhibits?
20             THE COURT:   Do you want your A1 and A2
21   back?
22             MR. BENJAMIN:   No, I'll use the
23   Government's.
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                     CROSS-EXAMINATION
 2   BY MR. BENJAMIN:
 3        Q.   Agent, you testified that Mr. Gallegos was
 4   located at about 8:30, you didn't say a.m., but
 5   that's about 8:30 a.m.; correct?
 6        A.   P.m., I believe.  It was in the evening.
 7        Q.   Would it surprise you if your report says
 8   your interview started at 6:55?
 9        A.   In the evening?
10        Q.   Yes.
11        A.   No.  That was five years ago, so that
12   wouldn't surprise me.
13        Q.   So Joe Gallegos wasn't located at 8:30, if
14   you're talking to him at the State Police
15   headquarters at 6:55 p.m.?
16        A.   It wouldn't appear so.
17        Q.   Do you know what time he was arrested?
18        A.   Not off the top of my head, no, sir.
19        Q.   Would it surprise you if it was earlier in
20   the day, closer to early afternoon or noon?
21        A.   It would because I recall it being later;
22   early evening or late afternoon, is my recollection
23   anyway.
24        Q.   But if I direct you to essentially what's
25   been admitted as Government's Exhibit 1, the
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                  PROFESSIONAL COURT                    e-mail: info@litsupport.com
                  REPORTING SERVICE

1   beginning of the recording is at 6:55 p.m.; correct?

2   Are you able to read that, sir?

3        A.   No -- oh, there it is, yes, sir.

4        Q.   Okay.  And based upon your experience,

5   between the time that an individual gets arrested --

6   because he was arrested and located at a motel by

7   Marshal Task Force, so you didn't respond there

8   immediately; correct?

9        A.   Correct.

10       Q.   And then you went to the hotel?

11       A.   Correct.

12       Q.   And then, essentially, talked to people,

13   tried to get a handle on some things, and then went

14   to the State Police headquarters, right?

15       A.   Correct.

16       Q.   Okay.  And forgive me, but none of that

17   government operation is what we might call very

18   efficient or done very quickly, right?

19       A.   Which part of that?

20       Q.   The marshals arriving, securing a scene,

21   arresting an individual, talking to the two females

22   that were there as well, and then transporting

23   somebody to State Police headquarters?

24       A.   I believe it was as efficient as possible,

25   yes, sir.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   I didn't mean that an insult, sir, I'm
 2   sorry.  But that's not done -- the arrest -- the
 3   location wasn't discovered at 6:00, and then they
 4   we're in the headquarters at 6:55?
 5        A.   I don't believe so.
 6        Q.   Okay.  And so the interview you said was an
 7   hour and 30 minutes, but it starts -- would you
 8   disagree with this timeline -- that it starts at
 9   6:55; there is a break at 8:31 p.m.; the interview
10   resumes at essentially midnight, or 12:04 p.m., and
11   then ends at 12:27 p.m. -- or a.m. -- I'm sorry,
12   a.m.?
13        A.   Yes, sir.
14        Q.   Okay.  And so that's not an hour and 30
15   minutes.  That's, essentially, if you do the math
16   essentially right at five-and-a-half hours of
17   interview time?
18        A.   Well, he wasn't being interviewed the
19   entire time.
20        Q.   But he was in the interview room, sweating?
21        A.   He was in the interview room.  I don't
22   recall if he stayed in that room or if he was moved
23   to a holding cell.  Actually, there is a comment in
24   there about it being cold, so I don't think he was
25   sweating.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Forgive me.   "Sweating" was meant slightly
2  different.

3           You'd said that the mother indicated that
4  he wanted to make a statement?

5      A.   I believe that's what Agent Mowduk
6  indicated, yes, sir.

7      Q.   Ms. Gallegos -- it's Tina Gallegos;
8  correct?

9      A.   Correct.

10     Q.   She indicated they were going to turn
11 themselves in from the 15th as well; correct?

12     A.   Yes.   And every time Agent Mowduk spoke
13 with her, it was going to be the next day, the next
14 day.

15     Q.   And he spoke to her, essentially, looking
16 at the reports, it looks like probably two times a
17 day or so?

18     A.   Yes, sir.

19     Q.   He was fairly persistent in following up on
20 things?

21     A.   Yes, sir.

22     Q.   Okay.   So when you provided Joe -- when
23 Agent Mowduk provided Joe Gallegos his rights, what
24 was unequivocal about, "I don't want to make no
25 statements"?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   We continued to have a discussion anyway,

2   whether we were just providing facts or providing him

3   an opportunity to speak.  Until he asked for a

4   lawyer, we were going to continue to talk to him.

5       Q.   You told him he had a right to remain

6   silent; correct?

7       A.   Correct.

8       Q.   It doesn't say -- well, right below that it

9   says:  "You have a right to an attorney"?

10      A.   Correct.

11      Q.   It says, "You have a right to remain

12  silent"?

13      A.   Correct.

14      Q.   When he said, "I don't want to make no

15  statements," what part of that was unequivocal that

16  he didn't want to talk to you?

17      A.   It wasn't.  That was clear.  We -- after

18  that point, I don't believe the next things that we

19  said to him were questions.  I believe they were

20  informative.  And then he stated he did have some

21  things he would like to state.  And that's where we

22  began to have more of a discussion.  But I don't

23  recall exactly what was said immediately after,

24  but --

25      Q.   Okay.  So the statement, "Well, your mom

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                      1-800-669-9492
                                         e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    had kind of indicated that you wanted to make a
 2    statement," isn't prodding him to make another
 3    statement?
 4         A.   It's just providing him with information
 5    that we had.  And then he reaffirms, on page 6, that
 6    I would rather not talk to anybody, right?
 7         A.   Correct.
 8         Q.   What's unequivocal about that?
 9         A.   No, that's clear.
10              MR. BENJAMIN:  Pass the witness, Your
11    Honor.
12              THE COURT:  All right.  Thank you, Mr.
13    Benjamin.
14              Anyone else have any questions?  All right.
15    Mr. Williamson, you may step down.
16              MS. ARMIJO:  Your Honor?
17              THE COURT:  Do you have something further?
18              MS. ARMIJO:  Yes.
19              THE COURT:  Okay, Ms. Armijo.
20                   REDIRECT EXAMINATION
21    BY MS. ARMIJO:
22         Q.   Is there a difference to you between
23    someone saying:  I want to invoke my right to remain
24    silent, and I don't want to make statements?
25         A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.   And what's your understanding of that?

2          A.   My understanding would be that he wasn't

3   really ending the conversation.  He just didn't want

4   to make any statements about anything or any facts.

5   He did give us the impression that he wanted to

6   continue to talk to us.  He wanted to find out what

7   was going on.  And we wanted to provide him

8   information.  So we would continue that conversation

9   until he said:  I don't want to talk anymore, or I

10  want to be silent, or of course when he said, "I

11  would like a lawyer."

12         Q.   And did he indicate to you that he did, in

13  fact, want to make a statement?

14         A.   In those exact words, he said, "There is

15  some things I'd like to state."

16         Q.   All right.  And is that what led you to

17  continue the conversation?

18         A.   Yes, ma'am.

19         Q.   All right.  Nothing further.  Thank you.

20              THE COURT:  Thank you, Ms. Armijo.

21              MR. BENJAMIN:  One second.  I may have --

22              THE COURT:  You may.

23              MR. BENJAMIN:  Pass the witness, Your

24  Honor.

25              THE COURT:  All right.  Mr. Williamson, you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   may step down.  Is there any reason that Mr.
 2   Williamson cannot be excused from the proceedings,
 3   Ms. Armijo?
 4              MS. ARMIJO:  No.
 5              THE COURT:  All right.  How about from the
 6   defendants?
 7              MR. BENJAMIN:  No, Your Honor.
 8              THE COURT:  All right.  You're excused from
 9   the proceedings.  Thank you for your testimony.
10              All right.  Are there further witnesses
11   that need to be presented, Ms. Armijo?
12              MS. ARMIJO:  No, Your Honor.  Thank you.
13              THE COURT:  How about you, Mr. Benjamin?
14              MR. BENJAMIN:  No, Your Honor.
15              THE COURT:  All right.  Do you wish to
16   argue your motion, Mr. Benjamin?
17              MR. BENJAMIN:  I do, Your Honor.
18              THE COURT:  Mr. Benjamin.
19              MR. BENJAMIN:  I think there is two things
20   that come to mind when I see an interview that was
21   conducted in this manner, Your Honor.
22              Mr. Gallegos was arrested during,
23   essentially for lack of a better term "a duty day."
24   And 18 USC 3501 talks about taking an individual to a
25   United States Magistrate without undue delay.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   think in this case it's clear that the tactic that
 2   was used was to take Mr. Gallegos into custody, and
 3   conduct what is, essentially, a five-and-a-half hour
 4   interview of an individual in order to be able to
 5   attempt to elicit as many statements as possible, and
 6   fish.
 7            And the Court noted that it had listened to
 8   the hour-and-a-half interview.  There is -- it's in
 9   circles.  There is no quote/unquote admissions made,
10   Your Honor.  But they do not listen to what Agent
11   Williamson said was a very -- he said it was clear
12   assertion, that he didn't want to -- that he wanted
13   to remain silent.  And I think that that cannot be
14   interpreted as any other way than the response that
15   was given to me.  That was a very clear assertion of
16   his intent to remain silent.
17            The agents utterly disrespected that.  And
18   if Miranda is to be given any weight, it can't be
19   that we give him information, or we rely on the fact
20   that his mom told us that we wanted this.  When he
21   makes one, and then a second assertion of his right
22   to remain silent, that right needs to be respected.
23            I guess the Government's arguing that's
24   unequivocal, and essentially, five hours later, he
25   then wises up and says the magic word "attorney."  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    don't think that's what case law holds by any means.
 2    And so I would submit that the agents in this case
 3    intentionally tried different tactics.  And the Court
 4    is aware of the different tactics that are used, and
 5    can take into consideration, having listened to the
 6    audiotape, that they utterly disregarded his
 7    assertion of his right to remain silent.
 8              Pass the witness, Your Honor, or excuse
 9    me --
10              THE COURT:  Thank you, Mr. Benjamin.
11              Any other defendant wish to speak on this
12    motion?
13              All right.  Ms. Armijo.
14              MS. ARMIJO:  Your Honor, I think it has to
15    be clear and unambiguous, and it's an objective
16    standard, that he invokes his right to remain silent,
17    or his request for counsel.
18              In this case, if you read the transcript,
19    and if you listen to it, which the Court already has,
20    you can see that Mr. Gallegos is quite smart in
21    giving -- in answering the agent's question.  The
22    first part of the interview before the break is
23    really the majority of the interview.  So even if the
24    Court were to find it's too long, it should only
25    strike the second part of the interview, which is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   much shorter, after the break.  But the first part of
2   the interview, he answers a great deal of questions
3   to minimize his actions.  He does make admissions.
4   He puts the victim at his residence at a certain time
5   period that evening, and confirms -- and I believe --
6   and I'd have to look back at the entire thing -- but
7   yes, he does, he admits that their main source of
8   drug supply was, in fact, Adrian Burns.  They were
9   purchasing heroin from him.  And he puts Adrian Burns
10  at their residence.  So there is statements in there
11  that are incriminating.  And given the whole nature
12  of the interview, and the fact that he does not say
13  immediate -- and he does know that he does have a
14  right to an attorney.
15          I think the Court can consider the
16  defendant's age, his background.  Clearly the
17  defendant has been arrested before.  He talks about
18  how he served 11 years.  And the fact that he does
19  actually at some point end up asking for an attorney
20  and the interview ceases, it shows that the officers
21  were, in fact, acting appropriately.  And that once
22  he did invoke his right to have an attorney present,
23  they honored that right.
24          So we would ask that the statements before
25  he invokes not be suppressed.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1              THE COURT:  All right.  Thank you, Ms.

2    Armijo.

3              Anything further, Mr. Benjamin?

4              MR. BENJAMIN:  No, Your Honor.

5              THE COURT:  Anyone else?

6              Well, I want to think about this a little

7    bit more.  But I'll tell you, at the present time,

8    I'm inclined to deny the motion.  I think that I

9    agree with the officer:  If you just take the one

10   statement -- or the two statements out of context,

11   then I agree they are unequivocal.  But I don't

12   understand how his statement on page 5 that, "I don't

13   want to make no statements," and then he repeats a

14   similar one on page 6, is an unequivocal invocation

15   of his right to remain silent, when he just goes on

16   talking.  So I think you have to put it in the

17   context of the -- of what is occurring.

18             Also, I'm inclined to think that an

19   invocation of one's right to remain silent, unlike

20   your right to an attorney, does permit the police to

21   continue to talk to a suspect to obtain a subsequent

22   waiver.

23             There is some language in the Supreme Court

24   cases that suggest otherwise.  But there are also

25   some statements that indicate that they can continue

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to talk.  And people can waive the right to silence,

2    and then come back -- or not waive the right, but

3    invoke the right to silence, and then come back and

4    waive it.  When you look at Michigan versus Moseley,

5    it says, "A reasonable and faithful interpretation of

6    the Miranda opinion must rest on the intention of the

7    court," in that case, "to adopt fully effective means

8    to notify the persons of his right of silence, and to

9    assure that the exercise of the right will be

10   scrupulously honored.  The critical safeguard

11   identified in the passage at issue is a person's

12   right to cut off questioning," which doesn't seem to

13   really be the issue here, because the questioning

14   hadn't really begun.  "Through the exercise of his

15   option to terminate questioning, he can control the

16   time at which questioning occurs, the subject is

17   discussed, and the duration of the interrogation."

18   And we see that exercised at the end, when he

19   exercised his right to an attorney, and then the

20   interview is over.  "The requirement that law

21   enforcement authorities must respect a person's

22   exercise of that option, counteracts the coercive

23   pressure of the custodial setting.  We, therefore,

24   conclude that the admissibility of statements

25   obtained after the person in custody has decided to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    remain silent depends on the Miranda, on whether his

2    right to cut off questioning was scrupulously

3    honored."  And we see that later on.

4           At that point the Supreme Court dropped a

5    footnote and said, "The dissenting opinion asserts

6    that Miranda establishes a requirement that once a

7    person has indicated a desire to remain silent,

8    questioning may be resumed only when counsel is

9    present.  But clearly the court" -- this is quoting

10   the Supreme Court -- "But clearly the court in

11   Miranda imposed no such requirement to distinguish

12   between the procedural safeguards triggered by a

13   request to remain silent and a request for an

14   attorney, and directed that the interrogation must

15   cease until an attorney is present only if the

16   individual states that he wants an attorney."

17          So I think Mr. Gallegos was in control of

18   the situation.  And he decided to say he didn't want

19   to make statements.  Then he decided to continue

20   talking.  He then said he didn't want to make

21   statements.  Then he decided to continue talking.  So

22   I do think that it was not an unequivocal invocation

23   of his right to remain silent.  And ultimately, when

24   he did invoke his right to an attorney, it was

25   scrupulously honored by the two police officers.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                   1-800-669-9492
                                                      e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    So I'll give it some further thought, but
2    I'm inclined to deny the motion to suppress.
3    All right.  The next motion is what is Tab
4    24, which is Troup and Billy Garcia's motion for
5    production of co-conspirators' statements and for
6    pretrial hearing on their admissibility.  Shall we
7    take that motion up at this time, Mr. Cooper?
8    MR. COOPER:  Judge, I think what we would
9    like to do is call Leonard Lujan.  He has some -- we
10   have some testimony directed at that motion, and
11   other testimony directed at our motion to dismiss.
12   He's being held downstairs.  I think the marshals
13   would like to get him out of town.  So I'd like to
14   call --
15   THE COURT:  What is his situation with his
16   attorney?
17   MR. COOPER:  His attorney is in the
18   building -- just walked out of the courtroom, Judge.
19   THE COURT:  Okay.  And remind me who his
20   attorney is.
21   MR. COOPER:  Dean Clark.
22   THE COURT:  Okay.
23   MR. COOPER:  And I will walk out in the
24   hallway and get him.
25   THE COURT:  You may.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. LAHANN:  Your Honor, Mr. Patterson
 2    needs to use the restroom.  Is that okay?
 3              THE COURT:  Yeah, run and do it before we
 4    get started with this witness.  This is kind of the
 5    second time you've done this.  Let's take care of
 6    business before we --
 7              THE DEFENDANT:  It's not intentional.
 8              THE COURT:  All right.  Well, it's the
 9    second time.  Let's take care of business before we
10    get in here, okay?  We don't have time to take breaks
11    with this many people.
12              MR. BECK:  And, Your Honor, I understand
13    that the James motion is closed, so why are we
14    hearing Mr. Lujan's testimony?
15              MR. COOPER:  Your Honor, it's for the
16    motion that you just called up, and also for the
17    motion to dismiss.  With regard to the motion to
18    dismiss, Judge, we're exploring the timing of his
19    cooperation relative to the federal government's
20    initiation of their investigation in the 2001
21    murders.  We think his testimony has a great deal of
22    relevance as to when -- the Government got
23    involved -- when he got involved with the Government.
24    And we want to see how far back he will say that his
25    cooperation first began.  And I think the relevance
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to that motion to dismiss, certainly, and also to the

2   other motion.

3          THE COURT:  All right.  Is that sufficient,

4   Mr. Beck?

5          MR. BECK:  Sure.  If we're going to go into

6   his cooperation, that's fine.

7          MR. COOPER:  And, Your Honor, if I may, I'm

8   going to start earlier than his cooperation.  Because

9   I need to -- I don't know when he started, when he

10  first cooperated.  So I'd like some leeway to begin

11  with what I think may be the start of his thinking

12  about cooperating, and any action to cooperate.

13         MR. BECK:  I don't mind him starting with

14  those questions, Your Honor.  I think we should

15  also -- while we have Mr. Lujan and his counsel here,

16  there has been a subpoena for his mental health

17  records, which I have -- I filed a motion to quash on

18  Corrections' behalf.  And I just haven't gotten a

19  response from his counsel.  So I think it's important

20  to take that up first.

21         MR. COOPER:  I agree.  I'd like to.  I have

22  been dealing with Doug Couleur, a lawyer for one of

23  the other individuals who is affected by that motion,

24  and I believe we've agreed to operate, basically, as

25  we had -- as the Court had and the Government had in

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                        1-800-669-9492
                  BEAN                                                      e-mail: info@litsupport.com
                  & ASSOCIATES, Inc.
                  PROFESSIONAL COURT
                  REPORTING SERVICE

```
 1   the Eric Duran matter.  And so we're going to submit,
 2   we believe later on, a motion -- or an order
 3   basically tracking what the Court had done in Eric
 4   Duran.
 5          THE COURT:  Yeah, if you're ready, we need
 6   to bring him on in.
 7          Mr. Benjamin, did you get Mr. Clark?
 8          MR. BENJAMIN:  I will go get him, Your
 9   Honor.
10          THE COURT:  Mr. Clark, there is a chair
11   right over here.  If you want to come up here and sit
12   up here.  Or if you want to sit back there, it's your
13   call.  Whatever you'd like to do.
14          MR. CLARK:  Thank you, Your Honor.  I
15   apologize to the Court and counsel.  I have another
16   docket, and I wasn't aware that we'd be starting this
17   early.
18          THE COURT:  Okay.  Are you okay --
19          MR. CLARK:  Yes, Your Honor.
20          THE COURT:  -- to get started?  There is a
21   chair back there.  If you want to, wherever you want
22   to sit.  Do you want to pull it up next to -- here in
23   front of the marshal?
24          MR. CLARK:  I would, Judge.  Thank you.
25          THE COURT:  All right.  Mr. Lujan, are you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   able to stand?

 2            THE DEFENDANT:  Yeah, I can stand.

 3            THE COURT:  Why don't you stand up and

 4   raise your right hand to the best of your ability.

 5   Ms. Bevel, my courtroom deputy, will swear you in.

 6                    LEONARD LUJAN,

 7       after having been first duly sworn under oath,

 8       was questioned and testified as follows:

 9                 DIRECT EXAMINATION

10            THE CLERK:  Please be seated.

11            THE COURT:  All right.  Mr. Lujan.  Mr.

12   Cooper.

13            MR. COOPER:  Thank you, Your Honor.

14   BY MR. COOPER:

15       Q.   Mr. Lujan, on July the 5th, 1998, you were

16   at --

17            MR. BECK:  Your Honor, should we take up

18   the issue with the mental health records, again, like

19   we said we were going to, before we get into this?

20            THE COURT:  All right.  What raised the

21   issue?

22            MR. BECK:  So Mr. Garcia's counsel

23   subpoenaed New Mexico Corrections Department.  But

24   they failed to comply with the HIPAA regulations for

25   a subpoena of the mental health records under HIPAA.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    So what we need is we need either Mr. Lujan's counsel

 2    to agree to provide the records with Mr. Lujan's

 3    consent, or we need a court order and a process for

 4    keeping them confidential.

 5            THE COURT:  All right.

 6            MR. BECK:  Since Mr. Lujan's counsel is

 7    here --

 8            THE COURT:  Where are the records?  If

 9    they've been subpoenaed, where are they physically

10    right now?

11            MR. COOPER:  Your Honor, they've denied our

12    request for -- they're refusing --

13            THE COURT:  So they're still at the

14    Corrections Department?

15            MR. COOPER:  -- refusing to submit those

16    records to us.  And what we propose to do is have a

17    court order.  The same thing happened with regard to

18    Eric Duran's mental health records.  And in that case

19    an order was directed to the Department of

20    Corrections to produce it.

21            If I may approach Mr. Clark and show him

22    the proposed order that we're speaking of?

23            THE COURT:  All right.

24            MR. BECK:  Your Honor, it sounds like this

25    isn't going to be resolved quickly.  So my
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    anticipation is that we're probably going to have to

2    bring this before the Court later on.  So I guess the

3    best way to proceed now, since the marshals would

4    like to -- well, I don't see that Mr. Lujan shouldn't

5    be here when we talk about the dispute over his

6    mental health records, so --

7            MR. COOPER:  Let's do it now.

8            MR. BECK:  That's fine.  I agree.

9            MR. COOPER:  I think he has to be here.

10            MR. BECK:  I agree.

11            MR. COOPER:  So, Judge, what we would like

12    for the Department of Corrections to do is receive an

13    order from this Court directing them to produce to

14    the United States the mental health records of Mr.

15    Lujan, Eugene Martinez, and Lawrence Torres.  I have

16    been in contact with Doug Couleur with regard to his

17    mental health records.  He has suggested that --

18            THE COURT:  And he represents who?

19            MR. COOPER:  And he represents Eugene

20    Martinez.  And he suggested to me that we do it the

21    way it had been done in Eric Duran's case.  I said,

22    "Sounds good, we will agree to a protective order.

23    We will not disclose any of these records to anybody.

24    We will prepare the order, submit it to the

25    Department of Corrections, give them five days to

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                                       Albuquerque, NM 87102
(505) 989-4949                                                                 (505) 843-9494
FAX (505) 843-9492                                                        FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    produce the documents, send them to the Government.
 2    The Government then will have five days to have
 3    counsel redact, if necessary, anything that they deem
 4    needs redaction.  And then, within five days of
 5    receipt, the Government would then disclose to
 6    counsel."
 7            And we have prepared, like I say, that
 8    order.  I don't know whether or not Lawrence Torres
 9    has a lawyer.  I don't believe -- I don't know if he
10    does.  But in any case, we would ask for those as
11    well.  Mr. Clark, I think, has a position with regard
12    to these records.  And I'll let him speak to those.
13    But that's what we would like.
14            THE COURT:  And what's your position on
15    this motion, Mr. Beck?
16            MR. BECK:  I think the United States'
17    position is that we just need -- I mean, we just need
18    to make sure we comply with HIPAA.  And it's pretty
19    specific as to what the qualified protective order
20    has to have.  The options are:  Either Mr. Lujan's
21    counsel can agree to hand them over, or that the
22    parties can agree to what's called "a qualified
23    protective order."  So if the parties agree to a
24    qualified protective order -- or if the parties don't
25    agree, then the Court can order a qualified
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  protective order.

2          THE COURT:  What is different between the

3  qualified protective order in the statute and what

4  Mr. Cooper has got in his hand?

5          MR. BECK:  That's what I'm trying to see.

6  I just saw what Mr. Cooper has in his hand for the

7  first time, so I'm trying to compare it with what's

8  required under the statute right now.  So it looks

9  like the Court's order would have to prohibit the

10  parties from using or disclosing the protected health

11  information for any purpose other than the litigation

12  or proceeding in which it's requested.  And it

13  requires "return to the covered entity or destruction

14  of the protected health information including all

15  copies at the end of litigation or the proceeding."

16          THE COURT:  Do you mind including those two

17  provisions in there, Mr. Cooper?

18          MR. COOPER:  I have no objection to doing

19  that.  It was my understanding the protective order

20  would be a separate document.  This is just the order

21  directing them to produce it.  The protective order

22  would be a document that all counsel would sign, that

23  would include that language and other language, and

24  it would be a document similar to the protective

25  order that we had prepared or that was prepared

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   actually by Doug Couleur and the Government when we

 2   got the mental health competency records.

 3          THE COURT:  Well, do you have any objection

 4   to me signing this order, Mr. Beck, with the

 5   agreement of all counsel that we'll use the form that

 6   Mr. Couleur used on Eric Duran's documents?

 7          MR. BECK:  Your Honor, I have an objection

 8   to the five-day time period, because I don't know how

 9   quickly Corrections can get the documents.  Five days

10   sounds pretty quick for what I've seen from their

11   paper files.

12          THE COURT:  Does yours have a five-day?

13          MR. COOPER:  It has a five-day, Your Honor.

14   But we moved it from 10 days to five days because we

15   subpoenaed these records three weeks ago.  Three

16   weeks ago we subpoenaed the records.  The Department

17   of Corrections refused to honor this Court's order

18   that they be turned over.  And when they did so, I

19   think that we're 20-some days away from trial.  We

20   need these documents.  These are two very important

21   witnesses against a number of the people who sit at

22   this table.  And I think we need those sooner than

23   later.  We needed them back when we subpoenaed them.

24   And we've got some serious problems with a lot of the

25   subpoenas that went out.  People are not responding

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    accordingly.  They're either refusing to obey the

 2    subpoenas, or sending it to the Government and not

 3    sending to us as we had directed them to do so, or

 4    the subpoena directed them to do so.  But that's

 5    another issue.

 6            But, in any case, we subpoenaed these

 7    records 15 days ago.  We would like to have those

 8    within five days of receipt of the order.  I think

 9    the Department of Corrections -- who by the way is an

10    arm of the prosecution.  They ought to produce this

11    stuff.  I think there is --

12            THE COURT:  Well, let's see how it goes.

13    Why don't I put "five days," and see if that lights a

14    fire under them.  If they can't do it in five days,

15    we can kind of reconvene and see where we are on

16    that.

17            All right.  Any other issues then, Mr.

18    Beck, from the Government's standpoint?

19            MR. BECK:  No, Your Honor.  And -- I mean,

20    I think that's fine.  As I said, I don't know if that

21    can happen.  And so my concern is that Corrections

22    would be in violation of a court order.  I think what

23    would be a more prudent approach is to put 10 days,

24    which I think will be a stretch.  They haven't been

25    dragging their feet.  They've been looking for them

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    since they got the subpoena.  Because I told them
 2    that I thought the Court would approach it this way.
 3    They've been looking for them.  And if they get them
 4    sooner than that, they're going to provide them to
 5    us.  And I'm not going to drag my feet because I have
 6    a 10-day order rather than a five-day order.  I just
 7    don't want Corrections to be in violation of a court
 8    order if they can't get that paperwork soon enough.
 9    So I think it could be 10 days with my
10    representation, my understanding that as soon as we
11    get them, we will get them over to Mr. Clark so he
12    can take a look, and then we will get them in the
13    hands of the defendants.
14            So I think for all practical purposes it
15    will be the same timing.  The only difference is that
16    if they can't get it together, then they wouldn't be
17    in violation of a court order for five days.  But I
18    understand the Court's position.  That's just my
19    request.
20            THE COURT:  Okay.  Mr. Cooper, why don't
21    you go first, then I'll hear from Mr. Solis.
22            MR. COOPER:  Thank you, Judge.
23            Judge, there is five days for Department of
24    Corrections to produce it to the Government, and then
25    five days for the Government to produce it to us.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   And I think that's plenty of time for both entities
 2   to get things done, and get it to us so that we can
 3   use it and be prepared for this trial.
 4              THE COURT:  All right.  Mr. Solis.
 5              MR. SOLIS:  May I be heard, Your Honor?
 6              THE COURT:  You may.
 7              MR. SOLIS:  Thank you, Your Honor.  This
 8   dovetails nicely into the motion I was going to argue
 9   yesterday, Document 1908.  What it seeks is,
10   essentially, the order the Court is getting ready to
11   sign where the Court is ready to order the release of
12   the medical records of Eugene Martinez, Leonard
13   Lujan, and Lawrence Torres.
14              In review of the conference evaluation
15   reports for Mr. Martinez, I don't think even the
16   Government would dispute there is significant Brady
17   material there.  So any backup to that evaluator's
18   assessment is probably ripe with additional Brady
19   material.  So given that we're fast approaching
20   trial, I would concur and support Mr. Fuller's
21   request for a five-day turnaround, Your Honor.  But
22   since the Court has ordered that, I think that would
23   moot the hearing of 1908 with regard to my
24   presentation on that, Your Honor.
25              That's all I had, sir.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Thank you, Mr.
 2     Solis.
 3              All right.  Mr. Clark, are you comfortable
 4     with what's being set up here?
 5              MR. CLARK:  Well, Your Honor, I'll take it,
 6     if I have to.  But one point, Judge, I'd like to
 7     bring up -- good morning, Your Honor, Dean Clark on
 8     behalf of Leonard Lujan -- is that once we get the
 9     documents and we fashion a protective order, I'd ask
10     that included in that protective order be a provision
11     that under no circumstances do these documents make
12     it to the tablet.  Counsel can carry hard copies in,
13     review them with his client, and take them home at
14     the end of the day, Judge.  That is our main concern.
15              THE COURT:  What did the protective order
16     on Eric Duran say?
17              MR. COOPER:  Your Honor, I just spoke with
18     Ms. Gilbert, and she advised me that the documents
19     were not loaded onto the tablet.
20              THE COURT:  All right.  So everybody in
21     agreement that they won't be put on the tablets?  All
22     right.  So we can include that in the order.  And so
23     that will -- not in Eric Duran's, we'll include them.
24              All right.  If you'll present that order to
25     me, I'll sign this.  And if there is problems next
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    week, Mr. Beck, you can get hold of me and we'll see

2    what the situation is.

3              MR. BECK:  Sure.  I do want to note we'll

4    work on our end to get some protective order in

5    place, but that order to produce still doesn't

6    comply, without the qualified protective order in

7    place, with HIPAA.  And so Corrections still can't

8    provide us -- still cannot provide us the records

9    without the qualified protective order in place.

10             So that's why I was asking for those other

11   two provisions.  I think we can add those two

12   provisions to that order that you're signing now,

13   along with Mr. Clark's request they not be placed on

14   the tablet, and that at least we can get things

15   moving to the extent that Corrections has --

16             THE COURT:  Why don't I just put at the

17   bottom here, "Conditioned on entry of a protective

18   order."

19             MR. BECK:  Yes, Your Honor.  As I said,

20   we'll --

21             THE COURT:  Then 2, "Documents will not be

22   put on tablet."  Any problem with me adding that, Mr.

23   Cooper?

24             MR. COOPER:  No, Your Honor.  Thank you.

25             THE COURT:  Is that all right putting it on
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1   the entry of the production order?  Does that work

 2   for you, Mr. Clark?

 3           MR. CLARK:  Yes, Your Honor, that's fine.

 4           THE COURT:  Okay.  All right.  So I'll hand

 5   this to Ms. Bevel.  Do you want her to go ahead and

 6   file it?

 7           Do you have something else, Mr. Beck?

 8           MR. BECK:  I don't, Your Honor.

 9           MR. COOPER:  It is, Your Honor.  Thank you.

10           THE COURT:  All right.  Mr. Cooper.

11           MR. COOPER:  Thank you, Judge.

12   BY MR. COOPER:

13       Q.  So Mr. Lujan, on July 5, 1998, you were at

14   Bernalillo County Detention Center; correct?

15       A.  Yes, sir.

16       Q.  And on that day --

17           THE COURT:  Why don't you do this, Mr.

18   Lujan:  Can you pull your seat up?  We're going to

19   pull the microphone as close to your mouth as

20   possible.

21           THE WITNESS:  Is that fine?  How's that?

22           THE COURT:  That sounds better.  Thank you,

23   Mr. Lujan.

24           THE WITNESS:  Thank you.

25       Q.  And on that day you killed Felix Animal
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Martinez; correct?
 2        A.   Yes, sir.
 3        Q.   And the way you came about to get to that
 4   point is prior to that you and Freddie Munoz had been
 5   out at Milan; correct?
 6        A.   Yes, sir.
 7        Q.   And while you were out there, you talked
 8   with Angel Munoz; correct?
 9        A.   Yes, sir.
10        Q.   And Angel is not related to Frederico, is
11   he?
12        A.   No, sir.
13        Q.   Okay.  And Angel at the time was the jefe,
14   he was the head of SNM, wasn't he?
15        A.   Yes, sir.
16        Q.   He was the heavy, heavy; he's the big dog,
17   no?
18        A.   Yes, sir.
19        Q.   And he told you and Freddie to go back and
20   hit Animal, right?
21        A.   Yes, sir.
22        Q.   And so you went back eventually to BCDC --
23   that's the old jail that was down on like 4th and
24   Roma?
25        A.   Yes, sir.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So while you were there, you and Freddie

2  and a guy named Manuel Benito talked about how you

3  were going to hit Animal; correct?

4      A.   Yes, sir.

5           MR. BECK:  Objection, Your Honor.  I don't

6  see how this is getting into his cooperation or the

7  James statements.  And the James statements aren't

8  part of this, so I don't see how this is getting into

9  his cooperation.

10          MR. COOPER:  Your Honor, I believe that it

11  is, because it sets the stage as to what he was

12  looking at in terms of the need to cooperate.  And

13  what he was looking at -- this was prior to the time

14  that he was involved in the 2001 murders.  I'm trying

15  to develop and show the Court that he had a motive

16  and a reason to cooperate with the investigation of

17  the 2001 murder.  If he had committed this murder,

18  which subjected him at that time to a life sentence,

19  then he would have a real motive to try to work to

20  cooperate with the Government once he learned about

21  the 2001 murders.

22          And I believe that it's relevant to show

23  that -- or for me to develop our theory of the

24  case -- and we're entitled to do that -- that he was

25  in a position to cooperate at a very early point in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

```
 1    time.  There is a statement that was given soon after

 2    the 2001 murders, where we believe that he started

 3    his cooperation.  And I think this kind of sets the

 4    stage.

 5              So I'd ask for some leeway to set this up,

 6    and give the Court the proper context to make a

 7    decision as to what he did to cooperate, how he got

 8    to the point of cooperation, and when that

 9    cooperation occurred, particularly as it relates to

10    the investigation.  We're going to have other

11    witnesses who are going to come to court and testify

12    as to when the investigation by the feds began.  And

13    I think this dovetails into some of their testimony.

14              MR. BECK:  Your Honor, I think that the

15    question here is when Mr. Lujan was signed up as a

16    cooperator, and what he said, and what we don't have

17    anymore.  The reason that he became a cooperator

18    really doesn't matter for this motion.  This is just

19    a fishing expedition to get testimony that they can

20    use at trial.

21              THE COURT:  He's leading him to get the

22    answers, so is not too much fishing.  Let me give Mr.

23    Cooper a little leeway.  I'm not quite tracking where

24    the defendant is going.  So let me give them some

25    leeway, so they can try to explain what their point
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   is.  Overruled.

 2           MR. COOPER:  Thank you, Judge.

 3       Q.  So you committed this murder of Animal, and

 4   by doing so, you gained some status in the eyes of

 5   Angel -- or of Munoz, right?

 6       A.  Yes, sir.

 7       Q.  And do you remember what you were in

 8   custody for in 1998, in July of 1998?

 9       A.  I believe it was residential burglaries and

10   some auto burglaries.

11       Q.  Okay.  So in July of 1998, you're at BCDC.

12   In the summer of 2007, when you meet Rich Lewis and

13   you make your first statement with regard to the 2001

14   murders -- there is a period of, what, nine years?

15   What happened -- what was going on in your life

16   between July of 1998 and the time that you first

17   talked with Rich Lewis in the summer of 2007?  Were

18   you in and out of custody?

19       A.  Yes, sir.

20       Q.  And on what sorts of matters?

21       A.  Pretty much the same:  Residential

22   burglaries, and stuff like that, you know.

23       Q.  Okay.  Are you from Albuquerque?

24       A.  Yes, sir.

25       Q.  And what street gang were you involved?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Happy Valley.
 2          Q.    Do you remember the first time that you got
 3    to the Department of Corrections?
 4          A.    I believe it was 1987, when I first got to
 5    the Penitentiary of New Mexico.
 6          Q.    Okay.  And did you first go -- you went to
 7    RDC first?
 8          A.    I went to RDC in Grants prior to that, and
 9    then I went to the main facility in Santa Fe.
10          Q.    Okay.  And at some point you became a
11    member of the SNM?
12          A.    I didn't become an SNM member till 1993.
13          Q.    Okay.  So in 2001, you were a member of
14    SNM?
15          A.    Yes, sir.
16          Q.    And today, you're cooperating with the
17    Government; correct?
18          A.    Yes, sir.
19          Q.    In 2001, you were a leader, you basically
20    were taking over Southern New Mexico Correctional
21    Facility, weren't you?
22          A.    Well, I wouldn't say I was a leader.
23          Q.    You weren't?
24          A.    I wouldn't that, you know.  I was
25    somebody's right-hand man, but I wasn't no leader,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you know.
 2        Q.   So did you ever become a captain?
 3        A.   No.
 4        Q.   No?  Are you sure?
 5        A.   Um-hum.
 6        Q.   Did you ever tell anybody you became a
 7   captain?
 8        A.   No.
 9        Q.   Okay.  You're just a soldier?
10        A.   Pretty much.
11        Q.   The whole time?
12        A.   Pretty much.  And then I became somebody
13   else's right-hand man.  And then from there, other
14   people thought that I had power, you know.  And, you
15   know, whatever they thought, that was on them.
16        Q.   You became somebody else's right-hand man.
17   Who was that?
18        A.   Billy Garcia.
19        Q.   Okay.  And before that, you were somebody's
20   right-hand man; who was that?
21        A.   I wasn't nobody's right-hand man prior to
22   that.
23        Q.   Oh, okay.  Being a member of SNM, you know
24   the rules, don't you?
25             MR. BECK:  Objection, Your Honor.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
1    thought we were going to get into when he cooperated,
2    and now we're getting into a lot of background
3    information that's not relevant to this motion.
4              MR. COOPER:  The next question, Your Honor,
5    if I may, is when he -- what those rules are, and
6    then when he violated those rules.  The main rule for
7    SNM members is:  "You don't snitch."  And that goes
8    to the meat of this testimony, his cooperation.
9              THE COURT:  All right.  Overruled.
10        Q.   So the rules, the reglas, the main one is
11   you don't snitch, right?
12        A.   Yes, sir.
13        Q.   You're not supposed to be a rat?
14        A.   Yes, sir.
15        Q.   Bad stuff happens if you snitch, right?
16        A.   Yes, sir.
17        Q.   You get subject to being killed?
18        A.   Yes, sir.
19        Q.   You're aware of a lot of instances where
20   rats have been killed, not only by SNM, but by people
21   in prison, right?
22        A.   Yes, sir.
23        Q.   It's not just a rule of SNM, but it's a
24   rule of prison culture that you don't snitch?
25        A.   Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   You violated that rule, didn't you?
 2        A.   Yeah.
 3        Q.   I want you to think back over the years.
 4   All of the time that you were in custody, from 1993,
 5   when you became a member of SNM, when was the first
 6   time that you violated that rule?
 7        A.   It was 2007.
 8        Q.   So when you talk to STG and give them
 9   information on something that's going on, whatever it
10   is in prison, that violates the rule, doesn't it?
11        A.   Um-hum.
12        Q.   When you talk to the cops, would you -- did
13   you answer that?
14        A.   Yes, sir.
15        Q.   Okay.  Because the court reporter has a
16   hard time writing down nods.  Okay?
17             So when you talk to the cops out on the
18   street, whether it's APD or BCSO or FBI, that
19   violates the rules, right?
20        A.   Yes, sir.
21        Q.   Anytime you talk to the STIU -- even if
22   it's not STIU, it's a CO, that violates the rules,
23   doesn't it?
24        A.   Yes, sir.
25        Q.   So you never talked to STIU?  STG?
```

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



PROFESSIONAL COURT                                           1-800-669-9492
REPORTING SERVICE                                   e-mail: info@litsupport.com

 1        A.    Not that I can recall.

 2        Q.    Okay.  So in March of 2001, Mr. Lujan,

 3   Frank Castillo and Rolando Garza were killed at the

 4   Southern New Mexico Correctional Facility; correct?

 5        A.    Yes, sir.

 6        Q.    And after that set of murders, the facility

 7   got locked down?

 8        A.    Yes, sir.

 9        Q.    And some people got shipped out.  Others

10   got put into Seg, where they remained a long time,

11   right?

12        A.    Yes, sir.

13        Q.    You didn't get shipped out, did you?

14        A.    No, sir.  I didn't get shipped out till, I

15   think, six months later.  I ended up getting shipped

16   to Virginia, to Wallens Ridge.

17        Q.    Do you know why you got shipped out?

18        A.    Apparently, they said that me and Charles

19   Saeda (phonetic) and Dale Chavez were going to take

20   Captain Armenta hostage, or something like that, and

21   ended up shipping to us Wallens Ridge.  They shipped

22   us to the North facility first.  And we were there

23   for like about four months.

24        Q.    Then they shipped you out?

25        A.    Yes, sir.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And right after the murders, you didn't get

2   put in Seg or anything like that, did you?

3      A.   Like about three days after.

4      Q.   But that's just everybody, right?

5      A.   No.

6      Q.   Just you?

7      A.   They locked down 16 of us first, 16 of us

8   SNMers.

9      Q.   And within three days you got out?

10     A.   No.  They locked us down in -- I think it

11  was J2 Red.  And we stayed there, I was there for

12  maybe six months before I got shipped to the North

13  facility, and then to Wallens Ridge.

14     Q.   And in the days and weeks and months right

15  after the murder, you talked to Tafoya and others

16  from STG, didn't you?

17     A.   Not that I can recall.  I talked to -- I

18  know there was -- one of the STG, they pulled me out.

19  One of them offered me some Copenhagen, and I sat

20  there and I did some Copenhagen.  But he was asking

21  me questions.  And I didn't answer anything he asked

22  me.

23     Q.   What did he ask you?

24     A.   Hum?

25     Q.   What did he ask you?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   Just asking me questions about the murder
2   and stuff.  And I didn't answer none of the
3   questions.  And he showed me some pictures of Frank
4   Castillo and Looney.
5        Q.   And he told you that they had a camera that
6   showed you talking to Billy Garcia, right?
7        A.   Yes, sir.  I think, yes, sir.  I think
8   that's what he had told me.
9        Q.   And did he show you the video of that?
10        A.   No, sir.
11        Q.   You didn't see it?
12        A.   No, sir.  No, I didn't see no video of me
13   and Billy talking.  He just told me they had us on
14   camera talking.
15        Q.   And did you believe him?
16        A.   At the time I did believe him, because at
17   the time they were up there -- all the STG was always
18   on the roof taking pictures of all of us on camera
19   and stuff, following us with their cameras on the
20   roofs, you know.
21        Q.   Do you know if it was video or just --
22        A.   They had us on video.  They would always
23   stand up on the roofs taking videos of all SNM
24   members of what we were doing and stuff in the yards.
25        Q.   And you saw them?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yeah.  Oh, yeah.  Plenty of us have saw
 2   them.  There was like 70, 80 of us on the yard there,
 3   and all of us knew about it and all of us would see
 4   them.
 5        Q.   So in 2001, you didn't cooperate with STG?
 6        A.   No, sir.
 7        Q.   Didn't answer any of their questions?
 8        A.   No, sir.
 9        Q.   Because to do so would be a rat?
10        A.   Yes, sir.
11        Q.   And you never ever --
12        A.   No, sir.
13        Q.   -- talked to COs or STG?
14        A.   No, sir.  Just that one time that we're
15   talking about now.
16        Q.   And it was only one time that they came to
17   you?
18        A.   Yes, sir.
19        Q.   What did they ask you?
20        A.   That I can recall, it was just that time.
21        Q.   Okay.  What were they asking you?
22        A.   Just simple questions about what happened
23   with Looney, and this and that; what happened, what
24   went down, you know, like that.
25        Q.   What did you tell them?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   I told them I got nothing to say.
 2          Q.   Did you ever talk with Trent Pedersen?
 3          A.   Not that I'm aware of.  I don't even
 4   remember that name.
 5          Q.   Okay.  He was an FBI agent that was
 6   investigating these murders way back when.
 7          A.   Not really.  To tell you the truth, I don't
 8   remember him.
 9          Q.   Do you remember Daniel Howington?
10          A.   No, sir.
11          Q.   An FBI agent?
12          A.   No, sir.
13          Q.   How about Jennifer Sparks?
14          A.   No, sir.
15          Q.   Jennifer was an FBI agent.
16          A.   I never talked to -- not one female back in
17   them days.
18          Q.   So on August 8th of 2007, you gave a
19   statement to a detective in Albuquerque by the name
20   of Rich Lewis, right?
21          A.   If I recall, the first statement I gave
22   about anything was to the head of the STG over there
23   in MDC, Matt Candelaria.  He's the first one I talked
24   to.
25          Q.   So tell me about that.  You talked to Matt.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    How did you -- did you know Matt?
 2         A.   Yeah, I went to high school with him.
 3         Q.   Okay.  And he was a captain there at the
 4    time?
 5         A.   Yes, sir.
 6         Q.   Where did you go to high school?
 7         A.   Rio Grande, Rio Grande High School.
 8         Q.   Were you guys in the same grade?
 9         A.   Yes, sir.
10         Q.   So Captain Candelaria doesn't make the
11    rounds and go through BCDC, and into each of the
12    various pods, does he -- or at that time?
13         A.   At that time?  At that time, he always made
14    his rounds.
15         Q.   Okay.  What about -- there was a CO by the
16    name of Ellis.  Do you remember --
17         A.   Yes, sir, Jason Ellis.
18         Q.   -- Jason Ellis?  Did you talk to him about
19    it as well?
20         A.   Yes, sir, he was there.  He was there when
21    I talked with Matt Candelaria.
22         Q.   Okay.
23         A.   He was present.
24         Q.   Did Jason run your pod?
25         A.   As far as I remember, I think so.  I think
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    it was Jason that ran the pod.  And then below him

 2    was Gallardo -- I don't remember Officer Gallardo's

 3    first name.

 4        Q.   And back in that time, the guys would sit

 5    in -- the pod had two doors where you could come in

 6    and out, little sally port doors, and right in the

 7    middle was a big glass control room.  And the COs

 8    would generally sit in there, right?

 9        A.   No.  Over there in Seg 3 at MDC, in Seg

10    4 --

11        Q.   No, we're not at -- oh, we are at MDC.  I'm

12    sorry, you're right, you're right.  Forget that.

13        A.    In Seg 3 and Seg 4, it's just a sliding

14    door that opens, and then another sliding door that

15    let's you in.  And it's one top row, one bottom row.

16    I'd say there is about maybe 20 cells on the bottom

17    and top.  And then there is two top -- bottom and top

18    row that has like six or seven guys in them.

19        Q.   Okay.  I'm sorry, I was thinking about

20    BCDC.  I'm an old guy, you know?

21        A.   No, that's okay.

22        Q.   But anyway, so this conversation in 2007 --

23    BCDC had long since closed -- we're at MDC, and the

24    Seg unit that you were in is as you described it;

25    correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.    Yes, sir.
 2         Q.    So you first talked for CO Ellis and said,
 3    Hey, I want to talk with -- I want -- I have some
 4    information, right?
 5         A.    No, I didn't say that.
 6         Q.    No?
 7         A.    No.
 8         Q.    What did you say?
 9         A.    I told -- I wasn't feeling too good at the
10    time.  I was feeling real sick and everything, and --
11         Q.    How long had you been in the facility?
12         A.    I'd say I'd already been maybe in a couple
13    of months.
14         Q.    You were still feeling sick?  From what?
15         A.    I had a lot of medical conditions with my
16    stomach, you know, and I was vomiting a lot and
17    everything.  And at that time Billy Garcia had
18    already went to Seg 4, and I went to Seg 3.
19         Q.    Why did Billy go to Seg 4?
20         A.    Apparently, they sent me a kite telling me
21    that he had PC'd from Seg 3 to Seg 4.
22         Q.    And who was at Seg 3?
23         A.    I was in --
24         Q.    What SNM members were in Seg 3?  There was
25    Gerald?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Gerald Archuleta.

2      Q.   Freddie Munoz?

3      A.   No.

4      Q.   Freddie wasn't there?

5      A.   No, Freddie Munoz wasn't there.

6           MR. BECK:  Objection, Your Honor.  I don't

7      see the relevance of who was there to when he

8      cooperated and what information he provided.

9           MR. COOPER:  Your Honor, I believe that it

10     helps set the stage.  I'll move on.

11          THE COURT:  Let's take our break.  If

12     you're going to move on, let's take our break.  We'll

13     be in recess for about 15 minutes.

14          (The Court stood in recess.)

15          THE COURT:  All right.  I think we've got

16     an attorney for every defendant.  Look around, make

17     sure.

18          MS. HARBOUR-VALDEZ:  Your Honor, I think

19     Mr. Benjamin is on a conference call with Cari Waters

20     right now.  She just called back, so Mr. Gallegos

21     does not have an attorney.

22          THE COURT:  Okay.  We'll hold just a second

23     then.  I'm sorry, Mr. Gallegos, I looked over there

24     and didn't see that empty chair next to you.  So I

25     apologize.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1              MR. BENJAMIN:  I apologize.
 2              THE COURT:  They told me where you were.
 3    Don't worry about it.  All right.  I think everybody
 4    is back in ready to go.
 5              Mr. Lujan, I'll remind you that you're
 6    still under oath.
 7              Mr. Cooper, if you wish to continue your
 8    direct examination of Mr. Lujan, you may do so at
 9    this time.
10              MR. COOPER:  Thank you, Your Honor.
11              THE COURT:  Mr. Cooper.
12    BY MR. COOPER:
13        Q.   So you gave the recorded statement to Rich
14    Lewis on August 8, 2007, right?
15        A.   I think so.
16        Q.   And that was at district court.  He was
17    there with Troy Davis, the Assistant District
18    Attorney; Gary -- or, no, Jeff?
19        A.   I don't know.
20        Q.   Some investigator?
21        A.   Yes.
22        Q.   You remember that meeting, right?
23        A.   Yes, sir, I remember that.
24        Q.   Okay.  I want to take you back a little
25    ways from that meeting.  And a moment ago you said
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that you had a meeting with Matt Candelaria.  You
 2    talked to him, did an interview with he and -- is it
 3    Jason?
 4         A.   It was Jason Ellis.
 5         Q.   Jason Ellis.  Do you remember the date of
 6    that meeting?
 7         A.   I don't recall the exact date, but I
 8    remember he was the first one, because we were in his
 9    office.  And at that time that's when I was getting
10    real sick, throwing up and everything, vomiting.
11              And if I recall, I had gotten out of the
12    county jail, and I was out for, I think, 17 days, or
13    something like that, and went back.  And when I went
14    back, there was already -- because me and Billy
15    Garcia, we were trying to do a power move against
16    Gerald Archuleta, and whoever was standing with him.
17    And when I came back into the county jail, they put
18    me in Seg 4.  And I guess Billy Garcia was sitting
19    there.  He was doing time in Seg 3 at the time.  And
20    all of a sudden Billy Garcia comes into Seg 4.  But
21    they don't put him on the tiers where they usually
22    put the SNMers, together on the top small tier or
23    bottom tier, they put him on the long tier where they
24    have all the guys that are from different
25    organizations that have PC'd and stuff.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            And about five, 10 minutes after, I get a
 2   kite, which is a letter saying that he PC'd from Seg
 3   3.  And everybody that was with us there at the time,
 4   I told them, "Don't treat him any different or
 5   nothing till we know exactly what's going on," you
 6   know.  And we treated Billy the same till we found
 7   out what was going on and stuff.
 8            But at that time I had already approached
 9   Jason Ellis a few times asking him to move me to Seg
10   3.
11        Q.   Okay.  So you brought up a couple of things
12   that I'd like to ask you about.
13        A.   Okay.
14        Q.   You got a kite saying that he was PC'd --
15        A.   From Seg 3.
16        Q.   -- from Seg 3?
17        A.   Yes.
18        Q.   And you said:  Don't anybody move on --
19   don't treat him any different.  Why do you say that?
20        A.   Because I was Billy Garcia's right-hand
21   man.  That was my -- that was who I stuck with.
22        Q.   Okay.  I'm sorry, I didn't make -- I need
23   to give you a better question.  So is there something
24   about PCing yourself that causes problems for you?
25        A.   If you PC -- that's protective custody --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   that means that you went and you did something, or
2   you didn't want to be around somebody, or you did
3   something wrong.
4          Q.   And so what happens to people who PC?
5          MR. BECK:  Objection, Your Honor.  I think
6   we're getting far afield of when he cooperated and
7   why he cooperated, and what he said.
8          MR. COOPER:  Judge, I'm just following up
9   on what he testified to.
10         THE COURT:  Well, I am having trouble
11  tracking why this is relevant.  But I'm also have
12  having trouble sustaining any objections, because I
13  can't figure out where we're going.  So I'm going to
14  overrule the objection.  But I've got to tell you I'm
15  not tracking what we're doing here.
16         MR. COOPER:  Thank you.
17         Q.   So people get in trouble, and they're in
18  danger if they PC, right?
19         A.   Yes, sir.
20         Q.   So you got sick, you were vomiting, and you
21  had to get out of your cell, and they took you to
22  Matt Candelaria's office?
23         A.   No, I told them -- they came -- they came
24  to my cell, and I told them, "I'm not feeling good,"
25  and everything.  I hadn't made the decision to go

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   against the SNM.  I didn't make that decision at that

2   time.  What happened is I was feeling sick and

3   everything, and I told them that they needed to get

4   me to medical and everything.  And while we were on

5   the way taking me to medical, that's when I told

6   them, you know what, I don't want no more of this,

7   you know, I'm ready to talk and everything, you know?

8        Q.   So you didn't go to medical?

9        A.   Yeah, I went to medical, and then went to

10   Matt Candelaria's office.

11        Q.   And this was sometime after March the 1st,

12   2007?

13        A.   This was way after March 1st.  This was in

14   2007, when all this was going on with me and Billy

15   Garcia.

16        Q.   Okay.  On March the 1st, 2007, you were

17   taken to get -- to give DNA samples for the Animal

18   murder; correct?

19        A.   I think so.  Because I wasn't taken over.

20   They put me in booking, and a detective came in and

21   did that -- did the swab on me.

22        Q.   Was that the same detective that you

23   eventually gave a statement to?

24        A.   I believe so.

25        Q.   On May 4, 2007, Frederico, who participated

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    in the Animal murder with you, he pled guilty to

2    first degree murder, right?

3         A.   Yes, sir.

4         Q.   And at that time there was a death penalty

5    in New Mexico, wasn't there?

6         A.   Yes, sir.

7         Q.   And killing an inmate would subject you to

8    the death penalty?

9         A.   Yes, sir.

10        Q.   So Frederico pled guilty to first degree

11   murder, and he ended up getting a life sentence for

12   that, right?  And that was on May 4th.  You knew that

13   they had already taken DNA from you with regard to

14   the Animal murder; correct?

15        A.   Yes, sir.

16        Q.   And you knew that Freddie Munoz, who had a

17   history of cooperating, was probably talking to them

18   to tell them who else participated; correct?

19        A.   Yes, sir.

20        Q.   And so he pled on May 4th.  And you knew

21   that soon after that, if not before that, he would

22   implicate you and rat you out?

23        A.   Not necessarily.  What was going on at that

24   time is me and Billy Garcia -- Billy Garcia was on

25   the top tier, on that long top tier, and I would



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                    BEAN                                      1-800-669-9492
                    &ASSOCIATES, Inc.              e-mail: info@litsupport.com
                    PROFESSIONAL COURT
                    REPORTING SERVICE

1  still talk to him, like I've always talked to him.
2  And I kept going -- they kept taking me to court, and
3  I kept telling Billy that -- Billy Garcia -- I kept
4  telling him that, you know, that Playboy is probably
5  going to testify against me.  And he kept telling me,
6  "Take it to trial, take it to trial."  So when Billy
7  Garcia was telling me to "Take it to trial," I
8  started getting weary with him, with Billy Garcia,
9  why is he telling me to take it to trial, when he
10  knows the same thing that I know, that Playboy, that
11  Freddie Munoz, is probably going to talk.  But Billy
12  Garcia keeps trying to push me to take it to trial,
13  and I'm thinking:  What's going on here, you know?
14          So I wasn't necessarily sitting there
15  thinking that that's what was going on, that Freddie
16  Munoz was going to testify against me.  I just had
17  that feeling, you know.  That's all it was, was just
18  a feeling.  I didn't know he was going to do it, you
19  know.
20      Q.   Sure.
21      A.   And every time I went to court, they would
22  postpone it, postpone it.  I kept telling Billy
23  Garcia, I kept telling him, Hey, this is what's going
24  on.  And Billy is the one that's telling me, "Take it
25  to trial."

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            And they came and offered me a plea bargain
 2    for 15 years, and I took that plea bargain.
 3        Q.   Let me back up, though.  But before they
 4    offered you that plea bargain, you had already
 5    talked --
 6        A.   Yes, sir.
 7        Q.   -- to Matt Candelaria, right?
 8        A.   Yes, sir.
 9        Q.   So it was after they took your DNA sample,
10    after Freddie pled guilty to first degree murder, you
11    started vomiting, you got sick, you went to medical,
12    came out of medical, said, "I've got to go see my
13    childhood friend, Matt Candelaria; take me to Matt's
14    office," right?
15        A.   It wasn't -- Matt Candelaria wasn't my
16    childhood friend.  We went to high school together.
17        Q.   Okay.  Your high school friend.
18        A.   We didn't hang out together, nothing like
19    that.
20        Q.   But you knew him from high school?
21        A.   Yeah, I knew him.
22        Q.   So a former classmate --
23        A.   Yes, sir.
24        Q.   -- was at the jail.  So you went to talk to
25    Matt Candelaria?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Um-hum.
 2        Q.    And was there -- there is an STG Unit at
 3   MDC; correct?
 4        A.    Yes, sir.
 5        Q.    And was an STG officer present when you
 6   were talking to Matt?
 7        A.    Yes, sir.  Matt Candelaria was the head of
 8   STG at that time.  And Jason Ellis was his second in
 9   command.
10        Q.    So you were talking not to somebody who is
11   a captain that runs the kitchen, or --
12        A.    No, I was talking to the gang unit.
13        Q.    You were talking to the guys, okay.  And
14   when you got there, describe for me Matt's office?
15        A.    Pretty much just a desk, and you know,
16   sometimes you would have canteen sitting there to --
17   because some of us from the SNM, when we'd come over
18   there to that facility, I don't know why they would
19   do it, but sometimes they would give us care
20   packages.  And Billy Garcia can testify to that
21   himself.  He knows, because they done it for him
22   before.
23        Q.    Sure.
24        A.    And they've given us shampoo, or soups, and
25   stuff like that.  So he has things like that in his
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    office, he has different stuff in his office hanging,
 2    you know.
 3         Q.   But there is a desk; he sits behind the
 4    desk.  There is a couple of chairs?
 5         A.   Yes, sir.
 6         Q.   Is there a big conference table?
 7         A.   No, sir.
 8         Q.   So you talked to Matt and Jason.  What did
 9    you tell Matt and Jason?
10         A.   I just -- I told Matt right away, I told
11    him, "You know what, I'm done with this, man.  I'm
12    tired.  I'm ready to just talk, dude.  I'm ready, you
13    know, I'm ready to testify against anybody," you
14    know.  I told him, "I'm tired of this bullshit."
15         Q.   Did you tell him what sort of information
16    that you had?
17         A.   Yeah.
18         Q.   Did he tape record that?
19         A.   No, I don't think he did.
20         Q.   You didn't see a tape recorder on the desk?
21         A.   No, not that I can remember, no.  Not that
22    I can recall.  I didn't see a recorder.
23         Q.   Okay.  And how long did that conversation
24    last?
25         A.   It lasted quite a while.  It lasted quite a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    while.  And they took me back, and they put me in Seg
 2    4.
 3         Q.   Okay.  Before we go back to Seg 4, let's
 4    talk about what it was that you guys talked about
 5    that took quite a while.  So you told him:  I'm tired
 6    (speaks Spanish), I'm done with this.  Let me tell
 7    you, let me -- help me get out of this position,
 8    right?
 9         A.   Yes, sir.
10         Q.   So he was the first one that you said you
11    wanted out?
12         A.   Yes, sir, him and Jason Ellis.
13         Q.   Him and Jason?
14         A.   Jason.
15         Q.   If you took long time, you talked about a
16    lot of things.
17         A.   Yeah.
18         Q.   What was the first thing you talked about?
19    Was it the Animal murder?
20         A.   No, it wasn't even that, that we talked
21    about.  The first thing we talked about was the stuff
22    that was going on with me and Billy and Gerald, and
23    all that power move and all that.  I started talking
24    about that, and giving up about -- talking about that
25    stuff and telling him what was going on there and
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    stuff, and you know.

2         Q.   And that power move had been going on for a

3    long time, que no?

4         A.   Um-hum.

5         Q.   It had been going on since back when you

6    were even at Southern?

7         A.   Yeah, it had been going on for a while.

8         Q.   For -- was it before 2000?

9         A.   Yes.

10        Q.   Billy never liked Gerald, right?

11        A.   No.

12        Q.   No.

13        A.   No.  Him and Julian Romero, Billy and

14   Julian, and you know, they just didn't see eye to

15   eye.  And, you know, there was conflict there always.

16        Q.   Billy and Julian didn't see eye to eye with

17   Gerald?

18        A.   Yeah.

19        Q.   But Billy and Julian did see eye to eye?

20        A.   Billy Garcia and Julian Romero -- Billy

21   Garcia and Julian Romero were real, real good

22   friends.

23        Q.   They were more brothers than you and --

24        A.   Yes, sir.

25        Q.   -- all of the carnals, right?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492
                                                     e-mail: info@litsupport.com



78

```
 1        A.    Yes, sir.
 2        Q.    So Billy and Julian were really tight?
 3        A.    Yes, sir.
 4        Q.    So you're talking to Matt about how tight
 5   Julian and Billy are, how they don't get along with
 6   Gerald.
 7        A.    No.  I didn't tell him anything about
 8   Julian, just about what me and Billy were doing, what
 9   was going on with me and Billy, and the stuff with --
10   I don't know if it was Max or -- Billy Garcia's
11   nephew's name was -- because Billy Garcia's nephew
12   was supposed to go and hit Gerald Archuleta.  And he
13   was following Gerald Archuleta, and they met up over
14   there at that methadone clinic.  And apparently,
15   Billy Garcia's nephew pulled out a gun on Gerald.
16   And Gerald grabbed the gun and shot Billy's nephew,
17   you know, that's what we were talking about.  I was
18   talking about that struggle and all that.
19        Q.    Did Billy's nephew ever tell you about how
20   that happened, about that incident?
21        A.    I already knew.
22        Q.    Did Gerald ever tell you about that
23   incident?
24        A.    No.
25        Q.    You heard it just on the street?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yeah, I already knew what had went down.

 2        Q.    And how did you know what had went down?

 3        A.    Word-of-mouth.

 4        Q.    Word-of-mouth?

 5        A.    Yeah.

 6        Q.    From somebody else?

 7        A.    Yeah.

 8        Q.    So you told Matt and Jason about that sort

 9   of stuff.  What else?

10        A.    I told them about that that happened, and

11   all that.  And then I was telling them about how Styx

12   and Arturo, how they had all put a hit on me because

13   I didn't send Styx money and stuff.  So they wanted

14   to kill me because I didn't send them money, and this

15   and that.  And I told him about all that and

16   everything.  And then I told them about -- let me

17   see, let me make sure -- yeah, that's what we were

18   talking about.  I told them about that hit and

19   everything.

20             And then I told them about the

21   consideration that me and Gerald had through the

22   vents, where we were talking about Popeye.  And I

23   told -- and that's Anthony Apodaca -- and I told them

24   that me and Gerald had -- me and Gerald sat there,

25   and I asked Gerald why he went and did that to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Popeye, why he hit Popeye, ordered the hit on Popeye,
 2   and everything.  And he tried to deny it and this and
 3   that.  And I told him, "Ese, you know what, Gerald,
 4   you already know, ese, if I can get you, I'm going to
 5   get you, you know."
 6            And he told me the same thing, "If I can
 7   get you, I'm going to get you."  Because I was the
 8   only one besides -- because see, the ones that were
 9   with Billy Garcia in the county jail -- see, at that
10   time, all of us -- see, we thought that everybody was
11   with us.
12            MR. BECK:  Objection to the narrative.
13            THE COURT:  All right.  Do a little Q and
14   A.
15            MR. COOPER:  I will, Judge.
16       Q.   So you were in the county jail, and in the
17   pod that you're speaking of, Billy was by himself?
18       A.   No, Billy was already in Seg 4.
19       Q.   Okay.  And who else was in Seg 3?
20       A.   I was there by myself.
21            MR. BECK:  Objection, Your Honor,
22   relevance.
23            THE COURT:  What's the relevance?
24            MR. COOPER:  Your Honor, he was trying to
25   tell his story and I'm allowing him to do so.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Well, why don't you be more in
 2    control.  Why don't you try to get to points that I
 3    need to hear to decide this motion.
 4            MR. COOPER:  Thank you, Judge.
 5       Q.   So at the time -- so what else did you talk
 6    to Matt Candelaria about?
 7       A.   That, and just about a few other things,
 8    you know, just a few things about --
 9       Q.   Give me the first thing you talked to him
10    about, or the next thing talked to him?
11       A.   It was about the power struggle me and
12    Billy were doing, just that kind of stuff and
13    everything.  But I didn't get into any detail about
14    of the SNM or anything of that until me and Troy
15    Davis -- I had that conversation with Troy Davis and
16    everything, with my attorney there.
17       Q.   Okay.  So during this conversation with
18    Matt and Jason, it was mostly about SNM politics?
19       A.   Yeah.
20       Q.   So it wasn't about specific incidents
21    that -- you talked a little bit about what happened
22    with Popeye.  But for the most part, it was other
23    stuff.  You didn't talk about the 2001 murders or the
24    Freddie Sanchez or anything later?
25       A.   No.  If I recall, if I remember, if I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  recall, I brought up about Animal, I brought about

2  that murder with me with me and Playboy.

3      Q.   I would think that you would, because --

4      A.   If I recall, me and him talked about that.

5  You know, I brought that up.

6      Q.   That was on your mind heavy at that time,

7  wasn't it?

8      A.   Oh, yeah, but I had been expecting it.  All

9  that whole -- all the whole time that I wasn't

10  comfortable, the whole nine years that we got away

11  with it, I wasn't comfortable, because I always knew

12  something was going to happen.

13      Q.   Eventually?

14      A.   You know, I always knew.

15      Q.   So you talked a little bit about Animal.

16  Anything else?

17      A.   No, just pretty much all that.

18      Q.   And do you think this conversation lasted

19  two hours?  Three hours?

20      A.   I would say about a good hour and a half.

21      Q.   An hour and a half, okay.

22      A.   A good hour and a half, couple hours.

23      Q.   Have you ever seen a statement that either

24  Matt or Jason prepared concerning what you said?

25      A.   No, sir.  No, sir, but part of my plea

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   bargain at that time -- part of my plea bargain at
 2   that time, when I signed it for the 15 years, part of
 3   the agreement on the plea bargain was for them to
 4   transport me within a couple of days.  And Jason
 5   and -- if I remember, it was Jason and -- no, it
 6   wasn't Jason.  It was Matt Candelaria and the other
 7   Candelaria that was part of the gang unit at that
 8   time, too, because it was a younger Candelaria -- I
 9   don't remember his first name.  He was part of the
10   gang unit.  They're the ones that transported me
11   right away to RDC there in Los Lunas, you know, and
12   they transported me right away.  And that was the
13   last time I seen him, heard of him, anything.
14        Q.   After the plea or after sentencing?
15        A.   After sentencing.
16        Q.   So you met with Candelaria and Jason for
17   about an hour and a half, with Matt Candelaria and
18   Jason, for an hour and a half.  At some point they
19   called Rich Lewis, didn't they?
20        A.   Yeah.
21        Q.   And Rich came and talked to you on July 25.
22   Do you remember that?
23        A.   No, I think -- I think after I talked with
24   Matt and Jason, I think the other -- the conversation
25   I had after that was the one that I had in the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    courtroom, with Troy Prichard and all of us sitting

2    in there.  I think that was the first time that --

3    other than the first conversation with Jason and

4    them.  Because in the other -- when I talked with

5    Troy Prichard, when I talked with him, Jason Ellis

6    and Matt Candelaria were in there also.

7         Q.   So you don't remember having a conversation

8    with Rich Lewis sometime prior to that conversation

9    at district court?

10        A.   No.  All I remember is the detective coming

11   to hit me with the charges of premeditated capital

12   murder on Animal.  And they swabbed me.  And after

13   that, I started going to courts and everything.  And

14   then I went in -- I went in there.  We went into, I

15   think it was Judge Murdock's room, where he has his

16   court and stuff, we went into a room, and we sat at a

17   table, and that's where we --

18        Q.   Big table, like a jury room?

19        A.   Yes, sir.

20        Q.   Okay.  And you know that interview with

21   Rich Lewis was tape-recorded, wasn't it?

22        A.   Yes, sir.

23        Q.   And Rich Lewis was there, Troy Davis was

24   there, his investigator was there, you were there,

25   right?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.
 2        Q.   I don't think that your lawyer was there
 3   that time.  I think he showed up -- and your lawyer
 4   was Troy Prichard?
 5        A.   Yes, sir.
 6        Q.   I think he showed up the middle of the next
 7   day.
 8        A.   Yeah, he showed up -- I think he showed up
 9   right when one was already going.
10        Q.   Almost done?
11        A.   Yeah.
12        Q.   So do you remember very early in the
13   interview on August 8, 2007, where Rich Lewis is
14   introducing everybody that's in the room in that jury
15   room, in Judge Murdock's courtroom, and he says:  The
16   district attorney is right here, his investigator is
17   here, and the police department investigator is here.
18             You said, "Okay."
19             And then he said, "Um, I know last time you
20   talked about federal involvement and going into the
21   witness security program."  Do you remember saying
22   that?
23        A.   Yes, sir.  I -- at the time, I told them
24   that I wanted to go into the witness protection
25   program.  And I wanted to make sure that my
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   girlfriend at the time was going to be safe, and --
 2   because she was pregnant.
 3        Q.   But when I read this, it appears to me that
 4   you had talked to Rich Lewis previously.
 5             MR. COOPER:  Your Honor, may I approach the
 6   witness?
 7             THE COURT:  You may.
 8        Q.   Let me know, Mr. Lujan, when you finish
 9   reading it.  And I really direct your attention to
10   the part that's underlined in yellow.
11        A.   I don't recall this conversation right
12   here.  Because at the time I think -- I think I was
13   pretty, you know, nervous and everything, with what
14   was going on at the time.  But I don't recall this
15   conversation here.  And I've never spoke of -- I
16   don't remember ever speaking of ATF.  Why would I
17   speak of ATF?
18             MR. COOPER:  May I approach, Your Honor?
19             THE COURT:  You may.
20        A.   I don't recall that conversation.
21        Q.   So when it says, "I've already talked to an
22   ATF agent," that's Rich Lewis saying that; he's
23   telling you he talked to an ATF agent; correct?
24        A.   Yes.  And I don't remember that.
25        Q.   Okay.  I guess my point, Mr. Lujan, is that
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                           FAX (505) 843-9492
                                                                                1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                               e-mail: info@litsupport.com

```
 1    it appears to me, when I read this, that Rich Lewis
 2    says, "I know last time you talked about federal
 3    involvement.  You wanted some help.  You wanted to
 4    stay safe and secure.  You wanted to get into the
 5    witness protection program."  And you must have
 6    talked to Rich Lewis about that, because during this
 7    conversation on August 8, he tells you:  "The last
 8    time we talked, Mr. Lujan, about the witness
 9    protection program.  I've already looked into it for
10    you.  In fact, I've talked to an ATF agent."
11           And at the next interview he brings Gary
12    Ainsworth, an FBI agent, to that interview, right?
13           MR. BECK:  Objection, compound, your Honor,
14    I'm not sure which questions he's asking Mr. Lujan.
15           THE COURT:  Well, see what he does with it.
16    Overruled.
17       Q.   He's a smart guy.  He can deal with it.
18       A.    At the time -- see, at the time when all
19    this first started and everything, I have never
20    been -- done anything like this or anything, you
21    know?  And I had never asked for witness protection,
22    nothing like that before, nothing.  And, you know, I
23    was kind of nervous, kind of freaking out, you know.
24    But, you know, that's one thing I always told him is
25    "I want to be protected.  I want to be protected."
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    And that was my main thing.  I didn't ask for

2    anything else.  I asked them to -- for protection.

3         Q.   And let me tell you what I'm asking.  What

4    I'm asking is, if you remember a conversation with

5    Richard Lewis, the APD detective that you talked to

6    for a long time -- two times that were recorded --

7    I'm asking if you remember having a conversation with

8    him prior to the time that you were in the conference

9    room of Judge Murdock's courtroom?

10        A.   No.  I don't remember that conversation.

11        Q.   Okay.  You don't think Rich Lewis ever went

12   out to MDC to talk to you?

13        A.   If you have it there, then he probably did.

14   But I don't remember it.

15        Q.   Okay.  So in this August 8 interview that

16   you gave Rich Lewis --

17        A.   Okay.

18        Q.   -- you think that was the first time you

19   ever spoke with Detective Lewis?

20        A.   I remember -- the only times I remember

21   having any conversations, I remember having that one

22   with Matt Candelaria, and then I remember going to

23   the courtroom and having that one.

24        Q.   Okay.

25        A.   If I remember correctly, I think there was

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
 1   a detective that did come and talk to me prior to me

 2   going to the courtroom, you know.  I think.  I know

 3   it's been a while, but, you know --

 4        Q.   And where did that conversation occur?

 5        A.   I don't know.  I can't tell you because I'm

 6   trying remember it.

 7        Q.   But you think there was a conversation with

 8   the detective?

 9        A.   There was.

10        Q.   Do you think it happened at MDC?

11        A.   No, I didn't have no conversations with

12   nobody at MDC.

13        Q.   So if you had one, it had to have been at

14   APD, or in the courthouse?

15        A.   The only time I ever had a conversation at

16   APD headquarters, or anything like that, was when

17   they did the investigation for Animal.  Other than

18   that, I've never been in the APD building before.

19        Q.   Okay.  So in that August 8 statement you

20   describe what occurred in the Animal murder, and you

21   describe what happened in the 2001 murders, right?

22        A.   Yes, sir.

23        Q.   And you talk about having had conversations

24   with Billy down at Southern before those murders?

25        A.   Yes, sir.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Was anybody else present when you had those

2    conversations?

3    A.   No.  Me and Billy talked about a lot of

4    different stuff when he got there to Southern.

5    Q.   And nobody else was present?

6    A.   Yeah, there was other people present, you

7    know.  But not for the stuff that meant anything, you

8    know, for all the other stuff that we talked about,

9    just -- excuse my language -- bullshit that we talked

10   about, was just, you know, that.  But when it was

11   serious stuff to talk about, it was just me and

12   Billy.

13   Q.   So after the August 8, 2007 interview, you

14   met at the district attorney's office, mid afternoon

15   on September 12, and at that time you were

16   interviewed by Norman Rhoades, New Mexico State

17   Police Officer; Felipe Gonzalez, New Mexico State

18   Police Officer; Detective Rich Lewis; Troy Davis was

19   there; Gary Ainsworth was there; and then,

20   eventually, Troy Prichard shows up.  Do you remember

21   that?

22   A.   Yes, sir.  Yeah, I remember that one.

23   Q.   And that was at the DA's Office?

24   A.   Yes, sir.

25   Q.   And that was recorded?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.

 2        Q.   And that happened on September 12, right?

 3        A.   Yes, sir.

 4        Q.   On September 13 -- well, was the entire

 5   discussion with them tape-recorded, do you know?

 6        A.   As far as I know, as soon as we started

 7   talking, they recorded.  I think there was some times

 8   that they shut it off, but it wasn't while we were

 9   talking.

10        Q.   Did they ever threaten you to tell you that

11   if you didn't do what you needed to do, you'd be

12   facing the death penalty?

13        A.   No, sir.

14        Q.   Or facing a life sentence?

15        A.   No, sir.

16        Q.   So the next day, an information charging

17   you with second degree murder was charged in your

18   case, right?

19        A.   Yes, sir.

20        Q.   And the day after that there was an amended

21   information charging you with first degree murder,

22   right?

23        A.   Yes, sir.

24        Q.   And five days after that you pled guilty to

25   second degree murder with a firearm enhancement, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that subjected you to 16 years -- 15 years?

2         A.   Excuse me, but I don't know what a firearm

3    enhancement -- I never even had one of those charges.

4         Q.   Oh, you're right, it wouldn't have been --

5    I think it was on the document, but it couldn't have

6    been, right?

7         A.   Yeah, because I've never been arrested for

8    a firearm.

9         Q.   Because what you pled to, there wasn't a

10   gun?

11        A.   There wasn't a gun.

12        Q.   Okay.  So you pled to a 15-year exposure?

13        A.   Yes, sir, with -- I pled with a 15-year

14   cap, to get 50/50 good time on it, and to be

15   transported to RDC right away.

16        Q.   Okay.  So for that murder and for your

17   cooperation, you basically got 7 and a half years on

18   that murder?

19        A.   Yes, sir.

20        Q.   So in the September 12, 2007 interview that

21   you did at the DA's Office the day before the

22   information was filed, a few days before you

23   ultimately pled guilty to the offense, you told them,

24   the investigators, that Tafoya and them from STG said

25   that:  They had me and Billy on camera talking to



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    each other, right?
 2         A.   Yes, sir.
 3         Q.   And you say that you didn't talk to them,
 4    and you didn't tell STG --
 5         A.   No, sir.
 6         Q.   -- at Southern, anything about those
 7    murders?
 8         A.   No, sir.
 9         Q.   You eventually -- once you're sentenced on
10    the Animal murder, you go to RDC, which at that time
11    was at Los Lunas?
12         A.   Yes, sir.
13         Q.   And eventually to PNM?
14         A.   Yeah, I go to PNM North.
15         Q.   Go to North.
16              At some point in time, you begin to start
17    talking to the feds, right?
18         A.   Yes, sir.
19         Q.   Tell me the first time that you talked to
20    them.
21         A.   They came -- the first time they came
22    was -- I started getting real, real sick, and got
23    sent out to St. Vincent's and all that stuff, and I
24    was real, real sick with a bowel obstruction and
25    everything.  I broke a TV and cut my legs, and they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   sent me to MHTC, the Mental Health Treatment Center
 2   there in Los Lunas.  And I remember, there is where I
 3   had one of the conversations.  And prior to that, I
 4   had a conversation at PNM, I think one time, if I
 5   recall.  I'm not sure.
 6        Q.   And what year would that have been?
 7        A.   I got to PNM in early 2008, or late 2007.
 8   So it had to have been around 2008.
 9        Q.   And so who did you talk to?
10        A.   I forget his name.
11        Q.   He was an FBI agent?
12        A.   Yeah, he was an FBI agent.
13        Q.   It was before Bryan Acee got into the case?
14        A.   Yeah.  It was way before Bryan got into the
15   case.  But he came and he talked to me, I think once
16   or twice there.  And just the one time -- you know, I
17   never asked him for anything, nothing.  They never
18   promised me anything or nothing.  And I just -- I was
19   doing real bad.  I didn't have nothing.  So I went
20   and I asked them if they could help me out with $500,
21   you know.  And I explained to them why.
22             And that's what I used that money for is, I
23   bought me a TV.  I bought me some clothes that I
24   needed, stuff like that, you know.  And that's the
25   only time I've ever asked anybody for help or
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   anything.  Nobody has ever promised me nothing,

 2   nothing like that.

 3        Q.   So that happened in 2008, that the FBI gave

 4   you $500?

 5        A.   Yes, sir.

 6        Q.   And you bought a TV?

 7        A.   Somewhere around there.  Because prior --

 8   because right after that -- right after that is when

 9   I was at MHTC -- it's kind of fuzzy -- it's a

10   little -- MHTC, the Mental Health Treatment Center in

11   Los Lunas, it's a little fuzzy, because at that time

12   I was real sick.  Not with my mind, but sick from

13   illnesses in my stomach.  I had a minor bowel

14   obstruction at that time.  And I had H. pylori, and I

15   threw a TV at the door and cut my legs, and they sent

16   me over there to St. Vincent's.  And at St.

17   Vincent's, from there, they transported me straight

18   to Mental Health Treatment Center in Los Lunas.  And

19   I wasn't even there, I think 24 hours, and they had

20   to send me back out because St. Vincent's botched the

21   surgery.  And they sent me to UNMH.

22        Q.   Okay.  Let me stop you there for a minute.

23   I appreciate you wanting to give me a lot of

24   information.

25        A.   No, I'm --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  So the agent that went to see you,
 2   the FBI agent, do you remember if it was Lance
 3   Roundy?  Does that name sound familiar?
 4        A.   I think -- you know what, I think that is
 5   who it was.  I think that was his name.
 6        Q.   And you think he gave you $500 and talked
 7   to you?
 8        A.   He didn't give me --
 9        Q.   No, no, he didn't give it like that, but
10   they put it on your books?
11        A.   Like I explained a while ago, I never asked
12   them for nothing.  They never promised me nothing
13   like that.  I was doing real bad and I didn't have
14   nothing.  I said, Well, you know what, I'm going to
15   ask them and see if they'll help me, you know.  And I
16   did.  I asked if they'd help me, you know?
17        Q.   Good.
18             And during the -- from that time until
19   2015, you continued to cooperate to some degree with
20   various agencies; if they ever talked to you about
21   something, you'd talk to them, right?
22        A.   It was always the FBI.
23        Q.   It was always the FBI?
24        A.   The FBI agent, always an FBI agent.
25        Q.   And how often during that period of time
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   would you talk to them?

 2        A.   I talked to -- I talked to an FBI agent, I

 3   think three times.  And then, while I was at MHTC --

 4        Q.   Okay.  Three times before you went to MHTC?

 5        A.   Two or three times before I went to MHTC.

 6   And when I got to MHTC, I wasn't doing too good.  I

 7   was real sick.  I was doing the hepatitis C treatment

 8   and everything.  I told -- I told the head

 9   psychiatrist over there -- now I'm getting stuck -- I

10   told the head psychiatrist there to not let -- I told

11   him, Captain Rodriguez --

12             MR. BECK:  Objection, nonresponsive, Your

13   Honor.

14        Q.   Did you tell them not to give you any more

15   visitors?

16        A.   Yes, sir.  I asked them -- I didn't want to

17   speak to nobody, nobody at all.  And they still came

18   and talked to me.

19             THE COURT:  Did the court reporter hear my

20   ruling?  I said "Overruled."

21        Q.   So how long were you at MHTC?

22        A.   Anywhere between, I'd say six, seven years,

23   six, seven years, somewhere around there.  But they

24   would move me back and forth from MHTC to APA.

25        Q.   What's APA?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.   It's for guys that have anger issues, that

2   can't manage -- that have problems, you know.

3        Q.   And where is that located?

4        A.   Right now, it's at the North facility in

5   PNM.

6        Q.   Okay, at the time --

7        A.   At the time it was at Los Lunas.

8        Q.   It was at Los Lunas?

9        A.   Yes, sir.

10       Q.   So you'd go from one unit at Los Lunas to

11  another?

12       A.   Yes, sir.  The Mental Health Treatment

13  Center is completely separate from APA, you know?

14  The Mental Health Treatment Center is -- it's like a

15  hospital.  You know, it's like a hospital.  But APA

16  is completely different.  It's like a management

17  unit.

18       Q.   Okay.  And that's separate than the RDC

19  units?

20       A.   Yes, sir.

21       Q.   And when you were at APA, did the agents

22  continue to come talk to you?

23       A.   Not while I was in APA.  I never talked to

24  nobody while I was in APA.  They came one time with

25  my attorney, and by then, I had already talked to Dr.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Horowitz.  That's where I got stuck a minute ago.
 2   That was the head psychiatrist at the time, Dr.
 3   Horowitz.  I had asked him, Captain Rodriguez, and
 4   Tim Norman, the unit manager, not to let nobody come
 5   and pull me out or nothing, because I wasn't doing
 6   too good.
 7        Q.   Okay.
 8        A.   At that time, I wasn't doing good at all.
 9   I was real, real sick.
10        Q.   So at some point of time your lawyer
11   brought an FBI agent to talk with you there?
12        A.   Yes, them and the district attorney came
13   and talked to me.  And the district attorney had a
14   laptop computer with him.  And --
15        Q.   Was it the same district attorney who you
16   met in Judge Murdock's jury room?
17        A.   No, sir.
18        Q.   Troy Davis?
19        A.   No, sir.  This was a district attorney out
20   of over here, out of the Dona Ana.
21        Q.   Was it a U.S. Attorney?
22        A.   I believe so.  I'm not sure.  I'm not too
23   sure.
24        Q.   But it was a prosecutor?
25        A.   Yeah, like I said, I was pretty sick at
```



SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

 1    that time, you know.  I was pretty sick.  But I

 2    understood what we were talking about, what was going

 3    on and stuff.

 4         Q.   And what sorts of things did you guys talk

 5    about during that visit?

 6         A.   I gave them a full and complete statement

 7    of everything.

 8         Q.   Of everything?

 9         A.   Of everything from -- when the time I

10    became an SNM member, to --

11         Q.   To the time you're in --

12         A.   -- to the time I walked away.

13         Q.   To include what happened in 2001, to

14    Rolando --

15         A.   Yes, sir.

16         Q.   -- and Pancho?

17         A.   Yes, sir.

18         Q.   Okay.  And during that meeting at MHTC, the

19    attorney, the prosecutor, had a laptop, and was --

20         A.   Yeah.

21         Q.   -- was continually typing away?

22         A.   Yes, sir.

23         Q.   Have you ever seen the statement, if any

24    was generated, from that interview?

25         A.   I've seen, like, two or three different

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



```
 1    statements.  But they're pretty coherent with -- they
 2    follow each other, and they all pretty much say the
 3    same thing.  There is like two or three statements
 4    that I've given.  And each one of those statements
 5    don't falter from the other one, that I'm aware of
 6    anyway.
 7         Q.   So two of the statements would be the
 8    statements that you gave to Rich Lewis, right --
 9         A.   Yes, sir.
10         Q.   -- two of those three.  Have you seen
11    others?
12         A.   No, sir.  Just the ones that -- I think the
13    only thing -- the only statements I've seen and that
14    I'm aware of is the ones from court that I did in the
15    courts with Mr. Davis, with Troy Davis, and then the
16    one at MHTC.  I remember speaking with the FBI
17    agents.  I don't know, I don't remember if there was
18    a recorder, or what, there with us.  And I remember
19    just what me and my attorney have talked about.
20         Q.   Okay.
21         A.   But I remember the statements I've given,
22    and every statement I've given has not faltered from
23    the other, that I'm aware of.
24         Q.   Okay.  I don't remember if I asked you
25    whether at that September 12, 2007 meeting, if Gary
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Ainsworth, the ATF agent, was there?
 2        A.   I don't even know who that was.
 3        Q.   Tall, kind of cowboy-looking guy, wearing
 4   cowboy boots, probably --
 5        A.   I can't recall.
 6        Q.   But there were a lot of people; there was
 7   Rich Lewis, Norman Rhoades --
 8        A.   Yes, a lot of people.
 9        Q.   -- Felipe Gonzalez, Troy Davis?
10        A.   There was a lot of people.  But I can't
11   remember all of their names, you know.
12        Q.   So you got indicted in this case with all
13   these guys and a bunch of others, right?
14        A.   Yes, sir.
15        Q.   And that indictment happened in December of
16   2015; correct?
17        A.   Yes, sir.
18        Q.   In March of that year -- so, like nine
19   months earlier, you told the Government that you
20   didn't want to cooperate anymore, right?
21        A.   No, sir.  I've never -- I've never told
22   them that.  I've never told them that.  My attorney
23   came -- my attorney at the time, he came with a
24   paper, and had me sign it, and he told me that they
25   weren't -- that the feds weren't going to prosecute
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492
                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   me.  I'm three months to the door, I'm three months
 2   to parole, and this comes up.
 3        Q.   What are we talking about?  What month?
 4   When were you three months to the door?
 5        A.   I was going to get out in 2016.  I was
 6   getting ready to get out.  Right before -- three
 7   months after -- February of 2016, I was going to get
 8   out.
 9        Q.   Okay.
10        A.   And this came up, all this came up.
11        Q.   But back in March of 2015, did you have a
12   discussion with agents, and perhaps with Jack
13   Burkhead, the United States Attorney -- Assistant
14   United States Attorney who was investigating this
15   case -- that you didn't want to cooperate anymore?
16        A.   I don't remember ever telling them I didn't
17   want to cooperate.  Because I've always cooperated.
18   I've always -- I've always been the same.  I've never
19   faltered that I know of, you know?
20             But there is times -- you've got to
21   remember that there is times, too, where I've been
22   sick, you know, where I've had illnesses, you know,
23   and been sick and stuff, and you know, maybe
24   something went on at that time that I don't remember.
25   But, from what I can recall, and what I remember and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    everything, I don't remember ever telling anybody

2    that I didn't want to cooperate anymore.

3        Q.   Now, you said you had a letter from the

4    Government telling you that they weren't going to

5    prosecute you anymore.  Tell me about that letter.

6        A.   My attorney at the time -- I forget his

7    name.  Excuse me, what was his name?  The one right

8    before?  I can't remember his name.

9        Q.   The one before Mr. Clark?

10       A.   Yes, sir.

11       Q.   Was he appointed after you got indicted?

12       A.   Yes, sir.

13           MR. BECK:  Objection, Your Honor,

14   relevance.  This seems like a fishing extradition for

15   discovery here.

16           MR. COOPER:  Your Honor, I think it is

17   relevant, in that we're talking about when he was

18   cooperating, when he was not cooperating.  I think

19   that, for our motion to dismiss, we need to show a

20   timeline, basically.  And I think -- I'm asking him

21   about a letter that he says the Government sent him,

22   telling him that they weren't going to -- they

23   weren't going to prosecute.

24           I have another letter --

25       A.   Excuse me --

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Hold on.
 2         A.   -- I don't mean to interrupt --
 3              THE COURT:  Hold on.  Let me rule on the
 4    objection.  Let me let him establish the timeline and
 5    the attorneys involved.  Overruled.
 6         Q.   So can you tell me, was it a lawyer that
 7    was appointed for you after you were indicted?
 8         A.   It was Daniel Tallon.
 9         Q.   Dan Tallon, okay.
10         A.   The attorney that represented me.  And he
11    came -- I'd say like about three months prior to me
12    getting out and everything, he came, like, three
13    months prior to that, and he told me that -- he gave
14    me the letter and everything, and told me, send it
15    and everything, and he told me that they didn't want
16    to prosecute me no more.  And I said, Okay, you know.
17    He said -- but he also said that they can pick it up
18    later on, you know, so I said, Okay.
19         Q.   Had you already been indicted?
20         A.   As far as I know, yes.
21         Q.   Was he representing you to try to negotiate
22    a deal for you before you got indicted?
23         A.   No, sir.  He wasn't doing anything like
24    that, that I know, that I'm aware of.  He was just --
25    he was representing me because they indicted me.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    we're trying to see what was going to go on at the

2    time, you know.  And at the time he, all of a sudden,

3    just out of the blue, came and told me that, and so

4    he gave me, he showed me the paper, and everything

5    and all that.  And that's when he said that they

6    weren't going to prosecute me no more.  And I said,

7    okay.  But then later on that they could, if they

8    wanted to.  So I said, Oh, all right.  You know, with

9    that understanding, I knew that later on that they

10   could come.  But wasn't expecting to get hit on this

11   RICO act stuff, you know?  I wasn't expecting that.

12        Q.   Okay.  On December 3, 2015, were you on the

13   street or were you in custody?

14        A.   I was in custody.  I've been in custody

15   since 2007.  I haven't been on the street since.

16        Q.   But you were three months to the door at

17   that time?

18        A.   Yes, sir.

19        Q.   Did you ever make it to the door?

20        A.   No, sir.

21        Q.   So you never told Jack Burkhead or Lance

22   Roundy that you were not going to cooperate anymore

23   back in March of 2015?

24        A.   Not that I can recall.

25        Q.   Did you have a lawyer back in March of

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                    1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                    e-mail: info@litsupport.com

1    2015?

2         A.   I've already had, I think, three or four

3    lawyers representing me in this case.  And the only

4    ones that have really stuck with it is my attorney

5    representing me now, and then Daniel Tallon; those

6    are the only two that have stuck with me all the way.

7    The other ones are only there for a short, minimal

8    time, and they are gone.

9         Q.   Did Mr. Tallon represent you on some state

10   matters before this?

11        A.   No, sir.  It was just federal stuff.

12        Q.   Okay.

13             MR. COOPER:  May I have a moment, Your

14   Honor?

15             THE COURT:  You may.

16             MR. COOPER:  Your Honor, I will pass the

17   witness.  Thank you.

18             THE COURT:  All right.  Thank you, Mr.

19   Cooper.

20             Any of the other defendants?  Mr. Burke?

21                  CROSS-EXAMINATION

22   BY MR. BURKE:

23        Q.   Mr. Lujan, I need to clarify that last

24   part.  So once you decided to cooperate, you have not

25   varied from that decision?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    No, sir.
 2        Q.    Once you made that decision, that was your
 3   decision; you're going to see it through?
 4        A.    Yes, sir.
 5        Q.    And the way you recall events, you've
 6   always told it exactly the same --
 7        A.    Yes, sir.
 8        Q.    -- each and every time?
 9        A.    Yes, sir.  There might have been something
10   that didn't -- but it was pretty much the same way,
11   the same thing.  You know, I might have said it a
12   different way, but it was the same thing.
13        Q.    Yeah.  And in this -- you've pled guilty in
14   this case then?
15        A.    Yes, sir.
16        Q.    And I didn't understand that part either.
17   Were you promised that you weren't going to be --
18   have you been made any promises about what the
19   sentence will be?
20        A.    No, sir.
21        Q.    So you could be facing a life sentence?
22        A.    Yes, sir.
23        Q.    And then -- and I notice -- and we haven't
24   talked about this, and we won't dwell on it -- but
25   you do have some health problems still?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.    Yes, sir.
 2         Q.    And are you hoping, then, to go to a BOP
 3    facility that has good doctors and such?
 4         A.    Well, I've never been in the feds, so I
 5    really don't know how that works.  So, you know, I
 6    really -- I'm hoping that I get to a medical
 7    facility.  But if I don't, I don't.  You know, I've
 8    been in the State, living with these medical issues
 9    for a long time already, so, you know --
10         Q.    Have there been any discussions about
11    getting to one of the BOP's good hospitals or health
12    care facilities?
13         A.    The only one I've talked to about any of
14    that was my attorney.
15         Q.    Yeah, and I don't want to know about that.
16               So you are going to testify at some point,
17    if you're called as a witness?
18               MR. BECK:  Your Honor, objection to
19    relevance.  This is certainly a fishing extradition.
20               THE COURT:  This seems to me to just be
21    getting into his credibility.  Is his credibility
22    important for this determination?
23               MR. BURKE:  No, not really.  It was my last
24    question.  I'm surprised that this is the line that
25    we're going to draw.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Sustained.
 2            MR. BURKE:  All right.
 3            THE COURT:  All right.  Mr. Solis.
 4                      EXAMINATION
 5   BY MR. SOLIS:
 6       Q.   Good morning, Mr. Lujan.
 7       A.   Good morning.
 8       Q.   I just want to follow up on some of the
 9   responses you gave a little while ago.  My name is
10   Eduardo Solis, Mr. Lujan.
11            So you mentioned you were interviewed by
12   Mr. Candelaria and Jason and Rich Lewis; is that
13   correct?
14       A.   Yes, sir -- no, I was interviewed by Jason
15   Ellis and Matt Candelaria.  And Jason was just
16   standing there.  It was pretty much me talking to
17   Matt Candelaria.
18       Q.   And, I'm sorry, you said Alice --
19       A.   Jason Ellis.
20       Q.   I'm sorry, I couldn't hear you.
21       A.   Jason Ellis.
22       Q.   And this was in 2007?
23       A.   Yes, sir.
24       Q.   And were these interviews with all three --
25   well, let me strike that and ask you:  Did you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  interview with Mr. Candelaria, and then you had a

2  subsequent interview where Jason was present, and

3  then Ellis --

4          A.    When I talked to Matt about it, Jason was

5  present.

6          Q.    Okay.  And you said Mr. Candelaria, in

7  response to the question, you saw him taking notes?

8          A.    Yeah.  He was sitting there, he was taking

9  notes.  I'm not -- I can't remember if he had a

10  recorder.  I don't think there was a recorder.  But I

11  know he was taking notes.  Because that's STG's --

12  that's what they do, they take notes.

13          Q.    Okay.  And you said -- in response to the

14  question, you talked a lot about the politicking of

15  the SNM at that interview.  Do you remember that?

16          A.    Yes, sir.

17          Q.    What did you discuss about the politicking

18  of the SNM?

19          A.    Just about where me and Billy Garcia were

20  doing a power play, and where me and Wild Bill were

21  over there in the county jail, and while we were

22  there --

23          Q.    When you talk about the politicking, Mr.

24  Lujan, did you get into how that was characterized or

25  what exactly was involved in politicking?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492
                                                                                1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.

1      A.   No.   We didn't talk about something like

2   that.   We never got into the characterization of

3   that.   We just pretty much sat there and went with

4   what was going on, you know.

5          And Billy Garcia, he's been up there for a

6   while, and -- you know, so, you know, with me being

7   his right-hand man, and me and him were sitting there

8   and we're going against Gerald Archuleta, and Gerald

9   Archuleta was the one calling all the shots.

10      Q.   Thank you, Mr. Lujan.

11          So those were your words, politicking, the

12   politics of the SNM.   What did you mean by that, if

13   you didn't get into it?

14      A.   The politicking is -- for one, is trying to

15   overplay the other one, you know, like a chess board

16   game.

17      Q.   Like alliances; you form alliance against

18   another --

19      A.   Yeah.

20      Q.   -- and you try to undermine the other

21   person, or the other alliance; is that right?

22          MR. BECK:   Your Honor, objection to

23   relevance.   This is fishing.   If we're talking about

24   what he told them, we've already heard what he told

25   them was politicking.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                            1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1           THE COURT:  Well, I'll let him explore a
 2   little bit.  Overruled.
 3           MR. SOLIS:  Thank you.
 4      Q.   So then, the politicking is what I've
 5   described, it involved that, right?
 6      A.   Yes, sir.
 7      Q.   And you understand what "undermining"
 8   means, right?
 9      A.   Yes, sir.
10      Q.   That could take various forms; is that
11   right?
12      A.   Yes, sir.
13      Q.   You could say things about others; some
14   true, some not true?
15      A.   Yes, sir.
16      Q.   And you were a member of the SNM for a good
17   while?
18      A.   Yes, sir.
19      Q.   And then you had a subsequent interview, I
20   think you said, with Troy -- and I'm not familiar
21   with all the names as of yet -- is "Troy" a first
22   name or a last name?
23      A.   What do you mean?  Troy Prichard?
24      Q.   Okay.  Troy Prichard.  And I suspect --
25      A.   That was my attorney representing me at the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    time.
 2         Q.   And he was present at the interview you
 3    just talked about, with Mr. Candelaria?
 4         A.   Yes, sir, he was present at that one.
 5         Q.   Okay.
 6         A.   That's the one, that's the interview that
 7    we had in Judge Murdock's chambers.
 8         Q.   So in Judge Murdock's chambers is Troy
 9    Davis -- or Troy Prichard, I think you said?
10         A.   Troy Prichard, I think it was.
11         Q.   Who else was present?
12         A.   Troy Davis was the district attorney at the
13    time.
14         Q.   Okay.
15         A.   Or the Assistant District Attorney.  And
16    Matt Candelaria was there; Jason --
17         Q.   Let me interrupt you there.  Matt
18    Candelaria, Troy Davis, and Troy Prichard -- two
19    Troys; is that right?
20         A.   Yes.
21         Q.   This is a subsequent interview from the one
22    we're talking where Matt Candelaria is present
23    initially; is that right?
24         A.   Yes.  I had -- there was two separate where
25    Matt Candelaria was present.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  And did you follow up on the

2   politicking of the SNM when you had that second

3   interview?

4      A.   In my whole statement, pretty much is

5   everything right there, in my whole statement.  In my

6   whole statement -- has been the same thing.  And

7   right there, just in my statement alone, you see

8   where the politicking was.  I mentioned it --

9      Q.   And I'm aware of your statement, but I'm

10   wondering -- I beg your pardon for talking over you.

11         I'm aware of your statement.  But was there

12   anything you talked about that's not in the

13   statement?

14      A.   No.

15      Q.   Okay.

16      A.   No, pretty much, it's been always just what

17   I've talked about in the statement.

18      Q.   Okay.  So at the second interview with

19   Candelaria and Troy Davis and Troy Prichard, was what

20   was discussed there similar to what was discussed at

21   the first interview with Matt Candelaria and Jason?

22      A.   Yes, sir.  Every time I've had an interview

23   or talked to anybody, it's been pretty much the same.

24      Q.   So the same topics?

25      A.   The same topics.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  You've also discussed, you met with
2  Felipe Gonzalez, State Police Officer Felipe
3  Gonzalez.  Do you remember that?
4      A.   No, sir.
5      Q.   Do you remember saying that a little while
6  ago?
7      A.   I don't remember talking with any State
8  Police.
9      Q.   Hold on a second.  Give me a second.
10          MR. SOLIS:  May I have a moment, Your
11  Honor?
12          THE COURT:  You may.
13     Q.   So you've never been asked -- a little
14  while ago you were asked if you met at the DA's
15  Office back, about September 12, where you had a
16  meeting with -- not he by himself, but Felipe
17  Gonzalez was present, State Police Officer?
18     A.   I'm not sure.  I don't know everybody that
19  was there.
20     Q.   Okay.  You mentioned the various facilities
21  you've been housed.  Where were you housed in 2001?
22     A.   2001, I was housed in Southern New Mexico
23  Correctional Facility.
24     Q.   How long were you there?
25     A.   I'd say about a year, year-and-a-half.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Do you remember what pod you were in?

 2        A.    I was in K-1, blue.

 3        Q.    When did your stay there begin?

 4              MR. BECK:   Your Honor, objection; this is

 5   clearly fishing.

 6              THE COURT:   What does this -- how are we

 7   tying this?

 8              MR. SOLIS:   I'm simply following up with

 9   the questions that were asked of him earlier, Your

10   Honor.  That's all.

11              THE COURT:   I'm going to sustain this one.

12   I think this is one of the areas where I began to

13   sustain.

14              MR. SOLIS:   Thank you, Your Honor.  I'll

15   pass the witness.

16              THE COURT:   Thank you, Mr. Solis.

17              Any of the other defendants have

18   cross-examination of Mr. Lujan?

19              MR. BENJAMIN:   No, Your Honor.

20              THE COURT:   All right.

21              Okay, Mr. Beck.  I guess I should say yours

22   is cross-examination.

23                      CROSS-EXAMINATION

24   BY MR. BECK:

25        Q.    Good morning, Mr. Lujan.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Good morning.
 2        Q.    I'm going to start sort of towards the end,
 3   because that's a little bit more fresh in my memory.
 4              I think you said the first time that you
 5   spoke with law enforcement, as far as you remember,
 6   was 2007; is that right?
 7        A.    Yes, sir.
 8        Q.    And that was with -- I think you said --
 9   STG Officers Candelaria and Ellis?
10        A.    Yes, sir.
11        Q.    Then, I think when Mr. Solis was asking you
12   questions, you talked about a subsequent interview
13   with Mr. Davis.  Do you remember that?
14        A.    I'm not sure, but I think I had -- because
15   everything was happening so fast, and I was like
16   getting, like -- I was a little confused at the time,
17   but not too confused where I don't remember the one
18   with Judge Murdock, where I talked in Judge Murdock's
19   office.  But all I remember is, when the detective
20   came and swabbed me, to hit me with first degree
21   premeditated capital murder; and that's where
22   everything started on that, you know.  But I don't
23   remember talking to somebody individually.
24        Q.    I understand.  It sounds to me like, at
25   this time, in 2007, because it was the first time you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  were cooperating or "telling," as you might say, it

2  was a little disorienting to you; fair to say?

3       A.   Yeah, it was something new to me, and I

4  was, like, you know --

5       Q.   And is that because, before 2007, you were

6  a good SNM Gang member?

7       A.   Yeah.

8       Q.   And as a good SNM Gang member -- I think

9  Mr. Cooper started with you here on this -- you don't

10  snitch, right?

11       A.   Yes, sir.

12       Q.   And you said that you were Billy Garcia's

13  right-hand man, right?

14       A.   Yes, sir.

15       Q.   You and Billy Garcia were close?

16       A.   Yes, sir.

17       Q.   You guys were tight?

18       A.   Yes, sir.

19       Q.   Was he your big homie?

20       A.   Yes, sir.

21       Q.   So you just followed him, right, whatever

22  he would say?

23       A.   Well, I would have done anything he asked

24  me to do.

25       Q.   And he trusted you?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    And you trusted him?

3        A.    Yeah.

4        Q.    So, if he told you something, he could be

5   believe it would be in confidence, as far as you

6   know?

7        A.    Yeah.

8        Q.    Is that why you said that if you talked

9   about anything -- I think you said "of substance" --

10   you two did it alone?

11        A.    Yes, sir.

12             MR. COOPER:  Your Honor.  Excuse me, I

13   object to the leading nature of this.  I know that

14   it's cross-examination, but it's really his witness.

15   This is not my witness.

16             THE COURT:  Let's not lead.

17             MR. COOPER:  Thank you.

18        Q.    Is that -- did you talk to Mr. Garcia in

19   your cell about the Garza and Castillo murders?

20        A.    Yes -- me and him, we didn't talk about it

21   until he arrived.  And when he arrived, we talked in

22   my cell.  Everybody approached him, hugging him,

23   telling him "Amor," which means love, and, you know,

24   this and that.

25             And I waited in my cell because I knew he

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    was going to come in and talk to me, you know.  And
 2    when he did, the first thing he told me:  "What the
 3    fuck is going on," excuse my language --
 4        Q.   Sure.
 5        A.   -- you know, and he told me that he had
 6    sent word with Earn Dog for me to take over the
 7    llaves from Lino G.  And, you know --
 8        Q.   Let me ask you one -- is Earn Dog Ernest
 9    Guerrero?
10        A.   Yes, sir.
11        Q.   And Lino G, does he also go by the name
12    Sexy Walker?
13        A.   Yes, sir.
14        Q.   When Lino G was -- I'm guessing, was he in
15    charge of Southern before Billy Garcia came?
16        A.   He was running the line.  And he had
17    already messed up -- him and Butch had already messed
18    up and talked, because Sleepy had already hit some
19    black dude, stuck some black guy, and he did it
20    without letting anybody know, or anything, so -- and
21    that's what Lino -- that's what Lino -- Lino went,
22    and him and Butch went and ratted and gave up to STG
23    that they didn't give him permission to do that, and
24    stuff like that, you know what I mean?  And that's
25    where all that came from, you know.  That's where
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Lino G lost his power, you know.

2        Q.   All right.  Did Billy Garcia expect that

3    you would have been -- before he got down there,

4    after sending word with Earn Dog, did he expect you

5    would have been in charge of Southern at that time?

6        A.   I'm pretty sure he would have.  Because if

7    I would have got the word, I would have let people

8    know, hey, you know.

9        Q.   I think you talked about this was after the

10   time you murdered Animal, right?

11       A.   Yes, sir.

12       Q.   And does a murder give you respect within

13   the SNM?

14       A.   Yes, sir.

15       Q.   At the time of the Castillo and Garza

16   murders, when Billy Garcia told you these things,

17   were you, at that time, a devoted SNM member?

18       A.   Excuse me?

19       Q.   In 2000, when Billy Garcia told you about

20   the Castillo and Garza murders, were you a devoted

21   SNM member at that time?

22       A.   Yes, sir.

23       Q.   And so was he also a devoted SNM member at

24   that time?

25       A.   Yes, sir.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1        Q.    Was he a leader of the SNM at that time?

2        A.    Yes, sir.

3        Q.    And so, given your close relationship with

4   Mr. Garcia, do you have any reason to think that he

5   would lie to you when he was telling you to murder

6   Garza and Castillo?

7        A.    No, sir.

8        Q.    Now, do some SNM members, such as yourself,

9   eventually go ahead and cooperate with law

10  enforcement?

11       A.    There has been some.  You know, there has

12  been some.  And I guess through all this, there has

13  been a lot, you know.

14       Q.    Sure.  And so, when other SNM members tell

15  you about killings they performed for the SNM,

16  assaults they've done for the SNM, in your opinion,

17  is there a possibility that that may lead to

18  incriminate them down the road, if someone cooperates

19  with law enforcement?

20       A.    I don't understand the question there.

21       Q.    Sure.  You said that you know, from your

22  experience, that some SNM members, like yourself,

23  cooperate with law enforcement eventually?

24       A.    Yes.

25       Q.    And you know -- if you know, do you know
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that telling someone else about a murder would tend
 2    to incriminate the person who is telling that?
 3         A.   Yeah.
 4         Q.   And so, knowing what you know, would
 5    someone in the SNM telling you, or someone else about
 6    a murder, possibly incriminate them sometime down the
 7    road?
 8         A.   Yes, sir.
 9         Q.   All right.  I want to go back into the
10    interviews that you had.  I think you said the
11    earliest you started cooperating with any law
12    enforcement was 2007, right?
13         A.   Yes, sir.
14         Q.   Now, it sounds like, from your conversation
15    with Mr. Solis, after you spoke with Mr. Candelaria
16    and Mr. Ellis, it was soon after that that you gave
17    the recorded conversation with Rich Lewis, wasn't it?
18         A.   Yes, sir.
19         Q.   Did you talk to Rich Lewis -- and I've read
20    over that transcript -- was that a long,
21    tape-recorded conversation?
22         A.   It took a long time.  We were in there for
23    quite a while.  And I was nervous the whole time, you
24    know?
25         Q.   Sure.  Did you talk in that interview
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   about -- well, let me ask you this question first --
 2   I think you told Mr. Solis this -- but was
 3   Mr. Candelaria also present for this recorded
 4   interview?
 5         A.   Yes, sir.
 6         Q.   And did you talk in this recorded interview
 7   with Mr. Lewis, Mr. Candelaria there, about
 8   everything that you've talked to Mr. Candelaria and
 9   Mr. Lewis about?
10         A.   Yes, sir.  Everything has always been the
11   same.
12         Q.   At some point in this case, you debriefed
13   with Mr. Clark there and Special Agent Acee and
14   myself in the jail.  Do you remember that?
15         A.   Yes, sir.
16         Q.   At the interview with Mr. Lewis, was there
17   any FBI agent at that interview?
18         A.   If I recall, when we -- the first -- we're
19   talking about the first interview?
20         Q.   Yes, sir.
21         A.   I think there was, you know?  I'm not sure.
22   I think there was.  But the whole time, the whole
23   time I emphasized that I -- about being protected.  I
24   wanted to be protected.  I always talked about that
25   through the whole conversation.  I kept asking them,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   you know?

2        Q.   Sure.

3             So Rich Lewis, was he -- what agency was he

4   with?

5        A.   Excuse me?

6        Q.   Rich Lewis, was he an APD detective, or

7   what was he?

8        A.   I think he was just an APD detective.

9        Q.   Okay.  And I think you said Troy Davis was

10  there.

11       A.   Because I remember Rich -- excuse me, I

12  remember Rich Lewis -- yeah, he was an APD officer.

13  And he said that he knew -- he knew -- he could get

14  me -- he knew people that -- he could help me to get

15  in witness protection and stuff, you know?

16       Q.   Sure.

17            And then Troy Davis, was he with the

18  District Attorney's Office?

19       A.   Yes, sir.

20       Q.   And other than Troy Davis, Rich Lewis, and

21  Mr. Candelaria from STG, was there anyone else there

22  that you remember?

23       A.   Jason Ellis was there.  Because they're the

24  ones that transported me to the hearing.

25       Q.   Is Jason Ellis a corrections officer?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                        1-800-669-9492
                                                         e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1          A.   I don't know if he's still working there.

2     As far as I know, Matt Candelaria retired, as far as

3     I know.

4          Q.   Let me ask you this question:  At that

5     time --

6          A.   At that time, yes.

7          Q.   -- he was a corrections officer?

8          A.   Yes, sir.

9          Q.   So other than Rich Lewis, Troy Davis, Matt

10    Candelaria, Jason Ellis, was there anyone else there?

11         A.   I think -- I think, if my memory is

12    right -- I think Gallardo was there, too.  He was one

13    of the STG officers there, too.

14         Q.   Oaky.  And as an STG officer, he's not an

15    FBI agent, right?

16         A.   No.

17         Q.   So going through those folks who were there

18    on August 8, 2007, does that refresh your memory as

19    to whether there was an FBI agent there?

20         A.   No, it doesn't.  It doesn't.

21         Q.   So is it fair to say you don't remember an

22    FBI agent being there?

23         A.   I don't think there was one there.

24         Q.   Okay.  And then, after that, you had an

25    interview on November 12 of 2007; correct?  I think
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    you went over this with Mr. Cooper earlier, and with

 2    Mr. Solis.  Do you remember that?  I think that's the

 3    one you were talking about where Mr. Prichard was

 4    there?

 5         A.   Yeah.  He was -- he even showed up a little

 6    late, I think.

 7         Q.   Right.  And this was the one, I think, Mr.

 8    Cooper was asking you about, that there was an ATF

 9    person there?  Do you remember Mr. Cooper asking you

10    about that?

11         A.   Yeah.  And as far as I can recall and

12    remember, I don't remember any ATF officer.

13         Q.   Okay.  If you looked at -- you know that

14    that conversation was recorded, right?

15         A.   Um-hum.

16         Q.   You know that there is a transcript that

17    came out of that?

18         A.   No.  I don't think I've ever seen it.

19         Q.   Okay, sure.  Would it refresh -- but you do

20    remember an interview with Mr. Lewis, Rich Lewis, on

21    September 12, 2007, right?

22         A.   Yeah, I remember that.

23         Q.   And would it refresh your memory as to who

24    else was there, if I provided you the transcript of

25    that recorded conversation?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   If I read the whole thing probably a couple
 2   of times, I would probably start thinking, you know.
 3   My memory is good.  But I have to sit there and, you
 4   know, think about it for, you know, and then I'll --
 5   you know, it will click in.
 6        Q.   Let me ask you this question:  When you had
 7   these interviews, would they oftentimes, when they
 8   started the interview, would they record the
 9   conversation?
10        A.   Yeah.  Most -- the majority of the time
11   that's what they would do, is they would tell me that
12   they were going to record this; if I had any problem
13   with it, and I told them "No."
14        Q.   Sure.  And when they recorded the
15   conversation, would they introduce themselves to you
16   as to who was in the room so that would be reflected
17   on the recording?
18        A.   Yeah, they would.  And a lot of times I
19   wasn't -- I was so nervous that I wasn't really
20   paying attention to a lot of who was introducing
21   themselves.  You know, I was just concentrating on
22   the one that was with the recorder and asking the
23   questions.
24        Q.   Sure.  And so that's what I'm saying:  You
25   weren't concentrating on it then, but now, if you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    looked at who was there in the transcript, that would
 2    probably help refresh your memory?
 3         A.   Yeah, it might jog my memory a little bit.
 4              MR. BECK:  May I approach, Your Honor?
 5              THE COURT:  You may.
 6         Q.   Just read over that first page, and I'll
 7    ask you some questions.
 8         A.   Okay.
 9         Q.   And Mr. Lujan, just let me know when your
10    memory is refreshed.  I think if you've read the
11    first page, that's --
12         A.   Yeah, I read it.  I can't recall an ATF
13    officer.
14         Q.   Sure.
15         A.   I can't recall.  I don't remember that at
16    all.
17         Q.   And just to make sure.  Hold on a second.
18    I'll come back to that in a moment.
19              When you read over this, there was -- at
20    least present, according to this, was Norman Rhoades,
21    who was an investigator with the New Mexico State
22    Police; is that right?
23         A.   See, I think he's the one that had the
24    recorder.  I think he's the one that had the
25    recorder.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Okay.  And then there was Detective Rich

2   Lewis from APD, right?

3        A.   Um-hum.

4        Q.   Troy Davis from the District Attorney's

5   Office; is that right?

6        A.   Um-hum.

7        Q.   And then it says here, "Gary Ainsworth out

8   of ATF"; is that right?

9        A.   Um-hum.

10        Q.   And then it also says that also in the room

11   was Agent Felipe Gonzalez from the State police,

12   right?

13        A.   Yes.

14        Q.   And it didn't say -- there wasn't anyone

15   there from FBI, right?

16        A.   No, sir.

17        Q.   And there wasn't an Assistant U.S. Attorney

18   there, right?

19        A.   No, sir.

20        Q.   I think you said you met with -- the first

21   time you met with the FBI was sometime around 2008?

22        A.   Yes, sir.

23        Q.   Is that fair to say?  And I think you

24   marked that in time by sort of where you were housed,

25   or where you were being transported at that time?

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                         1-800-669-9492
                                             e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.    Yes, sir.

2        Q.    And is that a way that you used to kind of

3   help you kind of think about dates?

4        A.    Yes, sir.  I remember the times when I got

5   sick and stuff, and that helps me remember pretty

6   much close to what dates, what was going on at that

7   time.

8        Q.    And I think you said it could have been

9   2008.  Could it have been January 23rd of 2009?

10        A.    If I remember -- if I remember correctly --

11   because I was already at MHTC in 2009 -- and I

12   remember -- I got to remember the attorney that was

13   representing me at that time.  I think it was Jason

14   Bowles that was representing me at that time.  Him

15   and the district attorney from over here, from Dona

16   Ana County, and there was somebody else there I can't

17   remember.  And I think a couple of the STG officers

18   from Los Lunas.  And that was one of the times I

19   remember.  That's the time when I told -- when I had

20   asked Dr. Horowitz not to allow nobody to pull me

21   out, because I wasn't feeling good and stuff.

22        Q.    So I guess my question to you -- you

23   remember talking to -- you remember talking to an FBI

24   agent at this time; is that right?

25        A.    Yes, sir.  Excuse me, that's exactly who

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                      1-800-669-9492
PROFESSIONAL COURT                                      e-mail: info@litsupport.com
REPORTING SERVICE


BEAN & ASSOCIATES, Inc.

1    was in there, was an FBI agent.

2         Q.   Okay.  Do you remember if Richard Lewis,

3    the APD detective, was also present?

4         A.   I think there was only Mr. Bowles, the

5    district attorney; I think it was the FBI agent --

6    I'm not sure if there was somebody else there.  But I

7    know that the STG -- a couple of the STG officers

8    were in there.

9         Q.   Okay.  Oh, this might have been sometime

10   around this -- okay, now, I'm looking -- does

11   September 17 of 2008, does that sound better than

12   January of 2009?

13        A.   I remember an FBI agent coming and talking

14   to me at PNM North.  And he came one time and talked

15   to me and everything, and we talked, and this and

16   that, and talked a little bit about stuff that was

17   going on, you know.

18        Q.   Yeah.  Was that the time that you asked to

19   be paid $500?

20        A.   I believe it was the second time he came to

21   see me.

22        Q.   Okay.

23        A.   I believe it was the second time he came to

24   see me.  But it was the same -- same FBI agent that

25   came to see me.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And you said -- were you paid the $500 for
 2   talking that time?
 3        A.   Yes, sir.  They put it on my account there
 4   at PNM.
 5        Q.   And do you know that you have to be
 6   actually opened as an FBI informant to be paid by the
 7   FBI for those services?
 8             MR. COOPER:  Objection.  Lack of personal
 9   knowledge.
10             THE COURT:  If he knows.  You might
11   establish some foundation how he knows that.  But if
12   he knows, I'll allow the testimony.
13             MR. BECK:  I think that's what I was doing.
14   I think his answer was yes.
15        Q.   Do you know that to be paid by the FBI, you
16   have to be opened as --
17        A.   I didn't know at the time.
18        Q.   Do you know that now?
19        A.   Yeah, I know that now.
20             THE COURT:  Well, and still establish how
21   he knows it.
22             MR. BECK:  I am.  Sorry, Your Honor, I
23   didn't mean --
24             THE COURT:  Let's do that first before we
25   get his testimony.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   And how do you know now that you have to be

2     opened as an FBI informant to be paid by the FBI?

3          MR. COOPER:  Objection, hearsay.

4          THE COURT:  Well, it may be.  But this is

5     partly, I guess, a 104 hearing, to some degree, so

6     I'll allow it.

7     A.   Would you repeat the question, please?

8     Q.   Sure.  How do you know now that you have to

9     be opened as an informant -- well, let me go with

10    this question first:  Have you personally signed

11    receipts when you've been paid by the FBI?

12    A.   Yes, sir.

13    Q.   And does that indicate to you that you have

14    to be officially opened as an informant --

15    A.   Yes, sir.

16    Q.   -- to be paid by the FBI?

17    A.   I never knew nothing about any of that,

18    never.

19    Q.   And have you also been -- how else do you

20    know now that you have to opened as an FBI --

21    A.   Word-of-mouth.  People have told me.  You

22    know, some people have told me.

23    Q.   Were you first opened as an FBI source on

24    February 4 of 2009, by Special Agent Sonya Chavez?

25    A.   I never knew if he had did anything, or

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1    what.  But all I did was ask them for the money, and
 2    they gave me that 500.  I never asked them for
 3    another penny.  I never asked for anything ever
 4    again.
 5        Q.   And was that around the beginning of 2009
 6    or end of 2008?
 7        A.   Right.
 8        Q.   Were you closed as an FBI informant on
 9    March 2 of 2011?
10        A.   Yes, sir.  That's when I believe that
11    Daniel Tallon came with that paper and told me that
12    they weren't going to prosecute me and stuff.
13        Q.   Were you reopened on September 2 of 2011,
14    by Special Agent Lance Roundy?
15        A.   I think so.  Yeah, I think so.
16        Q.   And then, were you closed as a Special
17    Agent -- or, excuse me, as a government informant --
18    by Lance Roundy on September 12th of 2012?
19        A.   I'm not sure.  I'm not sure, because I
20    don't know how any of that worked.  I never worked
21    with the feds.  I never been in the feds, nothing.
22    So I didn't know how any of that stuff was, you know.
23    All I know is that they would come and talk to me,
24    and this and that.
25             And that's the only time I ever asked for
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    money.  And I never asked -- I never sat there and
 2    asked a bunch of questions or nothing -- what goes on
 3    with the feds or anything like that, or anything like
 4    that, you know.
 5         Q.   And for this case, were you opened as an
 6    informant by Special Agent Nancy Stemo on January 5th
 7    of 2017, of last year?
 8         A.   I believe so.
 9         Q.   So I think you talked about the one meeting
10    in 2008, that we just talked about.  You also said
11    that you remember meeting with the FBI, with your
12    attorney, Jason Bowles.  Do you remember that?
13         A.   Yes, sir.
14         Q.   Was that February 27 of 2014?
15         A.   Yes, sir, I believe so.
16         Q.   And also present -- was Assistant United
17    States Attorney Jack Burkhead present at that
18    meeting?
19         A.   Yes, sir.
20         Q.   Mr. Lujan, have you ever testified in front
21    of a federal grand jury?
22         A.   No, sir.
23              MR. BECK:  May I have a moment, Your Honor?
24              THE COURT:  You may.
25              MR. BECK:  Nothing further, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Thank you.

 2              THE COURT:  Thank you, Mr. Beck.

 3              Mr. Cooper.  Do you want to take the lead

 4    on redirect?

 5              MR. COOPER:  I would, Your Honor.  Thank

 6    you.

 7              THE COURT:  Mr. Cooper.

 8                    REDIRECT EXAMINATION

 9    BY MR. COOPER:

10        Q.   After Billy came down to Southern and he

11    spoke with you -- or at that time, you and he were

12    pretty tight, weren't you?

13        A.   Yes, sir.

14        Q.   Mr. Beck asked you a series of questions

15    about how you and he were best friends, and you were

16    tight and that sort of stuff, right?

17        A.   Yes, sir.

18        Q.   And you would do anything for Billy at that

19    time; correct?

20        A.   Anything he would ask me, I would have

21    done.

22        Q.   And he expected you to keep a confidence,

23    and you would keep those confidences, right?

24        A.   Yes, sir.

25        Q.   And things between you and him were between
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    you and him, and it wasn't for anybody else?
 2         A.   Yes, sir.
 3         Q.   You wouldn't tell anybody anything that
 4    Billy told you?
 5         A.   No.
 6         Q.   And you said all of the interviews that
 7    you've done have been recorded; correct?
 8         A.   Yes, sir.
 9         Q.   Did the FBI record your interviews?
10         A.   Yes, sir.  As far as I know, the FBI --
11    there was some, I think, State Police.  And I had
12    quite a few interviews where they've recorded me and
13    everything.  So I mean, I can't sit there and tell
14    you exactly, oh, this guy's an FBI agent; oh, this
15    guy is APD; or this guy is a state police officer.  I
16    couldn't tell you that, you know.  I can only sit
17    there and tell you that they introduced -- and that's
18    what I -- you know, I thought that they were -- I
19    know the ones that went to PNM and talked to me were
20    FBI agents.
21         Q.   And did they have tape recorders, and did
22    they tape record those interviews with you?
23         A.   I think the first -- I think the first one
24    they did, if I'm correct.
25         Q.   And who was that that went the first time?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   I can't recall his name.  I can't recall
2   his name.  And then I remember one time there was a
3   female and a male that came to see me.
4        Q.   Did they tape record your interview?
5        A.   If I'm -- if I remember correctly, they
6   did.
7        Q.   Okay.
8             MR. COOPER:  May I have one moment?
9             THE COURT:  You may.
10            MR. COOPER:  Your Honor, I would like to
11   mark --
12            MR. BECK:  You know what, I think it would
13   be R.  He's got A through Q.
14            MR. COOPER:  Your Honor, may I approach the
15   witness?
16            THE COURT:  You may.
17   BY MR. COOPER:
18        Q.   Mr. Lujan, I'm handing you a document
19   that's marked Defendant's Exhibit S for
20   identification purposes.
21            MR. COOPER:  Your Honor, we have previously
22   marked a number of other Exhibits A through R.  So
23   this is S.
24            THE COURT:  And when did we do this?  When
25   did we do A through Q?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          MR. COOPER:  Well, we've already premarked
 2    exhibits.
 3          THE COURT:  Okay.  All right.
 4          MR. COOPER:  So this is S.
 5          THE COURT:  All right.  Okay.
 6     Q.   Mr. Lujan, take a look at that first page
 7    just for a minute.  It's a document that I have
 8    previously shown you, and the document that Mr. Beck
 9    had shown you a moment ago.  Do you recognize that
10    document?
11     A.   I don't think I've ever seen this document
12    before.
13     Q.   You have not seen the document --
14     A.   No, sir.
15     Q.   -- but does that document appear to be a
16    transcript of the interview that occurred in
17    September of 2007?
18          MR. BECK:  Just so we're clear, Your Honor,
19    the United States doesn't object to its admission.
20          THE COURT:  Do you want to move its
21    admission?
22          MR. COOPER:  Your Honor, I'd move its
23    admission.
24          THE COURT:  Any objection from any other
25    defendants?  If not, then Defendant's Exhibit S will
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   be admitted into evidence.

 2          MR. COOPER:  Thank you, Your Honor.  May I

 3   approach?

 4          THE COURT:  Yes, you may.

 5      A.   I remember all this stuff, but I don't

 6   remember the ATF officer.

 7      Q.   Okay.

 8      A.   That's it.

 9          MR. COOPER:  Thank you, Mr. Lujan.

10          Your Honor, one final matter.  I was

11   wondering if the Government would stipulate to the

12   fact that they have not disclosed to us any discovery

13   with regard to the interview that he had with Matt

14   Candelaria and Jason Ellis prior to the August 8

15   interview that he had with Rich Lewis?

16          MR. BECK:  That, I don't know.  I mean, I

17   don't have any reason to disagree with that based on

18   what I'm hearing today.  That doesn't sound familiar

19   to me.  So I can -- I'll stipulate to that.  If

20   something changes, I'll let the Court know.

21          THE COURT:  Does that work for you, Mr.

22   Cooper?

23          MR. COOPER:  That works for me, Judge.

24   Thank you very much.  And I don't have anything else,

25   Your Honor.  Thank you very much.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1           THE COURT:  I think Mr. Solis is going to
2    have some, Mr. Burke is going to have some.  Let's
3    take our lunch break at this time, and let's pick up
4    Mr. Lujan's redirect after lunch.
5           All right.  We'll be in recess for about an
6    hour.
7           (The lunch recess was held.)
8           THE COURT:  Let's go on the record.  I
9    think we've got all the defendants and all the
10   attorneys.
11          All right.  I think we were going to have
12   some cross-examination.  Is Mr. Solis back?  There he
13   is.  We need to get the witness back.
14          MR. BECK:  Your Honor, we might make some
15   use of this time when we have a little downtime here.
16          Mr. Cooper just moved into evidence Exhibit
17   S, which was the transcript of the September 2007
18   interview of Leonard Lujan.  I was going to move in
19   the August 8 interview of Leonard Lujan, which took
20   place just before that.  Primarily, the reason I
21   would move these into evidence is actually more for
22   the Document 1307 and our motion in limine, 1912,
23   statements motions.  And so I was wondering, I guess,
24   whether the Court would like me to just attach them
25   here and then cross-reference them, or if we should
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    do that at a different time, when we're talking
 2    about --
 3              THE COURT:  If they're not relevant to the
 4    motions we're arguing now, I'd prefer not to have
 5    them in here.
 6              MR. BECK:  That's all I was asking.
 7              THE COURT:  All right.
 8              MR. CASTLE:  Mr. Lujan's lawyer is not here
 9    yet, but if you want to take up some time, we have
10    some business to conduct.  We don't need to excuse
11    Mr. Lujan for it.
12              MR. BECK:  Oh, there he is.
13              MR. CASTLE:  Oh, he's here.
14              THE COURT:  All right.  Mr. Lujan, I'll
15    remind you that you're still under oath.
16              THE WITNESS:  Yes, sir.
17              THE COURT:  Mr. Solis, if you wish to
18    conduct redirect of Mr. Lujan, you may do so at this
19    time.
20              MR. SOLIS:  I do, Your Honor.  Thank you.
21                    REDIRECT EXAMINATION
22    BY MR. SOLIS:
23         Q.   Mr. Lujan, did you get something to eat?
24         A.   Oh, yes, sir.
25         Q.   Belly full of food now, right?  Feeling
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    pretty good?
 2         A.   I'm okay.
 3         Q.   Okay.  The questions I'll ask you are just
 4    to follow up on what Mr. Cooper asked you earlier,
 5    and I followed up a little bit on.  And then Mr. Beck
 6    asked you some questions, and I'm going to follow up
 7    a little bit on those, okay?  Do you follow me?
 8         A.   Yes.
 9         Q.   So remember we talked about, in follow-up
10    to Mr. Cooper's questions, about you talking about
11    the politicking and the politics of the SNM?  Do you
12    remember that?
13         A.   Yes, sir.
14         Q.   And I followed up with you, and I asked
15    you:  Do you remember -- or is it a fact that the
16    politicking involves trying to undermine other people
17    within the SNM?  Do you remember that?
18         A.   Yes, sir.
19         Q.   And then you also said and agreed with me
20    that that involves making alliances and that kind of
21    thing?  Do you remember that?
22         A.   Yes, sir.
23         Q.   And then you said the politicking also
24    involves other sorts of activities.  And the question
25    I have for you is, does that involve talking about
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   others or things of that sort?
 2        A.   Yes, sir.
 3        Q.   Does that involve talking about things that
 4   are true or not true or exaggerating or just making
 5   up stuff sometimes?
 6        A.   Yes, sir.
 7        Q.   Okay.  Now, Mr. Beck asked you about, or
 8   explored with you questions about status within the
 9   SNM.  Do you remember that?
10        A.   Yes, sir.
11        Q.   And he asked you also about murder and how
12   one can achieve status committing murder; is that
13   right?
14        A.   Yes, sir.
15        Q.   And is it true that within the SNM there is
16   a lot of what I call jockeying for position, or
17   trying to appear at a higher tier, higher level, than
18   your other associate or other prospect for an SNM?
19   Is that also true?
20        A.   Yes, sir.
21        Q.   And that involves probably exaggerating
22   what your role is sometimes; isn't that right?
23        A.   No, not really.
24        Q.   No?  So that's not part of the politicking
25   that you were talking about a little while ago?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, just -- no, when you commit murder
 2   within the SNM, you move up in rank.
 3        Q.   Right.  And status is important, right?
 4        A.   You get more respect like that.
 5        Q.   And that's because status is important?
 6        A.   Yes, sir.
 7        Q.   And status is something everyone strives to
 8   achieve, right?
 9        A.   Yes, sir.
10        Q.   And but isn't it also true that within the
11   SNM, there is some politicking that involves people
12   taking credit for stuff they didn't do, and that's
13   not agreeable?
14        A.   Sometimes people take credit for something
15   they didn't do.
16        Q.   People don't like that, right?
17        A.   Right.
18        Q.   That would include stuff like armed robbery
19   or assault, or any number of things; isn't that true?
20        A.   Yes, sir.
21             MR. SOLIS:  All right.  Thank you.  Pass
22   the witness.
23             THE COURT:  Thank you, Mr. Solis.
24             Mr. Burke, I think you were going to --
25             MR. BURKE:  No, Your Honor, I have no
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    further questions.
 2              THE COURT:  Anybody else?  All right, Mr.
 3    Lujan, you may step down.  Is there any reason that
 4    Mr. Lujan cannot be excused from the proceedings?
 5    Mr. Cooper, can he be excused?
 6              MR. COOPER:  Your Honor, he may be excused.
 7              THE COURT:  All right.  Is everybody with
 8    the defendants comfortable with that?
 9              Mr. Beck?
10              MR. BECK:  He may.
11              THE COURT:  All right.  So you are excused
12    from the proceedings.  Thank you for your testimony.
13              THE WITNESS:  Thank you.
14              THE COURT:  All right.  Mr. Cooper, did you
15    have further witnesses or evidence you wanted to
16    present?
17              MR. COOPER:  Yes, Your Honor.  We are going
18    to call Ben Clark.  And he's downstairs, and his
19    lawyer is on his way.
20              THE COURT:  All right.  And who is his
21    lawyer?
22              MR. COOPER:  Mr. Hosford.
23              MR. BECK:  If his lawyers is on his way, I
24    think we should move to Trent Pedersen.  He is ready
25    to testify and willing.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              I guess we should ask how quick Mr. Clark
 2    will be here, because I know Mr. Pedersen needs to
 3    leave before the end of the day.
 4              MS. HARBOUR-VALDEZ:  I don't know how
 5    quickly the marshals can get Mr. Clark up here.  But
 6    Mr. Hosford just texted me:  "I'm coming in."
 7              THE COURT:  Coming into the building?
 8              MS. HARBOUR-VALDEZ:  I don't know what that
 9    means.  I didn't ask him that.
10              THE COURT:  Why don't you ask if he's
11    coming in the building.
12              MR. CASTLE:  Your Honor, in the meantime,
13    we have some exhibits that are going to be entered by
14    stipulation.
15              THE COURT:  Okay.  Go ahead.
16              MR. CASTLE:  There are Exhibits A through
17    R -- and I could describe them for the Court.  These
18    are all pages that are from discovery, and at least
19    the content of them are discussed in our motion to
20    dismiss so this is relevant to the motion to dismiss.
21              The first document is Exhibit A, which is a
22    report authored by Special Agent Trent Pedersen.
23              Exhibit B is a report authored by Special
24    Agent Andrew Armijo of the FBI.
25              Exhibit C is a transcription of an
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                    1-800-669-9492
                                                        e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    interview conducted by Special Agent Trent Pedersen.

 2    All three of these documents are from 2001.

 3              Exhibit D is an email between Steven

 4    Libicer from New Mexico State Police, and Norman

 5    Rhoades and Felipe Gonzalez, dated April 20, 2003,

 6    and which copies Albert Venegas of the Joint Task

 7    Force.

 8              Exhibit E is a report authored by STG

 9    Officer Cheryl Lackey.

10              Exhibit F is a report dated -- well, on or

11    about March 26, 2001, by a Robert Duncan.

12              Exhibit G is a report, an FBI 302 dated

13    April 4, 2001, from Task Force Officer Edgar Rosa.

14              Exhibit H is an April 2, 2001 report from

15    STG Coordinator Jim Moore to Warden Lawrence Tafoya.

16              Exhibit I is an April 12, 2001 report

17    concerning the death of inmate Rolando Garza from

18    Lawrence Tafoya.

19              Exhibit J is a June 4, 2004 report from

20    STIU Coordinator Dwayne Santistevan to Lawrence

21    Jaramillo.

22              Exhibit K is a June 16, 2004 report from

23    STIU Coordinator Tammy Archuleta to STIU

24    Administrator Lawrence Jaramillo.

25              Exhibit L is March 7, 2001 report from a

SANTA FE OFFICE                                      MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Lieutenant Juan Barela to Lawrence Tafoya.

2              Exhibit M is a report -- it's dated March

3    25, 2001, but I believe from the contents of it, it's

4    probably an inaccurate date.  So the best way to say

5    it is on or after March 25, 2001 --

6              THE COURT:  Go ahead and bring him in.  Is

7    he there?  Go ahead and bring him in.  He's not

8    there?

9              Go ahead.

10             MR. CASTLE:  -- from Norman Rhoades.

11             Exhibit N is an FBI 302 dated April 10,

12   2001, and the author is Task Force Officer Edgar

13   Rosa.

14             Exhibit O is a report -- actually, I'm

15   going to pass on Exhibit O for just a moment.

16             Exhibit P is a report dated September 23,

17   2013, and it is a report authored by Lance Roundy.

18             Exhibit Q is an FBI 302 dated September 15,

19   2008, and that is authored by Sonya Chavez.

20             Exhibit R is a 302 dated April 8, 2015.

21   It's a 302 and a letter dated March 26, 2015.  It's a

22   combined exhibit.  The 302 is authored by Lance

23   Roundy.  And the letter that's attached is addressed

24   to Lance Roundy from United States Attorney Damon P.

25   Martinez.  And that letter is dated March 26, 2015.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Exhibit T is a stipulation that has been
 2    reached between the parties concerning what the
 3    testimony would be for Assistant United States
 4    Attorney James Braun.
 5              And I'll explain what the meaning of these
 6    are in my argument to the Court, so -- but these are
 7    exhibits that have been admitted by agreement.
 8              Your Honor, I don't know if it helps, we
 9    have an index of the exhibits I could provide to the
10    Court.  It's been provided to counsel.  I don't
11    believe any counsel has an objection to the exhibits,
12    including the Government.
13              THE COURT:  All right.  But you pulled O
14    out of there?
15              MR. CASTLE:  Yes.  I can admit O, but it
16    really is an exhibit that actually doesn't deal with
17    the motion to dismiss.  So I thought that it might be
18    better to be offered when it's relevant.
19              THE COURT:  All right.  Any objection from
20    any of the other defendants?
21              How about you, Mr. Beck?
22              MR. BECK:  No objection, Your Honor.
23              THE COURT:  All right.  So Defendants'
24    Exhibits A through R, minus O, otherwise inclusive,
25    are admitted into evidence.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Are you Mr. Hosford?

2          MR. HOSFORD:  Yes, sir.

3          THE COURT:  Mr. Hosford, if you want to

4    come up and make yourself comfortable over here,

5    you're welcome to do so.

6          MR. HOSFORD:  Thank you, Your Honor.

7          THE COURT:  Mr. Clark --

8          MR. BECK:  Your Honor, again I'd ask for

9    what Mr. Clark's testimony is relevant to and a

10   proffer of why it's relevant to whatever it's

11   relevant to.

12         THE COURT:  All right.  Mr. Cooper?

13         MR. COOPER:  Thank you, Judge.

14         Judge, this is relevant to motion 1909.

15   That's Defendant Billy Garcia's targeted response to

16   the United States' notice for proposed James

17   statement.  Mr. Clark gave a statement concerning the

18   2001 murders.  It's, for my part, a fairly

19   discrete -- one set of statements involving three

20   individuals that he said may have done something with

21   regard to the 2001 murders.  And this is -- my

22   examination is to find out whether or not there was

23   anything that was said with regard to Billy Garcia.

24         THE COURT:  And this is not on the --

25         MR. COOPER:  It's not on the motion to

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    dismiss.  But we're trying to -- I think the Marshal
2    Service wanted us to get these inmates in and out of
3    here today so that they didn't have to be housed here
4    again.
5              THE COURT:  But this is not -- this
6    statement that I'm going to hear is not on the
7    Government's James notice?
8              MR. COOPER:  It's on our -- no, it's on our
9    targeted response to that James.
10             THE COURT:  All right.
11             Mr. Clark, if you'll stand and raise your
12   right hand to the best of your ability, Ms. Bevel
13   will swear you in.
14                   BENJAMIN CLARK,
15        after having been first duly sworn under oath,
16        was questioned and testified as follows:
17                 DIRECT EXAMINATION
18             MR. BECK:  And, Your Honor, just for the
19   record, I object just like I did yesterday, that I
20   don't think there is a basis for this hearing.
21             THE COURT:  All right.  But this is the
22   hearing we were discussing yesterday; correct?
23             MR. BECK:  Yes.  Yes, the one that I --
24   yeah, the one that I objected to.
25             THE COURT:  All right.  So it's a 104
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   hearing; correct, whether this evidence is going to
 2   come in?  Is that --
 3              MR. COOPER:  Yes.
 4              THE COURT:  All right.  Mr. Clark.  Mr.
 5   Cooper.
 6              MR. COOPER:  Thank you, Your Honor.
 7   BY MR. COOPER:
 8        Q.   Good afternoon, Mr. Clark.
 9              On December 3, 2015, you made a
10   statement -- you were interviewed by Federal Bureau
11   of Investigation Special Agent George Dougherty and
12   the Dona Ana County Sheriff's Officer Lieutenant
13   Bobby Holden.  Do you recall that particular
14   interview?
15        A.   Somewhat.
16        Q.   Okay.  And on that date you talked about a
17   number of things.  And the only thing that I'm going
18   to ask you about today is that you said that, "In
19   2002, Billy Garcia, a/k/a Wild Bill, was the shot
20   caller for SNM, and he ordered the double homicide at
21   Southern New Mexico Correctional Facility."
22              Now, this is a report concerning the
23   interview and the statements you gave to the FBI
24   agent and the lieutenant, and -- supposedly, that's
25   what you said.  And then you said that, Angel DeLeon,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Eugene Martinez, from Albuquerque, and Ben Gallegos
 2    from Belen did the two murders.  Martinez and DeLeon
 3    told you they killed one of the guys.
 4              Later on, sometime much later, apparently,
 5    Mr. Gallegos told you that he had killed the guy,
 6    referring to either Garza or Castillo.
 7              My question to you is that Billy Garcia
 8    never told you about those hits, did he?
 9         A.   I never spoke to Billy Garcia.
10         Q.   Okay.  So when, in the statement it says
11    that Billy Garcia was a shot caller and he ordered
12    the homicides, that was just rumor?
13         A.   Can I see that statement?
14         Q.   Certainly.
15              MR. COOPER:  May I approach the witness,
16    Your Honor?
17              THE COURT:  You may.
18         A.   This statement is wrong.  It's wrong in the
19    context that I said.
20              MR. COOPER:  Okay.  May I approach?
21              THE COURT:  You may.
22         Q.   So the reference to Billy Garcia, that's
23    the wrong part?
24         A.   There is a lot of wrong parts to it.
25         Q.   Okay.  With regard -- on April -- but the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    reference to Billy Garcia is wrong, and you did not
 2    say that, right?
 3         A.   Billy Garcia was a shot caller.
 4         Q.   Okay.  But he never told you that he called
 5    the shots with regard to those individuals, did he?
 6         A.   No.
 7         Q.   April the 12th of 2016, you gave another
 8    interview.  And this interview, Mr. Hosford and Mr.
 9    Herrera, along with Maria Armijo, Randy Castellano,
10    and Celesia Wenton, an FBI agent, Bryan Acee, Mark
11    Myers from DOC, and New Mexico Corrections Department
12    Security Threat Intelligence Sergeant Ruben
13    Archuleta, and Officers Pablo Quesada and Arthur
14    Maldonado were also present when you were
15    interviewed; correct?  Do you remember that?
16         A.   Yes.
17         Q.   And in that particular interview it says
18    that, "Billy Garcia went down to SNM on a mission to
19    kill Garza, Castillo, and Larry Gutierrez.  The hit
20    order had come from SNM leadership, and Garcia was
21    responsible for bringing the message to Southern New
22    Mexico Correctional Facility, and ensuring that it
23    was carried out.  Garcia provided the kite to Leonard
24    Lujan to have the three men killed."
25              You didn't talk to Billy Garcia about any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    of that, did you?

 2         A.   No.

 3              THE COURT:   Let me ask this:   Do we know

 4    the United States is going to be offering these

 5    statements?   I mean, they're not going to be offered

 6    under co-conspirator statements because they weren't

 7    on the James notice; correct?

 8              MR. BECK:   Right.   But we are intending to

 9    offer these statements.

10              THE COURT:   Okay.   So my mind is thinking,

11    as I listen to them, the justification, what rule of

12    evidence?

13              MR. BECK:   It would be 803(3), it would be

14    804(b)(2).   And some of these statements, depending

15    on who said it, would be 801(d)(2)(A), which is

16    statements by a party opponent.

17              THE COURT:   Okay.

18    BY MR. COOPER:

19         Q.   So Mr. Clark, back to the first interview

20    that occurred December 3, 2015, when FBI Agent George

21    Dougherty and Dona Ana County Sheriff's Officer Bobby

22    Holden interviewed you, they said you said that

23    "Martinez and DeLeon told Clark that they killed one

24    of the guys"?

25         A.   Can I talk to my attorney real quick?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Certainly.

 2             (The defendant conferred with counsel.)

 3        A.   Okay.  I spoke to four people regarding

 4   them murders.

 5        Q.   Okay.  And who were those four people?

 6        A.   Eugene Martinez, Leonard Lujan, Edward

 7   Troup, and Joe Gallegos.

 8        Q.   And when you spoke to Leonard Lujan --

 9   well, let me start with Eugene Martinez first.  When

10   you spoke with Eugene Martinez, he did not tell you

11   that Billy Garcia had ordered the hit, did he?

12        A.   No, not that I recall.

13        Q.   Okay.  And likewise, when you spoke with

14   Leonard Lujan, he did not tell you that Billy Garcia

15   had anything to do with it, did he?

16        A.   No, Leonard Lujan did tell me Billy Garcia

17   had something to do with it.

18        Q.   Okay.  And where was that conversation with

19   you and Leonard Lujan?

20        A.   At the North facility.

21        Q.   And when did that conversation occur?

22        A.   The end of 2003, the beginning of 2004.  It

23   was an ongoing conversation.

24        Q.   Okay.  At some point in time, you spoke

25   with Edward Troup.  Did Mr. Troup -- he never told
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    you that Mr. Billy Garcia ordered the hits, did he?
2         A.   No.
3         Q.   So it was Eugene, Troup, and who was the
4    other person?
5         A.   Joe Gallegos.
6         Q.   So you spoke with Mr. Gallegos also
7    sometime later in 2003, 2004?
8         A.   Somewhere around there.
9         Q.   Okay.  Did Mr. Joe Gallegos tell you that
10   Billy Garcia had anything to do with the hits on
11   Castillo and Garza?
12        A.   Not that I recall.
13        Q.   Now, you say that you and Leonard Lujan had
14   an ongoing discussion in 2003 and 2004 with regard to
15   the Castillo-Garza murders?
16        A.   Yes, sir.
17        Q.   And how did it come up that you were
18   talking about it all that time later?
19        A.   It just came up.
20        Q.   Was Leonard telling you about his
21   involvement in it?
22        A.   Yes.
23        Q.   Did anybody else have any discussions with
24   you other than those four?
25        A.   I mean, there is plenty of discussions, but
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    not directly associated with the crime.

 2         Q.   Okay.

 3              MR. COOPER:  I don't have any further

 4    questions, Your Honor.  Thank you.

 5              THE COURT:  Thank you, Mr. Cooper.

 6              Anyone else on the defense side have

 7    cross-examination of Mr. Clark?

 8              THE COURT:  All right.  Mr. Beck, do you

 9    have cross-examination of Mr. Clark?

10                   CROSS-EXAMINATION

11    BY MR. BECK:

12         Q.   Good afternoon, Mr. Clark.

13         A.   Good afternoon, Mr. Beck.

14         Q.   When you had the conversation with Eugene

15    Martinez, were you cooperating with the Government at

16    that time?

17         A.   No.

18         Q.   When you had the conversation with Edward

19    Troup, were you cooperating with the Government at

20    that time?

21         A.   No.

22         Q.   When you had the conversation with Joe

23    Gallegos, were you cooperating with the Government at

24    that time?

25         A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   At all these times, were you instead a
 2   devoted and faithful member of the SNM?
 3        A.   Yes.
 4        Q.   I think you said the last one here was
 5   Leonard Lujan; is that right?
 6        A.   Yes, sir.
 7        Q.   You said an ongoing conversation from '03
 8   to '04.  Were there, in fact, multiple conversations
 9   from '03 to '04?
10        A.   Yes, sir.
11        Q.   And in those conversations, did he tell you
12   about his role in the Garza and Castillo murders?
13        A.   Yes, sir.
14        Q.   Did he tell you multiple times from '03 to
15   '04 that Billy Garcia called those hits?
16        A.   Yes, sir.
17             MR. BECK:  Nothing further, Your Honor.
18             THE COURT:  Let me ask you a couple of
19   questions here.  I'm trying to kind of figure out
20   what we're doing.  But when you said a minute ago
21   804(b)(2) --
22             MR. BECK:  Sorry, 804(b)(3).
23             THE COURT:  -- you're not referring to
24   dying declarations, right?
25             MR. BECK:  I think we got confused when Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Castle was showing you the chart.  It's 804(b)(3),

2    statements against penal interests.

3              THE COURT:  Okay.  Maybe I don't fully

4    understand the interest here, but, you know,

5    statement against interests exception, like all your

6    804 exceptions are going to require a showing of

7    unavailability.  If he's a cooperator here, he's

8    available.  What am I missing?

9              MR. BECK:  He's available.  It's the

10   declarant, Your Honor.  So, for example, if we're

11   going to admit Mr. Troup's statement to him, again,

12   it doesn't sound like Mr. Troup talked about Billy

13   Garcia, for instance.  But say that -- let's do a

14   hypothetical here:  Say that Leonard Lujan is not

15   cooperating with the Government, if indeed, he was a

16   defendant or something like that, he would be

17   unavailable to testify.

18              So what happens is, it would be against --

19   so let's get back to Mr. Troup -- it's against Mr.

20   Troup's interests, his penal interests.  It tends to

21   subject him to criminal liability to make this

22   statement to Mr. Clark.  So that statement comes in

23   because Mr. Troup is unavailable to testify unless he

24   takes the stand.

25              THE COURT:  Okay.  All right.  Thank you,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Mr. Beck.

2              MR. BECK:  So to go a little bit further on

3    that, the fact that multiple people are telling

4    multiple other SNM members the same story --

5              MR. CASTLE:  Your Honor, I would object to

6    those kind of facts being disclosed in the presence

7    of the witness.

8              MR. BECK:  That's fine.

9              THE COURT:  All right.  I brought some of

10   this up by asking the questions.  But I was trying to

11   understand fully what we're trying to do.

12             All right.  Thank you, Mr. Beck.

13             MR. BECK:  Nothing further.

14             THE COURT:  All right.  Mr. Cooper, do you

15   have redirect of Mr. Clark?

16             MR. COOPER:  No, Your Honor.  Thank you.

17             THE COURT:  Any other defendant?

18             MR. BENJAMIN:  No, Your Honor.

19             THE COURT:  All right.  Mr. Clark, you may

20   step down.  Is there any reason Mr. Clark cannot be

21   excused from the proceedings?  Mr. Cooper?

22             MR. COOPER:  No, Your Honor.  Thank you.

23             THE COURT:  How about you, Mr. Beck?

24             MR. BECK:  No, Your Honor.

25             THE COURT:  All right.  Any other defendant
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    have any objection?  Not hearing any, Mr. Clark,
 2    you're excused from the proceedings.  Thank you for
 3    your testimony.
 4                 THE WITNESS:  All right.  Thank you.
 5                 THE COURT:  All right.  Mr. Cooper, do you
 6    have further witnesses or evidence you want to
 7    present?  I guess is this where you need to squeeze
 8    in -- is it Mr. Pedersen?
 9                 MR. BECK:  I think it would be good for Mr.
10    Pedersen to go next.
11                 THE COURT:  Okay.  Any objection to that?
12                 MR. COOPER:  Your Honor, we would -- I
13    think that's probably a good plan.
14                 THE COURT:  All right.  And refresh my
15    memory.  Mr. Pedersen is going to testify about what
16    issue?
17                 MR. CASTLE:  It's going to be on the motion
18    to dismiss.  He was the special agent in charge in
19    2001 -- or maybe not Special Agent in charge, but
20    Special Agent.
21                 THE COURT:  Mr. Pedersen, if you'll come up
22    and stand next to the witness box on my right, your
23    left.  Before you're seated, my courtroom deputy, Ms.
24    Bevel, will swear you in.
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                    TRENT PEDERSEN,
 2        after having been first duly sworn under oath,
 3        was questioned and testified as follows:
 4                      EXAMINATION
 5             THE CLERK:  State your name and spell your
 6   last name for the record.
 7             THE WITNESS:  Trent Pedersen,
 8   P-E-D-E-R-S-E-N.
 9             THE COURT:  All right.  Mr. Pedersen.  Mr.
10   Castle.
11   BY MR. CASTLE:
12        Q.   Mr. Pedersen, how are you employed?
13        A.   I'm a Special Agent with the Federal Bureau
14   of Investigation.
15        Q.   And are you stationed here in New Mexico?
16        A.   I'm not.  I'm in a different division in a
17   different state.
18        Q.   What was your job in 2001?
19        A.   In approximately January of 2001, I was
20   assigned to work on a gang task force in Albuquerque,
21   New Mexico on behalf of the FBI.
22        Q.   Had you been in New Mexico for a while
23   prior to that assignment?
24        A.   I started my career out of Quantico, in
25   Albuquerque, so I had been there since approximately
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    1997.

2        Q.   In the time between 1997 and 2001, had you

3    become aware of a prison gang by the name -- or the

4    initials of SNM?

5        A.   I believe I had heard about it in the

6    media.  But I had not been involved with gang

7    investigations to that point, so I believe I'd heard

8    the name, but I was not readily familiar with the

9    gang.

10       Q.   And I may have missed it, when did you get

11   assigned to the joint task force?

12       A.   I believe it was January of 2001.  So my

13   first several years, from '97 to 2001, were working

14   different matters.

15       Q.   Prior to the subpoena being served for this

16   particular hearing, had you been contacted in the

17   last few years at all concerning your work in 2001?

18       A.   I don't recall any detailed conversations.

19   I was surprised to get the subpoena.  I don't recall

20   any specific ones.  If there had been, they would

21   have been very brief, or -- I wasn't familiar with

22   all of the things that were going on here, I guess,

23   is the best way I would put it.  I don't have

24   specific recollection of a detailed call about things

25   here.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   You had enough to worry about with the

2  location you're at?

3      A.   Yes, and a completely different assignment.

4      Q.   So was your work in 2001, had it kind of

5  been pushed out of your memory for quite a few years?

6      A.   Yes.  I was only involved in gang-related

7  activities for less than two years.  And I had not

8  done any gang-related work, per se, since then.

9      Q.   When you were assigned, in January of 2001,

10 to this gang task force, what was the name of the

11 gang task force?

12     A.   I believe it was something to the effect of

13 Central New Mexico Organized Criminal -- it was quite

14 a lengthy name.  It was referred to as the federal

15 gang task force, but it was something, Central New

16 Mexico Criminal Organization or Violent Criminal

17 Organization Task Force.

18     Q.   I might be able to help you here in a

19 little while.

20     A.   Okay.

21     Q.   Does the FBI have a number of joint task

22 forces that they have in various communities in which

23 they work with local law enforcement?

24     A.   Yes, sir.

25     Q.   And is this one of them that you're talking

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    about?

2         A.    This was at the time, yes.

3         Q.    So when you're assigned to that, is that

4    your sole duty, or do you also have other duties?

5         A.    Traditionally, that would be your sole

6    duty.

7              9/11 happened, which was an intervening

8    event.  And so much of my time after I joined the

9    task force, I was pulled away to work terrorism

10   things.  And eventually, I was pulled completely away

11   from the task force to work terrorism matters.  So,

12   traditionally, you would be detailed full-time there.

13   9/11 was a very different situation, because

14   terrorism became the Number 1 priority.

15             So several people, myself included, were

16   pulled off the task force; tried to juggle both

17   assignments, and eventually, I was taken full-time

18   off the task force.

19        Q.    So then, between January of 2001 and

20   September 11 of 2001, your primary duties would be

21   with regards to this gang task force in New Mexico?

22        A.    That's correct.

23        Q.    When you began with the joint task force,

24   did you learn of the prison gang, SNM?

25        A.    Yes, sir.

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1        Q.    What did you basically learn from the
 2   beginning of your work in January?
 3        A.    The way it was described to me is the SNM
 4   was the largest prison gang in New Mexico.  It was
 5   known for drug trafficking, violent assaults,
 6   murders.  It was considered a threat to the
 7   community.  And I believe in a management meeting of
 8   the heads of the agencies that participated in the
 9   task force, it was designated as a serious threat,
10   and they wanted it to be investigated.
11        Q.    Why would this be a matter of interest to
12   the Federal Bureau of Investigation, not just state
13   authorities?
14        A.    Any time you have violent crimes that reach
15   outside the prison system themselves -- for example,
16   Title 21 provides jurisdiction for drug trafficking.
17   The racketeering statute, RICO statute, all of those
18   are federal designated crimes which traditionally
19   would come under gang-type investigations.  And the
20   gang reached far outside the prison.  There were
21   hits; there were drugs being smuggled into the
22   prisons.  So it went well beyond just the state
23   issue.  That's the way it was explained to me.
24        Q.    And were the federal agents, specifically
25   FBI agents, able to provide assistance to local law

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   enforcement in these matters in kind of a specialty
 2   way, special way?
 3        A.   Yes, we provided office space, tried to
 4   help organize entities from many different agencies
 5   to work collectively.
 6        Q.   Talking a little about this office space,
 7   was it just offices, or did you all have files as
 8   well?
 9        A.   There were FBI files that were maintained,
10   and the FBI maintained the primary files for the
11   whole task force.  So state and local officers who
12   came and worked on the task force also could
13   contribute paperwork to the FBI files.  But it was
14   managed and operated by the FBI.
15        Q.   And in regards to the joint task force,
16   would the FBI share information from time to time
17   with state authorities and vice versa?
18        A.   Yes, sir.
19        Q.   And the whole idea is to cooperatively work
20   together to address gang issues?
21        A.   That's my understanding.
22        Q.   And that was true with regard to the SNM as
23   well?
24        A.   Yes.
25        Q.   I'd be shocked, but I'll ask you do you
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    recall whether there was an open investigation into
 2    the SNM in -- when you arrived at this position in
 3    January of 2001?
 4         A.   I don't believe there was.
 5         Q.   If I showed you a document, might it
 6    refresh your memory in that regard?
 7         A.   Sure.  Again, I believe I was asked to
 8    draft some of the opening documents.  So I was not
 9    aware that there was another case, or there would
10    have been no reason to open a new investigation.
11         Q.   What I'd like to do is have you take a look
12    at Exhibit A that's already been admitted.  But we're
13    going to project it up here on the screen, and it's
14    going to be on your screen as well.
15         A.   Okay.
16         Q.   Have you seen this document recently?
17         A.   Yes, sir, I have.
18         Q.   We provided it to you for your review?
19         A.   No, I was not provided anything prior to my
20    questioning.
21         Q.   So you were not provided with these
22    materials attached to your subpoena?
23         A.   No.  One page, but not -- I received the
24    front cover page of this document.  That's the only
25    thing I received.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  You were able to review this?

2    A.   Yes, I did go to the file based on what

3    information you requested in the subpoena.

4    Q.   If you take a look, there is a case ID

5    number here.  92D-AQ-54707.  Is that a case number

6    that you might have opened up?

7    A.   I believe this is actually the opening

8    document to open that case file.

9    Q.   And what is the date of that report?

10   A.   April 23rd of 2001.

11   Q.   And what was the subject of the

12   investigation?

13   A.   Syndicato de Nuevo Mexico, SNM.

14   Q.   Was there anything that happened in the

15   month prior to this case being opened that made the

16   SNM more of a focus of the joint task force?

17   A.   There were ongoing things for years.  And

18   my understanding was it was an accumulation of

19   ongoing homicides, ongoing drug trafficking.  There

20   had been a homicide at BCDC, Bernalillo County

21   Detention Center, Matthew Cavalier.  I believe there

22   had also been a homicide down here at the Southern

23   New Mexico Correctional Facility.

24        But my understanding, it was an ongoing

25   accumulation of years of criminal activity.  It was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    not precipitated by one specific event.

 2         Q.   The Cavalier murder happened in August the

 3    previous year, August, 2000?

 4         A.   I believe it was 2000.

 5         Q.   And the ones you're talking about in the

 6    Southern New Mexico Correctional Facility, were those

 7    the dual murders that happened on the same day, March

 8    26, 2001?

 9         A.   I was not responsible for investigating

10    those.  So my recollection is it was in early 2001.

11    But those were part of the Southern.  And my

12    assignment was the Northern and Central.

13         Q.   So you did have an opportunity to look at

14    Exhibit A?

15         A.   Yes, sir.

16         Q.   If you can scroll down a little bit on

17    Exhibit A.  The first or the second full paragraph

18    has a header there that is in regards to the SNM

19    homicides; is that right?

20         A.   Yes, sir.

21         Q.   And what this investigative plan -- you put

22    this investigative plan together; is that right?

23         A.   I was given a bunch of information and

24    asked to summarize it, so yes, I did draft it.

25         Q.   And what this document indicates is that,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    "the investigation of a number of SNM murders, either

 2    ordered or carried out by SNM members, would be

 3    beneficial in showing the gang's violent criminal

 4    nature and the gang's willingness to do anything to

 5    protect its drug-related activities"; is that right?

 6         A.   I think that's correct.

 7         Q.   So the homicides were at least one of the

 8    focuses of this investigative plan?

 9         A.   Yes, sir.

10         Q.   And, in fact, if we scroll down a little

11    bit to the next page, if possible, the two murders at

12    Southern were one of the focuses -- were one of the

13    sets of murders that you were looking at?

14         A.   I need to clarify that.  I was given a

15    summary of statewide information, and I did put that

16    in here.  If you would like, I can explain.  But

17    shortly after this time period, I was assigned to

18    focus on things in Northern and Central New Mexico.

19    So this document was a statewide document.

20              There was also a task force, I believe, in

21    Las Cruces, another violent crime task force.  So I

22    was not primarily responsible for investigating these

23    particular homicides.

24         Q.   But you have a write-up about these two

25    homicides in this investigative plan?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.   As a part of the entire gang, yes, sir.

2          Q.   If we could scroll down to page 6 of

3    Exhibit A.  As part of the investigative plan was

4    there at least a plan to collect information about

5    all known suspected SNM members?

6          A.   Yes, sir.

7          Q.   And was there a plan to collect the

8    information such as phone calls of the inmates,

9    letters that the inmates sent out, their actual

10   Corrections' records of the particular SNM members?

11         A.   Yes, sir.

12         Q.   Now, were you working at that time -- well,

13   actually, you had indicated you didn't know the exact

14   date that that 54711 investigation began, is that

15   right, you don't recall that today?

16         A.   When you say the 54707 --

17         Q.   That was the case number that we talked

18   about at the top of -- I'm sorry, 54707.

19         A.   My recollection in the way these cases have

20   to be opened -- because this is a particular type of

21   investigation, there has to be an entire summary

22   written and approval.  And I believe that's what this

23   document was.  So I think this would have been the

24   primary thing, notifying our headquarters of a major

25   gang investigation.  That's my understanding of what

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                    e-mail: info@litsupport.com

1    this document was when I drafted it.

2        Q.   I want to show you a page of materials that

3    we were provided in discovery.  It's page 598 of

4    discovery.  Take a look at that.  It appears, at

5    least on the top, that there was a full investigation

6    of the SNM that was initiated November 20 of 2000, or

7    at least some kind of investigation; is that right?

8        A.   I'm not familiar with that case file

9    number.  I don't believe that was ever assigned to

10   me.  So that could have been a different task force.

11   It could have been some other investigation.  But my

12   understanding is there was not an SNM investigation

13   going on on our task force, and in the area I worked.

14   So --

15       Q.   So the Central New Mexico Gang Task Force,

16   did they work at all with the Southern New Mexico

17   Gang Task Force?

18       A.   Obviously, there was a sharing of

19   information, but we operated separately because -- in

20   fact, I believe in June, they asked me to formally

21   document the fact that I would be focusing on Central

22   and Northern New Mexico, and not Southern.  And

23   that's why I was not intimately involved in these

24   murder cases in Southern New Mexico.  They had their

25   own task force.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.    But you say you would coordinate between

2    the task force.   Would that be when the

3    investigations would overlap?

4    A.    This investigation -- assuming that it is

5    an SNM case, which I don't believe I've actually

6    looked at this -- this could have been a drug case;

7    it could have been some other case that also targeted

8    those folks.   I was not aware of it.   And it didn't

9    really pertain to my task force because our task

10   force was not working the SNM at the time, as far as

11   I'm aware of.

12   Q.    Agent Pedersen, what I was wondering about

13   is whether, if there were overlapping investigations

14   that were from the two task forces that overlap in

15   focus, would they share information between the task

16   forces?

17   A.    Yes, sir.

18   Q.    And I think you indicated that you believe

19   this document I'm showing you here, it might be from

20   the Southern New Mexico Gang Task Force; in fact it

21   says that, right?

22   A.    Well, the reason I say that, that's not a

23   case file that I recognize as having worked on.   So I

24   would assume, if it is what you represented, then

25   it's an SNM case, it would have been from somewhere

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                           e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   else, and not from Albuquerque.

 2       Q.   Looking at this page of discovery it

 3   indicates that there is a confidential report

 4   regarding the murder of inmates Frank Castillo and

 5   Rolando Garza at the Southern New Mexico Correctional

 6   Facility; is that right?

 7       A.   I'm sorry, what?  Yes, I'm now reading that

 8   portion that you mentioned.

 9       Q.   At the time that you were stationed here,

10   did you work with an individual by the name of

11   Michael Sprunk from time to time?

12       A.   Yes, I have met him.

13       Q.   And, in fact, if we go back to Exhibit A.

14   Did you attend an executive board meeting of Central

15   New Mexico Violent Criminal Organization Task Force?

16       A.   I don't believe I was invited.  That's

17   usually a meeting for high-level sheriffs, high-level

18   FBI people.  This information was related to me, I

19   believe, by my supervisor, so I don't believe I

20   actually attended that meeting, sir.

21       Q.   So it was related to you that they had this

22   meeting?

23       A.   Yes.

24       Q.   And for purposes of -- can we just call it

25   the Central Task Force, instead of that long name?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Sure.

 2        Q.   At least one U.S. attorney attended the

 3   Central Task Force?

 4        A.   That was my understanding.

 5        Q.   And there was a plan at that point that the

 6   most effective way to dismantle the SNM would be to

 7   use a continuing criminal enterprise prosecution to

 8   do so; is that right?

 9        A.   That was my understanding of the plan, yes,

10   sir.

11        Q.   And when we were talking earlier about the

12   collection of phone calls, files, mail, and things

13   like that, that was to support a potential

14   prosecution of a continuing criminal enterprise?

15        A.   Yes, sir.

16        Q.   Now, when you're working on these joint

17   task forces, are you at all concerned that the local

18   authorities or state authorities you're working with

19   might compromise the investigation?

20        A.   I think there is a possibility anytime a

21   lot of people know about a case, that we -- law

22   enforcement worries that a case could be compromised,

23   yes.

24        Q.   And at times, when you working on these

25   joint forces, and there is a focus on a particular
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   group, or particular gang, does the FBI collect all
 2   the evidence that exists, or do you leave some in the
 3   hands of the state and local authorities?
 4       A.   We did not collect all of the evidence,
 5   because if it was not a charge that we thought
 6   federally would be prosecuted, it would not
 7   necessarily be something we would collect.  So I
 8   think that's a pretty broad question.
 9            If it was pertinent to something that we
10   were working on, or a defendant that we were trying
11   to prosecute, then I think we would normally request
12   that.  But I wouldn't say it would be fair to say
13   that we sought everything from state and local
14   agencies.
15       Q.   So it's basically on a case-by-case basis?
16       A.   It depended upon -- I don't think you could
17   gather all of the information on all of the members
18   of the SNM.  So, yes, it was focused.  If there was
19   specific crimes, specific individuals, things like
20   that, we would request it.
21       Q.   So, in April of 2001, when the FBI and the
22   joint task force started to investigate the SNM for a
23   CCE charge, what did they do to, I guess, martial the
24   evidence that might be out there?
25       A.   I know there were several meetings with the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   New Mexico Department of Corrections, specifically

2   with Will Jaramillo, who I believe ran -- at the time

3   it was called the STG, Security Threat Group -- and I

4   believe Mr. Jaramillo oversaw all of the gang matters

5   within the Corrections Department.  We requested

6   records from him.

7           The prison system had their own methodology

8   of documenting gang membership, things like that.  So

9   all of those records were obtained from Corrections.

10  They provided histories on some of the different

11  members of the gang.  And that was all placed in this

12  file.

13          So there was an initial push -- part of the

14  problem is we didn't necessarily know who all of

15  those players were.  Most had been brought in from

16  other areas, had not been working gangs, myself in

17  particular.  And so a lot of it was familiarizing

18  ourselves with the prison gang, who the members were,

19  the associations, how they operated.

20      Q.   Can you give us an estimate of how many FBI

21  agents were assigned to the Central Task Force?

22      A.   It varied from time to time.  There were

23  usually four or five, plus the state and local.  We

24  also asked that Corrections put a probation and

25  parole officer.  My understanding is that probation

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    and parole reports through Corrections.  And Nick

2    Costales from probation and parole was brought on to

3    assist us, because he had been dealing with a lot of

4    the gang members.

5         Q.   So at the task force is there someone that

6    directs a particular investigation, such as is it an

7    FBI person that directs the investigation, or is it a

8    state person, or --

9         A.   It can vary.  In this particular instance,

10   I was assigned to be the primary investigator for the

11   SNM for the Central Task Force.  Each of the other

12   FBI agents was assigned to their own gang.  And some

13   of the state and local officers that were deputized

14   also could have had their own gang cases.

15        Q.   So you were the primary case agent?

16        A.   For a short time period, yes, sir.

17        Q.   And you knew that there was a possibility

18   of a federal prosecution of the SNM that could

19   include homicides they committed?

20        A.   Yes, sir.

21        Q.   Including the 2001 homicides?

22        A.   Yes.

23        Q.   I take it you didn't collect all the

24   evidence that might be out there on the SNM at that

25   point in time?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

184

1        A.    No.   Initially, it was to get a baseline of

2   who the people were, and then to develop intelligence

3   about the leadership and their activities.

4        Q.    So, for example, with the homicide,

5   potential homicide portions of the CCE investigation,

6   would I be correct in stating that you didn't collect

7   the physical evidence that was being held?

8        A.    I was not involved with that homicide

9   investigation.  I did go and get reports and other

10  things for other murders; the Cavalier murder, for

11  example, because it was within the jurisdiction that

12  I had been asked to work.  But I was not, I believe,

13  in any way involved with the actual homicide

14  investigation of the two individuals in question.

15       Q.    Even with the Cavalier murder, you didn't

16  pick up all the physical evidence; is that right?

17       A.    I believe we did not pick it up.  It was in

18  custody of APD Gang Unit.  And because there was

19  declination on the federal prosecution, we did not

20  collect the evidence.

21       Q.    Now, when you picked up this investigation

22  of the SNM, did you have discussions with the state

23  and local authorities about their obligation to

24  preserve materials that might be relevant to a future

25  CCE prosecution?

SANTA FE OFFICE                                                                          MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                              Albuquerque, NM 87102
(505) 989-4949                                                                             (505) 843-9494
FAX (505) 843-9492                                                                  FAX (505) 843-9492
                                                                                       1-800-669-9492
                        BEAN
                        &ASSOCIATES, Inc.
                        PROFESSIONAL COURT
                        REPORTING SERVICE                                 e-mail: info@litsupport.com

1      A.   It was discussed in general when they

2    became federally deputized.  And we talked about our

3    rules.  And all of that information, once they were

4    deputized and a part of the task force, they needed

5    to comply with our rules.  So frequently, we would

6    instruct them -- they would come to us with

7    questions.  But we did it under the federal

8    guidelines at that time.

9      Q.   Which individuals from the New Mexico

10    Department of Corrections were deputized as part of

11    this task force in 2001, that you can recall?

12      A.   The only -- we worked very closely with the

13    Department of Corrections.  My -- again, this is 17

14    years ago -- my recollection is Nick Costales was the

15    only person that was assigned full time, or at least

16    was designated from Corrections as a task force

17    member.  Whether or not he was actually deputized,

18    that goes through FBI executive management, but I

19    know he did have access to our work space and worked

20    closely with us.

21      Q.   How about New Mexico State Police?

22      A.   There were several over the time period I

23    was there.  Ramon Casaus, possibly.  But there were

24    two or three New Mexico State Police officers that

25    had been detailed there.

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1       Q.   Was Michael Sprunk one of them?

 2       A.   I don't believe Michael Sprunk was with New

 3  Mexico State Police.  I thought he was with

 4  Corrections.

 5       Q.   So he would have been one of the

 6  Corrections people that worked with you?

 7       A.   I talked to him on occasion.  I don't

 8  believe he was a task force officer.

 9       Q.   How about Edgar Rosa?

10       A.   I'm sorry?

11       Q.   Edgar Rosa?  Does that name sound --

12       A.   I don't recall who that is.

13       Q.   Agent Pedersen, you seem to be looking over

14  to the prosecution table for assistance.  If you can,

15  just focus here, okay?

16       A.   I'm not familiar with that name.

17       Q.   How about -- did you work with Special

18  Agent Andrew Armijo?

19       A.   Are you referring to FBI Agent Andrew

20  Armijo?

21       Q.   Yes.  I thought it was special agent, but

22  is there a difference?

23       A.   There are special agents with other

24  agencies as well.

25       Q.   Oh, okay.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I think there was an agent, I think,

2  assigned to Las Cruces that worked on the Southern

3  New Mexico Task Force named Andy Armijo, or Andrew.

4  I called him "Andy."

5      Q.   What is an ITAR investigation?  I-T-A-R?

6      A.   I believe it stands for Interstate

7  Transportation in Aid of Racketeering.

8      Q.   If we go back to Exhibit B.  What I'm going

9  to do is approach you with my laptop, and I'll

10 represent to you this is Exhibit B.  Okay?

11     A.   Okay.

12     Q.   Just so we don't have to call in every FBI

13 agent that may have been involved in 2001, does it

14 appear that there was at least an ITAR investigation

15 of the SNM that was in existence as early as November

16 28, 2000?

17     A.   It would appear so based on this document.

18     Q.   And it appears that it was from the

19 Southern New Mexico Gang Task Force, based on the

20 initials?

21     A.   Based on who approved it, and the people

22 involved, yes.

23     Q.   Is this an FBI form?

24     A.   It appears to be, yes, sir.

25     Q.   And if you could scroll just to the bottom

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    of the page, does it appear that you may have

2    received a copy of this report back in 2001?

3         A.   It appears that at some point it would have

4    been distributed to me.  I was not on the task force

5    at the time this document was drafted.  So it would

6    have been sometime --

7         Q.   Afterwards?

8         A.   -- afterwards.  I couldn't tell you when

9    that was.  But my recollection was I was not assigned

10   to the task force until after the Christmas break,

11   between 2000 and 2001.

12        Q.   If we could scroll to the next page of this

13   document.  That's your name at the bottom again; is

14   that right?

15        A.   Yes.

16        Q.   And if we can scroll just a little bit

17   higher.  It appears that in at least at some point in

18   time the FBI task force that had started in 2000 on

19   the SNM was collecting the entire security threat

20   assessment of the SNM; is that right?

21        A.   According to this, they were, in Las

22   Cruces, yes.

23        Q.   I'd like to turn to page 27047 of the

24   discovery.

25             Agent Pedersen, did you -- when you were on



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   the task force, did you conduct some interviews of
 2   individuals in which some of the questions related to
 3   the murders that had happened at the Southern New
 4   Mexico Correctional Facility in March of 2001?
 5        A.   Yes, sir.
 6        Q.   And I'm showing you this report, or this
 7   document.  Is this one of the interviews that you may
 8   have conducted back in 2001?
 9        A.   Yes, I believe this is a transcription of a
10   videotaped interview that I did.
11        Q.   During that interview you asked some
12   questions of this informant?
13        A.   I fully debriefed this informant about the
14   SNM, and this individual's knowledge of the SNM.
15        Q.   Including the murders?
16        A.   Yes.
17        Q.   If we could go to page 55340 of discovery.
18             MR. BECK:  Is this an exhibit, Mr. Castle?
19             MR. CASTLE:  No, it is not.
20        Q.   Oh, I apologize -- the date of the material
21   I was just showing you a few minutes ago was dated
22   June 1, 2001, which was the interview you were
23   talking about?
24        A.   Yes.
25        Q.   And then what are these different case
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    numbers on the bottom here?

2              THE COURT:  Is there an identifier for this

3    exhibit?

4              MR. CASTLE:  Yes.  It's page 27047 of

5    discovery.  It's not an exhibit.  I'm just trying to

6    refresh his memory and show him some documents.

7         A.   The "92D," I believe is the intelligence

8    case regarding the SNM.  The "270B" would relate to

9    this particular informant.  And "166E" was my case

10   that I worked that dealt with the Central and

11   Northern portion of the SNM, which is what I was

12   assigned to work.

13        Q.   And would I be correct in assuming the

14   reason you put all three case numbers on there is

15   because they're related with respect to this witness?

16        A.   This witness provided information about

17   more than just my ongoing investigations.  And so the

18   intelligence case would capture things related to

19   other investigative matters, things that other task

20   forces or state and locals, might have an interest

21   in.

22        Q.   So that a copy of this report would go --

23        A.   That's why I put it in multiple files, yes,

24   because there was more information than just relevant

25   to subjects I was currently investigating.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Was that the only person that you

2  interviewed in 2001, in which the murders at Southern

3  were the subject of the interview?

4      A.   When you say "the subject," I don't believe

5  I did others -- I don't think I did any interviews

6  where that murder was the primary topic.  It came up,

7  because with almost every SNM member I met, I would

8  debrief them on every possible crime and criminal

9  thing they knew about.  So there were other people I

10  interviewed that mentioned something about these

11  homicides.

12      Q.   So, in other words, the net was cast fairly

13  wide concerning the SNM?

14      A.   Yes, sir.

15      Q.   And that would include the 2001 murders, if

16  the person knew something about that.

17      A.   I asked about every potential crime that

18  they knew about, which would include those.

19      Q.   Then would you share the information that

20  you obtained with the New Mexico State Police or the

21  Department of Corrections?

22      A.   They were actively involved in the

23  investigations and doing some of the interviews.  So,

24  normally, there was not a passage directly to them.

25  There could have been.  But normally, their task

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    force officers would be involved in the weekly

2    briefings.  They would be involved in the

3    investigation.  So there really wasn't a necessity to

4    pass reports.  They were involved in the

5    investigations.

6        Q.   So let's talk a little bit about these

7    weekly meetings.  And I'm only going to confine

8    myself to 2001, after the murders at the Southern

9    facility.  Were the various task force members,

10   including Corrections, State Police, and yourself,

11   sharing information from time to time concerning

12   developments in the 2001 murder investigation?

13       A.   We were not investigating the 2001 murder

14   as a primary target.  In June of 2001, my

15   understanding is -- and I was asked to open a

16   separate case.  You mentioned what the 166E

17   investigation was.  Our focus was on the SNM criminal

18   activities in central and northern New Mexico.  So we

19   were not actively investigating these two homicides.

20            There was a task force here in Las Cruces.

21   In fact, the document, where I opened this file, I

22   cc'd Andy Armijo.  My understanding was our

23   management had said:  We have another gang task force

24   in Southern New Mexico, you focus on Central and

25   Northern, if they want to do the Southern cases,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    that's fine.
 2            So there would be a sharing of information.
 3    We were not actively pursuing -- that was not one of
 4    my primary targets, per my management, to
 5    investigate.
 6            So we obtained information about it.  But I
 7    hesitate by your characterization, because our focus
 8    was not the homicides in Las Cruces.
 9        Q.   Okay.  So, in other words, the FBI
10    generally had a focus on the SNM; is that correct?
11        A.   Yes, sir, in New Mexico.
12        Q.   And then a certain task force might have a
13    piece of that investigation?
14        A.   Yes.
15        Q.   And so your piece of that investigation,
16    for possible federal prosecution, focused on things
17    that happened in Central New Mexico?
18        A.   Central and Northern, and then Southern had
19    it's own task force.
20        Q.   So Southern would be the one that might be
21    investigating the 2001 murders, because it's in
22    that --
23        A.   If they were involved.  That was not a
24    primary focus of our task force.
25        Q.   Let me finish the sentence, okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              So the Southern would be in charge of
 2    investigating the 2001 murders, if the FBI was
 3    focused on that because it was in their geographic
 4    area?
 5         A.   Yes, sir.
 6         Q.   And as these task forces would work, would
 7    they keep the U.S. Attorney's Office updated from
 8    time to time?
 9         A.   Yes.
10         Q.   If we can go to page 605 of the discovery,
11    which appears to be an FBI 302 form dated April 9,
12    2001.  Does that appear to be what that document is?
13         A.   It's not in the standard format.  It looks
14    like it's a historical electronic format.  But that's
15    what it represents to be.
16         Q.   And would this have been a 302 that would
17    have been prepared for the Central or the Southern
18    task force?
19         A.   I'm not familiar with that case file as
20    being one that we worked.  So my understanding is it
21    would have been the Southern.
22         Q.   Okay.  And I think I asked you earlier
23    about Edgar Rosa.  Was he an individual assigned to
24    the Southern or do you not know?
25         A.   I don't even know who he is.  I don't
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                1-800-669-9492
                      BEAN & ASSOCIATES, Inc.          e-mail: info@litsupport.com
                      PROFESSIONAL COURT
                      REPORTING SERVICE

1    believe I ever met him.

2        Q.   He wasn't assigned to Central?

3        A.   He was not in our task force.

4        Q.   Right.  Thank you.

5             Some of the New Mexico prisons are located

6    in the central and northern portions of the state; is

7    that correct?

8        A.   That's correct.

9        Q.   And during the investigation of the SNM,

10   that you were involved in, in 2001, would you

11   exchange information with STIU officers from any of

12   those prisons?

13       A.   At the time, I believe -- STIU is a new

14   name for me.  STG, the Security Threat Group was the

15   entities that I worked with.  I dealt primarily with

16   Will Jaramillo because he was the head person over

17   all of those groups.  But we did go out and talk to

18   other people on occasion, yes.

19       Q.   So Will Jaramillo was the STG coordinator

20   for the State?

21       A.   Yes, that's my understanding.

22       Q.   And he would funnel --

23       A.   He was our primary point of contact.

24       Q.   So he would, perhaps, collect information

25   and then provide it to you all?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes, sir.

 2          Q.   And vice versa?

 3          A.   Yes, sir.

 4          Q.   If we could look at Exhibit G.  This is

 5     another report from Edgar Rosa.  And I take it you

 6     would not know anything about this exhibit?

 7          A.   I'm sorry, sir, I don't.

 8          Q.   Did you interview an individual by the name

 9     of Toby Romero in your investigation?

10          A.   Yes, sir.

11          Q.   And did Mr. Romero -- well, do you recall

12     when you interviewed him?

13          A.   I believe it would have been in June of

14     2001.

15          Q.   Did you have an opportunity to look at that

16     transcript of that interview before testifying today?

17          A.   Are you talking about the one that you

18     referenced before as an exhibit?

19          Q.   Yes.

20          A.   Yes, I reviewed portions of it.

21          Q.   All of it wasn't -- well, the portions that

22     you saw -- what portions did you review, I mean?

23          A.   I believe two thirds of it was available

24     electronically, so I was able to review that.  I

25     specifically did the search for the names of Castillo
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and Garza to find any reports that I had written, and
2    I believe I reviewed those sections.
3        Q.   And you indicated, I think earlier, that
4    was video recorded?
5        A.   Yes, sir.
6        Q.   And do you know what came of that video
7    recording?  Would you have stored it somewhere?
8        A.   My understanding is it probably would have
9    been submitted to an ELSUR file.  And then it was
10   transcribed; I believe, the prosecutors requested
11   that it be transcribed.
12       Q.   Did Mr. Romero, when he was talking to you,
13   did he indicate that an individual that he identified
14   as Smurf had talked to him about murdering Frank
15   Castillo?
16       A.   My recollection is that he did mention the
17   name "Smurf."
18       Q.   Now, when he talked to you, he told you
19   things that he'd heard through the grapevine, and
20   also things that he personally saw or heard; is that
21   right?
22       A.   I believe a lot of his information about
23   that was secondhand.  My recollection is he was not
24   at Southern when the murders occurred.
25            But, yes, I documented -- we documented

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1   whatever he had to tell us about the incident.

2       Q.   I want to focus only on the stuff that he

3   saw personally or heard personally; not the things

4   that he heard secondhand, if I could.

5            He left the Southern facility shortly

6   before the homicides in March of 2001; is that right?

7       A.   My recollection is that he left and was not

8   there at the time of the homicides.

9       Q.   Did he indicate to you that he had left

10  shortly before the murders happened?

11      A.   I believe that was part of his statement to

12  us.

13      Q.   And in his interview with you, he

14  specifically indicated that Smurf was going to kill

15  Castillo, and that Smurf wanted Mr. Romero to kill

16  Mr. Garza; is that right?

17      A.   I believe that's correct.

18      Q.   Now, Smurf is an individual known as Leroy

19  Lucero; is that right?

20      A.   My recollection, after 17 years, is that

21  was a prison nickname or a gang name for Mr. Lucero.

22      Q.   If we could search Exhibit C for Lucero.

23           I know it's a long time, but do you recall

24  whether he gave the actual name for Smurf?

25      A.   I think I might have to go back and review

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492



```
 1    the actual interview.  My recollection was he may
 2    have told us:  Go talk to this person, he knows who
 3    it is, or eventually he told us -- but I think there
 4    may have been some hesitation initially.
 5         Q.   We're going to show you PDF page 141 of
 6    Exhibit C, which is also discovery page 14468.  It
 7    will be up on your monitor here in a second.
 8              Do you see where you asked him:
 9              "Just for the record, who is Smurf?"
10              And then he identifies him a little farther
11    down as Leroy Lucero from Las Vegas?
12         A.   Yes.
13         Q.   So would it be fair to say that at that
14    point the FBI at least had information from Mr.
15    Romero that Leroy Lucero was planning the murders of
16    the two people who died at the Southern facility in
17    2001?
18         A.   Mr. Romero had shared that information with
19    us, yes.
20         Q.   And he said he had a personal conversation
21    with Leroy Lucero?
22         A.   About --
23         Q.   About the --
24         A.   -- the murders.
25         Q.   -- planning the murder?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    And this would have been before Mr. Romero

3   left the facility?

4        A.    My understanding is that conversation took

5   place before he left.  That's my recollection.

6        Q.    Do you know what happened to Mr. Romero?  I

7   mean, is he alive?

8        A.    I have been told that he is dead.  But I

9   haven't done any personal investigation into that

10  after I left the gang task force.

11       Q.    Would you have distributed this interview

12  of Mr. Romero to the Southern Gang Task Force?

13       A.    It would have been placed in the file, and,

14  therefore, they would have had access to it.  I don't

15  know if it was specifically sent to them as a

16  separate item.

17            When we collected information, it would be

18  put in the file.  And they would have had access to

19  this file, as well as anything I was working on.  So

20  there was an intelligence analyst, who would be the

21  primary facilitator between the two of us.  Because

22  we were investigating separate things, the analyst

23  would look at both of those things and pass

24  information back and forth.  But the agents did less

25  of that than the analyst did.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                                         Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                           FAX (505) 843-9492

                                                                                   1-800-669-9492
PROFESSIONAL COURT                                          e-mail: info@litsupport.com
REPORTING SERVICE

1        Q.   So what I understand is you probably don't

2   remember where it was distributed, but it makes sense

3   that it would have been distributed to the Southern

4   Gang Task Force?

5        A.   I would assume that our analyst would have

6   shared that.  But it would have been put in the file.

7   So it was available.

8        Q.   And would you have shared that with

9   Lawrence Jaramillo?

10       A.   I believe he would have known about that.

11  By Lawrence are we talking -- is it Will?

12       Q.   I'm sorry, "Will," I apologize.

13       A.   "Will."  I'm sorry, I just want to make

14  sure.

15       Q.   There are a lot of names.

16       A.   Mr. Jaramillo would have known about that,

17  either through Mr. Costales, who was assigned to the

18  task force, or as a part of a weekly meeting or

19  update.

20       Q.   After this interview, did you make any

21  attempt to interview Mr. Leroy Lucero?

22       A.   Again, I was not investigating this

23  particular homicide, so I don't believe -- that

24  was -- I was focusing on other issues.  So, no, I did

25  not personally pursue that because it was outside of

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                        1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1    my assignment.

2         Q.   No, I understand.  You would interview SNM

3    members, and gather information that was something

4    that might be focused on your investigation, but

5    you'd collect information generally that might be the

6    focus of any other FBI investigation; is that right?

7    I'm sorry, that was poorly worded.

8         A.   I'm not quite sure what you're asking.

9         Q.   Okay.  You'd interview SNM members from

10   time to time; is that correct?

11        A.   Yes, sir.

12        Q.   And when you interviewed them, you wouldn't

13   just confine yourself to your immediate

14   investigation, but you would include other open SNM

15   investigations in your inquiry?

16        A.   I asked everything about the SNM.  Because,

17   if you have somebody who is cooperating, it doesn't

18   make sense to just ask them about the focus of mine.

19   So we would ask them about all criminal things.  The

20   analysts then would share that information and pass

21   it back and forth and coordinate that.

22        Q.   And do you recall whether you had shared

23   this interview with Mr. Romero with Special Agent

24   Armijo in the Southern Task Force?

25        A.   I don't recall specifically having that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    discussion.  But it very well could have happened.  I
 2    just don't recall that specific discussion, sir, I'm
 3    sorry.
 4                MR. CASTLE:  I don't have any other
 5    questions.
 6                THE COURT:  All right.  Thank you, Mr.
 7    Castle.
 8                Any other defendant have direct examination
 9    of Mr. Pedersen?
10                All right.  Mr. Beck, do you have
11    cross-examination?
12                MR. BECK:  I do, Your Honor.
13                THE COURT:  Mr. Beck.
14                      CROSS-EXAMINATION
15    BY MR. BECK:
16        Q.   Good afternoon, Agent Pedersen.
17        A.   Good afternoon.
18        Q.   Now, I think when you were talking with Mr.
19    Castle, you said your focus was on central and
20    northern New Mexico in the SNM?
21        A.   That's correct.  In my review of documents
22    related to my testimony, I actually was asked to
23    draft a document, and open an investigation
24    specifically for central and northern New Mexico, as
25    it pertains to the SNM.  And that was the 166 file
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   number that Mr. Castle referred to in an earlier

2   document.  So my focus was on crimes and ongoing

3   criminal activity at the correctional facilities, but

4   also geographically in the northern and central part

5   of New Mexico.

6        Q.   And I think you said with Mr. Castle that

7   your knowledge of the Southern Gang Task Force, their

8   investigation into these 2001 homicides was, quote --

9   you were told, quote, "If they want to do Southern

10  cases, that's fine."  Was that the extent of your

11  knowledge of whether the Southern Gang Task Force was

12  investigating?

13       A.   We had a separate governing board, is my

14  understanding.  And so the other federal, or state

15  and local agencies that tasked their officers to work

16  with us would kind of determine what we worked.  And

17  there was an executive board meeting -- the task

18  force that I was involved in, and my investigative

19  things were to focus on the central and northern part

20  of the state.  There was a separate group down in Las

21  Cruces, in this part of the state, that also was

22  looking into the SNM, apparently.  But they had their

23  own board of governors, their own people that

24  directed that.  So I think that would be a fair

25  statement.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  Yeah, what I'm trying to say is you

2  don't know whether the Southern Gang Task Force was

3  investigating the 2001 homicides; is that fair to

4  say?

5      A.   I don't know the specific activities they

6  were doing.  My understanding is they did start

7  looking into the SNM.

8           But I had so much of my own work, and then

9  getting pulled into 9/11 -- they might have cc'd me

10  on documents, or said, Hey, we're doing this, but I

11  had my own investigations and my own subjects.  So I

12  knew they were there.  I would cc Andy Armijo if I

13  did something occasionally.  But there wasn't a lot

14  of ongoing communication.  The analyst was the

15  primary person to share that information or to update

16  things.  We were runnin' and gunnin', doing our own

17  investigation.

18           THE COURT:  Mr. Beck, would this be a good

19  time for us to take one of our afternoon breaks?

20           MR. BECK:  Sure, Your Honor.

21           THE COURT:  All right.  We'll be in recess

22  for about 15 minutes.

23           (The Court stood in recess.)

24           THE COURT:  All right.  We'll go back on

25  the record.  All right.  Mr. Pedersen, I'll remind

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    you that you're still under oath.
2              THE WITNESS:  Yes, sir.
3              THE COURT:  Mr. Beck, if you wish to
4    continue your cross-examination of Mr. Pedersen, you
5    may do so at this time.
6              MR. CASTLE:  Your Honor, just before we
7    start, Mr. Cooper had to leave for the day.
8              THE COURT:  Yeah, Ms. Bevel explained that
9    to me.  Sorry.  Tell him we hope he gets to feeling
10   better.
11                   CROSS-EXAMINATION
12   BY MR. BECK:
13        Q.   Mr. Pedersen, you talked about 9/11, and I
14   want to go back to that in just a second, but did you
15   present an SNM-related case to the U.S. Attorney's
16   Office for possible prosecution?
17        A.   Yes.  There were three or four different
18   things that I was focusing on.  One was Angel Munoz,
19   who was the jefe at the time.  And I presented
20   information -- we conducted a search warrant at his
21   home shortly after he got out of prison.  And I
22   believe he was charged federally.  I was, I believe,
23   the person responsible for that federally.  There
24   were a couple of --
25        Q.   Let me stop you there.  So Angel Munoz, do
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you know if he's a defendant in this case?

2         A.   I believe he's diseased.

3         Q.   Fair enough.  Does that help refresh your

4    memory whether he's a defendant in this case?

5         A.   I believe not.

6         Q.   Okay.  Who is next?

7         A.   There were a couple of corrections officers

8    who were assisting the SNM in smuggling drugs into

9    the prison.  There were two corrections officers that

10   we addressed in Estancia.  I believe one of them was

11   named Sharon Easley, and the other, Elias Saenz.  And

12   then --

13        Q.   Were they prosecuted?

14        A.   I believe they were eventually prosecuted

15   at the state level.  But that was part of our

16   investigation, part of the drug trafficking aspect.

17        Q.   The U.S. Attorney's Office did not

18   prosecute that?

19        A.   They did not prosecute those.

20             I presented a case on the homicide of

21   Matthew Cavalier.  That was a homicide at Bernalillo

22   County Detention Center.  That was within my region,

23   so that one I investigated, and I believe it was

24   declined by the U.S. Attorney's Office.  But that was

25   one of the murders that I was actively investigating.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Q.   So out of the SNM investigation, is it fair

2     to say that, out of your investigation, the cases you

3     presented to the U.S. Attorney's Office, the only

4     prosecution that resulted from that was for Angel

5     Munoz?

6          A.   Yes, sir.

7          Q.   And what were the charges there?

8          A.   I believe it was a career criminal charge

9     based on the heroin and the drug that we found -- or

10    the heroin and the gun that we found at Mr. Munoz'

11    home.

12         Q.   And then -- as I said, I was going to come

13    back to 9/11.  Why was that a significant event in

14    relation to your investigation in the SNM enterprise?

15         A.   I was at the headquarters city office the

16    morning of 9/11.  And before the second plane hit the

17    second tower, the SAC came to me, and he said:  Set

18    up a command post, this appears to be an act of

19    terrorism.  And that pretty much changed my career

20    for the next five years.

21              On paper, I was still assigned to the gang

22    task force, but I spent probably three or four months

23    working mostly counter-terrorism matters.

24              And then I was sent to Salt Like City in

25    early 2002 for approximately 45 days to work the

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   Winter Olympics.  There were serious terrorism
 2   concerns.  Obviously, we just had 9/11.  So I was
 3   sent up there.  I believe we worked about 45 days
 4   straight, 12-hour shifts.  So when I came back, they
 5   gave us time off, because we hadn't really been able
 6   to take time off for a month and a half.
 7            So for about six months, through late
 8   August, first week or two of September, through
 9   probably March, I did very little work on the SNM, or
10   much gang work of any kind.  There may have a few
11   pieces of paper, a few things that had to be done
12   administratively.  But most of my time became focused
13   on terrorism things at that point.
14       Q.   Is that true for other members of the FBI
15   who were on the Central New Mexico Violent
16   Organization Task Force with you?
17       A.   I know that Agent Howington, at some point,
18   was transferred off.  I don't recall what squad he
19   was transferred to.  But it had a significant impact.
20   And I was the primary case agent on the SNM
21   investigation, on that task force.  So I think that
22   was one of the precipitating factors was, the lead
23   investigator was gone.
24            We did a few additional things, but by
25   October or so of 2002, I had been sent to Arabic
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   training and terrorism classes, and I no longer had

2   any involvement with the task force on a day-to-day

3   basis.

4        Q.   I think you said, in terms of sharing

5   information with the Department of Corrections during

6   their investigation, you asked for and were provided

7   some background information on specific SNM members;

8   is that right?

9        A.   Yes, sir.

10       Q.   You also earlier talked with Mr. Castle

11   that -- about if you were seeking to charge a

12   particular person, then you asked for information on

13   that particular person; is that right?

14       A.   Yes.

15       Q.   And then I think you also spoke with Mr.

16   Castle about concerns that investigation -- you know,

17   the fact that you're investigating someone may get

18   out; is that a concern that you have, when you're

19   working?

20       A.   It's always a concern.  Because evidence

21   can disappear.  Then subjects may act differently, if

22   they know they're being pursued.  So it was also a

23   caution that we had in gang investigations, was to

24   try to limit the number of people that knew

25   specifically who we were investigating.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So in pursuit of this investigation, you

2    didn't ask New Mexico Corrections Department for a

3    list of their internal sources, did you?

4      A.   They shared some names and information in

5    general with us, but I don't recall -- they had their

6    own sources.  So I did speak with them, and I think

7    they suggested people that we could try to talk to.

8    On some occasions those people had no interest.  In

9    others, it was kind of a game of "what will you give

10   me?"

11        But my understanding is they had some of

12   their own internal sources.  We did share information

13   back and forth.  But I don't recall ever seeing

14   something that listed all of the Corrections

15   Department sources.

16     Q.   I think that answered my question.  Thank

17   you.

18        I'm going to take you to Defendant's

19   Exhibit B.  What is the significance of the 166E

20   number that's highlighted there, on the top of that?

21     A.   Right.  My understanding is that the "92"

22   was an intelligence case.  The "166E" was an actual

23   substantive -- they're working towards gathering

24   evidence and potentially prosecuting someone.

25        So when I opened an "166E" case, we were

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

BEAN
&ASSOCIATES, Inc.

1-800-669-9492
e-mail: info@litsupport.com

1    looking at Angel Munoz, we were looking at these

2    prison -- the corrections officers that were bringing

3    drugs in, the Matthew Cavalier.  So my recollection,

4    from 17 years ago, is that's what we would do for a

5    substantive criminal investigation, rather than an

6    intelligence big picture case.

7         Q.   And for an intelligence case, I think you

8    talked about earlier having files that other agents

9    may pick pertinent information out of.  Is that what

10   an intelligence file would be?

11        A.   Initially, for example, those of us who had

12   no gang investigation background, we contacted other

13   agencies -- Corrections, in particular, in this

14   regard -- to get information on who the members of

15   the gang were, the basic background information,

16   which we then would reposit in that 92 case.

17            But as we started developing sources, or

18   information about potential criminal charges, at that

19   point, we would open a 166 case.

20        Q.   Okay, thank you.

21            And I want to take you to Exhibit A,

22   Defendants' Exhibit A.  Now, I think you went over

23   this with Mr. Castle.  And I just want to make sure

24   that I'm understanding this correctly.  Your

25   intention with this was to open sort of this



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   92D-AQ-54707 investigation into the SNM?

2        A.   Yes, this was the opening of an

3   intelligence case on the SNM Gang per instructions

4   from my management for the Central Task Force -- I

5   believe that's the term we decided to use for it.

6        Q.   Is it fair to say that this document

7   reflects the current state -- well, let me ask this

8   question first:   I think you said that the

9   information in here came from another document or

10   from another source.

11        A.   This would include open source information,

12   other discussions with Corrections.  This was just a

13   summary of things that were allegedly known, or

14   things summarizing what the SNM was doing; what their

15   believed crimes were, and then kind of set out an

16   investigative plan that we hoped to carry out.

17        Q.   Okay.  Is it fair to say that this was the

18   investigative plan -- again, you said earlier, the

19   two homicides here in Southern New Mexico that you

20   weren't pursuing -- is it fair to say that this is an

21   investigative plan for the whole background of the

22   SNM statewide?  At least the background information

23   for them?

24        A.   The background information came from all

25   the sources that I had, which would have been open



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    source, Corrections, everything else.

2         Q.   Okay.

3         A.   I opened, two months later, an actual

4    substantive 166E, where I started pursuing criminal

5    investigations against specific individuals

6    associated with the SNM.

7         Q.   All right.  And that answers my question.

8              So I'm going to take you to page 2 of this,

9    and I'm going to direct your attention to the bottom

10   of the first paragraph there, the last sentence,

11   where it says, "NMSP and the Department of

12   Corrections are investigating and a report should be

13   obtained from these agencies."  Do you see where it

14   says that?

15        A.   Yes.

16        Q.   Does that indicate to you that, at least at

17   this time, you didn't yet have access to those State

18   Police reports and Department of Corrections'

19   reports?

20        A.   My understanding is that the State was

21   conducting that investigation, and that's why I

22   documented it that way.  I don't believe we had

23   obtained those records, or I would have mentioned we

24   already have those documents in our possession.

25        Q.   Sure.  So it sounds like, at least at this

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                         (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    point, you weren't working hand-in-hand with the
 2    State Police and the Department of Corrections on the
 3    Garza and Castillo murder; is that fair to say?
 4         A.   I don't believe I ever did.  But at this
 5    point, I don't know that the FBI was either.  I'm not
 6    aware of that, because I was not actively involved in
 7    the Southern Task Force, sir.
 8         Q.   Okay.  Now, I want to take you down the
 9    page to the Matthew Cavalier heading.  And in the
10    first sentence there at the second to the third line:
11    Where did this murder occur, according to this
12    report?
13         A.   Bernalillo County Detention Center.
14         Q.   And then Bobby Ortega is the next one.
15    Does it say in this report that the case is currently
16    being prosecuted by Lea County?
17         A.   Yes, sir.
18         Q.   And then, on the third page, still talking
19    about Robert --
20              THE COURT:  Mr. Benjamin, you're okay,
21    right?  You're just looking --
22              MR. BENJAMIN:  -- at the monitor, Your
23    Honor.
24              THE COURT:  All right.  I just didn't want
25    to ignore you.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BENJAMIN:  Thank you, Your Honor.
 2            THE COURT:  All right.  Mr. Beck.
 3       Q.   The third page of this report, does that
 4  tell you where the murder of Robert Ortega happened?
 5  Or maybe that helps refresh your memory where it
 6  happened.
 7       A.   Yes, that helps refresh my memory.  I
 8  believe it was at the Hobbs Correctional Facility.
 9       Q.   And is that last sentence in relation to
10  Bobby Ortega, like the Castillo-Garza, does that tell
11  you whether you were joined in that investigation
12  into the Bobby Ortega murder at that time?
13       A.   I don't believe it documents the FBI
14  involvement in that matter.
15       Q.   Where it says in that last sentence,
16  "Reports need to be obtained from Lea County and
17  Hobbs Correctional Facility," does that indicate to
18  you that you were not participating in that
19  investigation?
20       A.   Yes.
21       Q.   The next one, Felix Animal Martinez, does
22  that report indicate where that murder happened?
23       A.   That was also the Bernalillo County
24  Detention Center.
25       Q.   The next one, Ronnie Baca; where did that
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    murder happen?

2        A.    Bernalillo County Detention Center.

3        Q.    Okay.  Now, it looks to me like this

4    report -- Phillip Silva -- it looks to me like this

5    murder happened -- from that first sentence -- after

6    he was released from prison?

7        A.    That's my understanding.

8        Q.    So this is the first one we've seen so far

9    that did not happen in a prison; is that fair to say?

10       A.    Yes, sir.

11       Q.    And then, in the last sentence of the

12   investigation into Mr. Silva; does that tell you

13   whether the FBI was joined in this investigation?

14       A.    My understanding is we were not, because we

15   still needed to obtain the records.  If we were

16   actively involved, I believe we would have already

17   had those records in our possession.

18       Q.    The next one, Victor Herrera; does this

19   report indicate to you where Victor Herrera's death

20   occurred?

21       A.    Central New Mexico Correctional Facility.

22       Q.    I'm going to turn your attention to page 4.

23   I believe this is still in relation to Mr. Herrera's

24   murder.  It looks like the first full paragraph on

25   that page refers to Toby Romero.  Do you see that?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.   Yes, sir.
 2         Q.   I think you know Toby Romero; is that
 3    right?
 4         A.   Yes, I've met him and interviewed him.
 5         Q.   Okay.  Does this indicate to you whether --
 6    at this time, does that second sentence indicate to
 7    you at that time whether he was an FBI cooperator?
 8         A.   I don't believe he was a cooperator at that
 9    time.
10         Q.   All right.  The next murder there:  Max
11    Gutierrez, Jr., where did that murder take place?
12         A.   I believe that was at the Main Correctional
13    Facility in Santa Fe.
14         Q.   So that's another prison murder, right?
15         A.   Yes, sir.
16         Q.   I'm going to direct your attention to page
17    5:  The murder of Michael Fuentes; where did that
18    take place?
19         A.   I believe that was also at the Main
20    Facility in Santa Fe.
21         Q.   And then the last murder on here:  Adam
22    Aragon.  It looks like this is the second murder --
23    only the second murder so far -- that did not take
24    place in prison, right?
25         A.   That's my understanding.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Now, reading through that Adam Aragon

2   sentence, it looks to me like it says that

3   Corrections had obtained a letter from an SNM member

4   which talked about the killing.  Do you see that?

5        A.    Yes, sir.

6        Q.    And it says that -- and it looks to me like

7   FBI intended to get a copy of this letter; is that

8   accurate?

9        A.    Yes.

10       Q.    So at this time, or at the time of writing

11   this, does that indicate to you whether Corrections

12   and FBI were working hand-in-hand in investigating

13   this murder?

14       A.    I believe this document was drafted at the

15   very beginning, when I was just starting to develop a

16   relationship with Corrections.  So I don't believe we

17   have that in our possession.

18       Q.    Now, the next couple of pages -- and I'm

19   not testing your knowledge on this -- the next couple

20   pages talk about SNM drug traffic activities; is that

21   fair to say?

22       A.    Yes.

23       Q.    Is it fair to say that this document at

24   least classified the SNM drug trafficking activities

25   as significantly, if not almost solely, within the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                           1-800-669-9492
                                                      e-mail: info@litsupport.com

```
 1    prison system?  And I'll direct your attention to

 2    page 5, where it starts talking about SNM drug

 3    trafficking activities and the penal system.

 4              And then it's not until page 7 till we get

 5    to SNM drug trafficking tied to street gangs.  Do you

 6    see that?

 7         A.   Yes.

 8         Q.   And if you need to look through this, you

 9    can.  But is it fair to say that the tie to street

10    gangs was a tie to street gangs that were providing

11    drugs into the prisons at this time?

12         A.   My understanding at the time was that that

13    was a problem.  A lot of the drugs that were coming

14    into the SNM came from street gangs or members of

15    street gangs, and that was one of the methods that

16    drugs were being smuggled into the prison.

17         Q.   So let me ask you a question generally

18    about this Defendants' Exhibit A proposed

19    investigative plan for the SNM.  Is it fair to say

20    that all except for two of the murders mentioned in

21    here -- and the majority, if not all of the drug

22    trafficking crimes -- was directed at things that

23    take place within the prison system only?

24         A.   I would say that the majority of the SNM's

25    activities are within the prison system.  We
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    considered this a prison gang case, although there
 2    were people on the outside.  That was the primary
 3    focus.  Obviously, all entities that large have some
 4    extended features.  But this was primarily a prison
 5    gang case, and activities related to the prisons.
 6              MR. BECK:  Give me one second here.
 7              THE COURT:  Certainly.
 8       Q.   You were asked about Mr. Romero's -- Toby
 9    Romero's -- discussions about -- with Smurf, or Leroy
10    Lucero.  Do you remember that?
11       A.   Yes, sir.
12       Q.   Did you follow up and corroborate Mr.
13    Romero's representation to you that Leroy Lucero told
14    him of the plan to kill two inmates inside the
15    Southern New Mexico Correctional Facility?
16       A.   I was not actively working that homicide,
17    so I did not -- I don't recall going out and trying
18    to verify that.  I did work on verifying other
19    information.  For example, Corrections officers that
20    were bringing drugs in, things like that.
21              But that was not one of my investigative
22    things at the time.  So I don't believe we ever --
23    myself or the people on our task force -- ever ran
24    that to ground.
25       Q.   And following up on that:  Again, you said
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that, I think three out of the four cases that you

2    presented to the U.S. Attorney's Office for

3    prosecution, is it fair to say that they actually

4    involved events outside of the prison system, what I

5    might call on the streets?

6              So let me ask a better question.  The

7    Corrections officers that you presented for

8    prosecution, were they confined within the prison, or

9    did they live outside on the streets and then go in

10   to prison for work?

11        A.   They lived outside on the streets, and then

12   they would bring drugs in to SNM members in the

13   prisons.  Angel Munoz was outside the prison.

14        Q.   That was my next question.

15             I want to show you what's been admitted as

16   Defendant's Exhibit I.  Does this appear to be a

17   Corrections, or Southern New Mexico Correctional

18   Facility memorandum dated April 12, 2001?

19        A.   Yes, sir.

20        Q.   And in this report it talks about Source

21   1-A.  Is that an FBI source?

22        A.   I have no way of knowing if that's an FBI

23   source.  I was not involved in this.  And it's not a

24   source that I ran, as far as I know, so I don't have

25   any idea who Source 1-A is.  I'm sorry.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   That's fine.  Do you think that this is one
 2   of the Corrections sources you've talked about, that
 3   you didn't have a list --
 4             MR. CASTLE:  Objection.  It calls for
 5   speculation.  He says he doesn't know anything about
 6   this report.
 7             THE COURT:  Well, let me see what the agent
 8   says.
 9             MR. BECK:  I can ask a better question.
10             THE COURT:  All right.
11        Q.   At any time you were working on the gang
12   task force investigating the SNM, did you have a list
13   that included a source who was termed or named Source
14   1-A?
15        A.   I'm not familiar with the Source 1-A, sir.
16        Q.   You opened and numbered sources for the FBI
17   during your time working on the Central New Mexico
18   Violent Organization Task force?
19        A.   Yes, sir.
20        Q.   And that's not the way that you would open
21   a source, or term a source with the FBI?
22        A.   At the time, that number would not
23   accurately reflect an FBI source.
24        Q.   During the time that you investigated the
25   SNM, throughout your entire time here in New Mexico
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    or elsewhere, did you have any discussions with the
 2    U.S. Attorney's Office about delaying prosecution of
 3    the SNM for any crimes to gain a tactical advantage?
 4         A.   I never have asked anyone to delay a
 5    prosecution that I'm aware of.  But particularly in
 6    this case, there was never a request for any delay.
 7    In fact, I pushed to prosecute the Cavalier case.
 8         Q.   Did you hear anyone ever say anything like
 9    that?
10         A.   No, sir.
11              MR. BECK:  I'll pass the witness.
12              THE COURT:  All right.  Thank you, Mr.
13    Beck.
14              Mr. Castle.  Do you want --
15              MR. CASTLE:  Yes, if we could pull up
16    Exhibit A again.
17                   REDIRECT EXAMINATION
18    BY MR. CASTLE:
19         Q.   Do you have a paper copy with you?
20         A.   I believe this is the same document you
21    referred to before.
22         Q.   Here it is.  This is titled, "Proposed
23    investigative plan for the SNM"; is that right?
24         A.   Yes.
25         Q.   Whose "Proposed investigative plan"?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   My understanding is there was an executive

2   board that met.  They had a discussion.  I was

3   instructed by my supervisor, who basically gave me a

4   brief of an outline.  And then I fleshed it out.  But

5   this was what I was asked to do, or assigned to do.

6      Q.   Would it be the FBI's investigative plan?

7      A.   Yes, for the task force specifically.

8      Q.   Now, it says here, it says, "The following

9   is a list of homicides which have been identified by

10  state and/or local law enforcement agencies as being

11  carried out or ordered by the SNM"; is that right?

12     A.   Yes.

13     Q.   Then it indicates, "In each of these cases,

14  incident reports and investigative reports need to be

15  obtained from the relevant correctional and/or

16  investigative agencies"; is that right?

17     A.   Yes, sir.

18     Q.   Part of the investigation was to gather all

19  those reports; is that right?

20     A.   That would have been one of the steps, yes.

21     Q.   And disciplinary reports were to be

22  obtained?

23     A.   Yes.

24     Q.   And to your knowledge they were?  Do you

25  have any knowledge they weren't obtained?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   My recollection is basic reports were

2    obtained that had gang members' affiliation, and

3    basic things.  I don't think it ever got to this

4    extent where we acquired all of these records from

5    different state and local agencies.

6    Q.   Also indicates "additional investigative

7    leads or suggestions are set forth for each homicide,

8    where such information has been developed"; is that

9    right?

10    A.   Yes.

11    Q.   And then it also indicates, "additional

12    leads should be developed"?

13    A.   That's correct.

14    Q.   Go to the next page.

15    The bottom of the first paragraph, it says,

16    "New Mexico State Police and the Department of

17    Corrections are investigating, and reports should be

18    obtained from these agencies."  Do you see that?

19    A.   Yes.

20    Q.   And was that investigative plan ever

21    abandoned, that goal?

22    A.   I was basically assigned, in June, to focus

23    on Central and Northern New Mexico specifically.  So

24    if that plan continued to go, it would have been

25    something communicated through a different chain of



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    command to the Southern Task Force.  Because I was

2    specifically told to focus on the Central and

3    Northern.  I do have a document to that effect, sir.

4    So if that's an abandonment, yes, for our task force.

5    But I can't speak for what the Southern Task Force

6    was assigned to do.  I'm sorry.

7        Q.   So you have no knowledge of whether the FBI

8    ever abandoned that particular goal?

9        A.   This document here was written for our task

10   force.  And if you look at the executive committee --

11   I believe I testified earlier that the task forces

12   were independent.  This plan was changed at least to

13   that extent, because I was ordered to focus my SNM

14   investigation, as of June, for the Central and

15   Northern prisons and the activities taking place

16   there.  This --

17       Q.   Agent, let me try to narrow this.  You

18   indicated to the attorney for the government that

19   this was a plan for the whole State of New Mexico; is

20   that right?  Did you say that?

21       A.   I believe I testified earlier that there

22   were two task forces.

23       Q.   I understand.  But the overall plan was for

24   both, for the State of New Mexico; is that correct?

25   Yes or no?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                     e-mail: info@litsupport.com

1        A.    This document was derived from a meeting

2   from my management.

3        Q.    I'm asking, was this plan for the whole

4   State of New Mexico:  Yes or no?

5        A.    I'm not aware of what Southern New Mexico's

6   plan was, sir.  So for the --

7        Q.    That's fine.

8        A.    -- for the Central Task Force this was the

9   plan.

10       Q.    Let's move on.  Robert Ortega -- Bobby

11  Ortega's murder, what part of the state did it occur

12  in, and why is it in this plan?

13       A.    Because, initially --

14       Q.    Let me break that down, that was two

15  questions.  What part of the state is the Bobby

16  Ortega murder?

17       A.    Hobbs, New Mexico.

18       Q.    Is that the Southern part?

19       A.    Yes, sir.

20       Q.    And if you could go to the next page.  In

21  the plan it says that "Reports need to be obtained

22  from Lea County and the Hobbs Correctional facility,

23  and Aragon needs to be interviewed regarding this

24  homicide.  Calderon also needs to be interviewed"; is

25  that right?

SANTA FE OFFICE                                                                        MAIN OFFICE
119 East Marcy, Suite 110                                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                                             Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492
                                                                                      1-800-669-9492
                                                                              e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1          A.    Yes, sir.
 2          Q.    So these were plans -- it's in your plan,
 3    and it involved a murder that happened in the
 4    Southern part of New Mexico:  Yes or no?
 5          A.    Yes.
 6          Q.    And throughout this plan, there are
 7    investigative leads that are indicated for the FBI to
 8    follow up on?
 9          A.    Yes, sir.
10          Q.    Let's go to the Ronnie Baca murder, a
11    little bit below.  In that murder, it even has the
12    FBI -- the plan is the medical records on Chavez and
13    Silva should be checked to verify possible serious
14    illnesses that must have been relevant in that
15    murder; is that right?
16          A.    Yes, sir.
17          Q.    Then the Phillip Silva murder, which is the
18    next one that's listed, there is an indication in
19    your plan that "reports need to be obtained from the
20    BCSO Homicide Unit regarding this homicide."  Do you
21    see that in the last sentence?
22          A.    Yes, sir.
23          Q.    Now, if we could go to page 5 of this
24    report, at the bottom of the page.  You indicate in
25    this plan that "there are a number of valuable
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    resources which the Department of Corrections has

 2    agreed to make available for this investigation"; is

 3    that correct?

 4         A.   I'm sorry?

 5         Q.   Where I put the little red dot.  I'm just

 6    learning the dot program here.

 7         A.   Yes, sir.

 8         Q.   So there was -- the plan was to share

 9    resources with the Department of Corrections, at

10    least with regard to drug trafficking?

11         A.   Yes.

12         Q.   Go to the next page.

13              Do you see where it indicates it would

14    appear that, "The easiest and most productive way to

15    work this part of the investigation would be to

16    capitalize on the resources of the Department of

17    Corrections, and work this part of the investigation

18    jointly with them"?

19         A.   Yes, sir.

20         Q.   And that happened?

21         A.   My understanding is that's why Mr. Costales

22    from probation and parole, was assigned to work with

23    us.  And my understanding was probation and parole

24    was a part of the Corrections Department.

25         Q.   So you were working jointly with them?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.   Yes, sir.

2        Q.   Then, if we could go to page 8.  Do you see

3   in the second to the last paragraph it says, "It is

4   anticipated, with the concentrated effort, working

5   the SNM through both the prisons, as well as the

6   streets, sufficient information will be obtained

7   regarding a number of prominent SNM members to

8   proceed with a CCE prosecution."  That was the plan?

9        A.   Yes, sir.

10       Q.   Now, there has been some indication that in

11  September of 2001, the bombings derailed at least

12  some of the FBI officers to direct their attention to

13  more important matters?

14       A.   At least me personally.  And I was the

15  primary case agent for the Central Task Force.

16       Q.   Did the task force dissolve?

17       A.   It had not dissolved by the time I left.

18  But, again, I was not there very long.

19       Q.   Members that were part of -- I think you

20  said probation, state parole that had been deputized

21  as federal agents, did they stop working on the SNM

22  investigation?

23       A.   I don't believe they continued to work it

24  heavily without my presence.  There were other gangs

25  also being investigated at that time.  My review of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT                          e-mail: info@litsupport.com
REPORTING SERVICE

```
 1    my investigative file suggests that there was not a
 2    lot of additional work done once I left.
 3         Q.   You said -- you indicated that -- well, you
 4    indicated that you had presented the Matthew Cavalier
 5    homicide to the U.S. Attorney's Office for
 6    prosecution?
 7         A.   Yes.
 8         Q.   When did you do that?
 9         A.   I don't have a specific date.  But I
10    believe it probably would have been sometime in that
11    2001, 2002 time period.  Because I believe I was off
12    the task force completely by the fall of 2002.
13    Without a specific date, going back 17 years, I'm
14    hesitate to say exactly which date or month, sir.
15    I'm not --
16         Q.   So at least your task force continued to do
17    enough work on that homicide to present a case to the
18    U.S. Attorney's Office?
19         A.   I believe that work was done by myself,
20    sir.
21              MR. CASTLE:  I have no further questions.
22              THE COURT:  Thank you, Mr. Castle.
23              Let me see --
24              MR. BECK:  I just have a quick --
25              THE COURT:  Let me see if any other
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   defendants have anything?
 2             MR. BURKE:  No, Your Honor.
 3             THE COURT:  Mr. Burke?  Nobody else?
 4             All right.  Mr. Beck.
 5                       CROSS-EXAMINATION
 6   BY MR. BECK:
 7        Q.   And I don't think this is within the scope,
 8   but in lieu of calling him back, I just have, I
 9   think, one question for him.
10             MR. CASTLE:  I have no objection, Your
11   Honor.
12             THE COURT:  All right.
13   BY MR. BECK:
14        Q.   Who were your SNM sources while you were
15   investigating -- your confidential sources while you
16   were investigating the SNM?
17        A.   The one I recall specifically was Toby
18   Romero.  There were several other SNM members who
19   approached me, who I may have interviewed, or had
20   discussions with.  They were never formally converted
21   to be confidential sources.  So I did interview a
22   number of other SNM members.  For various reasons,
23   they were never made official FBI sources.
24        Q.   All right.  Other than Mr. Romero, do you
25   remember any other names, sources that you had in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    2001?
 2         A.   I believe he was my only FBI SNM source, as
 3    far as I can recall.
 4              MR. BECK:   Thanks.
 5              THE COURT:   Thank you, Mr. Beck.
 6              Mr. Castle, do you have any further
 7    redirect?
 8              MR. CASTLE:   Yes.
 9                   REDIRECT EXAMINATION
10    BY MR. CASTLE:
11         Q.   Agent, do you recall providing two
12    additional reports concerning sources of information
13    that you developed in 2001, when you came here?
14         A.   They were not sources.  When we term an FBI
15    source, they have to go through a process, and we
16    document them.  Those were individuals that asked to
17    talk to me, who were SNM members.  And it was a
18    one-time interview.  But they were not considered
19    sources.
20         Q.   And their names are redacted so that no one
21    can know about them?
22         A.   They asked -- they spoke to us in
23    confidentiality.  And my understanding is they're not
24    witnesses in this matter.
25         Q.   How many SNM witnesses did you interview
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    that you did not classify as a source in the 2001,
 2    2002 time period?  Just an estimate.
 3         A.   It would be a guess at best, sir.
 4         Q.   Multiple?  More than two?  And less than --
 5         A.   Less than probably 20.
 6              Several times, sir, we would meet with
 7    people.  But they would want to exchange -- there was
 8    kind of a back and forth, so we never fully
 9    documented those meetings, because they weren't
10    really willing to cooperate.
11         Q.   And that would be you personally?
12         A.   Me, personally, yes.
13         Q.   Okay.  How many sources were developed by
14    your task force, concerning the SNM, during 2001,
15    2002?
16         A.   I'm not sure if any other FBI operated
17    sources within the SNM, other than the individuals
18    that I either met with, interviewed, or operated.  I
19    was the primary case agent on the SNM, and I don't
20    recall one of the state and local officers running an
21    SNM source.
22         Q.   How about SNM witnesses that are not
23    sources, that were interviewed by other members of
24    the task force?  Would that be a large number?
25         A.   I would -- I honestly don't recall.  But it

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    was not a great number.  I was involved in most of

2    the investigative steps for the SNM, for that task

3    force.

4         Q.   Well, it would be at least enough to

5    prosecute three officers, Angel Munoz, and at least

6    to present the Cavalier murder to the U.S. Attorney's

7    Office?

8         A.   A lot of that information came from Mr.

9    Romero, as far as the corrections officers, and some

10   of those other individuals, sir.

11            THE COURT:  Is that it, Mr. Castle?

12            MR. CASTLE:  Yes, Your Honor.

13            THE COURT:  Anybody else?  Let me see if

14   anybody else has got anything following your

15   questions.  Anything further?

16            All right.  Mr. Beck.

17            MR. BECK:  Nothing further.  He may be

18   excused.

19            THE COURT:  All right.  Is it all right if

20   he be excused, Mr. Castle?

21            MR. CASTLE:  Yes, Your Honor.

22            THE COURT:  All right.  Anybody have any

23   objection?  All right.  Mr. Pedersen, you may step

24   down.  And you may be also excused from the

25   proceedings.  Thank you for your testimony.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1              THE WITNESS:  Thank you.

 2              MR. CASTLE:  Your Honor, the next witness

 3    is in regards to the statements issue, and it's a

 4    person we have to get on their way.  It's an

 5    individual by the name of James Garcia.

 6              THE COURT:  All right.  Do you want to

 7    direct me to the statement again?  Where this is?

 8              MR. CASTLE:  Yes, Your Honor.  It's motion

 9    number 1909.

10              MR. BECK:  Your Honor, may we approach?

11              THE COURT:  All right.

12              (The following proceedings were held at the

13    bench.)

14              MR. BECK:  I just want to get a feel for

15    all of us being up here together.

16              THE COURT:  You miss it?

17              MS. ARMIJO:  It's different from this side.

18              THE COURT:  Short-lived.

19              MR. BECK:  Our understanding is that if

20    this is who we think it is, James Garcia, he is on

21    federal probation, so likely would need an attorney

22    assigned to him, based on what he's going to say.

23              MR. CASTLE:  Your Honor, we've asked him.

24    He doesn't have an attorney.  He's not requesting an

25    attorney.  We're only going to be asking him about

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492



1    statements that he has indicated in the past that

2    Mr. Troup made at a barbecue some time in the past.

3    He's not involved in these homicides whatsoever.  We

4    made inquiry of him about the attorney issue, because

5    of all the other witnesses.

6              THE COURT:  Is he in custody?

7              MR. CASTLE:  No, he's living in the

8    community.

9              THE COURT:  Well --

10              MR. CASTLE:  And I would say, if I could,

11   the Government has never required an attorney be

12   present when they questioned him whatsoever.  They

13   never required that.

14              THE COURT:  Well, is there something he's

15   about to say that you think you might prosecute him

16   for, if there is a violation of his probation or

17   otherwise?

18              MR. BECK:  That, I don't know.  I think the

19   possibility is there.  And so I think it would be --

20              THE COURT:  What do you think he's going to

21   say?

22              MR. BECK:  I think he's going to testify

23   about statements he got from the defendants in this

24   room about the Garza and Castillo murders.

25              THE COURT:  While he's been on pretrial

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    release -- while he's been on supervised release?
 2    I'll get it right.
 3              MR. BECK:  I don't have the documents in
 4    front of me, but I would think so, given my knowledge
 5    of the case.
 6              THE COURT:  So he's hanging around with
 7    felons, is that --
 8              MR. CASTLE:  This would have been a
 9    previous time that he was released -- not this
10    time -- so this would have been a number of years
11    ago, six years ago, at a barbecue.  Not during this
12    time of supervised release whatsoever.  So we're not
13    going to ask him about anything that's happened
14    during his supervised release this time.
15              THE COURT:  What do you think?
16              MR. BECK:  I think, given my knowledge, I
17    would feel more comfortable if he has an attorney.  I
18    don't know that he will be invoking his Fifth in
19    response to those questions.  I understand they're
20    limited, but I think it's --
21              THE COURT:  Is he local?  Is he a Las
22    Cruces person?
23              MS. HARBOUR-VALDEZ:  Albuquerque, Your
24    Honor.
25              MR. CASTLE:  He's from Albuquerque.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    Judge, I have 13 questions.  And my fear is when a
 2    party tries to get a lawyer for a witness who hasn't
 3    asked for one, has no demonstrated need for one, that
 4    that will act as an impediment for the person to
 5    testify.
 6            THE COURT:  Well, yeah, the Government has
 7    always threatened the witnesses.  That's hard ball.
 8    That's the reason I've got to protect them.
 9            MR. CASTLE:  We're not protecting them from
10    the Government.
11            THE COURT:  Well, we are.
12            MR. CASTLE:  Seems like when the attorneys
13    get appointed, they protect them from the defense.
14    That's what's actually happened here.
15            THE COURT:  Well, I understand the logic.
16            MR. CASTLE:  I don't think there is any
17    Fifth Amendment issue here.  I think it will scare
18    him.  And we're entitled to the evidence.
19            THE COURT:  I've got to protect him.  If
20    the Government thinks they might do something, I've
21    got to protect him.  Let me see if I can rustle up a
22    lawyer for him while he's here.  I'm running on fumes
23    as far as attorneys.  But let me see.
24            MR. CASTLE:  Your Honor, if the Court is
25    going to do that, what I would ask, between now and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    when he does testify, that he not be contacted by any

2    of the parties, either through his attorney or not.

3    I don't want this as an opportunity for the

4    Government to try to wrestle a different statement

5    out of him than what he has been telling us today and

6    previous days.  I really think -- I hate to try to

7    impugn anybody's motives here, but the past in this

8    case has shown they get lawyers for the defendant,

9    they negotiate -- I'm sorry, for witnesses -- they

10   negotiate a statement in return for a threat of

11   prosecution.  I don't think that's what this is

12   intended for.

13           If the Court has only appointed counsel to

14   advise him, and that's what the continuance -- the

15   time that's necessary to do, just to give him advice,

16   not for the Government to try to negotiate an

17   alternate story to be put on the stand here.

18           THE COURT:  Can you agree to that?

19           MR. BECK:  No, Your Honor.  I mean, I think

20   we want him to testify.  So if he's being appointed

21   an attorney, we'd have to talk to that attorney about

22   securing his testimony.  So I can't agree to that.

23   I'm not going to wrestle a story out of him.

24           THE COURT:  I'm not going to force an

25   attorney on him.  Let me speak to him here.  So why

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   don't you have your paralegal bring him inside the
 2   door and let me speak to him.
 3            MR. CASTLE:  Mr. Garcia is on the witness
 4   list, and has been for some time.  They've never had
 5   a need to get him an attorney during that time period
 6   whatsoever.  It's only when the defense wants to call
 7   him as a witness that they now think he needs to be
 8   protected by lawyer.  That speaks of what's going on
 9   here.
10            MS. ARMIJO:  Your Honor, this is why he
11   needs an attorney.  This is why we have not debriefed
12   him.  He does need a lawyer.  He is on the witness
13   list.  We are planning on probably getting him an
14   attorney at some point here.  But there is the Sammy
15   Chavez murder; we heard about it in the first trial.
16   It's the one that they said that Billy Cordova was
17   somewhat involved in.  It happened on the streets.
18   Arturo Garcia is charged with that as an Overt Act in
19   the RICO case that we have.  And it's also part of
20   our bad acts that we've listed for him.  He's a
21   suspect in that murder.
22            And so, you know, regardless of his
23   statements or anything else, and depending on what he
24   says -- we don't know what he's going to say.  At
25   times he's cooperating, at times he's not cooperating
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   with the Government.  He's a suspect in the murder
 2   that Arturo Garcia is directly related to as calling,
 3   and so he does need an attorney.  And depending on
 4   what he says, we will be able to impeach him
 5   potentially with statements that he's given about a
 6   murder case that he's a suspect in, so that's why he
 7   needs an attorney, Your Honor.
 8           MR. BURKE:  Your Honor, I think that's a
 9   good point.  And I think the testimony should steer
10   clear of the Sammy Chavez homicide for that reason.
11           MR. BECK:  So do I.  I don't know what he's
12   going to say.
13           THE COURT:  If we take that out, does the
14   Government still think he needs an attorney, if we
15   take the Sammy Chavez homicide out?
16           MR. BECK:  I do, Your Honor.  I think he's
17   a target.  And I think things he says on the stand
18   now could hurt him later on.  And so I can't say -- I
19   mean, I know my obligations, and I can't say that I
20   think it's a good idea that he proceed without a
21   lawyer on these questions.
22           MR. CASTLE:  They're saying he's a target.
23   There wasn't a single person named as a
24   co-conspirator in the homicides.  Who has a list of
25   each one of them?  James Garcia will not --
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              THE COURT:  But Sammy Chavez.

 2              MS. ARMIJO:  That's in the RICO case.

 3              MR. CASTLE:  Oh, it's the RICO case.

 4              MR. BURKE:  2008 homicide that is mentioned

 5    in the RICO.  We would steer clear of that on the

 6    direct examination.

 7              THE COURT:  I think it's more prudent for

 8    me to get an attorney rather than rush anything.  Let

 9    me have him step inside and see what he wants to do.

10    I can't force an attorney.

11              (The following proceedings were held in

12    open court.)

13              THE COURT:  Mr. Garcia, why don't you come

14    up here to the bench, if you don't mind.  If you'll

15    come up and stand right here, I'm going to talk to

16    you for a second.

17              (The following proceedings were held at the

18    bench.)

19              THE COURT:  How are you doing, Mr. Garcia?

20              WITNESS GARCIA:  All right.

21              THE COURT:  Glad to be here?

22              WITNESS GARCIA:  Not really.

23              THE COURT:  I understand.

24              Here's the situation:  Mr. Castle, who

25    represents Mr. Garcia, is wanting to -- Billy
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Garcia -- is wanting to question you.  He says he's
 2   got 13 questions, I don't know what the questions
 3   are, but there may be some further examination by the
 4   defense lawyers, and the Government gets a chance to
 5   cross-examine.  So you've got some questions.  I
 6   don't know what the length of them are.  After
 7   listening to some of the statements that the
 8   attorneys have made to me, it's my thought that you
 9   need to have an attorney appointed to advise you
10   about some of these questions, or at least advise you
11   of issues that may come up.  I'm not going to force
12   an attorney on you, but it's my judgment that I ought
13   to get you one before you start testifying.
14           Do you want me to try to get you one?
15           WITNESS GARCIA:  Yeah, if I need one, yeah.
16           THE COURT:  I can't tell you for certain
17   you need one.  But it's my judgment that it would be
18   prudent to get you one before you got on the stand
19   and started testifying.  So do you want me to try to
20   rustle up a lawyer to represent you?
21           WITNESS GARCIA:  Yeah, I guess, sure.  I
22   don't know what this is about.
23           THE COURT:  All right.  Why don't you step
24   out of the courtroom, and I'll try to make a call
25   here and see if we can find an attorney for you.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1            WITNESS GARCIA:  I have a question, sir:  I
 2    was told I was just going to come up here on
 3    testimony that I gave were a lie, you know what I
 4    mean?  I was trying to make a deal with the FBI.
 5            THE COURT:  Why don't you not say too much.
 6    Why don't you not tell me too much.  Why don't you
 7    step outside of the courtroom.  Let me make a call.
 8    I don't know what I can do at the present time.  But
 9    let me see what I can do, okay?  All right.  Why
10    don't you stay up here and make a call and see if I
11    can get --
12            MR. BECK:  And, Your Honor, I would say
13    based on what I heard right there, he definitely
14    should be represented by an attorney.
15            THE COURT:  Well, I'm concerned.
16            MS. ARMIJO:  And, Your Honor, the other
17    thing, I know the defense doesn't want -- but the
18    attorney should have the RICO indictment and overt
19    acts.  And there is a phone call.  That's why he's a
20    suspect, there is a phone call.
21            THE COURT:  The Baca indictment?
22            MS. ARMIJO:  Yes.  And there is a phone
23    call that he -- I'm pretty certain he's a suspect in
24    that incident.  So I think that the attorney should
25    at least be made aware of the allegations.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. HARBOUR-VALDEZ:  And that he met with
 2     your agents last year and took his DNA.
 3              MS. ARMIJO:  Absolutely.
 4              MS. HARBOUR-VALDEZ:  There was a search
 5     warrant.  They took his DNA.
 6              MR. BURKE:  But that issue is not going to
 7     come up in this examination.
 8              MS. HARBOUR-VALDEZ:  It has nothing to do
 9     with our case.
10              MR. CASTLE:  If counsel advises him on
11     this -- and I think what's likely to happen is that
12     there are going to be questions that may bring up a
13     Fifth Amendment invocation.  Other questions which
14     won't involve what was said at a barbecue eight years
15     ago about something he wasn't involved in is
16     unlikely.
17              THE COURT:  I think you've seen me over the
18     last few months.  I don't allow any sort of blanket
19     assertions.  I take them one at a time.  And I think
20     we've gotten for the most part most of the evidence
21     out.  There has been times where a question was going
22     to clearly incriminate the person.  But let me make a
23     call.  If I can't get something done here, then we
24     may have to move on a little bit.  Let me see if I
25     can get someone.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              (The following proceedings were held in
 2      open court.)
 3              THE COURT:  His first name is James, right?
 4              MS. ARMIJO:  Yes, Your Honor.
 5              (A discussion was held off the record.)
 6              THE COURT:  All right.  So we'll work on
 7      that.  As you know, I'm on fumes as far as finding
 8      lawyers.  So let me see what I can do.  But we're
 9      working on it at the present time.
10              All right.  So what do we go to next?
11              MR. BECK:  Your Honor, the United States
12      has a witness for the motions to dismiss that would
13      be out of the order, but he's been here all day and
14      he'll be short.
15              MR. CASTLE:  Your Honor, we're going to
16      call a different witness, Dwayne Santistevan.  He was
17      a witness in the first trial.
18              THE COURT:  Are you comfortable with this?
19              MR. BECK:  Comfortable?  I know
20      Mr. Santistevan doesn't want to be up here, but he's
21      got a subpoena.
22              THE COURT:  Are you comfortable with
23      calling --
24              MR. BECK:  Him going in front of my person,
25      I'm comfortable with that, yes, thank you.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com


```
 1          MR. CASTLE:  I'm sorry, I talked off the
 2   record with him, and didn't mention it.
 3          THE COURT:  All right.  Mr. Santistevan, if
 4   you'll come up and stand next to the witness box on
 5   my right, your left.  Before you're seated, Ms. Bevel
 6   will swear you in.
 7               DWAYNE SANTISTEVAN,
 8        after having been first duly sworn under oath,
 9        was questioned and testified as follows:
10                  DIRECT EXAMINATION
11          THE CLERK:  State your name and spell your
12   last name for the record, please.
13          THE WITNESS:  My name is Dwayne
14   Santistevan, S-A-N-T-I-S-T-E-V-A-N.
15          THE COURT:  Mr. Santistevan.  Mr. Castle.
16   BY MR. CASTLE:
17        Q.  Mr. Santistevan, in 2004, in June of 2004,
18   where were you employed?
19        A.  I was employed by the New Mexico
20   Corrections Department at the Central New Mexico
21   Correctional Facility.
22        Q.  Do you recall, prior to 2004, all the way
23   back to 2001, there being a pair of murders that had
24   happened in Southern New Mexico Correctional
25   Facility?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Mr. Castle, with all due respect to you,
 2   Your Honor, the rest of the court, I was a victim.   I
 3   testified here last month as a victim, okay?  I'm
 4   still a victim.  And I don't feel comfortable
 5   answering any questions about any homicide that
 6   occurred in 2001.
 7             THE COURT:  Mr. Santistevan, you have to
 8   answer the question.
 9        A.   Ask again, please.
10        Q.   Were you generally aware that two inmates
11   had died on the same day at Southern New Mexico
12   Correctional Facility in 2001?
13        A.   I was aware.
14        Q.   I want to bring you back to 2004.  Do you
15   recall -- well, what was your capacity?  How were you
16   working in 2004?  Were you part of an intelligence
17   unit?
18             THE WITNESS:  Do I have to answer that as
19   well, Your Honor?
20             THE COURT:  You do.
21        A.   I was Security Threat Intelligence Unit
22   Coordinator at the Central New Mexico Correctional
23   Facility.
24        Q.   And in that position at times would you
25   interview inmates who wanted to be confidential
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    informants?

 2         A.   Yes.

 3         Q.   Do you recall -- actually, let me show you

 4    a document.  I'll show you what's been admitted as

 5    Exhibit J.  Does that appear to be a memorandum that

 6    you authored dated June 4, 2004?

 7         A.   Yes.

 8         Q.   If we could scroll to page 2.  Do you see

 9    that there is an informant that's labeled "DFS #3"?

10         A.   Yes.

11         Q.   And is "DFS" your initials?

12         A.   Yes.

13         Q.   At that time, was it policy that when you

14    were having an informant, you would use your initials

15    and then you'd give a number to the informant?

16         A.   Yes.

17         Q.   And that was so that their identity

18    wouldn't be disclosed?

19         A.   It was an identifying number, yes.

20         Q.   See the black area next to it that's

21    redacted?

22         A.   Yes.

23         Q.   Would that normally have contained the name

24    of the informant, or what would be in that area that

25    would be blacked out?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          A.    It would be the informant number.

2          Q.    It would be an informant number in addition

3     to "DFS #3"?

4          A.    Yes.

5          Q.    This particular informant, it looks like

6     you interviewed on June 1st at 9:35 in the morning of

7     2004; is that right?

8          A.    Yes.

9          Q.    Did he provide information to you about the

10    2001 murders at Southern New Mexico Correctional

11    Facility?

12         A.    The only information that I see that this

13    informant provided me with is that Inmate Leroy

14    Lucero was telling inmates that they better get ready

15    because the SNM was about to clean house, and that

16    Billy Garcia had ordered the hits.

17         Q.    Okay.  So let's talk about the two parts of

18    that.  The first part is the CI telling you he

19    "overheard Leroy Lucero telling inmates in the

20    compound they better get ready because the SNM was

21    going to clean house, and the place was going to be

22    locked down"; is that right?

23         A.    That's what it reads, yes.

24         Q.    The second part is that he overheard

25    someone else say that "Billy Garcia had ordered the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                               1-800-669-9492
                                                     e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
 1    hits"; is that right?
 2         A.    That's what it reads, yes.
 3         Q.    He's not saying that he talked to Billy
 4    Garcia or anything like that?
 5         A.    Not from what I can read.
 6         Q.    Now, has anyone from the FBI talked to you
 7    about the identity of DFS #3?
 8         A.    No.
 9         Q.    When you gave this report, where would it
10    go?  Did it go to the --
11         A.    If you look at the first page, it went to
12    my then supervisor, Lawrence Jaramillo.
13         Q.    And he was the head of the STIU?
14         A.    Yes.
15         Q.    And to your knowledge, in 2004, was he
16    working on a gang task force with the FBI and other
17    agencies?
18         A.    Not that I can remember.
19         Q.    So when you say that, are you saying you
20    don't think he did, or that you just don't remember
21    one way or the other?
22         A.    I don't remember one way or the other.
23         Q.    Well, when you gave that information to --
24    well, strike that.
25               Would you keep a separate file where you
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   would write down the actual names that are associated

2   with the informant identifier?

3        A.   What we would do back then -- and I think

4   they still do it -- is we would keep a log, our own

5   individual logs with our CI numbers for future

6   reference.

7             I've since retired from the Corrections

8   Department.  All that documentation, that log, stayed

9   with the Corrections Department.

10       Q.   So you never threw out the logs that you

11  had on informants that you had questioned?

12       A.   No.

13       Q.   And when would you have turned that over?

14       A.   Upon my retirement.

15       Q.   Can you give us a year?

16       A.   February of 2016.

17       Q.   So prior to February of 2016, no agent from

18  the FBI, or individual on behalf of the United States

19  Attorney's Office, contacted you to find out the

20  identities of any informants that you had interviewed

21  that might have information relevant to the 2001

22  murders?

23       A.   I haven't seen this document or talked to

24  anybody else about this document till last week.

25       Q.   Do you recall who DFS #3 is?

SANTA FE OFFICE                                         MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                      1-800-669-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE
                                          e-mail: info@litsupport.com

```
 1          A.   I do not.
 2          Q.   So when you gave over your log -- I take it
 3     the log would have the name of the inmate and then a
 4     number; is that right?
 5          A.   It had the number, then the name of the
 6     inmate, and the date the information was received.
 7          Q.   So if we were to look at that and then --
 8     look at the log and this document, we'd be able to
 9     identify who DFS #3 is?
10          A.   Yes.
11          Q.   And the reason you do that is because you
12     don't have to remember years and years later who DFS
13     #3 is?
14          A.   Correct.  And plus, you'd just be
15     compromising the safety of your source.
16          Q.   Would you have been the one that redacted
17     the information next to the DFS #3, or is that some
18     other entity that would have redacted that?
19          A.   That would have been somebody else.
20          MR. CASTLE:  I have no further questions.
21          THE COURT:  Thank you, Mr. Castle.  Any
22     other defendant have any questions of
23     Mr. Santistevan?  All right.  Not hearing any.
24          Mr. Beck, do you have cross-examination of
25     Mr. Santistevan?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1              MR. BECK:  Yes, Your Honor.
 2              THE COURT:  Mr. Beck.
 3                      CROSS-EXAMINATION
 4   BY MR. BECK:
 5        Q.   Good afternoon, Mr. Santistevan.
 6        A.   Good afternoon.
 7        Q.   I just want to talk to you briefly about
 8   this statement from Source DFS #3.  Where it says in
 9   the second sentence, "The CI stated to me that three,
10   four days prior to the killing, Smurf Leroy Lucero
11   was telling inmates on the compound that they better
12   get ready because the SNM was going to clean house
13   and the place was going to be locked down."  Does
14   that indicate to you that someone in the SNM, other
15   than Leroy Lucero, was going to clean house?
16        A.   Could have been the whole group.
17        Q.   Do you think if he said Leroy Lucero said
18   "I, Leroy Lucero," was going to clean house that you
19   would have written Leroy Lucero was going to clean
20   house rather than the SNM?
21        A.   Yes.
22        Q.   And then when he says "He further
23   stated" -- this last sentence you went over with Mr.
24   Castle -- "He further stated that he had heard that
25   Billy Garcia had ordered the hits on the two inmates
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that were killed," it doesn't say one way or the
 2    other whether he heard that from Billy Garcia, does
 3    it?
 4         A.    It doesn't.
 5         Q.    And do you know that just days before -- I
 6    know it says three or four days on this -- but do you
 7    know that just days before Castillo and Garza were
 8    killed at the Southern New Mexico Correctional
 9    Facility, Billy Garcia arrived there?  Do you know
10    that?
11         A.    I don't know that.  I don't know when he
12    arrived at the facility.
13              MR. BECK:  All right.  Nothing further,
14    Your Honor.
15              THE COURT:  All right.  Thank you, Mr.
16    Beck.
17              Mr. Castle, do you have redirect?
18              MR. CASTLE:  Yes.
19                   REDIRECT EXAMINATION
20    BY MR. CASTLE:
21         Q.    If this informant had said to you that
22    Billy Garcia had confessed to killing the two people,
23    would you have written that in your report?
24         A.    All the information that that informant
25    gave me at the time was what I put on that report.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    And had that informant told me that, yes, I would
 2    have put it on the report.
 3         Q.   And I take it, then, you would have
 4    probably asked some follow-up questions from that
 5    informant:  Where did he confess to you, what the
 6    details of the confession were, and things of that
 7    nature?
 8         A.   I would have gone deeper into the
 9    interview, yes.
10         Q.   And you would have put that in your report?
11         A.   Yes.
12              MR. CASTLE:  Nothing further.
13              THE COURT:  Thank you, Mr. Castle.
14              Anybody else have redirect of
15    Mr. Santistevan?  All right.  Mr. Granberg.
16                     REDIRECT EXAMINATION
17    BY MR. GRANBERG:
18         Q.   Mr. Santistevan, had Mr. Lucero stated to
19    you that Mr. Chavez was in any way related to the
20    murder, you would have put that in the report;
21    correct?
22         A.   I'm sorry?
23         Q.   If Mr. Lucero had stated to you that
24    Christopher Chavez was in any way related to the
25    murders in 2001, of Rolando Garza, you would have put
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that in your report?

2         A.   Yes.

3         Q.   And it wasn't there?

4         A.   No, sir.

5              MR. GRANBERG:  Pass the witness.

6              THE COURT:  Thank you, Mr. Granberg.  Any

7    other defendant have redirect?

8              All right.  Mr. Santistevan, you may step

9    down.  Is there any reason that Mr. Santistevan

10   cannot be excused?  Mr. Castle?

11             MR. CASTLE:  No, Your Honor.

12             THE COURT:  Anyone else from the

13   defendants?  Mr. Beck?

14             MR. BECK:  No, Your Honor.

15             THE COURT:  All right.  You're excused from

16   the proceedings.  Thank you for your testimony.

17             All right.  Do you want to get, Mr. Beck,

18   your witness on this afternoon?

19             MR. BECK:  Yeah, if that's all right.  The

20   United States would call James Pedraza.

21             THE COURT:  Would you give me that name

22   again, Mr. Beck.

23             MR. BECK:  Sure.  James Pedraza.

24             THE COURT:  Mr. Pedraza, if you'll come up

25   and stand next to the witness box on my right, your

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492



```
 1   left.  Before you're seated, my courtroom deputy, Ms.
 2   Bevel, will swear you in.
 3                       JAMES PEDRAZA,
 4        after having been first duly sworn under oath,
 5        was questioned and testified as follows:
 6                    DIRECT EXAMINATION
 7             THE CLERK:  Please be seated.  Would you
 8   state your name and spell your last name for the
 9   record?
10             THE WITNESS:  James Pedraza, P-E-D-R-A-Z-A.
11             THE COURT:  Mr. Pedraza.  Mr. Beck.
12   BY MR. BECK:
13        Q.  Mr. Pedraza, how are you employed?
14        A.  I'm a correctional officer for the State of
15   New Mexico.
16        Q.  And where are you employed as a
17   correctional officer?
18        A.  Here at Southern New Mexico, outside of
19   Cruces.
20        Q.  Is that the Southern New Mexico
21   Correctional Facility?
22        A.  Yes.
23        Q.  In March of 2001, were you a correctional
24   officer at the Southern New Mexico Correctional
25   Facility?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Mr. Beck, before you start,
 2    could you tell me what his testimony -- which motion
 3    it relates to?
 4              MR. BECK:  Sorry, Your Honor.  Yes.  So
 5    this is in relation to both Mr. Garcia's and Mr. --
 6              THE COURT:  The motions to dismiss?
 7              MR. BECK:  Yes.
 8              THE COURT:  Sorry, Mr. Beck.
 9              MR. BECK:  No, not at all.
10        Q.   So in March of 2001, were you employed at
11    SNMCF as a correctional officer?
12        A.   Yes, I was.
13        Q.   Were you working on the night of March 25
14    into March 26 of 2001?
15        A.   Yes, I was.
16        Q.   And where were you working, if you
17    remember?
18        A.   At that time, the housing unit that I was
19    working in was designated as Paul 1.
20        Q.   And what were you doing that evening in the
21    housing unit of Paul 1?
22        A.   I was the control officer.
23        Q.   And what time were you working as control
24    officer?
25        A.   From 10:00 p.m. to 6:00 a.m.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And did you learn at some point the next

2  day -- the next day, on March 26 of 2001, after you

3  left work, were you called back in?

4      A.   Yes.  Obviously, I was working graveyard.

5  I didn't have to work overtime, so I got off at 6:00

6  a.m., and got home usually by 7:00 in the morning.

7  I'd go to bed.  So I received a call probably between

8  9:30, 9:45 from a sergeant at the facility stating

9  that the Warden wanted me to come in in full uniform.

10  He didn't say why.  He just said to come in.

11      Q.   What happened when you returned to the

12  Southern New Mexico Correctional Facility on March

13  26?

14      A.   I was at the lobby, and I was trying to

15  find out what was going on.  And some of the staff

16  was saying that some inmates had been shanked.

17      Q.   Did you learn that an inmate in the Paul 1

18  unit had been shanked, stabbed, and killed?

19      A.   I eventually found out that he was

20  strangled.

21      Q.   Strangled.  Oh, thank you.  You're right

22  about that.

23           And I think you said the overnight, during

24  the graveyard, you had been the control officer?

25      A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   What are your duties as the control

2    officer?

3    A.   I operate the controls, to let people in

4    and out, the cell doors.  I keep a log of the

5    activities in the unit I.  Keep an eye on my rover.

6    The rover is the officer that actually does the round

7    in the pods.

8    Q.   I want to talk to you about the log in your

9    unit.  Is that also referred to by some as the daily

10   log?

11   A.   Yes.

12   Q.   What sorts of activities do you log in the

13   daily log?

14   A.   Major activities, such as count time, when

15   they're released to go to breakfast, when they go to

16   recreation, education.  Whenever an inmate goes into

17   that unit assigned, I'll log it down.  Or whenever an

18   inmate leaves, I make note of that.

19   Q.   It sounds like you do not log -- and tell

20   me if I'm wrong.  Let me ask the question this way,

21   and it may be easier:  Do you log every movement an

22   inmate makes in Paul 1 unit in your daily logs?

23   A.   No.

24   Q.   Do you log in your daily logs if inmates

25   are playing cards at the table in the main area?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492
                                                              1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                 e-mail: info@litsupport.com

```
 1        A.   No.
 2        Q.   Do you log in your daily logs if one inmate
 3   goes into another inmate's cell or room?
 4        A.   No.
 5        Q.   On March 26, did you go back and check --
 6   or sometime close in time to March 26, did you go
 7   back and check the daily logs from the night of March
 8   25 in Paul 1 unit, if you remember?
 9        A.   What do you mean if I checked?
10        Q.   At some point did you go back and check
11   your daily logs for any irregular activity that you
12   had noted inside the cell, inside the pod, if you
13   remember?
14        A.   I don't remember any unusual activity.  The
15   only thing that I remember during that weekend was
16   that the mood of the facility was very odd, the way
17   the inmates were behaving.  They weren't social, the
18   way they normally would be.  They were like more
19   serious, not as social.
20             MR. BECK:  No further questions, Your
21   Honor.
22             THE COURT:  All right.  Thank you, Mr.
23   Beck.  Any defendant have cross-examination of Mr.
24   Pedraza?  Mr. Benjamin?
25             MR. BENJAMIN:  Yes, Your Honor.
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                            e-mail: info@litsupport.com



```
 1                  CROSS-EXAMINATION
 2   BY MR. BENJAMIN:
 3        Q.   The daily logs would show an inmate leaving
 4   the pod to go to work; correct?
 5        A.   Correct.
 6        Q.   Okay.  And that would show his name and,
 7   essentially, the time that he left?
 8        A.   Yes.
 9        Q.   And the time that he came back?
10        A.   Yes.
11        Q.   Okay.  And to the extent that -- have you
12   ever worked in the kitchen area or been familiar with
13   the kitchen area?
14        A.   A few times.
15        Q.   Okay.  Are you aware if they have the same
16   type of log, where they log somebody coming into the
17   kitchen and then, essentially, leaving work at the
18   kitchen?
19        A.   I believe so.
20             MR. BENJAMIN:  Okay.  Pass the witness,
21   Your Honor.
22             THE COURT:  Thank you, Mr. Benjamin.  Any
23   other defendant?  Mr. Castle?
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1                    CROSS-EXAMINATION
2     BY MR. CASTLE:
3          Q.   Did you get to know the individual who was
4     murdered in that pod when you were working there?
5          A.   You're talking about Castillo?
6          Q.   Yes.
7          A.   I vaguely remember him.
8          Q.   Was he acting nervous in those two days?
9     Was he one of the people you saw being extremely
10    quiet, et cetera?
11         A.   I don't recall anything unusual.  But like
12    I said earlier, the mood within the whole compound,
13    the facility, was just very different.  Normally,
14    when they'd be released to chow, they'd be talking to
15    each other, waving, or whatnot.  And that weekend
16    everybody was like very serious.
17         Q.   Did you see anyone that Mr. Castillo had
18    kind of a problem with, or at least you observed
19    problems with?
20         A.   Not that I recall.
21         Q.   Did you know an inmate by the name of Leroy
22    Lucero?
23         A.   I don't remember.
24         Q.   Was that pod that you were working in, was
25    that an SNM pod?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                             1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1        A.    At that time, the SNMers were scattered

2    throughout the facility.  They were within general

3    population, so they were everywhere at that time.

4        Q.    What does it mean to you, as a corrections

5    officer, when the inmates are unusually quiet and,

6    you know, that mood that you saw there?  What does

7    that mean to you?

8        A.    For me personally?

9        Q.    Yes.

10       A.    I felt that something was going to happen,

11   but I didn't know what or when.

12       Q.    As a corrections officer, I take it you get

13   in tune with the moods of the inmates, and where it

14   might cause danger to either yourself or the inmates?

15       A.    Yes.

16       Q.    So that kind of atmosphere was going on in

17   the two days before his murder?

18       A.    Yes.

19       Q.    Do you note on your logs when an unusual

20   number of inmates gather in a particular cell, or

21   what you would consider an unusual number?

22       A.    By policy they're not allowed to congregate

23   in the cell.  So if we see them starting to visit,

24   we'd give them a directive right away to get out.

25   But we would make a note of it.

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                              FAX (505) 843-9492
                                                    1-800-669-9492
                                              e-mail: info@litsupport.com



```
 1        Q.    So you're not even allowed to have a single
 2   inmate that doesn't belong in your cell in your cell?
 3        A.    No.
 4        Q.    What is pod hopping?  Are you familiar with
 5   that term?
 6        A.    I haven't heard it before.
 7        Q.    Is it against regulations for an inmate to
 8   go to a pod in which he doesn't live, unless he's a
 9   porter or something like that?
10        A.    Even if you're a porter, if they're not
11   assigned to that pod, they're not allowed in there.
12        Q.    Does that happen, though, where someone
13   comes in to a different pod that they don't belong
14   in?
15        A.    It depends on the officer in charge.  Me,
16   personally, I wouldn't allow it; I wouldn't allow
17   them to visit another pod.
18        Q.    So in the day before the murders, did you
19   see any unusual number of people going into Mr.
20   Castillo's cell?
21        A.    Not that I recall.
22        Q.    And if a number of inmates would have
23   entered his cell within a few seconds, is that when
24   you would intercede and tell them to disperse?
25        A.    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.   And that's policy?

2        A.   Yes.

3             MR. CASTLE:  I have no other questions.

4             THE COURT:  Thank you, Mr. Castle.  Any

5     other defendants have cross-examination of Mr.

6     Pedraza?

7             All right.  Mr. Beck, do you have redirect

8     of Mr. Pedraza?

9             MR. BECK:  Nothing further.

10            THE COURT:  All right.  Is there any reason

11    that Mr. Pedraza cannot be excused from the

12    proceedings?  Mr. Beck?

13            MR. BECK:  Not from the Government, Your

14    Honor.

15            THE COURT:  Any other defendant have any

16    objection to excusing him?  Not seeing or hearing

17    any, Mr. Pedraza, you may step down.  Thank you for

18    your testimony.  You are excused from the

19    proceedings.

20            THE WITNESS:  Thank you.

21            THE COURT:  All right.  We got -- I may

22    have an attorney coming over, so if somebody wants to

23    put a little packet together -- I'm going to take a

24    break here pretty quick -- if somebody wants to put a

25    packet together so that Mr. Garcia's counsel -- I
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    can't promise it, but can look at it, and sort of be
 2    briefed on what the issues are.
 3              MS. HARBOUR-VALDEZ:  May I speak to the
 4    Government about that?
 5              THE COURT:  Okay.  What do we have next?
 6    If we can squeeze Mr. Garcia in this afternoon, but
 7    it will be after the break -- do you have something,
 8    Mr. Benjamin, you were going to address?
 9              MR. BENJAMIN:  No, Your Honor.
10              THE COURT:  Okay.  Does the Government have
11    anything else it needs to squeeze in this afternoon?
12    Do we go back to arguing, or where do we go?
13              MR. BECK:  We don't have any additional
14    evidence that I can think of for this motion.
15              THE COURT:  How about you, Mr. Castle?
16              MR. CASTLE:  We have a witness, Warden
17    Tafoya, and Corrections Officer Juan Barela.
18              THE COURT:  Okay.  Tafoya is a what, a who?
19              MR. CASTLE:  Well, they're both witnesses
20    for the motion to dismiss.
21              THE COURT:  Are they both corrections
22    officers?
23              MR. CASTLE:  One was a former warden and
24    one was a corrections officer.
25              THE COURT:  All right.  So do you want to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   call one of them?  We can go ahead and take a break,
2   and call one of them right after the break.  We'll
3   see if we get an attorney over here.  I had something
4   else to tell you.  I can't think what it is.  Why
5   don't we take our break and come back in about 15
6   minutes, and we'll see where we are.
7              (The Court stood in recess.)
8              THE COURT:  Let's go on the record.  I've
9   got Cody Rogers walking over.  She's in jeans, but
10  I've sanctioned the attire, so she'll be here in a
11  little bit.  And so I don't know if I would recognize
12  Ms. Rogers.  So when she walks in, if somebody does,
13  if y'all give her whatever packet or information you
14  have.
15             Shall we take up one of your next
16  witnesses, Mr. Castle, while we're waiting for
17  Ms. Rogers to get over here?
18             MR. CASTLE:  Yes.  It would be Lawrence
19  Tafoya.
20             THE COURT:  Mr. Tafoya, if you'll come up
21  and stand next to the witness box on my right, your
22  left.  Before you're seated, Ms. Bevel, my courtroom
23  deputy, will swear you in.
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                        LAWRENCE TAFOYA,
 2          after having been first duly sworn under oath,
 3          was questioned and testified as follows:
 4                        DIRECT EXAMINATION
 5                  THE CLERK:  Please be seated.  Would you
 6     state your name and spell your last name for the
 7     record.
 8                  THE WITNESS:  My name is Lawrence Tafoya.
 9     T-A-F-O-Y-A.
10                  THE COURT:  Mr. Tafoya.  Mr. Castle.
11     BY MR. CASTLE:
12          Q.   Mr. Tafoya, how were you employed in 2001?
13          A.   I was the Warden at Southern New Mexico
14     Correctional Facility.
15          Q.   On March 26 of 2001, were there two murders
16     in that facility?
17          A.   There were.
18          Q.   In the days after those murders, did you
19     and others attempt to try to figure out what had
20     happened?
21          A.   Would you repeat that, please?
22          Q.   Did you and others that worked at that
23     facility try to figure out what had happened?
24          A.   Yes, with the assistance of other law
25     enforcement agencies.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        Q.   During that time, did you personally

 2   interview inmates regarding what happened?

 3        A.   I believe I did interview at least a couple

 4   of them.

 5        Q.   And if I showed you a report that you

 6   authored, would that refresh your memory as to how

 7   many you may have interviewed?

 8        A.   Yes.

 9        Q.   I show you what's been admitted as Exhibit

10   E.  It's up on the monitor there.  Is that a

11   report -- at least -- that's not your report, but it

12   indicates, the first paragraph, Memorandum from STG

13   to Warden Tafoya, titled "Confidential sources on the

14   murders of inmates Frank Castillo and Rolando Garza."

15   Do you see that?

16        A.   I do.

17        Q.   If we scroll down, is this the kind of --

18   is this how you would identify inmates by a number,

19   rather than by their name, if they're trying to give

20   you confidential information?

21        A.   That's correct, yes.

22        Q.   And would you number your sources 1, 2, 3,

23   et cetera?

24        A.   Pretty close, yes.

25        Q.   So does this look like a memorandum of

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 843-9492                                                             FAX (505) 843-9492
                                                                                    1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                                          e-mail: info@litsupport.com

```
 1    people that you may have -- or inmates you may have

 2    spoken to?

 3         A.   I don't know if I spoke to these

 4    individuals myself, no.

 5         Q.   Do you recall doing a memorandum -- I'm

 6    sorry, do you recall interviewing -- do you recall

 7    anything about the interviews you conducted?

 8         A.   Not -- no, not very much.  It's been a

 9    while, so --

10         Q.   I want to turn your attention to page 3 of

11    this document.  Well, actually, let me stay on this

12    page for just a second.  I apologize.  The memorandum

13    that -- this indicates memorandum from STG to you,

14    entitled "Confidential sources," et cetera, what

15    would you have done with that memorandum?

16         A.   I would have reviewed it and forwarded it

17    up the chain of command.

18         Q.   And who would be up the chain of command?

19         A.   That would be the Director of Adult

20    Facilities, John Shanks, and probably Mr. Jerry

21    Tafoya, and probably Mr. Elmer Bustos.

22         Q.   Let's go now to page 3 of the exhibit.  Do

23    you recall whether or not you interviewed an

24    individual identified as Source No. 13 that said he

25    overheard inmate Eugene Martinez talking with inmates
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    Leroy Lucero and Jesse Ibarra about carrying out
 2    assaults on inmates considered to be rats?
 3          A.    I do not recall.  It could have -- I could
 4    have conducted that interview.  I don't recall.
 5          Q.    Okay.  So that could have been conducted by
 6    you or someone else?
 7          A.    Yes.
 8          Q.    Do you recall inmate Eugene Martinez?
 9          A.    I -- vaguely, yes, I do.
10          Q.    And what do you recall about him?  Was he
11    an inmate there at that time?
12          A.    I would believe that he was an inmate at
13    the time, yeah, there at that facility.
14          Q.    As part of your job as the Warden, do you
15    try to keep a feel on the pulse of the institution
16    that you're the Warden of?
17          A.    Yes.
18          Q.    And does that involve knowing about prison
19    gangs that are operating within your facility?
20          A.    Yes, sir.
21          Q.    In 2001, was the Southern New Mexico
22    Correctional Facility an SNM prison?
23          A.    We had a large population of SNM members,
24    yes.
25          Q.    Would part of your duties be to get a feel
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    for who may be the leaders of the SNM Gang at your

2    facility?

3        A.   To my knowledge, yes.  There was also

4    documentation that would follow the inmates as they

5    would be transferred from facility to facility.

6        Q.   Prior to the homicides in 2001, was there

7    an inmate by the name of Lino Giron at your facility?

8        A.   Yeah, I believe so, yes.

9        Q.   And was he identified as the leader of the

10   SNM in your facility, at least through the early

11   months of 2001?

12       A.   If I recall correctly, he was one of the

13   leaders of the SNM.

14       Q.   And when he left, do you recall that

15   another individual became the leader at the facility

16   by the name of Leroy Lucero?

17       A.   I do not recall if -- I don't know if that

18   was the way it happened, or Leroy Lucero was the -- a

19   leader there, or what.

20       Q.   Do you recall Leroy Lucero?

21       A.   I do.

22       Q.   And was he an SNM member?

23       A.   Yes, he was.

24       Q.   Was he a high ranking SNM member, to your

25   knowledge?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   To my knowledge, yes, he was.
 2        Q.   And when -- in your memory, when you were
 3   investigating the murders, was Leroy Lucero a suspect
 4   in the murders of these two individuals?
 5        A.   I do not recall.  I don't think he was.
 6        Q.   How about Jesse Ibarra?
 7        A.   I do not recall.
 8        Q.   So with respect to this document, you can't
 9   endorse it or reject it as being reflective of your
10   interviews?
11        A.   I think these interviews, according to this
12   document, were conducted by the STG Unit.
13        Q.   Okay.  So that wouldn't be your interview
14   then?
15        A.   No, I don't think so.
16        Q.   Who would have conducted this interview?
17   If you could take a look at maybe page 1 of the
18   exhibit again.  Would this be Cheryl Lackey, perhaps?
19        A.   It would be someone within that unit.
20             MR. CASTLE:  Okay.  I have no other
21   questions for this witness.
22             THE COURT:  Thank you, Mr. Castle.  Any of
23   the other defendants have direct examination of
24   Mr. Tafoya?
25             MR. SOLIS:  I may have, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Mr. Solis.
 2              MR. SOLIS:  If I can have a look at the
 3    exhibit first.  May I approach?
 4              THE COURT:  You may.
 5              MR. SOLIS:  One moment, Your Honor.
 6              THE COURT:  You may.
 7              MR. SOLIS:  I have no questions, Your
 8    Honor.
 9              THE COURT:  Thank you, Mr. Solis.  Any
10    other defendant have any direct of Mr. Tafoya?
11              All right.  Mr. Beck, do you have
12    cross-examination of Mr. Tafoya?
13              MR. BECK:  I do, Your Honor.
14              THE COURT:  Mr. Beck.
15                       CROSS-EXAMINATION
16    BY MR. BECK:
17         Q.   Good afternoon, Mr. Tafoya.
18         A.   Good afternoon.
19         Q.   On March 25 and 26 of 2001, were there
20    cameras inside the pods filming the activities, what
21    was going on inside the pods?
22         A.   I do not believe that there were cameras in
23    the pods.
24         Q.   And why is that?
25         A.   I don't know if we had them back then.  I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    can't recall.  Or if they were not operational.

2         Q.   Okay.  You don't remember reviewing any

3    videotapes of what I would call security cameras in

4    the pods; is that fair to say?

5         A.   That's fair to say.

6         Q.   And I think you said with Mr. Castle, did

7    you investigate what happened after the Garza and

8    Castillo murders?

9         A.   Yes.

10        Q.   And if you were investigating that, if

11   there was video inside the pods at the time, is that

12   something that would have been important to your

13   investigation?

14        A.   Absolutely, yes.

15        Q.   So is that why, after thinking back on the

16   investigation, and not finding or reviewing any

17   videos, is that why you think that there were no

18   videos in 2001?

19        A.   I don't recall reviewing any videotapes.

20        Q.   And is that something you would have done

21   in that investigation?

22        A.   Yes, it would have been part of it,

23   absolutely.

24        Q.   After the Garza and Castillo murder, when

25   you were investigating those, do you recall seeing

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  pictures of the inside of one of the inmate's cells?

2      A.   Yes.

3      Q.   And I think there is some evidence that

4  there may have been a video.  Do you remember whether

5  you saw pictures or a video, or both?

6      A.   I think there were still photos.

7      Q.   They were still photos.  So you don't

8  remember seeing video of the inside of the pods at

9  that time?

10      A.   I don't recall seeing a video.

11          MR. BECK:  And, Your Honor, I'm going to

12  mark for identification purposes Government's

13  Exhibit -- I think we're on 1, right, Ms. Bevel?

14          THE COURT:  For the motion to dismiss, this

15  is your first one?

16          MR. BECK:  I think so, Your Honor.  And it

17  is -- it's a report that starts at Bates No. 716, and

18  I think it was probably the fifth attachment to

19  Mr. Garcia's motion.  And it's a memorandum on the

20  murders of inmates Orlando Garza, 46367, and Frank

21  Castillo, 35958.

22          May I approach the witness, Your Honor?

23          THE COURT:  You may.

24      Q.   I've handed you what I've marked for

25  identification purposes as Government's Exhibit 1.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Do you recognize that as a New Mexico Corrections
 2   Department memorandum?
 3        A.   I do.
 4        Q.   And who is that memorandum addressed to?
 5        A.   It's addressed to myself.
 6             MR. BECK:  Your Honor, at this time, I'll
 7   move Government's Exhibit 1 into evidence for the
 8   purposes of this motion.
 9             THE COURT:  Any objection from the
10   defendant?  Mr. Castle?
11             MR. CASTLE:  No, Your Honor.
12             THE COURT:  All right.  Not seeing or
13   hearing any objection, Government's Exhibit 1 will be
14   admitted into evidence.
15        Q.   What happened to the phone systems after
16   the Garza and Castillo murder, if you remember?
17        A.   They would routinely -- in the event of any
18   type of major incident, they would routinely be
19   turned off.
20        Q.   And if we turn to page 2 of Government's
21   Exhibit 1, I'll direct your attention to what I think
22   is the first full sentence there.  And it starts
23   with --
24        A.   I see that.
25        Q.   So does that indicate to you that at the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    time of the murder, the murders, all inmate telephone

 2    lines were turned off, to include the Paul Oliver

 3    unit?

 4         A.   That's correct.

 5         Q.   Then I'm going to turn your attention to

 6    page 10 of Government's Exhibit 1.  Do you remember

 7    that these murders happened sometime in the night or

 8    morning of March 25, March 26 of 2001?

 9         A.   As I recall, yes, sir.

10         Q.   So on page 6 of -- excuse me, on page 10 of

11    Government's Exhibit 1, do you see up there where it

12    has a report from April 6 of 2001?

13         A.   I do.

14         Q.   And I'm pointing to what looks like sort of

15    the third heading there.  Do you see that, at least

16    at this point, the telephones at Paul Oliver unit

17    were still not working properly?

18         A.   Yes, I do.

19         Q.   Do you have any reason to disagree that the

20    phones weren't work properly?

21         A.   No, I do not.

22         Q.   And do you recall whether, after the Garza

23    and Castillo murders, the Security Threat Group and

24    other corrections officers were monitoring the

25    inmates' mail?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1          A.   To my knowledge, that would be the

 2    procedure, yes.

 3          Q.   And on page 12 of Government's Exhibit 1,

 4    do you see where it indicates that, as of April 12,

 5    2001, mail scans were being continued by STG of

 6    inmate outgoing mail?

 7          A.   Yes.

 8          Q.   Is that consistent with your memory of what

 9    happened after the Garza and Castillo murders?

10          A.   Yes, sir.

11               MR. BECK:  May I have a moment, Your Honor?

12               THE COURT:  You may.

13               MR. BECK:  Nothing further, Your Honor.

14               THE COURT:  Thank you, Mr. Beck.

15               Mr. Castle, do you have redirect of

16    Mr. Tafoya?

17               MR. CASTLE:  Yes.

18                    RECROSS-EXAMINATION

19    BY MR. CASTLE:

20          Q.   Mr. Tafoya, there were some questions about

21    video of the pods.

22          A.   Yes.

23          Q.   How certain are you that there were no

24    video cameras in the pods?

25          A.   Pardon me?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.   How certain are you that there were not?

2        A.   I don't know if there were video cameras in

3    the pods.  But I -- I don't know -- we didn't have

4    any video recordings of the pods, I could say that

5    much.

6        Q.   So none were collected as evidence, is that

7    what you're indicating?

8        A.   I'm indicating that I don't know if there

9    was any video of the pods at all.

10       Q.   Okay.  So you don't know one way or the

11   other whether there were; but you never saw any?

12       A.   I never saw any.  I don't believe there

13   were.

14       Q.   Now, how about of the yard and other common

15   areas?

16       A.   I can't say for sure that there were video

17   recordings of the yard.

18       Q.   Do you recall, in thinking back to 2001,

19   ever looking at video either of the yard, or anywhere

20   else, that was a piece of evidence that you thought

21   showed a part of the planning or the commission of

22   the murders?

23       A.   I can't recall, no.

24       Q.   Do you recall ever interviewing an inmate

25   and telling them that you had them on video with

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                          e-mail: info@litsupport.com

 1   another individual that you suspected of the murder?

 2        A.   No, I can't recall that.

 3        Q.   Is that something you'd remember?

 4        A.   I would think so.  Again, it's been 17

 5   years, so --

 6        Q.   If you were to have done an interview like

 7   that, where you sat down with an inmate and said:

 8   Here, I have video.  We know you participated in the

 9   planning or the commission of the murder, would you

10   write a memo about that and memorialize that

11   interview?

12        A.   I would think I would, yes.

13        Q.   Did you do interviews with an individual by

14   the name of Billy Garcia?

15        A.   I don't recall doing an interview with

16   Billy Garcia.

17        Q.   Do you recall doing an interview with any

18   of the individuals here?

19        A.   I don't remember any of these individuals

20   here.  Or at least a couple of them, I don't

21   recognize them.

22        Q.   How about Leroy Lucero?

23        A.   No.

24        Q.   How about Leonard Lujan?

25        A.   I don't recall.

SANTA FE OFFICE                                                            MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Let's go through that report, if I could,

2  the Government's exhibit.  I'm going to represent

3  that what's up on your screen is the same report that

4  was admitted as Government's Exhibit 1.

5      A.   It looks like it.

6      Q.   If we could go to page 2.  I want you to

7  count down five lines.

8      A.   Okay.

9      Q.   The sentence that starts with, "The day

10  shift."  In this report, does it indicate, "The day

11  shift supervisors secured the daily logs of housing

12  units O1 and P1, as well as the rest of the

13  facilities' logs"?

14      A.   I see that.

15      Q.   Is that standard operating procedure in a

16  matter such as this?

17      A.   It is.

18      Q.   Why?

19      A.   To determine if any irregularities were

20  mentioned in those logs.

21      Q.   So unusual activity?

22      A.   Right.

23      Q.   And I notice that it didn't confine it to

24  the two pods where the murders happened, it went to

25  the whole facility itself?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Right.

2        Q.    Is that because in the investigation it may

3   turn out that important events happened somewhere

4   else other than the pods where the crimes occurred?

5        A.    Normally, it was a procedure to gather logs

6   from the entire facility every 24-hour shift.

7        Q.    And where would those logs have gone?

8        A.    If they were -- if there was significant

9   information in those logs pertaining to incidents, it

10  would be turned over as evidence.

11       Q.    If we could go to the bottom of that page.

12  The second to the last line indicates, "Inmate Martin

13  Chacon is discovered with a black shoelace inside a

14  toilet paper roll.  The shoelace was fashioned into a

15  noose."  And then if we could go on to the next page.

16  "This was also taken into evidence by the New Mexico

17  State Police."

18            Why was that important?  Let me ask you a

19  more pointed question.  Was that important because

20  these were strangulation deaths?

21       A.    Most likely, yes.  It was important anyway,

22  because that's contraband.

23       Q.    But contraband is not normally handed over

24  to the State Police if it isn't involved in a crime

25  or possibly involved in a crime?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Correct.
 2        Q.    In regard to the mail scans, why are those
 3   conducted?
 4        A.    To gather information on -- information
 5   that may be a threat to the security of the
 6   institution.
 7        Q.    And also, perhaps, if it was evidence that
 8   related to the murders that had happened, would that
 9   be correct?
10        A.    That would be correct.
11        Q.    And are the -- who does the mail scans?
12        A.    It depends on who was assigned to that task
13   at the time.
14        Q.    Would it be someone from the STIU, or
15   whatever that -- STG back then?
16        A.    It could have been.  We had other officers,
17   other staff doing mail scans as well.
18        Q.    And are they instructed -- what are they
19   instructed to do?
20        A.    Normally, turn it over as evidence.  If
21   they found anything that was relevant, to take it up
22   the chain of command.
23        Q.    Now, is mail normally scanned anyway, even
24   if there is not a murder?
25        A.    It is.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   So would this have been maybe a little
2  tighter scan of the mail than would have occurred
3  normally?
4    A.   I would anticipate that being the case.
5    Q.   And so any mail that was even remotely
6  suspicious would be copied or collected and sent
7  along to somewhere else?
8    A.   I would imagine that would be the case.
9    Q.   Would that be turned over to the State
10  Police, if it had to do with the murders?
11    A.   I would imagine so.
12        MR. CASTLE:   I don't have any other
13  questions.
14        THE COURT:   All right.  Thank you, Mr.
15  Castle.  Anyone else on the defense side have any
16  questions?
17        MR. SOLIS:   I have some questions, Your
18  Honor.
19        THE COURT:   All right.  Mr. Solis.
20             RECROSS-EXAMINATION
21  BY MR. SOLIS:
22    Q.   Mr. Tafoya, I'm going to direct your
23  attention to Defendant's Exhibit I.  Think we'll
24  bring it up here.  Do you see that?
25    A.   I do.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And you're the author of that memorandum?
 2        A.   I am.
 3        Q.   Back on April the 12th of 2001, addressed
 4   to Mr. Shanks and Mr. Jerry Tafoya -- is he any
 5   relation to you at all?
 6        A.   No.
 7        Q.   All right.  So this is just a few days
 8   after the incident, the murders at the facility;
 9   correct?
10        A.   Correct.
11        Q.   April the 12th; these events occurred on
12   March 26?
13        A.   Yes.
14        Q.   And it seems like you, yourself, conducted
15   an investigation, and then you mentioned that you
16   conducted several interviews of inmates or with
17   inmates; is that right?
18        A.   Correct.
19        Q.   And you note there at the -- towards the
20   bottom of that memorandum, on that first page, you
21   note several inmates as assailants, according to a
22   Source 1A.  Do you see that?
23        A.   I do.
24        Q.   And do you see anywhere there Christopher
25   Chavez mentioned?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Not on this memorandum, no.

2        Q.    Did you, yourself, conduct an interview

3   with Mr. Chavez?

4        A.    I do not recall.

5        Q.    Did you draft a report that would indicate

6   that you, yourself, conducted?

7        A.    I do not recall.  I may have.

8        Q.    And if -- well, would you agree with me

9   that to conduct an investigation following a murder,

10  it's best to conduct it soon after rather than later,

11  let's say a month later?

12       A.    Depends on how information surfaces.

13       Q.    Okay.  People's memories are better soon

14  after the event?

15       A.    I would imagine, yes.

16       Q.    And I think there was testimony earlier

17  today where there was indication that soon after the

18  murders, or immediately after the murders, there was

19  lockdown of several inmates; is that right?

20       A.    That would probably be the normal routine,

21  yes.

22       Q.    And that doesn't mean that they're not

23  allowed access to one another, at least to

24  communicate in some fashion?  That does happen,

25  doesn't it?

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I would imagine they can yell from cell to
 2   cell.
 3        Q.   Okay.  So communication isn't prohibited;
 4   they can still do it, they can find a way?
 5        A.   I would imagine, yes.
 6        Q.   Okay.  And so the memorandum that was a
 7   Government's exhibit moments ago, that came after the
 8   April 12, 2001 memorandum we're looking at now; is
 9   that right?
10        A.   Which?
11        Q.   I think that was Exhibit E.
12        A.   This one is dated April 2.
13        Q.   Yeah, Government's exhibit, where
14   Mr. Chavez is noted as a possible suspect by your
15   source.
16        A.   This one is dated April 2.
17        Q.   Right -- April the 12th, actually, 2001.
18        A.   This one is dated April 2, 2001.
19        Q.   Right.  And I'm looking for the
20   Government's exhibit, actually.
21             MR. BECK:  Yeah, I think it's probably page
22   12 you're looking for.
23             MR. SOLIS:  Page 12.  What's your exhibit?
24   Government's Exhibit 1.  May I approach, Your Honor?
25             THE COURT:  You may.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. SOLIS:  Can we get Exhibit 1 for the
 2    Government up?
 3              MR. BECK:  What's the Bates number on the
 4    last page there?
 5              MR. SOLIS:  727.  One moment, Your Honor.
 6              THE COURT:  Certainly.
 7    BY MR. SOLIS:
 8         Q.   Is that the reference to Mr. Chavez?  So on
 9    Government's Exhibit 1, dated April 2, there again,
10    days after the event, there is no mention of
11    Mr. Chavez?
12         A.   I don't see it.
13         Q.   And on April the 12th, again following the
14    event, 10 days after the April 2, again, as per a
15    source, there was no mention of Mr. Chavez as an
16    assailant or having participated in the event; is
17    that right?
18         A.   I don't see the document.
19         Q.   You don't see the document, or you don't
20    see reference to it?
21         A.   I don't see the document.
22              MR. SOLIS:  May I approach the witness,
23    Your Honor?
24              THE COURT:  You may.
25         Q.   That's Exhibit 1, or rather, Exhibit I.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   No, it doesn't say "Chavez" on this

2    document.

3      Q.   It does not indicate it, right?

4           MR. SOLIS:   May I approach again, Your

5    Honor?

6           THE COURT:   You may.

7      Q.   Again, just to emphasize the point:  April

8    the 2nd, which is prior to Exhibit I, this is

9    Government's Exhibit 1, there is no reference to

10   Mr. Chavez there, Mr. Tafoya?

11     A.   "Chavez" does not appear on this document.

12     Q.   Right.

13          You elicited the assistance of State Police

14   Officer Felipe Gonzalez to verify the information in

15   your investigation, or pursuant to your

16   investigation?

17     A.   I believe so, according to the

18   documentation.

19     Q.   And I think it's up now.  Exhibit I for the

20   defense, on page 2 you memorialize that assistance

21   where you ask Felipe Gonzalez to essentially

22   corroborate the information in speaking to the source

23   that resulted in your excluding -- or not including,

24   that is -- Mr. Chavez as a suspect or as an assailant

25   in that murder.  Do you see on the second page,

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                       1-800-669-9492
                                              e-mail: info@litsupport.com



```
 1    fourth paragraph down, Mr. Gonzalez, Felipe Gonzalez,
 2    state agent?
 3          A.   I see that.
 4          Q.   Did he not confirm the information from
 5    that source, that Mr. Chavez was not mentioned as a
 6    suspect or as an assailant?
 7          A.   It doesn't say whether he confirmed it or
 8    not.
 9          Q.   He did speak with the source, according to
10    your memorandum; correct?
11          A.   Yes.
12          Q.   Did you draft a second memorandum?
13          A.   I do not recall.
14          Q.   This is certainly a significant event, a
15    murder, right?
16          A.   Yes.
17          Q.   And you would draft a memorandum -- you,
18    yourself -- had you found different information
19    from -- or discovered information that was not
20    consistent with your initial report?
21          A.   I may have, yes.
22          Q.   Did you?
23          A.   I don't recall.
24          MR. SOLIS:   Thank you, sir.
25          THE COURT:   Thank you, Mr. Solis.  Any
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   other defendant have any redirect?
 2             Anything further, Mr. Beck -- or cross.
 3   All right.  Mr. Tafoya, you may step down.  Is there
 4   any reason Mr. Tafoya cannot be excused from the
 5   proceedings, Mr. Castle?
 6             MR. CASTLE:  No, Your Honor.
 7             THE COURT:  Anybody else?  Mr. Beck?
 8             MR. BECK:  No, Your Honor.
 9             THE COURT:  All right.  You're excused from
10   the proceedings.  Thank you for your testimony.
11             THE WITNESS:  Thank you, Your Honor.
12             THE COURT:  All right.  Does somebody want
13   to check with Ms. Rogers, and see if we want to go
14   with Mr. Garcia?  Or do you want to squeeze your
15   other witness in, Mr. Castle?
16             MR. CASTLE:  Your Honor, we've decided to
17   let that other witness go.  I think we don't need him
18   anymore.
19             THE COURT:  Okay.  So do you want to check
20   on Ms. Rogers and see if she's ready?
21             MR. CASTLE:  Somebody might have already
22   gone, but I'll go as well.  His lawyer needs a few
23   more minutes.  She said she'd come in and let us know
24   when she's ready.
25             THE COURT:  Do we have something we can do
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    profitably while we're waiting for her?
2              MR. CASTLE:  Mr. Benjamin has something.
3              MR. BENJAMIN:  We met this morning, Your
4    Honor.  If I could have a second with the Government.
5              THE COURT:  You may.
6              MR. BENJAMIN:  Your Honor, I'm just going
7    to try and find the number of the bill of
8    particulars, 13 through 16, and that will be just
9    about five minutes.
10             THE COURT:  All right.
11             MR. BECK:  I think it's 1319.
12             MR. BENJAMIN:  Your Honor, this morning Ms.
13   Armijo and I met regarding the bill of particulars,
14   as was discussed yesterday.  And Document 1319 should
15   be Joe Gallegos' motion for bill of particulars on
16   Counts 13 through 16.  And I am left with two
17   requests, Your Honor.  And those, I think, are fairly
18   simple requests, and they're the same as I had on
19   Counts 4 and 5.
20             For Count 13, it would simply be -- they've
21   alleged a deadly weapon.  I would request that they
22   elect and choose or identify the deadly weapon.
23             And for Counts 14 through 16, they have
24   three theories of liability, as far as what the
25   witness was being tampered with, or threatened.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  the Court has heard two of them, I believe.  There

2  was testimony during the James hearing that Jose

3  Gomez was being sought because he was a witness in a

4  murder investigation involving Joe Gallegos, and

5  because he was a witness in the -- or he was the

6  victim in the March 2015 assault that forms Count 13.

7          And as the Court heard, Mr. Castellano said

8  that wasn't it.  And the agent testified that was it.

9  So we're asking that the Government elect whether he

10  was being threatened and/or tampered with in Counts

11  14 through 16 because he was an SNM, and this was an

12  SNM investigation; whether it was because of the

13  March 2015 assault; or whether it was for an

14  unspecified -- and we request they specify the

15  murder, or any one of those three, or something to

16  that effect.  And that's the issue, Your Honor, I

17  think, just notice-wise, we're entitled to both of

18  those requests under Count 13, for the specificity of

19  the weapon, and Counts 14 through 16 for the act or

20  acts that he was going to be a witness in.

21          THE COURT:  All right.  Ms. Armijo.

22          Thank you, Mr. Benjamin.

23          MS. ARMIJO:  Your Honor, I believe that --

24  I'm surprised about the Count 13.  I believe that we

25  had said, and that when we spoke, that we believed it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  was knife.  So I don't know --

2          THE COURT:  I think he's looking for 4 and

3  5 now, right?

4          MR. BENJAMIN:  Your Honor, we did speak.

5  And we did agree.  That was my fault.  I guess I

6  would ask the Government to change its pleadings to

7  reflect that.  But she did clarify that it was a

8  knife.  We're talking about 14 through 16 as well.

9          MS. ARMIJO:  It believe it just says a

10 dangerous instrument, which a knife would be.  I

11 don't think we need to change any pleadings.

12         THE COURT:  Well, I probably won't order

13 any change of pleadings.  But let me make sure I

14 understand.  On 4 and 5, is it -- it's a gun, right?

15         MS. ARMIJO:  It's a firearm, yes.  A

16 firearm was not recovered.  I'm not sure --

17         THE COURT:  Do you need anything more than

18 that?

19         MR. BENJAMIN:  I apologize, Your Honor.

20 You're saying Counts 4 and 5, and we're talking about

21 Count 13 is the knife.  And there was no firearm

22 recovered in Count 13.  But 13, the Government has

23 told me is a knife.

24         THE COURT:  Okay.  So you don't need to

25 know the identity of the weapon for 4 and 5?  You

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   need it for 13?
 2           MR. BENJAMIN:  I'm not requesting -- I
 3   think the Court has covered my bill of particulars on
 4   4 and 5, Your Honor.  For Count 13 I'm asking that if
 5   they're saying -- and they did tell me this morning
 6   it was a knife -- I'm asking for them to plead that
 7   it's a knife.  And then on 14 through 16, Your Honor,
 8   it would simply be the election of what Mr. Gomez was
 9   a witness in.
10           MS. ARMIJO:  And I believe that he has our
11   three theories that we have.  He's asking us to
12   elect.  And I don't believe that we are required to
13   elect.
14           THE COURT:  You're not required to elect.
15   But I think what he's asking for on the third theory,
16   if I understand the numbering system, yesterday we
17   were talking about it being a murder case that he was
18   a witness in.  Can you identify the murder case?
19           MS. ARMIJO:  Your Honor, I'm not sure about
20   that.  Mr. Gomez -- and what I told him this morning
21   is that, if in fact, there is a murder that I'm
22   unaware of, there is another witness that would be in
23   reference to murder cases.
24           But as I am reading the 302s right now, I
25   don't have that as to Jose Gomez.  If, for any reason
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    that changes when we meet with Jose Gomez, I will
2    certainly let him know.  I explained to him, and he
3    was familiar with the procedure that we went through
4    in the first trial, that he would be immediately
5    notified.
6              But there isn't some underlying murder that
7    we're keeping from him or anything else right now.
8              THE COURT:  So you're just down to two
9    theories?  He wasn't a witness in any murder case
10   that you're aware of?
11             MS. ARMIJO:  Not a charged murder case that
12   I'm aware of.  And I know that Mr. Gallegos, we
13   believe, is the suspect of several murder cases.  And
14   I think he has 302s in reference to that.  I'm just
15   not sure, at this point in time -- and I refer to
16   that 302, and that witness, that would say those
17   things.
18             My only concern is I don't know if Jose
19   Gomez knows about those incidents, and if that's what
20   he's talking about.  But so at this point in time, I
21   don't have anything specific to give him.  I gave him
22   specific information on the other two.  If, in fact,
23   I learn more information, as I told him this morning,
24   I would certainly let him know right away.
25             But there isn't, like, some murder case

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that I -- like off the top of my head or in the

 2    discovery that I can think of that would be -- Jose

 3    Gomez was going to testify as to these other murders.

 4             THE COURT:  Let's put the word "case" then

 5    off the table.

 6             MS. ARMIJO:  Correct.

 7             THE COURT:  Do you at the present time have

 8    a murder that you intend to offer evidence of that

 9    Mr. Gomez would be a witness against Mr. Gallegos

10    for, at the present time?

11             MS. ARMIJO:  That Mr. Gomez would?  Not at

12    this time.

13             THE COURT:  All right.  So for the present

14    time, can we take the third theory off the table?

15             MS. ARMIJO:  Yes.  For the present time,

16    yes, as to Mr. Gomez.

17             THE COURT:  So unless you alert

18    Mr. Benjamin, he has two theories he has to deal

19    with, not three?

20             MS. ARMIJO:  Correct.

21             THE COURT:  And the knife takes care of the

22    weapon on 13?

23             MS. ARMIJO:  Correct.

24             THE COURT:  All right.  What else do you

25    need, Mr. Benjamin?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BENJAMIN:  Your Honor, the only way I
 2    know to say this is Ms. Armijo is correct.  They're
 3    not hiding anything.  My problem is they're also
 4    three weeks out from trial, and not choosing what
 5    they're going to try Mr. Gallegos on.  And so I
 6    have --
 7            THE COURT:  They've taken one theory off
 8    the table.  Do you have questions either on the knife
 9    or the two theories that they're still going to trial
10    on?
11            MR. BENJAMIN:  Your Honor, yes, because
12    I'm -- I think the indictment, essentially, says an
13    official proceeding.  So I think that has to be the
14    March 2015 assault, is my belief and my gut belief.
15            THE COURT:  It sounds like that's not the
16    case anymore; is that correct, Ms. Armijo?
17            MS. ARMIJO:  No.  As I explained in great
18    detail to Mr. Benjamin this morning, our theory is
19    that:  Once he was indicted on December 3 of 2015,
20    all of his racketeering activities are relevant to
21    his federal prosecution, much like all of his bad
22    acts, much like anything else that could be
23    considered relevant activity.  I explained to him
24    this morning about our theory as to how the March
25    incident would be SNM activity, would be considered
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    racketeering activities, and how, even though it
2    wasn't a formal state or formal federal proceeding,
3    it certainly could be evidence used in his formal
4    federal case as racketeering activity.
5              So, to that extent, no, that's not off the
6    table really, I don't believe it is.  And he also --
7    so -- I mean, I know he disagrees with us.  But
8    that's not a bill of particulars.  He can argue this
9    in the Rule 29 motion, which I'm sure he's going to,
10   that we have not met our VICAR and our elements of
11   the crime.  But at this point in time, he knows great
12   detail about our theory, about our evidence.  And I
13   think we can have various theories as to this.  We're
14   now down to two theories.  And just because he
15   disagrees with it, doesn't mean -- or feels that it's
16   not proper, bill of particulars is not the venue.
17   And we have bent over backwards now to explain our
18   theory, and to go over the evidence with him.
19              THE COURT:  All right.  Mr. Benjamin.
20              MR. BENJAMIN:  She has, Your Honor.  I'm
21   looking for it in black and white.  To wit: March
22   15 -- I'm missing the exact date -- March 2015
23   assault.  Because I think that if they're going to
24   try Mr. Gallegos on an indicted count, it should say
25   that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  Okay.  You're saying you want
2    it put into writing?
3              MR. BENJAMIN:  Yes, Your Honor.
4              THE COURT:  All right.  Well, I'm not going
5    to require any amendment of the pleadings.  I think
6    the bill of particulars is to get their theories and
7    evidence.
8              MR. BENJAMIN:  And they have done that,
9    Your Honor.
10             THE COURT:  All right.  So I'll deny the
11   motion.  But I do think that they've gotten the
12   theories and the evidence.  And if they're going to
13   try to do anything else, they committed to getting a
14   letter to you as soon as possible.
15             MR. BENJAMIN:  Thank you, Your Honor.
16             THE COURT:  Thank you, Mr. Benjamin.
17             I thought I saw Ms. Rogers duck her head in
18   and then head back out.  Anybody want to check on her
19   and tell her what time it is.
20             Do you have something, Mr. Burke?
21             MR. BURKE:  I'll take up 20 seconds.  If
22   they're going to really start piling on Joe Gallegos,
23   the idea of a bifurcated jury starts getting more
24   interesting to the defendants, Your Honor.  If
25   they're really going to do all that, that's really
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   going to create a spillover.
 2             THE COURT:  Well, they took one theory off
 3   the table.  So it's a little less piling on.
 4             MR. BURKE:  Yes, we've got a little less.
 5   But I'm hoping we can get that other jury going.
 6             THE COURT:  So we pull a theory off, and we
 7   get a renewed motion to sever?
 8             MR. BURKE:  I'm hearing some piling on,
 9   Judge.
10             THE COURT:  All right.  Mr. Castle.
11             MR. CASTLE:  Just to fill some time.  We
12   have two orders that the Court had asked us to draft.
13             THE COURT:  All right.
14             MR. CASTLE:  The first is phone calls
15   concerning Leonard Lujan.  But, Your Honor, what I've
16   been told from people that are actually handling all
17   these phone calls, that there is a number of
18   different individuals' phone calls that are missing
19   that we subpoenaed, and they've refused to give
20   without a federal court order.  And so what I'd like
21   to do is -- I've given copies to the prosecution --
22   is have the order be for all these different phone
23   calls, so that we're not having to come back to the
24   Court numerous times with the same similar orders.
25   And it's all for witnesses that the Government has
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   said they're going to call, and are likely to call.

2   So they'd be individuals such as Robert Lovato,

3   Frederico Munoz, Gerald Archuleta, Robert Martinez,

4   Benjamin Clark.

5           THE COURT:  Any objection to doing it that

6   way, Mr. Beck?

7           MR. BECK:  Well, no, but I will comment

8   that if these are the two orders that Mr. Castle

9   handed me earlier today, I think we're sort of two

10  ships passing in the night here.  Because these are

11  directed at New Mexico Corrections Department.  New

12  Mexico Corrections Department's calls have been

13  produced, and are ongoing production.  What my

14  understanding was from yesterday, is that they want

15  jail calls from facilities that are not Corrections.

16          THE COURT:  The Corrections' facilities in

17  possession of marshals?

18          MR. CASTLE:  Yes.  But it's my

19  understanding it's actually the Department of

20  Corrections has large gaps in their phone calls.  So

21  despite what --

22          THE COURT:  I didn't hear that objection in

23  the first trial that there was any gaps.  But if you

24  do, it sounds like you just need to talk to Mr. Beck

25  about that, because they will try to remedy it.  But

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    the only thing I heard complaints in the first trial

2    was just a lot of phone calls, but not gaps.

3              MR. CASTLE:  Well, I think they only

4    listened to certain ones because they didn't have

5    enough time.  I think that's --

6              THE COURT:  My suggestion is you just talk

7    to Mr. Beck about what gaps you have.  And then, if

8    you can't work it out, respond.  But I think -- I'll

9    use the word, not pejoratively, but they're dumping a

10   lot of phone calls on you, and I don't think they're

11   trying to create any gaps.

12             MR. CASTLE:  Well, I could tell the Court

13   that we did contact them in January about the gaps in

14   Leonard Lujan's calls.  And we haven't received any.

15   So I don't know how quickly they're going to get

16   turned around.  Perhaps, I could talk to the

17   prosecution.

18             THE COURT:  I guess if you don't care, Mr.

19   Beck, I can sign the order, and they can go the long

20   way, if you don't care.

21             MR. BECK:  That's news to me.  I think that

22   there are additional phone calls that were produced

23   to us over the weekend, that we produced either

24   yesterday or the day before to Mr. Aoki.  So those

25   may be these calls that they're looking for.  Yeah,

SANTA FE OFFICE                                         MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492

BEAN
& ASSOCIATES, Inc.                                  1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

```
 1    so I agree with the Court.  I don't care.  I think
 2    that if they talk to us, it will short-circuit --
 3              THE COURT:  Okay.  Anybody else have an
 4    objection?  Not hearing any, do you want to hand me
 5    that motion, Mr. Castle.
 6              MR. CASTLE:  Yes, Your Honor.  And I'll
 7    talk to the prosecutors.  If they already have it,
 8    then I won't serve it on Corrections.
 9              THE COURT:  All right.  So which order is
10    the one you just talked about?  Is it the one -- oh,
11    one to Corrections and one to PNM.  So you've seen
12    these, Mr. Beck?  You know what I'm about to sign?
13              MR. BECK:  Yes, Your Honor.
14              MS. HARBOUR-VALDEZ:  Your Honor, on Monday
15    you ordered the Government to turn over by Wednesday
16    the co-conspirator statements from Trial 1 that they
17    intended to use.  I asked Mr. Beck about this
18    yesterday morning, and he said they would file
19    something.  But we have yet to receive that.
20              THE COURT:  Were we going to resolve that
21    with just the production of the transcripts -- oh,
22    no, no, I know.  Yeah, okay, I got you.
23              MR. BECK:  Something different.  That
24    probably -- Mr. Castellano is out of the office --
25    that probably fell through the cracks.  I think what
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we're going to do is file -- just file a notice that

2    attaches the Court's opinion, the pages from the

3    Court's opinion that has the Trial 1 statements.  So

4    I will make sure that we do that tonight when I get

5    back.

6              THE COURT:  So every co-conspirator

7    statement in the first trial, you're going to try to

8    introduce in the second trial?

9              MR. BECK:  I don't know that we're going to

10   try to introduce it.  But I know that we're just

11   going to provide them notice of it because they asked

12   for it.  So they are co-conspirator statements, the

13   Court has already found they are co-conspirator

14   statements.  They're admissible in this trial, if

15   those people testify.

16             THE COURT:  Those were different

17   conspiracies?

18             MR. BECK:  Right.

19             THE COURT:  I don't know how they'd be

20   admissible in this trial under the co-conspirator

21   statement, if none of those defendants are -- if none

22   of those conspiracies are being tried here.

23             MR. BECK:  Those conspiracies would be

24   racketeering activity.

25             THE COURT:  Well, they might be, but they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    wouldn't be used against any of these people.
 2              MR. BECK:  Well, they'd be used against
 3    these people as racketeering activity.
 4              THE COURT:  No, they can't come in as
 5    evidence.  They're inadmissible in this trial.  There
 6    is not a party in here that they can be used against.
 7              MR. BECK:  All right.  Well, I see what
 8    you're saying, and I really hadn't thought much about
 9    it.  I wasn't taking this on.  I don't know that
10    changes our approach.  But it was an oversight.  I'll
11    talk to Mr. Castellano.  I think we're probably still
12    going to file the notice, and we can hash that out if
13    you want, and the Court can find them inadmissible.
14    But --
15              THE COURT:  Okay.  Well, they're probably
16    inadmissible.
17              MS. HARBOUR-VALDEZ:  I would agree.
18              THE COURT:  We have to establish, A,
19    conspiracy, and they've identified eight, and I don't
20    think any of those statements relate to this.  I'd
21    have to establish the membership.  But the whole
22    statements were being -- were largely the defendants'
23    in that case.
24              There is Ms. Rogers.  Let's see if we can
25    maybe use these five minutes to get these 13
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    questions done.  Ms. Rogers, have you had an
 2    opportunity to meet with Mr. Garcia?  Are you ready
 3    to deal with him?
 4              MS. ROGERS:  I am, Your Honor.  And again,
 5    I apologize for my attire.
 6              THE COURT:  You have no reason to
 7    apologize.  But you've had an adequate opportunity to
 8    talk to him this afternoon?
 9              MS. ROGERS:  I have, Your Honor.
10              THE COURT:  All right.  If you'll bring
11    Mr. Garcia in.  We'll go ahead and swear him in.  And
12    if you want to sit up here next to him, we've got a
13    seat up here for counsel for some of the witnesses.
14    You're welcome to sit up here.
15              MS. ROGERS:  Thank you, Your Honor.
16              THE COURT:  Thank you, Ms. Rogers.
17              All right.  Mr. Garcia, if you'll come up
18    and stand next to the witness box right here on my
19    right, and before you're seated, Ms. Bevel will swear
20    you in.
21
22
23
24
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                      JAMES GARCIA,
 2         after having been first duly sworn under oath,
 3         was questioned and testified as follows:
 4                      DIRECT EXAMINATION
 5              THE CLERK:  Please be seated.  Please state
 6    your name, and spell your last name for the record.
 7              THE WITNESS:  James Garcia, G-A-R-C-I-A.
 8              THE COURT:  Mr. Garcia.  Mr. Castle.
 9    BY MR. CASTLE:
10         Q.   Mr. Garcia, where were you living in March
11    of 2001?
12         A.   I was incarcerated.
13         Q.   In what facility, do you recall?
14         A.   I can't remember.
15         Q.   Was it in Southern New Mexico Correctional
16    Facility?
17         A.   No.
18         Q.   Have you been interviewed by the FBI or
19    state law enforcement concerning the 2001 murders
20    that happened at Southern New Mexico Correctional
21    Facility?
22         A.   I plead the Fifth on that, Fifth Amendment
23    right.
24              MR. CASTLE:  I would ask for -- on what
25    grounds, Your Honor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          THE COURT:  Yeah, Ms. Rogers, just simply

 2   the fact that he interviewed with the United States

 3   doesn't seem to me to invoke his rights.  Do you want

 4   to talk to Mr. Garcia on that?

 5          MS. ROGERS:  Briefly, Your Honor.

 6          (The defendant conferred with counsel.)

 7          MS. ROGERS:  Thank you, Your Honor.

 8          THE COURT:  All right.  Do you want to

 9   re-ask your question, Mr. Castle, and we'll see what

10   Mr. Garcia decides to do?

11   BY MR. CASTLE:

12       Q.   Have you been interviewed by the FBI or

13   state law enforcement concerning the 2001 murders

14   that happened at Southern New Mexico Correctional

15   Facility?

16       A.   Yes.

17       Q.   How many times?

18       A.   A few times.

19       Q.   Do you know a man by the name of Billy

20   Garcia personally?

21       A.   No.

22       Q.   Have you ever met him?

23       A.   No.

24       Q.   He's also known by the nickname of "Wild

25   Bill"?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.    I've heard of him, but I don't know him.

2        Q.    Has anyone ever told you -- in a

3    conversation with you, has anyone ever told you that

4    Billy Garcia ordered the murders that happened at the

5    Southern New Mexico Correctional Facility in 2001?

6        A.    No.

7        Q.    Has anyone ever admitted to you that they

8    were involved in those murders at the Southern New

9    Mexico Correctional Facility in 2001?

10        A.    Anybody what?

11        Q.    Has anybody ever admitted to you in a

12    conversation with you that they were involved in

13    those murders that happened at the Southern New

14    Mexico Correctional Facility in 2001?  Has anyone

15    ever told you that they did it?

16        A.    No, not that I remember, no.

17        Q.    That would be something you'd remember,

18    isn't it, if somebody admitted a murder to you?

19        A.    There is so much stories in there, I don't

20    remember.

21        Q.    Now, have you heard rumors about what

22    happened there in 2001, from other inmates, or other

23    people?

24        A.    Yeah.

25        Q.    But no one has personally said to you, "I

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                               1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    did it," or "I was part of it"?

 2         A.    No.

 3         Q.    Or say out loud, "I was part of it"?

 4         A.    No.

 5              MR. CASTLE:  No other questions.

 6              THE COURT:  All right.  Does any other

 7    defendant have direct examination of Mr. Garcia?

 8              All right.  Mr. Beck.  Do you have

 9    cross-examination of Mr. Garcia?

10              MR. BECK:  Yes, Your Honor.

11                     CROSS-EXAMINATION

12    BY MR. BECK:

13         Q.    Mr. Garcia, do you know an FBI Special

14    Agent by the name of Lance Roundy?

15         A.    No.

16         Q.    Okay.  So you were interviewed in person

17    with Lance Roundy on May 9, 2013; isn't that right?

18         A.    I think so.

19         Q.    So earlier when you just said you don't

20    know anyone named Lance Roundy with the FBI --

21         A.    I was with the FBI like about four or five

22    times already.  There is so many people that tried to

23    grab me.  Names go around.  I don't remember.  There

24    are so many of them.

25         Q.    And when you were interviewed by Lance

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    Roundy on May 9th of 2013, as an FBI agent, you were

 2    truthful with him, weren't you?

 3              MR. BURKE:  I'm going to object.  That

 4    question is not based on facts in evidence.  In fact

 5    he denied remembering who Lance Roundy is.

 6              THE COURT:  Well, I think the purpose of

 7    this, if I'm not mistaken -- Mr. Garcia, it's a 104

 8    to determine whether some evidence is coming in;

 9    correct?

10              MR. BECK:  That's my understanding.

11              THE COURT:  So I'll allow him to testify.

12    Overruled.  You can answer the question.

13         A.    Could you say it again?

14         Q.    Sure.  When you were interviewed by -- I'm

15    not sure I can quote myself, but when you were

16    interviewed by Lance Roundy with the FBI on May 9th

17    of 2013, you were truthful with Mr. Roundy then,

18    weren't you?

19              MR. BURKE:  Your Honor, I'm going to

20    object.  The 302 that I have of that interview is six

21    pages.  It contains many, many statements.  It's an

22    unfair question.  Mr. Garcia would be entitled to see

23    whatever statements that he's being examined about.

24              THE COURT:  Well, we'll let Mr. Beck

25    conduct his cross-examination.  And if you want to do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

318

```
 1    something on redirect, or you need something, let us
 2    know.  Overruled.  You can answer the question.
 3         A.   I plead the Fifth.
 4         Q.   So you're refusing to answer whether you
 5    were truthful with Mr. Roundy?
 6         A.   I plead the Fifth, sir.
 7         Q.   Okay.  So when you said that -- when you
 8    told Mr. Roundy in 2013 that you had a conversation
 9    with Edward Troup at a backyard barbecue in
10    Albuquerque in November 2012, that was true, wasn't
11    it?
12         A.   Plead the Fifth.
13         Q.   And when you said Troup confessed to being
14    part of two murders where two people were strangled
15    to death at the Southern New Mexico Correctional
16    Facility in Las Cruces, New Mexico, that was true,
17    wasn't it?
18         A.   I plead the fifth.
19         Q.   When you said that, "Troup stated that
20    during one of the murders he held Fred Dawg's legs
21    while Wino, gang member, Javier Alonso, strangled him
22    to death with a drawstring from a laundry bag," that
23    was true, wasn't it?
24         A.   Plead the Fifth.
25         Q.   You know who Edward Troup is, right?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   Yes, I do.

2      Q.   You know who Javier Alonso is?

3      A.   No.

4      Q.   Do you know who Wino is?

5      A.   No.

6      Q.   And why would you say that Wino held the

7   legs while Troup strangled him, if you don't know who

8   Wino is?

9      A.   I don't know what I said that day.  I don't

10   remember.  That's why I plead the Fifth.

11      Q.   Would it help if I showed you the report

12   from your conversation with Mr. Roundy?  Would it

13   help refresh your recollection as to what you told

14   him that day?

15      A.   Like I said, sir, I plead the Fifth.

16      Q.   Well, that's not my question.  My question

17   was --

18      A.   I don't remember, sir.

19      Q.   Okay.  And what I'm asking you is would it

20   refresh your recollection to see what you told

21   Mr. Roundy on May 9th of 2013, if I handed you his

22   report from that day?

23      A.   Show it to me, if you want.

24      Q.   Sure.

25           MR. BECK:  May I approach, Your Honor?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.
 2        Q.   And I'm showing Mr. Garcia what's been
 3   marked as Government's Exhibit -- or excuse me, it
 4   hasn't been marked at all.  It's Document 1909-1.
 5             So I'm going to direct your attention here
 6   to Bates No. 680 to 681.  So, again, let me just show
 7   you this whole document, see if it refreshes your
 8   recollection.  So this is May 9, 2013.  Do you see
 9   that?
10        A.   Yeah.
11        Q.   Then on the last page of this document it
12   says it was drafted by Lance Roundy.  Do you see
13   that?
14        A.   Um-hum.
15        Q.   Is that a yes?  I think you said yes -- I
16   think you said "um-hum."  For the court reporter --
17        A.   I don't know, I can't --
18        Q.   Does that say that it was drafted by Lance
19   Roundy?
20             MS. ROGERS:  Just for the record,
21   Mr. Garcia has some reading comprehension difficulty?
22        A.   Yeah.
23             MS. ROGERS:  So if you want to read it
24   aloud --
25        A.   I don't read too good.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  So here on the bottom it says, "In

2  late November, 2012" blank "had a -- redacted -- "had

3  a conversation with SNM Gang member, Edward Troup,

4  in" -- blank -- "backyard off of" -- blank -- "in

5  Albuquerque.  Do you see that?

6      A.   Um-hum.

7      Q.   It says, "During the conversation Troup

8  confessed to being a part of two murders, which two

9  people were strangled to death at Southern New Mexico

10  Correctional Facility in Las Cruces, New Mexico."  Do

11  you see that?

12      A.   Yeah.

13      Q.   It says, "Troup stated that during one of

14  the murders he held Fred Dawg's -- agent identified

15  as Freddie Sanchez" -- redacted -- "legs while

16  Wino -- agent identified as SNM gang member, Javier

17  Alonso, Jr." -- date of the birth redacted -- "and

18  strangled him to death with a drawstring from a

19  laundry bag."  Do you see that?

20      A.   Yes.

21      Q.   And then it says, "Both Troup and Alonso

22  disposed of the drawstring and took off their clothes

23  and tore up evidence in an attempt to hide their part

24  in the murder."  Do you see that?

25      A.   Yes, I do.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Does that refresh your recollection whether
 2    you told Lance Roundy in 2013 that Troup held Fred
 3    Dawg's legs while Wino strangled him?
 4        A.   I don't remember saying that.
 5        Q.   Do you remember that this was a long
 6    conversation with Mr. Roundy?
 7        A.   No.
 8        Q.   And so you don't remember a long
 9    conversation, that was approximately six pages of
10    notes in a 302, is that what you're saying today?
11        A.   I don't remember.
12        Q.   And with Mr. Castle on direct there, I
13    think you said that you had heard rumors about the
14    2001 murders.  Do you remember saying that?
15        A.   Yes.
16        Q.   And did those murders include that Troup
17    held Fred Dawg's legs down while Wino strangled him
18    to death with a drawstring from a laundry bag?
19        A.   I heard all kinds of rumors.
20        Q.   Okay.  That wasn't my question.  My
21    question was:  Did those rumors include that Troup
22    held down Fred Dawg's legs while Wino strangled him
23    to death with a drawstring and laundry bag?
24        A.   No.
25        Q.   Those weren't included?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, not that I know of, no.  I heard a lot
 2   of different other stories.  But just like what
 3   you're putting right there, no.
 4        Q.   Right.  So that's not a rumor; that's true,
 5   isn't it?
 6        A.   I don't know.
 7        Q.   Well, you know that because you told Agent
 8   Roundy that?
 9        A.   I don't --
10             MR. BURKE:  Objection, asked and answered.
11   Now, he's just pestering the witness.
12             THE COURT:  Overruled.
13        A.   I don't remember telling him that.
14        Q.   Okay.  But you were truthful with Mr.
15   Roundy in 2013, right?
16             MR. BURKE:  Objection; that's been covered
17   as well.
18             THE COURT:  Overruled.
19        A.   Based on that, whatever I said to them, I
20   plead the Fifth.
21        Q.   Okay.  Did you also tell -- did you also
22   tell Mr. Roundy in 2013 that Troup had told you about
23   Sanchez's murder also in 2008?
24        A.   Said what?
25        Q.   Did you also tell Special Agent Roundy, in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    2013, that Troup told you about Sanchez' murder in
 2    approximately 2008?
 3        A.    No.
 4        Q.    Okay.  So you didn't tell him that?
 5        A.    I don't remember.  I don't recall.  I don't
 6    remember.
 7        Q.    All right.  Do you remember you violated
 8    your parole in approximately 2008, right?
 9        A.    Yeah, I think so.
10        Q.    And because you violated your parole you
11    were in the prison system at that time, right?
12        A.    I've been in prison a lot, yes.
13        Q.    And so where it says here that Troup told
14    that to you in 2008, when you violated your
15    probation/parole and you were incarcerated in the New
16    Mexico prison system, that's true?
17        A.    I was in prison?
18        Q.    Right.
19        A.    Sure, I think so.
20        Q.    Okay.  So that part of this is true?
21        A.    That I was in prison?  Yes.
22        MS. ROGERS:  I'm sorry, just to clarify,
23    when you're saying "this," are you talking about the
24    statement we were just looking at?  I don't know what
25    "this" is.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Okay.  Mr. Garcia, where you say here --
 2   where you told Mr. Roundy, "Additionally, during the
 3   same conversation, Troup provided" -- blank -- "with
 4   information regarding his role in the murder of
 5   Pancho," do you remember telling Mr. Roundy that?
 6           MR. BURKE:  Asked and answered.  Now he's
 7   pestering the witness.
 8           THE COURT:  Overruled.
 9        A.   I don't remember.
10        Q.   Would it refresh your memory if I showed
11   you Mr. Roundy's report of your conversation?
12        A.   If you want to.
13        Q.   Sure.
14           MR. BECK:  May I approach, Your Honor?
15           THE COURT:  You may.
16        Q.   All right.  Mr. Garcia, I'm showing you the
17   same report that I just showed you below the
18   paragraph we just read.  So it says blank "stated
19   that Troup had told him about Sanchez' murder in
20   approximately 2008, when" -- blank -- "violated his
21   probation/parole and was incarcerated in the New
22   Mexico prison system."  Do you see that?
23        A.   Um-hum.
24        Q.   And it's true, isn't it -- I think you just
25   said this -- that in 2008, you violated your
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   probation/parole and you were incarcerated during
 2   that time, right?
 3        A.   Yes.
 4        Q.   And so, "Additionally during the same
 5   conversation Troup provided" -- blank -- "with
 6   information regarding his role in the murder of
 7   Pancho."  Do you see where it says that?
 8        A.   Um-hum.
 9        Q.   And that's true, isn't it --
10        A.   No.
11        Q.   -- that Troup told you, in 2008, that he
12   provided you information about his murder of Pancho,
13   right?
14             MR. BURKE:  Objection, asked and answered.
15             THE COURT:  Overruled.
16        A.   You're saying me and Troup were together in
17   2008?
18        Q.   Right.
19        A.   No, we weren't.
20        Q.   Okay.  So here, when you say that --
21        A.   You have to tell me what you're saying,
22   that me and him were together incarcerated.  We never
23   were.
24        Q.   So here in approximately 2008 --
25        A.   We don't even like each other.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  So let me ask you this question now.

2  Where it says here that you stated "Troup told you

3  about Sanchez' murder in 2008, when you were

4  incarcerated in the New Mexico prison system," is it

5  your testimony today that that's not true?

6      A.   I don't know.  I don't understand the

7  question.

8      Q.   Let me ask it again.  Here, where it says

9  that Troup told you about Sanchez' murder in

10  approximately 2008, when you violated your

11  probation/parole, and you were incarcerated in the

12  New Mexico prison system, is that not true?

13          MR. BURKE:  Objection.  This now has been

14  asked a half dozen times.  That is enough, I believe,

15  Your Honor.

16          THE COURT:  Overruled.

17          MS. ROGERS:  He's asking about witnesses

18  here in the statement.

19          THE WITNESS:  That I told him that?

20          MS. ROGERS:  Can you ask it again, please?

21      A.   I don't understand it.

22          THE COURT:  I think, Mr. Beck, you better

23  leave that microphone so Mr. Garcia's voice -- turn

24  it down just a little bit, Mr. Garcia, so it's

25  pointing.  There you go.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So where it says in this report that you

2 said that Troup told you about Sanchez' murder in

3 approximately 2008, when you violated your probation

4 and parole, and you were incarcerated in the New

5 Mexico prison system, you're saying that's not true?

6      A.   I don't remember it.  You know, if -- and I

7 understand that me and Huero were never in a facility

8 together, so I don't remember that, me telling the

9 FBI agent that.  All right, so --

10      Q.   Do you remember Mr. Troup telling you, in

11 approximately 2008, that he killed Freddie Sanchez?

12      A.   No, because --

13           MR. BURKE:  Objection, asked and answered.

14      A.   Because me and Huero Troup never liked each

15 other.  So in 2008, no.

16      Q.   So where it says here, "Additionally, the

17 same conversation Troup provided you with information

18 regarding his role in the murder of Pancho," is it

19 your story that this also is not true?

20           MS. ROGERS:  Do you need a second?

21      A.   Yes.

22           MS. ROGERS:  Your Honor, can we have a

23 brief sidebar?

24           THE COURT:  You may.

25           (The defendant conferred with counsel.)

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                       1-800-669-9492
                                                 e-mail: info@litsupport.com



```
 1              MS. ROGERS:  Thank you, Your Honor.  Sorry,
 2     Mr. Beck.
 3         Q.   So I asked you a question.
 4         A.   Go ahead.
 5              MR. BECK:  Ms. Bean, can you read that
 6     back, please?
 7              THE COURT:  The question is:  So where it
 8     says here, "Additionally the same conversation Troup
 9     provided you with information regarding his role in
10     the murder of Pancho."
11         A.   I don't remember saying that.
12         Q.   Pancho is Fred Castillo, right?
13         A.   I don't know.
14         Q.   Pancho was killed in 2001 in the Southern
15     New Mexico Correctional Facility; you know that?
16         A.   I heard of it, but I don't know who he is.
17         Q.   You heard of it from Troup when he told you
18     about it, right?
19         A.   No.
20         Q.   No, that's not where you heard of it?
21         A.   I don't remember.
22         Q.   And where it says Troup told you that Billy
23     Garcia, a/k/a Wild Bill, gave the order to kill
24     Pancho, that's true, right?
25              MR. BURKE:  Asked and answered, Your Honor.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    Now he's just pestering the witness.

 2            THE COURT:  Overruled, Mr. Burke.

 3        A.   Go ahead.  What's the question?

 4        Q.   Where it says Troup told you that Billy

 5    Garcia, a/k/a Wild Bill, gave the order to kill

 6    Pancho; that's true, right?

 7        A.   I don't remember.

 8        Q.   Now, you know that Billy Garcia did, in

 9    fact, put the order in to kill Pancho, right?

10        A.   Who is Billy Garcia?

11            MR. CASTLE:  I'm going to object.  That

12    assumes that --

13        A.   Can you tell me who Billy Garcia is?

14            THE COURT:  Overruled.  He can answer.

15        A.   I don't know what you're talking -- I don't

16    know who he is.

17        Q.   So you don't know who Billy Garcia, a/k/a

18    Wild Bill, is?

19        A.   I heard of him.  Remember I told you I

20    heard of him, but I don't know who he is.

21        Q.   That wasn't my question.  I said:  You know

22    that Billy Garcia gave the order to kill Pancho,

23    don't you?

24        A.   No.

25        Q.   And so when you told FBI Special Agent

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Roundy, in 2013, that Troup told you that Billy

2    Garcia, a/k/a Wild Bill, gave the order to kill

3    Pancho, that was a lie?

4              MR. BURKE:  That isn't --

5              THE COURT:  Well, I'm going to sustain.

6    That question has a lot of problems.  Sustained.

7         Q.   So was it not true when you told Special

8    Agent Roundy, in 2013, that Troup told you that Billy

9    Garcia, a/k/a Wild Bill --

10             MR. BURKE:  Object --

11             THE COURT:  Sustained.

12        Q.   So you told Special Agent Roundy that Troup

13   told you that Troup walked into Pancho's cell where

14   Angel DeLeon and others were waiting for Pancho?

15             MR. BURKE:  Objection.

16             THE COURT:  Overruled.

17        Q.   My question is:  Didn't you tell Special

18   Agent Roundy, in 2013, that Troup told you that he

19   walked into Pancho's cell, where Angel DeLeon and

20   others were waiting for Pancho?

21        A.   I don't remember that.  I don't remember

22   telling him that.

23        Q.   Would it refresh your recollection if I

24   showed you Mr. Roundy's report?

25        A.   Yes, but I don't remember.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 843-9492                                                                  FAX (505) 843-9492
                                                                                   1-800-669-9492

BEAN
& ASSOCIATES, Inc.                                           e-mail: info@litsupport.com
PROFESSIONAL COURT
REPORTING SERVICE

1           MR. BECK:  May I approach, Your Honor?

2           THE COURT:  Well, let's talk a little bit

3    about scheduling.  How much longer are you going to

4    go, Mr. Beck?

5           MR. BECK:  Well, probably another 15

6    minutes, Your Honor.

7           THE COURT:  Are you available to come back

8    tomorrow, Ms. Rogers, at 8:30 in the morning?

9           MS. ROGERS:  I am, Your Honor.

10          THE COURT:  Are you available, Mr. Garcia?

11          THE WITNESS:  Not really.  But if I have

12   to, I'll be here.

13          THE COURT:  All right.  Well, we've gone

14   longer -- we were trying to accommodate Mr. Garcia

15   and get him out of there, but if the Government is

16   going to take another 15 minutes, I think we better

17   let everybody go.  The transportation people are all

18   waiting.  And we've gone longer on this day than we

19   have in two months.  So I apologize we couldn't get

20   it done.

21          All right.  See y'all tomorrow at 8:30 in

22   the morning.

23          (The Court stood in recess.)

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1                      C-E-R-T-I-F-I-C-A-T-E

2

3     UNITED STATES OF AMERICA

4     DISTRICT OF NEW MEXICO

5

6

7          I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8     Official Court Reporter for the State of New Mexico,

9     do hereby certify that the foregoing pages constitute

10    a true transcript of proceedings had before the said

11    Court, held in the District of New Mexico, in the

12    matter therein stated.

13         In testimony whereof, I have hereunto set my

14    hand on March 24, 2018.

15

16

17

18    _____
      Jennifer Bean, FAPR, RMR-RDR-CCR
19    Certified Realtime Reporter
      United States Court Reporter
20    NM CCR #94
      333 Lomas, Northwest
21    Albuquerque, New Mexico 87102
      Phone:  (505) 348-2283
22    Fax:    (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com