1

1          IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF NEW MEXICO

3    UNITED STATES OF AMERICA,

4                   Plaintiff,

5        vs.            NO:  CR-15-4268 JB

6    ANGEL DELEON, et al.,

7                   Defendants.

8

9        Transcript of excerpt of testimony of

10                   BRYAN ACEE

11        February 23, 2018 and February 26, 2018

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

2

1                     I N D E X

2    EXAMINATION OF BRYAN ACEE

3    By Mr. Castellano                                3

4    EXAMINATION OF BRYAN ACEE

5    By Mr. Lowry                                    44

6    REPORTER'S CERTIFICATE                         234

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                    February 23, 2018
 2            THE COURT:  All right.  Does the
 3   Government have its next witness or evidence?
 4            MR. CASTELLANO:  Your Honor, the United
 5   States recalls Special Agent Bryan Acee.
 6            THE COURT:  All right.  Mr. Acee, if
 7   you'll return to the witness box, I'll remind you
 8   that you're still under oath.
 9                    BRYAN ACEE,
10       after having been previously duly sworn under
11       oath, was questioned, and continued continued as
12       follows:
13                 DIRECT EXAMINATION
14   BY MR. CASTELLANO:
15       Q.   Agent Acee, I wanted to recall you to
16   clarify and to touch on some points that have come
17   up during the trial now.  When Eric Duran left New
18   Mexico, was he still -- after his cooperation and
19   after the recordings, was he still working for the
20   FBI?
21       A.   Yes.
22       Q.   And at some point did you hand him off to
23   another FBI office in another state?
24       A.   I did.
25       Q.   At that point if he was earning benefits,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    was he earning benefits or basically getting paid as

2    a confidential human source from this case or was he

3    getting paid from the other district?

4         A.    From the other district.

5         Q.    And is that for any work he was doing over

6    there as a confidential human source?

7         A.    Yes.

8         Q.    Now, when someone's working as a source

9    like that, is the FBI supposed to be notified if

10   that person is arrested?

11        A.    Yes.

12        Q.    And in this case were you aware or were

13   you made aware of his arrest through FBI channels?

14        A.    No.

15        Q.    Do you know why that is?  How is it that

16   you're supposed to be notified when someone is

17   arrested?

18        A.    When someone is arrested, they're

19   fingerprinted by the jail facility.  Those

20   fingerprints are entered into the FBI's NCIC, or

21   National Criminal Information Center database.  And

22   it's been my experience, I've had informants

23   arrested before that I'll get the notification about

24   12 hours later.  In this case we did not get

25   notifications.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                                1-800-669-9492
                                                       e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.   How did you find out that Eric Duran had
2  been arrested?
3      A.   I learned it during a pretrial hearing
4  from one of the defense attorneys.
5      Q.   So before that time did you know of any
6  arrest by him?
7      A.   I did not.
8      Q.   If that's the case, were you involved in
9  any of his cases or arrests since you had not heard
10  about them?
11      A.   No.
12      Q.   What did you do once you learned this
13  information?
14      A.   Confirmed it.  I reported it to the
15  authorities in the district, the state he was
16  working in, and I requested that they pick him on an
17  arrest warrant for violating parole.
18      Q.   And did you try to contribute to his
19  arrest by using any investigative techniques?
20      A.   I did.
21      Q.   What did you do?
22      A.   The agents that I work with on my team and
23  I drafted and obtained search warrants for Google,
24  Facebook, and a couple cellular telephone accounts
25  that we had attributed to him.  We also interviewed

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                        1-800-669-9492
                                                                e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   his family and associates.  And we put out Be On The

 2   Lookout fliers with the proactive police units in

 3   the area that he was in and asked them to hunt him

 4   down, to look for him.

 5       Q.   And then was he eventually arrested?

 6       A.   He was.

 7       Q.   Did you have anything do with any of his

 8   cases or the disposition, dismissals, charging

 9   decisions, anything like that?

10       A.   Not with dismissals, no.  I pushed that he

11   would be charged federally once I learned that there

12   was a firearm involved and he may have possessed it.

13            I pushed hard with your office and the

14   other prosecuting authorities to charge him

15   federally for it so that he'd, in my mind, be held

16   more accountable.

17       Q.   And you mentioned a firearm was involved.

18   As a result -- was the firearm in the vehicle where

19   he was located?

20       A.   It was under his seat.  It wasn't on his

21   person, it was found under the seat that he was

22   seated in.

23       Q.   And as a result of it being in at least

24   the same vehicle as him, what steps did you take

25   then to possibly match him up to that firearm?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   I wrote a search warrant for Duran before
 2   he even arrived back in New Mexico.  I explained to
 3   the judge that I expected him to be here within a
 4   few days.  The judge approved that warrant.
 5            And once he arrived in New Mexico, myself
 6   and Agent Stemo went to that facility and we
 7   executed a search warrant, collected his DNA.  And
 8   then later that day, I Fed Ex'd it up to the FBI
 9   agent in the other office and asked her to submit it
10   to their lab and use it in the potential prosecution
11   of Duran, to match that, Duran's DNA profile, to
12   what might be on the firearm.
13        Q.   And are you aware of any results coming
14   back yet?
15            MR. LOWRY:  Objection.  Calls for hearsay.
16            THE COURT:  Well, this will just be a
17   yes/no answer, and then we'll see if the Government
18   wants to --
19            MR. CASTELLANO:  I'm not looking for what
20   the results are.  I'm just asking if the results
21   have come back.
22            THE COURT:  So it's a yes/no answer.
23        A.   No.
24   BY MR. CASTELLANO:
25        Q.   There has been discussion about Mr. Duran
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   receiving what's called a lump sum award from the
 2   Department of Corrections.  Did you have anything to
 3   do with that?
 4        A.   I did not.
 5        Q.   There has obviously been a lot of
 6   discussion about the Molina paperwork in this case.
 7   Are you aware of when that investigation happened?
 8        A.   Yes.
 9        Q.   When was that?
10        A.   July of 2009.
11        Q.   And as far as you know, at least until
12   very recently, was any of the paperwork from that
13   discovery disclosed in this case?
14        A.   It was not.
15        Q.   So in other words, would there have been
16   paperwork from that investigation loaded onto the
17   tablets for people to see?
18        A.   No.
19        Q.   When we talk about the investigation of
20   July 2009 regarding Mr. Molina, what was the nature
21   of that investigation?
22        A.   It talked about a lot of stuff, but I'll
23   try to narrow it.  It was what I would describe as a
24   strong-arm robbery that involved more than one
25   subject.  The police linked the vehicle in the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  robbery to Molina.  They questioned him about it,

2  and he provided a statement which actually was

3  recorded.  I don't know if Molina knew that.  But

4  the police reports included transcripts of the

5  recording the detective made of his interview.  I

6  believe his residence was also searched.

7       Q.   Regarding Mario Rodriguez, there was

8  discussion about a murder conspiracy he told you

9  about involving Carlos Herrera.  Do you remember

10 that?

11      A.   Yes.

12      Q.   And did you listen to the recordings in

13 this case involving Mr. Herrera?

14      A.   Yes.

15      Q.   Did some of those recordings involve Mr.

16 Herrera speaking in a way that would be considered

17 disrespectful towards other SNM members?

18      A.   Yes.

19      Q.   And was it your understanding that part of

20 that disrespect was part of the reason for the

21 murder conspiracy?

22      A.   Yes.

23           MR. MAYNARD:  Objection, Your Honor.

24 That's just opinion, speculation.

25           THE COURT:  Well, let me make sure I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   understand the question.  Did you ask the
 2   question -- what the transcript says is recordings
 3   involved Mr. Herrera speaking?
 4           MR. CASTELLANO:  That's correct, Your
 5   Honor.  From some of the recordings in this case.
 6           THE COURT:  Well, I'm going to sustain the
 7   objection then.
 8   BY MR. CASTELLANO:
 9       Q.   Regarding the shank found in Mario
10   Rodriguez's shoe, how is it that you became aware of
11   that?
12       A.   He told me about it during a debrief.
13       Q.   And then after he told you about it, was
14   it then discovered?
15       A.   Yes.
16       Q.   Did you discover any other items or shanks
17   from information that he provided?
18       A.   Yes.
19       Q.   Where were those shanks located?
20       A.   They're both located up at the
21   Penitentiary of New Mexico.  I believe one was in
22   the North facility, Level 6, and one in the South
23   facility.
24       Q.   I'm not going to ask you for names here,
25   but did Mr. Rodriguez give you a name of a hit list
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  of people who were on a list as a result of

2  cooperation in this case?

3       A.   Yes.

4       Q.   There is also the testimony about a

5  meeting between Mr. Calbert, also known as Spider,

6  and Mr. Urquizo, also known as Marijuano.  Do you

7  remember that?

8       A.   I do.

9       Q.   And do you remember the occasion where Mr.

10 Urquizo was debriefing at the FBI?

11      A.   Yes.

12      Q.   And was Mr. Calbert scheduled for a

13 possible debrief following Mr. Urquizo's debrief?

14      A.   Yes.

15      Q.   When these two meetings were scheduled,

16 was there any plan to have those two get together to

17 talk?

18      A.   No.

19      Q.   And as a result of speaking with Mr.

20 Urquizo, how was it that he and Mr. Calbert had the

21 idea of getting together?

22      A.   Well, Calbert wasn't involved in the idea.

23 What happened is during our debrief of Urquizo at

24 the FBI office in Albuquerque, he mentioned that he

25 thought Calbert would --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. LOWRY:  Objection.  Hearsay.

 2              THE COURT:  Well, it seems like these are

 3   just out-of-court statements being offered for the

 4   truth, so sustained.

 5              MR. CASTELLANO:  It's only used for the

 6   reason why they were -- we don't want them for the

 7   truth, Your Honor, just to explain why the meeting

 8   happened.

 9              THE COURT:  Well, I guess I'm not seeing

10   the importance of that, so it seems to me the

11   statements are coming in, so I'll sustain it.

12              MR. CASTELLANO:  I'll rephrase, Your

13   Honor.

14   BY MR. CASTELLANO:

15       Q.   Were you aware of any friendship between

16   Mr. Urquizo and Mr. Calbert as a result of the

17   debrief of Mr. Urquizo?

18       A.   Yes.

19       Q.   As a result of that friendship, on that

20   day was it clear whether or not Mr. Calbert would

21   cooperate with the Government?

22       A.   No.

23       Q.   And consequently then did Mr. Urquizo

24   believe that if he met with Mr. Calbert, he could

25   put him at ease about cooperation?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              MR. LOWRY:  Objection.  Calls for hearsay.

2              THE COURT:  Sustained.  Sustained.

3   BY MR. CASTELLANO:

4        Q.   Don't answer.  So based on what you knew

5   about the relationship between Mr. Urquizo and Mr.

6   Calbert, did you put those two together?

7        A.   Yes.

8        Q.   About how long did they meet?

9        A.    In my presence, about five minutes.

10       Q.   Where did they meet out of your presence?

11       A.    In the same area, but we allowed the

12  attorneys to close the door, both of their attorneys

13  were there and they wanted attorney-client

14  conversation without agents in the room.  So I stood

15  outside the door.

16       Q.   Were you able to see inside the room?

17       A.    I was.

18       Q.   How were you able to see in there?

19       A.    There is a window.  There are also

20  cameras, but we turned those off once the attorneys

21  went in.

22       Q.   About how long was the meeting with those

23  two individuals and their attorneys?

24       A.   About 10 minutes.

25       Q.   After that meeting then did Mr. Calbert
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                     1-800-669-9492
                                                 e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1  agree to cooperate?

 2      A.   He did.

 3      Q.   In terms of the investigation of the SNM

 4  prison gang, in addition to prosecuting people for

 5  crimes, was one of the goals the dismantlement of

 6  the gang?

 7      A.   It is.

 8      Q.   And by making people witnesses in this

 9  case, how does that contribute to the dismantlement

10  of the gang?

11      A.   Can't be FBI witnesses and prison gang

12  members.

13      Q.   What about people who aren't witnesses but

14  still became informants, provided information to the

15  FBI and whose names were listed in reports?

16      A.   Well, they have the same fate.  They can't

17  be government cooperators and gangsters.

18      Q.   So even for those people, once their name

19  comes out in the reports, is there much of an option

20  for them in terms of the SNM?

21      A.   No.  They sometimes think there is.  They

22  have identity crisis, but don't make any mistake

23  about it, they can't be both.

24      Q.   And the testimony in this case has

25  involved the SNM in the State of New Mexico prison

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    system.  So ideally for some people will they then

 2    be -- for convictions, just generally speaking, are

 3    there places in federal prisons out of state where

 4    people can be sent?

 5        A.   Yes.

 6        Q.   And there has been discussion about Gerald

 7    Archuleta and the three-year maximum sentence he

 8    faces.  Do you remember that?

 9        A.   Yes.

10        Q.   At one point were you seeking to have him

11    charged with something more serious based on the

12    injuries to Julian Romero?

13        A.   I was.

14        Q.   What happened as a result of the injuries?

15        A.   Well, I couldn't find -- the medical

16    professionals that treated him did not agree that he

17    sustained serious bodily injury.  And the statute,

18    in order for me to charge the more serious crime,

19    there had to be a finding of serious bodily injury.

20    And I needed a medical professional to testify to

21    that and they did not consider it serious bodily

22    injury.

23        Q.   So the actual injuries suffered?

24        A.   I'm sorry?

25        Q.   The actual injuries that he suffered.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                         1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

1     A.   Yes.  In the view of the medical staff,

2  that's what their conclusion was.

3     Q.   And what impact does it have for someone

4  like Gerald Archuleta to become a government

5  witness, in terms of the gang?

6     A.   It's demoralizing.  He's one of their

7  great leaders and he wired up for us.

8     Q.   And approximately how long before he

9  cooperated did he wire up, as you called it?

10     A.   Well, it took us a while to get him back

11  to New Mexico, so I think it was right after he got

12  here.  But I just -- I'm hesitating because I think

13  it might have taken a couple of months for him to

14  actually get here on the slow transport back to New

15  Mexico.

16     Q.   And back to New Mexico from what state?

17     A.   Tennessee.

18     Q.   And how quickly did he agree to cooperate?

19     A.   Right away, as soon as I met him.

20     Q.   And the jury heard about a number of

21  murders for which he was convicted.  Did he actually

22  serve time for those murders?

23     A.   Yes.

24     Q.   We've used the term debriefs a lot in this

25  trial.  I don't know if we've ever really defined it

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492
                                                    e-mail: info@litsupport.com



1  for the jury.  What would you call a debrief or

2  debrief session?

3       A.   Sure.  A debrief session is my first

4  sit-down with a defendant.  So I haven't met them.

5  And in the majority of these cases, the debriefs

6  were with defendants that were represented.  So we

7  had to -- you know, their attorneys would come.  The

8  attorneys here from the United States would come,

9  myself and the other agents.  And it would be our

10  initial meet.

11          We'd introduced who we were.  The

12  attorneys always introduced whatever legal

13  paperwork, typically the Kastigar letter.  Sometimes

14  there were other discussions that the attorneys had.

15          And then at some point in the debrief, the

16  conversations turned over to the agents.  And that's

17  when I or one of the other agents starts actually

18  debriefing and asking questions of the defendant.

19       Q.   At an initial debrief -- and let's focus

20  on the SNM, for example.  What's the initial

21  information you're seeking the first time you sit

22  down with somebody?

23       A.   I want the 30,000-foot view, if you will,

24  of what they know.  Because the case encompasses

25  over 30 years of stuff we're looking at.  So I want

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1  to know when they got in, what group, kind of what
 2  leadership they fell under, how long they've been
 3  in, who brought them in, which of the homicides they
 4  know about, what years they were incarcerated, what
 5  other family members they might have in.  That sort
 6  of general overview is what I'm looking for.  So we
 7  can narrow -- helps me narrow in later, in
 8  subsequent interviews.
 9       Q.   And then generally speaking, you said
10  there are sometimes subsequent interviews.  What do
11  you do with the information you initially get from a
12  first interview session?
13       A.   Write it up in a 302.
14       Q.   What's a 302?
15       A.   Those are our standard reports.  It's just
16  the number the FBI has given it many years ago.
17  It's a 302 form.
18       Q.   Then what do you do with that information?
19       A.   That's turned over to your office for
20  decisions in making prosecution, whether or not we
21  prosecute somebody.
22       Q.   And for the cases we've referred to as
23  cold case homicides, once you received information
24  like that, did you then start digging to try to find
25  information related to those homicides?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1       A.    Yes.

2       Q.    And other crimes as well?

3       A.    Yes.

4       Q.    Now in a case like this, as we moved

5  closer to trial, did the information become more

6  focused on the defendants and the information for

7  this trial?

8       A.    Absolutely.

9       Q.    Now, at some point when someone decides to

10  cooperate, were there times when you would do what's

11  called a threat analysis with family members?

12      A.    Yes, I always did that if they had family.

13      Q.    What was the purpose of doing that?

14      A.    Mainly so that the family -- particularly

15  in these cases, most of the family members were gang

16  members.  And I wanted to give them a face-to-face

17  where they could see us, gauge our sincerity in

18  trying to keep them safe, give them our contact

19  information.  Explain kind of our expectations of

20  the family and what their options were in terms of

21  safety.

22      Q.    And there's also been probably a little

23  confusion about who debriefed when and when they

24  pled guilty, things of that nature.  Did you prepare

25  something to aid you in your testimony in terms of

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492
                                                    1-800-669-9492
                                           e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  when people debriefed, how many times and when they

2  pled guilty?

3       A.   Yes.

4       Q.   Would it aid your testimony to look at

5  this document?

6       A.   Yes, sir.

7            MR. CASTELLANO:  May I have a moment, Your

8  Honor?

9            THE COURT:  You may.

10           MR. CASTELLANO:  May I approach the

11 witness, Your Honor?

12           THE COURT:  You may.

13 BY MR. CASTELLANO:

14      Q.   Agent Acee, for purposes of

15 identification, I'm handing you what's been marked

16 as Government's Exhibit 777.  I'll have you look at

17 it and tell us what that document is.

18      A.   This is a chart I created a couple days

19 ago.  It charts witness debriefings of the 16

20 cooperating defendants or witnesses in this case.

21      Q.   And what's documented in this exhibit?

22      A.   The dates of their debriefs.  And then

23 that's just in columns.  I've identified each one by

24 name as well as their moniker if they have one.  And

25 then on the end column, I put the date that they

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    pled guilty, if it involved a guilty plea.  Those

2    that weren't charged, it just says N/A next to it.

3        Q.   So when we talk about debriefs, really how

4    short or long can some of the reports be in a case

5    like this?

6        A.   I think my shortest reports might only be

7    a page.  And some of the longer ones might be a

8    dozen or 20 pages, single spaced, typed.

9        Q.   So on the first particular meeting, are

10   you going to get every bit of information out of

11   somebody that they have?

12       A.   No.  And I mean please keep in mind, I'm

13   learning about the organization as I'm meeting these

14   guys and talking to them.  It wasn't an organization

15   I had really any knowledge of before I started the

16   case.  So I'm learning as we go as well about the

17   organization.

18       Q.   And so when we call it a debrief, is it

19   basically just an interview between the defendant

20   and members of the government?

21       A.   Yes, and their attorney is there.

22       Q.   And speaking of attorneys, when Billy

23   Cordova first agreed to record in the prison, do you

24   know if he was even represented at the very

25   beginning?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   He wasn't.  He had an attorney related to
 2   his state case.  I didn't interact with that
 3   attorney.  He wasn't appointed a federal attorney
 4   until after, much later after the recordings.
 5        Q.   The debrief dates on here are based on
 6   what information?
 7        A.   My 302s or the 302s of other agents.
 8        Q.   Did you compile this list to aid you in
 9   your testimony?
10        A.   Yes, sir.
11             MR. CASTELLANO:  Your Honor, at this time
12   I move the admission of Government's Exhibit 777.
13             THE COURT:  Any objection?
14             MR. LOWRY:  Your Honor, yes.  Under 1006,
15   we just haven't had sufficient notice to review this
16   to compare or assess its accuracy.
17             MS. JACKS:  I would join.
18             THE COURT:  Well, let's do this.  Why
19   don't y'all take a look at it during the break?
20   What I'd be inclined to do is admit it, you can look
21   at it over the weekend.  If there's some problem, it
22   will be a conditional admittance.  The only issue is
23   whether he got it right, and give you some chance to
24   look at it.  If we need to correct it, we'll correct
25   it.  Would that work for you, Mr. Lowry?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

**BEAN & ASSOCIATES**, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
**1-800-669-9492**
e-mail: info@litsupport.com

```
 1            MR. LOWRY:  I believe it would, Your
 2   Honor.  Yes, if you're giving us the weekend to look
 3   at it.
 4            THE COURT:  If it's a conditional
 5   admittance, would that work with you, Ms. Jacks?
 6            MS. JACKS:  That will.
 7            THE COURT:  All right.  So I'll admit
 8   conditionally Exhibit 777, but give the defendants
 9   an opportunity to look at it during the break and
10   over the weekend.  If we need to make some changes,
11   we'll address it then.
12            All right.  Why don't we take our
13   afternoon break at this point, so be in recess for
14   about 15 minutes.  All rise.
15            (The jury left the courtroom.)
16            THE COURT:  All right.  We'll be in recess
17   for about 15 minutes.
18            (The Court stood in recess.)
19            THE COURT:  Let's go on the record while
20   Ms. Standridge is getting the jury.  We got a
21   note -- was it from Juror Number 14?  Was it from
22   Mr. Johnston or --
23            CLERK:  Yes.
24            THE COURT:  Mr. Johnston.  Received a note
25   from Mr. Johnston.  It says, "Clarification/:/"  It
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   says "Will transcripts or recordings be available,"

2   looks like he abbreviated that, just "A-V-A-I-L for

3   jury deliberation?"  I think I had ruled earlier

4   that they would not.  I think that was what the

5   defendants wanted.  So unless there's some change of

6   heart, do you want the transcripts to go back?  I

7   guess I could do two things.  One, I could just not

8   address it today and leave it for something -- you

9   know, they'll just get the evidence and they'll

10  figure it out on their own.  Or I could say no, or I

11  could read the cautionary instruction about

12  transcripts.  And then at the very end, after I do

13  it, just indicate what I said in the preliminary

14  instruction -- I'd have to get a copy of the

15  preliminary, printout of the preliminary, where I

16  told them that they wouldn't get transcript.  But

17  that was more of Ms. Bean's transcripts than

18  anything else.  I'm not sure it addresses it.

19          Any thoughts from the defendants?

20          MR. LOWRY:  Yes, Your Honor.  I don't know

21  that I speak on behalf of everyone.  But I exchanged

22  emails with Mr. Beck over the weekend, I believe.

23  And it was our understanding that the transcripts

24  would not go back and they would not be tendered as

25  exhibits.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              And frankly, out of a professional
 2    courtesy, we didn't quibble too much with the
 3    transcripts that were offered by the United States,
 4    but they're -- and I don't mean this in a derogatory
 5    way, but they're riddled with errors.  And it would
 6    be just fundamentally unfair --
 7              THE COURT:  I'm not asking you to change.
 8    I just need to know what you want me to tell the
 9    jury.
10              MR. LOWRY:  No, they're not going back.
11              THE COURT:  Do you want me to give them a
12    cautionary instruction at this time and then just
13    add that?
14              MR. LOWRY:  Yes.
15              MS. JACKS:  Your Honor --
16              MR. LOWRY:  Go ahead.
17              MS. JACKS:  -- may I be heard?
18              THE COURT:  Uh-huh.
19              MS. JACKS:  My suggestion would be to do
20    nothing until the case is over and the Court reads
21    the instructions to the jury.  And then at that
22    time, if they still have a further question, to
23    answer it then.
24              But I think by answering it now and
25    answering it so quickly, I think we're just inviting
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1   more questions of the same nature.
 2            THE COURT:  Well, y'all think about it
 3   over the weekend.  One thing we can do, we do have
 4   this cautionary instruction in our final.  So if you
 5   want to add something, you're not going to get the
 6   transcripts, or something, we can add that.  They'll
 7   figure it out soon enough.  Why don't I just have
 8   Ms. Standridge mark that as Exhibit --
 9            THE CLERK:  T.
10            THE COURT:  -- T, just so the record's
11   clear.  My yellow sheet to you today was R.
12   Ms. Duncan's three documents were S, so this will be
13   Exhibit T to the clerk's minutes.
14            All rise.
15            (The jury entered the courtroom.)
16            THE COURT:  All right.  Mr. Acee, I'll
17   remend you that you're still under oath.
18            Mr. Castellano, if you wish to continue
19   your direct examination of Mr. Acee, you may do so
20   at this time.
21            MR. CASTELLANO:  Thank you, Your Honor.
22            May I publish Government's Exhibit 777 at
23   this time?
24            THE COURT:  You may.
25   BY MR. CASTELLANO:
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Agent Acee, I'm showing you Government's
 2   Exhibit 777.  And for starters, I'm highlighting
 3   Gerald Archuleta's name on there.  He's number 10 on
 4   the list.  And can you see from his initial debrief
 5   on 1/21 of '16, to his guilty plea date on 6/16 of
 6   '16, is it fair to say within five months of his
 7   initial debrief he pled guilty?
 8        A.   Yes, sir.
 9        Q.   And so there's been a lot of questions in
10   this case about when people were housed with
11   cooperators and things of that nature.  For the most
12   part, when the initial debrief date is given in the
13   first column, is that generally the date when
14   someone decided to cooperate?
15        A.   Yes.
16        Q.   So if we see those dates, we know on or
17   about that date that that's when the person decided
18   to cooperate with the Government?
19        A.   Correct.
20        Q.   And so another example is, let's see,
21   Mario Rodriguez.  So he's Number 5 on this list.  So
22   is he one of the latest people to debrief and
23   cooperate?
24        A.   Yes, he's the latest.
25        Q.   And also on these dates, when we have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    later dates, going all the way to as recently as

2    January and February of 2018, are those going to be

3    the later debriefs in preparation for trial?

4         A.   Yes.  And those were largely driven by

5    your office, the terms of the debrief session, the

6    questioning or the attorneys.

7         Q.   Okay.  So moving closer to trial and now

8    asking more specific questions about the Javier

9    Molina and other charges in this case?

10        A.   Like a laser focus on events, yes.

11        Q.   Now, in terms of dismantlement of the

12   gang, I think you said we used Gerald Archuleta as

13   an example, number 10.  So in addition to

14   prosecution of Gerald Archuleta, then what impact

15   does that have to have someone like him cooperating

16   and out of the gang?

17        A.   Well, it's just hugely demoralizing for

18   the gang.  A lot of the guys I talked to didn't

19   believe me.  I had to actually play recordings of

20   him talking to me before they'd even believe that he

21   would talk to us.

22        Q.   And is it fair to say from the testimony

23   we heard in court that for a long period of time he

24   was an influential member of the SNM?

25        A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1       Q.   And once again referencing the testimony

 2   in this case, can he ever, in your opinion, be an

 3   influential member of the SNM Gang?

 4       A.   No, not any gang.

 5       Q.   Is that based on his cooperation?

 6       A.   Yes.

 7       Q.   Now, going back to dismantlement of the

 8   gang, was part of that process the recruitment of

 9   confidential informants or what you referred to as

10   confidential human sources?

11       A.   Yes.

12       Q.   At the beginning of this trial, you talked

13   about using certain investigative techniques.  Did

14   we see some of those techniques in this trial?

15       A.   Yes.

16       Q.   And one example I want to ask you about is

17   Mario Montoya, for example.  Did you use a

18   confidential human source to buy drugs from Mario

19   Montoya?

20       A.   Yes, Mario was a target when I started the

21   case.

22       Q.   And then after that, did he agree to

23   cooperate?

24       A.   Yes.

25       Q.   Did that enable you to capture some of the

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                 Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 843-9492                                                                 FAX (505) 843-9492
                                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                                                  e-mail: info@litsupport.com

1    information regarding the Marcantel and Santistevan

2    conspiracies?

3         A.   Yes, it did.

4         Q.   Also regarding people like Eric Duran and

5    Mario Montoya, at some point in time did it become

6    apparent that one of them was figuring out that the

7    other one might be a confidential source?

8         A.   Yes.

9         Q.   Who was that person?

10        A.   I think Duran figured it out first.  I can

11   explain why if you want, but I think Duran probably

12   figured it out first.

13        Q.   Do you know about how long it took before

14   he figured that out?

15        A.   It was toward the end of the conspiracy

16   investigation.

17        Q.   And did you do anything to try to throw

18   him off the scent of Mario Montoya as a cooperator?

19        A.   I did initially.

20        Q.   How did you do that?

21        A.   Well, I told him -- I pushed him toward

22   choosing Mario.  There were a couple of options for

23   guys on the street that could have been used as the

24   hit man on the street, if you will.  I wanted Mario

25   because he was cooperating.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          So I told Duran that we were tracking

2   Mario and that we had a wiretap on his phone, which

3   was true.  But I made it sound like it was more of

4   an unknown to Mario that we were tracking him, and I

5   represented that to Duran.

6          Q.   Some of the witnesses in this case have

7   talked about the witness protection program.  Do you

8   know it by any other names?

9          A.   That's what Hollywood calls it.  It's

10  actually Witness Security or WITSEC, but I do know a

11  little bit about the program.

12         Q.   And have you had discussions with some of

13  the cooperators about this being a potential option

14  for them?

15         A.   Yes.

16         Q.   At this point are any of the cooperators

17  in that program?

18         A.   No.

19         Q.   And do you anticipate at some point that

20  you may apply for them to enter that program?

21         A.   Yes, I anticipate applying for a few of

22  them.

23         Q.   And for the cooperators who have to do

24  prison time if they're in the program, is there a

25  safer prison for them to go to?



SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                                      Albuquerque, NM 87102
(505) 989-4949                                                                    (505) 843-9494
FAX (505) 843-9492                                                       FAX (505) 843-9492
                                                                               1-800-669-9492
                                                                         e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.    Yes.

 2        Q.    Is that basically a prison for other

 3   people who have cooperated?

 4        A.    Correct.

 5        Q.    A few of them mentioned getting things

 6   like new identities and money and cars and things of

 7   that nature.  What's your understanding of what --

 8   how that works when someone is not in a secure

 9   facility but then is on the streets into the

10   program?

11        A.    Yeah, those are all things that are

12   available as part of the Witness Security program.

13   But that's not something I represent because the FBI

14   doesn't run the program.  That's not something I can

15   control.  I think a lot of that came from just what

16   people see on the movies and stuff.

17        Q.    Have you made representations to that

18   effect, that they'll get houses and cars and things

19   of that nature?

20        A.    No.  These are not the kind of guys you

21   want to make fake promises to, they'll remember

22   that.

23        Q.    I want to talk to you about this meeting

24   with Ronald Sanchez that was discussed here in

25   court.  Do you remember that?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1       A.    Yes.

2       Q.    Who requested that meeting?

3       A.    Mr. Sanchez, Ronald Sanchez.

4       Q.    Is that Daniel Sanchez's brother?

5       A.    Yes.

6       Q.    Did you eventually meet with Ronald

7  Sanchez?

8       A.    I did.

9       Q.    Was anyone else at that meeting?

10      A.    Yes, Mario Rodriguez, Agent Nancy Stemo.

11 And at that time Task Force Officer Mark Myers, who

12 was a corrections official, and Sergio Sapien of the

13 STIU.  He's a captain with the STIU over at PNM.

14      Q.    Why was Mario Rodriguez present at this

15 meeting with Ronald Sanchez?

16      A.    My understanding was he wanted -- Ronald

17 wanted him there.

18      Q.    At that point was Mario Rodriguez already

19 cooperating?

20      A.    He was.

21      Q.    And did Ronald Sanchez know that Mario

22 Rodriguez was cooperating?

23      A.    Yes.

24      Q.    What questions did Ronald Sanchez have at

25 that meeting?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. JACKS:  Objection, hearsay.
 2              THE COURT:  Well, what is this being
 3   offered for?
 4              MR. CASTELLANO:  It's to lay the
 5   background of the meeting.  And these are questions,
 6   not assertions, Your Honor.  They would be
 7   nonhearsay.
 8              THE COURT:  Well, why don't you ask him
 9   first if he had questions.  Let's lay a foundation.
10              MR. CASTELLANO:  Sure.
11              MS. JACKS:  And I'm also going to object
12   based on relevance.
13              THE COURT:  Is it necessary to get into
14   all this to get the testimony you want from Mr.
15   Acee?
16              MR. CASTELLANO:  It is, Your Honor.  I
17   believe it was Mr. Sanchez's counsel who asked
18   questions about this meeting, and he also introduced
19   a letter that came out of this meeting.  They
20   actually moved some of this information into
21   evidence.
22              THE COURT:  All right.  Well, let's do
23   this.  Let's ask him first a foundational question,
24   whether he had questions, let me hear the answer to
25   that.  Then I'll decide how we're going to proceed
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  from there.

 2  BY MR. CASTELLANO:

 3      Q.   Did Ronald Sanchez have questions at this

 4  meeting?

 5      A.   Yes.

 6      Q.   And the questions were in the nature of

 7  what topics?

 8          THE COURT:  Let's do this.  If we're going

 9  to make them questions so they avoid hearsay,

10  Mr. Acee can just relate what the questions are and

11  nothing else.

12          MR. CASTELLANO:  Sure, Your Honor.

13  BY MR. CASTELLANO:

14      Q.   Okay.  So you heard the Court's

15  instructions.  Let's stick to that.  What -- one at

16  a time, what were the questions that Ronald Sanchez

17  had?

18      A.   The first one was what could be done for

19  his brother Daniel in terms of a plea agreement and

20  sentence.

21      Q.   Okay.  What was the next one?

22      A.   What could be done for Ronald and his --

23  the state case he was serving.  And the third

24  question was -- it was a couple different questions,

25  but it pertained to how could Ronald and Daniel do

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   their time together.
 2        Q.   And was there a clarification question
 3   about whether that would be in state or federal
 4   custody?
 5        A.   Both were discussed.
 6        Q.   And as a result of this meeting, then, did
 7   Mario Rodriguez write a letter to Daniel Sanchez?
 8        A.   He'd already written the letter because he
 9   gave it to me at the conclusion of the meeting, and
10   so it was already written.  There were two letters.
11        Q.   What did you do with those letters?
12        A.   I wasn't sure I could take them, so I
13   called Ms. Armijo and I asked her what I should do
14   with the letters.
15        Q.   And what happened to those letters?
16        A.   I delivered them to your office and I
17   believe Ms. Armijo sent them to -- the letters were
18   addressed to two people that had attorneys, and
19   that's why I hesitated in taking them.
20             So Ms. Armijo caused those letters to be
21   sent to the attorneys representing the defendants
22   that the letters were addressed to, if that makes
23   sense.
24        Q.   Who were those letters addressed to?
25        A.   Daniel Sanchez and Sergio Rodriguez,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Churro, who is a defendant in another case.

 2       Q.   Do you know what the general intent or

 3   purpose was in those letters?

 4       A.   Yes.

 5       Q.   What was the intent or the purpose?

 6            MS. JACKS:  Objection, calls for hearsay.

 7            THE COURT:  Well, I think probably given

 8   the contents of the other letters, would be -- would

 9   be, so I'll sustain.

10            MR. CASTELLANO:  I don't recall, Your

11   Honor, was one of those letters moved into evidence?

12            THE COURT:  If that's the case, then you

13   can discuss those.  But we probably need to be

14   reminded which ones you're referring to.

15            MR. CASTELLANO:  I don't have the defense

16   exhibit, Your Honor.  If the defense could provide

17   that, I'd be happy to show it to Agent Acee.

18            MS. JACKS:  I'm actually looking for that

19   now.  My recollection is that he was asked questions

20   but I don't believe the letter itself was admitted.

21            THE COURT:  Is it a defendants' exhibit?

22            MS. JACKS:  It is.

23            THE COURT:  Do you have any objection to

24   moving it into evidence?

25            MS. JACKS:  If it's not in evidence, I'm

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  not moving it in now.

2          THE COURT:  Then you would oppose the

3  Government doing so?

4          MS. JACKS:  If it's not already been

5  admitted, yes.

6          MR. CASTELLANO:  I move its admission at

7  this time, Your Honor.

8          THE COURT:  Well, I probably don't have

9  any basis for admitting it, so I won't admit it.

10  It's in evidence.  Do you know, Ms. Jacks, what the

11  number -- what the letter is?

12          MS. JACKS:  Your Honor, that's what I'm

13  looking for right now.  Obviously I didn't get a

14  preview of what this line of questioning would be,

15  so I don't have it at my fingertips.  I can get it

16  in the next few minutes.

17      Q.   At the time of this meeting, was Ronald

18  Sanchez still in prison?

19      A.   Yes.

20  BY MR. CASTELLANO:

21      Q.   And was that meeting recorded and was

22  there a transcript prepared of that meeting?

23      A.   Yes to both.

24          MR. CASTELLANO:  Your Honor, it's Bates

25  51520.  May have a moment, Your Honor?  I'll check

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1  with our paralegal.
 2            THE COURT:  You may.
 3            MS. JACKS:  According to the transcript,
 4  Your Honor, the exhibit is F as in Frank, C as in
 5  cat.
 6            THE COURT:  It was not admitted?
 7            MS. JACKS:  My recollection, and I'm
 8  looking at the transcript, is that Mr. Rodriguez was
 9  questioned about the content of the letter but the
10  letter itself was not offered into evidence.
11            MR. CASTELLANO:  Okay.  So it seems, Your
12  Honor, is that some of the content of that letter
13  then is part of the evidence.
14            MS. JACKS:  Correct.  It was the P.S.
15            THE COURT:  Well, unless you can explain
16  some basis for admitting it, I don't think it can be
17  admitted.
18            MR. CASTELLANO:  We'd move it under the
19  rule of completeness, Your Honor.
20            THE COURT:  I'll deny the admission.
21  BY MR. CASTELLANO:
22       Q.   Agent Acee, once again, whose idea was
23  this meeting?
24       A.   Ronald Sanchez.
25       Q.   Going back to meeting with other people
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   who were either targets of the investigation or
 2   defendants charged, did you ever threaten anybody
 3   with the death penalty?
 4        A.   No.
 5             MR. CASTELLANO:  Your Honor, I pass the
 6   witness.
 7             THE COURT:  Thank you, Mr. Castellano.
 8   Cross-examination of Mr. Acee, Mr. Lowry?
 9             MR. LOWRY:  Yes, Your Honor.  Could we
10   approach briefly?
11             THE COURT:  You may.
12             (The following proceedings were held at
13   the bench.)
14             MR. LOWRY:  Your Honor, I'm happy to
15   cross-examine him on the scope of what was just
16   presented.  Frankly, we would anticipate recalling
17   him early next week in the defense case-in-chief and
18   I'd rather pursue it that way, not to break up the
19   State's case, and make our presentation more
20   effective.
21             THE COURT:  Any objection to that?
22             MR. CASTELLANO:  I would ask the same
23   thing, if we have direct examination, that they do
24   it in their case.
25             MR. LOWRY:  Okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  So we have an agreement.  Is
 2    that where all the other defendants are, as well?
 3              MR. LOWRY:  I believe so.
 4              MS. JACKS:  We're agreeable.  We've
 5    actually had two witnesses sitting around for two
 6    days that we don't want to have to bring back next
 7    week, so we're prepared to go forward.
 8              THE COURT:  But there's no issues or
 9    problems with them calling Mr. Acee next week?
10              MR. CASTELLANO:  I anticipate that's what
11    we're going to do.
12              MR. MAYNARD:  There may be.
13              MS. JACKS:  That was just to cross-examine
14    him on what is brought out and bring out additional
15    information important for our case.  It's prior
16    statements and stuff like that.
17              MR. MAYNARD:  There might be another issue
18    coming up with -- Mr. Lowry wanted to get into about
19    the --
20              MR. LOWRY:  No, you're not going to.
21              MR. MAYNARD:  Okay.  I wanted to protect
22    Mr. Herrera's situation.
23              THE COURT:  Do y'all feel you have an
24    agreement?
25              MS. JACKS:  I think so.  So what we'll do
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    now is reserve the cross.
 2              THE COURT:  And would you rest and go
 3    forward?
 4              MR. CASTELLANO:  I think you just call him
 5    as a witness, as long as --
 6              THE COURT:  I'll just ask, "Any cross,"
 7    and y'all can say no.
 8              MS. FOX-YOUNG:  We'll say we reserve it,
 9    Your Honor.
10              THE COURT:  Say whatever you want.
11              MS. JACKS:  All right.
12              THE COURT:  Work for you?
13              MR. CASTELLANO:  Yes, Your Honor.  I think
14    we're about to rest.  I'd ask the Court for a
15    ten-minute recess just to make sure we check our
16    exhibits and make sure we haven't missed anything.
17              THE COURT:  What if we did this for the
18    defendants?  They can go ahead and rest and check
19    the exhibits afterwards.  If there is some
20    discrepancy between my list and Ms. Standridge's
21    list, and then the list the Government has, can
22    everybody agree that they can just reopen if
23    necessary to correct any exhibits?
24              MS. JACKS:  I agree.
25              MR. CASTELLANO:  Agreed, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. JACKS:  And in terms of a Rule 29
 2   motion, can we do those after the jury is gone?
 3              THE COURT:  What I was thinking about
 4   doing, and asking to reserve, this is after y'all
 5   say no more cross, you go ahead and rest.  I'll do
 6   my statement about the exhibits and then send them
 7   out.  And if y'all need to make motions, you can.
 8   And it sounds like you've got a couple of witnesses.
 9   You can probably make your motion as long or short
10   as you want, we'll bring them back and start with
11   your two witnesses.  Sound good?
12              MS. JACKS:  Yes.
13              MR. LOWRY:  Yes, sir.
14              (The following proceedings were held in
15   open court.)
16              THE COURT:  All right.  Do the defendants
17   have cross-examination of Mr. Acee at this time?
18              MS. JACKS:  Your Honor, based on our
19   discussion at the bench, we're going to reserve that
20   and recall Mr. Acee during our case next week.
21              THE COURT:  All right.  Is that where all
22   the other defendants are as well?
23              ALL:  Yes, Your Honor.
24              THE COURT:  All right.  Mr. Acee, you may
25   step down.  Thank you for your testimony.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1                    February 26, 2018

 2

 3          MR. LOWRY:  Your Honor, the defense would

 4  call Bryan Acee to the stand.

 5          THE COURT:  All right.  Mr. Acee, if

 6  you'll return to the stand, I'll remind you that

 7  you're still under oath.

 8          Mr. Lowry.

 9          MR. LOWRY:  May it please the Court.

10                    BRYAN ACEE,

11      after having been first duly sworn under oath,

12      was questioned and testified as follows:

13                    EXAMINATION

14  BY MR. LOWRY:

15      Q.   Good morning, Agent Acee.

16      A.   Good morning.

17      Q.   Agent Acee, I just want to follow up on

18  that last testimony we heard, real quickly.  You've

19  participated in undercover operations, haven't you?

20      A.   Yes, sir.

21      Q.   And you know what it's like to have

22  family?

23      A.   I do.

24      Q.   And you know what it's like to cherish

25  your children?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.
 2        Q.   If you were involved in an undercover
 3   operation, and say you were working with a fellow
 4   agent that had children --
 5        A.   Yes, sir.
 6        Q.   Would you tell the targets of your
 7   investigation -- let's say -- let me back up for a
 8   second.  You've investigated other drug
 9   organizations?
10        A.   Yes, sir.
11        Q.   You're an expert in the Juarez Cartel,
12   correct?
13        A.   Yes.
14        Q.   So if you were employed, and you were
15   interfacing with the Juarez Cartel, would you share
16   the personal home address, license plate number of a
17   fellow FBI agent with the cartel?
18        A.   No, sir.
19        Q.   You wouldn't think that that would be in
20   the line of duty as your role as an undercover
21   agent, would you?
22        A.   No.  I think that would be a terrible
23   thing to do.
24        Q.   Now, I want to talk to you about your
25   relationship with Eric Duran.  Can you pull up AE1.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   And you know this to be Eric Duran, correct?
 2        A.   Yes.
 3        Q.   You didn't sign Mr. Duran up as a
 4   confidential human source of information, did you?
 5        A.   No, sir.
 6        Q.   But you inherited him as a source of
 7   information?
 8        A.   That's right.
 9        Q.   And that transfer probably happened in
10   August 5, 2015?
11        A.   Yes.
12        Q.   And at the time of that transfer, you
13   wrote a report detailing the transfer and your
14   impressions of Mr. Duran?
15        A.   I'd call it just my first debrief.
16        Q.   Okay.  But your report indicated that
17   Mr. Duran was -- well, your report indicated that my
18   client, Anthony Ray Baca, was eager to kill the
19   Secretary of Corrections, Gregg Marcantel?
20        A.   Yes, sir.
21        Q.   And that's what you believed at that time,
22   correct?
23        A.   Well, that's what Mr. Duran told me, so
24   that's what I wrote down.
25        Q.   Now, in follow-up on that investigation,
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                        1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                            e-mail: info@litsupport.com

1  you had Duran record Mr. Baca at Level 6 in Santa

2  Fe, correct?

3        A.   Yes, sir.

4        Q.   And as part of that, as signing him up,

5  you give him certain admonishments, correct?

6        A.   Yes, sir.

7        Q.   But you really didn't give him much in the

8  way of instruction on how to use the recording

9  device?

10             MR. CASTELLANO:   Objection to leading

11  questions on direct, Your Honor.

12             THE COURT:   Overruled.

13        A.   I didn't give him a tremendous amount of

14  instruction, no.

15        Q.   But the one instruction you did give him

16  is that -- and we're talking about the recorded

17  conversations, and I'll quote you from a pretrial

18  hearing:  "If it's not recorded, the conversation,

19  in my mind, didn't happen."

20        A.   I often say that, yes.

21        Q.   But that was an instruction you gave to

22  Mr. Duran?

23        A.   I believe so.

24        Q.   Because you wanted him to tape Mr. Baca

25  and others about what you perceived to be their

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                        1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                   e-mail: info@litsupport.com

1    criminal activities?

2         A.    Yes, sir.

3         Q.    And you also testified -- you've testified

4    a number of times in this case, have you not?

5         A.    I have.

6         Q.    Probably too many to count at this point?

7         A.    A lot of hours, yes.

8         Q.    And on a different occasion under oath,

9    you testified that you instructed Mr. Duran, quote:

10   "If the informant tells me a conversation happened

11   and it's not there, then they're going to have to do

12   it over.  They don't get credit for it, or we don't

13   use it in terms of asking for prosecution."

14              Is that right?

15        A.    Yes, that's generally what happens.

16        Q.    And that's what -- I mean, you told this

17   Court that under oath?

18        A.    Yes, sir.

19        Q.    Now, you were responsible for

20   strategically placing my client, Mr. Baca, next to

21   Mr. Duran in October of 2015?

22        A.    Ultimately, Corrections did it, but at my

23   request, yes.

24        Q.    Right.  And actually, the whole setup when

25   Mr. Baca returned to New Mexico from Colorado was a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   strategic placement on your part?

2       A.   Yes, sir.

3       Q.   And you had Mr. Baca in the cell next to

4   Eric Duran?

5       A.   Yes.

6       Q.   And you had Roy Martinez very close by?

7       A.   I don't remember that.  I didn't make that

8   request.  I do believe he was in the same area.

9       Q.   Right.  But the purpose was so Mr. Duran

10  could record Mr. Baca?

11      A.   That was my primary objective, yes.

12      Q.   And he did record Mr. Baca?

13      A.   Yes, sir.

14      Q.   But the initial recordings in October of

15  2015 didn't reveal any desire on Mr. Baca's part to

16  murder the Secretary of Corrections, did they?

17      A.   I don't believe they did.

18      Q.   And, in fact, it took well into November

19  for Mr. -- well, are you aware of any recording

20  where Mr. Baca says affirmatively, "I want to kill

21  the Secretary of Corrections"?

22      A.   Not in those exact words.

23      Q.   And, in fact, all of the summaries of the

24  conversations that the FBI developed for you to

25  review, they really don't indicate that kind of
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

1  affirmative declaration on behalf of Mr. Baca?

2      A.   I think they demonstrate that he does want

3  to kill Mr. Marcantel.  Not in the exact phrase you

4  used, though.

5      Q.   But that was much later on into November?

6      A.   Into November, yes.

7      Q.   And during the pretrial hearings, again,

8  you've testified a number of times; correct?

9      A.   Yes, sir.

10     Q.   Each time, you took the oath of a witness

11  to tell the truth?

12     A.   Yes, sir.

13     Q.   And in prior testimony you've agreed that

14  Mr. Duran was a skilled manipulator?

15     A.   I think he is.

16     Q.   And you've said that he has, I think in

17  your words, "the gift of gab"?

18     A.   Did I say that?

19     Q.   Yes, you did.

20     A.   Okay.

21     Q.   Would you like to see the transcript?

22     A.   No.  I believe you.  He's a talker, I

23  agree.

24     Q.   You also testified at pretrial hearings

25  that any indication that this conspiracy to murder

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                            201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    the Secretary of Corrections wasn't captured until

2    after Mr. Duran disclosed to Mr. Baca that he had a

3    cellular telephone?

4         A.   I guess the answer is "Yes."  I mean, he

5    had the recording device and the phone at the same

6    time.

7         Q.   But do you recall that testimony where you

8    said that anything that was captured was captured

9    after the cellphone?

10        A.   How else would we capture it?  Yeah, I

11   guess that's true.

12        Q.   Well, you had an electronic ELSUR device,

13   right?

14        A.   Yes.  They were introduced at the same

15   time.

16        Q.   Right.  But in theory you could -- well,

17   let me back up for a second.  Mr. Duran didn't

18   reveal that he had a cellphone to Mr. Baca until

19   much later, correct?

20        A.   I don't know that that's true.

21        Q.   Do you recall exchanging text messages

22   with Mr. Duran, where Mr. Duran asked you if he

23   could let Mr. Baca know that he had a cellphone?

24        A.   I don't recall texting about that, no.

25             MR. LOWRY:  May I approach, Your Honor?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.

 2         A.   Thank you.

 3         Q.   Does that refresh your recollection?

 4         A.   Yes.

 5              MR. LOWRY:  May I approach?

 6              THE COURT:  You may.

 7         Q.   Now, the intercepts.  You were responsible

 8    for getting the intercepts on the phone to capture

 9    the text messages?

10         A.   Yes, sir.

11         Q.   And the intercepts captured the date and

12    the time and the content of the text messages back

13    and forth?

14         A.   Yes.

15         Q.   And it's fair to say that on November 3,

16    2015, Mr. Duran asked you if he could tell Mr. Baca

17    that he had a cellphone?

18         A.   Yes.

19         Q.   And that you responded affirmatively and

20    you said, "Let's do it.  We'll be all over the

21    streets"?

22         A.   Yes, sir.

23         Q.   And that response from you was on November

24    4, 2015, at approximately 8:15 a.m.?

25         A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    So up until November 4th, Mr. Baca wasn't
 2   aware that Mr. Duran had a cellphone?
 3        A.    That's correct.
 4        Q.    And so between October 22nd, when Mr. Baca
 5   arrived at the North facility, and November 4, 2015,
 6   any recording that Mr. Duran obtained was obtained
 7   using solely the ELSUR device?
 8        A.    I think he arrived October 24th.  But
 9   you're correct.
10        Q.    Well, we could go back and look, but --
11        A.    I don't need to argue that point.  I'll
12   take your representation, sir.  I thought he arrived
13   the 24th.
14        Q.    Would it refresh your recollection if you
15   looked at the HAWK data report?
16        A.    Well, does that tell us that he recorded
17   Baca earlier than the 24th?
18        Q.    Yes, sir.
19        A.    Yes, sir.
20        MR. LOWRY:  May I approach, Your Honor?
21        THE COURT:  You may.
22        Q.    Now, Mr. Acee, it's fair to say that this
23   is an electronic report that captured all the
24   information when Mr. Duran used a covert electronic
25   recording device with Mr. Baca?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   And the first recording indicated on here

 3   is October 22, 2015?

 4        A.   Yes.

 5        Q.   And it's approximately -- it's 19:29

 6   hours, so that's what?  7:30 p.m.?

 7        A.   Yes, sir.

 8        Q.   So that would indicate when Mr. Baca

 9   arrived sometime on the 22nd?

10        A.   It indicates that Duran started recording

11   on the 22nd.

12        Q.   All right.  But Mr. Baca had to be in the

13   building for him to record him with the covert

14   electronic device?

15        A.   That makes sense.

16        Q.   And so there were at least 13 days

17   transpired between the 22nd, when he arrived, and

18   November 2nd, when this cellphone activity is

19   engaged?

20        A.   Yes.

21        Q.   And I believe you agreed with me earlier

22   on that during that period of time there was no

23   indication whatsoever that Mr. Baca wanted to kill

24   the Secretary of Corrections?

25        A.   There is no recorded information.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Right.  And according to your instructions
 2   to Mr. Duran, if it wasn't recorded, it didn't
 3   happen?
 4        A.    Correct.
 5        Q.    Now, when I asked you at the pretrial
 6   hearings, you indicated in sworn testimony that it
 7   took six to eight weeks for Mr. Baca to open up with
 8   Mr. Duran about his plans?
 9        A.    Again, I'll take your representation, but
10   I don't remember saying that.
11        Q.    Would you like to see the transcript?
12        A.    Sure.
13              MR. LOWRY:  May I approach, Your Honor?
14              THE COURT:  You may.
15        A.    Okay.  Thank you.
16        Q.    Does that refresh your recollection, Agent
17   Acee, that that was your testimony, that Duran eased
18   his way into the conversation over a six- to eight-
19   week period?
20        A.    Yes, sir.
21        Q.    Pardon me?
22        A.    Yes, sir.
23        Q.    And when you were at the hearing
24   testifying under oath, you were doing your best to
25   give us the truth?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I always do, sir.

 2        Q.    Okay.  And that's part of your duties as a

 3   sworn FBI agent?

 4        A.    Yes, sir.

 5        Q.    The reason I ask, Agent Acee, is because

 6   I'm a little flummoxed, because your Grand Jury

 7   testimony in this case indicated that Mr. Baca, upon

 8   his return to New Mexico, within 48 hours expressed

 9   the desire to kill the Secretary of Corrections.  Do

10   you recall that testimony?

11        A.    You'd have to refresh my memory.

12        Q.    Sure.  Do you recall testifying in front

13   of the Grand Jury on December 1, 2015?

14        A.    Yes, sir.

15              MR. LOWRY:  May I approach, Your Honor?

16              THE COURT:  You may.

17        A.    Do you want me to turn the page, or is

18   it --

19        Q.    No, I just want you to refresh your

20   recollection.  Please read it.

21        A.    Just what you've highlighted, sir?

22        Q.    Yes.

23        A.    Okay.

24        Q.    So if that testimony is correct, you said

25   immediately upon his return --
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.   I was asked the question, "Upon his
 2   return, did he immediately start putting out hits?"
 3   And my answer was, "Yes."
 4             And I stand by that as I sit here today.
 5   I didn't see any reference to 48 hours or anything
 6   like that.
 7        Q.   Bear with me.  I'll get to that one.
 8             MR. LOWRY:  May I approach, Your Honor?
 9             THE COURT:  You may.
10        A.   Okay.  Thank you.
11        Q.   So you would agree with me that was your
12   testimony to the Grand Jury, that as soon as Mr.
13   Baca got back, within I think the first 48 hours he
14   renewed the order to hit Marcantel?
15        A.   Yes, sir.
16        Q.   And so both "immediately" and "48 hours"
17   is much sooner than the 13 or two weeks between the
18   22nd and the 4th.  Would you agree with me?
19        A.   I do agree with your question about the
20   timeliness of this, but I also mentioned the other
21   people that he renewed or that he talked about
22   hitting.  I mentioned Santistevan and Vigil.  And I
23   think he did talk about Santistevan before
24   Marcantel.
25        Q.   Right.  But in the exhibit I just showed

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                  1-800-669-9492
                                                        e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  you, you say he renewed the order to hit Marcantel?

2       A.   I think.  Is that in there?

3       Q.   I think.

4       A.   Yes.  I did say that, yes.

5       Q.   But according to your directions to

6  Mr. Duran, you didn't have any recording indicating

7  that?

8       A.   Not within 48 hours, no.  It wasn't until

9  in November, as you pointed out earlier.

10      Q.   Okay.  So did you get the 48 hours -- I

11 mean, is that something Eric Duran told you?

12      A.   Well, Duran would give me updates, yes,

13 but I tried to rely more on the recordings.  I put

14 more emphasis on what was actually recorded.

15      Q.   You did more than that.  You actually

16 affirmatively told everyone that if it wasn't

17 recorded, it didn't happen?

18      A.   Well, I often tell the informants that,

19 yeah.  It's important that they get recordings.  I

20 want to emphasize that with the informants in any

21 case.

22      Q.   But when you were in front of the Grand

23 Jury, you didn't have any recording that that had

24 happened?

25      A.   Regarding Marcantel, no.

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                          1-800-669-9492
                                                                 e-mail: info@litsupport.com



```
 1        Q.   But nonetheless, that was your testimony
 2   to the Grand Jury, that that had happened with
 3   regard to Marcantel?
 4        A.   I said I thought that that had happened.
 5        Q.   Now, unlike a situation today where we
 6   have a full Court, or even a pretrial hearing, at a
 7   Grand Jury, the only people there are yourself and
 8   the prosecutors and authorized staff like the court
 9   reporter, correct?
10        A.   Yes, sir.
11        Q.   So nobody else is in the room to correct
12   testimony that could be off?
13        A.   Like an adversarial?
14        Q.   Correct.
15        A.   No.
16        Q.   You're placed under the same oath that you
17   are today, to be honest with the Grand Jury?
18        A.   Yes, sir.  As soon as you walk in, you're
19   placed under oath.
20        Q.   Now, I want to talk about sort of your
21   comments -- well, your testimony last week when we
22   left off.  You've heard all the testimony in this
23   case?  Well, most of it?
24        A.   I have, sir.
25        Q.   And you testified that initial debriefs
```

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

1    with an informant, it's a 30,000-foot view, correct?

2         A.   Yes, sir.

3         Q.   And you testified that you might not get

4    all of the information relevant to what you're

5    looking for in that initial debrief?

6         A.   I think I almost never do in the initial

7    one.

8         Q.   But it's fair to say in your initial

9    debriefs, you know what you're looking for?

10        A.   Yes.

11        Q.   And you ask the individual about what

12   you're looking for?

13        A.   Well, I don't always know what they know,

14   so I want to make that distinction.  I'm trying to

15   gauge how much.  In the context of the SNM, there is

16   30-plus years of stuff I was looking at.  So I know

17   the overview of what I want to ask, but to really

18   drill down on it, it takes a little longer.

19        Q.   Right.  But in the context of those 30

20   years of FBI investigation, it's fair to say that

21   until this conspiracy to murder the Secretary of

22   Corrections, no FBI agent had been successful at

23   convincing the Department of Justice to mount a RICO

24   prosecution?

25        A.   That's true.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                                 (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Because it was tried in 2009, and it was

2  rejected by the U.S. Attorney's Office, wasn't it?

3    A.   Did they want a RICO?  I think they were

4  just charging -- trying to charge for a specific

5  couple of homicides.

6    Q.   But the point being, the Department of

7  Justice turned it down?

8    A.   The United States Attorney's Office for

9  the District of New Mexico turned it down.

10    Q.   That's part of the Department of Justice,

11  is it not?

12    A.   It is.

13    Q.   Now, you, from the very beginning of this

14  case, based on what Mr. Duran was telling you, were

15  focused on this Marcantel conspiracy?

16    A.   It was one of many areas, yes.

17    Q.   And it was a primary area, was it not?

18    A.   It was a very important area.

19    Q.   In fact, it was so important, Mr. Duran

20  got lump sum awards for purportedly saving the

21  secretary's life?

22    A.   He did receive those from the Department

23  of Corrections.

24    Q.   So, I mean, that's sort of an indication

25  of the value that law enforcement put on the case?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                                   e-mail: info@litsupport.com

```
 1        A.   That the Department of Corrections put on
 2   it, yes.
 3        Q.   And you asked about the Marcantel
 4   conspiracy every time you debriefed an individual
 5   that came to you that knew about the SNM?
 6        A.   I often did.  I mean, I've debriefed
 7   between 50 and 100 SNM members.  You know, guys
 8   getting out of the federal prison I don't typically
 9   ask because I don't think they know anything.  But I
10   would ask that question a lot of people that I think
11   might know about it.
12        Q.   And I know you weren't at Mr. Duran's
13   February 19, 2015, initial interview with the FBI
14   agent that landed him, but have you looked at the
15   transcript of that conversation?
16        A.   I have.
17        Q.   And even then, the FBI asked Mr. Duran
18   about Mr. Marcantel?
19        A.   Correct.
20        Q.   And at that point in time, Mr. Duran said
21   he didn't know anything about a hit on the
22   secretary?
23        A.   I believe that's correct.
24        Q.   Even other individuals like Roy Martinez,
25   who has testified before this jury, his first
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  interview with you, he said that it was Eric Duran

2  that approached him about killing Santistevan, not

3  vice versa?

4      A.   I don't recall that.

5      Q.   Okay.  Do you recall meeting with Roy Paul

6  Martinez on December 17, 2015?

7      A.   You'd have to refresh my memory.

8      Q.   Sure.

9           MR. LOWRY:  May I approach, Your Honor?

10          THE COURT:  You may.

11     A.   These aren't my writing.  But I'm happy to

12 review it.  These are another agent's notes.  Would

13 you like me to review?

14     Q.   Sure.  Do you recognize the writing?

15     A.   I think it's Agent Sainato.  Did I guess

16 correctly?  The 302 should indicate who --

17     Q.   It's -- Sainato wrote the 302.

18     A.   These are his notes, then.

19     Q.   But you were at that debrief, correct?

20     A.   Yes, sir.

21     Q.   And is there anything in Agent Sainato's

22 notes you would disagree with?

23     A.   I assume that he took the notes as the

24 conversation was happening, and that he would have

25 accurately -- nothing jumps out at me.  He would

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                              1-800-669-9492


PROFESSIONAL COURT
REPORTING SERVICE                           e-mail: info@litsupport.com

```
 1   have accurately written his notes.
 2           MR. LOWRY:  May I approach, Your Honor?
 3           THE COURT:  You may.
 4      Q.   You would agree that's Agent Sainato's
 5   present sense impression of the conversation?
 6      A.   Yes.
 7      Q.   And his impression -- I mean, it says
 8   "Marcantel hit."  That's his -- that's the way he
 9   captioned it, correct?
10           MR. CASTELLANO:  Objection.  This is going
11   to call for hearsay, Your Honor.
12           THE COURT:  Are you trying to solicit
13   these out-of-court statements?
14           MR. LOWRY:  Your Honor, actually what I
15   would like to do is show that the exculpatory
16   information in the notes never made it into the
17   formal report.
18           THE COURT:  Well, I think I'd better
19   instruct the jury that these statements that you're
20   going to be referring to are not being offered for
21   the truth of the matter; simply for the purpose of
22   showing what statements got in what report.
23           So the jury will not consider these
24   statements for the truth of the matter, but simply
25   for purposes of determining what statements got into
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                         1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

```
 1   what reports.
 2              MR. CASTELLANO:  I also object because
 3   it's hearsay within hearsay.  This isn't Agent
 4   Acee's report.  He's asking him to comment on
 5   another agent's report.
 6              THE COURT:  Whether it's hearsay or within
 7   hearsay, it's hearsay.  You're not to consider it
 8   for the truth of the matter.  You can only consider
 9   it for the purpose of whether they made it into the
10   report.  Mr. Lowry.
11              MR. LOWRY:  Thank you, Your Honor.  May I
12   approach?
13              THE COURT:  You may.
14   BY MR. LOWRY:
15       Q.   Agent Acee, I gave you the 302 that goes
16   along with those field notes, and take your time to
17   review it.  But my question is:  Would you agree
18   with me that the comment about Mr. Martinez being
19   approached by Mr. Duran and asked to kill Dwayne
20   Santistevan does not appear in the report?
21       A.   Could you ask me that question again,
22   please?
23       Q.   Sure.  The field notes indicate that Mr.
24   Martinez was approached by Eric Duran, and Eric
25   Duran asked him to kill Dwayne Santistevan?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1       A.    I see what you're saying, sir, but I don't
2  know if I agree with that.
3       Q.    Okay.  Well, do you mind reading the notes
4  out loud?
5       A.    Yes.  Under "Marcantel hit"?
6       Q.    Yes.
7       A.    "Crazo approached Shadow saying Santi
8  needed hit."
9       Q.    Okay.  So Eric Duran is Crazo?
10       A.    Yes.
11       Q.    Shadow is Mr. Martinez?
12       A.    Correct.
13       Q.    So Mr. Duran approached Mr. Martinez and
14  said, "Santi" -- meaning Santistevan -- "needed to
15  be hit"?
16       A.    It does say that.
17       Q.    Now, where is that notion reflected in the
18  302?
19       A.    The 302 doesn't reflect that sentence.
20       MR. LOWRY:  May I approach, Your Honor?
21       THE COURT:  You may.
22       Q.    Now, as the lead case agent, did you
23  review the reports of the FBI agents that you work
24  with?
25       A.    The majority of the time.  And at this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  point in time, Agent Sainato is one of my agents

2  assigned that I'm training, so I probably actually

3  approved that report in the system, yes.

4       Q.   But you would have approved that report,

5  and you were there for the interview?

6       A.   Yes, sir.

7       Q.   So you know what was said?

8       A.   Yes, sir.

9       Q.   But you didn't think it important to

10  include information that appeared to be, on its

11  face, exculpatory?

12       A.   To be clear, all exculpatory information

13  should be included.  I just hesitate because we're

14  basing this on the way Sainato wrote a single

15  sentence, and I don't know if it was said that way.

16       Q.   Well, you were at the meeting?

17       A.   I was at the meeting.  My testimony is, I

18  don't recall -- I was going to say Shadow -- Roy

19  Martinez talking about that.

20       Q.   That's essentially what Mr. Martinez

21  testified to on the stand, that he was approached by

22  Mr. Duran?

23       A.   That may be the case, sir.  Although I've

24  been here, I wasn't here the day Mr. Roy Martinez

25  testified.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.    And I believe that was on a Friday.

2       A.    Yeah, I had an inventory, a mandatory

3  thing I had to be up in Albuquerque for.

4       Q.    You weren't prepping Eric Duran

5  downstairs?

6       A.    No, sir.  I was in Albuquerque.

7       Q.    It's fair to say that the confidential

8  human sources under your supervision, you instructed

9  them what to do?

10      A.    Well, in terms of the recording?

11      Q.    Well, just in terms of -- I mean, not in

12  every particular aspect of their daily life, but you

13  would say:  Here's what we're trying to accomplish;

14  let's make it happen?

15      A.    Yeah, I'd give them the marching orders,

16  the objectives, whether it be in the prison or if we

17  were doing buys on the street.

18      Q.    Right.  Now, on November 29th, I mean, you

19  helped orchestrate the controlled buy of the pistol

20  from Chris Garcia?

21      A.    Yes.  But that wasn't a buy, but yes.  The

22  undercover acquisition of it, yes.

23      Q.    Fair enough.  I apologize for using the

24  wrong language.  But yes, the acquisition of the

25  weapon?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes.

2      Q.   And during that time, I mean, you were

3 concerned -- and I think you've testified about this

4 in the pretrial hearings -- you were concerned

5 because Christopher Garcia really didn't know what

6 the gun was going to be used for?

7      A.   Well, I don't know what he knew, but I

8 know or had an idea what makes good evidence.  And

9 any time we pick up a firearm, you know, we're going

10 to try to instruct the undercover agent or the

11 informant to elicit statements about the gun.

12 That's just good evidence.

13      Q.   Right.  But, again, you testified in front

14 of the Grand Jury, and do you recall telling the

15 Grand Jury that, you know, Baca called on Chris

16 Garcia and told him, "Get guns, we've got a

17 mission," but he didn't tell him what it was for?

18 And while Chris Garcia is a felon and he is

19 prohibited from possessing firearms, for us to be

20 able to go to the house and pick up guns wouldn't

21 necessarily be fair to charge Garcia with

22 racketeering because he didn't know what the guns

23 were for?

24      A.   Well, he knew they were for a mission, but

25 I think what I'm saying there is, he didn't know who

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  the target was of the mission.

2       Q.   Right.  And that's why you had to

3  affirmatively instruct Mario Montoya to tell him who

4  the target was?

5       A.   Yeah.  I would want that information

6  recorded, that Garcia -- I think it's good evidence.

7  Garcia is acknowledging who it is and is still

8  providing the gun.

9       Q.   Right.  But up until that point, it was

10  your understanding Chris had no idea what the gun

11  was for?

12      A.   I'm not sure if it was; but either way, I

13  would ask that that conversation, that the informant

14  mention that.

15      Q.   Well, you testified to the Grand Jury that

16  Mr. Garcia didn't know what it was for?

17      A.   Well, I want to clarify that I believe

18  Mr. Garcia knew there was a mission.  I don't know

19  that he knew -- I didn't have information that

20  Garcia at that time knew exactly whom was going to

21  be the target, but that there was a mission to kill

22  somebody.

23      Q.   Right.  But, I mean, what you told the

24  Grand Jury was, and I'm quoting your testimony, "He

25  didn't know what the guns were for"?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    A.    May I review that, sir?

2    Q.    Absolutely.

3          MR. LOWRY:  May I approach, Your Honor?

4          THE COURT:  You may.

5    A.    Thank you.

6    Q.    And because you were concerned about that,

7  you instructed Mr. Montoya to tell him, right, what

8  the gun was for?

9    A.    In no uncertain terms, yes.

10   Q.    Now, I want to move away from the

11 Marcantel allegations to the Julian Romero.  We're

12 going to go backwards in time.

13   A.    Okay.

14   Q.    Now, you recall taking Mr. Romero to the

15 Old Main to take a tour?

16   A.    A tour, yes.  I asked him to do a

17 recording in which he described his history in the

18 SNM and how the riot started.  He turned 21 the

19 first night of the riot.  And I asked him to walk me

20 around and explain that and the history of the SNM.

21   Q.    And that was last March 31, 2017?

22   A.    That sounds right.

23   Q.    And even though you spent the better part

24 of probably half a day with him, you didn't produce

25 a 302 on that?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                          1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1        A.   I don't think that's correct.

 2        Q.   Okay.  And I could be wrong.

 3        A.   I think I did.

 4        Q.   Okay.  But during that trip, you told Mr.

 5   Romero that Mr. Baca didn't want him killed?

 6        A.   Yes, that's my understanding.

 7        Q.   Right.  And you told Mr. Baca that Lupe

 8   Urquizo wanted Julian Romero killed?

 9        A.   I haven't talked to Mr. Baca in a while.

10        Q.   You told Mr. Romero?  Pardon me.

11        A.   Mr. Romero, yes.

12        Q.   So on that trip, on the way home, you told

13   Mr. Romero, "Lupe Urquizo was the one that wanted

14   you dead"?

15        A.   And some other guys, but that Baca just

16   wanted him beat up.  You're right.

17        Q.   Right.  And you said, "And Mario Rodriguez

18   wanted him dead"?

19        A.   I don't know if I said that, because Mario

20   left.  Mario was down there, but I think he got

21   transferred before the actual assault.

22        Q.   We can play the recording if you like.

23        A.   I don't think you've ever lied to me, Mr.

24   Lowry.  If you're representing that that's what I

25   said --
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    I try not to.
 2        A.    -- I believe you.
 3              THE COURT:  Mr. Lowry, can we talk to the
 4   jurors and see when they want to take their lunch
 5   break?
 6              MR. LOWRY:  Absolutely, Your Honor.
 7              THE COURT:  Do y'all want to do like we
 8   did on Friday and take about a 15-minute break, and
 9   then go another hour and a half, and take a late
10   lunch?  Is everybody in agreement with that?  It
11   looks like everybody's hands are kind of going up.
12   Does that work for the counsel and the parties?
13              All right.  Why don't we take a 15-minute
14   break.  And the jury did come in a little bit later,
15   so we'll do that.
16              All rise.
17              (The jury left the courtroom.)
18              THE COURT:  All right.  We'll be in recess
19   for about 15 minutes.
20              (The Court stood in recess.)
21              THE COURT:  All right.  Let's go on the
22   record.  While Ms. Standridge is bringing the jury
23   in, let me continue to talk a little bit about this
24   Count 8.  I know it's Count 3, I think, in our
25   current drafting.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1            But on Friday, the Court orally denied Mr.

2   Baca's motion for a judgment of acquittal under Rule

3   29 of the Federal Rules of Criminal Procedure as to

4   Count 8, or Count 3 now in our current instructions.

5   It's the conspiracy to commit assault resulting in

6   serious bodily injury.

7            What I understood Mr. Baca to be arguing

8   is that the uncontroverted evidence indicated that

9   Mr. Romero did not actually suffer a serious bodily

10  injury.  And what the United States replied is that

11  the Romero conspirators intended to inflict serious

12  bodily injury to Mr. Romero, or perhaps to kill him.

13           And then the Court denied Mr. Baca's

14  motion, reasoning that the intent of the

15  conspirators and not the result of the actual

16  assault provides the relevant inquiry.

17           Now, here is my concern, is that

18  committing and conspiring to commit assault with

19  intent to inflict serious bodily injury, I'm not

20  sure it violates 28 USC Section 1959 of the VICAR

21  statute.  What VICAR prescribes, instead, is

22  racketeering motivated -- and I'm going to quote the

23  language of the statute.  "Assaults" -- it says

24  "assault," but put a plural on it.  "Assaults" --

25  and here's the key language -- "resulting in" --

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   that's the language I think we need to focus on --
 2   "resulting in serious bodily injury that also
 3   violates state or federal law."  So that's right out
 4   of Section 1959(a).
 5            Accordingly, my concern is that if the
 6   Court concludes that the evidence presented in the
 7   United States' case-in-chief would not permit a
 8   reasonable juror to infer that Julian Romero
 9   suffered serious bodily injury, then the Court needs
10   to enter a judgment of acquittal on Count 8, which
11   is Count 3 in our instructions.
12            Mr. Baca is charged with conspiring to
13   commit assault resulting in serious bodily injury in
14   violation of New Mexico law.  But the details of New
15   Mexico's assault statute I don't think determine the
16   elements of that offense -- this is kind of an
17   interesting area -- establishing that Mr. Baca
18   violated VICAR by conspiring to commit assault
19   resulting in serious bodily injury in violation of
20   New Mexico law requires the United States to prove
21   that, one, Mr. Baca's conduct constitutes generic
22   conspiracy to commit assault resulting in serious
23   bodily injury; and two, that Mr. Baca's conduct also
24   violated New Mexico law.
25            So it looks like the jury is ready.  I'll
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    give you some cites maybe before you go to lunch or

2    after you get back from lunch, some cases that I'd

3    like for you to look at and comment on.

4          But that's the language I'm sort of

5    hanging up on.  It's out of the federal statutes.

6    So I'll give you some cites so that you can get a

7    fuller sense of what I'm thinking.

8          All rise.

9          (The jury entered the courtroom.)

10         THE COURT:  All right.  Mr. Acee, I'll

11   remind you, you're still under oath.

12         Mr. Lowry, if you wish to continue your

13   direct examination of Mr. Acee, you may do so at

14   this time.

15         MR. LOWRY:  Thank you, Your Honor, I do.

16         THE COURT:  Mr. Lowry.

17   BY MR. LOWRY:

18      Q.   Agent Acee, we left off talking about the

19   Julian Romero assault, and I just wanted to -- we

20   were talking about your conversation with Mr. Romero

21   on your way home from visiting Old Main, and the

22   things you told Mr. Romero.  You told Mr. Romero

23   that it was the younger guys that wanted to kill Mr.

24   Romero?

25      A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1     Q.   And that essentially Mr. Baca intervened

2  and said:  I don't want him killed.  He can't be

3  stabbed.  If anything happens to him, you could beat

4  him up, but that's it?

5          That's not exactly what he said.  He said,

6  and I'll quote, "He didn't want you to get hurt too

7  bad"?

8     A.   That sounds more like it, yes.

9     Q.   So essentially, Mr. Baca was calling off

10 the dogs, so to speak?

11    A.   Calling it down.

12    Q.   Because, again, this generational

13 difference between the thinking, if you will?

14    A.    I don't know what Mr. Baca's thinking was,

15 but that's how it was related to me by at least one

16 of the guys involved.

17    Q.   And that was your understanding?

18    A.   That was my understanding based on my

19 conversation with him.

20    Q.   Right.  Now, I'm just more than idly

21 curious, but when Mr. Urquizo was here, he testified

22 that Mr. Baca ordered Mr. Romero to be killed?

23    A.   Did he?

24    Q.   Yes.

25    A.   Okay.  I thought it was someone else that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   said that, Baby G, Jonathan Gomez.
 2       Q.   Well, bear with me for a second.
 3            MR. LOWRY:  May I approach, Your Honor?
 4            THE COURT:  You may.
 5       A.   Do you want me to read beyond the first
 6   page?
 7       Q.   If you care to.  I just want you to be
 8   comfortable with the testimony.
 9       A.   Okay, sir.
10       Q.   So did I understand his testimony to this
11   Court and this jury correctly that when Mr. Urquizo
12   testified, he said that he wanted -- that Mr. Baca
13   had ordered Julian Romero to be killed?
14       A.   Yes.
15       Q.   But that's not what you understood?
16       A.   No.  And in that, that you just had me
17   review, it looks like he's saying either he
18   misstated it or we miss-recorded it, recorded it in
19   our report.
20       Q.   And that's what I was just getting ready
21   to show you, your report of one of your interviews
22   with him.  This would be on March 6th.  So you would
23   have gone to visit Mr. Urquizo on the 24th.  He
24   says, "I need an attorney," and then that
25   precipitated this initial debrief.
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                 e-mail: info@litsupport.com

```
 1        A.    That time line sounds correct.

 2              MR. LOWRY:  May I approach, Your Honor?

 3              THE COURT:  You may.

 4        A.    Yes, sir.

 5        Q.    And this is where in his trial testimony

 6   he said -- he tried to blame you on -- my

 7   understanding was, he was trying to blame you on

 8   sloppy report writing, if you will?

 9        A.    No, that's not what I read.

10        Q.    Okay.  What did you read?

11        A.    That either he made a mistake or we got

12   the names wrong.

13        Q.    Right.  And -- but he certainly said in

14   his trial testimony that Mr. Baca wanted to murder

15   Mr. Romero?

16        A.    Yes.

17        Q.    And that's not what he told you on March

18   6, 2017?

19        A.    No, I don't believe that's what he told

20   me.

21        Q.    In fact, he told you the exact opposite?

22   He told you the story, the same version of events

23   that you told Mr. Romero?

24        A.    Yes.

25        Q.    Was the United States going to do anything
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to correct Mr. Urquizo's testimony that Mr. Baca

2    wanted Mr. Romero dead?

3        A.    I don't know.

4        Q.    Mr. Urquizo -- it's fair to say this

5    report also, he makes a comment in his report, as

6    you reported it.  I want to move on from the Julian

7    Romero thing, and actually this is going to be --

8    while we're on Mr. Urquizo, I want to clean this up.

9            But Mr. Urquizo had informed you that when

10   he initially got to the Southern facility here in

11   Las Cruces, that he was communicating with Timothy

12   Martinez and -- who was it? -- Mario Rodriguez, and

13   they were communicating by holding up notes to a

14   glass window.

15           Do you recall that?

16       A.    I do recall him telling me about that.

17       Q.    And you relied on those statements of Mr.

18   Urquizo when you testified at the pretrial hearings,

19   didn't you?

20       A.    Yes.

21       Q.    And you took the same seat you're sitting

22   in today and testified under oath that when Mr.

23   Urquizo got to Southern, he was trying to

24   communicate with everyone by holding up notes to his

25   cell door?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I testified that that's what he
 2   represented to me, yes.
 3             MR. LOWRY:   And can we get Government's
 4   Exhibit 162?  It's that overview.
 5        Q.   Are you familiar with this diagram by now?
 6        A.   Yes.
 7        Q.   And Mr. Urquizo's cell was right here?  Do
 8   you recall?
 9        A.   I don't.
10        Q.   Okay.  Would you accept my representation
11   that that was Mr. Urquizo's cell?
12        A.   Yes.
13        Q.   Okay.  And this is the door, would be
14   right here between the pods, that we've talked about
15   repeatedly?
16        A.   Yes.
17        Q.   But what you testified at the pretrial
18   hearing is that Mr. Urquizo was holding up notes to
19   his door that Mr. Martinez and Mr. Rodriguez were
20   reading out in the hallway?
21        A.   Correct.
22        Q.   And that Mr. Martinez and Mr. Rodriguez
23   were out there cleaning or painting?
24        A.   Something like that.
25        Q.   Now, we've seen photographs of the pods.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                  1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.

```
 1   I mean, do you honestly think that's possible, that
 2   anybody could have read a handwritten note from that
 3   distance?
 4        A.   It would be a pretty big note.
 5        Q.   And I think everybody would be reading it;
 6   correct?
 7        A.   I'm sorry?
 8        Q.   Everybody would be reading it, including
 9   the guards up here in the tower?
10        A.   A note that big, yeah, I guess everybody
11   would be able to see it.
12        Q.   Right.  So at this point in time, do you
13   credit that idea?
14             MR. CASTELLANO:  Objection, Your Honor.
15             THE COURT:  Yeah.
16             MR. LOWRY:  Fair enough.  I'll withdraw
17   the question, Your Honor.
18        Q.   When Mr. Urquizo testified, he testified
19   that didn't happen at all?
20        A.   I thought he talked about communicating
21   with those guys at the -- I don't know what door we
22   want to call it, but the door, the entryway into the
23   pod.
24        Q.   Right.  Both doors?  This door here, and
25   then this door here, correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   We've talked about those two doors, but I

 2   don't know if you want me to explain what my

 3   understanding was.

 4        Q.   No.  My question is this.  Mr. Urquizo

 5   dropped all the pretense that he communicated to

 6   anybody by holding a note up to the window when he

 7   testified to this jury at this trial?

 8        A.   I thought he testified about holding a

 9   note up at a different door, but I'm going off

10   memory here.

11             MR. LOWRY:  May I approach, Your Honor?

12             THE COURT:  You may.

13        A.   I think I see what might be the problem.

14        Q.   Okay.  Well, the problem was, he says

15   nobody -- at trial, he says nobody is communicating

16   with notes through a window, correct?

17        A.   He does say that.

18             MR. LOWRY:  May I approach?

19             THE COURT:  You may.

20        Q.   And he says that your report was wrong

21   when it said that they were communicating with notes

22   through the window?

23        A.   Yes.

24        Q.   I have more confidence in your report

25   writing than Mr. Urquizo.  Do you think you got it
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  wrong in your report?

 2      A.   I think I may have.  I appreciate the

 3  confidence but, I mean, I do make errors, and I

 4  think I see the sentence in my report where it may

 5  be wrong.

 6      Q.   Okay.  Which brings us to another issue

 7  that, you know, Ms. Armijo had even raised with the

 8  investigator, Mr. Filipiak.  Why don't you record

 9  these interviews with these witnesses so everybody

10  can understand what's being said?

11      A.   Well, I like to.  A lot of times the

12  defense attorneys don't allow me to.

13      Q.   Well, if they're there under your Kastigar

14  letter, I mean, you can demand that you get to

15  record, correct?

16      A.   Can I?  They're not my Kastigar letters.

17      Q.   Well, fair enough.  But the United States

18  has the ability to record these conversations, does

19  it not?

20      A.   We have recording devices but, I mean,

21  we're obviously at kind of the whim of the

22  defendant's attorney.

23      Q.   Were you aware that the defendants in this

24  case wrote a letter to the Department of Justice,

25  including the prosecutors in this case, asking that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   all of the pretrial interviews be recorded?

2       A.   I'm not sure.

3           MR. LOWRY:   May I approach, Your Honor?

4           THE COURT:   You may.

5       A.   I wasn't aware of this.  I only hesitate

6   because it could have come up at a pretrial hearing

7   that I was at, but I'm not part of this.

8       Q.   But that letter actually requested the

9   prosecutors in this case to alert you of the

10  request, so I'm assuming from your testimony that

11  did not happen?

12      A.   So what is this letter, sir?

13      Q.   It was a letter -- it was a formal request

14  from the defense counsel in this case, asking that

15  your pretrial interviews with witnesses in this case

16  be audio-recorded so we don't have to have these

17  debates about whether you could write a report

18  correctly.

19      A.   Okay.  I don't know that I was part of any

20  of those conversations.

21      Q.   Okay.  And my question to you is:  Even

22  though that letter asked for you to be notified

23  about this request, what I'm understanding you to

24  testify to is, you never heard about it?

25      A.   I'm not sure I did, but I can represent

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    that I was not directed to do so.
 2        Q.    Okay.  And when the United States is
 3    making charitable plea offers --
 4        A.    Charitable plea offers?
 5        Q.    -- charitable plea offers -- they get to
 6    set the terms, don't they?
 7        A.    I think there is some wrangling between
 8    the defense attorneys and the United States.  I'm
 9    oftentimes not part of those meetings.
10        Q.    But recording the interviews wouldn't be a
11    big heartburn for anybody?
12        A.    I don't typically record informant
13    interviews.  We're, in fact, kind of discouraged
14    from doing that.  A subject interview is different.
15        Q.    Right.  And, in fact, you emphatically
16    told Mr. Duran you don't like being recorded?
17        A.    As the agent in a wiretap, no, I don't.
18        Q.    Right.  And so it's your preference not to
19    have an audio recording of you working with your
20    agents?
21        A.    In the operational context, no.  I have no
22    problem interviewing subject interviews, and usually
23    do.
24        Q.    But suffice it to say, you had the
25    capability of recording these interviews?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I have a couple recording devices in my
 2   bag all the time.
 3        Q.    All the time?
 4        A.    Yes.
 5        Q.    Now, just moving on to the Molina count,
 6   which is the oldest counts, while we're on Mr.
 7   Urquizo, you were here when Mr. Urquizo testified
 8   that on the day he left PNM North to go to PNM
 9   South, he had a conversation with Mr. Baca through
10   the window while he was in the rec yard?
11        A.    He was in the yard, and Mr. Baca was
12   inside the facility.
13        Q.    Right.
14        A.    Yes.
15        Q.    You recall we had Mr. Urquizo mark this
16   exhibit.  These are his initials, that he had this
17   conversation somewhere in this area over here?
18        A.    I remember that.
19        Q.    Okay.  Now, if you recall correctly, he
20   said that happened on the very last day he was
21   there, before he went to the South facility at PNM?
22        A.    I don't remember that part, but I'll go
23   with you on it.
24              MS. ARMIJO:  Your Honor, may we approach?
25              THE COURT:  You may.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              (The following proceedings were held at the
 2    bench.)
 3              THE COURT:  This is an exhibit here?
 4              MR. LOWRY:  It's been admitted.
 5              THE COURT:  What is the number on it?
 6              MR. LOWRY:  EQ.
 7              MS. ARMIJO:  Your Honor, their medical
 8    expert doctor is here and is in the courtroom.  And
 9    my understanding is -- I would understand if they
10    had a medical expert testifying something with
11    relationship to Rudy Perez.  But the defense has
12    been keeping others outside, and she hadn't been
13    noticed for today.
14              THE COURT:  Isn't she an expert?
15              MS. ARMIJO:  She's medical, reviewing
16    records.
17              THE COURT:  She's not a factual witness?
18              MS. FOX-YOUNG:  No, Your Honor, she's not.
19    We alerted the Government she's an expert.  She's
20    not a treating physician at all.
21              THE COURT:  Well, I can't remember.  I
22    think when the rule was invoked -- I can look at
23    what I usually say, but I think I usually say
24    experts can remain in the courtroom.  So if she's a
25    pure expert, I don't see any problem with her being
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   in the courtroom.

 2             MS. ARMIJO:  Thank you, Judge.

 3             (The following proceedings were held in

 4   open court.)

 5             THE COURT:  For the record, this is EQ.

 6             MS. JACKS:  Your Honor, for the record,

 7   the area that Mr. Lowry was asking about appears to

 8   be marked Q in the photograph.

 9             MR. LOWRY:  That's correct.

10   BY MR. LOWRY:

11        Q.   I'll set this up.  If you recall, this is

12   housing unit 3, and this is Q, R, S, T, U, V, W, X.

13   You can faintly see the letters on the top, X, W, V,

14   U, and it goes around in alphabetical order on the

15   top of the buildings.

16        A.   I just see the Q and the R.

17        Q.   And that's what Mr. Urquizo handwrote on

18   there?

19        A.   Okay.

20        Q.   Now, Mr. Acee, you testified in pretrial

21   proceedings that you tried to corroborate people's

22   story by working with the Department of Corrections

23   to verify where they were at certain periods of

24   time?

25        A.   I have done that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And are you familiar with what we've
 2   looked at repeatedly, these prisoner location
 3   histories?
 4        A.   Yes, sir.
 5        Q.   And this has been previously marked, I
 6   think, as V24, and it's not been admitted.  Pardon
 7   me.  V29.
 8             MR. LOWRY:  May I approach, Your Honor?
 9             THE COURT:  You may been.
10        Q.   I just wanted to verify the last day, the
11   day he moved from PNM North to PNM South, would have
12   been September 13, 2012, correct?  We're looking at
13   a photograph of the North facility.  We're looking
14   at a photograph of PNM North.
15             And the testimony was, on his last day at
16   the North facility, when he transferred to the South
17   facility, not to be confused with Southern, but PNM
18   South Level 5 in Santa Fe, he had this conversation
19   with Mr. Baca, and that he was in the rec yard,
20   according to his testimony, and Mr. Baca was here in
21   the Q pod.
22        A.   Okay.
23        Q.   Would you agree with me that the last day
24   that Mr. Urquizo was here at the North facility was
25   September 13, 2012?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                         e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   Yes.  For that year.  It looks like he's
 2   at the North again in '14.  But yes.
 3        Q.   So that was after -- he's back in the
 4   North, after the Molina murder?
 5        A.   Yes.
 6             MR. LOWRY:  May I approach, Your Honor?
 7             THE COURT:  You may.
 8        Q.   Let me show you what's been admitted into
 9   evidence as Defendants' Exhibit V4.
10             Now, if we look at this and locate -- it's
11   fair to say on September 13, 2012, Mr. Baca is
12   housed at the North 3A in the S unit, correct?
13        A.   Yes, North 3A, Cell S101.  Yes.
14        Q.   So he's in the S pod?
15        A.   That's what's indicated here.
16        Q.   So he's not in the Q pod?
17        A.   No.  He's in the Q pod prior to that.  I
18   don't see the date because it's got the line through
19   it.
20        Q.   No, but my question is very specific.  On
21   this day that Mr. Urquizo testified that he is
22   waving to Mr. Baca, saying goodbye, and Mr. Baca is
23   housed in the Q pod, and he's having his rec time
24   out here in the cage on his last day, which was
25   September 12, September 13, 2012, that couldn't have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   happened because Mr. Baca is housed in the S pod

 2   over here?

 3        A.   I agree.  Mr. Baca is housed in the S pod.

 4        Q.   Now, the whole thing that starts off this

 5   paper trail is, according to the testimony this jury

 6   has heard, this hand-off of paperwork between Joe

 7   Martinez and David Calbert in the same facility,

 8   Level 6 in Santa Fe?

 9        A.   Yes.

10        Q.   And Mr. Calbert described this paper being

11   rolled up longways and placed in the rec cage yard;

12   correct?

13        A.   Yes.

14        Q.   And as -- well, Mr. Martinez did that.

15   And according to Mr. Calbert, he came by and grabbed

16   it as he was cuffed behind his back?

17        A.   Wasn't Calbert in the cage at the time?

18        Q.   No, Calbert -- well, pardon me.

19        A.   And Cheech was walking?

20        Q.   That's how -- well, the paper goes,

21   Cheech, according to the Government's theory, the

22   paper goes Cheech, Calbert, Calbert, Urquizo,

23   Urquizo to Southern; correct?

24        A.   Yes, sir.

25        Q.   So the paperwork gets to Calbert in the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    rec yard?

2         A.   Yes.

3         Q.   And he says he's walking by the cage, he's

4    handcuffed behind his back?

5         A.   I thought Cheech was handcuffed and handed

6    it to Calbert, who was in the rec cage.  I may have

7    misheard that, but I thought that's what I heard.

8         Q.   My larger point is:  Did you try to

9    attempt to verify whether that meeting or that

10   exchange was even possible?

11        A.   I believe it is.

12        Q.   Do the recreation sheets, where people

13   sign out to go to the rec yard, verify that they

14   were in the rec yard at the same time?

15        A.   I don't know that any sheets like that

16   exist.

17        Q.   Did you ask to see if they existed?

18        A.   Not in that specific circumstance, but in

19   others, and there weren't.

20        Q.   So you don't know?  Because when we looked

21   at the sheets for Southern, they very clearly

22   demarcated when people went to rec and when they

23   didn't.

24        A.   It depends on the officer.  But the ones

25   that we looked at were very good.  I was surprised.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    So, in your mind, it really depends on
 2   who's working the unit that day, of whether things
 3   are fairly documented?
 4        A.    Unfortunately, yes.
 5        Q.    Did you do anything to try to verify with
 6   the Department of Corrections that that meeting
 7   could have taken place as described by David
 8   Calbert?
 9        A.    Yes.
10        Q.    What was that?
11        A.    I asked officers what they thought of
12   that; basically, if that was possible.
13        Q.    And they just said generally it was
14   possible?
15        A.    Of course.  I mean, the same guards can
16   bring drugs in, or cellphones.
17             MR. LOWRY:  May I have a moment, Your
18   Honor?
19             THE COURT:  You may.
20             MR. LOWRY:  No further questions.
21             THE COURT:  All right.  Thank you, Mr.
22   Lowry.
23             Ms. Fox-Young.
24             MS. FOX-YOUNG:  Thank you, Your Honor.
25                   DIRECT EXAMINATION
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    BY MS. FOX-YOUNG:

 2         Q.    Agent Acee, you are currently an FBI

 3    Special Agent?

 4         A.    Yes, ma'am.

 5         Q.    And you have worked in that capacity for

 6    about nine years; is that right?

 7         A.    Yes, ma'am.

 8         Q.    And before that, you were a police

 9    officer?

10         A.    Yes.

11         Q.    For how many years?

12         A.    About 10.

13         Q.    So would it be accurate to say that you've

14    been trained in law enforcement practices for almost

15    20 years?

16         A.    Yes, ma'am.

17         Q.    And as an officer, and as an FBI agent,

18    you've been trained to be very thorough in

19    documenting information in your investigations,

20    right?

21         A.    Yes.

22         Q.    Maybe even more so in your work with the

23    FBI than as a police officer?

24         A.    I have become more thorough, yes.

25         Q.    And you conducted a number of interviews
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    in this case; isn't that right?
 2         A.   I did.
 3         Q.   Can you quantify how many?
 4         A.   More than 50.
 5         Q.   Okay.  And some of those interviews were
 6    also attended by other personnel from the FBI,
 7    right?
 8         A.   Yes.
 9         Q.   Including Agent Nancy Stemo?
10         A.   Yes.
11         Q.   And Agent Neale?
12         A.   Thomas Neale.
13         Q.   And Agent Roundy?
14         A.   No.
15         Q.   Roundy wasn't there?
16         A.   No.  Agent Sainato.
17         Q.   Agent Sainato.  And others, other
18    personnel?
19         A.   STIU, mostly.
20         Q.   And as the jury has heard, on many
21    occasions those interviews, prosecutors are present,
22    right?
23         A.   Yes.
24         Q.   Not all of them?
25         A.   Sometimes not the initial one, but usually
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   after that they are.

2        Q.   And for each of these interviews that you

3   conduct or attend, you take notes, right?

4        A.   If I'm the primary interviewer, I do.  If

5   I'm not, I don't.

6        Q.   Okay.  And in the instance that you were

7   discussing a little while ago, where Agent Sainato

8   was the primary interviewer, those were his notes

9   from that interview, right?

10       A.   Yes, ma'am.

11       Q.   So sometimes you take copious notes when

12   you're the primary interviewer?

13       A.   Sometimes, yes.

14       Q.   And is it from those notes that you, as

15   the primary interviewer, then develop what's called

16   a 302 report?

17       A.   It's from -- the notes are helpful.

18   They're a reference, yes.

19       Q.   So you use those notes as a reference.

20   You don't have a recording, as you just testified,

21   so you have to rely on the notes?

22       A.   Sometimes I have a recording.  Sometimes I

23   have both.

24       Q.   In this case, did you record some of those

25   interviews?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Some interviews have been recorded, yes.

 2        Q.    Do you recall which ones?

 3        A.    Ma'am, I said I interviewed over 50

 4  people.

 5        Q.    If you don't recall, it's okay.

 6        A.    I don't.  I can think of maybe a few off

 7  the top of my head, but I'd want some time to

 8  prepare something a little more accurate.

 9        Q.    And so you take the -- as the primary

10  interviewer, you take your notes and you develop a

11  302 report, and that report then is relied on by the

12  prosecution, right?

13        A.    Yes.

14        Q.    It's relied on by the FBI?

15        A.    It is.

16        Q.    And in some instances, it's relied on by

17  this Court, by Judge Browning?

18        A.    Judge Browning has looked at some of our

19  302s.

20        Q.    And the information in your reports is

21  relied on by this jury through the course of this

22  trial, right, as it comes out in the testimony?

23        A.    Yes.

24        Q.    And so I want to ask you about a specific

25  interview, one of the ones that I think you'll
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   recall conducting, and there has been testimony
 2   about it.  I don't know if you testified about it.
 3   Do you remember interviewing Robert Martinez in
 4   December 2015?
 5        A.   The SNM member?  Or the ex-BCSO detective?
 6        Q.   Baby Rob.  Do you remember that?
 7        A.   Yes.
 8        Q.   And I think you were in the courtroom
 9   earlier today when the prosecutor referred to him as
10   a "big leader."  Do you remember that?
11        A.   I think he was a leader.
12        Q.   Do you remember hearing her call him the
13   "big leader"?
14        A.   No.
15        Q.   And would you consider him to be somebody
16   who was influential in the organization?
17        A.   Yes.
18        Q.   Pretty high up?
19        A.   Yes.
20        Q.   And when you met with him, he prepared a
21   61-page written statement for you, didn't he?
22        A.   He did.
23        Q.   You asked him to do that?
24        A.   Yes.
25        Q.   And that statement or the substance of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  that statement ultimately became part of a report
 2  that you generated, right?
 3       A.   Did I?
 4       Q.   Do you remember that?
 5       A.   I remember that incident.  I remember
 6  talking to him.  Did I generate the report?
 7       Q.   Well, I'll show it to you, and you can see
 8  what you think.
 9            MS. FOX-YOUNG:  Your Honor, may I
10  approach?
11            THE COURT:  You may.
12       Q.   Agent Acee, do you remember whether this
13  report dated July 12, 2016, the December of 2015
14  interview of Robert Martinez, is yours?
15       A.   Yes and no.  So the report is mine.  I
16  think it indicates I cut and paste in there, an
17  intern transcribing it.  Did I say that correctly?
18       Q.   Okay.  And I'm not trying to catch you in
19  some sort of technicality.  I just want to know if
20  this is your report.
21       A.   Yes, ma'am.
22       Q.   And I know you have staff who work with
23  you to help you complete these things.  Do you
24  remember that as part of that 61-page written
25  statement from Baby Rob, there was provided to you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and the FBI a list of 167 individuals that Baby Rob

2    said were in the SNM?

3        A.   Yes.

4        Q.   I don't expect you to recite all 167.  I

5    know you have a good memory, but I don't expect you

6    to recite all the individuals today.  But do you

7    remember that list?

8        A.   Yes.

9        Q.   And you remember, do you not, that Rudy

10   Perez is nowhere on that list?

11       A.   I don't know.

12       Q.   Do you want to take a look?

13       A.   Sure.

14            MS. FOX-YOUNG:  May I approach?

15            THE COURT:  You may.

16       Q.   If you'll just turn to the third page,

17   that's where it starts.  You can take your time.

18       A.   I don't see his name listed.

19       Q.   And why don't you just hold on to that

20   document for a minute, Agent Acee.  Do you remember

21   that Baby Rob did include Mario Rodriguez on that

22   list as a shot caller?

23       A.   Yes.

24       Q.   And you see that there today?

25       A.   I do.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   And you remember that Baby Rob also

2  included for you and the FBI's consideration Billy

3  Cordova on that list?

4          MR. CASTELLANO:  Your Honor, objection to

5  hearsay at this point because these aren't prior

6  inconsistent statements.

7          MS. FOX-YOUNG:  Your Honor, Mario

8  Rodriguez being a shot caller is impeachment of

9  Mario Rodriguez's testimony.

10          THE COURT:  Let me do this:  What's in and

11  out of these reports, I'll allow the jury to know

12  what's in and out of those reports.  But you can't

13  consider these for the truth of the matter.  These

14  are only to determine why certain things were in

15  reports and what wasn't in other reports in your

16  determining the credibility of witnesses, but you

17  can't consider these statements for the truth of the

18  matter.

19  BY MS. FOX-YOUNG:

20     Q.   Can you answer the question, Agent Acee?

21     A.   Billy Cordova is listed.

22     Q.   Okay.  Thank you.

23          Just as a followup, you were in court when

24  Baby Rob testified, right?

25     A.   Yes, ma'am.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   You remember he never identified Rudy

2  Perez at all?  Do you recall that?

3    A.   That sounds familiar.

4    Q.   So let's talk about Mario Rodriguez.  And

5  you remember that Baby Rob identified him

6  specifically as a shot caller to you, and you

7  documented that in your report?

8    A.   Yes.  I think he did in his written

9  statement we were talking about, yes.

10    Q.   And that was then published in this FBI

11  302?

12    A.   Yes, ma'am.

13    Q.   Let's take a look at Government's Exhibit

14  586, and let's just pick up where you left off

15  talking about Mario Rodriguez last Friday.  It's

16  been a few days.

17         I think you testified that in a meeting

18  with Mario Rodriguez sometime in the last several

19  months, you learned about some other shanks that he

20  told you about, and I think you said they were at

21  the North and South facilities?

22    A.   Yes.

23    Q.   And when you said the North and South

24  facilities, did you mean in Santa Fe at PNM?  Or did

25  you mean in Santa Fe and also the Southern New

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mexico Correctional Facility?

2         A.    Both were in Santa Fe at the PNM.

3         Q.    Okay.  And we're looking at a picture of

4    Mario Rodriguez up here, Government's Exhibit 586?

5         A.    Yes.

6         Q.    So this is the same person that told you

7    about the additional shanks?

8         A.    Yes.

9         Q.    Did he tell you if those were his shanks?

10        A.    No, but I assumed they were.

11        Q.    You assumed that they were and that he had

12   hidden them, had secreted them somewhere in the

13   North and South facilities?

14        A.    Yes.

15        Q.    Where were they actually recovered?

16        A.    I wrote a report on it, and so did STIU.

17   Off the top of my head, I think one was in a heating

18   vent.  Is that what you're asking me, where

19   specifically?

20        Q.    Exactly.

21        A.    They were difficult to locate.  I think

22   one was in a heating vent, some kind of crevice.

23   And the other was inside a bed mattress.  And that's

24   why I assumed they were his, because he knew where

25   they were.

SANTA FE OFFICE                                                                      MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                               FAX (505) 843-9492
                                                                                    1-800-669-9492
                                                                            e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.    And what were they made of, if you know?

2    A.    They were either Plexiglas or metal.

3    Q.    Do you know if either or both of those

4  weapons had been used in the assault on Mr. Sosoya

5  that Mario Rodriguez described?

6    A.    I don't believe that they were.  Because I

7  remember asking him if there was DNA on them besides

8  his, something to that effect.  And he said

9  something that he had them but they weren't used on

10  people, something along those lines.

11    Q.    You don't remember exactly?

12    A.    I don't remember the exact words, but I

13  remember thinking:  Do I need to send these to the

14  lab?  Is there a victim attributed to these?

15          And these were unused, but carried by him

16  at one time, was my impression.

17    Q.    So based upon that impression, you took

18  his word for it and you didn't send them to the lab?

19    A.    No, they're still -- I'm not sure if we

20  have them or if STIU has them.  They may have been

21  transferred to us.

22    Q.    So you don't know whether there is any

23  forensic evidence connecting those weapons to any of

24  Mario Rodriguez' past assaults or killings?

25    A.    I don't believe there is, no.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1         Q.   You don't know because you didn't send
2    them to the lab, right?
3         A.   Well, the lab wouldn't tell me that.  The
4    lab wouldn't just give me that type of an answer.
5         Q.   Let me ask a different question, then.
6         A.   Sure.
7         Q.   You don't know if Mario Rodriguez' DNA or
8    the DNA of the victim is on those shanks, because
9    they haven't been processed, right?
10        A.   Well, the second part of your question,
11   it's true they haven't been processed.  I don't
12   believe they were used in any assaults on people.
13        Q.   But you don't know?  You believe they
14   weren't?
15        A.   I believe they weren't.  I don't have any
16   victims left that I would attribute it to.
17        Q.   Let's talk about Mr. Esparza.  Do you
18   remember Mario Rodriguez testified that he stabbed
19   Mr. Esparza, and that he bit his ear off?  Do you
20   remember that testimony?
21        A.   Yes.
22        Q.   Do you know what weapon was used to
23   stab -- I mean, I understand that Mario Rodriguez
24   used his teeth to bite Mr. Esparza's ear off, but do
25   you know what weapon was used to stab Mr. Esparza?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       A.   Yes.

 2       Q.   What weapon was that?

 3       A.   A shank.

 4       Q.   Do you know where that shank is?

 5       A.   I believe it broke in the victim.

 6       Q.   Okay.  So you think that shank was

 7  recovered and is not here today?

 8       A.   Yes.

 9       Q.   And do you know what weapon, sitting here

10  today, was used to assault Mr. Sosoya, what weapon

11  Mr. Rodriguez used to assault Mr. Sosoya?

12       A.   Yes.

13       Q.   Which weapon was that?

14       A.   It was a crudely made one.  He didn't have

15  enough time to finish it.  And it also broke.

16       Q.   So that is not one of the two weapons that

17  you've recovered from Santa Fe?

18       A.   Correct.

19       Q.   And you were aware, and I think

20  participated in the recovery of a shank that Mario

21  Rodriguez told you he had in his shoe, right?

22       A.   Yes.  I watched.  Yes.

23       Q.   Okay.

24       A.   I watched the shoe opened here in court.

25       Q.   Like we all did?
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                   e-mail: info@litsupport.com

1      A.    Yes.

2      Q.    So do you know when -- if and when Mario

3  Rodriguez used that shank on any victims?

4      A.    I don't believe he did.

5      Q.    Do you know?  This is based on what Mario

6  Rodriguez told you.

7      A.    That, and the lack of any other assaults.

8  We would need a victim to assume that he used it on

9  the person.

10     Q.    Okay.  So you don't have a victim with an

11  unknown assailant, so you're just presuming that

12  Mario Rodriguez didn't use that weapon?

13     A.    To assault a person, yes.

14     Q.    Okay.  Let's take a look at Defendants'

15  Exhibit EV.  Do you recognize this image, Agent

16  Acee?

17     A.    Yes.

18     Q.    What is that?

19     A.    That's two shanks wrapped in what I

20  believe is cellophane, that Mario Rodriguez removed

21  from his rectum during an interview here at the

22  courthouse on October 24th of 2017.

23     Q.    Okay.  And did you actually -- I'm not

24  trying be gross, but how do you know he removed them

25  from his rectum?  Did you see those shanks emerge?



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1       A.    No.

 2       Q.    He did it himself?  The FBI was not

 3  involved?

 4       A.    The Marshal Service was involved.

 5       Q.    Okay.

 6       A.    He told us they were there, and then the

 7  marshals removed him and took him to an area that

 8  they wanted the weapons produced.

 9       Q.    Okay.  And let's take a look at Exhibit

10  EW.  Are these the same weapons, but just unwrapped?

11       A.    Yes.

12       Q.    And let's also look at EX.  Same weapons,

13  right?

14       A.    Yes.

15       Q.    And so on that day that Mr. Rodriguez

16  presented you with these weapons, you took them into

17  evidence?

18       A.    Eventually.  That day, the Marshal Service

19  took them into their evidence, and I later caused

20  that to be transferred to the FBI's evidence.

21       Q.    Okay.  And so sitting here today, do you

22  know where these weapons are?  They're not in the

23  courtroom, right?

24       A.    I didn't bring them, no.  I believe

25  they're still in our evidence --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.    Okay.

2        A.    -- in Albuquerque.

3        Q.    They have not been processed for any

4   forensic evidence, have they --

5        A.    No.

6        Q.    -- to your knowledge?

7              And you don't know whether or not these

8   weapons were used on any victim, do you?

9        A.    Again, I don't believe they were.

10       Q.    You don't know?

11       A.    Do you want me to put a percentage on it?

12       Q.    No.

13       A.    I mean, I don't believe they were used on

14  any people.

15       Q.    Because that's what Mario Rodriguez told

16  you?

17       A.    And we don't have a victim.

18       Q.    Okay.  And on the same day that Mario

19  Rodriguez retrieved these weapons that he had been

20  keistering and provided them to the FBI, he also

21  told you about his desire to kill other defendants

22  in this case in the courtroom, right?

23       A.    Yes.

24       Q.    And, in fact, he told you that he had a

25  specific plan for how he was going to carry out
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    those executions; isn't that right?

2        A.    Yes.

3        Q.    And --

4        A.    Just one.

5        Q.    Just one?  He only told you about one?

6        A.    Just one execution he had planned.

7        Q.    And so you met with Mario Rodriguez on

8    November 1, 2017; isn't that right?

9        A.    I'm not sure.  One of the debriefs of him

10   I was not present at.  I did the follow-on.  I think

11   Agent Stemo did the first.  So I was there the 24th.

12   There was a second debrief that I wasn't at.  And

13   the third one, I did.

14       Q.    Okay.  So I'm just talking -- we don't

15   have to get the specific date.  And we'll talk about

16   the one Agent Stemo did.  But the one that you did,

17   you took a lot of notes, right?

18       A.    Yes, ma'am.

19       Q.    You were the primary investigator?  I'm

20   sorry.  What was the word?  Primary agent?

21       A.    Or interviewer, yes.

22       Q.    Interviewer on that one.  And so you took

23   a lot of notes.  And you actually produced a draft

24   302 that you then presented to Mario Rodriguez for

25   his commentary; isn't that right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I wanted to make sure -- not so much

 2   commentary.  I wanted to make sure I got details

 3   correct.

 4        Q.   Okay.

 5        A.   I had noticed in some prior 302s, where we

 6   didn't get the details exactly correct.

 7        Q.   Okay.  And so sometimes it has been your

 8   practice to draft a report, and then provide it to

 9   the government witness so the government witness can

10   annotate or make changes or additions to that

11   report; is that right?

12        A.   No.  That was actually -- I think that was

13   the first time I've done that.  I'll go over it with

14   them and their attorney.  But it was the first

15   time -- I think it had to do with some time

16   constraints, where I gave an actual physical copy.

17   I can't think of another circumstance where I've

18   done that.

19        Q.   But in this case with Mario Rodriguez, you

20   thought it was important enough to get the details

21   right, and you had the time, right?

22        A.   Yes, I definitely want to get the details

23   right.

24        Q.   And you didn't have any time constraints

25   that you were just talking about, so you provided
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Mario Rodriguez with a draft?

2       A.   I'm saying that we did have the time

3   constraints, and that's why I did provide it, so it

4   left with him.

5       Q.   Okay.

6       A.   Then I picked it up at a later date.

7       Q.   So Mario Rodriguez took your typewritten

8   draft report and made some additions to it, right?

9       A.   Correct.

10      Q.   And with respect to his plan to execute

11  one of the co-defendants during the course of the

12  trial, he provided you more detail, right?

13      A.   I assume so, if you're looking at it.

14      Q.   Would you like to see it, and would it

15  refresh your memory to look at his notes?

16      A.   Yes.

17           MS. FOX-YOUNG:  Your Honor, may I

18  approach?

19           THE COURT:  You may.

20      Q.   Agent Acee, you see right here?

21      A.   Yes.

22      Q.   And so Mario Rodriguez gave you a little

23  bit more detail.  Do you remember now what he told

24  you about how he was going to kill one of his

25  co-defendants in trial?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                            1-800-669-9492
                                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1        A.    Yes.

2        Q.    What did he say?

3        A.    During a lunch break, he was going to

4   retrieve -- I think what he said was, he was going

5   to stash the knife back there, behind that door,

6   during a bathroom break.  And then take a break, and

7   either during a lunch break or one of the court

8   recesses, he was going to stab Mauricio Varela, one

9   of his -- one of the co-defendants in the larger SNM

10  case.

11       Q.    Okay.  And the knife that he was going to

12  stash, is that the one that he was carrying in his

13  rectum?

14       A.    It would have been one of those two

15  knives.

16       Q.    Okay.  So he made this change for you, but

17  you didn't actually adopt his language and include

18  it in your final report, did you?

19       A.    I'm not sure.

20       Q.    So let's back up a little bit with Mario

21  Rodriguez.  You explained that you did not

22  participate in the first debrief of him, that Agent

23  Stemo was there, but you were not there; isn't that

24  right?

25       A.    I think that was the second one.  I just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   know that she wrote the report.  I don't think I was

 2   at that one.  Or I may have had to leave for some

 3   reason.

 4        Q.   Have you had occasion to review that

 5   report?

 6        A.   I have seen it, yes.

 7        Q.   Okay.  So you remember that it was at that

 8   debrief that Mario Rodriguez told the FBI that when

 9   he went into Rudy Perez' cell to take pieces off of

10   Rudy Perez' walker, Rudy Perez looked scared?  Do

11   you remember that?

12        A.   I do recall reading that, yes.

13        Q.   Okay.  And that was Agent Stemo's -- that

14   was included in Agent Stemo's report, and then

15   provided to you as the case agent, right?

16        A.   Yes, ma'am.

17        Q.   And you looked at that report before you

18   debriefed Mario Rodriguez on the occasion that we

19   just talked about?

20        A.   I did.

21        Q.   And on that occasion, when Mario Rodriguez

22   removed the shanks and told you about the other

23   shanks, you gave him an opportunity to review Agent

24   Stemo's earlier report, didn't you?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And you gave him an opportunity to clarify
 2   anything that he wanted to clarify in that report,
 3   right?
 4        A.    Yes.
 5        Q.    And he testified about that.  Do you
 6   remember that?
 7        A.    Yes.
 8        Q.    And he never changed his observation or
 9   the fact that when he entered Rudy Perez' cell on
10   March 7, 2014, to take shanks off of Rudy's walker,
11   Rudy looked scared?  He never changed that in the
12   report, right?
13        A.    Agent Stemo didn't change that in the
14   report, and he didn't request that that be changed.
15        Q.    Okay.  And so subsequent to his review of
16   that earlier report, I think you testified you
17   completed a report, and then you sent him back to
18   his cell with that report to annotate, right?
19        A.    My draft, yes.
20        Q.    And you took notes on it, and you looked
21   at some of those notes.
22             MS. FOX-YOUNG:  What is defense next in
23   order?  Your Honor, I am marking Defendants' Exhibit
24   FV.  And I would just like to approach the witness.
25             THE COURT:  You may.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   Agent Acee, do you know what this document

2  is?

3    A.   I believe so.  Did you just receive this?

4    Q.   Do you recognize it?

5    A.   Yes.

6    Q.   And I'm also going to show you the report

7  we looked at a few minutes ago with Mario Rodriguez'

8  handwritten annotations.  Do you see how they're in

9  caps?

10    A.   Yes.

11    Q.   And you see how this document has caps on

12  it?

13    A.   Yes.

14    Q.   Can you tell me if that handwriting looks

15  similar to you?

16    A.   It looks similar.

17    Q.   Okay.  Agent Acee, you said it looks

18  similar?

19    A.   Yes.

20    Q.   Okay.  I think it just might have been we

21  moved the mic, and it was a little hard to hear.

22    A.   It looks similar.

23    Q.   And having looked at this document, can

24  you tell me what it is?

25    A.   Yes.  It's a letter written by Mario

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                     1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

118

```
 1  Rodriguez.  I asked if that was a new document,

 2  because I think it was just produced to the

 3  Government and the defense yesterday.

 4       Q.   Last night, right?

 5       A.   Yes.

 6       Q.   And you think this is a document that

 7  Mario Rodriguez authored in 2014?

 8       A.   I do.

 9       Q.   All right.

10            MS. FOX-YOUNG:  Your Honor, I move the

11  admission of Defendants' Exhibit FV.

12            THE COURT:  Any objection, Mr. Castellano?

13            MR. CASTELLANO:  No objection, Your Honor.

14            THE COURT:  Any objection from any other

15  defendant?  Not seeing or hearing any, Defendants'

16  Exhibit FV will be admitted into evidence.

17            (Defendants' Exhibit FV admitted.)

18  BY MS. FOX-YOUNG:

19       Q.   All right.  And so you will recall that

20  when Mario Rodriguez testified a number of days ago,

21  Ms. Armijo asked him how Rudy Perez seemed when he

22  came in and he took the piece from the walker.  And

23  at first he said that Rudy Perez had no expression,

24  something along those lines.  Do you remember that?

25       A.   Vaguely.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Ms. Armijo asked him that.  And then Mr.
2  Villa got up, and he asked him about this prior
3  statement to Agent Stemo, that actually when he had
4  gone into Rudy Perez' cell, Rudy looked scared.  Do
5  you recall that?
6    A.   In the statement, yes.
7    Q.   Yes.  And you'll also recall that he was
8  asked about having the chance to correct Agent
9  Stemo's report, right?
10    A.   Yes.
11    Q.   And he testified, just as you just have,
12  that he had the opportunity to correct that report,
13  right?
14    A.   Correct.
15    Q.   And that he never changed that statement,
16  right?
17    A.   Right.
18    Q.   Okay.  So it wasn't until he testified
19  before this jury that he tried to change that
20  statement a little bit.  Do you remember that?
21    A.   I know that his testimony and the
22  statement are different.
23    Q.   Okay.  And Mario Rodriguez made a number
24  of annotations on this draft 302.  I'm sure -- it's
25  been a few months; it's been since November of last

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   year.  But you have reviewed at some point all of
 2   those changes, right?
 3        A.   Yes.
 4        Q.   And you took them to heart?
 5        A.   I wouldn't say that.  I mean, I reviewed
 6   them.
 7        Q.   Do you remember when you debriefed him
 8   that you asked him, as you ask all of these
 9   government witnesses, why he wanted to cooperate
10   with you, right?
11        A.   Yes.
12        Q.   And do you remember what you included in
13   your report as the answer to that question?
14        A.   No.  I have an answer off the top of my
15   head, but I don't recall exactly what I said in my
16   report.
17        Q.   What's the answer off the top of your
18   head?
19        A.   He was fatigued.  He was tired.
20        Q.   Do you remember that you wrote that he
21   cooperated because he wanted to change his life?
22        A.   Yes.
23        Q.   And that he was tired and out of energy?
24        A.   Yes.
25        Q.   And you think that's accurate?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I do.

 2        Q.    And you recall that when you gave Mario

 3   Rodriguez the chance to change or correct or add to

 4   that answer, he changed it?  Do you remember that?

 5        A.    No.

 6              MS. FOX-YOUNG:  Your Honor, may I

 7   approach?

 8              THE COURT:  You may.

 9        A.    Yes.

10        Q.    Do you see that, Agent Acee?

11        A.    Are you going to ask me to read it?  I

12   need to look at it longer, if I could.

13        Q.    You could read it.

14        A.    Just what he added?

15        Q.    Yeah.  What did he add?

16        A.    I think the first word is "and."  Yes.

17   "And the SNM was so fucked up, no loyalty!"

18   exclamation point.

19        Q.    So when you gave Mario Rodriguez the

20   chance to put in his report his reason for becoming

21   a government witness, he said because "the SNM was

22   fucked up, no loyalty," right?

23        A.    He added that.

24        Q.    Okay.  But that didn't go into your final

25   report?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    A.   Did it not?

2    Q.   No.

3    A.   Okay.

4    Q.   You also had what appears to be a lengthy

5    conversation, dialogue, with Mario Rodriguez about

6    what it was like to be in solitary confinement at

7    PNM, didn't you?

8    A.   I don't know how lengthy it was, but he's

9    talked about his experiences there.

10    Q.   You remember talking to him about that?

11    A.   I remember him making some comments about

12    that, yeah.  I don't know how interested I was in

13    it, but he did talk about it.

14    Q.   And he talked about all the increased

15    violence and the paranoia that comes from being in

16    solitary?

17    A.   Yes.

18        MR. CASTELLANO:  Calls for hearsay.

19        THE COURT:  Well, are you trying to elicit

20    out-of-court statements?

21        MS. FOX-YOUNG:  It's impeachment.

22        THE COURT:  Well, let me do this:  Let me

23    once again instruct the jury that you cannot

24    consider these for the truth of the matter.  These

25    are only to determine the credibility of the

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                        1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                           e-mail: info@litsupport.com

1   witnesses that you've heard, not for the purposes of

2   considering these statements for the truth of the

3   matter.

4           MR. CASTELLANO:  And I object because this

5   isn't impeaching any statement by Mario Rodriguez,

6   Your Honor.

7           THE COURT:  Well, why don't y'all

8   approach.

9           (The following proceedings were held at the

10  bench.)

11          THE COURT:  So what statement by Mr.

12  Rodriguez are you impeaching?

13          MS. FOX-YOUNG:  Your Honor, I don't have a

14  direct quote, but his testimony about solitary was

15  along the lines of:  It's not bad.

16          Mr. Villa asked him about it.  And I'm not

17  going any further on this.  I want to get into his

18  change, and what he added to it.  But he did not

19  talk about the extreme paranoia when Mr. Villa tried

20  to elicit that from him, and the violence that comes

21  from locking these guys in solitary.  So it's

22  impeachment of that testimony.

23          THE COURT:  I don't have a transcript

24  where I can dispute what Ms. Fox-Young says.  Is

25  your memory so different that I should not go ahead

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   and allow this?

 2             MR. CASTELLANO:  Yes, Your Honor.  Even

 3   from his statements, he said that's not that bad.

 4   That isn't necessarily impeachment.  That statement,

 5   even if the recollection is true, his opinions, it's

 6   not bad, regardless of the result.  So it's clearly

 7   trying to get in a hearsay statement to help Rudy

 8   Perez, obviously, but it doesn't impeach the

 9   statement.  It's not contradictory to his prior

10   statement.

11             MS. FOX-YOUNG:  I think it is

12   contradictory, and it's for the jury to decide.

13             THE COURT:  I think there is enough

14   tension there.  I'll go ahead and allow the

15   statement.  But I'll remind again, the jury, that

16   they're not to consider this for the truth.  They

17   can only use it to determine Mr. Rodriguez'

18   credibility.

19             (The following proceedings were held in

20   open court.)

21             THE COURT:  All right.  Again, I'll remind

22   you that you can't consider this testimony for the

23   truth of the matter, what Mr. Rodriguez said.  You

24   can only use it to determine how credible Mr.

25   Rodriguez is when he testified.  So you can use it
```



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                    1-800-669-9492
PROFESSIONAL COURT                                      e-mail: info@litsupport.com
REPORTING SERVICE

1  only for that purpose, but not for the truth of the

2  matter.

3          Ms. Fox-Young.

4          MS. FOX-YOUNG:  Thank you, Your Honor.

5  BY MS. FOX-YOUNG:

6      Q.   Agent Acee, I think you were saying you

7  did recall Mario Rodriguez talking to you about how

8  paranoid people get in solitary confinement, right?

9      A.   Yes.

10     Q.   And the violence that ensues as a result?

11     A.   Yes.

12     Q.   The plotting and the scheming?

13     A.   Yes.

14     Q.   And do you remember that that is another

15 area of your draft report that Mario Rodriguez

16 actually added to when you gave him the opportunity?

17     A.   That sounds familiar, yes.

18     Q.   Okay.  Do you remember what he said?

19     A.   No.

20          MS. FOX-YOUNG:  Your Honor, may I

21 approach?

22          THE COURT:  You may.

23     A.   Do you want me to read it?

24     Q.   Sure.

25     A.   Just what's highlighted?  Or everything?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    What's highlighted.

2      A.    It's a little difficult to read.

3      Q.    How about I'll read it, and you tell me if

4  you think this is inaccurate.  He says it's --

5            THE COURT:  Well, I think put it in front

6  of him to refresh his memory.  I think that's where

7  we are.

8      Q.    You can take your time.  It's a little bit

9  hard to read the writing.

10     A.    I think I can get everything but one word.

11 He says, "It's so fucked up that it will never

12 amount to what it was" -- and then I'm not sure what

13 the next word is; oh, it's parentheses -- "SNM being

14 what it used to be."

15     Q.    Thank you.

16           So Mario Rodriguez told you -- he added

17 this to the report.  He said, "It's so fucked up

18 that it will never amount to what it was, SNM being

19 what it used to be."

20           Do you think he meant that SNM would never

21 be what it used to be again?

22     A.    Yes.

23     Q.    But you didn't include that in your final

24 report, did you?

25     A.    I may not have.

SANTA FE OFFICE                                        MAIN OFFICE
119 East Marcy, Suite 110                     201 Third NW, Suite 1630
Santa Fe, NM 87501                             Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    Q.   You didn't include any F-words in your

2  final report, did you?

3    A.   Did I not?  I'll sometimes put them in

4  quotations.  But I don't word my reports that way,

5  no.

6    Q.   And did Mario Rodriguez tell you anything

7  about -- anything more about how different things

8  had become with the SNM as compared with the old

9  days?

10   A.   I'm not sure.  He may have.

11   Q.   You don't remember him telling you that

12 the tabla used to be really powerful and meaningful,

13 but it wasn't anymore?

14   A.   Not off the top of my head, no.  Forgive

15 me.  I've just talked to so many of these guys.

16   Q.   I understand, Agent Acee.  Would you like

17 to just take a look to refresh?

18   A.   Sure.

19   Q.   Agent Acee, it starts right here on this

20 page and just goes to the very beginning of the next

21 page.

22   A.   And the question is:  Did he add anything?

23   Q.   The question is:  Do you recall Mario

24 Rodriguez, when you debriefed him, telling you about

25 the tabla, how it used to be powerful and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   meaningful, and this wasn't true anymore?

2      A.   Yes.  Yes.

3      Q.   And that's actually what you documented in

4   the report, isn't it?

5      A.   Yes, ma'am.

6      Q.   Okay.  Thank you.  And so the truth is

7   that Mario Rodriguez gave you at least three big

8   reasons in his annotations to this report for why he

9   cooperated?  He added those in, didn't he?

10     A.   I don't know that he gave me big reasons.

11  The second part of your question is, yes, he

12  obviously added some information to my draft.

13     Q.   You don't dispute that he added the

14  information that there was no loyalty anymore in the

15  SNM, right?

16     A.   Correct.

17     Q.   And that it's "so fucked up"?

18     A.   Yes.

19     Q.   And that the tabla used to be meaningful,

20  but it isn't anymore?

21     A.   Yes.  That wasn't an addition.  That was

22  something he told me, and is in there.

23     Q.   That's right.  And that "SNM wasn't what

24  it used to be"?

25     A.   Yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        Q.    Okay.  And so the truth is that Mario
 2   Rodriguez told you in his own words that there was
 3   no loyalty anymore in this gang, and that's why
 4   he -- at least one of the reasons he wanted to
 5   cooperate; isn't that right?
 6        A.    Yes.  He was -- he felt that way, yes.
 7        Q.    Yeah.  And he also told you on more than
 8   one occasion that he wanted to work for the
 9   Government because he felt that was his best option,
10   right?
11        A.    No.  I think he came to that conclusion.
12   I don't know that he put it in those words.
13        Q.    He never told you it was his best option?
14        A.    I assume you're going to refresh my memory
15   with something.  I don't recall that, though, no.
16        Q.    You remember meeting -- well, I think
17   you've testified about a meeting with Mario
18   Rodriguez and Ron Sanchez --
19        A.    Yes.
20        Q.    -- and Mark Myers, who was with the New
21   Mexico Corrections Department?
22        A.    Yes.
23        Q.    And you had -- actually, this is one of
24   the occasions on which you recorded the interview,
25   isn't it?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

130

```
 1        A.   It is.
 2        Q.   Okay.  So you had a long recorded -- well,
 3   I think it was long.  Maybe you don't think it was
 4   long.  You had a recorded interview with these
 5   gentlemen, in which you discussed a variety of
 6   topics, right?
 7        A.   Two.  A couple topics.
 8        Q.   And do you remember when that happened?
 9        A.   November of 2017.  I don't remember the
10   exact date.  Maybe the 16th, November 16th.  Going
11   off memory here, though.
12        Q.   Okay.  And you don't remember Mario
13   Rodriguez telling you then that he thought best
14   option was to go into the feds and become a witness?
15        A.   I imagine he must have said that to Ronald
16   Sanchez.  Did he say it to me?  I don't remember it
17   that way.
18        Q.   Well, you testified that you were there,
19   right?
20        A.   I was there, yes.
21        Q.   I mean, you all were sitting in a small
22   room, right?
23        A.   Yes.
24        Q.   Were you sitting around a table?
25        A.   Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.    Were you sitting next to Mario Rodriguez?

2    A.    He was nearby at the other end of -- yeah.

3    Q.    And was Agent Stemo also there?

4    A.    She was.  So at the table it was Ronald

5    Sanchez, Mario Rodriguez, and myself.  Mark Myers

6    and Nancy Stemo were just kind of standing along the

7    wall.  And then Captain Sergio Sapien from the STIU

8    was seated elsewhere in the office, in a chair.

9    Q.    Okay.  So you and Agent Stemo were there

10   representing the Federal Bureau of Investigation?

11   A.    Yes.

12   Q.    And then the other personnel that you've

13   talked about, you said Sapien and Myers, they were

14   there from the New Mexico Corrections Department,

15   right?

16   A.    That's who they were employed by.

17   Q.    And Ron Sanchez was there?

18   A.    Yes.

19   Q.    And who else was there?

20   A.    Mario Rodriguez.

21   Q.    And Mario Rodriguez was there.  And so you

22   were sitting at a table with Mario Rodriguez and Ron

23   Sanchez?

24   A.    Yes.

25   Q.    Okay.  And that was when Mario Rodriguez

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    said to the two of you, "I think the best option is

2    to go into the feds and become a witness."  Right?

3         A.   Yes.  I think what I'm struggling with is,

4    I don't know if he's saying that to Ron, though,

5    like, "Hey, Ron, the best option is to do this," or

6    if he's representing that's his best option.

7         Q.   Okay.  But you don't dispute that he said

8    it was the best option?

9         A.   Yes.

10        Q.   You do dispute it?

11        A.   I don't dispute it.

12        Q.   Okay.

13        A.   I agree with you.

14        Q.   Okay.  And you also discussed with Mario

15   Rodriguez that as a result of his work for the

16   Government, telling stories on behalf of the

17   Government, that he was going to be able to do easy

18   time, didn't you?

19        A.   Well, no.

20        Q.   You don't think you talked about that at

21   this meeting?

22        A.   No.  Because I wouldn't say to somebody,

23   telling stories.  I'm not interested in their

24   stories.  I don't want to be told stories.

25        Q.   All right.  Let me put it this way, Agent

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   Acee:  At that meeting, where the three of you are
 2   at the table, do you remember discussing the subject
 3   of doing easy time?
 4        A.   Easier time.  I probably might have said
 5   something like that, yes.
 6        Q.   Okay.  And do you remember Mario Rodriguez
 7   saying, "It's going to be easy time"?
 8        A.   Compared to going to a gang yard, I
 9   believe that's correct, yes.
10        Q.   Do you remember that?
11        A.   I don't remember it verbatim, but I
12   remember talking about doing easy time versus going
13   and representing the SNM and the feds.  Yes, I
14   remember talking about that.
15        Q.   You remember that?  Do you recall that
16   Mario Rodriguez didn't like being in solitary
17   confinement?  He told you about the paranoia and the
18   violence and the plotting and the scheming, right?
19        A.   Yes.  He gave me examples of what it was
20   like, and he used me in one of his examples.
21        Q.   Okay.  And you remember that at this
22   meeting, where the three of you were at the table,
23   when he said, "It's going to be easy time in the
24   fed," he also talked about finally getting out, not
25   having to be in solitary anymore, right?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   Yes.

2      Q.   Wouldn't have to be in the hole no more?

3      A.   Yes.

4      Q.   You remember that?

5      A.   I do.

6      Q.   And he was -- you were -- the three of you

7   were having this group conversation, I think you

8   testified, at the request of Ron Sanchez, right?

9      A.   Yes.

10     Q.   And so this conversation came to be --

11  these statements from Mario Rodriguez were

12  descriptions of how good it could be if you become a

13  government witness, right?  That's what he's trying

14  to tell Ron Sanchez?

15     A.   He injected a lot of his opinion, yes.

16     Q.   Right.

17     A.   And I didn't stop him.

18     Q.   You didn't stop him because it's true,

19  right?

20     A.   I don't know.  I mean, I've never been in

21  a prison gang or in solitary confinement.  So I have

22  heard other prison gang members represent, you know,

23  PC yards and WITSEC as being easier time than being

24  on a gladiator yard or a gang yard, yes.

25     Q.   Well, you would agree with me that Mario

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                        FAX (505) 843-9492
                                                                   1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   Rodriguez is pretty excited about the fact that

2   whatever time he's got do -- and we'll talk about

3   that -- is going to be easy time in Tucson or in

4   Florida, right?  You remember him saying that?

5        A.   Something like that.  He's excited he

6   doesn't have to pick up a shank anymore and be a

7   gang member.

8        Q.   Well, that's not what I asked you.  I

9   asked you if he was excited about going to Tucson or

10  to Florida?

11       A.   For those reasons.

12       Q.   Yeah.  Because he's going to get contact

13  visits, right?  He said that?

14       A.   I don't know.

15       Q.   You don't remember that?

16       A.   He may have said something like that.

17       Q.   I know it's been a little while, but you

18  don't remember how excited he was, and how he was

19  trying to pump Ron Sanchez up, telling him, "You go

20  to Tucson or Florida, you get contact visits.  You

21  don't have to be in the hole.  It's a whole other

22  deal"?

23       A.   Well, Mr. Rodriguez is pretty stoic.  I

24  don't know that I'd say he's excited.  I agree with

25  you that he talked about that kind of stuff.  Maybe

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
1-800-669-9492



1    he was excited.  I don't know him real well.

2         Q.    You'd agree with me that as part of his

3    pitch, he said, "I'm going to get contact visits

4    when I go to Tucson or Florida"?

5         A.    I believe he did say that.

6         Q.    Would you like to see the transcript?

7    Would that help you remember?

8         A.    I'll take your representation.

9         Q.    All right.  So Mario Rodriguez is not even

10   close to the only government witness on Baby Rob's

11   list that you looked at earlier, right?  There were

12   a bunch?

13        A.    There were a bunch.

14        Q.    And we talked about Billy Cordova, that

15   he's on that list?

16        A.    Yes.

17        Q.    Can you tell me when you first learned

18   about Billy Cordova's involvement in the criminal

19   activity?

20        A.    Early on in the investigation I put, or

21   caused the Bureau to put together an organizational

22   chart, or not even an organizational, just who do we

23   know that's SNM.  And I had faces, names, and dates

24   of birth.  I think he was in on some of the original

25   stuff.  Because we were targeting everybody SNM.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      Q.    Okay.  And when you talk about some of the

2  original stuff, and making that chart, did you use

3  this list of 167 people from Baby Rob in your chart?

4      A.    No.

5      Q.    Okay.  So are you going back farther in

6  time?

7      A.    Yes.

8      Q.    So when did you make that chart?

9      A.    I initiated the investigation in March

10  2015.  Within weeks or a month, we would have had a

11  group of analysts already populating charts and

12  target lists and target packets.

13      Q.    Okay.

14      A.    Right away.

15      Q.    Okay.  Was Billy Cordova on your radar in

16  March 2015?

17      A.    I think we knew him as SNM, but he wasn't

18  on my radar in the first phase.  I had him in a

19  later phase.

20      Q.    Okay.  And the first indictment comes in

21  at the end of 2015, right?

22      A.    Correct.

23      Q.    And that's when you testified that you and

24  Agent Sainato and others sat down with Baby Rob's

25  brother, Roy Martinez, right, December 17, 2015?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492
                                                       e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    A.   You use that term loosely, right?  Because

2  they're not brothers.  Carnals?  Is that what we're

3  saying?

4    Q.   Do you want to call them carnals?

5    A.   I don't, but that's the only way they're

6  going to be brothers.

7    Q.   You sat down with Roy Martinez in December

8  of 2015.  Do you remember?

9    A.   I don't.  I remember meeting him, but

10  after the takedown.  I interviewed him sometime

11  after the takedown.

12    Q.   Okay.  But it is your testimony that you

13  were present when Agent Sainato took copious notes

14  at that interview with Roy Martinez, right?

15    A.   I was present.

16    Q.   And Roy Martinez is known as Shadow?

17    A.   Yes.

18    Q.   And you heard the prosecutor earlier this

19  morning call him a "big leader"?

20    A.   I might have missed that part where she

21  said about Baby Rob and him, but he's a leader.

22    Q.   Okay.  It's your testimony that he's a

23  leader.  And is he a leader on a par with Baby Rob,

24  real high up in the organization?

25    A.   Yes.  I don't think he was as well liked,

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    but he was a leader at one time.

2         Q.   And he disgorged a lot of information with

3    you and Agent Sainato, didn't he?

4         A.   Yes.

5         Q.   And if you hadn't already had Billy

6    Cordova on your radar in 2015, you certainly did

7    after you met with Shadow, Roy Martinez, right?

8         A.   To be clear, there is a lot of people on

9    the radar.  I mean, all SNM was on the radar.  So

10   Billy was on the radar in the earliest stages, as

11   were probably 100 or 150 guys.

12        Q.   167 guys on Baby Rob's list, right?

13        A.   I didn't count them, but that's what you

14   said.

15        Q.   And so when the FBI sat down, was this the

16   first time that you talked to Shadow, Roy Martinez,

17   December 17, 2015?  And I'll represent to you -- let

18   me just represent to you, Agent Sainato's notes that

19   you looked at reflect a date of December 17, 2015.

20   Do you have any reason to dispute the accuracy of

21   that date for that interview?

22        A.   No.

23        Q.   Do you know if that's the first time that

24   you sat down with Shadow?

25        A.   It's the first time I did.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                            1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

 1        Q.    Do you know if the FBI talked to him
 2   before that?
 3        A.    Everybody was interviewed or attempted to
 4   be interviewed on December 3rd, when we did the
 5   takedown.
 6        Q.    Okay.  So two weeks later, you and Agent
 7   Sainato debriefed Roy Martinez?
 8        A.    Yes.
 9        Q.    And part of your -- part of that debrief
10   covered Billy Cordova rather extensively, didn't it?
11        A.    I don't recall.
12        Q.    Do you remember learning anything about
13   Billy Cordova during the course of that debrief?
14        A.    I've learned a lot about Billy Cordova in
15   a lot of debriefs.  I don't know exactly what was
16   talked about in that one.
17        Q.    If you took a look at Agent Sainato's
18   notes, would that help you recall the specifics of
19   what you discussed about Billy Cordova with Roy
20   Martinez?
21        A.    I prefer the 302, if I have a choice.
22        Q.    I'm asking about the notes.
23        A.    If that's all you're going to let me look
24   at, I'll look at them.
25        Q.    And I can definitely provide the 302 for

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1   you, as well.

2       A.   I just prefer the 302, because it's going

3   to be more in-depth in detail.

4           MS. FOX-YOUNG:  Your Honor, may I

5   approach?

6           THE COURT:  You may.

7       Q.   Agent Acee, first, I'm just going to have

8   you take a look at these notes.  Does this refresh

9   your memory as to your discussion about something

10  involving Billy Cordova?

11      A.   Yes.

12          MR. CASTELLANO:  Could we get a Bates

13  stamp for this document, please?

14          MS. FOX-YOUNG:  42980, and 42974 to 42975.

15      Q.   All right.  Agent Acee, I'm also showing

16  you the report generated by Agent Sainato,

17  presumably with the assistance of these notes that

18  you've looked at.

19      A.   Okay.

20      Q.   Agent Acee, having looked at these

21  documents, do you have some recollection now of what

22  the FBI learned about Billy Cordova on December 17,

23  2015?

24      A.   Yes.

25      Q.   What was that?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                    1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    A.   That Billy Cordova and Roy Martinez did

2 some time together when they were incarcerated

3 together.  Billy Cordova, according to Roy Martinez,

4 told Roy that he shot Sammy Chavez over $100 drug

5 debt owed to Gerald Archuleta.  In the notes,

6 there's an indication that was highlighted that

7 said -- what I interpret from the notes is that it

8 said who's on the streets that might be able to

9 conduct the hit.  And Billy Cordova was one of the

10 names.

11    Q.   Okay.  And so Roy Martinez told you and

12 Agent Sainato that Billy Cordova shot Sammy Chavez,

13 right?

14    A.   He told us that Billy told him that.

15    Q.   Right.  And so Agent Sainato's notes

16 reflect, "Billy shot him, told Shadow," right?

17    A.   Yes.

18    Q.   Okay.  And you remember -- I think it was

19 Friday of last week -- that Billy Cordova testified

20 that he didn't shoot Sammy Chavez, right?

21    A.   Correct.

22    Q.   And Billy Cordova also told you that he

23 didn't shoot Sammy Chavez?

24    A.   Correct.

25    Q.   Okay.  But you learned in December 2015



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  that he apparently told somebody else that he shot

2  Sammy Chavez?

3       A.   According to that person, yes.

4       Q.   Okay.

5            THE COURT:  Ms. Fox-Young, would this be a

6  good time for us to take our lunch break?

7            MS. FOX-YOUNG:  Yes, Your Honor.

8            THE COURT:  Be patient with me, ladies and

9  gentlemen of the jury.  We're taking our first lunch

10  break during the defendants putting on evidence in

11  this case, so I'm going to remind you of a few

12  things that are especially important.

13           Until the trial is completed, you're not

14  to discuss this case with anyone, whether it's

15  members of your family, people involved in the

16  trial, or anyone else, and that includes your fellow

17  jurors.  If anyone approaches you and tries to

18  discuss the trial with you, please let me know about

19  it immediately.

20           Also, you must not read or listen to any

21  news reports of the trial.  Again, don't get on the

22  internet and do any research for purposes of this

23  case.  And finally, remember that you must not talk

24  about anything with any person who is involved in

25  the trial, even if it doesn't have anything to do

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   with the trial.
 2           If you need to speak with me, simply give
 3   a note to one of the Court Security Officers or
 4   Ms. Standridge.
 5           I am going to repeat these a little bit
 6   more as we transition in this case this week, but if
 7   I don't, do keep them in mind each time we do take a
 8   break.
 9           All right.  We'll be in recess for about
10   an hour.
11           All rise.
12           (The jury left the courtroom.)
13           THE COURT:  All right.  We'll see y'all in
14   about an hour.
15           (Lunch recess.)
16           THE COURT:  All right.  Let's go on the
17   record.  I think Ms. Standridge said that you,
18   Ms. Jacks, wanted to call some witnesses out of
19   order and you need to talk to the Government here?
20           MS. JACKS:  I haven't had a chance to ask
21   them.  Yes.
22           THE COURT:  All right.  Why don't you do
23   that now.  That would probably be the best use of
24   time.  So is everyone agreeable?  Is the Government
25   agreeable?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          MS. JACKS:  I think they're thinking about
 2    it, Your Honor.
 3          THE COURT:  They're thinking about it?
 4    All right.  While they're huddling, I did get to
 5    finish the Government's brief on Mr. Perez' medical,
 6    and I'll continue to think about it, but I'm
 7    inclined to deny the motion.  So I think there are
 8    more useful purposes for this information than just
 9    sympathy or jury nullification.
10          I haven't had a chance to look through the
11    jury instructions.  Whether anybody is interested in
12    a duress, I am sort of skeptical that anybody wants
13    that, but I haven't looked to see.  I mean, once you
14    sort of go that direction, you're kind of signaling
15    to the jury that:  I did it, but here's the reason I
16    did it.
17          But I can think of other reasons why it
18    goes to the factual voluntariness of the statement.
19    And those factors that we're going to put in the
20    jury instructions.  So I'm inclined to allow it.
21    But I'll think about it.
22          MS. ARMIJO:  Your Honor, we did think
23    about it, and we just would rather continue and
24    finish with Bryan Acee because, if not, it's just
25    going to give them -- he's already stopped one
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   cross-examination.  This would be stopping another

2   cross-examination, just continue to drag him on.

3   We'd rather just finish with him.

4           THE COURT:  Well, I think this is largely

5   the defendants' case at this time, so I'm going to

6   defer to them.  If they've got witnesses and they're

7   in agreement -- if there is disagreement, then I'll

8   resolve it among the defendants.  But if they're

9   agreeable to culling him down, and getting some

10  witnesses out of here, I'll defer to the defendants.

11  Y'all got a disagreement among yourselves, or --

12          MS. FOX-YOUNG:  I think the agreement is

13  just that I was going to finish examining Agent Acee

14  and then --

15          THE COURT:  And that's when the break

16  would occur?

17          MS. FOX-YOUNG:  Yes, Your Honor.

18          MS. JACKS:  Correct, Your Honor.  My

19  understanding is we are all in agreement, and I

20  appreciate that.  I think we've put these witnesses

21  through quite a bit of inconvenience already.

22          THE COURT:  All right.  We'll let Ms.

23  Fox-Young finish up, and then we'll take a break,

24  and then we'll come back and finish up Mr. Acee at

25  another point.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Let me, while -- well, we're out of time.
 2    I was going to give you a few case cites to looking
 3    at this Count 8 on Mr. Baca, but I'll try to find
 4    another time to do that.
 5              All rise.
 6              (The jury entered the courtroom.)
 7              THE COURT:  All right.  Mr. Acee, I'll
 8    remind you that you're still under oath.
 9              Ms. Fox-Young, if you wish to continue
10    your direct examination of Mr. Acee, you may do so
11    at this time.
12              MS. FOX-YOUNG:  Thank you, Your Honor.
13              THE COURT:  Ms. Fox-Young.
14    BY MS. FOX-YOUNG:
15        Q.   Agent Acee, before we went to lunch, I
16    think you had just testified that you became -- you
17    were made aware by Roy Martinez, the information
18    that Billy Cordova had told him that he shot Sammy
19    Chavez.  Do you remember that?
20        A.   Yes.
21        Q.   And that that was over a $100 debt to
22    Gerald Archuleta or Styx?
23        A.   Yes.
24        Q.   And you also -- you were made aware of
25    information having to do with Billy Cordova and the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    murder of Sammy Chavez before that interview with

2    Roy Martinez, weren't you?

3         A.   Yes.

4         Q.   You remember that you did a debrief with

5    Freddie Quintana in the summer of 2015 in August?

6         A.   Yes.

7         Q.   You learned something similar from him,

8    didn't you?

9         A.   I believe so.

10        Q.   Do you remember exactly what you learned

11   from Freddie Quintana?

12        A.   No, ma'am.

13        Q.   Well, if I represented to you that your

14   report indicated that Mr. Quintana told you that

15   Billy Cordova participated in the killing of Sammy

16   Chavez at a park in Albuquerque, would you think

17   that's the truth?

18             MR. CASTELLANO:  Your Honor, I object.  If

19   she's going to refresh recollection, she can show

20   the witness the document.

21             THE COURT:  Why don't you do it the

22   traditional way?

23             MS. FOX-YOUNG:  I'm happy to refresh him,

24   Your Honor.

25             THE COURT:  All right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  BY MS. FOX-YOUNG:
 2       Q.   So you recall this interview in August of
 3  2015.  Do you remember talking to Freddie Quintana
 4  about Billy Cordova?
 5       A.   No.
 6       Q.   Okay.  Will it help you remember if I show
 7  you your 1023 form?
 8       A.   Yes, ma'am.  Thank you.
 9       Q.   So, Agent Acee, just take a look at that
10  section that I've highlighted with regard to Billy
11  Cordova.
12       A.   Okay.
13       Q.   Does that help you remember the
14  conversation that you had with Freddie Quintana
15  about Billy Cordova and the Sammy Chavez murder?
16       A.   Yes.
17       Q.   What did you learn about Billy Cordova's
18  involvement in the murder?
19       A.   Quintana told me that he believed Cordova
20  killed Sammy Chavez and left him in a park in
21  Albuquerque.
22       Q.   And he told you a little bit more than
23  that, didn't he, about what Cordova told him?
24       A.   Could you point it out to me, ma'am?
25       Q.   Did he tell you that Cordova actually
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   admitted the murder to him?

2       A.   Yes.

3       Q.   And you included that in your report.

4   Now, I don't want to confuse anybody.  I told you

5   this is a 1023 report.  That's different than a 302

6   report, right?

7       A.   It is.

8       Q.   In layman's terms, can you tell me what

9   the difference is?

10      A.   Sure.  Once a person is opened as an

11  informant, we'll still write it in a 302.  But we

12  also include it in a specific report that's just

13  attributed to that informant, and that form happens

14  to be a 1023.  So oftentimes you'll see where I have

15  a 302, and the 1023 matches it exactly.  And we're

16  just duplicating it so that -- it's just a Bureau

17  procedure to make sure that it's also listed under

18  that informant, in their informant file.

19      Q.   Okay.  And this information happened to be

20  contained in your 1023, right?

21      A.   Yes, ma'am.  Yes.

22      Q.   And you also learned from at least one

23  other person -- maybe more -- but at least one other

24  person in the course of your investigation in 2015,

25  about how and why Billy Cordova was involved in the

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  murder of Sammy Chavez.  Do you recall there was

2  another person?

3       A.   No.

4       Q.   You don't recall discussing Billy Cordova

5  and the Sammy Chavez murder with anyone?

6       A.   I've done that with a lot of people.  But

7  I'm just not sure which one you're referring to.

8       Q.   Tell me who else you remember talking to

9  about Billy Cordova's involvement in the murder of

10 Sammy Chavez.

11      A.   Well, in trying to sort out the Sammy

12 Chavez murder, which is still unsolved, there are

13 usually three or four names that I bring up when I

14 talk to SNMers.  Billy is one of them.

15      Q.   And I'm just asking specifically.  You

16 have ascertained information from sources about

17 Billy Cordova's involvement in the Sammy Chavez

18 murder, correct?

19      A.   Yes.

20      Q.   And one of those sources is Shadow, Roy

21 Martinez?

22      A.   Correct.

23      Q.   And one of those sources is Freddie

24 Quintana, who told you and the FBI that Billy

25 Cordova admitted to murdering Sammy Chavez, right?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    And do you remember -- and I know it's
 3   been a while, but do you remember any other specific
 4   source who told you that Billy Cordova killed Sammy
 5   Chavez?
 6        A.    Not off the top of my head, no.
 7        Q.    Do you remember any specific source who
 8   told you that Billy Cordova bragged about killing
 9   Sammy Chavez?
10        A.    Not off the top of my head.
11        Q.    If I showed you a report based upon your
12   meeting with Sammy Griego in December 2015, would
13   that help refresh your memory?
14        A.    Yes, ma'am.
15             MS. FOX-YOUNG:  Your Honor, may I
16   approach?
17             THE COURT:  You may.
18        A.    Okay.
19        Q.    So having looked -- and this is your
20   report, right?
21        A.    I just need to look at that second page.
22   I think so.  It's an FBI report.
23             THE COURT:  While he's looking at that,
24   let me see counsel up here at the bench.
25             (The following proceedings were held at the
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   bench.)
 2            THE COURT:  When I'm looking at these jury
 3   instructions, is the red line version the one that
 4   y'all agree on?  Those changes you agree on?
 5            MS. JACKS:  Here's the situation:  The
 6   instructions outlined in the letter, in answer to
 7   your question, we all have agreed on.
 8            THE COURT:  The ones in the letter and the
 9   red line is what?
10            MS. JACKS:  The additional instructions --
11   there are red lines throughout.  The numbers we've
12   agreed on in the letter we've agreed on.  The other
13   red-lined ones, ones that we haven't agreed on,
14   we're in the process of reviewing and attempting to
15   agree.
16            THE COURT:  Okay.
17            MR. CASTELLANO:  So there is no current
18   agreement on the other red-lined items that are not
19   in the letter.
20            THE COURT:  Okay.
21            MS. JACKS:  And the reason we left the red
22   line in there is so that the Court could see the
23   changes that are being proposed.
24            THE COURT:  Okay.  And do you think that
25   y'all may agree to some of those?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. BECK:  I think we may.
 2              THE COURT:  But the red lines are largely
 3   the defendants' proposals?
 4              MS. JACKS:  They are.
 5              MR. CASTELLANO:  They are the defendants'
 6   proposed changes.
 7              MR. VILLA:  The defendants all agree.
 8   It's just getting the Government --
 9              MS. JACKS:  That was Saturday's work.
10              THE COURT:  Thank you.
11              (The following proceedings were held in
12   open court.)
13              THE COURT:  All right.  Ms. Fox-Young.
14              MS. FOX-YOUNG:  Thank you, Your Honor.
15   BY MS. FOX-YOUNG:
16       Q.  Agent Acee, you took a look at this report
17   from December 15, 2015.  And it's your report,
18   right?
19       A.  Yes, it is.
20       Q.  And this was based upon a debrief that you
21   did with Sammy Griego?
22       A.  Yes.
23       Q.  And having looked at it now, you remember
24   talking to Sammy Griego about Billy Cordova's
25   involvement in the murder of Sammy Chavez?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    Yes.

2        Q.    And what did you learn from Sammy Griego?

3        A.    Griego reported to me that, while housed

4   with Billy Cordova at the RDC, which is the Central

5   New Mexico Correctional Facility in Los Lunas, I

6   believe in 2011, that Cordova said that he killed

7   Sammy Chavez, because Chavez had messed with some of

8   Cordova's girls.  I'm not sure what that means.

9        Q.    Right.  So Sammy Griego told you that

10  Billy Cordova actually bragged to him that he had

11  killed Sammy Chavez for a personal reason, because

12  he'd messed with one of his girls, right, or some of

13  his girls?

14       A.    All of that is correct, except I don't

15  know if it's personal or not.

16       Q.    Okay.  You don't know if it's personal

17  that it was one of Cordova's girl, correct?

18       A.    Everything else I would agree with.

19       Q.    You might not characterize that as

20  personal?

21       A.    Correct.

22       Q.    But you do agree that Billy Cordova --

23  according to Sammy Griego, Billy Cordova bragged

24  about killing Sammy Chavez?

25       A.    Yes.
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                          e-mail: info@litsupport.com

```
1        Q.   And you remember that when Billy Cordova
2   took the stand last week, he absolutely denied
3   shooting Sammy Chavez?  Do you remember that?
4        A.   Yes.
5        Q.   And he also said something along the lines
6   that he would never take credit for something he
7   didn't do.  Do you remember that?
8        A.   I think he said that.
9        Q.   With regard to murders, right?
10        A.   Yes.
11        Q.   It was his testimony that he wouldn't brag
12   about murdering Sammy Chavez if he hadn't done it,
13   right?
14        A.   Yes.
15        Q.   But you had information -- sitting here
16   today, you and the FBI have information from sources
17   like Sammy Griego that apparently Billy Cordova did
18   brag about murdering Sammy Chavez, right?
19        A.   According to Griego, yes.
20        Q.   Right.  And, in fact, in your experience,
21   you said you've done at least 50 interviews related
22   to this case, right?
23        A.   At least.  Maybe closer to 100.  I'm not
24   sure.
25        Q.   And some of these sources you've talked to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  upwards of half a dozen times, right?

2      A.   Yes.

3      Q.   Some many more times than that?

4      A.   I don't think so.

5      Q.   In any event, you've become awfully

6  familiar with how things work among these gang

7  members in the New Mexico prison system, right?

8      A.   Yes.

9      Q.   And you've actually learned that it's not

10  terribly uncommon to brag about criminal conduct

11  that you didn't participate in, right?

12      A.   I can think of a couple of situations

13  where guys have done that; and then, when I later

14  interviewed them about it, to include playing the

15  recordings, they said they were bragging about

16  something they hadn't done.

17      Q.   Right.  But you heard Billy Cordova's

18  testimony that that doesn't happen, right?

19      A.   Did he say that?  He said that --

20      Q.   I'm asking what you remember him saying

21  about bragging about murders that he didn't do.

22      A.   I believe he said that wasn't a good idea,

23  that people shouldn't do that, and that he wasn't

24  involved in -- he didn't brag about Sammy Chavez.

25      Q.   But that's not what Sammy Griego says,

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   right?

 2       A.   Correct.

 3       Q.   And that's not what Freddie Quintana says,

 4   right?

 5       A.   Right.

 6       Q.   And are you also aware, based upon FBI

 7   reports and work that the FBI has done in this case,

 8   that some people also say Billy Cordova bragged

 9   about killing Shane Dix?

10       A.   I recall that coming up at least one time,

11   yes.

12       Q.   At least one source told you, "Billy

13   Cordova bragged to me, or to somebody, that he

14   killed Shane Dix"?

15       A.   I just remember that that rumor was out

16   there and that was something that we looked at.

17       Q.   Do you think Billy Cordova killed Shane

18   Dix?

19       A.   No.

20       Q.   How do you know that?

21       A.   In summary, through the totality of our

22   investigation.  But another -- the person who called

23   it has pled guilty to that.  And Mario Montoya took

24   me out to the scene of where that murder was, and

25   walked us through it.  So that's two people that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  have admitted their responsibility in it.  And then

 2  a third one is still facing trial.

 3      Q.   So in your estimation, if Billy Cordova is

 4  talking -- is telling people that he killed Shane

 5  Dix, he's bragging about a murder he didn't do?

 6      A.   If he's out there doing that, yeah.  I

 7  don't put him at the scene.  In fact, I think he's

 8  in custody at the time.

 9      Q.   And with respect to Sammy Chavez, do you

10  think Billy Cordova shot Sammy Chavez?

11      A.   I did for a long time.  But the problem

12  is, Corrections has him in custody at the time of

13  the murder.

14      Q.   Right.  So if Sammy Griego and Freddie

15  Quintana have him telling them that he bragged about

16  the murder, and has taken ownership for it, he'd be

17  bragging about a killing he didn't do, right?

18      A.   If all of that is correct, yeah.

19      Q.   Okay.  And I think I asked you, through

20  the course of your investigation you have learned

21  that people do -- people in the SNM, people in the

22  New Mexico prison system, do lay claims to things

23  that they didn't do, right?

24      A.   It has happened, yes.  It's not really

25  common.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE


MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       Q.   Oh, it's not common?
 2       A.   I don't think it's common.  But I do agree
 3   with you that it's happened.
 4       Q.   Okay.  And you're aware that sometimes
 5   people do that, brag about doing things they didn't
 6   do, for self-preservation?
 7       A.   That's probably a reason, yes.
 8       Q.   You know that you've testified before
 9   today, and answered questions along these lines with
10   regard to people in the SNM bragging about things
11   they didn't do, right?
12       A.   I've testified a whole bunch in this case.
13   I've probably talked about that.  I'm not sure.
14       Q.   Let me ask you this:  Do you remember
15   testifying in front of Judge Browning in this case
16   on questioning by Marc Lowery, where Marc Lowery
17   asked you:  You had mentioned about consequences for
18   taking credit for something you didn't do?
19            And you answered, "Yes."
20            Do you remember that?
21       A.   Yes.
22       Q.   And then you were asked:  And what are
23   some of the types of consequences?  You said there
24   were beatdowns, or what else?
25            Do you remember that question?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                       Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                              1-800-669-9492
                                                   e-mail: info@litsupport.com



```
 1        A.   Yes.
 2        Q.   And you remember that you answered, "Well,
 3   in some cases some of the members told me they
 4   didn't really see it as a problem, and that it's a
 5   common occurrence to take credit for something they
 6   didn't do, or to brag."
 7             Do you remember that?
 8        A.   Yeah, I agree with that.
 9        Q.   You're not walking back that testimony
10   today?
11        A.   No.  I think we should clarify --
12        Q.   Thank you, Agent Acee.
13             So we're talking about Sammy Chavez and we
14   talked about Shane Dix, and Billy Cordova bragging
15   about those murders.  Are there any other murders
16   that you know of that Billy Cordova bragged about,
17   that he didn't do, other than those two?
18        A.   I can't think of any, no.
19        Q.   And so I think you testified that at the
20   end of 2015, the first indictment in this case came
21   down, right?  That was the first phase?
22        A.   Yes.
23        Q.   And at the end of 2015, you went to see
24   Billy Cordova at the Metropolitan County Detention
25   Center, right?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.   I thought it was early 2016.

2      Q.   January 2016?

3      A.   Yes, ma'am.

4      Q.   Okay.  And so at the time that you went to

5  see Billy Cordova, you testified that you were at

6  MDC to see somebody else?

7      A.   Yes.

8      Q.   And you happened to engage with Billy

9  Cordova on that same day?

10      A.   Yeah.  We didn't plan it, but we needed to

11  salvage -- the way in which the correctional

12  officers pulled out an informant we had up there,

13  comprised the informant.  So I asked them to pull

14  everybody in the SNM pod, so it looked like we were

15  talking to everybody.

16      Q.   And you had Agent Neale with you?

17      A.   Yes, I believe.

18      Q.   And you had tasked Agent Neale with

19  writing up what are called overt acts for the RICO

20  case, right?

21      A.   Yes, ma'am.

22      Q.   And how many overt acts got ultimately

23  written up for that case?  Do you know?

24      A.   In the superseding indictment, I think

25  there is -- actually, I don't remember off the top

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                             (505) 843-9494
FAX (505) 843-9492                                                   FAX (505) 843-9492
                                                                          1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                               e-mail: info@litsupport.com

1    of my head -- 256 maybe, 254.

2        Q.   More than 250?

3        A.   Yes.

4        Q.   And as of the time, the day that you met

5    Billy Cordova, in January 2016, one of those overt

6    acts that you were looking at was on Sammy Chavez,

7    right?

8        A.   Yes.  I was looking at Billy Cordova for

9    that.

10       Q.   And one was Shane Dix?

11       A.   I'm not sure it was.  We ruled him out

12   pretty quick.

13       Q.   Let's go back to Sammy Chavez.  I know

14   it's your testimony that Billy Cordova did not pull

15   the trigger and kill -- as far as you know -- and

16   kill Sammy Chavez, but you think he was involved in

17   that murder, right?

18       A.   Yes, I think he gave some advice to the

19   person that shot him.  I mean, it's still open.

20   We're looking at a lot of angles on that.

21       Q.   And you were looking at charging him; that

22   was one of the overt acts for the RICO case, was the

23   Sammy Chavez murder?

24       A.   You mean that loosely, like in planning

25   it?  Those could be overt acts, and we would

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                    1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   definitely include those.
 2        Q.   I think you've previously testified that
 3   you were looking at Billy Cordova on the Sammy
 4   Chavez murder, in terms of that RICO case and those
 5   overt acts.  I'm just confirming that.
 6        A.   I have always looked at Billy Cordova in
 7   that homicide, yes.
 8        Q.   And you were also looking at Billy Cordova
 9   for his assault on his wife, Crystal Salas, which
10   you thought was gang-related, right?
11        A.   Yes.
12        Q.   And that was also an overt act?
13        A.   Yes.
14        Q.   And that's the case where Mr. Cordova
15   punched Crystal Salas repeatedly, broke ribs, caused
16   internal bleeding; is that right?
17        A.   I don't know what the specific injuries
18   were, but he beat her up pretty good.
19        Q.   Well, you heard his testimony.
20        A.   I heard him say "Yes" a lot to the
21   questions he was asked, yes, about that.  I don't
22   actually know what the injuries to her were.
23        Q.   Okay.  Well, you heard him admit that he
24   inflicted those injuries?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    On the stand last week?

 2        A.    Yes.

 3        Q.    So Agent Neale had included that as one of

 4   the overt acts that you were looking at?

 5        A.    Yes.

 6        Q.    And you also knew, didn't you, that Billy

 7   Cordova had waterboarded people?  He described for

 8   the jury what that consisted of?

 9        A.    I didn't know that until he told us that.

10        Q.    Okay.  You learned that later?

11        A.    Yes.

12        Q.    And you learned that he had wanted Javier

13   Molina hit?

14        A.    That was not something I knew when we were

15   working on the overt acts.

16        Q.    What other criminal conduct did you know

17   about with regard to Billy Cordova in January 2016?

18   How many other murders?

19        A.    I wanted to include the murder that he was

20   at MDC on, which he went to trial, and I think it

21   was a manslaughter.  I considered that gang-related,

22   based on what I knew about it at the time.

23        Q.    And who was the victim in that case?

24        A.    I don't recall the man's name, but it was

25   someone that was in a feud with one of Billy's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   family members.
 2        Q.   Was that Ray Gurule?
 3        A.   I'm sorry, I don't --
 4        Q.   So Sammy Chavez and that murder.  What
 5   others?
 6        A.   Anything that was in his criminal history
 7   we were looking at including as overt acts, if we
 8   thought they were gang-related or could further his
 9   status in the gang.
10        Q.   Crystal Salas' assault, correct?
11        A.   Yes.
12        Q.   Do you remember any others specifically?
13        A.   Some drug dealing.  But if you're asking
14   me specifically about murders, I think that's it.
15        Q.   What drug dealing activity were you going
16   to include in the RICO case with regard to Billy
17   Cordova?
18        A.   Any drug dealing we could prove.
19        Q.   Did you have some?
20        A.   Yes.
21        Q.   And what was that?
22        A.   I'd have to look at his NCIC, his criminal
23   history again.
24        Q.   But you know that, in January 2016, you
25   were going to go after him for dealing drugs in this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   RICO case?

 2        A.   As well as other crimes.

 3        Q.   What else?

 4        A.   Any assaults that we could articulate.

 5   And this is just the FBI presenting this.  Of

 6   course, it goes through a bunch of approvals.  But

 7   what I had tasked Neale with was any crime that we

 8   reasonably could tie to gang activity or furthering

 9   his reputation to either join the gang or stay in

10   the gang, mainly.

11        Q.   Okay.  And so we talked about one assault,

12   that was beating up his wife, and that you

13   considered furthering his reputation, right?

14        A.   Given the circumstances, yes.  Normally,

15   we wouldn't include a domestic violence, but this

16   was specific because his wife had engaged in a

17   romantic relationship with another member.  We knew

18   that historically had great significance to the SNM,

19   and we believed that he beat her up because of that.

20        Q.   So you were writing that up as one of the

21   overt acts?

22        A.   Yes.

23        Q.   Were there other assaults?  And if you

24   don't remember specifically, that's fine.  But do

25   you remember if there were others?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   I think that there were quite a few overt

2   acts.  We were also looking at letters, inter-prison

3   letters with other members.

4        Q.   Okay.  And at that point, in the course of

5   this case, the RICO case, death penalty was on the

6   table, right?  At the beginning of 2016, it was a

7   death case?

8        A.   For other -- for VICAR defendants?  I

9   believe it was.

10       Q.   The RICO case.

11       A.   Well, no, ma'am.  I mean, the RICO case

12  hadn't been charged, so death penalty is not on the

13  table.

14       Q.   The VICAR case was a death penalty case?

15       A.   Yes, it was still on the table.

16       Q.   And you were getting ready to charge the

17  RICO case the same way?  I understand that you and

18  the FBI don't make the charging decision.

19       A.   So in the RICO case, yes, any allegation

20  where there's death, where there's a murder, the

21  death penalty could be applied.

22       Q.   So, in January 2016, you were looking at

23  Billy Cordova for at least two murders, multiple

24  assaults, drug dealing, and other criminal conduct

25  for this RICO case, for which the death penalty was
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1  on the table, correct?

 2       A.   No.  All of that is correct except the

 3  death penalty part.

 4       Q.   Because it hadn't been charged yet?

 5       A.   Right.  And, I mean, that decision is made

 6  by the Attorney General himself or herself.

 7       Q.   I understand that you don't make that

 8  decision.  But at that time, there were SNM

 9  defendants facing the death penalty?

10       A.   Yes.

11       Q.   And so you went with Billy Cordova, and I

12  think your testimony at a prior hearing was that,

13  upon meeting with him and talking about what he

14  might be able to do for the Government in this case,

15  you directed Agent Neale to stop writing up overt

16  acts in the RICO case on Billy Cordova.  Do you

17  remember that testimony?

18       A.   At some point I did.  I don't know that it

19  was at the initial meeting.  But at some point I

20  definitely did.

21       Q.   Maybe soon after?

22       A.   Yes.

23       Q.   And so is it your testimony today, to this

24  jury, that even though the death penalty was on the

25  table for the SNM defendants, you never mentioned

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                               1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  that to Billy Cordova?

2       A.   I don't think I've ever said that.

3       Q.   You don't think you have?  You heard Billy

4  Cordova's calls last week with his family, where he

5  told the people he's closest to in the world that

6  the federal government did threaten him with the

7  death penalty?  You heard that, right?

8       A.   I did.

9       Q.   And the death penalty was on the table in

10 January 2016, but it's your testimony you never said

11 anything about that?

12      A.   Well, I think you're telling me I never

13 said that.

14      Q.   I'm just asking you what your testimony

15 is.

16      A.   I don't know that I came out and said

17 that.

18      Q.   Is it also your testimony that you never

19 mentioned a life sentence, the possibility of a life

20 sentence to Billy Cordova?

21      A.   I'm not sure.

22      Q.   And you heard those calls where he told

23 his family that, right?

24      A.   I think -- yes, I think he did say that.

25      Q.   Wouldn't it be pretty important to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                                 1-800-669-9492
                                                        e-mail: info@litsupport.com


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   remember whether or not you told a government

2   witness that they could be facing the death penalty

3   or a life sentence?

4        A.    Not necessarily.

5        Q.    It's not an important detail?

6        A.    Well, if Billy Cordova were the only

7   person I interviewed, I'd probably remember a lot

8   more about my conversation.  But, as I said, I've

9   interviewed somewhere between 50 and 100 of these

10  guys.  And each time one of them gets out of prison,

11  I'm at their parole office to meet them and talk to

12  them.

13       Q.    Okay.  But you heard what he told his

14  family soon after the meeting with you, right; that

15  you did threaten him with the death penalty and with

16  a life --

17       A.    I --

18       Q.    No, I'm just asking if you heard that

19  call.

20       A.    Where I threatened him?  No, I didn't hear

21  that.

22       Q.    The federal government threatened him?

23       A.    He did mention that.

24       Q.    And is it your testimony that you never

25  threatened to charge his wife, Crystal Salas?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.   No, I've never mentioned at all anything

2  like that.

3    Q.   But you heard his testimony last week, and

4  you heard the call where he said he was doing what

5  he was doing because of threats on his -- partly

6  because of threats on his wife, his family?  Do you

7  remember that?

8    A.   Not real clearly.  But he mentioned

9  something like that.  I don't know if that was

10 threats from us or threats from the gang.

11   Q.   I'm just asking if you remember hearing

12 that telephone call?

13   A.   I remember hearing a telephone call, yes.

14   Q.   So even though you had evidence that Billy

15 Cordova was implicated in multiple murders and

16 assaults and drug dealing and other criminal

17 activity, it all was washed away after you met with

18 him in January 2016, right?

19   A.   No.

20   Q.   You didn't tell him that you weren't going

21 to charge him in the RICO case?

22   A.   Not at that time, no, because I still

23 pushed to charge him.  Nor did I have evidence at

24 that time of the homicides you just mentioned.  I

25 had informants saying that they'd heard that.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    That's not evidence.

2          Q.    Do you remember your earlier testimony

3    that you told Billy Cordova -- that you told Agent

4    Neale in front of Billy Cordova to stop writing up

5    overt acts because he wouldn't be charged in the

6    RICO case based upon his work for the Government?

7    You don't remember that?

8          A.    That's not how I said it, no.

9          Q.    How did you say it?

10         A.    I introduced him to Agent Neale, and I

11   told him, "This is the guy I've assigned to work the

12   RICO on you."

13         Q.    And you certainly left Billy Cordova with

14   the impression that if he were to work for the

15   Government, all that would wash away, didn't you?

16         A.    No.  I got Billy Cordova an attorney

17   because I wanted to charge him.

18         Q.    Okay.  And so after that meeting at the

19   Metropolitan Detention Center, you later met with

20   him at the FBI office in Albuquerque, right?

21         A.    Yes.

22         Q.    And who was at that meeting?

23         A.    MDC staff brought him there; STIU staff

24   took him to the prison.  So those two entities were

25   there, as well as FBI agents.



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                        e-mail: info@litsupport.com

1      Q.    Okay.  And that's when you talked to him

2   in greater detail about what he might be able to do

3   for the federal government, right?

4      A.    When I tasked him with doing recordings at

5   the penitentiary.

6      Q.    Okay.  And that's when you made

7   arrangements to place Billy Cordova in a cell in

8   solitary confinement right next to Rudy Perez,

9   right?

10     A.    No.

11     Q.    You didn't make those arrangements?

12     A.    Not the way you're categorizing it, no.

13     Q.    When did you make the arrangements?

14     A.    I asked that he be placed near Herrera and

15  Perez.  And that's the extent of it.  How the

16  Department of Corrections maneuvered that, I didn't

17  have input on.

18     Q.    Okay.  And you recall testifying earlier

19  today that Eric Duran's placement was at your

20  request, right?

21     A.    No.  The return of Anthony Ray Baca.

22     Q.    But my question is:  Do you remember

23  testifying that Eric Duran's placement was at your

24  request?

25     A.    No.



SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Well, I can go back and pull the
2   transcript.
3      A.   Baca's was, not Duran's.  Duran was
4   already there.
5      Q.   The placement of Baca next to Duran was at
6   your request?
7      A.   Yes.
8      Q.   Okay.  And the placement of Billy Cordova
9   next to Rudy Perez was at your request, right?
10      A.   Yes.
11      Q.   Okay.  So two days after that second
12   meeting with Billy Cordova at the FBI office, Billy
13   Cordova lands at the Penitentiary of New Mexico in a
14   cell next to Rudy Perez, right?
15      A.   Correct.
16      Q.   And that was in February 2016, right?
17      A.   Yes.
18      Q.   Did you talk -- you heard Billy Cordova
19   use the phrase "pressure points" in court, right?
20   The pressure points he used on Rudy Perez?
21      A.   I have heard him talk about that.
22      Q.   Is that a phrase he got from you, or is
23   that his own language?
24      A.   That's his own language.
25      Q.   So that's when Billy Cordova used the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    pressure points on Rudy Perez, right, that period of

2    time?  This is Billy Cordova's own testimony.  You

3    remember that?

4        A.   Yes.  I'm just struggling to remember what

5    the pressure points were.

6        Q.   Well, I'll remind you.  Billy Cordova

7    testified at this trial, and also previously at a

8    hearing where you were present, that he took

9    advantage of the fact that Rudy Perez thought the

10   SNM was going to move on him.  And Billy Cordova

11   said he used that -- he used those rumors, he used

12   that information, as a pressure point to extract the

13   information that he wanted from Rudy Perez.

14           Do you remember that?  I'm just asking if

15   you remember that testimony; not what you think of

16   it.

17       A.   I remember him talking about that.

18       Q.   So that happened in February 2016, right?

19       A.   That Rudy and Billy were next to each

20   other, yes.

21       Q.   And those recordings were made in February

22   2016?

23       A.   Yes.

24       Q.   Several months later, Billy Cordova was

25   caught having sex with his wife during contact

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    visits, right?

 2         A.    Yes.

 3         Q.    That was at the end of 2016 and the

 4    beginning of 2017?

 5         A.    Yes.

 6         Q.    And we don't know how many times he had

 7    sex with his wife while he was in custody with the

 8    Department of Corrections, right?

 9         A.    I think we do.

10         Q.    How many times?

11         A.    I think it was six.

12         Q.    We know six were recorded on camera?

13         A.    How else would they have -- I believe it

14    was six.

15         Q.    We know there were at least six, right?

16         A.    I believe it was six.

17         Q.    Well, we don't know what wasn't recorded,

18    right?  I think Billy Cordova testified that he did

19    it all the time.  They'd find a way.  They'd go to a

20    bathroom.  He had all kind of ways of having sex

21    with his wife.  Do you remember that?

22         A.    I remember him saying that inmates had sex

23    with people in the bathroom.  I don't know that he

24    said that he did with his wife.

25         Q.    Okay.  But you know about six times that

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   you can verify because there is video of it, right?
 2       A.   Yes.
 3       Q.   And were all six times in front of his
 4   children?
 5       A.   No.
 6       Q.   How many times in front of his children?
 7       A.   At least four.  I'm just going off
 8   recollection of watching the videos.
 9       Q.   Okay.  When did you learn about this
10   misconduct?
11       A.   When the Department of Corrections called
12   me and told me about it.  And I drafted a 302.  I
13   just didn't know I'd be asked about this today, so I
14   don't have it in front of me.
15       Q.   Okay.  Well, you ultimately closed him as
16   your government witness on January 13, 2017, right?
17       A.   Yes, ma'am.
18       Q.   And why did you close him?
19       A.   He didn't follow instructions.
20       Q.   Which instructions did he fail to follow?
21       A.   I'd gone up and met with the CHSs, and I
22   told them I didn't want any more problems up at the
23   penitentiary between each other or between the
24   staff.  That instruction specifically.  There's not
25   an instruction, you know, in the FBI confidential
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   source manual about having sex with your wife while
 2   you're in custody.  It doesn't get that specific.
 3   But the specific instruction is not to -- to go with
 4   the program, and not cause any problems up there.
 5        Q.   And he didn't do that, right?
 6        A.   No.
 7        Q.   And it's important that your informants,
 8   that your witnesses do follow instructions, right?
 9        A.   Yes.
10        Q.   It's important that they follow your
11   instructions in the course of carrying out their
12   duties as government witnesses, right?
13        A.   Yes.
14        Q.   And it's important because you have to be
15   able to rely on the information that they give you,
16   right?
17        A.   Yes.
18        Q.   Because that's how you build your case,
19   right?
20        A.   One of the tools.
21        Q.   Because you want to go after people who
22   have done wrong, right?  And then you're trying to
23   collect the information that you need to do that,
24   right?
25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And you knew that information would be
 2   reliable, right?
 3        A.    Otherwise, we're wasting our time.
 4        Q.    And so you didn't want to waste your time
 5   anymore with Billy Cordova after January 13, 2017,
 6   because he'd broken the rules, right?
 7        A.    I didn't want to give him any more money.
 8   That's why I closed him.
 9        Q.    Okay.  You couldn't trust him anymore
10   after that, right?
11        A.    I don't agree with that.
12        Q.    Okay.  Sitting here today, can you still
13   say that you trust Billy Cordova?
14        A.    Yes, to a certain extent.
15        Q.    To a certain extent?
16        A.    Yes.
17        Q.    So you say that you trust Billy Cordova
18   and find him to be reliable?
19        A.    Depends what the circumstance is.
20        Q.    All right.  Well, how about given the
21   circumstance that Billy Cordova did not tell you the
22   truth about -- did not tell you or the prosecutors
23   in this case the truth about his drug use, and
24   continued drug use until just before this trial?
25   And does that cause you to question your trust in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   him?

2       A.   That's one of the areas that causes me

3   concern.

4       Q.   Okay.  And does it cause you concern to

5   know that Billy Cordova testified last week that his

6   statements before this Court in December about his

7   drug use were untrue, and that he made those

8   statements under oath?

9       A.   Yes.  Anytime somebody lies under oath,

10  that's a significant problem.  It sounded like to

11  me, from what I witnessed, that he was confused

12  about the question, or he had some -- he had some

13  difficulty with that question and understanding it,

14  and only he would know what that was.  I don't know.

15      Q.   Well, I mean, if you want, we can go back

16  and look at his testimony under oath at the end of

17  last year.  But I'll represent to you that he was

18  asked about his drug use, and he testified that he

19  hadn't used drugs in two years; and then we

20  subsequently learned, during the course of this

21  trial, that that was untrue, and that he had been

22  using drugs only weeks before he made those

23  statements in court.

24           Do you remember that?

25      A.   If what you're representing is true, then



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   that's a problem.
 2        Q.   Pretty simple questions, right?
 3        A.   The way you phrased it, yes.
 4        Q.   But that's not enough to break your trust
 5   in him?
 6        A.   Ma'am, I have some -- you asked me if I
 7   thought he's reliable.  In some areas I think he is;
 8   and in some areas he's not.
 9        Q.   Sure.  And you have discovered information
10   during the course of your investigation that
11   contradicts a lot of things Billy Cordova has told
12   you, right?  Let's just talk about the murder of
13   Sammy Chavez, and what Billy Cordova told this judge
14   and this jury last week, that he'd never brag about
15   it.  You learned from other individuals that he did,
16   right?
17        A.   According to those people, yes.
18        Q.   Okay.  Billy Cordova was not the only
19   government witness who declined to follow your
20   rules, right?
21        A.   Oh, no, no, he was not.
22        Q.   And you, as the case agent in this case,
23   cannot snap your fingers and assure that these
24   government witnesses will not continue to commit
25   criminal conduct, right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    Absolutely not.

2      Q.    And, in fact, that many of them have,

3 right?

4      A.    Yeah.

5      Q.    I understand that you had already closed

6 Jerry Armenta as a government witness for having sex

7 in the contact room before this trial, right?

8      A.    Yes.  All the guys that were caught doing

9 that, I closed right away.

10      Q.    Is that the only reason Jerry Armenta was

11 closed?

12      A.    At that time, yes.

13      Q.    At any time?

14      A.    Well, if he wasn't already closed when the

15 tablet thing came out, I would have closed him then.

16 And I closed people for that.

17          If it was drugs, anytime I discover a

18 reason to close them, I close them, because I don't

19 want to give them money if they're not following

20 directions.

21      Q.    Okay.  So upon learning that Jerry

22 Armenta's tablet was used to search child porn,

23 would that be enough for you to close him?

24      A.    If he searched child porn and there was

25 child porn, I would have charged him with it.  But

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                                (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  yes, not only would I have closed him, but I would

2  have charged him.

3       Q.   When did you learn about that?

4       A.   I learned that the tablets were

5  compromised when Benjamin Clark's attorneys emailed

6  me and said as much.  And then I asked to meet in

7  person so I could verify that, and have them explain

8  it to me.  So I wrote a report on it.  I don't

9  recall the exact date.

10      Q.   Okay.  Do you remember that Mark Myers

11  with the Department of Corrections summarized those

12  details and filed something in this court with

13  respect to the compromised tablets?

14      A.   I'm not sure what he might have written.

15      Q.   Okay.  Well, I know you said you don't

16  remember when you actually learned that these

17  government witnesses were accessing the internet and

18  searching for child porn.  Would it refresh your

19  memory if I showed you the document that Mark Myers

20  generated for the court on that subject?

21      A.   It might.  I don't know that I've seen it

22  before.  I can try it, sure.

23           MS. FOX-YOUNG:  Your Honor, may I approach

24  the witness?

25           THE COURT:  You may.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Agent Acee, have you ever seen this

 2   document?

 3        A.    No.

 4        Q.    All right.  It's pretty short.  Why don't

 5   you take a minute to look at it and see if it

 6   refreshes your memory as to when this all happened?

 7        A.    It does.  Thank you.

 8        Q.    Okay.  Having looked at it, can you tell

 9   me when you learned that government witnesses were

10   misusing their tablets and accessing the internet?

11        A.    On April 17, 2017.

12        Q.    Okay.  So that's almost a year ago, right?

13        A.    Yes.

14        Q.    And you said you learned this because one

15   of the government witnesses' lawyers contacted you

16   and told you, on April 17, 2017, that his client had

17   actually been able to compromise the tablet?

18        A.    I don't know that the attorney said it

19   like that.  The gist of it is, the attorney

20   contacted me and asked that I go to the detention

21   center with the attorneys -- there were two of

22   them -- and meet with their client to talk about

23   something.

24        Q.    So you did that, right?

25        A.    I did.
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                   Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                          1-800-669-9492



1    Q.   On the same day?

2    A.   That they asked me?  No, it took a couple

3 weeks to schedule it on their part.  They had court

4 and stuff.

5    Q.   And in order to prove that the tablets had

6 been compromised by these government witnesses, this

7 witness actually sent you an email from his tablet,

8 right?

9    A.   Yeah.  I didn't believe him, so I asked

10 him to send me an email.

11    Q.   Okay.  So on that same day, on April 17,

12 2017, you got an email that was sent from one of

13 these tablets, right?

14    A.   Yes.  I got two emails.

15    Q.   So the next day you got another email with

16 a picture of one of the government witnesses inside

17 his cell, right?

18    A.   I think it was the same day.  It was just

19 like at three or four in the morning, yes.

20    Q.   Was that Jerry Montoya?

21    A.   No, I think it was Armenta.

22    Q.   It was Jerry Armenta?

23    A.   Yes.

24    Q.   So Jerry Armenta told you, "Hey, look, I

25 took a picture of myself with my tablet, and I can



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  send it to you," right?

2       A.   No.  Benjamin Clark sent me an email.  I

3  didn't ask Armenta for anything.  I just woke up and

4  had an email from the guy with a selfie.  So, yeah,

5  I deduced that he would do it, too.

6       Q.   Okay.  And so having learned that last

7  April, what, if anything, did you do?

8       A.   I notified the U.S. Attorney's Office.

9  The Sandoval County Detention Center wanted to give

10 me the tablets.  But I didn't think I could take

11 them because they belonged to defendants, and there

12 was attorney-client protection.  So I didn't take

13 them.  I consulted with the U.S. Attorney's Office

14 about it.

15          I started preparing search warrants for

16 the tablets.  But then the decision was made that we

17 should bring it up to Judge Browning and have the

18 Court make a determination.  And there were some

19 pretrial hearings about that.

20      Q.   That's right.  And in the course of those

21 pretrial hearings, defense counsel actually asked

22 that these tablets be looked at, right, to see what

23 it meant that they'd been compromised; isn't that

24 right?

25          A.   Yes, but not by the FBI.  By the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Department of Corrections.

2         Q.   Well, the FBI, in fact, never looked at

3    these tablets, right?

4         A.   The FBI wasn't allowed to look at these

5    tablets.  It requires a court order.

6         Q.   Well -- and there was a court order that

7    the tablets ultimately be sent to an expert, to look

8    at them, because the FBI hadn't looked at them;

9    isn't that right?

10        A.   That is not right, no.  The Court ordered

11   that they could be looked at.  I visited with

12   defense attorneys, and I said the FBI can do it or

13   their expert can do it.  They requested that their

14   expert do it, and I turned them over to the expert.

15        Q.   Well, do you recall the representation by

16   the prosecutors in this case that the FBI didn't

17   have enough time, and it wasn't a priority to look

18   at these tablets?  Do you remember that?

19        A.   What I represented to the prosecutors

20   was --

21        Q.   I'm just asking -- you've sat through

22   court as the case agent in this case, right -- and

23   I'll let you finish, Agent Acee -- but I want to

24   know first, do you remember the prosecutors in this

25   case representing to this Court that the FBI didn't

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    have time to look at these tablets, and there were

 2    just too many other resource needs, and they weren't

 3    going to look at them?

 4         A.    No.

 5         Q.    You don't remember that?

 6         A.    Not the way you're saying it, no.

 7         Q.    It's your testimony that the FBI couldn't

 8    look at them?

 9         A.    Not without legal process, no.  The RCFL

10    won't accept them without a warrant or a court

11    order.

12         Q.    Okay.  And so the FBI never did look at

13    them?

14         A.    No.  The decision was made to send them to

15    the defense expert, who could get them done much

16    quicker.

17         Q.    Okay.  Much faster than the Federal Bureau

18    of Investigation.

19               So having learned on April 17, 2017, that

20    government witnesses in this case were accessing the

21    internet at the Walmart in Sandoval County and

22    getting on Facebook, right --

23         A.    That's what he said, yes.

24         Q.    -- and trying to communicate with people

25    outside of the prison?
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                                            Albuquerque, NM 87102
(505) 989-4949                                                                       (505) 843-9494
FAX (505) 843-9492                                                               FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      A.   I learned that today.

2      Q.   Well, they communicated with you, right?

3      A.   Yes.

4      Q.   And you learned through the course of this

5  trial about all the searches for porn and child

6  porn, right?

7      A.   I don't believe there has been any

8  searches for child porn.  There has been searches of

9  porn.

10      Q.   Teen porn.  Excuse me.

11      A.   There is a significant difference between

12  the two.

13      Q.   Okay.  You don't classify teen porn as

14  child porn?

15      A.   I don't make the classifications.  But

16  child porn is illegal to possess, to distribute.

17  Pornography is not.  There is a significant

18  difference between the two.

19      Q.   I'll recharacterize that.  You learned

20  about the teen porn during the course of this trial?

21      A.   Yes.

22      Q.   And you also recall that as a result of

23  Mr. Myers' filing, all of the defendants in this

24  room had their tablets checked, and it was learned

25  that they were not compromised.  Do you remember



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                  (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492
                                                            1-800-669-9492
                                          BEAN & ASSOCIATES, Inc.
                                          PROFESSIONAL COURT
                                          REPORTING SERVICE
                                          e-mail: info@litsupport.com

 1  that?

 2      A.   The four gentlemen in here's tablets were

 3  not compromised.

 4      Q.   That's right.

 5          All right.  So getting back to Billy

 6  Cordova, you recall his testimony under oath, on

 7  December 15, 2017 -- and we've already talked about

 8  this -- that the SNM was going to move on Rudy Perez

 9  in February 2016, right?  You told me that you

10  remember that testimony?

11      A.   I remember that there was a rumor, yeah.

12  I don't know that it was that they were going to

13  move on him, but there were concerns about it.

14      Q.   You remember his testimony that he thought

15  the SNM was going to move on him, right?

16      A.   Rudy's testimony, or --

17      Q.   Billy Cordova's testimony.

18      A.   I don't remember.

19      Q.   You don't remember that?

20          MR. CASTELLANO:  At this point, I'm going

21  to object about referring to other testimony in the

22  case.  If she has specific questions, I recommend

23  she do that.  But not referring to other people's

24  testimony throughout this testimony.

25          THE COURT:  Well, she can ask him if he

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                          1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                              e-mail: info@litsupport.com

1  remembers.  If he says "No," then he'll have to say

2  "No."  If he does remember, then she can build some

3  question off of it.  So I'm not going to make a

4  blanket ruling that she can't refer to other

5  testimony, because at times that's been helpful; and

6  other times we're not getting anywhere.  But I can't

7  make a blanket decision on that.

8       Q.   And, Agent Acee, you'll remember quite

9  clearly that two days after that testimony, Billy

10  Cordova had a phone interview with you which was

11  memorialized in another 302, right?

12       A.   I remember doing a phone interview with

13  Mr. Cordova in his attorney's office.

14       Q.   And he testified about that last week,

15  too, right?

16       A.   Yes.

17       Q.   So this is two days after his testimony

18  that the SNM was going to move on Rudy Perez, and he

19  talks to you on December 15, 2017, over the phone,

20  right?

21       A.   I talked to him over the phone on that

22  date.

23       Q.   And he never said, during the course of

24  that phone interview, that his testimony was

25  inaccurate with respect to the SNM moving on Rudy

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492
                                                             1-800-669-9492
                                                 e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1   Perez, right?

2        A.   I don't recall him telling me anything

3   about inaccurate testimony.

4        Q.   Right.  He did, however, tell you

5   something about the SNM suspecting that Rudy Perez

6   had talked to the STIU, right?

7        A.   I'd need to look at my report.

8        Q.   He actually added to his testimony and

9   gave some more information on that.

10            MS. FOX-YOUNG:  Your Honor, may I

11   approach?

12            THE COURT:  You may.

13       Q.   Agent Acee, I'm showing you your report

14   from that day, December 15, 2017.  Do you see the

15   area I've marked?

16       A.   The highlighted portion, or the blue?

17       Q.   The highlighted portion.  Does this

18   refresh your memory about that interview?

19       A.   Yes.

20       Q.   And that was the interview where Billy

21   Cordova didn't tell you, "No, I was wrong.  I didn't

22   really mean it when I said the SNM was going to move

23   on Rudy Perez"?  He didn't say that.  He said

24   something about the SNM suspecting that Rudy Perez

25   had talked to the STIU, didn't he?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    He explained why he thought that, yes.

2      Q.    Then last Friday, when Billy Cordova was

3  on the stand, he tried to say something a little bit

4  different, didn't he?  Do you remember that?

5      A.    I do not.

6      Q.    Were you in here for Billy Cordova's

7  testimony?

8      A.    I was seated right there, yes.

9      Q.    You don't remember him trying to back off

10  those statements?

11      A.    I don't.

12      Q.    Okay.  At any point in the course of your

13  investigation, have you investigated why Rudy Perez

14  was transferred to PNM in Santa Fe?

15      A.    I haven't investigated that.  I'm aware of

16  why he was transferred.

17      Q.    Have you looked into the reasons?

18      A.    No.

19      Q.    Okay.  That hasn't been a part of your

20  investigation?

21      A.    If I understand you correctly, you're

22  asking me if I investigated why Rudy was moved from

23  one corrections facility to another?

24      Q.    Have you looked into that?

25      A.    No.



SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                          1-800-669-9492
                                                              e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   No.  Have you looked into why Rudy Perez

2  was not transferred back to the Southern New Mexico

3  Correctional Facility in the fall of 2015 or the

4  spring of 2016?

5    A.   No.

6    Q.   Okay.  Do you know if anybody else has

7  looked into that?

8    A.   Not from the standpoint of the FBI

9  investigating a crime, no.

10   Q.   Well, let me put this way:  Rudy Perez'

11 location has been something of a focus for you in

12 this case, right?  I mean, you cared about where

13 Rudy Perez was at PNM, because you made a request

14 that Billy Cordova be placed next to him.

15   A.   I've never cared where Rudy Perez is.  I

16 just wanted an informant next to him with a

17 recorder.  Doesn't matter to me.

18   Q.   It's your testimony that you never looked

19 into why Rudy Perez was not transferred to the

20 Southern New Mexico Correctional Facility?

21       MR. CASTELLANO:  Objection; asked and

22 answered.

23       THE COURT:  Overruled.

24   A.   No, I don't care where Rudy Perez is

25 housed.  It doesn't matter to me.  The objective is

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to get the recordings.

2       Q.   So you don't know why he wasn't moved to

3   the Southern New Mexico Correctional Facility?

4       A.   That's a different question.  I know why

5   he was moved to PNM.

6       Q.   I'm asking if you know why he wasn't moved

7   to the Southern New Mexico Correctional Facility in

8   the fall of 2015?

9       A.   No, I have no idea.

10      Q.   Since Rudy Perez was charged in this case,

11  have the prosecutors asked you to look into why Rudy

12  Perez was not moved to the Southern New Mexico

13  Correctional Facility in the fall of 2015?

14      A.   No.  Not in the way you're phrasing it,

15  no.

16      Q.   In any way?

17      A.   Yes.  There has been some conversation as

18  to why he was moved to the Level 6.  But I've never

19  been asked, nor have I heard anyone discuss why he

20  wasn't moved to Southern.  I don't understand that.

21      Q.   I just want to be clear, because I know

22  there has been a lot of movement.  After he went to

23  Level 6, since that time, have you ever looked into

24  why he was not moved back to the facility in Las

25  Cruces?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       A.    No.

 2       Q.    Nobody has asked you to do that?

 3       A.    No.

 4       Q.    And you don't know if any other FBI

 5  personnel have done that?

 6       A.    No.  Normally, when there is a request

 7  from the prosecutors, it comes to me, and I either

 8  do it or I assign it to someone else.  And I don't

 9  recall assigning anything like that to anyone, nor

10  do I recall doing it.

11       Q.    Okay.  I asked because you're the case

12  agent, and you know what all the FBI personnel are

13  doing in the Main, with regard to this case, right?

14       A.    I try to.  Not always.

15            MS. FOX-YOUNG:  Your Honor, may I approach

16  the witness?

17            THE COURT:  You may.

18            MS. FOX-YOUNG:  Your Honor, I'm marking

19  what I'm going to call Defendants' Exhibit FW.  And

20  I'm going to show it to the witness.

21            MR. CASTELLANO:  May I see the exhibit,

22  please?

23  BY MS. FOX-YOUNG:

24       Q.    Agent Acee, I'm showing you Defendants'

25  Exhibit FW.  I'll represent to you that this is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  information that was contained in a filing made by

2  the prosecutors in this case.  Have you seen this

3  language before?

4      A.   I've seen the first half of it.  I'm aware

5  of the first half of it.  I haven't seen the

6  language.  I don't know that I saw the filing, but

7  I'm aware of this information about disciplinary.

8      Q.   And you're aware that this information was

9  contained in a filing that the prosecutors made in

10  this case?

11     A.   No.

12          MS. FOX-YOUNG:  Your Honor, I'd like to

13  move Defendants' Exhibit FW.  This is an admission

14  by the United States.

15          THE COURT:  Any objection, Mr. Castellano?

16          MR. CASTELLANO:  Yes, Your Honor.  May we

17  approach?

18          THE COURT:  All right.

19          (The following proceedings were held at the

20  bench.)

21          MS. FOX-YOUNG:  Your Honor, this is a

22  direct quote, but for the fact that "Defendant" has

23  been replaced with the words "Rudy Perez."  This is

24  from the Government's response to our motion to

25  suppress, in which the Government argued that Rudy

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Perez was not transferred to the Southern New Mexico

2    Correctional Facility for reasons of his own safety.

3            I would cite to the Court the Ganadonegro

4    opinion, in which this Court held that a statement

5    made by the prosecution -- and I can pull the case

6    if the Court would like to see it -- a statement

7    made by the prosecution in closing argument was an

8    admission that could be used in the next trial.  And

9    a number of circuits have held that while statements

10   by case agents are not necessarily statements by a

11   party opponent, statements by Government lawyers

12   certainly are.

13           This is a direct quote from their pleading

14   filed in December of last year, I believe, or

15   November.

16           THE COURT:  If you want to do that, I

17   think you've got to get the document.  And we can

18   redact it and mark it up, and then I can admit it.

19   But I don't think you enter admission by the

20   Government and change the quote, is the right way to

21   do it.

22           MS. FOX-YOUNG:  Can we use Exhibit FW as a

23   placeholder?  I have the document, and I can redact

24   it at the --

25           THE COURT:  I want to see it before you

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                              1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   do.
 2             MR. CASTELLANO:  There is a rule of
 3   completeness.  And that may then cause us to file
 4   their motion as part of pleadings in this court as
 5   an admission by party opponent to --
 6             THE COURT:  I'll take a look at what
 7   you've got.  I probably will let you admit something
 8   if it's an accurate statement.  You can put in a
 9   document that says that.  But I'm not going to let
10   you create a document and say, "Well, this is what
11   they admitted," because that's not quite what
12   they've said.
13             MS. FOX-YOUNG:  We can prepare a redacted
14   document for the Court to look at.
15             MR. VILLA:  Just for clarification, I
16   don't know how long the response was.
17             MS. FOX-YOUNG:  Seven pages.
18             MR. VILLA:  You want us to redact
19   everything?
20             THE COURT:  I think you probably need to
21   show it to the Government, and let's see how much
22   the Government wants in and how much -- if they
23   don't want anything in, probably I need a page.  If
24   they're going to want more, I'm going to have to
25   list it out and see what you can work out.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1             MR. CASTELLANO:  Another issue, Your

2    Honor, is one of the bad acts noticed up was a bad

3    act by Rudy Perez, I think in 2000 -- I forget the

4    year, I'll bring it to the bench -- which would be a

5    further reason why he was also disciplined and

6    remained possibly in segregation.  So I think it's

7    also going to bring in a bad act with it.  I can

8    bring the bad act to the bench if we need to discuss

9    it later.

10            THE COURT:  All right.

11            (The following proceedings were held in

12   open court.)

13            THE COURT:  All right.  Ms. Fox-Young.

14            MS. FOX-YOUNG:  Thank you, Your Honor.

15   BY MS. FOX-YOUNG:

16       Q.   All right.  Agent Acee, we've talked about

17   several of the government witnesses in this case,

18   and specifically Mario Rodriguez.  Mario Rodriguez

19   told you, in the context of your meeting with Ron

20   Sanchez and other personnel, that becoming a

21   government witness and going into the fed was the

22   best option for him.  You talked about that earlier,

23   right?

24       A.   For him or for Ronald.  I'm not sure which

25   he was referring to.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Well, Mario Rodriguez described it as the

2  best option, right?

3      A.   In his opinion, yes.

4      Q.   And you also heard Billy Cordova testify

5  that it was the best option for him, did you not?

6      A.   He did say things like that, yes.

7      Q.   And you've also testified just a few

8  minutes ago that, although these witnesses can say

9  that they've dropped out of the gang, and they've

10 abandoned criminal conduct, there is nothing that

11 you or the FBI can do to stop them from continuing

12 to commit criminal conduct, right?

13     A.   No.

14     Q.   And, in fact, a number of these government

15 witnesses have continued for months and months and

16 months while the Government has been paying them to

17 commit criminal conduct, right?

18     A.   No.

19     Q.   Shall we reflect on Tim Martinez'

20 continuing drug dealing?  Do you remember that

21 testimony?

22     A.   Yes.

23     Q.   That was after he became a government

24 witness, right?

25     A.   I think he's been a drug dealer most of

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

203

```
 1  his adult life.
 2       Q.   That wasn't my question.  Was he dealing
 3  drugs after he became a government witness, by his
 4  own admission?
 5       A.   Yes.
 6       Q.   And that was in Sandoval County?
 7       A.   Yes.
 8       Q.   And Mr. Billy Cordova has continued to use
 9  drugs, as we learned when he was on the stand, since
10  he became a government witness, right?
11       A.   He has.
12       Q.   And Jerry Montoya had sexual relations
13  with a correctional officer, right?
14       A.   Yes.
15       Q.   That's also criminal conduct, right?  It
16  was his response that it was criminal conduct.  I'm
17  not asking you to opine on the law.
18       A.   I didn't know that was a question.  I'm
19  sorry.
20       Q.   Was it criminal conduct when Jerry Montoya
21  had sexual relations with a correctional officer?
22       A.   I can't think of what law that might have
23  been a violation of, but he shouldn't have been
24  doing it.
25       Q.   You know that it is a violation for a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   correctional officer to have sex with an inmate,
 2   right?
 3        A.   I'm not that familiar with PREA, but
 4   that's the only one I can think of that it might
 5   fall under.
 6        Q.   And it was criminal conduct when Jerry
 7   Montoya used that same correctional officer to bring
 8   in contraband, including drugs for him, right?
 9        A.   That is a violation of the law.
10        Q.   And, if in fact Mr. Jerry Armenta accessed
11   teen porn, that's a criminal violation, too, right?
12        A.   Depends on the age of the child.  I mean,
13   18 and 19 is not.
14        Q.   Oh, okay.  So if some of the individuals
15   pictured in the porn were 17, it would be a criminal
16   violation, correct?
17             MR. CASTELLANO:  Your Honor, that
18   misstates the law.
19             THE COURT:  Well, if he knows, he can
20   answer.  If he doesn't know, he can just say he
21   doesn't know.
22        A.   I'm not certain of that.
23        Q.   So we just asked a few of the government
24   witnesses.  But you're aware that there has been a
25   pattern of ongoing criminal activity by these
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   witnesses working for the Government since the FBI

2   opened them as informants, right?

3       A.   I am now, yes.

4       Q.   When did you start to become aware?

5       A.   Which informant do you want to talk about?

6       Q.   Well, when did you become aware of the

7   pattern of criminal activity of these government

8   witnesses?

9       A.   These guys have never stopped committing

10  crimes or doing bad things.

11      Q.   Okay.  All right.  Now, some of the

12  government witnesses only have a short time

13  remaining on their state sentences, right?

14      A.   Yes.  And some have completed their state

15  sentences.

16      Q.   And we heard about that from Jerry

17  Montoya, right?

18      A.   Yes.

19      Q.   And we heard Jerry Montoya talking to

20  family members about the prospect that he might just

21  get time served in this case, right?  Do you

22  remember Jerry Montoya's testimony and the phone

23  calls in which he told his family the Government

24  was -- that the prosecutors were going to come in

25  and ask for time served?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

206

```
 1        A.    No, I don't remember it like that.  He
 2   talked about that, but I don't know that that's what
 3   he said.
 4        Q.    Do you remember that that's what he told
 5   his family on the phone?
 6        A.    Like I said, he said something about that,
 7   but I don't know that he said the prosecutors
 8   represented that.
 9        Q.    He said the Government was going to come
10   and ask for time served, didn't he?
11        A.    Again, he talked about that.  I just don't
12   know that that's exactly what he said.
13        Q.    And he's not the only one for whom you
14   heard these calls.  These men, one after another,
15   told their families about the promises that you and
16   the prosecutors have made to them, right?
17        A.    No, that's not true.
18        Q.    You didn't hear other calls like that?
19        A.    I heard other telephone calls where these
20   guys represented something as fact that was not.
21        Q.    Well, that's my question, if you remember
22   hearing those calls where they told their friends
23   and family about these promises?
24        A.    They represented to their family that
25   certain things were going to happen that weren't
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  discussed by us.

2       Q.   I'm just asking if you remember hearing

3  those calls in this court, in this trial.

4       A.   You're asking me, and you'll ask two

5  questions in one.  So part of that is "Yes," and

6  part of it is "No."  I remember that there were

7  phone calls.  You also said that the Government

8  promised things.  And we didn't.  And I didn't hear

9  them say that the Government promised anything.

10       Q.   You didn't hear Jerry Montoya say that the

11  Government was going to come in and ask for time

12  served, and so were his lawyers?

13       A.   He said something along those lines.

14       Q.   Okay.  And you didn't hear Lupe Urquizo

15  say that the more people he brought to the table,

16  the more time would be taken off his sentence?

17       A.   I don't remember that.

18       Q.   In any event, you would agree with me that

19  the government witnesses who got on board and began

20  cooperating early on sort of had the ability to

21  write their own tickets in this case, right?

22       A.   Absolutely not.

23       Q.   Nobody could write their own ticket?

24       A.   Defendants don't write their own ticket,

25  no.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

 1     Q.   So defendants in this case didn't have the
 2   option to decide whether they want to be charged
 3   federally or not?
 4     A.   I can think of two that did.
 5     Q.   Oh, you can.  Who are those?
 6     A.   Frederico Munoz and Lupe Urquizo.
 7     Q.   Okay.  I thought you just said that they
 8   didn't get to write their own ticket?
 9     A.   They don't.  What does that mean, to write
10   your own ticket?
11     Q.   All right.  Well, do they get to write
12   their own indictments?
13     A.   No.
14     Q.   Do they get to decide what charges were
15   going to be brought against them?
16     A.   Not exclusively, no.  They -- those two
17   specifically that I mentioned helped me determine
18   what overt acts to charge them with, which ones they
19   would admit to.
20     Q.   Do you remember in the context of that
21   meeting that you had, the one that was recorded with
22   Mario Rodriguez and Ron Sanchez, discussing this
23   very issue?
24     A.   Yes.
25     Q.   And do you remember that you actually

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  said, "I think the easiest charge would be a

2  racketeering conspiracy, where it was -- there was

3  some agreement with the Government that it would be

4  capped at whatever time you owed the state."

5          Do you remember saying that?

6      A.   Yes.

7      Q.   And then do you remember saying, "So it's

8  not like you -- I'll tell you who did that.  Playboy

9  did it.  He can tell you all about it."

10         Do you remember that?

11     A.   Yes.  Playboy is Frederico Munoz.

12     Q.   Playboy is Frederico Munoz.  And then do

13  you remember Mario Rodriguez saying, "Right, he

14  wrote his own, his own" --

15         Do you remember that?

16     A.   Yes.

17     Q.   And then your immediate response, "He

18  wrote it.  Yeah, pretty much."

19         Do you remember that?

20     A.   I do.

21     Q.   And then do you remember going on to

22  discuss Lupe Urquizo, and that Mario Rodriguez

23  agreeing that Lupe Urquizo had implicated himself

24  just so he could do his time in the feds?  Do you

25  remember that?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

210

```
 1        A.    Yes.

 2        Q.    So when you talked about Playboy,

 3   Frederico Munoz, "writing his own -- yeah, pretty

 4   much writing it," what was he writing for himself,

 5   if it wasn't the charges?

 6        A.    Well, to be clear, Frederico Munoz doesn't

 7   write any legal documents.  When I'm sitting talking

 8   with SNM Gang members, versus testifying in court,

 9   my language is sometimes very different.

10             So what I was telling Ronald is that

11   Frederico wrote his own indictment, meaning he sat

12   down with the FBI and he confessed all of his

13   crimes, to be used as overt acts.

14             So my representation to gang members was

15   that this guy rose his hand.  And Frederico did.  I

16   mean, he wanted to be charged in the feds.  He

17   wanted out of the state.  That is true.  But he

18   didn't write his own indictment.

19        Q.    Okay.  But he got to make the decision

20   about how he was going to be charged in the feds,

21   right?

22        A.    Did you say he got to?

23        Q.    Yes.

24        A.    He wanted to be charged in the feds, and

25   he participated with his attorney in what overt acts
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    we used.

2        Q.   And that's what you meant when you said,

3    "He wrote it, yeah, pretty much," right?

4        A.   Yes.

5        Q.   Okay.  And with respect to Lupe Urquizo,

6    you and Mario Rodriguez agreed he pretty much did

7    the same, because he wanted to serve time in the

8    feds, right?

9        A.   Yes.

10       Q.   And the reason that he wanted to serve

11   time in the feds was the same reason Mario Rodriguez

12   wanted to, right?  He wanted to be in Tucson or

13   Florida, he wanted contact visits, and he wanted to

14   do easy time, right?

15       A.   Well, there's a lot of questions there.  I

16   don't know -- their interpretation is it's easy

17   time.  I don't know if they get contact visits.  And

18   the defendants certainly don't pick what prison they

19   go to.

20       Q.   Do you remember during Billy Cordova's

21   testimony, he talked about conversations with you

22   about where he would make the decision whether he

23   was going to be in the state or the fed?  Do you

24   remember that?

25       A.   No.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1      Q.   You don't remember him saying that, yes,

 2 he was going to meet with you, and it would be

 3 his -- he had to decide whether he wanted to go to

 4 the state or the fed?

 5      A.   You're saying he testified to that?

 6      Q.   Do you remember his testimony?

 7      A.   I don't remember that discussed.

 8      Q.   Well, he did.  He testified that --

 9           MR. CASTELLANO:  Your Honor, she's

10 testifying.

11           THE COURT:  Ms. Fox-Young, hold on.

12           MS. FOX-YOUNG:  Your Honor -- oh, I'm

13 sorry.

14           THE COURT:  You can't do that.  You're not

15 testifying.

16           MS. FOX-YOUNG:  I understand.  I was just

17 going to say, I'll move on, Judge.

18           THE COURT:  All right.

19 BY MS. FOX-YOUNG:

20      Q.   Agent Acee, do you recall questioning

21 about whether Mr. Cordova talked on the phone about

22 meeting with you and telling you whether he was

23 going to be going to the state or the fed?

24      A.   I'm confused by your question.  Could you

25 say the first part again?
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1        Q.   Sure.  You recall Billy Cordova testifying

2   last week?

3        A.   Yes.

4        Q.   And you recall him being asked about

5   conversations he had on the phone about his charges?

6        A.   Yes.

7        Q.   And he was also asked, was he not, about

8   conversations that he had about meeting with you

9   about those charges, right?

10       A.   Yes.  Attorneys asked him questions about

11  that.

12       Q.   And he was also asked whether ultimately

13  it was going to be his decision whether he would go

14  to the state or the fed, and he was going to tell

15  you that, right?

16       A.    I believe part of that is true, but I

17  don't remember that line of questioning.

18       Q.   Okay.  With respect to all these

19  government witnesses, a lot of promises and benefits

20  have been afforded; would you agree with me?

21       A.   No.

22       Q.   Well, let's go through them.  Tens of

23  thousands of dollars have been paid to these

24  government witnesses; isn't that right?  Eric Duran

25  alone received over $40,000, right?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                       201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                           (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492



1-800-669-9492
PROFESSIONAL COURT
REPORTING SERVICE
e-mail: info@litsupport.com

```
 1        A.    46, yes.

 2        Q.    Do you know the sum total of monies that

 3   have been paid collectively to all the government

 4   witnesses in this case?

 5        A.    I could estimate.  I don't know the exact

 6   amount.

 7        Q.    Is it accurate to say that it's tens of

 8   thousands of dollars?

 9        A.    It's more accurate to say it's around,

10   probably, 70,000, 75,000.

11        Q.    Do you know if the government witnesses

12   have been issued 1099s in this case?

13        A.    We don't do that.

14        Q.    You don't issue 1099s?

15        A.    The FBI does not.

16        Q.    You don't know if they're going to pay

17   taxes on that money?

18        A.    They're advised that they're responsible

19   to, but the FBI doesn't give informants 1099s.

20        Q.    You've testified some about lump sum

21   benefits, right?

22        A.    I've answered some questions about it.

23   The Department of Corrections lump sum?  Because the

24   FBI has a lump sum, and they mean different things.

25        Q.    Well, Agent Acee, I just want to ask you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1 about lump sum benefits in this case.

2      A.   I just want to answer honestly.  I need to

3 know which one we're talking about.

4      Q.   So I don't know whether -- why don't you

5 tell me, would you characterize the lump sum

6 benefits that have already been given in this case

7 as Department of Corrections lump sum benefits?

8      A.   During the course of this investigation, I

9 learned that the Department of Corrections has a

10 lump sum award.  I understand it to be for

11 lifesaving.  And that Eric Duran received two of

12 those.  The Department of Corrections felt that he

13 earned them for saving the lives of Gregg Marcantel

14 and Dwayne Santistevan.

15      Q.   Agent Acee, would you just answer my

16 question?  Are they Department of Corrections lump

17 sum or FBI lump sum benefits?

18      A.   What I just explained was the Department

19 of Corrections lump sum.  The FBI has a lump sum,

20 which means something entirely different.

21      Q.   Okay.  Have you afforded any FBI lump sum

22 benefits in this case, or has the FBI afforded any

23 of those benefits in this case?

24      A.   Yes.  But not to any of the individuals

25 we've talked about.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1       Q.   Who has received an FBI lump sum benefit
2  in this case?
3       A.   Off the top of my head, I can think of
4  one, but I'm hesitant to give the name.  I'd need to
5  consult with the U.S. Attorney's Office before I do
6  that, because the Department of Justice has some
7  rules on that.
8            MR. CASTELLANO:  I would object, Your
9  Honor.  If it's a dollar amount, that's one thing.
10 But to protect the person's identity, I would ask
11 that he not have to answer that.
12           MS. FOX-YOUNG:  Your Honor, I think if the
13 Court wants to consider it at the bench --
14           THE COURT:  Let me hear what's going on.
15 I'm not quite sure.
16           MS. FOX-YOUNG:  We can do a voir dire at
17 the bench.
18           THE COURT:  Well, just come up and explain
19 to me what the issue is first.
20           (The following proceedings here held at the
21 bench.)
22           THE COURT:  What were you expecting the
23 answer to be?
24           MS. FOX-YOUNG:  I just want to go through
25 all the benefits that have been afforded the
```

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   witness.
 2           THE COURT:  No, you asked the question
 3   here:  Who has received an FBI lump sum in this
 4   case?
 5           MS. FOX-YOUNG:  I didn't know there had
 6   been any.  And the witness brought it up.  I want to
 7   know who received one.  I think if it's one of the
 8   witnesses testifying in this case --
 9           THE COURT:  Mr. Acee, come here.
10           MR. BECK:  Your Honor --
11           MR. CASTELLANO:  The real-time is playing
12   on the tables.
13           MR. BECK:  -- the real-time is playing on
14   all the tables.  We're worried about if a name is
15   said at this point.  That's the concern.
16           MR. VILLA:  Only for the jury.
17           MS. FOX-YOUNG:  Maybe we shouldn't do it
18   in front of the jury.  I don't want the jury to see.
19   We're worried about the jury seeing the defendants'
20   real-time. I don't think it's appropriate.
21           THE COURT:  Turn off the mute button.
22           (The following proceedings were held in
23   open court.)
24           THE COURT:  All right.  Ladies and
25   gentlemen, let me meet with counsel and the parties
```

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                             Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                                FAX (505) 843-9492
                                                    1-800-669-9492
                                            e-mail: info@litsupport.com



```
 1  here in a minute.  All right.  We'll be in recess
 2  for a few minutes.
 3              All rise.
 4              (The jury left the courtroom.)
 5              THE COURT:  All right.  Everyone be
 6  seated.  How does this solve the other problem?  It
 7  doesn't.  We solved one problem.  How do we solve
 8  the other?
 9              MR. VILLA:  We can close the real-time
10  now.
11              THE COURT:  Are you able to shut down
12  real-time without a great deal of effort?  Are you
13  able to?
14              MS. JACKS:  We closed ours, but now it's
15  broken.
16              THE COURT:  All right.  Well, put a paper
17  in front of it.
18              MS. JACKS:  We all closed them.  That's
19  what we were told to do.
20              THE COURT:  Are y'all satisfied now?
21              THE COURT REPORTER:  I can't hear you.
22              THE COURT:  Well, I'm going to mute the
23  button up here at the front.
24              (The following proceedings were held at the
25  bench.)
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. CASTELLANO:  We also have a reporter
 2   in here.
 3            I think what he's going to tell the Court
 4   is that he's not certain he can answer that question
 5   as to this lump sum afforded without breaking FBI
 6   rules.
 7            THE COURT:  Well, advise me whether he's
 8   breaking the FBI rules.
 9            MR. CASTELLANO:  He knows.  We don't know.
10            THE COURT:  All right.  Here's the
11   question that's on the table, Mr. Acee:  Who has
12   received an FBI lump sum benefit in this case?  So
13   you must have said something earlier that indicated
14   the question before is "Yes."  But not any
15   individual that we talked about.  So let me ask
16   this -- and maybe we can cut through this.
17            Have you -- has there been anybody that's
18   been a witness in this case, anybody that's been an
19   accomplice in this case, that received a lump sum
20   benefit?
21            THE WITNESS:  I can think of one.  That's
22   the one witness that is on the witness list that
23   wasn't called.
24            THE COURT:  Wasn't called?  The
25   defendants' list or the Government's?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE WITNESS:  The Government's.

2              THE COURT:  And you didn't call them?

3              THE WITNESS:  Didn't call them.

4              THE COURT:  With that, do you need

5    anything further?

6              MS. FOX-YOUNG:  I think, if he implicates

7    the defendants in this room, I'm comfortable with

8    the Court hearing it in camera.

9              THE COURT:  I guess I'm wondering what

10   benefit is a name?  Has that person been, to your

11   knowledge, even identified in this courtroom by

12   anybody's testimony?

13             THE WITNESS:  No.

14             THE COURT:  Do you recall the name coming

15   up or anything in front of the jury?

16             THE WITNESS:  No.

17             MS. FOX-YOUNG:  Well, Your Honor, I could

18   proceed with questioning without the name, and then

19   I think --

20             THE COURT:  Because it sounds like --

21             MS. FOX-YOUNG:  We're entitled to know if

22   he's on the Government's witness list.

23             THE COURT:  I think he said he is.

24             MS. FOX-YOUNG:  I think we're entitled to

25   know the answer to the question as to what the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   federal lump sum --

 2              THE COURT:  The answer is "Yes."

 3              MS. FOX-YOUNG:  -- and who received it.

 4              THE COURT:  You're asking a bunch of new

 5   questions now.

 6              MS. FOX-YOUNG:  No, the question on the

 7   table --

 8              THE COURT:  Well, the question was who has

 9   received.  So now you're asking for the identity of

10   this one witness.

11              MS. FOX-YOUNG:  Who has received an FBI

12   lump sum benefit in this case.  That's the question.

13   Who received one.

14              THE WITNESS:  I can't remember all the

15   names.  I think there have been three.  And I was

16   trying to define what a lump sum is.

17              THE COURT:  Let's do this:  You go back

18   and talk to your FBI people, see if you can disclose

19   these three names, and let's deal with this down the

20   road.

21              MR. BECK:  Sounds like one way to get

22   through it, just have people involved in the

23   investigation, the SNM, receive lump sum.

24              THE COURT:  How do you know?  And then we

25   move on.  I don't think the names are important.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    And if you say they're connected with this FBI

2    investigation --

3              MS. FOX-YOUNG:  Well, Your Honor --

4              THE COURT:  Well, that's not their

5    question.  She wants the answer.  So Mr. Acee can

6    find out the answer.  And if he can give it, he'll

7    give it, and we'll move on.  If he can't give it,

8    then I'll figure out what to do.

9              All right.  Let's tell the jury we're

10   going to take our afternoon break at this time, and

11   we'll be in recess until 4:00.

12             (The Court stood in recess.)

13             THE COURT:  All right.  Let's go on the

14   record.  I'd ask the Government's attorneys to be

15   involved with these discussions that Mr. Acee is

16   going to have.  Don't just leave Mr. Acee out there,

17   trying to figure out a legal issue.  So I need the

18   Government to get involved in that discussion and

19   see if this can be released; and if not, tell me why

20   not, and try to be lawyers in this thing, and argue

21   it, either agree that it can be disclosed or not.

22   But don't just leave Mr. Acee out there, having to

23   deal with legal counsel and trying to interpret it

24   here.  So I'll ask the Government to get involved in

25   those discussions.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                           Albuquerque, NM 87102
(505) 989-4949                                        (505) 843-9494
FAX (505) 843-9492                               FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1          MS. FOX-YOUNG:  Your Honor, I've talked

 2   with Mr. Beck, and I think I can move on.  I think

 3   there was some confusion as to what the benefit was,

 4   and who the three individuals are who we're talking

 5   about.  But I think I understand now from Mr. Beck,

 6   and I don't intend to elicit any more on this line

 7   of questions.

 8          THE COURT:  Okay.  So Mr. Acee doesn't

 9   need to do anything?

10          MS. FOX-YOUNG:  I think we can just leave

11   it, Your Honor.  I'll move on to the next question.

12          THE COURT:  All right.

13          Let me -- Ms. Duncan, on your transcript

14   that you sent to Ms. Standridge, I don't think a

15   limiting instruction on that testimony is necessary.

16   Because Mr. Cordova's testimony that Baby G and Mr.

17   Baca are close isn't hearsay, and doesn't suggest

18   that the Perez' statements should be used against

19   Baca.  So I'm not going to do anything further on

20   that one.

21          I'll still wait for yours, Ms. Jacks,

22   because yours is the one that I think concerned me a

23   little bit more.

24          MS. JACKS:  I'm sorry.  I didn't have time

25   at lunch because I was meeting with witnesses, but

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

1    I'll get it tonight.

2              THE COURT:  Just get it to me.  But I'm

3    not going to add your limiting instruction on that.

4              Let me see if I can get -- before the jury

5    comes in -- let me repeat something, so what I'm

6    then about to say makes sense.  Establishing that

7    Mr. Baca violated VICAR by conspiring to commit

8    assault resulting in serious bodily injury, in

9    violation of New Mexico law, requires, as I said

10   before we took the break, the United States to

11   prove, one -- and Mr. Baca's conduct constitutes

12   generic conspiracy to commit assault resulting in

13   serious bodily injury; and two, that Mr. Baca's

14   conduct also violated New Mexico law.  That

15   structure, identifying conduct that falls within a

16   generic category, and also violates a state or

17   nonracketeering federal law, features prominently in

18   federal racketeering statutes.

19             So when I have a chance, I'll give you the

20   cases.  But that's the setup for what I'm about to

21   give you.  So next time you hear from me, I'm just

22   going to give you cases instead of talking.  All

23   right.

24             All rise.

25             (The jury entered the courtroom.)



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Everyone be
 2   seated.
 3              All right.  Mr. Acee, I'll remind you that
 4   you're still under oath.  Ms. Fox-Young, if you wish
 5   to continue your direct examination of Mr. Acee, you
 6   may do so at this time.
 7              MS. FOX-YOUNG:  Thank you, Your Honor.
 8   BY MS. FOX-YOUNG:
 9       Q.   Agent Acee, before the break we talked a
10   little bit about benefits that some of the
11   government witnesses in this case have received;
12   isn't that right?
13       A.   Yes.
14       Q.   And you agree with me that a number of
15   witnesses received a huge benefit, in that they were
16   never prosecuted for murders in which they were
17   implicated, right?
18       A.   I can think of one person, yes.
19       Q.   You can think of Billy Cordova right off,
20   right?
21       A.   No.
22       Q.   You don't recall that Billy Cordova was
23   not prosecuted in the RICO case for multiple
24   murders, assaults, and other criminal conduct that
25   you had been compiling?
```



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                                1-800-669-9492
                                                        e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    A.   The evidence didn't suggest he did it, so

2  I can't charge him.

3    Q.   I thought it was clear from your testimony

4  earlier in this case and earlier today that you

5  think Billy Cordova absolutely was implicated in the

6  murder of Sammy Chavez, right?

7    A.   I agreed with you that informants told me

8  that Billy told them.  That doesn't constitute

9  evidence, probable cause for me to charge him on

10  that alone.

11    Q.   Based on Billy Cordova's statements to you

12  and his testimony to this jury, and if this is all

13  he did, that he gave instructions as to how to

14  commit the murder, you think he's implicated on that

15  basis, don't you?

16    A.   I think I can use those as overt acts,

17  yes.

18    Q.   And you were compiling those overt acts?

19    A.   Yes.  That particular overt act I didn't

20  know about until I interviewed him, though.

21    Q.   Okay.  But you elected not to charge him?

22  You elected not to pursue him as a defendant in that

23  RICO case?

24    A.   No, I didn't.  In fact, I pushed to charge

25  him.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   Wasn't it your prior testimony that you

2   instructed Agent Neale to stop compiling overt acts

3   on Billy Cordova?

4     A.   I did.  And then we resumed.  I said that

5   in front of Billy Cordova, but we resumed.

6     Q.   But ultimately, Billy Cordova was not

7   charged, right?

8     A.   He was not.

9     Q.   And isn't that something of a significant

10  benefit?

11    A.   It could be.

12    Q.   Okay.  In addition, the jury has heard,

13  and you have heard, and you have witnessed numerous

14  other benefits that these witnesses received:  The

15  ability to have sex and other contact visits with

16  their families, right?

17    A.   They -- a few of them were able to do

18  that, four of them.

19    Q.   And parties where they could all get

20  together around the holidays, right?

21    A.   The pizza party, yes.

22    Q.   And in Mario Rodriguez' words, the

23  opportunity to serve easy time in the fed, right?

24    A.   Mario has never been in the feds.

25    Q.   But those are his words?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Those were his words.
 2        Q.    And Frederico Munoz and Lupe Urquizo got
 3   to make that choice, right?
 4        A.    They made the choice to get charged in the
 5   feds, yes.
 6        Q.    And Billy Cordova had the same choice,
 7   right, but ultimately was not charged at all?
 8        A.    Yes.
 9        Q.    All right.  Agent Acee, you're aware that
10   a number of these government witnesses were housed
11   together during the course of the investigation of
12   this case, right?
13        A.    Yes.
14        Q.    And you, in fact, yourself sometimes
15   facilitated having them confer with one another,
16   right?  I'll give you an example.  You remember
17   testifying that in August 2017, Lupe Urquizo and
18   David Calbert had the opportunity to confer together
19   about their testimony for the Government?
20        A.    Yes, at the FBI office.
21        Q.    And then after that time, David Calbert
22   magically started telling the same story that --
23        A.    My last answer is not correct.  Because
24   you said to get their stories straight, or to
25   confer.  They conferred, but it wasn't about their
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  stories.

2       Q.   Okay.  You agree that they conferred?

3       A.   I agree that they met in front of me at

4  the FBI office, and they met for 10 minutes with

5  their attorneys.

6       Q.   And you don't know what was said when they

7  met for 10 minutes behind closed doors, right?

8       A.   No.

9       Q.   And then magically, after that time, David

10 Calbert started telling the same story that Lupe

11 Urquizo was telling, right?

12      A.   Their stories are for the most part

13 similar.

14      Q.   And after that time, Lupe Urquizo was

15 tasked with bringing Mario Rodriguez on board, was

16 he not?

17      A.   No.  No, I don't agree with that.

18      Q.   Do you remember Lupe Urquizo's testimony

19 and the call that he made -- we talked about getting

20 five years off if he could get that guy, Blue, to

21 come on board?

22      A.   Yeah, but to say he was tasked, he wasn't

23 by me, because Blue was represented.

24      Q.   Okay.

25      A.   I'm not able to task an informant and send

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

230

```
 1   an informant after someone who has an attorney.

 2        Q.   So these government witnesses, where they

 3   were housed together, they had months and months to

 4   study the electronic materials, the discovery in

 5   this case, right?

 6        A.   Not all the witnesses, cooperating

 7   defendants, had tablets.

 8        Q.   Those who were charged had tablets, right?

 9        A.   For a period of time.  And then they were

10   taken.

11        Q.   And that gave them time to figure out just

12   exactly what they needed to say that would qualify

13   as substantial assistance to the Government, right?

14        A.   No.

15        Q.   Because they all wanted the Government to

16   reach that same magic conclusion for them that they

17   had provided substantial assistance?

18        A.   I don't know what they want.  But they

19   gave their statements to me, many of them before

20   they had tablets.

21        Q.   Okay.  Well, you gave some witnesses a

22   roadmap as to where to look to find the information

23   for their testimony, didn't you?

24        A.   No.

25        Q.   Did you ever tell them that all the truth
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

231

 1  is in the tablet?

 2      A.   That's the truth about the SNM, guys dry

 3  snitching and turning their backs on each other.

 4  I've made that kind of a statement before.

 5      Q.   Did you make the statement to witnesses in

 6  this case that "All the truth is in the tablet"?

 7      A.   I think I just answered that.  What I'm

 8  telling them -- for example, Angel Munoz ratted.  A

 9  lot of these guys didn't know that.  I said, "Look

10  at the tablets.  I've turned everything over."

11          Let me be clear, though.  I've never

12  looked through the tablet.  I just know --

13      Q.   My question is just if you made that

14  statement to the witnesses in this case?

15      A.   And I'm saying I may have.

16      Q.   Well, would you like me to show you a

17  transcript to refresh your memory?

18      A.   Sure.

19      Q.   Agent Acee, do you see here on this

20  transcript where your response to Mario Rodriguez,

21  with Ron Sanchez in the room, was "All the truth is

22  in the tablet"?

23      A.   Yes.

24      Q.   The truth is that a whole lot of what the

25  witnesses in this case have said isn't true at all,



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  is it?

2       A.   No, I don't agree.

3       Q.   That's not the truth?

4       A.   No.

5       Q.   In fact, in your own words, half the

6  people who talk to you are bullshitting.  Haven't

7  you said that?

8       A.   I don't know that that's fair.

9       Q.   Well, are those your words?

10      A.   Yes.

11      Q.   So in speaking about the witnesses in this

12  case, you did say, "We know half the people that

13  talk to us are bullshitting," right?

14      A.   I'm saying, in my line of work, half the

15  people --

16      Q.   I'm just asking if you made that

17  statement.

18      A.   I did.  And I'm explaining what I meant by

19  it.  I don't have to explain, though.

20      Q.   And you went on to say, "But we have to

21  write it down anyway," didn't you?

22      A.   When I'm taking someone's statement, I

23  write down what they say.

24      Q.   Are those your words:  "Half the people

25  that talk to us are bullshitting, but we've got to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   write it down anyway"?

2       A.   They may be.

3       Q.   Would you like me to show you the

4   transcript?

5       A.   Please.

6       Q.   Agent Acee, do you see here where those

7   statements are?

8       A.   Yes.

9            MS. FOX-YOUNG:  No further questions, Your

10  Honor.

11           THE COURT:  Thank you, Ms. Fox-Young.

12  Other defendants -- or is this where we're going to

13  take a break and call some other witnesses?

14           MS. JACKS:  This is where we requested to

15  call other witnesses.

16           THE COURT:  The defendants have some

17  witnesses they need to get on and off, so we're

18  going to ask Mr. Acee to step down.

19           Thank you for your testimony, Mr. Acee.

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

234

1    UNITED STATES OF AMERICA

2    STATE OF NEW MEXICO

3

4              C-E-R-T-I-F-I-C-A-T-E

5         I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

6    Official Court Reporter for the State of New Mexico,

7    do hereby certify that the foregoing pages

8    constitute a true transcript of proceedings had

9    before the said Court, held in the District of New

10   Mexico, in the matter therein stated.

11        In testimony whereof, I have hereunto set my

12   hand on this 22nd day of March, 2018.

13

14        _____

15        Jennifer Bean, FAPR, RMR-RDR-CCR
          Certified Realtime Reporter
16        United States Court Reporter
          NM Certified Court Reporter #94
17        333 Lomas, Northwest
          Albuquerque, New Mexico 87102
18        Phone:        (505) 348-2283
          Fax: (505) 843-9492
19        License expires:  12/31/18

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com