**Patrick J. Burke, P.C.**
303 16th Street, Suite 200
Denver, Colorado 80202
(303) 825-3050
[Patrick-j-burke@msn.com](mailto:Patrick-j-burke@msn.com)

April 29, 2018

**VIA EMAIL**
The Honorable James O. Browning
([jobproposedtext@nmcourt.fed.us](mailto:jobproposedtext@nmcourt.fed.us))

    Re:    CJA Managing Attorney

Dear Judge Browning,

    I'm weighing in briefly on the issues outlined in your April 27, 2018 Memorandum (Doc. 2172).

    By way of background, I have been on the CJA Panel in Colorado since 1983. I was on the CJA Standing Committee from 1998-2000 (Chairman, 1999-2000). I was reappointed to the CJA Standing Committee from 2010-2017.

    The use of a CJA Managing attorney was adopted in Colorado in July of 2016.[1] I was on the Standing Committee when this provision was implemented. Under Colorado's CJA Plan, as it now exists, the CJA Coordinating Attorney, Leo Griffard, is actually housed within and supervised/employed by the Office of the Federal Public Defender. The Federal Public Defender is solely responsible for the selection, compensation, and supervision of the CJA Coordinating Attorney.

    The CJA Coordinating Attorney is responsible for the systematic distribution of cases to and for the management of the CJA Panel attorneys subject to the provisions of the Plan. The CJA Coordinating Attorney is responsible for opening and processing all new CJA appointments, and, in every case, reviews claims for payment and reimbursement and requests for services under the CJA for mathematical and technical accuracy, for conformity with the Guidelines for the Administration of the Criminal Justice Act (Vol. VII, Guide to Judiciary Policies and Procedures) and determines whether the claims are reasonably incurred.

---

[1] The Colorado CJA Committee adopted their new CJA Plan in May, 2016, effective July, 2016.

Before this provision was adopted, the Panel members were concerned about moving to this model for several reasons. First, having this person in the Federal Public Defender's Office could cause a conflict in multi-defendant cases where the FPD was representing a co-defendant/co-conspirator. Second, Panel attorneys wondered whether there could be tension regarding the authorization of funds for a co-defendant who was not represented by the FPD. Third, some Panel attorneys were concerned that there might be some manipulation regarding the attorneys who were selected for appointment. Fourth, there was a concern in Colorado that the folks in D.C. might eventually micro-manage how Panel activities were conducted in Colorado. Finally, there was an overarching concern that this model might lead to 'empire building' by the Federal Public Defender's Office. Essentially, the Panel attorneys, a naturally suspicious bunch, were concerned about gamesmanship inside the FPD's office.

These concerns were addressed in a couple of ways. First, a 'wall' has been erected whereby there is no case interaction between the FPD attorneys on one hand, and the Coordinating Attorney on the other. (I don't have that provision at my fingertips, but I remember some sort of wall was implemented.) Second, the Panel was assured that the budget being administered by the Coordinating Attorney was completely separate from the FPD budget. Thus, there was no financial impact on the FPD budget, regardless of how much money the Coordinating Attorney 'spent.' The wall seems to have dissipated some of the concerns about conflict. And the separation of the two budgets seems to have had the same effect.

The net conclusion is that placing the CJA Coordinating Attorney in the Federal Public Defender's Office has worked out okay. It is still relatively new to Colorado. In the past, under many circumstances, a person in the clerk's office administered many of the financial aspects of CJA activities. To be sure, there were concerns and complaints about that system, too. Time will tell whether this new approach proves to be better than the old one, but the early feedback seems to be positive.

I now turn to the issue of having judges alone conduct a reasonableness review of attorneys' fees and requests for expert witnesses and other specialized services. The Standing Committee frequently discussed issues relating to the Court having responsibility for the amount of attorneys' fees and expert witness expenditures. In particular, we discussed how judges would balance fiscal concerns with the concept of due process. Also discussed was the fear that the independence of decisions made by defense counsel would be impacted by the Court's decisions regarding approval of funds. I, personally, don't know any Article III judges who relish the responsibility of reviewing

attorneys' fees and expert witness expenditures.  It seems clear that there was an inherent conflict in this model, too.  For example, how can the judge who is called upon to sentence a defendant reject a funding request related to a sentencing issue?  It has been my distinct impression that the Article III judges with whom I was familiar were not fond of these 'reasonableness reviews.'  I think most federal judges will welcome the shedding of this responsibility.

      One additional comment, a great source of information on these issues would be the report of the Ad Hoc Committee on the Criminal Justice Act (aka "The Cardone Committee") named after Judge Kathleen Cardone.[2]

      Very Truly Yours,

*Pat Burke*

PJB/jjf

---

[2] The Cardone Committee spent two and a half years from 2015-2017 assessing the strengths and weaknesses of the program, and making recommendations for improvements.  The final report was delivered to Director James C. Duff, Administrative Office of the U.S. Courts on November 2, 2017.  Six of the policy-making body's standing committees will review and comment on the report before it is taken up by the Judicial Conference in 2018.  For more info: http://www.uscourts.gov/statistics-reports/defender-services-annual-report-2017.  My co-counsel, Cori Harbour-Valdez, testified before the Cardone Committee.