1           IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF NEW MEXICO

3

4   UNITED STATES OF AMERICA,

5       Plaintiff,

6       VS.                    CR. NO. 15-4268 JB

7   ANGEL DELEON, et al.,

8       Defendants.

9

10

11       Transcript of excerpts of testimony of

12               BRYAN ACEE

13              May 15, 2018

14

15

16

17

18

19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Mr. Acee, I'll
 2   remind you that you're still under oath.
 3            Mr. Castle, if you wish to continue your
 4   cross-examination of Mr. Acee, you may do so at this
 5   time.
 6            MR. CASTLE:  Thank you, Your Honor.
 7            CROSS-EXAMINATION (Continued)
 8   BY MR. CASTLE:
 9       Q.   Good morning, Agent.
10            When Mr. Archuleta testified, he indicated
11   that he left to go for Tennessee with his son so he
12   could get away from the S.  Do you remember him
13   saying that?
14       A.   Yes, sir.
15       Q.   In his phone conversations that he had with
16   Mr. Duran, do you recall that Mr. Archuleta indicated
17   that he went to Tennessee because "Darren White was
18   on his ass"?
19       A.   That sounds familiar.
20       Q.   And Darren White is that -- who was he
21   again?
22       A.   He was the former Sheriff in Bernalillo
23   County.
24       Q.   And do you recall also there being some
25   discussion with Mr. Archuleta in which he basically
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    says he's willing to do -- put in some work for the

2    S?

3            A.    Yes.

4            Q.    And he says, "I'm down for whatever, just

5    what's up, you know, like, you know, whatever."  Do

6    you recall --

7            A.    Yes.

8            Q.    -- him saying that?  And that's why you

9    still have him as a leader on your -- one of the

10   reasons?

11           A.    Yes, sir.

12           Q.    Now, when you testified earlier, or

13   yesterday, you indicated that Mario Rodriguez had

14   come clean.  Do you recall that?

15           A.    Oh, about being S, yes.

16           Q.    But he didn't come clean about being a

17   leader, did he?

18           A.    He acknowledged he was sort of a rising

19   star, if you will; he had a lot of influence.

20           Q.    But he didn't ever call himself a leader at

21   all, right?  Not certainly on the level that you had

22   them on on your chart, where you had him on the top

23   level?

24           A.    No.  He always put himself below Dan Dan.

25           Q.    Now, there was question about Jake Armijo,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and whether he had committed a certain homicide, and

2    whether you took it off as an overt act.  Do you

3    recall that?

4         A.   Yes.

5         Q.   Now, when Mr. Archuleta was testifying, he,

6    in response to questions about the Darren White hit,

7    he indicated -- and I quote, "That an individual by

8    the name of Jake Armijo, he was to hit Darren White."

9    Do you recall him testifying to that?

10        A.   I know there was some discussion about it,

11   but I think Mr. Archuleta disagreed with that.  That

12   was one side's narrative, not his.

13        Q.   Well, did Jake Armijo, did he talk to you

14   about Darren White?

15        A.   I believe I did ask him about that.

16        Q.   Did he deny any involvement?

17        A.   Yes.

18        Q.   He denied even knowledge of what you were

19   talking about, right?

20        A.   Well, I mean, he seemed somewhat familiar

21   with the overall kind of threat, because it was like

22   a Gangland episode, or something.  But he definitely

23   denied being part of that.

24        Q.   A TV special, is that what you are talking

25   about?  Gangland?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes, sir.

2        Q.    And just to be clear, there was -- you

3    testified about a lengthy search warrant affidavit,

4    where I think you said you searched 18 locations, 12

5    by search warrant; is that right?

6        A.    Yes.

7        Q.    None of those were related to Billy Garcia,

8    were they?

9        A.    No, sir.

10       Q.    Now, we had talked yesterday a little bit

11   about how the FBI goes about vetting certain

12   information and corroborating whether it's accurate

13   or not.

14            In this case, there were a number of

15   informers who said that they had conversations with

16   Billy Garcia on a particular -- at a particular time,

17   at a particular prison.  Do you recall that

18   happening?

19       A.    Yes.

20       Q.    And in your work did you obtain location

21   history records so you could see whether that was

22   possible?

23       A.    Not initially, but we did later.

24       Q.    And, for example -- I'll just use one

25   example -- Sammy Griego, you did that with, right?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Not initially when I interviewed him about

2  it, no.

3      Q.   But later on?

4      A.   Yes.

5      Q.   And when he initially was interviewed, he

6  said that he had a conversation with Mr. Garcia in

7  December of 2009, at Southern New Mexico Correctional

8  Facility.  And when you went to look at it, you

9  realized, number one, Billy Garcia wasn't in Southern

10 New Mexico Correctional Facility after 2001; and

11 number two, that he wasn't -- that the two of them

12 weren't in any facility together in December 2009; is

13 that right?

14     A.   I believe that's correct, yes.

15     Q.   Now, with regard to Freddie Munoz, he had

16 indicated that he spoke to Mr. Garcia immediately

17 before -- well, in the weeks before the murders, and

18 then immediately when he got back.  Do you recall

19 that?

20     A.   Yes.

21     Q.   And the record shows that Mr. Garcia, when

22 he was moved back after the homicide, was not in the

23 same unit as Freddie Munoz; is that right?

24     A.   I believe that's correct.

25     Q.   Now, when Freddie Munoz talked to you about



SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                     FAX (505) 843-9492
                                                          1-800-669-9492
                                                 e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    his discussion that he supposedly had -- the two
 2    discussions with Billy Garcia he had in 2004, was he
 3    able to give you any other things that the two of
 4    them talked about, like updates on their family life,
 5    details about -- you know, anything else they
 6    discussed, or was it, in fact, he just said:  I had
 7    these two conversations?
 8         A.   I don't recall there being any conversation
 9    about what you described as "updates."  I think I
10    just hit the points relevant to try and determine if
11    they had probable cause.
12         Q.   And any information that you obtained that
13    corroborated Freddie Munoz' statements, would it be
14    fair to say it was presented here in trial -- not all
15    of his information, but with regard to Mr. Garcia's
16    two statements that he allegedly made?
17         A.   Yes.
18         Q.   Let's go to Leroy Lucero, if we could.
19    First of all, did he -- you know, when he made
20    statements to the FBI, he indicated, I think, seven
21    different participants in the 2001 murders talked to
22    him in facilities after the homicides.  Do you recall
23    that?
24         A.   More or less.
25         Q.   Did he ever indicate that he talked to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Michael Jaramillo at all, or did he even tell you

2    that he'd been in the same facility and had come

3    across Michael Jaramillo on two different occasions?

4         A.    Before or after?

5         Q.    After.  And if you want to, I can show you

6    his statements.

7         A.    I don't recall discussing contacts after

8    the homicide with him.

9         Q.    But he didn't volunteer -- he was

10   volunteering, right, in some of his interviews, hey,

11   this is the person I talked to, this is the person I

12   talked to, this is the person I talked to, correct?

13   He even mentioned, like, Lorenzo Mora, which no one

14   knew had been involved.  He volunteered people that

15   he had talked to; is that right?

16        A.    Yes.  I asked him to relate the details.

17        Q.    And he didn't mention Michael Jaramillo who

18   he had brought in to the SNM, did he?

19        A.    He told me that he brought him in.

20        Q.    But that's it, right?  He didn't say he was

21   involved in the homicides?

22        A.    I don't think he did.

23        Q.    Let's move to Sammy Griego.  He indicates

24   he had a conversation with Mr. Garcia.  Was he able

25   to give you any other details other than, you know,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Garcia making this admission to him?  Did he say

2    that they talked about neighborhoods or places they

3    grew up or gangs that they used to be associated with

4    as kids, or anything like that?

5         A.   He talked to him about other things, but

6    none of the ones you mentioned.

7         Q.   Okay.  Same thing with Billy Cordova; in

8    vetting his information, I think he said that he had

9    a conversation with Mr. Garcia in two thousand --

10   what year was it he supposedly said?  Do you even

11   remember?

12        A.   Off the top of my head, no.

13        Q.   Okay.  But he says he had it at the

14   Metropolitan Detention Center; is that right?

15        A.   Yes, when -- around the same time Gerald

16   Archuleta and Manuel Jacob Armijo were there.

17        Q.   Okay.

18        A.   Maybe two thousand -- I'm uncertain.

19        Q.   2007, 2008 somewhere in there?

20        A.   That was going to be my guess.  I'm not

21   certain, though.

22        Q.   Now, in these facilities, these prison

23   facilities, either prison or county jails, when they

24   start to see people from the same prison gang

25   congregate when they're not supposed to be

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   congregating, have you seen reports where the

2   officers will write that up, and sometimes it even

3   makes it into an STG file of people having kind of

4   odd-looking meetings?

5           MR. CASTELLANO:  Objection, calls for

6   hearsay.  He's asking about other people's reports.

7           MR. CASTLE:  I'm just asking --

8           THE COURT:  I think this sort of general

9   question I'll allow, see where it goes.  Overruled.

10      A.   No, sir.  I haven't seen a lot of reports

11  like that.  I think that they -- in both the

12  facilities you mentioned, you know, they're housed

13  together, so that they do -- they are seen together

14  and they congregate together at times.

15      Q.   Well, let me talk to you a little bit more

16  about that.

17          Do you recall, when they were collecting

18  evidence in 2001, after the murders, there being

19  corrections officers who wrote up memorandums about

20  certain SNM members gathering together and observing

21  something unusual happening?

22      A.   I think I know what you're referring to,

23  sir.  Was this when they were all supposedly taking

24  photos together and videos?  They were supposed to be

25  on the roofs with cameras and stuff like that?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                        1-800-669-9492

BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE                     e-mail: info@litsupport.com

```
 1        Q.   Well, that's Leonard Lujan, right?

 2        A.   Okay.

 3        Q.   And no corrections officer said that,

 4   right?

 5        A.   That's right.

 6        Q.   I'm talking about how there had been some

 7   unusual gatherings with Leroy Lucero and other SNM

 8   members.  Do you recall that?

 9        A.   Yes, sir.  Correct me if I'm wrong, but I

10   think that was corrections officials writing up what

11   CI's were telling them.

12        Q.   Okay.  Well, in any event, did any -- were

13   you able to corroborate any of the corrections

14   officers or any reports that corroborated Jake

15   Armijo, for example, going over -- during his one

16   hour out of his cell, and going over to Mr. Garcia's

17   cell and having a confrontation with him?  Was there

18   any reports like that from the facility that

19   corroborated that?

20        A.   No, sir.

21        Q.   And the same thing with Billy Cordova, the

22   same thing?

23        A.   I'm unaware of any reports or videos or

24   photos.

25        Q.   And, in fact, neither Billy Cordova
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     corroborates that he saw Jake Armijo do that, nor did

2     Jake Armijo corroborate that Billy Cordova did that,

3     right?

4         A.    I believe that's accurate.

5         Q.    Now, let's move to Eugene Martinez.   When

6     he was interviewed, you participated in that

7     interview, right?

8         A.    I did.

9         Q.    Did he ever say he had a conversation with

10     Leroy Lucero in which he told Leroy Lucero he was the

11     one who finished Mr. Garza off?

12         A.    I don't believe Leroy Lucero came up in my

13     interview of Eugene.

14         Q.    Okay.  So he didn't talk to you about that?

15         A.    I don't believe so.

16         Q.    And, in fact, he denied that he strangled

17     Mr. Garza at all, right?

18         A.    If I remember correctly, off the top of my

19     head, he talked about holding his lower body down on

20     the bed.

21         Q.    There has been some discussion in this

22     trial at the facilities, if you're in these 23-hour

23     lockdown situations, that they would keep logbooks of

24     when you were taken out for exercise.  Do you recall

25     that discussion?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   I know I've been asked about that a few
 2   times.
 3        Q.   Okay.  And I take it that you've never been
 4   able to corroborate through any logbooks that any of
 5   these supposed conversations happened out in cages
 6   could have occurred?  In other words, you haven't
 7   been able to locate any logbooks and say, yeah, those
 8   two inmates were out at the same time?
 9        A.   Dating that far back, no, sir.
10        Q.   Okay.  Well, the FBI was investigating back
11   in 2007 and 2008, right?
12        A.   Yes, sir.
13        Q.   And so when you picked up that file from
14   them, did they have any logbooks that would indicate
15   that?
16        A.   No.
17        Q.   And to your knowledge, the logbooks -- the
18   materials at the New Mexico Department of
19   Corrections, they retain for 10 years, right?
20        A.   They should.  I don't know that they always
21   do.
22        Q.   Now, in your discussions with Gerald
23   Archuleta, he says he had some kind of meeting with
24   Mr. Billy Garcia, in which Billy Garcia made some
25   kind of admission to him; is that right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, sir.
 2        Q.   And did he tell you when that happened,
 3   around what year?
 4        A.   I believe so.  I just don't know as I sit
 5   here now.
 6        Q.   Now, this would have been a time when
 7   Mr. Billy Garcia and Mr. Archuleta were on parole; is
 8   that right?
 9        A.   Yes.
10        Q.   And were you able to obtain any GPS
11   monitoring data that showed that Gerald Archuleta and
12   Billy Garcia were in the same location?
13        A.   We had that same idea, and we tried.  But
14   no, it wasn't available.
15        Q.   Now, without going into details, in your
16   review of the materials, when you first got the
17   materials concerning the 2001 investigation, there
18   were four informants who you weren't able to identify
19   that indicated Leroy Lucero had planned or
20   participated in the murders; is that right?
21             MR. CASTELLANO:  Objection, calls for
22   hearsay.
23             MR. CASTLE:  Well, I'm going to ask him
24   what he did to find out and the follow-up, Your
25   Honor.  I'm not offering it for the truth at this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   point.

 2              THE COURT:  Well, I do think that the way

 3   it's framed, it's asking him to relay hearsay.  So

 4   I'm going to sustain the objection.

 5        Q.   These questionnaires, if I could show you

 6   EL 1 and EL 2, did you ask any -- or put in the

 7   questionnaire -- did you have any questions about

 8   whether Leroy Lucero was involved in the 2001

 9   murders?

10        A.   Not directly, not with his name, no.

11        Q.   And even though there was -- at least there

12   was information that was possessed that it was him

13   rather than Billy Garcia that ordered the hits?

14        A.   I am aware of one such informant claiming

15   that.

16        Q.   Did you question -- put in the

17   questionnaire any information about what Toby Romero

18   had said?

19        A.   No.

20        Q.   In other words, did you use Toby Romero's

21   information that he made in his recorded statements,

22   did you take that information and use it to formulate

23   questions for these questionnaires?

24        A.   No.

25        Q.   How about Jimmie Gordon?

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                        1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                                         e-mail: info@litsupport.com

```
 1         A.   I'm not sure how -- I'm not sure what
 2    you're asking there.
 3         Q.   Okay.  I show you what's in the discovery;
 4    this would have be an early document, right, because
 5    it's a lower number.  It says, 2001, two days after
 6    the homicide, there is an informant here that
 7    indicates that Leroy Lucero called the hits; is that
 8    right?
 9         A.   Yes.
10              MR. CASTELLANO:  Objection, calls for
11    hearsay.
12              THE COURT:  Well, let's not ask questions
13    that way.  It may be some other impeachment or
14    something.
15         Q.   Well, one of the things that the FBI tried
16    to do was go back, and at least talk to some of the
17    people that were in the pods and at the prison at the
18    time that the murders happened, right?
19         A.   Yes.
20         Q.   And so would you go with certain reports,
21    like the one I just showed you, and ask them
22    information from these?  Or did you make a statement
23    to Corrections Officers Will Jaramillo and Daniel
24    Lucero two days after the murder, in which you
25    identified who ordered it and how many assailants,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and things of that nature?

2        A.    Most of the time we were armed with that

3    information because people would deny having made a

4    statement in the past.  So we would show them the

5    statement if we had to.

6        Q.    If you thought it was that, right?  If you

7    thought that a particular statement was from that

8    person you're interviewing, you'd show it to them and

9    say:  We think this is you, did you say this, or

10   something like that, right?

11       A.    You hit the nail on the head.  Yeah, we'd

12   have to first show it was them --

13       Q.    Right.

14       A.    -- which is a tricky endeavor.

15       Q.    Would it be fair to say that there were a

16   number of informants who provided information, that

17   you were never able to identify who they were?

18       A.    I feel like there were a handful.

19       Q.    Okay.

20       A.    We worked pretty hard to -- I think you

21   both and I worked hard to try and ID a lot of them.

22       Q.    Right.  We shared information and tried to

23   figure it out.  But at least at that point in time,

24   when the evidence was fresh, there were people giving

25   information on two possible people that had ordered



SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                              1-800-669-9492
                                                      e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    the murders:  One being Leroy Lucero, and one being

2    Billy Garcia?

3        A.   There were a lot of theories.  But that's

4    accurate, someone thought that it was Leroy Lucero.

5        Q.   But when you gave the questionnaires out to

6    other agents to question people about, you didn't put

7    in there questions about whether Leroy Lucero did the

8    hits.  The question was only about Billy Garcia

9    ordering hits; is that right?

10       A.   Yes.  The questionnaire was designed around

11   our theory and the indictment.

12       Q.   Now, you know, the defense doesn't

13   necessarily have the same kind of access that the FBI

14   and Government and has to witnesses; is that a fair

15   statement?

16       A.   Probably.

17       Q.   We don't have -- we can't offer them

18   lawyers, freedom, and money, so to speak, right?

19       A.   I don't think you can legally, no.

20       Q.   Okay.  And so, you know, I think you've

21   seen throughout the trial that we've had to rely a

22   lot on the reports that the FBI does; is that right?

23       A.   Yes.

24       Q.   And so it's important, would you agree,

25   that the FBI should follow all possible leads?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.
 2          Q.   And then go where the evidence takes you,
 3    right?
 4          A.   That's the objective.
 5          Q.   And so when the questionnaires were put
 6    together, and the agents were sent out to interview
 7    people, why weren't the witnesses being asked about
 8    the possibility that it was Leroy Lucero?
 9          A.   We'd ruled that out.
10          Q.   Was it ruled out because he'd been paid as
11    an informant since 2011?
12          A.   No, that doesn't have anything to do with
13    it.  I'm happy to charge informants.
14          Q.   Do you think -- in your opinion, is he a
15    conspirator in this case?  Co-conspirator?
16          MR. CASTELLANO:  Objection, Your Honor.
17    That's for the jury to decide.
18          THE COURT:  Well, I think that given his
19    involvement in the charges, I'm going to allow the
20    question.  Overruled.
21          A.   I'm thinking about it.  I think we could
22    make the case.
23          Q.   Given that, witnesses should have been
24    questioned about his involvement, right?  And also
25    Jake Armijo's involvement?
```

SANTA FE OFFICE                                         MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                               e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   We ruled him out early on.
 2        Q.   Well, Leroy Lucero told you-all in an
 3   interview that Jake Armijo had brought down orders
 4   from Angel Munoz; correct?  That's what he said?
 5        A.   Yes.
 6        Q.   And in those questionnaires does anybody
 7   ask about -- is there any question in there that asks
 8   about whether Jake Armijo was involved in bringing
 9   down orders on the 2001 murders?
10        A.   The way you phrase the question, it's not
11   asked that way.  But we are asking what they know
12   about that homicide.
13        Q.   Well, just go ahead and read -- you know,
14   they're both worded the same, they just have two
15   different victims.  Just one more time can you read
16   what the question is that's asked about these 2001
17   murders?
18        A.   Just to myself?
19        Q.   Out loud, if you could.
20        A.   Before the question there is a statement,
21   but the question is --
22        Q.   Read the statement and the question then.
23        A.   Question 96 from the December 2016
24   questionnaire:  "Francisco Castillo, a/k/a Pancho,
25   was murdered in 2001 at the Southern New Mexico
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Correctional Facility by Angel DeLeon, Joe Lawrence

2   Gallegos, Edward Troup, Leonard Lujan, and Billy

3   Garcia.  Why was Castillo killed?

4          "Question 97.  Did Angel DeLeon, Joe

5   Lawrence Gallegos, Edward Troup, Leonard Lujan, or

6   Billy Garcia ever talk to you about the murder?  If

7   yes, what did they say?"

8      Q.   Then the same similar paragraph with just

9   the victim's name changed; is that correct?

10     A.   Yes, sir.

11     Q.   Nothing about possible involvement of Leroy

12  Lucero or Jake Armijo in those questions; correct?

13  Or the statement in the questions?

14     A.   The statement does not include those names.

15     Q.   Okay.  By the way, while you're looking at

16  those questionnaires, are there any questions about

17  Styx, Gerald Archuleta?  Are there questions about:

18  What do you know about that guy, since he was a head

19  leader?  And let's find out if he's confessed all of

20  his sins of sorts?  Do you know any more?

21     A.   Not the way you're phrasing it.  But I did

22  purposely ask about some other murders that I thought

23  he was involved in.

24     Q.   Okay.  So you asked about:  What do you

25  know about this murder, right?  And then the person



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    would be allowed to answer the question, right?

 2         A.   Right.

 3         Q.   But nothing about him specifically to:

 4    Please tell us what you know about Gerald Archuleta

 5    or what his crimes are, and things of that nature?

 6         A.   No, I don't believe I have a question like

 7    that.

 8         Q.   And a lot of people that you -- I think you

 9    said that after he agreed to work with the

10    Government, then that led to a number of other people

11    coming in after him, right?

12         A.   Yes.

13         Q.   And a lot of those were his followers,

14    people that were closely associated with his branch

15    of the SNM?

16         A.   In some cases.  Some were Julian Romero, to

17    include Julian.

18         Q.   Okay.  And but those were -- the ones that

19    were associated with Styx Archuleta would have had

20    pretty close knowledge of the various crimes he

21    committed on behalf of the SNM?

22         A.   Yes.  I mean, Frederico Munoz jumps out at

23    me right away.  That was his right-hand man.

24         Q.   Right.  Speaking of Frederico Munoz, I

25    think he said he really kind of dropped out of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    SNM in 2004.  Did your investigation corroborate that
 2    he really dropped out in 2004?
 3         A.   No.
 4         Q.   Okay.
 5              MR. CASTLE:  No other questions.  Thank
 6    you.
 7              THE COURT:  All right.  Thank you, Mr.
 8    Castle.
 9              Mr. Burke, do you have cross-examination of
10    Mr. Acee?
11              MR. BURKE:  Yes, Your Honor.  Thank you.
12              THE COURT:  Mr. Burke.
13                      CROSS-EXAMINATION
14    BY MR. BURKE:
15         Q.   Special Agent Acee, I did want to clarify
16    one thing we talked about briefly during the earlier
17    question and answer.  You actually became a law
18    enforcement officer with the California Highway
19    Patrol on February 9, 2001; correct?  Would you like
20    to see the letter from the Deputy Attorney General?
21         A.   I've not seen the letter, sir.
22         Q.   Would you like to see it?
23         A.   Sure.
24              MR. CASTELLANO:  Counsel?
25         Q.   So early 2001, you became a police officer?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    With the California Highway Patrol, yes.

2        Q.    Pardon?

3        A.    Yes, with the California Highway Patrol.

4        Q.    And then you stayed on the west coast until

5   you went to Quantico; correct?

6        A.    Yes, sir.

7        Q.    And then you were assigned to Las Cruces in

8   2010?

9        A.    I think it was 2009.

10        Q.    Spent five years or so there working on,

11   primarily, the cartel --

12        A.    Yes, sir.

13        Q.    -- the Juarez Cartel?  Moved to Albuquerque

14   late 2014 or early 2015?

15        A.    Yes.

16        Q.    Went out to PNM, and fortunately learned

17   about the Marcantel conspiracy, and intercepted that,

18   and stopped it?

19        A.    Yes, sir.

20        Q.    That's fair to say?

21        A.    Yes.

22        Q.    You personally did not arrest Edward Troup?

23        A.    No, sir.

24        Q.    You did not actively interview him during

25   the run-up to the first arrests in December 2015?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         A.    I did not.

 2         Q.    No drug buys with Mr. Troup?

 3         A.    Correct.

 4         Q.    No gun sales?

 5         A.    No.

 6         Q.    You did not actively sit down with him at

 7    the county lockup and inquire of Edward Troup; true?

 8         A.    I've never talked to him.

 9         Q.    Okay.  And you didn't put any money on the

10    books for him?

11         A.    No.

12         Q.    Could we take a look at Exhibit EI.  I just

13    wanted to clarify one aspect of the case.

14               You were asked about this -- how much money

15    had been spent on informants, and you, very

16    reasonably, used some flexible language -- which I

17    would have done, too, about how much it was -- but on

18    your earlier testimony you said you thought it was

19    around $90,000.

20         A.    Overall?

21         Q.    Yeah.

22         A.    Okay.

23         Q.    But those numbers didn't include Eric

24    Duran's 40,000, right?

25         A.    I don't know.  I thought they did.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   Okay.  And didn't include Tomas Clark's,

2     right?  That particular exhibit, he's not on there?

3          A.   He's not on that page, no.

4          Q.   I'll just represent to you Ben Clark is on

5     there.  And you didn't include Roundy's numbers

6     either?

7          A.   No.

8          Q.   And so the number actually is considerably

9     north of 100, isn't it?

10         A.   Well, I don't have access to Roundy's, all

11    of -- I don't even know who all of his informants

12    were.  So it's going to be higher than my estimate.

13         Q.   All right.  Thank you.

14              Could we take a look at ES, and go to page

15    9.  I'm going to follow up on some questions that Mr.

16    Castle just asked.  EL 1, I couldn't read the

17    writing.

18              I want to ask a little bit about question

19    96 as well.  So you do have the word "by Angel

20    DeLeon, Gallegos, Troup, Lujan," but you don't have

21    Jaramillo, do you?

22         A.   No, sir.

23         Q.   The actual killer, you don't have him in

24    there.  Was that question based, at least partially

25    on Lorenzo Torres' interview?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492
                                                               1-800-669-9492
                                                       e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   The question was based on who we charged in
 2   the indictment and the culmination of all the
 3   information we had.
 4        Q.   Well, we've talked about that, and we know
 5   what the information was on Count 1.  You didn't have
 6   Jaramillo, and you have Troup in there for Jaramillo.
 7   Did you ever investigate Jaramillo?
 8        A.   I didn't know Jaramillo's involvement until
 9   recently.
10        Q.   All right.  Had you seen the DNA finding of
11   indications of Jaramillo?
12        A.   No.  I saw --
13        Q.   You had not seen that?
14        A.   I recall seeing Angel DeLeon's, but not
15   Jaramillo's.
16        Q.   We know we have stipulated in this case
17   that there is a DNA finding in 2001 of indications of
18   Jaramillo.
19        A.   I don't doubt that.  I'm just not very
20   familiar with what you're talking about.
21        Q.   Could you pull up DeLeon 13063.  I was
22   going to show you the DNA document, but we can move
23   on.
24             Could we see Exhibit 235.  Do you remember
25   this exhibit?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.   Yes.

 2          Q.   That is the splotch on the bed?

 3          A.   Yes, sir.

 4          Q.   That is Javier Alonso's blood?

 5          A.   I believe so.

 6          Q.   Did you investigate that photograph during

 7    2015?

 8          A.   I was aware of it.  What do you mean by

 9    "investigate"?

10          Q.   Did you say:  We ought to really get the

11    DNA off of that blood?  Did you do that?

12          A.   Where DNA tests were done, we couldn't

13    redo.

14          Q.   Actually, Patrick Bucksath of the State

15    Police did redo it, and the result came back in 2016,

16    that it was Javier Alonso's?  Do you remember that

17    now?

18          A.   Yes, sir, I don't doubt that.  What I'm

19    saying is the FBI Laboratory won't allow me to

20    submit, where previous labs have done testing.

21          Q.   Did you talk to Lieutenant Bucksath about

22    getting it retested?

23          A.   I don't think I talked to him.  I think I

24    talked to --

25          Q.   His supervisor?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    -- a different State Police person.
 2        Q.    Okay.  When you decided in question 100 of
 3   the exhibit, of the questionnaire, that Fred Dawg was
 4   killed by Javier Alonso, and so forth, did you have
 5   the information when you wrote that question that
 6   Javier Alonso jumped on Fred Dawg from behind,
 7   smashed his face into the ground, and choked him out,
 8   rendering him unconscious within six seconds, did you
 9   have that information?
10        A.    Not all of it, no.
11        Q.    All right.  And were you relying to any
12   extent, on that question, on Ruben Hernandez'
13   statement?
14        A.    I believe that was one of the contributing
15   factors.
16        Q.    Okay.  Going back to Jaramillo, the actual
17   killer, you had a series of contacts with him, you
18   and your colleagues had a series of contacts with him
19   recently; correct?
20        A.    Yes.
21        Q.    And you actually prepared a report of all
22   those contacts; correct?
23        A.    Yes.
24        Q.    And if you don't mind me saying so, the
25   dance that you were having with Jaramillo to get him
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    in, right?
 2          A.   Yes, sir.
 3          Q.   And you wrote that -- and many contacts, it
 4    was a pretty active little dance that you were
 5    having, and you wrote that memo on April 19; correct?
 6          A.   Yes.
 7          Q.   And we sort of inadvertently found out
 8    about all those contacts when we were asking him
 9    questions here.  Why didn't you provide us with that
10    memo before court yesterday?
11          A.   I was under the impression you had it.
12          Q.   Because you had provided it?
13          A.   Yes, sir.
14          Q.   And you thought maybe they would give it to
15    us so that we could be prepared to cross-examine?
16          A.   Yes, sir.  I was under the impression you
17    had it.
18          Q.   Okay.  You have watched the video of --
19    what I'll call the Count 3 video?
20          A.   Yes.
21          Q.   And you would agree with me that there was
22    a lot of activity in the cell that afternoon?
23          A.   In the pod, yes, sir.
24          Q.   In the pod.  Thank you.
25               It was pretty obvious that people were
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    going around getting ready to cover the cameras.  I

 2    mean, you can see brooms and wet towels, and stuff

 3    like that?

 4         A.   I agree.

 5         Q.   It was also pretty obvious that Raymond

 6    Rascon was active that afternoon, wasn't he?

 7         A.   You see him moving around in there.

 8         Q.   He wasn't sitting in his cell with a broom

 9    waiting?

10         A.   That's not depicted, no.

11         Q.   Right.  And Brian Rascon was active that

12    afternoon as well?

13         A.   I imagine.  I don't know if I can pick him

14    out, but I imagine.

15         Q.   Now, I want to go to the shooting of Robert

16    Madrid that you referenced in your testimony, I think

17    it was on Friday afternoon.  And you mentioned the

18    shooting and then a fire bombing; correct?

19         A.   I did.

20         Q.   Do you know who Mary Lucero is?  Did you

21    talk to her, by any chance, the night of the

22    shooting?

23         A.   I didn't.  The night of the shooting, I

24    don't believe I talked to anyone.  I wasn't made

25    aware of it until the next day, when I met the victim
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1    at the hospital.  I think that's my first --

 2         Q.   There was an FBI -- did one of your

 3    colleagues go out there to talk to the people?

 4         A.   I don't believe so.  I think I was the

 5    first FBI agent to be involved in it.

 6         Q.   Okay.  And so let's just go back.  Robert

 7    Madrid was an FBI informant, going all the way back

 8    to 2004; correct?

 9         A.   No, I don't believe so.

10         Q.   There is a 302 -- it's not important, but

11    he wasn't just an informant in 2016.

12         A.   That doesn't sound right to me.  He may

13    have been, for the sheriff's office, an informant

14    that long.  I'm not quite sure.  I think the window

15    in which he was open with us was a matter of about a

16    month or two, and that was just to pay him $1,000.

17         Q.   And what were the circumstances of that

18    payment?

19         A.   He'd done a number of buys for us and phone

20    calls.  And the sheriff's department had some funding

21    troubles, and asked me to pay.  In order to pay, I

22    had to have an agent open him.

23         Q.   You learned that a juvenile by the name of

24    Julian shot him, right?

25         A.   Yes, sir.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And you learned that there had been a
 2   simmering dispute between the two; correct?
 3        A.    One account is of that, yes.
 4        Q.    And there is one account that it was simply
 5   really bad blood between the two; correct?
 6        A.    Yes.
 7        Q.    There was one account that it was not an
 8   SNM hit by anybody here, or anybody that had active
 9   goings on with the SNM; true?
10        A.    It sounds like you asked a couple of
11   questions.
12        Q.    A compound question, bad question.
13        A.    To the defendants here, I have no
14   information that it involved any of the gentlemen
15   here.
16        Q.    Okay.  But one of the possibilities is that
17   it was just a terrible family squabble; correct?
18        A.    That was one account that I read, yes.
19        Q.    And wouldn't it have been fair, Agent Acee,
20   to tell the jury that, rather than trying to lead
21   them to conclude that Mr. Madrid was shot because he
22   was an informant?
23        A.    That's what --
24        Q.    Wouldn't that have been fair?
25        A.    No.  That's what Mr. Madrid told me.  And
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    at the time, that's the information that I had at

 2    that time.

 3        Q.   But even today, sir, you have acknowledged

 4    that there is another scenario where it was a family

 5    dispute.  And yet, on Friday afternoon, you did not

 6    tell this jury that the cause of the shooting might

 7    have been a family dispute; isn't that true?

 8        A.   I'm happy to talk about that, sir.  I

 9    wasn't asked that.

10            MR. BURKE:  That's all I have.

11            THE COURT:  Thank you, Mr. Burke.

12            Anyone else have -- Mr. Sindel?

13            MR. SINDEL:  Yes, Your Honor.

14                    CROSS-EXAMINATION

15    BY MR. SINDEL:

16        Q.   Good morning, Agent Acee.  How are ya?

17        A.   Good morning.

18        Q.   May I call you "bro"?

19        A.   That's fine.

20        Q.   I probably won't.

21            I'm going to ask you a couple of questions

22    about the situation involving this Julian Montoya,

23    and the dispute between the Julian, the juvenile, and

24    Mr. Madrid; is that right?

25        A.   Those are their names, yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And as I understand it, at least, the
2    primary investigation was done by the Albuquerque
3    Police Department; is that right?
4    A.   Yes.
5    Q.   Did you interview any of the family members
6    of the people that were present at the time of the
7    incident to get their background materials and what
8    they understood was the basis for the attack?
9    A.   No.
10   Q.   Just so we're clear -- you tell me when I'm
11   wrong, I believe you can do that, and will -- that
12   there was a situation where Mr. Madrid was sitting
13   with his girlfriend outside of their house or
14   apartment, and then Julian Montoya, the juvenile,
15   walked up and started shooting him.  And there was
16   information in the police report that he had said
17   something to the effect of you had "disrespected my
18   mother"?
19   A.   So some parts of what you said are
20   accurate.  It was, he was -- Mr. Madrid was in a car
21   with his wife.  They were sitting in a car --
22   Q.   I said girlfriend; should have been wife.
23   A.   -- in a parking lot, in an apartment
24   complex that Julian lived in.
25   Q.   Right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    And one witness account had Julian saying

2    those words that you've said.

3        Q.    That witness account was from the wife, who

4    was actually sitting in the car when Montoya began --

5    Julian Montoya began shooting at Robert Madrid; is

6    that right?

7        A.    I thought it was from somebody else.  But

8    it's been a little while since I read the reports.

9        Q.    Okay.  I can show you the report, if you

10   need it to refresh your memory.

11       A.    If you want me to agree to that, I'd want

12   to look at it.

13       Q.    I always want you to agree.

14            I'm going to show you a portion of the

15   Albuquerque Police Department report number 16-19449

16   concerning an incident on March 1, 2006 (sic), right?

17       A.    Correct.

18       Q.    And is that the report that details the

19   particulars of the investigation of the shooting by

20   Julian Montoya of Mr. Madrid?

21       A.    Yes.

22       Q.    Okay.

23            MR. CASTELLANO:  Your Honor, I seek

24   clarification.  He said March 1, 2006.  Is that the

25   correct date?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. SINDEL:  I'm sorry, 2016.
 2        Q.    All right.  I'm going to refer then to the
 3   portion of the statement that deals with the
 4   interview of Bella Martinez?
 5        A.    I see that.
 6        Q.    And is that, in fact, Robert's
 7   girlfriend -- Mr. Madrid's girlfriend?
 8        A.    We'll call it the girlfriend.  I thought
 9   they were married, but I'm good with girlfriend.
10        Q.    So was he.
11              And then it says here -- this sentence
12   here, can you read that to yourself?
13        A.    Yes.
14        Q.    Does that indicate that Julian was
15   claiming, at the time of the shooting, that Robert
16   had disrespected his mother?
17              MR. CASTELLANO:  Objection, calls for
18   hearsay.
19              THE COURT:  I think that probably would.
20              MR. SINDEL:  I don't know that it's for the
21   truth of the matter, so much as that is what Julian
22   Montoya stated, and that was what was heard by the
23   girlfriend.
24              THE COURT:  But we're dealing with material
25   out of reports.  So I think it's got a couple layers
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   there, so --

2          MR. SINDEL:  It also, I believe, would be

3   used for impeachment for the purposes of the

4   testimony of Acee, Agent Acee, that to the effect

5   that it was as a result of him informing, as opposed

6   to what was said actually by the shooter at the time

7   of the shooting, as reported by the girlfriend who

8   was in the car.

9          THE COURT:  Well, what statement by Mr.

10  Acee are you trying to impeach?

11         MR. SINDEL:  Well, Mr. Acee, I asked them

12  whether or not there was any indication that it was

13  because of disrespect.

14         THE COURT:  I think he said yes to that.  I

15  don't think there is any dispute with that.  I think

16  he's agreeing with your story.

17         MR. SINDEL:  If I may re-ask the question

18  then.

19     Q.   Was it clear to you from your investigation

20  that at least people had said that Montoya's

21  motivation was the fact that Madrid had disrespected

22  his mother?

23     A.   That's one reporting, yes.

24     Q.   Do you know whether Robert Madrid was ever

25  listed as a witness by the Government in this case?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1       A.   In the overall case, he is.   In this

 2   particular trial, I don't believe so.

 3       Q.   Also, I'm going to go to a couple of

 4   questions that were asked of you by Mr. Burke and Mr.

 5   Castle.

 6            I think you said you were under the

 7   impression that we had the list that you had prepared

 8   concerning the contacts with Mr. Jaramillo; is that

 9   right?

10       A.   Yes, sir.

11       Q.   And was there somebody who told you that

12   that list had been provided to us prior to Mr.

13   Jaramillo's testimony?

14       A.   Not specifically.  But I send all my

15   reports to the U.S. Attorney's Office to get to you

16   guys.  I don't send the reports directly to you, as

17   you know.  I also, sir, don't like hiding reports

18   from you.  I like to turn the stuff over.

19       Q.   I mean, there are some times in the 302s

20   where you indicate, Look, the defense lawyers may not

21   have this information; they should have it.  It is

22   within the italics in some of the 302s that you

23   prepare.

24       A.   I think that's not my intent.  It's just to

25   make it known to you-all, to make it maybe more

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                      1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                                        e-mail: info@litsupport.com

1    apparent that this might be something you haven't

2    read before in a prior 302.

3        Q.   And there are certainly over 70,000 pages

4    of documents and materials that are connected with

5    this case, aren't there?  It's a massive, massive

6    amount of material.

7        A.   It is.

8        Q.   Did you first -- you know, you were here in

9    court when I was cross-examining Mr. Jaramillo about

10   his previous contacts with members of the FBI and the

11   STIU; correct?

12       A.   Yes.

13       Q.   It became obvious to you at that point in

14   time that we did not know about those interviews or

15   those contacts.  Would you say that's true?

16       A.   I found out about it as I was seated right

17   over there.  I got confirmation that you guys didn't

18   have it, and I provided one of your paralegals with

19   my copy of my notes.

20       Q.   Right, I know.

21            So at least at that point in time it was

22   apparent, from your perspective, that whether or not

23   you had turned it over to the U.S. Attorney's Office,

24   they had not turned it over to us?

25       A.   That's what happened, yes.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   Now, the other day you had talked about
 2     your contacts with Mario Rodriguez.  That's the guy
 3     named Blue, the ear eater.  And you said that he
 4     would be joking around with you about whether he was
 5     in the SNM.  Was he kind of a funny guy in that way,
 6     in those kind of exchanges, joking and laughing?
 7          A.   I don't know that we were both laughing.
 8     But, yeah, he would laugh sometimes.
 9          Q.   Okay.  But you said that was in a joking
10     manner, you know --
11          A.   That's, I guess, my best description of it,
12     yeah, I was calling him out and challenging him, and
13     he would laugh and say, "But you can't prove it."
14     And I thought that was wrong.
15          Q.   Do you remember when he testified and also
16     the various 302s, that he said something to the
17     effect of "When I'm in, I'm all in," in dealing with
18     his quote/unquote cooperation, right?
19          A.   I think everything he does in life, he's
20     all in.  That's been my observation of him.
21          Q.   Well, I mean, most of what your
22     observations of him have to do with what he's told
23     you, and the horrifying videos that you've seen;
24     correct?
25          A.   And discussions with others, but, yes.
```

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                               (505) 843-9494
FAX (505) 843-9492                                      FAX (505) 843-9492
                                                          1-800-669-9492



1      Q.   And, you know, at some point in time had he

2   contacted other members of the cooperating staff --

3   the people that were cooperating, and said, you know,

4   we need to get our stories straight?

5      A.   Are you asking if I thought that happened?

6      Q.   No.  Do you remember whether or not he ever

7   either wrote a letter or had contact with individuals

8   saying, basically, we need to get our stories

9   straight?

10      A.   Well, part of your question, he has had

11   contact with other individuals.  I can't think of an

12   instance where I suspected or heard him say anything

13   about getting stories straight.

14      Q.   Well, I'll get back to that, okay.

15           But Mr. -- I mean, you -- Mr. Jaramillo was

16   never listed as a witness on the initial Government

17   witness list, but he was on the second list they read

18   to the jury; is that correct, from your memory?

19      A.   Yes, I remember passing a sticky note to

20   Mr. Beck so that he would include his name.

21      Q.   So it would have been fair to say that at

22   least as of April 9, when we were bringing this jury,

23   and making our inquiry in voir dire, the defense

24   lawyers had no idea that Mr. Jaramillo was a possible

25   witness, or even involved in any of the homicides,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                 1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                              e-mail: info@litsupport.com

```
 1    including the Castillo murder; correct?
 2         A.   I don't think that's -- I mean, we've
 3    got -- and I can explain, if you want.
 4         Q.   Well, I'll ask the questions and we'll see
 5    where we go.  Okay?
 6              Did Torres mention the name Jaramillo, or
 7    Animal, (sic)?  We're talking about Lorenzo Torres.
 8         A.   No, he didn't mention Animal or Criminal.
 9         Q.   Did Lucero mention the name Jaramillo in
10    his debriefs?
11         A.   Not related to the homicide.
12         Q.   Did Lujan mention Jaramillo related to the
13    homicide in his debrief?
14         A.   He mentioned Criminal, who I think is the
15    same person.
16         Q.   And did he ever indicate at a meeting with
17    Criminal on the yard to discuss with him certain
18    ideas or plans he had in order to carry out the
19    Castillo homicide?
20         A.   To some extent.  He said he met with
21    Criminal.
22         Q.   Did anyone that you know of testify to any
23    incriminating statements made by Jaramillo prior to
24    the contacts you had with him on April the 18th?
25         A.   I think Leonard Lujan is the only person
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   that mentioned him.
 2       Q.   And in terms of who was involved and who is
 3   alleged to be involved, Angel DeLeon, he's long gone,
 4   isn't he?  As far as you know from your
 5   investigation, he's south of the border; correct?
 6       A.   I believe he is.
 7       Q.   When you went about sort of reviewing some
 8   of these things -- I mean, obviously, the Castillo
 9   and Garza homicides, which were quote/unquote old
10   news -- you had to go through, look at records, look
11   at reports to try and recreate what had occurred and
12   what had been observed there in March of 2001; fair
13   statement?
14       A.   Yes.
15       Q.   And did you have any information -- well,
16   let me rephrase that.  Did you look at the reports
17   that were prepared as part of the normal procedure
18   within the Department of Corrections concerning
19   activities in the various pods, daily activities?
20       A.   I reviewed everything they had.
21       Q.   And that would have been basically -- had
22   situations where they would -- sort of like a
23   checklist that the people that had certain
24   responsibilities were doing those responsibilities,
25   or taking those tasks seriously, and you know, there
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    was a report that reflected that; correct?
 2              For example, let me just get to the chase,
 3    you know, instead of goofing around here.  There were
 4    reports that were prepared by individuals that we
 5    have heard described as rovers?
 6         A.   Yes.
 7         Q.   People that went from cell to cell,
 8    basically, and made a count of the presence of
 9    inmates in those cells during various times of the
10    day?
11         A.   Correct.
12         Q.   And those records and reports indicate
13    that, basically, for example, in the pod where Mr.
14    Castillo was from, that a rover made those rounds
15    every hour --
16         A.   Yes.
17         Q.   -- right?  And you were aware, were you
18    not, from reviewing the reports that after the
19    contact with the medical examiner, some of those
20    rovers were reinterviewed?
21         A.   Yes.
22         Q.   Because there was a certain discrepancy or
23    disparity between the findings of the medical
24    examiners and what the rovers claimed had happened
25    during the course of the evening of March 25 and the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  early morning hours of March 26?

2       A.   I think a couple of rovers lied.

3       Q.   Okay.  And was there ever any indication

4  that the rovers just simply never went and did their

5  job in terms of went on their rounds, or whether they

6  did their jobs appropriately?

7       A.   Are you asking my opinion?

8       Q.   Yeah.

9       A.   I think some of them were honest and did

10 what they were supposed to do, and I think others did

11 not.

12      Q.   And the ones that did not, those were

13 located on the pod that housed Mr. Castillo; correct?

14      A.   Yes, sir.  But I mean, to be clear, I think

15 I have some suspicions with even some of their

16 documentation.  I just can't vouch that they always

17 were doing the right thing with the paperwork.

18      Q.   And certainly your investigation indicated

19 that corruption and malfeasance was rampant in the

20 Department of Corrections?

21      A.   Well, I wouldn't say rampant.  We are on

22 the record that I'm sure many of them may some day

23 read.  But corruption does exist.  I mean, we have a

24 public corruption squad that targets correctional

25 officers, among other officials.  And it does happen.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    I think that, over the years, it has happened.

2         Q.    And certainly in the descriptions of some

3    of the individuals who are working for the

4    Government, the former prisoners are there, there

5    was -- it certainly seemed easy for them to get

6    access to significant illegal substances like heroin,

7    right?

8         A.    That's still happening, yes.

9         Q.    Okay.  I may skip around a bit, just a

10   little bit, like Mr. Castellano did.  So bear with

11   me.  All right, bro?

12         There was a search warrant that was done of

13   Mr. Gallegos' home in April of 2016?

14         A.    Yes.

15         Q.    And you had, in fact, referred to some of

16   the photographs of the items that were seen there

17   during the course of the execution of that search

18   warrant?

19         A.    Yes.

20         Q.    And you were aware, were you not, that Mr.

21   Gallegos had been locked up since December 3, 2015,

22   at least four months prior to the search?

23         A.    Correct.

24         Q.    So he hadn't had any access to that trailer

25   for at least four months?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1           A.   Yes.
 2           Q.   Did you ever threaten him or his family
 3      that if they didn't cooperate, you would clean up
 4      that trailer?
 5           A.   I don't believe I've ever talked to anybody
 6      in his family.  I take that back.  I had one brief
 7      conversation with a family member.  But no, that I
 8      would clean it?
 9           Q.   There was a significant mess there, isn't
10      it?
11           A.   No, I wouldn't have offered to clean up
12      anybody's house for them.
13           Q.   You wouldn't want to take on that task for
14      sure?
15                You had also, in reference to your
16      testimony about Archuleta and the deal that was
17      offered to him, you said that there was a three-year
18      cap; correct?
19           A.   Unfortunately.
20           Q.   And you said that was because, when you
21      investigated further the beatdown of Mr. Romero that
22      occurred there in the penitentiary, you couldn't
23      elevate it higher than the offense that had a
24      three-year cap, because you couldn't get a physician
25      to indicate that there was serious physical injury,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    right?
 2         A.   I had assumed there was, until I tried to
 3    find a physician to agree with me.  And I couldn't at
 4    the hospital that treated him, nor at the Department
 5    of Corrections.
 6         Q.   What about the situation where Archuleta is
 7    supposedly orchestrating the Frederico Munoz,
 8    Playboy's, hit attempt on Mr. Romero?
 9         A.   So, for a VICAR charge, that had occurred
10    too long ago.  I believe that the act has to occur
11    within 10 years.  And so at the time of the -- and
12    I'm not an expert on this, but this is my memory of
13    that -- I looked at lot of shootings and stabbings,
14    but I simply couldn't charge him because of the
15    statute of limitations.
16         Q.   Well, the assault you were looking at
17    wasn't going to be a federal offense, was it?  It was
18    a state offense?
19         A.   I'm sorry, are we talking about when
20    Playboy shot at --
21         Q.   No, I'm sorry.  The assault, the Archuleta
22    beatdown -- Romero.
23         A.   You mean, Romero?
24         Q.   Yeah.
25         A.   So we did charge that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Yeah.  But I mean, that you could also

2    charge -- you could also refer the matter to the

3    state authorities for them to investigate and make a

4    charge, right?

5      A.   Well, in theory, yeah.  But the state

6    authorities didn't charge anything that happened at

7    the prisons down here.

8      Q.   Okay.  What about the shooting involving

9    Mr. Romero, where Frederico Munoz and another

10   individual tried to kill him?  Wouldn't that be an

11   attempted murder?

12     A.   I agree with you.  Getting -- and again, in

13   theory, I could call someone to state, and say, Hey,

14   you guys should charge this old case.  But that

15   almost never happens.

16     Q.   In theory, did you do that?  Did you call

17   anyone in the prosecuting attorney's office to

18   determine whether or not they would be willing to

19   look at whether someone who was shot in the presence

20   of their family might be an appropriate case to

21   bring?

22     A.   I talked to the two case agents from the

23   Albuquerque Police Department in Bernalillo, asking

24   why they didn't.  I didn't talk to the district

25   attorney.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1      Q.   Okay.  Were you aware that if they had

2   brought those charges and successfully prosecuted

3   that case, or if Mr. Archuleta pled guilty, like he

4   did on the assault case, that the punishment range

5   could be up to nine years, rather than three years?

6      A.   I'm sure there are a lot of possibilities

7   there.

8      Q.   And I'd like to ask you -- you had

9   mentioned both in your direct examination and your

10   cross-examination one of the cooperators with the

11   government, a gentleman named Eric Duran, right?

12      A.   Yes.

13      Q.   And you had said that he had received two

14   lump sum awards from the State of New Mexico, and

15   also you, I think, had said that you had helped

16   coordinate his work as an informant in Oregon?

17      A.   Both in Washington and Oregon.  I would say

18   the northwest.  He worked in both states.

19      Q.   So you were aware, were you not, of the

20   various activities that Mr. Duran was engaged in?

21      A.   The good ones or the bad ones?  I know more

22   about the bad activities than the good ones.

23      Q.   All right.  Let me ask you -- Defendant's

24   Exhibit EK 1.  Do you recognize who is depicted in

25   that particular photograph?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. GILBERT:  He doesn't have it.  It
 2   hasn't been admitted.
 3              MR. SINDEL:  I know it hasn't.  Never mind,
 4   never mind.
 5              MR. CASTELLANO:  If counsel is going to
 6   move the introduction of those exhibits, I'll object
 7   to relevancy and beyond the scope, Your Honor.
 8              MR. SINDEL:  I believe that they, you know,
 9   secured testimony from him concerning his
10   cooperation.
11              THE COURT:  Why don't y'all let me see the
12   photographs.  Do you want to come up here, Mr.
13   Castellano?
14              (The following proceedings were held at the
15   bench.)
16              THE COURT:  What are these?
17              MR. SINDEL:  Eric Duran.
18              THE COURT:  And you're about to tell me how
19   it was connected to the scope?
20              MR. SINDEL:  I think that those photographs
21   certainly demonstrate circumstances when, you know,
22   individuals are paid money by the federal government.
23   He, Duran, has testified himself.
24              THE COURT:  These are all of Eric Duran?
25              MR. SINDEL:  Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Given the amount of money
 2    that's been spent on the investigation, isn't that
 3    close enough to your examination involved in the
 4    scope?
 5            MR. CASTELLANO:  I don't think it does
 6    Because the money he made in the northwest was paid
 7    by a different FBI office.  Once Eric Duran left the
 8    district, he was no longer responsible, the FBI
 9    Albuquerque division was no longer responsible for
10    him.  And Eric Duran is not a witness in this case.
11            THE COURT:  Well, his name has come up a
12    few times.  And I think we have been talking about
13    the total cost.  And if you want to try to explain
14    it, I'll let you.  But I do think these come within
15    the scope.  So do you want to let him look at them
16    and authenticate them and --
17            MR. SINDEL:  And move their admission.
18            THE COURT:  Okay.
19            (The following proceedings were held in
20    open court.)
21            THE COURT:  All right.  Mr. Sindel.
22            MR. SINDEL:  Thank you, Your Honor.
23       Q.   I'll show you what's previously been marked
24    as Defendant's Exhibit EK 1.  And do you recognize
25    who is depicted in that particular photograph?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   And who is that?

 3        A.   Eric Duran.

 4        Q.   And Mr. Duran is the individual that you

 5   had testified to was initially a cooperator in this

 6   case and then moved to the northwest, right?

 7        A.   Yes, sir.

 8        Q.   And I'm going to show you what's previously

 9   been marked as EK 2, and ask you if you can recognize

10   who is depicted in that photograph?

11        A.   The same man.

12        Q.   Eric Duran?

13        A.   Yes.

14        Q.   EK 3?

15        A.   Eric Duran.

16        Q.   EK 4?

17        A.   Eric Duran.

18        Q.   EK 5?

19        A.   Eric Duran.

20             MR. SINDEL:   Your Honor, I move the

21   introduction of Defendants' Exhibit EK 1 through EK

22   5.

23             THE COURT:   Any other objection, comments

24   on it?  All right.  Not hearing any, Defendant's

25   Exhibits EK 1, EK 2, EK 3, EK 4, and EK 5 are
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    admitted into evidence.
 2              (Exhibits EK 1 through EK 5 admitted.)
 3         Q.   Would you display EK 1 for us, please.
 4    That particular photograph, that depicts the
 5    cooperator Eric Duran.  Is he flashing some sort of
 6    hand sign there?
 7         A.   Maybe the peace sign I guess.  I don't
 8    know.
 9         Q.   You think that's peace?
10         A.   I'm open to your interpretation, if you
11    want to give me an idea what else it might be.
12         Q.   Okay.  Is there something dripping from his
13    pockets?
14         A.   Yes, money.
15         Q.   Money, okay.  And at least there is --
16    these are photographs that he had taken of himself,
17    as far as you know?
18         A.   Yes, he posted them on a Facebook account.
19         Q.   I'm going to show you what's been marked
20    and admitted as Defendant's Exhibit EK 2.  And are
21    these additional photographs depicting the watch,
22    rings, and other jewelry of Mr. Duran?
23         A.   Yes.
24         Q.   They're also from Facebook; is that right?
25         A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.   And Defendant's Exhibit EK 3.   That's a

2   picture of Mr. Duran apparently in his apartment or

3   house throwing cash in the air, right?

4        A.   It is.

5        Q.   EK 4.   That's a picture of Mr. Duran.   Is

6   that an FBI coat he's wearing?   SWAT team?

7        A.   I certainly hope not.

8        Q.   Do you know if that in the background is

9   FBI headquarters up there?

10       A.   No.   The headquarters in Portland is a

11   little bit bigger than that, and it's made of brick,

12   red brick.

13       Q.   Do you know whether or not Mr. Duran has

14   ever testified in court that he used government money

15   to buy that coat?

16       A.   I did hear him say that.

17       Q.   Okay.   And Defendant's Exhibit EK 5.   And

18   is that Mr. Duran flashing a fan full of hundreds, or

19   what appears to be hundred dollar bills, for the

20   camera?

21       A.   Hundreds and 20s.

22       Q.   And you can see on his teeth -- you know

23   what I mean when I talk about a grill, don't you?

24       A.   I do.

25       Q.   Those are maybe gold and diamond, like

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   braces almost for kids, that some people put on their

2   teeth, right?

3        A.   Yeah, it's a decoration.  And his was gold.

4   And I believe I saw it one time, and it had some --

5   what looked like a diamond in it.

6        Q.   And are you aware that on his grill, that

7   with diamonds and gold, that Mr. Duran has testified

8   he used federal government funds in order to

9   accomplish that cosmetic improvement?

10        A.   I believe he purchased that grill and that

11   ridiculous coat with money that was given him by the

12   government.

13        Q.   And did Mr. Duran eventually lose his

14   status as a cooperator, and was he removed from the

15   FBI roles of individuals who were allowed to

16   cooperate?

17        A.   Well, he's always been a cooperator, but he

18   was closed as an FBI informant.

19        Q.   And that was as a result of an arrest that

20   occurred there in the northwest for possession of

21   heroin or having heroin in a car, and a gun in the

22   car he was in?

23        A.   Yes.  There were two incidents that that

24   was based on.  There was another arrest where he was

25   a passenger in a car that was pursued by the police,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and then he ran from the car.

2        Q.   Okay.  Sometimes, when you make deals they

3    don't last very long?

4        A.   Depends who you're making them with.

5        Q.   What?

6        A.   Depends who you're making them with.

7        Q.   Well, Mr. Duran didn't turn out to be such

8    a positive in many ways, did he?

9        A.   I'm very disappointed in Mr. Duran.

10       Q.   But he's looking good in his photos, I'll

11   say that for him.

12       A.   I don't agree.

13       Q.   Now, you also had mentioned something

14   concerning threats against Jason Van Veghel and Karen

15   Cartwright; is that right?

16       A.   I was asked about that, yes.

17           MR. SINDEL:  May I approach, Your Honor?

18           THE COURT:  You may.

19       Q.   I'm going to show you a 302 that was

20   prepared by your coworker, Agent Stemo, concerning

21   contacts with Karen Cartwright.  Is there any

22   indication in there that Jason Van Veghel was

23   threatened by anyone?  Not really, is there?

24       A.   I think there's a threat, but it's not made

25   specifically to him.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Right.  And that's also extremely far

2  removed from anything -- it's told to her by a

3  gentleman named Marquez, who, are you aware, was

4  Karen Cartwright's ex-boyfriend?

5    A.   Marquez is, or Jason?

6    Q.   Marquez.

7    A.   I don't know that name.

8    Q.   So you have no way of verifying if there is

9  any accuracy to anything that Marquez says to Karen

10  Cartwright or anyone else, right?

11    A.   Not at this point, no.

12    Q.   And in the timeline that you prepared in

13  connection with the testimony from Mr. Jaramillo,

14  would it be true to say that basically he had claimed

15  either no memory, blackouts, or he couldn't recall

16  anything that occurred in March of 2001, prior to

17  April 18, 2001 -- 2018?

18    A.   Do you mind if I look at it quickly?  I

19  have a copy, if that's all right.

20    Q.   You have a copy up there?

21    A.   He cites a number of reasons that, in his

22  opinion, he shouldn't be a witness.

23    Q.   He also says I don't remember anything;

24  correct?

25    A.   Yes.  In my conversation with him, he would

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                    1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                    e-mail: info@litsupport.com

```
1    say -- he would alternate between not remembering and
2    being afraid.
3         Q.   Did he also indicate that he had blackouts?
4         A.   There is a reference to a blackout.  Do you
5    know what number it's at on there?
6         Q.   But you recall him making that claim, at
7    least to you or to Agent Stemo, when you compiled
8    this list?
9         A.   He made it to me.  He said at one point he
10   had blacked out or something in reference to that
11   incident.
12        Q.   And you heard his testimony, did you not,
13   that he never changed his mind until he was offered
14   what he had believed was full immunity; correct?
15        A.   I'm not sure I understand.  Changed his
16   mind.
17        Q.   You heard his testimony yesterday, didn't
18   you, he hadn't changed his mind until he had been
19   offered what he thought was full immunity?
20        A.   About coming forward, yes.
21        Q.   Now, I think you testified a number of
22   times about threats that you've made against
23   individuals in order to try to convince them to
24   cooperate?
25        A.   Did I say I threatened people?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   I believe you did.  You said something
 2   about tanks.  I took that to mean that as a threat.
 3   Let's just say -- I'll rephrase the question.
 4             You would threaten that they would be
 5   brought into this case and put under this indictment
 6   if they didn't cooperate, right?
 7        A.   I don't agree that I threatened them.  I
 8   certainly made it known that the FBI was coming after
 9   the SNM.  And then I would -- if I believed they were
10   an SNM member, I would let them know that, you know,
11   they could be seeing us again, and it could involve
12   helicopters and tanks and indictments, and stuff like
13   that.
14        Q.   Helicopters and tanks and indictments and
15   stuff like that, right?  All within the same context,
16   right?
17        A.   Yes.
18        Q.   And you would also talk to each of them
19   about, you know, the advantages that they might have
20   if they decided to cooperate?
21        A.   I think, yeah, they would be in a better
22   place.
23        Q.   And you would tell them a number of times
24   concerning -- you used the murder of Shane Dix as an
25   example of what might occur?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1       A.   Yes, I furthered the rumor and beliefs that

 2   the SNM members had about that particular murder.

 3   They didn't understand what actually happened.  But I

 4   used that to my advantage.

 5       Q.   All right.  So you used that in order to

 6   say, Look, man, you know, you think you've got

 7   problems, this guy is a murderer and he's walking the

 8   streets, right?

 9       A.   Anything is possible.

10       Q.   So they might be left with the impression

11   that anything is possible?

12       A.   When I talked to them, they might have had

13   that impression, along with the best thing to do is

14   to talk to us.

15       Q.   Have you ever promised any potential

16   cooperators any results?

17       A.   No.  I really try hard to stay away from

18   that because I can't fulfill those promises.  And it

19   would be dumb for me to do that.  The only thing I

20   have promised is that I would do my best to protect

21   them and their family.  And if they or their attorney

22   ask me to come to court at any point and testify as

23   to what their contributions are, I would do that.

24       Q.   So there are no promises that you ever made

25   concerning actual resolution or disposition of a



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

PROFESSIONAL COURT
REPORTING SERVICE

1   case; it was simply a promise to help?

2          A.    Where it's appropriate for me to do so.

3   But I can't promise anything, what's going to happen

4   in a case.

5          Q.    Have you ever told them -- represented to

6   any of the potential cooperators that you could

7   guarantee to them certain results if they were to

8   cooperate?

9          A.    No.  I mean, I've talked about what I've

10  seen in the past in cases, and what I've seen other

11  people be sentenced to.  But I try to walk that --

12  you know, I try not to make any representations that

13  I can't back up.

14         Q.    I'm going to refer you to a recorded

15  interview about you and Jose Gomez.  Do you remember

16  that?

17         A.    Vaguely, yes.

18         Q.    But, I mean, certainly you recorded it --

19  it was transcribed -- you're aware of certain

20  statements that you may have made to Mr. Gomez when

21  you were trying to convince him to cooperate?

22         A.    I think the sheriff's office recorded it.

23  But I'll acknowledge I was part of that conversation.

24         Q.    And do you remember stating to Mr. Gomez,

25  "You can get probation, I give you my word"?

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Were we talking about state or federal
 2   case?
 3        Q.   We're talking about prison time.  "You can
 4   get probation, I give you my word."  Does that sound
 5   like a promise?
 6        A.   Well, maybe.  I mean, everybody gets
 7   probation.
 8        Q.   Does it sound like a promise?
 9        A.   Could you read what I said again?
10        Q.   Excuse me?
11        A.   Could you read what I said again?
12        Q.   "You can get probation, I give you my
13   word."  I'll show it to you, you know I'll show it to
14   you.
15        A.   I'd like to look at it.
16        Q.   Sure.
17             MR. SINDEL:  May I approach, Your Honor?
18             THE COURT:  You may.
19        A.   I'm glad I looked at it.
20        Q.   It says, "I'll give my word," right?
21        A.   I uttered the sentence, "I give my word,"
22   but it needs to be taken in context.
23        Q.   Well, okay.  Let's say you're Mr. Gomez and
24   you go, Hey, you can get probation, I give you my
25   word.  It wouldn't be unreasonable for him to take
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1    that as a commitment or a promise, would it?
2         A.   Sure, if that's all I said.  But there is a
3    lot of other points being made before that, where
4    it's all put in context.
5         Q.   And do you also talk with him about the
6    fact that if he structures his case a certain way, he
7    can get out of prison?  He has a state case and a
8    federal possible case, right?
9         A.   I'm discussing the federal case matching
10   whatever the state was going to give him; that I
11   could protect him better in the feds with the feds.
12        Q.   Do you remember the associate that you were
13   with at the time, another agent said, We could get
14   you out of the state case?  Do you remember that
15   portion of the conversation?
16        A.   Yes, and bring him into a federal case.
17        Q.   And if he were to agree and work with you,
18   did you indicate to him, you're guaranteed -- the
19   word "guaranteed" to get out from us?  I'll show it
20   to you.
21        A.   I need to look at it, yeah.
22             MR. SINDEL:  I didn't ask permission to
23   approach.
24             THE COURT:  That's okay.
25        Q.   The word that you used, "guaranteed"?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.   Yes.
 2        Q.   Were you present at the time that Mr.
 3   Jaramillo was actually brought in on April 18 and
 4   talked to Mr. Beck?
 5        A.   No, I was up here in this courtroom.
 6        Q.   So you don't know whether or not he was
 7   ever told that he would get immunity if he testified
 8   for the Government; is that a fair statement?  You
 9   only know from what he testified to, but not from
10   actually being present?
11        A.   Well, I would just add that I know from the
12   practice of sitting in many debriefs with these
13   attorneys, that I've never heard them use the word
14   "immunity."
15        Q.   Well, you certainly understood him to say
16   that that was his belief, right, as you sat here?
17        A.   Then he backed off here, he said that was
18   his understanding of it.
19        Q.   That was his understanding, right?  And he
20   described fairly minimal contact with his attorney
21   prior to making a decision, he said was one of the
22   most important he had to make in his life; is that
23   right?
24        A.   You got a lot of questions there, but he
25   had contact with his attorney.  I'm not sure how
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    much.  But I did have a conversation with him where
 2    he was -- both he and his wife were really struggling
 3    with this decision.
 4              THE COURT:  Mr. Sindel, would this be a
 5    good time for us to take our break?
 6              MR. SINDEL:  It's fine, Your Honor.
 7              THE COURT:  All right.  Let's be in recess
 8    for about 15 minutes.  All rise.
 9              (The jury left the courtroom.)
10              THE COURT:  All right.  We'll be in recess
11    for about 15 minutes.
12              (The Court stood in recess.)
13              THE COURT:  All right.  I think we have all
14    the defendants back in the courtroom and an attorney
15    for each one of the defendants.
16              Did you have something you needed to
17    discuss, Mr. Sindel?
18              MR. SINDEL:  No, I just wanted to flash you
19    the peace sign.
20              THE COURT:  Oh, you're flashing the peace
21    sign.
22              How about the Government?  Do you have
23    something?  Mr. Castellano?  Mr. Beck?
24              MS. ARMIJO:  I believe Mr. Castellano does.
25    I'm throwing him down.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Okay.
 2              MR. CASTELLANO:  I just want to make sure
 3    that at least two of the witnesses on the defense
 4    witness list have attorneys.  One I know was
 5    previously represented.  But those two witnesses are
 6    Felix Reyes and Jimmie Rae Gordon.
 7              THE COURT:  Do y'all know, does anybody
 8    know if they have attorneys?
 9              MR. CASTLE:  Yeah.  We've called Jimmie
10    Gordon's lawyer.  It's his civil lawyer, actually.
11    But we've called him on numerous occasions to let him
12    know, left messages, haven't had return calls.  But
13    we let him know.
14              THE COURT:  Jimmie Gordon is tomorrow?
15              MR. CASTLE:  Yes.
16              THE COURT:  And who is the other one, Mr.
17    Castellano?
18              MR. CASTELLANO:  Felix Reyes.
19              MR. CASTLE:  He doesn't have a lawyer.
20              THE COURT:  He doesn't have one?
21              MR. CASTLE:  No.  His statement isn't
22    something that implicates him at all.
23              MR. CASTELLANO:  The problem is as an SNM
24    Gang member, he has exposure.
25              MR. CASTLE:  He's not an SNM Gang member.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    He has an STIU file in which they actually have in

 2    there that they had mistakenly identified him as an

 3    SNM member.  But they took his name off, and they

 4    literally said -- like a letter of apology almost --

 5    to Mr. Reyes.  So he's not an SNM member.

 6              THE COURT:  Do you think he has exposure,

 7    Mr. Castellano?

 8              MR. CASTELLANO:  I'm trying to remember.

 9    He was a Sureno previously.

10              MR. CASTLE:  He was a Sureno street gang

11    member.

12              MR. CASTELLANO:  So he's a Sureno.  So he's

13    still a gang member.  So I think, same thing, anyone

14    who has been a gang member, obviously, could be tied

15    to some sort of racketeering activity.  And I think

16    out of an abundance of caution, I'm asking today, so

17    we don't have to hold up the proceedings, but I think

18    it would be a wise course of action to do so.

19              THE COURT:  Who is the lawyer for Jimmie

20    Gordon?  You said it was a civil lawyer?

21              MR. COOPER:  Your Honor, it's Barry

22    Crutchfield.

23              THE COURT:  He's a little more than a civil

24    lawyer.

25              MR. CASTLE:  But he represented him on a

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                               FAX (505) 843-9492
                                                                      1-800-669-9492



```
 1   civil case.
 2            THE COURT:  But he's got good counsel,
 3   right?
 4            MR. COOPER:  Yes.
 5            THE COURT:  So we're okay with Jimmie
 6   Gordon, don't you agree?
 7            MR. CASTELLANO:  I do agree.  The defense
 8   counsel has said they had a hard time getting ahold
 9   of him, so I don't know what the status is.  But even
10   the reports indicate that he has representation, yes.
11            THE COURT:  And you think -- and I haven't
12   appointed him, right?  Is he representing him in some
13   private capacity?
14            MR. CASTLE:  I believe he represented him
15   in a private capacity.  And he was present during
16   defense interviews.  And I think he was present when
17   the Government -- or when the agent may have been
18   trying to talk to Mr. Gordon as well.
19            THE COURT:  Does he have assets so that
20   he's paying Mr. Crutchfield himself?  Do I need to
21   reach out to him and appoint?  Has Mr. Crutchfield
22   shown up at any point in this case?
23            MR. CASTELLANO:  He's not.  The reports
24   only indicate that from time to time he's been
25   present or notified.  I think on occasion he was
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  unavailable, so the meeting was canceled.  But I'm

 2  not aware that he's been appointed in this case.

 3          THE COURT:  Why don't -- Ms. Bevel, why

 4  don't you see if you can find a lawyer for Felix

 5  Reyes.

 6          MR. CASTLE:  Judge, I don't know why.  I

 7  mean, this is what Mr. Reyes says:  He says he

 8  overheard a conversation that Leroy Lucero was having

 9  with Eugene Martinez and a couple of others, where

10  he's making an order for them to do a murder, and to

11  do it after he leaves the facility.  Mr. Reyes didn't

12  participate whatsoever.  He didn't do anything of the

13  kind.  And so he's not an SNM member.  So what I'm

14  afraid of is that when the attorney is going to get

15  involved, it's going to be a situation where we lose

16  a witness.

17          And I don't understand -- I mean, they've

18  known about Felix Reyes on our list.  They

19  interviewed him.  The FBI interviewed him.  When the

20  FBI interviewed him, guess what?  They didn't provide

21  him with a lawyer at all.  And so --

22          THE COURT:  But the problem is the last

23  time we had a similar situation was James Garcia, and

24  that was just -- that just didn't work out well.

25          MR. CASTLE:  I understand.  But I now won't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1 even be able to prep my witness, because if he's

2 getting appointed a lawyer, he's downstairs -- he

3 didn't come in early this morning, so I was going

4 to -- as soon as Agent Acee was done, go down and

5 prepare him as a witness.  And if the Court is saying

6 you're going to appoint him a lawyer then I'm shut

7 off from preparing a witness.  And so it's going to

8 put this trial at a standstill.

9   And I don't know why, if he thought it was

10 necessary, they didn't bring this to the Court's

11 attention before today.  He's just a percipient

12 witness, not a participant in the crime.

13   THE COURT:  Well, I've got a prosecutor

14 over here saying he's got exposure.  It puts me in a

15 difficult position.

16   MR. CASTELLANO:  One of the problems, Your

17 Honor, he puts Edward Troup in Garza's cell, so the

18 question is whether or not he was mistaken, or he

19 purposefully gave the wrong name.  He has Mr. Troup

20 in the wrong murder.

21   MR. CASTLE:  He doesn't have him in the

22 cell.  I'll give the Court a copy.

23   THE COURT:  Let's do this:  I'm going to

24 have Ms. Bevel find him a lawyer.  And I'm going to

25 have her also call Mr. Crutchfield and see if he has

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

73

```
 1   any conflict with the SNM cases, and does he need an
 2   appointment, or is he just going to represent Jimmie
 3   Gordon, continue to represent him.  But I need
 4   something from Mr. Crutchfield telling me what he
 5   needs and what, and that he is his attorney for
 6   purposes of this case.
 7           MR. CASTLE:  Am I still allowed to prepare
 8   my witness, though?
 9           THE COURT:  Well, I'm not shutting you
10   down.  So we'll just keep moving and -- you know,
11   we'll just keep moving.
12           THE CLERK:  Felix Reyes is for this
13   afternoon?
14           THE COURT:  Yeah.
15           (The jury entered the courtroom.)
16           THE COURT:  All right.  Mr. Acee, I'll
17   remind you that you're still under oath.
18           Mr. Sindel, if you wish to continue your
19   cross-examination of Mr. Acee, you may do so at this
20   time.
21           MR. SINDEL:  Thank you, Your Honor.
22       Q.  There was a lot -- well, let me -- I'm
23   going to bounce around, so bear with me because
24   usually I'm more organized -- but there is a lot of
25   different facts that you have testified to that I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    want to touch on.
 2              Were you a participant, or did you have
 3    anything to do or were you aware -- let me just
 4    change that.  Were you aware of a search warrant that
 5    had been issued through the state court in November
 6    of 2012 to obtain a buccal swab from Joe Lawrence
 7    Gallegos?  I can approach.
 8         A.   That sounds familiar.
 9         Q.   Do you want me to show it to you?  I don't
10    have a problem doing that, if he lets me?
11         A.   That sounds familiar.
12         Q.   Okay.  So maybe in November of 2012 there
13    was a search warrant in order to secure Mr. Gallegos'
14    buccal swab or DNA?
15         A.   Yes.
16         Q.   And a buccal swab is what's used to collect
17    DNA?
18         A.   Yes.
19         Q.   All right.  Now, there was a lot of
20    testimony that we had concerning the Government's
21    WITSEC program; correct?  You heard a lot of it,
22    right?
23         A.   Yes.
24         Q.   You were aware that a number of the
25    witnesses testified to what their beliefs were
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      concerning what might be available to them in WITSEC?

2          A.   Yes.

3          Q.   And I think there was an interview of one

4      of the informants in which the agents referred to

5      WITSEC as a, quote, "fucking resort."  Do you

6      remember that?

7          A.   It wasn't this agent, but I do.

8          Q.   I didn't say that.  We didn't have it on

9      tape from you.  But then there was -- and a lot of

10     those things are basically to try to leave the

11     inmates with the impressions that, like you said,

12     Hey, there is a murderer walking the street.  All

13     good things can come to you; correct, if you work

14     with us and provide us with the testimony?

15         A.   There is an incentive to cooperating.

16         Q.   Have you made any determination about

17     where, if you were to relocate some of these

18     witnesses, for example, Mario Blue Rodriguez, and the

19     others, where they might go?

20         A.   I'll suggest St. Louis.  If that doesn't

21     work out, definitely Denver, Colorado.

22         Q.   I was hoping you'd say that.

23         A.   St. Louis or Denver.

24         Q.   He'll be a client for the rest of his life.

25     And Denver, is that the home where Mr. Castle lives,

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    and the city?

 2          A.   And Mr. Burke, yes.

 3          Q.   All right.  Well, we will welcome them with

 4    handcuffs.

 5               Now, you had heard the testimony from some

 6    of them, including Mr. Rodriguez, that WITSEC could

 7    wipe out their criminal records?

 8          A.   I corrected that with him.

 9          Q.   But he said it, he thought it at one point

10    in time?

11          A.   He did.

12          Q.   You heard testimony the other day about

13    somebody who said I can get a new home or a new pad,

14    a new car, right, you heard all that, right?

15          A.   Right.

16          Q.   He's talking to his girlfriend or his wife

17    and he says, you know, life is going to be great.  We

18    get this WITSEC, and the Government is just going to

19    fatten us up, right?  That's what they thought?

20          A.   They have some misguided views.

21          Q.   I understand that.  There was even

22    situations where they talked about getting a job for

23    their girlfriend or spouses to work with the federal

24    government, and securing money, right?

25          A.   There may have.  I don't recall that one.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Well, there was various phone calls that
 2   were recorded in which they had indicated -- some of
 3   the inmates had indicated to their spouses, Look,
 4   there may even be a job for you within the federal
 5   government.  Do you remember that?
 6        A.   No.
 7        Q.   Okay.  Now, it's fair to say that not
 8   everyone that's in prison is in a prison gang;
 9   correct?
10        A.   Correct.
11        Q.   Not everyone who is in prison either has a
12   past with gang or joins a gang while they're in
13   prison?
14        A.   Correct.
15        Q.   You are aware, are you not, that the
16   present state of the law allows law enforcement to
17   lie to people in order to got statements, or
18   cooperation?  I mean, you can say:  We have your DNA
19   on something, when you don't?
20        A.   In certain situations we can do that.
21        Q.   You can say:  We have your fingerprints,
22   when you don't?
23        A.   Correct.
24        Q.   You can say:  Hey, your buddy is right next
25   door making a statement against you right now, when
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  he's not?

2      A.   Yes.

3      Q.   And all those things are at least

4  considered tools of law enforcement to move an

5  individual in a particular direction that the

6  interviewing agent may want?

7      A.   No.  It's to get them to open up and talk.

8      Q.   Were you present on the testimony of

9  Benjamin Clark?

10      A.   Yes.

11      Q.   Do you remember him saying something during

12  the course of his testimony about his spouse getting

13  a job?

14      A.   From the Government?  No.

15      Q.   All right.  And did you -- when -- you

16  worked with Duran, and I think Archuleta in order to

17  make taped statements, to secure statements on tape

18  recorders that were made by various individuals?

19      A.   I feel like you're talking about two

20  different things there.  So with Duran, he did covert

21  recordings, and then with Gerald Archuleta I actually

22  did a recorded debrief.

23      Q.   But wasn't Mr. Archuleta also, at one time,

24  equipped with some recording equipment?

25      A.   Oh, excuse me, yes, sir.  After he was

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                      1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    initially arrested, he was.
 2         Q.   All right.  And so the purpose for that was
 3    to see if they could -- you could secure statements
 4    from other individuals that would be incriminating
 5    and could be used in court?
 6         A.   Yes.
 7         Q.   And would it be fair to say that at least
 8    for Mr. Duran, you told him and others that:  If it's
 9    not recorded, the conversation, in your mind, never
10    happened?
11         A.   I have made statements like that to them.
12         Q.   And have you made statements:  If it's not
13    recorded, you may not get credit for securing any
14    kind of statement?
15         A.   Something along those lines.  I just wanted
16    them to make sure they were paying attention in using
17    recording devices.
18         Q.   Would you say that many of the witnesses
19    that were called, who are working for the Government,
20    are skilled manipulators?
21         A.   Some of them are.
22         Q.   Now, in terms of recording devices, do you
23    typically record informant interviews?
24         A.   No.
25         Q.   Do you typically record interviews with
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    other individuals who don't fall within the rat
 2    category?
 3         A.   Well, I record people right after their
 4    arrest pursuant to our policy.  Doing recordings
 5    beyond that is situational based.
 6         Q.   Do you have recording devices with you at
 7    all times?
 8         A.   No.
 9         Q.   Do you have recording devices with you in
10    your equipment that you carry in order to do
11    interviews and investigation?
12         A.   Yes.
13         Q.   Recording devices, when I said "at all
14    times," I didn't think the shower.  But when we're
15    talking about recording devices, are those generally
16    available, if you care to use them, in order to make
17    sure that the words that you use and the words that
18    the interviewee uses are preserved?
19         A.   I have recording devices, and they're
20    available to me at all times.
21         Q.   And would the AUSA -- when we're talking
22    about that, we're talking about the Assistant United
23    States Attorney, we're talking about the three
24    individuals lined up here, at least in this case --
25    are they usually with you when you do an initial
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    interview with an possible informant?

2         A.   With a cooperating defendant in this case,

3    they usually are, because they have an attorney.  If

4    I'm picking up informants on the street or in prison

5    settings, then they're usually not there with me.

6         Q.   So your initial interview, if they don't

7    have an attorney, would be with the AUSA not present,

8    and then subsequent interviews they may be there?

9         A.   They may be there, yes.

10        Q.   Do you remember a handwritten note from

11   Mario Rodriguez, a future resident of St. Louis,

12   Missouri, to the effect the SNM was so fucked up,

13   there was no loyalty?

14        A.   He expressed that sentiment a few times.

15        Q.   And there was a letter that Mr. Rodriguez

16   had written to Mr. Sanchez trying to persuade him to

17   join the group of cooperators; correct?

18        A.   He wrote two such letters; one to Sanchez

19   and one to Rodriguez; not one of the gentlemen here,

20   but in another matter.

21        Q.   He said, "I think the best option is to go

22   into the feds and become a witness."  Was that the

23   message he was conveying?

24        A.   I believe so.

25        Q.   And did he also convey to them what

SANTA FE OFFICE                                                         MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                    FAX (505) 843-9492
                                                                              1-800-669-9492
                                                              e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    benefits they could receive if they were to enter

 2    into that agreement?

 3         A.   He made some suggestions.  And I corrected

 4    at least one of them.

 5         Q.   And one of them was that, you know, you can

 6    get a completely clean identity, right?

 7         A.   Yes, and that's one I corrected.

 8         Q.   And you knew that one of the issues in

 9    Mario's background, and one of his present concerns

10    was the fact that, because of his sexual violation of

11    another human being, he had to register as a sex

12    offender?

13         A.   I was aware of that.

14         Q.   That was something that he had tried to

15    mitigate in his history before becoming a cooperator?

16         A.   Yes.

17         Q.   And you were aware from your contacts with

18    him that that was a big deal in his mind, right?

19         A.   I think, yes, that was a big deal.

20         Q.   And that at one point in time he, at least

21    seemed to think that, Hey, if I get into the WITSEC

22    program, I will have a brand new identity, no

23    criminal record, and I won't have to tell people that

24    I'm a sex offender by registering; correct?

25         A.   We never talked about that, no.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Didn't he indicate to Sanchez:  Look,

2  you'll get a clean record.  You can even carry a

3  weapon again?

4      A.   He kind of he made a reference to --

5      Q.   Going hunting?

6      A.   -- going hunting.  And I said "with a bow

7  and arrow."

8      Q.   All right.  But when he was making that

9  reference you didn't believe that he was talking

10  about bows and arrows, you wanted to make sure he

11  understood.  Hey, man, you can't carry a weapon

12  anymore?

13      A.   Whether you're --

14      Q.   New identity or not, right?

15      A.   Correct.

16      Q.   Did you ever talk to Willie Romero about

17  getting in touch with the woman who was writing a

18  book concerning this case?

19      A.   Yeah, I heard that as well.  I was a little

20  surprised by that.  He wanted to -- the shortest way

21  to answer this, he did some research, and I told him

22  that a number of media had contacted our office

23  wanting to talk to informants or cooperators.  And I

24  told him to Google that, and figure out who he wants

25  to talk to, try to get ahold of them.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So if he testified that you told him or
2  instructed him to contact a woman named Colleen
3  Hield, because she's writing a book about the prison
4  gang, that would not be accurate; correct?
5      A.   Not in the way that you're stating it
6  there.  It was more general.  Just do a Google
7  search.  I don't know that woman or where I could
8  say, Hey, call this person.  I'm aware of who she is,
9  but --
10      Q.   But I'm referencing the way that he
11  described it.  He described as you told him to
12  contact this woman about a book, or an article,
13  whichever?
14      A.   No, I think that he may have that
15  impression just because what I told him was to do
16  some research, and that woman would certainly be
17  someone he would quickly find, if he did do like a
18  Google search.
19      Q.   Do you know a woman by the name of Veronica
20  Chavez, also known as Barela?
21      A.   I don't believe so.
22      Q.   Do you know a woman by that name who was a
23  confidential source for other agents of the FBI
24  concerning dirty police officers or crooked police
25  officers in the Los Lunas Police Department?

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   No, sir.  And to be clear, I don't -- I'm
 2   not able to query another agent's informants.
 3        Q.   I was asking if you were aware of that
 4   investigation?
 5        A.   You'd have to tell me more about it.  That
 6   name I don't recognize.  I have heard of
 7   investigations regarding public corruption in that
 8   area, but I don't have a lot of details.
 9        Q.   That's not something that you, yourself,
10   pursued?
11        A.   I have no such cases like that, no.
12        Q.   Now, you also mentioned the fact that
13   Willie Romero had an antique firearm?
14        A.   Yes, sir.
15        Q.   Do you know when it was manufactured?
16        A.   Off the top of my head, I don't.  But
17   myself and some other -- I hesitate to say firearms
18   experts, but those knowledgeable of what constitutes
19   a firearm under federal law, looked at it.  And it
20   wasn't.  I'd have been happy to charge him with it,
21   but it didn't meet the criteria.
22        Q.   Do you have any idea what the cutoff is for
23   what is an antique versus what is considered to be
24   actionable?
25        A.   There is a cutoff.  And it is a specific
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    year.  But I would have to look at some of my

2    materials to be exact.

3        Q.   Let me ask you a few more questions about

4    your testimony the other day concerning the shooting

5    of Robert Madrid.  I think you also testified that

6    there was a firearm bombing of a home.  Was that your

7    testimony in that regard?

8        A.   Yes, I believe it was his apartment.

9        Q.   All right.  But it was a home, right,

10   that's what you testified to?

11       A.   Yes, sir.  My understanding is it was a

12   molotov cocktail through the window or door of his

13   apartment.

14       Q.   Have you ever reviewed any police reports

15   that support that?

16       A.   I may not have.  I talked to the victim and

17   I talked to an officer at the scene.

18       Q.   Do you remember whether or not the

19   apartment burned to the ground?

20       A.   I don't think it did.

21       Q.   Do you remember whether or not the fire

22   department was ever called?

23       A.   It sounded like they were, when I talked to

24   the officer, but I'm not a hundred percent sure.

25       Q.   Did you at any time, or instruct any other

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                               Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 843-9492                                 FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    agents to inspect the damage to the apartment or home

2    of Mr. Madrid?

3         A.    No, that wasn't our investigation.

4         Q.    Was there anything -- did you ever secure

5    any photographs which reflected the explosion and the

6    subsequent fire in that home or that apartment?

7         A.    No, that wasn't our investigation.

8         Q.    But I mean, it was something that you

9    testified to here in response to Mr. Castellano's

10   questions; correct?

11        A.    I testified about a lot of stuff that I

12   didn't directly participate in.

13        Q.    All right.  I'll just jump to another

14   subject, if I may for a second.  We have to get some

15   copies.  Do you have -- well, do you remember when

16   the date of the particular fire bombing was?

17        A.    July of 2016.  I don't remember the exact

18   date.

19        Q.    July 9, 2016, would that be consistent with

20   your memory?

21        A.    It may be.  I know it was in July.

22        Q.    Did you review any of the police reports

23   that were prepared in connection with the fire

24   bombing of that individual's apartment or home?

25        A.    I may have only talked to the officers.  I

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                  Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492
                                                                         1-800-669-9492
                                                          e-mail: info@litsupport.com



1    may not have waited for their reports.

2         Q.   Did you talk to the officers there on the

3    scene while the flames licked out of this apartment

4    or dwelling?

5         A.   I think -- I don't know if there was still

6    a fire, but I did talk to an officer on the scene.

7         Q.   And are those officers with the Albuquerque

8    Police Department, or do you know?

9         A.   I believe it was one of the responders,

10   because Mr. Madrid was saying:  Call this FBI agent.

11        Q.   So at least from what you understood, Mr.

12   Madrid had vacated his home and waited for the fire

13   department to come and put out -- extinguish the

14   flames, that he had said to some investigating

15   officer:  You need to contact Bryan Acee with the

16   FBI?

17        A.   In the aftermath -- I don't know the status

18   of the fire, I don't know the extent of the damage.

19   I just know that I got a call, a frantic call, from

20   Madrid, and then he handed the phone to an officer,

21   who clearly didn't understand why he was talking with

22   an FBI agent.

23        Q.   Sometimes I don't either.

24             Okay.  So at least that lays something of

25   the foundation for what had occurred, at least from

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                  1-800-669-9492
                                                             e-mail: info@litsupport.com



```
1    your understanding.  And right now we're securing a
2    copy of the report that was prepared in connection
3    with that fire bombing for Mr. Castellano's review.
4    So I will probably get back to it in a little bit.
5          Was it true that you discovered during the
6    course of your investigation that individuals with
7    the SNM frequently bragged about something that they
8    had not done?
9          A.   I came across a couple instances where that
10   happened.
11         Q.   And have you ever indicated it's a common
12   occurrence for them to take credit for something they
13   did not do, or to brag?
14         A.   It's a common occurrence to brag.  And I
15   have come across some circumstances where I think
16   someone represented they were part of something that
17   they probably were not.
18         Q.   Did you review any of the police reports
19   that were prepared in connection with the assault by
20   Billy, the brutal assault, by Billy Cordova on his
21   wife, Crystal?
22         A.   I did.
23         Q.   Was there anything in those reports to
24   indicate that the assault was done at the request or
25   behest of the SNM?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Not in the reports themselves, no.
 2        Q.    Is there anything that you got from your
 3   investigation that any SNM members either knew of the
 4   reason for the assault, or approved of it?
 5        A.    Yes, he got some advice from some of the
 6   other members on how he should handle it.
 7        Q.    Do you remember who those individuals were?
 8   Well, let me ask you this, a simple question:  Are
 9   they in this courtroom?
10        A.    No.
11        Q.    No.
12              MR. SINDEL:  Your Honor, may I approach?
13              THE COURT:  You may.
14        Q.    I'm going to show you what's been marked --
15   or not been marked, but which is an Albuquerque
16   Police Department record with location number
17   16-66090.  Do you see that?
18        A.    Yes, sir.
19        Q.    And there is a date on that indicating July
20   19 -- I think I said 9th -- but July 19, 2016?
21        A.    Yes.
22        Q.    Would that be consistent with your memory
23   of what had occurred with the molotov cocktail?
24        A.    Yes.
25        Q.    And is there an indication on the very
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1    front page of that, sort of a summary narrative of
 2    what had happened?
 3         A.   Yes.
 4         Q.   Does it indicate that there was -- that the
 5    fire bomb was allegedly thrown not in an apartment
 6    through a glass window, but at the person's vehicle?
 7         A.   Yes.
 8         Q.   Is there any indication in that report that
 9    the apartment at any time caught on fire?
10         A.   I have to read it.
11         Q.   There is a narrative here; correct?
12         A.   Yes.
13         Q.   Go ahead.  I don't want disabuse you of
14    that opportunity.
15         A.   Thank you.
16         Q.   Finished with the narrative?
17         A.   Yes.
18         Q.   In that report that was prepared by the
19    Albuquerque Police Department of the incident that
20    occurred on July 19, 2016, there is nothing to
21    indicate that a glass window in Mr. Madrid's
22    apartment was shattered or broken; correct?
23         A.   Correct.
24         Q.   There is nothing to indicate that there was
25    a fire in Mr. Madrid's apartment or home, correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Correct.
 2          Q.    There is nothing in there to indicate that
 3    there was a fire anywhere; correct?
 4          A.    No, that's not correct.
 5          Q.    There is a fire?
 6          A.    There is a molotov cocktail that's on fire
 7    next to his car when he walked outside, I think
 8    that's what I read.
 9          Q.    Well, let me ask you this:  "Robert added
10    that when he went outside, all of a sudden he smelled
11    gasoline, and looked down by his vehicle and saw a
12    beer bottle leaking gasoline, and a rag lying next to
13    it by his vehicle"?
14          A.    Okay.
15          Q.    Is that what --
16          A.    I thought it said there was a fire.  I'm
17    sorry.
18          Q.    That's all right.  But there isn't any
19    indication in this report that anything caught on
20    fire, right?
21          A.    Correct.
22          Q.    And certainly, if there was a beer bottle
23    with gasoline, it was not thrown at the home, but
24    apparently at the automobile?
25          A.    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And whatever damage that was sustained was

2    not as a result of a fire; correct?

3    A.   Correct.

4    Q.   There was some testimony -- Mr. Cordova

5    testified and he admitted to lying under oath

6    concerning his drug use.  He said one time at one

7    point in time it's been a minute, and he later said

8    it's been a couple of weeks prior to his testimony in

9    December 2017.  Do you remember that?

10   A.   Yes.  And I remember discussing this.

11   Q.   That's a significant problem when anyone

12   lies under oath, isn't it?

13   A.   Yes.

14   Q.   And you were aware that he had admitted to

15   that; he said it was -- he misunderstood the

16   question, but he -- you were here when he testified,

17   right?

18   A.   Yes.

19   Q.   He couldn't explain exactly why it was he

20   misunderstood a relatively straightforward question,

21   right?

22   A.   Yes.

23   Q.   And he also testified about throwing coffee

24   on the prison guard.  Do you remember that?

25   A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And I think, as I recall, there was some

2    testimony that that might be taken to the Grand Jury

3    in the state system?

4    A.   That was news to me.

5    Q.   All right.  But you heard him testify that

6    sometime in May, which is rapidly approaching -- or

7    concluding -- we may -- he may be taken in front of a

8    Grand Jury?

9    A.   I heard him talk about that.

10   Q.   And he said he didn't really know what he

11   threw on him, but he thought maybe it was coffee.  Do

12   you remember that?

13   A.   Something he said he'd been drinking.

14   Q.   Yeah.  And do you remember that it was

15   described in the reports as a yellow and brown

16   liquid?

17            MR. CASTELLANO:  Objection, calls for

18   hearsay.

19            THE COURT:  Well, I think these are being

20   offered for the truth, and -- so sustained.

21   Q.   All right.  Well, from the testimony that

22   you heard there, did you think that he had thrown

23   coffee on the prison guard, or something else?

24   A.   It was reported to me that it was something

25   else.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   You are aware sometimes that inmates who
 2   get angry or have a hard time controlling themselves
 3   may throw feces and urine on correctional officers?
 4        A.   Yes, they call it gassing them.
 5        Q.   There have been situations where there has
 6   been ongoing criminal conduct by certain cooperators
 7   who have engaged in criminal conduct even after you
 8   have debriefed them and gone through their
 9   obligations as a source, right?
10        A.   Yes.
11        Q.   Billy Cordova's drug use; correct?
12        A.   And the sexual contact with his wife.
13        Q.   And that's not as bad as some things,
14   right?  I mean, it's a violation of prison rules, but
15   it's not nothing like selling drugs, right?
16             Well, I'll just withdraw the question.
17             You were aware that Timothy Martinez had
18   been involved in selling drugs after he agreed to
19   cooperate?
20        A.   Yes, I heard him testify to that.
21        Q.   And you knew that Jerry Montoya had sexual
22   relations with a correctional officer, and used that
23   same officer to bring contraband into the facility?
24        A.   Yes.
25        Q.   Would it be fair to say that, in terms of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    your training as a police officer and as an FBI

 2    agent, that most of the time you try to do your

 3    interviews with individuals who are potential

 4    witnesses separately from other potential witnesses?

 5         A.   Yes.

 6         Q.   And you know, because there is always a

 7    possibility that if you do it in a group setting,

 8    each one can pollute the other?

 9         A.   Yes.  It's just better to do it separately.

10         Q.   You get that individual's memory rather

11    than a collective memory, which may be significantly

12    different from what the single person remembers,

13    right?

14         A.   It's always better to interview them

15    separately.

16         Q.   And is it your practice to encourage

17    potential witnesses in a criminal matter to discuss

18    their possible testimony with other witnesses so they

19    can make a more cohesive story?

20         A.   No.

21         Q.   That would be a bad practice as well;

22    correct?

23         A.   Yes.

24         Q.   And you were aware, were you not, that many

25    of these cooperators were housed together?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Had to be.
 2        Q.   And they were -- some of them started out
 3   at Level 6, which is a fairly restricted environment,
 4   and moved down to a classification of Level 4?
 5        A.   In practice.  They remained at the Level 6,
 6   but the facility granted them some Level 4
 7   privileges.
 8        Q.   Which would include frequent contact with
 9   family members?
10        A.   It sounds like --
11        Q.   Phone contact.
12        A.   Yes, phone definitely.
13        Q.   Some of them had contact more than others,
14   right?
15        A.   Yes.
16        Q.   But also it would allow them more time out
17   of their cells, which would be on the tier?
18        A.   As a Level 4 inmate, they would have had
19   that opportunity.
20        Q.   You know, where they could play board games
21   or card games, or talk amongst themselves.
22        A.   I'm sure they could have done all that.
23        Q.   And for a period of time all the people who
24   were named as defendants had tablets which contained
25   the information that had been provided by the other
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    cooperators?

 2         A.   The tablets contained all the discovery.

 3         Q.   So if there were 302s of one cooperator, he

 4    could see -- Joe could see what Frank said, and Frank

 5    could see what Joe said, if they had the tablets?

 6         A.   Correct.

 7         Q.   There were some cooperators you provided a

 8    phone to them for them to be able to do government

 9    business, government-issued cellphone?

10         A.   To purchase drugs and firearms and

11    ballistic vests, and things like that.

12         Q.   Were some of them using it to talk to and

13    exchange photographs with strippers?

14         A.   That does not sound familiar.

15         Q.   Do you remember asking certain questions

16    about Mr. Duran and Fantasy Football?

17         A.   Yes.

18         Q.   And using his phone allegedly to bet on

19    Fantasy Football?  I'm not saying he did.  Do you

20    remember being asked those questions?

21         A.   I remember him being asked about Fantasy

22    Football, and I definitely had a conversation with

23    Eric Duran about using his phone for Fantasy

24    Football.

25         Q.   And do you remember giving testimony on or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    about January 31 of this year, and February 1st of
 2    this year in another proceeding?
 3         A.   I'm sure I did.
 4         Q.   And do you remember at that time being
 5    asked this question, page 250:  "Did he use the phone
 6    to talk and exchange photographs with a stripper?
 7              "A.  He had contact with some females, and
 8    I think one of them was a stripper."
 9              Do you remember that question and that
10    answer?
11         A.   Yes.
12         Q.   "Q.  And he's doing this from inside the
13    prison, right?
14              "Yes.
15              "Q.  On a government-issued phone?
16              "Yes.
17              "Q.  That's for government business?
18              "A.  Yes."
19              Do you remember that exchange?
20         A.   That sounds familiar.
21         Q.   And you would agree that some of the
22    cooperators in this case had had frequent contact
23    with each other over a period of the investigation?
24         A.   Some have been housed with other
25    cooperators.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   There is an admonition that I have seen

2   that you've given on some 302s -- not all of them --

3   about talking to defense lawyers or defense

4   investigators; correct?

5      A.   Yes.

6      Q.   And do you -- I'm getting these little

7   Post-its here; it says, "You better wind this up,

8   everybody is dying of boredom."  I will.

9           I can't remember -- I lost my train of

10  thought.

11     A.   I put something in my reports telling them

12  not to talk to defense lawyers.

13     Q.   There you go.  I'm glad you can

14  concentrate.

15          And that is an admonition which basically

16  says, you know, I can't tell you not to talk to them,

17  but that's your choice.  But if you do, we prefer to

18  have, you know, an Assistant United States Attorney,

19  or someone else in law enforcement present, right?

20     A.   I'm explaining the various options, and

21  that's one of them.

22     Q.   Okay.  And do you include in any of the

23  302s an admonition about talking to other potential

24  or future witnesses or cooperators in the case?

25     A.   I don't write that in the report, but I've

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492
                                                              1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   given that instruction.

 2        Q.   Okay.  But there is one admonition that's

 3   specifically written in the report.  That one is not;

 4   is that right?

 5        A.   Correct.

 6        Q.   And is there any record that you have seen

 7   in any report that you have prepared or Agent Stemo

 8   has prepared or Agent Neale has prepared or any --

 9   Agent Lopez has prepared indicating that:  We told

10   them not to discuss the case with the other potential

11   witnesses?

12        A.   I don't believe so.

13        Q.   And you were aware, were you not, that not

14   only did Mr. Cordova while he agreed to work for the

15   Government was continuing to use drugs, but he also

16   brought a weapon to court?

17        A.   He sat in this very chair with a shank in

18   his rectum.

19        Q.   There wasn't anything about his expression

20   or the way he sat that led you to believe that

21   anything like that was going on; correct?

22        A.   No, I only know about it.

23        Q.   Total surprise?

24        A.   I spoke over you, I'm sorry.

25        Q.   Total surprise, right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   I wasn't surprised.  He told me about it.

2       Q.   Yeah, he told you about it, right,

3  afterwards?

4       A.   Yes.

5       Q.   I mean, obviously, you didn't say:  Good

6  idea, let's keister a weapon and come to court,

7  right?

8       A.   I think that's a bad idea.

9       Q.   Terrible idea, right?  As bad as you can

10  get as far as ideas; would you agree?

11       A.   Well, there is a long list of bad ideas,

12  but not all these guys agree with me.

13       Q.   Well, Mario Rodriguez, he was able to bring

14  actually two weapons in the vault?

15       A.   Multiple times.

16       Q.   Would it be fair to say that with many of

17  these individuals, if not most of them, your message

18  was either you become a witness or you become a

19  defendant?

20       A.   I often said that.

21       Q.   You're watching me turn these pages and

22  thinking, oh, I'm going to get off of here, right?

23       A.   I'm waiting for another note to come up

24  with some more questions.

25       Q.   Well, I just want to -- I'm just so glad

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1    you're going to send Mario to be a bus driver in my
 2    community.
 3             Do you remember, there was this whole thing
 4    that sort of occurred around the property of Mario
 5    Rodriguez, the poster boy for the Government
 6    informants, about some documents of his that weren't
 7    located, that were found under a desk in the FBI's
 8    office, right?
 9             MR. CASTELLANO:  Objection, relevance, Your
10    Honor, and beyond the scope of direct.
11             THE COURT:  How do you connect it to --
12             MR. SINDEL:  Yeah, I can connect it, Your
13    Honor.  I'm just laying the briefest of foundations.
14             THE COURT:  Well, I'll give Mr. Sindel a
15    little bit of leeway here to make it relevant.
16        Q.   And basically what happened was that the
17    box was discovered, and then it was disclosed, right?
18    It was disgorged, but it was late in the game, right?
19        A.   Yes, it was disclosed.
20        Q.   And there were certain letters in there
21    from Mr. Rodriguez, and certain writings that he had;
22    correct?
23        A.   There were.
24        Q.   And do you remember that there was his
25    concern in one of his statements to people that the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    Government witnesses statements didn't match up with
2    the discovery in the case?
3           MR. CASTELLANO:  Objection, Your Honor,
4    relevance and hearsay.
5           THE COURT:  Overruled.
6       A.   I'm not sure that was one of the letters we
7    saw or talked about.
8       Q.   All right.  Do you remember giving
9    testimony in another proceeding, March the 7th, 2018,
10   which you were asked about the property of Mario
11   Rodriguez?
12      A.   I was asked a lot of questions by a lot of
13   attorneys about that.
14      Q.   And I'm not challenging you on that.  I can
15   show you this, if you want me to.  Or I can read it
16   from here.  You tell me.
17      A.   What is the question, sir?
18      Q.   "And I think, first of all, those letters
19   written to Timothy Martinez were found in the
20   property of Mario Rodriguez?
21           "A.  Yes.
22           "Q.  And there was more than one?
23           "A.  I saw three this morning.
24           "Q.  And the letter specifically referenced
25   the fact that certain individuals' statements that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    people had made, Government witnesses had made,

 2    didn't match up with the discovery in the case?

 3              "A.  I saw one letter like that yesterday."

 4         A.   Is that Agent Sainato or me?  I thought --

 5    that sounds more like him.

 6         Q.   I believe that is you.

 7         A.   I don't --

 8              MR. SINDEL:  May I approach?

 9              THE COURT:  You may.

10         Q.   Yours truly, right?

11         A.   Yes.

12         Q.   Had you ever determined whether or not the

13    Department of Corrections, the prison institution,

14    kept any records concerning the inmates' access to

15    the recreation yards?

16         A.   I've inquired several times, and --

17         Q.   Sometimes yes, sometimes no; fair

18    statement?

19         A.   That's fair.

20         Q.   Okay.  And that, in terms of checking those

21    particular records, because it's not -- they're not

22    always consistent or consistently kept, it's pretty

23    difficult to make a determination as to whether

24    someone was actually in the recreation yard, when

25    they claimed to be, right?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    The records are inconsistent.  So it's
 2   tough to rely on records that don't exist or are
 3   inconsistent.
 4        Q.    In terms of those records, those that did
 5   exist would indicate when someone went to the
 6   recreation yard, what date, what time?
 7        A.    Maybe.
 8        Q.    Well, I mean, some of them you reviewed did
 9   say that, right?
10        A.    Some records --
11        Q.    Okay, I'm sorry.
12        A.    -- sometimes would record that.
13        Q.    Would indicate when they left to go to the
14   recreation yard?
15        A.    Yes.
16        Q.    And what recreational pen or run they would
17   be placed in?
18        A.    Yes.
19        Q.    The time they entered it?
20        A.    It should.
21        Q.    And the time they left it?
22        A.    It should as well.
23        Q.    And the officer who took them from their
24   living quarters to the rec yard.
25        A.    Yes.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Were you able to verify any of the

 2   information that's been provided by some of the

 3   people working for the Government, who testified

 4   here, whether or not their testimony about being in

 5   the recreational yard was supported by the records?

 6        A.   I'm not sure I understand.

 7        Q.   In other words, did you ever seek out

 8   whether or not there were records to support claims

 9   that were made by individuals that, Hey, I was in

10   recreation on the same day as Joe Gallegos?

11        A.   I did seek that.

12        Q.   Did you find it?

13        A.   The records are terrible.

14        Q.   Did you find it?

15        A.   No.

16             MR. SINDEL:  Pass the witness, Your Honor.

17             THE COURT:  Counsel, approach.  I want to

18   have Mr. Burke, and I was going to have Mr. Castle

19   step up here.

20   EXCERPT CONCLUDED

21   (Bench conference held.)

22   EXCERPT

23             THE COURT:  All right.  Mr. Sindel.

24             MR. SINDEL:  Just a few more questions,

25   Agent Acee.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    BY MR. SINDEL:

2        Q.   We had talked briefly about the incident on

3    March 1st, 2016, the shooting of Mr. Madrid by Julian

4    Montoya, the son of Roslyn Mirabal; correct?  Do you

5    remember that?

6        A.   Yes.

7        Q.   And there was a statement that was secured

8    on that same night within hours of the actual

9    shooting from a woman who was identified as Mr.

10   Madrid's girlfriend, Bella Martinez.  Do you remember

11   that?

12       A.   Yes.

13            MR. SINDEL:  May I approach, Your Honor?

14            THE COURT:  You may.

15       Q.   And there is a couple paragraphs of the

16   narrative in there.  And Ms. Martinez is describing

17   the shooting as it occurs; correct?

18       A.   Yes.

19       Q.   And where the shooter is, and what is going

20   on with Mr. Madrid, right?

21       A.   Yes.

22       Q.   And is there an indication in that report

23   that when the young man, Julian Montoya, approached

24   the passenger side of Madrid's vehicle, he began

25   accusing him of disrespecting his mother?

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492
                                                                                     1-800-669-9492
                                                                          e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1        A.    Yes.

 2        Q.    Is there anything that you see in that

 3   narrative -- and I know you read it before -- that

 4   indicates that that shooting is related to SNM?

 5        A.    Not in that paragraph.

 6        Q.    Or in the subsequent paragraph concerning a

 7   person who was actually there when the shooting

 8   occurred?

 9        A.    Can I look at it?

10        Q.    Sure.

11        A.    No, this report doesn't mention the SNM.

12              MR. SINDEL:  Your witness.

13              THE COURT:  All right.  Thank you, Mr.

14   Sindel.

15              Any other defendant have cross-examination

16   of Mr. Acee?

17              All right.  Mr. Acee, you may step down.

18

19   EXCERPT CONCLUDED

20

21

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   EXCERPT
 2              THE COURT:  All right.  Mr. Acee, do you
 3   want to return to the witness box, and I'll remind
 4   you that you're still under oath.
 5              Mr. Castellano, if you wish to conduct
 6   redirect examination of Mr. Acee, you may do so at
 7   this time.
 8              MR. CASTELLANO:  Your Honor, may we
 9   approach?
10              THE COURT:  You may.
11              (The following proceedings were held at the
12   bench.)
13              MR. BLACKBURN:  That was quicker than I
14   thought.  I thought they set aside two hours for that
15   or something.  It took longer to read the
16   stipulation.
17              During Mr. Castle's cross-examination, he
18   was questioning Mr. Acee about a poster, about a
19   poster that I think that -- the leadership of the
20   gang, one that I think that Mr. Acee had, and then
21   one that was the rolled-up version.  And going
22   through that, he went through and asked -- basically
23   what he was trying to do was to ask if Billy Garcia
24   was on there.  He went down and listed all of them,
25   and Mr. Acee said no.  Then, whenever he asked him
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   about a second one, he asked him if Billy Garcia was
2   on there.
3          On the first one, he went and named
4   everybody, and asked if there was people on there.
5   He never mentioned Arturo Garcia.  My client is on
6   there.  So he opened up -- I guess the Government is
7   probably going to ask about Arturo Garcia, indicating
8   now that Mr. Castle opened up the door.
9          I did not cross on that, and I think that
10  the answer now would be, if they're going to do
11  that -- I don't know if they're going to do that, I'm
12  assuming they are -- that the answer would -- well,
13  first of all, I didn't open up the door.  And I would
14  think it would be unfair, under the circumstances, to
15  allow him to cross-examine:  Now, isn't it true that
16  Arturo Garcia is one of the people that are mentioned
17  on there.  And that wasn't really the question that,
18  obviously, Mr. Castle asked originally.  So there is
19  no confrontation for me.  I wasn't the one opening up
20  the door.
21         So I would object to the Government asking.
22  If they want to ask about Billy Garcia on any of
23  these, that's fine.  But to now ask about Arturo
24  Garcia as being the leader on a document that we did
25  not ask about, I think would be unfair, and outside

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   the scope of --
 2            THE COURT:  What specific question did Mr.
 3   Castle ask that prompted the response from Mr. Acee?
 4   What did he ask him?
 5            MR. BLACKBURN:  So I think what he did was
 6   looked at this document and said the people who are
 7   listed on here are the leaders, are like, Julian
 8   Romero, Juan Mendez, Ramon Clark, Anthony Baca,
 9   Gerald Archuleta, Robert Martinez, Mario Rodriguez,
10   Roy Paul.  He did not ask about Arturo Garcia, as I
11   recall.
12            THE COURT:  You skipped him.
13            MR. CASTLE:  I skipped because I knew it
14   would implicate the confrontation rights of a
15   defendant.  I've done that throughout the trial,
16   where they had to identify some other defendant,
17   because even though I'm not the Government, if I
18   brought it out, it would implicate their
19   confrontation rights.  And I knew that Arturo
20   Garcia's name is on here had to have been from
21   informants, which of course would be testimonial
22   statements, so I avoided it specifically, so I
23   wouldn't be eliciting something that might violate
24   Mr. Arturo Garcia's constitutional rights to
25   confront.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  What is the chart?  Is it a
2    document that Mr. Acee made?
3              MR. BLACKBURN:  There were two of them.  Go
4    ahead.
5              MR. CASTELLANO:  So what Mr. Castle pulled
6    out of the testimony is that downstairs in the
7    marshal's secure area there is an organizational
8    chart from two years ago.  And so I think they got
9    names from the chart, the defense did, and then asked
10   Agent Acee about who the leaders were.
11             THE COURT:  So this chart is not down
12   there?  This is a derivative of a chart down there?
13             MR. CASTELLANO:  What the Court has in
14   front of it is what would be considered the top of
15   the chart, and below this.  So leaders at the top,
16   and then members and associates below that.  He also
17   has a current chart as well.  On both charts Arturo
18   Garcia is at the top as a leader, so in 2015.  Now,
19   he's still considered a leader.
20             MR. CASTLE:  With the current chart, I
21   didn't ask who was on it other than to say who wasn't
22   on it, which is Billy Garcia.
23             MR. CASTELLANO:  Right.  So the jury is
24   left with the impression that just because I didn't
25   say the name that Arturo Garcia was not mentioned on
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    the 2015 chart, and once again, left with the

2    impression that they may not be on the top of the

3    current chart.

4         THE COURT:  What would be your question?

5    What would you be asking him?

6         MR. CASTELLANO:  It would be based on the

7    defendant's questions that an old chart from 2015,

8    the defense asked about various leaders of the SNM,

9    and if one of those people was Arturo Garcia.

10        THE COURT:  But isn't that chart based upon

11   some law enforcement decision that he's a leader, and

12   so isn't it really being offered for the truth of an

13   out-of-court statement?

14        MR. CASTELLANO:  That's what I thought

15   yesterday when the defense asked that question.  I

16   didn't know why they would ask that question.

17        THE COURT:  But isn't it different for the

18   defense to ask it given it's a Government statement,

19   whereas, if you tried to elicit it, it's not a

20   statement of a party opponent?

21        MR. CASTELLANO:  I agree with that, Your

22   Honor.  And that's the issue with opening the door at

23   trial, is that we didn't go there.  The defense did.

24   And now we should have an opportunity to respond to

25   that.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           THE COURT:  Well, I think they probably
 2    walked up to the edge, but they didn't open the door.
 3    So I think I'm going to grant the request to preclude
 4    the Government from asking questions about that
 5    chart.
 6           I think -- I'm not sure that how much of
 7    that is catching on with the jury.  But if it does, I
 8    think it's still at the edge.  So I'll conclude that
 9    it doesn't open the door, and not allow the
10    Government to ask questions about that chart.
11           MR. CASTELLANO:  What I would like to do is
12    ask questions about the chart, and just ask if the
13    people who he had listed in 2015, not including
14    Mr. Garcia, have been in basically moved down as
15    nonleaders; that would be people who are
16    noncooperating, whether they are considered now a
17    leader based on the cooperation.
18           THE COURT:  Anybody have any problem with
19    that question?
20           MR. CASTLE:  I don't think -- we didn't
21    look at the chart too much, but we'd like to know who
22    that is, who was moved down.
23           MR. CASTELLANO:  No, what I'm saying is --
24           MR. BLACKBURN:  Those would be now?
25           MR. CASTELLANO:  Roy Martinez would no
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    longer be considered a leader because of the

 2    cooperation, and Gerald Archuleta.

 3               THE COURT:  That sounds fair.  There

 4    doesn't seem to be an objection to that.

 5               (The following proceedings were held in

 6    open court.)

 7               THE COURT:  All right.  Mr. Castellano.

 8               MR. CASTELLANO:  If I can borrow

 9    Defendant's Exhibits EK 1, please.  Let's start with

10    the fun part.

11                    REDIRECT EXAMINATION

12    BY MR. CASTELLANO:

13        Q.   All right.  Agent Acee, EK 1, who are we

14    looking at?

15        A.   Eric Duran.

16        Q.   Eric Duran was credited with doing what for

17    the Corrections Department?

18        A.   He was awarded two lifesaving awards.

19        Q.   So is this the person you referred to

20    before as the person who turned over letters

21    regarding the conspiracies to murder Mr. Marcantel

22    and Mr. Santistevan?

23        A.   Yes, that's him.

24        Q.   Let's go ahead and turn to EK 2 and 3 and

25    4, I believe.  Thank you.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Now, when these photos were taken, was Eric
 2    Duran working as a confidential human source for you?
 3         A.   No.
 4         Q.   Where was he working as a source?
 5         A.   In the Portland, Oregon, area for the FBI
 6    up there.
 7         Q.   At that point, were you paying him
 8    Government funds from FBI Albuquerque, that office,
 9    or was he getting paid from the Northwest FBI
10    offices?
11         A.   I wasn't paying him.  Any payment he
12    received from the FBI up there was -- I wasn't part
13    of.  I think that they did pay him, though.
14         Q.   And was he working as a confidential human
15    source for FBI in the northwest part of the United
16    States?
17         A.   Yes.
18         Q.   And are you aware of whether or not this
19    Facebook post was related to his undercover work?
20         A.   Yes.
21         Q.   You were also asked about whether he got in
22    trouble up there, and you said you were disappointed
23    in him?
24         A.   I was.
25         Q.   In one of those circumstances was he in a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   car where a firearm was also found?
 2        A.   Yes, two firearms.
 3        Q.   And how many people were in the vehicle?
 4        A.   Two.
 5        Q.   When you heard this what, if any, steps did
 6   you take to help investigate and potentially
 7   prosecute that crime?
 8        A.   I asked the Department of Corrections here
 9   in New Mexico to issue an arrest warrant for him,
10   because he was on parole.  His parole was transferred
11   up to Washington State.  I also asked Washington
12   State to issue an arrest warrant for him.  And then I
13   wrote a federal warrant to take a DNA swab from his
14   person, so I could compare it to the firearm.
15        Q.   Did you ever get the test results back with
16   the DNA?
17        A.   Yes.
18        Q.   What was the result?
19        A.   Eric Duran's DNA was not on the firearm.
20        Q.   Nonetheless, was he still arrested on a
21   parole violation?
22        A.   He was.  He was brought back to New Mexico.
23   And as soon as he arrived here, I met him at the
24   facility and took the swab.
25        Q.   Just a quick reminder on your phrase, "If
```

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                                    Albuquerque, NM 87102
(505) 989-4949                                                                  (505) 843-9494
FAX (505) 843-9492                                                       FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

```
 1   it's not recorded, it didn't happen."  What's the
 2   purpose of telling cooperators that?
 3       A.   So they remember to turn on the recording
 4   device.  I've had cooperators that leave it in the
 5   car when they go in to do a drug buy.  That buy
 6   doesn't count.  So I tell them, Make sure you take
 7   the recording device, because if it's not on there,
 8   it didn't happen.
 9       Q.   And, in reality, do things still happen
10   even if they're not recorded?
11       A.   Of course they do.  I'm just trying to
12   emphasize the importance of them remembering to
13   follow procedures.
14       Q.   I'm going to go back to a letter from
15   yesterday, Government's Exhibit 988.  Do you recall
16   testifying about a letter between Andrew Gallegos and
17   Brandy Rodriguez?
18       A.   Yes.
19       Q.   In that letter yesterday I think you
20   testified to a word "shafote."  Have you heard that
21   in context of the SNM Gang?
22       A.   Yes.
23       Q.   What does it mean in the context of the
24   gang?
25       A.   To be shafa, to be no good.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And for people to go to the dropout program
 2   in the context of the SNM, is that going to a good
 3   place or a bad place?
 4            MS. TORRACO:  Objection; that calls for
 5   this witness' conclusion and not the state of mind of
 6   Andrew Gallegos.
 7            THE COURT:  Well, I think he can testify
 8   about this.  Overruled.
 9            MS. TORRACO:  Well, it would be in his
10   opinion, not as a matter of fact.
11            THE COURT:  He can testify about it.
12   Overruled.
13        A.   Can you ask the question again, please?
14        Q.   Yes.  In the context of the SNM Gang is
15   going to a dropout program a good thing or a bad
16   thing?
17        A.   A bad thing.
18        Q.   You were also shown a chart yesterday with
19   various leaders at the top of it.  Do you remember
20   that?
21        A.   Yes.
22        Q.   Did you get a chance to look at that chart
23   during a break?
24        A.   I did.
25        Q.   Do you know how old that chart was?
```

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                     Albuquerque, NM 87102
(505) 989-4949                                                (505) 843-9494
FAX (505) 843-9492                                       FAX (505) 843-9492
                                                         1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                              e-mail: info@litsupport.com

1       A.   Yes.

2       Q.   How old was it?

3       A.   It was from August of 2015.

4       Q.   So was that a chart that was put together

5   even before this case was indicted?

6       A.   Yes.

7       Q.   Now, some of the people, by way of example,

8   at the top of that chart back then, you were asked

9   about people like Roy Martinez, Mario Rodriguez,

10  Robert Martinez, and Gerald Archuleta?

11      A.   Correct.

12      Q.   Would those people be at the top of that

13  chart today?

14      A.   Well, they're at the top of my chart.  But

15  if I made a -- yes, yes.

16      Q.   And would they, as cooperators in this

17  case, would they still be considered leaders of the

18  SNM, or that would be more of a historical chart that

19  you were putting together?

20      A.   Sorry, that's why I was hesitating, because

21  you said "today."  As dropouts and cooperators,

22  they're no longer part of the gang.

23      Q.   So like any other organization, are other

24  people expected to rise to the top and fulfill

25  leadership positions?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.    Yes.

 2        Q.    And in that context you were asked about

 3   Billy Garcia.  Do you recall that?

 4        A.    Yes.

 5        Q.    And did you have him listed as an SNM

 6   member?

 7        A.    Yes.

 8        Q.    And has leadership changed over the years

 9   in this organization?

10        A.    Yes.

11        Q.    And you were asked about a statement given

12   to you by Javier Alonso regarding a hit on Billy

13   Garcia for no longer being with the SNM.  Do you

14   remember that?

15        A.    Yes.

16        Q.    Now, do you remember the timing of that

17   hit?  Was that in 2001, or was that at a later date?

18        A.    It was at a later date.

19        Q.    So would a hit on Billy Garcia at a later

20   date have anything to do with his leadership in 2001,

21   at the time of the murders?

22        A.    Not necessarily.

23        Q.    In terms of witnesses and cooperators, Mr.

24   Castle asked you if anyone just volunteered to

25   cooperate.  Do you remember that?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                            FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1          A.   Yes.

2          Q.   Do you have witnesses who, maybe if they

3    didn't volunteer, agreed to testify without being

4    charged in anything of that nature?

5          A.   Yes.  And I don't think I finished the list

6    yesterday, but the answer is yes.

7          Q.   What about John Montano?

8          A.   That name -- late last night, that was one

9    of the names I struggled to remember yesterday.

10         Q.   And do you recall in which murder he gave

11   testimony or information?

12         A.   Yes.  I would need to look at my report.

13         Q.   What about Freddie Sanchez?

14         A.   He did.  I thought he also had information

15   on a second incident, but that was the primary one.

16         Q.   Now, for John Montano, did you ever

17   threaten him or suggest that he might be charged in

18   this case?

19         A.   No.

20         Q.   What about Joseph Otero?

21         A.   I did not ever threaten him or say he'd be

22   charged.

23         Q.   And do you recall if he gave information

24   related to the Rolando Garza murder?

25         A.   Yes, he did.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

```
 1        Q.    What about from Samuel Gonzalez?

 2        A.    Same thing, and no threats were made to

 3   him.

 4        Q.    Morgan Ramirez?

 5        A.    Same.

 6        Q.    Raymond Rascon?

 7        A.    Same.

 8        Q.    Leroy Lucero?

 9        A.    Same.

10        Q.    Now, you were asked about leads from what

11   various people said in various reports over the

12   years.  Do you remember that?

13        A.    Yes.

14        Q.    Now, taking a recorded statement from Leroy

15   Lucero, would that be something akin to following up

16   on a lead?

17        A.    Yes.

18        Q.    And did you have a chance to ask him

19   questions and then present him to the jury about what

20   role, if any, he had in the Castillo and Garza

21   murders?

22        A.    Yes, I did.

23        Q.    You were also asked if you considered him a

24   conspirator in this case.  Do you recall his

25   testimony where he said, in fact, stated that for a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    short period of time he was a conspirator?

2         A.   Yes.

3         Q.   And that Billy Garcia sent him home?

4         A.   Correct.

5         Q.   Once he's sent home, was he any longer a

6    conspirator?  Did the murders happen after he left

7    prison?

8         A.   So the first part of that is I don't feel

9    that he was a conspirator after he left.  And, yes,

10   the murders happened after he left.

11        Q.   You were also asked about the defendants in

12   this case, and we talked about threats.  Had there

13   been a time in this case where the defendants were

14   living in a pod and shanks were found in that pod?

15        A.   Yes.  Three shanks were found.

16        Q.   And to be fair to the defendants, were any

17   of those shanks attributed to any of the defendants,

18   or were they just found in the pod?

19        A.   They were just found in the pod.

20        Q.   You were also asked about a series of

21   isolated statements by Gerald Archuleta before he

22   cooperated.  Do you remember that?

23        A.   Yes, sir.

24        Q.   And were those statements made in the

25   context of undercover operations, where you had

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 843-9492                                                 FAX (505) 843-9492
                                                                   1-800-669-9492

PROFESSIONAL COURT                                e-mail: info@litsupport.com
REPORTING SERVICE

 1    people recording him?

 2         A.   Yes.

 3         Q.   And do you have the context of the full

 4    conversations, or just what you were asked about?

 5         A.   Just the snippets I was asked about.

 6         Q.   When it comes to the location histories,

 7    when you were interviewing people who were

 8    cooperating, was that something that you used

 9    routinely, was the location histories of where people

10    were located?

11         A.   No.

12         Q.   And so when people gave you information

13    about certain statements they took from other people,

14    or certain places they were, were they relying on

15    their memory to the best of their ability?

16              MR. BURKE:  Objection, leading.

17              THE COURT:  Don't lead.  I know you're

18    changing topics a lot.

19              MR. SOLIS:  Also calls for a hearsay

20    response, Your Honor.  That information comes from

21    another source.

22              THE COURT:  Well, I've already sustained

23    the objection.  So reword it, and then I'll listen to

24    it, and see if there is any objection to the reworded

25    question.

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 843-9492                                  FAX (505) 843-9492
                                                        1-800-669-9492
                                        e-mail: info@litsupport.com



```
 1        Q.   Generally speaking, what did people recall
 2   about the events?
 3        A.   The first thing is the statement, the
 4   conversation, and then where they were and about when
 5   it was.
 6        Q.   So what you would ask them about, to the
 7   best of their recollection what they can remember
 8   about what the statement was made or where they were?
 9        A.   I would ask just those questions:  Where
10   were you when that happened?  About what timeframe
11   was it?  Trying to figure out what facility and what
12   year or month it happened in.
13        Q.   And then whatever they told you, is that
14   what you would write in your report?
15        A.   Yes.
16        Q.   You were asked about Leroy Lucero and him
17   talking to seven people over the years.  Do you
18   remember that?
19        A.   Did you say "talking to seven people"?
20        Q.   Yes, the defense said he had talked to
21   seven people over the years, and no one mentioned
22   Michael Jaramillo.
23        A.   I remember that question.
24        Q.   So what does that tell you about what Leroy
25   Lucero knew about the murders firsthand?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. CASTLE:  Objection, Your Honor.  I
 2    think that calls for a hearsay response.
 3            THE COURT:  Well, I can't tell really from
 4    the question what it's -- are you asking for
 5    statements, or are you just asking what he concluded?
 6    What exactly is the question?
 7            MR. CASTELLANO:  Yes, Your Honor, I'm
 8    asking what he concluded by the fact that Leroy
 9    Lucero did not give the name "Michael Jaramillo."
10            THE COURT:  All right.  I think that's
11    appropriate.  Overruled.
12        A.   I think Mr. Lucero had some information
13    leading up to the event, and then he talked to some
14    people after the event.  And his information was
15    limited to those circumstances.
16            MR. CASTLE:  Your Honor, I believe that's a
17    comment on truthfulness of the witness, and I'd ask
18    that be stricken.  That's just vouching.
19            THE COURT:  Well, I think it may be getting
20    into that, so I will sustain the objection.  So I'll
21    strike that testimony and instruct the jury not to
22    consider it in its deliberations.
23        Q.   I think you touched on that, Agent Acee,
24    when you said that he provided some information
25    beforehand, and then some information afterwards.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Was the information he provided afterwards things he

2    claimed were firsthand, or things he claimed he knew

3    from other people?

4         A.   A little bit of both, in my interview with

5    him.

6         Q.   You were also asked about the timing of

7    when Billy Cordova had a conversation with Billy

8    Garcia at MDC?

9         A.   Yes.

10        Q.   Do you recall if that was at the same time

11   period as when Jake Armijo was there and confronting

12   him, or was that a different time period?  I want to

13   ask you if you recall Billy Garcia stating he was

14   actually there during the time of the barber shop

15   murder, when Freddie Munoz was there?

16             MR. CASTLE:  Objection.  I don't think

17   Billy Garcia stated that.  I think that might be a

18   misstatement.

19        Q.   Billy Cordova.

20        A.   I'm sorry, sir.  Can you ask that again?

21        Q.   Do you recall that Billy Cordova testified

22   he had this conversation with Billy Garcia during the

23   time that Freddie Munoz was at the jail related to

24   the barber shop murder?

25        A.   Yes.

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                              FAX (505) 843-9492



DEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   And is that a different time period than

2   when Jake Armijo was at MDC with Billy Garcia?

3      A.   Yes.

4      Q.   So to be fair, are we talking about two

5   different timeframes where people are talking to

6   Billy Garcia at MDC?

7      A.   At MDC, yes.

8      Q.   You were also asked about people --

9   statements made by Leonard Lujan about STG officers

10   being on the roof, either photographing or taking

11   video of inmates.  Do you recall that?

12      A.   Yes.

13      Q.   And is that the first time you've ever

14   heard that?

15      A.   Yes.

16      Q.   And you recall if Leroy Lucero ever said

17   the same thing?

18      A.   I think that was attributed to Lujan, not

19   Lucero.  I don't recall Lucero saying that.

20      Q.   You were also asked about New Mexico

21   Corrections Department records regarding exercise in

22   the yard and placement for purposes of recreation.

23   Do you remember that?

24      A.   Yes.

25      Q.   What's been your experience with those

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                               201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                   (505) 843-9494
FAX (505) 843-9492                                         FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    records?

2         A.   They largely don't exist, particularly that

3    far back.  I recently had firsthand observation of

4    inmates being moved from the pod to the rec yard, and

5    back up to the pod, and I didn't observe the officers

6    taking any notes on that.

7         Q.   So even in your own experience watching

8    movements in the prison, is that something that

9    you've seen?

10        A.   Yes.  Not only did I watch it, but I talked

11   to the inmates that were being moved, and walked with

12   the officers, and didn't see any kind of notes being

13   taken, or records.

14        Q.   Mr. Castle asked you about really just a

15   series of statements from reports from the 2001

16   murders.  And he told you:  Some people said Billy

17   Garcia called the hit, some people said Leroy Lucero

18   called the hit.  Do you remember that kind of

19   questions?

20        A.   Yes.

21        Q.   So when you have a bunch of statements like

22   that, what do you have to do to eventually try to get

23   to the bottom of what really happened?

24        A.   We need to sort through them and look for

25   corroboration, and -- of the people making the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    various statements, get to the bottom of why they
2    think that and try to corroborate that information.
3         Q.   Now, a few times on cross-examination
4    you've been asked whether you or the Government
5    provided lawyers for cooperators?  Do we do that, or
6    is that something that we ask of the Court and the
7    clerk's office?
8         A.   Yeah, we don't.  I definitely don't.  It's
9    asked by a representative from the Clerk of the
10   Court's office, either here, or up in Albuquerque.
11        Q.   So do we have any say-so in terms of who is
12   selected to represent any particular person?
13        A.   No.
14        Q.   I want to go back to this shooting and fire
15   bombing of Robert Madrid.  Have you now seen the
16   Albuquerque Police report?
17        A.   Yes.
18        Q.   And from that report, is there still an
19   indication that a molotov cocktail was used?
20        A.   Yes, sir.  It was thrown at the gas tank
21   area of his car, or the -- yes, the -- where the gas
22   cap would be.
23        Q.   And I want to ask you, based on your
24   conversations with Mr. Madrid, why you thought that
25   was a different scenario?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. SINDEL:  Well, your Honor, I'm going to
 2   object to that as being hearsay based on
 3   conversations --
 4            MR. CASTELLANO:  Your Honor, I can lay the
 5   foundation for an excited utterance.
 6            THE COURT:  All right.
 7       Q.   Did Mr. Madrid call you in relation to that
 8   incident?
 9       A.   Yes.
10       Q.   And how did he sound when he spoke to you
11   about what happened?
12       A.   He was freaking out.  I had to slow him
13   down.  I still don't largely understand what he was
14   saying.  But it was that -- I don't know if you want
15   me to go into it, but --
16       Q.   While he was under that state, did he make
17   certain statements to you?
18       A.   Yes.
19       Q.   What did he say?
20       A.   That he had just -- he was in his apartment
21   and somebody tried to fire bomb it.  They threw a
22   molotov cocktail at it.  He was trying to follow
23   them.  The police were coming.  His wife and kids
24   were home; just in a panic state.  And my first
25   concern was that he was following somebody that tried
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to do that.

2         Q.   And then, once that happened, did you still

3    have the opportunity to speak to the police officer

4    on scene?

5         A.   Yes.  He handed the phone over to the

6    police.  I started asking a bunch of questions.  I

7    said, "Are the cops there yet?"

8              He said, "Yeah, yeah."

9              I said, "Let me talk to them."  I thought

10   I'd get more information out of them.

11        Q.   And based on that interaction with him and

12   the police, did that lead you to believe that the

13   residence itself had been fire bombed?

14        A.   Yes.

15        Q.   Who was that person who was on the scene

16   who allegedly fire bombed the place?

17        A.   Julian Montoya's father, Benji.

18        Q.   Is it Benji Montoya?

19        A.   Yes.

20        Q.   Who is he?

21        A.   He's -- I don't know if he's validated, but

22   he's an SNM associate.

23        Q.   Now, going back to the actual shooting

24   itself, what is it that led you to believe that that

25   was an SNM-related shooting?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    Because I went and talked to Robert Madrid

2  at the hospital, after he came out of surgery.  And I

3  spoke to him for a few minutes, as long as the

4  doctors would let me, and he told me that it was.

5      Q.    And then, in addition to that, was there

6  anything about the timing of this shooting that led

7  you to believe it was SNM-related?

8      A.    Yes.   In the days leading up to that, I had

9  him making phone calls to Geraldine Herrera, the

10  mother of Carlos Herrera.  During one of the phone

11  calls Carlos got on the phone, so it was like a

12  three-way phone call.  Robert was ordering heroin

13  from Geraldine.  They became suspicious of him during

14  that conversation.

15          And I'd also used him to purchase drugs and

16  firearms from other SNM members on the street.  At

17  the time -- it was March -- we had done the first

18  round of indictments, and we were working on the

19  second, which we did in April.  So when we put all of

20  that together, particularly -- oh, and he'd also

21  talked to Vincent Garduno, another SNM member,

22  defendant, and had aroused his suspicion about buying

23  drugs as well.  The comment was made that maybe

24  Robert was an informant, working --

25          MR. SINDEL:  Objection, Your Honor.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Comments made are hearsay.

2           THE COURT:  I think this would be hearsay.

3    Sustained.

4        Q.   So how close in time were the suspicions

5    about him and the time when he was shot?

6        A.   A matter of days.

7        Q.   Going back to the threats regarding Jason

8    Van Veghel and Karen Cartwright.  What else is there

9    to that report that you were shown this morning in

10   terms of any potential threats to them?

11       A.   Karen wanted Jason brought to these guys

12   that were looking for him to set him up.

13       Q.   And was anyone's name mentioned in terms of

14   whether or not Mr. Van Veghel had snitched against

15   anybody?

16       A.   Yes, that he snitched against Joe Gallegos.

17       Q.   You were asked about Mario Rodriguez, also

18   known as Blue, and you were also asked about his

19   statement:  When he's in, he's in all the way.  As

20   long as he's been cooperating has he committed to

21   cooperation?

22       A.   Yes.

23       Q.   When you were asked about a question with

24   him, referring to people getting their stories

25   straight, do you remember the timing of when he made

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 843-9492                                                FAX (505) 843-9492
                                                                   1-800-669-9492
                                                        e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    that statement?

2         A.   Yes.

3         Q.   What do you remember about the timing of

4    that statement?

5         A.   It was in reference to the Javier Molina

6    murder, when the State was pursuing charges, so in

7    the 2014 timeframe.

8         Q.   So was that at a time before he began

9    cooperating?

10        A.   Yes.  It was in reference to all the people

11   being charged, all the suspects.

12        Q.   You were also asked about rover reports

13   written by corrections officials.  Do we have any

14   corrections officials who are eyewitnesses to any of

15   these murders?

16        A.   Eyewitnesses, no.

17        Q.   And is that true, even though they're

18   supposedly people who are rovers and people who are

19   up in the bubble looking at the pods?

20        A.   Yes.

21        Q.   You were asked about Joe Gallegos not being

22   at his residence when you hit the house with a

23   warrant in April of 2016.  The jury has seen a box

24   that had "SNM" on it.  Even though he wasn't there,

25   were there any documents inside that box indicating

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1   who it belonged to?
 2        A.   There were letters addressed to him, and
 3   mail.
 4        Q.   When you say "him," who are you referring
 5   to?
 6        A.   Mr. Joe Gallegos.
 7        Q.   You were also asked about things like
 8   charging Gerald Archuleta with a VICAR attempted
 9   murder, and other charges.  Do you know the statute
10   of limitations federally is only five years?
11        A.   I said 10 earlier.  I'm sorry, it's five,
12   yes.
13        Q.   And so, if you recall, are there people in
14   this case who are charged only with a murder and not
15   with the conspiracy to murder?
16        A.   Yes.
17        Q.   Can you tell the members of the jury
18   whether that's also related to the statute of
19   limitations?
20        A.   Yes, it is.
21        Q.   So for a murder charge, is there a statute
22   of limitations that you know of?
23        A.   No.
24        Q.   You were asked about a conversation with
25   Jose Gomez.  Do you remember that?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    And whether you made promises to him?

3        A.    Yes.

4        Q.    On cross-examination you said something

5   about it being slightly out of context.  So I want to

6   give you a chance to talk about that.  What was the

7   problem, as you saw it, from the context?

8        A.    We were having a discussion about -- he was

9   currently in custody when I met him.  In fact, he was

10  escorted over from the Valencia County Jail to the

11  Sheriff's Office, and that's where this recorded

12  conversation happened.  He was facing State charges,

13  so we were having a discussion about that, and how

14  much time he was facing.  Because he and I agreed he

15  was in danger, I was trying to suggest to him that

16  he'd be better off going into the feds, where we'd

17  have more control over his safety.

18       Q.    When you talked about him getting out, did

19  Jose Gomez get out at some point from jail?

20       A.    He did, yes, and he was on pretrial

21  release, under my supervision, after he was charged

22  federally.

23       Q.    What do you mean by under pretrial release

24  and under your supervision?

25       A.    When a defendant is arrested, they have the

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                    Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 843-9492                                    FAX (505) 843-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    opportunity or the ability to either remain in

2    custody, or be put on pretrial release.  In some

3    cases in this investigation, defendants were put on

4    pretrial release under the supervision of the FBI,

5    and put back on the streets.  They were under our

6    supervision because we used them operationally.  And

7    the pretrial service officers didn't want to

8    supervise them if they were operational.

9         Q.   So for some period of time, then, was he

10   partially under your supervision?

11        A.   Yes.

12        Q.   And what happened to him in terms of

13   following the rules?

14        A.   He didn't check in as often as I liked, so

15   some agents and I went down to his house and arrested

16   him, and put him back in jail.  And then he was later

17   released and put on regular pretrial supervision.

18        Q.   And then at a later time were you also --

19   did you also assist in returning him to the State of

20   New Mexico after he left the state?

21        A.   Yes.  He had a local warrant.  And I wrote

22   a UFAP warrant, Unlawful Flight to Avoid Prosecution.

23   I tracked him, and had the Denver FBI agents pick him

24   up, the Fugitive Task Force up there, and return him

25   to New Mexico.

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                                  1-800-669-9492

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                    e-mail: info@litsupport.com

 1        Q.   You've been asked a number of times about
 2   the tablets.  Was all the discovery on the tablets
 3   all at one time or did it come in waves?
 4        A.   It comes in waves.  It's periodically
 5   updated by the discovery coordinator.
 6        Q.   Do you know at what point each cooperator
 7   had any amount of discovery?
 8        A.   No.  And when they reset their tablets,
 9   they didn't have any.
10        Q.   You were also asked about Eric Duran having
11   photos of a stripper on his phone.  Do you remember
12   who sent him some of those photos?
13        A.   Chris Garcia, and his wife or girlfriend.
14        Q.   And do you recall if Mario Montoya ever
15   sent him any photos?
16        A.   I believe he had.
17        Q.   At the time that Mario Montoya had his
18   phone, working for the Government, and Eric Duran had
19   his phone, were you aware of whether or not they knew
20   that the other person was cooperating?
21        A.   They didn't know.
22        Q.   So if Mario Montoya was sending nude photos
23   to Eric Duran, in what context would that be?
24        A.   Just trying to play the part.  These two
25   guys don't know that they each have FBI phones, and

SANTA FE OFFICE                                                MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                             Albuquerque, NM 87102
(505) 989-4949                                                 (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492
                                                               1-800-669-9492
                                                               e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

```
 1    are both informants.  So they're trying to play the

 2    part of what they would normally do in this

 3    situation.

 4         Q.   You were asked about Billy Cordova bringing

 5    a shank to court and sitting in that very chair where

 6    you are.  Do you remember that?

 7         A.   Yes.

 8         Q.   Do you recall his explanation for why he

 9    carried a shank to court?

10         A.   Yes.

11         Q.   What was it?

12         A.   He thought he'd be attacked.

13         Q.   And how do we know that he brought a shank

14    to court?

15         A.   Because he told us.

16         Q.   Going back to Michael Jaramillo, you were

17    asked about a statement that you prepared in relation

18    to contacts with him.  Do you remember that?

19         A.   Yes.

20         Q.   Was that an FBI 302 or was it something

21    else?

22         A.   It was not a 302.  It was just typed notes

23    that I made.

24         Q.   Do you recall the purpose for which you

25    made those notes?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.

 2        Q.   What was it related to?

 3        A.    I heard an argument that we, the FBI, had

 4   not made any attempts to contact him.  And so I left

 5   my seat where I normally sit, and I went downstairs.

 6   I called the other agents; had them all get in the

 7   room and so I could construct a timeline.

 8        Q.   And was the timeline for the purpose of

 9   responding to a defense motion about Michael

10   Jaramillo?

11        A.   Yes.

12        Q.   And regarding Michael Jaramillo, was his

13   testimony consistent with what you documented, in

14   terms of his denials about the murder?

15        A.   Yes.

16        Q.   And what would you say about Michael

17   Jaramillo's attempts to get out of coming to court

18   initially?

19             MR. SINDEL:  I'll object, Your Honor.  That

20   is speculation.  He has to read Mr. Jaramillo's mind,

21   the conclusions he had reached.  We have his

22   testimony.

23             THE COURT:  Are you asking him about his

24   observations, or what are you --

25             MR. CASTELLANO:  About his observations
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    from the contacts with law enforcement, Your Honor.

 2            THE COURT:  All right.  Well, just give

 3    your observations.  Limit your answer.  I'll allow

 4    that portion of the question.

 5        A.   Just trying to get out of the subpoena.

 6        Q.   And did you persist in trying to get him to

 7    cooperate?

 8        A.   Each time the agents told me he was trying

 9    to get out of it, I told them to go back.

10        Q.   And the contacts with him, were those for

11    the purpose of interviewing him or for the purpose of

12    issuing a subpoena to him?

13        A.   Getting him here to court pursuant to a

14    subpoena.

15        Q.   And once Michael Jaramillo got to the

16    courthouse, did you know what, if anything, he was

17    going to say about that murder, since he had been

18    trying to get out of the subpoena?

19        A.   I had suspicions.  Of course, I don't know

20    exactly what he's going to say.  But, in my mind, he

21    went from a witness --

22            MR. SINDEL:  Objection, Your Honor, to

23    what's in his mind, and what his suspicions are are

24    irrelevant, immaterial, and calls for speculation.

25            THE COURT:  Well, he shouldn't testify
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    about what is in somebody's mind.  So I'll sustain

2    the objection.

3         Q.   Did you know what he was going to say when

4    he came to the courthouse?

5         A.   No.

6         Q.   And did you find out what he said after he

7    was under the Kastigar letter?

8         A.   Yes.

9         Q.   I'm going to ask you about your

10   questionnaires.  They are defense Exhibits EL 1 and

11   EL 2.  EL 1 is the questionnaire from 2016, and EL 2

12   is your questionnaire from 2017.  All right.  You've

13   been asked about this questionnaire.

14            Let me start with question number 92.  The

15   question states, "Alex Sosoya was assaulted at PNM in

16   2011 by Robert Martinez and Mario Rodriguez.  Why did

17   this assault take place?"  Is this an example of what

18   you would ask people when you would interview them?

19        A.   The question is.

20        Q.   And you have two players mentioned in

21   number 92?

22        A.   Yes.

23        Q.   And has Mario Rodriguez admitted that he

24   and Robert Martinez engaged in that assault against

25   Alex Sosoya?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   Yes.

2       Q.   And so did you have the correct names in

3   question number 92?

4       A.   Yes.

5       Q.   The same with question number 94.  It asked

6   about Felix Martinez, a/k/a Animal, which the jury

7   has heard about, the 1998 murder involving Frederico

8   Munoz, Leonard Lujan, and Manuel Benito.  So from the

9   testimony of Frederico Munoz and Leonard Lujan, did

10  you have the right players named in that murder?

11      A.   Yes.

12           MR. BURKE:  Your Honor, I'm going to object

13  to this comparison.  Those are two cases where people

14  have already pled guilty, as opposed to a case where

15  people are on trial.  It's an improper comparison.

16           THE COURT:  Well, I think probably the jury

17  ought to determine who are the proper participants in

18  the murder that they have.  So I'm going to sustain

19  the objection.

20      Q.   I will ask a different question regarding

21  number 96.  You have listed as participants, Angel

22  DeLeon, Joe Lawrence Gallegos, Edward Troup, and

23  Leonard Lujan.  Leonard Lujan, when was the first

24  time he mentions those names to law enforcement?

25      A.   During his initial interviews.  And it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   wasn't with me.
 2              MR. BURKE:  I'm going to object.  That is
 3   an incorrect statement of fact.  The first time
 4   Leonard Lujan mentioned Edward Troup's name was in
 5   his plea agreement.
 6              THE COURT:  Well, you'll have a chance, if
 7   you want, to follow up on redirect on that.
 8   Overruled.
 9              Let's take this all up after lunch.  We'll
10   be in recess for about an hour.
11
12   EXCERPT CONCLUDED
13
14
15
     EXCERPT
16              THE COURT:  Everybody ready to go?  All
17   rise.
18              (The jury entered the courtroom.)
19              THE COURT:  All right.  Mr. Acee, I'll
20   remind you that you're still under oath.
21              Mr. Castellano, if you wish to continue
22   your redirect of Mr. Acee, you may do so at this
23   time.
24              MR. CASTELLANO:  Yes, sir, thank you.
25              THE COURT:  Mr. Castellano.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BY MR. CASTELLANO:

Q.   Agent Acee, going back to question 96.  I'd asked you about the first time you recall Leonard Lujan mentioning Edward Troup to you.  Do you recall that?

A.   Yes.

Q.   When was that?

A.   In my debrief of him, January 2017.

Q.   And during that debrief, did he also mention the names of Joe Gallegos, Angel DeLeon, and someone known as Criminal?

A.   Yes.

Q.   Now, in your questionnaire, you don't have Criminal listed in there.  Why is that?

A.   I didn't know he was involved.

Q.   Now, were you aware of Leonard Lujan's 2007 statement where he mentioned somebody named Criminal?

A.   Yes.

Q.   But at that point in time, did you have any corroboration of what Leonard Lujan said about somebody named Criminal, who he picked to be part of that murder?

A.   No, he was the only person that mentioned that name.

Q.   And there has also been some talk about DNA

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

 

BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   today.  Were you aware of any DNA tying Michael

2   Jaramillo, also known as Criminal, to the Castillo

3   murder scene?

4        A.   No.

5        Q.   And had you looked at DNA reports before?

6        A.   Yes.

7        Q.   And did you see any positive results tying

8   him to that murder from the DNA report itself?

9        A.   No, he'd been ruled out.

10       Q.   So up until the point that Michael

11  Jaramillo, or Criminal, came forward himself, did you

12  have any corroboration about Leonard Lujan's

13  statement tying him to that murder?

14       A.   No.

15            MR. CASTELLANO:  I pass the witness, Your

16  Honor.

17            THE COURT:  All right.  Thank you, Mr.

18  Castellano.  Did you want something further, Mr.

19  Sindel?

20            MR. SINDEL:  If I may, Your Honor.  I

21  appreciate the Court's indulgence.  That's my word

22  for the day.

23                   RECROSS-EXAMINATION

24  BY MR. SINDEL:

25       Q.   The first thing I noticed was that Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   Castellano mentioned something about Jason Van

 2   Veghel.  And you said it was in his 302, that they

 3   wanted Karen Cartwright to bring Jason Van Veghel up

 4   to meet these two people?

 5        A.   Yes, something along those lines.

 6        Q.   Well, it wasn't along those lines.  He

 7   asked you:  Is it in the 302 that they wanted Karen

 8   Cartwright to bring Jason Van Veghel up to talk to

 9   these two guys?  And you said yes.

10             Okay, I'm waiting.  Is that correct, or do

11   you want to see the 302?

12        A.   No, I'm only hesitating because when the

13   questions are rephrased, they're not exactly the way

14   they were said.  But I agree that, yes, I had an

15   affirmative response to that.

16             MR. SINDEL:  May I approach, Your Honor?

17             THE COURT:  You may.

18        Q.   I'm going to show you the 302, as well as

19   the notes concerning Stemo's interview about Karen

20   Cartwright.  There in the second paragraph is there

21   an indication as to whether or not the men wanted

22   someone to bring Jason Van Veghel to them?  It's

23   about 10 words long.  So are we done?

24        A.   I like to read the words around it, too.

25   I'm sorry.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1         Q.   I'm sure you're looking.

 2         A.   What was the question, sir?

 3         Q.   Does it say anything in that 302 about

 4    anyone wanting Marquez or anyone else to bring Jason

 5    Van Veghel to them?

 6         A.   No, just Cartwright.

 7         Q.   And is that also consistent with the notes

 8    that were taken?  You recognize Agent Stemo's

 9    handwriting, right?

10         A.   Yes.

11         Q.   And it doesn't say anything about wanting

12    anyone to bring Jason Van Veghel for a meeting or

13    anything else; correct?

14         A.   No.

15         Q.   So certainly from this 302 your answers to

16    the question posed to you by Mr. Castellano were

17    incorrect, right?

18         A.   In reference to Van Veghel, yes.

19         Q.   And then in terms of the fire bombing

20    situation, I mean you said the guy called you up,

21    Robert Madrid, and he was excited and in a panic, and

22    saying all these things, right?

23         A.   Yes.

24         Q.   Did he indicate to you at any time why he

25    thought they had -- someone had fire bombed his
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    house?

2         A.   In that conversation, no.

3         Q.   Did he indicate to you at any time why he

4    thought someone had put a beer bottle with gasoline

5    and a rag in it near his car?

6         A.   No.

7         Q.   Do you know if he said anything to the

8    police about what he thought the reason that that

9    might have occurred was?

10        A.   Yes.

11        Q.   What did he say to the police at the scene

12   when they asked him:  Why do you think someone threw

13   a beer bottle at your car?

14        A.   It had to do with an upcoming court case,

15   that he was expected to be a witness or provide

16   testimony.

17        Q.   Was that an SNM case?  I can show you the

18   police report, if that would help refresh your memory

19   as to what you read about what case he might be

20   testifying on.

21        A.   My memory is not the issue.  It's --

22        Q.   Well, let me rephrase the question then.

23   Did it indicate -- did he indicate to the police that

24   he believed the incident was intimidation and

25   retaliation for possibly testifying against the

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                           FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1    perpetrator's son?

2         A.   Yes, he had.

3         Q.   And Julian Montoya, that was the

4    perpetrator's son?

5         A.   Correct.

6         Q.   And Julian Montoya was the person who was

7    suspected in -- certainly sounds like he did shoot at

8    Robert Madrid for whatever reason, including the

9    reasons stated in the police report; we talked about

10   it earlier, right?

11        A.   Yes.

12        Q.   Do you know whether Julian Montoya, the

13   juvenile, has any SNM tattoos?

14        A.   No, just West Side Street Gang.

15        Q.   Do you know whether or not he's ever been

16   put up for membership in the SNM?

17        A.   At that time he had not been.  I'm not sure

18   where he is now.

19        Q.   At that time -- I mean, is he still a

20   juvenile?

21        A.   No, he would be beyond 18 now.

22        Q.   And then Mr. Castellano asked you about the

23   lawyers that are utilized in order to provide

24   information or services to the individual

25   cooperators; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          A.    Yes, sir.
 2          Q.    And you heard Mr. Jaramillo describe the
 3    services he received from the attorney; is that
 4    right?
 5          A.    Yes.
 6          Q.    And you remember you and I talking about
 7    that?
 8          A.    Yes.
 9          Q.    And do you remember me expressing to you
10    certain concern about what I believe was the quality
11    of the representation he received?
12          A.    I do.
13          Q.    Deeply concerned; correct?
14          A.    You had some choice words.
15          Q.    And did you say that, "Well, it works
16    better for me if their lawyers aren't particularly
17    good"?
18          A.    Yes.
19          Q.    Does Jaramillo's name appear anywhere in
20    your questionnaire?
21          A.    No.
22          Q.    You were asked some questions about the
23    statute of limitations for VICAR and RICO Acts.  Do
24    you know whether or not there is any statute of
25    limitations with state law in New Mexico for murder?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1        A.    I don't believe there is.

 2        Q.    And what about attempted murder?

 3        A.    I'm not sure.

 4        Q.    Would it be fifteen years, perhaps, or you

 5   don't know?

 6        A.    I don't know.

 7        Q.    And in terms of these celebratory

 8   photographs of Mr. Duran, there was information

 9   clearly that he gave that he had installed gold and

10   diamonds on his teeth, a grill?

11        A.    I don't know that they're celebratory

12   photos, but --

13        Q.    You said he posted them on Facebook.

14   That's the only reason I so characterized them.

15        A.    Yeah, I think he was building an undercover

16   persona or something.

17        Q.    So he had had this oral surgery performed

18   to enhance his role as an undercover?

19        A.    No.  I think it was stupid to spend money

20   on that, I'll be clear.

21        Q.    It's stupid, but he did it, right?

22        A.    Well, I don't have any control over that.

23   But I don't know that there was surgery, because I

24   think you can take those in and out.

25        Q.    Do you know if he can?

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                             FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1        A.   Yes, because I saw him with it in, and I've

 2   seen him with it out.

 3        Q.   So he would take it off when he was taking

 4   photographs of himself, and when he went to church

 5   he'd wear a different outfit?

 6        A.   I don't know that he went to church.  The

 7   one time I saw him with it is -- let's just say it

 8   was the last time I ever saw him wear it.

 9        Q.   You probably commented on how stupid it

10   looked?

11        A.   I did, and that he had better things to

12   spend his money on, like his wife and kids.

13        Q.   And talking about spending money -- and

14   there was this exchange of money you talked about in

15   terms that he received from the Department of

16   Corrections.  How much money did he receive in a lump

17   sum from the New Mexico FBI?

18        A.   I think the FBI is the only one that's paid

19   him.  Not to be confused with his lump sum from

20   Corrections, which was more of a time off.

21        Q.   Right.  So how much did he receive while he

22   was working in New Mexico in a lump sum?

23        A.   All told, I think it was -- we have the

24   exact number somewhere that I've disclosed -- but it

25   was, I think, around 40 --

SANTA FE OFFICE                                                        MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                            (505) 843-9494
FAX (505) 843-9492                                                  FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
1          Q.   $47,000?

2          A.   I was going to say between 40 and 50.

3          Q.   And did he also receive one lump sum

4     payment of something like 25 grand?

5          A.   Yeah, I wouldn't call it that.  I had to

6     put 25,000 on his books because it was the end of the

7     federal fiscal year, and the Bureau said, You've got

8     to spend the money.  So I put it on his inmate

9     account.

10         Q.   So you did this as a bookkeeping move to

11    benefit the federal government and all the taxpayers

12    who threw money at Eric Duran's grill?

13         A.   No.

14              MR. SINDEL:  I withdraw the question.

15         A.   Okay.

16              MR. SINDEL:  That's all I have.

17              THE COURT:  Thank you, Mr. Sindel.

18              Let me get Mr. Burke back there, if he

19    wants to go first.

20              MR. BURKE:  Was there someone else?

21              THE COURT:  Mr. Castle was standing, but

22    you were up first.  It's your chair.  You can give it

23    away.

24              MR. BURKE:  Thank you, Your Honor.

25              THE COURT:  Mr. Burke.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1                     RECROSS-EXAMINATION
 2    BY MR. BURKE:
 3         Q.    I want to ask you about your statement that
 4    you didn't know anything about Michael Jaramillo.
 5    And I'm wondering if we could take a look at DeLeon
 6    discovery 13063.  And would you enlarge the bottom
 7    right-hand side.  This is a DNA report from March
 8    2001.  You've seen that; correct?
 9         A.    I saw it for the first time today, sir.
10         Q.    You never looked at the DNA reports until
11    today?
12         A.    This, with this notation here, was shown to
13    me today.  This is not in the case file.
14              MR. CASTELLANO:  I'll object, Your Honor,
15    because it's also not in evidence.
16              MR. BURKE:  This is impeachment.  He said
17    he had no reason to be suspecting Jaramillo.  And
18    there is a DNA report on Jaramillo.
19              MR. CASTELLANO:  That's not a DNA report.
20    That's an analysis for the attorneys, and it's not
21    the report itself.  It's the underlying data.
22              THE COURT:  Well, I'll still let Mr. Burke
23    ask his questions, and we'll sort it out.
24         Q.    You really have never seen the underlying
25    data from the DNA reports in 2001?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    I've never seen this, with these notations.

2        Q.    Okay.  Thank you.

3              Let me talk a little bit about Lujan.  The

4    reports I had on Lujan, the dates, August 8, 2007,

5    September 12, 2007, April 24, 2008 -- I'll say there

6    are 10 to 12 reports before he ever mentioned Mr.

7    Troup's name.  And he always mentioned Criminal's

8    name, right?  Are you telling us you did not ever

9    know that Criminal was Michael Jaramillo?

10       A.    No, that's not what I said.

11       Q.    Okay.  So you're not suggesting to this

12   jury that when you took over this case, you had no

13   idea Michael Jaramillo might have been involved in

14   the murder of Frank Castillo?  That's not what you're

15   saying?

16       A.    That's not what I said.

17       Q.    Okay.  And then, even when you interviewed

18   him in January of 2017, as part of his plea, all he

19   said was he was unsure of Troup's role; correct?

20       A.    That's not all he said.

21       Q.    He said, "Lujan knew Edward Troup joined

22   the group, but he was unsure as to which of the guys

23   asked him to help."

24       A.    That's what he said.

25       Q.    For the first time, after 12 reports and on

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    the verge of his plea, that's what he says?
2         A.   You read that correctly.
3         Q.   You mentioned John Montano.  Were you
4    present when he testified?
5         A.   For a portion of it, yes.
6         Q.   So did you see the part where Raymond
7    Rascon was hiding in the shower and came out to his
8    cell afterwards?  You didn't see that part?
9         A.   No, sir.
10        Q.   And you mentioned how the witnesses, you
11   know, the first thing they remember are the
12   conversations.  Do you recall that?
13        A.   Yes, sir.
14        Q.   And you've also been present in court when
15   it seems that all the damning conversations happen
16   just before trial, right?
17        A.   No, sir.
18        Q.   That seems to be the pattern, isn't it
19   true, sir?
20        A.   Well, the conversations themselves don't
21   take place just before the trial.
22        Q.   They just remember for the first time just
23   before trial, right?
24        A.   In that detail, yes.  But not always.
25        Q.   The point that I, at least, was concerned
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    about with the jury is, I would not know the reason
 2    for the shooting.  My concern was that you knew that
 3    there was a dispute, and you didn't share that
 4    dispute with the jury.  Do you understand that that
 5    can be a concern, sir?
 6         A.   No, because I'm asked not to share a lot of
 7    details that I know.
 8         Q.   Yeah.  You were asked about reprisals, and
 9    you came up with a shooting that, in all likelihood,
10    was a young man who was upset about criticism of his
11    mother.  And you characterized that as a reprisal by
12    the SNM.  Do you think that's fair to the jury?
13         A.   I think it's fair for me to report what the
14    victim told me as I stood next to him after he'd been
15    shot.
16         Q.   Do you think it's fair to report what the
17    victim told you, but without sharing with the jury
18    that there was another side to the story?  You do
19    think that's --
20         A.   As soon as you ask me if there is another
21    side, I always answer that.  I have to wait till I'm
22    asked a question.
23         Q.   Oh, the question has to be exactly right
24    before you'll be candid with the jury?
25         A.   I'm happy to -- you can put me on a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   narrative, and I'm happy to explain everything I know
 2   about the incident.
 3        Q.   But I think we'd like to get to the truth.
 4        A.   I will tell the truth, if you just let me
 5   speak.  I'm usually cut off.
 6        Q.   Um-hum.  And with regard to Jaramillo, it
 7   is true that for 17 years the FBI did not go contact
 8   him until a month before trial?
 9        A.   That is true.
10        Q.   And you know, as an experienced FBI agent,
11   that some of those things you listed on that two-page
12   report were the kinds of things that should have been
13   reported to the attorneys before they undertook the
14   task of cross-examining a witness on the stand; isn't
15   that true, sir?
16        A.   Absolutely.
17             MR. BURKE:  Thanks.  That's all I've got.
18             THE COURT:  Thank you, Mr. Burke.  Mr.
19   Castle.
20                  RECROSS-EXAMINATION
21   BY MR. CASTLE:
22        Q.   Agent Acee, there were some questions
23   about, you know, RICO and VICAR, statutes of
24   limitations.  Do you recall that?
25        A.   There was about VICAR.  We didn't talk
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    about RICO.

2        Q.   Okay.  And VICAR and RICO are very similar.

3    The difference is one is focused on violent crimes,

4    and one can include violent and nonviolent crimes,

5    right?

6        A.   Right.

7        Q.   As far as statute of limitation, if an

8    individual is someone they're going to charge with

9    RICO, only the last overt act they did has to be

10   within the five-year period, right?

11       A.   I believe it's -- I thought RICO was 10

12   years.  I sometimes mix the two.  So I'll defer to

13   the attorneys.

14       Q.   And I'll defer to the Government who does

15   the prosecuting.  But it's just the last act that has

16   to be within that statute of limitations, right?

17       A.   Yes, sir.

18       Q.   So then, if they did something within five

19   or 10 years, then you can also charge all the

20   criminal conduct they did in support of this

21   racketeering organization all the way back; is that

22   right?

23       A.   Yes, RICO is 10 years.  I'm reminded,

24   because Frederico Munoz was a little bit of a

25   challenge to get something.  VICAR is five years.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                201 Third NW, Suite 1630
Santa Fe, NM 87501                                        Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                          FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1      Q.   So, in other words, for example, Mr.

2  Archuleta, Styx Archuleta, as long as you had

3  something within the last 10 years, then you could go

4  back and find crimes that he did 15, 20, 25, 30, and

5  add them all up, right?

6      A.   Yes.

7      Q.   And the same thing with VICAR.  Well, it's

8  obviously not five years because we're sitting here

9  on two counts with my client, Mr. Garcia, and that

10 crime happened over 17 years ago, right?

11     A.   So for murder, to charge a VICAR homicide,

12 there is no statute of limitations.

13     Q.   So someone like Styx, who committed

14 numerous murders while he was -- or ordered

15 numerous -- committed and ordered numerous murders

16 over the process of his career with the SNM, he could

17 be charged even to this day?

18     A.   I don't believe he can with VICAR, because

19 he was already convicted of those.  It would have to

20 be an uncharged.

21     Q.   No, he was only convicted in state court,

22 right, not in federal court?

23     A.   Right, but there is a -- I asked for that.

24 There is -- I forget the term for it, but I don't

25 believe we're able to do that.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   He didn't plead guilty to every murder he

2    planned and organized, did he?

3    A.   I don't think so, no.

4    Q.   Now, you talked about Mr. Duran and that he

5    had a gun in his car, right?  And the DNA came back,

6    it wasn't his DNA on the gun?

7    A.   Yes, sir.  And the other term came to me,

8    I'm sorry, before I forget, the petit policy.

9    Q.   Okay.

10   A.   Regarding the gun, yes, there were two men

11   in the car and two guns.

12   Q.   Was Mr. Duran eventually charged?  He

13   wasn't, right?  He wasn't charged with possession of

14   those guns, right?

15   A.   Well, he was charged.  He was released.

16   Then there was Grand Jury.  And then I don't know

17   what the State is going to do.  I hope to charge him

18   federally.

19   Q.   Well, once the DNA -- I'm not trying to cut

20   you off, but once the DNA came back, the State

21   dropped the charges against him; is that right?

22   A.   I can't speak for the State, but I know

23   that the United States Attorney's Office in Portland

24   did not want to charge him unless there was DNA.

25   Q.   They apparently have a different policy

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    than the New Mexico U.S. Attorney's Office?

2         A.   I don't know the AUSA up there, and I can't

3    speak for them.

4         Q.   You talked about six people you indicated

5    had come in without being threatened or promised

6    anything.  Do you recall that?

7         A.   Yes.

8         Q.   And I think you said Montano, Otero, Samuel

9    Gonzales, Morgan Ramirez, and Raymond Rascon.  And

10   then a sixth one you said -- and that's what I want

11   to focus on -- is Leroy Lucero?

12        A.   Okay.

13        Q.   Leroy Lucero was given money; is that

14   right?

15        A.   By Agent Roundy, yes.

16        Q.   And before he would testify, he and his

17   lawyer requested a Kastigar protection, right?

18        A.   Yes.

19        Q.   So would you think that Leroy Lucero might

20   not belong on that list of six who didn't ask for

21   anything and didn't get promised or threatened with

22   anything?

23        A.   Okay.  Well, he wasn't threatened.  I

24   thought I was being asked if I promised him anything.

25        Q.   Oh, okay.  I apologize.  You personally

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 843-9492                                              FAX (505) 843-9492
                                                                   1-800-669-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                               e-mail: info@litsupport.com

```
 1    haven't, is what you were talking about?
 2        A.    I think the other things you described are
 3    just like Mr. Sindel pointed out, a conversation he
 4    and I had after court.  That's just good lawyering, I
 5    guess, to have your client protected.  I don't know.
 6        Q.    Well, Mr. Lucero was getting cash payments
 7    before he ever had a lawyer, right, by Agent Roundy?
 8        A.    While he was in federal prison, yes.
 9        Q.    Now, there was an indication of whether
10    there was any corrections officers that were
11    eyewitnesses to any portions of these case; is that
12    right?
13        A.    No, I was asked if any of the corrections
14    officers were eyewitnesses to the murder -- murders.
15        Q.    Okay.  But there were corrections officers
16    that were eyewitnesses to perhaps part of the
17    conspiracy that occurred before the 2001 murders?
18        A.    Perhaps.
19        Q.    And do you recall there being a Lieutenant
20    Juan Barela who reported that about a month prior to
21    the murders, he saw inmate --
22            MR. CASTELLANO:  Objection, calls for
23    hearsay.
24            THE COURT:  This looks like it's being
25    offered for the truth.  So sustained.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. CASTLE:  Your Honor, I would just argue
 2      they opened the door to that because they said there
 3      was no eyewitnesses.
 4              THE COURT:  Well, I think you're going to
 5      have to do something different than what you're
 6      doing.
 7         Q.   Okay.  In any event, there were officers
 8      that, after the murders took place, would do
 9      memorandums in which they would document unusual
10      activity that they saw that might be from SNM
11      members?
12         A.   Yes.
13         Q.   And in this case, was it unusual activity
14      that they saw, or they were reporting, at least,
15      Mr. --
16              (Mr. Castellano stood up.)
17              THE COURT:  Sustained.
18              MR. CASTLE:  Okay, I'll move on.
19         Q.   They indicated that -- there was some
20      questions about some statements, those early
21      statements that were made in 2001, pointing in a
22      couple different directions.  Do you recall Mr.
23      Castellano asking about that?
24         A.   Yes.
25         Q.   I showed you one before, but I want to show
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    you a couple more, 19128, and 4521.

2              MR. CASTELLANO:  I'll object now on hearsay

3    as well.  He'll just be asking to answer questions

4    from other people's reports.

5              MR. CASTLE:  I'm not going to be asking him

6    that, Your Honor.  I'm just going to have him review

7    them, if I could.

8              THE COURT:  Okay.  Let me see what the

9    question is.

10        Q.   19128 and 4521, just the circled areas.

11   Now, with regard to the first one, Eugene Martinez

12   testified here in these proceedings that he never

13   talked to Leroy Lucero before the murders.  Did you

14   recall that?

15        A.   I don't believe I was here.

16        Q.   Okay.  Would you take my word for it?

17        A.   Yes.

18        Q.   The first document, 19128, is this

19   regarding Inmate Eugene Martinez talking with Inmate

20   Leroy Lucero and Jesse Ibarra about carrying out

21   assaults on inmates?

22              MR. CASTELLANO:  Objection, hearsay.

23              THE COURT:  That question alone is fine, so

24   I'll allow that.  It may drift over too far.

25        Q.   Is that what Source 13 --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Source 13 indicated that.

 2        Q.    And was that one of the ones that no matter

 3   how hard we tried, we couldn't find him, right?

 4        A.    Right.

 5        Q.    And then the second one, DFS #3, did you

 6   get to look at that when I showed it to you?

 7        A.    Yes.

 8        Q.    And is DFS #3 talking about certain orders

 9   where Leroy Lucero was making certain orders to

10   people at the facility?

11            THE COURT:  I think this question is fine.

12   If it gets more detailed, then I may agree.

13            MR. CASTELLANO:  Otherwise, I'd object to

14   that; it's hearsay within hearsay.

15            THE COURT:  You can answer this question.

16   It's a yes/no question.  Then this may be about it.

17        Q.    Is that where he's telling other inmates to

18   do something?

19        A.    Yes.

20        Q.    Then the follow-up question is:  Was it

21   Leroy Lucero telling inmates in the compound, right

22   before the 2001 murders, to get ready because the SNM

23   was going to clean house?

24            MR. CASTELLANO:  I don't object to that,

25   Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          THE COURT:  Okay.
 2     A.   That's what it states.
 3     Q.   That's another one of those informants that
 4  no matter how hard we tried, we couldn't figure out
 5  who they were, right?
 6     A.   Right.
 7     Q.   Now, one last question, the main -- one
 8  little area, you were the main witness for the
 9  Government at the Grand Jury; is that right?
10     A.   Depends which time.  But I was -- I did
11  presentations at each of the Grand Juries.
12     Q.   Okay.  And during any of those
13  presentations, did the Government present to the
14  Grand Jury the evidence that was available that
15  pointed at Leroy Lucero or Jake Armijo or Angel Munoz
16  in the murder of the 2001 murders?
17     A.   I don't think there is any evidence of
18  that, so no.
19     Q.   Well, there was evidence -- well, whether
20  there is evidence or not, it could be in dispute, but
21  they didn't put that information before the jury;
22  correct?
23     A.   Sir, I'm just saying, I don't think I'm
24  just answering for myself as the one that was --
25     Q.   They didn't ask you questions about it, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN &
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    put evidence on before the jury; correct?

 2         A.   Correct.

 3         Q.   -- Grand Jury, I'm sorry.

 4              MR. CASTLE:  No more questions, Your Honor.

 5              THE COURT:  Thank you, Mr. Castle.

 6              Mr. Solis.

 7              MR. SOLIS:  May I, Your Honor?  Thank you.

 8                         CROSS-EXAMINATION

 9    BY MR. SOLIS:

10         Q.   Mr. Acee, do you remember six weeks ago I

11    visited with you about:  If it's not recorded, it

12    didn't happen?  It was about the second day or maybe

13    even the first day of trial.  Do you remember that?

14         A.   I believe so.  I've been asked about that

15    statement probably a dozen times.

16         Q.   Well, I'd like to think I was first.  And

17    do you remember you were somewhat coy, reluctant,

18    maybe even equivocal, as to whether or not to answer

19    that?  Do you remember that?

20         A.   No, when I hesitate, I'm making sure that

21    you or another attorney are attributing my statements

22    to me accurately, and I'm thinking about the answer.

23         Q.   Well, do you remember I was waving around

24    the actual trial or hearing testimony, where you

25    actually said that, and only then did you say, Well,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    okay, I said that?  Do you remember that?

2         A.   You were waving it around and I recognized

3    it?

4         Q.   Yeah.

5         A.   I don't think so.

6         Q.   You don't remember that?  Okay.  I wonder

7    if the jury will remember that's what we did.

8              So you walked it back a little bit then.

9    But today when Mr. Sindel asked you that phrase, that

10   mantra, "if it's not recorded, it didn't happen,"

11   today you were a little more forthcoming today; you

12   said, yeah, that's what I said.  Do you remember?

13        A.   I've never not said that.  I acknowledge

14   I've said that, and then I've tried to explain what

15   it meant.

16        Q.   And to be clear, these recording devices

17   were provided to, Mr. Acee, defendants in jail and

18   out of jail?  I think you've testified to that as

19   well; is that true?

20        A.   Yes.

21        Q.   Okay.  So those devices were readily

22   available to either those in jail or those out of

23   jail; is that right?

24        A.   A little trickier in the jail, but I have

25   recording devices and we utilize them.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Sure.  And conversations from both parts,
 2   let's say; those in jail and those out of jail?
 3        A.   Are we talking about the covert recordings?
 4        Q.   We're talking about any recordings by any
 5   defendants, any accused individuals; is that right?
 6        A.   Okay.
 7        Q.   Is that correct?
 8        A.   You're asking the questions.  They're
 9   readily available, yes.
10        Q.   Right.  So we have them both, those in jail
11   and those out of jail.  It's not a complicated thing,
12   Mr. Acee.
13        A.   I'm not trying to make it complicated.  I'm
14   trying to understand you.  And, yes, we have recorded
15   people on the street and in jail and prison.
16        Q.   All right.  Now, you understand the jury
17   passes ultimately on whom said what, what was said,
18   and ultimately, if any person is lying?  Do you
19   understand?  They ultimately decide that; you
20   understand that?
21        A.   I do.
22        Q.   All right.  So would you agree that a jury
23   in listening to a defendant's own words leave little
24   doubt as to what was said, if anything?  Would you
25   agree with that?
```

SANTA FE OFFICE                                                                          MAIN OFFICE
119 East Marcy, Suite 110                                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                                              Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 843-9492                                                               FAX (505) 843-9492
                                                                                      1-800-669-9492
                                                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1      A.    I think that it might be helpful.

2      Q.    Okay.   Now, and that would be in all cases,

3  wouldn't you think?

4      A.    I think it would be advantageous to have a

5  recording, if it's feasible.

6      Q.    But wouldn't it be especially important, in

7  a case like this where you've admitted you have

8  Government witnesses or skilled manipulators, don't

9  you think that would be crucial or even more

10  important than the general sense?

11      A.    I'll leave that up to the jury.

12      Q.    Well, I'm asking what you think.   I mean,

13  you're the one that admitted today, this morning to

14  Mr. Sindel, that in fact -- and I wrote it down:   We

15  have Government witnesses who are skilled

16  manipulators?

17      A.    I didn't say that.   I agreed that some of

18  them are skilled manipulators, yes.

19      Q.    Well, you didn't say it, but you agreed to

20  it, right?

21      A.    You all don't let me just sit up here and

22  talk.   So I wait for the question and I answer it.

23  And I agreed.

24      Q.    I mean, agreed means that you acquiesce,

25  and you acknowledge that that's a correct statement

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    right?  Agreed?  It's not a complicated concept or
2    definition, Mr. Acee?
3         A.   Some of the cooperators are quite skilled
4    at manipulating people.
5         Q.   All right.  And some of them, if not the
6    vast majority of them, have admitted to being less
7    than honest in the past, not only here, but to you,
8    and that is here, under oath, where you sit, but in
9    the past to you, they've admitted to you that they've
10   been less than honest in the past, haven't they, Mr.
11   Acee?
12        A.   In some cases, some have.  But the first
13   part of your question, I mean, any criminal, in my
14   mind, is less than honest.
15        Q.   Now, with regard to those skilled
16   manipulators that you've admitted are on the
17   Government's list of witnesses, do you think Billy
18   Cordova, Gerald Archuleta, Leroy Lucero, Playboy
19   Munoz, do you think they're skilled manipulators?
20        A.   Probably depends who their audience is.
21        Q.   Okay.  So you don't think Sammy, a/k/a
22   Sleazy, is a skilled manipulator?  You don't think
23   that, do you?
24        A.   Look, I'm not impressed with any of them,
25   but --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492




BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   I'm asking about Mr. Griego, though?
 2          A.   I know.  And I'll answer, I know for a fact
 3     he is because I did a search warrant on one of his
 4     women's houses who was sending him drugs disguised as
 5     legal mail.  So I know for a fact at least in one
 6     case he was able to hook somebody into doing stuff
 7     like that for him.
 8               MR. SOLIS:  Thank you, Mr. Acee.
 9               THE COURT:  Thank you, Mr. Solis.
10               Mr. Castellano, do you have further
11     redirect?
12               MR. CASTELLANO:  Yes, Your Honor.
13               THE COURT:  Mr. Castellano.
14                    FURTHER REDIRECT EXAMINATION
15     BY MR. CASTELLANO:
16          Q.   Agent Acee, when you put in your January
17     2017 report that Lujan told you that Troup joined the
18     group, but he was unsure as to which of the guys
19     asked him to help, did you record that on a recording
20     device?
21          A.   No.
22          Q.   Did it still happen?
23          A.   Yes.
24          Q.   And since this was January of 2017, when
25     Lujan told you about Troup, was that on the eve of
```

SANTA FE OFFICE                                           MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                            (505) 843-9494
FAX (505) 843-9492                                   FAX (505) 843-9492
                                                        1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   trial?

 2       A.   No.

 3       Q.   Regarding the issue of Jason Van Veghel and

 4   Karen Cartwright, was there still an indication that

 5   these people indicated that those two people had

 6   snitched against Joe?

 7       A.   Yes.

 8       Q.   Regarding Michael Jaramillo and his

 9   attorney, are you glad that his attorney advised him

10   to testify in this case?

11       A.   Yes.

12            MR. SINDEL:  I'm going to object to that as

13   irrelevant and immaterial, what he's glad about.

14            THE COURT:  Well, he's part of the

15   prosecution team.  I'll allow the question.

16   Overruled.

17       Q.   Are you glad that his attorney advised him

18   to testify in this case?

19       A.   I am.

20            MR. CASTELLANO:  No further questions, Your

21   Honor.

22            THE COURT:  Thank you, Mr. Castellano.

23            All right.  Mr. Acee, you may step down.

24   Thank you for your testimony.

25   EXCERPTS CONCLUDED
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1                         C-E-R-T-I-F-I-C-A-T-E

2

3   UNITED STATES OF AMERICA

4   DISTRICT OF NEW MEXICO

5

6

7       I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

8   Official Court Reporter for the State of New Mexico,

9   do hereby certify that the foregoing pages constitute

10   a true transcript of proceedings had before the said

11   Court, held in the District of New Mexico, in the

12   matter therein stated.

13       In testimony whereof, I have hereunto set my

14   hand on May 20, 2018.

15

16

17

18                  _____

19                  Jennifer Bean, FAPR, RMR-RDR-CCR

                     Certified Realtime Reporter

20                  United States Court Reporter

                     NM CCR #94

21                  333 Lomas, Northwest

                     Albuquerque, New Mexico 87102

22                  Phone:   (505) 348-2283

                     Fax:     (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 843-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com