**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | NO.  15-CR-4268-JB |
| | § | |
| ANGEL DELEON, ET AL., | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANT ANTHONY RAY BACA'S MOTION
FOR NEW TRIAL AND NOTICE OF JOINDER**

Defendant Anthony Ray Baca, by and through undersigned counsel, respectfully moves the Court for new trial, pursuant to FED. R. CRIM. P. 33.

Mr. Baca also provides notice of his joinder in his co-defendant Daniel Sanchez's Motion for Judgment of Acquittal, or, In the Alternative, a New Trial (Doc. 2408) and in his co-defendant Carlos Herrera's Motion for New Trial and Notice of Joinder (Doc. 2413).  The United States opposes this motion and the remaining defendants do not oppose it.

**I.      BACKGROUND**

The Second Superseding Indictment charged fifteen counts against thirty-one alleged members or associates of the Sindicato de Nuevo Mexico (SNM).  [Doc. 949.]  Defendant Anthony Ray Baca was charged with conspiring to murder Javier Molina (Count 6), the murder of Javier Molina (Count 7), conspiring to assault Julian Romero resulting in serious bodily harm (Count 8), and conspiring to murder correction officials Gregg Marcantel and Dwayne Santistevan (Counts 9 and 10).  By the time of trial, the majority of the defendants charged in

the superseding indictment had entered guilty pleas pursuant to agreements with the government that required those defendants to testify against Mr. Baca and others.

Mr. Baca proceeded to trial with co-defendants Daniel Sanchez, Rudy Perez, and Carlos Herrera on January 29, 2018. Mr. Sanchez, Mr. Perez, and Mr. Herrera were charged in Counts 6 and 7 of the indictment with conspiracy to commit murder and murder of Javier Molina in March 2014. With respect to Counts 6 and 7, the evidence showed that government witnesses Jerry Armenta and Jerry Montoya brutally stabbed Javier Molina to death on March 7, 2014. They were assisted by government witnesses Mario Rodriquez and Timothy Martinez. The murder took place at the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces. It was undisputed that Mr. Baca was incarcerated at the Penitentiary of New Mexico in Santa Fe at the time of the murder. Nonetheless, the government alleged that Mr. Baca aided and abetted the murder by causing paperwork showing that Mr. Molina cooperated with law enforcement to be sent to SNMCF knowing that alleged gang members at SNMCF would kill Mr. Molina in response. With no physical or documentary evidence linking Mr. Baca to the Molina murder, the government relied on the testimony of the four murderers and other government cooperators to convict Mr. Baca. The government also relied on purported informants to prove its case against Mr. Baca as to Counts 9 and 10, although it also introduced recordings of conversations between Mr. Baca and others and letters written by alleged co-conspirators and cooperating witnesses Robert Martinez and Roy Martinez.

Throughout the trial, the government disclosed massive amounts of discovery, including exculpatory information. For example, during voir dire, the government disclosed 3500 pages of discovery. After it rested its case-in-chief, the government disclosed 981 pages of witness Mario

Rodriguez's personal writings and documents and 482 pages of handwritten notes made during pretrial interviews of key government witnesses.  It also disclosed hours of recordings.  The vast majority, if not all, of this evidence was in the government's possession before trial began.

On March 1, 2018, the defendants filed a series of motions to dismiss based on the government's late-disclosure of discovery including *Brady* and *Giglio* materials. *See* Defendant Daniel Sanchez's Motion to Dismiss Case for Government's Outrageous Misconduct and Irreparable Violation of *Brady v. Maryland* [Doc. 1841], Defendant Carlos Herrera's Motion to Dismiss, or in the Alternative, for [Mistrial] Based on Repeated *Brady* and *Giglio* Violations [Doc. 1842], and Defendant Rudy Perez's Motion to Dismiss [Doc. 1844].  Mr. Baca joined these motions and in the arguments before the Court.  [Docs. 1843, 1860.]

The trial was completed on March 5, 2018. Following the close of the government's case, the Court granted Mr. Baca's oral motion for judgment of acquittal as to Count 8, which alleged the assault of Julian Romero.  [Doc. 1870.]  The Court denied the motion as to Counts 6, 7, 9 and 10.  On March 12, 2018, the jury returned verdicts finding Mr. Baca guilty of Counts 6-7 and 9-10.  [Doc. 1937.]

The government continued to disclose exculpatory discovery—including information in its possession prior to, and during, the trial—after the jury reached its verdicts.  For the reasons more fully discussed below, the interests of justice require a new trial be granted to Mr. Baca.

## II.   LEGAL STANDARDS GOVERNING A MOTION FOR NEW TRIAL UNDER RULE 33.

Rule 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." The decision to grant or deny a motion for new trial rests within the trial court's discretion. *See United States v.*

*Patterson,* 41 F.3d 577, 579–80 (10th Cir. 1994). In considering a motion for new trial, the district court "considers the credibility of witnesses and weighs the evidence as a thirteenth juror." *United States v. Lopez*, 576 F.2d 840, 845 n.1 (10th Cir. 1978). The district court "does not view the evidence in the light most favorable to the government as [it] would in ruling on a Rule 29 acquittal motion," but may grant the motion for any reason it deems is required by the interests of justice. *Id.* While the standard elaborated by the Tenth Circuit imbues the trial court with significant discretion, it is well established that a "motion for a new trial is not regarded with favor and should only be granted with great caution." *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997).

Rule 33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *See United States v. Wall,* 389 F.3d 457, 474 (5th Cir. 2004) (stating that "any error of sufficient magnitude to require reversal on appeal is an adequate ground for granting a new trial" (quoting 3 Charles Alan Wright, Federal Practice & Procedure § 556 (3d ed. 2004)); *United States v. Kuzniar,* 881 F.2d 466, 470 (7th Cir. 1989) (stating that Rule 33 relief is available where "the substantial rights of the defendant have been jeopardized by errors or omissions during trial").

The government's late disclosure of discovery and its suppression of *Brady* and *Giglio* evidence caused a miscarriage of justice in the trial against Mr. Baca.  In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963).  This is true whether or not the defense requests, specifically or generally, the exculpatory material.

*United States v. Agurs*, 427 U.S. 97, 106-08 (1976).  Evidence is "material" within the meaning of *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Young*, 45 F.3d 1405, 1408 (10th Cir. 1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule." *Young*, 45 F.3d at 1408 (*citing Giglio v. United States*, 405 U.S. 150, 154 (1972)). When exculpatory or impeachment evidence might make the difference between conviction and acquittal, the failure to disclose that evidence to the defense "deprive[s] the defendant of a fair trial." *Bagley*, 473 U.S. at 675.

As noted by the Tenth Circuit, "[i]t would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009). The belated disclosure of *Brady* material "tends to throw existing strategies and trial preparation into disarray." *Id.* (internal citations and quotations omitted). It becomes "difficult to assimilate new information, however favorable, when a trial already has been prepared on the basis of the best opportunities and choices available." *Id.* (*citing United States v. Devin*, 918 F.2d 280, 290 (1st Cir. 1990) (explaining that a *Brady* violation would occur if delayed disclosure altered defense strategy and timely disclosure would like have resulted in a more effective strategy)).

The Court in *Burke* went on to explain:

It is not hard to imagine the many circumstances in which the belated revelation of *Brady* material might meaningfully alter a defendant's choices before and during trial: how to apportion time and resources to various theories when investigating the case, whether the defendant should testify, whether to focus the jury's attention on this or that defense, and so on. To force the defendant to bear

5

these costs without recourse would offend the notion of fair trial that underlies the *Brady* principle.

571 F. 3d at 1054.

Furthermore, "a conviction obtained through use of false evidence, known to be such by representatives of the State," violates due process. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). The same is true when the government, "although not soliciting false evidence, allows it to go uncorrected when it appears." *Id.*  This rule applies even if the false evidence goes only to the credibility of the witness, *id.*, and notwithstanding the good or bad faith of the prosecution. *Giglio*, 405 U.S. at 154.

## III.    ARGUMENT

### A.    Mr. Baca is Entitled to a New Trial Based on the Late Disclosure of Critical Impeachment Evidence Against Witness Mario Rodriguez.

Mario Rodriquez was a critical witness against Mr. Baca.  He testified that Mr. Baca discussed with him ideas regarding the structure and future of the SNM, testimony the United States relied on to argue to the jury that Mr. Baca was a leader of the SNM.  Rodriquez also testified that he spoke with Mr. Baca in October 2015 regarding the Molina murder.  For example, Rodriquez testified that they discussed Jerry Armenta's cooperation with law enforcement and Mr. Baca offered to threaten Armenta's family. Rodriquez said he provided Mr. Baca with the family's address for that purpose.  Rodriquez also testified that Mr. Baca said he was disappointed Rodriguez and the others who murdered Molina were charged with the murder because Molina was supposed to be killed before 2014.  Rodriquez further alleged that Mr. Baca said he knew how the paperwork regarding Molina had been transferred down to SNMCF.

6

Rodriquez also testified that Mr. Baca told him about the conspiracy to kill Mr. Marcantel in 2015.  Rodriquez claimed that Mr. Baca said he was going to have someone follow Mr. Marcantel home from a barbeque, but before Mr. Baca could tell him any more Rodriquez interrupted him to say he wanted nothing to do with it.  In sum, Rodriquez claimed to know a lot about Mr. Baca and his role in various SNM activities.

On June 8, 2018, the United States disclosed to the defense a recording of a telephone call between Rodriquez and his mother that directly contradicted Rodriquez's claimed knowledge of Mr. Baca's activities.  The telephone call between Rodriquez and his mother took place on November 14, 2017, over two months before the trial started.  *See* Exhibit A (10.94.0.21-bb9b19f40a5e00157acb37ee8d4c8f1b.mp3).[1]  In that call, Rodriquez discussed his cooperation with the FBI and his anticipated testimony at the upcoming trial.  Rodriquez told his mother:

> The only one they want to use me against is Dan. ***And they won't use me against Pup because I don't have nothing on him.***  So I don't have to.  But I'll have to do for the other ones.  They want me to do four of them…

Exhibit A at 19:35 (emphasis added)[2].  At this point, Rodriquez had provided several statements to law enforcement, and those statements are consistent with Rodriquez's statement to his mother that he did not "have anything on" Mr. Baca.  In his first statement to law enforcement, for example, Rodriquez told law enforcement that Mr. Baca "liked Molina because Molina bought into the [changes Mr. Baca had proposed for the SNM]."  Exhibit B at 5 (Oct. 24, 2017 debrief of Rodriquez).  Rodriquez also told the agents:

---

[1] The United States disclosed a total of 58 calls Rodriquez made from November 14-27, 2017, while incarcerated at the Penitentiary of New Mexico.

[2] Given the size of this audio file Exhibit A will be lodged separately on a compact disk.

> When Baca returned from the ADX, a U.S. prison in Florence, CO [in October 2015], he asked Rodriguez if they saw the paperwork and Rodriguez confirmed they had. Baca asked to see the paperwork because Molina was a follower and he did not want a follower who was a rat. ***Rodriguez did not know if Baca wanted Molina killed.*** Baca said they had done the right thing by hitting/killing Molina. Rodriguez thought Baca would have stopped the hit if he had been at SNMCF because the SNM was progressing to a whole new unit yard. In Rodriguez's opinion, Baca would have likely had Molina assaulted instead of killed. Baca did not mean for Molina's killing to be revenge against NMCD. Baca asked if Calbert had the paperwork and J. Martinez told him he did. Rodriguez believed the interaction with Baca was caught on the Rookie Year show but was not shown because neither signed the consent forms. Rodriguez thought Baca was indirectly involved but had not seen the paperwork because the paperwork would have gone through too many hands to reach him. The government informants would have seen the paperwork if it had gone to Baca. The SNM bylaws indicate that rats should be killed. By virtue of his position, Baca ***possibly*** authorized it.

*Id*. at 7-8 (emphasis added). In this statement, the most Rodriguez could offer law enforcement was speculation regarding Mr. Baca's role in the Molina homicide. Critically, he did not mention anything about threats against Jerry Armenta or against Gregg Marcantel.

Rodriquez was interviewed a second time on November 1, 2017, approximately two weeks before the call with his mother. *See* Exhibit C (Nov. 1, 2017 debrief of Rodriguez). This statement was likewise consistent with Rodriguez's statement that he had "nothing" on Mr. Baca. For example, although Rodriguez said he thought the plot to murder Mr. Marcantel was "completely stupid," he said nothing about Mr. Baca attempting to discuss the plot with him. *Id*. at 5. Rodriguez made additional statements regarding the Molina murder, but provided no new information regarding Mr. Baca's alleged role in it. *Id*. at 8.

It was not until February 3, 2018, that Rodriguez told law enforcement the stories he told at trial regarding Mr. Baca discussing the alleged plot to kill Gregg Marcantel and Jerry Armenta. At trial, although defense counsel was aware of the evolution of Rodriguez's statements and believe the later statements to be fabricated, they did not have the recording of

the November 2017 phone call between Rodriguez and his mother, in which Rodriguez admitted to having "nothing" on Mr. Baca. If counsel had had that information, their cross examination of Rodriguez would have been far more effective and there is a reasonable probability that the result of the proceeding would have been different.

The November 2017 telephone call was also important evidence of Rodriguez's relationship with fellow conspirator and murderer Timothy Martinez. Like Rodriguez, Martinez claimed that Mr. Baca made statements to him in October 2015 regarding the Molina murder and the plots to kill Mr. Marcantel and Mr. Santistevan. Martinez was housed with Rodriguez in the weeks before trial, and Rodriguez discussed his connection with Martinez in the November 2017 phone call. Furthermore, after it had rested its case, the Government disclosed 981 pages of documents belonging to Rodriguez that included an October 2015 letter from Martinez's wife to Martinez demonstrating a strong connection between the two men and complaining that "ole boy['s]" story did "not match up to the evidence or to everyone else's statements!" Exhibit D at 5. Substantial evidence existed that Martinez and Rodriguez had previously colluded to manufacture evidence, and Rodriguez's phone call with his mother is substantial evidence that they did so again in concocting Rodriguez's testimony against Mr. Baca to "match up to" Martinez's statements.

The November 14, 2017, recorded telephone call was in the possession of the New Mexico Department of Corrections as of November 14, 2017. This Court previously held that "the United States … has a duty to search the files that the governmental agencies closely aligned with this prosecution maintain, where there is a reasonable prospect of finding exculpatory evidence -- those agencies being, at the least, New Mexico Corrections Department,

including STIU, and of course, the FBI."   [Doc. 809 at 104.]   The call was one of several included in a packet of calls Rodriguez made November 14-27, 2017, which could and should have been disclosed before trial.  Had the call been timely disclosed, counsel could have used it in their impeachments of Rodriguez and Martinez and there is a reasonable probability that the result of the trial would have been different.  For this reason, Mr. Baca is entitled to a new trial.

> **B.     The United States Presented What Can Only Be Described As Material Testimony That Was Perjured; As That Testimony Went Uncorrected By The United States, Despite Its *Brady* And *Giglio* Obligations To Provide Corrective Information, A New Trial Should Be Ordered.**

During Defendant Baca's trial, Lupe Urquizo testified that on his last day of residing on Level VI in 2012, he was in the first recreation yard cage for housing unit 3 and communicated to Defendant Baca who was standing in the window of his cell in the Q pod of Unit 3A.  *See* Exhibit E.  According to Lupe Urquizo, Defendant Baca use "his hands" to communicate using "sign language" through the window of his cell.  *Id.,* p. 38.  Lupe Urquizo testified that on this day, "the day I left to PNM South."  *Id.*, p. 39  Lupe Urquizo later clarified that Defendant Baca was residing in PNM North, Unit 3A, Q Pod, cell 106.  *Id.*, p. 280.  According to Lupe Urquizo's testimony, Defendant Baca used sign language to remind Lupe Urquizo to "Don't forget that message.  You need to take care of that" referring to "Javier Molina."  *Id*., p. 38.

There can be no mistake that this sign language conversation as described by Lupe Urquizo never happened.  First, contrary to the trial testimony, Lupe Urquizo's last day on Level VI in 2012 was on September 13, 2012.  On that day, Defendant Baca was housed in the Pod S of Unit 3A, not Pod Q as Lupe Urquizo claimed.  But even if one could contend that Lupe Urquizo simply had the wrong date (which is doubtful, since he testified that it was

on the day he moved to PNM South) his testimony was still perjured.  That is because it is impossible to stand in the first cage of the recreation yard where Lupe Urquizo claimed to be and see into what would have been (purportedly) Defendant Baca's cell.  A large prison guard shack stands in between the first cage in the recreation yard and the cell that is PNM 3A Q106, completely obstructing the view.  The attached photographs are taken from the vantage point inside N3A Q106 looking into the first exercise cage, as well as from the exercise cage looking toward cell N3A Q106.  *See* Exhibits F, G, & H.

As the Court can plainly see from exhibits F, G, & H the sign language conversation that Lupe Urquizo testified about having would have been impossible.  As Lupe Urquizo's testimony on this material issue effected Defendant Baca's constitutional right to a fair trial under *Brady* and *Giglio*, as well as his right to not have the United States present perjured testimony at trial in order to convict him, a new trial must be ordered.  The United States cannot reasonably argue, given the close relationship in this case with the DOC, that it could not have known that this viewing angle was impossible.  The fact that Lupe Urquizo's line of sight into cell Q106 from any location in the first recreation cage was completely obstructed goes to show the non-existent effort that was made to vet the cooperating witness testimony in this trial.  The failure of the United States to disclose an architectural obstruction that made its witness's testimony impossible violated the United States' duty to disclose exculpatory evidence and impeachment material to the defense, and allowed a material witness to lie on the stand.  As this was not a harmless error; the Court must order a new trial.

**C.**   **The Destruction of Exculpatory Records By The Department of Corrections Violates Defendant Baca's Right to Due Process of Law and Demands The Reversal of His Convictions and a New Trial**

  **1.   *Introduction***

Defendant Baca contends that a new trial is warranted here due to the destruction of a large body of exculpatory evidence that was in the possession of the New Mexico Department of Corrections ("DOC").   During the trial, various cooperating witnesses for the United States, like Lupe Urquizo, Mario Rodriquez, and Timothy Martinez testified that they had conversations with Defendant Baca about the criminal allegations involving the conspiracy to murder Greg Marcantel, Dwayne Santistevan as well as Javier Molina.   When pressed on the details of those conversations, the cooperating witnesses claimed that those conversations happened in the recreation yard at Level VI.   Another cooperating witness, David Calbert, claimed that he obtained the Molina paperwork from Anthony Baca via Joe Martinez while both men were exercising in the Level VI recreation yard.   Despite having the capability to verify the claims of the cooperating witnesses through DOC records memorializing who was in the recreation yard and when, *see* for example Defense Exhibit GB, the United States failed to do so.   *See* Trial Transcript, March 2, 2018, at p. 169, lines 9 to 17.

After the trial ended, defense counsel sought to obtain the recreation yard records from the Department of Corrections.   This Court has already ruled that the Department of Corrections is a part of the prosecution team in this case.   *See* Dkt. 907, p. 106 (holding that the "Court can confidently say that the New Mexico Correction's Department records, under the unique facts of this case, are under the AUSA's control").   Likewise, the Court ruled that insofar as the DOC is concerned, the United States had a duty under *Brady* to "search the files" of the DOC "where

12

there is a reasonable prospect of finding exculpatory evidence." Dkt. 907, p. 104. Tellingly, the United States had not turned over any exculpatory information concerning the Level VI recreation yard records.

On April 17, 2018, after the first trial had ended, Defense counsel requested and obtained the first batch of Level VI recreation yard records covering the time period from September 13, 2011 to September 13, 2012. *See* Exhibit I. On May 14, 2018, after securing the first batch of recreation yard records, defense counsel requested all recreation yard records from September 14, 2012 through March 6, 2014. *See* Exhibit J. On May 16, 2018 the DOC responded to the second request by claiming that "NMCD normally only keeps records of this nature for three years" and claimed that the "Department no longer has any responsive documents at this point." *See* Exhibit K. On May 17, 2018 the defense confronted DOC with the absurdity of that answer, having just received responsive documents for a year earlier. That same day the DOC responded once again that the Department did "not have any documents in response to your request." *See* Exhibit L. But that was not true.

On August 23, 2018, defense counsel requested all records concerning the destruction of the recreation yard records from September 14, 2012 through March 6, 2014. On September 19, 2018, in response to that request, the DOC explained that the materials defense counsel sought were destroyed four days ***after*** receiving defense counsel's request to disclose those same records. *See* Exhibit M. The DOC understood that the defense request was a request to "persevere" these materials. *Id*. Nevertheless, the DOC had the requested material destroyed on May 18, 2018, four days after the defense asked for those documents. *See* Exhibit N. The DOC

has not explained why the records were destroyed after the defense requested them to be turned over.

### 2.   *The Legal Standard*

The Due Process clause of the Fifth Amendment to the United States' Constitution provides that:

> *No person shall . . . be deprived of life, liberty, or property , without due process of law.*

U.S. Const. amend. V.  Over the years, our Supreme Court has addressed what due process means concerning a criminal defendant's right to inspect evidence and has developed "'what might loosely be called the area of constitutionally guaranteed access to evidence.'"  *California v. Trombetta*, 467 U.S. 479, 485 (1984) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982)).

Which constitutional analysis for destroyed evidence applies depends on how one assesses the exculpatory nature of the evidence.  If the exculpatory nature of the evidence was "apparent before" its destruction, *Trombetta* applies.  If the exculpatory value is indeterminate, and may have been "potentially useful," the legal standard articulated in *Arizona v. Youngblood*, 488 U.S. 51 (1988) applies.

### i.   The *Trombetta* Standard

Under this standard, a criminal defendant is entitled to a new trial if the defendant can show that (1) the exculpatory nature of the evidence was apparent before it was destroyed and (2) the defendant is unable to obtain the evidence by other reasonable means.  *United States v. Bohl*, 25 F.3d 904, 910 (10th Cir. 1994).

ii.    The *Youngblood* Standard

Under *Youngblood* a new trial should be ordered when (1) potentially useful evidence is destroyed and (2) the government entity acted in bad faith in destroying the evidence.

### 3.   *Under either legal analysis, Defendant Baca is entitled to a new trial*

In this case the exculpatory nature of the recreational yard materials was apparent before they were destroyed.  In witness testimony, for instance, Timothy Martinez claimed that in October of 2015 he had a conversation with Defendant Baca in the recreation yard of PNM Level VI.[3]  During that conversation Timothy Martinez claimed Defendant Baca discussed his desire to murder Greg Marcantel.  Despite Timothy Martinez's claim, Agent Acee testified that Defendant Baca had been audio recorded through October of 2015 by Eric Duran and even when asked directly by Mr. Duran during those recording Defendant Baca never indicated any intent at all to murder Greg Marcantel in October of 2015.  Given that fact, the recreation yard records would be expected to show that the recreation yard conversation Timothy Martinez referenced simply never happened.

Likewise, David Calbert claimed that he obtained the paperwork for the Javier Molina hit from Joe Martinez during a chance meeting in the recreational yard.  The trial testimony was that the paperwork was handed off between the men rolled up in a tube-like fashion and slipped between the mesh metal of the recreation yard cages.  This testimony is not credible, given that the prison guards strip search inmates going to and from the recreation yard.  But it is especially incredible here, given that after the jury rendered its verdict in this case the FBI interviewed Joe

---

[3]  According to the Offender Physical Location History provided by the DOC, such a conversation between Defendant Baca and Timothy Martinez would have had to have happened on one of four days: October 23 to October 27, 2015.

Martinez.  Joe Martinez informed Agent Acee during that interview that David Calbert had lied

when he claimed that he obtained paperwork from Joe Martinez in the recreation yard.  That

interview provides a solid foundation to believe that, once again, the recreation yard records

would have produced exculpatory information.

Mario Rodriguez also testified at trial about having recreation yard conversations with

Defendant Baca detailing the conspiracy to murder Greg Marcantel.  Yet that claim by Mario

Rodriguez is at odds with the telephone conversation Mario Rodriguez had with his family on

November 14, 2017, which the United States disclosed on June 8, 2018 after the trial ended.[4]  In

that conversation Mario Rodriguez informed his family that the United States did not want "to

use me against Baca because I don't have nothing on him."  According to Mario Rodriguez, he

would only be testifying against Daniel Sanchez.

When the recreation yards records were destroyed, the DOC was in a position to

understand that this evidence was material to Defendant Baca's defense.  The DOC and its

employees were critical players in this case, having participated in every aspect of the

investigation of the defendants in addition to providing an abundance of trial testimony.  When

juxtaposed against the defense request for recreation yard information a year before the 2012 to

2014 records, it is obvious that the first defense request for information precipitated widespread

document destruction at the DOC.  Such behavior is indicative of knowledge of the materiality

of the documents.  In addition, there is no comparable evidence to replace the recreation yard

records with.  Under the circumstances, the Court should order a new trial for Defendant Baca

---

[4]  *See* Exhibit A.

and instruct the next jury that the destruction of these records indicates that the missing evidence does not favor the government's case.

Should the Court find that the *Youngblood* standard applies, there is sufficient evidence to find bad faith on the part of the DOC in destroying these records. It cannot be seriously argued that the material at issue here is potentially useful. As for bad faith, it is clear that the DOC had these materials when Defendant Baca requested them and destroyed them with haste. Despite the request to produce all records concerning the destruction of this evidence, we only have a receipt for the collection of the evidence on May 18, 2018 four days after it was requested by Defendant Baca. The false claim by the DOC that they did not retain recreational yard records for over three years when they had just produced records that were six years old underscores the lack of honesty in their communications with Defendant Baca. Those communications, like the destruction of these records, was in bad faith.

## IV.   CONCLUSION

WHEREFORE, Defendant Anthony Ray Baca respectfully moves the Court for new trial, pursuant to FED. R. CRIM. P. 33.

Respectfully submitted,

/s/ Theresa M. Duncan
Theresa M. Duncan
Duncan Earnest LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

AND

17

ROTHSTEIN DONATELLI, LLP

/s/ Marc M. Lowry
MARC M. LOWRY
500 Fourth Street NW, Suite 400
Albuquerque, NM  87102
(505) 243-1443
mlowry@rothsteinlaw.com

*Attorneys for Anthony Ray Baca*

## CERTIFICATE OF SERVICE

I hereby certify that on October 15, 2018 I caused the instant motion to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

s/*Theresa M. Duncan*
Theresa M. Duncan