IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,　　　§
　　　　　　　　　　　　　　　　§
　　　　　*Plaintiff*,　　　　　　§
v.　　　　　　　　　　　　　　　§　　　　　NO.  15-CR-4268-JB
　　　　　　　　　　　　　　　　§
ANGEL DELEON, ET AL.,　　　　　§
　　　　　　　　　　　　　　　　§
　　　　　*Defendants*.　　　　　§

**DEFENDANT ANTHONY RAY BACA'S REPLY
IN SUPPORT OF HIS MOTION FOR NEW TRIAL**

Defendant Anthony Ray Baca files this reply brief supporting his motion for a new trial (Dkt. 2421) under FED. R. CRIM. P. 33.  For the reasons discussed below, the United States has not raised a legal or factual justification for denying Defendant Baca's request for a new trial. Hence the Court should grant Defendant Baca's request for a trial that comports with traditional notions of due process of law.

## I.　THE LEGAL STANDARD

The United States seeks to have the Court use a sufficiency of the evidence standard to evaluate Defendant Baca's request for a new trial.  To this end, the United States claims that Defendant Baca has requested a new trial "because the verdict was contrary to the weight of the evidence" in this case.  United States' Sealed Respnse, p. 3 (Dkt. 2457).  That assertion does not fairly reflect Defendant Baca's claim.  While the Court certainly has the discretion to weigh "the evidence as a thirteenth juror," *United States v, Patterson*, 41 F.3d 577, 579-80 (10th Cir. 1994), the Court retains discretion to grant a new trial in any instance where "the interest of justice so requires."  FED. R. CRIM. P. 33(a).

Our Supreme Court has held that where a paid government informant provides false

testimony that the Court cannot conclusively determine "was insignificant in the general case

against the defendants," a new trial should be ordered, the sufficiency of the evidence

notwithstanding.  *Mesarosh v. United States*, 352 U.S. 1, 10-11 (1956).  In granting a new trial

based on the false testimony of a government witness, the Court observed that the "untainted

administration of justice is certainly one of the most cherished aspects of our institutions," and

that a "government of strong and free nation does not need convictions based upon such

testimony."  *Mesarosh*, 352 U.S. at 14.  The legal standard suggested by the Government

overlooks this hallmark of our judicial system.  Defendant Baca asks that the Court consider the

false evidence provided by the government witnesses in this case, quite the opposite of an

"untainted administration of justice," when assessing whether a new trial is warranted here.

Defendant Baca's request for a new trial is not predicated on the sufficiency of the evidence

presented to the jury.

## II.  ARGUMENT

### A.  The Mario Rodriquez Phone Call Disclosed After The Trial Was Critical Impeachment Evidence For Defendant Baca's Case.

The government argues that the undisclosed phone call in which Mario Rodriquez

admitted to having nothing on Anthony Baca was cumulative of other trial evidence and

consistent with his evolving statements to law enforcement.  These arguments are without merit.

The Mario Rodriquez phone call, disclosed months after the trial in this case ended, is critical

impeachment information that Defendant Baca's jury should have considered.  This phone call

provided direct evidence, in Mario Rodriquez's own voice, that seriously undermines the

credibility of Rodriguez's subsequent claims on the eve of trial to have a great deal of

information incriminating Mr. Baca in the Molina murder and Marcantel murder conspiracy.

Rodriguez's statement to his mother is consistent only with Mr. Rodriguez's first

statement to law enforcement, in which he provided vague statements regarding Mr. Baca's

vision for the future of the SNM.  In that first statement to law enforcement, Rodriquez admitted

not knowing whether Mr. Baca was involved in the murder of Javier Molina.  Only later, after

having multiple opportunities to confer with Timothy Martinez to get their stories in alignment

and for the benefit of a reduction in his sentence, did Rodriquez claim that Mr. Baca discussed

the Molina murder and the Marcantal plot.  But those statements were directly at odds with

Mario Rodriquez' statement to his mother that while he would have to testify against Mr.

Sanchez and the other defendants housed in the Blue Pod at Southern Correctional Facility, his

testimony would be useless against Defendant Baca because he had "*nothing on him.*"

The government also seeks to assure the Court that there was nothing suspicious about

Rodriguez's failure to mention Mr. Baca's alleged statements regarding the Marcantel plot in his

initial debrief because Rodriguez was not asked specific questions about that plot.  While

Rodriguez may not have been asked Marcantel-specific questions during the initial debriefs, he

was asked about Mr. Baca's alleged leadership and he provided information about Mr. Baca's

relationship with NMDOC administration officials.  Never in the context of discussing the

administration officials of the NMDOC did Rodriguez mention anything about Defendant Baca

wanting to murder Marcantel.  By the time of Mario Rodrquez's first interview with the FBI on

October 24, 2017, Mr. Rodriquez would have known that the Molina murder and the Marcantel

plot were of interest to law enforcement since they were asserted in Indictments he had reviewed

multiple times before his arraignments in following the initial Indictment (Dkt. 2 in December of

2015), the superseding Indictment (Dkt. 368 in April of 2016), as well as the Second

Superseding Indictment (Dkt. 949 in March of 2017).  It is simply not plausible that Mario

Rodriquez became a government witness in October of 2017 yet was unaware of the

government's interest in knowing whether Defendant Baca participated in the Molina murder or

Marcantel plot until the eve of trial.  In fact, it defies logic.

The Mario Rodriquez phone call was undoubtedly critical impeachment information for

Defendant Baca.  It portrays Mario Rodriquez's own voice admitting that he did not know

anything about Defendant Baca's participation in the Molina murder or Marcantel conspiracy.

The fact that Mr. Baca did not directly request Rodriquez's calls via Ms. Jack's IPRA request is

irrelevant given the clear exculpatory nature of the information portrayed on the call.

Particularly when considered in light of the massive amount of *Brady/Giglio* material the

government withheld in this case, the government's failure to timely disclose the exculpatory

Mario Rodriguez calls mandates a new trial.  In any event, Defendant Baca placed the Court on

notice, repeatedly, that the failure to provide the defense with *Brady/Giglio* information was an

ongoing problem in this case.  *See*, *e.g.*, Dkts. 1332 (Defendant Baca's Motion to Compel

Immediate Production of *Brady* and *Giglio* Materials) & 1701, pp. 8-9 (Defendant Baca's

Motion to Strike Cooperating Witnesses From Testifying In This Case).  This was especially

true concerning the jailhouse phone calls of the various cooperating witnesses, some of which

were produce in mass in November of 2017 just before the January 2018 trial and others after

the trial was over.

**B. Lupe Urquizo's Trial Testimony Was Perjured, And The Government's Attempt To Deflect That Reality Is Unavailing.**

Tellingly, the United States does not try to defend Lupe Urquizo's actual trial testimony that Defendant Baca complains about:  that Lupe Urquizo communicated with Defendant Baca via sign language while Mr Urquizo's was on the recreation yard on his last day at Level VI on September 13, 2012, and Defendant Baca was housed inside Unit 3A, Q Pod, cell 106.  The United States cannot, because the United States knows, unequivocally, that Defendant Baca was not in cell 106 of the Q Pod during September of 2012.  *See* Exhibit O (Defendant Anthony Ray Baca's Offender Physical Location History).  Defendant Baca moved out of cell 106 on the Q Pod on June 29, 2012.  So Lupe Urquizo's trial testimony about standing in the recreation yard in September of 2012 receiving hand signals from Defendant Baca who was standing in cell 106 of the Q Pod is not true.  It is an undisputed lie.

Rather than own up to the lie, the United States contends that there were other occasions when Mr. Urquizo would have been able to speak with Mr. Baca.  But that is not the point.  The point is that if Mr. Urquizo would so easily lie about getting hand communications from Mr. Baca who was standing in a place that everyone knows he could not have been, then he could have lied about anything.  More importantly, Mr. Urquizo did lie about anything.

For instance, during the trial the prosecutor asked Mr. Urquizo the following question:

> Q:     Have you ever seen discovery on a tablet?
>
> A:     No sir.

*See* Exhibit P (February 6, 2018 Trial Transcript, p. 293 lines 15-16).  But the jailhouse recordings show that Lupe Urquizo had reviewed the tablets.  Extensively.  On a jailhouse recording from October 29, 2017, Lupe Urquizo told a girlfriend, Vanessa:

| Urquizo: | The tablet that my homie has, it has a lot of shit.  It has all those vatos that are dead.  Like pictures of them dead.  Like fucking they show the videos of the stabbings and everything, and, you know, it's like damn, its crazy. |
|---|---|
| Vanessa: | A la verga. |
| Urquizo: | Yeah, it has everything.  Everything.  Like all that shit and it has– and I seen all my mugshots when I was a little kid.  Little like when I first came to prison–a la verga–and I was like a little kid. |
| Vanessa: | I know (laughing) |
| Urquizo: | (Laughing) Yeah.  Skinny and like a little boy.  But yeah it shows everything.  It shows the vatos getting killed and the pictures afterwards. |

Government Audio 10.98.0.21-6b2efc330a6200155ffb5664b7e43dbd at minutes 7:08 to 7:50 out of an audio file lasting ten minutes and forty-nine seconds (10:49) (This will be lodged by hand on Monday, December 17, 2018 as Defendant Baca's Exhibit Q).  In another recording from October 12, 2017 Mr. Urquizo informs another friend, Dawn, about viewing the tablet.

| Dawn: | I just like picture you with no tattoos on your face. |
|---|---|
| Urquizo: | I seen my mugshot, like uh, whenever I was younger because the homie has a tablet with all the case right. |
| Dawn: | Yeah. |
| Urquizo: | And I went back and I seen my mugshot when I was like–when I first came to prison at seventeen.  And I had no tattoos on my face or nothing. |

Government Audio. 10.92.0.21-10f2ff7a0a5c001509b3f577f9664316 at minutes 12:06 to 12:30 out of an audio file lasting nineteen minutes and forty seconds (19:40) (This will be lodged by hand on Monday, December 17, 2018 as Defendant Baca's Exhibit R).

To be sure, Mr. Urquizo's review of the tablets was extensive.  When speaking with another friend, Becky, on September 20, 2017, Urquizo discussed the discovery on the tablet concerning Defendant Baca.

> Urquizo:       He (Defendant Baca) was pretty much writing letters he wasn't suppose to be doing.  All that stuff came out.  It's on the tablet. Like, there's so much stuff, Becky, that it's just crazy.

Government Audio. at minutes 16:20 to 16:32 out of an audio file lasting nineteen minutes and thrity-five seconds (19:35) (This will be lodged by hand on Monday, December 17, 2018 as Defendant Baca's Exhibit S).

Urquizo also lied about having a conversation with Defendant Baca when he was housed in the W Pod of Unit 3B.  When pressed at trial about where Urquizo spoke with Defendant Baca about the events at issue in this case, the following colloquy took place:

> Lowry:        And according to you, where did that conversation take place?
>
> Urquizo:     Housing Unit 3B at the North Facility.
>
> Lowry:        And what pod were you in?
>
> Urquizo:     I was in W Pod, and Anthony Baca was in X Pod.
>
> Lowry:        How long had you been housed in W Pod?
>
> Urquizo:     I wasn't there that long.  I had just got there from housing unit 3A.
>
> Lowry:        So what does that mean, you weren't there that long?
>
> Urquizo:     Maybe a few weeks.  I'm not too sure.

See Exhibit P (February 6, 2018 Trial Transcript, p. 107, lines 17-25 & p. 108, lines 1-3).  But Urquizo's Offender Physical Location History shows that Urquizo was only on W Pod for three hours, not days or weeks.  See Exhibit T (Defendant Lupe Urquizo's Offender Physical Location

History).  Once again, Urquizo lied about how much time he spent on W Pod where he

purportedly spoke with Defendant Baca, who lived in a separate Pod.  The record here reflects

that Urquizo would lie about anything.

Seeing the problems with Urquizo's testimony, the United States attempts to alter his

trial testimony and argue that the farewell conversation Urquizo had with Defendant Baca on

Urquizo's final day in the North Facility did not happen in September 2012 at all, but rather it

happened sometime between February or June of 2012.  But counsel cannot freely alter the

transcript this way.  And even if the Government could, the Government is stuck with the

impossibility of this conversation having happened due to the guard shack being in the way.  It

of no moment that defense counsel toured the facility and even the recreation yard at the North

Facility, because counsel had no notice to pay attention to the guard shack at all.  The first time

Urquizo ever mentioned having a conversation between the recreation yard and someone in the

housing unit was on the stand during the trial.  Counsel had no advance notice that the line of

sight between the two would be an issue, and therefore no meaningful time to investigate the

issue at all.

Given the demonstrable lies Urquizo made during his testimony, and the fact that these

lies were instrumental in connecting Defendant Baca to the Molina murder and the Marcantel

conspiracy, Defendant Baca is entitled to a new trial in the interest of justice under _Mesarosh._

### C.  The Government Cannot Offer An Innocent Explanation For The Destruction of Recreation Yard Records.

Defendant Baca is not arguing here that the Government directed the destruction of these

records.  Instead, Defendant Baca is arguing that the Department of Corrections, an arm of the

prosecution team in this case, destroyed the records after defense counsel made an explicit

request that they be preserved.  The Department of Corrections will concede that when defense

counsel made the request for these records to be preserved on May 17, 2018, the records were

still on site at the Penitentiary of New Mexico in Santa Fe.  An employee of Level VI informed

the general counsel's office that the records had been destroyed, when in fact they had not, so no

effort was made to preserve the documents.  No explanation exists for why this employee of

Level VI falsely informed the general counsel that the records had been destroyed.  Under these

facts, the United States cannot claim that an innocent explanation exists for an employee of the

Level VI facility to inform the DOC's general counsel that records that indeed existed had been

destroyed.  Defendant Baca is entitled to a hearing, as well as relief in the form of a new trial,

due to the destruction of these potentially exculpatory materials.

## CONCLUSION

Defendant Anthony Ray Baca respectfully requests that the Court grant his motion for a

new trial as the interests of justice demands it under FED. R. CRIM. P. 33.

Respectfully submitted,

/s/ Theresa M. Duncan
Theresa M. Duncan
Duncan Earnest LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

AND

ROTHSTEIN DONATELLI, LLP

/s/ Marc M. Lowry
MARC M. LOWRY
500 Fourth Street NW, Suite 400
Albuquerque, NM  87102
(505) 243-1443
mlowry@rothsteinlaw.com

*Attorneys for Anthony Ray Baca*

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2018 I caused the instant motion to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

/s/  Marc M. Lowry
MARC M. LOWRY