**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| v. | § | NO.  15-CR-4268-JB |
| | § | |
| ANGEL DELEON, ET AL., | § | |
| | § | |
| *Defendants*. | § | |

**DEFENDANT ANTHONY RAY BACA'S WRITTEN ARGUMENT IN
SUPPORT OF HIS MOTION FOR NEW TRIAL**

Defendant Anthony Ray Baca files his argument supporting his motion for a new trial (Dkt. 2421) under FED. R. CRIM. P. 33.  For the reasons discussed below, Defendant Baca is entitled to a new trial under the interests of justice standard articulated in *Mesarosh v. United States*, 352 U.S. 1, 10-11 (1956).  As the Tenth Circuit has observed, in keeping with *Mesarosh*, if "there is any reasonable likelihood that the Government knowingly relied on perjury to obtain a guilty verdict, reversal is required."  *United States v. Crockett,* 435 F.3d 1305, 1317 (10th Cir. 2006).  Here, the record shows that the Government had to have understood that their cooperating witnesses were presenting untruthful testimony at Defendant Baca's trial.  For that reason, a new trial is necessary here.

Tellingly, the Government's reliance on demonstrably untruthful testimony mirrored the prosecution's dismissal of its obligation to produce, in a timely fashion, exculpatory and impeachment information related to the cooperating witnesses under *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 450 U.S. 150 (1972), and the Jencks Act, 18 U.S.C. § 3500.  These two systematic failures–the reliance on perjury and the lack of timely

*Brady*/*Giglio*/*Jencks Act* disclosures–produced a trial result that is simply not reliable, at least not in a judicial system that cherishes an "untainted administration of justice." *Mesarosh*, 352 U.S. at 14.

Defendant Baca would remind the Court of its admonishment to the Government that "it would eviscerate the purpose of the *Brady* rule and encourage gamesmanship were we to allow the Government to postpone disclosures to the last minute, during trial." Doc. 907, p. 59, quoting *United States v. Burke*, 571 F. 3d 1048, 1054 (10th Cir. 2009). The Court reasoned that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'" *Id*., quoting *Burke*, 571 F.3d at 1054. With regard to cooperating witnesses on whom the Government has relied, the Court required "early *Brady* review of these materials by the Government. . . . You've got to produce the *Brady* materials promptly, immediately." Doc. 907, p. 106.

The Court also informed the Government about the correct standard to analyze *Brady* and *Giglio* materials. After the Government explained that it had employed search terms to electronically review the discovery for exculpatory or impeaching information, the Court expressed concerns that such a review was insufficient to accomplish the review required by *Brady* and *Giglio*. The Court stated:

> Well I'm uncomfortable with that search. I think you ought to look at these pages. You know, electronic discovery, I'm all for it, and I'm fully aware of what we're doing with algorithms in the search area, but–especially on the civil side–but I'm uncomfortable with there not being an Assistant U.S. Attorney putting their feet in the shoes of the defendants and the defendants' counsel, and being creative about how this information could possibly be used to benefit the defendant. And I don't think there is an algorithm or search function that does that. I think that

> takes a human being sitting there putting their feet in the defense lawyers'
> shoes and saying, Could I use this?

Transcript of October 4, 2016 Hearing, p. 111, lines 2-16.  In particular, the parties agreed that

field notes of the FBI agents involved in this case would be reviewed for *Brady* and *Giglio*

material[1] and that field notes would be produced, at a minimum, as *Jenks* materials.[2]  The record

here shows that the Government simply disregarded these standards of evidentiary review as

well as for the production of those materials.  That disregard tainted the administration of justice

in this case.

## I.  MARIO RODRIGUEZ

As the January 2018 trial got underway, the Government's discovery disclosures to date had

provided no notice to Defendant Baca that Rodriguez's testimony would pose any kind of

material evidence on the issue of Defendant Baca's guilt concerning the Molina murder or the

Marcantel/Santistevan murder conspiracy.  The first FBI debrief of Rodriguez on October 24,

2017 disclosed no direct evidence supporting the alleged crimes, but detailed Defendant Baca's

new structure for the SNM.  As for the Molina murder, Rodriguez informed the FBI that "BACA

liked MOLINA because MOLINA bought into the proposed changes.  David CALBERT did not

like the new structure."  *See* Dkt. 2432-1, p. 5.  In fact, Rodriguez informed the FBI, and the

jury, that at "Baca would have stopped the [Molina] hit if he had been at SNMCF because the

---

[1]  In fact, the prosecution stated to the Court that "we'll continue to ask our agents to preserve
their notes, as they've been doing, and to continue to review those notes for *Brady-Giglio*
material, which they've been doing."  Transcript of November 9, 2017 Hearing, p. 251, lines 21-
24.
[2]  The Court acknowledged that FBI field notes taken contemporaneously with debriefs of the
cooperating witnesses were, at a minimum, *Jenks* material.  *See* Transcript of November 9, 2017
Hearing, p. 253, lines 4-10.

SNM was progressing to a whole unit yard." *See* Dkt. 2432-1, p. 7.  Rodriguez did not mention the Marcantel/Santistevan murder conspiracy at all.

Rodriguez met with with FBI a second time on November 1, 2017.  At that meeting, Rodriguez answered written questions posed by the FBI.  When directly asked by the FBI in writing if Rodriguez was "familiar with any murders committed or sanctioned by Anthony Ray Baca?," Rodriguez said nothing about the Molina murder or the Marcantal/Santistevan murder conspiracy. *See* Dkt. 2423-3, p. 14 (question 128).  In fact, in response to direct questions about the Marcantel/Santistevan murder conspiracy, Rodriguez said that he "didn't know" why the SNM wanted to kill either individual nor whose idea it was. *Id*., p. 11 (questions 83 to 86). These notes from the FBI debrief of Rodriguez were produced to the defense on January 30, 2018 after the trial began.  While the substance of these notes was not adequately reflected in the FBI 302 memorializing the November 1, 2017 debrief of Rodriguez produced to the defense in 2017,[3] the notes once again provided the defense a false impression that Rodriguez did not have material information connecting Defendant Baca to the Molina murder or the Marcantel/ Santistevan murder conspiracy.

Given this state of affairs, Defendant Baca had no reason to believe that Rodriguez could provide direct testimony on his alleged role in the Molina murder or the murder conspiracy involving Marcantel/Santistevan as the trial began.  Yet this changed dramatically when the government produced, on February 3, 2018, an FBI 302 detailing Rodriguez's claims that

---

[3]  The November 1, 2017 302 failed to indicate the limitations on Rodriguez's knowledge, despite having been directly asked how many murders Defendant Baca committed or sanctioned.

Defendant Baca had informed Rodriguez not only about the Marcantel/Santistevan murder conspiracy, but that Defendant Baca knew about the Molina paperwork and wanted Molina killed because of it.  The February 3, 2018 302 was consistent with Rodriguez's trial testimony on February 7 & 8, 2018, but directly at odds with Rodriguez's initial statement to the FBI that Defendant Baca and Molina were friends, and Defendant Baca would have prevented the Molina murder had he been housed at SNMCF.

Rodriquez explained to the jury, as the Government does in their reply brief, *see* Dkt. 2457, p. 4 (stating that in "preparation for his upcoming testimony" Rodriguez for the first time was asked "detailed information about Defendant" Baca), that the February 3, 2018 debrief addressed these issues for the first time because "I told them I knew specific things, but I thought they were going to ask me about it, and I never got into it."  *See* November 8, 2018 Trial Transcript, p. 515, lines 18-25, p. 516, lines 1-6.

But that testimony is not true.  The SNM questionnaire that Rodriguez filled out on November 1, 2017 specifically asked Rodriguez what murders Defendant Baca had "committed or sanctioned," and Rodriguez mentioned only one–Joseph Montoya.  Rodriguez did not answer the FBI's questions about the Marcantel/Santistevan murder conspiracy other than to say that the idea was stupid, and that he "didn't know" who ordered the murder or why it had been done.  So the claim at trial and in the response brief that there had been no earlier opportunity to explore these topics simply does not comport with the record.  But the record does support the view that Rodriguez's statement to his mother is in agreement with the absence of information that Defendant Baca was responsible for the VICAR crimes alleged as reflected in the FBI debriefs that Rodriguez had on October 24, 2017, November 1, 2017, and January 22, 2018.  Those

debriefs, like the telephone call, show that Rodriguez had not learned anything about the murder or murder conspiracy from Defendant Baca.

Rodriguez's November 14, 2017 telephone call with his mother where Rodriguez admits that the Government could not use his testimony against Defendant Baca "*because I don't have nothing on him*" coming just two weeks after the November 1, 2017 debrief is the best evidence available for Defendant Baca to have to impeached Rodriguez. This was Rodriguez, *in his own voice*, admitting what he refused to concede at trial–that he had nothing on Defendant Baca and that Defendant Baca had not disclosed anything to him about the Molina murder or the murder conspiracy involving Marcantel or Santistevan. And that recorded telephone call was suppressed by the Government in this case.

The Government attempts to deflect the suppression issue by observing that Defendant Sanchez's counsel, Amy Jacks, obtained the telephone call after the trial had ended via an Inspection of Public Records Act request. But that is of no assistance to the Government. The Government had an affirmative duty, under *Brady*, *Giglio*, and *Jenks* to produce the statements of a cooperating witness that were in the possession and control of the Government. This Court has already held that the "New Mexico Corrections Department's records, under the unique facts of this case, are under the AUSA's control." Dkt. 907, p. 114. Hence, the burden was on the Government, not Defendant Baca, to produce this recorded phone call that was, if not exculpatory to Defendant Baca, most certainly was essential and critical *Giglio* impeachment material that undermined Rodriguez's claim that Defendant Baca participated in these crimes. At the very least it was a Jencks Act statement that the Government was obligated to produce,

before, or at a minimum, during trial but never did.[4]  The November 14, 2017 Rodriguez

confession that he could not help the Government with Defendant Baca's trial because he had

nothing on him was the best evidence available for Defendant Baca to show Rodriguez's trial

testimony was fabricated.  And given Rodriguez's November 1, 2017 answers to the SNM

questionnaire, the Government was on notice that Rodriguez's trial testimony was a sham.  The

Rodriguez trial testimony was not a natural evolution of this federal investigation as Rodriguez

and the Government contend.  The suppression of this unique impeachment evidence that strips

Rodriguez's testimony of all its value concerning whether Defendant Baca committed these

crimes warrants a new trial.

## II.  LUPE URQUIZO

Lupe Urquizo is a prolific liar.  For instance, during the trial Urquizo testified the

Defendant Baca had ordered Julian Romero to be killed.  February 5, 2018 Trial Transcript, p.

64, lines 11-16.  That testimony was directly at odds with the 302s that he provided before trial,

wherein he claimed that Defendant Baca did not want Julian Romero to be killed, but only

wanted him roughed up.  FBI Special Agent Acee agreed with Defendant Baca that Urquizo

informed the Government before trial that Defendant Baca only wanted Romero beaten up, but

neither killed nor even stabbed.  March 2, 2018 Trial Transcript, p. 166, lines 16-25, p. 167, p.

168, lines 1-23.  Urquizo also testified at trial that he had never seen discovery concerning this

case on the tablets issued to defendants in this case, yet described in detail to his friends and

family over the telephone the images and substance of the discovery on the tablets.  *See* Dkt.

---

[4]  At the very beginning of this case defense counsel had requested that the Government produce
the defendants' jailhouse calls on a rolling basis.  The Court, with Judge Gonzales presiding,
agreed that those calls should be produced, yet they never were.

2469, pp. 5-7.  Urquizo also testified on his last day residing on Level VI in September of 2012 Urquizo was in the recreation yard when Defendant Baca communicated with him via hand signals to kill Molina when Urquizo got to SNMCF.  According to Urquizo, Defendant Baca threw him hand signals from Cell Q106 in housing Unit 3A.  But the evidence in this case shows that Defendant Baca was not in Cell Q106 of housing Unit 3A at anytime in September of 2012 when Urquizo testified to the jury that this happened.

Given the demonstrated inconsistencies between Urquizo's testimony and the FBI's 302 reports, Defendant Baca filed a motion on February 28, 2018 demanding the production of all FBI field notes for principle cooperating witnesses against Defendant Baca, especially Urquizo. S*ee* Dkt. 1840.  Those notes show that during Special Agent Acee's initial interview of Urquizo on February 24, 2017, Urquizo admitted that he did not have first-hand knowledge that Defendant Baca called the hit on Molina, as he claimed throughout his trial testimony.  The FBI field notes of the initial meeting with Urquizo show that Urquizo informed Agent Acee that he had been "told by a person" who was a "friend from Clovis" that Defendant Baca called the hit on Molina.  *See* Defendant Baca's Exhibit DD.  Inexplicably, the FBI 302 memorializing Urquizo's February 24, 2017 meeting with the FBI reflects only 7 of the 8 enumerated topics that Urquizo could offer to support the Government's case.  *Compare* Defendant Baca's Exhibit DD *with* Defendant Baca's Exhibit EE.  The key topic missing from the 302 is Urquizo's admission that he only knew Defendant Baca called the Molina hit via inadmissible third party hearsay evidence, his friend from Clovis, New Mexico.  *Id*.

The Court should understand that the Government told the Court on November 9, 2017 that insofar as the review of FBI field notes for all cooperating witnesses were concerned, the

Government had "done a *Brady* and *Giglio* review" of the FBI field notes.  November 9, 2017 Hearing Transcript, p. 251, lines 4-5.  The Government observed the "*Brady-Giglio*" material would include the production of field notes when there was "some inconsistency in those notes with what goes in the 302s."  *Id.*, lines 15-20.  Here, we have a glaring inconsistency, one that is obviously *Giglio* material.  Yet the materials were never produced as part of the Government's discovery protocol.  Defendant Baca had to yank them out of the Government's possession with an opposed emergency motion at the conclusion of the trial.  And the production of those materials coincided with the end of trial production of the box of nearly 900 pages of Mario Rodriguez materials.

The Government is sure to argue that Defendant Baca is at fault for refusing to call Urquizo back to the stand to impeach him with the February 24, 2017 302, or the physical location history documents from the DOC, or the March 6, 2017 field notes discussing the Romero assault.  In doing so, the Government here is pulling a slight of hand trick.  Rather than addressing its own duty to correct untruthful testimony of its material witness, which were obvious to the Government given the glaring discrepancies between Urquizo's testimony, his housing records, the FBI's 302s, and the FBI's field notes, the Government want to blame the defense for the perjury of its own witnesses.  The Government would be wrong to suggest that.

Under Supreme Court precedent, the prosecution has an affirmative duty to correct the false testimony of its witnesses.  As Stated by our Supreme Court, it "is established that a conviction obtained through use of false evidence, known to be such by representatives of the State, must fall."  *Napue v. Illinois,* 360 U.S. 264, 269, (1959).  "One of the bedrock principles of our democracy, 'implicit in any concept of ordered liberty,' is that the State may not use false

evidence to obtain a criminal conviction." *Id.* There can be no doubt that Urquizo's testimony was false. Defendant Baca did not reside in cell Q106 on Unit 3A during September of 2012 when Urquizo swore Defendant Baca instructed him to have Molina killed. Urquizo's other comments about conversations he may have had about Defendant Baca ordering the crimes in this case cannot be considered true, especially given his initial comment to the FBI that he only knew about Defendant Baca's via third hand hearsay. The Government certainly knew about all of these discrepancies, in part because the Government admitted that it had completed the *Brady* and *Giglio* review of all of the field notes containing this information before the trial began.

The Government also has the existing problem with the guard shack in the recreation yard obstructing any view that Urquizo may have had into Cell Q106 of Unit 3A. Ms. Delgado testified that it was not possible to see into Cell Q106 from the first cage in the recreation yard given the physical barriers that are in the way. The photographic evidence provided to the Court by the defense supports that claim. The Government called Captain Sergio Sapien to undermine Ms. Delgado's testimony. Capt. Sapien testified that it was possible to see into Cell Q106 from the recreation yard, but, tellingly, did not offer any photographic proof to support his testimony. And while Capt. Sapien attempted to testify that the guard shack was not there in 2012 when he was a lieutenant, he was more than equivocal on that point. He did not say the shack was not there, he testified that he could not "recall" if it was there. December 17, 2018 Hearing Testimony, p. 300, lines 11-16. On cross-examination, Capt. Sapien testified that he did not recall when the guard shack that is there now was built, stating: "I don't recall if it was already there when I was a lieutenant or it wasn't. It wasn't being utilized." *Id.*, p. 312, lines 5-15. Capt. Sapien conceded that in September of 2012 Defendant Baca was housed in the S pod of

Unit 3A, and that it was impossible for anyone in the recreation yard to sign or communicate with someone living in the S pod.

In another subtle, but potentially misleading, bit of testimony, Capt. Sapien suggested that if prisoners were in the "same building" that they would have recreation in the same recreation yard. *Id.*, p. 296, lines 8-11. It is true that all of the prisoners in housing facility 3 used the same recreation yard. But the records are clear that while prisoners from housing pods located in Unit 3A may recreate together, a prisoner living in pods located in Unit 3A do not recreate at the same time as a prisoner who lives in Unit 3B, or vice versa. *See* Defendant Baca's Exhibit YY, p. 2 (documenting that prisoners residing at Housing Unit 3A go in and out of the recreation yard together without comingling with those prisoners from Unit 3B). Therefore it was not possible for Defendant Baca to have run into Urquizo in the recreation yard when they lived in separate housing Units. This is vitally important to understand that Urquizo was lying when he testified about talking to Defendant Baca while both men were in the recreation yard. Urquizo testified on direct examination that the first time he spoke with Defendant Baca about the Molina murder was in the recreation yard during August of 2012.[5] February 6, 2018 Trial Transcript, p. 280, lines 21-24. But they could not have talked in the recreation yard about the Molina murder because they lived in separate housing units in August of 2012. Defendant Baca lived in Unit 3A, and Urquizo lived in Unit 3B. *Compare* Defendant Baca's Exhibit O *with* Defendant Baca's Exhibit T. As the recreation yard records do not support the position that these separate housing units ever went to the recreation yard at the same time, that conversation could not have happened.

Here, a *Napue* violation occurred.  In the Tenth Circuit, a defendant raises a cognizable

claim under *Napue* "if the prosecutor knowingly failed to correct perjured testimony in its case,

even when the evidence went only to the credibility of the witness.  A *Napue* violation occurs

when (1) a government witness committed perjury, (2) the prosecution knew the testimony to be

false, and (3) the testimony was material."  *United States v. Garcia*, 793 F.3d 1194, 1207 (10th

Cir. 2015).  All three elements are met here because it was simply not possible for the last

conversation Urquizo had with Defendant Baca through the window of Q106 to have occurred in

June of 2012, which is what the Government suggested at trial through Urquizo's testimony, *see*

February 6, 2018 Trial Transcript, p. 282, lines 9-25, p. 283, lines 1-2, but for their first

conversation to have happened in August of 2012, which is the testimony the Government

solicited from their witness, *see* February 6, 2018 Trial Transcript, p. 280, lines 21-24.

Urquizo's trial testimony simply cannot be squared with the physical location histories or the

recreation yard records.  Urquizo's testimony about his communications with Defendant Baca

was perjured.  The Government had to have known his testimony was perjured.  And most

importantly, it was central and material testimony concerning the Molina murder.  Defendant

Baca is entitled to a new trial.

### III.   THE DESTRUCTION OF THE RECREATION YARD RECORDS

In this case, the general counsel for the DOC testified that the DOC had the recreation

yard records in their possession on May 17, 2018 when defense counsel sent a preservation

request to the DOC for those records.  *Compare* Defendant Baca's Exhibit AA *with* Defendant

---

[5]  Urquizo's 302s indicated that this initial conversation happened in late 2012 or early 2013.
This was eventually narrowed down to August of 2012.

Baca's BB & CC.  For the purpose of this discussion, Defendant Baca reminds the Court that the

DOC is under the control of the prosecution for the purpose of this case.  *See* Dkt. 907, p. 114

(holding that the "New Mexico Corrections Department's records, under the unique facts of this

case, are under the AUSA's control").  The prosecution was aware that the recreation yard

records may have contained exculpatory information, as defense counsel inquired about these

records of Agent Acee during the trial.  *See* March 2, 2018 Trail Transcript, p. 169.  Agent Acee

testified that, concerning whether the Government could show that David Calbert and Joe

Martinez ever shared recreation time together, he never obtained the recreation yard records for

the time period in question.  *Id*.  As of April of 2018, when the FBI interviewed Joe Martinez

and learned that Joe Martinez stated that he never provided David Calbert with any paperwork

concerning Molina's cooperation with law enforcement, *see* Defendant Baca's Exhibit FF, the

Government was on notice that the recreations yard records may contain tangible exculpatory

evidence concerning the very initial exchange of paperwork supporting the Government's theory

of guilt.  This exchange of the paperwork was central to the Government's case, as the

prosecution's origin story for the paperwork began with the Calbert/Martinez exchange.

The Government and Mr. Brewster attempt to downplay the destruction of the records here,

attributing the lack of preservation of the materials (despite a written request) to a communication error

with an employee from Level VI, who informed Mr. Brewster that the requested records had been

destroyed.  In an ordinary case, the miscommunication describe here would be understandable.  But here,

given that the same employee had provided a years worth of recreation yard records from 2011 to 2012

just days before, on May 10, 2018, Mr. Brewster would have been on notice inquiry to do more than take

that employee's claim of destruction of newer materials from 2012 to 2014 at face value.  Mr. Brewer

had an affirmative duty to inquire of that employee precisely how and when the records had been

destroyed, having just obtained a similar set. *See, e.g.*, *Sterlin v. Biomune Sys.*, 154 F.3d 1191, 1204

(10th Cir. 1998) (holding that a circumstances that cause heightened concern about an issue can can place

an individual on notice that "triggering the duty to exercise reasonable diligence" in assessing a claim).

The failure to perform due diligence is assessing whether defense counsel's preservation request could

have been honored, especially in circumstances placing Mr. Brewster on notice inquiry that more should

be done to honor the request, is tantamount to bad faith.  For that reason, the four factors set forth in

*United States v. Bohl*, 25 F.3d at 904, 910 (10th Cir. 1994) have been satisfied and Defendant Baca's

request for a new trial should be granted.

### IV. CONCLUSION

For the reasons discussed above, in addition to the arguments put forth in the original briefing,

Defendant Baca's motion for a new trial should be granted in the intersts of justice under Fed. R. Crim.

P. 33.

Respectfully submitted,

/s/ Theresa M. Duncan
Theresa M. Duncan
Duncan Earnest LLC
515 Granite NW
Albuquerque, NM 87102
505-842-5196
teri@duncanearnest.com

AND

ROTHSTEIN DONATELLI, LLP

/s/ Marc M. Lowry
MARC M. LOWRY
500 Fourth Street NW, Suite 400
Albuquerque, NM  87102
(505) 243-1443
mlowry@rothsteinlaw.com

*Attorneys for Anthony Ray Baca*

14

**CERTIFICATE OF SERVICE**

I hereby certify that on January 11, 2019 I caused the instant motion to be filed with the Clerk of the Court using the CM/ECF system that will serve all other parties entitled to service and notice.

/s/  Marc M. Lowry
MARC M. LOWRY