7158

1          IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF NEW MEXICO

3   UNITED STATES OF AMERICA,

4                  Plaintiff,

5       vs.            NO:  CR-15-4268 JB

6   ANGEL DELEON, et al.,

7                  Defendants.

8                  VOLUME 22

9       Transcript of Jury Trial before The Honorable

10  James O. Browning, United States District Judge, Las

11  Cruces, Dona Ana County, New Mexico, commencing on

12  February 28, 2018.

13  For the Plaintiff:  Ms. Maria Armijo, Mr. Randy
    Castellano, Mr. Matthew Beck
14

15  For the Trial 1 Defendants:  Ms. Amy Jacks, Mr.
    Richard Jewkes, Ms. Theresa Duncan, Mr. Marc Lowry,
16  Ms. Carey Bhalla, Mr. Bill Maynard, Mr. Ryan Villa,
    Ms. Justine Fox-Young.
17

18

19          Jennifer Bean, FAPR, RDR, RMR, CCR
               United States Court Reporter
20            Certified Realtime Reporter
                333 Lomas, Northwest
21             Albuquerque, NM  87102
               Phone:   (505) 348-2283
22              Fax:   (505) 843-9492

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7159

1                    I N D E X

2  EXAMINATION OF NANCY STEMO

3  By Ms. Jacks                              7172

4  By Mr. Lowry                              7175

5  By Mr. Castellano                         7177

6  By Mr. Villa                              7213

7  By Ms. Jacks                              7221

8  By Mr. Castellano                         7246

9  By Mr. Villa                              7252

10  EXAMINATION OF HEATHER BRISLEN, M.D.

11  By Ms. Fox-Young                          7255

12  By Ms. Armijo                             7368

13  By Ms. Fox-Young                          7483

14  By Ms. Armijo                             7492

15  EXAMINATION OF CLINT SNODGRASS

16  By Ms. Duncan                             7493

17  By Ms. Armijo                             7510

18  EXAMINATION OF ERNIE HOLGUIN

19  By Mr. Villa                              7514

20  By Ms. Armijo                             7534

21  By Mr. Villa                              7539

22  By Ms. Armijo                             7541

23  By Mr. Villa                              7542

24

25

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                   Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                     FAX (505) 843-9492
                                                         1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7160

```
 1   REPORTER'S CERTIFICATE                          7544

 2                    EXHIBITS ADMITTED

 3   Defendants' FY    Admitted                      7368

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  All right.  Good morning,
 2   everyone.  I appreciate everybody being here and
 3   ready to go and on time.
 4              Let me cover this issue with Juror Number
 5   14, bring you up to date on that, and I think we're
 6   probably at a close.  I received some notes
 7   yesterday afternoon, but we were so caught up on
 8   some other things throughout the afternoon that I
 9   was unable to kind of report them as they came in.
10              But Senior Inspector Luis Loya requested
11   time to brief me on the incident yesterday regarding
12   Juror Number 14, Cameron Johnston.  And that came at
13   the end of the day, after we'd concluded court.
14              Earlier in the day, Ms. Standridge
15   noticed, witnessed, and heard Juror Number 12,
16   Bridget Murphy, and Juror Number 7, Stanley Dixon,
17   teasing Juror Number 14, Cameron Johnston, about the
18   handgun issue.  Juror Number 14 did not respond to
19   either.  He did ask if the Judge would be giving
20   him, quote, a "butt chewing."
21              Last night, when I talked to the
22   inspector, he indicated that the Police Services had
23   done their investigation.  They think it's totally
24   innocent.  They're not going to bring any charges.
25   They said the gun checked out.  It was being
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   licensed.  He's a concealed carry permit holder.

2   He's very embarrassed by it.  He, as far as they can

3   tell and as far as they concluded, it was purely an

4   oversight on his part, putting it in his bag and

5   bringing it here.

6            So from the Federal Police Services, it's

7   a closed incident, and I think it is for the

8   Marshals, as well.

9            All right.  Ms. Fox-Young, you had

10  something you need to raise as far as a discovery

11  issue?

12           MS. FOX-YOUNG:  Your Honor, I do.  I don't

13  know if any of the counsel wanted to address that

14  matter with the juror first?  It looked like Ms.

15  Jacks was getting up.

16           MS. JACKS:  Can I confer with Ms.

17  Fox-Young, please?

18           THE COURT:  Certainly.

19           MS. FOX-YOUNG:  Your Honor, I guess I'll

20  take up the issue of the juror first.  I don't have

21  the transcript in front of me, but it's my

22  recollection that the Court informed the parties

23  yesterday that Ms. Standridge had given the juror

24  direction not to discuss this matter with the other

25  jurors, and that he had made the representation that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  he hadn't and wouldn't.

2          And clearly now, based upon the notes that

3  have been provided to the Court and what the Court

4  has just informed the parties, that didn't happen.

5          THE COURT:  Why do you conclude that?

6  There's nothing that I said that's inconsistent with

7  it.  When he was teased about it, he did not

8  respond.

9          MS. FOX-YOUNG:  Well, I guess I don't know

10  how any of the other jurors knew about it, if he

11  hadn't informed them.

12          THE COURT:  Well, we knew yesterday, when

13  I told that you that there were jurors and FPDs down

14  there when he was pulled out of line and sent back

15  to the car.  So I don't know how they know.  I

16  haven't gone any further than that.

17          MS. FOX-YOUNG:  So I guess it just isn't

18  clear at this point whether or not they know based

19  upon the fact that he told them or that they

20  observed it.

21          THE COURT:  It's clear, from what we

22  understand from the juror, that he has not talked to

23  anybody about it.  So his representations to us are

24  -- and Ms. Standridge can confirm what she's seen --

25  he did not respond when he was teased by the jurors.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1           MS. FOX-YOUNG:  Okay, Your Honor.  Well,

2    with that clarification, I'll move on. I can't speak

3    for the other counsel.

4           But I would like to raise this discovery

5    matter briefly with the Court.  On the 25th, which I

6    believe was Sunday, counsel received an email from

7    the Government regarding a bag of property that had

8    apparently belonged to Mario Rodriguez.  And the

9    representation from Ms. Armijo, as forwarded to her

10   from her agents at the FBI, was that Agent Sainato

11   had had these documents under his desk since

12   approximately July of last year, and they had

13   actually been obtained through STIU from the

14   Penitentiary of New Mexico.

15          And back in the summer, there had been

16   several SNM members who had property still at PNM,

17   and the FBI had been apprised of that by NMCD

18   officials; and that Agent Sainato had ended up with

19   these documents under his desk, although of course

20   he is a member of the prosecution team, the

21   Corrections Department officials are members of the

22   prosecution team, including Mr. Cupit, who was

23   involved.

24          They hadn't looked at these documents.

25   That's the representation from the Government.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          Yesterday, the Court will recall that
2     Agent Stemo testified about the letter that was
3     included in that batch of documents from Mario
4     Rodriguez, and that's Exhibit FU -- FV.  Excuse me,
5     Your Honor.  And that exhibit was admitted through
6     Agent Acee.
7          That document, as Agent Stemo
8     acknowledged, is absolutely contradictory to other
9     statements that Mr. Rodriguez made on the stand and
10    that he has made to the Government.  It's clearly
11    exculpatory information.
12         Agent Stemo's testimony is something along
13    the lines of, she ultimately did review these
14    materials before returning them, before planning to
15    return them to Mr. Rodriguez.
16         Our question now is:  What else is in this
17    bag of materials?  Why wasn't it produced to the
18    defense?  Why was this single document only produced
19    after the Government had rested and after Mario
20    Rodriguez had already taken the stand?
21         And so we had asked the Government to
22    produce all of these documents.  Immediately upon
23    receiving this email on February 25th, I made that
24    request.  I didn't receive a response.  I made
25    subsequent requests.  I asked that the Government

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  perform a Brady and Giglio review of the documents

2  if they weren't going to produce all of them.

3          I finally received a response yesterday,

4  and the Government has indicated this morning that

5  the documents will be provided and that they are

6  copying them.

7          My concern is, I don't understand how a

8  bag of documents from one of the Government's main

9  testifying informants didn't make its way to the

10  defense.  I think it's likely all Rule 16.

11          Certainly we already know about one

12  document that has exculpatory information in it, and

13  it's far too late for this stuff to be produced, and

14  it absolutely prejudices the defense.  And so I

15  think we need immediate production.  We need an

16  opportunity to review it and an opportunity to

17  re-call witnesses who we may need to recall.

18          You know, and the Court will recognize

19  perhaps that is something of a remedy, but when the

20  Government has already rested its case and we've

21  completed cross-examination of these witnesses, it

22  really prejudices the defense when we haven't had

23  the opportunity to even review these materials

24  which, you know, if we get them today, we will

25  attempt to review them immediately.  But as I stand

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  here, they have not yet been produced.

2          And I'd also ask that if the FBI or NMCD

3  or anybody else on the prosecution team, including

4  the prosecutors, are in possession of other property

5  for these cooperating witnesses, including writings

6  and other statements, that that immediately be

7  produced.

8          Thank you, Your Honor.

9          THE COURT:  All right.  Mr. Beck, do you

10  have a response?

11          MR. BECK:  I do, Your Honor.

12          The documents were looked through one

13  time.  They were looked through again February 23rd.

14          THE COURT:  Who looked through these?

15          MR. BECK:  Originally, I believe sometime

16  in the summer, late summer of 2017, Special Agent

17  Sainato and Task Force Officer Cupit looked through

18  the paperwork and these documents.

19          THE COURT:  Has an attorney from your

20  office looked through them?

21          MR. BECK:  I reviewed quickly the

22  documents last night.  And that's why they're being

23  copied and produced.

24          THE COURT:  Do you have them up here now?

25  I should say down here.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MR. BECK:  Down here.
 2            THE COURT:  Do you have them?
 3            MR. BECK:  Yes.  So the box of
 4   documents -- so going back a little bit, on February
 5   23rd when they were looked through, I think, as
 6   Special Agent Stemo testified yesterday, she
 7   recognized that the document was important and
 8   contradictory to some of the testimony or previous
 9   statements of Mr. Rodriguez.
10            As soon as she recognized that, the FBI
11   alerted us.  We alerted the defense.  We produced
12   that report, and they were able to use it with
13   Special Agent Acee, and now Special Agent Stemo.
14            The rest of the documents in the property
15   file were brought to our office in Las Cruces
16   yesterday.  As soon as we had them, last night after
17   we finished, I briefly looked through the documents.
18   There was a journal in there.  Based on -- the
19   journal had entries, I think, reflecting times when
20   Mr. Rodriguez was a juvenile.
21            Based on my review of it, we asked Special
22   Agent Sainato to make copies of all of the documents
23   in that folder as quickly as possible so that we may
24   produce them to the defense immediately.
25            That being said, I don't believe that they
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7169

```
 1   are exculpatory.  I don't believe they're Rule 16.
 2   I don't believe they're Brady/Giglio documents.  But
 3   because they may -- I could see an argument for some
 4   of them being useful to the defense or Brady/Giglio,
 5   is why out of an abundance of caution I asked the
 6   United States -- I asked Agent Sainato to make
 7   copies of those and make them available as soon as
 8   possible.  He is currently making copies of those
 9   documents at the FBI -- I don't know what's it
10   called -- branch office down here in Las Cruces.
11   That's not the official term for it.
12           But that is down the road a little ways.
13   As soon as those copies are made, he's bringing them
14   to the Court for the defendants to use.
15           THE COURT:  So this will be everything
16   that's in this basket or bag?
17           MR. BECK:  All of the documents in the
18   bag.  There may be -- it's a bag inside of a box.
19   And so all of the documents are being copied.  I
20   don't remember offhand; I think there were some
21   other materials in there, objects, but I don't
22   believe that -- we're not going to copy those.  And
23   there were -- I think as Nancy Stemo testified, as
24   far as we can tell, to our knowledge, there was no
25   weapon or drugs in that box, which is why Ms. Stemo
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   I think said she reviewed it originally.
 2           The document from Mr. Rodriguez that was
 3   entered into evidence with Special Agent Acee, about
 4   which Special Agent Acee and Special Agent Stemo
 5   testified about, there is an argument that it is
 6   exculpatory.  But given the testimony in court,
 7   vigorous cross-examination, it's the United States'
 8   position that it's not material.  So there has not
 9   been a Brady/Giglio violation as to that.
10           THE COURT:  Well, Ms. Fox-Young, do you
11   see, given what the Government is doing and what
12   you're going to get today, do you see anything else
13   I can really do at the present time until you get
14   these documents?
15           MS. FOX-YOUNG:  Yes, Your Honor.  I think,
16   first of all, there's no question that that document
17   is material, and I won't spend a lot of time on that
18   unless the Court wants --
19           THE COURT:  Let's focus on --
20           MS. FOX-YOUNG:  And I am focusing, Your
21   Honor.
22           THE COURT:  Let's focus on what -- is
23   there something I need to do before we bring the
24   jury in?
25           MS. FOX-YOUNG:  Your Honor, I think you
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   need to order the Government to make immediate

2   production.  I asked for these documents immediately

3   on the 25th.  It is now the 28th.  The Government

4   has acknowledged that there is at least an argument

5   that some of the documents are exculpatory.

6              THE COURT:  Hold on just a second.  What

7   time of day do you think these documents are going

8   to be produced?

9              MR. BECK:  I expect that they'll be here

10  sometime this morning, as quickly as the FBI can

11  make copies.  So the United States doesn't oppose

12  the Court ordering us to produce them immediately.

13             THE COURT:  Okay.  It will be so ordered.

14             MS. FOX-YOUNG:  And further, Your Honor, I

15  think the Court, given under Kyles v. Whitley, these

16  agents are absolutely member of the prosecution

17  team, there's no explanation for why these documents

18  sat for months and months and months.

19             THE COURT:  All right.

20             MS. FOX-YOUNG:  And just one more thing.

21  I'd like the Court to order --

22             THE COURT:  No, you're arguing, you know,

23  your motion to dismiss.

24             MS. FOX-YOUNG:  It'll take me -- no, it's

25  not, Your Honor.  I'm asking for relief.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7172

```
 1              THE COURT:  Well, I gave you a chance.
 2              MS. FOX-YOUNG:  On the other documents.
 3              THE COURT:  All rise.
 4              (The jury entered the courtroom.)
 5              THE COURT:  Good morning, ladies and
 6   gentlemen.  I appreciate you being back and ready to
 7   go and on time.  I appreciate all you're doing for
 8   us and the way you've gone about your task.  You're
 9   a great bunch to work with, and we appreciate it
10   very much.
11              All right.  Ms. Stemo, you're still under
12   oath.
13              THE WITNESS:  Yes, Your Honor.
14              THE COURT:  Ms. Jacks, if you wish to
15   continue your direct examination of Ms. Stemo, you
16   may do so at this time.
17              MS. JACKS:  Thank you.  I do.  I was
18   almost done yesterday.
19                      NANCY STEMO,
20        after having been first duly sworn under oath,
21        was questioned and testified as follows:
22              DIRECT EXAMINATION (Continued)
23   BY MS. JACKS:
24        Q.   Good morning, Ms. Stemo.
25        A.   Good morning.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   So yesterday when we broke, we were

2    talking about whether Mario Rodriguez had ever told

3    you, or members of the FBI in your presence, prior

4    to this trial, that he had exchanged notes with Lupe

5    Urquizo on the afternoon of March 6, 2014.  Do you

6    recall those questions?

7       A.   I do.

8       Q.   And at the end of the day, you said that

9    it was sort of in your mind that maybe Mr. Rodriguez

10   had told you that -- I think you said he didn't tell

11   you that in the October 24, 2017, interview, right?

12      A.   Correct.

13      Q.   And we also reviewed the 302 that you

14   prepared from the February 3, 2018, interview?

15      A.   Correct.

16      Q.   And he didn't tell you that during that

17   interview?

18      A.   No, he didn't.

19      Q.   But at the end of the day, you said maybe

20   there was something that related to that in one of

21   the other interviews you participated in?

22      A.   Correct.

23      Q.   So you got here a little bit early this

24   morning, right?

25      A.   I did.

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                               (505) 843-9494
FAX (505) 820-6349                                                           FAX (505) 843-9492
                                                                             1-800-669-9492
                                                                             e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1        Q.   And did you have a chance to review the
2    FBI 302s from three additional interviews with Mario
3    Rodriguez?
4        A.   I did.
5        Q.   And specifically, did you review the
6    11-page 302 dated November 1st, 2017?
7        A.   I did.
8        Q.   And the two-page 302 dated November 14,
9    2017?
10       A.   Yes.
11       Q.   And the one-page 302 dated January 22,
12   2018?
13       A.   Yes.
14       Q.   And were those all interviews of Mario
15   Rodriguez prior to this trial?
16       A.   They were.
17       Q.   And were they all interviews concerning,
18   at least in part concerning the circumstances
19   surrounding the Molina homicide?
20       A.   They were.
21       Q.   And based on your -- when you reviewed
22   those 302s, did those refresh your memory about what
23   had been discussed with Mr. Rodriguez on those three
24   dates?
25       A.   They did.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    And I guess now I want to re-ask the
 2   question.  So on any of those three dates did Mr.
 3   Rodriguez tell you that he exchanged notes with Lupe
 4   Urquizo on the afternoon of March 6, 2014, after
 5   Urquizo was transferred to Southern?
 6        A.    No, he didn't.  I think I was remembering
 7   Lupe Urquizo telling us that.
 8        Q.    Okay.
 9            MS. JACKS:  Thank you.  I have nothing
10   further.
11            THE COURT:  Thank you, Ms. Jacks.
12            Mr. Lowry?  Ms. Duncan?  Ms. Bhalla?  Mr.
13   Maynard?  Anybody?  All right.  Mr. Castellano?  Oh,
14   are you going to do some?
15            MR. LOWRY:  Yes, Your Honor.
16            THE COURT:  All right.  Mr. Lowry.
17            MR. LOWRY:  Just a quick question.
18            THE COURT:  All right.  Mr. Lowry.
19        was questioned and testified as follows:
20                  DIRECT EXAMINATION
21   BY MR. LOWRY:
22        Q.    Good morning, Ms. Stemo.
23        A.    Good morning.
24        Q.    Did you audio-record any of the interviews
25   you had or attended with Mr. Rodriguez or other
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    cooperators in this case?

2         A.    I don't think I did.  I believe the

3    meeting between Mario Rodriguez and Ronald Sanchez

4    was recorded.

5         Q.    Okay.  And how many interviews do you

6    think you attended in the course of this

7    investigation?

8         A.    That's hard to say.  A couple dozen.

9         Q.    Aside from that one interview, were any

10   attempts made to record the other interviews?

11        A.    I don't think so.

12        Q.    Why not?

13        A.    We're not required to do so unless it's

14   post-Miranda, right after they've been arrested.

15        Q.    Would it have provided everybody in this

16   room a better record to understand what transpired

17   at those meetings if they were audio-recorded?

18        A.    It could have.

19             MR. LOWRY:  No further questions, Your

20   Honor.

21             THE COURT:  Thank you, Mr. Lowry.

22             All right.  Mr. Castellano, do you have

23   redirect of Ms. Stemo?

24             MR. CASTELLANO:  Yes, Your Honor.

25             THE COURT:  Mr. Castellano.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          MR. CASTELLANO:  Thank you, sir.
 2                  REDIRECT EXAMINATION
 3  BY MR. CASTELLANO:
 4      Q.   Good morning, Agent Stemo.
 5      A.   Good morning.
 6      Q.   And had you recorded these things, is it
 7  possible that we would have more evidence of guilt
 8  reflected in the recordings, as opposed to just
 9  relying on notes and reports?
10          MS. JACKS:  Objection, calls for
11  speculation.
12          THE COURT:  Sustained.
13  BY MR. CASTELLANO:
14      Q.   Now, yesterday for part of your
15  examination they had Mr. Rodriguez' picture up here.
16  And are you familiar with Mr. Rodriguez?
17      A.   I am.
18      Q.   How are you familiar with him?
19      A.   I've interviewed him a couple of times.
20      Q.   And had you seen him before in court
21  before he decided to debrief and cooperate with the
22  Government?
23      A.   I had.
24      Q.   Has your perception of him changed from
25  before you met him and after you met him?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              MS. JACKS:  Objection, relevance.

 2              THE COURT:  Overruled.

 3        A.   It did change.  He'd seemed more relaxed,

 4   like a burden had been lifted, after he decided to

 5   cooperate.

 6        Q.   And were you there when he first decided

 7   to cooperate?

 8        A.   I was.

 9        Q.   What was his demeanor like?

10        A.   Initially, he seemed aggressive and tough;

11   but after a couple of hours of the interview, he

12   started to cry and was very emotional about his

13   decision to cooperate.

14        Q.   And so over time, has your perception of

15   him changed?

16        A.   It has.

17        Q.   You were asked about your report and this

18   statement about Rudy Perez being scared.  Do you

19   remember that?

20        A.   I do.

21        Q.   And the statement that he was down for

22   whatever, as long as it wasn't him?

23        A.   Yes.

24        Q.   Now, in your notes did you write down

25   anything other than "Rudy is scared"?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7179

```
 1          A.   I don't think I did.
 2          Q.   So when you wrote that down, did Mr.
 3   Rodriguez give you any description of how Mr. Perez
 4   looked?
 5          A.   No.
 6          Q.   And, for example, are you aware from the
 7   recordings that Mr. Perez said he was actually sick
 8   on that day?
 9          A.   Not personally, no.
10          Q.   Have you heard that recording?
11          A.   No.
12          Q.   So other than that, did he provide any
13   description of Mr. Perez' demeanor, what he looked
14   like, what his facial expression was?
15          A.   He did not.
16          Q.   Do you also recall from the statements
17   that Mr. Rodriguez gave you, that when he first
18   walked into Jerry Montoya's cell with a shank in his
19   hand, Jerry Montoya raised his hands?
20          A.   He did.
21          Q.   And did he also appear scared?
22          A.   I believe so.
23          Q.   Are you aware -- obviously you're familiar
24   with this case now, so you know that even though Mr.
25   Montoya had an initial reaction, he participated in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the murder of Javier Molina?

2       A.   He did.

3       Q.   I want to ask you about this exhibit.

4   It's I believe, Defendants' FV, Foxtrot-Victor.  And

5   in a second, I'll use the visualizer here.  I'm

6   putting my own copy in here because I marked it up.

7   I didn't want to mark the Defendants' exhibit.  This

8   is a copy of FV.

9           So first of all, when this document was

10  discovered this weekend in Mr. Rodriguez' property,

11  what significance did it have to you?

12      A.   I knew that his writing contradicted a lot

13  of what he told me initially.

14      Q.   Now, let's put this in chronological

15  order.  If this is dated October 16, 2014, if it was

16  made on that date, this would be a statement he made

17  before he spoke to you; is that correct?

18      A.   Correct.

19      Q.   So if this was found in his property --

20  and the property, what was it doing in the box?  Was

21  it basically personal property belonging to Mr.

22  Rodriguez?

23      A.   Pretty much, yes.

24      Q.   Was that personal property that was

25  initially stored at the Corrections Department?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Correct.
 2        Q.   And you were returning the item to Mr.
 3   Rodriguez or to the Corrections Department.  Is that
 4   when you decided to make sure you looked at the box,
 5   to make sure there wasn't any contraband in there?
 6        A.   Yes.
 7        Q.   And then when you found this document, it
 8   had significance to you because it was something
 9   different from what Mr. Rodriguez told you?
10        A.   Correct.
11        Q.   But in terms of the order of time, this
12   was actually written in 2014, and he gave statements
13   to you later than that, correct?
14        A.   Correct.
15        Q.   Actually, in the fall of last year?
16        A.   Yes.
17        Q.   So looking at this document, is it clear
18   to you that statements in here -- and we'll go
19   through them one at a time -- statements in here you
20   know are not true from what you know about this
21   investigation?
22             MR. VILLA:  Objection, Your Honor, as to
23   what is true and isn't true.
24             THE COURT:  Yeah, I don't think that she
25   probably ought to be the one answering that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. CASTELLANO:  I'll rephrase, Your
 2   Honor.
 3   BY MR. CASTELLANO:
 4      Q.   Okay.  So let me start here in the portion
 5   I have highlighted.  There is an indication that:
 6   "Martinez and Jason Wright's statements from March
 7   10th, 2014, are false.  Never once did I witness/see
 8   Jerry Montoya in possession of any sort of weapon or
 9   assault Javier Molina."
10              Now, having spoken to Mr. Rodriguez in the
11   fall of last year when he decided to cooperate, did
12   he tell you something different?
13      A.   He did.
14      Q.   And, in fact, did he tell you that Jerry
15   Montoya had any weapon in his hand?
16      A.   He did.
17      Q.   And when he decided to cooperate, did he
18   also tell you that in fact there was an assault on
19   Javier Molina?
20      A.   Correct.
21      Q.   And that he was part of it?
22      A.   Yes.
23      Q.   And given the fact this was found in his
24   personal property, did you have any indication that
25   he ever sent this to anybody?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       A.    No, it happened to be an original.

 2       Q.    So have you found this in any other place

 3  other than his personal property that was sitting in

 4  a box?

 5       A.    No.

 6       Q.    Turning to the next statement, so in other

 7  words, this statement would have been made a

 8  statement before he cooperated?

 9       A.    Correct.

10       Q.    And it would have been made -- if it's

11  made in October of 2014, this is still when the

12  state case was pending?

13       A.    Correct.

14       Q.    Okay.  Looking at the next statement I've

15  highlighted on this exhibit, it says:  "Also, I'd

16  like to note that it'd be impossible for anyone to

17  rush into a room with anyone other than that room's

18  occupants without the rooms in Las Cruces prison

19  being very overcrowded."

20             Now, after he decided to cooperate, did

21  Mr. Rodriguez tell you something different than

22  that?

23       A.    Yes.

24       Q.    What did he tell you?

25       A.    He said that he, Timothy Martinez, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7184

1  Javier Molina were all in Javier Molina's cell.

2       Q.   So, in fact, by his own admission they all

3  fit into that cell in some way?

4       A.   They did.

5       Q.   Okay.  I'm turning to the third part I've

6  highlighted on this exhibit where it states, "Not at

7  any point in there did I see any sort of weapons or

8  Mr. Montoya assault Mr. Molina.  I will testify to

9  this statement under oath due to the allegations

10  made by Martinez and Mr. Wright being false."

11            After he decided to cooperate, did he tell

12  you something different than that?

13       A.   He did.

14       Q.   What did he tell you in terms of -- let's

15  start with any weapons possessed by Mr. Montoya or

16  Mr. Montoya assaulting the victim?

17       A.   I believe me told me that he saw Mr.

18  Montoya stabbing Mr. Molina inside of Mr. Molina's

19  cell.

20       Q.   In fact, he was part of that conspiracy,

21  was he not?

22       A.   He was.

23       Q.   So when he said, "I will testify to the

24  statement under oath," did he testify to this

25  statement under oath?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I believe -- the one in the letter?

2      Q.   Yes.

3      A.   I believe he did not.

4      Q.   Even though you know the statements in

5  here aren't true, this is still significant to you

6  because you knew it would be something that the

7  defense attorneys would want; is that true?

8           MR. VILLA:  Objection to the form of the

9  question stating that the statements aren't the

10  truth.

11          THE COURT:  Well, I think I understand the

12  question.  Overruled.

13     A.   Yes.

14     Q.   So under those circumstances, then, did

15  you make sure that it was turned over immediately to

16  the defense attorneys?

17     A.   Yes.

18     Q.   And is this -- now, isn't this letter

19  consistent with kind of the scheme these guys had

20  going when it was still a state case?

21     A.   I believe so.

22          MR. VILLA:  Objection.

23          THE COURT:  What's the objection?

24          MR. VILLA:  Well, I think that it calls

25  for an opinion that is essentially for the jury to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1   decide whether these statements are consistent with

 2   what others have testified or said.

 3            THE COURT:  Well, let's let the jury make

 4   these determinations.

 5            MR. CASTELLANO:  Sure, Your Honor.

 6   BY MR. CASTELLANO:

 7       Q.   Are you aware of other letters sent by

 8   other cooperators, and specifically letters sent by

 9   Jerry Armenta to Jerry Montoya's attorney?

10       A.   I haven't read them, but I've heard of

11   them.

12       Q.   And are you aware, through what you've

13   heard of them, that that was a means of Mr. Armenta

14   taking the responsibility for the charges when it

15   was a state case?

16            MR. VILLA:  Objection, calls for hearsay.

17            THE COURT:  Well, she isn't familiar with

18   the letters, so I think we'd better just let this

19   go.

20            Sustained.

21   BY MR. CASTELLANO:

22       Q.   Going back to this date, October of 2014,

23   that was still a state prosecution and not a federal

24   case, correct?

25       A.   Correct.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And, in fact, this case wasn't even
 2   indicted until December of 2015?
 3        A.   Correct.
 4        Q.   Yesterday you were asked about a statement
 5   by Timothy Martinez in which he indicated that Rudy
 6   Perez told him something.  Do you remember that?
 7   About the shanks?
 8        A.   I do.
 9        Q.   And then there was talk about him being at
10   Torrance County Detention Center and then being
11   moved after that?
12        A.   Yes.
13        Q.   Do you know why people were moved after
14   they decided to cooperate?
15        A.   It's unsafe for cooperators to be housed
16   with defendants.
17        Q.   At that point, if it became known that
18   Timothy Martinez had cooperated, he could be put in
19   harm's way?
20        A.   He could.
21        Q.   And so under these circumstances, every
22   time somebody decided to cooperate, were they then
23   removed from any facilities where -- or moved
24   separately from any facilities where pending
25   defendants were?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7188

1        A.    Yes.

2        Q.    You were also asked about Billy Cordova in

3   this recording in April of 2017 of Gabriel Valdivia.

4   Do you remember that?

5        A.    I do.

6        Q.    How did that come about?  Because you said

7   you oversaw it, but it didn't sound like it was

8   necessarily an FBI operation.  What were the

9   circumstances of how that recording came about?

10       A.    I believe personnel from the New Mexico

11  Department of Corrections had information that Mr.

12  Valdivia was talking to Mr. Cordova.  They requested

13  a recording device from the FBI because they don't

14  have any of their own, so we provided one to them.

15  After the recordings were made, they turned it over

16  to me, and I processed that evidence into our

17  evidence and then made a report from it.

18       Q.    Okay.  So that was basically at the

19  Corrections Department's request?

20       A.    Correct.

21       Q.    And at that point, Billy Cordova wasn't

22  even working as a confidential human source for the

23  FBI?

24       A.    Correct.

25       Q.    Did the FBI compensate him for that?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7189

```
 1        A.   We did not.

 2        Q.   And did those recordings capture

 3   incriminating statements by Mr. Valdivia?

 4        A.   They did.

 5        Q.   Now, when it comes to debriefs and

 6   interviewing people, do you know everything that

 7   they know after you finish meeting with them, even

 8   if it's for a few hours?

 9        A.   No.

10        Q.   And why is that?

11        A.   I don't think it's possible to get every

12   piece of information from someone in a couple of

13   hours.

14        Q.   And even if someone is debriefed, let's

15   say three or four times, is there still more

16   information to be had?

17        A.   Yes.

18        Q.   And as we got closer to the actual trial

19   of this particular case, did the evidence or the

20   interviews become more specific and pointed at this

21   case?

22             MS. JACKS:  Objection, leading.

23             THE COURT:  Overruled.

24        A.   They did.

25        Q.   You were also asked about the exchange of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   notes between Mr. Rodriguez and Mr. Urquizo.  Do you

 2   remember that?

 3           MS. JACKS:  Objection, misstates the

 4   questions.  The questions were about what people

 5   said about the exchange of notes.

 6           THE COURT:  I'll let you deal with it on

 7   redirect.

 8   BY MR. CASTELLANO:

 9       Q.  Did you understand the point?  That will

10   be my question.  Go ahead and answer it.

11       A.  Yes.

12       Q.  So what do you recall about Mr. Urquizo

13   telling you?

14           MS. JACKS:  Objection, beyond the scope.

15           THE COURT:  Overruled.

16       A.  I remember --

17           MS. JACKS:  Objection, vague as to time.

18           THE COURT:  Overruled.

19       A.  Mr. Urquizo stated that Mario Rodriguez

20   had either shown a note over the door, because Mr.

21   Urquizo wanted to have somebody else hit at the same

22   time that the Javier Molina hit was supposed to

23   happen, in which Mr. Rodriguez basically apologized

24   that they needed to move quickly, and therefore the

25   individual Mr. Urquizo wanted to have hit wouldn't
```

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 820-6349                                                   FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1   be hit.
 2        Q.   So it's your understanding that there was
 3   an exchange of communication between the two?
 4        A.   Yes.
 5             MS. JACKS:  Objection, calls for a
 6   conclusion.  The question was what he said, not what
 7   actually happened.
 8             THE COURT:  Overruled.
 9        Q.   Is that your understanding, ma'am?
10        A.   Yes.
11        Q.   So you were asked what Mr. Rodriguez told
12   you, so I want to cover some of that information.  I
13   don't need the specific number.  Do you remember
14   approximately how many times you've now sat down
15   with Mr. Rodriguez to interview him?
16        A.   Approximately five.
17        Q.   And did those all start in the fall of
18   last year, the October/November timeframe?
19        A.   Yes.
20        Q.   So when you talked to him, did he give
21   information only about the Molina murder?
22        A.   No.
23        Q.   So starting in October, did he provide
24   information to you about other people named Samuel
25   Silva and Arturo Garcia, for example?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7192

```
 1       A.   He did.

 2       Q.   Did he also mention any rival gang members

 3  from Los Carnales gang?

 4       A.   I believe he did.

 5       Q.   If you're not sure, I can refresh your

 6  recollection with the report.

 7       A.   Yes, please.

 8            MR. CASTELLANO:  May I approach, Your

 9  Honor?

10            THE COURT:  You may.

11       Q.   Agent Stemo, after having reviewed the

12  report --

13            MS. JACKS:  Your Honor, I would object.

14  This line of questioning appears to be eliciting

15  hearsay.  Mr. Rodriguez testified.

16            MR. CASTELLANO:  I'm not asking what was

17  said.  I was asking about whether he gave

18  information about particular topics, Your Honor.

19            THE COURT:  Well, let's see what the

20  question is, and then we can deal with any

21  objection.

22  BY MR. CASTELLANO:

23       Q.   So the question was whether or not he also

24  discussed with you rival gang members from Los

25  Carnales gang?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   He did.

 2             MS. JACKS:  I would object as, A, calling

 3   for hearsay or based on hearsay; but also, B, what's

 4   the relevance if he provided information on some

 5   topic.

 6             THE COURT:  Overruled.

 7   BY MR. CASTELLANO:

 8        Q.   Agent Stemo, the defense attorneys asked

 9   you a lot of information about what Mario Rodriguez

10   did or didn't say, so let me ask you some more

11   questions about this.  Did he tell you about the

12   assault on Robert Esparza over a $900 drug debt?

13        A.   Yes.

14        Q.   So that was information that actually came

15   from him?

16        A.   Yes.

17        Q.   Did he also talk to you about the Alex

18   Sosoya assault?

19        A.   He did.

20        Q.   And his role in it, as well as Robert

21   Martinez' role?

22        A.   Yes.

23        Q.   Did he explain to you why the assault

24   happened?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Including how he prepared any weapons for

2  that assault?

3      A.   He did.

4      Q.   Now, as far back as October 24th of 2017,

5  did he provide you information about the Javier

6  Molina homicide?

7      A.   He did.

8      Q.   Did he also know Javier Molina was Crazy?

9      A.   I believe so.

10      Q.   Was that an a/k/a for him?

11      A.   Yes.

12      Q.   Did he provide any information about Mr.

13  Baca's feelings about rats --

14      A.   Yes.

15      Q.   -- and what should be done with them?

16      A.   They should be killed.

17      Q.   Did he provide you information about how

18  the paperwork got to the Southern New Mexico

19  Correctional Facility?

20      A.   I believe he did.

21      Q.   Do you remember if he mentioned the names

22  Cheech and Mr. Calbert?

23      A.   Yes.

24      Q.   And did he tell you what happened to the

25  paperwork once it arrived at the facility?

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                    201 Third NW, Suite 1630
Santa Fe, NM 87501                            Albuquerque, NM 87102
(505) 989-4949                                      (505) 843-9494
FAX (505) 820-6349                              FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1          MR. LOWRY:  Objection, hearsay, Your
2    Honor.
3          THE COURT:  Well, are you trying to elicit
4    this out-of-court statement?  And if you are, what
5    purpose are you trying to elicit it for?
6          MR. CASTELLANO:  No, Your Honor.  This is
7    specifically responsive to the defense indicating
8    what Mr. Rodriguez did not tell the FBI.
9          THE COURT:  Well, I'm going to allow him
10   to answer the question just to determine the
11   credibility of the witness, but you can't consider
12   this statement that's being offered for the truth of
13   the matter.  You can only use it in determining the
14   truthfulness of the witness that has testified
15   earlier in the trial.
16   BY MR. CASTELLANO:
17       Q.   So did he provide information to you about
18   what happened to the paperwork once it arrived at
19   the facility?
20       A.   Yes.
21       Q.   Including his own role in the Molina
22   homicide?
23       A.   He did.
24       Q.   And Mr. Herrera's role in the homicide?
25       A.   Yes.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    And Mr. Sanchez'?

2        A.    Yes.

3        Q.    And did he tell you about any discussions

4   he had with Mr. Sanchez about the homicide?

5        A.    He did.

6        Q.    And who should be picked to commit the

7   murder?

8        A.    I believe so.

9        Q.    Did he tell you how Timothy Martinez got

10  involved?

11       A.    He did.

12       Q.    Did he talk to you about the discussion

13  about whether or not the cameras should be covered

14  or not?

15       A.    He did.

16       Q.    And whose decision that was?  Did he tell

17  you that?

18       A.    He did.

19       Q.    Did he explain to you how the pieces came

20  from the walker belonging to Rudy Perez?

21       A.    He did.

22       Q.    And did he indicate to you that he ever

23  said anything at all to Rudy Perez?

24       A.    I don't think so.

25       Q.    So not a word?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    A.   Not that I remember.

 2    Q.   And we don't need to worry about what was

 3  said.  Actually, was Mr. Perez meeting with somebody

 4  before Mr. Rodriguez arrived, from what he told you?

 5    A.   He was.

 6    Q.   Who was he meeting with?

 7    A.   Mr. Daniel Sanchez.

 8         MS. JACKS:  Calls for hearsay.  This isn't

 9  inconsistent with the witness' testimony.

10         THE COURT:  Well, do you have -- do you

11  have a transcript, either one of you, so that I can

12  make that determination?

13         MS. JACKS:  Well, I would say that's on

14  the person offering the evidence.

15         THE COURT:  Well, you're making the

16  objection.  So find the transcript.

17         MS. JACKS:  I'll find it.

18         THE COURT:  And let's bring it up here to

19  the Court if you're going to make that objection.

20         MR. CASTELLANO:  I'll move forward while

21  she's doing that, Your Honor.

22         THE COURT:  All right.

23  BY MR. CASTELLANO:

24    Q.   And from the discussion, did you learn how

25  close Rudy Perez was to the inner pod door where the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7198

```
1   note was passed?

2       A.   Yes.

3       Q.   Was there discussion of Mr. Rodriguez

4   telling Mr. Martinez to go get high before this

5   happened?

6       A.   There was.

7       Q.   And how there might have been any change

8   of plan by Mr. Martinez about how Mr. Molina would

9   be incapacitated?

10      A.   Yes.

11      Q.   And is it true that Mr. Rodriguez actually

12  told you he's the person who made the shanks?

13      A.   Yes.

14      Q.   Did he also tell you what happened to the

15  shanks after the Molina murder?

16      A.   I believe he told me what happened to one

17  of the shanks.

18      Q.   And did he tell you what was supposed to

19  happen to each of the shanks after the murder?

20      A.   He did.

21      Q.   Did he tell you about any discussions he

22  had with Mr. Baca following the murder and regarding

23  the topic of paperwork?

24      A.   Yes.

25      Q.   I want to go back, take a step back for a
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    second.  On the day that Mr. Rodriguez decided to

 2    cooperate with the Government, are you aware of

 3    whether or not he had any shanks with him?

 4        A.   He did.

 5        Q.   How did you become aware that he had

 6    shanks?

 7        A.   He volunteered that information.

 8        Q.   And when he volunteered that information,

 9    was there any indication that since he was

10    cooperating, he should no longer carry those

11    shanks?

12        A.   Yes.

13        Q.   Did he agree to do that?

14        A.   He did.

15        Q.   And did he in fact turn over the shanks to

16    the Marshal Service on that date?

17        A.   He did.

18        Q.   And where were those shanks concealed?

19        A.   In his rectum.

20        Q.   And isn't it true that he also told you

21    that he came to court with the shanks?

22        A.   He did.

23        Q.   Pretty much any time he came to court?

24        A.   He did.

25             MS. JACKS:  Your Honor, I can respond to
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7200

```
 1   the Court's inquiry at this time.

 2            THE COURT:  All right.  Ms. Jacks.

 3            MS. JACKS:  It's the transcript of

 4   February 7, 2018, at page 192, beginning at line 11,

 5   going through the end of page 194.

 6            THE COURT:  All right.  We'll read it.

 7            MS. JACKS:  I'm sorry?

 8            THE COURT:  Read it.

 9            MS. JACKS:  Out loud to the jury?

10            THE COURT:  Yes.

11            MS. JACKS:  Well, I'd prefer not to do

12   that.

13            THE COURT:  Bring it to the bench, then.

14   Bring me a copy.

15            (The following proceedings were held at

16   the bench.)

17            MS. JACKS:  I don't have hard copies of

18   the transcript.  Do you want to see it?

19            MR. CASTELLANO:  I was asking who was

20   there first.

21            MS. JACKS:  Right, and it comes -- I'm

22   just showing it to him.

23            MR. CASTELLANO:  Show it directly to the

24   Judge.  I appreciate that.

25            THE COURT:  After you look at it --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1              MR. CASTELLANO:  She can show it to you
 2   now, Your Honor.
 3              THE COURT:  Do you need me to rephrase
 4   your question, or do you want a ruling?
 5              MR. CASTELLANO:  I'll --
 6              MS. JACKS:  If Mr. Sanchez was talking to
 7   Mr. Perez prior to him; and if so, what Mr.
 8   Castellano was trying to ask was not impeaching what
 9   Mr. Rodriguez testified to during this trial.
10              THE COURT:  So do you agree this is the
11   statement that we're trying to impeach?
12              MR. CASTELLANO:  I do, Your Honor.  What
13   I'm saying is, once again the defense highlighted
14   what wasn't in the reports.  Getting the information
15   that he actually did provide to the FBI.
16              MS. JACKS:  My point is, it's improper for
17   the Government to go over everything a witness said
18   with this case agent unless they can show it's
19   either a prior inconsistent statement or if it's a
20   prior consistent statement.  The purpose of the case
21   agent is not to simply repeat everything the
22   informant told her.
23              MR. CASTELLANO:  You can bolster that if
24   credibility has been attacked, and clearly it has.
25              THE COURT:  Tell me what I'm looking at
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   here.  Is that you question?
 2           MS. JACKS:  No, this is Mr. Castellano's
 3   direct of Mario Rodriguez, and what he's beginning
 4   to ask him is about how he got the piece from Mr.
 5   Perez' walker.
 6           MR. CASTELLANO:  I didn't question Mr.
 7   Rodriguez, Your Honor.
 8           MS. JACKS:  Well, the Government.
 9           THE COURT:  Hold on.  Don't talk.  Let me
10   read it so I can understand.
11           MS. JACKS:  You're going to have to page
12   through it.  It's multiple pages, unfortunately.
13           THE COURT:  Okay.  How do you get your
14   page to move?
15           MS. JACKS:  There are some arrow keys, and
16   I think if you just press down.  Did it work?  Let
17   me try.  Let's do it this way.  If you just click
18   right there, Your Honor, I believe it will work as
19   long as the arrow is down in that little --
20           THE COURT:  Well, why don't you click it
21   for me.  I'm not getting it to work.
22           MS. JACKS:  This is the specific area.
23           THE COURT:  You think this is it?
24           MS. JACKS:  Well, I think right here is
25   the specific area Mr. Castellano was just inquiring
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    about.

 2              THE COURT:  Okay.  Now, what are you

 3    trying to elicit from Ms. Stemo?

 4              MR. CASTELLANO:  It's only in a summary

 5    fashion.  What I asked was who was there first,

 6    having a conversation, and whether or not Mr.

 7    Rodriguez said anything whatsoever to Rudy Perez.

 8              THE COURT:  Well, I don't see that that is

 9    -- at least in this segment here, I don't see that

10    that would be either consistent with something he

11    said or impeaching what he said earlier, so I'll

12    sustain the objection on that question.

13              MR. CASTELLANO:  Sure.  I'll rephrase.

14              MS. JACKS:  And there was an answer, so

15    I'd ask it be stricken.  The answer was "Mr.

16    Sanchez."  Because he asked:  Who did he tell you

17    was talking to Mr. Perez prior?

18              THE COURT:  Let me see it.

19              MR. CASTELLANO:  And that would be

20    consistent.

21              MS. JACKS:  But it doesn't meet the

22    criteria for prior consistent statement whatsoever.

23              THE COURT:  I just don't think this

24    segment -- if the Government has got a different

25    segment that it's going on -- hold on.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          So you think when he said "Mr. Daniel

2    Sanchez," that was a statement by the witness?

3          MS. JACKS:  Yes, Your Honor.

4          THE COURT:  All right.  How do you want to

5    reference it for the jury?

6          MS. JACKS:  I mean, I guess the reason

7    that I'm up here and trying to make this point is, I

8    think the Court should put an end to the Government

9    standing up here and doing exactly this, contrary to

10   the Rules of Evidence.  So in terms of this one, I'm

11   not sure there is a good way to fix it at this

12   point.

13         THE COURT:  Okay.

14         MS. JACKS:  In terms of any sort of future

15   violations of the same sort, I think the Government

16   should be warned not to elicit hearsay unless they

17   have a good faith basis.  And given their

18   performance, they should have to establish it

19   outside the presence of the jury.

20         THE COURT:  Well, if we're trying to

21   bolster the witness with a prior consistent

22   statement, then make sure that there was an

23   inconsistent statement before you do it, and this

24   would be one at a time.

25         MR. CASTELLANO:  We can, Your Honor.  We

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    will take them one at a time.  And of course the

2    defense is saying his entire testimony, all of the

3    statements are inconsistent.  But I understand the

4    Court's ruling.

5         MS. JACKS:  And in my defense, I only

6    asked Ms. Stemo about -- very limited sort of

7    questions regarding Mr. Rodriguez, regarding the

8    note.  We didn't make a full-blast attack on this

9    witness.

10        THE COURT:  I'm telling the Government,

11   before they ask a question, they need to be having

12   in mind and be ready to defend a prior inconsistent

13   statement if they're going to come back and turn it

14   into consistent statements.

15        MR. CASTELLANO:  In addition, many of

16   these aren't even statements.  I asked about certain

17   topics that he discussed with them, without saying

18   what was said.

19        THE COURT:  Well, I might need to sustain

20   the outside the scope, then, if we're going to go

21   there, because it's not really relevant to the

22   direct examination.  So I think probably if you're

23   going to go through this, you're just going to have

24   to have firmly in mind some inconsistent statement

25   of Mr. Rodriguez that you're coming back and trying

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  to offer some prior consistent statement to bolster.

2  If you can't link it up, I think we probably

3  shouldn't be doing this.

4          MR. CASTELLANO:  Understood, Your Honor.

5          MR. LOWRY:  Your Honor, may I be heard?

6  Your Honor, again, I'm going to point out that we

7  didn't elicit any of this testimony at all.  And for

8  the United States to try to bolster the credibility

9  of its witness by soliciting comments about Mr. Baca

10  was uncalled for, and I'd ask the Court to strike

11  all of the testimony at this time.

12          THE COURT:  Well, if we can identify where

13  he talked about Mr. Baca.

14          MR. LOWRY:  Mr. Castellano asked her if

15  she recalled comments about Mr. Baca, about

16  snitches, and she said:  Yes, he wanted snitches

17  killed.

18          THE COURT:  And if you can do like

19  Ms. Jacks did and find that that is not a consistent

20  statement, I'll take a look at it.  Do you want me

21  to do anything?

22          MS. JACKS:  I'd ask the Court strike it

23  from the record.  But in terms of instructing the

24  jury, no.

25          THE COURT:  I'll strike Ms. Stemo's answer

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    about Daniel Sanchez.

2            MR. VILLA:  And, Your Honor, yesterday on

3    direct, I elicited inconsistent statements from Mr.

4    Rodriguez, very limited to the statements about Mr.

5    Perez; and when he made that statement, if he was in

6    fear.  I didn't get into any of this stuff in terms

7    of the scope.

8            THE COURT:  Well, I'm defining what the

9    Government is going to be able to do here.

10           MS. BHALLA:  Sorry, Your Honor.  Very

11   quickly.  We didn't ask any questions of this

12   witness, to avoid this very problem.  So just for

13   the record, we would object to that line of

14   questioning, as well.

15           Thank you.

16           (The following proceedings were held in

17   open court.)

18           THE COURT:  All right.  Mr. Castellano?

19           MR. CASTELLANO:  Thank you, Your Honor.

20   BY MR. CASTELLANO:

21       Q.   Okay.  So in addition to the information

22   he gave you on the Molina homicide, did he give you

23   information about the SNM in general?

24       A.   He did.

25       Q.   On November 1st, 2017, there was an

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   11-page report.  Attached to that report, was there
 2   something else provided to you by Mr. Rodriguez?
 3        A.   Yes.
 4        Q.   And did he basically handwrite -- let me
 5   see -- ten pages worth of notes to share with the
 6   agents?
 7        A.   He did.
 8        Q.   And in those ten pages of notes, did he
 9   also provide information about the Javier Molina
10   murder?
11        A.   I believe he did.
12        Q.   Okay.  Turning back to Government's
13   Exhibit FV, what was inconsistent between the
14   statements of Mr. Rodriguez when it came to Timothy
15   Martinez's role in the Molina homicide?
16             MR. VILLA:  Objection, asked and answered.
17             THE COURT:  Overruled.
18             MR. LOWRY:  Your Honor, I'm going to
19   object on behalf of Mr. Baca as beyond the scope of
20   direct examination of Ms. Stemo and ask for a
21   limiting instruction as to all of this testimony.
22             THE COURT:  Well, what tie to the direct,
23   what came up in direct that I guess --
24             MR. CASTELLANO:  Well, the whole letter is
25   part of the direct, Your Honor.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  Yeah, that's true.
 2              MR. CASTELLANO:  And it also refers to
 3   prior inconsistent statements alleged by the
 4   defense.
 5              THE COURT:  All right.  Are you going to
 6   elicit any statements about Mr. Baca?
 7              MR. CASTELLANO:  Not unless there's
 8   something inconsistent with what's in the letter,
 9   Your Honor.
10              THE COURT:  All right.
11              MR. LOWRY:  May I be heard?  Mr. Baca
12   didn't bring up this letter at all.
13              THE COURT:  I understand.  I'm trying to
14   deal with your first objection.
15              So if, to be truthful in answering any of
16   the questions that Mr. Castellano is going to ask
17   you, you need to mention Mr. Baca, just alert him,
18   and then I'll bring counsel up here and we'll see
19   what's going on.
20              All right.  Mr. Castellano.
21              MR. CASTELLANO:  Thank you, Your Honor.
22   BY MR. CASTELLANO:
23      Q.   So let me take a look at this statement
24   here.  Okay.  So in terms of prior inconsistent
25   statements, once again, was there an indication --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   the letter says that he never saw Jerry Montoya in

 2   possession of any sort of weapon or assault Javier

 3   Molina.  Did Mr. Rodriguez tell you something

 4   different than that?

 5        A.   He did.

 6        Q.   What was it?

 7             MR. VILLA:  This has been asked and

 8   answered.

 9             THE COURT:  Overruled.

10        A.   I believe he stated he provided Mr.

11   Montoya with the shank; observed Mr. Montoya stab

12   Mr. Molina; and then he disposed of Mr. Montoya's

13   shank after the stabbing occurred.

14        Q.   Where did he dispose --

15             MS. JACKS:  Your Honor, I'm going to

16   object because the statements that Agent Stemo is

17   relating are not prior inconsistent statements.

18   They're statements made after this letter was

19   written.

20             THE COURT:  Well, then what basis do you

21   have to bring these in, Mr. Castellano?

22             MR. CASTELLANO:  Well, Exhibit FV would be

23   the prior inconsistent statement, Your Honor.

24             THE COURT:  Well, I understand.  It was

25   written earlier than the statements that are being

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   talked about here.  So I think I'll sustain.
 2            MS. JACKS:  Will the answer be stricken,
 3   please?
 4            THE COURT:  That answer will be stricken.
 5   BY MR. CASTELLANO:
 6       Q.   Going back to this, do you in fact know
 7   that this was written before Mr. Rodriguez met with
 8   you?
 9       A.   If you go by the date that he provided on
10   the letter.
11       Q.   In addition, did this come from the
12   Corrections Department property?
13       A.   It did.
14       Q.   And so did you have this statement, or the
15   FBI had this statement, prior to the time that you
16   met with Mr. Rodriguez and he cooperated?
17       A.   I believe so.
18       Q.   Why did Mr. Rodriguez cooperate?
19       A.   I believe --
20            MS. JACKS:  Objection, calls for
21   speculation.
22            THE COURT:  Well, you can ask the
23   question, does she have an understanding, what was
24   her thought as to why he did it, but she can give
25   her thoughts.  But you probably can't ask the
```

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                      (505) 843-9494
FAX (505) 820-6349                                                              FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1    question that way.

2            MR. CASTELLANO:  I'll rephrase.

3            MS. JACKS:  Your Honor, no disrespect

4    meant to Agent Stemo, but what she understood or

5    what she thinks about that is not relevant to this

6    proceeding.

7            THE COURT:  Well, it may be.  We'll wait

8    until the follow-up questions.  Overruled.

9    BY MR. CASTELLANO:

10       Q.   After sitting down and talking with Mr.

11   Rodriguez, what was your understanding of why he

12   cooperated?

13           MS. JACKS:  Same objection, calls for a

14   conclusion based on hearsay.

15           THE COURT:  I've overruled these

16   objections.

17       A.   He was tired of the lifestyle.

18       Q.   And was he tired of carrying a weapon all

19   the time?

20       A.   He was.

21           MS. JACKS:  Objection, Your Honor.  That

22   appears to be based on hearsay.

23           THE COURT:  Sustained.

24           MS. JACKS:  Can the answer be stricken?

25           THE COURT:  It will be stricken.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7213

```
 1              MS. JACKS:  Can counsel be admonished to
 2   stop intentionally eliciting hearsay?
 3              THE COURT:  No.  You can make objections
 4   when the question is improper.
 5   BY MR. CASTELLANO:
 6        Q.   I'm almost done here, Agent Stemo.  Let me
 7   just check my notes.
 8              MR. CASTELLANO:  May I have a moment, Your
 9   Honor?
10              THE COURT:  You may.
11              MR. CASTELLANO:  Thank you.  Thank you,
12   Your Honor.  I pass the witness.
13              THE COURT:  Thank you, Mr. Castellano.
14              Mr. Villa.
15              MR. VILLA:  Thank you, Your Honor.
16              THE COURT:  Mr. Villa.
17                   REDIRECT EXAMINATION
18   BY MR. VILLA:
19        Q.   Good morning, Agent Stemo.
20        A.   Good morning.
21        Q.   You just testified that Mr. Rodriguez told
22   you the reason he cooperated was because he was
23   tired of the life?
24        A.   Yes.
25        Q.   But isn't it true that he also said that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1    one of the reasons he cooperated was that the SNM
2    was so fucked up and there's no loyalty?
3               MR. CASTELLANO:  Objection, calls for
4    hearsay.
5               THE COURT:  Well, it seems to me that
6    you're doing the same thing that you were objecting
7    to Mr. Castellano doing.
8               MR. VILLA:  Well, no, Your Honor.  I think
9    this is elaborating on the testimony that she just
10   gave about what Mr. Rodriguez told her.
11              THE COURT:  Sustained.
12   BY MR. VILLA:
13       Q.   Do you agree with me that right before Mr.
14   Rodriguez cooperated, his trial on the Sosoya case
15   was a couple weeks from starting?
16       A.   I believe it was a week away.
17       Q.   A week away?
18       A.   I think so.
19       Q.   And the Sosoya case was an assault that
20   Mr. Rodriguez was charged with?
21              MR. CASTELLANO:  Objection, beyond the
22   scope.
23              THE COURT:  Overruled.
24       Q.   Yes?
25       A.   Correct.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7215

1      Q.   And he was charged along with Baby Rob or

2  Rob Martinez?

3      A.   He was.

4      Q.   And Rob Martinez was going to testify

5  against Mario Rodriguez, wasn't he?

6      A.   He was.

7      Q.   You've talked about how, when you

8  interviewed Mr. Rodriguez, that it felt like -- it

9  looked like he had a burden lifted, right?

10     A.   Yes.

11     Q.   This is the October 24th interview that

12 you did?

13     A.   Yes.

14     Q.   The first one?

15     A.   Yes.

16     Q.   And he began to cry as he talked about

17 cooperating and those sorts of things?

18     A.   Yes.

19     Q.   He was emotional?

20     A.   He was.

21     Q.   And that was the interview in which he

22 told you that when he took the piece from Mr. Perez'

23 walker, Mr. Perez looked scared?

24     A.   Yes.

25     Q.   And you understood that when Mr. Rodriguez

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   was telling you that, it wasn't about necessarily
 2   something Mr. Perez said to him, but the way he
 3   viewed Mr. Perez' demeanor?
 4        A.   We didn't discuss why he said Mr. Perez
 5   was scared.
 6        Q.   I see.  Okay.  And you testified that I
 7   think you've figured out you interviewed Mr.
 8   Rodriguez about five times?
 9        A.   I think so.
10        Q.   And so just to make sure that the answer
11   stays the same from yesterday -- because I think we
12   talked about two or three times -- never did Mr.
13   Rodriguez waver from the statement he made to you
14   about Mr. Perez being in fear?
15        A.   No, he never brought that up to me.
16        Q.   Now, about this burden that Mr. Rodriguez,
17   it was lifted from him, is the way you described it.
18   Before he agreed to work for the Government, he was
19   facing a life sentence, wasn't he?
20        A.   I believe so.
21        Q.   And after he agreed to work for the
22   Government, he entered into a plea agreement which
23   he wouldn't have to face that life sentence if the
24   Government files a motion?
25        A.   I believe so.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   That's a pretty big burden to be lifted
 2   from, isn't it?
 3        A.   Yes.
 4        Q.   You testified on cross-examination about
 5   some -- about your notes?
 6        A.   Yes.
 7        Q.   Are those your handwritten notes from your
 8   interviews with Mr. Rodriguez?
 9        A.   Yes.
10        Q.   Do those notes still exist?
11        A.   Yes.
12        Q.   And have those notes been provided to the
13   United States?
14        A.   Yes.
15        Q.   Do you know if those notes have ever been
16   provided to the defense?
17        A.   I don't know.
18        Q.   Would it surprise you to learn that they
19   have not?
20        A.   I guess not.
21        Q.   That wouldn't surprise you?
22        A.   I don't know what they turn over and
23   what --
24             MR. CASTELLANO:  Don't testify.
25             THE COURT REPORTER:  I'm sorry?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          THE COURT:  Well, don't testify.  You can

2    ask her questions, and we'll deal with any discovery

3    issues later.

4    BY MR. VILLA:

5          Q.   Okay.  I just want to clarify your

6    testimony.  Would it surprise you to learn that the

7    defense has not received your notes?

8          A.   No, I don't know what they disclose and

9    what they don't.

10         Q.   Okay.  And understanding that you didn't

11   look through Mr. Rodriguez' box in which you

12   discovered Exhibit FV until this weekend, that box

13   was in the possession of the FBI since at least last

14   summer?

15         A.   Correct.

16         Q.   And according to Exhibit FV -- and if you

17   need to see it again, we'll pull it up -- Mr.

18   Rodriguez was saying he was going to testify to

19   those things under oath?

20         A.   That's my understanding.

21         Q.   And that's what he wrote in the letter?

22         A.   Yes.

23         Q.   And I think you testified that you knew at

24   that time, October 2014, the date of the letter, the

25   state proceedings were still underway?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    I believe so.

 2        Q.    And so Mr. Rodriguez says in this letter

 3   that he would testify under oath, referring to the

 4   state proceedings?

 5        A.    Yes.

 6        Q.    Now, you testified about how Mr. Rodriguez

 7   told you about his assault on Mr. Esparza for the

 8   drug debt?

 9        A.    Yes.

10        Q.    And how he told you about his role in the

11   Sosoya assault?

12        A.    He did.

13        Q.    And how he had prepared weapons for the

14   Javier Molina assault?

15        A.    Yes.

16        Q.    And his role in the Javier Molina assault?

17        A.    Yes.

18        Q.    When he was telling you about these

19   assaults that he did or that he played a role in,

20   was he excited about it?

21        A.    No.

22        Q.    Did he ever take -- did he ever apologize

23   for what he did to these men?

24        A.    I don't think he did in front of me.

25        Q.    Did you ever make a determination for
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    yourself that he wouldn't commit acts of violence

2    like he did against these three men ever again?

3        A.    No, I wouldn't say that.

4        Q.    You can't be sure, can you?

5        A.    I can't, no.

6        Q.    You were asked by Mr. Castellano if you

7    learned or if Mr. Rodriguez testified about where

8    Mr. Perez' cell was in relationship to the inner pod

9    door where this alleged paperwork was passed?

10       A.    Yes.

11       Q.    But Mr. Rodriguez never told you that Mr.

12   Perez saw anything like that happen, did he?

13       A.    No, he didn't.

14       Q.    And you don't have any information from

15   Mr. Rodriguez that he told Mr. Perez anything at all

16   about paperwork?

17       A.    No.

18       Q.    Or that Mr. Perez even knew who the target

19   of the piece that was taken from his walker actually

20   was, at the time the piece was taken?

21       A.    Correct.

22            MR. VILLA:  May I have a moment?

23            THE COURT:  You may.

24            MR. VILLA:  No further questions.

25            THE COURT:  Ms. Jacks, do you have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   redirect of Ms. Stemo?
 2             MS. JACKS:  I do, Your Honor.
 3             THE COURT:  Ms. Jacks.
 4                     REDIRECT EXAMINATION
 5   BY MS. JACKS:
 6        Q.   Good morning again, Ms. Stemo.
 7        A.   Good morning.
 8        Q.   I just have a few topics I want to cover
 9   with you based on Mr. Castellano's questions.  And
10   I'm probably going to go basically in the order that
11   he went.
12        A.   Okay.
13        Q.   Mr. Castellano asked you some questions
14   about Mario Rodriguez crying and becoming emotional.
15   Do you recall that?
16        A.   Yes.
17        Q.   Would you agree with me that just because
18   someone cries or becomes emotional, that doesn't
19   mean that they're telling the truth, does it?
20        A.   Not necessarily.
21        Q.   Okay.  So people can cry and be emotional
22   and still lie?
23        A.   I suppose so.
24        Q.   And you're aware, aren't you, that Mr.
25   Rodriguez was convicted of an offense that requires
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   him to register as a sex offender, if and when he's
 2   released from prison?
 3            MR. CASTELLANO:  Objection, beyond the
 4   scope.
 5            MS. JACKS:  This goes to his state of mind
 6   and why he might be emotional, Your Honor.
 7            THE COURT:  Overruled.
 8       A.   Yes.
 9       Q.   And in your conversations -- well, not
10   only -- you didn't just talk with Mr. Rodriguez, did
11   you?  I mean, you also performed some sort of
12   background investigation regarding him, didn't you?
13       A.   Yes.
14       Q.   Okay.  And in dealing with Mr. Rodriguez,
15   both in your conversations with him and in what you
16   discovered in looking at his background and his
17   history, did you become aware that this fact that he
18   had to register as a sex offender was something that
19   was very disturbing and upsetting to Mr. Rodriguez?
20       A.   I don't think I discussed that incident
21   with him, so I don't know if he was disturbed or not
22   when he discussed it with other agents.
23       Q.   Okay.  Did he ever, in your presence,
24   discuss the fact that that was something that was of
25   concern to him, this fact that he had to register?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I don't think we discussed that.

2      Q.   Okay.  And did you ever look at the

3  multiple petitions for writs of habeas corpus he

4  filed in regard to that sex conviction to try to

5  invalidate the conviction so he didn't have to

6  register?

7      A.   I didn't see those.

8      Q.   You're not aware of those?

9      A.   No.

10      Q.   Okay.  During any of your interactions

11  with Mr. Rodriguez did you hear Agent Acee discuss

12  with him that one result of his becoming a

13  Government witness could be that he'd get a new

14  identity with a new criminal record?

15      A.   I don't think I was at that initial

16  meeting.

17      Q.   Can we have Exhibit F, as in Frank, V as

18  in Victor.  Ms. Stemo, this is the letter that you

19  were asked some questions about yesterday?

20      A.   Yes.

21      Q.   And this is the letter that you actually

22  brought to the attention of the Government on

23  Sunday?

24      A.   I believe it was Agent Sainato that did.

25  I brought it to his attention.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7224

1      Q.    Okay.  You found the letter and brought it

2  to Sainato's attention, because he had actually been

3  in possession of it; is that right?

4      A.    Yes.

5      Q.    And Sainato had been in possession of this

6  letter since July, June or July of 2017?

7      A.    I was just told summer of 2017.

8      Q.    You don't know exactly when?

9      A.    No.

10      Q.    But the FBI -- somebody at the FBI had

11  possession of this letter prior to any of your

12  interviews with Mario Rodriguez, right?

13      A.    Correct.

14      Q.    And during your five or so interviews with

15  Mr. Rodriguez, was he ever confronted with this

16  letter and asked about it?

17      A.    No.  We didn't find it until after.

18      Q.    Well, somebody had it, right?  FBI Agent

19  Sainato had it?

20      A.    Correct.

21      Q.    But he didn't make you aware of it

22  until -- well, he never made you aware of it?

23      A.    Correct.

24      Q.    Just sort of by happenstance, you ran

25  across it?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes.
 2        Q.    So I guess my question -- I want to go
 3   back.  During your interviews with Mr. Rodriguez,
 4   was he ever confronted with the statements in this
 5   letter?
 6        A.    No.
 7        Q.    Was he ever asked whether he wrote this
 8   letter in preparation to lie on the witness stand?
 9        A.    No.
10        Q.    And are you aware -- were you present here
11   in court the days that Mr. Rodriguez testified
12   before this jury?
13        A.    I haven't been in the courtroom, as a
14   witness.
15        Q.    That's right.  That's right.  So -- and
16   you haven't been reading the transcripts of Mr.
17   Rodriguez' testimony?
18        A.    No.
19        Q.    Do you know whether he was asked during
20   this trial whether he participated, along with Jerry
21   Armenta and Jerry Montoya and Timothy Martinez, in
22   making up a story about the Molina murder so that
23   they could get out of or reduce their criminal
24   liability in the state case?
25        A.    I could assume they were, but I don't know
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   that for a fact.

 2        Q.   Do you know whether Mr. Rodriguez admitted

 3   doing that on the witness stand that you're sitting

 4   in right now?

 5             MR. CASTELLANO:  Objection, calls for

 6   speculation.

 7             THE COURT:  Well, it's a yes/no question.

 8   If she doesn't know, she can say she doesn't know.

 9        A.   I don't know that.

10        Q.   Okay.  Can we have Exhibit 757, please.

11   Agent Stemo, have you seen this letter before?  And

12   if you need me to make any part of it bigger.  This

13   is a letter that Jerry Armenta wrote to Jerry

14   Montoya, that was intercepted at the prison while

15   the state case was pending.  Have you ever seen that

16   letter before?

17        A.   No.

18        Q.   Okay.  Mr. Castellano asked you some

19   questions about -- let me go back for a second.  Do

20   you know that this letter was produced as part of

21   the discovery in this case?

22        A.   I don't know that.

23        Q.   Do you recall the questions that Mr.

24   Castellano asked you about Mr. Rodriguez telling you

25   during a debrief that when he tried to hand the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   shank to Jerry Montoya, that Mr. Montoya raised his

2   hands?

3        A.   Yes.

4        Q.   I want to direct you to a portion of this

5   letter.  Can we make it bigger?  I mean smaller.

6   Let's go just for the top third of the letter and

7   enlarge it.

8             Do you see three lines down, the sentence

9   starting "But"?  "But I had to tell the truth about

10  how it all went down, from you picking up your hands

11  when Blue handed you your piece to the threats of

12  your life."

13            Do you see that?

14       A.   I do.

15       Q.   Would you agree with me that the person

16  who wrote this letter wrote that Jerry Montoya had

17  to pick up or picked up his hands when Blue handed

18  him the shank?

19       A.   Yes.

20       Q.   And are you aware that Mr. Armenta

21  testified about this letter, that he wrote this

22  letter at least in part to try to communicate pieces

23  of his story to Jerry Montoya?

24       A.   I don't know that.

25       Q.   Okay.  And can we enlarge -- I mean, make

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7228

 1   the letter smaller?  Do you see that Bates stamp on

 2   the bottom, U.S. versus DeLeon, et al., 2350?

 3        A.   Yes.

 4        Q.   Is that how materials that are disclosed

 5   in discovery in this particular case are designated

 6   by the Government?

 7        A.   Yes.

 8        Q.   And so that means that it's page 2350 of

 9   the discovery in this case?

10        A.   Correct.

11        Q.   And the discovery in this case has been

12   provided to Mr. Rodriguez on a computer tablet,

13   correct?

14        A.   Yes.

15        Q.   And he's had the ability to read and to

16   have it in his cell for as much time as he wants

17   while the case has been pending?

18        A.   I don't know about the length of time

19   they're allowed to have it, but they are given

20   access to it.

21        Q.   To the discovery on the tablet?

22        A.   Yes.

23        Q.   Now, Mr. Castellano asked you some

24   questions about the handwritten notes that Mr.

25   Rodriguez prepared for your meeting on November 1st,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    2017.  Do you recall those questions?

2         A.    Yes.

3         Q.    And did Mr. Rodriguez prepare those notes

4    prior to meeting with you and Agent Acee?

5         A.    Yes.

6         Q.    And during the course of your interview,

7    did you read those notes and ask him about them?

8         A.    I don't think I read them during the

9    interview.

10        Q.    After the interview, did you read them?

11        A.    Yes.

12        Q.    And if you need to see the notes, let me

13   know.  But my question to you is the same about the

14   questions with respect to the 302 reports of your

15   interviews with Mario Rodriguez.  In those notes,

16   did Mr. Rodriguez say anything about exchanging

17   notes with Lupe Urquizo on March 6, 2014, in the

18   afternoon?

19        A.    Not that I remember.  I'd have to read the

20   notes.

21        Q.    Okay.  Do you want me to get -- I want you

22   to be accurate, so I'll bring them up.

23             MS. JACKS:  Your Honor, I have Bates pages

24   51522 to 51531.  May I approach the witness and show

25   them to her?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  You may.
 2   BY MS. JACKS:
 3       Q.   And there are some markings on here, Agent
 4   Stemo.  Those are mine, so I would just ask you to
 5   ignore them.  Just let me know when you're done.
 6       A.   Thank you.  I'm finished.
 7       Q.   Thank you, Agent Stemo.  I appreciate you
 8   taking your time doing that.  After you've had a
 9   chance to review those notes, can you answer the
10   question?  And the question was whether in those
11   notes Mr. Rodriguez said anything about exchanging
12   notes with Lupe Urquizo or showing notes to Lupe
13   Urquizo on the afternoon of March 6, 2014.
14       A.   He did not.
15       Q.   Now, Mr. Castellano asked you some
16   questions about whether it's possible to get --
17   basically, to download everything from a person's
18   brain in a debrief, and I think you said that you
19   can't do that; you can't find out everything a
20   person knows in a few hours' time?
21       A.   Correct.
22       Q.   Right?  But would you agree with me that
23   when you're investigating a case and you're
24   interviewing a witness about a particular incident,
25   that one of the reasons that you make a report of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   what was said during that interview is so that you

 2   can track over time whether the witness is

 3   consistent about the things that he's telling you

 4   about, or whether his story changes over time?

 5        A.   Yes.

 6        Q.   So you would agree that you try to be as

 7   thorough as possible and ask the witness -- in this

 8   particular instance, Mr. Rodriguez -- everything you

 9   can think of regarding the crime that you're

10   investigating?

11        A.   Yes.

12        Q.   And then try to document that as

13   accurately as possible?

14        A.   Correct.

15        Q.   And when you ask a witness questions in a

16   formal FBI interview, do you ask leading questions,

17   or do you ask open-ended questions that invite the

18   witness to remember things and tell you things that

19   you maybe don't already know?

20        A.   We try to ask open-ended questions.

21        Q.   To sort of download as much information as

22   you can from the witness?

23        A.   Yes.

24        Q.   And then do you also try to ask the

25   witness questions about things you already know the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   answers to, maybe, to ascertain whether he's telling
 2   the truth?
 3        A.   Yes.
 4        Q.   So prior to this trial, in total how many
 5   hours do you think the FBI, yourself and other
 6   agents included, spent downloading or debriefing Mr.
 7   Rodriguez about what he says happened around the
 8   time of the Molina homicide?
 9        A.   Ballpark, around 10 or 15.
10        Q.   And were the interviews -- were any of the
11   interviews cut short because of some sort of
12   emergency or some sort of reason that you didn't
13   anticipate?
14        A.   No.  I'd say we had to return him to his
15   facility.
16        Q.   At night, he would have to go back to
17   jail?
18        A.   Yes.
19        Q.   And you could then have him come back the
20   next day, right?
21        A.   Sometimes.
22        Q.   Or you could go out to the jail, like you
23   did at least once, to talk to him, right?
24        A.   Yes.
25        Q.   And in your experience, do you think that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   human memory gets better with time, or does it tend
 2   to fade with time?
 3       A.   I think it depends on the person.
 4       Q.   In preparing -- well, let's go back.  The
 5   other thing that we talked about or you were asked a
 6   little bit about yesterday is about how you're
 7   trained in the FBI Academy to prepare reports and to
 8   be as thorough as possible?
 9       A.   Yes.
10       Q.   And is the idea that when you're preparing
11   the report, you want to document every fact of
12   significance that a witness has told you, so that
13   you have a record of that?
14       A.   Yes.
15       Q.   And so that you have in your hands
16   evidence that you could use to rebut the charge that
17   somebody has made something up?
18       A.   Correct.
19       Q.   Or also to rebut the charge that somebody
20   has talked to somebody else and now is including
21   what that other person says as part of what they
22   claim to remember?
23       A.   Yes.
24       Q.   Now, specifically in connection with the
25   events that Mr. Rodriguez told you or that he said
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1 supposedly happened around the time of the Molina

2 murder, did you make efforts to corroborate that by

3 comparing his story to things that you knew to be

4 true?

5   A. Yes.

6   Q. What did you -- well, let me ask you this:

7 Did you compare what Mr. Rodriguez told you about

8 the events of March 6th and 7th, 2014, with

9 transportation records from the Department of

10 Corrections?

11   A. I personally did not.

12   Q. Did you compare what he told you about the

13 events of March 6th and 7th, 2014, with housing

14 records from the Southern New Mexico Correctional

15 Facility?

16   A. I personally did not.

17   Q. Did you compare what he told you about the

18 events of March 6th and 7th, 2014, with logs from

19 the correctional officers that were staffing that

20 Unit 1-A at the Southern New Mexico Correctional

21 Facility?

22   A. I did not.

23   Q. And Mr. Castellano asked you some

24 questions about the story that Mr. Rodriguez told

25 you about the passing of this paperwork from a guy

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    named Cheech to David Calbert?

2        A.   Yes.

3        Q.   Do you recall those questions?

4        A.   I do.

5        Q.   And Cheech -- do you know Cheech to be an

6    individual by the name of Joe Martinez?

7        A.   Yes.

8        Q.   And Joe Martinez is somebody that's been

9    in and out of New Mexico correctional institutions

10   for a long time, right?

11       A.   Yes.

12       Q.   Did you -- well, let me ask you this:  Do

13   you know whether Joe Martinez, Cheech, was in

14   custody between April 11, 2013, and February 10th of

15   2016?

16       A.   I don't know that.

17       Q.   You have seen offender physical location

18   histories prepared by the New Mexico Department of

19   Corrections, right?

20       A.   Yes.

21       Q.   And if I showed you -- do you know how to

22   read them?

23       A.   Yes.

24       Q.   It took me a while.  So if I showed you

25   the offender physical location history for Joe

SANTA FE OFFICE                                            MAIN OFFICE
119 East Marcy, Suite 110                         201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                     FAX (505) 843-9492
                                                         1-800-669-9492
                                                 e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   Patrick Martinez, might that enable you to refresh

2   your memory and answer the question as to whether he

3   was in custody on those dates?

4        A.   Yes.

5        Q.   Okay.

6             MS. JACKS:  May I approach, Your Honor?

7             THE COURT:  You may.

8        Q.   I have an exhibit that has been previously

9   marked as Defendants' Exhibit V-16, V as in Victor.

10            Agent Stemo, I'm handing you the whole

11   exhibit, but I think that the time period I asked

12   for is reflected on the first page.  And

13   specifically what I'm asking -- I'll break down the

14   question.

15            These are the housing records for Cheech,

16   right?

17       A.   Yes.

18       Q.   And can you look at the date April 11,

19   2013?

20       A.   That date's not on there.

21       Q.   Oh, I thought it was.  4/11?

22       A.   4?

23       Q.   No, 4/11/2013.

24       A.   No, it says April 4, 2013.

25            MS. JACKS:  May I approach?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              THE COURT:  You may.

2       A.   Oh, I see it now.

3       Q.   Okay.  So do you see that on April 11,

4  2013, it looks like Mr. Martinez was in custody,

5  right?

6       A.   Yes.

7       Q.   And housed at the North facility?

8       A.   Yes.

9       Q.   And then what's the next date on the

10 housing record?

11      A.   February 10th, 2016.

12      Q.   And there, he's in some sort of intake?

13      A.   Correct.

14      Q.   So between April 11, 2013, and February

15 10th, 2016, according to those records was Mr.

16 Martinez in the New Mexico Department of

17 Corrections?

18      A.   I don't think so.

19      Q.   Can we have a -- there's some doubt, so I

20 just want to make --

21      A.   I'm not an expert on location histories.

22      Q.   But looking at that history, he's not

23 housed, according to that, within the New Mexico

24 Department of Corrections?

25      A.   Yeah, I don't think so.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7238

```
 1       Q.   Okay.  Thank you.
 2            THE COURT:  Ms. Jacks, would this be a
 3  good point for us to take our morning break?
 4            MS. JACKS:  Yes.  And I can say I have
 5  nothing further.
 6            THE COURT:  Thank you, Ms. Jacks.
 7            All right.  We'll be in recess for about
 8  15 minutes.
 9            All rise.
10            (The jury left the courtroom.)
11            THE COURT:  All right.  We'll be in recess
12  for about 15 minutes.
13            (The Court stood in recess.)
14            THE COURT:  All right.  We'll go on the
15  record.
16            Ms. Fox-Young, do you want continue your
17  request for relief?
18            MS. FOX-YOUNG:  Yes, Your Honor.
19            THE COURT:  Ms. Fox-Young.
20            MS. FOX-YOUNG:  Your Honor, I'd just like
21  to start with a document that was produced to me
22  about 30 seconds ago, which I have not yet had time
23  to review.  But I'd like to mark it as the next
24  Court's exhibit.  Our exhibit.  I'm sorry.  I don't
25  get to decide what the Court's exhibits are.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1              FX.  And it purports to be Agent Stemo's
2     notes, I think from October 24, 2017, of her
3     interview with Mario Rodriguez.  Mr. Castellano used
4     those notes in cross-examination of Agent Stemo.  I
5     don't have the transcript in front of me, but he
6     asked her specifically -- and, Your Honor, I'd just
7     ask that the witness not be present for this
8     argument.
9              THE COURT:  All right.  Why don't you step
10    out, Ms. Stemo.
11             MS. FOX-YOUNG:  Thank you, Your Honor.
12             THE COURT:  Ms. Fox-Young.
13             MS. FOX-YOUNG:  And asked her specifically
14    whether she had included anything in her notes about
15    Mr. Perez' affect, as told to her by Mr. Rodriguez,
16    other than that Mr. Perez looked scared.  He may
17    have asked a couple of other questions about the
18    notes.
19             Of course, we didn't have the notes in
20    order to use on redirect.  I immediately emailed the
21    Government and asked them for the notes.  I think
22    we're entitled to the notes, as they're using them
23    in their case.
24             And this Court will recall prior rulings
25    to preserve and review and subsequently produce law

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   enforcement notes for any of the CHS law enforcement

2   handlers within 14 days.  I think that came out of

3   the May 9th to 10th, 2017, hearings.  And that was

4   the transcript from May 10th, 2017, page 4, lines 17

5   to 20; and page 5, line 25 to page 6, lines 1 to 2.

6           And in addition, Agent Stemo, although we

7   called her in our case, is the Government's agent.

8   We're entitled to Jencks on her.

9           And so I now have maybe a dozen

10  handwritten pages of notes that I haven't had a

11  chance to review.  I'm not sure how we'll be able to

12  use them at this moment, but we'd certainly ask that

13  we have the opportunity to use them with Agent

14  Stemo.  I think that's a clear violation of the

15  Court's multiple orders on production of Jencks,

16  production of notes of law enforcement handlers

17  within 14 days after review.

18          And with that, I'll just return to the

19  question of the box of documents that were

20  purportedly from Mario Rodriguez, which we still

21  have not received as of the present moment.  And

22  where I left off this morning, Your Honor, I was

23  also going to ask that the Court order the

24  Government to produce any and all FBI or New Mexico

25  Corrections Department reports documenting the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7241

```
 1   transfer of those records.  There have been

 2   thousands of documents in this case, but I don't

 3   think that we have received them.  In addition, any

 4   other documents under Agent Sainato's desk or any

 5   other FBI agent's desk in their offices that are

 6   relevant with these witnesses.

 7           THE COURT:  All right.  Well, let me

 8   consider your request.

 9           All rise.

10           (The jury entered the courtroom.)

11           THE COURT:  All right.  Everyone be

12   seated.

13           All right, Ms. Stemo, if you'll return to

14   the witness stand, and I'll remind you that you're

15   still under oath.

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  All right.  Do any of the

18   other defendants have redirect examination that they

19   wish to conduct of Ms. Stemo?

20           Mr. Lowry.

21           MR. LOWRY:  Your Honor, may I approach?

22           THE COURT:  You may.

23           (The following proceedings were held at

24   the bench.)

25           MR. LOWRY:  Your Honor, I want to renew my
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   objection I made earlier.  We went through the Mario

2   Rodriguez testimony that he gave on February 7th,

3   and the problem is, Mr. Rodriguez never made any

4   kind of comment about Mr. Baca wanting to kill rats.

5   So this idea that the United States needed to

6   bolster or, you know, come back and vouch for the

7   credibility of this witness, whose credibility was

8   never under attack by Mr. Baca, doesn't qualify for

9   the hearsay exception or even the use of these

10  statements.

11          So at this time, we're going to have to

12  move to strike all of that testimony.

13          THE COURT:  Well, find it in the record

14  and let me see, and then give the Government an

15  opportunity to show me anything that is

16  inconsistent, that they're trying to impeach.  It's

17  a little hard for me to remember what I heard on

18  February 7th.

19          MR. LOWRY:  Understood, Your Honor.  And

20  we dutifully did that, and my position is there is

21  nothing in the record.

22          THE COURT:  I understand your position,

23  but he's testified something here you need me to

24  strike, and you need to find that.  The Government

25  needs to show me what it is.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           MR. LOWRY:  I can do that, Your Honor.
 2  There was a series of questions where Mr. Castellano
 3  asked --
 4           THE COURT:  Tell me where in the record it
 5  is.
 6           MR. LOWRY:  Oh, gosh.  On this, I don't
 7  have the time signatures.  On ours, we only have
 8  page breaks.
 9           THE COURT:  Ms. Bean, we need to have
10  consistent real-time between the Court and the
11  lawyers that I've got, page numbers, and they don't
12  have the time, and I do.  So we need to have the
13  same real-time advantages the Court does, that the
14  parties do.  So let's make sure that gets done.
15           MR. LOWRY:  I apologize, Your Honor.  Can
16  I give you -- the statement was, Mr. Castellano
17  asked a question, did he provide information about
18  Baca's feelings about rats.  And the answer was
19  "Yes."  And then there was a follow-up question
20  which I thought was a "Yes" or "No" question, "What
21  should be done with them," meaning what should be
22  done with rats.  And rather than respond "Yes" or
23  "No," Ms. Stemo said, "They should be killed."
24           Now, as far as we can tell, everyone in
25  the jury box took notes about that specific answer,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   and I don't think the answer was responsive.

 2            THE COURT:  What do you want me to do?

 3            MR. LOWRY:  I would like the jury to be

 4   instructed that all of that testimony --

 5            THE COURT:  When you say "all of that

 6   testimony," tell me what you want to say.

 7            MR. LOWRY:  I would like the jury to be

 8   instructed that Ms. Stemo's testimony, any testimony

 9   she provided regarding Mr. Baca be disregarded as to

10   Mr. Baca.  I don't want to highlight that specific

11   statement, but I want the jury to know that any

12   statement she made regarding Mr. Baca should be

13   completely disregarded and not be used in their

14   consideration of this case, and that any notes that

15   they made should be stricken.

16            THE COURT:  Do you have any -- Mr.

17   Castellano, do you have any statements that you feel

18   that you were trying to get Ms. Stemo to make a

19   prior consistent statement, and can you link it with

20   the February 7th testimony?

21            MR. CASTELLANO:  I can't specifically link

22   it with that testimony.  I remembered him discussing

23   the rayos and the organization of the SNM.  I

24   thought it was in there, but I cannot pinpoint for

25   the Court.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           THE COURT:  Do you have any objection to
 2   me making this instruction, then?
 3           MR. CASTELLANO:  No, because that would be
 4   a "Yes" or "No" answer by providing information
 5   about what he thinks.
 6           THE COURT:  Well, why don't I give this
 7   answer -- or give this instruction to the jury,
 8   then.
 9           (The following proceedings were held in
10   open court.)
11           THE COURT:  All right.  As far as Ms.
12   Stemo's testimony as to Mr. Baca, anything that she
13   said as to Mr. Baca should be disregarded.  And if
14   you took notes and you put that in there, go right
15   now and strike it out as to Mr. Baca.  So remove
16   that, and her testimony as to Mr. Baca will be
17   stricken.
18           All right.  Mr. Lowry, did you have any
19   redirect of Ms. Stemo?
20           MR. LOWRY:  No, Your Honor.
21           THE COURT:  Mr. Maynard?  Ms. Bhalla?
22           MS. BHALLA:  No, Your Honor.
23           MR. MAYNARD:  No, Your Honor.
24           THE COURT:  All right.  Ms. Stemo, you may
25   step down.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Do you have something further, Mr.
 2   Castellano?
 3              MR. CASTELLANO:  Yes, Your Honor, based
 4   off the redirect.
 5              THE COURT:  All right.
 6              FURTHER REDIRECT EXAMINATION
 7   BY MR. CASTELLANO:
 8       Q.   Okay.  When you were referring to Mr.
 9   Rodriguez, once he made the decision to cooperate
10   and you said he cried or had tears in his eyes, was
11   that October 24th of 2017?
12       A.   It was.
13       Q.   And had he even pled guilty at that point?
14       A.   He had not.
15       Q.   So he pled guilty on November 1st, 2017,
16   correct?
17       A.   I believe so.
18       Q.   So the idea of him not getting a life
19   sentence and things of that nature, he hadn't even
20   pled guilty yet, correct?
21       A.   Correct.
22       Q.   Now, if we can have -- oh, you were also
23   asked by Mr. Perez' attorney about not knowing what
24   was said to Mr. Perez.  Do you remember that?
25       A.   Yes.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And isn't it true that Mr. Rodriguez,
2  well, told you he didn't say anything to Mr. Perez?
3    A.   I believe so.
4    Q.   And to be more specific, when he took the
5  piece from the walker to make shanks?
6    A.   Yes.
7    Q.   And so if Mr. Rodriguez didn't say
8  anything, then it must have been someone else who
9  said something; isn't that true?
10    A.   Yes.
11    Q.   Okay.  I'm going to show you Government's
12  Exhibit 757.  Okay.  So are you aware that this is a
13  letter that was supposed to be -- that was written
14  from Jerry Armenta and it was meant for Jerry
15  Montoya?  Do you know that?
16    A.   I did not until this morning.
17    Q.   And are you aware that this never even
18  reached Jerry Montoya and that it was intercepted?
19    A.   I don't know that.
20    Q.   Now, in the area where it says, "It all
21  went down, from you picking up your hands," do you
22  see that part?
23    A.   I do.
24    Q.   So that is Jerry Armenta referring to
25  Jerry Montoya picking up his hands?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   And is that consistent with what Mr.
 3   Rodriguez told you happened when he met with Mr.
 4   Montoya to give him his shank?
 5        A.   Yes.
 6        Q.   Now, you were asked about corroboration
 7   and records and things of that nature.  Do you
 8   remember that?
 9        A.   Yes.
10        Q.   And in addition to records and things of
11   that nature, can you also compare people's
12   statements to each other, to see if they make sense?
13        A.   Yes.
14        Q.   And so as part of your process, did you
15   also basically test statements against each other,
16   to see if they made sense?
17        A.   Yes.
18        Q.   Are you aware of a phone conversation
19   between Mr. Baca and the person known as Cheech, a
20   telephone conversation?
21             MR. LOWRY:  Objection, Your Honor, outside
22   the scope.
23             THE COURT:  Well, let me just see.  This
24   is a yes/no answer.  Let's see if she knows about it
25   first.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.    Yes.
2        Q.    And in terms of things by which you can
3    corroborate things, I won't ask you about the
4    contents of that now, but is there a conversation
5    between Mr. Baca and the person known as Cheech
6    which helps corroborate some of this information in
7    this case?
8              MR. LOWRY:  Objection, Your Honor.  It's
9    still beyond the scope.
10       A.    And I would --
11             THE COURT:  Well, tell me where it linked
12   up in the scope of the redirect.
13             MR. CASTELLANO:  Ms. Jacks asked about can
14   you compare records, can you look for people going
15   in and out of custody, and things of that nature,
16   and she even showed Agent Stemo a location history.
17   So the question is:  Are there other things you can
18   use to compare or corroborate other information?
19             THE COURT:  Well, I think you can ask
20   general questions without being specific, so keep it
21   at a general level.
22             MR. CASTELLANO:  Like I said, I'm not
23   asking for the contents.
24             THE COURT:  I know, but keep it general
25   rather than going into specific things.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7250

```
 1              MS. JACKS:  Your Honor, if I may, I also
 2  object, and I think that the question requires
 3  reliance on hearsay in order to provide the answer.
 4              THE COURT:  Well, let's see what the
 5  question is.  I've sustained the objection to this
 6  question.  I don't need more objections to it.
 7  Let's see what the new question is.
 8  BY MR. CASTELLANO:
 9      Q.  Are you aware of a phone conversation
10  between Mr. Baca --
11              THE COURT:  No, that's not consistent with
12  my -- you're not going to ask that question.
13              MR. CASTELLANO:  I wasn't asking for the
14  contents, Your Honor.
15              THE COURT:  I said keep it general, don't
16  go specific.
17  BY MR. CASTELLANO:
18      Q.  Are you aware of other information which
19  tends to corroborate some of the information we have
20  in this case?
21      A.  Yes.
22      Q.  Without telling us anything else, are you
23  aware of phone calls which also do that?
24      A.  Yes.
25      Q.  Showing you Defendants' Exhibit FV,
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Foxtrot-Victor, okay, so you've seen this exhibit

2    now, which is a letter written by Mario Rodriguez,

3    correct?

4          A.    Yes.

5          Q.    And, once again, purportedly written in

6    2014?

7          A.    Yes.

8          Q.    And are you aware of the letter written by

9    Jerry Armenta to Jerry Montoya's attorney?

10         A.    Yes.  The one you just showed?

11         Q.    Yes.

12         A.    Yes.

13         Q.    So once this case became a federal case,

14   did you see defendants trying to write letters like

15   this, in which they basically tried to take the rap

16   for somebody else?

17         A.    I don't --

18               MS. JACKS:  Objection, compound.

19               THE COURT:  Overruled.

20         A.    Not that I recall.

21         Q.    So in other words, have you seen a letter

22   like this from Mario Rodriguez after this became a

23   federal case?

24         A.    No.

25         Q.    Or Jerry Armenta?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1      A.   No.

 2      Q.   Or Jerry Montoya?

 3      A.   No.

 4      Q.   So did you only see this when this was a

 5 state case that was pending?

 6      A.   Yes.

 7           MR. CASTELLANO:  I pass the witness, Your

 8 Honor.

 9           THE COURT:  Thank you, Mr. Castellano.

10           Mr. Villa, do you have re-redirect?

11           MR. VILLA:  Just briefly, Your Honor.

12           THE COURT:  Okay.

13             FURTHER REDIRECT EXAMINATION

14 BY MR. VILLA:

15      Q.   Agent Stemo, in terms of what took place

16 when Mario Rodriguez was in Rudy Perez' cell, you

17 testified that Mario Rodriguez said to you that he

18 didn't say anything to Mr. Perez?

19      A.   Yes.

20      Q.   So you're assuming that that's true?

21      A.   Yes.

22      Q.   And that basically everything, what Mario

23 Rodriguez told you was not only true, but that he

24 told you every single detail?

25      A.   No, I don't assume that.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   Well, in fact, you didn't get every single

2  detail from Mario Rodriguez, did you?

3     A.   No.

4     Q.   You do agree, though, that if Mr. Perez

5  had said anything at that time, you know, as Mario

6  Rodriguez is doing what he's doing, taking the piece

7  off the walker and alerting the COs, that sort of

8  thing, that could label Mr. Perez as a rat?

9     A.   It could.

10     Q.   And Mario Rodriguez told you, did he not,

11  that anybody can sanction a rat?

12     A.   Yes.

13          MR. VILLA:  May I have just a moment?

14          THE COURT:  You may.

15          MR. VILLA:  That's all, Your Honor.

16          THE COURT:  All right.  Thank you, Mr.

17  Villa.

18          Anyone else?

19          MS. JACKS:  No, Your Honor.  I have

20  nothing further.

21          THE COURT:  All right.  Any other

22  defendants have anything further of Ms. Stemo?  All

23  right.  Ms. Stemo, you may step down.  Is there any

24  reason Ms. Stemo cannot be excused from the

25  proceedings?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7254

```
 1              MS. JACKS:  No, Your Honor.  Thank you.

 2              MR. VILLA:  Your Honor, based on the issue

 3  of the notes, we're going to reserve her.

 4              THE COURT:  All right.  You're subject to

 5  being re-called.  You will need to stay outside of

 6  the courtroom, but you are free to leave the

 7  courthouse.

 8              THE WITNESS:  Yes, Your Honor.

 9              THE COURT:  All right.  Thank you for your

10  testimony, Ms. Stemo.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  All right.  Do the defendants
 2   have their next witness or evidence?
 3            MS. FOX-YOUNG:  Yes, Your Honor, Mr. Perez
 4   calls Dr. Heather Brislen.
 5            THE COURT:  Dr. Brislen, if you'll come up
 6   and stand next to the witness box, before you're
 7   seated, Ms. Standridge will swear you in.
 8                 HEATHER BRISLEN, M.D.,
 9       after having been first duly sworn under oath,
10       was questioned and testified as follows:
11            THE CLERK:  State and spell your name for
12   the record.
13            THE WITNESS:  My name is Heather Brislen.
14   First name, H-E-A-T-H-E-R.  Last name,
15   B-R-I-S-L-E-N.
16            THE COURT:  Dr. Brislen, Ms. Fox-Young.
17                 DIRECT EXAMINATION
18   BY MS. FOX-YOUNG:
19       Q.   Good morning, Dr. Brislen.  Are you a
20   medical doctor?
21       A.   Yes, I am.
22       Q.   Can you tell the jury about your training,
23   beginning with your training in college?
24       A.   Sure.
25       Q.   I'm sorry, your education in college.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7256

         1      A.    Sure.  I went to college at Beloit

         2   College, which is a small school in Wisconsin.  I

         3   received a bachelor's degree in history.  I then

         4   returned to New Mexico -- this is my home -- and I

         5   went to medical school at the University of New

         6   Mexico.

         7      Q.    And Dr. Brislen, I hate to interrupt you,

         8   but maybe if you move the mic a little bit closer to

         9   you to make sure everybody can hear.

        10      A.    Is that better?  I went to medical school

        11   at the University of New Mexico.  At the end of that

        12   time, I completed an internal medicine residency,

        13   and I also did some public health training and

        14   public health fellowship during that time when I was

        15   a resident.

        16      Q.    And where was that fellowship?

        17      A.    It started at Oregon Health Sciences

        18   University in Portland, and then I finished after I

        19   returned to New Mexico.

        20      Q.    And going back to your college education,

        21   did you graduate with any kind of distinction?

        22      A.    I did, I graduated summa cum laude, which

        23   is high honors distinction.

        24      Q.    And what year, then, did you graduate from

        25   UNM Medical School?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7257

 1      A.    2007.

 2      Q.    And while you were in medical school, at

 3  some point did you start actually seeing patients in

 4  clinic?

 5      A.    Yes.  So traditionally in medical school,

 6  you begin your clinical care in the third year of

 7  medical school.  So for me that was 2005.

 8      Q.    So you began seeing patients in 2005.  Did

 9  you continue seeing patients through the time of

10  your residency that you talked about?

11      A.    Yes.

12      Q.    And when did you finish your residency?

13      A.    Actually, I'm sorry, during my public

14  health training I didn't see patients.  So that's

15  about a year in there where I didn't see patients,

16  and then, I'm sorry, what was the question?

17      Q.    When did you complete your residency?

18      A.    I completed residency in 2011.

19      Q.    Okay.  So you saw patients for that

20  six-year interval with the exception of about a year

21  when you were doing the public health training?

22      A.    Right.

23      Q.    Okay.  And where were you seeing patients

24  during that time?

25      A.    Primarily at -- in clinical settings

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7258

1    affiliated with the medical school and the

2    residency, which means at University Hospital,

3    University Clinics in Albuquerque, and also at the

4    Albuquerque VA.

5        Q.   And after you completed your residency,

6    what did you go do after that?

7        A.   My first job after residency was as a

8    faculty member for the University.  So I became -- I

9    was -- I'm sorry, that was at the Albuquerque VA.

10   So I was faculty at UNM, but I worked at the VA in

11   primary care and then in another group which is

12   called Clinical Informatics.

13       Q.   And as a faculty member, were you teaching

14   medical students?

15       A.   Yes, medical students and residents.

16       Q.   And what subjects were you teaching them?

17       A.   Internal medicine primarily.  We did some

18   clinical informatics training as well, but my

19   appointment was in the department of internal

20   medicine to teach residents, mostly, how to become

21   internists during their residency.

22       Q.   Okay.  And you've mentioned clinical

23   informatics a couple of times.  Can you tell the

24   jury what that means?

25       A.   Clinical informatics is a new specialty

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7259

1   within medicine and it's about how health care

2   systems run.  So how do we get our health care data

3   to work better, how do we get patients to move

4   through systems more efficiently, things like that.

5       Q.   So am I correct in saying that you came on

6   as faculty in 2011?

7       A.   Correct.

8       Q.   Then how long did you continue as a

9   faculty member?

10      A.   So I was a faculty member throughout my

11  entire time at the VA, which ended in -- my

12  full-time job at the VA ended in 2015.  I'm still a

13  clinical faculty member is what it's called, because

14  I still teach at the VA.  So even though I'm not

15  there full-time, I go back about once a month and

16  teach in the resident clinic.

17      Q.   Okay.  So you're still considered faculty

18  of the University of New Mexico Medical School?

19      A.   That's right.

20      Q.   And during that time, from 2011 up to

21  present, have you seen patients?

22      A.   Yes, consistently the whole time.

23      Q.   And can you tell the jury where you have

24  seen patients, in what capacity?

25      A.   So when I was at the VA, I saw patients

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   both as an attending physician and as an independent

2   physician.  Attending physician means you're seeing

3   them alongside residents.  When you're a resident,

4   you're a licensed physician, but you have to have a

5   supervisor around, essentially.  And then I have my

6   own clinic, so I have patients that recognize me as

7   their primary care physician.

8            And then in 2015, when I left the

9   full-time VA, I worked at Kaseman Hospital, which is

10  a Presbyterian rehab hospital in Albuquerque.  I was

11  there for about a year and a half, and then I opened

12  my own primary care clinic, and I've been doing that

13  since September 2016.

14       Q.   And I think you said that your residency

15  was in internal medicine?

16       A.   Correct.

17       Q.   Do you carry any licensures?

18       A.   You mean like a state license?  I'm

19  licensed to practice in New Mexico as a physician.

20  I'm board certified in internal medicine.  So that's

21  my clinical specialty.

22       Q.   And do you carry any other certifications?

23       A.   I'm board certified in clinical

24  informatics, as well.

25       Q.   Can you tell the jury to the best of your

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                                           Albuquerque, NM 87102
(505) 989-4949                                                                     (505) 843-9494
FAX (505) 820-6349                                                            FAX (505) 843-9492
                                                                             1-800-669-9492
                                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    ability and sort of in layman's terms, what is

2    internal medicine?

3         A.   That's a good question.  It's kind of a

4    funny name for a specialty.  Internal medicine is a

5    generalist specialty for adults.  So we do primary

6    care, which means really anything that might be new

7    to an adult that is a new health condition.  Primary

8    care, which you're familiar with, is in clinic,

9    usually for outpatients.

10        Also within the specialties of internal

11   medicine is mostly hospital care, so adults that get

12   sick and go to the hospital.  I do not do surgery

13   and I don't take care of people that are pregnant,

14   and I don't take care of children.  Other than that,

15   I'm a generalist physician for adults.

16        Q.   And do you carry any -- or have you

17   received any professional recognition or honors?

18        A.   You'll see that my title is Heather

19   Brislen, M.D., FACP.  FACP is Fellowship from the

20   American College of Physicians.  The American

21   College of Physicians is a big national group of

22   internal medicine physicians.  And when you are

23   awarded fellowship, it means your peers recognize

24   you as a leader in the field.  I received that --

25   I'm actually not sure -- I think maybe 2015.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   Would it refresh your memory if I showed
 2   you a copy of your CV?
 3        A.   Sure.  Right.  So that was January 2015.
 4        Q.   Thank you, Dr. Brislen.  Have you received
 5   any other professional recognitions or honors?
 6        A.   I'm sorry, is there something specifically
 7   that you're interested in?  I'm thinking, but --
 8        Q.   Well, I know you've been practicing for a
 9   number of years.  Would it refresh your memory if I
10   just showed you what you list on your CV?
11        A.   Yes, I'm sorry.
12             So when I was a medical student in 2006
13   the American Medical Association Foundation awarded
14   me with an award called the Leadership in Medicine,
15   which is basically given to young physicians that
16   show promise in health policy and advocacy work.
17             And then additionally Albuquerque the
18   Magazine puts out a top docs issue from time to
19   time, and I've been in that three or four different
20   times as one of the recognized internists in
21   Albuquerque.
22        Q.   And in the course of your work as faculty,
23   have you engaged in any scholarship or lectures?
24        A.   Yes, especially when I was full-time
25   faculty, that's part of the expectation, that you do
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  both teaching work and also research work.  So my

2  research and publications were primarily related to

3  the clinical informatics works, so we were learning

4  how to use the data in the VA's electronic medical

5  record to improve upon clinical systems and we

6  published a number of abstracts on that.

7          Additionally, I have a special interest in

8  physician supply issues:  How do we train and make

9  sure that we have enough physicians to satisfy the

10  needs of a community, and why does primary care in

11  particular struggle with physician supply issues?

12  And so to that end I've given a number of lectures

13  and I've given those from time to time to different

14  residencies at UNM.  And that has to do with, you

15  know, how the health system is structured.  And

16  medical professionalism is another avenue that I've

17  been published in.

18      Q.   And have your lectures -- and I'm not

19  talking about lectures to students and residents

20  that you described -- but your other scholarship and

21  lectures, have you covered in those lectures the

22  subject of internal medicine or subjects covered by

23  internal medicine?

24      A.   Yes.

25      Q.   And primary care?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        A.   Right.

2        Q.   And Dr. Brislen, our court reporter is on

3   week five, and we don't want to wear her out.  We've

4   got to get through this trial.  If you can, just

5   speak slowly enough so that we can --

6        A.   Okay.

7        Q.   Thank you.  Have you also produced any

8   manuscripts, abstracts, or other publications in

9   internal medicine?

10       A.   Yes.  In addition to the informatics that

11  I mentioned, there is an article about medical

12  professionals, some of which has to do with how we

13  train our medical students and teach them sort of

14  the ethical and moral standards of what we do.

15            And then I also -- one of my professional

16  activities was, I designed a primary care training

17  track for the internal medicine residency, and that

18  was published in actually one of the leading

19  academic medicine journals in the country, because

20  how to get internal medicine physicians incentivized

21  to do primary care is a really tough nut to crack.

22  People are struggling with figuring out how to do

23  that.  So a summary of that educational program that

24  I designed was also published.

25       Q.   Okay.  And in the course of your clinical
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  work, extending back to 2005, do you see patients

 2  with physical -- issues with their physical health

 3  covered by internal medicine?

 4       A.   Yes, absolutely.  Musculoskeletal health

 5  is a big deal in primary care.  Especially as our

 6  bodies age, physical health is a big part of what we

 7  manage.

 8       Q.   And you manage -- I know that internal

 9  medicine is -- well, is internal medicine sort of a

10  large specialty covering a number of systems?

11       A.   Yes, it is.  I mean, when I meet my new

12  patients -- when new patients come to me in the

13  clinic, the way I describe what I do is three

14  facets.  And one side of that is diagnosis and

15  treatment.  Anything new.  If something comes up,

16  what is it, how do we diagnose it, how do we treat

17  it, manage it?

18            Another piece is prevention, which is a

19  really big deal for adults; right?  People in this

20  country, we've researched a lot, we know what we're

21  at risk for, how do we forecast what you might be at

22  risk for, and then what do we do to sort of minimize

23  that risk within a tolerance level?

24            And then chronic disease management is

25  another piece of that.  A lot of the things that we



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   have to deal with are longitudinal.  Like if
2   somebody gets a diagnosis of diabetes, that's
3   permanent.  That's a diagnosis that will last their
4   entire life.  So managing that over time is another
5   piece of my usual care.
6        Q.   And so in terms of your usual care and in
7   managing patients, do you address all organ systems
8   of the body?
9        A.   Yes.
10       Q.   Okay.  And in the course of your clinical
11  work, do you also treat patients for mental health
12  issues?
13       A.   Yes, absolutely.
14            MS. FOX-YOUNG:  Your Honor, I offer Dr.
15  Brislen as an expert in internal medicine.
16            THE COURT:  Any objection, Mr. Beck, Ms.
17  Armijo?
18            MS. ARMIJO:  No, not as to internal
19  medicine.
20            THE COURT:  All right.  So we'll allow Dr.
21  Brislen to offer opinion testimony in the area of
22  internal medicine, Ms. Fox-Young.
23            MS. FOX-YOUNG:  Thank you, Your Honor.
24  BY MS. FOX-YOUNG:
25       Q.   Dr. Brislen, you are a Court-appointed

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7267

```
 1   expert in this case; is that right?
 2        A.   That's right.
 3        Q.   And as a Court-appointed expert, have you
 4   reviewed any materials related to Mr. Rudy Perez?
 5        A.   Yes, I have.  Starting as early as October
 6   of 2016, I started reviewing his extensive medical
 7   records which I'm estimating something in the nature
 8   of 10,000 to 12,000 pages of medical records.
 9        Q.   Okay.  So you started work around October
10   of 2016.  So that's almost a year and a half ago?
11        A.   Right.
12        Q.   And you said you've reviewed over 10,000
13   pages of records?
14        A.   I'm estimating based on the size of the
15   pile, and then comparing that to what I have
16   digitally, as well.  I'm thinking it's 10,000 to
17   12,000 pages, though I haven't specifically counted
18   them.
19        Q.   Are all of those records typewritten?
20        A.   No.  No, I would say at least a third of
21   them are handwritten.
22        Q.   And I'm not asking you if you've read
23   every word on them, but you have reviewed in some
24   way records spanning back to what date?
25        A.   The earliest records that I saw were 1992.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And what is your hourly rate for your work

2   in this case?

3       A.   My hourly rate is $300 an hour.

4       Q.   And is that a Court-approved rate?

5       A.   Yes, it is.

6       Q.   And you said you began work a year and a

7   half ago.  Do you know how much you have billed for

8   your work to date?

9       A.   So far, something around $27,000.

10      Q.   Okay.  And I hear you say, "So far."  Is

11  that because you're continuing to do work as we sit

12  in this trial?

13      A.   That's right.

14      Q.   And you have yet to bill for that work?

15      A.   Right.

16      Q.   Let me ask you:  You have sat through some

17  of the testimony in this case, haven't you?

18      A.   Yes.

19      Q.   And you don't have any control over when

20  you go on the stand, do you?

21      A.   No, I don't.

22      Q.   Speaking just of the records, you said

23  maybe a third of them are handwritten.  Do they

24  start in 1992 and continue to the present in

25  chronological order?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7269

1      A.   No, not at all.  Medical records in any

2  system can be kind of messy and hard to tease apart.

3  These, in particular, were really difficult.

4  Because the patient moved around between several

5  different systems, each system that he would become

6  enrolled at would request some amount of former

7  medical records that may or may not be completely

8  incorporated.  That means that there are lots of

9  holes and gaps and overlap and duplicates and

10  triplicates and other things in there as well.  So

11  putting them in chronological order and establishing

12  a timeline of his conditions was a lot of what I

13  spent my time on.

14      Q.   Okay.  And did some of the records that

15  you reviewed -- were some of the records that you

16  reviewed produced by individuals in the prison

17  system?

18      A.   That was my understanding.  I received

19  everything through --

20      Q.   Let me rephrase my question.  I think I

21  wasn't clear.

22      A.   Yeah.

23      Q.   Do you believe some of those records

24  originated or were created in the prison system?

25      A.   Yes, absolutely.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   And are those records -- can you say if
 2   they're easier or harder to review and to make
 3   conclusions from than other medical records that
 4   you're used to looking at?
 5        A.   Because -- yes, they are.  Most of the
 6   medical records that I am exposed to in my usual
 7   course of business or other expert witness work that
 8   I've done have been typewritten and fairly organized
 9   in terms of timeline.  That was not the case for
10   most of these.  Just in contrast, a large chunk of
11   the medical records for this case also came from the
12   University, and those were much easier to process
13   and sort of make sense of.  The medical records from
14   the prison system were more difficult.
15        Q.   Sounds like your review was pretty
16   time-consuming.
17        A.   Yes, it was.
18        Q.   Now, you have not ever physically examined
19   or even met with Mr. Rudy Perez, have you?
20        A.   No.
21        Q.   So you're not here as a treating provider
22   for Mr. Perez?
23        A.   Correct.  He's not my patient.
24        Q.   And in the course of your work as a
25   Court-appointed expert in this case, did you have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1    occasion to meet with me or Mr. Villa?

 2         A.    Yes, we met a handful of times.

 3         Q.    Okay.  Do you know how old Mr. Rudy Perez

 4    is?

 5         A.    He is 49 or maybe 50 now.

 6         Q.    And going back, you've looked at records

 7    from 1992 until what date?

 8         A.    I would say that my comprehensive review

 9    ended in June of 2016.

10         Q.    Okay.  So looking at your review for that

11    24-year period -- is that a 24-year period?  Sixteen

12    plus eight?

13         A.    I'm going to trust your math.  Yes, right.

14         Q.    Looking at your review of records spanning

15    the time period from 1992 to 2016, can you tell me

16    whether Mr. Perez -- whether it's your opinion Mr.

17    Perez has sustained any traumatic injuries in that

18    time?

19         A.    Yeah.  That's one of the most remarkable

20    things about his health, is that Mr. Perez has a

21    series of traumatic events that have led to this

22    sort of cumulative burden of musculoskeletal health

23    issues that's really remarkable.  Would you like me

24    to give some more detail about what those were?

25         Q.    If you can tell the jury about what

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                            FAX (505) 843-9492
                                                                 1-800-669-9492
                                                             e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   musculoskeletal injuries and diagnoses he has, in

2   your opinion?

3        A.   Okay.  Sure.  So starting in 1992 with the

4   early records, it was pretty clear that he'd already

5   had some substantial trauma, especially to his

6   chest, abdomen, and legs.  And those were listed --

7   you know, in terms of talking about his medical

8   history, those were listed as being stabbing

9   injuries, gunshot wounds, and also trauma from

10   surgical repair to those areas.

11            Sorry, my microphone is ringing.  I'm not

12   sure why it's doing that.

13        Q.   Is it continuing to ring for you, Dr.

14   Brislen?

15        A.   Yeah.  I mean, it's okay.  I wonder if

16   it's hard to hear on the other side.  It's a little

17   distracting.

18            Okay.  So even in 1992 it was very well

19   documented that he walks with a limp and he

20   struggles with falls, and that's thought to be

21   because of these injuries that he's had.

22            There is a gap in his medical records, and

23   I think that was because he wasn't incarcerated for

24   a number of years.  And then in 2002 it picks up,

25   and he's having so much trouble with his

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    musculoskeletal health, in particular ambulation and

2    mobility issues, that he's enrolled in an intensive

3    physical therapy program which takes something more

4    than a year to complete.

5         Q.   So he began an intensive physical therapy

6    program in 2002?

7         A.   2003 I think is when it started.  2003,

8    2004.

9         Q.   What did that consist of?

10        A.   So that consisted of multiple visits with

11   physical therapy.  I think every week I think he was

12   seen two or three times a week, which is a lot, and

13   that was graded therapy.  So physical therapists are

14   very disciplined in the way that they assess

15   mobility and strength, and then accelerate

16   challenges and exercise programs to try to get you

17   to maximal functioning.

18             At the end of that period in 2004, for

19   example, his maximal functioning at that time was

20   that he could walk for five minutes on a treadmill

21   at a level of 1, which is one mile an hour, and he

22   was not thought to be stable walking independently

23   without an assistive device like a walker without

24   falling.

25        Q.   And that was approximately 14 years ago?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.    That was in 2004.  So yes, that sounds

2  right.

3    Q.    And since that time, has Mr. Perez

4  undergone any further physical therapy regimen?

5    A.    Yeah.  He's had physical therapy several

6  different times due to reinjury or further mobility

7  issues.  Hospitalizations often include physical

8  therapy assessment and treatment, which was part of

9  what was happening with him.

10    Q.    Since that time, has he required the use

11  of any devices in order to ambulate or be mobile?

12    A.    Yes, consistently.  So even after that

13  2004 status that I described, in 2006,

14  unfortunately, he was shot in both legs and that

15  further sort of incapacitated his ability to walk.

16  And so through the medical records, if you're just

17  looking at mobility, he's very often in a

18  wheelchair.  He's given special dispensation to have

19  a chair out in the yard or to be transported between

20  his different locations using a wheelchair or

21  without shackles or other things because of the risk

22  of falls.  Oftentimes he asks to be given a cane

23  instead of a walker during the periods of time when

24  he's on a walker, but that almost always leads to

25  more falls and he ends up back in a wheelchair with

SANTA FE OFFICE                                                           MAIN OFFICE
119 East Marcy, Suite 110                                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                               Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 820-6349                                                    FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

 1  a walker.

 2          So the most stable condition seems to be

 3  wheelchair for short distances or around the place

 4  where he actually lives, and then a walker for short

 5  transport if he's walking.

 6      Q.   And are you talking generally about the

 7  period from 2003 to the early part of 2016?

 8      A.   Yes.

 9      Q.   Okay.  So you're not talking about any

10  specific time when you described those?

11      A.   Oh, no, I'm sorry.  Right.  That's just

12  sort of a background theme.  I would describe that

13  as that's his best, most mobile state, is what I was

14  just describing.

15      Q.   Okay.  And you talked about some traumatic

16  injuries that it's your opinion that Mr. Perez has

17  sustained.  Has he sustained any brain injuries?

18      A.   Yes, several of those.  We know that he

19  has had a seizure disorder as early as 1992.  He was

20  known to be in at least two different car accidents

21  in 2002 and in 2005 that included head injuries that

22  were said to have worsened his seizure disorder at

23  that time as well.  I believe there may have been

24  other head injuries, as well.  They're referenced

25  sort of vaguely in the record, but those are the two

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   that I can be certain of.

2       Q.   Are there any other injuries that you

3   would classify as traumatic injuries that Mr. Perez

4   has sustained?

5       A.   So I think it's important to recognize

6   that his abdominal injuries have had a really

7   profound impact on both his digestive health and

8   also his musculoskeletal health.  So he's had so

9   much trauma to his abdominal wall that his, sort of,

10  core musculature is now permanently distorted.  His

11  physical therapy notes are really clear that his

12  strength is limited, his posture is very weak and

13  unable to really ever improve because his muscular

14  status can't really get itself coordinated again

15  because of all of this disruption that he's had, and

16  that makes him very prone to falls and makes him

17  less able to accommodate the fact that he's had

18  these leg injuries, as well.  That's part of the

19  reason why he's so prone to falls.

20          Additionally, the internal injuries of the

21  stabbing are a couple of fold.  I mean, you can

22  obviously hit important organs and things like that

23  if you get stabbed, but he's had a really remarkable

24  accumulation of scar tissue inside of his abdomen,

25  which is very dangerous because then your intestines

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7277

```
 1    can't move through their usual course the way that

 2    they need to.

 3         Q.    And the traumatic injuries to Mr. Perez'

 4    abdominal region -- are those injuries that were in

 5    place in 2004?

 6         A.    Some of them, yes.

 7         Q.    Okay.  And also in 2014?

 8         A.    Oh, yeah, absolutely, including additional

 9    accumulated injuries over the course of that time.

10    So 2014, for example --

11         Q.    Well, let's not talk -- I'm not going to

12    ask you about that yet, Dr. Brislen.  Are there any

13    other diagnoses, physical problems, that it's your

14    opinion that Mr. Perez has had in this time period

15    from, say, 1992 to 2016 that you would classify as

16    internal medicine complaints?

17         A.    Sure.  Yeah.  So I mean, we've been

18    discussing his musculoskeletal health.  I think the

19    rest of his diagnoses are also substantial.

20              When we talk about internal medicine,

21    patients often characterize them just by a list of

22    their problem list, is what we call it.  So besides

23    the musculoskeletal stuff that we've been

24    discussing, he has significant digestive dysfunction

25    relative to all the scar tissue and things that have
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7278

1  happened in his abdomen.  He has diabetes type II.

2  He's now insulin-dependent.  There's a question of

3  whether or not he has hepatitis C, and I'm not sure

4  about that.  We know that he's been exposed to

5  hepatitis C.  I don't know that he really has the

6  viral infection.

7        Q.   So stopping you there, there are records

8  that may indicate that, but you question whether or

9  not they're accurate?

10       A.   That's right.

11       Q.   And why is that?

12       A.   So hepatitis C is an acquired virus that

13  about a third people that contract hepatitis C are

14  actually able to clear the virus on their own and

15  are, therefore, immune after that.  Otherwise, if

16  you don't clear it, you have a permanent infection

17  until recently; we have more effective medications

18  to treat it.

19            But the standard way to diagnose hepatitis

20  C is you do a screening test for an antibody.  And

21  if you're looking for hepatitis C in people that are

22  at risk, which anyone in a prison is at risk, anyone

23  born between 1945 and '65 is at risk.  It's a very

24  common virus.  You screen by doing a blood test to

25  look for an antibody.  An antibody would show that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  you've been exposed to the virus at some point in

2  your life; you did have an infection.  If that

3  antibody is positive, that means you've been

4  exposed, and then what you do to confirm whether or

5  not you have an active infection is called a viral

6  load, where you actually look specifically for the

7  little bits of virus floating around in your blood

8  to confirm that you're still infected.

9       Q.   And from what you can tell, that wasn't

10 done?

11      A.   From what I could tell, that wasn't done.

12 I couldn't find any reference to that test actually

13 having been done.

14      Q.   Now, despite your understanding that that

15 test wasn't done, is the hep C record carried

16 forward in time in the records?

17      A.   Yes, it is.  We call that chart lore.

18 Oftentimes our assessment of patients is built not

19 only on what the patient is able to tell you at that

20 time, but upon some degree of review of medical

21 records going forward.  So chart lore is when a

22 diagnosis gets carried forward through years and

23 years, and is never really re-evaluated or inspected

24 to see if that's valid or not.

25      Q.   Has Mr. Perez had any issues with chronic

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  pain?

2      A.   Yes, he does.  He has a lot of chronic

3  pain issues.

4      Q.   And what time period do those issues span?

5      A.   He has chronic pain issues through the

6  entire scope of his record.

7      Q.   And how about diabetes?  I think you

8  talked about that.

9      A.   He was borderline diabetic for a number of

10 years, and I would have to go back to figure out

11 when he actually crossed that threshold of

12 diagnosis, but I'm going to say it was, like, 2012,

13 maybe.

14     Q.   Okay.  And does he have hypertension?

15     A.   He has hypertension.  He also has high

16 cholesterol.  He has depression.  He has the seizure

17 disorder that I already mentioned.

18     Q.   Let's talk a little bit about the seizure

19 disorder.  What kind of -- speaking broadly, what

20 kind of seizure disorder does Mr. Perez have?

21     A.   Seizure disorders can be difficult to

22 characterize, and in the earlier part of his medical

23 records, it's pretty clear that both the patient --

24 both Mr. Perez and his providers thought that he had

25 just a classic tonic-clonic type seizure disorder.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        Q.    Tell the jury what that is.

2        A.    Tonic-clonic seizures are the classic kind

3   that you might see on TV or something, where someone

4   becomes unconscious, they lose their posture,

5   they're shaking, sometimes they lose bowel and

6   bladder continence, that kind of thing.  Very

7   dramatic, very obvious and easy to identify.

8              What we've since learned -- or what Mr.

9   Perez has since learned is that he also has

10  subclinical seizures, or absence seizures, is what

11  they're called.  Those are seizures that are really

12  just affecting your consciousness and they're very

13  difficult to diagnose.  They can look like someone

14  just spaces out for a few seconds.  They might just

15  be confused or have a hard time communicating for a

16  few minutes.  Those are difficult to diagnose.  And

17  one of the reasons why they're so hard to tease out

18  is because seizures also have an amnestic component,

19  meaning amnesia, meaning you don't know, yourself,

20  that you've just had one.  It's pretty easy to know

21  that you've had a seizure if you wake up on the

22  floor.  But if you just sort of come to at your desk

23  and wonder if you dozed off for a few seconds, it's

24  very hard to know if that's what's happening.

25              So witnesses to seizures become really

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 820-6349                                            FAX (505) 843-9492
                                                                    1-800-669-9492
                                                           e-mail: info@litsupport.com

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7282

1  crucial in the evaluation and diagnosis in those

2  cases.

3      Q.   Okay.  And you talked about a couple of

4  kinds of seizures.  Can you characterize Mr. Perez'

5  seizure disorder as simple or complex or in some or

6  other way?

7      A.   Those are tricky words.  So a simple

8  seizure, if you're talking medically, a simple

9  seizure is a seizure that doesn't take over your

10 consciousness.  And a complex seizure is one that

11 does.  So he has complex seizures.  He also has --

12 if you were speaking between physicians, for

13 example, you would say he suffers from multiple

14 kinds of seizures, which is very common.  He doesn't

15 just have a solitary seizure diagnosis.  He has more

16 than one kind.

17     Q.   Is that common among the general public,

18 or common among folks with seizures disorders?

19     A.   Common among folks with seizure disorders.

20     Q.   You talked about tonic-clonic seizures,

21 the kind where people might be on the floor

22 convulsing.  After one of those seizures occurs, can

23 you tell the jury what happens?

24     A.   So sometimes after a seizure -- and

25 oftentimes it just depends on the person and the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7283

```
 1   patient -- there is a post ictal phase.  I'm sorry,
 2   there is always a post ictal phase after a seizure,
 3   and that is like the grogginess, slow to come back
 4   to sort of fully alert.  Post ictal can be just
 5   sluggishness.  Oftentimes, though, it's a very
 6   frightening, disorienting sort of quasi-conscious
 7   state where patients that are coming out of seizures
 8   can be violent or physically disoriented, thrashing
 9   around, things like that, while their brain sort of
10   tries to get back to normal and settled.
11        Q.   And is that also the time period when the
12   amnesia that you talked about might occur?
13        A.   That's right.  So oftentimes if you don't
14   have memory of the seizure that you're in, you also
15   don't have memory of the post ictal phase either.
16        Q.   Okay.  Does Mr. Perez carry any other
17   diagnoses related to seizures?  Or has he at any
18   time?  I'm not necessarily talking about the
19   present, but --
20        A.   Yes.
21        Q.   Specifically in 2012?
22        A.   Right.  So the way that Mr. Perez became
23   aware that he has more than one kind of seizure was:
24   He was actually in the hospital at the University
25   and there was one of these periods of -- his care
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   team recognized that he wasn't communicating the way

2   that they expected, and he wasn't following

3   instructions the way that he should.  They actually

4   called a psychiatry consult, which wasn't able to

5   tease out what was going on, and then they asked a

6   neurologist to take a look at him, and he was then

7   diagnosed with what's called subclinical status

8   epilepticus.

9            Status is one of these Latin root words we

10  use, but status means you're frozen in a seizure,

11  and that's a seizure emergency.  So this is, like,

12  if you've ever heard that somebody who has a seizure

13  that lasts longer than a certain number of

14  minutes -- that's when you call 911 or something

15  like that.  If you get stuck in a seizure, it can be

16  life-threatening, especially if you're already sick,

17  like, in the hospital.  So he had a single seizure

18  during the stay at UNM that lasted at least eight

19  days without a break.

20       Q.   And do you know how it was that that

21  seizure ended?

22       A.   Yeah.  So he was finally diagnosed with a

23  seizure by a neurologist doing an EEG, and the

24  neurologist would visit him more than once a day

25  oftentimes, and he was tried on, I think, four

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  different antiseizure medications.  And the way that

2  you use those is, you layer them one on top of

3  another, and in the case where you might have an

4  actual -- an EEG is like an electronic reading of

5  brain waves.  So they're watching what's happening

6  to try to dampen that and make things look more

7  normal.

8          And at the end of eight days they finally

9  found one medication, which is called lacosamide,

10 which he'd never been on before, and they were able

11 to stop the seizure with that and withdraw the other

12 medications.  So then he was continued on lacosamide

13 going forward as a way to minimize his seizures.

14     Q.  If you know, from 1992 through the

15 present, how many different seizure medications has

16 Mr. Perez been on that are documented?

17          MS. ARMIJO:  Objection, foundation.  I

18 believe she indicated that she only reviewed records

19 through 2016.

20          MS. FOX-YOUNG:  Your Honor, I think she

21 said the substantial review.

22 BY MS. FOX-YOUNG:

23     Q.  And I can ask you about that period first.

24     A.  Sure.  And you said --

25     Q.  Let me rephrase.  If you know, how many

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  different seizure medications have been documented

2  as used to treat Mr. Perez from the period 1992 to

3  early 2016?

4       A.    Seven.

5       Q.    Okay.

6       A.    So I would like clarify that, if that's

7  okay.  You know, we use seizure medications for both

8  their anti-epileptic activity, both for their

9  seizure benefit, but we also use them for other

10  uses, as well.  Sometimes in the medical record it

11  was very clear that these anti-epileptic medications

12  were being used specifically for his seizures, and

13  other times there's a little bit of ambiguity, like,

14  were they being used for neuropathic pain, for

15  example, or were they being used as a psychoactive

16  medication.  So sometimes these were prescribed by

17  his psychiatrist, because they can be

18  mood-stabilizing.  Oftentimes that's not accidental.

19  You use them because they have complementary

20  benefits.  They might also help with seizures and

21  also help with mood as a side benefit for that.

22            So the seven medications that he's on are

23  all clearly within the sort of label of antiseizure

24  medications, though what they were being used for at

25  the time sometimes is a little bit fuzzy.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   There is some overlap --
 2        A.   Correct.
 3        Q.   -- in their use?  And I don't mean there's
 4   some overlap in their use for Mr. Perez.  There's
 5   some overlap in their FDA approved use or
 6   prescriptive use?
 7        A.   Both of those are true.  I think that they
 8   were used for more than one reason in Mr. Perez, and
 9   yes, they're commonly used for more than one thing.
10        Q.   And you testified that you have also
11   reviewed records dating after February 2016; is that
12   right?
13        A.   Very superficially.
14        Q.   Have you reviewed any records pertaining
15   to Mr. Perez' seizure activities since that time?
16        A.   I could recheck my notes, but I don't
17   think so.
18        Q.   Okay.  You discussed a number of internal
19   medicine diagnoses and complaints from Mr. Perez,
20   and I think -- did you also say that you reviewed
21   his mental health diagnoses?
22        A.   Yes, that's correct.
23        Q.   And what are those?
24        A.   So his current diagnoses from the most
25   recent psychiatry note that I reviewed are major
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  depressive disorder, anxiety.  The psychiatrist

2  described diagnoses according to this five-axis

3  system, and I'm thinking about other things that

4  might show up on there.

5           One of the axes describes background

6  issues, sort of innate issues since childhood, and

7  it was described that he's known to have a low IQ

8  and to have needed mental health treatment since he

9  was very young.

10     Q.   And you talked about his -- the recent

11  diagnoses.  Are there any other mood disorders with

12  which he was diagnosed at any time during the period

13  that you've reviewed?

14     A.   Yes.  His early notes described a disorder

15  called intermittent explosive disorder, which is an

16  impulse control disorder that overlaps a number of

17  other psychiatric diagnoses.  I mean, it's used in

18  terms of other psychiatric diagnoses.

19     Q.   Can you explain what that means?  And if

20  you can, in layman's terms, you said it overlaps

21  other diagnoses.  What does that mean?

22     A.   So intermittent explosive disorder is

23  pretty easy to understand what it's talking about in

24  the title.  It is a description of a kind of

25  behavior or an impulse control issue where somebody

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  might have, like, extremely short temper.  You might

2  think it that way, where rising emotion and ability

3  to control your emotions and behavior is questioned.

4          Intermittent explosive disorder is what we

5  call a diagnosis of exclusion, which means it's a

6  catch-all label for certain kinds of things that we

7  don't have another name for.  So another example you

8  might be familiar with is, like, fibromyalgia.

9  Fibromyalgia is a disease that has very intense back

10 pain.  Before we give you a diagnosis of

11 fibromyalgia, we need to make sure there is nothing

12 actually musculoskeletally wrong with your back;

13 right?  So you don't have broken bones, you don't

14 have a muscle spasm.  You have this other thing

15 called fibromyalgia.  So there is a workup that has

16 to be done before you give somebody this diagnosis.

17     Q.   Do you know if that workup was done with

18 Mr. Perez?

19     A.   I don't see -- so you very clearly have to

20 confirm in intermittent explosive disorder that

21 they're not having these episodes of impulse control

22 due to, like, for example, a post ictal state or due

23 to another psychiatric condition.

24     Q.   When you say "due to a post ictal state,"

25 you mean it could be due to -- result from a seizure

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    or seizures?

2         A.    Right.

3         Q.    Go on.

4         A.    So as I reviewed the records, I did not

5    see evidence that a workup had been done to prove

6    that he has intermittent explosive disorder.  I

7    suspect that that is why that diagnosis has fallen

8    off his more recent psychiatric records, because

9    that label may not be appropriate, given the other

10   medical conditions that he has.

11        Q.    So do you know if the other possible

12   disorders were excluded before making a diagnosis

13   that appears on the records of IED?

14        A.    I do not know that.  It doesn't seem like

15   it.

16        Q.    Okay.  And so today -- or in the most

17   recent records that you described, when did those

18   date to, those psychiatric records?

19        A.    The one that describes an anxiety

20   disorder, major depressive disorder, the diagnoses

21   that I just went through, that was in 2016.

22        Q.    So as of that time in 2016, is it your

23   opinion -- or can you give an opinion as to whether

24   or not Mr. Perez carried the diagnosis of

25   intermittent explosive disorder?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.   According to his psychiatrist's notes, no,

2  that was not listed as one of his diagnoses then.

3       Q.   Do you think this is another example of

4  what you called chart lore?

5       A.   That's my suspicion.

6       Q.   Okay.  And can you explain why?

7       A.   So there are lots of different kinds of

8  medical records; right?  It would be very convenient

9  for me if all I saw was a chart of notes by

10 physicians, but that's not what we have.  We have

11 vital signs and medication administration records

12 and intake records and all different kinds of

13 flavors of things.  So the label intermittent

14 explosive disorder, which is abbreviated IED in the

15 medical records, gets carried forwards on lots of

16 ancillary stuff, not by his psychiatrists, per se,

17 but by other people on the care team who I believe

18 are probably just looking back and carrying

19 diagnoses forward, just the same way those records

20 continue to say hepatitis C the whole time, though I

21 don't see that we've got confirmatory proof that he

22 has that disorder, either.

23      Q.   Dr. Brislen, can impulsivity come from

24 seizures?

25      A.   In a post ictal state, you would see poor

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  ability to control your emotions and behavior.  That

2  is one of the ways to characterize impulsivity.

3  It's different than, I saw a donut on the table and

4  I ate it.  That's my impulse.  But impulsivity -- if

5  you characterize it as difficulty to control

6  emotions and behaviors, then yes, that would be

7  characteristic of post ictal state.

8       Q.   Dr. Brislen, does any one person know how

9  many seizures Mr. Perez has had in his life?

10      A.   I don't think so.

11      Q.   Do the records that you reviewed from 1992

12 through the early part of 2016 accurately reflect

13 how many seizures Mr. Perez has had in that time

14 period?

15      A.   No.

16      Q.   How do you know that?

17      A.   I think they would at very high risk of

18 underrepresenting the number of seizures that he's

19 had.  The only seizures that we have documented in

20 the record are witnessed seizures by other people.

21      Q.   Why do you say that it's your opinion that

22 they underrepresent the number of seizures that Mr.

23 Perez actually had?

24      A.   Because in notes with physicians, when Mr.

25 Perez was actually in clinic with his physician or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   his psychiatrist -- I mean, psychiatric physician --
 2   he describes his angry outbursts as oftentimes he
 3   says, "I just black out and then I go off."  And to
 4   me, that doesn't sound like a short temper.  That
 5   sounds like a seizure.  And because I haven't seen
 6   examples of anyone else being alerted to the, Wait a
 7   second, we should see if he's had further seizure
 8   workup, that's my question.  I feel like we can't
 9   say that he hasn't had a lot of seizures unless he's
10   established with a neurologist and had a better
11   opportunity to quantify how often and how much this
12   is happening.
13        Q.   Do the records document some seizures that
14   Mr. Perez didn't report but that were witnessed?
15        A.   I'm sorry, could you repeat that?
16        Q.   Do the records that you reviewed document
17   any seizures that were not reported by Mr. Perez but
18   were witnessed as having happened?
19        A.   It wasn't really differentiated.  The only
20   one that I can think of is the one at UNM.
21   Actually, that's not true.  So he had this very
22   difficult-to-diagnose seizure at the University in
23   2012.  2013, I'm sorry.  That was in 2013.  He
24   also -- while he was in the medical facility, there
25   is a hospital-like facility within the incarceration
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  environment, and he had at least one, I think, two

2  seizures in that period that were documented as

3  witnessed without Mr. Perez himself saying, "I had a

4  seizure."

5        The things that show up in his clinic

6  notes, it's not clear who reported it.

7    Q.   Okay.  And do you yourself in clinic treat

8  any patients with epilepsy?

9    A.   I do maintenance of care for patients with

10  epilepsy, meaning that the medication choice --

11  medication choice and longitudinality as dictated by

12  my relationship with the neurologist who I'm in

13  touch with, and then I'll maintain them on their

14  therapy.  When things are complicated, I involve my

15  neurology colleagues.

16    Q.   And when things are complicated in a

17  certain specialty, you consult with specialists;

18  right?

19    A.   That's right.  That's part of -- right.

20    Q.   Okay.  But for patients who you see who

21  have seizure disorders, are there times when those

22  patients have seizures and they don't know they've

23  had them?

24    A.   Yes.

25    Q.   And so if they are alone when they have

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   them, they're not reported; right?

 2       A.   Oftentimes, right.

 3       Q.   Okay.  And so if Mr. Perez was alone and

 4   had a seizure, it might not be reflected in the

 5   records; right?

 6       A.   That's true.

 7       Q.   Okay.  Is that one reason why the records

 8   certainly don't document every seizure he had?

 9       A.   That's my concern, yeah.

10       Q.   Are there any other organ system problems

11   or general internal medicine complaints or diagnoses

12   that Mr. Perez has had over this time period we've

13   been discussing?

14       A.   I think his digestive health has an

15   incredible impact on his quality of life, and -- but

16   we mentioned that already.  Are you asking about

17   diagnoses we haven't covered yet?

18       Q.   I just want to make sure that there is

19   nothing that you want to bring to the jury's

20   attention as to other internal medicine complaints.

21   And let me ask you specifically about Mr. Perez'

22   digestive health.  In this time period we've been

23   discussing, has he been prescribed a special diet?

24       A.   Yes.  So for -- two things.  He's on a

25   diabetic diet, which is pretty standard.  He's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   also --

 2        Q.   I'm sorry, could you repeat that?

 3        A.   He's on a diabetic diet, which is a pretty

 4   standard thing that we're familiar with.  He's

 5   also -- because of all the scar tissue in his

 6   abdomen and because he's lost a significant amount

 7   of his functioning intestines, he has to be on a

 8   special diet to avoid constipation and

 9   reobstruction.  So his intestinal obstruction was a

10   catastrophic thing that happened a number of years

11   ago.  So he has to have a bland, low-residue type

12   diet.

13        Q.   When did that catastrophic thing happen?

14        A.   September of 2012.

15        Q.   Okay.  Do you know if this diet -- just

16   from your review of the records and your knowledge

17   of the system, do you know if this diet is difficult

18   to get in prison?

19        A.   I imagine that it is.  I didn't have

20   access to any of the actual, like, dietary log.

21        Q.   If you don't know --

22        A.   All I saw was requests for a special diet,

23   and then Mr. Perez' response to that, asking for

24   different adjustments and things like that to make

25   it more tolerable.

SANTA FE OFFICE                                                              MAIN OFFICE
119 East Marcy, Suite 110                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 820-6349                                                    FAX (505) 843-9492
                                                                        1-800-669-9492

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE
                                                                  e-mail: info@litsupport.com

1      Q.   Okay.

2      A.   So I guess I would like to say I have no

3  idea if it's difficult to get or not.  It seems

4  likes there has been a lot of documentation related

5  to his diet.

6           MS. FOX-YOUNG:  Your Honor, I'd like to

7  show the witness a document that I intend to use as

8  a demonstrative aid.  May I approach?

9           THE COURT:  You may show it to her, yes.

10 BY MS. FOX-YOUNG:

11     Q.   Dr. Brislen, do you see this four-page

12 document which we'll mark as defense next in order?

13     A.   Yes.

14     Q.   Can you tell me if this would aid in your

15 testimony today?

16     A.   I think so.  I think this is a nice marker

17 of where he was when, which will help me spell out

18 the series of events.

19     Q.   Thank you.

20          MS. FOX-YOUNG:  What is our next in order?

21 FY.  Your Honor, I'd like to mark this as

22 Defendants' FY, if the Court will allow.

23          THE COURT:  You may.

24          MS. FOX-YOUNG:  And I'd like permission to

25 publish it to the jury for use as a demonstrative

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7298

```
 1   aid.
 2            THE COURT:  Any objection, Ms. Armijo?
 3            MS. ARMIJO:  No, Your Honor.
 4            THE COURT:  All right.  You may do so.
 5            MS. FOX-YOUNG:  Thank you, Your Honor.
 6            THE COURT:  Ms. Fox-Young.
 7   BY MS. FOX-YOUNG:
 8       Q.   All right.  Dr. Brislen, can you see this
 9   first page of Exhibit FY?
10       A.   Yes.
11       Q.   And does it appear to be calendars from
12   September through December of 2012?
13       A.   Yes, that's right.
14       Q.   So I want to ask you first about September
15   2012.  So I'm just going to zoom in on that month,
16   and I want to talk to you first about Mr. Perez'
17   seizure disorder and your knowledge of the status of
18   that disorder in September 2012.  Can you tell me if
19   it is known whether or not Mr. Perez had any
20   seizures in September of 2012?
21       A.   You know, I'm not sure specifically.  I
22   could review my notes, if you like.
23       Q.   Would it help you recall if I provide you
24   with your notes?
25       A.   It would.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7299

```
 1              MS. ARMIJO:  Your Honor, the United States
 2    has not been provided with a copy of the notes.  May
 3    we request one at this time?
 4              THE COURT:  Do you have an extra one?
 5              MS. FOX-YOUNG:  Your Honor, I don't have
 6    an extra one, but the substance of all this has been
 7    provided, but I'm happy to provide a copy.
 8              THE COURT:  If you want to hand it to Ms.
 9    Standridge, she can make a copy for Ms. Armijo.
10              Does that work for you, Ms. Armijo?
11              MS. ARMIJO:  Yes, sir.  Thank you.
12              THE COURT:  All right.
13              MS. FOX-YOUNG:  If the Court doesn't mind,
14    I'll continue and get back to that.
15              THE COURT:  You may.
16    BY MS. FOX-YOUNG:
17         Q.   Do you see on this exhibit where there is
18    a portion that's marked in yellow?
19         A.   Yes.
20         Q.   And that begins September 4?
21         A.   Right.
22         Q.   And you see where it reads Memorial
23    Medical Center?
24         A.   Yes.
25         Q.   Do you know, from your review, where Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Perez was September 4 to 6?

2         A.   Yes.  So he was admitted to Memorial

3    Medical Center, which is a hospital, I'm assuming,

4    that's nearby to wherever he was held at the time,

5    because of complaints of extreme abdominal pain.

6         Q.   Okay.

7         A.   And then he was discharged to --

8         Q.   And so he remained at Memorial Hospital

9    until the 6th of September?

10        A.   That's right.

11        Q.   And then where did he go?

12        A.   Back to the jail or -- I don't know.

13   Whichever facility he was at.  He went to, like, a

14   medical facility within wherever he had been held.

15        Q.   Okay.

16        A.   So they're calling it the LTCU; right.

17        Q.   And if at any time -- I know you've looked

18   at a lot of records.  If at any time you want to see

19   Mr. Perez' location history, we can compare it with

20   this record.

21        A.   Okay.

22        Q.   I think we have your notes back, Dr.

23   Brislen.  So I want to back-track to a question that

24   I asked you about whether you know from your review

25   and from what you've documented whether Mr. Perez

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  had any seizures that were documented in September

2  2012.

3       A.   Yes, I did.  He had a seizure on September

4  1st of 2012.

5       Q.   I'm going to make a notation then

6  reflecting your testimony on September 1st of an

7  asterisk, and I'm just going to add to this legend

8  at the bottom and we'll say an asterisk means a

9  seizure.  Okay, Dr. Brislen?

10       A.   Sounds good.

11       Q.   So the seizure that happened on September

12  1st -- do you know what variety of seizure it was?

13       A.   Yes, this was one of the reported

14  witnessed seizures of a tonic-clonic nature, shaking

15  type, dramatic, obvious.

16       Q.   Okay.  And do you know if that's why Mr.

17  Perez went to the hospital on September 4?

18       A.   That is not my recollection.

19       Q.   Okay.  Can you tell the jury why Mr. Perez

20  went to the hospital on September 4?

21       A.   He went to the hospital on September 4

22  because he was having abdominal pain.

23       Q.   Okay.  And you already testified that he

24  remained there for three days?

25       A.   Right.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   And then he went to a prison hospital?

2    A.   That's right.

3    Q.   And then do you know where he went after

4  that?

5    A.   Yeah.  So he got worse and he was admitted

6  to the University Hospital then on the 8th.

7    Q.   And I have this zoomed in so you can't see

8  it, but do you know that the legend reflects that

9  the portion in blue is UNMH?

10   A.   Right.

11   Q.   So according to your review, do you know

12  how long Mr. Perez stayed at UNMH?

13   A.   Somewhere on the order of eight to ten

14  weeks.

15   Q.   And did anything significant happen while

16  he was at UNMH in September 2012?

17   A.   Yes.  So what happened even since the

18  beginning, this relates to the scar-tissue-in-his-

19  abdomen issue that I was outlining before.  When you

20  have scar tissue in your abdomen and your intestines

21  are at risk of becoming sort of entangled in that so

22  they can't work, that's oftentimes referred to as a

23  small bowel obstruction.

24        So what happened in earlier September in

25  the Memorial Medical Center is that he had this

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7303

1  extreme abdominal pain, and then probably whatever

2  was blocked released.  He got a little bit better.

3  They were confident that he would be able to

4  continue to produce bowels movements, to stool on

5  his own, and that's why he was discharged.  But then

6  pretty quickly his pain returned.  He developed a

7  fever, which is a very big red flag if you're

8  developing abdominal pain issues.  And when he got

9  to the University, they did a CT scan that showed

10 that he had free air.

11      Q.   Can you tell the jury what the CT scan --

12      A.   CAT scan.  Imaging, a picture of the

13 inside of your abdomen.  It's a lot more detailed

14 than a plain x-ray.

15      Q.   And Dr. Brislen, just try to spell slowly,

16 especially with the medical words.

17      A.   The imaging that they did at the

18 University Hospital showed that he had air inside of

19 his abdominal cavity.  And that is always a big red

20 flag.  That means something has broken open.  So on

21 the assumption that he had a bowel obstruction, a

22 piece of blockage that has then developed to the

23 point where it's actually broken open, he had

24 emergency surgery.

25          The surgery that they did revealed

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  actually quite a bit of now disseminated or

2  widespread infection within his abdomen.  He had

3  several abscesses, which are pockets of infection,

4  as well as an area of intestine that had died

5  completely due to getting entangled, it didn't have

6  enough blood supply to be able to function.  And the

7  place of the rupture was so badly damaged that they

8  weren't able to just sew up the hole; they had to

9  connect it to the outside.  So they gave him an

10  ostomy, which means you have a hole in the side of

11  your abdomen where you put a bag over it and collect

12  poop into a bag for a number of -- you know, however

13  long it takes until you get better.

14        Q.    Dr. Brislen, do you know what week all

15  this happened?  Or weeks?

16        A.    This all -- so this surgery probably

17  happened on the 8th or 9th, depending on how late he

18  was there.  This was an emergency thing.

19        Q.    So he had emergency surgery, and you can

20  go on.  You had described the ostomy bag.  What

21  happened after that?  I'm just going to mark on here

22  "surgery."

23        A.    Well, he had so much infection and

24  swelling and distortion to the inside of his abdomen

25  that they weren't able to close him.  They couldn't

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   sew him back up at the end of the surgery.  So they

2   put a special kind of dressing on and transferred

3   him to the surgical ICU with an open abdomen,

4   meaning actually the two sides are still far apart

5   from each other.  Oftentimes you just can't even

6   bring them together because there is so much

7   swelling, so you put kind of a fancy spongy Saran

8   Wrap kind of thing on there to prevent infection.

9       Q.   You say oftentimes.  Is this something

10  that happens often?

11      A.   No.  This is something that I've seen

12  happen as a course of my medical training, and these

13  devices that -- the thing I described as Saran Wrap

14  and spongy -- a wound VAC is another word for it --

15  was actually invented during part of my training, so

16  we were all very excited that these were able to be

17  used.  So it's something that does happen.  It's

18  something that you can look up in the surgical

19  literature, and there are enough cases there, but I

20  wouldn't expect that anyone else in this room would

21  ever have to go through this.

22      Q.   Okay.  So after -- I don't know if you've

23  finished describing the emergency surgery.  Go ahead

24  and please finish, if you hadn't.

25      A.   So his -- he had also -- let me think how

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   to describe this.  So besides the fact that they

2   couldn't close the surgical cut that was made, there

3   was also an area of bowel that was so entangled with

4   scar tissue and skin that it actually resolved into

5   a fistula.  So that means part of your intestines

6   actually meets the skin and there is a hole there

7   rather than a loop of bowel beneath the skin as it's

8   supposed to be.

9         He had -- I could more specifically

10  research the notes; I don't think it's really that

11  important -- but somewhere on the order of seven or

12  eight procedures then over the following several

13  weeks to continue to help this infection and this

14  situation resolve.  So that means abdominal wash-out

15  where they very literally pour a bunch of

16  antibiotics into your abdomen and slosh it around

17  and then drain it out and hope that that treats any

18  residual infection they haven't been able to find.

19  I know I'm speaking a little quickly.  Sorry.

20        They also had an enterotomy that they had

21  to repair, which means in the urgency of the

22  original emergency surgery, a nick was made in one

23  of the loops of bowel that led to another infection

24  that he had to have.  Rudy almost died during this

25  time.  I think it was in October that he was




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1   actually referred to the palliative care service,

 2   which means special doctors that are just there for

 3   relieving suffering and sort of transitioning care

 4   away from care of curative intent, but really more

 5   to comfort measures, were called in to talk to him

 6   about whether or not we ought to be preparing for

 7   sort of end-of-life measures.

 8        Q.   Okay.  And that happened in October of

 9   2012, the palliative care?

10        A.   I think it did.  I don't have the specific

11   date noted, but it was approximately two-thirds of

12   the way through his UNM stay.

13        Q.   Okay.  And let me just back up.  I know

14   this calendar starts in September 2012.  Did Mr.

15   Perez have any documented tonic-clonic shaking

16   seizures before September 1st, 2012?

17        A.   Yes.

18        Q.   Okay.  Can you tell me about those?

19        A.   The last documented one that we know of

20   before that was July 2010.

21        Q.   Okay.  And that was a documented

22   tonic-clonic seizure?

23        A.   Correct.

24        Q.   And so sometime, you believe in October of

25   2012, palliative care was ordered.  And is that --

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   you said that's where you start planning for end of

2   life?

3        A.   Correct.

4        Q.   I'm going to just write "palliative care"

5   next to October 2012.  Do you think that's

6   accurately reflecting your review?

7        A.   Sure.

8        Q.   And is that the time when your family

9   members prepare to say goodbye to you?

10       A.   Oftentimes, that is part of the course of

11  palliative care.

12       Q.   Okay.  Mr. Perez remained at UNMH for some

13  time; right?  After that?

14       A.   Right, through November 19.

15       Q.   And so what else was going on with him?

16  Did he remain in palliative care through late

17  November?  Did he have other procedures done?

18       A.   He did have other procedures done and my

19  understanding is that really he started to

20  stabilize.  So the antibiotics were working, the

21  surgical process, the different procedures that he

22  had were able to get him to a place where his sort

23  of organ systems could function again.  He was

24  probably somewhere in November able to come out of

25  ICU care.  Usually, you're kept -- when you're going

SANTA FE OFFICE                                                                    MAIN OFFICE
119 East Marcy, Suite 110                                                  201 Third NW, Suite 1630
Santa Fe, NM 87501                                                          Albuquerque, NM 87102
(505) 989-4949                                                                        (505) 843-9494
FAX (505) 820-6349                                                            FAX (505) 843-9492



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

1  through this much surgical trauma, oftentimes you're

2  in the ICU, you're in a medical coma, you have a

3  breathing tube down your throat, that kind of thing.

4  So he started to recover to the point where he could

5  breathe and function on his own.  The swelling got

6  down to the point where they were able to -- they

7  never could actually reapproximate the two edges of

8  that surgical wound because he had what was called

9  frozen abdomen.  The scar tissue in there had become

10  so dense and involved that there wasn't any anatomy

11  normalization that could happen, and so he had

12  another surgery that they debrided, which means you

13  cut away, the scar tissue that they could access to

14  try to give him normal bowel function again.  And

15  they did a skin graft.  So he had a skin donation

16  from one part of his body pulled over onto that

17  abdominal scar, and that was then closed so he

18  didn't have to have that mechanical sponge thing

19  anymore.  And that was the point where he was deemed

20  ready to go back to the prison hospital.

21      Q.   Okay.  Would it accurately reflect your

22  opinion if I called this surgery on the 8th or 9th

23  emergency surgery?

24      A.   Definitely.

25      Q.   And then you referred to approximately

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    seven other procedures; that is right?

2         A.   That's right.

3         Q.   So approximately seven other procedures,

4    those happened between September 9th and late

5    November?

6         A.   Right.

7         Q.   Okay.  So I'm just going to write on here,

8    if this is fair and accurate, "approximately seven

9    additional procedures."  And so you said the

10   antibiotics started working; right?

11        A.   That's one way to characterize what might

12   have made the difference in him stabilizing.  So if

13   you think of that palliative care consult as a

14   crossroads for him, at that point when a surgery

15   team calls in the palliative care team, usually it

16   means we are doing or have done everything we can

17   think of, and we're no longer getting better; we're

18   worried we're sliding backwards and losing ground

19   with this patient.  At that point, I don't know what

20   it was that made that turn the corner.  Sometimes

21   you just need time, sometimes a nice dose of good

22   luck.  I don't know.

23        Q.   But somehow having been on death's door,

24   Mr. Perez was actually released to the prison

25   hospital on November 19th or 20th, was he not?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    That's right.

2        Q.    Okay.  And do you know if he had any

3    additional seizures in November that were

4    documented?  And if you need to refer to your notes,

5    Dr. Brislen, that's fine.

6        A.    He did.  He had another seizure on

7    November 30, but as you can see there, he had

8    already been briefly readmitted to UNM at one point.

9    So witness-documented seizure there on November 30.

10       Q.    So we'll call these witnessed seizures.

11   And the eighth day status epilepticus seizure that

12   you talked about, when did that happen?

13       A.    It's going to be on a different page.

14   That happened in May of 2013.

15       Q.    Okay.  And so November 30 there is another

16   witness-documented seizure, and this is after he had

17   returned to UNMH on the 23rd; right?  And then gone

18   back to the prison hospital?

19       A.    Right.

20       Q.    And then he returned to UNMH.  Did he

21   return to UNMH again in December?

22       A.    Yes, he did.

23       Q.    And do you know what that was all about?

24       A.    I believe -- well, one of those UNM

25   readmissions -- and I think it was this one that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7312

```
 1   started on December 1st -- was because he tore out
 2   his feeding tube.
 3        Q.   He had a perforation?
 4        A.   Well, he had a deliberate perforation.  So
 5   he had a tube in the side of his abdomen where
 6   his -- where there's a little mechanical attachment
 7   that you can put a tube into to put tube feeds
 8   through.  So he wasn't allowed to take enough food
 9   by mouth that he could actually sustain himself, and
10   was discharged with this tube feed mechanism.  So
11   there is a line there that got tugged, and it got
12   dislodged, and so you have to go back to the
13   hospital and get that reincorporated.  The length of
14   that stay shows me that there was some kind of
15   complication probably.  That he was there for a
16   whole week is a little bit surprising, and I would
17   have to go further into my notes than what I have
18   here to remember why that took so long.
19        Q.   Okay.  And then ultimately on December 11,
20   was he returned to the prison hospital?
21        A.   That's right.
22        Q.   Okay.  Is there anything else of note with
23   regard to this emergency surgery and the opening of
24   Mr. Perez' abdominal cavity that you want to note in
25   2012?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7313

1    A.   Yeah.   I mean, the fact that he could go

2    back to the prison hospital does not correlate with

3    if he were a community-dwelling person that he could

4    have gone home.   He's still bed-bound, he has a tube

5    putting food into his stomach, he still has the

6    fistula on the side of his intestines, which -- I'm

7    sorry, this is a little bit gory, but essentially

8    tube feeds are being fed through a tube into his

9    stomach.   The partly digested food then spills out

10   of the side of his abdominal cavity, is collected in

11   a container, and then is put back into the

12   downstream part of his intestine because those two

13   pieces have not been able to be reattached because

14   his abdominal wall is so fragile.   And so he also

15   then has the ostomy bag that I mentioned.   They're

16   collecting urine in a bag.   He's still very much a

17   hospitalized, very sick person.

18       Q.   Okay.   And so is he in an intensive care

19   unit at the prison hospital?

20       A.   They call it an intensive care unit, and

21   I'm not sure what that designation means.   It's

22   different than a hospital would call an intensive

23   care unit.

24       Q.   Would it be accurate if I wrote here on

25   this period in December that Mr. Perez had a feeding

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7314

1  tube?

2      A.   Yes.

3      Q.   Okay.  And would it be accurate if I said

4  he had a detached intestine?  I don't know what the

5  layman's word is for what you just described.

6      A.   I'd never see it before reviewing this

7  case, either.  I would call it a fistula.  A

8  functional fistula.  He has an ostomy, if you're

9  noting.

10      Q.   And tell the jury what an ostomy is.

11      A.   An ostomy is the site where the blockage

12  of his intestine that actually broke open was not

13  able to be reattached downstream so that he could

14  form and pass bowel movements normally.  So they had

15  to divert that and take that piece of intestine

16  intentionally and bring it to the surface to collect

17  his stool.  He also had what's called a PICC line,

18  P-I-C-C, which is a long-term in-dwelling port for

19  antibiotics and other medications to be given by IV.

20      Q.   Okay.  I'm going to write "port for

21  antibiotics."

22      A.   Sure.

23      Q.   And I'm going to just flip now to 2013.

24  And I know this calendar is a little smaller, but

25  can you see here that -- can you tell the jury

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   whether Mr. Perez remained in the prison ICU for --
 2               THE COURT:  Ms. Fox-Young, can we kind of
 3   talk to the jury a little bit about lunch?
 4               MS. FOX-YOUNG:  Yes, Your Honor.
 5               THE COURT:  Our breaks are coming a little
 6   late.  Do y'all want to take a 15-minute break and
 7   take a late lunch break?  How many would like to do
 8   that?  Seems like most people.
 9               Does that work for the counsel and
10   parties?  So why don't we take about a 15-minute
11   break.  Then we'll come back in and take a late
12   lunch break.  All rise.
13               (The jury left the courtroom.)
14               THE COURT:  All right.  We'll be in recess
15   for about 15 minutes.
16               (The Court stood in recess.)
17               THE COURT:  Let's go on the record.  Do
18   you want to continue to tell me what you want, Ms.
19   Fox-Young?
20               MS. FOX-YOUNG:  Well, Your Honor, there
21   are a few things that I want.  But based upon what I
22   think is a Brady violation, a Jencks violation, a
23   Giglio violation, a Rule 16 violation, we'd ask that
24   the Court strike the testimony of Mario Rodriguez.
25   And I can submit a brief -- I can't do it this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  minute, but I can do it tonight with some more

2  detail on the Court's prior rulings.

3           But I would just alert the Court to Agent

4  Stemo's testimony that this letter, Exhibit FV,

5  was -- she testified it was in the possession of the

6  FBI, of the Government, before they ever debriefed

7  Mario Rodriguez.  There is no explanation as to why

8  it wasn't produced.  And so that's my first request.

9           I also request any and all materials that

10 the FBI continues to have regarding the writings,

11 the statements of these informants.  When we argued

12 this in the spring, similar issues for the Court,

13 the Court recognized that where these informants

14 have contrary and evolving stories, these statements

15 and the FBI notes on the statements are relevant and

16 often exculpatory.  They are exculpatory where the

17 statements contradict one another.  And that is why

18 the Court ordered the notes for Armenta, the

19 interviews of Armenta, the notes for the interviews

20 of Armenta, Martinez, Montoya, I think among others.

21           Mr. Castle has brought this up before Mr.

22 Lowry and I have.  And in my brief, I'll include the

23 transcript cites and the Court's previous orders.

24 But here we are at trial in the defense case, we've

25 absolutely been prejudiced.  Mario Rodriguez is off

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7317

```
 1   the stand, and now we learn about these documents.
 2           THE COURT:  Well, let's get the documents
 3   that the Government is going to give.
 4           I don't have time right now, Mr. Beck, but
 5   why don't you -- now that you know what Ms.
 6   Fox-Young is requesting, why don't you be prepared
 7   to give me a response when we have time.
 8           MS. FOX-YOUNG:  And Your Honor, we still
 9   don't have those documents.
10           THE COURT:  All rise.
11           (The jury entered the courtroom.)
12           THE COURT:  All right, Dr. Brislen, I'll
13   remind you you're still under oath.
14           Ms. Fox-Young, if you wish to continue
15   your direct examination of Dr. Brislen, you may do
16   so at this time.
17           MS. FOX-YOUNG:  Thank you, Your Honor.
18           THE COURT:  Ms. Fox-Young.
19   BY MS. FOX-YOUNG:
20       Q.   Dr. Brislen, before we broke, we were
21   starting to talk about Mr. Perez' medical history in
22   2013.  Do you recall?
23       A.   Yes.
24       Q.   I'd like to ask you, first, do you know if
25   Mr. Perez remained in the prison ICU for several
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   months in 2013?

2       A.   He did.

3       Q.   And in fact, did he remain in the prison

4   ICU for most of 2013?

5       A.   He did.  His total time, if you include

6   UNM, was greater than a year that this sort of bowel

7   obstruction and rupture caused him to spend in

8   hospital.

9       Q.   Okay.  And a portion of that -- you just

10  said -- you referenced his time in UNM.  Did he

11  spend some time in 2013 back in the University of

12  New Mexico Hospital?

13      A.   Yes, he did.  You can see that starts at

14  the end of May.  That initially was actually a

15  planned admission, so he was following up with the

16  surgeons at the University as an outpatient in this

17  interim time.  And sometime earlier than that in

18  May, he saw the surgeons in clinic, and they

19  determined that he was ready for sort of his

20  definitive surgical treatment to put all the pieces

21  back together again.

22      Q.   Okay.  So when you say there was a planned

23  admission in May, was that on May 27 or some other

24  day?

25      A.   No, that's right; May 27.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  Then would it be accurate for me to

2  write "May 27 planned admission"?

3    A.   Right.

4    Q.   Okay.  And what happened after that

5  planned admission?

6    A.   So he was admitted to the surgery service.

7  He had surgery; not an emergency surgery at this

8  point.  And they were able to further remove scar

9  tissue that was present, give him a permanent

10  abdominal wall.

11    Q.   Was that surgery on the 28th; do you know?

12    A.   I believe it was on the 28th.

13    Q.   Okay.  Go on.  I'm just going to write

14  that there was a surgery.

15    A.   Yeah.  It may have been on the 27th, but I

16  believe it was on the 28th.  The fistula that was

17  sort of the outgoing and ingoing parts together were

18  now able to be reattached into one tube and the

19  ostomy that he had was also able to be reattached to

20  his downstream intestinal tract, so that now he can

21  have regular bowel movements after that.

22    Q.   Okay.  So that surgery was successful in

23  terms of reattaching his intestines?

24    A.   That's right.

25    Q.   And what happened after that for



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   Mr. Perez?

 2        A.   So he was recovering, I believe, in the

 3   ICU at UNM, and on the 28th to 29th there was

 4   concern for altered mental status, is what it's

 5   called.  So he was confused, not able to communicate

 6   well, not following instructions.  And that -- I was

 7   talking a little bit about that earlier.  The

 8   medical team couldn't quite figure out what was

 9   wrong, why he wasn't recovering and waking up

10   appropriately after his surgery.

11        Q.   I'm just going to make an indication here

12   on this chart.  You said on the 28th and the 29th he

13   had altered mental status?

14        A.   It was after his surgery that that

15   happened.

16        Q.   Okay.  Do you know the date?

17        A.   So his -- I believe it was noticed on the

18   28th.  I'm sorry that this is a little bit fuzzy,

19   but he saw psychiatry either on the 28th or the

20   29th.

21        Q.   Okay.  I'm going to put a plus here for

22   altered mental status, but I'm going to put it in

23   parentheses, because I think you're saying that you

24   know what happened and you think it was close to the

25   28th --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1       A.   Right.

 2       Q.   -- but you can't say for sure that it was

 3  that day or the next day; is that right?

 4       A.   Right.

 5       Q.   So I'm just putting on the legend down

 6  here, a plus means altered mental status.

 7       A.   Right.

 8       Q.   Then what happened after that?

 9       A.   So neurology was asked to see him on the

10  30th.

11       Q.   Okay.

12       A.   And that was when he was diagnosed as

13  having subclinical status epilepticus, meaning a

14  seizure that isn't obvious, that is unrelenting.

15       Q.   Okay.  So did he have a witnessed

16  unrelenting seizure beginning then?

17       A.   I believe it began with his altered mental

18  status.  I think that's the assessment of his UNM

19  physicians, was this entire episode is actually one

20  seizure.

21       Q.   Okay.  Then I'm going to note on the

22  legend, again with an asterisk, means witnessed

23  seizure.  And how long did that continue?

24       A.   That continued until June 7.

25       Q.   And I think you already testified about
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the medications that Mr. Perez was administered to

2   try to stop that seizure from persisting; right?

3        A.   That's right.  So he was started on a

4   couple of different anti-epileptic medications.  The

5   neurologist continued to watch that EEG recording of

6   his brain waves to see if they're making headway.

7   They weren't.  They added a third anti-epileptic

8   medication, they withdrew one, and saw some

9   improvement.  They started the medication called

10  lacosamide on June 2, and that's when they started

11  to see things turn around.

12       Q.   During this period from the 28th of May

13  until the 7th of June, was Mr. Perez responsive?

14       A.   No.

15       Q.   He was completely unresponsive?

16       A.   That's right.

17       Q.   And was he in the ICU?

18       A.   I believe he was in the ICU the whole

19  time.

20       Q.   And this is when he had status -- this is

21  when he was diagnosed with status epilepticus?

22       A.   That's right.

23       Q.   So finally, you talked about the

24  lacosamide.  Did he see more than one neurologist

25  during this time?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   He did.   So for a couple of different

2   reasons.   One is:   UNM is a teaching hospital, and

3   so you have broad teams of folks moving around; and

4   also because the neurology team that was on call for

5   managing the seizure also called in epileptologists,

6   meaning their colleagues that specialize in seizure

7   control.

8      Q.   So Mr. Perez saw a neurologist while he

9   was at UNM.   Do you know, is it your opinion -- do

10  you have an opinion as to whether or not Mr. Perez

11  was receiving regular neurological care when he

12  wasn't at UNM?

13     A.   I believe that he was not.

14     Q.   Okay.

15     A.   And it's pretty clear, when he was

16  discharged on the 12th of June, the neurology notes

17  and the discharge summary from the hospital both

18  said that they intended for him to continue to see

19  the neurologists at UNM, but that didn't happen.

20     Q.   That didn't happen.   So he went back to

21  the prison hospital, then, on June 12; is that

22  right?

23     A.   That's right.

24     Q.   And he actually remained there for many

25  more weeks, didn't he?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7324

1       A.   He did.  All the way through October.

2       Q.   Okay.  That's where you see in green here,

3   on October 3, the color changes, right, and he moves

4   somewhere else?

5       A.   That's right.

6       Q.   And do you know where he went after that?

7       A.   Southern New Mexico, SNM.

8       Q.   Southern New Mexico Correctional Facility,

9   SNMCF?

10      A.   Thank you.  Yeah.

11      Q.   Throughout the period of 2013, did Mr.

12  Perez continue to have other internal medicine

13  related problems that you know of?  Anything

14  notable?

15      A.   Yes, absolutely.  So the amount of

16  deconditioning that occurred over the course of this

17  year-long medical event is pretty amazing.  At one

18  point he had lost 100 pounds because of the

19  inability to feed himself through his mouth and just

20  the metabolic exhaustion of your body trying to heal

21  itself from something this profound.

22      Q.   Can you tell the jury when it was

23  recorded, if you know, that Mr. Perez had lost 100

24  pounds?

25      A.   So in June of 2013.  So not very long

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  after he got back from the hospital after this long
2  seizure was when his weight was noted to be 196.
3  And prior to his admission, it was 270.  So actually
4  about 75 pounds.
5      Q.   I'm going to just note on here in June
6  weight 196?
7      A.   Right.
8      Q.   Lost 75 pounds.  Is that accurate?
9      A.   Yes.
10      Q.   And any other internal medicine related
11  issues that you have not already described come up
12  in 2013?
13      A.   The way I categorize that time in 2013 is
14  really sort of trying to get back to whatever his
15  new baseline is going to be.  So a lot of physical
16  therapy time.  Again, he's learning now again to eat
17  by mouth and regaining strength and figuring out how
18  to use the sort of remodeled abdominal architecture
19  that he has now.
20      Q.   Okay.  That continued through the end of
21  the year?
22      A.   That's right.
23      Q.   All right.  Now, let's take a look at the
24  third page of this exhibit, which reflects the first
25  three months of 2014, does it not?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   That's right.

2      Q.   Okay.  Do you know -- do you have an

3  opinion as to whether or not Mr. Perez had any

4  witnessed, documented seizures in late 2013 that we

5  haven't talked about, or 2014?

6      A.   He did.  There is a note from his -- of

7  his visit with his physician that occurred on

8  January 11 that he had a seizure two weeks before

9  that.  So it was more or less Christmastime, but we

10 don't know the exact date.

11     Q.   Okay.  Well, let's go back and look at

12 2013.  So we know it was close to Christmastime?

13     A.   Right.

14     Q.   I'm just going to indicate -- is this

15 accurate if I indicate a witnessed seizure on

16 Christmas?  I'll put parentheses.  We don't know if

17 it was Christmas Eve or Christmas.

18     A.   We just know it was about two weeks before

19 January 11.

20     Q.   Okay.  And that was while he was at

21 Southern?

22     A.   Right.

23     Q.   And then you said on January 11 there was

24 a note about his seizure activity.  Is there

25 anything else notable about his seizure activity or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  his treatment on January 11, 2014?

2      A.   Yeah.  This is actually, I think, an

3  interesting part that's a little bit hard to

4  understand.  So on January 11 he saw his physician.

5  This is the first time that he has a known witnessed

6  seizure since starting on this new medication called

7  lacosamide.  As far as anyone knows, he has been

8  seizure-free since leaving UNM Hospital back in

9  June.  We're not certain of that, but that seems to

10  be -- that's the premise that his providers are

11  going on at this point.

12      Q.   So we don't know, but it appears from the

13  record -- are you saying it appears from the record

14  that that was the belief of his providers?

15      A.   That's correct.

16      Q.   And those providers were not neurologists;

17  right?

18      A.   Correct.

19      Q.   Okay.  Go on.

20      A.   So the physician that he saw on the 11th

21  decided to change his seizure medication to one

22  called levetiracetam or Keppra, if you've heard of

23  that.  And so he puts in an order -- let me just get

24  this exactly right.  He puts in an order that day,

25  on January 11, to convert from lacosamide to Keppra.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  The wording of the order is not very clear to read,

2  and part of that is because when you switch from one

3  seizure medication to another, by convention, if you

4  know that someone has seizures but aren't optimally

5  controlled, what you do is, you're on a medication,

6  you start the second medication, bring it up to

7  therapeutic dose, and then take the other one away.

8          The way that his physician wrote for the

9  medication to happen was to start the new medication

10  at the same time that he dropped this one by half,

11  and then he wanted to follow up with him to see what

12  to do with the second one.

13          That is probably a fine way to do it.

14  It's just not the way that I'm familiar with.

15  However, there was a medication error.  So if you

16  skip in the medical record to the part that's called

17  the MAR, the medication administration record, you

18  can see that unfortunately his -- so without

19  starting the second medication, his lacosamide, the

20  new medication, was dropped by half and he was left

21  on that dose for a number of days.  Then the Keppra

22  was started and the lacosamide was stopped

23  altogether.  There is no other way to characterize

24  that except a medication error.  And it may have

25  been just an honest mistake because reading these

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    kinds of instructions is difficult and tricky.  That
 2    is a big problem, especially with somebody who
 3    already has seizures.  You're withdrawing
 4    medications too quickly without having sort of a
 5    stable safety net under them, and that can often
 6    precipitate what's called a seizure flurry, so a
 7    whole lot of seizures in a short period of time.
 8         Q.   Dr. Brislen, I'm just going to write on
 9    the legend a triangle means change in seizure
10    medication.  Okay?
11         A.   Yeah.
12         Q.   And an E means medication error.
13         A.   Okay.
14         Q.   And so would it be accurate to reflect
15    your opinion if I put "Change in seizure medication
16    and medication error on January 11"?
17         A.   Yes, with the understanding the medication
18    transition should probably have taken a couple of
19    weeks, so you could say the error was spread out
20    over time.
21         Q.   So the error goes forward.
22         A.   Yes.
23         Q.   And how far does it go forward?
24         A.   I would say through at least the 15th.
25         Q.   Okay.  I'm just going to draw an arrow
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    showing that the error goes through at least the

2    15th.  And it's sort of complicated material, isn't

3    it, that you're covering?

4         A.   Yeah.

5         Q.   Are you saying -- correct me if I'm

6    mischaracterizing your testimony, but are you saying

7    that the medications were not properly titrated to

8    make the switch?

9         A.   That's exactly right.

10        Q.   Okay.  And you testified earlier that Mr.

11   Perez was on -- I think you said he was on

12   approximately seven different seizure medications

13   over the course of the period that you've looked at?

14        A.   He has been at different times on seven

15   different medications.

16        Q.   Okay.  So on January 11, this is one time

17   where he changed.

18        A.   Right.

19        Q.   And back at UNMH, when he had the

20   eight-day continuous seizure where he was

21   unresponsive, that's another time when he changed

22   multiple times; right?

23        A.   That's true.  Yeah.

24        Q.   Okay.  And so do you know why his seizure

25   medication -- I mean, let's go back.  When he was in

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7331

1  the hospital, why were his seizure medications

2  changed?

3       A.   During that long seizure?

4       Q.   Yes.

5       A.   Because it was urgent that we find a

6  medication that would bring him out of seizure

7  status and back to normal.  And so lots of different

8  things were tried.  First line, second line, third

9  line, you know.  Kind of pulling all of your cards

10 out of your deck to try to find something that

11 works.

12      Q.   Is that because the seizure medications

13 that he was on weren't working?

14      A.   That's right.  So you know, something to

15 think about in big-picture seizure treatment, if you

16 think about community-dwelling people that have

17 seizures --

18      Q.   And when you say community-dwelling

19 people, you mean people who aren't in prison?

20      A.   That's right.  And the reason I mention

21 that is because community-dwelling people have

22 oftentimes social supports around them that serve as

23 their witnesses, and I don't know what Mr. Perez'

24 social structure was for people that might have been

25 able to know when he was having a seizure, what his

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    witness structure is like.  But if you think about

2    what I'm calling community-dwelling people having

3    seizures, sometimes optimal control of your

4    seizures, you may still have seizures once in a

5    while, and that doesn't necessarily mean that you

6    have to change medications, but ideally in working

7    with a neurologist, you are able to fine-tune to

8    find sort of your best, most positive place.  There

9    is really no reason to change medications unless

10   you're unable to tolerate your current medication

11   because of side effects or you're having recurrent

12   seizures.

13           So the case that you were just describing,

14   he had one long seizure, it was very hard to -- it

15   was refractory to treatment; lots of different

16   things were tried, until they finally discovered one

17   that did seem to work, and that became his new

18   anti-epilepsy therapy.

19        Q.   Okay.  And to be clear, in January of

20   2014, when you say Mr. Perez' seizure medication was

21   changed again, was he seeing a neurologist?

22        A.   No.

23        Q.   Okay.  Do you know why his seizure

24   medication was changed on January 11?

25        A.   I believe it's because -- and as reflected

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  in his physician note it's implied that it's changed

2  because of the seizure he reported that had happened

3  about two weeks prior.

4      Q.   Okay.  And so that medication error then,

5  where you say the titration wasn't done right,

6  continued until about January 15th?

7      A.   The reason I say that is because his --

8  the first thing that was done wrong, different than

9  the instructions, was that the lacosamide was cut in

10 half without having any Keppra being administered at

11 the same time.

12          The second thing that went wrong was that

13 when the Keppra was started four days later, his

14 lacosamide was stopped altogether, and that wasn't

15 correct, either.  He was supposed to stay on that

16 lacosamide.  The way the order was written, he would

17 have stayed on both medications together for a

18 month, and that didn't happen.  So you could read

19 it, you know, as a longitudinal error or two

20 distinct errors or whatever, but whatever it was

21 predisposed him, put him at great risk for either

22 seizure flurry or recurrent seizures.

23      Q.   Okay.  So he was actually, then, according

24 to the order, supposed to remain on both seizure

25 medications until February 11; is that right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     A.   I believe so.  I mean, the order says "for

2  30 days."  The follow-up appointment that was

3  arranged with his physician -- I don't recall when

4  he was going to follow up to make sure everything

5  was going okay.  So there's two mechanisms there.

6  The medications are written to last a certain amount

7  of time, and the fail-safe is:  I'm going to see you

8  back in a couple of weeks.  It was a two-week

9  follow-up-ish, we'll see how things are going.

10     Q.   Okay.  Now, when you say this is a

11  medication error, do you know what, if any,

12  consequences could result from that?  Well, you said

13  errors, result from those errors.

14     A.   What you would be worried about is lots of

15  seizure burden occurring in a short amount of time,

16  so many seizures happening.

17     Q.   Okay.  So there is then a period of time

18  after the medication errors when you would worry

19  about seizure activity?

20     A.   Yes.

21     Q.   You'd worry more than you otherwise would?

22     A.   Right.

23     Q.   How long is that time period?

24     A.   It's really -- it's impossible to know.  I

25  mean, it's going to be very individualized, how long

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7335

1  the insult of having your medication sort of too

2  suddenly adjusted might last, but I can't estimate.

3       Q.   Okay.  You just know for some time after

4  January 15, Mr. Perez -- is it accurate to say that

5  he was at risk for even more seizure activity?

6       A.   That's correct.

7       Q.   Okay.  And did Mr. Perez, in fact -- do

8  you know Mr. Perez had any witnessed seizure during

9  this interval?

10       A.   I'm pretty sure that he had another

11  seizure on February 8 or prior to February 8.

12       Q.   How do you know that?

13       A.   Because there's further notes from his

14  physician that they increased his Keppra -- this is

15  the new medication -- was increased on February 8

16  and then in follow-up to that, the comment is made,

17  "No further seizures since the increase."

18            So my read into that is:  He did have a

19  seizure that triggered further adjustment of his

20  medications on the 8th of February, and then --

21       Q.   So let's slow down.

22       A.   Sorry.

23       Q.   I'm trying to keep up with you, Dr.

24  Brislen.

25       A.   Yeah.  Yeah.  Yeah.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Is it accurate, then, for me to note a
2  change in seizure medication on February 8?
3    A.   Yes.  That's perfect.
4    Q.   And was there a medication error at that
5  time?
6    A.   No, not that I know of.
7    Q.   And it's your belief, it's your opinion,
8  that sometime in the lead-up to February 8 that Mr.
9  Perez had seizure activity; is that right?
10    A.   Probably.
11    Q.   And is that between January 16 and
12  February 8?
13    A.   That's my understanding.
14    Q.   Okay.  So I'm going to indicate on here,
15  this is accurate, what would be -- what is your
16  opinion as to what happened in that time?  Would it
17  be accurate for me to say "probable seizure
18  activity"?
19    A.   That's a perfect way to phrase that.
20    Q.   Okay.  So I'm going to just make a
21  squiggly line here on the legend that says "probable
22  seizure activity."  And we haven't gone into detail
23  on it, but you explained to the jury earlier, with
24  each of these seizures, witnessed or not, is there a
25  post ictal period?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1        A.    Yes.

2        Q.    And tell me again what that is.

3        A.    A post ictal period is a period of time

4  with altered mental status or incomplete cognition

5  or awareness.  Sometimes post ictal periods can

6  include difficulty controlling mood, feelings,

7  behavior.

8        Q.    Okay.  And I think you said that there is

9  a later note.  Do you know, was that later note that

10  you talked about, saying that there was no known

11  seizure activity -- do you know when that was?

12        A.    That was in April.  There is a physician

13  note in which he inquires and there is -- it's

14  written down, "No seizure since Keppra adjustment,"

15  which we can take to mean no witnessed seizures

16  since February 8.

17        Q.    Okay.  I don't have April on this

18  calendar.

19        A.    Right.

20        Q.    But I'm going to write here after March --

21  you tell me if it's accurate for me to say April

22  note documenting -- well, you can't document

23  seizures that weren't witnessed; right?

24        A.    Right.

25        Q.    But there is an April note that says no

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7338

```
 1   witnessed or known?
 2        A.   The note says, "No seizures."  I read that
 3   to mean no witnessed seizures.
 4        Q.   Okay.  I'm going to say, "No witnessed
 5   seizures."  And you described earlier, did you not,
 6   that -- I just want to be clear.  These records that
 7   you've reviewed only reflect witnessed seizures;
 8   right?
 9        A.   Right.
10        Q.   Okay.  So we don't know about the
11   unwitnessed ones.
12        A.   Right.
13        Q.   Is there anything else -- oh, you know,
14   there is one thing I want to ask you about, going
15   back to 2013, and we haven't talked about every
16   single ambulatory or assistive device that Mr. Perez
17   has ever used; right?
18        A.   That's right.
19        Q.   But do you know if in 2013 Mr. Perez was
20   issued a walker that had handle brakes?
21        A.   Yes, that's right.
22        Q.   Do you know when that happened?
23        A.   That happened in October.  So his --
24   basically when he got out of UNM Hospital for the
25   last time, he was classified as what's called
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1  modified -- I'm sorry, moderate assist, which means

 2  he can only perform 50 percent of the effort of

 3  standing from sitting or walking.  He needed a human

 4  being to hold him up.

 5       Q.   Okay.  So that's October 2013, he is

 6  moderate --

 7       A.   No, no.  Sorry.  This is June.  June of

 8  2013, he's moderate assist.

 9       Q.   Okay.  I'm going to X that out.  That's

10  when his weight is 196?

11       A.   That's right.

12       Q.   He's moderate assist.  So he needs a

13  person to hold on to.  I'm going to write that on

14  here.  Is that accurate, Dr. Brislen?

15       A.   That's correct.  In September, then he is

16  reclassified -- this is a physical therapy

17  diagnosis -- as modified independent.  And what that

18  means is:  He's progressed to the point where he can

19  get around without another person's help, but the

20  modification is a piece of equipment.  So he's not

21  fully independent.  He can't walk by himself, and

22  the truth is, he's never gotten better than that in

23  any of the physical therapy notes we've seen.  But

24  now he's gotten back to this modified independent

25  state.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.    So is it accurate, Dr. Brislen, if I write

2  under September 2013, "modified independent," and if

3  I say, "Needs -- needed equipment," would that be

4  accurate?

5     A.    Yes.

6     Q.    Okay.  I'm going to write that then.  Go

7  on.

8     A.    So in September of 2013 -- and I'm sorry,

9  I didn't note the exact date -- a wheelchair and a

10 walker are ordered for him.

11    Q.    Okay.  Both a wheelchair and a walker?

12    A.    That's correct.  And on November 8, so two

13 months later, the walker is delivered.

14    Q.    Okay.

15    A.    And he gets it -- he receives it on the

16 12th.  He signs a -- you know, a medical equipment

17 check-out form on October 12.  I'm sorry.  Hold on.

18 November 12.  November 12, that he is now in

19 possession of this walker with hand brakes.

20    Q.    So I'm going to just include on the legend

21 a W, meaning walker delivered.  Okay?

22    A.    Okay.

23    Q.    Does that correspond with your testimony?

24    A.    Um-hum.

25    Q.    And you said that was on November 12?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Um-hum.
 2        Q.    So I'm going to put that W on November 12.
 3   And at some point he was also delivered a
 4   wheelchair; is that right?
 5        A.    That's right.
 6        Q.    Do you know the date of that?
 7        A.    I don't.
 8        Q.    And so this walker that was delivered for
 9   which he acknowledged receipt on November 12, 2013,
10   that's the equipment that was prescribed to him;
11   right?
12        A.    Right.
13        Q.    That's the equipment that he needed based
14   upon the physical therapy recommendation in 2013;
15   right?
16        A.    That's right.
17        Q.    Okay.  And so let's go back to 2014.  So
18   in 2014, do you know whether Mr. Perez still had
19   that same walker that he received in November of
20   2013?
21        A.    As far as I can tell based on the medical
22   records, he still had it.
23        Q.    Okay.  And prior to that, had he been
24   ordered other walkers?
25        A.    Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1        Q.    Okay.  And other devices to assist him?

2        A.    Yes.

3        Q.    How would you characterize -- and you've

4   talked about Mr. Perez' seizures in the early part

5   of 2014; right?

6        A.    Right.

7        Q.    How would you characterize Mr. Perez'

8   general health from January to March of 2014?

9        A.    I would characterize it as probably close

10  to his baseline, fairly debilitated and still in

11  some degree of recovering from his acute illness.

12       Q.    So would it be accurate if I write,

13  "Fairly debilitated and recovering"?

14       A.    Sure.

15            MS. ARMIJO:  Your Honor, I'm going to

16  object at this point to "probably."  Witnesses are

17  not allowed to guess.

18            THE WITNESS:  I'm sorry.

19            MS. ARMIJO:  If she has an idea or can

20  state an opinion -- but she's stating probably, so I

21  would move to strike the answer.

22            THE COURT:  Well, I think that if she

23  can't testify to a reasonable degree of medical

24  probability, then she probably shouldn't be offering

25  a medical opinion here.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1          MS. FOX-YOUNG:  Judge, I agree.
 2   BY MS. FOX-YOUNG:
 3      Q.   And Dr. Brislen, I only want to know what
 4   you can say with a reasonable degree of medical
 5   certainty about Mr. Perez' general health from
 6   January to March of 2014.
 7      A.   Okay.  Mr. Perez has a walker that he is
 8   able to use to ambulate somewhat, which is an
 9   improvement on where he was a number of months
10   before that.  He has regained all of the weight that
11   he lost and then some, which unfortunately means his
12   diabetes is not in as good a condition as it was
13   before, but it reflects his appetite is back and his
14   general strength has improved.  He remains
15   physically fragile, very prone to falls, and with
16   chronic pain, and now pretty profound digestive
17   issues which I think impact his quality of life and
18   probably -- I'm sorry.  Impacts his quality of life.
19      Q.   Let's stop there, because I want to
20   capture some of your testimony here.  He'd gained
21   the weight back; is that right?
22      A.   That's right.
23      Q.   Okay.  I'm going to just write that he had
24   gained the weight back.  I think you said it's your
25   opinion that he was -- did you say he was -- his
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  state was generally fragile?  Or what is your

2  opinion generally about his physical state?

3       A.   So yes, fragile, and also at baseline.

4       Q.   Okay.  So I'm going to write "fragile and

5  at baseline."  And can you tell the jury what you

6  mean by "at baseline"?

7       A.   So this gets back to when I say he's never

8  been certified to be more mobile than modified

9  independent, meaning he is going to need a walker if

10 he's going to ambulate safely I think for the rest

11 of his life.

12      Q.   And you said something about the state of

13 his diabetes at the time.

14      A.   That's right.  He required accelerated

15 medication treatment at this point which goes along

16 with weight gain to the point of obesity.

17      Q.   And is there a way that you can

18 characterize his diabetes specifically at this time?

19 You said he required accelerated medication.

20      A.   Right.  So when he lost the weight during

21 his acute illness, he didn't require medication for

22 his diabetes and he now requires medical treatment

23 to keep his blood sugars within a safe bound.

24      Q.   Okay.  I'm just going to say "requires

25 medical treatment for diabetes"; is that accurate?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7345

```
 1        A.   Sure.
 2        Q.   And you've talked specifically about
 3   changes in his seizure medication.  And you
 4   testified that it is your opinion that he had
 5   probable seizure activity during this time.  Is it
 6   accurate to say that he had probable seizure
 7   activity through March, or do you know?
 8        A.   I don't know.
 9        Q.   Okay.  And we've already reflected on the
10   calendar what you do know about his seizure
11   activity; is that right?
12        A.   That's right.
13        Q.   And can you tell the jury how -- did you
14   say he was in chronic pain at this time?
15        A.   Yes, that's true.
16        Q.   What can you tell me about his pain?
17        A.   So at this point we know, based on
18   complaints that he makes specifically to nursing
19   staff in the medical record and to his physicians,
20   that he has lot of pain.  That's abdominal pain
21   primarily and also leg pain; in particular, one of
22   his knees bothers him quite a lot.  He is taking
23   hydrocodone every day three times a day, and also
24   Neurontin, which is a nerve pain medication.
25        Q.   Okay.  I want to separately capture what
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    your opinions are about his medications.

2        A.   Okay.

3        Q.   Is it accurate, Dr. Brislen, if I say he

4    had chronic abdominal and leg pain at this time?

5        A.   That's true.

6        Q.   Do you have any opinions that you haven't

7    already stated with respect to this time period

8    about Mr. Perez' neurological state?

9        A.   I know that he continues to receive sleep

10   aids like doxepin.  I'm sorry, I don't want to jump

11   into medication.  He continues to receive

12   medications for sleep and follow with mental health

13   providers.  He also receives medication for

14   agitation and anxiety.  So those all contribute.

15       Q.   So I think this is a good time for us to

16   talk, then, about your opinions with regard to the

17   medications that Mr. Perez was receiving at this

18   time and their effects.

19       A.   Okay.

20       Q.   So what opinions do you have about the

21   medications that Mr. Perez was receiving in January

22   to March 2014?  Start there.

23       A.   So I'm going off of a list of medications

24   that I took from March of 2014.  And besides that

25   adjustment on February 8 that we talked about and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  the change of medications on the 11th, I think these

2  were fairly stable.  But I'm not -- there may have

3  been, you know, insignificant adjustments during

4  this period of time.

5      Q.   So I'm going to say March 2014

6  medications.

7      A.   Right.  Okay.  So I've broken these

8  conceptually into two groups:  The psychoactive

9  medications and the nonpsychoactive medications,

10  just so we can think about --

11          MS. ARMIJO:  Excuse me, Your Honor.  I'm

12  going to object to any testimony without laying a

13  foundation.  I believe she's an expert in internal

14  medicine, but to talk about the effects of

15  medications is a different specialty.

16          THE COURT:  Well, why don't you lay some

17  foundation, see if she's got enough expertise to

18  opine on this to a reasonable degree of medical

19  certainty.  If she can't go that far, then probably

20  she shouldn't be testifying about the effects of

21  medicine.

22          MS. FOX-YOUNG:  Thank you, Your Honor.

23  And I don't think that's the question on the table

24  at this point, but before I elicit any testimony

25  with regard to the effects, I will lay some

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   foundation.
 2              THE COURT:  All right.
 3   BY MS. FOX-YOUNG:
 4       Q.   Dr. Brislen, you were saying that you --
 5   in your consideration of Mr. Perez' medical history,
 6   I think, were you saying that you grouped the
 7   medications that he was prescribed in March of 2014
 8   into categories?
 9       A.   That's right.
10       Q.   Okay.  Tell me what categories.
11       A.   So I call it psychoactive and not
12   psychoactive.
13       Q.   Okay.
14       A.   And that would be a way in clinic, for
15   example, that you might, as a physician, tease out
16   what kinds of side effects might be coming from
17   certain medications or what kinds of medications you
18   would need to be careful with.
19       Q.   Dr. Brislen, don't tell me anything about
20   side effects or effects yet.
21       A.   Okay.
22       Q.   All I'm asking you to tell the jury first
23   is what medications you know or it's your opinion
24   that Mr. Perez was prescribed at that time in March
25   of 2014.
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7349

```
 1        A.   All right.  So under the label in my head
 2   of psychoactive, he was taking Haldol, hydrocodone,
 3   Neurontin, Benadryl, Keppra -- that's his new
 4   seizure medication -- and doxepin.
 5        Q.   Is that seven different medications?
 6        A.   Oh.  Six.
 7        Q.   Okay.  Would it be accurate if I say six
 8   psychoactive medications in March of 2014?
 9        A.   Sure.
10        Q.   Okay.  And what other categories of
11   medications was he receiving?
12        A.   So I've lumped these together under the
13   not-psychoactive label, and he was taking
14   omeprazole, lactulose, vitamin D, lisinopril,
15   metoprolol, fibromax, docusate, doxazosin, and
16   that's it.  Eight.
17        Q.   So he was taking eight medications which
18   you classify as not psychoactive.
19        A.   Not psychoactive.
20        Q.   Okay.  And do you know, Dr. Brislen, the
21   date that Javier Molina died?
22        A.   I actually don't, off the top of my head.
23   It is early March 2014.
24        Q.   Okay.  The eight -- and maybe it's hard --
25   maybe you need to take them one by one.  But the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    eight medications that you just listed -- what are

2    those used to treat?

3         A.   So three of them -- I'm sorry, two of

4    them.  Three of them are for gastrointestinal

5    health.  So he's on three different stool softeners

6    and laxatives in order to make sure that his

7    intestines continue to move soft stool through them

8    to reduce the risk of him reobstructing.

9              Two of them are high blood pressure

10   medications.  One is for acid reflux related, again,

11   to his GI injuries.  One is an antidepressant.  One

12   is a medication for prostate, bladder obstruction;

13   and then vitamin D is a supplement for bone health.

14        Q.   Okay.  So you listed 14 different

15   medications.  Are any of these 14 medications

16   medications that you did not learn about in your

17   extensive training in medical school and your

18   residency?

19        A.   No, I'm familiar with all of these

20   medications.

21        Q.   Of these 14 medications, are there any

22   that you have not at some time either prescribed or

23   done maintenance care with your own patients?

24        A.   I have never used doxepin personally.

25   That's it.  I've used all the rest of them.

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 820-6349                                    FAX (505) 843-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1-800-669-9492
e-mail: info@litsupport.com

```
 1          Q.   And when you say you've used them, does
 2    that mean that you have prescribed them or have
 3    patients who are receiving them being treated?
 4          A.   Yes, exactly.
 5          Q.   In your clinic or at the hospital?
 6          A.   Right.
 7          Q.   And what is doxepin for?
 8          A.   It's an older -- it's called a tricyclic
 9    antidepressant.  For Mr. Perez it was used as a
10    sleep aid that also, when you use medications like
11    this for patients with chronic pain, it acts as a
12    sleep aid and also an adjunct medication for pain
13    control.
14          Q.   Okay.  And for each of these 14
15    medications, are you familiar with the reasons to
16    use them for -- in treatment?
17          A.   Yes.
18          Q.   And are you also aware of the side effects
19    that they have?
20          A.   Yes.
21          Q.   And I think you said there was one of the
22    14 medications that you haven't used.  Is there a
23    reason that you haven't prescribed it or seen it
24    prescribed?
25          A.   Doxepin is a close relative of another
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    medication called amitryptyline, and I have used

2    that preferentially because I'm used to it.  My

3    understanding is they're very closely related, but

4    that's the reason why, there is another easily

5    available alternative.

6          Q.    Okay.  So this is not a preferred

7    medication, the doxepin?

8          A.    For me.  Right.  I mean, formularies

9    change, things like that.  So, yeah.

10         Q.    And is the information that you have about

11   the treatment used and the side effects of these

12   medications based upon your training and clinical

13   experience?

14         A.    Yes, it is.  I'd like to add to that that

15   oftentimes, beside side effects, drug interactions

16   are one of the things that we have to be careful

17   about, and that's something that we all -- that

18   nobody can manage that in their own heads, so we

19   tend to use textbooks and on-line resources and

20   things like that to tease those out.

21         Q.    Okay.  And so we've talked about treatment

22   and side effects.  With respect to the drug

23   interactions, what do you rely on to formulate any

24   opinions about drug interactions between these 14

25   drugs?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7353

```
 1        A.   So for these 14 drugs I used the same
 2   clinical resource that I use for my patients, which
 3   is called Medscape, which is an on-line tool where
 4   you submit names of medications and it will tell you
 5   if they contradict with each other or they have an
 6   interaction.  Those can be lots of different
 7   flavors.  So if two medications interact either/or
 8   the other one might be amplified or decreased in its
 9   ability to work, or one of them might -- if they're
10   processed using the same enzymes in your body,
11   they'll, like -- the duration of action might get
12   stretched out or shortened, depending upon the
13   metabolic effects and things like that.  So you plug
14   in names of medications into this tool and it will
15   tell you these two shouldn't go together; these two
16   can, but be careful.  That sort of thing.
17        Q.   You talked about Medscape as a tool that
18   you use --
19        A.   That's the one I tend to use.
20        Q.   Okay.  Is the ordinary practice of doctors
21   in the community to use a tool to determine whether
22   there are drug interactions?
23        A.   Yes.
24        Q.   Dr. Brislen, can you tell me what the side
25   effects of the six -- and you're calling them
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   psychoactive medications -- are?
 2             MS. ARMIJO:  I still object based on
 3   foundation.
 4             THE COURT:  Well, I think she has enough
 5   expertise to be helpful to the jury, so overruled.
 6   BY MS. FOX-YOUNG:
 7        Q.   And you can tell me medication by
 8   medication.
 9        A.   Okay.
10        Q.   Or tell the jury.
11        A.   So Haldol is an old antipsychotic.  It has
12   a lot of side effects of GI issues, nausea, as well
13   as sedation; makes you very sleepy, feel sluggish,
14   feel fuzzy-headed.
15             Hydrocodone is a pain medication, and that
16   one classically causes itching, constipation, also
17   fatigue and sedation.
18             Neurontin is the same thing as gabapentin,
19   which is a pretty common medication.  That's the
20   nerve pain medication.  It's actually classified --
21   it's an antiseizure medication, but we've learned
22   that it's good for nerve pain, and that's what we
23   use that for primarily now.  That one has profound
24   sedating effects.
25             Benadryl.  Oftentimes we use that for
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    sleep.  It's an antihistamine, but it's so sedating

2    that we use that side effect as a therapeutic

3    benefit.

4            Keppra or levetiracetam.  That's the new

5    seizure medication that he was put on on January 11.

6    It causes the same thing:  Fatigue, sedation, and

7    nausea or stomach upset classically.

8            Doxepin is an antidepressant that helps

9    with pain, but is -- again, it's one of the

10    medications where we use the fatiguing or the

11    sedating side effect for therapeutic benefit, which

12    is why we give it at bedtime.  That's it.

13        Q.    So Dr. Brislen, I documented here on this

14    exhibit side effects of nausea, sedation, itching,

15    fatigue, and profound sedation?

16        A.    Right.

17        Q.    Does that accurately capture the overall

18    side effects of these drugs?

19        A.    It does.

20        Q.    Now, I know you testified that

21    sometimes -- is it true that sometimes there is

22    overlap between side effect and the intended effect

23    of the drug?

24        A.    Yes.

25        Q.    Okay.  And is it true that one or more of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   these medications was prescribed to Mr. Perez for
 2   sedation?
 3        A.   Correct.
 4        Q.   Okay.  So I'm listing sedation and
 5   profound sedation and fatigue as side effects, but
 6   is it your testimony that Mr. Perez was receiving
 7   some of these medications because he needed to
 8   sleep?
 9        A.   Yes.
10        Q.   Now, do you have an opinion -- and let's
11   talk about the side effects, if there are any
12   notable, of the eight other medications that you
13   know that Mr. Perez was taking in March of 2014.
14        A.   Those side effect are going to be minimal,
15   if any.  For some people taking metoprolol, which is
16   a classic, very common blood pressure medication,
17   can cause some sleepiness.  The stool softeners have
18   an obvious side effect of diarrhea if they're
19   overused or if they're not absorbed consistently.
20   And blood pressure medications can make your blood
21   pressure go too low depending on the circumstances.
22   But otherwise, nothing substantial.
23        Q.   Okay.  I'm not going to add anything
24   because it's your opinion that there are no
25   substantial side effects at least documented for Mr.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Perez; right?

2          A.    Right.

3          Q.    And I'm not going to write fatigue again.

4    I think you said that there were -- is it true that

5    there are at least four or five medications that he

6    was taking that cause fatigue?

7          A.    Yes.

8          Q.    Okay.  Do you have an opinion as to

9    whether these 14 medications taken together had any

10   dangerous interactions or notable interactions?

11         A.    Yes.  So -- and I'm sorry that I didn't

12   bring the list with me.  But when you plug this list

13   of medications, especially the first six, into a

14   medication interaction checker, the important things

15   that surface out of that are, one, Haldol is very

16   difficult to mix with any other medications because

17   it changes the way electricity gets conducted in

18   your heart.  And so you just have to monitor people

19   very carefully with that one.  That's one of the big

20   red flags.  You should be checking an EKG to make

21   sure you're not putting people in cardiac danger

22   with this one.

23                But the others are interesting because

24   their metabolism is shared by similar enzymes in

25   several instances, meaning that even though he may

SANTA FE OFFICE                                                                              MAIN OFFICE
119 East Marcy, Suite 110                                                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                                                  Albuquerque, NM 87102
(505) 989-4949                                                                          (505) 843-9494
FAX (505) 820-6349                                                                 FAX (505) 843-9492



1-800-669-9492
e-mail: info@litsupport.com

1  take doxepin and Benadryl for sleep, that's helpful.

2  The other sedating medications are going to get

3  absorbed in a way and metabolized in a way that's

4  unpredictable.  So there's a lot of warnings that

5  surface when you look at this medication panel that

6  says:  Be very wary of sedation which for a

7  community-dwelling person would mean I would have a

8  conversation with them about "You should not drive

9  when you take these medications.  You probably

10 shouldn't do complex tasks, those kinds of things."

11      Q.   Okay.  Dr. Brislen, would it be accurate

12 for me to say under interactions that sedation is at

13 issue here?

14      A.   It would be, yes.  That would be the

15 primary concern to me.

16      Q.   And I won't list all the others because

17 that's your primary concern.  I'm going to put

18 sedation there.  And those are already there for

19 side effects.  But do you have an opinion as to

20 whether or not it's a greater concern given the

21 potential drug interactions than it would be without

22 interaction, if that makes sense?

23      A.   Yes, I do.  I think that compounds the

24 effect.

25      Q.   Okay.  Do you have any opinions as to what

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Mr. Perez' level of alertness was in March of 2014,

2    given these 14 medications he was taking?

3          A.    Aside from just understanding the

4    prescriptions that he was on, I don't.

5          Q.    Okay.  You talked about driving.  Do you

6    have any opinion as to Mr. Perez' ability to perform

7    complex tasks in March 2014 given his medical

8    condition and the medications he was on?

9          A.    Likely diminished.

10         Q.    Diminished.  Okay.  Do you have any

11   opinion as to -- I think you've covered it,

12   Dr. Brislen.  Now, I'm going to note on here,

13   because it's in evidence, that Javier Molina died on

14   March 7.  And I'm going to put that on this legend

15   as JM, Javier Molina, died.  And now, Dr. Brislen,

16   I'd like to talk to you about the remainder of 2014

17   and Mr. Perez' medical condition during that time,

18   and also 2015 and January 2016.  So from April 2014

19   to January 2016, were there any notable changes in

20   Mr. Perez' general health?

21         A.    So we know that he continued to struggle

22   with mobility, which isn't a surprise.  Over the

23   course of that time he went through at least one

24   more cycle where he had a wheelchair and a walker,

25   attempted to transition to a walker and a cane, fell

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7360

1  when using the cane, went back to a wheelchair, then

2  again a walker.  That kind of progresses.  There's

3  lots of comments in the notes from his provider

4  about when he's ambulating without the use of a

5  walker, how slow and painful that process is for

6  him.

7       Q.   Okay.  And is this the same cycle that

8  you've already testified about seeing over the

9  course of 1992 to 2016?

10      A.   That's right.

11      Q.   Is there anything notable about Mr. Perez'

12 seizure activity in January 2016?

13      A.   January of 2016.  So --

14      Q.   Let me ask you this.

15      A.   I'm with you.

16      Q.   Is there anything notable, Dr. Brislen,

17 about Mr. Perez' antiseizure medications which were

18 prescribed in January of 2016?

19      A.   Right.  So again, this is one of the

20 overlap issues where in January of 2016, actually

21 starting October the year before, Mr. Perez was

22 prescribed a medication called oxcarbazepine, which

23 is an antiseizure medication just like gabapentin,

24 which we talked about before.  He had been taking it

25 in 2014.  This is a similar medication used for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   neuropathic pain, meaning used for pain that's
2   caused by nerves.  He was put on that medication in
3   October for pain control.
4       Q.   Is there -- are you talking about October
5   of 2015?
6       A.   Correct.
7       Q.   So in October of 2015, Mr. Perez had a
8   medication change?
9       A.   Yes.  You know, medically, he's a really
10  complex patient and there's a lot of medication
11  titration that happens kind of all the time.  It's
12  kind of like background noise.  His providers are
13  always trying to find a way to get him better pain
14  control, always trying to optimize the control of
15  his diabetes, blood pressure, those kinds of things.
16  So those are pretty minimal, and I didn't even make
17  specific note of things that I didn't think were
18  remarkable.
19      Q.   And you have not documented for the jury
20  the many, many times that there have been medication
21  changes; right?
22      A.   Correct.
23      Q.   We just talked about a couple of them.
24      A.   Correct.
25      Q.   Okay.  Go on.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    A.   So he started taking this new medication

2 in October, and pretty quickly said that he didn't

3 like it; it wasn't as helpful for his pain as it had

4 been.  Come January, his physician decided to try a

5 different medication for him and stopped his

6 oxcarbazepine suddenly before they substituted

7 another medication.  That is something we could flag

8 on the calendar as a medication error.

9    Q.   And when was that, Dr. Brislen?

10    A.   That happened on January 21.

11    Q.   Of 2016?

12    A.   Correct.

13    Q.   I'm going to show you the last page of

14 this exhibit, which is February 2016, but I'm going

15 to write at the top of it, because we don't have

16 January -- you said January 25?

17    A.   21.

18    Q.   21st.  There is a medication error?

19    A.   Right.

20    Q.   Okay.  Tell the jury about that error.

21    A.   Okay.  So this is a prescribing mistake.

22 So oxcarbazepine -- I'm going to call it Trileptal

23 because that's an easier word.  That's the brand

24 name.  So Trileptal being used for pain control in

25 anyone, anyone in this room today, part of what it

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7363

1   does to your brain that helps it increase the pain

2   has the side effect of decreasing your seizure

3   threshold, meaning you're covered because you're

4   taking this medication, but the ease with which your

5   brain can sort of go a little haywire and have a

6   seizure, it gets much easier.  You're suddenly on a

7   slippery slope.  So if I were prescribing this

8   medication to a patient, I would have a serious

9   timeout conversation as part of our visit.  "This

10  medication might help with your pain.  If you don't

11  like it, you cannot stop it suddenly.  Because then

12  you're left again flying without a safety net,

13  predisposed to seizures."

14          And this is for anyone, not just people

15  who already have seizures.

16      Q.   So a person on this medication who is not

17  an epileptic would be at risk for increased seizure

18  activity if the medication were stopped?

19      A.   That's right.  If it were stopped

20  suddenly.

21      Q.   And is that what happened on January 21st?

22      A.   That is.  That is.  And Mr. Perez had been

23  taking 600 milligrams twice a day, which was maximum

24  dose.  So he was on a high dose of a medication that

25  suppresses his own defenses against seizures, and

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   then that medication was withdrawn suddenly.  That's

2   a red flag and something that stood out to me in his

3   medical chart as another period of time where we

4   would see very likely seizure activity.

5        Q.   So Dr. Brislen, would it be accurate for

6   me to say after January 21, very likely seizure

7   activity?

8        A.   Yes.

9        Q.   And can you characterize Mr. Perez'

10  general health in February 2016?

11       A.   I would say apart from this medication

12  change and the concern that I have for that

13  precipitating seizures, it's unchanged from

14  previous.

15       Q.   And so --

16       A.   The same mobility issues, same digestive

17  issues, hypertension, diabetes, pain control.

18       Q.   Okay.  So then is it accurate to say that

19  your testimony with regard to your opinions about

20  Mr. Perez' general health in March of 2014 would

21  also apply to his general health in February of

22  2016?

23       A.   Yes.  I think that's true.

24            MS. FOX-YOUNG:  Okay.  Your Honor, just a

25  moment?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            THE COURT:  Certainly.

 2            MS. FOX-YOUNG:  Your Honor, I'd like to

 3   show the witness an exhibit that's already in

 4   evidence, which is Government's 770.

 5            THE COURT:  All right.

 6   BY MS. FOX-YOUNG:

 7       Q.   And while we're waiting for that, Dr.

 8   Brislen, would it be accurate if I mark this exhibit

 9   to say that Mr. Perez had the same general health as

10   in March of 2014?

11       A.   I think that's fair to say.

12       Q.   Okay.  So I'm not going to write

13   everything on this page that we already looked at.

14   But I'm going to say "as in March 2014."

15            All right.  Now, Dr. Brislen, is this a

16   document that you've ever seen?

17       A.   I have seen documents that look similar to

18   this, but I don't know if this is the same as

19   something I've seen.

20       Q.   Well, do you see here at the top where

21   it's titled "Offender physical location history for

22   Billy Vidal Cordova, Jr."?

23       A.   Okay.  So I don't think I've seen this

24   before.

25       Q.   Okay.  And if we would just look at this
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    area covering 2016, do you see this entry that I am

2    underlining -- I'm sorry, somebody else's

3    underlining.  Do you see this entry that I am

4    underlining, circling?

5         A.   Is that January 21 or --

6         Q.   January 21.

7         A.   Okay.

8         Q.   Now, you can't read it because I marked it

9    up.  Now it's highlighted.  The January 21 entry

10   showing N3BX107.  Do you see that?

11        A.   Yeah.

12        Q.   And this is Billy Cordova's location

13   history.  Can you tell if Mr. Cordova was moved on

14   January 21, 2016, to N3BX107?  If you don't know,

15   it's okay.

16        A.   I can't tell if this is where he -- so if

17   you look at January 7 to January 21, I see -- okay.

18   So could you repeat the question?  From January 7 to

19   January 21 it looks like that corresponds to N3B and

20   then starting January 21 you see N3A.

21        Q.   And so it looks likes Billy Cordova --

22   then this entry changes.  Does it look like he's

23   moved on January 21, 2016 to N3AQ102?

24        A.   Yes, it does.

25        Q.   And this is on January 21, 2016; right?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7367

1      A.    Right.

2      Q.    Thank you.  I don't need Government's

3  Exhibit 770 anymore.  If we can just look at the

4  Elmo again.

5            So that is actually the same day where you

6  note a medication error?  Is that right?  January

7  21, 2016?

8      A.    That's right.

9      Q.    And after that time, very likely seizure

10 activity for Mr. Rudy Perez?

11     A.    That's right.

12     Q.    And if you'd like, I can show you Mr. Rudy

13 Perez' location history.  Are you aware that on

14 January 21 of 2016, Rudy Perez was in a cell next to

15 Billy Cordova?

16     A.    No, I didn't.  I mean, I wondered if

17 that's why we were looking at that, but I don't know

18 that.

19            MS. FOX-YOUNG:  Your Honor, I'll pass the

20 witness.  Oh, actually, I'm sorry.  I'd like to move

21 the admission of Defendants' FY.

22            THE COURT:  Any objection, Ms. Armijo?

23            MS. ARMIJO:  No objection.

24            THE COURT:  All right.  Anybody else have

25 any objection?  Not seeing or hearing any,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1  Defendants' Exhibit FY will be admitted into

 2  evidence.

 3          (Defendants' Exhibit FY admitted.)

 4          THE COURT:  All right.  Do any of the

 5  other defendants have any direct examination of Dr.

 6  Brislen?

 7          MS. DUNCAN:  No, Your Honor.

 8          THE COURT:  Not seeing any, Ms. Armijo, if

 9  you have cross-examination, you may do so at this

10  time.

11                  CROSS-EXAMINATION

12  BY MS. ARMIJO:

13      Q.   Good afternoon, Dr. Brislen.

14      A.   Hi.

15      Q.   Now, you previously testified before the

16  judge in this case, and was that in December 2017?

17      A.   November or December.  I can't remember.

18      Q.   All right.  And what have you done in this

19  case since you have testified in preparation for

20  your testimony today?

21      A.   I prepared a time line of medical events

22  based on a synthesis of the medical records, and

23  reviewed my notes in preparation to come here today.

24      Q.   Okay.  So you created the time line.  Is

25  that part of the notes that the United States just

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7369

1  received for the first time today?

2       A.   Yes.  I mean, and little scribblings,

3  notes that I made on the side.

4       Q.   Okay.  And so that is your exact -- that's

5  the only thing that you've done other than -- and

6  you said you reviewed the notes?

7       A.   Well, okay, so I had literally heaps of

8  notes to look through, medical records, and over the

9  course of the time that I've been doing this, since

10  a year and a half ago, I've accumulated notes and

11  little indexes that I made for myself, ways for me

12  to navigate, sort of, this enormous medical chart.

13  So to review that, I'd go back through my own

14  written notes, references that I've made to the

15  actual chart, and just like you would study for an

16  exam, I'm just refreshing and reviewing things.

17       Q.   Okay.  So you have refreshed and reviewed

18  the medical records in this case; is that correct?

19       A.   Sure.

20       Q.   And you've looked over your notes; is that

21  correct?

22       A.   Yes.

23       Q.   What opinions of yours have changed from

24  the time that you testified previously to today?

25       A.   I'm not sure that I'd be able to distill



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   that out.  One interesting thing that happened was
 2   I -- maybe a week ago I was reviewing my notes and
 3   the medication change from lacosamide to Keppra that
 4   we talked about a little while ago, I had not been
 5   able to find in the medical record justification for
 6   that.  And I did find it, and the trouble that I had
 7   been having was that the handwritten note from his
 8   physician wasn't legible, and in this intervening
 9   period I was able to better tease out what it said.
10   So I guess my opinion evolved regarding that
11   medication change because I was able to read
12   something that I hadn't previously been able to
13   read.
14        Q.   All right.  Any other changes since your
15   testimony?
16        A.   Not that I can think of off the top of my
17   head, no.
18        Q.   And you also wrote a report in this case;
19   correct?
20        A.   That's true.
21        Q.   And when did you --
22        A.   You're talking about the report from
23   August?
24        Q.   I don't know, because I was just provided
25   with it on Friday and it doesn't have a date on it.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Okay.

2      Q.   Maybe I should show you a copy of it.

3      A.   I'm familiar with it.

4      Q.   Okay.  You're familiar with it?  So you

5  say you wrote it in August?

6      A.   I believe so.

7      Q.   In what year?

8      A.   2017.

9      Q.   And it's not dated; correct?

10     A.   Probably not.  I think there is a date on

11  the file name in my computer, but I didn't put a

12  date at the top of the report.

13     Q.   Okay.  So there's no date of when you

14  wrote it.  Okay.  And you don't have Mr. Perez'

15  first name on it; correct?

16     A.   I'm not sure.

17     Q.   All right.  Would you like to see a copy

18  of that report?

19     A.   Sure.

20          MS. ARMIJO:  May I approach the witness,

21  Your Honor?

22          THE COURT:  You may.

23     A.   I think this is two copies.  Same thing.

24  BY MS. ARMIJO:

25     Q.   I'm sorry?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7372

```
 1        A.    That's okay.  Well, okay.  From what I can
 2   see here, I did not use his first name.
 3        Q.    All right.  And you also do not include
 4   his date of birth; correct?
 5        A.    Seems like probably not.
 6        Q.    All right.  And this report does not
 7   have -- we already talked about doesn't have the
 8   date; correct?
 9        A.    Right.
10        Q.    And you do not have, like, your name
11   anywhere on it either.
12        A.    Correct.
13        Q.    Okay.  And when you talk about things in
14   here, you don't ever say to a degree of medical
15   certainty; correct?
16        A.    The phrase -- I believe I did not use that
17   phrase.
18        Q.    Okay.  Why don't you explain to the jury
19   what that phrase is.
20        A.    I'm not sure what you mean.
21        Q.    Okay.
22              MS. FOX-YOUNG:  Your Honor, objection.
23   That's asking for a legal conclusion.
24              THE COURT:  Overruled.
25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7373

```
 1   BY MS. ARMIJO:

 2        Q.   Have you heard that term before?

 3        A.   Yes, I have.

 4        Q.   Okay.  Then what do you take that term to

 5   mean?

 6        A.   I would assume -- and I'm partly guessing

 7   here -- I would assume that in legal circles that is

 8   used as a way to quantify your degree of certainty.

 9        Q.   Well, when Ms. Fox-Young asked you a

10   question, one of the questions that she asked you

11   was if your opinion was based to a degree of medical

12   certainty and you said yes.

13        A.   When you say --

14             MS. FOX-YOUNG:  Your Honor, that misstates

15   the question.

16             THE COURT:  Overruled.

17        A.   When you say "to a degree," do you mean

18   like to a large degree or --

19   BY MS. ARMIJO:

20        Q.   I just mean -- have you ever testified

21   previously?

22        A.   No.

23        Q.   Okay.

24        A.   I mean, I testified in the hearing that

25   you were present at.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   Okay.

2       A.   And I've been deposed in another case.

3  This is my first time with a real jury in a

4  courtroom.

5       Q.   Okay.  So the question, then, in order to

6  give an opinion, an expert opinion -- and you're

7  here as an expert; correct?

8       A.   Yes.

9       Q.   Okay.  And when an expert gives their

10  medical opinion, it's usually to the degree of

11  medical certainty.  Okay?

12       A.   Okay.  Yes.

13       Q.   So I guess I'm going to ask:  In reference

14  to your report that you wrote, are the opinions that

15  you state to a degree of medical certainty?

16       A.   Based on what you're explaining, yes.

17       Q.   Okay.  And is all your testimony that you

18  gave in your opinions with Ms. Fox-Young -- were

19  those all to a degree of medical certainty?

20       A.   Yes.

21       Q.   All right.  Now, in regard to your report,

22  you also don't have any references; correct?

23       A.   Correct.

24       Q.   For instance, you talk about a great deal

25  of his medications and different treatments, but you

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 820-6349                                                FAX (505) 843-9492
                                                                  1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

 1    don't have references to where you found that

 2    information.

 3         A.    That's right.

 4         Q.    Okay.  And you also don't have any

 5    references as far as if you used any sources;

 6    correct?

 7         A.    In that report, that's correct.

 8         Q.    In that report.

 9         A.    That's right.

10         Q.    Okay.  So you have these opinions but it

11    doesn't say -- so it doesn't say -- for instance,

12    you talked about the med tool you use; correct?

13         A.    Correct.

14         Q.    Is that similar to what a pharmacist uses,

15    like, when I pick up medications and usually

16    sometimes I get warnings that say, you know,

17    "Warning.  You shouldn't be taking this with that."

18    And the pharmacist will say, you know, "These two

19    medicines, you know, come up with an interaction."

20    Is that the same sort of tool?

21         A.    I don't know what pharmacists use.  I

22    mean, their level of expertise in terms of

23    medications is pretty expansive.  Most of the things

24    that they would run across that would automatically

25    print out on a prescription that you would pick at

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   Walgreen's are going to be automatically generated
2   by databases that we -- you know, the computer
3   systems that we use.
4        Q.   Okay.  Now, you just mentioned
5   pharmaceuticologists (sic).  They're better suited
6   as far as giving opinions about medicines, correct,
7   and the interactions?
8        A.   Yeah.  It depends.  I mean, we are the
9   prescribers, because we're the ones reading the
10  actual interactions in the patients.  They are -- I
11  think of them more as, like, expert chemists.  They
12  understand the interactions of medications with each
13  other in a way that reflects their expertise and
14  their training different than clinical care.
15       Q.   Okay.  So could you agree that
16  pharmaceuticologists -- and there are
17  pharmaceuticologists; experts?
18       A.   I'm not familiar with the word
19  "pharmaceuticologist."  I work with a lot of
20  pharmacists.
21       Q.   Okay.  Are you aware of another expert?
22  Have you worked with -- let me ask this.  Have you
23  worked with any other expert in this case regarding
24  Mr. Perez' medications?
25       A.   No.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   All right.  Now, you talked about the
 2   medical records that you reviewed.  And would it
 3   surprise you that it's actually 14,913 pages?
 4        A.   I'm not surprised.  It's -- but I didn't
 5   count them.  What did I say?  10,000 to 12,000?
 6        Q.   10,000 to 12,000.
 7        A.   Yeah.
 8        Q.   Now, and that is the extent of what you
 9   have based your opinions on here today; correct?
10        A.   Correct.
11        Q.   Okay.  Now -- and there's, I guess, two
12   time lines and I'm going to talk about two different
13   time periods here, and you refer to them in your
14   reports.  I'm going to go first to March of 2014.
15   And during that time period are you aware that Mr.
16   Perez actually gave an interview after the murder of
17   Javier Molina?
18        A.   What kind of interview?
19        Q.   An interview with law enforcement.
20        A.   Oh, no.  I wouldn't be aware of that.
21        Q.   Okay.  Would that be something that would
22   be important for you to consider?
23        A.   I don't think so.
24        Q.   Well, you talk about how during that time
25   period, I believe the term -- and I can go back and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7378

```
 1  look -- that you used was that he was fragile;
 2  correct?
 3       A.   Correct.
 4       Q.   Okay.  And you talked about all these
 5  different possibilities with the medications he's
 6  taking; correct?
 7       A.   Probably.  In the report, did I talk about
 8  his drug interactions?
 9       Q.   No.  I'm just asking you now in general.
10  I'm not talking about the report.
11       A.   Okay.  Could you repeat the question?
12       Q.   Okay.  In March of 2014, I think you just
13  testified as to what you believed his physical
14  condition was; correct?
15       A.   Yes, that's correct.
16       Q.   And did you use the term "fragile"?
17       A.   I believe I did.
18       Q.   Okay.  And then you talked about the
19  possible side effects of these drug interactions;
20  correct?
21       A.   Correct.
22       Q.   Okay.  And some of which -- and what are
23  these possible side effects, again?
24       A.   So the side effects that we just discussed
25  in particular are sedation, constipation and GI
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  upset; nausea, constipation, upset stomach, things

2  like that.  Itching was another one that we talked

3  about.

4      Q.    So I guess I'll go with sedation.

5      A.    Okay.

6      Q.    If there was a recording of him in March

7  of 2014 while he was under the effects of this

8  medicine, wouldn't it be something that you

9  should -- could consider in listening to see if he

10  was, in fact, sedated by these medicines?

11      A.    I'm not sure that I would know.

12      Q.    You're not sure that you would know?

13      A.    Based on an audio recording of somebody's

14  voice, whether or not they're sedated?

15      Q.    Correct.

16      A.    I am not sure I would know.

17      Q.    Okay.  So what's your definition of

18  "sedated"?  I guess I should ask that.

19      A.    Sedated can be anything from tired to

20  incapacitated.  So sedation waxes and wanes and can

21  be fatigue to inability to complete tasks, drive

22  safely, diminished reflex times goes along with

23  sedation, things like that.

24      Q.    And your testimony is not that under this

25  possible sedation that a person is not able to



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7380

1  understand what they are doing; correct?

2       A.   That would be one of the variables that

3  would be an extreme case of sedation, if you don't

4  know what you're doing.

5       Q.   Okay.  So in order to consider if Mr.

6  Perez was under any sedation to any degree -- for

7  instance, you said extreme sedation would be

8  unconsciousness; correct?

9       A.   You could say that that would be an

10 extreme state of sedation.

11      Q.   Okay.  So we can rule out at least on the

12 date of his interview -- and I believe it was March

13 10th, 2014 -- that he was -- if he's able to give an

14 interview to law enforcement, that he was not under

15 extreme sedation at that point in time.

16      A.   That he was not unconscious.

17      Q.   That he was not unconscious.

18      A.   Correct.

19      Q.   Okay.  And you're not saying that -- and

20 if he was able to understand questions and respond

21 to questions in a logical manner, what's your

22 opinion about that?

23      A.   It's too subtle of a question for me to

24 form a medical opinion on.  I don't have an opinion

25 on that.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   But you have an opinion on possible side

2   effects, but you're saying that actually listening

3   to somebody talk, that wouldn't come into your

4   opinion?

5    A.   I am not able to diagnose someone just

6   based on an audio recording.  So it's a different

7   thing to talk about their -- the effects that you

8   would counsel someone that they might experience,

9   and then ask them about the symptoms that they're

10   experiencing and how they feel, than to perceive

11   them in a moment in time and try to make a judgment

12   about what their status is.  I just don't feel

13   comfortable offering a medical opinion on that.

14    Q.   Okay.  But you feel comfortable talking

15   about the effects of these medications on Mr. Perez;

16   correct?

17    A.   I feel comfortable talking about the

18   effects of these medications, yes.

19    Q.   All right.  And so I'm going to assume,

20   then, that you also did not listen to any of the

21   hours and hours of recordings that he had in 2016;

22   correct?

23    A.   I have never listened to a recording made

24   by Mr. Perez.

25    Q.   All right.  And in reference to those

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7382

 1  recordings, specifically in 2016, in your report I
 2  believe you phrased it, because you address it, that
 3  he is accused of confessing.  I believe that's the
 4  term that you used; correct?
 5       A.   That might be true.  I'm sorry, I don't
 6  remember that sentence.
 7            MS. FOX-YOUNG:  Your Honor, objection,
 8  hearsay.
 9            THE COURT:  If it's part of her report and
10  what she said.
11            MS. FOX-YOUNG:  Your Honor, the report
12  wasn't prepared for trial.
13            THE COURT:  Well, you elicited a lot of
14  stuff out of court statements, so if this is in her
15  report, she can be examined about it.
16       A.   Okay.
17  BY MS. ARMIJO:
18       Q.   Is that what you have in your report?
19       A.   Are you reading it off the report?  I
20  believe you.
21       Q.   Well, if you want to look at your report,
22  I'll be more than happy to provide it to you.
23       A.   Okay.  I wonder if you could help me find
24  what you're looking for, because there are some
25  duplicate pages in here.  I mean, I'm happy to dig

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   through it, but I'm not sure what I'm looking for.
 2        Q.   Sure.  Page 6.  The second new paragraph.
 3   So third paragraph total.
 4        A.   Yes, I wrote that around the time that
 5   Mr. Perez is accused of confessing to a role.
 6        Q.   In a murder?
 7        A.   In a murder.  In the murder; right.
 8        Q.   Okay.  And so I guess I'm wondering where
 9   you got that information, since we know that you
10   only reviewed medical records.
11        A.   So the attorneys I have been working with
12   let me know that the areas of interest that were
13   particularly relevant in this trial were the date of
14   the murder and then something that happened in
15   January or February of 2016, which was that he was
16   accused of confessing to the murder at that time.
17        Q.   All right.  And that was their
18   characterization of it?
19        A.   I would say that was their
20   characterization of it.
21        Q.   Now, just to be clear, I believe you
22   testified to this.  You did not perform an
23   evaluation on Mr. Perez; correct?
24        A.   Correct.
25        Q.   But you've been here -- today is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Wednesday.  You came in on Monday afternoon; is that

2  correct?

3       A.   Yes.

4       Q.   And so have you had an opportunity to

5  watch him get up in between court sessions and go

6  over and throw things away?

7       A.   No, I didn't.  I did watch him walk in one

8  day after a break.

9       Q.   Okay.  And so you haven't witnessed him

10  actually walk even without the assistance of a cane?

11       A.   Correct, I have not.

12       Q.   All right.  You talked about -- again,

13  this is in your report, and you testified to it --

14  that he has a low IQ number.  What is that number?

15       A.   I don't know.

16       Q.   What do you base that opinion on?

17       A.   Medical records.

18       Q.   Which medical records?

19       A.   I believe that that was mentioned a couple

20  of different times on psychiatry initial evaluation

21  notes.  So that would be the first note done by a

22  psychiatrist at one of the facilities right after

23  he's taken in there.  As I mentioned before,

24  psychiatrists talk about these five different axes

25  of mental health, and so the background of your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7385

1  psychosocial or innate congenital things that you

2  may have had since childhood are included as one of

3  those, and I believe that's where it was mentioned.

4      Q.   So you cannot tell this jury exactly what

5  his IQ is; correct?

6      A.   Correct.

7      Q.   And you can't tell this jury whether or

8  not his low IQ comes from an actual test or whether

9  that is something self-reported?

10      A.   Correct.  I don't know.

11      Q.   Okay.  So you really can't say to a degree

12  of medical certainty that he has a low IQ; correct?

13      A.   I would say that if someone that's a

14  colleague of mine by virtue of being a physician

15  puts it in their note, then I have a degree of

16  medical certainty to trust that, unless there's

17  other evidence of something else.  I hope that's

18  clear.  But medical records have a lot of problems,

19  and discerning how to filter out what's valid and

20  what's not is difficult.  So I have some degree of

21  certainty.  I'm not confident.

22      Q.   So you're not confident; correct?

23      A.   That he has a low IQ?

24      Q.   Yes.

25      A.   I'm not sure how to quantify it.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Okay.  So maybe we can take that off of

2    your expert opinion as far as the fact that he has

3    low IQ, because you just say you're not certain of

4    it.  Would that be reasonable?

5    A.   Sure.

6    Q.   Okay.  Now, you also talked about IED.

7    Explain to the jurors what that is.

8    A.   That's intermittent explosive disorder.

9    Q.   Okay.  And you indicated that it's

10   something similar to -- I believe that it's a

11   diagnosis when other things can't be found; correct?

12   A.   Diagnosis of exclusion.

13   Q.   Much like SIDS?

14   A.   No, I don't know anything about SIDS, not

15   being a pediatrician.  Sorry.

16   Q.   Then I won't use that.  So are you

17   familiar with the DSM-IV?  I guess the current one

18   is DSM-V that was effective as of May 2013; correct?

19   A.   I have no idea when it was published, but

20   DSM-V is the current psychiatric diagnostic manual.

21   Q.   And the DSM-IV is the one prior to it?

22   A.   Correct.

23   Q.   In looking it up, it appears that the

24   DSM-V came out in May of 2013.

25   A.   Okay.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So I'm going to be talking to you about
 2   medical records that were before -- that include
 3   before that date.
 4        A.   Okay.
 5        Q.   Now, going specifically to the
 6   intermittent explosive disorders --
 7             THE COURT:  Ms. Armijo, I'm wondering if
 8   we ought to take our break before you go into this
 9   next segment.  Would this be a good place to take
10   our lunch break?
11             MS. ARMIJO:  Yes, Your Honor, it would be.
12   Thank you.
13             THE COURT:  All right.  We'll be in recess
14   for about an hour.  All rise.
15             (The jury left the courtroom.)
16             MS. ARMIJO:  Your Honor, can you please
17   admonish the witness not to have any discussions
18   during the lunch period, since she's in
19   cross-examination?
20             THE COURT:  You're on the stand right now,
21   so you're in the middle of cross-examination.  So
22   don't discuss your testimony with anyone.
23             THE WITNESS:  All right.
24             THE COURT:  We'll be in recess for about
25   an hour.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7388

```
 1              (The Court stood in recess).
 2              THE COURT:  All right.  Let's go back on
 3    the record.  Ms. Fox-Young, do you want to complete
 4    your request and let me -- let anybody else speak on
 5    that?
 6              MS. FOX-YOUNG:  Your Honor, I'll note that
 7    sometime in the last -- I think in the last few
 8    minutes, a stack of documents that appears to be
 9    maybe at least six inches high, almost six inches
10    high, has been provided to each defense team.  I
11    haven't had a chance to look at it.  I know some of
12    the other counsel have begun to look at it, and
13    there is a lot of material which we would certainly
14    classify as exculpatory, certainly material to Mario
15    Rodriguez's testimony, including admissions to the
16    rapes, which I think he denied in part.
17              And you know, Your Honor, we'll just have
18    to supplement the record at such time as we can look
19    at these hundreds of pages.  So we have asked for
20    the Court to strike Mario Rodriguez' testimony, and
21    in writing I will inform the Court, in addition to,
22    of course, the Government's ongoing Brady and Jencks
23    obligations, and the Brady obligations are not
24    something the defense is required to alert the
25    Government to.  This should have been turned over of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7389

```
 1   their own accord a long time ago, but I would alert
 2   the Court to the prior rulings that are pertinent,
 3   and we'd ask that that testimony be stricken.
 4            I also am requesting any other documents
 5   that the FBI has that pertain to these informants,
 6   including writings of the informants.  And I'd ask
 7   the Court to find a Brady violation on that basis,
 8   Judge.
 9            THE COURT:  All right.  Thank you,
10   Ms. Fox-Young.
11            Did you have something you want to say on
12   this issue, Mr. Lowry?
13            MR. LOWRY:  Not on this issue with regard
14   to the Rodriguez documents.  But I did have
15   something with regard to the FBI field notes.
16            THE COURT:  Let me do this.  Let me get
17   the response so that I have it in my mind and I can
18   be thinking about it, and then I'll come back to
19   you, Mr. Lowry.
20            MS. FOX-YOUNG:  Your Honor, just one other
21   item.  We moved for a mistrial on the basis of Ms.
22   Armijo's questioning as to Mr. Perez' ability to
23   walk.  He's shackled.  She can't cross this witness
24   on that subject because Mr. Perez is shackled.  And
25   there were numerous questions about:  Did the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  witness see him walking?  Did the witness see him

2  moving around?  The answer is:  He cannot freely

3  walk.  He is shackled.  And on that basis, we had

4  move for a mistrial.

5        THE COURT:  Well, I recall her testimony

6  as saying she didn't see it.  She said she wasn't

7  watching him and didn't see him do it.  So I don't

8  think there is any prejudice, because she denied she

9  saw any of it.

10        MS. FOX-YOUNG:  Well, Your Honor, I still

11  think if he weren't shackled, I'd be able to cross

12  on that subject, and I can't.  But I understand the

13  Court's ruling.

14        MR. MAYNARD:  Your Honor, just briefly.

15        THE COURT:  Are you going to speak on this

16  stack of materials?

17        MR. MAYNARD:  Yes, just to join in that

18  request and move to strike Mr. Rodriguez' testimony.

19        THE COURT:  Okay.  All right.  Mr. Beck.

20        MR. BECK:  Your Honor, as I said, the FBI

21  just found out about these documents.  As soon as

22  those documents made their way down here, I made

23  sure that they were copied overnight and into the

24  morning.  We provided them to them as soon as they

25  got into the courthouse.  I walked them up to the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    attorneys so they had a hand on them.

2            I do not believe that any of these

3    documents are material.  I don't believe many of

4    them, aside from the letter, are exculpatory.  And I

5    don't believe the letter is exculpatory; the rest of

6    the documents less so.  But do I not believe that

7    they are material, so there is no Brady or Giglio

8    violation.

9            We have been diligent in getting this

10   information to the defendants, in the defendants'

11   hands, as much as we can, and I'm not saying that it

12   wasn't just provided just now, but it's been a

13   diligent effort.  I think that the requested relief

14   is extreme, because we are still in trial.  We gave

15   it to them as quickly as possible, and they are

16   still able to use it.  In fact, the defendants asked

17   that we make sure Mr. Rodriguez is available to be

18   recalled, and we've done that.  They asked for Mr.

19   Sainato to be here so he could appear if they had to

20   call him for questioning.  We did that.

21           So the United States has made both

22   witnesses available.  It's produced the documents as

23   quickly as it was able to.

24           And the second request, that all writings

25   in the United States' possession be turned over for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   the cooperators -- you may order that if you wish,

2   but all of the writings have been turned over.  They

3   have all of those, aside from -- I don't know if

4   they're currently sitting in the cells with the

5   defendants -- with the cooperators.  I don't know if

6   they contemporaneously have writings with them.  But

7   any that are in the United States' possession have

8   been turned over.

9          THE COURT:  So you don't oppose any order

10  ordering you to turn over those documents.

11         MR. BECK:  The United States does not

12  oppose that.

13         THE COURT:  All right.  So I'll so order

14  that.  Then let's do this.  Let's just see what's in

15  the stack of material, and then we'll kind of have

16  to make a call after we're better informed on it.

17         MS. FOX-YOUNG:  Your Honor, if we could

18  have the opportunity to question Agent Sainato

19  outside of the presence of the jury at some point,

20  if the Government has made him available.

21         THE COURT:  Well, does it even need to be

22  here?  Do I need to hear it?  Can they just talk

23  to --

24         MS. FOX-YOUNG:  I'd like to do it on the

25  record, Judge.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1            MR. BECK:  They can talk to him.  That's
 2  fine.  We'll make him available.
 3            THE COURT:  Why don't you just talk to
 4  him.  If there is a need to put something on the
 5  record, we can.  But why don't you start by just
 6  talking to him.
 7            All rise.
 8            (The jury entered the courtroom.)
 9            THE COURT:  All right, Dr. Brislen.  I'll
10  remind you that you're still under oath.
11            Ms. Armijo, if you wish to continue your
12  cross-examination of Dr. Brislen, you may do so at
13  this time.
14            MS. ARMIJO:  Thank you.
15  BY MS. ARMIJO:
16      Q.   I believe before lunch we were talking
17  about intermittent explosive disorders.
18      A.   You were -- yes, either of -- the DSM-IV.
19      Q.   And I believe that you had indicated that
20  you saw on some psychiatric evaluations how that had
21  been part of his diagnosis; correct?
22      A.   Correct.
23      Q.   And you also indicated that that can only
24  be considered -- only -- you didn't say this, but
25  I'm referring to the DSM-IV, and I want to see if
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you agree with this -- only after all other
 2   disorders that are associated with aggressive
 3   impulses or behavior can be ruled out.
 4        A.   That terminology you just read is
 5   consistent with what I think of as diagnosis of
 6   exclusion, which we were talking about.
 7        Q.   All right.  And that's to be different
 8   from purposeful behavior, which includes the
 9   presence of motivation and gain in an aggressive
10   act; correct?
11        A.   I'm sorry.  Could you clarify the
12   question?
13        Q.   Well, aggressive behavior -- a person can
14   have aggressive behavior when there is no mental
15   disorder; correct?
16        A.   Right.  That's right.
17        Q.   And so the purposeful behavior can be
18   distinguished, different, from the intermittent
19   explosive disorder.
20        A.   Like behavior can happen without
21   impulsivity; that's correct.
22        Q.   Right.  All right.  But you are aware from
23   going through his medical records and his
24   psychiatric records that he also has a diagnosis
25   consistently for antisocial personality disorder.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    That's true.
 2        Q.    Okay.  And what is your understanding of
 3   antisocial personality disorder?
 4        A.    Personality disorders are complicated, and
 5   they're a bit controversial, I'd like to mention as
 6   well.  So a personality disorder is a way of
 7   categorizing --
 8        Q.    I'm sorry.  I was talking about antisocial
 9   personality disorder.
10        A.    I don't feel I can categorize that without
11   talking about what a personality disorder is.
12        Q.    All right.  Go ahead.
13        A.    So personality disorders are ways of
14   categorizing what we consider to be abnormal
15   behavior for which there is no known cause and no
16   cure.  So it's a permanent label to put on someone,
17   which -- the reason why they're controversial is
18   because among the medical community, if there is no
19   cause and no treatment, is it really a disorder at
20   all, or how would you categorize that, is the
21   question.
22              So antisocial personality disorder is one
23   of the seven, I think, types of personality
24   disorders, and it has to do with not following usual
25   social norms about behavior in terms of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  cause-and-effect consequences of your actions, usual
 2  mores and customs.  Does that make sense?
 3       Q.   Well, I'm asking you if that's what you
 4  believe antisocial personality disorder is.
 5       A.   That's -- I would characterize it that
 6  way.
 7       Q.   Okay.  Would you also agree with the
 8  DSM-IV that individuals with antisocial personality
 9  disorder frequently lack empathy and tend to be
10  callous, cynical, and contemptuous for the feelings
11  and rights and sufferings of others?
12       A.   That is how it is described.
13       Q.   And in fact, they show little remorse for
14  the consequences of their acts?
15       A.   Right.  That's what I was talking about
16  with the consequences, cause and effect.
17       Q.   Okay.  And somebody with that can also be
18  referred to as a psychopath, a sociopath, or a
19  psychopathy; is that correct?
20       A.   I can't comment on that.  I don't know if
21  those two things are equivalent.
22       Q.   Okay.  Because deceit and manipulation are
23  central features of an antisocial personality
24  disorder.
25       A.   Okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Would you agree with that?

 2        A.    I believe you.  If you're reading from the

 3   DSM-IV, that seems reasonable.

 4        Q.    Okay.  So that seems reasonable.  And you

 5   would agree that his psychiatric records include

 6   more often than the IED the antisocial personality

 7   disorder diagnosis.

 8        A.    That diagnosis is definitely in there.  I

 9   can't comment as to which one happens more

10   frequently, which one is written down more

11   frequently.

12        Q.    But you didn't mention this one in your --

13   you talked a great deal about the medical records

14   and everything else as far as your conclusions and

15   significance.  But you failed to mention the

16   antisocial personality disorder.

17        A.    In the report?

18        Q.    In your direct.  No, in your direct.

19        A.    Oh, okay.

20        Q.    Is that true?

21        A.    I don't think we talked about it in

22   direct.

23        Q.    Okay.  And do you disagree with me that

24   it's in there a great deal?  Because I'm looking at

25   the medical records, and I'm more than happy to show
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7398

1    you some.

2        A.    No, no, I know it's in there.

3        Q.    Okay.  And it's in there and it dates back

4    several years.  Why don't you tell the jury when

5    that started.

6        A.    I don't know.  I would assume around the

7    same time that I saw IED, which might be as early as

8    '92.  It might be in his very first medical records.

9        Q.    Okay.  You didn't take note of that as far

10   as in your timetable and everything else?

11       A.    Right.  So the reason for that, if you'd

12   like me to explain, is because, as I mentioned,

13   personality disorder is a label that's permanent for

14   which there is no treatment.  So whether or not

15   that's relevant to his health care is -- personality

16   disorders don't always get recorded by internal

17   medicine people because they're sort of just -- this

18   sounds very callous and I'm sorry for the gallows

19   humor, but in internal medicine circles, we

20   sometimes refer to personality disorder people as

21   wacky and wild.  They're just kind of different.

22   But it's not something that necessarily -- yeah.  I

23   don't know what else to say.  Personality disorders

24   are special among diagnoses.

25       Q.    Okay.  Well, but I think you're trying to



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7399

```
 1   give this jury a complete picture of Mr. Perez;
 2   correct?  His health?
 3        A.   That's correct.
 4        Q.   And I believe that a lot of questions were
 5   elicited about his mental health; correct?
 6        A.   That's true.
 7        Q.   Okay.  But yet you purposely left off the
 8   antisocial personality disorder; correct?
 9        A.   I didn't think to mention it.
10        Q.   All right.  Now --
11             MS. FOX-YOUNG:  Your Honor, at least one
12   of the jurors is just motioning that they're having
13   trouble hearing the witness.
14             JUROR:  Ms. Armijo.
15             MS. ARMIJO:  Oh, I'm sorry.  I'm the
16   offender.  I'm so sorry.  I will try not to walk
17   away from the mic.
18   BY MS. ARMIJO:
19        Q.   And individuals with antipersonality (sic)
20   disorders tend to be irritable and aggressive and
21   may repeatedly get into physical fights or commit
22   acts of physical assault.  Would you agree with
23   that?
24        A.   That's my understanding.
25        Q.   Okay.  Now --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7400

```
 1           MS. FOX-YOUNG:  Your Honor, we just ask
 2  for a limiting instruction as this evidence can't be
 3  offered for propensity purposes.  And if you'd like
 4  us to approach.  I don't need to approach.
 5           THE COURT:  What did you offer your
 6  testimony for?
 7           MS. FOX-YOUNG:  Well, I think this is
 8  propensity evidence.  I don't think --
 9           THE COURT:  What did you offer yours for?
10           MS. FOX-YOUNG:  We didn't offer any
11  propensity evidence.
12           THE COURT:  What is it offered for, then?
13           MS. FOX-YOUNG:  Your Honor, if the Court
14  declines to give a limiting instruction --
15           THE COURT:  Well, I guess I need to know
16  what you offered it for.
17           MS. FOX-YOUNG:  Well, we didn't offer
18  evidence for -- we didn't offer any propensity
19  evidence, Judge.
20           THE COURT:  That's not my question.  What
21  did you offer it for?
22           MS. FOX-YOUNG:  Your Honor, we offered it
23  to demonstrate that Mr. Perez didn't agree, as is
24  charged in this case, among other purposes.
25           THE COURT:  Well, I'm not understanding
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   your objection.  Overruled.
 2   BY MS. ARMIJO:
 3        Q.   And just to be clear, there are several --
 4   and I can show you this, just to refresh your
 5   recollection, specifically going to March of 2013
 6   and April of 2013, and January of 2013 and February
 7   of 2013.  And I don't have a problem.  I can
 8   certainly show you these.
 9        A.   What are we talking about?
10        Q.   Well, I'm getting there.  I'm just putting
11   it in reference to a time period.
12        A.   Okay.
13        Q.   So specifically from January 2013 through
14   April of 2013 that on his New Mexico Corrections
15   Department psychiatric encounter -- which you're
16   familiar with those records; correct?
17        A.   I am.
18        Q.   Because he was seen by a psychiatrist, or
19   at least they attempted to see him, at least every
20   month; correct?
21        A.   Right.
22        Q.   That there is no mention of IED but there
23   is mention of the antisocial personality disorder.
24        A.   Okay.
25        Q.   Do you want to see those?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



1    A.    I can concede that.  That makes sense that

2  those would be there.  If you would like me to

3  verify it, I will.

4    Q.    Well, I believe you were saying that you

5  thought that most of the records have both the

6  antisocial personality disorder and the IED;

7  correct?

8    A.    No, I just said I can't tell from my

9  memory which one occurs more frequently in the

10  record.  I thought you were saying there is a tally

11  of some kind, and I think they're both in there,

12  they're both in there a lot, but I don't know which

13  one is there more.  That's all I was trying to say.

14    Q.    Well, would you agree with me that at

15  least during the time period -- because this, at

16  least in 2013 -- because that 2013 I believe is in

17  one of your charts -- I don't know where the charts

18  are.  Let's see.

19    A.    We talked about 2013 extensively.  All

20  those months -- or all those dates that you

21  mentioned I think was when he was in the hospital

22  incarceration environment.

23    Q.    All right.  So you would not disagree with

24  me that during a lot of those medical records --

25    A.    Right.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   -- they have him -- they evaluated him
2  quite extensively; correct?
3    A.   That's true.
4    Q.   And they have him down as having
5  antisocial personality disorder.
6    A.   Sure.
7    Q.   And not IED.
8    A.   Okay.
9    Q.   And then -- now --
10   A.   So I don't -- sorry.  Go ahead.
11   Q.   All right.  But you did not include that
12 in either your testimony or your report; correct?
13   A.   I don't know if it's in the report.  I can
14 check, if you like.
15   Q.   Well, I believe there is a mention of it.
16 There actually may be.
17   A.   There is.  It's actually in the second
18 line.
19   Q.   Okay.  Where you talk about low IQ; is
20 that correct?
21   A.   Low IQ, antisocial personality disorder.
22   Q.   We already kind of ruled out that you're
23 not going to be considering him low IQ right now;
24 correct?  To a degree of medical certainty.  That's
25 what we discussed before lunch.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7404

```
1        A.    That's right.
2        Q.    Okay.  So -- but you don't disagree that
3   there have been findings by people who actually
4   examined Mr. Perez who are experts in this field,
5   not internal medicine, but actually in psychiatry or
6   mental health?  I'll put it mental health.
7        A.    Psychiatry is correct.
8        Q.    Okay.  Psychiatry.  Even better.  That
9   gave this diagnosis; correct?
10       A.    So he was given that diagnosis before the
11  medical records that I saw, and he carried that
12  diagnosis throughout.  I don't believe that's an
13  example of chart lore.  I think he does have that
14  diagnosis.
15       Q.    You think he does?
16       A.    Yeah.
17       Q.    Okay.  Now, and you are being paid by Mr.
18  Perez' defense; correct?
19       A.    I believe I'm contracted by the
20  Government.  I'm paid by the infrastructure that
21  supports this whole process.
22       Q.    They did hire you, though.
23       A.    They did hire me, yes.
24       Q.    Okay.  Now, there is also in those medical
25  records refusals of Mr. Perez to participate in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  therapy or go to appointments.

 2       A.   That's right.  He declines appointments.

 3       Q.   And there's also inconsistencies with what

 4  he tells providers about his childhood and any

 5  issues of -- issues regarding his childhood.  Would

 6  you agree with that?

 7       A.   That is true.  There are different

 8  accounts, yeah.

 9       Q.   By him.  Sometimes he mentions certain

10  events and sometimes he does not.  Like he denies

11  certain events and other times he relates certain

12  events?

13       A.   That's right.  You have to be a little bit

14  careful about history-taking that happens.  I think

15  in some cases it seems like he's told a different

16  story on different occasions, and at other times it

17  sounds like, reading those notes, questions may have

18  been asked a different way and therefore it comes

19  out differently.

20       Q.   Well, but they're very specific as to

21  certain things; correct?

22       A.   That's true.

23       Q.   And you would agree that sometimes -- and

24  if you want, I can ask, but there are certain things

25  that are very sensitive in his past; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    That's correct.

 2        Q.    And there are certain times that he admits

 3   to those actions; correct?

 4        A.    Yes.

 5        Q.    And there are other records in there where

 6   he's asked about those incidents and he denies any

 7   of it.

 8        A.    Yes, I think that's true.

 9        Q.    All right.  Now, are you aware that there

10   is at least an allegation that he is an SNM Gang

11   member?

12        A.    By virtue of being in this courtroom, yes,

13   I've gathered that.

14        Q.    All right.  And in some of the medical

15   records that were provided to you, there is also a

16   mention of that.

17        A.    That may be true, but I can't recall.

18        Q.    You can't recall?

19        A.    That the medical records said that he was

20   a gang member?  No, I just --

21        Q.    No, not -- okay.  Let me go back.  I guess

22   I can get into this area now.  You mentioned that he

23   had several traumatic events regarding -- let's

24   start with the traffic accidents.

25        A.    Okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Did you see those medical records?

2    A.   No.

3    Q.   Okay.  So you have no idea of the severity

4  of injuries, correct?  From medical records.

5    A.   Disagree.  I think that I saw sequela

6  medical records, follow-up medical records, that

7  documented those injuries sufficiently.

8    Q.   Every one of those injuries?  Let's

9  talk -- how many injures were there?

10    A.   I don't know.  I have to say that in my

11  notes I wrote occasionally TNTC, which is an

12  abbreviation for too numerous to count, when it

13  comes to physical injuries.  So they were documented

14  in different ways.  I would not be able to

15  reconstruct the car accidents individually and tell

16  you what happened in each one.

17    Q.   But you're telling the jury that's

18  significant to you; correct?

19    A.   What do you mean?

20    Q.   Well, you were telling the jury about his

21  car accidents and the trauma that was inflicted on

22  him; correct?

23    A.   That's right.

24    Q.   Okay.  But you can't give this jury an

25  idea of any exact details as to when these injuries

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  occurred, if you saw -- I'll do one at time.  You

2  can't tell this jury when any of these accidents

3  occurred?

4        A.   I know he had car accidents in 2002 and

5  again in 2005.

6        Q.   Okay.  That's two incidents; correct?

7        A.   Yes.

8        Q.   Are there any others?

9        A.   There were references to others that I

10 couldn't confirm that they were distinct from those,

11 so I'm not sure.

12       Q.   Okay.  So then we'll narrow it down that

13 your testimony is then -- since you don't know about

14 any of the others, so you can't really talk about --

15 2002 and 2005; correct?

16       A.   So what I feel like I'm testifying on is

17 accumulated trauma and physical health in a certain

18 period of time that I have records for, and those

19 are attributed to these car accidents or attributed

20 to injuries that happened outside of the medical

21 records.  I'm a little bit puzzled about what you're

22 asking.

23       Q.   Well, I'm trying to get to the point that

24 you rely on these medical records a great deal;

25 correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7409

```
 1        A.    Yes.
 2        Q.    That's the only thing that you base your
 3   opinion on.
 4        A.    Correct.
 5        Q.    Okay.  But wouldn't it be important -- if
 6   there is information that's incomplete in here, then
 7   your information is incomplete; correct?
 8        A.    I've never encountered a medical record
 9   that was actually complete.  So I suppose, yes, it's
10   always incomplete, yes.
11        Q.    Okay.  Well, you're here to give the whole
12   health picture for the relevant time periods;
13   correct?
14        A.    That's right.
15        Q.    We heard a lot about these relevant time
16   periods.  And so when you talked about trauma in a
17   generalized way -- and I'm just trying to get
18   specific information from you.
19        A.    Okay.
20        Q.    Okay.  So you mentioned 2002 and 2005;
21   correct?
22        A.    That's right.
23        Q.    Okay.  And those are the only ones that
24   you can tell this jury that you are aware of it
25   being documented; correct?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7410

```
 1        A.    That's right.

 2        Q.    And by "documented," you just mean

 3   referred to.  You did not see the actual -- any --

 4   by documented, you saw, like, self-admissions to it;

 5   correct?

 6        A.    Or a physician's reference to it, yeah.

 7        Q.    Okay.  Did you see any CAT scans?

 8        A.    No.

 9        Q.    Did you know whether or not in these two

10   car accidents -- whether or not he was unconscious?

11        A.    There was reference to him losing

12   consciousness, yes.

13        Q.    Okay.  Any reference for how long that

14   consciousness was?  I believe you talked --

15        A.    No.

16        Q.    No?  Okay.  Any reference on whether or

17   not was any permanent damage from this?

18        A.    Yes.

19        Q.    Okay.  For which incident?

20        A.    That's a good question.  I can't recall

21   whether there was a distinct reference to the car

22   accident of 2002 specifically worsening his seizure

23   disorder, or whether that was sort of a summary

24   statement made after the car accident in 2005.  I

25   don't remember.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.   So you can't tell the jury which incident
 2   it was, but your recollection is that somewhere
 3   there is a reference that it may have impacted his
 4   seizure disorder?
 5        A.   There are several references to the fact
 6   that these car accidents impacted his seizure
 7   disorder.
 8        Q.   Okay.  But again, you didn't see any of
 9   the records or know -- or anything about
10   hospitalization, CAT scans or anything else;
11   correct?
12        A.   Right.
13        Q.   Because that would have been even more
14   valuable to you, to go straight to the horse's mouth
15   to make your determination; correct?  So to speak?
16        A.   Sure, yes.  The more information, the
17   better.
18        Q.   All right.  So -- okay.  That's the car
19   accidents.  And then you talked about stabbings, I
20   believe.
21        A.   That's right.
22        Q.   Okay.  And where was the stabbing?
23        A.   I have multiple.  There are records of
24   multiple stabbing injuries to the chest and abdomen,
25   and those are documented extensively, actually.  So
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349





MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    every time he has a comprehensive physical exam,

2    there's documentation of the scars.  Sometimes

3    that's done generally and it just says several

4    abdominal scars.  Other times there have been

5    drawings where those are marked where those were.

6         Q.   But those are references to evidence of a

7    stabbing.  I'm talking specifically about when the

8    stabbings occurred and how.

9         A.   That's right.  I don't have specific

10   records of him being stabbed during the time that I

11   evaluated the records.

12        Q.   Okay.  And is there any self-reporting to

13   this that you recall?

14        A.   Yes.  Absolutely, yes.

15        Q.   Okay.  And what is the self-recording by

16   Mr. Perez as to the stabbing?

17        A.   Describing the same thing, multiple

18   stabbing injuries in abdomen and chest.

19        Q.   Okay.  What about when these stabbings

20   occurred and the circumstances?

21        A.   I don't recall.  I'm sorry.  I mean --

22   well, I don't recall.

23        Q.   So you can't tell this jury anything about

24   when these stabbing occurred?

25        A.   I would have to go pretty detailed into my

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7413

```
 1  notes to pick out the specifics of those.
 2       Q.   Well, I'm going to show you and refresh
 3  your recollection.  And I'm referring to Perez 3183,
 4  which is a New Mexico Corrections Department
 5  clinical assessment.
 6            MS. ARMIJO:  May I approach, Your Honor?
 7            THE COURT:  You may.
 8       A.   Okay.
 9  BY MS. ARMIJO:
10       Q.   All right.  Do you see that?
11       A.   I did read that.
12       Q.   Okay.  And is that a self-report of it?
13       A.   Yes.
14       Q.   Okay.  What did he indicate about the
15  stabbing?
16       A.   He said that he was stabbed while he was
17  an inmate, due to him being a member of the gang.
18       Q.   All right.  And of the gang, it's of the
19  SNM specifically; correct?
20       A.   That is what that says, yes.
21       Q.   And just so that we're clear -- and I can
22  show you -- this assessment was dated June 25, 2014?
23       A.   Okay.
24       Q.   Well, I'll show you.  I believe it's on
25  that page.
```




SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes, that's the date, 6/25.

 2             MS. FOX-YOUNG:  Your Honor, I object to

 3   relevance, since Mr. Perez doesn't dispute his

 4   membership.

 5             THE COURT:  Well, overruled.  The

 6   Government can prove its point how it wants.

 7   Overruled.

 8   BY MS. ARMIJO:

 9        Q.   Now, did you consider his personal history

10   in addition to his medical history?

11        A.   What do you mean by personal history?

12        Q.   Well, you are aware that he has 10

13   children by nine different women?

14        A.   Yes.

15        Q.   And the age of those children?

16        A.   Widely distributed.  Something like five

17   years old to 25 years old or something.

18             MS. FOX-YOUNG:  Your Honor, may we

19   approach?

20             THE COURT:  You may.

21             (The following proceedings were held at

22   the bench.)

23             MS. FOX-YOUNG:  Your Honor, I understand

24   that relevance is construed broadly, but I struggle

25   to see the relevance of Mr. Perez' children, how
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   many, and what their ages are, to his medical

2   history.  I don't know where the prosecutor intends

3   to go, but if Ms. Armijo is just trying to elicit

4   facts for the jury outside of his medical record,

5   that is inappropriate to put on character evidence

6   about Mr. Perez.

7           MS. ARMIJO:  I think it's important

8   because she has labeled him as fragile.  We went

9   through a great deal about his medical history

10  starting from 1992, and his seizures and everything

11  else.  So I think the fact that -- about all this,

12  his issues and health, he can't walk, and the term

13  "fragile" is quite important.  I think he has

14  several children.

15          THE COURT:  He had several children since

16  1992?

17          MS. ARMIJO:  I think since 2014 he had a

18  five-year-old.

19          MS. FOX-YOUNG:  Your Honor, we didn't

20  elicit anything about his sexual ability or ability

21  to have children.

22          THE COURT:  I'm not sure that you get to

23  slice things this thinly.  Why don't you just ask

24  leading questions on this to make your point on the

25  50-year-old, and let's get in and out on it.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com


```
1            MS. ARMIJO:  I'm done with this area now.
2            THE COURT:  Okay.  Let me talk to you a
3   little bit about the 404(b) objection.  I mean, I'm
4   confused and I think you're struggling to articulate
5   why you're offering her as a witness.  It seems
6   because you're offering to say that because he has
7   all these conditions he could not act in conformity
8   with the charges.  You're putting on 404(b) and then
9   the Government is eliciting testimony about, you
10  know, he's got these medical conditions and can act
11  in conformity with them.  I mean, isn't everybody
12  putting on this evidence to establish that, you
13  know, either he had the ability to act in conformity
14  or not act in conformity?  I mean, isn't that what
15  this basically is?  How do you distinguish what you
16  did from what Ms. Armijo is doing?
17           MS. FOX-YOUNG:  Well, Your Honor, I don't
18  struggle to do it.  I just didn't want to do it in
19  front of the jury.  But a lot of this evidence to
20  get Mr. Perez' reasonable fear and his state of mind
21  at the time that rumors were swirling --
22           THE COURT:  Aren't you trying to solicit
23  testimony and evidence saying at different points in
24  time he had conditions that would prevent him from
25  doing it and, therefore, in this case he's acting
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   the way he did on prior occasions?  Isn't that
 2   404(b)?
 3            MS. FOX-YOUNG:  No, Your Honor, because
 4   we're getting into specific aspects of his medical
 5   state in March 2014 and February 2016 that informed
 6   his state of mind.  He couldn't defend himself.  He
 7   was faced with, as Ms. Armijo just solicited,
 8   attacks by gang members, he was a fragile guy, he
 9   was weak, he was not in a position to defend
10   himself.
11            THE COURT:  But you objected to Ms. Armijo
12   asking about a medical condition in a generic sense.
13   She was simply asking for, I guess, it was impulsive
14   explosive disorder, and she was asking what are the
15   symptoms and characteristics of that.  So it wasn't
16   even directly on point as to Mr. Perez.  But --
17            MS. FOX-YOUNG:  I believe she asked if he
18   had that disorder and therefore those would be
19   applied to him.
20            THE COURT:  Well, hold on a second.  Let's
21   get the question, because it didn't seem to me it
22   was appropriate to the question.  But I'm trying to
23   understand overall what you were trying to do with
24   the witness, and now what you're objecting to, and
25   if there is any difference between the two.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1           MS. FOX-YOUNG:  I think you're right,
 2   Judge, that I objected immediately after a question
 3   about the disorder itself.  But this was after a
 4   line of questioning as to whether Mr. Perez had this
 5   condition, implying to the jury --
 6           THE COURT:  Here's the question that you
 7   objected to and it says, "Individuals with
 8   antipersonality disorders tend to be irritable and
 9   aggressive, repeatedly get into physical fights or
10   commit acts of physical assault.  Would you agree
11   with" -- I'm not sure what it's saying, but that's
12   my understanding, the generic question about this
13   particular disorder, which I thought was a disorder
14   that you brought up.
15           MS. FOX-YOUNG:  And Your Honor, actually
16   it wasn't.  Ms. Armijo brought this disorder up.
17   But I don't object to the question or the response.
18   We just ask for a limiting instruction that it can't
19   be used as propensity evidence.  I think the Court
20   is right that it's relevant and that it's within the
21   scope.
22           THE COURT:  If it's not being brought for
23   propensity, what is it being brought for?  I guess
24   what is your testimony before, because it seems to
25   me you're asking the jury to look at a lot of
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7419

```
 1  medical conditions and say because of these
 2  particular points, this must have been his situation
 3  on March 9.  And it sounds to me like that's 404(b)
 4  propensity, that because these are the ways he was
 5  afflicted and hurting at different points in time,
 6  that must have been the case on March 9, or whatever
 7  other date you think is relevant to the discussion.
 8  So I'm trying to distinguish what you're doing from
 9  what the Government is doing.
10            MS. FOX-YOUNG:  I think the evidence that
11  we put on is intended to assist the jury in making
12  the determination whether Mr. Perez agreed.
13            THE COURT:  Would you have any objection
14  if I gave the jury a limiting instruction that was
15  across the board that says something to the effect
16  of all the testimony that Dr. Brislen is using
17  cannot be used for propensity purposes?  And by that
18  I mean that because certain things occurred at
19  certain times in the past to Mr. Perez, necessarily
20  they are applicable on the days that are important
21  for the facts of this case.  It seems to me I'm
22  struggling to see what the difference is between
23  your testimony and Ms. Armijo.  If we just say they
24  can't use it and then at some point y'all can
25  articulate what you are using it for --
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1            MR. VILLA:  Judge, 404(b) says we're using
2   this evidence not for propensity but for some other
3   purpose.  And when the propensity -- bringing it in
4   as Ms. Armijo is, we ask for a limiting instruction,
5   we are entitled to one.  We didn't offer it to show
6   propensity.
7            THE COURT:  Maybe it's my own inability to
8   understand the difference between the two here.  I
9   mean, you all seem to be reluctant to offer the
10  reason that you're offering this testimony in front
11  of the jury.  And if I ask the Government what
12  they're offering it for, they'll probably say just
13  elaborate and discredit and explore what y'all
14  offer.
15           MR. VILLA:  The evidence isn't offered to
16  show that in the past he didn't agree to the crime
17  or he did agree to the crime.  The evidence is
18  offered to show what his medical state was at the
19  time that Mario Rodriguez came in and took that
20  piece from the walker, and it's offered to show what
21  his medical state was at the time that he made
22  statements to Billy Cordova.
23           THE COURT:  What, then, is that being
24  offered for?
25           MR. VILLA:  For the jury to determine
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  whether he was in fear, whether he could defend

2  himself.  It supports the duress defense whether he

3  would agree or not to allow that, whether he could

4  have stopped Mr. Rodriguez if he wanted to.  That's

5  not propensity.  It's relevant to show whether he

6  entered into an agreement to commit the crime.

7          THE COURT:  And what are you eliciting

8  this for, Ms. Armijo?  What non-404(b) purpose are

9  you eliciting it for?

10          MR. BECK:  Your Honor, I think showing

11  that Mr. Perez was infirm, he had some kind of

12  mental condition that was preventing him from

13  agreeing or preventing him from acting in a certain

14  way, on the day in particular, March 7, or during

15  his February confessions, the only way they can come

16  to that conclusion is by showing in the time leading

17  up to that -- and I think we've had testimony from

18  1992 -- specifically from 2012 on her chart that he

19  was at risk health wise; that he was infirm

20  physically, that his seizures mentally may have

21  prevented him from voluntarily providing statements

22  throughout that time.  And so the jury can use that

23  as propensity for him to have the mental effects

24  during February.  And so the only basis on which

25  this would be relevant is if the jury can infer from

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  his past health conditions that on the days relevant

2  to this case, March 7 and February 2016, they can

3  infer because he was sick before, he was sick on

4  those days.  So the only way her testimony has been

5  relevant at all was propensity.  They can infer from

6  the fact that he was sick before that he was sick on

7  those days.  So Mr. Villa just said about the

8  reasons they're offering this is propensity.  So

9  under 404(b), that's the reason they're bringing it

10 in.  We're allowed to rebut that evidence.  That's

11 the purpose of cross-examination and the purpose of

12 rebuttal.  And so the Court is probably correct that

13 if there is a limiting instruction, that limiting

14 instruction would be that both parties are using Ms.

15 Brislen's testimony and Mr. Perez' health and mental

16 health conditions for a nonpropensity purpose, one

17 of which I can't think of.  But if there is some

18 purpose, then it would apply to both sides equally,

19 and then I don't see the relevance or admissibility

20 of her testimony at all.

21          THE COURT:  Well --

22          MS. FOX-YOUNG:  Your Honor, could I add

23 three additional purposes for which we offer this

24 testimony which are not 404(b)?

25          THE COURT:  Give me the year again.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS FOX:  It's 2014; March 7, 2014.

 2              MR. BECK:  Right.

 3              THE COURT:  Then the transcripts had what

 4    date?

 5              MR. BECK:  February of 2016.

 6              THE COURT:  Well, I guess I'm inclined to

 7    just make sure that -- I mean, it doesn't seem that

 8    there is any objection to the testimony coming in.

 9    But I do think that I'm going to tell the jury that

10    they can't use this evidence of Mr. Perez' medical

11    condition to prove that on those two dates he was

12    acting in accordance with some of the diagnoses that

13    are being elicited by Ms. Armijo's testimony.  They

14    can use it for other purposes and issues in the

15    case, but not for the fact that he was acting in

16    accordance with those diagnoses that appear in the

17    records on those particular dates.  Does that then

18    address the defendant's concern?

19              MS. FOX-YOUNG:  Yes, Your Honor.

20              MR. BECK:  The concern that I have with

21    that, Your Honor, is that if this isn't being

22    offered to show that he acted in conformance with

23    these diagnoses, then what is the purpose of this

24    testimony at all?  What is the relevance?

25              THE COURT:  All right.  Let me go ahead
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    and let Ms. Fox-Young state those three reasons.  I

2    think it seems to me that I'm having a hard time

3    seeing how Mr. Perez will be offering this as

4    propensity evidence.  But go ahead and state what

5    you think the reasons are for offering this

6    testimony.

7         MS. FOX-YOUNG:  Well, Your Honor, you've

8    heard several, but I just wanted to tell the Court

9    they fall under motive, the voluntariness of the

10   statements, and also his state of mind.  And I

11   described some of the ways in which it informs his

12   state of mind.  And I think perhaps the Court sees

13   that is applicable both on March 2014 and in

14   February 2016.  So these are non-404(b) purposes.

15        MR. VILLA:  And Your Honor, specific to

16   one issue I brought up with Mr. Cordova, when Mr.

17   Perez tells Mr. Cordova on the recordings he

18   wouldn't have allowed them to take the piece from

19   his walker if it wasn't a legitimate move, and I

20   asked Mr. Cordova if Mr. Perez was physically able

21   to do anything about it to stop it, and he said yes,

22   he was.  And this testimony directly contradicts

23   that.  So it goes to Mr. Perez' physical ability to

24   stop somebody like Mario Rodriguez from doing what

25   he was doing, taking that piece from his walker.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7425

```
 1            THE COURT:  All right.  On these
 2  diagnoses, it appears I'm going to give the limiting
 3  instruction and take it a question at a time.
 4            MR. BECK:  I'll just note for the record,
 5  Your Honor, that the United States is offering this
 6  testimony for the exact same reason, because -- to
 7  the extent that the diagnoses of having seizures or
 8  being infirm physically go to his state of mind.
 9            THE COURT:  Then you shouldn't have any
10  problem with the limiting instruction I'm about to
11  give.
12            MR. BECK:  Okay.
13            (The following proceedings were held in
14  open court.)
15            THE COURT:  All right.  In Ms. Armijo's
16  testimony she's elicited some testimony from Dr.
17  Brislen regarding some diagnoses that are in the
18  medical records.  Evidence of Mr. Perez' diagnoses
19  that are in the records is not admissible and it
20  should not be used by you to prove or to influence
21  you in any way that on March 7, 2014, or in February
22  of 2016, when the recordings were made, that Mr.
23  Perez was acting in accordance with those characters
24  or traits or diagnoses that appear in the medical
25  records that Dr. Brislen is testifying about.  She's
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  given some testimony about what some of those

2  disorders are, and you can't use those to decide

3  that Mr. Perez was acting in accordance with those

4  diagnoses on those particular dates, which are the

5  ones that are primarily at issue here.

6            Ms. Armijo.

7  BY MS. ARMIJO:

8       Q.   Dr. Brislen, now, in reference to the

9  antisocial personality disorder, you kind of

10  mentioned that you think it's kind of just carried

11  through at times; is that correct?  My term, not

12  yours.

13      A.   No, you mean -- so what I think happens

14  is, when he sits down with one of his mental health

15  providers and they write ASPD on it, or ASD for

16  antisocial personality disorder, they're documenting

17  that in sort of a general assessment historical

18  sense.  They're not evaluating him at every visit to

19  see if he meets the criteria for that disorder.

20  It's not a diagnosis that's being made at that time.

21  It's the same way we would start a visit by saying,

22  "This is 49-year-old male with diabetes and

23  hypertension."  They're saying, "This is a gentleman

24  with antisocial personality disorder, anxiety, and

25  depression."  And then they get on with the meat of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  what they're working on that day.  Does that answer

2  your question?

3      Q.   Yes.  But actually, there is a clinical

4  assessment that goes into detail about that and goes

5  into why it is that the antisocial personality

6  disorder was given to him, and they actually go into

7  statements that he made.  Do you recall that

8  assessment?

9      A.   I would love to refresh my memory.

10     Q.   All right.  Let me do that.  And I'm

11  referring to --

12         MS. FOX-YOUNG:  If Ms. Armijo would just

13  let me take a look at the document.

14         MS. ARMIJO:  I would.  I'm trying to get a

15  clean copy as opposed to my copy.

16  BY MS. ARMIJO:

17     Q.   And specifically for the record I'm

18  referring to Perez 3182.

19         MS. FOX-YOUNG:  Your Honor, may we

20  approach?

21         THE COURT:  You may.

22         (The following proceedings were held at

23  the bench.)

24         MS. FOX-YOUNG:  So my concern, Judge, is

25  that Ms. Armijo wants to refresh Dr. Brislen with a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1   document that goes into detail about Mr. Perez

2   presenting with threatening statements about his

3   potential to harm people who cross him.  And this is

4   dated -- I believe this is 2/16/09.  Well, there is

5   no date on the document itself.

6           MS. ARMIJO:  The second page.

7           MS. FOX-YOUNG:  This is five years prior

8   to the incidents in question, and I think on 403

9   grounds, if she intends to start getting into

10  statements, some statements that Mr. Perez made five

11  years before the Molina murder when his psychiatric

12  state has been evolving, this is very prejudicial.

13  If she just wants to refresh and that the antisocial

14  personality disorder was a diagnosis that stuck at

15  this time, but if she wants to elicit the statement

16  that Mr. Perez may commit crimes in the future, five

17  years before Javier Molina was killed, this is

18  totally prejudicial, and on 403 grounds I'd ask the

19  Court to disallow it.

20          THE COURT:  Let's do this:  I think there

21  are certainly things she can ask that aren't going

22  to be 403.  Let's see how far she goes.  You can

23  make an objection.  I guess I'm inclined to think,

24  given how far back Dr. Brislen went on his

25  diagnosis, I'm probably not going to sustain.  But

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  if you want to renew when a particular question is

 2  raised, you can do it.  But I think there's going to

 3  be certain questions raised that are not

 4  objectionable.

 5          MS. FOX-YOUNG:  Is the Court willing to

 6  take a look at the document and see if those

 7  particular statements could be excluded?

 8          THE COURT:  Given that you went back to

 9  1992, it's kind of difficult for me now to start

10  cutting things off.

11          MS. FOX-YOUNG:  Your Honor, the Government

12  didn't have a 403 objection.  We went back for

13  context to show what she had reviewed.

14          THE COURT:  I remember they really did

15  object to the entire -- Dr. Brislen being put on the

16  stand.  They filed a formal motion which I denied.

17          MR. VILLA:  That was based on the

18  incorrect understanding of the law that this Court

19  excluded -- just denied the motion to suppress, that

20  the voluntariness of the statement wasn't still

21  relevant for the jury.  And that was argument one.

22  The other argument in the motion was with respect to

23  the duress defense, and whether he could have taken

24  some action in the two hours that he had to stop the

25  murder.  And the statements from 2009 have no effect
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  upon this.

2         THE COURT:  Her testimony has been that

3  she thinks her assessment of him is the same today

4  as it was several years back.  So she's reaching

5  back in time and forming an opinion as to his mental

6  or physical condition and pulling the cord.  It's

7  difficult.

8         MS. FOX-YOUNG:  She reached back from 2016

9  to 2013, but we didn't elicit specific findings with

10 regard to his mental health status at this time, and

11 I agree that there is some relevance to the fact

12 that he had the disorder at this time.  But the

13 statements themselves are so highly prejudicial and

14 they're offered for no other reason.

15        THE COURT:  Well, there are statements of

16 the defendant here.  I'm not inclined to exclude

17 them, but let's take the questions one at a time.

18 Because I think there is some evidence that the

19 Government can get that would be unobjectionable and

20 I'll just have to take them one at a time.

21        MR. BECK:  Your Honor, the motion to

22 exclude Dr. Brislen also was based on the fact that

23 the purpose of offering her was to engender sympathy

24 and prejudice to the jury; that she couldn't

25 specifically opine on any relevant factor for

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7431

1  duress, and so this -- the fact that she left out

2  this diagnosis and these acts is important to rebut

3  that purpose for which she's offered.  And I don't

4  think -- I don't think that the danger of unfair

5  prejudice outweighs the probative value of this when

6  they did not mention once in any report or her notes

7  diagnosis of this disorder which appears almost all

8  the way throughout the medical records, and she

9  didn't mention once what this is.

10          And I also will note the danger of unfair

11  prejudice significantly lessened once the judge has

12  already instructed the jury that they cannot use

13  this evidence for propensity purposes but only for

14  the state of mind.  So they're already coming in for

15  a limited purpose.

16          MS. FOX-YOUNG:  Your Honor, she did say he

17  had a mood disorder, and we're talking about the

18  statements themselves which are highly prejudicial,

19  five years before this murder.  I don't object to

20  questioning about the existence of the disorder.

21  It's just Mr. Perez' statements which are so

22  inflammatory, and have no relevance to activity five

23  years later and highly prejudicial.

24          MS. ARMIJO:  But she specifically stated

25  just now that she thinks that they don't do a

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  comprehensive evaluation for antisocial personality

2  disorder; that it's just something in the records

3  that just kind of gets carried through.  And this is

4  a specific incident of where they're doing an

5  assessment of him and he gives statements that help

6  this provider make the determination that he has

7  antisocial personality disorder as opposed to what

8  she just testified about.  So it's also being used

9  to impeach her and her credibility and show her

10  bias, that she's totally dismissing this actual

11  evaluation from her complex review of the medical

12  records.

13          THE COURT:  Let me give it some thought.

14  But let's take it a question at a time.

15          (The following proceedings were held in

16  open court.)

17          THE COURT:  All right, Ms. Armijo.

18  BY MS. ARMIJO:

19      Q.   All right, Doctor.  I'm sorry.  We are --

20  I'm referring to a clinical assessment done by the

21  New Mexico Corrections Department, which is dated

22  February 16 of 2009, and so -- and I will give you a

23  copy of the report.

24          MS. ARMIJO:  May I approach the witness,

25  Your Honor?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              THE COURT:  You may.
 2   BY MS. ARMIJO:
 3       Q.   Are you familiar with those types of
 4   reports that are throughout Mr. Perez' medical
 5   records that you reviewed?
 6       A.   Yes.
 7       Q.   And you see on the bottom that it says
 8   Perez 732 on the first page, and Perez 733; correct?
 9       A.   I do see that.
10       Q.   And I'm specifically looking for the
11   paragraph on the first page, "Current or most recent
12   mental health/psychiatric/medical diagnosis and
13   treatment."  Do you see that?
14       A.   Yes.  Would you give me just a minute to
15   look at this?
16       Q.   Sure.
17       A.   All right.  Thank you.
18       Q.   And you've reviewed that document?
19       A.   I haven't read it word for word because
20   it's quite long, but I'm ready to answer some
21   questions if you like.
22       Q.   Okay.  Well, you would agree -- did you
23   read the one paragraph I was referring to?
24       A.   "Current or most recent mental health/
25   psychiatric/medical diagnosis"?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     Q.   Yes.

2     A.   No.

3     Q.   Can you read that one paragraph?

4     A.   You'd like me to read it out loud?

5     Q.   No.  Did you read it to yourself?

6     A.   I will now.  All right.

7     Q.   All right.  You've read that paragraph?

8  Okay.  And would you agree with me that in

9  discussing his -- and the title of this is "Current

10 or most recent mental health/psychiatric/medical

11 diagnosis and treatment"?

12    A.   Right.

13    Q.   And you would agree with me that in

14 addition to indicating that he has consistently been

15 diagnosed with antisocial personality disorder due

16 to his history, that they also interviewed him, as

17 well; correct?

18    A.   I'm sorry, I didn't understand the

19 question.

20    Q.   Okay.  In addition to mentioning that he

21 has a long-standing history of being diagnosed with

22 it; correct?

23    A.   Right.  Right.

24    Q.   And they even talk about specifically that

25 he's diagnosed with it due to his long-standing

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  criminal and violent offense history; correct?

2        A.   I'm just not connecting the question.  So

3  yes, he is consistently diagnosed with that; and

4  yes, his violent history is also described in this

5  paragraph.

6        Q.   Okay.  And so then the next thing, you had

7  indicated that you weren't sure whether or not these

8  providers that are evaluating him -- whether or not

9  they actually kind of do an evaluation themselves

10 and really consider the issue, so to speak.

11       A.   That's right.  I still go with that.  I

12 mean, coming to the conclusion of giving that

13 diagnosis versus stating it as part of his medical

14 history are two different things.

15       Q.   Well, the statement that I just made was

16 part of his medical history; correct?

17       A.   The statement that you made is:  He has

18 consistently been diagnosed with antisocial

19 personality disorder due to blah, blah, blah.  Yes.

20       Q.   Due to his longstanding criminal and

21 violent offense history.

22       A.   Yes.

23       Q.   Okay.  But then after that, there is also

24 a determination made from their interview of Mr.

25 Perez; correct?  It would be consistent with that.

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                     201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                         (505) 843-9494
FAX (505) 820-6349                                               FAX (505) 843-9492
                                                                        1-800-669-9492
                                                            e-mail: info@litsupport.com



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7436

1      A.   That's right.  So there is a statement at

2   the end of the document that says he fully meets

3   Axis 2 criteria with prominent antisocial

4   personality disorder.

5      Q.   Well, no.  But right after that it says,

6   "During interview, Mr. Perez presented with

7   threatening statements about" --

8           THE COURT:  Let's ask our questions rather

9   than reading from the document.

10          MS. ARMIJO:  Okay.

11  BY MS. ARMIJO:

12     Q.   Is there any indication about a statement

13  that Mr. Perez made?

14          MS. FOX-YOUNG:  Your Honor.  I'd object.

15          THE COURT:  Let her ask this question.

16  It's a yes/no.

17     A.   Sure.  Yes.

18  BY MS. ARMIJO:

19     Q.   And is the statement that he made directly

20  related to the reference to antisocial personality

21  disorder?

22     A.   He made statements consistent with that

23  disorder during this visit.

24     Q.   Okay.  All right.  And what statement did

25  he make?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7437

```
 1          THE COURT:  Well, I'm going to sustain.  I
 2   think you've gotten her opinion and why she's
 3   relying on it.  And I don't think we need to get
 4   into the specific statements, so I'll sustain the
 5   objection.
 6       Q.   Okay.  Would you agree with me, Doctor,
 7   that there is a statement that Mr. Perez makes in
 8   February of 2009 that indicates that this antisocial
 9   personality disorder was just not something that was
10   carried through; that this person actually made the
11   diagnosis, as well, based on statements that Mr.
12   Perez made?
13       A.   I think they made that diagnosis based on
14   the comprehensive -- everything in this note
15   contributed to that diagnosis, which was made and
16   confirmed at this time.
17       Q.   Okay.  Made and confirmed.  And there are
18   statements that he made that are consistent with
19   that diagnosis?
20       A.   Sure.
21       Q.   Yes?
22       A.   Yes.  I mean, yes, absolutely.  They could
23   be consistent with a number of things, and in this
24   context they were consistent with that diagnosis,
25   and that's part of why that diagnosis was made, is
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   how I read this note.
 2       Q.   Okay.  So -- all right.  And that's in
 3   2009, and then -- and going back to the -- I'm
 4   sorry -- to the June 25, 2014, assessment that
 5   you -- that I showed you, do you recall that was the
 6   one that I showed you in reference to him being
 7   stabbed?
 8       A.   Yes, right.  That's the one that said he
 9   had been in the car accident and hit the railroad
10   tracks, et cetera, and was in a coma for nine days.
11   You were asking me to clarify.
12       Q.   Yes.  And that information is self-report
13   by him?
14       A.   Yes.
15       Q.   Okay.  This doesn't refer to any medical
16   records for that; correct?
17       A.   My impression of what I read that you
18   showed me is that that was all just patient history
19   that was given at that time.
20       Q.   Okay.  As far as -- in fact, it says he
21   reported; correct?
22       A.   Right.
23       Q.   And then the part about the stabbing, it
24   actually happened in Texas; correct?  I can show you
25   the document again.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MS. ARMIJO:  May I approach, Your Honor?
 2              THE COURT:  You may.
 3       A.   Yes, this says he reported being stabbed
 4  in the Texas Department of Corrections.
 5  BY MS. ARMIJO:
 6       Q.   Because?
 7       A.   Because of being an SNM Gang member.
 8       Q.   Now, you're also aware in records where --
 9  I believe we talked about he refused to have
10  psychiatric evaluations; correct?
11       A.   Or declined visits.  Might be -- I mean,
12  they noted as refused or declined or he would say,
13  "My meds are fine," and then he wouldn't go.
14       Q.   Well, I'm referring to --
15       A.   There are a lot of visits that he
16  declined, like a dozen or more.
17       Q.   He declined, but do they also say refused?
18       A.   Yes.
19       Q.   So your word is "declined," but would you
20  agree that a lot of medical records say refused?
21       A.   Those words are equivalent in this case,
22  yes.
23       Q.   Okay.  But we're going off the medical
24  records.  So wouldn't we want to be as accurate as
25  possible as to what the medical records says?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    A.    Okay.

2    Q.    Would you not agree?

3    A.    I don't think there is a meaningful

4 difference between those two words.  We can say

5 "refused."  I'm happy to say "refused."

6    Q.    Now -- and I believe you talked about the

7 changes in his medicines at times; correct?

8    A.    Yes.

9    Q.    And you're aware that sometimes he doesn't

10 take his medicine as directed.

11   A.    That's true.

12   Q.    And in fact, in 2013 he refused to take

13 some of his seizure medicine and was told that

14 stopping it suddenly could put him at risk for

15 seizures?

16   A.    I believe that that did happen.  I don't

17 know that it happened -- I mean, I can't confirm in

18 my memory that it happened in 2013, but the way

19 that's noted in the medical record is, sometimes he

20 has to sign a consent if he's declining a

21 medication.  Oftentimes it will just be noted that

22 patient refused if he wasn't taking the medication

23 that day.

24   Q.    I'm actually referring to a psychiatric

25 encounter that is Perez 1472.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MS. ARMIJO:  May I approach the witness,
 2   Your Honor?
 3            THE COURT:  You may.
 4            MS. FOX-YOUNG:  Your Honor, may I just see
 5   the document?
 6            MS. ARMIJO:  I believe it's just that
 7   front page.
 8       A.   Okay.  So this is about actually Klonopin
 9   and Effexor.  And Klonopin is a benzodiazepine like
10   Valium, and Effexor is an antidepressant.  And he
11   stopped them though the physician said stopping
12   them -- this is like one of the medications you
13   shouldn't stop suddenly.  So what I'm looking for is
14   whether or not he ever took them or whether he
15   refused advice to take them.  I don't know, based on
16   this.
17   BY MS. ARMIJO:
18       Q.   Well, there is documentation there as to
19   what the doctor notes, or the medical
20   administration.
21       A.   Right.  Okay.  So Effexor was refused for
22   two doses and Klonopin was refused for two doses,
23   which is like 18 hours.  And he said he didn't want
24   any psych meds at that time.  He was also taking
25   Dilantin, which is a seizure medication, and
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Benadryl and Haldol.

2       Q.   All right.  So then I guess you would

3  agree that at least on April 2 of 2013, this is not

4  just one of his -- there are several times that he

5  just outright refuses medication; correct?  Like you

6  indicated?

7       A.   That seems like one of those.

8       Q.   But you indicated that it just indicates

9  like in the log, because --

10      A.   Right.

11      Q.   -- and to be clear --

12      A.   There should be a log that goes along with

13  that log that reflects what the doctor's writing.

14      Q.   This is actually a psychiatric encounter

15  log; right?

16      A.   Right.

17      Q.   This is different from the logs, because

18  what you have from Corrections is a log with the

19  nurse who daily dispenses medication; correct?

20      A.   Right.  So there's nursing notes as one

21  file, and then other pages there's medication

22  administration records where it actually gets

23  initialed every tablet that goes out.

24      Q.   And do you know where he was on April 2 of

25  2013?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1     A.   He was in the hospital incarceration

2  facility prior to going back to the University for

3  his surgical revision.  So this was the period of

4  time when he had tubes coming out of everywhere and

5  in what was called the ICU facility there.

6     Q.   All right.  And they did tell him -- it

7  indicates that stopping would affect possible

8  seizures?

9     A.   That's right.  They did say that.

10     Q.   And I believe on your direct testimony you

11  spoke about one time where he removed his tubes.  Do

12  you recall that?

13     A.   Yes.

14     Q.   And he was sent back to the hospital?

15     A.   That's right.

16     Q.   That was like in December 2012?

17     A.   That was -- I believe that that's right.

18  I didn't note that on my notes.  So he was -- if you

19  look at that colorful calendar, there's about a week

20  period where he went back to the hospital in

21  December, and I'm pretty certain that that was the

22  time that he pulled his G tube out.

23     Q.   And actually, he pulled his tubes out --

24  in the mental health and psychiatry notes it

25  indicates that he had behavioral problems

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  regarding --

2       MS. FOX-YOUNG:  Your Honor, I would just

3  object to the hearsay and ask for a question that

4  doesn't include hearsay elicited.  If she has a

5  question and wants to refresh the witness, I think

6  that's appropriate; or impeach.

7       THE COURT:  Well, if you need to ask a

8  question and then have Dr. Brislen answer.  But

9  don't read from the document.

10 BY MS. ARMIJO:

11     Q.  All right.  Dr. Brislen, did he actually

12 remove his tubes and there was a finding of

13 self-manipulating?

14      MS. FOX-YOUNG:  Your Honor, she's just

15 reading from the document.

16      MS. ARMIJO:  I'm not.

17      MS. FOX-YOUNG:  Same objection.

18      MS. ARMIJO:  I'm sorry.

19      THE COURT:  Why don't you just ask her

20 what the note says.  If she doesn't remember what it

21 says, you can refresh her memory, and then we can go

22 from there.  But don't just read from the document.

23 BY MS. ARMIJO:

24     Q.  All right, Doctor.  Do you recall there

25 being any psychiatric notes in reference to that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  incident?

2      A.   I remember he had a number of psychiatric

3  notes during that time when he was in the hospital

4  facility and he struggled quite a bit with complying

5  with his therapy during that time.  I can comment to

6  that generally, if you like, or I can --

7      Q.   Okay.  And was there an assessment done as

8  to why -- a psychiatric assessment done as to why he

9  pulled his tubes?

10      A.   I don't know that that triggered the

11  specific visit, but they did talk about it.

12      Q.   And what did they say?

13      A.   He was frustrated and angry and wanted to

14  be able to eat with his mouth, is my memory of what

15  I read.  So that may not be in the note that you saw

16  there, but the feeding tube got pulled.  It

17  wasn't -- there was no other disruption of his

18  lines.

19           MS. ARMIJO:  All right.  May I approach?

20      Q.   And I'm showing Perez 1483.  And I guess

21  I'm referring to that first paragraph.

22      A.   So what I'm reading here is not consistent

23  with the visit to the University Hospital.

24      Q.   Okay.  Well, that's part of the medical

25  records; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7446

1       A.    Yes, it is.

2       Q.    Okay.  And it's part of his psychiatric

3  evaluation for going to the hospital; correct?

4       A.    I'm sorry?  Say that again.

5       Q.    Well, what's the date of that?

6       A.    So this is 12/20 of '12.  I can't remember

7  if this is before or after he went back to the

8  University Hospital.  I think it's after he was

9  already back, and it looks like they had a meeting

10 with his physician and his psychiatrist and the

11 nurse and another mental health staffer and the

12 patient to talk about, was he deliberately trying to

13 get back to UNM by sabotaging his care.

14      Q.    Okay.  And to be fair, on your document

15 you have -- it's in green, so it looks like he's in

16 the prison hospital at that time?

17      A.    That's right, yeah.

18      Q.    Okay.  And so are there other reasons that

19 they note for him going back, other than what you've

20 already testified to?

21      A.    You mean the time that he was actually

22 admitted at the hospital, why did he go back?  Are

23 you asking me medically why he went back to the

24 hospital or are you asking me what this says?

25      Q.    I'm asking you, the assessment that was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  made as to the pulling of the tubes.  They give

2  several reasons and I think you've covered a couple,

3  but you didn't cover Number 1.

4      A.  Right.  Okay.  So the way that I read this

5  note is that he was acting out, and there is concern

6  that he might end up back in the hospital.  And so

7  all of these people met and talked about his

8  behavior and how they might make him feel more

9  comfortable or more in control, and the plan is,

10  like, to offer him television time, talk about

11  finding out what he does like or doesn't like, and

12  make him feel more in control of his health care

13  decisions.  And that was the plan that they came up

14  with.  So...

15      Q.  Well, I guess I'm not asking about the

16  plan.  I'm asking about what the Number 1 reason was

17  that they felt that he was going -- that he pulled

18  his tube.

19      A.  Right.  So that he could get back to UNM.

20  And this says, "Where he gets pain meds."  Is that

21  what you're asking?

22      Q.  Yes.

23      A.  Yes.

24      Q.  All right.  Now, I believe you've already

25  indicated that -- I'm sorry.  I'm going through

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    things that I've covered already.

2             Now you indicated that he's on a special

3    diet; correct?

4        A.    Yes, that's right.

5        Q.    And that special diet is for diabetes?

6        A.    It's for diabetes, but it's also for his

7    intestinal motility issues.

8        Q.    Okay.  And so are you aware of whether or

9    not they can purchase items separate from the food

10   that they're provided by the --

11       A.    Yes.  As far as I know, yes, they can.

12   He's still in control of his own diet to some

13   degree.

14       Q.    All right.  Do you know whether or not he

15   is violating the diabetes diet by purchasing things

16   that would not be consistent with that?

17       A.    That has been mentioned on and off for a

18   long time, yes.

19       Q.    Okay.  Mentioned that he is; correct?

20       A.    Right, that he eats foods that aren't

21   consistent with what you would recommend a diabetic

22   person eat.

23       Q.    And how does that impact things?

24       A.    You know, his diabetes has actually always

25   been fairly well controlled.  He's obviously

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  overweight.  I would be concerned about his

2  intestinal motility being a more immediate threat to

3  him than his blood sugar levels.

4       Q.   Now, in your report you talk about -- you

5  focus in on the time of the murder of Javier Molina;

6  correct?

7       A.   Focused in on?  I didn't comment

8  specifically on the murder except that it happened,

9  I think.

10      Q.   Okay.  We already know that you did not

11 listen to the recordings.  Have you read any police

12 reports in reference to it?

13      A.   No.

14      Q.   Are you aware or have you been told what

15 his alleged role is in the murder?

16      A.   Yes, I've been told.

17      Q.   And what have you been told?

18      A.   I was told that a piece of Mr. Perez'

19 walker was used to make what's thought to be the

20 murder weapon.

21      Q.   And that's just told to you by the defense

22 in this case; you haven't looked at anything else;

23 correct?  Reviewed any police reports or anything

24 else?

25      A.   No, except that I've now been in this

SANTA FE OFFICE                                                      MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 820-6349                                              FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7450

```
1   courtroom, if you include the hearing and this
2   trial, probably almost five days.  So whatever other
3   impression I might have picked up.
4       Q.   Now, you are also aware from your
5   comprehensive review of the medical records that the
6   medicine is dispensed by a nurse from Corrections?
7       A.   The medication is dispensed by nurses.
8   That's my understanding, yes.
9       Q.   And so we know at a minimum he is -- he,
10  Mr. Perez -- while he's been in custody of
11  Corrections is visited by a medical professional
12  once a day; correct?
13      A.   At least once a day, I would think, yes.
14      Q.   And if he gets medicine -- do you know if
15  he gets medicine more than once a day?
16      A.   Oftentimes, yes, he does.
17      Q.   Okay.  So then we know that he's visited
18  by a medical professional at least twice a day?
19      A.   Or more.
20      Q.   Or more; correct?
21      A.   Correct.
22      Q.   And they would have contact with him as
23  far as dispensing his medicine; correct?
24      A.   I don't actually know the mechanism how
25  that works.  I don't know if it's left outside his
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7451

```
1   door or if it's actually put in his hand.  I don't
2   know any of that part.
3        Q.   Okay.  Well, wouldn't that be something
4   important for you to find out if it's actually --
5   well, they note in the records whether or not he
6   takes it; correct?  Because we know that they also
7   note that he refuses it.
8        A.   That's true.  Those seem like different
9   things to me.
10        Q.   Okay.  Well, so if they just left it there
11   for him to take, you know, whenever he wanted to,
12   then they wouldn't know that he refused it; correct?
13        A.   Unless he's standing there and he said, "I
14   don't want that."
15        Q.   Okay.  True.  But then they would have
16   contact with him.
17        A.   Yes.
18        Q.   At a minimum, you know they have contact
19   with him when he refuses it; correct?
20        A.   Yes.  That makes sense.
21        Q.   Okay.  And it also makes sense that
22   they're just not going to leave medicine lying
23   around for any inmate to come get; correct?
24        A.   Oh, true.  Absolutely.  What I was
25   imagining is that it might be like along with his
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  food or something.
 2        Q.   Okay.
 3        A.   And I just don't know.  I don't know how
 4  that's done.
 5        Q.   But you do know that he goes in and that a
 6  nurse documents it; correct?
 7        A.   Documents that it was given.  I don't know
 8  actually specifically, and I didn't look
 9  specifically to see if she notes that he put it in
10  his mouth or -- I don't know.
11        Q.   All right.  That wasn't important for you
12  to find out?
13        A.   It honestly didn't occur to me until right
14  now.
15        Q.   Okay.  And then another question that I
16  have.  Did you go and talk to any of his medical
17  providers?
18        A.   No.
19        Q.   Okay.  And I believe in the notes that we
20  were provided with today, you specifically mentioned
21  that it would be helpful for you to go -- to get
22  notes from one of the doctors.  Do you recall that,
23  if you check your notes?
24        A.   This is on the outline?
25        Q.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   I don't see it on the copy I have in my

2  hand, but there were records that I didn't have for

3  a while and that may just be an artifact on my notes

4  that I didn't have access to the discharge summary

5  from UNM and the neurology notes for followup.  I've

6  since learned that there weren't any neurology notes

7  in followup, and I was able to obtain that discharge

8  summary.  I think that's probably what you're

9  referring to.

10     Q.   Okay.  It specifically says it would be

11 helpful; correct?  You make a notation.

12     A.   Are you talking about my report or are you

13 talking about the little bullet --

14     Q.   I'm talking about the notes that were just

15 provided to us today.

16     A.   Yes.

17     Q.   I think you referred to them, I don't

18 know, as an outline.  I believe Ms. Fox-Young

19 referred to them as notes.

20          MS. FOX-YOUNG:  Is there a question, Your

21 Honor?

22          MS. ARMIJO:  There is a question.

23          THE COURT:  I think it's a sufficient

24 question trying to figure out what the -- these are.

25     A.   Can you show me where you see that

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 820-6349                                              FAX (505) 843-9492
                                                                   1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE                                    e-mail: info@litsupport.com

1  notation and I'll be --

2  BY MS. ARMIJO:

3      Q.    Sure.  Page 3.  It's number 10, "I would

4  love to get ahold of the results of that next Monday

5  study and the discharge summary."

6      A.    Oh, yeah.  That's what I was talking

7  about, exactly.  Those have all been discovered.

8  That's old.  I did find those notes.  And then when

9  I say it it's implied from these notes that

10 Dr. Saria -- she's the epileptologist at UNM.  So

11 that was a note that I made to myself a while ago as

12 part of making this notation in this outline, and I

13 didn't take it off because I found it.  But sorry, I

14 didn't mean to confuse you with that.

15     Q.    When did you write these notes?

16     A.    These are -- well, various times over the

17 whole year and a half.  This is a running file that

18 I kept.

19     Q.    Now, so you did talk to that doctor; you

20 were satisfied about getting that information;

21 correct?

22     A.    I did not talk to that doctor.  I did get

23 those records from UNM.  So I got everything I

24 needed to answer my question.

25     Q.    Okay.  Did you talk to any of the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  caregivers that -- any caregivers that Mr. Perez has

2  seen?

3       A.   No.

4       Q.   And I believe you go back to 1992;

5  correct?

6       A.   The records go back to 1992.

7       Q.   Okay.  You've reviewed records since 1992;

8  correct?

9       A.   Correct.

10      Q.   Okay.  And through -- what was the most

11 recent records that you've seen?

12      A.   The most recent records that I reviewed

13 in-depth, as I mentioned, were in the summer of 2016

14 and then since this trial began, I briefly saw a

15 more recent set.  I think Mr. Perez was ill

16 recently, and that set was sent to me, but I didn't

17 have time to review those prior to this.

18      Q.   Okay.  So you have not spoken to any of

19 his medical staff at all?

20      A.   That's right.

21      Q.   You are relying simply on the records?

22      A.   Yes.

23      Q.   Even though sometimes the records you say

24 you're assuming things; correct?  Off of the

25 records?  I believe you said -- and we'll get to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                      201 Third NW, Suite 1630
Santa Fe, NM 87501                                              Albuquerque, NM 87102
(505) 989-4949                                                          (505) 843-9494
FAX (505) 820-6349                                              FAX (505) 843-9492
                                                                        1-800-669-9492
                                                              e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    this in a second -- for instance, seizures, you

2    assume that they were witnessed seizures, but you

3    don't actually know that sometimes without talking

4    to the doctor; correct?

5          A.   No, I don't think that talking to the

6    doctor would have offered extra help there.  Witness

7    seizures you assume because they're described that

8    way.

9          Q.   Okay.  If they're described that way, do

10   you assume, then, that somebody actually saw it or

11   do you assume that it's self-reported?

12         A.   I assume -- well, that's a good question.

13   I assume that someone saw it, because most of the

14   time it's written down as a witnessed seizure.

15   There is some possibility there that Mr. Perez could

16   have had a seizure and then contacted someone else

17   who acted as sort of an after-the-fact witness, I

18   suppose, but it's not really relevant to the medical

19   diagnosis to tease that out, so I didn't chase it

20   any further.

21         Q.   Now, in reference to his seizures -- and

22   you talk a lot about behavior, that there can be

23   violent behavior during seizures; correct?

24         A.   Post ictal.

25         Q.   Post ictal?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7457

1      A.    During a seizure you wouldn't see someone

2  act violently.

3      Q.    Well --

4      A.    After the seizure.

5      Q.    Well, during a seizure people can be

6  violent.  You disagree with that?

7      A.    Yes.  I don't --

8      Q.    And I'm not saying --

9      A.    -- know of any kind of seizures that cause

10 people to be violent.  I think of violence as, like,

11 targeted, directed action.

12     Q.    And that's what I'm getting at.

13     A.    Right.

14     Q.    Okay.  And I guess when I say "violent

15 behavior," I mean during a big seizure.  My term,

16 not a medical term.

17     A.    That's okay.

18     Q.    Okay.  You know, the person can shake, be

19 thrown against things, damage furniture, things like

20 that; correct?

21     A.    Falling or shaking.

22     Q.    Correct.

23     A.    But they're not throwing something or

24 hitting something with a fist intentionally.  That's

25 the distinction I'm making.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Correct.  Okay.  I think we're on the same

2   page.  And then you mentioned post the seizure --

3      A.   Right.

4      Q.   You talk about violent behavior.

5      A.   That's right.

6      Q.   And do you associate that with violent

7   behavior as being directed?

8      A.   Yes.  When I'm talking about how sometimes

9   in a post ictal phase, patients can become violent,

10  yes, I'm talking about that being directed.  For

11  example, in my training, we were treating a patient

12  with seizures, and as they came out of the seizure,

13  I got punched in the face intentionally by the

14  patient, who was in this quasi-frightened

15  not-quite-conscious post ictal phase, and that's the

16  kind of thing I'm talking about.

17     Q.   Well, and that's a good example, but then

18  that person may not have known what they were doing;

19  correct?

20     A.   Correct.  They did not know what they were

21  doing.

22     Q.   As opposed to somebody after a seizure

23  going and getting a knife and stabbing someone.

24     A.   That would be different.

25     Q.   That's different.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN &ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.  Right.
 2        Q.   So when you're talking about directed
 3   behavior or intentional behavior, it's still after
 4   this seizure where, although they may not be
 5   shaking, it's this level of consciousness where
 6   they're unaware of their surroundings and may act
 7   out physically.  Would that be a fair assessment?
 8        A.   Yes.
 9        Q.   It's not directed behavior at a specific
10   person.
11        A.   Well, it might be directed at anyone close
12   enough to get at.
13        Q.   Correct.  It's not, "I've been meaning to
14   kill you, so I'm going to go get a knife and kill
15   you."
16        A.   That would not be post ictal, right.
17        Q.   Okay.  Now, I believe you indicate -- how
18   many witnessed seizures do you think that there are
19   in the medical records, other than the one at UNM
20   where it was -- and to be fair, the one at UNM you
21   say is eight days, but that is actually noted eight
22   days because of the EKGs -- not the EKG.  EEGs --
23        A.   Right.
24        Q.   -- and other tests for his brain wave
25   activity; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   He was not conscience or able to
2   participate in any way with the outside world for
3   eight days.  He seized that whole time.
4      Q.   Okay.  So we --
5      A.   We knew that also, you know, confirmed by
6   EEG.
7      Q.   Okay.  So that is one of those incidents
8   where it would be a witnessed seizure; correct?
9      A.   Sure.  It's an interesting question,
10  because what we've been using the term witnessed
11  seizure for here, we mean obvious tonic-clonic
12  seizures.  The one he had at UNM was not that type.
13  It was a different type of seizure.  It was
14  witnessed because everyone participating in his care
15  knew what was happening.
16     Q.   Okay.  All right.  And how many witnessed
17  seizures do we have outside of the UNM one?
18     A.   Maybe five or six.
19     Q.   And when was the last one?
20     A.   Most recent one?
21     Q.   Yes.
22     A.   It was in August 2016.
23     Q.   And do you have -- and some of this, you
24  indicate there is ambiguity in his medical records
25  regarding actual seizures; correct?  The frequency

SANTA FE OFFICE                                              MAIN OFFICE
119 East Marcy, Suite 110                        201 Third NW, Suite 1630
Santa Fe, NM 87501                                 Albuquerque, NM 87102
(505) 989-4949                                              (505) 843-9494
FAX (505) 820-6349                                    FAX (505) 843-9492
                                                            1-800-669-9492



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

e-mail: info@litsupport.com

1   of seizures?

2       A.   Not the witnessed seizures.  Those are

3   clear.  The ambiguity is my suspicion that he's

4   having others and pointing at particular incidents

5   as examples when he might have had more.  Is that

6   what you mean?

7       Q.   Yes.  Okay.  Now, then you would agree

8   that the best way to determine if he's having a

9   seizure is to witness it; correct?

10      A.   In a community-dwelling person with

11  seizures, what would typically happen is an EEG

12  would be done, ideally during seizure activity, but

13  also at rest, to see if you can tell by brain waves

14  where the location of the seizure is in your brain

15  and where it starts, and whether or not there's

16  easily diagnosable ongoing sort of focus.

17           So then, once you've confirmed that you

18  have a disorder, the neurologist will counsel a

19  patient over time as to how to identify seizures and

20  how to counsel their family members or their social

21  structure to help them recognize those, and they

22  keep a journal.  It's really hard to tell.  And so

23  there's a gold standard.  If somebody has an EEG

24  that shows seizure activity, then they are having a

25  seizure.  There is no debating that.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1    Q.   Okay.  That would be the best way to
2    determine if there is a seizure; correct?
3        A.   I'm trying to clarify your use of the word
4    "best."  That's the most definitive way.  The best
5    most useful way or most effective way.  You're not
6    going to catch very many seizures with EEG, because
7    it's like a huge helmet full of wires that you have
8    to wear around, and you have to be in a facility
9    where they have this.  So the best way is to have a
10   patient that knows a lot about seizures and
11   understands themselves that can keep track of what's
12   happening.  You know, if you're like me, if you're a
13   clinic provider, you need a savvy, invested patient
14   with a social structure that can capture those.
15       Q.   Okay.  And the best way would be for -- in
16   addition -- okay, I guess you're saying the best way
17   would be for someone to document it themselves?
18       A.   Yes.  That would be great.
19       Q.   Okay.  Another way would be for somebody
20   to witness it?
21       A.   Yes.  That's another way.
22       Q.   Okay.  And if you can't actually witness
23   it, another way to do it would be to talk to a
24   person who witnesses the seizure; correct?
25       A.   Like having a witness report it?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Yes.

2      A.    Yes.  That would be another way.

3      Q.    That would be one other way; correct?

4  Because I guess if we're talking about -- you talked

5  about the subclinical issues.  The person is

6  confused; correct?

7      A.    I'm sorry, you mean when they're having a

8  subclinical seizure?

9      Q.    Yes.

10     A.    I would say they're not really even

11 conscious.  They might seem to be confused, if you

12 don't know what's happening.  To a layperson, they

13 might just seem confused.  But oftentimes they can't

14 really meaningfully speak or participate in social

15 stuff.

16     Q.    Can't participate in social stuff,

17 confused, disoriented potentially?

18     A.    Maybe.  I mean, you wouldn't be able to

19 ask them, "Where are you," and they say, "I don't

20 know."  So I don't know.  I wouldn't use the word

21 "disoriented."  That's a medical term.

22     Q.    And so you might want to be able to see if

23 a person is having one of these types of seizures,

24 based upon that, by actually -- it would be helpful

25 if there was video of it, correct, of the person and

SANTA FE OFFICE                                    MAIN OFFICE
119 East Marcy, Suite 110                      201 Third NW, Suite 1630
Santa Fe, NM 87501                              Albuquerque, NM 87102
(505) 989-4949                                          (505) 843-9494
FAX (505) 820-6349                                 FAX (505) 843-9492
                                                      1-800-669-9492



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE                          e-mail: info@litsupport.com

1  how they were acting at the time?

2      A.   Yes.  Anything to help you observe a

3  patient that's having these could be helpful.

4      Q.   Anything would be helpful; correct?  To

5  see if they were having these seizures; correct?

6      A.   Sure.

7      Q.   So then when we talk about that, you

8  indicated that the recordings you didn't think would

9  help you, and so you did not listen to recordings --

10     A.   You asked --

11     Q.   -- of Mr. Perez.

12     A.   I thought that the question was whether

13 the recordings would help me tease out whether or

14 not he was sedated by his medication.  And I still

15 feel like that wouldn't help me.

16     Q.   Okay.  Well, now I'm talking about

17 seizures.  Would the recordings help you determine

18 whether or not he was having any seizures?

19     A.   During the time --

20     Q.   That he -- at any time -- well, because --

21     A.   I feel very uncomfortable saying that I

22 could diagnose a seizure based on an audio

23 recording, especially for somebody that's not an

24 ongoing patient.

25     Q.   But you just said that one of the things

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  that you consider is whether or not they're

2  confused, disoriented.  Would you agree you would

3  want to know that anything could help you?  I

4  believe I said video, and you said, "Sure, anything

5  would help me determine that"; correct?

6       A.   Are you asking if I would be able to

7  diagnose a seizure based on a video of a patient

8  that I don't know?  Because the answer is no.

9       Q.   Well, but then you indicated that anything

10  would be helpful to you in determining whether or

11  not that was a possibility, I guess.

12       A.   That's right.  That's right.  Exactly.

13  Because seizures are very hard to recognize,

14  especially subclinical seizures.  And so if you're

15  trying to recognize them, I would want to have

16  access to everything that I could.  If I had a high

17  degree of suspicion that somebody might be prone to

18  having seizures, it would be interesting to see

19  whatever kind of capture you had.  But whether or

20  not that actually could contribute or would be

21  definite in making a diagnosis, you just have to

22  sort of gather everything you can and then make a

23  call on that.

24       Q.   All right.  Well, let's jump forward for

25  February of 2016 -- or January, February 2016.  Do

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   you know from being in this courtroom that Mr. Perez
 2   specifically -- oh, and it's also in your report --
 3   that he's accused of making a confession in the
 4   murder?
 5        A.   Right.
 6        Q.   Okay.  Now -- and you found that important
 7   to list in your report; correct?
 8        A.    I listed it in my report as a milestone:
 9   This is the time period that I'm about to talk
10   about.
11             THE COURT:  Ms. Armijo, would this be a
12   good time, if you're going to go into this
13   discussion --
14             MS. ARMIJO:  Sure.
15             THE COURT:  Let's take our afternoon
16   break.
17             All right.  I haven't given these
18   instruction today, but let me give them now.  Until
19   the trial is completed, you're not to discuss the
20   case with anyone, whether it's people involved in
21   the trial, your family, or anyone else.  And that
22   includes your fellow jurors.  If anyone approaches
23   and tries to discuss the trial with you, please let
24   me know immediately.  Also, you must not read or
25   listen to any news reports of the trial.  Don't get
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   on the internet and do any research for purposes of
 2   this case.  And finally, remember that you must not
 3   talk about anything with any person who's involved
 4   in the trial, even if it doesn't have anything to do
 5   with the trial.
 6            If you need to speak with me, simply give
 7   a note to one of the court security officers or Ms.
 8   Standridge.  I won't repeat these again today, but
 9   when we do break for the evening, do keep them in
10   mind, and we'll see how tomorrow goes as to whether
11   I give them tomorrow.
12            All right.  We'll be in recess for about
13   15 minutes.  All rise.
14            (The jury left the courtroom.)
15            THE COURT:  All right.
16            MS. ARMIJO:  Your Honor, can you admonish
17   the witness to not speak to --
18            THE COURT:  You're still under
19   cross-examination, so don't speak to anyone about
20   your testimony at the present time.
21            All right.  We'll be in recess for about
22   15 minutes.
23            MS. BHALLA:  Your Honor, if I may really
24   quickly -- no, never mind.
25            (The Court stood in recess.)
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7468

```
 1              THE COURT:  All right.  We'll go on the
 2    record.
 3              Mr. Maynard, Ms. Bhalla wanted to say
 4    something before the break.  Do you know what she
 5    was wanting to talk about?
 6              MR. MAYNARD:  I'm not sure in particular.
 7    I'll find out.
 8              MR. LOWRY:  Not be rude, but I think I was
 9    next in line.
10              THE COURT:  Go ahead.
11              MR. LOWRY:  Your Honor, I made a request
12    of the United States to get the FBI 302 field notes.
13    There is some tension in the record here between
14    what happened back in March 6, 2017, with regard to
15    Lupe Urquizo's communication through the window of
16    his pod door.  And what I've asked the United States
17    to produce is the FBI 302 field notes for all the
18    people that participated in the interviews of Lupe
19    Urquizo, Mario Rodriguez, and Timothy Martinez, so
20    we could sort this out.  It's not as simple I think
21    as the United States would think, because this
22    involves the credibility of either Lupe Urquizo or
23    the case agent, Bryan Acee, in this matter.  So
24    there is no way around the credibility issue at
25    play, and the field notes would be indispensable to
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   resolving who is being honest and who is not.  And I

2   would ask that the Court order the Government to

3   produce those.  I've made the request; they

4   declined.  This trial is coming to an end and we

5   need those in order to wrap this up.

6                THE COURT:  Are you handling this, Mr.

7   Beck?

8                MR. BECK:  Sure.

9                THE COURT:  It seems to me that these

10  would be Jencks material and that they ought to be

11  produced.  Your thoughts?

12               MR. BECK:  Yeah, this is something that I

13  think I discussed with the Court back before we

14  started this trial.  And I sort of resent that it's

15  not as easy as the United States may think, because

16  I thought hard about this.  Notes may be Jencks

17  material, and this Court held that.  And what

18  happens is, they're Jencks material if they're

19  verbatim statements.

20               The FBI notes -- we produced Nancy Stemo's

21  notes this morning, and so this bolsters the

22  argument that I'm about to make.  The FBI notes are

23  shorthand notes for what they take during a debrief.

24  They use those shorthand notes to write a more

25  robust 302, and so the only way in which there may

SANTA FE OFFICE                                          MAIN OFFICE
119 East Marcy, Suite 110                           201 Third NW, Suite 1630
Santa Fe, NM 87501                                  Albuquerque, NM 87102
(505) 989-4949                                             (505) 843-9494
FAX (505) 820-6349                                     FAX (505) 843-9492
                                                         1-800-669-9492
                                                  e-mail: info@litsupport.com



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7470

```
 1  be Giglio information --
 2          THE COURT:  Do this.  Turn over the
 3  requested notes either to the Court or to Mr. Lowry,
 4  and I'll take a look at them and make a decision.  I
 5  tend to think that most of the notes are verbatim,
 6  particularly if they are in fact shorthand.  That is
 7  what Ms. Bean's doing.  But if you don't want to
 8  turn them over to Mr. Lowry, turn them over to me
 9  and I'll find time to take a look at them.
10          MR. BECK:  All right.  And I think that's
11  inconsistent with the law to say under Jencks --
12          THE COURT:  I know that Judge Brack has
13  one opinion and I have one.  You can take a look at
14  mine.  I think I may have been more liberal in
15  construing certain FBI statements than he was.
16          All right, Ms. Bhalla.  Quickly, quickly.
17          MS. BHALLA:  I can do it at another time,
18  Your Honor.
19          THE COURT:  All right.  All rise.
20          (The jury entered the courtroom.)
21          THE COURT:  All right, Dr. Brislen.
22  You're still under oath.  I'll remind you of that.
23          Ms. Armijo, if you wish to continue your
24  cross-examination of Dr. Brislen, you may do so at
25  this time.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
1            MS. ARMIJO:  Thank you, Your Honor.
2            THE COURT:  Ms. Armijo.
3  BY MS. ARMIJO:
4       Q.   Dr. Brislen, I believe we were talking
5  before the break about possibly listening to
6  recordings.  You had mentioned that videos might be
7  helpful; correct?
8       A.   That's right.
9       Q.   Okay.  And if you can't have a video, a
10 recording might actually be helpful.
11      A.   Again, I'm not sure what you're asking
12 for.  If you're asking me to make a diagnosis of a
13 seizure based on an audio recording, I'm going to
14 say no, I can't do that.
15      Q.   Okay.  Well, but if you can't make a
16 diagnosis as to a seizure on a recording, a
17 recording would tell you certain things; correct?
18 Such as it would tell you whether or not the person
19 was coherent?  If they're answering questions.
20      A.   It seems like it.
21      Q.   Okay.  If someone is having a conversation
22 and talking in a normal tone and there doesn't seem
23 to be any indication that the person is not
24 understanding the other person, that would be
25 helpful.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7472

```
 1        A.    That they're not having a seizure at that

 2   time.

 3        Q.    You would assume they would not be having

 4   a seizure at that time?

 5        A.    That's what I'm saying.

 6        Q.    Okay.  Let's talk about a hypothetical,

 7   since you haven't listened to the recordings.

 8        A.    Okay.

 9        Q.    There is a recording between two

10   individuals.

11        A.    Okay.

12        Q.    And there seems to be no confusion by

13   either party.

14        A.    Okay.

15        Q.    If there seems to be -- if they seem to be

16   talking about an incident that happened in the past,

17   so there is some sort of recollection by the

18   individuals.  And there doesn't seem to be any

19   indication of any type that the person is being,

20   like, on the ground thrashing about or anything like

21   that.  Would you agree with me that that would be an

22   indication that the person was not having a seizure?

23        A.    So until this point, my comments have been

24   limited to the type of seizures that we know Mr.

25   Perez to have.  Early, early on, during direct, I
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  mentioned that there is such a thing as a partial

2  seizure.  So just in case that's where you're

3  headed, partial seizure is something where you have

4  consciousness and then that can progress into a

5  lapse of consciousness.  And that's a very

6  specialized other thing that is not what we believe

7  Mr. Perez has.  So I just need to clarify that that

8  exists, and the situation that we're hypothetically

9  exploring might allow for that to be happening, but

10  what you just described would not take place during

11  one of the seizures that we've also been discussing

12  here, the kind of seizures that Mr. Perez has.

13       Q.   Okay.  And you still disagree with me that

14  listening to hours of calls would not rule out for

15  you the fact that he was having the type of seizure?

16       A.   No, I'm sorry.  I thought we were talking

17  about diagnosing seizures, not ruling out seizures,

18  which are two different things.  Capturing seizures

19  and recognizing them is what's difficult in this

20  case.

21       Q.   Okay.  So you would not be able to say he

22  was having a seizure?

23       A.   That's right.

24       Q.   But you would be able to say he was not

25  having a seizure?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       A.    Probably.  Again, this is hypothetical,

2  and --

3       Q.    Under the circumstances that we talked

4  about where the person --

5       A.    That's right.  That does not sound

6  consistent with a seizure.  That seems like -- you

7  could just say that's not a seizure.

8       Q.    Because you cannot tell this jury that

9  either in January, February of 2016, that when Mr.

10  Perez was being recorded, he was having any type of

11  seizure; correct?

12      A.    I have not heard those recordings.  I

13  don't think -- what you're describing doesn't sound

14  like seizure.  This is not something I've reviewed.

15  I believe that what you're describing is not a

16  seizure.

17      Q.    And you don't have an opinion as to that;

18  correct?

19      A.    What do you mean?

20      Q.    Well, you do not have an opinion as to

21  whether or not he was having a seizure?

22      A.    That is right.  I do not have an opinion

23  about whether or not he was having seizures during

24  the time that he was recorded.

25      Q.    And you do not have an opinion as to

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                           Albuquerque, NM 87102
(505) 989-4949                                                       (505) 843-9494
FAX (505) 820-6349                                              FAX (505) 843-9492
                                                               1-800-669-9492
e-mail: info@litsupport.com




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7475

```
 1   whether or not he had a seizure on March 7 of
 2   2016 -- or '14.
 3        A.   March 7 of 2014?  That's right.  I don't
 4   have an opinion about that.
 5        Q.   Okay.  And although you talk about his --
 6   the possible effects of medication, you cannot tell
 7   the jury whether or not he actually had any
 8   impact -- any effect from those medications on March
 9   7 of 2014?
10        A.   That's right.  I do not.  I can't say
11   that.
12        Q.   And you cannot say that during the time
13   period of January through February -- I'll be more
14   specific, because you know there's recordings.
15        A.   I do.  I don't know when they were, but I
16   know there are recordings.
17        Q.   Okay.  Well, you refer to them in your
18   report.
19        A.   That they exist, that's right.
20        Q.   Okay.  So I assume that that would be a
21   relevant time period for you to consider.
22        A.   I'm sorry, I thought you meant the
23   specific date.
24        Q.   No.
25        A.   Okay.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7476

1      Q.   Just the relevant time period; correct?

2      A.   Okay.

3      Q.   February 2016?

4      A.   Okay.

5      Q.   And you cannot tell this jury, you don't

6  have an opinion as to whether or not his medications

7  were actually impacting him significantly?

8      A.   Right.  All I can say is that the

9  medications he was on posed a risk of the things we

10 discussed earlier.

11     Q.   And you also indicated -- and you had

12 plenty of time if you wanted to listen to those

13 recordings; correct?

14     A.   I did not desire to listen to those

15 recordings.  I don't think they're part of the

16 medical record.

17     Q.   That was a conscious effort on your part

18 to not listen to them.

19     A.   I didn't ask to listen to them.

20     Q.   Okay.  So you purposely didn't --

21     A.   I didn't consider asking.  I didn't

22 consider deciding not to.  It didn't occur to me to

23 listen to them.

24     Q.   Until when?

25     A.   Now.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Really?  Because Mr. Beck asked you about

2   listening to the recordings back when you testified;

3   do you recall?

4      A.    No, I don't.

5      Q.    All right.

6           MS. ARMIJO:  May I approach, Your Honor?

7           THE COURT:  You may.

8   BY MS. ARMIJO:

9      Q.    And I'm referring to the transcript, page

10   299.

11      A.    Okay.  "Did you listen to the recordings?"

12   And I said no.  Oh, you're asking why did I say it

13   hadn't occurred to me to listen to them?

14      Q.    Well, you were saying that it didn't occur

15   to you till today, as if that wasn't a question

16   posed to you before.

17      A.    Oh.

18      Q.    Correct?

19      A.    Even though I was asked had I listened to

20   them, I said no.  It still didn't occur to me that I

21   might ask for them to listen to.  I just don't feel

22   that's part of my role here.

23      Q.    Well, part of your role here -- and in

24   looking at your report, isn't the whole point of

25   your testimony, at least part of the point of your

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  testimony is to try and give the jury about what was

2  going on with Mr. Perez during those recordings, the

3  potential for it?

4       A.   I understand my role to be reviewing his

5  medical records in a way that can be translated into

6  a comprehensive picture of his medical health.  So

7  what I did was review those medical records and

8  distill them into something that made sense that

9  could characterize what his health state was.

10      Q.   But you specifically in your report

11 referred to the time period of January and February

12 of 2016, and you put in your report, "Around the

13 time that Mr. Perez is accused of confessing to a

14 role in the murder, he was similarly on a host of

15 medications with aggregate effects of sedation,

16 confusion, fatigue, and likely inability to think

17 clearly."

18      A.   That's right.  So that is a statement

19 regarding the medical records that cover that time

20 period.

21      Q.   Okay.  So -- but you're focusing in on

22 basically him -- and I'm using your words --

23 confessing to a role in the murder; correct?

24      A.   That, as I mentioned before, is to

25 describe a milestone in time.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.    Okay.  And that milestone in time you in

2  your report indicate that he could have the effects

3  of sedation, confusion, fatigue and likely inability

4  to think clearly; correct?

5      A.    That's right.

6      Q.    But if you had listened to the recordings,

7  you could have possibly figured out if he was

8  confused in the recordings or if he had the

9  inability to think clearly based upon that

10 conversation; correct?

11     A.    Because Mr. Perez isn't my patient, I did

12 not, whether by recording or in physical presence or

13 any other way, attempt to diagnose him with anything

14 in person.  All I did was review the medical records

15 and translate those.

16     Q.    But that certainly would have answered

17 that question for you; correct?

18     A.    To me, that crosses that boundary of a

19 subject becoming my patient.  And no, I don't -- I

20 mean, that just seems like an entirely separate

21 issue.  Listening to him might have given some

22 insight into his mental capacity at that time,

23 maybe, but I don't know this person and I don't know

24 the circumstances, so I wouldn't have felt

25 comfortable making a judgment.  I can't imagine.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      Q.   Okay.  So you probably can't make the

2  judgment, then, before this jury whether or not

3  those medications were actually doing that during

4  those recordings; correct?

5      A.   All I can tell you is what those

6  medications were and what their effects are.

7      Q.   And the jury can determine whether or not

8  the medications actually had that effect by

9  listening to those recordings; correct?

10     A.   I don't know.  I suppose that that's what

11  they're being asked to do.

12     Q.   All right.  And then you also make the

13  determination that -- your conclusion is that you

14  anticipated that Mr. Perez would be in a walker or

15  wheelchair-dependent for the rest of his life;

16  correct?

17     A.   That's correct.

18     Q.   And you wrote this report in what year?

19     A.   August of 2017.

20     Q.   Okay.  And you've seen him both at the

21  previous court hearing and then the last -- now,

22  this is your third day here.  Do you see a walker or

23  wheelchair next to him?

24     A.   No, but we've talked about that, that he

25  continues to decelerate his supportive devices to a

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                 201 Third NW, Suite 1630
Santa Fe, NM 87501                                         Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 820-6349                                        FAX (505) 843-9492
                                                                 1-800-669-9492

PROFESSIONAL COURT
REPORTING SERVICE
BEAN & ASSOCIATES, Inc.
e-mail: info@litsupport.com

1   cane, after which time he falls.  I would imagine

2   that if you had a physical therapy evaluation of the

3   way that he ambulates with a cane right now, the

4   determination would mean that that's not a safe

5   option for him.  And actually, that's in the report,

6   as well.  It's just further down in that paragraph.

7        Q.   Well, I'm referring to your summary.

8   Actually, it's not in that paragraph.  You indicate

9   that "I anticipate he will be walker- or

10  wheelchair-dependent for the rest of his life."  And

11  I'm looking at page 7.  And that would not be --

12  that would -- I take it, and I'm not a medical

13  professional -- I would take it that somebody being

14  dependent on a walker or wheelchair would mean that

15  they have to use that as opposed to it just being

16  merely a choice; correct?  Dependent.

17       A.   That's incorrect.  So we can make choices

18  all the time.  If you'll look at the bottom of page

19  2, what I wrote is that "The notes of March 2017,

20  for example, document use of a cane again.  Though

21  he may prefer it, a cane is not an appropriate

22  choice of assistive device for him because of the

23  obvious increase in falls that he sustains when

24  using it.  Progress to a cane in his medical records

25  is not in fact indicative of improved gait or

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1    mobility."  So that's how I see that.
 2         Q.   But yet you still wrote that he would be
 3    dependent; correct?
 4         A.   I believe he remains dependent even though
 5    he doesn't have one next to him at this moment.
 6    That is the safest mechanism for him to use for
 7    ambulation.
 8              MS. ARMIJO:  All right.  May I have a
 9    moment?
10              THE COURT:  You may.
11    BY MS. ARMIJO:
12         Q.   Did you believe he was
13    wheelchair-dependent back in January and February of
14    2016?
15         A.   He was, I believe, though I could go back.
16    He was given a wheelchair for long-distance
17    transport and a walker for shorter distance.  So he
18    had both devices then.
19         Q.   And would it surprise you to learn that on
20    one of the recordings he indicates that he's on the
21    ground talking?
22         A.   No.  Why would that surprise me?  I'm
23    sorry.
24         Q.   Well, he's able to at least stand up, get
25    on the ground, and talk, and then get back up.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Okay.

 2        Q.   You would disagree?

 3        A.   That doesn't sound consistent with what

 4   I've read.

 5        Q.   And just to be clear, in your -- not page

 6   2, but on page 7, your summary portion, what you

 7   state is that -- and this is just a yes or no --

 8   that you anticipate that he will be walker- or

 9   wheelchair-dependent for the rest of his life.

10        A.   Yes.

11             MS. ARMIJO:  I have no further questions.

12             THE COURT:  Thank you, Ms. Armijo.

13             Anyone else beside Ms. Fox-Young have any

14   cross?

15             All right, Ms. Fox-Young, if you -- I

16   guess I should say redirect.

17             MS. FOX-YOUNG:  Thank you, Your Honor.

18                  REDIRECT EXAMINATION

19   BY MS. FOX-YOUNG:

20        Q.   Dr. Brislen, would you consider Mr. Perez

21   to be at risk of falling if he has a cane at this

22   time?

23        A.   Yes.

24        Q.   And I think you testified earlier that in

25   the 24 years of records that you've looked at, Mr.
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                    201 Third NW, Suite 1630
Santa Fe, NM 87501                                            Albuquerque, NM 87102
(505) 989-4949                                                        (505) 843-9494
FAX (505) 820-6349                                               FAX (505) 843-9492
                                                                  1-800-669-9492
              BEAN & ASSOCIATES, Inc.
              PROFESSIONAL COURT
              REPORTING SERVICE              e-mail: info@litsupport.com

7484

```
 1   Perez has cycled through the use of different

 2   ambulatory devices; right?

 3        A.    That's right.

 4        Q.    So sometimes a wheelchair; right?

 5        A.    That's right.

 6        Q.    Sometimes a walker?

 7        A.    Right.

 8        Q.    And this is a cycle that repeats itself?

 9        A.    Right.

10        Q.    And a person who is wheelchair-bound can

11   potentially get down on the floor on their butt, on

12   their back; right?

13        A.    Right.   Wheelchairs aren't just for people

14   that are paralyzed.

15        Q.    You were asked if your opinions in this

16   case are based only on medical records.  Do you

17   remember that?

18        A.    Yes.

19        Q.    Are your opinions also based upon your

20   training and experience?

21        A.    Yes.

22        Q.    Are they also based upon your clinical

23   work?

24        A.    That's right.

25        Q.    Mr. Villa and I asked you to review
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    medical records in this case; right?

2         A.    That's right.

3         Q.    But you're a Court-appointed expert.

4         A.    That's my understanding, yes.

5         Q.    And you're paid by the Court.

6         A.    That's right.

7         Q.    Mr. Villa and I don't pay you.

8         A.    Right.

9         Q.    And we never provided you with audio

10   recordings to listen to; right?

11        A.    That's right.

12        Q.    And we never asked you if you could give

13   any opinion as to whether or not Mr. Perez was

14   having a seizure at the particular time that he was

15   recorded.

16        A.    That's right.  I was not asked that.

17        Q.    Right.  And have you ever done a diagnosis

18   of a patient using an audio recording?

19        A.    No.

20        Q.    Do you think it's appropriate for a

21   medical doctor to make a diagnosis using an audio

22   recording?

23        A.    I spoke with a patient over the break that

24   thinks has an urinary tract infection, and I agreed

25   with her.  But in general, no.  I mean, that's a

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                          201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                     (505) 843-9494
FAX (505) 820-6349                                                 FAX (505) 843-9492
                                                                   1-800-669-9492
                                                                   e-mail: info@litsupport.com



```
 1  telephone conversation for something
 2  straightforward.  You would never diagnose someone
 3  that you've never met based on an audio recording
 4  for something as complex as a seizure.
 5        Q.   If given the opportunity, you examine your
 6  patients in person; right?
 7        A.   That's correct.
 8        Q.   And Mr. Perez is not your patient; right?
 9        A.   No, he's not.
10        Q.   And you were not asked to make a medical
11  diagnosis in this case; right?
12             MS. ARMIJO:  Objection, leading.
13        A.   Correct.
14             THE COURT:  Overruled.
15  BY MS. FOX-YOUNG:
16        Q.   You were asked some questions about a
17  report that you wrote.  Did you author that report
18  for the purposes of this trial?
19        A.   No, I didn't.  That was a summary that I
20  wrote for you and Mr. Villa to understand sort of my
21  global assessment of the medical records that I'd
22  reviewed up to that point.
23        Q.   Okay.  And are you aware whether the
24  substance of that report was, in fact, transmitted
25  to the Government, to the prosecutors months ago in
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   the form of a letter?
 2        A.   I was not aware of that.  I'm sorry.  My
 3   understanding at the time that that was written was
 4   that there were some discussions about a possible
 5   plea going on.
 6        Q.   I don't need to know any more, Dr.
 7   Brislen.  If you don't know, it's okay.
 8        A.   Okay.
 9        Q.   Did you testify on direct about mood
10   disorders that Mr. Perez has?
11        A.   Yes.
12        Q.   And the antisocial personality disorder
13   that you were asked about -- is that a mood
14   disorder?
15        A.   No, it's not.
16        Q.   It's not?  How do you classify it?
17        A.   It's a personality disorder.  So it's this
18   whole other facet of psychiatry.
19        Q.   You were asked about some medical records
20   that reflect self-reporting of problems or
21   incidents; right?
22        A.   That's right.
23        Q.   Including stabbings?
24        A.   Right.
25        Q.   Do you know if those self -- those
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    instances where there was self-reporting, if there

2    is confirmation documented in the reports by actual

3    injuries?

4        A.    Oftentimes, yes.  For example, the reports

5    of scars that were noted in his physical exam would

6    confirm his self-reported stabbing injuries.

7        Q.    You talked about the eight-day seizure

8    that Mr. Perez suffered in September of 2012.  I'm

9    sorry, in May of 2013.

10       A.    That's right.

11       Q.    And you also were asked about Mr. Perez'

12   refusals or declinations of medications; right?

13       A.    That's right.

14       Q.    Do you know, based upon all of the over

15   14,000 pages of records that you've looked at,

16   whether there is any record that shows that Mr.

17   Perez has seen a neurologist since that eight-day

18   seizure in May of 2013?

19       A.    No, there is none.

20       Q.    And if Mr. Perez is refusing medications,

21   do you know whether he was even on the right

22   medications for a seizure disorder?

23       A.    I don't know that.

24       Q.    Or whether he felt that they were working

25   for him?

SANTA FE OFFICE                                                          MAIN OFFICE
119 East Marcy, Suite 110                                       201 Third NW, Suite 1630
Santa Fe, NM 87501                                                 Albuquerque, NM 87102
(505) 989-4949                                                              (505) 843-9494
FAX (505) 820-6349                                                  FAX (505) 843-9492
                                                                           1-800-669-9492
                                                               e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7489

```
1        A.    His -- I can't really comment on that.
2   Most of his issues with his medications were due to
3   side effects or ineffective pain control.
4        Q.    With respect to -- and you're not Mr.
5   Perez' medical provider.  I understand.  But with
6   respect to some of the medical providers who he has
7   had, you were asked if you obtained any information
8   directly from those providers.  Do you recall that
9   line of questioning?
10       A.    Yes, I do.
11       Q.    In fact, you did request that records be
12  obtained from neurologists at UNMH; right?
13       A.    That's right.
14       Q.    And did you also request that records be
15  obtained from other providers like Dr. Andrade,
16  Dr. Rounseville?
17       A.    Yes.
18       Q.    And did we make efforts to obtain every
19  record we could at your request?
20       A.    My understanding is yes.
21       Q.    And at some point you indicated that you
22  had wanted to talk to one of the neurologists at
23  UNMH; right?
24       A.    Yes.
25       Q.    But were your questions and concerns
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  satisfied by the records that you ultimately

2  obtained?

3      A.   I think so.  The primary piece of

4  information that settled that was when we were able

5  to get the discharge summary from the

6  hospitalization that described their intent to

7  follow up with him as an outpatient.  That was my

8  primary question, was what had happened that he

9  didn't get neurological followup; did they discharge

10 him thinking that he could go back to usual care?

11 And what was revealed in that discharge summary was

12 that neurology intended to follow him, and then I

13 was able to confirm with his other medical records

14 that that had not happened.

15     Q.   Okay.  You made some efforts to try to

16 reach that Dr. Saria, didn't you?

17     A.   I did.

18     Q.   You talked about -- and you explained to

19 the jury what the post ictal phase after a seizure

20 is, but I'm not sure you said how long a post ictal

21 phase lasts.  Can you tell the jury how long it

22 lasts?

23     A.   It's highly variable.  It can be a couple

24 of minutes to several hours.

25     Q.   When a person has a seizure, is it common

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7491

1    to become incontinent?

2        A.   Very common.

3        Q.   It's sort of an embarrassing occurrence,

4    isn't it?

5        A.   Yeah.   Seizures can be really frightening

6    and disorienting.   That's part of why we think that

7    the post ictal period might be characterized the way

8    that it did because if you're just coming back into

9    a noisy room and you've lost continence or you're

10   lying on the floor suddenly or you've broken

11   something or something like that, it's very scary

12   for folks.

13       Q.   And do you think that that fear and

14   disorientation might prevent somebody from reporting

15   a seizure?

16       A.   I could see that it might.

17       Q.   I think you said that the last witnessed

18   seizure that you're aware of from the records you

19   looked at was in August 2016?

20       A.   That's right.

21       Q.   Did you also say that the substantial part

22   of your review of the records only went through

23   2016?

24       A.   That's right.

25       Q.   And to be clear, we never asked you

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  whether you had an opinion as to whether Mr. Perez

2  was having a seizure at the precise time that he

3  allegedly talked to Billy Cordova; right?

4       A.   That's right.

5       Q.   And is it your opinion that you could not

6  give an opinion on that based upon an audio

7  recording?

8       A.   That's right.

9            MS. FOX-YOUNG:  No further questions, Your

10 Honor.

11           THE COURT:  Thank you, Ms. Fox-Young.

12           Anyone else?  All right.  Did you have

13 something further, Ms. Armijo?

14           MS. ARMIJO:  Yes, Your Honor.

15                  RECROSS-EXAMINATION

16 BY MS. ARMIJO:

17      Q.   And Doctor, you don't have an opinion

18 about whether or not he was not only not having a

19 seizure, but also in that post ictal period;

20 correct?

21      A.   That's right.

22      Q.   All right.

23           MS. ARMIJO:  That's all, Your Honor.

24           THE COURT:  Thank you, Ms. Armijo.

25           Anything further, Ms. Fox-Young?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1            MS. FOX-YOUNG:  No, thank you, Your Honor.
 2            THE COURT:  All right.  Dr. Brislen, you
 3   may step down.  Thank you for your testimony.
 4            All right.  Do the defendants have their
 5   next witness or evidence?
 6            MS. DUNCAN:  Yes, Your Honor.  Mr. Baca
 7   calls Clint Snodgrass.
 8            THE COURT:  Mr. Snodgrass, if you'd come
 9   up and stand next to the witness box on my right,
10   your left, before you're seated, my courtroom
11   deputy, Ms. Standridge, will swear you in.
12                   CLINT SNODGRASS,
13       after having been first duly sworn under oath,
14       was questioned, and testified as follows:
15            THE CLERK:  State and spell your name for
16   the record.
17            THE WITNESS:  It's Clint Snodgrass.
18   C-L-I-N-T, S-N-O-D-G-R-A-S-S.
19            THE COURT:  Mr. Snodgrass.
20            Ms. Duncan.
21            MS. DUNCAN:  Thank you, Your Honor.
22                   DIRECT EXAMINATION
23   BY MS. DUNCAN:
24       Q.   Good afternoon, Mr. Snodgrass.
25       A.   Good afternoon.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    Q.   Would you please tell us where you are

2  employed?

3    A.   I'm employed by the City of Portland,

4  Oregon, as a police officer.

5    Q.   How long have you been employed at the

6  City of Portland as a police officer?

7    A.   I've been employed by the City of Portland

8  as a police officer for 11 years.

9    Q.   And were you employed as a law enforcement

10 officer before you joined the Portland Police

11 Department?

12   A.   Yes.  I was a reserve police officer for

13 the city of Oregon City, Oregon.

14   Q.   And what position do you hold at the

15 Portland Police Department?

16   A.   I'm a police officer.

17   Q.   I'd like to talk to you about an encounter

18 you had with an individual named Eric Duran on

19 November 11, 2017.  Do you remember that encounter?

20   A.   Yes, I do.

21   Q.   Can you tell us how did you come into

22 contact with Mr. Duran?

23   A.   A hotel in the area I patrol called in for

24 a couple of people who were sleeping in a car in

25 their underground parking garage.  So Officer

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Gillingham responded and asked for another officer

2  to assist him, and then I joined him in addressing

3  the two people sleeping in the car.

4         Q.   So you drove into the parking garage; is

5  that correct?

6         A.   Yeah, Officer Gillingham already pulled

7  his car in.  The car was backed up to a concrete

8  wall that had the people sleeping in it.  So he

9  pulled up directly in front of it, and then I pulled

10  up kind of offset from his car, kind of behind to

11  the side of his car.

12         Q.   And after you parked your car in front of

13  Officer Gillingham's car, what did you do?

14         A.   I parked behind his car.

15         Q.   Behind his car.  Excuse me.

16         A.   Then he was up -- he had already ran the

17  car and verified that it wasn't stolen or anything

18  suspicious about the car.  And he was up next to the

19  driver's side of the car, the white Chevy Equinox.

20              So I walked up with him and began looking

21  in the car.  When I arrived, I saw the two occupants

22  were asleep in the car.  So I walked up and joined

23  Officer Gillingham to look into the car.  And it was

24  kind of a dim-lit garage, so I used my flashlight to

25  shine through the windows in the car and to see who

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                              201 Third NW, Suite 1630
Santa Fe, NM 87501                                      Albuquerque, NM 87102
(505) 989-4949                                                    (505) 843-9494
FAX (505) 820-6349                                          FAX (505) 843-9492
                                                                    1-800-669-9492
                                                    e-mail: info@litsupport.com


BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1  was in it, and make sure that it was safe to

2  awake -- make them wake up.

3      Q.   How many individuals were in the car?

4      A.   It was two.  Front-seat passenger and the

5  driver.

6      Q.   And how were they positioned in the seat?

7  Let's start with the driver.  How was he positioned?

8      A.   The driver was just asleep, kind of

9  sitting upright but asleep, kind of just head to the

10  side type asleep.

11      Q.   And how about the passenger?

12      A.   The passenger had fully reclined the seat

13  backwards and was laying back in the seat.

14      Q.   Was Mr. Duran the driver or the passenger

15  of the car?

16      A.   He was the passenger.

17      Q.   When you walked up to the car and you

18  observed the two men, did you notice anything else

19  inside the car?

20      A.   Yeah.  So as I shined my flashlight in the

21  car, just for safety reasons I wanted to make sure

22  there's no surprises.  And so I shone my light first

23  at where Duran was in the passenger seat and saw he

24  had a cellphone in his lap.

25            Then I moved over to the driver and shone

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7497

1   my light in his lap and initially I thought it was a

2   cellphone, but then I realized that it was the

3   muzzle of a gun protruding out from his hand.  So at

4   that point in time I told Officer Gillingham the

5   driver had a gun, so we kind of backed up away from

6   the car.

7        Q.   What did you do after you backed away from

8   the car?

9        A.   So I went back to my patrol car and took

10  out my rifle that was in the patrol car and covered

11  the passenger side of the Equinox.  I mean, just

12  kind of make sure that if they came out, we were

13  ready.  Then Officer Gillingham went to the driver's

14  side -- well, the passenger side of my patrol car,

15  but then to cover the driver's side of the Equinox.

16  The two cars were facing head to head.  And then he

17  started coordinating getting more officers there to

18  bring the subjects out safely.

19        Q.   And at that point, were the two men in the

20  car still asleep?

21        A.   Yeah, completely asleep, yeah.

22        Q.   At some point did you do something to try

23  to wake them up?

24        A.   Yeah.  So once we had more officers there,

25  we then got on our P.A. system and announced,

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7498

```
1    "Portland police.  We know you have a gun."
2           And there is no response from either
3    occupant of the car.  So then we shone the takedown
4    lights on the front of the patrol car, which is just
5    white lights that shine forward.  We turned those on
6    and then announced again in the P.A. system, and
7    this time the driver woke up.
8         Q.   How loud is your P.A. system?
9         A.   It's loud.  I mean, especially in the
10   parking garage, it's very loud.
11        Q.   And how bright is that light?
12        A.   They're pretty light, pretty bright.
13   They're bright LED lights.
14        Q.   So you said at that point the driver woke
15   up.  Did the passenger wake up at that point?
16        A.   No.  There was no movement from the
17   passenger at that time.
18        Q.   Once the driver woke up, what did you do?
19        A.   So then the officers that were on that
20   side of the vehicle began giving commands to the
21   driver telling him we know he had a gun, keep his
22   hands where we could see them, and then have him
23   exit the car where we could still maintain control
24   of his hands.  And he complied in doing that, and
25   walked out onto their side of the vehicle, which was
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

7499

```
 1   opposite where I was, and he was taken into custody
 2   at that time.
 3        Q.   What did you do when the driver was taken
 4   into custody?
 5        A.   So during -- when the driver exited the
 6   Equinox, I then saw Duran in the passenger seat sit
 7   up.  So I started giving him commands to keep his
 8   hands up where I could see them while they were
 9   still dealing with the driver.
10        Q.   And did Mr. Duran obey your commands?
11        A.   He initially did.  He put his hands where
12   I could see them.  But on two separate occasions he
13   put his hands down into his lap area, which is
14   concerning to me because, one, I couldn't see them,
15   and I knew there was a gun in the car still.  So I
16   started giving him words like, "Don't put your hands
17   where I can't see them.  You're going to end up --
18   you're going to get shot if you do."
19             So he brought them back up.  He did that
20   twice.  But the second time he did it, he slid all
21   the way down completely out of view, kind of
22   slouched on the seat where I couldn't see any of his
23   person, his body, his head.  But he kept his hands
24   up above the dash so I could see that his hands were
25   still there.  Considering that was enough compliance
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7500

1  for me, so I just let him remain like that, which he

2  remained probably 30 seconds, then he sat back up,

3  kept his hands where I could see them, and was

4  compliant after that time.

5      Q.   And when Mr. Duran slid down in his seat

6  so you could no longer see him except for his hands,

7  was that unusual to you?

8      A.   It was unusual, yeah.  I've never had

9  anyone do that before.  Yeah.

10     Q.   So after Mr. Duran sat up, how long did he

11 stay in the car?

12     A.   He might have been -- seems like it was a

13 couple of minutes until we had the driver fully

14 secured in the back of the patrol car.

15     Q.   And then what did you do?

16     A.   So after the driver was secured, then we

17 started giving Duran commands to get out of the car

18 and walk back towards us, which he complied and he

19 was taken into custody at that point in time,

20 handcuffed, and then placed in the patrol car.

21     Q.   Whose patrol car was he placed in?

22     A.   He was placed in my patrol car.

23     Q.   After he was placed in the patrol car,

24 what did you do?

25     A.   So after, yeah, the two occupants were

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7501

```
1   secured in the patrol car, we then approached the
2   car, their car, to make sure that there wasn't no
3   one else in there, to make sure that it was safe.
4   So that's what I did, was approach their car.
5        Q.   Did you search the car?
6        A.   I did search the car, yes.
7        Q.   What did you find?  Let's start with the
8   cabin of the car.  What did you find, if anything,
9   in the cabin?
10       A.   So immediately I could see there was a
11  Glock semi-automatic handgun on the driver's seat.
12  And then in further searching the car, I found that
13  there were other magazines, gun magazines for
14  different caliber guns and some ammo in the car, as
15  well.  And then on the passenger side under the
16  front passenger seat, kind of partially under the
17  seat, partially by the front floor board, there was
18  another semi-automatic handgun.
19       Q.   So that other semi-automatic handgun was
20  found under the passenger seat where Eric Duran had
21  been seated?
22       A.   Correct.
23       Q.   Do you know what kind of gun it was?
24       A.   It was some Egyptian type gun.  I don't
25  recall offhand exactly.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN &
ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

 1          Q.    Do you know if that gun was loaded?

 2          A.    It had ammunition in the magazine, but

 3     there was nothing in the chamber of the gun.

 4          Q.    And do you recall, did you find any extra

 5     magazines that belonged to that gun?

 6          A.    I believe there was another magazine in

 7     the car behind the passenger seat in the map pocket.

 8          Q.    Did you search any other area of the car

 9     besides the cabin?

10          A.    Yeah.  We searched the hatch area, the

11     trunk area, and there was another gun -- like a gun

12     lock and a holster back there.  That was about all I

13     can recall right now.

14          Q.    Did you find a box of bullets?

15          A.    There was a box of bullets located, yes.

16          Q.    And did you find -- was there anything on

17     the box of bullets?

18          A.    Yes.  The box of bullets had what appeared

19     to be dried blood on the actual cardboard box.

20          Q.    So after searching the car, did you find

21     anything else that you haven't testified about in

22     the search of that car?

23          A.    No.

24          Q.    So what did you do then?

25          A.    So after finding magazines -- so that the

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7503

1    two guns that were in the car were nine millimeter

2    guns.  I found some .45 caliber magazines.  So I was

3    concerned that we might have missed a gun on one of

4    the two occupants of the car.  So I had another

5    officer research the driver, and I went back to

6    research Duran.

7         Q.   And what did your research uncover?

8         A.   He was already handcuffed behind his back,

9    seated in the back of my patrol car.  So I had him

10   exit out of the car and face away from me.  When he

11   turned around, I could see that he had -- his hand

12   was kind of clasped.  He had his fingers curled in.

13   So I asked him to uncurl his fingers so I could see.

14   And he kind of pulled away, and I grabbed his hand

15   and told him to open his hand up so I could see his

16   palm.  And he did.  And when he opened his hand, I

17   could see he had a bag of what appeared to be

18   heroin.

19        Q.   Officer Snodgrass, can you demonstrate to

20   the jury how Mr. Duran was holding that bindle?

21        A.   Yes.  So if you can hear me, so his hands

22   are behind his back.  So most people just relax and

23   let their hands hang.  So he had one hand that was

24   open, and the other hand, he had his palm, fingers

25   kind of curled tightly.  I don't know if you guys

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.

PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  can see.  So he was trying to palm and conceal what

2  appeared to be heroin.

3       Q.   And did you ask Mr. Duran what he had in

4  his hand?

5       A.   Yes.  I Mirandized him and asked what he

6  had in his hand.  He said he found it in the patrol

7  car.

8       Q.   Did you get the sense when Mr. Duran

9  had -- was putting in his fingers that he was trying

10  to hide it from you?

11       A.   Yes.  Based on how he was clasping it, and

12  then I told him to uncurl his fingers, he pulled

13  away, was his first reaction.

14       Q.   So he told you that he had found the

15  bindle of heroin in the back of your patrol car?

16       A.   That's correct.

17       Q.   And did that explanation make sense to

18  you?

19       A.   No, because I knew he was the first person

20  I had placed in the car for the day.  And at the

21  beginning of my shift I always check the backseat to

22  make sure there's nothing back there, and I knew the

23  seat was clear and there was nothing back there.  So

24  I knew it wasn't there before.

25       Q.   And if he had, in fact, found a bindle of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7505

1  heroin, would you have expected him to just hand it

2  over to you instead of trying to hide it from you?

3       A.   Yes.  If you found it and you wanted to

4  turn it over, that would be the first thing, "I

5  found this," and to me that would be a reasonable

6  response.

7       Q.   So after Mr. Duran told you that he had

8  just found the bindle of heroin in your car, what

9  did you do?

10       A.   Well, I explained to him that that's not

11  accurate, that I knew there was nothing else back

12  there.  So then I continued my search of him to make

13  sure that there wasn't a missed weapon, and there

14  was nothing else found on his person, so I placed

15  him back in the patrol car.

16       Q.   And at any point did you find additional

17  bindles of heroin?

18       A.   Yeah.  So there was a large substance --

19  or amount that was found in his hand in that bag.

20  And then when I got -- I transported him to the

21  precinct to be placed in a holding cell.  And when I

22  got him out of the car to go into the precinct, I

23  located three other small little bindles of what

24  appeared to be a brown substance which appeared to

25  be heroin to me.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7506

1    Q.   Did you find those three little bindles?

2    A.   There on the seat, and then on the floor

3    board of the back seat.

4    Q.   And did you talk to Mr. Duran again about

5    the heroin and where he got it?

6    A.   Yeah, I asked him -- I requestioned him

7    about it, and he said that he got it from the

8    driver; when he got into the car with the driver, he

9    handed it to him.

10    Q.   And at any point did he discuss with you

11    why he would have gotten heroin from the driver?

12    A.   He told me that he was an FBI informant

13    and that when he got in the car, the driver handed

14    him the heroin and he didn't want to reveal his -- I

15    guess what he was there for, so he kept it.

16    Q.   Did you discuss his claim to be an FBI

17    informant with him any further?

18    A.   Yeah.  I mean, he kept reiterating he was

19    an FBI informant.  I told him if he would provide me

20    with a name and somebody I could call to show up and

21    vouch for him, we could address it.  But I was never

22    provided with a phone number or a name.

23    Q.   Did you ask him for the name or number of

24    the handler more than once?

25    A.   Yes.  It was a continuing conversation.  I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  asked several times that I can recall.

2      Q.   Did he ever tell you who he was working

3  with?

4      A.   No, he never told me.

5      Q.   Did he ever provide you a phone number for

6  you to call and verify his status?

7      A.   No, he did not.

8      Q.   So after you searched Mr. Duran and placed

9  him back in the patrol car, you then drove to the

10  station.  At any point did you talk to Mr. Duran

11  about the gun?

12      A.   Yeah, I asked him about the gun that was

13  located under the passenger seat, and he just denied

14  there being -- he didn't know there was any gun in

15  the car.  He knew the driver had a gun, but he said

16  he had no idea there was any other gun in the car.

17      Q.   And did that story seem credible to you?

18      A.   No.  Based off of his actions when we

19  first contacted him in the car, it didn't seem

20  logical that the gun was where we pointed and he was

21  unaware of it.

22      Q.   Why do you say that?

23      A.   Because where the gun -- how the car was

24  set up, the front floorboard, there's a little hump

25  between the front floorboard and where it goes under

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  the seat, so it's kind of a raised portion, and

2  that's where the gun was kind of set.  So in my

3  opinion that if the car had been driven a short

4  distance, it would have either slid forward onto the

5  floorboard or backward under the seat further.

6       Q.   So did it seem to you that the gun had

7  just been placed there?

8       A.   Yes, it did.

9       Q.   Based on your training and experience, do

10  you -- is it your opinion or do you have an opinion

11  about whether or not Mr. Duran was under the

12  influence of drugs during your encounter?

13       A.   Initially when we got there -- because the

14  call came out that the hotel staff had knocked on

15  the window and got no response from the two

16  occupants, Officer Gillingham knocked on the window

17  and got no response from the two occupants, and then

18  they were completely asleep for probably five or

19  more minutes while we were there dealing with it

20  before they woke up, which is, to me, an indication

21  that you're under the influence of heroin.

22       Q.   How would you describe Mr. Duran's

23  attitude during your encounter with him?

24       A.   He kind of just had an I-don't-care

25  attitude, like it just didn't really matter.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1       Q.   And while Mr. Duran was in the back of

2   your car, did he fall asleep at any point?

3       A.   Yeah.  So after I took him to the

4   precinct, placed him in a holding cell, I then drove

5   him to jail and he fell asleep from the precinct to

6   jail, which is maybe a 20-minute trip.

7       Q.   So based on your encounter with Mr. Duran,

8   do you have an opinion as to his truthfulness?

9       A.   Do I have an opinion?

10           MS. ARMIJO:  Objection, relevance.

11           THE COURT:  I didn't quite hear.  Oh,

12  truthfulness.

13           MS. DUNCAN:  Opinion as to Mr. Duran's

14  truthfulness, Your Honor.

15           THE COURT:  It's a yes/no question at this

16  point.

17      A.   Do I have an opinion?

18  BY MS. DUNCAN:

19      Q.   Yes.

20      A.   Yes.

21      Q.   And what is that opinion?

22           MS. ARMIJO:  Objection, relevance.

23           THE COURT:  Overruled.

24      A.   That he was not being 100% honest with me.

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   BY MS. DUNCAN:
 2        Q.   Since your encounter with Mr. Duran, have
 3   you ever been contacted by the U.S. Attorney's
 4   Office in New Mexico?
 5        A.   Not that I'm aware of, no.
 6        Q.   Have you ever been contacted by the FBI?
 7        A.   Not I'm aware of, no.
 8             MS. DUNCAN:  Your Honor, if I could have a
 9   moment?
10             THE COURT:  You may.
11             MS. DUNCAN:  No further questions, Your
12   Honor.
13             THE COURT:  Thank you, Ms. Duncan.
14             Any other defendant have direct
15   examination of Mr. Snodgrass?
16             All right, Ms. Armijo.
17             MS. ARMIJO:  Thank you, Your Honor.
18             THE COURT:  Ms. Armijo.
19                       CROSS-EXAMINATION
20   BY MS. ARMIJO:
21        Q.   Officer Snodgrass, now, when you said you
22   have an opinion as to him being truthful, that's as
23   to that day; correct?  Or that evening?
24        A.   My encounter with him, yes.
25        Q.   You have no opinion as to him other than
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   that one incident; correct?
 2       A.   Correct.
 3       Q.   And nobody has contacted you and told you
 4   to dismiss the case; correct?
 5       A.   For the City of Portland?
 6       Q.   Yes.
 7       A.   No.
 8       Q.   For the charges.
 9       A.   No.
10       Q.   And nobody being -- I should say the
11   federal government; correct?
12       A.   No, no one has told me to dismiss it.
13       Q.   No one has asked you to give him favorable
14   treatment; correct?
15       A.   Correct.
16       Q.   And are the amount of drugs that he had,
17   was that consistent with a personal usage amount?
18       A.   I would say no.
19       Q.   You thought it was more?
20       A.   Yes.
21       Q.   Okay.  And -- but it wasn't a large
22   amount; correct?
23       A.   It wasn't a huge amount, no, but it was
24   more than what I consider to be personal use, and
25   couple that with the three extra little bindles that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  were individually packaged.

2      Q.   Okay.  But you believe that he was under

3  the influence of heroin at the time; correct?

4      A.   Based on how he initially presented

5  himself, being completely, like, deep asleep, yes.

6      Q.   And are you aware that the FBI actually

7  served a search warrant on him for DNA to pursue the

8  case?

9      A.   I was not aware of that, no.

10         MS. ARMIJO:  All right.  So I have no

11  further questions.  Thank you.

12         THE COURT:  Thank you, Ms. Armijo.

13         Any redirect of Mr. Snodgrass?

14         MS. DUNCAN:  No, Your Honor.

15         THE COURT:  Anybody else?

16         All right.  Mr. Snodgrass, you may step

17  down.

18         Is there any reason that Mr. Snodgrass

19  cannot be excused from the proceedings?

20         MS. DUNCAN:  No, Your Honor.

21         THE COURT:  And Ms. Armijo, is that --

22         MS. ARMIJO:  No, Your Honor.  Thank you.

23         THE COURT:  All right.  You are excused

24  from the proceedings.  Thank you for your testimony.

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1          THE COURT:  All right.  Do the defendants

2    have their next witness or evidence?

3          MR. VILLA:  Yes, Your Honor.  Mr. Perez

4    calls Ernie Holguin.

5          MS. ARMIJO:  Your Honor, may we approach?

6          THE COURT:  You may.

7          (The following proceedings were held at

8    the bench.)

9          MS. ARMIJO:  Your Honor, we would just --

10   we believe that they're calling Ernie Holguin to try

11   to get in the hearsay statement of Mr. Perez and so

12   we would just ask that any statements by Mr. Perez,

13   since they are a party opponent, be excused.

14         THE COURT:  Okay.

15         MR. VILLA:  Your Honor, I won't ask about

16   any statements.  There is a point in time when I'll

17   ask to approach the bench that I can make a record

18   about a statement I think the Court should admit,

19   but I won't elicit.  I'll lead him to that point and

20   approach the bench at the appropriate time.

21         THE COURT:  All right.  Does that work?

22         MS. ARMIJO:  Yes.  Thank you.

23         (The following proceedings were held in

24   open court.)

25         THE COURT:  Mr. Holguin, if you'll come up

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7514

1    and stand next to the witness box, it's on my right,

2    your left, before you're seated, my courtroom

3    deputy, Ms. Standridge, will swear you in.

4                        ERNIE HOLGUIN,

5         after having been first duly sworn under oath,

6         was questioned, and testified as follows:

7              THE CLERK:  State and spell your name for

8    the record.

9              THE WITNESS:  My name is Ernie Holguin.

10   E-R-N-I-E, H-O-L-G-U-I-N.

11             THE COURT:  Mr. Holguin.  Mr. Villa.

12             MR. VILLA:  Thank you, Your Honor.

13                     DIRECT EXAMINATION

14   BY MR. VILLA:

15        Q.   Mr. Holguin, how are you employed?

16        A.   I'm employed with the State of New Mexico

17   Department of Corrections.

18        Q.   How long have you been employed with the

19   Department of Corrections?

20        A.   Sixteen years.

21        Q.   And prior to that were you involved in the

22   field of corrections?

23        A.   No, sir.

24        Q.   Law enforcement?

25        A.   Yes, sir.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        Q.    Can you tell the jury about that?
 2        A.    Prior to Department of Corrections, I
 3   worked for the City of Deming Police Department.
 4        Q.    How long did you work for the City of
 5   Deming?
 6        A.    Two years.
 7        Q.    And before becoming a police officer with
 8   the City of Deming, were you certified as a law
 9   enforcement officer?
10        A.    No.
11        Q.    After your two years with Deming, did you
12   immediately go to the Department of Corrections?
13        A.    Yes.
14        Q.    Did you receive training upon your hire at
15   the Department of Corrections?
16        A.    Yes, I had.
17        Q.    Will you tell the jury about that
18   training?
19        A.    I was sent to Santa Fe for eight weeks for
20   DOC corrections training, which consisted of
21   policies, procedures, use of force.
22        Q.    And you said that was about 16 years ago?
23        A.    Yes, sir.
24        Q.    And I think you testified it's an
25   eight-week training?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Yes, sir.

 2        Q.    And then after the training, what did you

 3   do?

 4        A.    I was sent to Southern New Mexico

 5   Correctional Facility as a correctional officer 1.

 6        Q.    That's the facility that's right outside

 7   Las Cruces?

 8        A.    Yes, sir.

 9        Q.    And what's a correctional officer 1?

10        A.    It's just the first level of supervision.

11        Q.    I guess that's the beginning or

12   introductory position?

13        A.    Yes.

14        Q.    What is a correctional officer 1's job

15   duties?

16        A.    Security -- safety and security of the

17   inmates and the citizens.

18        Q.    Can you tell the jury approximately what

19   year that was that you started as a correction

20   officer 1?

21        A.    2002.

22        Q.    And how long were you a correction officer

23   1?

24        A.    About seven years.

25        Q.    After that seven years, what was the next?
```



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.    I went to the STIU gang unit and K-9
2   officer.
3      Q.    What is STIU?
4      A.    Security Threat Intelligence Unit.
5      Q.    When you say you moved up, is that a
6   promotion or a lateral transfer?
7      A.    It's a lateral transfer.
8      Q.    Did you receive any specialized training
9   for that transfer?
10     A.    Yes, I did.
11     Q.    Can you tell the jury about that?
12     A.    I was sent to Santa Fe to do a two-week
13  course on just gang activities, what to look for.
14     Q.    And when you're talking about gangs,
15  you're talking about prison gangs, I assume?
16     A.    Prison and street, yes, sir.
17     Q.    And street gangs?
18     A.    Yes, sir.
19     Q.    Now, when you obtained this new position
20  in the STIU, where did you work?
21     A.    At Southern, still.
22     Q.    Is it fair to say the entire 16 years of
23  your career has been at Southern New Mexico?
24     A.    Yes.
25     Q.    Have you ever worked in any of the other

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7518

 1  facilities?

 2      A.   Just duty assignments when they send us to

 3  different facilities to conduct interviews and

 4  things like that.

 5      Q.   What was your job title when you first

 6  became a member of the STIU?

 7      A.   Correctional officer 1.

 8      Q.   Still a correctional officer 1?

 9      A.   Yes.

10      Q.   What's your job title now?

11      A.   STIU, K-9.

12      Q.   And you talked about K-9.  What is that?

13      A.   I have a K-9 that I run there at the

14  facility.

15      Q.   And what does the K-9 do?

16      A.   He's used for searching narcotics and

17  contraband.

18      Q.   What kind of K-9 is it?

19      A.   It's a Malinois, just a regular dog,

20  Malinois, that's been through an eight-week training

21  course.

22      Q.   Did you go through the K-9 training course

23  with the K-9?

24      A.   Yes.

25      Q.   What are the job duties that you have now

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

```
 1   in the STIU?

 2        A.   It's still the same, but I primarily

 3   monitor gang activity and contraband introductions.

 4        Q.   How do you monitor gang activity?

 5        A.   We use phones, we use intel, we do

 6   interviews, we walk amongst the inmates and talk to

 7   them out there in the field.

 8        Q.   So when you say interviews, that includes

 9   interviews of inmates?

10        A.   Correct.

11        Q.   And when you interview an inmate, do you

12   prepare reports or documentation?

13        A.   Yes.

14        Q.   Tell me about that.  What kind of

15   documentation?

16        A.   It depends on the situation.  If we're

17   going to go interview a fight or something, we may

18   look up the inmates that were involved and look at

19   their background and see what's happened prior to

20   them being investigated.

21        Q.   When you say, "look at their backgrounds,"

22   what do you mean?

23        A.   We'll look at any incidents that have

24   occurred in the Department of Corrections.

25        Q.   Now, are there certain inmates that are
```

SANTA FE OFFICE                                                    MAIN OFFICE
119 East Marcy, Suite 110                                   201 Third NW, Suite 1630
Santa Fe, NM 87501                                          Albuquerque, NM 87102
(505) 989-4949                                                      (505) 843-9494
FAX (505) 820-6349                                             FAX (505) 843-9492
                                                                 1-800-669-9492
                                                          e-mail: info@litsupport.com



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

1 identified as members of gangs as opposed to inmates

2 that aren't?

3     A.   I don't understand that question.

4     Q.   So let me ask the question a little bit

5 different way.  Are there inmates that you know are

6 members of a gang?

7     A.   Yes.

8     Q.   And how do you make that determination?

9     A.   Through their activities, their tattoos,

10 their involvement in different activities within the

11 prison that are illegal.

12     Q.   And do sometimes you interview prison gang

13 members?

14     A.   Yes, all the time.

15     Q.   Do they always talk to you?

16     A.   Yes.

17     Q.   Let me ask you this.  If you go to talk to

18 a prison gang member, do they often refuse to talk

19 to you?

20     A.   Occasionally, but not too often.

21     Q.   Now, what about if you're asking for

22 specific information about a specific incident?

23     A.   It takes a little bit more time.

24     Q.   Are there times when inmates will -- that

25 are members of a gang, at least known to you, refuse

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    to talk to you about a specific incident?

2         A.   Yes.

3         Q.   And refuse to provide any specific

4    information?

5         A.   Yes.

6         Q.   Now, when you write a report about an

7    interview and let's say it's of a prison gang member

8    and they actually give you some information, are

9    there any steps taken to try to protect that

10   paperwork from getting into the hands of the wrong

11   people?

12        A.   Yes.

13        Q.   Tell me about that.

14        A.   Usually we'll assign a confidential

15   informant number to that individual, which only the

16   coordinator and the wardens will know about, and

17   then we'll write a memo based off that CI number.

18        Q.   Do sometimes -- well, is there a term that

19   inmates refer to that paperwork as?

20        A.   Basically they'll refer to it as ratting

21   or telling.

22        Q.   But have you ever heard the term

23   "black-and-whites"?

24        A.   No.

25        Q.   You never heard that term before?  Okay.

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7522

 1    But clearly, if there was a document that you

 2    prepared that says, "Person X made a statement about

 3    this incident," and that information got into the

 4    wrong hands, that could be a problem for person X.

 5         A.   Yes.

 6         Q.   Were you working at the Southern New

 7    Mexico Correctional Facility during the time, March

 8    2014?

 9         A.   Yes.

10         Q.   And are you familiar with the Javier

11    Molina homicide?

12         A.   Yes.

13         Q.   Did you participate in any way in the

14    investigation of that homicide?

15         A.   Yes.

16         Q.   And just generally, without getting into

17    any specifics, what did you do to help with that

18    investigation?

19         A.   I conducted interviews.

20         Q.   How many interviews did you conduct?

21         A.   Probably eight or ten.

22         Q.   And can you tell me the individual -- not

23    necessarily by name, but who were the individuals

24    that you were interviewing?  Are you talking about

25    inmates or guards, or who were they?



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    Inmates.

 2        Q.    Were all those interviews inmates?

 3        A.    Yes.

 4        Q.    Were they inmates known to you to be

 5   members of a prison gang?

 6        A.    Yes.

 7        Q.    Were you working in conjunction with the

 8   State Police on this investigation?

 9        A.    Yes.

10        Q.    Do you remember who the case agent or, I

11   guess, the lead agent for the State Police was for

12   the Javier Molina homicide?

13        A.    It would have to be Agent Palomares.

14        Q.    So you were working with him?

15        A.    We were turning our information over to

16   him, yes.

17        Q.    When you say "turning information over to

18   him," what do you mean?

19        A.    Any memos or any interviews that we

20   conducted went through my coordinator and then given

21   to State Police.

22        Q.    Who was your coordinator?

23        A.    Daniel Blanco.

24        Q.    Is the coordinator -- was he Captain

25   Daniel Blanco?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.    He was a captain prior to being the
 2   coordinate.
 3        Q.    Okay.  So he was a captain, and then he
 4   became the STIU coordinator?
 5        A.    Yes.
 6        Q.    So you did these eight or ten interviews;
 7   right?
 8        A.    Yes.
 9        Q.    And then prepared memorandums of them?
10        A.    Yes.
11        Q.    And you provided those to your
12   coordinator, Blanco?
13        A.    Yes.
14        Q.    Did you also provide some of these
15   directly to Agent Palomares?
16        A.    Yes.
17        Q.    And that was because you knew he was
18   involved in the investigation of the homicide?
19        A.    Correct.
20        Q.    So I wanted to ask you specifically -- and
21   I don't want to get into anything that Mr. Perez has
22   said at this juncture.  Did you conduct an interview
23   of Rudy Perez?
24        A.    Yes, I did.
25        Q.    Did you conduct that interview because
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1   Warden Mulheron asked you to do that?

2        A.   No.

3        Q.   Let me ask you this.  Before you conducted

4   the interview, did you know Rudy Perez?

5        A.   I've talked to him off and on.

6        Q.   And just from doing your job, walking

7   around and talking to people?

8        A.   Yes.

9        Q.   Was Mr. Perez handicapped?

10       A.   Yes.

11       Q.   In what way?

12       A.   He required a walker.

13       Q.   Did you ever see him in his cell prior to

14  the Javier Molina homicide?

15       A.   No.

16       Q.   Do you know if he was given accommodations

17  while he was housed at Southern New Mexico

18  Correctional Facility in his cell because he was

19  handicapped?

20       A.   No.  Well, I think he was allowed to keep

21  the walker in his cell.

22       Q.   Okay.  Now, without any -- I don't want to

23  get into anything Mr. Perez said.  What was the

24  reason you interviewed Mr. Perez?

25       A.   In conjunction with the homicide that

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   occurred, we interviewed all the inmates that were
 2   that pod.
 3        Q.   Okay.  And after you interviewed Mr.
 4   Perez, you prepared a memorandum of that; right?
 5        A.   Yes.
 6        Q.   And do you remember the date you
 7   interviewed Mr. Perez?
 8        A.   I don't.
 9        Q.   If I showed you the memorandum, would that
10   refresh your memory?
11        A.   Yes.
12             MR. VILLA:  May I approach?
13             THE COURT:  You may.
14   BY MR. VILLA:
15        Q.   Mr. Holguin, I'm showing you a two-page
16   document.  Does that look like the memo you prepared
17   of your interview of Mr. Perez?
18        A.   Yes.
19        Q.   And will you look at that and see if it
20   refreshes your memory about when the interview
21   occurred?
22        A.   Yes.
23        Q.   It does?
24        A.   Yes.
25        Q.   Will you tell the jury when the interview
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1   occurred?

 2        A.   3/13/2014.

 3        Q.   And again, I don't want to know what Mr.

 4   Perez said.  Did you ask questions about Mr. Perez'

 5   walker?

 6        A.   Yes, I did.

 7        Q.   And just a yes or no question.  Did Mr.

 8   Perez answer those questions?

 9        A.   Yes, he did.

10        Q.   And the answers that he gave -- don't tell

11   me what they were -- were documented in your report?

12        A.   Yes.

13        Q.   And that's the same report that you gave

14   to Agent Palomares?

15        A.   Yes.

16        Q.   After you did this interview of Mr. Perez,

17   did you have concerns for Mr. Perez' safety?

18        A.   Yes.

19             MR. VILLA:  And Your Honor, may we

20   approach?

21             THE COURT:  You may.

22             (The following proceedings were held at

23   the bench.)

24             MR. VILLA:  Your Honor, the statements

25   that I believe that we should be able to elicit that
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  Mr. Perez said to Mr. Holguin is that Mr. Holguin

2  asked him why he had not reported that the piece

3  from his walker was missing to anyone else, and Mr.

4  Perez' answer was that -- he said if he didn't, he

5  would have been handled.  And Mr. Holguin asked him,

6  "Handled?"

7           And he said, "Yeah, they would beat me up,

8  or worse, if I had said something."

9           And the reason that we're offering that is

10 not necessarily for the truth, but to show Mr.

11 Perez' state of mind.

12          The other reason that we're offering that

13 is two-fold.  It impeaches Agent Palomares.  Agent

14 Palomares testified -- and I just have a clip of it,

15 Your Honor; I'll show it to the Government -- that

16 he never heard anything about Mr. Perez being

17 threatened.  And the statement expressly says -- by

18 Mr. Perez -- that he was threatened.  Mr. Holguin

19 has testified that he provided this memo to Agent

20 Palomares.  So it impeaches Agent Palomares'

21 testimony that he never heard about Mr. Perez being

22 threatened.

23          It also impeaches Billy Cordova's

24 testimony about that there was just rumors and

25 nobody knew if he talked to STIU and those sorts of

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7529

1   things.

2          And also, pursuant to our trial briefs, it

3   impeaches Mr. Perez' own statements that the

4   Government has elicited both to Agent Palomares and

5   to Billy Cordova.  And so under our -- pursuant to

6   our two trial briefs, Mr. Perez has a constitutional

7   right to present this evidence as well as under

8   803(6) to impeach his own statements.

9          THE COURT:  This is a transcript from Mr.

10  Palomares?

11          MR. VILLA:  Real-time transcript, Your

12  Honor, where he denied knowledge of any threats to

13  Mr. Perez.

14          THE COURT:  What does that mean when it

15  says, "Did you articulate or have -- conduct an

16  investigation into whether Mr. Perez had been" -- it

17  says "treatened."  What does that mean?

18          MR. VILLA:  I think it's supposed to be

19  "threatened."  The real-time hasn't been proofed.

20  But by the answer Mr. Palomares gives, I think it's

21  clear that it was "threatened."

22          THE COURT:  All right.  Ms. Armijo?

23          MS. ARMIJO:  Your Honor, I don't see in

24  the transcript -- and I looked at it -- that Agent

25  Palomares was specifically asked or not when he was

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7530

1   provided with that and asked if, in fact, he

2   received this memo and if it had been provided.

3          THE COURT:  I'm having trouble hearing

4   you.

5          MS. ARMIJO:  As for impeachment with

6   Palomares, this record does not show that Agent

7   Palomares was confronted with this.  So I think it's

8   improper impeachment because they would have to get

9   this to fail, at which point Agent Palomares, oh,

10  yes, this refreshes my recollection that I received

11  it.  So I think it's improper impeachment.

12         As to the other reasons, it's self-serving

13  hearsay and it is trying to backdoor it in.  So I

14  think it's improper for them to get in Mr. Perez'

15  statement of -- as you may recall, Your Honor, this

16  is part of the documents that came in at the hearing

17  that the United States didn't have and that Agent

18  Palomares -- because we had his complete file.

19  Agent Palomares didn't have this, and this is the

20  agent that had a whole stack of memos that we had

21  never seen, "we" being the United States or New

22  Mexico State Police and he had it in his own

23  personal possession.

24         MR. LOWRY:  On behalf of Defendant Baca,

25  we'd object, Your Honor, because this is precisely

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1   the antagonistic defense we've been complaining
2   about since day one.  If you're going to allow this
3   testimony to come in, we'd ask for a severance or a
4   mistrial, because this bolsters the credibility of
5   the entire Government's case as we pointed out in
6   our trial briefs from day one.
7             MS. JACKS:  Can I say it's also
8   testimonial?  This is a statement of Mr. Perez to a
9   law enforcement officer after the crime under
10  questioning by the officer.  So it's testimonial as
11  to anybody but Mr. Perez.  We would object based on
12  the Sixth Amendment to its admission.
13            I'd also note the purpose that Mr. Vigil's
14  asking it as to Mr. Perez was being threatened.
15  What appears to have happened, Mr. Perez didn't tell
16  anybody, or it would have to be handled.  He doesn't
17  communicate any direct threat to Officer Holguin.
18  So I don't think it even serves the merits being
19  offered.
20            THE COURT:  Were you done?
21            MR. LOWRY:  Yes, Your Honor.
22            THE COURT:  Do you have anything you need
23  to say?
24            MS. BHALLA:  Not on this particular one.
25            MR. VILLA:  So my response would be to the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7532

1  Government that Agent Palomares clearly testified

2  that he never heard anything about any threat

3  whatsoever.  It was definitive.  Mr. Holguin just

4  testified he provided this document to Mr. Perez

5  regarding the testimonial nature.  It's not

6  testimonial to the exclusion of Mr. Perez.  I

7  understand that it affects the rights of other

8  co-defendants, but that's not a reason to exclude it

9  as to Mr. Perez.

10            THE COURT:  Well, as far as the transcript

11  of Palomares, I don't guess he was ever shown this

12  or anything like that.  And so I can't -- at most he

13  said, "I never heard anything about it."

14            This being provided, I don't think that's

15  enough to allow this to come in for impeachment

16  purposes.  It's just not enough of, if any,

17  contradiction.

18            As far as the statement itself, I do think

19  it's being offered for the truth of the matter by

20  Mr. Perez.  What he said is what he wants the jury

21  to believe here, and so it's being offered for the

22  truth of the matter.

23            And so I think that I'll sustain the

24  objections.  It is a testimonial testimony so we

25  have to be very careful with this material and I

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1  don't think it fits within the two justifications.
 2  So I'll sustain the objections and prohibit him from
 3  stating what's in this document.
 4          MS. ARMIJO:  And Your Honor, we would ask
 5  to have the last question stricken, because it is
 6  based upon this.  He asked him if after he was -- if
 7  he had a concern for Mr. Perez' safety, and clearly
 8  he's probably basing it on that.  And I'm sorry, I
 9  didn't have an opportunity to jump up.
10          THE COURT:  I think I'll leave the
11  question.  We've allowed some similar questions and
12  I didn't allow the jury -- I didn't allow Mr. Perez
13  to lay out before the jury why he did what he did,
14  but we are simply laying what he did, and I think
15  that's probably an appropriate line.  So I'll deny
16  the request to strike that question.
17          MS. ARMIJO:  Okay.  Thank you.
18          (The following proceedings were held in
19  open court.)
20          THE COURT:  All right, Mr. Villa.
21  BY MR. VILLA:
22      Q.  Mr. Holguin, you testified that after the
23  interview, you had safety concerns.  At the time you
24  interviewed Mr. Perez, was he locked down?
25      A.  Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7534

```
 1        Q.   What does lockdown mean?

 2        A.   He's confined to his cell.

 3        Q.   And is he -- if you're on lockdown as I've

 4   just said it, are you allowed to get out?

 5        A.   No.  Well, for one hour, for shower and

 6   recreation.

 7        Q.   But not into a pod with other inmates?

 8        A.   No.

 9        Q.   So were your safety concerns based on if

10   he had at some point gotten released into a pod with

11   other inmates?

12        A.   Yes.

13             MR. VILLA:  May I have just a moment?

14             THE COURT:  You may.

15             MR. VILLA:  That's all the questions.

16             THE COURT:  Thank you, Mr. Villa.

17             Do any other defendants have direct

18   examination of Mr. Holguin?

19             All right, Ms. Armijo.

20             MS. ARMIJO:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22   BY MS. ARMIJO:

23        Q.   Mr. Holguin, you indicated that you

24   interviewed eight to ten inmates; correct?

25        A.   Yes.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349




BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7535

```
 1        Q.   Those were all inmates that were in the
 2   pod where Javier Molina was murdered.
 3        A.   Correct.
 4        Q.   They were all SNM Gang members.
 5        A.   Yes.
 6        Q.   It was an SNM pod.
 7        A.   Yes.
 8        Q.   Now, you indicated that Mr. Perez was
 9   locked down, but actually, everybody was locked down
10   that was SNM; correct?
11        A.   Yes.
12        Q.   Okay.  And so that wasn't anything in
13   particular to Mr. Perez?
14        A.   Correct.
15        Q.   Now, in reference to your -- you indicated
16   you spoke to Mr. Perez on March 13 of 2014; correct?
17        A.   Yes.
18        Q.   And now, when you spoke to him, did he
19   appear to be confused?
20        A.   No.
21        Q.   Did he appear to be able to understand
22   your questions?
23        A.   Yes.
24        Q.   Did he have -- did you have an ongoing
25   conversation with him?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1        A.   Yes.
 2        Q.   He never dropped to the floor; correct?
 3        A.   No.
 4        Q.   You saw no sign that he would be having an
 5   ongoing seizure, did you?
 6        A.   No.
 7        Q.   Any indication to you that he was having
 8   difficulty understanding you in any way?
 9        A.   No.
10        Q.   And this would have been on the 13th, and
11   the murder was on the 7th; correct?
12        A.   Correct.
13        Q.   All right.  And when he came to see you --
14   well, in reference to these interviews in general,
15   this isn't -- you don't pass out these interviews to
16   other people, correct?
17        A.   No.
18        Q.   Because that could endanger a person;
19   correct?
20        A.   Yes.
21        Q.   And I believe you indicated that you
22   usually put CI numbers on people; correct?
23        A.   Yes.
24        Q.   Now, you testified previously in this
25   case; correct?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1      A.   Yes.

2      Q.   And in this case -- I should say in a

3 hearing just before the judge; correct?

4      A.   Yes.

5      Q.   Do you recall that at that hearing you had

6 actually brought paperwork that the United States

7 didn't have in its possession?

8      A.   Yes.

9      Q.   And that the United States had everything

10 that New Mexico State Police had; correct?

11     A.   Yes.

12          MR. VILLA:   Objection, lack of foundation.

13          THE COURT:   Well, if he knows the answer

14 to these questions.  If he doesn't know, he'll need

15 to say he doesn't know.  But I'm not sure how else

16 to lay a foundation other than these questions.

17          Overruled.

18 BY MS. ARMIJO:

19     Q.   So you were aware at least at that time

20 that the New Mexico State Police did not have many

21 of your memos; correct?

22     A.   At what time?

23     Q.   At the time of the hearing, do you recall

24 that you came to the hearing and you brought a bunch

25 of -- you had a file; correct?

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

7538

```
1          A.   Correct.
2          Q.   And it was one of your personal files -- I
3   won't say personal, but it was your file,
4   work-related, on the Molina murder; correct?
5          A.   It was copies of the memos; correct.
6          Q.   And copies of the memos.  And when you
7   came to testify, the prosecution did not have any
8   copies of those memos.  Do you recall that?
9          A.   Yes.
10         Q.   And we actually had to make copies at that
11  time because -- and provide them to everybody
12  because they had not been disclosed; correct?
13         A.   Yes.
14         Q.   And you are aware that New Mexico State
15  Police was the -- and Agent Palomares was the
16  original investigating agency; correct?
17         A.   Yes.
18         Q.   And that the United States, the federal
19  government, basically got all the reports from New
20  Mexico State Police.
21         A.   Yes.
22         MS. ARMIJO:  Thank you, Your Honor.  Pass
23  the witness.
24         THE COURT:  Thank you, Ms. Armijo.
25         Mr. Villa, do you have redirect?
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN
&ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              MR. VILLA:  Just real quick, Your Honor.
 2    Thank you.
 3              THE COURT:  Mr. Villa.
 4                   REDIRECT EXAMINATION
 5    BY MR. VILLA:
 6         Q.   Mr. Holguin, there is no doubt, as you
 7    just testified on direct, that you gave this memo
 8    concerning the interview you did of Mr. Perez to
 9    Agent Palomares; right?
10         A.   It was originally sent to the coordinator,
11    Blanco, and then he disperses  it from there.  I
12    didn't hand it to him.
13         Q.   You actually handed this particular memo
14    to Agent Palomares, didn't you?
15         A.   No.
16         Q.   Do you remember testifying at the previous
17    hearing in this case in December?
18         A.   Yes, I remember testifying.
19              MR. VILLA:  May I approach, Your Honor?
20              THE COURT:  You may.
21              MS. ARMIJO:  Mr. Villa, do you have a page
22    number?
23              MR. VILLA:  Yes, 193.
24    BY MR. VILLA:
25         Q.   Mr. Holguin, I'm showing you a copy of the
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN
& ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com



```
 1   transcript of your testimony, and this is a question

 2   that Ms. Fox-Young asked you.  Let's see here.  "Did

 3   you ever talk to the State Police about these

 4   findings concerning your investigation findings?"

 5   Right?

 6       A.   Yes.

 7       Q.   You said, "I believe they received the

 8   same memos that Captain Blanco, Coordinator Blanco,

 9   received."  That was your answer?

10       A.   Yes.

11       Q.   And then you were asked, "Agent Palomares

12   received the same memos"?

13       A.   Yes.

14       Q.   And you answered, "Yes, ma'am"?

15       A.   Yes.

16       Q.   And then you were asked, "How do you know

17   that?"  And your answer was:  "I gave them to him";

18   right?

19       A.   Correct.

20       Q.   And the next question was:  "You gave them

21   to Agent Palomares?"

22       A.   Yes.

23       Q.   And your answer was "Yes"?

24       A.   Yes.

25       Q.   And this particular memo did not assign a
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349



BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1    CI number to Mr. Perez, did it?

2        A.    No.

3        Q.    It just said his name.

4        A.    Right.

5            MR. VILLA:  That's all I have, Your Honor.

6            THE COURT:  Thank you, Mr. Villa.

7            I guess we're going to keep going here.  I

8    probably need to shut her down for the day.

9            MS. ARMIJO:  I just have one question.

10           THE COURT:  All right.  Ask your one

11   question.

12           MS. ARMIJO:  I promise to be quick.

13                    RECROSS-EXAMINATION

14   BY MS. ARMIJO:

15       Q.    Continuing on with that transcript, did

16   you also say -- "Did you give it to Agent Palomares

17   the same day that you wrote it?"  And you say, "No"?

18       A.    Correct.

19       Q.    And then you indicated that you did not

20   remember when you gave it to him.

21       A.    Correct.

22           MS. ARMIJO:  No further questions.  Thank

23   you.

24           THE COURT:  All right.  Thank you, Ms.

25   Armijo.



SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
 1              Anything further, Mr. Villa?
 2                 FURTHER REDIRECT EXAMINATION
 3  BY MR. VILLA:
 4      Q.   It was given to him prior to the day of
 5  that hearing, though; right?  The day you testified
 6  in December, you gave the memo before that day.
 7      A.   Yes.
 8              MR. VILLA:  That's it.
 9              THE COURT:  All right.  Thank you, Mr.
10  Villa.
11              Anyone else?
12              All right, Mr. Holguin.  You may step
13  down.
14              Is there any reason Mr. Holguin cannot be
15  excused from the proceedings?
16              MR. VILLA:  No, he's free to go.
17              THE COURT:  You're in agreement with that,
18  Ms. Armijo?
19              MS. ARMIJO:  Yes, Your Honor.
20              THE COURT:  All right.  You are excused
21  from the proceedings.  Thank you for your testimony.
22              All right.  I appreciate your hard work.
23  We'll see you at 8:30 in the morning.  Y'all have a
24  safe trip, if you're traveling, and a good evening.
25  I appreciate all you're doing for us.
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349


BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

```
1              (The jury left the courtroom.)

2              THE COURT:  All right.  Y'all have a good

3    evening.

4              MS. BHALLA:  Your Honor, if I may, would

5    it be all right for us to discuss the issue in the

6    morning that I wanted to bring up today?

7              THE COURT:  Yeah.

8              MS. BHALLA:  Okay.  Thank you.

9              (The Court stood in recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com

1  UNITED STATES OF AMERICA

2  STATE OF NEW MEXICO

3

4              C-E-R-T-I-F-I-C-A-T-E

5      I, Jennifer Bean, FAPR, RDR, CRR, RMR, CCR,

6  Official Court Reporter for the State of New Mexico,

7  do hereby certify that the foregoing pages

8  constitute a true transcript of proceedings had

9  before the said Court, held in the District of New

10  Mexico, in the matter therein stated.

11      In testimony whereof, I have hereunto set my

12  hand on this 4th day of February, 2019.

13

14      _____

15      Jennifer Bean, FAPR, RMR-RDR-CCR
        Certified Realtime Reporter
16      United States Court Reporter
        NM Certified Court Reporter #94
17      333 Lomas, Northwest
        Albuquerque, New Mexico 87102
18      Phone:          (505) 348-2283
        Fax: (505) 843-9492
19      License expires:  12/31/19

20

21

22

23

24

25

SANTA FE OFFICE
119 East Marcy, Suite 110
Santa Fe, NM 87501
(505) 989-4949
FAX (505) 820-6349

 

BEAN & ASSOCIATES, Inc.
PROFESSIONAL COURT
REPORTING SERVICE

MAIN OFFICE
201 Third NW, Suite 1630
Albuquerque, NM 87102
(505) 843-9494
FAX (505) 843-9492
1-800-669-9492
e-mail: info@litsupport.com