# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                    No. CR 15-4268 JB

ANTHONY RAY BACA, a.k.a. "Pup,"

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant Baca's Objections to Presentence Report, filed June 10, 2019 (Doc. 2690)("Objections"). The Court held a sentencing hearing on June 12, 2019. The primary issues are: (i) whether the 2-level adjustment for attacking a vulnerable victim under § 3A1.1 of the United States Sentencing Guidelines Manual (U.S. Sentencing Comm'n 2018)("U.S.S.G." or "Guidelines")[1] applies where Defendant Anthony Ray

---

[1]The Supreme Court of the United States of America held, in <u>Peugh v. United States</u>, 569 U.S. 530 (2013):

> District courts must begin their sentencing analysis with the Guidelines in effect at the time of the offense and use them to calculate the sentencing range correctly; and those Guidelines will anchor both the district court's discretion and the appellate review process in all of the ways we have described. The newer Guidelines, meanwhile, will have the status of one of many reasons a district court might give for *deviating* from the older Guidelines, a status that is simply not equivalent for *ex post facto* purposes.

569 U.S. at 549 (emphasis in original). The 2018 Guidelines Manual provides, however, that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced" unless doing so "would violate the *ex post facto* clause of the United States Constitution," in which case "the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. § 1B1.11(a)-(b)(1). Further, where the defendant is convicted of multiple offenses to which different versions of the Guidelines Manual applies, the court uses the revised edition. <u>See</u> U.S.S.G. § 1B1.11(b)(3). Defendant Anthony Ray Baca conspired to murder and murdered Javier Molina in March, 2014, and conspired to murder Dwayne Santistevan and Gregg Marcantel "no later than 2013," Second Superseding Indictment at 14-15, filed March 9,

Baca was not present at Javier Molina's murder and where Baca argues that there is no evidence that Baca "was involved in ordering, planning, or directing the details of Mr. Molina's murder," Objections ¶ 6, at 3; and (ii) whether the Court should apply U.S.S.G. § 5G1.3(a) so Baca's federal sentence will run consecutively with his state sentence, because Baca was incarcerated and serving a sentence for murder when he committed the federal offenses. The Court concludes that: (i) a preponderance of the evidence establishes that Baca knew or should have known that Molina was particularly vulnerable to being murdered, because of his cooperation with law enforcement, Baca's order that Molina be killed, and Molina's incarceration with fellow Syndicato de Nuevo Mexico ("SNM") members who knew of his cooperation and the order for his death; and (ii) a preponderance of the evidence establishes that Baca committed the instant offenses while serving an undischarged term of imprisonment, and therefore his federal sentence will run consecutively to his prior state sentence. Accordingly, the Court overrules Baca's Objections and applies U.S.S.G. §§ 3A1.1 and 5G1.3(a).

## FACTUAL BACKGROUND

Baca is one of many Defendants named in a sixteen-count indictment charging "members/prospects/associates of the" SNM with "acts of violence and other criminal activities, including[] murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Second Superseding Indictment ¶ 1, at 2, filed March 9, 2017 (Doc. 949)("Indictment"). The Indictment alleges that SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in

_____

2017 (Doc. 947); id. at 12-13, so the 2013 Guidelines Manual, effective November 1, 2013, would apply to the offenses if the Court does not use the current Guidelines Manual, see U.S.S.G. § 1B1.11(b)(3). Using the 2013 Guidelines Manual does not change the result here. See U.S.S.G. § 1B1.11(b)(1). Accordingly, the Court uses the 2018 Guidelines Manual.

fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment ¶ 2, at 2-3. The Court has provided background information on the SNM in a number of prior opinions, including in its Memorandum Opinion and Order, 287 F. Supp. 3d 1187, filed March 7, 2018 (Doc. 1882)("MOO"). The Court provides this information, which is gathered from the Indictment, to provide background information on this case and recognizes that this information reflects largely Plaintiff United States of America's version of events:

> SNM is a violent prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates seriously assaulted and raped twelve correctional officers after taking them hostage. . . . Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 were injured. See . . . Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, and "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals, the main one being the control of and profit from narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its illegal activities. See Indictment at 4. If another gang does not abide by SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM further engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM as an enterprise generates income by having its members and associates traffic controlled substances and extort narcotic traffickers. See Indictment at 8. SNM's recent activities in a conspiracy to murder high-ranking New Mexico Corrections Department Officials inspired the Federal Bureau of Investigation's present investigation. See United States v. Garcia, No. CR 15-4275,

Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).

. . . .

       The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts. <u>See</u> Indictment at 1, 9-18. All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity." Indictment at 9-18. Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta, Defendant Benjamin Clark, [Defendant Mario] Rodriguez, Defendant Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez, and [Defendant Daniel] Sanchez are the enterprise's alleged leaders. <u>See</u> Indictment at 6. The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders. <u>See</u> Indictment at 6. The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim or an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841 and 846. Indictment at 9.

. . . .

       For fuller factual context, there are now four cases before the Court related to SNM's alleged criminal activity. In a related case -- <u>United States v. Baca</u>, No. CR 16-1613, 2016 WL 6404772 (D.N.M.)(Browning, J.) -- the United States names twelve defendants, all alleged SNM members or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d). There is also a separate prosecution of [Defendant Christopher] Garcia for drug crimes, <u>see</u> <u>United States v. Garcia</u>, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959. <u>See</u> <u>United States v. Varela</u>, No. CR 15-4269 (D.N.M.)(Browning, J.).

MOO at 5-12, 287 F. Supp. 3d at 1195-99 (footnotes omitted)(first four alterations in the MOO, last two added). The Indictment charges Baca in five Counts: (i) Count 6's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), for the March, 2014, conspiracy to murder Molina; (ii) Count 7's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(1), (2),

for the March 7, 2014, murder of Molina; (iii) Count 8's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(6), for conspiracy to commit assault resulting in serious bodily injury to Julian Romero; (iv) Count 9's violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), for conspiracy to murder Dwayne Santistevan; and (v) violent crimes in aid of racketeering activity, 18 U.S.C. § 1959(a)(5), for conspiracy to murder Gregg Marcantel. See Indictment at 12-15.

On Monday, January 29, 2018, the Court began jury selection for the trial on the Indictment's Counts 6-12. See Clerk's Minutes at 3, filed January 29, 2018 (Doc. 1746)("Jan. Trial Minutes"). Baca went to trial with three co-Defendants: Sanchez, Carlos Herrera, and Rudy Perez. See Jan. Trial Minutes at 2. The parties gave their opening statements on Wednesday, January 31, 2018, and the United States began its case in chief the same day. See Jan. Trial Minutes at 7.

Aside from several minor changes, the Court takes the offense-conduct facts from the Presentence Investigation Report, filed June 6, 2019 (Doc. 2682)("Revised PSR"), and the Addendum to the Presentence Report, filed June 11, 2019 (Doc. 2703)("Addendum"), because, although Baca objects to portions of the Revised PSR's recitation of the facts, the Court concludes that the trial testimony and evidence supports the Revised PSR's factual recitation, see Transcript of Proceedings (Sentencing) at 78:25-79, taken June 12, 2019 ("Tr.")(Court)(The Revised "PSR . . . match[es] up with the trial testimony. . . . So my reading of the [Revised] PSR . . . [and] my reviewing of the [trial testimony] transcript itself[] didn't see any particularly factual mistakes in

the [Revised] PSR.").[2]  Accordingly, the Court adopted all of the Revised PSR's factual findings with the following changes: (i) in the Revised PSR's paragraph 22, replace "somehow obtained" with "was aware of," Tr. at 83:1-5 (Court); (ii) in the Revised PSR's paragraph 22, delete the phrase "in his cell," Tr. at 84:17-19 (Court); and (iii) in the Revised PSR's paragraph 26, the first sentence should read: "In summary, Herrera ordered the murder of JM after receiving the paperwork." Tr. at 86:5-7 (Duncan). See id. at 86:8-14 (Court, Armijo, Mills). The Court's findings of fact on the conspiracy to murder Molina and Molina's murder are as follows:

14.     On March 7, 2014, officers with the New Mexico State Police (NMSP) were dispatched to the Southern New Mexico Correctional Facility (SNMCF) in Las Cruces, New Mexico, in reference to a homicide.  Upon arrival, the officers learned the deceased inmate was identified as J.M.  They further learned J.M. was a known member of the SNM gang and had been stabbed to death by other known SNM members.  It was later learned J.M. was murdered because of his cooperation with law enforcement.

15.     NMSP officers and crime scene agents were shown the video recordings of the incident that occurred in Pod 1A-B. Pod 1A-B is made up of 16 cells, eight on the bottom floor and eight on the top floor, with a shower stall on each floor.  According to the SNMCF sergeant, there were four possible suspects involved in the murder of J.M.: Timothy Martinez, Mario Rodriguez, Jerry Armenta, and Jerry Montoya.

16.     According to the video, at approximately 5:15 in the evening, J.M. was standing on the top floor leaning against the railing in front of his cell and appeared to be engaged in a conversation with Martinez, who was standing next to him.  A few minutes later, J.M. walked into his cell but then returned to his prior location, and Martinez walked away.  Rodriguez subsequently provided J.M. with an unidentified object, after which, J.M. returned to his cell, and Rodriguez followed him.  The two later walked out of the cell together.  During this time, Montoya was in the common area and top floor holding a white rag in his hands.

17.      At 5:18 in the evening, Rodriguez, Martinez, and J.M. entered J.M.'s cell, where Rodriguez and Martinez attempted to incapacitate J.M.  Less than

_____

[2]The Court's citations to the transcript of the proceedings refer to the court reporter's original, unedited version; any final transcripts may contain slightly different page and/or line numbers.

two minutes later, Armenta and Montoya entered the cell, and almost immediately, Martinez and Rodriguez exited the cell. Within seconds, J.M. exited his cell with what appeared to be blood stains on the chest area of his white shirt. Armenta and Montoya followed J.M. as they all walked down the stairs to the first floor. Once at the bottom of the staircase, Montoya attacked J.M., and Armenta became involved in the altercation shortly thereafter. The video showed Armenta holding a sharp object in his right hand and motioning as if he was stabbing J.M., who was just outside of the camera's view. Moments later, Armenta and Montoya walked away, leaving J.M. on the floor by the main entrance of the pod.

18.    Armenta then walked next to a trashcan and appeared to throw an object into it. Subsequently, Armenta walked back to J.M. and made a motion as if he was kicking J.M. Simultaneously, Montoya walked into the shower on the first floor and then entered his cell. Armenta then picked up an object off of the floor and walked upstairs, where he entered the shower on the second floor. Shortly thereafter, Rodriguez exited the shower, fully clothed, as the entire pod was being ordered by SNMCF officials to return to their assigned pods.

19.    Crime scene analysts searched the entire pod area during the evening hours of March 7, 2014. The analysts located a homemade knife ("shank") in the second-floor shower area and two more shanks in the trashcan on the first floor next to the staircase. While the analysts were reviewing the crime scene, NMSP and SNMCF officers attempted to question all of the inmates in the pod. The majority of the inmates refused to waive their *Miranda*[3] Rights, and none would answer any questions posed by the officers. The

---

[3]Miranda v. Arizona, 384 U.S. 436 (1966), "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting Miranda v. Arizona, 384 U.S. at 444). The Supreme Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed. The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently. If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda v. Arizona, 384 U.S. at 444-45.

inmates that did agree to speak to officers were unable and/or unwilling to provide any information about the attack on J.M.

20.     J.M.'s cause of death was ruled a homicide by multiple mortal stab wounds. The autopsy of J.M. revealed 43 stab wounds and 5 cuts to the head, trunk, left upper arm, and left thigh. The majority of the stab wounds were on the chest and abdomen, and several stab wounds injured the heart and lungs, which lead to extensive bleeding within the deep soft tissues of the chest and was fatal. Additionally, the autopsy revealed there were two clearly discernible stabbing patterns, indicating two persons stabbed J.M.

21.     Trial testimony provided was by other co-conspirators and identified SNM members, including Gerald Archuleta, a.k.a. "Styx" and "Grandma"; Billy Cordova; Armenta; Guadalupe Urquizo, a.k.a. "Lupe" and "Marijuano"; and Rodriguez. Their testimonies revealed Herrera was in a position of authority in the gang and an identified leader in his pod, with the ability to authorize the killing of another member provided he could justify it within the gang.

22.     On September 17, 2015, and again on October 6, 2015, special agents with the FBI met with Armenta, who stated that prior to March 6, 2014, **Anthony Ray Baca, a.k.a. "Pup,"** the recognized leader of the SNM, [was aware of] a copy of a police report prepared by the Las Cruces Police Department, which reflected J.M. had provided information to aid in a police investigation. After receiving this report, **Baca**, who was housed at the Penitentiary of New Mexico (PNM) in Santa Fe, declared J.M. was to be murdered . . . at the SNMCF. Armenta testified that on the day of the murder, he spoke to Herrera, who indicated the paperwork on J.M. was real, and it was okay to move forward with the "hit". Armenta further testified Herrera decided Armenta and Montoya would carry out the "hit" on J.M., as they needed to show their loyalty to the SNM. Additionally, Armenta testified Herrera indicated these selections were made by him and Daniel Sanchez, a.k.a. "Dan Dan". Armenta stated he participated in the murder of J.M., as Sanchez told him if he did not comply, he would be the one killed.

23.     Cordova testified Herrera had shown him documents (paperwork) reflecting J.M. was speaking to law enforcement, and J.M. was murdered on the same date they received the paperwork in order to avoid J.M. becoming aware of the pending "hit". In later taped communication with Cordova, Herrera acknowledged the existence of the paperwork and indicated he called the "hit" on J.M. Herrera further explained that although other SNM members had conflicting feelings about how the situation with J.M. was handled, no one else had addressed the issue until Herrera did.

24.      Urquizo testified that on March 6, 2014, through a routine transfer process, he was moved from the PNM to the SNMCF. Upon arrival, Herrera inquired if Urquizo had the paperwork on J.M. Urquizo indicated he did, but it remained in his property. Upon receipt of his property the following day, Urquizo provided the paperwork on J.M. to Herrera, who delivered it to Rodriguez, according to Urquizo's testimony. Urquizo indicated Rodriguez then wrote him a letter indicating they could "take care of him," meaning J.M. The killing of J.M. occurred later on the same date, and Urquizo testified he destroyed the paperwork on J.M. by flushing it down the toilet.

25.      Rodriguez testified Herrera showed him and Sanchez the paperwork on J.M. Sanchez then chose Rodriguez, Martinez, Montoya, and Armenta to kill J.M., as they needed to show their loyalty to the gang. Rodriguez indicated Herrera directed them to "get it done," as he did not want J.M. to be notified of the "hit".

26.      In summary, Herrera ordered the murder of J.M. after receiving [the paperwork] from **Baca** . . . . Based on the facts in this case, while incarcerated at the SNMCF, two SNM gang members entered J.M.'s cell and stabbed him to death with shanks. J.M. was murdered as a result of his cooperation with law enforcement. Due to the close quarters of J.M.'s cell, which had only one entrance and exit, J.M. was not able to fight off his assailants or escape while he was being stabbed. Moreover, J.M. became susceptible to injury or death when other SNM members became aware he cooperated with law enforcement, and he was subsequently placed in a correctional facility with other SNM members after a "green light" was placed on him which meant he was to be killed, thus making him a vulnerable victim being physically restrained.

Revised PSR ¶¶ 14-26, at 9-11 (bold in original).

     The Court's findings of fact on the conspiracies to murder Santistevan and Marcantel are as follows:

27.      On March 23, 2015, an NMCD captain advised FBI agents a credible and reliable confidential source (CS) had provided information that a "hit" was placed on Cabinet Secretary, Gregg Marcantel (G.M.) and STIU Administrator, Dwayne Santistevan (D.S.) by SNM leadership. Specifically mentioned as having ordered the assaults/murders were Roy Paul Martinez, a.k.a. "Shadow"; Robert Martinez, a.k.a. "Baby Rob"; and **Anthony Ray Baca**.

28.    On April 7, 2015, the NMCD and STIU provided original letters to the FBI regarding planned assassinations of NMCD staff to be carried out by SNM members. The following information was located in the letters:

Letter #1

29.    On April 6, 2015, the STIU received a letter written by Martinez to Sammy Griego, which read that SNM leadership had decided to allow Griego one opportunity to show his loyalty to the SNM by "taking out" G.M. and D.S. In the letter, Martinez gave Griego the flexibility to work out the details of "hits" on his own. Martinez threatened Griego by stating if he failed to conduct the "hits," he would be "taken out". In the letter, Martinez explained to Griego if the other SNM members could not get in contact with Griego, they would hurt or kill his family members. Martinez instructed Griego to get in contact with Gerald Archuleta, a.k.a. "Styx". In the letter, Archuleta is referred to as "Grandma" (a lesser known nickname). Martinez indicated if Griego contacted Archuleta, they both would be obligated to conduct the "hits".

Letter #2

30.    On April 6, 2015, the STIU received a letter written by Martinez to Ruben Hinojosa. In the letter, Martinez stated the SNM leadership was tired of SNM members getting out of prison and doing nothing for the SNM. Martinez stated this type of behavior would no longer be tolerated and ordered Hinojosa to show his loyalty by "taking out" G.M. and D.S. Martinez proceeded to threaten Hinojosa by explaining that if he failed to conduct the hits, he would be "taken out". Martinez advised if the other SNM members could not get in contact with Hinojosa, they would hurt or kill his family members. Martinez concluded the letter by telling Hinojosa the SNM was counting on him and not to let down the SNM.

31.    Beginning in October 2015, electronic surveillance was utilized in the PNM to capture conversations between **Baca**, a CHS, and SNM member Christopher Garcia. During these conversations, it was clear **Baca** had sanctioned the killing of G.M. and D.S., as well as correctional officer, A.V.

32.    On November 11, 2015, **Baca** requested that Garcia assist the SNM gang in a "mission". On November 15, 2015, Garcia and **Baca** used coded language to discuss the acquisition of firearms for the SNM gang. Garcia agreed to obtain "a couple" of guns and said he already had firearms on hand. On November 18, 2015, Garcia used coded language to tell **Baca** he would plant a firearm at a secret location to be retrieved by another SNM gang member. On November 26, 2015, Garcia and **Baca** used coded language to discuss a firearm that was to be provided to another SNM gang member.

33.     On November 28, 2015, Garcia advised he had a firearm for the CHS. Garcia instructed the CHS to come to his residence and retrieve the weapon; however, the CHS stated he/she was unable to do so and would go the following day. On November 29, 2015, the CHS met with FBI special agents, who provided the CHS with a covert recording device to be utilized during the meeting with Garcia.

34.     The CHS proceeded to Garcia's residence and retrieved a handgun identified by the CHS as a semiautomatic pistol. The CHS told Garcia he/she had scouted G.M.'s residence in Rio Rancho, New Mexico. The CHS specifically stated G.M. walked his dogs by the river three times per week. The CHS indicated he/she and SNM member Mandel Lon Parker would approach G.M. while he was walking and shoot him.

35.     Garcia instructed the CHS to be careful when conducting the murder and warned the CHS not to trust Parker. Garcia suggested the CHS give Parker a "hot shot" (heroin overdose) after murdering G.M. and leave the murder weapon on Parker's body, so he would be blamed for the murder. Garcia went on to say the CHS should use a shotgun on G.M., because of his big size. The CHS told Garcia he/she would hide the weapon for Garcia, and the two could meet up at a later date and time. The CHS left Garcia's residence and met with the FBI special agents at a prearranged location. The CHS provided the agents with the weapon, identified as a Phoenix Arms, model HP22, .22 caliber semiautomatic pistol bearing serial number 4208834.

36.     On November 30, 2015, Garcia used coded language to tell **Baca** he had provided a gun to the CHS to be used in the "mission" to kill G.M. On December 3, 2015, Garcia sent a text message to another person (possibly the CHS), stating he had another gun to be used in the murder of G.M.

37.     In summary, **Baca**, a high-ranking member in the SNM, ordered the murders of D.S. and G.M. G.M. is an official victim, as he was the Cabinet Secretary for the NMCD. D.S. is an official victim, as he was the STIU Administrator for the NMCD. Additionally, **Baca** was an organizer, leader, manager, or supervisor in the criminal activity involving five or more participants.

38.     It should also be noted a record check revealed **Baca** has the following countable felony crime of violence convictions in the Second Judicial District Court of Bernalillo County in Albuquerque, New Mexico, which qualify him as a career offender:

- Armed Robbery (Firearm) on February 27, 1989, Docket No: D-202-CR-1987-44765; and

- First Degree Murder on June 22, 1990, Docket No: D-202-CR-1989-00415.

Revised PSR ¶¶ 27-38, at 12-13 (bold in original).

## PROCEDURAL BACKGROUND

The parties gave their closing statements and turned the case over to the jury for its deliberations on Monday, March 5, 2018. See Clerk's Minutes, filed March 5, 2018 (Doc. 1931)("Mar. Trial Minutes). That same day, the Court granted Baca's oral motion for a judgment of acquittal as to Count 8. See Memorandum Opinion and Order at 7, filed March 5, 2018 (Doc. 1870). The jury returned its verdict on Monday, March 12, 2018, finding Baca: (i) "guilty of violent crimes in aid of racketeering in conspiring to murder Javier Molina, as charged in Count 6 of the Indictment"; (ii) "guilty of violent crimes in aid of racketeering in the murder of Javier Molina, as charged in Count 7 of the Indictment"; (iii) "guilty of violent crimes in aid of racketeering in conspiring to murder Dwayne Santistevan, as charged in Count 9 of the Indictment"; and (iv) "guilty of violent crimes in aid of racketeering in conspiring to murder Gregg Marcantel, as charged in Count 10 of the Indictment." Verdict at 1-2 (dated March 12, 2018), filed March 12, 2018 (Doc. 1937). The Court originally set Baca's sentencing for May 9, 2019, see Notice of Hearing as to Anthony Ray Baca, filed March 11, 2019 (Doc. 2587)(this is a text-only entry on the docket); however, the Court later ordered a continuance, and the sentencing was rescheduled for June 11, 2019, see Order to Continue May 9, 2019 Sentencing Hearing, filed May 8, 2019 (Doc. 2639). The United States Probation Office ("USPO") filed its original presentence investigation report on May 1, 2019. See Presentence Investigation Report, filed May 1, 2019 (Doc. 2624)("Original PSR"). Baca submitted informal objections by email on May 20,

2019, see Email from Theresa M. Duncan and Marc Lowry to David Mills (sent May 20, 2019), filed May June 10, 2019 (Doc. 2690-1), and the USPO responded on June 4, 2019, see Letter from David Mills to Theresa M. Duncan and Marc Lowry (sent June 4, 2019), filed June 10, 2019 (Doc. 2690-2), and revised the Original PSR.

### 1.    **The Revised PSR.**

In calculating Baca's Guidelines sentence, the USPO notes that no adjustment will be made for acceptance of responsibility, because the "defendant was found guilty at a jury trial." Revised PSR ¶ 41, at 17. The USPO groups Count 6 and 7 for calculating Baca's Guidelines sentence, because both counts "involve the same victim and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan." Revised PSR ¶ 43, at 17 (citing U.S.S.G. § 3D1.2(b)). As to Counts 6 and 7, the USPO determines that the underlying crime of racketeering activity, and aiding and abetting, is first-degree murder, which entails a base level of 43. See Revised PSR ¶ 44, at 17 (citing U.S.S.G. §§ 2A1.1(a) and 2E1.3(a)(2)). The USPO applies three upward adjustments. See Revised PSR ¶¶ 46-48, at 17. First, the USPO applies a 2-level adjustment for attacking a vulnerable victim, see Revised PSR ¶ 46, at 17, because Molina "became susceptible to injury or death when other SNM members became aware he cooperated with law enforcement, and he subsequently was placed in a correctional facility with other SNM members after a 'green light' was placed on him which meant he was to be killed," Revised PSR ¶ 26, at 14 (internal quotation marks in original for emphasis). Second, the USPO applies a 2-level adjustment for physical restraint of the victim, see Revised PSR ¶ 47, at 17, because, "[d]ue to the close quarters of [Molina's] cell, which had only one entrance and exit, [Molina] was not able to fight off his assailants or escape while he was being stabbed," Revised PSR ¶ 26, at 14. Third, the USPO applies a 4-level adjustment for organizing

- 13 -

or leading a criminal activity that involved five or more participants, see Revised PSR ¶ 48, at 17 (citing U.S.S.G. § 3B1.1(a)), because Baca was "the recognized leader of the SNM," and he "declared [that Molina] was to be murdered . . . at the [Southern New Mexico Correctional Facility]," Revised PSR ¶ 22, at 14. The USPO does not apply an adjustment for obstruction of justice, see Revised PSR ¶ 49, at 17, and calculates an adjusted offense level of 51 for Counts 6 and 7, see Revised PSR ¶ 50, at 18.

As to Count 9, the USPO determines that the underlying crime of racketeering activity is conspiracy to commit murder, which entails a base level of 33. See Revised PSR ¶ 57, at 18. The USPO applies a 6-level adjustment for targeting a government officer, see Revised PSR ¶ 59, at 18 (citing U.S.S.G. § 3A1.2(b)), because Baca ordered the murder of Santistevan, a government official, see Revised PSR ¶¶ 27, 31, at 15, and Santistevan's status motivated the offense, see Revised PSR ¶ 37, at 16. The USPO also applies a 4-level adjustment for organizing or leading a criminal activity that involved five or more participants, see Revised PSR ¶ 60, at 18 (citing U.S.S.G. § 3B1.1(a)), because Baca was "a high-ranking member in the SNM" and he ordered Santistevan's murder, Revised PSR ¶ 37, at 16. The USPO does not apply an adjustment for obstruction of justice. See Revised PSR ¶ 55, at 18. Accordingly, the USPO calculates an adjusted offense level of 43 for Count 9. See Revised PSR ¶ 56, at 18.

As to Count 10, the USPO determines that the underlying crime of racketeering activity is conspiracy to commit murder, which entails a base level of 33. See Revised PSR ¶ 51, at 18. The USPO applies a 6-level adjustment for targeting a government officer, see Revised PSR ¶ 53, at 18 (citing U.S.S.G. § 3A1.2(b)), because Baca ordered the murder of Marcantel, a government official, see Revised PSR ¶¶ 27, 31, at 15, and Marcantel's status motivated the offense, see Revised PSR ¶ 37, at 16. The USPO also applies a 4-level adjustment for organizing or leading a

criminal activity that involved five or more participants, see Revised PSR ¶ 54, at 18 (citing U.S.S.G. § 3B1.1(a)), because Baca was "a high-ranking member in the SNM," and he ordered Marcantel's murder, Revised PSR ¶ 37, at 16. The USPO does not apply an adjustment for obstruction of justice. See Revised PSR ¶ 61, at 18. Accordingly, the USPO calculates an adjusted offense level of 43 for Count 10. See Revised PSR ¶ 62, at 18.

The USPO calculates the combined adjusted offense level as 53. See Revised PSR ¶ 64, at 19 (citing U.S.S.G. § 3D1.4). Accordingly, the USPO determines that the total offense level is 43. See Revised PSR ¶ 69, at 19 (citing U.S.S.G. ch. 5, pt. A n.2). The USPO then provides Baca's criminal history, which the Court summarizes in the following table.

| Date of Arrest | Charge/Court | Guideline | Points |
|---|---|---|---|
| August 7, 1982<br>Age 19 | Voluntary Manslaughter (Firearm)<br>Second Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.2(e)(3) | 0 |
| October 15, 1982<br>Age 19 | Battery on a Peace Officer<br>Second Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.2(e)(3) | 0 |
| September 26, 1986<br>Age 23 | Conspiracy to Commit Receiving Stole Property (Retain) (Over $100)<br>Second Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.2(e)(3) | 0 |
| November 28, 1987<br>Age 24 | Armed Robbery (Firearm); Conspiracy to Commit Armed Robbery; Aggravated Burglary (Firearm)<br>Second Judicial District Court of Bernalillo County, Albuquerque, New Mexico | § 4A1.1(a) | 3 |
| June 22, 1989<br>Age 25 | First-Degree Murder; Possession of a Deadly Weapon by a Prisoner<br>First Judicial District Court of Santa Fe County, Santa Fe, New Mexico | § 4A1.1(a) | 3 |

See Revised PSR ¶¶ 72-76, at 20-21. The Revised PSR notes that these convictions "result in a subtotal criminal history score of 6," but that, because Baca "committed the instant offense while under a criminal justice sentence for the conviction listed in paragraph 76," 2 points are added, for

a total criminal history score of 8. Revised PSR ¶¶ 77-79, at 21 (citing U.S.S.G. § 4A1.1(d)). This criminal history score places Baca in criminal history category IV, see Revised PSR ¶ 79, at 21, but the USPO determines that Baca "is a career offender; therefore, the criminal history category is VI." Revised PSR ¶ 80, at 22 (citing U.S.S.G. § 4B1.1(b)). The total offense level of 43 and criminal history category of VI provide a Guidelines imprisonment term of life. See Revised PSR ¶ 99, at 25. The USPO notes that, as to Counts 6, 9, and 10, the "statutorily authorized maximum sentences are less than the maximum of the applicable guideline term; therefore, . . . the guideline sentence is 120 months as to each count." Revised PSR ¶ 99, at 25 (citing U.S.S.G. § 5G1.2(b)).

      **2.**      **The Objections.**

         Baca objects to some of the Revised PSR's facts and to the Revised PSR's Guidelines calculations. See Objections ¶¶ 2-18, at 1-8. First, Baca objects to the Revised PSR "to the extent it relies on 'discovery materials contained in the Assistant United States Attorney's file gleaned from FBI investigative reports,'" because the case went to trial and he maintains his innocence. Objections ¶ 2, at 1 (quoting Revised PSR ¶ 6, at 11). Baca argues that much of the discovery material is "unreliable" or "was never subjected to cross-examination" to ensure its reliability. Objections ¶ 2, at 1. Next, Baca avers that the Revised PSR's paragraph 22, which summarizes Armenta's testimony, is inaccurate, because: (i) "Armenta admitted that he had no firsthand knowledge that Mr. Baca was involved in the murder of Javier Molina"; (ii) "there is no evidence that Mr. Baca ever obtained or possessed a copy of a police report referencing Javier Molina"; and (iii) "there is no evidence that Mr. Baca 'declared J.M. was to be murdered in his cell at SNMCF.'" Objections ¶ 3, at 2 (quoting Revised PSR ¶ 22, at 14 (emphasis added by Baca)). Baca maintains that he was at PNM when Molina was killed at Southern New Mexico, and that this "misstatement

of fact in the [Revised] PSR provides the [USPO's] basis for an upward adjustment for a vulnerable victim." Objections ¶ 3, at 2. In addition, Baca objects to the Revised PSR's paragraph 26 for two reasons: (i) "[t]here is no evidence that Mr. Baca communicated or provided co-defendant Carlos Herrera with 'instructions' as suggested in this paragraph," Objections ¶ 4, at 2 (quoting Revised PSR ¶ 26, at 14); and (ii) "[t]here is zero evidence that Mr. Molina was 'unusually vulnerable due to age, physical or mental condition, or was otherwise particularly susceptible to the criminal conduct,'" Objections ¶ 4, at 2 (quoting U.S.S.G. § 3 A1.1, Application Note 2).

Baca objects to the vulnerable-victim adjustment and argues that "Molina's status as an inmate living in prison is legally insufficient to justify application of this enhancement." Objections ¶ 5, at 3. Baca asserts that the "location of the attack (in this case, a jail cell) standing alone is also an improper basis upon which to find a victim 'vulnerable.'" Objections ¶ 5, at 3 (quoting U.S.S.G. § 3A1.1(b)(1), and citing United States v. Rising Sun, 522 F.3d 989, 995 (9th Cir. 2008)). Baca also argues that the vulnerable-victim adjustment should not apply, because Baca "was neither present when Mr. Molina was killed nor is there evidence that he was involved in ordering, planning, or directing . . . Molina's murder." Objections ¶ 6, at 3. Baca attests that he did not know where within Southern New Mexico Molina's murder would take place. See Objections ¶ 6, at 3.

Next, Baca objects to the Revised PSR's paragraph 115's application of U.S.S.G. § 5G1.3(a), which advises that his sentence run consecutively to the undischarged term of imprisonment for his state sentence. See Objections ¶ 7, at 3. In particular, "[t]o the extent the application of U.S.S.G. § 5G1.3(a) applies, Mr. Baca requests that the Court vary from this particular guideline." Objections ¶ 8, at 4. According to Baca, his 1989 state conviction "was used to prove an element" in this case, namely, that Baca was involved with SNM. Objections

¶ 8, at 4.  Baca argues that, because this evidence was introduced over his objection, "fundamental fairness would dictate a merger of the state murder sentence with the current underlying offense conduct."  Objections ¶ 8, at 4.  Baca states that the Guidelines do not bind the Court and that the advisory Guidelines range constitutes one factor of many for sentencing courts to consider.  <u>See</u> Objections ¶ 9, at 4 (citing <u>Kimbrough v. United States</u>, 552 U.S. 85, 91, 98 (2007)).  Baca emphasizes that a "sentence should be 'sufficient, but not greater than necessary' to serve justice upon the individual before the Court."  Objections ¶ 10, at 5 (quoting <u>Kimbrough v. United States</u>, 552 U.S. at 101).

Baca maintains that 18 U.S.C. § 3584(b) governs whether his sentence runs consecutively or concurrently with his state sentence.  <u>See</u> Objections ¶ 11, at 5.  Baca argues that, "in determining whether the terms imposed are to be ordered to run concurrently or consecutively, [the Court] shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a).'"  Objections ¶ 11, at 5 (quoting 18 U.S.C. § 3584(b)).  Baca emphasizes that the "Guidelines simply do not dictate the final outcome."  Objections ¶ 11, at 5.  Baca argues that the first § 3553(a) factor -- "'nature [and circumstances] of the offense'" -- "militates in favor of concurrent sentences," because the Revised PSR erroneously states that Baca ordered the "hit" on Molina.  Objections ¶ 13, at 6 (quoting 18 U.S.C. § 3553(a)(1)).  According to Baca, the United States and USPO's theory is that Baca ordered Molina's murder in 2012 -- when Baca was living at PNM -- by telling Urquizo that Molina would be killed.  <u>See</u> Objections ¶ 13, at 6.  Baca states that he was transferred from PNM to Southern New Mexico in January, 2013, and that he lived with Molina from March 14, 2013, to July 27, 2013.  <u>See</u> Objections ¶ 14, at 6 (citing Exhibit C, Offender Physical Location History for Anthony Ray Baca at 1, filed June 10, 2019 (Doc. 2690-3); Exhibit D, Offender Physical Location History for Javier Enrique Molina

at 1, filed June 10, 2019 (Doc. 2690-4)).  Baca states that Molina's murder occurred in 2014, after

Urquizo moved from PNM to Southern New Mexico.  <u>See</u> Objections ¶ 14, at 6 (citing Exhibit E,

Offender Physical Location History for Lupe Urquizo at 1, filed June 10, 2019 (Doc. 2690-5)).

According to Baca,

> [i]f the Government's theory of the case were true, and Mr. Baca was the titular
> head of the SNM who "ordered" Mr. Molina killed, Mr. Molina's life would have
> expired upon Mr. Baca's arrival at Southern [New Mexico] where he would have
> personally directed the murder.  But that never happened because Mr. Baca never
> "ordered" Mr. Molina to be killed.

Objections ¶ 14, at 6-7 (quoting Revised PSR ¶ 119, at 28).

Baca argues that the same "circumstances-of-the-offense analysis applies" to the Marcantel

conspiracy, because he initially declined an invitation to kill Marcantel from Eric Duran, who was

one of the United States' informants who recorded conversations with Baca.  Objections ¶ 15, at

7.  Baca asserts that, after he declined the invitation to kill Marcantel, Duran "stopped recording"

their conversations for several days "while he convinced Mr. Baca that the Marcantel hit was a

good idea," and then Duran resumed recording their conversations.   Objections ¶ 15, at 7.

According to Baca, "[t]he fact that [he] had to be cajoled into participating in the conspiracy once

again militates in favor of a concurrent, not consecutive, sentence."  Objections ¶ 15, at 7.

Next, Baca argues that "a sentence of life imprisonment is more than enough" to satisfy

the second § 3553(a) factor -- "'to promote respect for the law'"; "'provide [] just punishment'";

"adequately deter others who may contemplate committing such crimes"; and "'protect the public'

from Mr. Baca."  Objections  ¶ 16, at 7 (quoting 18 U.S.C. § 3553(a)(2)(A)-(C)).  Baca asserts that

"a concurrent federal life sentence will ensure that if [he] ever successfully paroles out of his life

sentence imposed by the state court, the federal prison system will simply continue his

incarceration."  Objections ¶ 16, at 7.  As to the third § 3553(a) factor -- "'the kinds of sentence

- 19 -

available,'" Objections ¶ 12, at 6 (quoting 18 U.S.C. § 3553(a)(3)) -- Baca argues that, because he

will be serving two life sentences, "there is no practical need to impose a consecutive sentence,"

Objections ¶ 17, at 8.  See id. ¶ 18, at 8 ("There is no such thing as dying in prison twice.  Once is

enough.  A concurrent sentence here will achieve just that.").

    **3.**        **The Addendum.**

The USPO responds to Baca's Objections.  See Addendum at 1-2.  As to Armenta's

testimony in the Revised PSR's paragraph 22, the USPO admits that it "has not had adequate time

to review the transcripts of Armenta's trial testimony," because of the "late nature of [Baca's]

objections."  Addendum at 1.  The USPO states that it "defers to the Court's discretion," and takes

no position "on whether certain statements [by] Armenta should remain in the [Revised] PSR or

[be] deleted."  Addendum at 1.

Next, the USPO argues that the vulnerable-victim adjustment applies, because Molina's

"status as an SNM gang member who cooperated with law enforcement made him vulnerable."

Addendum at 2.  According to the USPO, one definition of a "vulnerable victim" is a person "who

is a victim of the offense of conviction and any conduct for which the defendant is accountable

under § 1B1.3."   Addendum at 1 (quoting U.S.S.G. § 3A1.1, Application Note 2)(internal

quotation marks omitted).  According to the USPO, § 1B1.3 ensures that, for criminal enterprises,

> the defendant is held accountable for all acts and omissions of others that were
> (i) within the scope of the jointly undertaken criminal activity; (ii) in furtherance of
> that criminal activity; and (iii) reasonably foreseeable in connection  with that
> criminal activity that occurred during the commission of the offense of conviction,
> in preparation for that offense, or in the course of attempting to avoid detection or
> responsibility for that offense.

Addendum at 1-2 (citing U.S.S.G. § 1B1.3).  The USPO notes that Molina was attacked and killed

in a small cell, and that he "was not able to fight off his assailants or escape or call for assistance

from correctional officers while being held down and strangled by multiple individuals." Addendum at 2. In addition, the USPO argues that Molina was "targeted" for his cooperation with law enforcement and attacked at a "specific confined location," which made him "particularly susceptible to the defendants' criminal conduct." Addendum at 2.

Last, the USPO argues that "a concurrent sentence is required if the term of imprisonment resulted from another offense that is 'relevant conduct' to the instant offense, under § 1B1.3, and was the basis for an increase in the offense level for the instant offense under Chapters 2 or 3 of the Guidelines." Addendum at 2 (quoting U.S.S.G. § 5G1.3(b)). On the other hand, the USPO maintains that, "where the offense level underlying the undischarged sentence does not result in an increase in the offense level for the present offense, the defendant should not be credited with the time served on the undischarged sentence." Addendum at 2. The USPO maintains that Baca's prior state conviction does not factor into his offense level calculation under Chapters 2 or 3. See Addendum at 2. Rather, the USPO states that the prior state conviction "was accounted for under the criminal history section" and that Baca's sentence "shall run consecutively to the [] undischarged term of imprisonment" for his prior state conviction. Addendum at 2.

4.     **The Hearing**.

The Court sentenced Baca on June 12, 2019. See Tr. at 74:13-15 (Court). The Court began the sentencing hearing by giving Baca time to review the Revised PSR. See Tr. at 77:3-9 (Court, Duncan). Baca and his counsel then confirmed that they had reviewed the Original PSR, the Revised PSR, and the Addendum. See Tr. at 77:22-78:8 (Court, Baca, Duncan). Baca stated that he had a "general objection" to the Revised PSR "to the extent" that it relied on investigative reports instead of trial testimony. Tr. at 78:13-15 (Duncan). Baca then outlined that he has one objection with a "factual and legal basis," and a request for a variance. Tr. at 78:16-18 (Duncan).

The Court stated that the USPO should have reviewed the trial transcripts when drafting the Revised PSR, but that, after reviewing the Revised PSR, the Court concluded that it "match[ed] up with the trial testimony. In those cases where it didn't, the probation officer [] change[d] it." Tr. at 79:1-3 (Court).

Baca raised his objection to the Revised PSR's paragraph 22, which he characterized as a "summary of the statements of Jerry Armenta, which probation is relying on to support its allegation that the vulnerable victim enhancement applies." Tr. at 79:11-13 (Duncan). The United States then suggested that the phrase "'somehow obtained a copy'" be replaced with "'was aware of a police report prepared by the police department which reflected JM had provided information in aid to.'" Tr. at 80:9-12 (Armijo). The United States explained that, after reviewing the trial testimony, it found several instances in which Baca indicated that he was aware of "paperwork" on Molina. Tr. at 80:14-81:8 (Armijo). The United States said that "it appears that probation did review [Armenta's] testimony" and that the remainder of the Revised PSR's paragraph 22 is consistent with Armenta's testimony, which the USPO confirmed. Tr. at 80:16-81:16 (Armijo, Court, Mills). Baca then confirmed that the United States' suggested change to the Revised PSR is sufficient. See Tr. at 82:18-20 (Court, Duncan). The Court then ordered that it would "make the change" by replacing "'somehow obtained'" with "'was aware of.'" Tr. at 83:14 (Court).

Baca then stated that he objected to another sentence in the Revised PSR's paragraph 22, which states that Molina "'was to be murdered in his cell at SNMCF.'" Tr. at 83:10-11 (Duncan)(quoting Revised PSR ¶ 22, at 14). Baca argued that "there was never any testimony by any witness that Mr. Baca ordered that Mr. Molina be killed in his cell." Tr. at 83:12-14 (Duncan). Baca stated that removing the phrase "in his cell at SNMCF," Revised PSR ¶ 22, at 14, would be "sufficient," Tr. at 84:1-4 (Court, Duncan). The United States argued that Urquizo's testimony

supports that Baca told Urquizo that Molina "was to be murdered at SNMCF." Tr. at 84:6-8 (Armijo). Baca then stated that removing the words "in his cell" would be "sufficient," and the United States agreed. Tr. at 84:9-16 (Court, Duncan, Armijo). The Court then ordered that it would "take out the words 'in his cell,' but leave in the words 'in SNMCF.'" Tr. at 84:17-19 (Court)(quoting Revised PSR ¶ 22, at 14).

Next, Baca argued that he objected to the first sentence of the Revised PSR's paragraph 26 -- which states that "Herrera ordered the murder of JM after receiving instructions from Baca," Revised PSR ¶ 26, at 14 -- because "there was never any evidence that Mr. Herrera communicated directly with Mr. Baca," Tr. at 85:4-6 (Duncan). Baca conceded, however, that there is evidence of a "chain [of communication] from Mr. Baca to one person to the next person." Tr. at 85:6-8 (Duncan). The United States suggested changing the phrase "instructions from Baca," Revised PSR ¶ 26, at 14, to "the paperwork," Tr. at 85:10-15 (Armijo). The United States and Baca agreed that the change would suffice, and they further agreed that the phrase at the end of the sentence -- "a higher-ranking member of the gang, who was housed at the PNM," Revised PSR ¶ 26, at 14 -- should be removed so the sentence would make sense, see Tr. at 85:22-86:7 (Duncan, Armijo, Court). The Court ordered the changes, which the USPO incorporated. See Tr. at 85:18-20 (Court, Mills); id. at 86:1-2 (Court); id. at 86:11-13 (Court, Mills).

Baca stated "that's all of our factual objections," Tr. at 87:12-13 (Duncan), and the Court proceeded to address the legal objections, beginning with Baca's objection to the vulnerable-victim adjustment, see Tr. at 87:14-16 (Court). Baca agreed to hear the Court's "thoughts first" on the adjustment. Tr. at 87:19-20 (Duncan). The Court characterized the "primary issue" as "whether the two-level adjustment for a vulnerable victim . . . applies where Mr. Baca was not present at Mr. Molina's murder." Tr. at 87:25-88:4 (Court). The Court also noted that Baca argues that there

is no evidence to support that he was "involved in ordering, planning or directing the details of Mr. Molina's murder." Tr. at 88:4-7 (Court)(citing Objections ¶ 6, at 3). The Court opined, however, that it is

> inclined to think that a preponderance of the evidence establishes that Mr. Baca knew or should have known that Mr. Molina was particularly vulnerable to being murdered because of Mr. Molina's cooperation with law enforcement, Mr. Baca's order that Mr. Molina be killed and Mr. Molina's incarceration with fellow SNM members who knew of his cooperation and the order for his death.

Tr. at 88:8-15 (Court). The Court agreed with Baca that "the fact that Mr. Molina was an inmate at the time of his murder and that he was killed in his prison cell are not proper bases, without more, to conclude that Mr. Molina was a vulnerable victim." Tr. at 89:21-24 (Court).

The Court noted, however, that the vulnerable-victim adjustment "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." Tr. at 90:8-11 (Court). The Court stated that a victim can be "'particularly vulnerable by virtue of his incarceration with [other inmates] and his inability to escape and that the victim was targeted because of this vulnerability.'" Tr. at 90:23-25 (Court)(quoting United States v. Tapia, 59 F.3d 1137, 1143 (11th Cir. 1995)). Additionally, the Court noted that an inmate can be a vulnerable victim if "'he was completely dependent upon the care of the corrections officers, [. . .] was locked in his cell prior to the assault, and [. . .] could not protect himself from the assault.'" Tr. at 91:6-9 (Court)(quoting United States v. Lambright, 320 F.3d 517, 518 (5th Cir. 2003)). The Court further instructed that the vulnerable-victim enhancement applies "'when the victim is less able to resist than the typical victim and requires greater societal protection.'" Tr. at 91:13-15 (Court)(quoting United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)).

The Court stated that the trial testimony supports that Baca was aware of "paperwork" on Molina and that "Baca wanted Calbert to take the paperwork to the Southern New Mexico Correctional Facility." Tr. at 92:24-93:1 (Court). The Court noted that Urquizo's testimony also supports that Baca knew about the "paperwork on Mr. Molina and stated that Mr. Molina needed to be killed." Tr. at 93:93:5-6 (Court). The Court then stated its inclination "to conclude that Mr. Baca not only advocated for Mr. Molina's murder, but he knew and wanted other SNM members to know that Mr. Molina had cooperated with law enforcement." Tr. at 94:4-7 (Court). The Court said that the testimony supports that

> Mr. Baca knew that his spreading word that Mr. Molina had cooperated with law enforcement and needed to be murdered[,] especially considering Mr. Baca's high position in the SNM[,] would increase Mr. Molina's particular susceptibility to being murdered. Mr. Molina's incarceration in a pod with SNM members who knew of his cooperation and the order that he be killed also increased this vulnerability.

Tr. at 94:19-95:2 (Court).

The Court stated that Molina was incarcerated and that his murderers lived in cells near him, and that the United States Court of Appeals for the Eleventh Circuit has "found that [a] victim [can be] vulnerable, in part, because of his incarceration with the defendants." Tr. at 95:10-12 (Court)(citing United States v. Tapia, 59 F.3d at 1143). The Court stated that Rodriguez testified that Molina "was a rat, which is not allowed in the gang," Tr. at 95:8-9 (Court), and that Molina's murderers entered Molina's cell "with shanks with the sole purpose of carrying out the hit on Mr. Molina," Tr. at 95:15-16 (Court). The Court said that the vulnerable-victim adjustment is "justified where [t]he defendant selected and targeted this particular victim for the offense because of unusual circumstances.'" Tr. at 95:19-21 (Court). The Court summarized that it is inclined to conclude that "Baca knew that Mr. Molina was a vulnerable victim," because Baca knew that Molina cooperated with law enforcement, there was an order to kill Molina for his cooperation,

and Molina was incarcerated "with other SNM members who had to act on the hit or be murdered themselves." Tr. at 96:1-9 (Court).

The United States agreed with the USPO that the vulnerable-victim adjustment applies. See Tr. at 96:22-23 (Armijo). The United States said that Urquizo also testified that Baca "said there was paperwork and that Javier needed to be hit and to take care of it when he went down there." Tr. at 97:2-4 (Armijo). The United States also stated that Molina's murderers had planned to give Molina drugs before killing him, but it conceded that there is no evidence that Baca was aware of this detail. See Tr. at 97:13-98:5 (Armijo, Court). The United States argued that, since Baca became leader of SNM, all of the murders at Southern New Mexico occurred inside cells, and, thus, "it was certainly foreseeable" to Baca that Molina's murder would occur in a cell as well. Tr. at 98:16-22 (Armijo).

Baca argued that he "had no control over where Javier Molina resided" when Baca ordered Molina's murder, and that the "location" of Molina's murder was "irrelevant" and "ancillary" to Baca's order. Tr. at 98:22-99:4 (Duncan). Baca argued that this detail distinguishes him from the defendant in United States v. Tapia, in which the victim was "particularly vulnerable because he was brought in[to a prison pod] solely for [the] purpose" of killing the victim. Tr. at 100:7-11 (Duncan). Baca also argued that, unlike the correctional officers who attacked victims in some cases, Baca "had no control over Mr. Molina whatsoever." Tr. at 100:25 (Duncan). Baca asserted that, although Molina was an informant and SNM kills people who cooperate with law enforcement, these details "didn't make him particularly vulnerable." Tr. at 101:13 (Duncan). In addition, Baca argued that the "location of the hit is not enough for a vulnerable victim" adjustment. Tr. at 101:24-25 (Duncan). Baca reiterated that "there's no evidence that Mr. Baca had specific directions on how" Molina's murder was to occur. Tr. at 102:9-10 (Duncan). Baca

argued that Molina was not unusually vulnerable, given that he was "targeted exactly because that's the way that the SNM operated and, . . . [those are the] rules that he [] signed onto." Tr. at 103:1-5 (Duncan).

The United States responded by arguing that the instruction from Baca to Urquizo, "who was taking down [Molina's] paperwork" to Southern New Mexico, was "very specific." Tr. at 103:22-25 (Armijo). The United States also stated that Molina "knew that there was a hit out on him," but that Molina trusted the other inmates around him, including the inmates who murdered him, and thus Molina "never saw [his murder] coming." Tr. at 104:10 (Armijo), id. at 104:19 (Armijo). The United States contended that these details make Molina's murder similar to the cases in which the corrections officers on whom the victims depended as caretakers attacked the victims. See Tr. at 104:10-19 (Armijo). Baca then stated that, when Baca lived with Molina at Southern New Mexico, "nothing happened." Tr. at 105:7-8 (Duncan). Last, Baca argued that, although Molina trusted the inmates who murdered him, the inmates "betrayed him." Tr. at 105:12 (Duncan).

The Court then stated that it will "overrule the objection and apply the two-level enhancement." Tr. at 106:7-8 (Court). The Court confirmed that the offense level is 43, the criminal history category is VI, and that the Guidelines imprisonment term is 120 months for Counts 6, 9 and 10. See Tr. at 106:13-16 (Court). For Count 7, the Court instructed that the Guidelines imprisonment range is life, "which is consistent with the statutory provision of mandatory life imprisonment." Tr. at 106:18-19 (Court).

The Court turned to Baca's request that his sentence run concurrently to his state sentence, and Baca agreed to hear, first, the Court's "thoughts on the law and the guidelines." Tr. at 107:13-17 (Court, Lowry). The Court noted that the Revised PSR's paragraph 115 states that Baca "was

convicted of murder in 1990 and sentenced to life imprisonment." Tr. at 108:1-3 (Court). The Court also acknowledged that the USPO argues that Baca's sentence should run consecutively to his prior sentence, because his prior conviction does not factor into Baca's offense level calculation. See Tr. at 108:4-13 (Court)(citing Revised PSR ¶ 115, at 27). The Court noted that "Baca requests that the Court vary from U.S.S.G. § 5G1.3's application," because Baca's prior conviction "was used to prove an element of the crimes here, whether Mr. Baca was involved in a criminal enterprise." Tr. at 108:17-19 (Court)(citing Objections ¶ 8, at 4). The Court noted Baca's statement that the Guidelines "are advisory and do not bind the Court." Tr. at 108:21-22 (Court)(citing Objections ¶ 9, at 4). The Court then quoted § 5G1.3:

> "[I]f the instant offense was committed while the defendant was serving a term of imprisonment, including a work release, furlow or escape status, or after sentencing for, but before commencing service of, such term of imprisonment, the sentence for the instant offense shall be imposed to run consecutively to the undischarged term of imprisonment."

Tr. at 109:8-15 (quoting U.S.S.G. § 5G1.3(a)).

The Court agreed with Baca that the Guidelines do not bind the Court and that it may vary from § 5G1.3(a) by imposing a concurrent sentence. See Tr. at 109:20-110:5 (Court)(citing United States v. Mihaly, 67 F.3d 894, 896 (10th Cir. 1995); United States v. Shewmaker, 936 F.2d 1124, 1127 (10th Cir. 1991)). The Court noted that 18 U.S.C. § 3584 also permits the Court to sentence concurrently or consecutively. See Tr. at 110:6-12 (Court). The Court stated that § 3584 directs courts to consider the factors in 18 U.S.C. § 3553(a). See Tr. at 110:19-20 (Court). The Court instructed that it may vary from the Guidelines where the "'factors relevant to the sentencing have not been addressed adequately by the Guidelines.'" Tr. at 110:23-25 (Court)(quoting United States v. Shewmaker, 936 F.2d at 1127). The Court stated that the United States Court of Appeals for the Tenth Circuit was "talking about depart[ing] rather than varying" in United States v.

Shewmaker, but that Baca is arguing for a variance and not a departure. Tr. at 110:1-4 (Court). The Court then summarized its understanding of the law to be that the Guidelines instruct the Court to impose a consecutive sentence, but that the Court has discretion to impose a concurrent sentence under United States v. Booker, 543 U.S. 220 (2005). See Tr. at 111:5-12 (Court). Both the United States and Baca agreed with the Court's characterization of the relevant law. See Tr. at 111:13-18 (Court, Lowry, Armijo).

Baca stated that the "gestalt of our argument for concurrent sentences is frankly what's the point of adding life sentences on top of life sentences?" Tr. at 112:25-113:3 (Lowry). Baca argued that a single life sentence is "sufficient to compensate for" all of the § 3553(a) factors. Tr. at 113:7 (Lowry). Baca asserted that, under the United States' theory, Baca "didn't need to wait for Mr. Urquizo to show up [to Southern New Mexico] almost a year and a half later to" kill Molina. Tr. at 114:15-17 (Lowry). Baca argued that the United States' "chronology of events . . . undermines the theory that Mr. Baca wanted Molina murdered." Tr. at 115:22-25 (Lowry). Baca contended that these circumstances indicate that Baca lacked "malice," and the Court can take this into consideration in deciding whether to impose a concurrent sentence. Tr. at 115:6 (Lowry). Baca also argued that he did not change his mind about murdering Marcantel until he was persuaded by Duran that doing so was a "good idea." Tr. at 116:5 (Lowry). Baca argued that this lack of malice shows that he is not "stone-cold" and does not warrant multiple life sentences. Tr. at 116:12 (Lowry). According to Baca, one life sentence is "enough to promote all the 3553(a) factors." Tr. at 116:20 (Lowry).

Baca then argued that policy concerns also militate in favor of a concurrent sentence, and he shared a quote from Justice Benjamin Cardozo: "Be it my will that my justice be ruled by mercy." Tr. at 117:18-19 (Lowry). Baca noted that "you can't die multiple times[, and] the

pragmatic reality of you running these sentences concurrently means that Mr. Baca is going to die in federal prison at some point." Tr. at 118:1-4 (Lowry). Baca argued that a concurrent sentence "could speak to [] the Court's capacity for mercy for anybody . . . under the circumstances." Tr. at 119:7-8 (Court). Baca concluded that whether he receives a concurrent or consecutive sentence "doesn't really change his fate. . . . It's just a matter of . . . judicial philosophy and temperament." Tr. at 119:15-18 (Lowry). The Court then gave Baca an opportunity to speak before the Court imposed his sentence, and Baca stated that he had nothing to say. See Tr. at 120:7-13 (Court, Baca).

Molina's mother then approached the podium to give a statement. See Tr. 120:22-25 (Court, Molina). Ms. Molina stated that she loves her family "more than anything," and that Baca "really, really affected my life and my family's life." Tr. at 121:18-22 (Molina). Ms. Molina said that her son will not get to celebrate his thirty-sixth birthday in August. See Tr. at 122:12-13 (Molina). Ms. Molina also stated that she would "never forgive [Baca] for what [he] did" and that Baca is "like a bowel movement to [her]." Tr. at 15-18 (Molina).

The United States argued that it would characterize the decision to impose consecutive sentences in terms of "justice and punishment," rather than "in terms of vengeance," as Baca did. Tr. at 123:2-4 (Armijo). The United States reiterated that Molina was stabbed forty-three times, and it argued that a concurrent sentence would send "a message of nondeterrence." Tr. at 123:8-11 (Armijo). The United States asserted that "there needs to be some sort of message sent out to the streets." Tr. at 123:19-20 (Armijo). The United States maintained that Baca told Duran that, "[i]f they would have let me out, [Molina] wouldn't be a dead man. That man would still be alive." Tr. at 124:17-18 (Armijo). The United States argued that Baca's statements show that he wielded significant power within SNM. See Tr. at 124:22-125:1 (Armijo). The United States said that the

reason that Baca did not kill Molina himself was that SNM has "soldiers," or members "underneath him," to carry out Baca's orders. Tr. at 125:17-18 (Armijo). The United States argued that, although Baca did not kill Molina with his own hands, "that's not to say that he is not responsible for the murder any less than the people who actually did it themselves." Tr. at 126:2-5 (Armijo). The United States asserted that a consecutive sentence would "recognize that this was a separate life, a separate murder." Tr. at 126:9-10 (Armijo). The United States further argued that the § 3553(a) factors do not justify a concurrent sentence. See Tr. at 126:11-127:14 (Armijo).

The Court then adopted the Revised PSR's factual findings, along with the changes that the Court had made earlier in the hearing. See Tr. at 128:2-5 (Court). The Court also adopted the Revised PSR's Guideline applications and repeated that it overruled Baca's Objection to the Revised PSR's Guideline calculations. See Tr. at 128:9-11 (Court). The Court also stated that it had considered the § 3553(a)(1)-(7) factors, the relevant Guidelines provisions and statutory provisions for each count, and the finding that Baca is a career offender. See Tr. at 128:14-20 (Court). The Court determined that the offense level is 43 and the criminal history category is VI. See Tr. at 128:21-23 (Court). For Counts 6, 9, and 10, the Court determined that the Guidelines imprisonment term is 120 months pursuant to U.S.S.G. § 5G1.1, and, for Count 7, the Guidelines imprisonment term is life, "which is consistent with the statutory provision of mandatory life imprisonment." Tr. at 129:1-3 (Court).

The Court noted that Baca is a high-ranking SNM member who ordered Molina's murder. See Tr. at 129:4-11 (Court). The Court stated that Baca also ordered the murders of Santistevan and Marcantel. See Tr. at 129:12-15 (Court). The Court said that it had considered not only the Guidelines, but also other sentencing goals, see Tr. at 129:20-22 (Court), and it concluded that "the punishment that's set forth in the guidelines is appropriate for this sort of offense," Tr.

at 130:1-3 (Court). The Court agreed that 120-month sentences for Counts 6, 9, and 10, and life imprisonment for Count 7, are adequate and necessary "to reflect the seriousness of the offenses, to promote respect for the law, provide just punishment, afford adequate deterrence both at a specific and general level, [and] protect the public." Tr. at 130:7-11 (Court)(citing 18 U.S.C. § 3553(a)(2)). The Court stated that a Guidelines sentence "avoid[s] unwarranted sentencing disparity among defendants with similar records who have been found guilty of similar conduct." Tr. at 140:12-14 (Court). The Court stated that the "guideline sentence fully and effectively reflects each of the factors embodied in [18 U.S.C. § 3553(a)] and produces a reasonable sentence . . . that is sufficient without being greater than is necessary." Tr. at 130:19-24 (Court).

The Court then imposed a sentence of 120 months for each of Counts 6, 9, and 10, and life imprisonment without release for Count 7. See Tr. at 131:7-8 (Court). The Court stated that these sentences "shall run concurrently for a total term of life." Tr. at 131:8-9 (Court). The Court also placed Baca on supervised release for three years as to each count, with the terms running concurrently. See Tr. at 131:10-13 (Court). The Court then imposed special conditions for Baca's supervised release: (i) Baca must submit to a "search of [his] person, property, residence, vehicle, papers, computers," Tr. at 131:21-23 (Court); (ii) Baca's "probation officer may conduct a search . . . only when reasonable suspicion exists," Tr. at 132:1-2 (Court); (iii) Baca must inform other residents or occupants where he lives "that the premises may be subject to a search," Tr. at 132:6-7 (Court); (iv) Baca may not possess firearms or ammunition, see Tr. at 132:18-19 (Court); (v) Baca "must not communicate or otherwise interact with codefendants [and] co-conspirators," Tr. at 133:1-2 (Court); (vi) Baca "must not communicate or otherwise interact with any known gang members," Tr. at 133:3-4 (Court); (vii) Baca "must reside in a residential reentry center for a term of six months," Tr. at 133:21-22 (Court); (viii) Baca "must not communicate or otherwise

interact with the victim or victims either directly or through someone else," Tr. at 134:6-8 (Court); (ix) Baca "must participate in an outpatient substance abuse treatment program and follow the rules and regulations of that program," Tr. at 134:16-18 (Court); (x) Baca must "allow the treatment provider to release treatment records to the probation officer," Tr. at 134:24-25 (Court); (xi) Baca "must submit to substance abuse testing to determine if [he has] used a prohibited substance," Tr. at 135:6-8 (Court); (xii) Baca "must not use or possess alcohol," Tr. at 135:15 (Court); and (xiii) Baca "must not possess, sell, offer for sale, transport, cause to be transported, cause to affect interstate commerce[,] import or export any drug paraphernalia as defined in 21 [U.S.C. §] 863(d)," Tr. at 135:16-19 (Court). The Court further noted that, although the Mandatory Restitution Act of 1996 applies, no victim or victims had requested restitution, and thus the Court would not order restitution. See Tr. at 136:2-5 (Court). The Court determined that it would not impose a fine, but it "imposed a special condition that [Baca] reside at a residential reentry center" pursuant U.S.S.G. § 5E1.2(e). Tr. at 136:12-14 (Court). The Court also ordered Baca to pay a special assessment of $100.00 for each count of conviction, resulting in a total of $400.00. See Tr. at 136:19-21 (Court). Last, the Court determined that the § 3553(a) factors do not support a variance, and thus the Court ordered that Baca's sentence run consecutively to his state sentence. See Tr. at 136:23-25 (Court).

The United States and Baca did not have any reason that the Court should not impose the sentence as stated. See Tr. at 137:5-12 (Court, Armijo, Lowry). The Court then informed Baca that he can appeal his conviction, and that, if he decides to appeal, he must file a notice of appeal within fourteen days of the judgment's entry. See Tr. at 138:14-139:3 (Court). Baca stated that he understood his rights to appeal. See Tr. at 138:4-6 (Court, Baca). Baca made an oral motion to continue possessing his tablet "throughout the appellate process." Tr. at 138:16-18 (Lowry).

The United States did not oppose the motion.  See Tr. at 138:24-139:3 (Armijo).  The Court instructed Baca "to submit an order or [state] if you want me to just make an oral order," and the Court will communicate Baca's request to the U.S. Marshal's service.  Tr. at 139:6-10 (Court). Baca said that he would submit an order, see Tr. at 139:11-12 (Lowry), and the Court wished "good luck" to Baca, Tr. at 140:4 (Court).

## RELEVANT LAW REGARDING THE GUIDELINES

In United States v. Booker, the Supreme Court of the United States severed the mandatory provisions from the Sentencing Reform Act, Pub. L. No. 98-473, 98 Stat. 1976, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)    to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)    to afford adequate deterrence to criminal conduct;
>
> (C)    to protect the public from further crimes of the defendant; and
>
> (D)    to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D).

> [A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a). To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the nature of the offense and of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing. See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration. See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007). The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'" United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants with similar records who

have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  <u>See</u> <u>United States v. Booker</u>, 543 U.S. at 261-62.

The Tenth Circuit has "joined a number of other circuits in holding that a sentence within the applicable Guidelines range is presumptively reasonable."  <u>United States v. Terrell</u>, 445 F.3d at 1264.  This presumption, however, is an appellate presumption, and not one that the trial court can or should apply.  <u>See</u> <u>Kimbrough v. United States</u>, 552 U.S. 85, 90-91 (2007); <u>Gall v. United States</u>, 552 U.S. at 46-47; <u>Rita v. United States</u>, 551 U.S. at 350-51 (repeating that the presumption of reasonableness "is an *appellate* court presumption" (emphasis in original)); <u>United States v. Conlan</u>, 500 F.3d 1167, 1169-70 (10th Cir. 2007)(stating that "the government rightly concedes the district court erred in affording a presumption of reasonableness to the recommended advisory sentence," because "the guideless are presumptively reasonable only at the appellate level").  Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption in favor of the advisory[4] Guidelines sentence.  <u>See</u> <u>Kimbrough v. United States</u>, 552 U.S. at 90-91; <u>Gall v. United States</u>, 552 U.S. at 46-47; <u>Rita v. United States</u>, 551 U.S. at 351.

---

[4]Attorneys and courts often say that the "Guidelines" are advisory, <u>Gall v. United States</u>, 552 U.S. at 46 ("As a result of our decision [in <u>United States v. Booker</u>, 543 U.S. 220 (2005)], the Guidelines are now advisory . . . ."); <u>United States v. Leroy</u>, 298 F. App'x 711, 712 (10th Cir. 2008)(unpublished)("[T]he Guidelines are advisory, not mandatory."); <u>United States v. Sells</u>, 541 F.3d 1227, 1237 (10th Cir. 2008)("[T]he sentence ultimately imposed by the district court was based on a correctly calculated Guidelines range, a stated consideration of the § 3553(a) factors, and an understanding that the Guidelines are advisory."), but it is more appropriate to say that the resulting Guidelines ranges are advisory.  The Court must consider the Guidelines, <u>see</u> <u>Gall v. United States</u>, 552 U.S. at 46 ("It is . . . clear that a district judge must give serious consideration to the extent of any departure from the Guidelines . . . ."), and must accurately calculate the Guidelines range, <u>see</u> <u>Gall v. United States</u>, 552 U.S. at 49 ("[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.").  The Court is not mandated, however, to apply a sentence within the calculated Guidelines range.  <u>See</u> <u>United States v. Sierra-Castillo</u>, 405 F.3d 932, 936 n.2 (10th Cir. 2005)("[D]istrict courts post-*Booker* have discretion to assign sentences outside of the Guidelines-authorized range . . . .").  <u>Accord</u>

While the Supreme Court's decision in United States v. Booker has given the sentencing court discretion that it did not have earlier, the sentencing court's first task remains to accurately and correctly determine the advisory-guideline sentence. Thus, before the sentencing court takes up a defendant's Booker arguments, the sentencing court must first determine whether the defendant is entitled to downward departures. The sentencing court may, however, also use these same departure

---

United States v. Chavez-Rodarte, No. CR 08-2499 JB, 2010 WL 3075285, at *2-3 (D.N.M. July 16, 2010)(Browning, J.).

The Court must adhere to the following three-step sequence when sentencing a criminal defendant: first, determining the appropriate sentencing range on the basis of Guidelines' chapters 2 through 4; next, applying Guidelines-contemplated departures based on parts 5H and 5K; and, only then, varying from the Guidelines framework on the basis of the § 3553(a) factors taken as a whole. The Court must follow this sequence, because: (i) the Guidelines expressly provide for it, and courts must still consult the Guidelines, even if they will subsequently vary from them in the third step of the sequence; and (ii) adherence to this sequence is the only way to give effect to 18 U.S.C. § 3553(e).

. . . .

The Supreme Court held in United States v. Booker that "district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing," 543 U.S. at 264, but further expounded in Kimbrough v. United States that "courts may vary [from the Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines," 552 U.S. 85, 101 (2007)(alteration in original)(internal quotation marks omitted). In theory, this freedom could mean that a district court may excise individual portions of the Guidelines along the way as it performs an otherwise by-the-book Guidelines analysis, end up with a sentence with built-in variances, and never even know what sentence a true, rigid Guidelines application would yield. In practice, however, appellate courts expect district courts to first obtain the true Guidelines' sentence range and circumscribe their United States v. Booker-granted authority to post-Guidelines analysis "variances." Irizarry v. United States, 553 U.S. 708, 710-16 (2008). A district court that attempts to vary from U.S.S.G. § 1B1.1's basic sequence most likely acts procedurally unreasonably. See Gall v. United States, 552 U.S. 38, 51 (2007)(holding that a sentence is procedurally reasonable if "the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence" (emphasis added)).

---

United States v. Nolf, 30 F. Supp. 3d 1200, 1222-24 (D.N.M. June 20, 2014)(Browning, J.).

factors in the <u>Booker</u> calculus, even if the court does not grant a downward departure.

<u>United States v. Apodaca-Leyva</u>, No. CR 07-1479 JB, 2008 WL 2229550, at *6 (D.N.M. Feb. 13, 2008)(Browning, J.). The Supreme Court has recognized, however, that sentencing judges are "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." <u>Kimbrough v. United States</u>, 552 U.S. at 89 (quoting <u>Gall v. United States</u>, 552 U.S. at 51).

## LAW REGARDING THE BURDEN OF PROOF REQUIRED FOR ENHANCEMENTS UNDER THE GUIDELINES

In <u>Apprendi v. New Jersey</u>, 530 U.S. 466 (2000), the Supreme Court reaffirmed the principle that it is permissible for sentencing judges "to exercise discretion -- taking into consideration various factors relating both to offense and offender -- in imposing judgment *within the range* prescribed by statute." 530 U.S. at 481 (emphasis in original). The Supreme Court cautioned, however, that the Constitution of the United States of America limits this discretion and the Sixth Amendment to the Constitution requires that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." <u>Apprendi v. New Jersey</u>, 530 U.S. at 490. In <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), the Supreme Court elaborated on its holding in <u>Apprendi v. New Jersey</u>, stating that the "'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*." <u>Blakely v. Washington</u>, 542 U.S. at 303 (emphasis in original)(citing <u>Ring v. Arizona</u>, 536 U.S. 584, 602 (2002); <u>Harris v. United States</u>, 536 U.S. 545, 563 (2002)(plurality opinion), <u>overruled by</u> <u>Alleyne v. United States</u>, 570 U.S. 99 (2012)). In <u>United States v. Booker</u>, however, the Supreme Court held that, because the sentencing guideline ranges are no longer mandatory, "*Apprendi* does not apply to the present advisory-Guidelines

regime." United States v. Ray, 704 F.3d 1307, 1314 (10th Cir. 2013)(citing United States v. Booker, 543 U.S. at 259). See United States v. Booker, 543 U.S. at 259 ("[W]ithout this provision [of the Guidelines statute] -- namely, the provision that makes 'the relevant sentencing rules . . . mandatory and impose[s] binding requirements on all sentencing judges' -- the statute falls outside the scope of *Apprendi*'s requirement." (second alteration added by United States v. Booker)(quoting United States v. Booker, 543 U.S. at 221). More recently, the Supreme Court held that the requirements in Apprendi v. New Jersey apply to facts that increase a defendant's mandatory minimum sentence. See Alleyne v. United States, 570 U.S. at 103.

In United States v. Magallanez, 408 F.3d 672 (10th Cir. 2005)(McConnell, J.), the Tenth Circuit held that Blakely v. Washington and United States v. Booker did not change the district court's enhancement findings analysis. See United States v. Magallanez, 408 F.3d at 684-85. United States v. Magallanez involved plain-error review of a drug sentence in which a jury found the defendant guilty of conspiracy to possess with intent to distribute and conspiracy to distribute methamphetamine. See United States v. Magallanez, 408 F.3d at 676. As part of its verdict, the jury, through a special interrogatory, attributed to the defendant 50-500 grams of methamphetamine; at sentencing, however, the judge -- based on government witnesses' testimony of the various amounts that they had sold to the defendant -- attributed 1,200 grams of methamphetamine to the defendant and used that amount to calculate his sentence under the Guidelines. See United States v. Magallanez, 408 F.3d at 682. The district court's findings increased the defendant's Guidelines sentencing range from 63 to 78 months, based on the jury's 50 grams amount, to 121 to 151 months, based on the judge's 1,200 grams amount. See United States v. Magallanez, 408 F.3d at 682-83. On appeal, the Tenth Circuit stated that, both before and after Congress' passage of the "Sentencing Reform Act, sentencing courts maintained the

power to consider the broad context of a defendant's conduct, even when a court's view of the conduct conflicted with the jury's verdict." United States v. Magallanez, 408 F.3d at 684. Although United States v. Booker made the Guidelines ranges "effectively advisory," United States v. Booker, 543 U.S. at 245, the Tenth Circuit reaffirmed that "district courts are still required to consider Guideline ranges, which are determined through application of the preponderance standard, just as they were before," United States v. Magallanez, 408 F.3d at 685 (citation omitted).

The Tenth Circuit, while "recognizing 'strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof,'" has "long held that sentencing facts in the 'ordinary case' need only be proven by a preponderance." United States v. Olsen, 519 F.3d 1096, 1105 (10th Cir. 2008)(quoting United States v. Washington, 11 F.3d 1510, 1516 (10th Cir. 1993)).[5] "[T]he application of an enhancement . . . does not implicate

---

[5]Although the Tenth Circuit stated in United States v. Washington that "the issue of a higher than a preponderance standard is foreclosed in this circuit," 11 F.3d at 1516, the Tenth Circuit has since characterized its holding as leaving "open the possibility that due process may require proof by clear and convincing evidence before imposition of a Guidelines enhancement that increases a sentence by an 'extraordinary or dramatic' amount," United States v. Ray, 704 F.3d at 1314 (quoting United States v. Olsen, 519 F.3d at 1105). See United States v. Olsen, 519 F.3d at 1105 (affirming the use of the preponderance-of-the-evidence standard for sentencing facts that increase a sentence in the "'ordinary case'" (quoting United States v. Washington, 11 F.3d at 1516)). The Tenth Circuit has not yet found that an "extraordinary or dramatic" instance warrants a higher standard of proof for certain facts that enhance a defendant's sentence. United States v. Olsen, 519 F.3d at 1105 (explaining that it need not determine whether a higher standard of proof is required to sentence a defendant for committing perjury in relation to a grand jury investigation, because the enhancement did not require the district court to determine that the defendant committed murder, but only that he obstructed a homicide investigation). See United States v. Constantine, 263 F.3d 1122, 1125 n.2 (10th Cir. 2001)(affirming a preponderance-of-the-evidence standard for facts that enhance a defendant's offense level 4 levels); United States v. Valdez, 225 F.3d 1137, 1143 n.2 (10th Cir. 2000)(rejecting the defendant's argument that a dramatic increase in a sentence because of a sentencing judge's finding of additional amounts of methamphetamine associated with acquitted charges entitled the defendant to a clear-and-convincing evidence standard at sentencing, and noting that the Tenth Circuit "foreclosed by binding precedent" this argument); United States v. Washington, 11 F.3d at 1516 (concluding that a district court need not find by any more than a preponderance of the evidence the amount of cocaine a defendant

the Supreme Court's holding in *Apprendi v. New Jersey*." United States v. Reyes-Vencomo, No. CR 11-2563 JB, 2012 WL 2574810, at *7 (D.N.M. June 26, 2012)(Browning, J.). The Tenth Circuit applies Apprendi v. New Jersey's requirement that a fact be submitted to a jury only where the fact would increase a defendant's sentence "above the statutory maximum permitted by the statute of conviction." United States v. Price, 400 F.3d 844, 847 (10th Cir. 2005). Accord United States v. Ray, 704 F.3d at 1314. A defendant may assert an error under Apprendi v. New Jersey only where the fact at issue increased his sentence beyond the statutory maximum. See United States v. O'Flanagan, 339 F.3d 1229, 1232 n.2 (10th Cir. 2003)(holding that a defendant could not assert an error under Apprendi v. New Jersey, because "his sentence does not exceed the statutory maximum"); United States v. Hendrickson, 592 F. App'x 699, 705 (10th Cir. 2014)(unpublished)[6](holding that, after Alleyne v. United States, "[i]t is well-established that sentencing factors need not be charged in an indictment and need only be proved to the sentencing judge by a preponderance of the evidence"). The Court has noted:

> [A]lthough the decision of the Supreme Court of the United States in Alleyne v. United States . . . expands the rule from Apprendi v. New Jersey, . . . (holding that

---

distributed, even though its findings increased the defendant's sentence from twenty years to consecutive forty-year terms).

[6]United States v. Hendrickson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A) ("Unpublished decisions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored. However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court concludes that United States v. Hendrickson, United States v. Leroy, 298 F. App'x 711 (10th Cir. 2008)(unpublished), United States v. Banda, 168 F. App'x 284 (10th Cir. 2006), United States v. Schmidt, 353 F. App'x 132 (10th Cir. 2009), and United States v. Fillman, 325 F. App'x 700 (10th Cir. 2000)(unpublished), have persuasive value with respect to a material issue, and will assist the Court in its disposition of this Memorandum Opinion and Order.

facts that increase the maximum sentence a defendant faces must be proven to a jury beyond a reasonable doubt), to cover facts that increase the mandatory minimum sentence, as well as the maximum sentence, it does not prohibit district judges from continuing to find advisory sentencing factors by a preponderance of the evidence. See [United States v. Sangiovanni, No. CR 10-3239 JB,] 2014 WL 4347131, at *22-26 [(D.N.M. Aug. 29, 2014)(Browning, J.)].

United States v. Cervantes-Chavez, 59 F. Supp. 3d 1295, 1315 (D.N.M. 2014)(Browning, J.). The Supreme Court has clarified that "[b]oth the 'floor' and 'ceiling' of a sentencing range 'define the legally prescribed penalty.' [] And under our Constitution, when 'a finding of fact alters the legally prescribed punishment so as to aggravate it[,]' that finding must be made by a jury of the defendant's peers beyond a reasonable doubt." United States v. Haymond, 139 S. Ct. 2369, 2378 (2019)(quoting Alleyne v. United States, 570 U.S. at 112-14). Further, the Tenth Circuit has determined that a district court could use its own finding on drug quantity to enhance a defendant's Guidelines range consistent with Alleyne v. United States, "so long as the court does not use its own drug quantity finding to alter the defendant's *statutory* sentencing range." United States v. Cassius, 777 F.3d 1093, 1094 (10th Cir. 2015)(emphasis in original).

## LAW REGARDING RELEVANT CONDUCT FOR SENTENCING

In calculating an appropriate sentence, the Guidelines consider a defendant's "offense of conviction and all relevant conduct under § 1B1.3 (Relevant Conduct) unless a different meaning is specified or is otherwise clear from the context." U.S.S.G. § 1B1.1 Application Note 1(I). In United States v. Booker, the Supreme Court notes:

Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction. That determination is particularly important in the federal system where crimes defined as, for example, "obstruct[ing], delay[ing], or affect[ing] commerce or the movement of any article or commodity in commerce, by . . . extortion," 18 U.S.C. § 1951(a), . . . can encompass a vast range of very different kinds of underlying conduct.

543 U.S. at 250-51 (emphasis and alterations in original). The Supreme Court's reasoning in United States v. Booker suggests that the consideration of real conduct is necessary to effectuate Congress' purpose in enacting the Guidelines.

Section 1B1.3(a) provides that the base offense level under the Guidelines "shall be determined" based on the following:

> (1)  (A)  all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B)  in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were --
>
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> (2)  solely with respect to offenses of a character for which § 3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;
>
> (3)  all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4)  any other information specified in the applicable guideline.

U.S.S.G. § 1B1.3(a)(1)-(4). The court may consider, as relevant conduct, actions that have not resulted in a conviction. Pursuant to the commentary to U.S.S.G. § 6A1.3, evidentiary standards lower than beyond a reasonable doubt are permitted to show relevant conduct. The court may rely

upon reliable hearsay, so long as the evidence meets the preponderance-of-the-evidence standard. See United States v. Banda, 168 F. App'x 284, 289 (10th Cir. 2006)(unpublished)(stating that "there is no prohibition on considering hearsay testimony at sentencing, provided it bears indicia of reliability"); United States v. Vigil, 476 F. Supp. 2d 1231, 1245 (D.N.M. 2007)(Browning J.), aff'd, 523 F.3d 1258 (10th Cir. 2008). Accord United States v. Schmidt, 353 F. App'x 132, 135 (10th Cir. 2009)(unpublished)("The district court's determination of 'relevant conduct' is a factual finding subject to a preponderance of the evidence standard, and clear error review."). The evidence and information upon which the court relies, however, must have sufficient indicia of reliability. See U.S.S.G. § 6A1.3 ("In resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

Supreme Court precedent on relevant conduct consists primarily of two cases: Witte v. United States, 515 U.S. 389 (1995), and United States v. Watts, 519 U.S. 148 (1997). In Witte v. United States, the Supreme Court upheld the use of uncharged conduct at sentencing against a double-jeopardy challenge. See 515 U.S. at 404-06. The defendant in Witte v. United States had been involved in an unsuccessful attempt to import marijuana and cocaine into the United States in 1990, and in an attempt to import marijuana in 1991. See Witte v. United States, 515 U.S. at 392-93. In March, 1991, a federal grand jury indicted the defendant for attempting to possess marijuana with intent to distribute in association only with the defendant's latter attempt to import narcotics. See Witte v. United States, 515 U.S. at 392-93. At sentencing, the district court concluded that, because the 1990 attempt was part of the continuing conspiracy, it was relevant conduct under U.S.S.G. § 1B1.3, and thus the court calculated the defendant's base offense level

based on the aggregate amount of drugs involved in both the 1990 and 1991 episodes.  See Witte v. United States, 515 U.S. at 394.

In September, 1992, a second federal grand jury indicted the defendant for conspiring and attempting to import cocaine in association with his activities in 1990.  See Witte v. United States, 515 U.S. at 392-94.  The defendant moved to dismiss the indictment, contending that he had already been punished for the cocaine offenses, because the court had considered those offenses relevant conduct at the sentencing for the 1991 marijuana offense.  See Witte v. United States, 515 U.S. at 395. The district court agreed and dismissed the indictment, holding that punishment for the cocaine offenses would violate the prohibition against multiple punishments in the Double Jeopardy Clause of the Fifth Amendment to the Constitution.  See Witte v. United States, 515 U.S. at 395.  The United States Court of Appeals for the Fifth Circuit reversed and held that "the use of relevant conduct to increase the punishment of a charged offense does not punish the offender for the relevant conduct."  United States v. Witte, 25 F.3d 250, 258 (5th Cir. 1994).  In reaching this holding, the Fifth Circuit acknowledged that its conclusion was contrary to other United States Courts of Appeals opinions, including a Tenth Circuit opinion, that previously had considered this question.  See United States v. Witte, 25 F.3d at 255 n.19 (citing United States v. Koonce, 945 F.2d 1145 (10th Cir. 1991)).

The Supreme Court granted certiorari to resolve the conflict between the Courts of Appeals and affirmed the Fifth Circuit decision.  See Witte v. United States, 515 U.S. at 395.  In holding that a district court's consideration of the defendant's relevant conduct does not punish the defendant for that conduct, the Supreme Court concluded that "consideration of information about the defendant's character and conduct at sentencing does not result in 'punishment' for any offense other than the one of which the defendant was convicted."  Witte v. United States, 515 U.S. at 401.

The Supreme Court reasoned that sentencing courts had always considered relevant conduct and agreed with the United States' argument that "[t]he fact that the sentencing process has become more transparent under the Guidelines . . . does not mean that the defendant is now being punished for uncharged relevant conduct as though it were a distinct criminal offense." Witte v. United States, 515 U.S. at 402 (internal quotation marks omitted)(quoting Brief for the United States at 23, Witte v. United States, 515 U.S. 389 (1995)(No. 94-6187), 1995 WL 130559, at *23). Sentencing enhancements do not punish a defendant for uncharged offenses; rather, they reflect Congress' policy judgment "that a particular offense should receive a more serious sentence within the authorized range if it was either accompanied by or preceded by additional criminal activity." Witte v. United States, 515 U.S. at 403.

In United States v. Watts, the Supreme Court, in a per curiam opinion, relied upon Witte v. United States and upheld, against a double-jeopardy challenge, a sentencing judge's use of conduct for which the defendant had been acquitted. See United States v. Watts, 519 U.S. at 149. The Supreme Court noted that its conclusion was in accord with every United States Court of Appeals -- other than the Court of Appeals for the Ninth Circuit -- and that each had previously held that a sentencing court may consider conduct for which the defendant had been acquitted, "if the Government establishes that conduct by a preponderance of the evidence." United States v. Watts, 519 U.S. at 149 & n.1 (citing, e.g., United States v. Coleman, 947 F.2d 1424, 1428-29 (10th Cir. 1991)). The Supreme Court began its analysis with 18 U.S.C. § 3661: "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." United States v. Watts, 519 U.S. at 151 (internal quotation marks omitted)(quoting 18 U.S.C. § 3661). According to the Supreme Court, 18 U.S.C. § 3661

embodies the codification of "the longstanding principle that sentencing courts have broad discretion to consider various kinds of information" and that "the Guidelines did not alter this aspect of the sentencing court's discretion." United States v. Watts, 519 U.S. at 151-52.

Tenth Circuit caselaw adheres closely to the Supreme Court's results in Witte v. United States and United States v. Watts. See United States v. Andrews, 447 F.3d 806, 810 (10th Cir. 2006)(applying Witte v. United States' holding to affirm that a career-offender enhancement does not violate the Fifth Amendment's Double Jeopardy Clause). In United States v. Banda, the Tenth Circuit rejected a defendant's argument that it was "structural error" for a district court to find sentencing factors "by a preponderance of the evidence rather than the jury applying a beyond-a-reasonable-doubt standard." United States v. Banda, 168 F. App'x at 290. The Tenth Circuit explained that "[i]t is now universally accepted that judge-found facts by themselves do not violate the Sixth Amendment. Instead, the constitutional error was the court's reliance on judge-found facts to enhance [the defendant's] sentence *mandatorily*." United States v. Banda, 168 F. App'x at 290 (alterations added by United States v. Banda, emphasis in United States v. Lauder)(internal quotation marks omitted)(quoting United States v. Lauder, 409 F.3d 1254, 1269 (10th Cir. 2005)(Tymkovich, J.)).

In United States v. Coleman, the defendant appealed the district court's sentence enhancement for firearms possession after he was convicted of conspiracy to possess with intent to distribute and possession of a controlled substance with intent to distribute, but was acquitted of using or carrying a firearm during and in relation to a drug trafficking crime. See United States v. Coleman, 947 F.2d at 1426, 1428. The Tenth Circuit acknowledged that courts had taken various positions on whether a sentence may be enhanced for firearms possession despite a defendant's acquittal on firearms charges. See United States v. Coleman, 947 F.2d at 1428-29

(citing United States v. Duncan, 918 F.2d 647, 652 (6th Cir. 1990)("[A]n acquittal on a firearms carrying charge leaves ample room for a district court to find by the preponderance of the evidence that the weapon was possessed during the drug offense."); United States v. Rodriguez, 741 F. Supp. 12, 13-14 (D.D.C. 1990)(refusing to apply 2-level enhancement for firearms possession, because "[t]o add at least 27 months to the sentence for a charge of which the defendant was found not guilty violates the constitutional principle of due process and the ban against double jeopardy")).

Without discussion related to the standard of proof a sentencing court should use to make factual findings, the Tenth Circuit held that the district court did not err in enhancing the defendant's sentence for possession of a firearm. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit based its conclusion on evidence that: (i) the weapons had been located at the arrest scene for several days; (ii) the weapons were handled at will by individuals who lived at the apartment; and (iii) the weapons were kept for the protection of conspiracy participants and the narcotics involved. See United States v. Coleman, 947 F.2d at 1429. The Tenth Circuit summarized that, in reviewing relevant federal case law, it found "persuasive the decisions that have allowed a sentencing court to consider trial evidence that was applicable to a charge upon which the defendant was acquitted." United States v. Coleman, 947 F.2d at 1429.

In United States v. Washington, the defendant argued that the United States needed to prove drug quantities used as relevant conduct to establish a defendant's offense level by clear-and-convincing evidence, rather than by a preponderance of the evidence. See United States v. Washington, 11 F.3d at 1512. The defendant objected to his sentencing, because the drug quantity that the district court considered as relevant conduct, which the court found by a preponderance of the evidence, increased his Guidelines sentencing range from 210-262 months to life in prison. See United States v. Washington, 11 F.3d at 1515. The defendant argued "that[,] because the

additional drug quantities effectively resulted in a life sentence[,] a higher standard of proof should be required." United States v. Washington, 11 F.3d at 1515. Although the Tenth Circuit in United States v. Washington "recognize[d] the strong arguments that relevant conduct causing a dramatic increase in sentence ought to be subject to a higher standard of proof," it held that "the Due Process Clause does not require sentencing facts in the ordinary case to be proved by more than a preponderance standard." United States v. Washington, 11 F.3d at 1516. See United States v. Sangiovanni, 2014 WL 4347131, at *22-26 (concluding that a sentencing court can cross reference from the Guidelines that correspond to the defendant's crime of conviction to the Guidelines for another, more harshly punished crime, if it can be established by a preponderance of the evidence that the defendant committed the more serious crime); United States v. Cervantes-Chavez, 59 F. Supp. 3d at 1314-17 (cross-referencing from the guideline for being an illegal alien in possession of a firearm to the drug-possession guideline after finding by a preponderance of the evidence that the defendant committed a drug-possession crime).

The Court previously has held that it may consider a defendant's refusal to answer questions for the presentence investigation report, while not drawing an adverse inference from the refusal. See United States v. Goree, No. CR 11-0285 JB, 2012 WL 592869, at *11 (D.N.M. Feb. 13, 2012)(Browning, J.). The Court also has held that, although it can consider a defendant's silence about information regarding herself or others engaging in criminal conduct, it will not rely on that silence to increase the defendant's sentence. See United States v. Chapman, No. CR 11-0904 JB, 2012 WL 2574814, at *13 n.5 (D.N.M. June 22, 2012)(Browning, J.). Finally, the Court has held that a defendant's "aggression towards other individuals, and the murder he may have attempted to orchestrate while incarcerated" is relevant information which the Court can consider

in fashioning a proper sentence. United States v. Romero, No. CR 09-1253, 2012 WL 6632493,

at *23 (D.N.M. Dec. 6, 2012)(Browning, J.).

**LAW REGARDING THE VULNERABLE-VICTIM ADJUSTMENT**

The vulnerable-victim adjustment, U.S.S.G. § 3A1.1(b), provides:

(b)    (1)    If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by **2** levels.

        (2)    If (A) subdivision (1) applies; and (B) the offense involved a large number of vulnerable victims, increase the offense level determined under subdivision (1) by **2** additional levels.

U.S.S.G. § 3A1.1(b)(1) (bold in original). Application Note 2 to U.S.S.G. § 3A1.1 explains:

For purposes of subsection (b), "***vulnerable victim***" means a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

Subsection (b) applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank.

Do not apply subsection (b) if the factor that makes the person a vulnerable victim is incorporated by the offense guideline. For example, if the offense guideline provides an enhancement for the age of the victim, this subsection would not be applied unless the victim was unusually vulnerable for reasons unrelated to age.

U.S.S.G. § 3A1.1 Application Note 2 (bold in original). "In order to classify a victim as 'vulnerable,' 'the sentencing court must make particularized findings of vulnerability.'" United States v. Brunson, 54 F.3d 673, 676 (10th Cir. 1995)(quoting United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992)). "The focus of the inquiry must be on the 'victim's personal or individual

vulnerability.'" United States v. Brunson, 54 F.3d at 676 (quoting United States v. Lee, 973 F.2d at 835).

"'[V]ulnerable victims' are those who are in need of greater societal protection." United States v. Brunson, 54 F.3d at 676. "Specifically, the enhancement should apply when the victim is 'less able to resist than the typical victim.'" United States v. Scott, 529 F.3d 1290, 1300 (10th Cir. 2008)(quoting United States v. Castaneda, 239 F.3d 978, 980 (9th Cir. 2001)). "Moreover, the vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class; the sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged." United States v. Smith, 133 F.3d at 749.

In United States v. Janusz, 135 F.3d 1319 (10th Cir. 1998), the Tenth Circuit held that an enhancement under U.S.S.G. § 3A1.1 was appropriate. See United States v. Janusz, 135 F.3d at 1325. The enhancement was appropriate because the sentencing court "made specific findings as to the vulnerability of both [of the victims]. [One victim] was bedridden, unable to tend for himself, sick and extremely vulnerable." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The other victim "was confused about many things, very susceptible to suggestion from anyone, including the defendant [and] . . . was extremely trusting in many respects." United States v. Janusz, 135 F.3d at 1325 (internal quotation marks omitted). The enhancement was also appropriate because the sentencing court "found a nexus between [the victims]' vulnerability and the commission of the crimes." United States v. Janusz, 135 F.3d at 1325. The Tenth Circuit commented:

> It would be difficult, indeed, to imagine a stronger nexus. The evidence indicate[d that the defendant] recognized [the victims]' age, wealth, and diminished physical capacity, and believing they would both soon die . . . devised a scheme to separate

them from their money by making loans which he would collect for himself after
their death.

United States v. Janusz, 135 F.3d at 1325 (citations omitted). The Tenth Circuit provides that the

vulnerable-victim adjustment is warranted where "the defendant selected and targeted this

particular victim for the [offense] because of unusual characteristics." United States v. Pearce,

967 F.2d 434, 435 (10th Cir. 1992). The vulnerable-victim adjustment, however, "does not require

a finding that the defendant targeted the victim because of the victim's vulnerability." United

States v. Checora, 175 F.3d 782, 789 n.4 (10th Cir. 1999). See United States v. Smith, 133 F.3d

at 749; United States v. Hardesty, 105 F.3d 558, 560-61 (10th Cir.1997); United States v. Joe, 325

F. Supp. 3d 1226, 1230-31 (D.N.M. 2018)(Browning, J.), aff'd 2019 WL 3956431 (10th Cir. Aug.

22, 2019); United States v. Hubbard, No. CR 15-0430, 2016 WL 4009826, *4-5 (D.N.M. June 8,

2016)(Browning, J.).

## LAW REGARDING VARIANCES FROM THE GUIDELINES

After United States v. Booker, the sentencing Guideline ranges are now advisory and are

one of several factors set out in 18 U.S.C. § 3553(a). Although appellate courts are allowed to

assume that sentences within the Guidelines' ranges are reasonable, subject to rebuttal, the

Supreme Court has made it clear that no presumption of reasonableness attaches at the district

court level to the sentence that the Guidelines suggest. See Gall v. United States, 552 U.S. at 50-

51 (explaining that the sentencing judge "may not presume that the Guidelines range is

reasonable," while "the appellate court may, but is not required to, apply a presumption of

reasonableness"); Rita v. United States, 551 U.S. at 351 (stating that "the presumption before us

is an *appellate* court presumption" and that "the sentencing court does not enjoy the benefit of a

legal presumption that the Guidelines sentence should apply" (emphasis in original)).

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary" to comply with four statutorily defined purposes enumerated in 17 U.S.C. § 3553(a)(2):

> (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)     to afford adequate deterrence to criminal conduct;
>
> (C)     to protect the public from further crimes of the defendant; and
>
> (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2)(A)-(D). Section 3553(a) also directs sentencing courts to consider: (i) the nature of the offense and the defendant's character; (ii) the available sentences; (iii) the sentencing guidelines and policy statements that the United States Sentencing Commission has promulgated; (iv) a policy favoring uniformity in sentences for defendants who commit similar crimes; and (v) the need to provide restitution to victims. See 18 U.S.C. § 3553(a)(1), (3)-(7).

In Kimbrough v. United States, the Supreme Court stated that, in the ordinary case, "the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" 552 U.S. at 89 (quoting Rita v. United States, 551 U.S. at 350). The Supreme Court recognized, however, that the sentencing judge is "'in a superior position to find facts and judge their import under § 3553(a)' in each particular case." Kimbrough v. United States, 552 U.S. at 89 (quoting Gall v. United States, 552 U.S. at 51). Applying § 3553(a)'s factors, the Court has found that the case of an illegal immigrant who re-entered the United States to be able to provide for his two children and two siblings was not materially different from other re-entry cases, and thus, no variance from the Guidelines sentence was warranted. See United States v. Almendares-Soto, No. CR 10-1922 JB, 2010 WL 5476767,

at *12 (D.N.M. Dec. 14, 2010)(Browning, J.). On the other hand, in United States v. Jager, although the defendant's military service was not present to an unusual degree and thus did not warrant a downward departure, the Court concluded that a variance was appropriate, because the defendant's military service was "superior and uniformly outstanding," as the defendant appeared to have been "trustworthy[] and dedicated, and he served with distinction." 2011 WL 831279, at *14.

## ANALYSIS

The Court overrules all of Baca's Objections and adopts the Revised PSR's Guidelines calculations. The Court concludes that a preponderance of the evidence establishes that Molina was a vulnerable victim under U.S.S.G. § 3A1.1(b)(1). The Court declines to vary from U.S.S.G. § 5G1.3(a), in light of the offenses' seriousness, the need to deter similar crime, and because these offenses evidence a lack of rehabilitation. See 18 U.S.C. § 3553(a). The Court therefore concludes that Baca's sentence will run consecutively to his state sentence of life imprisonment. The Court sentences Baca to the statutory maximum of 120 months as to each of Counts 6, 9 and 10, and life imprisonment without release as to Count 7, all to run concurrently.

## I.    THE COURT DETERMINES THAT A PREPONDERANCE OF THE EVIDENCE ESTABLISHES THAT MOLINA WAS A VULNERABLE VICTIM UNDER U.S.S.G. § 3A1.1(b)(1).

Baca objects to the 2-level adjustment that the USPO imposes under U.S.S.G. § 3A1.1(b)(1). The USPO imposes this adjustment, because it asserts that Molina's "status as an SNM gang member who cooperated with law enforcement made him vulnerable." Addendum at 2. Moreover, the USPO notes that Molina was incarcerated, was attacked in a small, enclosed cell, and was unable to fight off or escape from his attackers, all of which, the USPO argues, made him "particularly susceptible to the defendants' criminal conduct." Addendum at 2. The United

States agrees with the USPO that the vulnerable-victim adjustment applies. See Tr. at 96:22-23 (Armijo). Baca counters that "Molina's status as an inmate" does not justify the vulnerable-victim adjustment. Objections ¶ 5, at 3. Baca further argues that the vulnerable-victim adjustment should not apply, because Baca maintains that he was not present when Molina was killed, did not order Molina's murder, and did not know where within Southern New Mexico the murder would occur. See Objections ¶ 6, at 3.

The 2-level enhancement for a vulnerable victim applies where the victim of the offense of conviction "is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct," and "the defendant knows or should have known of the victim's unusual vulnerability." U.S.S.G. § 3A1.1, Application Note 2. The Tenth Circuit has explained that the adjustment should apply where "the victim is *unusually* vulnerable or *particularly susceptible* to the crime committed," and where the victims are "unable to protect themselves [and] therefore require greater societal protection." United States v. Proffit, 304 F.3d 1001, 1007 (10th Cir. 2002)(emphasis in original). In United States v. Tapia, the Eleventh Circuit reviewed the district court's decision that an incarcerated government informant, whom other prisoners assaulted, was a vulnerable victim for U.S.S.G. § 3A1.1's purposes. See 59 F.3d at 1143. The Eleventh Circuit concluded that there was no error in the application of the enhancement to the appellants' convictions and determined that the district court "correctly concluded that [the victim], as an individual, was particularly vulnerable by virtue of his incarceration with Appellants and his inability to escape, and that [the victim] was targeted because of this vulnerability." United States v. Tapia, 59 F.3d at 1143. In United States v. Lambright, the Fifth Circuit upheld a vulnerable-victim adjustment where a corrections officer killed an inmate. See 320 F.3d at 518. The district court concluded that the inmate was a vulnerable victim, because "he was completely

dependent upon the care of the correction officers, . . . was locked in his cell prior to the assault, and . . . he could not protect himself from the assault." United States v. Lambright, 20 F.3d at 518.

Here, several witnesses testified that the SNM had "paperwork" on Molina containing a statement which Molina made to the Las Cruces Police Department. Transcript of Jury Trial Volume 5 at 179:10-18 (taken February 2, 2018)(Jewkes, Rubio), filed February 22, 2018 (Doc. 2521)("Feb. 2 Tr."); id. at 312:6-13 (Beck, Calbert). Urquizo testified that Baca told him that Molina needed to be "hit," because there was "paperwork" on him. Transcript of Excerpted Testimony of Guadalupe Urquizo at 36:14 (taken February 5, 2018, and February 6, 2018)(Urquizo), filed July 8, 2019 (Doc. 2735)("Uquizo Tr."). Urquizo also testified that, when David Calbert was moved to PNM South where Urquizo was also living, Calbert had Molina's paperwork and "said, 'Pup wants this done.'" Urquizo Tr. at 39:5-6 (Urquizo). See id. at 235:5-236:5 (Beck, Urquizo). Calbert testified that Joe Martinez told him that Baca wanted Calbert to take the "paperwork" to Southern New Mexico. Feb. 2 Tr. at 311:18-25 (Beck, Calbert). See id. at 312:6-13 (Beck, Calbert). In addition, Urquizo stated that Baca also wanted him to tell other SNM members about Molina down to Southern New Mexico when he moved. See Urquizo Tr. at 36:15-17 (Beck, Urquizo). The trial testimony therefore shows that Baca not only advocated for Molina's murder, but that Baca knew, and wanted other SNM members to know, that Molina had cooperated with law enforcement as well.

The Court concludes that Baca knew that Molina was a vulnerable victim, because Baca knew that Molina had cooperated with law enforcement, which made Molina particularly susceptible to being killed. SNM prohibits its members from cooperating with law enforcement, and it orders its members to murder those who do cooperate. See Feb. 2 Tr. at 126:21-24 (Beck, Rubio); id. at 127:20-24 (Beck, Rubio). Moreover, any SNM member who "does not want to carry

out a hit is to be murdered." Feb. 2 Tr. at 139:16-17 (Rubio). Trial testimony reveals that Molina was an SNM member and that he lived in Southern New Mexico in a pod with other SNM members. See Transcript of Jury Trial Volume 7 at 247:3-6 (taken February 6, 2018)(Beck, Blanco), filed February 22, 2019 (Doc. 2523)("Feb. 6 Tr.")(stating that Molina was an SNM member living in an "SNM pod"). See also Revised PSR ¶ 14, at 12. Baca was aware that there was "paperwork" on Molina describing Molina's cooperation with law enforcement. Urquizo Tr. at 36:14 (Urquizo). Molina's incarceration in a pod with other SNM members -- who knew of his cooperation with law enforcement and the order that he be killed -- made him particularly susceptible to being killed. See Urquizo Tr. at 36:2-4 (Beck, Urquizo)(stating that Baca is SNM's leader); Feb. 6 Tr. at 247:3-6 (Beck, Blanco)(stating Molina was housed in an SNM pod); Transcript of Jury Trial Volume 8 at 145:18-146:8 (taken February 7, 2018)(Armijo, Rodriguez), filed February 22, 2019 (Doc. 2524)("Feb. 7 Tr.")(providing that some of Molina's murderers were housed near him); id. at 148:4-10 (Armijo, Rodriguez)(stating that Molina was a "rat" who "had given information to the police," which SNM forbids). See also United States v. Tapia, 59 F.3d at 1143 (finding the victim vulnerable, in part, because of his incarceration with the defendants). If the SNM members who were ordered to kill Molina did not follow through with the murder, SNM rules would have required other SNM members to kill them. See Feb. 2 Tr. at 139:16-17 (Rubio).

Baca targeted Molina because of his vulnerability. Baca was aware of Molina's cooperation with law enforcement, the order for his murder, and his incarceration with other SNM members who had to act on the order to murder Molina or be murdered themselves. Although Molina's status as an inmate contributed to his vulnerability, this fact alone does not justify applying the vulnerable-victim adjustment. See United States v. Smith, 133 F.3d at 749 ("[T]he

vulnerable victim enhancement cannot be based solely on the victim's membership in a certain class."). Nevertheless, the Court concludes that, because of his cooperation with law enforcement, Molina was particularly susceptible to being killed. <u>See</u> <u>United States v. Smith</u>, 133 F.3d at 749 ("[T]he sentencing court is required to make particularized findings of vulnerability, focusing on the individual victim and not the class of persons to which the victim belonged."). The Tenth Circuit instructs that the vulnerable-victim adjustment is warranted where "the defendant selected and targeted this particular victim for the [offense] because of unusual characteristics." <u>United States v. Pearce</u>, 967 F.2d at 435. Because Molina had cooperated with law enforcement, he was "in need of greater [] protection" than the incarcerated SNM members and other inmates who had not cooperated. <u>United States v. Brunson</u>, 54 F.3d at 676. Moreover, Molina was unable to resist his attack when Armenta and Montoya stabbed him forty-three times in his cell. <u>See</u> <u>United States v. Scott</u>, 529 F.3d at 1300 ("[T]he [vulnerable-victim] enhancement should apply when the victim is 'less able to resist than the typical victim.'" (quoting <u>United States v. Castaneda</u>, 239 F.3d at 980)). Several inmates attacked Molina in a small, enclosed cell, where he was particularly vulnerable, and Molina's assailants continued to attack him when he tried to escape the cell. <u>See</u> Feb. 7 Tr. at 218:3-6 (Rodriguez); <u>id.</u> at 16-19 (Armijo, Rodriguez). <u>See</u> <u>also</u> <u>United States v. Lambright</u>, 320 F.3d at 518 (concluding that an inmate was a vulnerable victim because he was attacked in his cell and "could not protect himself from the assault"). The Court thus overrules Baca's Objection and applies U.S.S.G. § 3A1.1(b)(1)'s 2-level adjustment for attacking a vulnerable victim.

## II.  THE COURT DETERMINES THAT A VARIANCE FROM U.S.S.G. § 5G1.3(a) IS NOT WARRANTED AND SENTENCES BACA TO CONSECUTIVE LIFE SENTENCES.

Baca requests a variance from U.S.S.G. § 5G1.3(a), and asks that the Court impose his sentence to run concurrently.  See Objections ¶ 8, at 4.  Baca "makes this request because the current sentence from his state court conviction in 1989 for murder was used to prove an element for the crimes here: whether Mr. Baca was involved in a criminal enterprise called the SNM." Objections ¶ 8, at 4.  Baca argues that the 1989 murder is evidence in this matter of "an essential element of the current crimes before the Court," and so "fundamental fairness would dictate a merger of the state murder sentence with the current underlying offense conduct."  Objections ¶ 8, at 4.  Baca thus argues that the Court should vary from U.S.S.G. § 5G1.3(a), which recommends consecutive sentences if the "instant offense was committed while the defendant was serving a term of imprisonment."  U.S.S.G. § 5G1.3(a).

Regarding the § 3553(a) factors, Baca argues that the nature of his offenses "militate[s] in favor of concurrent sentences," because, according to Baca, he did not commit the offenses for which he was convicted.  See Objections ¶¶ 13-15, at 6-7.  Specifically, Baca argues that the United States' theory of the Molina murder is implausible, because Baca "lived *with* Molina in the Blue pod at Southern" in mid-2013; "if Mr. Baca had truly ordered the killing of Mr. Molina in 2012, Mr. Molina would have most certainly been killed when" Baca and Molina lived in the same pod in 2013.  Objections ¶ 14, at 6 (emphasis in original).

To decide whether Baca's requested variance is appropriate, the Court considers: (1) the offense's nature and circumstances, and Baca's history and characteristics; (2) the need for the sentence to reflect the offense's seriousness and to provide just punishment, while deterring others and protecting the public from similar criminal conduct;  (3) the range and nature of available

sentences; (4) the Guidelines' recommendations for Baca's offense and criminal history category; (5) pertinent policy statements in effect when Baca is sentenced; (6) the need for sentencing uniformity for similar crimes and criminal history categories; and (7) the need to afford restitution to the offense's victims.  See 18 U.S.C. § 3553(a).

The Court agrees with Baca that it is not required to order that the sentence in this case run consecutively to his state sentence, and the Court notes that it may depart from § 5G1.3(a) and impose this sentence concurrently, rather than consecutively.  See United States v. Mihaly, 67 F.3d 894, 896 (10th Cir. 1995)(citing United States v. Shewmaker, 936 F.2d at 1127).  Additionally, 18 U.S.C. § 3584 also gives the Court clear authority to sentence concurrently or consecutively.  See 18 U.S.C. § 3584(a) ("If . . . a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively.").  The statute counsels that "[t]he court, in determining whether the terms imposed are to be ordered to run concurrently or consecutively, shall consider, as to each offense for which a term of imprisonment is being imposed, the factors set forth in section 3553(a)."  18 U.S.C. § 3584(b).

The Court has considered carefully Baca's Objections.  Baca's criminal history is extensive and dates to at least 1982.  Before the federal offenses, Baca's prior convictions include murder, manslaughter, and armed robbery.  The federal convictions are Baca's ninth, tenth, eleventh, and twelfth felonies and include his third murder-related conviction.  Baca does not dispute that he was incarcerated, serving a life sentence for murder, when he committed the federal offenses, and the record supports that he was.

Baca first quibbles with the facts -- which the jury found beyond a reasonable doubt -- to argue that the offenses' nature and characteristics do not merit consecutive sentences.  See

Objections ¶¶ 13-15, at 6-7. Baca argues that he did not commit the crime for which he was convicted. See Objections ¶¶ 13-15, at 6-7. The Court declines Baca's invitation to second-guess the jury. Instead, the Court concludes that the nature of Baca's offenses -- murder and conspiracy to murder: serious offenses by a serious career criminal -- do not counsel the imposition of concurrent sentences.

As for the second factor, Baca argues that "a sentence of life imprisonment is more than enough to promote respect for the law, provide for just punishment, adequately deter others who may contemplate committing such crimes, and protecting the public from Mr. Baca." Objections ¶ 16, at 7. Baca was serving a life sentence when he committed the federal offenses. That he committed murders and conspired in planning others while serving a life sentence for a previous murder does not counsel varying from § 5G1.3(a). Further, Baca committed the federal offenses while incarcerated for a different murder, suggesting a lack of deterrence and rehabilitation. His life sentence was not enough to protect Molina from Baca, promote Baca's respect for the law, or to deter Baca from further serious offenses. The Court agrees with Baca that he is already imprisoned, thus somewhat reducing the need to protect the public. Baca's life sentence, however, was not enough to protect the prison population from Baca. As for just punishment, a consecutive sentence underlines that Baca committed multiple offenses, for which he should receive multiple punishments. To impose concurrent sentences would suggest Baca should be punished once for committing multiple crimes. The Court concludes that the second factor does not warrant a variance.

For the third factor, Baca argues that "there is no practical need to impose a consecutive sentence under the circumstances presented here," as a "life sentence is the most serious sentence this Court can impose, with the exception of a death sentence." Objections ¶ 17, at 7-8. Instead

of asking whether there is a need to impose consecutive life sentences, however, the Court asks whether there is justification to vary from § 5G1.3(a)'s recommendation of consecutive sentences. The seriousness of Baca's offense, and the fact that he committed it while incarcerated on a life sentence for a prior murder, do not justify varying from § 5G1.3(a).

Last, Baca argues that consecutive life sentences would "not pragmatically promote the traditional sentencing factors outlined under 18 U.S.C. § 3553(a). There is no such thing as dying twice in prison. Once is enough. A concurrent sentence here will achieve just that." Objections ¶ 18, at 8. The Court emphasizes Baca's crimes' severity and the fact that he committed them while already serving a life sentence for murder. Further, the need for uniformity for similar crimes and criminal history categories also points to consecutive sentences, as § 5G1.3(a) recommends. Having carefully considered the § 3553(a) factors, the Court declines to vary from § 5G1.3(a), and imposes Baca's sentence to run consecutively with his state sentence.

With U.S.S.G. § 3C1.1's application, Baca's total offense level is 43. Baca's criminal history score of 8 places him in criminal history category IV. See Revised PSR ¶ 79, at 21. Because the Court determines that Baca is a career offender, see Revised PSR ¶ 38, at 16, his criminal history category is VI, see Revised PSR ¶ 80, at 22 (citing U.S.S.G. § 4B1.1(b)). With a criminal history category of VI and a total offense level of 43, the Guideline imprisonment range is life, which is the same as the Revised PSR's Guideline imprisonment range. See Revised PSR ¶ 99, at 25.

**IT IS ORDERED** that the Defendant Baca's Objections to Presentence Report, filed June 10, 2019 (Doc. 2690), are overruled.

UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
  Attorney for the United States
    Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

      *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

--and--

Susan M. Porter
Albuquerque, New Mexico

      *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

      *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

      *Attorneys for Defendant Edward Troup*

Donald R. Knight
Littleton, Colorado

--and--

Russell Dean Clark
Las Cruces, New Mexico

      *Attorneys for Defendant Leonard Lujan*

Jason Bowles
Bowles Law Firm
Albuquerque, New Mexico

--and--

Joseph Libory Green
The Law Firm of Joseph Green, L.L.C.
Chesterfield, Missouri

--and--

Kathleen Lord
Lord Law Firm, LLC
Denver, Colorado

--and--

Mario Carreon
Las Cruces, New Mexico

--and--

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

*Attorneys for Defendant Billy Garcia*

Carlos Ibarra
Las Cruces, New Mexico

--and--

David A. Lane
Killmer, Lane & Newman, LLP
Denver, Colorado

--and--

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

*Attorneys for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

*Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

*Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver Colorado

--and--

Noel Orquiz
Deming, New Mexico

*Attorneys for Defendant Javier Alonso*

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

      *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

      *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

      *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

      *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

      *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and

Ray Velarde
El Paso, Texas

     *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

     *Attorneys for Defendant Mauricio Varela*

Josh R. Lee
Denver, Colorado

--and--

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

     *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

     *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

--and--

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Christopher Garcia*

Michael V. Davis
Michael V. Davis, Attorney & Counselor at Law, P.C.
Corrales, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

--and--

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

    *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

    *Attorneys for Defendant Rudy Perez*

Lisa Torraco
Albuquerque, New Mexico

--and--

Donavon A. Roberts
Albuquerque, New Mexico

      *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

      *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

      *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

      *Attorney for Defendant Shauna Gutierrez*

Alfred D. Creecy
Albuquerque, New Mexico

--and--

Jerry A. Walz
Walz and Associates
Albuquerque, New Mexico

      *Attorneys for Defendant Brandy Rodriguez*