# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                                       No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

     Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) the Defendants' Motion for Additional Discovery Regarding Monetary Payments to Inmate Informant Witnesses, filed November 30, 2017 (Doc. 1501)("Discovery Motion"); and (ii) the Defendants' Motion in Limine re: Plea Agreements and Addenda, filed November 30, 2017 (Doc. 1502)("Motion in Limine").  The Court held a hearing on December 18, 2017.   See Transcript of Combined Motions to Suppress Proceedings and Daubert Hearings at 224:18-231:10, 259:2-272:3 (taken December 18, 2017), filed January 2, 2018 (Doc. 1600)("Tr.").  The primary issues are: (i) whether the United States must produce information concerning payments to cooperating witnesses; and (ii) whether the United States may introduce or reference written plea agreements from cooperating witnesses at the trial.  The Court concludes that: (i) Giglio v. United States, 405 U.S. 150 (1972)("Giglio"), requires the United States to produce government payments and benefits provided to cooperating witnesses as well as any requests these cooperators made; and (ii) the United States must redact testimonial statements from plea agreements that it introduces into evidence and raise related evidentiary issues before the bench, rather than in open court.

## FACTUAL BACKGROUND

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment").  The background facts are largely unchanged from those facts that the Court provided in its Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585).  The Court does not set forth these facts as findings or the truth.  The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that the Syndicato de Nuevo Mexico ("SNM") allegedly committed through its members.  Indictment at 2.  SNM, through its members, operated in the

District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a prison gang that formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4. SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power. See Indictment at 4. If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM engages in violence "to assert its gang

identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM generates income by having its members and associates traffic drugs and extort narcotics traffickers. See Indictment at 8. SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials led to the Federal Bureau of Investigation's ("FBI") present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.). The other relevant facts giving rise to this case are as follows.

In March, 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina. See Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). Molina was J. Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). See MOO at 6, 2016 WL 7242579, at *3. The New Mexico Third Judicial District Attorney's Office accused J. Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment charged J. Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy. See MOO at 6-7, 2016 WL 7242579, at *3. In November, 2015, the state District Attorney dismissed the charges against J. Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant

Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy.  See MOO at 7, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts.  See Indictment at 1, 9-18.  All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Indictment at 9-18.  Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[1] Defendant Benjamin Clark, M. Rodriguez, Defendant

---

[1]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we were both engaged in racketeering activities for the SNM.  J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R.  Based upon my status in the SNM, this "green-light" was well known to members of the SNM.  The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting.  The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico.  This attack and "hit" had been approved of by

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[2] and D. Sanchez are the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly members or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) defines that term; (ii) murder and

---

leaders of the SNM gang, including Anthony Ray Baca.  As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R.  This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[2]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM.  On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S.  Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State.  Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S.  As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S.  I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

robbery in violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and

1513, "involving obstruction of justice, tampering with or retaliating against a witness, victim, or

an informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841

and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon,

Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9

(Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson,

and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17,

2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez

allegedly murdered "F.S."  Indictment at 10-11 (Count 3).  On November 12, 2012, J. Gallegos

and Defendant Andrew Gallegos allegedly conspired to murder "A.B."  Indictment at 11 (Count

4).  On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Indictment at 11-

12 (Count 5).  In March 2014, Armenta, Montoya, M. Rodriguez, Defendant Timothy Martinez,

Baca, Defendant Mauricio Varela, D. Sanchez, Defendant Carlos Herrera, and Defendant Rudy

Perez allegedly conspired to murder "J.M."  Indictment at 12 (Count 6).  On March 7, 2014,

Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Varela, D. Sanchez, Herrera, and R. Perez

allegedly murdered J.M.  See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and

Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury

to "J.R."  Indictment at 13-14 (Count 8).  Starting "on a date uncertain, but no later than 2013,"

and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez

allegedly conspired to murder "D.S."  Indictment at 14 (Count 9).  During the same time period,

Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to

murder "G.M."  Indictment at 15 (Count 10).  On November 29, 2015, C. Garcia, a convicted

felon, allegedly unlawfully possessed a firearm.  See Indictment at 15-16 (Count 11).  On the same

day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a

conspiracy to murder charge.  See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon

against "J.G."  Indictment at 16 (Count 13).  From February 1, 2016, until February 27, 2016, J.

Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez

allegedly conspired to murder "J.G."  Indictment at 17 (Count 14).  Also, on February 27, 2016, J.

Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and

committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.

See Indictment at 17-18 (Count 15).  The same Defendants also allegedly tampered with a witness,

J.G.  See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged

criminal activity.    In a related case -- United States v. Baca, No. CR 16-1613

(D.N.M.)(Browning, J.)[3] -- the United States names twelve defendants, all alleged SNM members

---

[3]The Court granted a conditional severance to one Defendant in that case.  See United
States v. Baca, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.).  The Court severed Defendant
Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his Speedy Trial
Act, 18 U.S.C. §§ 3161-74, rights.  The Court concluded that, given R. Gallegos' assertion of those
rights, there was sufficient prejudice to warrant a conditional severance of R. Gallegos from the
joint-trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique
position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and
> he "[is] basically being tried for the same thing here. . . ." in federal court . . . .  If
> the Court does not sever, Gallegos will have to wait for discovery to be complete
> as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the
> trial against him and all eleven of his co-Defendants.

or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[4]  There is also a separate prosecution of C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## PROCEDURAL BACKGROUND

The FBI's SNM investigation resulted in this case as well as three other cases before the Court.  See United States v. Varela, No. CR 15-4269; United States v. Garcia, No. CR 15-4275; and United States v. Baca, No. CR 16-1613.  On June 9, 2017, the Court severed Counts 6-12 from Counts 1-5 and 13-16 in United States v. Deleon.  See United States v. DeLeon, No. CR 15-4268, 2017 WL 3054511 (D.N.M. June 30, 2017)(Browning, J.).  This decision creates two trials. Defendants Sanchez, Baca, Herrera, and Perez will be tried in the first trial; Defendants J. Gallegos, Troup, B. Garcia, Patterson, A. Garcia, and A. Gallegos will be tried in the second trial.  Other Defendants listed in the Indictment have agreed to plea deals with the United States.  The parties agree to begin the first trial on January 29, 2018.  See Fourth Scheduling Order at 2, filed July 7, 2017 (Doc. 1205).

---

United States v. Baca, 2016 WL 6404772, at *30-32.  Ultimately, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were upheld).  On March 22, 2017, R. Gallegos pled guilty in his severed case.  See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

[4]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, 2016 WL 6404772, at *33.

1.      **The Discovery Motion.**

The Defendants jointly filed the Discovery Motion on November 30, 2017.  See Discovery Motion at 1.  The Defendants note that the United States has already disclosed some payment information -- the informants' names, and the amount and method of their payment.  See Discovery Motion at 1-2.  The Defendants seek more information, including any payment date, the reason for the payments, the dates and manner in which the payments were requested, authorized or promised, whether the informant was advised that he must report the payments as taxable income, FBI forms requesting authorization to pay informants, receipts that the informants provided for expenses and payments, all FBI summaries of payments to informants, gifts that the FBI or NM Corrections Department provided to informants, all payment reports entered into the FBI's financial management system, and any documented requests, promises, or discussions regarding post-testimony lump sum payments.  See Discovery Motion at 2-6.

As legal support, the Defendants state that the "prosecution must disclose known sources of a witness's bias, motive or interest" and cite, among other cases, Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009).  Discovery Motion at 6.  They also argue that the "constitutional right to cross-examination of one's accusers for such bias and motive would be hollow indeed if the Government possesses such information concerning its own witnesses and does not disclose it."  Discovery Motion at 6 (citing Davis v. Alaska, 415 U.S. 308, 315 (1974); United States v. Ray, 731 F.2d 1361, 1364 (9th Cir. 1984); Chipman v. Mercer, 628 F.2d 528 (9th Cir. 1980); Patterson v. McCarthy, 581 F.2d 220 (9th Cir. 1978); United States v. Owens, 933 F. Supp. 76, 87 (D. Mass. 1996)(Young, J.)).  Finally, the Defendants state that they do not object to "personal identifying or location information" redactions.  Discovery Motion at 7.

## 2.      **The Motion in Limine.**

The Defendants also jointly filed the Motion in Limine on November 30, 2017.  <u>See</u> Motion in Limine at 1.  The Defendants state that they filed the Motion in Limine after the United States "indicated it may move for admission and/or question witnesses about parts of the [plea] agreements and/or addenda."  Motion in Limine at 1.  They argue that prosecutors may not offer improper suggestions, insinuations, or assertions of personal knowledge regarding a defendant's guilt or the credibility of government witnesses.  <u>See</u> Motion in Limine at 2 (citing <u>Berger v. United States</u>, 295 U.S. 78, 88 (1932); <u>Lawn v. United States</u>, 355 U.S. 339, 359-60 n.15 (1968); <u>United States v. Roberts</u>, 618 F.2d 530, 533 (9th Cir. 1980)).  Vouching for guilt or credibility, the Defendants argue, risks that the jury may decide the case based on the United States' judgment, rather than the evidence.  <u>See</u> Motion in Limine at 3 (citing <u>United States v. Young</u>, 470 U.S. 1, 18-19 (1985); <u>United States v. Roberts</u>, 618 F.2d at 533).  The Defendants contend that using "the 'truthfulness' portion of a plea agreement 'becomes impermissible vouching . . . when the prosecutors explicitly or implicitly indicate that they can monitor and accurately verify the truthfulness of the witness' testimony.'"  Motion in Limine at 3 (quoting <u>United States v. Bowie</u>, 892 F. 2d 1494, 1498 (10th Cir. 1990)).  The Defendants state that the plea agreements contain testimonial statements by the United States and by Defendants' counsel.  <u>See</u> Motion in Limine at 3.  Finally, the Defendants request that the United States approach the Court to obtain an admissibility ruling before attempting to use plea agreements at trial.  <u>See</u> Motion in Limine at 3-4.

## 3.      **The Response.**

The United States filed a response to the Motion in Limine on December 14, 2017.  <u>See</u> United States' Response to Defendants' Motion in Limine re: Plea Agreements and Addenda [Doc.

1502], filed December 14, 2017 (Doc. 1568)("Response").  In the Response, the United States

argues that the "Court should admit the plea agreements 'if the cooperators testify and for the

limited purposes of the jury evaluating the cooperators' credibility.'"  Response at 1 (quoting

United States v. Vigil, CR 05-2051 JB, 2006 WL 4109684, at *5 (D.N.M. Aug. 14,

2006)(Browning, J.)("Vigil")).  It notes that, in Vigil, 2006 WL 4109684, at *6, the Court said

that, because it is difficult to draw "'a clear demarcation between elements of the plea agreement

that might be impeaching and those that might bolster, the possibility of bolstering does not alone

render the plea agreement inadmissible.'"  Response at 1 (quoting Vigil").  It concludes that "plea

agreements may also be admissible to refresh the recollection of a witness or after cross-

examination."  Response at 1.

    **4.**    **The Reply.**

The Defendants filed a jointly replied to the Response on December 15, 2017.  See Reply

to United States' Response to Motion in Limine re: Plea Agreements and Addenda (Doc. 1568),

filed December 15, 2017 (Doc. 1582)("Reply").  The Defendants argue that Vigil did not address

objections under the Confrontation Clause of the Sixth Amendment to the United States

Constitution, and that since then the Supreme Court has issued cases analyzing the Confrontation

Clause's effect on written exhibits.  Reply at 1-2 (citing Bullcoming v. New Mexico, 564 U.S. 647

(2011); Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009)).  They argue that "any portion of

the plea agreement which sets forth the government's agreement or statements is testimonial

hearsay," Reply at 2, and specifically challenge the plea agreement's statements that "the

defendant has clearly demonstrated a recognition and affirmative acceptance of personal

responsibility for the defendant's criminal conduct," Reply at 2.  The Defendants state that,

according to Vigil, the United States may not introduce impeachment evidence for the primary

purpose of placing inadmissible substantive evidence before the jury.  See Reply at 2.  They urge the Court to find an alternative to admitting entire plea agreements.  See Reply at 2-3.  Finally, the Defendants say that, "[i]n lieu of a redacted plea agreement, the defense is willing to stipulate" to various details contained in the agreement.  Reply at 3.

  **5.** **The Hearing.**

  The Court held a hearing on December 18, 2017.  After handling other motions, the parties discussed the Discovery Motion.  See Tr. at 224:18-25 (Court).  Garcia stated that: "I really don't have a lot more argument other than what I put in my motion."  Tr. at 225:7-8 (Castle).  After refreshing the Court's memory about the issues, see Tr. at 225:12-226:6 (Castle), Garcia confirmed that the Defendants seek the information under Giglio, see Tr. at 226:7-16 (Court, Castle).  The United States responded that it agreed to turn over all "FBI files on, or payments to" the confidential human sources that were in its possession.  Tr. at 226:21-227:2 (Armijo).  It noted that it would redact some of the files, but that the Defendants could later request the full files if they needed something specific.  See Tr. at 227:3-11 (Armijo).  Garcia stated that he believed that the United States' duty to disclose extended to oral promises, see 227:16-23 (Castle), and the United States agreed that, if any oral promises were made, the United States would disclose them, see Tr. at 228:5-8 (Armijo).

  The Court then proposed that the United States send a letter to the Defendants saying that, "with the materials we're producing, we know of no other promises or benefits that are being bestowed other than what's going to be revealed by the documents produced."  Tr. at 228:12-15 (Court).  The Defendants objected that whatever benefits have been "requested by these witnesses" are also relevant, and they noted that "any speed with which we could receive this material would

be appreciated" and that "an order from the Court would be in line with that."  Tr. 229:1-2 (Castle); id. at 229:16-19 (Castle).

The Court then revised its proposal:

All right.  Could we do this?  Could we have Mr. Acee sit down on each cooperating witness, and just think about it, and think about if anything was requested; if he has to talk to somebody else, and then could he do something for you that indicates to the best of his memory, and any review of documents he has to make, that these are the requests that were made and not honored?

Tr. at 230:5-12 (Court).  The United States and the Defendants agreed to the proposal.  See Tr. at 230:13 (Armijo); id. at 230:17 (Castle).  The parties then agreed on a production deadline of January 2, 2018.  See Tr. at 230:22-231:10 (Armijo, Court, Castle).

The parties later addressed the Motion in Limine.  See Tr. at 259:2-4 (Court).  The Court noted the competing arguments for admitting the plea agreements and discussed the Motion in Limine's briefing.  See Tr. at 259:4-260:16 (Court).  The Court then asked the Defendants if they "could [] live with" redacted plea agreements, Tr. at 260:23 (Court), and asked for background context about its decision in Vigil, see Tr. at 261:3-4 (Court).  The Defendants distinguished the plea agreements in Vigil, reiterated that the case did not discuss the Confrontation Clause, and said that admitting the plea agreements would essentially convert the agreements to written testimony "that the jury takes back to the jury room."  Tr. at 261:19-20 (Castle).  See id. at 261:5-261:20 (Castle).

The Court then discussed with the Defendants the specific parts of the plea agreement to which they objected.  See Tr. at 261:21-268:4 (Court, Castle, Duncan, Benjamin).  In addition to the statement of facts, the Defendants objected to the line "[t]he defendants clearly demonstrate the recognition of affirmative acceptance of personal responsibilities for the defendant's criminal conduct," Tr. at 262:10-13 (Castle), a section about "the Court's role in accepting or not accepting

the plea agreement," Tr. at 263:14-15 (Castle), and the plea agreement's attestation of the particular defendant witnesses' attorney, see Tr. at 264:19-24 (Castle).  Baca also objected to the stipulation that the Defendant "does not possess any exculpatory information regarding any of his charged co-defendants" as a legal conclusion.  Tr. at 266:14-17 (Duncan).

The United States responded that it could "live with" these redactions, Tr. at 269:21 (Court), with a caveat for information that "becomes relevant during cross examination," id. at 269:25-270:1 (Beck), and it promised that it would not attempt to introduce this evidence without first approaching the bench, see Tr. at 271:24-272:1 (Beck).  The United States also noted that it would propose its own redactions.  See Tr. at 270:14-17 (Beck).

6.     **The First and Second Trials.**

Defendants Sanchez, Baca, Herrera, and Perez were tried in the first trial for Counts 6-12. Jury selection began on January 29, 2018.  See Transcript of Trial Proceedings Volume I (taken January 29, 2018), filed February 28, 2019 (Doc. 2548).  The United States entered into evidence, without objection, redacted plea agreements for: (i) Frederico Munoz, see Transcript of Excerpted Testimony at 49:13-25, filed April 4, 2018 (Doc. 2060); (ii) R.P. Martinez, see Transcript of Excerpted Testimony at 4:16-18, filed April 3, 2018 (Doc. 2035); (iii) Archuleta, see Transcript of Excerpted Testimony at 4:4-6, filed April 3, 2018 (Doc. 2037); (iv)  David Calbert, see Transcript of Excerpted Testimony at 31:17-18, filed April 4, 2018 (Doc. 2056); (v) Guadalupe Urqizo, see Transcript of Excerpted Testimony at 23:22-24, filed April 4, 2018 (Doc. 2058); (vi) M. Rodriguez, see Transcript of Trial Proceedings at 280:7-9, filed February 22, 2019 (Doc. 2524); (vii) Montoya, see Transcript of Excerpted Testimony at 14:21-23, filed April 3, 2018 (Doc. 2047); and (viii) Armenta, see Transcript of Trial Proceedings at 112:10-11, filed February 22, 2019 (Doc. 2526).  The United States honored its agreement to approach the bench when it sought to

introduce redacted sections of a plea agreement.  See Transcript Excerpt of Testimony at 294:4-15 (Beck, Court), filed April 4, 2018 (Doc. 2058).

Defendants J. Gallegos, Troup, B. Garcia, Patterson, A. Garcia, and A. Gallegos were tried in the second trial.  Jury selection began on April 9, 2018.  See Clerk's Minutes at 7, filed April 9, 2018 (Doc. 2324).   The United States entered into evidence, without objection, redacted plea agreements for: (i) Archuleta, see Transcript of Excerpted Testimony at 46:14-17, filed May 23, 2018 (Doc. 2314); (ii) Gutierrez, see Transcript of Excerpted Testimony at 21:21-23, filed May 16, 2018 (Doc. 2289); (iii) Rivera, see Transcript of Excerpted Testimony at 28:16-18, filed May 23, 2018 (Doc. 2306); (iv) Lujan, see Transcript of Excerpted Testimony at 3:14-16, filed May 16, 2018 (Doc. 2282); (v) Manuel Jacob Armijo, see Transcript of Excerpted Testimony at 3:24-4:2, filed May 16, 2018 (Doc. 2284); (vi) Alonso, see Transcript of Excerpted Testimony at 3:12-14, filed May 23, 2018 (Doc. 2310); (vii) Munoz, see Transcript of Trial Excerpt at 34:23-24, filed June 1, 2018 (Doc. 2321); and (viii) R.P. Martinez, see Transcript of Excerpted Testimony at 53:24-54:2, filed May 9, 2018 (Doc. 2238).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES.

In Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), the Supreme Court explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153; Douglas v. Workman, 560 F.3d at 1172-73 ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's]

witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").  On the other hand, "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. 2005)(Browning, J.)(internal quotation marks omitted).  "A prosecutor does not have a duty . . . to obtain evidence from third parties."  United States v. Badonie, 2005 WL 2312480, at *2.

During a criminal prosecution, the Federal Rules of Criminal Procedure and the Constitution of the United States of America require the United States to disclose certain evidence to a criminal defendant.  Rule 16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United States.  Fed. R. Crim. P. 16(a).  The Due Process Clause of the Constitution is another source imposing a duty to disclose on the United States.

**LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION**

The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good

faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d at 1172-73 ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. at 676); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government." Kyles v. Whitley, 514 U.S. at 433 (quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d at 1304 ("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

       1.      **Material Exculpatory Evidence Under Brady.**

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United

States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir.

2010). A "reasonable probability," is a "probability sufficient to undermine confidence in the

outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth

Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the

constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir.

1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter

a defendant's choices before and during trial . . . including whether the defendant should testify."

Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048,

1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that

information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir.

1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court in Cone v. Bell,

556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as
> interpreted by Brady, only mandates the disclosure of material evidence, the
> obligation to disclose evidence favorable to the defense may arise more broadly
> under a prosecutor's ethical or statutory obligations. See Kyles, 514 U.S. at 437
> ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than
> the ABA Standards for Criminal Justice Prosecution Function and Defense
> Function 3-3.11(a) (3d ed. 1993)"). See also ABA Model Rules of Professional
> Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely
> disclosure to the defense of all evidence or information known to the prosecutor
> that tends to negate the guilt of the accused or mitigates the offense, and, in
> connection with sentencing, disclose to the defense and to the tribunal all
> unprivileged mitigating information known to the prosecutor, except when the
> prosecutor is relieved of this responsibility by a protective order of the tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; the defendants have

no obligation to first note that such materials exist. See Kyles v. Whitley, 514 U.S. at 437 (stating

that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, 2011 WL 1103876, at *6 (D.N.M. 2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way." Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).  Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).  "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

  2. **Timing of the Disclosure Under Brady.**

  "The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue." United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd, 742 F.3d 451 (10th Cir. 2014).  As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland." United States v. Burke, 571 F.3d at 1054.  The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." United States v. Burke, 571 F.3d at 1054.  "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure

would have created a reasonable doubt of guilt.'" United States v. Burke, 571 F.3d at 1054.  The

Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its
> compliance with Brady, to the prejudice of the defendant, the district court has
> discretion to determine an appropriate remedy, whether it be exclusion of the
> witness, limitations on the scope of permitted testimony, instructions to the jury, or
> even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of Brady material

is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify

imposition of a remedy, the defense must articulate to the district court the reasons why the delay

should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

Once a prosecutor's obligations under Brady have been triggered, however, they

"continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For

instance, the prosecutor's obligation to disclose Brady material can arise during trial.  See United

States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from

nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable

evidence (such as impeachment evidence) that is unavailable to the government until trial is

underway.").  The disclosure obligation continues even while a case is on direct appeal.  See United

States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir.

1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial

but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of

impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide

whether the Constitution requires that preguilty plea disclosure of impeachment information.  We

conclude that it does not.").  The Supreme Court recognized that "impeachment information is

special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice."  United States v. Ruiz, 536 U.S. at 630.  The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence.  The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement.  Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."  Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United States v. Ruiz, 546 U.S. at 630).[5]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to exculpatory evidence, but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects.  First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence.  Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea.  Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid the consequence of a Brady violation if the defendant accepts an eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit qualified its holding in United States v. Ohiri, however, stating that the case presented "unusual circumstances."  133 F. App'x at 562.

### 3.    Evidence Must Be in the United States' Possession.

---

[5]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court concludes that United States v. Johnson; United States v. Hernandez-Mejia, 406 F. App'x at 336; McGee v. Hayes, 43 F. App'x 214, 217 (10th Cir. 2002); and United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

"It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'" United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991)(quoting United States v. Beaver, 524 F.2d 963, 966 (5th Cir. 1975)).  Accord United States v. Kraemer, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); United States v. Badonie, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).   Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access."  United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady does not oblige the government to obtain evidence from third parties).

## LAW REGARDING THE CONFRONTATION CLAUSE.

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI.  The Tenth Circuit "has determined the Confrontation Clause does not apply at noncapital sentencing proceedings under the Guidelines."  United States v. Phillips, 165 F. App'x 677, 681 (10th Cir. 2006)(cited in United States v. Mata, No. CR 05-2046 JB, 2006 WL 4079127, at *10 (D.N.M. May 2, 2006)(Browning, J.)).  In Crawford v. Washington, 541 U.S.

36 (2004), the Supreme Court of the United States of America held that, consistent with the Sixth

Amendment, "[t]estimonial statements of witnesses absent from trial [are admissible] only where

the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-

examine." Crawford v. Washington, 541 U.S. 36, 59 (2004).  In Davis v. Washington, 547 U.S.

813 (2006), the Supreme Court further elaborated on what a "testimonial" statement is:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822.  The Tenth Circuit has restated this rule, defining a testimonial statement as "a

'formal declaration made by the declarant that, when objectively considered, indicates' that the

'primary purpose of the [statement is] to establish or prove past events potentially relevant to later

criminal prosecution.'"  United States v. Morgan, Nos. 12-1408, 12-1442, 13-1032, 2014 WL

1378207, at *9 (10th Cir. 2014)(alteration in original)(quoting United States v. Smalls, 605 F.3d

765, 777-78 (10th Cir. 2010)).  Accord United States v. Chaco, 801 F. Supp. 2d 1200, 1207-10

(D.N.M. 2011)(Browning, J.)(discussing developments in Tenth Circuit precedent on the test

regarding what qualifies as a testimonial statement).[6]

---

[6]In United States v. Chaco, the Court explained:

> The Tenth Circuit has stated that a critical element in determining whether a statement is testimonial or non-testimonial "centers on the reasonable expectations of the declarant."  United States v. Summers, 414 F.3d 1287, 1302 (10th Cir. 2005).  The Tenth Circuit has held that "a statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that his statement might be used in the investigation or prosecution of a crime."  United States v. Townley, 472 F.3d 1267, 1272 (10th Cir. 2007)(quoting United States v. Summers, 414 F.3d at 1302).  Other Circuit Courts of Appeal are in accord.  See United States v. Townley, 472 F.3d at 1272 (citing United States v. Hinton, 423 F.3d 355, 360 (3d Cir. 2005); United States v. Cromer, 389 F.3d 662, 675 (6th Cir.

In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), the Supreme Court addressed whether the admission of an affidavit by a forensic chemist, who swore that the substance which the police seized from the defendant was cocaine, violated the Confrontation Clause. See 557 U.S. at 307. The Supreme Court first concluded that such affidavits were testimonial, because they were "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," and because, under Massachusetts law,

---

2004); United States v. Saget, 377 F.3d 223, 229 (2d Cir. 2004)). The Tenth Circuit in United States v. Smalls called into question some aspects of the definition of testimonial that it set down in United States v. Summers. See United States v. Smalls, 605 F.3d at 777 ("Upon close inspection, Summers' definition of 'testimonial' appears somewhat in tension with Davis[ v. Washington, 547 U.S. 813 (2006)]' strictures, and perhaps overly broad . . . ."). Specifically, the Tenth Circuit stated that a testimonial statement must be made in a "formal" context, although they were not specific about what that might mean. See United States v. Smalls, 605 F.3d at 777-78. Next, the Tenth Circuit specified that the United States v. Summers articulation ignored the statement's "primary purpose," and focused instead on the foreseeability to the declarant of the purposes to which the statement "might" be put. United States v. Smalls, 605 F.3d at 777-78. With those two clarifications, it declined to restate a precise definition of a testimonial statement, instead setting forth two proposed definitions, either one of which it might adopt if the issue were put directly before it:

> [W]e might today formulate a definition of a testimonial statement which reads: a formal declaration made by the declarant that, when objectively considered, indicates the primary purpose for which the declaration was made was that of establishing or proving some fact potentially relevant to a criminal prosecution. Or, to better conform to the current state of Tenth Circuit precedent, we might say: A formal statement is testimonial if a reasonable person in the position of the declarant would objectively foresee that the primary purpose of the statement was for use in the investigation or prosecution of a crime.

United States v. Smalls, 605 F.3d at 778 (proffering these potential tests, but holding "we need not now . . . . tender a definitive definition of 'testimonial,' because Cook's statement is nontestimonial regardless of which of the foregoing definitions we apply").

United States v. Chaco, 801 F. Supp. 2d at 1209-10.

the affidavit's sole purpose was to provide prima facie evidence of the content of the substance seized. 557 U.S. at 310. The Supreme Court then used the affidavit introduced by the prosecution to outline its concerns regarding the lack of cross-examination when such affidavits are introduced as evidence:

> The affidavits submitted by the analysts contained only the bare-bones statement that "[t]he substance was found to contain: Cocaine." At the time of trial, petitioner did not know what tests the analysts performed, whether those tests were routine, and whether interpreting their results required the exercise of judgment or the use of skills that the analysts may not have possessed. While we still do not know the precise tests used by the analysts, we are told that the laboratories use "methodology recommended by the Scientific Working Group for the Analysis of Seized Drugs." At least some of that methodology requires the exercise of judgment and presents a risk of error that might be explored on cross-examination.

557 U.S. at 320. Because there was no opportunity to cross-examine on these issues, the Supreme Court concluded that introduction of the affidavit violated the defendant's rights under the Confrontation Clause. See 557 U.S. at 329 ("The Sixth Amendment does not permit the prosecution to prove its case via *ex parte* out-of-court affidavits, and the admission of such evidence against Melendez-Diaz was error.")(emphasis in original). The Supreme Court has since extended this holding to "forensic laboratory report[s] containing a testimonial certification -- made for the purpose of proving a particular fact -- through the in-court testimony of a scientist who did not sign the certification or perform or observe the test reported in the certification." Bullcoming v. New Mexico, 564 U.S. 647, 661 (2011)("Accordingly, the analysts who write reports that the prosecution introduces must be made available for confrontation even if they possess 'the scientific acumen of Mme. Curie and the veracity of Mother Teresa.'" (quoting Melendez-Diaz, 557 U.S. at 310 n.6)). See United States v. Harry, No. CR 10–1915 JB, 2014 WL 1950409 at *13 (D.N.M. May 7, 2014)(Browning, J.)(discussing the Confrontation Clause, but finding no violation where statement was not testimonial).

Except in rare cases, the prosecution's use of live or recorded video testimony without the defendant having the ability to confront the witness face-to-face violates a defendant's Confrontation Clause rights -- absent a showing of unavailability and prior opportunity to confront the witness.  See United States v. Sandoval, No. CR 04–2362 JB, 2006 WL 1228953, at *7-9 (D.N.M. Mar. 7, 2006)(Browning, J.).  In Maryland v. Craig, 497 U.S. 836 (1990) -- which the Supreme Court decided before Crawford v. Washington -- the Supreme Court rejected a Confrontation Clause challenge to a Maryland statute that allowed a child witness in a child molestation case, under certain circumstances, to testify via a one-way closed circuit television, which did not allow the witness to view the defendant.  See Maryland v. Craig, 497 U.S. at 860. While upholding the constitutionality of a child's testimony outside the defendant's presence, the Supreme Court in Maryland v. Craig recognized that the "central concern of the Confrontation Clause is to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact."  497 U.S. at 845.[7]

The Supreme Court in Maryland v. Craig recognizes that the context of an adversary proceeding before the trier of fact involves "[t]he combined effect of these elements of confrontation -- physical presence, oath, cross-examination, and observation of demeanor by the trier of fact" that "is the norm of Anglo-American criminal proceedings."  497 U.S. at 846.  The Supreme Court in Maryland v. Craig also acknowledges the peculiar power of face-to-face confrontation in that "face-to-face confrontation enhances the accuracy of fact finding by reducing

---

[7]The Supreme Court has since distanced itself from this holding that the purpose of the Confrontation Clause is to ensure the reliability of evidence.  See Bullcoming v. New Mexico, 564 U.S. at 652; Crawford v. Washington, 541 U.S. at 61.

the risk that a witness will wrongfully implicate an innocent person," 497 U.S. at 846 (citing <u>Coy v. Iowa</u>, 487 U.S. 1012, 1019-20 (1988)), and that "face-to-face confrontation forms 'the core of the values furthered by the Confrontation Clause,'" <u>Maryland v. Craig</u>, 497 U.S. at 847 (quoting <u>California v. Green</u>, 399 U.S. 149, 157 (1970)).

The Supreme Court explains in <u>Maryland v. Craig</u> that the Confrontation Clause "reflects a preference for face-to-face confrontation at trial," but that the preference "must occasionally give way to considerations of public policy and the necessities of the case." 497 U.S. at 849 (internal quotation marks omitted). The Supreme Court emphasizes that the preference for face-to-face confrontation is strong, and that a defendant's Sixth Amendment confrontation right "may be satisfied absent a physical, face-to-face confrontation at trial only where denial of such confrontation is necessary to further an important public policy and only where the reliability of the testimony is otherwise assured." 497 U.S. at 850.

While the issue is decidedly less clear, a violation of a defendant's Confrontation Clause rights does not occur when the defendant calls by videoconference or telephonically one of his or her own witnesses who is aligned with him. <u>See</u> U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to . . . be confronted with the witnesses against him . . . ."). <u>Cf</u>. <u>United States v. Olguin</u>, 643 F.3d 384, 392 (5th Cir. 2011)("The Sixth Amendment guarantees the right to confrontation against a party testifying against him, not against others."). The need for "adversariness" is not present when the witness is aligned with the defendant. <u>Maryland v. Craig</u>, 497 U.S. at 845. The Supreme Court spoke in <u>Crawford v. Washington</u> about the need for the defendant to have "an adequate opportunity to cross-examine" a witness to satisfy the Confrontation Clause, a need which is not present when the witness is aligned with the defendant. <u>See</u> 541 U.S. at 58. The Federal Rules of Evidence, for example, generally do not

permit a party to ask leading questions -- a key tool of cross examination -- of a witness aligned with the party calling the witness. See Fed. R. Evid. 611(c).[8]  A defendant also waives a Confrontation Clause challenge by calling his own witness by videoconference or telephonically. See United States v. Lopez-Medina, 596 F.3d 716, 730-34 (10th Cir. 2010)("Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause. The parties do not argue Crawford changed this rule.").

In 1969, the Supreme Court recognized that a defendant may waive his Confrontation Clause rights and that defendants commonly do so when pleading guilty. See Boykin v. Alabama, 395 U.S. 238, 270 (1969)("Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial . . . .  Third, is the right to confront one's accusers.").  The Tenth Circuit recognizes that, both before and after the Supreme Court's decision in Crawford v. Washington, a defendant may knowingly waive his Confrontation Clause rights at trial.  See United States v. Lopez-Medina, 596 F.3d at 730-34 (recognizing that Confrontation Clause rights may be waived at trial "at least where there is an explicit waiver").  Specifically, the Tenth Circuit states: "Prior to Crawford, we held there was 'no doubt' a defendant could waive his rights under the Confrontation Clause.  The parties do not argue Crawford changed this rule." United States v. Lopez-Medina, 596 F.3d at 731 (citations omitted).  The Tenth Circuit has held in prior cases that a defendant's counsel can stipulate to the admissibility of evidence that would otherwise violate the Confrontation Clause if doing so "was a matter of prudent trial strategy." Hawkins v. Hannigan, 185 F.3d 1146, 1155 (10th Cir. 1999).  The United States Court

---

[8]Rule 611(c) of the Federal Rules of Evidence provides: "(c) **Leading Questions.**  Leading questions should not be used on direct examination except as necessary to develop the witness' testimony.  Ordinarily, the court should allow leading questions: (1) on cross-examination; and (2) when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." Fed. R. Evid. 611(c).

of Appeals for the Sixth Circuit has recognized that such a waiver can be permissible in the context

of the prosecution admitting a videotaped deposition of one of its witnesses.   See Earhart v.

Konteh, 589 F.3d 337, 344 (6th Cir. 2009).  The Sixth Circuit in that case relied on one of its prior

decisions where it had permitted such a waiver:

> The State relies upon our holding in Bailey v. Mitchell, 271 F.3d 652 (6th
> Cir. 2001), to argue that Earhart waived his right to contest the admission of the
> videotape deposition.  In Bailey, we held that a criminal defendant waived his right
> to confrontation by entering into a quid pro quo agreement with a state prosecutor.
> Id. at 657.  The petitioner in Bailey had agreed to allow the State to admit the
> videotape deposition if the prosecutor would consent to the defendant's motion for
> a continuance.  Id.  Importantly, the Ohio state courts found as a factual matter that
> Bailey had made an explicit deal with the prosecutor for the admission of the
> videotape.  Id.

Earhart v. Konteh, 589 F.3d at 344.  Notably, the Tenth Circuit's case in United States v. Lopez-

Medina involved an oral waiver on the record in open court.  See 596 F.3d at 731 ("It is clear from

this statement [to the judge] that defense counsel intentionally relinquished his (or rather, his

client's) confrontation right through his questioning of Johnson.").

In United States v. Sandoval, the Court considered the Confrontation Clause in the context

of a minor victim and her alleged sexual attacker, as well as a statute permitting such testimony

over closed-circuit television.  See United States v. Sandoval, 2006 WL 1228953, at *10-13.  The

Court concluded that "[t]wo-Way closed-circuit television testimony" would be appropriate in that

case "because the introduction of testimony in this manner" did not "violate[] the Confrontation

Clause of the Sixth Amendment."  2006 WL 1228953, at *10.  Given the nature of the accusations

and the unique circumstances in that case, the Court thereby allowed closed-circuit television

testimony.  See 2006 WL 1228953, at *12.  The Court explained:

> Jane Doe will suffer emotional trauma if forced to testify in open court, in
> the same courtroom, with the person who allegedly abused her, and will thus be
> unable to testify.  Jane Doe will also be unable to testify because of her fear of her
> father -- Dr. Kern's opinion does not rest on Jane Doe's ability to testify in a court

room setting generally, but is based upon the fear of her father. The Court had an opportunity to examine Dr. Kern's findings at a hearing before trial and to make specific findings to satisfy the factors set forth in Maryland v. Craig and § 3509. The Court will best protect Jane Doe's welfare if it allows her to testify by two-way closed circuit television, and Sandoval's Confrontation Clause rights will not be violated.

United States v. Sandoval, 2006 WL 1228953, at *12.  See United States v. DeLeon, 2017 WL 2272936, at *20-23 (disallowing partitions between defendants when defendants could see the witness box and there was a risk that defendants would send coded messages between themselves).

## ANALYSIS

The Defendants' Motion seeks additional discovery concerning payments and promises made to cooperating witnesses.  See Discovery Motion at 1.  The United States agreed at the hearing to produce this information with redactions.  See Tr. at 226:21-227:11 (Armijo).  The Court concludes, however, that the United States must also provide the Defendants with confirmation that it is unaware of any other promises or benefits given to cooperating witnesses, or any requests for such benefits the cooperating witnesses made.  See Tr. at 228:9-15 (Court); id. at 230:5-12 (Court).  The information that the Defendants seek is relevant impeachment material, and accordingly, the United States must produce it.  See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d at 1172-73; United States v. Burton, 81 F. Supp. 3d 1229, 1253 (D.N.M. 2015)(Browning, J.).  The Court thus grants the Discovery Motion.

The Defendants' Motion in Limine seeks to prevent the United States from introducing cooperating witnesses' written plea agreements.  The Court has admitted plea agreements "if the cooperators testify and for the limited purposes of the jury evaluating the cooperators' credibility." Vigil, 2006 WL 4109684, at *5.  See United States v. Nickl, 427 F.3d 1286, 1294 n.2 (10th Cir. 2005)(noting that using one co-conspirator's guilty plea to establish the elements of another's crime is impermissible).  While the possibility of bolstering does not alone render the plea agreement

inadmissible, see United States v. Lord, 907 F.2d 1028, 1031 (10th Cir. 1990); Vigil, 2006 WL 4109684, at *6, "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. at 59. See Motion in Limine at 1.  At the hearing, the United States agreed to redact certain sections of the plea agreements that Defendants argued were testimonial or legal conclusions, and it noted that it may redact additional sections as well. See Tr. at 270:14-17 (Beck).  The United States also agreed that it would not attempt to introduce any redacted evidence without first approaching the bench.  See Tr. at 271:24-272:1 (Beck).  The United States entered eight redacted plea agreements into evidence during the first trial, and eight redacted plea agreements during the second trial.  The United State did attempt to introduce a previously redacted plea agreement section, see Transcript of Excerpted Testimony at 294:4-15 (Beck, Court), filed April 4, 2018 (Doc. 2058); the Court denied the United States' request but did give it a "little leeway" to "clear up the record," see id. at 295:21-25 (Court).

> **IT IS ORDERED** that: (i) Defendants' Motion for Additional Discovery Regarding Monetary Payments to Inmate Informant Witnesses, filed November 30, 2017 (Doc. 1501), is granted; and (ii) the Defendant's Motion in Limine re: Plea Agreements and Addenda, filed November 30, 2017 (Doc. 1502), is granted.  The United States must fully produce all information it possesses regarding Defendant plea agreements.  Further, the United States may not introduce plea agreement sections that are testimonial statements or legal conclusions.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
   Attorney for the United States
      Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
   Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

> *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

> *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

> *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

     *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

     *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

     *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

     *Attorneys for Defendant Benjamin Clark*


Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*

Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

    *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

     *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

     *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

     *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

     *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

     *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

*Attorneys for Defendant Brandy Rodriguez*