## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                    No. CR 15-4268 JB

ANGEL DELEON, JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a.
"Huero Troup," LEONARD LUJAN,
BILLY GARCIA, a.k.a. "Wild Bill,"
EUGENE MARTINEZ, a.k.a. "Little
Guero," ALLEN PATTERSON,
CHRISTOPHER CHAVEZ, a.k.a. "Critter,"
JAVIER ALONSO, a.k.a. "Wineo,"
ARTURO ARNULFO GARCIA, a.k.a.
"Shotgun," BENJAMIN CLARK, a.k.a.
"Cyclone," RUBEN HERNANDEZ;
JERRY ARMENTA, a.k.a. "Creeper,"
JERRY MONTOYA, a.k.a. "Boxer,"
MARIO RODRIGUEZ, a.k.a. "Blue,"
TIMOTHY MARTINEZ, a.k.a. "Red,"
MAURICIO VARELA, a.k.a. "Archie,"
a.k.a. "Hog Nuts," DANIEL SANCHEZ,
a.k.a. "Dan Dan," GERALD ARCHULETA,
a.k.a. "Styx," a.k.a. "Grandma," CONRAD
VILLEGAS, a.k.a. "Chitmon," ANTHONY
RAY BACA, a.k.a. "Pup," ROBERT
MARTINEZ, a.k.a. "Baby Rob," ROY
PAUL MARTINEZ, a.k.a. "Shadow,"
CHRISTOPHER GARCIA, CARLOS
HERRERA, a.k.a. "Lazy," RUDY PEREZ,
a.k.a. "Ru Dog," ANDREW GALLEGOS,
a.k.a. "Smiley," SANTOS GONZALEZ;
PAUL RIVERA, SHAUNA GUTIERREZ,
and BRANDY RODRIGUEZ,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

    **THIS MATTER** comes before the Court on: (i) Defendants Anthony Ray Baca and Rudy

Perez' Sealed Motion to Compel Rule 16 and *Brady* Materials and for Order to Preserve Law

Enforcement Notes, filed March 31, 2017 (Doc. 1037)("Motion to Compel"); (ii)   Defendant

Carlos Herrera's Notice of Joinder in Defendant Rudy Perez's Motion and Briefing to Compel

Rule 16 and *Brady* Materials and for Order to Preserve Law Enforcement Notes, filed April 3,

2017 (Doc. 1041)("Herrera Joinder"); (iii) Defendant Daniel Sanchez' Notice of Joinder in

Co-Defendant Rudy Perez's Motion to Compel (Doc. 1037), filed April 10, 2017

(Doc. 1077)("Sanchez Joinder"); (iv) United States' Opposed Motion to Reconsider the Court's

Order for Limited Production of Sensitive Government Recording Devices or Programs, filed

December 6, 2017 (Doc. 1551)("Motion to Reconsider"); and (v) United States' Motion *in Limine*

to Preclude Soliciting Testimony about Sensitive Government Recording Devices or Programs,

filed December 1, 2017 (Doc. 1524)("Motion in Limine").  The Court held evidentiary hearings

on May 9, 2017, and May 10, 2017, and hearings on November 27, 2017, December 11, 2017, and

December 19, 2017.  The primary issue is whether the Court should compel Plaintiff United States

of America to disclose and/or preserve the documents and materials that Defendants Daniel

Sanchez, Anthony Ray Baca, Carlos Herrera, and Rudy Perez argue are material and exculpatory.

Specifically, the Court must determine: (i) whether  the United States must produce the original

audio and video recordings of Baca's and Perez' conversations with informants; (ii) whether the

United States must produce the recording devices used to generate the recordings and whether the

Defendants may solicit testimony from the United States' witnesses about the recording devices;

(iii) whether, and under what circumstances, the Defendants may handle the physical evidence;

(iv) whether the United States must produce Perez' location within the Penitentiary of New

Mexico ("PNM") when recordings of his conversations with informants were made; (v) whether

the United States must produce the identity of the law enforcement handler -- agents who dealt

directly with informants -- for the informant who recorded conversations with Perez; and

(vi) whether the United States must produce correspondence between the law enforcement officers and the New Mexico Corrections Department regarding Defendant Billy Cordova's contraband possession.  The Court will grant in part and deny in part the Motion to Compel; grant the Motion to Reconsider; and will grant in part and deny in part the Motion in Limine.  The Court concludes that: (i) the United States does not need to produce any additional audio or video recordings, or recording devices; (ii) the United States does not need to produce the recording devices, and the Defendants may ask questions only about the recording devices' general appearance; (iii) the United States must allow Baca and Perez to handle physical evidence, and must provide a custodian who is not a member of the prosecution team to supervise Baca and Perez; (iv) the United States must produce the dates on which any conversations occurred if the date has been redacted from any transcript, but does not need to produce the locations of where the conversations occurred; (v) the United States does not need to produce the identities of the informants' handlers; and (vi) rule 16 of the Federal Rules of Criminal Procedure, <u>Brady v. Maryland</u>, 373 U.S. 83 (1963)("<u>Brady</u>"), or <u>Giglio v. United States</u>, 405 U.S. 150 (1972)("<u>Giglio</u>"), require the United States to produce, within fourteen days, any correspondence that may exist between the Federal Bureau of Investigation ("FBI") or other law enforcement, and the NM Corrections Department, regarding whether Cordova possessed contraband.

## FACTUAL BACKGROUND

Before setting out its findings of fact, the Court will provide background information regarding the Syndicato de Nuevo Mexico ("SNM"), as well as background information regarding each of the Defendants in this case and the charges that they face.  The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment").  The background facts are largely unchanged from those facts that the Court provided in its

Memorandum Opinion and Order, 323 F.R.D. 672, filed December 18, 2017 (Doc. 1585). The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events.

This case deals with crimes that the Syndicato de Nuevo Mexico allegedly committed through its members. Indictment at 2. SNM, through its members, operated in the District of New Mexico at all relevant times, and its members engaged in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking." Indictment at 2. SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce." Indictment at 2-3.

SNM is a prison gang that formed in the early 1980s at PNM after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage. Indictment at 3. During the riot, thirty-three inmates were killed, and over 200 inmates were injured. See Indictment at 3. After the PNM riot, SNM expanded throughout the state's prison system and has had as many as 500 members. See Indictment at 3. SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members." Indictment at 3. SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system. See Indictment at 3. Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking. See Indictment at 3-4. Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults." Indictment at 4.

SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power. See Indictment at 4. If another gang does not follow SNM's demands, SNM will assault or kill one of the other gang's members to show its power. See Indictment at 4. SNM's rivalry with other gangs also manifests itself in beatings and stabbings within the prison system. See Indictment at 4. SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others." Indictment at 4. To show its strength and influence, SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders. See Indictment at 5. To achieve its purpose of preserving its power, SNM uses intimidation, violence, threats of violence, assaults, and murder. See Indictment at 7. SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers. See Indictment at 8. SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") Officials motivated the Federal Bureau of Investigation's present investigation. See United States v. Garcia, 221 F. Supp. 3d 1275, 1277 (D.N.M. 2016)(Browning, J.).

In March, 2014, a Doña Ana County, New Mexico, grand jury indicted Defendants Jerry Montoya and Jerry Armenta on charges of first-degree murder and four other felonies related to the death of Javier Enrique Molina. See Memorandum Opinion and Order at 6, 2016 WL 7242579, at *3, filed October 28, 2016 (Doc. 753)("MOO"). Molina was Montoya and Armenta's fellow inmate during their incarceration at the Southern New Mexico Correctional Facility ("Southern New Mexico"). See MOO at 6, 2016 WL 7242579, at *3. The New Mexico Third Judicial District Attorney's Office accused Montoya and Armenta of fatally stabbing Molina with a shank in a gang-related attack. See MOO at 6, 2016 WL 7242579, at *3. That New Mexico indictment

charged Montoya and Armenta with: (i) Molina's murder; (ii) possessing a deadly weapon; (iii) tampering with evidence; and (iv) two counts of conspiracy.  See MOO at 6-7, 2016 WL 7242579, at *3.  In November, 2015, the state District Attorney dismissed the charges against Montoya and Armenta -- as well as separate charges against their alleged accomplice, Defendant Mario Rodriguez, who had been charged with possession of a deadly weapon by a prisoner, tampering, and conspiracy.  See MOO at 7, 2016 WL 7242579, at *3.  "A spokesperson for the District Attorney's Office indicated the charges were dismissed because the cases were going to be prosecuted at the federal court level."  MOO at 7, 2016 WL 7242579, at *3.

The United States now brings this case, which it initiated in Las Cruces, New Mexico, against thirty-one Defendants, charging them with a total of sixteen counts.  See Indictment at 1, 9-18.  All Defendants are accused of participating in the SNM enterprise's operation and management, and of committing unlawful activities "as a consideration for the receipt of, and as consideration for a promise and an agreement to pay, anything of pecuniary value from SNM and for the purpose of gaining entrance to and maintaining and increasing position in SNM, an enterprise engaged in racketeering activity."  Indictment at 9-18.  Defendant Arturo Arnulfo Garcia, Defendant Gerald Archuleta,[1] Defendant Benjamin Clark, M. Rodriguez, Defendant

---

[1]Archuleta pled guilty on June 16, 2016, stipulating:

In 1990, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang.  The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics.  The SNM operates in the District of New Mexico and elsewhere.  The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2003, I was an active member of the SNM.  The person listed as J.R. in Count 8 of the Superseding Indictment was also a member of the SNM, and we

Anthony Ray Baca, Defendant Robert Martinez, Defendant Roy Paul Martinez,[2] and Sanchez are

_____

were both engaged in racketeering activities for the SNM. J.R. and I had a falling out in 2003 and as a result, I put a "green-light" on J. R. Based upon my status in the SNM, this "green-light" was well known to members of the SNM. The "green-light" resulted in other members of the SNM shooting J.R. in 2003; however, J.R. survived the shooting. The "green-light" remained in effect in 2015; consequently, another member or associate of the SNM acted on the "hit," and J.R. was assaulted while incarcerated at the Southern New Mexico Correctional Facility in Dona Ana County, New Mexico. This attack and "hit" had been approved of by leaders of the SNM gang, including Anthony Ray Baca. As leader of the SNM gang in 2015, Baca was aware of the outstanding "green-light" and sanctioned it.

Thus, from 2003 to July, 2015, I conspired with members and associates of the SNM gang to commit assault resulting in serious bodily injury to J.R. This conspiracy was for the purpose of maintaining and increasing my position in the SNM, as well as the other people who were involved with the assault.

Plea Agreement at 4-5, filed June 16, 2016 (Doc. 586).

[2]R.P. Martinez plead guilty on September 15, 2016, stipulating:

In 1995, while incarcerated at the Penitentiary of New Mexico, I became a member of the Syndicato Nuevo Mexico (SNM) prison gang. The SNM is an ongoing criminal organization whose members, prospects and associates engage in acts of violence and other criminal activities, including murder, kidnapping, attempted murder, and conspiracy to manufacture / distribute narcotics. The SNM operates in the District of New Mexico and elsewhere. The SNM constitutes an enterprise (individuals associated in fact that engaged in, or the activities of which, affected interstate commerce) that is engaged in racketeering activity.

In 2013, I was an active member of the SNM. On or before 2013, I conspired with Robert Martinez, a.k.a. "Baby Rob," Anthony Baca, a.k.a. "Pup," and others to murder G.M. and D.S. Specifically, Anthony Baca was angry at the New Mexico Corrections Department (NMCD) for moving him out of State. Baca, as the purported leader of the SNM at the time, ordered the murders of G.M. and D.S. As a result, in 2015, I agreed to write letters to SNM gang members ordering the murders and in fact, did write letters ordering the members to kill G.M. and D.S. I did this by virtue of my membership in the SNM and to maintain and increase my position in the SNM.

Thus, from 2013 to continuing into 2015, I conspired with members of the SNM gang to murder G.M and D.S.

Plea Agreement at 4-5, filed September 15, 2016 (Doc. 686).

the enterprise's alleged leaders.  See Indictment at 6.  The other Defendants are allegedly members

or associates who acted under the direction of the enterprise's leaders.  See Indictment at 6.  The

SNM gang enterprise, through its members and associates, allegedly engaged in: (i) racketeering

activity as 18 U.S.C. §§ 1959(b)(1) and 1961(1) define that term; (ii) murder and robbery in

violation of New Mexico law; (iii) acts, indictable under 18 U.S.C. §§ 1503, 1512, and 1513,

"involving obstruction of justice, tampering with or retaliating against a witness, victim, or an

informant"; and (iv) offenses involving trafficking in narcotics in violation of 21 U.S.C. §§ 841

and 846.  Indictment at 9.

Specifically, the Indictment alleges that, on March 26, 2001, Defendants Angel DeLeon,

Joe Gallegos, Edward Troup, Leonard Lujan, and Billy Garcia murdered "F.C."  Indictment at 9

(Count 1).  On the same day, Lujan, B. Garcia, and Defendants Eugene Martinez, Allen Patterson,

and Christopher Chavez allegedly murdered "R.G."  Indictment at 10 (Count 2).  On June 17,

2007, Defendant Javier Alonso, Troup, A.A. Garcia, Clark, and Defendant Ruben Hernandez

allegedly murdered "F.S."  Indictment at 10-11 (Count 3).  On November 12, 2012, J. Gallegos

and Defendant Andrew Gallegos allegedly conspired to murder "A.B."  Indictment at 11 (Count

4).  On the same day, J. Gallegos and A. Gallegos allegedly murdered A.B.  See Indictment at 11-

12 (Count 5).  In March 2014, Armenta, Montoya, M. Rodriguez, T. Martinez, Baca, Defendant

Mauricio Varela, Sanchez, Defendant Carlos Herrera, and Defendant Rudy Perez allegedly

conspired to murder "J.M."  Indictment at 12 (Count 6).  On March 7, 2014, Armenta, Montoya,

M. Rodriguez, T. Martinez, Baca, Varela, Sanchez, Herrera, and R. Perez allegedly murdered J.M.

See Indictment at 13 (Count 7).

Further, starting in or around 2003 -- and until about July 13, 2015 -- Baca, Archuleta, and

Defendant Conrad Villegas allegedly conspired to commit assault resulting in serious bodily injury

to "J.R."  Indictment at 13-14 (Count 8).  Starting "on a date uncertain, but no later than 2013," and until the date of the Indictment -- April 21, 2014 -- Baca, R.P. Martinez, and R. Martinez allegedly conspired to murder "D.S."  Indictment at 14 (Count 9).  During the same time period, Baca, R.P. Martinez, R. Martinez, and Defendant Christopher Garcia allegedly conspired to murder "G.M."  Indictment at 15 (Count 10).  On November 29, 2015, C. Garcia, a convicted felon, allegedly unlawfully possessed a firearm.  See Indictment at 15-16 (Count 11).  On the same day, C. Garcia, a convicted felon, allegedly knowingly used and carried a firearm in relation to a conspiracy to murder charge.  See Indictment at 16 (Count 12).

On March 17, 2015, J. Gallegos allegedly committed assault with a dangerous weapon against "J.G."  Indictment at 16 (Count 13).  From February 1, 2016, until February 27, 2016, J. Gallegos and Defendants Santos Gonzales, Paul Rivera, Shauna Gutierrez, and Brandy Rodriguez allegedly conspired to murder "J.G."  Indictment at 17 (Count 14).  Also, on February 27, 2016, J. Gallegos, B. Rodriguez, Gonzales, Rivera, and Gutierrez allegedly attempted to murder J.G., and committed assault with a dangerous weapon and assault resulting in serious bodily injury to J.G.  See Indictment at 17-18 (Count 15).  The same Defendants also allegedly tampered with a witness, J.G.  See Indictment at 18 (Count 16).

For fuller factual context, there are four cases before the Court related to SNM's alleged criminal activity.   In a related case -- United States v. Baca, No. CR 16-1613 (D.N.M.)(Browning, J.)[3] -- the United States names twelve defendants, all alleged SNM members

---

[3]The Court granted a conditional severance to one Defendant in that case.  See United States v. Baca, No. CR 16-1613 JB, 2016 WL 6404772 (D.N.M. 2016)(Browning, J.).  The Court severed Defendant Richard Gallegos, because R. Gallegos -- unlike his co-Defendants -- asserted his rights under the Speedy Trial Act, 18 U.S.C. §§ 3161-74.  The Court concluded that, given R. Gallegos' assertion of those rights, there was sufficient prejudice to warrant a conditional

or associates, who have allegedly engaged in a racketeering conspiracy, under 18 U.S.C. § 1962(d).[4]  The United States is separately prosecuting C. Garcia for drug crimes, see United States of America v. Garcia, No. CR 15-4275 (D.N.M.)(Browning, J.), and a four-defendant prosecution for alleged violent crimes in aid of racketeering, under 18 U.S.C. § 1959, see United States v. Varela, No. CR 15-4269 (D.N.M.)(Browning, J.).

## **FINDINGS OF FACT**

The Court will make findings of fact, because, "[w]hen factual issues are involved in deciding a motion, the court must state its essential findings on the record," Fed. R. Crim. P. 12(d), even though rule 12(d) of the Federal Rules of Criminal Procedure "'does not require detailed findings of facts as long as the essential basis of the court's decision is apparent,'" United States v. Burbage, 365 F.3d 1174, 1178 (10th Cir. 2004)(quoting United States v. Toro-Pelaez, 107 F.3d 819, 824 (10th Cir. 1997)).  The Court sets out the following explicit findings of fact:

1.    Adaptive Digital Systems ("ADS") manufactured the recording devices, and the recording device models used in the case are called "HAWK8," "RAVEN2A," and the "EAGLE."

---

severance of R. Gallegos from the joint-trial grouping.  Further, the Court was convinced that R. Gallegos was in a wholly unique position, distinct from his co-Defendants, because:

> Gallegos is ready for trial, because his counsel prepared his state court defense and he is basically being tried for the same thing here in federal court. . . .  If the Court does not sever, Gallegos will have to wait for discovery to be complete as to all Defendants, pre-trial motions as to all Defendants, and then, ultimately, the trial against him and all eleven of his co-Defendants.

United States v. Baca, 2016 WL 6404772, at *30-32 (internal citations and quotation marks omitted).  Ultimately, it was clearly the speedy trial concerns which tipped the scale of prejudice in R. Gallegos' favor.  See 2016 WL 6404772, at *32 (setting a new trial date to ensure his speedy trial rights were protected).  On March 22, 2017, R. Gallegos pled guilty in his severed case.  See United States v. Gallegos, No. CR 16-4299, Plea Agreement at 1, filed March 22, 2017 (Doc. 24).

[4]The Court has also declared that case complex under the Speedy Trial Act.  See United States v. Baca, 2016 WL 6404772, at *32.

Transcript of Motion to Suppress Proceedings on December 11, 2017 at 12:8-13 (Williamson, Beck), filed December 21, 2017 (Doc. 1592)("Dec. 11 Tr.").

2.      The recording devices in this case operate using a "proprietary software" designed by ADS.  Dec. 11 Tr. at 12:22 (Williamson).  See Dec. 11 Tr. at 13:19-24 (Williamson).

3.      The FBI does not have access to the recording devices' software or "source code,"[5] which is "held by ADS."  Dec. 11 Tr. at 13:18-19 (Beck, Williamson).

4.      The FBI "deliberately" outsourced designing the source code and manufacturing the recording devices to ADS so that it would not have access to the source code or be able to manipulate the recording devices.  Dec. 11 Tr. at 13:19-24 (Williamson).

5.      The FBI deploys the recording devices used in this case "around the world." Dec. 11 Tr. at 36:8 (Williamson).

6.      The recording devices' users "can only turn it on and turn it off," and cannot "record over what's on the device" or "rewind" the device.  Dec. 11 Tr. at 14:3-7 (Williamson, Beck).

7.      When a user presses the button that turns on the recording device, recording begins "practically instantaneously."  Dec. 11 Tr. at 104:8 (Williamson).

8.      When a recording device runs out of power, the computer program is designed to indicate the event with a flag.  See Dec. 11 Tr. at 15:10-12 (Williamson).

9.      A recording device will create a new "session" for fitting its data onto an evidentiary disc when the user turns the device on and then off, when the device needs to "split[] the file because of its size," or when the device runs out of power.  Dec. 11 Tr. at 16:1-20 (Williamson, Beck).

---

[5]Source code is "the literal text of a program's instructions written in a particular programming language."  Gates Rubber Co. v. Bando Chem. Indus., Ltd., 9 F.3d 823, 835 (10th Cir. 1993).

10.     When the recording devices' software downloads the recording devices' data, "it takes all of the recorded sessions, all the sessions that are collected, and takes the metadata on the recorder" and downloads it to an evidentiary disc.  Dec. 11 Tr. at 17:21-24 (Williamson).

11.     The evidentiary disc "cannot be manipulated," and, after downloading a recording device's data, "you have to erase the recorder if you want to use it again."  Dec. 11 Tr. at 19:12-13 (Williamson).

12.     A file in the recording devices' software called the "RCD file" "contains the metadata," which the FBI cannot access or manipulate.  Dec. 11 Tr. at 23:4-5 (Williamson).

13.     When a recording device's data is downloaded onto an evidentiary disc, ADS' software provides a "text file," which contains a "hash calculation" unique to that file.  Dec. 11 Tr. at 21:1-3 (Williamson).

14.     Using a third-party software, such as an "after-market SHA256 calculator," Dec. 11 Tr. at 21:6-7 (Williamson), users can verify that the data downloaded onto an evidentiary disc is "identical" to the data existing on a recording device by comparing the hash values.  Dec. 11 Tr. at 27:22 (Williamson).  See Dec. 11 Tr. at 20:25-21:9 (Williamson).

15.     If the data on an evidentiary disc does not match the data on a recording device, ADS' "player" will display an error message and a person cannot listen to the recording.  Dec. 11 Tr. at 35:10-19 (Beck, Williamson).

16.     Although different recording devices may have different data storage capacities, a recording device will create new sessions that are the same data size for that recording device.  See Dec. 11 Tr. at 50:13-51:17 (Jacks, Williamson).

17.     The FBI treats evidentiary discs as "original evidence" and stores the discs in the electronic surveillance ("ELSUR") storage room.  <u>See</u> Dec. 11 Tr. at 82:16-20 (Williamson, Sirignano).

18.     The data on an evidentiary disc is a "mirror copy of what was originally on the device."  Dec. 11 Tr. at 98:22-25 (Lowry, Williamson).

19.     After making copies of evidentiary discs, FBI agents are still able to confirm that the copies are identical to the original evidentiary disc stored in the ELSUR storage room by "running a hash calculation" on the copies.  Dec. 11 Tr. at 101:22-102:13 (Lowry, Williamson).

20.     A recording device transitions to a new session when its data storage reaches maximum capacity, and not when a recording reaches a particular length of time.  <u>See</u> Dec. 11 Tr. at 109:7-10 (Williamson).

## CONCLUSIONS OF LAW

Having set out its findings of fact, the Court now articulates its conclusions of law.  It begins by providing procedural background regarding this case.  The Court then states the law regarding issues relevant to the Court's analysis.  Finally, the Court conducts its analysis.

## PROCEDURAL BACKGROUND

1.     On October 4, 2016, in a pretrial hearing, the Court outlined its general approach regarding discovery in this case.  <u>See</u> Transcript of Hearing (held October 4, 2016), filed October 18, 2016 (Doc. 743)("Oct. 2016 Tr.").  The United States agreed to produce material under the Jencks Act, 18 U.S.C. § 3500, fourteen days before trial, even though the Jencks Act does not require the United States to produce a witness' statements until after the witness testifies, <u>see</u> Oct. 2016 Tr. at 19:2-12 (Beck), and the Court indicated that it was "not going to require any Jencks material to be produced before the 14 days," Oct. 2016 Tr. at 23:10-12 (Court).  On the other hand,

the Court indicated that the United States "needs to go in and look at these files and do a Brady review," and "produce the Brady material promptly, immediately." Oct. 2016 Tr. at 23:16-19 (Court). The Court later memorialized its discovery determinations in its Sealed Memorandum Opinion and Order at 106-11, 2017 WL 2271430, at *50-52, filed January 3, 2017 (Doc. 809).

       1.    **The Motion to Compel**.

       2.    On March 3, 2017, Perez filed the Motion to Compel, making fourteen specific discovery and/or preservation requests. See Motion to Compel at 1. Baca joins the Motion to Compel, see Motion to Compel at 1, and Herrera and Sanchez filed notices of joinder, see Herrera Joinder at 1; Sanchez Joinder at 1. Herrera makes two additional discovery requests. See Herrera Joinder at 2. The Motion to Compel requests

> routine discovery, including the disclosure of exculpatory statements of his co-
> defendants, the unsealing of plea addenda which the Government has no legal
> justification to seal, physical access to the evidence in the case including digital,
> recorded and location evidence, and other information pertaining directly to the
> voluntariness of his alleged statements.

Motion to Compel at 24. The Motion to Compel argues that the United States must produce many of these materials immediately under rule 16, Brady, and Giglio. See Motion to Compel at 22. The Motion to Compel also requests that the United States preserve "various categories of law enforcement notes so that they are available at the time of trial." Motion to Compel at 24.

       3.    The Motion to Compel and the Herrera Joinder specifically request that the United States provide the following: (i) the production, pursuant to rule 16, Brady, and Giglio, of any written and/or recorded statements that Montoya, T. Martinez, and Armenta made; (ii) the production of Montoya's, T. Martinez', and Armenta's plea addenda and written recorded

statements; (iii) the production of FBI 302s[6] and law enforcement notes pertaining to Montoya, T. Martinez, and Armenta; (iv) the production of copies of all recorded materials tagged into evidence and access by an expert to the original recorded materials; (v) the production of original audio and video recordings of Perez' and Baca's conversations with informants, and the recordings devices used to generate the recordings; (vi) confirmation from the United States that it does not possess any physical evidence other than evidence itemized in the NM State Police evidence inventory; (vii) permission from the United States to handle the physical evidence; (viii) the production of Perez' location within the PNM when recordings of his conversations with informants were made; (ix) verification that the United States has provided Perez with transcripts of all recorded conversations between Perez and informants; (x) the production of law enforcement handler's identity who dealt with the informant who recorded conversations with Perez; (xi) the preservation of any notes prepared by law enforcement handlers of the informant who recorded conversations with Perez; (xii) the production of any documentation and/or correspondence between the FBI or other law enforcement, and the NM Corrections Department, regarding Cordova possessing contraband; (xiii) the production of Cordova's pen pack and STIU file; (xiv) physical access to Southern New Mexico's wheelchair program, the Southern New Mexico infirmary, the cell where Perez was housed, and the cell neighboring Perez' cell; (xv) the production of any transcripts of recorded conversations between informants and Herrera that have yet to be disclosed; and (xvi) the production of any audio recordings in which Herrera purportedly admitted to his involvement in Javier Molina's murder.  See Motion to Compel at 9 22.

---

[6]302s, also known as FD-302s, are FBI forms that agents prepare to summarize the interviews they conduct.

2.      **The Herrera Joinder**.

4.      In addition to joining Baca and Perez' Motion to Compel, Herrera requests the disclosure of additional materials.  See Herrera Joinder at 1-2.  Specifically, Herrera requests "[c]opies of all Recorded Statements in evidence along with access by an expert to the original recorded materials and any evidence that Mr. Herrera was in a leadership position or authorized the 'hit' on Mr. Molina."  Herrera Joinder at 2.  Herrera argues that the United States asserted in a hearing on November 29, 2016, that "Herrera admitted to sanctioning the hit and confessed to such involvement."  Herrera Joinder at 2 (citing Transcript of Motion Proceedings on November 29, 2016 at 136:2-22 (taken November 29, 2016)(Armijo, Court), filed December 20, 2016 (Doc. 804)).  Herrera maintains that he contacted the United States and requested any statements by Herrera about sanctioning the "hit" on Molina.  Herrera Joinder at 2.  According to Herrera, he requested statements on December 1, 2016, January 23, 2017, January 26, 2017, and March 6, 2017, but the United States never located or provided any statements.  See Herrera Joinder at 2.  Herrera further requests "any evidence" indicating that he "is in a leadership position within SNM that supports the government's theory that he has the authority to sanction SNM activity."  Herrera Joinder at 2.

3.      **The Response**.

5.      The United States responded on April 17, 2017.  See Sealed United States' Response to Defendant's Motion to Compel Rule 16 and *Brady* Materials and for Order to Preserve Law Enforcement Notes [1037], filed April 17, 2017 (Doc. 1098)("Response").  The United States maintains that it has either "already produced" the requested materials, or "is not required to produce [the materials] under Rule 16, Jencks, or *Brady*."  Response at 1.  First, the United States argues that the request for any and all written and/or recorded statements made by Montoya,

T. Martinez, and Armenta is too broad, and that "the United States is not obligated to produce statements that are beyond the scope of the Court's order or the Government's Constitutional disclosure obligations."  Response at 6.  The United States contends that rule 16 forecloses the request, because Sanchez, Baca, Herrera, and Perez are entitled only to their "*own* oral or written statements made 'in response to interrogation by a person the defendant knew was a government agent.'"  Response at 6-7 (quoting Fed. R. Crim. P. 16(a)(1)(A) & (B))(emphasis added by the United States).  Next, the United States argues that it is not required to turn over Jencks Act material until "*after* the witness has testified on direct examination at trial."  Response at 7 (emphasis in original).  The United States asserts that this request, moreover, "sweeps [too] broadly . . . by characterizing *any and all* statements by Defendants as *Brady* material."  Response at 8 (emphasis in original).

6.      As to the request for all plea addenda and written recorded statements of Montoya, T. Martinez, and Armenta, the United States argues that "all requested plea agreements have been disclosed in open court."  Response at 8-9.  Next, the United States contends that the request for all FBI 302s and law enforcement notes pertaining to Montoya, T. Martinez, and Armenta is too speculative, because it presupposes that "*all* FBI 302[s] and interview notes [are] *Brady* material."  Response at 9 (emphasis in original).  The United States says that, moreover, it will comply with the Jencks Act by disclosing 302s and interview notes regarding Montoya, Armenta, and T. Martinez after the relevant witness testifies at trial.  See  Response at 11.  As to the request for copies of all recorded materials tagged into evidence and access by an expert to the original recorded materials, the United States argues that it "will coordinate with NM State Police prior to the hearing to determine if the materials have been provided since the United States was not present

at the evidence viewing.  The United States will disclose what has not been disclosed."  Response at 11.

7.      Next, the United States contends that it has "produced all known physical evidence" in response to the request for confirmation that there is no additional evidence related to Counts 6 and 7.  Response at 12.  As to the request to handle the physical evidence, the United States responds that Sanchez, Baca, Herrera, and Perez have "not specified what items of evidence it seeks to handle," and that, "depending on the sensitive nature of the evidence to be handled," it will honor this request if the Defendants provide a legal or factual basis for discovery.  Response at 12.  The United States maintains that Perez' request for his location within PNM when recordings were made lacks "support in law or fact."  Response at 12.  Although Perez argues that the location will help determine if his statements were voluntarily made, the United States argues that the Court should deny his request, because Perez does not "contend[] that his statements were involuntarily made; that his statements were obtained by coercion, duress, or threat of force; or that disclosure of the specific locations of this recording is 'material' to his defense."  Response at 13 (quoting United States v. Bagley, 473 U.S. 667, 682 (1985)).  The United States further posits that "disclosure of the exact location where the recordings were obtained would certainly reveal the identity of the informant in this case, placing his life and his testimony in danger."  Response at 14.

8.      The United States next verifies that it already has disclosed "all relevant transcripts of all recordings" to Perez.  Response at 14.  As to the request for original audio and video recordings of Baca's and Perez' conversations with informants, the manner of recording, and access to the recording devices used to generate the recordings, the United States responds that: (i) "it has already produced all enhanced and unenhanced recordings"; (ii) it should not have to

disclose the manner of recording, because doing so would reveal "sensitive law enforcement techniques"; and (iii) the Court should deny access to the recording devices, because "it is improper to disclose methods and means of investigation."  Response at 14-15.  Next, the United States argues that it should not have to reveal the identity of Cordova's law enforcement handlers, because Sanchez, Baca, Herrera, and Perez do not show how disclosure of this information relates to the voluntariness of their statements.  See Response at 15 (citing United States v. DeLeon, No. CR 15-4268, 2017 WL 2271430, at *7 (D.N.M. Feb. 8, 2017)(Browning, J.); United States v. Lujan, 530 F. Supp. 2d 1224, 1234 (D.N.M. 2008)(Brack, J.)).  As to Perez' request for the preservation of any notes prepared by law enforcement handlers of the informant who recorded conversations with Perez, the United States responds that it will preserve relevant Jencks material.  See Response at 16 (citing United States v. Hykes, No. CR 15-4299 JB, 2016 WL 1730125 (D.N.M. Apr. 11, 2016)(Browning, J.)).

9.     In response to the request for documentation and correspondence between the FBI and the NM Corrections Department regarding Cordova possessing contraband, including recording devices or telephones, the United States argues that Sanchez, Baca, Herrera, and Perez "fail to offer any factual relationship between the voluntariness of [their] statements and any of the requested information."  Response at 16.  The United States avers that Sanchez, Baca, Herrera, and Perez admit that the purpose of the request is to "identify the 'source of any recording device' used to capture [their] statements," Response at 16 (quoting Motion to Compel at 20), and that rule 16(a) prohibits discovery pertaining to "'investigating or prosecuting the case'," Response at 17 (quoting Fed. R. Evid. 16(a)(2)).  The United States also argues that it should not have to disclose recording devices used to record conversations with informants, because doing so "threatens to reveal law enforcement methods and means which could hamper the use of such items in the

future." Response at 17. The United States argues that it should not have to produce Cordova's penitentiary pack and STIU file, because Sanchez, Baca, Herrera, and Perez "*merely* contend[] that Billy Cordova's pen pack and STIU files are 'material'" without explaining how the pen pack and files are material. Response at 17 (quoting Fed R. Evid. 16(a)(1)(E)(i))(emphasis in Response). Last, the United States does not object to the request to access Southern New Mexico's wheelchair program, the infirmary, and the cell neighboring Perez' cell. See Response at 18. The United States maintains that Sanchez, Baca, Herrera, and Perez are "aware of the procedures and arrangements required to access NMCD facilities." Response at 18.

### 4. **The Reply**.

10. Perez replied on May 5, 2017, with Baca and Herrera joining. See Sealed Reply to Government's Response to Motion to Compel Rule 16 and *Brady* Materials and for Order to Preserve Law Enforcement Notes at 1 n.1, filed May 5, 2017 (Doc. 1130)("Reply"). Baca, Herrera, and Perez argue that the United States has not provided the requested materials, and that neither rule 16 nor the Jencks Act bars production. See Reply at 2-3. First, Baca, Herrera, and Perez limit their request for all statements by Montoya, Armenta, and T. Martinez only to statements "made by these Defendants, not already produced, between March 7, 2014 and the present." Reply at 4. Next, Baca, Herrera, and Perez aver that the United States "offers no substantive arguments in response to" their request for Montoya's, T. Martinez', and Armenta's plea addenda under rule 11(c)(2) of the Federal Rules of Criminal Procedure and the First Amendment to the Constitution of the United States of America. See Reply at 4.

11. Next, Baca, Herrera, and Perez argue that the United States must produce 302s and law enforcement notes pertaining to Montoya, T. Martinez, and Armenta. See Reply at 4. According to Baca, Herrera, and Perez, "[a]lthough Rule 16(a)(2) prohibits the disclosure of . . .

internal government documents made . . . investigating or prosecuting the case, . . . an agent's rough interview notes may be discoverable under *Brady* if the defendant shows that the notes are exculpatory and material."  Reply at 4-6 (citing Fed. R. Civ. P. 16(a)(2)).  Baca, Herrera, and Perez also reiterate their request for "recorded and digital material" pertaining to Counts 6 and 7, because "five months have passed since the evidence viewing, at which Mr. Perez and the other Defendants charged in Counts 6 and 7 were denied permission to play [] or view the material on these discs."  Reply at 5.  In addition, Baca, Herrera, and Perez argue that the United States must, under rule 16, provide them and an expert access to the audio and visual recordings.  See Reply at 5.  Baca, Herrera, and Perez also aver that the United States has not provided all known physical evidence related to Counts 6 and 7, and request that the United States must produce any additional evidence immediately.  See Reply at 6.

12.     Next, Baca, Herrera, and Perez argue that they are entitled to the locations where an informant recorded conversations with Perez, because this information is material to the statements' voluntariness, just "as the voluntariness of a defendant's statements is always an issue at trial."  Reply at 6 (citing Dickerson v. United States, 530 U.S. 428, 433 (2000)).  According to Perez, "[i]t makes no difference that Mr. Perez has not explicitly stated . . . that his statements were not voluntary," which Perez will argue in a later motion to suppress.  Reply at 6.  Baca, Herrera, and Perez also argue that the United States produce "*all* transcripts [of recordings by informants] in the United States['] custody . . . , not only the ones the Government deems 'relevant.'"  Reply at 7 (quoting Response at 14)(emphasis in Reply).  Next, Baca, Herrera, and Perez repeat their request that the United States produce all unedited recordings of conversations, the "manner of recording," the "type of device" used to record conversations, and access to the recording devices.  Reply at 8.  According to Baca, Herrera, and Perez, "the Government's desire to safeguard the

original recordings must give way to [their] right to access the content of the original unedited recordings and recording equipment pursuant to Rule 16 and *Brady*." Reply at 8.

13. As to their request for the identity of Cordova's law enforcement handler, Baca, Herrera, and Perez assert that this information is "clearly material," because it "is directly related to the extent of the Government's involvement and use of informants to generate statements," which, they maintain, were involuntary. Reply at 9. Baca, Herrera, and Perez also modify their request for preservation to include "*all* handwritten and typed notes, not only the material the Government deems relevant, of any law enforcement handlers involved in the coercion of Mr. Perez's statement." Reply at 10 (citing United States v. Lujan, 530 F. Supp. at 1267)(emphasis in Reply). As to documentation and correspondence between the FBI and the NM Corrections Department, regarding Cordova's possession of contraband, Baca, Herrera, and Perez maintain that "[t]his information will elucidate the type and source of any recording device or devices Mr. Cordova used to coerce [their] statements as well as demonstrate[e] the extent of the Government's role in obtaining the records." Reply at 10. Furthermore, Baca, Herrera, and Perez argue that Cordova's pen pack and STIU files are "material to a determination of the voluntariness of any recorded statements," and that the pen pack and files may contain Brady material to which they are entitled. Reply at 11. Last, Baca, Herrera, and Perez contend that they are entitled to access Southern New Mexico's wheelchair program, the infirmary, the cell where Perez was housed, and the cell neighboring Perez' cell. See Reply at 11. Baca, Herrera, and Perez maintain that they are "unable to access these facilities without the Government's cooperation, and thus request that "the Court order the Government to facilitate visits" to the specified locations. Reply at 12.

5.      **The Hearing on the Motion to Compel**.

14.      The Court held a hearing on the Motion to Compel on May 9, 2017, see Transcript of Motion Proceedings on May 9, 2017 at 1 (taken May 9, 2017), filed May 23, 2017 (Doc. 1160)("May 9. Tr."), and May 10, 2017, see Transcript of Motion Proceedings on May 10, 2017 at 1 (taken May 10, 2017), filed May 23, 2017 (Doc. 1161)("May 10 Tr.").  Perez argued that the requested materials in his Motion to Compel "pertain directly to the voluntariness of statements that Mr. Perez is alleged to have made," and he stated that he intends to file a motion to suppress involuntary statements.  May 9 Tr. at 7-15 (Fox-Young).  Perez stated that his first request is for "any and all written and/or recorded statements made by Defendants Montoya, Armenta, and T. Martinez."  May 9 Tr. at 203:2-3 (Fox-Young).  Perez noted that, in his Reply, he limited his request to "statements made with respect to the murder of Javier Molina, with respect to Count 6 and 7."  May 9 Tr. at 203:21-24 (Fox-Young).  The Court then asked if any of Perez' co-Defendants wished to speak about the first request, and none of the co-Defendants responded affirmatively.  See May 9 Tr. at 205:15-20 (Court).  The United States responded that any statements that have not been disclosed "are being withheld as Jencks materials," because Montoya, Armenta, and T. Martinez are witnesses in the case.  May 9 Tr. at 206:4-6 (Beck).  The United States also stated that it is reviewing any materials for which Brady and Giglio require disclosure.  See May 9 Tr. at 206:7-10 (Beck).  The United States confirmed that it would provide any Jencks materials two weeks before the trial commences.  See May 9 Tr. at 206:8-10 (Court, Beck).  Perez next argued that he is "entitled to the statements in their entirety," because statements which  Montoya, Armenta, and T. Martinez made before they started cooperating with the United States were "exculpatory" to Perez, and statements the witnesses made after they started cooperating "are either consistent [with the earlier exculpatory statements] or clearly

impeachment," and thus constitute <u>Giglio</u> material.  May 9 Tr. at 209:22-210:5 (Fox-Young).  The United States asserted that <u>Giglio</u> material may be disclosed later than <u>Brady</u> material, May 9 Tr. at 213:6-23 (Beck), and the Court said that it was unsure if courts draw a "distinction between Giglio and Brady for timing purposes," May 9 Tr. at 214:16-17 (Court).  The Court then ruled that the United States must review the requested statements through "the eyes of [Perez'] arguments," and that the United States must produce all <u>Brady</u>, <u>Giglio</u>, and rule 16 material by June 9, 2017, and produce Jencks material fourteen days before trial.  May 9 Tr. at 215:4-9 (Court).

15.     Perez next turned to the request for Montoya's, Armenta's, and T. Martinez' plea addenda, because, Perez argued, "it's pretty clear that the plea addenda for these defendants contain something with regard to the benefits that each [of] these cooperators expect to receive in exchange for subsequent testimony."  May 9 Tr. at 216:3-6 (Fox-Young).  Perez cited the Court's opinion, <u>United States v. Roybal</u>, 46 F. Supp. 1127 (D.N.M. 2014)(Browning, J.), as support, and Perez stated that rule 11(c)(2) of the Federal Rules of Criminal Procedure requires "'parties [to] disclose the plea agreement in open court when the plea is offered, unless the court for good cause allows the parties to disclose the plea agreement in camera.'"   May 9 Tr. at 216:9-15 (Fox-Young)(quoting Fed. R. Crim. P. 11(c)(2)).  According to Perez, the United States has not offered "any basis for good cause to refrain from disclosing the addenda."  May 9 Tr. at 216:20-22 (Fox-Young).  Perez admitted that he does not "know 100 percent" whether any plea addenda exist but noted that the plea agreements reference addenda.  May 9 Tr. at 217:3-8 (Court, Fox-Young).  Perez also argued that the First Amendment provides him a "right to access documents, materials, portions of the case, and portions of documents."  May 9 Tr. at 217:17-19 (Fox-Young)(citing <u>In re Copley Press, Inc.</u>, 518 F.3d 1022, 1028 (9th Cir. 2008); <u>Washington Post v. Robinson</u>, 935 F.2d 282, 292 (D.C. Cir. 1991); <u>United States v. McVeigh</u>, 119 F.3d 806, 815 (10th Cir. 1997)).

The United States conceded that plea addenda may contain Brady or Giglio material, and the Court instructed that the plea addenda may contain "classic impeachment material" which has to "be turned over." May 9 Tr. at 221:5-22 (Court, Beck). Baca requested that the Court's "order encompass all the addenda for the defendants who have pled so far in this case," and the United States did not object. May 9 Tr. at 224:18-25 (Duncan, Court, Beck). The Court then ordered the United States to disclose all plea addenda, sealed or unfiled, pertaining to co-Defendants in United States v. DeLeon, No. CR 15-4268 JB, but not pertaining to co-Defendants in the other SNM cases, unless the plea addenda in the other cases contain Brady, Giglio, or rule 16 material. See May 9 Tr. at 227:23-228:1 (Fox-Young); id. at 231:11-18 (Court); id. at 232:2-7 (Court).

16.     Perez then argued that the United States must disclose 302s and law enforcement notes pertaining to Montoya, Armenta, and T. Martinez. See May 9 Tr. at 234:2-4 (Fox-Young). Perez asserted that statements made before the witnesses began cooperating with the United States are exculpatory to Perez, and that statements made after the witnesses began cooperating "will either be Brady or Giglio." May 9 Tr. at 234:4-8 (Fox-Young). The Court determined that its first ruling -- which requires the United States to produce written and recorded statements by the witnesses if disclosure is required by Brady, Giglio, or the Jencks Act -- also applies to the 302s and law enforcement notes. See May 9 Tr. at 235:19-22 (Court). Perez also argued that any materials not disclosed -- because Brady, Giglio, or the Jencks Act does not require disclosure -- be preserved. See May 9 Tr. at 236:11-16 (Fox-Young). The United States did not object, and the Court ordered the United States to preserve any law enforcement notes that it does not produce. See May 9 Tr. at 236:17-18 (Court).

17.     Perez then turned to the request for production of all materials tagged into evidence and access by an expert, arguing that there is material on several compact discs ("CDs") that he

and his co-Defendants were not permitted to view at an evidence viewing in Las Cruces on December 2, 2016.   See May 9 Tr. at 236:25-237:8 (Fox-Young); id. at 238:5-6 (Fox-Young)("There was no denotation on the CDs as to what digital material they contained."). The United States stated that it believed it had produced the material on the CDs, but that it would confirm and then produce the material if it already had not been produced.   See May 9 Tr. at 238:14-25 (Armijo).  The Court then ordered that the United States provide the Defendants with a written response within ten days whether there are additional materials that have not been produced, and if the material had not been produced, the United States must produce such material within fourteen days.   See May 9 Tr. at 241:2-6 (Court).  The Court further ordered that, if the United States responds that it has already produced the materials, then it must also provide the Bates numbers for the evidence.  See May 9 Tr. at 241:16-23 (Fox-Young, Court, Beck).

18.     Perez next turned to the request for confirmation from the United States that it does not possess any physical evidence that the Defendants have not been permitted to view.  See May 9 Tr. at 246:15-25 (Fox-Young).  The United States said that it was still waiting on confirmation from the NM State Police, and the Court ordered the United States to provide a response to the Defendants within ten days as to the NM State Police's confirmation, and if the Defendants do not receive a response, then "it will be deemed that the Government has represented that all the evidence they have is on the [NM State Police's] inventory list."  May 9 Tr. at 247:22-248:1 (Court).  See id. at 249:20-25 (Court).  Perez also requested that the United States permit the Defendants to handle the physical evidence.  See May 9 Tr. at 250:12-14 (Fox-Young).  The United States responded that Perez and the Defendants had not identified what pieces of evidence they wish to handle and why, and the United States shared its concern that case agents would not be present to supervise the handling of physical evidence.  See May 9 Tr. at 251:11-25 (Armijo).

The Court then granted Perez' request and advised the United States that it "can have somebody there [to supervise the handling of physical evidence], and I'll give that person veto power." May 9 Tr. at 252:1-6 (Court). The Court further ordered that the United States must supply a supervisor who is not a witness in the case or part of the prosecution team. See May 9 Tr. at 252:20-23 (Court).

19. Perez next turned to his request for the recording location of his conversation with confidential informants. See May 9 Tr. at 253:11 (Fox-Young). Perez argued that where the recording occurred is material information, because the jury needs the information to determine whether Perez' statements were voluntary. See May 9 Tr. at 253:25-255:5 (Fox-Young). Perez argued that knowing more about the circumstances surrounding the recording is essential for determining whether the statements are permitted under Arizona v. Fulminante, 499 U.S. 279 (1991). See May 9 Tr. at 255:25-256:25 (Fox-Young). The United States responded that rule 16 does not require producing this information. See May 9 Tr. at 257:12-258:11 (Beck). The Court questioned whether Perez' request would require the United States to "invent a document" and likened the request for production to an interrogatory. May 9 Tr. at 260:1 (Court). See id. at 260:1-5 (Court). After Perez stated that he was "just asking the government to confirm whether or not [he] was in solitary confinement at the time they put an informant next to him," May 9 Tr. at 261:7-9 (Fox-Young), the Court asked the United States why it was redacting recording dates, see May 9 Tr. at 262:11-12 (Court). The United States did not know. See May 9 Tr. at 262:13-17 (Beck). The Court, therefore, ordered the United States to produce the recordings' dates if it knew them, but it otherwise denied the request. See May 9 Tr. at 262:21-263:4 (Court).

20. Perez then turned to his request for transcripts of recorded conversations between Perez and informants. See May 9 Tr. at 264:5-14 (Fox-Young). The United States responded that

it had disclosed eight transcripts on March 10, 2017, but that it would verify that this production had occurred and respond within ten days with any outstanding transcripts. See May 9 Tr. at 264:16-265:4 (Armijo). The Court confirmed that this solution was acceptable to Perez. See May 9 Tr. at 265:5-7 (Court, Fox-Young).

21.     Perez then returned to his request that the Court order the United States to permit his expert to examine the original audio and video recordings, and the recording devices. See May 9 Tr. at 265:9-268:1 (Fox-Young). He argued that such access is "routine" and protects Perez' right to a "fair trial." May 9 Tr. at 242:17-20 (Fox-Young). Further, Perez argued that his forensic expert had concluded that the recorded "segments were not cleanly cut, indicating that there may have been stopping or pausing." May 9 Tr. at 266:9-11 (Fox-Young). Perez said that full recordings may reveal circumstances that suggest his statements were not voluntary. See May 9 Tr. at 267:17-268:1 (Fox-Young). The United States responded that "there is no basis for testing or physically examining" the recordings and recording devices, because the United States will authenticate the recordings when its witnesses testify. May 9 Tr. at 244:17-22 (Beck). The Court opined that Perez' request seems to be "fishing to see if anything turns up," and, therefore, the Court was inclined to deny the request. May 9 Tr. at 245:18-22 (Court). The Court also noted that "we know" that the recordings were not one continuous conversation with Perez and wondered what more Perez could gain by examining the equipment. May 9 Tr. at 270:9 (Court); id. at 269:15-22 (Court).

22.     Baca then spoke on the Motion to Compel. See May 9 Tr. at 271:6 (Duncan). Baca argued that the United States' arguments on Counts 9 and 10 hinge entirely on the recordings, and "it's just unclear if these recordings are accurate." May 9 Tr. at 272:18-19 (Duncan). He argued

that looking at the recording devices was necessary for impeachment at trial.  See May 9 Tr. at 273:3-8 (Duncan).

23.     The United States responded that Baca and Perez' requests "go[] beyond what the rules or any other authority provides the United States must disclose."  May 9 Tr. at 273:15-16 (Beck).  It argued that the requested information was appropriate for cross-examination and argument at trial.  See May 9 Tr. at 273:25-274:7 (Beck).  The Court asked whether the United States could make the representation that "everything that is on the machine is on the CD that's been produced to the defendant," May 9 Tr. at 274:19-20 (Court), and the United States agreed that it could, see May 9 Tr. at 275:1-2 (Beck).

24.     Perez then replied that neither he nor the United States could tell whether all information was downloaded without an expert examining the device and that he wanted to know the extent to which an informant could control the device.  See May 9 Tr. at 275:19-276:14 (Fox-Young).  Finally, Baca argued that, like Perez, he would not be able to tell if all information was downloaded from the recording device without examining it, and that he wanted to determine whether any device had malfunctioned or suffered damage.  See May 9 Tr. at 277:14-279:16 (Duncan).

25.     The United States, after the Court's prodding, then stated that the recording devices had on/off switches and that the United States produced everything that it had received.  See May 9 Tr. at 280:5-12 (Court, Beck).  The Court concluded that it would not order the United States to produce the recording devices.  See May 9 Tr. at 281:6-7 (Court).  It noted that expert forensic testimony on the recordings would give "a pretty good picture of what's going on," without the need for production.  May 9 Tr. at 281:9 (Court).

26.     Perez then discussed his request for the identity of Cordova's law enforcement handler or other agents who dealt with him.  See May 9 Tr. at 281:11-19 (Fox-Young).  Perez argued that, because there were already questions whether Perez' statements are voluntary, he is "entitled to know who was coaching, training, prepping, and directing Mr. Cordova at the time of these recordings."  May 9 Tr. at 282:10-12 (Fox-Young).  The Court asked why Perez cared about who helped prepare Cordova, see May 9 Tr. at 284:16-17 (Court), and Perez responded that "exactly what the government did in handling Mr. Cordova, basically using him as a government agent to extract statements, goes directly to the question of the voluntariness of those statements," May 9 Tr. at 285:22-25 (Fox-Young).  Perez also noted that asking Cordova about his handler on the stand would not help, because it would be too late to subpoena the handler, and investigate his or her practices.  See May 9 Tr. at 287:1-7 (Fox-Young).  The United States responded that Perez was asking for more than to what he is entitled under rule 16.  See May 9 Tr. at 288:1-11 (Beck).  The Court then stated that it would deny the request, because Perez sought evidence that would not be useful or helpful.  See May 9 Tr. at 289:8-15 (Court).

27.     The next day, Perez discussed his request for documentation of communications between law enforcement officers and the NM Corrections Department concerning Cordova's possession of contraband items.  See May 10 Tr. at 6:9-15 (Fox-Young).  Perez argued that this evidence could impeach Cordova and shed light on the voluntariness of Perez' statements  See May 10 Tr. at 6:15-7:10 (Fox-Young).  The Court noted that it had denied a similar request from C. Garcia last week, see May 10 Tr. at 7:11-20 (Court), and Perez reiterated his impeachment arguments, see May 10 Tr. at 8:19-9:3 (Fox-Young).  The United States responded that Cordova's telephone was not contraband, because a warden authorized it, and that the Court's inclination to deny the request is correct.  See May 10 Tr. at 9:7-22 (Beck).  The Court stated that it was "having

a hard time figuring out how" the requested material would be helpful, but that it would order the United States to review the materials for "anything that's helpful to the other side."  May 10 Tr. at 10:1-6 (Court).

28.    Perez next addressed his request for Cordova's pen pack and STIU file.  See May 10 Tr. at 10:13-21 (Fox-Young).  The United States quickly agreed that it would produce these items within fourteen days.  See May 10 Tr. at 11:9-12:8 (Court, Beck, Fox-Young).  Perez then notified the Court that the parties had come to an agreement regarding access to prison facilities. See May 10 Tr. at 12:9-14 (Fox Young); Motion to Compel at 22.

29.    Finally, Herrera noted that he had not received transcripts from the United States of Cordova's conversations with Herrera.  See May 10 Tr. at 14:5-11 (Davis).  The United States responded that it did not object to producing whatever transcripts it had.  See May 10 Tr. at 14:15-20 (Beck).  The United States also agreed to direct Herrera to part of an audio recording that it, at an earlier hearing, had characterized as Herrera's confession to involvement in Molina's murder.  See May 10 Tr. at 16:3-6 (Beck).

### 6.    The Hearing on November 27, 2017.

30.    The Court held a hearing on November 27, 2017.  See Transcript of Motions and James Hearing Proceedings on November 27, 2017, filed December 6, 2017 (Doc. 1545)("Nov. 27 Tr.").  Sanchez informed the Court that he had met with a law enforcement expert and that he now needs to know "which cooperators had what devices."   Nov. 27 Tr. at 134:15 (Jacks).  Baca stated that there have been numerous requests to compel the United States to produce recording devices, and he reminded the Court that it has considered allowing "a single defense counsel or a defense expert" to access the recording devices.  Nov. 27 Tr. at 136:25-137:1 (Lowry).  Baca then

asked the Court if it would allow two experts to access the recording devices, "because time is of the essence."  Nov. 27 Tr. at 137:8 (Lowry).

31.     The United States said that it had communicated with one of the Defendants' attorneys and one expert "to allow them to inspect devices, as long as that's okay with the FBI." Nov. 27 Tr. at 140:5-7 (Beck).  The Court asked whether the FBI had indicated its position on producing the recording devices and cellphones given to informants, and the United States responded that the FBI had not provided clear guidance.  See Nov. 27 Tr. at 140:8-21 (Court, Beck).  The Court asked whether it would "move things forward" if the Court ordered production "with the understanding the Government could come back and ask me to reconsider before anything is done."  Nov. 27 Tr. at 140:24-141:2 (Court).  The United States responded that it thought "that would move it forward."  Nov. 27 Tr. at 141:5-6 (Beck).  The Court then ordered the United States to produce the cellphones, but stated that, if the FBI is "uncomfortable with [production], they can explain" their position to the Court.  Nov. 27 Tr. at 141:13-14 (Court).  The Court reasoned that production is appropriate, because the trial is approaching and it "think[s] the FBI has trusted [the cellphones] with some people that the Court would feel less comfortable with them having it than Ms. Jacks and their expert."  Nov. 27 Tr. at 141:19-22 (Court).  Baca asked whether the Court would order production of the recording devices as well, or whether the Defendants must "pick one" -- the cellphones or the recording devices.  Nov. 27 Tr. at 142:10 (Lowry).  The Court instructed the Defendants to choose one, because the FBI would more likely cooperate if the Court ordered production of only one.  See Nov. 27 Tr. at 142:11-14 (Court).

7.     **The Motion in Limine.**

32.     On December 1, 2017, the United States filed the Motion in Limine, asking the Court to

> preclude the defense from cross-examining or in any other manner soliciting testimony in the presence of the jury the following information: (1) technical specifications of the audio recording devices, to include methods of installation, concealment and location of devices; and (2) training of government witnesses that would reveal sensitive government programs or sources and methods.

Motion in Limine at 1.  The United States argues that the Defendants seek information pertaining to law enforcement procedures and that the law enforcement sensitive qualified evidentiary privilege protects the United States from producing such information.  See Motion in Limine at 8. The United States avers that the recordings exist and that the recordings are admissible once they are authenticated.  See Motion in Limine at 8.  The United States identifies the primary issue as "what weight the jury should give to the evidence."  Motion in Limine at 9.  The United States argues that the recording devices' "technical specifications," the recording devices' "precise concealments or locations," and the "sensitive training" given to informants are "not probative of the weight that the jury should give to recordings."  Motion in Limine at 9.  The United States concedes, however, that "it is probative of the weight the jury should give to the recordings to ask the CHS-witness [or, confidential human source] whether the CHS had the ability to turn on and off the audio recording devices."  Motion in Limine at 9.  According to the United States, information about the "specifications of, concealment of, or [CHS's] training on how to operate" the recording devices is "irrelevant."  Motion in Limine at 9.

33.     The United States contends that eliciting information about the recording devices' specifications and the FBI's training procedures would "compromise[] the sources and methods used and the future deployment of these investigative tools."  Motion in Limine at 10.  The United States asserts that the "public's knowledge of such tradecraft and personnel could enable individuals to employ measures to evade such law enforcement actions."  Motion in Limine at 10. The United States argues that

> FBI policy dictates that the devices themselves are not to be compromised through
> court proceedings. The probative value of any evidence elicited by the defense
> concerning technical specifications of audio recording devices, specific training of
> government witnesses on sources and methods, tradecraft of entering and exiting
> defendant's residences during physical searches or installation of audio devices,
> and the identity and role of other non-testifying witnesses during collection
> activities, in light of the security interests in this case, is substantially outweighed
> by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue
> delay, and wasting time.

Motion in Limine at 11. Finally, the United States contends that, if any Defendants argue in other

motions that evidence was "obtained illegally," the Court will resolve those arguments when it

decides those motions. Motion in Limine at 11.

### 8.   **The Motion to Reconsider**.

34.     On December 6, 2017, the United States filed the Motion to Reconsider, asking the

Court to reconsider the oral order on November 27, 2017, allowing Sanchez to inspect one of the

United States' electronic surveillance ("ELSUR") recording devices. Motion to Reconsider at 1.

The United States noted that the Court orally had ordered limited production of recording devices

for Sanchez at the November 27, 2017, hearing. See Motion to Reconsider at 1 (citing Nov. 27

Tr. at 141:8-14 (Court)). The United States argues that it "did not properly assert the

law-enforcement-sensitive qualified evidentiary privilege" at the November 27, 2017, hearing.

Motion to Reconsider at 1. The United States now argues that, at the November 27, 2017, hearing,

it "failed to develop the record in a manner sufficient for the Court to make an informed decision

as to the basis of [its] order." Motion to Reconsider at 18. According to the United States,

> [t]he record was not clear that the CHS using the ELSUR recording device could
> turn "OFF" or "ON" the recording mechanism on the device only. The record was
> not clear whether some data (or metadata) may remain on the ELSUR recording
> device after that data was downloaded to the evidentiary DVDs and the ELSUR
> recording device's computer was erased. The record was not clear even whether
> the evidentiary DVDs produced to Defendants contained all of the data (and
> metadata) that was contained on the ELSUR devices. Because of these deficiencies
> in the record, the Court could not reach the conclusion that allowing Defendants

access to the ELSUR devices or a similar-type device would not produce nothing of any probative value in addition to what Defendants already have.

Motion to Reconsider at 18-19.

35.     The United States admits that Sanchez is entitled to the recording devices' metadata, because Sanchez has sufficiently shown that the metadata is material to preparing his defense under rule 16 of the Federal Rules of Criminal Procedure.  See Motion to Reconsider at 19-20 (citing Defendant Daniel Sanchez's Motion to Compel Specific Discovery at 13, filed September 15, 2017 (Doc. 1253)).  The United States argues, however, that it already disclosed the recording devices' metadata in June, 2017, but that "the United States failed to make a clear record that the evidentiary DVDs provided to the Defendants, which include the metadata, contain all of the helpful information that Sanchez requested" at the November 27, 2017, hearing.  Motion to Reconsider at 20.  The United States asserts that production of the recording devices is not necessary, because Sanchez "has access to all of the metadata that was contained on the devices." Motion to Reconsider at 20.  The United States adds that,

> given the nature of the multi-layer protection system ADS created for its body recorders, including the ELSUR procedure through which the devices are downloaded, an evidentiary DVD such as those produced to Defendants cannot exist unless it contains every single piece of data (and metadata) that was on the ELSUR device when downloaded -- in exactly the same form in which that data was generated when it was generated.  Just as the ADS software generates an error message when it attempts to play a recording session for which the hash values do not align under its algorithm, the ADS download system through the standalone computer will not complete the download unless all of the data (and metadata) is downloaded completely to the evidentiary DVD. . . .  [T]he DVDs in Defendants' possession contain everything that was ever created on the ELSUR recording devices from when they were deployed with the CHSs to when they were given to the ELSUR Operations Technician to download onto the evidentiary DVDs.

Motion to Reconsider at 21.  The United States notes, however, that three of the evidentiary DVDs' software indicates that the recording time lengths are inaccurate, but the United States confirms that the metadata accurately reflects the time lengths.  See Motion to Reconsider at 22.  The United

States argues that it has produced all of the evidence "that may be material in preparing the Defendants' defense," and that it has "complied with its Rule 16, . . . *Brady* and *Giglio*[] obligations."  Motion to Reconsider at 22.

36.     The United States contends that the Defendants have or will have all of the information that they seek by the end of the hearing.  See Motion to Reconsider at 23.  First, the United States argues that, although it did not have an answer at the November 27, 2017, hearing to explain the presence of "gaps of time between recording sessions," it now clarifies that "there are no gaps."  Motion to Reconsider at 23.  The United States maintains that "what Defendants refer to as 'gaps' between the recording sessions aren't gaps, but are due either to the CHS/user turning 'OFF' and back 'ON' the recording device, or because of operations internal to the . . . recording device."  Motion to Reconsider at 23.  The United States also asks the Court to "allow the United States to present testimony from FBI Operational Technology Division Supervisory Special Agent Hugh S. Williamson, Program Manager for the FBI Body Recorder Program," Motion to Reconsider at 2, whose testimony will help answer the Defendants' questions about the apparent "gaps,"  Motion to Reconsider at 23.  Moreover, the United States asserts that "no data (or metadata) exists on the ELSUR recording devices once the devices are downloaded by the ELSUR Operations Technician to the evidentiary optical drive or disc (and then wiped clean)," so the recording devices will not provide any metadata.  Motion to Reconsider at 24.  According to the United States, no one except for the recording device manufacturer can examine any data that may remain on the recording devices.  See Motion to Reconsider at 25.  The United States argues that, after the Defendants hear from Williamson, they "will have all of the information probative to preparing their defense."  Motion to Reconsider at 25.  Furthermore, the United States argues that the Defendants have not overcome the United States' law-enforcement-sensitive qualified

evidentiary privilege.  See Motion to Reconsider at 26 (citing In re City of New York, 607 F.3d 923, 948 (2d Cir. 2010)).

37.     Next, the United States argues that, because the Defendants have not made the necessary showing to overcome the United States' law-enforcement-sensitive qualified evidentiary privilege, the Court should reconsider its limited order of production and not require production.  See Motion to Reconsider at 26-27.  The United States recites a three-prong test -- which the United States Court of Appeals for the Second Circuit promulgated -- which a defendant must satisfy to overcome the United States' law-enforcement-sensitive qualified evidentiary privilege.  See Motion to Reconsider at 26 (citing In re City of New York, 607 F.3d at 948).  According to the United States,

> to rebut the presumption against lifting the privilege, the party seeking disclosure must show: (1) the request is "non-frivolous and brought in good faith"; (2) "the information sought is not available through other discovery or from other sources"; and (3) there is a "compelling need" for the information relevant to the party's case.

Motion to Reconsider at 26 (quoting  In re City of New York, 607 F.3d at 948 (citation omitted in In re City of New York)).

38.     The United States also asserts that the Defendants' argument that it is inconsistent or illogical for the United States to oppose producing the recording devices for a forensic expert to examine when the United States has provided the recording devices to CHSs "does not find support in the law or the facts."  Motion to Reconsider at 27.  The United States argues that it may decide how it conducts its investigations.  See Motion to Reconsider at 27.  The United States also argues that ordering production of the recording devices "would set a poor and dangerous precedent for future production, completely destroying the utility of this cover recording device and means in any future investigations."  Motion to Reconsider at 27.  According to the United States, ordering production of the recording devices "unnecessarily compromises the sources and

methods used and the future deployment of these investigative tools." Motion to Reconsider at 30. For example, the United States suggests that allowing a forensic expert to investigate the recording devices, which use a proprietary software, could "lead to disclosure of sensitive law enforcement programs or even classified materials." Motion to Reconsider at 30. The United States argues that, even if the Defendants satisfy the first two prongs of the three-prong test to overcome the United States' law-enforcement-sensitive qualified evidentiary privilege, "the public interest in nondisclosure significantly outweighs defendant's need for the information." Motion to Reconsider at 31 (citing In re City of New York, 607 F.3d at 945).

### 9.     The Hearing on the Motion to Reconsider.

39.     The Court held a hearing on the Motion to Reconsider on December 11, 2017. See Dec. 11 Tr. at 1. The Court first noted that it was "surprised by the quality, amount of material that was put into the motion. I don't know if this is something that is stock around the country, this is an issue, or what. But it did seem to me the Government was working pretty hard to protect these devices." Dec. 11 Tr. at 3:25-4:5 (Court). The Court asked its two questions after reading the Motion to Reconsider: (i) what is the United States trying to keep secret, if they have disclosed all of the metadata on the recording devices?; and (ii) if the Defendants have so much information, what do they need from the recording devices that they do not already have? See Dec. 11 Tr. at 4:6-17 (Court). The Court opined that, if production of the recording devices "really does implicate national security, I think it's in all of [our] interest to be careful about forcing the disclosure of this." Dec. 11 Tr. at 5:23-5:1 (Court).

40.     The United States argued that its interest in not producing the recording devices is to protect its method for secreting the devices into prisons, and to prevent disclosure of the devices' dimensions and appearance. See Dec. 11 Tr. at 5:12-18 (Beck). The United States asserted that

the recording devices use a "proprietary software" that only the manufacturer possesses.  Dec. 11 Tr. at 6:23-7:2 (Beck).  The United States said that the FBI Operational Technology Division is not aware of a court ever ordering disclosure of the recording devices, but that it could not say for sure.  See Dec. 11 Tr. at 7:17-24 (Beck).  The United States confirmed that Matthew Beck wrote the Motion to Reconsider, and that he "provided it to the attorneys in Washington so that they could make sure that this was publicly available information and okay for public filing."  Dec. 11 Tr. at 8:15-18 (Beck).

41.    The Court then summoned Williamson to the witness stand.  See Dec. 11 Tr. at 9:13-16 (Court).  Williamson stated that he is the "Supervisory Special Agent at the FBI, assigned to the Operational Technology Division."  Dec. 11 Tr. at 10:5-6 (Williamson).  He said that his job title is "Program Manager for the FBI's Covert Body Recorder Program."  Dec. 11 Tr. at 10:10-11 (Williamson).  Williamson testified that he "provided the makes and models" of the recording devices used in the case.  Dec. 11 Tr. at 12:5 (Williamson).  Williamson stated that Adaptive Digital Systems ("ADS") manufactured the recording devices and that the recording device models used in the case are called "HAWK8," "RAVEN2A," and that he believes that the "EAGLE" was used as well.  Dec. 11 Tr. at 12:8-13 (Williamson, Beck).  Williamson testified that ADS manufactures recording devices for the FBI that use a "proprietary software."  Dec. 11 Tr. at 12:22 (Williamson).  Williamson stated that the FBI does not have access to the ADS recording devices' "source code."  Dec. 11 Tr. at 13:19 (Williamson).  According to Williamson, users of the recording device "can only turn it on and turn it off," and cannot "record over what's on the device" or "rewind" the device.  Dec. 11 Tr. at 14:3-7 (Williamson, Beck).  Williamson testified that, "[w]hen the recorder runs out of power, the program on the recorder is designed to indicate that it occurred, and it will gave [sic] you a flag."  Dec. 11 Tr. at 15:10-12 (Williamson).

Williamson verified that the recording device will create a new "session" for fitting its data on an evidentiary disc whenever the user turns the device on and then off, if the device needs to "split[] the file because of its size," or when the device runs out of power.  Dec. 11 Tr. at 16:1-20 (Williamson, Beck).

42.     Williamson testified that the recording devices' data is downloaded using a "proprietary software" called "USBird software."  Dec. 11 Tr. at 16:24 (Williamson).  Williamson testified that, in Albuquerque, New Mexico, "all ELSUR [data] is downloaded by ELSUR operations technicians" who work for the FBI.  Dec. 11 Tr. at 17:13-14 (Williamson).  According to Williamson, when the USBird software downloads the recording devices' data, "it takes all of the recorded sessions, all the sessions that are collected, and takes the metadata on the recorder," and downloads it to an evidentiary disc.  Dec. 11 Tr. at 17:21-24 (Williamson).  Williamson stated that the evidentiary disc "cannot be manipulated" and that, after downloading a recording device's data, "you have to erase the recorder if you want to use it again."   Dec. 11 Tr. at 19:12-13 (Williamson).  Williamson confirmed that evidentiary discs are "stored in an ELSUR operations storage room," but the data on the discs is sometimes copied and uploaded to FBI "databases."  Dec. 11 Tr. at 19:24-20:8 (Williamson, Beck).   The United States then asked Williamson to demonstrate on a courtroom computer how he "ensure[d] that what was downloaded from [a recording] device is the same as what appears on the evidentiary disc, which the defendants have."  Dec. 11 Tr. at 21:17-19 (Beck).  Williamson narrated the process, and he stated that a file called the "RCD file" "contains the metadata," which is inaccessible to the FBI.  Dec. 11 Tr. at 23:4-5 (Williamson).  Williamson testified that, moreover, before a person downloads the data files on the recording devices to an  evidentiary disc, the files "only can be seen using [ADS's] proprietary software, and [the FBI does not] have the source code for that."   Dec. 11  Tr. at 24:7-9

(Williamson).  Williamson then demonstrated how he can verify, using a third-party software, that the data downloaded to an evidentiary disc is "identical" to the data existing on a recording device. Dec. 11 Tr. at 27:22 (Williamson).

     43.     Williamson showed how to check the date and time that a recording occurred.  <u>See</u> Dec. 11 Tr. at 30:25-31:11 (Williamson).  Williamson stated that, when he views the data from a recording device on a computer using a third-party software, "flags" indicate when the file for a recording session is split "due to size limits" or when the recording device's battery dies.  Dec. 11 Tr. at 32:22-25 (Williamson).  Williamson then explained how he verified that the data on the recording device "matches up" with the data on an evidentiary disc.

> The data on the device, during recording, it creates a cyclic redundancy check, which is basically a long division problem against every certain block of information.  And it records that with the original evidence, and it allows you to go back and see if the solution comes out, if it's been changed or not.  If it's been changed, you'll have a failure, you won't have the same solution.  And it's built into this computer, it's built into every computer; pretty much every computer uses something like [] this to make sure that data is not corrupted.  In this case, what's on the ADS recorder, a cyclic redundancy check was created, and that was provided with the evidence.  And the player looks at that.  And if it doesn't solve correctly, it will give you a "check some error."

Dec. 11 Tr. at 34:18-35:9 (Williamson).  According to Williamson, if the data on the evidentiary disc does not match the data on a recording device, there would be an error message, and a person could not listen to the recording.  <u>See</u> Dec. 11 Tr. at 35:10-19 (Beck, Williamson).  Williamson admitted that the dates and times at which recordings occur may be inaccurate, because the dates and times may be set to a different time zone than the time zone where a person uses the recording device.  <u>See</u> Dec. 11 Tr. at 36:10-24 (Williamson, Beck).

     44.     Next, Sanchez cross-examined Williamson.  <u>See</u> Dec. 11 Tr. at 41:10-12 (Jacks). Williamson testified that part of his job is to "make sure" that recording devices "work," and that "they actually make a recording and they actually function the way they're supposed to."  Dec. 11

Tr. at 42:14-16 (Williamson).   Williamson admitted that he does not know if the FBI's Albuquerque office calibrated the recording devices "with the proper date and time" before deploying the recording devices in the case.  Dec. 11 Tr. at 43:8-14 (Williamson).   Williamson testified that the FBI does not provide training to individuals who are "going to use [a recording device] in the field."  Dec. 11 Tr. at 48:6-9 (Jacks, Williamson).  Williamson confirmed that, when a recording session file reaches a certain size, the recording device "will create a new session." Dec. 11 Tr. at 49:8 (Williamson).  Williamson testified that, although different recording devices may have different capacities for storing data, a recording device will create new sessions that are the same data size for that recording device.  See Dec. 11 Tr. at 50:13-51:17 (Jacks, Williamson). Sanchez inquired about a recording for which the date is December 30, 1899, and Williamson responded that the date is "obviously" wrong and attributed the error to the recording device's clock battery dying.   Dec. 11  Tr.  at 55:20-56:3  (Jacks, Williamson).   Sanchez questioned Williamson about an evidentiary disc, labeled 1D56, that had malfunctioned, and Williamson testified that the evidentiary disc was sent to the vendor for inspection, which responded that there was no way to determine the date and time of the recordings on the evidentiary disc.  See Dec. 11 Tr. at 56:7-59:1 (Jacks, Williamson).  Williamson confirmed, however, that the vendor said that the  evidentiary  disc  contained  "authentic  recording[s]."    Dec. 11  Tr.  at 58:24  (Williamson). Williamson testified that no other recording devices or evidentiary discs were sent back to the vendor because of malfunctioning.  See Dec. 11 Tr. at 59:6-12 (Jacks, Williamson).

45.    C. Garcia cross-examined Williamson next.  See Dec. 11 Tr. at 60:1-3 (Sirignano). Williamson stated that he had communicated by telephone and email with Assistant United States Attorney Matthew Beck before testifying.  See Dec. 11 Tr. at 60:7-20 (Sirignano, Williamson). Williamson testified that he had read the Motion to Reconsider and notified the United States of

errors, such as the "wrong name or wrong model number of the recorder." Dec. 11 Tr. at 61:11-12

(Williamson). Williamson stated that he did not view any of the recording devices before his

testimony. See Dec. 11 Tr. at 1-11 (Williamson, Sirignano). Williamson said that his "point of

contact" for the FBI's Albuquerque office is "a technically trained agent, Special Agent Hugo

Nanez." Dec. 11 Tr. at 64:18-24 (Sirignano, Williamson). Williamson stated that ELSUR

operations technicians assigned to the FBI's Albuquerque office are responsible for receiving

evidence and entering it into evidentiary storage. See Dec. 11 Tr. at 66:11-14 (Williamson).

Williamson testified that the chief of the ELSUR Program Management Unit is Kristen Moxley.

See Dec. 11 Tr. at 67:24-68:2 (Williamson, Sirignano).

46.     C. Garcia entered his Exhibit B -- a recording device user manual -- into evidence.

See Dec. 11 Tr. at 74:19-24 (Sirignano, Court, Beck); Exhibit and Witness List at 1, filed

December 11, 2017 (Doc. 2492-1). When C. Garcia asked Williamson how the HAWK recording

device depicted in the user manual is different from the recording devices that the FBI used in the

case, the United States objected. See Dec. 11 Tr. at 75:1-16 (Sirignano, Court, Beck). The United

States objected that it had already provided the information that C. Garcia sought and that

C. Garcia's questioning was "treading upon law enforcement sensitive information." Dec. 11 Tr.

at 76:25 (Beck). The Court sustained the United States' objection and instructed C. Garcia that he

can "make an argument for" the information he sought "when we get to the argument side" of the

hearing. Dec. 11 Tr. at 77:4-6 (Court). C. Garcia then admitted his Exhibit A -- screen shots of

evidentiary discs -- into evidence. See Dec. 11 Tr. at 81:19-82:1 (Sirignano, Court, Beck); Exhibit

and Witness List at 1. Williamson testified that the FBI treats the evidentiary discs as "original

evidence" and stored in the ELSUR storage room. See Dec. 11 Tr. at 82:16-20 (Williamson,

Sirignano). Williamson confirmed that he does not know if any technically trained agents checked

any of the recording devices used in the case.  See Dec. 11 Tr. at 83:21-25 (Sirignano, Williamson).

Williamson testified that agents are trained to check the recording devices before deploying them

in the field.  See Dec. 11 Tr. at 84:23-25 (Williamson).  Williamson said that he maintains a log

for devices and predicted that the FBI's Albuquerque office also keeps a log.  See Dec. 11 Tr.

at 86:3-11 (Sirignano, Williamson).  Williamson testified that he does not believe every FBI

division has a record of recording device malfunctions.  See Dec. 11 Tr. at 87:12-15 (Sirignano,

Williamson).   Williamson testified that, for one recording device that had malfunctioned, the

FBI's Los Angeles division sent a copy of an evidentiary disc to ADS "to see if they could find

any more data that we couldn't see."  Dec. 11 Tr. at 88:19-20 (Williamson).  Williamson explained

that the Los Angeles division did not send the actual recording device, because after creating the

evidentiary disc, the data on the recording device was deleted.  See Dec. 11 Tr. at 91:12-18

(Williamson).

47.    Williamson next testified that agents fill out a consent form when they provide a

recording device to a cooperator.  See Dec. 11 Tr. at 92:9-21 (Sirignano, Williamson).  According

to Williamson, "[y]ou need to have consent in most cases to do a covert recording.  So you have

to get consent of the person who is carrying the recorder."  Dec. 11 Tr. at 94:10-12 (Williamson).

Williamson stated that agents instruct operators how to use the recording devices.  See Dec. 11 Tr.

at 95:8-9 (Williamson).  When C. Garcia asked Williamson what kind of instructions are given to

cooperators in a correctional facility, the United States objected, arguing that "we're getting pretty

far afield of Agent Williamson's role in this case and expertise."  Dec. 11 Tr. at 96:1-4 (Beck).

The Court sustained the United States' objection.  See Dec. 11 Tr. at 96:5-6 (Court).  Williamson

testified that, because there are no written instructions for how agents are supposed to instruct

cooperators using the recording devices, agents must use their "ingenuity and determine a way to do it." Dec. 11 Tr. at 96:25-97:1 (Williamson).

48.     Next, Baca cross-examined Williamson.   See Dec. 11 Tr. at 97:11-13 (Lowry). Williamson reiterated that the "original evidence is the first download from the device when it's transferred to an evidentiary disc." Dec. 11 Tr. at 98:6 (Williamson).  Williamson confirmed that the FBI is "taking ADS at its word" that the data on an evidentiary disc is a "mirror copy of what was originally on the device." Dec. 11 Tr. at 98:22-25 (Lowry, Williamson).  Williamson testified that he is unsure whether a third party ever validated ADS's proprietary software.  See Dec. 11 Tr. at 99:25-100:2 (Lowry, Williamson).  Williamson testified that, after making copies of evidentiary discs, he and other agents are still able to confirm that the copies are identical to the original evidentiary disc stored in the ELSUR storage room.  See Dec. 11 Tr. at 101:22-102:13 (Lowry, Williamson).  Williamson stated that the recording devices have a light that flashes when the recording device is on and that users are instructed how to look for the flashing light.  See Dec. 11 Tr. at 103:18-25 (Williamson, Lowry).  Williamson said that, when a user presses the button that turns on the recording device, recording begins "practically instantaneously." Dec. 11 Tr. at 104:8 (Williamson).  Williamson then inspected a data file from a RAVEN2A device, and he stated that the recordings in the file add up to over fifty-three minutes of recording.  See Dec. 11 Tr. at 105:25 (Williamson).  Baca asked Williamson why the person who operated the recording device told the FBI that he recorded over five hours of audio when the file is less than fifty-five minutes long, and Williamson responded that he was unsure but opined that perhaps the user turned off the recording device by mistake.  See Dec. 11 Tr. at 106:6-14 (Lowry, Williamson).

49.     Baca asked Williamson if the recording devices have a data storage limit for each session, and Williamson responded that the limit varies from recorder to recorder.  See Dec. 11 Tr.

at 108:18-24 (Lowry, Williamson).  Baca also asked why the data file indicates that the recording device transitioned to a new session after less than five minutes in one instance and after two hours in another instance.  See Dec. 11 Tr. at 109:3-6 (Lowry).  Williamson explained that the transitions between sessions is "based on data," and not on the length of the recording itself.  See Dec. 11 Tr. at 109:7-10 (Williamson).  Williamson stated:

> You could have a recorder going on for an hour, and it be quiet, and there is very little data hitting the microphone transducers, so there is very little data being compiled on the recorder.  Or you can be in a noisy environment, having a lot of data hitting the microphone and recording a lot of data.

Dec. 11 Tr. at 109:12-17 (Williamson).  Baca also asked Williamson about a recording data file that had a red flag on one line of the file, indicating that the battery was low, but no red flags on the file's the subsequent lines.  See Dec. 11 Tr. at 110:7-20 (Lowry, Williamson).  Williamson responded that the batteries were likely replaced, because the recording device was a RAVEN2A model, which is battery-powered.  See Dec. 11 Tr. at 110:18-20 (Williamson).  Williamson also testified that he cannot determine when a session ends on its own and when a session ends because the user turns off the recording device.  See Dec. 11 Tr. at 111:24-112:3 (Lowry, Williamson).  Williamson then stepped down from the witness stand, and the Court excused him from the proceedings.  See Dec. 11 Tr. at 112:12-20 (Court, Beck, Sirignano).

      50.    The United States then argued in support of the Motion to Reconsider.  See Dec. 11 Tr. at 113:6 (Beck).  The United States argued that the Defendants have all of the information to which rule 16, Brady, and Giglio entitle them, except for the recording devices' dimensions and the ability to inspect the recording devices.  See Dec. 11 Tr. at 113:6-13 (Beck).  The United States asserted that the recording devices do not contain any "trace metadata."  Dec. 11 Tr. at 114:9 (Beck).  The United States argued that it should not have to produce the recording devices, because "[t]here is a procedure in place . . . that makes sure that what was on [the recording devices] is

authentically reproduced and not modified in any way."  Dec. 11 Tr. at 115:8-11 (Beck).  The

United States maintained that the recordings on the evidentiary discs are "self-authenticating"

under rule 902(14) of the Federal Rules of Evidence, and that an expert would "write[] out in a

certificate all of the things by affidavit that he did to certify this."  Dec. 11 Tr. at 115:25-116:3

(Beck).  According to the United States, if the evidentiary discs were ever modified, the "hash

values" in the data files of the evidentiary discs would not match with the "hash values" of copies

of the evidentiary discs, and "that's how [the United States] can authenticate digital evidence in

court."  Dec. 11 Tr. at 117:6-7 (Beck).  As for the three evidentiary discs containing data from the

recording devices that malfunctioned, the United States argued that "nothing would be gained"

from production of the recording devices, because the recording devices do not contain any

metadata.  Dec. 11 Tr. at 118:14 (Beck).  According to the United States, under the caselaw, "the

defendants cannot establish [that] they have a compelling need for the devices or for access to the

devices, because nothing would be gained from accessing the devices."  Dec. 11 Tr. at 19:11-15

(Beck).

51.    Next, Baca argued that the "real issue[], for Defendant Baca, is how easy was it for

Mr. Duran to manipulate this device?"  Dec. 11 Tr. at 120:9-10 (Lowry).  Baca noted the

discrepancy between witness Eric Duran telling Agent Bryan Acee that he recorded five to six

hours on the recording device, while the evidentiary disc for his recording device contains less

than fifty-five minutes of recorded material.  See Dec. 11 Tr. at 120:11-18 (Lowry).  Baca stated

that he wants to inspect the device to determine how easy it is to turn the device on or off

inadvertently, and that he is less interested in the metadata.  See Dec. 11 Tr. at 120:18-25 (Lowry).

Baca stated that he found it "disconcerting" that Williamson did not know how to tell whether a

recording device was turned off intentionally or accidentally based on the recording device's data

file, and he argued that he "need[s] to explore" this issue by examining the recording devices.

Dec. 11 Tr. at 121:17-20 (Lowry).  Baca also stated that he was concerned that the "proprietary

software has never been vetted or validated by an independent agency."  Dec. 11 Tr. at 122:16-17

(Lowry).  Baca then summarized that his

> primary concern is really about the mechanics of this device: How does it cut on?
> How does it cut off?  And is it accidental or not?  And I think that's a critical part
> of the case.  And I think that's something we don't get from looking at the metadata,
> and unfortunately, it not even something we get from looking at a picture of a
> device.  You'd actually have to handle it to understand how the buttons function and
> how it cuts on and off, and whether it can be accidentally turned on and accidentally
> turned off, or whether it's damn near impossible.

Dec. 11 Tr. at 123:12-23 (Lowry).

52.     Baca added that his need to inspect the recording devices is "compelling," and he

noted that the United States Court of Appeals for the Seventh Circuit affirmed a district court's

decision that "ordered the FBI to disclose a HAWK device not once, but twice to two different

experts for forensic review."  Dec. 11 Tr. at 124:13-16 (Lowry)(citing United States v. Chapman,

804 F.3d 895 (7th Cir. 2015)).  Baca stated that, in United States v. Chapman, the "compelling

need" was that the defendants believed that a recording had been "tampered with," and thus they

needed to inspect the recording device.  Dec. 11 Tr. at 124:24-125:3 (Court, Lowry).  Baca further

argued that he finds it "odd" that the United States argues that producing the recording devices

would pose a "security risk to the United States when you have somebody who . . . is a fugitive

from justice, who knows everything about this device."  Dec. 11 Tr. at 2-8 (Lowry).  Baca

confirmed that he primarily wants to know how easy it is to press the button on the recording

devices and start recording, and how the flashing lights on the recording devices operate "in

tandem with the buttons."  Dec. 11 Tr. at 128:4-5 (Lowry).  Baca also pointed out for the record

that Duran had three devices -- "a RAVEN device, a HAWK device, and an EAGLE device."

Dec. 11 Tr. at 128:14-15 (Lowry).  The Court opined that Baca's request looks like "fishing for evidence," because he was able to ask Williamson about turning the recording devices on and off, and about how the lights on the recording devices operate.  Dec. 11 Tr. at 130:3-12 (Court, Lowry). Baca emphasized that his request is "not a fishing expedition" and that the evidence indicates that some recording devices did not work as intended.  Dec. 11 Tr. at 131:12 (Lowry).

53.     C. Garcia next stated that he tried to question Williamson about problematic metadata for one of the recording device's data files, but that he was "shut down because of some alleged national security or proprietary argument privilege."  Dec. 11 Tr. at 132:13-15 (Sirignano). C. Garcia contended that the United States' national security argument "fails terribly," because most of the information regarding the recording devices is on the internet.  Dec. 11 Tr. at 132:21 (Sirignano).  C. Garcia argued that the date and time irregularities for some of the recording devices amount to a "compelling need" for the recording devices' production.   Dec. 11 Tr. at 133:7 (Sirignano).  C. Garcia also argued that the "original recording on the device itself should have been sent to Los Angeles, and not a copy.  That's not the best evidence.  The best evidence is not a duplicate." Dec. 11 Tr. at 134:3-6 (Sirignano).  C. Garcia contended that, without inspecting the recording devices, "it's impossible to make sure that the integrity of the data exists, or still exists." Dec. 11 Tr. at 135:1-3 (Sirignano).  C. Garcia added that the recordings which he has received are "copies of copies," and that he would like to look at the original copy of the recordings "to see if there [are] any anomalies or any manipulation."  Dec. 11 Tr. at 136:24-25 (Sirignano).  The Court asked if the metadata issue is limited to accessing the original copies, and not the recording devices, and C. Garcia responded affirmatively, except for evidentiary disc twenty, which does not contain metadata because the device's battery died.  See Dec. 11 Tr. at 137:10-15 (Court, Sirignano).  The Court then confirmed that Baca and C. Garcia want to inspect the recording devices' on/off switch

and lights, and want to view the original evidentiary discs to see if they match the copies they had received.  See Dec. 11 Tr. at 17:20-24 (Court).

54.     Sanchez admitted that the United States had answered most of the Defendants' questions, but he argued that "what we're hearing is that there were various errors, some mechanical and some human caused, that produced this confusing data set that we've been trying to make sense of."  Dec. 11 Tr. at 140:2-5 (Jacks).  Sanchez also admitted that there is little that the Defendants "can gain by looking at the actual ELSUR devices, looking at the metadata on the ELSUR devices," because the devices were "simply wiped clean."  Dec. 11 Tr. at 140:11-14 (Jacks).  Sanchez joined Baca's request to examine the recording devices.  See Dec. 11 Tr. at 140:22 (Jacks).  Sanchez requested that the Defendants have "an opportunity to examine a prototype of each one of the type[s] of electronic surveillance devices" -- HAWK8A, RAVEN2A, and EAGLE8C.  Dec. 11 Tr. at 141:19-22 (Jacks).  Sanchez confirmed that he is not requesting anything in addition to Baca and C. Garcia's three requests.  Dec. 11 Tr. at 144:4-13 (Court, Jacks).  Baca added that, if the Court decides to order the United States to produce prototypes of the recording devices, rather than the original recording devices, then he would

> like to get some kind of admission out of the United States [that it will not] complain that the pressure points or the illumination on this device is unlike the one on the actual devices, when they have access to those and could make them available for us to look at.

Dec. 11 Tr. at 144:22-145:2 (Lowry).

55.     After reviewing United States v. Chapman, the United States argued that the court in that case required the United States to produce evidentiary discs, and not the recording devices.  See Dec. 11 Tr. at 145:17-25 (Beck).  Regarding evidentiary disc twenty, the United States argued that, "because [the data] downloaded fully, because it completed that DVD, that established that there was nothing else to be gained from the device."  Dec. 11 Tr. at 147:13-15 (Beck).  As to the

Defendants' request to allow an expert to verify that the evidentiary disc copies which they have received match the original evidentiary discs, the United States reminded the Court that Williamson testified that anyone can verify this fact by using third-party software.  See Dec. 11 Tr. at 148:6-9 (Beck).  According to the United States, "that third-party software [is] available to anyone, including us in this room, [and that Williamson] checked and saw that the hash value that was assigned when the recording was downloaded in the ELSUR technician office in Albuquerque was the same as the copy of the DVD he was playing today."  Dec. 11 Tr. at 148:9-14 (Beck).  According to the United States, the metadata on the evidentiary discs "account[s] for every hour, minute, and second that it was inside the prison after it had been activated the first time, to when it was turned off the last time, aside from DVD 20, you can't do that on DVD 20."  Dec. 11 Tr. at 150:4-7 (Beck).  The United States also predicted that "everyone will disagree about how easy or difficult it is to unintentionally turn off the recording device[s]" if the United States produces the recording devices.  Dec. 11 Tr. at 151:7-9 (Beck).

56.     As to the production of the original evidentiary discs, the Court then stated its opinion that the Defendants probably are "not going to gain anything by putting [their] hands on the original, because the copy [] can tell [if] there was a problem."  Dec. 11 Tr. at 152:10-12 (Court).  The Court said that the Defendants could look at a copy of an evidentiary disc and determine "if there is a problem, because of the hash value."  Dec. 11 Tr. at 153:7-8 (Court).  C. Garcia stated that, while the Court is correct, it is possible that the original copy's "hash value itself was manipulated in some way."  Dec. 11 Tr. at 153:10-11 (Sirignano).  The United States asserted that ADS processes the data and that, if the data is manipulated, the devices will not play the material.  See Dec. 11 Tr. at 154:1-7 (Beck).  The United States reiterated that it can authenticate a voice recording by making a recording with the device and then playing the

recording to determine if the "proprietary software has [] worked."  Dec. 11 Tr. at 155:5-6 (Beck).

The Court asked the United States: "How much resistance do you have to [the Defendants'] expert

coming over and [authenticating] the original [copies?]"  Dec. 11 Tr. at 155:17-19 (Court).  The

United States responded that it would not be opposed to that process.  <u>See</u> Dec. 11 Tr.

at 155:20-156:11 (Beck).  C. Garcia argued that only one file contains all the data files, and thus,

"if there was any way that those data values or the hash within these data values were manipulated,

then you'd have a problem with the subsequent copies."  Dec. 11 Tr. at 156:25-157:3 (Sirignano).

C. Garcia confirmed that he would like an expert to authenticate the original disc rather than copies

of the disc.  <u>See</u> Dec. 11 Tr. at 157:17-24 (Court, Sirignano).

57.     The Court asked the United States whether the FBI could cover up parts of the

recording devices so that Baca could inspect the devices' buttons without seeing the devices'

features that the FBI does not want to disclose.  <u>See</u> Dec. 11 Tr. at 158:3-12 (Court).  The United

States responded that it was unsure if the FBI would approve the limited inspection, but that the

Court's suggestion "would be a rational middle ground for everyone to meet, and it seems like it

would assuage . . . the FBI's concerns, and allow Mr. Lowry to get what he's looking for."  Dec. 11

Tr. at 158:15-18 (Beck).  The Court asked the United States how it plans to explain the discrepancy

between Duran's statement that he recorded five to six hours of material when Duran's recording

device contains less than one hour of material.  <u>See</u> Dec. 11 Tr. at 159:16-21 (Court).  The United

States responded that it was unsure how it would explain the discrepancy.  <u>See</u> Dec. 11 Tr.

at 159:22-160:3 (Beck).  The Court then instructed the United States to "talk to the people you

need to talk to, see if something like that could be worked out, and then, I think we probably

exhausted the issues on this recorder device."  Dec. 11 Tr. at 160:5-8 (Court).  The United States

agreed and stated that it could have an answer to Baca and the Court "by the end of the hearings

this week." Dec. 11 Tr. at 160:11 (Beck).  The United States also said that Williamson possesses exemplar models of the recording devices, which are identical to the recording devices used in the case.  See Dec. 11 Tr. at 163:24-164:6 (Beck).

>    **10.    The Hearing on the Motion in Limine.**

58.    The Court held a hearing on the Motion in Limine on December 19, 2017.  See Transcript of Combined Motions to Suppress Proceedings and Daubert Hearings on December 19, 2017, filed January 4, 2018 (Doc. 1608)("Dec. 19 Tr.").  The Court stated that it is inclined to preclude the Defendants from asking about the size of the recording devices used in the case, or "portals" on the recording devices that are used for charging or to connect with other devices. Dec. 19 Tr. at 103:4 (Court).  The Court then asked the United States if it is comfortable with the Court granting its motion in part and denying it in part.  See Dec. 19 Tr. at 103:12-15 (Court).  The United States responded that it still opposes other questions about the recording devices, because the Defendants seek information that is "already out there in a publicly filed document."  Dec. 19 Tr. at 104:17-18 (Beck).  According to the United States, the Court should not give the Defendants "free rein" by allowing the Defendants to ask about "how [the CHSs] were trained to use the devices, how they secreted the devices in prison, the dimensions of the devices, how they turn them on or off."  Dec. 19 Tr. at 104:6-9 (Beck).  The United States also contended that the Defendants' production requests "may be for naught, because I don't think the defense is going to want to waste a lot of time in trial trying to ferret out this evidence."  Dec. 19 Tr. at 105:10-13 (Beck).

59.    The Court noted that the Defendants will likely "attack every possible angle" of the recording device issue and that it likely cannot preclude the Defendants from asking any questions about the recording devices.  Dec. 19 Tr. at 105:22-23 (Court).  The Court stated that, "at trial, if

[the evidence] gets cumulative, if it[] gets irrelevant, immaterial, . . . then those objections are always available." Dec. 19 Tr. at 106:7-9 (Court).  The United States then requested that the Court preclude questions about how often the recording devices' batteries were replaced, because that information could "be used for counterintelligence purposes."  Dec. 19 Tr. at 107:2-3 (Beck).  The Court asked whether the United States is comfortable with the Court precluding only questions about the two initial topics, or whether the Court should also preclude questions about replacing batteries, and the United States responded that it "can live with" the Court's original proposed order.  Dec. 19 Tr. at 108:5 (Court).  The Court noted that "some information about the size [of the recording devices] is going to be important to both sides telling their story here."  Dec. 19 Tr. at 109:12-14 (Court).  The United States responded that it is acceptable if the Defendants ask questions about the recording devices' size in comparison to other objects' size, but it stated that the law enforcement privilege likely outweighs the Defendants' need to ask questions about the "specific aesthetics."  Dec. 19 Tr. at 109:24-25 (Beck).  The United States added that questions about the general size and shape are "fair game," but that the Court should preclude questions about the packaging and aesthetics, such as a question whether a recording device can fit inside the heel of an informant's shoe.  Dec. 19 Tr. at 111:12-13 (Beck).

60.     Herrera inquired whether he may ask about how the recording devices are "disguised," Dec. 19 Tr. at 112:9 (Maynard), and the United States responded that the law enforcement privilege likely would preclude such a question, see Dec. 19 Tr. at 112:11-17 (Beck).  The Court asked whether it would be a problem if the Defendants showed a picture from 2007 or 2008 of "just the recording device."  Dec. 19 Tr. at 113:13 (Court).  The United States responded that such a question would fall under the law enforcement privilege.  See Dec. 19 Tr. at 113:23-25 (Beck).  The United States argued that there "may be classified information out there in the public

sphere, but we can't talk about that; we can't bring it in, even if it's out there."  Dec. 19 Tr. at 114:10-13 (Beck).  The United States added that asking a question such as, "[i]s it about that big?" would be "going too far," but asking a question such as, "is it about the size of a fist?" would be acceptable.  Dec. 19 Tr. at 114:21-24 (Beck).  According to the United States, asking whether the recording device looks like a certain picture of a recording device would not be probative.  See Dec. 19 Tr. at 114:24-115:3 (Beck).  The United States also argued that the Court should preclude questions about sensitive government recording programs, which refer to "the ways in which devices are secreted or installed."  Dec. 19 Tr. at 115:19-20 (Beck).  The Court then summarized the United States' position:

> There would be no questioning about the portal or what goes into the portal, what devices are used in the portal, or what it would look like.  And then as far as this category of disguises, we could talk generally about shape and size.  So you can probe there, using somewhat general language.  The technique of taking Ms. Sirignano's picture and showing it both to the jury and to the defendant, or having the defendant take, on butcher block paper and draw it or something like that, that sort of specificity would not be allowed.

Dec. 19 Tr. at 116:20-117:5 (Court).  The United States confirmed that the Court accurately characterized its position.  See Dec. 19 Tr. at 117:10-12 (Court, Beck).

61.    C. Garcia criticized the United States' assertion of the law enforcement privilege, because "[t]his is not a terrorism case."  Dec. 19 Tr. at 117:16 (Adams).  The Court instructed that, although this is not a terrorism case, the FBI uses the same recording devices "throughout the world in terrorism cases."  Dec. 19 Tr. at 117:25-118:1 (Court).  C. Garcia argued that pictures of the recording devices should be "fair game," because the United States is "making the choice to introduce this evidence," and the Defendants have the right "to fully confront the witness and a right to present a full defense."  Dec. 19 Tr. at 118:5-11 (Adams).  C. Garcia emphasized that the main issue he and some of the Defendants are concerned about is cthe United States' "ability and

their agents' ability to manipulate the collection of evidence that's presented in this courtroom."
Dec. 19 Tr. at 118:21-23 (Adams). C. Garcia argued that he should be able to ask questions about
the recording devices' battery life, and the Court agreed that the Defendants can ask about battery
life. See Dec. 19 Tr. at 119:5-10 (Adams, Court). C. Garcia asserted that he should be able to ask
any question so that he can "complete the fullest, broadest, most powerful defense we can present
as to their witnesses' ability to manipulate the evidence." Dec. 19 Tr. at 119:14-17 (Adams).

62.     The United States responded that the rules of evidence "take into consideration
constitutional rights," and it argued that the Defendants are seeking irrelevant information, which
would not be admissible under rule 402 of the Federal Rules of Evidence. Dec. 19 Tr. at 120:8
(Beck). C. Garcia argued that the contention that the recording devices' aesthetics and packaging
are "secretive is just complete nonsense," and that anyone "can pull up this stuff on the internet."
Dec. 19 Tr. at 121:1-3 (Sirignano). According to C. Garcia, "thousands of people, informants,
cooperators, know how these devices are being used by the FBI, and the fact that our clients can't
delve into that is utterly ridiculous." Dec. 19 Tr. at 121:25-122:4 (Sirignano). The United States
responded that "the FBI and the Government consider[] this extremely sensitive . . . [a]nd that's
why the law enforcement sensitive privilege exists." Dec. 19 Tr. at 122:15-23 (Beck). The Court
then stated:

> I am going to grant the motion in part. We don't have a lot that's off the table.
> There is a lot about the device that is fair game and can be disclosed. But I do think
> in the particular areas the Government has established their privilege. And so I will
> honor it, and not see it's been overcome. . . . [F]or purposes of trial there will be no
> testimony elicited about the portals or the devices that go into the portals. No
> pictures will be shown to the witnesses: Was this the device? And we'll not ask the
> witnesses to draw on butcher block paper the exact size or shape. Size or shape can
> be asked, and answered generally. As far as how they are disguised, packaging,
> anything like that, that will be off limits as well, any sort of program the
> Government has for disguising or secreting these will be off limits.

Dec. 19 Tr. at 123:9-124:3 (Court).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE IN CRIMINAL CASES

63.     In Brady, the Supreme Court of the United States of America explained that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  In Giglio, the Supreme Court extended the prosecution's disclosure obligation to evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See 405 U.S. at 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'")(quoting United States v. Bagley, 473 U.S. 667, 676 (1985)).  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence; "regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request.");  United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.");  United States v. Garcia, 2017 WL 2290963, at *21 (D.N.M. May 2, 2017)(Browning, J.).  On the other hand, "[i]t is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."  United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)(internal quotation

marks omitted).  "A prosecutor does not have a duty . . . to obtain evidence from third parties."

United States v. Badonie, 2005 WL 2312480, at *2.

64.     During a criminal prosecution, the Federal Rules of Criminal Procedure and the

Constitution require the United States to disclose certain evidence to a criminal defendant.  Rule

16 of the Federal Rules of Criminal Procedure is one source that imposes such a duty on the United

States.  The Due Process Clause of the United States Constitution is another source imposing a

duty to disclose on the United States.

## LAW REGARDING RULE 16

65.     Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.**  Upon a defendant's request, the government
must permit the defendant to inspect and to copy or photograph books, papers,
documents, data, photographs, tangible objects, buildings or places, or copies or
portions of any of these items, if the item is within the government's possession,
custody, or control and:

**(i)**     the item is material to preparing the defense;

**(ii)**    the government intends to use the item it its case-in-chief at
trial; or

**(iii)**   the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E) (bold in original).  Although rule 16's language is permissive, it does

not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule

to engage in a "fishing expedition."  United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir.

1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)).  Rule 16 also does not obligate

the United States to "take action to discover information which it does not possess."  United States

v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th

Cir. 1991))(internal quotation marks omitted).  Nor is the United States required to secure

information from third parties.  See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir.

1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

66.     Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted).  "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

67.     Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief.  The court may permit a party to show good cause by a written statement that the court will inspect ex parte.  If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1).  In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information."  In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122.  In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

68.     Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16.  United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.**  If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or
>
> **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2) (bold in original).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).  In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit held that "a court should impose the least severe sanction."  455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)).  The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies."  455 F.3d at 1131.

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA

69.     The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the

good faith or bad faith of the prosecution."  Brady, 373 U.S. at 87.  The Supreme Court has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory.  See Giglio, 405 U.S. 150; Douglas v. Workman, 560 F.3d at 1172-73 ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. at 676); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence.").  Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government."  Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682).  See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

> **1.   Material Exculpatory Evidence Under Brady.**

70.    "The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant."  Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995).  Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment."  Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d 1202, 1215 (10th

Cir. 2010).  A "reasonable probability," in turn, is a "probability sufficient to undermine

confidence in the outcome."  United States v. Bagley, 473 U.S. at 682 (internal quotation marks

omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory

does not satisfy the constitutional materiality standard."  United States v. Fleming, 19 F.3d 1325,

1331 (10th Cir. 1994).  The Tenth Circuit also has stated that evidence is material if it "might

meaningfully alter a defendant's choices before and during trial . . . including whether the

defendant should testify."  Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States

v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

71.    "To be material under Brady, undisclosed information or evidence acquired

through that information must be admissible."  Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th

Cir. 1995)(quoting United States v. Kennedy, 890 F.2d at 1059).  The Supreme Court in Cone v.

Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as
> interpreted by Brady, only mandates the disclosure of material evidence, the
> obligation to disclose evidence favorable to the defense may arise more broadly
> under a prosecutor's ethical or statutory obligations.  See Kyles[v. Whitley], 514
> U.S. at 437 ("[T]he rule in [United States v. ]Bagley (and, hence, in Brady) requires
> less of the prosecution than the ABA Standards for Criminal Justice Prosecution
> Function and Defense Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model
> Rules of Professional Conduct 3.8(d) (2008)("The prosecutor in a criminal case
> shall" "make timely disclosure to the defense of all evidence or information known
> to the prosecutor that tends to negate the guilt of the accused or mitigates the
> offense, and, in connection with sentencing, disclose to the defense and to the
> tribunal all unprivileged mitigating information known to the prosecutor, except
> when the prosecutor is relieved of this responsibility by a protective order of the
> tribunal").

Cone v. Bell, 556 U.S. at 470 n.15.

72.    The government bears the burden of producing exculpatory materials; the

defendants have no obligation to first note that such materials exist.  See Kyles v. Whitley, 514

U.S. at 437 (stating that the prosecution has an affirmative duty to disclose evidence, because "the prosecution, which alone can know what is undisclosed, must be assigned the consequent responsibility to gauge the likely net effect of all such evidence and make disclosure when the point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir. 1973)(granting a mistrial for failure to produce personnel files of government witnesses), overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14, 2011)(Browning, J.).   This obligation means that the United States must "volunteer exculpatory evidence never requested, or requested only in a general way."   Kyles v. Whitley, 514 U.S. at 433 (internal quotation marks omitted).   Additionally, "[u]nder Brady, the good or bad faith of government agents is irrelevant." United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).   "This means, naturally, that a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." Kyles v. Whitley, 514 U.S. at 439.

    **2.**    **Timing of the Disclosure Under Brady.**

    73.    "The obligation of the prosecution to disclose evidence under Brady can vary depending on the phase of the criminal proceedings and the evidence at issue."   United States v. Harmon, 871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.), aff'd by 742 F.3d 451 (10th Cir. 2014).   As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in Brady v. Maryland."   United States v. Burke, 571 F.3d at 1054.   The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."   United States v. Burke, 571 F.3d at 1054.   "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an

'earlier disclosure would have created a reasonable doubt of guilt.'"  United States v. Burke, 571

F.3d at 1054 (quoting United States v. Young, 45 F.3d 1405, 1408 (10th Cir. 1995)).  The Tenth

Circuit has stated:

> Where the district court concludes that the government was dilatory in its
> compliance with Brady, to the prejudice of the defendant, the district court has
> discretion to determine an appropriate remedy, whether it be exclusion of the
> witness, limitations on the scope of permitted testimony, instructions to the jury, or
> even mistrial.

United States v. Burke, 571 F.3d at 1054.  Notably, "not every delay in disclosure of Brady material

is necessarily prejudicial to the defense."  United States v. Burke, 571 F.3d at 1056.  "To justify

imposition of a remedy, the defense must articulate to the district court the reasons why the delay

should be regarded as materially prejudicial."  United States v. Burke, 571 F.3d at 1056.

74.     Once a prosecutor's obligations under Brady have been triggered, however, they

"continue[] throughout the judicial process."  Douglas v. Workman, 560 F.3d at 1173.  For

instance, the prosecutor's obligation to disclose Brady material can arise during trial.  See United

States v. Headman, 594 F.3d at 1183 (10th Cir. 2010)("Although Brady claims typically arise from

nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable

evidence (such as impeachment evidence) that is unavailable to the government until trial is

underway.").  The disclosure obligation continues even while a case is on direct appeal.  See United

States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th Cir.

1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received after trial

but while the case was on direct appeal).

75.     The Supreme Court has held that Brady does not require "preguilty plea disclosure

of impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide

whether the Constitution requires that preguilty plea disclosure of impeachment information.  We

conclude that it does not."). The Supreme Court recognized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." United States v. Ruiz, 536 U.S. at 632 (emphasis in original). The Supreme Court acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant." United States v. Ruiz, 536 U.S. at 632. The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness of relevant circumstances, does not require complete knowledge of the relevant circumstances, but permits a court to accept a guilty plea, with its accompanying waiver of various constitutional rights, despite various forms of misapprehension under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630. The Supreme Court explained that "a constitutional obligation to provide impeachment information during plea bargaining, prior to entry of a guilty plea, could seriously interfere with the Government's interest in securing those guilty pleas that are factually justified, desired by defendants, and help to secure the efficient administration of justice." United States v. Ruiz, 536 U.S. at 630. The Tenth Circuit has reiterated these principles from United States v. Ruiz:

> Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United

States v. Ruiz, 546 U.S. at 630).[7]

76.     The Tenth Circuit has held, however, that United States v. Ruiz does not apply to

exculpatory evidence, but rather applies only to impeachment evidence:

> Ruiz is distinguishable in at least two significant respects.  First, the
> evidence withheld by the prosecution in this case is alleged to be exculpatory, and
> not just impeachment, evidence.  Second, Ohiri's plea agreement was executed the
> day jury selection was to begin, and not before indictment in conjunction with a
> "fast-track" plea.   Thus, the government should have disclosed all known
> exculpatory information at least by that point in the proceedings. By holding in
> Ruiz that the government committed no due process violation by requiring a
> defendant to waive her right to impeachment evidence before indictment in order
> to accept a fast-track plea, the Supreme Court did not imply that the government
> may avoid the consequence of a Brady violation if the defendant accepts an
> eleventh-hour plea agreement while ignorant of withheld exculpatory evidence in
> the government's possession.

United States v. Ohiri, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit

qualified its holding in United States v. Ohiri, however, by stating that the case presented "unusual

circumstances."  133 F. App'x at 562.

---

[7]United States v. Johnson is an unpublished opinion, but the Court can rely on an
unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th
Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive
value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we
> have generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order has persuasive value with respect to a
> material issue in a case and would assist the court in its disposition, we allow a
> citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted).  The Court
concludes that United States v. Johnson, United States v. Ohiri, 133 F. App'x 555 (10th Cir.
2005)(unpublished), and United States v. Bullock, 130 F. App'x 706, 723 (6th Cir.
2005)(unpublished), have persuasive value with respect to a material issue, and will assist the court
in its disposition of this Memorandum Opinion and Order.

77.     The United States Courts of Appeals "have split on the issue whether <u>Brady v.</u> <u>Maryland</u>'s restrictions apply to suppression hearings." <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material.  See <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found that

> disclosure of the evidence existing at the time of the hearing, even if impeaching, would not establish a reasonable probability that the outcome of the suppression hearing would have been different.  First, we question whether the evidence in question would have been admitted at the suppression hearing.  Even if it had been admitted, however, in light of [the defendant's] lack of truthfulness, our confidence in the result of the hearing has not been undermined.  Therefore, we hold that the evidence was not material, and that its nondisclosure by the prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

78.     The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet <u>Brady</u> rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'" <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir. 1999)(citation and internal quotation omitted).  Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from <u>United States v. Bowie</u>.  See <u>United States v. Bullock</u>, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the <u>Brady</u> issues at stake here.").  The United States Court

of Appeals for the Seventh Circuit held that, under its precedent and the law from other Courts of Appeals, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."  United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).  The Second Circuit also noted that Brady's applicability to suppression hearings was not "obvious" for plain error purposes.  United States v. Nelson, 193 F. App'x 47, 50 (2d Cir. 2006).

79.    Before the Supreme Court decided United States v. Ruiz, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).  Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "Brady rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment." United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013)(acknowledging that "[w]hether Brady's disclosure requirements even apply at the motion to suppress stage is an open question")). Although the Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea."  United States v. Harmon,

871 F. Supp. 2d at 1151.  The Tenth Circuit affirmed <u>United States v. Harmon</u>, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of <u>United States v. Ruiz</u> to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.   In <u>United States v. Ruiz</u>, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is <u>voluntary</u>."  <u>United States v. Ruiz</u>, 536 U.S. at 632 . . . (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  <u>United States v. Ruiz</u>, 536 U.S. at 632 . . . .  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant."  <u>United States v. Ruiz</u>, 536 U.S. at 632 . . . .

<u>United States v. Harmon</u>, 871 F. Supp. 2d at 1169 (emphasis in original).  Accordingly, <u>Brady</u> does not require the United States to disclose impeachment evidence before suppression hearings.  <u>See</u> <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1165-67.

### 3.      <u>Evidence Must Be in the United States' Possession.</u>

80.      "It is well settled that there is no 'affirmative duty upon the government to take action to discover information which it does not possess.'"  <u>United States v. Tierney</u>, 947 F.2d 854, 864 (8th Cir. 1991)(quoting <u>United States v. Beaver</u>, 524 F.2d 963, 966 (5th Cir. 1975)).  <u>Accord</u> <u>United States v. Kraemer</u>, 810 F.2d 173, 178 (8th Cir. 1987)(explaining that the prosecution is not required "to search out exculpatory evidence for the defendant"); <u>United States v. Badonie</u>, 2005 WL 2312480, at *2.  On the other hand, "a prosecutor's office cannot get around <u>Brady</u> by keeping itself in ignorance, or by compartmentalizing information about different aspects

of a case." Carey v. Duckworth, 738 F.2d 875, 878 (7th Cir. 1984).  Under Brady, "[a] prosecutor must disclose information of which it has knowledge and access." United States v. Padilla, 2011 WL 1103876, at *7 (citing United States v. Bryan, 868 F.2d 1032, 1037 (9th Cir. 1989)).  "A prosecutor may have a duty to search files maintained by other 'governmental agencies closely aligned with the prosecution' when there is 'some reasonable prospect or notice of finding exculpatory evidence.'" United States v. Padilla, 2011 WL 1103876, at *7 (quoting United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)).  A prosecutor does not have a duty, however, to obtain evidence from third parties.  See United States v. Combs, 267 F.3d 1167, 1173 (10th Cir. 2001)(observing that Brady v. Maryland does not oblige the government to obtain evidence from third parties).

## LAW REGARDING THE JENCKS ACT

81.    In Jencks v. United States, 353 U.S. at 667, the Supreme Court held that a "criminal action must be dismissed when the government, on the ground of privilege, elects not to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial."  353 U.S. at 672.  In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 670-671.  Congress later codified the Jencks v. United States in 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

82.    Section 3500 of Title 18 of the United States Code provides:

**(a)**    In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

**(b)**    After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b) (bold in original).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d 1224, 1232 (D.N.M. 2008)(Brack, J.)(quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the use of such statements to impeachment."  Palermo v. United States, 360 U.S. 343, 349 (1959).  The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment."  United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

83.    The Jencks Act defines statements as:

**(1)**    a written statement made by said witness and signed or otherwise adopted or approved by him;

**(2)**    a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

**(3)**    a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e) (bold in original).

84.    The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993).  At least one district court within the Tenth cCrcuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act.  United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.).   In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense."  530 F. Supp. 2d at 1266.  Judge Brack held that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must, under 18 U.S.C. § 3500, preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses."  530 F. Supp. 2d at 1267.  See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

85.    The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 WL 684671, at *10 (D.N.M. 2013)(Browning, J.).  To satisfy this burden,

the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry." United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)). See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. 2015)(Browning, J.). The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements. See United States v. Smith, 984 F.2d at 1086. For example, in United States v. Smith, the Tenth Circuit concluded that a defendant had made a prima facie showing that a witness statement was producible under the Jencks Act when a government witness testified during the United States' case-in-chief that a government agent had interviewed her before she testified, and the defense counsel moved for production of the notes. See 984 F.2d at 1085-86. Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement. See United States v. Smith, 984 F.2d at 1086.

86.    The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be given to the defendants after the agents testify at trial. See United States v. Goxcon-Chagal, 2012 WL 3249473, at *2, *6 (D.N.M. 2012)(Browning, J.). In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce FBI agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial. See 760 F. Supp. 2d at 1164, 1167.

## ANALYSIS

87.     The Court will grant in part and deny in part the Motion to Compel; grant the Motion to Reconsider; and will grant in part and deny in part the Motion in Limine.  Several issues that the Defendants raised in the Motion to Compel were resolved at the hearings on May 9, 2017, and May 10, 2017, without the need for a ruling.  The United States indicated at the hearing that it already had complied with: (i) the request to produce all recorded materials tagged into evidence, see May 9 Tr. at 238:18-20 (Armijo); (ii) the request for a written response identifying physical evidence not itemized in the NM State Police evidence inventory, see May 9 Tr. at 247:12-20 (Armijo); and (iii) the request to produce transcripts of conversations between themselves and informants, see May 9 Tr. at 264:22-265:7 (Armijo, Court, Fox-Young); May 10 Tr. at 14:15-20 (Beck).  The United States and Perez also notified the Court that they had reached an agreement concerning access to Southern New Mexico Correctional Facility.  See May 10 Tr. at 12:9-17 (Fox-Young, Court, Beck).

88.     The United States also conceded several issues at the hearings.  It conceded: (i) that, pursuant to Brady, Giglio, and rule 16, it would review Montoya's, T. Martinez', and Armenta's statements within thirty days of the hearing, see May 9 Tr. at 207:10-208:3 (Beck); (ii) that it would produce plea addenda from any co-Defendant who has pled guilty thus far, see May 9 Tr. at 221:25-222:2 (Beck); id. at 224:25 (Beck); (iii) that it must review and produce all 302s and law enforcement notes required under Brady and preserve all law enforcement notes not produced, see May 9. Tr. at 235:13-18; (iv) that it must preserve any notes prepared by the law enforcement handlers of the informant who recorded conversations with Perez, see May 10 Tr. at 3:17-19 (Court, Beck); (v) that it must produce Cordova's pen pack and STIU file pursuant to Brady, Giglio, and rule 16 of the Federal Rules of Criminal Procedure, see May 10 Tr. at 11:10-15 (Beck);

and (vi) that it would direct Herrera to a recorded conversation that the United States, at a prior hearing, characterized as a confession, <u>see</u> May 10 Tr. at 16:3-6 (Beck).  As a result, the Court faced only six disputed issues: (i) whether the United States must produce the original audio and video recordings of Perez' and Baca's conversations with informants; (ii) whether the United States must produce the recording devices used by informants and whether the Defendants may ask questions about the recording devices during cross-examination; (iii) whether, and under what circumstances, the Defendants may handle the physical evidence; (iv) whether the United States must produce Perez' location within PNM when recordings of his conversations with informants were made; (v) whether the United States must produce the identity of the law enforcement handler who dealt with the informant who recorded conversations with Perez; and (vi) whether the United States must produce correspondence between the law enforcement officers and the NM Corrections Department regarding Cordova's contraband possession.  The Court concludes that: (i) the United States does not need to produce any additional audio or video recordings; (ii) the United States does not need to produce the recording devices and the Defendants may ask the United States' informants questions only about the general appearance of the recording devices; (iii) the United States must allow Baca and Perez to handle physical evidence, and must provide a custodian who is not a member of the prosecution team to supervise Baca and Perez; (iv) the United States must produce the dates on which any conversations occurred if the date has been redacted from any transcript; (v) the United States does not need to produce the identities of the informants' handlers; and (vi) the United States must produce, within fourteen days, correspondence between the FBI or law enforcement and NM Corrections Department, regarding whether Cordova possessed contraband if rule 16, <u>Brady</u>, or <u>Giglio</u> require disclosure.

## I.      THE UNITED STATES DOES NOT NEED TO PRODUCE ANY ADDITIONAL AUDIO OR VIDEO RECORDINGS.

89.     Baca and Perez argue that they need access to all original recordings that informants made.  See Motion to Compel at 19.  The United States says that the request goes "beyond what the rules or any other authority provides the United States must disclose."  May 9 Tr. at 273:15-16 (Beck).  Although it argued against disclosure at the hearing, the United States clarified that everything the recording devices recorded has been disclosed to the Defendants.  See May 9 Tr. at 275:1-2 (Beck).  In light of these additional disclosures, Baca and Perez cannot justify compelling production of all original recordings.  See United States v. Maranzino, 860 F.2d at 985 ("Rule 16 does not authorize a blanket request to see the prosecution's file.").  The requested information will be appropriate for cross-examination and argument at trial, see May 9 Tr. at 273:25-274:7 (Beck), but it is not material to the Defendants' defense or to the Defendants' "guilt or [] punishment," Brady, 373 U.S. at 87.  See Fed. R. Crim. P. 16(a)(1)(E)(1).  The Court concludes that the Defendants and their forensic expert will be able to present their case fully without the requested production.  See May 9 Tr. at 281:5-9 (Court).  Accordingly, the Court denies Baca and Perez' request for access to all original recordings that the informants made.

## II.     THE UNITED STATES DOES NOT NEED TO PRODUCE THE RECORDING DEVICES UNLESS THE FBI AUTHORIZES PRODUCTION, AND THE DEFENDANTS MAY ASK QUESTIONS ONLY ABOUT THE RECORDING DEVICES' GENERAL APPEARANCE.

90.     The United States requests that the Court reconsider its oral order on November 27, 2017, which orders the United States to produce one of its recording devices for Sanchez.  See Motion to Reconsider at 1 (citing Nov. 27 Tr. at 141:8-14 (Court)).  The United States also requests that the Court preclude the Defendants from soliciting testimony from the United States' witnesses about the recording devices.  See Motion in Limine at 1.  According to the United States,

the law enforcement privilege protects it from producing the recording devices or divulging information about them.  The Defendants argue that they have a compelling need for production, because the United States has chosen to introduce the recordings into evidence and the recordings might have been manipulated.  The Court concludes that production of the recording devices would not uncover additional material evidence and, furthermore, that the United States has established that the law enforcement privilege protects the United States from having to produce the recording devices or disclose confidential information about them.  Accordingly, the United States does not have to produce the recording devices, and the Defendants may ask the United States' witnesses only about the recording devices' general appearance, but not about recording devices' specifications, portals, or how informants disguised the recording devices in prison.

### A.   RULE 16 AND **BRADY** DO NOT REQUIRE, AND THE LAW ENFORCEMENT PRIVILEGE PRECLUDES, PRODUCTION OF THE RECORDING DEVICES.

91.   The United States argues that the Court should not order it to produce the recording devices, because it has already produced all evidence material to the Defendants' defense, see Motion to Reconsider at 22, and that the law enforcement privilege applies, because ordering production of the recording devices "unnecessarily compromises the sources and methods used and the future deployment of these investigative tools," Motion to Reconsider at 30.   The Defendants counter that the law enforcement privilege should not apply, because the FBI provided prison inmates with recording devices, and "[t]his is not a terrorism case."  Dec. 19 Tr. at 117:16 (Adams).   According to the Defendants, the FBI's willingness to issue recording devices to numerous informants across the country, including prison inmates, is inconsistent with the United States' refusal to produce the recording devices for the Defendants' defense counsel to inspect. See Dec. 19 Tr. at at 2-8 (Lowry).   Moreover, the Defendants contend that production of the

recording devices is necessary to prepare the strongest defense "as to [the] witnesses' ability to manipulate the evidence." Dec. 19 Tr. at 119:14-17 (Adams).

92.     The Court concludes that the recording devices do not amount to "material" evidence under rule 16 or Brady, because the Defendants are unlikely to uncover relevant evidence. Moreover, the Defendants were able to obtain answers to their questions from the evidence that the United States already produced and from cross-examining Williamson.   Under rule 16, evidence is "material" if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d at 1474 (quoting United States v. Lloyd, 992 F.2d at 351).  Similarly, Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87.  "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682.  See United States v. Allen, 603 F.3d at 1215.  A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted).  The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d at 1331.

93.     Here, the Court determines that ADS manufactures recording devices for the FBI using a "proprietary software," Dec. 11 Tr. at 12:22 (Williamson), which is inaccessible to the FBI, see Dec. 11 Tr. at 13:19 (Williamson).  ADS downloads the data on a recording device to an evidentiary disc, which "cannot be manipulated." Dec. 11 Tr. at 19:12-13 (Williamson).  The data on an evidentiary disc is a "mirror copy of what was originally on the device." Dec. 11 Tr.

at 98:22-25 (Lowry, Williamson).  If for some reason the data on an evidentiary disc does not match the data on a recording device, the ADS "player" will display an error message, and a person cannot listen to the recording.  Dec. 11 Tr. at 35:10-19 (Beck, Williamson).  The Defendants argue that, without inspecting the recording devices, "it's impossible to make sure that the integrity of the data exists, or still exists," Dec. 11 Tr. at 135:1-3 (Sirignano), and that production of the recording devices would enable the Defendants to inspect them for "any anomalies or any manipulation," Dec. 11 Tr. at 136:24-25 (Sirignano).  Based on Williamson's testimony, the Court concludes, however, that ADS designed the recording devices to be immune to any attempt to manipulate them.  The Defendants have had a robust opportunity to ask Williamson almost questions about the recording devices -- such as about how the recording devices' lights operate and about how data is downloaded to evidentiary discs -- and there is no indication that production of the recording devices will yield more evidence about the recording devices' integrity or lack thereof.  <u>See</u> Dec. 11 Tr. at 130:3-12 (Court, Lowry).  Furthermore, as Sanchez concedes, there is little that the Defendants "can gain by looking at . . . the metadata on the ELSUR devices," because the devices were "simply wiped clean."  Dec. 11 Tr. at 140:11-14 (Jacks).  <u>See</u> Motion to Reconsider at 24.  In sum, the United States has produced for the Defendants enough material and probative evidence, and there is no "strong indication" that producing the recording devices will uncover additional material evidence.  <u>United States v. Graham</u>, 83 F.3d at 1474.

94.     Baca argues that the primary reason he seeks production of the recording devices is to determine how easy it is to press the button on the recording devices and start recording, and how the flashing lights on the recording devices operate "in tandem with the buttons."  Dec. 11 Tr. at 128:4-5 (Lowry).  The United States and Williamson confirm that the recording devices have an on/off button.  <u>See</u> Dec. 11 Tr. at 104:8 (Williamson); May 9 Tr. at 280:5-12 (Court, Beck).

The Court asked the United States whether the FBI could cover up parts of the recording devices so that Baca could inspect the devices' buttons without seeing the devices' features that the FBI deems confidential.  See Dec. 11 Tr. at 158:3-12 (Court).  The United States responded that the FBI might approve such limited inspection.  Accordingly, the Court orders the United States to consult with the FBI to determine whether Baca may inspect the recording devices' buttons.  The United States agreed to consult with the FBI, and stated that it could have an answer to Baca and the Court "by the end of the hearings this week," which ended December 15, 2017.  Dec. 11 Tr. at 160:11 (Beck).

95.    C. Garcia also requested to view the original evidentiary discs rather than copies of the evidentiary discs.  See Dec. 11 Tr. at 136:24-25 (Sirignano).  The Court concludes that the data on an evidentiary disc is a "mirror copy of what was originally on the device," Dec. 11 Tr. at 98:22-25 (Lowry, Williamson), and that, if the data on an evidentiary disc does not match the data on a recording device, the ADS "player" will display an error message and a person cannot listen to the recording, Dec. 11 Tr. at 35:10-19 (Beck, Williamson).  Thus, the Court denies C. Garcia's request, because inspection of the recording devices will not lead to material evidence.  The Court will allow, however, C. Garcia's expert to authenticate the evidentiary disc copies by verifying that their hash values match those of the original evidentiary discs.  See Dec. 11 Tr. at 155:17-19 (Court).  The United States does not oppose this process.  See Dec. 11 Tr. at 155:20-156:11 (Beck).

96.    The United States further argues that the Court should not order production of the recording discs, because the recording devices contain sensitive information to which the law enforcement privilege applies.  See Motion to Reconsider at 1.  According to the United States, allowing a forensics expert to investigate the recording devices, which use a proprietary software, could "lead to disclosure of sensitive law enforcement programs or even classified materials."

- 80 -

Motion to Reconsider at 30.  The United States draws support from the Second Circuit's decision in In re City of New York, which held that the law enforcement privilege's purpose is "'to prevent disclosure of law enforcement techniques and procedures, to preserve the confidentiality of sources, to protect witness and law enforcement personnel, to safeguard the privacy of individuals involved in an investigation, and otherwise to prevent interference with an investigation.'"  607 F.3d at 941 (quoting In re Dep't of Investigation of City of New York, 856 F.2d 481, 484 (2d Cir. 1988)).  The Tenth Circuit also recognizes the law enforcement privilege, and has held that the law enforcement privilege is "based primarily on the harm to law enforcement efforts which might arise from public disclosure of investigatory files."  United States v. Winner, 641 F.2d 825, 831 (10th Cir. 1981)(internal citation and quotation marks omitted).  To assert the law enforcement privilege, the United States must state "with particularity the information for which protection is sought, and explain why the information falls within the scope of the privilege."  United States v. Winner, 641 F.2d at 831.  Furthermore, "[t]he party claiming the privilege bears the burden of showing the privilege applies."  United States v. Ramos-Burciaga, 2018 WL 5314922, at *5 (D.N.M. Oct. 26, 2018)(Johnson, J.).  Although the Tenth Circuit has not precisely outlined the scope of the law enforcement privilege, in In re City of New York, the Second Circuit determined that the law enforcement privilege applies to: (i) "law enforcement techniques and procedures"; (ii) "information that would undermine the confidentiality of sources"; (iii) "information that would endanger witness and law enforcement personnel or the privacy of individuals involved in an investigation"; and (iv) "information that would otherwise interfere with an investigation."  856 F.2d at 944 (internal citation and quotation marks omitted). Moreover, according to the Second Circuit, when the law enforcement privilege applies, "'there ought to be a pretty strong

presumption against lifting the privilege.'"   In re City of New York, 607 F.3d at 945 (quoting

Dellwood Farms, Inc. v. Cargill, Inc., 128 F.3d 1122, 1125 (7th Cir. 1997)).

97.     While the Tenth Circuit has not articulated a test for how a party may rebut the law

enforcement privilege's application, several United States District Courts within the Tenth Circuit

have indicated that the party seeking disclosure must show a "'substantial need for the documents

and its inability to obtain their substantial equivalent by other means.'"   In re M & L Bus. Mach.

Co., Inc., 161 B.R. 689, 693 (D. Colo. 1993)(Kane, J.)(quoting Friedman v. Bache Halsey Stuart

Shields, Inc., 738 F.2d 1336, 1341 (D.C. Cir. 1984)).  See Carbajal v. Warner, 2015 WL 1945129,

at *2 n.4 (D. Colo. Apr. 28, 2015)(Mix, J.)(same);   United States v. Ramos-Burciaga, 2018 WL

5314922, at *5 (same).  The Second Circuit devised a three-part test for what the "party seeking

disclosure must show" to "rebut" the law enforcement privilege's application: (i) "that its suit is

'non-frivolous and brought in good faith'"; (ii) "that 'the information sought is not available

through other discovery or from other sources'"; and (iii) "that the information sought is

'important' to the party's case."   In re City of New York, 607 F.3d at 945 (quoting Friedman v.

Bache Halsey Stuart Shields, Inc., 738 F.2d 1336, 1343 (D.C. Cir. 1984)).

98.     The Court concludes that the United States has stated "with particularity the

information for which protection is sought, and explain[ed] why the information falls within the

scope of the privilege."  United States v. Winner, 641 F.2d at 831.  Electronic surveillance devices

are important tools for law enforcement and national security.  See United States v. Van Horn, 789

F.2d 1492, 1508 (11th Cir. 1986).  In United States v. Van Horn, the United States Court of

Appeals for the Eleventh Circuit held that the law enforcement privilege "applies equally to the

nature and location of electronic surveillance equipment." 789 F.2d at 1508.  The Eleventh Circuit

reasoned that "[d]isclosing the precise locations where surveillance devices are hidden or their

precise specifications will educate criminals regarding how to protect themselves against police surveillance," and thus, surveillance devices' "effectiveness should not be unnecessarily compromised."  United States v. Van Horn, 789 F.2d at 1508.  Here, the FBI "deliberately" outsourced designing the source code and manufacturing the recording devices to ADS so that the FBI would not have access to manipulate the source code or the recording devices.  Dec. 11 Tr. at 13:19-24 (Williamson).  When a user presses the button that turns on the recording device, recording begins "practically instantaneously."  Dec. 11 Tr. at 104:8 (Williamson).  ADS designed the recording devices so that users cannot "record over what's on the device," "rewind" the device, or otherwise manipulate the recording devices.   Dec. 11 Tr. at 14:3-7 (Williamson, Beck). Similarly, the evidentiary discs were designed to be immune to manipulation, see Dec. 11 Tr. at 19:12-13 (Williamson), and, if the data on an evidentiary disc does not match the data on a recording device, the ADS "player" will display an error message, and a person cannot listen to the recording, Dec. 11 Tr. at 35:10-19 (Beck, Williamson).  The Court determines that these efforts to immunize the recording devices from manipulation support the conclusion that the recording devices' design and specifications are sensitive material, and thus the law enforcement privilege applies.

99.     The Court also concludes that the Defendants have not demonstrated a "substantial need for the [recording devices] and [their] inability to obtain their substantial equivalent by other means."  United States v. Ramos-Burciaga, 2018 WL 5314922, at *5.  When the recording devices' software downloads the recording devices' data, "it takes all of the recorded sessions, all the sessions that are collected, and takes the metadata on the recorder," and downloads it to an evidentiary disc.  Dec. 11 Tr. at 17:21-24 (Williamson).  Thus, the evidentiary discs do not contain metadata.  See Dec. 11 Tr. at 140:11-14 (Jacks)(stating that there is little which the Defendants

"can gain by looking at the . . . metadata on the ELSUR devices," because the devices were "simply wiped clean"); Dec. 11 Tr. at 114:9 (Beck)(asserting that the recording devices do not contain any "trace metadata").  The Defendants possess the evidentiary disc copies on which all of the metadata now resides.  Moreover, Williamson was able to answer nearly all of the Defendants' questions about the recording devices at the December 11, 2017, hearing, and thus the Court will not authorize additional "fishing for evidence" where there is no indication that the recording devices are defective.  Dec. 11 Tr. at 130:3-12 (Court, Lowry).  Accordingly, the Court grants the Motion to Reconsider.

### B.   THE DEFENDANTS MAY NOT SOLICIT TESTIMONY ABOUT THE RECORDING DEVICES' SPECIFICATIONS, PORTALS, OR METHODS OF CONCEALMENT.

100.   The United States argues that the Court should not allow the Defendants to ask the United States' witnesses about (i) "technical specifications of the audio recording devices, to include methods of installation, concealment and location of devices"; and (ii) "training of government witnesses that would reveal sensitive government programs or sources and methods." Motion in Limine at 1.  The United States also requests that the Court preclude questions about how often the recording devices' batteries are replaced, because that information could "be used for counterintelligence purposes."  Dec. 19 Tr. at 107:2-3 (Beck).  According to the United States, eliciting testimony about the recording devices' specifications and how informants conceal the recording devices would "compromise[] the sources and methods used and the future deployment of these investigative tools."  Motion in Limine at 10.  The Defendants counter that they should be able to ask questions about the recording devices to "complete the fullest, broadest, most powerful defense [they] can present as to their witnesses' ability to manipulate the evidence."  Dec. 19 Tr. at 119:14-17 (Adams).  The Defendants also argue that introducing pictures of the recording

devices should be "fair game," because the United States is "making the choice to introduce this evidence," and the Defendants have the right "to fully confront the witness and a right to present a full defense."  Dec. 19 Tr. at 118:5-11 (Adams).  The Defendants contend that the recording devices' specifications and dimensions do not constitute sensitive material that would threaten national security, because "[t]his is not a terrorism case."  Dec. 19 Tr. at 117:16 (Adams).

101.     The Court concludes that the law enforcement privilege precludes the Defendants from asking questions about the recording devices' specifications, portals, or methods of concealment.  As discussed above, the recording devices are an important law enforcement tool.  See United States v. Van Horn, 789 F.2d at 1508.  Although this is not a "terrorism case," the FBI "deploy[s] these [recording devices] around the world," Dec. 11 Tr. at 36:8 (Williamson), and allowing testimony about the recording devices' specifications could affect their effectiveness in other cases, see Dec. 19 Tr. at 117:25-118:1 (Court).  The recording devices operate using a proprietary software specifically designed for the FBI, see Dec. 11 Tr. at 12:22 (Williamson), and disclosing "their precise specifications will educate criminals regarding how to protect themselves against police surveillance," United States v. Van Horn, 789 F.2d at 1508.  Thus, for the same reasons that the law enforcement privilege prevents the recording devices  from being produced, the Court concludes that the law enforcement privilege also applies to testimony about the recording devices' specifications, portals, or methods of concealment.  The Defendants may solicit testimony about the recording devices' general appearance, which poses less of a risk that sensitive information will be disclosed.  At the December 19, 2017, hearing, the Court outlined the exact contours for acceptable testimony:

> [F]or purposes of trial there will be no testimony elicited about the portals or the devices that go into the portals.  No pictures will be shown to the witnesses: Was this the device?  And we'll not ask the witnesses to draw on butcher block paper the exact size or shape.  Size or shape can be asked, and answered generally.  As

far as how they are disguised, packaging, anything like that, that will be off limits as well, any sort of program the Government has for disguising or secreting these will be off limits.

Dec. 19 Tr. at 123:18-124:3 (Court).  Accordingly, the Motion in Limine is granted in part and denied in part.

### III.   THE UNITED STATES MUST ALLOW BACA AND PEREZ TO HANDLE PHYSICAL EVIDENCE, AND MUST PROVIDE A CUSTODIAN WHO IS NOT A MEMBER OF THE PROSECUTION TEAM TO SUPERVISE BACA AND PEREZ.

102.   Baca and Perez request access to handle Count 6 and 7's physical evidence as part of their investigation.  See Motion to Compel at 17; May 9 Tr. at 250:12-251:9 (Fox-Young).  The United States opposes this request, arguing that, because the Defendants would interact with the evidence only in the presence of someone who did not know anything about the case, the request raises too many concerns.  See May 9 Tr. at 251:11-20 (Armijo).  The United States concedes that, if "there is something that there probably won't be any further testing on, then probably we wouldn't have an objection," but said that, "if it's something that's very fragile, or could be tested, or toxic, then we might have an issue with it." May 9 Tr. at 251:20-25 (Armijo).

103.   The Court grants Baca and Perez' request.  The Court has previously granted the Joint Motion to Exclude the Prosecution Team from December 2, 2016 Evidence Viewing, filed November 8, 2016 (Doc. 763).  See United States v. DeLeon, No. CR 15-4268, 2017 WL 2271427, at *58 (D.N.M. Mar. 8, 2017).  In making the ruling, the Court stated that "the Defendants are owed as robust of an opportunity to gather work product as possible consistent with security needs."  United States v. DeLeon, 2017 WL 2271427, at *60.  Inspecting the physical evidence against them is essential to Baca and Perez' defense.  The Defendants are entitled to view the physical evidence with a "certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel."  Hickman v. Taylor, 329 U.S. 495, 510 (1947).  See United States v.

DeLeon, 2017 WL 2271427, at *59.  While the United States is not entitled to have a member of the prosecution team oversee the Defendants' review of the physical evidence, it may appoint someone knowledgeable to secure the inspected evidence and to maintain chain of custody.  See May 9 Tr. at 252:1-11 (Court); id. at 252:20-253:3 (Court).

## IV. THE UNITED STATES MUST PRODUCE THE DATES ON WHICH ANY CONVERSATIONS OCCURRED IF THE DATE HAS BEEN REDACTED FROM ANY TRANSCRIPT, BUT THE UNITED STATES DOES NOT NEED TO PRODUCE A LIST OF LOCATIONS WHERE RECORDED CONVERSATIONS TOOK PLACE.

104.    Perez requests that the Court order disclosure of the location where recordings between Perez and informants occurred.  See Motion to Compel at 17-18.  He argues that the "location where these recordings were made is critical" and "highly material," because this information sheds light on whether Perez' statements were made voluntarily.  Motion to Compel at 18.  The United States argues that the request is "well beyond" the scope of criminal discovery and that it is not required to provide this information.  May 9 Tr. at 257:12-13 (Beck); id. at 257:12-23 (Beck).  The Court expressed its skepticism towards the request at the hearing, because Perez' request seems to require the United States to "invent a document."  May 9 Tr. at 260:1 (Court).  Rule 16 of the Federal Rules of Criminal Procedure requires the United States only to allow defendants to inspect, copy, and photograph documents and objects "within the government's possession, custody, or control."  Fed. R. Crim. P. 16(a)(1)(E).  Rule 16 does not require the United States to respond to interrogatory-like requests for information not already contained in documents or objects in the government's possession.  At the hearing, however, the United States could not explain why recordings' dates were redacted when the recordings were given to the Defendants.  See May 9 Tr. at 262:13-17 (Beck).  In contrast to the recordings' locations, this information is already in a document within the United States' possession.  Accordingly, as stated at the hearing,

the Court orders the United States to produce the dates the recordings were made, but not the locations where they occurred.  See May 9 Tr. at 262:21-263:4 (Court).

## V.    THE UNITED STATES DOES NOT NEED TO PRODUCE THE IDENTITIES OF THE INFORMANTS' HANDLERS.

105.    Perez requests that the Court order the United States to disclose Cordova's "law enforcement handler(s) and other agents who dealt directly with Mr. Cordova at the time of the recordings," because it is "highly material" to determining whether Perez' statements were made voluntarily.  Motion to Compel at 20.  At the hearing, Perez noted that "exactly what the Government did in handling Mr. Cordova, basically using him as a government agent to extract statements, goes directly to the question of the voluntariness of those statements."  May 9 Tr. at 285:22-25 (Fox-Young).  The United States stated at the hearing that Acee was Cordova's handler and that it has disclosed this information to the Defendants.  See May 9 Tr. at 288:1-11 (Beck).  It also noted that Perez' request for the identities of the other agents who interacted with Cordova was a "fishing expedition" and beyond what he was entitled to under rule 16.  May 9 Tr. at 288:9 (Beck).  See Jencks v. United States, 353 U.S. 657, 667 (1957)).

106.    The Court concludes that the information which Perez seeks is not material to his defense.  See United States v. Graham, 83 F.3d at 1474 (stating that evidence is material under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal."  United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996).  The arguments that Perez seeks to advance concerning his statement's voluntariness can already be made with evidence that the United States has produced.  See May 9 Tr. at 289:8-15 (Court).  The United States has disclosed Cordova's primary handler, and there is no indication that learning the identities of other agents who interacted with Cordova will play an important role in his defense.

## VI.   UNDER RULE 16, <u>BRADY</u>, AND <u>GIGLIO</u>, THE UNITED STATES MUST PRODUCE ANY CORRESPONDENCE BETWEEN LAW ENFORCEMENT OFFICERS AND THE NM CORRECTIONS DEPARTMENT REGARDING CORDOVA'S CONTRABAND POSSESSION WITHIN FOURTEEN DAYS.

107.     Perez next argues that he is entitled to documents concerning Cordova's possession of contraband items while in prison.  <u>See</u> Motion to Compel at 20.  Perez argues that this information "pertain[s] directly" to Perez' statements' voluntariness, Motion to Compel at 20, and may also help impeach Cordova, <u>see</u> May 10 Tr. at 7:4-10 (Fox-Young).  At the hearing, the United States noted that the request is likely broader than a similar request which C. Garcia previously made and stated that communications concerning Cordova's prison contraband would be impeachment material.  <u>See</u> May 10 Tr. at 9:7-19 (Beck).  Nevertheless, the United States suggested that the Court deny the request.  <u>See</u> May 10 Tr. at 9:20-22 (Beck).  The Court agrees that evidence Cordova had contraband in prison is impeachment material which the United States must turn over to the Defendants.  Accordingly, the Court orders the United States to review the requested materials for <u>Brady</u>, <u>Giglio</u>, and rule 16 material within fourteen days and turn over what it finds.

**IT IS ORDERED** that: (i) Defendants Anthony Ray Baca and Rudy Perez' Sealed Motion to Compel Rule 16 and *Brady* Materials and for Order to Preserve Law Enforcement Notes, filed March 31, 2017 (Doc. 1037), is granted in part and denied in part; and (ii) the requests in Carlos Herrera's Notice of Joinder in Defendant Rudy Perez's Motion and Briefing to Compel Rule 16 and *Brady* Materials and for Order to Preserve Law Enforcement Notes, filed April 3, 2017 (Doc. 1041), are granted in part and denied in part; (iii) the requests in Defendant Daniel Sanchez' Notice of Joinder in Co-Defendant Rudy Perez's Motion to Compel (Doc. 1037), filed April 10, 2017 (Doc. 1077), are granted in part and denied in part; (iv) the United States' Opposed Motion to Reconsider the Court's Order for Limited Production of Sensitive Government Recording

Devices or Programs, filed December 6, 2017 (Doc. 1551), is granted; and (v) the United States'

Motion in Limine to Preclude Soliciting Testimony about Sensitive Government Recording

Devices or Programs, filed December 1, 2017 (Doc. 1524), is granted in part and denied in part.

The Court concludes that: (i) Plaintiff United States of America does not need to produce any

additional audio or video recordings; (ii) the United States does not need to produce the recording

devices, and the Defendants may ask the United States' informants questions about only the

recording devices' general appearance; (iii) the United States must allow Defendants Anthony Ray

Baca and Rudy Perez to handle physical evidence and must provide a custodian who is not a

member of the prosecution team to supervise Baca and Perez; (iv) the United States must produce

the dates on which any conversations occurred if the date has been redacted from any transcript;

(v) the United States does not need to produce the identities of the informants' handlers; and

(vi) rule 16 of the Federal Rules of Criminal Procedure, Brady, and Giglio require the United States

to produce, within fourteen days, any correspondence that exists between the Federal Bureau of

Investigations or law enforcement, and the New Mexico Corrections Department, regarding

whether Billy Cordova possessed contraband.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred Federici
   Attorney for the United States
      Acting Under Authority Conferred by 28 U.S.C. § 515
Albuquerque, New Mexico

--and--

Maria Ysabel Armijo
Randy M. Castellano
Matthew Beck
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

     *Attorneys for the Plaintiff*

Susan M. Porter
Albuquerque, New Mexico

--and--

Sarah M. Gorman
Albuquerque, New Mexico

     *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

--and--

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

     *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

--and--

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

     *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

     *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

--and--

Robert R. Cooper
Albuquerque, New Mexico

     *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

     *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

--and--

Jeffrey C. Lahann
Las Cruces, New Mexico

     *Attorneys for Defendant Allen Patterson*

Eduardo Solis
El Paso, Texas

--and--

John L. Granberg
Granberg Law Office
El Paso, Texas

--and--

Orlando Mondragon
El Paso, Texas

  *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

--and--

Noel Orquiz
Deming, New Mexico

  *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

--and--

Scott Moran Davidson
Albuquerque, New Mexico

--and--

Billy R. Blackburn
Albuquerque, New Mexico

  *Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

--and--

Jerry Daniel Herrera
Albuquerque, New Mexico

  *Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

--and--

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

     *Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

     *Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

--and--

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

     *Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

--and--

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

     *Attorneys for Defendant Mario Rodriguez*


Steven Lorenzo Almanza
Las Cruces, New Mexico

--and--

Ray Velarde
El Paso, Texas

    *Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

--and--

Mary Stillinger
El Paso, Texas

    *Attorneys for Defendant Mauricio Varela*

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

--and--

Richard Jewkes
El Paso, Texas

--and--

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

    *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

--and--

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

    *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

 *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

--and--

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

 *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

 *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Las Cruces, New Mexico

 *Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Charleston, South Carolina

--and--

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

 *Attorneys for Defendant Christopher Garcia*

William R. Maynard
El Paso, Texas

--and--

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

     *Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Albuquerque, New Mexico

--and--

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

     *Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Albuquerque, New Mexico

--and--

Lisa Torraco
Albuquerque, New Mexico

     *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

     *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

     *Attorney for Paul Rivera*

Angela Arellanes
Albuquerque, New Mexico

     *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

    *Attorneys for Defendant Brandy Rodriguez*