# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

     Plaintiff,

vs.                                    No. CR 15-4268 JB

ANGEL DELEON; JOE LAWRENCE
GALLEGOS, EDWARD TROUP, a.k.a. "Huero
Troup"; LEONARD LUJA; BILLY GARCIA,
a.k.a. "Wild Bill"; EUGENE MARTINEZ, a.k.a.
"Little Guero"; ALLEN PATTERSON;
CHRISTOPHER CHAVEZ, a.k.a. "Critter";
JAVIER ALONSO, a.k.a. "Wineo"; ARTURO
ARNULFO GARCIA, a.k.a. "Shotgun";
BENJAMIN CLARK, a.k.a. "Cyclone"; RUBEN
HERNANDEZ; JERRY ARMENTA, a.k.a.
"Creeper"; JERRY MONTOYA, a.k.a. "Boxer";
MARIO RODRIGUEZ, a.k.a. "Blue"; TIMOTHY
MARTINEZ, a.k.a. "Red"; MAURICIO VARELA,
a.k.a. "Archie," a.k.a. "Hog Nuts"; DANIEL
SANCHEZ, a.k.a. "Dan"; GERALD
ARCHULETA, a.k.a. "Styx," a.k.a. "Grandma";
CONRAD VILLEGAS, a.k.a. "Chitmon";
ANTHONY RAY BACA, a.k.a. "Pup"; ROBERT
MARTINEZ, a.k.a. "Baby Rob"; ROY PAUL
MARTINEZ, a.k.a. "Shadow"; CHRISTOPHER
GARCIA; CARLOS HERRERA, a.k.a. "Lazy";
RUDY PEREZ, a.k.a. "Ru Dog"; ANDREW
GALLEGOS, a.k.a. "Smiley"; SANTOS
GONZALEZ; PAUL RIVERA; SHAUNA
GUTIERREZ and BRANDY RODRIGUEZ,

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Plaintiff United States' Motion to Exclude

Expert Witness or in the Alternative to Hold a <u>Daubert</u> Hearing, filed June 28, 2021 (Doc.

3297)("Motion"). The Court held a hearing on August 23, 2021. <u>See</u> Clerk's Minutes at 1, filed

August 23, 2021 (Doc. 3410). The primary issue is whether Dr. Jeffrey Scott Neuschatz, a

Professor of Psychology at the University of Alabama in Huntsville, may testify at Defendant Angel DeLeon's trial about the Plaintiff the United States of America's cooperating witnesses, the psychology of cooperating witnesses in general, and the reliability of the cooperating witness' testimony.  The Court concludes that Dr. Neuschatz may not testify, because: (i) his proposed expert testimony does not help the trier of fact to understand the evidence or to determine a fact in issue; and (ii) he has not applied reliably the principles and methods to the facts of the case.  See Fed. R. Evid. 702.  The Court, therefore, will grant the Motion.

## FACTUAL BACKGROUND

The Court takes its background facts from the Second Superseding Indictment, filed March 9, 2017 (Doc. 947)("Indictment").  The background facts are largely unchanged from those facts that the Court provides in its Memorandum Opinion and Order, 423 F. Supp. 3d 1210, filed November 19, 2019 (Doc. 1585).  The Court does not set forth these facts as findings or the truth. The Court recognizes that the factual background largely reflects the United States' version of events and that the Defendants are all presumed innocent.  The Court takes the particular facts relevant to this matter largely from the Defendant's Notice of Expert Witness Testimony, filed June 7, 2021 (Doc. 3285)("Notice"), and the attached documents.

1. **Background Facts**.

This case deals with crimes that the Syndicato Nuevo Mexico ("SNM") allegedly committed through its members.  See Indictment at 2.  SNM, through its members, operates in the District of New Mexico, and its members engage in acts of violence and other criminal activities, "including murder, kidnapping, attempted murder, conspiracy to manufacture/distribute narcotics, and firearms trafficking."  Indictment at 2.  The SNM constitutes an enterprise "as defined in Title 18, United States Code, Section 1959(b)(2), that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce."  Indictment at

2-3.

The SNM is a prison gang formed in the early 1980s at the Penitentiary of New Mexico ("PNM") after a violent prison riot at PNM during which inmates assaulted and raped twelve correctional officers after taking them hostage.  Indictment at 3.  During the riot, thirty-three inmates were killed, and over 200 inmates were injured.  See Indictment at 3.  After the PNM riot, SNM expanded throughout the State's prison system and has had as many as 500 members.  See Indictment at 3.  SNM now has approximately 250 members, including "a 'panel' or 'mesa' (Spanish for table) of leaders who issue orders to subordinate gang members."  Indictment at 3.  SNM controls drug distribution and other illegal activities within the New Mexico penal system, but it also conveys orders to members outside the prison system.  See Indictment at 3.  Members who rejoin their communities after completing their sentences are expected to further the gang's goals: primarily the control and profit of narcotics trafficking.  See Indictment at 3-4.  Members who fail "to show continued loyalty to the gang [are] disciplined in various ways, [] includ[ing] murder and assaults."  Indictment at 4.

The SNM also intimidates and influences smaller New Mexico Hispanic gangs to expand its power.  See Indictment at 4.  If another gang does not follow the SNM's demands, SNM will assault or kill one of the other gang's members to show its power.  See Indictment at 4.  The SNM's rivalry with other gangs also manifests in beatings and stabbings within the prison system.  See Indictment at 4.  The SNM engages in violence "to assert its gang identity, to claim or protect its territory, to challenge or respond to challenges, to retaliate against a rival gang or member, [and] to gain notoriety and show its superiority over others."  Indictment at 4.  To show its strength and influence, the SNM expects its members to confront and attack any suspected law enforcement informants, cooperating witnesses, homosexuals, or sex offenders.  See Indictment at 5.  To

achieve its purpose of preserving its power, the SNM uses intimidation, violence, threats of violence, assaults, and murder.  See Indictment at 7.  The SNM generates income by having its members and associates traffic drugs and extort narcotic traffickers.  See Indictment at 8.  The SNM members' recent conspiracy to murder high-ranking New Mexico Corrections Department ("NM Corrections Department") officials inspired the Federal Bureau of Investigation's present investigation.  See United States v. Garcia, No. CR 15-4275, Memorandum Opinion and Order at 2, 221 F. Supp. 3d 1275, 1277, filed November 16, 2016 (Doc. 133).

2.  **Particular Facts: Dr. Neuschatz' Analysis and Proposed Testimony.**

During its investigation into the SNM, the United States has relied upon several government informants, including Lawrence Torres, Leonard Lujan, and Michael Jaramillo.  See Neuschatz Report at 1, filed June 7, 2021 (Doc. 3285-2)("Neuschatz Report").  Torres, Lujan, and Jaramillo are allegedly former SNM members.  See Neuschatz Report at 40-50.  Torres, Lujan, and Jaramillo are all cooperating with the United States in exchange for some leniency or favorable treatment by the United States in lieu of prosecution for crimes they allegedly committed as SNM members.  See Neuschatz Report at 1-2.

Dr. Neuschatz is a Distinguished Professor of Psychology at the University of Alabama in Huntsville.  See Neuschatz Report at 1; Curriculum Vitae, Jeffrey Scott Neuschatz at 1, filed June 7, 2021 (Doc. 3285-1)("Neuschatz CV").  He received a Ph.D. in Cognitive Psychology from Binghamton University in Binghamton, New York, in 1999.  See Neuschatz Report at 2.  Dr. Neuschatz has been "studying psycho-legal issues for twenty-five years and jailhouse informant testimony in particular for the last ten years."  Neuschatz Report at 3.  He has published "dozens of articles on these topics in peer reviewed journals, written peer-invited chapters, and presented research findings at regional, national, and international conferences."  Neuschatz Report at 3.  Dr.

Neuschatz has been qualified as an expert in "approximately 100 criminal cases in 7 states and military courts." Neuschatz Report at 3.

Dr. Neuschatz reviewed "selected discovery" relating to Torres, Lujan, and Jaramillo, including "police interviews, police reports, witness statements, and previous trial testimony." Neuschatz Report at 1. After reviewing these documents, Dr. Neuschatz concludes, first, that Torres, Lujan, and Jaramillo "are prototypical cooperating witnesses," meaning that they are "career criminal[s], [have] worked with authorities in the past, [are] looking at a lot of jail time, and [are] expecting some benefit in exchange for testifying." Neuschatz Report at 1-2. Dr. Neuschatz summarizes the findings of several studies relevant to five areas: (i) the persuasive power of confession evidence; (ii) the corruptive power of confession evidence; (iii) the limited ability of jurors to detect lies; (iv) how incentives can motivate someone to lie; and (v) false informant testimony and wrongful convictions. See Neuschatz Report at 3-16.

Dr. Neuschatz concludes that Torres, Lujan, and Jaramillo are "prototypical government cooperators," because Jaramillo and Lujan "admit that they have lied to authorities in the past about their criminal behavior" and "admit that they are cooperating with the government in exchange for leniency and/or money," and confession evidence from Jaramillo and Lujan "has the potential to taint the jurors' perception of all other evidence at the trial." Neuschatz Report at 1-2. Second, Dr. Neuschatz concludes that the research shows that "it is difficult for people, even trained police officers, to determine the veracity of statements," and that this conclusion is particularly true "when the deceptive person is a practiced liar and has rehearsed their decision." Neuschatz Report at 2. Dr. Neuschatz states that "[t]his describes" Torres, Lujan, and Jaramillo, "as they have lied several times to authorities." Neuschatz Report at 2. Third, Dr. Neuschatz concludes that "the research has unequivocally demonstrated that confession evidence, which is

the evidence from the cooperating witnesses in this case, is extremely persuasive."  Neuschatz Report at 2.  Fourth and finally, Dr. Neuschatz concludes that the "informant testimony contains details that are inconsistent with the facts," and, based on "archival analysis of DNA exoneration cases, inconsistency in the facts is a hallmark of false testimony from jailhouse informants." Neuschatz Report at 2.

After summarizing the findings of relevant research on the psychological effects of cooperating witnesses and the effects of cooperating witness testimony on jurors, see Neuschatz Report at 3-16, Dr. Neuschatz offers opinions on each of the three cooperating witnesses -- Torres, Lujan, and Jaramillo, see Neuschatz Report at 16-26.  Dr. Neuschatz again asserts that Torres, Lujan, and Jaramillo are "prototypical jailhouse informants or cooperating witnesses," because they have "lengthy criminal histories and are cooperating in order to get relief on their ongoing legal issues."  Neuschatz Report at 16.  According to Dr. Neuschatz, it is "extremely difficult for lay jurors," who are "unfamiliar with the research on jailhouse informants, informant testimony, and confession evidence," to "appreciate the facts that can affect the reliability of informant testimony."  Neuschatz Report at 16.  Dr. Neuschatz asserts that "jurors should be made aware of all the facts that can impact the reliability of cooperating witnesses such as inconsistent testimony and any promises made in exchange for their testimony," at least, in part, because "people tend to reflexively accept statements made against interest without appreciating the factors that would make an incentivized witness testify falsely."  Neuschatz Report at 16-17.

First, Dr. Neuschatz offers opinions on Michael Jaramillo.  See Neuschatz Report at 17. Dr. Neuschatz notes that Jaramillo was part of the SNM gang while in prison and "participated in the killing of Frank Castillo in 2001."  Neuschatz Report at 17.  According to Dr. Neuschatz, there are "inconsistencies" in Jaramillo's reports and statements.  Neuschatz Report at 17.  For example,

Dr. Neuschatz states that, in Jaramillo's April 5, 2018, statement to police, Jaramillo stated that he did not remember 2001, but later contradicted that by telling police on April 18, 2018, and April 20, 2018, about his SNM involvement and his participation in the killing of Frank Castillo.  See Neuschatz Report at 17-18.  Dr. Neuschatz also states that there are examples of Jaramillo giving false information and false testimony to authorities, including lying to State police and FBI investigators about his participation in the SNM and in Castillo's death, and whether he was in protective custody in May, 2000.  See Neuschatz Report at 19.  Dr. Neuschatz also states that Jaramillo has an incentive to produce false testimony, because Jaramillo "states that he came forward because he was granted immunity," that he "received money for his testimony," and that he was "told that he was expected to perform to a certain standard in order to receive the benefits of his immunity."  Neuschatz Report at 19-20.

Second, Dr. Neuschatz concludes that Torres also has a lengthy criminal history, including convictions for armed robbery, possession of a controlled substance, and conspiracy to commit trafficking by distribution.  See Neuschatz Report at 20.  According to Dr. Neuschatz, when Castillo was killed in prison in March, 2001, Torres was being held in the same facility.  See Neuschatz Report at 20.  Dr. Neuschatz also asserts that there are inconsistencies in Torres' statements and testimony -- for example, that Torres says that he did not see Jaramillo very much, and that Heuro Troup held Castillo's door shut while the alleged murder was happening, but that Torres later stated that Troup was downstairs during the murder.  See Neuschatz Report at 21.  Further, Dr. Neuschatz finds that Torres lied during his testimony by telling law enforcement on March 26, 2001, about what he saw in Castillo's cell, but later telling a jury something different.  See Neuschatz Report at 21-22.  Finally, Dr. Neuschatz states that Torres has an incentive to create false testimony, because Torres "wanted to come forward with information because his main

priority was" for his parole to be reinstated.  Neuschatz Report at 22.

Third, Dr. Neuschatz discusses Lujan.  Dr. Neuschatz asserts that Lujan has an "extensive criminal background," which began when Lujan joined a gang while he was in high school, continued with murdering Felix Martinez in 1998, and later included joining SNM and organizing "several murders and assaults," including the "murders of Castillo and Garza."  Neuschatz Report at 23.  Moreover, according to Dr. Neuschatz, there are inconsistencies in Lujan's prior testimony and statements, too.  See Neuschatz Report at 23-24.  For example, Dr. Neuschatz asserts that, in a statement that Lujan made on December 3, 2015, he "stated that Frederico Munoz assisted in the murder of Felix Martinez, but in his trial testimony, he also includes Manuel Benito."  Neuschatz Report at 23.  Additionally, Dr. Neuschatz states that Lujan testified that he did not say to other SNM members that he wanted to know what was happening before making a decision about Garcia, despite "being presented with a report stating that he made that claim to other inmates."  Neuschatz Report at 24.  Dr. Neuschatz contends that Lujan has lied, either because there is evidence Lujan has lied or because Lujan has admitted to lying.  See Neuschatz Report at 24.  For example, Dr. Neuschatz states that Lujan "stated that he does not have antisocial personality disorder," but he has "been diagnosed with the disorder on multiple occasions."  Neuschatz Report at 24.  Lujan also "states that he has never been prescribed opioids, but his medical records show multiple prescriptions for Percocet."  Neuschatz Report at 24-25.  Lujan also has, according to Dr. Neuschatz, a "significant history of manipulation within the prison system," including one instance where he "cut himself to encourage authorities to get his television fixed."  Neuschatz Report at 25.  Finally, Dr. Neuschatz contends that Lujan has an incentive to falsify his testimony, because he signed "a plea agreement that involved information that he could give to authorities" and "received a 15-year plea deal for the murder of Felix Martinez by giving authorities information."

Neuschatz Report at 26.  Like Jaramillo, Lujan "was told that he was expected to perform to a certain standard in order to receive these benefits."  Neuschatz Report at 26.

## PROCEDURAL BACKGROUND

This case includes the remaining Defendant in the Indictment.  See Indictment at 1.  This case is set for trial on September 7, 2021.  See Proposed Amended Scheduling Order, filed July 12, 2021 (Doc. 3304).  This Motion comes before the Court as the parties prepare for trial.

1.    **DeLeon's Notice of Expert Witness Testimony.**

On June 7, 2021, DeLeon, pursuant to rule 16(b)(1)(C) of the Federal Rules of Criminal Procedure, alerted the Court of his intent to call Dr. Neuschatz at trial to testify in general about "prototypical" cooperating witnesses and informants, "the persuasive power of confession evidence, and false informant testimony," and specifically that "the government's primary cooperating witnesses, Leonard Lujan, Michael Jaramillo, and Lawrence Torres are prototypical cooperating witnesses."  Notice at 2.   DeLeon states that Dr. Neuschatz is a "psychologist and Distinguished Professor at the University of Alabama [in Hunstville]."  Notice at 1.  Dr. Neuschatz has "been a psychologist and professor for over twenty years and has published dozens of articles in peer-reviewed journal, written peer-reviewed chapters and presented his findings at numerous national and international conferences."  Notice at 1.  In the Notice, DeLeon states that Dr. Neuschatz has done "significant research on the prototypical cooperating witness/informant, the persuasive power of confession evidence, and false informant testimony."  Notice at 2.  DeLeon proposes that Dr. Neuschatz "testify as to these aforementioned subjects generally and that based on his research, studies and expertise and review of relevant discovery in this case, the government's primary cooperating witnesses, Leonard Lujan, Michael Jaramillo, and Lawrence Torres are prototypical cooperating witnesses."  Notice at 2.  According to DeLeon, Dr. Neuschatz will "further opine that . . . it is difficult to determine the veracity of cooperating witness statements

and that their confession evidence has the potential to taint remaining evidence."  Notice at 2.

DeLeon contends that there are "no new scientific principles at play" and that there are "adequate

assurances of reliability," so the Court should, "within [its] 'broad discretion,'" allow Dr.

Neuschatz to testify.  Notice at 2-3 (quoting United States v. Velarde, 214 F.3d 1204, 1208-09

(10th Cir. 2000)).

### 2. The United States' Motion to Exclude or Hold a Daubert Hearing.

The United States asks the Court either to exclude Dr. Neuschatz or to hold a Daubert

hearing.  See Motion at 1.  The United States argues that: (i) the Notice does not meet the

requirements of rule 16 of the Federal Rules of Civil Procedure; (ii) DeLeon does not demonstrate

that Dr. Neuschatz can be tested for reliability; and (iii) if Dr. Neuschatz is allowed to testify, the

Court should greatly limit his testimony.  See Motion at 3-7.  The United States, therefore, asks

the Court to preclude Dr. Neuschatz from testifying.  See Motion at 7.

First, the United States argues that DeLeon does not meet rule 16's requirements, because

DeLeon does not "provide[] an adequate explanation of the opinions or the bases and reasons for

the opinions that Dr. Neuschatz intends to express."  Motion at 3.  According to the United States,

the Notice "merely indicates" that Dr. Neuschatz will testify that "the three named witnesses are

'prototypical cooperating witnesses' and that 'it is difficult to determine the veracity of cooperating

witness statements and that their confession evidence has the potential to taint remaining

evidence."  Motion at 3 (quoting Notice at 1-2).  The United States asserts that the Notice is

"problematic," because it "makes the claims above then merely refers to Dr. Neuschatz' attached

report."  Motion at 3.  Finally, the United States alleges that the Notice's contentions that the

witnesses' truthfulness is in doubt, and that it has the potential to "taint remaining evidence," lacks

a "description of what the remaining evidence is or how it may be tainted."  Motion at 3.

Second, the United States argues that DeLeon does not demonstrate that Dr. Neuschatz' testimony can be tested for reliability.  See Motion at 3.  According to the United States, DeLeon's notice does not "provide the requisite indicia of reliability to" Dr. Neuschatz' proposed testimony. Motion at 3.  In particular, the United States argues that Dr. Neuschatz' proposed testimony will "not be helpful to the jury," because the Court "already provides at least two instructions regarding the veracity or believability of witnesses."  Motion at 3.  The United States contends that Dr. Neuschatz' report is "canned" and that Dr. Neuschatz "proposes to tell the jury what they already know -- that witness veracity can be difficult to determine -- and goes further by telling them that they should discard the Court's instructions because informant instructions are ineffective." Motion at 4.  The United States, therefore, asserts that Dr. Neuschatz' testimony is unreliable and should be excluded under rule 403, because it will be "confusing and a waste of time."  Motion at 5.

Third, the United States argues that, if the Court allows Dr. Neuschatz to testify, the Court should bar him from "testifying about many of the conclusions listed in his report."  Motion at 5. First, the United States asserts that one of Dr. Neuschatz' opinions is "based on DNA exoneration cases," but this case is "not a DNA exoneration case."  Motion at 5.  Second, the United States argues that Dr. Neuschatz "simply labels Michael Jaramillo, Leonard Lujan, and Lawrence Torres as typical jailhouse informants (or cooperating witnesses) when they are not."  Motion at 5. According to the United States, there is a "stark contrast" between Jaramillo, Lujan, and Torres, and "how they came about providing testimony previously."  Motion at 5.  Third, the United States contends that Dr. Neuschatz "improperly proposes to be the one and only witness who the jurors can believe to determine witness credibility."  Motion at 5.  Although Dr. Neuschatz asserts that "confession evidence from Mr. Jaramillo and Lujan has the potential to taint the jurors' perception

of all other evidence at the trial," according to the United States, Dr. Neuschatz does not explain what "all other evidence at trial" "will be and how his conclusion can be accurate without knowing what that evidence is."  Motion at 5 (citing Neuschatz Report at 2).  The United States asserts that, although the cooperating witnesses' "[p]otential bias . . . is relevant for the jury to consider," DeLeon's attorneys will be able to "directly inquire of the cooperating witnesses what benefits they can expect to receive for providing testimony."  Motion at 6.  The United States argues, in other words, that "[w]hat would not be relevant to the bias of those cooperating witnesses are Dr. Neuschatz' opinions about the witnesses."  Motion at 6.  The United States notes: "Simply put, the jury does not need expert testimony to understand the straightforward concept of potential sentencing or other benefits stemming from cooperation with the government."  Motion at 6.

    **3.**    **DeLeon's Response.**

    DeLeon responds to the Motion.  <u>See</u> Defendant Angel DeLeon's Response to Government's Motion to Exclude witness or in the Alternative to Hold a <u>Daubert</u> Hearing, filed July 14, 2021 (Doc. 3307)("Response").  DeLeon contends that Dr. Neuschatz' testimony is reliable and meets rule 16's requirements, because DeLeon provides a "summary of Dr. Neuschatz' testimony and his qualifications with a lengthy report."  Response at 1.  DeLeon states that Dr. Neuschatz' report is neither boilerplate nor canned, because he "relays general findings supported by his research and then provides specific details to Mr. DeLeon's case."  Response at 2.  DeLeon contends that the United States' arguments are "based solely on their disagreement with the notice" rather than any "true deficiency under Rule 16."  Response at 2.  Because the United States' proposed witnesses' "credibility is at issue," DeLeon asserts that Dr. Neuschatz' testimony "bears directly on that issue because it goes directly to the cooperating witnesses' credibility and bias."  Response at 4.  Moreover, DeLeon notes that the United States may cross-

examine Dr. Neuschatz at trial.  See Response at 4.  According to DeLeon, the admissibility of Dr. Neuschatz' proposed testimony is a "matter involving the weighing of evidence, which is a determination for the jury to make."  Response at 4.

### 4.    The Hearing.

The Court held a hearing on August 23, 2021.  See Clerk's Minutes at 1, filed August 23, 2021 (Doc. 3410).  The hearing began with a discussion of a different proposed expert, Thomas Jameson, who DeLeon planned to call.  See Draft Transcript of August 23, 2021, Hearing at 5:17 (Taken Aug. 23, 2021)(Court)("Tr.").[1]  After concluding that Mr. Jameson is allowed to testify, the hearing turned to Dr. Neuschatz.  See Tr. at 14:17-18 (Court).  First, the United States spoke in support of its Motion.  See Tr. at 15:16 (Castellano).  The United States noted that it found Dr. Neuschatz' proposed testimony "troubl[ing]," Tr. at 15:17, because the United States worries that, before the Court instructs the jury, Dr. Neuschatz is "going to tell them that . . . jurors don't really follow [instructions] . . . and therefore there is a strong likelihood that they're going to disregard the Court's instructions," Tr. at 16:9-12 (Castellano).  The United States also noted its concern that Dr. Neuschatz wants to serve "as a human lie detector, and how . . . he can instruct the jury also on how to divine truth from falsity in court."  Tr. at 16:15-19 (Castellano).  Further, the United States stated that Dr. Neuschatz wants to "group" Jaramillo, Lujan, and Torres together, and "[t]hen form opinions about anything that they might say."  Tr. at 17:6-8 (Castellano).  The United States argued that "we need to at a minimum carve out part of [Dr. Neuschatz'] testimony," because it is "inconsistent with the Court's instructions, and it will be confusing to the jury under 403."  Tr. at 18:12-16 (Castellano).

---

[1]The Court's citations to the transcripts of the hearings refer to the court reporter's original, unedited version.  Any final transcripts may contain slightly different page and/or line numbers.

DeLeon's attorney then responded.  See Tr. at 18:19 (Gorman).  DeLeon's attorney stated that she could "assure the Court that Dr. Neuschatz is not going to be testifying to influence [the jury] . . . to disregard the Court's instruction.  That's certainly not what was in the notice or in his report."  Tr. at 18:19-23 (Gorman).  According to DeLeon's attorney, Dr. Neuschatz is "going to testify based on reliable studies, based on reliable research that he himself has done as the leader in the field . . . [that] confessions are also immune to the effect [of] judicial instruction . . . [and what] research has shown regarding confessions and false confessions."  Tr. at 18:24-19:5 (Gorman).  DeLeon's attorney argued that Dr. Neuschatz is going to provide

> information on what the studies in the field show, why there is such a thing as a prototypical cooperating [witness and] why specific witnesses that they may hear from fall under that profile, but it will still be up to the jury to decide what they find to be credible [and] what they don't find to be credible.

Tr. at 19:20-20:1 (Gorman).  DeLeon's attorney contended that "providing the jurors with these tools and understanding -- that is important -- because the government has [chosen to make] . . . a majority of their witnesses be cooperating witnesses [or] jailhouse informants[, ] people who have something to [gain] and that is not something that we take lightly."  Tr. at 20:13-19 (Gorman).  DeLeon argues that, because he has a "right to present his defense where the jury can be informed and he had indicated . . . [that] he is far more than qualified and is the leader in this field[,] so at the very least I would ask the court allow us [to] move forward with the Daubert hearing."  Tr. at 20:19-21:1 (Gorman).

DeLeon then called Dr. Neuschatz to the stand.  See Tr. at 21:4-5 (Gorman).  After discussing his credentials and his educational background, see Tr. at 22:1-25 (Neuschatz), Dr. Neuschatz summarized the field of cognitive psychology, see Tr. at 23:3-7 (Neuschatz).  According to Dr. Neuschatz, cognitive psychology is "the study of all brain processes if you will so it's like problem solving, decision making regarding language, language exposition, memory

[--] all of the things that you think inside the brain." Tr. at 23:3-7 (Neuschatz). Dr. Neuschatz then discussed his duties as a distinguished professor, including the courses he teaches and his institutional services. Tr. at 25:1-14 (Neuschatz).

When DeLeon's attorney asked Dr. Neuschatz about his research, Dr. Neuschatz noted that his "research has always been focused on memory." Tr. at 27:24 (Neuschatz). Dr. Neuschatz explained that he has applied his research on memory to "psychology and law," Tr. at 27:25, and to "jury decision making as well," Tr. at 28:1 (Neuschatz). Dr. Neuschatz stated that he has published his research in two books, with a third forthcoming, peer-reviewed journal articles, book chapters, encyclopedia entries, and articles in trade journals. See Tr. at 28:5-14 (Neuschatz). In particular, Dr. Neuschatz said that he has published ten peer-reviewed articles, two book chapters, and one law review article about jailhouse informants. See Tr. at 30:1-4 (Neuschatz). DeLeon's attorney then asked about Dr. Neuschatz' testifying history. See Tr. at 31:10-11 (Gorman). Dr. Neuschatz noted that he has testified in federal court two or three times, but that he is not sure whether he was qualified as an expert. See Tr. at 31:12-15 (Neuschatz). Dr. Neuschatz stated that he has testified in state court "[p]robably over 100" times. Tr. at 31:21 (Neuschatz).

The discussion then turned to Dr. Neuschatz' involvement in this case. Dr. Neuschatz explained that DeLeon's attorney contacted him and asked him if he was willing to "come up with an opinion if [he] had one." Tr. at 32:8-9 (Neuschatz). Dr. Neuschatz stated that he reviewed "materials related to the three [cooperating] witnesses being Leonard Lujan, Jaramillo, and Lawrence Torres," as well as "some information on another [witness], . . . Javier Alonso" and "some testimony from Bryan Acee." Tr. at 32:12-16 (Neuschatz). After reviewing the materials, Dr. Neuschatz prepared a report. See Tr. at 32:21-23 (Gorman, Neuschatz). Dr. Neuschatz explained that he based the "prototypical cooperating witness" on archival analysis, which

analyzed the "characteristics of the people who give testimony." Tr. at 37:3-5 (Neuschatz). He

explained that "prototypical" cooperators generally "are people who have a lot of exposure . . . as

they're looking at lot of jail time" and are "motivated to work with the police or the [g]overnment

or the [state] . . . [or] they probably have worked with the state it the past." Tr. at 37:13-17

(Neuschatz). According to Dr. Neuschatz, these people "don't have a big commitment to the

truth." Tr. at 37:17-18 (Neuschatz). Dr. Neuschatz explained that he is not "saying that everybody

that has these factors are liars or are giving false confessions," but that, "when you look at the

people who have given false confessions[s], . . . these are the characteristics that seem to be

common in most of them." Tr. at 39:3-8 (Neuschatz).

Dr. Neuschatz discussed a phenomenon called "prosecutorial vouching." Tr. at 44:2-23

(Neuschatz). According to Dr. Neuschatz, "prosecutorial vouching" is

> the idea that people have a belief in the system so that when the prosecution puts
> on a witness, they don't . . . evaluate the witness as stringently as they would, or
> look at them as in detail because they believe that the prosecution has . . . done their
> due diligence and believe that if the person was lying the prosecution wouldn't have
> called them as a witness.

Tr. at 44:24-45:6 (Neuschatz). DeLeon's attorney then asked Dr. Neuschatz about a cooperating

witness' "incentives as a motive to lie." Tr. at 45:34 (Gorman). Dr. Neuschatz responded that

"[i]t's a huge motive." Tr. at 45:25 (Neuschatz). According to Dr. Neuschatz, giving people "a

little bit of incentive" will make them confess at "very alarmingly high rates." Tr. at 46:5-8

(Neuschatz). Next, when asked about the connection between these incentives, false confessions,

and cooperating witnesses, Dr. Neuschatz contended that "there is no greater incentive [than]

getting freedom." Tr. at 47:4-5 (Neuschatz). Dr. Neuschatz stated that, although jurors "don't

understand the risk factors that are associated with false confessions," he is "certainly not going to

tell anyone that a particular witness is lying." Tr. at 49: 14-17 (Neuschatz).

DeLeon's attorney asked Dr. Neuschatz why jurors cannot just "use their own sense of credibility the way they would for civilian witnesses" when assessing a government informant. Tr. at 50:6-8 (Neuschatz).  In response, Dr. Neuschatz stated that jurors "have myths about what jailhouse informants do and the persuasiveness of their testimony," so, although they believe they can detect lies, they "don't understand or they disregard" the incentives, or the benefits' extent. Tr. at 51:10-22 (Neuschatz).  Dr. Neuschatz clarified by saying that he is not saying that a cooperating witness is more likely to lie than another witness, but, "to the extent that those risk factors exist, the possibility is increased."  Tr. at 51:6-7.

Dr. Neuschatz then turned specifically to his report.  See Tr. at 51:17 (Neuschatz). According to Dr. Neuschatz, the three cooperating witnesses at issue are prototypical cooperating witnesses.  See Tr. at 52:6-9 (Gorman, Neuschatz).  Starting with Jaramillo, Dr. Neuschatz explained that Jaramillo has a criminal history and was granted immunity, so he has an incentive to lie, and that his testimony is sometimes inconsistent.  See Tr. at 53:17-55:25 (Neuschatz). Second, Dr. Neuschatz discussed Torres.  See Tr. at 65:11 (Neuschatz).  Dr. Neuschatz stated that Torres has "been in jail a long time," is "doing this because he wants his parole reinstated," and "admitted that he lied to the police about what he saw in Mr. Castillo's [cell]."  Tr. at 56:11-19 (Neuschatz).  In general, there are "inconsistencies" in Torres' testimony.  Tr. at 57:8 (Neuschatz). Third, Dr. Neuschatz discussed Lujan.  See Tr. at 57:12 (Neuschatz).  According to Dr. Neuschatz, Lujan has "a lot of exposure," because "he's looking [at] jail time."  Tr. at 57:12-13 (Neuschatz). Dr. Neuschatz noted that Lujan "said he's worked [with] the police before [and] he's quite clear in this . . . that he's doing this because he wants relief on some charges."  Tr. at 57:14-17 (Neuschatz).  Lujan has lied and been inconsistent, too, according to Dr. Neuschatz.  See Tr. at 57:18-58:9 (Neuschatz).  In sum, Dr. Neuschatz stated: "It seems to me that they are all

- 17 -

prototypical cooperating witnesses."  Tr. at 58:14-15 (Neuschatz).  To Dr. Neuschatz, the three

witnesses "exhibit many of the risk factors -- if not all -- associated with false testimony."  Tr. at

58:15-17 (Neuschatz).

Dr. Neuschatz stated that he believes the jury should have his information, because he is

"informing the jury about the situation that . . . leads to a greater risk of false testimony and when

they have information hopefully they'll be more informed and more educated about jailhouse

informant testimony, memory, [and] cognition when they make decisions based on the credibility

of these witnesses."  Tr. at 59:6-12 (Neuschatz).  In response to the Court's question about what

Dr. Neuschatz means by "confession testimony,"  Tr. at 60:13 (Court), Dr. Neuschatz clarified

what he means when "witnesses are giving confessions about their role in the crime and

implicating Mr. DeLeon in the crime based on their confession," Tr. at 61:7-9 (Neuschatz).  When

he says, "confession testimony," Dr. Neuschatz agreed with DeLeon's attorney that phrase means

"both somebody confessing to their own involvement" in a crime or someone else's involvement.

Tr. at 62:1-4 (Gorman, Neuschatz).  DeLeon's attorney then asked Dr. Neuschatz to address the

Court's concern about determining a confession's reliability more accurately than the jury; Dr.

Neuschatz stated: "I don't make that determination."  Tr. at 62:8 (Neuschatz).

After a brief interlude to discuss whether the Court's law clerk's prior representation of Dr.

Neuschatz when the law clerk was a law student presented a conflict, see Tr. at 64:1-70:17 (Court,

Castellano, Sumrall, Gorman), the United States began its cross-examination of Dr. Neuschatz,

see Tr. at 71:10 (Castellano).  The United States asked Dr. Neuschatz how he prepared his report.

See Tr. at 71:22-23 (Castellano).  Dr. Neuschatz explained that he has a template report that he

uses for every case on which he works, and that he does not rewrite for each case.  See Tr. at 72:1-

5 (Neuschatz).  The United States expressed concern about Dr. Neuschatz' report, because it seems

that Dr. Neuschatz is "stating opinions about whether or not a witness has lied or whether a witness is telling the truth."  Tr. at 75:5-7 (Castellano).  Dr. Neuschatz responded by noting that his report accounts for the difference between lies and inconsistencies, and that one of the witnesses he discusses in his report "indicate[s] that he's been untruthful."  Tr. at 75:23-24 (Neuschatz).  When pressed, Dr. Neuschatz admitted that "it would have been better to say that [the witness] acknowledged that he had lied; that he's not currently lying, but he has in the past."  Tr. at 76:8-12 (Neuschatz).

The United States then asked Dr. Neuschatz about his Lujan analysis.  See Tr. at 76:20-23 (Castellano).  The United States suggested that Dr. Neuschatz relies on inadmissible hearsay to form the opinions that he puts in his report.  See Tr. at 77:8-10 (Castellano).  Dr. Neuschatz stated: "I don't know that I'm qualified to make decisions about what's admissible in court," but that if "these statements are made under oath . . . and made to law enforcement under oath then I don't see what the problem would be."  Tr. at 78:6-10 (Castellano).  The United States then asked Dr. Neuschatz about the veracity of the materials on which he bases his analysis, including whether his studies had been peer-reviewed.  See Tr. at 78:19-85:4 (Castellano, Neuschatz).  Dr. Neuschatz clarified that some of his work relies on archival analysis, which, he claimed, is "is looking at data that already exists."  Tr. at 81:19-20 (Neuchatz).

Next, the United States asked Dr. Neuschatz what he means when he says, "it was found that regardless of the type of information given and the reliability of the informant participants [are] more likely to vote guilty when a jail . . . informant was present."  Tr. at 85:13-16 (Castellano).  Specifically, the United States asked: "So when you say judicial instructions, what typically do you mean in terms of what the Court . . . [when] instructing the jury and what you think the jury is actually doing?"  Tr. at 85:18-21 (Castellano).  Dr. Neuschatz responded by

discussing a study done in Connecticut where participants were asked to make decisions based on varied jury instructions.  See Tr. at 85:22-86:17 (Neuschatz).  The United States inquired:

> So you think even though the Court instructs the jury that these witnesses[,] even though there is a credibility instruction generally and they have a specific instruction related to them, that you can [assist] the jury, even though it says consider the motive they have to lie, whether they received benefits, [and] anything of that nature?

Tr. at 87: 17-23 (Castellano).  Dr. Neuschatz explained that he believes that jury members do not "understand the effect of those things . . . on people, so if an expert explains it to them, I think that they'll be better able to use the instructions in a more informed way."  Tr. at 87:24-88:3 (Neuschatz).  In particular, Dr. Neuschatz stated that he would explain to the jury what "we talked about," including "what the typical jailhouse informant is, the effect of incentives on people, the difficulty in detecting lies, [and] . . . the risk factors associated with these things."  Tr. at 88:5-9 (Neuschatz).

After a series of questions about Dr. Neuschatz' history of testifying, Dr. Neuschatz noted that he has always testified "about memory," including "eyewitness memory or memory in general, talking about . . . how memory works and things of that nature."  Tr. at 92:6-9 (Neuschatz).  Dr. Neuschatz confirmed that, if the Court allows Dr. Neuschatz to testify here, it will "be the first time [he] testif[ies] under these circumstances in this case."  Tr. at 92: 10-11 (Castellano).  The United States next asked Dr. Neuschatz whether he is able to compare false confessions to true confessions.  See Tr. at 92:13-20 (Castellano).  Dr. Neuschatz explained that he is not doing such a comparison, because there is "no data kept on true confessions," Tr. at 92:21-22 (Neuschatz), but that he would "love to have that data and see if there are differences," Tr. at 93:2-3 (Neuschatz).  In addition, none of the studies on which Dr. Neuschatz relies involve gang members.  See Tr. 94:23-25 (Castellano, Neuschatz).  The United States concluded its cross-examination by asking

Dr. Neuschatz to provide more detail about some of the studies on which he relies.  See Tr. at 96:7-105:16 (Castellano, Neuschatz).

The Court then stated that it is "trying to figure out exactly the testimony that's in this report."  Tr. at 104:24-25 (Court).  The Court noted that it "doesn't sound like he's ever been allowed to give this one in federal court, and I guess my question is has he ever given this testimony in state court?"  Tr. at 104:25-105:4 (Court).  Dr. Neuschatz responded that he has "not testified on this in either state, federal[,] or military [c]ourt."  Tr. at 105:8-10 (Neuschatz).

DeLeon's attorney then began Dr. Neuschatz' redirect examination.  See Tr. at 105:16 (Gorman).  DeLeon's attorney asked Dr. Neuschatz to follow up on the Court's recent question and explain again the field of cognitive psychology.  See Tr. at 105:24-106:1.  After asking as series of clarification questions about Dr. Neuschatz' report, publications, and the studies on which he relies, DeLeon's attorney's concluded her redirect examination.  See Tr. at 106:9-112:21 (Gorman, Neuschatz).

The Court stated that it is "struggling to see how the profile for people that are telling the truth is any different than the profile for people that [lie]."  Tr. at 112:24-113:1 (Court).  The Court noted that "this profile looks the same to me."  Tr. at 113:3 (Court).  The Court expressed that, when talking about a "prototypical cooperating witness," "it looks to me like it's the same one that would be credible and [Dr. Neuschatz] [has not] come up with the profile for them but isn't it just . . . the same folks [and] the same profile[?]"  Tr. at 113:6-9 (Court).  Dr. Neuschatz said that "it's impossible," because "we don't have the data" to distinguish between those who tell the truth and those who do not.  Tr. at 113:12-13 (Neuschatz).  Dr. Neuschatz stated that his "personal feeling is that it would probably look a little bit different," that is, "these people probably haven't lied to the authorit[ies] in the past, the people who were indict[ed] probably don't have inconsistencies in

their testimony." Tr. at 113:15-20 (Neuschatz).  According to Dr. Neuschatz, the two groups might look different based on their experience working with law enforcement: those who have not lied to law enforcement and not been indicted "probably don't have inconsistencies and lies in previous testimony or dealing with the [police]."  Tr. at 114:7-9 (Neuschatz).  Dr. Neuschatz then stepped down from the witness stand.  See Tr. at 114:18-19 (Court).

Because the United States already had an opportunity to argue its motion, DeLeon's attorney then offered her response.  See Tr. at 115: 24 (Gorman).  DeLeon argued that Dr. Neuschatz "qualifies as an expert," Tr. at 116: 2 (Gorman), under rule 702, and that he is offering Dr. Neuschatz as an expert on "cognitive psychology," Tr. at 116:5 (Gorman).  DeLeon contended that the Court should allow Dr. Neuschatz to testify that "there are certain characteristics that can be attribute[d] to a prototypical cooperating or jailhouse informant."  Tr. at 117:5-8 (Gorman). The Court asked, if Dr. Neuschatz can testify about prototypical cooperating witnesses but cannot do anything but speculate about the "particulars of somebody telling the truth," Tr. at 117:11-12 (Gorman), then "what is the use of the testimony?",  Tr. at 117:15-16 (Court).  The Court noted that, because "we don't have that other half of the equation," it does not "see the benefit of the testimony."  Tr. at 117:23-25 (Court).  Without more information, the Court stated, Dr. Neuschatz' proposed testimony "doesn't seem to be useful to the jury" and "doesn't seem to be reliable," because it is "just stuff that you're going to bring out and the Government is going to bring out through cross-examination," and "then I'm going to warn [the jury] strenuously about the reliability of this stuff."  Tr. at 118:5-11. (Court).  Summing up, the Court stated: "I guess I don't see what he adds."  Tr. at 118:11 (Court).

DeLeon maintained that Dr. Neuschatz' testimony is useful, because he is "somebody who [is] a cognitive psychologist," Tr. at 118:14 (Gorman), and can "provide education," Tr. at 118:21

(Gorman).  The Court noted: "So it's kind of like a summary expert witness is [doing] your closing."  Tr. at 118:22-23 (Court).  DeLeon countered that Dr. Neuschatz can "talk about actual data," Tr. at 118:25-119:1 (Gorman), which is "not something that I can do or that I [will] bring out of the witnesses themselves," Tr. 119:25-120:1 (Gorman).  DeLeon also contended that unreliable hearsay in Dr. Neuschatz' report is not a problem, because "we can limit him talking specifically about some of those things that may be a little questionable in the Government's eyes, so he doesn't get so far into the details . . . ."  Tr. at 120:9-13 (Gorman).  The United States responded and contended that Dr. Neuschatz' testimony would not "help the jury in any way whatsoever," because "under 403 [it is] confusing and a waste of time, because[,] as the Court noted[,] the profile for truth tellers and the liars for him is the same."  Tr. at 122:23-24 (Castellano).

The Court stated that it would review Dr. Neuschatz' proposed testimony "with a fine [tooth] comb," but that it is "not hearing anything that . . . you as lawyer's aren't going to bring out through your evidence," which solves the potential hearsay problem.  Tr. at 123:22-25 (Court). The Court also noted that it is "not seeing the methodology as being either reliable and/or helpful given that he hasn't studied the people that offer exclusively [truthful] testimony."  Tr. at 124:6-9 (Court).  According to the Court, everything Dr. Neuschatz adds "will either be brought out by you as lawyers . . . [or] is not reliable or helpful."  Tr. at 124:16-19 (Court).  The Court, therefore, stated that it is likely going to "grant this motion," so the parties should not "be very optimistic I'm going to allow this expert to testify at the present time."  Tr. at 124:20-23 (Court).  After discussing some scheduling concerns and logistical issues, the hearing concluded.  See Tr. at 125:7-128:14 (Court, Gorman, Armijo, Castellano).

### LAW REGARDING RULE 16 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E) Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

    **(i)**    the item is material to preparing the defense;

    **(ii)**    the government intends to use the item it its case-in-chief at trial; or

    **(iii)**    the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E) (bold in original). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." United States v. Maranzino, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing Jencks v. United States, 353 U.S. 657, 667 (1957)). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." United States v. Badonie, 2005 WL 2312480, at *2 (quoting United States v. Tierney, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted). Nor is the United States required to secure information from third parties. See United States v. Gatto, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly

to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations, citations, and internal quotation marks omitted).

Rule 16(d)(1) provides guidelines for courts to regulate discovery by issuing or modifying protective orders:

> At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte. If relief is granted, the court must preserve the entire text of the party's statement under seal.

Fed. R. Crim. P. 16(d)(1). In In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d 93 (2d Cir. 2008), the Second Circuit held that rule 16(d) gives district courts the discretion to determine the circumstances "under which the defense may obtain access to discoverable information." In re Terrorist Bombings of United States Embassies in East Africa, 552 F.3d at 122. In United States v. Delia, 944 F.2d 1010 (2d Cir. 1991), the Second Circuit noted that rule 16(d)(1) is "permissive," and gives district courts the ability to "limit or otherwise regulate discovery pursuant to Rule [16(d)(1)]." United States v. Delia, 944 F.2d at 1018.

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2) Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or
>
> **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2) (bold in original).

> In selecting a proper sanction, a court should typically consider: (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay; and (3) the feasibility of curing the prejudice with a continuance.

United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)). In United States v. Martinez, 455 F.3d 1127 (10th Cir. 2006), the United States Court of Appeals for the Tenth Circuit held that "a court should impose the least severe sanction." 455 F.3d at 1131 (quoting United States v. Wicker, 848 F.2d 1059, 1061 (10th Cir. 1988)). The Tenth Circuit noted: "Rule 16 and our cases specifically mention continuance or exclusion of the evidence as preferred remedies." 455 F.3d at 1131.

Rule 16(b)(1)(a) specifically provides:

> **(A)**  **Documents and Objects.** If a defendant requests disclosure under Rule 16(a)(1)(E) and the government complies, then the defendant must permit the government, upon request, to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items if:
>
> >  **(i)**  the item is within the defendant's possession, custody, or control; and
> >
> >  **(ii)**  the defendant intends to use the item in the defendant's case-in-chief at trial.

Fed. R. Crim. P. 16(b)(1)(A). Certain information, however, is not subject to disclosure under rule 16(b)(1)(A).

> **(2)**  **Information Not Subject to Disclosure.** Except for scientific or medical reports, Rule 16(b)(1) does not authorize discovery or inspection of:
>
> >  **(A)**  reports, memoranda, or other documents made by the defendant, or the defendant's attorney or agent, during the case's investigation or defense; or
> >
> >  **(B)**  a statement made to the defendant, or the defendant's attorney or agent, by:

- 26 -

> **(i)** the defendant;
>
> **(ii)** a government or defense witness; or
>
> **(iii)** a prospective government or defense witness.

Fed. R. Crim. P. 16(b)(2). Rule 16(b)(2) is considered to be the "work product exception[] to the general discovery requirements." Fed. R. Crim. P. 16 advisory committee's notes (1975 enactment). See United States v. Fort, 472 F.3d 1106, 1123 (9th Cir. 2007)("Rule 16 of the Federal Rules of Criminal Procedure recognizes the work product privilege." (alterations omitted)(quoting United States v. Fernandez, 231 F.3d 1240, 1247 (9th Cir. 2000)).

Rule 16(b)(1)(C) states:

> (C) **Expert witnesses**. -- The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if --
>
> (i) the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or
>
> (ii) the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.
>
> This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C). Additionally, "[i]f a party fails to comply with this rule, the court may . . . prohibit that part from introducing the undisclosed evidence; or . . . enter any other order that it just under the circumstances." Fed. R. Crim. P. 16(d)(2)(C), (D). Even if a party fails to comply with rule 16, it would be "a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings." United States v. Golyanksy, 291 F.3d 1245, 1249 (10th Cir. 2002). Rule 16 requires a "*summary* of the expected testimony, not a list of topics."

United States v. Duvall, 272 F.3d 825, 828-29 (7th Cir. 2001)(emphasis in original).

A defendant's duty to disclose under rule 16(b) does not arise until the United States first complies with the defendant's request under rule 16(a).  See United States v. McVeigh, 954 F. Supp. 1141, 1149 (D. Colo. 1997)("Compliance with such a request [under rule 16(a)] triggers the defense obligation to provide reciprocal discovery under Rule 16(b)").  Once a party has a duty to disclose under rule 16(a) or rule 16(b), that duty continues throughout the case as additional evidence is discovered.  See United States v. McVeigh, 954 F. Supp. at 1149 (citing Fed. R. Crim. P. 16(c)).  Rule 16(c) provides:

> **(c)** **Continuing Duty to Disclose.** A party who discovers additional evidence or material before or during trial must promptly disclose its existence to the other party or the court if:
>
> **(1)** the evidence or material is subject to discovery or inspection under this rule; and
>
> **(2)** the other party previously requested, or the court ordered, its production.

Fed. R. Crim. P. 16(c).  A defendant's obligations under Rule 16(b)(1)(A) apply only to evidence that he or she "intends to use . . . in the defendant's case-in-chief at trial."  Fed. R. Crim. P. 16(b)(1)(A).  In United States v. Harry, No. CR 10-1915, 2014 WL 6065705 (D.N.M. Oct. 14, 2014)(Browning, J.), the Court defined the term "case-in-chief" to mean the part of a trial during which a party presents evidence to support a claim or defense, and after which it rests.  2014 WL 6065705, at *6 ("The Court concludes that rule 16(b)(1)(A)'s drafters intended for the word 'case-in-chief' to have a more restrictive meaning -- the more traditional 'part of a trial in which a party presents evidence to support the claim or defense.'"  (quoting Black's Law Dictionary 224 (9th ed. 2009))).  The Court, thus, concluded that evidence used in a party's case-in-chief "refers to evidence that a party presents between the time that the party calls its first witness and the time the

party rests," and not to evidence that a party introduces while cross-examining the other party's witness.  2014 WL 6065705, at *10.  If a defendant refuses to disclose evidence required under rule 16(b)(1)(A), the trial court may order the defendant to disclose the evidence or prohibit the defendant from introducing the undisclosed evidence at trial.  See Fed. R. Crim. P. 16(d)(2).  See also United States v. Rodriguez Cortez, 949 F.2d 532, 546 (1st Cir. 1991)("It is within the trial court's discretion to exclude evidence for non-compliance with 16(b)(1)(A).").

The Court has spoken before on the Advisory Committee on Evidence Rules at one of its meetings at the University of Denver school of Law in Denver, Colorado, against expanding the detailed report required under the Federal Rules of Civil Procedure to reports in criminal cases. See Advisory Committee on Evidence Rules, Minutes of the Meeting of October 19, 2019, available at https://www.uscourts.gov/sites/default/files/ev_minutes_oct_2018_final_0.pdf; Conference on Proposed Amendments: Experts, The Rule of Completeness, and Sequestration of Witnesses, 87 Fordham L. Rev. 1361, 1387-89 (2019).  The reports serve different purposes in some important respects.  Under the Federal Rules of Civil Procedure, the expert reports need to be detailed enough so that the parties can share the burden and expenses of deposing the expert. See Fed. R. Civ. P. 26(a)(2).  See also Shelak v. White Motor Co., 581 F.2d 1155, 1159 (5th Cir. 1978)(noting that the purpose of the civil discovery rules is to "narrow and clarify the issues and to give the parties mutual knowledge of all relevant facts, thereby preventing surprise"); Sec. and Exch. Comm'n v. Team Res. Inc., 942 F.3d 272, 278 (5th Cir. 2019)("Discovery in civil litigation is litigant-driven; courts are not required to prod parties into conducting discovery if they do not move the process forward themselves.").  In criminal cases, there is no deposition, so the criminal expert report is more of a heads-up to the opposing party that the opposing party may need to get their own expert, ask for a Daubert hearing, or ask for more information. See United States v.

Jordan, 316 F.3d 1215, 1249 n.69 (11th Cir. 2003)(explaining that rule 16's purpose is to proscribe the minimum amount of discovery to which parties are entitled, and not to interfere with a court's discretion to grant more thorough requests).  Criminal cases typically move more quickly than civil cases.  Criminal cases do not involve the discovery that civil cases do.  Equating the expected details of expert reports in civil and criminal cases runs the risk of slowing the speedy trial process and introducing additional work into criminal cases.  The Court's experience is that parties in criminal cases are rarely surprised by the contents of an expert's testimony, because they know everything through the notice, informal communications, or a Daubert hearing.  Civil attorneys insist on knowing everything in the report.  See Conference on Proposed Amendments: Experts, The Rule of Completeness, and Sequestration of Witnesses, 87 Fordham L. Rev. 1361, 1387-89 (2019).

## LAW REGARDING EXPERT TESTIMONY

"Since the Supreme Court of the United States decided Daubert . . ., trial courts have had the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide." United States v. Gutierrez-Castro, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011)(Browning, J.).  "The Court now must not only decide whether the expert is qualified to testify, but, under Daubert, whether the opinion testimony is the product of a reliable methodology." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224. "Daubert . . . requires a court to scrutinize the proffered expert's reasoning to determine if that reasoning is sound." United States v. Gutierrez-Castro, 805 F. Supp. 2d at 1224.

1.     **Rule 702.**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

**(b)** the testimony is based on sufficient facts or data;

**(c)** the testimony is the product of reliable principles and methods; and

**(d)** the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  Rule 702 thus requires the trial court to "determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue."  United States v. Muldrow, 19 F.3d 1332, 1337 (10th Cir. 1994).  Rule 702 uses a liberal definition of "expert."  Fed. R. Evid. 702 advisory committee's note to 1972 proposed rules ("[W]ithin the scope of this rule are not only experts in the strictest sense of the word, e.g., physicians, physicists, and architects, but also the large group sometimes called 'skilled' witnesses, such as bankers or landowners testifying to land values.").  An expert is "required to possess such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth."  LifeWise Master Funding v. Telebank, 374 F.3d 917, 928 (10th Cir. 2004).

In  United States v. Goxcon-Chagal,  886  F. Supp.  2d  1222,  1239  (D.N.M. 2012)(Browning, J.), the Court identified as relevant, and admitted, testimony on:

> (ii) the likelihood that a drug organization would entrust individuals outside of the organization with a large amount of drugs; (iii) the significance of the presence of multiple cellular telephones in the vehicle; (iv) the significance of the possession of multiple license plates; (v) the separation of individuals who package drugs and individuals who are drug couriers within a drug organization; (vi) the significance of the presence of multiple air fresheners in the vehicle; and (vii) the significance of the presence of a firearm in the vehicle.

886 Supp. 2d at 1239.  The Court did not admit testimony on whether a highway portion was a "drug route," because the "proposed testimony is too close to characterizing 'nearly any trip down

the interstate' as traveling in a known drug route"   United States v. Goxcon-Chagal, 886

F. Supp. 2d at 1247.    See United States v. Harry, 20 F. Supp. 3d 1196, 1243 (D.N.M.

2014)(Browning, J.)(deeming inadmissible testimony on a sex crime's victim's demeanor during

an examination, because "demeanor is not always a reliable indicator whether someone is telling

the truth, especially about sex -- then no expert testimony is needed.  That knowledge is well within

the knowledge of jurors and most people."); United States v. Rodella, No. CR 14-2783 JB, 2014

WL 6634310, at *25 (D.N.M. Nov. 19, 2014)(Browning, J.)(stating that "testimony regarding

nationally accepted police standards is irrelevant" to issues of "excessive force and"

reasonableness).   The proponent of expert testimony has the burden of establishing by a

preponderance of the evidence that the pertinent admissibility requirements are met.[2]  See Morales

v. E.D. Etnyre & Co., 382 F. Supp. 2d 1252, 1266 (D.N.M. 2005)(Browning, J.)(citing Bourjaily

v. United States, 483 U.S. 171, 175 (1987)).   Once the trial court has determined that expert

testimony would be helpful to the trier of fact, a witness "may qualify as an expert by knowledge,

---

[2]The Court is clipping the wings of experts all the time.  See, e.g., Abraham v. WPX Prod.
Prods., LLC, 184 F. Supp. 3d at 1204 (precluding an expert from discussing class certification
requirements, but allowing the expert to testify to information about royalty instruments); United
States v. Rodriguez, 125 F. Supp. 3d at 1255-56 (permitting an expert to describe a cartel's
structure and organization, and to explain drug running, but not admitting the expert's testimony
opining that the defendant was running drugs); Montoya v. Sheldon, 286 F.R.D. at 619 (precluding
a treating physician from testifying about a party's PTSD diagnosis, opinions about the causes for
a party's symptoms, or a party's prognosis).  Attorneys ask experts to do too much, and experts
try to do too much.  The experts are being paid; they are trying to be helpful to the attorney.  Cf.
Mark I. Bernstein, Jury Evaluation of Expert Testimony under the Federal Rules, Drexel L.R. 239,
268 (2015)("Any use of expert witnesses paid by a party raises concerns of partisanship,
competency, and honesty.  Because experts are partisan witnesses paid by a party, there is an
inevitable danger of bias.).  The experts will often do anything.  They toss statements into their
reports to be helpful.  Too many attorneys release the report as written -- without editing and
without trimming.  This failure to edit and to trim creates unnecessary litigation.  Many expert
reports contain statements that the proponent attorney does not need or even want.  The reports
draw Daubert motions or rule 702 challenges.  The proponent is then forced to defend the
statements.

skill, experience, training, or education and . . . the expert . . . should not be required to satisfy an overly narrow test of his own qualifications." Gardner v. Gen. Motors Corp., 507 F.2d 525, 528 (10th Cir. 1974)(internal quotation marks omitted). See United States v. Rodella, 2014 WL 6634310, at *20 ("Because of [the proposed expert's] lack of practical experience, lack of nationwide experience, and lack of an advanced degree in criminology or law enforcement, [the proposed expert] is not qualified to testify about nationally accepted police procedures and practices."); United States v. Goxcon-Chagal, 886 F. Supp. 2d at 1245 (determining an expert qualified to testify to drug trafficking when he had personal knowledge of the subject from working in the Drug Enforcement Agency for almost fifteen years).

Courts should, under the Federal Rules of Evidence, liberally admit expert testimony, see United States v. Gomez, 67 F.3d 1515, 1526 (10th Cir. 1995)(describing rule 702 as a "liberal standard"), and the trial court has broad discretion in deciding whether to admit or exclude expert testimony, see Werth v. Makita Elec. Works, Ltd., 950 F.2d 643, 647 (10th Cir. 1991)(noting the trial court's decision will not be overturned "unless it is manifestly erroneous or an abuse of discretion"). "The [United States Court of Appeals for the] Tenth Circuit appears to draw a line between expert testimony regarding credibility and expert testimony regarding voluntariness." United States v. Ganadonegro, 805 F. Supp. 2d 1188, 1214 (D.N.M. 2011)(Browning, J.)(citing United States v. Benally, 541 F.3d 990, 996 (10th Cir. 2008)). "The Tenth Circuit may draw this distinction because, generally, it is the jury's exclusive function to make credibility determinations . . . whereas a court makes a pretrial determination of the constitutional voluntariness of a statement." United States v. Ganadonegro, 805 F. Supp. 2d at 1214 (citation omitted)(citing United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001)).

2.    **The Daubert Standard.**

In its gatekeeper role, a court must assess the reasoning and methodology underlying an expert's opinion, and determine whether it is both scientifically valid and relevant to the facts of the case, i.e., whether it is helpful to the trier of fact.  See Daubert, 509 U.S. at 594-95; Witherspoon v. Navajo Ref. Co., No. 03-1160, 2005 WL 5988649, at *2 (D.N.M. July 18, 2005)(Black, J.)(citing Dodge v. Cotter Corp., 328 F.3d 1212, 1221 (10th Cir. 2003)).   The Supreme Court articulated a non-exclusive list of factors that weigh into a district court's first-step reliability determination, including: (i) whether the method has been tested; (ii) whether the method has been published and subject to peer review; (iii) the error rate; (iv) the existence of standards and whether the witness applied them in the present case; and (v) whether the witness' method is generally accepted as reliable in the relevant medical and scientific community. See Daubert, 509 U.S. at 594-95.  The district court is also to consider whether the witness' conclusion represents an "unfounded extrapolation" from the data; whether the witness has adequately accounted for alternative explanations for the effect at issue; whether the opinion was reached for the purposes of litigation or as the result of independent studies; or whether it unduly relies on anecdotal evidence.  See Witherspoon v. Navajo Ref. Co., 2005 WL 5988649, at *3 (citing Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997)).  The Tenth Circuit stated the applicable standard in Norris v. Baxter Healthcare Corp., 397 F.3d 878 (10th Cir. 2005):

> Rule 702 requires the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable."  Bitler v. A.O. Smith Corp., 391 F.3d 1114, 1120 (10th Cir. 2004)(quoting Daubert, 509 U.S. at 589 . . .).  This obligation involves a two-part inquiry.  Id.  "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his [or her] discipline.'"  Id.  (quoting Daubert, 509 U.S. at 592 . . .).  In making this determination, the district court must decide "whether the reasoning or methodology underlying the testimony is scientifically valid. . . ."  Id. (quoting Daubert, 509 U.S. at 592-93 . . .).  Second, the district court must further inquire into whether proposed testimony is sufficiently "relevant to the task at hand."  Daubert, 509 U.S. at 597 . . . .

Norris v. Baxter Healthcare Corp., 397 F.3d at 883-84 (footnote omitted).  "The second inquiry is related to the first.  Under the relevance prong of the Daubert analysis, the court must ensure that the proposed expert testimony logically advances a material aspect of the case. . . .  The evidence must have a valid scientific connection to the disputed facts in the case."  Norris v. Baxter Healthcare Corp., 397 F.3d at 884 n.2 (citing Daubert v. Merrell Dow Pharm., Inc., 43 F.3d 1311, 1315 (9th Cir. 1995)(on remand from the Supreme Court); Daubert, 509 U.S. at 591).  If the expert's proffered testimony fails on the first prong, the court does not reach the second prong. See Norris v. Baxter Healthcare Corp., 397 F.3d at 884.  In Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), the Supreme Court expanded the rules under Daubert to non-scientific expert testimony.  See Kumho Tire Co. v. Carmichael, 526 U.S. at 141 ("We conclude that Daubert's general holding -- setting forth the trial judge's general 'gatekeeping' obligation -- applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (quoting Carmichael v. Samyang Tires, Inc., 923 F. Supp. 1514, 1521 (S.D. Ala. 1996)).  The Supreme Court recognized in Kumho Tire Co. v. Carmichael that the factors from Daubert will not apply to all cases:

> Our emphasis on the word "may" thus reflects Daubert's description of the Rule 702 inquiry as a flexible one.  Daubert makes clear that the factors it mentions do not constitute a definitive checklist or test.  And Daubert adds that the gatekeeping inquiry must be tied to the facts of a particular case.

Kumho Tire Co. v. Carmichael, 526 U.S. at 150 (internal quotation marks omitted).

In conducting its review under Daubert, a court must focus generally on "principles and methodologies, and not on the conclusions generated."  Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, No. CIV 05-0619, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006)(Browning, J.)(citing Daubert, 509 U.S. at 595).  "Despite this focus on methodology, an expert's conclusions are not immune from scrutiny . . . and the court may conclude that there is

simply too great an analytical gap between the data and the opinion proffered." Armeanu v. Bridgestone/Firestone N. Am., Tire, LLC, 2006 WL 4060665, at *11 (alterations and internal quotation marks omitted)(quoting Dodge v. Cotter Corp., 328 F.3d at 1222). The proponent of the expert's opinion testimony bears the burden of establishing that the expert is qualified, that the methodology he or she uses to support his or her opinions is reliable, and that his or her opinion fits the facts of the case and thus will be helpful to the jury. See Norris v. Baxter Healthcare Corp., 397 F.3d at 881. The Tenth Circuit noted in Hollander v. Sandoz Pharm. Corp., 289 F.3d 1193 (10th Cir. 2002):

> Because the district court has discretion to consider a variety of factors in assessing reliability under Daubert, and because, in light of that discretion, there is not an extensive body of appellate case law defining the criteria for assessing scientific reliability, we are limited to determining whether the district court's application of the Daubert manifests a clear error of judgment or exceeds the bounds of permissible choice in the circumstances. . . . Thus, when coupled with this deferential standard of review, Daubert's effort to safeguard the reliability of science in the courtroom may produce a counter-intuitive effect: different courts relying on the essentially the same science may reach different results.

289 F.3d at 1206. The United States Court of Appeals for the Ninth Circuit noted in Claar v. Burlington N.R.R., 29 F.3d 499 (9th Cir. 1994):

> Coming to a firm conclusion first and then doing research to support it is the antithesis of this method. Certainly, scientists may form initial tentative hypotheses. However, scientists whose conviction about the ultimate conclusion of their research is so firm that they are willing to aver under oath that it is correct prior to performing the necessary validating tests could properly be viewed by the district court as lacking the objectivity that is the hallmark of the scientific method.

29 F.3d at 502-03.

> Once reliability is established, however, it is still within the district court's discretion to determine whether expert testimony will be helpful to the trier of fact. In making that determination, the court should consider, among other factors, the testimony's relevance, the jurors' common knowledge and experience, and whether the expert's testimony may usurp the jury's primary role as the evaluator of evidence.

Ram v. N.M. Dep't of Env't, No. CIV 05-1083, 2006 WL 4079623, at *10 (D.N.M. Dec. 15, 2006)(Browning, J.)(citing United States v. Rodriguez-Felix, 450 F.3d 1117, 1123 (10th Cir. 2006)).

An untested hypothesis does not provide a scientific basis to support an expert opinion. See Norris v. Baxter Healthcare Corp., 397 F.3d at 887 ("[A]t best, silicone-associated connective tissue disease is an untested hypothesis.  At worst, the link has been tested and found to be untenable.  Therefore, there is no scientific basis for any expert testimony as to its specific presence in Plaintiff."); In re Breast Implant Litig., 11 F. Supp. 2d 1217, 1228 (D. Colo. 1998)(Sparr, J.)("An untested hypothesis cannot be a scientifically reliable basis for an opinion on causation.").  A court is not required "to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert.  The court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."  Gen. Elec. Co. v. Joiner, 522 U.S. at 146.  See Hollander v. Sandoz Pharm. Corp., 289 F.3d at 1209 (noting a lack of similarity between animal studies and human studies); Tyler v. Sterling Drug, Inc., 19 F. Supp. 2d 1239, 1244 (N.D. Okla. 1998)(Cook, J.)("Test results on animals are not necessarily reliable evidence of the same reaction in humans.").  Courts have excluded experts' opinions when the experts depart from their own established standards.  See Truck Ins. Exch. v. MagneTek, Inc., 360 F.3d 1206, 1213 (10th Cir. 2004)("The district court noted that [the expert]'s opinion did not meet the standards of fire investigation [the expert] himself professed he adhered to."); Magdaleno v. Burlington N.R.R., 5 F. Supp. 2d 899, 905 (D. Colo. 1998)(Babcock, J.)("In sum, [the expert]'s methodology is not consistent with the methodologies described by the authors and experts whom [the expert] identifies as key authorities in his field.").

### 3.    Necessity of Evaluating an Issue Under Daubert.

The restrictions in Daubert apply to both "novel" expert testimony and "well-established propositions."  509 U.S. at 593 n.11 ("Although the Frye[3] decision itself focused exclusively on 'novel' scientific techniques, we do not read the requirements of Rule 702 to apply specially or exclusively to unconventional evidence.").   "Of course, well-established propositions are less likely to be challenged than those that are novel, and they are more handily defended."  Daubert, 509 U.S. at 593 n.11.  "Indeed, theories that are so firmly established as to have attained the status of scientific law, such as the laws of thermodynamics, properly are subject to judicial notice under Federal Rule of Evidence 201."  Daubert, 509 U.S. at 593 n.11.

"[W]hen experts employ established methods in their usual manner, a district court need not take issue under Daubert. . . ."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 780 (10th Cir. 2009).  "[H]owever, where established methods are employed in new ways, a district court may require further indications of reliability."  Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780.  Whether courts have accepted theories underlying an expert's opinion is a relevant consideration in determining whether expert testimony is reliable.  See Att'y Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d at 780 ("The case law indicates that the courts are not unfamiliar with the PCR methodology, and in fact some courts have indicated their acceptance of it.").

### 4.    Expert Testimony Bolstering Other Witnesses' Credibility.

"The credibility of witnesses is generally not an appropriate subject for expert testimony." United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993).  See United States v. Ganadonegro,

---

[3]Frye v. United States, 293 F. 1013 (D.C. Cir. 1923), superseded by rule 702 of the Federal Rules of Evidence, held that, for an expert opinion to be admissible, "the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."  293 F. at 1014.

805 F. Supp. 2d 1188, 1213 (D.N.M. 2011)(Browning, J.)(excluding expert testimony on whether defendant's confession was credible).

> There are several reasons for the prohibition against expert testimony on other witness' credibility. Such testimony: (1) "usurps a critical function of the jury"; (2) "is not helpful to the jury, which can make its own determination of credibility"; and (3) when provided by "impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury."

United States v. Hill, 749 F.3d 1250, 1258 (10th Cir. 2014)(quoting United States v. Toledo, 985 F.2d at 1470).  The bar on credibility bolstering expert testimony is grounded in a number of evidentiary rules.  See United States v. Charley, 189 F.3d 1251, 1267 n.21 (10th Cir. 1999)(en banc).  Expert testimony that vouches for the credibility of other witnesses lacks "relevance [under rule 401] and would not 'assist the trier of fact as required by Rule 702.'"  United States v. Adams, 271 F.3d 1236, 1246 (10th Cir. 2001)(quoting United States v. Charley, 189 F.3d at 1267).  See United States v. Harry, No. CR 10-1915 JB, 2014 WL 1949993, at *38 (D.N.M. May 5, 2014)(Browning, J.)(concluding that expert's testimony was not relevant if expert testified that witness' demeanor suggested that the witness was not subjected to a sexual assault, because the testimony impermissibly went to the witness' credibility).

> Courts have also held that testimony which vouches for the credibility of a witness violates other evidentiary rules, such as Rule 608(a)(1) or Rule 403.  Some courts have held that, although Rule 608(a)(1) "permits testimony concerning a witness's general character or reputation for truthfulness," it "prohibits any testimony as to a witness's truthfulness on a particular occasion."  State v. Rimmasch, 775 P.2d 388, 391 (Utah 1989)(construing Utah R. Evid. 608); see also United States v. Azure, 801 F.2d 336, 341 (8th Cir. 1986); State v. Wood, 194 W. Va. 525, 460 S.E. 2d 771, 778 (W. Va. 1995)(construing W. Va. R. Evid. 608); People v. Koon, 713 P.2d 410, 412 (Colo. Ct. App. 1985)(construing Colo. R. Evid. 608).  And at least one court has held, in a sexual abuse case, that testimony that bolsters the credibility of the complaining witness violates Rule 403's balancing test.  United States v. Funds Held in the Name or for the Benefit of John Hugh Wetterer, 991 F. Supp. 112, 120-21 (E.D.N.Y. 1998).

United States v. Charley, 189 F.3d at 1267 n.21.  See also United States v. Benally, 541 F.3d 990, 995 (10th Cir. 2008)(affirming district court's exclusion of vouching testimony under rule 403's balancing test).  The bar on bolstering a witness' testimony only extends to expert testimony concerning the credibility of the witness and not to expert testimony that is consistent with another witness' testimony.  See United States v. Charley, 189 F.3d at 1264.  In United States v. Charley, the Tenth Circuit held, en banc, that the district court did not err in permitting an expert witness to testify that the actions and symptoms of two girls were consistent with those of a sexual assault victim.  See 189 F.3d at 1264.  The expert's testimony was consistent with the two girls' testimony that they had been sexually assaulted.  See 189 F.3d at 1258.  The Tenth Circuit held, however, that the district court erred in permitting a psychiatrist to testify that he believed the girls were sexually assaulted, based on statements the girls made to the psychiatrist, because the testimony "was essentially vouching for [the girls'] truthfulness."  189 F.3d at 1267.

In United States v. Chaco, 801 F. Supp. 2d 1200 (D.N.M. 2011)(Browning, J.), the Court permitted a doctor to testify that an examination of a sexual assault victim did not show any signs of sexual assault but that the majority of physical examinations on sexually assaulted prepubescent girls result in normal findings.  See 801 F. Supp. 2d at 1216.  The Court permitted the doctor to testify that the examination, which resulted in no evidence of sexual abuse, was still consistent with the victim being sexually abused.  See 801 F. Supp. 2d at 1216.  The Court, however, excluded testimony from the doctor that the victim had been sexually assaulted, because the doctor knew that the victim was sexually assaulted based on statements that the victim made to the doctor.  See 801 F. Supp. 2d at 1216.  The Court reasoned that permitting the doctor to testify that the victim had been sexually assaulted would serve to impermissibly vouch for the credibility of the witness. See 801 F. Supp. 2d at 1216 (citing United States v. Velarde, 214 F.3d 1204, 1211 n.6 (10th Cir.

2000)).  The Court however, concluded that the doctor's testimony that the examination results were consistent with that of a sexual assault victim was based on the doctor's knowledge and experience, and was, thus, permissible expert testimony.  See United States v. Chaco, 801 F. Supp. 2d at 1216.

## ANALYSIS

The United States argues that the Court should not allow Dr. Neuschatz to testify, because: (i) the Notice does not meet rule 16's requirements; (ii) DeLeon does not demonstrate that Dr. Neuschatz can be tested for reliability; and (iii) Dr. Neuschatz' testimony is unreliable and unhelpful to the jury, so if Dr. Neuschatz is allowed to testify, the Court should greatly limit his testimony.  See Motion at 3-7.  The Court concludes that: (i) although the Notice meets rule 16's requirements; (ii) he has not applied reliably the principles and methods to the case's facts; and (iii) Dr. Neuschatz' proposed expert testimony does not help the trier of fact to understand the evidence or to determine a fact in issue.  See Fed. R. Evid. 702.  Dr. Neuschatz, therefore, may not testify.

## I.    THE NOTICE OF DR. NEUSCHATZ TESTIMONY MEETS RULE 16'S REQUIREMENTS, BECAUSE IT WAS TIMELY AND OFFERS AN APPROPRIATE SUMMARY OF DR. NEUSCHATZ' PROPOSED TESTIMONY.

First, the United States contends that DeLeon's notice does not meet rule 16's requirements, because it does not provide "adequate explanation of the opinions or the bases and reasons for the opinion that Dr. Neuschatz intends to express," and that it "merely refers to Dr. Neuschatz' attached report."  Motion at 3.  Rule 16(b)(1)(C) states:

(C)     **Expert witnesses**. -- The defendant must, at the government's request, give to the government a written summary of any testimony that the defendant intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial, if --

(iii)     the defendant requests disclosure under subdivision (a)(1)(G) and the government complies; or

(iv)    the defendant has given notice under Rule 12.2(b) of an intent to present expert testimony on the defendant's mental condition.

This summary must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

Fed. R. Crim. P. 16(b)(1)(C).  Additionally, "[i]f a party fails to comply with this rule, the court may . . . prohibit that part from introducing the undisclosed evidence; or . . . enter any other order that it just under the circumstances."  Fed. R. Crim. P. 16(d)(2)(C), (D).  Even if a party fails to comply with rule 16, it would be "a rare case where, absent bad faith, a district court should exclude evidence rather than continue the proceedings."  United States v. Golyanksy, 291 F.3d 1245, 1249 (10th Cir. 2002).  Rule 16 requires a "*summary* of the expected testimony, not a list of topics." United States v. Duvall, 272 F.3d 825, 828-29 (7th Cir. 2001)(emphasis in original).

DeLeon's notice meets rule 16's requirements.  A rule 16 disclosure requires: (i) a disclosure of the witness's opinions; (ii) an explanation of the bases and reasons for those opinions; (iii) disclosure of the witnesses' qualifications.  See United States v. Nacchio, 519 F.3d 1140, 1151 (10th Cir. 2008),vacated in part on rehearing for unrelated grounds by United States v. Nacchio, 555 F.3d 1234 (10th Cir. 2009).  First, the Notice provides a disclosure of Dr. Neuschatz' opinions. The Notice states that Dr. Neuschatz will testify about "judgment, memory and specifically as it relates to cooperating witnesses/jailhouse informants."  Notice at 1.  The Notice also states that Dr. Neuschatz will testify that "the government's primary cooperating witnesses" are "prototypical cooperating witnesses," so it is "difficult to determine the veracity of cooperating witness statements and that their confession evidence has the potential to taint remaining evidence." Notice at 2.  Second, the Notice explains the reasons for Dr. Neuschatz' opinions, which include that Dr. Neuschatz has done "significant research on the prototypical cooperating witness/informant, the persuasive power of confession evidence, and false informant testimony."

Notice at 2.  The Notice also contends that Dr. Neuschatz bases his opinions on "his research, studies, and expertise."  Notice at 2.  Third, the Notice offers ample evidence of Dr. Neuschatz' qualifications, including acknowledging that he is a distinguished professor of psychology at the University of Alabama Huntsville, as well as attaching Dr. Neuschatz' nineteen-page curriculum vitae.  See Notice at 1; Neuschatz CV at 1-19.  Moreover, the United States has ample information to argue that Dr. Neuschatz should not testify because his proposed testimony cannot be tested for reliability and that it could prove harmful to the jury.  See Notice at 3-5.  The strength of the United States' arguments about reliability or harm to the jury weighs against concluding that the Notice does not satisfy rule 16.  See Motion at 1-8.  The Notice, therefore, is adequate and complies with rule 16's requirements.

## II.    DR. NEUSCHATZ HAS NOT APPLIED RELIABLE PRINCIPLES WHEN ANALYZING TORRES', LUJAN'S, AND JARAMILLO'S STATEMENTS AND TESTIMONY.

Third, Dr. Neuschatz has not applied reliable principles when analyzing Torres', Lujan's, and Jaramillo's statements.  Rule 702 requires that an expert "has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.  Here, it does not matter if Dr. Neuschatz' principles are reliable or whether they meet Daubert's reliability standard.  See Daubert, 509 U.S. at 594-95.  The Neuschatz Report spends thirteen pages summarizing research findings that Dr. Neuschatz contends are relevant here.  See Neuschatz Report at 3-16.  In his report, Dr. Neuschatz does not apply these findings to this case's facts.  For Torres, Lujan, and Jaramillo each, Dr. Neuschatz discusses their criminal histories, and examples of each being allegedly manipulative or untruthful.  See Neuschatz Report at 16-26.  Dr. Neuschatz does not apply any scientific principles or methods to his analysis of each of the three witnesses.  See Neuschatz Report at 1-28.  The first half of the Neuschatz Report summarizes research findings.  See Neuschatz Report

at 3-16. The second half of the Neuschatz Report presents reasons why Torres, Lujan, and Jaramillo might have an incentive to lie or are alleged to have lied or to have been manipulative in the past. In the Neuschatz Report, Dr. Neuschatz makes little effort to explain how his findings apply to each individual witness or what a jury could learn from his analysis that is not a passing judgment on each witness' credibility. In other words, although Dr. Neuschatz presents findings, principles, and methods, he does not apply them as rule 702 requires. The Neuschatz Report and its accompanying Notice, therefore, do not meet rule 702's requirements.

There are also problems with Dr. Neuschatz' methodology, even if Dr. Neuschatz were to apply his methodology to this case's facts and witnesses. Dr. Neuschatz admits that he has conducted no studies on when cooperating witnesses tell the truth; he also states that he is unaware of any studies about when cooperating witnesses tell the truth. See Tr. at 92:21-22 (Neuschatz). Thus, there is no available comparison between cooperating witnesses who lie and cooperating witnesses who tell the truth. Dr. Neuschatz does not indicate whether cooperating witnesses overwhelmingly tell the truth, tell the truth half the time, or never tell the truth. See Neuschatz Report at 1-28. The Court and the jury would be left to speculate about what is going on with witnesses generally, which undercuts considerably, if not completely, the usefulness of his testimonial opinions.

This lack of studies with which to compare Dr. Neuschatz' work is related to what he has studied about the limits of making assumptions about human behavior by trying to extrapolate from unrelated data. Dr. Neuschatz' studies and those on which he relies have mostly been on the cognitive effects of certain kinds of evidence have on witnesses or juries. See Neuschatz CV at 2-8. This case involves cooperating witnesses. Thus, Dr. Neuschatz really has no data on how often cooperating witnesses lie; he is extrapolating from data about the cognitive effects that certain

kinds of evidence of juries or witnesses.  Thus, in the end, Dr. Neuschatz does not have any data

on the issues in this case: whether Torres, Lujan, and Jaramillo are lying or telling the truth.  And,

even if he did, the controlling law suggests that an expert witness does not get to come to court

and tell a jury who is lying and who is telling the truth; that is the jury's job.  See Davis v. Alaska,

415 U.S. 308, 318 (1974)(explaining that defense counsel should have the opportunity "to expose

to the jury facts from which jurors, as the sole triers of fact and credibility, could appropriately

draw inferences relating to the reliability of the witness."); United States v. Arias-Santos, 39 F.3d

1070, 1074.  In the end, Dr. Neuschatz would be telling the jury that cooperating witnesses may

lie.  The Court concludes that DeLeon's attorneys will ably make the point with the cross-

examination, opening arguments, and closing arguments.

## III.    DR. NEUSCHATZ' PROPOSED TESTIMONY DOES NOT HELP A TRIER OF FACT UNDERSTAND THE EVIDENCE TO DETERMINE A FACT IN ISSUE.

Second, Dr. Neuschatz' proposed testimony will not help a jury understand the evidence

to determine a fact in issue.  Rule 702 requires that an expert's specialized knowledge "help the

trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  If the

expert's proposed testimony will not assist a jury -- or other trier of fact -- to determine a fact in

issue, then it is not admissible under rule 702.  See United States v. Muldrow, 19 F.3d at 1337.

Nothing Dr. Neuschatz states in his report does anything more than raise doubts about the

truthfulness of Torres', Lujan's, and Jaramillo's testimony, which can be done ably during cross-

examination.  In the Notice, DeLeon contends that, because the United States "has chosen to use

cooperating witnesses, some former co-defendants, and many incarcerated, as the primary

witnesses against"' him, the witnesses' credibility is "at issue."  Notice at 3-4.  According to

DeLeon, Dr. Neuschatz' testimony "bears directly on [the issue of the witnesses' credibility]

because it goes to the cooperating witnesses' credibility and bias."  Notice at 4.  The Tenth Circuit

- 45 -

notes, however, that "testimony which essentially simply vouches for the truthfulness of another witness is impermissible." United States v. Velarde, 214 F.3d 1204, 1211 (10th Cir. 2000). See United States v. Toledo, 985 F.2d 1462, 1470 (10th Cir. 1993)("The credibility of witnesses is generally not an appropriate subject for expert testimony."). Further, it is "plain error to admit testimony that is a thinly veiled comment on a witnesses' credibility." Nichols v. Am. Nat. Ins. Co., 154 F.3d 875, 884 (10th Cir. 1998). Because the purpose of Dr. Neuschatz' proposed testimony is to call into question Torres', Lujan's, and Jaramillo's credibility, Dr. Neuschatz may not testify. DeLeon remains free to attack Torres', Lujan's, and Jaramillo's credibility on cross examination, which renders Dr. Neuschatz' testimony redundant at best, and "a thinly veiled comment" on Torres', Lujan's, and Jaramillo's credibility at worse. Nichols v. Am. Nat. Ins. Co., 154 F.3d at 884. See United States v. Benedict, 855 F.3d 880, 885 (8th Cir. 2017)(concluding that the district court did not abuse its discretion by declining to admit Dr. Neuschatz' testimony, because it was a comment on a witness' credibility); United States v. Davis, 690 F.3d 226, 257-58 (4th Cir. 2012)("[W]e also agree with the government that, even if the testimony was wrongfully excluded, it was at most, harmless error. Most of the points that would have been made by Dr. Neuschatz were made by Davis' counsel on cross-examination.").

If this case follows the course of the prior SNM trials, DeLeon will rigorously cross-examine these cooperating witnesses, bringing out all that the United States is doing for them. Every question will imply that the cooperating witnesses' testimony is being bought. The questions will imply that the cooperating witness is saying only what pleases the United States and is not necessarily telling the truth. Closings are usually blunt arguments that these cooperating witnesses are lying. DeLeon's capable counsel may well do a more through and detailed job of impeaching these witnesses than Dr. Neuschatz' more general observations. See United States v.

Arias-Santos, 39 F.3d 1070, 1074 (10th Cir. 1994)(noting that, during cross-examination, "defense counsel should be allowed to expose to the jury facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of witnesses"). DeLeon's attorneys will expose all inconsistencies and benefits.

In addition, while the Court tries not to comment about particular evidence lest it run the risk of putting its thumb on the scale, it intentionally mentions the issues with cooperating witnesses, and it puts the thumb on the scales for DeLeon's benefit.   The Court gives four instructions that deal with cooperating witnesses:

> **Jury Instruction No. 6** -- I remind you that it is your job to decide whether the government has proved the guilt of Mr. DeLeon beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.  You are the sole judges of the credibility or "believability" of each witness and the weight to be given to the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should think about the testimony of each witness you have heard and decide whether you believe all or any part of what each witness had to say, and how important that testimony was. In making that decision, I suggest that you ask yourself a few questions: Did the witness impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome in this case? Did the witness have any relationship with either the government or Mr. DeLeon? Did the witness seem to have a good memory?  Did the witness clearly see or hear the things about which he/she testified?  Did the witness have the opportunity and ability to understand the questions clearly and answer them directly?  Did the witness's testimony differ from the testimony of other witnesses?  When weighing the conflicting testimony, you should consider whether the discrepancy has to do with a material fact or with an unimportant detail.  And you should keep in mind that innocent misrecollection -- like failure of recollection -- is not uncommon.  In reaching a conclusion on particular point, or ultimately in reaching a verdict in this case, do not make any decisions simply because there were more witnesses on one side than on the other.
>
> . . . .
>
> **Jury Instruction No. 11 --** The testimony of a witness may be discredited or impeached by showing that the witness previously has been convicted of a felony, that is, of a crime punishable by imprisonment for a term of years or of a crime of dishonesty or false statement.  A prior conviction does not mean that a

witness is not qualified to testify, but is merely one circumstance that you may consider in determining the credibility of the witness. You may decide how much weight to give any prior felony conviction or crime of dishonesty that was used to impeach a witness.

       **Jury Instruction No. 12 --** . . . . **Informant** An informant is someone who provides evidence against someone else for a personal reason or advantage. The testimony of an informant alone, if believed by the jury, may be of sufficient weight to sustain a verdict of guilt, even though not corroborated or supported by other evidence. You must examine and weigh an informant's testimony with greater care than the testimony of an ordinary witness. You must determine whether the informant's testimony has been affected by self-interest, by an agreement he has with the government, by his own interest in the outcome of the case, or by prejudice against Mr. DeLeon. You should not convict Mr. DeLeon based on the unsupported testimony of an informant, unless you believe the unsupported testimony beyond a reasonable doubt.

       **Jury Instruction No. 13 --** The government called as one of its witnesses an alleged accomplice, who was named as a co-defendant in the indictment. The government has entered into a plea agreement with the co-defendant, providing for the possibility of a recommendation of a lesser sentence than he would otherwise likely receive. Plea bargaining is lawful and proper, and the rules of this court expressly provide for it. An alleged accomplice, including one who has entered into a plea agreement with the government, is not prohibited from testifying. On the contrary, the testimony may, by itself, support a guilty verdict. You should receive this type of testimony with caution and weigh it with great care. You should never convict Mr. DeLeon upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered into a guilty plea to the offense charged is not evidence of the guilt of any other person.

Court's Final Jury Instructions at 7-14, filed September 16, 2021 (Doc. 3463).

       The Court has worked hard, during discovery and at trial, to ensure that DeLeon has robust opportunity to expose these cooperating witnesses' many flaws. The Court does not want DeLeon to come into the courthouse at the end of trial and say that juries ignore the Court's instructions and are duped by the United States. The Court concludes that the jury has all it needs to determine these cooperating witnesses' credibility, and it should look at each one independently and not paint them with Dr. Neuschatz' broad brushstrokes of generality. See United States v. Bridwell, 583 F.2d 1135, 1142 (10th Cir. 1978)(concluding that the trial court did not err by instructing the

testimony of an informant had to be examined and weighed with greater care than that of an ordinary witness).

**IT IS ORDERED** that: (i) the Plaintiff United States' Motion to Exclude Expert Witness or in the Alternative to Hold a <u>Daubert</u> Hearing, filed June 28, 2021 (Doc. 3297), is granted; the Court held a <u>Daubert</u> hearing on August 23, 2021, <u>see</u> Clerk's Minutes at 1, filed August 23, 2021 (Doc. 3410); and (ii) Dr. Neuschatz will not be allowed to testify at Defendant Angel DeLeon's trial.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Fred J. Federici
  Acting United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

-- and --

Maria Ysabel Armijo
Randy M. Castellano
Ryan Ellison
  Assistant United States Attorneys
United States Attorney's Office
Las Cruces, New Mexico

       *Attorneys for the Plaintiff*

Sarah M. Gorman
Law Offices of Robert D. Gorman
Albuquerque, New Mexico

-- and --

Heather M. LeBlanc
Bailey, LeBlanc & Lane, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendant Angel DeLeon*

Richard Sindel
Sindel, Sindel & Noble, P.C.
Clayton, Missouri

-- and --

Brock Benjamin
Benjamin Law Firm
El Paso, Texas

    *Attorneys for Defendant Joe Lawrence Gallegos*

Patrick J. Burke
Patrick J. Burke, P.C.
Denver, Colorado

-- and --

Cori Ann Harbour-Valdez
The Harbour Law Firm, P.C.
El Paso, Texas

    *Attorneys for Defendant Edward Troup*

Russell Dean Clark
Las Cruces, New Mexico

    *Attorney for Defendant Leonard Lujan*

James A. Castle
Castle & Castle, P.C.
Denver, Colorado

-- and --

Robert R. Cooper
Robert R. Cooper Law Firm
Albuquerque, New Mexico

    *Attorneys for Defendant Billy Garcia*

Douglas E. Couleur
Douglas E. Couleur, P.A.
Santa Fe, New Mexico

       *Attorney for Defendant Eugene Martinez*

Joseph E. Shattuck
Marco & Shattuck Law Firm
Albuquerque, New Mexico

-- and --

Jeffrey C. Lahann
Las Cruces, New Mexico

       *Attorneys for Defendant Allen Patterson*

Eduardo Solis
Law offices of Eduardo Solis
El Paso, Texas

-- and --

John L. Granberg
Granberg Law Office
El Paso, Texas

-- and --

Orlando Mondragon
The Law Office of Orlando Mondragon
El Paso, Texas

       *Attorneys for Defendant Christopher Chavez*

Nathan D. Chambers
Nathan D. Chambers, Attorney at Law
Denver, Colorado

-- and --

Noel Orquiz
Deming, New Mexico

       *Attorneys for Defendant Javier Alonso*

Laura E. Udall
Cooper & Udall Law Offices
Tucson, Arizona

-- and --

Scott Moran Davidson
Law Offices of Scott Moran Davidson
Albuquerque, New Mexico

-- and --

Billy R. Blackburn
Billy Blackburn Law Office
Albuquerque, New Mexico

*Attorneys for Defendant Arturo Arnulfo Garcia*

Stephen E. Hosford
Stephen E. Hosford, P.C.
Arrey, New Mexico

-- and --

Jerry Daniel Herrera
Albuquerque, New Mexico

*Attorneys for Defendant Benjamin Clark*

Pedro Pineda
Las Cruces, New Mexico

-- and --

León Encinias
León Felipe Encinias, Attorney at Law
Albuquerque, New Mexico

*Attorneys for Defendant Ruben Hernandez*

Gary Mitchell
Mitchell Law Office
Ruidoso, New Mexico

*Attorney for Defendant Jerry Armenta*

Larry A. Hammond
Osborn Maledon, P.A.
Phoenix, Arizona

-- and --

Margaret Strickland
McGraw & Strickland
Las Cruces, New Mexico

　　　*Attorneys for Defendant Jerry Montoya*

Steven M. Potolsky
Jacksonville Beach, Florida

-- and --

Santiago D. Hernandez
Law Office of Santiago D. Hernandez
El Paso, Texas

　　　*Attorneys for Defendant Mario Rodriguez*

Ray Velarde
El Paso, Texas

-- and --

Steven Lorenzo Almanza
Las Cruces, New Mexico

　　　*Attorneys for Defendant Timothy Martinez*

Joe Spencer
El Paso, Texas

-- and --

Mary Stillinger
El Paso, Texas

　　　*Attorneys for Defendant Mauricio Varela*

Richard Jewkes
El Paso, Texas

-- and --

Lauren Noriega
The Noriega Law Firm
Los Angeles, California

-- and --

Amy E. Jacks
Law Office of Amy E. Jacks
Los Angeles, California

      *Attorneys for Defendant Daniel Sanchez*

George A. Harrison
Las Cruces, New Mexico

-- and --

Kimberly S. Bruselas-Benavidez
Albuquerque, New Mexico

      *Attorneys for Defendant Gerald Archuleta*

B.J. Crow
Crow Law Firm
Roswell, New Mexico

      *Attorney for Defendant Conrad Villegas*

Theresa M. Duncan
Duncan Earnest LLC
Albuquerque, New Mexico

-- and --

Marc M. Lowry
Rothstein Donatelli LLP
Albuquerque, New Mexico

      *Attorneys for Defendant Anthony Ray Baca*

Charles J. McElhinney
CJM Law Firm
Las Cruces, New Mexico

      *Attorney for Defendant Robert Martinez*

Marcia J. Milner
Marcia J. Milner Attorney at Law
Las Cruces, New Mexico

*Attorney for Defendant Roy Paul Martinez*

Christopher W. Adams
Adams & Bischoff, L.L.C.
Charleston, South Carolina

-- and --

Amy Sirignano
Law Office of Amy Sirignano, P.C.
Albuquerque, New Mexico

*Attorneys for Defendant Christopher Garcia*

William R. Maynard
William R. Maynard Attorney at Law
El Paso, Texas

-- and --

Carey Corlew Bhalla
Law Office of Carey C. Bhalla, LLC
Albuquerque, New Mexico

*Attorneys for Defendant Carlos Herrera*

Justine Fox-Young
Justine Fox-Young Attorney at Law
Albuquerque, New Mexico

-- and --

Ryan J. Villa
Law Office of Ryan J. Villa
Albuquerque, New Mexico

*Attorneys for Defendant Rudy Perez*

Donavon A. Roberts
Donavon A. Roberts Attorney at Law
Albuquerque, New Mexico

-- and --

Lisa Torraco
Lisa Torracco Attorney at Law
Albuquerque, New Mexico

   *Attorneys for Defendant Andrew Gallegos*

Erlinda O. Johnson
Law Office of Erlinda Ocampo Johnson
Albuquerque, New Mexico

   *Attorney for Defendant Santos Gonzalez*

Keith R. Romero
Keith R. Romero, Attorney and Counselor at Law
Albuquerque, New Mexico

   *Attorney for Paul Rivera*

Angela Arellanes
Angela Arellanes Attorney at Law
Albuquerque, New Mexico

   *Attorney for Defendant Shauna Gutierrez*

Jerry A. Walz
Alfred D. Creecy
Samuel Winder
Walz and Associates
Albuquerque, New Mexico

   *Attorneys for Defendant Brandy Rodriguez*